# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | ) | |
| | ) | |
| THE STATE OF MISSOURI, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| JOSEPH R. BIDEN, JR., | ) | |
| in his official capacity as | ) | |
| President of the United States of | ) | |
| America; | ) | |
| | ) | |
| The UNITED STATES OF AMERICA; | ) | |
| | ) | |
| ALEJANDRO MAYORKAS, | ) | |
| in his official capacity as | ) | |
| Secretary of the United States | ) | |
| Department of Homeland Security; | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HOMELAND SECURITY; | ) | |
| | ) | |
| TROY MILLER, | ) | |
| in his official capacity as | ) | |
| Acting Commissioner of the | ) | |
| United States Customs and Border | ) | |
| Protection; | ) | |
| | ) | |
| UNITED STATES CUSTOMS AND BORDER | ) | |
| PROTECTION; | ) | |
| | ) | |
| TAE JOHNSON, | ) | |
| in his official capacity as | ) | |
| Acting Director of the | ) | |
| United States Immigration and | ) | |
| Customs Enforcement; | ) | |
| | ) | |
| UNITED STATES IMMIGRATION AND | ) | |

CUSTOMS ENFORCEMENT;                                        )
                                                           )
TRACY RENAUD,                                              )
in her official capacity as                               )
Acting Director of the United States                      )
Citizenship and Immigration Services; and                 )
                                                           )
UNITED STATES CITIZENSHIP AND                             )
IMMIGRATION SERVICES,                                     )
                                                           )
                                   *Defendants.*          )

## COMPLAINT

1.      In the first several hours following President Biden's inauguration, the incoming Administration suspended the successful Migrant Protection Protocols ("MPP"). These regulations required individuals who both lacked a legal basis to be present in the United States and who had passed through Mexico en route to the United States to remain in Mexico pending adjudication of their immigration claims. Prior to the MPP, individuals passing through Mexico could enter the United States, raise asylum claims, expect to be released into the United States in violation of statutory requirements mandating their detention, and stay in the U.S. for years pending the resolution of their claims—even though most were ultimately rejected in court. MPP changed the incentives for economic migrants with weak asylum claims, and therefore reduced the flow of aliens—including aliens who are victims of human trafficking—to the southern border.

2.      This lawsuit challenges the Administration's unexplained and inexplicable two-sentence statement functionally ending the MPP. The result of this arbitrary and capricious decision has been a huge surge of Central American

2

migrants, including thousands of unaccompanied minors, passing through Mexico in order to advance meritless asylum claims at the U.S. border.

3.     This migrant surge has inflicted serious costs on Texas as organized crime and drug cartels prey on migrant communities and children through human trafficking, violence, extortion, sexual assault, and exploitation.  These crimes directly affect Texas and its border communities, especially given Texas's strong focus on combating human trafficking both at the border and throughout the State.  The additional costs of housing, educating, and providing healthcare and other social services for trafficking victims or illegal aliens further burden Texas and its taxpayers.

4.     The effects of unlawful immigration do not stop at the southern border. Indeed, "[t]he pervasiveness of federal regulation does not diminish the importance of immigration policy to the States[,]" which "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012).  With its intersection of major interstate highway routes, Missouri is a major destination and hub for human trafficking.  Missouri's ongoing fight against human trafficking— including the exploitation and trafficking of vulnerable migrants—likewise provides it with justiciable interests that fall within the zone of interests of federal statutes on immigration-related policy.  Indeed, irresponsible border-security policies that invite and encourage human traffickers to exploit vulnerable border-crossing victims irreparably injure Missouri and other States.

5.     Recently, Texas's and Missouri's interests in combating human

3

trafficking have become more urgent.  By dismantling the MPP, the Administration has directly caused a massive uptick in illegal immigration through Central America, Mexico, and to the U.S. southern border.

6.      MPP is an exercise of DHS's express authority under the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, to return those aliens temporarily to Mexico during the pendency of their removal proceedings. *See* 8 U.S.C. § 1225(b)(2)(C).  The Secretary of Homeland Security implemented MPP to manage the large influx of aliens arriving on the southern border with no lawful basis for admission.  MPP proved to be enormously effective: it enabled DHS to avoid detaining or releasing into the United States more than 71,000 migrants during removal proceedings, and curtailed the number of aliens approaching or attempting to cross the southern border.[1]  The program served as an indispensable tool in the United States' efforts, working cooperatively with the governments of Mexico and other countries, to address the migration crisis by diminishing incentives for illegal immigration, weakening cartels and human smugglers, and enabling DHS to better focus its resources on legitimate asylum claims.

7.      Nonetheless, the Biden Administration cast aside congressionally enacted immigration laws and suspended new enrollments in MPP on its first day in office.  In a peremptory two-sentence, three-line memorandum, the Acting Secretary of Homeland Security issued a directive, effective January 21, 2021, that DHS would

---

[1] *See, e.g.*, TRAC Immigration, *Details on MPP (Remain in Mexico) Deportation Proceedings*, https://trac.syr.edu/phptools/immigration/mpp/.

4

"suspend new enrollments in [MPP], pending further review of the program."  Exhibit A ("January 20 Memorandum").  This memorandum provided no analysis or reasoned justification for this abrupt suspension.  In doing so, the Biden Administration ignored the governing legal authority and basic requirements set forth in the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, 5 U.S.C. § 701 *et seq.*

8.     The Biden Administration's suspension "takes off the table one of the few congressionally authorized measures available to process" the vast numbers of migrants arriving at the southern border on a daily basis.  *Innovation L. Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019) (per curiam).  Before MPP, U.S. officials encountered an average of approximately 2,000 inadmissible aliens at the southern border each day, and the rate at which those aliens claimed fear of return to their home countries surged exponentially.

9.     That huge influx imposes enormous, avoidable burdens on the United States' immigration system.  Most asylum claims are meritless.  For example, the Executive Office for Immigration Review ("EOIR") reported that between FY 2008 and FY 2019, only 14 percent of aliens who claimed credible fear were granted asylum.[2]  Alongside the fact that immigration courts were faced with a backlog of over 768,000 cases at the end of FY 2018—a number that since has grown—it is clear the asylum system was and continues to be manipulated by aliens presenting at the

---

[2] *See* Executive Office for Immigration Review Adjudication Statistics, *Credible Fear and Asylum Process: Fiscal Year (FY) 2008 – FY 2019* (Oct. 23, 2019), https://www.justice.gov/eoir/file/1216991/download.

border.[3]

10.   MPP played a critical role in addressing this crisis.  By returning migrants to Mexico to await their asylum proceedings—in cooperation with the Mexican Government, which has permitted these aliens to remain in Mexico—MPP eased the strain on the United States' immigration-detention system and reduced the ability of inadmissible aliens to abscond into the United States.  Between FY 2008 and FY 2019, 32 percent of aliens referred to EOIR absconded into the United States and were ordered removed in absentia.[4]

11.   MPP also discouraged aliens from attempting illegal entry or making meritless asylum claims in the hope of staying inside the United States, thereby permitting the government to better focus its resources on individuals who legitimately qualify for relief or protection from removal.  In February 2020, for example, the number of aliens either apprehended or deemed inadmissible at the southern border was down roughly 40,000 from February 2019.[5]  The Biden Administration's suspension of the MPP has imposed severe and ongoing burdens on Texas and Missouri because the government will not process into the MPP the tens of thousands of aliens who are resuming attempts to cross the southern border with no legal basis for admission, and the government will process the tens of thousands of aliens already admitted into the MPP into the United States.

