# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, | ) | |
| STATE OF MISSOURI, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:21-cv-00067-Z |
| | ) | |
| JOSEPH R. BIDEN, JR., | ) | |
| in his official capacity as | ) | |
| President of the United States, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## APPENDIX TO DEFENDANTS' MOTION TO TRANSFER VENUE

BRIAN M. BOYNTON
Acting Assistant Attorney General

WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
District Court Section

EREZ REUVENI
Assistant Director

JOSEPH A. DARROW
Trial Attorney

FRANCESCA GENOVA
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 305-1062
Francesca.M.Genova@usdoj.gov

Contents

A.      Declaration of LaToya Morgan..........................................................................App. 001

B.      Texas's Mem. of Law in Supp. of Defs.' Mot. to Dismiss or Transfer|
        the Consolidated Case, *City of El Cenizo v. Texas*, Case No. 5:17-cv-404-OG,
        ECF 32-1 (W.D. Tex. filed June 8, 2017) ..........................................................App. 009

C.      Complaint, *Texas v. United States*, 1:14-cv-254, ECF 1 (S.D. Tex. filed Dec. 3, 2014)
        ............................................................................................................................App. 026

Date: May 3, 2021                         Respectfully submitted,

                                          BRIAN M. BOYNTON
                                          *Acting Assistant Attorney General*

                                          WILLIAM C. PEACHEY
                                          *Director*
                                          Office of Immigration Litigation
                                          District Court Section

                                          EREZ REUVENI
                                          *Assistant Director*

                                          JOSEPH A. DARROW
                                          *Trial Attorney*

                                          /s/ Francesca Genova
                                          FRANCESCA GENOVA
                                          *Trial Attorney*
                                          U.S. Department of Justice
                                          Civil Division
                                          Office of Immigration Litigation
                                          District Court Section
                                          P.O. Box 868, Ben Franklin Station
                                          Washington, DC 20044
                                          Tel.: (202) 305-1062
                                          Francesca.M.Genova@usdoj.gov

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

|  |  |
|---|---|
| The State of Texas, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 2:21-cv-00067-Z |
| ) | |
| Joseph R. Biden, Jr., President of the ) | |
| United States, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF LATOYA MORGAN

I, LaToya Morgan, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1. I am the Acting Director (Supervisory Customs and Border Protection Officer)) for the CBP STAT Division within Operations Support, U.S. Customs and Border Protection (CBP), Department of Homeland Security, where I manage CBP STAT's creation and delivery of high-level analysis and reporting into CBP's immigration and seizure data.

2. Previously, I served as the Acting Deputy Director of the CBP STAT Division since November 2020 until April 28, 2021. Previously, I also served as a Supervisory CBP Officer with the National Targeting Center's Analytic Management Systems Control Office.

3. CBP STAT provides CBP senior leadership with aggregate statistics related to alien apprehensions, inadmissible aliens, drug seizures, use of force and assault data, in the

1

App. 001

form of both recurring and ad hoc reports.  In my role as the Acting Director of CBP

STAT, I supervise a team that runs reports of, and retrieves data from, CBP's electronic

systems of records, including U.S. Border Patrol's (USBP) e3 system and CBP Office of

Field Operations' (OFO) SIGMA and Unified Secondary (USEC) systems.  Many of

these reports combine data from the e3 system and the SIGMA or USEC systems.  In

Fiscal Year 2020 (Oct 2019 – Sept 2020), CBP STAT performed over 4,090 recurring

reports (representing a 121% increase compared to the same time last year) and almost

1,400 ad hoc reports (representing an 83% increase compared to the same time last year).

I have general familiarity with SIGMA, USEC, and e3 and their capabilities.

4.  I am making this Declaration for the purpose of supplying statistical information

regarding the number of individuals enrolled in the Migrant Protection Protocols (MPP)

in various locations in Texas.[1]  I am also providing CBP data regarding expulsions

pursuant to 42 U.S.C. § 265 by USBP and OFO, apprehensions processed under Title 8

---

[1] For the USBP Sectors listed below, the stations in Texas in which USBP processed MPP enrollments are as follows:
- Big Bend Sector:  Alpine, Big Bend Substation, Marfa, Midland, Presidio, Sanderson, Sierra Blanca, and Van Horn
- Del Rio Sector: Brackettville, Carrizo Springs, Comstock, Del Rio, Eagle Pass, Eagle Pass South, and Uvalde
- El Paso Sector: Clint, El Paso, Fort Hancock, and Ysleta
- Laredo Sector: Cotulla, Freer, Hebbronville, Laredo North, Laredo South, Laredo West, and Zapata
- Rio Grande Valley Sector: Brownsville, Falfurrias, Fort Brown, Harlingen, Kingsville, McAllen, Rio Grande and Weslaco

For the Field Offices listed below, the land Ports of Entry in Texas in which OFO processed MPP enrollments are as follows:
- El Paso Field Office: El Paso, Presidio, and Ysleta
- Laredo Field Office: Brownsville, Eagle Pass, Hidalgo, Laredo, Progreso, Rio Grande City, and Roma

For all data contained in this declaration, figures from USBP Stations within the El Paso Sector and OFO Ports of Entry within the El Paso Field Office located in the state of New Mexico are not included in the totals.

App. 002

of United State Code ("Title 8") by USBP, and individuals determined to be inadmissible under Title 8 by OFO for those same locations.

5. This Declaration is based on my personal knowledge and other information conveyed to me by my staff and other knowledgeable CBP personnel in the course of my official duties and responsibilities.

6. As of April 22, 2021, the number of individuals enrolled in MPP by USBP at the below locations within Texas are as follows:

    a. In Fiscal Year 2019,

        i. For Big Bend Sector: 354.

        ii. For Del Rio Sector: 891.

        iii. For El Paso Sector (Texas Stations only): 10,251.

        iv. For Laredo Sector:  869.

        v. For Rio Grande Valley Sector: 15,888.

    b. In Fiscal Year 2020,

        i. For Big Bend Sector: 411.

        ii. For Del Rio Sector: 3,617.

        iii. For El Paso Sector (Texas Stations only): 2,942.

        iv. For Laredo Sector:  507.

        v. For Rio Grande Valley Sector: 5,400.

    c. In Fiscal Year 2021,

        i. For Big Bend Sector: 378

        ii. For Del Rio Sector: 413.

        iii. For El Paso Sector (Texas Stations only): 566.

App. 003

       iv.  For Laredo Sector:  2.

       v.  For Rio Grande Valley Sector: 776.

7.  As of April 22, 2021, the number of individuals enrolled in MPP by OFO at land Ports of Entry within Texas are as follows:

    a.  In Fiscal Year 2019,

       i.  For the El Paso Field Office (Texas Ports of Entry only): 1,120.

       ii.  For the Laredo Field Office: 2,974.

    b.  In Fiscal Year 2020,

       i.  For the El Paso Field Office (Texas Ports of Entry only): 1,084.

       ii.  For the Laredo Field Office: 1,769.

    c.  In Fiscal Year 2021,

       i.  For the El Paso Field Office (Texas Ports of Entry only): 2.

       ii.  For the Laredo Field Office: 0.

8.  As of April 3, 2021, the number of individuals expelled under 42 U.S.C. § 265 or apprehended under Title 8 by USBP at the below locations within Texas are as follows:

    a.  In Fiscal Year 2019 (excluding October 2018 through December 2018),

       i.  For Big Bend Sector: 8,013.

       ii.  For Del Rio Sector: 51,155.

       iii.  For El Paso Sector (Texas Stations only): 121,523.

       iv.  For Laredo Sector: 30,202.

       v.  For Rio Grande Valley Sector: 279,295.

    b.  In Fiscal Year 2020,

       i.  For Big Bend Sector: 8,628.

App. 004

    ii.   For Del Rio Sector: 40,342.

    iii.   For El Paso Sector (Texas Stations only): 27,070.

    iv.   For Laredo Sector: 51,425.

    v.   For Rio Grande Valley Sector: 90,206.

c.   In Fiscal Year 2021 to date through March 2021,

    i.   For Big Bend Sector: 15,389.

    ii.   For Del Rio Sector: 68,570.

    iii.   For El Paso Sector (Texas Stations only): 28,449.

    iv.   For Laredo Sector: 53,661.

    v.   For Rio Grande Valley Sector: 159,470.

9.   As of April 3, 2021, the number of individuals expelled under 42 U.S.C. § 265 or determined to be inadmissible under Title 8 by OFO at land Ports of Entry within Texas are as follows:

a.   In Fiscal Year 2019[2] (excluding October 2018 through December 2018),

    i.   For the El Paso Field Office (Texas Ports of Entry only): 19,514.

    ii.   For the Laredo Field Office: 36,885.

b.   In Fiscal Year 2020,

    i.   For the El Paso Field Office (Texas Ports of Entry only): 9,005.

    ii.   For the Laredo Field Office: 20,461.

c.   In Fiscal Year 2021 to date through March 2021,

    i.   For the El Paso Field Office (Texas Ports of Entry only): 2,070.

    ii.   For the Laredo Field Office: 4,208.

---

[2] OFO individuals determined to be inadmissible under Title 8 for January 2019 through September 2019 are as of October 5, 2020.

App. 005

10. Notably, the USBP Rio Grande Valley Sector is seeing the highest levels of combined Title 42 expulsions and Title 8 apprehensions by USBP amongst all Texas USBP Sectors for FY21 to date through March 2021. The USBP Del Rio Sector has the next highest levels of combined Title 42 expulsions and Title 8 apprehensions levels amongst the Texas USBP Sectors for the same time period.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 30 day of April, 2021.

LaToya Morgan
Acting Director, CBP STAT Division
Operations Support
U.S. Customs and Border Protection

6

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| CITY OF EL CENIZO, et al., | No. 5:17-cv-404-OG [Lead Case] |
| *Plaintiffs,* | |
| v. | |
| STATE OF TEXAS, et al., | |
| *Defendants.* | |
| | |
| EL PASO COUNTY, et al., | No. 5:17-cv-459-OG [Consolidated Case] |
| *Plaintiffs,* | |
| v. | |
| STATE OF TEXAS, et al., | |
| *Defendants.* | |
| | |
| CITY OF SAN ANTONIO, et al., | No. 5:17-cv-489-OG [Consolidated Case] |
| *Plaintiffs,* | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR TRANSFER THE CONSOLIDATED CASES** |
| STATE OF TEXAS, et al., | |
| *Defendants.* | |

App. 007

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION .......................................................................................... 1

ARGUMENT .................................................................................................. 2

I.  28 U.S.C. § 1406 Mandates Dismissal or Transfer of these
Consolidated Cases to the Austin Division. ........................................... 2

II.  The First-to-File Rule Mandates Dismissal or Transfer of
these Consolidated Cases to the Austin Division. ................................. 6

III.  Alternatively, the Court Should Transfer these
Consolidated Cases Pursuant to 28 U.S.C. § 1404 for
Consolidation with Texas's Previously Filed Action. ............................ 9

A.  The private factors favor transfer. ............................................. 10

B.  The public factors favor transfer. .............................................. 11

CONCLUSION .............................................................................................. 12

CERTIFICATE OF SERVICE ....................................................................... 14

App. 008

i

# TABLE OF AUTHORITIES

**Cases**

*Abbott Lab. v. Gardner*, 387 U.S. 136 (1967) ................................................. 6

*Action Indus., Inc. v. U.S. Fid. & Guar. Corp.*, 358 F.3d 337 (5th Cir.
2004) .................................................................................................. 10

*Ahmad v. ZT Grp. Int'l, Inc.*, No. A–14–CA–11O1–SS, 2015 WL 339735
(W.D. Tex. Jan. 23, 2015) ..................................................................... 6

*Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Texas*, 134
S. Ct. 568 (2013) .................................................................................. 2

*Banks v. F.D.I.C.*, No. CIV.A.308-CV-1076-G, 2009 WL 289604 (N.D.
Tex. Feb. 2, 2009) ................................................................................ 5

*Butterworth v. Hill*, 114 U.S. 128 (1885) ..................................................... 5

*Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599 (5th Cir. 1999) ................... 6, 7

*Candela Corp. v. Palomar Med. Techs., Inc.*, No. 9:06-CV-277, 2007 WL
738615, at *3 (E.D. Tex. Feb. 22, 2007) .................................................... 3

*Chapman v. Dell, Inc.*, No. EP-09-CV-7-KC, 2009 WL 1024635 (W.D.
Tex. Apr. 15, 2009) ........................................................................... 11, 12

*Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800
(1976) ................................................................................................ 6

*Ex Parte Young*, 209 U.S. 123 (1908) .......................................................... 8

*Fla. Nursing Home Ass'n v. Page*, 616 F.2d 1355 (5th Cir.1980), *rev'd
on other grounds, Fla. Dep't of Health & Rehab. Servs. v. Fla.
Nursing Home Ass'n*, 450 U.S. 147 (1981) ................................................. 5

*Gray Cas. & Sur. Co. v. Lebas*, No. CIV.A. 12-2709, 2013 WL 74351
(E.D. La. Jan. 7, 2013) ......................................................................... 4

*Hirtz v. Texas*, 974 F.2d 663 (5th Cir. 1992) ............................................... 8

*Humble Oil & Refining Co. v. Bell Marine Serv., Inc.*, 321 F.2d 53 (5th
Cir. 1963) ........................................................................................... 9

*In re Spillman Dev. Grp., Ltd.*, 710 F.3d 299 (5th Cir. 2013) ......................... 8

*In re Volkswagen AG*, 371 F.3d 201 (5th Cir. 2004) ..................................... 10

*In re Volkswagen of Am., Inc.*, 545 F.3d 304 (5th Cir. 2008) ..................... 9, 10

App. 009

*Jam Strait, Inc. v. Am. Prods. Co., Inc.*, No. 02–2055, 2002 WL
   31246566 (E.D. La. Oct. 4, 2002) ............................................................ 11

*Justice v. Hoseman*, 771 F.3d 285 (5th Cir. 2014) ........................................ 8

*Langton v. Cbeyond Commc'n, L.L.C.*, 282 F. Supp. 2d 504 (E.D. Tex.
   2003) ................................................................................................................. 2

*Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403 (5th Cir. 1971) .................... 6

*Needbasedapps, LLC v. Robbins*, 926 F. Supp. 2d 907 (W.D. Tex. 2013) ............... 6, 9

*O'Neill v. Battisti*, 472 F.2d 789 (6th Cir. 1972) ......................................... 5

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981) ........................................ 3

*Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947 (5th Cir. 1997) ...................... 6, 7

*Schreiber v. Kohn*, 434 F. Supp. 2d 1 (D.D.C. 2006) .............................. 11, 12

*Sherwin-Williams Co. v. Holmes Cty.*, 343 F.3d 383 (5th Cir. 2003) .......................... 1

*Spiegelberg v. Collegiate Licensing Co.*, 402 F. Supp. 2d 786 (S.D. Tex.
   2005) .............................................................................................................. 10

*St. Paul Ins. Co. v. Trejo*, 39 F.3d 585 (5th Cir. 1994) ............................... 1

*Sutter Corp. v. P&P Indus., Inc.*, 125 F.3d 914 (5th Cir. 1997) .................. 7

*Texas Instruments, Inc. v. Micron Semiconductor, Inc.*, 815 F. Supp.
   994 (E.D. Tex. 1993) ..................................................................................... 7

*Travelers Ins. Co. v. La. Farm Bureau Fed'n, Inc.*, 996 F.2d 774 (5th
   Cir. 1993) ........................................................................................................ 1

*W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721 (5th Cir.
   1985) ............................................................................................................ 6, 8

*Yeti Coolers, LLC v. Beavertail Products, LLC*, No. 1–15–CV–415 RP,
   2015 WL 4759297 (W.D. Tex. Aug. 12, 2015) ........................................... 7

**Statutes**

28 U.S.C. § 124(b)(3) ....................................................................................... 3

28 U.S.C. § 124(d)(3) ....................................................................................... 3

28 U.S.C. § 124(d)(5) ....................................................................................... 3

28 U.S.C. § 1391 ............................................................................................... 9

App. 010

28 U.S.C. § 1391(b) ......................................................................... 4

28 U.S.C. § 1391(b)(1–2) ................................................................ 2

28 U.S.C. § 1391(b)(2) .................................................................... 4

28 U.S.C. § 1391(c)(2) ..................................................................... 3

28 U.S.C. § 1404 ................................................................. 2, 9, 10, 12

28 U.S.C. § 1404(a) ......................................................................... 9

28 U.S.C. § 1406 ............................................................................. 2

28 U.S.C. § 1406(a) ......................................................................... 2

**Rules**

Fed. R. Civ. P. 12(b)(3) ................................................................... 2

Fed. R. Civ. P. 42 ....................................................................... 2, 9

**Constitutional Provisions**

Tex. Const. art. 3, § 58 .............................................................. 5, 10

Tex. Const. art. 4, § 13 .................................................................. 5

App. 011

## INTRODUCTION

The San Antonio Division is not the proper venue for these facial challenges to the constitutionality of Senate Bill 4 ("SB 4"), Texas's sanctuary cities law. No claims arose here. Plaintiffs' claims against SB 4 arose in Austin, and the three state officials they sued in these three consolidated cases work in Austin and must be sued there. Thus, the Austin Division is the appropriate venue for this litigation.

Texas first-filed a nearly identical declaratory judgment action in the Austin Division, asking the Court to rule on the constitutionality of SB 4. Texas filed an amended complaint in the Austin Division adding, *inter alia*, Plaintiffs from two of these three consolidated lawsuits and their claims. There may be more facial challenges to SB 4 and Austin is the appropriate division for litigation addressing the same issues raised by all in an efficient, consolidated fashion.

On May 7, 2017, the Governor signed SB 4 into law. That same day, knowing the law's opponents would challenge its constitutionality in federal court, Texas filed a declaratory judgment action in the only proper district and division: the Austin Division. *See Texas v. Travis Cty., Texas, et al.*, No. 1:17-cv-425-SS. The Fifth Circuit permits the type of anticipatory declaratory judgment action filed by Texas. *See Sherwin-Williams Co. v. Holmes Cty.*, 343 F.3d 383, 388 (5th Cir. 2003) (allowing for declaratory judgment action in anticipation of other threatened lawsuits); *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 591 (5th Cir. 1994) (same); *Travelers Ins. Co. v. La. Farm Bureau Fed'n, Inc.*, 996 F.2d 774, 776–77 (5th Cir. 1993) (same).[1]

Because the San Antonio Division is an improper venue, and because Texas's first-filed case in the Austin Division raises the same legal issues, involving the same parties, the Court should dismiss or transfer these consolidated cases pursuant to

---

[1] Defendants City of Austin, Travis County, and Sheriff Hernandez in Case No. 1:17-cv-425-SS moved to dismiss, ECF Nos. 26, 27, to which Texas responded.

App. 012

1

Rule 12(b)(3) and 28 U.S.C. § 1406; transfer the case under the Fifth Circuit's first-to-file rule; or transfer the case pursuant to 28 U.S.C. § 1404 for consolidation with the matter already pending in the Austin Division.[2]

## ARGUMENT

## I.  28 U.S.C. § 1406 Mandates Dismissal or Transfer of these Consolidated Cases to the Austin Division.

Plaintiffs improperly filed this action in the San Antonio Division. Rule 12(b)(3) and 28 U.S.C. § 1406(a) allow dismissal when venue is "wrong" or "improper." *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Texas*, 134 S. Ct. 568, 577 (2013). Venue lies where "any defendant resides," or "a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(1–2). But under section 1406, the "district court of a district in which is filed a case laying venue in the *wrong division* or district *shall* dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a) (emphasis added). "Once a defendant raises a 12(b)(3) motion to dismiss for improper venue, the burden of sustaining venue lies with the plaintiff." *Langton v. Cbeyond Commc'n, L.L.C.*, 282 F. Supp. 2d 504, 508 (E.D. Tex. 2003). Plaintiffs cannot meet that burden.

None of the venue criteria under section 1391 are met by Plaintiffs' filing in the San Antonio Division. No Defendant resides in the San Antonio Division and the events giving rise to this action did not occur within the division.

The San Antonio Division has little connection to the underlying dispute between these parties. Regarding the first case filed in this Division, No. 5:17-cv-00404-OG, the City of El Cenizo and Mayor Reyes are located in Webb County, First

---

[2] In the identical matter before the Austin Division, Texas has filed Rule 42 motions to consolidate the first two of these three cases with the case in the Austin Division. *Texas v. Travis Cty., Texas, et al.*, No. 1:17-cv-425-SS (ECF Nos. 17, 24).  A motion to consolidate these now consolidated three cases is forthcoming.

App. 013

2

Am. Compl. ¶ 12, ECF No. 4, which lies in the Laredo Division of the Southern District of Texas. 28 U.S.C. § 124(b)(3). Maverick County and the Maverick County Sheriff and Constable are located in the Del Rio Division of the Court. 28 U.S.C. § 124(d)(5). Regarding the second filed case in the Division, No. 5:17-cv-00459-OG, El Paso County and its Sheriff, Richard Wiles, Compl. ¶¶ 13 & 17, ECF No. 1, are located within the El Paso Division of the Western District of Texas. 28 U.S.C. § 124(d)(3). The "weight given to a plaintiff's choice of forum is diminished when the plaintiff does not reside in his chosen forum and no operative facts occurred within the forum." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255–56 (1981); *Candela Corp. v. Palomar Med. Techs., Inc.*, No. 9:06-CV-277, 2007 WL 738615, at *3 (E.D. Tex. Feb. 22, 2007).

