**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of Contents ..................................................................................................... ii

Table of Authorities .................................................................................................. iii

Introduction ............................................................................................................... 1

Statement of Facts ..................................................................................................... 1

    I.     The Crisis at the Border and the Implementation of MPP ....................... 1

    II.    The Consequences of Suspending MPP ................................................. 4

Summary of the Argument ......................................................................................... 8

Argument .................................................................................................................... 9

    I.     Plaintiffs Are Likely to Succeed on the Merits ...................................... 9

        A.    The January 20 Memorandum Violates the APA ....................... 9

        B.    The January 20 Memorandum Violates Section 1225 ............................ 13

        C.    The January 20 Memorandum Violates the Take Care Clause ................ 15

        D.    The January 20 Memorandum Violates the Agreement with Texas ......... 16

        E.    No Procedural Issue Precludes this Court's Review ................................ 17

    II.    Texas and Missouri Will Suffer Irreparable Harm if an Injunction Is Not Granted ..................................................................................................... 28

    III.   The Equities Overwhelmingly Favor an Injunction ............................... 29

    IV.   The Injunction Should Apply Nationwide ......................................... 32

Conclusion ............................................................................................................... 32

Certificate of Conference ......................................................................................... 34

Certificate of Service ............................................................................................... 34

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
458 U.S. 592 (1982)........................................................................30

*Arizona v. United States*,
567 U.S. 387 (2012)........................................................18, 24, 38

*Armstrong v. Exceptional Child Ctr., Inc.*
575 U.S. 320 (2015)........................................................................21

*Bennett v. Spear*,
520 U.S. 154 (1997)........................................................................33

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984)........................................................................31

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962)........................................................................16

*Czyzewski v. Jevic Holding Corp.*,
137 S. Ct. 973 (2017)..............................................................24, 25

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
710 F.3d 579 (5th Cir. 2013) ........................................................37

*Dart v. United States*,
848 F.2d 217 (D.C. Cir. 1988) ......................................................22

*DeCanas v. Bica*,
424 U.S. 351 (1976)........................................................................30

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019)....................................................................33

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020)..................................................19, 31, 32

*Green Valley Special Util. Dist. v. City of Schertz*,
969 F.3d 460 (5th Cir. 2020) (en banc) ........................................21

*Hamama v. Adducci*,
946 F.3d 875 (6th Cir. 2020) (Sutton, J.)......................................32

iii

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.,*
    804 F.2d 1390 (5th Cir. 1986) ..........................................................................34

*Japan Whaling Ass'n v. Am. Cetacean Soc.,*
    478 U.S. 221 (1986)..........................................................................................31

*League of Women Voters of United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) .............................................................................35

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)..........................................................................................24

*Michigan v. EPA,*
    576 U.S. 743 (2015)..............................................................................16, 17, 18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 .................................................................................................18, 19

*N.Y. Progress & Prot. PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013)..............................................................................35

*Plyler v. Doe,*
    457 U.S. 202 (1982)..........................................................................................25

*Roho Inc. v. Marquis,*
    902 F.2d 356 (5th Cir. 1990) ...........................................................................15

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943)......................................................................................16, 17

*Simmat v. U.S. Bureau of Prisons,*
    413 F.3d 1225 (10th Cir. 2005) (McConnell, J.) ..............................................22

*Texas v. United States,*
    328 F. Supp. 3d 662 (S.D. Tex. 2018) ..................................................... *passim*

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ............................................................... *passim*

*Texas v. United States,*
    86 F. Supp. 3d 591 (S.D. Tex.), *aff'd,* 809 F.3d 134 (5th Cir. 2015), *as revised*
    (Nov. 25, 2015) ................................................................................................30

*Texas v. United States,*
    No. 6:21-cv-00003, 2021 WL 247877 (S.D. Tex. Jan. 26, 2021).................31, 38

*Texas v. United States,*
    No. 6:21-cv-00003, 2021 WL 723856 (S.D. Tex. Feb. 23, 2021) ................ *passim*

*United States v. Garner*,
   767 F.2d 104 (5th Cir. 1985) ...............................................................16

*Valley v. Rapides Parish School Bd.*,
   118 F.3d 1047 (5th Cir. 1997) ..............................................................15

*Wolf v. Innovation Law Lab*,
   140 S. Ct. 1564 (Mar. 11, 2020) ...........................................................10

*Wolf v. Innovation Law Lab*,
   141 S. Ct. 617 (Oct. 19, 2020) .............................................................10

*Wolf v. Innovation Law Lab*,
   366 F. Supp. 3d 1110 (N.D. Cal. 2019) ...............................................10

*Wolf v. Innovation Law Lab*,
   924 F.3d 503 (9th Cir. 2019)(per curiam) ..........................................10

*Wolf v. Innovation Law Lab*,
   951 F.3d 986 (9th Cir. 2020) ...............................................................10

*Wolf v. Innovation Law Law Lab*,
   951 F.3d 1073 (9th Cir. 2020) .............................................................10

**Statutes**

5 U.S.C.
   § 701.............................................................................................22, 31, 33
   § 701(a)....................................................................................................33
   § 701(a)(1)...............................................................................................31
   § 701(a)(2)...............................................................................................32
   § 704........................................................................................................34
   § 706........................................................................................................21
   § 706(2)....................................................................................................21
   § 706(2)(A)..............................................................................................15

8 U.S.C.
   § 1182(d)(5)(A).......................................................................................20
   §§ 1221–1232..........................................................................................32
   § 1225..................................................................................................15, 21
   § 1225(b)(1)(B)(ii)..................................................................................19
   § 1225(b)(1)(B)(iii)(IV)..........................................................................19
   § 1225(b)(2)(A).......................................................................................20
   § 1225(b)(2)(C)....................................................................................8, 20
   § 1252(g)..............................................................................................31, 32

Tex. Transp. Code § 521.142....................................................................24

**Other Authorities**

42 C.F.R. § 440.255(c)...........................................................................................................24, 26

U.S. Const. art. II, § 3 ........................................................................................................14, 21

**INTRODUCTION**

In a few short months, the Biden Administration's immigration policy has created a humanitarian catastrophe at the border. The results of this crisis are as predictable as they are tragic—an explosion of illegal immigration, human trafficking, and abuse of migrants by criminals. Central to the federal government's immigration failures has been the Biden Administration's day-one cancellation of the Migrant Protection Protocols ("MPP").

Under MPP, aliens from Central America who arrive at the southern border claiming asylum would typically be ordered to remain in Mexico pending resolution of their asylum claims. This policy ensured aliens could not use fraudulent claims of asylum to gain entry into the United States. As a result, it provided a powerful disincentive to illegal immigration.

But the Biden Administration suspended this effective program in a two-sentence memorandum. It offered no reasoned analysis. That decision has had pernicious effects, not only for Texas, Missouri, and their citizens but also for migrants themselves. The relatively few aliens with legitimate asylum claims face increased delays, and countless migrants have been lured into situations leaving them vulnerable to human trafficking and abuse.

The suspension of MPP violates the Administrative Procedure Act ("APA"), the Immigration and Nationality Act ("INA"), the Constitution, and binding promises Defendants made to Texas. For these reasons, the Court should enjoin Defendants, on a nationwide basis, from implementing the memorandum suspending MPP.

