# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF RYAN D. WALTERS**

# EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| THE STATE OF TEXAS and §<br>§<br>THE STATE OF MISSOURI, §<br>§<br>    Plaintiffs, §<br>§<br>v. §<br>§<br>JOSEPH R. BIDEN, JR., in his official §<br>capacity as President of the United States §<br>of America, *et al.*, §<br>§<br>    Defendants. §<br>§ | Case No. 2:21-cv-00067-Z |

**DECLARATION OF RYAN D. WALTERS IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Ryan D. Walters, hereby declare as follows:

1.      I am over 18 years of age and am fully competent to make this declaration. I am

Special Counsel in the Special Litigation Unit at the Texas Office of Attorney General, and I am

admitted to practice law in this Court, and I represent the State of Texas in the above-captioned

matter. I submit this Declaration in support of Plaintiffs' Motion for Preliminary Injunction. I have

personal knowledge of the facts stated herein.

2.      Appended to the Plaintiffs' Motion for Preliminary Injunction are the following

exhibits:

| Ex. No. | Title |
|---|---|
| 1 | U.S. Dept. of Homeland Security Migrant Protection Protocols Website, which is publicly available at Dep't of Homeland Sec., *Migrant Protection Protocols* (Jan. 24, 2019), https://www.dhs.gov/news/2019/ 01/24/migrant-protection-protocols |
| 2 | Assessment of the Migrant Protection Protocols (Oct. 28, 2019), which is publicly available at Dep't of Homeland Sec., *Assessment of the Migrant Protection Protocols* |

| | |
|---|---|
| | *(MPP)*, https://www.dhs.gov/sites /default/files/publications/assessment_of_the_migrant_protection_protocols_mpp.pdf |
| 3 | Memorandum of Understanding between the U.S. Department of Homeland Security and the State of Texas |
| 4 | U.S. Customs and Border Protection Custody and Transfer Statistics FY2021, which is publicly available at U.S. Customs and Border Protection, *Custody and Transfer Statistics FY2021*, Office of Field Operations - Dispositions and Transfers, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics |
| 5 | U.S. Customs and Immigration Services Description of Parole, which is publicly available at USCIS, *Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States*, "What is Parole?" (Mar. 31, 2021), https://www.uscis.gov/humanitarian/humanitarian-or-significant-public-benefit-parole-for-individuals-outside-the-united-states. |
| 6 | U.S. Department of Homeland Security's Letter to Texas Attorney General Ken Paxton |
| 7 | Texas Department of Public Safety Texas Criminal Illegal Alien Data |
| 8 | U.S. Census Bureau Table – Geographic Mobility by Citizenship Status |
| 9 | Foreign-Born Population in Texas: Sources of Growth |
| 10 | Gone to Texas |

3.      The exhibits listed above are true and correct copies of what they purport to be.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on May 14, 2021

*/s/ Ryan D. Walters*
Ryan D. Walters

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2021, I electronically filed the foregoing document through the Court's ECF system, which automatically serves notification of the filing on counsel for all parties.

*/s/ Ryan D. Walters*
Ryan D. Walters

2

**App.299**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF RYAN D. WALTERS

U.S. Dept. of Homeland Security Migrant Protection Protocols Website

# EXHIBIT B-1



Official website of the Department of Homeland Security

U.S. Department of
Homeland Security

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Migrant Protection Protocols

**Release Date:** January 24, 2019

*"We have implemented an unprecedented action that will address the urgent humanitarian and security crisis at the Southern border. This humanitarian approach will help to end the exploitation of our generous immigration laws. The Migrant Protection Protocols represent a methodical commonsense approach, exercising long-standing statutory authority to help address the crisis at our Southern border." – Secretary of Homeland Security Kirstjen M. Nielsen*

## What Are the Migrant Protection Protocols?

The Migrant Protection Protocols (MPP) are a U.S. Government action whereby certain foreign individuals entering or seeking admission to the U.S. from Mexico – illegally or without proper documentation – may be returned to Mexico and wait outside of the U.S. for the duration of their immigration proceedings, where Mexico will provide them with all appropriate humanitarian protections for the duration of their stay.

## Why is DHS Instituting MPP?

The U.S. is facing a security and humanitarian crisis on the Southern border. The Department of Homeland Security (DHS) is using all appropriate resources and authorities to address the crisis and execute our missions to secure the borders, enforce immigration and customs laws,

facilitate legal trade and travel, counter traffickers, smugglers and transnational criminal organizations, and interdict drugs and illegal contraband.

MPP will help restore a safe and orderly immigration process, decrease the number of those taking advantage of the immigration system, and the ability of smugglers and traffickers to prey on vulnerable populations, and reduce threats to life, national security, and public safety, while ensuring that vulnerable populations receive the protections they need.

Historically, illegal aliens to the U.S. were predominantly single adult males from Mexico who were generally removed within 48 hours if they had no legal right to stay; now over 60% are family units and unaccompanied children and 60% are non-Mexican. In FY17, CBP apprehended 94,285 family units from Honduras, Guatemala, and El Salvador (Northern Triangle) at the Southern border. Of those, 99% remain in the country today.

Misguided court decisions and outdated laws have made it easier for illegal aliens to enter and remain in the U.S. if they are adults who arrive with children, unaccompanied alien children, or individuals who fraudulently claim asylum. As a result, DHS continues to see huge numbers of illegal migrants and a dramatic shift in the demographics of aliens traveling to the border, both in terms of nationality and type of aliens- from a demographic who could be quickly removed when they had no legal right to stay to one that cannot be detained and timely removed.

In October, November, and December of 2018, DHS encountered an average of 2,000 illegal and inadmissible aliens a day at the Southern border. While not an all-time high in terms of overall numbers, record increases in particular types of migrants, such as family units, travelling to the border who require significantly more resources to detain and remove (when our courts and laws even allow that), have overwhelmed the U.S. immigration system, leading to a "system" that enables smugglers and traffickers to flourish and often leaves aliens in limbo for years. This has been a prime  cause of our near-800,000 case backlog in immigration courts and delivers no consequences to aliens who have entered illegally.

Smugglers and traffickers are also using outdated laws to entice migrants to undertake the dangerous journey north where on the route migrants report high rates of abuse, violence, and sexual assault. Human smugglers and traffickers exploit migrants and seek to turn human misery into profit. Transnational criminal organizations and gangs are also deliberately exploiting the situation to bring drugs, violence, and illicit goods into American communities. The activities of these smugglers, traffickers, gangs and criminals endanger the security of the U.S., as well as partner nations in the region.

The situation has had severe impacts on U.S. border security and immigration operations. The dramatic increase in illegal migration, including unprecedented number of families and

fraudulent asylum claims is making it harder for the U.S. to devote appropriate resources to individuals who are legitimately fleeing persecution. In fact, approximately 9 out of 10 asylum claims from Northern Triangle countries are ultimately found non-meritorious by federal immigration judges. Because of the court backlog and the impact of outdated laws and misguided court decisions, many of these individuals have disappeared into the country before a judge denies their claim and simply become fugitives.

The MPP will provide a safer and more orderly process that will discourage individuals from attempting illegal entry and making false claims to stay in the U.S., and allow more resources to be dedicated to individuals who legitimately qualify for asylum.

# What Gives DHS the Authority to Implement MPP?

Section 235 of the Immigration and Nationality Act (INA) addresses the inspection of aliens seeking to be admitted into the U.S. and provides specific procedures regarding the treatment of those not clearly entitled to admission, including those who apply for asylum.  Section 235(b)(2)(C) provides that "in the case of an alien . . . who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the U.S.," the Secretary of Homeland Security "may return the alien to that territory pending a [removal] proceeding under § 240" of the INA.  The U.S. has notified the Government of Mexico that it is implementing these procedures under U.S. law.

# Who is Subject to MPP?

With certain exceptions, MPP applies to aliens arriving in the U.S. on land from Mexico (including those apprehended along the border) who are not clearly admissible and who are placed in removal proceedings under INA § 240.  This includes aliens who claim a fear of return to Mexico at any point during apprehension, processing, or such proceedings, but who have been assessed not to be more likely than not to face persecution or torture in Mexico. Unaccompanied alien children and aliens in expedited removal proceedings will not be subject to MPP.  Other individuals from vulnerable populations may be excluded on a case-by-case basis.

# How Will MPP Work Operationally?

Certain aliens attempting to enter the U.S. illegally or without documentation, including those who claim asylum, will no longer be released into the country, where they often fail to file an

asylum application and/or disappear before an immigration judge can determine the merits of any claim. Instead, these aliens will be given a "Notice to Appear" for their immigration court hearing and will be returned to Mexico until their hearing date.

While aliens await their hearings in Mexico, the Mexican government has made its own determination to provide such individuals the ability to stay in Mexico, under applicable protection based on the type of status given to them.

Aliens who need to return to the U.S. to attend their immigration court hearings will be allowed to enter and attend those hearings. Aliens whose claims are found meritorious by an immigration judge will be allowed to remain in the U.S. Those determined to be without valid claims will be removed from the U.S. to their country of nationality or citizenship.

DHS is working closely with the U.S. Department of Justice's Executive Office for Immigration Review to streamline the process and conclude removal proceedings as expeditiously as possible.

# Will Migrants in MPP Have Access to Counsel?

Consistent with the law, aliens in removal proceedings can use counsel of their choosing at no expense to the U.S. Government. Aliens subject to MPP will be afforded the same right and provided with a list of legal services providers in the area which offer services at little or no expense to the migrant.

# What Are the Anticipated Benefits of MPP?

Every month, tens of thousands of individuals arrive unlawfully at the Southern Border. MPP will reduce the number of aliens taking advantage of U.S. law and discourage false asylum claims. Aliens will not be permitted to disappear into the U.S. before a court issues a final decision on whether they will be admitted and provided protection under U.S. law. Instead, they will await a determination in Mexico and receive appropriate humanitarian protections there. This will allow DHS to more effectively assist legitimate asylum-seekers and individuals fleeing persecution, as migrants with non-meritorious or even fraudulent claims will no longer have an incentive for making the journey. Moreover, MPP will reduce the extraordinary strain on our border security and immigration system, freeing up personnel and resources to better protect our sovereignty and the rule of law by restoring integrity to the American immigration system.

# Additional Information

- **Secretary Nielsen Implementation Memo** (/publication/policy-guidance-implementation-migrant-protection-protocols) (January 25, 2019, PDF)

Topics: Border Security (/topics/border-security) , Immigration and Customs Enforcement (/topics/immigration-enforcement)

Keywords: Border Security (/keywords/border-security) , Immigration Enforcement (/keywords/immigration-enforcement) ,
Migrant Protection Protocols (MPP) (/keywords/migrant-protection-protocols-mpp) , Southwest Border (/keywords/southwest-border)

Last Published Date: January 24, 2019

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF RYAN D. WALTERS**

Assessment of the Migrant Protection Protocols (Oct. 28, 2019)

# EXHIBIT B-2

**Assessment of the Migrant Protection Protocols (MPP)**
**October 28, 2019**

## I.   Overview and Legal Basis

The Department of Homeland Security (DHS) remains committed to using all available tools to address the unprecedented security and humanitarian crisis at the southern border of the United States.

- At peak of the crisis in May 2019, there were more than 4,800 aliens crossing the border daily—representing an average of more than *three apprehensions per minute*.

- The law provides for mandatory detention of aliens who unlawfully enter the United States between ports of entry if they are placed in expedited removal proceedings. However, resource constraints during the crisis, as well as other court-ordered limitations on the ability to detain individuals, made many releases inevitable, particularly for aliens who were processed as members of family units.

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) authorizes the Department of Homeland Security to return certain applicants for admission to the contiguous country from which they are arriving on land (whether or not at a designated port of entry), pending removal proceedings under INA § 240.

- Consistent with this express statutory authority, DHS began implementing the Migrant Protection Protocols (MPP) and returning aliens subject to INA § 235(b)(2)(C) to Mexico, in January 2019.

- Under MPP, certain aliens who are nationals and citizens of countries other than Mexico (third-country nationals) arriving in the United States by land from Mexico who are not admissible may be returned to Mexico for the duration of their immigration proceedings.

The U.S. government initiated MPP pursuant to U.S. law, but has implemented and expanded the program through ongoing discussions, and in close coordination, with the Government of Mexico (GOM).

- MPP is a core component of U.S. foreign relations and bilateral cooperation with GOM to address the migration crisis across the shared U.S.-Mexico border.

- MPP expansion was among the key "meaningful and unprecedented steps" undertaken by GOM "to help curb the flow of illegal immigration to the U.S. border since the launch of the U.S.-Mexico Declaration in Washington on June 7, 2019."[1]

---

[1] https://www.whitehouse.gov/briefings-statements/readout-vice-president-mike-pences-meeting-mexican-foreign-secretary-marcelo-ebrard/

1

- On September 10, 2019, Vice President Pence and Foreign Minister Ebrard "agree[d] to implement the Migrant Protection Protocols to the fullest extent possible."[2]

- Therefore, disruption of MPP would adversely impact U.S. foreign relations—along with the U.S. government's ability to effectively address the border security and humanitarian crisis that constitutes an ongoing national emergency.[3]

## II.   MPP Has Demonstrated Operational Effectiveness

In the past nine months—following a phased implementation, and in close coordination with GOM—DHS has returned more than 55,000 aliens to Mexico under MPP. MPP has been an indispensable tool in addressing the ongoing crisis at the southern border and restoring integrity to the immigration system.

### *Apprehensions of Illegal Aliens are Decreasing*

- Since a recent peak of more than 144,000 in May 2019, total enforcement actions—representing the number of aliens apprehended between points of entry or found inadmissible at ports of entry—have decreased by 64%, through September 2019.

- Border encounters with Central American families—who were the main driver of the crisis and comprise a majority of MPP-amenable aliens—have decreased by approximately 80%.

- Although MPP is one among many tools that DHS has employed in response to the border crisis, DHS has observed a connection between MPP implementation and decreasing enforcement actions at the border—including a rapid and substantial decline in apprehensions in those areas where the most amenable aliens have been processed and returned to Mexico pursuant to MPP.

### *MPP is Restoring Integrity to the System*

- Individuals returned to Mexico pursuant to MPP are now at various stages of their immigration proceedings: some are awaiting their first hearing; some have completed their first hearing and are awaiting their individual hearing; some have received an order of removal from an immigration judge and are now pursuing an appeal; some have established a fear of return to Mexico and are awaiting their proceedings in the United States; some have been removed to their home countries; and some have withdrawn claims and elected to voluntarily return to their home countries.

---

[2] https://www.whitehouse.gov/briefings-statements/readout-vice-president-mike-pences-meeting-mexican-foreign-secretary-marcelo-ebrard/
[3] https://www.whitehouse.gov/presidential-actions/presidential-proclamation-declaring-national-emergency-concerning-southern-border-united-states/

- MPP returnees with meritorious claims can be granted relief or protection within months, rather than remaining in limbo for years while awaiting immigration court proceedings in the United States.

  - The United States committed to GOM to minimize the time that migrants wait in Mexico for their immigration proceedings.  Specifically, the Department of Justice (DOJ) agreed to treat MPP cases such as detained cases such that they are prioritized according to longstanding guidance for such cases.

  - The first three locations for MPP implementation—San Diego, Calexico, and El Paso—were chosen because of their close proximity to existing immigration courts.

  - After the June 7, 2019, Joint Declaration between GOM and the United States providing for expansion of MPP through bilateral cooperation, DHS erected temporary, dedicated MPP hearing locations at ports of entry in Laredo and Brownsville, in coordination with DOJ, at a total six-month construction and operation cost of approximately $70 million.

  - Individuals processed in MPP receive initial court hearings within two to four months, and—as of October 21, 2019—almost 13,000 cases had been completed at the immigration court level.

  - A small subset of completed cases have resulted in grants of relief or protection, demonstrating that MPP returnees with meritorious claims can receive asylum, or any relief or protection for which they are eligible, more quickly via MPP than under available alternatives.

  - Individuals not processed under MPP generally must wait years for adjudication of their claims.  There are approximately one million pending cases in DOJ immigration courts.  Assuming the immigration courts received no new cases and completed existing cases at a pace of 30,000 per month—it would take several years, until approximately the end of 2022, to clear the existing backlog.

- MPP returnees who do not qualify for relief or protection are being quickly removed from the United States.  Moreover, aliens without meritorious claims—which no longer constitute a free ticket into the United States—are beginning to voluntarily return home.

  - According to CBP estimates, approximately 20,000 people are sheltered in northern Mexico, near the U.S. border, awaiting entry to the United States.  This number— along with the growing participation in an Assisted Voluntary Return (AVR) program operated by the International Organization for Migration (IOM), as described in more detail below—suggests that a significant proportion of the 55,000+ MPP returnees have chosen to abandon their claims.

### III.   Both Governments Endeavor to Provide Safety and Security for Migrants

- The Government of Mexico (GOM) has publicly committed to protecting migrants.

  - A December 20, 2018, GOM statement indicated that "Mexico will guarantee that foreigners who have received their notice fully enjoy the rights and freedoms recognized in the Constitution, in the international treaties to which the Mexican State is a party, as well as in the current Migration Law.  They will be entitled to equal treatment without any discrimination and due respect to their human rights, as well as the opportunity to apply for a work permit in exchange for remuneration, which will allow them to meet their basic needs."

    - Consistent with its commitments, GOM has accepted the return of aliens amenable to MPP.  DHS understands that MPP returnees in Mexico are provided access to humanitarian care and assistance, food and housing, work permits, and education.

    - GOM has launched an unprecedented enforcement effort bringing to justice transnational criminal organizations (TCOs) who prey on migrants transiting through Mexico—enhancing the safety of all individuals, including MPP-amenable aliens.

  - As a G-20 country with many of its 32 states enjoying low unemployment and crime, Mexico's commitment should be taken in good faith by the United States and other stakeholders.  Should GOM identify any requests for additional assistance, the United States is prepared to assist.

- Furthermore, the U.S. government is partnering with international organizations offering services to migrants in cities near Mexico's northern border.

  - In September 2019, the U.S. Department of State Bureau of Population, Refugees, and Migration (PRM) funded a $5.5 million project by IOM to provide shelter in cities along Mexico's northern border to approximately 8,000 vulnerable third-country asylum seekers, victims of trafficking, and victims of violent crime in cities along Mexico's northern border.

  - In late September 2019, PRM provided $11.9 million to IOM to provide cash-based assistance for migrants seeking to move out of shelters and into more sustainable living.

- The U.S. Government is also supporting options for those individuals who wish to voluntarily withdraw their claims and receive free transportation home.  Since November 2018, IOM has operated its AVR program from hubs within Mexico and Guatemala, including Tijuana and Ciudad Juarez.  PRM has provided $5 million to IOM to expand that program to Matamoros and Nuevo Laredo and expand operations in other Mexican

4

**App.310**

northern border cities.  As of mid-October, almost 900 aliens in MPP have participated in the AVR program.

- The United States' ongoing engagement with Mexico is part of a larger framework of regional collaboration.  Just as United Nations High Commissioner for Refugees has called for international cooperation to face the serious challenges in responding to large-scale movement of migrants and asylum-seekers travelling by dangerous and irregular means, the U.S. Government has worked with Guatemala, El Salvador, and Honduras to form partnerships on asylum cooperation (which includes capacity-building assistance), training and capacity building for border security operations, biometrics data sharing and increasing access to H-2A and H-2B visas for lawful access to the United States.

## IV.    Screening Protocols Appropriately Assess Fear of Persecution or Torture

- When a third-country alien states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, the alien is referred to U.S. Citizenship & Immigration Services (USCIS).  Upon referral, USCIS conducts an MPP fear-assessment interview to determine whether it is more likely than not that the alien will be subject to torture or persecution on account of a protected ground if returned to Mexico.

    o  MPP fear assessments are conducted consistent with U.S. law implementing the *non-refoulement* obligations imposed on the United States by certain international agreements and inform whether an alien is processed under—or remains—in MPP.

    o  As used here, "persecution" and "torture" have specific international and domestic legal meanings distinct from fear for personal safety.

- Fear screenings are a well-established part of MPP.  As of October 15, 2019, USCIS completed over 7,400 screenings to assess a fear of return to Mexico.

    o  That number included individuals who express a fear upon initial encounter, as well as those who express a fear of return to Mexico at any subsequent point in their immigration proceedings, including some individuals who have made multiple claims.

    o  Of those, approximately 13% have received positive determinations and 86% have received negative determinations.

    o  Thus, the vast majority of those third-country aliens who express fear of return to Mexico are not found to be more likely than not to be tortured or persecuted on account of a protected ground there.  This result is unsurprising, not least because aliens amenable to MPP voluntarily entered Mexico en route to the United States.

5

## V.      Summary and Conclusion

In recent years, only about 15% of Central American nationals making asylum claims have been granted relief or protection by an immigration judge.  Similarly, affirmative asylum grant rates for nationals of Guatemala, El Salvador, and Honduras were approximately 21% in Fiscal Year 2019.  At the same time, there are—as noted above—over one million pending cases in DOJ immigration courts, in addition to several hundred thousand asylum cases pending with USCIS.

These unprecedented backlogs have strained DHS resources and challenged its ability to effectively execute the laws passed by Congress and deliver appropriate immigration consequences: those with meritorious claims can wait years for protection or relief, and those with non-meritorious claims often remain in the country for lengthy periods of time.

This broken system has created perverse incentives, with damaging and far-reaching consequences for both the United States and its regional partners.  In Fiscal Year 2019, certain regions in Guatemala and Honduras saw 2.5% of their population migrate to the United States, which is an unsustainable loss for these countries.

MPP is one among several tools DHS has employed effectively to reduce the incentive for aliens to assert claims for relief or protection, many of which may be meritless, as a means to enter the United States to live and work during the pendency of multi-year immigration proceedings. Even more importantly, MPP also provides an opportunity for those entitled to relief to obtain it within a matter of months.  MPP, therefore, is a cornerstone of DHS's ongoing efforts to restore integrity to the immigration system—and of the United States' agreement with Mexico to address the crisis at our shared border.

**Appendix A: Additional Analysis of MPP Fear-Assessment Protocol**

U.S. Citizenship and Immigration Services (USCIS) strongly believes that if DHS were to change its fear-assessment protocol to affirmatively ask an alien amenable to MPP whether he or she fears return to Mexico, the number of fraudulent or meritless fear claims will significantly increase. This prediction is, in large part, informed by USCIS's experience conducting credible fear screenings for aliens subject to expedited removal. Credible fear screenings occur when an alien is placed into expedited removal under section 235(b)(1) of the Immigration and Nationality Act – a streamlined removal mechanism enacted by Congress to allow for prompt removal of aliens who lack valid entry documents or who attempt to enter the United States by fraud – and the alien expresses a fear of return to his or her home country or requests asylum. Under current expedited removal protocol, the examining immigration officer – generally U.S. Customs and Border Protection officers at a port of entry or Border Patrol agents – read four questions, included on Form I-867B, to affirmatively ask each alien subject to expedited removal whether the alien has a fear of return to his or her country of origin.[4]

The percentage of aliens subject to expedited removal who claimed a fear of return or requested asylum was once quite modest. However, over time, seeking asylum has become nearly a default tactic used by undocumented aliens to secure their release into the United States. For example, in 2006, of the 104,440 aliens subjected to expedited removal, only 5% (5,338 aliens) were referred for a credible fear interview with USCIS. In contrast, 234,591 aliens were subjected to expedited removal in 2018, but 42% (or 99,035) were referred to USCIS for a credible fear interview, significantly straining USCIS resources.

Table A1: Aliens Subject to Expedited Removal and Share Making Fear Claims, FY 2006 - 2018

| Fiscal Year | Subjected to Expedited Removal | Referred for a Credible Fear Interview | Percentage Referred for Credible Fear |
|---|---|---|---|
| 2006 | 104,440 | 5,338 | 5% |
| 2007 | 100,992 | 5,252 | 5% |
| 2008 | 117,624 | 4,995 | 4% |
| 2009 | 111,589 | 5,369 | 5% |
| 2010 | 119,876 | 8,959 | 7% |
| 2011 | 137,134 | 11,217 | 8% |
| 2012 | 188,187 | 13,880 | 7% |
| 2013 | 241,442 | 36,035 | 15% |
| 2014 | 240,908 | 51,001 | 21% |
| 2015 | 192,120 | 48,052 | 25% |
| 2016 | 243,494 | 94,048 | 39% |
| 2017 | 178,129 | 78,564 | 44% |
| 2018 | 234,591 | 99,035 | 42% |

---

[4] *See* 8 C.F.R.§ 235.3(b)(2).

7

Transitioning to an affirmative fear questioning model for MPP-amenable aliens would likely result in a similar increase.  Once it becomes known that answering "yes" to a question can prevent prompt return to Mexico under MPP, DHS would experience a rise in fear claims similar to the expedited removal/credible fear process.  And, affirmatively drawing out this information from aliens rather than reasonably expecting them to come forward on their own initiative could well increase the meritless fear claims made by MPP-amenable aliens.

It also bears emphasis that relatively small proportions of aliens who make fear claims ultimately are granted asylum or another form of relief from removal. Table A2 describes asylum outcomes for aliens apprehended or found inadmissible on the Southwest Border in fiscal years 2013 – 2018.  Of the 416 thousand aliens making fear claims during that six-year period, 311 thousand (75 percent) had positive fear determinations, but only 21 thousand (7 percent of positive fear determinations) had been granted asylum or another form of relief from removal as of March 31, 2019, versus 72 thousand (23 percent) who had been ordered removed or agreed to voluntary departure. (Notably, about 70 percent of aliens with positive fear determinations in FY 2013 – 2018 remained in EOIR proceedings as of March 31, 2019.)

Table A2: Asylum Outcomes, Southwest Border Encounters, FY 2013 – 2018

| Year of Encounter | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|
| Total Encounters | 490,093 | 570,832 | 446,060 | 560,432 | 416,645 | 522,626 | 3,006,688 |
| Subjected to ER | 225,426 | 222,782 | 180,328 | 227,382 | 160,577 | 214,610 | 1,231,105 |
| Fear Claims[1] | 39,648 | 54,850 | 50,588 | 98,265 | 72,026 | 100,756 | 416,133 |
| Positive Fear Determinations[2] | 31,462 | 36,615 | 35,403 | 76,005 | 55,251 | 75,856 | 310,592 |
| Asylum Granted or Other Relief[3] | 3,687 *11.7%* | 4,192 *11.4%* | 3,956 *11.2%* | 4,775 *6.3%* | 2,377 *4.3%* | 2,168 *2.9%* | 21,155 *6.8%* |
| Removal Orders[4] | 9,980 *31.7%* | 11,064 *30.2%* | 9,466 *26.7%* | 17,700 *23.3%* | 12,130 *22.0%* | 11,673 *15.4%* | 72,013 *23.2%* |
| Asylum Cases Pending | 17,554 *55.8%* | 21,104 *57.6%* | 21,737 *61.4%* | 53,023 *69.8%* | 40,586 *73.5%* | 61,918 *81.6%* | 215,922 *69.5%* |
| Other | 241 | 255 | 244 | 507 | 158 | 97 | 1,502 |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.
  Notes for Table A2: Asylum outcomes are current as of March 31, 2019.
  [1] Fear claims include credible fear cases completed by USCIS as well as individuals who claimed fear at the time of apprehension but who have no record of a USCIS fear determination, possibly because they withdrew their claim.
  [2] Positive fear determinations include positive determinations by USCIS as well as negative USCIS determinations vacated by EOIR.
  [3] Asylum granted or other relief includes withholding of removal, protection under the Convention Against Torture, Special Immigrant Juvenile status, cancelation of removal, and other permanent status conferred by EOIR.
  [4] Removal orders include completed repatriations and unexecuted orders of removal and grants of voluntary departure.

Implementing MPP assessments currently imposes a significant resource burden to DHS.  As of October 15, 2019, approximately 10% of individuals placed in MPP have asserted a fear of return to Mexico and have been referred to an asylum officer for a MPP fear assessment.  The USCIS Asylum Division assigns on average approximately 27 asylum officers per day to handle this caseload nationwide.  In addition, the Asylum Division must regularly expend overtime resources after work hours and on weekends to keep pace with the same-day/next-day processing requirements under MPP. This workload diverts resources from USCIS's affirmative asylum caseload, which currently is experiencing mounting backlogs.

Most importantly, DHS does not believe amending the process to affirmatively ask whether an alien has a fear of return to Mexico is necessary in order to properly identify aliens with legitimate fear claims in Mexico because under DHS's current procedures, aliens subject to MPP **may raise a fear claim to DHS at any point in the MPP process**.  Aliens are not precluded from receiving a MPP fear assessment from an asylum officer if they do not do so initially upon apprehension or inspection, and many do.  As of October 15, 2019[5], approximately 4,680 aliens subject to MPP asserted a fear claim and received an MPP fear-assessment **after** their initial encounter or apprehension by DHS, with 14% found to have a positive fear of return to Mexico. Additionally, Asylum Division records indicate as of October 15, 2019[6], approximately 618 aliens placed into MPP have asserted **multiple** fear claims during the MPP process (from the point of placement into MPP at the initial encounter or apprehension) and have therefore received multiple fear assessments to confirm whether circumstances have changed such that the alien should not be returned to Mexico.  Of these aliens, 14% were found to have a positive fear of return to Mexico.

