## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION TO TRANSFER VENUE**

**DECLARATION OF JEFFREY M. WHITE**

# EXHIBIT A

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Case No. 2:21-cv-00067-Z |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**DECLARATION OF JEFFREY M. WHITE IN SUPPORT OF
PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION TO TRANSFER VENUE**

I, Jeffrey M. White, hereby declare as follows:

1.      I am over 18 years of age and am fully competent to make this declaration. I am Special Counsel in the Special Litigation Unit at the Office of the Attorney General of Texas, I am admitted to practice law in this Court, and I represent the State of Texas in the above-captioned matter. I submit this Declaration in support of Plaintiffs' Response in Opposition to Defendant's Motion to Transfer Venue. I have personal knowledge of the facts stated herein.

2.      Appended to Plaintiffs' Response in Opposition to Defendants' Motion to Transfer Venue are the following exhibits:

| Ex. No. | Title |
|---|---|
| 1 | *Monarch Networking Sols. LLC v. Cisco Sys., Inc.*, No. 2:20-cv-00015-JRG, 2021 U.S. Dist. LEXIS 1551 (E.D. Tex. Jan. 5, 2021). |
| 2 | CJRA Table 8—Report of Motions Pending Over Six Months for Period Ending |

|  | March 31, 2020 (Excerpts), https://www.uscourts.gov/sites/default/files/data_tables/CJRA_8_03312020.pdf. |
|---|---|
| 3 | CJRA Table 7—Report of Civil Cases Pending Over Three Years for Period Ending March 31, 2020 (Excerpts), https://www.uscourts.gov/sites/default/files/data_tables/CJRA_7_03312020.pdf |
| 4 | *Estimates of U.S. Unauthorized Immigrant Population, by Metro Area, 2016 and 2007*, Pew Research Center, Mar. 11, 2019, https://www.pewresearch.org/hispanic/interactives/unauthorized-immigrants-by-metro-area-table/ (filtered for Amarillo, TX) |
| 5 | *QuickFacts, Amarillo city, Texas*, United States Census Bureau, https://www.census.gov/quickfacts/fact/table/amarillocitytexas/POP060210 |
| 6 | *Estimates of U.S. Unauthorized Immigrant Population, by Metro Area, 2016 and 2007*, Pew Research Center, Mar. 11, 2019, https://www.pewresearch.org/hispanic/interactives/unauthorized-immigrants-by-metro-area-table/ (filtered for Dallas-Fort Worth-Arlington, TX) |
| 7 | Notice of Voluntary Dismissal Without Prejudice, ECF No. 25, *K.P.P.R. v. Mayorkas*, No. 1:21-cv-7 (S.D. Tex. Apr. 27, 2021). |
| 8 | Order, ECF No. 39, *Turcios v. Wolf*, No. 1:20-cv-93 (S.D. Tex. Oct. 16, 2020) |
| 9 | Docket Sheet, *Doe v. Barr*, No. 1:19-cv-213 (S.D. Tex.) |

3.     The exhibits listed above are true and correct copies of what they purport to be.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on May 24, 2021

*/s/ Jeffrey M. White*
Jeffrey M. White

2

**App.003**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION TO TRANSFER VENUE**

**DECLARATION OF JEFFREY M. WHITE**

*MONARCH NETWORKING SOLS. LLC V. CISCO SYS., INC.*

# EXHIBIT A-1

Ⓐ Neutral
As of: May 21, 2021 9:29 PM Z

## *Monarch Networking Sols. LLC v. Cisco Sys.*

United States District Court for the Eastern District of Texas, Marshall Division

January 5, 2021, Decided; January 5, 2021, Filed

CIVIL ACTION NO. 2:20-CV-00015-JRG

**Reporter**
2021 U.S. Dist. LEXIS 1551 *

MONARCH NETWORKING SOLUTIONS LLC, Plaintiff,
v. CISCO SYSTEMS, INC., Defendant.

**Counsel:** **[*1]** For Monarch Networking Solutions LLC, Plaintiff: Alden Harris, Michael F Heim, Robert Allan Bullwinkel, William Brown Collier, Jr, Heim, Payne & Chorush, LLP-Houston, Houston, TX; Andrea Leigh Fair, Claire Abernathy Henry, Thomas John Ward, Jr, Ward, Smith & Hill, PLLC, Longview, TX; Catriona Lavery, Susman Godfrey LLP - Los Angeles, Los Angeles, CA; Elizabeth L DeRieux, Capshaw DeRieux LLP, Gladewater, TX; Joseph Samuel Grinstein, Susman Godfrey, LLP - Houston, Houston, TX; Sidney Calvin Capshaw, III, Capshaw DeRieux LLP, Gladewater, TX; Steven M. Shepard, Susman Godrey LLP - New York, New York, NY; Max Lalon Tribble, Jr, Susman Godfrey LLP, Houston, TX.

For Cisco Systems, Inc., Defendant: Earl Glenn Thames, Jr, Michael E Jones, Patrick Colbert Clutter, IV, Potter Minton, a Professional Corporation, Tyler, TX; Jennifer Przybylski, Raymond N. Habbaz, Ryan T. Lawson, Tamir Packin, William N. Yau, Desmarais LLP - New York, New York, NY; Marta Y Beckwith, TechSea Law P.C., Santa Cruz, CA; Michael R Rhodes, Desmarais LLP - San Francisco, San Francisco, CA; Taeg Ssang Cho, Desmarais LLP, New York, NY.

**Judges:** RODNEY GILSTRAP, UNITED STATES DISTRICT JUDGE.

**Opinion by:** RODNEY GILSTRAP

## Opinion

<u>**MEMORANDUM OPINION AND ORDER**</u> **[*2]**

Before the Court is Defendant Cisco Systems, Inc.'s ("Defendant" or "Cisco") Motion to Transfer Venue to the Northern District of California (the "Motion to Transfer"). (Dkt. No. 77). Having considered the parties' briefing (Dkt. Nos. 77, 91, 95, 100), Cisco's Notice of Supplemental Authority (Dkt. No. 106), and the oral arguments presented at the hearing held on December 2, 2020 (Dkt. Nos. 117, 124, 125), and for the reasons stated herein, the Court is of the opinion that the Motion to Transfer should be **DENIED.**

### I. BACKGROUND

#### A. The Patents-in-Suit

This is a case involving allegations of patent infringement. Plaintiff Monarch Networking Solutions LLC ("Plaintiff" or "Monarch") accuses Cisco of infringing four United States Patents: U.S. Patent Nos. 8,451,844 ("the '844 Patent"), 8,451,845 ("the '845 Patent"), 9,019,965 ("the '965 Patent"), and 8,130,775 ("the '775 Patent") (collectively, the "Asserted Patents"). (Complaint, Dkt. No. 1). The Asserted Patents all relate generally to the field of internet telecommunication networks. (*See id.* ¶¶ 18-33; Dkt. Nos. 1-2, 1-3, 1-4, 1-5). Monarch's infringement allegations bear on standards issued by the Internet Engineering Task Force ("IETF"), a standard-setting organization (SSO).

The Asserted Patents were initially issued to France Telecom (later Orange, S.A. ("Orange")), **[*3]** a French

telecommunications company. France Telecom/Orange assigned the patents to Transpacific IP Group Limited ("Transpacific") in 2017, which later reassigned the patents to Acacia Research Group LLC ("Acacia"). (Dkt. No. 1 at ¶ 5). Acacia assigned the Asserted Patents to Monarch in late 2019. (Dkt. No. 1 at ¶ 5). Monarch is a wholly owned subsidiary of Acacia. (Dkt. No. 35).

## B. Procedural History

On January 21, 2020, Monarch filed the Complaint in this matter accusing Cisco and Co-Defendant Charter Communications, Inc.[1] ("Charter") of infringing the Asserted Patents. (Dkt. No. 1). Cisco answered the complaint on March 31, 2020. (Dkt. No. 27). On the same day, Cisco and Charter moved to stay this case pending a collateral proceeding (unrelated to this venue dispute) that implicates the chain-of-title to the Asserted Patents in the Delaware Chancery Court. (*See* Motion to Stay, Dkt. No. 31). The Court found the factual recitals in the Motion to Stay to be "lacking" relative to the complex nature of the chancery case, and denied the Motion to Stay without prejudice on May 22, 2020. (Dkt. No. 47, at 2-3). In denying the Motion to Stay, the Court advised the movants to "exercise caution **[*4]** to ensure that the factual representations included are both clear and accurate" should they choose to re-urge the Motion to Stay within the allowed window. (*Id.* at 3).[2]

A scheduling conference was held telephonically on May 18, 2020. On June 2, the Court entered a Docket Control Order ("DCO"). (Dkt. No. 51). In accordance with the Court's normal scheduling protocol, the Court set the above-captioned matter for jury selection in May of 2021, with a pretrial conference on March 29, 2021 and a claim construction hearing on November 20, 2020. (*Id.*).[3] Infringement and invalidity contentions under the Local Patent Rules were exchanged in May and June (*see* Dkt. Nos. 42, 67, 68). The Court also

---

[1] As will be discussed *infra*, Monarch later dismissed its claims against Charter. (*See* Dkt. Nos. 71, 72).

[2] The motion was re-urged on June 2, 2020 (Dkt. No. 54), but the Court ultimately declined to stay the case. (Dkt. No. 101).

[3] Save for minor adjustments to individual dates, and a one-month continuance recently granted, the case has substantially remained on that schedule. At approximately the same time as the Motion to Transfer was heard, the parties agreed to a one-month continuance to resolve an unrelated dispute about amending contentions under the Court's Local Patent Rules. (*See* Dkt. Nos. 120, 121, 123).

entered a Discovery Order (Dkt. No. 52), a Protective Order (after resolving a dispute over where source code was to be produced) (Dkt. No. 62; *see also* Dkt. No. 58), and an E-Discovery Order (Dkt. No. 65). The parties complied with their obligations under the Local Rules and the Discovery Order and exchanged their initial disclosures. (*See* Dkt. Nos. 57, 59, 61).

Monarch dismissed its claims against Charter on July 30, 2020. (Dkt. No. 71; *see also* Dkt. No. 72). Meanwhile, the case continued to develop **[*5]** between Monarch and Cisco as fact discovery got underway. In the months following the scheduling conference, 32,200 documents were produced. (Sealed Transcript at 52:8, Dkt. No. 125). Since the patents were issued to France Telecom/Orange, a French entity, discovery required the Court to issue Letters Rogatory to the French Ministry of Justice so the parties could obtain documents under the Hague Convention for the Taking of Evidence. (*See* Dkt. Nos. 75, 76).[4] In parallel, the parties engaged in the early stages of the claim construction process. In late July, the parties exchanged their proposed claim terms under Patent Rule 4-1. (Dkt. Nos. 69, 70). In mid-August, the parties exchanged their preliminary claim constructions under Patent Rule 4-2. (Dkt. Nos. 73, 74). Under the then-controlling DCO, the parties were due to file their Joint Claim Construction Statement on September 4, 2020. (*See* Dkt. No. 51).

Significantly, on September 3, 2020—nearly nine months after the complaint was filed, and nearly nine months away from trial—Cisco filed its Motion to Transfer. At the approximate midpoint of this case's life cycle—after scheduling, after the exchange of infringement and invalidity contentions, **[*6]** substantially into discovery, and with claim construction briefing and discovery well underway—Cisco asked the Court to transfer the above-captioned matter to the Northern District of California on the basis of convenience.

## II. LEGAL STANDARDS

If venue is proper in the district where a case was originally filed, a federal district court may transfer the

---

[4] The timeline of this process only highlights the complexity of discovery in this case. The Court issued the Letters Rogatory on August 24, 2020. (Dkt. No. 76). Although the parties requested compliance by September 30 (*see* Dkt. No. 75-1, at 1, ¶ 4), the French authorities did not process the request until October 27. (*See* Dkt. No. 115).

case "[f]or the convenience of parties and witnesses" to "any other district or division where it might have been brought." *28 U.S.C. § 1404(a)*. *Section 1404(a)*'s threshold inquiry is whether the case could initially have been brought in the proposed transferee forum. *In re Volkswagen AG, 371 F.3d 201, 202-03 (5th Cir. 2004)* [*Volkswagen I*]. If that inquiry is satisfied, the Court determines whether transfer is proper by analyzing and weighing various private and public interest factors. *Humble Oil & Ref. Co. v. Bell Marine Serv., 321 F.2d 53, 56 (5th Cir. 1963)*; *accord In re Nintendo Co., Ltd, 589 F.3d 1194, 1198 (Fed. Cir. 2009)*; *In re Apple Inc., 979 F.3d 1332, 1338 (Fed. Cir. 2020)* (applying Fifth Circuit law). The private interest factors are "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *In re Volkswagen of Am., Inc., 545 F.3d 304, 315 (5th Cir. 2008)* (en banc) [*Volkswagen* **[*7]** *II*] (quoting *Volkswagen I, 371 F.3d at 203*). The public interest factors are "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Id.* (quoting *Volkswagen I, 371 F.3d at 203*) (alterations in original). The factors are neither exclusive nor exhaustive, and no one factor is dispositive. *Id.*

The burden to prove that a case should be transferred for convenience falls squarely on the moving party. *See id.* Although the plaintiff's choice of forum is not a separate factor entitled to special weight, respect for the plaintiff's choice of forum is encompassed in the movant's elevated burden to "clearly demonstrate" that the proposed transferee forum is "clearly more convenient" than the forum in which the case was filed. *Id. at 314-15*; *Apple, 979 F.3d at 1338*. While "clearly more convenient" is not necessarily equivalent to "clear and convincing," the moving party "must show materially more than a mere preponderance of convenience, lest the standard have no real or practical meaning." *Quest NetTech Corp. v. Apple, Inc., No.* **[*8]** *2:19-cv-118, 2019 U.S. Dist. LEXIS 206019, 2019 WL 6344267, at *7 (E.D. Tex. Nov. 27, 2019)*. In considering a transfer under *§ 1404(a)*, the Court may consider undisputed facts outside of the pleadings, but must draw all reasonable inferences and resolve factual disputes in favor of the non-movant. *Vocalife LLC v. Amazon.com, Inc., No. 2:19-CV-00123, 2019 U.S. Dist. LEXIS*

*205696, 2019 WL 6345191, at *2 (E.D. Tex. Nov. 27, 2019)*; *cf. Trois v. Apple Tree Auction Cent. Inc., 882 F.3d 485, 492-93 (5th Cir. 2018)* (reviewing a transfer under *§ 1406)*; *Ambraco, Inc. v. Bossclip B.V., 570 F.3d 233, 238 (5th Cir. 2009)* (reviewing enforcement of a forum-selection clause).

