**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**VOLUME I OF II**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | ) | |
| | ) | |
| THE STATE OF MISSOURI, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-CV-00067-Z |
| | ) | |
| JOSEPH R. BIDEN, JR., | ) | |
| in his official capacity as | ) | |
| President of the United States of | ) | |
| America; | ) | |
| | ) | |
| ALEJANDRO MAYORKAS, | ) | |
| in his official capacity as | ) | |
| Secretary of the United States | ) | |
| Department of Homeland Security; | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HOMELAND SECURITY; | ) | |
| | ) | |
| TROY MILLER, | ) | |
| in his official capacity as | ) | |
| Acting Commissioner of the | ) | |
| United States Customs and Border | ) | |
| Protection; | ) | |
| | ) | |
| UNITED STATES CUSTOMS AND BORDER | ) | |
| PROTECTION; | ) | |
| | ) | |
| TAE JOHNSON, | ) | |
| in his official capacity as | ) | |
| Acting Director of the | ) | |
| United States Immigration and | ) | |
| Customs Enforcement; | ) | |
| | ) | |
| UNITED STATES IMMIGRATION AND | ) | |
| CUSTOMS ENFORCEMENT; | ) | |
| | ) | |
| TRACY RENAUD, | ) | |
| in her official capacity as | ) | |
| Acting Director of the United States | ) | |

Citizenship and Immigration Services; and    )
                                              )
UNITED STATES CITIZENSHIP AND                 )
IMMIGRATION SERVICES,                         )
                                              )
                          *Defendants.*       )

## DECLARATION OF WYATT SULING

1.  My name is Wyatt Suling.  I am a professional researcher and data analyst for the Missouri Attorney General's Office.  I am over 21 years of age and competent to testify to the matters asserted herein.

2.  Attached hereto as Exhibit 1 is a true and correct copy of the Department of Homeland Security's publication, *Assessment of the Migrant Protection Protocols (MPP)*, dated October 28, 2019, which is publicly available on DHS's website at https://www.dhs.gov/sites/default/files/publications/assessment_of_the_migrant_protecti on_protocols_mpp.pdf.

3.  Attached hereto as Exhibit 2 is a true and correct copy of the Department of Homeland Security's press release dated Dec. 20, 2018, and entitled *Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration*, which is publicly available on DHS's website at https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration.

4.  Attached hereto as Exhibit 3 is a true and correct copy of the Memorandum of Secretary Kirstjen M. Nielsen entitled "Policy Guidance for Implementation of the Migrant Protection Protocols," dated Jan. 25, 2019, which is publicly available on DHS's website at https://www.dhs.gov/publication/policy-guidance-implementation-migrant-protection-protocols.

5.  Attached hereto as Exhibit 4 is a true and correct copy of the Jan. 28, 2019 memorandum entitled "MPP Guiding Principles," which is publicly available at https://www.dhs.gov/publication/policy-guidance-implementation-migrant-protection-protocols.

6.  Attached hereto as Exhibit 5 is a true and correct copy of the Jan. 20, 2021 memorandum from Acting Secretary David Pekoske entitled "Suspension of Enrollment in the Migrant Protection Protocols Program," which is publicly filed on the U.S. Supreme Court's docket at https://www.supremecourt.gov/DocketPDF/19/19-1212/167806/20210201143843402_19-1212%20Innovation%20Law%20Lab%20-%20Motion%20to%20Hold%20in%20Abeyance%20-%20FINAL.pdf.

7.  Attached hereto as Exhibit 6 is a true and correct copy of the March 16, 2021 Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border, which is publicly available on DHS's website at

https://www.dhs.gov/news/2021/03/16/statement-homeland-security-secretary-alejandro-n-mayorkas-regarding-situation.

8. Attached hereto as Exhibit 7 is a true and correct copy of the March 31, 2021 news article entitled "Border Patrol official expects more than 1 million migrant encounters this year," which is publicly available on Fox News's website at https://www.foxnews.com/politics/more-than-1-million-migrants-expected-us-border-2021.

9. In May 2021, the U.S. Customs and Border Protection reported 173,348 southwest border land encounters during March 2021 and 178,622 in April, a month-over-month increase of 3.04%. U.S. Customs and Border Protection, *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters. These included 18,960 encounters with unaccompanied children for March and another 17,171 in April 2021. *See id.* The overall number of border encounters in April 2021 exceeds the April 2019 influx by 63.25% and appears to be the highest recorded number of April encounters since at least 2000. *See id.* A true and correct copy of this report is attached hereto as Exhibit 8.

10. Attached hereto as Exhibit 9 is a true and correct copy of the April 1, 2021 news article entitled "Migrants freed without court notice – sometimes no paperwork," which is publicly available on the Associated Press's website at https://apnews.com/article/migrants-freed-without-court-notice-paperwork-9ace3e41e0acadac7cece17c83a8f7ff.

11. Attached hereto as Exhibit 10 is a true and correct copy of the March 23, 2021 news article entitled "Ex-DHS Chief Says Biden Was Warned About Dismantling Trump's Border Policies," which is publicly available on National Public Radio's website at https://www.npr.org/2021/03/23/980272165/ex-dhs-chief-says-biden-was-warned-about-dismantling-trumps-border-policies.

12. Attached hereto as Exhibit 11 is a true and correct copy of the April 1, 2021 opinion entitled "The Real Reason for the Border Crisis," which is publicly available on the New York Times's website at https://www.nytimes.com/2021/04/01/opinion/us-migrants-jobs.html.

13. Attached hereto as Exhibit 12 is a true and correct copy of the March 3, 2019 news article entitled " 'You Have to Pay With Your Body,' " which is publicly available on the New York Times's website at https://www.nytimes.com/2019/03/03/us/border-rapes-migrant-women.html.

14. Attached hereto as Exhibit 13 is a true and correct copy of the December 2016 report entitled "Human Trafficking by the Numbers: The Initial Benchmark of Prevalence and Economic Impact for Texas," which is publicly available on the University of Texas's website at https://globalinitiative.net/wp-content/uploads/2018/01/Human-trafficking-by-the-numbers.pdf.

15. Attached hereto as Exhibit 14 is a true and correct copy of the Department of Homeland Security's publication, *DHS Announces Process to Address Individuals in Mexico with Active MPP Cases*, dated February 11, 2021, which is publicly available on DHS's website at https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

16. Attached hereto as Exhibit 15 is a true and correct copy of Polaris Project's publication, *The Latino Face of Human Trafficking and Exploitation in the United States*, which is publicly available on Polaris Project's website at https://polarisproject.org/wp-content/uploads/2020/04/EXECUTIVE-SUMMARY-The-Latino-Face-of-Human-Trafficking-and-Exploitation-in-the-United-States.pdf.

17. Before MPP was implemented, U.S. officials encountered an average of approximately 2,000 inadmissible aliens at the Southern border each day, and the rate at which those aliens claimed asylum surged exponentially. *See, e.g.*, 83 Fed. Reg. 55,934, 55,935 (Nov. 9, 2018). A true and correct copy of the *Federal Register* is attached hereto as Exhibit 16, and is publicly available at https://www.govinfo.gov/content/pkg/FR-2018-11-09/pdf/2018-24594.pdf.

18. In Fiscal Year 2006, only 5% of the 104,440 aliens subject to expedited removal claimed a credible fear of return to their home country and were entered into the asylum process. In Fiscal Year 2018, that rate had grown to 42% of over 234,000 aliens under expedited removal making a credible fear claim, an increase of 740% in the rate of claims. *See* Ex. 1.

19. Of the credible fear claimants referred for asylum proceedings with the Executive Office for Immigration Review (EOIR) between Fiscal Year 2008 and Fiscal Year 2019, approximately 45% did not actually file asylum claims. Executive Office for Immigration Review Adjudication Statistics, *Credible Fear and Asylum Process: Fiscal Year (FY) 2008 – FY 2019* (Oct. 23, 2019), https://www.justice.gov/eoir/file/1216991/download. A true and correct copy of this report is attached hereto as Exhibit 17.

20. Between Fiscal Year 2008 and Fiscal Year 2019, 32 percent of aliens referred to EOIR absconded into the United States and were ordered removed in absentia. *See* Ex. 17.

21. The EOIR reported that between Fiscal Year 2008 and FY 2019, only 14 percent of aliens who claimed credible fear of persecution or torture were granted asylum. *See* Ex. 17.

22. Immigration courts were faced with a backlog of 768,257 cases at the end of Fiscal Year 2018—a number that since has grown 69.1% to 1,299,239 as of February 2021. TRAC Immigration, *Immigration Court Backlog Tool*, https://trac.syr.edu/phptools/immigration/court_backlog/. A true and correct copy of this publication is attached hereto as Exhibit 18.

23. As of February 2021, the immigration court backlog has led to cases having an average wait time of over 900 days, providing unauthorized aliens released into the United States nearly two and half years in country. *See* Ex. 18.

24. In February 2020, the number of aliens either apprehended or deemed inadmissible at the Southern border was down roughly 40,000 from February 2019. *See* Ex. 8.

25. Missouri spent an average of $10,654 per student in school year 2019-2020 regardless of immigration status. Missouri Department of Elementary and Secondary Education, *State Report Card – 2020 Data*, https://apps.dese.mo.gov/MCDS/Reports/SSRS_Print.aspx?Reportid=84d85ca8-c722-4f9b-9935-70d36a53cf54. A true and correct copy of this publication is attached hereto as Exhibit 19.

26. A 2018 study shows that an estimated 3,000 illegal alien school-aged children were enrolled in Missouri schools. Migration Policy Institute, *Profile of the Unauthorized Population: Missouri*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/MO. A true and correct copy of this publication is attached hereto as Exhibit 20.

27. Statistically, for every 1,000 unlawful aliens who remain in the United States, 56 reside in Missouri. Pew Research Center, *U.S. unauthorized immigrant population estimates by state, 2016* (Feb. 5, 2019), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/. A true and correct copy of this publication is attached hereto as Exhibit 21.

28. According to records of Missouri's Department of Social Services, Missouri expended $5,427,715 in health-care costs for treatment of ineligible aliens during Fiscal Year 2020.

29. Missouri's Department of Revenue (DOR) uses the Systemic Alien Verification of Entitlements (SAVE) system to verify individuals' lawful immigration status at a cost of $0.80 for the initial inquiry and $0.50 for any additional inquiries. In state fiscal year 2020, DOR paid $30,114.11 for SAVE inquiries.

30. While applicants for drivers' licenses are charged a fee, no part of that fee is specifically designated for SAVE costs and DOR must annually request appropriations from the state legislature to cover the costs of SAVE inquiries.

31. At the end of March 2021, a little more than two months after the Biden administration took office, 3,911 individuals with immigration cases subject to the Migrant Protection Protocols (MPP) program had been allowed into the United States. At the end of April 2021, only a month later, that number more than doubled to 8,387, signifying an increased pace in admissions. Of the cases admitted into the United States thus far, 56 were transferred to the immigration court in Kansas City, MO. Attached hereto as Exhibit 22 is a true and correct copy of the Transactional Access Records Clearinghouse (TRAC) publication, *Now Over 8,000 MPP Cases Transferred Into United States Under Biden*,

which is publicly available on TRAC's website at
https://trac.syr.edu/immigration/reports/647/.

I swear or affirm under penalty of perjury that the foregoing is true and correct.

Dated: 05/13/2021

*Wyatt Suling*

Wyatt Suling

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

Assessment of the Migrant Protection Protocols (MPP)

# EXHIBIT A-1

**Assessment of the Migrant Protection Protocols (MPP)**
**October 28, 2019**

## I.   Overview and Legal Basis

The Department of Homeland Security (DHS) remains committed to using all available tools to address the unprecedented security and humanitarian crisis at the southern border of the United States.

- At peak of the crisis in May 2019, there were more than 4,800 aliens crossing the border daily—representing an average of more than *three apprehensions per minute*.

- The law provides for mandatory detention of aliens who unlawfully enter the United States between ports of entry if they are placed in expedited removal proceedings. However, resource constraints during the crisis, as well as other court-ordered limitations on the ability to detain individuals, made many releases inevitable, particularly for aliens who were processed as members of family units.

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) authorizes the Department of Homeland Security to return certain applicants for admission to the contiguous country from which they are arriving on land (whether or not at a designated port of entry), pending removal proceedings under INA § 240.

- Consistent with this express statutory authority, DHS began implementing the Migrant Protection Protocols (MPP) and returning aliens subject to INA § 235(b)(2)(C) to Mexico, in January 2019.

- Under MPP, certain aliens who are nationals and citizens of countries other than Mexico (third-country nationals) arriving in the United States by land from Mexico who are not admissible may be returned to Mexico for the duration of their immigration proceedings.

The U.S. government initiated MPP pursuant to U.S. law, but has implemented and expanded the program through ongoing discussions, and in close coordination, with the Government of Mexico (GOM).

- MPP is a core component of U.S. foreign relations and bilateral cooperation with GOM to address the migration crisis across the shared U.S.-Mexico border.

- MPP expansion was among the key "meaningful and unprecedented steps" undertaken by GOM "to help curb the flow of illegal immigration to the U.S. border since the launch of the U.S.-Mexico Declaration in Washington on June 7, 2019."[1]

---

[1] https://www.whitehouse.gov/briefings-statements/readout-vice-president-mike-pences-meeting-mexican-foreign-secretary-marcelo-ebrard/

- On September 10, 2019, Vice President Pence and Foreign Minister Ebrard "agree[d] to implement the Migrant Protection Protocols to the fullest extent possible."[2]

- Therefore, disruption of MPP would adversely impact U.S. foreign relations—along with the U.S. government's ability to effectively address the border security and humanitarian crisis that constitutes an ongoing national emergency.[3]

## II.   MPP Has Demonstrated Operational Effectiveness

In the past nine months—following a phased implementation, and in close coordination with GOM—DHS has returned more than 55,000 aliens to Mexico under MPP. MPP has been an indispensable tool in addressing the ongoing crisis at the southern border and restoring integrity to the immigration system.

### *Apprehensions of Illegal Aliens are Decreasing*

- Since a recent peak of more than 144,000 in May 2019, total enforcement actions—representing the number of aliens apprehended between points of entry or found inadmissible at ports of entry—have decreased by 64%, through September 2019.

- Border encounters with Central American families—who were the main driver of the crisis and comprise a majority of MPP-amenable aliens—have decreased by approximately 80%.

- Although MPP is one among many tools that DHS has employed in response to the border crisis, DHS has observed a connection between MPP implementation and decreasing enforcement actions at the border—including a rapid and substantial decline in apprehensions in those areas where the most amenable aliens have been processed and returned to Mexico pursuant to MPP.

### *MPP is Restoring Integrity to the System*

- Individuals returned to Mexico pursuant to MPP are now at various stages of their immigration proceedings: some are awaiting their first hearing; some have completed their first hearing and are awaiting their individual hearing; some have received an order of removal from an immigration judge and are now pursuing an appeal; some have established a fear of return to Mexico and are awaiting their proceedings in the United States; some have been removed to their home countries; and some have withdrawn claims and elected to voluntarily return to their home countries.

---

[2] https://www.whitehouse.gov/briefings-statements/readout-vice-president-mike-pences-meeting-mexican-foreign-secretary-marcelo-ebrard/
[3] https://www.whitehouse.gov/presidential-actions/presidential-proclamation-declaring-national-emergency-concerning-southern-border-united-states/

- MPP returnees with meritorious claims can be granted relief or protection within months, rather than remaining in limbo for years while awaiting immigration court proceedings in the United States.

  o The United States committed to GOM to minimize the time that migrants wait in Mexico for their immigration proceedings.  Specifically, the Department of Justice (DOJ) agreed to treat MPP cases such as detained cases such that they are prioritized according to longstanding guidance for such cases.

  o The first three locations for MPP implementation—San Diego, Calexico, and El Paso—were chosen because of their close proximity to existing immigration courts.

  o After the June 7, 2019, Joint Declaration between GOM and the United States providing for expansion of MPP through bilateral cooperation, DHS erected temporary, dedicated MPP hearing locations at ports of entry in Laredo and Brownsville, in coordination with DOJ, at a total six-month construction and operation cost of approximately $70 million.

  o Individuals processed in MPP receive initial court hearings within two to four months, and—as of October 21, 2019—almost 13,000 cases had been completed at the immigration court level.

  o A small subset of completed cases have resulted in grants of relief or protection, demonstrating that MPP returnees with meritorious claims can receive asylum, or any relief or protection for which they are eligible, more quickly via MPP than under available alternatives.

  o Individuals not processed under MPP generally must wait years for adjudication of their claims.  There are approximately one million pending cases in DOJ immigration courts.  Assuming the immigration courts received no new cases and completed existing cases at a pace of 30,000 per month—it would take several years, until approximately the end of 2022, to clear the existing backlog.

- MPP returnees who do not qualify for relief or protection are being quickly removed from the United States.  Moreover, aliens without meritorious claims—which no longer constitute a free ticket into the United States—are beginning to voluntarily return home.

  o According to CBP estimates, approximately 20,000 people are sheltered in northern Mexico, near the U.S. border, awaiting entry to the United States.  This number— along with the growing participation in an Assisted Voluntary Return (AVR) program operated by the International Organization for Migration (IOM), as described in more detail below—suggests that a significant proportion of the 55,000+ MPP returnees have chosen to abandon their claims.

App.011

### III. Both Governments Endeavor to Provide Safety and Security for Migrants

- The Government of Mexico (GOM) has publicly committed to protecting migrants.

  o A December 20, 2018, GOM statement indicated that "Mexico will guarantee that foreigners who have received their notice fully enjoy the rights and freedoms recognized in the Constitution, in the international treaties to which the Mexican State is a party, as well as in the current Migration Law.  They will be entitled to equal treatment without any discrimination and due respect to their human rights, as well as the opportunity to apply for a work permit in exchange for remuneration, which will allow them to meet their basic needs."

    ▪ Consistent with its commitments, GOM has accepted the return of aliens amenable to MPP.  DHS understands that MPP returnees in Mexico are provided access to humanitarian care and assistance, food and housing, work permits, and education.

    ▪ GOM has launched an unprecedented enforcement effort bringing to justice transnational criminal organizations (TCOs) who prey on migrants transiting through Mexico—enhancing the safety of all individuals, including MPP-amenable aliens.

  o As a G-20 country with many of its 32 states enjoying low unemployment and crime, Mexico's commitment should be taken in good faith by the United States and other stakeholders.  Should GOM identify any requests for additional assistance, the United States is prepared to assist.

- Furthermore, the U.S. government is partnering with international organizations offering services to migrants in cities near Mexico's northern border.

  o In September 2019, the U.S. Department of State Bureau of Population, Refugees, and Migration (PRM) funded a $5.5 million project by IOM to provide shelter in cities along Mexico's northern border to approximately 8,000 vulnerable third-country asylum seekers, victims of trafficking, and victims of violent crime in cities along Mexico's northern border.

  o In late September 2019, PRM provided $11.9 million to IOM to provide cash-based assistance for migrants seeking to move out of shelters and into more sustainable living.

- The U.S. Government is also supporting options for those individuals who wish to voluntarily withdraw their claims and receive free transportation home.  Since November 2018, IOM has operated its AVR program from hubs within Mexico and Guatemala, including Tijuana and Ciudad Juarez.  PRM has provided $5 million to IOM to expand that program to Matamoros and Nuevo Laredo and expand operations in other Mexican

4

northern border cities.  As of mid-October, almost 900 aliens in MPP have participated in the AVR program.

- The United States' ongoing engagement with Mexico is part of a larger framework of regional collaboration.  Just as United Nations High Commissioner for Refugees has called for international cooperation to face the serious challenges in responding to large-scale movement of migrants and asylum-seekers travelling by dangerous and irregular means, the U.S. Government has worked with Guatemala, El Salvador, and Honduras to form partnerships on asylum cooperation (which includes capacity-building assistance), training and capacity building for border security operations, biometrics data sharing and increasing access to H-2A and H-2B visas for lawful access to the United States.

### IV.    Screening Protocols Appropriately Assess Fear of Persecution or Torture

- When a third-country alien states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, the alien is referred to U.S. Citizenship & Immigration Services (USCIS).  Upon referral, USCIS conducts an MPP fear-assessment interview to determine whether it is more likely than not that the alien will be subject to torture or persecution on account of a protected ground if returned to Mexico.

    o  MPP fear assessments are conducted consistent with U.S. law implementing the *non-refoulement* obligations imposed on the United States by certain international agreements and inform whether an alien is processed under—or remains—in MPP.

    o  As used here, "persecution" and "torture" have specific international and domestic legal meanings distinct from fear for personal safety.

- Fear screenings are a well-established part of MPP.  As of October 15, 2019, USCIS completed over 7,400 screenings to assess a fear of return to Mexico.

    o  That number included individuals who express a fear upon initial encounter, as well as those who express a fear of return to Mexico at any subsequent point in their immigration proceedings, including some individuals who have made multiple claims.

    o  Of those, approximately 13% have received positive determinations and 86% have received negative determinations.

    o  Thus, the vast majority of those third-country aliens who express fear of return to Mexico are not found to be more likely than not to be tortured or persecuted on account of a protected ground there.  This result is unsurprising, not least because aliens amenable to MPP voluntarily entered Mexico en route to the United States.

### V.    Summary and Conclusion

In recent years, only about 15% of Central American nationals making asylum claims have been granted relief or protection by an immigration judge.  Similarly, affirmative asylum grant rates for nationals of Guatemala, El Salvador, and Honduras were approximately 21% in Fiscal Year 2019.  At the same time, there are—as noted above—over one million pending cases in DOJ immigration courts, in addition to several hundred thousand asylum cases pending with USCIS.

These unprecedented backlogs have strained DHS resources and challenged its ability to effectively execute the laws passed by Congress and deliver appropriate immigration consequences: those with meritorious claims can wait years for protection or relief, and those with non-meritorious claims often remain in the country for lengthy periods of time.

This broken system has created perverse incentives, with damaging and far-reaching consequences for both the United States and its regional partners.  In Fiscal Year 2019, certain regions in Guatemala and Honduras saw 2.5% of their population migrate to the United States, which is an unsustainable loss for these countries.

MPP is one among several tools DHS has employed effectively to reduce the incentive for aliens to assert claims for relief or protection, many of which may be meritless, as a means to enter the United States to live and work during the pendency of multi-year immigration proceedings. Even more importantly, MPP also provides an opportunity for those entitled to relief to obtain it within a matter of months.  MPP, therefore, is a cornerstone of DHS's ongoing efforts to restore integrity to the immigration system—and of the United States' agreement with Mexico to address the crisis at our shared border.

**Appendix A: Additional Analysis of MPP Fear-Assessment Protocol**

U.S. Citizenship and Immigration Services (USCIS) strongly believes that if DHS were to change its fear-assessment protocol to affirmatively ask an alien amenable to MPP whether he or she fears return to Mexico, the number of fraudulent or meritless fear claims will significantly increase. This prediction is, in large part, informed by USCIS's experience conducting credible fear screenings for aliens subject to expedited removal. Credible fear screenings occur when an alien is placed into expedited removal under section 235(b)(1) of the Immigration and Nationality Act – a streamlined removal mechanism enacted by Congress to allow for prompt removal of aliens who lack valid entry documents or who attempt to enter the United States by fraud – and the alien expresses a fear of return to his or her home country or requests asylum. Under current expedited removal protocol, the examining immigration officer – generally U.S. Customs and Border Protection officers at a port of entry or Border Patrol agents – read four questions, included on Form I-867B, to affirmatively ask each alien subject to expedited removal whether the alien has a fear of return to his or her country of origin.[4]

The percentage of aliens subject to expedited removal who claimed a fear of return or requested asylum was once quite modest. However, over time, seeking asylum has become nearly a default tactic used by undocumented aliens to secure their release into the United States. For example, in 2006, of the 104,440 aliens subjected to expedited removal, only 5% (5,338 aliens) were referred for a credible fear interview with USCIS. In contrast, 234,591 aliens were subjected to expedited removal in 2018, but 42% (or 99,035) were referred to USCIS for a credible fear interview, significantly straining USCIS resources.

Table A1: Aliens Subject to Expedited Removal and Share Making Fear Claims, FY 2006 - 2018

| Fiscal Year | Subjected to Expedited Removal | Referred for a Credible Fear Interview | Percentage Referred for Credible Fear |
|---|---|---|---|
| 2006 | 104,440 | 5,338 | 5% |
| 2007 | 100,992 | 5,252 | 5% |
| 2008 | 117,624 | 4,995 | 4% |
| 2009 | 111,589 | 5,369 | 5% |
| 2010 | 119,876 | 8,959 | 7% |
| 2011 | 137,134 | 11,217 | 8% |
| 2012 | 188,187 | 13,880 | 7% |
| 2013 | 241,442 | 36,035 | 15% |
| 2014 | 240,908 | 51,001 | 21% |
| 2015 | 192,120 | 48,052 | 25% |
| 2016 | 243,494 | 94,048 | 39% |
| 2017 | 178,129 | 78,564 | 44% |
| 2018 | 234,591 | 99,035 | 42% |

---

[4] *See* 8 C.F.R. § 235.3(b)(2).

Transitioning to an affirmative fear questioning model for MPP-amenable aliens would likely result in a similar increase. Once it becomes known that answering "yes" to a question can prevent prompt return to Mexico under MPP, DHS would experience a rise in fear claims similar to the expedited removal/credible fear process. And, affirmatively drawing out this information from aliens rather than reasonably expecting them to come forward on their own initiative could well increase the meritless fear claims made by MPP-amenable aliens.

It also bears emphasis that relatively small proportions of aliens who make fear claims ultimately are granted asylum or another form of relief from removal. Table A2 describes asylum outcomes for aliens apprehended or found inadmissible on the Southwest Border in fiscal years 2013 – 2018. Of the 416 thousand aliens making fear claims during that six-year period, 311 thousand (75 percent) had positive fear determinations, but only 21 thousand (7 percent of positive fear determinations) had been granted asylum or another form of relief from removal as of March 31, 2019, versus 72 thousand (23 percent) who had been ordered removed or agreed to voluntary departure. (Notably, about 70 percent of aliens with positive fear determinations in FY 2013 – 2018 remained in EOIR proceedings as of March 31, 2019.)

Table A2: Asylum Outcomes, Southwest Border Encounters, FY 2013 – 2018

| Year of Encounter | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|
| Total Encounters | 490,093 | 570,832 | 446,060 | 560,432 | 416,645 | 522,626 | 3,006,688 |
| Subjected to ER | 225,426 | 222,782 | 180,328 | 227,382 | 160,577 | 214,610 | 1,231,105 |
| Fear Claims[1] | 39,648 | 54,850 | 50,588 | 98,265 | 72,026 | 100,756 | 416,133 |
| Positive Fear Determinations[2] | 31,462 | 36,615 | 35,403 | 76,005 | 55,251 | 75,856 | 310,592 |
| Asylum Granted or Other Relief[3] | 3,687 _11.7%_ | 4,192 _11.4%_ | 3,956 _11.2%_ | 4,775 _6.3%_ | 2,377 _4.3%_ | 2,168 _2.9%_ | 21,155 _6.8%_ |
| Removal Orders[4] | 9,980 _31.7%_ | 11,064 _30.2%_ | 9,466 _26.7%_ | 17,700 _23.3%_ | 12,130 _22.0%_ | 11,673 _15.4%_ | 72,013 _23.2%_ |
| Asylum Cases Pending | 17,554 _55.8%_ | 21,104 _57.6%_ | 21,737 _61.4%_ | 53,023 _69.8%_ | 40,586 _73.5%_ | 61,918 _81.6%_ | 215,922 _69.5%_ |
| Other | 241 | 255 | 244 | 507 | 158 | 97 | 1,502 |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.
   Notes for Table A2: Asylum outcomes are current as of March 31, 2019.
   [1] Fear claims include credible fear cases completed by USCIS as well as individuals who claimed fear at the time of apprehension but who have no record of a USCIS fear determination, possibly because they withdrew their claim.
   [2] Positive fear determinations include positive determinations by USCIS as well as negative USCIS determinations vacated by EOIR.
   [3] Asylum granted or other relief includes withholding of removal, protection under the Convention Against Torture, Special Immigrant Juvenile status, cancelation of removal, and other permanent status conferred by EOIR.
   [4] Removal orders include completed repatriations and unexecuted orders of removal and grants of voluntary departure.

Implementing MPP assessments currently imposes a significant resource burden to DHS.  As of October 15, 2019, approximately 10% of individuals placed in MPP have asserted a fear of return to Mexico and have been referred to an asylum officer for a MPP fear assessment.  The USCIS Asylum Division assigns on average approximately 27 asylum officers per day to handle this caseload nationwide.  In addition, the Asylum Division must regularly expend overtime resources after work hours and on weekends to keep pace with the same-day/next-day processing requirements under MPP. This workload diverts resources from USCIS's affirmative asylum caseload, which currently is experiencing mounting backlogs.

Most importantly, DHS does not believe amending the process to affirmatively ask whether an alien has a fear of return to Mexico is necessary in order to properly identify aliens with legitimate fear claims in Mexico because under DHS's current procedures, aliens subject to MPP **may raise a fear claim to DHS at any point in the MPP process**.  Aliens are not precluded from receiving a MPP fear assessment from an asylum officer if they do not do so initially upon apprehension or inspection, and many do.  As of October 15, 2019[5], approximately 4,680 aliens subject to MPP asserted a fear claim and received an MPP fear-assessment **after** their initial encounter or apprehension by DHS, with 14% found to have a positive fear of return to Mexico.  Additionally, Asylum Division records indicate as of October 15, 2019[6], approximately 618 aliens placed into MPP have asserted **multiple** fear claims during the MPP process (from the point of placement into MPP at the initial encounter or apprehension) and have therefore received multiple fear assessments to confirm whether circumstances have changed such that the alien should not be returned to Mexico.  Of these aliens, 14% were found to have a positive fear of return to Mexico.

Additionally, asylum officers conduct MPP fear assessments with many of the same safeguards provided to aliens in the expedited removal/credible fear context.  For example, DHS officers conduct MPP assessment interviews in a non-adversarial manner, separate and apart from the general public, with the assistance of language interpreters when needed.[7]

In conducting MPP assessments, asylum officers apply a "more likely than not" standard, which is a familiar standard.  "More likely than not" is equivalent to the "clear probability" standard for statutory withholding and not unique to MPP.  Asylum officers utilize the same standard in the reasonable fear screening process when claims for statutory withholding of removal and protection under the Convention Against Torture (CAT).[8]  The risk of harm standard for withholding (or deferral) of removal under the Convention Against Torture (CAT) implementing regulations is the same, i.e., "more likely than not."[9]  In addition to being utilized by asylum

---

[5] USCIS began tracking this information on July 3, 2019.
[6] USCIS began tracking this information on July 3, 2019.
[7] USCIS Policy Memorandum PM-602-0169, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*, 2019 WL 365514 (Jan. 28, 2019).
[8] See INA § 241(b)(3); 8 C.F.R. § 1208.16(b)(2) (same); See 8 C.F.R. § 1208.16(c)(2).
[9] *See* 8 C.F.R. § 1208.16(c)(2); Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8480 (Feb. 19, 1999) (detailing incorporation of the "more likely than not" standard into U.S. CAT ratification history); *see also Matter of J-F-F-*, 23 I&N Dec. 912 (BIA 2006).

officers in other protection contexts, the "more likely than not" standard satisfies the U.S. government's *non-refoulement* obligations.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

Department of Homeland Security's Press Release dated December 20, 2018

# EXHIBIT A-2



Homeland
Security

 

## News Archive

Search

Blog Archive  Events & Media Advisories Archive

Fact Sheets Archive  Press Release Archive

Speeches Archive

### Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration



**Release Date:**  December 20, 2018

Announces Migration Protection Protocols

">

WASHINGTON – Today, Secretary of Homeland Security Kirstjen M. Nielsen announced historic action to confront the illegal immigration crisis facing the United States.  Effective immediately, the United States will begin the process of invoking Section 235(b)(2)(C) of the Immigration and Nationality Act.  Under the Migration Protection Protocols (MPP), individuals arriving in or entering the United States from Mexico— illegally or without proper documentation—may be returned to Mexico for the duration of their immigration proceedings.

"Today we are announcing historic measures to bring the illegal immigration crisis under control," said Secretary Nielsen.  "We will confront this crisis head on, uphold the rule of law, and strengthen our humanitarian commitments.  Aliens trying to game the system to get into our country illegally will no longer be able to disappear into the United States, where many skip their court dates.  Instead, they will wait for an immigration court decision while they are in Mexico.  'Catch and release' will be replaced with 'catch and return.'  In doing so, we will reduce illegal migration by removing one of the key incentives that encourages people from taking the dangerous journey to the United States in the first place.  This will also allow us to focus more attention on those who are actually fleeing persecution.

"Let me be clear:  we will undertake these steps consistent with all domestic and international legal obligations, including our humanitarian commitments.  We have notified the Mexican government of our

App.020

intended actions.  In response, Mexico has made an independent determination that they will commit to implement essential measures on their side of the border.  We expect affected migrants will receive humanitarian visas to stay on Mexican soil, the ability to apply for work, and other protections while they await a U.S. legal determination."

## Background

Illegal aliens have exploited asylum loopholes at an alarming rate.  Over the last five years, DHS has seen a 2000 percent increase in aliens claiming credible fear (the first step to asylum), as many know it will give them an opportunity to stay in our country, even if they do not actually have a valid claim to asylum.  As a result, the United States has an overwhelming asylum backlog of more than 786,000 pending cases.  Last year alone the number of asylum claims soared 67 percent compared to the previous year.  Most of these claims are not meritorious—in fact *nine out of ten asylum claims are not granted by a federal immigration judge.*  However, by the time a judge has ordered them removed from the United States, many have vanished.

## Process

- Aliens trying to enter the U.S. to claim asylum will no longer be released into our country, where they often disappear before a court can determine their claim's merits.
- Instead, those aliens will be processed by DHS and given a "Notice to Appear" for their immigration court hearing.
- While they wait in Mexico, the Mexican government has made its own determination to provide such individuals humanitarian visas, work authorization, and other protections. Aliens will have access to immigration attorneys and to the U.S. for their court hearings.
- Aliens whose claims are upheld by U.S. judges will be allowed in. Those without valid claims will be deported to their home countries.

## Anticipated Benefits

- As we implement, illegal immigration and false asylum claims are expected to decline.
- Aliens will not be able to disappear into U.S. before court decision.
- More attention can be focused on more quickly assisting legitimate asylum-seekers, as fraudsters are disincentivized from making the journey.
- Precious border security personnel and resources will be freed up to focus on protecting our territory and clearing the massive asylum backlog.
- Vulnerable populations will get the protection they need while they await a determination in Mexico.

Topics: Border Security, Immigration and Customs Enforcement, Secretary of Homeland Security
Keywords: Border Security, Immigration Enforcement, Southwest Border

Last Published Date: December 20, 2018

>   Archive   >   News Archive   >   Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration

App.021

Official website of the Department of Homeland Security

App.022

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | § | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF WYATT SULING

Memorandum of Secretary Kirstjen M. Nielsen dated January 25, 2019

# EXHIBIT A-3

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

 **Homeland Security**

January 25, 2019

**ACTION**

MEMORANDUM FOR:    L. Francis Cissna
Director
U.S. Citizenship and Immigration Services

Kevin K. McAleenan
Commissioner
U.S. Customs and Border Protection

Ronald D. Vitiello
Deputy Director and Senior Official Performing the Duties of
Director
U.S. Immigration and Customs Enforcement

FROM:    Kirstjen M. Nielsen
Secretary

SUBJECT:    Policy Guidance for Implementation of the Migrant Protection
Protocols

On December 20, 2018, I announced that the Department of Homeland Security (DHS), consistent with the Migrant Protection Protocols (MPP), will begin implementation of Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) on a large-scale basis to address the migration crisis along our southern border. In 1996, Congress added Section 235(b)(2)(C) to the INA. This statutory authority allows the Secretary of Homeland Security to return certain applicants for admission to the contiguous country from which they are arriving on land (whether or not at a designated port of entry) pending removal proceedings under Section 240 of the INA. Consistent with the MPP, citizens and nationals of countries other than Mexico ("third-country nationals") arriving in the United States by land from Mexico—illegally or without proper documentation—may be returned to Mexico pursuant to Section 235(b)(2)(C) for the duration of their Section 240 removal proceedings.

## Section 235(b)(2)(C) and the MPP

The United States issued the following statement on December 20, 2018, regarding implementation of the Migrant Protection Protocols:

> [T]he United States will begin the process of implementing Section 235(b)(2)(C) . . . with respect to non-Mexican nationals who may be arriving on land (whether or not at a designated port of entry) seeking to enter the United States from Mexico illegally or without proper documentation. Such implementation will be done consistent with applicable domestic and international legal obligations. Individuals subject to this action may return to the United States as necessary and appropriate to attend their immigration court proceedings.

> The United States understands that, according to the Mexican law of migration, the Government of Mexico will afford such individuals all legal and procedural protection[s] provided for under applicable domestic and international law. That includes applicable international human rights law and obligations as a party to the 1951 Convention relating to the Status of Refugees (and its 1967 Protocol) and the Convention Against Torture.

> The United States further recognizes that Mexico is implementing its own, sovereign, migrant protection protocols providing humanitarian support for and humanitarian visas to migrants.

> The United States proposes a joint effort with the Government of Mexico to develop a comprehensive regional plan in consultation with foreign partners to address irregular migration, smuggling, and trafficking with the goal of promoting human rights, economic development, and security.[1]

The Government of Mexico, in response, issued a statement on December 20, 2018. That statement provides, in part, as follows:

> 1. For humanitarian reasons, [the Government of Mexico] will authorize the temporary entrance of certain foreign individuals coming from the United States who entered that country at a port of entry or who were detained between ports of entry, have been interviewed by U.S. immigration authorities, and have received a notice to appear before an immigration judge. This is based on current Mexican legislation and the international commitments Mexico has signed, such as the Convention Relating to the Status of Refugees, its Protocol, and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, among others.

---

[1] Letter from Chargé d'Affaires John S. Creamer to Sr. Jesús Seade, Subsecretaría para América del Norte, Secretaría de Relaciones Exteriores (Dec. 20, 2018).

2

2. It will allow foreigners who have received a notice to appear to request admission into Mexican territory for humanitarian reasons at locations designated for the international transit of individuals and to remain in national territory. This would be a "stay for humanitarian reasons" and they would be able to enter and leave national territory multiple times.

3. It will ensure that foreigners who have received their notice to appear have all the rights and freedoms recognized in the Constitution, the international treaties to which Mexico is a party, and its Migration Law. They will be entitled to equal treatment with no discrimination whatsoever and due respect will be paid to their human rights. They will also have the opportunity to apply for a work permit for paid employment, which will allow them to meet their basic needs.

4. It will ensure that the measures taken by each government are coordinated at a technical and operational level in order to put mechanisms in place that allow migrants who have receive[d] a notice to appear before a U.S. immigration judge have access without interference to information and legal services, and to prevent fraud and abuse.[2]

### Prosecutorial Discretion and *Non-Refoulement* in the Context of the MPP

In exercising their prosecutorial discretion regarding whether to place an alien arriving by land from Mexico in Section 240 removal proceedings (rather than another applicable proceeding pursuant to the INA), and, if doing so, whether to return the alien to the contiguous country from which he or she is arriving pursuant to Section 235(b)(2)(C), DHS officials should act consistent with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees[3] (1951 Convention) and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).[4] Specifically, a third-country national should not be involuntarily returned to Mexico pursuant to Section 235(b)(2)(C) of the INA if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the

---

[2] Secretaría de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018).

[3] The United States is not a party to the 1951 Convention but is a party to the 1967 Protocol Relating to the Status of Refugees, which incorporates Articles 2 to 34 of the 1951 Convention. Article 33 of the 1951 Convention provides that: "[n]o Contracting State shall expel or return (*'refouler'*) a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

[4] Article 3 of the CAT states, "No State Party shall expel, return (*'refouler'*) or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *See also* Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, Title XXII, § 2242(a) (8 U.S.C. § 1231 note) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.").

3

INA), or would more likely than not be tortured, if so returned pending removal proceedings. The United States expects that the Government of Mexico will comply with the commitments articulated in its statement of December 20, 2018.

U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and U.S. Immigration and Customs Enforcement will issue appropriate internal procedural guidance to carry out the policy set forth in this memorandum.[5]

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

---

[5] A DHS immigration officer, when processing an alien for Section 235(b)(2)(C), should refer to USCIS any alien who has expressed a fear of return to Mexico for a *non-refoulement* assessment by an asylum officer.

4

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF WYATT SULING

## MPP Guiding Principles

# EXHIBIT A-4

## **MPP Guiding Principles**

**Date:**                         January 28, 2019

**Topic:**                      Guiding Principles for Migrant Protection Protocols

**HQ POC/Office:**       Enforcement Programs Division

- Effective January 28, 2019, in accordance with the Commissioner's Memorandum of January 28, 2019, the Office of Field Operations, San Diego Field Office, will, consistent with its existing discretion and authorities, begin to implement Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) through the Migrant Protection Protocols (MPP).
    - To implement the MPP, aliens arriving from Mexico who are amenable to the process (see below), and who in an exercise of discretion the officer determines should be subject to the MPP process, will be issued an Notice to Appear (NTA) and placed into Section 240 removal proceedings.  They will then be transferred to await proceedings in Mexico.

- Aliens in the following categories are not amenable to MPP:
    - Unaccompanied alien children,
    - Citizens or nationals of Mexico,
    - Aliens processed for expedited removal,
    - Aliens in special circumstances:
        - Returning LPRs seeking admission (subject to INA section 212)
        - Aliens with an advance parole document or in parole status
        - Known physical/mental health issues
        - Criminals/history of violence
        - Government of Mexico or USG interest,
    - Any alien who is more likely than not to face persecution or torture in Mexico, or
    - Other aliens at the discretion of the Port Director

- Nothing in this guidance changes existing policies and procedures for processing an alien under procedures other than MPP, except as specifically provided. Thus, for instance, the processing of aliens for expedited removal is unchanged. Once an alien has been processed for expedited removal, including the supervisor approval, the alien may not be processed for MPP.
- Officers, with appropriate supervisory review, retain discretion to process aliens for MPP or under other procedures (e.g., expedited removal), on a case-by-case basis.  Adverse factors precluding placement in the MPP process include, but are not limited to, factors such as prior removal, criminal history, it is more likely than not that the alien will face persecution or torture in Mexico, and permanent bars to readmission.
- If an alien who is potentially amenable to MPP affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, whether before or after they are processed for MPP or other disposition, that alien will be referred to a USCIS asylum officer for screening following the affirmative statement of fear of persecution or

torture in, or return to, Mexico, so that the asylum officer can assess whether it is more likely than not that the alien will face persecution or torture if returned to Mexico.

- If USCIS assesses that an alien who affirmatively states a fear of return to Mexico is more likely than not to face persecution or torture in Mexico, the alien may not be processed for MPP. Officers retain all existing discretion to process (or re-process) the alien for any other available disposition, including expedited removal, NTA, waivers, or parole.
- Aliens at the POE who are processed for MPP will receive a specific immigration court hearing date and time. Every effort will be made to schedule similar MPP alien populations (e.g. single adult males, single adult females, family units) for the same hearing dates.
- OFO and USBP will be sharing court dates using only one existing Immigration Scheduling System (ISS) queue.
- Any alien who is subject to MPP will be documented in the appropriate system of records, SIGMA, and the proper code will be added.
- POEs will provide aliens subject to MPP a tear sheet containing information about the process, as well as a list of free or low-cost legal service providers.
- Aliens who return to the POE for their scheduled hearing and affirmatively state a fear of return to Mexico will be referred to USCIS for screening prior to any return to Mexico. If USCIS assesses that such an alien is more likely than not to face persecution or torture in Mexico, CBP Officers should coordinate with ICE Enforcement and Removal Operations (ERO) to determine whether the alien may be maintained in custody or paroled, or if another disposition is appropriate. Such an alien may not be subject to expedited removal, however, and may not be returned to Mexico to await further proceedings.

*Hearing date and processing*
- POEs will establish scheduling for the arrival of aliens returning for their hearing to permit efficient transportation, according to applicable policy.
- Returning aliens who arrive at the POEs for proceedings will be biometrically identified, screened to ensure they have requisite documents, and turned over to ICE ERO.
- POEs will coordinate with ICE ERO to establish transfer of custody and expeditious transportation from the POE to the hearing. ERO is responsible for the transportation of aliens between the POE and court location, as well as the handling of the alien during all court proceedings.
- If the alien receives a final order of removal from an immigration judge, the alien will be processed in accordance with ERO operations.
- If the alien's INA section 240 removal proceedings are ongoing ERO will transport the alien back to the POE and CBP officers will escort the alien to the United States/Mexico limit line.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

Memorandum of Acting Secretary David Pekoske dated January 20, 2021

# EXHIBIT A-5



U.S. Department of Homeland Security
Washington, DC 20528



# Homeland Security

January 20, 2021

**MEMORANDUM FOR:**     Troy Miller
Senior Official Performing the Duties of the Commissioner
U.S. Customs and Border Protection

Tae Johnson
Acting Director
U.S. Immigration and Customs Enforcement

**FROM:**     David Pekoske
Acting Secretary

**SUBJECT:**     **Suspension of Enrollment in the Migrant Protection Protocols Program**

---

Effective January 21, 2021, the Department will suspend new enrollments in the Migrant Protection Protocols (MPP), pending further review of the program. Aliens who are not already enrolled in MPP should be processed under other existing legal authorities.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | § | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**


Department of Homeland Security's Press Release dated March 16, 2021


# EXHIBIT A-6

Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border | Homeland Security

Case 2:21-cv-00067-Z    Document 54-1    Filed 06/08/21    Page 35 of 297    PageID 1174

# Homeland Security

## News

Search

Blog  Data  Events  Fact Sheets  Homeland Security LIVE

In Focus  Media Contacts  Multimedia

National Terrorism Advisory System  Podcasts

Press Releases  Publications Library  Social Hub

Social Media  Speeches  Testimony  News Archive

Comunicados de Prensa

# Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border



**Release Date:** March 16, 2021

There is understandably a great deal of attention currently focused on the southwest border.  I want to share the facts, the work that we in the Department of Homeland Security (DHS) and across the government are doing, and our plan of action.  Our personnel remain steadfast in devotion of their talent and efforts in the service of our nation.

The situation at the southwest border is difficult.  We are working around the clock to manage it and we will continue to do so.  That is our job.  We are making progress and we are executing on our plan.  It will take time and we will not waver in our commitment to succeed.

We will also not waver in our values and our principles as a Nation.  Our goal is a safe, legal, and orderly immigration system that is based on our bedrock priorities: to keep our borders secure, address the plight of children as the law requires, and enable families to be together. As noted by the President in his Executive Order, "securing our borders does not require us to ignore the humanity of those who seek to cross them." We are both a nation of laws and a nation of immigrants.  That is one of our proudest traditions.

## The Facts

We are on pace to encounter more individuals on the southwest border than we have in the last 20 years.  We are expelling most single adults and families.  We are not expelling unaccompanied children.  We are securing our border, executing the Centers for Disease Control and Prevention's (CDC) public health authority to safeguard the American public and the migrants themselves, and protecting the children.  We

App.034

Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border | Homeland Security

have more work to do. Case 2:21-cv-00067-Z   Document 54-1   Filed 06/08/21   Page 36 of 297   PageID 1175

This is not new. We have experienced migration surges before – in 2019, 2014, and before then as well. Since April 2020, the number of encounters at the southwest border has been steadily increasing. Border Patrol Agents are working around the clock to process the flow at the border and I have great respect for their tireless efforts. To understand the situation, it is important to identify who is arriving at our southwest border and how we are following the law to manage different types of border encounters.

## Single Adults

The majority of those apprehended at the southwest border are single adults who are currently being expelled under the CDC's authority to manage the public health crisis of the COVID-19 pandemic.  Pursuant to that authority under Title 42 of the United States Code, single adults from Mexico and the Northern Triangle countries of El Salvador, Guatemala, and Honduras are swiftly expelled to Mexico.  Single adults from other countries are expelled by plane to their countries of origin if Mexico does not accept them.  There are limited exceptions to our use of the CDC's expulsion authority.  For example, we do not expel individuals with certain acute vulnerabilities.

The expulsion of single adults does not pose an operational challenge for the Border Patrol because of the speed and minimal processing burden of their expulsion.

## Families

Families apprehended at the southwest border are also currently being expelled under the CDC's Title 42 authority.  Families from Mexico and the Northern Triangle countries are expelled to Mexico unless Mexico does not have the capacity to receive the families.  Families from countries other than Mexico or the Northern Triangle are expelled by plane to their countries of origin.  Exceptions can be made when a family member has an acute vulnerability.

Mexico's limited capacity has strained our resources, including in the Rio Grande Valley area of Texas. When Mexico's capacity is reached, we process the families and place them in immigration proceedings here in the United States.  We have partnered with community-based organizations to test the family members and quarantine them as needed under COVID-19 protocols.  In some locations, the processing of individuals who are part of a family unit has strained our border resources.  I explain below additional challenges we have encountered and the steps we have taken to solve this problem.

## Unaccompanied Children

We are encountering many unaccompanied children at our southwest border every day.  A child who is under the age of 18 and not accompanied by their parent or legal guardian is considered under the law to be an unaccompanied child.  We are encountering six- and seven-year-old children, for example, arriving at our border without an adult.  They are vulnerable children and we have ended the prior administration's practice of expelling them.

An unaccompanied child is brought to a Border Patrol facility and processed for transfer to the Department of Health and Human Services (HHS).  Customs and Border Protection is a pass-through and is required to transfer the child to HHS within 72 hours of apprehension.  HHS holds the child for testing and quarantine, and shelters the child until the child is placed with a sponsor here in the United States. In more than 80 percent of cases, the child has a family member in the United States. In more than 40 percent of cases, that family member is a parent or legal guardian.  These are children being reunited with their families who will

App.035

Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border | Homeland Security

Case 2:21-cv-00067-Z    Document 54-1    Filed 06/08/21    Page 37 of 297    PageID 1176

care for them.

The children then go through immigration proceedings where they are able to present a claim for relief under the law.

The Border Patrol facilities have become crowded with children and the 72-hour timeframe for the transfer of children from the Border Patrol to HHS is not always met.  HHS has not had the capacity to intake the number of unaccompanied children we have been encountering.  I describe below the actions we have taken and the plans we are executing to handle this difficult situation successfully.

## Why the Challenge is Especially Difficult Now

Poverty, high levels of violence, and corruption in Mexico and the Northern Triangle countries have propelled migration to our southwest border for years.  The adverse conditions have continued to deteriorate.  Two damaging hurricanes that hit Honduras and swept through the region made the living conditions there even worse, causing more children and families to flee.

The COVID-19 pandemic has made the situation more complicated.  There are restrictions and protocols that need to be followed.  The physical distancing protocol, for example, imposes space and other limitations on our facilities and operations.

The prior administration completely dismantled the asylum system.  The system was gutted, facilities were closed, and they cruelly expelled young children into the hands of traffickers.  We have had to rebuild the entire system, including the policies and procedures required to administer the asylum laws that Congress passed long ago.

The prior administration tore down the lawful pathways that had been developed for children to come to the United States in a safe, efficient, and orderly way.  It tore down, for example, the Central American Minors program that avoided the need for children to take the dangerous journey to our southwest border.

The previous administration also cut foreign aid funding to the Northern Triangle.  No longer did we resource efforts in El Salvador, Guatemala, and Honduras to tackle the root causes of people fleeing their homes.

And, there were no plans to protect our front-line personnel against the COVID-19 pandemic.  There was no appropriate planning for the pandemic at all.

As difficult as the border situation is now, we are addressing it.  We have acted and we have made progress.  We have no illusions about how hard it is, and we know it will take time.  We will get it done.  We will do so adhering to the law and our fundamental values.  We have an incredibly dedicated and talented workforce.

## Actions We Have Taken

In less than two months, Customs and Border Protection stood-up an additional facility in Donna, Texas to process unaccompanied children and families.  We deployed additional personnel to provide oversight, care, and transportation assistance for unaccompanied minors pending transfer to HHS custody.

App.036

Case 2:21-cv-00067-Z Document 54-1 Filed 06/08/21 Page 38 of 297 PageID 1177

We are standing up additional facilities in Texas and Arizona to shelter unaccompanied children and families. We are working with Mexico to increase its capacity to receive expelled families. We partnered with community-based organizations to test and quarantine families that Mexico has not had the capacity to receive. We have developed a framework for partnering with local mayors and public health officials to pay for 100% of the expense for testing, isolation, and quarantine for migrants. ICE has also developed additional facilities to provide testing, local transportation, immigration document assistance, orientation, travel coordination in the interior, and mechanisms to support oversight of the migrant families who are not expelled.

Working with Mexico and international organizations, we built a system in which migrants who were forced to remain in Mexico and denied a chance to seek protection under the previous administration can now use a virtual platform – using their phones – to register. They do not need to take the dangerous journey to the border. The individuals are tested, processed, and transported to a port of entry safely and out of the hands of traffickers. We succeeded in processing the individuals who were in the Matamoros camp in Mexico. This is the roadmap going forward for a system that is safe, orderly, and fair.

To protect our own workforce, we launched Operation Vaccinate Our Workforce (VOW) in late January. At the beginning of this administration, less than 2 percent of our frontline personnel were vaccinated. Now more than 25 percent of our frontline personnel have been vaccinated.

We directed the Federal Emergency Management Agency (FEMA) to assist HHS in developing the capacity to meet the surge of unaccompanied children. FEMA already established one new facility for HHS to shelter 700 children. They have identified and are currently adding additional facilities. We are working with HHS to more efficiently identify and screen sponsors for children. In two days, we recruited more than 560 DHS volunteers to support HHS in our collective efforts to address the needs of the unaccompanied children.

We are restarting and expanding the Central American Minors program. It creates a lawful pathway for children to come to the United States without having to take the dangerous journey. Under this expansion, children will be processed in their home countries and brought to the United States in a safe and orderly way.

In addition, DHS and HHS terminated a 2018 agreement that had a chilling effect on potential sponsors – typically a parent or close relative – from coming forward to care for an unaccompanied child placed in an HHS shelter. In its place, DHS and HHS signed a new Memorandum of Agreement that promotes the safe and timely transfer of children. It keeps safeguards designed to ensure children are unified with properly vetted sponsors who can safely care for them while they await immigration proceedings.

## The Path Forward

We are creating joint processing centers so that children can be placed in HHS care immediately after Border Patrol encounters them. We are also identifying and equipping additional facilities for HHS to shelter unaccompanied children until they are placed with family or sponsors. These are short-term solutions to address the surge of unaccompanied children.

Longer term, we are working with Mexico and international organizations to expand our new virtual platform so that unaccompanied children can access it without having to take the dangerous journey to our border. As mentioned, we are expanding the Central American Minors program to permit more children to be processed in their home countries and if eligible, brought to the United States in a safe and orderly way.

App.037

Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border | Homeland Security

Case 2:21-cv-00067-Z   Document 54-1   Filed 06/08/21   Page 39 of 297   PageID 1178

We are developing additional legal and safe pathways for children and others to reach the United States. While we are building a formal refugee program throughout the region, we are working with Mexico, the Northern Triangle countries, and international organizations to establish processing centers in those countries so that individuals can be screened through them and brought to the United States if they qualify for relief under our humanitarian laws and other authorities.

For years, the asylum system has been badly in need of reengineering.  In addition to improving the process by which unaccompanied children are placed with family or sponsors, we will be issuing a new regulation shortly and taking other measures to implement the long-needed systemic reforms.  We will shorten from years to months the time it takes to adjudicate an asylum claim while ensuring procedural safeguards and enhancing access to counsel.

President Biden laid out a vision of a "multi-pronged approach toward managing migration throughout North and Central America that reflects the Nation's highest values." To that end, we are working with the Departments of Health and Human Services, Justice, and State in an all-of-government effort to not only address the current situation at our southwest border, but to institute longer-term solutions to irregular migration from countries in our hemisphere that are suffering worsening conditions.  This is powerfully exemplified by the President's goal to invest $4 billion in the Northern Triangle countries to address the root causes of migration.

## Conclusion

The situation we are currently facing at the southwest border is a difficult one.  We are tackling it.  We are keeping our borders secure, enforcing our laws, and staying true to our values and principles. We can do so because of the incredible talent and unwavering dedication of our workforce.

I came to this country as an infant, brought by parents who understood the hope and promise of America. Today, young children are arriving at our border with that same hope.  We can do this.

Topics:
Border Security, Citizenship and Immigration Services, Homeland Security Enterprise, Secretary of Homeland Security
Keywords:
Family, Immigration, Immigration Reform, Secretary Alejandro Mayorkas, Southwest Border, Unaccompanied Children (UC)

Last Published Date: March 16, 2021

>   News   >   Press Releases   >   Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border



Official website of the Department of Homeland Security

App.038

Site Links    Privacy    FOIA    Accessibility    Plug-ins

App.039

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

Fox News Article dated March 31, 2021
"Border Patrol official expects more than 1 million migrant encounters this year"

# EXHIBIT A-7

By using this site, you agree to our Privacy Policy and our Terms of Use. Close

Fox News
12:17 PM

- U.S.
- Politics
- Media
- Opinion
- Business
- Entertainment
- Sports
- Lifestyle
- TV
- Fox Nation
- Listen
- More

Expand / Collapse search
Login
Watch TV
Menu
Hot Topics

- LIVE UPDATES: Chauvin trial continues Thursday

Search foxnews.com    Search

**Coronavirus**

**U.S.**

- Crime
- Military
- Education
- Terror
- Immigration
- Economy
- Personal Freedoms
- Fox News Investigates

**World**

- U.N.
- Conflicts
- Terrorism
- Disasters
- Global Economy
- Environment
- Religion
- Scandals

**Opinion**

App.041

Border Patrol official expects more than 1 million migrant encounters this year | Fox News

**Politics**

- [Executive](#)
- [Senate](#)
- [House](#)
- [Judiciary](#)
- [Foreign Policy](#)
- [Polls](#)
- [Elections](#)

**Entertainment**

- [Celebrity News](#)
- [Movies](#)
- [TV News](#)
- [Music News](#)
- [Style News](#)
- [Entertainment Video](#)

**Business**

- [Personal Finance](#)
- [Economy](#)
- [Markets](#)
- [Watchlist](#)
- [Lifestyle](#)
- [Real Estate](#)
- [Tech](#)

**Lifestyle**

- [Food + Drink](#)
- [Cars + Trucks](#)
- [Travel + Outdoors](#)
- [House + Home](#)
- [Fitness + Well-being](#)
- [Style + Beauty](#)
- [Family](#)
- [Faith](#)

**Science**

- [Archaeology](#)
- [Air & Space](#)
- [Planet Earth](#)
- [Wild Nature](#)
- [Natural Science](#)
- [Dinosaurs](#)

**Tech**

- [Security](#)
- [Innovation](#)
- [Drones](#)

App.042

- Computers
- Video Games
- Military Tech

**Health**

- Coronavirus
- Healthy Living
- Medical Research
- Mental Health
- Cancer
- Heart Health
- Children's Health

**TV**

- Shows
- Personalities
- Watch Live
- Full Episodes
- Show Clips
- News Clips

**About**

- Contact Us
- Careers
- Fox Around the World
- Advertise With Us
- Media Relations
- Corporate Information
- Compliance
- Supplier Diversity

**Other**

- Fox Nation
- Fox News Shop
- Fox News Go
- Fox News Radio
- Newsletters
- Alerts
- Podcasts
- Apps & Products

Fox News

- New Terms of Use
- Updated Privacy Policy
- Do Not Sell my Personal Information
- Closed Captioning Policy
- Help
- Contact Us

This material may not be published, broadcast, rewritten, or redistributed. ©2021 FOX News Network, LLC. All rights

App.043

reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by [FactSet Digital Solutions](#). [Legal Statement](#). Mutual Fund and ETF data provided by [Refinitiv Lipper](#).

- [Facebook](#)
- [Twitter](#)
- [Google+](#)
- [Instagram](#)
- [RSS](#)
- [Email](#)

[IMMIGRATION](#)
**Published** 20 hours ago

# Border Patrol official expects more than 1 million migrant encounters this year

## Officials encountered more than 100,000 migrants in February

By [Adam Shaw | Fox News](#)

- [Facebook](#)
- [Twitter](#)
- [Flipboard](#)
- [Comments](#)
- [Print](#)
- [Email](#)

[close](#)

App.044

**Biden has posted 'open for business' sign at border: Texas Congressman**

U.S. Rep. Michael Burgess, who just visited the region, with a firsthand account of the crisis.

A border official on Tuesday told reporters that he expects Border Patrol to have more than a million migrant encounters in 2021 -- the latest indication of the scale of the escalating crisis at the southern border that the Biden administration faces.

Texas Deputy Border Chief Raul Ortiz told pool reporters that he "fully expects" Border Patrol to encounter more than a million migrants this year.

**INSIDE THE BORDER CRISIS: PRESS TOUR PACKED TEXAS FACILITY WITH 4,000+ MIGRANTS**

App.045

In February, there were more than 100,000 migrant encounters in February, and there is little sign that that rate is slowing down -- with peak migration season coming before June.

While the administration has noted that many of those encountered are single adults, and therefore able to be swiftly returned under Title 42 health protections, those that arrive as part of a family unit or who are unaccompanied children are not so easily returned.

Some migrant families can be returned under Title 42, but Mexico has been refusing to take back families with tender-age children, meaning families are being held in the U.S. or released into the interior.

There are currently more than 5,000 unaccompanied children in Customs and Border Protection custody and more than 11,000 in Health and Human Services custody.

**GOP SENATORS REVEAL SHOCKING IMAGES OF MIGRANTS, BABIES PACKED IN BORDER FACILITIES**

Some of those minors were seen by reporters on Tuesday, when press was allowed in to view a migrant facility in Donna, Texas, which is at 1700 percent capacity -- with more than 3,400 children in custody.

Eight "pods" were seen -- each containing 500-600 migrants. Guidelines say there should only be 32 migrants in each pod. Donna's temporary facility is 140,000 square feet.

 Video

The images, as well as indications that the border crisis will not abate any time soon, is continuing to increase pressure on the Biden administration to act. The administration has claimed it is not facing a "crisis" but calling it a "challenge" instead -- a claim rejected by Republicans.

**MIGRANT CHILDREN IN BIDEN'S PACKED BORDER FACILITIES NOT BEING COVID TESTED, CAN'T SOCIAL DISTANCE**

"It is a humanitarian disaster and crisis," Sen. Ted Cruz, R-Texas, who led a delegation to Donna last week, said on "Fox & Friends" on Wednesday. "And it's man-made. Joe Biden caused this by political decisions made in the opening weeks of his administration."

Critics have blamed the ending of Trump-era policies like the Migrant Protection Protocols (MPP) -- which kept migrants in Mexico -- and the halting of border wall construction for giving a green light to migrants to make the journey north. The administration has blamed the prior administration for dismantling legal pathways for asylum.

**CLICK HERE TO GET THE FOX NEWS APP**

"What we're working to do is put in place steps and actions to help address the situation at the border, including...expediting processing and opening up additional shelters, but also reinstituting policies like the Central American Minors Program to encourage young people to apply in their country and not make that treacherous journey,"

App.046

White House Press Secretary Jen Psaki said on Monday.

"We are also in a circumstance where we are digging out of a broken system over the past four years -- not just the inhumane policies, but the fact that there were never efforts put in place to look for and seek shelters where these children could be safely and humanely housed," she said.

Adam Shaw is a reporter covering U.S. and European politics for Fox News. He can be reached at adam.shaw@foxnews.com.

## Sponsored Stories You May Like

Ads by Verizon Media



### 13 Moments At Airports That People Stared At

Sponsored | MoneyPail Travel

 

### Celebrity Prom Photos Before They Were Famous

Sponsored | CultureHook



### Things That Were Actually Acceptable In The '60s

Sponsored | History A2Z

App.047



**Grossly Uncool Things Boomers Still Think Are Cool**

Sponsored | Autooverload



**When She Was Younger She Was Beyond Hot**

Sponsored | forwhatitsearth.com



**Fake Reality Shows That People Believed Were Real**

Sponsored | Definition

## Sponsored Stories
### More from Fox News

- **McDonald's Sandwiches, Ranked From Worst to First**

  Sponsored | Thrillist

- **Olivia Jade Giannulli is all 'smiles for a sunny day' in teeny tiny bikini**

  Fox News

- **The 2021 Jeep Grand Cherokee Is Stunning And Cheap**

  Sponsored | CarsGenius

- **'Desperate Housewives' star James Denton reveals why he moved his family away from Hollywood**

  Fox News

App.048

- **US Surgeon Drops Over 70 LBS: "I Quit 3 Foods"**

Sponsored | TotalRestore

- **Kentucky teen, 14, killed in Florida while jumping in front of gun aimed at stepbrother, family says**

Fox News

- **Tom Bradys New Missouri Mansion As Big As A City**

Sponsored | Bonvoyaged

- **Wendy's customer asks for extra mayo, gets way more than she expected**

Fox News

- **He Left Pregnant Wife. Weeks Later, She Opens Oven**

Sponsored | World Life Style

- **Matt Gaetz case gets more bizarre as extortion claim involves search for missing ex-FBI agent Robert Levinson**

Fox News

- **At 92, He's The Last Living TV Western Star**

Sponsored | Definition

- **Sarah Palin discloses COVID-19 diagnosis, urges Americans to wear masks**

Fox News

Ads by Verizon Media





Get all the stories you need-to-know from the most powerful name in news delivered first thing every morning to your inbox

Arrives Weekdays
Subscribe

Subscribed

Type your email
Subscribe

You've successfully subscribed to this newsletter!

## More from Fox News



**Olivia Jade Giannulli is all 'smiles for a sunny day' in teeny tiny bikini**



**'Desperate Housewives' star James Denton reveals why he moved his family away from Hollywood**

App.050



Kentucky teen, 14, killed in Florida while jumping in front of gun aimed at stepbrother, family says

Wendy's customer asks for extra mayo, gets way more than she expected

Netflix purchases 'Knives Out' sequel rights in massive two-movie deal

Matt Gaetz case gets more bizarre as extortion claim involves search for missing ex-FBI agent Robert Levinson

## More from Politics

17 mins ago

**How China gains leverage over developing countries through secret debt contracts**

21 mins ago

**Bipartisan bill would demand DHS establish plan to counter border surges, create $1B fund**

57 mins ago

**Intelligence, national security agencies warn of US supply chain threats**

1 hour ago

**Texas sheriff warns border crisis stretching police resources: 'We can't serve our citizens' the way we need**

## Sponsored Stories

App.051

Verizon Media



**13 Moments At Airports That People Stared At**

Sponsored | MoneyPail Travel

Coronavirus

U.S.

- Crime
- Military
- Education
- Terror
- Immigration
- Economy
- Personal Freedoms
- Fox News Investigates

App.052

Border Patrol official expects more than 1 million migrant encounters this year | Fox News

**World**

- U.N.
- Conflicts
- Terrorism
- Disasters
- Global Economy
- Environment
- Religion
- Scandals

**Opinion**

**Politics**

- Executive
- Senate
- House
- Judiciary
- Foreign Policy
- Polls
- Elections

**Entertainment**

- Celebrity News
- Movies
- TV News
- Music News
- Style News
- Entertainment Video

**Business**

- Personal Finance
- Economy
- Markets
- Watchlist
- Lifestyle
- Real Estate
- Tech

**Lifestyle**

- Food + Drink
- Cars + Trucks
- Travel + Outdoors
- House + Home
- Fitness + Well-being
- Style + Beauty
- Family
- Faith

**Science**

App.053

Case 2:21-cv-00067-Z   Document 54-1   Filed 06/08/21   Page 55 of 297   PageID 1194

- Archaeology
- Air & Space
- Planet Earth
- Wild Nature
- Natural Science
- Dinosaurs

**Tech**

- Security
- Innovation
- Drones
- Computers
- Video Games
- Military Tech

**Health**

- Coronavirus
- Healthy Living
- Medical Research
- Mental Health
- Cancer
- Heart Health
- Children's Health

**TV**

- Shows
- Personalities
- Watch Live
- Full Episodes
- Show Clips
- News Clips

**About**

- Contact Us
- Careers
- Fox Around the World
- Advertise With Us
- Media Relations
- Corporate Information
- Compliance
- Supplier Diversity

**Other**

- Fox Nation
- Fox News Shop
- Fox News Go
- Fox News Radio
- Newsletters

App.054

- Alert
- Podcasts
- Apps & Products

- Facebook
- Twitter
- Instagram
- Youtube
- Flipboard
- LinkedIn
- Slack
- RSS
- Newsletters
- Spotify
- iHeartRadio

Fox News

- New Terms of Use
- Updated Privacy Policy
- Do Not Sell my Personal Information
- Closed Captioning Policy
- Help
- Contact Us
- Accessibility Statement

This material may not be published, broadcast, rewritten, or redistributed. ©2021 FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.

App.055

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

U.S. Customs and Border Protection Encounters
Southwest Land Border Encounters for Fiscal Year 2021

# EXHIBIT A-8



**U.S. Customs and Border Protection (CBP) Encounters**
Southwest Land Border Encounters for Fiscal Year (FY) 2021

| Demographic<br>All | Citizenship Grouping<br>All | Title of Authority<br>All | Reset Filters |

|  | OFO | USBP | All CBP |
|---|---|---|---|
| MAR FY21 | **4,135** | **169,213** | **173,348** |
| APR FY21 | **5,162** | **173,460** | **178,622** |
| PERCENT CHANGE | ▲24.8% | ▲2.5% | ▲3.% |

Demographic: All; Citizenship: All; Title of Authority: All

### FYTD Southwest Land Border Demographic by Month

|  |  | OCT | NOV | DEC | JAN | FEB | MAR | APR | FYTD Total |
|---|---|---|---|---|---|---|---|---|---|
| Office of Field Operations | Accompanied Minors | 112 | 89 | 87 | 105 | 145 | 159 | 134 | **831** |
|  | FMUA | 113 | 130 | 156 | 230 | 301 | 719 | 1,790 | **3,439** |
|  | Single Adults | 2,544 | 2,606 | 2,493 | 2,631 | 2,872 | 3,030 | 3,000 | **19,176** |
|  | UC / Single Minors | 131 | 124 | 140 | 163 | 160 | 227 | 238 | **1,183** |
|  | Total | *2,900* | *2,949* | *2,876* | *3,129* | *3,478* | *4,135* | *5,162* | **24,629** |
| U.S. Border Patrol | FMUA | 4,634 | 4,170 | 4,248 | 7,066 | 19,287 | 53,406 | 48,226 | **141,037** |
|  | Single Adults | 59,727 | 60,516 | 62,042 | 62,560 | 69,085 | 97,074 | 108,301 | **519,305** |
|  | UC / Single Minors | 4,690 | 4,476 | 4,852 | 5,688 | 9,270 | 18,733 | 16,933 | **64,642** |
|  | Total | *69,051* | *69,162* | *71,142* | *75,314* | *97,642* | *169,213* | *173,460* | **724,984** |
|  | FYTD Total | **71,951** | **72,111** | **74,018** | **78,443** | **101,120** | **173,348** | **178,622** | **749,613** |

**Source:** USBP and OFO official year end reporting for FY18-FY20; USBP and OFO month end reporting for FY21 to date. Data is current as of 5/4/2021.



**U.S. Customs and Border Protection (CBP) Encounters**
US Border Patrol (USBP) Title 8 Apprehensions,
Office of Field Operations (OFO) Title 8 Inadmissible Volumes,
and Title 42 Expulsions by Fiscal Year (FY)

FY — All
Component — All
Demographic — All

Citizenship Grouping — All
Title of Authority — All
Reset Filters

FY: 2018, 2019, 2020, 2021 (FYTD)

**FY Southwest Land Border Encounters by Month**

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021 (FYTD) | 71,951 | 72,111 | 74,018 | 78,443 | 101,120 | 173,348 | 178,622 | | | | | | 749,613 |
| 2020 | 45,139 | 42,643 | 40,565 | 36,585 | 36,687 | 34,460 | 17,106 | 23,237 | 33,049 | 40,929 | 50,014 | 57,674 | 458,088 |
| 2019 | 60,781 | 62,469 | 60,794 | 58,317 | 76,545 | 103,731 | 109,415 | 144,116 | 104,311 | 81,777 | 62,707 | 52,546 | 977,509 |
| 2018 | 34,871 | 39,051 | 40,519 | 35,905 | 36,751 | 50,347 | 51,168 | 51,862 | 43,180 | 40,149 | 46,719 | 50,568 | 521,090 |

**FY Comparison by Demographic**

Source: USBP and OFO official year end reporting for FY18-FY20; USBP and OFO month end reporting for FY21 to date. Data is current as of 5/4/2021.

App.058



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2000

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore | 716 | 523 | 514 | 527 | 525 | 588 | 496 | 529 | 449 | 395 | 517 | 426 | 6,205 |
| Miami | 401 | 342 | 493 | 375 | 562 | 614 | 461 | 613 | 483 | 639 | 543 | 711 | 6,237 |
| New Orleans | 559 | 626 | 333 | 596 | 684 | 1,000 | 581 | 507 | 375 | 262 | 392 | 563 | 6,478 |
| Ramey | 221 | 102 | 115 | 142 | 28 | 71 | 63 | 202 | 124 | 99 | 284 | 280 | 1,731 |
| Blaine | 246 | 184 | 177 | 228 | 204 | 226 | 200 | 311 | 229 | 196 | 197 | 183 | 2,581 |
| Buffalo | 168 | 106 | 61 | 80 | 65 | 117 | 117 | 110 | 109 | 185 | 219 | 233 | 1,570 |
| Detroit | 213 | 145 | 191 | 190 | 183 | 227 | 169 | 146 | 138 | 165 | 130 | 160 | 2,057 |
| Grand Forks | 68 | 30 | 20 | 33 | 33 | 71 | 44 | 57 | 57 | 36 | 48 | 65 | 562 |
| Havre | 73 | 82 | 80 | 122 | 78 | 100 | 190 | 246 | 129 | 120 | 178 | 170 | 1,568 |
| Houlton | 51 | 37 | 32 | 25 | 42 | 25 | 30 | 30 | 25 | 45 | 105 | 42 | 489 |
| Spokane | 112 | 103 | 65 | 92 | 100 | 95 | 80 | 102 | 118 | 156 | 154 | 147 | 1,324 |
| Swanton | 153 | 111 | 125 | 97 | 87 | 108 | 132 | 118 | 140 | 370 | 374 | 142 | 1,957 |
| Big Bend (formerly Marfa) | 891 | 1,111 | 1,192 | 1,093 | 1,675 | 1,597 | 1,272 | 1,154 | 885 | 921 | 998 | 900 | 13,689 |
| Del Rio | 8,161 | 6,812 | 5,118 | 20,354 | 24,706 | 24,416 | 18,145 | 13,443 | 7,820 | 9,373 | 10,132 | 8,698 | 157,178 |
| El Centro | 13,761 | 11,035 | 8,882 | 21,924 | 31,072 | 33,301 | 26,534 | 27,460 | 20,071 | 15,820 | 15,018 | 13,248 | 238,126 |
| El Paso | 6,386 | 5,203 | 4,651 | 14,914 | 15,049 | 16,018 | 12,883 | 10,645 | 7,637 | 7,533 | 8,106 | 6,671 | 115,696 |
| Laredo | 6,962 | 6,058 | 4,477 | 13,794 | 14,745 | 15,549 | 11,174 | 9,707 | 6,436 | 6,760 | 6,971 | 6,340 | 108,973 |
| Rio Grande Valley (formerly McAllen) | 8,416 | 7,371 | 5,808 | 15,443 | 16,814 | 17,995 | 15,005 | 12,390 | 7,764 | 9,842 | 9,073 | 7,322 | 133,243 |
| San Diego | 9,046 | 7,620 | 5,978 | 15,363 | 20,204 | 18,279 | 16,751 | 16,615 | 13,186 | 10,630 | 9,356 | 8,653 | 151,681 |
| Tucson | 32,384 | 25,767 | 30,182 | 70,632 | 73,506 | 76,245 | 65,213 | 62,555 | 44,341 | 46,849 | 47,905 | 40,767 | 616,346 |
| Yuma | 5,403 | 5,219 | 4,964 | 12,462 | 13,557 | 16,663 | 13,073 | 12,327 | 6,953 | 6,228 | 6,753 | 5,145 | 108,747 |
| Coastal Border | 1,897 | 1,593 | 1,455 | 1,640 | 1,799 | 2,273 | 1,601 | 1,851 | 1,431 | 1,395 | 1,736 | 1,980 | 20,651 |
| Northern Border | 1,084 | 798 | 751 | 867 | 792 | 969 | 962 | 1,120 | 945 | 1,273 | 1,405 | 1,142 | 12,108 |
| Southwest Border | 91,410 | 76,196 | 71,252 | 185,979 | 211,328 | 220,063 | 180,050 | 166,296 | 115,093 | 113,956 | 114,312 | 97,744 | 1,643,679 |
| Monthly Total | 94,391 | 78,587 | 73,458 | 188,486 | 213,919 | 223,305 | 182,613 | 169,267 | 117,469 | 116,624 | 117,453 | 100,866 | 1,676,438 |



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2001

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore | 532 | 449 | 360 | 403 | 407 | 463 | 443 | 482 | 463 | 436 | 406 | 367 | 5,211 |
| Miami | 338 | 590 | 481 | 483 | 452 | 392 | 399 | 503 | 607 | 735 | 532 | 450 | 5,962 |
| New Orleans | 315 | 306 | 396 | 358 | 634 | 446 | 740 | 377 | 346 | 402 | 354 | 359 | 5,033 |
| Ramey | 399 | 285 | 187 | 418 | 79 | 73 | 19 | 117 | 94 | 107 | 101 | 73 | 1,952 |
| Blaine | 179 | 168 | 151 | 141 | 159 | 175 | 145 | 194 | 231 | 192 | 186 | 168 | 2,089 |
| Buffalo | 203 | 85 | 74 | 87 | 81 | 116 | 89 | 137 | 134 | 165 | 156 | 107 | 1,434 |
| Detroit | 132 | 139 | 107 | 195 | 182 | 167 | 157 | 156 | 177 | 195 | 349 | 150 | 2,106 |
| Grand Forks | 48 | 23 | 45 | 44 | 66 | 73 | 96 | 85 | 112 | 100 | 144 | 85 | 921 |
| Havre | 108 | 67 | 58 | 77 | 136 | 108 | 104 | 97 | 93 | 169 | 175 | 113 | 1,305 |
| Houlton | 40 | 37 | 30 | 54 | 27 | 30 | 24 | 31 | 33 | 153 | 182 | 44 | 685 |
| Spokane | 158 | 114 | 126 | 99 | 100 | 131 | 87 | 95 | 117 | 132 | 109 | 67 | 1,335 |
| Swanton | 126 | 120 | 75 | 101 | 73 | 95 | 109 | 139 | 168 | 543 | 715 | 199 | 2,463 |
| Big Bend (formerly Marfa) | 844 | 874 | 776 | 846 | 1,046 | 1,427 | 1,249 | 1,123 | 1,058 | 1,107 | 906 | 831 | 12,087 |
| Del Rio | 7,648 | 5,344 | 3,756 | 11,218 | 16,447 | 16,833 | 11,444 | 9,005 | 7,048 | 6,069 | 6,038 | 4,025 | 104,875 |
| El Centro | 13,712 | 9,979 | 8,299 | 18,672 | 21,412 | 21,815 | 20,699 | 17,203 | 11,385 | 11,175 | 10,965 | 7,536 | 172,852 |
| El Paso | 6,095 | 5,401 | 4,683 | 10,862 | 12,369 | 15,311 | 12,738 | 11,343 | 8,035 | 8,607 | 9,945 | 7,468 | 112,857 |
| Laredo | 5,154 | 3,652 | 2,762 | 8,228 | 10,656 | 12,604 | 9,928 | 9,216 | 6,586 | 6,475 | 7,338 | 4,469 | 87,068 |
| Rio Grande Valley (formerly McAllen) | 6,634 | 5,975 | 4,280 | 10,102 | 12,298 | 12,890 | 11,366 | 11,204 | 8,152 | 9,191 | 9,426 | 6,326 | 107,844 |
| San Diego | 8,002 | 5,556 | 5,270 | 11,558 | 12,085 | 13,510 | 12,597 | 11,270 | 8,467 | 7,580 | 8,297 | 5,883 | 110,075 |
| Tucson | 30,009 | 25,889 | 20,907 | 43,972 | 54,913 | 64,779 | 52,949 | 44,573 | 33,602 | 29,550 | 28,028 | 20,504 | 449,675 |
| Yuma | 4,534 | 5,039 | 4,348 | 9,632 | 11,003 | 11,411 | 9,843 | 7,990 | 4,798 | 3,848 | 3,705 | 2,234 | 78,385 |
| Coastal Border | 1,584 | 1,630 | 1,424 | 1,662 | 1,572 | 1,374 | 1,601 | 1,479 | 1,510 | 1,680 | 1,393 | 1,249 | 18,158 |
| Northern Border | 994 | 753 | 666 | 798 | 824 | 895 | 811 | 934 | 1,065 | 1,649 | 2,016 | 933 | 12,338 |
| Southwest Border | 82,632 | 67,709 | 55,081 | 125,090 | 152,229 | 170,580 | 142,813 | 122,927 | 89,131 | 83,602 | 84,648 | 59,276 | 1,235,718 |
| Monthly Total | 85,210 | 70,092 | 57,171 | 127,550 | 154,625 | 172,849 | 145,225 | 125,340 | 91,706 | 86,931 | 88,057 | 61,458 | 1,266,214 |



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2002

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore | 437 | 439 | 373 | 362 | 247 | 314 | 359 | 340 | 360 | 358 | 457 | 325 | 4,371 |
| Miami | 391 | 352 | 251 | 445 | 415 | 494 | 422 | 475 | 440 | 532 | 564 | 362 | 5,143 |
| New Orleans | 352 | 220 | 299 | 357 | 373 | 459 | 492 | 307 | 460 | 427 | 424 | 495 | 4,665 |
| Ramey | 3 | 47 | 11 | 37 | 36 | 98 | 32 | 94 | 29 | 90 | 222 | 136 | 835 |
| Blaine | 127 | 152 | 172 | 106 | 147 | 132 | 156 | 175 | 124 | 148 | 157 | 136 | 1,732 |
| Buffalo | 50 | 73 | 36 | 74 | 101 | 112 | 155 | 121 | 85 | 64 | 142 | 89 | 1,102 |
| Detroit | 135 | 106 | 98 | 99 | 135 | 107 | 137 | 132 | 106 | 173 | 133 | 150 | 1,511 |
| Grand Forks | 85 | 80 | 87 | 93 | 87 | 113 | 131 | 159 | 153 | 138 | 108 | 135 | 1,369 |
| Havre | 114 | 119 | 92 | 89 | 107 | 144 | 123 | 138 | 113 | 139 | 163 | 122 | 1,463 |
| Houlton | 27 | 31 | 24 | 43 | 40 | 35 | 31 | 36 | 28 | 42 | 59 | 36 | 432 |
| Spokane | 62 | 53 | 60 | 98 | 91 | 100 | 90 | 104 | 99 | 135 | 121 | 129 | 1,142 |
| Swanton | 82 | 73 | 76 | 71 | 58 | 104 | 100 | 125 | 210 | 293 | 387 | 157 | 1,736 |
| Big Bend (formerly Marfa) | 913 | 810 | 876 | 826 | 1,040 | 1,184 | 1,312 | 1,163 | 702 | 748 | 940 | 878 | 11,392 |
| Del Rio | 2,938 | 2,367 | 2,104 | 8,384 | 10,087 | 12,068 | 8,540 | 5,404 | 3,787 | 3,301 | 4,297 | 3,708 | 66,985 |
| El Centro | 4,069 | 3,318 | 3,720 | 9,670 | 11,118 | 15,673 | 14,274 | 11,415 | 8,870 | 7,897 | 9,557 | 8,692 | 108,273 |
| El Paso | 4,441 | 3,483 | 3,784 | 8,185 | 9,393 | 11,309 | 11,783 | 9,972 | 6,931 | 8,044 | 9,018 | 7,811 | 94,154 |
| Laredo | 3,431 | 2,949 | 2,608 | 7,711 | 10,628 | 12,270 | 10,709 | 7,861 | 6,545 | 5,830 | 6,376 | 5,177 | 82,095 |
| Rio Grande Valley (formerly McAllen) | 4,784 | 3,744 | 3,843 | 8,035 | 8,438 | 10,153 | 10,310 | 9,473 | 8,109 | 7,523 | 8,762 | 6,753 | 89,927 |
| San Diego | 4,530 | 3,178 | 3,183 | 7,716 | 9,172 | 12,832 | 11,712 | 11,222 | 9,251 | 9,340 | 10,115 | 8,430 | 100,681 |
| Tucson | 11,124 | 10,523 | 9,208 | 25,182 | 32,264 | 46,094 | 47,712 | 36,333 | 30,898 | 30,212 | 30,078 | 24,020 | 333,648 |
| Yuma | 1,582 | 2,134 | 2,175 | 4,084 | 3,584 | 5,409 | 5,569 | 4,581 | 3,562 | 3,766 | 3,414 | 2,794 | 42,654 |
| Coastal Border | 1,183 | 1,058 | 934 | 1,201 | 1,071 | 1,365 | 1,305 | 1,216 | 1,289 | 1,407 | 1,667 | 1,318 | 15,014 |
| Northern Border | 682 | 687 | 645 | 673 | 766 | 847 | 923 | 990 | 918 | 1,132 | 1,270 | 954 | 10,487 |
| Southwest Border | 37,812 | 32,506 | 31,501 | 79,793 | 95,724 | 126,992 | 121,921 | 97,424 | 78,655 | 76,661 | 82,557 | 68,263 | 929,809 |
| Monthly Total | 39,677 | 34,251 | 33,080 | 81,667 | 97,561 | 129,204 | 124,149 | 99,630 | 80,862 | 79,200 | 85,494 | 70,535 | 955,310 |

App.061



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2003

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore | 371 | 292 | 288 | 309 | 253 | 315 | 336 | 330 | 267 | 247 | 211 | 346 | 3,565 |
| Miami | 686 | 398 | 287 | 493 | 542 | 461 | 623 | 434 | 408 | 491 | 481 | 627 | 5,931 |
| New Orleans | 462 | 430 | 349 | 535 | 506 | 504 | 576 | 516 | 399 | 378 | 252 | 244 | 5,151 |
| Ramey | 198 | 316 | 121 | 201 | 32 | 36 | 46 | 231 | 81 | 21 | 172 | 233 | 1,688 |
| Blaine | 107 | 107 | 89 | 92 | 116 | 125 | 93 | 121 | 69 | 152 | 140 | 169 | 1,380 |
| Buffalo | 112 | 79 | 55 | 35 | 30 | 34 | 26 | 22 | 33 | 28 | 30 | 80 | 564 |
| Detroit | 151 | 195 | 153 | 178 | 188 | 170 | 220 | 195 | 196 | 235 | 232 | 232 | 2,345 |
| Grand Forks | 102 | 81 | 88 | 78 | 110 | 119 | 113 | 90 | 99 | 123 | 131 | 89 | 1,223 |
| Havre | 151 | 105 | 86 | 92 | 98 | 97 | 156 | 135 | 132 | 128 | 110 | 116 | 1,406 |
| Houlton | 53 | 22 | 12 | 19 | 17 | 16 | 19 | 30 | 21 | 38 | 29 | 16 | 292 |
| Spokane | 126 | 88 | 72 | 79 | 69 | 54 | 42 | 60 | 68 | 137 | 87 | 110 | 992 |
| Swanton | 107 | 80 | 80 | 101 | 113 | 121 | 101 | 156 | 337 | 352 | 235 | 172 | 1,955 |
| Big Bend (formerly Marfa) | 754 | 722 | 872 | 862 | 974 | 1,097 | 860 | 1,099 | 678 | 773 | 867 | 761 | 10,319 |
| Del Rio | 3,037 | 1,942 | 2,083 | 6,546 | 7,127 | 6,579 | 5,020 | 4,973 | 2,857 | 2,993 | 3,700 | 3,288 | 50,145 |
| El Centro | 8,399 | 6,107 | 4,572 | 12,369 | 13,293 | 11,632 | 6,116 | 6,528 | 5,791 | 6,128 | 6,076 | 5,088 | 92,099 |
| El Paso | 6,545 | 5,303 | 4,008 | 9,255 | 10,000 | 8,883 | 7,359 | 8,120 | 6,998 | 7,618 | 7,538 | 7,189 | 88,816 |
| Laredo | 4,644 | 4,157 | 3,991 | 7,444 | 7,603 | 7,803 | 5,990 | 6,683 | 5,165 | 5,570 | 6,371 | 5,100 | 70,521 |
| Rio Grande Valley (formerly McAllen) | 6,024 | 4,218 | 3,814 | 7,630 | 7,905 | 7,498 | 6,560 | 7,095 | 6,153 | 7,042 | 7,737 | 6,073 | 77,749 |
| San Diego | 7,339 | 5,379 | 4,280 | 10,177 | 10,958 | 11,158 | 9,082 | 10,680 | 9,271 | 10,207 | 11,217 | 11,767 | 111,515 |
| Tucson | 21,352 | 17,206 | 11,481 | 26,826 | 33,854 | 37,055 | 29,099 | 37,847 | 32,532 | 34,201 | 36,639 | 29,171 | 347,263 |
| Yuma | 3,698 | 2,697 | 2,723 | 5,816 | 5,155 | 6,694 | 5,273 | 5,665 | 6,085 | 4,752 | 4,341 | 3,739 | 56,638 |
| Coastal Border | 1,717 | 1,436 | 1,045 | 1,538 | 1,333 | 1,316 | 1,581 | 1,511 | 1,155 | 1,137 | 1,116 | 1,450 | 16,335 |
| Northern Border | 909 | 757 | 635 | 674 | 741 | 736 | 770 | 809 | 955 | 1,193 | 994 | 984 | 10,157 |
| Southwest Border | 61,792 | 47,731 | 37,824 | 86,925 | 96,869 | 98,399 | 75,359 | 88,690 | 75,530 | 79,284 | 84,486 | 72,176 | 905,065 |
| Monthly Total | 64,418 | 49,924 | 39,504 | 89,137 | 98,943 | 100,451 | 77,710 | 91,010 | 77,640 | 81,614 | 86,596 | 74,610 | 931,557 |

App.062



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2004

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore | 296 | 225 | 220 | 172 | 184 | 183 | 185 | 214 | 171 | 0 | 0 | 0 | 1,850 |
| Miami | 437 | 321 | 367 | 522 | 418 | 346 | 371 | 252 | 415 | 344 | 494 | 315 | 4,602 |
| New Orleans | 284 | 244 | 184 | 293 | 226 | 376 | 282 | 286 | 296 | 98 | 158 | 162 | 2,889 |
| Ramey | 213 | 247 | 332 | 166 | 188 | 31 | 178 | 87 | 99 | 74 | 165 | 33 | 1,813 |
| Blaine | 135 | 100 | 101 | 76 | 118 | 145 | 132 | 136 | 106 | 85 | 117 | 103 | 1,354 |
| Buffalo | 25 | 17 | 30 | 28 | 28 | 84 | 60 | 84 | 85 | 86 | 95 | 49 | 671 |
| Detroit | 154 | 157 | 111 | 114 | 108 | 202 | 149 | 173 | 148 | 184 | 212 | 200 | 1,912 |
| Grand Forks | 92 | 89 | 85 | 105 | 70 | 106 | 84 | 134 | 136 | 122 | 105 | 97 | 1,225 |
| Havre | 81 | 48 | 90 | 84 | 62 | 84 | 69 | 92 | 83 | 108 | 106 | 79 | 986 |
| Houlton | 27 | 19 | 17 | 38 | 17 | 15 | 17 | 22 | 17 | 32 | 24 | 18 | 263 |
| Spokane | 83 | 79 | 51 | 69 | 103 | 101 | 52 | 58 | 84 | 54 | 49 | 64 | 847 |
| Swanton | 177 | 82 | 107 | 224 | 182 | 195 | 141 | 179 | 270 | 526 | 374 | 244 | 2,701 |
| Big Bend (formerly Marfa) | 707 | 710 | 824 | 696 | 907 | 1,104 | 993 | 923 | 885 | 1,068 | 930 | 783 | 10,530 |
| Del Rio | 2,913 | 2,372 | 2,307 | 5,044 | 6,561 | 7,983 | 4,960 | 5,177 | 3,709 | 4,242 | 4,573 | 3,953 | 53,794 |
| El Centro | 5,438 | 3,799 | 2,802 | 7,826 | 8,417 | 10,761 | 8,327 | 7,616 | 5,611 | 4,581 | 5,086 | 4,203 | 74,467 |
| El Paso | 6,451 | 5,244 | 4,030 | 8,768 | 10,584 | 13,483 | 12,632 | 10,343 | 8,432 | 8,654 | 8,321 | 7,457 | 104,399 |
| Laredo | 4,479 | 4,670 | 3,571 | 6,540 | 8,057 | 9,686 | 7,069 | 7,421 | 6,149 | 5,376 | 6,570 | 5,118 | 74,706 |
| Rio Grande Valley (formerly McAllen) | 5,414 | 5,053 | 4,636 | 8,102 | 8,732 | 10,149 | 9,618 | 8,916 | 7,423 | 8,826 | 8,542 | 7,536 | 92,947 |
| San Diego | 10,426 | 7,996 | 5,849 | 13,405 | 13,252 | 17,532 | 15,962 | 14,976 | 11,548 | 9,530 | 9,716 | 8,416 | 138,608 |
| Tucson | 26,530 | 24,890 | 17,349 | 34,913 | 45,312 | 72,095 | 64,563 | 53,132 | 42,013 | 39,114 | 38,740 | 33,120 | 491,771 |
| Yuma | 3,033 | 3,160 | 2,246 | 7,227 | 8,847 | 12,188 | 11,344 | 10,222 | 8,820 | 10,774 | 10,768 | 9,431 | 98,060 |
| Coastal Border | 1,230 | 1,037 | 1,103 | 1,153 | 1,016 | 936 | 1,016 | 839 | 981 | 516 | 817 | 510 | 11,154 |
| Northern Border | 774 | 591 | 592 | 738 | 688 | 932 | 704 | 878 | 929 | 1,197 | 1,082 | 854 | 9,959 |
| Southwest Border | 65,391 | 57,894 | 43,614 | 92,521 | 110,669 | 154,981 | 135,468 | 118,726 | 94,590 | 92,165 | 93,246 | 80,017 | 1,139,282 |
| Monthly Total | 67,395 | 59,522 | 45,309 | 94,412 | 112,373 | 156,849 | 137,188 | 120,443 | 96,500 | 93,878 | 95,145 | 81,381 | 1,160,395 |



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2005

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore | 51 | 26 | 6 | 3 | 0 | 7 | 5 | 3 | 7 | 1 | 0 | 5 | 114 |
| Miami | 541 | 460 | 489 | 641 | 487 | 574 | 536 | 717 | 676 | 648 | 586 | 890 | 7,245 |
| New Orleans | 140 | 129 | 135 | 155 | 73 | 100 | 96 | 170 | 69 | 83 | 186 | 22 | 1,358 |
| Ramey | 188 | 112 | 205 | 33 | 106 | 63 | 163 | 67 | 103 | 101 | 156 | 322 | 1,619 |
| Blaine | 89 | 92 | 75 | 69 | 93 | 96 | 68 | 88 | 93 | 85 | 72 | 81 | 1,001 |
| Buffalo | 26 | 27 | 21 | 28 | 29 | 37 | 40 | 53 | 19 | 34 | 45 | 41 | 400 |
| Detroit | 200 | 176 | 133 | 164 | 205 | 193 | 132 | 113 | 122 | 107 | 132 | 116 | 1,793 |
| Grand Forks | 109 | 72 | 73 | 98 | 90 | 61 | 35 | 24 | 41 | 28 | 56 | 67 | 754 |
| Havre | 83 | 106 | 57 | 73 | 70 | 85 | 105 | 89 | 88 | 70 | 74 | 48 | 948 |
| Houlton | 17 | 47 | 31 | 27 | 26 | 6 | 19 | 10 | 11 | 18 | 8 | 13 | 233 |
| Spokane | 26 | 26 | 30 | 26 | 7 | 22 | 33 | 30 | 41 | 18 | 14 | 6 | 279 |
| Swanton | 193 | 186 | 141 | 95 | 105 | 152 | 105 | 123 | 241 | 274 | 214 | 106 | 1,935 |
| Big Bend (formerly Marfa) | 844 | 713 | 722 | 802 | 1,113 | 1,364 | 1,276 | 866 | 620 | 761 | 777 | 678 | 10,536 |
| Del Rio | 3,856 | 2,795 | 2,768 | 6,120 | 7,248 | 7,935 | 7,584 | 6,270 | 4,947 | 5,873 | 6,498 | 6,612 | 68,506 |
| El Centro | 3,723 | 2,798 | 1,772 | 4,963 | 5,926 | 6,632 | 6,010 | 5,352 | 3,829 | 3,712 | 5,047 | 5,958 | 55,722 |
| El Paso | 7,472 | 5,801 | 4,464 | 9,898 | 13,033 | 13,249 | 15,274 | 11,041 | 8,445 | 11,568 | 12,099 | 10,335 | 122,679 |
| Laredo | 4,691 | 3,997 | 3,367 | 6,331 | 7,530 | 8,112 | 9,043 | 7,569 | 5,699 | 6,623 | 6,635 | 5,749 | 75,346 |
| Rio Grande Valley (formerly McAllen) | 7,813 | 7,512 | 7,214 | 9,136 | 10,147 | 13,176 | 14,635 | 14,796 | 13,109 | 12,208 | 12,713 | 11,727 | 134,186 |
| San Diego | 6,702 | 5,428 | 4,632 | 9,390 | 10,864 | 12,750 | 16,534 | 15,114 | 10,921 | 10,010 | 11,798 | 12,761 | 126,904 |
| Tucson | 31,940 | 27,673 | 17,631 | 35,873 | 45,875 | 64,096 | 52,644 | 40,764 | 31,694 | 32,390 | 29,178 | 29,321 | 439,079 |
| Yuma | 8,872 | 8,418 | 5,836 | 10,507 | 12,039 | 15,734 | 17,062 | 14,051 | 11,522 | 11,809 | 11,988 | 10,600 | 138,438 |
| Coastal Border | 920 | 727 | 835 | 832 | 666 | 744 | 800 | 957 | 855 | 833 | 928 | 1,239 | 10,336 |
| Northern Border | 743 | 732 | 561 | 580 | 625 | 652 | 537 | 530 | 656 | 634 | 615 | 478 | 7,343 |
| Southwest Border | 75,913 | 65,135 | 48,406 | 93,020 | 113,775 | 143,048 | 140,062 | 115,823 | 90,786 | 94,954 | 96,733 | 93,741 | 1,171,396 |
| Monthly Total | 77,576 | 66,594 | 49,802 | 94,432 | 115,066 | 144,444 | 141,399 | 117,310 | 92,297 | 96,421 | 98,276 | 95,458 | 1,189,075 |



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2006

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 438 | 543 | 693 | 506 | 452 | 450 | 592 | 725 | 523 | 358 | 295 | 457 | 6,032 |
| New Orleans | 48 | 176 | 214 | 372 | 300 | 230 | 136 | 402 | 238 | 289 | 325 | 323 | 3,053 |
| Ramey | 184 | 119 | 174 | 60 | 208 | 136 | 127 | 149 | 112 | 46 | 85 | 36 | 1,436 |
| Blaine | 71 | 103 | 49 | 54 | 54 | 50 | 83 | 85 | 64 | 66 | 64 | 68 | 811 |
| Buffalo | 120 | 107 | 71 | 85 | 96 | 101 | 111 | 178 | 154 | 174 | 148 | 172 | 1,517 |
| Detroit | 120 | 134 | 130 | 138 | 92 | 149 | 83 | 108 | 78 | 76 | 97 | 76 | 1,281 |
| Grand Forks | 59 | 48 | 41 | 56 | 36 | 18 | 66 | 49 | 26 | 31 | 48 | 40 | 518 |
| Havre | 26 | 58 | 28 | 40 | 62 | 32 | 43 | 63 | 56 | 47 | 52 | 61 | 568 |
| Houlton | 17 | 21 | 15 | 28 | 10 | 12 | 11 | 5 | 22 | 12 | 16 | 6 | 175 |
| Spokane | 8 | 23 | 8 | 10 | 3 | 12 | 26 | 6 | 19 | 6 | 19 | 45 | 185 |
| Swanton | 107 | 98 | 89 | 96 | 75 | 87 | 83 | 121 | 155 | 352 | 201 | 80 | 1,544 |
| Big Bend (formerly Marfa) | 655 | 590 | 563 | 739 | 908 | 910 | 746 | 711 | 478 | 392 | 403 | 425 | 7,520 |
| Del Rio | 4,840 | 4,016 | 2,910 | 4,839 | 5,854 | 5,636 | 4,555 | 2,633 | 2,106 | 1,947 | 1,683 | 1,617 | 42,636 |
| El Centro | 5,072 | 3,831 | 2,998 | 5,797 | 6,399 | 9,048 | 6,847 | 6,187 | 4,112 | 3,240 | 3,705 | 4,229 | 61,465 |
| El Paso | 11,027 | 8,191 | 5,668 | 11,941 | 14,457 | 18,668 | 15,238 | 12,239 | 7,664 | 6,970 | 5,027 | 5,166 | 122,256 |
| Laredo | 5,014 | 4,323 | 3,544 | 7,415 | 9,554 | 10,179 | 8,530 | 6,866 | 4,815 | 4,667 | 5,525 | 4,408 | 74,840 |
| Rio Grande Valley (formerly McAllen) | 10,060 | 9,111 | 7,128 | 9,533 | 10,444 | 13,080 | 11,264 | 11,649 | 7,516 | 7,109 | 7,020 | 6,614 | 110,528 |
| San Diego | 10,145 | 7,730 | 6,531 | 13,959 | 17,160 | 18,361 | 14,736 | 13,888 | 10,597 | 8,683 | 10,009 | 10,305 | 142,104 |
| Tucson | 27,316 | 24,270 | 16,447 | 33,229 | 43,153 | 63,583 | 51,588 | 40,190 | 25,049 | 21,187 | 23,256 | 22,806 | 392,074 |
| Yuma | 9,428 | 8,913 | 6,884 | 13,743 | 17,117 | 21,231 | 13,034 | 11,087 | 6,029 | 5,446 | 3,123 | 2,514 | 118,549 |
| Coastal Border | 670 | 838 | 1,081 | 938 | 960 | 816 | 855 | 1,276 | 873 | 693 | 705 | 816 | 10,521 |
| Northern Border | 528 | 592 | 431 | 507 | 428 | 461 | 506 | 615 | 574 | 764 | 645 | 548 | 6,599 |
| Southwest Border | 83,557 | 70,975 | 52,673 | 101,195 | 125,046 | 160,696 | 126,538 | 105,450 | 68,366 | 59,641 | 59,751 | 58,084 | 1,071,972 |
| Monthly Total | 84,755 | 72,405 | 54,185 | 102,640 | 126,434 | 161,973 | 127,899 | 107,341 | 69,813 | 61,098 | 61,101 | 59,448 | 1,089,092 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2007

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 669 | 429 | 405 | 751 | 531 | 475 | 477 | 573 | 905 | 648 | 651 | 606 | 7,120 |
| New Orleans | 379 | 379 | 222 | 327 | 398 | 492 | 336 | 336 | 340 | 354 | 155 | 300 | 4,018 |
| Ramey | 41 | 61 | 117 | 39 | 71 | 37 | 51 | 48 | 32 | 13 | 28 | 10 | 548 |
| Blaine | 61 | 36 | 62 | 61 | 59 | 87 | 50 | 67 | 82 | 67 | 60 | 57 | 749 |
| Buffalo | 141 | 155 | 104 | 123 | 125 | 170 | 167 | 178 | 219 | 223 | 233 | 353 | 2,191 |
| Detroit | 106 | 99 | 83 | 77 | 56 | 83 | 85 | 76 | 51 | 52 | 66 | 68 | 902 |
| Grand Forks | 56 | 32 | 45 | 25 | 40 | 48 | 49 | 33 | 35 | 40 | 54 | 40 | 497 |
| Havre | 68 | 56 | 53 | 41 | 60 | 40 | 27 | 27 | 31 | 17 | 31 | 35 | 486 |
| Houlton | 7 | 7 | 4 | 6 | 12 | 2 | 3 | 6 | 5 | 22 | 6 | 15 | 95 |
| Spokane | 30 | 18 | 23 | 30 | 22 | 37 | 24 | 29 | 42 | 47 | 27 | 12 | 341 |
| Swanton | 73 | 78 | 80 | 75 | 68 | 75 | 91 | 105 | 74 | 101 | 183 | 116 | 1,119 |
| Big Bend (formerly Marfa) | 368 | 442 | 383 | 556 | 532 | 677 | 602 | 407 | 362 | 439 | 403 | 365 | 5,536 |
| Del Rio | 1,618 | 1,701 | 1,051 | 2,044 | 2,421 | 3,314 | 2,699 | 1,858 | 1,579 | 1,862 | 1,440 | 1,333 | 22,920 |
| El Centro | 4,379 | 3,667 | 3,037 | 4,983 | 5,187 | 7,198 | 6,983 | 5,747 | 3,842 | 3,835 | 3,789 | 3,236 | 55,883 |
| El Paso | 6,183 | 5,098 | 4,189 | 6,570 | 7,482 | 10,537 | 8,957 | 6,741 | 5,632 | 5,109 | 4,969 | 3,997 | 75,464 |
| Laredo | 4,286 | 3,810 | 2,890 | 4,678 | 5,855 | 7,673 | 6,428 | 4,928 | 4,595 | 4,338 | 3,858 | 3,375 | 56,714 |
| Rio Grande Valley (formerly McAllen) | 5,772 | 4,549 | 3,649 | 5,798 | 6,172 | 8,431 | 7,645 | 7,736 | 5,791 | 6,225 | 6,331 | 5,331 | 73,430 |
| San Diego | 9,494 | 7,764 | 6,591 | 12,489 | 12,997 | 18,044 | 17,999 | 16,136 | 13,283 | 12,941 | 13,312 | 11,410 | 152,460 |
| Tucson | 25,135 | 21,323 | 16,136 | 29,459 | 34,148 | 52,692 | 49,044 | 41,789 | 34,103 | 30,373 | 24,388 | 19,649 | 378,239 |
| Yuma | 3,478 | 3,240 | 2,601 | 5,357 | 4,474 | 5,571 | 4,108 | 3,162 | 2,151 | 1,660 | 1,305 | 885 | 37,992 |
| Coastal Border | 1,089 | 869 | 744 | 1,117 | 1,000 | 1,004 | 864 | 957 | 1,277 | 1,015 | 834 | 916 | 11,686 |
| Northern Border | 542 | 481 | 454 | 438 | 442 | 542 | 496 | 521 | 539 | 569 | 660 | 696 | 6,380 |
| Southwest Border | 60,713 | 51,594 | 40,527 | 71,934 | 79,268 | 114,137 | 104,465 | 88,504 | 71,338 | 66,782 | 59,795 | 49,581 | 858,638 |
| Monthly Total | 62,344 | 52,944 | 41,725 | 73,489 | 80,710 | 115,683 | 105,825 | 89,982 | 73,154 | 68,366 | 61,289 | 51,193 | 876,704 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2008

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 553 | 496 | 685 | 456 | 539 | 699 | 634 | 433 | 519 | 277 | 335 | 394 | 6,020 |
| New Orleans | 382 | 429 | 329 | 650 | 305 | 365 | 462 | 318 | 439 | 296 | 251 | 77 | 4,303 |
| Ramey | 90 | 40 | 20 | 52 | 12 | 55 | 48 | 33 | 53 | 28 | 50 | 91 | 572 |
| Blaine | 52 | 75 | 40 | 91 | 69 | 108 | 101 | 67 | 75 | 88 | 82 | 106 | 954 |
| Buffalo | 382 | 290 | 295 | 228 | 260 | 304 | 233 | 222 | 260 | 259 | 291 | 315 | 3,339 |
| Detroit | 100 | 63 | 68 | 79 | 71 | 95 | 64 | 113 | 83 | 73 | 84 | 68 | 961 |
| Grand Forks | 67 | 91 | 41 | 24 | 38 | 22 | 41 | 30 | 52 | 41 | 38 | 56 | 541 |
| Havre | 63 | 121 | 13 | 33 | 19 | 3 | 23 | 28 | 33 | 21 | 38 | 32 | 427 |
| Houlton | 15 | 5 | 2 | 17 | 2 | 0 | 5 | 3 | 1 | 7 | 14 | 10 | 81 |
| Spokane | 30 | 40 | 17 | 18 | 27 | 15 | 20 | 10 | 34 | 38 | 34 | 57 | 340 |
| Swanton | 106 | 126 | 64 | 74 | 85 | 87 | 72 | 92 | 148 | 195 | 159 | 74 | 1,282 |
| Big Bend (formerly Marfa) | 386 | 388 | 451 | 350 | 612 | 613 | 527 | 586 | 369 | 416 | 415 | 278 | 5,391 |
| Del Rio | 1,679 | 1,059 | 945 | 1,961 | 2,462 | 2,667 | 2,286 | 1,745 | 1,708 | 1,482 | 1,618 | 1,149 | 20,761 |
| El Centro | 3,230 | 2,412 | 2,000 | 3,839 | 4,095 | 4,604 | 5,090 | 3,860 | 3,161 | 2,726 | 2,995 | 2,949 | 40,961 |
| El Paso | 3,605 | 2,648 | 2,015 | 3,470 | 3,944 | 3,129 | 2,808 | 2,035 | 1,811 | 1,634 | 1,615 | 1,598 | 30,312 |
| Laredo | 3,825 | 2,658 | 1,969 | 3,907 | 5,001 | 5,355 | 4,904 | 3,733 | 3,432 | 3,066 | 3,310 | 2,498 | 43,658 |
| Rio Grande Valley (formerly McAllen) | 5,989 | 4,695 | 3,974 | 5,216 | 6,880 | 8,543 | 9,417 | 7,967 | 6,308 | 5,562 | 6,103 | 4,819 | 75,473 |
| San Diego | 9,801 | 9,163 | 7,773 | 12,877 | 15,091 | 18,869 | 20,569 | 16,015 | 12,395 | 13,127 | 13,734 | 12,976 | 162,390 |
| Tucson | 21,730 | 18,231 | 11,721 | 26,347 | 34,309 | 45,239 | 45,442 | 32,845 | 24,289 | 21,093 | 18,406 | 18,044 | 317,696 |
| Yuma | 1,094 | 955 | 954 | 1,061 | 1,089 | 751 | 523 | 447 | 381 | 366 | 345 | 397 | 8,363 |
| Coastal Border | 1,025 | 965 | 1,034 | 1,158 | 856 | 1,119 | 1,144 | 784 | 1,011 | 601 | 636 | 562 | 10,895 |
| Northern Border | 815 | 811 | 540 | 564 | 571 | 634 | 559 | 565 | 686 | 722 | 740 | 718 | 7,925 |
| Southwest Border | 51,339 | 42,209 | 31,802 | 59,028 | 73,483 | 89,770 | 91,566 | 69,233 | 53,854 | 49,472 | 48,541 | 44,708 | 705,005 |
| Monthly Total | 53,179 | 43,985 | 33,376 | 60,750 | 74,910 | 91,523 | 93,269 | 70,582 | 55,551 | 50,795 | 49,917 | 45,988 | 723,825 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2009

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 342 | 302 | 317 | 401 | 383 | 382 | 407 | 314 | 343 | 413 | 358 | 463 | 4,425 |
| New Orleans | 386 | 267 | 309 | 259 | 282 | 429 | 317 | 257 | 264 | 253 | 271 | 233 | 3,527 |
| Ramey | 114 | 34 | 27 | 27 | 21 | 42 | 26 | 11 | 50 | 5 | 58 | 3 | 418 |
| Blaine | 103 | 93 | 68 | 96 | 68 | 85 | 61 | 65 | 39 | 49 | 67 | 49 | 843 |
| Buffalo | 254 | 210 | 201 | 176 | 194 | 220 | 225 | 263 | 250 | 198 | 240 | 241 | 2,672 |
| Detroit | 120 | 62 | 63 | 78 | 118 | 99 | 97 | 91 | 80 | 117 | 122 | 110 | 1,157 |
| Grand Forks | 52 | 53 | 37 | 29 | 26 | 29 | 22 | 41 | 35 | 50 | 49 | 49 | 472 |
| Havre | 31 | 21 | 11 | 29 | 30 | 23 | 30 | 21 | 31 | 22 | 18 | 16 | 283 |
| Houlton | 1 | 8 | 13 | 3 | 0 | 4 | 4 | 4 | 2 | 8 | 4 | 8 | 59 |
| Spokane | 32 | 44 | 22 | 20 | 18 | 14 | 15 | 16 | 17 | 19 | 38 | 22 | 277 |
| Swanton | 65 | 80 | 106 | 36 | 77 | 71 | 74 | 111 | 99 | 125 | 104 | 95 | 1,043 |
| Big Bend (formerly Marfa) | 539 | 459 | 472 | 533 | 689 | 590 | 458 | 511 | 569 | 484 | 575 | 481 | 6,360 |
| Del Rio | 1,321 | 1,064 | 872 | 1,604 | 1,908 | 2,231 | 1,619 | 1,426 | 1,304 | 1,383 | 1,321 | 1,029 | 17,082 |
| El Centro | 2,619 | 2,176 | 1,691 | 2,969 | 2,904 | 4,141 | 3,314 | 2,955 | 2,811 | 2,449 | 2,767 | 2,725 | 33,521 |
| El Paso | 1,469 | 1,153 | 866 | 1,344 | 1,435 | 1,508 | 1,344 | 1,238 | 1,208 | 1,160 | 1,181 | 1,093 | 14,999 |
| Laredo | 2,709 | 2,465 | 1,932 | 3,970 | 3,718 | 4,538 | 4,168 | 3,722 | 3,283 | 3,512 | 3,671 | 2,881 | 40,569 |
| Rio Grande Valley (formerly McAllen) | 5,092 | 4,259 | 3,341 | 4,575 | 5,207 | 5,479 | 6,107 | 5,293 | 5,094 | 5,509 | 6,025 | 5,008 | 60,989 |
| San Diego | 10,036 | 7,954 | 6,552 | 10,246 | 11,678 | 16,472 | 12,618 | 11,000 | 10,278 | 8,655 | 6,743 | 6,489 | 118,721 |
| Tucson | 18,814 | 12,844 | 9,862 | 18,649 | 20,941 | 31,432 | 28,072 | 24,083 | 20,842 | 20,146 | 20,810 | 15,178 | 241,673 |
| Yuma | 339 | 406 | 359 | 612 | 731 | 951 | 793 | 656 | 655 | 545 | 429 | 475 | 6,951 |
| Coastal Border | 842 | 603 | 653 | 687 | 686 | 853 | 750 | 582 | 657 | 671 | 687 | 699 | 8,370 |
| Northern Border | 658 | 571 | 521 | 467 | 531 | 545 | 528 | 612 | 553 | 588 | 642 | 590 | 6,806 |
| Southwest Border | 42,938 | 32,780 | 25,947 | 44,502 | 49,211 | 67,342 | 58,493 | 50,884 | 46,044 | 43,843 | 43,522 | 35,359 | 540,865 |
| Monthly Total | 44,438 | 33,954 | 27,121 | 45,656 | 50,428 | 68,740 | 59,771 | 52,078 | 47,254 | 45,102 | 44,851 | 36,648 | 556,041 |

*Livermore Sector was closed after FY 2004

App.068



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2010

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 463 | 478 | 416 | 265 | 335 | 326 | 370 | 427 | 442 | 367 | 427 | 335 | 4,651 |
| New Orleans | 247 | 179 | 173 | 303 | 303 | 394 | 404 | 218 | 223 | 204 | 244 | 279 | 3,171 |
| Ramey | 41 | 20 | 10 | 8 | 23 | 32 | 40 | 44 | 25 | 4 | 94 | 57 | 398 |
| Blaine | 50 | 69 | 52 | 59 | 57 | 58 | 54 | 44 | 53 | 65 | 70 | 42 | 673 |
| Buffalo | 241 | 214 | 207 | 168 | 216 | 252 | 207 | 231 | 189 | 135 | 180 | 182 | 2,422 |
| Detroit | 168 | 154 | 157 | 129 | 126 | 122 | 110 | 98 | 128 | 113 | 165 | 199 | 1,669 |
| Grand Forks | 55 | 47 | 36 | 26 | 37 | 45 | 39 | 80 | 23 | 34 | 74 | 47 | 543 |
| Havre | 31 | 23 | 17 | 11 | 18 | 54 | 30 | 32 | 20 | 12 | 20 | 22 | 290 |
| Houlton | 3 | 2 | 0 | 0 | 0 | 12 | 5 | 10 | 6 | 12 | 6 | 0 | 56 |
| Spokane | 35 | 21 | 14 | 19 | 15 | 27 | 25 | 34 | 33 | 42 | 51 | 40 | 356 |
| Swanton | 71 | 101 | 68 | 58 | 128 | 132 | 97 | 136 | 124 | 233 | 197 | 77 | 1,422 |
| Big Bend (formerly Marfa) | 530 | 421 | 373 | 433 | 484 | 660 | 575 | 493 | 415 | 280 | 295 | 329 | 5,288 |
| Del Rio | 1,119 | 897 | 697 | 1,234 | 1,245 | 1,874 | 1,791 | 1,718 | 1,326 | 767 | 1,095 | 931 | 14,694 |
| El Centro | 2,589 | 2,412 | 2,196 | 2,688 | 2,836 | 4,408 | 3,419 | 3,126 | 2,440 | 2,331 | 2,075 | 2,042 | 32,562 |
| El Paso | 1,007 | 894 | 725 | 1,124 | 1,140 | 1,528 | 1,359 | 1,380 | 1,005 | 725 | 732 | 632 | 12,251 |
| Laredo | 2,613 | 2,130 | 1,802 | 2,526 | 3,173 | 4,433 | 4,528 | 3,813 | 3,475 | 1,857 | 2,819 | 2,118 | 35,287 |
| Rio Grande Valley (formerly McAllen) | 4,236 | 3,688 | 2,987 | 3,658 | 4,845 | 7,141 | 7,139 | 7,477 | 5,595 | 3,832 | 5,329 | 3,839 | 59,766 |
| San Diego | 5,017 | 4,738 | 4,636 | 6,413 | 6,982 | 9,061 | 7,115 | 5,858 | 5,092 | 5,113 | 4,528 | 4,012 | 68,565 |
| Tucson | 23,197 | 16,986 | 10,907 | 16,122 | 21,266 | 31,197 | 28,579 | 22,572 | 13,160 | 10,303 | 9,280 | 8,633 | 212,202 |
| Yuma | 582 | 649 | 711 | 586 | 819 | 1,059 | 732 | 608 | 447 | 401 | 262 | 260 | 7,116 |
| Coastal Border | 751 | 677 | 599 | 576 | 661 | 752 | 814 | 689 | 690 | 575 | 765 | 671 | 8,220 |
| Northern Border | 654 | 631 | 551 | 470 | 597 | 702 | 567 | 665 | 576 | 646 | 763 | 609 | 7,431 |
| Southwest Border | 40,890 | 32,815 | 25,034 | 34,784 | 42,790 | 61,361 | 55,237 | 47,045 | 32,955 | 25,609 | 26,415 | 22,796 | 447,731 |
| Monthly Total | 42,295 | 34,123 | 26,184 | 35,830 | 44,048 | 62,815 | 56,618 | 48,399 | 34,221 | 26,830 | 27,943 | 24,076 | 463,382 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2011

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 401 | 441 | 349 | 447 | 364 | 466 | 324 | 325 | 309 | 330 | 340 | 305 | 4,401 |
| New Orleans | 231 | 144 | 121 | 156 | 132 | 105 | 109 | 124 | 111 | 63 | 114 | 99 | 1,509 |
| Ramey | 55 | 25 | 59 | 47 | 44 | 54 | 46 | 82 | 42 | 90 | 38 | 60 | 642 |
| Blaine | 68 | 42 | 37 | 54 | 31 | 69 | 35 | 53 | 46 | 48 | 64 | 44 | 591 |
| Buffalo | 231 | 190 | 139 | 161 | 148 | 203 | 174 | 158 | 176 | 157 | 188 | 189 | 2,114 |
| Detroit | 177 | 143 | 110 | 133 | 121 | 175 | 118 | 103 | 110 | 96 | 126 | 119 | 1,531 |
| Grand Forks | 47 | 34 | 32 | 24 | 37 | 56 | 20 | 24 | 49 | 52 | 44 | 49 | 468 |
| Havre | 46 | 23 | 16 | 24 | 21 | 17 | 32 | 25 | 4 | 9 | 31 | 22 | 270 |
| Houlton | 4 | 4 | 0 | 1 | 1 | 9 | 1 | 1 | 10 | 5 | 2 | 3 | 41 |
| Spokane | 32 | 28 | 20 | 5 | 26 | 28 | 20 | 23 | 24 | 21 | 41 | 25 | 293 |
| Swanton | 78 | 74 | 37 | 67 | 67 | 50 | 53 | 53 | 50 | 121 | 110 | 55 | 815 |
| Big Bend (formerly Marfa) | 375 | 290 | 282 | 332 | 300 | 457 | 512 | 350 | 296 | 235 | 311 | 296 | 4,036 |
| Del Rio | 1,043 | 837 | 704 | 899 | 1,399 | 2,132 | 1,977 | 1,499 | 1,525 | 1,386 | 1,356 | 1,387 | 16,144 |
| El Centro | 2,201 | 1,851 | 1,734 | 2,135 | 2,569 | 3,772 | 3,563 | 3,278 | 2,904 | 2,225 | 2,074 | 1,885 | 30,191 |
| El Paso | 732 | 660 | 622 | 779 | 911 | 1,354 | 1,380 | 904 | 816 | 794 | 711 | 682 | 10,345 |
| Laredo | 2,286 | 2,174 | 1,797 | 2,285 | 2,943 | 4,686 | 3,891 | 3,168 | 3,205 | 2,913 | 3,262 | 3,443 | 36,053 |
| Rio Grande Valley (formerly McAllen) | 3,628 | 3,625 | 3,349 | 3,485 | 4,233 | 6,806 | 6,502 | 5,953 | 5,409 | 5,276 | 5,973 | 5,004 | 59,243 |
| San Diego | 4,344 | 3,480 | 3,233 | 3,379 | 3,977 | 4,811 | 4,031 | 3,474 | 3,109 | 3,016 | 2,863 | 2,730 | 42,447 |
| Tucson | 11,165 | 9,097 | 7,354 | 10,131 | 11,790 | 17,056 | 13,816 | 12,088 | 9,585 | 6,923 | 7,270 | 7,010 | 123,285 |
| Yuma | 391 | 391 | 354 | 501 | 664 | 940 | 579 | 522 | 317 | 402 | 346 | 426 | 5,833 |
| Coastal Border | 687 | 610 | 529 | 650 | 540 | 625 | 479 | 531 | 462 | 483 | 492 | 464 | 6,552 |
| Northern Border | 683 | 538 | 391 | 469 | 452 | 607 | 453 | 440 | 469 | 509 | 606 | 506 | 6,123 |
| Southwest Border | 26,165 | 22,405 | 19,429 | 23,926 | 28,786 | 42,014 | 36,251 | 31,236 | 27,166 | 23,170 | 24,166 | 22,863 | 327,577 |
| Monthly Total | 27,535 | 23,553 | 20,349 | 25,045 | 29,778 | 43,246 | 37,183 | 32,207 | 28,097 | 24,162 | 25,264 | 23,833 | 340,252 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2012

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 216 | 293 | 195 | 249 | 180 | 156 | 159 | 226 | 137 | 249 | 207 | 242 | 2,509 |
| New Orleans | 49 | 48 | 39 | 40 | 42 | 24 | 22 | 58 | 22 | 12 | 21 | 97 | 474 |
| Ramey | 72 | 100 | 41 | 51 | 50 | 68 | 41 | 39 | 123 | 41 | 33 | 43 | 702 |
| Blaine | 50 | 58 | 47 | 41 | 53 | 51 | 42 | 28 | 40 | 41 | 41 | 45 | 537 |
| Buffalo | 118 | 87 | 56 | 78 | 90 | 100 | 89 | 106 | 61 | 126 | 104 | 128 | 1,143 |
| Detroit | 127 | 109 | 57 | 62 | 67 | 95 | 111 | 67 | 82 | 67 | 55 | 51 | 950 |
| Grand Forks | 58 | 46 | 16 | 29 | 13 | 30 | 33 | 26 | 36 | 43 | 32 | 56 | 418 |
| Havre | 21 | 9 | 18 | 4 | 9 | 11 | 9 | 5 | 5 | 3 | 4 | 4 | 102 |
| Houlton | 0 | 3 | 2 | 1 | 0 | 1 | 2 | 1 | 7 | 4 | 9 | 11 | 41 |
| Spokane | 34 | 18 | 23 | 24 | 18 | 21 | 35 | 22 | 25 | 40 | 34 | 23 | 317 |
| Swanton | 40 | 43 | 43 | 26 | 51 | 48 | 47 | 52 | 103 | 120 | 69 | 60 | 702 |
| Big Bend (formerly Marfa) | 284 | 317 | 288 | 323 | 423 | 450 | 393 | 304 | 300 | 303 | 333 | 246 | 3,964 |
| Del Rio | 1,364 | 1,289 | 871 | 1,204 | 1,788 | 2,375 | 2,791 | 2,480 | 2,123 | 1,942 | 1,770 | 1,723 | 21,720 |
| El Centro | 1,946 | 1,698 | 1,401 | 1,655 | 2,041 | 2,857 | 2,805 | 2,622 | 2,107 | 1,896 | 1,411 | 1,477 | 23,916 |
| El Paso | 647 | 662 | 534 | 625 | 812 | 1,151 | 888 | 823 | 840 | 793 | 984 | 919 | 9,678 |
| Laredo | 2,835 | 2,846 | 1,853 | 3,180 | 3,855 | 5,154 | 5,100 | 4,478 | 4,019 | 3,670 | 4,306 | 3,576 | 44,872 |
| Rio Grande Valley (formerly McAllen) | 6,201 | 5,513 | 4,285 | 5,514 | 6,709 | 9,622 | 11,160 | 11,583 | 10,112 | 9,023 | 9,295 | 8,745 | 97,762 |
| San Diego | 2,439 | 2,185 | 2,136 | 2,185 | 2,439 | 3,064 | 2,879 | 2,787 | 2,170 | 2,165 | 2,020 | 1,992 | 28,461 |
| Tucson | 9,306 | 8,361 | 7,100 | 10,209 | 12,836 | 16,559 | 14,095 | 11,343 | 8,636 | 6,856 | 7,116 | 7,583 | 120,000 |
| Yuma | 590 | 497 | 515 | 819 | 676 | 986 | 517 | 546 | 362 | 330 | 332 | 330 | 6,500 |
| Coastal Border | 337 | 441 | 275 | 340 | 272 | 248 | 222 | 323 | 282 | 302 | 261 | 382 | 3,685 |
| Northern Border | 448 | 373 | 262 | 265 | 301 | 357 | 368 | 307 | 359 | 444 | 348 | 378 | 4,210 |
| Southwest Border | 25,612 | 23,368 | 18,983 | 25,714 | 31,579 | 42,218 | 40,628 | 36,966 | 30,669 | 26,978 | 27,567 | 26,591 | 356,873 |
| Monthly Total | 26,397 | 24,182 | 19,520 | 26,319 | 32,152 | 42,823 | 41,218 | 37,596 | 31,310 | 27,724 | 28,176 | 27,351 | 364,768 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2013

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 248 | 134 | 130 | 135 | 89 | 92 | 157 | 92 | 113 | 212 | 171 | 165 | 1,738 |
| New Orleans | 49 | 74 | 47 | 32 | 49 | 27 | 46 | 28 | 15 | 30 | 47 | 56 | 500 |
| Ramey | 24 | 56 | 45 | 39 | 107 | 194 | 11 | 27 | 99 | 43 | 164 | 115 | 924 |
| Blaine | 37 | 34 | 33 | 21 | 32 | 31 | 24 | 26 | 34 | 32 | 25 | 31 | 360 |
| Buffalo | 106 | 54 | 60 | 53 | 47 | 47 | 73 | 54 | 78 | 83 | 58 | 83 | 796 |
| Detroit | 65 | 58 | 64 | 58 | 44 | 50 | 49 | 43 | 42 | 67 | 59 | 51 | 650 |
| Grand Forks | 32 | 27 | 12 | 19 | 36 | 31 | 39 | 36 | 52 | 73 | 55 | 57 | 469 |
| Havre | 4 | 2 | 0 | 3 | 3 | 2 | 3 | 9 | 9 | 8 | 21 | 24 | 88 |
| Houlton | 15 | 1 | 0 | 0 | 1 | 2 | 2 | 0 | 7 | 1 | 3 | 5 | 37 |
| Spokane | 33 | 36 | 17 | 19 | 13 | 19 | 28 | 20 | 26 | 33 | 34 | 21 | 299 |
| Swanton | 35 | 21 | 29 | 17 | 41 | 50 | 53 | 57 | 42 | 72 | 48 | 66 | 531 |
| Big Bend (formerly Marfa) | 356 | 238 | 213 | 340 | 400 | 416 | 473 | 341 | 232 | 219 | 218 | 238 | 3,684 |
| Del Rio | 1,792 | 1,715 | 1,135 | 1,617 | 2,223 | 2,771 | 2,778 | 2,332 | 1,695 | 2,039 | 1,817 | 1,596 | 23,510 |
| El Centro | 1,527 | 1,408 | 1,101 | 1,103 | 1,340 | 2,098 | 1,972 | 1,513 | 1,222 | 1,035 | 1,056 | 931 | 16,306 |
| El Paso | 977 | 860 | 629 | 776 | 1,030 | 1,176 | 1,217 | 1,163 | 857 | 852 | 852 | 765 | 11,154 |
| Laredo | 3,829 | 3,537 | 2,835 | 3,280 | 4,628 | 5,903 | 5,621 | 5,338 | 4,029 | 4,212 | 3,944 | 3,593 | 50,749 |
| Rio Grande Valley (formerly McAllen) | 8,869 | 8,352 | 6,587 | 7,190 | 10,828 | 16,115 | 18,455 | 17,522 | 14,275 | 15,217 | 16,253 | 14,790 | 154,453 |
| San Diego | 1,922 | 1,924 | 1,795 | 2,150 | 2,227 | 3,062 | 2,833 | 2,854 | 2,324 | 2,313 | 2,069 | 2,023 | 27,496 |
| Tucson | 9,224 | 9,185 | 8,481 | 9,871 | 11,831 | 14,990 | 14,051 | 12,119 | 9,357 | 7,014 | 7,278 | 7,538 | 120,939 |
| Yuma | 433 | 417 | 467 | 594 | 535 | 762 | 812 | 674 | 445 | 329 | 310 | 328 | 6,106 |
| Coastal Border | 321 | 264 | 222 | 206 | 245 | 313 | 214 | 147 | 227 | 285 | 382 | 336 | 3,162 |
| Northern Border | 327 | 233 | 215 | 190 | 217 | 232 | 271 | 245 | 290 | 369 | 303 | 338 | 3,230 |
| Southwest Border | 28,929 | 27,636 | 23,243 | 26,921 | 35,042 | 47,293 | 48,212 | 43,856 | 34,436 | 33,230 | 33,797 | 31,802 | 414,397 |
| Monthly Total | 29,577 | 28,133 | 23,680 | 27,317 | 35,504 | 47,838 | 48,697 | 44,248 | 34,953 | 33,884 | 34,482 | 32,476 | 420,789 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2014

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 131 | 146 | 125 | 228 | 178 | 113 | 151 | 199 | 213 | 134 | 217 | 199 | 2,034 |
| New Orleans | 58 | 48 | 57 | 55 | 90 | 103 | 114 | 88 | 86 | 82 | 72 | 97 | 950 |
| Ramey | 133 | 120 | 48 | 79 | 39 | 79 | 38 | 86 | 133 | 77 | 73 | 53 | 958 |
| Blaine | 16 | 22 | 18 | 29 | 26 | 19 | 36 | 27 | 19 | 28 | 14 | 18 | 272 |
| Buffalo | 58 | 39 | 52 | 36 | 47 | 87 | 64 | 81 | 54 | 79 | 97 | 47 | 741 |
| Detroit | 48 | 53 | 51 | 34 | 55 | 35 | 40 | 49 | 86 | 66 | 70 | 60 | 647 |
| Grand Forks | 59 | 45 | 36 | 42 | 49 | 85 | 65 | 63 | 71 | 81 | 73 | 98 | 767 |
| Havre | 18 | 10 | 2 | 5 | 6 | 2 | 1 | 13 | 12 | 3 | 7 | 12 | 91 |
| Houlton | 3 | 4 | 2 | 3 | 3 | 1 | 2 | 13 | 1 | 4 | 8 | 1 | 45 |
| Spokane | 35 | 24 | 15 | 24 | 16 | 31 | 17 | 22 | 19 | 19 | 16 | 31 | 269 |
| Swanton | 44 | 25 | 45 | 30 | 21 | 17 | 31 | 33 | 57 | 69 | 64 | 70 | 506 |
| Big Bend (formerly Marfa) | 316 | 260 | 241 | 278 | 522 | 445 | 403 | 374 | 414 | 341 | 302 | 200 | 4,096 |
| Del Rio | 1,587 | 1,586 | 1,360 | 1,514 | 2,133 | 2,823 | 2,616 | 3,432 | 2,857 | 1,830 | 1,279 | 1,238 | 24,255 |
| El Centro | 1,193 | 1,077 | 987 | 1,126 | 1,365 | 1,502 | 1,441 | 1,353 | 1,203 | 1,250 | 1,095 | 919 | 14,511 |
| El Paso | 885 | 845 | 738 | 813 | 1,060 | 1,278 | 1,244 | 1,371 | 1,221 | 939 | 948 | 997 | 12,339 |
| Laredo | 3,638 | 3,026 | 2,567 | 2,756 | 3,838 | 5,087 | 5,117 | 4,737 | 3,946 | 3,546 | 2,960 | 2,831 | 44,049 |
| Rio Grande Valley (formerly McAllen) | 15,192 | 14,170 | 13,540 | 12,255 | 16,808 | 25,398 | 28,624 | 37,510 | 38,446 | 24,938 | 17,273 | 12,239 | 256,393 |
| San Diego | 2,218 | 2,153 | 2,091 | 2,548 | 2,469 | 3,378 | 3,035 | 2,863 | 2,438 | 2,497 | 2,132 | 2,089 | 29,911 |
| Tucson | 9,785 | 8,334 | 7,629 | 6,825 | 7,566 | 8,925 | 8,473 | 8,407 | 6,867 | 5,019 | 5,105 | 4,980 | 87,915 |
| Yuma | 498 | 445 | 375 | 553 | 642 | 760 | 549 | 636 | 470 | 348 | 294 | 332 | 5,902 |
| Coastal Border | 322 | 314 | 230 | 362 | 307 | 295 | 303 | 373 | 432 | 293 | 362 | 349 | 3,942 |
| Northern Border | 281 | 222 | 221 | 203 | 223 | 277 | 256 | 301 | 319 | 349 | 349 | 337 | 3,338 |
| Southwest Border | 35,312 | 31,896 | 29,528 | 28,668 | 36,403 | 49,596 | 51,502 | 60,683 | 57,862 | 40,708 | 31,388 | 25,825 | 479,371 |
| Monthly Total | 35,915 | 32,432 | 29,979 | 29,233 | 36,933 | 50,168 | 52,061 | 61,357 | 58,613 | 41,350 | 32,099 | 26,511 | 486,651 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2015

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 90 | 50 | 143 | 121 | 79 | 116 | 101 | 110 | 203 | 168 | 346 | 225 | 1,752 |
| New Orleans | 115 | 98 | 100 | 79 | 78 | 35 | 39 | 75 | 71 | 72 | 32 | 55 | 849 |
| Ramey | 55 | 76 | 32 | 71 | 12 | 60 | 44 | 25 | 39 | 74 | 9 | 60 | 557 |
| Blaine | 37 | 47 | 29 | 25 | 20 | 16 | 14 | 19 | 17 | 23 | 23 | 12 | 282 |
| Buffalo | 28 | 34 | 35 | 21 | 19 | 20 | 15 | 16 | 18 | 40 | 27 | 18 | 291 |
| Detroit | 75 | 68 | 109 | 42 | 35 | 30 | 44 | 36 | 72 | 32 | 54 | 40 | 637 |
| Grand Forks | 87 | 78 | 72 | 53 | 74 | 65 | 73 | 40 | 40 | 76 | 69 | 62 | 789 |
| Havre | 5 | 3 | 3 | 3 | 10 | 6 | 5 | 3 | 2 | 2 | 18 | 4 | 64 |
| Houlton | 1 | 2 | 8 | 4 | 6 | 0 | 3 | 0 | 0 | 4 | 2 | 2 | 32 |
| Spokane | 24 | 15 | 10 | 15 | 23 | 12 | 15 | 14 | 7 | 18 | 13 | 24 | 190 |
| Swanton | 26 | 23 | 25 | 6 | 19 | 27 | 14 | 16 | 35 | 39 | 68 | 43 | 341 |
| Big Bend (formerly Marfa) | 302 | 232 | 336 | 233 | 330 | 453 | 438 | 567 | 373 | 428 | 600 | 739 | 5,031 |
| Del Rio | 1,246 | 985 | 1,051 | 985 | 1,291 | 1,718 | 2,100 | 2,083 | 1,928 | 1,752 | 1,918 | 1,956 | 19,013 |
| El Centro | 894 | 842 | 980 | 902 | 991 | 1,355 | 1,244 | 1,295 | 1,063 | 1,072 | 1,058 | 1,124 | 12,820 |
| El Paso | 904 | 924 | 921 | 874 | 859 | 1,455 | 1,516 | 1,335 | 1,410 | 1,417 | 1,436 | 1,444 | 14,495 |
| Laredo | 3,276 | 2,540 | 2,367 | 2,776 | 2,864 | 3,093 | 3,497 | 3,127 | 2,958 | 3,110 | 3,072 | 3,208 | 35,888 |
| Rio Grande Valley (formerly McAllen) | 12,031 | 11,466 | 11,035 | 8,425 | 9,557 | 11,817 | 12,602 | 14,103 | 13,750 | 13,719 | 14,750 | 14,002 | 147,257 |
| San Diego | 2,133 | 1,924 | 2,280 | 2,111 | 2,466 | 2,876 | 2,284 | 2,308 | 2,081 | 1,985 | 1,883 | 1,959 | 26,290 |
| Tucson | 5,261 | 5,303 | 5,610 | 4,869 | 5,553 | 6,256 | 5,543 | 6,105 | 5,081 | 4,071 | 4,733 | 5,012 | 63,397 |
| Yuma | 403 | 425 | 439 | 339 | 465 | 768 | 526 | 653 | 659 | 834 | 789 | 842 | 7,142 |
| Coastal Border | 260 | 224 | 275 | 271 | 169 | 211 | 184 | 210 | 313 | 314 | 387 | 340 | 3,158 |
| Northern Border | 283 | 270 | 291 | 169 | 206 | 176 | 183 | 144 | 191 | 234 | 274 | 205 | 2,626 |
| Southwest Border | 26,450 | 24,641 | 25,019 | 21,514 | 24,376 | 29,791 | 29,750 | 31,576 | 29,303 | 28,388 | 30,239 | 30,286 | 331,333 |
| Monthly Total | 26,993 | 25,135 | 25,585 | 21,954 | 24,751 | 30,178 | 30,117 | 31,930 | 29,807 | 28,936 | 30,900 | 30,831 | 337,117 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2016

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 271 | 206 | 337 | 207 | 181 | 310 | 331 | 266 | 232 | 286 | 274 | 304 | 3,205 |
| New Orleans | 74 | 59 | 48 | 40 | 53 | 50 | 76 | 57 | 56 | 96 | 72 | 83 | 764 |
| Ramey | 21 | 57 | 64 | 28 | 68 | 63 | 61 | 78 | 72 | 66 | 43 | 73 | 694 |
| Blaine | 27 | 28 | 13 | 13 | 21 | 33 | 19 | 20 | 17 | 28 | 30 | 22 | 271 |
| Buffalo | 15 | 4 | 7 | 22 | 14 | 17 | 29 | 21 | 15 | 37 | 27 | 18 | 226 |
| Detroit | 55 | 38 | 35 | 35 | 54 | 61 | 51 | 78 | 67 | 64 | 89 | 66 | 716 |
| Grand Forks | 40 | 40 | 25 | 48 | 26 | 49 | 35 | 34 | 34 | 66 | 62 | 46 | 505 |
| Havre | 4 | 5 | 1 | 4 | 1 | 2 | 9 | 4 | 2 | 2 | 7 | 2 | 43 |
| Houlton | 6 | 0 | 1 | 1 | 2 | 2 | 2 | 7 | 1 | 2 | 1 | 0 | 25 |
| Spokane | 4 | 16 | 9 | 4 | 6 | 11 | 18 | 56 | 20 | 19 | 20 | 23 | 206 |
| Swanton | 25 | 13 | 25 | 10 | 14 | 26 | 18 | 14 | 34 | 35 | 30 | 47 | 291 |
| Big Bend (formerly Marfa) | 735 | 637 | 690 | 388 | 458 | 616 | 739 | 491 | 292 | 344 | 326 | 650 | 6,366 |
| Del Rio | 1,873 | 1,798 | 2,185 | 1,531 | 1,780 | 2,022 | 2,224 | 2,588 | 1,918 | 1,833 | 1,445 | 1,881 | 23,078 |
| El Centro | 1,214 | 1,239 | 1,253 | 1,061 | 1,342 | 1,775 | 2,097 | 2,000 | 1,719 | 1,669 | 2,047 | 2,032 | 19,448 |
| El Paso | 1,639 | 1,679 | 2,187 | 1,148 | 1,399 | 2,158 | 2,408 | 2,481 | 2,369 | 2,503 | 2,708 | 2,955 | 25,634 |
| Laredo | 3,146 | 3,249 | 2,995 | 2,454 | 2,895 | 3,196 | 3,654 | 3,403 | 2,906 | 2,647 | 2,888 | 3,129 | 36,562 |
| Rio Grande Valley (formerly McAllen) | 15,036 | 15,297 | 17,736 | 9,398 | 9,660 | 13,325 | 16,688 | 18,291 | 15,972 | 16,519 | 19,155 | 19,753 | 186,830 |
| San Diego | 2,081 | 2,022 | 2,196 | 2,525 | 2,504 | 3,108 | 3,329 | 3,118 | 2,522 | 2,555 | 2,748 | 3,183 | 31,891 |
| Tucson | 5,899 | 5,791 | 6,263 | 4,572 | 5,245 | 6,142 | 5,784 | 6,574 | 5,427 | 4,364 | 4,303 | 4,527 | 64,891 |
| Yuma | 1,101 | 1,126 | 1,509 | 681 | 789 | 974 | 1,166 | 1,391 | 1,325 | 1,289 | 1,428 | 1,391 | 14,170 |
| Coastal Border | 366 | 322 | 449 | 275 | 302 | 423 | 468 | 401 | 360 | 448 | 389 | 460 | 4,663 |
| Northern Border | 176 | 144 | 139 | 137 | 138 | 201 | 181 | 234 | 190 | 253 | 266 | 224 | 2,283 |
| Southwest Border | 32,724 | 32,838 | 37,014 | 23,758 | 26,072 | 33,316 | 38,089 | 40,337 | 34,450 | 33,723 | 37,048 | 39,501 | 408,870 |
| Monthly Total | 33,266 | 33,304 | 37,602 | 24,170 | 26,512 | 33,940 | 38,738 | 40,972 | 35,000 | 34,424 | 37,703 | 40,185 | 415,816 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2017

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 178 | 186 | 329 | 161 | 194 | 150 | 193 | 221 | 173 | 195 | 196 | 104 | 2,280 |
| New Orleans | 76 | 98 | 81 | 121 | 94 | 88 | 50 | 105 | 57 | 52 | 74 | 24 | 920 |
| Ramey | 77 | 41 | 62 | 99 | 15 | 15 | 39 | 17 | 0 | 8 | 15 | 0 | 388 |
| Blaine | 45 | 36 | 28 | 20 | 23 | 21 | 16 | 12 | 23 | 27 | 27 | 10 | 288 |
| Buffalo | 9 | 19 | 12 | 24 | 66 | 16 | 33 | 76 | 48 | 55 | 37 | 52 | 447 |
| Detroit | 64 | 30 | 34 | 43 | 71 | 143 | 119 | 112 | 118 | 113 | 132 | 91 | 1,070 |
| Grand Forks | 19 | 25 | 23 | 40 | 48 | 56 | 57 | 44 | 42 | 51 | 58 | 33 | 496 |
| Havre | 1 | 3 | 2 | 0 | 4 | 0 | 4 | 6 | 4 | 7 | 7 | 1 | 39 |
| Houlton | 5 | 0 | 0 | 1 | 0 | 1 | 0 | 5 | 1 | 5 | 8 | 4 | 30 |
| Spokane | 16 | 10 | 7 | 5 | 18 | 22 | 14 | 14 | 50 | 19 | 17 | 16 | 208 |
| Swanton | 10 | 22 | 25 | 19 | 43 | 43 | 25 | 41 | 51 | 63 | 73 | 34 | 449 |
| Big Bend (formerly Marfa) | 697 | 603 | 477 | 473 | 383 | 357 | 413 | 552 | 378 | 492 | 563 | 614 | 6,002 |
| Del Rio | 2,106 | 1,880 | 1,817 | 1,243 | 1,104 | 746 | 589 | 740 | 761 | 760 | 798 | 932 | 13,476 |
| El Centro | 2,441 | 1,850 | 1,870 | 1,796 | 1,196 | 871 | 849 | 1,134 | 1,280 | 1,478 | 1,880 | 1,988 | 18,633 |
| El Paso | 3,973 | 4,105 | 3,948 | 2,779 | 1,575 | 978 | 906 | 1,032 | 1,180 | 1,395 | 1,782 | 1,540 | 25,193 |
| Laredo | 3,350 | 3,194 | 2,460 | 2,265 | 1,710 | 1,256 | 1,304 | 1,722 | 1,839 | 2,120 | 2,143 | 2,097 | 25,460 |
| Rio Grande Valley (formerly McAllen) | 22,642 | 24,686 | 23,418 | 15,580 | 7,855 | 4,147 | 3,942 | 4,882 | 5,817 | 7,107 | 8,650 | 8,836 | 137,562 |
| San Diego | 2,934 | 2,947 | 3,099 | 2,927 | 1,808 | 1,356 | 1,392 | 1,724 | 1,652 | 1,764 | 2,241 | 2,242 | 26,086 |
| Tucson | 5,924 | 5,912 | 4,303 | 3,357 | 2,589 | 2,148 | 1,487 | 2,199 | 2,632 | 2,177 | 2,913 | 3,016 | 38,657 |
| Yuma | 2,117 | 2,034 | 1,859 | 1,156 | 534 | 336 | 245 | 534 | 548 | 894 | 1,318 | 1,272 | 12,847 |
| Coastal Border | 331 | 325 | 472 | 381 | 303 | 253 | 282 | 343 | 230 | 255 | 285 | 128 | 3,588 |
| Northern Border | 169 | 145 | 131 | 152 | 273 | 302 | 268 | 310 | 337 | 340 | 359 | 241 | 3,027 |
| Southwest Border | 46,184 | 47,211 | 43,251 | 31,576 | 18,754 | 12,195 | 11,127 | 14,519 | 16,087 | 18,187 | 22,288 | 22,537 | 303,916 |
| Monthly Total | 46,684 | 47,681 | 43,854 | 32,109 | 19,330 | 12,750 | 11,677 | 15,172 | 16,654 | 18,782 | 22,932 | 22,906 | 310,531 |

*Livermore Sector was closed after FY 2004

App.076



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2018

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livermore* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Miami | 196 | 168 | 164 | 189 | 189 | 202 | 205 | 172 | 130 | 244 | 173 | 137 | 2,169 |
| New Orleans | 46 | 62 | 27 | 86 | 63 | 54 | 63 | 35 | 115 | 43 | 102 | 102 | 798 |
| Ramey | 7 | 17 | 14 | 77 | 18 | 21 | 9 | 36 | 5 | 20 | 53 | 3 | 280 |
| Blaine | 19 | 22 | 22 | 15 | 10 | 54 | 40 | 35 | 27 | 22 | 43 | 50 | 359 |
| Buffalo | 48 | 23 | 17 | 25 | 16 | 29 | 32 | 46 | 55 | 33 | 28 | 32 | 384 |
| Detroit | 119 | 150 | 86 | 193 | 159 | 175 | 166 | 158 | 280 | 168 | 127 | 149 | 1,930 |
| Grand Forks | 48 | 40 | 38 | 21 | 30 | 41 | 31 | 41 | 38 | 41 | 55 | 37 | 461 |
| Havre | 10 | 13 | 2 | 0 | 2 | 1 | 1 | 0 | 6 | 4 | 6 | 2 | 47 |
| Houlton | 0 | 2 | 5 | 3 | 3 | 6 | 9 | 3 | 4 | 6 | 3 | 8 | 52 |
| Spokane | 30 | 16 | 17 | 22 | 19 | 36 | 27 | 32 | 29 | 39 | 52 | 28 | 347 |
| Swanton | 28 | 29 | 32 | 30 | 47 | 66 | 36 | 66 | 105 | 92 | 67 | 138 | 736 |
| Big Bend (formerly Marfa) | 819 | 828 | 802 | 543 | 838 | 703 | 808 | 743 | 375 | 456 | 585 | 545 | 8,045 |
| Del Rio | 1,046 | 1,186 | 1,113 | 1,083 | 1,306 | 1,466 | 1,451 | 1,486 | 1,462 | 1,365 | 1,506 | 1,363 | 15,833 |
| El Centro | 2,194 | 2,123 | 2,110 | 2,052 | 1,954 | 2,697 | 2,790 | 2,683 | 2,327 | 2,531 | 2,821 | 2,948 | 29,230 |
| El Paso | 1,489 | 1,647 | 1,713 | 1,607 | 1,737 | 2,782 | 2,671 | 3,510 | 3,560 | 2,890 | 3,585 | 4,370 | 31,561 |
| Laredo | 2,451 | 2,283 | 1,982 | 2,296 | 2,671 | 3,652 | 3,370 | 3,210 | 2,586 | 2,600 | 2,785 | 2,755 | 32,641 |
| Rio Grande Valley (formerly McAllen) | 9,722 | 11,726 | 11,668 | 9,484 | 9,611 | 14,140 | 15,993 | 17,491 | 14,703 | 13,238 | 16,744 | 17,742 | 162,262 |
| San Diego | 2,377 | 2,760 | 2,764 | 3,171 | 3,107 | 4,101 | 3,644 | 3,418 | 3,014 | 3,098 | 3,507 | 3,630 | 38,591 |
| Tucson | 3,854 | 4,562 | 4,400 | 3,925 | 3,824 | 5,785 | 5,012 | 4,760 | 4,146 | 3,241 | 3,627 | 5,036 | 52,172 |
| Yuma | 1,536 | 1,970 | 2,443 | 1,814 | 1,618 | 2,064 | 2,504 | 3,038 | 1,916 | 1,880 | 2,364 | 3,097 | 26,244 |
| Coastal Border | 249 | 247 | 205 | 352 | 270 | 277 | 277 | 243 | 250 | 307 | 328 | 242 | 3,247 |
| Northern Border | 302 | 295 | 219 | 309 | 286 | 408 | 342 | 381 | 544 | 405 | 381 | 444 | 4,316 |
| Southwest Border | 25,488 | 29,085 | 28,995 | 25,975 | 26,666 | 37,390 | 38,243 | 40,339 | 34,089 | 31,299 | 37,524 | 41,486 | 396,579 |
| Monthly Total | 26,039 | 29,627 | 29,419 | 26,636 | 27,222 | 38,075 | 38,862 | 40,963 | 34,883 | 32,011 | 38,233 | 42,172 | 404,142 |

*Livermore Sector was closed after FY 2004



# United States Border Patrol

Total Illegal Alien Apprehensions By Month - FY 2019

| SECTOR | October | November | December | January | February | March | April | May | June | July | August | September | Yearly Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miami | 201 | 136 | 149 | 172 | 111 | 184 | 191 | 163 | 140 | 165 | 179 | 100 | 1,891 |
| New Orleans | 74 | 82 | 60 | 100 | 101 | 94 | 132 | 105 | 100 | 87 | 105 | 92 | 1132 |
| Ramey | 21 | 26 | 36 | 32 | 20 | 61 | 15 | 64 | 78 | 27 | 106 | 76 | 562 |
| Blaine | 53 | 35 | 48 | 41 | 41 | 54 | 35 | 27 | 53 | 49 | 38 | 50 | 524 |
| Buffalo | 40 | 29 | 19 | 26 | 27 | 43 | 33 | 18 | 55 | 93 | 123 | 31 | 537 |
| Detroit | 188 | 107 | 119 | 107 | 115 | 118 | 102 | 114 | 95 | 79 | 80 | 98 | 1,322 |
| Grand Forks | 24 | 28 | 29 | 20 | 24 | 36 | 48 | 41 | 43 | 31 | 41 | 47 | 412 |
| Havre | 7 | 7 | 5 | 8 | 0 | 5 | 7 | 3 | 8 | 14 | 5 | 8 | 77 |
| Houlton | 2 | 3 | 2 | 0 | 0 | 4 | 1 | 0 | 4 | 19 | 8 | 9 | 52 |
| Spokane | 38 | 41 | 23 | 57 | 42 | 52 | 37 | 46 | 11 | 19 | 30 | 32 | 428 |
| Swanton | 148 | 68 | 79 | 40 | 58 | 109 | 73 | 104 | 87 | 91 | 80 | 119 | 1056 |
| Big Bend | 555 | 448 | 621 | 588 | 845 | 942 | 941 | 1557 | 628 | 799 | 922 | 791 | 9,637 |
| Del Rio | 2,002 | 2,088 | 2,024 | 2,524 | 4,013 | 5,563 | 5,848 | 8,563 | 8,085 | 6,686 | 5,297 | 4,576 | 57,269 |
| El Centro | 3,242 | 3,189 | 2,718 | 2,461 | 3,319 | 3,561 | 3,386 | 3,482 | 2,885 | 2,214 | 2,327 | 2,354 | 35,138 |
| El Paso | 7,334 | 8,867 | 9,450 | 9,137 | 14,171 | 22,224 | 27,073 | 38,637 | 18,882 | 11,594 | 8,078 | 6,696 | 182,143 |
| Laredo | 3,448 | 2,669 | 2,059 | 2,632 | 3,123 | 4,192 | 3,975 | 4,115 | 3,819 | 2,686 | 2,421 | 3,239 | 38,378 |
| Rio Grande Valley | 20,755 | 20,713 | 18,372 | 17,713 | 25,366 | 33,763 | 36,727 | 49,821 | 43,207 | 36,854 | 22,355 | 13,489 | 339,135 |
| San Diego | 4,227 | 4,577 | 5,816 | 4,122 | 5,448 | 6,881 | 6,197 | 5,882 | 4,684 | 3,458 | 3,321 | 3,436 | 58,049 |
| Tucson | 5,828 | 5,062 | 4,912 | 4,096 | 4,911 | 7,257 | 5,921 | 6,875 | 5,517 | 4,129 | 4,080 | 4,902 | 63,490 |
| Yuma | 3,614 | 4,244 | 4,779 | 4,706 | 5,687 | 8,450 | 9,205 | 13,924 | 7,195 | 3,558 | 1,883 | 1,024 | 68,269 |
| Coastal Border | 296 | 244 | 245 | 304 | 232 | 339 | 338 | 332 | 318 | 279 | 390 | 268 | 3,585 |
| Northern Border | 500 | 318 | 324 | 299 | 307 | 421 | 336 | 353 | 356 | 395 | 405 | 394 | 4,408 |
| Southwest Border | 51,005 | 51,857 | 50,751 | 47,979 | 66,883 | 92,833 | 99,273 | 132,856 | 94,902 | 71,978 | 50,684 | 40,507 | 851,508 |
| Monthly Total | 51,801 | 52,419 | 51,320 | 48,582 | 67,422 | 93,593 | 99,947 | 133,541 | 95,576 | 72,652 | 51,479 | 41,169 | 859,501 |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

Associated Press Article dated April 1, 2021
"Migrants freed without court notice – sometimes no paperwork"

# EXHIBIT A-9



ADVERTISEMENT

AP NEWS

Top Stories
Topics

AP Top Ne

Coronaviru

Politics

Sports

Entertainm

Lifestyle

Oddities

Photograpr

Travel

Technology

AP Fact Ch

Business

U.S. News

Health

Science

World New

Religion

Podcasts

Press Rele

Click to copy

Click to copy

**RELATED TOPICS**

Religion

U.S. News

AP Top News

Coronavirus pandemic

Latin America

Immigration

Border patrols

Texas

United States

App.080

# Migrants freed without court notice — sometimes no paperwork

By ELLIOT SPAGAT    2 hours ago



MISSION, Texas (AP) — Overwhelmed and underprepared, U.S. authorities are releasing migrant families on the Mexican border without notices to appear in immigration court or sometimes without any paperwork at all — time-saving moves that have left some migrants confused.

The rapid releases ease pressure on the Border Patrol and its badly overcrowded holding facilities but shifts work to Immigration and Customs and Enforcement, the agency that enforces immigration laws within the United States. Families are released with booking

records; only parents are photographed and fingerprinted.

ADVERTISEMENT

The Border Patrol began the unusual practice last week in Texas' Rio Grande Valley, which has seen the biggest increase in the number of migrant families and unaccompanied minors crossing the border. Last week, the agency added instructions to report to an ICE office within 60 days to adults' booking documents.

But some got no documents at all, including dozens at Our Lady of Guadalupe Catholic Church in the Texas border city of Mission, where about 100 migrants released by U.S. authorities had been arriving each night to sleep on mats in classrooms in a shuttered elementary school.

App.082

Carlos Enrique Linga, 27, waited at the shelter for a week without documents along with his 5-year-old daughter, hoping to join a friend in Tennessee. His wife is still in Guatemala with their 2-year-old twin daughters and a 3-month-old.

Linga was unwilling to leave the shelter until he got documents and was asking Catholic Charities of Rio Grande Valley for help.

"We hope they can help with our papers so that we can move on, work and send (money) to my family," said Linga, whose home in Guatemala was destroyed by storms in November. "The church has told us that there are mistakes sometimes. Because there are so many people, they forget."

Customs and Border Protection, which oversees the Border Patrol, said it stopped issuing court notices in some cases because preparing even one of the documents often takes hours. Migrants undergo background checks and are tested for COVID-19.

App.083

ADVERTISEMENT

The agency didn't answer questions about how many migrants have been released without court notices or without documents at all.

Sister Norma Pimentel, executive director of Catholic Charities of Rio Grande Valley, knows of 10 to 15 families released without any paperwork since last week, an issue that has cropped up before when there are large increases in new arrivals.

"It's a problem, it's a situation we need to resolve, to make sure we follow up," she said.

Migrants will be issued notices to appear in court at their 60-day check-ins with ICE, according to a U.S. official with direct knowledge of the plans who spoke on condition of anonymity because the plans have not been made public. It is unclear how widespread the practice has been, but it is very common in Rio Grande Valley, the busiest corridor for illegal crossings.

Preparing a court appearance notice can take an hour to 90 minutes, said Chris Cabrera, spokesman for the National Border Patrol Council, a union that represents agents. He welcomed the change.

"Honestly, from my end, I think it's good because it's less paperwork for our guys," said Cabrera, who works in the Rio Grande Valley.

An uptick in the number of people crossing the border, especially children traveling alone and families, has filled up federal holding facilities. The U.S. has been releasing families with children 6 and under and expelling families with older children under pandemic-related powers that deny an opportunity to seek asylum.

Immigration attorneys had mixed reactions to people being released without court notices or

App.084

paperwork, particularly the requirement to check in with ICE. They advise migrants to apply for a different route to asylum — one that's only for people already in the country. In that option, they meet a Citizenship and Immigration Services asylum officer in a less adversarial environment and if denied, can appeal to an immigration judge, advocates say.

"It's a whole different tone," said Charlene D'Cruz, director of Lawyers for Good Government's Project Corazon legal aid program. And if they fail, they get "a second bite at the apple" before a judge.

Initially, U.S. authorities didn't even require the ICE check-in when it began releasing families without court notices over the past two weeks. But they shifted course. D'Cruz said ICE could potentially issue a notice to appear in court, expel people from the country or do nothing.

"There are so many different options, and I don't know what's going to happen," D'Cruz said.

The immigration courts, with a backlog of 1.3 million cases, is ill-prepared for a large increase in new asylum claims.

At the shelter in Mission, a city of about 85,000 people bordering Mexico with a large park known for birdlife, migrants who have booking records closely guarded them. Along with their proof of a COVID-19 test, the documents are kept in large yellow envelopes that say, "Please help me. I do not speak English."

Information on the booking form is sparse: name, nationality, gender, date of birth. Some forms say they are eligible for "prosecutorial discretion," a designation that signals they are not a priority for deportation.

Jose Sansario waited at the shelter for a week after coming from Guatemala with his wife, Kimberly, and their 3-year-old daughter, Genesee. They had difficulty finding flights to Richmond, Virginia, their final destination.

They left their homeland in early March because a gang threatened to kill him if he didn't hand over money from his auto repair business. He said he heard the Biden administration was friendly to immigrants, despite repeated statements from the president and top aides that the border is not open.

"We didn't know what was true, but we had faith — faith that God would help us and that faith would allow us in," Sansario said.

Alba Urquia of El Salvador waited for a week at the shelter because she was released without any documents after crossing the Rio Grande with a large group of migrants, including her 4-

App.085

year-old daughter. She plans to help her father with his car repair shop in Los Angeles.

"I can't leave," she said, sitting on a bench in the shuttered school's playground. The shelter has since closed. "Our fear is that they return us to Mexico or to our country."

"That would be a nightmare," said Alexi Sarmiento of Honduras, who came to the U.S. with her 6- and 9-year-old daughters and was released without documents.

ADVERTISEMENT

**Trending on AP News**



Migrants freed without court notice — sometimes no paperwork



Guatemala declares emergency measures as new caravan rumored



Man charged with smuggling after California crash kills 13

Migrants freed without court notice — sometimes no paperwork



Germany drops probe of former Nazi guard deported from US

by Taboola

ADVERTISEMENT

https://apnews.com/article/us-news-immigration-coronavirus-pandemic-border-patrols-texas-9ace3e41e0acadac7cece17c83a8f7ff[4/1/2021 10:09:10 AM]



## Guatemala declares emergency measures as new caravan rumored

GUATEMALA CITY (AP) — Guatemalan President Alejandro Giammattei decreed a "stat…



 March 29, 2021

## Ad Content

First-Timer's Guide to the…

Promoted: Visit Arizona



Forget the 30yr mortgage if you owe less than $356K.…

Promoted: LowerMyBills NMLS#167283; 3306

2020 BMW M850 |

Forget Bitcoin – "ID



Mileage: 2,116... 

Coin 'Potential Market Is Bigger

Promoted: CarMax

Promoted: Stansberry Research



## Germany drops probe of former Nazi guard deported from US

BERLIN (AP) — German prosecutors said Wednesday that they have dropped an …

 yesterday



## AP sources: SolarWinds hack got emails of top DHS officials

Suspected Russian hackers gained access to email accounts belonging to the Trump administratio…

 March 29, 2021



# Ad Content



### 2012 Kia Soul | Mileage: 99,725 miles

Promoted: CarMax



### L.O.C.K. System Predicts Crash Before May

Promoted: Altimetry



### 30 Pictures of What Harry Potter Characters Should Have Looked Like in the…

Promoted: World Lifestyle

App.090

## AP PHOTOS: For migrants at border, both opportunity and risk

For many Americans, the scenes unfolding at the U.S.-Mexico border are visceral and jarring. A 7...

 March 29, 2021



## Man charged with smuggling after California crash kills 13

LOS ANGELES (AP) — A Mexican man was charged Tuesday with coordinating a smuggling...

 yesterday



ADVERTISEMENT

**AP NEWS**
Top Stories
Video
Contact Us
Cookie Settings
**DOWNLOAD AP NEWS**
Connect with the definitive source for global and local news

**MORE FROM AP**
ap.org
AP Insights
AP Definitive Source
AP Images Spotlight
AP Explore

App.091

Migrants freed without court notice — sometimes no paperwork

AP Books

**FOLLOW AP**

**THE ASSOCIATED PRESS**
About
Contact
Customer Support
Careers
Terms & Conditions
Privacy

All contents © copyright 2021 The Associated Press. All rights reserved.

App.092

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

NPR Article dated March 23, 2021
"Ex-DHS Chief Says Biden Was Warned About Dismantling Trump's Border Policies"

# EXHIBIT A-10

Accessibility links

- Skip to main content
- Keyboard shortcuts for audio player

- Open Navigation Menu
- 🔲

KSMU

- ○
- ○ donate
- ○ Change

Sign in or register to see your station everywhere you enjoy NPR.

- Sign In
- NPR Shop
- Donate

Close

- Home
- News    Expand/collapse submenu for News
  - ○ National
  - ○ World
  - ○ Politics
  - ○ Business
  - ○ Health
  - ○ Science
  - ○ Technology
  - ○ Race & Culture
- Arts & Life    Expand/collapse submenu for Arts & Life
  - ○ Books
  - ○ Movies
  - ○ Television
  - ○ Pop Culture
  - ○ Food
  - ○ Art & Design
  - ○ Performing Arts
- Music    Expand/collapse submenu for Music
  - ○ Tiny Desk
  - ○ All Songs Considered

App.094

Best Music Of 2020
  - Music News
  - New Music
  - Music Features
  - Live Sessions
- Shows & Podcasts    Expand/collapse submenu for Shows & Podcasts

Daily
  - Morning Edition
  - Weekend Edition Saturday
  - Weekend Edition Sunday
  - All Things Considered
  - Fresh Air
  - Up First

Featured
  - Consider This from NPR
  - Embedded
  - How I Built This with Guy Raz
  - TED Radio Hour
  - More Shows & Podcasts
- Search
- Sign In
- NPR Shop

-
- Tiny Desk
- All Songs Considered
- Best Music Of 2020
- Music News
- New Music
- Music Features
- Live Sessions

- About NPR
- Diversity
- Organization
- Support
- Careers
- Connect
- Press
- Ethics

**Chad Wolf: Biden Was Warned About Revoking Trump Border Policy Former acting Homeland Security Secretary Chad Wolf says the Biden administration did not heed advice from the former administration about preventing an influx of migrants at the southern border.**

**Ex-DHS Chief Says Biden Was Warned About Dismantling Trump's Border Policies**

5-Minute Listen

App.095

- **Download**
- 

⬜ **Embed**  `<iframe src="https://www.npr.org/player/embed/980272165/980305643" width=` **<iframe**

`src="https://www.npr.org/player/embed/980272165/980305643" width="100%" height="290"`
`frameborder="0" scrolling="no" title="NPR embedded audio player">`

**Ex-DHS Chief Says Biden Was Warned About Dismantling Trump's Border Policies** 5:30

NPR

⬜ subscribe

- ○ NPR One
  ○ Apple Podcasts
  ○ Google Podcasts
  ○ Pocket Casts
  ○ Spotify
  ○ RSS link

## **Politics**

# Ex-DHS Chief Says Biden Was Warned About Dismantling Trump's Border Policies

- 
- 
- 
- 

March 23, 2021 10:06 AM ET

Franco Ordoñez

Twitter Instagram

**Ex-DHS Chief Says Biden Was Warned About Dismantling Trump's Border Policies**

5-Minute Listen

- **Download**
- 

⬜ **Embed**  `<iframe src="https://www.npr.org/player/embed/980272165/980305643" width=` **<iframe**

`src="https://www.npr.org/player/embed/980272165/980305643" width="100%" height="290"`
`frameborder="0" scrolling="no" title="NPR embedded audio player">`

Enlarge this image

App.096

Case 2:21-cv-00067   Document 54-1   Filed 06/08/21   Page 98 of 297   PageID 1237

Then-acting Homeland Security Secretary Chad Wolf testifies before Congress in September. **Greg Nash/Pool/Getty**

**Images hide caption**

**toggle caption**

Greg Nash/Pool/Getty Images

Then-acting Homeland Security Secretary Chad Wolf testifies before Congress in September.

Greg Nash/Pool/Getty Images

Former acting Homeland Security Secretary Chad Wolf says Trump officials warned the incoming Biden administration that dismantling the Trump administration's immigration policies would cause problems at the southern border.

The Biden administration has largely blamed the challenges at the border on the previous administration, saying it guided the Department of Homeland Security and used inhumane practices to try to deter migrants. Biden officials describe steps they've taken to accept the new influx of unaccompanied minors into the country and end controversial programs that require migrants to remain in Mexico as "a moral imperative."

But some former Trump administration leaders, such as Wolf, say the Biden administration is dismantling systems that worked.

"There is no consequence anymore," Wolf told NPR. "The administration is treating this as though it's a capacity issue and not an illegal behavior issue, and that's a fundamental difference."



Politics

## Hundreds Of Migrant Children Held In Border Detention For More Than 10 Days

Wolf was acting secretary from November 2019 until he abruptly resigned in January weeks before the inauguration following a court ruling that challenged the legality of his appointment.

He said he and his career staff held multiple briefings with the incoming Biden transition team to outline the challenges. He said they shared data that showed migration trends increasing since September and October 2020.

He said the Trump administration implemented programs such as "Remain in Mexico"; made asylum agreements with El Salvador, Guatemala and Honduras; and stopped allowing unaccompanied migrants to remain in the United States following the last migration crisis in 2019.

Article continues after sponsor message

## Politics

## Deaths Of Migrant Children Haunt Former Official As Border Surge Increases

He said his staff at U.S. Customs and Border Protection warned the Biden team that it would risk another crisis if it removed those programs.

"CBP would tell them and, in a sense, warn them, 'If you remove this ... this is the consequence for that. We will see a significant uptick,' " he said.

But those programs were quite controversial and included reports of abuse and misuse. Asylum-seekers lived in squalid camps awaiting a court date. *The New York Times* reported that the Trump administration expelled some Central American migrants into Mexico.

Wolf said children were flown back to their home countries and received by government officials and taken home.



Enlarge this image

Homeland Security Secretary Alejandro Mayorkas discusses the Biden administration's immigration policy at the White House in early March. **Drew Angerer/Getty Images hide caption**

**toggle caption**
Drew Angerer/Getty Images

Homeland Security Secretary Alejandro Mayorkas discusses the Biden administration's immigration policy at the White House in early March.

Drew Angerer/Getty Images

Homeland Security Secretary Alejandro Mayorkas acknowledged earlier this month that the administration was wrestling with the number of migrants — particularly unaccompanied minors — arriving at the border.

But he stressed there were more pressing moral imperatives to address in implementing immigration policy.

"Sometimes the tools of deterrence defy values and principles for which we all stand," Mayorkas said. "And one of those tools of deterrence that the Trump administration employed was deplorable and absolutely unacceptable."



## Politics

## 'Undoubtedly Difficult': Mayorkas Says DHS Is Working To Manage Influx At Border

These surges in migration also appear to be cyclical. They occurred during the Obama administration in 2014 and again in 2019 during the Trump administration despite its harsh policies.

President Biden sent some of this top officials to Mexico and Guatemala this week to discuss how to address the root causes of migration.

Wolf agrees that the numbers would have likely increased as Biden took office regardless, but he argued that Biden's

App.098

policies inflated the challenge. And he said that the U.S. government's resources wouldn't have been as taxed.

"We were telling them ... 'If you take down this, there's no capacity in Border Patrol stations. There's no capacity at HHS [facilities]. You will begin to have a backup. And here's the consequences to that.' "

- 
- 
- 
- 

# Sign Up For The NPR Politics Newsletter

From the White House to your home — political news and analysis that matter, sent twice a week.

E-mail address | What's your email? |

By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station. See Details. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

## More Stories From NPR



**National**

**Biden To Say All Adults Should Be Vaccine Eligible By April 19**



**Politics**

**Ruling By Senate Parliamentarian Opens Up Potential Pathway For Democrats**



**Politics**

**Slain Capitol Police Officer Will Lie In Honor In The Rotunda**



**Politics**

**Longtime Florida Congressman Alcee Hastings Dies At 84**



App.099

**National**

## As Biden Pushes Major Rail Investments, Amtrak's 2035 Map Has People Talking

**Law**

## Arkansas Governor Vetoes Ban On Gender-Affirming Care For Trans Youth

# Popular on NPR.org

**Music Videos**

## Tiny Desk Meets SXSW: Yasser Tejeda & Palotré

**Music Videos**

## Tiny Desk Meets SXSW: Steady Holiday

# NPR Editors' Picks

**Global Health**

## How One Man – And A Creative Map – Made A Difference In Panama's COVID-19 Crisis

**Health**

## Scientists Race To Develop Next Generation Of COVID Vaccines

**National**

## African Immigrant Health Groups Battle Trans-Atlantic Tide Of Vaccine Disinformation

App.100

Case 2:21-cv-00067-Z   Document 54-1   Filed 06/08/21   Page 102 of 297   PageID 1241

**National**

### Police Expert Testifies About Medical Support In Trial Of Derek Chauvin



**Music Interviews**

### H.E.R. Is A 'Soul Baby' With a Social Conscience



**Health**

### Eligible For The COVID Vaccine? Here's How To Book It In Your State

**Read & Listen**

- Home
- News
- Arts & Life
- Music
- Podcasts
- Programs

**Connect**

- Newsletters
- Facebook
- Twitter
- Instagram
- Press
- Contact & Help

**About NPR**

- Overview
- Diversity
- Ethics
- Finances
- Public Editor
- Corrections

**Get Involved**

- Support Public Radio
- Sponsor NPR
- NPR Careers
- NPR Shop
- NPR Events
- NPR Extra

App.101

Chad Wolf: Biden Was Warned About Revoking Trump Border Policy : NPR

- Terms of Use
- Privacy
- Your Privacy Choices
- Text Only
- © 2021 npr

NPR thanks our sponsors

Become an NPR sponsor

https://www.npr.org/2021/03/23/980272165/ex-dhs-chief-says-biden-was-warned-about-dismantling-trumps-border-policies[4/6/2021 4:20:02 PM]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

New York Times Article dated April 1, 2021
"The Real Reason for the Border Crisis"

# EXHIBIT A-11

Subscribe for $1    Log in

Thursday, April 1, 2021

LOG IN

ADVERTISEMENT

## Opinion

# The Real Reason for the Border Crisis

No one is holding American employers to account for their willingness to hire millions of unauthorized immigrants.

**By Christopher Landau**
Mr. Landau served as U.S. ambassador to Mexico from 2019 to 2021.

April 1, 2021, 5:00 a.m. ET



Matt Black for The New York Times

Once again, a humanitarian crisis is engulfing our southern border, as tens and potentially hundreds of thousands of migrants arrive from Mexico,

Central America and around the world in the hope that the Biden administration will let them in and let them stay.

The new administration has certainly given them — and the human smugglers who profit from their journeys — a basis for such hope: The administration declared that it would stop most deportations (a decision since blocked by a Federal District Court), halted construction of the border wall, announced new "priorities" that sharply limit immigration enforcement, stopped expelling unaccompanied minors under health-related authority invoked during the pandemic and began to phase out the Migrant Protection Protocols that helped prevent abuse of our asylum system and end the last surge of family units across the border.

As the most recent U.S. ambassador to Mexico, I am not at all surprised by the border surge: It is a reprise of the humanitarian crisis that engulfed the border shortly after President Andrés Manuel López Obrador took office in Mexico in December 2018. His administration also came into office pledging to adopt a more "humane" approach toward migration and wound up unleashing an inhumane situation at the border. It was only after President Donald Trump threatened to impose tariffs on cross-border trade that the Mexican government reversed course, and from then on the two countries cooperated closely to reduce the flows of third-country migrants across Mexico.

But the biggest factor driving such flows has gone largely unaddressed: the willingness and ability of American employers to hire untold millions of unauthorized immigrants. The vast majority of the people are coming here for the same reason people have always come here: to work (or to join their families who are here to work).

ADVERTISEMENT

App.106

Unless there is a serious effort, through mandatory E-Verify and other relatively simple means, to ensure that persons hired to work in the United States are eligible to do so, our country will continue to entice unauthorized immigrants and reward unauthorized immigration.

Dig deeper into the moment.
Special offer: Subscribe for $1 a week.

Would-be migrants, like other people, are economically rational: They weigh the benefits of living and working in the United States against the costs and odds of successfully making the dangerous journey across Mexico and into our country. As we have witnessed, shifts in enforcement policy by Mexico or the United States that alter the journey's likelihood of success greatly influence migrant flows.

This is a domestic matter that fell outside my jurisdiction as ambassador. But it was certainly awkward for me to ask my Mexican counterparts to crack down on unauthorized migrant flows when our own government had not meaningfully addressed the major engine of such flows. Congress,

App.107

Case 2:21-cv-00067-Z   Document 54-1   Filed 06/08/21   Page 109 of 297   PageID 1248

regardless of the party in control, has never taken the simple step of making E-Verify mandatory for all employers. Nor has the federal bureaucracy — again, regardless of which party controls the executive branch — shown much zeal for enforcing the law against employers. The Department of Homeland Security points the finger at the Department of Justice, while the Department of Justice points the finger at the Department of Homeland Security.

Until we meaningfully hold employers accountable for the people they hire, and disincentivize them from hiring unauthorized immigrants, I am not optimistic about our ability to contain unauthorized immigration.

It is no answer for employers to argue that there are certain jobs that citizens or legal residents will not do. If raising wages will not do the trick, and we really do need immigrants to perform these jobs, then such workers should be brought in legally with work permits and be subject to the full protection of our laws. There are programs in place to do just that, like the H-2A and H-2B visa programs, which permit employers to hire foreign workers to perform temporary agricultural and nonagricultural services or labor in the United States on a one-time, seasonal, peak load or intermittent basis.

ADVERTISEMENT

But here again, the incentives are all wrong. Those programs are cumbersome, and many employers apparently prefer to hire unauthorized immigrants than go to the trouble of hiring eligible legal workers.

App.108

Employers who do the right thing are thereby placed at a competitive disadvantage.

It is discouraging to see the Biden administration characterizing the "root causes" of unauthorized immigration as poverty, corruption and violence in Mexico, Central America and elsewhere and vowing to address the issue by attacking these problems. These are certainly "push" factors, but they are nowhere near as powerful as the "pull" factor of jobs in the United States readily available at wages unimaginable in these other parts of the world.

And obviously the U.S. government has far greater power to regulate the conduct of employers within its own borders than to solve deep-rooted social problems abroad. Indeed, the United States has been talking about improving conditions in Latin America for more than half a century, with precious little to show for it.

As long as our country continues to incentivize unauthorized immigration by turning a blind eye to the employment of millions of unauthorized immigrants within our borders, we cannot claim to have a "humane" policy. Such migration is big business for criminals; it encourages impoverished people to turn over their life savings to the human smugglers who control the routes. The transportation is hellish. Migrants find themselves jammed into locked, and sometimes abandoned, tractor-trailers like those recently discovered in Mexico's Veracruz State with up to 233 people aboard. Last month, 13 people died when an eight-passenger SUV packed with 25 unauthorized immigrants collided with a big rig just over the border in California. Migrants are routinely subject to rape, assault and other crimes. And unauthorized immigrants who ultimately succeed in reaching our territory are consigned to live and work in the shadows without the full protection of our laws.

Migration, as our government likes to say, should be safe, legal and orderly. Now let's act as if we really mean it.

Christopher Landau (@ChrisLandauUSA) served as U.S. ambassador to Mexico from

App.109

Opinion | The Real Reason for the Border Crisis - The New York Times

Case 2:21-cv-00067-Z   Document 54-1   Filed 06/08/21   Page 111 of 297   PageID 1250
2013 to 2021.

*The Times is committed to publishing a diversity of letters to the editor. We'd like to hear what you think about this or any of our articles. Here are some tips. And here's our email: letters@nytimes.com.*

*Follow The New York Times Opinion section on Facebook, Twitter (@NYTopinion) and Instagram.*

ADVERTISEMENT

Comments 153
The Real Reason for the Border CrisisSkip to Comments
Share your thoughts.
The Times needs your voice. We welcome your on-topic commentary, criticism and expertise. **Comments are moderated for civility.**
OFFER EXTENDED: Subscribe for $1 a week.
**Thanks for reading The Times.**
EXPAND



**JOURNALISM LIKE NO OTHER.**

© 2021 The New York Times Company

**OFFER EXTENDED:** Subscribe for $1 a week.

**VIEW OFFER**

Contact Us   Accessibility   Work with us   Advertise   T Brand Studio   Your Ad Choices   Privacy Policy   Terms of Service
Terms of Sale   Site Map   Help   Subscriptions

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

New York Times Article dated March 3, 2019
"You Have to Pay With Your Body"

# EXHIBIT A-12

**The New York Times**

# 'You Have to Pay With Your Body': The Hidden Nightmare of Sexual Violence on the Border

**By Manny Fernandez**

March 3, 2019

MCALLEN, Tex. — It was dark in the stash house where they kept her, the windows covered so no one could see inside. At first, the smugglers had her cook for the other migrants who had recently crossed illegally into the United States. Then they took her to a room upstairs, locked the door and began taking turns with her.

It was the summer of 2014, and Melvin, a 36-year-old mother of three, had just completed the journey from her native Guatemala, crossing the Rio Grande on a raft before being led to the house in the Texas border city of McAllen.

For weeks in that locked room, the men she had paid to get her safely to the United States drugged her with pills and cocaine, refusing to let her out even to bathe. "I think that since they put me in that room, they killed me," she said. "They raped us so many times they didn't see us as human beings anymore."

On America's southern border, migrant women and girls are the victims of sexual assaults that most often go unreported, uninvestigated and unprosecuted. Even as women around the world are speaking out against sexual misconduct, migrant women on the border live in the shadows of the #MeToo movement.

*[Read: In a Border Courtroom, a Migrant Woman Confronts Her Biggest Fear]*

The stories are many, and yet all too similar. Undocumented women making their way into American border towns have been beaten for disobeying smugglers, impregnated by strangers, coerced into prostitution, shackled to beds and trees and — in at least a handful of cases — bound with duct tape, rope or handcuffs.

The New York Times found dozens of documented cases through interviews with law enforcement officials, prosecutors, federal judges and immigrant advocates around the country, and a review of police reports and court records in Texas, New Mexico, Arizona and California. The review showed more than 100 documented reports of sexual assault of undocumented women along the border in the past two decades, a number that most likely only skims the surface, law enforcement officials and advocates say.

In addition, interviews with migrant women and those working with them along the border point to large numbers of cases that are either unreported or unexamined, suggesting that sexual violence has become an inescapable part of the collective migrant journey.

*[Read the Newsletter: Yes, There Was Duct Tape: The Harrowing Journeys of Migrants Across the Border. Sign up for Crossing the Border here]*

President Trump has used the threat faced by migrant women to make his case for a border wall. "One in three women are sexually assaulted on the dangerous trek up through Mexico," he said in January — an estimate that appears to have originated from some limited surveys, one of them by Doctors Without Borders, of women traveling through Mexico.

But less understood is that the violence that befalls migrant women happens not just during the perilous journey through Mexico: Much of it happens after women reach the supposed safety of the United States.

In July, a 23-year-old Honduran woman told the authorities that she was sexually assaulted in a bedroom closet by a smuggler who had helped her and her sister cross into the South Texas city of Mission. The following month, a sheriff's deputy in San Antonio was charged with sexually assaulting the 4-year-old daughter of an undocumented Guatemalan woman and threatening to have her deported if she reported the abuse. In 2017, a guide leading a group of migrants through the Tohono O'odham Nation's reservation in Arizona raped a woman from El Salvador twice during a seven-day desert hike, threatening to leave her stranded if she resisted. "I hope I leave you pregnant so you have one of my kids," he said, the woman told the authorities.

In 2016, a migrant woman fled a stash house in the South Texas city of Edinburg, where she said she had been raped by a smuggler who brandished a machete. In West Texas that same year, two teenage girls reported that they had been sexually assaulted by a Customs and Border Protection officer, who they said forced them to strip, fondled them, then tried to get them to stop crying by offering chocolates, potato chips and a blanket. In an unusual turn, the girls filed legal claims against the federal government, which settled the case in 2018 for $125,000.

At least five of the women who were assaulted — in one case, bound with duct tape, raped and stabbed — were attacked not by migrant smugglers, who are often the perpetrators, but by on-duty Border Patrol agents and Customs officers.

App.112

Case 2:21-cv-00067-Z   Document 54-1   Filed 06/08/21   Page 114 of 297   PageID 1253

Experts say the actual number of sexual assaults is almost certainly much higher than those documented by prosecutors and the police, because most attacks are never reported. And such attacks don't end at the border. Women have reported being assaulted in immigration detention facilities, and the federal government over a recent four year period has received more than 4,500 complaints about the sexual abuse of immigrant children at government-funded detention facilities.

The Times interviewed eight migrant women from Central America who were sexually assaulted between 2013 and 2016 — women still struggling with nightmares, depression and in some cases, thoughts of suicide  One reported that she was attacked in Mexico; six said they were assaulted in South Texas. One said she was attacked in both Mexico and South Texas. The oldest victims were in their early 40s when they were attacked; the two youngest were 14

Most of their attackers were never prosecuted or identified, and The Times was not able to independently verify the women's accounts. But all eight women either gave sworn testimony or submitted statements under penalty of perjury to the federal government in order to qualify for visas, and cooperated with the police in the investigation of their cases.

They described a netherworld of fear that coexists with the bustling life of American cities up and down the border  One woman told of being held prisoner in a house that had been turned into a makeshift brothel in McAllen, a city of 143,000 in the Rio Grande Valley. "Nueva carne"    new meat, the smugglers said as she and other migrant women were led into the house, said the woman, Lucy, 45, a migrant from Honduras who, like others interviewed, did not want her last name used.

She said a series of men came into the house over the next several days and raped her. "Because I didn't want to let them, they tied my feet together and my hands behind my back," Lucy said

Gladys, 45, a mother of four from Guatemala, said she was kidnapped by armed smugglers after crossing the border and jumped out of a car to escape, but was captured again. For days, she was held prisoner at a stash house in McAllen and forced to have sex with six men. "I thought it would be better if I died when I fell from the car," she said.

Law enforcement officials on the border said they had made arrests in many of the cases brought to them and would pursue more if they could. But the majority of women who have been assaulted do not report it, often because their attackers threaten to expose their immigration status — or worse — if they do. One woman, raped repeatedly at gunpoint in a stash house in Phoenix in 2005, said her attacker threatened to sell her 3-year-old daughter if she reported him. Those who do go to the authorities may not know the names of their attackers, or even where the assault occurred. Smugglers make sure their clients are unsure of their whereabouts; if they are detained by Border Patrol, they won't be able to pinpoint where they were held.

*[Read: Open Wounds, Head Injuries, Fever: Ailing Migrants Suffer at the Border]*

The women are powerless by almost any measure. Most of the eight interviewed now live in the United States after receiving the victim-related visas. They work in stores, restaurants and factories, most barely making a living. Their English is limited. Many of them have not even told their families what happened.

"They don't have many defenses," said Jesus R. Romo Vejar, an Arizona lawyer who has represented many migrant women victimized by sexual assault. "Undocumented women and children are the most unprotected of human beings."

Here are some of their stories.



Lucy, 45, was raped while being forced to work at makeshift brothels, first in Mexico and then in McAllen, Texas.  Caitlin O'Hara for The New York Times

App.113

Case 2:21-cv-00067-Z   Document 54-1   Filed 06/08/21   Page 115 of 297   PageID 1254

**They just told us, "You have to pay with your body."**

*Lucy, 45, was raped while being forced to work at makeshift brothels, first in Mexico and then in McAllen.*

When we got to the house, there were many women. It was a big house. I couldn't see everybody's face, but there were different women in different rooms for prostitution. I wanted to flee but I was afraid they were going to kill me. They just told us, "You guys don't have money, so you have to pay with your body."

When we crossed the river, there was a man waiting, a white guy with tattoos. He was in a truck. We got into the truck. He brought us into a house in McAllen. When we got there, the guy started talking and he said that I was new meat.

When they wanted to have sex with me they had to tie me up because I wasn't cooperative. They tied my feet together and my hands behind my back and then they'd have sex with me from behind.

Before, I could not talk about this. I would have panic, really serious panic. I didn't want to leave the house. I didn't want to talk to anybody. I thought that everyone in the world saw me as a prostitute. I come from a poor family but a very decent family.

It has affected me, yes. But not anymore. I'm kind of enraged. Those guys have mothers and daughters. What they did to us is what they did to women.

Melvin  Caitlin O'Hara for The New York Times

**Every time I closed my eyes, the men would appear.**

*Melvin, 36, was raped and forced into prostitution in a locked room at a stash house in McAllen.*

I lost count of how long I was there for. It wasn't me anymore. I think that since they put me in that room, they killed me. They have no mercy. They don't care that you're a mother, that you have family. They see someone who doesn't matter to them.

And I still remember while I was with them there, it was my birthday, and I didn't want to, not that day. And I remember that he grabbed me and at one point bit me, and when I arrived at the detention center, I still had the bite marks. I told them that it was my birthday. And according to them, the rape that day was for my birthday.

I tried to commit suicide three times. Because you can't live with all of that. And every time I closed my eyes, the men would appear. You'd shower. You'd close your eyes. They were there. I didn't want to live with that in my head anymore. But here I am.

App.114

J.E.   Caitlin O'Hara for The New York Times

## I didn't know what to do. My feet were tied up.

*J.E., 19, and two other migrants were kidnapped in South Texas by a Border Patrol agent, Esteban Manzanares, when J.E. was 14. He raped her in his apartment in Mission, Tex., and later committed suicide.*

He took me and tied me up to a tree. He said he would come back. I was thinking about my little brother, who's in Honduras, and I'd never see him again. He was about 10, I think. It was hours.

He undid me from the tree and put me in the car. In the apartment, there were two beds on top of the other, children's bunk beds, and ropes there, too. They were shoelaces. For my wrists and my feet.

My mind was blank. I was trying to understand everything. I didn't know what to do. My feet were tied up. I would look at him and he had a gun. And that frightened me. I asked him why, and he answered me that he was doing this to me because I was the prettiest one of the three.

There are people who sort of discard you when they know what happened to you. But the majority of my girlfriends do know so they can understand what I went through, and they support me.

## He bit my mouth so I could not cry out.

*V.E.M.L., 39, was raped in the South Texas brush by a smuggling guide. She was apprehended, detained at the Hutto detention center in Taylor, Tex., and later deported.*

I knew that they were the ones who were going to take me across, so I knew that I had to stay with them. I never learned his name. I felt nervous about him. He was very strange. I wasn't sure if he was on drugs. He always stood up and sat down, and stood up and sat down.

The older one walked ahead. The younger one said, "Come with me."

I said, "Where are we going?" And he said, "We're going to catch up with them ahead."

He bit my mouth so I could not cry out. I was scared that it might occur to him to kill me.

Afterwards, he told me to hurry up or he would leave me there on the ground. The guys in the group start saying, "Immigration! Immigration!" I ran toward Immigration. I wanted to get away. But then when they took me and put me in the car, I felt frustrated and alone. I just felt like I couldn't stop crying. They were all men agents. They kept asking me why I was crying and I couldn't explain.

When they brought me to Laredo, I told a doctor what happened. He said, "Don't feel like you're the only one that this happened to. This has happened to many other women."

Case 2:21-cv-00067-Z   Document 54-1   Filed 06/08/21   Page 117 of 297   PageID 1256

Cindy and her son.  Caitlin O'Hara for The New York Times

## I had been marked because of what had happened to me, that violation.

*Cindy, 26, and her son Samuel stayed at a stash house in Mexico while waiting to cross the border. She and another woman were raped by a smuggler, and she learned after being apprehended by Border Patrol that she was pregnant. Samuel is now 8. His little brother, to whom Cindy gave the biblical name of Adonai, is 2.*

When he entered the room, he had the gun. He took the children out. He had the gun and he pointed the gun at my head when he was attacking us. First he abused me and then he abused her. We're in his power and we feel like we're disposable. We can't do anything because it's like they tell us, they can kill us and nobody will say anything.

It wasn't until that test that I knew I was pregnant. In that moment, it was like I had been marked. I had been marked because of what had happened to me, that violation.

I wanted to kill myself. Going to the psychologist, that's what helped me heal. She told me that we had to talk about it, we had to think about it, and we had to learn to live with our lives moving forward, even with what happened.

My son, I realized he was an innocent bystander in this situation and that it wasn't his fault. My motivation to keep going in life are my two kids. I thank God because everything that I suffered, they're the happiness that came out of that.

App.116

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

Human Trafficking by the Numbers:
The Initial Benchmark of Prevalence and Economic Impact for Texas
The University of Texas at Austin Institute on Domestic
Violence & Sexual Assault

December 2016

# EXHIBIT A-13

# Human Trafficking by the Numbers:

The Initial Benchmark of Prevalence and Economic Impact for Texas

Final Report
December 2016



The University of Texas at Austin
**Institute on Domestic Violence & Sexual Assault**
*School of Social Work*

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Page was intentionally left blank

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

# Human Trafficking by the Numbers:
## The Initial Benchmark of Prevalence and Economic Impact for Texas

Final Report
December 2016

**Noël Busch-Armendariz, PhD, LMSW, MPA**
**Nicole Levy Nale, MSW**
**Matt Kammer-Kerwick, PhD**
**Bruce Kellison, PhD**
**Melissa Irene Maldonado Torres, PhD**
**Laurie Cook Heffron, PhD**
**John Nehme, MPEc**

*Staff & Consultant Contributors:*

Melody Huslage
Sandra Molinari
Amber McDonald
McKenna Talley
Alex Wang
Anna Wasim
Leila Wood, PhD

*"Harriet Tubman did not wait around for a proper measurement
of how many slaves were in the South. Neither should we. The
work needs to be done while we try to measure it."*

-- Timothy McCarthy, Harvard Kennedy School
*The Freedom Ecosystem*, Monitor Deloitte/Deloitte Consulting LLP

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

This project was funded by the Texas Office of the Governor, Criminal Justice Division (Contract No. 2847101). The opinions, findings, and conclusions expressed in this publication are those of the authors and do not necessarily reflect the official position or policies of the Texas Office of the Governor.

Permission to reproduce any portion of this report is granted on the condition that the authors are credited. When using these data use this citation:
Busch-Armendariz, N.B., Nale, N.L., Kammer-Kerwick, M., Kellison, B., Torres, M.I.M., Cook Heffron, L., Nehme, J. (2016). Human Trafficking by the Numbers: The Initial Benchmark of Prevalence and Economic Impact for Texas. Austin, TX: Institute on Domestic Violence & Sexual Assault, The University of Texas at Austin.

**Last Updated January 27, 2017**

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Page was intentionally left blank

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

## Acknowledgements

This project has been made possible through the commitment, vision, and efforts of many in Texas who are working in the anti-trafficking movement and fighting to end exploitation and trafficking of some of our most vulnerable populations.

Our sincere thanks goes to the many research participants who worked closely with us over the last two years, answering survey questions, participating in interviews and focus groups, and supporting us as we worked towards a greater understanding of the prevalence and economic impact of human trafficking in Texas. In particular, we are deeply grateful to the social service providers and advocates, law enforcement officers and victim specialists, prosecutors, legal service providers, educators, and the many others working to protect adults and children from exploitation and trafficking.

We would like to acknowledge the following individuals and agencies for their expertise and specific contributions through this research study.

We extend our sincere gratitude to the leadership at the Texas Office of the Governor, Criminal Justice Division and, in particular, the newly established Child Sex Trafficking Team. This team's expertise and commitment to children impacted by trafficking will continue to elevate our response as a state and continue our reputation of being a nationally recognized leader for protecting minor and youth victims of sex trafficking. We thank them for their continued vision to support and fund empirically-grounded research that increases the understanding of the prevalence and impact of this crime, research that we hope will influence our future response, legislation priorities, and ability to serve victims and survivors.

We would like to extend our sincere appreciation to our core partner on this research, Allies Against Slavery. John Nehme and his team contributed vision and field expertise to this research that deserves special recognition. We look forward to their continued impact in this field, and we thank them for all they do to promote innovation and elevate our expectations for the anti-trafficking field.

A big Texas thank you to the team at Polaris, CEO Bradley Myles and Data Analysis Director Jennifer Kimball. The innovative work of Polaris and the National Human Trafficking Hotline continues to illuminate the complexity of human trafficking and support the field through actionable insights. Their pioneering approach has helped the anti-trafficking movement improve data collection efforts and has shaped the entire solution ecosystem by grounding promising practices in evidence.

Numerous IDVSA staff and consultants deserve a special recognition for their contributions to this research. We are indebted to all of you for your service.

Dr. Leila Wood, IDVSA Director of Research, who provided support and guidance on the research methodology and social justice perspectives.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Amber McDonald, member of the Colorado Human Trafficking Council's Data and Research Task Force, for her guidance and expertise as a forensic social worker and consultant of this research. We are grateful for her commitment to youth affected by trauma and exploitation.

We are especially grateful for the contributions of all our graduate research assistants and research associates. GRAs McKenna Talley, Melody Huslage, Melissa Forrow, and Research Fellow Sandra Molinari contributed their thinking, time, and exemplary skills to this project; it is better for their input. Thanks also to Research Associates Alex Wang and Anna Wasim for their commitment to this issue and contribution to the development of this report.

A very special thanks to the many individuals and agencies that we met with as part of this research; we simply cannot name them all. We do want to acknowledge the work of agencies who have been committed to the research and the anti-trafficking field for many years: the Human Trafficking & Transnational Organized Crime Section of the Attorney General of Texas, U.S. Attorney's Office, Human Smuggling and Trafficking Center, Federal Bureau of Investigations and the Innocence Lost National Initiative, Homeland Security Investigations, Department of Public Safety, Department of Family and Protective Services, and the Texas Association Against Sexual Assault. Their contributions continue to advance and elevate Texas's human trafficking prevention, protection, and prosecution efforts.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Page was intentionally left blank

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

# Table of Contents

**Executive Summary** ................................................................................................................... **13**
*Prevalence Highlights* ...............................................................................................................13
*Cost Highlights*..........................................................................................................................13
*Background*.................................................................................................................................13
*Methods*.....................................................................................................................................13
*Overall Findings* ........................................................................................................................14
   Prevalence of minor and youth sex trafficking in Texas.........................................................14
   Prevalence of labor trafficking in Texas. ...............................................................................15
   Economic impact of human trafficking in Texas. ...................................................................16

**Introduction** ..................................................................................................................... **18**

**Research Methodology** ...................................................................................................... **20**

**Background and Theory** ..................................................................................................... **21**
*U.S. Federal Human Trafficking Policy* ....................................................................................21
*U.S. Federal and Texas State Labor Policy*................................................................................22
*Building on Lessons About Vulnerabilities Seen in DMST* .......................................................22
*Victim Typologies* ......................................................................................................................26
*Estimation of risk* ......................................................................................................................27

**Research Activities**............................................................................................................ **28**
*Secondary research* ...................................................................................................................29
   Human Trafficking Reporting System (HTRS). .....................................................................29
   National Human Trafficking Hotline Data (Hotline)..............................................................30
   ***Statewide Governmental Agencies.*** ......................................................................................33
*Primary research* .......................................................................................................................37
   Agency Survey. .......................................................................................................................37
   Victimization Rates. ...............................................................................................................39
   Agency Survey: Collaboration with New Orleans Trafficking Task Force...............................41
   Follow-up in-depth interviews. ..............................................................................................42
   Focus groups, including worksheets filled out prior to the group............................................42
   DMST working group..............................................................................................................44
   Pilot study on labor trafficking: Houston. ..............................................................................47

**Prevalence of Human Trafficking in Texas**........................................................................ **51**
*Minor and youth sex trafficking.* ...............................................................................................52
   How large are these community segments?.............................................................................53
   How many are at risk?.............................................................................................................53
*Labor trafficking.* .......................................................................................................................54
   How large are these labor segments?.......................................................................................55
   How many workers are at risk?................................................................................................56

**Economic Impact of Human Trafficking in Texas** .............................................................. **57**
*Sex trafficking.* ..........................................................................................................................57
*Labor trafficking.* .......................................................................................................................59

**Our Understanding of Human Trafficking in Texas** ........................................................... **60**
*Law enforcement response*.........................................................................................................60
*Prosecution response*.................................................................................................................61
*Under investigation: Labor trafficking* ......................................................................................62

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

**Discussion** ....................................................................................................................... **63**
*Conclusions*.......................................................................................................................64
*Recommendations*.............................................................................................................65
*Next Steps: Phase 2* ..........................................................................................................66

**References** ......................................................................................................................... **67**

**Appendix A: Frequently Asked Questions (FAQ)** .......................................................... **77**

**Appendix B: Resources** ...................................................................................................... **80**

**Appendix C: Definitions detailed in Trafficking Victims Protection Act of 2000** ............... **82**

**Appendix D: DPS Offense Codes Related to Human Trafficking** ................................... **84**

**Appendix E: Secondary Sources in Support of Victimization Rate** ................................ **87**

**Appendix F: Gaps Analysis** ............................................................................................... **89**

**Appendix G: Research on Minor and Youth Sex Trafficking** ......................................... **97**

**Appendix H: Research on Labor Trafficking** .................................................................. **103**

**Appendix I: Hierarchy of Information Needs: Victims** ................................................... **105**

**Appendix J: IDVSA History** ............................................................................................. **107**

**Appendix K: Human Trafficking and Transnational Organized Crime Section** ............... **110**

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

## Figures and Tables

Figure 1: Trafficking and exploitation summary ........................................................ 50

Table 1: Statewide Prevalence of Human Trafficking in Texas ............................... 14
Table 2: Economic Impact of Human Trafficking in Texas ...................................... 14
Table 3: Minor and Youth Sex Trafficking in Texas ............................................... 15
Table 4: Labor Trafficking in Texas ....................................................................... 15
Table 5: Lifetime Costs of Care for Victims of Minor and Youth Sex Trafficking .................. 16
Table 6: Annual Value of Labor Exploited from Trafficking Victims ......................... 17
Table 7: BJA Anti-Trafficking Task Force Funding for Texas, since 2005 ................. 30
Table 8: The National Human Trafficking Hotline  Cases– Texas Data ..................... 31
Table 9: The National Human Trafficking Hotline  Segments– Texas Data............... 32
Table 10: The National Human Trafficking Hotline by Region – Texas Data............ 32
Table 11: Agency Survey Summary ........................................................................ 38
Table 12: Agency Survey – Services Provided........................................................ 39
Table 13: Research to Support Sex Trafficking Victimization Rate ........................... 40
Table 14: Participants in Follow-Up Depth Interviews .............................................. 42
Table 15: Clients Served by Type of Stakeholder – Focus Groups ........................... 43
Table 16: Common Gaps and Barriers Identified by Stakeholders – Focus Groups .................. 44
Table 17: Labor Exploitation and Trafficking Criteria............................................... 48
Table 18: Trafficking Typology with Data Sources .................................................. 52
Table 19: Examples of Community Segment Sizes in Texas (Annually) at High Risk for Minor
        and Youth Sex Trafficking .......................................................................... 53
Table 20: Minor and Youth Sex Trafficking in Texas............................................... 54
Table 21: Example of Individual Segment Sizes in Texas at High Risk for Labor Trafficking .. 56
Table 22: Labor Trafficking in Texas ...................................................................... 56
Table 23: Unit Costs ............................................................................................... 58
Table 24: Lifetime Cost of Care for Victims of Minor and Youth Sex Trafficking.................. 59
Table 25: Annual Value of Labor Exploited from Trafficking Victims ....................... 60

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

# HUMAN TRAFFICKING IMPACT IN TEXAS

APPROXIMATELY

## 79,000

MINORS AND YOUTH
**ARE VICTIMS OF
SEX TRAFFICKING**

## IN TEXAS ★ ★

APPROXIMATELY

## 234,000 WORKERS ARE VICTIMS OF LABOR TRAFFICKING

THERE ARE CURRENTLY AN ESTIMATED **VICTIMS OF**

## 313,000 HUMAN TRAFFICKING IN TEXAS ★ ★ ★ ★ ★ ★

**TRAFFICKERS
EXPLOIT** APPROXIMATELY **$600 MILLION**
FROM VICTIMS OF LABOR TRAFFICKING
★ ★ ★ ★ ★ **IN TEXAS**

MINOR AND YOUTH
**SEX TRAFFICKING COSTS
THE STATE OF
T E X A S**
APPROXIMATELY

## $6.6 BILLION

When using this data please use the following citation:  Busch-Armendariz, N.B., Nale, N.L., Kammer-Kerwick, M., Kellison,B., Torres, M.I.M., Cook-Heffron, L., Nehme, J. (2016). Human Trafficking by the Numbers: Initial Benchmarks of Prevalence & Economic Impact in Texas. Austin, TX: Institute on Domestic Violence & Sexual Assault, The University of Texas at Austin.

## Executive Summary

### Prevalence Highlights

Currently, there are approximately 79,000 minor and youth victims of sex trafficking in Texas.

Currently, there are approximately 234,000 workers who are victims of labor trafficking in Texas.

Currently, there are an estimated 313,000 victims of human trafficking in Texas.

### Cost Highlights

Minor and youth sex trafficking costs the state of Texas approximately $6.6 billion. Traffickers exploit approximately $600 million from victims of labor trafficking in Texas.

### Background

Though human trafficking is widespread in geographically large states with large urban centers like Texas, the true scope of this hidden crime is largely unconfirmed as data on human trafficking are difficult to ascertain. Existing data gathered in anti-trafficking efforts focus almost exclusively on identified victims, shedding light on only a fraction of the problem. The first phase of the Statewide Human Trafficking Mapping Project of Texas focused on providing empirically grounded data as a benchmark about the extent of human trafficking across the state. The following three primary research questions guided our data collection efforts, which included queries of existing databases, interviews, focus groups, and web-based surveys.

1. What is the prevalence of human trafficking in Texas?
2. What is the economic impact of human trafficking in Texas?
3. What is our understanding of human trafficking in Texas?

### Methods

The findings in this report were derived using a multi-methods approach to quantify the prevalence and economic impact of human trafficking in Texas. Higher-than-average risk industry and community segments were chosen for sex and labor markets. We defined community segments as groups of people considered to be at higher-than-average risk of trafficking because of risk indicators found in trafficking cases (e.g. homelessness). More specifically, rather than attempting to establish prevalence of trafficking among the 27.4 million people living in Texas, for the purposes of demonstrating our methodology, establishing some benchmarks on human trafficking prevalence and economic impact estimates, and providing a concrete example of our planned activities moving forward, victimization rates were applied to a

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

select few community segments that are at higher-than-average risk of trafficking. The methodology has addressed the critical industry and community segments to accurately estimate prevalence while reducing overlap between the chosen segments.

### Overall Findings

Table 1

*Statewide Prevalence of Human Trafficking in Texas*

| Types of Human Trafficking | Estimated Number of Victims |
|---|---|
| Minor and youth sex trafficking | 78,996 |
| Labor trafficking | 234,457 |
| Total | 313,453 |

Table 2

*Economic Impact of Human Trafficking in Texas*

| Types of Economic Impact of Human Trafficking | Estimated Economic Impact ($) |
|---|---|
| Net present value (NPV) of estimated lifetime cost of minor and youth sex trafficking victims | $6,566,529,071 |
| Estimated annual value of lost wages for labor trafficking victims | $598,127,942 |

#### Prevalence of minor and youth sex trafficking in Texas.

For minor and youth sex trafficking, we selected groups that are believed to be at higher-than-average risk of sex trafficking, including children in the foster care system, those who have experienced abuse, and the homeless. Furthermore, for at-risk youth being served by the Department of Family and Protective Services, we focused on the population currently receiving services due to being identified as at-risk select sub-segments of minors and youth who are at highest risk of exploitation.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Table 3

*Minor and Youth Sex Trafficking in Texas*

| High-Risk Sex Trafficking Community Segments* | Community Size Segment | Victimization Rate | Estimated Victims |
|---|---|---|---|
| Child abuse/maltreatment | 290,471 | 25% | 72,618 |
| At-risk youth being served by DFPS | 24,097 | 25% | 6,024 |
| Homeless | 1,416 | 25% | 354 |

* The research team acknowledges the limitations of this narrow definition of human trafficking. Phase 2 benchmarks will incorporate additional segments such as adult sex trafficking, other economic sectors, etc.

### Prevalence of labor trafficking in Texas.

For labor trafficking, we conservatively estimate the number of workers at higher-than-average risk of trafficking victimization within select industries: agriculture, domestic services, construction, restaurant and food service industries, and landscaping/grounds keeping. Furthermore, for greater clarity, within these industries we focus on select sub-segments of workers who are at the highest risk of exploitation.

Table 4

*Labor Trafficking in Texas*

| High-Risk Labor Trafficking Segments* | Community Size Segment | Victimization Rate | Estimated Victims |
|---|---|---|---|
| Migrant farmworkers | 132,034 | 28% | 36,970 |
| Cleaning services | 233,610 | 36% | 84,100 |
| Construction | 101,250 | 35% | 35,438 |
| Kitchen workers in restaurants | 190,390 | 32% | 60,925 |
| Landscaping and grounds keeping workers | 63,050 | 27% | 17,024 |

* The research team acknowledges the limitations of this narrow definition of human trafficking. Phase 2 benchmarks will incorporate additional segments such as adult sex trafficking, other economic sectors, etc.

As this research continues, we will expand this list to include other industries and labor segments at high risk of labor trafficking victimization that emerge from our primary data collection efforts in Houston and elsewhere.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

### Economic impact of human trafficking in Texas.

For the purposes of this benchmark research, we have focused on two main aspects of human trafficking's economic impact: 1) Measuring the value of the economic output, including the value of the labor produced by human trafficking activity; and 2) Quantifying the costs to provide care to victims and survivors of human trafficking, including costs related to law enforcement, prosecution, and social services.

For victims of sex trafficking, we estimate lifetime social service costs that both society and trafficking victims can expect to incur, such as mental and physical health costs, strains to the public health system, and law enforcement expenses.

Table 5

*Lifetime Cost of Care for Victims of Minor and Youth Sex Trafficking*

| High-Risk Sex Trafficking Community Segments* | Estimated Victims | NPV of Cost of Care Required as Consequence of HT (Lifetime) | Estimated Lifetime Cost |
|---|---|---|---|
| Child abuse/maltreatment | 72,618 | $83,125 | $6,036,358,905 |
| At-risk youth being served by DFPS | 6,024 | $83,125 | $500,743,976 |
| Homeless | 354 | $83,125 | $29,426,190 |
| Total | | | $6,566,529,071 |

* The research team acknowledges the limitations of this narrow definition of human trafficking. Phase 2 benchmarks will incorporate additional segments such as adult sex trafficking, other economic sectors, etc.

We offer the following estimates for the annual value of labor expended by trafficking victims in the five vulnerable industries presented previously.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Table 6

*Annual Value of Labor Exploited from Trafficking Victims*

| High-Risk Labor Trafficking Segments* | Estimated Victims | Estimated Annual Value Wages Lost |
|---|---|---|
| Migrant farmworkers | 36,970 | $94,314,906 |
| Cleaning services | 84,100 | $214,549,192 |
| Construction | 35,438 | $90,406,591 |
| Kitchen workers in restaurants | 60,925 | $155,426,986 |
| Landscaping and grounds keeping workers | 17,024 | $43,430,267 |
| Total | | $598,127,942 |

\* The research team acknowledges the limitations of this narrow definition of human trafficking. Phase 2 benchmarks will incorporate additional segments such as adult sex trafficking, other economic sectors, etc.

This report presents what we learned during the first phase of this research, some preliminary findings from our research activities, and a description of future research activities, which will focus on the accrual of additional primary and secondary data to expand our understanding of the prevalence and economic impact of trafficking in Texas. We will also continue to build upon past research about the needs of victims and survivors and our understanding of traffickers. With this continued research, in the future we expect these emerging data to be more exhaustive, especially since this research is running parallel to a time when both governmental and non-governmental agencies are improving data collection efforts, increasing and improving screening of potential victims, and working to share that information in the name of more effective, comprehensive solutions.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

# Introduction

The United States Department of State considers human trafficking a form of modern-day slavery and broadly defines it as when a person is deceived or coerced in situations of prostitution, forced labor, or domestic servitude.  An accurate scope of human trafficking is unknown, although it has been hypothesized that states larger in geography and populous are higher in prevalence and rates. The study of human trafficking is challenging for a variety of reasons that are well documented (Small, Adams, Owens, & Roland, 2008; Barrick, Lattimore, Pitts, & Zhang, 2014; Clawson, 2006; Dank, 2014; Farrell, 2009; Busch-Armendariz, Nsonwu, and Cook Heffron, et al., 2009; Muslim, Labriola, & Rempel, 2008; Owens et al., 2014; Smith, 2010; S. X. Zhang, Spiller, Finch, & Qin, 2014; S. X. Zhang, 2012; Newton, Mulcahy, and Martin, 2008). Fundamental to this challenge is the hidden nature of the crime and the need for a deeper understanding of it beyond what is visible. Data on human trafficking is difficult to ascertain and the widely held belief among stakeholders involved in anti-trafficking efforts is that existing information focuses almost exclusively on identified victims, shedding light on only a fraction of the problem.

The purpose of this study is to provide empirically grounded data about the extent of human trafficking across the state. The study's impetus is grounded in the scarcity of empirical studies of trafficking, compounded by a "hidden population" that is historically difficult to reach.

The general approach has been to:

- Assess and use available data (the tip of the iceberg);
- Network and collaborate with and collect data from the people doing this work;
- Develop a methodology for converting data into insights and wisdom; and
- Engage with and collect data from high-risk segments and locations across the state.

Funded by a $500,000 grant from the Texas Office of the Governor Criminal Justice Division, this two-year initiative is a collaborative effort by:
- Institute on Domestic Violence and Sexual Assault (IDVSA) at The University of Texas at Austin School of Social Work
- Bureau of Business Research at The University of Texas at Austin
- Allies Against Slavery

This report is organized in a way that explains our learning to date about the prevalence of human trafficking, its financial impact on the economy, and how we understand trafficking in Texas. An explanation of our research activities will illuminate how we arrived at our preliminary findings. We then offer some insight about where we think we are headed—most specifically the way forward during phase 2—and what we need to be able to offer as better solutions to a complex crime.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

In its 2014 report to the Texas legislature, the Texas Human Trafficking Prevention Task Force cited the limitations of human trafficking statistics and the need for improving data collection efforts. It stated:

> "Collecting accurate data on human trafficking is difficult, yet becoming increasingly more important. This challenge makes the scope of trafficking across the state difficult to fully understand, which also affects the provision of resources."

This study looks broadly at human trafficking to include adults and children, labor and sex trafficking, and domestic and international victims. It expands our perspective from criminal cases and community outreach to a risk assessment of industry and community segments in Texas. The approach taken starts with and goes beyond what we can easily see when looking at reports of criminal cases and national hotline calls. However, phase 1 of this study has struggled under the limitations of both extant data and research. Those resources have allowed us to produce initial benchmarks for both sex and labor trafficking, while providing a much deeper set of insights for sex trafficking.

Summarized below is case data as well as hotline calls recorded for the State of Texas. As will be discussed later, most of these pertain to sex trafficking.

Criminal Cases

The following is 2014 data from the Texas Human Trafficking Prevention Task Force Report, human trafficking reporting system cases from January 1, 2007, to August 31, 2014:

- 737 human trafficking-related incidents
- 628 reported victims
- 320 reported child victims
- 210 suspects arrested
- 85 suspects convicted

Hotline Calls

The following is 2015 data from the National Human Trafficking Hotline for Texas:

- 1,876 calls in 2015 from Texas alone
- 452 human trafficking cases

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

The following is data for victims and survivors identified from the same dataset.

- 393 (with high indications of victimization)
- 448 (moderate)
- 246 calls from victims themselves

The risk assessment approach taken in this study expands our perspective beyond cases and community outreach by producing an assessment of expected levels of trafficking. This expectation is conditioned on the risk of trafficking in an industry or community segment coupled with an assessment of the risk of victimization for an individual who is a member of that segment. This expectation approach can then be applied in parallel to various victim typologies, including victims in both licit labor sectors and illicit sectors like prostitution.

## Research Methodology

This research study employs a mixed design that uses both qualitative and quantitative methods. Primary and secondary data collection efforts, including but not limited to queries of existing databases, interviews, focus groups, and web-based surveys contribute to the understanding of our three primary research questions:

1. What is the prevalence of human trafficking in Texas? Primary and secondary data collected by the research team will contribute to our understanding of the scope of the crime and increase our understanding of the extent of trafficking across the state.

2. What is the economic impact of human trafficking in Texas? According to the International Labor Organization, human trafficking is a $150 billion annual criminal industry worldwide. Texas has a large and diverse economy and the economic impact analysis will benchmark our understanding of the tangible and human costs of the crime to our economy, its victims, and the systems that must respond.

3. What is our understanding of human trafficking in Texas? Human trafficking is a complex crime that involves a broad spectrum of the community, from survivors and advocates to social service agency professionals. As the experiences of the many stakeholders develop, we gain perspective on a new and different angle of the crime of human trafficking. Furthermore, elements of the crime are fluid and dynamic, resulting in continuous reconfiguration of the issue and its factors. This research attempts to gain better images of what human trafficking looks like and how it functions, while considering the varying experiences and perspectives of its many stakeholders.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

**Background and Theory**

## U.S. Federal Human Trafficking Policy

Human trafficking is a broad umbrella term that encompasses trafficking of persons of any age, nationally or internationally, for sex or labor purposes. Empirical research on the issue dates back to 1928; however, human trafficking did not become salient in US politics until the late 1990's (Atkins, Moran, & Hanser, 2013). Attention toward human trafficking came as a response to criticism from Janie Chuang, Harvard Law School graduate and United Nations advisor, on the 1949 United Nations *Convention for the Suppression of the Traffic in Persons and of the Exploitation of the Prostitution of Others* (1998). Chuang (1998) highlighted the importance of international trafficking law, but emphasized that without social and political support at the domestic level, international law would be meaningless. Also in 1998, Congresswomen Linda Smith established a faith-based, international organization in Vancouver, Washington committed to combatting child sex trafficking abroad (Shared Hope International, 2016). In 1999, the Trafficking Victims Protection Act (TVPA, 2000) was proposed by Republican Representative Christopher Smith, and it was adopted as federal law in 2000.

The enactment of the TVPA paralleled the United Nation's adoption of the *Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children*, which served as an international agreement made between 80 countries to address human trafficking. Similarly, the TVPA's initial efforts were geared towards international persons, and both policies became the driving force behind international efforts to combat human trafficking (Atkins, Moran, & Hanser, 2013). Specifically, the TVPA was enacted to address issues of human trafficking among immigrant women and children abroad. Subsequent revisions and reauthorizations of the TVPA continued to focus on international persons as President George W. Bush successfully framed human trafficking as a terrorist threat after the September 11, 2001 terrorist attacks in the United States (Weitzer, 2011).

In the case of minors involved in commercial sex, the TVPA removed the words "force, fraud, or coercion" from the statutory definition of human trafficking. As previously mentioned, the initial intent of the removal of the language was not geared towards domestic persons, but was broad enough to be applied to youth in the US. Additionally, the TVPA established a three-pronged approach to trafficking: prevention, protection, and prosecution, with prosecution being the predominant focus of implementation efforts (Shamir, 2012).

The TVPA has been revised and renewed five times (2003, 2005, 2008, 2013, and 2015) since its enactment, and in 2008, minor victim service provisions were added for US citizens and permanent residents. In 2015, the first provisions, which specifically address services for domestic youth programming related to commercial sex, were added to the TVPA. Definitions detailed in the federal statute can be found in Appendix C.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

## U.S. Federal and Texas State Labor Policy

For labor trafficking, one of the biggest vulnerabilities faced by immigrant labor is being undocumented without legal permission to work. Because this permission is lacking, immigrant laborers are at risk of exploitation by those who believe that lacking legal immigration status means that the immigrant laborer is a criminal unable to report any abuse or exploitation at the risk of deportation. Many immigrant laborers themselves are unaware of the law or their rights, and believe that they should stay silent and hidden rather than risk any consequences. However, being an undocumented presence in the US is not a criminal offense, and all workers (with minor exceptions), are covered by the same basic labor rights in the US regardless of immigration status. Under federal law, the Fair Labor Standards Act (FLSA) and the National Labor Relations Act (NLRA) apply to any employee and do not distinguish between U.S. citizens and undocumented laborers. Therefore, any worker laboring in the US has the right to 1) minimum wage, 2) maximum 40 hours a week and overtime, 3) the ability to organize and negotiate with employers, and 4) freedom from unfair labor practices (including discrimination or retaliation for an employee filing charges against them).

Furthermore, if an undocumented worker files charges or sues their employer for unfair labor practices and the employer tries to use the worker's undocumented status to nullify the contention, undocumented workers may not have immigration proceedings brought against them. The Department of Labor and the Immigration and Customs Enforcement will not interfere with one another when an undocumented laborer is involved in a labor dispute. The federal policy on human trafficking, the Trafficking Victims Protection Act, also includes undocumented laborers in protecting and offering legal recourse for exploitation and labor trafficking. In addition, several state laws in Texas include undocumented laborers in their labor rights policies. Under the Texas Payday Law, private employers must follow Texas Labor Code standards in paying their employees, including undocumented workers.

## Building on Lessons About Vulnerabilities Seen in DMST

Existing research on domestic minor sex trafficking (DMST) provides a valuable frame of reference for our efforts in characterizing a more comprehensive view of trafficking victimization. While further research is also needed for DMST and should occur as part of a broader typology of victims, the next paragraphs review DMST as a portion of that broader typology. The following section then expands that discussion toward the goal of developing a more complete typology that encompasses the vulnerabilities and risks faced by different types of trafficking victims.

DMST is a narrow subset of human trafficking, and involves individuals under the age of 18 years who are citizens or lawful residents of the US and are involved in commercial sex (Gibbs,

Hardison Walters, Lutnick, Miller & Kluckman, 2015). Under the TVPA, individuals under the age of 18 years involved in commercial sex of any kind or for any reason are identified and labeled as victims of a crime (P.L. 106-386). In addition, under the TVPA any adult who aids or benefits from a relationship with an underage person involved in commercial sex is labeled as a human trafficker (Marcus, Horning, Curtis, Sanson, & Thompson, 2014).

DMST is a relatively new term and recognized phenomenon within the US. The term has received criticism because of its application of overarching labels that ignore the many structural factors and inequalities that precede youths' involvement in the sex industry (Lutnick, 2016). Empirical attempts to quantify the number of young people involved in DMST has been generally unsuccessful and has been criticized as being inflammatory (Gibbs et al., 2015), specifically for not using rigorous statistical methods to identify the numbers given (Stranskey & Finkelhor, 2008).  Overall, prevalence is difficult to extrapolate due to the varying reasons youth become involved in commercial sex (e.g. survival sex, romantic relationships, etc.), (Anderson, Coyle, Johnson, & Denner, 2014; Cecchet & Thornburn, 2014; Kennedy, Klein, Bristowe, Cooper, & Yuille, 2007; Marcus, Horning, Curtis, Sanson, & Thompson, 2014; Mones, 2011; Reid, 2012), and the clandestine nature of the behavior.

Even more scarce is the empirical literature available related to causes and consequences of child victims of sex trafficking. The literature available is predominantly descriptive in nature and the information reported is largely influenced by the sample recruitment methods (recruitment to the study from treatment programs after an arrest/social service intervention). Scholars have started to explore the phenomenon of individuals' involvement in commercial sex through the use of qualitative methods; however, participants in these studies are adults who engaged in commercial sex as children/youth, thus placing a large emphasis on retrospective memories of participants. Notably, there are a few quantitative studies that highlight the use of commercial sex among homeless/street youth (under TVPA definition is considered DMST) as survival mechanisms. However, the central focus of these empirical studies is on homeless/street youth in general, and not their involvement in commercial sex in particular. Therefore, these quantitative studies do not provide any additional information pertaining to DMST behavior except that it exists (Green, Ennett, & Ringwalt, 1999; Ferguson, et al., 2011; Halcon & Lifson, 2004).

The following is a comprehensive review of the literature regarding DMST available to-date. Each section concludes with a brief critique of the literature and areas for future research.

### Risk factors.

There is no argument that there are clear health risks associated with involvement in commercial sex at any age (e.g., sexual transmitted infection). However, those who are deceived into commercial sex or who enter prior to maturity exhibit poorer health outcomes than those who

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

enter at an older age (Muftic & Finn, 2013). Adult survivors of child sex trafficking report that there is a continuous threat to life while engaged in commercial sex and that severe mental health problems such as depression, anxiety, flash-backs, avoidance, and the experience of numbness and detachment from feelings and interactions with others exists (Cecchet & Thorburn, 2014; Hossain, Zimmerman, Abas, Light, & Watts, 2010).  Additionally, 70-90% of those involved in commercial sex report that they have a childhood sexual abuse history (Bagley & Young, 1987).

Post-traumatic stress disorder (PTSD) is the most common primary mental health diagnosis of youth exiting sex trafficking; this is followed by depression (Twill, Green, & Traylor, 2010).  On average, youth receiving treatment after engaging in sex trafficking are managing two primary mental health diagnoses (Twill, et al., 2010). Adult women *actively* involved in prostitution report PTSD as well, but at much lower rates than those who are involved in trafficking or those who have exited sex work entirely. Similarly, a study that interviewed youth who were actively engaged in commercial sex found that study participants described their work experience as positive (Holger-Ambrose, Lengmade, Edinburgh, & Saewyc, 2013).

When we look to validate the general risks associated with commercial sexual involvement of people, these are compelling findings. This literature also promotes the idea that there is a possible difference between individuals who are involved in trafficking versus those who are involved in commercial sex. This is a conundrum to be explored considering all youth who are involved in commercial sex are deemed trafficking victims. Additionally, methodological limitations and the lack of theoretical application in commercial sex literature involving youth prevent this information from providing a comprehensive picture of the risks and experiences of youth.

### *Pathways.*

The varying ways or reasons youth get involved in commercial sex contributes to the contention in the literature. There is a large disagreement in the literature about the level of agency of youth and the appropriate use of terms "trafficker/pimp," and "victim" when referring to youth who are involved in commercial sex (see Kennedy, et al., 2007 vs. Marcus, et al., 2014). Potential avenues for entering commercial sex for youth have been described as follows: the youth is kidnapped or manipulated by an unrelated adult into engaging in exchanging sex for money (Reid, 2012; Mones, 2011), engaging in survival sex in order to get money for food, drugs, shelter, or other goods (Kennedy, et al., 2007); youth commit sex acts as an extension of the sexual abuse and/or general abusive relationships that already exist within their own families (Anderson et al., 2014; Cecchet & Thornburn, 2014; Marcus et al., 2014; Reid, 2012); youth participate in commercial sex as validation or an exploration of their sexual identity (Lutnick, 2016); youth believe commercial sex provides easy and quick money (Lutnick, 2016); or youth simply do not have any other viable job opportunities (Marcus et al., 2014). Regardless of a

youth's pathway into commercial sex, there *is* agreement among scholars that some level of vulnerability (e.g. child abuse/neglect, emotional insecurities, etc.) precedes a youth's entry into commercial sex, and that many youths rarely identify themselves as victims.

### *Relationship with traffickers.*

When youth involved in commercial sex are contacted by law enforcement officials, they are either arrested or placed in a residential treatment facility (Greve, 2014). Almost immediately after placement, youth run and return to their "trafficker" or overtly refuse to participate in the proposed treatment (Anderson et al., 2014; Cecchet & Thoburn, 2014; Marcus et al., 2014; Reid, 2013; Mones, 2011). This behavior by a youth indicates a relationship with third parties, and is worth exploring. Mainstream media's narrative is that brutal violence and manipulation between youth and traffickers is what causes these youths to return. Frequency and duration of the use of violence by third parties/traffickers is highly contested in the literature; however, most agree that there is at least some form used. Some research suggests that there is a complex and sometimes mutually beneficial relationship between the child and those benefitting from their sexual labor; as a result, when the violence is too excessive youth voluntarily leave (Marcus et al., 2014). Others have suggested that physical violence is used later in the relationship as a form instilling fear in the youth to keep them from leaving the business entirely (Kennedy et al., 2007). All agree that when family members or those acting as legal guardians are in the role of third party/trafficker violence is most perilous and the hardest to escape (Anderson et al., 2014; Cecchet & Thornburn, 2014; Marcus et al., 2014; Reid, 2013; Mones, 2011).

The use of manipulation and control by third parties/traffickers is also minutely explored in the literature. Much of the literature paints a picture of a cis-gender female who is enticed into a committed and loving relationship with an adult cis-gender male who then convinces the youth to engage in commercial sex as a way of earning money because they are both in a desperate situation (Anderson et al., 2014; Reid, 2014). Others have said that these adults then prey on the vulnerabilities of these youth and their trauma histories (Cecchet & Thornburn, 2014) by using threats of ending the relationship to keep the females working in the sex trade (Raphael & Shapiro, 2010).

Conversely, the few studies that have spoken with youth directly found that youth are describing their experience in commercial sex as positive and without fear (Reid, 2013). Moreover, they are describing their relationship with the third party/trafficker as someone who cares for them like no one else ever has before (Marcus et al., 2014), and that only 10% of them were forced by another to trade sex the first time (Lutnick, 2016).

Conclusively, the state of DMST research is still exploratory in nature. The research available is starting to uncover the intricacies of youth involvement in commercial sex, but much more needs

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

to be done to understand the complexities of the phenomenon. Once there is a more in-depth and comprehensive understanding of the varying facets of youth involvement in commercial sex appropriate intervention and treatment options can be explored and tested.

## Victim Typologies

Extant research has clearly shown that human traffickers target individuals who are perceived to be vulnerable in society, and understanding the conditions contributing to a person's vulnerability to being trafficked is central to preventing the crime from occurring (Cho, 2015; UNODC, 2008). We have used that research to begin the development of an empirically grounded, theoretically sound victim typology. This theory-grounded approach has been used effectively (Busch-Armendariz, Nsonwu, and Cook Heffron, 2014) to better understand the benefit to victims and service providers of ecological, strengths-based, and victim-centered approaches to service delivery. While this effort is ongoing in phase 2, progress on this typology informed our thinking and allowed us to establish priorities among the community segments included in our benchmark estimates.

Drawing from the field of criminology, opportunity theory focuses on the conditions precipitating the targeting of an individual or group for exploitation rather than focusing on the motivations of the offender (Felson & Clarke, 1998), making it a useful theoretical lens for examining the typologies of human trafficking victims. Applying this theoretical framework to "conditions of vulnerability" (UNODC, 2008) or characteristics and behaviors of populations that place them at increased risk of trafficking strengthens our methodology as it pertains to identifying the extent of human trafficking in Texas.

Opportunity theory synthesizes rational choice theory, routine activity theory, and situational crime theory to assess what factors contribute to a person's risk of victimization (Guerette & Santana, 2010). Rational choice theory controls for offender motivation, theorizing that offenders engage in crime as part of a logical decision-making process and participate in crime when the benefits of the crime outweigh the assessed risk (Clarke & Cornish, 1985). Routine activity theory posits that crime occurs when an offender has access to a suitable target and there is a lack of capable guardians to prevent an offense from occurring (Cohen & Felson, 1979). Victims may enter this scenario because of their daily activities, with certain populations at an increased risk depending on their individual characteristics and lifestyle choices (Meier & Miethe, 1993). Situational crime theory places these components in an "opportunity structure for crime" (Clarke, 1995, p. 103), or a dynamic environment where motivated offenders are continuously assessing their ability and method for victimization. These dynamic environments allow for the gradual engagement of victims and the collaboration between co-offenders, elements common to human trafficking situations. While this theory has been applied to understanding the

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

experiences of sex trafficking victims (Cockbain & Wortley, 2015; Lutya & Lanier, 2012), in extant research opportunity theory has yet to be extended to labor trafficking victims.

Busch-Armendariz, Nsonwu, and Cook Heffron (2009) developed human trafficking perpetrator typologies in previous work. These typologies laid the groundwork for conceptualizing the broad spectrum of human trafficking crimes and how they impact victims. The authors reviewed 67 prosecuted cases related to human trafficking and conducted six interviews with federal and state prosecutors and other national experts with experience working cases involving human trafficking crimes. Based on this analysis, four working perpetrator typologies were developed: 1) organized labor exploitation for profit, 2) family-based domestic servitude, 3) sex trafficking of U.S. citizens, and 4) sex trafficking of foreign-born victims. Each typology was discussed in terms of the demographics of traffickers and victims, the nature of the victimization, the methods of recruitment, the location, scope, and size of an operation; and methods of control and coercion. Additionally, across all typologies commonalities of cases were broadly reviewed based on the scope of operation, age, gender, socio-economic status, immigration status, and countries of origin.

Using this framework, we have begun to develop victim-oriented typologies to better illustrate the prevalence of human trafficking. Through conversations with human trafficking experts and an exhaustive review of the literature (such as Verité, 2015), a concept of a preferred typology has begun to emerge. Ideally, this typology would be hierarchically differentiated by non-overlapping segments concerning sex trafficking and labor trafficking, and domestic and foreign victims. At the top level, this hierarchy would resemble a tree with four branches: domestic sex trafficking victims, international sex trafficking victims, domestic labor trafficking victims, and international labor trafficking victims. Subsequent branches may differentiate between non-overlapping demographic factors such as age (e.g. minor trafficking victims), gender, race/ethnicity, sexual orientation, and socioeconomic background. Additionally, these branches may be further differentiated by overlapping segments such as industry, for labor (e.g. agriculture, Verité, 2005) and sex trafficking (e.g. massage parlors, bars) victims alike.

Although this model is not yet complete, understanding how these typologies are differentiated within this hierarchy will provide a more complete understanding of the unique vulnerabilities associated with different types of human trafficking, and will allow us to make a more accurate estimation of risk for each type of human trafficking.

### Estimation of risk

The risk perspective produces an assessment of expected levels of trafficking as conditioned on risk of trafficking in an industry or community segment, and the risk of victimization given that an individual is a member of that segment. This expectation approach can then be applied in

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

parallel to various segmentation schemes, including victims in both licit and illicit labor sectors like prostitution.

To this end, we have identified industry and community segments that are at higher-than-average risk of human trafficking. We have applied victimization rates to a select few for the purposes of demonstrating our methodology, establishing some preliminary benchmarks for human trafficking prevalence estimates, and providing a concrete example of our planned activities moving forward in phase 2 of this project. Our estimation methodology thus far addresses industry and community segments that have minimal overlap to avoid double counting. We have applied this methodology to only a small number of segments as a proof of concept.

*As such, the results in this report are preliminary benchmarks that remain a conservative understatement of the prevalence of human trafficking in Texas.*

It is important to recognize that our approach was *not* to count cases or conduct a census of the 27.7 million people living in Texas to assess trafficking victimization rates. Not only would such an approach be unlikely to succeed due to the hidden nature of this crime, in our view, cases and victim counts represent only the observable portion of the population of trafficking victims. However, phase 2 of this project does include community-focused research activities designed to improve our ability to estimate victimization rates among at-risk community segments by incorporating more primary research activities among those segments.

### Research Activities

To address our three primary research questions, our activities to date include:
- Extensive review of the relevant literature;
- Development of an approach tailored for this study that leverages available secondary sources of data for the state;
- Identification of primary research to fill data gaps. For the purposes of illustrating our planned process, we also apply this approach to selective commercial activities as a proof of concept.

These research activities provide initial benchmarks on the prevalence, economic impact, and description of human trafficking in Texas.

To these ends, this project has included the following secondary research activities.
- Human Trafficking Reporting System (HTRS)
- National Human Trafficking Hotline (formerly known as National Human Trafficking Resource Center, Operated by Polaris)
- Statewide Governmental Agencies

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

This project has also included the following primary research activities.

- Agency survey
- Follow-up in depth interviews
- Focus groups, including worksheets filled out prior to the group
- DMST working group
- Pilot study on labor trafficking (Houston)
- Telephone interviews (in field)
- Combo survey (in field)
- Additional focus groups (planned)

Each of these is reviewed in the sections that follow. The summaries provided highlight key results germane to our research questions.

## Secondary research

The research team explored the data contents of numerous databases and data sets at the national and state levels. Interviews with content experts contributed to our understanding of the variables available and how these variables might contribute to our understanding of the problem. While we cannot rely on information in these databases to tell the whole story, they are useful data points to increase understanding of the information currently collected about the crime.

### *Human Trafficking Reporting System (HTRS).*

The Human Trafficking Reporting System (HTRS) is an online database developed by researchers at The Institute on Race and Justice at Northeastern University, and is managed by the Bureau of Justice Statistics (BJS). The Bureau of Justice Assistance (BJA) provides federal funding for Anti-Human Trafficking Task Forces and has provided funding to 48 task forces since 2004. HTRS is an incident-based system utilized by BJA-funded task forces to report data on all investigations into suspected or confirmed trafficking (both sex and labor) in their jurisdictions. Agencies are also expected to update the status of incidents previously reported. Information collected includes incident status, type of human trafficking, lead investigating agency, number of known victims, and number of known offenders.

Since 2005, Texas has received close to $6 million in BJA anti-trafficking task force funding (see Table 7). As of 2015, federal funding for all Texas anti-trafficking task forces has been retracted, and the limited information being entered into HTRS has become outdated and obsolete. The Texas Office of the Attorney General encourages local law enforcement to utilize HTRS; however, since there are no incentives, inadequate information is being entered. We know that the work of these task forces continues, but without the mandate to submit information to HTRS, we lose the input of data that would help us understand the extent of this crime.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Severely limited access to law enforcement data, because of either lack of authority to access or the fact that the information is not collected in a way that can be shared, exacerbates this issue.

*Table 7*   BJA Anti-Trafficking Task Force Funding for Texas, since 2005
*Organized by city/county*

| | |
|---|---|
| El Paso | $450,000 |
| Ft. Worth | $669,992 |
| Bexar (San Antonio) | $726,862 |
| Austin | $820,000 |
| Arlington (Ft. Worth / Dallas) | $1,450,000 |
| Harris (Houston) | $1,781,708 |

### *National Human Trafficking Hotline Data (Hotline).*

We collaborated with Polaris Project, through a Memorandum of Understanding (MOU), to access the data specific to Texas in order to apply their risk ratio stratification more specifically to a broader range of industries. Polaris operates the National Human Trafficking Hotline to provide annual statistics on the number of signals (i.e. phone calls, online tip reports, and emails) about human trafficking in the US. Since December 2007, the Hotline has received over 115,000 signals. The Hotline uses this data to help human trafficking victims and survivors and to provide information to law enforcement and other professionals in the anti-trafficking field.

In Texas in 2015, 1,731 phone contacts were made to the Hotline and 433 potential human trafficking cases were reported. One in four calls came from victims and survivors. The vast majority of the 433 potential cases in Texas last year were sex trafficking (77.8%), although labor trafficking was not insignificant, making up 14.5% of cases. Seventy percent of phone contacts were to report a trafficking tip.

Professionals often cite Hotline statistics in the absence of more accurate case data to describe the scope of the problem in their area. What many do not realize is that signals to the Hotline are only one data point in the scope of trafficking, and many signals are not connected to actual cases. The Hotline includes the following disclaimer on all published data: "The data are not intended to represent the full scope of human trafficking, but to help identify trends." Polaris recently reported that calls to the Hotline are on the rise, but as the Texas Human Trafficking Prevention Task Force concluded in 2012, "increased education and awareness of trafficking is a more likely explanation for the increase in calls," rather than that Texas's trafficking problem is becoming more severe. Understanding more about these calls is important for the purposes of this research.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Fortunately, the Hotline database has evolved and is now a case-based system, "crucial to hotline operations as situations tend to develop over time and resolution is rarely reached on the first interaction with an individual" (Polaris).

The Hotline currently classifies victimization risk as high, moderate, and none. Cases coded as "high" contain a high level of human trafficking indicators. Cases coded as "moderate" contain several indicators of human trafficking, or fit a pattern of trafficking, but might lack core details of force, fraud, or coercion. Furthermore, the Hotline provides data on the numbers of victims for the high and moderate categories for Texas.

The National Human Trafficking Hotline data from 2013 – 2015 are shown in Table 8 below.

Table 8

*The National Human Trafficking Hotline, Cases, Texas Data*

|                     | 2015 | 2014 | 2013 |
|---------------------|------|------|------|
| Cases               | 433  | 452  | 431  |
| High indicators     | 427  | 393  | 499  |
| Moderate indicators | 453  | 448  | 537  |
| Total victims       | 880  | 841  | 1036 |

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Taken in aggregate these data provide a strong indication of the community segments facing trafficking, as well as the strength of the indicators. Table 9 summarizes the segments seen in Hotline data for the State of Texas from 2013 – 2015, a total of 1,228 suspected cases.

Table 9

*The National Human Trafficking Hotline, Segments, Texas Data*

| SEGMENT | TOTAL | HIGH | MODERATE |
|---------|-------|------|----------|
| *Agriculture/farms/animal husbandry* | 12.7% | 4.3% | 20.3% |
| *Arts and entertainment* | 9.9% | 14.6% | 5.7% |
| *Bar/club/cantina* | 6.9% | 5.3% | 8.4% |
| *Begging rings* | 5.5% | 4.6% | 6.2% |
| *Commercial front brothel* | 4.1% | 4.8% | 3.4% |
| *Construction* | 3.7% | 3.9% | 3.4% |
| *Domestic work* | 3.5% | 2.7% | 4.2% |
| *Escort service/delivery services* | 3.3% | 4.6% | 2.2% |
| *Health and beauty services* | 2.7% | 3.3% | 2.2% |
| *Hospitality* | 2.4% | 1.5% | 3.3% |
| *Hostess/strip club* | 2.1% | 2.1% | 2.2% |
| *Hotel/motel-based commercial sex* | 1.6% | 1.5% | 1.7% |
| *Other* | 12.9% | 10.8% | 14.9% |
| *Unknown* | 28.6% | 35.8% | 22.0% |

Table 10 summarizes the same cases by region, illustrating that, for the most part, Hotline tip data track the population distribution in the State of Texas.

Table 10

*The National Human Trafficking Hotline, Texas Data by Region*

| Region | % of Tips |
|--------|-----------|
| Greater Houston | 41.6% |
| Dallas/Fort Worth Metro Area | 23.6% |
| Greater Austin | 7.3% |
| Greater San Antonio | 6.5% |
| Corpus Christi Metro Area | 2.6% |
| McAllen–Edinburg–Mission | 1.6% |
| El Paso Metro Area | 1.0% |
| Other and redacted* | 15.6% |

\* The Hotline redacted the location of tips for locations with small numbers of tips for the protection of victims and witnesses. Other regions included in the data received less than 1% of tips, but include Killeen, Temple, Beaumont/Port Arthur, and Brownsville/Harlingen.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Collectively, these data from the Hotline allow us to assess the proportion of potential victims at high risk for trafficking victimization by industry and community segment.  These data reveal patterns and gradients of risk associated with a diverse range of trafficking victimization in the State of Texas.

### *Statewide Governmental Agencies.*

#### *DPS Arrest and TDCJ Conviction Data*

The Texas Department of Public Safety (DPS) and the Texas Department of Criminal Justice (TDCJ), as part of improvements to the criminal justice system in 1989, created a comprehensive system called the Criminal Justice Information System (CJIS) that includes relevant data for criminal justice agencies responsible for the arrest, prosecution, adjudication and correction of criminal offenders. Similar reforms were made years later to the Juvenile Justice Information System (JJIS), and both CJIS and JJIS data is maintained in a statewide Computerized Criminal History (CCH) system regulate by the Crime Records Service of DPS.

To improve understanding of prevalence for all types of trafficking, the research team requested CCH data dating back to 2011 for a broad set of offenses that might relate to trafficking based on elements of the case and nature of the crime.  The 91 offense codes are documented in D. The list of requested variables was developed with support of DPS and the list of offense codes was developed with support from professionals in the field, including law enforcement familiar with human trafficking and legal professionals involved in prosecuting human trafficking cases.  The variables requested per offender are detailed below:

- SID numbers (for purposes of cross-referencing with TDCJ)
- Demographics (including age, gender, race, etc.)
- Address provided
- Dates (both offense and disposition)
- Location of offense
- Prior offenses & incarcerations
- Final pleading
- Prosecution action and any notes available
- Court decision(s) - included history from court clerk report
- Literal field, even if sparse
- Probation information
- Any details related to costs incurred
- Agency case # and Cause #
- Any other variables applicable and available

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

The research team constructed a relational database from data files received from DPS.  The database included 23,656 records dating back to 1973.  Exploratory work with the DPS data revealed only 1500 cases since 2012 in the data set.  More importantly, only three trafficking charges were included in the data set – one each of "trafficking of person," "smuggling of persons," and "trafficking child engage conduct/sexual." In the entire dataset, there were only 1772 related offenses.

Conviction data that can be linked to the DPS arrest data are available from Texas Department of Criminal Justice (TDCJ) and were requested but were not obtained.

DPS and TDCJ data continue to have potential to provide insights about trafficking activity in phase 2, but the data received to date have contributed little to phase 1 benchmark estimates.

### Texas Office of Court Administration (OCA)

The limitations in trafficking data collected by state agencies are well documented. As reported in previous reports from the Texas Human Trafficking Prevention Task Force:

> *Even when a victim is discovered and a trafficker is arrested, tried, and convicted, data collection and dissemination is not necessarily easy or reliable. Due to 2011 legislation, the Texas Office of Court Administration (OCA) is now required to collect data on court cases. DPS is also required to collect data on human trafficking arrests. The two agencies collect data on two different aspects of trafficking, but there is not a statewide system in place to consolidate, evaluate, and disseminate information on the crime. In addition, the new data collection requirements have been problematic to implement. Both agencies cited extremely low numbers – which were not necessarily indicative of the actual extent of trafficking. Furthermore, due to the hidden and convoluted nature of human trafficking, identifying, and deciphering trafficking cases from other cases is difficult.*

The research team worked with Texas Office of Court Administration (OCA) to assess the degree to which data collected by the courts might help inform estimates of cases in the State of Texas.  OCA routinely reports on the progression of cases associated with several major crime categories and has recently begun efforts to similarly track trafficking cases.  The research team intended to cross reference OCA with DPS arrest and TDCJ conviction data, but due to the nature of the current court activity reporting system highlighted above, the statistics reported by the courts cannot be compared directly to information reported to the Department of Public Safety (cited from 2012 testimony to the Joint Interim Committee).

OCA found that some counties were reporting criminal case information as required, although the human trafficking section was blank due to outdated case management software. Counties across Texas have converted to new case management systems in recent years, but even still,

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

there are case management systems that are not programmed properly to capture required information.

In recent years, there has been dramatic improvement in data collection efforts, which can be credited not only to improved legislation (House Bill 2014, effective September 1, 2011) but also to the advocacy efforts of those in influential positions within state agencies. OCA has reported corrections in over-reporting; improvement in completeness of reporting, which OCA credits to an improvement in identification of human trafficking cases and criminal case activity reports submitted to OCA in a more timely manner; and a substantial increase in reported cases, due to improved and continued reporting by specific counties with a large volume of activity (Bexar, Harris, Dallas, Tarrant, Travis).

House Bill 2014 (HB 2014) requires district courts and county courts at law to report to OCA each month the number of cases filed for the following offenses:
1.  trafficking of persons under Section 20A.02, Penal Code;
2.  prostitution under Section 43.02, Penal Code;
3.  compelling prostitution under Section 43.05, Penal Code.

Reporting of data has been incomplete and at times problematic. For example, some counties were using outdated offense codes even after DPS had implemented new offense codes in September 2011.

A major consideration is that a case with multiple charges is reported on the monthly report as one case under the most serious charge. Some case management systems may not be able to capture and report the required information if one or more of the human trafficking violations is not the most serious charge. In addition, as noted during 2012 testimony at the Joint Interim Committee to Study Human Trafficking (Joint Interim Committee) hearing and in the Texas Human Trafficking Prevention Task Force Report 2011, prosecutors usually charge defendants with non-human trafficking related violations (sexual assault, kidnapping, etc.) or with more serious charges (weapons violations, drug violations, etc.).

A 2012 survey request from the Joint Interim Committee to all district and county clerks to better understand the current state of data collection, to determine which counties are reporting completely and accurately, which are reporting data but have issues with completeness and accuracies, and which counties are not reporting for whatever reason. Over 290 district and county clerks were surveyed – only 13 counties responded that they had human trafficking cases to report. An overwhelming majority (120 counties) indicated that they had no human trafficking cases to report.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Based on our review of the survey results, testimonies, and memos from 2011-2012, OCA has worked diligently to educate district and county clerks about reporting requirements of HB 2014, but issues with case management systems, offense codes, and reporting compliance persist and will likely need to be addressed on a county by county basis, an arduous task. Additional issues such as prosecutors charging defendants with non-human trafficking related violations (sexual assault, kidnapping, etc.) or with more serious charges (weapons violations, drug violations, etc.) contribute to the data issues. From interviews with OCA, it appears there have been improvements in data reporting accuracy and completeness since 2011, to date there remains an absence of any substantive data on specific cases, (i.e. no case level information is collected; aggregate totals are reported by county for each court level.  Additional funding was earmarked for OCA to modify the existing database and possibly pursue case-level information, although OCA has 5 years to complete this work.

House Bill 2455 (Texas 84th Legislature) established a task force to promote uniformity in the collection and reporting of information relating to family violence, dating violence, sexual assault, stalking, and human trafficking. The task force, and various working groups, convened between October 2015 and September 2016 to "develop policy recommendations and best practice guidelines for the uniform collection and reporting of information" (see Recommendations in references).  The task force report was released in September 2016 and can be accessed online at http://www.txcourts.gov/media/1436043/hb-2455-final-report-september-2016.pdf.

*DPS Suspicious Activity Reporting*

In addition to the data query from the DPS Computerized Criminal History system, the research team collected information about suspicious activity reporting (SAR). We received data from 34 SAR reports in an excel file. SAR data is based on a level of suspicion – based on observations by the reporter – including prostitution, alien smuggling, and human trafficking. A preliminary review of SAR data, specifically observations flagged as potentially human trafficking in nature, was exploratory to understand data points available from those reports, for example, indicators of trafficking, source of the SAR, geographic region, victim demographic, to name a few.

The effort to build a statewide SAR is a new initiative we will learn more about over time is network. The initiative is terrorism focused, but will provide insights about human trafficking since the SAR network will have an all-crimes perspective. Data from such reports, consist of leads for future investigations, and could be very useful in increasing understanding of prevalence.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

### Primary research

While available secondary sources provided context and additional background on human trafficking in the State of Texas, they also confirmed the paucity of data available to policy makers about the extent, impact, and character of this crime. Several primary research activities were developed and implemented to begin to close the informational gaps.  Specifically, due to the inherent difficulty of studying victims directly, our research focused initially on collecting data from providers of services to victims. Several phases of mixed methods research provided significant learning about trafficking in Texas and have allowed us to transition to community data collection in the latter part of phase 1. Data obtained and analysis performed to date, allowed us to develop preliminary benchmarks for our three research questions and to develop a comprehensive plan for phase 2 of this project.  The sections that follow summarize our findings and highlight how these data inform our preliminary benchmarks.

#### *Agency Survey.*

The research team designed an in-depth, mixed-methods, web-based survey instrument (Agency Survey, developed for this study) to administer to a wide range of professionals working in the fields of human trafficking, violence against women, policy development, law enforcement, prosecution, survivor services, legal immigration assistance, community advocacy, and related fields. Phone interviews, consultation with professionals (including during the survey testing phase), and research on gaps in current knowledge contributed to the survey development phase. The purpose of the Agency Survey is to create new knowledge, collect new data, and establish new facts related to human trafficking in Texas.

To date, 230 professionals have participated in the survey from 171 unique Texas zip codes in 108 cities across the state (33 criminal justice, 20 social service, 12 medical or health provider, 113 elementary or secondary education providers, 52 "Other"). Data from additional stakeholders is still being collected as part of this primary data collection survey. Below we provide a quick summary of those results that are germane to our current estimation efforts. Tables 11 and 12 illustrate who responded to our survey: a cross-section of service providers who provide a broad range of services to their clients, and thus, we argue, provide a reasonable perspective on sex trafficking victimization in Texas among the clients they serve.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Table 11.

*Agency Survey Summary*

| Mission of Responding Organizations | Who Participated (n=44) |
|---|---|
| Victim services | 48% |
| Human trafficking and sexual exploitation | 41% |
| Advocacy | 34% |
| Community-based programming | 27% |
| Family services | 25% |
| Human trafficking | 23% |
| Faith-based | 23% |
| Domestic violence and sexual assault | 20% |
| Legal services | 14% |
| Homelessness | 11% |
| Refugee resettlement | 5% |
| Immigrant advocacy/ethnic group | 5% |
| Other | 27% |

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Table 12

*Agency Survey - Services Provided (n=31)*

| Services Provided | Percentage of Respondents Providing Service |
|---|---|
| Clothing and goods | 100% |
| Case management | 100% |
| Advocacy | 97% |
| Mental health/counseling | 94% |
| Food | 87% |
| Transportation | 77% |
| Housing | 74% |
| Familial support/reunification | 68% |
| Medical care | 65% |
| Education | 65% |
| Legal services | 61% |
| Financial support | 39% |
| Job training | 35% |
| Language services | 23% |

### *Victimization Rates.*

A key preliminary finding from our survey relates to the frequency with which representatives of social service agencies provide services to potential and confirmed human trafficking victims. We estimate that in the last 12 months the overall human trafficking victimization rate among clients is 25.1%. In other words, one in four agency clients are victims of human trafficking. This estimate has the following assumptions:

- Numbers were calculated from total client and human trafficking victim counts.
- Nineteen service providers offered client and victim counts in survey responses.
- These 19 providers served 7,484 clients and saw 1,877 human trafficking victims among those clients. (Note: double-counting clients (and victims) is possible in our survey methodology, but this effect should not impact the estimate of victimization rate seen by agencies.)
- Ninety-seven percent of reported victimization was sex trafficking.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Currently, our Agency Survey provides preliminary estimates of the number of known or highly likely cases seen in the last 12 months relative to the number of clients served. There will be continued analyses on the data collected to date. Moving forward, we plan to enroll various service provider partners in the field to track what they actually see among clients served during the next 6–12 month period. A visual of the research team's hierarchy of information needs about victims is included as Appendix I. However, the results of the Agency Survey are corroborated by several other studies summarized in Table 13. These studies collectively estimate a range of trafficking victimization between 21% and 37%, with estimates clustering near 25%. For more detail about these studies, see Appendix E for a brief summary.

Table 13

*Research to Support Sex Trafficking Victimization Rate*

| Research* | Percentage |
|---|---|
| Homeless/street youth who acknowledge involvement in commercial sex | 28% |
| Homeless and sexually abused youth | 21% |
| Homeless youth who were propositioned for sexual favors | 37% |
| Children who reported trading sex for money, sex, or gifts | 23% |
| Homeless youth who indicated exchanging sex for food, shelter, or drugs | 36% |
| Youth who revealed to health care providers they were involved in prostitution | 25% |
| Overall survival sex among shelter and street youth | 28% |

*Swaner, R., Labriola, M., Rempel, M., Walker, A., Spadafore, J. (2016); McDonald, A. R., & Laser Maira, J. A. (2016); Beech, B. M., Myers, L., & Beech, D. J. (2012) ; Greene, J. M., Ennett, S. T., & Ringwalt, C. L. (1999) ; Stoltz, J. M., Shannon, K., Kerr, T., Zhang, R., Montaner, J. S., & Wood, E. (2007) ; Terrell, N. E. (1997) ; Tyler, K. A. (2009); Yates, G. L., Mackenzie, R. G., Pennbridge, J., & Swoffor, A. (1991).

Based on the totality of our secondary sources and the results of our Agency Survey, we adopt a victimization rate of 25% for sex trafficking among community segments included in our phase 1 results.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

### *Agency Survey: Collaboration with New Orleans Trafficking Task Force.*

The Greater New Orleans Human Trafficking Task Force (NOLA Task Force) disseminated our Agency Survey to their membership to increase understanding of human trafficking in their area. Some highlights of their data collection are included below.

- Fifty-eight respondents participated in the survey (17 social service, six medical or health provider, five criminal justice, five religious non-profits, and nine elementary or secondary education providers).
- Service providers reported serving 245 victims of sex trafficking and 14 victims of labor trafficking. (Of those reported victims of sex trafficking served, 136 of them were female adults, 72 were female minors, 20 were male adults, and nine were male minors.)
- Law enforcement reported recovering 16 victims of sex trafficking and arresting four sex traffickers.

The NOLA Task Force collected data about gaps in services, needs of both victims and professionals who serve them, and challenges with victim identification and service provision. Identified gaps included housing, trauma-informed counseling/mental health services, and legal services for victims. Education and training specific for service providers on how to interact with and best serve victims of human trafficking was identified as a top need. Challenges identified by law enforcement and service providers included victims not self-identifying as victims, and victims not wanting to cooperate with treatment because of a fear of criminalization and retribution by their traffickers. The task force also identified areas where further research is needed: labor trafficking, foreign national victims, men and boys as victims, and the victims of the LGBTQ population.

The NOLA Task Force has planned important next steps to combat human trafficking in New Orleans based on the findings from the Agency Survey. They concluded that law enforcement and service providers are only identifying a limited demographic of victims. They identified these issues prior to the survey, but the results from the survey provided empirical evidence and a primary source of data to support their theories. According to the NOLA Task Force Director of Operations, the task force's next action steps are based on results from the Agency Survey. Data collected provided valuable information needed to create training plans responding to gaps and to better support efforts of shelter programs across New Orleans. As a result, service providers will receive more training on serving victims of human trafficking, law enforcement will participate in training on the neurobiology of trauma, outside organizations will provide trainings on labor trafficking, and trainings will focus on LGBTQ populations. The results from the Agency Survey provided a way for the NOLA Task Force to focus their efforts and zoom in on the highest areas of need among victims of human trafficking in their community.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

*Follow-up in-depth interviews.*

Select participants in the Agency Survey were contacted by phone to obtain additional information about the percentage of their agency budget that is related to human trafficking, the percentage of their agency staff who spend a portion of their time dedicated to human trafficking issues, and the amount of funding made available to agencies dedicated to addressing human trafficking.

Table 14

*Participants in Follow-up Depth Interviews*

| Stakeholders | Total Number of clients served | Number of CST victims |
|---|---|---|
| Health care providers | 1,000 to 2,200 | 9 to 35 |
| Service providers | 7 to 8,000 | 1 to 546 |
| Criminal justice | 16 to 1,532 | 1 to 130 |

While these interviews were informative, they mostly confirmed gaps and barriers of which we were already aware. The following are key take-aways:

- Participants did not feel comfortable or equipped with the necessary information to make estimates about costs to their organizations.
- Only service providers made estimates on the human trafficking funding within their organizations. Estimates ranged from $50,000--$1.6 million of their agency budget.
- Many felt that cost-related questions were outside of their scope. For example, one health care provider described not making human trafficking a priority in tracking costs to hospitals because they haven't seen a need for it.
- Law enforcement all said that their organizations were not currently tracking costs of providing services to victims of human trafficking.

*Focus groups, including worksheets filled out prior to the group.*

In collaboration with the Child Sex Trafficking Team (CSTT) from the Office of the Governor, the research team convened focus groups with professionals working in the field of human trafficking (and related fields) to assess perceived gaps in services currently available to child victims of human trafficking and exploitation.

In order to stimulate a more detailed, empirically grounded discussion prior to attending the focus group respondents were sent a set of background questions regarding their professional experience in working with victims. The background questions focused on direct service provision to clients. Participants were asked to submit their responses before attending focus groups in part to allow the research team to review the range of responses, but also to allow

participating organizations to gather those data ahead of time. Nearly one-third of the responses were returned before the focus groups occurred. Participants were asked about specific data points as well as reflection on services to victims. Participants were informed that, for the purpose of this discussion, a "victim" referred to a child who is trafficked and is served by their agency.

Sample questions were as follows:

1. How many victims does your agency serve, confirm, or interact with somehow per year?
2. What types of victims do you serve (include typology or segmentation scheme used, if available)?
3. What services do you offer to victims?
4. For budget planning, what is the estimated unit cost per victim per day used?

There were 36 sets of responses to the background questions that were submitted by participants. Table 15 describes the responses to question 1 from the background questions. The number of clients served varied between participants so to represent the responses given, we used ranges of the highest and lowest number of clients and victims served. The table is divided into the total number of clients served by their agency versus how many of those clients are victims of child sex trafficking (CST).

Table 15

*Clients Served by Type of Stakeholder – Focus Groups*

| Stakeholders | Number of clients served | Number of CST victims |
|---|---|---|
| Health care providers | 1,000 to 2,200 | 9 to 35 |
| Service providers | 7 to 8,000 | 1 to 546 |
| Criminal justice | 16 to 1,532 | 1 to 130 |

Based on the responses from the medical, criminal justice, and social service sectors we compiled Table 16 with descriptions of their views of the gaps in services, investigation, and prosecution. While there were varied responses, we decided to present the responses that were most commonly mentioned among participants. Additional analysis of the responses to background questions may help clarify the findings covered in this report. For instance, further analysis of housing and shelter needs are necessary because we have learned that shelter is a need. But an appropriate shelter for trafficking victims must be more than a safe house in order to fully offer effective and long-term care for victims. For further detail, please refer to F – Gaps Analysis.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Table 16

*Common Gaps and Barriers Identified by Stakeholders – Focus Groups*

| Stakeholders | Common gaps in resources (training, funding, etc.) | Common gaps in services, investigation, prosecution |
|---|---|---|
| Health care providers | Medical personnel need training in identifying and treating victims. More funding is needed. | A lack of communication between hospitals and law enforcement (LE). Victims are picked up by LE and never brought to hospitals or doctors for care. A lack of communication between hospitals and social service agencies/knowing where to refer. |
| Criminal justice | There is a need for forensic interviewers. More needs to be done with community awareness. There need to be lock down facilities where girls can't leave, but that are not punishment based. There is a need for more placement funds. | No universal screening tools exist. Coordination between LE, child welfare, Juvenile Justice is unclear. There is no easy way to share data with other agencies/organizations. A lack of training for prosecutors and law enforcement. A lack of residential or safe housing options for victims waiting for prosecution/not involved in Juvenile Justice. |
| Service providers | A lack of consistent and reliable funding sources leads to lack of staff. A lack of proper educational resources (child victims are usually missing a lot of school and need proper support to catch up). Licensure for housing should be put in the name of the agency and not an individual. | A lack of collaboration with LE. A lack of long term housing. Penalties for buyers/traffickers need to increase. A lack of LGBTQ services. A lack of prosecutors for human trafficking cases. |

### *DMST working group.*

The Domestic Minor Sex Trafficking (DMST) Working Group formed one of the primary research activities of the Texas Slavery Mapping Project during phase 1. Allies Against Slavery convenes and facilitates the group, which consists of more than 20 regional criminal justice personnel, service providers, and survivor leaders. The DMST Working Group was initially

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

formed in early 2015 and meets biweekly to develop comprehensive solutions to domestic minor sex trafficking in Central Texas and beyond.

The Texas Slavery Mapping Project research team participated throughout the inception and initial work of the group by:

- Contributing to the shared learning of the group by providing insights from the broader literature on domestic minor sex trafficking;
- Sharing expertise about data collection and data management;
- Evaluating and co-designing solutions, such as a screening tool to identify possible victims of domestic minor sex trafficking;
- Participating in group discussions and interviews about how group members defined domestic minor sex trafficking, what they perceived as gaps in services, and other insights about the field, which helped shape research methodology and supplemented the agency survey.

While the DMST Working Group focused on a range of issues and solutions over the last 18 months, one activity is of particular relevance to phase 1 and phase 2 of the Texas Slavery Mapping Project: the development of the Tier 1 Screening Tool.

The Tier 1 Screening Tool was developed in response to an identified gap shared by the majority of Working Group members: the need to more quickly and effectively identify possible victims of domestic minor sex trafficking who come in contact with the "system" or one of the member agencies. The Texas Human Trafficking Prevention Task Force in its 2014 report to the Texas Legislature highlighted the complex yet critical task of identifying victims of trafficking—the private nature or concealment of some victims, the denial of victimization by those who may in fact encounter help, and others who may be "hiding in plain sight."

This challenge of accurate identification was corroborated by the Working Group members, who agreed that victims often "slip through the cracks." In response to this need, the group focused on creating a brief assessment tool meant to be flexible enough to fit into any intake process and able to be administered by staff with little-to-no specific training on DMST. The tool was designed to be used with every youth the agencies encountered to help form a "suspicion of victimization" and funnel possible victims toward a deeper screening.

The Tier 1 Screening Tool was the resulting instrument. It is comprised of a section of strong indicators of victimization observable during intake, followed by targeted but conversational questions that can be utilized or skipped. Intake staff then make a final assessment indicating if the youth in question is a "possible victim of DMST" or if there is "not enough information" to

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

make a determination. This tool is now being piloted in multiple counties among various types of service providers and institutions.

For example, the research team worked closely with administrators from Bell County Juvenile Services Center (Juvenile Services) in Fall 2015 to learn more about current screening and data collection efforts, specifically how those efforts could be developed to improve identification of potential victims of trafficking being placed at the juvenile detention center. Juvenile Services needed a way to screen all incoming youth in its care for child sex trafficking. Through some training and awareness, senior staff had developed a "gut instinct" that they were seeing victims of child sex trafficking, but they had no tool to confirm their suspicions or collect and report data about victimization. Juvenile Services' early efforts to identify victims of sex trafficking mostly relied on a victim self identifying, which is extremely rare, before funneling that victim to specialized services.

The research team worked closely with administrators to develop a draft intake flowchart for the DMST Internal Response Team to follow when screening youth. As part of that process, Allies Against Slavery worked with administrators to implement the Tier 1 Screening Tool. Allies helped establish a procedure for using the Tier 1 Screener to evaluate each child during their standard intake process. Juvenile Services is now able to use the tool as a first touch point to build rapport with the child and form an initial suspicion that sex trafficking may have occurred. The research team provided information about existing screening tools that the DMST Internal Response Team could potentially use as a "Tier 2" screening tool to further assess the potential victim. One of those tools was developed specifically for a juvenile services setting and the DMST Internal Response Team has been able to gather additional information and build rapport with the youth.

Now Juvenile Services uses the Tier 1 Screener with every youth who comes through its doors. Additionally, the Tier 1 Screener has been a standard training tool for senior staff to use with front-line intake staff where there are high levels of turnover. Each front-line staff member now receives quarterly training on child sex trafficking and how to identify victims using the Tier 1 Screener. Juvenile Services is now identifying more trafficking victims and diverting them into services. After using the Tier 1 Screener for 12 months (November 2015 – November 2016), Juvenile Services identified 27 possible victims of child sex trafficking. One hundred and thirty-one female youth were screened and 20% were identified as possible victims of sex trafficking, further supporting our victimization rate. Juvenile Services reports that the Tier 1 Screener has equipped it to better advocate for youth in juvenile court. It can also report how many victims it sees and identifies trends in victimization, a vital next step in improving data collection across the state.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Organizations and professionals who are most likely to encounter and interact with victims need to be fully invested in this effort. This is a positive next step in our efforts to get below the tip of the iceberg, increase screening (and ultimately, identification) of victims.

Fundamentally, this activity in phase 1 does not contribute to our preliminary benchmarks, but it improves our estimation activities in phase 2.

### *Pilot study on labor trafficking: Houston.*

In Spring 2016, the research team began a pilot study focused on labor-related exploitation in Houston, specifically targeting immigrant day laborers, primarily those that work in construction, house cleaning, and child or elder care. The purpose of this pilot is to assess, among other things, levels of victimization risk among these community segments. The research team developed a brief structured interview tool modified from the interview protocol developed for the San Diego study (Zhang et al., 2014) with migrant laborers, and informed by the VERA Trafficking Victim Identification Tool (TVIT) Short Form. One member of the research team had unique access to migrant workers in Harris County and she conducted interviews. These data will provide Texas-specific primary estimates of victimization in several at-risk industry segments and allow us to assess the relevance of the estimates from sources like Barrick et al., (2014) and Zhang et al., (2014) to Texas. Table 17 summarizes the trafficking and exploitation criteria that we have adapted from their study.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Table 17

*Labor Exploitation and Trafficking Criteria*

---

**Abusive practice during transportation**

- Forbade you from leaving the traveling group, or restricting what you could do.
- Forbade or restrict you from communicating freely with family.
- Forbade or restrict you from communicating freely with other travelers.
- Assaulted/fined you when you failed to obey the rules.
- Required you to pay more smuggling fee than originally agreed or bad things would happen to you or your family (e.g. be abandoned halfway, be turned over to U.S. border patrol, family members would be hurt).

**Trafficking violation during transportation**

- Withheld your identification documents (including passport, visa, and birth certificate).
- Held you hostage at or prevented you from leaving a safe house while demanding ransom from your family.

**Labor exploitation**

- Denied you pay for work you performed in Houston or anywhere in the US.
- Received less pay than what you had been promised.
- Received a bad check.
- Employer disappeared before paying you.
- Were told to work in hazardous environments (with unknown chemicals) without proper protection.
- Any other work experience you consider grossly abusive or exploitative.

**Threats to physical safety (Trafficking)**

- Physical abuse (including beating, kicking, slapping, etc.).
- Sexual abuse (including repeated unwanted groping, touching, exposing oneself, deliberate display of pornographic materials, repeated solicitation of sexual favors, etc.).
- Locked up (including physically restrained).
- Threatened with physical abuse (including beating, kicking, slapping, etc.).
- Threatened with sexual abuse.
- Threatened with harm to you in any other form.
- Threatened with harm to your family in any form.
- Threatened to get you deported.
- Threatened to get you arrested.
- Threatened to turn you over to police or immigration officials.

---

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Restriction/Deprivation (trafficking)

   - Forbade you from leaving the workplace.
   - Restricted where you could go during non-work hours.
   - Withheld your identification papers (such as passport, visa, birth certification, or other identification documents).
   - Didn't allow you to have adequate food or sleep.
   - Prevented or restricted you from communicating freely with family, other workers, others outside the workplace.

Deception and lies (exploitation)

   - Pay was less than you were promised.
   - The type of work was different than what you were promised.
   - The work environment was different than what you were promised.
   - The amount of work was different from what you were promised.
   - Told you that you would not be believed if you try to seek help from U.S. authorities.
   - Instructed you to lie about your identity.
   - Instructed you to lie about the identity of your employer.

To date, 44 interviews have been conducted (22 female) among respondents ranging in age from 20 to 70 (mean 40). These interviews have revealed substantial levels of labor exploitation and trafficking victimization, with the results shown in Figure 1.  Approximately two-thirds of participants reported experiences that meet the force, fraud, or coercion criteria for labor trafficking. This effort continues in phase 2.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*



*Figure 1.* Trafficking and exploitation summary. This figure illustrates trafficking and exploitation rates from our Labor Trafficking Pilot.

The rates of trafficking observed in our pilot study are alarming and require additional study and continued data collection. Two recent larger studies using similar victim identification methods have provided consistent and lower estimates for labor sectors at high risk for trafficking victimization (the percent of laborers who have experienced human trafficking are included in parentheses).

Barrick et al. (2014)
- Farm workers in NC (25%)

Zhang et al. (2014)
- Spanish-speaking migrant workers in San Diego County (28%)
- Construction (35%)
- Janitorial and cleaning (36%)
- Landscaping (27%)
- Agriculture (16%)
- Food processing (32%)
- Manufacturing (38%)

These studies use a common methodology that establishes robust estimates of prevalence using respondent-driven sampling (RDS) that can be generalized to the broader population. RDS uses study participant referrals in a systematic way to increase the randomness and representativeness

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

of the resulting sample. This sampling process is combined with a formal screening process that uniformly and systematically assesses victimization rates among the population being studied.

We plan to expand our pilot survey in phase 2 to other geographic areas and different economic sectors in Texas. In addition, the survey's reach and effectiveness could expand through the use of RDS.

Our preliminary benchmarks for the prevalence of labor trafficking in this phase 1 report adopt the more conservative rates reported by both Barrick and Zhang, but it is important to keep in mind that rates in Texas could be higher, even substantially so.

The pilot survey also provides an initial estimate of the degree of victimization laborers have experienced. The survey asked participants to estimate their typical earned wages and then to estimate the amount of money that they had not been paid. Data was collected in a variety of formats (hourly wage, weekly pay, etc.) as appropriate and familiar for the participant. In aggregate, these data reveal that participants who have experienced labor exploitation or trafficking perceive that they had not been paid approximately 11% of wages earned. We use this preliminary estimate of degree of victimization in our calculations of the economic impact of labor trafficking.

### Prevalence of Human Trafficking in Texas

Estimation of the prevalence of human trafficking is challenging for a variety of reasons that are well documented (Small, Adams, Owens, & Roland, 2008; Barrick, Lattimore, Pitts, & Zhang, 2014; Clawson, 2006; Dank, 2014; Farrell, 2009; Muslim, Labriola, & Rempel, 2008; Owens et al., 2014; Smith, 2010; Zhang, Spiller, Finch, & Qin, 2014; Zhang, 2012; Newton, Mulcahy, and Martin, 2008).

Among the most conservative representations of the prevalence of human trafficking are statistics for reported cases and reported outreach by victims and witnesses. Central to the estimation challenge is that victims are difficult to count. They may not identify as being victims if they are concurrently involved in illicit activities or have a legal status that makes them reluctant to seek or accept help. Human trafficking occurs across broad geographies and commercial activities, further complicating the estimation task.

Although our victim typology begins to provide a theoretically grounded vision for how our phase 2 efforts will extend our understanding of the prevalence, economic impact, and character of trafficking in Texas, current limitations in available data constrain our ability to address these issues in the phase 1 report. Table 18 summarizes those community and labor segments that have been analyzed in phase 1, with an indication of which do not have sufficient data to be included in our preliminary benchmarks.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Table 18

*Trafficking Typology with Data Sources*

| Sex | Labor |
|-----|-------|
| Child abuse/maltreatment | Cleaning services |
| At-risk youth being served by DFPS | Construction |
| Homeless | Farmworkers |
| Juvenile justice* | Kitchen workers in restaurants |
| Unauthorized population* | Landscaping and grounds keeping workers |
| | Migrant farmworkers |
| | Nail salon workers* |

* Current data sources insufficient to include in preliminary benchmarks, either because population sizes are poorly understood or because of the potential for overlap with other segments included.

Our phase 1 estimates for sex trafficking focus on children, and our selection of community segments is informed by recent research identifying risk factors for domestic minors. For example, Fedina, Williamson, & Perdue (2016) found that childhood experiences, including emotional and sexual abuse, a history of running away from home, having family members in sex work, and having friends who purchased sex, were significantly associated with subsequent sex trafficking victimization. The community segments from Table 18 were selected based on secondary research regarding different populations at risk for sexual exploitation (Countryman-Roswurm and Bolin, 2014; Knight, S., 2002; Reid, J. A., & Piquero, A. R., 2013; Edberg, M. C., Gies, S. V., Cohen, M. I., & May-Slater, S., 2014; Shively et al., 2010; Child Welfare Information Gateway, 2015; California Child Welfare, 2013; Smith, L. , Vardaman, S. H., Snow, M.A., 2009; Halcon, L. L., & Lifson, A. R., 2004; Ferguson, K. M., Bender, K., Thompson, S., Xie, B., & Pollio, D., 2011; Salisbury, E. J., Dabney, J. D., & Russell, K., 2014; Hammer, H., Finkelhor, D., Sedlak, A. J., & Porcellini, L. E., 2002). More support for our minor and youth sex trafficking typology selections can be found in Appendix G.

**Minor and youth sex trafficking.**

Fundamentally, our approach to estimating the prevalence of minor and youth sex trafficking requires three levels of information: identification of community segments that are at higher-than-average risk for human trafficking, the number of individuals in a community segment, and a quantification of the risk of victimization within that segment. We researched community segments at higher-than-average risk for this specific type of victimization.

Estimates of the numbers of individuals involved in the commercial sex industry are vague at best. Our methodology for assessing the prevalence of minor and youth sex trafficking looks at

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

how such victims might be encountered by various professions that provide services to or are otherwise engaged with community segments whose members are at high risk of sex trafficking victimization. We use secondary sources to size these community segments and a survey of experts from agencies that serve these individuals (see Agency Survey on pages 37-42 for more detail) to estimate the high risk of trafficking victimization. Note that our phase 1 estimates for sex trafficking focus on minors and youth, whereas "minors" are under 18 years of age and "youth" includes those up to 25 years of age who remain enrolled with Department of Family & Protective Services.

### How large are these community segments?

The research team continues to learn about community segments vulnerable to sex trafficking through available secondary sources of data, but knowledge of the size of some of these populations may not yet exist. For this report, we have selected example community segments that are believed to be at higher-than-average risk of sex trafficking: youth who have experienced child abuse or maltreatment, at-risk youth being served by the Department of Family and Protective services (DFPS), and homeless youth.

Table 19

*Examples of Community Segment Sizes in Texas (Annually) at High Risk for Minor and Youth Sex Trafficking*

| High-Risk Sex Trafficking Community Segments | Size of Community Segment |
| --- | --- |
| Child abuse/maltreatment | 290,471 |
| At-risk youth being served by DFPS | 24,097 |
| Homeless | 1,416 |

*Sources: U.S. Department of Housing & Urban Development; Texas Department of Family & Protective Services; Center for Missing and Exploited Children*

### How many are at risk?

We apply the 25% victimization rate developed from the Agency Survey (and corroborated with similar studies found in the extant literature) to estimate numbers of victims in the community segments. We view the use of this calculation as conservative because most service providers who shared victimization data with us in the Agency Survey indicate that they use a formal process to screen clients for victimization; in fact, more than half (56%) of those service providers use an evidence-based or validated tool.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Our prevalence calculation then takes the following form.

$$V_s = N_s \text{ x } VR_s$$

- $V_s$ is the number of expected victims in a community segment.
- $N_s$ is the number of individuals in a segment, i.e. the size of the segment.
- $VR_s$ is the rate of trafficking victimization in that segment.

Results for the example community segments are shown in Table 20.

Table 20

*Minor and Youth Sex Trafficking in Texas*

| High-Risk Sex Trafficking Community Segments* | Size of Community Segment | Victimization Rate | Estimated Victims |
|---|---|---|---|
| Child abuse/maltreatment | 290,471 | 25% | 72,618 |
| At-risk youth being served by DFPS | 24,097 | 25% | 6,024 |
| Homeless | 1,416 | 25% | 354 |

\* The research team acknowledges the limitations of this narrow definition of human trafficking. Phase 2 benchmarks will incorporate additional segments such as adult sex trafficking, other economic sectors, etc.

Since example community segments do not represent the entirety of at-risk communities in Texas, we have not summed the individuals at high risk of victimization across these community segments. Just as in labor trafficking, we offer this example list as illustrative only of the methods we are using to estimate the prevalence of trafficking in Texas.

**Labor trafficking.**

Labor trafficking is the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery. According to the ILO, an estimated 21 million people around the globe are forced labor victims in either the private economy or state-imposed forms of forced labor. Sixty-six percent of professional respondents to our web-based survey (see pages 38-42 for more detail) noted that labor trafficking is a serious or very serious problem in their area, with 86% believing that it is bigger problem than most people think.

Fundamentally, our approach to estimating the prevalence of labor trafficking requires three levels of information: 1) identification of commercial activities that are at higher-than-average risk for human trafficking, 2) the number of workers participating in the at-risk activity, and 3) a

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

quantification of the risk of victimization within that activity. It is also worth noting that there is an intersection of sex and labor trafficking in some industries (see section *Our Understanding of Human Trafficking in Texas*). That intersection is minimized in this report by our choice of labor sectors.

Verité's (2015) methodology assesses risk of labor trafficking by evaluating five factors, concluding that these industries possess at least four out of five of the following.

1. Hazardous/undesirable work
2. Vulnerable, easily replaced, and/or low-skilled workforce
3. Migrant workforce
4. Presence of labor contractors, recruiters, agents, or other middlemen in labor supply chain
5. Long, complex, and/or non-transparent supply chains

Polaris provides a largely corroborating view of vulnerable industries in Texas. Data from 2013 through 2015 indicate that the following industries are represented by human trafficking cases reported to the National Human Trafficking Hotline from Texas.

- Agriculture
- Begging rings
- Construction
- Domestic service
- Health and beauty services
- Landscaping
- Restaurant and food services
- Traveling sales crews

Although all of these industries have relevancy for Texas, for this report we only consider agriculture, construction, and restaurant and food services. These are three vulnerable industries for which we argue that the overlap in the associated workforce is minimal. Furthermore, for clarity, within these industries we focus on sub-segments of workers who are at the highest risk of exploitation.

1. Migrant farmworkers
2. Cleaning Services
3. Construction
4. Kitchen Workers in Restaurants
5. Landscaping and Grounds Keeping Workers

### How large are these labor segments?

We use secondary sources to establish the size of the selected segments, shown in Table 21.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Table 21

*Examples of Industry Segment Sizes in Texas at High Risk for Labor Trafficking*

| High-Risk Labor Trafficking Segments | Size of Community Segment |
|---|---|
| Migrant farmworkers | 132,034 |
| Cleaning services | 233,610 |
| Construction | 101,250 |
| Kitchen workers in restaurants | 190,390 |
| Landscaping and grounds keeping workers | 63,050 |

*Sources: Texas Department of Housing and Community Affairs; Bureau of Labor Statistics*

### How many workers are at risk?

We have applied Barrick et al. (2014) and Zhang et al. (2014) victimization rates to our selected industry segments. We view this approach as conservative because the screening process by Barrick and Zhang already partitions trafficking victimization as being distinctly different than exploitation that occurs without the required elements of force, fraud, or coercion. Furthermore, our own labor trafficking pilot project has provided preliminary data that suggest that labor trafficking prevalence in Texas may be substantially higher than seen in their studies.

This approach allows us to conservatively estimate the number of workers in the example industries who have likely experienced some form of trafficking victimization. Table 22 shows these results for select agriculture, construction, and restaurant and food service industry segments.

Table 22

*Labor Trafficking in Texas*

| High-Risk Labor Trafficking Segments* | Community Size Segment | Victimization Rate | Estimated Victims |
|---|---|---|---|
| Migrant farmworkers | 132,034 | 28% | 36,970 |
| Cleaning services | 233,610 | 36% | 84,100 |
| Construction | 101,250 | 35% | 35,438 |
| Kitchen workers in restaurants | 190,390 | 32% | 60,925 |
| Landscaping and grounds keeping workers | 63,050 | 27% | 17,024 |

* The research team acknowledges the limitations of this narrow definition of human trafficking. Phase 2 benchmarks will incorporate additional segments such as adult sex trafficking, other economic sectors, etc.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Since these are example industry segments, they in no way represent the entirety of the labor force in Texas. As such, we have not summed the individuals at high risk of trafficking victimization across these industry segments. We offer this example list as illustrative only of the methods we are using to estimate the prevalence of trafficking in Texas. We plan on expanding this list to include industries that emerge from our primary data collection efforts in Houston and elsewhere.

### Economic Impact of Human Trafficking in Texas

There are two main aspects to the economic impact of :

1) Measuring the value of the economic output, including the value of the labor, produced by human trafficking activity;
2) Quantifying the costs to provide care to victims and survivors of human trafficking, including costs related to law enforcement, prosecution, and social services.

### Sex trafficking

The Agency Survey was a first step toward quantifying the costs to provide care to victims and survivors of human trafficking, but initial survey responses related to costs of services were incomplete. Additional data collection efforts, such as a survey specific to quantifying cost, have yielded additional yet still preliminary information. These data allow us to multiply the estimated number of trafficking victims in high-risk industry and community segments with the cost figures supplied by both secondary and primary sources, to arrive at a cost-per-victim estimate that could be rolled into a statewide cost figure.

Table 23 presents an estimate of the Net Present Value (NPV) of the estimated lifetime social service costs that both society and trafficking victims themselves can expect to incur, such as mental and physical health costs, burdens on the public health system, and law enforcement expenses. It builds on a cost-benefit analysis approach presented in Martin & Lotspeich (2014).

We have adjusted the Martin & Lotspeich (2014) model by inflating the NPV from 2011 to 2016 dollars and have added a component to our assessment of costs to cover the expected

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

consumption by victims of shelter and associated services. The unit costs from their model (in 2016 dollars) are listed in Table 23.

Table 23

Unit Costs (2016 $)

| Unit Cost | 2016 $$ |
|---|---|
| Public health expenditures | |
| Injury from assault | |
| Minor (a) | 4,757 |
| Major | 68,859 |
| PTSD | 6,609 |
| STIs | |
| Chlamydia-early treatment | 116 |
| Chlamydia-late treatment | 1,431 |
| HIV/AIDS | 29,303 |
| Pregnancy with abortion | 681 |
| Pregnancy with birth (c) | 14,866 |
| Chemical dependency | 39,810 |
| Criminal justice expenditures (b) | |
| Homicide investigation | 10,730 |
| Adolescents: Arrests | 2,356 |
| Adults | |
| Arrests | 2,356 |
| Court hearings | 621 |
| Incarcerations | 97 |
| Probation supervision | 951 |
| Child foster care expenditures (child of victim) | 8,551 |
| Forgone income tax revenue | 1 |

Consumption of shelter and related services were omitted from the Martin & Lotspeich (2014) study purposefully because they were conducting a benefit cost analysis wherein the lifetime societally born costs were being compared to an intervention designed to divert victims of child sex trafficking from those circumstances. That intervention included long-term shelter and associated therapeutic services. Our inclusion of shelter and associated services covers only those services that our research indicates many victims periodically receive on a short-term basis.

Anecdotally, we have evidence that minor and youth victims fall back into victimization situations several times before escaping (if they ever do), and that they make five to seven trips to some sort of facility or service provider before victims have processed enough of their

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

situation to engage in a meaningful recovery. These trips to shelters vary in length, but anecdotally it seems that a minimum stay necessary for any sort of meaningful progress could be around two weeks. Many victims leave much sooner (very likely returning to their victimized circumstance), and some receive services for as much as a year. It seems that a duration of around two months is needed to provide truly meaningful and effective services; however, it seems short-term stays are likely closer to a week.

In summary, we adopt a lifetime NPV of $83,125 for the cost of care born by society for a victim of minor and youth sex trafficking. This NPV probabilistically incorporates the likelihood of various costs and covers the likelihood for various durations of time being in circumstance of sex trafficking.

Table 24

*Lifetime Cost of Care for Victims of Minor and Youth Sex Trafficking*

| High-Risk Sex Trafficking Community Segments* | Estimated Victims | NPV of Cost of Care Required as Consequence of HT (Lifetime) | Estimated Lifetime Cost |
|---|---|---|---|
| Child abuse/maltreatment | 72,618 | $83,125 | $6,036,358,905 |
| At-risk youth being served by DFPS | 6,024 | $83,125 | $500,743,976 |
| Homeless | 354 | $83,125 | $29,426,190 |
| Total | | | $6,566,529,071 |

* The research team acknowledges the limitations of this narrow definition of human trafficking. Phase 2 benchmarks will incorporate additional segments such as adult sex trafficking, other economic sectors, etc.

**Labor trafficking.**

Table 25 presents an estimate of the annual value of labor expended by trafficking victims in the three vulnerable industries presented earlier: agriculture, construction, and restaurant and food services.

These economic impacts are presented here with important data limitations. For instance, we can only estimate how many hours the average victim works under conditions of modern slavery (we know that most episodes of victimization last only a few days or weeks and not months or years). We also do not yet fully understand how to make a reasonable estimate of the wages that a trafficking victim is actually paid. Data from our labor pilot study reveal that participants who have experienced labor exploitation or trafficking perceive that they had not been paid approximately 11% of wages earned. We use this preliminary estimate of degree of victimization

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

in our calculations of the economic impact of labor trafficking and applied to a normal 2080-hours worked per year. The Department of Labor's "Adverse Effect Wage Rate" of $11.15 per hour for H-2A workers is used here as a proxy for what we are calling the Fair Market Wage Rate. The Department of Labor sets that wage rate for migrant farmworkers on H2-A visas so as not to discriminate against domestic labor and depress wages in the agriculture sector. (Other wage rates could be used; the prevailing Texas wage for low-skilled workers in the other sectors may be the federal minimum wage, currently $7.25 per hour).

Table 25

*Annual Value of Labor Exploited from Trafficking Victims*

| High-Risk Labor Trafficking Segments* | Estimated Victims | Estimated Annual Value Wages Lost |
|---|---|---|
| Migrant farmworkers | 36,970 | $94,314,906 |
| Cleaning services | 84,100 | $214,549,192 |
| Construction | 35,438 | $90,406,591 |
| Kitchen workers in restaurants | 60,925 | $155,426,986 |
| Landscaping and grounds keeping workers | 17,024 | $43,430,267 |
| Total | | $598,127,942 |

* The research team acknowledges the limitations of this narrow definition of human trafficking. Phase 2 benchmarks will incorporate additional segments such as adult sex trafficking, other economic sectors, etc.

These industry and community segments do not represent the entirety of populations at higher-than-average risk for trafficking victimization in Texas and are provided here as a preliminary benchmark and a demonstration of our methodological approach. We plan to further develop the list of industry and community segments to be included in the study during phase 2.

## Our Understanding of Human Trafficking in Texas

As data related to our understanding of the economic impact and the prevalence of trafficking increase, so will the dimensions, descriptions, and understanding of the complex crime of human trafficking as it operates in Texas. To date, we have collected data that help describe some of these dimensions, and continue to collect and analyze data that will expand our shared knowledge.

### Law enforcement response

While law enforcement task forces report important criminal justice insights, standardized measures that accurately estimate the number of trafficking victims remain relatively elusive. This is in part due to barriers faced by law enforcement regarding identification, investigation,

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

and prosecution of these crimes, and an understanding that this crime is not static. Understanding the factors that promote and hinder law enforcement strategies will effectively guide future programs, policies, and laws about trafficking. The U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics tracks human trafficking incidents by federally funded law enforcement human trafficking task forces. Banks and Kyckelhahn (2011) found that 80% of trafficking cases were suspected sex trafficking cases, 10% were labor trafficking cases, and 10% were identified as other or unknown forms of trafficking. Of the 2,515 total incidents investigated, 389 cases were confirmed as human trafficking, with 488 suspects and 527 victims identified. Of the sex trafficking victims, 83% were U.S. citizens. Of confirmed cases opened for one year, 30% were later confirmed to be human trafficking, 38% were confirmed not to be human trafficking, and the remaining were still under investigation. One hundred and forty-four arrests were made. Of those opened and confirmed, "64% involved allegations of prostitution or sexual exploitation of a child, and 42% involved allegations of adult prostitution. Most cases that were not confirmed as human trafficking involved allegations of adult prostitution" (Banks & Kyckelhahn, 2011, p.8).

Law enforcement responses to human trafficking are varied and complex. Many law enforcement professionals have previously perceived human trafficking as rare or nonexistent (Farrell et al., 2011). A National Institute of Justice (NIJ)-sponsored study found that 32% of trafficking cases were discovered as a result of the investigation of other cases (Clawson et al., 2006), highlighting the need for broadly trained law enforcement. Agents themselves have called for more training (Clawson et al., 2006), knowing that well-crafted investigations are central to successful prosecution. Human trafficking investigations are time- and resource-intensive for law enforcement (David, 2008). Given this reality, law enforcement agents have cited the need for specific techniques and resources for investigating human trafficking cases, including dedicated agents and new technology (Busch-Armendariz, Nsonwu, & Heffron, 2014, 2008; Clawson et al., 2008).

**Prosecution response**

Responsiveness through prosecution is bleak. Worldwide only 7,000 human trafficking cases were prosecuted for a crime in which 40,000 victims were identified (in 2012, according to U.S. Department of State, 2013). We have little empirical data available about prosecutions of human trafficking in the US at the federal or state levels. According to the Office of Research and Evaluation, NIJ has funded several studies (for instance, Shively, Kliorys, Wheeler, & Hunt, 2012)) that inform the prosecutorial processes. What we do know is that the prosecution of human trafficking cases is also fraught with hurdles, especially for state and local prosecutors, who operate with fewer resources and less training than federal prosecutors (Clawson et al., 2008).

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Sentencing and punishment for human traffickers is another area of concern (Clawson et al., 2008). Research from Europe, Australia, and North America indicate a clear need to develop collaborations among law enforcement entities, from the federal to local level (Reichel, 2008; David, 2008).  Law enforcement agents and service providers in the United States have cited the need for creating and improving mechanisms for such collaborative efforts (Busch-Armendariz et al., 2007). Federally funded task forces have a positive impact on the delivery of services to victims (Busch-Armendariz, et al., 2007), and on investigation and prosecution efforts (Farrell, et al., 2008). Despite recent increases in the identification and prosecution of traffickers (Busch-Armendariz, et al., 2014), the numbers for each remain dismally low in relationship to the extent of the crime.

### Under investigation: Labor trafficking

Research shows that both men and women are affected by labor trafficking. Although the TVPA splits sex and labor trafficking by definition, sexual violence can be present in situations of labor exploitation. In studies from the University of California, Santa Cruz and Human Rights Watch, most female farmworkers interviewed reported experiencing or knowing someone who had experienced some form of sexual harassment as part of their work (Waugh, 2010; Meng & Coursen, 2012).

In our previous work, *A Research Study on Human Trafficking Victims: Survivors Speak Out about Long-Term Needs* (Busch-Armendariz, Nsonwu, & Heffron, 2009), IDVSA reported that sex trafficking often overlaps with labor trafficking. That is, sex trafficking cases often include elements of labor trafficking (such as being coerced or forced to cook, clean, or perform other labor). Similarly, labor trafficking cases frequently include sexual violence as a component of the strategies of control and coercion used by traffickers. Given these overlapping elements of sex and labor trafficking, it is critical that initiatives to learn more about human trafficking in Texas incorporate all possible manifestations of the crime.

During phase 1, the research team coordinated numerous efforts to increase our understanding of the prevalence and impact of labor trafficking in Texas. Interviews with field experts uncovered a pervasive concern that they are only seeing the tip of the iceberg of a large and complex problem. In fact, 66% of professional respondents to the Agency Survey noted that labor trafficking is a serious or very serious problem in their area, with 86% believing that it is a bigger problem than most people think.

This concern is compounded by the fact that organizations whose mission includes service provision to immigrant and migrant worker populations feel isolated, with little to no sharing of information or resources with other organizations. Initial research tasks intended to accomplish two primary goals:

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

- Increase knowledge about labor industries in Texas and the employment visa process;
- Build a network for data collection.

The research team performed an extensive literature review. We compiled a list of stakeholders with knowledge of labor exploitation in Texas. We conducted interviews with the Department of Labor (DOL), officials with the Mexican Consulate, and special agents with Immigration and Customs Enforcement (ICE) Homeland Security Investigations to learn more about top industries for exploitation, databases housing related data, and existing labor anti-trafficking efforts. A review of labor trafficking cases as part of the 2014 study from the Urban Institute found that most victims worked in the major U.S. industries of agriculture, domestic service, construction and hospitality (Owens, et al., 2014). Researchers found that victims of labor trafficking frequently obtained temporary work visas (usually H-2A or H-2B), which is in-line with information learned from interviews with Texas-based Department of Labor officials and data analysts at the National Human Trafficking Hotline.

These preliminary efforts led to the first focus group with Central Texas professionals who primarily work with immigrants to provide social services, legal services, and advocacy. These connections increased our understanding of service provision, and focus group participants identified numerous challenges to serving the immigrant and migrant worker populations, specifically in Central Texas. Misidentification of cases, confusion among professionals about definitions and blurred lines between extreme labor exploitation and trafficking, lack of education about rights and labor laws among workers, and the geography challenges of Texas were some of the most common problems professionals identified.

While governmental organizations such as ICE and DOL want to assist victims in exploitive work situations, the challenge of identifying cases continues due to a victim's fear of the economic impact on the family and community. Professionals working with both documented and undocumented workers cannot compel victims to move forward if they cannot guarantee confidentiality. Furthermore, when ICE does not identify exploited workers as being victims of trafficking, it may send a strong message to victims to not seek help.

### Discussion

This phase 1 report presents our learning to date, preliminary benchmarks, and how the continuation of these activities will increase our understanding of the crime. We have identified industry and community segments at higher than average risk of human trafficking. We have applied victimization rates to a select few segments for the purposes of demonstrating our methodology, establishing some baseline human trafficking prevalence and economic impact estimates, and providing a concrete example of our planned activities moving forward.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Our preliminary assessments and quantifications need additional refinement, which requires an expanded level of data collection beyond the timeline of this current research. We will also continue to build upon past research about the needs of victims and survivors and our understanding of traffickers. We expect this emerging data to be more complete in the future, if solely for the fact that organizations are improving data collection efforts, increasing and improving screening of potential victims, and working to share that information in the name of more effective, comprehensive solutions.

In addition to the learning presented thus far, we have also detailed some challenges to researching human trafficking, such as severely limited access to law enforcement data, victims continuing to slip through the cracks because identification is so difficult, and the inability of professionals to quantify costs to provide care to victims and survivors of human trafficking. These challenges, among others, are not unique to Texas and will continue to guide our research activities. In other words, a key component of this work is to identify gaps and work toward better understanding *how* to fill those gaps.

This research is a benchmark of our understanding of human trafficking, especially in prevalence and economic impact; the state's diversity, its cultural context, and regional differences make it difficult to fully describe the scope of trafficking in Texas. Furthermore, the landscape of and the response to the crime are constantly evolving. The research team continues to collect and analyze data as part of this research through the conclusion of the project, and hopefully, beyond.

*The preliminary results in this final report are illustrative only and remain a conservative estimate of the prevalence of human trafficking in Texas.*

## Conclusions

This study is groundbreaking as the first benchmark of prevalence and economic impact of human trafficking for the State of Texas. Few states have invested more to understand the extent of the crime, who is exploited and under what conditions, and the economic impact in order to develop programs, services and policies to alleviate it. Human trafficking research is a young field, making data collection and analysis challenging, particularly as definitions continue to evolve among the disciplines charged with responding to it.

As an example, early on, many limited their understanding of human trafficking to sex trafficking and conflated it with prostitution. Although practice among many professionals has begun to catch up with the legal definitions, useable data available to determine prevalence may not be available for several years.

The wide range of definitions for DMST, its conflation with prostitution, and low rates of identification have significant implications for data collection across the state. DMST regularly

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

presents as prostitution, and without accurate identification or a consistently applied definition of what qualifies as trafficking, those cases are often documented as prostitution or a similar criminal code. In many cases, stakeholders are able to accurately collect information about children and youth being exploited. Against that backdrop, though, data on domestic minor sex trafficking is low and overlaps considerably with prostitution data. However, when data on domestic minor sex trafficking is collected, it is not standardized across multiple organizations, thus making any aggregated understanding just preliminary.

Our study findings also conclude that labor trafficking is a significant issue for the State of Texas. In fact, this research leads us to conclude that it is woefully understudied and perhaps ignored as a policy area. Our initial steps to explore secondary data from local law enforcement and other governmental agencies on human trafficking crimes generated data that was limited to sex exploitation only. This reflects a narrow understanding of human trafficking that perhaps prioritizes sex trafficking cases over labor trafficking, limiting the ability to reach a large number of vulnerable and victimized Texans.

We know that human trafficking includes the exploitation of different groups of people (adults, youth, children, foreign-born, Texans and other Americans). We encourage our state to continue to expand our understanding of this crime; otherwise we may close off our ability to identify all exploited people in Texas and provide these crime victims with needed services.

## Recommendations

We make the following recommendations to stakeholders and policymakers using the findings contained in the report:

I.  Increase investigation and prosecution of traffickers. In general, there are several reasons that the rates of investigation and prosecution of human trafficking cases are low, including:  1) a lack of precedence and case law, 2) victim reluctance to testify, 3) a lack of institutional infrastructure, and 4) a lack of training for investigators and prosecutors on how to investigate and litigate human trafficking cases. The ultimate vision is for law enforcement to preempt strategies used by traffickers so that incidence rates of human trafficking decline. The first step toward this goal is to gain a better understanding of how to increase the success of law enforcement, including its role in the prosecution of trafficking cases. The research team is conducting a survey among prosecutors and investigators of human trafficking cases to gain insights that improve outcomes on those cases. Our initial efforts focus on minor and youth sex trafficking because of the higher number of available cases.

II. Identify more victims and increase our understanding of how they became victims. During phase 2, the Working Group and the research team will finalize a Screening Starter Pack containing a more in-depth, validated screening tool for professionals who treat victims. Such a screening tool would include a scaled assessment of risk and allow the development of better estimates of the most vulnerable, at-risk populations.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

III. <u>Expand our understanding of traffickers themselves</u>. The methods and strategies used by traffickers, as well as their attempts to evade law enforcement, are dynamic and ever-changing; any attempt to pin down trafficker typologies must be open to continuous exploration and analysis. In this vein, the research will continue to review and refine the typologies of traffickers in operation in Texas.

**Next Steps: Phase 2**

Phase 2 will expand the initial 2016 human trafficking prevalence and economic impact benchmarks. The current methodology was conservative in its initial assessment of the problem for Texas. As agreed, the next phase of this research will deepen our understanding of the problem of domestic minor sex trafficking. Phase 2 research activities will also include providing the Child Sex Trafficking Team at the Criminal Justice Division with an independent, pre-assessment of several Texas cities in need of programs or services.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

# References

Anderson, P. M., Coyle, K.K., Johnson, A., & Denner, J. (2014).  An exploratory study of adolescent pimping relationships.  *Journal of Primary Prevention, 35,* 113-117. doi: 10.1007/s10935-014-0338-3

Atkins, B., Moran, N. R., & Hanser, R.D. (2013).  Human smuggling and the international sex trade: An evaluation of the trafficking victims protection act.  *Sociology Study, 3*(1), p. 23-39.

Bagley, C. & Young, L. (1987). Juvenile prostitution and child sexual abuse: A controlled study. *Canadian Journal of Community Mental Health, 6*(1), 5-26.

Banks, D., & Kyckelhahn, T. (2011). *Characteristics of suspected human trafficking incidents, 2008-2010.* Bureau of Justice Statistics, Office of Justice Programs, U.S. Department of Justice. Retrieved from https://www.bjs.gov/content/pub/pdf/cshti0810.pdf

Barrick, K., Lattimore, P. K., Pitts, W. J., & Zhang, S. X. (2014). When farmworkers and advocates see trafficking but law enforcement does not: challenges in identifying labor trafficking in North Carolina. *Crime, Law and Social Change*, *61*(2), 205–214. doi:10.1007/s10611-013-9509-z

Beech, B. M., Myers, L., & Beech, D. J. (2012). Hepatitis B and C infections among homeless adolescents. *Family & Community Health, 25*(2), 28-36.

Biggeri, M., & Ferrannini, A. (2014). Opportunity gap analysis: Procedures and methods for applying the capability approach in development initiatives. *Journal of Human Development and Capabilities, 15*(1), 60-78.

Bigleson, J., Vuotto, S. (2013). *Homelessness, survival sex and human trafficking: As experienced by the youth of Covenant House New York*. Retrieved from https://traffickingresourcecenter.org/sites/default/files/Homelessness,%20Survival%20Sex,%20and%20Human%20Trafficking%20-%20Covenant%20House%20NY.pdf

Bureau of Labor Statistics, United States Department of Labor (2014). *National, state, metropolitan, and nonmetropolitan area occupational employment and wage estimates*. Retrieved from http://www.bls.gov/oes/home.htm

Busch-Armendariz, N. B., Fong, R., Heffron, L. C., Faulkner, M., & Mahapatra, N. (2007). Assessing the needs of human trafficking victims: An evaluation of the central Texas coalition against human trafficking. Retrieved from https://socialwork.utexas.edu/dl/files/cswr/institutes/idvsa/publications/evaluation_of_trafficking-2007.pdf

Busch-Armendariz, N., Nsonwu, M., & Cook Heffron, L. (2009). *Understanding human trafficking: Development of typologies of traffickers phase II*. Paper presented at the First Annual Interdisciplinary Conference on Human Trafficking, Lincoln, NE.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Busch-Armendariz, N. B., Nsonwu, M. B., & Cook Heffron, L., Hernandez, M., Garza, J. (2009). *A research study on human trafficking victims: Survivors speak out about long-term needs*. Retrieved from https://www.researchgate.net/publication/242229476_A_Research_Study_on_Human_Trafficking_Victims_Survivors_Speak_Out_About_Long-Term_Needs

Busch-Armendariz, N. B., Nsonwu, M. B., & Cook Heffron, L. C. (2011). Human trafficking victims and their children: Assessing needs and vulnerabilities and strengths and survivorship. *The Journal of Applied Research on Children, 2*(1), 1-19.

Busch-Armendariz, N., Nsonwu, M. B., & Cook Heffron, L. C. (2014). A kaleidoscope: The role of the social work practitioner and the strength of social work theories and practice in meeting the complex needs of people trafficked and the professionals that work with them. *International Social Work, 57*(1), 7–18. doi:10.1177/0020872813505630

California Child Welfare Council. (2013). *Ending the commercial sexual exploitation of children: A call for multi-system collaboration in California*. Retrieved from http://www.chhs.ca.gov/Child%20Welfare/Ending%20CSEC%20-%20A%20Call%20for%20Multi-System%20Collaboration%20in%20CA%20-%20February%202013.pdf

Cecchet, S.J. & Thoburn, J. (2014). The psychological experience of child and adolescent sex trafficking in the United States: Trauma and resilience in survivors. *Psychological Trauma: Research, Practice, and Policy, 6*(5), 482-493.

Child Welfare Information Gateway. (2015). *Child welfare and human trafficking*. Retrieved from https://www.childwelfare.gov/pubs/issue-briefs/trafficking/

Cho, S. (2015). Modeling for determinants of human trafficking: An empirical analysis. *Social Inclusion, 3*(1), 2-21. doi:10.17645/si.v3i1.125

Clarke, R. (1995). Situational crime prevention. *Crime and Justice, 19*, 91-150. Retrieved from http://www.jstor.org/stable/1147596

Clarke, R. V., & Cornish, D. B. (1985). Modeling offenders' decisions: A framework for research and policy. *Crime and Justice, 6*, 147-185. doi:10.1086/449106

Clawson, H., Dutch, N., & Cummings, M. (2006, October). *Law enforcement response to human trafficking and implications for victims: Current practices and lessons learned*. Retrieved March 1, 2009, from http://www.ojp.usdoj.gov/nij/

Clawson, H., Layne, M., & Small, K. (2006, December). *Estimating human trafficking in the United States: Development of a methodology*. Retrieved March 1, 2009, from http://www.ojp.usdoj.gov/nij/

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Clawson, H. J., Dutch, N., Lopez, S., & Tiapula, S. (2008, September). *Prosecuting human trafficking cases: Lessons learned and promising practices.* Retrieved March 1, 2009, from http://www.ojp.usdoj.gov/nij/

Cockbain, E., & Wortley, R. (2015). Everyday atrocities: Does internal (domestic) sex trafficking of British children satisfy the expectations of opportunity theories of crime? *Crime Science, 4*(1), 1-12. doi:10.1186/s40163-015-0047-0

Cohen, L. E., & Felson, M. (1979). Social change and crime rate trends: A routine activity approach. *American Sociological Review, 44*(4), 588-608.

Countryman-Roswurm, K., & Bolin, B. L. (2014). Domestic minor sex trafficking: Assessing and reducing risk. *Child and Adolescent Social Work Journal 31*(6), 521–538. doi:10.1007/s10560-014-0336-6

Dank, M., Khan, B., Downey, M., Kotonias, C., Mayer, D., Owens, C., & Yu, L. (2014). *Estimating the size and structure of the underground commercial sex economy in eight major US cities.* Retrieved from http://www.urban.org/sites/default/files/alfresco/publication-pdfs/413047-Estimating-the-Size-and-Structure-of-the-Underground-Commercial-Sex-Economy-in-Eight-Major-US-Cities.PDF

David, F. (2008). Trafficking of women for sexual purposes. *Australian Institute of Criminology Research and Public Policy Series No. 95*. Retrieved from http://www.aic.gov.au/media_library/publications/rpp/95/rpp095.pdf

Edberg, M. C., Gies, S. V., Cohen, M. I., & May-Slater, S. (2014). Trajectories of involvement in commercial sex exploitation and domestic trafficking of girls and young women: Selected qualitative results from an evaluation study. *Journal of Ethnographic & Qualitative Research, 9*(2), 89-110.

Fang, X., Brown, D.S., Florence, C.S., and Mercy, J.A. (2012). The economic burden of child maltreatment in the United States and implications for prevention. *Child Abuse & Neglect, 36*(2), 156-165.

Farrell, A. (2009). *Understanding the determinants of police identification in human trafficking cases.* Paper presented at the First Annual Interdisciplinary Conference on Human Trafficking, Lincoln, NE.

Farrell, A., McDevitt, J., & Fahy, S. (2010). Where are all the victims? Understanding the determinants of official identification of human trafficking incidents. *Criminology & Public Policy, 9*(2), 201-233. doi:10.1111/j.1745-9133.2010.00621.x

Fedina, L., Williamson, C., & Perdue, T. (2016). Risk factors for domestic child sex trafficking in the United States. *Journal of Interpersonal Violence*. Advance online publication. doi: 10.1177/0886260516662306

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Felson, M., & Clarke, R. V. (1998). *Opportunity makes the thief: Practical theory form crime prevention*. Police Research Series Paper 98. London: Home Office.

Ferguson, K. M., Bender, K., Thompson, S., Xie, B., & Pollio, D. (2011). Correlates of street survival behaviors in homeless young adults in four U.S. Cities. *American Journal of Orthopsychiatry, 81*(3), 401-409. doi:10.1111/j.1939-0025.2011.01108.x

Gibbs, D. A., Hardison Walters, J. L., Lutnick, A., Miller, S., & Kluckman, M. (2015). Services to domestic minor victims of sex tafficking: Opportunities for Engagement and support. *Children and Youth Services Review, 54*, 1–7.

Greene, J. M., Ennett, S. T., & Ringwalt, C. L. (1999). Prevalence and correlates of survival sex among runaway and homeless youth. *American Journal of Public Health, 89*(9), 1406-1409.

Greve, A. (2014). *The controversies behind safe harbor*. Retrieved from: www.humantraffickingcenter.org/blog

Guerette, R. T., & Santana, S. A. (2010). Explaining victim self-protective behavior effects on crime incident outcomes: A test of opportunity theory. *Crime & Delinquency, 56*(2), 198-226. doi:10.1177/0011128707311644

Halcon, L. L., & Lifson, A. R. (2004, February). Prevalence and predictors of sexual risks among homeless youth. *Journal of Youth and Adolescence, 33*(1), 71-80.

Hammer, H., Finkelhor, D., Sedlak, A. J., & Porcellini, L. E. (2002). *National incidence studies of missing, abducted, runaway, and thrownaway children: National estimates of missing children: Selected trends, 1988-1999*. PsycEXTRA Dataset. doi:10.1037/e401072005-001

Hodge, D. R. (2014). Assisting victims of human trafficking: Strategies to facilitate identification, exit from trafficking, and the restoration of wellness. *Social Work, 59*(2), 111-118. doi:10.1093/sw/swu002

Holger-Ambrose, B., Langmade, C., Edinburgh, L. D., & Saewyc, E. (2013). The illusions and juxtapositions of commercial sexual exploitation among youth: identifying effective street-outreach strategies. *Journal of Child Sexual Abuse, 22*(3), 326–40. http://doi.org/10.1080/10538712.2013.737443

Hossain, M., Zimmerman, C., Abas, M., Light, M., & Watts, C. (2010). The relationship of trauma to mental disorders among trafficked and sexually exploited girls and women. *American Journal of Public Health, 100*, 2442-2449.

Hu, H., Chiu, S., Cheng, C., & Yen, T. (2011). Applying the IPA and DEMATEL models to improve the order-winner criteria: A case study of Taiwan's network communication equipment manufacturing industry. *Expert Systems with Applications, 38*(8), 9674-9683. doi:10.1016/j.eswa.2011.01.147

International Labour Organization. (2012). *Hard to see, harder to count: Survey guidelines to estimate forced labour of adults and children*. Retrieved from http://un-act.org/wp-content/uploads/2015/06/Harder-to-See-Harder-to-Count.pdf

International Labour Office. (2012). *ILO global estimate of forced labour 2012: Results and methodology*. Retrieved from http://www.ilo.org/global/topics/forced-labour/publications/WCMS_182004/lang--en/index.htm

Kennedy, M. A., Klein, C., Bristowe, J. T. K., Cooper, B. S., & Yuille, J. C. (2007). Routes of recruitment: Pimps' techniques and other circumstances that lead to street prostitution. *Journal of Aggression, Maltreatment & Trauma, 15*(2), 1-19.  doi:10.1300/J146v15n02

Knight, S. (2002). Children abused through prostitution. *Emergency Nurse, 10*(4), 27-30. doi:10.7748/en2002.07.10.4.27.c1069

Lemieux, C., Thompson, J. L., Dawson, J., Schuster, R. M. (2013). Natural resource manager perceptions of agency performance on climate change. *Journal of Environmental Management, 114*(15), 178-189.

Lu, D., Ertek, G., & Betts, A. (2014). Modeling the supply chain perception gaps. *The International Journal of Advanced Manufacturing Technology, 71*(1), 731-751. doi:10.1007/s00170-013-5504-x

Lutnick, A. (2016). *Domestic minor sex trafficking: The disconnect between research and legislation*. Paper presentation at the Society for Social Work Research, Washington, D.C.

Lutya, T. M. & Lanier, M. (2012). An integrated theoretical framework to describe human trafficking of young woman and girls for involuntary prostitution. In J. Maddock (Eds.), *Public Health: Social and Behavioral Health*. Retrieved from http://www.intechopen.com/books/public-health-social-and-behavioral-health/an-intergrated-theoretical-framework-to-describe-human-trafficking-of-young-women-and-girls-for-invo

Marcus, A., Horning, A., Curtis, R., Sanson, J., & Thompson, E. (2014). Conflict and agency among sex workers and pimps: A closer look at domestic minor sex trafficking. *The ANNALS of the American Academy of Political and Social Science*, *653*(1), 225–246. doi:10.1177/0002716214521993

Martin, L., & Lotspeich, R. (2014). A benefit-cost framework for early intervention to prevent sex trading. *Journal of Benefit Cost Analysis*, *5*(1); 43-87.

Martin, M., Champeau, H., Ullirch, S., Johnson, A., Cardarell, K. (2016). *Experiences of youth in the sex trade in North Texas: Shattered lives*. Retrieved from http://www.courtinnovation.org/sites/default/files/documents/Dallas_0.pdf

Meier, R. F., & Miethe, T. D. (1993). Understanding theories of criminal victimization. *Crime and Justice, 17*, 459-499. doi:10.1086/4492

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Meng, G., & Coursen-Neff, Z. (2012). *Cultivating fear: The vulnerability of immigrant farmworkers in the US to sexual violence and sexual harassment*. Human Rights Watch. Retrieved from https://www.hrw.org/report/2012/05/15/cultivating-fear/vulnerability-immigrant-farmworkers-us-sexual-violence-and-sexual

Mones, C. (2011). *Domestic sex trafficking the struggle to connect girls to services* (Unpublished bachelor's thesis).  Brown University, Providence, RI. Retrieved from https://devl1980.files.wordpress.com/2011/09/cara-mones-final-thesis.pdf

Morris, S., Cassidy, J., Parker, A., Joshi, S., Malik, A., Melfi, D. (2015). *The freedom ecosystem: How the power of partnership can help stop modern slavery*. Retrieved from https://dupress.deloitte.com/dup-us-en/topics/social-impact/freedom-ecosystem-stop-modern-slavery.html

Muftic, L.R. & Finn, M.A. (2013). Health outcomes among women trafficked for sex in the United States: A closer look.  *Journal of Interpersonal Violence, 28*(9), 1859-1885.

Muslim, A., Labriola, M., & Rempel, M. (2008). *The commercial sexual exploitation of children in New York City, Volume 2. Center for Court Innovation & John Jay College of Criminal Justice.* Retrieved from https://www.ncjrs.gov/pdffiles1/nij/grants/225083.pdf

Newton, P. J., Mulcahy, T. M., & Martin, E. (2008). *Finding victims of human trafficking. National Opinion Research Center at the University of Chicago*. Retrieved from https://www.ncjrs.gov/pdffiles1/nij/grants/224393.pdf

Office of the Attorney General. (2013). *Report to the Texas legislature, sexually oriented businesses, and human trafficking: Associations, challenges, and approaches.* Retrieved from https://www.texasattorneygeneral.gov/files/agency/20131912_htr_fin_3.pdf

Office of the Attorney General. (2012). *The Texas Human Trafficking Prevention Task Force Report to the Texas Legislature.* Retrieved from https://texasattorneygeneral.gov/files/cj/20121912_htr_fin_3.pdf

Office of the Attorney General. (2016). *The Texas Human Trafficking Prevention Task Force Report to the Texas Legislature.* Retrieved from https://texasattorneygeneral.gov/files/agency/20162911_htr_fin.pdf

Owens, C., Dank, M., Breaux, J., Bañuelos, I., Farrell, A., Pfeffer, R., & McDevitt, J. (2014). *Understanding the organization, operation, and victimization process of labor trafficking in the United States.* Urban Institute. Retrieved from https://www.urban.org/sites/default/files/alfresco/publication-pdfs/413249-Understanding-the-Organization-Operation-and-Victimization-Process-of-Labor-Trafficking-in-the-United-States.PDF

Parasuraman, A., Zeithaml, V. A., & Berry, L. L. (1985). A conceptual model of service quality and its implications for future research. *Journal of Marketing, 49*(4), 41.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Polaris Project. (2014). *Shelter beds for human trafficking survivors in the United States.* Retrieved from http://www.ccasa.org/wp-content/uploads/2014/01/Shelter-Beds-For-Human-Trafficking-Survivors.pdf

Reid, J.A. (2012).  Exploratory review of route-specific, gendered, and age-graded dynamics of exploitation: Applying life course theory to victimization in sex trafficking in North America. *Aggression and Violent Behavior, 17,* 257-271.

Reid, J. A., & Piquero, A. R. (2013). Age-graded risks for commercial sexual exploitation of male and female youth. *Journal of Interpersonal Violence, 29*(9), 1747-1777. doi:10.1177/0886260513511535

Rood, S.A. & Dziadkowiec, J. (2013). Cross cultural service gap analysis: Comparing SERVQUAL customers and IPA mystery shoppers. *Journal of Foodservice Business Research 16*(4), 359-377.

Salisbury, E. J., Dabney, J. D., & Russell, K. (2014). Diverting victims of commercial sexual exploitation from juvenile detention: Development of the InterCSECt screening protocol. *Journal of Interpersonal Violence, 30*(7), 1247-1276. doi:10.1177/0886260514539846

Santrić Milicevic, M. M., Bjegovic-Mikanovic, V. M., Terzic-Supić, Z. J., & Vasic, V. (2011). Competencies gap of management teams in primary health care. *European Journal of Public Health 21*(2), 247.

Sedlak, A. , Finkelhor, D., Hammer H., & Schultz, D. (2002). *National estimates of missing children: An overview. National incidence studies of missing, abducted, runaway, and thrown away children.* U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Shamir, H. (2012). A Labor Paradigm for Human Trafficking. *UCLA Law Review, 60*(1), 76–136. Retrieved from http://search.ebscohost.com/login.aspx?direct=true&db=a9h&AN=83851149&site=ehost-live

Shared Hope International (2015). *About Us.* Retrieved from: www.sharedhope.org

Shared Hope International. (2016). *2016 Protected Innocence Challenge: State report cards on the legal framework of protection for the Nation's children.* Retrieved from https://sharedhope.org/what-we-do/bring-justice/reportcards/2016-reportcards/

Shively, M., Kliorys, K., Wheeler, K., & Hunt, D. (2012). *A national overview of prostitution and sex trafficking demand reduction.* Retrieved from https://www.ncjrs.gov/pdffiles1/nij/grants/238796.pdf

Schellinck, T., & Brooks, M. (2014). Improving port effectiveness through determinance/performance gap analysis. *Maritime Policy & Management, 41*(4), 328-345. doi:10.1080/03088839.2013.809632

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Shively, M., McLaughlin, K., Durchslag, R., McDonough, H., Hunt, D., Kliorys, D., Nobo, C., Olsho, L., Davis, S., Collins, S., Houlihan, C., SAGE, Pfeffer, R., Corsi, J., & Mauch, D. (2010). *Developing a National Action Plan for Eliminating Sex Trafficking: Final Report*. Cambridge, MA: Abt Associates, Inc.

Simich, L., Goyen, L., Mallozzi, K. (2014). *Improving human trafficking victim identification: Validation and dissemination of a screening tool*. Vera Institute of Justice. Retrieved from https://www.ncjrs.gov/pdffiles1/nij/grants/246712.pdf

Small, K. M., Adams, W., Owens, C., & Roland, K. (2008). *An analysis of federally prosecuted commercial sexual exploitation of children (CSEC): Cases since the passage of the victims of trafficking and violence protection act of 2000*. Urban Institute. Retrieved from www.urban.org/research/publication/analysis-federally-prosecuted-commercial-sexual-exploitation-children-csec-cases-passage-victims-trafficking-and-violence-protection-act-2000

Smith, H. M. (2010). Sex trafficking: Trends, challenges, and the limitations of international law. *Human Rights Review*, *12*(3), 271–286. doi:10.1007/s12142-010-0185-4

Smith, L. A., Healy Vardaman, S., & Snow, M.A. (2009). The National report on domestic minor sex trafficking: America's prostituted children. Retrieved from www. sharedhope.org/wp-content/uploads/2012/09/SHI_National_Report_on_DMST_2009.pdf

Solorio, M. R., Rosenthal, D., Milburn, N. G., Weiss, R. E., Batterham, P. J., Gandara, M., & Rotheram-Borus, M. (2008). Predictors of sexual risk behaviors among newly homeless youth: A longitudinal study. *Journal of Adolescent Health, 42*, 401-409. doi:10.1037/e456032008-004

Stoltz, J. M., Shannon, K., Kerr, T., Zhang, R., Montaner, J. S., & Wood, E. (2007). Associations between childhood maltreatment and sex work in a cohort of drug-using youth. *Social Science & Medicine, 65*, 1214-1221.

Stransky,M., & Finkelhor, D. (2008). How many juveniles are involved in prostitution in the U.S.? Crimes against Children Research Center, University of New Hampshire. Retrieved form http://www.unh.edu/ccrc/pdf/CV279_Revised_Sex_Trafficking_Bulletin.pdf

Swaner, R., Labriola, M., Rempel, M., Walker, A., & Spadafore, J. (2016). *Youth involvement in the sex trade: A national study*.  Retrieved from http://www.courtinnovation.org/sites/default/files/documents/Youth%20Involvement%20in%20the%20Sex%20Trade_3.pdf

Terrell, N. E. (1997). Street life: Aggravated and sexual assaults among homeless and runaway adolescents. *Youth & Society, 28*(3), 267-290.

Texas Department of Housing and Community Affairs. (2006). *Migrant labor housing facilities in Texas: A report on the quantity, availability, need, and quality of migrant labor housing in the state*. Retrieved from https://www.tdhca.state.tx.us/migrant-housing/docs/06-MLHfacilities.pdf

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Texas Juvenile Justice Department. (2015). *Community juvenile justice appropriations, riders, and special diversion programs*. Retrieved from http://www.tjjd.texas.gov/publications/reports/AnnualReportFundingandRiders2015.pdf

Twill, S.E., Green, D.M., & Traylor, A. (2010). A descriptive study on sexually exploited children in residential treatment. *Child Youth Care Forum, 39*, 187-199.

Tyler, K. A. (2009). Risk factors for trading sex among homeless young adults. *Archives of Sexual Behavior, 38*, 290-297.

United Nations Office on Drugs and Crime. (2008). *An introduction to human trafficking: Vulnerability, impact and action*. Retrieved from http://www.unodc.org/documents/human-trafficking/An_Introduction_to_Human_Trafficking_-_Background_Paper.pdf

U.S. Department of State. (2013). *Trafficking in persons report.* Retrieved from http://www.state.gov/documents/organization/210737.pdf

U.S. Department of Housing & Urban Development, Office of Community Planning and Development. (2015). *The 2015 annual homeless assessment report (AHAR) to Congress*. Retrieved from https://www.hudexchange.info/resources/documents/2015-AHAR-Part-1.pdf

Verit . (2015). *Strengthening protections against trafficking in persons in federal and corporate supply chains*. Retrieved from https://www.state.gov/documents/organization/237137.pdf

Victims of Trafficking and Violence Protection Act of 2000, 22 U.S.C. §§ 7102 101-113 (2000).

Waugh, I. (2010). Examining the sexual harassment experiences of Mexican immigrant farmworking women. *Violence Against Women, (16)*3, 237-261. doi: 10.1177/1077801209360857

Weitzer, R. (2011). Sex trafficking and the sex industry: The need for evidence-based theory and legislation. *The Journal of Criminal Law and Criminology, 101*(4), 1337-1369.

Wheaton, E. M., Schauer, E. J., & Galli, T. V. (2010). Economics of human trafficking. *International Migration, 48*(4), 114–141. doi:10.1111/j.1468-2435.2009.00592.x

Yates, G. L., Mackenzie, R. G., Pennbridge, J., & Swoffor, A. (1991). A risk profile comparison of homeless youth involved in prostitution and homeless youth not involved. *Journal of Adolescent Health, 12,* 545-548. Texas Department of Family & Protective Services Annual Report and Data Book. Retrieved from https://www.dfps.state.tx.us/About_DFPS/Data_Books_and_Annual_Reports/

Zhang, S. X. (2012). Measuring labor trafficking: a research note. *Crime, Law and Social Change, 58*(4), 469–482. doi:10.1007/s10611-012-9393-y

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Zhang, S. X., Spiller, M. W., Finch, B. K., & Qin, Y. (2014). Estimating labor trafficking among unauthorized migrant workers in San Diego. The ANNALS of the American Academy of Political and Social Science, 653(1), 65–86. doi:10.1177/0002716213519237

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

## Appendix A: Frequently Asked Questions (FAQ)

*Are the research findings based on empirical knowledge, and how were prevalence and economic impact calculated?*

The findings were derived using a qualitative and quantitative mixed-methods approach. Primary and secondary data collection efforts, including but not limited to queries of existing databases, interviews, focus groups, and web-based surveys, were employed to quantify the prevalence and economic impact of human trafficking in Texas. Higher-than-average-risk industry and community segments are groups of people considered to be at elevated risk of trafficking because of risk indicators found in trafficking cases (e.g. homeless or runaway youth, workers in sectors that are characterized by hazardous activity or that involve low skill or migrant workers).

*Why doesn't the report simply count cases of human trafficking in Texas that are in the criminal justice system?*

Because human trafficking is an under-reported "hidden crime" whose victims are often hard to identify and reluctant to come forward, the risk-assessment approach expands our perspective beyond cases already in the law enforcement system by producing an estimate of expected levels of trafficking. The "iceberg" metaphor is used to convey the idea that reported cases of sex and labor trafficking are only a small fraction of the crime that is actually occurring. This expectation is based on empirically derived evidence that the risk of trafficking in an industry or community segment can be coupled with an assessment of the risk of victimization for an individual member of that segment.

*Could there really be 313,000 victims of trafficking in Texas?*

This initial conservative benchmark provides an opportunity for educating stakeholders and community members about the true nature of human trafficking in Texas. The perceived "invisibility" of human trafficking has led to many myths and misconceptions about the issue, including that it does not occur with high frequency or is not "our problem." From interviews with victims, we know that in most instances, trafficking victims experience episodes of victimization and are not trapped in a trafficking situation for months or years at a time. The empirical grounding behind our estimation of 313,000 victims helps dispel those misconceptions and highlights how human trafficking intersects directly with other more visible forms of sexual violence, exploitation, and commerce in Texas.

*Are there other community segments that could be included in the estimation of prevalence?*

Yes. For the initial benchmarks, however, we identified only segments that are easily quantified and mutually exclusive. For instance, the number of adult sex trafficking victims is currently unknown because of a lack of data about the size of relevant at-risk population segments. In addition, we selected the highest risk segments we could find to be able to perform estimates in the most conservative way possible. Other labor-sector examples of hard-to-estimate populations would include domestic work, begging rings, and massage parlors.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

*What went into calculation of expected economic impacts incurred by both society and trafficking victims?*

For sex trafficking victims, we used an estimate of lifetime impacts such as mental and physical health costs incurred by victims, burdens on the public health system, law enforcement expenses, consumption of shelter and associated services, and lost tax revenue. For labor trafficking victims, we used an annual estimate of lost wages.

*Why should the prevalence numbers and economic impacts contained in the report be considered "benchmarks"?*

Data and statistics on trafficking are limited and difficult to collect. Data presented here should be considered preliminary and will allow policymakers and community leaders to measure progress in their fight against trafficking in Texas, even if the scope of the crime expands in the future to include additional vulnerable population segments and economic sectors. Human trafficking is a complex crime that impacts a wide variety of survivors, traffickers, professionals, and communities. As each piece of the puzzle moves, we gain perspective on a new and different angle of the crime of human trafficking. Furthermore, elements of the crime are fluid and dynamic, resulting in continuous reconfiguration of the puzzle. This research attempts to gain better images of what the puzzle looks like when it is turned and when those pieces shift. As data related to our understanding of the economic impact and the scope of trafficking increase, so will the dimensions, descriptions, and understanding of the 3-D puzzle of trafficking as it operates in Texas.

*What are some of the biggest challenges to collecting more information about the prevalence of human trafficking in Texas?*

In addition to the learning presented thus far, we have also detailed some challenges to researching human trafficking, such as severely limited access to law enforcement data, victims continuing to slip through the cracks because identification is such a difficult issue to tackle, and the inability of professionals to quantify costs to provide care to victims and survivors of human trafficking. These challenges, among others, are not unique to Texas and will continue to guide our research activities. In other words, a key component of this work is to identify gaps and work toward better understanding *how* to fill those gaps with knowledge and understanding.

*In light of these findings, what recommendations does the study contain on how to prevent human trafficking in Texas?*

    IV.  Increase investigation and prosecution of traffickers. In general, there are several reasons that the rates of investigation and prosecution of human trafficking cases are low, including: 1) a lack of precedence and case law, 2) victim reluctance to testify, 3) a lack of institutional infrastructure, and 4) a lack of training for investigators and prosecutors on how to investigate and litigate human trafficking cases. The ultimate vision is for law enforcement to preempt strategies used by traffickers so that incidence rates of human trafficking decline. The first step toward this goal is to gain a better understanding of how to increase the success of law enforcement, including its role in the prosecution of trafficking cases. The research team is conducting a survey among prosecutors and

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

investigators of human trafficking cases to gain insights that improve outcomes on those cases. Our initial efforts focus on minor and youth sex trafficking because of the higher number of available cases.

V. <u>Identify more victims and increase our understanding of how they became victims</u>. During phase 2, the Working Group and the research team will finalize a Screening Starter Pack containing a more in-depth, validated screening tool for professionals who treat victims. Such a screening tool would include a scaled assessment of risk and allow the development of better estimates of the most vulnerable, at-risk populations.

VI. <u>Expand our understanding of traffickers themselves</u>. The methods and strategies used by traffickers, as well as their attempts to evade law enforcement, are dynamic and ever-changing; any attempt to pin down trafficker typologies must be open to continuous exploration and analysis. In this vein, the research will continue to review and refine the typologies of traffickers in operation in Texas.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

## Appendix B: Resources

Below are some useful resources for accessing policy, funding, training, and other human trafficking initiatives. This list is in no way exhaustive and inclusion on this list is not an endorsement of a specific organization or viewpoint. This list does not include social service providers in Texas and is not intended to be a directory of service providers. The intention of this list is strictly to provide additional resources for further learning.

The Abolition Seminar: www.abolitionseminar.org

Allies Against Slavery: www.alliesagainstslavery.org

The Attorney General of Texas: www.texasattorneygeneral.gov/cj/human-trafficking

Coalition of Immokalee Workers: www.ciw-online.org

Child Welfare Information Gateway through Health and Human Services Children's Bureau: https://capacity.childwelfare.gov/states/focus-areas/preventing-sex-trafficking/

Fair Food Program: www.fairfoodprogram.org

Fair Trade USA: www.fairtradeusa.org

Free the Slaves: www.freetheslaves.net

GEMS Girls Education and Mentoring Services: www.gems-girls.org

Human Trafficking Data through Texas Christian University: www.humantraffickingdata.org

Human Trafficking Index through the Human Trafficking Center at the University of Denver: http://humantraffickingcenter.org/research/human-trafficking-index/

Human Trafficking Knowledge Portal through United Nations Office on Drugs and Crime [UNODC]: www.unodc.org/cld

The Human Trafficking Pro Bono Legal Center: www.htprobono.org

Historians Against Slavery: www.historiansagainstslavery.org

International Organization for Migration: Counter-Trafficking: www.iom.int

International Labour Organization: www.ilo.org

Made in a Free World: www.madeinafreeworld.com

National Center for Missing and Exploited Children [NCMEC]: www.missingkids.org

National Guestworker Alliance: www.guestworkeralliance.org

National Human Trafficking Hotline operated by Polaris: www.humantraffickinghotline.org

Polaris: www.polarisproject.org

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

Porn Harms Research through The National Center on Sexual Exploitation [NCOSE]: www.pornharmsresearch.com

Responsible Sourcing Tool: www.responsiblesourcingtool.org

Sex + Money: A National Search for Human Worth: *Documentary*

Shared Hope International: www.sharedhope.org

Slavery Footprint: www.slaveryfootprint.org

Slavery Out of the Shadows: Spotlight on Human Trafficking: *Documentary*

Southern Poverty Law Center: www.splcenter.org

Substance Abuse and Mental Health Services Administration [SAMHSA]: www.samhsa.gov (concept of Trauma and Guidance for a Trauma-Informed Approach)

The Texas Association for the Protection of Children [TexProtects]: www.texprotects.org

Texas Association Against Sexual Assault [TAASA]: http://taasa.org/

Trafficking Victim Identification Tool [TVIT] through VERA Institute of Justice: Currently an archived report; you can locate through any search engine.

Trafficking Victims Protection Reauthorization Act of 2013: Title XII of the Violence Against Women Reauthorization Act of 2013

United Nations. (1948). Universal Declaration of Human Rights: http:/www.un.org/en/documents/udhr/

UNHCR (2008). Refugee Protection and Human Trafficking: www.unhcr.org/trafficking

UNICEF: www.unicef.org

University of North Carolina Human Trafficking Database: http://humantrafficking.unc.edu/resources/

United Nations Global Initiative to Fight Human Trafficking: www.ungift.org

Urban Institute Human Trafficking Research Portfolio: www.urban.org/policy-centers/justice-policy-center/projects/human-trafficking-research-portfolio

U.S. Department of Labor, List of Goods Produced by Child Labor or Forced Labor: www.dol.gov/ilab/reports/child-labor/list-of-goods

U.S. Department of State, Trafficking in Persons [TIP] Report: www.state.gov/g/tip/rls/tiprpt/2015

Walk Free: www.walkfree.org

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

## Appendix C: Definitions detailed in Trafficking Victims Protection Act of 2000

### Federal Anti-Trafficking Laws: Summary from National Human Trafficking Hotline

The Trafficking Victims Protection Act (TVPA) of 2000 is the first comprehensive federal law to address trafficking in persons. The law provides a three-pronged approach that includes prevention, protection, and prosecution. The TVPA was reauthorized through the Trafficking Victims Protection Reauthorization Act (TVPRA) of 2003, 2005, 2008, and 2013.

Under U.S. federal law, "severe forms of trafficking in persons" includes both sex trafficking and labor trafficking:

**Sex trafficking** is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act, in which the commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such an act has not attained 18 years of age (22 USC § 7102).

**Labor trafficking** is the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purposes of subjection to involuntary servitude, peonage, debt bondage, or slavery, (22 USC § 7102).

### Victims of Trafficking and Violence Protection Act of 2000

### SEC. 103. DEFINITIONS.

In this division:

(2) COERCION.—The term ''coercion'' means—

(A) threats of serious harm to or physical restraint against any person;

(B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

(C) the abuse or threatened abuse of the legal process.

(3) COMMERCIAL SEX ACT.—The term ''commercial sex act'' means any sex act on account of which anything of value is given to or received by any person.

(4) DEBT BONDAGE.—The term ''debt bondage'' means the status or condition of a debtor arising from a pledge by the debtor of his or her personal services or of those of a person under his or her control as a security for debt, if the value of those services as reasonably assessed is not applied toward the liquidation of the debt or the length and nature of those services are not respectively limited and defined.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

(5) INVOLUNTARY SERVITUDE.—The term ''involuntary servitude'' includes a condition of servitude induced by means of—

> (A) any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint; or

> (B) the abuse or threatened abuse of the legal process.

(8) SEVERE FORMS OF TRAFFICKING IN PERSONS.—The term ''severe forms of trafficking in persons'' means—

> (A) sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age; or

> (B) the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

(9) SEX TRAFFICKING.—The term ''sex trafficking'' means the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act.

(13) VICTIM OF A SEVERE FORM OF TRAFFICKING.—The term ''victim of a severe form of trafficking'' means a person subject to an act or practice described in paragraph (8).

(14) VICTIM OF TRAFFICKING.—The term ''victim of trafficking'' means a person subjected to an act or practice described in paragraph (8) or (9).

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

## Appendix D: DPS Offense Codes Related to Human Trafficking

**KIDNAPPING (1099)**

10990001   KIDNAPPING
10990002   AGREEMENT TO ABDUCT FROM CUSTODY
10990003   AGG KIDNAPPING RELEASE VICTIM SAFEPLACE
10990004   AGG KIDNAPPING
10990007   AGG KIDNAPPING FOR RANSOM/REWARD
10990008   AGG KIDNAPPING FOR RANSOM/REWARD SAFE RELEASE
10990009   AGG KIDNAPPING USE AS SHIELD/HOSTAGE
10990010   AGG KIDNAPPING USE AS SHIELD/HOSTAGE SAFE RELEASE
10990011   AGG KIDNAPPING FACILITATE
10990012   AGG KIDNAPPING FACILITATE SAFE RELEASE
10990013   AGG KIDNAPPING BI/SEXUAL ABUSE
10990014   AGG KIDNAPPING BI/SEXUAL ABUSE SAFE RELEASE
10990015   AGG KIDNAPPING TERRORIZE
10990016   AGG KIDNAPPING TERRORIZE SAFE RELEASE
10990017   AGG KIDNAPPING INTERFERE PERFORMANCE
10990018   AGG KIDNAPPING INTERFERE PERFORMANCE SAFE RELEASE

**SEXUAL ASSAULT (1199)**

11990001   SEXUAL ASSAULT
11990002   SEXUAL ASSAULT CHILD
11990003   AGG SEXUAL ASSAULT
11990004   AGG SEXUAL ASSAULT CHILD
11990006   AGG SEXUAL ASSAULT OF ELDERLY/DISABLED PERSON
11990008   IMPROPER RELATIONSHIP BETWEEN EDUCATOR/STUDENT
11990009   SEXUAL ASSLT PROH/PURPORT SPOUSE
11990010   SEXUAL ASSLT PROH/PURPORT SPOUSE UNDER 14YOA
11990012   SEX ABUSE OF CHILD CONTINUOUS: VICTIM UNDER 14
11990013   SEXUAL CONT/INTERCOURSE W/PERSON TYC/ST FAC

**SEX OFFENSES (36…)**

36010001   INDECENCY W/CHILD SEXUAL CONTACT
36990002   PROH SEXUAL CONDUCT
36990003   FAIL TO REPORT AGG SEXUAL ASSLT OF CHILD
36990005   SEX OFFENDERS FAILURE TO COMPLY/CIVIL
36990011   PROH OWN/OPERATE/MANAGE BUSINESS BY SEX OFFENDER
36990012   FAILURE TO REPORT FELONY W/SBI OR DEATH RESULTS
36990013   INDECENCY W/A CHILD EXPOSES
36990014   SEXUAL PERFORM CHILD EMPLOY INDUCE/AUTHORIZE
36990015   SEXUAL PERFORM CHILD PRODUCE/DIRECT/PROMOTE
36990020   PROH SEXUAL CONDUCT WITH ANCESTOR/DESCENDANT

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

36990022   ONLINE SOLICIT OF A MINOR
36990023   ONLINE SOLICITATION OF A MINOR UNDER 14
36990024   ONLINE SOLICIT OF A MINOR SEXUAL CONDUCT
36990025   SEXUAL PERF BY CHILD <14YRS EMPLOY/DIR/PROMO
36990026   SEXUAL PERF BY CHILD <14 YRS PRODUCE/DIR/PROMO
36990028   IMPROPER PHOTOGRAPHY OR VISUAL RECORDING
36990029   IMPROPER PHOTO/VIDEO BATH/DRESS RM

**OBSCENITY (37…)**
37040001   POSS OF CHILD PORNOGRAPHY
37040002   POSS W/INT TO PROMOTE CHILD PORNOGRAPHY
37040007   POSS CERTAIN VIS MAT PREV CONV
37040008   POSS CERTAIN VIS MAT 2+ CONV
37050001   PROMOTE CERTAIN VIS MAT: HARASS/PREV CONV
37050002   PROMOTE CERTAIN VIS MAT:1+ HARASS/2+ CONV
37050003   OBSCENE WHOLESALE PROMOTION
37990002   OBSCENE PROMOTE/PRODUCE/DIRECT
37990003   TECHNICIAN INTENTIONALLY FAIL TO REPORT IMAGE
37990004   SALE/DISTR/DISPLAY HARMFUL MATERIAL TO MINOR
37990005   USES MINOR SELL/DISTR/DISPLAY HARMF MATERIAL

**COMMERCIAL SEX OFFENSES (40…)**
40020003   PROMOTE PROSTITUTION
40020004   PROMOTE PROSTITUTION W/PREV CONV
40020005   PROMOTE PROSTITUTION OF < 18 YOA PERSON
40020006   AGG PROMOTION OF PROSTITUTION
40020007   AGG PROMOTION OF PROSTITUTION PERSON/S < 18YOA
40040007   COMPELLING PROSTITUTION UNDER AGE 18
40040008   COMPELLING PROST BY FORCE/THREAT/FRAUD
40040009   PROSTITUTION
40040010   PROSTITUTION WITH ONE/TWO PREV CONVIC
40040011   PROSTITUTION W/3RD OR MORE
40040014   PROSTITUTION SOLICIT PERSON < 18 YOA
40990001   ENFORCE MUNICIPAL AND COUNTY REGULATION
40990002   EMPLOY HARMFUL TO CHILDREN
40990003   EMPLOY HARMFUL TO CHILDREN < 14 YOA

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

**SMUGGLING (58…)**

| | |
|---|---|
| 58990002 | TRAFFICKING OF PERSON |
| 58990004 | TRAFFICKING A PERSON CAUSING DEATH |
| 58990005 | TRAFFIC OF PERSONS <18 PROST/FORCED LABOR |
| 58990006 | SMUGGLING OF PERSONS |
| 58990007 | SMUGGLING OF PERSONS: MONETARY GAIN |
| 58990008 | SMUGGLING OF PERSONS: SBI OR DEATH |
| 58990009 | TRAFFICKING OF PERSONS: CONTINUOUS |
| 58990010 | TRAFFICKING PERSON ENGAGE CONDUCT/SEXUAL |
| 58990011 | TRAFFICKING PERSON ENGAGE CONDUCT/SEX/BENEFIT |
| 58990012 | TRAFFICKING CHILD WITH INTENT FORCED LABOR |
| 58990013 | TRAFFICK A CHILD W/INTENT FORCED LABOR BENEFIT |
| 58990014 | TRAFFICKING CHILD ENGAGE CONDUCT/SEXUAL |
| 58990015 | TRAFFICKING CHILD ENGAGE CONDUCT/SEX/BENEFIT |

**CRIMES AGAINST PERSON (7099)**

| | |
|---|---|
| 70990045 | HARBORING RUNAWAY CHILD |
| 70990052 | UNLAWFUL RESTRAINT: EXPOSE TO SBI |
| 70990058 | UNLAWFUL RESTRAINT |
| 70990059 | UNLAWFUL RESTRAINT LESS THAN 17 YRS OF AGE |
| 70990066 | USE OF CHILD FOR SALES/SOLICITATION |

**MORALS – DECENCY CRIMES (7299)**

| | |
|---|---|
| 72990005 | ENTICING A CHILD |
| 72990017 | SALE OR PURCHASE OF CHILD |
| 72990018 | ADVERTISING PLACEMENT OF CHILD |
| 72990019 | ADVERTISING PLACEMENT OF CHILD W/PREV CONVIC |
| 72990024 | ENTICING A CHILD W/INT FELONY |
| 72990031 | SELL OR PURCHASE CHILD FOR SEXUAL PERFORMANCE |

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

## Appendix E: Secondary Sources in Support of Victimization Rate

**Youth Involvement in Sex Trade – Swaner, Labriola, Rempel, Walker, Spadafore (2016)**
Total sample size n= 949 from national study (six sites)
At some point in their lives: 80% met legal definition of trafficking*
*had a pimp or, in most cases, because they were < 18 yo when they first traded sex*
At time of interview: 32% met legal definition of trafficking
Dallas participants, n=78; 88% respondents had been arrested for a crime; 19% had been arrested for prostitution in the last year; Eligibility of participants, age range 13-24 years

**The BELL Measure of Homeless/Street Youth – McDonald, A. R., & Laser Maira, J. A. (2016)**
Total sample size n=101 from Colorado study (three suburban shelters across the Colorado front-range).
Includes youth ages 12-24 years: 28% acknowledged involvement in commercial sex*
*trading/selling sex as primary source of support, exchange of sex for a favor for a partner, trading/selling sex money, clothes, food, drugs, phones, or electronics*

**Risk factors for trading sex among homeless young adults - Kimberly A. Tyler (2009)**
Total sample size: n=151
Homeless GLB population: 29.2% who traded sex n=24
Homeless male: 11.5% who traded sex n=96
Homeless female: 20% who traded sex n=55
Homeless and have been sexually abused: 21.1% who traded sex n=71

**Prevalence and correlates of survival sex among runaway and homeless youth – Greene, Ennett, & Ringwalt (1999)**
Prevalence and correlates of survival sex among runaway and homeless youth

Street male: 28.2 %                          Shelter male: 11.1 %

Street female: 26.3%                         Shelter female: 8.3 %

Overall survival sex among shelter and street youth was 27.5%.

**Associations between childhood maltreatment and sex work in a cohort of drug-using youth - Stoltz, J.-A. M., Shannon, K., Kerr, T., Zhang, R., Montaner, J. S., & Wood, E. (2007)**
"Between September 2005 and June 2006, 361 street-involved youth were recruited into the ARYS cohort. The mean age of the sample was 22 (Interquartile range 20.3-24.1); 106 (29%) were female, and 86 (24%) were Aboriginal."
"Eighty-four (23%) of the participants reported trading sex for money or gifts at least once in their lives."

**Hepatitis B and C infections among homeless adolescents – Beech, Myers, & Beech (2002)**

"Thirty-six percent of homeless youth indicated exchanging sex for food, shelter, or drugs."

**A risk comparison of homeless youth involved in prostitution and homeless youth not involved – Yates et al. (1991)**
"Of these youth, 153 (25%) revealed to their health care providers that they were involved in prostitution at the time of visit."

**Aggravated and sexual assaults among homeless and runaway adolescents – Terrell (1997)**
Total sample: 240
"Thirty-six point six percent (male and female) of homeless youth were propositioned for sexual favors."
"Twenty point seven percent (male and female) of homeless youth were sexually assaulted."

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

## Appendix F: Gaps Analysis

**Summary**

During the summer of 2016, the Texas Slavery Mapping Project research team collaborated with the Child Sex Trafficking Team (CSTT) from the Office of the Governor's Criminal Justice Department to research the support systems available to victims and survivors of child sex trafficking. Themes arose from discussions that spanned across service systems. The Social Ecological Model (SEM) provides a framework for understanding the way in which the themes impact the overall processes of service provision. In particular, three levels of the SEM will be used to present the information: 1) Macro – policy and infrastructure, 2) Mezzo – service providers, organizations, and social institutions, 3) Micro – the individual. Themes provide a more comprehensive explanation of the infrastructure of services available to victims.

As this was a mixed-methods project, with both focus groups and individual surveys, a deeper analysis is necessary to assess depths and perspectives of all responses provided. This is a brief analysis of primary findings. Further analyses of all data will continue in order to fully assess respondents' perceptions.



© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

**Purpose**

The focus groups expanded our knowledge about professional stakeholders' perceived gaps in services that are currently available to child victims of human trafficking and exploitation. Discussion focused on challenges in investigating and prosecuting cases, emergency placement or housing challenges, geographic hot spots of trafficking (if known), and regional differences in services and identified challenges in providing services. Professionals working in the field of human trafficking identified gaps so that the CSTT can establish a request for grant applicants to fill identified gaps across the state. The Texas Slavery Mapping Project research team analyzed data collected from the focus groups to assess gaps in services and provide recommendations to the Office of the Governor around two primary research questions: What are perceived gaps in services? Where should services be placed across the state?

**Participants/Methodology**

Dates, locations, and number of participants is as follows.

| DATE | CITY | LOCATION | PARTICIPANTS |
|------|------|----------|--------------|
| June 17 | Austin | Governor's Office | 19 |
| June 27 AM | Austin | Capitol Extension | 21 |
| June 27 PM | Austin | Capitol Extension | 41 |
| June 30 | Austin | Center for Child Protection | 26 |
| | | n= | 107 |

*Regions represented:* San Antonio, Amarillo/Lubbock, Rio Grande Valley, Corpus Christi, El Paso, Houston, Dallas, Austin, and other.
*Service providers present*: State/federal association, health/medical provider, law enforcement/criminal justice, NGO/direct service provider, and other.

**Research Questions**

In order to stimulate a more detailed, empirically grounded discussion, respondents were sent a set of background questions regarding their professional experience in working with victims prior to attending the focus group. The background questions focused on direct service provision to clients. Participants were asked to submit their responses before attending focus groups in part to allow the research team to review the range of responses, but also to allow participating organizations to gather those data ahead of time. Nearly one-third of the responses were returned before the focus groups occurred. Participants were asked about specific data points, as well as reflection on services to victims. Participants were informed that, for the purpose of this discussion, a "victim" referred to a child who is trafficked who is served by their agency. The following are sample questions.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

1. How many child sex trafficking victims does your agency serve, confirm, or interact with per year?
2. How are victims identified (details about screening and identification tools, if applicable)?
3. What are your gaps in services, investigations, and prosecutions?
4. What is the estimated unit cost per victim per day used for budget planning?

Focus groups opened with presentations and the purpose of the groups. Facilitators presented topics to be reviewed, as well as research questions and information regarding the mapping project in a PowerPoint presentation before group discussion. Groups were guided by a discussion framework ranging in topics and themes. The following are sample questions and a discussion guide.

1. Regional differences – Talk "globally"; goal is to understand some geographic priorities
   - Segmented view of what you're seeing around the state
   - Differences in what?
     - Intensity of the problem – victims
     - Typologies of victims – people tell us where vulnerable populations are; indications of "hotspots" of different segments by region. Who is the victim?
     - Identification – how do you identify victims?
     - Resources - move to understanding gaps

2. Gaps in services - walk people through the resources and services delivered by organization
   a. What are you trying to do differently for human trafficking victims? E.g., how does service delivery to a runaway child who might be at low risk of human trafficking differ, if at all, to a runaway child?
      - As people say "it depends," for example, a runaway child is at higher risk of trafficking if s/he was abused at home
   b. Cost of services?
      - Unit cost/day /victim to provide holistic services?
      - What's included? What's not included?
      - What should the cost be based on what we know is or isn't included? This could be due to length of time of services or what is offered and which services are offered
      - Flipchart – an example of unit cost/day/victim

**Findings Overview**

Overall, groups stated that reliable and confirmable data were the biggest gaps in knowing, understanding, and responding to human trafficking in Texas. Housing and shelter (addressed in

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

macro) was the most discussed issue, with differing perspectives voiced about the types of shelter needed, the location of shelters (urban vs. rural), and the services provided. Misidentification of victims was the most prevalent theme across several issues faced by service providers. Regarding victim typology, respondents primarily voiced concerns about victims from foster care systems and familial trafficking, though those types were not said to be the most commonly seen in cases. Although certain types of victims have more uniform sets of needs, respondents couldn't say how they customize services for different types of victims.

Themes that arose during the discussion span several levels of system services. In particular, topics touched on the macro, mezzo, and micro levels of the Social Ecological Model (SEM) and will be presented as such in this report.

### Macro-level findings

Macro-level themes address the needs of systems. These issues are affected by local, state, or national policies, as well as funding and resources. The themes that most frequently arose were misidentification of victims, funding and availability of services, and housing and shelter.

#### *Misidentification of victims*

Not identifying human trafficking as a form of interpersonal violence was seen as problematic as it is connected to other forms of violence and may be part of a cycle of violence for both victim and perpetrator. A feature of the cycle of interpersonal violence is that not only are victims misidentified, but so are offenders. Respondents anecdotally mentioned a series of domestic violence offenders who were involved in trafficking cases, but that the criminal justice system did not have information systems capable of connecting disparate but related pieces of evidence.

The law enforcement response can affect how victims are (mis)identified depending on how resources and focus are placed. Police and sheriff departments may create a human trafficking unit, but its focus might not span all kinds of trafficking. Examples given were if pimps who regularly traffic girls or have a usual set of victims might be investigated, while the larger massage parlor or store front trafficking may be the focus of an organized crime unit. Similarly, human trafficking units might only investigate smaller cases due to limited resources. Criminalization of victims is another issue in the law enforcement response. Given that victims of sex trafficking are usually exploited in illicit terms or conditions, there is an increased chance that victims enter legal systems through a criminal act. In first engaging with law enforcement, victims are suspected of illegal activity.

#### *Funding and availability of services*

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

When working with child victims, available service provision is dependent on who is the trafficker. It is often assumed that Child Protective Services (CPS) will get involved on all cases of child endangerment, but they only have jurisdiction in cases of familial trafficking, where the trafficker is a parent or caregiver. CPS does not have jurisdiction over cases where the child's trafficker is a pimp, stranger, or someone outside of the family. In such cases, the victim is impacted by which services are available through other organizations or systems.

In instances where services are not available due to location, lack of funding, immigration status, or non-trafficking specific options, victims are often moved and their long-term care suffers. Service providers state that even when case management is available, victims may not stay in the location of identification and rescue. If a victim is moved out-of-county, to a rural area, or even out of state then the work, effort, rapport, and service initiation is void.

Respondents mentioned a lack of funding but a real need for forensic services including forensic exams and interviews. It was suggested that a well-trained forensic interviewer record such interviews in order to train others, such as is done with child sexual assault victims. A lack of testing, treatment, and care of sexually transmitted infections was also mentioned.

### Housing and shelter

Perhaps the more immediate need addressed was housing for victims. Respondents mentioned little to no availability of short-term "safe houses" for victims of trafficking overall, and for child sex trafficking victims in particular. Once identified, victims do not have an initial place to go where they will be safe and where service providers can follow up with long-term care. For the few safe houses in existence in Texas, sustainability is an issue; the services are not helpful if the organizations close down. Respondents stated that this might be due to funding, as they stated that most availability of federal funding is for adults, not children.

Shelters and services meant for victims of domestic violence and sexual assault are increasingly seeing emergency placements, but those facilities often have little understanding of the situations or best practices in working with victims of trafficking, and very little support for servicing child sex trafficking victims in particular. Similarly, victims of child sex trafficking who are also foster kids, kids leaving the juvenile criminal justice system, or kids who have been arrested, often face confounded issues of shelter placement and a lack of funding for proper housing.

Though this need was mentioned often, specifics and priorities for the components of housing were lacking in discussion from respondents. Services offered at safe houses or shelters were discussed generally, but suggestions for which services or how they were offered at shelters were not given. Respondents did not have a general consensus on whether shelters should or should not be locked down.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

### Mezzo-level findings

Mezzo-level themes address the needs of the respondents, who were legal, medical, and social service providers. These issues deal with understanding victim needs and the development of services that impact the service provision processes and organizations. The themes that arose most often were training and burnout of the workforce.

### *Training*

Several of the aforementioned themes addressed the need for training on how those issues affect service provision and impact victims. Overall, respondents felt that uniform training was lacking. Specifics and examples given were the following.

- Training for prosecution, especially for juvenile justice cases, is rare. Respondents stated that kids in the system tend to be stigmatized and may not have a standard face of victimology saying, "Delinquent youth don't have the face of what prosecutors think of as a good witness." Standard training for prosecution is needed on a statewide level and should, perhaps, even be mandatory. Judges also need to be included in uniform training and coordinated efforts in assisting victims.
- Healthcare professionals receive a lot of training and may be familiar with sexual assault, but not other types of violence; they may not understand the subtle indicators of sex trafficking. Without such training, opportunities for identification and effective care are slipping by.
- On top of uniform training, a centralized referral process is needed. There is a lack of coordinated efforts and a strong, established system of care and services.
- Service providers discussed hearing indicators of labor trafficking among potential sex trafficking victims. The need for and the importance of understanding broader exploitation and the intersection of sex and labor trafficking were addressed. Examples given were travelling sales crews being exploited for both labor and commercial sex.

### *Burnout and the workforce*

A theme arising from metadata was burnout of the workforce, which was, though not explicitly addressed, discussed in terms of secondary trauma. Members of the research team stated hearing indicators of secondary trauma, burnout, and the need to retain a competent and experienced workforce. Respondents indicated being traumatized by the work and, as a result, professionals leaving the field. In other cases, respondents shared about working in their field, but may not have realized their own secondary trauma in connection with their cases. In sharing, respondents indicated having difficulty in screening all types of victims of human trafficking and being able to define them, while providing competent services and being able to evaluate those services. Recruiting competent professionals, retaining an experienced workforce, and identification of

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

secondary trauma and burnout are necessary in order to care for service providers, while providing the best care for victims.

### Micro-level findings

Micro-level themes address the needs of victims. These are issues that impact the individual. The theme which most arose was victim-centered approaches in the service provision processes.

#### *Victim-centered approaches*

Discussion of services revealed general agreement that victim assistance and service processes need to be more trauma-informed and culturally grounded. The victims and their needs, which are not limited to the trafficking experience, should to be at the center of these processes and solutions. The following are some examples mentioned of this lack of trauma-informed and culturally grounded care.

- Child sexual abuse separate from the sex trafficking experience is often seen as a causal relationship. Service providers stated that there is a correlation with their clients, but do not see it as causation. They stated, however, that there is a causal relationship between running away and being trafficked, since traffickers seek out vulnerable kids in the streets.
- Gaps exist across the life span and among different communities since developmental stages, gender, and sexual orientation may relate to resources that are available and stigmas that may apply. Without considering how these factors intersect and impact the client during the service processes, providers risk doing more harm.
- Translation continues to be an issue in service provision, especially with law enforcement, since they generally do not have the ability to fund a translation service or are responding to an emergency/crisis with limited time.

Gaps in service provision collectively contribute to the vulnerability and recidivism of victims and negatively affect their rescue and recovery processes.

## Implications for Research

While the CSTT has identified initial priorities to build capacity, more research and analysis is necessary to continue to learn about the unmet needs of victims and service providers. There are 36 sets of responses to the background questions that were sent by invited participants. The human trafficking research team will continue reviewing and coding the data for a more detailed analysis of emerging themes. Also, the large size of the focus groups complicated a streamlined discussion and analysis of the results. Additional analysis of the responses to background questions may help clarify the findings covered in this report. For instance, further analysis of housing and shelter needs are necessary as we have learned that shelter is a need. But an

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

appropriate shelter for trafficking victims must be more than a safe house in order to fully offer effective and long-term care for victims. Continuation of the discussion with participants is also necessary in order to follow-up on the themes discussed here and those that will arise from the responses to the background questions. Field visits with respondents in different regions of Texas will be planned for more in-depth and mixed-methods surveys in order to address this need.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

## Appendix G: Research on Minor and Youth Sex Trafficking

| Typologies | Title | Population Size from Data | Population being Described | Research to support connection to human trafficking |
|---|---|---|---|---|
| Child Abuse/Maltreatment | Child Maltreatment Annual Report | 252,773 | Children who received an investigation for maltreatment in Texas | Knight, S. (2002). CHILDREN ABUSED THROUGH PROSTITUTION. *Emergency Nurse, 10*(4), 27. |
| Child Abuse/Maltreatment | | 290,471 | Children, alleged victims in CPS care | |
| Child Abuse/Maltreatment | | 65,334 | Child Victims | |
| Child Abuse/Maltreatment | | 5,591 | Child Victims with an alcohol abuse caregiver risk factor | Countryman-Roswurm and Bolin (2014) http://link.springer.com/article/10.1007/s10560-014-0336-6 |
| Child Abuse/Maltreatment | NCA CAC National Statistics | 165,703 | Number of children served at Children's Advocacy Centers January - June | Countryman-Roswurm and Bolin (2014) http://link.springer.com/article/10.1007/s10560-014-0336-6 |
| Child Abuse/Maltreatment | NCA CAC National Statistics | 110,454 | Children reported sexual abuse | Shively, M., McLaughlin, K., Durchslag, R., McDonough, H., Hunt, D., Kliorys, D., Nobo, C., Olsho, L., Davis, S., Collins, S., Houlihan, C., SAGE, Pfeffer, R., Corsi, J., & Mauch, D. (2010). "Developing a National Action Plan for Eliminating Sex Trafficking: Final Report." Cambridge, MA: Abt Associates, Inc. |
| Child Abuse/Maltreatment | NCA CAC National Statistics | 32,511 | Children reported physical abuse | Knight, S. (2002). Children abused through prostitution. Emergency Nurse,10(4), 27-30. doi:10.7748/en2002.07.10.4.27.c1069 |
| Child Abuse/Maltreatment | NCA CAC National Statistics | 15,135 | Children served at a CAC in Texas | |
| Child Abuse/Maltreatment | NCA CAC National Statistics | 11,317 | Children with reported sexual abuse in Texas | |
| Child Abuse/Maltreatment | Sexual Violence Report | 14,367 | Teens ages 15 to 19 who sought medical treatment at a hospital for sexual assault | Knight, S. (2002). Children abused through prostitution. Emergency Nurse,10(4), 27-30. doi:10.7748/en2002.07.10.4.27.c1069 |
| Child Abuse/Maltreatment | CPS: Alleged and Confirmed Victims of Child Abuse/Neglect | 66,572 | Confirmed victims | |
| Child Abuse/Maltreatment | CPS: Alleged and Confirmed Victims of Child Abuse/Neglect | 206,519 | Unconfirmed victims | |
| Child Abuse/Maltreatment | Confirmed Allegations of Child Abuse/Neglect by Type of Abuse | 5,563 | Confirmed allegations of sexual abuse | Reid, J. A., & Piquero, A. R. (2013, December 22). Age-graded risks for commercial sexual exploitation of male and female youth. Journal of Interpersonal Violence, 29(9), 1747-1777. doi:10.1177/0886260513511535 |

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

| Child Abuse/Maltreatment | Confirmed Allegations of Child Abuse/Neglect by Type of Abuse | 51,197 | Confirmed allegations of neglectful supervision | Reid, J. A., & Piquero, A. R. (2013, December 22). Age-graded risks for commercial sexual exploitation of male and female youth. Journal of Interpersonal Violence, 29(9), 1747-1777. doi:10.1177/0886260513511535 |
|---|---|---|---|---|
| Foster Youth | CPS: Children in Foster Care During Fiscal Year | 31,176 | Children in foster care | Edberg, M. C., Gies, S. V., Cohen, M. I., & May-Slater, S. (2014). TRAJECTORIES OF INVOLVEMENT IN COMMERCIAL SEX EXPLOITATION AND DOMESTIC TRAFFICKING OF GIRLS AND YOUNG WOMEN: SELECTED QUALITATIVE RESULTS FROM AN EVALUATION STUDY. Journal Of Ethnographic & Qualitative Research, 9(2), 89-110. |
| Foster Youth | Child Maltreatment Annual Report | 17,357 | Children entering foster care | Edberg, M. C., Gies, S. V., Cohen, M. I., & May-Slater, S. (2014). TRAJECTORIES OF INVOLVEMENT IN COMMERCIAL SEX EXPLOITATION AND DOMESTIC TRAFFICKING OF GIRLS AND YOUNG WOMEN: SELECTED QUALITATIVE RESULTS FROM AN EVALUATION STUDY. Journal Of Ethnographic & Qualitative Research, 9(2), 89-110. |
| Foster Youth | Child Maltreatment Annual Report | 16,420 | Children exiting foster care | |
| Foster Youth | Numbers of Children In Foster Care on September 30th, by State FY 2005–FY 2014 | 30,358 | Children in foster care in Texas | |
| Foster Youth | Annual Reports and Data Books | 290,471 | Children, Alleged Victims | Edberg, M. C., Gies, S. V., Cohen, M. I., & May-Slater, S. (2014). TRAJECTORIES OF INVOLVEMENT IN COMMERCIAL SEX EXPLOITATION AND DOMESTIC TRAFFICKING OF GIRLS AND YOUNG WOMEN: SELECTED QUALITATIVE RESULTS FROM AN EVALUATION STUDY. Journal Of Ethnographic & Qualitative Research, 9(2), 89-110. |
| Foster Youth | Annual Reports and Data Books | 40,318 | Confirmed risk assessment finding of completed child abuse/neglect investigations | Edberg, M. C., Gies, S. V., Cohen, M. I., & May-Slater, S. (2014). TRAJECTORIES OF INVOLVEMENT IN COMMERCIAL SEX EXPLOITATION AND DOMESTIC TRAFFICKING OF GIRLS AND YOUNG WOMEN: SELECTED QUALITATIVE RESULTS FROM AN EVALUATION STUDY. Journal Of Ethnographic & Qualitative Research, 9(2), 89-110. |
| Foster Youth | Annual Reports and Data Books | 16,378 | TOTAL CHILDREN IN FOSTER CARE | |
| Foster Youth | Annual Reports and Data Books | 21,969 | Risk Indicated of Completed Child Abuse/Neglect Investigations | Walker, Kate. (2013). California Child Welfare Council. . Ending the Commercial Sexual Exploitation of Children: A Call for Multi-System Collaboration in California. Available at: http://www.chhs.ca.gov/Child%20Welfare/Ending%20CSEC%20-%20A%20Call%20for%20Multi-System%20Collaboration%20in%20CA%20-%20February%202013.pdf |
| Foster Youth | The Adoption and Foster Care Analysis and Reporting System (AFCARS) | 415,129 | Children in foster care in 2014 | |
| Foster Youth | The Adoption and Foster Care Analysis and Reporting System (AFCARS) | 60,898 | Number of children waiting to be adopted whose parental rights (for all living parents) were terminated | Child Welfare Information Gateway. (2015). Child welfare and human trafficking. Washington, DC: U.S. Department of Health and Human Services, Children's Bureau. |

| | | | | |
|---|---|---|---|---|
| Foster Youth | The Adoption and Foster Care Analysis and Reporting System (AFCARS) | 364,746 | Number of children who entered foster care during 2014 | |
| Foster Youth | The Adoption and Foster Care Analysis and Reporting System (AFCARS) | 4,544 | Children in foster care whose most recent placement setting is "Runaway" | Finkelstein, M., Warnsley, M., Curry, D., & Miranda, D. (2004). Youth who chronically AWOL from foster care: Why they run, where they go, and what can be done (Rep.). Retrieved http://archive.vera.org/sites/default/files/resources/downloads/Foster_AWOLs.pdf |
| Foster Youth | Archive of Regional Statistical Information About Children in DFPS Care | 1,668 | Foster children living in residential treatment facilities in Texas in 2016 | Walker, Kate. (2013). California Child Welfare Council. . Ending the Commercial Sexual Exploitation of Children: A Call for Multi-System Collaboration in California. Available at: http://www.chhs.ca.gov/Child%20Welfare/Ending%20CSEC%20-%20A%20Call%20for%20Multi-System%20Collaboration%20in%20CA%20-%20February%202013.pdf |
| Foster Youth | Archive of Regional Statistical Information About Children in DFPS Care | 765 | Foster children living in an emergency shelter in Texas in 2016 | |
| Foster Youth | Archive of Regional Statistical Information About Children in DFPS Care | 28 | Foster children living in Independent living status in Texas in 2016 | |
| Foster Youth | Numbers of Children Entering Foster Care by State | 17,357 | Numbers of children entering Foster Care in Texas in 2014 | Linda a. Smith et al., Shared Hope Int'l, The National Report on Domestic Minor Sex Trafficking: America's Prostituted Children 4 (2009), available at http://sharedhope.org/wp-content/uploads/2012/09/SHI_National_Report_on_DMST_2009.pdf |
| Foster Youth | Numbers of Children Exiting Foster Care by State | 16,420 | Number of children exiting foster care in Texas in 2014 | |
| Foster Youth | Foster Care FY2003-FY2011 Entries, Exits, and Numbers of Children In Care on the Last Day of Each Federal Fiscal Year | 16,903 | Number of children entering foster care in Texas in 2011 | |
| Foster Youth | Foster Care FY2003-FY2011 Entries, Exits, and Numbers of children In Care on the Last Day of Each Federal Fiscal Year | 15,717 | Number of children exiting foster care in Texas in 2011 | |

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

| | | | | |
|---|---|---|---|---|
| Foster Youth | Intercountry Adoption Statistics | 392 | Total adoptions in Texas in 2015. | |
| Foster Youth | Children in Foster Care | 30,427 | Number of children in foster care in 2015. | |
| Foster Youth | 2015 Annual Report and Data Book | 24,097 | Number of youth who received services for at risk youth | |
| Homeless | The Annual Homeless Assessment Report (AHAR) to Congress | 1,416 | Homeless unaccompanied youth under 25 in Texas | Chester, H., Lummert, N., & Mullooly, A. (2015). Child victims of human trafficking: Outcomes and service adaptation within the U.S. unaccompanied refugee minor programs (Rep.). |
| Homeless | The Annual Homeless Assessment Report (AHAR) to Congress | 797 | Sheltered homeless unaccompanied youth under 25 in Texas | Halcon, L. L., & Lifson, A. R. (2004, February). Prevalence and predictors of sexual risks among homeless youth. *Journal of Youth and Adolescence, 33*(1), 71-80. |
| Homeless | The Annual Homeless Assessment Report (AHAR) to Congress | 619 | Unsheltered homeless youth in Texas | Halcon, L. L., & Lifson, A. R. (2004, February). Prevalence and predictors of sexual risks among homeless youth. Journal of Youth and Adolescence, 33(1), 71-80. |
| Homeless | 2015 Point-In-Time Count | 932 | Children experiencing homelessness in Texas | Ferguson, K. M., Bender, K., Thompson, S., Xie, B., & Pollio, D. (2011). Correlates of street-survival behaviors in homeless young adults in four U.S. Cities. American Journal of Orthopsychiatry, 81(3), 401-409. doi:10.1111/j.1939-0025.2011.01108.x |
| Homeless | 2015 Point-In-Time Count | 4,197 | People experiencing homelessness in Texas | |
| Homeless | How Many Homeless Youth Are In America? | 1.3 - 1.7 million | Youth experience one night of homelessness | Solorio, M. R., Rosenthal, D., Milburn, N. G., Weiss, R. E., Batterham, P. J., Gandara, M., & Rotheram-Borus, M. (2008, September 23). Predictors of sexual risk behaviors among newly homeless youth: A longitudinal study. Journal of Adolescent Health, 42, 401-409. doi:10.1037/e456032008-004 |
| Homeless | How Many Homeless Youth Are In America? | 550,000 | Youth being homeless for a week or longer | Solorio, M. R., Rosenthal, D., Milburn, N. G., Weiss, R. E., Batterham, P. J., Gandara, M., & Rotheram-Borus, M. (2008, September 23). Predictors of sexual risk behaviors among newly homeless youth: A longitudinal study. *Journal of Adolescent Health, 42*, 401-409. doi:10.1037/e456032008-004 |
| Homeless | NISMART | 1,682,900 | Runaway or throwaway episodes nationally | |
| Homeless | NISMART | 285,400 | children who were victims of a sexual assault | |
| Homeless | America's Youngest Outcasts: A Report Card on Child Homelessness | 2,483,539 | Children homeless annually in the U.S. | Ferguson, K. M., Bender, K., Thompson, S., Xie, B., & Pollio, D. (2011). Correlates of street-survival behaviors in homeless young adults in four U.S. Cities. American Journal of Orthopsychiatry, 81(3), 401-409. doi:10.1111/j.1939-0025.2011.01108.x |
| Homeless | America's Youngest Outcasts: A Report Card on Child Homelessness | 190,018 | Homeless children in Texas 2012-13. | |

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

| | | | | |
|---|---|---|---|---|
| Homeless | The State of Homelessness in America | 36,907 | Homeless unaccompanied youth and children in the U.S. | Ferguson, K. M., Bender, K., Thompson, S., Xie, B., & Pollio, D. (2011). Correlates of street-survival behaviors in homeless young adults in four U.S. Cities. American Journal of Orthopsychiatry, 81(3), 401-409. doi:10.1111/j.1939-0025.2011.01108.x |
| Homeless | The State of Homelessness in America | 1,416 | Homeless unaccommpanied children and youth in 2015 | |
| Homeless | The State of Homelessness in America | 586 | Homeless unsheltered children and youth in 2015 | |
| Homeless | Prevalence and Correlates of Survival Sex Among Runaway and Homeless Youth | 28% of Street youths and 10% of shelter youths | Homeless youth | Ferguson, K. M., Bender, K., Thompson, S., Xie, B., & Pollio, D. (2011). Correlates of street-survival behaviors in homeless young adults in four U.S. Cities. American Journal of Orthopsychiatry, 81(3), 401-409. doi:10.1111/j.1939-0025.2011.01108.x |
| Homeless | High-risk behaviors among male street youth in Hollywood, California | 27.1% of male street youth | Homeless male youth in California | |
| Juvenile Justice | Community Juvenile Justice Appropriations, Riders and Special Diversion Programs | 27,729 | Juveniles ended their probation or deferred prosecution supervision | Salisbury, E. J., Dabney, J. D., & Russell, K. (2014). Diverting Victims of Commercial Sexual Exploitation From Juvenile Detention: Development of the InterCSECt Screening Protocol. Journal of Interpersonal Violence, 30(7), 1247-1276. doi:10.1177/0886260514539846 |
| Juvenile Justice | Community Juvenile Justice Appropriations, Riders and Special Diversion Programs | 30,056 | Juveniles began deferred prosecution/probation | Hammer, H., Finkelhor, D., Sedlak, A. J., & Porcellini, L. E. (2002, October). National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children: National Estimates of Missing Children: Selected Trends, 1988-1999. PsycEXTRA Dataset. doi:10.1037/e401072005-001 |
| Juvenile Justice | Community Juvenile Justice Appropriations, Riders and Special Diversion Programs | 62,535 | Formal referrals to juvenile probation depts | |
| LGBTQ | Surviving the Streets of New York: Experiences of LGBTQ Youth, YMSM, and YWSW Engaged in Survival Sex | | Homeless LGBTQ youth engaged in commecial sex in New York City | |
| Runaway | Crisis Hotline and Online Service Statistics | 4,080 | calls to the National Runaway Safeline from Texas | |

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

| | | | | |
|---|---|---|---|---|
| Runaway | Key Facts | 11,800 | Endangered runaways reported to NCMEC | |
| Runaway | NCIC Missing Person | 634,908 | Records entered of missing persons | Hammer, H., Finkelhor, D., Sedlak, A. J., & Porcellini, L. E. (2002, October). National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children: National Estimates of Missing Children: Selected Trends, 1988-1999. PsycEXTRA Dataset. doi:10.1037/e401072005-001 |
| Runaway | NCIC Missing Person | 300,044 | Missing persons coded as Runaways | Hammer, H., Finkelhor, D., Sedlak, A. J., & Porcellini, L. E. (2002, October). National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children: National Estimates of Missing Children: Selected Trends, 1988-1999. PsycEXTRA Dataset. doi:10.1037/e401072005-001 |
| Runaway | Child Victims of Stereotypical Kidnappings Known to Law Enforcement in 2011 | 105 | children who were victims of stereotypical kidnappings | Hammer, H., Finkelhor, D., Sedlak, A. J., & Porcellini, L. E. (2002, October). National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children: National Estimates of Missing Children: Selected Trends, 1988-1999. PsycEXTRA Dataset. doi:10.1037/e401072005-001 |
| Typologies | Child Welfare Information Gateway | * | * | |
| Typologies | Youth Involvement in the Sex Trade | 4,457-20,994 | Prevalence estimates for underage youth in the sex trade | |
| Typologies | Youth Involvement in the Sex Trade | 434-2,044 | Texas prevalence estimates for underage youth in the sex trade | |
| Typologies | Youth Involvement in the Sex Trade | 13 | Average age of first sexual experience | |
| Typologies | Youth Involvement in the Sex Trade | 15 | Average age they left home | |
| Typologies | Youth Involvement in the Sex Trade | 16 | Average age first sold sex | |
| Typologies | Youth Involvement in the Sex Trade | $190 | Average amount charged at last customer | |
| Typologies | Youth Involvement in the Sex Trade | 96 | Prostitution arests in Texas in 2009 | |
| Unauthorized Population | Profile of the Unauthorized Population: Texas | 834,000 | U.S. citizen children with unauthorized immigrant parents in Texas from 2009-2013 | |
| Unauthorized Population | Profile of the Unauthorized Population: Texas | 81,000 | Unauthorized child population ages 3 to 12 | |
| Unauthorized Population | Profile of the Unauthorized Population: Texas | 73,000 | Enrolled in school | |

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

| Unauthorized Population | Profile of the Unauthorized Population: Texas | 8,000 | Not enrolled in school | |
|---|---|---|---|---|

## Appendix H: Research on Labor Trafficking

| Category | Title | Population Size from Data | Population being Described |
|---|---|---|---|
| Border | Border Crossing/Entry Data: Query Detailed Statistics | 38,313,972 | Number of personal vehicle passengers crossing the Texas Mexico borders through Texas ports from January-July |
| Cleaning Services | Occupational Employment and Wages, May 2015: 37-2012 Maids and Housekeeping Cleaners | 66,400 | Maids and housekeeping cleaners in Texas |
| Cleaning Services | Occupational Employment and Wages, May 2015: 37-2011 Janitors and Cleaners, Except Maids and Housekeeping Cleaners | 167,210 | Janitors and cleaners in Texas |
| Construction | Occupational Employment and Wages, May 2015: 47-2061 Construction Laborers | 101,250 | Construction laborers in Texas |
| Drop-out | Secondary School Completion and Dropouts in Texas Public Schools, 2012-13 | 192 | Immigrant dropouts from Texas public schools grades 9-12 |
| Drop-out | Secondary School Completion and Dropouts in Texas Public Schools, 2012-13 | 1,462 | English language learner dropouts from Texas public schools grades 9-12 |
| Drop-out | Secondary School Completion and Dropouts in Texas Public Schools, 2012-13 | 34,696 | Students who dropped out of school grades 7-12 in 2012-13 |
| Drop-out | Secondary School Completion and Dropouts in Texas Public Schools, 2012-13 | 22,856 | Students who dropped out of school who were economicaly disadvantages in 2012-13 |
| Farmworkers | Occupational Employment and Wages, May 2015: 45-2092 Farmworkers and Laborers, Crop, Nursery, and Greenhouse | 5,850 | Farmworkers and laborers, crop, nursery, and greenhouse workers in Texas |
| Farmworkers | Migrant Labor Housing Facilities in Texas: A Report on the Quantity, Availability, Need, and Quality of Migrant Labor Housing in the State | 132,034 | Migrant farmworkers in Texas |
| Farmworkers | The National Agricultural Workers Survey | | |
| Farmworkers | Summary by Tenure of Principal Operator and by Operators on Farm | 965 | Number of farms with 5 or more operators on the farm |
| Farmworkers | Summary by Legal Status For Tax Purposes | 11,736 | farms registered under state law out of 16,660 total farms in Texas |
| Forced Labour | Profits and Poverty: The Economics of Forced Labour | 20.9 million | Forced labourers |
| Forced Labour | Profits and Poverty: The Economics of Forced Labour | 18.7 million | Individuals exploited in the pricate economy, by individuals or enterprises |
| Forced Labour | Profits and Poverty: The Economics of Forced Labour | 4.5 million | Victims of forced sexual exploitation |
| Forced Labour | Profits and Poverty: The Economics of Forced Labour | 14.2 million | Victims of forced labour exploitation |
| Forced Labour | Profits and Poverty: The Economics of Forced Labour | 2.2 million | Victims of state-imposed forms of forced labour (prisons or military forces) |
| Forced Labour | Profits and Poverty: The Economics of Forced Labour | 1 million | Number of forced labour exploitation victims in developed economies & EU |

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence and Sexual Assault*

| | | | |
|---|---|---|---|
| Kitchen Workers in Restaurants | Occupational Employment and Wages, May 2015: 35-2014 Cooks, Restaurant | 91,470 | Cooks in Texas |
| Kitchen Workers in Restaurants | Occupational Employment and Wages, May 2015: 35-9021 Dishwashers | 36,910 | Dishwashers in Texas |
| Kitchen Workers in Restaurants | Occupational Employment and Wages, May 2015: 35-2021 Food Preparation Workers | 62,010 | Food prep workers in Texas |
| Labor Visas | Office of Foreign Labor Certification Annual Report 2014 | 2,511 | H2A Visa positions vertified in Texas |
| Landscaping and Groundskeeping Workers | Occupational Employment and Wages, May 2015: 37-3011 Landscaping and Groundskeeping Workers | 63,050 | Landscaping and groundskeeping workers in Texas |
| Migrant farmworkers | Migrant and Seasonal Farmworker Demographics | 362,724 | Number of migrant and seasonal farmworkers and their dependents in Texas |
| Nail Salon Workers | Occupational Employment and Wages, May 2015: 39-5092 Manicurists and Pedicurists | 2,310 | Manicurists and pedicurists in Texas |
| Nonimmigrant visas | Immigrant and Nonimmigrant Visas Issued at Foreign Service Posts: Fiscal Years 2011-2015 | 10,891,745 | Nonimmigrant visas issued in 2015 |
| Nonimmigrant visas | Immigrant and Nonimmigrant Visas Issued at Foreign Service Posts: Fiscal Years 2011-2015 | 10,909 | Ambassador, public minister, career diplomat, consul, and immediate family visas issued in 2015 |
| Nonimmigrant visas | Immigrant and Nonimmigrant Visas Issued at Foreign Service Posts: Fiscal Years 2011-2015 | 1,203,876 | B1/B2/Border Crossing Cards issued at foreign service posts in 2015 |
| T-Visas and U-Visas | Number of I-918 Petitions for U Nonimmigrant Status | 10,026 | Number of I-918 petitions for U nonimmigrant status that were approved victims of criminal activities |
| T-Visas and U-Visas | Number of I-918 Petitions for U Nonimmigrant Status | 2,715 | Number of I-918 petitions for U nonimmigrant status that were denied victims of criminal activities |
| T-Visas and U-Visas | Number of I-918 Petitions for U Nonimmigrant Status | 7,662 | Number of I-918 petitions for U nonimmigrant status that were approved for family members |
| T-Visas and U-Visas | Number of I-918 Petitions for U Nonimmigrant Status | 1,965 | Number of I-918 petitions for U nonimmigrant status that were denied for family members |
| T-Visas and U-Visas | Number of I-914 Applications for T Nonimmigrant Status | 811 | Number of I-914 applications for T nonimmigrany status for victims of trafficking  Oct 2014-June 2015 |
| Undocumented Immigrants | Profile of the Unauthorized Population: Texas | 222,000 | Unauthorized immigrant families below 50% of the poverty level |
| Undocumented Immigrants | Profile of the Unauthorized Population: Texas | 226,000 | Civilian employed construction workers ages 16 and older |

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence & Sexual Assault*

**Appendix I: Hierarchy of Information Needs: Victims**



Modeled after DIKW Pyramid, Zeleny & Ackoff

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence & Sexual Assault*

*Suspicion of Victimization (Screening)*

a.    New cases – Brief intake or screening tool that can be utilized before employing a more in-depth screener.

b.    Historical cases – Assessment might be made based on contextual clues included in the structured fields of case management system or narrative notes.

*Identification – Confirmation or more detailed characterization of victimization (Screening)*

a.    New cases – Trafficking screening tool that collects standardized data on victims; forensic interview by trained professional.

b.    Historical cases – Assessment might come from referrals made for services, involvement of LE, etc.

*Demographics*

a.    Age, gender identity, sexual orientation

b..    Educational background

c..    Country of origin

d.     Some measure or measures of socioeconomics

e.    Location of family home or home where they last received care

*History of Victimization*

a.    Events, circumstances, choices, attitudes

b.    Relationship to perpetrator

c.     Length of time

*Needs*

a.    Interest in and/or desire for services, including short-term aid associated with trauma, as well as services to aid in escape and recovery.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence & Sexual Assault*

## Appendix J: IDVSA History

**IDVSA and Human Trafficking**

IDVSA's involvement in human trafficking was an organic progression. There is a tendency to silo violence into separate and distinct categories, but the strategies employed by traffickers are very similar to those of perpetrators of interpersonal violence (IPV). So it should come as no surprise that IDVSA's research focus on IPV and work with immigrant populations would naturally lead the organization to a more active role in the area of human trafficking, both in terms of community engagement and in formal research.

**Community Engagement**

**Central Texas Coalition Against Human Trafficking and Allies Against Slavery.**

The first known case of human trafficking in Austin occurred in 2003 and involved three immigrant girls from Mexico forced into prostitution. The city's response to that first case highlighted a lack of community resources available for human trafficking victims, as well as the need for better collaboration between social service agencies and law enforcement.

In response, community leaders led an effort to bring multi-disciplinary professionals together around the issue of human trafficking. This group included IDVSA staff members Drs. Noël Busch-Armendariz and Laurie Cook Heffron, and would eventually become the Central Texas Coalition Against Human Trafficking (CTCAHT). In 2004, CTCAHT was awarded a grant from the U.S. Department of Justice, Office for Victims of Crime. Refugee Services of Texas became the Chair of the Central Texas Coalition Against Human Trafficking and acted as a subcontractor responsible for providing services to victims of human trafficking. IDVSA staff regularly attended monthly meetings and were heavily involved in coalition efforts.

For several years after its formation, concerned citizens would contact the coalition inquiring as to how they could assist in the community's efforts against human trafficking. Continued interest and engagement by community organizations, faith groups, and university students lead to a new grassroots effort in 2010.

Spearheaded by a number of coalition members including Dr. Laurie Cook Heffron, a monthly community advocacy group on human trafficking was launched, only this time meetings were open to anyone in the general public. These first unstructured meetings would later evolve into the non-profit, Allies Against Slavery. Initially envisioned as the fundraising and implementation arm of the coalition, Allies has become a non-profit 501(c)(3) organization with advocacy, education and activism programs throughout the community.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence & Sexual Assault*

**Expert Witness Training**

Multiple IDVSA staff members have experience providing written and oral testimony as expert witnesses in cases involving interpersonal violence, including human trafficking. Beginning in 2004, IDVSA started providing trainings to the larger community around expert witness testimony. IDVSA provides education for prosecutors in Texas and across the country on domestic violence, sexual assault, and stalking, and how to utilize experts on these topics. To social workers, counselors, or similar professionals IDVSA offers training that includes the role of an expert witness, qualifying as an expert witness, and tips to improve oral and written testimony. In 2015, IDVSA added an additional training program for social work professionals providing testimony in immigration cases.

**Academic Efforts – Research and Educational Initiatives**

At the same time IDVSA was helping shape the community's response to human trafficking, the Institute also began to broaden its research efforts to include a more focused look at the subject. This included a program evaluation of services and CTCAHT coalition operation for Refugee Services of Texas, as part of a direct grant RST received from the Office of Victims of Crime in 2006. This research effort gathered information from service providers and law enforcement professionals, as well as victims of human trafficking around barriers, services needed, services used, and coalition operations. *Survivors Speak Out* was a phase II effort that took a more in-depth look at the services available to victims of human trafficking at RST.

In 2008, IDVSA published *Human Trafficking in Texas: A Statewide Evaluation of Existing Laws and Social Services.* The study was funded by the Office of the Attorney General and the Health and Human Services Commission, and assessed current laws and services and unmet needs.

IDVSA has also conducted a literature review and analysis of information from prosecuted cases to explore and better understand typologies of traffickers. In *Understanding Human Trafficking: Development of Typologies of Traffickers, Phase I and Phase II*, the Institute developed four working typologies of traffickers. While these working typologies can be useful to those involved in prevention or prosecution of these crimes, they stressed the dynamic nature of the methods employed by traffickers, which calls for continued investigation into this field.

In 2009, IDVSA staff member Karen Kalergis published *A Passionate Practice*, which was an in-depth look at three different women involved in service provision to commercially sexually exploited teenagers. It discusses their personal experiences working in the field of commercial sexual exploitation of children and compares it to the early days of working in the area of domestic violence.

In addition to these publications, IDVSA has assisted in the creation and teaching of a University of Texas at Austin signature course on human trafficking for undergraduate students, and has supported student thesis work that intersects with human trafficking. Dr. Cook Heffron's dissertation research looked at the larger issue of violence against migrating women, including a look at human trafficking within this population. IDVSA developed a research fellow program in 2011, offering research fellow positions in human trafficking for undergraduate and graduate students. Drs. Busch-Armendariz and Cook Heffron are currently working on a multi-disciplinary textbook on human trafficking.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence & Sexual Assault*

## Appendix K: Human Trafficking and Transnational Organized Crime Section

In January 2016, the Office of the Texas Attorney General established the Human Trafficking and Transnational Organized Crime Section (HTTOC). The new section is led by Assistant Attorney General Kirsta Melton, an experienced prosecutor with an extensive background in combatting human trafficking. The HTTOC section will help investigate and prosecute human trafficking cases across the state, as well as contribute training resources and help increase awareness. The section consists of three prosecutors, four investigators, a crime analyst, and a victim advocate. As released in the December 2016 Texas Human Trafficking Prevention Task Force Report to the Texas Legislature, the section has been involved in launching initiatives and providing prosecutorial support for jurisdictions across the state. You can review the full report at https://texasattorneygeneral.gov/files/agency/20162911_htr_fin.pdf.

- Since January 2016, HTTOC prosecutors have conducted over 60 human trafficking trainings for over 7,000 individuals around the state, including, but not limited to, judges, law enforcement, education professionals, children aging out of foster care, trucking industry representatives, the public, attorneys, and medical personnel.
- HTTOC is currently assisting multiple other law enforcement agencies and district attorneys on trafficking cases and pursuing cases independently generated, including a complex multi-jurisdiction human trafficking and organized crime investigation
- In July 2016, HTTOC prosecutors, in partnership with the Nueces County District Attorney's Office, successfully prosecuted the first human trafficking case in Corpus Christi at the county level that resulted in a 40-year sentence.
- In early October, HTTOC, in partnership with the state of California, participated in the arrest of the CEO of Backpage.com, one of the largest purveyors of adult sex ads in the United States. HTTOC also executed a search warrant on Backpage.com and initiated a criminal investigation into the company's conduct related to money laundering, human trafficking and organized crime.
- At the announcement of the HTTOC, the OAG launched its "I Am Not for Sale" campaign, a positive public awareness campaign focused on reminding people about the inherent worth and humanity of all people. Social media, editorial submissions, informational brochures, and interviews with print and television media have all served to advance the OAG's goal of an informed and empowered public within the past year.
- The HTTOC section will host the first statewide human trafficking conference for prosecutors in the fall of 2017.

© 2016 The University of Texas at Austin, School of Social Work, *Institute on Domestic Violence & Sexual Assault*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

Migrant Protection Protocols Update
U. S. Department of Homeland Security

# EXHIBIT A-14

 Official website of the Department of Homeland Security

**U.S. Department of
Homeland Security**

# Migrant Protection Protocols

En español (/protocolos-de-protecci-n-migrantes)

## *DHS Begins to Process Individuals in MPP Into the United States to Complete their Immigration Proceedings*

On February 11, 2021, the Department of Homeland Security (DHS) announced a plan (/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases) to process into the United States certain individuals who had been returned to Mexico under the Migrant Protection Protocols (MPP) and have pending cases before the Executive Office for Immigration Review (EOIR). Beginning on February 19, 2021, DHS started phase one of its effort to restore safe and orderly processing at the Southwest Border.

Individuals should not approach the border to access this program. Registration is available online through https://conecta.acnur.org (/redirect?url=https%3A%2F%2Fconecta.acnur.org). Once individuals are contacted by facilitating organizations, in-person intake occurs away from ports of entry. We strongly discourage anyone from approaching the border without proper documentation or instructions to present themselves at a specific port of entry. Individuals who attempt to cross illegally are putting themselves and their families at risk, especially during a global pandemic.

# What is MPP and what changed? (#)

The Migrant Protection Protocols (MPP) were initiated in 2019. Under this program, certain individuals who arrived at the Southwest Border were returned to Mexico pursuant to Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) to await removal proceedings under Section 240 of the INA. DHS suspended new enrollment into the program on January 21, 2021.

As outlined in the President's executive actions, the United States is committed to reforming our immigration system, addressing the root causes of migration, and ensuring safe, orderly, and humane processing at our border. Addressing individuals in MPP with on-going removal

App.229

proceedings is an initial step in achieving these goals. DHS is collaborating with the Departments of State and Justice, as well as international and non-governmental organizations. Under this effort, these international organizations will administer a triaging system to identify, prioritize, and transport individuals to select ports of entry consistent with our capacity to safely process them at those ports. This process is currently designed for a limited number of individuals with pending removal proceedings before the Executive Office for Immigration Review (EOIR) who were returned to Mexico under MPP. There are approximately 25,000 individuals in the MPP program with proceedings pending before EOIR.

# What are the general steps in this process? (#)

First, individuals may register for intake via an online support hub, where they will be asked to provide basic information to confirm eligibility. Through the support hub, they can ask questions about the process of their case. There will also be a telephone hotline to answer questions and offer support. The support hub is available via: https://conecta.acnur.org (/redirect?url=https%3A%2F%2Fconecta.acnur.org%2F) , and registration went live on February 19, 2021. This hub is operated by facilitating organizations with the support of the U.S. government.

Next, facilitating organizations will transmit registration information to DHS to verify that the individual has an on-going removal proceeding pursuant to MPP and is eligible for this facilitated process. DHS will respond with a positive or negative indicator based on several data points to inform the facilitating organizations whether an individual is eligible to enter the United States as part of this process. DHS has provided criteria to facilitating organizations to prioritize individuals based on duration of their enrollment in MPP and other vulnerability factors.

Once confirmed as having a pending immigration court case, individuals will be contacted by facilitating organizations and provided instructions for accessing a designated staging location, where they will complete a health questionnaire and undergo testing for COVID-19. Individuals who test negative will be sheltered and receive further assistance in preparation for U.S. processing. Those who test positive will be supported by facilitating organizations to isolate and/or seek treatment in line with the policy of the relevant local health authority in Mexico. Following isolation and screening, such an individual will again be eligible for facilitated arrival at a designated port of entry. At the staging site, facilitating organizations will provide EOIR-33 Change of Address forms and offer additional legal services and support.

Individuals who complete the testing and screening requirements above will be transported from the staging site to the designated port of entry for processing into the United States. If they completed the Change of Address form, DHS will use this form to administratively move their case to the immigration court closest to the migrant's identified address. Unless an individual presents a national security or public safety concern, the individual will generally be assessed for enrollment in an alternative-to-detention program, released by DHS, and provided instructions for contacting U.S. Immigration and Customs Enforcement (ICE) at their destination.

# Am I able to use this process? (#)

This process is available to a limited set of individuals. Only those who were returned to Mexico under MPP and have pending immigration proceedings can use this process. Individuals returned to Mexico who do not currently have pending proceedings will not be processed into the United States at this time. Case status information is available on the EOIR website in English and Spanish (https://portal.eoir.justice.gov/) (under "Automated Case Information" on the right side). This process is not currently available for individuals who have received a final order of removal or have had their cases terminated.

For those who believe they may have been enrolled in MPP and have a pending immigration proceeding before EOIR, they can register through the virtual hub at https://conecta.acnur.org (/redirect?url=https%3A%2F%2Fconecta.acnur.org%2F). Individuals should not take any action at this time and should remain where they are to await further instructions. Facilitating organizations will confirm the status of their removal proceedings and once confirmed, they will receive instructions on entry protocols.

# How is DHS protecting individuals and communities against COVID-19? (#)

The Administration's policy is to protect our national and border security, address the humanitarian challenges at the U.S.-Mexico border, and ensure public health and safety. Resolving the plight of vulnerable migrants at our borders is aligned with both our national interests and our values as a nation. The United States will prioritize the public health and safety of our communities, U.S. government personnel, and migrants throughout the process.

DHS will employ all necessary safety precautions in accordance with Centers for Disease Control and Prevention (CDC) guidance, including mandatory face coverings and social

App.231

distancing. Individuals processed through this program will be tested for COVID-19 before entering the United States. At staging sites, facilitating organizations will use antigen testing for COVID-19, temperature checks, and health questionnaires to determine whether individuals intended to be presented at ports of entry have COVID-19 or other communicable diseases.

After being cleared, facilitating organizations will transport individuals to designated ports of entry in accordance with applicable physical distancing guidelines. Surgical masks will be provided for any individual who lacks an appropriate face covering. The facilitating organizations will also provide each individual the same CDC instructions given to international air travelers. DHS will only process individuals consistent with its capacity to safely do so while fully executing its important national security and trade and travel facilitation missions.

## How can I register? (#)

A virtual registration process, accessible online from any location, opened on February 19, 2021 via: https://conecta.acnur.org (/redirect?url=https%3A%2F%2Fconecta.acnur.org%2F) . Once registered, individuals enrolled in MPP determined to have pending cases before EOIR will be provided additional information about where and when to present themselves at staging sites. Facilitating organizations will support individuals in the program and ready them for processing into the United States.

Approaching the border on your own or waiting near ports of entry is dangerous and discouraged. Registration for this process does not happen at the border, but through the virtual hub and intake interview with facilitating organization staff.

## Where is this happening? (#)

Processing of individuals enrolled in MPP with pending immigration proceedings is occurring at several sites. Once registered individuals are staged, provided information, and tested for COVID-19, they are scheduled with appointments and transported by facilitating organizations to designated ports of entry. DHS began processing scheduled cases at the San Ysidro port of entry (San Diego, CA) on February 19, 2021; the Gateway International Bridge (Brownsville, TX) on February 25, 2021; the Paso del Norte port of entry (El Paso, TX) on February 26, 2021; the

Hidalgo, TX port of entry on March 22, 2021; and the Laredo, TX port of entry on March 29, 2021. Beginning the week of April 19, cases will be processed at the Eagle Pass, TX port of entry. Together with partners on both sides of the border, DHS will consider additional sites.

As a reminder, intake for this process does not occur at the ports of entry, but through the https://conecta.acnur.org (/redirect?url=https%3A%2F%2Fconecta.acnur.org%2F) website. Once registered, individuals will be instructed on where to go for staging and to be scheduled for processing at the ports. DHS plans to initially process limited numbers of individuals to identify and resolve any logistical challenges that may arise. DHS expects that in the coming days and weeks, designated ports of entry will be able to expand processing to their full capacity. This capacity will be consistent with the ability to safely process individuals and will depend on factors impacting our partners on both sides of the border. DHS will consider additional ports for this process over time, but registration will continue to be remote.

Physical presence at a port of entry does not offer access to this phased effort. Instead, individuals must register virtually at https://conecta.acnur.org (/redirect?url=https%3A%2F%2Fconecta.acnur.org%2F) . We strongly discourage anyone from approaching the border without proper documentation or instructions to present themselves at a specific port of entry. Anyone who attempts to cross illegally are putting themselves and their families at risk, especially during a global pandemic.

# If I have an active removal proceeding and am not currently in Mexico, should I return to Mexico for processing? (#)

Individuals enrolled in MPP who have pending proceedings before EOIR but are located in a country other than Mexico should remain where they are and first follow the directions to identify themselves through https://conecta.acnur.org (/redirect?url=https%3A%2F%2Fconecta.acnur.org%2F) . If your pending MPP case status is confirmed, you will receive specific instructions.

# Once I am processed through the POE, how will I get to my next destination? (#)

To the extent possible, individuals will need to arrange their own transportation. If needed, there are networks of non-governmental organizations that may be able to help arrange transportation and shelter in route to designated staging locations.

# Are individuals vetted before entry? (#)

The United States is continuing to strictly enforce our existing immigration laws and border security measures. DHS will follow existing protocols – including biometric checks – to confirm that individuals do not pose a threat to the American public. Anyone determined to pose a national security or public safety threat will be referred to ICE for a custody determination.

# How long will this new process for individuals in MPP last? (#)

DHS is working as expeditiously as possible but has not set a deadline by which the process will end. Any such determination would be made in consultation with partners.

# What are the vulnerability criteria that facilitating organizations will use? (#)

Facilitating organizations will generally prioritize individuals based on their enrollment date into MPP, while also considering other vulnerability criteria provided by DHS. Those who have been waiting the longest will generally be prioritized first, along with those who find themselves in particularly vulnerable situations.

# What happens if the facilitating organization cannot verify my case status? (#)

Facilitating organizations will request more information and contact CBP to seek resolution.

# What happens when my case is completed? (#)

This new process is about ensuring that individuals who were returned to Mexico under MPP can proceed with their immigration proceedings in the United States. Entry into the United States through this process does not guarantee the right to stay in the United States, nor does it impact eligibility for relief or protection from removal. The process, however, will facilitate an individual's ability to appear before an immigration judge and have their claims heard. If a claim is denied, and any appeal process runs its course, the individual will be subject to removal from the United States.

## How is DHS tracking individuals once they are processed into the United States? (#)

The safety of the American public and all those we encounter remains a top priority. DHS will make a risk-based determination to take into custody or enroll certain individuals into alternative-to-detention (ATD) programs at the port of entry. Otherwise, ICE will consider enrolling these individuals into ATD or other case management programs after the migrants arrive at their final destination.

## What happens if I attempt to cross the border in between ports of entry instead of being scheduled through the established process? (#)

This process is meant to ensure that all eligible individuals are processed into the United States in a fair and efficient manner consistent with public health measures. DHS strongly discourages anyone from circumventing the established process facilitated by international organizations. Individuals should not approach the border without proper documentation or attempt to cross illegally between ports of entry.

If you have been returned to Mexico under MPP and are encountered between the ports of entry, or otherwise attempt to enter the United States without inspection or parole, you will be apprehended and processed according to all applicable immigration laws and border security priorities, which include detention and removal. Any individual who illegally enters the United States and is placed into removal proceedings, or any individual who has previously been ordered removed from the United States, may be considered inadmissible to the United States in the future.

# Additional Resources (#)

- March 10, 2021: Press Briefing by Press Secretary Jen Psaki and Special Assistant to the President and Coordinator for the Southern Border Ambassador Roberta Jacobson (https://www.whitehouse.gov/briefing-room/press-briefings/2021/03/10/press-briefing-by-press-secretary-jen-psaki-and-special-assistant-to-the-president-and-coordinator-for-the-southern-border-ambassador-roberta-jacobson-march-10-2021/) | Whitehouse.gov

- March 01, 2021: Press Briefing by Press Secretary Jen Psaki and Secretary of Homeland Security Alejandro Mayorkas (https://www.whitehouse.gov/briefing-room/press-briefings/2021/03/01/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-homeland-security-alejandro-mayorkas/) | Whitehouse.gov

- February 23, 2021: DHS Statement on Processing Current Residents of the Matamoros Camp Into the U.S. (/news/2021/02/23/dhs-statement-processing-current-residents-matamoros-camp-us)

- February 19, 2021: DHS Statement on First Step in Process to Address Individuals in Mexico with Active MPP Cases (/news/2021/02/19/dhs-statement-first-step-process-address-individuals-mexico-active-mpp-cases)

- February 18, 2021: Public Health and the Draw Down of the Migrant Protection Protocols Program (https://www.state.gov/public-health-and-the-draw-down-of-the-migrant-protection-protocols-program/) | State.gov

- February 18, 2021: FACT SHEET: DHS Announces Process to Address Individuals Outside the United States with Active MPP Cases (/news/2021/02/18/fact-sheet-dhs-announces-process-address-individuals-outside-united-states-active)

- February 16, 2021: The MPP Program and Border Security Joint Statement by Assistant to the President and National Security Advisor Jake Sullivan and Assistant to the President and Homeland Security Advisor Elizabeth Sherwood-Randall (https://www.whitehouse.gov/briefing-room/statements-releases/2021/02/16/the-mpp-program-and-

border-security-joint-statement-by-assistant-to-the-president-and-national-security-advisor-jake-sullivan-and-assistant-to-the-president-and-homeland-security-advisor-and-deputy-na/) | Whitehouse.gov

- February 11, 2021: DHS Announces Process to Address Individuals in Mexico with Active MPP Cases (/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases)

- February 2, 2021: Executive Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border (https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration-throughout-north-and-central-america-and-to-provide-safe-and-orderly-processing/) | Whitehouse.gov

- January 20, 2021: DHS Statement on the Suspension of New Enrollments in the Migrant Protection Protocols Program (/news/2021/01/20/dhs-statement-suspension-new-enrollments-migrant-protection-protocols-program)

# Previous Administrations (#)

- Archive: Migrant Protection Protocols (/archive/migrant-protection-protocols)

Last Published Date: April 13, 2021

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

Polaris Project's publication, "The Latino Face of Human Trafficking and Exploitation in the United States"

# EXHIBIT A-15

**EXECUTIVE SUMMARY**

# The Latino Face of Human Trafficking and Exploitation in The United States

**Polaris**

# About this report

In 2017, Polaris released its seminal report, The Typology of Modern Slavery, which for the first time identified and described 25 distinct types of sex and labor trafficking occurring in the United States at that time. The data the report was based upon was gleaned from a decade of operating the U.S. National Human Trafficking Hotline. While data from the Trafficking Hotline cannot be taken as a reflection of prevalence, it can give a good sense of trends and patterns, painting a very clear picture of who is being trafficked and exploited in the United States. In doing so, it gives communities, service providers, educators, law enforcement and others in the anti-trafficking ecosystem a valuable tool to help formulate targeted prevention and intervention strategies.

Among the key takeaways of the original Typology report was that immigrants are extremely vulnerable to both sex and labor trafficking, in part as a direct result of their migration.

**In particular, while anyone can fall prey to traffickers, the data shows that an incredibly high number of people who come to this country from Latin America and the Caribbean are being exploited in this way.[1]**

**The most egregious figures come from the agriculture sector, where 76 percent of the likely victims were immigrants and nearly half of all likely victims - immigrant and not - were from Mexico.[2]**

The fact of this should not come as a surprise. Human trafficking does not happen in a vaccuum, but rather is one of the many, tragic results of other societal ills and inequities - oppression, discrimination, poverty, endemic corruption - to name but a few.

Those same factors are the major drivers of immigration. A significant percentage of people who migrate to the United States, legally and otherwise, do so because they are facing danger or economic desperation in their home countries.

Those vulnerabilities come with them across the border, making the threat of being deported an extremely powerful weapon for traffickers.

Nonetheless, the fact that victims and survivors reported to the Trafficking Hotline are so frequently from these specific regions should be a jolting wake-up call. As this country continues to debate and indeed dramatically reshape longstanding immigration and refugee policies and procedures, it is vital that we have full transparency into how such changes affect human trafficking now and in the future.

[1] The U.S. National Human Trafficking Hotline identified around 31,000 individuals with unknown immigration status. This is about two thirds of the total number of individuals in trafficking situations reported to the Trafficking Hotline from 2015 to 2018.

[2] This references statistics of those individuals whose immigration status is known.

Hence this project: La cara latina de la trata y la explotación en Estados Unidos - The Latino Face of Human Trafficking and Exploitation in the United States. The data set in this report spans two more years worth of data than were available in the original Typology publication. Additionally, this report deepens the analysis in the original Typology by looking more closely at the nationalities of victims in each type of trafficking.

In doing so, we hope to better understand and isolate the factors that lead to sex and labor trafficking of migrants and refugees from Latin America and the Caribbean, and to share that information with policymakers and others in positions to make change.

Among those changes must be a substantial reexamination and ultimately, overhaul of the current system of temporary work visas provided to overseas workers to fill jobs that U.S. businesses claim they are not able to fill with the workforce already available to them in the United States. As this analysis shows, a substantial number of likely trafficking victims and survivors from Latin America and the Caribbean are not, as stereotypes would have it, here without legal documentation. As detailed in a 2018 Polaris report, immigrants who come to the United States on legal, temporary work visas make up a significant portion of cases learned about through the Trafficking Hotline. Revamping that system could help substantially reduce trafficking of immigrants who play by the rules, provide an invaluable labor force to the U.S. economy, and yet are virtually set up for victimization nonetheless.

# About the data

Polaris's data set cannot be seen as a definitive look at the prevalence of human trafficking in the United States. The Trafficking Hotline exists to support victims and survivors. Data collection is secondary. That means that the same information is not collected as a result of every contact and this may skew figures in one direction or another. For example, we only record the visa status of those who were asked about it and chose to answer. In many cases, this information was not requested because it was not relevant to the needs of the person in the situation or the person contacting the Trafficking Hotline, or it was unknown by that person.

Additionally, data must be seen in light of the fact that certain groups are more likely to have received information about the existence of the Trafficking Hotline prior to entering the United States if they came here through official channels. This is particularly relevant in the analysis of migrant victims of labor trafficking because a substantial portion of them arrived in the United States on legal temporary visas and received statutorily required information about trafficking and contacting the Trafficking Hotline.

Finally, it can not be said enough that human trafficking of all types and involving victims of all demographic groups is a still a substantially under-reported crime. What we learn about through the Trafficking Hotline is likely only a miniscule sliver of what is really happening around the country.

Also worth noting: Prior to 2015, Polaris tracked individual situations of human trafficking but did not record details about individual people victimized within those situations and so did not include those numbers in the original Typology. Particularly in labor trafficking, where there are frequently more than one victim in each trafficking situation, we felt that this did not represent the full picture of human trafficking as accurately as possible. To improve our data set, in 2015 we began to keep track of individuals, as well as situations or "cases" of human trafficking learned about through the Trafficking Hotline. With the addition of four years of individual victimization data, we believe we now have an even clearer picture of how trafficking operates in the United States and who it impacts the most.

For a more detailed look in Spanish at the typology of human trafficking in the United States affecting immigrant victims and survivors, please see this link. For more information please contact: Rafael Flores - rflores@polarisproject.org

# Findings Overview

Polaris analyzed over 51,000 likely cases of human trafficking - inclusive of sex and labor trafficking - and over 12,000 cases of labor exploitation[3] learned about through operation of the Trafficking Hotline from December 2007 through December 2018.

From 2015 to 2018, Polaris collected and analyzed information about nearly 48,000 potential victims of sex and labor trafficking. Available evidence suggests that the patterns in the individual victim data for 2015 to 2018 are not unique to this time frame and in fact, would be largely mirrored by victim numbers for the entire data set starting in 2007.

[3] "Labor trafficking occurs when an employer compels or deceives a worker into providing involuntary labor. The employer often uses violence, threats, manipulation of debt, blackmail, or fraud to compel victims to work. Typically, such work takes place in abusive conditions, such as an unsafe work environment, long hours without breaks, or work without pay. Labor exploitation occurs when employers profit from the illegal treatment of their workers, but do not exert the level of control that characterizes labor trafficking." (http://www.stopvaw.org/labor_trafficking_and_forced_labor_exploitation_2)

[4] The Trafficking Hotline exists to support victims and survivors. Data collection is secondary, and information about likely victims' immigration status is not relevant to the provision of services requested. For the purposes of this report immigration status refers to whether likely victims were U.S. citizens, legal permanent resident, or foreign nationals.

## Between 2015 and 2018:

• Of the nearly 48,000 likely victims of sex and labor trafficking who were reported to the Trafficking Hotline, information about immigration status was collected for about 36 percent (17,000 likely victims). That means the immigration status of 64 percent is unknown.

• Of the 17,000 likely victims whose immigration status was recorded, approximately 8,800 (52 percent) were not U.S. citizens or legal permanent residents.

• 3,700 individuals from Latin America and the Caribbean were reported to the Trafficking Hotline, comprising 22 percent of all victims about whom immigration status was provided.

• There is an average of 5.4 likely victims per situation of human trafficking in the agriculture industry. This is compared to an average of 1.4 likely victims per situation in all forms of trafficking.

## Other key findings:

• 77 percent of immigrant victims from Latin America and the Caribbean were trafficked in labor situations.

• The primary type of trafficking reported to involve Latin American and Caribbean victims was agriculture (35 percent of Latin American and Caribbean victims)

• The vast majority of Latin American and Caribbean victims were from Mexico (58 percent), followed by Guatemala (12 percent) and Honduras (seven percent)

The chart below show the types of sex and labor trafficking in which victims from Latin America and the Caribbean were victimized for the period between 2015 - 2018.

## Victims by Type of Trafficking



The chart below shows the countries of origin of iden-
tified immigrant victims of labor trafficking and/or labor
exploitation between 2015 and 2018.

**Countries of origin of likely victims from Latin America and The Caribbean**



\* Chart only includes countries with more than ten potential victims reported.

# Top Five Types of Trafficking Targeting People from Latin America

## 01  Agriculture

Of the 25 types of human trafficking in the United States, agriculture has the dubious distinction of being the industry with the largest number of reported immigrant victims. Over the time period studied, the Trafficking Hotline learned of 2,678 individuals who were likely victims of human trafficking in agriculture or animal husbandry. Of these:

- Over 2,000 people - (76 percent) - were immigrants

- Individuals from Mexico specifically constitute 46 percent of both immigrant and non-immigrant likely victims of this type of trafficking (of those whose immigration status was known).

This figure is greater than the percentage of Mexican natives in the agricultural manual labor workforce overall, which was 57 percent according to published data.

That discrepancy may well be a result of the entrenched cross-border recruitment system in this industry. In many cases, U.S. agricultural producers rely on Mexican recruiters to find their workforce and provide little or no oversight to that process. In such cases it is common for farm owners to pay recruiters or middlemen, rather than the workers directly. Along with the ever-present threats of deportation and confiscation of documents, this system makes migrant farm workers from Mexico extremely vulnerable to trafficking. This vulnerability is present regardless of immigration status as workers who come here legally on temporary H-2A and H-2B work visas are subject to deportation if they leave the employ of the specific sponsoring business.

### Total trafficking cases since 2007





### Total victims of trafficking (2015-2018)





# 02  Domestic Work

Diplomatic personnel and employees of certain international organizations are allowed to hire domestic workers from overseas and bring them to the United States on certain kinds of temporary visas. The work involved might include child care, cooking, cleaning and taking care of older adults or other family members. Because these workers virtually always live in their employers' homes, they often are extremely isolated from the outside world. Along with language barriers, this isolation leaves them extremely vulnerable to trafficking since few outsiders are in a position to notice if, for example, if the worker is required to labor 15 hours a day or to sleep in a closet, for example.

In this type of labor trafficking, the Hotline managed by Polaris reports at least 228 individuals that had legal status, being the most common ones visas, B-1, J-1, G-5, and A-3. Cases have also been recorded in which employers committed fraud by bringing domestic workers to the United States on visas that are supposed to be used for tourists, fiancés, or students, such as B-2, K-1, and F1. Of the total of 803 foreign nationals identified, 251 were undocumented.

The majority of victims arriving in the United States in this type of trafficking are from Mexico, followed by the Philippines, Guatemala, Honduras, El Salvador, and Colombia. Through the data, Polaris has been able to identify victims from 94 different countries in this trafficking type.

**Total trafficking cases since 2007**



**1,654** Total trafficking cases

**555** Labor exploitation

**Total victims of trafficking (2015-2018)**



Total victims **1,128**

Victims from Latin America and the Caribbean **335** (30%)

# 03  Construction

Victims of labor trafficking may be forced to work in the construction industry, usually within small contracting businesses completing tasks such as roofing, carpentry, welding, electrical work, and masonry on both large commercial construction sites as well as in private homes. Employers may misclassify workers as independent contractors, thus limiting their access to worker protections and benefits.

Because of the complicated nature of the labor supply chain and the roles of direct employers, recruiters, contractors, and smugglers, in many cases victims are unable to identify who is responsible for their

exploitation. Workers can enter their exploitative situations through formal job offers and misrepresented visa contracts. In some cases, workers may be charged illegal and exorbitant recruitment fees, which may be a method of control to keep workers in abusive situations. Recruitment may also begin through an abusive migration journey or through word-of-mouth referrals. The majority of labor trafficking survivors in construction are men from Mexico and the Northern Triangle (El Salvador, Honduras, and Guatemala), most of whom have H-2B visas or are undocumented.

Hotline data also shows that victims are kept in their trafficking situation through threats of deportation and threats to blacklist the worker from future U.S. jobs if he leaves or reports his situation. Survivors have also reported experiencing verbal abuse, harassment, and denial of necessities such as water and safety equipment.

**Total trafficking cases since 2007**





**244** Total trafficking cases

**502** Labor exploitation

**Total victims of trafficking (2015-2018)**



Total victims **402**

Victims from Latin America and the Caribbean **195** (48.5%)

# 04  Restaurants

The fourth most prevalent type of trafficking identified in Polaris's data set in terms of the number of victims from Latin America and the Caribbean is forced labor in restaurants and food service businesses. Migrants from all over the world arrive in the United States with promises of decent work, but end up hidden in restaurant kitchens and virtually disconnected from the outside world. Traffickers often take advantage of language barriers between workers and employers.

Within this type of trafficking, approximately 26 percent of victims come from Latin America, but it should also be noted that a large number of victims also come from throughout Asia.

**Total trafficking cases since 2007**





**672** Total trafficking cases

**1,448** Labor exploitation

**Total victims of trafficking (2015-2018)**



Total victims **625**



Victims from Latin America and the Caribbean **168** (27%)

# 05  Escort Services

Escort Services is a broad term used widely in the commercial sex trade, referring to commercial sex acts that primarily occur at a temporary indoor location. The operations are often described as "outcall," where traffickers deliver victims to a buyer's hotel room or residence for "private parties," or as "in-call," where potential buyers cycle in and out of a hotel room where the trafficker has confined the victim for extended stays.

Victims may be tricked into a situation through fraudulent job offers, such as fake modeling contracts. Traffickers may also recruit victims by pretending to have a romantic interest in the victim or falsely promising that they can provide shelter, financial support, or other benefits. Extreme physical and sexual violence, often accompanied by weapons, is common, as is coercion in the form of unmanageable quotas, debts, threats of harm or police involvement, excessive monitoring, gang intimidation, social isolation, and constant surveillance. Traffickers often condition victims to believe they are the only ones who care for them, manipulating an attachment bond that makes the decision to leave the trafficker extremely difficult.

**Total trafficking cases since 2007**



**7,957**
Total trafficking cases

**Total victims of trafficking (2015-2018)**



**Total victims**
**8,520**

**Victims from Latin America and the Caribbean**
**144**
(1.7%)

**For more information and to view/download the full report in Spanish visit:**

https://polarisproject.org/resources/
the-latino-face-of-human-trafficking-and-exploitation-in-the-united-states/



**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

83 Fed. Reg. 55,934-55,935 (Nov. 9, 2018)

# EXHIBIT A-16

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Part 208**

**RIN 1615–AC34**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Parts 1003 and 1208**

[EOIR Docket No. 18–0501; A.G. Order No. 4327–2018]

**RIN 1125–AA89**

**Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security; Executive Office for Immigration Review, Department of Justice.

**ACTION:** Interim final rule; request for comment.

**SUMMARY:** The Department of Justice and the Department of Homeland Security ("DOJ," "DHS," or, collectively, "the Departments") are adopting an interim final rule governing asylum claims in the context of aliens who are subject to, but contravene, a suspension or limitation on entry into the United States through the southern border with Mexico that is imposed by a presidential proclamation or other presidential order ("a proclamation") under section 212(f) or 215(a)(1) of the Immigration and Nationality Act ("INA"). Pursuant to statutory authority, the Departments are amending their respective existing regulations to provide that aliens subject to such a proclamation concerning the southern border, but who contravene such a proclamation by entering the United States after the effective date of such a proclamation, are ineligible for asylum. The interim rule, if applied to a proclamation suspending the entry of aliens who cross the southern border unlawfully, would bar such aliens from eligibility for asylum and thereby channel inadmissible aliens to ports of entry, where they would be processed in a controlled, orderly, and lawful manner. This rule would apply only prospectively to a proclamation issued after the effective date of this rule. It would not apply to a proclamation that specifically includes an exception for aliens applying for asylum, nor would it apply to aliens subject to a waiver or exception provided by the proclamation. DHS is amending its regulations to specify a screening

process for aliens who are subject to this specific bar to asylum eligibility. DOJ is amending its regulations with respect to such aliens. The regulations would ensure that aliens in this category who establish a reasonable fear of persecution or torture could seek withholding of removal under the INA or protection from removal under regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").

**DATES:**

*Effective date:* This rule is effective November 9, 2018.

*Submission of public comments:* Written or electronic comments must be submitted on or before January 9, 2019. Written comments postmarked on or before that date will be considered timely. The electronic Federal Docket Management System will accept comments prior to midnight eastern standard time at the end of that day.

**ADDRESSES:** You may submit comments, identified by EOIR Docket No. 18–0501, by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. To ensure proper handling, please reference EOIR Docket No. 18–0501 on your correspondence. This mailing address may be used for paper, disk, or CD–ROM submissions.

• *Hand Delivery/Courier:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041, Contact Telephone Number (703) 305–0289 (not a toll-free call).

**FOR FURTHER INFORMATION CONTACT:** Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041, Contact Telephone Number (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**I. Public Participation**

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule. The Departments also invite comments that relate to the economic or federalism effects that might result from this rule. To provide the most assistance to the Departments, comments should reference a specific portion of the rule;

explain the reason for any recommended change; and include data, information, or authority that supports the recommended change.

All comments submitted for this rulemaking should include the agency name and EOIR Docket No. 18–0501. Please note that all comments received are considered part of the public record and made available for public inspection at *www.regulations.gov.* Such information includes personally identifiable information (such as a person's name, address, or any other data that might personally identify that individual) that the commenter voluntarily submits.

If you want to submit personally identifiable information as part of your comment, but do not want it to be posted online, you must include the phrase "PERSONALLY IDENTIFIABLE INFORMATION" in the first paragraph of your comment and precisely and prominently identify the information of which you seek redaction.

If you want to submit confidential business information as part of your comment, but do not want it to be posted online, you must include the phrase "CONFIDENTIAL BUSINESS INFORMATION" in the first paragraph of your comment and precisely and prominently identify the confidential business information of which you seek redaction. If a comment has so much confidential business information that it cannot be effectively redacted, all or part of that comment may not be posted on *www.regulations.gov.* Personally identifiable information and confidential business information provided as set forth above will be placed in the public docket file of DOJ's Executive Office of Immigration Review ("EOIR"), but not posted online. To inspect the public docket file in person, you must make an appointment with EOIR. Please see the **FOR FURTHER INFORMATION CONTACT** paragraph above for the contact information specific to this rule.

**II. Purpose of This Interim Final Rule**

This interim final rule ("interim rule" or "rule") governs eligibility for asylum and screening procedures for aliens subject to a presidential proclamation or order restricting entry issued pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), or section 215(a)(1) of the INA, 8 U.S.C. 1185(a)(1), that concerns entry to the United States along the southern border with Mexico and is issued on or after the effective date of this rule. Pursuant to statutory authority, the interim rule renders such aliens ineligible for asylum if they enter the United States after the effective date of

such a proclamation, become subject to the proclamation, and enter the United States in violation of the suspension or limitation of entry established by the proclamation. The interim rule, if applied to a proclamation suspending the entry of aliens who cross the southern border unlawfully, would bar such aliens from eligibility for asylum and thereby channel inadmissible aliens to ports of entry, where such aliens could seek to enter and would be processed in an orderly and controlled manner. Aliens who enter prior to the effective date of an applicable proclamation will not be subject to this asylum eligibility bar unless they depart and reenter while the proclamation remains in effect. Aliens also will not be subject to this eligibility bar if they fall within an exception or waiver within the proclamation that makes the suspension or limitation of entry in the proclamation inapplicable to them, or if the proclamation provides that it does not affect eligibility for asylum.

As discussed further below, asylum is a discretionary immigration benefit. In general, aliens may apply for asylum if they are physically present or arrive in the United States, irrespective of their status and irrespective of whether or not they arrive at a port of entry, as provided in section 208(a) of the INA, 8 U.S.C. 1158(a). Congress, however, provided that certain categories of aliens could not receive asylum and further delegated to the Attorney General and the Secretary of Homeland Security ("Secretary") the authority to promulgate regulations establishing additional bars on eligibility that are consistent with the asylum statute and "any other conditions or limitations on the consideration of an application for asylum" that are consistent with the INA. *See* INA 208(b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(2)(C), (d)(5)(B).

In the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA"), Public Law 104–208, Congress, concerned with rampant delays in proceedings to remove illegal aliens, created expedited procedures for removing inadmissible aliens, and authorized the extension of such procedures to aliens who entered illegally and were apprehended within two years of their entry. *See generally* INA 235(b), 8 U.S.C. 1225(b). Those procedures were aimed at facilitating the swift removal of inadmissible aliens, including those who had entered illegally, while also expeditiously resolving any asylum claims. For instance, Congress provided that any alien who asserted a fear of persecution would appear before an asylum officer, and that any alien who is determined to

have established a "credible fear"— meaning a "significant possibility . . . that the alien could establish eligibility for asylum" under the asylum statute— would be detained for further consideration of an asylum claim. *See* INA 235(b)(1), (b)(1)(B)(v), 8 U.S.C. 1225(b)(1), (b)(1)(B)(v).

When the expedited procedures were first implemented approximately two decades ago, relatively few aliens within those proceedings asserted an intent to apply for asylum or a fear of persecution. Rather, most aliens found inadmissible at the southern border were single adults who were immediately repatriated to Mexico. Thus, while the overall number of illegal aliens apprehended was far higher than it is today (around 1.6 million in 2000), aliens could be processed and removed more quickly, without requiring detention or lengthy court proceedings.

In recent years, the United States has seen a large increase in the number and proportion of inadmissible aliens subject to expedited removal who assert an intent to apply for asylum or a fear of persecution during that process and are subsequently placed into removal proceedings in immigration court. Most of those aliens unlawfully enter the country between ports of entry along the southern border. Over the past decade, the overall percentage of aliens subject to expedited removal and referred, as part of the initial screening process, for a credible-fear interview jumped from approximately 5% to above 40%, and the total number of credible-fear referrals for interviews increased from about 5,000 a year in Fiscal Year ("FY") 2008 to about 97,000 in FY 2018. Furthermore, the percentage of cases in which asylum officers found that the alien had established a credible fear— leading to the alien's placement in full immigration proceedings under section 240 of the INA, 8 U.S.C. 1229a—has also increased in recent years. In FY 2008, when asylum officers resolved a referred case with a credible-fear determination, they made a positive finding about 77% of the time. That percentage rose to 80% by FY 2014. In FY 2018, that percentage of positive credible-fear determinations has climbed to about 89% of all cases. After this initial screening process, however, significant proportions of aliens who receive a positive credible-fear determination never file an application for asylum or are ordered removed in absentia. In FY 2018, a total of about 6,000 aliens who passed through credible-fear screening (17% of all completed cases, 27% of all completed cases in which an asylum application was filed, and about 36% of

cases where the asylum claim was adjudicated on the merits) established that they should be granted asylum.

Apprehending and processing this growing number of aliens who cross illegally into the United States and invoke asylum procedures thus consumes an ever increasing amount of resources of DHS, which must surveil, apprehend, and process the aliens who enter the country. Congress has also required DHS to detain all aliens during the pendency of their credible-fear proceedings, which can take days or weeks. And DOJ must also dedicate substantial resources: Its immigration judges adjudicate aliens' claims, and its officials are responsible for prosecuting and maintaining custody over those who violate the criminal law. The strains on the Departments are particularly acute with respect to the rising numbers of family units, who generally cannot be detained if they are found to have a credible fear, due to a combination of resource constraints and the manner in which the terms of the Settlement Agreement in *Flores* v. *Reno* have been interpreted by courts. *See* Stipulated Settlement Agreement, *Flores* v. *Reno*, No. 85–cv–4544 (N.D. Cal. Jan. 17, 1997).

In recent weeks, United States officials have each day encountered an average of approximately 2,000 inadmissible aliens at the southern border. At the same time, large caravans of thousands of aliens, primarily from Central America, are attempting to make their way to the United States, with the apparent intent of seeking asylum after entering the United States unlawfully or without proper documentation. Central American nationals represent a majority of aliens who enter the United States unlawfully, and are also disproportionately likely to choose to enter illegally between ports of entry rather than presenting themselves at a port of entry. As discussed below, aliens who enter unlawfully between ports of entry along the southern border, as opposed to at a port of entry, pose a greater strain on DHS's already stretched detention and processing resources and also engage in conduct that seriously endangers themselves, any children traveling with them, and the U.S. Customs and Border Protection ("CBP") agents who seek to apprehend them.

The United States has been engaged in sustained diplomatic negotiations with Mexico and the Northern Triangle countries (Honduras, El Salvador, and Guatemala) regarding the situation on the southern border, but those negotiations have, to date, proved

unable to meaningfully improve the situation.

The purpose of this rule is to limit aliens' eligibility for asylum if they enter in contravention of a proclamation suspending or restricting their entry along the southern border. Such aliens would contravene a measure that the President has determined to be in the national interest. For instance, a proclamation restricting the entry of inadmissible aliens who enter unlawfully between ports of entry would reflect a determination that this particular category of aliens necessitates a response that would supplement existing prohibitions on entry for all inadmissible aliens. Such a proclamation would encourage such aliens to seek admission and indicate an intention to apply for asylum at ports of entry. Aliens who enter in violation of that proclamation would not be eligible for asylum. They would, however, remain eligible for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), or for protections under the regulations issued under the authority of the implementing legislation regarding Article 3 of the CAT.

The Departments anticipate that a large number of aliens who would be subject to a proclamation-based ineligibility bar would be subject to expedited-removal proceedings. Accordingly, this rule ensures that asylum officers and immigration judges account for such aliens' ineligibility for asylum within the expedited-removal process, so that aliens subject to such a bar will be processed swiftly. Furthermore, the rule continues to afford protection from removal for individuals who establish that they are more likely than not to be persecuted or tortured in the country of removal. Aliens rendered ineligible for asylum by this interim rule and who are referred for an interview in the expedited-removal process are still eligible to seek withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), or protections under the regulations issued under the authority of the implementing legislation regarding Article 3 of the CAT. Such aliens could pursue such claims in proceedings before an immigration judge under section 240 of the INA, 8 U.S.C. 1229a, if they establish a reasonable fear of persecution or torture.

## III. Background

### A. Joint Interim Rule

The Attorney General and the Secretary of Homeland Security publish this joint interim rule pursuant to their respective authorities concerning asylum determinations.

The Homeland Security Act of 2002, Public Law 107–296, as amended, transferred many functions related to the execution of federal immigration law to the newly created Department of Homeland Security. The Homeland Security Act of 2002 charges the Secretary "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. 1103(a)(1), and grants the Secretary the power to take all actions "necessary for carrying out" the provisions of the INA, *id.* 1103(a)(3). The Homeland Security Act of 2002 also transferred to DHS some responsibility for affirmative asylum applications, *i.e.,* applications for asylum made outside the removal context. *See* 6 U.S.C. 271(b)(3). Those authorities have been delegated to U.S. Citizenship and Immigration Services ("USCIS"). USCIS asylum officers determine in the first instance whether an alien's affirmative asylum application should be granted. *See* 8 CFR 208.9.

But the Homeland Security Act of 2002 retained authority over certain individual immigration adjudications (including those related to defensive asylum applications) in DOJ, under the Executive Office for Immigration Review ("EOIR") and subject to the direction and regulation of the Attorney General. *See* 6 U.S.C. 521; 8 U.S.C. 1103(g). Thus, immigration judges within DOJ continue to adjudicate all asylum applications made by aliens during the removal process (defensive asylum applications), and they also review affirmative asylum applications referred by USCIS to the immigration court. *See* INA 101(b)(4), 8 U.S.C. 1101(b)(4); 8 CFR 1208.2; *Dhakal* v. *Sessions,* 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals ("BIA" or "Board"), also within DOJ, in turn hears appeals from immigration judges' decisions. 8 CFR 1003.1. In addition, the INA provides "[t]hat determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1). This broad division of functions and authorities informs the background of this interim rule.

### B. Legal Framework for Asylum

Asylum is a form of discretionary relief under section 208 of the INA, 8 U.S.C. 1158, that precludes an alien from being subject to removal, creates a path to lawful permanent resident status and citizenship, and affords a variety of other benefits, such as allowing certain alien family members to obtain lawful immigration status derivatively. *See R–S–C* v. *Sessions,* 869 F.3d 1176, 1180 (10th Cir. 2017); *see also, e.g.,* INA 208(c)(1)(A), (C), 8 U.S.C. 1158(c)(1)(A), (C) (asylees cannot be removed and can travel abroad with prior consent); INA 208(b)(3), 8 U.S.C. 1158(b)(3) (allowing derivative asylum for asylee's spouse and unmarried children); INA 209(b), 8 U.S.C. 1159(b) (allowing the Attorney General or Secretary to adjust the status of an asylee to that of a lawful permanent resident); INA 316(a), 8 U.S.C. 1427(a) (describing requirements for naturalization of lawful permanent residents). Aliens who are granted asylum are authorized to work in the United States and may receive certain financial assistance from the federal government. *See* INA 208(c)(1)(B), (d)(2), 8 U.S.C. 1158(c)(1)(B), (d)(2); 8 U.S.C. 1612(a)(2)(A), (b)(2)(A); 8 U.S.C. 1613(b)(1); 8 CFR 274a.12(a)(5); *see also* 8 CFR 274a.12(c)(8) (providing that asylum applicants may seek employment authorization 150 days after filing a complete application for asylum).

Aliens applying for asylum must establish that they meet the definition of a "refugee," that they are not subject to a bar to the granting of asylum, and that they merit a favorable exercise of discretion. INA 208(b)(1), 240(c)(4)(A), 8 U.S.C. 1158(b)(1), 1229a(c)(4)(A); *see Moncrieffe* v. *Holder,* 569 U.S. 184, 187 (2013) (describing asylum as a form of "discretionary relief from removal"); *Delgado* v. *Mukasey,* 508 F.3d 702, 705 (2d Cir. 2007) ("Asylum is a discretionary form of relief . . . . Once an applicant has established eligibility . . . it remains within the Attorney General's discretion to deny asylum."). Because asylum is a discretionary form of relief from removal, the alien bears the burden of showing both eligibility for asylum and why the Attorney General or Secretary should exercise discretion to grant relief. *See* INA 208(b)(1), 240(c)(4)(A), 8 U.S.C. 1158(b)(1), 1229a(c)(4)(A); *Romilus* v. *Ashcroft,* 385 F.3d 1, 8 (1st Cir. 2004).

Section 208 of the INA provides that, in order to apply for asylum, an applicant must be "physically present" or "arriv[e]" in the United States, "whether or not at a designated port of arrival" and "irrespective of such alien's status"—but the applicant must also "apply for asylum in accordance with" the rest of section 208 or with the expedited-removal process in section 235 of the INA. INA 208(a)(1), 8 U.S.C. 1158(a)(1). Furthermore, to be granted asylum, the alien must demonstrate that he or she meets the statutory definition

of a "refugee," INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A), and is not subject to an exception or bar, INA 208(b)(2), 8 U.S.C. 1158(b)(2). The alien bears the burden of proof to establish that he or she meets these criteria. INA 208(b)(1)(B)(i), 8 U.S.C. 1158(b)(1)(B)(i); 8 CFR 1240.8(d).

For an alien to establish that he or she is a "refugee," the alien generally must be someone who is outside of his or her country of nationality and "is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A).

In addition, if evidence indicates that one or more of the grounds for mandatory denial may apply, an alien must show that he or she does not fit within one of the statutory bars to granting asylum and is not subject to any "additional limitations and conditions . . . under which an alien shall be ineligible for asylum" established by a regulation that is "consistent with" section 208 of the INA. INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see* 8 CFR 1240.8(d). The INA currently bars a grant of asylum to any alien: (1) Who "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of" a protected ground; (2) who, "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States"; (3) for whom there are serious reasons to believe the alien "has committed a serious nonpolitical crime outside the United States" prior to arrival in the United States; (4) for whom "there are reasonable grounds for regarding the alien as a danger to the security of the United States"; (5) who is described in the terrorism-related inadmissibility grounds, with limited exceptions; or (6) who "was firmly resettled in another country prior to arriving in the United States." INA 208(b)(2)(A)(i)–(vi), 8 U.S.C. 1158(b)(2)(A)(i)–(vi).

An alien who falls within any of those bars is subject to mandatory denial of asylum. Where there is evidence that "one or more of the grounds for mandatory denial of the application for relief may apply," the applicant in immigration court proceedings bears the burden of establishing that the bar at issue does not apply. 8 CFR 1240.8(d); *see also, e.g., Rendon* v. *Mukasey,* 520 F.3d 967, 973 (9th Cir. 2008) (applying 8 CFR 1240.8(d) in the context of the aggravated felony bar to asylum); *Gao* v. *U.S. Att'y Gen.,* 500 F.3d 93, 98 (2d Cir.

2007) (applying 8 CFR 1240.8(d) in the context of the persecutor bar); *Chen* v. *U.S. Att'y Gen.,* 513 F.3d 1255, 1257 (11th Cir. 2008) (same).

Because asylum is a discretionary benefit, aliens who are eligible for asylum are not automatically entitled to it. After demonstrating eligibility, aliens must further meet their burden of showing that the Attorney General or Secretary should exercise his or her discretion to grant asylum. *See* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A) (the "Secretary of Homeland Security or the Attorney General may grant asylum to an alien" who applies in accordance with the required procedures and meets the definition of a "refugee"). The asylum statute's grant of discretion "is a broad delegation of power, which restricts the Attorney General's discretion to grant asylum only by requiring the Attorney General to first determine that the asylum applicant is a 'refugee.'" *Komarenko* v. *INS,* 35 F.3d 432, 436 (9th Cir. 1994), *overruled on other grounds by Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009) (en banc) (per curiam). Immigration judges and asylum officers exercise that delegated discretion on a case-by-case basis. Under the Board's decision in *Matter of Pula,* 19 I&N Dec. 467 (BIA 1987), and its progeny, "an alien's manner of entry or attempted entry is a proper and relevant discretionary factor" and "circumvention of orderly refugee procedures" can be a "serious adverse factor" against exercising discretion to grant asylum, *id.* at 473, but "[t]he danger of persecution will outweigh all but the most egregious adverse factors," *Matter of Kasinga,* 21 I&N Dec. 357, 367 (BIA 1996).

*C. Establishing Bars to Asylum*

The availability of asylum has long been qualified both by statutory bars and by administrative discretion to create additional bars. Those bars have developed over time in a back-and-forth process between Congress and the Attorney General. The original asylum provisions, as set out in the Refugee Act of 1980, Public Law 96–212, simply directed the Attorney General to "establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee" within the meaning of the title. *See* 8 U.S.C. 1158(a) (1982); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 427–29 (1987) (describing the 1980 provisions).

In the 1980 implementing regulations, the Attorney General, in his discretion, established several mandatory bars to granting asylum that were modeled on the mandatory bars to eligibility for withholding of deportation under the existing section 243(h) of the INA. *See* Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980) ("The application will be denied if the alien does not come within the definition of refugee under the Act, is firmly resettled in a third country, or is within one of the undesirable groups described in section 243(h) of the Act, *e.g.,* having been convicted of a serious crime, constitutes a danger to the United States."). Those regulations required denial of an asylum application if it was determined that (1) the alien was "not a refugee within the meaning of section 101(a)(42)" of the INA, 8 U.S.C. 1101(a)(42); (2) the alien had been "firmly resettled in a foreign country" before arriving in the United States; (3) the alien "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular group, or political opinion"; (4) the alien had "been convicted by a final judgment of a particularly serious crime" and therefore constituted "a danger to the community of the United States"; (5) there were "serious reasons for considering that the alien ha[d] committed a serious non-political crime outside the United States prior to the arrival of the alien in the United States"; or (6) there were "reasonable grounds for regarding the alien as a danger to the security of the United States." *See id.* at 37394–95.

In 1990, the Attorney General substantially amended the asylum regulations while retaining the mandatory bars for aliens who persecuted others on account of a protected ground, were convicted of a particularly serious crime in the United States, firmly resettled in another country, or presented reasonable grounds to be regarded as a danger to the security of the United States. *See* Asylum and Withholding of Deportation Procedures, 55 FR 30674, 30683 (July 27, 1990); *see also Yang* v. *INS,* 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding firm-resettlement bar); *Komarenko,* 35 F.3d at 436 (upholding particularly-serious-crime bar). In the Immigration Act of 1990, Public Law 101–649, Congress added an additional mandatory bar to applying for or being granted asylum for "[a]n[y] alien who has been convicted of an aggravated felony." Public Law 101–649, sec. 515.

In IIRIRA and the Antiterrorism and Effective Death Penalty Act of 1996, Public Law 104–132, Congress amended the asylum provisions in section 208 of the INA, 8 U.S.C. 1158. Among other amendments, Congress created three exceptions to section 208(a)(1)'s provision that an alien may apply for asylum, for (1) aliens who can be removed to a safe third country pursuant to bilateral or multilateral agreement; (2) aliens who failed to apply for asylum within one year of arriving in the United States; and (3) aliens who have previously applied for asylum and had the application denied. Public Law 104–208, div. C, sec. 604(a); *see* INA 208(a)(2)(A)–(C), 8 U.S.C. 1158(a)(2)(A)–(C).

Congress also adopted six mandatory exceptions to the authority of the Attorney General or Secretary to grant asylum that largely reflect pre-existing bars set forth in the Attorney General's asylum regulations. These exceptions cover (1) aliens who "ordered, incited, or otherwise participated" in the persecution of others on account of a protected ground; (2) aliens convicted of a "particularly serious crime"; (3) aliens who committed a "serious nonpolitical crime outside the United States" before arriving in the United States; (4) aliens who are a "danger to the security of the United States"; (5) aliens who are inadmissible or removable under a set of specified grounds relating to terrorist activity; and (6) aliens who have "firmly resettled in another country prior to arriving in the United States." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(A)(i)–(vi), 8 U.S.C. 1158(b)(2)(A)(i)–(vi). Congress further added that aggravated felonies, defined in 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]." Public Law 104–208, div. C, sec. 604(a); *see* INA 201(a)(43), 8 U.S.C. 1101(a)(43).

Although Congress enacted specific exceptions, that statutory list is not exhaustive. Congress, in IIRIRA, expressly authorized the Attorney General to expand upon two of those exceptions—the bars for "particularly serious crimes" and "serious nonpolitical offenses." While Congress prescribed that all aggravated felonies constitute particularly serious crimes, Congress further provided that the Attorney General may "designate by regulation offenses that will be considered" a "particularly serious crime" that "constitutes a danger to the community of the United States." INA 208(b)(2)(A)(ii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(ii), (B)(ii). Courts and the Board have long held that this grant of authority also authorizes the Board to

identify additional particularly serious crimes (beyond aggravated felonies) through case-by-case adjudication. *See, e.g., Ali* v. *Achim,* 468 F.3d 462, 468–69 (7th Cir. 2006); *Delgado* v. *Holder,* 648 F.3d 1095, 1106 (9th Cir. 2011) (en banc). Congress likewise authorized the Attorney General to designate by regulation offenses that constitute "a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States." INA 208(b)(2)(A)(iii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(iii), (B)(ii). Although these provisions continue to refer only to the Attorney General, the Departments interpret these provisions to also apply to the Secretary of Homeland Security by operation of the Homeland Security Act of 2002. *See* 6 U.S.C. 552; 8 U.S.C. 1103(a)(1).

Congress further provided the Attorney General with the authority, by regulation, to "establish additional limitations and conditions, consistent with [section 208 of the INA], under which an alien shall be ineligible for asylum under paragraph (1)." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). As the Tenth Circuit has recognized, "the statute clearly empowers" the Attorney General to "adopt[] further limitations" on asylum eligibility. *R–S–C,* 869 F.3d at 1187 & n.9. By allowing the imposition by regulation of "additional limitations and conditions," the statute gives the Attorney General and the Secretary broad authority in determining what the "limitations and conditions" should be. The additional limitations on eligibility must be established "by regulation," and must be "consistent with" the rest of section 208 of the INA. INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C).

Thus, the Attorney General in the past has invoked section 208(b)(2)(C) of the INA to limit eligibility for asylum based on a "fundamental change in circumstances" and on the ability of an applicant to safely relocate internally within the alien's country of nationality or of last habitual residence. *See* Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000). The courts have also viewed section 208(b)(2)(C) as conferring broad discretion, including to render aliens ineligible for asylum based on fraud. *See R–S–C,* 869 F.3d at 1187; *Nijjar* v. *Holder,* 689 F.3d 1077, 1082 (9th Cir. 2012) (noting that fraud can be "one of the 'additional limitations . . . under which an alien shall be ineligible for asylum' that the Attorney General is authorized to establish by regulation").

Section 208(d)(5) of the INA, 8 U.S.C. 1158(d)(5), also establishes certain procedures for consideration of asylum applications. But Congress specified that the Attorney General "may provide

by regulation for any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B).

In sum, the current statutory framework leaves the Attorney General (and, after the Homeland Security Act, the Secretary) significant discretion to adopt additional bars to asylum eligibility. Beyond providing discretion to further define particularly serious crimes and serious nonpolitical offenses, Congress has provided the Attorney General and Secretary with discretion to establish by regulation any additional limitations or conditions on eligibility for asylum or on the consideration of applications for asylum, so long as these limitations are consistent with the asylum statute.

### D. Other Forms of Protection

Aliens who are not eligible to apply for or be granted asylum, or who are denied asylum on the basis of the Attorney General's or the Secretary's discretion, may nonetheless qualify for protection from removal under other provisions of the immigration laws. A defensive application for asylum that is submitted by an alien in removal proceedings is also deemed an application for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* 8 CFR 208.30(e)(2)–(4), 1208.3(b), 1208.16(a). An immigration judge may also consider an alien's eligibility for withholding and deferral of removal under regulations issued pursuant to the authority of the implementing legislation regarding Article 3 of the CAT. *See* Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, div. G, sec. 2242(b); 8 CFR 1208.3(b); *see also* 8 CFR 1208.16–1208.17.

These forms of protection bar an alien's removal to any country where the alien would "more likely than not" face persecution or torture, meaning that the alien would face a clear probability that his or her life or freedom would be threatened on account of a protected ground or a clear probability of torture. 8 CFR 1208.16(b)(2), (c)(2); *see Kouljinski* v. *Keisler,* 505 F.3d 534, 544–45 (6th Cir. 2007); *Sulaiman* v. *Gonzales,* 429 F.3d 347, 351 (1st Cir. 2005). Thus, if an alien proves that it is more likely than not that the alien's life or freedom would be threatened on account of a protected ground, but is denied asylum for some other reason—for instance, because of a statutory exception, an eligibility bar adopted by regulation, or a discretionary denial of asylum—the alien may be entitled to

statutory withholding of removal if not otherwise barred for that form of protection. INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 208.16, 1208.16; *see also Garcia* v. *Sessions,* 856 F.3d 27, 40 (1st Cir. 2017) ("[W]ithholding of removal has long been understood to be a mandatory protection that must be given to certain qualifying aliens, while asylum has never been so understood."). Likewise, an alien who establishes that he or she will more likely than not face torture in the country of removal will qualify for CAT protection. *See* 8 CFR 208.16(c), 1208.16(c). But, unlike asylum, statutory withholding and CAT protection do not: (1) Prohibit the Government from removing the alien to a third country where the alien would not face the requisite probability of persecution or torture; (2) create a path to lawful permanent resident status and citizenship; or (3) afford the same ancillary benefits (such as protection for derivative family members). *See R–S–C,* 869 F.3d at 1180.

*E. Implementation of Treaty Obligations*

The framework described above is consistent with current U.S. obligations under the 1967 Protocol Relating to the Status of Refugees ("Refugee Protocol"), which incorporates Articles 2 to 34 of the 1951 Convention Relating to the Status of Refugees ("Refugee Convention"), as well as U.S. obligations under Article 3 of the CAT. Neither the Refugee Protocol nor the CAT is self-executing in the United States. *See Khan* v. *Holder,* 584 F.3d 773, 783 (9th Cir. 2009) ("[T]he [Refugee] Protocol is not self-executing."); *Auguste* v. *Ridge,* 395 F.3d 123, 132 (3d Cir. 2005) (the CAT "was not self-executing"). These treaties are not directly enforceable in U.S. law, but some of the obligations they contain have been implemented through domestic implementing legislation. For example, the United States has implemented the non-refoulement provisions of these treaties—*i.e.,* provisions prohibiting the return of an individual to a country where he or she would face persecution or torture— through the withholding of removal provisions at section 241(b)(3) of the INA and the CAT regulations, not through the asylum provisions at section 208 of the INA. *See Cardoza-Fonseca,* 480 U.S. at 440–41; Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, div. G, sec. 2242(b); 8 CFR 208.16(c), 208.17– 208.18; 1208.16(c), 1208.17–1208.18. Limitations on the availability of asylum that do not affect the statutory withholding of removal or protection under the CAT regulations are consistent with these provisions. *See R– S–C,* 869 F.3d at 1188 & n.11; *Cazun* v. *Att'y Gen.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016).

Limitations on eligibility for asylum are also consistent with Article 34 of the Refugee Convention, concerning assimilation of refugees, as implemented by section 208 of the INA, 8 U.S.C. 1158. Section 208 of the INA reflects that Article 34 is precatory and not mandatory, and accordingly does not provide that all refugees shall receive asylum. *See Cardoza-Fonseca,* 480 U.S. at 441; *Garcia,* 856 F.3d at 42; *Cazun,* 856 F.3d at 257 & n. 16; *Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *R–S–C,* 869 F.3d at 1188; *Ramirez-Mejia,* 813 F.3d at 241. As noted above, Congress has long recognized the precatory nature of Article 34 by imposing various statutory exceptions and by authorizing the creation of new bars to asylum eligibility through regulation.

Courts have likewise rejected arguments that other provisions of the Refugee Convention require every refugee to receive asylum. Courts have held, in the context of upholding the bar on eligibility for asylum in reinstatement proceedings under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5), that limiting the ability to apply for asylum does not constitute a prohibited "penalty" under Article 31(1) of the Refugee Convention. *Cazun,* 856 F.3d at 257 & n.16; *Mejia,* 866 F.3d at 588. Courts have also rejected the argument that Article 28 of the Refugee Convention, governing the issuance of international travel documents for refugees "lawfully staying" in a country's territory, mandates that every person who might qualify for statutory withholding must also be granted asylum. *Garcia,* 856 F.3d at 42; *R–S–C,* 869 F.3d at 1188.

**IV. Regulatory Changes**

*A. Limitation on Eligibility for Asylum for Aliens Who Contravene a Presidential Proclamation Under Section 212(f) or 215(a)(1) of the INA Concerning the Southern Border*

Pursuant to section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), the Departments are revising 8 CFR 208.13(c) and 8 CFR 1208.13(c) to add a new mandatory bar on eligibility for asylum for certain aliens who are subject to a presidential proclamation suspending or imposing limitations on their entry into the United States pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), or section 215(a)(1) of the INA, 8 U.S.C. 1185(a)(1), and who enter the United States in contravention of such a proclamation after the effective date of this rule. The bar would be subject to several further limitations: (1) The bar would apply only prospectively, to aliens who enter the United States after the effective date of such a proclamation; (2) the proclamation must concern entry at the southern border; and (3) the bar on asylum eligibility would not apply if the proclamation expressly disclaims affecting asylum eligibility for aliens within its scope, or expressly provides for a waiver or exception that entitles the alien to relief from the limitation on entry imposed by the proclamation.

The President has both statutory and inherent constitutional authority to suspend the entry of aliens into the United States when it is in the national interest. *See United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 542 (1950) ("The exclusion of aliens is a fundamental act of sovereignty" that derives from "legislative power" and also "is inherent in the executive power to control the foreign affairs of the nation."); *see also Proposed Interdiction of Haitian Flag Vessels,* 5 Op. O.L.C. 242, 244–45 (1981) ("[T]he sovereignty of the Nation, which is the basis of our ability to exclude all aliens, is lodged in both political branches of the government," and even without congressional action, the President may "act[ ] to protect the United States from massive illegal immigration.").

Congress, in the INA, has expressly vested the President with broad authority to restrict the ability of aliens to enter the United States. Section 212(f) states: "Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. 1182(f). "By its plain language, [8 U.S.C.] § 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States," including the authority "to impose additional limitations on entry beyond the grounds for exclusion set forth in the INA." *Trump* v. *Hawaii,* 138 S. Ct. 2392, 2408 – 12 (2018). For instance, the Supreme Court considered it "perfectly clear that 8 U.S.C. 1182[f] . . . grants the President ample power to establish a naval blockade that would simply deny illegal Haitian immigrants the ability to disembark on our shores," thereby preventing them from entering

the United States and applying for asylum. *Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 187 (1993).

The President's broad authority under section 212(f) is buttressed by section 215(a)(1), which states it shall be unlawful "for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. 1185(a)(1). The presidential orders that the Supreme Court upheld in *Sale* were promulgated pursuant to both sections 212(f) and 215(a)(1)—*see* 509 U.S. at 172 & n.27; *see also* Exec. Order 12807 (May 24, 1992) ("Interdiction of Illegal Aliens"); Exec. Order 12324 (Sept. 29, 1981) ("Interdiction of Illegal Aliens") (revoked and replaced by Exec. Order 12807)—as was the proclamation upheld in *Trump* v. *Hawaii, see* 138 S. Ct. at 2405. Other presidential orders have solely cited section 215(a)(1) as authority. *See, e.g.,* Exec. Order 12172 (Nov. 26, 1979) ("Delegation of Authority With Respect to Entry of Certain Aliens Into the United States") (invoking section 215(a)(1) with respect to certain Iranian visa holders).

An alien whose entry is suspended or limited by a proclamation is one whom the President has determined should not enter the United States, or only should do so under certain conditions. Such an order authorizes measures designed to prevent such aliens from arriving in the United States as a result of the President's determination that it would be against the national interest for them to do so. For example, the proclamation and order that the Supreme Court upheld in *Sale,* Proc. 4865 (Sept. 29, 1981) ("High Seas Interdiction of Illegal Aliens"); Exec. Order 12324, directed the Coast Guard to interdict the boats of tens of thousands of migrants fleeing Haiti to prevent them from reaching U.S. shores, where they could make claims for asylum. The order further authorized the Coast Guard to intercept any vessel believed to be transporting undocumented aliens to the United States, "[t]o make inquiries of those on board, examine documents, and take such actions as are necessary to carry out this order," and "[t]o return the vessel and its passengers to the country from which it came, or to another country, when there is reason to believe that an offense is being committed against the United States immigration laws." Exec. Order 12807, sec. 2(c).

An alien whose entry is suspended or restricted under such a proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the alien should not be in the United States, would remain subject to various procedures under immigration laws. For instance, an alien subject to a proclamation who nevertheless entered the country in contravention of its terms generally would be placed in expedited-removal proceedings under section 235 of the INA, 8 U.S.C. 1225, and those proceedings would allow the alien to raise any claims for protection before being removed from the United States, if appropriate. Furthermore, the asylum statute provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival)," and "irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C.] 1225(b)." INA 208(a)(1), 8 U.S.C. 1158(a)(1). Some past proclamations have accordingly made clear that aliens subject to an entry bar may still apply for asylum if they have nonetheless entered the United States. *See, e.g.,* Proc. 9645, sec. 6(e) (Sept. 24, 2017) ("Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats") ("Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the Convention Against Torture, consistent with the laws of the United States.").

As noted above, however, the asylum statute also authorizes the Attorney General and Secretary "by regulation" to "establish additional limitations and conditions, consistent with [section 208 of the INA], under which an alien shall be ineligible for asylum," INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C), and to set conditions or limitations on the consideration of an application for asylum, INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B). The Attorney General and the Secretary have determined that this authority should be exercised to render ineligible for a grant of asylum any alien who is subject to a proclamation suspending or restricting entry along the southern border with Mexico, but who nonetheless enters the United States after such a proclamation goes into effect. Such an alien would have engaged in actions that undermine a particularized determination in a proclamation that the President judged as being required by the national interest: That the alien should not enter the United States.

The basis for ineligibility in these circumstances would be the Departments' conclusion that aliens who contravene such proclamations should not be eligible for asylum. Such proclamations generally reflect sensitive determinations regarding foreign relations and national security that Congress recognized should be entrusted to the President. *See Trump* v. *Hawaii,* 138 S. Ct. at 2411. Aliens who contravene such a measure have not merely violated the immigration laws, but have also undercut the efficacy of a measure adopted by the President based upon his determination of the national interest in matters that could have significant implications for the foreign affairs of the United States. For instance, previous proclamations were directed solely at Haitian migrants, nearly all of whom were already inadmissible by virtue of other provisions of the INA, but the proclamation suspended entry and authorized further measures to ensure that such migrants did not enter the United States contrary to the President's determination. *See, e.g.,* Proc. 4865; Exec. Order 12807.

In the case of the southern border, a proclamation that suspended the entry of aliens who crossed between the ports of entry would address a pressing national problem concerning the immigration system and our foreign relations with neighboring countries. Even if most of those aliens would already be inadmissible under our laws, the proclamation would impose limitations on entry for the period of the suspension against a particular class of aliens defined by the President. That judgment would reflect a determination that certain illegal entrants—namely, those crossing between the ports of entry on the southern border during the duration of the proclamation—were a source of particular concern to the national interest. Furthermore, such a proclamation could authorize additional measures to prevent the entry of such inadmissible aliens, again reflecting the national concern with this subset of inadmissible aliens. The interim final rule reflects the Departments' judgment that, under the extraordinary circumstances presented here, aliens crossing the southern border in contravention of such a proclamation should not be eligible for a grant of asylum during the period of suspension or limitation on entry. The result would be to channel to ports of entry aliens who seek to enter the United States and assert an intention to apply for asylum or a fear of persecution, and to provide for consideration of those statements there.

Significantly, this bar to eligibility for a grant of asylum would be limited in scope. This bar would apply only prospectively. This bar would further

apply only to a proclamation concerning entry along the southern border, because this interim rule reflects the need to facilitate urgent action to address current conditions at that border. This bar would not apply to any proclamation that expressly disclaimed an effect on eligibility for asylum. And this bar would not affect an applicant who is granted a waiver or is excepted from the suspension under the relevant proclamation, or an alien who did not at any time enter the United States after the effective date of such proclamation.

Aliens who enter in contravention of a proclamation will not, however, overcome the eligibility bar merely because a proclamation has subsequently ceased to have effect. The alien still would have entered notwithstanding a proclamation at the time the alien entered the United States, which would result in ineligibility for asylum (but not for statutory withholding or for CAT protection). Retaining eligibility for asylum for aliens who entered the United States in contravention of the proclamation, but evaded detection until it had ceased, could encourage aliens to take riskier measures to evade detection between ports of entry, and would continue to stretch government resources dedicated to apprehension efforts.

This restriction on eligibility to asylum is consistent with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1). The regulation establishes a condition on asylum eligibility, not on the ability to apply for asylum. *Compare* INA 208(a), 8 U.S.C. 1158(a) (describing conditions for applying for asylum), *with* INA 208(b), 8 U.S.C. 1158(b) (identifying exceptions and bars to granting asylum). And, as applied to a proclamation that suspends the entry of aliens who crossed between the ports of entry at the southern border, the restriction would not preclude an alien physically present in the United States from being granted asylum if the alien arrives in the United States through any border other than the southern land border with Mexico or at any time other than during the pendency of a proclamation suspending or limiting entry.

*B. Screening Procedures in Expedited Removal for Aliens Subject to Proclamations*

The rule would also modify certain aspects of the process for screening claims for protection asserted by aliens who have entered in contravention of a proclamation and who are subject to expedited removal under INA 235(b)(1), 8 U.S.C. 1225(b)(1). Under current procedures, aliens who unlawfully enter the United States may avoid being removed on an expedited basis by making a threshold showing of a credible fear of persecution at a initial screening interview. At present, those aliens are often released into the interior of the United States pending adjudication of such claims by an immigration court in section 240 proceedings especially if those aliens travel as family units. Once an alien is released, adjudications can take months or years to complete because of the increasing volume of claims and the need to expedite cases in which aliens have been detained. The Departments expect that a substantial proportion of aliens subject to an entry proclamation concerning the southern border would be subject to expedited removal, since approximately 234,534 aliens in FY 2018 who presented at a port of entry or were apprehended at the border were referred to expedited-removal proceedings.[1] The procedural changes within expedited removal would be confined to aliens who are ineligible for asylum because they are subject to a regulatory bar for contravening an entry proclamation.

1. Under existing law, expedited-removal procedures—streamlined procedures for expeditiously reviewing claims and removing certain aliens—apply to those individuals who arrive at a port of entry or those who have entered illegally and are encountered by an immigration officer within 100 miles of the border and within 14 days of entering. *See* INA 235(b), 8 U.S.C. 1225(b); Designating Aliens For Expedited Removal, 69 FR 48877, 48880 (Aug. 11, 2004). To be subject to expedited removal, an alien must also be inadmissible under INA 212(a)(6)(C) or (a)(7), 8 U.S.C. 1182(a)(6)(C) or (a)(7), meaning that the alien has either tried to procure documentation through misrepresentation or lacks such documentation altogether. Thus, an alien encountered in the interior of the United States who entered in contravention of a proclamation and who is not otherwise amenable to expedited removal would be placed in proceedings under section 240 of the INA. The interim rule does not invite comment on existing regulations implementing the present scope of expedited removal.

Section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1), prescribes procedures in the expedited-removal context for screening an alien's eligibility for asylum. When these provisions were being debated in 1996, legislators expressed particular concern that ''[e]xisting procedures to deny entry to and to remove illegal aliens from the United States are cumbersome and duplicative,'' and that ''[t]he asylum system has been abused by those who seek to use it as a means of 'backdoor' immigration.'' *See* H.R. Rep. No. 104–469, pt. 1, at 107 (1996). Members of Congress accordingly described the purpose of expedited removal and related procedures as ''streamlin[ing] rules and procedures in the Immigration and Nationality Act to make it easier to deny admission to inadmissible aliens and easier to remove deportable aliens from the United States.'' *Id.* at 157; *see Am. Immigration Lawyers Ass'n* v. *Reno,* 18 F. Supp. 2d 38, 41 (D.D.C. 1998), *aff'd,* 199 F.3rd 1352 (DC Cir. 2000) (rejecting several constitutional challenges to IIRIRA and describing the expedited-removal process as a ''summary removal process for adjudicating the claims of aliens who arrive in the United States without proper documentation'').

Congress thus provided that aliens ''inadmissible under [8 U.S.C.] 1182(a)(6)(C) or 1182(a)(7)'' shall be ''removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. 1158] or a fear of persecution.'' INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i); *see* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii) (such aliens shall be referred ''for an interview by an asylum officer''). On its face, the statute refers only to proceedings to establish eligibility for an affirmative grant of asylum and its attendant benefits, not to statutory withholding of removal or CAT protection against removal to a particular country.

An alien referred for a credible-fear interview must demonstrate a ''credible fear,'' defined as a ''significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [8 U.S.C. 1158].'' INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). According to the House report, ''[t]he credible-fear standard [wa]s designed to weed out non-meritorious cases so that only applicants with a likelihood of success will proceed to the regular asylum process.'' H.R. Rep. No. 104–69, at 158.

---

[1] As noted below, in FY 2018, approximately 171,511 aliens entered illegally between ports of entry, were apprehended by CBP, and were placed in expedited removal. Approximately 59,921 inadmissible aliens arrived at ports of entry and were placed in expedited removal. Furthermore, ICE arrested some 3,102 aliens and placed them in expedited removal.

If the asylum officer determines that the alien lacks a credible fear, then the alien may request review by an immigration judge. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). If the immigration judge concurs with the asylum officer's negative credible-fear determination, then the alien shall be removed from the United States without further review by either the Board or the courts. INA 235(b)(1)(B)(iii)(I), (b)(1)(C), 8 U.S.C. 1225(b)(1)(B)(iii)(I), (b)(1)(C); INA 242(a)(2)(A)(iii), (e)(5), 8 U.S.C. 1252(a)(2)(A)(iii), (e)(5); *Pena* v. *Lynch,* 815 F.3d 452, 457 (9th Cir. 2016). By contrast, if the asylum officer or immigration judge determines that the alien has a credible fear—*i.e.,* "a significant possibility . . . that the alien could establish eligibility for asylum," INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v)—then the alien, under current regulations, is placed in section 240 proceedings for a full hearing before an immigration judge, with appeal available to the Board and review in the federal courts of appeals, *see* INA 235(b)(1)(B)(ii), (b)(2)(A), 8 U.S.C. 1225(b)(1)(B)(ii), (b)(2)(A); INA 242(a), 8 U.S.C. 1252(a); 8 CFR 208.30(e)(5), 1003.1. The interim rule does not invite comment on existing regulations implementing this framework.

By contrast, section 235 of the INA is silent regarding procedures for the granting of statutory withholding of removal and CAT protection; indeed, section 235 predates the legislation directing implementation of U.S. obligations under Article 3 of the CAT. *See* Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, sec. 2242(b) (requiring implementation of CAT); IIRIRA, Public Law 104–208, sec. 302 (revising section 235 of the INA to include procedures for dealing with inadmissible aliens who intend to apply for asylum). The legal standards for ultimately granting asylum on the merits versus statutory withholding or CAT protection are also different. Asylum requires an applicant to ultimately establish a "well-founded fear" of persecution, which has been interpreted to mean a "reasonable possibility" of persecution—a "more generous" standard than the "clear probability" of persecution or torture standard that applies to statutory withholding or CAT protection. *See INS* v. *Stevic,* 467 U.S. 407, 425, 429–30 (1984); *Santosa* v. *Mukasey,* 528 F.3d 88, 92 & n.1 (1st Cir. 2008); *compare* 8 CFR 1208.13(b)(2)(i)(B) *with* 8 CFR 1208.16(b)(2), (c)(2). As a result, applicants who establish eligibility for asylum are not necessarily eligible for statutory withholding or CAT protection.

Current regulations instruct USCIS adjudicators and immigration judges to treat an alien's request for asylum in expedited-removal proceedings under section 1225(b) as a request for statutory withholding and CAT protection as well. *See* 8 CFR 208.3(b), 208.30(e)(2)–(4), 1208.3(b), 1208.16(a). In the context of expedited-removal proceedings, "credible fear of persecution" is defined to mean a "significant possibility" that the alien "could establish eligibility for asylum under section 1158," not CAT or statutory withholding. INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Regulations nevertheless have generally provided that aliens in expedited removal should be subject to the same process for considering statutory withholding of removal claims under INA 241(b)(3), 8 U.S.C. 1231(b)(3), and claims for protection under the CAT, as they are for asylum claims. *See* 8 CFR 208.30(e)(2)–(4).

Thus, when the Immigration and Naturalization Service provided for claims for statutory withholding of removal and CAT protection to be considered in the same expedited-removal proceedings as asylum, the result was that if an alien showed that there was a significant possibility of establishing eligibility for asylum and was therefore referred for removal proceedings under section 240 of the INA, any potential statutory withholding and CAT claims the alien might have were referred as well. This was done on the assumption that that it would not "disrupt[ ] the streamlined process established by Congress to circumvent meritless claims." Regulations Concerning the Convention Against Torture, 64 FR 8478, 8485 (Feb. 19, 1999). But while the INA authorizes the Attorney General and Secretary to provide for consideration of statutory withholding and CAT claims together with asylum claims or other matters that may be considered in removal proceedings, the INA does not require that approach, *see Foti* v. *INS,* 375 U.S. 217, 229–30 & n.16 (1963), or that they be considered in the same way.

Since 1999, regulations also have provided for a distinct "reasonable fear" screening process for certain aliens who are categorically ineligible for asylum and can thus make claims only for statutory withholding or CAT protections. *See* 8 CFR 208.31. Specifically, if an alien is subject to having a previous order of removal reinstated or is a non-permanent resident alien subject to an administrative order of removal resulting from an aggravated felony conviction, then he is categorically ineligible for asylum. *See id.* § 208.31(a), (e). Such an alien can be placed in withholding-only proceedings to adjudicate his statutory withholding or CAT claims, but only if he first establishes a "reasonable fear" of persecution or torture through a screening process that tracks the credible-fear process. *See id.* § 208.31(c), (e). Reasonable fear is defined by regulation to mean a "reasonable possibility that [the alien] would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal." *Id.* § 208.31(c). "This . . . screening process is modeled on the credible-fear screening process, but requires the alien to meet a higher screening standard." Regulations Concerning the Convention Against Torture, 64 FR at 8485; *see also Garcia* v. *Johnson,* No. 14–CV–01775, 2014 WL 6657591, at *2 (N.D. Cal. Nov. 21, 2014) (describing the aim of the regulations as providing "fair and efficient procedures" in reasonable-fear screening that would comport with U.S. international obligations).

Significantly, when establishing the reasonable-fear screening process, DOJ explained that the two affected categories of aliens should be screened based on the higher reasonable-fear standard because, "[u]nlike the broad class of arriving aliens who are subject to expedited removal, these two classes of aliens are ineligible for asylum," and may be entitled only to statutory withholding of removal or CAT protection. Regulations Concerning the Convention Against Torture, 64 FR at 8485. "Because the standard for showing entitlement to these forms of protection (a probability of persecution or torture) is significantly higher than the standard for asylum (a well-founded fear of persecution), the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher." *Id.*

2. Drawing on the established framework for considering whether to grant withholding of removal or CAT protection in the reasonable-fear context, this interim rule establishes a bifurcated screening process for aliens subject to expedited removal who are ineligible for asylum by virtue of entering in contravention of a proclamation, but who express a fear of return or seek statutory withholding or CAT protection. The Attorney General and Secretary have broad authority to

implement the immigration laws, *see* INA 103, 8 U.S.C. 1103, including by establishing regulations, *see* INA 103, 8 U.S.C. 1103(a)(3), and to regulate ''conditions or limitations on the consideration of an application for asylum,'' *id.* 1158(d)(5)(B). Furthermore, the Secretary has the authority—in her ''sole and unreviewable discretion,'' the exercise of which may be ''modified at any time''—to designate additional categories of aliens that will be subject to expedited-removal procedures, so long as the designated aliens have not been admitted or paroled nor continuously present in the United States for two years. INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii). The Departments have frequently invoked these authorities to establish or modify procedures affecting aliens in expedited-removal proceedings, as well as to adjust the categories of aliens subject to particular procedures within the expedited-removal framework.[2]

This rule does not change the credible-fear standard for asylum claims, although the regulation would expand the scope of the inquiry in the process. An alien who is subject to a relevant proclamation and nonetheless has entered the United States after the effective date of such a proclamation in contravention of that proclamation would be ineligible for asylum and would thus not be able to establish a ''significant possibility . . . [of] eligibility for asylum under section 1158.'' INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). As current USCIS guidance explains, under the credible-fear standard, ''[a] claim that has no possibility, or only a minimal or mere possibility, of success, would not meet the 'significant possibility' standard.'' USCIS, Office of Refugee, Asylum, & Int'l Operations, Asylum Div., *Asylum Officer Basic Training Course, Lesson Plan on Credible Fear* at 15 (Feb. 13, 2017). Consistent with section 235(b)(1)(B)(iii)(III) of the INA, the alien could still obtain review from an immigration judge regarding whether the asylum officer correctly determined that the alien was subject to a limitation

[2] *See, e.g.,* Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769 (Jan. 17, 2017); Designating Aliens For Expedited Removal, 69 FR 48877; Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR 10620 (March 8, 2004); New Rules Regarding Procedures for Asylum and Withholding of Removal, 63 FR 31945 (June 11, 1998); Asylum Procedures, 65 FR 76121; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999).

or suspension on entry imposed by a proclamation. Further, consistent with section 235(b)(1)(B) of the INA, if the immigration judge reversed the asylum officer's determination, the alien could assert the asylum claim in section 240 proceedings.

Aliens determined to be ineligible for asylum by virtue of contravening a proclamation, however, would still be screened, but in a manner that reflects that their only viable claims would be for statutory withholding or CAT protection pursuant to 8 CFR 208.30(e)(2)–(4) and 1208.16(a). After determining the alien's ineligibility for asylum under the credible-fear standard, the asylum officer would apply the long-established reasonable-fear standard to assess whether further proceedings on a possible statutory withholding or CAT protection claim are warranted. If the asylum officer determined that the alien had not established the requisite reasonable fear, the alien then could seek review of that decision from an immigration judge (just as the alien may under existing 8 CFR 208.30 and 208.31), and would be subject to removal only if the immigration judge agreed with the negative reasonable-fear finding. Conversely, if either the asylum officer or the immigration judge determined that the alien cleared the reasonable-fear threshold, the alien would be put in section 240 proceedings, just like aliens who receive a positive credible-fear determination for asylum. Employing a reasonable-fear standard in this context, for this category of ineligible aliens, would be consistent with the Department of Justice's longstanding rationale that ''aliens ineligible for asylum,'' who could only be granted statutory withholding of removal or CAT protection, should be subject to a different screening standard that would correspond to the higher bar for actually obtaining these forms of protection. *See* Regulations Concerning the Convention Against Torture, 64 FR at 8485 (''Because the standard for showing entitlement to these forms of protection . . . is significantly higher than the standard for asylum . . . the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher.'').

The screening process established by the interim rule will accordingly proceed as follows. For an alien subject to expedited removal, DHS will ascertain whether the alien seeks protection, consistent with INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). All aliens seeking asylum, statutory withholding of

removal, or CAT protection will continue to go before an asylum officer for screening, consistent with INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B). The asylum officer will ask threshold questions to elicit whether an alien is ineligible for a grant of asylum pursuant to a proclamation entry bar. If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates sufficient facts pertaining to asylum eligibility), then the alien will have established a credible fear.

If, however, an alien lacks a significant possibility of eligibility for asylum because of the proclamation bar, then the asylum officer will make a negative credible-fear finding. The asylum officer will then apply the reasonable-fear standard to assess the alien's claims for statutory withholding of removal or CAT protection.

An alien subject to the proclamation-based asylum bar who clears the reasonable-fear screening standard will be placed in section 240 proceedings, just as an alien who clears the credible-fear standard will be. In those proceedings, the alien will also have an opportunity to raise whether the alien was correctly identified as subject to the proclamation ineligibility bar to asylum, as well as other claims. If an immigration judge determines that the alien was incorrectly identified as subject to the proclamation, the alien will be able to apply for asylum. Such aliens can appeal the immigration judge's decision in these proceedings to the BIA and then seek review from a federal court of appeals.

Conversely, an alien who is found to be subject to the proclamation asylum bar and who does not clear the reasonable-fear screening standard can obtain review of both of those determinations before an immigration judge, just as immigration judges currently review negative credible-fear and reasonable-fear determinations. If the immigration judge finds that either determination was incorrect, then the alien will be placed into section 240 proceedings. In reviewing the determinations, the immigration judge will decide de novo whether the alien is subject to the proclamation asylum bar. If, however, the immigration judge affirms both determinations, then the alien will be subject to removal without further appeal, consistent with the existing process under section 235 of the INA. In short, aliens subject to the proclamation eligibility bar to asylum will be processed through existing procedures by DHS and EOIR in accordance with 8 CFR 208.30 and 1208.30, but will be subject to the

App.259

reasonable-fear standard as part of those procedures with respect to their statutory withholding and CAT protection claims.[3]

2. The above process will not affect the process in 8 CFR 208.30(e)(5) for certain existing statutory bars to asylum eligibility. Under that regulatory provision, many aliens who appear to fall within an existing statutory bar, and thus appear to be ineligible for asylum, can nonetheless be placed in section 240 proceedings if they are otherwise eligible for asylum and obtain immigration judge review of their asylum claims, followed by further review before the BIA and the courts of appeals. Specifically, with the exceptions of stowaways and aliens entering from Canada at a port of entry (who are generally ineligible to apply for asylum by virtue of a safe-third-country agreement), 8 CFR 208.30(e)(5) provides that "if an alien is able to establish a credible fear of persecution or torture but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and 208(b)(2) of the [INA] . . . [DHS] shall nonetheless place the alien in proceedings under section 240 of the [INA] for full consideration of the alien's claim."

The language providing that the agency "shall nonetheless place the alien in proceedings under section 240 of the [INA]" was promulgated in 2000 in a final rule implementing asylum procedures after the 1996 enactment of IIRIRA. *See Asylum Procedures*, 65 FR at 76137. The explanation for this change was that some commenters suggested that aliens should be referred to section 240 proceedings "regardless of any apparent statutory ineligibility under section 208(a)(2) or 208(b)(2)(A) of the [INA]. The Department has adopted that suggestion and has so amended the regulation." *Id.* at 76129.

This rule will avoid a textual ambiguity in 8 CFR 208.30(e)(5), which is unclear regarding its scope, by adding a new sentence clarifying the process

applicable to an alien barred under a covered proclamation. *See* 8 CFR 208.30(e)(5) (referring to an alien who "appears to be subject to one or more of the mandatory bars to . . . asylum contained in section 208(a)(2) and 208(b)(2) of the [INA]"). By using a definite article ("the mandatory bars to . . . asylum") and the phrase "contained in," 8 CFR 208.30(e)(5) may refer only to aliens who are subject to the defined mandatory bars "contained in" specific parts of section 208 of the INA, such as the bar for aggravated felons, INA 208(b)(2)(B)(i), 8 U.S.C. 1558(b)(2)(B)(i), or the bar for aliens reasonably believed to be a danger to U.S. security, INA 208(b)(2)(A)(iv), 8 U.S.C. 1158(b)(2)(A)(iv). It is thus not clear whether an alien subject to a further limitation or condition on asylum eligibility adopted pursuant to section 208(b)(2)(C) of the INA would also be subject to the procedures set forth in 8 CFR 208.30(e)(5). Notably, the preamble to the final rule adopting 8 CFR 208.30(e)(5) indicated that it was intended to apply to "any apparent statutory ineligibility under section 208(a)(2) or 208(b)(2)(A) of the [INA]," and did not address future regulatory ineligibility under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). *Asylum Procedures*, 65 FR at 76129. This rule does not resolve that question, however, but instead establishes an express regulatory provision dealing specifically with aliens subject to a limitation under section 212(f) or 215(a)(1) of the INA.

*C. Anticipated Effects of the Rule*

1. The interim rule aims to address an urgent situation at the southern border. In recent years, there has been a significant increase in the number and percentage of aliens who seek admission or unlawfully enter the United States and then assert an intent to apply for asylum or a fear of persecution. The vast majority of such assertions for protection occur in the expedited-removal context, and the rates at which such aliens receive a positive credible-fear determination have increased in the last five years. Having passed through the credible-fear screening process, many of these aliens are released into the interior to await further section 240 removal proceedings. But many aliens who pass through the credible-fear screening thereafter do not pursue their claims for asylum. Moreover, a substantial number fail to appear for a section 240 proceeding. And even aliens who passed through credible-fear screening and apply for asylum are granted it at a low rate.

Recent numbers illustrate the scope and scale of the problems caused by the disconnect between the number of aliens asserting a credible fear and the number of aliens who ultimately are deemed eligible for, and granted, asylum. In FY 2018, DHS identified some 612,183 inadmissible aliens who entered the United States, of whom 404,142 entered unlawfully between ports of entry and were apprehended by CBP, and 208,041 presented themselves at ports of entry. Those numbers exclude the inadmissible aliens who crossed but evaded detection, and interior enforcement operations conducted by U.S. Immigration and Customs Enforcement ("ICE"). The vast majority of those inadmissible aliens—521,090—crossed the southern border. Approximately 98% (396,579) of all aliens apprehended after illegally crossing between ports of entry made their crossings at the southern border, and 76% of all encounters at the southern border reflect such apprehensions. By contrast, 124,511 inadmissible aliens presented themselves at ports of entry along the southern border, representing 60% of all port traffic for inadmissible aliens and 24% of encounters with inadmissible aliens at the southern border.

Nationwide, DHS has preliminarily calculated that throughout FY 2018, approximately 234,534 aliens who presented at a port of entry or were apprehended at the border were referred to expedited-removal proceedings. Of that total, approximately 171,511 aliens were apprehended crossing between ports of entry; approximately 59,921 were inadmissible aliens who presented at ports of entry; and approximately 3,102 were arrested by ICE and referred to expedited removal.[4] The total number of aliens of all nationalities referred to expedited-removal proceedings has significantly increased over the last decade, from 161,516 aliens in 2008 to approximately 234,534 in FY 2018 (an overall increase of about 45%). Of those totals, the number of aliens from the Northern Triangle referred to expedited-removal proceedings has increased from 29,206 in FY 2008 (18% of the total

---

[3] Nothing about this screening process or in this interim rule would alter the existing procedures for processing alien stowaways under the INA and associated regulations. An alien stowaway is unlikely to be subject to 8 CFR 208.13(c)(3) and 1208.13(c)(3) unless a proclamation specifically applies to stowaways or to entry by vessels or aircraft. INA 101(a)(49), 8 U.S.C. 1101(a)(49). Moreover, an alien stowaway is barred from being placed into section 240 proceedings regardless of the level of fear of persecution he establishes. INA 235(a)(2), 8 U.S.C. 1225(a)(2). Similarly, despite the incorporation of a reasonable-fear standard into the evaluation of certain cases under credible-fear procedures, nothing about this screening process or in this interim rule implicates existing reasonable-fear procedures in 8 CFR 208.31 and 1208.31.

[4] All references to the number of aliens subject to expedited removal in FY 2018 reflect data for the first three quarters of the year and projections for the fourth quarter of FY 2018. It is unclear whether the ICE arrests reflect additional numbers of aliens processed at ports of entry. Another approximately 130,211 aliens were subject to reinstatement, meaning that the alien had previously been removed and then unlawfully entered the United States again. The vast majority of reinstatements involved Mexican nationals. Aliens subject to reinstatement who express a fear of persecution or torture receive reasonable-fear determinations under 8 CFR 208.31.

161,516 aliens referred) to approximately 103,752 in FY 2018 (44% of the total approximately 234,534 aliens referred, an increase of over 300%). In FY 2018, nationals of the Northern Triangle represented approximately 103,752 (44%) of the aliens referred to expedited-removal proceedings; approximately 91,235 (39%) were Mexican; and nationals from other countries made up the remaining balance (17%). As of the date of this rule, final expedited-removal statistics for FY 2018 specific to the southern border are not available. But the Departments' experience with immigration enforcement has demonstrated that the vast majority of expedited-removal actions have also occurred along the southern border.

Once in expedited removal, some 97,192 (approximately 41% of all aliens in expedited removal) were referred for a credible-fear interview with an asylum officer, either because they expressed a fear of persecution or torture or an intent to apply for protection. Of that number, 6,867 (7%) were Mexican nationals, 25,673 (26%) were Honduran, 13,433 (14%) were Salvadoran, 24,456 (25%) were Guatemalan, and other nationalities made up the remaining 28% (the largest proportion of which were 7,761 Indian nationals).

In other words: Approximately 61% of aliens from Northern Triangle countries placed in expedited removal expressed the intent to apply for asylum or a fear of persecution and triggered credible-fear proceedings in FY 2018 (approximately 69% of Hondurans, 79% of Salvadorans, and 49% of Guatemalans). These aliens represented 65% of all credible-fear referrals in FY 2018. By contrast, only 8% of aliens from Mexico trigger credible-fear proceedings when they are placed in expedited removal, and Mexicans represented 7% of all credible-fear referrals. Other nationalities compose the remaining 26,763 (28%) referred for credible-fear interviews.

Once these 97,192 aliens were interviewed by an asylum officer, 83,862 cases were decided on the merits (asylum officers closed the others).[5]

Those asylum officers found a credible fear in 89% (74,574) of decided cases—meaning that almost all of those aliens' cases were referred on for further immigration proceedings under section 240, and many of the aliens were released into the interior while awaiting those proceedings.[6] As noted, nationals of Northern Triangle countries represent the bulk of credible-fear referrals (65%, or 63,562 cases where the alien expressed an intent to apply for asylum or asserted a fear). In cases where asylum officers decided whether nationals of these countries had a credible fear, they received a positive credible-fear finding 88% of the time.[7] Moreover, when aliens from those countries sought review of negative findings by an immigration judge, they obtained reversals approximately 18% of the time, resulting in some 47,507 cases in which nationals of Northern Triangle countries received positive credible-fear determinations.[8] In other words: Aliens from Northern Triangle countries ultimately received a positive credible-fear determination 89% of the time. Some 6,867 Mexican nationals were interviewed; asylum officers gave them a positive credible-fear determination in 81% of decided cases (4,261), and immigration judges

reversed an additional 91 negative credible-fear determinations, resulting in some 4,352 cases (83% of cases decided on the merits) in which Mexican nationals were referred to section 240 proceedings after receiving a positive credible-fear determination.

These figures have enormous consequences for the asylum system writ large. Asylum officers and immigration judges devote significant resources to these screening interviews, which the INA requires to happen within a fixed statutory timeframe. These aliens must also be detained during the pendency of expedited-removal proceedings. *See* INA 235(b), 8 U.S.C. 1225(b); *Jennings* v. *Rodriguez,* 138 S. Ct. 830, 834 (2018). And assertions of credible fear in expedited removal have rapidly grown in the last decade—especially in the last five years. In FY 2008, for example, fewer than 5,000 aliens were in expedited removal (5%) and were thus referred for a credible-fear interview. In FY 2014, 51,001 referrals occurred (representing 21% of aliens in expedited removal). The credible-fear referral numbers today reflect a 190% increase from FY 2014 and a nearly 2000% increase from FY 2008. Furthermore, the percentage of cases in which asylum officers found that aliens had established a credible fear—leading to the aliens being placed in section 240 removal proceedings—has also increased in recent years. In FY 2008, asylum officers found a credible fear in about 3,200 (or 77%) of all cases. In FY 2014, asylum officers found a credible fear in about 35,000 (or 80%) of all cases in which they made a determination. And in FY 2018, asylum officers found a credible fear in nearly 89% of all such cases.

Once aliens are referred for section 240 proceedings, their cases may take months or years to adjudicate due to backlogs in the system. As of November 2, 2018, there were approximately 203,569 total cases pending in the immigration courts that originated with a credible-fear referral—or 26% of the total backlog of 791,821 removal cases. Of that number, 136,554 involved nationals of Northern Triangle countries (39,940 cases involving Hondurans; 59,702 involving Salvadoran nationals; 36,912 involving Guatemalan nationals). Another 10,736 cases involved Mexican nationals.

In FY 2018, immigration judges completed 34,158 total cases that originated with a credible-fear referral.[9]

---

[5] DHS sometimes calculates credible-fear grant rates as a proportion of all cases (positive, negative, and closed cases). Because this rule concerns the merits of the screening process and closed cases are not affected by that process, this preamble discusses the proportions of determinations on the merits when describing the credible-fear screening process. This preamble does, however, account for the fact that some proportion of closed cases are also sent to section 240 proceedings when discussing the number of cases that immigration judges completed involving aliens referred for a credible-fear interview while in expedited-removal proceedings.

[6] Stowaways are the only category of aliens who would receive a positive credible-fear determination and go to asylum-only proceedings, as opposed to section 240 proceedings, but the number of stowaways is very small. Between FY 2013 and FY 2017, an average of roughly 300 aliens per year were placed in asylum-only proceedings, and that number includes not only stowaways but all classes of aliens subject to asylum-only proceedings. 8 CFR 1208.2(c)(1) (describing 10 categories of aliens, including stowaways found to have a credible fear, who are subject to asylum-only proceedings).

[7] Asylum officers decided 53,205 of these cases on the merits and closed the remaining 10,357 (but sent many of the latter to section 240 proceedings). Specifically, 25,673 Honduran nationals were interviewed; 21,476 of those resulted in a positive screening on the merits, 2,436 received a negative finding, and 1,761 were closed—meaning that 90% of all Honduran cases involving a merits determination resulted in a positive finding, and 10% were denied. Some 13,433 Salvadoran nationals were interviewed; 11,034 of those resulted in a positive screening on the merits 1,717 were denied, and 682 were closed—meaning that 86% of all Salvadoran cases involving a merits determination resulted in a positive finding, and 14% were denied. Some 24,456 Guatemalan nationals were interviewed; 14,183 of those resulted in a positive screening on the merits, 2,359 were denied, and 7,914 were closed—meaning that 86% of all Guatemalan cases involving a merits determination resulted in a positive finding, and 14% were denied. Again, the percentages exclude closed cases so as to describe how asylum officers make decisions on the merits.

[8] Immigration judges in 2018 reversed 18% (288) of negative credible-fear determinations involving Hondurans, 19% (241) of negative credible-fear determinations involving Salvadorans, and 17% (285) of negative credible-fear determinations involving Guatemalans.

[9] All descriptions of case outcomes before immigration judges reflect initial case completions by an immigration judge during the fiscal year

Continued

Those aliens were likely referred for credible-fear screening between 2015 and 2018; the vast majority of these cases arose from positive credible-fear determinations as opposed to the subset of cases that were closed in expedited removal and referred for section 240 proceedings. In a significant proportion of these cases, the aliens did not appear for section 240 proceedings or did not file an application for asylum in connection with those proceedings. In FY 2018, of the 34,158 completions that originated with a credible-fear referral, 24,361 (71%) were completed by an immigration judge with the issuance of an order of removal. Of those completed cases, 10,534 involved in absentia removal orders, meaning that in approximately 31% of all initial completions in FY 2018 that originated from a credible-fear referral, the alien failed to appear at a hearing. Moreover, of those 10,534 cases, there were 1,981 cases where an asylum application was filed, meaning 8,553 did not file an asylum application and failed to appear at a hearing. Further, 40% of all initial completions originating with a credible-fear referral (or 13,595 cases, including the 8,553 aliens just discussed) were completed in FY 2018 without an alien filing an application for asylum. In short, in nearly half of the cases completed by an immigration judge in FY 2018 involving aliens who passed through a credible-fear referral, the alien failed to appear at a hearing or failed to file an asylum application.

Those figures are consistent with trends from FY 2008 through FY 2018, during which time DHS pursued some 354,356 cases in the immigration courts that involved aliens who had gone through a credible-fear review (i.e., the aliens received a positive credible-fear determination or their closed case was referred for further proceedings). During this period, however, only about 53% (189,127) of those aliens filed an asylum application, despite the fact that they were placed into further immigration proceedings under section 240 because they alleged a fear during expedited-removal proceedings.

Even among those aliens who received a credible-fear interview, filed for asylum, and appeared in section 240 proceedings to resolve their asylum claims—a category that would logically include the aliens with the greatest confidence in the merits of their claims—only a very small percentage received asylum. In FY 2018 immigration judges completed 34,158 cases that originated with a credible-fear referral; only 20,563 of those cases involved an application for asylum, and immigration judges granted only 5,639 aliens asylum. In other words, in FY 2018, less than about 6,000 aliens who passed through credible-fear screening (17% of all completed cases, 27% of all completed cases in which an asylum application was filed, and about 36% of cases where the asylum claim was adjudicated on the merits) established that they should be granted asylum. (An additional 322 aliens received either statutory withholding or CAT protection.) Because there may be multiple bases for denying an asylum application and immigration judges often make alternative findings for consideration of issues on appeal, EOIR does not track reasons for asylum denials by immigration judges at a granular level. Nevertheless, experience indicates that the vast majority of those asylum denials reflect a conclusion that the alien failed to establish a significant possibility of persecution, rather than the effect of a bar to asylum eligibility or a discretionary decision by an immigration judge to deny asylum to an alien who qualifies as a refugee.

The statistics for nationals of Northern Triangle countries are particularly illuminating. In FY 2018, immigration judges in section 240 proceedings adjudicated 20,784 cases involving nationals of Northern Triangle countries who were referred for credible-fear interviews and then referred to section 240 proceedings (i.e., they expressed a fear and either received a positive credible-fear determination or had their case closed and referred to section 240 proceedings for an unspecified reason). Given that those aliens asserted a fear of persecution and progressed through credible-fear screening, those aliens presumably would have had the greatest reason to then pursue an asylum application. Yet in only about 54% of those cases did the alien file an asylum application. Furthermore, about 38% of aliens from Northern Triangle countries who were referred for credible-fear interviews and passed to section 240 proceedings did not appear, and were ordered removed in absentia. Put

differently: Only a little over half of aliens from Northern Triangle countries who claimed a fear of persecution and passed threshold screening submitted an application for asylum, and over a third did not appear at section 240 proceedings.[10] And only 1,889 aliens from Northern Triangle countries were granted asylum, or approximately 9% of completed cases for aliens from Northern Triangle countries who received a credible-fear referral, 17% of the cases where such aliens filed asylum applications in their removal proceedings, and about 23% of cases where such aliens' asylum claims were adjudicated on the merits. Specifically, in FY 2018, 536 Hondurans, 408 Guatemalans, and 945 Salvadorans who initially were referred for a credible-fear interview (whether in FY 2018 or earlier) and progressed to section 240 proceedings were granted asylum.

The Departments thus believe that these numbers underscore the major costs and inefficiencies of the current asylum system. Again, numbers for Northern Triangle nationals—who represent the vast majority of aliens who claim a credible fear—illuminate the scale of the problem. Out of the 63,562 Northern Triangle nationals who expressed an intent to apply for asylum or a fear of persecution and received credible-fear screening interviews in FY 2018, 47,507 received a positive credible-fear finding from the asylum officer or immigration judge. (Another 10,357 cases were administratively closed, some of which also may have been referred to section 240 proceedings.) Those aliens will remain in the United States to await section 240 proceedings while immigration judges work through the current backlog of nearly 800,000 cases—136,554 of which involve nationals of Northern Triangle countries who passed through credible-

unless otherwise noted. All references to applications for asylum generally involve applications for asylum, as opposed to some other form of protection, but EOIR statistics do not distinguish between, for instance, the filing of an application for asylum or the filing of an application for statutory withholding. As noted, an application for asylum is also deemed an application for other forms of protection, and whether an application will be for asylum or only for some other form of protection is often a post-filing determination made by the immigration judge (for instance, because the one-year filing bar for asylum applies).

[10] These percentages are even higher for particular nationalities. In FY 2018, immigration judges adjudicated 7,151 cases involving Hondurans whose cases originated with a credible-fear referral in expedited-removal proceedings. Of that 7,151, only 49% (3,509) filed an application for asylum, and 44% (3,167) had their cases completed with an in absentia removal order because they failed to appear. Similarly, immigration judges adjudicated 5,382 cases involving Guatemalans whose cases originated with a credible-fear referral; only 46% (2,457) filed an asylum application, and 41% (2,218) received in absentia removal orders. The 8,251 Salvadoran cases had the highest rate of asylum applications (filed in 65% of cases, or 5,341), and 31% of the total cases (2,534) involved in absentia removal orders. Numbers for Mexican nationals reflected similar trends. In FY 2018, immigration judges adjudicated 3,307 cases involving Mexican nationals who progressed to section 240 proceedings after being referred for a credible-fear interview; 49% of them filed applications for asylum in these proceedings, and 25% of the total cases resulted in an in absentia removal order.

fear screening interviews. Immigration judges adjudicated 20,784 cases involving such nationals of Northern Triangle countries in FY 2018; slightly under half of those aliens did not file an application for asylum, and over a third were screened through expedited removal but did not appear for a section 240 proceeding. Even when nationals of Northern Triangle countries who passed through credible-fear screening applied for asylum (as 11,307 did in cases completed in FY 2018), immigration judges granted asylum to only 1,889, or 17% of the cases where such aliens filed asylum applications in their removal proceedings. Immigration judges found in the overwhelming majority of cases that the aliens had no significant possibility of persecution.

These existing burdens suggest an unsustainably inefficient process, and those pressures are now coupled with the prospect that large caravans of thousands of aliens, primarily from Central America, will seek to enter the United States unlawfully or without proper documentation and thereafter trigger credible-fear screening procedures and obtain release into the interior. The United States has been engaged in ongoing diplomatic negotiations with Mexico and the Northern Triangle countries (Guatemala, El Salvador, and Honduras) about the problems on the southern border, but those negotiations have, to date, proved unable to meaningfully improve the situation.

2. In combination with a presidential proclamation directed at the crisis on the southern border, the rule would help ameliorate the pressures on the present system. Aliens who could not establish a credible fear for asylum purposes due to the proclamation-based eligibility bar could nonetheless seek statutory withholding of removal or CAT protection, but would receive a positive finding only by establishing a reasonable fear of persecution or torture. In FY 2018, USCIS issued nearly 7,000 reasonable-fear determinations (*i.e.*, made a positive or negative determination)—a smaller number because the current determinations are limited to the narrow categories of aliens described above. Of those determinations, USCIS found a reasonable fear in 45% of cases in 2018, and 48% of cases in 2017. Negative reasonable-fear determinations were then subject to further review, and immigration judges reversed approximately 18%.

Even if rates of positive reasonable-fear findings increased when a more general population of aliens became subject to the reasonable-fear screening

process, this process would better filter those aliens eligible for that form of protection. Even assuming that grant rates for statutory withholding in the reasonable-fear screening process (a higher standard) would be the same as grant rates for asylum, this screening mechanism would likely still allow through a significantly higher percentage of cases than would likely be granted. And the reasonable-fear screening rates would also still allow a far greater percentage of claimants through than would ultimately receive CAT protection. Fewer than 1,000 aliens per year, of any nationality, receive CAT protection.

To the extent that aliens continued to enter the United States in violation of a relevant proclamation, the application of the rule's bar to eligibility for asylum in the credible-fear screening process (combined with the application of the reasonable-fear standard to statutory withholding and CAT claims) would reduce the number of cases referred to section 240 proceedings. Finally, the Departments emphasize that this rule would not prevent aliens with claims for statutory withholding or CAT protection from having their claims adjudicated in section 240 proceedings after satisfying the reasonable-fear standard.

Further, determining whether an alien is subject to a suspension of entry proclamation would ordinarily be straightforward, because such orders specify the class of aliens whose entry is restricted. Likewise, adding questions designed to elicit whether an alien is subject to an entry proclamation, and employing a bifurcated credible-fear analysis for the asylum claim and reasonable-fear review of the statutory withholding and CAT claims, will likely not be unduly burdensome. Although DHS has generally not applied existing mandatory bars to asylum in credible-fear determinations, asylum officers currently probe for this information and note in the record where the possibility exists that a mandatory bar may apply. Though screening for proclamation-based ineligibility for asylum may in some cases entail some additional work, USCIS will account for it under the Paperwork Reduction Act, 44 U.S.C. 3501 *et seq.*, as needed, following issuance of a covered proclamation. USCIS asylum officers and EOIR immigration judges have almost two decades of experience applying the reasonable-fear standard to statutory withholding and CAT claims, and do so in thousands of cases per year already (13,732 in FY 2018 for both EOIR and USCIS). *See, e.g.*, Memorandum for All Immigration Judges, et al., from The

Office of the Chief Immigration Judge, Executive Office for Immigration Review at 6 (May 14, 1999) (explaining similarities between credible-fear and reasonable-fear proceedings for immigration judges).

That said, USCIS estimates that asylum officers have historically averaged four to five credible-fear interviews and completions per day, but only two to three reasonable-fear case completions per day. Comparing this against current case processing targets, and depending on the number of aliens who contravene a presidential proclamation, such a change might result in the need to increase the number of officers required to conduct credible-fear or reasonable-fear screenings to maintain current case completion goals. However, current reasonable-fear interviews are for types of aliens (aggravated felons and aliens subject to reinstatement) for whom relevant criminal and immigration records take time to obtain, and for whom additional interviewing and administrative processing time is typically required. The population of aliens who would be subject to this rule would generally not have the same type of criminal and immigration records in the United States, but additional interviewing time might be necessary. Therefore, it is unclear whether these averages would hold once the rule is implemented.

If an asylum officer determines that credible fear has been established but for the existence of the proclamation bar, and the alien seeks review of such determination before an immigration judge, DHS may need to shift additional resources towards facilitating such review in immigration court in order to provide records of the negative credible-fear determination to the immigration court. However, ICE attorneys, while sometimes present, generally do not advocate for DHS in negative credible-fear or reasonable-fear reviews before an immigration judge.

DHS would, however, also expend additional resources detaining aliens who would have previously received a positive credible-fear determination and who now receive, and challenge, a negative credible-fear and reasonable-fear determination. Aliens are generally detained during the credible-fear screening, but may be eligible for parole or release on bond if they establish a credible fear. To the extent that the rule may result in lengthier interviews for each case, aliens' length of stay in detention would increase. Furthermore, DHS anticipates that more negative determinations would increase the number of aliens who would be

detained and the length of time they would be detained, since fewer aliens would be eligible for parole or release on bond. Also, to the extent this rule would increase the number of aliens who receive both negative credible-fear and reasonable-fear determinations, and would thus be subject to immediate removal, DHS will incur increased and more immediate costs for enforcement and removal of these aliens. That cost would be counterbalanced by the fact that it would be considerably more costly and resource-intensive to ultimately remove such an alien after the end of section 240 proceedings, and the desirability of promoting greater enforcement of the immigration laws.

Attorneys from ICE represent DHS in full immigration proceedings, and immigration judges (who are part of DOJ) adjudicate those proceedings. If fewer aliens are found to have credible fear or reasonable fear and referred to full immigration proceedings, such a development will allow DOJ and ICE attorney resources to be reallocated to other immigration proceedings. The additional bars to asylum are unlikely to result in immigration judges spending much additional time on each case where the nature of the proclamation bar is straightforward to apply. Further, there will likely be a decrease in the number of asylum hearings before immigration judges because certain respondents will no longer be eligible for asylum and DHS will likely refer fewer cases to full immigration proceedings. If DHS officers identify the proclamation-based bar to asylum (before EOIR has acquired jurisdiction over the case), EOIR anticipates a reduction in both in-court and out-of-court time for immigration judges.

A decrease in the number of credible-fear findings and, thus, asylum grants would also decrease the number of employment authorization documents processed by DHS. Aliens are generally eligible to apply for and receive employment authorization and an Employment Authorization Document (Form I–766) after their asylum claim has been pending for more than 180 days. *See* INA 208(d)(5)(A)(iii), 8 U.S.C. 1158(d)(5)(A)(iii); 8 CFR 1208.7(a)(1)(2). This rule and any associated future presidential proclamations would also be expected to have a deterrent effect that could lessen future flows of illegal immigration.

3. The Departments are not in a position to determine how all entry proclamations involving the southern border could affect the decision calculus for various categories of aliens planning to enter the United States through the southern border in the near future. The focus of this rule is on the tens of thousands of aliens each year (97,192 in FY 2018) who assert a credible fear in expedited-removal proceedings and may thereby be placed on a path to release into the interior of the United States. The President has announced his intention to take executive action to suspend the entry of aliens between ports of entry and instead to channel such aliens to ports of entry, where they may seek to enter and assert an intent to apply for asylum in a controlled, orderly, and lawful manner. The Departments have accordingly assessed the anticipated effects of such a presidential action so as to illuminate how the rule would be applied in those circumstances.

a. *Effects on Aliens.* Such a proclamation, coupled with this rule, would have the most direct effect on the more than approximately 70,000 aliens a year (as of FY 2018) estimated to enter between the ports of entry and then assert a credible fear in expedited-removal proceedings.[11] If such aliens contravened a proclamation suspending their entry unless they entered at a port of entry, they would become ineligible for asylum, but would remain eligible for statutory withholding or CAT protection. And for the reasons discussed above, their claims would be processed more expeditiously. Conversely, if such aliens decided to instead arrive at ports of entry, they would remain eligible for asylum and would proceed through the existing credible-fear screening process.

Such an application of this rule could also affect the decision calculus for the estimated 24,000 or so aliens a year (as of FY 2018) who arrive at ports of entry along the southern border and assert a credible fear in expedited-removal proceedings.[12] Such aliens would likely face increased wait times at a U.S. port of entry, meaning that they would spend more time in Mexico. Third-country nationals in this category would have added incentives to take advantage of Mexican asylum procedures and to make decisions about travel to a U.S. port of entry based on information about which ports were most capable of swift processing.

Such an application of this rule could also affect aliens who apply for asylum affirmatively or in removal proceedings after entering through the southern border. Some of those asylum grants would become denials for aliens who became ineligible for asylum because they crossed illegally in contravention of a proclamation effective before they entered. Such aliens could, however, still obtain statutory withholding of removal or CAT protection in section 240 proceedings.

Finally, such a proclamation could also affect the thousands of aliens who are granted asylum each year. Those aliens' cases are equally subject to existing backlogs in immigration courts, and could be adjudicated more swiftly if the number of non-meritorious cases declined. Aliens with meritorious claims could thus more expeditiously receive the benefits associated with asylum.

b. *Effects on the Departments' Operations.* Applying this rule in conjunction with a proclamation that channeled aliens seeking asylum to ports of entry would likely create significant overall efficiencies in the Departments' operations beyond the general efficiencies discussed above. Channeling even some proportion of aliens who currently enter illegally and assert a credible fear to ports of entry would, on balance, be expected to help the Departments more effectively leverage their resources to promote orderly and efficient processing of inadmissible aliens.

At present, CBP dedicates enormous resources to attempting to apprehend aliens who cross the southern border illegally. As noted, CBP apprehended 396,579 such aliens in FY 2018. Such crossings often occur in remote locations, and over 16,000 CBP officers are responsible for patrolling hundreds of thousands of square miles of territory, ranging from deserts to mountainous terrain to cities. When a United States Border Patrol ("Border Patrol" or "USBP") agent apprehends an alien who enters unlawfully, the USBP agent takes the alien into custody and transports the alien to a Border Patrol station for processing—which could be hours away. Family units apprehended after crossing illegally present additional logistical challenges, and may require additional agents to assist

---

[11] The Departments estimated this number by using the approximately 171,511 aliens in FY 2018 who were referred to expedited removal after crossing illegally between ports of entry and being apprehended by CBP. That number excludes the approximately 3,102 additional aliens who were arrested by ICE, because it is not clear at this time whether such aliens were ultimately processed at a port of entry. The Departments also relied on the fact that approximately 41% of aliens in expedited removal in FY 2018 triggered credible-fear screening.

[12] The Departments estimated this number by using the approximately 59,921 aliens in FY 2018 who were referred to expedited removal after presenting at a port of entry. That number excludes the approximately 3,102 additional aliens who were arrested by ICE, because it is not clear at this time whether such aliens were ultimately processed at a port of entry. The Departments also relied on the fact that approximately 41% of aliens in expedited removal in FY 2018 triggered credible-fear screening.

with the transport of the illegal aliens from the point of apprehension to the station for processing. And apprehending one alien or group of aliens may come at the expense of apprehending others while agents are dedicating resources to transportation instead of patrolling.

At the Border Patrol station, a CBP agent obtains an alien's fingerprints, photographs, and biometric data, and begins asking background questions about the alien's nationality and purpose in crossing. At the same time, agents must make swift decisions, in coordination with DOJ, as to whether to charge the alien with an immigration-related criminal offense. Further, agents must decide whether to apply expedited-removal procedures, to pursue reinstatement proceedings if the alien already has a removal order in effect, to authorize voluntary return, or to pursue some other lawful course of action. Once the processing of the alien is completed, the USBP temporarily detains any alien who is referred for removal proceedings. Once the USBP determines that an alien should be placed in expedited-removal proceedings, the alien is expeditiously transferred to ICE custody in compliance with federal law. The distance between ICE detention facilities and USBP stations, however, varies. Asylum officers and immigration judges review negative credible-fear findings during expedited-removal proceedings while the alien is in ICE custody.

By contrast, CBP officers are able to employ a more orderly and streamlined process for inadmissible aliens who present at one of the ports of entry along the southern border—even if they claim a credible fear. Because such aliens have typically sought admission without violating the law, CBP generally does not need to dedicate resources to apprehending or considering whether to charge such aliens. And while aliens who present at a port of entry undergo threshold screening to determine their admissibility, *see* INA 235(b)(2), 8 U.S.C. 1225(b)(2), that process takes approximately the same amount of time as CBP's process for obtaining details from aliens apprehended between ports of entry. Just as for illegal entrants, CBP officers at ports of entry must decide whether inadmissible aliens at ports of entry are subject to expedited removal. Aliens subject to such proceedings are then generally transferred to ICE custody so that DHS can implement Congress's statutory mandate to detain such aliens during the pendency of expedited-removal proceedings. As with

stations, ports of entry vary in their proximity to ICE detention facilities.

The Departments acknowledge that in the event all of the approximately 70,000 aliens per year who cross illegally and assert a credible fear instead decide to present at a port of entry, processing times at ports of entry would be slower in the absence of additional resources or policies that would encourage aliens to enter at less busy ports. Using FY 2018 figures, the number of aliens presenting at a port of entry would rise from about 124,511 to about 200,000 aliens if all illegal aliens who assert a credible fear went to ports of entry. That would likely create longer lines at U.S. ports of entry, although the Departments note that such ports have variable capacities and that wait times vary considerably between them. The Departments nonetheless believe such a policy would be preferable to the status quo. Nearly 40% of inadmissible aliens who present at ports of entry today are Mexican nationals, who rarely claim a credible fear and who accordingly can be processed and admitted or removed quickly.

Furthermore, the overwhelming number of aliens who would have an incentive under the rule and a proclamation to arrive at a port of entry rather than to cross illegally are from third countries, not from Mexico. In FY 2018, CBP apprehended and referred to expedited removal an estimated 87,544 Northern Triangle nationals and an estimated 66,826 Mexican nationals, but Northern Triangle nationals assert a credible fear over 60% of the time, whereas Mexican nationals assert a credible fear less than 10% of the time. The Departments believe that it is reasonable for third-country aliens, who appear highly unlikely to be persecuted on account of a protected ground or tortured in Mexico, to be subject to orderly processing at ports of entry that takes into account resource constraints at ports of entry and in U.S. detention facilities. Such orderly processing would be impossible if large proportions of third-country nationals continue to cross the southern border illegally.

To be sure, some Mexican nationals who would assert a credible fear may also have to spend more time waiting for processing in Mexico. Such nationals, however, could still obtain statutory withholding of removal or CAT protection if they crossed illegally, which would allow them a safeguard against persecution. Moreover, only 178 Mexican nationals received asylum in FY 2018 after initially asserting a credible fear of persecution in expedited-removal proceedings, indicating that the category of Mexican

nationals most likely to be affected by the rule and a proclamation would also be highly unlikely to establish eligibility for asylum.

## Regulatory Requirements

### A. Administrative Procedure Act

While the Administrative Procedure Act ("APA") generally requires agencies to publish notice of a proposed rulemaking in the **Federal Register** for a period of public comment, it provides an exception "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. 553(b)(B). This exception relieves agencies of the notice-and-comment requirement in emergency situations, or in circumstances where "the delay created by the notice and comment requirements would result in serious damage to important interests." *Woods Psychiatric Inst.* v. *United States,* 20 Cl. Ct. 324, 333 (1990), *aff'd,* 925 F.2d 1454 (Fed. Cir. 1991); *see also Nat'l Fed'n of Federal Emps.* v. *Nat'l Treasury Emps. Union,* 671 F.2d 607, 611 (D.C. Cir. 1982); *United States* v. *Dean,* 604 F.3d 1275, 1279 (11th Cir. 2010). Agencies have previously relied on this exception in promulgating a host of immigration-related interim rules.[13] Furthermore, DHS has invoked this exception in promulgating rules related to expedited removal—a context in which Congress recognized the need for dispatch in addressing large volumes of aliens by giving the Secretary significant discretion to "modify at any time" the classes of aliens who would be subject to such procedures. *See* INA 235(b)(1)(A)(iii)(I), 8 U.S.C. 1225(b)(1)(A)(iii)(I).[14]

---

[13] *See, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (interim rule citing good cause to immediately require additional documentation from certain Caribbean agricultural workers to avoid "an increase in applications for admission in bad faith by persons who would otherwise have been denied visas and are seeking to avoid the visa requirement and consular screening process during the period between the publication of a proposed and a final rule"); Suspending the 30-Day and Annual Interview Requirements From the Special Registration Process for Certain Nonimmigrants, 68 FR 67578, 67581 (Dec. 2, 2003) (interim rule claiming good cause exception for suspending certain automatic registration requirements for nonimmigrants because "without [the] regulation approximately 82,532 aliens would be subject to 30-day or annual re-registration interviews" over six months).

[14] *See, e.g.,* Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR at 4770 (claiming good cause exception because the ability to detain certain Cuban nationals "while admissibility and identity are

*Continued*

The Departments have concluded that the good-cause exceptions in 5 U.S.C. 553(b)(B) and (d)(3) apply to this rule. Notice and comment on this rule, along with a 30-day delay in its effective date, would be impracticable and contrary to the public interest. The Departments have determined that immediate implementation of this rule is essential to avoid creating an incentive for aliens to seek to cross the border during pre-promulgation notice and comment under 5 U.S.C. 553(b) or during the 30-day delay in the effective date under 5 U.S.C. 553(d).

DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[] human life and hav[e] a potential destabilizing effect in the region." Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR at 4770. DHS in particular cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule." *Id.* DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations." *Id.* DHS concluded: "[A] surge could result in significant loss of human life." *Id.; accord, e.g.,* Designating Aliens For Expedited Removal, 69 FR 48877 (noting similar destabilizing incentives for a surge during a delay in the effective date); Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR at 5907 (finding the good-cause exception applicable

because of similar short-run incentive concerns).

These same concerns would apply here as well. Pre-promulgation notice and comment, or a delay in the effective date, could lead to an increase in migration to the southern border to enter the United States before the rule took effect. For instance, the thousands of aliens who presently enter illegally and make claims of credible fear if and when they are apprehended would have an added incentive to cross illegally during the comment period. They have an incentive to cross illegally in the hopes of evading detection entirely. Even once apprehended, at present, they are able to take advantage of a second opportunity to remain in the United States by making credible-fear claims in expedited-removal proceedings. Even if their statements are ultimately not found to be genuine, they are likely to be released into the interior pending section 240 proceedings that may not occur for months or years. Based on the available statistics, the Departments believe that a large proportion of aliens who enter illegally and assert a fear could be released while awaiting section 240 proceedings. There continues to be an "urgent need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations." Designating Aliens For Expedited Removal, 69 FR at 48878.

Furthermore, there are already large numbers of migrants—including thousands of aliens traveling in groups, primarily from Central America—expected to attempt entry at the southern border in the coming weeks. Some are traveling in large, organized groups through Mexico and, by reports, intend to come to the United States unlawfully or without proper documentation and to express an intent to seek asylum. Creating an incentive for members of those groups to attempt to enter the United States unlawfully before this rule took effect would make more dangerous their already perilous journeys, and would further strain CBP's apprehension operations. This interim rule is thus a practical means to address these developments and avoid creating an even larger short-term influx; an extended notice-and-comment rulemaking process would be impracticable.

Alternatively, the Departments may forgo notice-and-comment procedures and a delay in the effective date because this rule involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1). The flow of aliens across the

southern border, unlawfully or without appropriate travel documents, directly implicates the foreign policy interests of the United States. *See, e.g.,* Exec. Order 13767 (Jan. 25, 2017). Presidential proclamations invoking section 212(f) or 215(a)(1) of the INA at the southern border necessarily implicate our relations with Mexico and the President's foreign policy, including sensitive and ongoing negotiations with Mexico about how to manage our shared border.[15] A proclamation under section 212(f) of the INA would reflect a presidential determination that some or all entries along the border "would [be] detrimental to the interests of the United States." And the structure of the rule, under which the Attorney General and the Secretary are exercising their statutory authority to establish a mandatory bar to asylum eligibility resting squarely on a proclamation issued by the President, confirms the direct relationship between the President's foreign policy decisions in this area and the rule.

For instance, a proclamation aimed at channeling aliens who wish to make a claim for asylum to ports of entry at the southern border would be inextricably related to any negotiations over a safe-third-country agreement (as defined in INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A)), or any similar arrangements. As noted, the vast majority of aliens who enter illegally today come from the Northern Triangle countries, and large portions of those aliens assert a credible fear. Channeling those aliens to ports of entry would encourage these aliens to first avail themselves of offers of asylum from Mexico.

Moreover, this rule would be an integral part of ongoing negotiations with Mexico and Northern Triangle countries over how to address the influx of tens of thousands of migrants from Central America through Mexico and into the United States. For instance, over the past few weeks, the United States has consistently engaged with the Security and Foreign Ministries of El Salvador, Guatemala, and Honduras, as well as the Ministries of Governance and Foreign Affairs of Mexico, to

---

determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status, is a necessity for national security and public safety"); Designating Aliens For Expedited Removal, 69 FR at 48880 (claiming good cause exception for expansion of expedited-removal program due to "[t]he large volume of illegal entries, and attempted illegal entries, and the attendant risks to national security presented by these illegal entries," as well as "the need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations").

---

[15] For instance, since 2004, the United States and Mexico have been operating under a memorandum of understanding concerning the repatriation of Mexican nationals. Memorandum of Understanding Between the Department of Homeland Security of the United States of America and the Secretariat of Governance and the Secretariat of Foreign Affairs of the United Mexican States, on the Safe, Orderly, Dignified and Humane Repatriation of Mexican Nationals (Feb. 20, 2004). Article 6 of that memorandum reserves the movement of third-country nationals through Mexico and the United States for further bilateral negotiations.

discuss how to address the mass influx of aliens traveling together from Central America who plan to seek to enter at the southern border. Those ongoing discussions involve negotiations over issues such as how these other countries will develop a process to provide this influx with the opportunity to seek protection at the safest and earliest point of transit possible, and how to establish compliance and enforcement mechanisms for those who seek to enter the United States illegally, including for those who do not avail themselves of earlier offers of protection. Furthermore, the United States and Mexico have been engaged in ongoing discussions of a safe-third-country agreement, and this rule will strengthen the ability of the United States to address the crisis at the southern border and therefore facilitate the likelihood of success in future negotiations.

This rule thus supports the President's foreign policy with respect to Mexico and the Northern Triangle countries in this area and is exempt from the notice-and-comment and delayed-effective-date requirements in 5 U.S.C. 553. *See Am. Ass'n of Exporters & Importers-Textile & Apparel Grp.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (noting that foreign affairs exception covers agency actions ''linked intimately with the Government's overall political agenda concerning relations with another country''); *Yassini* v. *Crosland,* 618 F.2d 1356, 1361 (9th Cir. 1980) (because an immigration directive ''was implementing the President's foreign policy,'' the action ''fell within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA'').

Invoking the APA's foreign affairs exception is also consistent with past rulemakings. In 2016, for example, in response to diplomatic developments between the United States and Cuba, DHS changed its regulations concerning flights to and from the island via an immediately effective interim final rule. This rulemaking explained that it was covered by the foreign affairs exception because it was ''consistent with U.S. foreign policy goals''—specifically, the ''continued effort to normalize relations between the two countries.'' Flights to and From Cuba, 81 FR 14948, 14952 (Mar. 21, 2016). In a similar vein, DHS and the State Department recently provided notice that they were eliminating an exception to expedited removal for certain Cuban nationals. The notice explained that the change in policy was subject to the foreign affairs exception because it was ''part of a major foreign policy initiative announced by the President, and is central to ongoing diplomatic discussions between the United States and Cuba with respect to travel and migration between the two countries.'' Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR at 4904–05.

For the foregoing reasons, taken together, the Departments have concluded that the foreign affairs exemption to notice-and-comment rulemaking applies.

*B. Regulatory Flexibility Act*

The Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.,* as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires an agency to prepare and make available to the public a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.,* small businesses, small organizations, and small governmental jurisdictions). A regulatory flexibility analysis is not required when a rule is exempt from notice-and-comment rulemaking.

*C. Unfunded Mandates Reform Act of 1995*

This interim final rule will not result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*D. Congressional Review Act*

This interim final rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

*E. Executive Order 12866, Executive Order 13563, and Executive Order 13771 (Regulatory Planning and Review)*

This interim final rule is not a ''significant regulatory action'' under section 3(f) of Executive Order 12866 because the rule is exempt under the foreign-affairs exemption in section 3(d)(2) as part of the actual exercise of diplomacy. The rule is consequently also exempt from Executive Order 13771 because it is not a significant regulatory action under Executive Order 12866. Though the potential costs, benefits, and transfers associated with some proclamations may have any of a range of economic impacts, this rule itself does not have an impact aside from enabling future action. The Departments have discussed what some of the potential impacts associated with a proclamation may be, but these impacts do not stem directly from this rule and, as such, they do not consider them to be costs, benefits, or transfers of this rule.

This rule amends existing regulations to provide that aliens subject to restrictions on entry under certain proclamations are ineligible for asylum. The expected effects of this rule for aliens and on the Departments' operations are discussed above. As noted, this rule will result in the application of an additional mandatory bar to asylum, but the scope of that bar will depend on the substance of relevant triggering proclamations. In addition, this rule requires DHS to consider and apply the proclamation bar in the credible-fear screening analysis, which DHS does not currently do. Application of the new bar to asylum will likely decrease the number of asylum grants. By applying the bar earlier in the process, it will lessen the time that aliens who are ineligible for asylum and who lack a reasonable fear of persecution or torture will be present in the United States. Finally, DOJ is amending its regulations with respect to aliens who are subject to the proclamation bar to asylum eligibility to ensure that aliens who establish a reasonable fear of persecution or torture may still seek, in proceedings before immigration judges, statutory withholding of removal under the INA or CAT protection.

*Executive Order 13132 (Federalism)*

This rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*F. Executive Order 12988 (Civil Justice Reform)*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

## G. Paperwork Reduction Act

This rule does not propose new or revisions to existing "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

## List of Subjects

### 8 CFR Part 208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 1003

Administrative practice and procedure, Aliens, Immigration, Legal services, Organization and functions (Government agencies).

### 8 CFR Part 1208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

## Regulatory Amendments

## DEPARTMENT OF HOMELAND SECURITY

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR part 208 as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as fol1ows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229, 8 CFR part 2.

■ 2. In § 208.13, add paragraph (c)(3) to read as follows:

### § 208.13   Establishing asylum eligibility.

\*      \*      \*      \*      \*

(c) \* \* \*

(3) *Additional limitation on eligibility for asylum.* For applications filed after November 9, 2018, an alien shall be ineligible for asylum if the alien is subject to a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico that is issued pursuant to subsection 212(f) or 215(a)(1) of the Act on or after November 9, 2018 and the alien enters the United States after the effective date of the proclamation or order contrary to the terms of the proclamation or order. This limitation on eligibility does not apply if the proclamation or order

expressly provides that it does not affect eligibility for asylum, or expressly provides for a waiver or exception that makes the suspension or limitation inapplicable to the alien.

■ 3. In § 208.30, revise the section heading and add a sentence at the end of paragraph (e)(5) to read as follows:

### § 208.30   Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act or whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act.

\*      \*      \*      \*      \*

(e) \* \* \*

(5) \* \* \* If the alien is found to be an alien described in 8 CFR 208.13(c)(3), then the asylum officer shall enter a negative credible fear determination with respect to the alien's application for asylum. The Department shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's claim for withholding of removal under section 241(b)(3) of the Act, or for withholding or deferral of removal under the Convention Against Torture if the alien establishes a reasonable fear of persecution or torture. However, if an alien fails to establish, during the interview with the asylum officer, a reasonable fear of either persecution or torture, the asylum officer will provide the alien with a written notice of decision, which will be subject to immigration judge review consistent with paragraph (g) of this section, except that the immigration judge will review the reasonable fear findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g) and in 8 CFR 1208.30(g).

\*      \*      \*      \*      \*

Approved:

Dated: November 5, 2018.

**Kirstjen M. Nielsen,**

*Secretary of Homeland Security.*

## DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR parts 1003 and 1208 as follows:

## PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 4. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 6 U.S.C 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28

U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to −328.

■ 5. In § 1003.42, add a sentence at the end of paragraph (d) to read as follows:

### § 1003.42   Review of credible fear determination.

\*      \*      \*      \*      \*

(d) \* \* \* If the alien is determined to be an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5), the immigration judge shall first review de novo the determination that the alien is described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) prior to any further review of the asylum officer's negative determination.

\*      \*      \*      \*      \*

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 6. The authority citation for part 1208 continues to read as fol1ows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229.

■ 7. In § 1208.13, add paragraph (c)(3) to read as follows:

### § 1208.13   Establishing asylum eligibility.

\*      \*      \*      \*      \*

(c) \* \* \*

(3) *Additional limitation on eligibility for asylum.* For applications filed after November 9, 2018, an alien shall be ineligible for asylum if the alien is subject to a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico that is issued pursuant to subsection 212(f) or 215(a)(1) of the Act on or after November 9, 2018 and the alien enters the United States after the effective date of the proclamation or order contrary to the terms of the proclamation or order. This limitation on eligibility does not apply if the proclamation or order expressly provides that it does not affect eligibility for asylum, or expressly provides for a waiver or exception that makes the suspension or limitation inapplicable to the alien.

■ 8. In § 1208.30, revise the section heading and add paragraph (g)(1) to read as follows:

App.268

**§ 1208.30   Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act or whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act.**

\* \* \* \* \*

(g) \* \* \*

(1) *Review by immigration judge of a mandatory bar finding.* If the alien is determined to be an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5), the immigration judge shall first review de novo the determination that the alien is described in 8 CFR 208.13(c)(3) or 1208.13(c)(3). If the immigration judge finds that the alien is not described in 8 CFR 208.13(c)(3) or 1208.13(c)(3), then the immigration judge shall vacate the order of the asylum officer, and DHS may commence removal proceedings under section 240 of the Act. If the immigration judge concurs with the credible fear determination that the alien is an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3), the immigration judge will then review the asylum officer's negative decision regarding reasonable fear made under 8 CFR 208.30(e)(5) consistent with paragraph (g)(2) of this section, except that the immigration judge will review the findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g)(2).

\* \* \* \* \*

Dated: November 6, 2018.

**Jefferson B. Sessions III,**

*Attorney General.*

[FR Doc. 2018–24594 Filed 11–8–18; 4:15 pm]

**BILLING CODE 4410–30–P; 9111–97–P**

---

# DEPARTMENT OF TRANSPORTATION

## Federal Aviation Administration

## 14 CFR Part 39

**[Docket No. FAA–2018–0589; Product Identifier 2018–NM–021–AD; Amendment 39–19489; AD 2018–23–03]**

**RIN 2120–AA64**

## Airworthiness Directives; Airbus SAS Airplanes

**AGENCY:** Federal Aviation Administration (FAA), Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** We are adopting a new airworthiness directive (AD) for certain Airbus SAS Model A318 and A319 series airplanes; Model A320–211, –212,

–214, –231, –232, and –233 airplanes; and Model A321–111, –112, –131, –211, –212, –213, –231, and –232 airplanes. This AD was prompted by reports of false resolution advisories (RAs) from certain traffic collision avoidance systems (TCASs). This AD requires modification or replacement of certain TCAS processors. We are issuing this AD to address the unsafe condition on these products.

**DATES:** This AD is effective December 14, 2018.

The Director of the Federal Register approved the incorporation by reference of certain publications listed in this AD as of December 14, 2018.

**ADDRESSES:** For service information identified in this final rule, contact Honeywell Aerospace, Technical Publications and Distribution, M/S 2101–201, P.O. Box 52170, Phoenix, AZ 85072–2170; phone: 602–365–5535; fax: 602–365–5577; internet: *http://www.honeywell.com.* You may view this service information at the FAA, Transport Standards Branch, 2200 South 216th St., Des Moines, WA. For information on the availability of this material at the FAA, call 206–231–3195. It is also available on the internet at *http://www.regulations.gov* by searching for and locating Docket No. FAA–2018–0589.

### Examining the AD Docket

You may examine the AD docket on the internet at *http://www.regulations.gov* by searching for and locating Docket No. FAA–2018–0589; or in person at Docket Operations between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The AD docket contains this final rule, the regulatory evaluation, any comments received, and other information. The address for Docket Operations (phone: 800–647–5527) is U.S. Department of Transportation, Docket Operations, M–30, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue SE, Washington, DC 20590.

**FOR FURTHER INFORMATION CONTACT:** Steven Dzierzynski, Aerospace Engineer, Avionics and Administrative Services Section, FAA, New York ACO Branch, 1600 Stewart Avenue, Suite 410, Westbury, NY 11590; telephone 516–228–7367; fax 516–794–5531.

**SUPPLEMENTARY INFORMATION:**

### Discussion

We issued a notice of proposed rulemaking (NPRM) to amend 14 CFR part 39 by adding an AD that would apply to certain Airbus SAS Model A318 and A319 series airplanes; Model

A320–211, –212, –214, –231, –232, and –233 airplanes; and Model A321–111, –112, –131, –211, –212, –213, –231, and –232 airplanes. The NPRM published in the **Federal Register** on July 10, 2018 (83 FR 31911). The NPRM was prompted by reports of false RAs from certain TCASs. The NPRM proposed to require modification or replacement of certain TCAS processors.

We are issuing this AD to address the occurrence of false RAs from the TCAS, which could lead to a loss of separation from other airplanes, possibly resulting in a mid-air collision.

The European Aviation Safety Agency (EASA), which is the Technical Agent for the Member States of the European Union, has issued EASA AD 2017–0196, dated October 5, 2017 (referred to after this as the Mandatory Continuing Airworthiness Information, or "the MCAI"), to correct an unsafe condition for certain Airbus SAS Model A318 and A319 series airplanes; Model A320–211, –212, –214, –231, –232, and –233 airplanes; and Model A321–111, –112, –131, –211, –212, –213, –231, and –232 airplanes. The MCAI states:

Since 2012, a number of false TCAS resolution advisories (RA) have been reported by various European Air Navigation Service Providers. EASA has published certification guidance material for collision avoidance systems (AMC 20–15) which defines a false TCAS RA as an RA that is issued, but the RA condition does not exist. It is possible that more false (or spurious) RA events have occurred, but were not recorded or reported. The known events were mainly occurring on Airbus single-aisle (A320 family) aeroplanes, although several events have also occurred on Airbus A330 aeroplanes. Investigation determined that the false RAs are caused on aeroplanes with a Honeywell TPA–100B TCAS processor installed, P/N [part number] 940–0351–001. This was caused by a combination of three factors: (1) Hybrid surveillance enabled; (2) processor connected to a hybrid GPS [global positioning system] source, without a direct connection to a GPS source; and (3) an encounter with an intruder aeroplane with noisy (jumping) ADS–B Out position.

EASA previously published Safety Information Bulletin (SIB) 2014–33 to inform owners and operators of affected aeroplanes about this safety concern. At that time, the false RAs were not considered an unsafe condition. Since the SIB was issued, further events have been reported, involving a third aeroplane.

This condition, if not corrected, could lead to a loss of separation with other aeroplanes, possibly resulting in a mid-air collision.

Prompted by these latest findings, and after review of the available information, EASA reassessed the severity and rate of occurrence of false RAs and has decided that mandatory action must be taken to reduce the rate of occurrence, and the risk of loss of separation with other aeroplanes. Honeywell International Inc. published Service Bulletin

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

Executive Office for Immigration Review Adjudication Statistics
Credible Fear and Asylum Process: Fiscal Year (FY) 2008 – FY 2019

# EXHIBIT A-17

## Credible Fear and Asylum Process:
## Fiscal Year (FY) 2008 – FY 2019

### Out of 100 aliens who were to claim a credible fear...[1]

**CREDIBLE FEAR INTERVIEW**
United States Citizenship and
Immigration Services (USCIS)
would refer 81 credible fear
claimants to EOIR
*(81% of claims referred to EOIR)[2]*

**OPTION FOR EOIR TO REVIEW A NEGATIVE FEAR FINDING**

7 cases are closed[3]

3 credible fear claimants would not request review by
an immigration judge (IJ) — — — — — — — — — — — — *Alien Is Removed*

9 credible fear claimants
would request review by an IJ

**CREDIBLE FEAR REVIEW (CFR)[4]**
IJs would find credible fear for
2 credible fear claimants
*(IJs find credible fear in 22% of CFRs)*

**REMOVAL PROCEEDINGS**
EOIR would receive and
complete 83 I-862 cases[5]
originating from credible
fear claims

**ASYLUM APPLICATION**
45 credible fear claimants
would file for asylum
*(Of completed I-862 cases originating from a
credible fear claim made to USCIS, 54 percent of
aliens filed for asylum)*

**ASYLUM DECISION**
IJs would grant asylum to only
14 credible fear claimants and
would not grant asylum to 31
credible fear claimants
*(Of completed I-862 cases originating from a
credible fear claim made to USCIS, IJs grant
asylum 17 percent of the time)*

### ... only 14 out of 100 would be granted asylum.



*Never Referred to EOIR*

*Referred, but Never Filed Asylum (23 ordered removed in absentia)*

*Referred & Filed, but Not Granted (4 ordered removed in absentia)*

*Referred, Filed, & Granted Asylum*

---

EOIR Data Generated: October 23, 2019.

[1] Percentages used in assessing this population may change as more
cases are completed over time and because some cases may be
reopened.

[2] Based on USCIS data (generated October 15, 2019). Includes
claims referred to EOIR in which USCIS did not make a credible fear
finding because it could not obtain an interpreter.

[3] Closed cases include those in which a claim is dissolved or

withdrawn or an alien is found to be ineligible for the credible fear
process.

[4] If USCIS finds that an alien has not established a credible fear, the
alien may request review of that finding by an IJ. If the IJ finds that an
alien has established a credible fear, then the alien (unless the alien
is a stowaway) is placed in removal proceedings.

[5] Includes completed removal, exclusion, and deportation case types.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### DECLARATION OF WYATT SULING

Transactional Access Records Clearinghouse (TRAC) Immigration
Immigration Court Backlog Tool

# EXHIBIT A-18



**TRAC** Immigration

# Immigration Court Backlog Tool
### Pending Cases and Length of Wait by Nationality, State, Court, and Hearing Location

**About the Data**
*through February 2021*

**What to graph:**
- ● Pending Cases
- ○ Average Days

**Charge Type:**
- ● All Charges
- ○ Immigration
- ○ Criminal/Nat. Sec./Terror

**What to tabulate:**
- ● Pending Cases
- ○ Average Days

**Starting with:**
- ● States
- ○ Nationalities



*California - Los Angeles*

- ● Time series
- ○ Top 10

| Fiscal Year 2021 *click on column headings to sort* | | State = California *click on column headings to sort* | | State = California, Court Location = Los... *click on column headings to sort* | |
|---|---|---|---|---|---|
| **State** | **Pending Cases** | **Court Location** | **Pending Cases** | **Nationality** | |
| Entire US | 1,299,239 | All Courts | 197,269 | All Nationalities | |
| Texas | 211,795 | San Francisco | 73,841 | Mexico | |
| California | 197,269 | Los Angeles | 70,251 | El Salvador | |
| New York | 144,391 | Van Nuys | 23,591 | Guatemala | |
| Florida | 127,867 | San Diego | 13,592 | Honduras | |
| New Jersey | 69,788 | Los Angeles - North | 11,132 | China | |
| Virginia | 62,745 | Sacramento | 3,484 | India | |
| Massachusetts | 56,255 | Imperial | 1,217 | Philippines | |
| Illinois | 49,030 | Otay Mesa | 119 | Nicaragua | |
| North Carolina | 45,663 | Adelanto | 42 | Indonesia | |
| Georgia | 45,406 | **Hearing Location** | **Pending Cases** | Romania | |
| Maryland | 36,540 | Los Angeles , California | 70,140 | Russia | |
| Louisiana | 28,945 | San Francisco , California | 69,232 | Nigeria | |
| Tennessee | 28,491 | Van Nuys Immigration Court | 23,539 | South Korea | |
| Pennsylvania | 28,338 | Los Angeles - North Los Angeles Street | 11,110 | Armenia | |

**TRAC**
Copyright 2021, TRAC Reports, Inc.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

Missouri Department of Elementary and Secondary Education
State Report Card – 2020 Data

# EXHIBIT A-19

## State Report Card - UPDATED! 2020 Data

School Year    2020         View Report

|◄ ◄ 1 of 1 ► ►|    Find | Next

**Document Map**

- State Report Card
  - (1) Preschool Enrollment
  - (2) K-12 Enrollment
  - (3) Proportional Attendance Rate
  - (4) Students Eligible for Free or Reduced-Price Lunch
  - (5) Graduation Rate
  - (6) Dropout Rate
  - (7) Where Our Graduates Go
  - (9) Staffing Ratios
  - (10) Years of Experience of Professional Staff
  - (11) Disproportionate Rates of Access to Educators
  - (12) Professional Staff with Advanced Degrees
  - (13) Average Teacher Salaries
  - (14) Average Administrator Salaries
  - (15) Current Expenditures per Pupil - Building Level
  - (16) Adjusted Tax Rate per District
  - (17) Assessed Valuation per District
  - (18) Sources of Revenue
  - (19) Missouri Assessment Program (MAP) Results
  - (20) Missouri Performance Index - Department of Education
  - (21) ACT Results
  - (22) Disciplinary Actions
  - (24) How Do Student Groups Perform?
  - (25) Students in Gifted Education Program
  - (26) English Learner Proficiency Status
  - (27) Comprehensive and Targeted Status
  - (28) CRDC Information

### (15) Current Expenditures per Pupil - State Level

(Data as of 1/25/2021)

| Missouri | 2020 |
|---|---|
| A.   Membership * | 875,043.19 |
| **State Level Per-Pupil Expenditures** | |
| B.   Federal | $782 |
| C.   State/Local | $10,654 |
| D.   State Level Per-Pupil Total (Sum of B+C) | $11,436 |

(Excluded expenditures include capital outlay, debt service, community services, non-instruction/support, adult education, and Title I expenditures. Impact aid is considered local expenditures.)

Definition

### (16) Average Tax Rate Per District

(Data as of 11/17/2020)

| MISSOURI | 2020 |
|---|---|
| Incidental | $3.4392 |
| Teachers | $0.1214 |
| Debt Service | $0.4951 |
| Capital Projects | $0.0890 |

Definition

### (17) Assessed Valuation

(Data as of 11/17/2020)

| MISSOURI | 2020 |
|---|---|
| Total | $110,589,446,990 |

Definition

### (18) Sources of Revenue

(Data as of 11/17/2020)

| MISSOURI | 2020 |
|---|---|
| Local | 48.19% |
| State | 40.74% |
| Federal | 11.07% |

Definition

### (19) Missouri Assessment Program (MAP) Results

On March 19, 2020, in response to the COVID-19 pandemic, the Department of Elementary and Secondary Education (DESE (MAP) assessments would not be administered, including Grade-Level (GLA), End-of-Course (EOC) and Missouri Assessmen available for the 2020 school year.

App.275

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | § | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

Migration Policy Institute, Profile of the Unauthorized Population: Missouri

# EXHIBIT A-20

MENU

Home » Data Hub » Unauthorized Immigrant Population

# Profile of the Unauthorized Population: Missouri

| Demographics | Estimate | % of Total |
|---|---|---|
| Unauthorized Population | 54,000 | 100% |
| **Top Countries of Birth** | | |
| Mexico | 22,000 | 41% |
| China/Hong Kong | 4,000 | 7% |
| Guatemala | 4,000 | 7% |
| | | |
| - | - | - |
| **Regions of Birth** | | |
| Mexico and Central America | 30,000 | 55% |
| Caribbean | | |
| South America | - | - |
| Europe/Canada/Oceania | 6,000 | 11% |
| Asia | 12,000 | 23% |
| Africa | 3,000 | 5% |
| **Years of U.S. Residence** | | |
| Less than 5 | 15,000 | 27% |
| 5 to 9 | 12,000 | 22% |
| 10 to 14 | 12,000 | 22% |
| 15 to 19 | 12,000 | 22% |
| 20 or more | 4,000 | 8% |
| **Age** | | |
| Under 16 | 3,000 | 5% |
| 16 to 24 | 10,000 | 19% |

App.277

Case 2:21-cv-00067-Z    Document 54-1    Filed 06/08/21    Page 279 of 297    PageID 1418

| | | |
|---|---|---|
| 25 to 34 | 18,000 | 33% |
| 35 to 44 | 15,000 | 27% |
| 45 to 54 | 6,000 | 11% |
| 55 and over | 3,000 | 5% |
| **Gender** | | |
| Female | 27,000 | 49% |

| **Family** | **Estimate** | **% of Total** |
|---|---|---|
| **Parental Status** | | |
| Population ages 15 and older | 52,000 | 100% |
| Reside with at least one U.S.-citizen child under 18 | 21,000 | 40% |
| Reside with noncitizen children only under 18 | 3,000 | 5% |
| Reside with no children | 29,000 | 55% |
| **Marital Status** | | |
| Population ages 15 and older | 52,000 | 100% |
| Never married | 19,000 | 37% |
| Married to a U.S. citizen | 11,000 | 20% |
| Married to a legal permanent resident (LPR) | 3,000 | 6% |
| Married to non-U.S. citizen/non-LPR | 12,000 | 24% |
| Divorced, separated, widowed | 7,000 | 14% |

| **Education and Language** | **Estimate** | **% of Total** |
|---|---|---|
| **School Enrollment of Children and Youth** | | |
| Population ages 3 to 17 | 3,000 | 100% |
| Enrolled | 3,000 | 83% |
| Not enrolled | - | - |
| Population ages 3 to 12 | - | - |
| Enrolled | - | - |
| Not enrolled | - | - |
| Population ages 13 to 17 | - | - |
| Enrolled | - | - |
| Not enrolled | - | - |
| Population ages 18 to 24 | 10,000 | 100% |

App.278

Case 2:21-cv-00067-Z    Document 54-1    Filed 06/08/21    Page 280 of 297    PageID 1419

| | | |
|---|---|---|
| Enrolled | 5,000 | 48% |
| Not enrolled | 5,000 | 52% |
| **Educational Attainment of Adults** | | |
| Population ages 25 and older | 41,000 | 100% |
| 0-5 grade | 5,000 | 12% |
| 6  8 grade | 5,000 | 11% |
| 9-12 grade | 4,000 | 11% |
| High school diploma or equivalent | 9,000 | 22% |
| Some college or associate's degree | 5,000 | 13% |
| Bachelor's, graduate, or professional degree | 13,000 | 32% |
| **English Proficiency** | | |
| Population ages 5 and older | 54,000 | 100% |
| Speak only English | 7,000 | 12% |
| Speak English "very well" | 19,000 | 35% |
| Speak English "well" | 13,000 | 24% |
| Speak English "not well"/"not at all" | 16,000 | 29% |
| **Top 5 Languages Spoken at Home** | | |
| Population ages 5 and older | 54,000 | 100% |
| Spanish | 30,000 | 55% |
| English | 7,000 | 12% |
| Chinese | 4,000 | 7% |
| | | |
| - | - | - |

| **Workforce** | **Estimate** | **% of Total** |
|---|---|---|
| **Labor Force Participation** | | |
| Civilian population ages 16 and older | 51,000 | 100% |
| Employed | 33,000 | 64% |
| Unemployed | 2,000 | 5% |
| Not in the labor force | 16,000 | 31% |
| **Top Industries of Employment** | | |
| Civilian employed population ages 16 and older | 33,000 | 100% |
| Accommodation and food services, arts, entertainment, and recreation | 6,000 | 19% |

App.279

| | | |
|---|---|---|
| Construction | 5,000 | 16% |
| Manufacturing | 4,000 | 14% |
| Professional, scientific, management, administrative, and waste management services | 3,000 | 10% |
| Health services and social assistance | 3,000 | 9% |

| Economics | Estimate | % of Total |
|---|---|---|
| **Family Income** | | |
| Below 50% of the poverty level | 9,000 | 16% |
| 50-99% of the poverty level | 7,000 | 14% |
| 100-149% of the poverty level | 8,000 | 14% |
| 150-199% of the poverty level | 6,000 | 11% |
| At or above 200% of the poverty level | 24,000 | 45% |
| **Access to Health Insurance** | | |
| Uninsured | 26,000 | 48% |
| **Home Ownership*** | | |
| Homeowner | 19,000 | 35% |

*Source*: These 2018 data result from Migration Policy Institute (MPI) analysis of U.S. Census Bureau data from the pooled 2014–18 American Community Survey (ACS) and the 2008 Survey of Income and Program Participation (SIPP), weighted to 2018 unauthorized immigrant population estimates provided by Jennifer Van Hook of The Pennsylvania State University.

*Note*: For U.S., state, and county estimates of the unauthorized population potentially eligible for the Deferred Action for Childhood Arrivals (DACA) program, click here.

*Data-related* notes
* "Homeowners" are unauthorized immigrants residing in homes that are owned, not rented.

+ Includes the following Colorado counties: Adams, Broomfield, Clear Creek, Douglas, Elbert, Gilpin, and Jefferson, as well as portions of Arapahoe, Boulder, and Weld counties.

++ NECTAs refer to New England City and Town Areas, geographic entities defined by the U.S. Census Bureau for use as alternatives to counties in the six-state New England region.

1. Estimate for China includes Hong Kong but excludes Taiwan; estimate for Korea includes South Korea and North Korea.

App.280

Case 2:21-cv-00067-Z   Document 54-1   Filed 06/08/21   Page 282 of 297   PageID 1421

2. "School Enrollment of Children and Youth" refers to unauthorized immigrants who reported attending school or college at any time in the three months prior to the survey.

3. For languages, "Chinese" includes Mandarin, Cantonese, and other Chinese languages; "English" includes English, Jamaican Creole, Krio, Pidgin Krio, and other English-based Creole languages; "French" includes French, Patois, and Cajun; "Pacific Island languages" includes Ilocano, Samoan, Hawaiian, Sebuano, Chamorro, Guamanian, Marshallese, Trukese, Tongan, and other Austronesian languages, but excludes Tagalog and Filipino, which are reported separately; "Portuguese" includes Portuguese and Cape Verdean Creole; "Sub-Saharan African" includes Swahili or other Bantu languages, Mande, Fulani, Kru, and other unspecified African languages; "Tagalog" includes Tagalog and Filipino.

4. For industries, "Other services" are miscellaneous services, not including the following services listed separately: (1) professional, scientific, management, administrative, and waste management services; (2) educational services; (3) health and social services; and (4) accommodation and food services, arts, entertainment, and recreation.

5. "-" estimates are zero, not applicable, or not displayed due to small sample size.

6. Percentages may not add up to 100 due to rounding.

*Methodology in Brief:*

MPI's method uses information from the SIPP to assign legal status to noncitizens in the ACS. In the SIPP, noncitizens report whether they currently have lawful permanent resident (LPR) status—i.e., a green card. Those without LPR status may be recent refugees, temporary visitors (e.g., international students or high-skilled H-1B workers), or unauthorized immigrants. Our method maps characteristics such as country of birth, year of U.S. entry, age, gender, and educational attainment between the two surveys, and those noncitizens in the ACS who have characteristics similar to those reporting LPR status in the SIPP are coded as LPRs in the ACS. The remaining noncitizens—who are similar in characteristics to those not reporting LPR status in the SIPP—are classified as either unauthorized or legal temporary migrants, depending on whether they meet the qualifications for H-1B and the other temporary visa classifications. Estimates of unauthorized immigrants are weighted to match control totals (benchmarks) for immigrants from a set of origin countries and world regions. These control totals are calculated by subtracting the number of legal immigrants from the total of all immigrants for each country and region that are captured in the ACS data. The number of legal immigrants is estimated by adding up all legal admissions from each country and region in every year—using Department of Homeland Security administrative data—and then reducing this number to account for deaths and emigration of legal immigrants. Finally, the unauthorized immigrant population estimates are adjusted upward slightly to account for the undercount of this population in the ACS.

MPI's overall method was developed in consultation with James Bachmeier of Temple University and Jennifer Van Hook of The Pennsylvania State University, Population Research Institute. For more detail on the methods, see MPI, "MPI Methodology for Assigning Legal Status to Noncitizen Respondents in U.S. Census Bureau Survey Data." The control totals were developed by Jennifer Van Hook. These estimates have the same sampling and coverage errors as any other survey-based estimates that rely on ACS and other Census Bureau data.

## DEMOGRAPHICS

App.281

## FAMILY

## EDUCATION AND LANGUAGE

## WORKFORCE

## ECONOMICS



1400 16th St NW, Suite 300, Washington, DC 20036
ph. 202-266-1940 | fax. 202-266-1900

     

Copyright © 2001-2021 Migration Policy Institute. All rights reserved.

CONTACT   |   SITE MAP   |   EXPERTS   |   SIGN UP   |   DONATE

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

Pew Research Center
U.S. unauthorized immigrant population estimates by state, 2016

# EXHIBIT A-21

*Hispanic Trends*

MAIN         MORE ▾

FEBRUARY 5, 2019

# U.S. unauthorized immigrant population estimates by state, 2016

Pew Research Center estimates that 10.7 million unauthorized immigrants, the lowest level in a decade, lived in the U.S. in 2016. Select a measure from the dropdown below to view state by state data on unauthorized immigration.

**POPULATION**     LABOR FORCE

Unauthorized immigrant population, 2016         ▾

A majority of U.S. unauthorized immigrants live in just six states – including California (with the largest population at 2.2 million), Texas, Florida, New York, New Jersey and Illinois. There are eight states with 5,000 or fewer unauthorized immigrants. For more, see our report, "U.S. Unauthorized Immigrant Total Dips to Lowest Level in a Decade," and our interactive charts on unauthorized immigrant population trends.

▸ **Methodology**

*Unauthorized immigrant population, 2016*



✕

❋ Pew Research Center

When you're finished with our website, would you be willing to answer a quick question?

Yes         No

App.284

Case 2:21-cv-00067-Z   Document 54-1   Filed 06/08/21   Page 286 of 297   PageID 1425



U.S.: 10,700,000

Note: All numbers are rounded; see Methodology for rounding rules.
Source: Pew Research Center estimates based on augmented U.S. Census Bureau data. See Methodology for details.

| State ▲ | Unauthorized immigrant population ⇕ | Unauthorized immigrant % of population ⇕ | Unauthorized immigrant % of all immigrants ⇕ | % of K-12 students with unauthorized immigrant parent(s) ⇕ | Mexican % of unauthorized immigrants ⇕ | % of unauthorized immigrant adults in U.S. 5 years or less ⇕ | Change in unauthorized immigrant population, 2007 to 2016 ⇕ |
|---|---|---|---|---|---|---|---|
| U.S. | 10,700,000 | 3.3% | 24% | 7.6% | 51% | 18% | -1,550,000 |
| Alabama | 55,000 | 1.2% | 34% | 3.3% | 59% | 13% | -15,000 |
| Alaska | 5,000 | 1.0% | 13% | 0.5% | 23% | 43% | Not sig. |
| Arizona | 275,000 | 3.9% | 28% | 10.7% | 78% | 13% | -220,000 |
| Arkansas | 55,000 | 1.9% | 41% | 6.3% | 64% | 15% | -10,000 |
| California | 2,200,000 | 5.6% | 20% | 13.3% | 69% | 10% | -550,000 |
| Colorado | 190,000 | 3.4% | 34% | 10.6% | 70% | 14% | Not sig. |
| Connecticut | 120,000 | 3.5% | 23% | 6.9% |  |  |  |
| Delaware | 30,000 | 3.0% | 31% | 7.0% |  |  |  |
| District of Columbia | 25,000 | 3.8% | 28% | 9.0% |  |  |  |
| Florida | 775,000 | 3.8% | 18% | 7.1% |  |  |  |

Pew Research Center

When you're finished with our website, would you be willing to answer a quick question?

Yes      No

App.285

Case 2:21-cv-00067-Z   Document 54-1   Filed 06/08/21   Page 287 of 297   PageID 1426

| State | Unauthorized immigrant population | Unauthorized immigrant % of population | Unauthorized immigrant % of all immigrants | % of K-12 students with unauthorized immigrant parent(s) | Mexican % of unauthorized immigrants | % of unauthorized immigrant adults in U.S. 5 years or less | Change in unauthorized immigrant population, 2007 to 2016 |
|---|---|---|---|---|---|---|---|
| Georgia | 400,000 | 3.8% | 36% | 8.6% | 49% | 17% | Not sig. |
| Hawaii | 45,000 | 3.3% | 17% | 7.0% | 6% | 34% | Not sig. |
| Idaho | 35,000 | 2.2% | 37% | 5.7% | 79% | 19% | Not sig. |
| Illinois | 400,000 | 3.2% | 22% | 7.8% | 71% | 11% | -140,000 |
| Indiana | 100,000 | 1.5% | 29% | 4.2% | 59% | 23% | Not sig. |
| Iowa | 50,000 | 1.7% | 31% | 4.2% | 56% | 26% | Not sig. |
| Kansas | 75,000 | 2.6% | 35% | 7.6% | 69% | 16% | Not sig. |
| Kentucky | 35,000 | 0.8% | 22% | 1.6% | 48% | 24% | Not sig. |
| Louisiana | 70,000 | 1.5% | 36% | 2.7% | 28% | 23% | +15,000 |
| Maine | <5,000 | 0.4% | 9% | 0.5% | – | – | Not sig. |
| Maryland | 275,000 | 4.5% | 29% | 8.5% | 9% | 22% | +60,000 |
| Massachusetts | 250,000 | 3.8% | 22% | 6.1% | 2% | 29% | +35,000 |
| Michigan | 100,000 | 1.0% | 15% | 2.2% | 29% | 27% | -45,000 |
| Minnesota | 95,000 | 1.7% | 20% | 3.8% | 50% | 21% | Not sig. |
| Mississippi | 20,000 | 0.7% | 35% | 1.8% | 59% | 21% | Not sig. |
| Missouri | 60,000 | 1.0% | 23% | 2.7% | 45% | 20% | Not sig. |
| Montana | <5,000 | 0.3% | 12% | 0.1% | – | – | Not sig. |
| Nebraska | 60,000 | 3.1% | 41% | 9.2% | 62% | 14% | Not sig. |
| Nevada | 210,000 | 7.1% | 35% | 20.2% | | | |
| New Hampshire | 10,000 | 0.7% | 13% | 0.9% | | | |
| New Jersey | 475,000 | 5.2% | 22% | 8.8% | | | |
| New Mexico | 60,000 | 2.8% | 29% | 7.9% | | | |

**Pew Research Center**

When you're finished with our website, would you be willing to answer a quick question?

Yes                    No

App.286

| State ▲ | Unauthorized immigrant population ⇕ | Unauthorized immigrant % of population ⇕ | Unauthorized immigrant % of all immigrants ⇕ | % of K-12 students with unauthorized immigrant parent(s) ⇕ | Mexican % of unauthorized immigrants ⇕ | % of unauthorized immigrant adults in U.S. 5 years or less ⇕ | Change in unauthorized immigrant population, 2007 to 2016 ⇕ |
|---|---|---|---|---|---|---|---|
| New York | 725,000 | 3.6% | 15% | 6.6% | 24% | 20% | -300,000 |
| North Carolina | 325,000 | 3.1% | 39% | 8.9% | 56% | 16% | Not sig. |
| North Dakota | 5,000 | 0.7% | 23% | 1.7% | – | – | Not sig. |
| Ohio | 90,000 | 0.8% | 17% | 1.4% | 25% | 33% | Not sig. |
| Oklahoma | 85,000 | 2.2% | 38% | 6.4% | 78% | 15% | Not sig. |
| Oregon | 110,000 | 2.6% | 26% | 8.2% | 69% | 16% | -40,000 |
| Pennsylvania | 170,000 | 1.3% | 19% | 2.4% | 21% | 31% | Not sig. |
| Rhode Island | 30,000 | 2.8% | 19% | 6.8% | 8% | 28% | Not sig. |
| South Carolina | 85,000 | 1.7% | 35% | 4.4% | 54% | 20% | Not sig. |
| South Dakota | 5,000 | 0.7% | 19% | 1.2% | – | – | Not sig. |
| Tennessee | 130,000 | 2.0% | 38% | 5.2% | 56% | 23% | Not sig. |
| Texas | 1,600,000 | 5.7% | 33% | 13.3% | 73% | 16% | Not sig. |
| Utah | 95,000 | 3.2% | 38% | 7.5% | 71% | 14% | Not sig. |
| Vermont | <5,000 | 0.1% | 4% | 0.2% | – | – | Not sig. |
| Virginia | 275,000 | 3.4% | 27% | 6.9% | 12% | 23% | Not sig. |
| Washington | 240,000 | 3.3% | 23% | 8.9% | 56% | 17% | Not sig. |
| West Virginia | <5,000 | 0.2% | 14% | 0.5% | – | – | Not sig. |
| Wisconsin | 75,000 | 1.3% | 24% | 3.6% | 70% | 15% | Not sig. |
| Wyoming | 5,000 | 1.2% | 32% | 3.9% | | | |

EMBED ⟨⟩     REPORT     DATA

**✻ Pew Research Center**

When you're finished with our website, would you be willing to answer a quick question?

Yes          No

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WYATT SULING**

Transactional Access Records Clearinghouse (TRAC) publication
Now Over 8,000 MPP Cases Transferred Into United States Under Biden

# EXHIBIT A-22



# Now Over 8,000 MPP Cases Transferred Into United States Under Biden

As of the end of April 2021, a total of 8,387 individuals formerly forced to remain in Mexico under the Migrant Protection Protocols (MPP) have been able to enter the United States since President Biden ended this Trump-era program[1]. TRAC previously reported that by the end of March 3,911 individuals had been allowed to enter the U.S. under a phased process. During April, the pace picked up so that by the end of last month entrants had increased to 8,387—more than double the previous total which had covered transfers during February and March. According to court records, as of the end of April a total of 18,087 individuals still remain in Mexico and have not yet been allowed to enter the U.S.

These findings come from analysis conducted by the Transactional Records Access Clearinghouse (TRAC) at Syracuse University. Results are based on comparing MPP court records at the end of January 2021 matched with those from the end of April 2021. TRAC analyzed this matched MPP case cohort to track the Biden administration's phased process of allowing individuals entry into the U.S.

## Pace of Transfers Varied by Location

MPP cases assigned to the Brownsville, Texas hearing location continued to show the highest proportion of individuals allowed to enter the U.S.: 45 percent. However, MPP cases from Laredo, Texas which had been scheduled to start its processing over a month later made up a lot of lost ground by the end of April. Only 3 percent of its cases had been transferred into the U.S. at the end of March to await their Immigration Court hearings. But by the end of April this had jumped to 28 percent, vaulting ahead of rates in the San Ysidro MPP Court which had been scheduled to start processing cases the earliest. Laredo's rate was also close behind the proportion at the El Paso MPP court which also had been scheduled to start processing transfers more than a month earlier. See Figure 1 and Table 1.



Figure 1. Individuals with Pending MPP Immigration Court Cases Allowed to Enter U.S., January 31, 2021 - April 30, 2021

*(Click for larger image)*

**Table 1. Transfer of Individuals with Pending Immigration Court Cases From MPP Hearing Locations Into the U.S. During February - April 2021**

| MPP Immigration Court Hearing Location End of January | Pending Cases as of:* | | Cases Transferred as of:** | | Total Percent Transferred |
|---|---|---|---|---|---|
| | End of March | End of April | End of March | End of April | |
| **MPP Court El Paso** | 10,825 | 10,830 | 1,357 | 3,362 | 31.0% |
| **MPP Brownsville Gateway International Bridge** | 6,207 | 6,211 | 1,719 | 2,784 | 44.8% |
| **MPP Laredo, Texas - Port of Entry** | 3,408 | 3,426 | 102 | 948 | 27.7% |
| **MPP Court San Ysidro Port** | 3,217 | 3,226 | 467 | 748 | 23.2% |
| **MPP Court Calexico Port** | 2,775 | 2,781 | 266 | 545 | 19.6% |
| **Total**** | 26,432 | 26,474 | 3,911 | 8,387 | **31.7% |

*\* Increase since March reflects formerly closed MPP cases that were reopened during April.*
*\*\* An additional 2,988 now pending MPP cases, due to special circumstances, had been allowed to enter the country during the Trump administration to await their court hearings.*

Not only were processing rates highest from the MPP courts in El Paso and Brownsville, but the sheer number of individuals transferred into the U.S. from these two MPP courts were the greatest. Transfers into the U.S. from the MPP courts in El Paso and Brownsville accounted for nearly three out of every four individuals (73%) allowed to enter the U.S. This was due in part to the much larger volume of MPP cases pending there.

## Pace of Transfers Varied by How Long Cases Had Been Pending

MPP court locations also showed very different priorities assigned to cases that had been waiting the longest versus shortest periods of time. Laredo, Texas and San Ysidro, California MPP courts tended to follow a 'first in-first processed' pattern.

In contrast, for individuals in the MPP courts in El Paso, Texas and Calexico, California, cases tended to prioritize more recent arrivals. In El Paso, for example, only 15 percent of individuals who had been waiting since FY 2019 had been allowed into the U.S., as compared with 52 percent of those arriving at the border in FY 2020 and 66 percent allowed into the U.S. who had just arrived during FY 2021 (October 2020-January 2021). The Calexico MPP court showed a very similar pattern with 19 percent processed into U.S. for those waiting since FY 2019, 48 percent processed for FY 2020, and 67 percent processed for arrivals in FY 2021. See Table 2.

**Table 2. Processing Rates for Individuals Allowed into U.S. from February - April 2021 Depending Upon How Long MPP Case Pending**

| MPP Immigration Court Hearing Location End of January | MPP Cases Pending | Percent Allowed into U.S. by Date of NTA | | |
|---|---|---|---|---|
| | | FY 2019 | FY 2020 | FY 2021 |
| **MPP Court El Paso** | 10,830 | 15% | 52% | 66% |
| **MPP Brownsville Gateway International Bridge** | 6,211 | 48% | 18% | 40% |
| **MPP Laredo, Texas - Port of Entry** | 3,426 | 58% | 21% | 29% |
| **MPP Court San Ysidro Port** | 3,226 | 38% | 11% | 10% |
| **MPP Court Calexico Port** | 2,781 | 19% | 48% | 67% |
| **Total** | 26,474 | 39% | 20% | 35% |

## Pace of Transfers by Nationality

Around half of individuals from Venezuela (51%) and Cuba (46%) with pending MPP cases had been paroled into the U.S. to awaiting their Immigration Court hearings by the end of April. In

App.290

Case 2:21-cv-00067-Z   Document 54-1   Filed 06/08/21   Page 292 of 297   PageID 1431

contrast, much lower percentages of people from Guatemala (19%), Peru (17%), Brazil (13%) and Ecuador (4%) with pending MPP cases had made their way into the U.S. by the same time. See Figure 2.and Table 3.



**Figure 2. Individuals by Nationality with Pending MPP Immigration Court Cases Allowed to Enter U.S. from February - April 2021**

*(Click for larger image)*

Part of this difference may be explained by the higher concentration of Venezuelans and Cubans assigned to MPP courts in Texas, where the speed of processing of transfers was much higher than in the California MPP courts. See Table 4. Individuals from Peru, Brazil and Ecuador experienced among the lowest transfer rates even though their cases were similarly concentrated in Texas MPP courts, indicating that court location did not provide a full explanation of the disparities.

Some of these differences can be explained by the timing of when different nationality groups arrived. The picture is somewhat complicated since, as we saw above, the impact of arrival times varied by MPP court in determining whether persons who waited longer periods of time were processed first or last. For example, two out of three (68%) Guatemalans had arrived at the southwest border during FY 2019. However, few individuals from Peru, Brazil or Ecuador had arrived in this early wave during FY 2019. And nearly half (45%) of Nicaraguans assigned to MPP arrived very recently (October 2020 - January 2021). This means that who is being allowed to enter the United States is conditioned by which point of entry they went to and when (during the life of MPP) they arrived. See Table 5 and compare with Tables 2-4.

**Table 3. Transfer of Individuals by Nationality with Pending Immigration Court Cases From MPP Hearing Locations Into the U.S. During February - April 2021**

| Nationality | Pending MPP Cases | | Transferred by End of April | |
|---|---|---|---|---|
| | Number | Percent | Number | Rate* |
| Cuba | 7,593 | 28.7% | 3,473 | 45.7% |
| Honduras | 5,864 | 22.2% | 1,792 | 30.6% |
| Guatemala | 4,483 | 16.9% | 848 | 18.9% |
| Ecuador | 2,557 | 9.7% | 105 | 4.1% |

App.291

| Nationality | Pending MPP Cases | | Transferred by End of April | |
|---|---|---|---|---|
| | Number | Percent | Number | Rate* |
| El Salvador | 1,935 | 7.3% | 732 | 37.8% |
| Venezuela | 1,663 | 6.3% | 854 | 51.4% |
| Nicaragua | 1,355 | 5.1% | 380 | 28.0% |
| Brazil | 584 | 2.2% | 74 | 12.7% |
| Peru | 116 | 0.4% | 20 | 17.2% |
| Colombia | 114 | 0.4% | 31 | 27.2% |
| Other | 210 | 0.8% | 78 | 37.1% |
| Total | 26,474 | 100.0% | 8,387 | 31.7% |

*\* Percent of cases assigned to MPP courts at the end of January 2021 that had been transferred to a hearing location within the U.S. by the end of March 2021.*

**Table 4. Pending Immigration Court Cases by Nationality and MPP Hearing Location at end of January 2021**

| Nationality | Pending MPP Cases | Percent in MPP Hearing Locations at: | | | | | |
|---|---|---|---|---|---|---|---|
| | | El Paso | Brownsville | Laredo | San Ysidro | Calexico | Total % |
| Cuba | 7,593 | 57% | 26% | 11% | 2% | 4% | 100% |
| Honduras | 5,864 | 24% | 25% | 17% | 23% | 12% | 100% |
| Guatemala | 4,483 | 29% | 13% | 3% | 21% | 34% | 100% |
| Ecuador | 2,557 | 73% | 15% | 8% | 2% | 3% | 100% |
| El Salvador | 1,935 | 24% | 36% | 10% | 25% | 5% | 100% |
| Venezuela | 1,663 | 27% | 24% | 40% | 6% | 2% | 100% |
| Nicaragua | 1,355 | 21% | 47% | 19% | 11% | 3% | 100% |
| Brazil | 584 | 97% | 0% | 0% | 2% | 1% | 100% |
| Peru | 116 | 36% | 36% | 15% | 12% | 1% | 100% |
| Colombia | 114 | 54% | 22% | 5% | 17% | 2% | 100% |
| Other | 210 | 33% | 31% | 30% | 3% | 4% | 100% |
| Total | 26,474 | 41% | 23% | 13% | 12% | 10% | 100% |

**Table 5. Nationalities Allowed into U.S. During February - April 2021 Depending Upon How Long MPP Case Pending**

| Nationality | MPP Cases Pending | Percent Allowed into U.S. by Date of NTA | | | |
|---|---|---|---|---|---|
| | | FY 2019 | FY 2020 | FY 2021 | Total NTAs |
| Cuba | 7,604 | 34% | 47% | 19% | 100% |
| Honduras | 5,874 | 58% | 41% | 0% | 100% |
| Guatemala | 4,484 | 68% | 32% | 1% | 100% |
| Ecuador | 2,558 | 5% | 74% | 21% | 100% |
| El Salvador | 1,938 | 55% | 45% | 0% | 100% |
| Venezuela | 1,663 | 26% | 56% | 18% | 100% |
| Nicaragua | 1,356 | 20% | 35% | 45% | 100% |
| Brazil | 585 | 0% | 67% | 33% | 100% |
| Peru | 116 | 9% | 53% | 38% | 100% |
| Colombia | 114 | 17% | 46% | 37% | 100% |
| Other | 182 | 9% | 46% | 37% | 100% |
| All Nationalities | 26,474 | 42% | 46% | 12% | 100% |

## Asylum-Seekers Inside United States More Likely to Have an Attorney

App.292

Case 2:21-cv-00067-Z   Document 54-1   Filed 06/08/21   Page 294 of 297   PageID 1433

Given the complexity of immigration law and the asylum process, immigration attorneys have been shown to play a central role in the process and outcome of asylum cases. TRAC previously found that asylum-seekers who obtain an attorney are five times more likely to be granted asylum. TRAC also found that very few asylum seekers in MPP were represented by an attorney.

Updated data through the end of April 2021 shows that the likelihood of asylum seekers being represented by an attorney increases after the person is paroled into the United States and increases the longer the person is in the United States. For this section, we include cases that were transferred to a non-MPP court prior to January to illustrate how more time in the United States contributes to the likelihood of obtaining representation.

Of the nearly 3,000 individuals with pending cases in MPP who were paroled into the country on or before January 31 of this year, 44 percent of them now showed a record of an attorney on file. For cases paroled in February through April, this number was lower at 19 percent, but still higher than the 9 percent of those still in Mexico who had an attorney.



**Figure 3. Percent of Pending MPP Immigration Court Cases with Representation (as of April 2021)**
*(Click for larger image)*

Although representation rates among MPP cases have been low, having an attorney in itself may have made it more likely for migrants to be aware of and to complete the required MPP registration process through the UNHCR's Conecta website. Only individuals who registered were considered for transfer. Moreover, the percent of these cases with representation may increase over time, between now and the time their cases are heard and decided. For comparison, 80 percent of the asylum cases of the nearly 60,000 cases decided in FY 2020 were represented by an attorney (see also TRAC's asylum decisions tool here).

## Where Inside the U.S. Did MPP Cases Go?

A total of 74 different hearing locations across the country received MPP transferred cases during February - April 2021. Florida proved to be the most popular location that the 8,387 MPP entrants transferred their cases to, followed by Texas. In fact, fully 31 percent of cases—nearly one in three—transferred to either Miami, Florida (1,791 cases) or Orlando, Florida (808 cases).

Case 2:21-cv-00067-Z   Document 54-1   Filed 06/08/21   Page 295 of 297   PageID 1434

The hearing location in Dallas, Texas received the third most transferred cases (449), following by Houston, Texas (S. Gessner) with 335. San Antonio, Texas was in fifth place with 324.

Other hearing locations in Georgia, California, Virginia, and New Jersey also were among the top ten. Table 6 provides a complete list of Immigration Court hearing locations where individuals transferred their cases.

**Table 6. Hearing Locations in U.S. Individuals with Pending MPP Immigration Court Cases Transferred During February - April 2021**

| Immigration Court Hearing Location MPP Cases Transferred | Cases Transferred as of: | |
|---|---|---|
| | End of March | End of April |
| All | 3,911 | 8,387 |
| Miami, Florida | 651 | 1,791 |
| Orlando, Florida | 321 | 808 |
| Dallas, Texas | 201 | 443 |
| Houston - S. Gessner | 144 | 335 |
| San Antonio, Texas | 135 | 324 |
| Houston Greenspoint Park | 117 | 316 |
| Atlanta, Georgia | 131 | 250 |
| Los Angeles, California | 139 | 248 |
| Arlington, Virginia | 143 | 229 |
| Newark, New Jersey | 134 | 228 |
| Charlotte | 115 | 216 |
| Baltimore, Maryland | 126 | 208 |
| Memphis, Tennessee | 137 | 207 |
| Chicago, Illinois | 101 | 199 |
| San Francisco, California | 114 | 197 |
| Louisville, Kentucky | 69 | 176 |
| Boston, Massachusetts | 86 | 170 |
| New Orleans, Louisiana | 89 | 165 |
| Las Vegas, Nevada | 66 | 161 |
| Houston, Texas | 83 | 155 |
| Denver, Colorado | 64 | 112 |
| Omaha, Nebraska | 51 | 111 |
| New York City, New York | 54 | 110 |
| El Paso, Texas | 19 | 107 |
| Van Nuys Immigration Court | 63 | 104 |
| Philadelphia, Pennsylvania | 58 | 99 |
| New York Varick | 58 | 98 |
| Salt Lake City, Utah | 28 | 88 |
| New York Broadway | 45 | 77 |
| Harlingen, Texas | 43 | 70 |
| Phoenix, Arizona | 24 | 66 |
| Kansas City, Missouri | 32 | 56 |
| Seattle, Washington | 30 | 53 |
| Hartford, Connecticut | 23 | 48 |
| Cleveland, Ohio | 20 | 47 |
| Los Angeles - North Los Angeles Street | 34 | 47 |
| Bloomington | 21 | 30 |

App.294

Case 2:21-cv-00067-Z   Document 54-1   Filed 06/08/21   Page 296 of 297   PageID 1435

| Immigration Court Hearing Location MPP Cases Transferred | Cases Transferred as of: | |
| --- | --- | --- |
| | End of March | End of April |
| Detroit, Michigan | 12 | 29 |
| Portland, Oregon | 8 | 27 |
| San Diego, California | 22 | 24 |
| Buffalo, New York | 8 | 22 |
| Leland Federal Building | 14 | 20 |
| San Antonio Satellite Office | 3 | 16 |
| Unnamed | 10 | 14 |
| Portland, Oregon - POO | 15 | 13 |
| Tucson, Arizona | 5 | 11 |
| Port Isabel Service Processing Center | 7 | 9 |
| Sacramento Immigration Court | 7 | 8 |
| Arlington Detained Location | 0 | 5 |
| Honolulu, Hawaii | 4 | 4 |
| San Francisco Annex | 4 | 4 |
| MIA Non-Detained Juveniles | 0 | 4 |
| Pearsall, Texas - Detention Facility | 4 | 3 |
| San Francisco Non-Detained Juveniles | 2 | 2 |
| Eloy INS Detention Center | 1 | 2 |
| El Paso Juvenile Detained | 1 | 2 |
| Pittsburgh, Pennsylvania | 1 | 2 |
| Boise, Idaho | 0 | 2 |
| San Antonio Detained Juvenile | 0 | 2 |
| La Palma Correctional Center | 3 | 1 |
| Boston Detained | 2 | 1 |
| Conroe Immigration Court | 1 | 1 |
| Newark Detained DOCket | 1 | 1 |
| Pittsburgh Detained Juveniles | 1 | 1 |
| San Juan, Puerto Rico | 1 | 1 |
| Denver Family Unit | 0 | 1 |
| Imperial, California | 0 | 1 |
| The Villages, Inc. | 0 | 1 |
| Otero County Processing Center | 0 | 1 |
| San Antonio Non-Detained Juvenile | 0 | 1 |
| San Diego Non-Detained Juvenile | 0 | 1 |
| Southwest Key Sunzal | 0 | 1 |
| La Palma | 3 | 0 |
| Laredo, Texas - Detention Facility | 1 | 0 |
| Houston Female Detained | 1 | 0 |

## How TRAC Identified Cases for This Study

TRAC's MPP analysis identified cases that were initially assigned to one of the Immigration Courts designated as an MPP hearing location along the U.S.-Mexico border in the Executive Office for Immigration Review's (EOIR) internal court records[1]. Once a case has been filed at an MPP court, TRAC is able to follow the life of the case over time. For this report, TRAC analyzed MPP cases at the end of January, matched them with case-by-case court records at the end of April, and then identified cases that had been transferred to a non-MPP court. Due to

Case 2:21-cv-00067-Z   Document 54-1   Filed 06/08/21   Page 297 of 297   PageID 1436

anticipated delays between the time that an asylum seeker is paroled into the United States and the time that the court case is reassigned (i.e. transferred) to a court near that person's final destination, this approach may not necessarily capture all cases where parole has been granted.

Tables in this report focus upon MPP pending cases (29,462). This included all cases that had been pending at the end of January (29,148), plus an additional 314 closed cases that had reopened during the February - April 2021 period. Of these, 26,474 cases individuals were still waiting outside the U.S. at the end of January when President Biden assumed office. A total of 2,988 MPP cases of the pending total of 29,462 had already transferred into the U.S. during President Trump's administration[2].

## Footnotes

[1] *EOIR also established a flag for MPP cases but this wasn't consistently used. As a cross-check, TRAC identified MPP cases if a case was identified either by this flag or assignment to a MPP hearing location.*

[2] *This report includes additional MPP cases closed at the end of March that were reopened during April. These newly reopened cases were not included in TRAC's earlier report based on their status at the end of March.*

*TRAC is a nonpartisan, nonprofit data research center affiliated with the Newhouse School of Public Communications and the Whitman School of Management, both at Syracuse University. For more information, to subscribe, or to donate, contact trac@syr.edu or call 315-443-3563.*

*Report date: May 11, 2021*



Copyright 2021, TRAC Reports, Inc.