IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS; STATE OF MISSOURI | : | No. 2:21-CV-00067-Z |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| JOSEPH R. BIDEN, JR. in his official capacity as President of the United States, ET. AL. | : | |
| | : | |
| Defendants | : | |

**AMICUS BRIEF OF ADVOCATES FOR VICTIMS OF ILLEGAL ALIEN CRIME IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Lorraine G. Woodwark
Attorneys United for Secure America
25 Massachusetts Ave., NW,
Suite 335
Washington, DC 20001
Tel: 202-591-0962
Fax: 202-464-3590
Email: LWoodwark@IRLI.org

Walter S. Zimolong, Esquire
Zimolong, LLC
Villanova, PA 19085
353 West Lancaster Avenue,
Suite 300
Wayne, PA 19087
Tel: 215-665-0842
Email: wally@zimolonglaw.com

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

INTERESTS OF AMICUS CURIAE .............................................................................. 1

ARGUMENT .................................................................................................................. 1

I.   ILLEGAL ALIENS HAVE A DELETERIOUS IMPACT ON TEXAS AND THE UNITED STATES ................................................................................................... 2

II.  DHS IS IGNORING A CLEAR CONGRESSIONAL MANDATE ........................ 5

CONCLUSION ............................................................................................................. 10

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Richardson*,
  480 F.2d 1159 (D.C. Cir. 1973) ............................................................................ 12

*Arizona v. United States*,
  567 U.S. 387 (2012) ............................................................................................... 2

*Fiallo v. Bell*,
  430 U.S. 787 (1977) ............................................................................................... 7

*Galvan v. Press*,
  347 U.S. 522 (1954) ............................................................................................... 7

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ............................................................................................. 12

*Henderson v. Mayor of City of New York*,
  92 U.S. 259 (1875) ................................................................................................. 8

*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013) ............................................................................... 6

*Texas v. United States*,
  2021 WL 723856 (S.D. Tex. Feb. 23, 2021) .......................................................... 7

*Trump v. Hawaii*,
  138 S.Ct. 2392 (2018) ..................................................................................... 9, 11

**Statutes**

8 U.S.C. § 1101 ........................................................................................................ 11

8 U.S.C. § 1225 ........................................................................................................ 10

8 U.S.C. § 1225 (b)(1)(B)(iii)(IV) ............................................................................................ 10

8 U.S.C. § 1225(b)(1)(A)(ii) ..................................................................................................... 10

8 U.S.C. § 1225(b)(1)(B)(ii) ..................................................................................................... 10

8 U.S.C. § 1225(b)(1)(B)(iii) .................................................................................................... 10

8 U.S.C. 1225(a)(1) .................................................................................................................. 10

8 U.S.C. 1225(a)(3) .................................................................................................................. 10

## Constitutional Provisions

U.S. Const. Art. II, § 2, cl. 2 ...................................................................................................... 8

## Executive Materials

Department of Justice, *Immigration, Citizenship, and the Federal Justice System*, 1998-2018 (2021). https://www.bjs.gov/content/pub/pdf/icfjs9818.pdf ...................... 3

Federal Bureau of Prisons, Inmate Citizenship, last updated June 5, 2021 https://www.bop.gov/about/statistics/statistics_inmate_citizenship.jsp .................. 3

Immigration and Customs Enforcement Annual Report (2020) ................................. 2

The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and Defer Removal of Others, 38 O.P. O.L.C. 1, 31-33 (Nov. 19, 2014) ....................................................................... 9

## Other Authorities

Texas Criminal Illegal Alien Crime Data, https://www.dps.texas.gov/section/crime-records-service/texas-criminal-illegal-alien-data. ...................................................... 3

Adam B Cox & Cristina M. Rodriquez, The President And Immigration Law (2020) 8

*Miranda-Cota v. State*, Supreme Court of Nevada, http://caseinfo.nvsupremecourt.us/public/caseView.do?csIID=56321 ...................... 5

Boston.CBSlocal.com, Driver in Florida Crash That Killed 4 From Mass. Family Charged With Careless Driving, (March 9, 2020) ................................................... 5

