FILED
June 16, 2021
KAREN MITCHELL
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS,
AMARILLO DIVISION

| | |
|---|---|
| STATE OF TEXAS; STATE OF MISSOURI,<br><br>　　　　　　Plaintiffs,<br>v.<br><br>JOSEPH R. BIDEN, JR., et al.,<br><br>　　　　　　Defendants. | Civil Action No. 2:21-cv-00067 |

MEMORANDUM OF LAW OF IMMIGRATION REFORM LAW INSTITUTE
AS *AMICUS CURIAE* IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

MATT A. CRAPO
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
(540) 205-7986
matt.crapo@pm.me
litigation@irli.org

*Counsel for Amicus Curiae
Immigration Reform Law Institute*

# **TABLE OF CONTENTS**

                                                                                                               Page

TABLE OF AUTHORITIES ............................................................................................... ii

INTEREST OF *AMICUS CURIAE* .................................................................................... 1

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 3

    I.      Plaintiffs Have Standing ........................................................................................ 3

    II.     Plaintiffs are Likely to Succeed on the Merits ..................................................... 9

CONCLUSION ................................................................................................................. 11

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*Adams v. Richardson*,
    480 F.2d 1159 (D.C. Cir. 1973) .............................................................................. 6, 7

*Arizona v. United States*,
    567 U.S. 387 (2012) ....................................................................................... 4, 5, 6, 10

*Ass'n of Data Processing Serv. Org., Inc. v. Camp*,
    397 U.S. 150 (1970) ................................................................................................... 3

*Burgess v. FDIC*,
    871 F.3d 297 (5th Cir. 2017) ..................................................................................... 11

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987) ................................................................................................... 8

*Corley v. United States*,
    556 U.S. 303 (2009) ................................................................................................... 7

*DHS v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ..................................................................................... 4, 9, 10

*Galvan v. Press*,
    347 U.S. 522 (1954) ................................................................................................... 6

*Gonzales-Veliz v. Barr*,
    938 F.3d 219 (5th Cir. 2019) ..................................................................................... 10

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................................................... 6

*Hawaii v. Trump*,
    859 F.3d 741 (9th Cir. 2017) ..................................................................................... 1

*Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*,
    924 F.3d 375 (7th Cir. 2019) ..................................................................................... 1

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................................. 3, 7

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ................................................................................................. 5

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ................................................................................................. 8

*Matter of Silva-Trevino*,
   26 I&N Dec. 826 (BIA 2016) ................................................................................... 1

*Plyler v. Doe*,
   457 U.S. 202 (1982) ............................................................................................ 4, 5

*Smiley v. Citibank (South Dakota), N.A.*,
   517 U.S. 735 (1996) ................................................................................................. 9

*Southern Cal. Edison Co. v. F.E.R.C.*,
   502 F.3d 176 (D.C. Cir. 2007) ................................................................................. 3

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) ................................................................................... 8

*Texas v. United States*,
   2021 U.S. Dist. LEXIS 33890, 2021 WL 723856 (S.D. Tex. 2021) ..................... 2, 4

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) .................................................................................. 11

*Texas v. United States*,
   86 F. Supp. 3d 591 (S.D. Tex. 2015) ...................................................................... 6

*Warth v. Seldin*,
   422 U.S. 490 (1975) ................................................................................................. 3

## **STATUTES & REGULATIONS**

6 U.S.C. § 202 ................................................................................................................... 1

8 U.S.C. § 1103(a)(5) ........................................................................................................ 1

8 U.S.C. § 1225(b)(1)(B)(ii) ............................................................................................. 7

U.S. Const. art. II, § 3 ...................................................................................................... 6

## **MISCELLANEOUS**

Executive Order 13993, Revision of Civil Immigration Enforcement
  Policies and Priorities, 86 Fed. Reg. 7051 (Jan. 25, 2021) ...................................... 2

Proclamation 10142, Termination of Emergency With Respect to the
Southern Border of the United States and Redirection of Funds Diverted
to Border Wall Construction, 86 Fed. Reg. 7225 (Jan. 27, 2021) ................................ 2

## INTEREST OF *AMICI CURIAE*

*Amicus curiae* Immigration Reform Law Institute ("IRLI") filed this brief with the consent of all parties.[1] IRLI is a non-profit 501(c)(3) public interest law firm dedicated to litigating immigration-related cases on behalf of, and in the interests of, United States citizens and lawful permanent residents, and also to assisting courts in understanding and accurately applying federal immigration law. IRLI has litigated or filed amicus curiae briefs in a wide variety of cases, including *Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017); *Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*, 924 F.3d 375 (7th Cir. 2019); and *Matter of Silva-Trevino*, 26 I&N Dec. 826 (BIA 2016).