---

[3]   *See* TRAC Immigration, *Immigration Court Backlog Tool*, https://trac.syr.edu/phptools/immigration/court_backlog/.

[4]   *See Credible Fear and Asylum Process*, *supra*, at n.2.

[5]   U.S. Customs & Border Protection, *Southwest Border Migration FY 2020*, https://go.usa.gov/xdhSh (last visited Apr. 9, 2020).

12.     Additionally, the Biden Administration's suspension threatens damage to the bilateral relationship between the United States and Mexico.  Migration has been the subject of substantial discussion between the two countries and is a key topic of ongoing concern in their relationship.[6]  The unchecked flow of third-country migrants through Mexico to the United States strains both countries' resources and produces significant public safety risks—not only to the citizens of Mexico and the United States, but also to the migrants themselves, who are often targeted by criminals for human trafficking, violence, and extortion.  MPP played a key role in joint efforts to address the crisis, but the suspension of MPP upsets those efforts and undermines Mexican confidence in U.S. foreign policy commitments.  And like Texas and Missouri, the Mexican government intends to "crack down on migrant trafficking."[7]  But the suspension of MPP can only significantly delay those enforcement efforts given the constant flow of migrants.

13.     Texas contains more than half of the border between the United States and Mexico, and a large share of individuals crossing into the United States to claim asylum arrive through the Texas-Mexico border.  Likewise, human traffickers and their victims frequently arrive in Texas and either settle there, travel to one of

---

[6] *See, e.g.*, U.S. Department of Homeland Security, *Assessment of the Migrant Protection Protocols (MPP)* (Oct. 28, 2019), https://www.dhs.gov/sites/default/files/publications/assessment_of_the_migrant_pro tection_protocols_mpp.pdf; Declaration of Ambassador Christopher Landau, No. 19-15716, Doc. 92-3, ¶ 3 (9th Cir.).

[7] Mark Stevenson et al., *Biden tries to reset relationship with Mexican president*, ASSOCIATED PRESS (Mar. 1, 2021), https://apnews.com/article/biden-obrador-us-mexico-migration-issues-edb25cf298b7c9a83d15ff4f6c7ea95f.

Texas's major cities, or travel along Texas's state highways to proceed further into the United States.

14.    Missouri is a destination and transit state for many human traffickers, including human traffickers of migrants from Central American countries who have crossed the border illegally.   This is mainly due to the state's substantial transportation infrastructure and major population centers.   Indeed, St. Louis and Kansas City are major human-trafficking hubs connected by Interstate 70.

15.    As a direct result of the suspension of new enrollments into the MPP, and the corresponding increase in human-trafficking incidents involving vulnerable Central American migrants, both Texas and Missouri will be forced to spend significantly more resources in combating human trafficking.   Thus, the Biden Administration's unlawful suspension of the MPP will cause both States immediate and irreparable harm if it is not enjoined.

16.    Moreover, the influx of unlawful immigrants with meritless claims of asylum will result in additional unlawful migrants entering and remaining in Texas and Missouri, thus forcing both States to expend more taxpayer resources on health care, education, social services, and similar services for such migrants.   There is no monetary remedy for these increased costs and thus they constitute irreparable injury to the State of Texas, the State of Missouri, and their taxpayers.

17.    Because suspension of the MPP is invalid, it must be enjoined in its entirety.   *See, e.g.*, *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."); *Nat'l*

*Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (unlawful agency regulations are vacated); *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 848 (D.C. Cir. 1987) ("The APA requires us to vacate the agency's decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]' "). Indeed, federal law contemplates a "comprehensive and unified" immigration policy. *Arizona*, 567 U.S. at 401. As the Fifth Circuit has held, "[t]he Constitution requires an uniform Rule of Naturalization; Congress has instructed that the immigration laws of the United States should be enforced vigorously and uniformly; and the Supreme Court has described immigration policy as a comprehensive and unified system." *Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015), *aff'd*, 136 S. Ct. 2271 (2016) (per curiam). Thus, "a fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy." *Washington v. Trump*, 847 F.3d 1151, 1166–67 (9th Cir. 2017) (per curiam); *see also Texas v. United States*, No. 6:21-CV-00003, 2021 WL 247877, at *8 (S.D. Tex. Jan. 26, 2021) (enjoining government from executing 100-day moratorium on the removal of aliens everywhere in the United States).

## PARTIES

18.    Plaintiffs incorporate by reference all preceding paragraphs.

19.    Plaintiff State of Texas is a sovereign State of the United States of America.

20.     Defendants' unlawful suspension of MPP injures Texas. MPP reduced both the number of illegal aliens attempting to come to Texas and the percentage of illegal aliens released into Texas and the rest of the United States. Suspending MPP has increased and will increase the number of illegal aliens attempting to come to Texas and the percentage of illegal aliens released into Texas and the rest of the United States. That harms Texas in multiple ways.

21.     The suspension of MPP will cause Texas to "incur significant costs in issuing driver's licenses." *Texas*, 809 F.3d at 155. Texas law subsidizes driver's licenses, including for noncitizens who have "documentation issued by the appropriate United States agency that authorizes [them] to be in the United States." *Id.* (quoting Tex. Transp. Code § 521.142(a)). Aliens paroled into the United States, rather than enrolled in MPP, will be eligible for subsidized driver's licenses.[8] By enabling more aliens to secure subsidized licenses, the suspension of MPP will impose significant financial harm on the State of Texas. *See Texas*, 809 F.3d at 155.

22.     Texas spends significant amounts of money providing services to illegal aliens. Those services include education services and healthcare, as well as many other social services broadly available in Texas. Federal law requires Texas to include illegal aliens in some of these programs. The suspension of MPP will injure Texas by increasing the number of illegal aliens receiving such services at Texas's expense.

23.     The State funds multiple healthcare programs that cover illegal aliens.

_____

[8] Tex. Dep't of Public Safety, *Verifying Lawful Presence* 4 (Rev. 7-13), https:// www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifying lawfulpresence.pdf (listing "Parolees" as eligible for driver's licenses).