   The remaining Plaintiffs' connection to the San Antonio Division is not legally cognizable for venue purposes. "For all venue purposes . . . an entity with the capacity to sue and be sued in its common name . . . shall be deemed to reside . . . if a plaintiff, only in the judicial district in which it maintains its principal place of business." 28 U.S.C. § 1391(c)(2). Plaintiff Texas Organizing Project Education Fund ("TOPEF") pleads that it is incorporated in Texas and has offices in San Antonio, Houston, and Dallas, with members in Bexar and Harris Counties. Compl. ¶ 19. The City of San Antonio is located in Bexar County within the Division, as is councilmember Ray A. Saldana. No. 5:17-cv-00489-OG, ECF 1, at ¶¶ 4, 6. Plaintiff Texas Association of Chicanos in Higher Education ("TACHE") pleads it is a statewide professional association with its principle place of business in Canyon, Texas.[3] *Id.* ¶ 7.Plaintiff La Union Del Pueblo Entero ("LUPE") pleads it is a community union with members in

---

[3] Tex. Ass'n of Chicanos in Higher Educ., https://tache.memberclicks.net/ (last visited June 7, 2017).

App. 014

the Rio Grande Valley, whose offices are in the Southern District of Texas.[4] *Id.* ¶ 8. Plaintiff Workers Defense Project ("WDP") pleads it is a membership organization (though it fails to plead with specificity any connection to the Division). *Id.* ¶ 9. Plaintiff League of United Latin American Citizens ("LULAC") is a national nonprofit with headquarters in Washington, D.C. and a membership office in El Paso.[5]

The location of these plaintiffs and members of the organizational plaintiffs is irrelevant to the section 1391 inquiry. *See* 28 U.S.C. § 1391(b) (stating venue is proper in a judicial district where any defendant resides or a substantial part of the events giving rise to the claim occurred). Further, any argument that venue can lie in a "place of injury," which Plaintiffs could allege is in any part of the Texas, "is contrary to the venue statute and the weight of jurisprudence." *Gray Cas. & Sur. Co. v. Lebas*, No. CIV.A. 12-2709, 2013 WL 74351, at *2 (E.D. La. Jan. 7, 2013). There is simply no legally cognizable connection to the San Antonio Division for venue purposes.

In contrast, venue is proper in the Austin Division because all the actions giving rise to the passage and implementation of SB 4 occurred and will continue to occur in Austin. The Texas Legislature wrote, debated, and passed SB 4 in Austin; Governor Abbott signed it in Austin; and Attorney General Paxton will enforce it from Austin. All of the allegedly unlawful activities that Plaintiffs currently complain about, not just "a substantial part of the events," occurred in Austin. 28 U.S.C. § 1391(b)(2). And the Defendants sued in their official capacities reside in Austin.

---

[4] La Union Del Pueblo, Locations, http://lupenet.org/contact/locations/ (last visited June 7, 2017).

[5] League of United Latin Am. Citizens, Contact Us, http://lulac.org/about/contact_us_listing/ (last visited June 7, 2017). We note the Court's order allowing LULAC to amend and assert its Texas entity as Plaintiff, with an allegation that its headquarters are located in San Antonio. LULAC has now done so, *see* ECF No. 31. However, that change does not bear on, and does not moot, this venue analysis. It is the place where a defendant resides or where substantial events giving rise to the litigation occurred that is of consequence as explained below.

App. 015

Governor Abbott, Attorney General Paxton, and Director Steven McCraw, all maintain their principal offices in Austin, the seat of Texas government. *See* TEX. CONST. ART. 4, § 13 (providing that during the session of the Legislature, the Governor shall reside where its sessions are held, and at all other times at the seat of Government); *id.* art. 3, § 58 ("The Legislature shall hold its session at the City of Austin, which is hereby declared to be the seat of government.").

Defendants' residence for venue purposes is a key consideration under section 1391 analysis, and it takes on special meaning for public officials. Even if venue was legally permissible in San Antonio, courts have repeatedly recognized that proper venue lies in the district and division where government officials perform their official duties. *See Butterworth v. Hill*, 114 U.S. 128, 132 (1885) (holding proper venue for suit against commissioner of patents was not Vermont, but Washington, D.C.). "The general rule in suits against public officials is that a defendant's residence for venue purpose[s] is the district where he performs his official duties." *Fla. Nursing Home Ass'n v. Page*, 616 F.2d 1355, 1360 (5th Cir.1980), *rev'd on other grounds*, *Fla. Dep't of Health & Rehab. Servs. v. Fla. Nursing Home Ass'n*, 450 U.S. 147 (1981); *Banks v. F.D.I.C.*, No. CIV.A.308-CV-1076-G, 2009 WL 289604, at *2 (N.D. Tex. Feb. 2, 2009); *see also O'Neill v. Battisti*, 472 F.2d 789, 791 (6th Cir. 1972) (finding improper venue in case against Ohio Supreme Court justice filed in Northern District of Ohio when the justice performs his official duties in the Southern District of Ohio); *Gray Cas.*, No. CIV.A. 12-2709, 2013 WL 74351, at *2 ("All Defendants [including state official] have been sued in their official capacities, and the general rule in suits against public officials is that the official's residence for venue purpose is the district where he performs his official duties."). Since Plaintiffs chose to sue these officials, they must do so in the Austin Division.

Given Plaintiffs' tenuous connection to San Antonio, Defendants' residence in Austin, the centrality of Austin to the circumstances of this litigation, and the

doctrine that preference be given to the division where the public officials primarily carry out their official duties, these consolidated cases should be dismissed for improper venue or transferred immediately to the Austin Division for consolidation with Texas's previously filed matter.

## II.    The First-to-File Rule Mandates Dismissal or Transfer of these Consolidated Cases to the Austin Division.

"Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999). "[I]f the two actions are likely to 'overlap on the substantive issues,' they should be consolidated in 'the jurisdiction first seized of the issues.'" *Needbasedapps, LLC v. Robbins*, 926 F. Supp. 2d 907, 913 (W.D. Tex. 2013) (*quoting Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 408 n.6 (5th Cir. 1971). The first-to-file rule is a principle of comity that "requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs." *W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728 (5th Cir. 1985). "'As between federal district courts . . . the general principle is to avoid duplicative litigation.'" *Id.* at 728–29 (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). Doing so avoids "waste," "rulings which may trench upon the authority of sister courts," and "piecemeal resolution of issues that call for a uniform result." *Id.* at 729 (citing cases); *accord Cadle*, 174 F.3d at 604. This is particularly true in cases seeking a declaratory judgment or injunctive relief when the same issue is pending in litigation elsewhere. *Abbott Lab. v. Gardner*, 387 U.S. 136, 155 (1967).

Two cases need not be identical for the first-to-file rule to apply. *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997); *Ahmad v. ZT Grp. Int'l, Inc.*, No. A–14–CA–11O1–SS, 2015 WL 339735, at *2 (W.D. Tex. Jan. 23, 2015). They

must only involve closely related questions, common subject matter, or core issues that substantially overlap. *Texas Instruments, Inc. v. Micron Semiconductor, Inc.*, 815 F. Supp. 994, 997 (E.D. Tex. 1993). A substantial relationship exists when the issues, though not identical, are similar enough that the cases would be consolidated if filed in the same court. *Save Power*, 121 F.3d at 950.

"[T]he 'first to file rule' not only determines which court may decide the merits of substantially similar issues, but also establishes which court may decide whether the second suit filed must be dismissed, stayed or transferred and consolidated." *Cadle*, 174 F.3d at 606 (quoting *Sutter Corp. v. P&P Indus., Inc.*, 125 F.3d 914, 920 (5th Cir. 1997)). As noted above, "[t]he Fifth Circuit adheres to the general rule, that the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed." *Save Power*, 121 F.3d at 948. The "second court should defer" to the "court with the first case." *Id*.

In *Yeti Coolers, LLC v. Beavertail Products, LLC*, No. 1–15–CV–415 RP, 2015 WL 4759297, at *1 (W.D. Tex. Aug. 12, 2015), the Court applied the first-to-file rule in a similar scenario involving mostly the same parties and claims. Yeti sued Beavertail for patent infringement, but, in anticipation of a lawsuit, Beavertail had already filed a declaratory judgment action in the District of Minnesota. *Id*. at *2. Although the Minnesota action did not involve identical parties or claims, they substantially overlapped enough that the Court applied the first-to-file rule to transfer Yeti's case to the District of Minnesota. *Id*. at *4.

Like *Yeti*, the claims here substantially overlap with those pending before the Austin Division. *Texas v. Travis Cty., Texas, et al.*, No. 1:17-cv-425-SS. The issues in all cases concern the facial constitutionality of SB 4, which, among other things, prohibits localities from having policies restricting various forms of cooperation with federal immigration officials. These cases present pure legal issues and require no

App. 018

analysis of as-applied facts because SB 4 is not operative until September 1, 2017. Instead, all cases seek pre-enforcement review of the law and ask whether SB 4 is facially valid under the United States Constitution, particularly the First, Fourth, Tenth, and Fourteenth Amendments, and whether SB 4 is preempted by federal law. *Justice v. Hoseman*, 771 F.3d 285, 291, 295 (5th Cir. 2014) (discussing the difference between a pre-enforcement facial challenge to a law's constitutionality and an as-applied challenge). When related cases are pending before two federal courts and present the same, purely legal dispute, transfer of venue to the first-filed court is warranted. *See In re Spillman Dev. Grp., Ltd.*, 710 F.3d 299, 307 (5th Cir. 2013) (affirming transfer of similar case involving pure legal issues from Eastern District of Louisiana to Western District of Texas).

With the filing of Texas's and Attorney General Paxton's First Amended Complaint in the Austin lawsuit,[6] all Plaintiffs in this matter are now included in the Austin-based lawsuit except for those in the third-filed suit in this Division, *City of San Antonio et al. v. State of Texas et al.*, SA-17-CV-0489-OLG, which Texas intends to seek permission to add in a second amended complaint. Governor Abbott and Director McCraw are absent defendants from the Austin lawsuit.[7] Plaintiffs presumably sued the Governor, Attorney General, and Director McCraw because Texas is immune from suit under the Eleventh Amendment. *Ex Parte Young*, 209 U.S. 123, 159–60 (1908) (noting state is immune from suit but permitting suit against state official in his official capacity); *Hirtz v. Texas*, 974 F.2d 663, 666 (5th Cir. 1992) (same). Texas is a party to both cases—a defendant in this case and a plaintiff in the case in Austin. *See W. Gulf Mar. Ass'n*, 751 F.2d at 731 n.5 (noting that incomplete

---

[6] *Texas v. Travis Cty.*, First Am. Compl., May 31, 2017, ECF No. 23.

[7] Their presence, in their official capacities, seems to have no substantive impact upon the litigation.

App. 019

8

identity of the parties does not require the simultaneous litigation of two essentially identical actions where the parties could obtain complete relief in one forum and any missing parties could probably be joined in that action); *Needbasedapps,* 926 F. Supp. 2d at 913 ("The rule does not require that the claims or even the parties be identical.").

Since the issues and parties here and *Texas v. Travis County* substantially overlap, the first-to-file rule requires that the Court "defer" to the first case already pending before the Austin Division. Accordingly, because these cases involve "the same issues of law" as the Austin Division case and "[m]ost of the named defendants are also the same," "the interests of justice and judicial economy warrant consolidation" of these cases with the first filed case in the only proper division: the Austin Division.[8]  ECF No. 27 at 1.

## III.   Alternatively, the Court Should Transfer these Consolidated Cases Pursuant to 28 U.S.C. § 1404 for Consolidation with Texas's Previously Filed Action.

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). To justify transfer, Texas need only show "good cause," *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc) (quoting *Humble Oil & Refining Co. v. Bell Marine Serv., Inc.*, 321 F.2d 53, 56 (5th Cir. 1963)), which it can show by "demonstrat[ing] that the transferee venue is clearly more convenient," *id.* "The preliminary question under § 1404(a) is whether a civil action might have been brought in the destination venue." *Id.* at 312 (citation omitted). Ultimately, the question of whether to transfer a case involves a balance of the plaintiff's choice of forum under 28 U.S.C. § 1391, with the defendant's demonstration that a more convenient forum exists under § 1404.

---

[8] As previously noted, Texas is filing an amended Rule 42 motion to consolidate these cases in the Austin Division.

The Fifth Circuit uses private and public interest factors to determine whether venue transfer under section 1404 is for the convenience of the parties and witnesses and in the interest of justice. *In re Volkswagen*, 545 F.3d at 315. The private interest factors are: "'(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive.'" *Id.* (quoting *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004)). The public interest factors are: "'(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law.'" *Id.* (quoting *In re Volkswagen*, 371 F.3d at 203). No factor is of dispositive weight. *Action Indus., Inc. v. U.S. Fid. & Guar. Corp.*, 358 F.3d 337, 340 (5th Cir. 2004).

### A.     The private factors favor transfer.

Given that this is a pre-enforcement, facial challenge to SB 4, the private factors should bear little on the outcome of this motion. To the extent they weigh into the Court's analysis, they favor the Austin Division. Any sources of proof as to Plaintiffs' claim that SB 4 is unconstitutional and discriminatory are located in Austin, the seat of Texas government. TEX. CONST. ART. 3, § 58; *see In re Volkswagen*, 371 F.3d at 206 (favoring the venue in which auto accident giving rise to the litigation occurred and where the entirety of witnesses could be located); *Spiegelberg v. Collegiate Licensing Co.*, 402 F. Supp. 2d 786, 792 (S.D. Tex. 2005) (favoring venue where events giving rise to claim occurred). Plaintiffs assert no particular facts about the operation of SB 4 in their municipalities or counties, nor could they because SB 4 is not operative until September.

App. 021

Moreover, even if the Plaintiffs asserted particular local facts relevant to this matter, only one of the many Plaintiffs reside in this Division.  Other Plaintiffs such as El Paso County and its sheriff are in the El Paso Division, while it is unclear where TOPEF resides, other than having members and offices in various parts of Texas. Plaintiffs chose not to file in El Paso, Del Rio, or Laredo. Thus, it would make little practical difference to Plaintiffs like El Paso County, City of El Cenizo, and the many public-interest organizations that this case be transferred to Austin. *See Chapman v. Dell, Inc.*, No. EP-09-CV-7-KC, 2009 WL 1024635, at *4 (W.D. Tex. Apr. 15, 2009) (concluding that "the normal deference to Plaintiffs' choice of forum would receive is tempered in this case" because "Plaintiffs do not live in the El Paso Division," and "the operative facts of the dispute occurred outside the plaintiff's chosen forum"); *Jam Strait, Inc. v. Am. Prods. Co., Inc.*, No. 02–2055, 2002 WL 31246566 (E.D. La. Oct. 4, 2002) (when "plaintiff has not brought suit on its 'home turf' . . . the quantum of inconvenience to defendant needed to tip the balance in favor of transfer is concomitantly reduced"). This is especially true since a nearly identical case is currently pending in Austin and will require the same effort and expense as this case. Moreover, the City of Austin has moved to intervene, and Travis County has voted to intervene, in these consolidated cases.  It would seem particularly odd to make them litigate outside of their Division when their Division is the only appropriate venue. Thus, transferring the case to Austin will actually reduce the overall costs of these cases for all the parties involved.

## B.   The public factors favor transfer.

The Austin Division is also the proper venue because all the actions giving rise to the passage and implementation of SB 4 occurred and will continue to occur in Austin. In *Schreiber v. Kohn*, 434 F. Supp. 2d 1, 2 (D.D.C. 2006), the court restated the general rule that a public official resides in the judicial district where he performs

App. 022

11

his official duties; hence the defendant, director of the Department of Justice's Commercial Litigation Branch, could be sued in the District of Columbia. But the court transferred the case to Austin under 28 U.S.C. § 1404, because this district was the source of the allegedly unlawful acts and the District of Columbia had no connection whatsoever to the facts. *Id*. at 2–3. Here, like *Schreiber*, the case is appropriate in the Austin Division because the Governor, Attorney General, and Director McCraw all maintain their primary offices for the performance of their public duties in Austin. All of the allegedly unlawful activities that Plaintiffs complain about also occurred in Austin.

The Court held, in a similar context involving defendants located in Austin, that it should transfer a case from the El Paso Division to the Austin Division since the defendant was located there and "none of the parties or facts have any connection to the El Paso Division." *See Chapman*, 2009 WL 1024635, at *5.

All the factors weigh in favor of transfer to the Austin Division, and, as discussed above, the San Antonio Division is an improper venue.

## CONCLUSION

San Antonio has no substantial connection to the acts giving rise to this litigation, but Austin does. All of the public officials who are sued work in Austin. SB 4 was passed and signed into law in Austin. And a previously filed, nearly identical case already exists in Austin. San Antonio is not a proper venue. Thus, these consolidated cases should be dismissed, or, at minimum, transferred to the Austin Division for consolidation with *Texas v. Travis County*, No. 1:17-cv-425-SS (W.D. Tex.).

App. 023

12

Respectfully submitted this the 8th day of June, 2017.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant Attorney General

MICHAEL C. TOTH
Special Counsel to the First Assistant
Attorney General

ANDREW D. LEONIE
Associate Deputy Attorney General

AUSTIN R. NIMOCKS
Associate Deputy Attorney General

*/s/ Darren McCarty*
DARREN MCCARTY
Special Counsel for Civil Litigation
Texas Bar No. 24007631
darren.mccarty@oag.texas.gov

DAVID J. HACKER
Senior Counsel

JOEL STONEDALE
Counsel
Office of Special Litigation
ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Mail Code 009
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545

*ATTORNEYS FOR TEXAS*

App. 024

## CERTIFICATE OF SERVICE

I, Darren McCarty, hereby certify that on this the 8th day of June, 2017, a true and correct copy of the foregoing document was transmitted using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Darren McCarty*
Darren McCarty

App. 025

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS; | ) |
| | ) |
| STATE OF ALABAMA; | ) |
| | ) |
| STATE OF GEORGIA; | ) |
| | ) |
| STATE OF IDAHO; | ) |
| | ) |
| STATE OF INDIANA; | ) |
| | ) |
| STATE OF KANSAS; | ) |
| | ) |
| STATE OF LOUISIANA; | ) |
| | ) |
| STATE OF MONTANA; | ) |
| | ) |
| STATE OF NEBRASKA; | ) |
| | ) |
| STATE OF SOUTH CAROLINA; | ) |
| | ) |
| STATE OF SOUTH DAKOTA; | ) |
| | ) |
| STATE OF UTAH; | ) |
| | ) |
| STATE OF WEST VIRGINIA; | ) |
| | ) |
| STATE OF WISCONSIN; | ) |
| | ) |
| GOVERNOR PHIL BRYANT, State of Mississippi; | ) |
| | ) |
| GOVERNOR PAUL R. LEPAGE, State of Maine; | ) |
| | ) |
| GOVERNOR PATRICK L. MCCRORY, State of North Carolina; and | ) )  ) |
| | ) |
| GOVERNOR C.L. "BUTCH" OTTER, State of Idaho, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| vs. | )   Case No. _____ |
| | ) |

App. 026

UNITED STATES OF AMERICA;                                    )
                                                             )
JEH JOHNSON, Secretary of the Department of                  )
        Homeland Security;                                   )
                                                             )
R. GIL KERLIKOWSKE, Commissioner of U.S. Customs             )
        and Border Protection;                               )
                                                             )
RONALD D. VITIELLO, Deputy Chief of U.S. Border              )
        Patrol, U.S. Customs and Border Protection;          )
                                                             )
THOMAS S. WINKOWSKI, Acting Director of U.S.                 )
        Immigration and Customs Enforcement; and             )
                                                             )
LEÓN RODRÍGUEZ, Director of U.S. Citizenship and             )
        Immigration Services,                                )
                                                             )
                                       *Defendants.*         )
                                                             )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    The State of Texas, the State of Alabama, the State of Georgia, the State of Idaho, the State of Indiana, the State of Kansas, the State of Louisiana, the State of Montana, the State of Nebraska, the State of South Carolina, the State of South Dakota, the State of Utah, the State of West Virginia, the State of Wisconsin, and Governor Phil Bryant of Mississippi, Governor Paul R. LePage of Maine, Governor Patrick L. McCrory of North Carolina, and Governor C.L. "Butch" Otter of Idaho (collectively, "Plaintiffs" or "Plaintiff States") seek declaratory and injunctive relief against the United States and the above-named federal officials (collectively, "the Defendants") for their violations of the Take Care Clause, U.S. CONST. art. II, § 3, cl. 5, and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*.

2.    This lawsuit is not about immigration.  It is about the rule of law, presidential power, and the structural limits of the U.S. Constitution.

2

3.     On November 20, 2014, the President of the United States announced that he would unilaterally suspend the immigration laws as applied to 4 million of the 11 million undocumented immigrants in the United States.

4.     The President candidly admitted that, in so doing, he unilaterally rewrote the law:  "What you're not paying attention to is, *I just took an action to change the law*."

5.     In accordance with the President's unilateral exercise of lawmaking, his Secretary of the Department of Homeland Security ("DHS") issued a directive that purports to legalize the presence of approximately 40% of the known undocumented-immigrant population, and affords them legal rights and benefits. *See* Memorandum from Jeh Charles Johnson, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents* (Nov. 20, 2014) ("DHS Directive") (attached as Ex. A).

6.     That unilateral suspension of the Nation's immigration laws is unlawful.  Only this Court's immediate intervention can protect the Plaintiffs from dramatic and irreparable injuries.