**STATEMENT OF FACTS**

## I. The Crisis at the Border and the Implementation of MPP

In 2018 and 2019, the border was in crisis. Federal officials encountered an average of approximately 2,000 inadmissible aliens at the Southern border each day, and the rate at which those aliens claimed asylum surged exponentially. App.005 ¶ 17. That influx imposed enormous

burdens on the immigration system, even though the vast majority of the aliens lacked meritorious claims for asylum. "[A]pproximately 9 out of 10 asylum claims from Northern Triangle countries [were] ultimately found non-meritorious by federal immigration judges." App.303. More generally, between Fiscal Year 2008 and FY 2019, only 14 percent of aliens who claimed credible fear of persecution or torture were granted asylum. App.005 ¶ 21. With so many "fraudulent asylum claims," "[t]he dramatic increase in illegal migration" was "making it harder for the U.S. to devote appropriate resources to individuals who [were] legitimately fleeing persecution." App.302–303.[1]

But diverting resources from legitimate asylum seekers was not the only problem. Illegal aliens with meritless asylum claims were being released into the United States. "[M]any of these individuals . . . disappeared into the country before a judge denie[d] their claim and simply bec[a]me fugitives." App.303. Between Fiscal Year 2008 and Fiscal Year 2019, 32 percent of aliens referred to [the Executive Office for Immigration Review] absconded into the United States and were ordered removed in absentia. App.005 ¶ 20.

The Trump Administration addressed that crisis through the Migrant Protection Protocols ("MPP"). Established under 8 U.S.C. § 1225(b)(2)(C), MPP applies to illegal aliens "arriving on land . . . from a foreign territory contiguous to the United States." It allows the federal government to temporarily return those aliens to Mexico pending their removal proceedings. MPP ensures that "[c]ertain aliens attempting to enter the U.S. illegally or without documentation, including those who claim asylum, will no longer be released in to the country, where they often fail to file an asylum application and/or disappear before an immigration judge can determine the merits of any claim." App.303–304. The goal was to "provide a safer and more orderly process that will

---

[1] Dep't of Homeland Sec., *Migrant Protection Protocols* (Jan. 24, 2019), https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols.

discourage individuals from attempting illegal entry and making false claims to stay in the U.S., and allow more resources to be dedicated to individuals who legitimately qualify for asylum." App.303. The federal government hoped MPP would "help restore a safe and orderly immigration process, decrease the number of those taking advantage of the immigration system, and the ability of smugglers and traffickers to prey on vulnerable populations, and reduce threats to life, national security, and public safety, while ensuring that vulnerable populations receive the protections they need." App.302.

MPP proved effective. When DHS analyzed the program's implementation, it concluded that "MPP has been an indispensable tool in addressing the ongoing crisis at the southern border and restoring integrity to the immigration system." App.308.[2] MPP reduced the incentives to cross the border illegally, which allowed the government to conserve enforcement resources. "DHS ha[d] observed a connection between MPP implementation and decreasing enforcement actions at the border—including a rapid and substantial decline in apprehensions in those areas where the most amenable aliens have been processed and returned to Mexico pursuant to MPP." App.308. In February 2020, for example, the number of aliens either apprehended or deemed inadmissible at the southern border was down roughly 40,000 from February 2019. App.006 ¶ 24.

MPP also restored integrity to the immigration system by allowing faster processing times for meritorious claims faster removal of aliens without meritorious claims. "MPP returnees with meritorious claims can be granted relief or protection within months, rather than remaining in limbo for years while awaiting immigration court proceedings in the United States." App.309. Thus, the federal government was helping true refugees—aliens with meritorious asylum claims—

---

[2] Dep't of Homeland Sec., *Assessment of the Migrant Protection Protocols (MPP)*, https://www.dhs.gov/sites /default/files/publications/assessment_of_the_migrant_protection_protocols_mpp.pdf; *see also* Dep't of Homeland Sec., *Assessment of the Migrant Protection Protocols (MPP)* (Oct. 28, 2019), https://www.dhs.gov/publication/ assessment-migrant-protection-protocols-mpp.

"more quickly via MPP than under available alternatives." App.309. But aliens "who do not qualify for" asylum "are being quickly removed from the United States." App.309. Indeed, some "aliens without meritorious claims," now lacking "a free ticket into the United States," were "voluntarily return[ing] home." App.309. By more quickly separating the wheat from the chaff, MPP significantly improved immigration enforcement.

Despite its effectiveness, MPP has been subject to legal challenge in *Wolf v. Innovation Law Lab*, in which a district court enjoined its implementation. 366 F. Supp. 3d 1110 (N.D. Cal. 2019). The Ninth Circuit stayed that injunction, *see* 924 F.3d 503 (9th Cir. 2019) (per curiam), but then a separate panel affirmed the injunction on the merits, *see* 951 F.3d 1073 (9th Cir. 2020). The Ninth Circuit then granted a stay insofar as the district court's injunction applied outside the territorial limits of the Ninth Circuit but otherwise denied the government's request for a stay. *See* 951 F.3d 986 (9th Cir. 2020). Finally, the Supreme Court stayed the injunction in full, *see* 140 S. Ct. 1564 (Mar. 11, 2020), and granted certiorari, *see* 141 S. Ct. 617 (Oct. 19, 2020).

Last Fall, the Biden transition team met with career staff from DHS. According to a former CBP official, "CPB career employees . . . fully briefed the Biden transition officials on the importance of MPP and the consequences that would follow a suspension of MPP." App.399 ¶ 31. "The Biden transition personnel were specifically warned that the suspension of the MPP, along with other polices, would lead to a resurgence of illegal aliens attempting to illegally enter our [southwest border]." App.309 ¶ 33. Moreover, "[t]hey were warned [that] the smuggling organizations would exploit the rescission and convince migrants the U.S. borders are open" and that a "predictable" increase in illegal immigration "would overwhelm Border Patrol's capacity and facilities, as well as HHS facilities." App.399 ¶ 33; *see also* App.093–099.

## II.    The Consequences of Suspending MPP

Having (1) found MPP effective as a matter of policy, (2) successfully defended MPP in

court, and (3) explained the dangers of repealing MPP, Defendants could have continued the program. Instead, they reversed course—without explanation—on the Biden Administration's very first day in office. On January 20, 2021, Acting Secretary Pekoske declared that "[e]ffective January 21, 2021, the Department will suspend new enrollments in the Migrant Protection Protocols (MPP), pending further review of the program." App.032. The only other sentence in the memorandum provides no explanation: "Aliens who are not already enrolled in MPP should be processed under other existing legal authorities." App.032.

Since Defendants suspended new enrollment into MPP, the crisis at the border has worsened. According to Secretary Mayorkas, the federal government is "on pace to encounter more individuals on the southwest border than we have in the last 20 years." App.034. Indeed, in February alone, "there were more than 100,000 migrant encounters" and Texas Deputy Border Chief Raul Ortiz has said that he "'fully expects' Border Patrol to encounter *more than a million migrants* this year." App.045. Then, on May 4, 2021, U.S. Customs and Border Protection ("CBP") reported 173,348 southwest border land encounters during March 2021 and 178,622 in April, the latter exceeding the April 2019 immigration surge by 63.25%—with no sign of slacking. App.004 ¶ 9; App.056–078. These included 18,960 encounters with unaccompanied children in March and another 17,171 in April—the overall number of encounters in April 2021 appears to be the highest number for that month since at least the year 2000. App.004 ¶ 9.

"Overwhelmed and underprepared, U.S. authorities are releasing migrant families on the Mexican border without notices to appear in immigration court or sometimes without any paperwork at all." App.081. "Customs and Border Protection, which oversees the Border Patrol, said it stopped issuing court notices in some cases because preparing even one of the documents often takes hours. . . . . The agency didn't answer questions about how many migrants have been

released without court notices or without documents at all." App.083–084.