Additionally, asylum officers conduct MPP fear assessments with many of the same safeguards provided to aliens in the expedited removal/credible fear context.  For example, DHS officers conduct MPP assessment interviews in a non-adversarial manner, separate and apart from the general public, with the assistance of language interpreters when needed.[7]

In conducting MPP assessments, asylum officers apply a "more likely than not" standard, which is a familiar standard.  "More likely than not" is equivalent to the "clear probability" standard for statutory withholding and not unique to MPP.  Asylum officers utilize the same standard in the reasonable fear screening process when claims for statutory withholding of removal and protection under the Convention Against Torture (CAT).[8]  The risk of harm standard for withholding (or deferral) of removal under the Convention Against Torture (CAT) implementing regulations is the same, i.e., "more likely than not."[9]  In addition to being utilized by asylum

---

[5] USCIS began tracking this information on July 3, 2019.
[6] USCIS began tracking this information on July 3, 2019.
[7] USCIS Policy Memorandum PM-602-0169, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*, 2019 WL 365514 (Jan. 28, 2019).
[8] See INA § 241(b)(3); 8 C.F.R. § 1208.16(b)(2) (same); See 8 C.F.R. § 1208.16(c)(2).
[9] *See* 8 C.F.R. § 1208.16(c)(2); Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8480 (Feb. 19, 1999) (detailing incorporation of the "more likely than not" standard into U.S. CAT ratification history); *see also Matter of J-F-F-*, 23 I&N Dec. 912 (BIA 2006).

officers in other protection contexts, the "more likely than not" standard satisfies the U.S. government's *non-refoulement* obligations.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF RYAN D. WALTERS**

Memorandum of Understanding Between Texas and DHS

# EXHIBIT B-3

## AGREEMENT BETWEEN DEPARTMENT OF HOMELAND SECURITY AND THE STATE OF TEXAS

The parties to this Agreement are on the one hand:

 (1)  the Department of Homeland Security,
 (2)  U.S. Customs and Border Protection (CBP),
 (3)  U.S. Immigration and Customs Enforcement (ICE), and
 (4)  U.S. Citizenship and Immigration Services (USCIS);[1]

 and on the other hand:

 (5)  the State of Texas, by and through the Office of the Governor (Texas).

## I. AUTHORITY

The authorities governing this Agreement include, but are not limited to:

 (1)  the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, as amended;
 (2)  the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, as amended;
 (3)  the Privacy Act, 5 U.S.C. Section 552a, as amended;
 (4)  the Inter-Governmental Cooperation Act, 31 U.S.C. Section 6501, *et. seq.* as amended;
 (5)  the Homeland Security Act of 2002, 116 Stat. 2135, 6 U.S.C. Section 101, *et seq.* as amended; and
 (6)  the Immigration and Nationality Act, 8 U.S.C. Section 1101, *et seq.* as amended.

## II. PURPOSE AND COMMITMENT

DHS recognizes that Texas, like other States, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can impact Texas's law enforcement, housing, education, employment, commerce, and healthcare needs and budgets. The harm to Texas is particularly acute where its budget has been set months or years in advance and it has no time to adjust its budget to respond to DHS policy changes. Specifically, DHS recognizes that the following actions result in concrete injuries to Texas:

 (1)  a decrease of any immigration enforcement priorities;
 (2)  a reduction in the number of DHS agents performing immigration enforcement functions;

---

[1] The Department of Homeland Security, CBP, ICE, and USCIS are collectively referred to in this Agreement as "DHS." The Department of Homeland Security, CBP, ICE, and USCIS enter into this Agreement individually and collectively, such that termination or removal of one or more of those parties (whether by law or contract) does not terminate this Agreement as to any other parties.

(3)    a decrease or pause on returns or removals of removable or inadmissible aliens;

(4)    a decrease or pause on apprehensions or administrative arrests;

(5)    relaxation of the standards for granting relief from return or removal, such as asylum;

(6)    an increase in releases from detention;

(7)    a relaxation of the standards for granting release from detention;

(8)    changes to immigration benefits or eligibility, including work authorization, discretionary actions, or discretionary decisions; and

(9)    rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community.

At the same time, Texas recognizes that DHS relies on cooperation with Texas and information shared by Texas to carry out DHS's immigration enforcement functions. Any decrease in a State's cooperation or information sharing with DHS may result in a decrease in immigration enforcement.

To that end, this Agreement establishes a binding and enforceable commitment between DHS and Texas, in which Texas will provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions in exchange for DHS's commitment to consult Texas and consider its views before taking any action, adopting or modifying a policy or procedure, or making any decision that could:

(1)    reduce, redirect, reprioritize, relax, or in any way modify immigration enforcement;

(2)    decrease the number of ICE agents performing immigration enforcement duties;

(3)    pause or decrease the number of returns or removals of removable or inadmissible aliens from the country;

(4)    increase or decline to decrease the number of lawful, removable, or inadmissible aliens;

(5)    increase or decline to decrease the number of releases from detention;

(6)    relax the standards for granting relief from return or removal, such as asylum;

(7)    relax the standards for granting release from detention;

(8)    relax the standards for, or otherwise decrease the number of, apprehensions or administrative arrests;

(9)    increase, expand, extend, or in any other way change the quantity and quality of immigration benefits or eligibility for other discretionary actions for aliens; or

(10)    otherwise negatively impact Texas.

In case of doubt, DHS will err on the side of consulting with Texas.

## III.   RESPONSIBILITIES

### A.   DHS agrees to:

(1)    Utilize its immigration authorities, to the maximum extent possible, to prioritize the protection of the United States and its existing communities. This includes:

a. enforcing the immigration laws of the United States to prohibit the entry into, and promote the return or removal from, the United States of inadmissible and removable aliens;

b. enforcing the immigration laws of the United States to prioritize detention over release of inadmissible and removable aliens;

c. enforcing the immigration laws of the United States to apprehend and administratively arrest inadmissible and removable aliens;

d. eliminating incentives and so-called "pull factors" for illegal immigration;

e. limiting eligibility for asylum and other relief from detention, return, or removal to the statutory criteria; and

f. refusing asylum and other relief from detention, return, or removal for those aliens who pose a danger to the United States, whether due to prior criminal history, the security of the United States, health, or some other bar.

(2) Consult with Texas before taking any action or making any decision that could reduce immigration enforcement, increase the number of removable or inadmissible aliens in the United States, or increase immigration benefits or eligibility for benefits for removable or inadmissible aliens. This includes policies, practices, or procedures which have as their purpose or effect:

a. reducing, redirecting, reprioritizing, relaxing, lessening, eliminating, or in any way modifying immigration enforcement;

b. decreasing the number of ICE agents within Texas's territorial jurisdiction performing immigration enforcement duties;

c. pausing or decreasing the number of returns or removals of removable or inadmissible aliens from the country;

d. decreasing the number of or criteria for detention of removable or inadmissible aliens from the country;

e. decreasing or pausing apprehensions or administrative arrests;

f. increasing or declining to decrease the number of lawful, removable, or inadmissible aliens residing in the United States;

g. increasing, expanding, extending, or in any way changing the quantity or quality of immigration benefits or eligibility for these benefits or other discretionary actions for aliens; or

h. otherwise negatively impacting Texas.

(3) Provide Texas with 180 days' written notice (in the manner provided for in Section IV of this Agreement) of any proposed action listed in Section III.A.2 and an opportunity to consult and comment on the proposed action. DHS will in good faith consider Texas's input and provide a detailed written explanation of the reasoning behind any decision to reject Texas's input before taking any action listed in Section III.A.2. In case of doubt as to whether DHS's action is implicated by this provision,

Page 3 of 9

**App.320**

DHS will err on the side of consulting with Texas before taking any such action listed above.

      **B.**    **Texas agrees to:**

Support DHS's immigration enforcement by honoring "detainer requests" or "requests to hold" issued to Texas by ICE or CBP, and honoring DHS requests for records or information from the Texas Department of Motor Vehicles.

## IV.   NOTICES

All notices required hereunder shall be given by certified United States mail, postage prepaid return receipt requested, and addressed to the respective parties at their addresses set forth below, or at such other address as any party shall hereafter inform the other party by written notice. All written notices so given shall be deemed effective upon receipt.

    Department of Homeland Security
    Secretary of Homeland Security
    Washington, D.C. 20528

    U.S. Customs and Border Protection
    Office of the Commissioner
    1300 Pennsylvania Ave. NW
    Washington, D.C. 20229

    U.S. Immigration and Customs Enforcement
    Office of the Director
    500 12th Street SW
    Washington, D.C. 20536

    U.S. Citizenship and Immigration Services
    Office of the Director
    5900 Capital Gateway Drive
    Suitland, Maryland 20746

    Texas
    c/o Greg Abbott, Governor of Texas    c/o Ken Paxton, Attorney General
    1100 San Jacinto Boulevard, 4th Floor    300 West 15th Street
    Austin, Texas 78701    Austin, Texas 78711

## V.   PENALTIES

Texas acknowledges that the information it receives from DHS is governed by the Privacy Act, 5 U.S.C. section 552a(i)(1), and that any person who obtains this information under false pretenses or uses it for any purpose other than as provided for in this Agreement may be subject to civil or criminal penalties.

## VI.    INJUNCTIVE RELIEF

It is hereby agreed and acknowledged that it will be impossible to measure in money the damage that would be suffered if the parties fail to comply with any of the obligations herein imposed on them and that in the event of any such failure, an aggrieved party will be irreparably damaged and will not have an adequate remedy at law. Any such party shall, therefore, be entitled (in addition to any other remedy to which it may be entitled in law or in equity) to injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law.

## VII.    THIRD PARTY LIABILITY

Each party to this Agreement shall be solely responsible for its own defense against any claim or action by third parties arising out of or related to the execution or performance of this Agreement, whether civil or criminal, and retains responsibility for the payment of any corresponding liability.

Nothing in this Agreement is intended, or should be construed, to create any right or benefit, substantive or procedural, enforceable at law by any non-party to this Agreement against any party, its agencies, officers, or employees.

## VIII.    DISPUTE RESOLUTION

DHS and Texas will endeavor to the best of their ability to resolve their disputes informally and through consultation and communication. Disagreements on the interpretation of the provisions of this Agreement that cannot be resolved between the parties should be provided in writing to the authorized officials at both agencies for resolution. If settlement cannot be reached at this level, the disagreement may be adjudicated in a United States District Court located in Texas.

## IX.    CONFLICTS

This Agreement constitutes the full agreement on this subject between DHS and Texas. Any inconsistency or conflict between or among the provisions of this Agreement, will be resolved in the following order of precedence: (1) this Agreement and (2) other documents incorporated by reference in this Agreement. Provided, however, that this Agreement shall not void, abrogate, or modify any other agreement between DHS and Texas unless and to such extent as such agreement conflicts with this Agreement.

## X.      SEVERABILITY

The Parties agree that if a binding determination is made that any term of this Agreement is unenforceable, such unenforceability shall not affect any other provision of this Agreement, and the remaining terms of this Agreement shall, unless prohibited by law, remain effective as if such unenforceable provision was never contained in this Agreement.

The parties additionally agree that if this Agreement is found to be unenforceable as to one or more of the parties comprising DHS, including the Department of Homeland Security, such unenforceability shall not affect the validity of this Agreement as to the remaining parties and this Agreement shall remain effective as if such party was never a party to this Agreement.

## XI.     ASSIGNMENT

Texas may not assign this Agreement, nor may it assign any of its rights or obligations under this Agreement. To the greatest extent possible, this Agreement shall inure to the benefit of, and be binding upon, any successors to DHS and Texas without restriction.

## XII.    WAIVER

No waiver by any party of any breach of any provision of this Agreement shall constitute a waiver of any other breach. Failure of any party to enforce at any time, or from time to time, any provision of this Agreement shall not be construed to be a waiver thereof.

## XIII.   EFFECTIVE DATE

This Agreement shall be effective immediately when all parties have signed this Agreement. This Agreement shall continue in effect unless modified or terminated in accordance with the provisions of this Agreement.

## XIV.    MODIFICATION

This Agreement is subject to periodic review by DHS, its authorized agents or designees, and, if necessary, periodic modification or renewal, consistent with this Agreement's terms, to assure compliance with current law, policy, and standard operating procedures. This Agreement constitutes the complete Agreement between the parties for its stated purpose, and no modification or addition will be valid unless entered into by mutual consent of all parties evidenced in writing and signed by all parties.

Any party may accomplish a unilateral administrative modification to change point-of-contact information. A written bilateral modification (*i.e.*, agreed to and signed by authorized officials of all parties) is required to change any other term of this Agreement.

## XV.   TERMINATION

Any party may terminate its involvement in this Agreement by submitting a request in writing to the other parties and providing 180 days' notice of intent to terminate its involvement in this Agreement. The termination will be effective 180 days after the written termination request was submitted or upon a date agreed upon by all parties, whichever is earlier. Termination by one party of its involvement in this Agreement shall not terminate this Agreement as to the remaining parties.

## XVI.  STATUS

The foregoing constitutes the full agreement on this subject between DHS and Texas.

Nothing in this Agreement may be construed to (1) negate any right of action for a State, local government, other person, or entity affected by this Agreement; or (2) alter the laws of the United States.

## XVII.  KNOWING AND VOLUNTARY ACKNOWLEDGMENT

The parties enter into this Agreement voluntarily, without coercion or duress, and fully understand its terms. The parties acknowledge they had an opportunity to review and reflect on this Agreement and have discussed its provisions with their respective counsel, if any. The parties attest they understand the effect of each of the provisions in this Agreement and that it is binding on all parties.

## XVIII. COUNTERPARTS

This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

## XIX.  FORMALIZATION

The undersigned represent that they are authorized to execute this Agreement on behalf of CBP, ICE, USCIS, and Texas, respectively.

Furthermore, the undersigned execute this Agreement on behalf of CBP, ICE, USCIS, Texas, respectively.

[Signatures on the following pages]

**Signature for the Department of Homeland Security**

DEPARTMENT OF HOMELAND SECURITY

_____   1/8/2021
Kenneth T. Cuccinelli II                          Date
Senior Official Performing the Duties of the Deputy Secretary
Signed individually and collectively[2]

---

[2] "Signed individually and collectively" as used here indicates that the agency is entering into this Agreement both (1) for itself, independently, and (2) along with the other entities that comprise DHS, collectively.  Should one agency, for whatever reason, cease to be a party to this Agreement, this Agreement shall still survive for all other parties and be read and interpreted as if the removed party had never been a party to this Agreement.

**Signature for the Office of the Governor of Texas**

OFFICE OF THE GOVERNOR OF TEXAS

_____    December 31, 2020
Greg Abbott                         Date
Governor

**Signature for the Office of the Attorney General of Texas**

OFFICE OF THE ATTORNEY GENERAL OF TEXAS

_____    12/31/2020
Ken Paxton                          Date
Attorney General

**App.326**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | § | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF RYAN D. WALTERS**

U.S. Customs and Border Protection Custody and Transfer Statistics FY2021

# EXHIBIT B-4

Published on *U.S. Customs and Border Protection* (https://www.cbp.gov (https://www.cbp.gov))

# Custody and Transfer Statistics FY2021

Fiscal Year 2021 runs from October 1, 2020 to September 30, 2021

⌄Collapse All

⌄Office of Field Operations - Dispositions and Transfers

## OFO Monthly Southwest Border Credible Fear Inadmissibles by Disposition

| Disposition | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| Expedited Removal - Credible Fear (ERCF) [1] | 63 | 94 | 111 | 133 | 117 | 56 | 77 |
| Notice to Appear (NTA) [2,7] | 22 | 36 | 74 | 93 | 200 | 795 | 2,027 |
| Notice to Appear (NTA) - Person Released | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Notice to Appear (NTA) - Person Detained | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Visa Waiver Program (VWP)-Removal - Limited Review [3] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Visa Waiver Program (VWP)-Refusal - Limited Review [3] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Stowaway - Limited Review [3] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Credible Fear Inadmissibles | 85 | 130 | 185 | 226 | 317 | 851 | 2,104 |

## Title 8 Inadmissibles

| Field Office | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| El Paso | 163 | 196 | 229 | 229 | 257 | 283 | 521 |
| Laredo | 417 | 369 | 347 | 351 | 360 | 561 | 659 |
| San Diego | 325 | 373 | 490 | 695 | 827 | 1,148 | 1,972 |
| Tucson | 97 | 70 | 66 | 83 | 92 | 143 | 261 |
| Total | 1,002 | 1,008 | 1,132 | 1,358 | 1,536 | 2,135 | 3,413 |

## OFO Monthly Southwest Border Credible Fear Inadmissibles by Program

| | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| **Migrant Protection Protocols (MPP)** [4] **- Initial returns** | 3 | 9 | 8 | 9 | 0 | 0 | 0 |
| **Asylum Cooperative Agreement (ACA)** [5] **Program - Expedited Removal - Credible Fear (ERCF)** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **ACA - Notice to Appear (NTA)** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Humanitarian Asylum Review Process (HARP)** [6] **Program -Expedited Removal - Credible Fear (ERCF)** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **HARP - Notice to Appear** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

## OFO Monthly Southwest Border Credible Fear by Transfer Destination

| Destination | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| **Federal/State/Local Facility** | 10 | 11 | 18 | 20 | 15 | 23 | 54 |
| **ICE/ERO** | 62 | 105 | 130 | 187 | 235 | 455 | 1,491 |
| **ICE/HSI** | 3 | 0 | 0 | 0 | 0 | 0 | 6 |
| **OFO** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Return to Foreign** | 2 | 7 | 12 | 11 | 0 | 0 | 0 |
| **USBP** | 5 | 5 | 0 | 0 | 7 | 16 | 32 |
| **Total** | 82 | 128 | 160 | 218 | 257 | 494 | 1,583 |

[1] *Includes subjects who claimed credible fear in Office of Field Operations (OFO) custody at a port of entry. OFO refers all such claims to USCIS. Credible fear may be claimed at any time prior to removal.*

[2] *Office of Field Operations has the discretion to process arriving noncitizens for expedited removal or notice to appear in removal proceedings or other disposition.  In the event of NTA disposition, applicants for admission have up to one year to seek asylum and while proceeding before the immigration judge.*

[3] *The term "limited review" refers to the process of an immigration judge considering prior administrative adjudicated claims of US citizenship, Lawful Permanent Residence, Asylum or Refugee status.  The immigration judge considers only the claim to such benefit and not the underlying inadmissibility or removal ground that may apply in the noncitizen's case.*

[4] *Migrant Protection Protocols (MPP) - An exercise of the Department of Homeland Security's (DHS) express statutory authority under the Immigration and Nationality Act (INA) to return certain applicants for admission, or those who enter illegally between the ports of entry, who are subject to removal proceedings under INA Section 240 Removal Proceedings to Mexico pending removal proceedings.  Individuals processed for MPP are released from detained immigration docket while awaiting their removal proceedings and like all asylum seekers have up to one year after initiation of removal proceedings to claim fear and file form I589 to have their claims heard by an Asylum Officer or Immigration Judge.*

[5] *Asylum Cooperative Agreement (ACA) - CBP, in coordination with ICE Enforcement Removal Operations (ERO), and USCIS, have executed ACAs to facilitate the transfer of noncitizens to a third country where they will have access to full and fair procedures for determining their protection claims, based on the ACAs. Currently, Guatemala is the only ACA participant.*

[6]

6 *Humanitarian Asylum Review Process (HARP) - Developed by Customs and Border Protection (CBP), in coordination with ICE, USCIS, and EOIR to promptly address credible fear claims of amenable Mexican nationals.*

7 *Initial disposition of Expedited Removal is converted to a Notice to Appear in full removal proceedings after a preliminary finding by Asylum Officer, Supervisor or Immigration Judge of credible fear; Custody status is most likely released on recognizance or "Order of Recognizance" pending discretion of an asylum grant. Legal status while out of custody is parole until asylum is granted. Continued detention of a migrant who has more likely than not demonstrated credible fear is not in the interest of resource allocation or justice.*

---

❤ Office of Field Operations - In Custody

# Field Operations - Southwest Border In Custody [1]

| Detention Capacity | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| 1005 | 39 (3.88%) | 49 (4.88%) | 53 (5.27%) | 55 (5.47%) | 64 (6.37%) | 107 (10.6%) | 195 (19.4%) |

1 *Represents an estimate of each cell's code occupancy limit, as outlined in technical design standards when constructed, multiplied by the total number of cells for all ports of entry within each field office. This number does not account for the unique circumstances that may limit the occupancy of a given cell (e.g., high risk, nursing/pregnant, transgender, unaccompanied minor, etc.) nor does it reflect operational limitations that affect a port's capacity to detain. CBP's capacity to detain individuals in its short-term facilities depends on many factors, including: demographics of the individual in custody; medical or other needs of individuals in custody; ability of ICE ERO (or, if an unaccompanied child, the U.S. Department of Health and Human Services) to transfer individuals out of CBP custody; and OFO's available resources to safely process and hold individuals.*

2 *Represents the average number of travelers in custody on a daily basis averaged over the 30 day period, at all Southwest Border Field Office locations. Travelers include inadmissible individuals, lawful permanent residents, asylees, refugees, and United States Citizens who are being detained to verify wants, warrants, criminal, administrative or other judicial process.*

---

❤ Office of Field Operations - Title 8, 19 and 42

# OFO Southwest Border T8, T19, T42

| Category | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| Title 8 | 1,002 | 1,008 | 1,132 | 1,358 | 1,536 | 2,135 | 3,413 |
| Title 19 | 7,198 | 6,937 | 6,917 | 5,447 | 5,251 | 6,826 | 9,332 |
| Title 42 | 1,899 | 1,942 | 1,748 | 1,775 | 1,947 | 2,003 | 1,751 |

# OFO Southwest Border T8, T19, T42

| Category | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| Title 8 | 1,002 | 1,008 | 1,132 | 1,358 | 1,536 | 2,135 | 3,413 |

| Category | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|----------|--------|--------|--------|--------|--------|--------|--------|
| Title 19 | 7,198 | 6,937 | 6,917 | 5,447 | 5,251 | 6,826 | 9,332 |
| Title 42 | 1,899 | 1,942 | 1,748 | 1,775 | 1,947 | 2,003 | 1,751 |

❯ U.S. Border Patrol - Dispositions and Transfers

# USBP Monthly Southwest Border Apprehensions by Processing Disposition

*The processing disposition decision related to each apprehension is made on a case-by-case basis. The processing dispositions below are representative of the time data was aggregated. As dispositions are subject to change throughout the immigration process, the data does not necessarily reflect final dispositions or removals.*

| Processing Disposition | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| Expedited Removal (ER) | 1,248 | 1,449 | 1,642 | 2,286 | 3,637 | 6,416 | 10,669 |
| PACR, HARP, ACA [1] | 0 | 2 | 0 | 6 | 2 | 13 | 25 |
| Notice To Appear/Order of Recognizance, I-385 – Released [2] | 20 | 9 | 18 | 1,317 | 8,797 | 26,282 | 26,233 |
| Reinstatement of Prior Removal | 1,533 | 1,418 | 1,430 | 1,274 | 1,126 | 1,488 | 1,697 |
| Voluntary Return | 169 | 964 | 1,736 | 1,815 | 1,857 | 2,387 | 2,268 |
| Warrant/Notice To Appear (NTA) - Detained | 2,092 | 2,766 | 4,184 | 5,151 | 9,639 | 24,610 | 20,762 |
| MPP [1] | 796 | 1,106 | 1,347 | 717 | 30 | 0 | 0 |
| Other [3] | 186 | 172 | 189 | 217 | 232 | 919 | 1,843 |
| Total Title 8 Apprehensions | 6,044 | 7,886 | 10,546 | 12,783 | 25,320 | 62,115 | 63,497 |

[1] Subjects enrolled in multiple programs are only counted once based on the following order: PACR, ACA, HARP, MPP.

[2] Includes individuals released with a Notice to Appear/Order of Recognizance (NTA/OR) with an order to appear for immigration proceedings and individuals who are processed, not admitted, and released without an NTA as a matter of discretion.

[3] Processing dispositions may include subjects that do not yet have a final disposition at the time the data was collected or subjects processed under the visa waiver program, turned over to, paroled, etc.

# USBP Monthly Southwest Border Apprehensions by Transfer Destination

*Following processing, U.S. Border Patrol arranges transfer of individuals to the appropriate entity based on disposition and other factors such as criminal charges. The transfer destinations below are representative of the time data was aggregated. The data does not reflect subsequent transfer destinations after subjects leave Border Patrol custody and are subject to change if an individual returns to U.S. Border Patrol custody during the same event.*

App.331

| Transfer Destination | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| Humanitarian Release | 19 | 9 | 18 | 1,321 | 8,798 | 26,103 | 26,098 |
| Federal [1] | 3,491 | 4,077 | 5,746 | 7,443 | 13,518 | 30,993 | 30,747 |
| Federal - Northern Triangle Repatriation Flights | 20 | 7 | 0 | 26 | 11 | 8 | 1 |
| Federal - Mexican Repatriation Flights | 499 | 894 | 566 | 528 | 187 | 205 | 164 |
| Port of Entry (Non-MPP) | 920 | 1,377 | 2,411 | 2,150 | 2,100 | 2,825 | 3,042 |
| Port of Entry (MPP) | 796 | 1,106 | 1,347 | 717 | 30 | 0 | 0 |
| State and Local Law Enforcement Agencies | 184 | 229 | 315 | 443 | 525 | 1,166 | 727 |
| Other [2] | 114 | 186 | 143 | 151 | 151 | 475 | 1,485 |
| Total Title 8 Transfers | 6,043 | 7,885 | 10,546 | 12,779 | 25,320 | 61,775 | 62,264 |

[1] Manifested as turned over to other Federal agencies, to include Immigration and Customs Enforcement, Health and Human Services, U.S. Marshals, etc.

[2] Includes subjects that have not been transferred out of USBP custody at the time the data was collected or subjects manifested as transferred to hospital, paroled, etc.

❤ U.S. Border Patrol - In Custody

# USBP Average Daily Subjects In Custody by Southwest Border Sector

*U.S. Border Patrol facilities, such as stations and central processing centers, provide short-term holding capacity for the processing and transfer of individuals encountered by agents. Maximum facility capacity along the Southwest border is approximately 11,200, which assumes a homogenous population and full operating status at all facilities. Actual capacity fluctuates constantly based on characteristics of in-custody population, to include demographics, gender, criminality, etc.*

| Sector | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|---|---|---|---|---|---|---|---|
| Big Bend | 10 | 16 | 19 | 22 | 43 | 68 | 40 |
| Del Rio | 379 | 78 | 91 | 174 | 367 | 625 | 816 |
| El Centro | 34 | 35 | 35 | 36 | 53 | 204 | 424 |
| El Paso | 72 | 74 | 123 | 107 | 231 | 913 | 476 |
| Laredo | 113 | 113 | 73 | 72 | 95 | 263 | 334 |
| Rio Grande | 178 | 176 | 120 | 158 | 878 | 3,779 | 2,883 |
| San Diego | 55 | 62 | 57 | 107 | 153 | 503 | 1,139 |
| Tucson | 70 | 72 | 98 | 87 | 186 | 490 | 305 |
| Yuma | 8 | 11 | 17 | 28 | 160 | 488 | 785 |
| Total | 919 | 637 | 633 | 791 | 2,164 | 7,331 | 7,202 |

❤ Pathways and Programs Definitions

# Migrant Protection Protocols (MPP)

The Migrant Protection Protocols (MPP) is an exercise of the Department of Homeland Security's express statutory authority under the Immigration and Nationality Act (INA) to return certain applicants for admission, or those who enter illegally between the ports of entry, who are subject to removal proceedings under INA Section 240 Removal Proceedings to Mexico pending removal proceedings.

# Prompt Asylum Claim Review (PACR)

The Prompt Asylum Claim Review (PACR) pathway was developed by U.S. Border Patrol (USBP), in coordination with U.S. Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), and the Executive Office for Immigration Review (EOIR) to promptly address credible fear claims of amenable individuals.

# Asylum Cooperative Agreement (ACA)

U.S. Customs and Border Protection (CBP), in coordination with U.S. Immigration and Customs Enforcement (ICE) Enforcement Removal Operations (ERO), and U.S. Citizenship and Immigration Services (USCIS), have executed Asylum Cooperative Agreements (ACAs) to facilitate the transfer of individuals to a third country where they will have access to full and fair procedures for determining their protection claims, based on the ACAs.

# Humanitarian Asylum Review Process (HARP)

The Humanitarian Asylum Review Process (HARP), was developed by U.S. Customs and Border Protection (CBP), in coordination with U.S. Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), and the Executive Office for Immigration Review (EOIR) to promptly address credible fear claims of amenable Mexican nationals.

# Electronic Nationality Verification

Under the Electronic Nationality Verification (ENV) program U.S. Customs and Border Protection (CBP), in coordination with U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO), remove eligible noncitizens with a final order of removal to their native countries.

# Interior Repatriation Initiative (IRI)

Under the Interior Repatriation Initiative (IRI), U.S. Customs and Border Protection (CBP), in coordination with U.S. Immigration and Customs Enforcement (ICE) Enforcement Removal Operations (ERO) and the Mexican Ministry of the Interior, remove eligible noncitizens from Mexico to the interior of Mexico.

**Tags:**
Statistics (https://www.cbp.gov/tags/statistics) [1]

**Source URL:** https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics
**Links**
[1] https://www.cbp.gov/tags/statistics

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DECLARATION OF RYAN D. WALTERS

U.S. Citizenship and Immigration Services Description of Parole

# EXHIBIT B-5


U.S. Citizenship
and Immigration
Services

# Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States

> ℹ️ Both the special parole policy for arriving Cuban nationals, commonly known as the "wet foot/dry foot" policy, and the Cuban Medical Professional Parole Program expired on January 12, 2017. Read the announcement on the DHS website. The Cuban Family Reunification Parole Program remains in effect.