## III. DISCUSSION

The threshold inquiry under *§ 1404(a)* is whether the case could have properly been brought in the proposed transferee forum—in this case, the Northern District of California. Neither Cisco nor Monarch contest that this case could have been brought there initially. (*See* Dkt. No. 77, at 8; Dkt. No. 91, at 4). The Court finds that this case could have been brought in that district. Accordingly, the Motion to Transfer turns entirely on the private and public interest factors and their relative weights.

### A. Private Factor #1: Relative Ease of Access to Sources of Proof

The first private factor, ease of access to sources of proof, considers "documents and physical evidence" as opposed to witnesses. *See Volkswagen II, 545 F.3d at 315*; *Apple, 979 F.3d at 1339-40*. Certain appellate courts have stressed that the physical location of such sources of proof remains relevant notwithstanding technological **[*9]** advances in data storage, copying, and transmission. *See Volkswagen II, 545 F.3d at 316*; *In re Genentech, Inc., 566 F.3d 1338, 1346 (Fed. Cir. 2009)*. However, parties must specifically identify sources of proof, explain their relevance, and specifically identify the location of those sources. *AGIS Software Dev. LLC v. Huawei Device USA Inc., No. 2:17-cv-513, 2018 U.S. Dist. LEXIS 86382, 2018 WL 2329752, at *5 (E.D. Tex. May 23, 2018)*; *Utterback v. Trustmark Nat'l Bank, 716 F. App'x 241, 245 n.10 (5th Cir. 2017)* ("Additionally, Utterback fails to identify with any specificity *which witnesses* and *what evidence* would be inaccessible in Mississippi but readily available in Florida. Without more, we cannot credit such vague and conclusory assertions." (emphasis in original)).

Cisco identifies five discrete sources of proof: (1) Cisco's headquarters in the Northern District of California; (2) Monarch's sources of proof in California (but outside of the Northern District); (3) Third-party licensee Apple's headquarters in the Northern District of

California; (4) Third-party IETF, an SSO, whose headquarters is in the Northern District of California; and (5) Acacia, Monarch's corporate parent, whose headquarters is in California (but outside of the Northern District).[5] (Dkt. No. 77, at 8-10). Monarch argues that Cisco has failed to identify any relevant evidence physically located at its headquarters in the Northern District of **[\*10]** California. (Dkt. No. 91, at 4-5). Monarch also identifies Cisco's facilities in the Eastern District of Texas as having relevant documentary and physical evidence for issues such as infringement and damages. (*Id.* at 5-7). Monarch argues that itself and Acacia are willing to transport their evidence to Marshall, and that this heavily cuts against convenience in the Northern District. (*Id.* at 7). Monarch contests the relevance of evidence from Apple and IETF. (*Id.* at 7-8). Finally, Monarch identifies sources of proof that are convenient to neither district, such as Orange in Europe and Transpacific in Asia. (*Id.* at 8). The Court will address each in turn.

### 1. Cisco's Sources of Proof

Turning first to Cisco's sources of proof, there is a substantial dispute over the location of such sources and the significance of their locations. Cisco argues that the Accused Products were "principally designed from its California locations," and that four of the five Accused Products are "managed" from Cisco's California locations. (Dkt. No. 77, at 4, 9). However, Cisco also concedes that it "maintains electronic document repositories and thus does not anticipate identifying relevant non-electronic, **[\*11]** physical documents." (*Id.* at 9). Therefore, Cisco argues that the "fact that Cisco's document repositories can be accessed electronically from many locations" renders these electronic documents neutral for a transfer analysis. (*Id.*). Nonetheless, Cisco posits that "to the extent any non-electronic, physical documents exist, they would likely be in California." (*Id.*)

Monarch urges the Court to reject the argument that

---

[5] Cisco states that Monarch and Acacia are located in the Central District of California. (*See* Dkt. No. 77, at 8, 10). Monarch states that they are located in the Southern District of California. (*See* Dkt. No. 91, at 7). The evidence in the record shows that both Monarch and Acacia are based in Irvine, California. (*See* Dkt. No. 1, at ¶ 4; Dkt. No. 91-3, at ¶ 4). Irvine is in Orange County, which is in the Central District of California. *See* Jurisdiction, U.S. Dist. Ct. for Cent. Dist. Cal., https://www.cacd.uscourts.gov/jurors/jurisdiction .

physical location of electronic documents does not matter, as appellate courts have similarly rejected "antiquated era" arguments. *See Volkswagen II, 545 F.3d at 316*; *In re Genentech, Inc., 566 F.3d 1338, 1346 (Fed. Cir. 2009)*. It contends that Cisco also has sizeable server facilities in the Eastern District of Texas that house relevant documents. (Dkt. No. 91, at 5-6). It also argues that Cisco has not identified with particularity *any* documents that are physically located on Cisco servers in the Northern District of California. (*Id.* at 7). Since the Court must resolve factual disputes in favor of the non-movant, Monarch argues that the Court should discount the relevance of Cisco's California servers (as unsupported assertions) and find Cisco's Texas servers (as potential sources of proof) to weigh heavily against transfer. (Dkt. No. 91, at 7).

The Court observes significant **[\*12]** tension between the facts in the record and the law as announced by the Circuits. On the one hand, the arguments advanced by Cisco have been raised and rejected time and time again. The Fifth Circuit has explained that a decreased inconvenience in access to proof due to technological advances "does not render this factor superfluous." *Volkswagen II, 545 F.3d at 316*. Similarly, the Federal Circuit found error in concluding that the ease-of-access factor was neutral merely because "many of the documents were stored electronically[.]" *In re TS Tech USA Corp., 551 F.3d 1315, 1321 (Fed. Cir. 2008)* (citing *Volkswagen II, 545 F.3d at 316*); *see also Genentech, 566 F.3d at 1346* (citing *Volkswagen II, 545 F.3d at 316*). Thus, the physical location of evidence—even if stored electronically—remains a relevant consideration for the convenience analysis. Cisco's argument that its electronic documents can be easily accessed anywhere is not persuasive.

On the other hand, the facts before the Court call into serious question whether, in a practical sense, a physical "location" for Cisco's data can even be ascertained on this record. The evidence shows that Cisco's data storage architecture is "distributed," or, in other words, decentralized. Cisco's *Rule 30(b)(6)* corporate representative, Sean Gill, testified to this effect:

> Q: Earlier you said that Cisco uses a distributed system; is that **[\*13]** right?
> A: Yes, I did say that.
> Q: What did you mean by that?
> A: Distributed means that general data is stored in more than one location.

(Gill Dep. Transcript at 38:12-17, Dkt. No. 91-2).

Q: You didn't investigate whether copies of Cisco's technical documents for the accused products are stored in Cisco's data centers in Texas, correct?
A: So I did sit down with several product managers, and their expert testimony was that these products were designed outside of Texas and they are managed outside of Texas.

> I think that satisfied my curiosity enough. Is it possible? I really don't know. I don't know where their documents are stored given that they are located in regions outside of Texas like Research Triangle Park; they even have a data center in Ottawa, Canada, in San Jose. It's very possible those technical documents are stored there.

(*Id.* at 41:5-2).

Q: At which data centers are Cisco's marketing documents for the accused products stored?
A: So the Cisco Texas data centers, Allen and Richardson, do have some marketing documents stored there. I wouldn't assume that all of them are stored there, though, because we do have a distributed system, a distributed network.

(*Id.* at 44:6-14).

Q: So it's **[*14]** possible that Cisco has duplicates of many of its documents stored at its data centers?
A: I mean, I would say its likely we have -- people could have the data for business continuity, marketing, finance, sales. Those are all very important aspects of Cisco's business, so I'm sure.

(*Id.* at 45:5-13). Clearly, relevant Cisco documents are located in the Eastern District of Texas, and it is very likely that there are relevant documents on Cisco's California servers. The relative numbers of documents in each location, however, are elusive. So is the location of any given document, as Cisco's counsel represented during oral argument:

> [W]hen you go get these documents, as a practical matter, you know, obviously they're confidential documents. And the way you get them, you don't specify locations to get them from. You don't say, I want all the documents from, you know, this storage center or that storage center. You are a person that is given a password that's qualified to get access to certain confidential information. And then you just go in and get it. And it doesn't really matter where you are when you get it, nor where you get it from as the production is made.

(Sealed Transcript at 9:7-18, **[*15]** Dkt. No. 125).

The physical location of electronic documents remains an important consideration under the convenience analysis. That aside, the Court should not have to hazard a guess as to where those locations might be. Consequently, the Court finds that the locations of Cisco's data storage sites have a neutral effect on the first private factor—not because physical location is unimportant, but because it has not been established with certainty or clarity. While Cisco documents are likely to be on both Texas and California servers, each counterweighs the other.

Turning next to Cisco's non-electronic documents and physical evidence, Cisco contends that, to the extent they exist, "they would likely be found in California." (Dkt. No. 77, at 9). With respect to the Accused Products themselves, Monarch contends that there is equal convenience between this District and the Northern District of California because Cisco has admitted that the Accused Products are used in the Richardson and Allen data centers. (Dkt. No. 91, at 6; *see also* Gill Dep. Transcript at 101:7-11, Dkt. No. 91-2). The Court agrees with Monarch that there is equal convenience between the two districts with respect to transporting **[*16]** physical exemplars of the Accused Products.

In sum, Cisco's electronic documents and physical, non-documentary evidence are both neutral with respect to transfer. Given Cisco's concession that it "does not anticipate identifying relevant non-electronic, physical documents," (Dkt. No. 77, at 9), Cisco is left to stand on the likelihood that other non-electronic documentary evidence exists and is found in California. Cisco has not identified any such documents. If such evidence does exist, it would likely be found at Cisco's headquarters in the Northern District of California, and for that reason, Cisco's own sources of proof add some limited weight in favor of transfer. *See Genentech, 566 F.3d at 1345*; *In re Acer Am. Corp., 626 F.3d 1252, 1256 (Fed. Cir. 2010)*. Since this likelihood is small, and since it is necessarily rooted in speculation, the corresponding weight in favor of transfer is very slight.

## 2. Monarch's Sources of Proof

Cisco next argues that Monarch's sources of proof are located primarily in Irvine, in the Central District of California. (Dkt. No. 77, at 9). Monarch responds that this should be given little weight because of Monarch's choice to litigate in the Eastern District of Texas. (Dkt. No. 91, at 7). Monarch also argues that Cisco has failed

to identify [*17] any particular documents or other evidence that Monarch has in California.

"In patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer." *Genentech, 566 F.3d at 1345*. The Court notes in passing that Cisco has not counterclaimed against Monarch. Given the comparatively low likelihood that evidence from Monarch's location in the Central District of California will need to be transported to trial, and Monarch's acceptance of producing whatever it is here, this factor also weighs very slightly in favor of transfer to the Northern District of California.

### 3. Third-Party Sources of Proof

Cisco identifies three third parties as relevant sources of proof: (1) Acacia, Monarch's corporate parent; (2) Apple, a licensee to the Asserted Patents; and (3) IETF, a standards-setting organization. (Dkt. No. 77, at 9-10). Monarch identifies two further sources: Orange and Transpacific, both predecessors-in-title to the Asserted Patents. (Dkt. No. 91, at 8). The parties' arguments regarding Acacia are similar to those regarding Monarch. Cisco argues that Acacia's headquarters in Irvine is closer to the Northern District of California. (Dkt. No. 77, at 10). Monarch responds that Acacia's [*18] evidence is only marginally more convenient in the Northern District of California. (Dkt. No. 91, at 7). The Court agrees with Monarch that Acacia's evidence is only marginally more convenient there than here. Moreover, the odds that evidence from Monarch's corporate parent will play a major role at trial are slim.

Turning next to third-party licensee Apple, Cisco contends that Apple is expected to have proof relevant to negotiations for the Asserted Patents, and that Apple's AirPort product may embody at least some of the patents. (Dkt. No. 77, at 10). Apple's headquarters is in Cupertino, in the Northern District of California. (*Id.*). Monarch contests the relevance of Apple's California evidence. First, Monarch argues that there is no evidence that Apple's products actually practice the Asserted Patents. (Dkt. No. 91, at 7). Second, Monarch argues that there is no proof that Apple maintains such evidence in California, as opposed to its other facilities (including Apple's sizeable facility in Austin, Texas). (*Id.* at 7-8). The Court is persuaded that Apple's evidence would be more convenient in the Northern District of California, but that Apple's evidence would likely only play a small role [*19] at trial. Also, Cisco's contentions as to Apple are rooted in maybe and perhaps—without

the certainty needed to afford this any material weight.

As to IETF, Cisco contends that IETF will have proof in the Northern District related to the accused standards (RFC Nos. 7597 and 7599), working draft documents related to the Asserted Patents, licensing obligations of the original patentee, invention disclosures made to IETF, and prior art. (Dkt. No. 77, at 10). IETF is headquartered in the Northern District of California, but Monarch argues that the contributors to the standards are located all around the world, with only one contributor in that district. (Dkt. No. 91, at 8). Nonetheless, the IETF headquarters is relevant and more convenient to the Northern District of California, even if its contributors (for whom neither district is more convenient, with one exception) are also relevant. Since IETF documents that are not publicly available could play some role at trial, the Court is persuaded that IETF's sources of proof in the proposed transferee forum weigh slightly in favor of transfer.

Turning finally to Orange and Transpacific, neither district is more convenient to these entities because [*20] Orange is based in France and Transpacific is based in Singapore. (*See* Dkt. Nos. 91-18, 91-19). Both are neutral with respect to transfer.