John Binder, *Three-Time Deported Illegal Alien Accused of Stabbing Attack in Florida,* (March 11, 2021) ........................................................................................... 5

Vinny Vella, *A would be car thief tried to kill a police officer who stopped him, Montgomery County DA says,* (Mar. 11, 2021) ...................................................... 4

Jack Martin & Eric Ruark, Federation for American Immigration Reform, The Fiscal Burden of Illegal Immigration on Unites States Taxpayers, (Feb. 2011) ..... 6

Kris W. Kobach, Reinforcing the Rule of Law: What States Can and Should Do to Reduce Illegal Immigration, 22 Geo. Immigr. L.J. 459, 462 (2008) ......................... 2

## INTERESTS OF AMICUS CURIAE

Advocates for Victims of Illegal Alien Crime (AVIAC) is an advocacy organization founded and led by individuals, including Texans, who have lost family members because of crimes committed by illegal aliens. AVIAC's mission is to be both a source of support for such victims across the country and an advocate for policies that will enforce the nation's immigration laws and prevent government actors from sheltering illegal aliens, particularly criminal aliens, from deportation. AVIAC presents the raw statistics of illegal alien crime. And it gives a face on these statistics with victims' stories. It also presents legal arguments unique from that being advanced by the parties. AVIAC, therefore, takes an interest in the case at bar challenging government action that frustrates the enforcement of immigration laws.

ARGUMENT

Among the Biden Administration's immigration failures has been the termination of the Migrant Protection Protocols ("MPP"). Under the MPP, those aliens entering through the southern border by claiming "asylum" would be required to remain in Mexico pending resolution of their asylum claims. The reason for the MPP was those individuals had already passed through other safe countries where they should have requested asylum, instead of "country shopping" for their country of choice. The MPP helped reduce fraudulent claims of asylum to enter the United States. It also helped with the backlog of asylum cases ensuring that those who could prove a valid asylum claim were aided. The Biden Administration's termination of the program has created a massive humanitarian crisis along the border. Human traffickers and other criminals have made enormous profits as they control the Southern border ensuring no one enters without paying a steep price, including forced slave labor, sex industry work, and organ harvesting. Illegal aliens are often forced to carry in drugs, such as fentanyl and methamphetamines that kill thousands of Americans. The explosion of illegal entries has caused the largest crisis along the border in over 20 years. This is the result of the Administration's suspension on January and then termination of the MPP on June 1. These reckless and unlawful actions violate the Administrative Procedure Act ("APA"), the Immigration and Nationality Act ("INA"), and the United States Constitution. It also breaks binding agreemenst the Administration had with

1

Texas and other states. Therefore, the court should grant the Plaintiffs' request for a preliminary injunction.

## I. ILLEGAL ALIENS HAVE A DELETERIOUS IMPACT ON TEXAS AND THE UNITED STATES.

Illegal alien crime has a deleterious effect on our nation's public safety and public health. The State of Texas, like all states, depends on the federal government to ameliorate these impacts because the states cannot do it themselves. *See Arizona v. United States*, 567 U.S. 387 (2012).

In 2020, ICE arrested 103,603 illegal aliens, *approximately 90% of whom had prior criminal convictions or pending criminal charges*. ICE ANN. REP. (2020)[1]. While these statistics are jarring, they are still cold statistics. And the statistics also only count state level offenses committed by illegal aliens; not federal crimes. Moreover, the most recent study on the topic indicates approximately 90 percent of MS-13 gang members in the United States are illegal aliens.[2] And almost 17% of the federal prison population consists of non-US citizens.[3] In 2018, arrests of illegal aliens represented over two thirds of all federal arrests.[4]

The Texas Department of Public Safety keeps statistics on the impact of illegal alien crime specific to Texas. Using the Department of Homeland Security's own statistics, the Department of Public Safety found that 300,000 illegal aliens, **who DHS**

---

[1] https://www.ice.gov/doclib/news/library/reports/annualreport/iceReportFY2020.pdf
[2] Kris W. Kobach, Reinforcing the Rule of Law: What States Can and Should Do to Reduce Illegal Immigration, 22 Geo. Immigr. L.J. 459, 462 (2008)
[3] https://www.bop.gov/about/statistics/statistics_inmate_citizenship.jsp
[4] Department of Justice, *Immigration, Citizenship, and the Federal Justice System*, 1998-2018 (2021). https://www.bjs.gov/content/pub/pdf/icfjs9818.pdf