## INTRODUCTION

Congress has charged the Department of Homeland Security ("DHS") with the responsibility of securing the nation's borders against illegal immigration. *See* 6 U.S.C. § 202 ("The [DHS] Secretary shall be responsible for … (2) [s]ecuring the borders, territorial waters, ports, terminals, waterways, and air, land, and sea transportation systems of the United States …."); 8 U.S.C. § 1103(a)(5) (the DHS Secretary "shall have the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens"). In order to meet this responsibility, DHS implemented the Migrant Protection Protocols ("MPP"),

---

[1] No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

1

also referred to as the "remain in Mexico" policy in January 2019. As Plaintiffs observe, the MPP proved effective at both reducing the number of aliens attempting to cross the southern border and reducing the number of frivolous asylum claims burdening the immigration system. *See* Plaintiffs' Motion for Preliminary Injunction ("PI Motion") at 3-4 (citing App.006, 308-09, attached thereto).

But on President Biden's first day in office, his administration immediately began dismantling programs and policies designed to secure the nation's borders and enforce the Immigration and Nationality Act ("INA"). For example, President Biden issued Executive Order 13993, 86 Fed. Reg. 7051 (Jan. 25, 2021), revising immigration enforcement priorities, and Proclamation 10142, 86 Fed. Reg. 7225 (Jan. 27, 2021), terminating border wall construction. DHS also issued a memorandum entitled "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities" in which it announced an immediate 100-day pause of all removals and extremely narrow immigration enforcement priorities consisting of: 1) terrorists, spies, or other national security risks; 2) recent arrivals (defined as those aliens who enter or attempt to enter the United States on or after November, 1, 2020); and 3) aggravated felons who pose a risk to public safety.[2] *See* Memorandum from Acting Secretary Pekoske on Immigration Enforcement Policies, available at https://www.dhs.gov/sites/

---

[2] On January 26, 2021, a district court entered a nationwide temporary restraining order against the 100-day stay of removals, and on February 23, that court converted the TRO into a preliminary injunction. *See Texas v. United States*, 2021 U.S. Dist. LEXIS 33890, *9, *147-48, 2021 WL 723856 (S.D. Tex. 2021).

default/files/publications/21_0120_enforcement-memo_signed.pdf (last visited May 26, 2021). Finally, DHS announced the termination of the MPP program, the government action challenged here. *See* App.032.

Collectively, these government actions signal to potential border crossers that the government is no longer acting to secure our border, and have resulted in the ongoing surge of migrants at the southern border. Indeed, the actions by the Biden administration reflect a conscious decision to cease effective immigration enforcement policies and pursue a policy of non-enforcement going forward. This case arises in the context of the executive branch's ongoing abdication of its duty to enforce the nation's immigration laws.

## ARGUMENT

### I. Plaintiffs Have Standing

To establish standing, a plaintiff must show that: (1) the challenged action constitutes an "injury in fact," (2) the injury is "arguably within the zone of interests to be protected or regulated" by the relevant statutory or constitutional provision, and (3) nothing otherwise precludes judicial review. *Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153 (1970). An "injury in fact" is (1) an actual or imminent invasion of a constitutionally cognizable interest, (2) which is causally connected to the challenged conduct, and (3) which likely will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992). The standing analysis assumes the plaintiff's merits views. *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *Southern Cal. Edison Co. v. F.E.R.C.*, 502 F.3d 176, 180 (D.C. Cir.

3

2007) ("in reviewing the standing question, the court… must therefore assume that on the merits the [plaintiffs] would be successful in [their] claims").

Plaintiffs demonstrate that the termination of the MPP program causes the requisite injury in fact by increasing the costs that the Plaintiff States expend on drivers' licenses, education, healthcare, and law enforcement. *See* PI Motion at 18-23. The Supreme Court has acknowledged such financial injuries in the immigration context, where States have "an interest in mitigating the potentially harsh economic effects of sudden shifts in population." *Plyler v. Doe*, 457 U.S. 202, 228 (1982); *see id.* at n.23 (explaining that, because the Constitution deprives States of any "direct interest in controlling entry into this country, . . . unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service"); *see also Arizona v. United States*, 567 U.S. 387, 397 (2012) (acknowledging that States "bear[] many of the consequences of unlawful immigration"); *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (finding a sudden shift in the government's immigration policy was arbitrary and capricious in part because the government "failed to address whether there was legitimate reliance" on the former immigration policy) (internal quotation marks omitted). The financial harm to States from sudden shifts in their population due to immigration policies are serious and well recognized. As the district court in *Texas v. United States* observed, the various States are "all but required to provide free public education to any unlawfully present noncitizens pursuant to the Equal

4

Protection Clause." 2021 U.S. Dist. LEXIS 33890, *33 (S.D. Tex. 2021) (citing *Plyler*, 457 U.S. at 230).