The provision of these services—utilized by illegal aliens—results in millions of dollars of expenditures per year. These services include the Emergency Medicaid program, the Texas Family Violence Program, and the Texas Children's Health Insurance Program.

24.     The Emergency Medicaid program provides health coverage for low-income children, families, seniors and the disabled. Federal law requires Texas to include illegal aliens in its Emergency Medicaid program. The program costs the State tens of millions of dollars annually.

25.     The Texas Family Violence Program provides emergency shelter and supportive services to victims and their children in the State of Texas. Texas spends over a million dollars per year on the Texas Family Violence Program for services to illegal aliens.

26.     The Texas's Children's Health Insurance Program offers low-cost health coverage for children from birth through age 18. Texas spends tens of millions of dollars each year on CHIP expenditures for illegal aliens.

27.     Further, Texas faces the costs of uncompensated care provided by state public hospital districts to illegal aliens which results in expenditures of hundreds of millions of dollars per year.

28.     Aliens and the children of those aliens receive education benefits from the State at significant taxpayer expense. Defendants' failure to detain criminal aliens increases education expenditures by the State of Texas each year for children of those aliens.

29.     DHS itself has previously recognized "that Texas, like other States, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement." Exhibit B § II (Agreement between Department of Homeland Security and the State of Texas). DHS agrees that "rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community" "result in concrete injuries to Texas." *Id.*

30.     Plaintiff State of Missouri is a sovereign State of the United States of America.

31.     There is a well-documented and tragic connection between human trafficking in the Midwest and unlawful immigration from the southern border. Indeed, data makes it readily apparent that trafficking on the southern border is a contributing factor to overall rates of human trafficking in the United States—and such cross-border human trafficking activity directly affects the overall prevalence of human trafficking within Missouri.[9] The prevalence of human trafficking in Missouri

---

[9] *See generally* U.S. Department of State, *Trafficking in Persons Report* (20th ed., June 2020), https://www.state.gov/wp-content/uploads/2020/06/2020-TIP-Report-Complete-062420-FINAL.pdf; *U.S.-Mexico Bilateral Human Trafficking Enforcement Initiative*, U.S. DEPARTMENT OF JUSTICE, https://www.justice.gov/humantrafficking/special-initiatives#bilateral (last visited Mar. 30, 2021) ("Mexico is the country of origin of the largest number of foreign-born human trafficking victims identified in the United States."); Polaris Project, *Fighting Human Trafficking Across the U.S. – Mexico Border* (2018), https://polarisproject.org/wp-content/uploads/2016/10/Consejo-NHTH-Statistics-2018.pdf ("Every day, powerful criminal networks and individual traffickers on both sides of the border recruit people for labor or sexual exploitation."); U.S. Customs and Border Protection, *CBP Releases Fiscal Year 2020 Southwest Border Migration and Enforcement Statistics* (Oct. 14, 2020), https://www.cbp.gov/newsroom/national-

directly affects Missouri financially.

32.    Because "[h]uman trafficking is a form of modern slavery that occurs in every state, including Missouri[,]"[10] the Attorney General of Missouri has created a Human Trafficking Task Force that is designed and structured to identify, respond to, investigate, and ultimately eradicate human trafficking in Missouri.[11]

33.    While one case of human trafficking in Missouri is tragic enough, Missouri has seen higher numbers just in the last few years.  For example, of the 233 human trafficking cases reported in Missouri to the Human Trafficking Hotline in 2019, 21 were foreign nationals.[12]  Of the 179 human trafficking cases reported in Missouri to the Human Trafficking Hotline in 2018, 18 were foreign nationals.[13]  And of the 146 human trafficking cases reported in Missouri to the Human Trafficking Hotline in 2017, 17 were foreign nationals.[14]

34.    Missouri annually expends funds on the Human Trafficking Task Force and Human Trafficking Hotline to combat human trafficking.  Those amounts will increase should DHS be allowed to halt future enrollments into the MPP.

---

media-release/cbp-releases-fiscal-year-2020-southwest-border-migration-and; United Nations Office on Drugs and Crime, *Global Report on Trafficking in Persons* (2018), https://www.unodc.org/documents/data-and-analysis/glotip/2018/GLOTiP_2018_BOOK_web_small.pdf.
    [10]    *Missouri*, NATIONAL HUMAN TRAFFICKING HOTLINE, https://humantraffickinghotline.org/state/missouri (last visited Apr. 11, 2021).
    [11]    *Human Trafficking Task Force*, OFFICE OF THE MISSOURI ATTORNEY GENERAL,  https://ago.mo.gov/home/human-trafficking/task-force (last visited Mar. 29, 2021).
    [12] *Missouri*, *supra*, at n.10.
    [13] *Id.*
    [14] *Id.*

35.     When DHS fails to enroll illegal aliens in compliance with the MPP and federal law, Missouri faces other significant costs.  Aside from the higher costs associated with fighting human trafficking, the Administration's decision to end MPP—and therefore allow more unlawfully present aliens to enter and remain in Missouri—requires Missouri to increase taxpayer expenditures for social services for such aliens, resulting in irreparable injury.

36.     The Biden Administration's unlawful suspension of the MPP will require Missouri to increase funding for its Human Trafficking Task Force, which will have to expend substantially more resources in order to combat a substantial increase in human trafficking efforts that arise out of the mass-migration surge.

37.     While the costs of combating human trafficking will vary from state to state, Texas and Missouri will inevitably face these costs.  For example, a report from 2016 concluded that Texas spends approximately $6.6 billion in lifetime expenditures on minor and youth sex trafficking victims, and that traffickers exploit approximately $600 million annually from victims of labor trafficking in Texas (i.e., lost wages), which necessarily results in corresponding lost tax revenue to the State.[15]  Missouri faces comparable costs.  Other States likewise suffer these costs proportional to their sizes and populations of trafficking victims.

38.     Defendants are officials of the United States government and United

---

[15] The University of Texas at Austin, School of Social Work: Institute on Domestic Violence and Sexual Assault, *Human Trafficking by the Numbers* (2016), https://globalinitiative.net/wp-content/uploads/2018/01/Human-trafficking-by-the-numbers.pdf.

States governmental agencies responsible for the issuance and implementation of the challenged suspension of the MPP.

39.     Defendant Joseph R. Biden, Jr., is the President of the United States of America.  He is sued in his official capacity.

40.     Defendant United States Department of Homeland Security is a federal cabinet agency responsible for implementing and enforcing certain immigration-related statutes, policies, and directives, including the suspension of MPP.  DHS is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 551(1).  DHS oversees Defendants United States Citizenship and Immigration Services, United States Customs and Border Protection, and United States Immigration and Customs Enforcement.

41.     Defendant Alejandro Mayorkas is the Secretary of Homeland Security and the head of DHS.  He is sued in his official capacity.