## I. THE PARTIES

7.     Plaintiffs are the State of Texas, the State of Alabama, the State of Georgia, the State of Idaho, the State of Indiana, the State of Kansas, the State of Louisiana, the State of Montana, the State of Nebraska, the State of South Carolina, the State of South Dakota, the State of Utah, the State of West Virginia,

App. 028

the State of Wisconsin, and the Governors of Mississippi, Maine, North Carolina, and Idaho.

8.      Defendant United States of America is sued under the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 703 ("[T]he action for judicial review may be brought against the United States.").

9.      Defendant Jeh Johnson is the Secretary of DHS. Johnson and DHS are responsible for U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE"). Johnson authored the DHS Directive.

10.     Defendant R. Gil Kerlikowske is the Commissioner of CBP. Defendant Kerlikowske shares responsibility for implementing the DHS Directive. And Kerlikowske is Defendant Vitiello's supervisor.

11.     Defendant Ronald D. Vitiello is the Deputy Chief of U.S. Border Patrol. Vitiello authored a May 30, 2014, memorandum entitled "Unaccompanied Alien Children Transfer Process Bottleneck" ("Vitiello Memorandum"), which recognizes that Defendants' abandonment of the federal immigration laws caused and is continuing to cause crises in the Plaintiff States.

12.     Defendant Thomas S. Winkowski is the Acting Director for ICE. ICE administers a formal program for allowing undocumented immigrants to apply for deferred action and to appeal for reconsideration if deferred action is denied.

13.     Defendant León Rodríguez is the Director of USCIS. Rodríguez and USCIS administer the Deferred Action for Childhood Arrivals ("DACA") program.

App. 029

President Obama announced the DACA program on June 12, 2012, to allow undocumented immigrants to stay in the United States in violation of the Nation's immigration laws. And USCIS is the principal agency charged with implementing the DHS Directive.

## II.  JURISDICTION AND VENUE

14.   The Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution, art. II, § 3, cl. 5, and the APA, 5 U.S.C. § 706.   The Court also has jurisdiction under 28 U.S.C. § 1346 because this is a civil action or claim against the United States.  Finally, the Court has jurisdiction to compel an officer or employee of the above-named federal agencies to perform his or her duty under 28 U.S.C. § 1361.

15.   Venue is proper in this District under 28 U.S.C. § 1391(e) because the State of Texas is a resident of this judicial district, and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District.

16.   This Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the APA, 5 U.S.C. § 706, and 28 U.S.C. § 1361.

## III.  FACTUAL ALLEGATIONS

### A.    The DREAM Act

17.   On March 26, 2009, Senator Richard Durbin and Representative Howard Berman introduced the DREAM Act in the U.S. Senate and House, respectively.  *See* DREAM Act of 2009, S. 729 (111th Cong.) (2009); American Dream Act, H.R. 1751 (111th Cong.) (2009).   Both bills would have allowed

5

App. 030

undocumented immigrants to apply for conditional permanent resident status if, among other things, (a) they entered the United States before their 16th birthdays, and (b) they had been in the United States continuously for five years.

18.    The President repeatedly and forcefully urged Congress to pass the DREAM Act.

19.    And the President consistently insisted that he could not achieve the goals of the DREAM Act on his own.  He said, for instance:

- "Comprehensive reform, that's how we're going to solve this problem. . . . Anybody who tells you . . . that I can wave a magic wand and make it happen hasn't been paying attention to how this town works."  (May 5, 2010)

-  "I am president, I am not king.  I can't do these things just by myself. . . . [T]here's a limit to the discretion that I can show because I am obliged to execute the law. . . . I can't just make the laws up by myself."  (Oct. 25, 2010)

- In response to a question about whether he could stop deportation of undocumented students with an executive order:  "Well, first of all, temporary protective status historically has been used for special circumstances where you have immigrants to this country who are fleeing persecution in their countries, or there is some emergency situation in their native land that required them to come to the United States.  So it would not be appropriate to use that just for a particular group that came

6

App. 031

here primarily . . . for economic opportunity.  With respect to the notion that I can just *suspend deportations through executive order, that's just not the case*, because there are laws on the books that Congress has passed. . . . There are enough laws on the books by Congress that are *very clear in terms of how we have to enforce our immigration system* that for me to simply through executive order *ignore those congressional mandates* would not conform with my appropriate role as President."  (Mar. 28, 2011) (emphasis added)

- "I can't solve this problem by myself. . . . We're going to have to change the laws in Congress."  (Apr. 20, 2011)

- "I know some here wish that I could just bypass Congress and change the law myself.  But that's not how democracy works.  See, democracy is hard.  But it's right.  Changing our laws means doing the hard work of changing minds and changing votes, one by one."  (Apr. 29, 2011)

- "And sometimes when I talk to immigration advocates, they wish I could just bypass Congress and change the law myself.  But that's not how a democracy works."  (May 10, 2011)

- "[B]elieve me, the idea of doing things on my own is very tempting. . . . But that's not how . . . our system works. . . . That's not how our Constitution is written."  (July 25, 2011)

7

App. 032

- "Administratively, we can't ignore the law. . . . We are doing everything we can administratively.  But the fact of the matter is there are laws on the books that I have to enforce."  (Sept. 28, 2011)

20.    Neither congressional chamber passed the DREAM Act.

**B.    DACA**

21.    The President then asked the Department of Justice's Office of Legal Counsel ("OLC") whether he could effectuate the goals of the un-enacted DREAM Act by executive fiat.  OLC said "yes," with certain conditions.  In particular, OLC advised the President that he could use the concept of "deferred action for childhood arrivals," or "DACA," to stop deporting individuals who (a) entered the United States before their 16th birthdays, and (b) had been in the United States continuously for five years.  *See* Memorandum Opinion for the Secretary of Homeland Security, from Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* at 18 n.8 (Nov. 19, 2014) ("OLC Memo") (attached as Ex. B) (noting that OLC orally advised the President "[b]efore DACA was announced" in 2012).  OLC further advised, however, that "it was critical that, like past policies that made deferred action available to certain classes of aliens, the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria." *Ibid.*

App. 033

22.     Notwithstanding his repeated insistence that he could not stretch his executive powers any further, the President announced his unilateral creation of the DACA program on June 15, 2012.

23.     At the President's direction, the DHS Secretary then suspended the Nation's immigration laws for approximately 1.7 million undocumented immigrants.   *See* Memorandum from Janet Napolitano, Secretary of the Department of Homeland Security, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) ("DACA Memo") (attached as Ex. C).

24.     The President and his DHS Secretary ordered federal immigration officials to extend "deferred action" to undocumented immigrants who (a) entered the United States before their 16th birthdays, and (b) had been in the United States continuously for five years.

25.     Although OLC had cautioned the President that it was "critical" to DACA's legality that the Administration evaluate every application on a case-by-case basis, the President and DHS ignored that advice.   According to the latest figures available, the Administration granted deferred action to 99.5-99.8% of DACA applicants.

### C.   *Nava-Martinez*

26.     The Executive Branch did not stop at dispensing with the Nation's immigration laws.   Rather, as this Court already has found, the Administration adopted a policy that encouraged international child smuggling across the Texas-

App. 034

Mexico border. *See* Order, *United States v. Nava-Martinez*, No. 1:13-cr-00441, at 2 (S.D. Tex. Dec. 13, 2013) ("*Nava-Martinez* Order").

27.     The defendant in *Nava-Martinez*, an admitted human trafficker, was caught attempting to smuggle a ten-year-old El Salvadorean girl into the United States. *Id.* at 1.

28.     The Court noted that this was "the fourth case with the same factual situation this Court has had in as many weeks." *Id.* at 3. Although the human traffickers were apprehended in each case, "the DHS completed the criminal conspiracy . . . by delivering the minors to the custody of the parent." *Ibid.*

29.     This was done pursuant to DHS's "apparent policy . . . of completing the criminal mission of individuals who are violating the border security of the United States." *Id.* at 2. As this Court observed, "[t]his DHS policy is a dangerous course of action." *Ibid.* Under the policy, "instead of enforcing the laws of the United States, the Government [takes] direct steps to help the individuals who violated it." *Id.* at 3.

30.     Moreover, this Court found that DHS's policy promotes human trafficking, which in turn "help[s] fund the illegal drug cartels which are a very real danger for both citizens of this country and Mexico." *Id.* at 6. The Court explained that citizens of the United States bear the economic brunt of this policy, because DHS "funds these evil ventures with their tax dollars." *Id.* at 8. In addition, the policy harms the citizens of each country that suffers from the "nefarious activities of the cartels." *Ibid.*

App. 035

### D.     The Defendants Cause a Humanitarian Crisis

31.     The Defendants' policies (including DACA and the policy described in
*Nava-Martinez*) have had and continue to have dire consequences in the Plaintiff
States.  In the summer of 2014, an enormous wave of undocumented immigrants
surged across the Texas-Mexico border, creating what President Obama described
as a "humanitarian crisis."  Nick Miroff & Joshua Partlow, *Central American
Migrants Overwhelm Border Patrol Station in Texas*, WASH. POST (Jun. 12, 2014).

32.     As many as 90,000 undocumented children are expected to be detained
this year, and as many as 140,000 may be detained in 2015.  Brett LoGiurato,
*There's a Staggering Humanitarian Crisis on the US Border, and It's Only Going to
Get Worse,* BUS. INSIDER (Jun. 16, 2014).  By comparison, only 6,000 to 7,500
children were detained between 2008 and 2011, under 14,000 were detained in
2012, and only 24,000 were detained in 2013.  Alicia A. Caldwell, *Border Patrol
Resources Stretched Thin As Children Illegally Enter U.S. Alone*, ASSOCIATED PRESS
(Jun. 5, 2014).

33.     Law enforcement officers reported "picking up children as young as 4
without their parents and other children with Hello Kitty backpacks, cellphones
and the telephone numbers of U.S. relatives on note cards."  Miroff & Partlow,
*supra.*

34.     But the humanitarian crisis is by no means limited to unaccompanied
children.  There is also "an unprecedented surge of families crossing illegally into
the U.S."  Cindy Carcamo, *Rumors of U.S. Haven for Families Spur Rise in Illegal
Immigration*, L.A. TIMES (June 6, 2014).  While immigration officials do not have an

App. 036

official count of such families, they acknowledge that "the numbers appear to be substantial." *Ibid.*

36. This wave of immigration has been concentrated in the Rio Grande Valley of South Texas. Miroff & Partlow, *supra.* "Every day, hundreds of Central American migrants, in groups as large as 250 people, are wading across the muddy Rio Grande." *Ibid.*

36. The crisis has imposed enormous law enforcement costs on the Plaintiff States. For example, the Texas Department of Public Safety estimated that it was spending $1.3 million a week on troopers and resources to deal with the immigration surge; in addition, Governor Perry deployed 1,000 National Guard troops to the border at a cost of $38 million.

37. This crisis was caused by the immigration policies of the federal government, including the policy that this Court has already held to be unlawful. As Defendant Vitiello explained in his May 30th memorandum, "[i]f the U.S. government fails to deliver adequate consequences to deter aliens from attempting to illegally enter the U.S., the result will be an even greater increase in the rate of recidivism and first-time illicit entries." And the Obama Administration acknowledges that there is a "growing perception minors are crossing the border because they feel they will not be deported by the administration." LoGiurato, *supra.* Indeed, a research report commissioned by DHS revealed that "[w]ord had spread in Central America about a 'lack of consequences' for illegal entry" and that

App. 037

"[s]mugglers were exploiting the system."  Susan Carroll, *Report Warned of Child Migrant Crisis*, HOUSTON CHRON. (Jun. 17, 2014).

38.  The President himself predicted this outcome.  On July 1, 2010, he explained that it would be "both unwise and unfair" to "ignore the laws on the books and put an end to deportation" because it "would suggest to those thinking about coming here illegally that there will be no repercussion for such a decision."  That in turn "could lead to a surge in more illegal immigration."  As the President concluded, "no matter how decent they are, no matter their reasons, the 11 million who broke these laws should be held accountable."

39.  The Defendants, however, have contributed to the surge of illegal immigration by refusing to enforce the laws on the books.  On average, only 1,600 unaccompanied children are removed each year; in 2013, there were over 20,000 detentions of unaccompanied children from Guatemala, Honduras, and El Salvador, but only 496 unaccompanied children from those countries were repatriated.  Carroll, *supra*.  And the total number of undocumented children deported by the Obama Administration in 2013 was only 1,669 — an 80 percent reduction from 2008.  Brian Bennett, *Deportation Data Won't Dispel Rumors Drawing Migrant Minors to U.S.*, L.A. TIMES (July 5, 2014).

40.  Similarly, adults with children who are detained at the border are routinely released and allowed to travel within the United States.  Carcamo, *supra*.  And while they may be instructed to show up for a follow-up appointment, "ICE officials said they couldn't guarantee that they would pursue all cases in which

App. 038

immigrants do not show up for follow-up appointments." *Ibid.*  Tellingly, the immigrants arrested for illegally entering the U.S. refer to ICE's Notice to Appear documents as "*permisos*," or permits.  Byron York, *On Immigrant Surge, White House Story Falls Apart*, WASH. EXAMINER (Jun. 16, 2014).

41.  Unsurprisingly, the undocumented immigrants crossing the border are motivated primarily by the belief that they will not be deported.  The federal government's own analysis demonstrates as much.  When Border Patrol agents recently questioned 230 undocumented immigrants about why they came, "the results showed overwhelmingly that the immigrants, including those classified as . . . unaccompanied children, were motivated by the belief that they would be allowed to stay in the United States." *Ibid.*

42.  Multiple reports indicate that undocumented immigrants are counting on federal officials for help in reuniting with their friends or family in the U.S.  Hundreds of Central American migrants "turn[] themselves in to the Border Patrol" on a daily basis.  Miroff & Partlow, *supra*.  One undocumented immigrant stated that she and her group "had looked forward to being caught . . . at one point even waving down federal helicopters . . . because of the welcoming treatment they had assumed they would receive."  Carcamo, *supra*.  Another planned to surrender to Border Patrol because she had heard "that the Americans are helping Hondurans right now," especially women and children.  Miroff & Partlow, *supra.*  All of the 230 undocumented immigrants interviewed by Border Patrol agents for their recent

App. 039

report "stated that they had family members or, to a lesser extent, friends already living in the U.S." York, *supra*.

43.     And the Defendants have conceded that their failure to enforce the federal immigration laws has increased the flow of illegal immigration across the Texas-Mexico border.  *See* Vitiello Memorandum.  The effects of that failure have caused acute crises in the Plaintiff States.

### E.     The President "Change[s] the Law"

44.     Between his 2012 DACA announcement and the midterm elections in November 2014, the President repeatedly acknowledged that his non-enforcement efforts already had reached the outer limit of his administrative powers, and that any further transformation of the immigration system would have to be accomplished by legislation.  He said, for instance:

- "[A]s the head of the executive branch, there's a limit to what I can do. . . . [U]ntil we have a law in place that provides a pathway for legalization and/or citizenship for the folks in question, we're going to continue to be bound by the law."  (Sept. 20, 2012)

- "We are a nation of immigrants. . . . But we're also a nation of laws.  So what I've said is, we need to fix a broken immigration system.  And I've done everything that I can on my own."  (Oct. 16, 2012)

- In response to a question about the possibility of a moratorium on deportations for non-criminals:  "I'm not a king.  I am the head of the

App. 040

executive branch of government.  I'm required to follow the law."  (Jan. 30, 2013)

- In response to the question whether he could do for "an undocumented mother of three" what he did for DACA recipients: "I'm not a king. . . . [W]e can't simply ignore the law.  When it comes to the dreamers we were able to identify that group. . . . But to sort through all the possible cases of everybody who might have a sympathetic story to tell is very difficult to do.  This is why we need comprehensive immigration reform. . . . [I]f this was an issue that I could do unilaterally I would have done it a long time ago. . . . The way our system works is Congress has to pass legislation.  I then get an opportunity to sign and implement it."  (Jan. 30, 2013)

- "This is something I've struggled with throughout my presidency.  The problem is that you know I'm the president of the United States, I'm not the emperor of the United States. . . . And what that means is that we have certain obligations to enforce the laws that are in place. . . . [W]e've kind of stretched our administrative flexibility as much as we can."  (Feb. 14, 2013)

- "I think that it's very important for us to recognize that the way to solve this problem has to be legislative. . . . And we've been able to provide help through deferred action for young people and students. . . . But this is a problem that needs to be fixed legislatively."  (July 16, 2013)

App. 041

- "[M]y job in the executive branch is supposed to be to carry out the laws that are passed. Congress has said 'here is the law' when it comes to those who are undocumented, and they've allocated a whole bunch of money for enforcement. . . . What we can do is then carve out the DREAM Act, saying young people who have basically grown up here are Americans that we should welcome. . . . *But if we start broadening that, then essentially I would be ignoring the law in a way that I think would be very difficult to defend legally. So, that's not an option.*" (Sept. 17, 2013) (emphasis added)

- "[I]f in fact I could solve all these problems without passing laws in Congress, then I would do so. But we're also a nation of laws. That's part of our tradition. And so the easy way out is to try to yell and pretend like I can do something by violating our laws. And what I'm proposing is the harder path, which is to use our democratic processes to achieve the same goal." (Nov. 25, 2013)

- "[W]hat I've said in the past remains true, which is until Congress passes a new law, then I am constrained in terms of what I am able to do. What I've done is to use my prosecutorial discretion. . . . What we've said is focus on folks who are engaged in criminal activity, focus on people who engaged in gang activity. Do not focus on young people, who we're calling DREAMers. . . . That already stretched my administrative capacity very far. But I was confident that that was the right thing to do. But at a

App. 042

certain point the reason that these deportations are taking place is, Congress said, 'you have to enforce these laws.' They fund the hiring of officials at the department that's charged with enforcing. *And I cannot ignore those laws any more than I could ignore, you know, any of the other laws that are on the books*." (Mar. 6, 2014) (emphasis added)

45.     Accordingly, the President repeatedly called on Congress to pass an immigration reform bill. On June 27, 2013, the Senate passed a bill that, among other things, would have created a pathway to citizenship for undocumented immigrants. *See* Border Security, Economic Opportunity, & Immigration Modernization Act, S. 744 (113th Cong.) (2013). The House, on the other hand, did not pass similar legislation.

46.     Before the midterm elections in November 2014, Democrats in the Senate urged the President not to act unilaterally because it "could be so politically damaging in their states that it would destroy their chances to hold control of the Senate." Michael D. Shear & Julia Preston, *Obama Pushed 'Fullest Extent' of His Powers on Immigration Plan*, N.Y. TIMES (Nov. 28, 2014). The President honored that request.

47.     On November 20, 2014, the President announced that he would unilaterally create legal protections for approximately 4 million undocumented immigrants. Under the President's plan, the undocumented parents of U.S. citizens and legal permanent residents would receive deferred action status, as well as work permits and tolling of their unlawful presence in the United States. The President

App. 043

also expanded DACA to hundreds of thousands of additional undocumented immigrants.

48. The President candidly admitted that his plan was unilateral legislation: "What you're not paying attention to is, *I just took an action to change the law*."

49. The President further admitted that he was changing the law because Congress chose not to: "[W]hen members of Congress question my authority to make our immigration system work better, I have a simple answer: Pass a bill. . . . And the day I sign that bill into law, the actions I take will no longer be necessary."

50. The President also made clear that he was "offer[ing] the following deal": "[I]f you've taken responsibility, you've registered, undergone a background check, you're paying taxes, you've been here for five years, you've got roots in the community — you're not going to be deported. . . . If you meet the criteria, you can come out of the shadows, you can get right with the law."

**F.   The DHS Directive**

51. The President's new policies were effectuated through Defendant Johnson's DHS Directive. The DHS Directive closely resembled, and purported to "supplement[] and amend[]," the DACA Memo. *See* Exs. A & C.

52. In particular, Johnson instructed USCIS "to expand DACA as follows:" by "[r]emov[ing] the age cap" that had previously applied, by "[e]xtend[ing] DACA renewal and work authorization to three-years [sic]" from the previous two, and by "[a]djust[ing] the date-of-entry requirement" from June 15, 2007, to January 1, 2010. DHS Directive at 3-4.

App. 044

53.    Johnson also "direct[ed] USCIS to establish a process, similar to DACA" for extending deferred action to the parents of citizens or lawful permanent residents.  *Id.* at 4.  In addition, the beneficiaries of deferred action are eligible to apply for federal work authorization.

54.    The DHS Directive sets out a series of explicit criteria for who will be eligible for this expansion of deferred action.  It requires applicants to "file the requisite applications for deferred action" and "submit biometrics for USCIS to conduct background checks."  *Ibid*.  USCIS is instructed to "begin accepting applications from eligible applicants no later than one hundred and eighty (180) days" from the date of the Directive.  *Id.* at 5.  Moreover, USCIS, ICE, and CBP are directed to consider the new deferred action criteria "for all individuals [they] encounter[]," including individuals in their custody, and individuals whose removal is pending.  *Ibid.*

55.    The Defendants have made clear that the DHS Directive will operate like the DACA program that came before it — namely, as an entitlement to relief for virtually every applicant who meets DHS's eligibility criteria.  That is evident from the President's statement that the DHS Directive provides a "deal" to ensure that eligible applicants "will not be deported"; from the DHS Directive itself, which creates an application process and eligibility criteria in mandatory terms (like "shall" and "must"); and from the 99.5-99.8% acceptance rate for DACA applicants.