One critical aspect of this humanitarian crisis is the explosion of human-trafficking activities by organized crime at the border during the immigration surge. The former Ambassador to Mexico has said that unlawful immigration "is big business for criminals" because "it encourages impoverished people to turn over their life savings to the human smugglers who control the routes." App.109. Moreover, "[m]igrants are routinely subject to rape, assault and other crimes. And unauthorized immigrants who ultimately succeed in reaching our territory are consigned to live and work in the shadows without the full protection of our laws." App.109.

These statements echo a chilling New York Times report on the sex-trafficking of migrants, especially women and minors. App.111–116. That 2019 investigation by the New York Times found more than 100 documented reports of sexual assault of migrant women along the border in the past two decades—a number that certainly "only skims the surface" of a vast problem. App.112. Several personal stories recounted in the report typify migrants' experience of sex trafficking. In July 2019, a 23-year-old Honduran woman told authorities that she was sexually assaulted by a smuggler who had helped her and her sister cross into the South Texas city of Mission. App.112. In 2014, a 36-year-old Guatemalan mother of three was held captive for weeks, drugged with pills and cocaine, and repeatedly raped by the smugglers she paid to bring her to the United States. App.112. "They raped us so many times they didn't see us as human beings anymore," she said of her captors. App.112. "The stories are many, and yet all too similar," the New York Times report stated. App.112. "Undocumented women making their way into American border towns have been beaten for disobeying smugglers, impregnated by strangers, coerced into prostitution, shackled to beds and trees and … bound with duct tape, rope or handcuffs." App.112. The study "suggest[s] that sexual violence has become an inescapable part of the collective migrant

journey." App.112.

Human trafficking experts emphasize the powerful incentives that open-borders policies—such as the suspension of the MPP—create for human traffickers to exploit our newly porous borders and traffic victims into the United States. App.403–409 ¶¶ 1–18; App.423 ¶ 14. "Destination countries with weak border security and lax immigration policies in effect create an open door for traffickers to enter and do business." App.405 ¶ 7. "It creates more opportunity for them to make money and in turn motivates traffickers to recruit more victims from origin countries." App.405 ¶ 7. "Put simply, traffickers would not invest the time and resources to groom, recruit and transport large numbers of potential victims to the U.S. border if they had reason to believe a crossing would not be possible. There's no money in that." App.405 ¶ 7.

Making the border more permeable thus results in an increase in human trafficking crimes. "International criminal organizations look for weaknesses in U.S. borders and immigration policy in order to bring their victims into the country. Russian mafia, Asian organized crime, and Mexican cartels smuggle people into the United States for the purpose of human trafficking. Much of this occurs across the U.S.-Mexico border." App.405–406 ¶ 8. This includes numerous victims destined for such abuses as commercial sex trafficking in illicit massage businesses, App.406 ¶¶ 10, 12, for agricultural labor trafficking, App.407–408 ¶ 15, and for use in underage-victim mass brothels, where girls as young as nine or ten years old are commercially raped for money, sometimes more than 30 times an hour, App.408 ¶ 16.

"Unaccompanied and undocumented minors who enter the United States via smugglers are extremely vulnerable to traffickers and other abusers. There is no one to file a missing child report, or issue an Amber Alert. There is no record that the child is even here in this country. No one even knows to look. In the eyes of a trafficker, children in these circumstances make ideal victims."

App.407 ¶ 13.

State Plaintiffs are likely to succeed on the merits of their claims that the suspension of MPP was unlawful. First, the suspension was arbitrary and capricious under the APA. Defendants' two-sentence memorandum lacked any reasoned explanation, failed to grapple with the costs of suspension, and failed to consider a more limited policy.

Second, the suspension violates the INA. When an alien arrives at the southern border and claims asylum, the INA offers Defendants a choice: detain him or return him to Mexico while his asylum application is processed. MPP implemented the second option. But with MPP's suspension, Defendants are doing neither. Instead, they are paroling aliens into the interior of the United States on a categorical basis, contrary to the case-by-case basis required to grant parole.

Third, the suspension violates the Take Care Clause, the constitutional obligation that the President and his subordinates "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. By refusing to follow Congress's commands in the INA that aliens arriving at the border seeking asylum either be detained pending resolution of their claims, or returned to Mexico during that period, the Biden Administration has violated its constitutional duty.

Fourth, the Defendants have violated a binding agreement they entered into with the State of Texas. Under that agreement, Defendants were required to provide Texas with notice and an opportunity to comment on any changes to immigration policies, including those that, like the suspension of the MPP at issue here, increase the number of aliens present in the United States.

Only an injunction can avoid irreparable injuries to Texas and Missouri. Illegal aliens impose increased costs on both States, but there is no way for the States to recover those costs from the federal government.

8

The final requirements for a preliminary injunction—the related factors of the balancing of the equities and whether issuance of the injunction is in the public interest—are also satisfied here. Defendants have no legitimate interest in implementing an unlawful memorandum, and the public interest strongly favors enforcement of the federal statutes Defendants are violating.

Finally, the Court should enjoin Defendants on a nationwide basis. Once inside the United States, the mobility of migrants among the States would make any relief granted on a limited geographical basis ineffective.

ARGUMENT

The issuance of a preliminary injunction is appropriate when the movant shows (1) a likelihood of success on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and that (4) an injunction is in the public interest. *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997) (citing *Roho Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)). The Plaintiff States easily satisfy these standards.

## I. Plaintiffs Are Likely to Succeed on the Merits

Texas and Missouri are likely to succeed on the merits of their claims because the January 20 Memorandum is unlawful. First, it is arbitrary and capricious under the APA. Second, it substantively violates 8 U.S.C. § 1225. Third, it is inconsistent with the President's constitutional obligation to take care that the laws be faithfully executed. Fourth, it violates a binding agreement between DHS and Texas. Finally, no procedural hurdle prevents the Court from reaching the merits of these claims.

### A. The January 20 Memorandum Violates the APA

The January 20 Memorandum violates the APA because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

9

"Federal administrative agencies are required to engage in reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (internal quotation marks omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* Although agencies are entitled to deference, "the arbitrary and capricious standard of review . . . is by no means a rubber stamp." *Texas v. United States*, No. 6:21-cv-00003, 2021 WL 723856, at *40 (S.D. Tex. Feb. 23, 2021) (quoting *United States v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985)).

The January 20 Memorandum is arbitrary and capricious for multiple reasons. As an initial matter, the it fails to provide *any* justification for suspending new enrollments into the MPP. The January 20 Memorandum consists of only two sentences:

> Effective January 21, 2021, the Department will suspend new enrollments in the Migrant Protection Protocols (MPP), pending further review of the program. Aliens who are not already enrolled in MPP should be processed under other existing legal authorities.

App.032.

That is an order, not an explanation. Neither sentence explains *why* DHS suspended the MPP. The memorandum does not include so much as a "because." Perhaps that is because the January 20 Memorandum was "signed within hours of the Inauguration of President Biden," which meant Defendants "did not [have] much time for reflection and analysis." *Texas*, 2021 WL 723856, at *41.

The absence of reasoning is a fatal flaw in any administrative action. "[A] court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan*, 576 U.S. at 758 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). Because there is no "basis articulated in the order by the agency itself," the January 20 Memorandum cannot "be upheld." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962).