Individuals who are outside of the United States may be able to request parole into the United States based on humanitarian or significant public benefit reasons.

**For information on the types of documents and evidence you should submit** in support of a request for parole, please see Guidance on Evidence for Certain Types of Humanitarian or Significant Public Benefit Parole Requests.

This webpage does **not** cover the following types of parole requests:

- *Requests for individuals who are already in the United States and seek "advance parole" to leave and return*. For information on how an individual already in the United States may be considered for advance parole to return to the United States after departure, please see Form I-131 instructions (PDF, 284.74 KB).

- *Requests for individuals who are in the United States and seek parole in place*.  For more information, please contact the local USCIS office through my.uscis.gov/appointment.

- *Requests for parole that are under the jurisdiction of Immigration and Customs Enforcement (ICE)*. ICE has primary jurisdiction over a person seeking parole who is in removal proceedings in the United States or who has previously been removed or deported. Requests to ICE for parole should be submitted to ICE via the USCIS address under Humanitarian parole applicants. Please see the Memorandum of Agreement between USCIS, ICE and CBP (PDF) for more information about each agency's jurisdiction over parole requests.

- *Requests for individuals who apply under special parole programs such as*:
  - The Haitian Family Reunification Parole Program
  - The Cuban Family Reunification Parole Program

- The Central American Minor Refugee/Parole Program
  - The Filipino World War II Veterans Parole Program
- International Entrepreneur Parole

 Close All     Open All

## Terminology

The following terms are used on this page:

- **Petitioner**: The person completing the Form I-131, Application for Travel Document, on behalf of an individual outside the United States who is seeking parole (or re-parole as explained below). The term "self-petitioner" refers to an individual who files Form I-131, Application for Travel Document for him or herself.
- **Beneficiary**: A beneficiary is an individual, residing outside the United States (or a person seeking re-parole as explained below) who receives parole.
- **Sponsor**: A sponsor is an individual who agrees to provide financial support for the beneficiary of a parole application by filing Form I-134, Affidavit of Support (PDF, 463.53 KB).
- **Parolee**: A parolee is an individual who is paroled into the United States.

## What is Parole?

USCIS uses its discretion to authorize parole. Parole allows an individual, who may be inadmissible or otherwise ineligible for admission into the United States, to be paroled into the United States for a temporary period. The Immigration and Nationality Act (INA) allows the secretary of Homeland Security to use their discretion to parole any alien applying for admission into the United States temporarily for urgent humanitarian reasons or significant public benefit. (See INA section 212(d)(5)).

An individual who is paroled into the U.S. has not been formally admitted into the United States for purposes of immigration law.

Parole is not intended to be used solely to avoid normal visa processing procedures and timelines, to bypass inadmissibility waiver processing, or to replace established refugee processing channels.

**Length of Parole**

If authorized, we will specify the duration of parole for a temporary period of time to accomplish the purpose of the parole, as indicated in Part 3 of Form I-131, Application for Travel Document. For example, if parole is requested to attend a civil court proceeding between private parties, we may authorize parole for the period of time necessary to attend the proceedings. Parole is typically granted for no more than a year.

Parole ends on the date the parole period expires or when the beneficiary departs the United States or acquires an immigration status, whichever occurs first. In some cases, we may place conditions on

**App.336**

parole, such as reporting requirements. We may revoke parole at any time and without notice if it determines that parole is no longer warranted or the beneficiary fails to comply with any conditions of parole.

**Work Permits**

If not inconsistent with the purpose and duration of parole, we may, in our discretion, grant a parolee temporary employment authorization. The parolee may request employment authorization after being paroled into the United States by filing Form I-765, Application for Employment Authorization.

## Who Can Apply for Parole?                                                                    ⌃

Anyone may request parole for himself or herself, or on behalf of another individual, by filing Form I-131, Application for Travel Document. The petitioner is an individual or entity who is filing the Form I-131, Application for Travel Document, on behalf of an individual outside of the United States. The petitioner may also self-petition for parole. The petitioner does not have to be a resident of the United States or related to the beneficiary.

## The Need for a Sponsor                                                                       ⌃

One important factor we consider in determining whether to exercise discretion to authorize parole is whether the beneficiary will have a means of support while in the United States. We require evidence of a sponsor to provide financial support to the parolee in the United States. Lack of evidence of financial support while in the United States is a strong negative factor that may lead to a denial of parole. We will take into account the Health and Human Services Federal poverty guidelines along with any special circumstances related to the beneficiary's need for care in assessing whether there are sufficient funds in place to adequately support the beneficiary once in the United States.

**Requirements for Sponsors**

The sponsor is the individual who agrees to provide financial support to the beneficiary while they are in the United States for the duration of the parole authorization period. The financial sponsor may or may not be the same person or entity as the petitioner. The sponsor must submit a Form I-134, Affidavit of Support (PDF, 463.53 KB) for each parole request to establish whether they have enough financial resources to support the parolee during their stay in the United States, and if the funds are overseas, access to those funds for the parolee's stay in the United States.

Though there is no requirement regarding the sponsor's immigration status in the United States, a sponsor who has a more permanent status in the United States, such as lawful permanent residence or is a U.S. citizen, may more readily be able to establish the ability to support the parolee in the United States. Evidence of the sponsor's immigration status or citizenship in the United States may be relevant to the sponsor's ability to support the beneficiary. Therefore, the petitioner should generally include evidence of the sponsor's immigration status or citizenship in the United States, such as the sponsor's permanent residence card, naturalization certificate, birth certificate or passport with the parole request.

**App.337**

**It is important to read the [Form I-134 instructions (PDF, 222.2 KB)](#) carefully for information about what kind of evidence is required to demonstrate sufficient income and financial resources.**  Some examples of evidence that is helpful in demonstrating financial resources include pay stubs, last filed tax return or a letter from a sponsor's employer.

*Multiple Sponsors*

When determining a sponsor, the petitioner must take into account the Health and Human Services Federal [poverty guidelines](#), and any special needs of the beneficiary. If the petitioner is unable to identify a sponsor who alone has sufficient means to support the beneficiary in the United States, the petitioner may indicate more than one sponsor if they have the means and agree to support the beneficiary while paroled in the United States. In this situation, the petitioner must submit a [Form I-134, Affidavit of Support (PDF, 463.53 KB)](#), along with the proper supporting documentation, from each sponsor.

*Self-Sponsor*

A beneficiary may also demonstrate that he or she is financially self-sufficient by submitting a [Form I-134, Affidavit of Support (PDF, 463.53 KB)](#), with supporting financial documentation.

*Organization as a Sponsor*

Occasionally, a non-profit organization or medical institution may serve as a sponsor on a parole application. In those instances, if an employee of the organization cannot complete a [Form I-134, Affidavit of Support (PDF, 463.53 KB)](#), the petitioner should include with the parole application, a letter from the organization committing to support the beneficiary.

---

## Eligibility for Parole 

A USCIS officer considers each request and the evidence provided on a case-by-case basis, taking into account all of the circumstances. (See Section 212(d)(5) of the INA.) The burden of proof is on the petitioner to establish that parole should be authorized. Parole will be authorized only if we conclude, based on all the evidence the petitioner submits and any other relevant evidence available to us, that

- There are urgent humanitarian or significant public benefit reasons for the beneficiary to be in the United States; and
- The beneficiary merits a favorable exercise of discretion.

**Urgent Humanitarian Reasons**

There is no statutory or regulatory definition of "urgent humanitarian reasons." USCIS officers look at all of the circumstances, taking into account factors such as (but not limited to):

- Whether or not the circumstances are pressing;
- The effect of the circumstances on the individual's welfare and wellbeing; and
- The degree of suffering that may result if parole is not authorized.

**App.338**

An applicant may demonstrate urgency by establishing a reason to be in the United States that calls for immediate or other time-sensitive action, including (but not limited to) critical medical treatment, or the need to visit, assist or support a family member who is at an end of life stage of an illness or disease.

The factors considered in determining urgent humanitarian reasons are dependent on the type of parole request. See Guidance for Certain Types of Humanitarian or Significant Public Benefit Parole Requests for more information on factors often considered in some of the more common types of requests.

**Significant Public Benefit**

There is no statutory or regulatory definition of "significant public benefit." Parole based on significant public benefit  includes, but is not limited to, law enforcement and national security reasons or foreign or domestic policy considerations. USCIS officers look at all of the circumstances presented in the case.

While the beneficiary may personally benefit from the authorization of parole, the statutory standard focuses on the public benefit in extending parole. For example, a beneficiary's participation in legal proceedings may constitute a significant public benefit, because the opportunity for all relevant parties to participate in legal proceedings may be required for justice to be served.

There may be circumstances where a request is based on both urgent humanitarian reasons and significant public benefit reasons. For example, a person may be paroled if they have a request for medical care that involves experimental treatment or medical trials from which a larger community in the United States may benefit.

**Determining Who is Authorized Parole**

We exercise our discretion on a case-by-case basis, by evaluating positive factors in the record against any negative factors. Having an urgent humanitarian reason or a significant public benefit is a positive determining factor and it is evaluated against any negative factors present in a case. We evaluate the complete record.

Some common discretionary factors that we evaluate include (but are not limited to):

- Whether the purpose of the parole request may be accomplished within a specific, temporary period of time;

- Whether the beneficiary intends to leave the United States once their parole expires or has means to obtain lawful immigration status during the parole authorization period or any re-parole period that is envisioned (where applicable);

- Whether there is evidence of any national security concerns;

- Whether there is evidence of any criminal history or previous immigration violations;

- Whether there is evidence of any previous participation in fraud;

- Whether the beneficiary's presence would benefit a U.S. citizen or lawful permanent resident or community in the United States;

- Whether the beneficiary will have sufficient financial support while in the United States;

- Evidence of the beneficiary's character;

**App.339**

- The effect of the beneficiary's presence on a community in the United States; and

- Whether there are other means, other than parole, that are available to the beneficiary so they can travel to and remain in the United States for the stated parole purpose, such as the ability or inability to obtain a visa.

No one factor determines the outcome of the case. Each decision is based on all of the circumstances present in a case.

We may revoke parole at any time if it determines that parole is no longer warranted or the beneficiary fails to comply with any conditions on the parole.

## Parole Process 

**An overview of the parole process steps is as follows:**

*Step 1: Filing of Parole Request*

The petitioner files the following at the USCIS Lockbox in Dallas:

- [Form I-131, Application for Travel Document](#)
- [Form I-134, Affidavit of Support (PDF, 463.53 KB)](#)
- Supporting documentation
- The filing fee (or [Form I-912, Request for Fee Waiver](#))

(See the **Requesting Parole** section below for more specific information)

The Lockbox sends the parole request to USCIS International and Refugee Affairs Division (USCIS-IRAD) in Washington, D.C.

*Step 2: USCIS Reviews the Request for Urgency (Triage)*

Within 2 business days of receiving the request, (usually two weeks after Lockbox filing), USCIS-IO reviews each request to confirm jurisdiction and determine whether it warrants expedited processing because of an urgent or time-sensitive reason. All requests are reviewed initially to determine urgency, regardless of whether the petitioner specifically requests expedited consideration.

*Step 3: USCIS Officer Makes a Decision*

A USCIS officer considers the request. This includes:

- Reviewing the request and all supporting documents;
- Conducting all mandatory security checks and vetting;
- Issuing a Request for Evidence (RFE) or Notice of Intent to Deny, if necessary;
- Documenting the basis for the decision; and
- Preparing the decision notice(s).

**App.340**

*Step 4: Supervisor Reviews the Decision*

A supervisor reviews all parole decisions before any decision is finalized.

*Step 5: USCIS Provides Notification of the Decision*

**If authorized:** We will mail an approval letter to the petitioner, the beneficiary and any representative of record. The letter provides notice of the decision and next steps for obtaining travel documents. We will also notify the U.S. Embassy or U.S. Consulate closest to the beneficiary's residence.

**If denied:** We will mail a denial letter to the petitioner, beneficiary, and any representative of record.

*Step 6: Issuance of Travel Documents and Parole into the United States (Approvals Only)*

If a request is authorized, the approval notice will inform the beneficiary that he or she must complete a Form DS-160, Application for a Nonimmigrant Visa, and appear for an appointment with the Department of State consular section to verify their identity and collect biometrics for additional security vetting. All beneficiaries 14 years and older must provide biometrics. If no derogatory information or new identity information is identified during vetting, the U. S. Consulate issues a document referred to as a boarding foil that allows the beneficiary to travel to the United States within 30 days of it being issued.  Issuance of a boarding foil does not guarantee parole but allows the beneficiary to proceed to Step 7 below.

*Step 7: Customs and Border Protection (CBP) Paroles into the United States (Approvals Only)*

A CBP officer inspects the beneficiary at the port of entry. If CBP paroles the beneficiary, CBP will issue the parolee an I-94, Arrival/Departure Record, documenting the length of their parole period. The parole period begins when CBP paroles the beneficiary at the port of entry. After arriving in the United States, the parolee may request employment Form I-765, Application for Employment Authorization.

**Requesting Parole**

To request parole you must:

- Complete a Form I-131, Application for Travel Document, and, for each parole beneficiary, include the filing fee or Form I-912, Request for Fee Waiver.

- Complete a Form I-134, Affidavit of Support (PDF, 463.53 KB), for each beneficiary to show how each beneficiary will be financially supported in the United States.

  - If there is more than one sponsor, each sponsor must submit a Form I-134, Affidavit of Support (PDF, 463.53 KB).

- Include a detailed explanation, as well as supporting documentation, of the reasons parole is being requested for the beneficiary. (See the **Submitting Evidence** section below for more specific information.)

- If you are represented, you must include a completed Form G-28, Notice of Entry of Appearance as Attorney or Representative, for USCIS to communicate with your attorney or representative.

**Submitting Evidence**

**App.341**

The petitioner must show, through the parole request and supporting evidence, that the beneficiary qualifies for parole and merits a favorable exercise of discretion. Submitting all relevant supporting evidence will avoid delays. A USCIS officer may issue a Request for Evidence (RFE) to seek additional information. In addition to the Form I-131, Application for Travel Document, Form I-134, Affidavit of Support (PDF, 463.53 KB), and the filing fee or request for fee waiver, the petitioner should submit the following evidence to support their parole request:

- Detailed explanation of the reasons why the petitioner is requesting parole;

- Detailed explanation of the length of time for which the beneficiary needs parole;

- Detailed explanation of why the beneficiary cannot obtain a U.S. nonimmigrant or immigrant visa from the U.S. Department of State including:

  - When and where the beneficiary attempted to obtain visas, if applicable;

  - If a visa application was denied, include a copy of the denial letter; and

  - If applicable, a detailed explanation of the reasons why the beneficiary cannot obtain any required waiver of inadmissibility and a copy of any denial letter received.

- Copies of any previously filed immigrant petitions (Forms I-130, I-140, I-360, etc.) or nonimmigrant petitions filed by or for the beneficiary, if available;

- Copies of any documents that support the request, including a clear and legible copy of a government-issued identification that indicates the beneficiary's citizenship.

  - If a birth certificate is provided, please submit a copy of the front and back of the original birth certificate.

- Copies of a U.S. passport, lawful permanent resident card, birth certificate or other evidence of valid U.S. immigration status or citizenship for the petitioner and sponsor, where applicable.

- See Guidance for Certain Types of Humanitarian or Significant Public Benefit Parole Requests for information on what additional evidence may support specific types of parole requests.

**Requesting Parole for Children**

Depending on the circumstances, when parole is requested for a minor child (a child under the age of 18), we will require proof of parentage, and in addition may require the following types of evidence in the interest of protecting the child:

| Circumstance: | Type of evidence that may be requested: |
| --- | --- |
| Where the minor beneficiary is traveling with one parent and the other parent will remain outside the United States | Written authorization from the non-traveling parent for the minor to travel, to include:<br><br>- Permission from the non-traveling parent for the child to accompany the traveling parent;<br><br>- The duration of authorized travel; and<br><br>- If the parents of the child are divorced or separated, proof showing that the traveling parent has been awarded legal custody of the minor. |

**App.342**

| Circumstance: | Type of evidence that may be requested: |
|---|---|
| Where neither parent is traveling | Written authorization from both parents for the child to leave the country with an appointed guardian, to include:<br><br>• The duration of travel and<br>• Proof of legal guardianship issued by a government authority. |
| Where the parent or parents' consent cannot be obtained | • Written explanation from the petitioner or beneficiary explaining efforts to locate the parent; or<br>• The circumstances surrounding their unavailability; and<br>• Evidence of guardianship for the person who is accompanying the child on travel or receiving the child once he or she arrives. |

**Submitting a Request for Parole**

USCIS Dallas Lockbox
For U.S. Postal Service (USPS) Deliveries:
USCIS
P.O. Box 660865
Dallas, TX 75266

For Express Mail and courier deliveries:
USCIS
Attn: HP
2501 S. State Hwy 121, Business
Suite 400
Lewisville, TX 75067

Please see the I-131, Application for Travel Document website for instructions on submitting requests.

**Length of Parole Consideration Process**

While processing time varies according to case complexity and how thorough the supporting documentation is in the initial filing, we strive to complete requests for parole for applicants outside the United States (or seeking re-parole as explained below) within 3 months. Please see our processing times website for current processing times. To avoid delays in processing, **it is critical that applicants include all relevant supporting evidence at the time of application and in response to any request for evidence (RFE)**.

**Expedited Processing**

**App.343**

To request expedited processing, the petitioner should:

- Follow the guidance on the Form I-131 instructions (PDF, 284.74 KB).

- Write the word EXPEDITE in the top right corner of the application in black ink.

- Provide an email address, phone number, and fax number for the petitioner or representative with any expedite request.

- Include a detailed explanation of the reason for the expedite request along with any available supporting evidence.
  - Generally, all requests for parole are based on urgent needs; therefore, the petitioner must demonstrate significant reasons for expediting the request, such as a life threatening or other extremely urgent situation.

**If Parole is Denied**

The petitioner cannot appeal the denial of parole, as the grant of parole confers no substantive right or immigration status. However, if there are significant new facts that are relevant to the application for parole, the petitioner may file a new Form I-131, Application for Travel Document, packet with fee or request for fee waiver. There is no limit to the number of Forms I-131, Application for Travel Document a person may file.

---

## Travel for Parolees 

**Leaving the United States**

A parole document provided to an individual outside the United States is valid to be presented only once for parole at the port of entry. If the petitioner leaves the United States, their parole will end once the petitioner departs. If the petitioner wishes to travel abroad and then return to the United States as a parolee, they may file a separate application on a new Form I-131for advance parole before traveling abroad. For information on how to apply for advance parole while in the United States, please see Form I-131 instructions (PDF, 284.74 KB). The petitioner may also apply for a visa or again request parole from outside of the United States in order to return.

---

## Re-Parole 

Parole ends on the date the parole period expires, is revoked, or when the parolee departs the United States or obtains an immigration status, whichever happens first. Although parole is temporary in nature, in some instances, a beneficiary may need to remain in the United States beyond the period of authorized parole. In such instances, an individual may request re-parole from within the United States.

The petitioner may request re-parole by:

- Filing a new Form I-131, Application for Travel Document;

**App.344**

- Checking box 1.e or 1.f in Part 2 of the form; and
- Writing "re-parole" across the top of the application.

In addition to required fees or request for fee waiver, the submission should include materials and evidence to support re-parole, including explaining and providing supporting documents on the need for an additional authorized parole period.

The request should be filed at least 90 days in advance of the expiration of the authorized parole period to allow for sufficient processing time and to avoid the potential for accruing time in unlawful status.

---

## Related Links ⌃

- [Memorandum Of Agreement between CBP, ICE and USCIS regarding Parole Authority (PDF)](#)

**Forms**

- [I-134, Affidavit of Support](#)
- [I-765, Application for Employment Authorization](#)
- [I-131, Application for Travel Document](#)

---

⤢ Close All   ⤢ Open All

Last Reviewed/Updated: 03/31/2021

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | § | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF RYAN D. WALTERS**

2.2.2021 DHS letter to Texas

# EXHIBIT B-6

App.346

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528



February 2, 2021

Ken Paxton
Attorney General
State of Texas
300 West 15th Street
Austin, Texas  78711

Dear Attorney General Paxton:

I am writing in response to your letter to me of January 21, 2021 alleging that the Department of Homeland Security (DHS) has violated a purported "Agreement" (Document) with the State of Texas.

As you are fully aware, the State of Texas has initiated a lawsuit against DHS seeking to enjoin, on the basis of that Document, the Department's lawful exercise of its authority.  *Texas v. United States*, No. 6:21-cv-00003, Complaint, ECF No. 1 (S.D. Tex. filed Jan. 22, 2021).  The Document that you reference in your letter is void, not binding, and unenforceable, as explained in the Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Application for a Temporary Restraining Order, ECF No. 8 (filed Jan. 24, 2021).

Notwithstanding that the Document is void, not binding, and unenforceable—and preserving all rights, authorities, remedies, and defenses under the law—this letter also provides notice, on behalf of DHS, U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS), that DHS, CBP, ICE and USCIS rescinds, withdraws, and terminates the Document, effective immediately.  DHS will continue to comply with applicable executive orders, statutes, regulations, and court orders.

Please direct any further correspondence concerning the Document to the Department of Justice.

Sincerely,

David P. Pekoske
Acting Secretary

**App.347**

**COPIES OF NOTICE TO**:

Brian M. Boynton
Acting Assistant Attorney General
Civil Division, U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Greg Abbott, Governor of Texas
1100 San Jacinto Boulevard, 4th Floor
Austin, TX  78701

Department of Homeland Security
c/o Joseph B. Maher, Acting General Counsel
Washington, D.C. 20528

U.S. Customs and Border Protection
c/o Troy Miller, Acting Commissioner
Office of the Commissioner
1300 Pennsylvania Ave. NW
Washington, D.C. 20229

U.S. Immigration and Customs Enforcement
c/o Tae Johnson, Acting Director
Office of the Director
500 12th Street SW
Washington, D.C. 20536

U.S. Citizenship and Immigration Services
c/o Tracy Renaud, Acting Director
Office of the Director
5900 Capital Gateway Drive
Suitland, Maryland 20746

**App.348**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DECLARATION OF RYAN D. WALTERS

DPS Texas Criminal Illegal Alien Data

EXHIBIT B-7

Home   >   Crime Records Service   >   Texas Criminal Illegal Alien Data

# Texas Criminal Illegal Alien Data

The Department of Public Safety and local law enforcement agencies in Texas participate in the Department of Homeland Security's (DHS) Priority Enforcement Program (PEP). Participation in PEP enables DHS to work with state and local law enforcement to take custody of individuals who pose a danger to public safety before those individuals are released into our communities. In Texas, PEP begins at the local level when an individual is arrested and booked by a Texas law enforcement officer for a criminal violation of Texas law. The arrested individual's fingerprints are submitted to the Texas DPS and subsequently to the FBI for criminal history and warrant checks. This same biometric data is also sent to DHS' IDENT database so that ICE can determine the person's immigration status and whether the individual is a priority for removal, consistent with the DHS enforcement priorities. The immigration status information is returned to DPS by DHS. The following report is based upon the status indicators provided to the DPS. For the purposes of this report, the term "criminal alien" refers to an individual who has been identified as an alien by DHS and who has been arrested for a state criminal offense, typically a Misdemeanor B or higher, committed in Texas.

### Lawful Presence Determined Through PEP

According to DHS status indicators, over 334,000 criminal aliens have been booked into local Texas jails between June 1, 2011 and January 31, 2021, of which over 228,000 were classified as illegal aliens by DHS.

Between June 1, 2011 and January 31, 2021, these 228,000 illegal aliens were charged with more than 368,000 criminal offenses which included arrests for 681 homicide charges; 42,698 assault charges; 6,950 burglary charges; 45,557 drug charges; 590 kidnapping charges; 18,662 theft charges; 28,892 obstructing police charges; 2,050 robbery charges; 4,505 sexual assault charges; 5,651 sexual offense charges; and 3,871 weapon charges.  DPS criminal history records reflect those criminal charges have thus far resulted in over 143,000 convictions including 300 homicide convictions; 16,864 assault convictions; 3,707 burglary convictions; 20,763 drug convictions; 223 kidnapping convictions; 8,000 theft convictions; 13,012 obstructing police convictions; 1,217 robbery convictions; 2,146 sexual assault convictions; 2,749 sexual offense convictions; and 1,527 weapon convictions.



[Enlarge chart](#)

These figures only count individuals who previously had an encounter with DHS that resulted in their fingerprints being entered into the DHS IDENT database. Foreign nationals who enter the country illegally and avoid detection by DHS, but are later arrested by local or state law enforcement for a state offense will not have a DHS response in regard to their lawful status and do not appear in these counts. However, in addition to the PEP program, DHS actively adjudicates the immigration status of individuals incarcerated in the Texas prison system. From 2011 to date, the Department of Criminal Justice (TDCJ) has provided DPS with information on more than 29,000 individuals who were identified by DHS as in the country illegally while they were

## Crime Records Service Menu

CRS Home

Overview

FAQs

Criminal History Reporting

Fingerprinting Services

Texas Data Exchange (TDEx)

Texas Transnational Intelligence Center (TTIC)

CRS Related Links

Misuse of Identity

Uniform Crime Reporting Program (UCR)

ViCAP - Violent Criminal Apprehension Program

Contact Crime Records Service

Criminal History Search

Sex Offender Search

Back to Crime Records Home >

**App.350**

incarcerated at TDCJ. 10,450 of these individuals were not identified through the PEP program at the time of their arrest. DPS does not know the current incarceration status of the individuals identified while they were incarcerated nor when their alien status was initially determined.

### Lawful Presence Determined While Incarcerated at TDCJ

Between June 1, 2011 and January 31, 2021, these 10,450 individual identified as illegal aliens while in prison, but who were not previously identified through PEP, were charged with more than 7,000 criminal offenses which included arrests for 100 homicide charges; 979 assault charges; 529 burglary charges; 1,455 drug charges; 36 kidnapping charges; 364 theft charges; 741 obstructing police charges; 301 robbery charges; 632 sexual assault charges; 282 sexual offense charges; and 173 weapon charges.  DPS criminal history records reflect those criminal charges have thus far resulted in over 4,000 convictions including 76 homicide convictions; 589 assault convictions; 344 burglary convictions; 847 drug convictions; 21 kidnapping convictions; 200 theft convictions; 323 obstructing police convictions; 231 robbery convictions; 448 sexual assault convictions; 210 sexual offense convictions; and 79 weapon convictions.



[Enlarge chart](#)

Because DPS does not know the date these individuals were identified as illegal while in prison, the count of charges for which this population was arrested between June 1, 2011 and January 31, 2021 does not necessarily align with the size of the population of illegal aliens identified while in prison. A more accurate assessment can be seen when examining this population's entire Texas criminal history and not just for offenses committed during this time period (see the Historical Data section of this report). However, for this report, in order to be consistent with the timeframe utilized to provide counts of arrest and conviction for the population identified through PEP, we have limited the arrest and conviction counts for prison identified illegal aliens to the same June 1, 2011 to January 31, 2020 time frame used for individuals identified through PEP.

### Report Notes

These figures do not attempt to allege that foreign nationals in the country illegally commit more crimes than other groups. It simply identifies thousands of crimes that should not have occurred and thousands of victims that should not have been victimized because the perpetrator should not be here. It is also important to note that these figures represent the minimum number of crimes associated with criminal illegal aliens:

- These figures only count arrests in Texas for state offenses.  These individuals may have criminal records in other states.
- These figures only represent offenses and convictions that are associated with arrest events that occurred between June 1, 2011 and January 31, 2021.
- The criminal activity for individuals identified as illegal while in prison is under represented for this time period because they may have been incarcerated during the time frame used in this report.
- These figures do not count federal criminal charges.
- These figures do not include similar data for foreign nationals who are lawfully in the country and commit state criminal offenses.
- Individuals whose lawful presence was determined while in prison may or may not be currently incarcerated.

# Historical Data

Because individuals identified as being illegally present in the country may have had a Texas criminal history prior to their immigration status being known to law enforcement, DPS has traditionally published criminal history data for an alien's entire criminal history.

### Lawful Presence Determined Through PEP

According to DHS status indicators, over 334,000 criminal aliens have been booked into local Texas jails between June 1, 2011 and January 31, 2021, of which over 228,000 were classified as illegal aliens by DHS.

Over the course of their entire Texas criminal careers, these 228,000 illegal aliens were charged with more than 555,000 criminal offenses which included arrests for 1,210 homicide charges; 64,323 assault charges; 17,037 burglary charges; 70,506 drug charges; 912 kidnapping charges; 32,700 theft charges; 47,931 obstructing police charges; 4,070 robbery charges; 6,804 sexual assault charges; 8,051 sexual offense charges; and 7,995 weapon charges. DPS criminal history records reflect those criminal charges have thus far resulted in over 247,000 convictions including 556 homicide convictions; 26,896 assault convictions; 8,723 burglary convictions; 35,242 drug convictions; 343 kidnapping convictions; 15,130 theft convictions; 23,282 obstructing police convictions; 2,235 robbery convictions; 3,484 sexual assault convictions; 4,223 sexual offense convictions; and 3,441 weapon convictions.