### 4. The First Private Factor Weighs Slightly in Favor of Transfer

Summing the relative weights of each identified source of proof, the Court finds that the first private factor weighs slightly in favor of transfer. As discussed above, the bulk of the evidence likely to be relevant in this case is located on Cisco's distributed data storage system, which the Court concludes is neutral with respect to transfer. Weighing in favor of transfer is any non-electronic evidence remaining at Cisco's headquarters (yet to be identified), any evidence from Monarch, and evidence from third parties Acacia, Apple, and IETF. For evidence from these sources, the Northern District of California would be slightly more convenient. However, its existence (and, if it exists, its relevance) is highly speculative, as compared to the corpus of evidence typically presented in a patent infringement lawsuit—the bulk of which is Cisco's and is electronic. Accordingly, while the first private factor tips in favor of transfer, its weight is only slight.

### B. Private Factor #2: Availability [*21] of Compulsory Process to Secure the Attendance of

Case 2:21-cv-00067-Z   Document 39-1   Filed 05/24/21   Page 11 of 60   PageID 871

Page 7 of 12
2021 U.S. Dist. LEXIS 1551, *21

## Witnesses

The second private factor considered is the availability of compulsory process to secure the attendance of witnesses. *Volkswagen II, 545 F.3d at 316*. Federal district courts have the absolute power to compel attendance of a trial, hearing, or deposition "within 100 miles of where the person resides, is employed, or regularly transacts business in person." *Fed. R. Civ. P. 45(c)(1)(A)*. Federal district courts have trial subpoena power over a person "within the state where the person resides, is employed, or regularly transacts business in person, if the person . . . is a party or a party's officer; or . . . [if the person] is commanded to attend a trial and would not incur substantial expense." *Fed. R. Civ. P. 45(c)(1)(B)*. As party witnesses almost invariably attend trial willingly, "[t]his factor is directed towards unwilling third-party witnesses." *C&J Spec Rent Servs. v. Leam Drilling Sys. LLC, No. 2:19-cv-00079, 2019 U.S. Dist. LEXIS 114010, 2019 WL 3017379, at *3 (E.D. Tex. July 10, 2019)*.

Cisco argues that the Northern District of California has absolute subpoena power over Apple and IETF witnesses, as well as three prior art witnesses who reside within 100 miles of San Francisco. (Dkt. No. 77, at 11-12). Cisco also argues that the Northern District of California has trial subpoena **[*22]** power over Acacia witnesses, who are located within the State of California. (*Id.*).

Monarch argues that the relevance of the Apple, IETF, and prior art witnesses is overstated. (Dkt. No. 91, at 9). As to prior art witnesses, Monarch argues that prior art witnesses are rarely called to trial. (*Id.*). Additionally, because any Acacia witnesses will come to trial willingly, Monarch argues that Cisco has "double counted" Acacia witnesses as both willing and unwilling. (Dkt. No. 91, at 11; *see also* Dkt. No. 91-3 ¶ 6). Finally, Monarch notes that a significant number of witnesses are outside of *either* Court's subpoena power, including the inventors of the Asserted Patents (in Europe) and most of the prior art witnesses (twelve of whom are located in other states, and others abroad). (Dkt. No. 91, at 10-11).

Since Acacia's witnesses are willing to testify, Monarch is correct that Acacia's witnesses should be deemed willing witnesses, and as such are not to be considered under the compulsory process factor. *See Quest NetTech, 2019 U.S. Dist. LEXIS 206019, 2019 WL 6344267, at *4* ("Given th[e] representation [that a witness would testify willingly], the fact that he is subject

to subpoena power in the Northern District of California and not in this District is **[*23]** neutralized."). Turning to the Apple and IETF witnesses, their testimony would likely be relevant at trial and they are subject to absolute subpoena power in the Northern District of California. The Apple and IETF witnesses weigh in favor of transfer to that district. The three prior art witnesses cited by Cisco also weigh in favor of transfer, but to a lesser degree; there is no indication that they would be unwilling to travel, and the relevance of a particular prior art witness's live testimony at trial is speculative at best. *2019 U.S. Dist. LEXIS 206019, [WL] at *5*; *AGIS, 2018 U.S. Dist. LEXIS 86382, 2018 WL 2329752, at *7*.

Although more third-party witnesses are subject to subpoena power in the Northern District of California than in the Eastern District of Texas, the convenience value of compulsory process is greatly diluted because a sizeable majority of all third-party witnesses are not subject to subpoena in *either* district. As to the prior art witnesses, Cisco concedes that they are generally "dispersed throughout the world." (Dkt. No. 77, at 7). Cisco has identified three prior art authors or witnesses in California, but a greater number of domestic prior art witnesses are likely to be found in states such as Colorado, Florida, Illinois, Massachusetts, New Hampshire, **[*24]** New York, and Washington. (Dkt. No. 91, at 9; *see also* Dkt. Nos. 91-4 - 91-10). The inventors of the Asserted Patents will also likely be found in Europe. (Dkt. No. 91, at 10; Dkt. No. 77-8, at 8-9; Dkt No. 77-10, at 3). These witnesses are subject to neither Court's absolute subpoena power. While the second private factor leans in favor of transfer, the number of witnesses not subject to subpoena greatly diminishes the overall weight this factor should have relative to other factors.

## C. Private Factor #3: Cost of Attendance for Willing Witnesses

The third private factor, the cost of attendance for willing witnesses, has been described as the most important factor. *See Genentech, 566 F.3d at 1343* (quoting *Neil Bros. Ltd. v. World Wide Lines, Inc., 425 F. Supp. 2d 325, 329 (E.D.N.Y. 2006)*). Courts properly give more weight to the convenience of non-party witnesses than to party witnesses. *See Frito-Lay N. Am., Inc. v. Medallion Foods, Inc., 867 F. Supp. 2d 859, 870-71 (E.D. Tex. 2012)*; *State Street Capital Corp. v. Dente, 855 F. Supp 192, 198 (S.D. Tex. 1994)*. The Fifth Circuit has established a so-called "100-mile rule": when the distance between the transferor and proposed

transferee venues exceeds 100 miles, "the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *Volkswagen I, 371 F.3d at 201*; *Genentech, 566 F.3d at 1343*; *Apple, 979 F.3d at 1341*. The distance between Marshall, Texas and San Francisco, California is approximately 1,600 miles from point to point.

Cisco identifies **[*25]** three of its own witnesses in the Northern District of California: Rob Hamilton, Mark Townsley, and Vishnuprakash Selvarajan. (Dkt. No. 77, at 5). A fourth, Ole Trøan, is identified by Cisco as living in Norway. (*Id.*). Cisco also argues that six "Monarch-aligned" fact witnesses (including five Acacia witnesses),[6] along with Monarch's technical expert witness, reside in California. (*Id.* at 13). Cisco contends that the Northern District of California would be more convenient to all of these witnesses except Trøan, for whom this factor is neutral. (*Id.*)

Monarch identifies three additional Cisco witnesses relevant to this lawsuit who are located in the Eastern District of Texas: Scott Biavaschi, Marc Surplus, and Curt Reid. (Dkt. No. 91, at 11-12). Monarch also identifies a fourth Cisco witness, Rajiv Asati, located in Raleigh-Durham, North Carolina, for whom travel to this District would be more convenient. (*Id.* at 11-12). As to Monarch/Acacia witnesses, Monarch contends that those identified by Cisco "all live hundreds of miles from [the Northern District of California], and there is no reason to believe that [the Eastern District of Texas] is any less convenient." (*Id.* at 11).

Turning first to the identified Cisco **[*26]** witnesses, the Court is presented with three witnesses located in the Northern California area and three witnesses located in the East Texas area. A trial conducted in either district would necessarily cause the same inconvenience to three Cisco witnesses. Accordingly, the Cisco witnesses who are at home in either district are neutral with respect to transfer. Mr. Asati in North Carolina would have to travel approximately 900 miles to Marshall, and would have to travel an *additional* 1,600 miles (for a total of 2,500) for a trial in San Francisco.[7] For Mr.

Asati, a trial in the Eastern District of Texas would be significantly more convenient. Mr. Trøan of Norway is neutral for the transfer analysis.[8]

Turning next to the identified Monarch witnesses, Cisco has identified Monarch's CEO, Mr. Mark Booth, in Newport Beach, CA (in the state's Central District) along with Monarch's technical expert, Dr. Martin Walker, in Palo Alto, CA (in the state's Northern District). (Dkt. No. 77, at 5; Dkt. No. 95, at 4 n.7). The Northern District of California would be more convenient for these witnesses. However, the weight of this is diminished with respect to expert witnesses, such as Dr. Walker, who **[*27]** are invariably well compensated for their time in appearing to testify.[9]

Like Monarch's CEO, Acacia's willing witnesses reside in California but outside of the Northern District. (Dkt. No. 77, at 6; Dkt. No. 91, at 11). Although the Northern District of California would be somewhat more convenient than the Eastern District of Texas, the weight of this is diminished by the speculative nature of their relevance. Monarch argues that no more than one of the Acacia witnesses is likely to testify at trial. (Dkt. No. 91, at 11). Although Cisco claims that it will need to bring all five Acacia witnesses **[*28]** to trial (Dkt. No. 95,

---

Court does not consider the potential convenience of such witnesses.

[8] Like Mr. Asati, Mr. Trøan would have to travel an additional 1,500 miles westward for trial in San Francisco versus trial in Marshall. The Federal Circuit has cautioned against an overly rigid application of the Fifth Circuit's 100-mile rule with respect to foreign witnesses who must travel a significant distance in any event. *Genentech, 566 F.3d at 1344*.

[9] This follows naturally from the policy behind convenience transfers. As the Fifth Circuit has stated,

> Additional distance means additional travel time; additional travel time increases the probability for meal and lodging expenses; and additional travel time with overnight stays increases the time which these fact witnesses must be away from their regular employment. Furthermore, the task of scheduling fact witnesses so as to minimize the time when they are removed from their regular work or home responsibilities gets increasingly difficult and complicated when the travel time from their home or work site to the court facility is five or six hours one-way as opposed to 30 minutes or an hour.

*Volkswagen I, 371 F.3d at 205*. Unlike with fact witnesses, testifying at trial *is* an expert witness's employment (at least in part), and traveling for trial is a necessary and expected incident of accepting such employment.

---

[6] (*See* Dkt. No. 91, at 11 ("As an initial matter, Cisco double counted the "Monarch aligned witnesses in both willing Monarch witnesses and unwilling Acacia witnesses.")).

[7] Monarch also identifies Ottawa, Canada as a possible location of Cisco witnesses. (*See* Dkt. No. 91, at 11; Gill Dep. Transcript at 107:13-23, Dkt. No. 91-2). Since Monarch does not identify any particular witnesses located in Ottawa, the

at 4 n.6), the Court has seen time after time that many witnesses disclosed in early trial witness lists (presumably with the most honest of intentions) do not end up on the witness stand at trial. As cases develop and issues narrow, so do the rosters of witnesses who will provide supporting testimony. Live testimony from multiple witnesses from a plaintiff's corporate parent are not likely to play a significant role at trial.[10]

Other potential willing witnesses include the inventors of

_____

[10] It is worth pausing here to illustrate how this factor varies considerably between cases of different types. In car-wreck cases, for example, the witness lists are fairly determinate well before trial. The typical witness lists include the drivers, eyewitnesses, investigating peace officers and paramedics, and treating physicians, with the possible inclusion of accident reconstructionists and consulting medical experts. For the most part, the identities of these witnesses are crystalized by real-world events, independent of trial. Accordingly, the convenience and cost-of-attendance for these witnesses can be assessed early in the case.

In patent cases, to the contrary, the Court's experience is that witness lists are almost certain to change in a meaningful way as trial strategy develops. Early assessment of witness lists is highly speculative. In the typical patent case, the key trial witnesses are usually corporate representatives, technical experts, and damages experts from both sides. Other roles may be played by inventors, prior art authors, party employees, and third-party witnesses depending on the facts and theories of each case. Often, witnesses with smaller roles appear by deposition. Parties generally, and properly, disclose broad witness lists early on to provide fair notice to one another. In practice, these lists are simply not representative of who will ultimately testify at trial. Depositions reveal who is knowledgeable and who is not. Case strategies change as plaintiffs narrow their asserted claims and defendants focus on certain prior art references and discard others, or discard theories of invalidity altogether. As case strategies change, so does the relative importance of each witness. Often, witness lists retain significant quantities of "May Call" witnesses even through the pretrial conference. A party's assertion that certain witnesses will be necessary for trial must be assessed with a careful eye towards the facts and needs of the case itself. *See Van Dusen v. Barrack, 376 U.S. 612, 622, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964)* (noting that a transfer analysis requires an "individualized, case-by-case consideration of convenience and fairness").

It is also worth noting that the *Volkswagen* cases (which are the starting points for a *§ 1404(a)* dispute filed before a district court in the Fifth Circuit) were car-wreck/products liability cases. *Volkswagen I, 371 F.3d 201*; *Volkswagen II, 545 F.3d 304*. They were free of the realities embedded in the realm of patent litigation.

the Asserted Patents and the inventors/authors of Cisco's prior art references. As witnesses from Orange are located in Europe, they are neutral with respect to transfer. The same is true regarding prior art witnesses who live abroad. As to domestic prior art witnesses scattered about the country,[11] the central location of the Eastern District of Texas is more convenient to them as a body than the Northern District of California.

The Court concludes that the third private factor weighs slightly against transfer. Concerning party witnesses, trial in either district would be equally convenient for the Cisco witnesses, and trial in the Northern District of California would **[*29]** be slightly more convenient for the Monarch witnesses. Despite the questionable relevance of five Acacia witnesses and fifteen domestic prior art authors, trial in this District is more convenient for most of these third-party witnesses. On balance, trial in the Eastern District of Texas would be slightly more convenient for most of the willing witnesses.