**had previously identified as being in the country illegally**, committed crimes, including major felonies, in the State of Texas, between June 1, 2011 through January 31, 2021. According to the Texas Department of Public Safety:

> "According to DHS status indicators, over 334,000 criminal aliens have been booked into local Texas jails between June 1, 2011 and January 31, 2021, of which over 228,000 were classified as illegal aliens by DHS. [b]etween June 1, 2011 and January 31, 2021, these 228,000 illegal aliens were charged with more than 368,000 criminal offenses which included arrests for 681 homicide charges; 42,698 assault charges; 6,950 burglary charges; 45,557 drug charges; 590 kidnapping charges; 18,662 theft charges; 28,892 obstructing police charges; 2,050 robbery charges; 4,505 sexual assault charges; 5,651 sexual offense charges; and 3,871 weapon charges."

Texas Criminal Illegal Alien Crime Data, https://www.dps.texas.gov/section/crime-records-service/texas-criminal-illegal-alien-data.

While these statistics are staggering enough, they likely underreport the true number of crimes illegal aliens commit in Texas each year and the true count is likely much higher. The Department of Public Safety's statistics count only those illegal aliens that "had an encounter with DHS that resulted in their fingerprints being entered into the DHS IDENT database." *Id.* As the report notes, "[f]oreign nationals who enter the country illegally and avoid detection by DHS but are later arrested by local or state law enforcement for a state offense will not have a DHS response in regard to their lawful status and do not appear in these counts." *Id.* The statistics also only count state level offenses committed by illegal aliens not federal crimes.

What happens when our immigration laws are not enforced? On March 11, 2021, illegal alien Reynaldo Figueroa-Ardon, a Honduran national, got into an altercation with a Pennsylvania police officer who was trying to detain him for breaking into cars. He wrestled away the officer's firearm, held it to the officer's head, and pulled the trigger three times. Luckily, there was no round in the chamber and the officer's life was spared.[5]

In another case on March 7, 2021, three-time deported illegal alien Obduliu Godines, a Mexican national, tried to kill his neighbor in Collier County, Florida, by stabbing him. Godines allegedly kicked open his neighbor's door and said, "I'm going to kill you" before lunging towards the man with a knife.[6]

In March 2020, illegal alien Lucas Dos Reis Laurindo, killed Julie Smith, age 41, her 5-year-old daughter Scarlett, her 12-year old son Jaxson, and their grandmother, who were on their way to Disney World, in a careless driving accident.[7]

In 2012, in Texas, Antonio Miranda Cota, assaulted an American citizen and was removed. Yet Cota returned to Texas, and this time assaulted a law enforcement officer who required surgery paid for by worker's compensation. But Cota was not finished. In 2019, Cota violently assaulted a construction worker and family man named Guston Smith, with a hammer (the claw end), striking him in the head four times and rendering him permanently disfigured and disabled. Mr. Smith, a U.S.

---

[5]https://www.inquirer.com/news/reynaldo-figueroa-ardon-attempted-murder-police-whitemarsh-township-20210311.html
[6] https://www.breitbart.com/politics/2021/03/11/three-time-deported-illegal-alien-accused-of-stabbing-attack-in-Florida/
[7]https://boston.cbslocal.com/2020/03/09/florida-crash-lucas-dos-reis-laurindo-smith-family-whitman-massachusetts-disney-world-orlando/

4

citizen, was almost killed, remained in a coma for several days after the attack, and is now unable to work or pay for basic expenses and is unsure of his future. He also lost his family since he could not financially support them. Cota is currently serving time in a correctional institute.[8]

These horrific crimes represent only a slice of the thousands of crimes illegal aliens commit each year. There is one thing these crimes have in common; they would not have happened if these individuals were not in the country illegally.

Then there is the fiscal toll of illegal alien crime. One study pegged the fiscal damage of illegal alien crime at over $8 billion, much of that sustained by the states[9]. That study indicated that Texas' share of that total was over $8 billion.