The Court, moreover, should evaluate standing in the context of the federal government's recent abdication of its duty to enforce the immigration laws.

Despite their inherent authority as sovereigns, States do not have control over immigration enforcement within their own borders. The various States agreed to cede this and other powers as sovereigns to the federal government in return for its protection. *See Massachusetts v. EPA*, 549 U.S. 497, 519 (2007) ("When a State enters the Union, it surrenders certain sovereign prerogatives."). The States accepted such dependence on the federal government with the expectation that it would act to protect their continued interests by enacting and enforcing national immigration laws. *See Arizona*, 567 U.S. at 397 ("The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States. Arizona bears many of the consequences of unlawful immigration."). As a result, the States are "entitled to special solicitude in [the] standing analysis" where the inaction of the federal government implicates their "quasi-sovereign interests." *Massachusetts*, 549 U.S. at 520.

While the average citizen cannot establish standing to compel government enforcement of the law, the courts have recognized that there are certain situations in which the States may challenge government inaction. Abdication standing exists

> when the federal government asserts sole authority over a certain area of American life and excludes any authority or regulation by a state; yet subsequently refuses to act in that area. Due to this refusal to act in a realm where other governmental entities are barred from interfering, a

5

state has standing to bring suit to protect itself and the interests of its citizens.

*Texas v. United States*, 86 F. Supp. 3d 591, 636 (S.D. Tex. 2015).

The first element—total control to the exclusion of others—is well established. *See*, *e.g.*, *Arizona*, 567 U.S. at 388 (holding that Arizona's actions were preempted due to "[t]he Federal Government's broad, undoubted power over immigration and alien status"); *Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress . . . ."). Not only are States and localities prevented from legislating with respect to immigration, State officials are largely prevented from enforcing federal immigration laws. *See Arizona*, 567 U.S. at 407-10 (describing the limited circumstances in which State officers may perform the functions of an immigration officer). Thus, States are powerless to address the consequences of illegal immigration if the federal government refuses to enforce the immigration laws.

The second element—refusal to act—is established by showing the executive branch has intentionally abandoned its constitutional duty to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, §3; *see also Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (explaining that a State has standing where a federal agency "has consciously and expressly adopted a general policy which is in effect an abdication of its statutory duty"); *Heckler v. Chaney*, 470 U.S. 821, 833 (1985) (explaining that "Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers."); *Texas v. United*

6

*States*, 86 F. Supp. 3d 591, 639 (S.D. Tex. 2015) ("[S]tanding under a theory of abdication requires only that the Government declines to enforce the law.").

Where an agency has a statutory duty to act and establishes a policy that conflicts with that duty, the states may bring a challenge on abdication grounds. *See Adams*, 480 F.2d at 1162 ("Congress's clear statement of an affirmative enforcement duty should not be discounted."). As Plaintiffs show, Defendants' termination of the MPP program results in the government violating its duty to detain aliens pending adjudication of their asylum claims as required by 8 U.S.C. § 1225(b)(1)(B)(ii). *See* PI Motion at 13-15. Defendants' failure either to return aliens to Mexico through the MPP program or to detain them pending resolution of their asylum claims as required by statute, results in harm to Plaintiff States that could be remedied by an injunction enjoining Defendants from terminating the MPP program.

Finally, insofar as Plaintiffs allege procedural violations, the bar for Article III standing is lowered. "The history of liberty has largely been the history of observance of procedural safeguards," *Corley v. United States*, 556 U.S. 303, 321 (2009) (internal quotation marks omitted), and "procedural rights are special," *Lujan*, 504 U.S. at 572 n.7 (internal quotation marks omitted). For procedural injuries, Article III's redressability and immediacy requirements apply to the present procedural violation (which may someday injure a concrete interest) rather than to a concrete future injury. *Lujan*, 504 U.S. at 571-72 & n.7. Plaintiffs' allegations of procedural-rights violations thus undercut the potential claim that it

7

lacks a sufficiently immediate injury. Importantly, when it comes to redressability, Plaintiffs need not show that a procedurally valid change in policy would result in a rule more to their liking: "If a party claiming the deprivation of a right to notice-and-comment rulemaking under the APA had to show that its comment would have altered the agency's rule, section 553 would be a dead letter." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002). Instead, vacatur would put the parties back in the position they should have been in all along, and thus provide enough redress, even if Defendants potentially could take the same action on remand, leaving Plaintiffs no better off in the end.