42.     Defendant Troy Miller is the Acting Commissioner of the United States Customs and Border Protection.  He received the January 20 Memorandum.  He is sued in an official capacity.

43.     Defendant Tae Johnson is the Acting Director of the United States Immigration and Customs Enforcement.  He received the January 20 Memorandum. He is sued in his official capacity.

44.     Defendant Tracy Renaud is the Acting Director of the United States Citizenship and Immigration Services.  She is sued in her official capacity.

## JURISDICTION AND VENUE

45.     Plaintiffs incorporate by reference all preceding paragraphs.

46.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2201(a).  This action arises under the Constitution (art. II, §§ 1, 3), 5 U.S.C. §§ 702–703, and other federal statutes.

47.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e).  Defendants are United States agencies or officers sued in their official capacities.  The State of Texas is a resident of this judicial district and a substantial part of the events or omissions giving rise to this complaint occurred and continue to occur within the Northern District of Texas.

48.     Texas and Missouri bring this action to redress harms to their sovereign interests, quasi-sovereign interests, proprietary interests, and interests as *parens patriae*; and to vindicate their interests under 5 U.S.C. § 702.  Plaintiffs' ongoing fight against human trafficking—including the exploitation and trafficking of vulnerable migrants—provides them with justiciable interests that fall within the zone of interests of federal statutes on immigration-related policy.  The injury to Texas's and Missouri's fiscal interests from the increase in unlawful migrants entering and remaining in Texas and Missouri provides them with redressable injuries in this case as well.

49.     This Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. §§ 1361, 2201, and 2202, and its inherent equitable powers.

## BACKGROUND

50.     Plaintiffs incorporate by reference all preceding paragraphs.

### Legal Framework

51.     Section 1225 of Title 8 of the United States Code establishes procedures for DHS to process aliens who are "applicant[s] for admission" to the United States, whether they arrive at a port of entry or cross the border unlawfully. 8 U.S.C. § 1225(a)(1).[16]

52.     An immigration officer must first inspect the alien to determine whether he is entitled to be admitted.  8 U.S.C. § 1225(a)(3); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 836–37 (2018).

53.     Section  1225(b)(2)(A)  provides  that,  if  an  immigration  officer "determines" that an "applicant for admission" is "not clearly and beyond a doubt entitled to be admitted," then the alien "shall be detained for a proceeding under section 1229a of this title" to determine whether he will be removed from the United States.  8 U.S.C. § 1225(b)(2)(A); *see In re M-S-*, 27 I. & N. Dec. 509, 510 (A.G. 2019). Section 1229a, in turn, sets out the procedures for a "full" removal proceeding, which involves a hearing before an immigration judge with potential review by the Board of Immigration Appeals.  *See* 8 U.S.C. § 1229a; 8 C.F.R. § 1003.1.  In a full removal proceeding, the government may charge the alien with any applicable ground of inadmissibility, and the alien may seek asylum or any other form of relief or

---

[16] Section 1225 refers to the Attorney General, but those functions have been transferred to the Secretary of Homeland Security. *See Department of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1965 n.3 (2020).

protection from removal to his home country.  *See* 8 U.S.C. § 1229a(a)(2), (c)(4).

54.    As an alternative to a full removal proceeding, an immigration officer may also determine whether an applicant for admission is eligible for, and should be placed in, the expedited removal process described in Section 1225(b)(1), which is designed to remove certain aliens quickly using specialized procedures.  *See Jennings*, 138 S. Ct. at 837; *M-S-*, 27 I. & N. Dec. at 510.  An alien is generally eligible for expedited removal when an officer "determines" that he engaged in fraud, made a willful misrepresentation in an attempt to gain admission or another immigration benefit, or lacks any valid entry documents.   8  U.S.C. § 1225(b)(1)(A)(i); *see* 8 U.S.C. § 1182(a)(6)(C), (7).

55.    An alien subject to expedited removal will be "removed from the United States without further hearing or review," unless he expresses an intention to apply for asylum or a fear of persecution or torture.  8 U.S.C. § 1225(b)(1)(A)(i); *see* 8 C.F.R. § 235.3(b)(4).  An alien who does so is referred to an asylum officer to determine whether he has a "credible fear of persecution" or torture; if so, he "shall be  detained  for  further  consideration  of  the  application  for  asylum." 8 U.S.C. § 1225(b)(1)(B)(ii); *see* 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 235.3(b)(4); *see also Jennings*, 138 S. Ct. at 842 (observing that aliens in expedited removal are subject to mandatory detention).  By regulation, the government has provided that an alien found to have a credible fear will be placed in a Section 1229a full removal proceeding.  *See* 8 C.F.R. § 208.30(f); *M-S-*, 27 I. & N. Dec. at 512.

56.    When DHS places an applicant for admission into a full removal

proceeding under Section 1229a, the alien is subject to mandatory detention during that proceeding, *see* 8 U.S.C. § 1225(b)(2)(A), except that certain aliens may be temporarily released on parole "for urgent humanitarian reasons or significant public benefit," 8 U.S.C. § 1182(d)(5)(A). *See Jennings*, 138 S. Ct. at 837.

57.    But Congress has also provided in the alternative that, "[i]n the case of an alien described in [Section 1225(b)(2)(A)] who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, [DHS] may return the alien to that territory pending a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(C). This contiguous-territory-return authority enables DHS to avoid keeping aliens arriving on land from Mexico or Canada in the United States during their full removal proceedings, and instead to temporarily return those aliens to the foreign territory from which they just arrived pending those proceedings.

## Factual Background

58.    Plaintiffs incorporate by reference all preceding paragraphs.

59.    In 2018, the United States faced a surge of hundreds of thousands of migrants, many from the Northern Triangle countries of Central America (Honduras, El Salvador, and Guatemala), attempting to cross through Mexico to enter the United States despite having no lawful basis for admission. *See, e.g.*, 83 Fed. Reg. 55,934, 55,944–55,945 (Nov. 9, 2018). By the fall of 2018, U.S. officials encountered an average of approximately 2,000 inadmissible aliens per day at the border. *Id.* at 55,935. This surge created a humanitarian, public safety, and security crisis on the

southern border.

60.     Many of these inadmissible aliens were enticed to make the dangerous journey north by smugglers and human traffickers, who promoted the belief that, if the migrants simply claimed fear of return to their home country once they reached the United States (especially when traveling with children), they could gain release into the United States, even though their asylum claims overwhelmingly lacked merit.

61.     In fiscal year 2018, approximately 97,192 aliens in expedited removal were referred for a credible-fear interview because they expressed a fear of persecution or torture in their home country or else an intention to apply for relief or protection from removal (as compared to approximately 5,000 aliens referred in fiscal year 2008), and 65% of those were from Northern Triangle countries.  83 Fed. Reg. at 55,945.