56.    The purported legal justification for the DHS Directive is contained in the OLC Memo.  *See* Ex. B.  In relevant part, the memo analyzed two DHS

20

App. 045

proposals. The first proposal, which the Administration adopted, was the extension of deferred action status to parents of U.S. citizens and lawful permanent residents. The second proposal, which the Administration has not yet adopted, was the extension of deferred action status to parents of DACA recipients. OLC concluded that the first proposal would be a lawful exercise of enforcement discretion, but the second would not.

57. The OLC Memo acknowledged that there are three important differences between the proposed programs and exercises of enforcement discretion. *Id.* at 20-21. First, deferred action is not merely a "decision not to prosecute an individual for past unlawful conduct"; instead, it is "a decision to openly tolerate an undocumented alien's continued presence in the United States." *Id.* at 20. Second, deferred action carries legal benefits beyond non-enforcement, such as the right to seek employment authorization. *Ibid.* Third, class-based deferred action programs, like the ones at issue here, "do not merely enable individual immigration officials to select deserving beneficiaries," but instead "set forth certain threshold eligibility criteria and then invite individuals who satisfy these criteria to apply for deferred action status." *Ibid.* In spite of all this, OLC concluded that the programs could potentially constitute exercises of enforcement discretion.

58. OLC then considered whether the proposals would be lawful under *Heckler v. Chaney*, 470 U.S. 821 (1985), a seminal enforcement-discretion case. OLC acknowledged that *Chaney* imposes four limitations on enforcement

App. 046

discretion.  First, enforcement decisions must rely on factors that are within the agency's expertise; second, the executive cannot effectively rewrite the laws under the guise of enforcement discretion; third, the executive cannot adopt a general policy that amounts to an abdication of its statutory responsibilities; and finally, enforcement discretion generally requires case-by-case decisionmaking.  OLC Memo at 6-7.

59.    OLC concluded that the first DHS proposal, which concerned the parents of citizens and legal permanent residents, met this test.  *Id.* at 26-31.  OLC based that conclusion, in part, on much smaller and more targeted deferred action programs that previous Congresses approved.  In particular, OLC found probative that Congress previously approved deferred action for victims of violence and trafficking, family members of U.S. citizens killed in combat, and family members of individuals killed in the September 11 attacks.  *Id.* at 29-30.  In OLC's view, those previous congressional approvals legalized DHS's unilateral effort to create the single largest deferred action program in our Nation's history, permitting 4 million undocumented immigrants to remain in the country.

60.    OLC reached the opposite conclusion with respect to the second DHS proposal, which concerned deferred action for parents of DACA recipients.  Although OLC acknowledged that the two proposals had significant similarities, it nevertheless rejected the second proposal as unlawful because it was not "consistent with the congressional policies and priorities embodied in the immigration laws." *Id.* at 33.

App. 047

### G.     The DHS Directive Harms Plaintiffs

61.     The DHS Directive will substantially increase the number of undocumented immigrants in the Plaintiff States.  At the most basic level, the Directive is a promise to openly tolerate entire classes of undocumented immigrants.  In addition, the Directive offers affirmative legal inducements to stay, such as work authorization and the tolling of unlawful presence.  White House officials also have stated that the beneficiaries of deferred action are eligible for Social Security and Medicare.  The removal of the deportation threat, combined with the incentives to stay, will make remaining in the United States far more attractive for the affected classes of undocumented immigrants.

62.     Moreover, the DHS Directive is certain to trigger a new wave of undocumented immigration.  As explained above, DACA led directly to a flood of immigration across the Texas-Mexico border and a "humanitarian crisis" in Texas. The federal government itself recognized that its lax attitude toward the immigration laws caused this wave.  *See* Vitiello Memorandum.  The DHS Directive is a much larger step than DACA, and it will trigger a larger response.

63.     The DHS Directive will increase human trafficking in the Plaintiff States.  Such trafficking is largely controlled by the Mexican drug cartels, which are the most significant organized crime threat to the State of Texas.  *See* Texas Department of Public Safety, *Texas Public Safety Threat Overview* at 2, 23 (Feb. 2013).  By boosting undocumented immigration, the DHS Directive will bolster the business of the cartels and greatly exacerbate the risks and dangers imposed on

App. 048

Plaintiffs by organized crime.  *See Nava-Martinez* Order at 6 (explaining that human trafficking "help[s] fund the illegal drug cartels which are a very real danger for both citizens of this country and Mexico").

64.    The Plaintiff States will be forced to expend substantial resources on law enforcement, healthcare, and education.  Some of these expenditures are required or coerced by federal law.  For instance, the Supreme Court has held that States are constitutionally obligated to provide free education to children of undocumented immigrants.  *Plyler v. Doe,* 457 U.S. 202 (1982).  Similarly, both Medicare and Medicaid require provision of emergency services, regardless of documented immigration status, as a condition of participation.  *See* 42 U.S.C. § 1395dd; 42 C.F.R. § 440.225.

65.    Other expenditures are required by state law.  For example, Texas law requires local governments to provide healthcare for the indigent.  *See* Indigent Health Care and Treatment Act, TEX. HEALTH & SAFETY CODE §§ 61.001 *et seq*.  In FY2014, Texas counties reported over $23 million in indigent health care expenditures.  Texas law also requires nonprofit hospitals to provide unreimbursed care for the indigent as a condition of maintaining their nonprofit status.  *See* TEX. HEALTH & SAFETY CODE § 311.043.

66.    Other costs follow specifically from the extension of deferred action status.  For instance, federal work authorization functions as a precondition for certain professional licenses in the Plaintiff States.  *See, e.g.*, 16 TEX. ADMIN. CODE § 33.10 (requiring applicants for an alcoholic beverage license to be "legally

App. 049

authorized to work in the United States"); 37 TEX. ADMIN. CODE § 35.21 (requiring employees of private security companies to submit application, including a copy of a current work authorization card); TEX. RULES GOVERN. BAR ADM'N, R. II(a)(5)(d) (making individuals who are "authorized to work lawfully in the United States" eligible to apply for admission as licensed attorneys).

67.     Texas and other Plaintiff States also rely on Defendants' evidence of lawful presence for certain benefits under their respective state laws. *See, e.g.*, TEX. LAB. CODE § 207.043(a)(2) (extending unemployment benefits to individuals who were "lawfully present for purposes of performing the services"); TEX. FAM. CODE § 2.005(b)(4) (allowing an "Employment Authorization Card" to be used as proof of identity for the purposes of a marriage license application).

68.     By authorizing a large class of undocumented immigrants to work in the United States, the DHS Directive will expose Texas to the cost of processing and issuing additional licenses and benefits. Moreover, it will cause Texas to issue such licenses and benefits to individuals who are not legally authorized to be in the country (or to take on the burdensome task of attempting to figure out which undocumented immigrants have bona fide deferred action status and which ones benefited from the unlawful DHS Directive).

69.     If the Plaintiff States had the sovereign power to redress these problems, they would. *See Massachusetts v. EPA*, 549 U.S. 497, 519 (2007) (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982)). But the Supreme Court has held that authority over immigration is largely lodged

App. 050

in the federal government.  *See, e.g.*, *Arizona v. United States,* 132 S. Ct. 2492 (2012).  Accordingly, litigation against the federal government is the only way for the States to vindicate their interests and those of their citizens.

## IV.  CLAIMS FOR RELIEF

### COUNT ONE

### Violation Of The Take Care Clause, Art. II, § 3, Cl. 5

70.     The allegations in paragraphs 1-69 are reincorporated herein.

71.     The DHS Directive violates the President's constitutional duty to "take Care that the Laws be faithfully executed."  U.S. CONST. art. II, § 3, cl. 5.

72.     The Supreme Court has made clear that the Take Care Clause is judicially enforceable against presidential invocations of the dispensing power.  *See, e.g.*, *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 612-13 (1838); *Angelus Milling Co. v. Comm'r of Internal Revenue*, 325 U.S. 293, 296 (1945).

73.     The Take Care Clause limits the President's power and ensures that he will faithfully execute Congress's laws — not rewrite them under the guise of executive "discretion."

74.     In this case, the President admitted that he "took an action to change the law."  The Defendants could hardly contend otherwise because a deferred action program with an acceptance rate that rounds to 100% is a de facto entitlement — one that even the President and OLC previously admitted would require a change to the law.

75.     At least for the 4 million people who will benefit from the DHS Directive, Congress has taken several steps to curtail the reunification of

26

undocumented immigrants and their documented family members. The undocumented parent of a U.S. citizen or legal permanent resident generally can stay in the United States only by (i) waiting until their child turns 21, (ii) leaving the country, (iii) waiting 10 more years, and then (iv) obtaining a family-preference visa from a U.S. consulate abroad. *See* 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255. The Defendants cannot faithfully execute the law by directly contravening Congress's objectives.

76. Accordingly, the Defendants' actions violate the Take Care Clause.

## COUNT TWO

### Violation of the APA, 5 U.S.C. § 553

77. The allegations in paragraphs 1-76 are reincorporated herein.

78. The APA requires this Court to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

79. DHS is an "agency" under the APA. 5 U.S.C. § 551(1).

80. The DHS Directive is a "rule" under the APA. 5 U.S.C. § 551(4).

81. With exceptions that are not applicable here, agency rules must go through notice-and-comment rulemaking. 5 U.S.C. § 553.

82. The Defendants promulgated and relied upon the DHS Directive without authority and without notice-and-comment rulemaking. It is therefore unlawful.

## COUNT THREE

### Violation of the APA, 5 U.S.C. § 706

83.     The allegations in paragraphs 1-82 are reincorporated herein.

84.     The APA requires this Court to hold unlawful and set aside any agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

85.     The DHS Directive purports to create legal rights for millions of undocumented immigrants. And it does so by rewriting the immigration laws and contradicting the priorities adopted by Congress. *See, e.g.*, ¶ 75, *supra*.

86.     As such, the DHS Directive violates the aforementioned provisions in 5 U.S.C. § 706, and it is therefore unlawful.

## V. DEMAND FOR JUDGMENT

Plaintiffs respectfully request the following relief from the Court:

A.     A declaratory judgment and injunction that the Defendants' deferred action program violates the Take Care Clause;

B.     A declaratory judgment that the Defendants' deferred action program is procedurally unlawful under the APA;

C.     A declaratory judgment that the Defendants' deferred action program is substantively unlawful under the APA; and

D.     All other relief to which the Plaintiffs may show themselves to be entitled.

App. 053

Respectfully submitted.

LUTHER STRANGE
*Attorney General of Alabama*

SAMUEL S. OLENS
*Attorney General of Georgia*

LAWRENCE G. WASDEN
*Attorney General of Idaho*

JOSEPH C. CHAPELLE
*Counsel for the State of Indiana*

DEREK SCHMIDT
*Attorney General of Kansas*

JAMES D. "BUDDY" CALDWELL
*Attorney General of Louisiana*

TIMOTHY C. FOX
*Attorney General of Montana*

JON C. BRUNING
*Attorney General of Nebraska*

ALAN WILSON
*Attorney General of South Carolina*

MARTY J. JACKLEY
*Attorney General of South Dakota*

SEAN D. REYES
*Attorney General of Utah*

PATRICK MORRISEY
*Attorney General of West Virginia*

J.B. VAN HOLLEN
*Attorney General of Wisconsin*

GREG ABBOTT
*Attorney General of Texas*

DANIEL T. HODGE
*First Assistant Attorney General*

JAMES D. BLACKLOCK
*Deputy Attorney General for Legal Counsel*

ANDREW S. OLDHAM
*Deputy Solicitor General*
    Attorney-in-Charge

Office of the Attorney General of Texas
P.O. Box 78711
Austin, Texas 78711-2548
512-936-1700

*additional counsel on the following page*

App. 054

DREW SNYDER
*Counsel for the Governor of Mississippi*

CARLISLE MCLEAN
*Counsel for the Governor of Maine*

ROBERT C. STEPHENS
*Counsel for the Governor of North
    Carolina*

TOM C. PERRY
CALLY YOUNGER
*Counsel for the Governor of Idaho*

Dated:  December 3, 2014

App. 055

# Exhibits

A

App. 057

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



November 20, 2014

MEMORANDUM FOR:   León Rodríguez
                  Director
                  U.S. Citizenship and Immigration Services

                  Thomas S. Winkowski
                  Acting Director
                  U.S. Immigration and Customs Enforcement

                  R. Gil Kerlikowske
                  Commissioner
                  U.S. Customs and Border Protection

FROM:             Jeh Charles Johnson
                  Secretary

SUBJECT:          **Exercising Prosecutorial Discretion with Respect to
                  Individuals Who Came to the United States as
                  Children and with Respect to Certain Individuals
                  Whose Parents are U.S. Citizens or Permanent
                  Residents**

This memorandum is intended to reflect new policies for the use of deferred action. By memorandum dated June 15, 2012, Secretary Napolitano issued guidance entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.* The following supplements and amends that guidance.

The Department of Homeland Security (DHS) and its immigration components are responsible for enforcing the Nation's immigration laws. Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. Secretary Napolitano noted two years ago, when she issued her prosecutorial discretion guidance regarding children, that "[o]ur Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case."

App. 058

1

Deferred action is a long-standing administrative mechanism dating back decades, by which the Secretary of Homeland Security may defer the removal of an undocumented immigrant for a period of time.[1] A form of administrative relief similar to deferred action, known then as "indefinite voluntary departure," was originally authorized by the Reagan and Bush Administrations to defer the deportations of an estimated 1.5 million undocumented spouses and minor children who did not qualify for legalization under the *Immigration Reform and Control Act* of 1986. Known as the "Family Fairness" program, the policy was specifically implemented to promote the humane enforcement of the law and ensure family unity.

Deferred action is a form of prosecutorial discretion by which the Secretary deprioritizes an individual's case for humanitarian reasons, administrative convenience, or in the interest of the Department's overall enforcement mission. As an act of prosecutorial discretion, deferred action is legally available so long as it is granted on a case-by-case basis, and it may be terminated at any time at the agency's discretion. Deferred action does not confer any form of legal status in this country, much less citizenship; it simply means that, for a specified period of time, an individual is permitted to be lawfully present in the United States. Nor can deferred action itself lead to a green card. Although deferred action is not expressly conferred by statute, the practice is referenced and therefore endorsed by implication in several federal statutes.[2]

Historically, deferred action has been used on behalf of particular individuals, and on a case-by-case basis, for classes of unlawfully present individuals, such as the spouses and minor children of certain legalized immigrants, widows of U.S. citizens, or victims of trafficking and domestic violence.[3] Most recently, beginning in 2012, Secretary Napolitano issued guidance for case-by-case deferred action with respect to those who came to the United States as children, commonly referred to as "DACA."

---

[1] Deferred action, in one form or another, dates back to at least the 1960s. "Deferred action" per se dates back at least as far as 1975. *See,* Immigration and Naturalization Service, Operation Instructions § 103.1(a)(1)(ii) (1975).

[2] INA § 204(a)(1)(D)(i)(II), (IV) *(Violence Against Women Act (VAWA) self-petitioners not in removal proceedings are "eligible for deferred action and employment authorization");* INA § 237(d)(2) *(DHS may grant stay of removal to applicants for T or U visas but that denial of a stay request "shall not preclude the alien from applying for . . . deferred action");* REAL ID Act of 2005 § 202(c)(2)(B)(viii), Pub. L. 109-13 *(requiring states to examine documentary evidence of lawful status for driver's license eligibility purposes, including "approved deferred action status");* National Defense Authorization Act for Fiscal Year 2004 § 1703(c) (d) Pub. L. 108-136 *(spouse, parent or child of certain U.S. citizen who died as a result of honorable service may self-petition for permanent residence and "shall be eligible for deferred action, advance parole, and work authorization").*

[3] In August 2001, the former-Immigration and Naturalization Service issued guidance providing deferred action to individuals who were eligible for the recently created U and T visas. Two years later, USCIS issued subsequent guidance, instructing its officers to use existing mechanisms like deferred action for certain U visa applicants facing potential removal. More recently, in June 2009, USCIS issued a memorandum providing deferred action to certain surviving spouses of deceased U.S. citizens and their children while Congress considered legislation to allow these individuals to qualify for permanent residence status.

App. 059

By this memorandum, I am now expanding certain parameters of DACA and issuing guidance for case-by-case use of deferred action for those adults who have been in this country  since January 1, 2010, are the parents of U.S. citizens or lawful permanent residents, and who are otherwise not enforcement priorities, as set forth in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum.

The reality is that most individuals in the categories set forth below are hard-working people who have become integrated members of American society. Provided they do not commit serious crimes or otherwise become enforcement priorities, these people are extremely unlikely to be deported given this Department's limited enforcement resources—which must continue to be focused on those who represent threats to national security, public safety, and border security.  Case-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities are in this Nation's security and economic interests and make common sense, because they encourage these people to come out of the shadows, submit to background checks, pay fees, apply for work authorization (which by separate authority I may grant), and be counted.

### A.    Expanding DACA

DACA provides that those who were under the age of 31 on June 15, 2012, who entered the United States before June 15, 2007 (5 years prior) as children under the age of 16, and who meet specific educational and public safety criteria, are eligible for deferred action on a case-by-case basis.  The initial DACA announcement of June 15, 2012 provided deferred action for a period of two years.  On June 5, 2014, U.S. Citizenship and Immigration Services (USCIS) announced that DACA recipients could request to renew their deferred action for an additional two years.

In order to further effectuate this program, I hereby direct USCIS to expand DACA as follows:

**Remove the age cap.**  DACA will apply to all otherwise eligible immigrants who entered the United States by the requisite adjusted entry date before the age of sixteen (16), regardless of how old they were in June 2012 or are today.  The current age restriction excludes those who were older than 31 on the date of announcement (*i.e.*, those who were born before June 15, 1981).  That restriction will no longer apply.

**Extend DACA renewal and work authorization to three-years**.  The period for which DACA and the accompanying employment authorization is granted will be extended to three-year increments, rather than the current two-year increments.  This change shall apply to all first-time applications as well as all applications for renewal effective November 24, 2014.  Beginning on that date, USCIS should issue all work

App. 060

authorization documents valid for three years, including to those individuals who have applied and are awaiting two-year work authorization documents based on the renewal of their DACA grants. USCIS should also consider means to extend those two-year renewals already issued to three years.

**Adjust the date-of-entry requirement.** In order to align the DACA program more closely with the other deferred action authorization outlined below, the eligibility cut-off date by which a DACA applicant must have been in the United States should be adjusted from June 15, 2007 to January 1, 2010.

USCIS should begin accepting applications under the new criteria from applicants no later than ninety (90) days from the date of this announcement.

## B.    Expanding Deferred Action

I hereby direct USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals who:

- have, on the date of this memorandum, a son or daughter who is a U.S. citizen or lawful permanent resident;

- have continuously resided in the United States since before January 1, 2010;

- are physically present in the United States on the date of this memorandum, *and* at the time of making a request for consideration of deferred action with USCIS;

- have no lawful status on the date of this memorandum;

- are not an enforcement priority as reflected in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum; and

- present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.

Applicants must file the requisite applications for deferred action pursuant to the new criteria described above. Applicants must also submit biometrics for USCIS to conduct background checks similar to the background check that is required for DACA applicants. Each person who applies for deferred action pursuant to the criteria above shall also be eligible to apply for work authorization for the period of deferred action, pursuant to my authority to grant such authorization reflected in section 274A(h)(3) of

App. 061

the Immigration and Nationality Act.[4] Deferred action granted pursuant to the program shall be for a period of three years. Applicants will pay the work authorization and biometrics fees, which currently amount to $465. There will be no fee waivers and, like DACA, very limited fee exemptions.

USCIS should begin accepting applications from eligible applicants no later than one hundred and eighty (180) days after the date of this announcement. As with DACA, the above criteria are to be considered for all individuals encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or USCIS, whether or not the individual is already in removal proceedings or subject to a final order of removal. Specifically:

- ICE and CBP are instructed to immediately begin identifying persons in their custody, as well as newly encountered individuals, who meet the above criteria and may thus be eligible for deferred action to prevent the further expenditure of enforcement resources with regard to these individuals.

- ICE is further instructed to review pending removal cases, and seek administrative closure or termination of the cases of individuals identified who meet the above criteria, and to refer such individuals to USCIS for case-by-case determinations. ICE should also establish a process to allow individuals in removal proceedings to identify themselves as candidates for deferred action.

- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear. The USCIS process shall also be available to individuals subject to final orders of removal who otherwise meet the above criteria.

Under any of the proposals outlined above, immigration officers will be provided with specific eligibility criteria for deferred action, but the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only an Act of Congress can confer these rights. It remains within the authority of the Executive Branch, however, to set forth policy for the exercise of prosecutorial discretion and deferred action within the framework of existing law. This memorandum is an exercise of that authority.

---

[4] INA § 274A(h)(3), 8 U.S.C. § 1324a(h)(3) ("As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the[Secretary]."); 8 C.F.R. § 274a.12 (regulations establishing classes of aliens eligible for work authorization).

App. 062

B

# The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others

The Department of Homeland Security's proposed policy to prioritize the removal of certain aliens unlawfully present in the United States would be a permissible exercise of DHS's discretion to enforce the immigration laws.

The Department of Homeland Security's proposed deferred action program for parents of U.S. citizens and legal permanent residents would also be a permissible exercise of DHS's discretion to enforce the immigration laws.

The Department of Homeland Security's proposed deferred action program for parents of recipients of deferred action under the Deferred Action for Childhood Arrivals program would not be a permissible exercise of DHS's enforcement discretion.