The Supreme Court has repeatedly emphasized the importance of this rule. *See, e.g.*, *Michigan*, 576 U.S. at 758 ("foundational principle of administrative law"); *Chenery Corp.*, 332 U.S. at 196 ("simple but fundamental rule of administrative law").

The closest the January 20 Memorandum comes to explaining a policy rationale for suspending the MPP is its note that the suspension is effective "pending further review of the program." App.032. But that addresses *when* the suspension is effective, not *why* DHS ordered a suspension in the first place. Even putting that distinction to one side, the memorandum provides no reason why that "further review" cannot occur without suspending new enrollments into the MPP. As Judge Tipton held when enjoining enforcement of an unlawful "100-day pause on removals," "a need to assess priorities does not necessarily mean a pause on government functions." *Texas*, 2021 WL 723856, at *42.

But even if DHS had provided some explanation, the January 20 Memorandum would still be arbitrary and capricious. "Agency action is lawful only if it rests on a consideration of the relevant factors." *Michigan*, 576 U.S. at 750 (internal quotation marks omitted). In suspending the MPP, DHS ignored multiple relevant factors.

First, DHS ignored *its own* analysis supporting MPP. In January 2019, DHS answered the question "Why is DHS Instituting MPP?" App.301. It explained that MPP addresses a fundamental problem: "The dramatic increase in illegal migration, including [an] unprecedented number of families and fraudulent asylum claims[,] is making it harder for the U.S. to devote appropriate resources to individuals who are legitimately fleeing persecution." App.302–303. As explained above, DHS had good reason to think MPP would be an effective solution. *See supra* Background Part I. And DHS later concluded it was effective. App.306-316. According to DHS, "MPP has been an indispensable tool in addressing the ongoing crisis at the southern border and restoring

integrity to the immigration system." App.308. Indeed, CBP had even acknowledged that dismantling MPP would provoke a resurgence in illegal immigration. App.399 ¶¶ 31–33 ; *see also supra* Background Part I.

In its suspension of MPP, DHS completely ignored these benefits, despite its previous endorsement of them. DHS's approach was arbitrary and capricious not only because it did not discuss "the relevant factors," *Michigan*, 576 U.S. at 750, but also because "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *State Farm*, 463 U.S. at 42. Here, DHS "chang[ed] its course by rescinding" the MPP for new applicants, but it did not provide any "reasoned analysis for" doing so. *Id.*

Second, the January 20 Memorandum failed to discuss the costs the suspension of MPP would impose on States. Failing to consider important costs of a new policy renders that policy arbitrary and capricious. "Agency action is lawful only if it rests on a consideration of the relevant factors." *Michigan*, 576 U.S. at 750 (internal quotation marks omitted). But DHS ignored the harms that suspending new enrollments into the MPP would cause, and now is causing. In contrast to DHS, the Supreme Court has recognized that States "bear[] many of the consequences of unlawful immigration" and that "[t]he problems posed to the State by illegal immigration must not be underestimated." *Arizona v. United States*, 567 U.S. 387, 397, 398 (2012). Failing to discuss the impact on States is particularly egregious because DHS has previously acknowledged "that Texas, like other States, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement." App.318 § II.

Defendants have a "clear and obvious responsibility to consider the relevant factors," which in this case include "Texas's [and Missouri's] expenses and costs stemming from" their

policies. *Texas*, 2021 WL 723856, at *42. Even if DHS could have decided that other policy considerations outweighed the costs to States, DHS did not in fact make such a decision. Considering such policy concerns "was the agency's job, but the agency failed to do it." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914 (2020).

Third, DHS failed to consider whether it could achieve its (unstated) goals through a less-burdensome or less-sweeping means. This too rendered its decision arbitrary and capricious. The Supreme Court recently held that the rescission of DACA was arbitrary and capricious because it was issued "'without any consideration whatsoever' of a [more limited] policy." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1912 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29. 51 (1983)). By omitting any analysis of continuing at least some enrollments into the MPP, DHS "failed to consider important aspects of the problem before" it. *Id.* at 1910 (alterations and internal quotation marks omitted). Perhaps a more limited suspension of the MPP that allowed its continued use for at least some aliens would have satisfied DHS's (unstated) goals. The January 20 Memorandum does not say. This, too, is arbitrary and capricious.

### B. The January 20 Memorandum Violates Section 1225

When an alien at the border claims asylum, the INA generally mandates that Defendants detain that alien. If the officer determines that an alien subject to expedited removal does not have a credible fear of persecution, the alien can invoke further administrative proceedings but "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). Even if the officer determines that the "alien has a credible fear of persecution . . . , the alien shall be detained for further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii).

For aliens not going through expedited removal (that is, aliens given a Notice to Appear), the INA still mandates detention. "[I]f the examining immigration officer determines that an alien

seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for" removal proceedings. 8 U.S.C. § 1225(b)(2)(A). But in this case, the INA gives the federal government an alternative choice. If the alien "is arriving on land . . . from a foreign territory contiguous to the United States," the government "may return the alien to that territory pending" asylum proceedings. *Id.* § 1225(b)(2)(C). Thus, the government has two options for the default rule governing aliens seeking asylum: (1) detention or (2) return to a contiguous territory. MPP implements the second option. App.303; App.307.

To be sure, the INA does not mandate the creation of MPP. After all, the second option is, by definition, optional. *See* 8 U.S.C. § 1225(b)(2)(C) (providing that the federal government "may return the alien to that territory"). If the federal government does not want to return to use of a program like MPP, it can always choose the first option: detention.

What the INA forbids—and what Defendants are doing—is systematically rejecting both options. Instead of detaining the aliens or returning them to Mexico, Defendants are paroling them into the United States. But parole is available "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," not on a class-wide basis. 8 U.S.C. § 1182(d)(5)(A).

After a "preliminary finding" of "credible fear," Defendants are "convert[ing]" an alien's status from "Expedited Removal" to "Notice to Appear" and then allowing the alien to be "released on recognizance." App.330 n.7. According to Defendants, the aliens' "[l]egal status while out of custody is parole until asylum is granted." App.330 n.7. They claim to be doing so because "[c]ontinued detention of a migrant who has more likely than not demonstrated credible fear is not in the interest of resource allocation or justice." App.330 n.7. But that is a class-based determination, not the "case-by-case" determination required by Section 1182(d)(5)(A). Thus, Defendants are doing exactly what they acknowledge is prohibited, using parole "to replace

established refugee processing channels." App.336 (explaining that for which "[p]arole is not intended to be used").

In short, Section 1225 makes detention of aliens applying for asylum the default rule. But Defendants claim they cannot detain so many aliens, so they violate the limits on parole. But the reason there are so many aliens in need of detention is Defendants' suspension of MPP. Thus, Defendants' suspension of MPP is causing their violation of Section 1225. For this additional reason, the January 20 Memorandum suspending MPP should be held unlawful and set aside. *See* 5 U.S.C. § 706(2).

### C.     The January 20 Memorandum Violates the Take Care Clause

The President and those who work for him in the Executive Branch are obligated to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. The January 20 Memorandum violates that constitutional obligation. As explained above, the January 20 Memorandum contradicts federal law and undermines the statutory scheme by increasing the number of aliens who are not detained, despite Congress's command.

Systematically violating federal law across tens of thousands of cases is the opposite of ensuring that the laws are faithfully executed. A violation of the Constitution is also a violation of the APA—indeed, the Take Care Clause provides an independent basis that the January 20 Memorandum is contrary to law. *See* 5 U.S.C. § 706. But if the Court were to conclude that the APA did not provide a proper cause of action in this case, the Plaintiff States' constitutional claim would present the same merits question on its own.