[Enlarge chart](#)

### Lawful Presence Determined While Incarcerated at TDCJ

From 2011 to date, the Department of Criminal Justice (TDCJ) has provided DPS with information on more than 29,000 individuals who were identified by DHS as in the country illegally while they were incarcerated at TDCJ. 10,450 of these individuals were not identified through the PEP program at the time of their arrest. DPS does not know the current incarceration status of the individuals identified while they were incarcerated nor when their alien status was initially determined. Over the course of their entire Texas criminal careers, these 10,450 individual identified as illegal aliens while in prison, were charged with more than 47,000 criminal offenses which included arrests for 1,930 homicide charges; 5,643 assault charges; 3,588 burglary charges; 6,763 drug charges; 341 kidnapping charges; 2,695 theft charges; 3,697 obstructing police charges; 2,424 robbery charges; 2,985 sexual assault charges; 1,151 sexual offense charges; and 1,563 weapon charges. DPS criminal history records reflect those criminal charges have thus far resulted in over 25,000 convictions including 1,150 homicide convictions; 2,870 assault convictions; 1,961 burglary convictions; 3,964 drug convictions; 152 kidnapping convictions; 1,275 theft convictions; 1,664 obstructing police convictions; 1,636 robbery convictions; 1,923 sexual assault convictions; 718 sexual offense convictions; and 616 weapon convictions.

**App.352**



**Enlarge chart**

---

## Follow DPS

## Keep Texas Safe

Report Suspicious Activity

## Policies

Site Policies

Accessibility

The Governor's Committee on
People with Disabilities

Statement on Telemarketing

Texas Fusion Center Privacy
Policy

Public Information Act

## Texas Sites

Texas Homeland Security

Texas Veterans Portal

Texas State Library & Archives

Public Safety Commission

texas.gov

## Feedback

Customer Feedback

Report Fraud, Waste, or Abuse

Complaints & Compliments

## Helpful Links

Outlook Web Access

CAPPS Login

ERR Entry

Compact with Texans

© 2021 Texas Department of Public Safety. PDF files require Adobe Reader or compatible.



**Arrest and Conviction Data for Select Offenses Associated with Illegal Criminal Aliens**
Identified by DHS through Texas arrests from 6/1/2011 through 01/31/2021

| Offense | Arrests | Convictions |
|---|---|---|
| Weapons | 3,871 | 1,527 |
| Sexual Offense | 5,651 | 2,749 |
| Sexual Assault | 4,505 | 2,146 |
| Robbery | 2,050 | 1,217 |
| Obstructing Police | 28,892 | 13,012 |
| Theft | 18,662 | 8,000 |
| Kidnapping | 590 | 223 |
| Drugs | 45,557 | 20,763 |
| Burglary | 6,950 | 3,707 |
| Assault | 42,698 | 16,864 |
| Homicide | 681 | 300 |
| All Other Offenses | 208,528 | 73,223 |

App.354





**Historical Arrest and Conviction Data for Select Offenses Associated with Illegal Criminal Aliens**

Identified by DHS through Texas arrests

| Offense | Arrests | Convictions |
|---|---|---|
| Weapons | 7,995 | 3,441 |
| Sexual Offense | 8,051 | 4,223 |
| Sexual Assault | 6,804 | 3,484 |
| Robbery | 4,070 | 2,235 |
| Obstructing Police | 47,931 | 23,282 |
| Theft | 32,700 | 15,130 |
| Kidnapping | 912 | 343 |
| Drugs | 70,506 | 35,242 |
| Burglary | 17,037 | 8,723 |
| Assault | 64,323 | 26,896 |
| Homicide | 1,210 | 556 |
| All Other Offenses | 294,295 | 123,867 |

**App.356**



Historical Arrest and Conviction Data for Select Offenses Associated with Incarcerated Illegal Criminal Aliens

Identified by DHS through Texas arrests

| Offense | Arrests | Convictions |
| --- | --- | --- |
| Weapons | 1,563 | 616 |
| Sexual Offense | 1,151 | 718 |
| Sexual Assault | 2,985 | 1,923 |
| Robbery | 2,424 | 1,636 |
| Obstructing Police | 3,697 | 1,664 |
| Theft | 2,695 | 1,275 |
| Kidnapping | 341 | 152 |
| Drugs | 6,763 | 3,964 |
| Burglary | 3,588 | 1,961 |
| Assault | 5,643 | 2,870 |
| Homicide | 1,930 | 1,150 |
| All Other Offenses | 14,570 | 7,905 |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF RYAN D. WALTERS**

U.S. Census Bureau Table – Geographic Mobility by Citizenship Status

# EXHIBIT B-8

| | Texas | | | |
| --- | --- | --- | --- | --- |
| | Total | | Moved; within same county | |
| Label | Estimate | Margin of Error | Estimate | Margin of Error |
| Population 1 year and over | 28,642,658 | ±11,223 | 8.5% | ±0.2 |
| AGE | | | | |
| 1 to 4 years | 1,628,532 | ±13,105 | 11.6% | ±0.7 |
| 5 to 17 years | 5,414,876 | ±7,620 | 8.3% | ±0.3 |
| 18 to 24 years | 2,826,700 | ±9,587 | 12.9% | ±0.5 |
| 25 to 34 years | 4,242,661 | ±12,557 | 13.9% | ±0.4 |
| 35 to 44 years | 3,959,419 | ±12,322 | 8.4% | ±0.3 |
| 45 to 54 years | 3,556,845 | ±10,636 | 6.0% | ±0.3 |
| 55 to 64 years | 3,274,898 | ±6,891 | 4.6% | ±0.2 |
| 65 to 74 years | 2,259,341 | ±7,279 | 3.3% | ±0.3 |
| 75 years and over | 1,479,386 | ±5,575 | 3.9% | ±0.3 |
| Median age (years) | 35.5 | ±0.1 | 28.0 | ±0.3 |
| SEX | | | | |
| Male | 14,205,551 | ±12,331 | 8.4% | ±0.2 |
| Female | 14,437,107 | ±12,058 | 8.5% | ±0.2 |
| RACE AND HISPANIC OR LATINO ORIGIN | | | | |
| One race | 27,831,753 | ±29,803 | 8.4% | ±0.2 |
| White | 21,031,553 | ±47,146 | 7.9% | ±0.2 |
| Black or African American | 3,506,078 | ±23,226 | 11.1% | ±0.5 |
| American Indian and Alaska Native | 144,038 | ±8,743 | 9.3% | ±1.9 |
| Asian | 1,431,296 | ±11,251 | 7.1% | ±0.6 |
| Native Hawaiian and Other Pacific Islander | 26,595 | ±3,972 | 11.7% | ±7.3 |
| Some other race | 1,692,193 | ±44,598 | 9.4% | ±0.9 |
| Two or more races | 810,905 | ±27,487 | 10.7% | ±1.1 |

| Label | Moved; from different county, same state | | Moved; from different state | |
|---|---|---|---|---|
| | Estimate | Margin of Error | Estimate | Margin of Error |
| Population 1 year and over | 3.8% | ±0.1 | 2.0% | ±0.1 |
| AGE | | | | |
| 1 to 4 years | 4.0% | ±0.4 | 2.3% | ±0.3 |
| 5 to 17 years | 2.6% | ±0.2 | 1.5% | ±0.1 |
| 18 to 24 years | 8.3% | ±0.4 | 3.5% | ±0.2 |
| 25 to 34 years | 6.5% | ±0.3 | 3.3% | ±0.2 |
| 35 to 44 years | 3.6% | ±0.2 | 2.0% | ±0.2 |
| 45 to 54 years | 2.9% | ±0.2 | 1.4% | ±0.1 |
| 55 to 64 years | 2.2% | ±0.2 | 1.1% | ±0.1 |
| 65 to 74 years | 1.7% | ±0.2 | 1.0% | ±0.1 |
| 75 years and over | 1.7% | ±0.2 | 0.8% | ±0.1 |
| Median age (years) | 28.1 | ±0.4 | 28.8 | ±0.5 |
| SEX | | | | |
| Male | 4.0% | ±0.1 | 2.0% | ±0.1 |
| Female | 3.7% | ±0.1 | 1.9% | ±0.1 |
| RACE AND HISPANIC OR LATINO ORIGIN | | | | |
| One race | 3.8% | ±0.1 | 1.9% | ±0.1 |
| White | 3.7% | ±0.1 | 1.7% | ±0.1 |
| Black or African American | 4.5% | ±0.3 | 2.4% | ±0.3 |
| American Indian and Alaska Native | 4.9% | ±1.7 | 2.7% | ±0.8 |
| Asian | 3.6% | ±0.5 | 3.7% | ±0.5 |
| Native Hawaiian and Other Pacific Islander | 3.2% | ±2.0 | 9.4% | ±8.3 |
| Some other race | 3.0% | ±0.4 | 0.9% | ±0.2 |
| Two or more races | 5.1% | ±0.6 | 3.9% | ±0.7 |

|  | Moved; from abroad | |
| --- | --- | --- |
| Label | Estimate | Margin of Error |
| Population 1 year and over | 0.8% | ±0.1 |
| AGE | | |
| 1 to 4 years | 1.0% | ±0.2 |
| 5 to 17 years | 0.7% | ±0.1 |
| 18 to 24 years | 1.2% | ±0.1 |
| 25 to 34 years | 1.3% | ±0.1 |
| 35 to 44 years | 0.8% | ±0.1 |
| 45 to 54 years | 0.5% | ±0.1 |
| 55 to 64 years | 0.4% | ±0.1 |
| 65 to 74 years | 0.4% | ±0.1 |
| 75 years and over | 0.3% | ±0.1 |
| Median age (years) | 27.9 | ±1.1 |
| SEX | | |
| Male | 0.8% | ±0.1 |
| Female | 0.7% | ±0.1 |
| RACE AND HISPANIC OR LATINO ORIGIN | | |
| One race | 0.8% | ±0.1 |
| White | 0.6% | ±0.1 |
| Black or African American | 0.4% | ±0.1 |
| American Indian and Alaska Native | 1.1% | ±0.6 |
| Asian | 2.9% | ±0.4 |
| Native Hawaiian and Other Pacific Islander | 1.0% | ±1.4 |
| Some other race | 1.8% | ±0.4 |
| Two or more races | 0.7% | ±0.2 |

| | Texas | | | |
| --- | --- | --- | --- | --- |
| | Total | | Moved; within same county | |
| Label | Estimate | Margin of Error | Estimate | Margin of Error |
| Hispanic or Latino origin (of any race) | 11,363,374 | ±7,932 | 8.8% | ±0.3 |
| White alone, not Hispanic or Latino | 11,816,132 | ±8,528 | 7.5% | ±0.2 |
| NATIVITY AND CITIZENSHIP STATUS | | | | |
| Native | 23,694,288 | ±55,093 | 8.6% | ±0.2 |
| Foreign born | 4,948,370 | ±52,930 | 7.7% | ±0.4 |
| Naturalized U.S. citizen | 1,958,749 | ±30,459 | 5.2% | ±0.5 |
| Not a U.S. citizen | 2,989,621 | ±47,047 | 9.4% | ±0.5 |
| MARITAL STATUS | | | | |
| Population 15 years and over | 22,833,954 | ±7,734 | 8.2% | ±0.2 |
| Never married | 7,715,686 | ±41,287 | 11.1% | ±0.3 |
| Now married, except separated | 11,041,301 | ±50,997 | 6.0% | ±0.2 |
| Divorced or separated | 2,938,935 | ±31,574 | 10.0% | ±0.4 |
| Widowed | 1,138,032 | ±21,081 | 5.4% | ±0.4 |
| EDUCATIONAL ATTAINMENT | | | | |
| Population 25 years and over | 18,772,550 | ±10,843 | 7.5% | ±0.2 |
| Less than high school graduate | 2,882,388 | ±33,539 | 7.3% | ±0.4 |
| High school graduate (includes equivalency) | 4,734,422 | ±47,856 | 7.6% | ±0.3 |
| Some college or associate's degree | 5,379,207 | ±41,497 | 7.8% | ±0.3 |
| Bachelor's degree | 3,750,797 | ±35,494 | 7.6% | ±0.3 |
| Graduate or professional degree | 2,025,736 | ±29,709 | 7.1% | ±0.4 |

| | Moved; from different county, same state | | Moved; from different state | |
|---|---|---|---|---|
| Label | Estimate | Margin of Error | Estimate | Margin of Error |
| Hispanic or Latino origin (of any race) | 2.9% | ±0.1 | 1.0% | ±0.1 |
| White alone, not Hispanic or Latino | 4.6% | ±0.2 | 2.4% | ±0.1 |
| NATIVITY AND CITIZENSHIP STATUS | | | | |
| Native | 4.1% | ±0.1 | 2.0% | ±0.1 |
| Foreign born | 2.4% | ±0.2 | 1.8% | ±0.2 |
| Naturalized U.S. citizen | 2.4% | ±0.2 | 1.6% | ±0.2 |
| Not a U.S. citizen | 2.5% | ±0.3 | 1.8% | ±0.2 |
| MARITAL STATUS | | | | |
| Population 15 years and over | 4.0% | ±0.1 | 2.0% | ±0.1 |
| Never married | 5.7% | ±0.2 | 2.5% | ±0.1 |
| Now married, except separated | 2.8% | ±0.1 | 1.8% | ±0.1 |
| Divorced or separated | 4.6% | ±0.2 | 1.7% | ±0.2 |
| Widowed | 2.4% | ±0.3 | 1.1% | ±0.2 |
| EDUCATIONAL ATTAINMENT | | | | |
| Population 25 years and over | 3.5% | ±0.1 | 1.8% | ±0.1 |
| Less than high school graduate | 2.6% | ±0.2 | 0.7% | ±0.1 |
| High school graduate (includes equivalency) | 3.4% | ±0.2 | 1.2% | ±0.1 |
| Some college or associate's degree | 3.9% | ±0.2 | 1.9% | ±0.1 |
| Bachelor's degree | 3.7% | ±0.2 | 2.7% | ±0.2 |
| Graduate or professional degree | 3.6% | ±0.3 | 3.0% | ±0.3 |

|  | Moved; from abroad | |
| --- | --- | --- |
| Label | Estimate | Margin of Error |
| Hispanic or Latino origin (of any race) | 1.0% | ±0.1 |
| White alone, not Hispanic or Latino | 0.4% | ±0.1 |
| NATIVITY AND CITIZENSHIP STATUS |  |  |
| Native | 0.3% | ±0.1 |
| Foreign born | 3.1% | ±0.3 |
| Naturalized U.S. citizen | 0.6% | ±0.2 |
| Not a U.S. citizen | 4.7% | ±0.4 |
| MARITAL STATUS |  |  |
| Population 15 years and over | 0.8% | ±0.1 |
| Never married | 1.0% | ±0.1 |
| Now married, except separated | 0.7% | ±0.1 |
| Divorced or separated | 0.4% | ±0.1 |
| Widowed | 0.4% | ±0.1 |
| EDUCATIONAL ATTAINMENT |  |  |
| Population 25 years and over | 0.7% | ±0.1 |
| Less than high school graduate | 1.1% | ±0.2 |
| High school graduate (includes equivalency) | 0.5% | ±0.1 |
| Some college or associate's degree | 0.4% | ±0.1 |
| Bachelor's degree | 0.9% | ±0.1 |
| Graduate or professional degree | 1.0% | ±0.2 |

| | Texas | | | |
| | Total | | Moved; within same county | |
| Label | Estimate | Margin of Error | Estimate | Margin of Error |
|---|---|---|---|---|
| INDIVIDUAL INCOME IN THE PAST 12 MONTHS (IN 2019 INFLATION-ADJUSTED DOLLARS) | | | | |
| Population 15 years and over | 22,833,954 | ±7,734 | 8.2% | ±0.2 |
| $1 to $9,999 or loss | 3,203,558 | ±32,025 | 8.7% | ±0.3 |
| $10,00 to $14,999 | 1,713,105 | ±26,543 | 8.7% | ±0.5 |
| $15,000 to $24,999 | 2,959,404 | ±29,675 | 9.3% | ±0.4 |
| $25,000 to $34,999 | 2,407,403 | ±28,262 | 9.4% | ±0.4 |
| $35,000 to $49,999 | 2,631,883 | ±32,926 | 8.5% | ±0.3 |
| $50,000 to $64,999 | 2,041,160 | ±33,830 | 8.6% | ±0.4 |
| $65,000 to $74,999 | 861,911 | ±18,513 | 7.5% | ±0.6 |
| $75,000 or more | 3,355,247 | ±36,009 | 6.4% | ±0.3 |
| Median income (dollars) | 31,505 | ±139 | 29,297 | ±918 |
| POVERTY STATUS IN THE PAST 12 MONTHS | | | | |
| Population 1 year and over for whom poverty status is determined | 28,016,731 | ±12,536 | 8.3% | ±0.2 |
| Below 100 percent of the poverty level | 3,790,948 | ±67,495 | 12.6% | ±0.6 |
| 100 to 149 percent of the poverty level | 2,623,138 | ±67,036 | 9.9% | ±0.8 |
| At or above 150 percent of the poverty level | 21,602,645 | ±94,258 | 7.4% | ±0.2 |
| HOUSING TENURE | | | | |
| Population 1 year and over in housing units | 28,041,965 | ±11,223 | 8.3% | ±0.2 |

| | Moved; from different county, same state | | Moved; from different state | |
|---|---|---|---|---|
| Label | Estimate | Margin of Error | Estimate | Margin of Error |
| INDIVIDUAL INCOME IN THE PAST 12 MONTHS (IN 2019 INFLATION-ADJUSTED DOLLARS) | | | | |
| Population 15 years and over | 4.0% | ±0.1 | 2.0% | ±0.1 |
| $1 to $9,999 or loss | 5.3% | ±0.3 | 2.1% | ±0.2 |
| $10,000 to $14,999 | 3.8% | ±0.3 | 1.9% | ±0.2 |
| $15,000 to $24,999 | 3.6% | ±0.2 | 2.1% | ±0.2 |
| $25,000 to $34,999 | 3.7% | ±0.2 | 1.8% | ±0.2 |
| $35,000 to $49,999 | 3.7% | ±0.2 | 2.0% | ±0.2 |
| $50,000 to $64,999 | 4.1% | ±0.3 | 1.9% | ±0.2 |
| $65,000 to $74,999 | 3.8% | ±0.5 | 2.2% | ±0.4 |
| $75,000 or more | 3.1% | ±0.2 | 2.2% | ±0.2 |
| Median income (dollars) | 28,266 | ±1,439 | 31,784 | ±946 |
| POVERTY STATUS IN THE PAST 12 MONTHS | | | | |
| Population 1 year and over for whom poverty status is determined | 3.4% | ±0.1 | 1.9% | ±0.1 |
| Below 100 percent of the poverty level | 4.4% | ±0.3 | 1.8% | ±0.2 |
| 100 to 149 percent of the poverty level | 3.1% | ±0.4 | 1.7% | ±0.3 |
| At or above 150 percent of the poverty level | 3.3% | ±0.1 | 1.9% | ±0.1 |
| HOUSING TENURE | | | | |
| Population 1 year and over in housing units | 3.4% | ±0.1 | 1.9% | ±0.1 |

|  |  |  |
|---|---|---|
|  | **Moved; from abroad** |  |
| **Label** | **Estimate** | **Margin of Error** |
| INDIVIDUAL INCOME IN THE PAST 12 MONTHS (IN 2019 INFLATION-ADJUSTED DOLLARS) |  |  |
| Population 15 years and over | 0.8% | ±0.1 |
| $1 to $9,999 or loss | 1.2% | ±0.2 |
| $10,000 to $14,999 | 0.5% | ±0.1 |
| $15,000 to $24,999 | 0.7% | ±0.2 |
| $25,000 to $34,999 | 0.4% | ±0.1 |
| $35,000 to $49,999 | 0.4% | ±0.1 |
| $50,000 to $64,999 | 0.3% | ±0.1 |
| $65,000 to $74,999 | 0.3% | ±0.1 |
| $75,000 or more | 0.4% | ±0.1 |
| Median income (dollars) | 19,924 | ±2,317 |
| POVERTY STATUS IN THE PAST 12 MONTHS |  |  |
| Population 1 year and over for whom poverty status is determined | 0.7% | ±0.1 |
| Below 100 percent of the poverty level | 1.6% | ±0.3 |
| 100 to 149 percent of the poverty level | 0.7% | ±0.2 |
| At or above 150 percent of the poverty level | 0.6% | ±0.1 |
| HOUSING TENURE |  |  |
| Population 1 year and over in housing units | 0.7% | ±0.1 |

| | Texas | | | |
| | Total | | Moved; within same county | |
| Label | Estimate | Margin of Error | Estimate | Margin of Error |
|---|---|---|---|---|
| Householder lived in owner-occupied housing units | 18,304,178 | ±101,137 | 4.1% | ±0.1 |
| Householder lived in renter-occupied housing units | 9,737,787 | ±101,070 | 16.3% | ±0.4 |
| PERCENT ALLOCATED | | | | |
| Residence 1 year ago | 7.8% | (X) | (X) | (X) |

| Label | Moved; from different county, same state | | Moved; from different  state | |
|---|---|---|---|---|
| | Estimate | Margin of Error | Estimate | Margin of Error |
| Householder lived in owner-occupied housing units | 2.1% | ±0.1 | 1.1% | ±0.1 |
| Householder lived in renter-occupied housing units | 5.8% | ±0.2 | 3.2% | ±0.2 |
| PERCENT ALLOCATED | | | | |
| Residence 1 year ago | (X) | (X) | (X) | (X) |

|  | Moved; from abroad | |
| Label | Estimate | Margin of Error |
|    Householder lived in owner-occupied housing units | 0.3% | ±0.1 |
|    Householder lived in renter-occupied housing units | 1.5% | ±0.1 |
| PERCENT ALLOCATED | | |
|    Residence 1 year ago | (X) | (X) |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | § | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF RYAN D. WALTERS**

Foreign-Born Population in Texas

# EXHIBIT B-9



# THE FOREIGN-BORN POPULATION IN TEXAS: SOURCES OF GROWTH

Based on the size and composition of its foreign-born population, Texas is more international than at any time since its statehood in 1845. By 2013, more than one of every 10 foreign-born persons in the United States resided in Texas. Presently, about one out of six Texas residents was born in a foreign country. In this brief, we examine the sources of growth for the foreign-born population in Texas and discuss the implications of this trend for the State. Using U.S. Census Bureau data, we show that slightly more than half of the 2012-2013 net migration to Texas was by foreign-born persons and that domestic migration accounts for almost 40 percent of the growth in the State's foreign-born population[1].

## Background

International in-migrants are persons who move to the United States from abroad. The American Community Survey (ACS) asks respondents where they lived one year ago.  If they lived abroad one year ago, they are considered to be recent international in-migrants. In this context, international in-migrants represent the annual inflow of persons from other countries into the United States.

### Census Terminology

*Foreign-Born*
The foreign-born population includes anyone who is not a U.S. citizen at birth.

*In-Migrant*
A person entering a specified area by crossing its boundary from some point outside the area.

*Native-Born*
Anyone born in the United States, Puerto Rico, or a U.S. Island Area, or those born abroad of at least one U.S. citizen parent.

*Immigrant*
Admitted for lawful permanent residence in the United States.

*International Migrant*
A person who changes his or her usual place of residence from one country to another.

*Domestic Migration*
Domestic migration is the movement of people within the United States.

*Net Migration*
Net migration for a given geographic area is the difference between in-migration and out-migration during a specified time frame.

*Sources: Schmidley and Gibson 1999;  Grieco et al 2012; Perry 2006; U.S. Census 1992*

Included in this Brief:

- Texas is experiencing strong growth in its foreign-born population.

- Both international and domestic migration are fueling the growth of the foreign-born population in Texas.

- The growth of the foreign-born population is making the Texas population more international than at any time since it became a state.

Authors :

Steve White

Lloyd B. Potter, Ph.D.

Helen You, Ph.D.

Lila Valencia, Ph.D.

Jeffrey A. Jordan , Ph.D.

Beverly Pecotte

The Office of the State Demographer is responsible for interpreting and communicating information on demographic and socioeconomic issues for  the State of Texas to the public and the legislature.

**October 2015**

By contrast, the foreign-born population includes all persons who were not U.S. citizens at birth. As such, the foreign-born population in the United States represents all non-native international migrants regardless of when they arrived in the United States or their immigration status. Consequently, while international in-migrants represent a flow phenomenon, the foreign-born population is a stock or resident phenomenon that results from this flow.

## Historical Trends in Texas Nativity

Both the size and the share of the foreign-born population in Texas are greater than at any time since statehood in 1845. In Table 1, we find that 8.3 percent of Texas residents were foreign-born in 1850. After declining to 2.8 percent in 1970, the share of the foreign-born population in Texas increased to 16.4 percent in 2010.

### Table 1: Number and Percent of Texas Residents by Nativity, Selected Years

| Year | Native-Born Residents | | Foreign-Born Residents | | Total Residents | |
|------|--------|---------|--------|---------|--------|---------|
| | Number | Percent | Number | Percent | Number | Percent |
| 1850 | 194,911 | 91.7% | 17,681 | 8.3% | 212,592 | 100.0% |
| 1900 | 2,869,353 | 94.1% | 179,357 | 5.9% | 3,048,710 | 100.0% |
| 1960 | 9,282,717 | 96.9% | 298,791 | 3.1% | 9,581,508 | 100.0% |
| 1970 | 10,885,644 | 97.2% | 309,772 | 2.8% | 11,195,416 | 100.0% |
| 1980 | 13,372,978 | 94.0% | 856,213 | 6.0% | 14,229,191 | 100.0% |
| 1990 | 15,462,074 | 91.0% | 1,524,436 | 9.0% | 16,986,510 | 100.0% |
| 2000 | 17,952,178 | 86.1% | 2,899,642 | 13.9% | 20,851,820 | 100.0% |
| 2010 | 21,115,083 | 83.6% | 4,142,031 | 16.4% | 25,257,114 | 100.0% |

*Sources: Gibson and Jung 2006; U.S. Census Bureau ACS 1-Year Summary Data, 2010*

**Figure 1:**     Texas Population Size by Nativity, 1850-2010



*Sources: Gibson and Jung 2006; U.S. Census Bureau ACS 1-Year Summary Data, 2010*

App.373

Table 1 and Figure 1 show that as recently as the last decades of the twentieth century, the growth of the foreign-born population in Texas was slight and gradual. For example, from 1900 to 1970, the state's foreign-born population increased by 130,415 or by less than 2,000 persons per year. From 1970 to 2010, the number of foreign-born Texans increased by 3,832,259 which is almost 96,000 persons per year.

In Figure 2, we see the Texas share of the U.S. population has increased every decade since 1850. Until 1990, the state's share of the U.S. native

-born population was greater than its share of the U.S. foreign-born population. Beginning in 1990, Texas' share of the U.S. foreign-born population has exceeded its share of the U.S. native-born population.

*SINCE 1990, TEXAS FOREIGN-BORN POPULATION HAS GROWN MORE RAPIDLY THAN THE NATIVE-BORN POPULATION.*

From 1990 until the present, the Texas share of the U.S. foreign-born population has increased so that by 2010, Texas had 7.8 percent of the U.S. native-born population and 10.4 percent of

**Figure 2:**    Texas Percentage of the U.S. Population by Nativity, 1850-2010



■ Texas Foreign-Born Population as a Percent of U.S. Foreign-Born Population
■ Texas Native-Born Population as a Percent of U.S. Native-Born Population

*Sources: Gibson and Jung 2006; U.S. Census Bureau ACS 1-Year Summary Data, 2010*

App.374

the U.S. foreign-born population. Thus, in recent decades, the state's foreign-born population has grown more rapidly than its native-born population.

In contrast with the native-born population, migration is the sole source of growth for the foreign-born population. The following section describes the migration patterns of foreign-born persons in Texas.

## Historical Trends in Foreign-Born Migration to Texas

Table 1 and Figures 1 and 2 presented the 'migrant stock' or resident population which is the total number of foreign-born persons living in Texas at a given point in time. With these data, we saw that the state's foreign-born population has experienced tremendous growth in recent decades. In this section, we describe the sources of this growth.

Growth in the foreign-born population is the result of migration flows - the number of foreign-born persons moving to Texas during a given time period. These migration flows have two sources: international migration (originating in another country) and domestic migration (originating in another state).

Figure 3 shows the 2005 through 2013 'migrant flow' data for the foreign-born population moving to Texas. In this figure, migrants are persons who lived in another country or state in the prior year.

Between 2005 and 2013, the greatest annual migration of foreign-born people to Texas occurred in 2006, at 216,605. The least annual migration was 174,741 in 2010 following the end of the 'great recession' of 2007-2009. By 2013, the number of foreign-born migrants to Texas had increased to 213,504, the second highest level during the nine year time series.

Figure 3 shows that international migration has been the major source of growth for the foreign-born population in Texas, constituting around 60 percent of the annual foreign-born in-migration. However, growth in the domestic migration of the foreign-born also has been strong.

The domestic migration of foreign-born persons has grown from about 64,000 in 2005 to over 82,000 in 2013. This increase of almost 18,000 represents an average annual growth of more than 3 percent. By contrast, the international migration of

**Figure 3:**    Number and Percent of Foreign-Born Migrants to Texas by Migration Type, 2005-2013



*Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2005-2013*

**App.375**

foreign-born persons to Texas grew from around 126,000 in 2005 to 131,000 in 2013, an increase of around 5,000 which reflects an average annual growth rate of less than 1 percent.

*RECENTLY, FOR EVERY 10 FOREIGN-BORN PERSONS ENTERING TEXAS, ROUGHLY 4 MOVED FROM ANOTHER STATE IN THE U.S.*

Even though international migration remains the largest source of growth for foreign-born Texans, domestic migrants represented close to 40 percent of the foreign-born migration to Texas between 2005 and 2013. Thus, in recent years, about four of every ten foreign-born persons moving to Texas migrated from another U.S. state.