### D. Private Factor #4: All Other Practical Problems That Make Trial of a Case Easy, Expeditious and Inexpensive

The fourth private factor, practical problems, includes concerns rationally based on judicial economy. *Quest NetTech, 2019 U.S. Dist. LEXIS 206019, 2019 WL 6344207, at *6*; *see also In re Vistaprint Ltd., 628 F.3d 1342, 1346 (Fed. Cir. 2010)*. Cisco urges that this factor is "neutral" because none of the Asserted Patents have been previously litigated and because "no substantive proceedings regarding the Patents-In-Suit have occurred in this litigation." (Dkt. No. 77, at 13). Monarch responds that Cisco's delay in filing its Motion to Transfer "strongly disfavors transfer." (Dkt. No. 91, at 12-13). The Court is persuaded that Cisco's substantial delay in moving to transfer is a fact that weighs heavily against transfer.

Cisco waited until roughly halfway through this case's lifecycle to first assert that litigation in this forum would be inconvenient—that **[*30]** is, nearly nine months after the complaint was filed, and a further nine months out from the set trial date.[12] In the meantime, the parties

_____

[11] According to the prior art references, these witnesses appear to reside in Colorado, Florida, Illinois, Massachusetts, New Hampshire, New York, and Washington. (Dkt. No. 91, at 9; Dkt. Nos. 91-4 - 91-10).

[12] At all relevant times, jury selection was set for May for 2021.

and the Court expended substantial resources in litigating pretrial aspects of this case, both procedural and substantive. While Cisco's contentions that no substantive proceedings had yet occurred may be true in a literal sense, the lengthy preparations for a *Markman* hearing do not occur overnight. Cisco filed its Motion to Transfer the day before the parties' Joint Claim Construction and Prehearing Statement was due. At that time, the parties had already exchanged proposed claim terms and preliminary constructions. This Motion to Transfer was not fully briefed until October 28, 2020, at which point the parties' Opening and Responsive Claim Construction Briefs had already been filed and the *Markman* hearing was just three weeks away.[13] (*See* Dkt. Nos. 88, 96). Cisco had been aware of these deadlines since June 2, when the Court entered its Docket Control Order setting them. (*See* Dkt. No. 51).

In reply, Cisco endeavors to explain away this delay by saying that it waited for Connecticut-based Co-Defendant Charter to be dismissed from the suit, **[*31]** at which point "the weight of the evidence shifted significantly to California." (Dkt. No. 95, at 5). The Court finds this explanation unpersuasive. Cisco's argument is belied by the fact that Cisco *also* argues that there was a "clear connection" to the Northern District of California from before Charter's dismissal—a connection that, in Cisco's view, Monarch was deliberately trying to "obfuscate." (*Id.*). However, if the connection to the Northern District of California was so clear, Cisco could and should have filed its Motion to Transfer months earlier. Nonetheless, Cisco maintains that the dismissal of Charter had a real, material effect on convenience. Cisco cannot have it both ways.[14] The Court is not persuaded that the dismissal changed the operative facts for convenience or somehow gave Cisco new knowledge—at least not in a way that justifies the strategic timing of Cisco's motion.[15]

---

That date has since been advanced one month, to June 2021, by agreement of the parties, to resolve an unrelated dispute. (*See* Dkt. No. 121).

[13] The *Markman* hearing was held before Magistrate Judge Roy S. Payne on November 20, 2020. (Dkt. No. 110).

[14] Cisco claims Monarch toyed with the convenience issue *vis-à-vis* the Northern District of California *months before* Cisco even raised convenience as a live issue before the Court. (Dkt. No. 95, at 5). The Court does not agree with Cisco's *post hoc* interpretation of the events.

[15] In any event, the relevant facts about Charter's effect on

To transfer this matter to another district would largely obviate all the resources expended by the parties and the Court to prepare this case for claim construction. It is for this reason that the appellate courts have emphasized the importance of timely filing **[*32]** and resolving motions to transfer. The Fifth Circuit has stated that "[p]arties seeking a change of venue should act with 'reasonable promptness.'" *Peteet v. Dow Chem Co., 868 F.2d 1428, 1436 (5th Cir. 1989)*; *see also Utterback, 716 F. App'x at 245* ("Utterback insists the timing of his motion is immaterial to the § 1404(a) analysis. Our caselaw suggests the opposite."). Parties typically file these motions early. In fact, it is not uncommon in this district for parties to inform the Court of a pending or impending transfer motion at an initial scheduling conference. A transfer motion filed midway through the case necessarily forfeits some convenience. The longer a litigant waits to file a transfer motion, the more resources the parties and the Court will expend by the time the motion is ripe for consideration. Therefore, the later a motion is filed, the less convenient a transfer would be. Notably, that reduction in convenience is caused by the very party seeking transfer because of convenience.

The Federal Circuit recently addressed a reciprocal issue. In *Apple*, the Federal Circuit stated that "[a] district court's decision to give undue priority to the merits of a case over a party's transfer motion should not be counted against that party in the venue transfer analysis."[16] *Apple, 979 F.3d at 1343*; *see* **[*33]** *also In re Horseshoe Ent'r, 337 F.3d 429, 433 (5th Cir. 2003)* ("[T]he Middle District Court waited some 13 months . . . to rule on Horseshoe's motion to transfer. . . . [I]n our view disposition of that motion should have taken a top priority. . . ."). In *Apple*, the Federal Circuit criticized the District Court for "barrel[ling] ahead on the merits" while a transfer motion had been pending for approximately eight months, and then relying on the intervening substantive proceedings to deny the transfer motion.

---

convenience are not before the Court. (*See, e.g.*, Sealed Transcript at 32:6-10, Dkt. No. 125).

[16] Apple filed its motion to transfer in November of 2019. *Apple, 979 F.3d at 1336*. The District Court held a hearing on that motion in May of 2020 and stated that it would deny the motion. *Id.* After the hearing, but before issuing a written order, the District Court held a *Markman* hearing, issued a claim construction order, and resolved a discovery dispute. *Id.* The District Court relied on these intervening events in its written order to deny transfer. *Id. at 1343*.

*Apple, 979 F.3d at 1338*.[17]

Read together, cases such as *Apple, Horseshoe, Peteet, Utterback*, and others state a preference for resolution of venue issues before the merits of a case—when possible. In the uncommon circumstance where a *party* chooses to prioritize litigating the merits over filing a motion to transfer—as Cisco has done here—that timing is a factor the Court should consider. The timing of Cisco's Motion to Transfer unavoidably set it on a collision course with "the most important and time-intensive substantive tasks . . . in a patent case." *Id.* Under these circumstances, unlike *Apple*, to overlook what has intervened between filing and resolution of the Motion to Transfer would be to give no effect to timing at all. "On the question [*34] of convenience, timing is obviously salient[.]" *Utterback, 716 F. App'x at 245*.

The Court finds in this case that the timing of Cisco's Motion to Transfer was not reasonably prompt. Transferring this case would send it to the back of the line in the transferee Court. Additionally, transfer could subject significant aspects of this case to re-litigation—thus wasting the resources expended by both the Court and the parties—unless the transferee Court simply accepts this Court's rulings across the board.[18] In the least, transfer would create an incentive and opportunity for Cisco to make a second run at issues already litigated here. *See Utterback, 716 F. App'x at 245* ("[I]t would emphatically not serve the interest of justice to allow [the moving party] to take a second 'bite[ ] at the apple' in Florida, just after learning that he would lose in Mississippi."). The Court is wary that the interests of justice would be served under a regime that encourages a "wait-and-see" approach to transfer motions. Accordingly, this factor weighs materially against transfer.

### E. Public Factor #1: Administrative Difficulties Flowing from Court Congestion

The first public factor disfavors transfer because [*35]

this district has a faster time to trial than the Northern District of California. A faster average time to trial means a more efficient and economical resolutions of the claims at issue. According to the latest statistics released by the Administrative Office of the U.S. Courts, trial times are consistently and significantly faster in this district than in the Northern District of California.[19] Additionally, the projected time to trial in this district would be even faster given the stage of the case when Cisco's motion was filed. The trial date was roughly nine months out at that time. Transferring this case to the Northern District of California would both turn back the clock and then run it more slowly. This factor weighs against transfer.

### F. Public Factor #2: The Local Interest in Having Localized Interests Decided at Home

"[J]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Volkswagen I, 371 F.3d at 206*. Cisco argues that this factor favors transfer because the Northern District of California has a strong localized interest in this case. (Dkt. No. 77, at 14). Cisco contends [*36] that this case implicates the reputations of California companies and individuals, including Cisco's San Jose-based engineers, California prior art witnesses, and a California-based standards body. (*Id.*). Monarch argues that this factor is neutral because the Eastern District of Texas also has strong local interests in this case. (Dkt. No. 91, at 14-15). Monarch identifies several Cisco witnesses located in this District whose reputations are also implicated. (*Id.*). Monarch also notes that Cisco employs over 3,000 Texans, 1,200 of whom are in this District with the balance in the neighboring Western District of Texas. Finally, Monarch points to Cisco receiving "significant financial incentives

---

[17] The Federal Circuit also noted that the transferee court in *Apple* had multiple pending cases with overlapping issues. *Apple, 979 F.3d at 1343*. That is not the case here.

[18] This is not a given. *See, e.g., Personalized Media Comm'cns, LLC v. Netflix, Inc., No. 1:20-cv-3708, 2020 U.S. Dist. LEXIS 153811, 2020 WL 5026600 (S.D.N.Y. Aug. 25, 2020)* (revisiting claim construction after a discretionary transfer).

[19] *See National Judicial Caseload Profile*, ADMIN. OFFICE OF U.S. CTS. (Sept. 30, 2020), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2020.pdf . For the twelve-month period ending September 30, 2020, the median time from filing to trial in civil cases was 18.0 months in the Eastern District of Texas and 44.5 months in the Northern District of California. *Id.* at 35, 66. For the period ending September 30, 2019, those figures were 16.8 months in the Eastern District of Texas and 22.8 months in the Northern District of California. *Id.* The Court is mindful that the statistics for the most recent reporting period may be skewed due to the COVID-19 pandemic. Nonetheless, the statistics from previous reporting periods confirm that trial times are consistently and significantly faster in this district.

from taxpayers" in Collin County, Texas and the City of Richardson, Texas—both located in this District—regarding its facilities there.

The Court finds that both the Northern District of California and the Eastern District of Texas have strong local interests in hearing this case. However, the Court is not persuaded that either district's interest is particularly stronger than the other's. On balance, the Court finds this factor to be neutral.

### G. Public Factors #3 and #4: Familiarity with Governing [*37]  Law and Conflicts of Laws

The parties agree that the third and fourth public factors are neutral. (*See* Dkt. No. 77, at 15; Dkt. No. 91, at 15). Noting that this case implicates federal patent law under Title 35 of the United States Code, the Court find that both factors are neutral for the transfer analysis.

### H. Cisco Has Failed to Demonstrate That the Northern District of California Would Be Clearly More Convenient

Having considered the private and public interest factors, the Court now proceeds to weigh them. In summary: the access-to-evidence factor weighs only slightly in favor of transfer; the compulsory-process factor weighs only slightly in favor of transfer; the convenience-for-willing-witnesses factor weighs slightly against transfer; the practical-problems factor weighs heavily against transfer because of the timing of Cisco's motion; the court-congestion factor also weighs against transfer; and the other public interest factors are neutral. On these facts, the Court is not persuaded that trial in the Northern District of California would be clearly more convenient than trial in the Eastern District of Texas.

### IV. CONCLUSION

For the reasons stated above, the Court is of the opinion [*38]  that Cisco has failed to meet its burden to demonstrate that litigating in the Northern District of California would be clearly more convenient. Accordingly, the Motion to Transfer is **DENIED**.

**So ORDERED and SIGNED this 5th day of January, 2021**.

/s/ Rodney Gilstrap

RODNEY GILSTRAP

UNITED STATES DISTRICT JUDGE

*End of Document*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'**
**MOTION TO TRANSFER VENUE**

**DECLARATION OF JEFFREY M. WHITE**

CJRA Table 8—Report of Motions Pending Over Six Months for Period Ending
March 31, 2020 (Excerpts)

# EXHIBIT A-2

**CJRA Table 8—Report Of Motions Pending Over Six Months**
**For Period Ending March 31, 2020**

**5TH Circuit**

**U.S. District Court for TEXAS NORTHERN**

**District Judge  KACSMARYK, MATTHEW J.**

| Office | Docket Number | NOS Code | Case Title | Motion Text | CJRA Deadline | Status | Status Description |
|---|---|---|---|---|---|---|---|
| | | | | There are no events of this type to report | | | |

**Total Cases for District Judge : KACSMARYK, MATTHEW J.**                                                                 **0**

**CJRA Table 8—Report Of Motions Pending Over Six Months**
**For Period Ending March 31, 2020**

**5TH Circuit**

**U.S. District Court for TEXAS SOUTHERN**

**District Judge  HINOJOSA, RICARDO H.**

| Office | Docket Number | NOS Code | Case Title | Motion Text | CJRA Deadline | Status | Status Description |
|--------|---------------|----------|------------|-------------|---------------|--------|--------------------|
|        |               |          |            | There are no events of this type to report |               |        |                    |

**Total Cases for District Judge : HINOJOSA, RICARDO H.**                                                                 **0**

**CJRA Table 8—Report Of Motions Pending Over Six Months**
**For Period Ending March 31, 2020**

**5TH Circuit**

**U.S. District Court for TEXAS SOUTHERN**

**District Judge  CRANE, RANDY**

| Office | Docket Number | NOS Code | Case Title | Motion Text | CJRA Deadline | Status | Status Description |
|---|---|---|---|---|---|---|---|
| 7 | 18-cv-00341 | 430 | Champion v. PlainsCapital Bank | AMENDED [18]   MOTION | 03/10/2020 | B | Opinion/Decision in Draft |
| | | | | Amended MOTION TO DISMISS FOR FAILURE TO STATE A C* | | B | Opinion/Decision in Draft |
| 7 | 19-cv-00064 | 896 | Panasonic Corporation of North America v. Alonzo Cantu | MOTION to Consolidate Lead Case No. 7:19-CV-000064 | 11/22/2019 | C | Settlement Pending |
| | | | | Amended  MOTION to Compel Arbitration | 11/22/2019 | C | Settlement Pending |
| | | | | Opposed MOTION TO DISMISS FOR FAILURE TO STATE A C | 12/07/2019 | C | Settlement Pending |
| | | | | Amended  MOTION to Consolidate Lead Case No. 7:19- | 02/13/2020 | C | Settlement Pending |
| | | | | MOTION for Permanent Injunction | 02/13/2020 | C | Settlement Pending |
| 7 | 19-cv-00130 | 190 | Alonzo Cantu Construction, Inc. v. Panasonic Corporatio | Opposed  MOTION to Remand | 12/15/2019 | C | Settlement Pending |
| | | | | MOTION to Compel Arbitration | 02/13/2020 | C | Settlement Pending |
| 7 | 19-cv-00185 | 190 | Alonzo Cantu Construction, Inc. v. Panasonic Corporatio | Opposed  MOTION to Remand | 01/23/2020 | C | Settlement Pending |

Run :  11/09/2020

862 of 2,269

**CJRA Table 8—Report Of Motions Pending Over Six Months**
**For Period Ending March 31, 2020**

**5TH Circuit**

**U.S. District Court for TEXAS SOUTHERN**

**District Judge  CRANE, RANDY**

| Office | Docket Number | NOS Code | Case Title | Motion Text | CJRA Deadline | Status | Status Description |
|--------|---------------|----------|------------|-------------|---------------|--------|--------------------|
|  |  |  |  | MOTION to Compel Arbitration | 02/13/2020 | C | Settlement Pending |
| 7 | 19-cv-00206 | 190 | Bloom v. LaRosa et al | MOTION to Remand | 02/09/2020 | B | Opinion/Decision in Draft |
|  |  |  |  | MOTION to Compel Ameriprise Financial Services, In | 03/02/2020 | B | Opinion/Decision in Draft |

**Total Cases for District Judge : CRANE, RANDY**                                                        **12**

 * Filed at same time as first item listed in this box in a multi-part motion.  Each multi-part motion is counted as a single motion regardless of the number of parts.