DHS's abdication of its duties will surely make these statistics increase and Texas will be left picking up the pieces. The State of Texas and her citizens pay the price for these crimes in the form of the victim's emotional toll and the tax dollars spent processing the accused through the justice system and ultimately incarcerating them in Texas prisons.

## II.   DHS IS IGNORING A CLEAR CONGRESSIONAL MANDATE

The executive branch may not "disregard legislative direction in the statutory scheme that [it] administers." *Heckler v. Chaney*, 470 U.S. 821, 833, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985). Nor may it "ignore statutory mandates or prohibitions

---

[8] http://caseinfo.nvsupremecourt.us/public/caseView.do?csIID=56321

[9] Jack Martin & Eric Ruark, Federation for American Immigration Reform, The Fiscal Burden of Illegal Immigration on Unites States Taxpayers, (Feb. 2011) https://www.fairus.org/sites/default/files/2017-08/USCostStudy_2010.pdf

5

merely because of policy disagreements with Congress." *In re Aiken Cnty.,* 725 F.3d 255, 260 (D.C. Cir. 2013) This is perhaps most pronounced in our immigration laws.

Courts have long recognized Congress' supreme and almost exclusive power to set immigration policy. *Galvan v. Press*, 347 U.S. 522, 530-31 (1954) ("The power of Congress over the admission of aliens and their right to remain is necessarily very broad, touching as it does basic aspects of national sovereignty, more particularly our foreign relations and the national security."); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens.") And absent express delegation from Congress, the executive branch may not set its own policy in contravention of Congressional intent in the area of immigration. "Whatever 'inherent authority' the Executive may have in the area of immigration, that authority, along with the executive Power, does not include the authority to 'suspend' or 'dispense with' Congress's exercise of legislative Powers in enacting immigration laws." *Texas v. United States*, 6:21-CV-00003, 2021 WL 723856, at *37 (S.D. Tex. Feb. 23, 2021)

The constitution does not expressly address whether the power to regulate immigration belongs to Congress or the President. Congress' drives power of immigration flows from two sources: the commerce clause and the treaty clause. Before any federal broad immigration law, in *Henderson v. Mayor of City of New York*, 92 U.S. 259 (1875), the Supreme Court considered a law requiring the owner of a boat docking in New York to post a $300 bond for each foreign person that landed. The Court invalidated the law based on the commerce clause, specifically its power to regulate

commerce with foreign nations.: "a law or a rule emanating from any lawful authority, which prescribes terms or conditions on which alone the vessel can discharge its passengers, is a regulation of commerce; and, in case of vessels and passengers coming from foreign ports, is a regulation of commerce with foreign nations." *Id.* at 271.

The treaty clause of the United States Constitution, U.S. Const. Art. II, § 2, cl. 2, vest in the President the power to make treaties with foreign nations, but those treaties must still be ratified by two-thirds of the Senate. So, the President can negotiate a treaty with a nation regarding immigration but his power is not unilateral.

Congress's exclusive power has played a role in checking executive immigration policies of administrations across the ideological spectrum. ADAM B COX & CRISTINA M. RODRIQUEZ, THE PRESIDENT AND IMMIGRATION LAW (2020). In *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), the Supreme Court reaffirmed Congressional authority over immigration policy, but found it had delegated certain authority to the executive branch. There, the Supreme Court found in 8 U.S.C. § 1182(a)(1) it had delegated to the President "the authority to suspend or restrict the entry of aliens in certain circumstances." Id.

In 2014, the Justice Department concluded that President Obama could not apply DACA to parents of children because it violated a clear Congressional mandate. *See* The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and Defer Removal of Others, 38 O.P. O.L.C. 1, 31-33 (Nov. 19, 2014). In that memorandum, the Justice Department

7

acknowledged that executive discretion in immigration policy is limited by the bounds of the INA.

But this has not stopped DHS. DHS has established a position that is in direct contravention to the INA. It is no longer detaining or returning aliens seeking asylum. DHS's action taken together mean that it has wholesale ignored a Congressional mandate concerning aliens seeking asylum. On that basis alone this Court should enter an injunction.