The Plaintiff States also fall within the zone of interests protected by immigration law. Under the APA, the interest asserted need only be "arguably within the zone of interests to be protected or regulated by the statute" in question. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (internal quotation marks omitted). The Supreme Court has described the test as "not meant to be especially demanding" and as "not requir[ing] any 'indication of congressional purpose to benefit the would-be plaintiff.'" *Id.* at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987)). Here, the INA was enacted to regulate immigration in the interests of the American people and the states. Because Plaintiff States' claims fall well within the zone of interests protected by the INA, they have demonstrated standing to challenge the termination of the MPP program.

8

## II.    Plaintiffs are Likely to Succeed on the Merits

Plaintiffs have demonstrated that Defendants' termination of the MPP program is arbitrary and capricious because they did not provide any justification for the change in policy nor consider relevant factors in making that change. PI Motion at 10-13. That alone is sufficient to demonstrate a likelihood of success for Plaintiffs. But Plaintiffs are also likely to succeed on the merits because, in terminating the MPP program, Defendants also acted in an arbitrary and capricious manner by not considering the Plaintiff States' reliance interests in the continuation of the MPP program.

Defendants did not consider whether "there was 'legitimate reliance' on the" continued implementation of the MPP program. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)). When the MPP program was terminated on January 20, 2021, it had been in place for approximately two years and had been very effective at preventing the release of tens of thousands of aliens into the country. *See* App. 308 (indicating that in the first nine months of the MPP program, more than 55,000 aliens were returned to Mexico pending consideration of their asylum claims).[3] This

---

[3] In addition to the number of aliens enrolled in the MPP program and returned to Mexico, the existence of the program substantially reduced the number of aliens who attempted to enter the country illegally. *See* App. 308 (indicating that border encounters with Central American families—those most amenable to the MPP program—decreased approximately 80 percent). Thus, the number of aliens returned to Mexico under the MPP program represents a mere fraction of the number of aliens who did not attempt to enter the country unlawfully as a result of the program.

9

reduction in the number of aliens allowed into the country enabled Plaintiff States to preserve resources that would have gone toward the education, healthcare, and law enforcement costs attendant to those aliens and instead devote their resources to addressing the needs of their respective citizens. In terminating the MPP program, Defendants gave no consideration whatsoever to the impact on available State resources. *See* App. 032 (announcing suspension of new enrollments in the MPP, "pending further review of the program."). That failure was arbitrary and capricious; where, as here, "an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interest that must be taken into account." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913 (internal quotations omitted); *see also Gonzales-Veliz v. Barr*, 938 F.3d 219, 234 (5th Cir. 2019) ("[U]nexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.") (internal quotation omitted).

Defendants also ignored the costs that Plaintiff States would incur as a result of the suspension of the MPP program. As the Supreme Court has acknowledged, the various States always "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397. Defendants' failure to consider such reliance costs was arbitrary and capricious.

Plaintiffs have shown that the suspension of the MPP program will cause harm sufficient both for standing and for a preliminary injunction. *See* PI Motion at 17-24, 28-29. In order to qualify for an injunction, Plaintiffs need only demonstrate

"a substantial threat of irreparable injury if the injunction is not issued." *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015). For their injury to be sufficiently "irreparable," Plaintiffs need only show it "cannot be undone through monetary remedies." *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017). Plaintiffs have met this burden here. Further, Defendants will suffer no harm if an injunction is granted. Even if Defendants would incur additional enforcement costs due to an injunction, such costs are mandated by statute and should not be weighed against the harm Plaintiff States are suffering due to Defendants non-enforcement policies.

## CONCLUSION

For the foregoing reasons, Plaintiffs' request for a preliminary injunction should be granted.

Respectfully submitted on May 27, 2021,

> <u>/s/ Matt A. Crapo</u>
> MATT A. CRAPO
> Immigration Reform Law Institute
> 25 Massachusetts Ave., NW, Suite 335
> Washington, DC 20001
> matt.crapo@pm.me
> litigation@irli.org
>
> *Counsel for Amicus Curiae*
> *Immigration Reform Law Institute*