62.     Yet among Northern Triangle aliens who claimed fear and were referred for a Section 1229a proceeding, and whose cases were completed in fiscal year 2018, they filed an asylum application only about 54 percent of the time, and they were granted asylum in only about nine percent of cases.  *Id.* at 55,946.  In 38 percent of cases, those aliens did not even appear for immigration proceedings. *Id.*  Before MPP, detention-capacity constraints or court orders forced DHS to release tens of thousands of aliens into the United States, where many disappeared.  *See id.* at 55,935, 55,946.

63.     Amid this crisis, the Secretary of Homeland Security announced MPP in

December 2018.[17]  The Secretary explained that DHS would exercise its statutory authority in 8 U.S.C. § 1225(b)(2)(C) to "return[] to Mexico" certain aliens "arriving in or entering the United States from Mexico" "illegally or without proper documentation," "for the duration of their immigration proceedings."[18]  MPP aimed "to bring the illegal immigration crisis under control" by, among other things, alleviating crushing burdens on the U.S. immigration detention system and reducing "one of the key incentives" for illegal immigration: the ability of aliens to "stay in our

---

[17] *See, e.g.*, U.S. Department of Homeland Security, *Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration* (Dec. 20, 2018), https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration; *see also* 84 Fed. Reg. 6811 (Feb. 28, 2019); U.S. Immigration and Customs Enforcement, *Implementation of the Migrant Protection Protocols* (Feb. 12, 2019), https://www.ice.gov/sites/default/files/documents/Fact%20sheet/2019/ICE-Policy-Memorandum-11088-1.pdf; U.S. Immigration and Customs Enforcement, *Migrant Protection Protocols Guidance* (Feb. 12, 2019), https://www.ice.gov/sites/default/files/documents/Fact%20sheet/2019/ERO-MPP-Implementation-Memo.pdf; U.S. Customs and Border Protection, *MPP Guiding Principles* (Jan. 28, 2019), https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/MPP%20Guiding%20Principles%201-28-19.pdf; U.S. Customs and Border Protection, *Implementation of the Migrant Protection Protocols* (Jan. 28, 2019); U.S. Customs and Border Protection, *Guidance on Migrant Protection Protocols* (Jan. 28, 2019); U.S. Citizenship and Immigration Services, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols* (Jan. 28, 2019), https://www.uscis.gov/sites/default/files/document/memos/2019-01-28-Guidance-for-Implementing-Section-35-b-2-C-INA.pdf; U.S. Department of Homeland Security, *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019), https://www.dhs.gov/sites/default/files/publications/19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf; *Migrant Protection Protocols*, U.S. DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols (last visited Mar. 29, 2021).

[18] *Nielsen Announces Historic Action to Confront Illegal Immigration*, *supra*, at n.17.

country" during immigration proceedings "even if they do not actually have a valid claim to asylum," and in many cases to "skip their court dates" and simply "disappear into the United States."[19]

64.     MPP excluded several categories of aliens: "[u]naccompanied alien children"; "[c]itizens or nationals of Mexico"; "[a]liens processed for expedited removal"; "[a]liens in special circumstances" (such as returning lawful permanent residents or aliens with known physical or mental health issues); and "[o]ther aliens at the discretion of the Port Director."[20]   Even when an alien was eligible for MPP, the policy did not mandate return: "[o]fficers, with appropriate supervisory review, retain discretion to process aliens for MPP or under other procedures (e.g., expedited removal), on a case-by-case basis."[21]

65.     The Secretary also directed that MPP would be implemented consistent with non-refoulement principles—*i.e.*, DHS would avoid sending an alien to a country where he will more likely than not be persecuted on account of a protected ground (race, religion, nationality, membership in a particular social group, or political opinion) or tortured.[22]   "If an alien who is potentially amenable to MPP affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, whether before or after they are processed for MPP or other disposition, that alien will be referred to a [U.S. Citizenship and Immigration Services] asylum

---

[19] *Id.*
[20] *MPP Guiding Principles*, *supra*, at n.17.
[21] *Id.*
[22] *Policy Guidance for Implementation of the Migrant Protection Protocols*, *supra*, at n.17.

officer for screening ... [to] assess whether it is more likely than not that the alien will face" persecution on account of a protected ground, or torture, in Mexico.[23]  If so, then "the alien may not be" returned to Mexico.[24]  The screening interview is "non-adversarial" and is conducted "separate and apart from the general public," and officers are required to ensure that the alien "understand[s]" both "the interview process" and "that he or she may be subject to return to Mexico."[25]

66.    If an alien is eligible for MPP and an immigration officer "determines" that MPP should be applied, the alien "will be issued a[] Notice to Appear (NTA) and placed into Section [1229a full] removal proceedings," and then "transferred to await proceedings in Mexico."[26]  The alien is directed to return to a port of entry on the appointed date for immigration proceedings.[27]

67.    The Secretary further explained that the Government of Mexico has committed to "authorize the temporary entrance" of third-country nationals who are returned pending U.S. immigration proceedings; to "ensure" that returned migrants "have all the rights and freedoms recognized in the Constitution [of Mexico], the international treaties to which Mexico is a party, and its Migration Law"; to accord the migrants "equal treatment with no discrimination whatsoever and due respect … paid to their human rights"; to permit the migrants "to apply for a work permit for

---

[23] *MPP Guiding Principles*, *supra*, at n.17.
[24] *Id.*
[25] *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*, *supra*, at n.17.
[26] *MPP Guiding Principles*, *supra*, at n.17.
[27] *Id.*

paid employment"; and to coordinate "access without interference to information and legal services" for them.[28]

68.    DHS began processing aliens under MPP on January 28, 2019, first at a single port of entry and gradually expanding across the southern border.  MPP proved to be extremely effective at reducing the strain on the United States' immigration-detention capacity and improving the efficient resolution of asylum applications.[29] DHS reported that it had applied MPP to more than 60,000 aliens who would otherwise have needed to be detained in the United States or else released into the interior, and the EOIR reported that immigration judges had issued more than 32,000 orders of removal.  The program had also become a crucial component of the United States' diplomatic efforts in coordination with the governments of Mexico and other countries to deter illegal immigration.[30]

69.    The MPP, however, functionally came to an end on January 20, 2021, when the Biden Administration immediately suspended new enrollments into the program through a two-sentence memorandum.  The Biden Administration stated that it intends to "rebuild fair and effective asylum procedures that respect human rights,"[31] yet the sudden shift in immigration-related policy and enforcement has led

---

[28] *Policy Guidance for Implementation of the Migrant Protection Protocols*, *supra*, at n.17.
[29] *Assessment of the Migrant Protection Protocols (MPP)*, *supra*, at n.6.
[30] *Id.*
[31] U.S. Department of Homeland Security, *Review of and Interim Revision of Civil Immigration Enforcement and Removal Policies and Priorities* (Jan. 20, 2021), https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf.