November 19, 2014

MEMORANDUM OPINION FOR THE SECRETARY OF HOMELAND SECURITY
AND THE COUNSEL TO THE PRESIDENT

You have asked two questions concerning the scope of the Department of Homeland Security's discretion to enforce the immigration laws. First, you have asked whether, in light of the limited resources available to the Department ("DHS") to remove aliens unlawfully present in the United States, it would be legally permissible for the Department to implement a policy prioritizing the removal of certain categories of aliens over others. DHS has explained that although there are approximately 11.3 million undocumented aliens in the country, it has the resources to remove fewer than 400,000 such aliens each year. DHS's proposed policy would prioritize the removal of aliens who present threats to national security, public safety, or border security. Under the proposed policy, DHS officials could remove an alien who did not fall into one of these categories provided that an Immigration and Customs Enforcement ("ICE") Field Office Director determined that "removing such an alien would serve an important federal interest." Draft Memorandum for Thomas S. Winkowski, Acting Director, ICE, et al., from Jeh Charles Johnson, Secretary of Homeland Security, *Re: Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants* at 5 (Nov. 17, 2014) ("Johnson Prioritization Memorandum").

Second, you have asked whether it would be permissible for DHS to extend deferred action, a form of temporary administrative relief from removal, to certain aliens who are the parents of children who are present in the United States. Specifically, DHS has proposed to implement a program under which an alien could apply for, and would be eligible to receive, deferred action if he or she is not a DHS removal priority under the policy described above; has continuously resided in the United States since before January 1, 2010; has a child who is either a U.S. citizen or a lawful permanent resident; is physically present in the United

App. 064

1

*Opinions of the Office of Legal Counsel in Volume 38*

States both when DHS announces its program and at the time of application for deferred action; and presents "no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." Draft Memorandum for Leon Rodriguez, Director, U.S. Citizenship and Immigration Services, et al., from Jeh Charles Johnson, Secretary of Homeland Security, *Re: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and Others* at 4 (Nov. 17, 2014) ("Johnson Deferred Action Memorandum"). You have also asked whether DHS could implement a similar program for parents of individuals who have received deferred action under the Deferred Action for Childhood Arrivals ("DACA") program.

As has historically been true of deferred action, these proposed deferred action programs would not "legalize" any aliens who are unlawfully present in the United States: Deferred action does not confer any lawful immigration status, nor does it provide a path to obtaining permanent residence or citizenship. Grants of deferred action under the proposed programs would, rather, represent DHS's decision not to seek an alien's removal for a prescribed period of time. *See generally Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 483–84 (1999) (describing deferred action). Under decades-old regulations promulgated pursuant to authority delegated by Congress, *see* 8 U.S.C. §§ 1103(a)(3), 1324a(h)(3), aliens who are granted deferred action—like certain other categories of aliens who do not have lawful immigration status, such as asylum applicants—may apply for authorization to work in the United States in certain circumstances, 8 C.F.R. § 274a.12(c)(14) (providing that deferred action recipients may apply for work authorization if they can show an "economic necessity for employment"); *see also* 8 C.F.R. § 109.1(b)(7) (1982). Under DHS policy guidance, a grant of deferred action also suspends an alien's accrual of unlawful presence for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I), provisions that restrict the admission of aliens who have departed the United States after having been unlawfully present for specified periods of time. A grant of deferred action under the proposed programs would remain in effect for three years, subject to renewal, and could be terminated at any time at DHS's discretion. *See* Johnson Deferred Action Memorandum at 2, 5.

For the reasons discussed below, we conclude that DHS's proposed prioritization policy and its proposed deferred action program for parents of U.S. citizens and lawful permanent residents would be permissible exercises of DHS's discretion to enforce the immigration laws. We further conclude that, as it has been described to us, the proposed deferred action program for parents of DACA recipients would not be a permissible exercise of enforcement discretion.

## I.

We first address DHS's authority to prioritize the removal of certain categories of aliens over others. We begin by discussing some of the sources and limits of

App. 065

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

DHS's enforcement discretion under the immigration laws, and then analyze DHS's proposed prioritization policy in light of these considerations.

## A.

DHS's authority to remove aliens from the United States rests on the Immigration and Nationality Act of 1952 ("INA"), as amended, 8 U.S.C. §§ 1101 *et seq.* In the INA, Congress established a comprehensive scheme governing immigration and naturalization. The INA specifies certain categories of aliens who are inadmissible to the United States. *See* 8 U.S.C. § 1182. It also specifies "which aliens may be removed from the United States and the procedures for doing so." *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012). "Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Id.* (citing 8 U.S.C. § 1227); *see* 8 U.S.C. § 1227(a) (providing that "[a]ny alien . . . in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien" falls within one or more classes of deportable aliens); *see also* 8 U.S.C. § 1182(a) (listing classes of aliens ineligible to receive visas or be admitted to the United States). Removal proceedings ordinarily take place in federal immigration courts administered by the Executive Office for Immigration Review, a component of the Department of Justice. *See id.* § 1229a (governing removal proceedings); *see also id.* §§ 1225(b)(1)(A), 1228(b) (setting out expedited removal procedures for certain arriving aliens and certain aliens convicted of aggravated felonies).

Before 2003, the Department of Justice, through the Immigration and Naturalization Service ("INS"), was also responsible for providing immigration-related administrative services and generally enforcing the immigration laws. In the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, Congress transferred most of these functions to DHS, giving it primary responsibility both for initiating removal proceedings and for carrying out final orders of removal. *See* 6 U.S.C. §§ 101 *et seq.*; *see also Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005) (noting that the immigration authorities previously exercised by the Attorney General and INS "now reside" in the Secretary of Homeland Security and DHS). The Act divided INS's functions among three different agencies within DHS: U.S. Citizenship and Immigration Services ("USCIS"), which oversees legal immigration into the United States and provides immigration and naturalization services to aliens; ICE, which enforces federal laws governing customs, trade, and immigration; and U.S. Customs and Border Protection ("CBP"), which monitors and secures the nation's borders and ports of entry. *See* Pub. L. No. 107-296, §§ 403, 442, 451, 471, 116 Stat. 2135, 2178, 2193, 2195, 2205; *see also Name Change From the Bureau of Citizenship and Immigration Services to U.S. Citizenship and Immigration Services*, 69 Fed. Reg. 60938, 60938 (Oct. 13, 2004); *Name Change of Two DHS Components*, 75 Fed. Reg. 12445, 12445 (Mar. 16, 2010). The Secretary of Homeland Security is thus now "charged with the administration and

App. 066

*Opinions of the Office of Legal Counsel in Volume 38*

enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1).

As a general rule, when Congress vests enforcement authority in an executive agency, that agency has the discretion to decide whether a particular violation of the law warrants prosecution or other enforcement action. This discretion is rooted in the President's constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and it reflects a recognition that the "faithful[]" execution of the law does not necessarily entail "act[ing] against each technical violation of the statute" that an agency is charged with enforcing. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Rather, as the Supreme Court explained in *Chaney*, the decision whether to initiate enforcement proceedings is a complex judgment that calls on the agency to "balanc[e] . . . a number of factors which are peculiarly within its expertise." *Id.* These factors include "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and . . . whether the agency has enough resources to undertake the action at all." *Id.* at 831; *cf. United States v. Armstrong*, 517 U.S. 456, 465 (1996) (recognizing that exercises of prosecutorial discretion in criminal cases involve consideration of "'[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan'" (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985))). In *Chaney*, the Court considered and rejected a challenge to the Food and Drug Administration's refusal to initiate enforcement proceedings with respect to alleged violations of the Federal Food, Drug, and Cosmetic Act, concluding that an agency's decision not to initiate enforcement proceedings is presumptively immune from judicial review. *See* 470 U.S. at 832. The Court explained that, while Congress may "provide[] guidelines for the agency to follow in exercising its enforcement powers," in the absence of such "legislative direction," an agency's non-enforcement determination is, much like a prosecutor's decision not to indict, a "special province of the Executive." *Id.* at 832–33.

The principles of enforcement discretion discussed in *Chaney* apply with particular force in the context of immigration. Congress enacted the INA against a background understanding that immigration is "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (internal quotation marks omitted). Consistent with this understanding, the INA vested the Attorney General (now the Secretary of Homeland Security) with broad authority to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority" under the statute. 8 U.S.C. § 1103(a)(3). Years later, when Congress created the Department of Homeland Security, it expressly charged DHS with responsibility for "[e]stablishing national immigration enforcement policies and

4

App. 067

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

priorities." Homeland Security Act of 2002, Pub. L. No. 107-296, § 402(5), 116 Stat. 2135, 2178 (codified at 6 U.S.C. § 202(5)).

With respect to removal decisions in particular, the Supreme Court has recognized that "the broad discretion exercised by immigration officials" is a "principal feature of the removal system" under the INA. *Arizona*, 132 S. Ct. at 2499. The INA expressly authorizes immigration officials to grant certain forms of discretionary relief from removal for aliens, including parole, 8 U.S.C. § 1182(d)(5)(A); asylum, *id.* § 1158(b)(1)(A); and cancellation of removal, *id.* § 1229b. But in addition to administering these statutory forms of relief, "[f]ederal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." *Arizona*, 132 S. Ct. at 2499. And, as the Court has explained, "[a]t each stage" of the removal process—"commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders"—immigration officials have "discretion to abandon the endeavor." *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 483 (quoting 8 U.S.C. § 1252(g) (alterations in original)). Deciding whether to pursue removal at each of these stages implicates a wide range of considerations. As the Court observed in *Arizona*:

> Discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service. Some discretionary decisions involve policy choices that bear on this Nation's international relations. . . . The foreign state may be mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return. The dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities.

132 S. Ct. at 2499.

Immigration officials' discretion in enforcing the laws is not, however, unlimited. Limits on enforcement discretion are both implicit in, and fundamental to, the Constitution's allocation of governmental powers between the two political branches. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952). These limits, however, are not clearly defined. The open-ended nature of the inquiry under the Take Care Clause—whether a particular exercise of discretion is "faithful[]" to the law enacted by Congress—does not lend itself easily to the application of set formulas or bright-line rules. And because the exercise of enforcement discretion generally is not subject to judicial review, *see*

App. 068

*Chaney*, 470 U.S. at 831–33, neither the Supreme Court nor the lower federal courts have squarely addressed its constitutional bounds. Rather, the political branches have addressed the proper allocation of enforcement authority through the political process. As the Court noted in *Chaney*, Congress "may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Id.* at 833. The history of immigration policy illustrates this principle: Since the INA was enacted, the Executive Branch has on numerous occasions exercised discretion to extend various forms of immigration relief to categories of aliens for humanitarian, foreign policy, and other reasons. When Congress has been dissatisfied with Executive action, it has responded, as *Chaney* suggests, by enacting legislation to limit the Executive's discretion in enforcing the immigration laws.[1]

Nonetheless, the nature of the Take Care duty does point to at least four general (and closely related) principles governing the permissible scope of enforcement discretion that we believe are particularly relevant here. First, enforcement decisions should reflect "factors which are peculiarly within [the enforcing agency's] expertise." *Chaney*, 470 U.S. at 831. Those factors may include considerations related to agency resources, such as "whether the agency has enough resources to undertake the action," or "whether agency resources are best spent on this violation or another." *Id.* Other relevant considerations may include "the proper ordering of [the agency's] priorities," *id.* at 832, and the agency's assessment of "whether the particular enforcement action [at issue] best fits the agency's overall policies," *id.* at 831.

Second, the Executive cannot, under the guise of exercising enforcement discretion, attempt to effectively rewrite the laws to match its policy preferences. *See id.* at 833 (an agency may not "disregard legislative direction in the statutory scheme that [it] administers"). In other words, an agency's enforcement decisions should be consonant with, rather than contrary to, the congressional policy underlying the statutes the agency is charged with administering. *Cf. Youngstown*, 343 U.S. at 637 (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb."); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (explaining that where Congress has given an agency the power to administer a statutory scheme, a court will not vacate the agency's decision about the proper administration of the statute unless, among other things, the agency "'has relied on factors which Congress had not intended it to consider'" (quoting

---

[1] *See, e.g.*, Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law*, 119 Yale L.J. 458, 503–05 (2009) (describing Congress's response to its dissatisfaction with the Executive's use of parole power for refugee populations in the 1960s and 1970s); *see also, e.g., infra* note 5 (discussing legislative limitations on voluntary departure and extended voluntary departure).

App. 069

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))).

Third, the Executive Branch ordinarily cannot, as the Court put it in *Chaney*, "'consciously and expressly adopt[] a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. at 833 n.4 (quoting *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc)); *see id.* (noting that in situations where an agency had adopted such an extreme policy, "the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion'"). Abdication of the duties assigned to the agency by statute is ordinarily incompatible with the constitutional obligation to faithfully execute the laws. *But see, e.g., Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 200 (1994) (noting that under the Take Care Clause, "the President is required to act in accordance with the laws—including the Constitution, which takes precedence over other forms of law").

Finally, lower courts, following *Chaney*, have indicated that non-enforcement decisions are most comfortably characterized as judicially unreviewable exercises of enforcement discretion when they are made on a case-by-case basis. *See, e.g., Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996); *Crowley Caribbean Transp., Inc. v. Peña*, 37 F.3d 671, 676–77 (D.C. Cir. 1994). That reading of *Chaney* reflects a conclusion that case-by-case enforcement decisions generally avoid the concerns mentioned above. Courts have noted that "single-shot non-enforcement decisions" almost inevitably rest on "the sort of mingled assessments of fact, policy, and law . . . that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion." *Crowley Caribbean Transp.*, 37 F.3d at 676–77 (emphasis omitted). Individual enforcement decisions made on the basis of case-specific factors are also unlikely to constitute "general polic[ies] that [are] so extreme as to amount to an abdication of [the agency's] statutory responsibilities." *Id.* at 677 (quoting *Chaney*, 477 U.S. at 833 n.4). That does not mean that all "general policies" respecting non-enforcement are categorically forbidden: Some "general policies" may, for example, merely provide a framework for making individualized, discretionary assessments about whether to initiate enforcement actions in particular cases. *Cf. Reno v. Flores*, 507 U.S. 292, 313 (1993) (explaining that an agency's use of "reasonable presumptions and generic rules" is not incompatible with a requirement to make individualized determinations). But a general policy of non-enforcement that forecloses the exercise of case-by-case discretion poses "special risks" that the agency has exceeded the bounds of its enforcement discretion. *Crowley Caribbean Transp.*, 37 F.3d at 677.

## B.

We now turn, against this backdrop, to DHS's proposed prioritization policy. In their exercise of enforcement discretion, DHS and its predecessor, INS, have long

7

App. 070

employed guidance instructing immigration officers to prioritize the enforcement of the immigration laws against certain categories of aliens and to deprioritize their enforcement against others. *See, e.g.*, INS Operating Instructions § 103(a)(1)(i) (1962); Memorandum for All Field Office Directors, ICE, et al., from John Morton, Director, ICE, *Re: Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* (June 17, 2011); Memorandum for All ICE Employees, from John Morton, Director, ICE, *Re: Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (Mar. 2, 2011); Memorandum for Regional Directors, INS, et al., from Doris Meissner, Commissioner, INS, *Re: Exercising Prosecutorial Discretion* (Nov. 17, 2000). The policy DHS proposes, which is similar to but would supersede earlier policy guidance, is designed to "provide clearer and more effective guidance in the pursuit" of DHS's enforcement priorities; namely, "threats to national security, public safety and border security." Johnson Prioritization Memorandum at 1.

Under the proposed policy, DHS would identify three categories of undocumented aliens who would be priorities for removal from the United States. *See generally id.* at 3–5. The highest priority category would include aliens who pose particularly serious threats to national security, border security, or public safety, including aliens engaged in or suspected of espionage or terrorism, aliens convicted of offenses related to participation in criminal street gangs, aliens convicted of certain felony offenses, and aliens apprehended at the border while attempting to enter the United States unlawfully. *See id.* at 3. The second-highest priority would include aliens convicted of multiple or significant misdemeanor offenses; aliens who are apprehended after unlawfully entering the United States who cannot establish that they have been continuously present in the United States since January 1, 2014; and aliens determined to have significantly abused the visa or visa waiver programs. *See id.* at 3–4. The third priority category would include other aliens who have been issued a final order of removal on or after January 1, 2014. *See id.* at 4. The policy would also provide that none of these aliens should be prioritized for removal if they "qualify for asylum or another form of relief under our laws." *Id.* at 3–5.

The policy would instruct that resources should be directed to these priority categories in a manner "commensurate with the level of prioritization identified." *Id.* at 5. It would, however, also leave significant room for immigration officials to evaluate the circumstances of individual cases. *See id.* (stating that the policy "requires DHS personnel to exercise discretion based on individual circumstances"). For example, the policy would permit an ICE Field Office Director, CBP Sector Chief, or CBP Director of Field Operations to deprioritize the removal of an alien falling in the highest priority category if, in her judgment, "there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority." *Id.* at 3. Similar discretionary provisions would apply to

App. 071

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

aliens in the second and third priority categories.[2] The policy would also provide a non-exhaustive list of factors DHS personnel should consider in making such deprioritization judgments.[3] In addition, the policy would expressly state that its terms should not be construed "to prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities," and would further provide that "[i]mmigration officers and attorneys may pursue removal of an alien not identified as a priority" if, "in the judgment of an ICE Field Office Director, removing such an alien would serve an important federal interest." *Id.* at 5.

DHS has explained that the proposed policy is designed to respond to the practical reality that the number of aliens who are removable under the INA vastly exceeds the resources Congress has made available to DHS for processing and carrying out removals. The resource constraints are striking. As noted, DHS has informed us that there are approximately 11.3 million undocumented aliens in the country, but that Congress has appropriated sufficient resources for ICE to remove fewer than 400,000 aliens each year, a significant percentage of whom are typically encountered at or near the border rather than in the interior of the country. *See* E-mail for Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from David Shahoulian, Deputy General Counsel, DHS, *Re: Immigration Opinion* (Nov. 19, 2014) ("Shahoulian E-mail"). The proposed policy explains that, because DHS "cannot respond to all immigration violations or remove all persons illegally in the United States," it seeks to "prioritize the use of enforcement personnel, detention space, and removal assets" to "ensure that use of its limited resources is devoted to the pursuit of" DHS's highest priorities. Johnson Prioritization Memorandum at 2.

In our view, DHS's proposed prioritization policy falls within the scope of its lawful discretion to enforce the immigration laws. To begin with, the policy is based on a factor clearly "within [DHS's] expertise." *Chaney*, 470 U.S. at 831. Faced with sharply limited resources, DHS necessarily must make choices about which removals to pursue and which removals to defer. DHS's organic statute itself recognizes this inevitable fact, instructing the Secretary to establish "national

---

[2] Under the proposed policy, aliens in the second tier could be deprioritized if, "in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or USCIS Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety, and should not therefore be an enforcement priority." Johnson Prioritization Memorandum at 4. Aliens in the third tier could be deprioritized if, "in the judgment of an immigration officer, the alien is not a threat to the integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority." *Id.* at 5.

[3] These factors include "extenuating circumstances involving the offense of conviction; extended length of time since the offense of conviction; length of time in the United States; military service; family or community ties in the United States; status as a victim, witness or plaintiff in civil or criminal proceedings; or compelling humanitarian factors such as poor health, age, pregnancy, a young child or a seriously ill relative." Johnson Prioritization Memorandum at 6.

App. 072

immigration enforcement policies and priorities." 6 U.S.C. § 202(5). And an agency's need to ensure that scarce enforcement resources are used in an effective manner is a quintessential basis for the use of prosecutorial discretion. *See Chaney*, 470 U.S. at 831 (among the factors "peculiarly within [an agency's] expertise" are "whether agency resources are best spent on this violation or another" and "whether the agency has enough resources to undertake the action at all").

The policy DHS has proposed, moreover, is consistent with the removal priorities established by Congress. In appropriating funds for DHS's enforcement activities—which, as noted, are sufficient to permit the removal of only a fraction of the undocumented aliens currently in the country—Congress has directed DHS to "prioritize the identification and removal of aliens convicted of a crime by the severity of that crime." Department of Homeland Security Appropriations Act, 2014, Pub. L. No. 113-76, div. F, tit. II, 128 Stat. 5, 251 ("DHS Appropriations Act"). Consistent with this directive, the proposed policy prioritizes individuals convicted of criminal offenses involving active participation in a criminal street gang, most offenses classified as felonies in the convicting jurisdiction, offenses classified as "aggravated felonies" under the INA, and certain misdemeanor offenses. Johnson Prioritization Memorandum at 3–4. The policy ranks these priority categories according to the severity of the crime of conviction. The policy also prioritizes the removal of other categories of aliens who pose threats to national security or border security, matters about which Congress has demonstrated particular concern. *See, e.g.*, 8 U.S.C. § 1226(c)(1)(D) (providing for detention of aliens charged with removability on national security grounds); *id.* § 1225(b) & (c) (providing for an expedited removal process for certain aliens apprehended at the border). The policy thus raises no concern that DHS has relied "on factors which Congress had not intended it to consider." *Nat'l Ass'n of Home Builders*, 551 U.S. at 658.