Federal courts have long exercised the power to enjoin federal officers from violating the Constitution. *See Armstrong v. Exceptional Child Ctr., Inc.* 575 U.S. 320, 327–28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England"). The Plaintiff States have a cause of action "at equity." *Green Valley Special Util. Dist. v. City of*

*Schertz*, 969 F.3d 460, 475 (5th Cir. 2020) (en banc). "Equity thus provides the basis for relief—the cause of action, so to speak"—when a plaintiff seeks prospective relief for a constitutional violation committed by a federal official. *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1232 (10th Cir. 2005) (McConnell, J.). As a result, even if the Court were to disagree with the Plaintiff States' arguments relating to their APA claim, *but see supra*, that would not affect their right to relief on the constitutional claim. *See Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) (APA's reviewability limitation in Section 701 "serves only to take away what the APA has otherwise given—namely, the APA's own guarantee of judicial review," "not repeal the review of *ultra vires* actions that was recognized long before" the APA); *Simmat*, 413 F.3d at 1233 n.9 (allowing the plaintiff's constitutional claim to proceed even though he "appear[ed] to concede that his claim does not satisfy the APA's requirement of 'final agency action'").

### D.     The January 20 Memorandum Violates the Agreement with Texas

The January 20 Memorandum is also invalid because it did not go through the notice-and-consultation procedures required by an agreement that DHS negotiated and signed with Texas.

Recognizing the importance of cooperation between federal and state agencies, DHS has signed immigration-related agreements with multiple States, including Texas (the "Agreement"). App.317–326. The Agreement establishes a binding and enforceable commitment. App.319 § II.

Generally, the Agreement provides that "Texas will provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions in exchange for DHS's commitment to consult Texas and consider [its] views before taking" certain administrative actions. App.319 § II. DHS must "[c]onsult with Texas before taking any action or making any decision that could reduce immigration enforcement" or "increase the number of removable or inadmissible aliens in the United States." App.320 § III.A.2. That "includes policies, practices, or procedures which have as their purpose or effect . . .

16

increasing or declining to decrease the number of lawful, removable, or inadmissible aliens residing in the United States." App.320 § III.A.2.f.

To enable this consultation process, the Agreement requires DHS to "[p]rovide Texas with 180 days' written notice . . . of any proposed action" subject to the consultation requirement. App.320 § III.A.3. That gives Texas "an opportunity to consult and comment on the proposed action." App.320 § III.A.3. After it submits its views, "DHS will in good faith consider Texas's input and provide a detailed written explanation of the reasoning behind any decision to reject Texas's input before taking any action" covered by the Agreement. App.320 § III.A.3.

But DHS did not comply with these requirements before promulgating the January 20 Memorandum. How to redress DHS's breach is addressed in the Agreement itself: "Any [aggrieved] party shall . . . be entitled (in addition to any other remedy to which it may be entitled in law or in equity) to injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement." App.322 § VI.

To be sure, DHS purported to terminate the Agreement "effective immediately" by letter on February 2, 2021, App.347–348, but DHS's letter did not comply with the provision of the Agreement governing termination. A party must "provid[e] 180 days' notice of intent to terminate," so "[t]he termination will be effective 180 days after the written termination request was submitted." App.324 § XV. As a result, the Agreement remains binding until August 1, 2021.

### E. No Procedural Issue Precludes this Court's Review

Defendants cannot avoid this Court's review by raising non-merits arguments.

#### 1. The Plaintiff States have standing to bring these claims

The Plaintiff States have standing to challenge Defendants' suspension of MPP for the same reasons that Texas has had standing to challenge other federal agency actions related to

immigration. *See Texas v. United States*, 809 F.3d 134, 150–62 (5th Cir. 2015) (DAPA); *Texas v. United States*, 328 F. Supp. 3d 662, 690–705 (S.D. Tex. 2018) (DACA); *Texas*, 2021 WL 723856, *10–21 (100-day pause on removals). Texas and Missouri can establish significant injuries, including millions of dollars of financial harm, but the magnitude of those injuries is not relevant to the standing inquiry. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017). Plaintiffs' standing is especially clear in light of the "special solicitude" federal courts give States when considering standing. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007); *Texas*, 809 F.3d at 151.

The suspension of MPP will lead to additional illegal aliens being present in the Plaintiff States. Texas, of course, is a border State, and Defendants are releasing aliens directly into Texas who otherwise would have been enrolled in MPP. *See* ECF 11 at 2 (noting that "the largest percentage of apprehensions and inspections of noncitizens and enrollments in MPP occur[ed] in Texas"). But aliens arriving elsewhere also travel to Missouri. Statistically, for every 1,000 aliens who remain unlawfully in the United States, fifty-six end up residing in Missouri. App.006 ¶ 27.

This injures Missouri and Texas because, like other States, they "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397.

First, consider the costs that additional illegal aliens impose on Texas's driver's license program. The Fifth Circuit approved this basis for standing—"the driver's-license rationale"— when Texas challenged the legality of DAPA. *See Texas*, 809 F.3d at 150. Texas provides driver's licenses to aliens so long as their presence in the United States is authorized by the federal government. *See id.* at 155; Tex. Transp. Code § 521.142; App.425–427 ¶¶ 3–5. Because "Texas subsidizes its licenses," it "would lose" money "on each one it issued to" an alien present because of a change in federal immigration policy. *Texas*, 809 F.3d at 155. The Chief of the Texas

Department of Public Safety's Driver License Division has submitted a declaration estimating the costs of issuing additional licenses to aliens. App. 427–428 ¶ 8. If Defendants' suspension of MPP results in tens of thousands of additional aliens seeking licenses, it will cost Texas millions of dollars. App.427–428 ¶ 8; *cf. Texas*, 809 F.3d at 155 ("Even a modest estimate would put the loss at 'several million dollars.'").

Millions of dollars in harm—though certainly sufficient for standing—is not necessary. "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski*, 137 S. Ct. at 983. Thus, even the small amounts of money that Texas pays for each search of the federal government's immigration-status-verification system qualify as an injury in fact. App.427 ¶¶ 6–7. Missouri also incurs costs when aliens apply for driver's licenses. App.006 ¶¶ 29–30.

Next, consider the education, healthcare, and law enforcement costs States face when additional illegal aliens are present. District courts in Texas found these injuries sufficient to support standing when Texas challenged DACA and the Biden Administration's 100-day pause on removals. *See 809*; *Texas*, 2021 WL 723856, *10–21. They likewise support standing in this case. Texas and Missouri "bear the costs of providing these social services required by federal law, and the [suspension of MPP] increases the volume of individuals to whom they must provide these services." *Texas*, 328 F. Supp. 3d at 700.

*Education*: The suspension of MPP injures Texas and Missouri by increasing their public-education costs. Under Supreme Court precedent, federal law requires States to provide public education to illegal alien children. *See Plyler v. Doe*, 457 U.S. 202, 230 (1982). The annual cost of educating unaccompanied alien children—a subset of illegal aliens eligible for public education—cost Texas tens of millions of dollars each year from FY 2016 through FY 2019 and

more than $112 million in FY 2020. App.440–441 ¶ 4. The Associate Commissioner for School Finance/Chief School Finance Officer at the Texas Education Agency "anticipate[s] that the total costs to the State of providing public education to [unaccompanied alien children] will rise in the future to the extent that the number of [unaccompanied alien children] enrolled in the State's public school system increases." App.442 ¶ 9. "Texas incurs real financial costs in providing public education to unaccompanied children. And the harm is imminent because Texas is currently providing public education to unaccompanied children and demonstrates plans to continue doing so in the future." *Texas*, 2021 WL 723856, at *12.