Figure 3 showed migration flow data for total in-migrants – the number of persons moving into an area. Though in-migration is an important migration measure, it does not account for out-migration – the number of people moving out of an area. For example, in 2013, 82,174 foreign-born persons migrated to Texas from other states. However, in that same year, 50,789 foreign-born persons moved out of Texas into other states. To capture the total population gain from migration, we employ net migration. Net migration is the numerical difference between in-migration and out-migration. Using net migration, Texas gained an estimated total of 31,385 foreign-born persons from domestic migration in 2013 (i.e., 82,174 – 50,789 = 31,385).

Table 2 shows the 10 U.S. states with the largest average net domestic migration for the 2005-2013 time period. These data include both native-born and foreign-born persons. Net migration for international migrants is not presented because the ACS (American Community Survey) does not track international out-migration.

In Table 2 we see that Texas led the nation in net domestic migration between 2005 and 2013. The state's average of 125,778 net domestic migrants is 1.8 times larger than that for Florida which had the second largest number of net domestic migrants for 2005-2013.

*HIGH DOMESTIC IN-MIGRATION TO TEXAS HAS FUELED THE GROWTH OF FOREIGN-BORN POPULATION INCREASES; ABOUT ONE IN FIVE DOMESTIC MIGRANTS WAS FOREIGN-BORN.*

The rapid growth in Texas' foreign-born population has occurred alongside this pattern of high net domestic in-migration. The state's substantial net domestic migration helped fuel the growth of the foreign-born population because around one in every five of these domestic migrants was foreign-born.

Table 3 and Figure 4 have the net domestic migration to Texas for native- and foreign-born persons from 2005 through 2013. During these nine years, Texas added a little over 1.1 million persons through domestic migration. Of these, 254,181, or 22.5 percent, were foreign-born.

In the 2005-2013 series, 2006 had the largest total net migration, at 169,404, while 2010 had the smallest at 81,277. After the 2006 peak, net migration declined until 2011. As noted above, this cycle of peak and decline reflects the effects of the 2007-2009 recession. By 2013, net domestic migration had risen to 133,749, the fourth highest number during the 2005-2013 annual series.

These data suggest that the native-born and foreign-born migrants have somewhat different migration patterns. For example, the peak number of native-born migrants occurred in 2006 while the peak number of foreign-born migrants happened in 2007. The smallest net migration for the native-born happened in 2010 at 21,237. For the foreign-born, the smallest net migration was in 2005 at 10,046. As for shares of net migration, native-born in-migrants range from a high of 91.3 percent in 2005 to a low of

| Table 2 | |
| --- | --- |
| **States Ranked by Average Annual Net Domestic Migration 2005-2013** | |
| **State** | **Net Migration** |
| Tennessee | 24,684 |
| Oregon | 25,422 |
| Washington | 27,763 |
| Colorado | 33,504 |
| South Carolina | 38,189 |
| Georgia | 48,050 |
| Arizona | 53,863 |
| North Carolina | 67,501 |
| Florida | 69,801 |
| Texas | 125,778 |
| *Source: U.S. Census Bureau ACS 1-Year PUMs, 2005-2013* | |

Table 3: Number and Percent of Net Domestic Migrants to Texas by Nativity, 2005-2013

| Year | Native-Born Migrants | | Foreign-Born Migrants | | Total Migrants | |
|------|--------|---------|--------|---------|--------|---------|
| | Number | Percent | Number | Percent | Number | Percent |
| 2005 | 105,041 | 91.3% | 10,046 | 8.7% | 115,087 | 100.0% |
| 2006 | 146,422 | 86.4% | 22,982 | 13.6% | 169,404 | 100.0% |
| 2007 | 103,034 | 70.7% | 42,638 | 29.3% | 145,672 | 100.0% |
| 2008 | 103,372 | 77.3% | 30,388 | 22.7% | 133,760 | 100.0% |
| 2009 | 89,647 | 72.2% | 34,524 | 27.8% | 124,171 | 100.0% |
| 2010 | 59,950 | 73.8% | 21,327 | 26.2% | 81,277 | 100.0% |
| 2011 | 92,693 | 78.2% | 25,831 | 21.8% | 118,524 | 100.0% |
| 2012 | 75,295 | 68.2% | 35,060 | 31.8% | 110,355 | 100.0% |
| 2013 | 102,364 | 76.5% | 31,385 | 23.5% | 133,749 | 100.0% |
| **All Years** | 877,818 | 77.5% | 254,181 | 22.5% | 1,131,999 | 100.0% |

*Source: U.S. Census Bureau ACS 1-Year Summary Data, 2005-2013*

**Figure 4:**     Net Domestic Migration to Texas by Nativity, 2005-2013



*Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2005-2013*

**App.377**

68.2 percent in 2012. Conversely for the foreign-born, their highest share was in 2012 at 31.8 percent and the lowest was 2005 at 8.7 percent. Also, for the recession years, 2007-2009, the foreign-born share of net migration was 26.6 percent, higher than its overall average share of 22.5 percent. By contrast, the native-born share fell to 73.4 percent in this period, below its overall 77.5 percent average share.

We have demonstrated that the stock of foreign-born persons in Texas has had strong growth in recent years. We have also shown that migration - both international and domestic – is the source of this growth. In the next section we will describe the origins of these foreign-born migrants to Texas.

## Origins of Foreign-Born Migrants to Texas

Figures 5, 6, and 7 are based on the world area of birth for foreign-born migrants to Texas. In Figure 5, we find that, for both international and domestic migration, persons from Latin America and Asia[2] predominate foreign-born migration to Texas (for more details on the origins of international migrants to Texas, please see White et al 2015).

Between 2005 and 2013, 2005 was a peak year for the international migration of Latin-American born persons to Texas. During 2005, over 70 percent of the Latin-American origin migrants were international migrants. By 2013, less than 60 percent

**Figure 5:**   Comparison of 2005 and 2013 Foreign-Born Migrants to Texas by World Area of Birth and Migration Type



*Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2005 and 2013*

**Figure 6:**    Foreign-Born Migrants to Texas by Region of Origin, 2005-2013

| Year | Latin America | Asia | (All Others) |
|------|------|------|------|
| 2013 | 92,867 | 85,542 | 34,440 |
| 2012 | 101,416 | 71,652 | 32,185 |
| 2011 | 102,893 | 54,683 | 32,149 |
| 2010 | 89,831 | 58,630 | 25,967 |
| 2009 | 101,454 | 56,987 | 25,533 |
| 2008 | 109,561 | 55,317 | 27,834 |
| 2007 | 123,995 | 51,081 | 31,466 |
| 2006 | 137,419 | 50,445 | 28,741 |
| 2005 | 122,092 | 41,836 | 26,601 |

■ Latin America   ■ Asia

*Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2005-2013*

of Latin-American born persons moving to Texas were international migrants, resulting in nearly 31,000 fewer international Latin-American origin migrants to Texas.

*BETWEEN 2005 AND 2013, DECLINES IN LATIN AMERICAN ORIGIN MIGRATION TO TEXAS WERE LARGELY OFFSET BY INCREASES IN ASIAN ORIGIN MIGRATION.*

In 2005, 56.0 percent of Asian-born persons moving to Texas were international migrants while 44.0 percent came from other U.S. states. By 2013, Texas was experiencing an unprecedented growth in the Asian-born population. The peak year for Asian migration to Texas was 2013 and 62.4 percent of Asian-origin migrants to Texas moved from abroad while 37.6 percent moved from other states.

Figure 6 shows a time-series for foreign-born migration to Texas. In this figure, international and domestic migration are combined, and we see a trend where migration to Texas from Latin-American origin persons is declining while that for Asian origin persons is increasing. Between 2005 and 2013, Latin American migration declined by almost 25 percent while migration for Asian origin persons doubled.

**Figure 7:**    Numerical Difference in the Size of the 2005 and 2013 Foreign-Born Migrant Streams to Texas by World Area of Birth and Migration Type



| | Domestic | International |
|------|------|------|
| All Others | 1,849 | 5,990 |
| Asia | 13,794 | 29,912 |
| Latin America | 1,668 | (30,893) |

■ Domestic   ■ International

*Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2005 and 2013*

The shift from Latin-American born to Asian born migration to Texas is further illustrated in Figure 7. This figure shows differences in the 2005 and 2013 migration streams for international and domestic migration to Texas. We find that the international migration of Latin-American origin persons declined by more than 30,000 while that for Asian origin persons increased by almost 30,000. With domestic migration, the Latin-American origin migrants increased by less than 2,000 while Asian origin migration increased by more than 13,000. Thus, between 2005 and 2013, the declining Latin American origin migration to Texas was largely offset by increases in Asian origin migration.

The primary states of origin for domestic migration to Texas are examined in Figure 8. Taken together, the 10 states in this figure contributed to more than half of the total domestic migration to Texas in 2013.

*IN 2013, ONE OF EVERY FIVE FOREIGN-BORN DOMESTIC MIGRANTS MOVED TO TEXAS FROM CALIFORNIA.*

Figure 8 shows that California, the nation's most populous state, is the primary source of domestic migration to Texas. In 2013, California sent a total of 62,386 migrants to Texas. This was almost twice as many as the 33,321 from Florida, the second largest sender.

California also dominates as the primary sender of foreign-born domestic migrants to Texas. In 2013, 16,412 foreign-born persons migrated from

**Figure 8:**  Nativity of Domestic Migrants to Texas from the Top Ten Origin States, 2013



*Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2013*

California to Texas. This represented 26.3 percent of the 62,386 total migrants from California. The 16,412 foreign-born migrants from California comprise 20 percent of the 82,174 total 2013 domestic foreign-born migrants from all states to Texas. That is, one of every five foreign-born domestic migrants to Texas in 2013 originated from California.

We have seen that Texas's foreign-born migrants are predominantly of Asian and Latin American origin. We also found that California is a primary source for foreign-born domestic migrants to Texas. The next section describes the destinations of these migrants within Texas.

### Destinations of Foreign-Born Migrants to Texas

Figure 8 indicated that most of the state's domestic in-migrants originate in large population states such as California and geographically proximate states such as Oklahoma. Figures 9-11

**Figure 9:**     Top Ten Receiving Counties in Texas for Foreign-Born International Migrants, 2013



*Source: U.S. Census Bureau ACS 1-Year Summary Data, 2013*

**Figure 10:**     Top Ten Receiving Counties in Texas for Foreign-Born Domestic Migrants, 2013



*Source: U.S. Census Bureau ACS 1-Year Summary Data, 2013*

App.381

show there also is a degree of selectivity in where these in-migrants locate within Texas.

*IN 2013, THE MAJORITY OF FOREIGN-BORN MIGRANTS TO TEXAS SETTLED IN THE STATE'S FOUR MOST POPULOUS COUNTIES.*

Figures 9 and 10 respectively show the top destination counties for foreign-born international and domestic in-migrants to Texas. Not surprisingly, these migrants tend to settle in the state's more populous counties. However, these migrants also tend to be highly concentrated. For example, four counties, Harris, Dallas, Bexar, and Tarrant, received 52.4 percent of the state's foreign-born migrants in 2013. For comparison, these four counties contained only 39.8 percent of the state's total population.

Figure 11 shows the five counties that received 60 percent of the foreign-born migration to Texas in 2013. This figure indicates there are some

differences in the types of migrants to the destination counties. For Harris, Dallas, and Travis counties, there is roughly a 60-40 split between international and domestic foreign-born migrants. In Tarrant County, the split is close to 50-50. For Bexar County, the foreign-born migrant stream is about 70 percent international versus 30 percent domestic.

We have shown that foreign-born migrants to Texas tend to settle in the state's largest metropolitan areas. Next we examine how current trends in foreign-born migration are shaping population growth in Texas.

### Current Trends in Texas Nativity

The foreign-born population of Texas is growing because of international and domestic migration. Table 4 indicates that between 2010 and 2013, Texas received an average of 182,593 international migrants per year (the left panel in Table 4). This made Texas second only to California

**Figure 11:** Number and Percentage of Foreign-Born In-migrants by Migration Type to the Top Five Receiving Counties in Texas, 2013



*Source: U.S. Census Bureau ACS 1-Year Summary Data, 2013*

App.382

Table 4: Comparison of International Migration and Foreign-Born Population Growth 2010-2013

| Average Annual International Migration | | Numerical Change Foreign-Born | |
|---|---|---|---|
| **State** | **Migration** | **State** | **Foreign-Born** |
| Illinois | 67,106 | New Jersey | 81,192 |
| New York | 151,412 | New York | 85,699 |
| Florida | 164,710 | Florida | 140,019 |
| Texas | 182,593 | California | 160,771 |
| California | 268,868 | Texas | 227,240 |

*Source: U.S. Census Bureau ACS 1-Year Summary Data, 2010-2013*

which received an annual average of 268,868 international in-migrants during the 2010-2013 time period.

*WHILE CALIFORNIA CONSISTENTLY RECEIVES THE LARGEST NUMBER OF INTERNATIONAL MIGRANTS, TEXAS LEADS THE NATION IN THE GROWTH OF THE FOREIGN-BORN POPULATION.*

Even though California is the leading destination for international migrants, recent data indicate that Texas leads the nation in the growth of the foreign-born population. Between 2010 and 2013, Texas added 227,240 foreign-born persons (the right panel in Table 4). California was second to Texas, adding 160,771 foreign-born persons during the same time period.

Thus, while California consistently receives the largest number of international migrants, Texas leads the nation in the growth of the foreign-born population. The explanation for this apparent paradox is the domestic migration of the foreign-born population to Texas.

Earlier, we saw that California is a major source of foreign-born domestic migrants to Texas. In 2013, around one-in-five foreign-born domestic migrants to Texas moved from California. The data suggest that California is not only a gateway for international migrants but also a 'staging area' for their subsequent relocation. It appears that many of the international migrants who initially settle in California subsequently relocate in Texas as domestic migrants.

**Figure 12:** Net Population Gain from Domestic and International Migration to Texas by Migrant Nativity, 2013[3]



*Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2013*

When net migration is examined in Figure 12, the importance of foreign-born migration to the recent growth of the Texas population is immediately apparent. Using net migration, Figure 12 shows that slightly more than half of Texas' 2013 growth from migration can be attributed to foreign-born persons moving to Texas.

For contemporary Texas, about half of its population growth is from natural increase (i.e., the excess of births over deaths) while the other half is from net migration. Figure 12 shows about half of this net migration was by the foreign-born. Consequently, this means that about one of every four new Texans in 2013 was born abroad.

The migration of foreign-born persons to Texas is not only adding to the size of the state's population but also leading to greater diversity in the state's population composition. Recent migrants to Texas represent an increasing variety of countries, yielding greater racial/ethnic heterogeneity in the state's population (White et al 2015).

## Summary and Conclusions

In recent decades, the international and domestic migration of foreign-born persons have made Texas more international than at any time since its statehood in 1845. In 2013, about one of every four new Texans was born abroad. These foreign-born Texans came to the state from other countries as well as other states. International migration accounts for the majority of these foreign-born Texans. Nonetheless, between 2005 and 2013, Texas added a little over 1.1 million persons through net domestic migration and 254,181, or 22.5 percent, of these domestic migrants were foreign-born.

For both international and domestic migration, persons from Latin America and Asia dominate the migration of the foreign-born to Texas. Historically, people of Latin-American origin have comprised the vast majority of Texas' foreign-born population. Recently, however, this trend has moderated as the migration of Latin-American origin persons to Texas has declined while that for Asian origin persons has increased. Between 2005 and 2013, Latin-American origin migration to Texas declined by almost 25 percent while the migration of

Asian origin persons to the state doubled. With this shift in the traditional migration patterns of the foreign-born, Texas now has an unprecedented number of Asian origin residents.

The data show selectivity in both the origins and destinations of foreign-born migrants to Texas. For example, in 2013, one of every five foreign-born domestic migrants to Texas originated in California. As for destinations, in 2013, the majority of the state's foreign-born in-migrants (52.4 percent) settled in just four counties: Bexar, Dallas, Harris, and Tarrant.

Whether these recent patterns will sustain into the future is impossible to know. But, should there be continued growth in the state's foreign-born population, Texas can expect an increasingly diverse and more international population in its future. The continuing growth of the foreign-born population could lead to a future Texas that is different in several important ways:

• First, a continuing shift toward more Asian origin migrants which would make the state's population more racially and culturally diverse.

• Second, while the state as a whole will become more international, the foreign-born will not be distributed evenly across Texas' geography. Because of geographic selectivity, the population of cities such as Houston and Dallas will become more similar to the traditional foreign-born gateways of New York, Miami, and Los Angeles.

• Lastly, the continued domestic migration of the foreign-born to the state would mean that even in the absence of international migration to Texas the state's foreign-born population would continue to grow.

This report has examined the sources of growth for the foreign-born population in Texas. The focus has been on domestic and international migration because these are the only processes by which the foreign-born population of the state can grow. By definition, these migrants either lived abroad or in another U.S. state one year ago. As such, the report described only the newly arrived foreign-born Texans. The majority of the state's foreign-born residents have been in Texas for more than a year. Future reports will examine the entire

foreign-born population of Texas. Topics to be covered include:

◊ Education and Labor Force Characteristics;
◊ Income Levels, Poverty, and Income Distribution;
◊ Family, Household, and Fertility Patterns;
◊ Age, Sex, and Race/Ethnicity;
◊ Housing and Suburbanization Patterns; and,
◊ Language Acquisition and Citizenship Patterns.

## Notes

[1]  Please be aware that the U.S. Census Bureau has several programs that estimate migration. These include the American Community Survey (ACS), the Current Population Survey (CPS), Population Estimate (Components of Population Change), and the Survey of Income and Program Participation. Each of these estimation programs uses specific data sources, time frames, and sampling techniques. For example migration estimates in the ACS are based on the respondents' answer to where they lived one year ago. By contrast, migration in the Population Estimates is based on a wide range of administrative data including IRS filings, Medicare enrollment, Social Security information, and Defense Manpower data. Consequently, the estimates of migration by the different Census programs are not equivalent. As such, data users should not compare estimates from one Census source to another without a thorough understanding of their differing methodologies.

[2]  The U.S. Census (2014) uses the following countries to designate the world area of birth for Asia and Latin America:

• Asia:  Afghanistan, Armenia, Azerbaijan, Bahrain, Bangladesh, Bhutan, Brunei, Burma (Myanmar), Cambodia, China, Cyprus, East Timor, Georgia, Hong Kong, India, Indonesia, Iran, Iraq, Israel, Japan, Jordan, Kazakhstan, Korea, Kuwait, Kyrgyzstan, Laos, Lebanon, Macau, Malaysia, Maldives, Mongolia, Nepal, North Korea, Oman, Pakistan, Paracel Islands, Philippines, Qatar, Saudi Arabia, Singapore, South Korea, Spratly Islands, Sri Lanka, Syria, Taiwan, Tajikistan, Thailand, Turkey, Turkmenistan, United Arab Emirates, Uzbekistan, Vietnam, and Yemen.

• Latin America:  Anguilla, Antigua & Barbuda, Argentina, Aruba, Bahamas, Barbados, Belize, Bolivia, Bonaire, Brazil, British Virgin Islands, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, Falkland Islands, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Netherlands Antilles, Nicaragua, Panama, Paraguay, Peru, Saba, Sint Eustatius, Sint Maarten, St. Barthelemy, St. Kitts-Nevis, St. Lucia, St. Vincent & the Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos Islands, Uruguay, Venezuela, and West Indies

[3]  Please note that international migrants are persons who were living abroad one year ago. The Census Bureau includes the following as native-born migrants who were living abroad one year ago: persons from Puerto Rico, the U.S. Virgin Islands, Guam, and other outlying parts of the United States who are U.S. citizens at birth; overseas military personnel and their dependents who are returning to the U.S.; and, any other U.S. citizens who return from abroad (Faber 2000).

## References

Faber, Carol S. 2000. "Geographical Mobility – March 1997 to March 1998." Current Population Reports, Series P20-520, U.S. Census Bureau (Available: https://www.census.gov/prod/2000pubs/p20-520.pdf 09/02/2015).

Gibson, Campbell and Kay Jung. 2006. "Historical Census Statistics on the Foreign-Born Population of the United States: 1850 to 2000." U.S. Census Bureau, Population Division, Working Paper No. 81 (Available: https://www.census.gov/population/www/documentation/twps0081/twps0081.pdf 07/31/2015).

Grieco, Elizabeth, Yesensia Acosta, G. Patricia de la Cruz, Christine Gambino, Thomas Gryn, Luke Larsen, Edward Trevelyan, and Nathan Walters. 2012. "The Foreign-Born Population in the United States: 2010." American Community Survey Reports, ACS-19, U.S. Census Bureau (Available: https://www.census.gov/prod/2012pubs/acs-19.pdf 07/28/2015)

Perry, Mark. 2006. "Domestic Net Migration in the United States: 2000 to 2004." Current Population Reports, Series P25-1135, U.S. Census Bureau (Available: https://www.census.gov/prod/2006pubs/p25-1135.pdf 07/28/2015)

Schmidley, A. Dianne and Campbell Gibson. 1999. "Profile of the Foreign-Born Population in the United States: 1997." Current Population Reports, Series P23-195, U.S. Census Bureau (Available: https://www.census.gov/prod/99pubs/p23-195.pdf 01/26/2015)

U.S. Census Bureau. 1992. "Part B. Glossary, 1990 Census of Population and Housing." (Available: http://www.census.gov/prod/cen1990/cph-r/cph-r-1b.pdf 07/29/2015)

_____. 2014. "American Community Survey and Puerto Rico Community Survey: 2013 Code List." (Available: http://www2.census.gov/programs-surveys/acs/tech_docs/code_lists/2013_ACS_Code_Lists.pdf 08/10/2015)

_____. (various years). American Community Survey (ACS): One-Year Public Use Microdata Sample (PUMS). (Available: http://www.census.gov/programs-surveys/acs/data/pums.html 09/03/2015).

_____. (various years). One-Year American Community Survey. (Available: http://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml 09/03/2015).

White, Steve, Lloyd B. Potter, Helen You, Lila Valencia, Jeffrey A. Jordan, and Beverly Pecotte. 2015. "Origins of Immigrants to Texas." Office of the State Demographer. (Available: http://osd.state.tx.us/Publications/2015_05_Origins.pdf 06/25/2015).



OFFICE OF
THE STATE
DEMOGRAPHER

P.O. Box 13455
Austin, TX 78701
http://osd.state.tx.us
Ph: 512-463-8390
Fx: 512-463-7632
Email: state.demographer@state.tx.us



TEXAS
STATE DATA CENTER

501 West Cesar E. Chavez Blvd.
San Antonio, TX 78207-4415
http://txsdc.utsa.edu
Ph: 210-458-6543
Fx: 210-458-6541
Email: txsdc@utsa.edu



UTSA
The University of Texas at San Antonio™

App.386

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF RYAN D. WALTERS**

Gone to Texas

# EXHIBIT B-10

# GONE TO TEXAS

The latest state-to-state migration flows data from the U.S. Census Bureau reveal over half a million people moved to Texas from other states in 2019, among the highest in-migration flows of all U.S. states, second only to Florida. Texas net migration (in-migrants minus out-migrants) during this time was over 106,000, with California contributing over 42% to this net migration. The next two highest sending states to Texas were Florida and Illinois. During this same period, over 37,000 Texans moved to California, but the greatest net migrant loss from Texas went to Colorado.

## Percent of Net Migration Flows to Texas, 2019



Source: U.S. Census Bureau, 2019 State-to-State Migration Flows Data

demographics.texas.gov          tdc@utsa.edu          @TexasDemography

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | § | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF MARK MORGAN**

# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS AND THE STATE OF MISSOURI, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 2:21-cv-00067-Z |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.*, | ) ) ) ) ) | |
| Defendants. | ) ) | |

### DECLARATION OF MARK MORGAN

I, Mark Morgan, am over the age of 18 and fully competent in all respects to make this declaration.

Pursuant to 28 U.S.C. § 1746, testify that:

1.      I make this declaration on the basis of my own personal and professional knowledge. I have almost 30 years of combine law enforcement experience at the local, county, and federal levels, as well as, more than ten years of service with the United States Marine Corps.

2.      Since February 2021, I have been a Senior Fellow for the Federation for American Immigration Reform, a non-partisan public interest organization evaluating immigration policies and seeking solutions to reduce the negative impact of uncontrolled immigration on the Nation's security, economy, workforce, education, healthcare, and environment.

3.      From July 5, 2019 to January 20, 2021, I was Acting Commissioner of U.S. Customs and Border Protection ("CBP"). In this position, I oversaw 60,000 employees at the largest law enforcement agency and the second-largest revenue-collecting source in the federal

government. I managed a budget of over $13 billion and ensured the effective operations of CBP's mission to protect national security while promoting economic prosperity. I directed CBP's five core missions of counterterrorism, combatting transnational crime, border security, facilitation of lawful trade and travel, and revenue enforcement, including $4 trillion in trade and the travel of over 410 million people through ports of entry.

4.     From March 28, 2019 to July 5, 2019, I was Acting Director of U.S. Immigration and Customs Enforcement ("ICE"). During my leadership of ICE, I was responsible for overseeing an organization of approximately 19,000 employees with a budget of more than $7.5 billion. ICE is the lead federal agency responsible for enforcing federal laws related to immigration, border control, customs, and trade. In addition to enforcing our immigration laws, ICE's law enforcement responsibilities include investigating financial and cybercrimes as well as intellectual property and commercial fraud; human rights violations; weapons, narcotics, and human smuggling; transnational gang activity; and enforcing our export laws.

5.     From January 2017 to January 2018, I served as the Executive Director of the FBI's National Academy Associates, a non-profit, international organization of more than 16,500 senior law enforcement professionals dedicated to providing communities and profession with the highest degree of law enforcement expertise, training, and education.

6.     From October 12, 2016 to January 26, 2017, I was Chief of U.S. Border Patrol, a component of CBP within the Department of Homeland Security ("DHS"), after having begun to serve in that position in an acting capacity in July 2016. In this position, I had oversight of nearly 21,000 Border Patrol Agents. The mission of Border Patrol is preventing the illegal trafficking of people and contraband and is specifically responsible for patrolling nearly 6,000 miles of Mexican and Canadian international land borders and over 2,000 miles of coastal waters surrounding the

Florida Peninsula, as well as the island of Puerto Rico.

7.     From August of 1996 to August of 2016, I served as a Special Agent with Federal Bureau of Investigation.  Over the span of 20 years, I served in a variety of positions including supervisor of an MS-13 Gang Task Force; Assistant Special Agent In-Charge of the New Haven Division; Deputy On-Scene Commander in Baghdad, Iraq; Special Agent In-Charge of the El Paso Division; and Assistant Director of the FBI's Training Division, Quantico.  I was a member of the Special Weapons and Tactics Team, certified Firearms Instructor, and Tactical Medic.

8.     From 1995 to 1996 I served as a Police Officer with the Los Angeles Police Department where I was assigned to the 77th Division as a patrol officer.

9.     From 1992 to 1995 I attended the University of Missouri – Kansas City, School of Law.  I earned a Juris Doctor degree in 1995 and passed the Missouri Bar.  While attending law school I served as a Reserve Deputy Sheriff in Platte County, Missouri.

10.    I served in the United States Marine Corps, active duty and reserves, from August of 1984 until my Honorable Discharge in September of 1996.

**The 2018-2019 Border Crisis**

11.    In Fiscal Year ("FY") 2018, CBP experienced a steady increase in total apprehensions along the Southwest Border ("SWB"). Starting the FY with just under 35,000 apprehensions for the month of October and ending the FY with just over 50,000 apprehensions in the month of September.  The total apprehensions in FY 2018 were approximately 521,000, an increase of more than 100,000 from FY 2017.  The apprehensions were continuing to rise and already over-burdening agencies involved in the immigration process due to the increase in families and unaccompanied minor apprehensions.

12.    As FY 2019 began, apprehensions spiked.  At the end of FY 2018, CBP

apprehended over 50,000 aliens in a single month (September). That number increased by 10,000 for the first month of FY 2019 (October) and had more than doubled to over 100,000 only a few months later (March). The apprehension numbers continued to climb and by May of FY 2019 CBP apprehended more than 144,000 aliens along the SWB – more than double the monthly highwater mark of the previous 6 years. At the time it was acknowledged by the White House and the DHS as a full-blown crisis.

13.     In addition to the skyrocketing number of apprehensions, the major element exacerbating the crisis was the demographic composition of those being apprehended. Historically, the majority of migrants illegally entering our SWB were adult single males, primarily from Mexico. The U.S. immigration system, laws, and agency's capability and capacity were designed around the single adult male demographic. By contrast, dealing with families and unaccompanied minors consumes an exhaustive amount time and resources to support the humanitarian efforts required.

14.     By the end of FY 2019 CBP's enforcement actions totaled more than 979,000 – a staggering 88% higher than FY 2018 and 72% higher than FY 2014's highwater mark. The U.S. Border Patrol alone reported more than 850,000 apprehensions – 115% higher than FY 2018. Family units consisted of more than 473,000, the highest year on record and 342% higher than FY 2018. Unaccompanied minors consisted of more than 76,000, 26% higher than FY 2018.

15.     These are numbers no immigration system in the world is designed to handle – including the U.S. Arrivals of families at our SWB in FY 2019 more than tripled any previous FY on record. CBP's facilities are not designed for long-term hold for families and unaccompanied minors. The dual front crisis, both volume and demographics, quickly strained CBP resources along the SWB and forced the diversion of many of our essential front-line personnel securing our

border to address the humanitarian crisis – negatively impacting CBP's ability to carry-out its national security mission. In some sectors along the SWB, 40% of front-line personnel were pulled to provide humanitarian assistance.