**CJRA Table 8—Report Of Motions Pending Over Six Months**
**For Period Ending March 31, 2020**

**5TH Circuit**

**U.S. District Court for TEXAS SOUTHERN**

**District Judge ALVAREZ, MICAELA**

| Office | Docket Number | NOS Code | Case Title | Motion Text | CJRA Deadline | Status | Status Description |
|--------|---------------|----------|------------|-------------|---------------|--------|--------------------|
| 7 | 18-cv-00356 | 530 | Armstrong v. Davis | MOTION for Summary Judgment with Brief in Suppo | 02/24/2020 | CC | Recently Received from Magistrate Judge on Recommendation |

**Total Cases for District Judge : ALVAREZ, MICAELA**                    **1**

\* Filed at same time as first item listed in this box in a multi-part motion.  Each multi-part motion is counted as a single motion regardless of the number of parts.

**CJRA Table 8—Report Of Motions Pending Over Six Months**
 **For Period Ending March 31, 2020**

---

**5TH Circuit**

**U.S. District Court for TEXAS SOUTHERN**

**District Judge  OLVERA, ROLANDO, JR.**

| Office | Docket Number | NOS Code | Case Title | Motion Text | CJRA Deadline | Status | Status Description |
|---|---|---|---|---|---|---|---|
| | | | | **There are no events of this type to report** | | | |

**Total Cases for District Judge : OLVERA, ROLANDO, JR.**                                    **0**

**CJRA Table 8—Report Of Motions Pending Over Six Months**
**For Period Ending March 31, 2020**

**5TH Circuit**

**U.S. District Court for TEXAS SOUTHERN**

**District Judge  RODRIGUEZ, FERNANDO, JR.**

| Office | Docket Number | NOS Code | Case Title | Motion Text | CJRA Deadline | Status | Status Description |
|---|---|---|---|---|---|---|---|
| 1 | 08-cv-00298 | 210 | UNITED STATES OF AMERICA v. 0.17 ACRES OF LAND, more or | Opposed  MOTION for Final Hearing to (a) Determine | 03/30/2020 | D | Awaiting Materials --Additional Briefs/ Memos --Report & Recommendation -- Findings of Fact & Conclusions of Law |
| 1 | 18-cv-00089 | 710 | Ried v. Asset Protection & Security Services, L.P et al | MOTION to Certify Class | 09/03/2019 | C | Settlement Pending |

**Total Cases for District Judge : RODRIGUEZ, FERNANDO, JR.**                                    **2**

 * Filed at same time as first item listed in this box in a multi-part motion.  Each multi-part motion is counted as a single motion regardless of the number of parts.

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION TO TRANSFER VENUE**

**DECLARATION OF JEFFREY M. WHITE**

CJRA Table 7—Report of Civil Cases Pending Over Three Years for Period Ending
March 31, 2020 (Excerpts)

# EXHIBIT A-3

**5TH Circuit**

**U.S. District Court for TEXAS NORTHERN**

**District Judge KACSMARYK, MATTHEW J.**

| Office | Docket Number | Nature of Suit | Case Title | CJRA Deadline | Status | Status Description |
|--------|--------------|----------------|------------|---------------|--------|-------------------|
| 2 | 15-cv-00285 | Habeas Corpus - Death Penalty | Holberg v. Davis, Director TDCJ-CID | 09/16/2018 | Q | Complexity of Case |

**Total All Cases for District Judge : KACSMARYK, MATTHEW J.**                                      **1**

**5TH Circuit**

**U.S. District Court for TEXAS SOUTHERN**

**District Judge HINOJOSA, RICARDO H.**

| Office | Docket Number | Nature of Suit | Case Title | CJRA Deadline | Status | Status Description |
|--------|---------------|----------------|------------|---------------|--------|--------------------|
| 7 | 09-cv-00143 | Deportation | Morales-Lopez v. Holder | 04/20/2012 | R | Heavy Criminal & Civil Caseload |
| 7 | 13-cv-00366 | Habeas Corpus - Alien Detainee | Barba-Molina v. Napolitano et al | 07/15/2016 | R | Heavy Criminal & Civil Caseload |
| 7 | 15-cv-00435 | Other Civil Rights | Trevino v. Hidalgo County et al | 10/17/2018 | I | Hearing on Motion Necessary |
| 7 | 16-cv-00523 | Trademark | Springboards to Education, Inc. v. McAllen ISD et al | 08/29/2019 | E | Voluminous Briefs/Transcripts To Be Read |
| | | | | | G | Extensive Discovery Involved |
| | | | | | Q | Complexity of Case |
| 7 | 16-cv-00524 | Trademark | Springboards to Education Inc v. Galvan et al | 08/29/2019 | E | Voluminous Briefs/Transcripts To Be Read |
| | | | | | G | Extensive Discovery Involved |
| | | | | | Q | Complexity of Case |
| 7 | 16-cv-00527 | Trademark | Springboards to Education, Inc. v. Mission ISD | 08/29/2019 | E | Voluminous Briefs/Transcripts To Be Read |

**5TH Circuit**

**U.S. District Court for TEXAS SOUTHERN**

**District Judge HINOJOSA, RICARDO H.**

| Office | Docket Number | Nature of Suit | Case Title | CJRA Deadline | Status | Status Description |
|--------|--------------|----------------|------------|---------------|--------|--------------------|
| | | | | | G | Extensive Discovery Involved |
| | | | | | Q | Complexity of Case |
| 7 | 16-cv-00617 | Trademark | Springboards to Education Inc v. IDEA Public Schools et | 10/25/2019 | E | Voluminous Briefs/Transcripts To Be Read |
| | | | | | G | Extensive Discovery Involved |
| | | | | | Q | Complexity of Case |
| 7 | 17-cv-00035 | Personal Injury - Product Liability | Villarreal v. Taro Pharmaceuticals, U.S.A., Inc. | 02/01/2020 | G | Extensive Discovery Involved |
| 7 | 17-cv-00085 | Other Real Property Actions | Villarreal et al v. Wells Fargo Bank, N.A. | 03/17/2020 | V | Change of Counsel |
| | | | | | W | Counsel Asked to Withdraw |

**Total All Cases for District Judge : HINOJOSA, RICARDO H.**                    **9**

**5TH Circuit**

**U.S. District Court for TEXAS SOUTHERN**

**District Judge CRANE, RANDY**

| Office | Docket Number | Nature of Suit | Case Title | CJRA Deadline | Status | Status Description |
|---|---|---|---|---|---|---|
| 7 | 08-cv-00063 | Land Condemnation | United States of America v. 1.66 ACRES OF LAND, more or | 02/08/2011 | Q | Complexity of Case |
| 7 | 08-cv-00176 | Land Condemnation | UNITED STATES OF AMERICA v. 9.19 ACRES OF LAND, more or | 06/21/2011 | Q | Complexity of Case |
| 7 | 08-cv-00207 | Land Condemnation | UNITED STATES OF AMERICA v. 1.71 Acres of Land, More or | 07/01/2011 | Q | Complexity of Case |
| 7 | 16-cv-00510 | Civil Rights Employment | Maldonado et al v. Rodriguez, Jr. et al | 08/24/2019 | Z | Interlocutory Appeal --for cases or motions held pending an interlocutory appeal |
| 7 | 16-cv-00702 | Prisoner Petitions - Vacate Sentence | Nunez v. United States of America | 10/12/2019 | B | Opinion/Decision in Draft |
| 7 | 17-cv-00003 | Prisoner Petitions - Vacate Sentence | De Leon v. United States of America | 01/03/2020 | B | Opinion/Decision in Draft |

**Total All Cases for District Judge : CRANE, RANDY**                 **6**

**5TH Circuit**

**U.S. District Court for TEXAS SOUTHERN**

**District Judge ALVAREZ, MICAELA**

| Office | Docket Number | Nature of Suit | Case Title | CJRA Deadline | Status | Status Description |
|--------|---------------|----------------|------------|---------------|--------|--------------------|
| 7 | 08-cv-00061 | Land Condemnation | United States of America v. 26.744 ACRES OF LAND, more | 02/08/2011 | XX | No Comment on Status |
| 7 | 08-cv-00066 | Land Condemnation | United States of America v. 10.64 ACRES OF LAND, more o | 02/08/2011 | XX | No Comment on Status |
| 7 | 08-cv-00177 | Land Condemnation | UNITED STATES OF AMERICA v. Montalvo et al | 06/21/2011 | XX | No Comment on Status |
| 7 | 08-cv-00202 | Land Condemnation | UNITED STATES OF AMERICA v. Pablo A. Ramirez, Inc., a T | 06/30/2011 | XX | No Comment on Status |
| 7 | 08-cv-00302 | Land Condemnation | United States of America v. 0.094 Acres of Land, More | 10/16/2011 | XX | No Comment on Status |
| 7 | 16-cv-00373 | Prisoner Petitions - Vacate Sentence | Navarro v. United States of America | 06/27/2019 | J | Referred to Magistrate Judge |

**Total All Cases for District Judge : ALVAREZ, MICAELA**                6

**5TH Circuit**

**U.S. District Court for TEXAS SOUTHERN**

**District Judge OLVERA, ROLANDO, JR.**

| Office | Docket Number | Nature of Suit | Case Title | CJRA Deadline | Status | Status Description |
|--------|---------------|----------------|------------|---------------|--------|--------------------|
| 1 | 16-cv-00196 | Other Immigration Actions | Abundis v. Tillerson et al | 08/02/2019 | O | Judicial Officer Action Delayed by Illness |
| 1 | 16-cv-00293 | Habeas Corpus - Alien Detainee | Garcia v. Kerry et al | 11/11/2019 | T | Parties Given Additional Time to File Supplemental Briefs |

**Total All Cases for District Judge : OLVERA, ROLANDO, JR.**                2

**5TH Circuit**

**U.S. District Court for TEXAS SOUTHERN**

**District Judge RODRIGUEZ, FERNANDO, JR.**

| Office | Docket Number | Nature of Suit | Case Title | CJRA Deadline | Status | Status Description |
|--------|---------------|----------------|------------|---------------|--------|--------------------|
| 1 | 08-cv-00159 | Land Condemnation | United States of America v. 0.36 Acres, More or Less, | 05/14/2011 | G | Extensive Discovery Involved |
| 1 | 08-cv-00190 | Land Condemnation | UNITED STATES OF AMERICA v. 1.01 Acres of Land, More or | 05/27/2011 | G | Extensive Discovery Involved |
| 1 | 08-cv-00196 | Land Condemnation | UNITED STATES OF AMERICA v. 0.48 ACRE OF LAND, more or | 05/28/2011 | G | Extensive Discovery Involved |
| 1 | 08-cv-00213 | Land Condemnation | UNITED STATES OF AMERICA v. 0.37 ACRE OF LAND, more or | 05/29/2011 | G | Extensive Discovery Involved |
| 1 | 08-cv-00224 | Land Condemnation | UNITED STATES OF AMERICA v. 1.09 ACRES OF LAND, more or | 06/02/2011 | G | Extensive Discovery Involved |
| 1 | 08-cv-00259 | Land Condemnation | UNITED STATES OF AMERICA v 1.12 Acres of Land et al | 06/12/2011 | G | Extensive Discovery Involved |
| 1 | 08-cv-00269 | Land Condemnation | UNITED STATES OF AMERICA v. 0.31 ACRES OF LAND, more or | 06/14/2011 | G | Extensive Discovery Involved |
| 1 | 08-cv-00329 | Land Condemnation | UNITED STATES OF AMERICA v. 0.74 ACRES OF LAND, more or | 06/27/2011 | G | Extensive Discovery Involved |
| 1 | 08-cv-00343 | Land Condemnation | UNITED STATES OF AMERICA v. 3.51 Acres of land, More or | 06/30/2011 | G | Extensive Discovery Involved |
| 1 | 08-cv-00345 | Land Condemnation | UNITED STATES OF AMERICA v. Quinones et al | 07/01/2011 | G | Extensive Discovery Involved |