Congress has established statutory responsibilities concerning aliens seeking asylum in Section 1225 of the INA, 8 U.S.C. § 1225. Under Section 1225(a)(1) of the INA, every alien who arrives in the United States shall be deemed an applicant for admission. 8 U.S.C. 1225(a)(1). The INA mandates that an immigration officer shall inspect all applicants for admission. 8 U.S.C. 1225(a)(3). If an alien, otherwise inadmissible, instructs the inspecting officers that he wishes to seek asylum, then the immigration officer shall refer him to an asylum officer. 8 U.S.C. § 1225(b)(1)(A)(ii). After the asylum officer interviews the alien, the officer has two choices. If the asylum officer believes the alien has a credible fear of persecution, she may allow the application to be considered further. 8 U.S.C. § 1225(b)(1)(B)(ii). If the asylum officer does not believe there is a credible fear of persecution, the officer must remove the alien from the United States. 8 U.S.C. § 1225(b)(1)(B)(iii). Even when the application for asylum is to be considered further based on a credible fear of persecution, the alien **shall be detained** pending that determination. 8 U.S.C. § 1225(b)(1)(B)(ii). Indeed, detention is mandatory. 8 U.S.C. § 1225 (b)(1)(B)(iii)(IV) ("Mandatory detention - Any

alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.") There is one exception to this procedure. If the alien arrives from Mexico or Canada, in lieu of detaining the alien seeking asylum, the DHS **may** return him to Mexico or Canada, as the case may be.

Congress exercised its power to establish immigration policy through the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1101, et. seq. (INA). The text of Section 1225 of the INA, 8 U.S.C. § 1225, is clear: when an alien claiming asylum arrives in the United States **the alien shall be detained**. If the alien arrives from Mexico or Canada, INA gives DHS discretion to return the alien to those countries. So, for aliens arriving from Mexico and Canada, the INA gives DHS two choices: detention or return.

DHS's decision to cancel the Migrant Protection Program Protocol is an exercise of the discretion conferred to it by Congress. Of course, by itself there is nothing wrong with DHS exercising that discretion because Congress delegated to DHS the discretion to direct aliens seeking asylum to remaining in Mexico (or Canada). *See Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ("The Proclamation exempts lawful permanent residents and foreign nationals who have been granted asylum"). It just means DHS must detain aliens seeking asylum because it only has two options: (1) detain or (2) remain. By cancelling the remain option it leaves only one left – detain. But DHS is not detaining either. That it cannot do. Congress has issued a clear mandate and DHS has no means of ignoring it, even under the guise of prosecutorial discretion.

9

*Heckler v. Chaney*, 470 U.S. 821, 833, n. 4 (1985). DHS is simply "consciously and expressly adopts a general policy, which is in effect an abdication of its statutory duty." *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973).

Congress has established a detailed practice for processing aliens seeking asylum and only Congress can change that practice. DHS is bound to follow the mandate of Congress and when it refuses, like here, it is for this Court to control its recalcitrance.

## CONCLUSION

Based on the foregoing, amicus respectfully requests that the Court grant the State of Texas' requested relief.

Dated: June 14, 2021                                Respectfully submitted,

*/s/ Walter S. Zimolong, Esq.*
Walter S. Zimolong, Esquire
Attorney No. 89151
wally@zimolonglaw.com
P. O. Box 552
Villanova, PA 19085
(215) 665-0842


*/s/ Lorraine G. Woodwark, Esq.*
Lorraine G. Woodwark, Esquire
Attorneys United for a Secure America (AUSA)
25 Massachusetts Avenue NW, Ste 335
Washington, D.C. 20001
(202) 591-0962

LWoodwark@IRLI.org

*Counsel for Amicus Curiae*
*Advocates for Victims of Illegal Alien Crime (AVIAC).*

11

CERTIFICATE OF SERVICE

      I hereby certify the foregoing has been filed electronically and is available for viewing and downloading from the Electronic Case Filing System of the United States District Court for the Northern District of Texas.  I further hereby certify that, in accordance with Fed. R. Civ. P. 5, service has been made upon counsel of record via ECF.


Date:  June 14, 2021                                      */s/ Walter S. Zimolong, Esquire*