to a crisis on the southern border—as acknowledged by the White House Press Secretary.[32]

70.    For example, "[t]housands more migrants from Latin America have pushed their way toward Mexico[,]" many of whom "have told journalists that they are making their way north because they expect it to be easier to enter the U.S. under the Biden administration."[33]   Earlier this year, Border Patrol reported that "the number of migrants apprehended at the border in the month of January reached nearly 78,000, up from 36,679 in January 2020.   Single adult Mexican citizens accounted for more than 37,000 CBP encounters, a 119 percent increase from this time last year, according to the agency."[34]   "The Biden administration's undoing of Trump's border policies has prompted a flood of Central American and Mexican illegal migrants at the US border, including thousands of unescorted children. Central Americans looking for refuge from the Northern Triangle countries—El Salvador, Honduras and Guatemala—have taken these policy moves, as well as the overwhelmingly more welcoming tone from Democrats, as a sign that this president

---

[32] Sarah Kolinovsky, *White House Press Secretary Slips Up, Calls Border Migrant Surge a 'Crisis'*, ABC NEWS (Mar. 18, 2021), https://abcnews.go.com/Politics/white-house-press-secretary-slips-calls-border-migrant/story?id=76540202.
[33] Jaclyn Diaz, *Biden Suspends Deportations, Stops 'Remain In Mexico' Policy*, NPR (Jan. 21, 2021), https://www.npr.org/sections/president-biden-takes-office/2021/01/21/959074750/biden-suspends-deportations-stops-remain-in-mexico-policy.
[34] Emily Jacobs, *Biden administration opens another tent city to detain surge of illegal migrants*, NEW YORK POST (Feb. 11, 2021), https://nypost.com/2021/02/11/biden-admini-opens-tent-city-to-detain-illegal-migrants/.

is inviting them to cross the border."[35]  More recently, the President of Mexico blamed President Biden for the migrant surge.[36]

71.    Like Texas and Missouri, the Mexican government intends to "crack down on migrant trafficking."[37]  But the suspension of MPP can only impede those enforcement efforts given the constant flow of migrants.  During the Trump Administration, "[t]he hardening of U.S. and Mexican immigration policies ... 'complicated' the business" of "handling the income from smuggling migrants across a 375-mile stretch of the U.S.-Mexico border."[38]  Just one territory "nets an average of $1 million per month.  But that's just a tiny piece of a multi-billion-dollar business that the United Nations Office on Drugs and Crime estimates involves $4 billion annually.  The Mexican government has calculated it could be as high as $6 billion."[39]  Indeed, "[a] migrant rarely crosses the U.S. border without paying someone."[40]

72.    The Biden Administration's suspension of the MPP has greatly exacerbated the crisis at the southern border.  Indeed, "Mexico's government is worried the new U.S. administration's asylum policies are stoking illegal immigration

---

[35] Emily Jacobs, *Mexican President Andrés Manuel López Obrador Blames Migrant Crisis on Biden*, NEW YORK POST (Mar. 24, 2021), https://nypost.com/2021/03/24/mexican-president-obrador-blames-migrant-crisis-on-biden/.

[36] *See id.*

[37] Stevenson et al., *supra*, at n.7.

[38] Maria Verza & Christopher Sherman, *What crackdown? Migrant smuggling business adapts, thrives*, ASSOCIATED PRESS (Dec. 19, 2019), https://apnews.com/article/202a751ac3873a802b5da8c04c69f2fd.

[39] *Id.*

[40] *Id.*

and creating business for organized crime[.]"[41]  Moreover, "[p]reviously unreported details in the internal assessments, based on testimonies and intelligence gathering, state that gangs are diversifying methods of smuggling and winning clients as they eye U.S. measures that will 'incentivize migration.' "[42]  "One Mexican official familiar with migration developments, who spoke on condition of anonymity, said organized crime began changing its modus operandi 'from the day Biden took office' and now exhibited 'unprecedented' levels of sophistication. 'Migrants have become a commodity,' the official said, arguing they were now as valuable as drugs for the gangs."[43]

73.    "[A]s in previous years, migrants are being told to bring along children to make it easier to apply for asylum."[44]  Tragically, drug cartels in Mexico "are using helpless children as decoys to smuggle their members into the US" and "making a killing off the border crisis, jacking up their fees to smuggle the growing flood of people into the country—and now 'making more money on humans than they are on the drug side[.]' "[45]  "[T]he cartels also are further exploiting the disastrous situation

---

[41] Dave Graham, *Exclusive: 'Migrant president' Biden Stirs Mexican Angst Over Boom Time for Gangs*, REUTERS (Mar. 10, 2021), https://www.reuters.com/article/us-usa-immigration-mexico-exclusive/exclusive-migrant-president-biden-stirs-mexican-angst-over-boom-time-for-gangs-idUSKBN2B21D8.

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] Gabrielle Fonrouge, *Mexican drug cartels using kids as decoys in to smuggle its members into US: sheriff*, NEW YORK POST (Mar. 22, 2021), https://nypost.com/2021/03/22/mexican-drug-cartels-use-kids-as-decoys-to-smuggle-members-into-us/.

by splitting up kids from their wannabe immigrant parents, then having members pose as the children's relatives to  cross the border[.]"[46]  As a former U.S. marshal in El Paso explained, "Mexican drug cartels are taking advantage of the recent influx of migrants, using it as an opportunity to 'make money' " because  "it's more cost effective to be involved in human smuggling that it is to be in drug trafficking."[47]  And "human smuggling often also turns into human trafficking[.]"[48]

74.    Recently sources advised that "notorious drug gangs . . . are seizing upon [the Biden Administration's] reforms to ratchet up human trafficking operations."[49] Indeed, the "mass-migration surge along the U.S. southern border has so overwhelmed Mexican cartel-associated smugglers that they are requiring their customers to wear numbered, colored, and labeled wristbands to denote payment and help them manage their swelling human inventory."[50]  However, if migrants " 'don't pay their debt then the cartel has the information about where they're going, but

---

[46] *Id.*

[47] Briana Chavez, *El Paso's former U.S. Marshal says Mexican cartels 'make money' from migrant influx*, KVIA (Mar. 18, 2021), https://kvia.com/news/border/2021/03/18/el-pasos-former-u-s-marshal-says-mexican-cartels-make-money-from-migrant-influx/.

[48] *Id.*

[49] Ben Ashford, *EXCLUSIVE: 'People are the new dope.' Mexican cartels are seizing on Biden's lax border policies to run multimillion-dollar human trafficking scheme and are using families as DECOYS to smuggle single adults and drugs from elsewhere*, DAILY MAIL (Mar. 22, 2021), https://www.dailymail.co.uk/news/article-9367713/Mexican-cartels-ratchet-human-trafficking-operations-amid-Bidens-relaxed-immigration-policy.html.