Further, although the proposed policy is not a "single-shot non-enforcement decision," neither does it amount to an abdication of DHS's statutory responsibilities, or constitute a legislative rule overriding the commands of the substantive statute. *Crowley Caribbean Transp.*, 37 F.3d at 676–77. The proposed policy provides a general framework for exercising enforcement discretion in individual cases, rather than establishing an absolute, inflexible policy of not enforcing the immigration laws in certain categories of cases. Given that the resources Congress has allocated to DHS are sufficient to remove only a small fraction of the total population of undocumented aliens in the United States, setting forth written guidance about how resources should presumptively be allocated in particular cases is a reasonable means of ensuring that DHS's severely limited resources are systematically directed to its highest priorities across a large and diverse agency, as well as ensuring consistency in the administration of the removal system. The proposed policy's identification of categories of aliens who constitute removal

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

priorities is also consistent with the categorical nature of Congress's instruction to prioritize the removal of criminal aliens in the DHS Appropriations Act.

And, significantly, the proposed policy does not identify any category of removable aliens whose removal may not be pursued under any circumstances. Although the proposed policy limits the discretion of immigration officials to expend resources to remove non-priority aliens, it does not eliminate that discretion entirely. It directs immigration officials to use their resources to remove aliens in a manner "commensurate with the level of prioritization identified," but (as noted above) it does not "prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities." Johnson Prioritization Memorandum at 5. Instead, it authorizes the removal of even non-priority aliens if, in the judgment of an ICE Field Office Director, "removing such an alien would serve an important federal interest," a standard the policy leaves open-ended. *Id.* Accordingly, the policy provides for case-by-case determinations about whether an individual alien's circumstances warrant the expenditure of removal resources, employing a broad standard that leaves ample room for the exercise of individualized discretion by responsible officials. For these reasons, the proposed policy avoids the difficulties that might be raised by a more inflexible prioritization policy and dispels any concern that DHS has either undertaken to rewrite the immigration laws or abdicated its statutory responsibilities with respect to non-priority aliens.[4]

## II.

We turn next to the permissibility of DHS's proposed deferred action programs for certain aliens who are parents of U.S. citizens, lawful permanent residents ("LPRs"), or DACA recipients, and who are not removal priorities under the proposed policy discussed above. We begin by discussing the history and current practice of deferred action. We then discuss the legal authorities on which deferred

---

[4] In *Crane v. Napolitano*, a district court recently concluded in a non-precedential opinion that the INA "mandates the initiation of removal proceedings whenever an immigration officer encounters an illegal alien who is not 'clearly and beyond a doubt entitled to be admitted.'" Opinion and Order Respecting Pl. App. for Prelim. Inj. Relief, No. 3:12-cv-03247-O, 2013 WL 1744422, at *5 (N.D. Tex. Apr. 23) (quoting 8 U.S.C. § 1225(b)(2)(A)). The court later dismissed the case for lack of jurisdiction. *See Crane v. Napolitano*, No. 3:12-cv-03247-O, 2013 WL 8211660, at *4 (N.D. Tex. July 31). Although the opinion lacks precedential value, we have nevertheless considered whether, as it suggests, the text of the INA categorically forecloses the exercise of enforcement discretion with respect to aliens who have not been formally admitted. The district court's conclusion is, in our view, inconsistent with the Supreme Court's reading of the INA as permitting immigration officials to exercise enforcement discretion at any stage of the removal process, including when deciding whether to initiate removal proceedings against a particular alien. *See Arizona*, 132 S. Ct. at 2499; *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 483–84. It is also difficult to square with authority holding that the presence of mandatory language in a statute, standing alone, does not necessarily limit the Executive Branch's enforcement discretion, *see, e.g.*, *Chaney*, 470 U.S. at 835; *Inmates of Attica Corr. Facility v. Rockefeller*, 477 F.2d 375, 381 (2d Cir. 1973).

App. 074

*Opinions of the Office of Legal Counsel in Volume 38*

action relies and identify legal principles against which the proposed use of deferred action can be evaluated. Finally, we turn to an analysis of the proposed deferred action programs themselves, beginning with the program for parents of U.S. citizens and LPRs, and concluding with the program for parents of DACA recipients.

### A.

In immigration law, the term "deferred action" refers to an exercise of administrative discretion in which immigration officials temporarily defer the removal of an alien unlawfully present in the United States. *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484 (citing 6 Charles Gordon et al., *Immigration Law and Procedure* § 72.03[2][h] (1998)); *see* USCIS, *Standard Operating Procedures for Handling Deferred Action Requests at USCIS Field Offices* at 3 (2012) ("USCIS SOP"); INS Operating Instructions § 103.1(a)(1)(ii) (1977). It is one of a number of forms of discretionary relief—in addition to such statutory and non-statutory measures as parole, temporary protected status, deferred enforced departure, and extended voluntary departure—that immigration officials have used over the years to temporarily prevent the removal of undocumented aliens.[5]

---

[5] Parole is available to aliens by statute "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Among other things, parole gives aliens the ability to adjust their status without leaving the United States if they are otherwise eligible for adjustment of status, *see id.* § 1255(a), and may eventually qualify them for Federal means-tested benefits, *see id.* §§ 1613, 1641(b)(4). Temporary protected status is available to nationals of designated foreign states affected by armed conflicts, environmental disasters, and other extraordinary conditions. *Id.* § 1254a. Deferred enforced departure, which "has no statutory basis" but rather is an exercise of "the President's constitutional powers to conduct foreign relations," may be granted to nationals of appropriate foreign states. USCIS, Adjudicator's Field Manual § 38.2(a) (2014). Extended voluntary departure was a remedy derived from the voluntary departure statute, which, before its amendment in 1996, permitted the Attorney General to make a finding of removability if an alien agreed to voluntarily depart the United States, without imposing a time limit for the alien's departure. *See* 8 U.S.C. §§ 1252(b), 1254(e) (1988 & Supp. II 1990); *cf.* 8 U.S.C. § 1229c (current provision of the INA providing authority to grant voluntary departure, but limiting such grants to 120 days). Some commentators, however, suggested that extended voluntary departure was in fact a form of "discretionary relief formulated administratively under the Attorney General's general authority for enforcing immigration law." Sharon Stephan, Cong. Research Serv., 85-599 EPW, *Extended Voluntary Departure and Other Grants of Blanket Relief from Deportation* at 1 (Feb. 23, 1985). It appears that extended voluntary departure is no longer used following enactment of the Immigration Act of 1990, which established the temporary protected status program. *See U.S. Citizenship and Immigration Services Fee Schedule*, 75 Fed. Reg. 33446, 33457 (June 11, 2010) (proposed rule) (noting that "since 1990 neither the Attorney General nor the Secretary have designated a class of aliens for nationality-based 'extended voluntary departure,' and there no longer are aliens in the United States benefiting from such a designation," but noting that deferred enforced departure is still used); H.R. Rep. No. 102-123, at 2 (1991) (indicating that in establishing temporary protected status, Congress was "codif[ying] and supersed[ing]" extended voluntary departure). *See generally* Andorra Bruno et al., Cong. Research Serv., *Analysis of June 15, 2012 DHS Memorandum*, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children at 5–10 (July 13, 2012) ("CRS Immigration Report").

App. 075

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

The practice of granting deferred action dates back several decades. For many years after the INA was enacted, INS exercised prosecutorial discretion to grant "non-priority" status to removable aliens who presented "appealing humanitarian factors." Letter for Leon Wildes, from E. A. Loughran, Associate Commissioner, INS at 2 (July 16, 1973) (defining a "non-priority case" as "one in which the Service in the exercise of discretion determines that adverse action would be unconscionable because of appealing humanitarian factors"); *see* INS Operating Instructions § 103.1(a)(1)(ii) (1962). This form of administrative discretion was later termed "deferred action." *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484; *see* INS Operating Instructions § 103.1(a)(1)(ii) (1977) (instructing immigration officers to recommend deferred action whenever "adverse action would be unconscionable because of the existence of appealing humanitarian factors").

Although the practice of granting deferred action "developed without express statutory authorization," it has become a regular feature of the immigration removal system that has been acknowledged by both Congress and the Supreme Court. *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484 (internal quotation marks omitted); *see id.* at 485 (noting that a congressional enactment limiting judicial review of decisions "to commence proceedings, adjudicate cases, or execute removal orders against any alien under [the INA]" in 8 U.S.C. § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations"); *see also, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"). Deferred action "does not confer any immigration status"—i.e., it does not establish any enforceable legal right to remain in the United States—and it may be revoked by immigration authorities at their discretion. USCIS SOP at 3, 7. Assuming it is not revoked, however, it represents DHS's decision not to seek the alien's removal for a specified period of time.

Under longstanding regulations and policy guidance promulgated pursuant to statutory authority in the INA, deferred action recipients may receive two additional benefits. First, relying on DHS's statutory authority to authorize certain aliens to work in the United States, DHS regulations permit recipients of deferred action to apply for work authorization if they can demonstrate an "economic necessity for employment." 8 C.F.R. § 274a.12(c)(14); *see* 8 U.S.C. § 1324a(h)(3) (defining an "unauthorized alien" not entitled to work in the United States as an alien who is neither an LPR nor "authorized to be . . . employed by [the INA] or by the Attorney General [now the Secretary of Homeland Security]"). Second, DHS has promulgated regulations and issued policy guidance providing that aliens who receive deferred action will temporarily cease accruing "unlawful presence" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I). 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); Memorandum for Field Leadership, from Donald Neufeld, Acting Associate Director, Domestic Operations Directorate, USCIS, *Re: Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act* at 42

App. 076

(May 6, 2009) ("USCIS Consolidation of Guidance") (noting that "[a]ccrual of unlawful presence stops on the date an alien is granted deferred action"); *see* 8 U.S.C. § 1182(a)(9)(B)(ii) (providing that an alien is "unlawfully present" if, among other things, he "is present in the United States after the expiration of the period of stay authorized by the Attorney General").[6]

Immigration officials today continue to grant deferred action in individual cases for humanitarian and other purposes, a practice we will refer to as "ad hoc deferred action." Recent USCIS guidance provides that personnel may recommend ad hoc deferred action if they "encounter cases during [their] normal course of business that they feel warrant deferred action." USCIS SOP at 4. An alien may also apply for ad hoc deferred action by submitting a signed, written request to USCIS containing "[a]n explanation as to why he or she is seeking deferred action" along with supporting documentation, proof of identity, and other records. *Id.* at 3.

For decades, INS and later DHS have also implemented broader programs that make discretionary relief from removal available for particular classes of aliens. In many instances, these agencies have made such broad-based relief available through the use of parole, temporary protected status, deferred enforced departure, or extended voluntary departure. For example, from 1956 to 1972, INS implemented an extended voluntary departure program for physically present aliens who were beneficiaries of approved visa petitions—known as "Third Preference" visa petitions—relating to a specific class of visas for Eastern Hemisphere natives. *See United States ex rel. Parco v. Morris*, 426 F. Supp. 976, 979–80 (E.D. Pa. 1977). Similarly, for several years beginning in 1978, INS granted extended voluntary departure to nurses who were eligible for H-1 visas. *Voluntary Departure for Out-of-Status Nonimmigrant H-1 Nurses*, 43 Fed. Reg. 2776, 2776 (Jan. 19, 1978). In addition, in more than two dozen instances dating to 1956, INS and later DHS granted parole, temporary protected status, deferred enforced departure, or extended voluntary departure to large numbers of nationals of designated foreign states. *See, e.g.*, CRS Immigration Report at 20–23; Cong. Research Serv., ED206779, *Review of U.S. Refugee Resettlement Programs and Policies* at 9, 12–14 (1980). And in 1990, INS implemented a "Family Fairness" program that authorized granting extended voluntary departure and work authorization to the estimated 1.5 million spouses and children of aliens who had been granted legal status under the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 ("IRCA"). *See* Memorandum for Regional Commissioners,

---

[6] Section 1182(a)(9)(B)(i) imposes three- and ten-year bars on the admission of aliens (other than aliens admitted to permanent residence) who departed or were removed from the United States after periods of unlawful presence of between 180 days and one year, or one year or more. Section 1182(a)(9)(C)(i)(I) imposes an indefinite bar on the admission of any alien who, without being admitted, enters or attempts to reenter the United States after previously having been unlawfully present in the United States for an aggregate period of more than one year.

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

INS, from Gene McNary, Commissioner, INS, *Re: Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990) ("Family Fairness Memorandum"); *see also* CRS Immigration Report at 10.

On at least five occasions since the late 1990s, INS and later DHS have also made discretionary relief available to certain classes of aliens through the use of deferred action:

*1. Deferred Action for Battered Aliens Under the Violence Against Women Act.* INS established a class-based deferred action program in 1997 for the benefit of self-petitioners under the Violence Against Women Act of 1994 ("VAWA"), Pub. L. No. 103-322, tit. IV, 108 Stat. 1796, 1902. VAWA authorized certain aliens who have been abused by U.S. citizen or LPR spouses or parents to self-petition for lawful immigration status, without having to rely on their abusive family members to petition on their behalf. *Id.* § 40701(a) (codified as amended at 8 U.S.C. § 1154(a)(1)(A)(iii)–(iv), (vii)). The INS program required immigration officers who approved a VAWA self-petition to assess, "on a case-by-case basis, whether to place the alien in deferred action status" while the alien waited for a visa to become available. Memorandum for Regional Directors et al., INS, from Paul W. Virtue, Acting Executive Associate Commissioner, INS, *Re: Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* at 3 (May 6, 1997). INS noted that "[b]y their nature, VAWA cases generally possess factors that warrant consideration for deferred action." *Id.* But because "[i]n an unusual case, there may be factors present that would militate against deferred action," the agency instructed officers that requests for deferred action should still "receive individual scrutiny." *Id.* In 2000, INS reported to Congress that, because of this program, no approved VAWA self-petitioner had been removed from the country. *See Battered Women Immigrant Protection Act: Hearings on H.R. 3083 Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary*, 106th Cong. at 43 (July 20, 2000) ("H.R. 3083 Hearings").

*2. Deferred Action for T and U Visa Applicants.* Several years later, INS instituted a similar deferred action program for applicants for nonimmigrant status or visas made available under the Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA"), Pub. L. No. 106-386, 114 Stat. 1464. That Act created two new nonimmigrant classifications: a "T visa" available to victims of human trafficking and their family members, and a "U visa" for victims of certain other crimes and their family members. *Id.* §§ 107(e), 1513(b)(3) (codified at 8 U.S.C. § 1101(a)(15)(T)(i), (U)(i)). In 2001, INS issued a memorandum directing immigration officers to locate "possible victims in the above categories," and to use "[e]xisting authority and mechanisms such as parole, deferred action, and stays of removal" to prevent those victims' removal "until they have had the opportunity to avail themselves of the provisions of the VTVPA." Memorandum

App. 078

*Opinions of the Office of Legal Counsel in Volume 38*

for Michael A. Pearson, Executive Associate Commissioner, INS, from Michael D. Cronin, Acting Executive Associate Commissioner, INS, *Re: Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2—"T" and "U" Nonimmigrant Visas* at 2 (Aug. 30, 2001). In subsequent memoranda, INS instructed officers to make "deferred action assessment[s]" for "all [T visa] applicants whose applications have been determined to be bona fide," Memorandum for Johnny N. Williams, Executive Associate Commissioner, INS, from Stuart Anderson, Executive Associate Commissioner, INS, *Re: Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status* at 1 (May 8, 2002), as well as for all U visa applicants "determined to have submitted *prima facie* evidence of [their] eligibility," Memorandum for the Director, Vermont Service Center, INS, from William R. Yates, USCIS, *Re: Centralization of Interim Relief for U Nonimmigrant Status Applicants* at 5 (Oct. 8, 2003). In 2002 and 2007, INS and DHS promulgated regulations embodying these policies. *See* 8 C.F.R. § 214.11(k)(1), (k)(4), (m)(2) (promulgated by *New Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status*, 67 Fed. Reg. 4784, 4800–01 (Jan. 31, 2002)) (providing that any T visa applicant who presents "*prima facie* evidence" of his eligibility should have his removal "automatically stay[ed]" and that applicants placed on a waiting list for visas "shall maintain [their] current means to prevent removal (deferred action, parole, or stay of removal)"); *id.* § 214.14(d)(2) (promulgated by *New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status*, 72 Fed. Reg. 53014, 53039 (Sept. 17, 2007)) ("USCIS will grant deferred action or parole to U-1 petitioners and qualifying family members while the U-1 petitioners are on the waiting list" for visas.).

*3. Deferred Action for Foreign Students Affected by Hurricane Katrina.* As a consequence of the devastation caused by Hurricane Katrina in 2005, several thousand foreign students became temporarily unable to satisfy the requirements for maintaining their lawful status as F-1 nonimmigrant students, which include "pursuit of a 'full course of study.'" USCIS, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ)* at 1 (Nov. 25, 2005) (quoting 8 C.F.R. § 214.2(f)(6)), *available at* http//www.uscis.gov/sites/default/files/USCIS/Humanitarian/Special%20Situations/Previous%20Special%20Situations%20By%20Topic/faq-interim-student-relief-hurricane-katrina.pdf (last visited Nov. 19, 2014). DHS announced that it would grant deferred action to these students "based on the fact that [their] failure to maintain status is directly due to Hurricane Katrina." *Id.* at 7. To apply for deferred action under this program, students were required to send a letter substantiating their need for deferred action, along with an application for work authorization. Press Release, USCIS, *USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina* at 1–2 (Nov. 25, 2005), *available at* http://www.uscis.gov/sites/default/files/files/pressrelease/F1Student_11_25_05_PR.pdf (last visited Nov. 19, 2014). USCIS explained that such

App. 079

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

requests for deferred action would be "decided on a case-by-case basis" and that it could not "provide any assurance that all such requests will be granted." *Id.* at 1.

4. *Deferred Action for Widows and Widowers of U.S. Citizens.* In 2009, DHS implemented a deferred action program for certain widows and widowers of U.S. citizens. USCIS explained that "no avenue of immigration relief exists for the surviving spouse of a deceased U.S. citizen if the surviving spouse and the U.S. citizen were married less than 2 years at the time of the citizen's death" and USCIS had not yet adjudicated a visa petition on the spouse's behalf. Memorandum for Field Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, *Re: Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* at 1 (Sept. 4, 2009). "In order to address humanitarian concerns arising from cases involving surviving spouses of U.S. citizens," USCIS issued guidance permitting covered surviving spouses and "their qualifying children who are residing in the United States" to apply for deferred action. *Id.* at 2, 6. USCIS clarified that such relief would not be automatic, but rather would be unavailable in the presence of, for example, "serious adverse factors, such as national security concerns, significant immigration fraud, commission of other crimes, or public safety reasons." *Id.* at 6.[7]

5. *Deferred Action for Childhood Arrivals.* Announced by DHS in 2012, DACA makes deferred action available to "certain young people who were brought to this country as children" and therefore "[a]s a general matter . . . lacked the intent to violate the law." Memorandum for David Aguilar, Acting Commissioner, CBP, et al., from Janet Napolitano, Secretary, DHS, *Re: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 1 (June 15, 2012) ("Napolitano Memorandum"). An alien is eligible for DACA if she was under the age of 31 when the program began; arrived in the United States before the age of 16; continuously resided in the United States for at least 5 years immediately preceding June 15, 2012; was physically present on June 15, 2012; satisfies certain educational or military service requirements; and neither has a serious criminal history nor "poses a threat to national security or public safety." *See id.* DHS evaluates applicants' eligibility for DACA on a case-by-case basis. *See id.* at 2; USCIS, *Deferred Action for Childhood Arrivals (DACA) Toolkit: Resources for Community Partners* at 11 ("DACA Toolkit"). Successful DACA applicants receive deferred action for a

---

[7] Several months after the deferred action program was announced, Congress eliminated the requirement that an alien be married to a U.S. citizen "for at least 2 years at the time of the citizen's death" to retain his or her eligibility for lawful immigration status. Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, § 568(c), 123 Stat. 2142, 2186 (2009). Concluding that this legislation rendered its surviving spouse guidance "obsolete," USCIS withdrew its earlier guidance and treated all pending applications for deferred action as visa petitions. *See* Memorandum for Executive Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, et al., *Re: Additional Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children (REVISED)* at 3, 10 (Dec. 2, 2009).

App. 080

*Opinions of the Office of Legal Counsel in Volume 38*

period of two years, subject to renewal. *See* DACA Toolkit at 11. DHS has stated that grants of deferred action under DACA may be terminated at any time, *id.* at 16, and "confer[] no substantive right, immigration status or pathway to citizenship," Napolitano Memorandum at 3.[8]

Congress has long been aware of the practice of granting deferred action, including in its categorical variety, and of its salient features; and it has never acted to disapprove or limit the practice.[9] On the contrary, it has enacted several pieces of legislation that have either assumed that deferred action would be available in certain circumstances, or expressly directed that deferred action be extended to certain categories of aliens. For example, as Congress was considering VAWA reauthorization legislation in 2000, INS officials testified before Congress about their deferred action program for VAWA self-petitioners, explaining that "[a]pproved [VAWA] self-petitioners are placed in deferred action status," such that "[n]o battered alien who has filed a[n approved] self petition . . . has been deported." H.R. 3083 Hearings at 43. Congress responded by not only acknowledging but also expanding the deferred action program in the 2000 VAWA reauthorization legislation, providing that children who could no longer self-petition under VAWA because they were over the age of 21 would nonetheless be "eligible for deferred action and work authorization." Victims of Trafficking and

---

[8] Before DACA was announced, our Office was consulted about whether such a program would be legally permissible. As we orally advised, our preliminary view was that such a program would be permissible, provided that immigration officials retained discretion to evaluate each application on an individualized basis. We noted that immigration officials typically consider factors such as having been brought to the United States as a child in exercising their discretion to grant deferred action in individual cases. We explained, however, that extending deferred action to individuals who satisfied these and other specified criteria on a class-wide basis would raise distinct questions not implicated by ad hoc grants of deferred action. We advised that it was critical that, like past policies that made deferred action available to certain classes of aliens, the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria. We also noted that, although the proposed program was predicated on humanitarian concerns that appeared less particularized and acute than those underlying certain prior class-wide deferred action programs, the concerns animating DACA were nonetheless consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion.