Missouri is similarly injured. It spent an average of $10,654 per student in school year 2019–2020 regardless of immigration status. App.006 ¶ 25. A 2018 study shows that 3,000 illegal alien school-aged children were enrolled in Missouri schools. App.006 ¶ 26. So, Missouri spends approximately $31,962,000 in public-education costs on unlawful aliens. App.006 ¶¶ 25–26. But if Defendants continue allowing additional illegal aliens into the country rather than enrolling them in MPP, Missouri's education costs will continue to rise.

These education costs are independently sufficient for standing. They have supported standing to challenge federal agency action relating to immigration in two different cases. *See Texas*, 2021 WL 723856, at *17-18; *Texas*, 328 F. Supp. 3d at 700.

*Healthcare*: In addition, Texas funds three healthcare programs that require significant expenditures to cover illegal aliens; the Emergency Medicaid Program, the Family Violence Program, and the Texas Children's Health Insurance Program. App.450 ¶ 6. Texas is required by federal law to include illegal aliens in its Emergency Medicaid Program. *See* 42 C.F.R. § 440.255(c). Between 2007 and 2019, Texas spent an estimated $62–$90 million annually on Medicaid services for illegal aliens, including an estimated $80 million dollars in SFY 2019.

App.450–451 ¶ 7. Additionally, Texas spends over a million dollars per year providing services to illegal aliens though its Family Violence Program. App.451 ¶ 8. Texas also spends millions of dollars per year on the Children's Health Insurance Program for perinatal coverage for illegal aliens, including an estimated $38 million dollars in 2013, and $6 million in 2019. App.451–452 ¶ 9. These amounts are more than sufficient; as long as Texas spends *some* money, it has established an injury in fact.

Texas also incurs costs for uncompensated care provided by state public hospital districts to illegal aliens. Between 2006 and 2008, these estimated costs ranged from $597 million to $717 million. App.452 ¶ 10. And these figures will only increase over time. As the Chief Data and Analytics Officer at Texas's Health and Human Services Commission attested, "it is a certainty that each of these programs has some positive cost to the State of Texas due to utilization by undocumented immigrants," and "the total costs to the State of providing such services and benefits to undocumented immigrants will continue to reflect trends to the extent that the number of undocumented immigrants residing in Texas increases or decreases each year." App.452 ¶¶ 11–12.

Again, Missouri faces similar harm. In Fiscal Year 2020 alone, Missouri spent $5,427,715 in health-care costs for treatment of ineligible aliens. App.006 ¶ 28. These healthcare costs are independently sufficient injuries in fact. *See Texas*, 328 F. Supp. 3d at 700.[3]

*Criminal Justice and Human Trafficking*: Both Missouri and Texas face serious injuries from the increase in human trafficking and other crime caused by the suspension of MPP.

In one year alone, the Texas Department of Criminal Justice housed 8,951 illegal criminal aliens for a total of 2,439,110 days. App.460 ¶ 6. That cost more than $150 million, but the federal

---

[3] Texas has provided more recent and more detailed information concerning healthcare expenses than it did in *Texas*, 2021 WL 723856, at *13.

government reimbursed the State less than $15 million. App.460 ¶¶ 6–7; *see also* App.349–357 (detailing the tens of thousands of illegal aliens arrested by Texas law enforcement over the past decade). Those amounts will increase should DHS continue to parole aliens into Texas. Criminal activity by aliens that would not occur had they not been present in the State imposes significant costs on Texans, not only because of the irreparable harm resulting from criminal activity but also because of the significant financial cost of the criminal justice system. As one TDCJ official explained, "to the extent the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well." App.460 ¶ 8. These costs are sufficient for standing because "Texas's claimed injury from unanticipated detention costs is sufficiently concrete and imminent. The harm is concrete or de facto because Texas incurs real financial costs in detaining criminal aliens. And the harm is imminent because Texas is currently operating a detention system that holds criminal aliens and has demonstrated plans to continue doing so in the future." *Texas*, 2021 WL 723856, at *12.

Missouri is a destination and transit state for many human traffickers, including human traffickers of migrants from Central American countries who have crossed the border illegally. App.409–410 ¶¶ 19–22. This is mainly due to the State's substantial transportation infrastructure and major population centers. App.410 ¶ 22. Indeed, St. Louis and Kansas City are major human-trafficking hubs connected by Interstate 70. App.409–410 ¶¶ 19–22.

Missouri devotes significant resources to combating human trafficking. The Missouri Attorney General's Office, for example, has an Anti-Human Trafficking Task Force. App.403 ¶ 1; *see also* App.409 ¶ 17 (noting expenses for state and federal governments). But effectively combatting human trafficking will require even more resources if DHS is allowed to halt future enrollments into the MPP because the Task Force will have to address human trafficking efforts

that arise out of the mass-migration surge. "[T]here is a relationship between the prevalence of human trafficking in the United States and activity on the US-Mexico border." App.409 ¶ 18. "Immigration policies as they relate to the management of the southern border of the United States are a contributing factor to overall rates of human trafficking in the United States." App.409 ¶ 18. Cross-border trafficking "has implications for the overall prevalence of human trafficking in all fifty states, not just the states along the U.S. Mexico border." App.409 ¶ 18. States such as Missouri, which is well-documented destination and hub for human trafficking due to its location at the intersection of major interstate highways, *see* App.410 ¶ 22 , experience increases in human trafficking and larger numbers of human trafficking victims as a direct result of such open-border policies. App.409–410 ¶¶ 19–22. And to the extent Missouri cannot stop the increase in human trafficking, that will itself impose costs on the State. Human trafficking "has a very real price tag to it" for state social-service providers. App.408–409 ¶ 17.

The same is true for Texas, which consistently has the second highest number of human trafficking cases in the Nation. App.418 ¶ 7. A 2016 report concluded that Texas spends approximately $6.6 billion in lifetime expenditures on minor and youth sex trafficking victims, and that traffickers exploit approximately $600 million annually from victims of labor trafficking in Texas (i.e., lost wages), which necessarily results in corresponding lost tax revenue to the State. App.418–419 ¶ 7 Traffickers exploit communication barriers and a fear of deportation to isolate trafficking victims, making aliens a target of choice. App.422–423 ¶ 13; App.419 ¶ 9 (noting that 16% of trafficking cases involved foreign nationals). The Chief of the Texas Attorney General's Human Trafficking and Transnational Organized Crime Section believes that an increased number of aliens present in Texas claiming asylum will increase human trafficking, both because it is a tool that will be used by traffickers to get their victims into the United States, and because even

legitimate asylum seekers face an increased risk of being trafficked once present in the United States. App.423 ¶ 14.

Finally, Texas and Missouri have *parens partriae* standing based on their quasi-sovereign interests "in the well-being of [their] populace." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 602 (1982). That includes an interest in protecting its citizens' "well-being—both physical and economic" *Id*. at 607. "States are not barred outright from suing the federal government based on a *parens patriae* theory; rather, provided that the states are seeking to *enforce*—rather than prevent the enforcement of—a federal statute, a *parens patriae* suit between these parties may be maintained." *Texas v. United States*, 86 F. Supp. 3d 591, 626 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015). Such is the case here.