**The Migrant Protection Protocols**

16.     As CBP was navigating the crisis, including the unprecedented volume of families and unaccompanied minors, the Trump Administration was developing strategies and introducing policies and initiatives in an effort to restore the rule of law; remove the incentives driving illegal immigration; and close the loopholes undermining the integrity of our immigration system. Although FY 2019 began with skyrocketing apprehensions and ended with record setting number of families and unaccompanied minors, had there not been intervention with a network of tools, polices, and initiatives, the crisis would have been catastrophic.  Increased interior enforcement; Asylum Cooperative Agreement ("ACA") with Guatemala; and Mexico's support of the Migrant Protection Protocols ("MPP") laid the foundation to dramatically reduce the flow of illegal immigration – especially by families and unaccompanied minors.

17.     In FY 2019, DHS announced the MPP as part of its network of polices to assist with addressing the crisis at the border. The MPP declared migrants who illegally enter our borders or otherwise were deemed inadmissible, may be removed to Mexico while the illegal alien continues to participate in  immigration proceedings conducted in the U.S. Illegal aliens enrolled in MPP and removed to Mexico are not barred from claiming asylum or fully participating in the U.S. immigration proceedings but rather are required to do so while remaining in Mexico.

18.     There was extensive coordination and planning between the U.S. and the Government of Mexico concerning the effective implementation of MPP.  I personally oversaw CBP's "phased-in" implementation strategy area by area along the SWB over several months

during FY 2019, to ensure a smooth and safe approach. We constantly coordinated with partners in the Mexican Government–both with my counterparts at the agency-head level, as well as, field leadership at the ground level. By the beginning of FY 2020 MPP had been initiated along the entire SWB.

19.      Pursuant to the Flores Settlement Agreement ("FSA") court order, unaccompanied minors arriving at the border who have been determined not to have been trafficked and are from non-contiguous countries, can only be detained by U.S. authorities 20 days before being released into the United States. This 20-day detention rule was later reinterpreted to apply to families as well.

20.      Historically, especially when the immigration system is inundated with the volume experienced in FY 2019, immigration proceedings generally cannot be completed within 20 days. Thus, the FSA resulted in the mandatory release of any family and unaccompanied minor who illegally crosses our borders. The inability to detain a migrant while immigration proceedings progress is what directly resulted in the process commonly referred to as "catch and release". Meaning illegally alien families and unaccompanied minors could no longer be detained while awaiting their proceedings due to the 20-day restriction order, but rather were mandated to be released into the U.S. Whereas single adults could still be detained.

21.      By FY 2019, the human smuggling organizations were using this judicially created loophole in our immigration system as an incentive to convince families to illegally enter the U.S. That's exactly what CBP experienced. In FY 2019, Border Patrol apprehended the highest number of illegal alien families on record. The human smugglers were so successful because they, along with the migrants, understood if they came to our borders with a minor child, they would be released into the interior of the U.S. in just a few days. The result of the FSA, regardless of its

noble premise, had the opposite impact.  It resulted in the ruthless and dangerous exploitation of minors.  Children were being used as human passports.  They were being sold or rented to non-family members, being forced to make the dangerous overland journey, with some being flown or driven back to their home country to repeat the journey all over again.

22.     Additionally, not only did the FSA create an unmitigated loophole to be exploited, it enhanced the human smuggler's ability to take advantage of those seeking a better life. If the cartels smuggle 300,000 migrants per year at an average "fee" of $5,000 per person, it's estimated the cartels can make more than $1.5 billion.  And the migrants are often abused, locked in overcrowded, unsanitary stash house or tractor trailers during their journey.  Fear is part of the smuggler's business model, often subjecting the migrants to extortion, sexual assault, and even forced labor to pay off their debts.  The smugglers often use the families as distraction techniques to pull Border Patrol agents off the line allowing the smugglers to bring in dangerous drugs and criminal illegal aliens across the border.

23.     DHS implemented MPP, as part of the network of policies and tools, to manage this crisis at the border. By allowing CBP to directly remove illegal aliens to Mexico it not only ended "catch and release," but it simultaneously sent a powerful message to the smugglers and immigrants themselves that we had closed a significant loophole. Bringing a child with you to the border was no longer your passport into the U.S.  Not only did the MPP enable DHS to stop releasing illegal aliens into the U.S. but just as important, it acted to deter aliens from paying smugglers, risking their lives, and attempting to illegally cross the southern border. This policy created a powerful disincentive for aliens to arrive at the southern border to seek entry with meritless claims of asylum.

24.     The MPP played a critical role in addressing the border crisis.  By removing

migrants to Mexico to await their asylum proceedings, MPP reduced the ability of illegal aliens to remain in the U.S. in defiance of their court ordered removals; deterred aliens from attempting illegal entry or making meritless asylum claims in the hope of staying inside the United States; and shut down the driving force behind the FY 2019 illegal migration crisis by closing the FSA generated loophole.   An additional benefit to MPP is it's allowed the government to better focus its resources on individuals who have legitimate asylum claims.   To illustrate MPP's effectiveness, the underlying demographic driving the crisis–families from Central America was significantly mitigated by February of FY 2020 when CBP saw a decline of families from the previous year of 66%. And families decreased from the height of May FY 2019 by 92%.  In FY 2019, because of the FSA and other loopholes, CBP alone had released more than 230,000 illegal aliens and inadmissible migrants into the U.S. In FY 2020, in large part directly related to MPP, CBP released fewer than 1,000.

**The Biden Presidential Transition**

25.    I have served in a variety of federal law enforcement positions during my 25 years of federal service, including more than a decade in the Senior Executive Service ranks, and as such I am familiar with the Presidential Transition processes.

26.    The process to transition-in a new administration is an extremely formal and a time-tested process.  The incoming administration selects its own transition members and drives not only the briefing schedule but the areas of focus for the briefings.  The transition teams often ask for specific briefers by name – as did the Biden transition team.  Each Cabinet-level Department selects a senior executive to act the Department's "lead" coordinator.   Each agency within its respective Department also selects a lead "coordinator." The incoming transition team coordinates directly with Department coordinators, as well as agency coordinators after consultation with the

department coordinator, to set all briefings – including dates, times, and topics. Included in most transition briefings there will be an "Agency 101" covering the general mission, statistics, and accomplishments, as well as a series of more detailed topics addressing areas of critical importance.

27.    The transition process following the 2020 election was consistent with previous transitions that I participated in.

28.    For the transition following the 2020 election, Deputy Director of the U.S. Citizenship and immigration Services ("USCIS") Mark Koumans, a career official, led the DHS transition team and each agency within DHS appointed a transition official to assist the Biden transition team.

29.    Assistant Commissioner, Chief Acquisition Officer ("CAO") of CBP Mark Borkowski, a career official, was the lead coordinator for the CBP transition. As such CAO Borkowski provided regular updates to the CBP executive team, including myself, regarding all aspects on the transition. He provided detailed briefing materials which outlined the transition progress, issues and concerns, topics, and over all timetable of briefings. CAO Borkowski coordinated with the senior leadership of each of the six program offices within CBP to ensure timely and effective materials were provided in advance and addressed the transition teams inquires.

30.    As Acting Commissioner of CBP, it was my duty to ensure that CBP was providing any and all materials requested by the transition team members; that CBP provided timely and complete responses; and that CBP made the transition team aware of issues and concerns requiring their awareness and attention. I not only received regular status updates from CAO Borkowski regarding the transition process but also from senior executives who participated in the briefings.

31.     Based on the "back briefs" I received, I was confident the Biden Transition Team members were fully and completely briefed on a series of critical issues facing CBP's five mission priorities, especially border security and the progress we made addressing the illegal immigration crisis we faced in FY 2019.  I recall one such back-brief detailing the transition team briefing concerning implementation of MPP, its effectiveness, and the consequences if the policy were suspended.  One of the reasons I recall the back brief was the significance of MPP.  CPB career employees informed me that they had fully briefed the Biden transition officials on the importance of MPP and the consequences that would follow a suspension of MPP.

32.     During the transition, DHS provided approximately 200 hundred briefings to the Biden transition team, most of them concerning border security and immigration related topics, including the effectiveness of the MPP program and the border crisis that would occur if it were to be suspended.

33.     The Biden transition personnel were specifically warned that the suspension of the MPP, along with other polices, would lead to a resurgence of illegal aliens attempting to illegally enter our SWB.  They were warned the smuggling organizations would exploit the rescission and convince migrants the U.S. borders are open. They were warned the increased volume was predictable and would overwhelm Border Patrol's capacity and facilities, as well as HHS facilities.

**The Biden Administration's Suspension of the MPP Program**

34.     I have reviewed the memorandum issued by then-Acting Secretary of DHS titled "Suspension of Enrollment in the Migrant Protection Protocols Program" dated January 20, 2021 (the "Pekoske Memorandum").  The body of that memorandum consists entirely of the following: "Effective January 21, 2021, the Department will suspend new enrollments in the Migrant Protection Protocols (MPP), pending further review of the program. Aliens who are not already

enrolled in MPP should be processed under other existing legal authorities."

35.     The Pekoske Memorandum does not reflect any understanding regarding the consequence of rescinding MPP to the CBP briefers, nor does it heed the warning of border security experts who predicted the very crisis we are now experiencing at our SWB as a result of the suspension of MPP.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 12th day of May 2021.

MARK MORGAN

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF ALISON PHILLIPS

# EXHIBIT D

App.401

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

The State of Texas; and                    )
                                           )
The State of Missouri,                     )
                                           )
                    *Plaintiffs*,          )
                                           )
v.                                         )        Case No. 2:21-CV-00067-Z
                                           )
Joseph R. Biden, Jr.,                      )
in his official capacity as                )
President of the United States of          )
America;                                   )
                                           )
Alejandro Mayorkas,                        )
in his official capacity as                )
Secretary of the United States             )
Department of Homeland Security;           )
                                           )
United States Department of                )
Homeland Security;                         )
                                           )
Troy Miller,                               )
in his official capacity as                )
Acting Commissioner of the                 )
United States Customs and Border           )
Protection;                                )
                                           )
United States Customs and Border           )
Protection;                                )
                                           )
Tae Johnson,                               )
in his official capacity as                )
Acting Director of the                     )
United States Immigration and              )
Customs Enforcement;                       )
                                           )
United States Immigration and              )
Customs Enforcement;                       )
                                           )
Tracy Renaud,                              )
in her official capacity as                )
Acting Director of the United States       )

Citizenship and Immigration Services; and )

)

UNITED STATES CITIZENSHIP AND )

IMMIGRATION SERVICES, )

)

*Defendants*. )

## DECLARATION OF ALISON PHILLIPS

**Background**

1.      My name is Alison Phillips and I am the Director for the Anti-Human Trafficking Task Force (HTTF) for the Missouri Attorney General's Office. My job entails facilitating and implementing a multi-disciplinary, comprehensive approach to addressing human trafficking in the state of Missouri. Toward that end, I work with federal, state, county and local law enforcement, as well as regulatory, and social service agencies. I train hundreds of professionals every year about how to identify and respond to human trafficking and have extensive public speaking experience, including my own Tedx Talk. Under my leadership, our HTTF launched a first of its kind in the nation, strategy to address human trafficking in illicit massage businesses; named The Hope Initiative. This initiative is achieving unprecedented success in closing IMB's within our state. It has been featured in multiple national forums and to date, nine other states are looking to replicate the Hope Initiative.

2.      Prior to my employment with the Attorney General's Office, I worked as an Adjunct Professor at the University of Missouri, Kansas City and Mid-America Nazarene University teaching courses on human trafficking to undergraduate criminal justice majors. I have worked as a consultant to churches and other community groups, helping them to plan effective and strategic efforts to combat human trafficking. In 2017, I obtained a Master's Degree in Criminal Justice and Criminology from the University of Missouri, Kansas City.  I have almost a decade of experience in the anti-trafficking field.

3.      As part of my work, I have interviewed, worked with, advocated for and mentored dozens of survivors of human trafficking. Many of them have shared with me personal details about the inhumane and horrific things that they have experienced; things that I will never forget. These stories and the resilience of those that have survived and carry on to build a new life for themselves motivate and inspire me to continue to fight.

4.      Part of my background in human trafficking work also originates from my experiences as a foster parent. Additionally, I am the proud mother of a daughter that my husband and I adopted internationally at the age four. Our adoption is the result of an intensive, three year process that we underwent before we could bring our daughter home. This was followed by another year before we were permitted to legally finalize her adoption. When we traveled to our daughter's birth country of India to bring her home, we were allowed to do so because an Indian court had granted us legal guardianship and we had obtained a Visa so that she could enter the United States. In order to finalize the adoption and for our daughter to become a U.S. citizen, we first submitted to a year's worth of social work visits and progress reports which were forwarded to

India for their review and approval. We understood that all of this was to ensure that children brought into the U.S. for the purpose of adoption are protected from abuse and exploitation.

**Human Trafficking on a Global Level**

5.     Recent estimates state that human trafficking is a $150 billion dollar annual industry in which 40 million people around the world are currently victimized (International Labor Organization, 2014). Victims are trafficked for the purpose of forced labor, commercial sexual exploitation, using children as soldiers, begging, surrogacy, adoption and even organ harvesting. In financial terms, human trafficking is the second largest criminal enterprise on earth, following the illegal trade in drugs. Traffickers all around the world are increasingly recognizing the lucrative nature of human trafficking as it is relatively low risk when compared to the trade in illegal drugs, which requires extensive time and investment to manufacture, and high risk to transport and sell. Victims of human trafficking, on the other hand, can be easily obtained for little or no investment and can be sold repeatedly.

6.     On a global scale, human trafficking victims are recruited and sold domestically within their own native country, but they are also moved via trans-regional flows that are influenced by "push and pull" factors. In so-called "origin countries," government corruption, war, persecution, natural disasters, poverty, and organized crime create environments that in effect *push* victims out of their native country. Traffickers use financial rewards, opportunities to make money and the provision of basic needs to lure potential victims. Individuals from backgrounds of poverty and desperation are especially vulnerable to these offers. Traffickers capitalize on these circumstances of desperation and further exploit their victims' vulnerabilities by creating situations of debt bondage and dependency. The affluence of "destination countries," and the presence of demand for commercial sex and forced labor present a powerful economic *pull* that influence the flow of victims from one country to another.



■ Main destinations of transregional flows and their significant origins, 2012-2014

7.      Policy makers in destination countries who are interested in protecting vulnerable people groups from exploitation within their country, should understand trans-regional flow and global patterns of human trafficking. Yury Fedotov, former Executive Director of the United Nations Office of Drugs and Crime, was quoted in the 2020 Annual Trafficking in Persons Report (TIPS) as saying, "[Human Trafficking] thrives in situations where the rule of law is weak and people lack opportunities. Humanitarian crises and conflicts create an environment in which traffickers easily prey upon the vulnerable." (Trafficking In Persons Report, 2020 p. 23) Destination countries with weak border security and lax immigration policies in effect create an open door for traffickers to enter and do business. It creates more opportunity for them to make money and in turn motivates traffickers to recruit more victims from origin countries. Put simply, traffickers would not invest the time and resources to groom, recruit and transport large numbers of potential victims to the U.S. border if they had reason to believe a crossing would not be possible. There's no money in that.

**Human Trafficking in the United States**

8.      According to years of data collected by Polaris Project, the nation's largest anti-human trafficking non-governmental organization and the operator of the National Human Trafficking Hotline, the majority of human trafficking victims in the United States are U.S. citizens. The affluence of the U.S., however, also makes it a destination country for victims from other countries. International criminal organizations look for weaknesses in U.S. borders and

immigration policy in order to bring their victims into the country. Russian mafia, Asian organized crime, and Mexican cartels smuggle people into the United States for the purpose of human trafficking. Much of this occurs across the U.S.-Mexico border.

9.      The most common origin countries for human-trafficking victims documented in 2020 were from Mexico followed by Honduras and Guatemala (*US Department of State (2020) Trafficking in Persons Report. pgs. 515-523. Retrieved from:*[https://www.state.gov/wp-content/uploads/2020/06/2020-TIP-Report-Complete-062420-FINAL.pdf](https://www.state.gov/wp-content/uploads/2020/06/2020-TIP-Report-Complete-062420-FINAL.pdf)). In the years 2015-2018, 2,552 victims of human trafficking were identified by Polaris Project that related to cross US-Mexico border human trafficking activities. Of those victims, 1,535 originated from Mexico, 151 from the USA, 82 from Honduras, 76 from Guatemala, 33 from India, and 33 from El Salvador. In the same years, Polaris identified 1,782 traffickers committing cross US-Mexico border human trafficking. 380 of those traffickers originated from Mexico, 132 from the USA, 29 from Honduras, 20 from Guatemala, and 13 from India.

10.     Not all victims entering the U.S. via the southern border are Hispanic. Victims from Eastern Europe have also been smuggled into the United States via the U.S.-Mexico border by Russian mafia and other Eastern European criminal organizations. Their tactic is to disguise their victims as American students by purchasing a nice car and western clothing for their Caucasian victims as a means to ensure passage across the border. Asian organized crime also has a history of using the southern border as a means to bring in women they intend to traffic through illicit massage businesses.

11.     It is important to understand that human trafficking and human smuggling, while interconnected, are two different things. Smuggling is a crime against a nation and is something that an individual can consent to. Human trafficking, however, is a crime against an individual. As defined by law, a person cannot consent to being trafficked. Smuggling can make an individual vulnerable to traffickers in a number of ways. For example, many smuggling operations are conducted for the purpose of creating debt bondage situations or circumstances in which children are separated from their families. Many traffickers employ smugglers to transport the victims recruited in origin countries.

12.     To be clear, the United States is a desirable location for human traffickers to be doing business. There is money to be made here. International organized crime groups seek to exploit loopholes in our visa system, policies about asylum, and find areas of our borders that can be physically crossed with relative ease. For example, many of the workers in the estimated 9,000 illicit massage businesses across the United States entered the U.S. in one of two ways: they were smuggled across the U.S.-Mexico border via coyotes or took advantage of loopholes in immigration policy enacted in 2012 under the Obama Administration that allowed them to claim asylum for persecution. No verification of the basis for seeking asylum is required and follow up is not provided. Thus, the victims disappeared into the United States. Many of these women are under the control of Asian organized crime groups and are being sex trafficked in illicit massage parlors across the United States (Polaris, 2018, Human Trafficking in Illicit Massage Businesses.)

**App.406**

13.      Foreign national victims of human trafficking are found in both labor and sex trafficking across the United States. Foreign nationals who don't speak English and are undocumented can easily be marginalized and isolated. Fear of deportation can keep victims from reporting to law enforcement. Often these victims have been told to fear law enforcement and are unaware of their rights. Unaccompanied and undocumented minors who enter the United States via smugglers are extremely vulnerable to traffickers and other abusers. There is no one to file a missing child report, or issue an Amber Alert. There is no record that the child is even here in this country. No one even knows to look. In the eyes of a trafficker, children in these circumstances make ideal victims.

14.      The following graphic represents top venues for human trafficking reported to the National Human Trafficking Hotline during the year of 2019 (the latest year those statistics are available):



**TOP VENUES/INDUSTRIES FOR LABOR TRAFFICKING**

| Domestic Work (218) |
| Agriculture (108) |
| Traveling Sales Crews (107) |
| Restaurants/Food Service (81) |
| Construction (55) |

# of Cases                                    1,236

**TOP VENUES/INDUSTRIES FOR SEX TRAFFICKING**

| Illicit Massage/Spa Business (1,247) |
| Pornography (733) |
| Residence-Based Commercial Sex (592) |
| Hotel/Motel-Based (534) |
| Online Ad, Venue Unknown (452) |

# of Cases                                    8,248

Source: Polaris Project (2019), Retrieved from: https://humantraffickinghotline.org/states

15.      Unskilled labor pools are common places to find labor trafficking victims in states all across the U.S. Undocumented, marginalized immigrants are ideal candidates for these situations. Female labor trafficking victims are also often subjected to harassment and sexual abuse including sex trafficking.

- According to the International Journal of Rural Criminology (2014), 39% of North Carolina's farm workers report being trafficked or otherwise abused.
- In 2008, approximately 1,200 undocumented migrant workers were freed from slave-like conditions on tomato farms in central Florida. Victims had wages withheld, were beaten, threatened and forced to work long hours in extreme conditions. They were locked up and confined. Some of the women reported sexual abuse.
- In 2015, a Justice Department press release announced the unsealing of a 15-count superseding indictment "charging three defendants with luring Guatemalan minors and adults into the United States on false pretenses, then using threats of physical harm to compel their labor at egg farms in Ohio."
- Other cases have involved tomato pickers locked in box trucks under armed guard and children around the age of 7 laboring in Michigan blueberry groves.

App.407

Retrieved from: https://www.csmonitor.com/World/2015/1116/Trafficking-In-Florida-s-tomato-fields-a-fight-for-ethical-farm-labor-grows)

16.     Farley, Ugarte & Zarate (2004) document reports of residential brothels and camps that extend from San Diego all the way up to Canada where undocumented immigrant young girls and women are sold for sex. These victims entered the United States via the southern border with the assistance of coyotes who initially promised them a better life (Farley, M., Ugarte, MB., Zarate, L. 2004. Prostitution and trafficking of women and children from Mexico to the United States. Journal of Trauma Practice, Taylor & Francis.) One of these camps is described in a 2003 report by a physician working with migrant workers, "'The first time I went to the camps I didn't vomit only because I had nothing in my stomach. It was truly grotesque and unimaginable.' Many of the girls were 9 to 10 years old. On one occasion the physician counted 35 men raping a girl for money during a single hour." (Hernandez, A. 2003. The Sex Trafficking of Children in San Diego: Minors are prostituted in farm labor camps in San Diego. El Universal, Mexico City. Jan 11, 2003).

# Number of Trafficking Cases by State of Exploitation



17.     Humanitarian considerations are primary in our border policy. Nevertheless, there are fiscal costs to consider as well. Expenses are incurred by our federal government, but also by states for things like law enforcement; and other criminal justice system resources, social service costs, the public health system as well as opportunity costs should be considered. Labor trafficking results in lost wages and tax revenue and puts downward pressure on wages in general, especially in unskilled labor pools. This further exacerbates the economic challenges for individuals working in those areas of the economy which often impacts increased demand for

assistance with housing and food. The money made through human trafficking by international organized criminal organizations operating in the United States further empowers these entities and contributes to an increase in crime in general. All of this has a very real price tag to it.  In 2016, the University of Texas and published a report estimating the prevalence of child sex trafficking and labor trafficking in Texas and the associated financial cost to the state. Key findings of this report estimate that approximately 79,000 minors were being sex-trafficked in Texas at any given time during that year. The lifetime social service costs incurred by the state and the victims themselves through mental and physical health costs, strains to the public health system, and law enforcement expenses is estimated to be $6.6 billion dollars. The study additionally estimates the annual value of lost wages for labor trafficking victims to be approximately $600 million dollars. (Source retrieved from: https://globalinitiative.net/wp-content/uploads/2018/01/Human-trafficking-by-the-numbers.pdf)

18.     In conclusion, the data presented indicates there is a relationship between the prevalence of human trafficking in the United States and activity on the US-Mexico border. Immigration policies as they relate to the management of the southern border of the United States are a contributing factor to overall rates of human trafficking in the United States. Cross border trafficking is not the largest cause of overall human trafficking in the United States, as the majority of human trafficking cases within the United States originate domestically. Nevertheless, cross border human trafficking activity has implications for the overall prevalence of human trafficking in all fifty states, not just the states along the U.S. Mexico border.

**Missouri**

19.     For the three years 2017 through 2019, between 9% and 12% of calls made to the National Human Trafficking Hotline for the state of Missouri involved foreign nationals. It is my professional opinion, based on my study of relevant research and my work in the field, that what is reported to the National Human Trafficking Hotline are just the proverbial "tip of the iceberg." The vast majority of cases of human trafficking are not identified or reported at all, this is especially true for cases in which the victims are foreign nationals. Most of these victims are very isolated and marginalized by physical, geographical, cultural and linguistic factors. They, like many human trafficking victims, do not self-identify as victims, do not know their rights, and do not know who or how to ask for help.

20.     Several recent sample cases of human trafficking involving foreign nationals who were able to gain entry into the United States due to weaknesses in immigration policy and then were exploited in or through Missouri are provided in the following section. They detail the ways in which lax immigration policy and open borders create opportunities for traffickers. Once victims arrive in the United States, they do not just stay in the bordering states of California, Arizona, New Mexico and Texas. Cases involving human trafficking of foreign nationals are documented in all fifty states.

21.     In 2014, an 80% increase in unaccompanied minors at the U.S. Mexico border was reported. This increase is attributed to several factors, including a change in policy regarding the

potential deportation for undocumented immigrants who were minors. Accompanying that change in policy was a marked increase in smugglers' recruitment in origin countries. ( Robertson, Lori (2018-06-28). *"Illegal Immigration Statistics")*. As Director of our state HTTF, I have the opportunity to work with numerous social service and law enforcement agencies across the state. A veteran state Trooper with over two decades of experience on Missouri highways recounted for me how in 2014, he saw a marked increase in activity on our highways involving foreign nationals. Some of that activity he suspects involved human trafficking.

22.      Missouri can be a destination or transit state for many human traffickers. This is mainly due to the state's substantial transportation infrastructure, major population centers and various aspects of our economy that are reliant on unskilled labor such as agriculture. Missouri has the 7th largest highway system in the nation with six major interstates. Coupled with its geographical middle location in the country, this ensures that a significant portion of transnational movement passes through Missouri.



Source: Missouri Department of Economic Development (2021). Retrieved from: https://ded.mo.gov/transportation-and-logistics/why-missouri/centrally-located-with-excellent-infrastructure

**Case Examples**

**An Unaccompanied Three Year Old Girl**

23.     On December 22, 2020, a Kansas Highway Patrol Technical Trooper conducted a traffic stop on U-54 Hwy in SW Kansas.  The vehicle was full of illegal immigrants.  The trooper observed 9 males and 1 female and wanted to check the welfare of the female to make sure that she was not being trafficked.  During the traffic stop, it came to light that there was a small female child in the vehicle.  The trooper re-approached and eventually discovered that the 3 year old female from Ecuador was concealed under the rear bench seat and covered with a blanket.  Further investigation revealed that the child was not related to anyone in the vehicle.  Further, her parents had her smuggled across the U.S.-Mexico border in one fashion and they were going to attempt to cross utilizing a different method.  The parents didn't make it across.  However, they had sent the girl with a phone and some phone numbers to contact if this scenario happened.  The driver stated he picked the child up in Albuquerque, NM at a gas station from a different vehicle.  He admitted he was taking the child to Chicago [via Missouri].  The parents had planned to arrive in New York to live with family.  The driver didn't know why the girl was going to Chicago or whether she would end up in New York or not.  He was being paid to transport these immigrants.

24.     The girl was removed from the situation and family in New York was contacted.  No one had heard from this girl in the six days since she crossed the border.  Two days later, the family members from New York arrived to take custody of the girl.

25.     This traffic stop came five days after some human trafficking/sex offender training that the Missouri State Highway Patrol provided to this trooper and other members of the Kansas Highway Patrol.

(Source: Personal Communication (April 2, 2021). Kansas Highway Patrol)

26.     As task force director, I am aware of children in situations like this, especially very young ones, being sexually exploited in residential brothels and through websites that specialize in producing child sexual abuse material (CSAM) (also referred to as child pornography). There is a very specific niche market for CSAM featuring very young children with subscribers who are willing to pay high dollar to access. Some of these websites require subscriptions where a viewer can pay for customized sessions where they can request specific acts to be done to the child while the viewer watches live. The website platforms that participate in this horrible practice often use children from developing countries with unstable governments where they have reasonable assurance that there will be no law enforcement involvement. Children who are unaccompanied and undocumented in the United States are ideal potential victims for this form of horrific abuse as well.

_____

**Labor Trafficking in the Kansas City Area**

27.     In 2016, the owners and crew leaders of a company named Century Roofing were found to be involved in labor trafficking of undocumented immigrants. The federal indictment alleges that the workers were threatened, intimidated, and coerced into paying kickbacks to the company and its managers. Workers were housed in over-crowded apartments, and threatened with deportation if they did not work long hours and pay money back to supervisors. Further investigation indicated that Century Roofing helped facilitate the recruitment and transportation of their victims for the purpose of providing below market wages.  Three arrests were made.

Retrieved from: https://fox4kc.com/news/3-arrested-in-kck-on-criminal-charges-following-homeland-security-investigation/

**Labor Trafficking in the Branson Area**

28.     In 2009, a labor leasing company named Santa Cruz Management, was found to be hiring foreign nationals who had been trafficked into the United States utilizing loopholes in the U.S. H-2B Visa system. The company sent recruiters to countries like Belize and the Phillipines to find workers to fill their positions knowing there were weaknesses in the H-2B Visa system that could be used to facilitate their entry into the U.S. Workers agreed to incur a debt that they believed could later be paid off once they started working. The labor company would help facilitate travel, and provided assistance with circumventing the immigration process by telling them how to lie to immigration officials. Victims were then forced violate the terms of their visas, housed in overcrowded apartments and hotel rooms, and threatened with deportation. The victims were employed as landscapers, housekeepers and worked in restaurants in the Branson Area.