**5TH Circuit**

**U.S. District Court for TEXAS SOUTHERN**

**District Judge RODRIGUEZ, FERNANDO, JR.**

| Office | Docket Number | Nature of Suit | Case Title | CJRA Deadline | Status | Status Description |
|--------|---------------|----------------|------------|---------------|--------|--------------------|
| 1 | 08-cv-00349 | Land Condemnation | UNITED STATES OF AMERICA v. 0.09 Acres of Land, More or | 07/01/2011 | G | Extensive Discovery Involved |
| 1 | 08-cv-00361 | Land Condemnation | UNITED STATES OF AMERICA v. 5.58 of Acres of Land, More | 07/07/2011 | G | Extensive Discovery Involved |
| 1 | 08-cv-00378 | Land Condemnation | UNITED STATES OF AMERICA v. 0.87 ACRES OF LAND, more or | 07/19/2011 | G | Extensive Discovery Involved |
| 1 | 08-cv-00416 | Land Condemnation | UNITED STATES OF AMERICA v. 0.16 ACRES OF LAND, more or | 09/02/2011 | G | Extensive Discovery Involved |
| 1 | 08-cv-00467 | Land Condemnation | UNITED STATES OF AMERICA v. 0.14 ACRE OF LAND, more or | 11/05/2011 | G | Extensive Discovery Involved |
| 1 | 10-cv-00186 | Land Condemnation | UNITED STATES OF AMERICA v. 17.924 ACRES OF LAND, MORE | 08/17/2013 | G | Extensive Discovery Involved |

**Total All Cases for District Judge : RODRIGUEZ, FERNANDO, JR.**     **16**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | § | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## APPENDIX IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER VENUE

### DECLARATION OF JEFFREY M. WHITE

Estimates of U.S. Unauthorized Immigrant Population, by Metro Area, 2016 and 2007, Pew Research Center, Mar. 11, 2019 (Amarillo, TX)

# EXHIBIT A-4

Case 2:21-cv-00067-Z   Document 39-1   Filed 05/24/21   Page 35 of 60   PageID 895

*Hispanic Trends*

**MAIN** | **MORE** ▾

MARCH 11, 2019

# Estimates of U.S. unauthorized immigrant population, by metro area, 2016 and 2007

*These estimates of unauthorized immigrant populations in 182 metropolitan areas were derived from a sample of census data, so they have a margin of error. The margins of error are included here as a rough guide to the possible range of the estimates. For example, the estimate of 25,000 for Albuquerque could range from 15,000 to 35,000.*

*Unauthorized immigrants include people who either crossed the border illegally or overstayed their visas. For more, read "20 metro areas are home to six-in-ten unauthorized immigrants in U.S." Additional notes can be found at the bottom of the table.*



| | Amarillo, TX ✕ | | ▾ | | ▼ Filter | ⟳ Reset |

| Metro area | Estimate, 2016 | Margin of error, 2016 | Estimate, 2007 | 2007 to 2016 change | Total, 2016 | Foreign born, 2016 | 2016 | 2007 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Unauthorized immigrant % of … | | Rank of unauthorized immigrant population | |
| Amarillo, TX | 15,000 | +/-5,000 | 10,000 | Not sig. | 5.0% | 40% | 96 | 106 |

Notes: Metropolitan areas are defined using the 2013 definitions for metropolitan statistical areas (MSAs) from the U.S. Office of Management and Budget, as implemented by IPUMS. Areas shown are those estimated to have 20,000 or more total immigrants or 5,000 or more unauthorized immigrants in either 2016 or 2007. Ranks and differences are based on unrounded estimates. See methodology for rounding rules.

Only seven metro areas in 2016 differ significantly from the next smaller area; all are among the top 20 and are marked with **. "Not sig." signifies that the 2007 to 2016 difference is not statistically significant at the 90% confidence level. "N/A" signifies that data are not available and the metro area cannot be identified in the IPUMS data for that year.

Not all metro areas can be adequately identified in the IPUMS data. Three of 107 metro areas with total populations exceeding 500,000 in 2016 are not shown in the table because they cannot be identified in the 2007 or 2016 IPUMS data; these are Tulsa, OK (#55), Madison, WI (#86) and Lexington-Fayette, KY (#106). Among the 112 metro areas with populations between 200,000 and 500,000, 19 are not shown in

**App.035**

Case 2:21-cv-00067-Z    Document 39-1    Filed 05/24/21    Page 36 of 60    PageID 896

the table.

Source: Pew Research Center estimates based on augmented American Community Surveys, 2016 and 2007 (IPUMS).

PEW RESEARCH CENTER

EMBED </>     REPORT     DATA                          © PEW RESEARCH CENTER

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | § | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'**
**MOTION TO TRANSFER VENUE**

**DECLARATION OF JEFFREY M. WHITE**

QuickFacts, Amarillo city, Texas, United States Census Bureau

# EXHIBIT A-5

**QuickFacts**

**Amarillo city, Texas**

QuickFacts provides statistics for all states and counties, and for cities and towns with a *population of 5,000 or more*.

**Table**

| All Topics ▼ | Amarillo city, Texas |
|---|---|
| **Population estimates, July 1, 2019, (V2019)** | **199,371** |
| 👤 **PEOPLE** | |
| **Population** | |
| **Population estimates, July 1, 2019, (V2019)** | **199,371** |
| Population estimates base, April 1, 2010, (V2019) | 190,666 |
| Population, percent change - April 1, 2010 (estimates base) to July 1, 2019, (V2019) | 4.6% |
| Population, Census, April 1, 2010 | 190,695 |
| Population, Census, April 1, 2020 | X |
| **Age and Sex** | |
| Persons under 5 years, percent | ▲ 7.7% |
| Persons under 18 years, percent | ▲ 27.0% |
| Persons 65 years and over, percent | ▲ 13.5% |
| Female persons, percent | ▲ 50.7% |
| **Race and Hispanic Origin** | |
| White alone, percent | ▲ 82.1% |
| Black or African American alone, percent   (a) | ▲ 6.6% |
| American Indian and Alaska Native alone, percent   (a) | ▲ 0.6% |
| Asian alone, percent   (a) | ▲ 4.3% |
| Native Hawaiian and Other Pacific Islander alone, percent   (a) | ▲ 0.3% |
| Two or More Races, percent | ▲ 3.3% |
| Hispanic or Latino, percent   (b) | ▲ 33.1% |
| White alone, not Hispanic or Latino, percent | ▲ 54.0% |
| **Population Characteristics** | |
| Veterans, 2015-2019 | 11,442 |
| Foreign born persons, percent, 2015-2019 | 11.8% |
| **Housing** | |
| Housing units, July 1, 2019, (V2019) | X |
| Owner-occupied housing unit rate, 2015-2019 | 60.5% |
| Median value of owner-occupied housing units, 2015-2019 | $132,500 |
| Median selected monthly owner costs -with a mortgage, 2015-2019 | $1,272 |
| Median selected monthly owner costs -without a mortgage, 2015-2019 | $479 |
| Median gross rent, 2015-2019 | $850 |
| Building permits, 2020 | X |
| **Families & Living Arrangements** | |
| Households, 2015-2019 | 76,319 |
| Persons per household, 2015-2019 | 2.58 |
| Living in same house 1 year ago, percent of persons age 1 year+, 2015-2019 | 81.4% |
| Language other than English spoken at home, percent of persons age 5 years+, 2015-2019 | 24.8% |
| **Computer and Internet Use** | |
| Households with a computer, percent, 2015-2019 | 90.8% |
| Households with a broadband Internet subscription, percent, 2015-2019 | 80.2% |
| **Education** | |
| High school graduate or higher, percent of persons age 25 years+, 2015-2019 | 84.3% |
| Bachelor's degree or higher, percent of persons age 25 years+, 2015-2019 | 23.7% |
| **Health** | |
| With a disability, under age 65 years, percent, 2015-2019 | 7.7% |
| Persons without health insurance, under age 65 years, percent | ▲ 18.8% |
| **Economy** | |
| In civilian labor force, total, percent of population age 16 years+, 2015-2019 | 66.6% |
| In civilian labor force, female, percent of population age 16 years+, 2015-2019 | 59.4% |
| Total accommodation and food services sales, 2012 ($1,000)   (c) | 1,885,522 |

Total health care and social assistance receipts/revenue, 2012 ($1,000)   (c)

| Total manufacturers shipments, 2012 ($1,000)   (c) | |
|---|---|
| Total merchant wholesaler sales, 2012 ($1,000)   (c) | 2,985,141 |
| Total retail sales, 2012 ($1,000)   (c) | 4,067,856 |
| Total retail sales per capita, 2012   (c) | $20,834 |
| **Transportation** | |
| Mean travel time to work (minutes), workers age 16 years+, 2015-2019 | 18.2 |
| **Income & Poverty** | |
| Median household income (in 2019 dollars), 2015-2019 | $52,725 |
| Per capita income in past 12 months (in 2019 dollars), 2015-2019 | $28,274 |
| Persons in poverty, percent | ▲ 15.1% |

### 📊 BUSINESSES

| **Businesses** | |
|---|---|
| Total employer establishments, 2019 | X |
| Total employment, 2019 | X |
| Total annual payroll, 2019 ($1,000) | X |
| Total employment, percent change, 2018-2019 | X |
| Total nonemployer establishments, 2018 | X |
| All firms, 2012 | 17,343 |
| Men-owned firms, 2012 | 9,029 |
| Women-owned firms, 2012 | 5,584 |
| Minority-owned firms, 2012 | 4,750 |
| Nonminority-owned firms, 2012 | 11,540 |
| Veteran-owned firms, 2012 | 1,531 |
| Nonveteran-owned firms, 2012 | 14,520 |

### 🌐 GEOGRAPHY

| **Geography** | |
|---|---|
| Population per square mile, 2010 | 1,917.0 |
| Land area in square miles, 2010 | 99.48 |
| FIPS Code | 4803000 |

About datasets used in this table.

**Value Notes**

⚠ Estimates are not comparable to other geographic levels due to methodology differences that may exist between different data sources.

Some estimates presented here come from sample data, and thus have sampling errors that may render some apparent differences between geographies statistically indistinguishable. Click the Quick Info ⓘ icon to the right of each row in TABLE view to learn about sampling error.

The vintage year (e.g., V2019) refers to the final year of the series (2010 thru 2019). *Different vintage years of estimates are not comparable.*

**Fact Notes**
|  |  |
|---|---|
| **(a)** | Includes persons reporting only one race |
| **(c)** | Economic Census - Puerto Rico data are not comparable to U.S. Economic Census data |
| **(b)** | Hispanics may be of any race, so also are included in applicable race categories |

**Value Flags**
|  |  |
|---|---|
| **-** | Either no or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest or upper interval of an open ended distribution. |
| **F** | Fewer than 25 firms |
| **D** | Suppressed to avoid disclosure of confidential information |
| **N** | Data for this geographic area cannot be displayed because the number of sample cases is too small. |
| **FN** | Footnote on this item in place of data |
| **X** | Not applicable |
| **S** | Suppressed; does not meet publication standards |
| **NA** | Not available |
| **Z** | Value greater than zero but less than half unit of measure shown |

QuickFacts data are derived from: Population Estimates, American Community Survey, Census of Population and Housing, Current Population Survey, Small Area Health Insurance Estimates, Small Area Income and Poverty Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits.

**CONNECT WITH US**
. ✕

Accessibility | Information Quality | FOIA | Data Protection and Privacy Policy | U.S. Department of Commerce

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | § | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'**
**MOTION TO TRANSFER VENUE**

**DECLARATION OF JEFFREY M. WHITE**

Estimates of U.S. Unauthorized Immigrant Population, by Metro Area, 2016 and 2007,
Pew Research Center, Mar. 11, 2019 (Dallas-Fort Worth-Arlington, TX)

# EXHIBIT A-6

Case 2:21-cv-00067-Z   Document 39-1   Filed 05/24/21   Page 42 of 60   PageID 902

*Hispanic Trends*

**MAIN**                                    |                    **MORE** ▾

---

MARCH 11, 2019

# Estimates of U.S. unauthorized immigrant population, by metro area, 2016 and 2007

*These estimates of unauthorized immigrant populations in 182 metropolitan areas were derived from a sample of census data, so they have a margin of error. The margins of error are included here as a rough guide to the possible range of the estimates. For example, the estimate of 25,000 for Albuquerque could range from 15,000 to 35,000.*

*Unauthorized immigrants include people who either crossed the border illegally or overstayed their visas. For more, read "20 metro areas are home to six-in-ten unauthorized immigrants in U.S." Additional notes can be found at the bottom of the table.*

---



| Metro area | Estimate, 2016 | Margin of error, 2016 | Estimate, 2007 | 2007 to 2016 change | Unauthorized immigrant % of ... Total, 2016 | Foreign born, 2016 | Rank of unauthorized immigrant population 2016 | 2007 |
|---|---|---|---|---|---|---|---|---|
| Dallas-Fort Worth-Arlington, TX* | 475,000 | +/-25,000 | 500,000 | Not sig. | 6.7% | 35% | 4 | 5 |

Notes: Metropolitan areas are defined using the 2013 definitions for metropolitan statistical areas (MSAs) from the U.S. Office of Management and Budget, as implemented by IPUMS. Areas shown are those estimated to have 20,000 or more total immigrants or 5,000 or more unauthorized immigrants in either 2016 or 2007. Ranks and differences are based on unrounded estimates. See methodology for rounding rules.

Only seven metro areas in 2016 differ significantly from the next smaller area; all are among the top 20 and are marked with "*". "Not sig." signifies that the 2007 to 2016 difference is not statistically significant at the 90% confidence level. "N/A" signifies that data are not available and the metro area cannot be identified in the IPUMS data for that year.

Not all metro areas can be adequately identified in the IPUMS data. Three of 107 metro areas with total populations exceeding 500,000 in 2016 are not shown in the table because they cannot be identified in the 2007 or 2016 IPUMS data; these are Tulsa, OK (#55), Madison, WI

**App.042**

Case 2:21-cv-00067-Z   Document 39-1   Filed 05/24/21   Page 43 of 60   PageID 903

(#86) and Lexington-Fayette, KY (#106). Among the 112 metro areas with populations between 200,000 and 500,000, 19 are not shown in the table.

Source: Pew Research Center estimates based on augmented American Community Surveys, 2016 and 2007 (IPUMS).