[50] Todd Bensman, *Overwhelmed Mexican Alien-Smuggling Cartels Use Wristband System to Bring Order to Business*, CENTER FOR IMMIGRATION STUDIES (Mar. 2, 2021), https://cis.org/Bensman/Overwhelmed-Mexican-AlienSmuggling-Cartels-Use-Wristband-System-Bring-Order-Business.

more importantly, they have the information on their families in home countries. ... 'From there, they can start the threats and hold them accountable through debt bondage, a form of human trafficking.  Either pay or we're going to come after your family.' "[51]

75.   Cooperation and coordination between federal and state officials are essential to the effective enforcement of federal immigration law—including in preventing human trafficking and the surge of violent crimes associated with cartel smuggling.

76.   To promote such cooperation and coordination, Texas and DHS entered into a mutually beneficial agreement. *See* Ex. B (hereinafter, the "Agreement"). The Agreement establishes a binding and enforceable commitment between DHS and Texas. *Id.* § II.

77.   The Agreement provides that "Texas will provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions in exchange for DHS's commitment to consult Texas and consider its views before taking" certain administrative actions. Ex. B § II.

78.   For example, DHS must "[c]onsult with Texas before taking any action or making any decision that could reduce immigration enforcement" or "increase the number of removable or inadmissible aliens in the United States." Ex. B § III.A.2. That "includes policies, practices, or procedures which have as their purpose or

---

[51] *Id.*

effect":

- "reducing, redirecting, reprioritizing, relaxing, lessening, eliminating, or in any way modifying immigration enforcement";

- "pausing or decreasing the number of returns or removals of removable or inadmissible aliens from the country"; or

- "increasing or declining to decrease the number of lawful, removable, or inadmissible aliens residing in the United States."

Ex. B § III.A.2.a, c, f.

79.     The termination of MPP is an administrative action and decision that reduces immigration enforcement.  It likewise increases the number of removable or inadmissible aliens in the United States.

80.     The termination of MPP does so by removing a lawful means by which the Executive may prevent aliens without a clear basis for admission into the United States from absconding into the country pending appropriate removal proceedings.

81.     To enable this consultation process, the Agreement requires DHS to "[p]rovide Texas with 180 days' written notice of any proposed action" subject to the consultation requirement. Ex. B § III.A.3. That gives Texas "an opportunity to consult and comment on the proposed action." *Id.* After Texas submits its views, "DHS will in good faith consider Texas's input and provide a detailed written explanation of the reasoning behind any decision to reject Texas's input before taking any action" covered by the consultation requirement. *Id.*

82.     The Agreement authorizes adjudication of disputes about the Agreement "in a United States District Court located in Texas." Ex. B § VIII.

83.     To the extent DHS fails to comply with its obligations, the Agreement

expressly provides for injunctive relief. It would "be impossible to measure in money the damage that would be suffered if the parties fail[ed] to comply with" the Agreement. Ex. B § VI. "[I]n the event of any such failure, an aggrieved party [would] be irreparably damaged and [would] not have an adequate remedy at law." *Id.* "Any such party shall, therefore, be entitled (in addition to any other remedy to which it may be entitled in law or in equity) to injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law." *Id*.

84. The Agreement provides mechanisms by which it can be modified or terminated. *See* Ex. B §§ XIV–XV. DHS purported to terminate the Agreement "effective immediately" by letter on February 2, 2021, but it did not provide the requisite 180 days' notice required for termination under the terms of the Agreement. Texas therefore treats DHS's letter as notice of intent to terminate, which will become effective after 180 days (*i.e.*, on August 1, 2021). The Texas Agreement remains binding until then.

## CLAIMS

### COUNT I
### (Arbitrary and Capricious Agency Action—Lack of Reasoned Decision-Making)

85. Plaintiffs incorporate by reference all preceding paragraphs and incorporate each paragraph of each count as applicable to each other count.

86. The APA prohibits agency action that is "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

87.    The January 20 suspension constitutes final agency action reviewable under the APA.  *See* 5 U.S.C. § 701.  Defendants cannot identify any "clear and convincing evidence of legislative intention to preclude review" of the January 20 Memorandum suspending new enrollments into the MPP.  *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986).

88.    Federal administrative agencies are required to engage in "reasoned decision-making."  *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (quotation marks omitted).  "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational."  *Id.*  Put differently, "agency action is lawful only if it rests 'on a consideration of the relevant factors.' "  *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

89.    DHS has previously recognized the importance of the MPP.  The January 20 suspension of new enrollees into the MPP represents a sharp departure from DHS's previous policy.  In a two-sentence memorandum, DHS suspended the carefully crafted and assessed MPP program created during the prior Administration. DHS provided no reasoning, much less sufficient reasoning, for the immediate suspension of new enrollments into the program.  The current Administration failed to consider the benefits of the MPP program (and the costs of not having it), as detailed by the prior Administration.  Failing to consider important costs of a new

policy renders that policy arbitrary and capricious. *See Michigan*, 135 S. Ct. at 2706 ("[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.' ").

## COUNT II
### (Arbitrary and Capricious Agency Action—Failure to Consider State Reliance Interests)

90.     Even had DHS considered the costs and benefits to the United States from the MPP, DHS was also obligated to consider the costs of ending the MPP to the States.  It transparently failed to do so, having made its decision without seeking input from Texas and Missouri and without inquiring about the costs Texas and Missouri bear from illegal immigration.  DHS ignored the harms that suspending new enrollments will cause, such as increased costs to states, which "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397.  Certainly, the January 20 Memorandum did not analyze those costs.  This, too, was arbitrary and capricious. *See Michigan*, 135 S. Ct. at 2706.

91.     DHS particularly failed to consider whether "there was 'legitimate reliance' on the" prior administration's method of using the MPP as an indispensable tool in bilateral efforts to address the migration crisis by diminishing incentives for illegal immigration, weakening cartels and human smugglers, and enabling DHS to better focus its resources on legitimate asylum claims. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)).  That was arbitrary and capricious; where, as here, "an agency changes course ... it must 'be cognizant that longstanding policies may have engendered serious reliance interest that must be taken into

account.'" *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting another source)).

## COUNT III
**(Arbitrary and Capricious Agency Action—Failure to Consider Alternative Approaches)**

92.     But even had the Administration considered the States' costs as well— and it did not—it failed to consider whether it could achieve its (unstated) goals through a less-burdensome or less-sweeping means.  This too rendered its resulting decision arbitrary and capricious.