[9] Congress has considered legislation that would limit the practice of granting deferred action, but it has never enacted such a measure. In 2011, a bill was introduced in both the House and the Senate that would have temporarily suspended DHS's authority to grant deferred action except in narrow circumstances. *See* H.R. 2497, 112th Cong. (2011); S. 1380, 112th Cong. (2011). Neither chamber, however, voted on the bill. This year, the House passed a bill that purported to bar any funding for DACA or other class-wide deferred action programs, H.R. 5272, 113th Cong. (2014), but the Senate has not considered the legislation. Because the Supreme Court has instructed that unenacted legislation is an unreliable indicator of legislative intent, *see Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 n.11 (1969), we do not draw any inference regarding congressional policy from these unenacted bills.

App. 081

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

Violence Protection Act of 2000, Pub. L. No. 106-386, § 1503(d)(2), 114 Stat. 1464, 1522 (codified at 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV)).[10]

Congress demonstrated a similar awareness of INS's (and later DHS's) deferred action program for bona fide T and U visa applicants. As discussed above, that program made deferred action available to nearly all individuals who could make a prima facie showing of eligibility for a T or U visa. In 2008 legislation, Congress authorized DHS to "grant . . . an administrative stay of a final order of removal" to any such individual. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 204, 122 Stat. 5044, 5060 (codified at 8 U.S.C. § 1227(d)(1)). Congress further clarified that "[t]he denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for . . . deferred action." *Id.* It also directed DHS to compile a report detailing, among other things, how long DHS's "specially trained [VAWA] Unit at the [USCIS] Vermont Service Center" took to adjudicate victim-based immigration applications for "deferred action," along with "steps taken to improve in this area." *Id.* § 238. Representative Berman, the bill's sponsor, explained that the Vermont Service Center should "strive to issue work authorization and deferred action" to "[i]mmigrant victims of domestic violence, sexual assault and other violence crimes . . . in most instances within 60 days of filing." 154 Cong. Rec. 24603 (2008).

In addition, in other enactments, Congress has specified that certain classes of individuals should be made "eligible for deferred action." These classes include certain immediate family members of LPRs who were killed on September 11, 2001, USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361, and certain immediate family members of certain U.S. citizens killed in combat, National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)–(d), 117 Stat. 1392, 1694. In the same legislation, Congress made these individuals eligible to obtain lawful status as "family-sponsored immigrant[s]" or "immediate relative[s]" of U.S. citizens. Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361; Pub. L. No. 108-136, § 1703(c)(1)(A), 117 Stat. 1392, 1694; *see generally Scialabba v. Cuellar de Osorio*, 134 S. Ct. 2191, 2197 (2014) (plurality opinion) (explaining which aliens typically qualify as family-sponsored immigrants or immediate relatives).

Finally, Congress acknowledged the practice of granting deferred action in the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231, 302 (codified at

---

[10] Five years later, in the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960, Congress specified that, "[u]pon the approval of a petition as a VAWA self-petitioner, the alien . . . is eligible for work authorization." *Id.* § 814(b) (codified at 8 U.S.C. § 1154(a)(1)(K)). One of the Act's sponsors explained that while this provision was intended to "give[] DHS statutory authority to grant work authorization . . . without having to rely upon deferred action . . . [t]he current practice of granting deferred action to approved VAWA self-petitioners should continue." 151 Cong. Rec. 29334 (2005) (statement of Rep. Conyers).

App. 082

49 U.S.C. § 30301 note), which makes a state-issued driver's license or identification card acceptable for federal purposes only if the state verifies, among other things, that the card's recipient has "[e]vidence of [l]awful [s]tatus." Congress specified that, for this purpose, acceptable evidence of lawful status includes proof of, among other things, citizenship, lawful permanent or temporary residence, or "approved deferred action status." *Id.* § 202(c)(2)(B)(viii).

## B.

The practice of granting deferred action, like the practice of setting enforcement priorities, is an exercise of enforcement discretion rooted in DHS's authority to enforce the immigration laws and the President's duty to take care that the laws are faithfully executed. It is one of several mechanisms by which immigration officials, against a backdrop of limited enforcement resources, exercise their "broad discretion" to administer the removal system—and, more specifically, their discretion to determine whether "it makes sense to pursue removal" in particular circumstances. *Arizona*, 132 S. Ct. at 2499.

Deferred action, however, differs in at least three respects from more familiar and widespread exercises of enforcement discretion. First, unlike (for example) the paradigmatic exercise of prosecutorial discretion in a criminal case, the conferral of deferred action does not represent a decision not to prosecute an individual for past unlawful conduct; it instead represents a decision to openly tolerate an undocumented alien's continued presence in the United States for a fixed period (subject to revocation at the agency's discretion). Second, unlike most exercises of enforcement discretion, deferred action carries with it benefits in addition to non-enforcement itself; specifically, the ability to seek employment authorization and suspension of unlawful presence for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I). Third, class-based deferred action programs, like those for VAWA recipients and victims of Hurricane Katrina, do not merely enable individual immigration officials to select deserving beneficiaries from among those aliens who have been identified or apprehended for possible removal—as is the case with ad hoc deferred action—but rather set forth certain threshold eligibility criteria and then invite individuals who satisfy these criteria to apply for deferred action status.

While these features of deferred action are somewhat unusual among exercises of enforcement discretion, the differences between deferred action and other exercises of enforcement discretion are less significant than they might initially appear. The first feature—the toleration of an alien's continued unlawful presence—is an inevitable element of almost any exercise of discretion in immigration enforcement. Any decision not to remove an unlawfully present alien—even through an exercise of routine enforcement discretion—necessarily carries with it a tacit acknowledgment that the alien will continue to be present in the United States without legal status. Deferred action arguably goes beyond such tacit acknowledgment by expressly communicating to the alien that his or her unlawful

App. 083

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

presence will be tolerated for a prescribed period of time. This difference is not, in our view, insignificant. But neither does it fundamentally transform deferred action into something other than an exercise of enforcement discretion: As we have previously noted, deferred action confers no lawful immigration status, provides no path to lawful permanent residence or citizenship, and is revocable at any time in the agency's discretion.

With respect to the second feature, the additional benefits deferred action confers—the ability to apply for work authorization and the tolling of unlawful presence—do not depend on background principles of agency discretion under DHS's general immigration authorities or the Take Care Clause at all, but rather depend on independent and more specific statutory authority rooted in the text of the INA. The first of those authorities, DHS's power to prescribe which aliens are authorized to work in the United States, is grounded in 8 U.S.C. § 1324a(h)(3), which defines an "unauthorized alien" not entitled to work in the United States as an alien who is neither an LPR nor "authorized to be . . . employed by [the INA] or by the Attorney General [now the Secretary of Homeland Security]." This statutory provision has long been understood to recognize the authority of the Secretary (and the Attorney General before him) to grant work authorization to particular classes of aliens. *See* 8 C.F.R. § 274a.12; *see also Perales v. Casillas*, 903 F.2d 1043, 1048–50 (5th Cir. 1990) (describing the authority recognized by section 1324a(h)(3) as "permissive" and largely "unfettered").[11] Although the INA

---

[11] Section 1324a(h)(3) was enacted in 1986 as part of IRCA. Before then, the INA contained no provisions comprehensively addressing the employment of aliens or expressly delegating the authority to regulate the employment of aliens to a responsible federal agency. INS assumed the authority to prescribe the classes of aliens authorized to work in the United States under its general responsibility to administer the immigration laws. In 1981, INS promulgated regulations codifying its existing procedures and criteria for granting employment authorization. *See Employment Authorization for Aliens in the United States*, 46 Fed. Reg. 25079, 25080–81 (May 5, 1981) (citing 8 U.S.C. § 1103(a)). Those regulations permitted certain categories of aliens who lacked lawful immigration status, including deferred action recipients, to apply for work authorization under certain circumstances. 8 C.F.R. § 109.1(b)(7) (1982). In IRCA, Congress introduced a "comprehensive scheme prohibiting the employment of illegal aliens in the United States," *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002), to be enforced primarily through criminal and civil penalties on employers who knowingly employ an "unauthorized alien." As relevant here, Congress defined an "unauthorized alien" barred from employment in the United States as an alien who "is not . . . either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter *or by the Attorney General*." 8 U.S.C. § 1324a(h)(3) (emphasis added). Shortly after IRCA was enacted, INS denied a petition to rescind its employment authorization regulation, rejecting an argument that "the phrase 'authorized to be so employed by this Act or the Attorney General' does not recognize the Attorney General's authority to grant work authorization except to those aliens who have already been granted specific authorization by the Act." *Employment Authorization; Classes of Aliens Eligible*, 52 Fed. Reg. 46092, 46093 (Dec. 4, 1987). Because the same statutory phrase refers both to aliens authorized to be employed by the INA and aliens authorized to be employed by the Attorney General, INS concluded that the only way to give effect to both references is to conclude "that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined 'unauthorized alien' in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the

App. 084

*Opinions of the Office of Legal Counsel in Volume 38*

requires the Secretary to grant work authorization to particular classes of aliens, *see, e.g.,* 8 U.S.C. § 1158(c)(1)(B) (aliens granted asylum), it places few limitations on the Secretary's authority to grant work authorization to other classes of aliens. Further, and notably, additional provisions of the INA expressly contemplate that the Secretary may grant work authorization to aliens lacking lawful immigration status—even those who are in active removal proceedings or, in certain circumstances, those who have already received final orders of removal. *See id.* § 1226(a)(3) (permitting the Secretary to grant work authorization to an otherwise work-eligible alien who has been arrested and detained pending a decision whether to remove the alien from the United States); *id.* § 1231(a)(7) (permitting the Secretary under certain narrow circumstances to grant work authorization to aliens who have received final orders of removal). Consistent with these provisions, the Secretary has long permitted certain additional classes of aliens who lack lawful immigration status to apply for work authorization, including deferred action recipients who can demonstrate an economic necessity for employment. *See* 8 C.F.R. § 274a.12(c)(14); *see also id.* § 274a.12(c)(8) (applicants for asylum), (c)(10) (applicants for cancellation of removal); *supra* note 11 (discussing 1981 regulations).

The Secretary's authority to suspend the accrual of unlawful presence of deferred action recipients is similarly grounded in the INA. The relevant statutory provision treats an alien as "unlawfully present" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I) if he "is present in the United States after the expiration of the period of stay authorized by the Attorney General." 8 U.S.C. § 1182(a)(9)(B)(ii). That language contemplates that the Attorney General (and now the Secretary) may authorize an alien to stay in the United States without accruing unlawful presence under section 1182(a)(9)(B)(i) or section 1182(a)(9)(C)(i). And DHS regulations and policy guidance interpret a "period of stay authorized by the Attorney General" to include periods during which an alien has been granted deferred action. *See* 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); USCIS Consolidation of Guidance at 42.

The final unusual feature of deferred action programs is particular to class-based programs. The breadth of such programs, in combination with the first two features of deferred action, may raise particular concerns about whether immigration officials have undertaken to substantively change the statutory removal system rather than simply adapting its application to individual circumstances. But the salient feature of class-based programs—the establishment of an affirmative application process with threshold eligibility criteria—does not in and of itself cross the line between executing the law and rewriting it. Although every class-wide deferred action program that has been implemented to date has established

regulatory process, in addition to those who are authorized employment by statute." *Id.*; *see Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 844 (1986) (stating that "considerable weight must be accorded" an agency's "contemporaneous interpretation of the statute it is entrusted to administer").

App. 085

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

certain threshold eligibility criteria, each program has also left room for case-by-case determinations, giving immigration officials discretion to deny applications even if the applicant fulfills all of the program criteria. *See supra* pp. 15–18. Like the establishment of enforcement priorities discussed in Part I, the establishment of threshold eligibility criteria can serve to avoid arbitrary enforcement decisions by individual officers, thereby furthering the goal of ensuring consistency across a large agency. The guarantee of individualized, case-by-case review helps avoid potential concerns that, in establishing such eligibility criteria, the Executive is attempting to rewrite the law by defining new categories of aliens who are automatically entitled to particular immigration relief. *See Crowley Caribbean Transp.*, 37 F.3d at 676–77; *see also Chaney*, 470 U.S. at 833 n.4. Furthermore, while permitting potentially eligible individuals to apply for an exercise of enforcement discretion is not especially common, many law enforcement agencies have developed programs that invite violators of the law to identify themselves to the authorities in exchange for leniency.[12] Much as is the case with those programs, inviting eligible aliens to identify themselves through an application process may serve the agency's law enforcement interests by encouraging lower-priority individuals to identify themselves to the agency. In so doing, the process may enable the agency to better focus its scarce resources on higher enforcement priorities.

Apart from the considerations just discussed, perhaps the clearest indication that these features of deferred action programs are not per se impermissible is the fact that Congress, aware of these features, has repeatedly enacted legislation appearing to endorse such programs. As discussed above, Congress has not only directed that certain classes of aliens be made eligible for deferred action programs—and in at least one instance, in the case of VAWA beneficiaries, directed the expansion of an existing program—but also ranked evidence of approved deferred action status as evidence of "lawful status" for purposes of the REAL ID Act. These enactments strongly suggest that when DHS in the past has decided to grant deferred action to an individual or class of individuals, it has been acting in a manner consistent with congressional policy "'rather than embarking on a frolic of its own.'" *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 139

---

[12] For example, since 1978, the Department of Justice's Antitrust Division has implemented a "leniency program" under which a corporation that reveals an antitrust conspiracy in which it participated may receive a conditional promise that it will not be prosecuted. *See* Dep't of Justice, *Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model Leniency Letters (November 19, 2008), available at* http://www.justice.gov/atr/public/criminal/239583.pdf (last visited Nov. 19, 2014); *see also* Internal Revenue Manual § 9.5.11.9(2) (Revised IRS Voluntary Disclosure Practice), *available at* http://www.irs.gov/uac/Revised-IRS-Voluntary-Disclosure-Practice (last visited Nov. 19, 2014) (explaining that a taxpayer's voluntary disclosure of misreported tax information "may result in prosecution not being recommended"); U.S. Marshals Service, *Fugitive Safe Surrender FAQs, available at* http://www.usmarshals.gov/safesurrender/faqs.html (last visited Nov. 19, 2014) (stating that fugitives who surrender at designated sites and times under the "Fugitive Safe Surrender" program are likely to receive "favorable consideration").

App. 086

(1985) (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 375 (1969)); *cf. id.* at 137–39 (concluding that Congress acquiesced in an agency's assertion of regulatory authority by "refus[ing] . . . to overrule" the agency's view after it was specifically "brought to Congress'[s] attention," and further finding implicit congressional approval in legislation that appeared to acknowledge the regulatory authority in question); *Dames & Moore v. Regan*, 453 U.S. 654, 680 (1981) (finding that Congress "implicitly approved the practice of claim settlement by executive agreement" by enacting the International Claims Settlement Act of 1949, which "create[d] a procedure to implement" those very agreements).

Congress's apparent endorsement of certain deferred action programs does not mean, of course, that a deferred action program can be lawfully extended to any group of aliens, no matter its characteristics or its scope, and no matter the circumstances in which the program is implemented. Because deferred action, like the prioritization policy discussed above, is an exercise of enforcement discretion rooted in the Secretary's broad authority to enforce the immigration laws and the President's duty to take care that the laws are faithfully executed, it is subject to the same four general principles previously discussed. *See supra* pp. 6–7. Thus, any expansion of deferred action to new classes of aliens must be carefully scrutinized to ensure that it reflects considerations within the agency's expertise, and that it does not seek to effectively rewrite the laws to match the Executive's policy preferences, but rather operates in a manner consonant with congressional policy expressed in the statute. *See supra* pp. 6–7 (citing *Youngstown*, 343 U.S. at 637, and *Nat'l Ass'n of Home Builders*, 551 U.S. at 658). Immigration officials cannot abdicate their statutory responsibilities under the guise of exercising enforcement discretion. *See supra* p. 7 (citing *Chaney*, 470 U.S. at 833 n.4). And any new deferred action program should leave room for individualized evaluation of whether a particular case warrants the expenditure of resources for enforcement. *See supra* p. 7 (citing *Glickman*, 96 F.3d at 1123, and *Crowley Caribbean Transp.*, 37 F.3d at 676–77).

Furthermore, because deferred action programs depart in certain respects from more familiar and widespread exercises of enforcement discretion, particularly careful examination is needed to ensure that any proposed expansion of deferred action complies with these general principles, so that the proposed program does not, in effect, cross the line between executing the law and rewriting it. In analyzing whether the proposed programs cross this line, we will draw substantial guidance from Congress's history of legislation concerning deferred action. In the absence of express statutory guidance, the nature of deferred action programs Congress has implicitly approved by statute helps to shed light on Congress's own understandings about the permissible uses of deferred action. Those understandings, in turn, help to inform our consideration of whether the proposed deferred action programs are "faithful[]" to the statutory scheme Congress has enacted. U.S. Const. art. II, § 3.

App. 087

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

## C.

We now turn to the specifics of DHS's proposed deferred action programs. DHS has proposed implementing a policy under which an alien could apply for, and would be eligible to receive, deferred action if he or she: (1) is not an enforcement priority under DHS policy; (2) has continuously resided in the United States since before January 1, 2010; (3) is physically present in the United States both when DHS announces its program and at the time of application for deferred action; (4) has a child who is a U.S. citizen or LPR; and (5) presents "no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." Johnson Deferred Action Memorandum at 4. You have also asked about the permissibility of a similar program that would be open to parents of children who have received deferred action under the DACA program. We first address DHS's proposal to implement a deferred action program for the parents of U.S. citizens and LPRs, and then turn to the permissibility of the program for parents of DACA recipients in the next section.

### 1.

We begin by considering whether the proposed program for the parents of U.S. citizens and LPRs reflects considerations within the agency's expertise. DHS has offered two justifications for the proposed program for the parents of U.S. citizens and LPRs. First, as noted above, severe resource constraints make it inevitable that DHS will not remove the vast majority of aliens who are unlawfully present in the United States. Consistent with Congress's instruction, DHS prioritizes the removal of individuals who have significant criminal records, as well as others who present dangers to national security, public safety, or border security. *See supra* p. 10. Parents with longstanding ties to the country and who have no significant criminal records or other risk factors rank among the agency's lowest enforcement priorities; absent significant increases in funding, the likelihood that any individual in that category will be determined to warrant the expenditure of severely limited enforcement resources is very low. Second, DHS has explained that the program would serve an important humanitarian interest in keeping parents together with children who are lawfully present in the United States, in situations where such parents have demonstrated significant ties to community and family in this country. *See* Shahoulian E-mail.

With respect to DHS's first justification, the need to efficiently allocate scarce enforcement resources is a quintessential basis for an agency's exercise of enforcement discretion. *See Chaney*, 470 U.S. at 831. Because, as discussed earlier, Congress has appropriated only a small fraction of the funds needed for full enforcement, DHS can remove no more than a small fraction of the individuals who are removable under the immigration laws. *See supra* p. 9. The agency must therefore make choices about which violations of the immigration laws it

App. 088

will prioritize and pursue. And as *Chaney* makes clear, such choices are entrusted largely to the Executive's discretion. 470 U.S. at 831.

The deferred action program DHS proposes would not, of course, be costless. Processing applications for deferred action and its renewal requires manpower and resources. *See Arizona*, 132 S. Ct. at 2521 (Scalia, J., concurring in part and dissenting in part). But DHS has informed us that the costs of administering the proposed program would be borne almost entirely by USCIS through the collection of application fees. *See* Shahoulian E-mail; *see also* 8 U.S.C. § 1356(m); 8 C.F.R. § 103.7(b)(1)(i)(C), (b)(1)(i)(HH). DHS has indicated that the costs of administering the deferred action program would therefore not detract in any significant way from the resources available to ICE and CBP—the enforcement arms of DHS—which rely on money appropriated by Congress to fund their operations. *See* Shahoulian E-mail. DHS has explained that, if anything, the proposed deferred action program might increase ICE's and CBP's efficiency by in effect using USCIS's fee-funded resources to enable those enforcement divisions to more easily identify non-priority aliens and focus their resources on pursuing aliens who are strong candidates for removal. *See id.* The proposed program, in short, might help DHS address its severe resource limitations, and at the very least likely would not exacerbate them. *See id.*

DHS does not, however, attempt to justify the proposed program solely as a cost-saving measure, or suggest that its lack of resources alone is sufficient to justify creating a deferred action program for the proposed class. Rather, as noted above, DHS has explained that the program would also serve a particularized humanitarian interest in promoting family unity by enabling those parents of U.S. citizens and LPRs who are not otherwise enforcement priorities and who have demonstrated community and family ties in the United States (as evidenced by the length of time they have remained in the country) to remain united with their children in the United States. Like determining how best to respond to resource constraints, determining how to address such "human concerns" in the immigration context is a consideration that is generally understood to fall within DHS's expertise. *Arizona*, 132 S. Ct. at 2499.