Defendants' suspension of MPP "injures the economic well-being of [Texas and Missouri] citizens because those citizens are forced to compete in distorted labor markets in which it is more difficult to obtain a job." *Texas*, 328 F. Supp. 3d at 694–95; *see also Alfred L. Snapp & Son, Inc.*, 458 U.S. at 609 (holding that avoiding unemployment among Puerto Rico's residents was a quasi-sovereign interest sufficient for standing because "[u]nemployment among Puerto Rican residents is surely a legitimate object of the Commonwealth's concern").

By paroling aliens into the United States instead of enrolling them in MPP, Defendants are increasing the supply of workers because, **according to Defendants, those aliens are eligible for work authorization. App.337.**[4] Of course, the basic economic law of supply and demand applies to the labor market, so an increase in the supply of illegal aliens authorized to work will harm the employment prospects of Texans and Missourians competing with them. *See DeCanas v. Bica*,

---

[4] USCIS, Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States (Mar. 31, 2021), https://www.uscis.gov/humanitarian/humanitarian-or-significant-public-benefit-parole-for-individuals-outside-the-united-states ("If not inconsistent with the purpose and duration of parole, we may, in our discretion, grant a parolee temporary employment authorization.").

424 U.S. 351, 356–57 (1976) (explaining that "[e]mployment of illegal aliens in times of high unemployment deprives citizens and legally admitted aliens of jobs" and that the problem is "particularly acute in California in light of the significant influx into that State of illegal aliens from neighboring Mexico").

### 2.        The January 20 Memorandum is subject to judicial review

The January 20 Memorandum is reviewable under the APA. *See* 5 U.S.C. § 701. "The APA establishes a basic presumption of judicial review for one suffering legal wrong because of agency action. That presumption can be rebutted by a showing that the relevant statute precludes review, or that the agency action is committed to agency discretion by law." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1905 (cleaned up). Neither exception applies here.

*First*, no "statutes preclude judicial review." 5 U.S.C. § 701(a)(1); *see Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 n.4 (1986). "Establishing unreviewability is a heavy burden, and where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *Texas*, 809 F.3d at 164 (cleaned up). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Id.* (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984)).

No provision of the INA prohibits judicial review here. 8 U.S.C. § 1252(g) prevents courts from hearing aliens' challenges to final orders of removal, but that has nothing to do with the Plaintiff States' challenge to the January 20 Memorandum. A State is not an "alien," and the States do not bring the underlying action "on behalf of" any alien. Thus, section 1252(g) does not preclude this Court's review. *See Texas v. United States*, No. 6:21-cv-00003, 2021 WL 247877, at *3 (S.D. Tex. Jan. 26, 2021) (rejecting the government's claim that Section 1252(g) precluded

judicial review of Texas' action challenging 100-day moratorium on removal). Moreover, the Plaintiff States' claim does not "aris[e] from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g). Rather, their claim arises from Defendants' suspension of new enrollments into MPP. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1907 (holding the rescission of DACA reviewable); *Texas*, 809 F.3d at 164 (holding DAPA was reviewable).

Section 1252(f), likewise, does not bar judicial review here. To be sure, under Section 1252(f)(1), "Congress stripped all courts, save for the Supreme Court, of jurisdiction to enjoin or restrain the operation of 8 U.S.C. §§ 1221–1232 on a class-wide basis." *Hamama v. Adducci*, 946 F.3d 875, 877 (6th Cir. 2020) (Sutton, J.). But Plaintiffs are not seeking to enjoin operation of those statutory sections. Far from it, the Plaintiff States want Defendants to comply with federal statutes and cease implementation of an unlawful memorandum.

*Second*, allowing aliens without credible claims of asylum to skip their court dates, remain in the country unlawfully, and escape removal is not "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "To honor the presumption of review," the Supreme Court has "read the exception in § 701(a)(2) quite narrowly, confining it to those rare administrative decisions traditionally left to agency discretion." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1905. The January 20 Memorandum is not within that "limited category." *Id.* Although "an agency's decision not to institute enforcement proceedings" is often not reviewable, the January 20 Memorandum is not "simply a non-enforcement policy." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1905–07 (holding that DACA is not "simply a non-enforcement policy" but instead "a program for conferring affirmative immigration relief," meaning "that program—and its rescission—is an action that provides a focus for judicial review") (cleaned up). Although INA "provisions leave much to

[DHS's] discretion," "they do not leave [its] discretion unbounded." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019). Because there is a "meaningful standard by which to judge [Defendants'] action," the January 20 Memorandum is reviewable. *Id.*

Any reviewability argument made by Defendants would fail for the reasons explained above. But even if the January 20 Memorandum were not reviewable under the APA, that would not preclude the Court from considering claims based on the Take Care Clause or the Agreement. Those claims are properly before the Court even without the APA, so Section 701 cannot be an obstacle. *See* 5 U.S.C. § 701(a) (establishing a rule for "[t]his chapter").

### 3.    The January 20 Memorandum is final agency action

Agency action is "final" for the purposes of judicial review if two conditions are met: "First, the action must mark the consummation of the agency's decision making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks omitted).

The January 20 Memorandum directs DHS to immediately "suspend new enrollments" into MPP. App.032. That is not tentative. The fact that the suspension is "pending further review of the program" does not alter the final nature of the agency action. App.032. "'[D]iscretion' to reverse course, by itself, is insufficient to convert an action that is final to one that is nonfinal." *Texas*, 2021 WL 723856, at *32.

The January 20 Memorandum determines rights and obligations. Federal officials were immediately obligated to allow otherwise removable aliens to be released into the United States, where many will disappear, rather than enrolled in MPP. *See Texas*, 2021 WL 723856, at *32 (finding final agency action where a memorandum "alters DHS's obligation"). The January 20 Memorandum also relieves illegal aliens from the prospect of being removed and thus constitutes

27

a significant benefit to them. *See id.* (finding final agency action where a memorandum affected aliens). And the Plaintiff States will be obligated to provide social services to illegal aliens who remain unlawfully in the United States. *See Texas*, 328 F. Supp. 3d at 731, 737 (DACA "impacts the obligations of the individual States" because "the program requires states to spend money on various social services" and "the program affects the obligations of the United States Government" because "it obligates the Government to forebear from implementing immigration enforcement proceedings"). Additionally, the January 20 Memorandum causes "legal consequences" such as increasing the likelihood that Defendants will release illegal aliens from custody into the interior during their removal proceedings. In any event, "final agency action" is a requirement of the APA, not the Constitution or the Agreement, so it does not affect Plaintiff States' other claims. 5 U.S.C. § 704.

## II.     Texas and Missouri Will Suffer Irreparable Harm if an Injunction Is Not Granted

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Instead, "[t]he plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id.* (footnote omitted).

The Plaintiff States can readily make this showing. They face significant financial costs. *See supra* Part I.E.1. These increased financial expenditures will irreparably harm the States because they cannot recover the money from the federal government. *See Texas*, 809 F.3d at 186; *Texas*, 328 F. Supp. 3d at 737 (state's financial injury was irreparable because "there is no source of recompense"); *Texas*, 2021 WL 723856, at *48 ("[N]o Party has suggested that Texas could recover any of its likely financial injury here, and the Court cannot conceive of any path for Texas to pierce the federal government's usual sovereign immunity or contrive a remedial cause of action

sufficient to recover from its budgetary harm.").