29.     This case is a classic example of how the tactic of utilizing debt bondage is a common means to control labor trafficking victims and exploit them for their wages. Many victims make substandard wages, but even those who make minimum wage can then be forced, coerced or tricked into paying all or most of that back to the company as a means to pay of that debt. Traffickers will continue to find ways to add to this contrived debt as a means to continue control and make money. An important aspect of this story to keep in mind is that were it not for weaknesses in our immigration system, be it loopholes in our Visa system or a physical opening in a border where crossing is permissible, traffickers would not invest in recruiting, transporting and harboring of victims in the first place.

Retrieved from: https://www.hoppocklawfirm.com/a-branson-human-trafficking-scheme-and-its-hopeful-aftermath/

**Multi State Labor Trafficking Case**

30.     In 2009, eight individuals from Uzbekistan were charged with racketeering, forced labor trafficking, immigration violations. They owned and operated three labor leasing companies that primarily was looking to hire house cleaners for hotels across 14 states including Missouri, specifically in the Kansas City and Branson areas.  The workers were largely undocumented immigrants who entered via the southern U.S.-Mexico border or had overstayed their visas. They were controlled by debt bondage tactics in which sometimes worker would receive paychecks with negative earnings and threats of physical violence and abuse and threat of deportation. The indictment also included violations related to identity theft, harboring illegal aliens, mail fraud, conspiracy to commit money laundering, transporting illegal aliens, visa fraud, extortion, interstate travel in aid of racketeering, wire fraud and inducing the illegal entry of foreign nationals.

Retrieved from: https://www.justice.gov/opa/pr/eight-uzbekistan-nationals-among-12-charged-racketeering-human-trafficking-immigration

I swear or affirm under penalty of perjury that the foregoing is true and correct.

Dated: April 28, 2021

Alison Phillips

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF CARA PIERCE**

# EXHIBIT E

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| THE STATE OF TEXAS AND THE STATE OF MISSOURI, *Plaintiffs,* v. JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.,* *Defendants.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) )   Case No. 2:21-cv-00067-Z |

## DECLARATION OF CARA PIERCE

My name is Cara Foos Pierce, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

**Background**

1.    I am the Chief of the Texas Attorney General's Human Trafficking and Transnational Organized Crime Section ("HTTOC"), and I also serve, as designee of Texas Attorney General Ken Paxton, as the chair of the Texas Human Trafficking Prevention Taskforce and the Texas Human Trafficking Coordinating Council.  In these roles, I am charged with developing and implementing a comprehensive plan to eradicate human trafficking in Texas.  I work with federal, state and local partners, including prosecutors, law enforcement, social service providers, and non-government organizations to combat human trafficking. I also supervise seven prosecutors that support District Attorneys throughout Texas on human trafficking prosecutions. I have trained thousands of law enforcement officers, prosecutors and community members about

human trafficking. I also consult and serve as a Resource Witness to the Texas Legislature on human trafficking. In my role as Chief of HTTOC, I was asked to write this Declaration summarizing the scope of human trafficking in Texas.

2.     Prior to joining the Attorney General's Office in June of 2020, I was an Assistant United States Attorney in the Northern District of Texas for twelve years. I served as the Human Trafficking Coordinator for the District for nine years, and I prosecuted over 80 human trafficking cases, involving over 200 victims. I have seen first-hand the horrific trauma traffickers inflict on victims, and the long-term impact it has on their lives. Traffickers frequently target the most vulnerable people – children, people with substance abuse problems, people without legal status in the United States, people with mental or physical disabilities and those experiencing homelessness. They are master manipulators that prey on people's vulnerabilities, and they profit greatly from exploiting others.

**Human Trafficking in the United States**

3.     Human trafficking is the fastest growing crime impacting every continent and economic structure in the world.[1] Affecting every ethnicity, gender, age and socioeconomic background, human trafficking knows no boundaries. And the true magnitude of this hidden crime is largely unconfirmed as human trafficking data is often difficult to collect.[2] The majority of existing data focuses primarily on identified victims, highlighting only a fraction of the problem. Because many survivors do not report their exploitation for a variety of reasons, including fear of harm or retaliation, language barriers, mistrust of government and trauma, the data will never fully

---

[1] https://www.a21.org/content/human-trafficking/gqe0rc (last visited Apr 29, 2021).
[2] Noël L. Busch-Armendariz et al., Human Trafficking by the Numbers: The Initial Benchmark of Prevalence and Economic Impact for Texas (December 2016), https://ic2.utexas.edu/pubs/human-trafficking-by-the-numbers-the-initial-benchmark-of-prevalence-and- economic-impact-for-texas/.

reflect the gravity of human trafficking cases. However, data can provide useful insight into human trafficking trends.

4.    For example, the Counter Trafficking Data Collaborative collects data on human trafficking from organizations across the world. By collaborating data from several different organizations, it determined that 10.9% of trafficking victims in the United States came from Mexico. The second highest nationality of non-American trafficking victims was the 3.7% who came from China.[3]



5.    Federal agencies provide additional insight into the number of foreign nationals in trafficking situations in the United States. In 2019, the United States Department of Health and Human Services served 1573 individuals, including 968 trafficking victims and 605 family members who were foreign national victims.[4] The State Department's Trafficking in Persons Report also tracks Certification Letters, which allow foreign national adult victims of severe trafficking to receive continued presence, and Eligibility Letters, which does the same for children. In 2019, HHS issued 331 Certification Letters, which was approximately 75% of the number

---

[3] https://www.ctdatacollaborative.org/.
[4] 2020 Trafficking in Persons Report, p.525, found at https://www.state.gov/wp-content/uploads/2020/06/2020-TIP-Report-Complete-062420-FINAL.pdf.

issued in 2018.[5] The number of Eligibility Letters, in contrast, increased from 466 in 2018 to 892 in 2019.[6] DHS also reported on the issuance of T visas, which allow for Continued Presence in the United States. It requires that the applicant show that they are (1) a victim of severe trafficking in persons, (2) are physically present in the United States, (3) have complied with law enforcement, and (4) would suffer hardship if they were removed from the United States. In 2019, DHS granted T status to 500 individuals and 491 family members, which was a significant decrease from 576 victims and 703 family members in 2018.[7] DHS also issued Continued Presence in 2019 to 125 trafficking victims.[8]

6.      Many immigrants come to the United States in hopes of finding a legitimate job, and they end up being exploited, in places such as illicit massage businesses ("IMBs"). IMBs frequently traffic women from Asian countries, including China and South Korea.[9] Women who come to the United States and end up working in an IMB are frequently smuggled into the United States, or they enter on a tourist visa, and overstay that visa. These girls and women are frequently indebted to their smuggler, and they end up being trafficked to repay that debt.[10] Once here, they are unable to leave because they are controlled by their traffickers due to their immigrant status and through threats and coercion.[11]

**Human Trafficking in Texas**

7.      Texas consistently has the second highest number of reported human trafficking cases in the United States. Texas' size, diverse economy, and geographic location as a border state

---

[5] *Id.* at 526.
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] Polaris: *Human Trafficking in Illicit Massage Businesses* p. 19.
[10] *Id.*
[11] *Id.*

leads to a wide range of human trafficking related crimes and issues. According to *Human Trafficking by the Numbers: The Initial Benchmark of Prevalence and Economic Impact for Texas*, a prevalence data report published in 2016, minor and youth sex trafficking is estimated to cost Texas approximately $6.6 billion, and traffickers are estimated to exploit approximately $600 million from victims of labor trafficking.[12] Migrants are frequently targeted by traffickers and exploited for their labor because of their lack of community and family ties in the United States, their uncertain immigration status and language barriers.

8.      Currently, Texas has over 1,000 active illicit massage businesses, as identified by Heyrick Research. These storefront brothels frequently employ women without legal status in the United States. This makes them particularly susceptible to traffickers, who exploit them through sex trafficking and debt bondage arising from being smuggled into the United States. In 2020, there were over 37,000 online commercial advertisements for illicit massage businesses in Texas.

9.      In 2019, the National Human Trafficking Hotline identified 2,455 victims, 515 traffickers, and 240 trafficking businesses located in Texas.[13] It also identified 1,080 trafficking cases in Texas.[14] Of those, 16% involved foreign nationals, with unreported citizenship.[15] While this is not a complete picture of the scope of the human trafficking problem in Texas for the reasons stated in paragraph 3 above, it indicates that non-citizens are particularly susceptible to being trafficked  Also, non-citizens may not report their trafficking through the Hotline because of language barriers and fear of deportation.

---

[12] *Id.* Net present value (NPV) of estimated lifetime cost of minor and youth sex trafficking victims.
[13] https://humantraffickinghotline.org/sites/default/files/2019%20Texas%20State%20Report.pdf
[14] *Id.*
[15] https://humantraffickinghotline.org/state/texas

## LOCATIONS OF REPORTED HUMAN TRAFFICKING IN TEXAS



16

This image represents locations in Texas where trafficking was reported to the Hotline.  While these figures are shocking, they represent only a small glimpse of the whole picture as these statistics indicate only reported cases. Many cases are not reported either because of fear, or victims may not even know that they are victims of a crime.

10.     Since 2008, when Texas issued its first report on human trafficking in the state, there are five times the number of trafficking arrests and four times the number of human trafficking convictions in Texas courts.  Likewise, according to the Texas Department of Public Safety, when many industries in Texas slowed down because of COVID-19, human trafficking flourished. In 2020, there were 1,817,605 online commercial sex advertisements posted in Texas. Of those ads, 323,900 are believed to advertise children for commercial sex.  Even more startling, most of the more than 1.8 million commercial sex ads were likely reused on several occasions, making the actual number of commercial sex transaction substantially higher.

---

[16] *Id.*

11.     The Texas Attorney General's Human Trafficking and Transnational/Organized Crime Section (HTTOC) was established in 2016 to assist human trafficking prosecutions across the State.   HTTOC is currently comprised of a team of seven criminal attorneys, two civil attorneys, one policy attorney, three legal assistants, a victim advocate, a policy specialist, and a criminal analyst. The OAG- HTTOC section assists law enforcement and prosecutors on human trafficking cases, pursues civil litigation against traffickers and businesses, assists victims with resources, engages the public through training, develops initiatives to enhance the state's support and coordination of human trafficking efforts, and facilitates collaboration between federal, state, and local law enforcement and prosecutors.  Since its inception, HTTOC has resolved 51 cases, resulting in 734 years in prison and one life sentence for human traffickers.  HTTOC is currently involved in 42 ongoing human trafficking cases and investigations across the state.

12.     The charts below provide data on the number of arrests and convictions for human trafficking and related offenses in state courts in Texas, including compelling prostitution, promotion of prostitution, and aggravated promotion of prostitution. [17] It should be noted that arrests and cases from recent years, may be ongoing and delayed in the court process because of COVID-19, thus producing a relatively low number of convictions compared to prior years as of the date of this Declaration.

| HUMAN TRAFFICKING | | | | | |
|---|---|---|---|---|---|
| FY | ARRESTS | DISPOSED BY PROSECUTOR | CONVICTIONS | DEFERRED | DISMISSAL |
| 2007 | 39 | 11 | 9 | 7 | 3 |
| 2008 | 24 | 5 | 10 | 10 | 5 |
| 2009 | 12 | 2 | 4 | 0 | 10 |
| 2010 | 16 | 7 | 3 | 2 | 3 |
| 2011 | 24 | 8 | 5 | 1 | 2 |

[17] Source: Texas Department of Public Safety. All data by fiscal years. 2007 from January 1-August 31.

App.421

| 2012 | 68 | 10 | 5 | 5 | 3 |
|---|---|---|---|---|---|
| 2013 | 109 | 20 | 11 | 1 | 20 |
| 2014 | 110 | 26 | 19 | 1 | 14 |
| 2015 | 120 | 19 | 32 | 6 | 40 |
| 2016 | 142 | 26 | 53 | 6 | 34 |
| 2017 | 128 | 18 | 41 | 6 | 46 |
| 2018 | 184 | 20 | 62 | 3 | 39 |
| 2019 | 165 | 27 | 46 | 7 | 53 |
| 2020 | 185 | 21 | 28 | 5 | 39 |
| 2021 | 45 | 2 | 2 | 2 | 5 |

| COMPELLING PROSTITUTION | | | | | |
|---|---|---|---|---|---|
| FY | ARRESTS | DISPOSED BY PROSECUTOR | CONVICTIONS | DEFERRED | DISMISSAL |
| 2007 | 45 | 0 | 13 | 3 | 5 |
| 2008 | 45 | 4 | 22 | 0 | 16 |
| 2009 | 51 | 2 | 13 | 6 | 14 |
| 2010 | 48 | 6 | 13 | 3 | 4 |
| 2011 | 65 | 4 | 10 | 2 | 16 |
| 2012 | 70 | 4 | 21 | 3 | 14 |
| 2013 | 85 | 7 | 19 | 2 | 22 |
| 2014 | 113 | 16 | 25 | 5 | 34 |
| 2015 | 105 | 19 | 38 | 6 | 49 |
| 2016 | 142 | 6 | 35 | 12 | 37 |
| 2017 | 141 | 7 | 31 | 15 | 81 |
| 2018 | 106 | 7 | 43 | 7 | 35 |
| 2019 | 105 | 5 | 26 | 6 | 53 |
| 2020 | 97 | 5 | 18 | 3 | 28 |
| 2021 | 21 | 1 | 4 | 0 | 4 |

13.    In 2019, Texas had the highest number of active human trafficking cases pending in federal courts in the United States.[18]  Forty-eight federal human trafficking defendants were convicted in Texas in 2019, which was also the highest in the nation.  The 2019 Federal Human Trafficking Report also noted that 19.6% of victims in new trafficking cases across the country

---

[18] *Federal Human Trafficking Report*, The Human Trafficking Institute (2019).

App.422

lacked regular immigration status in the United States.[19]   Victims hailed from 24 different countries, including Guatemala, Honduras, Mexico, Columbia, the Dominican Republic and Venezuela.  It also noted that traffickers exploited communication barriers to isolate these victims, along with their fear of deportation, as a means of control. [20]

14.    Based on my knowledge and experience, I anticipate that any increase in non-citizens present in the United States, including those claiming asylum, is likely to increase human trafficking because traffickers often target non-citizens for exploitation.  Traffickers may use any method available to get their victims into the United States, including instructing them to claim asylum at the border; many victims feel compelled to comply with their trafficker's demands.  Also, even legitimate asylum seekers, especially children, face the risk of being trafficked once they are within the United States.  They are especially vulnerable because of cultural and language barriers and the lack of a stable home and system of support in this country.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ⁴ᵗʰ day of May 2021.

*Cara Foos Pierce*
Cara Foos Pierce

---

[19] *Id.* at 30.
[20] *Id.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § § § | |
| THE STATE OF MISSOURI, | § § | |
| Plaintiffs, | § § | Case No. 2:21-cv-00067-Z |
| v. | § § | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.*, | § § § § | |
| Defendants. | § § | |

APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DECLARATION OF SHERI GIPSON

# EXHIBIT F

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF SHERI GIPSON

My name is Sheri Gipson, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.      I am the Chief of the Texas Department of Public Safety ("DPS") Driver License Division. In this capacity, I oversee DPS's issuance of driver licenses and identification cards to residents of the State of Texas.

2.      I was appointed to my current position and confirmed by the Texas Public Safety Commission in February 2020. Prior to that, I served as Assistant Chief of the Driver License Division from March 2016 through February 2020.  I have worked for the Driver License Division of DPS for 38 years.

3.      Pursuant to Section 521.142(a) of the Texas Transportation Code, an individual applying for an original driver license "who is not a citizen of the United States must present to [DPS] documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States before the applicant may be issued a driver's license." Section

**App.425**

521.1425(d) of the Texas Transportation Code provides that DPS "may not deny a driver's license to an applicant who provides documentation described by Section 521.142(a) based on the duration of the person's authorized stay in the United States, as indicated by the documentation presented under Section 521.142(a)."

4.      Pursuant to Section 521.101(f-2) of the Texas Transportation Code, an individual applying for an original personal identification certificate "who is not a citizen of the United States must present to [DPS] documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States." Section 521.101(f-4) of the Texas Transportation Code provides that DPS "may not deny a personal identification certificate to an application who complies with Subsection (f-2) based on the duration of the person's authorized stay in the United States, as indicated by the documentation presented under Subsection (f-2)."

5.      If an individual presents documentation issued by the federal government showing authorization to be in the United States (such as an Employment Authorization Document), and otherwise meets eligibility requirements, DPS will issue a limited term driver license or personal identification certificate to a non-citizen resident of Texas.[1] A license or identification certificate issued to such an applicant is limited to the term of the applicant's lawful presence, which is set by the federal government when it authorizes that individual's presence. In fiscal year 2019 (September 2018 through August 2019), DPS issued 386,898 limited term licenses and identification certificates. In fiscal year 2020 (September 2019 through August 2020), DPS issued 304,031 limited term licenses and identification certificates. Driver license and identification card transactions for FY 2020 were impacted by office closures and reduced

---

[1] DPS maintains a list documents acceptable for verifying lawful presence. *See* Tex. Dep't of Public Safety, Verifying Lawful Presence 4 (Rev. 7-13), https://www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifyinglawfulpresence.pdf. A copy is attached to this declaration as Exhibit 1.

**App.426**

customer capacity in offices due to the pandemic.

6.  For each non-citizen resident of Texas who seeks a limited term driver license or personal identification certificate, DPS verifies the individual's lawful presence status with the United States government using the Systematic Alien Verification of Entitlements ("SAVE") system. The State of Texas currently pays $0.30 per customer for SAVE verification purposes. Approximately 18% of customers must complete additional SAVE verification at $0.50 per transaction.

7.  For each non-United States citizen resident of Texas who seeks a limited term driver license, DPS verifies the individual's social security number and that person's eligibility through Social Security Online Verification ("SSOLV") and the American Association of Motor Vehicle Administrators' ("AAMVA") Problem Drivers Pointer System ("PDPS") and, if applicable, the Commercial Driver License Information System ("CDLIS"). The State of Texas currently pays $0.05 per customer for SSOLV and PDPS verification purposes. There is a cost of $0.028 for CDLIS verification purposes, which is about 2% of all limited term licenses.

8.  Each additional customer seeking a limited term driver license or personal identification certificate imposes a cost on DPS. DPS estimates that for an additional 10,000 driver license customers seeking a limited term license, DPS would incur a biennial cost of approximately $2,014,870.80. The table below outlines the estimated costs that DPS would incur based on the additional number of customers per year for employee hiring and training, office space, office equipment, verification services, and card production cost. For every 10,000 additional customers above the 10,000-customer threshold, DPS may have to open additional driver license offices or expand current facilities to meet that increase in customer demand.

| Customer Volume Scenario | Additional Employees Required | Additional Office Space Required (SqFt) (96 per employee) | Biennial Cost for Additional Employees, Leases, Facilities and Technology | Biennial Cost for Verification Services | Biennial Cost for Card Production | Total Cost to DPS |
|---|---|---|---|---|---|---|
| 10,000 | 9.4 | 902.4 | $1,978,859.60 | $9,011.20 | $27,000.00 | $2,014,870.80 |
| 20,000 | 18.8 | 1,804.8 | $3,957,719.20 | $18,022.40 | $54,000.00 | $4,029,741.60 |
| 30,000 | 28.2 | 2,707.2 | $5,936,578.80 | $27,033.60 | $81,000.00 | $6,044,612.40 |
| 40,000 | 37.6 | 3,609.6 | $7,915,438.40 | $36,044.80 | $108,000.00 | $8,059,483.20 |
| 50,000 | 46.9 | 4,502.4 | $9,894,298.00 | $45,056.00 | $135,000.00 | $10,074,354.00 |
| 100,000 | 93.9 | 9,014.4 | $19,788,596.01 | $90,112.00 | $270,000.00 | $20,148,708.01 |
| 150,000 | 140.8 | 13,516.8 | $29,682,894.01 | $135,168.00 | $405,000.00 | $30,223,062.01 |
| 200,000 | 187.8 | 18,028.8 | $39,577,192.01 | $180,224.00 | $540,000.00 | $40,297,416.01 |

9.      Standard term licenses issued to most citizens are valid for a period of eight years with an allowance to renew online once after an office visit. Therefore, most license holders only have to visit a driver license office once every sixteen years. Because limited term licenses are limited to the term of the applicant's lawful presence, it is possible that an individual would have to renew their limited term license sixteen or more times during the same sixteen-year span. The frequency of renewing the license would depend on the length of time the appropriate United States agency authorizes the applicant to be in the United States. Every renewal for a limited term license requires an additional in-person visit to a DPS facility, and thus requires additional costs related to employee hiring and training, verification of lawful presence status through the SAVE system, office space, office equipment, and infrastructure. Thus, the estimated costs identified above that DPS would incur would only increase as more limited term licenses are issued.

10.     The added customer base that may be created by an increase in the number of individuals authorized to be in the United States who chose to reside in Texas will substantially burden driver license resources without additional funding and support.

11.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on this _6th__ day of May 2021.

_____

SHERI GIPSON

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF SHERI GIPSON**

Verifying Lawful Presence

# EXHIBIT F-1

# Verifying Lawful Presence

An applicant for a driver license (DL) or identification card (ID) must present proof of lawful presence in the US.  The table on the following pages describes the acceptable documents for each type of applicant attempting to verify lawful presence.  All documentation must show the applicant's name and date of birth.  The applicant must validate a name change or other inconsistent information through additional documentation such as a marriage license, divorce decree or court order.

The department must verify applicable lawful presence documentation through the US Department of Homeland Security's (DHS) Systematic Alien Verification for Entitlements (SAVE) Program.  Verification through SAVE is often instantaneous, but when it is not, receipt of the DL/ID may be delayed for up to 30 days.  If SAVE cannot verify on the first attempt, SAVE will permit two additional stages of verification.  Each stage may require additional documentation from the applicant.  After each stage, the applicant will receive instructions either verbally or by mail on how to proceed with the transaction.  To avoid further delay, the applicant should comply with the instructions fully and as soon as possible.  If the applicant provides timely responses, the process timeline generally occurs as follows.

| Stage | DLD receives response from DHS | DLD response to applicant |
|-------|-------------------------------|---------------------------|
| **First** | Within a few seconds | If verified, card issued |
| **Second** | 3 to 5 business days | Instruction letter issued within 48 hours after DHS response received by DLD |
| **Third** | Up to 20 additional business days after second response received from DHS | Instruction letter issued within 48 hours after DHS response received by DLD |

### *Temporary Visitor/Limited Term Issuance*

An applicant may be issued a limited term DL/ID if he or she is NOT:

- A US citizen;
- A US national;
- A lawful permanent resident;
- A refugee; or
- An asylee.

A limited term DL/ID will expire with the applicant's lawful presence as determined by DHS.

### *Commercial Driver Licenses*

This guide does not apply to commercial driver licenses.  A person who is a US citizen, US national, lawful permanent resident, refugee or asylee may apply for a commercial driver license.  All others may apply for a nonresident commercial driver license, if eligible.  Refer to http://www.dps.texas.gov/DriverLicense/CommercialLicense.htm or Chapter 522 of the Transportation Code for application and eligibility requirements.

| Category | Acceptable Documents |
|---|---|
| U.S. Citizen | ❖ Birth certificate issued by the appropriate vital statistics agency of a U.S. State, a U.S. territory, or the District of Columbia indicating birth in U.S.<br>❖ Department of State Certification of Birth issued to U.S. Citizens born abroad (FS-240, DS-1350, or FS-545) or Consular Report of Birth Abroad<br>❖ Certificate of U.S. Citizenship<br>❖ Certificate of Naturalization<br>❖ U.S. Dept. of Justice – INS U.S. Citizenship Identification Card (I-197 or I-179)<br>❖ Northern Mariana Card (I-873)<br>❖ U.S. passport book that **does not** indicate on the last page that "THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN"<br>❖ U.S. passport card |
| U.S. National | U.S. passport book that indicates on the last page that "THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN" |
| Kickapoo Traditional Tribe of Texas ("KIC") (U.S. citizen) | American Indian Card (form I-872) which indicates "KIC" |
| Kickapoo Traditional Tribe of Texas ("KIP") (non-U.S. citizen) | American Indian Card (form I-872) which indicates "KIP" |
| American Indian born in Canada (First Nations) | An applicant may refer to the Jay Treaty, 8 U.S.C. § 1359, or 8 C.F.R. § 289.2 and may present a variety of documents.  Issuance cannot occur without approval of the documents by Austin headquarters.  DLD Personnel:  make copies of documentation and seek approval through the chain of command. |
| Lawful Permanent Resident | ❖ Permanent Resident Card (I-551)<br>❖ Resident Alien Card (I-551) – card issued without expiration date<br>❖ Valid Immigrant Visa (with adit stamp) and unexpired foreign passport<br>❖ Unexpired foreign passport stamped with temporary I-551 language (adit stamp), "Approved I-551," or "Processed for I-551"<br>❖ I-94 stamped with temporary I-551 language (adit stamp), "Approved I-551," or "Processed for I-551"<br>❖  Re-entry Permit I-327<br><br>Note: I-151, the predecessor to I-551, is not acceptable as proof of permanent resident status. |
| Immigrant Visa with Temporary I-551 language | A valid Immigrant Visa within one year of endorsement (i.e. stamped by Customs and Border Protection – adit stamp) and an unexpired passport |
| Conditional entrants | Immigration documentation with an alien number or I-94 number indicating this status, which can include but is not limited to:<br>❖ I-94 or other document showing admission under Section 203(a)(7), "refugee conditional entry"<br>❖ I-688B coded 274a.12(a)(3)<br>❖ I-766 with category A3 or A03 |

**App.432**

| Category | Acceptable Documents |
|---|---|
| Asylee | Immigration documentation with an alien number or I-94 number indicating this status, which can include but is not limited to:<br>❖ I-94 with annotation "Section 208" or "asylee"<br>❖ Unexpired foreign passport with annotation "Section 208" or "asylee"<br>❖ I-571 Refugee Travel Document<br>❖ I-688B coded 274a.12(a)(5)<br>❖ I-766 with category A5 or A05 |
| Refugee | Immigration documentation with an alien number or I-94 number indicating this status, which can include but is not limited to:<br>❖ I-94 with annotation "Section 207" or "refugee"<br>❖ Unexpired foreign passport with annotation "Section 207" or "refugee"<br>❖ I-571 Refugee Travel Document<br>❖ I-688B coded 274a.12(a)(3)<br>❖ I-766 with category A3 or A03 |
| Temporary Protected Status (TPS) | Immigration documentation with an alien number or I-94 number indicating this status or Employment Authorization Document (EAD) (I-766) with category A12 or C19 |
| Applicant with Employment Authorization Document | Employment Authorization Document (EAD)( I-766) |
| Applicants for adjustment of status<br><br>Note: These are individuals applying to become lawful permanent residents. | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to a form I-797 indicating pending I-485 or pending application for adjustment of status. |
| Applicants for extension of status, change of status, petition for non-immigrant worker, with a pending I-918 application, or other pending category. | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to a form I-797 indicating a pending application for an extension of status, change of status, petition for non-immigrant worker, or other pending category. |
| Citizens of the Republic of Palau | Unexpired foreign passport or I -94 with annotation "CFA/PAL" or other annotation indicating the Compact of Free Association/Palau<br><br>**OR**<br><br>Employment Authorization Document (EAD)(I-766) with category A8 or A08 |
| Citizens of the Republic of the Marshall Islands | Unexpired foreign passport or I -94 with annotation "CFA/RMI" or other annotation indicating the Compact of Free Association/Republic of Marshall Islands<br><br>**OR**<br><br>Employment Authorization Document (EAD)(I-766) with category A8 or A08 |

3

**App.433**

| Category | Acceptable Documents |
|---|---|
| Citizens of the Federated States of Micronesia | Unexpired foreign passport or I -94 with annotation "CFA/FSM" or other annotation indicating the Compact of Free Association/Federated States of Micronesia<br><br>**OR**<br><br>Employment Authorization Document (EAD)(I-766) with category A8 or A08 |
| Cuban/Haitian entrants | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to an I-94 with annotation "Cuban/Haitian entrant" |
| Lawful temporary residents | Immigration documentation with an alien number or I-94 number |
| Self-petitioning abused spouses or children, parents of abused children, or children of abused spouses<br><br>(Applicants with Violence Against Women Act (**VAWA**) petitions) | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to I-797 indicating approved, pending, or prima facie determination of I-360 or an approved or pending I-360 or an I-766 with category C31. |
| Parolees | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to an I-94 with annotation "parole" or "paroled pursuant to Section 212(d)(5)." |
| Person granted **deferred action** | Immigration documentation with an alien number or I-94 number |
| Persons granted **deferred enforcement departure** (DED) | Immigration documentation with an alien number or I-94 number or Employment Authorization Document (EAD) (I-766) with category A11<br><br>Note: Individuals in this status may have been granted an extension to the period of authorized stay that is not reflected on the current EAD.  Notifications regarding any extensions to this category will be distributed by Austin headquarters. |
| Person granted **family unity** | Immigration documentation with an alien number or I-94 number |
| Persons under an **order of supervision** | Immigration documentation with an alien number or I-94 number |
| Persons granted **extended or voluntary departure** | Immigration documentation with an alien number or I-94 number |

4

App.434

| Category | Acceptable Documents |
|---|---|
| Persons granted **withholding of deportation or removal** | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to an I-94 or passport with annotation "Section 243(h)" or a letter or order from USCIS or court granting withholding of deportation or removal. |
| Persons in **removal or deportation proceedings** | Immigration documentation with an alien number or I-94 number |
| Persons granted a **stay of deportation** | Immigration documentation with an alien number or I-94 number |
| Persons granted **voluntary departure** | Immigration documentation with an alien number or I-94 number |
| **A-1, A-2, and A-3** | Unexpired foreign passport or I -94<br><br>**Note:** Issuance **cannot occur unless** applicant presents a letter from U.S. Department of State with original signature <u>indicating ineligibility for Department of State issued driver license or requesting issuance of a state issued identification card.</u> |
| **B1/B2 Visa/BCC with I-94**<br><br>(Border Crosser Card , DSP-150, or "laser visa") | All of the following:<br>♦ Unexpired foreign passport,<br>♦ Visa (border crosser card), **and**<br>♦ **I -94**<br>Note:  Applicant must have an I-94 to be eligible because of the time and distance from the border restrictions for applicants who do not obtain an I-94. |
| **B-1, B-2, C-1, C-3, D-1, and D-2** | Unexpired foreign passport or I -94<br><br>Note: The applicant may not be able meet residency/domicile requirements. |
| **C-2**<br><br>Alien in transit to U.N. Headquarters district.  Travel limited to 25 miles radius of Columbus Circle in New York, NY | This status is restricted to New York, NY and not eligible for a Texas driver license under the domicile/residency requirements**.** |
| **E-1, E-2, and E-3** | Unexpired foreign passport or I -94 |
| **E-2 CNMI**<br><br>Treaty-investor and dependents in Commonwealth of the Northern Mariana Islands | This status is limited to persons entering the Commonwealth of the Northern Mariana Islands (CNMI) and is not eligible for a Texas driver license (8 CFR § 214.2(3)(23)). |
| **F-1**<br><br>Foreign academic student | Unexpired foreign passport or I -94 or I-20 |

5

**App.435**

| Category | Acceptable Documents |
|---|---|
| **F-2**<br><br>Dependent on F-1 | Unexpired foreign passport or I -94 |
| **F-3**<br><br>Commuter Student from Canada or Mexico | This status is for commuters from Mexico or Canada and is not eligible for a Texas driver license under the domicile/residency requirements. |
| **G-1, G-2, G-3, G-4, and G-5** | Unexpired foreign passport or I -94<br><br>Note: Issuance cannot occur unless applicant presents a letter from US Department of State approving the issuance of a DL/ID. |
| **H-1B, H-1B1, H-1C, H-2A, H-2B, H-2R, H-3, H-4, and I** | Unexpired foreign passport or I -94 |
| **J-1**<br><br>Exchange visitor (may be student, trainee, work/travel, au pair, etc.) | Unexpired foreign passport or I -94 or DS-2019 |
| **J-2**<br><br>Dependent of J-1 exchange visitor | Unexpired foreign passport or I -94 |
| **K-1, K-2, K-3, K-4, L-1A, L-1B, and L-2,** | Unexpired foreign passport or I -94 |
| **M-1**<br><br>Non-academic student | Unexpired foreign passport or I -94 or I-20 |
| **M-2**<br><br>Dependents of non-academic students | Unexpired foreign passport or I -94 |
| **M-3**<br><br>Commuter Student from Canada or Mexico | This status is for commuters from Mexico or Canada and is not eligible for a Texas driver license under the domicile/residency requirements. |
| **N-1 through N-7 (NATO)**<br><br>North American Treaty Organization Representatives and dependents | Unexpired foreign passport or I -94 |
| **N-8, N-9, O-1, O-2, O-3, P-1, P-2, P-3, P-4, Q-1, Q-2, Q-3, R-1, R-2, S-5, S-6, S-7, T-1, T-2, T-3, T-4, T-5, TN-1, TN-2, TD, U-1, U-2, U-3, U-4, U-5, V-1, V-2, and V-3** | Unexpired foreign passport or I -94 |

**App.436**

| Category | Acceptable Documents |
|---|---|
| **WB\***<br><br>Visitor for business (visa waiver program) | Unexpired foreign passport with admission stamp annotated "WT/WB" or I -94<br><br>Note: The applicant may not be able meet residency/domicile requirements. |
| **WT\***<br><br>Visitor for pleasure (tourist in visa waiver program) | Unexpired foreign passport with admission stamp annotated "WT/WB" or I -94<br><br>Note: The applicant may not be able meet residency/domicile requirements. |

\*Visa waiver program countries: Andorra, Australia, Austria, Belgium, Brunei, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Japan, Latvia, Liechtenstein, Lithuania, Luxembourg, Malta, Monaco, the Netherlands, New Zealand, Norway, Portugal, San Marino, Singapore, Slovakia, Slovenia, South Korea, Spain, Sweden, Switzerland, and the United Kingdom.