PEW RESEARCH CENTER

EMBED </>     REPORT     DATA

© PEW RESEARCH CENTER

**App.043**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'**
**MOTION TO TRANSFER VENUE**

**DECLARATION OF JEFFREY M. WHITE**

Notice of Voluntary Dismissal Without Prejudice, ECF No. 25, *K.P.P.R. v. Mayorkas*

# EXHIBIT A-7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

K.P.P.R., A.J.V.P, A.C.C.C., A.C.C.C., R.C.A.P., J.R.A.M., R.C.A.M., J.S.S.S., R.R.S., J.M.A., K.J.P.M., E.M.C., A.B.C.C., O.D.C.C., C.J.C.C., D.C.M.V., G.J.M.V., Y.A.C.B., D.J.U.V., W.R.O.P., E.J.M.A., J.A.B.M., O.W.J.M., individually, and on behalf of all Class members,

     *Plaintiffs*,

     v.

Alejandro Mayorkas, Secretary of the Department of Homeland Security; Troy Miller, Senior Official Performing Duties of the Commissioner of U.S. Customs and Border Protection; Monty Wilkinson, Acting Attorney General; Joseph Robinette Biden Jr., President of the U.S.

     *Defendants*.

Case No. 4:21-cv-7

Date: April 27, 2021

---

### NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE

---

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), Plaintiffs, K.P.P.R., A.J.V.P, A.C.C.C., A.C.C.C., R.C.A.P., J.R.A.M., R.C.A.M., J.S.S.S., R.R.S., J.M.A., K.J.P.M., E.M.C., A.B.C.C., O.D.C.C., C.J.C.C., D.C.M.V., G.J.M.V., Y.A.C.B., D.J.U.V., W.R.O.P., E.J.M.A., J.A.B.M., O.W.J.M., individually, and on behalf of all Class members, by and through counsel, submits

1

this notice of voluntary dismissal of Plaintiffs' Complaint (ECF No. 1). Plaintiffs

maintain that dismissal is appropriate because the Department of Homeland Security

("DHS") has paroled all Plaintiffs into the United States and has released them from

immigration custody, effectively granting the relief that Plaintiffs have requested in

their Complaint. Accordingly, the issues in this case are now moot, and as such, this

Court should dismiss Plaintiffs' Complaint without prejudice.

Respectfully submitted,

*/s/ Raed Gonzalez*

_____

Raed Gonzalez, Esq.
*Counsel of Record for Plaintiff*
Texas Bar No. 24010063
2200 Southwest Freeway, Suite 120
Houston, Texas 77098
Phone: (713) 481-3040
Fax: (713) 588-8683
rgonzalez@gonzalezolivierillc.com

**App.046**

## CERTIFICATE OF SERVICE

I hereby certify a true copy of the foregoing Notice of Voluntary Dismissal was served on Defendants and Defendants' counsel via the Court's electronic filing system on April 27, 2021.


Respectfully submitted,

*/s/ Raed Gonzalez*

_____
Raed Gonzalez, Esq.
*Counsel of Record for Plaintiff*

**App.047**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## APPENDIX IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER VENUE

## DECLARATION OF JEFFREY M. WHITE

Order, ECF No. 39, *Turcios v. Wolf*

# EXHIBIT A-8

United States District Court
Southern District of Texas
**ENTERED**
October 16, 2020
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

WILMER RAMIRO ENRIQUEZ TURCIOS, §
individually, and on behalf of ELBA §
GUERRERO ALVARADO, JOSUE §
ENRIQUEZ, and JOSE ENRIQUEZ, §
     Plaintiffs, §
      §
v. §     Civil Action No. 1:20-cv-00093
      §
CHAD WOLF, ACTING SECRETARY §
OF THE DEPARTMENT OF HOMELAND §
SECURITY, *et al.*, §
     Defendants. §

## <u>ORDER</u>

The following pleadings are before the Court: "Plaintiffs' Emergency Motion for Preliminary Injunction" ("MPI") (Docket No. 6), "Defendants' Response to Plaintiffs' Motion for a Mandatory Preliminary Injunction (Docket No. 13), "Defendants' Supplemental Brief" (Docket No. 31) and "Defendants' Surreply" (Docket No. 37). For the following reasons, Plaintiffs' MPI (Docket No. 6) is **GRANTED**.

## I.    FACTUAL BACKGROUND

Wilmer Ramiro Enriquez Turcios[1] ("Wilmer") sues individually and on behalf of his spouse, Elba Guerrero Alvarado ("Elba"), and their two minor children, Josue Enriquez, and Jose Enriquez ("children") (collectively "Plaintiffs"). Elba and the children departed Honduras to seek asylum in the U.S. Docket No.1, Exhibit 1. Elba and the children entered the U.S. without inspection near McAllen, Texas. Docket No. 13. After being apprehended by U.S. Customs and Border Patrol agents ("CBP agents"), Elba and the children were placed in removal proceedings under 8 U.S.C. § 1229(a) and processed for return to Mexico under the Migrant Protection Protocol ("MPP").[2] *Id.* Elba told CBP agents she feared being sent to Matamoros, Mexico ("Matamoros"),

---

[1] Wilmer fled Honduras before Elba and the children. Docket No. 1. He applied for asylum prior to the existence of MPP; he currently resides in the U.S.

[2] In January 2019, the U.S. Department of Homeland Security ("DHS") promulgated the MPP without the standard notice-and-comment rulemaking period. The MPP provides that non-Mexican asylum seekers arriving at the U.S. southern border be "returned to Mexico for the duration of their immigration proceedings, rather than either being detained for expedited or regular removal proceedings or issued notices to appear for regular removal proceedings."

**App.049**

because of its high level of crime and requested to remain in the U.S. *Id.* Elba's request was denied, and she and the children were sent to Matamoros to await their next court hearing. *Id.*

Plaintiffs filed a motion for a preliminary injunction seeking to enjoin Elba and the children's placement in the MPP. Docket No. 6. Plaintiffs request to await the adjudication of their asylum claims in the U.S. *Id.*

## II.     LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must clearly show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *See Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 457 (5th Cir. 2017).

## III.    DISCUSSION

A.     Plaintiffs are likely to succeed on the merits.

Plaintiffs challenge the MPP on several grounds. Plaintiffs argue the MPP does not apply to them, because it is inconsistent with Section 235(b) of the Immigration and Nationality Act ("INA") ( "8 U.S.C. § 1225(b)"), and for that reason, they should be allowed to await the adjudication of their asylum claims in the U.S.[3] Docket No. 6. The Court agrees.

The essential feature of the MPP is that non-Mexican asylum seekers who arrive at a port of entry along the U.S.'s southern border must be returned to Mexico to await the adjudication of their asylum application. *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1082 (9th Cir. 2020). Asylum seekers (or "applicants") fall into one of two statutory categories, 8 U.S.C. § 1225(b)(1) ("(b)(1)") or § 1225(b)(2) ("(b)(2)"). Section (b)(2) allows applicants to be removed to Mexico while they await their asylum hearing, but (b)(1) does not provide for removal of applicants to Mexico. § 1225(b)(1) *et seq*. That said, the MPP subjects both (b)(1) and (b)(2) applicants to

---

*Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1077 (9th Cir. 2020) (quoting *Innovation Law Lab v. Nielsen*, 366 F. Supp. 3d 1110, 1114 (N.D. Cal. 2019) (quotation marks omitted)).

[3] Because the Court finds the MPP does not apply to Plaintiffs under their INA claims, the Court declines to consider Plaintiffs' other claims. Plaintiffs also allege: (1) their removal to Mexico violates the Government's non-refoulment duties under Art. III of the U.N.H.C.R.; 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 208.16; (2) the MPP was implemented in violation of the Administrative Procedure Act's notice and comment period; (3) the MPP is arbitrary, capricious, and unlawful; (4) the MPP violates Plaintiffs' Fifth Amendment due process rights; and (5) the MPP violates Plaintiffs' Fifth Amendment rights to equal protection under the law. Docket Nos. 1 and 6.

**App.050**

removal to Mexico.  In summary, because section (b)(1) does not provide for removal to Mexico, and Plaintiffs are (b)(1) applicants, they were improperly removed to Mexico.

The relevant text of § 1225 states:

**8 U.S.C. § 1225 (b)(1)**

**(b) Inspection of applicants for admission**
**(1) Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled**
**(ii) Claims for asylum**
If an immigration officer determines that an alien ... is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).
...
**(B) Asylum interviews**
...
**(ii) Referral of certain aliens**
If the [asylum] officer determines at the time of the interview that an alien has a credible fear of persecution ..., the alien shall be detained for further consideration of the application for asylum.

**8 U.S.C. § 1225 (b)(2)**

**(2) Inspection of other aliens**
**(A) In general**
Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.
**(B) Exception**
Subparagraph (A) shall not apply to an alien —
**(i)** who is a crewman
**(ii)** to whom paragraph (1) applies, or
**(iii)** who is a stowaway.
**(C) Treatment of aliens arriving from contiguous territory**
In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

i.        The Supreme Court found sections (b)(1) and (b)(2) distinct.

The Supreme Court distinguished (b)(1) and (b)(2) applicants, finding they fall into two separate categories:

**App.051**

> [A]pplicants for admission fall into one of two categories, those covered by §
> 1225(b)(1) and those covered by § 1225(b)(2). Section 1225(b)(1) applies to aliens
> initially determined to be inadmissible due to fraud, misrepresentation, or lack of
> valid documentation. ...   Section 1225(b)(2) is broader.   It serves as a catchall
> provision that applies to all applicants for admission **not covered by § 1225(b)(1).**

*Jennings v. Rodriguez*, —— U.S. ——, 138 S. Ct. 830, 837, 200 L.Ed.2d 122 (2018) (emphasis

added) (citations omitted).   Defendants ("Government") maintain DHS, in its discretion, may

apply the procedures specified in (b)(2) to a (b)(1) applicant.   Relying on the Supreme Court's

language in *Jennings*, this Court holds the relevant statutes are not ambiguous, and further that the

Government's position contradicts the statute's text.[4]

> ii.   Sections (b)(1) and (b)(2) describe two distinct categories of applicants and two
>       distinct procedures for removal.

Under 8 U.S.C. § 1225, there are two distinct categories of alien applicants for admission,

(b)(1) applicants and (b)(2) applicants.   § 1225(a).   Applicants described in (b)(1) can be

inadmissible to the U.S. for presenting fraudulent travel documents (§ 1182(a)(6)(C)) or not having

travel documents (§ 1182(a)(7)).   Applicants described in (b)(2) are in a separate category; they

are "other aliens" (§ 1225(b)(2) (heading) "to whom paragraph [(b)](1)" does not apply.   §

1225(b)(2)(B)(ii).   Applicants under (b)(2) include aliens with "a communicable disease of public

health significance" or who are "drug abuser[s] or addict[s]" (§ 1182(a)(1)(A)(i), (iv));   aliens

who have "committed ... a crime involving moral turpitude" or who have "violat[ed] ... any law or

regulation ... relating to a controlled substance" (§ 1182(a)(2)(A)(i));   aliens who "seek to enter

the United States ... to violate any law of the United States relating to espionage or sabotage," or

who have "engaged in a terrorist activity" (§ 1182(a)(3)(A), (B));   aliens who are "likely ... to

become a public charge" (§ 1182(a)(4)(A));   and aliens who are alien "smugglers" (§

1182(a)(6)(E)).

Both (b)(1) and (b)(2) applicants are subject to distinct removal proceedings under 8 U.S.C.

§ 1229a.   *See* 8 C.F.R. § 208.30(f).   A (b)(2) applicant may be "return[ed]" to a "territory

---

[4] The Government also relies on a recent decision where the BIA found, "for aliens who are eligible for expedited
removal under § 1225(b)(1), DHS retains discretion to place them in expedited removal or full removal proceedings."
*Matter of M-D-C-V-*, 28 I. & N. Dec. at 22. n.6 (citing *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 523 (BIA
2011)).   The Government alleges this Court is bound by the BIA's decision through *Chevron* deference.   Docket No.
31.   Yet in the Fifth Circuit, BIA decisions are entitled to *Chevron* deference only when the decision is interpreting an
ambiguous statute.   *Rodriguez-Avalos v. Holder*, 788 F.3d 444, 449 (5th Cir. 2015).   This Court will not afford
*Chevron* deference to a statute that is not ambiguous.

**App.052**

contiguous to the United States" pending their regular removal proceeding. *See* § 1225(b)(2)(C). The Court notes there is no comparable "return" procedure specified in (b)(1). The statutory question posed by the MPP is whether a (b)(1) applicant may be "returned" to a contiguous territory under (b)(2)(C). *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1084 (9th Cir. 2020). A plain reading of the statute confirms a (b)(1) applicant should not be "returned" outside the U.S.

Section (b)(1) contains no language that a (b)(1) applicant is subject to the "return" procedure set forth in (b)(2)(C). Likewise, Section (b)(2) contains no language addressing a (b)(1) applicant's "return" under § 1225(b)(2)(C). Section (b)(1) applicants are mentioned only once in (b)(2), in subparagraph (B)(ii); that subparagraph specifies that subparagraph (A)—which automatically entitles (b)(2) applicants to removal proceedings—does not apply to (b)(1) applicants. The return-to-a-contiguous-territory provision of (b)(2)(C) is thus available for only (b)(2) applicants. Being an applicant in removal proceedings *does not change the applicant's underlying category*. *Innovation Law Lab*, 951 F.3d 1073, 1084 (emphasis added). The statute's language does not explicitly provide for nor does its construction suggest a (b)(1) applicant becomes a (b)(2) applicant, or vice versa, by being placed in removal proceedings. *Id.*

iii.   Plaintiffs' claims are not barred by the Administrative Procedure Act ("APA").

The Government also contends Plaintiffs' claims are barred by the APA because Plaintiffs are challenging a discretionary decision by DHS (to return Plaintiffs to Mexico for the rest of their removal proceedings), and therefore the challenge is not reviewable. *See* Docket No. 31 at 7-9. The Government relies on 8 U.S.C. § 1252(a)(2)(B)(ii), which provides a reviewing court cannot review any discretionary decision taken by an agency. *Id.* at 8-9.