93.     The January 20 Memorandum failed to consider alternative approaches that would allow at least some additional enrollments to continue, and that would have accordingly imposed less-significant burdens on the States.  The Supreme Court recently held that a DHS immigration action was arbitrary and capricious because it was issued "'without any consideration whatsoever' of a [more limited] policy." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1912 (quoting *State Farm*, 463 U.S. at 51). The January 20 Memorandum categorically suspends *all* new enrollments into the MPP.

94.     By omitting any analysis of continuing at least some enrollments into the MPP, DHS "failed to consider important aspects of the problem" before it.  *Id.* at 1910 (alterations and citation omitted).

## COUNT IV
**(Arbitrary and Capricious Agency Action—No Stated Basis for Agency Action)**

95.     Even if there were some way to explain or justify DHS's decision, it

would be irrelevant because DHS did not provide any such explanation or justification in the January 20 Memorandum. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). Because DHS failed to provide *any* grounds for its decision, it is precluded from asserting new grounds before this Court—and therefore its termination of the MPP is necessarily arbitrary.

96.     Further, by suspending new enrollees into the MPP program, DHS is precluded from complying with the congressionally-enacted statutory framework detailed above and provides a key incentive for illegal immigration: the ability of aliens to remain in the United States during immigration proceedings even if they do not have a valid asylum claim and in many instances never appear for court dates and simply disappear into the United States.

97.     Because DHS does not sufficiently explain its sudden departure from implementing the MPP program, the January 20 Memorandum suspending new enrollees into the MPP is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).

98.     Each of these numerous flaws renders DHS's decision legally invalid. Yet that invalid suspension will cause Texas and Missouri irreparable injury that cannot be remedied adequately at law.  Texas and Missouri are therefore entitled to injunctive relief to enforce DHS's obligations under the applicable law.

## COUNT V
### (Failure to Provide Notice to, and Consult with, Texas)

99.    DHS suspended MPP without following the notice-and-consultation requirements contained in the Agreement.

100.    The Agreement is currently in effect and remains so until August 1, 2021.

101.    The suspension is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A), (D).

102.    The suspension exceeds the authority DHS can delegate to Acting Secretary Pekoske and is therefore *ultra vires*.

103.    As a result of the suspension, Texas "will be irreparably damaged and will not have an adequate remedy at law."  Ex. A § VI.  Texas is therefore "entitled ... to injunctive relief ... to enforce [DHS's] obligations" under the Agreement.  *Id*. § VI.

## COUNT VI
### (Violation of Section 1225)

104.    The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

105.    Federal law directs the Executive to detain virtually all aliens applying for admission into the United States.  The Executive "shall ... detain[]" any alien who is not "clearly and beyond a doubt entitled to be admitted" pending removal proceedings. 8 U.S.C. § 1225(b)(2)(A).  In lieu of detention, a second subparagraph of

the same section permits the Executive, for aliens "arriving on land ... from a foreign territory contiguous to the United States," to optionally "return the alien to that territory pending" removal proceedings.  8 U.S.C. § 1225(b)(2)(C).  These provisions give the Executive an exclusive choice for aliens not "clearly and beyond a doubt entitled to be admitted" who "arriv[e] on land ... from a foreign territory contiguous to the United States:" either detain the alien pending removal proceedings, or otherwise return him to the country from which he arrived pending removal proceedings.

106.   Though it could create such capacity if it chose to do so, the Executive presently lacks the capacity to detain the vast majority of the tens of thousands of aliens arriving on land from Mexico, a foreign territory contiguous to the United States, who are not clearly and beyond a doubt entitled to admission to the United States.  Through MPP, the Executive was capable of addressing this dilemma by electing to return aliens not clearly and beyond a doubt entitled to admission to Mexico pending removal proceedings.

107.   The suspension of new enrollments in MPP will necessarily cause the Executive to fail to meet its statutory obligations to detain or otherwise return aliens pending removal proceedings.  Because the Executive cannot detain many of these aliens, tens of thousands will instead abscond into the United States and fail to show up for statutorily required removal proceedings.  83 Fed. Reg. 55,946.

108.   This release provides a key incentive for illegal immigration: the ability of aliens to remain in the United States during immigration proceedings even if they

do not have a valid asylum claim and in many instances never appear for court dates and simply disappear into the United States—notwithstanding that these aliens have no legal entitlement to enter the country, much less remain in it.

109.    The suspension of the MPP therefore violates 8 U.S.C. § 1225.

## COUNT VII
### (Failure to Take Care that the Laws be Faithfully Executed)

110.    The Constitution requires the President to "take Care that the Laws be faithfully executed."  U.S. CONST. art. II, § 3.

111.    This constitutional limitation is binding on agencies and officers exercising executive power.  *See* U.S. CONST. art. II, § 1, cl. 1 (vesting "[t]he executive Power" in the President).

112.    The suspension of MPP violates the Executive's Take Care Clause obligations in two ways:  first, by placing the Executive in a position where it will necessarily violate a statutory framework obligating it to detain or otherwise return aliens, and second, by predictably allowing (and encouraging) more aliens to illegally enter into the United States and violate immigration-law requirements once released into the interior.

113.    Unconstitutional agency action or inaction violates the APA.  *See* 5 U.S.C. § 706.

114.    This constitutional violation is also actionable independent of the APA. Federal courts have long exercised the power to enjoin federal officers from violating the Constitution, pursuant to their inherent equitable powers.  *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327–28 (2015) (discussing "a long history

38

of judicial review of illegal executive action, tracing back to England").

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a.      Hold unlawful and set aside the January 20 Memorandum suspending new enrollments into the MPP;

b.      Declare that the January 20 Memorandum is unlawful;

c.      Issue preliminary and permanent injunctive relief enjoining Defendants nationwide from enforcing or implementing the January 20 Memorandum suspending new enrollments into the MPP;

d.      Award Texas and Missouri the costs of this action and reasonable attorney's fees; and

e.      Award such other and further relief as the Court deems equitable and just.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JUDD E. STONE II
Solicitor General
Texas Bar No. 24076720

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Texas Bar No. 00798537

*/s/ William T. Thompson*
WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
*Attorney-in-Charge*
Texas Bar No. 24088531

OFFICE OF THE ATTORNEY GENERAL
SPECIAL LITIGATION UNIT
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov

*Counsel for Plaintiff State of Texas*

ERIC S. SCHMITT
Attorney General of Missouri

/s/     *D. John Sauer*
D. JOHN SAUER, #58720MO
  *Solicitor General*
JESUS A. OSETE, #69267MO
  *Deputy Solicitor General*
MICHAEL E. TALENT, #322220CA
  *Deputy Solicitor General*

Office of the Attorney General
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-8870
Fax (573) 751-0774
John.Sauer@ago.mo.gov
(*pro hac vice* motions forthcoming)

*Counsel for Plaintiff State of Missouri*

40