This second justification for the program also appears consonant with congressional policy embodied in the INA. Numerous provisions of the statute reflect a particular concern with uniting aliens with close relatives who have attained lawful immigration status in the United States. *See, e.g., Fiallo v. Bell*, 430 U.S. 787, 795 n.6 (1977); *INS v. Errico*, 385 U.S. 214, 220 n.9 (1966) ("'The legislative history of the Immigration and Nationality Act clearly indicates that the Congress . . . was concerned with the problem of keeping families of United States citizens and immigrants united.'" (quoting H.R. Rep. No. 85-1199, at 7 (1957)). The INA provides a path to lawful status for the parents, as well as other immediate relatives, of U.S. citizens: U.S. citizens aged twenty-one or over may petition for parents to obtain visas that would permit them to enter and permanently reside

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

in the United States, and there is no limit on the overall number of such petitions that may be granted. *See* 8 U.S.C. § 1151(b)(2)(A)(i); *see also Cuellar de Osorio*, 134 S. Ct. at 2197–99 (describing the process for obtaining a family-based immigrant visa). And although the INA contains no parallel provision permitting LPRs to petition on behalf of their parents, it does provide a path for LPRs to become citizens, at which point they too can petition to obtain visas for their parents. *See, e.g.*, 8 U.S.C. § 1427(a) (providing that aliens are generally eligible to become naturalized citizens after five years of lawful permanent residence); *id.* § 1430(a) (alien spouses of U.S. citizens become eligible after three years of lawful permanent residence); *Demore v. Kim*, 538 U.S. 510, 544 (2003).[13] Additionally, the INA empowers the Attorney General to cancel the removal of, and adjust to lawful permanent resident status, aliens who have been physically present in the United States for a continuous period of not less than ten years, exhibit good moral character, have not been convicted of specified offenses, and have immediate relatives who are U.S. citizens or LPRs and who would suffer exceptional hardship from the alien's removal. 8 U.S.C. § 1229b(b)(1). DHS's proposal to focus on the parents of U.S. citizens and LPRs thus tracks a congressional concern, expressed in the INA, with uniting the immediate families of individuals who have permanent legal ties to the United States.

At the same time, because the temporary relief DHS's proposed program would confer to such parents is sharply limited in comparison to the benefits Congress has made available through statute, DHS's proposed program would not operate to circumvent the limits Congress has placed on the availability of those benefits. The statutory provisions discussed above offer the parents of U.S. citizens and LPRs the prospect of permanent lawful status in the United States. The cancellation of removal provision, moreover, offers the prospect of receiving such status

---

[13] The INA does permit LPRs to petition on behalf of their spouses and children even before they have attained citizenship. *See* 8 U.S.C. § 1153(a)(2). However, the exclusion of LPRs' parents from this provision does not appear to reflect a congressional judgment that, until they attain citizenship, LPRs lack an interest in being united with their parents comparable to their interest in being united with their other immediate relatives. The distinction between parents and other relatives originated with a 1924 statute that exempted the wives and minor children of U.S. citizens from immigration quotas, gave "preference status"—eligibility for a specially designated pool of immigrant visas—to other relatives of U.S. citizens, and gave no favorable treatment to the relatives of LPRs. Immigration Act of 1924, Pub. L. No. 68-139, §§ 4(a), 6, 43 Stat. 153, 155–56. In 1928, Congress extended preference status to LPRs' wives and minor children, reasoning that because such relatives would be eligible for visas without regard to any quota when their LPR relatives became citizens, granting preference status to LPRs' wives and minor children would "hasten[]" the "family reunion." S. Rep. No. 70-245, at 2 (1928); *see* Act of May 29, 1928, ch. 914, 45 Stat. 1009, 1009–10. The special visa status for wives and children of LPRs thus mirrored, and was designed to complement, the special visa status given to wives and minor children of U.S. citizens. In 1965, Congress eliminated the basis on which the distinction had rested by exempting all "immediate relatives" of U.S. citizens, including parents, from numerical restrictions on immigration. Pub. L. No. 89-236, § 1, 79 Stat. 911, 911. But it did not amend eligibility for preference status for relatives of LPRs to reflect that change. We have not been able to discern any rationale for this omission in the legislative history or statutory text of the 1965 law.

App. 090

immediately, without the delays generally associated with the family-based immigrant visa process. DHS's proposed program, in contrast, would not grant the parents of U.S. citizens and LPRs any lawful immigration status, provide a path to permanent residence or citizenship, or otherwise confer any legally enforceable entitlement to remain in the United States. *See* USCIS SOP at 3. It is true that, as we have discussed, a grant of deferred action would confer eligibility to apply for and obtain work authorization, pursuant to the Secretary's statutory authority to grant such authorization and the longstanding regulations promulgated thereunder. *See supra* pp. 13, 21–22. But unlike the automatic employment eligibility that accompanies LPR status, *see* 8 U.S.C. § 1324a(h)(3), this authorization could be granted only on a showing of economic necessity, and would last only for the limited duration of the deferred action grant, *see* 8 C.F.R. § 274a.12(c)(14).

The other salient features of the proposal are similarly consonant with congressional policy. The proposed program would focus on parents who are not enforcement priorities under the prioritization policy discussed above—a policy that, as explained earlier, comports with the removal priorities set by Congress. *See supra* p. 10. The continuous residence requirement is likewise consistent with legislative judgments that extended periods of continuous residence are indicative of strong family and community ties. *See* IRCA, Pub. L. No. 99-603, § 201(a), 100 Stat. 3359, 3394 (1986) (codified as amended at 8 U.S.C. § 1255a(a)(2)) (granting lawful status to certain aliens unlawfully present in the United States since January 1, 1982); *id.* § 302(a) (codified as amended at 8 U.S.C. § 1160) (granting similar relief to certain agricultural workers); H.R. Rep. No. 99-682, pt. 1, at 49 (1986) (stating that aliens present in the United States for five years "have become a part of their communities[,] . . . have strong family ties here which include U.S. citizens and lawful residents[,] . . . have built social networks in this country[, and] . . . have contributed to the United States in myriad ways"); S. Rep. No. 99-132, at 16 (1985) (deporting aliens who "have become well settled in this country" would be a "wasteful use of the Immigration and Naturalization Service's limited enforcement resources"); *see also Arizona*, 132 S. Ct. at 2499 (noting that "[t]he equities of an individual case" turn on factors "including whether the alien has . . . long ties to the community").

We also do not believe DHS's proposed program amounts to an abdication of its statutory responsibilities, or a legislative rule overriding the commands of the statute. As discussed earlier, DHS's severe resource constraints mean that, unless circumstances change, it could not as a practical matter remove the vast majority of removable aliens present in the United States. The fact that the proposed program would defer the removal of a subset of these removable aliens—a subset that ranks near the bottom of the list of the agency's removal priorities—thus does not, by itself, demonstrate that the program amounts to an abdication of DHS's responsibilities. And the case-by-case discretion given to immigration officials under DHS's proposed program alleviates potential concerns that DHS has

App. 091

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

abdicated its statutory enforcement responsibilities with respect to, or created a categorical, rule-like entitlement to immigration relief for, the particular class of aliens eligible for the program. An alien who meets all the criteria for deferred action under the program would receive deferred action only if he or she "present[ed] no other factors that, in the exercise of discretion," would "make[] the grant of deferred action inappropriate." Johnson Deferred Action Memorandum at 4. The proposed policy does not specify what would count as such a factor; it thus leaves the relevant USCIS official with substantial discretion to determine whether a grant of deferred action is warranted. In other words, even if an alien is not a removal priority under the proposed policy discussed in Part I, has continuously resided in the United States since before January 1, 2010, is physically present in the country, and is a parent of an LPR or a U.S. citizen, the USCIS official evaluating the alien's deferred action application must still make a judgment, in the exercise of her discretion, about whether that alien presents any other factor that would make a grant of deferred action inappropriate. This feature of the proposed program ensures that it does not create a categorical entitlement to deferred action that could raise concerns that DHS is either impermissibly attempting to rewrite or categorically declining to enforce the law with respect to a particular group of undocumented aliens.

Finally, the proposed deferred action program would resemble in material respects the kinds of deferred action programs Congress has implicitly approved in the past, which provides some indication that the proposal is consonant not only with interests reflected in immigration law as a general matter, but also with congressional understandings about the permissible uses of deferred action. As noted above, the program uses deferred action as an interim measure for a group of aliens to whom Congress has given a prospective entitlement to lawful immigration status. While Congress has provided a path to lawful status for the parents of U.S. citizens and LPRs, the process of obtaining that status "takes time." *Cuellar de Osorio*, 134 S. Ct. at 2199. The proposed program would provide a mechanism for families to remain together, depending on their circumstances, for some or all of the intervening period.[14] Immigration officials have on several

---

[14] DHS's proposed program would likely not permit all potentially eligible parents to remain together with their children for the entire duration of the time until a visa is awarded. In particular, undocumented parents of adult citizens who are physically present in the country would be ineligible to adjust their status without first leaving the country if they had never been "inspected and admitted or paroled into the United States." 8 U.S.C. § 1255(a) (permitting the Attorney General to adjust to permanent resident status certain aliens present in the United States if they become eligible for immigrant visas). They would thus need to leave the country to obtain a visa at a U.S. consulate abroad. *See id.* § 1201(a); *Cuellar de Osorio*, 134 S. Ct. at 2197–99. But once such parents left the country, they would in most instances become subject to the 3- or 10-year bar under 8 U.S.C. § 1182(a)(9)(B)(i) and therefore unable to obtain a visa unless they remained outside the country for the duration of the bar. DHS's proposed program would nevertheless enable other families to stay together without regard to the 3- or 10-year bar. And even as to those families with parents who would become subject to that bar, the proposed deferred action program would have the effect of reducing the

App. 092

occasions deployed deferred action programs as interim measures for other classes of aliens with prospective entitlements to lawful immigration status, including VAWA self-petitioners, bona fide T and U visa applicants, certain immediate family members of certain U.S. citizens killed in combat, and certain immediate family members of aliens killed on September 11, 2001. As noted above, each of these programs has received Congress's implicit approval—and, indeed, in the case of VAWA self-petitioners, a direction to expand the program beyond its original bounds. *See supra* pp. 18–20.[15] In addition, much like these and other programs Congress has implicitly endorsed, the program serves substantial and particularized humanitarian interests. Removing the parents of U.S. citizens and LPRs—that is, of children who have established permanent legal ties to the United States—would separate them from their nuclear families, potentially for many years, until they were able to secure visas through the path Congress has provided. During that time, both the parents and their U.S. citizen or LPR children would be deprived of both the economic support and the intangible benefits that families provide.

We recognize that the proposed program would likely differ in size from these prior deferred action programs. Although DHS has indicated that there is no reliable way to know how many eligible aliens would actually apply for or would be likely to receive deferred action following individualized consideration under the proposed program, it has informed us that approximately 4 million individuals could be eligible to apply. *See* Shahoulian E-mail. We have thus considered whether the size of the program alone sets it at odds with congressional policy or the Executive's duties under the Take Care Clause. In the absence of express statutory guidance, it is difficult to say exactly how the program's potential size bears on its permissibility as an exercise of executive enforcement discretion. But because the size of DHS's proposed program corresponds to the size of a population to which Congress has granted a prospective entitlement to lawful status

---

amount of time the family had to spend apart, and could enable them to adjust the timing of their separation according to, for example, their children's needs for care and support.

[15] Several extended voluntary departure programs have been animated by a similar rationale, and the most prominent of these programs also received Congress's implicit approval. In particular, as noted above, the Family Fairness policy, implemented in 1990, authorized granting extended voluntary departure and work authorization to the estimated 1.5 million spouses and children of aliens granted legal status under IRCA—aliens who would eventually "acquire lawful permanent resident status" and be able to petition on behalf of their family members. Family Fairness Memorandum at 1; *see supra* pp. 14–15. Later that year, Congress granted the beneficiaries of the Family Fairness program an indefinite stay of deportation. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 301, 104 Stat. 4978, 5030. Although it did not make that grant of relief effective for nearly a year, Congress clarified that "the delay in effectiveness of this section shall not be construed as reflecting a Congressional belief that the existing family fairness program should be modified in any way before such date." *Id.* § 301(g). INS's policies for qualifying Third Preference visa applicants and nurses eligible for H-1 nonimmigrant status likewise extended to aliens with prospective entitlements to lawful status. *See supra* p. 14.

App. 093

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

without numerical restriction, it seems to us difficult to sustain an argument, based on numbers alone, that DHS's proposal to grant a limited form of administrative relief as a temporary interim measure exceeds its enforcement discretion under the INA. Furthermore, while the potential size of the program is large, it is nevertheless only a fraction of the approximately 11 million undocumented aliens who remain in the United States each year because DHS lacks the resources to remove them; and, as we have indicated, the program is limited to individuals who would be unlikely to be removed under DHS's proposed prioritization policy. There is thus little practical danger that the program, simply by virtue of its size, will impede removals that would otherwise occur in its absence. And although we are aware of no prior exercises of deferred action of the size contemplated here, INS's 1990 Family Fairness policy, which Congress later implicitly approved, made a comparable fraction of undocumented aliens—approximately four in ten— potentially eligible for discretionary extended voluntary departure relief. *Compare* CRS Immigration Report at 22 (estimating the Family Fairness policy extended to 1.5 million undocumented aliens), *with* Office of Policy and Planning, INS, *Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990 to 2000* at 10 (2003) (estimating an undocumented alien population of 3.5 million in 1990); *see supra* notes 5 & 15 (discussing extended voluntary departure and Congress's implicit approval of the Family Fairness policy). This suggests that DHS's proposed deferred action program is not, simply by virtue of its relative size, inconsistent with what Congress has previously considered a permissible exercise of enforcement discretion in the immigration context.

In light of these considerations, we believe the proposed expansion of deferred action to the parents of U.S. citizens and LPRs is lawful. It reflects considerations—responding to resource constraints and to particularized humanitarian concerns arising in the immigration context—that fall within DHS's expertise. It is consistent with congressional policy, since it focuses on a group—law-abiding parents of lawfully present children who have substantial ties to the community— that Congress itself has granted favorable treatment in the immigration process. The program provides for the exercise of case-by-case discretion, thereby avoiding creating a rule-like entitlement to immigration relief or abdicating DHS's enforcement responsibilities for a particular class of aliens. And, like several deferred action programs Congress has approved in the past, the proposed program provides interim relief that would prevent particularized harm that could otherwise befall both the beneficiaries of the program and their families. We accordingly conclude that the proposed program would constitute a permissible exercise of DHS's enforcement discretion under the INA.

2.

We now turn to the proposed deferred action program for the parents of DACA recipients. The relevant considerations are, to a certain extent, similar to those

31

App. 094

*Opinions of the Office of Legal Counsel in Volume 38*

discussed above: Like the program for the parents of U.S. citizens and LPRs, the proposed program for parents of DACA recipients would respond to severe resource constraints that dramatically limit DHS's ability to remove aliens who are unlawfully present, and would be limited to individuals who would be unlikely to be removed under DHS's proposed prioritization policy. And like the proposed program for LPRs and U.S. citizens, the proposed program for DACA parents would preserve a significant measure of case-by-case discretion not to award deferred action even if the general eligibility criteria are satisfied.

But the proposed program for parents of DACA recipients is unlike the proposed program for parents of U.S. citizens and LPRs in two critical respects. First, although DHS justifies the proposed program in large part based on considerations of family unity, the parents of DACA recipients are differently situated from the parents of U.S. citizens and LPRs under the family-related provisions of the immigration law. Many provisions of the INA reflect Congress's general concern with not separating individuals who are legally entitled to live in the United States from their immediate family members. *See, e.g.*, 8 U.S.C. § 1151(b)(2)(A)(i) (permitting citizens to petition for parents, spouses and children); *id.* § 1229b(b)(1) (allowing cancellation of removal for relatives of citizens and LPRs). But the immigration laws do not express comparable concern for uniting persons who lack lawful status (or prospective lawful status) in the United States with their families. DACA recipients unquestionably lack lawful status in the United States. *See* DACA Toolkit at 8 ("Deferred action . . . does not provide you with a lawful status."). Although they may presumptively remain in the United States, at least for the duration of the grant of deferred action, that grant is both time-limited and contingent, revocable at any time in the agency's discretion. Extending deferred action to the parents of DACA recipients would therefore expand family-based immigration relief in a manner that deviates in important respects from the immigration system Congress has enacted and the policies that system embodies.

Second, as it has been described to us, the proposed deferred action program for the parents of DACA recipients would represent a significant departure from deferred action programs that Congress has implicitly approved in the past. Granting deferred action to the parents of DACA recipients would not operate as an interim measure for individuals to whom Congress has given a prospective entitlement to lawful status. Such parents have no special prospect of obtaining visas, since Congress has not enabled them to self-petition—as it has for VAWA self-petitioners and individuals eligible for T or U visas—or enabled their undocumented children to petition for visas on their behalf. Nor would granting deferred action to parents of DACA recipients, at least in the absence of other factors, serve interests that are comparable to those that have prompted implementation of deferred action programs in the past. Family unity is, as we have discussed, a significant humanitarian concern that underlies many provisions of the INA. But a concern with furthering family unity alone would not justify the

App. 095

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

proposed program, because in the absence of any family member with lawful status in the United States, it would not explain why that concern should be satisfied by permitting family members to remain in the United States. The decision to grant deferred action to DACA parents thus seems to depend critically on the earlier decision to make deferred action available to their children. But we are aware of no precedent for using deferred action in this way, to respond to humanitarian needs rooted in earlier exercises of deferred action. The logic underlying such an expansion does not have a clear stopping point: It would appear to argue in favor of extending relief not only to parents of DACA recipients, but also to the close relatives of any alien granted deferred action through DACA or any other program, those relatives' close relatives, and perhaps the relatives (and relatives' relatives) of any alien granted any form of discretionary relief from removal by the Executive.

For these reasons, the proposed deferred action program for the parents of DACA recipients is meaningfully different from the proposed program for the parents of U.S. citizens and LPRs. It does not sound in Congress's concern for maintaining the integrity of families of individuals legally entitled to live in the United States. And unlike prior deferred action programs in which Congress has acquiesced, it would treat the Executive's prior decision to extend deferred action to one population as justifying the extension of deferred action to additional populations. DHS, of course, remains free to consider whether to grant deferred action to individual parents of DACA recipients on an ad hoc basis. But in the absence of clearer indications that the proposed class-based deferred action program for DACA parents would be consistent with the congressional policies and priorities embodied in the immigration laws, we conclude that it would not be permissible.

### III.

In sum, for the reasons set forth above, we conclude that DHS's proposed prioritization policy and its proposed deferred action program for parents of U.S. citizens and lawful permanent residents would be legally permissible, but that the proposed deferred action program for parents of DACA recipients would not be permissible.

KARL R. THOMPSON
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

App. 096

C



**U.S. Department of Homeland Security**
Washington, DC 20528

# Homeland Security

June 15, 2012

MEMORANDUM FOR:     David V. Aguilar
                    Acting Commissioner, U.S. Customs and Border Protection

                    Alejandro Mayorkas
                    Director, U.S. Citizenship and Immigration Services

                    John Morton
                    Director, U.S. Immigration and Customs Enforcement

FROM:               Janet Napolitano
                    Secretary of Homeland Security

SUBJECT:            Exercising Prosecutorial Discretion with Respect to Individuals
                    Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the
Department of Homeland Security (DHS) should enforce the Nation's immigration laws against
certain young people who were brought to this country as children and know only this country as
home. As a general matter, these individuals lacked the intent to violate the law and our ongoing
review of pending removal cases is already offering administrative closure to many of them.
However, additional measures are necessary to ensure that our enforcement resources are not
expended on these low priority cases but are instead appropriately focused on people who meet
our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of
prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of
  this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education
  development certificate, or is an honorably discharged veteran of the Coast Guard or
  Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple
  misdemeanor offenses, or otherwise poses a threat to national security or public safety;
  and
- is not above the age of thirty.

App. 098

Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal. No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.

1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2. With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

App. 099

2

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Janet Napolitano

App. 100

JS 44 (Rev. 12/12)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

(see attachment)

**(b)** County of Residence of First Listed Plaintiff   Cameron County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Andrew S. Oldham; Arthur C. D'Andrea
Office of the Attorney General of Texas, PO Box 12548
Austin, Texas 78711  (512) 936 1700

## DEFENDANTS

United States of America; Jeh Johnson; R. Gil Kerlikowske; Ronald D. Vitiello; Thomas S. Winkowski; Leon Rodriguez

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF
     THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Kenneth Magidson, United States Attorney for the Southern District of Texas

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government
       Plaintiff
- ☒ 2   U.S. Government
       Defendant
- ☐ 3   Federal Question
       *(U.S. Government Not a Party)*
- ☐ 4   Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*            *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☒ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from Another District *(specify)*
- ☐ 6   Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Administrative Procedure Act, 5 U.S.C. 551, et seq
Brief description of cause:
Plaintiffs are suing the United States and federal officials for their violations of the Take Care Clause and the APA

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
   UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____   DOCKET NUMBER _____

DATE
12/03/2014

SIGNATURE OF ATTORNEY OF RECORD
/s/ Andrew S. Oldham

App. 101

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

Attachment

Plaintiffs:


State of Texas; State of Alabama; State of Georgia; State of Idaho; State of Indiana;
State of Kansas; State of Louisiana; State of Montana; State of Nebraska; State of
South Carolina; State of South Dakota; State of Utah; State of West Virginia; State
of Wisconsin; Governor Phil Bryant, State of Mississippi; Governor Paul LePage,
State of Maine; Governor Patrick L. McCrory, State of North Carolina; Governor
C.L. "Butch" Otter, State of Idaho

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2021, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Francesca Genova
Francesca Genova
Trial Attorney
United States Department of Justice
Civil Division