DHS has already acknowledged that policies like those in the January 20 Memorandum cause States irreparable harm. According to DHS, "Texas, like other States, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can impact Texas's law enforcement, housing, education, employment, commerce, and healthcare needs and budgets." App.318 § II. DHS specifically agreed that upon breach of its agreement with Texas, "an aggrieved party will be irreparably damaged and will not have an adequate remedy at law." App.322 § VI.

Texas and Missouri face particular harm because the rushed implementation of the January 20 Memorandum deprived them of the ability to adjust their policies in light of the federal shift. As DHS itself has acknowledged, "[t]he harm to Texas is particularly acute where its budget has been set months or years in advance and it has no time to adjust its budget to respond to DHS policy changes." App.318 § II.

## III.    The Equities Overwhelmingly Favor an Injunction

The threat of injury to Missouri and Texas outweighs any potential harm to Defendants. In fact, Defendants face no cognizable harm from a preliminary injunction. They have no legitimate interest in the implementation of an unlawful memorandum. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (recognizing that government officials "do[] not have an interest in the enforcement of an unconstitutional law"); *Texas*, 2021 WL 723856, at *51. But even if Defendants had a legitimate interest in the January 20 Memorandum, they face no substantial prejudice from a delayed implementation. DHS has already recognized that any costs from delaying new policies is outweighed by the benefits of consultation and more reasoned decisionmaking. App.319 § II.

Further, the public interest strongly favors the Plaintiff States. The Biden Administration's three-line memorandum indefinitely suspending the highly effective MPP has contributed to a massive humanitarian crisis at the border. The suspension has induced a huge surge of Central American migrants, including thousands of unaccompanied minors, to pass through Mexico and advance meritless claims of asylum at the U.S. border. This migrant surge emboldens organized crime and drug cartels that prey on migrant communities and children through human trafficking, violence, extortion, sexual assault, and exploitation. It has led to an explosion in human trafficking activity across the border. The suspension of the MPP, the resulting border crisis, and their devastating impact on migrants and victims of human trafficking have spillover effects that directly injure the Plaintiff States.

The Biden Administration's unreasoned and ill-advised decision to suspend new enrollments into the MPP exacerbates the tragic crises of sexual assault and sex trafficking among migrant and immigrant communities. *See supra* Statement of Facts. Sex trafficking within the United States afflicts the community of unlawful immigrants with particular harm. The Polaris Project, which operates the National Human Trafficking Hotline, highlights the critical risks of human trafficking that migrants face. Polaris's 2019 Report, *The Latino Face of Human Trafficking and Exploitation in the United States*, emphasizes that "immigrants are extremely vulnerable to both sex and labor trafficking, in part as a direct result of their migration." App.240. "In particular, while anyone can fall prey to traffickers, the data shows that an incredibly high number of people who come to this country from Latin America and the Caribbean are being exploited in this way." App.240.

For those who fall victim to such sex trafficking, the outlook is grim indeed: "Extreme physical and sexual violence, often accompanied by weapons, is common, as is coercion in the

form of unmanageable quotas, debts, threats of harm or police involvement, excessive monitoring, gang intimidation, social isolation, and constant surveillance." App.248. Again, the Polaris Project emphasizes that the data gleaned from the Hotline almost certainly undercounts the actual incidence of human exploitation: "What we learn about through the Trafficking Hotline is likely only a miniscule sliver of what is really happening around the country." App.241; *see also* App.409 ¶ 19 (noting that reported incidents of human trafficking "are just the proverbial 'tip of the iceberg'"). Human trafficking of minors is particularly underreported. "Unaccompanied and undocumented minors who enter the United States via smugglers are extremely vulnerable to traffickers and other abusers. There is no one to file a missing child report, or issue an Amber Alert. There is no record that the child is even here in this country. No one even knows to look." App.407 ¶ 13.

Tens of thousands of unaccompanied minors are now crossing the border every month. App.004 ¶ 9; App.056–078. (CBP reporting 18,890 border encounters with unaccompanied minors in March 2021 alone). No one will ever know how many thousands of those children are simply vanishing into lives of commercial sex slavery, rape, and abuse. *See, e.g.,* App.411 ¶ 26 (describing online sexual abuse involving live online sessions of sexual abuse of very young children, and noting that "[c]hildren who are unaccompanied and undocumented in the United States are ideal potential victims for this form of horrific abuse"). By removing a powerful "pull factor" creating incentives for illegal migration, App.404 ¶ 6, reinstating the MPP will reduce these critical problems.

"'[T]he public is served when the law is followed,' and the public will indeed be served if DHS is enjoined from suspending the law." *Texas*, 2021 WL 723856, at *51 (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)).

## IV.     The Injunction Should Apply Nationwide

The injunction should govern Defendants' conduct nationwide. As the U.S. District Court for the Southern District of Texas recently held, nationwide relief is appropriate in the immigration context because "the Fifth Circuit's precedent in this area is applicable and controlling." *Texas*, 2021 WL 723856, at * 53; *see also Texas*, 2021 WL 247877, at *7–8. A geographically limited injunction would be improper because federal immigration law must be uniform. *Texas*, 809 F.3d at 187–88; *see also Arizona*, 567 U.S. at 401 (explaining that federal law contemplates a "comprehensive and unified" immigration policy).

A geographically limited injunction would also be "ineffective" for redressing Plaintiffs' injuries "because [aliens] would be free to move among states." *Texas*, 809 F.3d at 188. According to the Census Bureau, more than 50,000 noncitizens moved into Texas from another U.S. State in 2019. App.362–363 (showing almost 3 million noncitizens residing in Texas and that 1.8% of them moved from another State within the last year). This is in keeping with a previous analysis by the Texas State Demographer finding that "domestic migration accounts for almost 40 percent of the growth in the State's foreign-born population." App.372; *see also* App.388 (showing net migration to Texas from other States).

That is why federal courts have granted nationwide injunctions in previous challenges to federal immigration policies. *See Texas*, 809 F.3d at 187; *Texas*, 2021 WL 723856, at * 53. This Court should do likewise.

### CONCLUSION

The Plaintiff States respectfully request that the Court issue a preliminary injunction preventing Defendants from implementing the January 20 Memorandum.

Date: May 14, 2021

Respectfully submitted.

ERIC S. SCHMITT
Attorney General of Missouri

KEN PAXTON
Attorney General of Texas

/s/ *D. JOHN SAUER*
D. JOHN SAUER, #58720MO*
Solicitor General

BRENT WEBSTER
First Assistant Attorney General

JESUS A. OSETE, #69267MO*
Deputy Solicitor General

JUDD E. STONE II
Solicitor General
Texas Bar No. 24076720

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-8870
Fax (573) 751-0774
John.Sauer@ago.mo.gov

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Texas Bar No. 00798537

/s/ *William T. Thompson*
WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
*Attorney-in-Charge*
Texas Bar No. 24088531

*Counsel for Plaintiff State of Missouri*

*Admitted pro hac vice

RYAN D. WALTERS
Special Counsel
Texas Bar No. 24105085

OFFICE OF THE ATTORNEY GENERAL
SPECIAL LITIGATION UNIT
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov

*Counsel for Plaintiff State of Texas*

**CERTIFICATE OF CONFERENCE**

I certify that, on May 14, 2021, I conferred with Defendants' counsel, who represented that Defendants oppose this motion.

/s/ William T. Thompson
WILLIAM T. THOMPSON

**CERTIFICATE OF SERVICE**

I certify that on May 14, 2021, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

/s/ William T. Thompson
WILLIAM T. THOMPSON