**App.437**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | § | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF LEONARDO R. LOPEZ**

# EXHIBIT G

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS AND | ) | |
| THE STATE OF MISSOURI, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-00067-Z |
| | ) | |
| JOSEPH R. BIDEN, JR., | ) | |
| in his official capacity as | ) | |
| President of the United States of | ) | |
| America, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |

## <u>DECLARATION OF LEONARDO R. LOPEZ</u>

My name is Leonardo R. Lopez, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.      I am the Associate Commissioner for School Finance/Chief School Finance Officer at the Texas Education Agency ("TEA"). I have worked for TEA in this capacity since June 2016, having previously served as the Executive Director of Finance for the Austin Independent School District ("AISD") for four years. Prior to my time at AISD, I served for ten years in a variety of roles for TEA, including six years as the Foundation School Program Operations Manager for the TEA's State Funding Division.

2.      In my current position, I oversee TEA's school finance operations, including the administration of the Foundation School Program and analysis and processing of financial data.

My responsibilities also include representing TEA in legislative hearings and school finance-related litigation.

3.      TEA estimates that the average funding entitlement for 2021 will be $9,216 per student in attendance for an entire school year. If a student qualifies for the additional Bilingual and Compensatory Education weighted funding (for which most, if not all, UAC presumably would qualify), it would cost the State $11,432 to educate each student in attendance for the entire school year. Assuming additional Bilingual and Compensatory Education weighted funding, comparable student costs for fiscal year 2022 would be $11,532.

4.      TEA has not received any information directly from the federal government regarding the precise number of unaccompanied children ("UAC") in Texas. However, I am aware that data from the U.S. Health and Human Services ("HHS") Office of Refugee Resettlement (accessed on April 29, 2021 at 4 p.m. CST at https://www.acf.hhs.gov/orr/grant-funding/unaccompanied-children-released-sponsors-state) (attached as Exhibit 1), indicates that in Texas, 3,272 UAC were released to sponsors during the 12-month period covering October 2014 through September 2015; 6,550 UAC were released to sponsors during the 12-month period covering October 2015 through September 2016; 5,391 UAC were released to sponsors during the 12-month period covering October 2016 through September 2017; 4,136 UAC were released to sponsors during the 12-month period covering October 2017 through September 2018; 9,900 UAC were released to sponsors during the 12-month period covering October 2018 through September 2019; and 2,336 UAC were released to sponsors during the 12-month period covering October 2019 through September 2020. If each of these children is educated in the Texas public school system and qualifies for Bilingual and Compensatory Education weighted funding (such that the State's annual cost to educate each student for fiscal years 2016, 2017, 2018, 2019, 2020, and 2021

would be roughly $9,573, $9,639, $9,841, $10,330, $11,323, and $11,432, respectively), the annual costs to educate these groups of children for fiscal years 2016, 2017, 2018, 2019, 2020, and 2021 would be approximately $31.32 million, $63.13 million, $53.05 million, $42.73 million, $112.10 million, and $26.71 million, respectively.

5.      Additionally, if the same number of UAC are released to sponsors during the 12-month period covering October 2020 through September 2021 as were released during the 12-month period covering October 2019 through September 2020, and if each of these children is educated in the Texas public school system and qualifies for Bilingual and Compensatory Education weighted funding (such that the State's annual cost to educate each student for fiscal year 2022 would be roughly $11,532), the State's annual cost to educate this group of children for fiscal year 2022 would be approximately $26.94 million. Currently, all the costs of educating these students would be borne by the State.

6       In fact, the number of UAC released to sponsors in Texas may end up being higher than this, as 2,389 UAC were released to sponsors in Texas during the 6-month period covering October 2020 through March 2021.  (Exhibit 1).  If the rate of this 6-month period is maintained for the rest of the 12-month period through September 2021, 4,778 UAC would be released to sponsors in Texas for that period.  This would be an increase of nearly 105% over the previous 12-month period number of 2,336.

7.      School formula funding is comprised of state and local funds. The state funding is initially based on projections made by each school district at the end of the previous biennium. Districts often experience increases in their student enrollment from year to year, and the State plans for an increase of approximately 36,000 students in enrollment growth across Texas each year.

8.      The Foundation School Program serves as the primary funding mechanism for providing state aid to public schools in Texas. Any additional UAC enrolled in Texas public schools would increase the State's cost of the Foundation School Program over what would otherwise have been spent.

9.      Based on my knowledge and expertise regarding school finance issues impacting the State of Texas, I anticipate that the total costs to the State of providing public education to UAC will rise in the future to the extent that the number of UAC enrolled in the State's public school system increases.

10.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of April 2021.

_____

LEONARDO R. LOPEZ

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF LEONARDO R. LOPEZ**

U.S. Health and Human Services Office of Refugee Resettlement

# EXHIBIT G-1

# Unaccompanied Children Released to Sponsors by State

Publication Date: April 29, 2021

The data in the table below shows **state-by-state** data of unaccompanied children released to sponsors as of March 31, 2021. ACF will update this data each month. View unaccompanied children released to sponsors by county.

**Please note:** ORR makes considerable effort to provide precise and timely data to the public, but adjustments occasionally occur following review and reconciliation. The FY2014 release data posted in the chart below were updated on March 13, 2015. The FY2015 release data were updated May 9, 2016. The FY2017 release data were updated May 22, 2018. The FY2018 release data were updated December 3, 2019. Questions may be addressed to ORR directly, at (202) 401-9246.

## Unaccompanied Children Release Data

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY15 (OCT. 2014 — SEPT. 2015)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 — SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 — SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 — SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 — SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 — SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 — MAR. 2021)* |
|---|---|---|---|---|---|---|---|
| Alabama | 808 | 870 | 598 | 736 | 1,111 | 247 | 333 |
| Alaska | 2 | 5 | 3 | 0 | 4 | 0 | 0 |
| Arizona | 167 | 330 | 322 | 258 | 493 | 162 | 96 |
| Arkansas | 186 | 309 | 272 | 193 | 359 | 87 | 116 |
| California | 3,629 | 7,381 | 6,268 | 4,675 | 8,447 | 2,225 | 1,696 |
| Colorado | 248 | 427 | 379 | 313 | 714 | 172 | 168 |
| Connecticut | 206 | 454 | 412 | 332 | 959 | 260 | 249 |
| Delaware | 152 | 275 | 178 | 222 | 383 | 107 | 86 |
| DC | 201 | 432 | 294 | 138 | 322 | 48 | 38 |
| Florida | 2,908 | 5,281 | 4,059 | 4,131 | 7,408 | 1,523 | 1,779 |
| Georgia | 1,041 | 1,735 | 1,350 | 1,261 | 2,558 | 559 | 708 |
| Hawaii | 2 | 4 | 4 | 1 | 16 | 6 | 3 |
| Idaho | 11 | 39 | 11 | 28 | 62 | 19 | 13 |
| Illinois | 312 | 519 | 462 | 475 | 863 | 211 | 255 |

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY15 (OCT. 2014 — SEPT. 2015)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 — SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 — SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 — SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 — SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 — SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 — MAR. 2021)* |
|---|---|---|---|---|---|---|---|
| Indiana | 240 | 354 | 366 | 394 | 794 | 209 | 234 |
| Iowa | 201 | 352 | 277 | 238 | 489 | 119 | 115 |
| Kansas | 245 | 326 | 289 | 305 | 453 | 95 | 100 |
| Kentucky | 274 | 503 | 364 | 370 | 710 | 158 | 177 |
| Louisiana | 480 | 973 | 1,043 | 931 | 1,966 | 355 | 478 |
| Maine | 4 | 9 | 11 | 22 | 26 | 11 | 17 |
| Maryland | 1,794 | 3,871 | 2,957 | 1,723 | 4,671 | 825 | 838 |
| Massachusetts | 738 | 1,541 | 1,077 | 814 | 1,756 | 448 | 410 |
| Michigan | 132 | 227 | 160 | 136 | 248 | 74 | 67 |
| Minnesota | 243 | 318 | 320 | 294 | 624 | 151 | 176 |
| Mississippi | 207 | 300 | 237 | 299 | 482 | 108 | 128 |
| Missouri | 170 | 261 | 234 | 203 | 431 | 93 | 112 |
| Montana | 2 | 0 | 2 | 3 | 0 | 2 | 2 |
| Nebraska | 293 | 486 | 355 | 374 | 563 | 130 | 158 |
| Nevada | 137 | 283 | 229 | 132 | 324 | 79 | 41 |
| New Hampshire | 14 | 25 | 27 | 20 | 25 | 8 | 8 |
| New Jersey | 1,462 | 2,637 | 2,268 | 1,877 | 4,236 | 921 | 955 |
| New Mexico | 19 | 65 | 46 | 43 | 89 | 34 | 22 |
| New York | 2,630 | 4,985 | 3,938 | 2,845 | 6,367 | 1,663 | 1,545 |
| North Carolina | 844 | 1,493 | 1,290 | 1,110 | 2,522 | 610 | 674 |
| North Dakota | 2 | 10 | 3 | 2 | 10 | 1 | 0 |
| Ohio | 483 | 693 | 584 | 547 | 1,091 | 260 | 251 |
| Oklahoma | 225 | 301 | 267 | 286 | 581 | 120 | 150 |

App.445

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY15 (OCT. 2014 — SEPT. 2015)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 — SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 — SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 — SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 — SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 — SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 — MAR. 2021)* |
|---|---|---|---|---|---|---|---|
| Oregon | 122 | 188 | 170 | 200 | 318 | 71 | 89 |
| Pennsylvania | 333 | 604 | 501 | 563 | 1,229 | 271 | 295 |
| PR | 0 | 0 | 0 | 1 | 3 | 3 | 0 |
| Rhode Island | 185 | 269 | 234 | 235 | 453 | 92 | 62 |
| South Carolina | 294 | 562 | 483 | 508 | 1,012 | 255 | 245 |
| South Dakota | 61 | 81 | 81 | 96 | 149 | 44 | 36 |
| Tennessee | 765 | 1,354 | 1,066 | 1,173 | 2,191 | 510 | 717 |
| Texas | 3,272 | 6,550 | 5,391 | 4,136 | 9,900 | 2,336 | 2,389 |
| Utah | 62 | 126 | 99 | 97 | 179 | 75 | 39 |
| Vermont | 1 | 1 | 0 | 2 | 6 | 1 | 2 |
| Virginia | 1,694 | 3,728 | 2,888 | 1,650 | 4,215 | 770 | 792 |
| Washington | 283 | 476 | 494 | 435 | 723 | 237 | 210 |
| West Virginia | 12 | 26 | 23 | 23 | 41 | 4 | 12 |
| Wisconsin | 38 | 85 | 94 | 98 | 246 | 62 | 63 |
| Wyoming | 6 | 23 | 14 | 15 | 15 | 6 | 5 |
| Virgin Islands | 0 | 0 | 3 | 0 | 0 | 0 | 0 |
| **TOTAL** | **27,840** | **52,147** | **42,497** | **34,953** | **72,837** | **16,837** | **17,154** |

*The FY2015 numbers have been reconciled.

*The FY2017 numbers have been reconciled.

*The FY2018 numbers have been reconciled.

*The FY2021 numbers have been reconciled.

For more information, please read ORR's reunification policy.

Topics:

**App.446**

Unaccompanied Children (UC)

**Types:**
Grant & Funding

**Audiences:**
Unaccompanied Alien Children (UAC)

Last Reviewed Date: April 29, 2021

App.447

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DECLARATION OF LISA KALAKANIS

# EXHIBIT H

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

THE STATE OF TEXAS AND               )
THE STATE OF MISSOURI,               )
                                     )
            *Plaintiffs*,            )
                                     )
v.                                   )        Case No. 2:21-cv-00067-Z
                                     )
JOSEPH R. BIDEN, JR.,                )
in his official capacity as          )
President of the United States of    )
America, *et al.*,                   )
                                     )
            *Defendants*.            )

## DECLARATION OF LISA KALAKANIS

My name is Lisa Kalakanis, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.      I serve as the Interim Director of the Texas Health and Human Services Commission's Center for Analytics and Decision Support (CADS). The Texas Health and Human Services Commission (HHSC) is the state agency responsible for ensuring the appropriate delivery of health and human services in Texas. As such, HHSC has operational responsibility for certain health and human services programs and oversight authority over the state health and human services (HHS) agencies.

2.      As a part of my employment with HHSC, I am responsible for analytic and quantitative research on health care utilization, demographic trends, and enrollment patterns for the state's health care and human service programs, including Medicaid. I am also responsible for program evaluation activities and analytic support across all of the HHS agencies and programs.

App.449

3.      I have served as Interim CADS Director since September 1, 2020. I also serve as the Director for the Data Dissemination Unit within CADS.

4.      This declaration was first prepared by Monica Smoot, then Chief Data and Analytics Officer for the Texas Health and Human Services Commission's Center for Analytics and Decision Support (CADS). Ms. Smoot retired from the agency in August 2020. The data contained in this declaration is true and correct.

5.      In 2007, as part of the 2008-2009 General Appropriations Act, the Texas Legislature required HHSC to report the cost of services and benefits provided by HHSC to undocumented immigrants in the State of Texas. This report, also known as the Rider 59 Report, was first completed by HHSC in 2008. Due to numerous requests for more recent information following the issuance of the 2008 report, the Rider 59 Report was updated in 2010, 2013, 2014 and 2017. The Rider 59 Report completed in 2017 covered state fiscal year (SFY) 2015.

6.      HHSC provides three principal categories of services and benefits to undocumented immigrants in Texas: (i) Texas Emergency Medicaid; (ii) the Texas Family Violence Program (FVP); and (iii) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage. Undocumented immigrants also receive uncompensated medical care from public hospitals in the State.

7.      Emergency Medicaid is a federally required program jointly funded by the federal government and the states. The program provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor, to undocumented immigrants living in the United States. Because HHSC Medicaid claims data do not conclusively identify an individual's residency status, the portion of Emergency Medicaid payments attributable to undocumented immigrants must be estimated. Attached as Exhibit 1 is a document that explains the methodology

**App.450**

HHSC utilized to obtain the estimates provided in this affidavit. It is the same methodology relied upon by HHSC for preparing internal estimates and for preparation of the Rider 59 report. The total estimated cost to the State for the provision of Emergency Medicaid services to undocumented immigrants residing in Texas was approximately $80 million in SFY 2007, $62 million in SFY 2009, $71 million in SFY 2011, $90 million in SFY 2013, $73 million in SFY 2015, and $85 million in SFY 2017; the estimate in SFY 2019 was $80 million.

8.      The Family Violence Program contracts with non-profit agencies across the State to provide essential services to family violence victims, including undocumented immigrants, in three categories: shelter centers, non-residential centers, and Special Nonresidential Projects. Because the FVP does not ask individuals about their residency status, the portion of the FVP's expenditures attributable to undocumented immigrants must be estimated. Attached as Exhibit 1 is a document that explains the methodology HHSC utilized to obtain the estimates provided in this affidavit. It is the same methodology relied upon by HHSC for preparing internal estimates and for preparation of the Rider 59 report. The total estimated cost to the State for the provision of direct FVP services to undocumented immigrants residing in Texas was $1.2 million in SFY 2007, $1.3 million in SFY 2009, $1.3 million in SFY 2011, $1.4 million in SFY 2013, $1.0 million in SFY 2015, and $1.2 million in SFY 2017; the estimate for SFY 2019 is $1.0 million.

9.      Texas CHIP Perinatal Coverage provides prenatal care to certain low-income women who do not otherwise qualify for Medicaid. There is no way to definitively report the number of undocumented immigrants served by CHIP Perinatal Coverage because the program does not require citizenship documentation. Attached as Exhibit 1 is a document that explains the methodology HHSC utilized to obtain the estimates provided in this affidavit. It is the same methodology relied upon by HHSC for preparing internal estimates and for preparation of the

Rider 59 report. CHIP Perinatal Coverage expenditures were not included in HHSC's original Rider 59 Report because a full year of program data was not available when the report was prepared. The total estimated cost to the State for CHIP Perinatal Coverage to undocumented immigrants residing in Texas was $33 million in SFY 2009, $35 million in SFY 2011, $38 million in SFY 2013, $30 million in SFY 2015, and $30 million in SFY 2017; the estimate for SFY 2019 is $6 million.

10.     In the 2008 and 2010 versions of the Rider 59 Report, HHSC also provided estimates of the amount of uncompensated medical care provided by state public hospital district facilities to undocumented immigrants. In these reports, HHSC estimated that the State's public hospital district facilities incurred approximately $596.8 million in uncompensated care for undocumented immigrants in SFY 2006 and $716.8 million in SFY 2008. HHSC has not provided any estimates of uncompensated care for undocumented immigrants in more recent versions of the Rider 59 Report.

11.     Although all of these numbers are estimated costs for the respective programs, it is a certainty that each of these programs has some positive cost to the State of Texas due to utilization by undocumented immigrants.

12.     Based on my knowledge, expertise, and research regarding the provision of services and benefits to undocumented immigrants by HHSC, I believe that the total costs to the State of providing such services and benefits to undocumented immigrants will continue to reflect trends to the extent that the number of undocumented immigrants residing in Texas increases or decreases each year.

13.     CADS can produce an updated report on the cost of services and benefits provided by HHSC to undocumented immigrants in the State of Texas. Because of other CADS workload,

including ongoing reporting on the impacts of COVID on Texas' vulnerable populations and demands associated with other litigation, as well as the ongoing legislative session, we estimate that the report will be ready by May 15.

14.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30 day of April, 2021.


Lisa Kalakanis
_____

LISA KALAKANIS

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | § | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF LISA KALAKANIS**

Estimating the Percent of Undocumented Clients

# EXHIBIT H-1

# Appendix B:  Estimating the Percent of Undocumented Clients

<u>Previous Undocumented Immigrant Estimates</u>

Previously, HHSC relied on different methods to estimate the percent of non-U.S. citizens in Texas who are undocumented. The first method consisted of assuming that one-half of the estimated non-U.S. citizen population in the state was undocumented. Under this method, HHSC would obtain the estimate for total number of non-U.S. citizens in the state, as reported from the U.S. Census Bureau's American Community Survey (ACS)[1], and would divide that number by two in order to obtain an estimate of the undocumented population in the state.

More recently HHSC relied on a method that uses two different sources of official federal government data to develop its own in-house estimates of the percent of Texas residents that are undocumented immigrants:

- The Texas-specific sample of the U.S. Census Bureau's American Community Survey (ACS), and
- The Office of Immigration Statistics of the U.S. Department of Homeland Security (DHS).

The ACS was the source for estimates of the total non-U.S. citizen population in the state while DHS was the source for the estimated number of persons in the state who are undocumented.

Using these two sources, HHSC estimated the percent of non-U.S. citizens who are undocumented by taking DHS' estimate of the number of undocumented immigrants in Texas (the numerator) and dividing it by the ACS estimate for the number of non-U.S. citizens in the state (the denominator). This calculation resulted in HHSC's estimate of the proportion/percent of non-U.S. citizens in the state who are undocumented.

---

[1] The ACS is a large-scale demographic survey that provides annual estimates of the total population in Texas according to U.S. citizen status (citizen versus non-citizen). However, the estimate for the non-U.S. citizen population is not broken down any further according to documented/undocumented status because that type of information is not collected by the survey.

According to this method, during 2008-2014, an estimated two-thirds (62 to 66%) of non-citizens were considered undocumented on any given year within that period.

DHS temporarily suspended the publication of its estimates for the unauthorized/undocumented population after March 2013, when it published estimates for this population as of January 2012. It resumed publication of the estimates on April 19, 2021, when it released previously unpublished estimates for the years 2013-2018.  The new updates may be used to develop future versions of this report.

With the temporary suspension of DHS's estimates after March 2013, HHSC lost the official information source relied upon for data on the number of non-citizens who are undocumented, as none of the other Federal and Texas state agencies collected and published information about the legal status of non-U.S. citizens' residing in the state of Texas.

This situation resulted in the need to develop and alternative method for estimating the number and percent of non-U.S. citizens using HHSC services who are undocumented. The goal was to develop a method that does not rely on the simple assumptions previously used (that one-half of non-citizens are undocumented). The alternative method is explained below.

## Method for Current Estimates

### Benchmark Program: Texas' Medicaid Type Program 30

Texas' Medicaid Type Program 30 (TP 30) plays an important role in paying for emergency medical services provided to non-U.S. citizens who do not meet the eligibility criteria for Medicaid. Given the high-profile role the program plays in compensating health care providers for services provided to non-eligible non-citizens, it was chosen as the benchmark program for developing an estimate of the percent of non-citizens provided HHSC services who are undocumented.

To a very significant degree, uninsured non-citizen reproductive-age (ages 15-44) females are the main caseload driver within TP 30. In SFY 2017, reproductive- age females accounted for 81% of the clients served. Given the highly disproportionate impact this group has on the program, it is by far the most important one to analyze to obtain the best and most accurate estimate possible of the percent of clients served under this program that are likely to be undocumented non-citizens.

Data Analysis and Estimate

According to the U.S. Census Bureau's American Community Survey (ACS), in 2016 there were approximately 446,000 uninsured non-U.S. citizen reproductive-age females in Texas. Of those, 39 percent (176,000) had resided in the U.S. for 10 years or less and 61 percent (270,000) for more than 10 years.

It is reasonable to expect that the longer a non-citizen has resided in the U.S., the more likely he/she would have been able to attain some form of U.S. legal permanent resident status.

Assuming that the fraction of non-citizen reproductive-age females (ages 15-44) who have not attained some form of legal permanent resident status is 7 of every 10 (70%) among those who have lived in the U.S 10 years or less, and 4 of every 10 (40%) among those in the U.S. for more than 10 years, the estimated potential percentage for undocumented females of reproductive age in Texas is 52%.

**Calculation for Estimated Percent Undocumented**

**$((0.7*176,000 + 0.4*270,000) / (446,000)) * 100 = 51.8\% \sim 52\%$**

Extending these assumptions derived from the ACS data to non-citizen reproductive-age females that received assistance under TP 30 – for whom year of entry into the U.S. information is not known -- it is then estimated that 52% of them are likely to be undocumented.

Taking into consideration that uninsured, non-citizen reproductive-age females represent a highly disproportionate share of the program's caseload, the estimated potential percentage for undocumented clients applicable to them, slightly adjusted downwards to 50%, is also applied to the entire TP 30 program. Due to the lack of sufficient demographic data on populations at-risk for other programs of interest, the same percentage was also applied to the Family Violence and CHIP-P programs for the purposes of the analysis in this report.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | § | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF REBECCA WALTZ**

# EXHIBIT I

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| THE STATE OF TEXAS AND<br>THE STATE OF MISSOURI,<br><br>     *Plaintiffs,*<br><br>v.<br><br>JOSEPH R. BIDEN, JR.,<br>in his official capacity as<br>President of the United States of<br>America, *et al.*,<br><br>     *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 2:21-cv-00067-Z |

## **DECLARATION OF REBECCA WALTZ**

My name is Rebecca Waltz, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.  I am the Budget Director for the Texas Department of Criminal Justice. The Texas Department of Criminal Justice (TDCJ) is the state agency responsible for the care, custody, and rehabilitation of persons convicted of a criminal offense in the state of Texas.

2.  I have been employed with TDCJ since June 2004, and I have served in my current position since January 2020. Prior to that, I served as TDCJ's Deputy Budget Director from December 2017 to December 2019, a Senior Budget Analyst from October 2007 to November 2017, and a Junior Budget Analyst from September 2004 to September 2007.

3.  The Bureau of Justice Assistance (BJA) administers the State Criminal Alien Assistance Program (SCAAP) in conjunction with the U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (OHS). SCAAP provides federal payments to states and localities that incurred correctional officer salary costs for incarcerating

**App.459**

undocumented criminal aliens with at least one felony or two misdemeanor convictions for violations of state or local law, and incarcerated for at least 4 consecutive days during the reporting period.

4.      As a part of my employment with TDCJ, I am responsible for compiling the data to be included in TDCJ's application for federal reimbursement to the State Criminal Alien Assistance Program. These data sets include the number of correctional officers and their salary expenditures ( correctional officer is defined as a person whose primary employment responsibility is to maintain custody of individuals held in custody in a correctional facility) for the reporting period, information regarding maximum bed counts and inmate days, and information about the eligible inmates - (1) whom the agency incarcerated for at least four consecutive days during the reporting period; and (2) who the agency knows were undocumented criminal aliens, or reasonably and in good faith believes were undocumented criminal aliens.

5.      TDCJ has sought reimbursement from the federal government through SCAAP since 1998.

6.      For the most recently completed SCAAP application (reporting period of July 1, 2017 through June 30, 2018), TDCJ reported data for 8,951 eligible inmates and total of 2,439,110 days. An estimate of the cost of incarceration for these inmates can be calculated by multiplying the systemwide cost per day per inmate for Fiscal Year 2018 ($62.34) as reported by the Texas Legislative Budget Board by the number of days.  For example ($62.34 x 2,439,110 days = $152,054,117).

7.      Of this estimated amount, TDCJ was reimbursed $14,657,739 by SCAAP.

8.      It is my belief that to the extent the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well.

**App.460**

9.      All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30th day of April 2021.

_____
REBECCA WALTZ