That said, an APA claim challenging the expansion and implementation of the MPP to individuals is reviewable by the district courts. *See Nora v. Wolf*, 2020 WL 3469670, at *7 (D.D.C., 2020) (citing to *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1287 (D.C. Cir. 2016) (differentiating between a discrete agency action and the broader ongoing policy underlying that action); *Cruz v. Dep't of Homeland Sec.*, 2019 WL 8139805, at *3 (D.D.C., 2019) (finding that "the Court has jurisdiction to consider this claim because it concerns the legality of the [MPP] program itself rather than the substance of the Attorney General's discretionary choices," and the Court also has jurisdiction over plaintiffs' due process and equal protection claims); *Innovation Law Lab v. Nielsen*, 366 F.Supp.3d 1110, 1118 (N.D. Cal., 2019) (finding that the threshold question of whether applying the MPP violates the APA is justiciable and 8 U.S.C. § 1252(a) does not bar judicial

App.053

review).  For these reasons, the Government's claim that § 1252(a)(2)(B)(ii) precludes judicial review is erroneous.  Thus, Plaintiffs have satisfied the first element required for an injunction.

      B.      Plaintiffs will be irreparably harmed if an injunction is not granted.

Plaintiffs will be irreparably harmed if an injunction is not granted. The family is separated. Wilmer, the father, awaits adjudication in the U.S.  Elba and the children are in Matamoros, Tamaulipas, Mexico.  The U.S. Department of State ("DOS") issued a Level 4 travel warning for the state of Tamaulipas.[5] DOS warns armed criminal groups patrol Tamaulipas, often acting illegally without repercussions from law enforcement.  *Id.*  The criminal activity includes gun battles, murder, armed robbery, carjacking, kidnapping, forced disappearances, extortion, and sexual assault.[6]  U.S. government employees are instructed to travel to Tamaulipas only in the limited areas between the U.S. consulates and ports of entry.[7] In addition, U.S. government employees are forbidden from using freeways to travel between cities in Tamaulipas.

Plaintiffs allege the following: Elba and the children are living in a shelter in Matamoros. Docket No. 6.  Drug cartel members fired weapons near the shelter, which prompted Mexican national police to intervene, causing a shootout.  *Id.*  Elba and her children also live in unsanitary conditions hazardous to their health.  The shelter houses 150 adults and children.  *Id.*  There is one restroom, which males and females share, and the facility is crowded, making it impossible to practice safe social distancing during the ongoing coronavirus ("COVID-19") pandemic. *Id.* There are no tests for COVID-19 available, and no one at the shelter is being provided with gloves or masks to prevent spreading the disease.  *Id.*  The shelter is infested with rats.  *Id.*  Besides being separated from Wilmer, Elba and the children are at risk of becoming seriously ill or being injured by Cartel violence. Plaintiffs have satisfied the second element required for an injunction.

      C.      The balance of equities weighs in favor of Plaintiffs.

Balancing equities involves determining whether the "substantial injury [to Plaintiffs] outweighs the threatened harm to the party whom [the Plaintiffs] seek to enjoin…" *See Tex. Med.*

---

[5]     U.S.   Department   of   State  –   Department   of   Consular   Affairs, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html#:~:text=Tamaulipas%20state%20%E2%80%93%20Do%20Not%20Travel&text=Organized%20crime%20activity%20%E2%80%93%20including%20gun,border%20and%20in%20Ciudad%20Victoria. The Level 4 designation   has   been   given   to   countries   such   as   Syria   and   Afghanistan.   (*See* https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/afghanistanadvisory. html).

[6]     OSAC,  *Mexico  2019  Crime  and  Safety  Report:  Matamoros*  (Apr.  2,  2019), https://www.osac.gov/Content/Report/03b73ba8-0cd3-4772-bc97-15f4aebfc985.

[7]     Department   of   State,   *Mexico   Travel   Advisory*   (Dec.   17,   2019), travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html.

**App.054**

*Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012) (brackets and citations omitted).

The Government will not be harmed by allowing Elba and the children to join Wilmer and enter the U.S. for the pendency of their asylum claim adjudications. Plaintiffs are not a threat to national security. Because, the equities weigh in favor of Plaintiffs, they have satisfied the third element required for an injunction.

     D.     The public interest weighs in favor of granting an injunction.

The public interest is served when the U.S. immigration law is applied properly (as explained above) and when families await their asylum adjudication together. There is no consistent rationale why Elba and the children cannot join Wilmer in the U.S. Plaintiffs thus meet the fourth and final prong for injunctive relief.

## IV.    CONCLUSION

Because all four elements of the preliminary injunction were met, Plaintiffs' MPI (Docket No. 6) is **GRANTED**. The Court holds Plaintiffs are (b)(1) applicants and not subject to the MPP. Thus, Plaintiffs may await the adjudication of their asylum claims in the U.S.

Signed on this ___16th___ day of ___October___, 2020.

_____
Rolando Olvera
United States District Judge

App.055

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'**
**MOTION TO TRANSFER VENUE**

**DECLARATION OF JEFFREY M. WHITE**

Docket Sheet, *Doe v. Barr*

# EXHIBIT A-9

# U.S. District Court
## SOUTHERN DISTRICT OF TEXAS (Brownsville)
## CIVIL DOCKET FOR CASE #: 1:19-cv-00213

Doe v. Barr et al                                    Date Filed: 11/20/2019
Assigned to: Judge Fernando Rodriguez, Jr           Date Terminated: 03/12/2020
Related Case: 7:19-cv-00389                          Jury Demand: None
Cause: 28:1651 Petition for Writ of Habeas Corpus   Nature of Suit: 463 Habeas Corpus - Alien
                                                     Detainee
                                                     Jurisdiction: U.S. Government Defendant

**Petitioner**

**Jane Doe**                        represented by   **Natalie Lauren Cadwalader-Schultheis**
                                                     South Texas Pro Bono Asylum
                                                     Representation Project
                                                     South Texas Pro Bono Asylum
                                                     Representation Project
                                                     202 S. 1st St.
                                                     Ste. 300
                                                     Harlingen, TX 78550
                                                     956-425-9231
                                                     Fax: 956-425-9233
                                                     Email: natalie.cadwalader@abaprobar.org
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Richard Isaac Newman**
                                                     PO Box 931
                                                     Harlingen, TX 78551
                                                     7184196202
                                                     Email: rnewman0905@gmail.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**William Pelham Barr**             represented by   **Christopher D Pineda**
*Attorney General of the United States*             United States Attorneys Office
                                                     600 E. Harrison
                                                     Suite 201
                                                     Brownsville, TX 78520
                                                     956-548-2554
                                                     Fax: 956-548-2776
                                                     Email: christopher.pineda@usdoj.gov
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**App.057**

Case 2:21-cv-00067-Z   Document 39-1   Filed 05/24/21   Page 58 of 60   PageID 918

**James McHenry**                                  represented by   **Christopher D Pineda**
*Director of the Executive Office for*                              (See above for address)
*Immigration Review*                                               *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

__Defendant__

**Chad Wolf**                                      represented by   **Christopher D Pineda**
*Acting Secretary of the Department of*                            (See above for address)
*Homeland Security*                                                *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

__Defendant__

**Mark Morgan**                                    represented by   **Christopher D Pineda**
*Acting Commissioner of CBP*                                       (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

__Defendant__

**Matthew T Albence**                              represented by   **Christopher D Pineda**
*Acting Director of ICE*                                           (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

__Defendant__

**Kenneth T. Cuccinelli**                          represented by   **Christopher D Pineda**
*Acting Director of USCIS*                                         (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

__Defendant__

**Tater Ortiz**                                    represented by   **Christopher D Pineda**
*Port Director*                                                    (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/20/2019 | 1 | COMPLAINT against All Defendants filed by Jane Doe. (Attachments: # 1 Affidavit Cadwalader statement, # 2 Affidavit Sepulveda statement, # 3 Civil Cover Sheet, # 4 Proposed Order)(Newman, Richard) Modified on 12/9/2019 (dnoriega, 1). (Entered: 11/20/2019) |
| 11/20/2019 | 2 | Request for Issuance of Summons as to William Pelham Barr, filed.(Newman, Richard) (Entered: 11/20/2019) |
| 11/20/2019 | 3 | Request for Issuance of Summons as to chad wolf, filed.(Newman, Richard) (Entered: 11/20/2019) |
| 11/20/2019 | 4 | First SEALED EMERGENCY MOTION *for Temporary Restraining Order* by Jane Doe, filed. (Attachments: # 1 Proposed Order) (Newman, Richard) Modified on 12/9/2019 (dnoriega, 1). (Entered: 11/20/2019) |
| 11/20/2019 | 5 | Summons Issued as to William Pelham Barr, U.S. Attorney and U.S. Attorney General. Issued summons returned to plaintiff via: ECF, filed.(klopez, 7) (Entered: 11/20/2019) |

**App.058**

| 11/20/2019 | [6](#) | Summons Issued as to Chad Wolf, U.S. Attorney and U.S. Attorney General. Issued summons returned to plaintiff via: ECF, filed.(klopez, 7) (Entered: 11/20/2019) |
| 11/20/2019 | [7](#) | First MOTION/APPLICATION to Proceed In Forma Pauperis, EMERGENCY MOTION( Motion Docket Date 12/11/2019.) by Jane Doe, filed. (Attachments: # [1](#) Supplement AO240 form)(Newman, Richard) Modified on 12/9/2019 (dnoriega, 1). (Entered: 11/20/2019) |
| 11/20/2019 | [8](#) | MOTION to Seal Petitioner's name and identity( Motion Docket Date 12/11/2019.), MOTION to use a pseudonym, EMERGENCY MOTION by Jane Doe, filed. (Newman, Richard) Modified on 12/9/2019 (dnoriega, 1). (Entered: 11/20/2019) |
| 11/20/2019 | [9](#) | ORDER TO TRANSFER CASE to Brownsville Division (Signed by Judge Randy Crane) Parties notified.(klopez, 7) (Entered: 11/20/2019) |
| 11/20/2019 | | Intradistrict Transfer to Brownsville Division, filed. (klopez, 7) (Entered: 11/20/2019) |
| 11/20/2019 | [10](#) | NOTICE of Appearance by Christopher D. Pineda on behalf of Matthew T Albence, William Pelham Barr, Kenneth T. Cuccinelli, James McHenry, Mark Morgan, Tater Ortiz, Chad Wolf, filed. (Pineda, Christopher) (Entered: 11/20/2019) |
| 11/20/2019 | [11](#) | ORDER denying [4](#) Emergency Motion for Temporary Restraining Order and Stay of Removal (Signed by Judge Fernando Rodriguez, Jr) Parties notified.(bespinoza, 1) (Entered: 11/20/2019) |
| 11/20/2019 | | Case transferred in from McAllen Division on 11/20/2019 ; Case Number 7:19-cv-389. (ltien, 4) (Entered: 12/10/2019) |
| 12/03/2019 | [12](#) | Improper Service Letter by William Pelham Barr, James McHenry, Mark Morgan, Tater Ortiz, Chad Wolf, filed.(Pineda, Christopher) (Entered: 12/03/2019) |
| 12/03/2019 | [13](#) | Second MOTION/APPLICATION to Proceed In Forma Pauperis by Jane Doe, filed. Motion Docket Date 12/24/2019. (Attachments: # [1](#) Unredacted attachment AO240 form) (Newman, Richard) Modified on 12/9/2019 (dnoriega, 1). (Entered: 12/03/2019) |
| 12/09/2019 | [14](#) | ORDER granting [13](#) Motion for Leave to Proceed In forma pauperis. It is ordered that Petitioner is permitted to proceed in forma pauperis in this Court.(Signed by Judge Fernando Rodriguez, Jr) Parties notified.(dnoriega, 1) (Entered: 12/09/2019) |
| 12/09/2019 | [15](#) | ORDER granting [8](#) Motion to Seal. It is ordered that Petitioner's name in this case be changed to Jane Doe; and Ordered that any and all court records which could be used by the public to identify Petitioner be sealed.(Signed by Judge Fernando Rodriguez, Jr) Parties notified.(dnoriega, 1) (Entered: 12/09/2019) |
| 01/31/2020 | [16](#) | Unopposed MOTION for Extension of Time to File Responsive Pleading as to Plaintiff's Complaint by Matthew T Albence, William Pelham Barr, Kenneth T. Cuccinelli, James McHenry, Mark Morgan, Tater Ortiz, Chad Wolf, filed. Motion Docket Date 2/21/2020. (Attachments: # [1](#) Proposed Order)(Pineda, Christopher) (Entered: 01/31/2020) |
| 02/03/2020 | [17](#) | ORDER granting [16](#) Motion for Extension of Time; Answer due for All Defendants. (Signed by Judge Fernando Rodriguez, Jr) Parties notified.(balvina, 1) (Entered: 02/03/2020) |
| 02/14/2020 | [18](#) | Joint MOTION to Abate by Matthew T Albence, William Pelham Barr, Kenneth T. Cuccinelli, James McHenry, Mark Morgan, Tater Ortiz, Chad Wolf, filed. Motion Docket Date 3/6/2020. (Attachments: # [1](#) Proposed Order)(Pineda, Christopher) (Entered: 02/14/2020) |
| 02/18/2020 | [19](#) | ORDER granting [18](#) Joint MOTION to Abate All Deadlines for Thirty Days ( Answer due by 3/17/2020 )(Signed by Judge Fernando Rodriguez, Jr) Parties notified.(balvina, 1) |

| | | |
|---|---|---|
| | | (Entered: 02/18/2020) |
| 03/11/2020 | 20 | STIPULATION of Dismissal *Without Prejudice* by Matthew T Albence, William Pelham Barr, Kenneth T. Cuccinelli, James McHenry, Mark Morgan, Tater Ortiz, Chad Wolf, filed. (Attachments: # 1 Proposed Order)(Pineda, Christopher) (Entered: 03/11/2020) |
| 03/12/2020 | 21 | ORDER re: 20 STIPULATION of Dismissal Without Prejudice. The Clerk's Office is ordered to terminate this case. Case terminated on 3/12/2020 (Signed by Judge Fernando Rodriguez, Jr) Parties notified.(balvina, 1) (Entered: 03/12/2020) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/21/2021 15:33:52 | | |
| **PACER Login:** | ExecutiveOAG:2768233:0 | **Client Code:** |  |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-cv-00213 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

**App.060**