**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

|  |  |  |
|---|---|---|
| STATE OF TEXAS, | ) | |
| STATE OF MISSOURI, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:21-cv-00067-Z |
| | ) | |
| JOSEPH R. BIDEN, JR., | ) | |
| in his official capacity as | ) | |
| President of the United States, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |

**ADMINISTRATIVE RECORD**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| STATE OF TEXAS,<br>STATE OF MISSOURI,<br><br>    *Plaintiffs,*<br><br>v.<br><br>JOSEPH R. BIDEN, JR.,<br>in his official capacity as<br>President of the United States, *et al.,*<br><br>    *Defendants.* | Civil Action No. 2:21-cv-00067-Z |

## CERTIFICATION

My name is Juliana Blackwell. I am employed with the U.S. Department of Homeland Security, as the Deputy Executive Secretary. I am responsible for the oversight and management of the Office of the Executive Secretary, which oversees the management of written communication intended for, and originated by, the Secretary and Deputy Secretary of Homeland Security and maintains official Department records. I have held this position since August 2019.

I am the custodian of the June 1, 2021 memorandum "Termination of the Migrant Protection Protocols Program" and the administrative record for that decision for DHS. I certify that, to the best of my knowledge, information, and belief, the attached index contains the non-privileged documents considered by DHS, and that these documents constitute the administrative record the agency considered in issuing the memorandum.

Executed this 22nd day of June 2021 in Washington, D.C.

JULIANA J
BLACKWELL

Digitally signed by
JULIANA J BLACKWELL
Date: 2021.06.22 08:24:39
-04'00'

Juliana Blackwell
Deputy Executive Secretary

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

|                                              |     |                                      |
| -------------------------------------------- | --- | ------------------------------------ |
| STATE OF TEXAS,                              | )   |                                      |
| STATE OF MISSOURI,                           | )   |                                      |
|                                              | )   |                                      |
| *Plaintiffs,*                                | )   |                                      |
|                                              | )   |                                      |
| v.                                           | )   | Civil Action No. 2:21-cv-00067-Z     |
|                                              | )   |                                      |
| JOSEPH R. BIDEN, JR.,                        | )   |                                      |
| in his official capacity as                  | )   |                                      |
| President of the United States, *et al.,*   | )   |                                      |
|                                              | )   |                                      |
| *Defendants.*                                | )   |                                      |

**CERTIFIED INDEX**

**DOCUMENT**                                                                            **PAGE**

1. *Termination of the Migrant Protection Protocols Program*, Secretary Mayorkas,
   June 1, 2021 ................................................................................................1

2. *Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens;
   Conduct of Removal Proceedings; Asylum Procedures, Proposed Rule*, Federal
   Register vol. 62, No. 2 444-517, January 3, 1997 .............................................8

3. *Implementation of Expedited Removal*, Office of the Deputy Commissioner,
   March 31, 1997 ..............................................................................................82

4. *Regulations Concerning the Convention Against Torture*, Federal Register, Vol. 64,
   No. 33 8478-08496, February 19, 1999 .........................................................90

5. *Detention Guidelines Effective October 9, 1998*, Michael A. Pearson, Executive
   Associate Commissioner, Office of Field Operations, October 7, 1998 ........................109

6. *Treatment of Cuban Asylum Seekers at Land Border Ports of Entry*, Jayson P.
   Ahern, Assistant Commissioner, Office of Field Operations, June 10, 2005 .................120

7. *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution of Torture*,
   Immigration and Customs Enforcement Directive No. 11002.1, December 8, 2009 ......126

8. *U.S. Immigration and Customs Enforcement's Award of the Family Case
   Management Program Contract*, OIG-18-22, DHS Office of the Inspector
   General, November 30, 2017 ..........................................................................136

9. *Mexican Government Statement regarding MPP*, December 20, 2018 ..........................147

10. *Policy Guidance for Implementation of the Migrants Protection Protocols*, Secretary Nielsen, January 25, 2019......................................................................151

11. *Guidance on Migrant Protection Protocols*, Todd A. Hoffman, Executive Director, Admissibility and Passenger Programs, Office of Field Operations, January 28, 2019 ......................................................................................................155

12. *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*, Policy Memorandum, January 28, 2019 ......................................................................................................156

13. *MPP Guiding Principles*, Enforcement Programs Division, January 28, 2019..............161

14. *Pentagon Announces Nearly 4,000 Additional Troops Heading to U.S.-Mexico Border*, Brett Samuels, The Hill, February 3, 2019.......................................................163

15. *Implementation of the Migrant Protection Protocols*, Ronald D. Vitiello, Deputy Director and Senior Official Performing the Duties of Director, February 12, 2019......165

16. *Migrant Protection Protocols Guidance*, Nathalie R. Asher, Acting Executive Associate Director, February 12, 2019 ..................................................................167

17. *Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States*, February 15, 2019 .........................................171

18. *Trump Declares National Emergency at Border*, Jordan Fabian, February 15, 2019.....175

19. *Guidance on Migrant Protection Protocols*, Carla L. Provost, March 1, 2019..............179

20. *Trump Attorney General's Ruling Expands Indefinite Detention for Asylum Seekers*, Mica Rosenberg, Kristina Cooke, Reuters, April 16, 2019 ..............................181

21. *Review of Migrant Protection Protocols Policy and Implementation*, Acting Secretary McAleenan, June 12, 2019 ..............................................................186

22. *Immigration Court Backlog exceeds 1 Million Cases, Data Group Says*, Priscilla Alvarez, CNN, September 18, 2019 .................................................187

23. *The Migrant Protection Protocols Red Team Report*, DHS Office of Operations Coordination, October 25, 2019..........................................................................192

24. *Review of the Migrant Portection Protocols Policy and Implementation – Final Recommendation*, Acting Secretary McAleenan, November 8, 2019 ...........................202

25. *Examining the Human Rights and Legal Implications of DHS's Remain in Mexico Policy*, Hearing before the Subcommittee on Border Security, Facilitation, and Operations, November 19, 2019...............................................................204

26. *Publicly Reported Cases of Violent Attacks on Individuals Returned to Mexico Under the Migrant Protection Protocols*, Human Rights First, December 2019...........374

27. *Report: Crimes Against Migrants Waiting in Mexico to Seek U.S. Asylum Continue to Climb*, Julian Aquilar, The Texas Tribune, December 5, 2019 .................422

28. *Dismantling Asylum: A Year Into the Migrant Protection Protocols*, American Friends Service Committee, January 2020.....................................................426

2

29. *Response to the Migration [sic] Protection Protocols Red Team Report*, Memorandum for the Acting Secretary, January 14, 2020 ................................................452

30. *The Devastating Toll of Remain in Mexico One Year Later*, Doctors Without Borders, January 29, 2020 ................................................456

31. *Supreme Court Says Trump Administration May Continue Remain in Mexico Policy for Asylum Seekers*, Robert Barnes, The Washington Post, March 11, 2020 ................463

32. *Joint DHS/EOIR Statement on MPP Rescheduling*, March 23, 2020 ............................466

33. *DHS OIG Formal Complaint Regarding Remain in Mexico*, Human Rights Watch, June 2, 2020 ................................................468

34. *Migrant Protection Protocols*, DHS Archived Website, July 17, 2020 ........................490

35. *CBP Has Taken Steps to Limit Processing of Undocumented Aliens at the Ports of Entry*, OIG-21-02, DHS Office of Inspector General, October 27, 2020 ................506

36. *Closing out the Migrant Protection Protocols Red Team Report Evaluation Process*, Acting Secretary Chad Wolf, December 7, 2020 ................................................543

37. *Supplemental Policy Guidance for Additional Improvement of the Migrant Protection Protocols*, December 7, 2020 ................................................546

38. *Supplemental Migrant Protection Protocols Guidance – Initial Document Service*, Enforcement Programs Division, December 7, 2020 ................................................551

39. *Supplemental Migrant Protection Protocols Guidance – MPP Amenability*, Enforcement Programs Division, December 7, 2020 ................................................552

40. *Migrant Protection Protocols Metrics and Measures*, December 2020 ........................554

41. *Measuring In Absentia Removal in Immigration Court*, American Immigration Council, January 2021 ................................................557

42. *Suspension of Enrollment in the Migrant Protection Protocols Program*, Acting Secretary David Pekoske, January 20, 2021 ................................................581

43. *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, Executive Order 14010, Federal Register Vol 86, No. 23, 8267-8271, February 2, 2021 ...............582

44. *DHS Announces Process to Address Individuals in Mexico with Active MPP Cases*, February 11, 2021 ................................................587

45. *Delivered to Danger, Trump Administration Sending Asylum Seekers and Migrants to Danger*, Human Rights First, February 19, 2021 ................................................589

46. *Mexican Camp That Was Symbol of Migrant Misery Empties Out Under Biden*, Laura Gottesdiener, Reuters, March 7, 2021 ................................................614

47. *Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border*, March 16, 2021 ................................................621

48. *The Facts on the Increase in Illegal Immigration*, FactCheck.org, March 23, 2021 .......628

49. Email: *MPP Data*, March 29, 2021 ..................................................................634

50. *Total MPP In Absentia Removal Orders*, March 29, 2021 ..............................635

51. *Total MPP In Person Removal Orders*, March 29, 2021 .................................636

52. *Total MPP Removal Orders*, March 29, 2021 .................................................637

53. *Total MPP Termination Order*, March 29, 2021 ............................................638

54. *Protection Postponed: Asylum Office Backlogs Cause Suffering, Separate Families, and Undermine Integration*, Human Rights First, April 2021........................639

55. *Final or Most Current Outcomes, Total SW Border Encounters by MPP case*, May 2021................................................................660

56. *Southwest Land Border Encounters*, April 2021 ............................................664

57. *CBP Encounters Data*, April 2021[1] ..............................................................669

58. *USBP Total Enforcement Encounter FY 21*, May 8, 2021 .............................670

59. *Restoring the Department of Justice's Access-to-Justice Function and Reinvigorating the White House Legal Aid Interagency Roundtable*, Presidential Memorandum for the Heads of the Executive Departments and Agencies, Federal Register Vol. 86, No. 97, 27793-27796, May 18, 2021....................................674

60. *Number of Persons Entering the U.S. Under the End of MPP Operation as of May 21, 2021*, IOM End of MPP Daily Monitoring......................................678

61. *Number of Persons Entering the U.S. Under the End of MPP Operation as of May 25, 2021*, IOM End of MPP Daily Monitoring......................................679

62. *DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings*, May 28, 2021 ...........................................................680

---

[1] The charts came from the Southwest Land Border Encounters website.  However, they were unable to be downloaded together as one pdf.

**Secretary**
**U.S. Department of Homeland Security**
Washington, DC 20528



Homeland
Security

June 1, 2021

MEMORANDUM FOR:     Troy A. Miller
                                Acting Commissioner
                                U.S. Customs and Border Protection

                                Tae D. Johnson
                                Acting Director
                                U.S. Immigration and Customs Enforcement

                                Tracy L. Renaud
                                Acting Director
                                U.S. Citizenship and Immigration Services

FROM:                            Alejandro N. Mayorkas
                                Secretary

SUBJECT:                     **Termination of the Migrant Protection Protocols Program**

On January 25, 2019, Secretary of Homeland Security Kirstjen Nielsen issued a memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols." Over the course of the Migrant Protection Protocols (MPP) program, the Department of Homeland Security and its components issued further policy guidance relating to its implementation. In total, approximately 68,000 individuals were returned to Mexico following their enrollment in MPP.[1]

On January 20, 2021, then-Acting Secretary David Pekoske issued a memorandum suspending new enrollments in MPP, effective the following day.[2] On February 2, 2021, President Biden issued Executive Order 14010, 86 Fed. Reg. 8267, *Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border.* In this Executive Order, President Biden directed me, in coordination with the Secretary of State, the Attorney General, and the Director of the Centers for Disease Control and Prevention, to "promptly

---

[1] *See* "Migrant Protection Protocols Metrics and Measures," Jan. 21, 2021, available at
https://www.dhs.gov/publication/metrics-and-measures.

[2] Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Suspension of Enrollment in the Migrant Protection Protocols Program* (Jan. 20, 2021).

Case 2:21-cv-00067-Z  Document 61   Filed 06/22/21   Page 8 of 688   PageID 1665
**Subject: Termination of the Migrant Protection Protocols Program**
**Page 2**

consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subjected to MPP for further processing of their asylum claims," and "to promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols."[3]

On February 11, the Department announced that it would begin the first phase of a program to restore safe and orderly processing at the Southwest Border of certain individuals enrolled in MPP whose immigration proceedings remained pending before the Department of Justice's Executive Office for Immigration Review (EOIR).[4]  According to Department of State data, between February 19 and May 25, 2021, through this program's first phase approximately 11,200 individuals were processed into the United States.  The Department is continuing to work with interagency partners to carry out this phased effort and to consider expansion to additional populations enrolled in MPP.

Having now completed the further review undertaken pursuant to Executive Order 14010 to determine whether to terminate or modify MPP, and for the reasons outlined below, I am by this memorandum terminating the MPP program.  I direct DHS personnel to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives or policy guidance issued to implement the program.

**Background**

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1225(b)(2)(C), authorizes DHS to return to Mexico or Canada certain noncitizens who are arriving on land from those contiguous countries pending their removal proceedings before an immigration judge under Section 240 of the INA, 8 U.S.C. § 1229a.  Historically, DHS and the legacy Immigration and Naturalization Service primarily used this authority on an ad-hoc basis to return certain Mexican and Canadian nationals who were arriving at land border ports of entry, though the provision was occasionally used for third country nationals under certain circumstances provided they did not have a fear of persecution or torture related to return to Canada or Mexico.

On December 20, 2018, the Department announced the initiation of a novel program, the Migrant Protection Protocols, to implement the contiguous-territory-return authority under Section 235(b)(2)(C) on a wide-scale basis along the Southwest Border.  On January 25, 2019, DHS issued policy guidance for implementing MPP, which was subsequently augmented a few days later by guidance from U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, and U.S. Citizenship and Immigration Services.  During the course of MPP, DHS and its components continued to update and supplement the policy, including through the "Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols" issued on December 7,

---

[3] Executive Order 14010, *Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, 86 Fed. Reg. 8267 (Feb. 2, 2021), available at https://www.federalregister.gov/documents/2021/02/05/2021-02561/creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration.

[4] U.S. Department of Homeland Security, *DHS Announces Process to Address Individuals in Mexico with Active MPP Cases*, Feb. 11, 2021, available at https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

2020 by the Senior Official Performing the Duties of the Under Secretary for Strategy, Policy, and Plans.

Under MPP, it was DHS policy that certain non-Mexican applicants for admission who arrived on land at the Southwest Border could be returned to Mexico to await their removal proceedings under INA Section 240. To attend removal proceedings, which were prioritized by EOIR on the non-detained docket, DHS facilitated program participants' entry into and exit from the United States. Due to public health measures necessitated by the ongoing COVID-19 pandemic, however, DHS and EOIR stopped being able to facilitate and conduct immigration court hearings for individuals enrolled in MPP beginning in March 2020.[5]

Following the Department's suspension of new enrollments in MPP, and in accordance with the President's direction in Executive Order 14010, DHS has worked with interagency partners and facilitating organizations to implement a phased process for the safe and orderly entry into the United States of certain individuals who had been enrolled in MPP.

**Determination**

In conducting my review of MPP, I have carefully evaluated the program's implementation guidance and programmatic elements; prior DHS assessments of the program, including a top-down review conducted in 2019 by senior leaders across the Department, and the effectiveness of related efforts by DHS to address identified challenges; the personnel and resource investments required of DHS to implement the program; and MPP's performance against the anticipated benefits and goals articulated at the outset of the program and over the course of the program. I have additionally considered the Department's experience to date carrying out its phased strategy for the safe and orderly entry into the United States of certain individuals enrolled in MPP. In weighing whether to terminate or modify the program, I considered whether and to what extent MPP is consistent with the Administration's broader strategy and policy objectives for creating a comprehensive regional framework to address the root causes of migration, managing migration throughout North and Central America, providing alternative protection solutions in the region, enhancing lawful pathways for migration to the United States, and—importantly—processing asylum seekers at the United States border in a safe and orderly manner consistent with the Nation's highest values.

As an initial matter, my review confirmed that MPP had mixed effectiveness in achieving several of its central goals and that the program experienced significant challenges.

- I have determined that MPP does not adequately or sustainably enhance border management in such a way as to justify the program's extensive operational burdens and other shortfalls. Over the course of the program, border encounters increased during certain periods and decreased during others. Moreover, in making my assessment, I share the belief that we can only manage migration in an effective, responsible, and durable manner if we approach the issue comprehensively, looking well beyond our own borders.

---

[5] *See* "Joint DHS/EOIR Statement on MPP Rescheduling," Mar. 23, 2020, available at https://www.dhs.gov/news/2020/03/23/joint-statement-mpp-rescheduling.

**Subject: Termination of the Migrant Protection Protocols Program**
**Page 4**

- Based on Department policy documents, DHS originally intended the program to more quickly adjudicate legitimate asylum claims and clear asylum backlogs. It is certainly true that some removal proceedings conducted pursuant to MPP were completed more expeditiously than is typical for non-detained cases, but this came with certain significant drawbacks that are cause for concern. The focus on speed was not always matched with sufficient efforts to ensure that conditions in Mexico enabled migrants to attend their immigration proceedings. In particular, the high percentage of cases completed through the entry of *in absentia* removal orders (approximately 44 percent, based on DHS data) raises questions for me about the design and operation of the program, whether the process provided enrollees an adequate opportunity to appear for proceedings to present their claims for relief, and whether conditions faced by some MPP enrollees in Mexico, including the lack of stable access to housing, income, and safety, resulted in the abandonment of potentially meritorious protection claims. I am also mindful of the fact that, rather than helping to clear asylum backlogs, over the course of the program backlogs increased before both the USCIS Asylum Offices and EOIR.

- MPP was also intended to reduce burdens on border security personnel and resources, but over time the program imposed additional responsibilities that detracted from the Department's critically important mission sets. The Department devoted resources and personnel to building, managing, staffing, and securing specialized immigration hearing facilities to support EOIR; facilitating the parole of individuals into and out of the United States multiple times in order to attend immigration court hearings; and providing transportation to and from ports of entry in certain locations related to such hearings. Additionally, as more than one-quarter of individuals enrolled in MPP were subsequently re-encountered attempting to enter the United States between ports of entry, substantial border security resources were still devoted to these encounters.

A number of the challenges faced by MPP have been compounded by the COVID-19 pandemic. As immigration courts designated to hear MPP cases were closed for public health reasons between March 2020 and April 2021, DHS spent millions of dollars each month to maintain facilities incapable of serving their intended purpose. Throughout this time, of course, tens of thousands of MPP enrollees were living with uncertainty in Mexico as court hearings were postponed indefinitely. As a result, any benefits the program may have offered are now far outweighed by the challenges, risks, and costs that it presents.

In deciding whether to maintain, modify, or terminate MPP, I have reflected on my own deeply held belief, which is shared throughout this Administration, that the United States is both a nation of laws and a nation of immigrants, committed to increasing access to justice and offering protection to people fleeing persecution and torture through an asylum system that reaches decisions in a fair and timely manner. To that end, the Department is currently considering ways to implement long-needed reforms to our asylum system that are designed to shorten the amount of time it takes for migrants, including those seeking asylum, to have their cases adjudicated, while still ensuring adequate procedural safeguards and increasing access to counsel. One such initiative that DHS recently announced together with the Department of Justice is the creation of a Dedicated Docket to

process the cases of certain families arriving between ports of entry at the Southwest Border.[6]  This process, which will take place in ten cities that have well-established communities of legal service providers, will aim to complete removal proceedings within 300 days—a marked improvement over the current case completion rate for non-detained cases.  To ensure that fairness is not compromised, noncitizens placed on the Dedicated Docket will receive access to legal orientation and other supports, including potential referrals for pro bono legal services. By enrolling individuals placed on the Dedicated Docket in Alternatives to Detention programs, this initiative is designed to promote compliance and increase appearances throughout proceedings.  I believe these reforms will improve border management and reduce migration surges more effectively and more sustainably than MPP, while better ensuring procedural safeguards and enhancing migrants' access to counsel.  We will closely monitor the outcomes of these reforms, and make adjustments, as needed, to ensure they deliver justice as intended: fairly and expeditiously.

In arriving at my decision to now terminate MPP, I also considered various alternatives, including maintaining the status quo or resuming new enrollments in the program.  For the reasons articulated in this memorandum, however, preserving MPP in this manner would not be consistent with this Administration's vision and values and would be a poor use of the Department's resources.  I also considered whether the program could be modified in some fashion, but I believe that addressing the deficiencies identified in my review would require a total redesign that would involve significant additional investments in personnel and resources.  Perhaps more importantly, that approach would come at tremendous opportunity cost, detracting from the work taking place to advance the vision for migration management and humanitarian protection articulated in Executive Order 14010.

Moreover, I carefully considered and weighed the possible impacts of my decision to terminate MPP as well as steps that are underway to mitigate any potential negative consequences.

- In considering the impact such a decision could have on border management and border communities, among other potential stakeholders, I considered the Department's experience designing and operating a phased process, together with interagency and nongovernmental partners, to facilitate the safe and orderly entry into the United States of certain individuals who had been placed in MPP.  Throughout this effort, the Department has innovated and achieved greater efficiencies that will enhance port processing operations in other contexts.  The Department has also worked in close partnership with nongovernmental organizations and local officials in border communities to connect migrants with short-term supports that have facilitated their onward movement to final destinations away from the border.  The Department's partnership with the Government of Mexico has been an integral part of the phased process's success.  To maintain the integrity of this safe and orderly entry process for individuals enrolled in MPP and to encourage its use, the Department has communicated the terms of the process clearly to all stakeholders and has continued to use, on occasion and where appropriate, the return-to-contiguous-territory authority in INA Section 235(b)(2)(C) for MPP enrollees who nevertheless attempt to enter between ports of entry instead of through the government's process.

---

[6] *See* U.S. Department of Homeland Security, "DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings," May 28, 2011, available at https://www.dhs.gov/news/2021/05/28/dhs-and-doj-announce-dedicated-docket-process-more-efficient-immigration-hearings.

- In the absence of MPP, I have additionally considered other tools the Department may utilize to address future migration flows in a manner that is consistent with the Administration's values and goals. I have further considered the potential impact to DHS operations in the event that current entry restrictions imposed pursuant to the Centers for Disease Control and Prevention's Title 42 Order are no longer required as a public health measure. At the outset, the Administration has been—and will continue to be—unambiguous that the immigration laws of the United States will be enforced. The Department has at its disposal various options that can be tailored to the needs of individuals and circumstances, including detention, alternatives to detention, and case management programs that provide sophisticated wraparound stabilization services. Many of these detention alternatives have been shown to be successful in promoting compliance with immigration requirements. This Administration's broader strategy for managing border processing and adjudicating claims for immigration relief—which includes the Dedicated Docket and additional anticipated regulatory and policy changes—will further address multifaceted border dynamics by facilitating both timely and fair final determinations.

- I additionally considered the Administration's important bilateral relationship with the Government of Mexico, our neighbor to the south and a key foreign policy partner. Over the past two-and-a-half years, MPP played an outsized role in the Department's engagement with the Government of Mexico. Given the mixed results produced by the program, it is my belief that MPP cannot deliver adequate return for the significant attention that it draws away from other elements that necessarily must be more central to the bilateral relationship. During my tenure, for instance, a significant amount of DHS and U.S. diplomatic engagement with the Government of Mexico has focused on port processing programs and plans, including MPP. The Government of Mexico was a critically important partner in the first phase of our efforts to permit certain MPP participants to enter the United States in a safe and orderly fashion and will be an important partner in any future conversations regarding such efforts. But the Department is eager to expand the focus of the relationship with the Government of Mexico to address broader issues related to migration to and through Mexico. This would include collaboratively addressing the root causes of migration from Central America; improving regional migration management; enhancing protection and asylum systems throughout North and Central America; and expanding cooperative efforts to combat smuggling and trafficking networks, and more. Terminating MPP will, over time, help to broaden our engagement with the Government of Mexico, which we expect will improve collaborative efforts that produce more effective and sustainable results than what we achieved through MPP.

Given the analysis set forth in this memorandum, and having reviewed all relevant evidence and weighed the costs and benefits of either continuing MPP, modifying it in certain respects, or terminating it altogether, I have determined that, on balance, any benefits of maintaining or now modifying MPP are far outweighed by the benefits of terminating the program. Furthermore, termination is most consistent with the Administration's broader policy objectives and the Department's operational needs. Alternative options would not sufficiently address either consideration.

Therefore, in accordance with the strategy and direction in Executive Order 14010, following my review, and informed by the current phased strategy for the safe and orderly entry into the United States of certain individuals enrolled in MPP, I have concluded that, on balance, MPP is no longer a

necessary or viable tool for the Department. Because my decision is informed by my assessment that MPP is not the best strategy for implementing the goals and objectives of the Biden-Harris Administration, I have no intention to resume MPP in any manner similar to the program as outlined in the January 25, 2019 Memorandum and supplemental guidance.

Accordingly, for the reasons outlined above, I hereby rescind, effective immediately, the Memorandum issued by Secretary Nielsen dated January 25, 2019 entitled "Policy Guidance for Implementation of the Migrant Protection Protocols," and the Memorandum issued by Acting Secretary Pekoske dated January 20, 2021 entitled "Suspension of Enrollment in the Migrant Protection Protocols Program." I further direct DHS personnel, effective immediately, to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives issued to carry out MPP. Furthermore, DHS personnel should continue to participate in the ongoing phased strategy for the safe and orderly entry into the United States of individuals enrolled in MPP.

The termination of MPP does not impact the status of individuals who were enrolled in MPP at any stage of their proceedings before EOIR or the phased entry process describe above.

<p style="text-align:center">*　*　*　*　*</p>

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

CC:    Kelli Ann Burriesci
       Acting Under Secretary
       Office of Strategy, Policy, and Plans

**444**  **Federal Register** / Vol. 62, No. 2 / Friday, January 3, 1997 / Proposed Rules

## DEPARTMENT OF JUSTICE

**Immigration and Naturalization Service and Executive Office for Immigration Review**

**8 CFR Parts 1, 3, 103, 204, 207, 208, 209, 211, 212, 213, 214, 216, 217, 221, 223, 232, 233, 234, 235, 236, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 248, 249, 251, 252, 253, 274a, 286, 287, 299, 316, 318, and 329**

**[INS No. 1788–96; AG Order No. 2065–96]**

**RIN 1115–AE47**

**Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures**

**AGENCY:** Immigration and Naturalization Service, Justice, and Executive Office for Immigration Review, Justice.

**ACTION:** Proposed rule.

**SUMMARY:** This rule proposes to amend the regulations of the Immigration and Naturalization Service (Service) and the Executive Office for Immigration Review (EOIR) governing the conduct of both expedited and regular removal proceedings, and handling of asylum claims. The regulation addresses other activities involving the apprehension, detention, hearing of claims and ultimately the removal of inadmissible and deportable aliens. In addition, this rule incorporates a number of changes which are a part of the Administration's reinvention initiative, mandated in a directive signed by the President on March 4, 1995, requiring all heads of departments and agencies to conduct a page-by-page review of all regulations and to eliminate or revise those that are outdated or otherwise in need of reform. This rule is necessary to implement the provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) and the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

**DATES:** Written comments must be submitted on or before February 3, 1997.

**ADDRESSES:** Please submit written comments, in triplicate, to the Director, Policy Directives and Instructions Branch, Immigration and Naturalization Service, 425 I Street, NW., Room 5307, Washington, DC 20536. To ensure proper handling, please refer INS number 1788–96 on your correspondence. Comments are available for public inspection at the above address by calling (202) 514–3048 to arrange for an appointment.

**FOR FURTHER INFORMATION CONTACT:**

For matters relating to the Executive Office for Immigration Review—Peggy Philbin, General Counsel, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2400, Falls Church, VA 22041, telephone number (703) 305–0470; for asylum issues—Michael Shaul, Field Manual Project Office, Immigration and Naturalization Service, 425 I Street NW., ULLB–4th Floor, Washington, DC 20536, telephone number (202) 616–7439; for inspections issues—Linda Loveless, Office of Inspections, Immigration and Naturalization Service, 425 I Street NW., Room 4064, Washington, DC 20536, telephone number (202) 616–7489; for detention and removal issues—Len Loveless, Office of Detention and Deportation, Immigration and Naturalization Service, 425 I Street NW., Room 3008, Washington, DC 20536, telephone number (202) 616–7799.

**SUPPLEMENTARY INFORMATION:** The Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104–208, enacted on September 30, 1996, amends the Immigration and Nationality Act (Act) in several ways. This rule proposes to implement the IIRIRA by creating a new, expedited removal process for aliens attempting to enter the United States through fraud or misrepresentation or without proper documents while providing a mechanism for the determination and review of applicants who demonstrate a credible fear of persecution if returned to their own country. It consolidates exclusion and deportation proceedings into one unified removal proceeding. It revises the asylum process.

It provides that persons who are present in the United States without inspection are considered applicants for admission and indicates that such persons will not be subject to expedited removal unless and until the INS Commissioner invokes the provisions in the statute and this rule allowing her to expand the use of the expedited removal process to include such individuals. Also, various sections of IIRIRA have revised and expanded the grounds of inadmissibility (formerly exclusion grounds).

The effective date of the changes implementing the expedited removal process is April 1, 1997. The Antiterrorism and Effective Death Penalty Act of 1996, Public Law 104–132, was enacted April 24, 1996. Many of its major provisions were superseded by IIRIRA before they became effective. Several of the remaining provisions will be implemented with this rulemaking.

Taken together, the provisions of IIRIRA have made pervasive changes in

the laws governing admission, inspection, removal, and detention of aliens—eliminating or revising old standards, creating new ones, and reorganizing and revising numerous provisions of existing law. In some respects, even after the effective date of the new provisions, existing legal standards will still be applied with respect to legal matters initiated prior to that date. The length of this rulemaking document alone—only one of the regulatory actions necessary to implement IIRIRA— demonstrates the breadth and complexity of these changes.

Congress directed that the provisions of Title III–A of IIRIRA take effect on April 1, 1997, and also directed that the Attorney General publish implementing regulations by March 1, 1997. A five-month period is an extremely short time frame for completing the regulatory process for a rule of this magnitude, given the time needed to draft the rule, coordinate with interested agencies, complete the regulatory review process by OMB pursuant to Executive Order 12866, and allow time for public comment. In particular, it means that there is not adequate time for the usual rulemaking model of 60 days public notice.

Because of these exigencies, the Department has limited the public comment period on this proposed rule to 30 days. However, in order to provide a fuller opportunity for public input on the numerous issues addressed in this rulemaking, the Department will allow a 120-day comment period on the Interim Rule when that is published by the beginning of March, prior to the development of a Final Rule.

As of the date this document was submitted for publication, Public Law 104–208 had not been printed. The conference report accompanying the House version of the bill, however, contains the provisions of IIRIRA. *See* H.R. Conf. Rep. No. 863, 104th Cong. 2d Sess., at 561. The Act should be printed in its entirety in the next few weeks.

### Applicants for Admission and Arriving Aliens

Section 302 of IIRIRA amends section 235(a) of the Act to describe as applicants for admission both aliens who are arriving in the United States (whether or not they arrive at a designated port-of-entry) and aliens present in the United States who have not been admitted. This section also includes aliens brought to the United States after having been interdicted in international or United States waters. Prior to the enactment of the IIRIRA, aliens apprehended after entering the

United States without inspection were subject to deportation proceedings under section 242 of the Act. By considering such aliens to be applicants for admission, this amendment significantly changes the manner in which aliens who have entered the United States without inspection are considered under the Act.

In some instances, IIRIRA distinguishes between the broader term "applicants for admission" and a narrower group, "arriving aliens." For clarity, "arriving alien" has now been specifically defined in 8 CFR part 1. The proposed definition of "arriving alien" in section 1.1(q) includes aliens arriving at a port-of-entry, aliens interdicted at sea, and aliens previously paroled upon arrival. The term "arriving alien" could also include other classes of aliens, e.g., those apprehended crossing a land border between ports-of-entry. The Department would value commentary on the proper scope of the regulatory definition.

**Parole of Aliens**

The proposed rule amends § 212.5 to permit chief patrol agents to authorize parole from Service custody of aliens who have not been admitted to the United States. The regulations previously allowed the district director to exercise this authority for emergent reasons or when strictly in the public interest. Because many of the aliens apprehended and processed under the jurisdiction of a chief patrol agent will now be considered applicants for admission, this change is necessary to allow discretionary release of those aliens in the particular circumstances enumerated in § 212.5.

**Custody of Aliens Applying at Land Border Ports-of-entry**

The proposed regulation implements a new provision added to section 235(b)(2) of the Act to state that an applicant for admission arriving at a land border port-of-entry and subject to a removal hearing under section 240 of the Act may be required to await the hearing in Canada or Mexico. This simply adds to statute and regulation a long-standing practice of the Service. If the alien fails to appear for the hearing, the immigration judge may order the alien removed *in absentia.*

**Withdrawal of Application for Admission**

Section 302(a) of IIRIRA incorporates into section 235(a)(4) of the Act the longstanding practice used by the Service to permit applicants for admission to voluntarily withdraw their applications for admission to the United

States, in lieu of removal proceedings, and to depart immediately. Permitting an alien to withdraw his or her application for admission allows the Service to better manage its resources by removing inadmissible aliens quickly at little or no expense to the Government, and may be considered instead of expedited or regular removal when the circumstances of the inadmissibility may not warrant a formal removal. The option to permit withdrawal is solely at the discretion of the Government, and is not a right of the alien. An immigration judge may allow only arriving aliens to withdraw an application for admission. Such a grant should ordinarily require the Service's concurrence once the issue of inadmissibility or deportability has been resolved. During the pendency of an appeal from an order of removal, permission to withdraw must be obtained from the immigration judge or the Board of Immigration Appeals (Board).

**Expedited Removal of Certain Applicants for Admission**

Pursuant to section 302(a) of IIRIRA, aliens who attempt to enter the United States by fraud or misrepresentation or who arrive without valid entry documents may be removed under an expedited process without further hearing or review. An exception is provided for Cuban nationals arriving by aircraft at a port-of-entry. Aliens who are inadmissible on other grounds will be referred for proceedings before an immigration judge under the new removal provisions of section 240 of the Act. Although not required by statute, the proposed regulation provides for review and approval of the expedited removal order by a supervisory immigration officer prior to removal of the alien. The expedited removal order bars reentry for 5 years following the removal, or 20 years in the case of a second or subsequent removal, unless the alien obtains advance permission to reenter the Untied States.

The Department requests public comment regarding the appropriate use of the authority conferred by the statute upon the Attorney General to expand the class of aliens subject to expedited removal. Section 235(b)(1)(A)(iii) of the Act permits the Attorney General, in her sole and unreviewable discretion, to apply expedited removal to aliens not admitted or paroled (and not described in section 235(b)(1)(H)) who cannot establish continuous physical presence in the United States for the previous two years.

Under the proposed rule, expedited removal will generally apply only to "arriving aliens," as defined in section

1.1(q), i.e., aliens arriving at a port-of-entry, aliens interdicted at sea, and aliens previously paroled upon arrival. The Commissioner may, however, elect to apply the expedited removal procedures to additional classes of aliens within the limits set by the statute, if, in the Commissioner's discretion, such action is operationally warranted. The Commissioner's designation may be localized, in response to specific needs within a particular region, or nationwide, as appropriate. The designation would become effective upon publication in the **Federal Register,** except where circumstances require immediate implementation. The Department would value commentary on two alternative approaches as well: (1) application of expedited removal only to "arriving aliens"; and (2) application of expedited removal to all aliens not admitted or paroled (and not described in section 235(b)(1)(F) who cannot demonstrate continuous physical presence for the previous two years.

Finally, commentary on the proper scope of the term "arriving alien" would be helpful to the Department in implementing section 235(b)(1). The proposed regulatory definition in section 1.1(q) includes aliens arriving at a port-of-entry, aliens interdicted at sea, and aliens previously paroled upon arrival. The term "arriving alien" could also include other classes of aliens, e.g., those apprehended crossing a land border between ports-of-entry.

**Review of Claim to Lawful Permanent Resident, Refugee, or Asylee Status in Expedited Removal**

An expedited removal order entered against an alien by an immigration officer at the time of arrival or by an asylum officer following a determination that the alien does not have a credible fear of persecution is not subject to administrative appeal, but may be reviewed by an immigration judge upon request of the alien. An exception is provided in section 235(b)(1)(C) of the act for an alien who claims under oath or under penalty of perjury to be a lawful permanent resident, to have been admitted as a refugee under section 207 of the Act, or to have been granted asylum under section 208 of the Act.

Before entering an expedited removal order against these aliens, the Service will attempt to verify the alien's claim to lawful permanent resident, refugee, or asylee status. If a claim to lawful permanent resident status is verified, the examining officer will determine whether the alien is considered an applicant for admission within the

meaning of section 101(a)(13) of the Act. Section 301(a) of IIRIRA amended section 101(a)(13) of the Act to provide that an alien lawfully admitted for permanent residence is not seeking admission unless the alien has abandoned or relinquished that status, has been absent for a continuous period in excess of 180 days, has engaged in illegal activity after having departed the United States, has departed while under legal process seeking removal, has committed certain criminal offenses, or is attempting to enter at a time or place other than as designated or has not been inspected and admitted to the United States. If the verified lawful permanent resident is determined to be an applicant for admission, the officer may consider appropriate discretionary waivers, if applicable, such as a waiver of documents under section 211(b) or other administrative options.

Current regulations do not provide for a waiver of documents or similar options for refugees and asylees who seek to reenter the United States without a refugee travel document. The regulations at § 223.2(b)(2) require that an application for a refugee travel document be filed before a refugee or asylee departs from the United States. The regulations also require at § 223.1(b) that a refugee or asylee must have a refugee travel document to return to the United States after temporary travel abroad unless he or she is in possession of a valid advance parole document. The combination of these two provisions has resulted in a few refugees and asylees (who had no intention of abandoning their status in the United States at the time of their departure) not being able to be readmitted in such status. With the advent of the expedited removal provisions, including the procedure for a review by an immigration judge of a claim to refugee or asylee status, the need for a formal process for dealing with such individuals has become more critical. The Service proposes to address the problem by giving district directors the discretionary authority to accept an application for a refugee travel document from an alien who is outside the United States, provided that alien: (1) held bonafide refugee or asylee status in the United States at the time of his or her departure from the United States, (2) did not intend to abandon such refugee or asylee status, (3) did nothing while outside the United States which would be inconsistent with refugee or asylum status, (4) has been outside the United States for less than one year (the maximum period of time for which the refugee travel document

can be issued), and (5) files the requisite Form I–131, Application for a Travel Document, with the appropriate fee. Upon the filing and approval of such application, the alien may be readmitted to the United States as if he or she were in possession of a valid refugee travel document, provided the alien is otherwise admissible.

If the immigration officer determines that an alien verified to have once held the status of a lawful permanent resident, refugee, or asylee does not merit a waiver, the officer will not issue an expedited removal order; rather, the officer may place the alien in removal proceedings under section 240 of the Act. Section 235(b)(1)(C) of the Act does not specify what should occur if an alien actually establishes to the satisfaction of an inspecting officer or an immigration judge that he or she is a lawful permanent resident, refugee, or asylee. However, section 242(e)(4) of the amended Act provides that if an alien appealing an expedited removal order to Federal district court establishes by a preponderance of the evidence that he or she is a lawful permanent resident, has been admitted as a refugee, or has been granted asylum, then the district court may order that the alien be provided a hearing under section 240 of the Act. In light of these judicial review provisions that would result in such aliens receiving a regular removal proceeding under section 240 of the Act, the Department considers a referral into section 240 removal proceedings upon verification of such status by an immigration officer or demonstration of such status to an immigration judge to be the most practical and efficient implementation of these provisions.

In cases where the alien's claim to lawful permanent resident, refugee, or asylee status cannot be verified, the immigration officer or the asylum officer will order the alien removal under section 235(b)(1)(A)(i) of the Act or for a credible fear determination under section 235(b)(1)(B)(iii), and then refer the alien to an immigration judge for review of the order. If the judge determines that the alien is not a lawful permanent resident, has not been admitted as a refugee, or has not been granted asylum under section 208 of the Act, the order issued by the examining immigration officer or asylum officer will be effected and the alien will be removed from the United States under that order. No further review is available. If the judge determines that the alien was once admitted and/or currently is a lawful permanent resident, refugee, or asylee, the order will be canceled and proceedings under section 235(b)(1) of the Act will be

terminated. The Service may then admit the alien or pursue any other grounds of inadmissibility or deportability under section 212 or 237 of the Act in a removal proceeding pursuant to section 240 of the Act, if appropriate.

**Revision of Asylum Procedures**

The regulation proposes to amend 8 CFR part 208 to create new procedures for the consideration of asylum applications as mandated by section 604 of IIRIRA, to make certain other changes which are not mandated by IIRIRA, but that will significantly improve the asylum process, and to streamline the existing regulations in accordance with the principles discussed elsewhere in the supplementary information.

Of special significance are the provisions in the regulation providing the immigration judges with exclusive jurisdiction over certain categories of asylum applications, including those filed by alien crewmen, stowaways who establish a credible fear of persecution, aliens covered by the Visa Waiver Pilot Program, aliens subject to removal under section 235(c) of the Act, and aliens who have applied for or received an "S" visa. Under the current regulations, some of these classes of aliens (stowaways, crewmen, and aliens removable under section 235(c) of the Act) receive only an interview with an asylum officer which is reviewed directly by the Board. However, some problems have arisen with these procedures, most significantly, the difficulty of generating a reliable and complete record and the absence of a government-provided interpreter in asylum officer interviews. The Department believes that giving the immigration judges exclusive jurisdiction over such determinations will certify these problems while still maintaining the high quality and consistency of the interview and decision-making process which the public has come to expect.

The proposed rule's treatment of section 208(a)(2) of the Act, which establishes a number of new grounds barring an alien from applying for asylum, is equally important. Regarding section 208(a)(2)(C) of the Act, which bars an alien from applying for asylum if the alien had a previous asylum application denied, the rule makes clear that this provision applies only to asylum applications that have been denied by an immigration judge or the Board. This ensures that aliens who received a denial of their application from an asylum officer because they applied for asylum while in valid status or under procedures in place prior to January 1995 receive consideration of

their application by an immigration judge. The rule also interprets the terms "changed circumstances" and "extraordinary circumstances" in section 208(a)(2)(D) of the Act as those terms apply to the 1-year bar in section 208(a)(2)(B) of the Act. The regulation provides minimal guidance on the meaning of the term "changed circumstances." Nevertheless, because of the novelty of the "extraordinary circumstances" exception to the 1-year bar, the rule offers a regulatory interpretation of this term. While the Department considered having the regulation identify specific examples of extraordinary circumstances that would justify a waiver of the one-year filing requirement, the proposed rule opts in favor of a provision that generally defines the term as events or factors beyond the alien's control that caused the failure to meet the one-year deadline. The regulation also provides that the alien file the application as soon as practicable under those circumstances. Thus, an event or factor of relatively brief duration would be insufficient to excuse the filing of an application long after the deadline. In our view, such a general definition provides guidance to decision makers while offering more flexibility than a definition by example would. Nevertheless, we can imagine several examples that would likely satisfy this definition: the applicant suffered a physical or mental disability that prevented a timely filing; the applicant was under a legal disability (e.g., an unaccompanied minor) during the one-year period; or the applicant received ineffective assistance of counsel, as that concept has been interpreted by the Board of Immigration Appeals, resulting in a failure to file a timely application. Nevertheless, because of both the novelty and importance of these new provisions, the Department welcomes suggestions from the public on how best to implement them.

The proposed rulemaking also offers guidance on how to apply section 208(d)(6) of the Act, which provides that an alien who knowingly makes a frivolous asylum application shall be permanently ineligible for any benefits under the Act. In § 208.18, the rule first provides that such determinations may only be made in a final order by an immigration judge or the Board of Immigration Appeals. The rule also defines an application as "frivolous" if it is fabricated or brought for an improper purpose. In doing so, the Department is carrying out one of the central principles of the asylum reform process begun in 1993; to discourage

applicants from making patently false claims.

It should be noted that the proposed rule does not discuss § 208.19 dealing with the admission of the spouse and children of an alien granted asylum status. This topic was the subject of a separate proposed rule published July 9, 1996. *See* 61 FR 35,984 (1996). That separate rulemaking will be incorporated into the overall asylum regulations once it is finalized.

## Credible Fear Determination and Claims of Asylum or Fear of Persecution by Alien Subject to Expedited Removal

Under the new section 235(b)(1)(A)(ii) of the Act, an alien subject to expedited removal who indicates an intention to apply for asylum or who expresses a fear of persecution will be referred to an asylum officer to determine if the alien has a credible fear of persecution. Credible fear of persecution is defined in section 302(a) of IIRIRA to mean that "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 208."

Interviews to determine whether an alien has a credible fear of persecution will be conducted by an asylum officer, either at the port-of-entry or at designated locations such as detention centers. For purposes of this credible fear interview, an asylum officer is defined in the Act as an immigration officer who has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 208, and is supervised by an officer who meets the same criteria and who has had substantial experience adjudicating asylum applications. This definition may include officers other than full-time asylum officers, provided they have undergone the necessary training and have the requisite supervision, but the Service will generally attempt to assign full-time asylum officers to the task of determining credible fear. Prior to the interview, the alien may consult with a person or persons of his or her own choosing at no cost to the Government, provided it does not unreasonably delay the process.

The asylum officer will make a determination whether the alien has a credible fear of persecution. Service procedures will require that the determination be reviewed by a supervisory asylum officer. The

supervisory asylum officer may direct the asylum officer to interview the applicant further, or to research country conditions or other matters relevant to the decision. If the supervisory asylum officer agrees that the alien has not demonstrated a credible fear of persecution, the alien will be ordered removed under the provisions of section 235(b)(1)(B)(iii)(I) of the Act. If the alien requests review of the determination that he or she has not demonstrated a credible fear of persecution, the credible fear determination will be promptly reviewed by an immigration judge. The alien will have the opportunity to be heard and questioned by the immigration judge. This review will be limited solely to the issue of credible fear, and may be conducted either in person or by telephonic or video connection. By statute, the review should be conducted as soon as possible following the credible fear determination, preferably within 24 hours, and no later than seven days after the date of determination. The alien will be detained during this review period, and if found by the immigration judge not to have a credible fear, will be promptly removed.

Section 235(b)(1)(B)(ii) of the Act provides that aliens who are determined by an asylum officer to have a credible fear of persecution will be detained for further consideration of the asylum claim. While the statute does not specify how or by whom this further consideration should be conducted, the proposed rule provides for such consideration by an immigration judge in removal proceedings conducted pursuant to section 240 of the Act. In the removal hearing, the immigration judge will make a determination whether alien is eligible for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act. The removal order will be subject to administrative review by the Board in accordance with section 240 of the Act and § 3.1(b)(3).

Credible fear determinations are also made in the case of stowaways. Although not entitled to removal proceedings under section 240 of the Act, a stowaway who has been determined by an asylum officer (or by an immigration judge upon review of a negative determination by an asylum officer) to have a credible fear of persecution may file an asylum application to be adjudicated by an immigration judge in asylum-only proceedings. There is no appeal from the decision of an immigration judge as to whether the stowaway has a credible fear of persecution. A stowaway who is found not to have a credible fear will be

expeditiously removed. However, a stowaway who meets the credible fear threshold and is allowed to present an asylum or withholding of removal application in a proceeding before an immigration judge may appeal the resulting decision to the BIA.

### Proposed Changes Not Mandated by IIRIRA

The rulemaking also proposes to remove §§ 208.13(b)(2)(ii) and 208.16(b)(4) which require that adjudicators give "due consideration to evidence that the government of the applicant's country of nationality or last habitual residence persecutes its nationals or residents if they leave the country without authorization or seek asylum in another country." The regulations accomplish little and are potentially misleading in their current form. The term "due consideration" provides little guidance. Moreover, the question of whether punishment for a migration-related offense is "persecution" hinges on an evaluation of the circumstances of each case. Under current law, prosecution for migration-related offenses does not ordinarily amount to persecution. Since the provision does not offer any assistance in adjudicating claims involving prosecution for unauthorized departure, we propose removing it from the regulations.

The rule provides a special regulation to govern the application of section 243(h)(3) of the Act, a provision added by section 413(f) of AEDPA that was eliminated by section 307 of IIRIRA. That section provided that, notwithstanding any other provision of law, the Attorney General could grant an alien withholding of deportation if she determined that it was necessary to do so to ensure compliance with the 1967 Protocol Relating to the Status of Refugees. In new section 241(b)(3)(B) of the Act, the only change Congress made to the existing bars to withholding of deportation was to require, in the case of an alien convicted of an aggravated felony (or felonies), that the alien receive an aggregate term of imprisonment of at least 5 years before such crime or crimes are automatically considered to be particularly serious. We understand this change to reflect Congress' conclusion that the bars to withholding of deportation or removal are consistent with the United States' obligations under the 1967 Protocol Relating to the Status of Refugees, except potentially in the case of an aggravated felon who receives less than a 5-year aggregate sentence. The Department proposes a regulatory interpretation of section 243(h)(3) that is

consistent with this most recently expressed view of the Congress. Thus, the rule provides that an alien may attempt to obtain relief under section 243(h)(3) of the Act only if he or she is an aggravated felon who received an aggregate sentence of less than 5 years and can establish that the crime or crimes of which he or she has been convicted are not particularly serious. This will require a case-by-case determination whether the crime or crimes committed by the alien are particularly serious. Only if the crime is determined not to be particularly serious will the alien be entitled to have his or her withholding of deportation claim considered. Because section 243(h)(3) of the Act was eliminated by IIRIRA, this rule applies only to applications for withholding made in proceedings commenced prior to April 1, 1997, so long as a final action on any such withholding request was not taken prior to April 24, 1996, the date of AEDPA's passage.

### Establishment of a Fee for Filing an Application for Asylum

This rulemaking does not propose to establish a fee for filing an application for asylum or to expand the situations under which fees may be charged for asylum-based applications for work authorization, despite the statutory permission to do so contained in section 208(d)(3) of the Act. Should the Department decide to do so at a later date, that action would be part of a separate rulemaking.

### Employment Authorization for Asylum Applicants

The proposed regulations will continue to allow asylum applicants to apply for an employment authorization document (EAD) once the asylum application has been pending for 150 days, which is 30 days before the new statutorily-mandated time for granting such authorization contained in section 208(d)(2) of the Act.

### Rules of Procedure for Executive Office for Immigration Review

Implementation of IIRIRA will impact the rules of procedure for proceedings before the Executive Office for Immigration Review. These proposed rules amend the regulations to expand the scope of the rules of procedure to include new removal proceedings in provisions regarding motions to reopen and reconsider, jurisdiction and commencement of proceedings, stipulated requests for orders, in absentia hearings, public access to hearings, and additional charges. The proposed rules also add provisions

regarding the scheduling of removal cases, custody and bond in removal proceedings, and contents of the Notice of Appear form.

### Subpoenas by Immigration Judges

Section 304 of IIRIRA bestows upon immigration judges the statutory authority to issue subpoenas for the attendance of witnesses and presentation of evidence in removal proceedings. This subpoena power had previously been granted to immigration judges by regulation only and the immigration judges had to enlist the district director to invoke the aid of the district court for failure to comply with the subpoena. The proposed rule amends the subpoena provisions to provide that an immigration judge directly invokes the aid of the district court for an order requiring the compliance with a subpoena instead of requiring the district director to take such action.

### New Removal Proceedings

Section 240 of the Act as amended by section 304(a) of IIRIRA merges the separate proceedings of exclusion and deportation into one removal proceeding. In this single proceeding, the immigration judge will determine whether an alien is inadmissible under section 212 of the Act or deportable under section 237 (formerly section 241) of the Act. In light of these statutory changes, individuals in removal proceedings are referred to in the proposed rule as determined to be removable or ordered removed after being found to be either inadmissible or deportable (but no longer will be referred to as excludable or excluded). Removal proceedings will in nearly all respects resemble present day deportation or exclusion proceedings, with some minor differences outlined below and implemented by this proposed rule.

Although not as a result of any provision of IIRIRA, the Department is soliciting public comments on whether these regulations should include a provision for appointment of a guardian ad litem in a case where a minor or incompetent respondent in removal proceedings is otherwise unrepresented.

### Applicability of New Removal Provisions

The IIRIRA provides that the newly created removal procedures and the new amended forms of relief available in removal proceedings which appear in title III–A of IIRIRA will apply to all individuals placed into removal proceedings on or after April 1, 1997, and will not affect individuals who

were in deportation or exclusion proceedings prior to April 1, 1997. *See* Section 309(a) of IIRIRA. For this reason, the proposed rule preserves the former regulations relating to deportation and exclusion proceedings for those individuals who will continue on in such proceedings after April 1, 1997. The proposed rule preserves such provisions by retaining current regulatory provisions previously contained in 8 CFR parts 236, 242, and 244 within separate new subparts of part 240. In addition, sections formerly contained in parts 237 and 243 have been retained in new subparts of part 241. A more detailed description of the entire reorganization of effected parts of title 8 is contained later in this supplementary information.

### The Notice to Appear (Form I–862)

The charging document which commences removal proceedings under section 240 of the Act will be referred to as the Notice to Appear, Form I–862, replacing the Order to Show Cause, Form I–221, that was used to commence deportation proceedings and the Notice to Detained Applicant of Hearing Before an Immigration Judge, Form I–110. The Notice to Appear must contain nearly all of the information that was required to be in the Form I–221. The regulations reflect the fact that section 304 of IIRIRA did not retain the requirement that the Notice to Appear be provided in Spanish; that the mandatory period between service of a Notice to Appear and the date of an individual's first hearing is 10 days rather than the 14 days required for the Order to Show Cause; that service of the Notice to Appear by ordinary mail, rather than certified mail, is sufficient if there is proof of attempted delivery to the last address provided by the alien and noted in the Central Address File; and that no written notice need be provided if the alien has failed to provide his or her address as required under the amended Act.

In addition, the proposed rule implements the language of the amended Act indicating that the time and place of the hearing must be on the Notice to Appear. The Department will attempt to implement this requirement as fully as possible by April 1, 1997. Language has been used in this part of the proposed rule recognizing that such automated scheduling will not be possible in every situation (e.g., power outages, computer crashes/downtime.)

### Burdens of Proof in Removal Proceedings

The proposed regulation restates the burden of proof language in section 240(c) of the Act as revised by section 304(a) of IIRIRA. In removal proceedings in which an alien is charged with deportability, the Service must establish deportability by clear and convincing evidence. This replaces the clear, convincing, and unequivocal standard set forth in *Woodby* v. *INS,* 385 U.S. 276 (1966). An applicant for admission to the United States must establish that he or she is clearly and beyond a doubt entitled to be admitted and is not inadmissible. In the case of an alien present in the United States without being admitted or paroled, once the Service establishes alienage, the alien must prove that he or she is clearly and beyond a doubt entitled to be admitted and is not inadmissible, unless the alien proves by clear and convincing evidence that he or she is lawfully present pursuant to a prior admission.

### Cancellation of Removal

The proposed rule provides for the application by qualified individuals in removal proceedings for the new form of relief created by section 304(a) of IIRIRA: cancellation of removal. Cancellation of removal comes in two forms. The first form, available to lawful permanent residents, is similar to relief under section 212(c) of the pre-IIRIRA Act, except that only 5 years of the required 7 years of residence to statutorily qualify for this form of cancellation of removal need be fulfilled as a lawful permanent resident. This means that up to 2 years of the 7 years can be satisfied with temporary residence. This provision codifies the interpretation by a number of Federal circuit courts that a period of temporary residence counts toward the 7-year residency requirement for relief under section 212(c) of the pre-IIRIRA Act.

The second form of cancellation of removal resembles suspension of deportation under section 244 of the pre-IIRIRA Act, except that an applicant for the second form of cancellation of removal must demonstrate continuous physical presence for 10 years instead of 7 years, and must show "exceptional and extremely unusual hardship" instead of "extreme hardship." Further, unlike suspension of deportation, this form of cancellation of removal is not available for aliens who can only show hardship to themselves. The proposed rule also implements the availability of this second form of cancellation of removal to a battered spouse or child who can demonstrate 3 years of continuous physical presence in the United States and who shows that removal would result in "extreme hardship" to the battered spouse, his or her child, or the battered child's parent.

### Administrative Motions To Reopen and Reconsider Removal Proceedings

Section 304(a) of IIRIRA added a number of motions procedures to the Act regarding the reopening or reconsideration of a final order of removal. For the most part, these new statutory provisions encompass the new procedures implemented by EOIR's new motions and appeals regulation, which took effect on July 1, 1996. However, the statute does place the time and number restrictions for motions specifically on the alien. The proposed rule implements this change by adding a provision to indicate that in removal proceedings, the restrictions only apply to the alien and not to the Service. In addition, unlike the pre-IIRIRA regulations excepting motions to reopen exclusion or deportation orders rendered in absentia from both the 90-day and 1-motion restrictions, the statute only excepts motions to reopen removal orders rendered in absentia from the 90-day time period and not the numerical restriction. The proposed rule implements this change as well.

### Proceedings To Review Asylum Claims by Certain Aliens Not Eligible for Section 240 Proceedings

This rule established a new Notice of Referral to Immigration Judge, Form I–863, to be used to institute limited proceedings before an immigration judge. This referral form will be used by immigration officers to initiate review by an immigration judge for asylum or withholding of removal claims by Visa Waiver Pilot Program (VWPP) refusal cases and VWPP status violators, crew members, aliens ordered removed pursuant to section 235(c) of the Act, aliens present pursuant to section 101(a)(15)(S) of the Act, and alien stowaways found to have a credible fear of persecution. This proceeding is limited solely to the asylum or withholding claim and no other forms of relief may be presented by the alien or considered by the immigration judge.

Asylum officers will also use the Notice of Referral for expedited removal cases where the alien seeks review of a "no credible fear" finding by the asylum officer in section 235(b)(1) proceedings or for stowaways, prior to the execution of the expedited removal order or removal of the stowaway.

In addition, the Notice of Referral will be used to institute an immigration judge review of expedited removal orders issued against aliens claiming to be lawful permanent residents, refugees or asylees. In such cases, the immigration judge will review the

expedited removal order, which may either be affirmed or canceled.

Existing regulations regarding deportable VWPP aliens who claim asylum state that the alien will be referred for a determination of deportability. The current regulations for VWPP applicants arriving at ports-of-entry are vague, stating only that the alien will be referred to an immigration judge for further inquiry. The proposed change will clarify that VWPP applicants and status violators are to be provided a hearing and appeal on the asylum and withholding claim only.

Existing regulations provide that a crewman, stowaway, or alien temporarily excluded under section 235(c) of the Act file an application for asylum with the district director and that the district director forward it to an asylum officer for adjudication. The Attorney General has determined that these claims should be adjudicated by an immigration judge. This determination to adjudicate the asylum claims for these classes of aliens in a proceeding before an immigration judge is in response to recent case law holding that stowaway asylum applicants must be afforded the same asylum procedures deemed necessary for other aliens. In *Marincas* v. *Lewis,* 92 F.3d 195, 200–201 (3rd Cir. 1996), the court held that the plain language of the Refugee Act left no room to construe the statue to permit differing asylum procedures for stowaways. Although the Department with that holding, the Attorney General has found that providing a proceeding before an immigration judge to hear the asylum claim will address the concerns raised in *Mirancas,* while remaining consistent with the statutory directives to limit due process for these classes of aliens. As required by IIRIRA, a stowaway will receive a credible fear determination prior to the referral to an immigration judge.

**Reorganization of Certain Regulatory Sections**

The IIRIRA substantially revised sections of the Act relating to the arrest of aliens suspected of inadmissibility to or unlawful presence in the United States, detention of such aliens prior to and during removal proceedings, the conduct of removal proceedings, and ancillary issues such as voluntary departure and available forms of relief. The Service and EOIR have jointly undertaken a complete revision of the affected parts of title 8, to bring the relevant regulatory parts into alignment with the new sections of the Act. The newly revised sections are organized in the following manner: 8 CFR part 236, Subpart A—Detention of aliens prior to

order of removal, Subpart B—Family Unity Program; 8 CFR part 238—Expeditious removal of aggravated felons; 8 CFR part 239—Initiation of removal proceedings; 8 CFR part 240, Subpart A—Removal proceedings, Subpart B—Cancellation of removal, Subpart C—Voluntary departure, Subpart D—Exclusion of aliens (for proceedings commenced prior to April 1, 1997); Subpart E—Proceedings to determine deportability of aliens in the United States: Hearing and Appeal (commenced prior to April 1, 1997); Subpart F—Suspension of deportation and voluntary departure (for proceedings commenced prior to April 1, 1997); Subpart G—Civil penalties for failure to depart; 8 CFR part 241, Subpart A—Post-hearing detention and removal, Subpart B—Deportation of Excluded Aliens (for hearings commenced prior to April 1, 1997), Subpart C—Deportation of Aliens in the United States (for hearings commenced prior to April 1, 1997); 8 CFR parts 237, 242, and 243 have been removed and reserved; 8 CFR part 244 will now contain regulations pertaining to the Temporary Protected Status program.

Sections of the old regulations which are still applicable to proceedings commenced prior to April 1, 1997, have been retained, but moved to new parts of the regulations as separate subparts according to topic. For example, the regulations relating to the conduct of proceedings, formerly contained in 8 CFR part 242, have been moved to 8 CFR part 240, which contains regulations for the conduct of removal proceedings.

Most sections of the regulations have not been retained in this manner. They have been totally revised, in conformity with the new statute. In some instances, these regulations distinguish between situations involving aliens "grandfathered" under former statutory authority and those encompassed by the provisions of IIRIRA. For example, new § 252.2(b) contains separate provisions for alien crewmen who arrived prior to April 1, 1997, and those who arrive after that date.

Because the Service and EOIR have concerns about the serious restructuring of these regulations, the public is invited to comment on the approach taken by this rulemaking. In particular, the Service wishes to solicit comments concerning any possible unintended consequences of the restructuring, such as the inclusion of new sections which encompass aliens entitled to consideration under "old" provisions.

**Apprehension, Custody, and Detention of Aliens**

This rule incorporates the changes made to section 242 of the Act by section 440(c) of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Public Law 104–132 as well as section 303(a) of the IIRIRA. By enactment of AEDPA, Congress altered the provisions created by section 504 of the Immigration Act of 1990 (IMMACT), Public Law 101–649, enacted November 29, 1990, relating to release of lawfully admitted aliens who had been convicted of aggravated felonies. The AEDPA directed the Attorney General to detain aliens convicted of aggravated felonies without bond and extended the mandatory detention provisions to aliens deportable for conviction of certain other felonies. The IIRIRA extended the mandatory detention provisions to additional classes of inadmissible and deportable aliens but provided an exception for certain witnesses. It also allowed the Attorney General the option of a transition period for implementation of mandatory detention. The INS exercised this discretion and implemented the transition period custody rules on October 9, 1996, effective for 1 year. The Act is very clear as to which aliens may be released. This rule proposes to amend the Service's regulations to comply with the amended Act by removing the release from custody provisions for aliens who may no longer be released. These amendments to the regulations will take effect upon the termination of the transition period. As for non-criminal aliens, the rule reflects the new $1,500 minimum bond amount specified by IIRIRA. Otherwise, the proposed rule essentially preserves the status quo for bond determination by the Service and bond redetermination proceedings before immigration judges. Despite being applicants for admission, aliens who are present without having been admitted (formerly referred to as aliens entering without inspection) will be eligible for bond and bond redetermination.

**Expedited Deportation Procedures for Aliens Convicted of Aggravated Felonies Who Are Not Lawful Permanent Residents**

This rule incorporates the changes made to section 242A(b) of the Act by section 442 of the AEDPA and section 304(c) of the IIRIRA. By enactment of the AEDPA, Congress made several changes to the expedited administrative deportation procedure authorized under section 130004 of the Violent Crime Control and Law Enforcement Act of

1994, Public Law 103–322. Some of these changes were modified by the IIRIRA and one was eliminated. This rule proposes to amend the Service's regulations to comply with the amended Act as follows: aliens who have lawful permanent residence on a conditional basis under section 216 of the Act are subject to expedited administrative deportation procedures and have been included in the regulation. Since section 238(b)(5) of the Act states that an alien subject to these proceedings is ineligible for any relief from removal, all references to prima facie eligibility for relief and to relief from deportation have been removed. This revision also eliminates references to release from custody, since aliens subject to these proceedings are now statutorily ineligible for release as a result of changes to other sections of the Act.

**Voluntary Departure**

The proposed rule outlines how voluntary departure will be handled at various stages of proceedings. Prior to the initiation of proceedings, the Service has sole jurisdiction to grant voluntary departure for a period not to exceed 120 days. The Service may impose any conditions it deems necessary to ensure the alien's timely departure from the Untied States, including the posting of a bond, continued detention pending departure and removal under safeguards. After proceedings have been commenced and at any time up to 30 days subsequent to the master calendar, the immigration judge may grant voluntary departure for a period not to exceed 120 days. In each instance, the alien will be required to present to the Service travel documents sufficient to assure lawful entry into the country to which the alien is departing, unless such document is not necessary for the alien's return.

An alien may be granted voluntary departure at the conclusion of proceedings if the immigration judge finds that the alien meets the conditions of section 240B(b) of the Act. The judge may impose such conditions as he or she deems necessary to ensure the alien's timely departure from the United States, but in all cases, the alien shall be required, within 5 days of the order, to post a voluntary departure bond of no less than $500. In order for the bond to be canceled, the alien must provide proof of departure to the district director. If the alien fails to depart, or to meet any of the conditions attached to the grant of voluntary departure, such order will vacate and the alternate order of deportation will stand.

Section 304(a) of IIRIRA makes significant changes to both the nature and duration of voluntary departure. Under the new law, voluntary departure is clearly meant to be granted to aliens illegally in the United States who are able and willing to depart in a relatively short period of time. It will no longer be available to those who are seeking to significantly extend their time in the United States for other reasons. If fact, the time periods which will be allowed for voluntary departure are such that they meet or exceed the normal processing time for applications for employment authorization. In light of these changes, the Department is eliminating the provisions currently contained in 8 CFR parts 242 and 274a which permit the granting of work authorization to aliens who have been given voluntary departure.

New section 240B of the Act and the corresponding regulations represent a significant departure from the predecessor provisions for voluntary departure. Public comments regarding the Department's approach to implementation of this provision will be particularly welcome.

**Reinstatement of Removal Orders Against Aliens Illegally Reentering**

Section 241(b)(5) of the Act requires the Attorney General to reinstate the removal order for an alien who illegally reenters the United States after having been removed or after having departed voluntarily under a removal order. Removal would be accomplished under the proposed rule without referral to an Immigration Court. Although the Act previously contained a provision for reinstatement of a final order of deportation, the accompanying regulation required the issuance of an order to show cause and a hearing before an immigration judge. This resulted in limited use of the provision. The proposed rule provides a procedure for a district director to reinstate a final order upon establishing identity and unlawful reentry of a previously deported or removed alien found in the United States. Once identity is affirmed, the original order will be executed.

**Detention and Removal of Aliens Ordered Removed**

This rule incorporates the changes made to section 241 of the Act by section 305(a) of IIRIRA. Section 241 of the Act now relates to the period for removal of aliens, post-order detention and removal of aliens, reinstatement of final orders, and detention and removal of stowaways.

This rule provides for the assumption of custody during the removal period, allows detention beyond the period, and provides condition for discretionary release and supervision of aliens who cannot be removed during the period. A district director may issue a warrant of removal based on a final administrative order of removal. The warrant of removal will authorize the Service to take an alien in the United States into custody during the removal period. The Service is required to assume custody of any alien within the United States once the 90-day removal period begins, as defined in section 241 of the Act, and detain the alien until removal or expiration of the removal period. At the expiration of the removal period, the Service has the discretion to release an alien. If the alien shows to the satisfaction of the district director that the alien is not a threat to the community and is likely to report for removal, the district director may release the alien on an order of supervision. As a condition or release, an authorized officer may require the posting of a bond, impose restrictions on conduct, and require periodic reporting to a designated officer. The district director may grant employment authorization as specified in the Act. The district director retains the authority to grant humanitarian stays of removal.

This rule restates the principle, previously found at § 243.5, that an alien who departs the United States while a final order is outstanding has executed the order.

**Detention and Removal of Stowaways**

The arrival of stowaways in the United States, particularly aboard cargo vessels, has long been a problem for both the transportation companies and the Service. Section 308(e) of IIRIRA has stricken former section 273(d) of the Act, which governed stowaways and section 305 of IIRIRA has clearly defined the responsibilities for stowaways and costs of detention in the new section 241 of the Act. All stowaways are deemed to be inadmissible under the Act and are not entitled to a hearing on admissibility. Those with a credible fear of persecution may seek asylum in accordance with 8 CFR part 208 in proceedings before an immigration judge.

Under the provisions of section 241 of the Act, the carrier (which includes the owner, agent, master, commanding officer, person in charge, purser, or consignee) is responsible for detaining the stowaways on board the vessel or aircraft (or at another approved location) until completion of the inspection, and may not permit the alien to leave the vessel or aircraft, unless authorized by the Service for either medical treatment,

detention by the Service, or removal of the stowaways. The Service may order that the stowaway be removed on the vessel or aircraft of arrival when that is the most practical manner of removal. With the mutual goal of removing stowaways by the most expeditious and secure means, the Service will generally favor any reasonable request to remove the stowaway on other than the vessel or aircraft of arrival. The carrier must make all travel arrangements, including obtaining any necessary travel documents.

Since asylum-seeking stowaways may not be removed pending a final decision on their asylum claim, which may sometimes extend for a lengthy period, the statute limits the detention liability of the owner of the vessel or aircraft. The owner is now responsible for a period of time needed to determine whether the stowaway has a credible fear of persecution, and a reasonable period, beginning when a credible fear is found to exist, during which the asylum application may be considered. The statute and regulations allow for up to 72 hours to arrange and conduct the credible fear interview, although the Service anticipates that this will occur as expeditiously as possible, depending on the location and circumstances of the stowaway's arrival. If the stowaway is allowed to pursue his or her asylum application, the statute provides 15 working days, excluding Saturdays, Sundays, and holidays, for the asylum claim to be heard, at the expense of the owner of the vessel or aircraft. Any detention required beyond that time period will be at the expense of the Service. The carrier remains liable for removal, including removal expenses, if the alien is denied asylum.

**Adjustment of Status**

Adjustment of status is granted in the discretion of the Attorney General. Consistent with Congress' intent that arriving aliens, as that term is defined in § 1.1(g), be removed in an expedited manner through the procedures provided in section 235(b)(1) of the Act, the Attorney General has determined that she will not favorably exercise her discretion to adjust the status of arriving aliens who are ordered removed pursuant to section 235(b)(1) of the Act or who are placed in removal proceedings under section 240 of the Act. Of course, any such alien who has been persecuted or has a reasonable fear of persecution may request asylum in expedited removal. Arriving aliens who are granted asylum may then adjust their status outside of the removal proceeding context. In all other instances, those apprehended after

arriving illegally in the United States should have no other benefit available to them, and should not be permitted to delay their removal through an application for adjustment of status. Any other arriving alien who is eligible to receive an immigrant visa will be required to return to his or her country of residence and request it through the consular process available to all aliens outside of the United States. If the Service decides as a matter of prosecutorial discretion, not to initiate removal proceedings but to parole the arriving alien, the alien will be able to apply for adjustment of status before the district director.

**Disposition of Cases of Aliens Arrested in the United States**

The regulation proposes to amend § 287.3 to differentiate the actions that must be taken when an alien is apprehended entering or attempting to enter the United States in violation of the immigration laws, or is otherwise found in the United States in violation of those laws. Disposition of the case will vary depending on the circumstances of entry or attempted entry, or the specific violation with which the alien is charged. This section is amended to include those cases that may now be processed under the expedited removal provisions of section 235(b)(1) of the Act, if such provisions are invoked by the Commissioner.

**Elimination of Mexican Border Visitor's Permit**

The Mexican Border Visitor's Permit, Form I–444, is a record of entry issued by the Service at land border ports-of-entry along the United States/Mexico border to holders of Nonresident Alien Border Crossing Cards, Forms I–186 and I–586. The Nonresident Alien Border Crossing Card is issued in place of a nonimmigrant visa. Currently, Form I–444 is issued when the requested visit to the United States will be for more than 72 hours but less than 30 days in duration or when requested travel is more than 25 miles from the United States/Mexico border but within the five states of Arizona, California, Nevada, New Mexico, or Texas. The Service also issues Form I–444 to Mexican nationals who are in possession of valid Mexican passports and multiple-entry nonimmigrant visas requesting admission to the United States under the limitations described above.

The current Form I–444 has been in use since 1983 and the Service now issues over 200,000 of these forms per month. Due largely to its lack of security features and the absence of standardization between ports, Form I–

444 is widely counterfeited. The Service has been unable to demonstrate that there is a connection between the limits on travel by persons issued Forms I–444 and immigration violations. These restrictions should be lifted and applicants for admission should be admitted as any other person in possession of a B–1 or B–2 visa is admitted.

This regulation proposes to remove references to the issuance of the form and the section requiring a fee for issuance of Form I–444. A provision is added requiring the issuance of Form I–94, and collection of the fee, for Mexican nationals seeking to enter for more than 72 hours and/or to travel further than 25 miles from the United States/Mexico border. The Form I–94 issued to a B–2 visitor for pleasure is normally valid for 6 months. The proposed rule provides in § 235.1(f) that a Form I–94 issued at a land border port-of-entry is valid for multiple entries unless otherwise indicated.

**Streamlining and Updating of Regulations**

The President has directed each agency to undertake a review of its regulations for the purpose of reducing the regulations or, when possible, rendering them more readable and comprehensible. *See* E.O. 12866, 58 FR 51,735 (1993). The Service is engaging in a thorough line-by-line review of all regulations in Title 8 of the Code of Federal Regulations.

**Updated Sections**

References to the former section 212(a)(17) of the Act dealing with the Attorney General's consent to apply for readmission have been removed from § 217.2(b) and replaced with the current citation. References throughout 8 CFR part 235 to special inquiry officers have been replaced with the title ''immigration judge.'' References to regional commissioners have been replaced with references to regional directors. The regulatory language contained in §§ 238.1, 238.2, 238.3, and 238.5 has been moved to 8 CFR part 233, to conform with redesignation of those statutory sections by the IIRIRA. Lists of carriers signatory to agreements with the Service for carriage to transit passengers and preinspection have been removed form the regulations and will be maintained by the Headquarters Office of Inspections.

**Terminated Programs**

References to initial (not replacement) application procedures in § 235.12 for Form I–777, Northern Mariana Card, have been removed as the application

period for that form expired in July 1990. Section 235.9, dealing with refugee admissions, has been removed as that procedure is no longer followed and its subject is now governed by section 207 of the Act. Provisions in § 211.2 dealing with waivers of passport requirements for third-preference immigrants have been removed as that category of immigrant no longer exists. Terms which were appropriate in referring to exclusion and deportation procedures have been changed to reflect the single removal process.

## Removal of Purely Procedural Matters Involving Only Internal Service Processes

The discussion of internal Service procedures regarding the admission of immigrant children formerly found in § 211.4 has been removed. Language in § 211.5 relating to admission procedures for alien commuters has been removed in favor of placing such information into Service Field Manuals. Examples dealing with alien crewmen, as well as Canadian nationals, have been removed from § 235.1. Part 232 of 8 CFR dealing with the procedures for notification of the master or agent of an arriving vessel when arriving aliens were placed in detention for mental or physical examination has been removed since it is addressed in Service manuals. Language dealing with procedures for completion of entry documents for nonimmigrant aliens, Mexican border crossers, bearers of Mexican diplomatic passports, and paroled aliens in 8 CFR part 235 has been removed. Language in § 235.2 relating to deferred inspection procedures for incapacitated or incompetent aliens has also been removed. Section 235.4 dealing solely with Service procedures for endorsing documents evidencing admission has been revised to address the withdrawal of an application for admission. The former § 251.1(d), dealing with the notations to be made on Service forms when inspecting crewmen, has been incorporated into Service manuals.

## Elimination of Duplication

Duplicative references have been removed. Language in § 217.2, relating to eligibility for the Visa Waiver Program, has been removed as it merely restates the eligibility requirements contained in the Act. Language in § 217.3 and throughout relating to Visa Waiver Program participants' eligibility for other immigration benefits and readmission after departure to contiguous territory has been removed as it merely restates the Act and is covered by other regulations in this part.

## Streamlining

Section 211.1. has been restructured in its entirety to make it easier to comprehend. The provisions relating to admission of children of lawful permanent residents formerly contained in § 211.2 have been consolidated into the general waiver provisions of section § 211.1. Language formerly in § 211.2(b) which referred to other code sections by description has been replaced by a simple citation. Sections 211.3, 211.4, and 235.9 have been removed and reserved as their contents are addressed in other sections of this part. The 8 CFR part 251, relating to alien crewmen, longshore work, and vessels has been restructured and clarified.

Unnecessary recitals of the law have been removed in the following: § 211.5(b), relating to forfeiture of an I–551 upon loss of resident status by a commuter alien; and § 217.1, which merely restates statutory language regarding eligibility for admission under the Visa Waiver Pilot Program. The 8 CFR part 217 has been streamlined by consolidating various definitions throughout that part into one section. Confusing language in § 217.3 has been streamlined with regard to readmission under the Visa Waiver Pilot Program of an alien who has departed to contiguous territory or an adjacent island has been streamlined.

## Other Changes

In addition, conforming and purely editorial or grammatical revisions have been made, as appropriate.

## Regulatory Flexibility Act

The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and, by approving it, certifies that the rule will not have a significant adverse economic impact on a substantial number of small entities because of the following factors. This rule affects only Federal government operations by codifying statutory amendments to the Immigration and Nationality Act primarily regarding the examination, detention, and removal of aliens from the United States. It affects only individuals and does not impose any reporting or compliance requirements on small entities.

## Executive Order 12866

This rule is considered by the Department of Justice to be a "significant regulatory action" under Executive Order 12866, section 3(f), because it will have a significant economic impact on the Federal government in excess of $100,000,000. No economic impact is anticipated for

state and local governments. The Service projects significant increases in detention-related costs due to the provisions of IIRIRA which mandate the custody of criminal aliens who have committed two or more crimes involving moral turpitude, aliens convicted of firearms offenses, and aliens who have been convicted of an aggravated felony. The type of crime that will qualify as an "aggravated felony" has been greatly expanded under IIRIRA. In addition, all aliens, even non-criminal aliens, who are subject to a final administrative order of removal must be held in custody until the alien can be removed from the United States. If the person is not removed within 90 days he or she may be released from custody.

The Commissioner has notified Congress pursuant to section 303(b) of IIRIRA that the Service lacks sufficient space to immediately implement the mandatory custody provisions. This notification will delay for 1 year full implementation of the new mandatory custody provisions. Section 303(b) also provides for an additional 1-year delay in implementation of the mandatory custody provisions upon a second certification that space and personnel are inadequate to comply with the requirement. The Service estimates that the cost to enforce the requirement to detain all criminal aliens will be at least $205,000,000. Of that total, personnel costs account for $65,284,000 which include detention and deportation officers ($32,873,000), investigators ($25,501,000), legal proceedings personnel ($4,968,000), and administrative support ($1,942,000). Non-personnel requirements are projected to be at least $139,732,000 which includes increases in bedspace and related alien custody requirements ($82,782,000—funds 3,600 beds @ $63.00 per day), increases in alien travel expenses ($36,000,000–3,600 removals @ $1,000 each), and detention vehicle expenses ($20,950,000). The Service is currently in the process of projecting the cost of the IIRIRA requirements that we detain all aliens with administratively final orders of deportation pending their removal.

In addition to these detention related costs, the Service estimates that the expenses for training employees on the provisions of the new law and the regulations will be $2,977,500. The cost to the Service related to additional forms or changes needed to current forms is estimated to be $2,000,000 (until the final list of form requirements is completed it is not possible to more accurately assess this cost). Finally, the Department believes there may be some

increases needed for immigration judges to review credible fear determinations made under section 235(b) of the INA.

The EOIR estimates increases in its costs related to IIRIRA-mandated immigration judge review of credible fear determinations (which must be made under stringent time frames) and the prompt immigration judge review which IIRIRA requires of certain expedited removal orders entered against aliens claiming to be lawful permanent residents, asylees or refugees. Further, EOIR projects costs associated with the need for an Immigration Court presence in nearly ever port-of-entry, which will result from the above-mentioned credible fear review and expedited removal review process. Also, there will be costs related to the overall need for an increased Immigration Court presence at existing Service detention centers to support the processing of the additional detainees that will result from the implementation of this rule. Similarly, EOIR anticipates a need for construction of new Immigration Courts at new detention facilities the Service may open as a result of this rule's implementation.

Although there are still a number of unknown variables which could affect the total costs to EOIR to implement its part of the new expedited removal process and to respond to the increased number of detained individuals in proceedings under this rule, EOIR estimates that the total annual cost for EOIR could be as high as $25,000,000. Of that total, the cost for hiring new immigration judges and legal support staff is projected to be $21,300,000. The cost for new video and audio teleconfering equipment is estimated at $3,000,000. Training costs are expected to be approximately $400,000. Finally, forms and other support requirements are estimated to cost $300,000.

## Small Business Regulatory Enforcement Act of 1996

At this time the Department considers this rule a ''major rule'' as defined in 5 U.S.C. § 804(2).

## Executive Order 12612

The regulations proposed herein will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 12612, it is determined that this rule does not have sufficient Federalism implications to warrant the preparation of a Federalism Assessment.

## Executive Order 12988

This proposed rule meets the applicable standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988.

## Paperwork Reduction Act

The information collection requirements contained in this rule have been forwarded to the Office of Management and Budget under the Paper Reduction Act. The OMB control numbers for these collections are contained in 8 CFR 299.5, Display of control numbers.

## List of Subjects

*8 CFR Part 1*

Administrative practice and procedure, Immigration.

*8 CFR Part 3*

Administrative practice and procedure, Immigration, Organization and functions (Government agencies).

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Reporting and recordkeeping requirements.

*8 CFR Part 204*

Administrative practice and procedure, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 207*

Administrative practice and procedure, Refugees, Reporting and recordkeeping requirements.

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 209*

Aliens, Immigration, Refugees.

*8 CFR Part 211*

Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 213*

Immigration, Surety bonds.

*8 CFR Part 214*

Administrative practice and procedure, Aliens.

*8 CFR Part 216*

Administrative practice and procedure, Aliens.

*8 CFR Part 217*

Air carriers, Aliens, Maritime carriers, Passports and visas.

*8 CFR Part 221*

Aliens, Surety bonds.

*8 CFR Part 223*

Aliens, Reporting and recordkeeping requirements.

*8 CFR Part 232*

Aliens, Public health.

*8 CFR Part 233*

Administrative practice and procedure, Air carriers, Government contracts, Travel.

*8 CFR Part 234*

Air carriers, Aircraft, Airports, Aliens.

*8 CFR Part 235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 236*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 237*

Aliens.

*8 CFR Part 238*

Administrative practice and procedure, Aliens.

*8 CFR Part 239*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 240*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 241*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 242*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 243*

Administrative practice and procedure, Aliens.

*8 CFR Part 244*

Administrative practice and procedure, Aliens.

*8 CFR Part 245*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 246*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 248*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 249*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 251*

Air carriers, Aliens, Maritime carriers, Reporting and recordkeeping requirements, Crewmen.

*8 CFR Part 252*

Air carriers, Airmen, Aliens, Maritime carriers, Reporting and recordkeeping requirements, Crewmen.

*8 CFR Part 253*

Air carriers, Airmen, Aliens, Maritime carriers, Reporting and recordkeeping requirements, Seamen.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

*8 CFR Part 286*

Air carriers, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 287*

Immigration, Law enforcement officers.

*8 CFR Part 299*

Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 316*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 318*

Citizenship and naturalization.

*8 CFR Part 329*

Citizenship and naturalization, Military personnel, Veterans.

Accordingly, chapter I of title 8 of the Code of Federal Regulations is proposed to be amended as follows:

## PART 1—DEFINITIONS

1. The authority citation for part 1 is revised to read as follows:

**Authority:** 8 U.S.C. 1101.

2. Section 1.1 is amended by revising paragraph (l), and by adding new paragraphs (q) and (r) to read as follows:

### § 1.1   Definitions.

\*     \*     \*     \*     \*

(l) The term *immigration judge* means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under section 240 of the Act. An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe, but shall not be employed by the Immigration and Naturalization Service.

\*     \*     \*     \*     \*

(q) The term *arriving alien* means an alien who seeks admission to or transit through the United States, as provided in 8 CFR part 235, at a port-of-entry, or an alien who is interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act.

(r) the term *respondent* means a person named in a Notice to Appear issued in accordance with section 239(a) of the Act, or in an Order to Show Cause issued in accordance with § 242.1 of this chapter as it existed prior to April 1, 1997.

## PART 3—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

3. The authority citation for part 3 continues to read as follows:

**Authority:** 5 U.S.C. 301; 8 U.S.C. 1103, 1252 note, 1252b, 1324b, 1362; 28 U.S.C. 509, 510, 1746; sec. 2, Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002.

4. Section 3.1 is amended by revising paragraphs (b)(1), (b)(2), (b)(3), (b)(7), (b)(9), and (b)(10) to read as follows:

### § 3.1   General authorities.

\*     \*     \*     \*     \*

(b) \* \* \*

(1) Decisions of Immigration Judges in exclusion cases, as provided in 8 CFR part 236, Subpart D.

(2) Decisions of Immigration Judges in deportation cases, as provided in 8 CFR part 240, Subpart E, except that no appeal shall lie from an order of an Immigration Judge under 8 CFR part 240, Subpart F, granting voluntary departure within a period of at least 30 days, if the sole ground of appeal is that

a greater period of departure time should have been fixed.

(3) Decisions of Immigration Judges in removal proceedings, as provided in 8 CFR part 240.

\*     \*     \*     \*     \*

(7) Determinations relating to bond, parole, or detention of an alien as provided in 8 CFR part 236, Subpart A and 8 CFR part 240, Subpart E.

\*     \*     \*     \*     \*

(9) Decisions of Immigration Judges in asylum proceedings pursuant to § 208.2(b) of this chapter.

(10) Decisions of Immigration Judges relating to Temporary Protected Status as provided in 8 CFR part 244.

\*     \*     \*     \*     \*

5. Section 3.2 is amended by:
a. Revising the section heading;
b. Revising paragraph (b)(2);
c. Revising paragraph (c)(2) and (c)(3), and by
d. Revising paragraphs (d) through (f), to read as follows:

### § 3.2   Reopening or reconsideration before the Board of Immigration Appeals.

\*     \*     \*     \*     \*

(b) \* \* \*

(2) A motion to reconsider a decision must be filed with the Board within 30 days after the mailing of the Board decision or on or before July 31, 1996, whichever is later. A party may file only one motion to reconsider any given decision and may not seek reconsideration of a decision denying a previous motion to reconsider. In removal proceedings pursuant to section 240 of the Act, an alien may file only one motion to reconsider a decision that the alien is removable from the United States.

(c) \* \* \*

(2) Except as provided in paragraph (c)(3) of this section, a party may file only one motion to reopen deportation or exclusion proceedings (whether before the Board or the Immigration Judge) and that motion must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened. Except as provided in paragraph (c)(3) of this section, an alien may file only one motion to reopen removal proceedings (whether before the Board or the Immigration Judge) and that motion must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened.

(3) In removal proceedings pursuant to section 240 of the Act, the time limitation set forth in paragraph (c)(2) of this section shall not apply to a motion to reopen filed pursuant to the

provisions of § 3.23(b)(4)(ii). The time and numerical limitations set forth in paragraph (c)(2) of this section shall not apply to a motion to reopen proceedings:

(i) Filed pursuant to the provisions of § 3.23(b)(4)(iii)(A)(*1*) or § 3.23(b)(4)(iii)(A)(*2*);

(ii) To apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing;

(iii) Agreed upon by all parties and jointly filed. Notwithstanding such agreement, the parties may contest the issues in a reopened proceeding; or

(iv) Filed by the Service in exclusion or deportation proceedings when the basis of the motion is fraud in the original proceeding or a crime that would support termination of asylum in accordance with § 208.22(f) of this chapter.

\*     \*     \*     \*     \*

(d) *Departure, deportation, or removal.* A motion to reopen or a motion to reconsider shall not be made by or on behalf of a person who is the subject of exclusion, deportation, or removal proceedings subsequent to his or her departure from the United States.

(e) *Judicial proceedings.* Motions to reopen or reconsider shall state whether the validity of the exclusion, deportation, or removal order has been or is the subject of any judicial proceeding and, if so, the nature and date thereof, the court in which such proceeding took place or is pending, and its result or status. In any case in which an exclusion, deportation, or removal order is in effect, any motion to reopen or reconsider such order shall include a statement by or on behalf of the moving party declaring whether the subject of the order is also the subject of any pending criminal proceeding under the Act, and, if so, the current status of the proceeding. If a motion to reopen or reconsider seeks discretionary relief, the motion shall include a statement by or on behalf of the moving party declaring whether the alien for whose relief the motion is being filed is subject to any pending criminal prosecution and, if so, the nature and current status of that prosecution.

(f) *Stay of deportation.* Except where a motion is filed pursuant to the provisions of §§ 3.23(b)(4)(ii) and 3.23(b)(4)(iii)(A), the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision

made in the case. Execution of such decision shall proceed unless a stay of execution is specifically granted by the Board, the Immigration Judge, or an authorized officer of the Service.

\*     \*     \*     \*     \*

## Subpart B—Immigration Court

b. In Part 3, the heading of Subpart B is revised as set forth above.

7. Section 3.9 is revised to read as follows:

### § 3.9   Chief Immigration Judge.

The Chief Immigration Judge shall be responsible for the general supervision, direction, and scheduling of the Immigration Judges in the conduct of the various programs assigned to them. The Chief Immigration Judge shall be assisted by Deputy Chief Immigration Judges and Assistant Chief Immigration Judges in the performance of his or her duties. These shall include, but are not limited to:

(a) Establishment of operational policies; and

(b) Evaluation of the performance of Immigration Courts, making appropriate reports and inspections, and taking corrective action where indicated.

8. Section 3.10 is revised to read as follows:

### § 3.10   Immigration Judges.

Immigration Judges, as defined in 8 CFR part 1, shall exercise the powers and duties in this chapter regarding the conduct of exclusion, deportation, removal, and asylum proceedings and such other proceedings which the Attorney General may assign them to conduct.

9. Section 3.11 is revised to read as follows:

### § 3.11   Administrative control Immigration Courts.

An administrative control Immigration Court is one that creates and maintains Records of Proceedings for Immigration Courts within an assigned geographical area. All documents and correspondence pertaining to a Record of Proceeding shall be filed with the Immigration Court having administrative control over that Record of Proceeding and shall not be filed with any other Immigration Court. A list of the administrative control Immigration Courts with their assigned geographical areas will be made available to the public at any Immigration Court.

## Subpart C—Immigration Court—Rules of Procedure

10. In part 3, the heading of Subpart C is revised as set forth above.

11. Section 3.12 is amended by revising the last sentence, and adding a new sentence at the end of the section, to read as follows:

### § 3.12   Scope of rules.

\* \* \* Except where specifically stated, these rules apply to matters before Immigration Judges, including, but not limited to, deportation, exclusion, removal, bond, rescission, departure control, and asylum proceedings. The sole procedures for review of credible fear determinations by Immigration Judges are provided for in § 3.42.

12. Section 3.13 is revised to read as follows:

### § 3.13   Definitions.

As used in this subpart:

*Administrative control* means custodial responsibility for the Record of Proceeding as specified in § 3.11.

*Charging document* means the written instrument which initiates a proceeding before an Immigration Judge. For proceedings initiated prior to April 1, 1997, these documents include an Order to Show Cause, a Notice to Applicant for Admission Detained for Hearing before Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien. For proceedings initiated after April 1, 1997, these documents include a Notice to Appear, a Notice of Referral to Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien.

*Filing* means the actual receipt of a document by the appropriate Immigration Court.

*Service* means physically presenting or mailing a document to the appropriate party or parties; except that an Order to Show Cause or Notice of Deportation Hearing shall be served in person to the alien, or by certified mail to the alien or the alien's attorney and a Notice to Appear or Notice of Removal Hearing shall be served to the alien in person, or if personal service is not practicable, shall be served by regular mail to the alien or the alien's attorney of record.

13. Section 3.14 is amended by:

a. Revising paragraph (a), and by

b. Adding a new paragraph (c) to read as follows:

### § 3.14   Jurisdiction and commencement of proceedings.

(a) Jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service. The charging document must include a certificate showing service on the

opposing party pursuant to § 3.32 which indicates the Immigration Court in which the charging document is filed. However, no charging document is required to be filed with the Immigration Court to commence bond proceedings pursuant to §§ 3.19, 236.1(d) and 240.2(b) of this chapter or credible fear determinations pursuant to § 208.30 of this chapter.

*      *      *      *      *

(c) Immigration Judges have jurisdiction to administer the oath of allegiance in administrative naturalization ceremonies conducted by the Service in accordance with § 337.2(b) of this chapter.

14. Section 3.15 is amended by:
a. Revising the section heading;
b. Amending paragraph (b) introductory text and paragraph (b)(6), by adding the phrase ''and Notice to Appear'' immediately after the phrase ''Order to Show Cause'';
c. Redesignating paragraph (c) as (d);
d. Adding a new paragraph (c); and by
e. Revising newly redesignated paragraph (d), to read as follows:

**§ 3.15  Contents of the order to show cause and notice to appear and notification of change of address.**

*      *      *      *      *

(c) *Contents of the Notice to Appear for Removal Proceedings.* In the Notice to Appear for removal proceedings, the Service shall provide the following administrative information to the Immigration Court. Failure to provide any of these items shall not be construed as affording the alien any substantive or procedural rights.

(1) The alien's names and any known aliases;
(2) The alien's address;
(3) The alien's registration number, with any lead alien registration number with which the alien is associated;
(4) The alien's alleged nationality and citizenship; and
(5) The language that the alien understands.

(d) *Address and telephone number.* (1) If the alien's address is not provided on the Order to Show Cause or Notice to Appear, of if the address on the Order to Show Cause or Notice to Appear is incorrect, the alien must provide to the Immigration Court where the charging document has been filed, within five days of service of that document, a written notice of an address and telephone number at which the alien can be contacted. The alien may satisfy this requirement by completing and filing Form EOIR–33.

(2) Within five days of any change of address, the alien must provide written notice of the change of address on Form

EOIR–33 to the Immigration Court where the charging document has been filed, or if venue has been changed, to the Immigration Court to which venue has been changed.

**§ 3.16  [Amended]**

15. Section 3.16(b) is amended by revising the term ''respondent/applicant'' to read ''alien''.

**§ 3.17  [Amended]**

16. Section 3.17(a) is amended in the first sentence by revising the term ''respondent/applicant'' to read ''alien'', and by revising the phrase ''the appropriate EOIR form'' to read ''Form EOIR–28''.

17. Section 3.18 is revised to read as follows:

**§ 3.18  Scheduling of cases.**

(a) The Immigration Court shall be responsible for scheduling cases and providing notice to the government and the alien of the time, place, and date of hearings.

(b) In removal proceedings pursuant to section 240 of the Act, the Service shall provide in the Notice to Appear, the time, place and date of the initial removal hearing, where practicable. If that information is not contained in the Notice to Appear, the Immigration Court shall be responsible for scheduling the initial removal hearing and providing notice to the government and the alien of the time, place, and date of hearing. In the case of any change or postponement in the time and place of such proceeding, the Immigration Court shall provide written notice to the alien specifying the new time and place of the proceeding and the consequences under section 240(b)(5) of the Act of failing, except under exceptional circumstances as defined in section 240(e)(1) of the Act, to attend such proceeding. No such notice shall be required for an alien not in detention if the alien has failed to provide the address required in section 239(a)(1)(F) of the Act.

**§ 3.19  [Amended]**

18. Section 3.19(a) is amended by revising the reference to ''part 242 of this chapter'' to read ''8 CFR part 236'' wherever it appears in the paragraph.

19. Section 3.19(d) is amended in the first sentence by adding the term ''or removal'' immediately after the word ''deportation''.

20. Section 3.19 is amended by removing paragraph (h).

21. In § 3.20, paragraph (a) is revised to read as follows:

**§ 3.20  Change of venue.**

(a) Venue shall lie at the Immigration Court where jurisdiction vests pursuant to § 3.14.

*      *      *      *      *

22. Section 3.23 is amended by revising the section heading and paragraph (b) to read as follows:

**§ 3.23  Reopening or Reconsideration before the Immigration Court.**

*      *      *      *      *

(b) *Before the Immigration Court.* (1) *In general.* An Immigration Judge may upon his or her own motion at any time, or upon motion of the Service or the alien, reopen or reconsider any case in which he or she has made a decision, unless jurisdiction is vested with the Board of Immigration Appeals. Subject to the exceptions in this paragraph and paragraph (b)(4) of this section, a party may file only one motion to reconsider and one motion to reopen proceedings. A motion to reconsider must be filed within 30 days of the date of entry of a final administrative order of removal, deportation, or exclusion. A motion to reopen must be filed within 90 days of the date of entry of a final administrative order of removal, deportation, or exclusion. A motion to reopen or to reconsider shall not be made by or on behalf of a person who is the subject of removal, deportation, or exclusion proceedings subsequent to his or her departure from the United States. The time and numerical limitations set forth in this paragraph do not apply to motions by the Service in removal proceedings pursuant to section 240 of the Act, or to motions by the Service in exclusion or deportation proceedings, when the basis of the motion is fraud in the original proceeding or a crime that would support termination of asylum in accordance with § 208.22(f) of this chapter.

(i) *Form and contents of the motion.* The motion shall be in writing and signed by the affected party or the attorney or representative of record, if any. The motion and any submission made in conjunction with it must be in English or accompanied by a certified English translation. Motions to reopen or reconsider shall state whether the validity of the exclusion, deportation, or removal order has been or is the subject of any judicial proceeding and, if so, the nature and date thereof, the court in which such proceeding took place or is pending, and its result or status. In any case in which an exclusion, deportation, or removal order is in effect, any motion to reopen or reconsider such order shall include a statement by or on behalf of the moving party declaring whether the subject of the order is also the subject

of any pending criminal proceeding under the Act, and, if so, the current status of that proceeding.

(ii) *Filing.* Motions to reopen or reconsider a decision of an Immigration Judge must be filed with the Immigration Court having administrative control over the Record of Proceeding. A motion to reopen or a motion to reconsider shall include a certificate showing service on the opposing party of the motion and all attachments. If the moving party, other than the Service, is represented, a Form EOIR–28, Notice of Appearance as Attorney or Representative Before an Immigration Judge must be filed with the motion. The motion must be filed in duplicate with the Immigration Court, accompanied by a fee receipt.

(iii) *Assignment to an Immigration Judge.* If the Immigration Judge is unavailable or unable to adjudicate the motion to reopen or reconsider, the Chief Immigration Judge or his or her delegate shall reassign such motion to another Immigration Judge.

(iv) *Replies to motions; decision.* The Immigration Judge may set and extend time limits for replies to motions to reopen or reconsider. A motion shall be deemed unopposed unless timely response is made. The decision to grant or deny a motion to reopen or a motion to reconsider is within the discretion of the Immigration Judge.

(v) *Stays.* Except in cases involving in absentia orders, the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision made in the case. Execution of such decision shall proceed unless a stay of execution is specifically granted by the Immigration Judge, the Board, or an authorized officer of the Service.

(2) *Motion to reconsider.* A motion to reconsider shall state the reasons for the motion by specifying the errors of fact or law in the Immigration Judge's prior decision and shall be supported by pertinent authority. Such motion may not seek reconsideration of a decision denying previous motion to reconsider.

(3) *Motion to reopen.* A motion to reopen proceedings shall state the new facts that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits and other evidentiary material. Any motion to reopen for the purpose of acting on an application for relief must be accompanied by the appropriate application for relief and all supporting documents. A motion to reopen will not be granted unless the Immigration Judge is satisfied that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing. A

motion to reopen for the purpose of providing the alien an opportunity to apply for any form of discretionary relief will not be granted if it appears that the alien's right to apply for such relief was fully explained to him or her by the Immigration Judge and an opportunity to apply therefore was afforded at the hearing, unless the relief is sought on the basis of circumstances that have arisen subsequent to the hearing. Pursuant to section 240A(d)(1) of the Act, a motion to reopen proceedings for consideration or further consideration of an application for relief under section 240A(a) (cancellation of removal for certain permanent residents) or 240A(b) (cancellation of removal and adjustment of status for certain nonpermanent residents) may be granted only if the alien demonstrates that he or she was statutorily eligible for such relief prior to the service of a notice top appear, or prior to the commission of an offense referred to in section 212(a)(2) of the Act that renders the alien inadmissible or removable under sections 237(a)(2) of the Act or (a)(4), whichever is earliest. The Immigration Judge has discretion to deny a motion to reopen even if the moving party has established a prima facie case for relief.

(4) *Exceptions to filing deadlines.*

(i) *Asylum.* The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply if the basis of the motion is to apply for relief under section 208 or 241(b)(3) of the Act and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding. The filing of a motion to reopen under this section shall not automatically stay the removal of the alien. However, the alien many request a stay and, if granted by the Immigration Judge, the alien shall not be removed pending disposition of the motion by the Immigration Judge. If the original asylum application was denied based upon a finding that it was frivolous, then the alien is ineligible to file either a motion to reopen or reconsider, or for a stay of removal.

(ii) *Order entered in absentia in removal proceedings.* An order of removal entered in absentia pursuant to section 240(b)(5) of the Act may be rescinded only upon a motion to reopen filed within 180 days after the date of the order of removal, if the alien demonstrates that the failure to appear was because of "exceptional circumstances" as defined in section

240(e)(1) of the Act. An order entered in absentia pursuant to section 240(b)(5) may be rescinded upon a motion to reopen filed at any time if the alien demonstrates that he or she did not receive notice in accordance with sections 239(a) (1) or (2) of the Act, or the alien demonstrates that he or she was in Federal or state custody and the failure to appear was through no fault of the alien. However, in accordance with section 240(b)(5)(B) of the Act, no written notice of a change in time or place of proceeding small be required if the alien has failed to provide the address required under section 239(a)(1)(F) of the Act. The filing of a motion to reopen under this section shall stay the removal of the alien pending disposition of the motion by the Immigration Judge. An alien may file only one motion pursuant to this paragraph.

(iii) *Order entered in absentia in deportation or exclusion proceedings.* (A) An order entered in absentia in deportation proceedings may be rescinded only a motion to reopen filed:

(*1*) Within 180 days after the date of the order of deportation if the alien demonstrates that the failure to appear was because of "exceptional circumstances" beyond the control of the alien (e.g., serious illness of the alien or serious illness or death of an immediate relative of the alien, but not including less compelling circumstances); or

(*2*) At any time if the alien demonstrates that he or she did not receive notice or if the alien demonstrates that he or she was in federal or state custody and the failure to appear was through no fault of the alien.

(B) A motion to reopen exclusion hearings on the basis that the Immigration Judge improperly entered an order of exclusion in absentia must be supported by evidence that the alien had reasonable cause for his failure to appear.

(C) The filing of a motion to reopen under paragraph (b)(4)(iii)(A) of this section shall stay the deportation of the alien pending decision on the motion and the adjudication of any properly filed administrative appeal.

(D) The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply to a motion to reopen filed pursuant to the provisions of paragraphs (b)(4)(iii)(A)(*1*) of this section.

(iv) *Jointly filed motions.* The time and numerical limitations set forth in subsection (b)(1) of this section shall not apply to a motion to reopen agreed upon by all parties and jointly filed.

23. Section 3.25 is revised to read as follows:

**§ 3.25   Form of the proceeding.**

(a) *Waiver of presence of the parties.* The Immigration Judge may, for good cause, and consistent with section 240(b) of the Act, waive the presence of the alien at a hearing when the alien is represented or when the alien is a minor child at least one of whose parents or whose legal guardian is present. When it is impracticable by reason of an alien's mental incompetency for the alien to be present, the presence of the alien may be waived provided that the alien is represented at the hearing by an attorney or legal representative, a near relative, legal guardian, or friend.

(b) *Stipulated request for order, wavier of hearing.* An Immigration Judge may enter an order of deportation, exclusion or removal stipulated to by the alien (or the alien's representative) and the Service. The Immigration Judge may enter such an order without a hearing and in the absence of the parties based on a review of the charging document, the written stipulation, and supporting documents, if any. If the alien is unrepresented, the Immigration Judge must determine that the alien's waiver is voluntary, knowing, and intelligent. The stipulated request and required waivers shall be signed on behalf of the government and by the alien and his or her attorney or representative, if any. The attorney or representative shall file a Notice of Appearance in accordance with § 3.16(b). A stipulated order shall constitute a conclusive determination of the alien's deportability or removability from the United States. The stipulation shall include:

(1) An admission that all factual allegations contained in the charging document are true and correct as written;

(2) A concession of deportability or inadmissibility as charged;

(3) A statement that the alien makes no application for relief under the Act;

(4) A designation of a country for deportation or removal under section 241(b)(2)(A)(i) of the Act;

(5) A concession to the introduction of the written stipulation of the alien as an exhibit to the Record of Proceeding;

(6) A statement that the alien understands the consequences of the stipulated request and that the alien enters the request voluntarily, knowingly, and intelligently;

(7) A statement that the alien will accept a written order for his or her deportation, exclusion or removal as a final disposition of the proceedings; and

(8) A waiver of appeal of the written order of deportation or removal.

(c) *Telephonic or video hearings.* An Immigration Judge may conduct hearings through video conference to the same extent as he or she may conduct hearings in person. An Immigration Judge may also conduct a hearing through a telephone conference, but an evidentiary hearing on the merits may only be conducted through a telephone conference with the consent of the alien involved after the alien has been advised of the right to proceed in person or, where available, through a video conference, except that credible fear determinations may be reviewed by the Immigration Judge through a telephone conference without the consent of the alien.

24. Section 3.26 is amended by revising paragraph (c) and adding a new paragraph (d) to read as follows:

**§ 3.26   In absentia hearings.**

\*      \*      \*      \*      \*

(c) In any removal proceeding before an Immigration Judge in which the alien fails to appear, the Immigration Judge shall order the alien removed *in absentia* if:

(1) The Service establishes by clear, unequivocal, and convincing evidence that the alien is removable; and

(2) The Service establishes by clear, unequivocal, and convincing evidence that written notice of the time and place of proceedings and written notice of the consequences of failure to appear were provided to the alien.

(d) Written notice to the alien shall be considered sufficient for purposes of this section if it was provided at the most recent address provided by the alien. If the respondent fails to provide his or her address as required under § 3.15(d), no written notice shall be required for an Immigration Judge to proceed with an *in absentia* hearing. This paragraph shall not apply in the event that the Immigration Judge waives the appearance of an alien under § 3.25.

25. Section 3.27 is amended by revising paragraph (c) to read as follows:

**§ 3.27   Public access to hearings.**

\*      \*      \*      \*      \*

(c) In any proceeding before an Immigration Judge concerning an abused alien spouse, the hearing and the Record of Proceeding shall be closed to the public unless the abused spouse agrees that the hearing and the Record of Proceeding shall be open to the public. In any proceeding before an Immigration Judge concerning an abused alien child, the hearing and the Record of Proceeding shall be closed to the public.

26. Section 3.30 is revised to read as follows:

**§ 3.30   Additional charges in deportation or removal hearings.**

At any time during deportation or removal proceedings, additional or substituted charges of deportability and/or factual allegations may be lodged by the Service in writing. The alien shall be served with a copy of these additional charges and/or allegations and the Immigration Judge shall read them to the alien. The Immigration Judge shall advise the alien, if he or she is not represented by counsel, that the alien may be so represented. The alien may be given a reasonable continuance to respond to the additional factual allegations and charges. Thereafter, the provision of § 240.10(b) of this chapter relating to pleading shall apply to the additional factual allegations and charges.

27. Section 3.35 is revised to read as follows:

**§ 3.35   Depositions and Subpoenas.**

(a) *Depositions.* If an Immigration Judge is satisfied that a witness is not reasonably available at the place of hearing and that said witness' testimony or other evidence is essential, the Immigration Judge may order the taking of deposition either at his or her own instance or upon application of a party. Such order shall designate the official by whom the deposition shall be taken, may prescribe and limit the content, scope, or manner of taking the deposition, and may direct the production of documentary evidence.

(b) *Subpoenas issued subsequent to commencement of proceedings.* (1) *General.* In any proceeding before an Immigration Judge, other than under 8 CFR part 335, the Immigration Judge shall have exclusive jurisdiction to issue subpoenas requiring the attendance of witnesses or for the production of books, papers and other documentary evidence, or both. An Immigration Judge may issue a subpoena upon his or her own volition or upon application of the Service or the alien.

(2) *Application for subpoena.* A party applying for a subpoena shall be required, as a condition precedent to its issuance, to state in writing or at the proceeding, what he or she expects to prove by such witnesses or documentary evidence, and to show affirmatively that he or she has made diligent effort, without success, to produce the same.

(3) *Issuance of subpoena.* Upon being satisfied that a witness will not appear and testify or produce documentary evidence and that the witness' evidence

Case 2:21-cv-00067-Z Document 61 Filed 06/22/21 Page 30 of 688 PageID 1687

is essential, the Immigration Judge shall issue a subpoena. The subpoena shall state the title of the proceeding and shall command the person to whom it is directed to attend and to give testimony at a time and place specified. The subpoena may also command the person to whom it is directed to produce the books, papers, or documents specified in the subpoena.

(4) *Appearance of witness.* If the witness is at a distance of more than 100 miles from the place of the proceeding, the subpoena shall provide for the witness' appearance at the Immigration Court nearest to the witness to respond to oral or written interrogatories, unless there is no objection by any party to the witness' appearance at the proceeding.

(5) *Service.* A subpoena issued under this section may be served by any person over 18 years of age not a party to the case.

(6) *Invoking aid of court.* If a witness neglects or refuses to appear and testify as directed by the subpoena served upon him or her in accordance with the provisions of this section, the Immigration Judge issuing the subpoena shall request the United States Attorney for the district in which the subpoena was issued to report such neglect or refusal to the United States District Court and to request such court to issue an order requiring the witness to appear and testify and to produce the books, papers or documents designated in the subpoena.

28. In Subpart C, a new § 3.42 is added to read as follows:

**§ 3.42   Review of credible fear determination.**

(a) *Referral.* Jurisdiction for an Immigration Judge to review an adverse credible fear finding by an asylum officer pursuant to section 235(b)(1)(B) of the Act shall commence with the filing by the Service to Form I–863, Notice of Referral to Immigration Judge. The Service shall also file with the notice of referral a copy of the written record of determination as defined in section 235(b)(1)(B)(iii)(II) of the Act, including a copy of the alien's written request for review, if any.

(b) *Record of proceeding.* The Immigration Court shall create a Record of Proceeding for a review of an adverse credible fear determination. This record shall be merged with any later proceeding pursuant to section 240 of the Act involving the same alien.

(c) *Procedures and evidence.* The Immigration Judge may receive into evidence any oral or written statement which is material and relevant to any issue in the review. The testimony of the alien shall be under oath or affirmation administered by the Immigration Judge. If an interpreter is necessary, one will be provided by the Immigration Court. The Immigration Judge shall determine whether the review shall be in person, or through telephonic or video connection (where available). The alien may consult with a person or persons of the alien's choosing prior to the review.

(d) *Standard of review.* The Immigration Judge shall make a de novo determination as to whether there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the Immigration Judge, that the alien could establish eligibility for asylum under section 208 of the Act.

(e) *Timing.* The Immigration Judge shall conclude the review to the maximum extent practicable within 24 hours, but in no case later than 7 days after the determination of the asylum officer.

(f) *Decision.* If an Immigration Judge determines that an alien has a credible fear of persecution, the Immigration Judge shall vacate the order entered pursuant to section 235(b)(1)(B)(iii)(I) of the Act. Subsequent to the order being vacated, the Service shall issue and file Form I–862, Notice to Appear, with the Immigration Court to commence removal proceedings. The alien shall have the opportunity to apply for asylum in the course of removal proceedings pursuant to section 240 of the Act. If an Immigration Judge determines that an alien does not have a credible fear of persecution, the Immigration Judge shall affirm the asylum officer's determination and remand the case to the Service for execution of the removal order entered pursuant to section 235(b)(1)(B)(iii)(I) of the Act. No appeal shall lie from a review of an adverse credible fear determination made by an Immigration Judge.

(g) *Custody.* An Immigration Judge shall have no authority to review an alien's custody status in the course of a review of an adverse credible fear determination made by the Service.

**PART 103—POWERS AND DUTIES OF SERVICE OFFICERS; AVAILABILITY OF SERVICE RECORDS**

29. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 552, 552(a); 8 U.S.C. 1101, 1103, 1201, 1252 note, 1252b, 1304, 1356; 31 U.S.C. 9701; E.O. 12356; 47 FR. 14874, 15557; 3 CFR, 1982 Comp. p. 166; 8 CFR part 2.

30. In § 1301, paragraph (g)(3)(ii) is revised to read as follows:

**§ 103.1   Delegations of authority.**

\* \* \* \* \*

(g) \* \* \*

(3) \* \* \*

(ii) *Asylum Officers.* Asylum officers constitute a professional corps of officers who serve under the supervision and direction of the Director of International Affairs and shall be specially trained as required in § 208.1(b) of this chapter. Asylum officers are delegated the authority to hear and adjudicate credible fear of persecution determinations under section 235(b)(1)(B) of the Act and applications for asylum and for withholding of removal, as provided under 8 CFR part 208.

\* \* \* \* \*

**§ 103.5   [Amended]**

31. Section 103.5 is amended by:

a. Removing paragraphs (a)(1)(iii)(B);

b. Redesignating paragraphs (a)(1)(iii) (C) through (F) as paragraphs (a)(1)(iii) (B) through (E), respectively; and

c. Removing paragraph (a)(5)(iii).

32. In § 103.5a, paragraph (c)(1) is revised to read as follows:

**§ 103.5a   Service of notification, decisions, and other papers by the Service.**

\* \* \* \* \*

(c) \* \* \*

(1) *Generally.* In any proceeding which is initiated by the Service, with proposed adverse effect, service of the initiating notice and of notice of any decision by a Service officer shall be accomplished by personal service, except as provided in section 239 of the Act.

\* \* \* \* \*

33. In § 103.6, paragraph (a) is revised to read as follows:

**§ 103.6   Surety bonds.**

(a) *Posting of surety bonds.*—(1) *Extension agreements; consent of surety; collateral security.* All surety bonds posted in immigration cases shall be executed on Form I–352, Immigration Bond, a copy of which, and any rider attached thereto, shall be furnished the obligor. A district director is authorized to approve a bond, a formal agreement to extension of liability of surety, a request for delivery of collateral security to a duly appointed and undischarged administrator or executor of the estate of a deceased depositor, and a power of attorney executed on Form I–312, Designation of Attorney in Fact. All other matters relating to bonds, including a power of attorney not

executed on Form I–312 and a request for delivery of collateral security to other than the depositor or his or her approved attorney in fact, shall be forwarded to the regional director for approval.

(2) *Bond riders.*—(i) *General.* Bond riders shall be prepared on Form I–351, Bond Riders, and attached to Form I–352. If a condition to be included in a bond is not on Form I–351, a rider containing the condition shall be executed.

\* \* \* \* \*

### § 103.7  [Amended]

34. Section 103.7(b)(1) is amended by removing the entry to "Form I–444".

## PART 204—IMMIGRANT PETITIONS

35. The authority citation for part 204 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1186a, 1255; 8 CFR part 2.

36. Section 204.2 is amended by:
a. Revising paragraph (a)(1)(iii) introductory text;
b. Removing paragraphs (a)(1)(iii) (A) through (C); and
c. Redesignating paragraphs (a)(1)(iii) (D) through (I) as paragraphs (a)(1)(iii) (A) through (F) respectively, to read as follows:

### § 204.2  Petitions for relatives, widows, and widowers, and abused spouses and children.

\* \* \* \* \*

(a) \* \* \*
(1) \* \* \*
(iii) *Marriage during proceedings—general prohibition against approval of visa petition.* A visa petition filed on behalf of an alien by a United States citizen or a lawful permanent resident spouse shall not be approved if the marriage creating the relationship occurred on or after November 10, 1986, and while the alien was in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto. Determination of commencement and termination of proceedings and exemptions shall be in accordance with § 245.1(c)(8) of this chapter.

\* \* \* \* \*

## PART 207—ADMISSION OF REFUGEES

37. The authority citation for part 207 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1157, 1159, 1182; 8 CFR part 2.

38. Section 207.1 is amended by removing paragraph (e), and by revising paragraph (a) to read as follows:

### § 207.1  Eligibility.

(a) *Filing jurisdiction.* Any alien who believes he or she is a refugee as defined in section 101(a)(42) of the Act, and is included in a refugee group identified in section 207(a) of the Act, may apply for admission to the United States by filing an application in accordance with § 207.2 with the Service office having jurisdiction over the area where the applicant is located. In those areas too distant from a Service office, the application may be filed at a designated United States consular office.

\* \* \* \* \*

39. Section 207.3 is revised to read as follows:

### § 207.3  Waivers of inadmissibility.

(a) *Authority.* Section 207(c)(3) of the Act sets forth grounds of inadmissibility under section 212(a) of the Act which are not applicable and those which may be waived in the case of an otherwise qualified refugee and the conditions under which such waivers may be approved. Officers in charge of overseas offices are delegated authority to initiate the necessary investigations to establish the facts in each waiver application pending before them and to approve or deny such waivers.

(b) *Filing requirements.* The applicant for a waiver must submit Form I–602, Application by Refugee for Waiver of Grounds of Inadmissibility, with the Service office processing his or her case. The burden is on the applicant to show that the waiver should be granted based upon humanitarian grounds, family unity, or the public interest. The applicant shall be notified in writing of the decision, including the reasons for denial, if the application is denied. There is no appeal from such decision.

### § 207.8  [Amended]

40. Section 207.8 is amended in the last sentence by revising the reference to "sections 235, 236, and 237" to read "sections 235, 240, and 241".

41. Part 208 is revised to read as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

### Subpart A—Asylum and Withholding of Removal

Sec.
208.1   General.
208.2   Jurisdiction.
208.3   Form of application.
208.4   Filing the application.
208.5   Special duties toward aliens in custody of the Service.
208.6   Disclosure to third parties.
208.7   Employment authorization.
208.8   Limitations on travel outside the United States.
208.9   Procedure for interview before an asylum officer.
208.10   Failure to appear at an interview before an asylum officer.
208.11   Comments from the Department of State.
208.12   Reliance on information compiled by other sources.
208.13   Establishing asylum eligibility.
208.14   Approval, denial, or referral of application.
208.15   Definition of "firm resettlement."
208.16   Withholding of removal.
208.17   Decisions.
208.18   Determining if an asylum application is frivolous.
208.19   [Reserved]
208.20   Effect on exclusion, deportation, and removal proceedings.
208.21   Restoration of status.
208.22   Termination of asylum or withholding or removal or deportation.
208.23–29   [Reserved]

### Subpart B—Credible Fear of Persecution

208.30   Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

**Authority:** 8 U.S.C. 1103, 1158, 1226, 1252, 1282; 8 CFR part 2.

## Subpart A—Asylum and Withholding of Removal

### § 208.1  General.

(a) *Applicability.* Unless otherwise provided herein, this subpart shall apply to all applications for asylum under section 208 of the Act or for withholding of deportation or withholding of removal under section 241(b)(3) of the Act, whether before an asylum officer or an immigration judge, regardless of the date of filing. For purposes of this chapter, withholding of removal shall also mean withholding of deportation under section 243(h) of the Act, as it appeared prior to April 1, 1997, except as provided in § 208.16(c) of this chapter. Such applications are hereinafter referred to generically as asylum applications. The provisions of this part shall not affect the finality or validity of any decision made by a district director, an immigration judge, or the Board of Immigration Appeals in any such case prior to April 1, 1997. No asylum application that was filed with a district director, asylum officer or immigration judge prior to April 1, 1997, may be reopened or otherwise reconsidered under the provisions of this part except by motion granted in the exercise of discretion by the Board of Immigration Appeals, an immigration judge, or an asylum officer for proper cause shown. Motions to reopen or reconsider must meet the requirements of sections 240(c)(5) and (c)(6) of the Act, and 8 CFR parts 3 and 103, where

applicable. The provisions of this part relating to a person convicted of an aggravated felony, as defined in section 101(a)(43) of the Act, shall apply to asylum applications that are filed on or after November 29, 1990.

(b) *Training of asylum officers.* The Director of International Affairs shall ensure that asylum officers receive special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles. The Director of International Affairs shall also, in cooperation with the Department of State and other appropriate sources, compile and disseminate to asylum officers information concerning the persecution of persons in other countries on account of race, religion, nationality, membership in a particular social group, or political opinion, as well as other information relevant to asylum determinations, and shall maintain a documentation center with information on human rights conditions.

## § 208.2  Jurisdiction.

(a) *Office of International Affairs.* Except as provided in paragraph (b) of this section, the Office of International Affairs shall have initial jurisdiction over an asylum application filed by, or a credible fear determination pertaining to, an alien physically present in the United States or seeking admission at a port-of-entry. An application that is complete within the meaning of § 208.3(c)(3) shall be either adjudicated or referred by asylum officers under this part in accordance with § 208.14. An application that is incomplete within the meaning of § 208.3(c)(3) shall be returned to the applicant. Except as provided in § 208.16(a), an asylum officer shall not decide whether an alien is entitled to withholding of removal under section 241(b)(3) of the Act.

(b) *Immigration Court.* (1) *Certain aliens not entitled to proceedings under section 240 of the Act.* After Form I–863, Notice of Referral to Immigration Judge, has been filed with the Immigration Court, an immigration judge shall have exclusive jurisdiction over any asylum application filed on or after April 1, 1997, by:

(i) An alien crewman who:

(A) Is an applicant for a landing permit;

(B) Has been refused permission to land under section 252 of the Act; or

(C) Has been granted permission to land under section 252 of the Act, regardless of whether the alien has remained in the United States longer than authorized;

(ii) An alien stowaway who has been found to have a credible fear of persecution pursuant to the procedure set forth in Subpart B of this part;

(iii) An alien who is an applicant for admission pursuant to the Visa Waiver Pilot Program under section 217 of the Act;

(iv) An alien who was admitted to the United States pursuant to the Visa Waiver Pilot Program under section 217 of the Act and has remained longer than authorized or has otherwise violated his or her immigration status;

(v) An alien who has been ordered removed under section 235(c) of the Act; or

(vi) An alien who is an applicant for admission, or has been admitted, as an alien classified under section 101(a)(15)(S) of the Act.

(2) *Rules of procedure.* Proceeding falling under the jurisdiction of the immigration judge pursuant to paragraph (b)(1) of this section shall be conducted in accordance with the same rules of procedure as proceedings conducted under 8 CFR part 240, except the scope of review shall be limited to a determination of whether the alien is eligible for asylum or withholding of removal and whether asylum shall be granted in the exercise of discretion. During such proceeding all parties are prohibited from raising or considering any other issues, including but not limited to issues of admissibility, removability, eligibility for waivers, and eligibility for any form of relief other than asylum or withholding of removal.

(3) *other aliens.* Immigration judges shall have exclusive jurisdiction over asylum applications filed by an alien who has been served Form I–221, Order to Show Cause; Form I–122, Notice to Applicant for Admission Detained for a Hearing before an Immigration Judge; or Form I–862, Notice to Appear, after a copy of the charging document has been filed with the Immigration Court. Immigration judges shall also have jurisdiction over any asylum applications filed prior to April 1, 1997, by alien crew members who have remained in the United States longer than authorized, by applicants for admission under the Visa Waiver Pilot Program, and by aliens who have been admitted to the United States under the Visa Waiver Pilot Program.

## § 208.3  Form of application.

(a) An asylum applicant must file, in triplicate, Form I–589 together with any additional supporting material. The applicant's spouse and children may be listed on the application and may be included in the request for asylum if they are in the United States. One

additional copy of the principal applicant's Form I–589 must be submitted for each dependent included in the principal's application. An application shall be accompanied by one completed fingerprint card, Form FD–258, for every individual included in the application who is 14 years of age or older. The application also shall be accompanied by two photographs of the applicant and of each dependent included in the application.

(b) An asylum application shall be deemed to constitute at the same time an application for withholding of removal, unless adjudicated in deportation or exclusion proceedings commenced prior to April 1, 1997. In such instances, the asylum application shall be deemed to constitute an application for withholding of deportation under section 243(h) of the Act, as that section existed prior to its amendment by Pub. L. 104–208.

(c) Form I–589 shall be filed under the following conditions and shall have the following consequences:

(1) Information provided on the application may be used as a basis for the institution of or as evidence in removal proceedings, and in deportation and exclusion proceedings where the application has been filed on or after January 4, 1995, as well as to satisfy the Service's burden of proof in such proceedings;

(2) The applicant and anyone other than a spouse, parent, son, or daughter of the applicant who assists the applicant in preparing the application must sign the application under penalty of perjury. The applicant's signature is evidence that the applicant is a aware of the contents of the application. A person other than a relative specified in this paragraph who assists the applicant in preparing the application also must provide his or her full mailing address;

(3) An asylum application that does not include a response to each of the questions contained in the Form I–589, is unsigned, or is unaccompanied by the required materials specified in paragraph (a) of this section is incomplete. The filling of an incomplete application shall not commence the 150-day period after which the applicant may file an application for employment authorization in accordance with § 208.7. An application that is incomplete shall be retuned by mail to the applicant within 30 days of the receipt of the application by the Service. If the Service has not mailed the incomplete application back to the applicant within 30 days, it shall be deemed complete;

(4) Knowing placement of false information on the application may

subject the person placing that information on the application to criminal penalties under title 18 of the United States Code and to civil penalties under section 274C of the Act; and

(5) Knowing filing of a frivolous application on or after April 1, 1997, so long as the applicant has received the notice required by section 208(d)(4) of the Act, shall render the applicant permanently ineligible for any benefits under the Act pursuant to § 208.18.

### § 208.4  Filing the application.

Except as prohibited in paragraph (a) of this section, asylum applications shall be filed in accordance with paragraph (b) of this section.

(a) *Prohibitions on filing.* Section 208(a)(2) of the Act prohibits certain aliens from filing for asylum on or after April 1, 1997, unless the alien can demonstrate that the exceptions in section 208(a)(2)(D) of the Act apply. For the purpose of making determinations under section 208(a)(2) of the Act, the following rules shall apply:

(1) For the purpose of section 208(a)(2)(C) of the Act, an asylum application has not been denied unless denied by an immigration judge or the Board of Immigration Appeals;

(2) The term "changed circumstances" in section 208(a)(2)(D) of the Act shall refer to circumstances materially affecting the applicant's eligibility for asylum that have arisen:

(i) For the purpose of section 208(a)(2)(C) of the Act, since the denial of the last asylum application by the alien. Changed circumstances arising after the denial of the application but before the alien's departure or removal from the United States shall only be considered as part of a motion to reopen under section 240(c)(6) of the Act and §§ 3.2, 3.23 and 103.5 of this chapter; or

(ii) For the purpose of section 208(a)(2)(B) of the Act, since the 1-year period has expired; and

(3) The term "extraordinary circumstances" in section 208(a)(2)(D) of the Act shall refer to events or factors beyond the alien's control that caused the failure to meet the 1-year deadline. Such circumstances shall excuse the failure to file within the 1-year period so long as the alien filed the application as soon after the deadline as practicable given those circumstances.

(b) *Filing location.* (1) *With the service center by mail.* Except as provided in paragraphs (b)(2), (b)(3), (b)(4) and (b)(5) of this section, asylum applications shall be filed directly by mail with the service center servicing the asylum office with jurisdiction over the place of the applicant's residence or, in the case of an alien without a United States residence, the applicant's current lodging or the land border port-of-entry through which the alien seeks admission to the United States.

(2) *With the asylum office.* Asylum applications shall be filed directly with the asylum office having jurisdiction over the matter in the case of an alien who has received the express consent of the Director of Asylum to do so.

(3) *With the immigration judge.* Aslyum applications shall be filed directly with the Immigration Court having jurisdiction over the case in the following circumstances:

(i) During exclusion, deportation, or removal proceedings, with the Immigration Court having jurisdiction over the port, district office, or sector after service and filing of the appropriate charging document.

(ii) After completion of exclusion, deportation, or removal proceedings, and in conjunction with a motion to reopen pursuant to 8 CFR part 3 where applicable, with the Immigration Court having jurisdiction over the prior proceeding. Any such motion must reasonably explain the failure to request asylum prior to the completion of the proceedings

(iii) In asylum proceedings pursuant to § 208.2(b)(1) and after the Notice of Referral to Immigration Judge has been served on the alien and filed with the Immigration Court having jurisdiction over the case.

(4) *With the Board of Immigration Appeals.* In conjunction with a motion to remand or reopen pursuant to §§ 3.2 and 3.8 of this chapter where applicable, an initial asylum application shall be filed with the Board of Immigration Appeals if jurisdiction over the proceedings is vested in the Board of Immigration Appeals under 8 CFR part 3. Any such motion must reasonably explain the failure to request asylum prior to the completion of the proceedings.

(5) *With the district director.* In the case of any alien described in § 208.2(b)(1) and prior to the service on the alien of Form I–863, any asylum application shall be submitted to the district director having jurisdiction pursuant to 8 CFR part 103. The district director shall forward such asylum application to the appropriate Immigration Court with the Form I–863 being filed with that Immigration Court.

(c) *Amending an application after filing.* Upon request of the alien and as a matter of discretion, the asylum officer or immigration judge having jurisdiction may permit an asylum applicant to amend or supplement the application, but any delay caused by such request shall extend the period within which the application may not apply for employment authorization in accordance with § 208.7(a).

### § 208.5  Special duties toward aliens in custody of the Service.

(a) *General.* When an alien in the custody of the Service requests asylum or withholding of removal or expresses a fear of persecution or harm upon return to his or her country of origin or to agents thereof, the Service shall make available the appropriate application forms and shall provide the applicant with the information required by section 208(d)(4) of the Act, except in the case of an alien who is in custody pending a credible fear of persecution determination under section 235(b)(1)(B) of the Act. Where possible, expedited consideration shall be given to applications of detained aliens. Except as provided in paragraph (c) of this section, such alien shall not be excluded, deported, or removed before a decision is rendered on his or her asylum application.

(b) *Certain aliens aboard vessels.* (1) If an alien crewman or alien stowaway on board a vessel or other conveyance alleges, claims, or otherwise makes known to an immigration inspector or other official making an examination on the conveyance that he or she is unable or unwilling to return to his or her country of nationality or last habitual residence (if not a national of any country) because of persecution or a fear of persecution in that country on account of race, religion, nationality, membership in a particular social group, or political opinion, the alien shall be promptly removed from the conveyance. If the alien makes such fear known to an official while off such conveyance, the alien shall not be returned to the conveyance but shall be retained in or transferred to the custody of the Service.

(i) An alien stowaway will be referred to an asylum officer for a credible fear determination under § 208.30.

(ii) An alien crewman shall be provided the appropriate applications forms and information required by section 208(d)(4) of the Act and may then have 10 days within which to submit an asylum application to the district director having jurisdiction over the port of entry. The district director, pursuant to § 208.4(b), shall serve Form I–863 on the alien and immediately forward any such application to the appropriate Immigration Court with a copy of the Form I–863 being filed with that court.

(2) Pending adjudication of the application, and, in the case of a

stowaway the credible fear determination and any review thereof, the alien may be detained by the Service or otherwise paroled in accordance with § 212.5 of this chapter. However, pending the credible fear determination, parole of an alien stowaway may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

(c) *Exception to prohibition on removal.* A motion to reopen or an order to remand accompanied by an asylum application pursuant to § 208.4(b)(3)(iii) shall not stay execution of a final exclusion, deportation, or removal order unless such stay is specifically granted by the Board of Immigration Appeals or the immigration judge having jurisdiction over the motion.

### § 208.6   Disclosure to third parties.

(a) Information contained in or pertaining to any asylum application shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Attorney General.

(b) The confidentiality of other records kept by the Service that indicate that a specific alien has applied for asylum shall also be protected from disclosure. The Service will coordinate with the Department of State to ensure that the confidentiality of these records is maintained if they are transmitted to Department of State offices in other countries.

(c) This section shall not apply to any disclosure to:

(1) Any United States Government official or contractor having a need to examine information in connection with:

(i) The adjudication of asylum applications;

(ii) The defense of any legal action arising from the adjudication of or failure to adjudicate the asylum application;

(iii) The defense of any legal action of which the asylum application is a part; or

(iv) Any United States Government investigation concerning any criminal or civil matter; or

(2) Any Federal, state, or local court in the United States considering any legal action:

(i) Arising from the adjudication of or failure to adjudicate the asylum application; or

(ii) Arising from the proceedings of which the asylum application is a part.

### § 208.7   Employment authorization.

(a) *Application and approval.* (1) Subject to the restrictions contained in sections 236(a) and 208(d) of the Act, an applicant for asylum who is not an aggravated felon shall be eligible pursuant to §§ 274a.12(c)(8) and 274a.13(a) of this chapter to submit a Form I–765, Application for Employment Authorization. The application shall be submitted no earlier than 150 days after the date on which a complete asylum application submitted in accordance with §§ 208.3 and 208.4 has been received. If an asylum application has been returned as incomplete in accordance with § 208.3(c)(3), the 150-day period will commence upon receipt by the Service of a complete asylum application. An applicant whose asylum application has been denied by an asylum officer or by an immigration judge within the 150-day period shall not be eligible to apply for employment authorization. If an asylum application is denied prior to a decision on the application for employment authorization, the application for employment authorization shall be denied. If the asylum application is not so denied, the Service shall have 30 days from the date of filing of the Form I–765 to grant or deny that application, except that no employment authorization shall be issued to an asylum applicant prior to the expiration of the 180-day period following the filing of the asylum application filed on or after April 1, 1997.

(2) Employment authorization pursuant to § 274a.12(c)(8) of this chapter may not be granted to an alien who fails to appear for a scheduled interview before an asylum officer or a hearing before an immigration judge, unless the applicant demonstrates that the failure to appear was the result of exceptional circumstances.

(3) The time periods within which the alien may not apply for employment authorization and within which the Service must respond to any such application and within which the asylum application must be adjudicated pursuant to section 208(d)(5)(A)(iii) of the Act shall begin when the alien has filed a complete asylum application in accordance with §§ 208.3 and 208.4. Any delay requested or caused by the applicant shall not be counted as part of these time periods. Such time periods also shall be extended by the equivalent of the time between issuance of a request for evidence under § 103.2(b)(8) of this chapter and the receipt of the applicant's response to such request.

(4) The provisions of paragraphs (a) (1) through (3) of this section apply to

applications for asylum filed on or after January 4, 1995.

(b) *Renewal and termination.* Employment authorization shall be renewable, in increments to be determined by the Commissioner, for the continuous period of time necessary for the asylum officer or immigration judge to decide the asylum application and, if necessary, for completion of any administrative or judicial review.

(1) If the asylum application is denied by the asylum officer, the employment authorization shall terminate at the expiration of the employment authorization document or 60 days after the denial of asylum, whichever is longer.

(2) If the application is denied by the immigration judge, the Board of Immigration Appeals, or a Federal court, the employment authorization terminates upon the expiration of the employment authorization document, unless the applicant has filed an appropriate request for administrative or judicial review.

(c) *Supporting evidence for renewal of employment authorization.* In order for employment authorization to be renewed under this section, the alien must provide the Service (in accordance with the instructions on or attached to the employment authorization application) with a Form I–765, the required fee (unless waived in accordance with § 103.7(c) of this chapter), and (if applicable) proof that he or she has continued to pursue his or her asylum application before an immigration judge or sought administrative or judicial review. For purposes of employment authorization, pursuit of an asylum application is established by presenting to the Service one of the following, depending on the stage of the alien's immigration proceedings:

(1) If the alien's case is pending in proceedings before the immigration judge, and the alien wishes to continue to pursue his or her asylum application, a copy of any asylum denial, referral notice, or charging document placing the alien in such proceedings;

(2) If the immigration judge has denied asylum, a copy of the document issued by the Board of Immigration Appeals to show that a timely appeal has been filed from a denial of the asylum application by the immigration judge; or

(3) If the Board of Immigration Appeals has dismissed the alien's appeal of a denial of asylum, or sustained an appeal by the Service of a grant of asylum, a copy of the petition for judicial review or for habeas corpus

pursuant to section 242 of the Act, date stamped by the appropriate court.

(d) In order for employment authorization to be renewed before its expiration, the application for renewal must be received by the Service 90 days prior to expiration of the employment authorization.

### § 208.8   Limitations on travel outside the United States.

(a) An applicant who leaves the United States without first obtaining advance parole under § 212.5(e) of this chapter shall be presumed to have abandoned his or her application under this section.

(b) An applicant who leaves the United States pursuant to advance parole under § 212.5(e) of this chapter and returns to the country of claimed persecution shall be presumed to have abandoned his or her application, unless the applicant is able to establish compelling reasons for such return.

### § 208.9   Procedure for interview before an asylum officer.

(a) The Service shall adjudicate the claim of each asylum applicant whose application is complete within the meaning of § 208.3(c)(3) and is within the jurisdiction of the Service.

(b) The asylum officer shall conduct the interview in a nonadversarial manner and, except at the request of the applicant, separate and apart from the general public. The purpose of the interview shall be to elicit all relevant and useful information bearing on the applicant's eligibility for asylum. At the time of the interview, the applicant must provide complete information regarding his or her identity, including name, date and place of birth, and nationality, and may be required to register this identity electronically or through any other means designated by the Attorney General. The applicant may have counsel or a representative present, may present witnesses, and may submit affidavits of witnesses and other evidence.

(c) The asylum officer shall have authority to administer oaths, verify the identity of the applicant (including through the use of electronic means), verify the identity of any interpreter, present and receive evidence, and question the applicant and any witnesses.

(d) Upon completion of the interview, the applicant or the applicant's representative shall have an opportunity to make a statement or comment on the evidence presented. The asylum officer may, in his or her discretion, limit the length of such statement or comment and may require their submission in

writing. Upon completion of the interview, the applicant shall be informed that he or she must appear in person to receive and to acknowledge receipt of the decision of the asylum officer and any other accompanying material at a time and place designated by the asylum officer, except as otherwise provided by the asylum officer. An applicant's failure to appear to receive and acknowledge receipt of the decision shall be treated as delay caused by the applicant for purposes of § 208.7(a)(3) and shall extend the period within which the applicant may not apply for employment authorization by the number of days until the applicant does appear to receive and acknowledge receipt of the decision or until the applicant appears before an immigration judge in response to the issuance of a charging document under § 208.14(b).

(e) The asylum officer shall consider evidence submitted by the applicant together with his or her asylum application, as well as any evidence submitted by the applicant before or at the interview. As a matter of discretion, the asylum officer may grant the applicant a brief extension of time following an interview during which the applicant may submit additional evidence. Any such extension shall extend by an equivalent time the periods specified by § 208.7 for the filing and adjudication of any employment authorization application.

(f) The asylum application, all supporting information provided by the applicant, any comments submitted by the Department of State or by the Service, and any other information specific to the applicant's case and considered by the asylum officer shall comprise the record.

(g) An applicant unable to proceed with the interview in English must provide, at no expense to the Service, a competent interpreter fluent in both English and the applicant's native language. The interpreter must be at least 18 years of age. Neither the applicant's attorney or representative of record, a witness testifying on the applicant's behalf, nor a representative or employee of the applicant's country of nationality, or if stateless, country of last habitual residence, may serve as the applicant's interpreter. Failure without good cause to comply with this paragraph may be considered a failure without good cause to appear for the interview for purposes of § 208.10.

### § 208.10   Failure to appear at an interview before an asylum officer.

Failure to appear for a scheduled interview without prior authorization may result in dismissal of the

application, waiver of the right to an interview, or denial of any application for an employment authorization document. Failure to appear shall be excused if the notice of the interview was not mailed to the applicant's current address and such address had been provided to the Office of International Affairs by the applicant prior to the date of mailing in accordance with section 265 of the Act and regulations promulgated thereunder, unless the asylum officer determines that the applicant received reasonable notice of the interview. Failure to appear will be excused if the applicant demonstrates that such failure was the result of exceptional circumstances.

### § 208.11   Comments from the Department of State.

(a) The Service shall forward to the Department of State a copy of each completed application it receives. At its option, the Department of State may provide detailed country conditions information relevant to eligibility for asylum or withholding of removal.

(b) At its option, the Department of State may also provide:

(1) An assessment of the accuracy of the applicant's assertions about conditions in his or her country of nationality or habitual residence and his or her particular situation;

(2) Information about whether persons who are similarly situated to the applicant are persecuted in his or her country of nationality or habitual residence and the frequency of such persecution; or

(3) Such other information as it deems relevant.

(c) Asylum officers and immigration judges may request specific comments from the Department of State regarding individual cases or types of claims under consideration, or such other information as they deem appropriate.

(d) Any such comments received pursuant to paragraphs (b) and (c) of this section shall be made part of the record. Unless the comments are classified under the applicable Executive Order, the applicant shall be provided an opportunity to review and respond to such comments prior to the issuance of any decision to deny the application.

### § 208.12   Reliance on information compiled by other sources.

(a) In deciding an asylum application, or whether the alien has a credible fear of persecution pursuant to section 235(b)(1)(B) of the Act, the asylum officer may rely on material provided by the Department of State, the Office of

International Affairs, other Service offices, or other credible sources, such as international organizations, private voluntary agencies, news organizations, or academic institutions.

(b) Nothing in this part shall be construed to entitle the applicant to conduct discovery directed toward the records, officers, agents, or employees of the Service, the Department of Justice, or the Department of State.

### § 208.13  Establishing asylum eligibility.

(a) *Burden of proof.* The burden of proof is on the applicant for asylum to establish that he or she is a refugee as defined in section 101(a)(42) of the Act. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. The fact that the applicant previously established a credible fear of persecution for purposes of section 235(b)(1)(B) of the Act does not relieve the alien of the additional burden of establishing eligibility for asylum.

(b) *Persecution.* The applicant may qualify as a refugee either because he or she has suffered actual past persecution or because he or she has a well-founded fear of future persecution.

(1) *Past persecution.* An applicant shall be found to be a refugee on the basis of past persecution if he or she can establish that he or she has suffered persecution in the past in his or her country of nationality or last habitual residence on account of race, religion, nationality, membership in a particular social group, or political opinion, and that he or she is unable or unwilling to return to or avail himself or herself of the protection of that country owing to such persecution.

(i) If it is determined that the applicant has established past persecution, he or she shall be presumed also to have a well-founded fear of persecution unless a preponderance of the evidence establishes that since the time the persecution occurred conditions in the applicant's country of nationality or last habitual residence have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return.

(ii) An application for asylum shall be denied if the applicant establishes past persecution under this paragraph but it is also determined that he or she does not have a well-founded fear of future persecution under paragraph (b)(2) of this section, unless it is determined that the applicant has demonstrated compelling reasons for being unwilling to return to his or her country of nationality or last habitual residence arising out of the severity of the past

persecution. If the applicant demonstrates such compelling reasons, he or she may be granted asylum unless such a grant is barred by paragraph (c) of this section.

(2) *Well-founded fear of persecution.* An applicant shall be found to have a well-founded fear of persecution if he or she can establish first, that he or she has a fear of persecution in his or her country of nationality or last habitual residence on account of race, religion, nationality, membership in a particular social group, or political opinion; second, that there is a reasonable possibility of actually suffering such persecution if he or she were to return to that country; and third, that he or she is unable or unwilling to return to or avail himself or herself of the protection of that country because of such fear. In evaluating whether the applicant has sustained his or her burden of proving that he or she has a well-founded fear of persecution, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for persecution if:

(i) The applicant establishes that there is a pattern or practice in his or her country of nationality or last habitual residence of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that his or her fear of persecution upon return is reasonable.

(c) *Mandatory denials.* (1) *Applications filed on or after April 1, 1997.* For applications filed on or after April 1, 1997, an applicant shall not qualify for asylum if section 208(a)(2) or 208(b)(2) of the Act applies to the applicant. If the evidence indicates that the applicant may be ineligible under section 208(a)(2) of the Act to apply for asylum, or under section 208(b)(2) of the Act to be granted asylum, the applicant shall have the burden of proving by a preponderance of the evidence, or in the case of an alien described in section 208(a)(2)(B) of the Act by clear and convincing evidence, that he or she is eligible.

(2) *Applications filed before April 1, 1997.* An immigration judge or asylum officer shall not grant asylum to any applicant who filed his or her application before April 1, 1997, if the alien:

(i) Having been convicted by a final judgment of a particularly serious crime in the United States, constitutes a danger to the community;

(ii) Has been firmly resettled within the meaning of § 208.15;

(iii) Can reasonably be regarded as a danger to the security of the United States;

(iv) Has been convicted of an aggravated felony, as defined in section 101(a)(43) of the Act; or

(v) Ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion. If the evidence indicates that one of the above grounds apply to the applicant, he or she shall have the burden of proving by a preponderance of the evidence that he or she did not so act.

(d) *Discretionary denial.* An asylum application may be denied in the discretion of the Attorney General if the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution.

### § 208.14  Approval, denial, or referral of application.

(a) *By an immigration judge.* Unless otherwise prohibited in § 208.13(c), an immigration judge may grant or deny asylum in the exercise of discretion to an applicant who qualifies as a refugee under section 101(a)(42) of the Act.

(b) *By an asylum officer.* Unless otherwise prohibited in § 208.13(c):

(1) An asylum officer may grant asylum in the exercise of discretion to an applicant who qualifies as a refugee under section 101(a)(42) of the Act.

(2) If the alien appears to be deportable, excludable or removable under section 240 of the Act, the asylum officer shall either grant asylum or refer the application to an immigration judge for adjudication in deportation, exclusion, or removal proceedings. An asylum officer may refer such an application after an interview conducted in accordance with § 208.9 or if, in accordance with § 208.10, the applicant is deemed to have waived his or her right to an interview.

(3) If the applicant is maintaining valid nonimmigrant status at the time the application is decided, the asylum officer may grant or deny asylum, except in the case of an applicant described in § 208.2(b)(1).

(c) *Applicability of § 103.2(b) of this chapter.* No application for asylum or withholding of deportation shall be subject to denial pursuant to § 103.2(b) of this chapter.

(d) *Duration.* If the alien's asylum application is granted, the grant will be effective for an indefinite period, subject to termination as provided in § 208.22.

## § 208.15  Definition of "firm resettlement."

An alien is considered to be firmly resettled if, prior to arrival in the United States, he entered into another nation with, or while in that nation received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he establishes:

(a) That his entry into that nation was a necessary consequence of his flight from persecution, that he remained in that nation only as long as was necessary to arrange onward travel, and that he did not establish significant ties in that nation; or

(b) That the conditions of his residence in that nation were so substantially and consciously restricted by the authority of the country of refuge that he was not in fact resettled. In making his determination, the Asylum Officer or Immigration Judge shall consider the conditions under which other residents of the country live, the type of housing made available to the refugee, whether permanent or temporary, the types and extent of employment available to the refugee, and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation including a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

## § 208.16  Withholding of removal.

(a) *Consideration of application for withholding of removal.* An asylum officer shall not decide whether the exclusion, deportation, or removal of an alien to a country where the alien's life or freedom would be threatened must be withheld, except in the case of an alien who is otherwise eligible for asylum but is precluded from being granted such status due solely to section 207(a)(5) of the Act. In exclusion, deportation, or removal proceedings, an immigration judge may adjudicate both an asylum claim and a request for withholding of removal whether or not asylum is granted.

(b) *Eligibility for withholding of removal; burden of proof.* The burden of proof is on the applicant for withholding of removal to establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. The evidence shall be evaluated as follows:

(1) The applicant's life or freedom shall be found to be threatened if it is more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion.

(2) If the applicant is determined to have suffered persecution in the past such that his or her life or freedom was threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that his or her life or freedom would be threatened on return to that country unless a preponderance of the evidence establishes that conditions in the country have changed to such an extent that it is no longer more likely than not that the applicant would be so persecuted there.

(3) In evaluating whether the applicant has sustained the burden of proving that his or her life or freedom would be threatened in a particular country on account of race, religion, nationality, membership in a particular social group, or political opinion, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for such persecution if:

(i) The applicant establishes that there is a pattern or practice in the country of proposed removal of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that it is more likely than not that his or her life or freedom would be threatened upon return.

(c) *Approval or denial of application.* (1) *General.* Subject to paragraphs (c)(2) and (c)(3) of this section, an application for withholding of deportation or removal to a country of proposed removal shall be granted if the applicant's eligibility for withholding is established pursuant to paragraph (b) of this section.

(2) *Mandatory denials.* Except as provided in paragraph (c)(3) of this section, an application for withholding of removal shall be denied if the applicant falls within section 241(b)(3)(B) of the Act or, for applications for withholding of deportation adjudicated in proceedings commenced prior to April 1, 1997, within section 243(h)(2) of the Act as it appeared prior to that date. For purposes of section 241(b)(3)(B)(ii) of

the Act, or section 243(h)(2)(B) of the Act as it appeared prior to April 1, 1997, an alien who has been convicted of a particularly serious crime shall be considered to constitute a danger to the community. If the evidence indicates the applicability of one or more of the grounds for denial enumerated in the Act, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

(3) *Exception to the prohibition on withholding of deportation in certain cases.* Section 243(h)(3) of the Act, as added by section 413 of Pub. L. 104–132, shall apply only to applications adjudicated in proceedings commenced before April 1, 1997, and in which final action had not been taken before April 24, 1996. The discretion permitted by that section to override section 243(h)(2) shall be exercised only in the case of an applicant convicted of an aggravated felony (or felonies) where he or she was sentenced to an aggregate term of imprisonment of less than 5 years and the immigration judge determines on an individual basis that the crime (or crimes) of which the applicant was convicted does not constitute a particularly serious crime. Except in the cases specified in this paragraph, the grounds for denial of withholding of deportation in section 243(h)(2) of the Act as it appeared prior to April 1, 1997, shall be deemed to comply with the 1967 Protocol Relating to the Status of Refugees.

(d) *Reconsideration of discretionary denial of asylum.* In the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal under this section, thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her, the denial of asylum shall be reconsidered. Factors to be considered will include the reasons for the denial and reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country.

## § 208.17  Decisions.

The decision of an asylum officer to grant or to deny asylum or withholding of removal, or to refer an asylum application in accordance with § 208.14(b), shall be communicated in writing to the applicant. Notices of decisions to grant or deny asylum by asylum officers shall generally be served in person unless, in the discretion of the asylum office director, routine service by mail is appropriate. A letter communicating denial of the

application shall state the basis for denial of the asylum application. The letter also shall contain an assessment of the applicant's credibility, unless the denial is the result of the applicant's conviction of an aggravated felony. Pursuant to § 208.9(d), an applicant must appear in person to receive and to acknowledge receipt of the decision.

### § 208.18   Determining if an asylum application is frivolous.

For applications filed on or after April 1, 1997, an applicant is subject to the provisions of section 208(d)(6) of the Act only if a final order by an immigration judge or the Board of Immigration Appeals specifically finds that the alien knowingly filed a frivolous asylum application. An asylum application is frivolous if it is fabricated or is brought for an improper purpose. Such finding shall only be made if the immigration judge or the Board is satisfied that the applicant, during the course of the proceedings, has had sufficient opportunity to account for any discrepancies or implausible aspects of the claim.

### § 208.19   [Reserved]

### § 208.20   Effect on exclusion, deportation and removal proceedings.

(a) An alien who has been granted asylum may not be deported or removed unless his or her asylum status is terminated pursuant to § 208.22. An alien in exclusion, deportation, or removal proceedings who is granted withholding of removal or deportation may not be deported or removed to the country to which his or her deportation or removal is ordered withheld unless the withholding order is terminated pursuant to § 208.22.

(b) When an alien's asylum status or withholding of removal or deportation is terminated under this chapter, the Service shall initiate removal proceedings under section 235 or 240 of the Act, as appropriate, if the alien is not already in exclusion, deportation, or removal proceedings. Removal proceedings may also be in conjunction with a termination hearing scheduled under § 208.22(e).

### § 208.21   Restoration of status.

An alien who was maintaining his or her nonimmigrant status at the time of filing an asylum application and has such application denied may continue in or be restored to that status, if it has not expired.

### § 208.22   Termination of asylum or withholding of removal or deportation.

(a) *Termination of asylum by the Service.* Except as provided in

paragraph (e) of this section, an asylum officer may terminate a grant of asylum made under the jurisdiction of an asylum officer or a district director if following an interview, the asylum officer determines that:

(1) There is a showing of fraud in the alien's application such that he or she was not eligible for asylum at the time it was granted;

(2) As to the applications filed on or after April 1, 1997, one or more of the conditions described in section 208(c)(2) of the Act exist; or

(3) As to applications filed before April 1, 1997, the alien no longer has a well-founded fear of persecution upon return due to a change of country conditions in the alien's country of nationality or habitual residence or the alien has committed any act that would have been grounds for denial of asylum under § 208.14(e)(2).

(b) *Termination of withholding of deportation or removal by the Service.* Except as provided in paragraph (e) of this section, an asylum officer may terminate a grant of withholding of deportation or removal made under the jurisdiction of an asylum officer or a district director if the asylum officer determines, following an interview, that:

(1) The alien is no longer entitled to withholding of deportation or removal due to a change of conditions in the country to which removal was withheld;

(2) There is a showing of fraud in the alien's application such that the alien was not eligible for withholding of removal at the time it was granted;

(3) The alien has committed any other act that would have been grounds for denial of withholding of removal under section 241(b)(3)(B) of the Act had it occurred prior to the grant of withholding of removal; or

(4) For applications filed in proceedings commenced before April 1, 1997, the alien has committed any act that would have been grounds for denial of withholding of deportation under section 243(h)(2) of the Act.

(c) *Procedure.* Prior to the termination of a grant of asylum or withholding of deportation or removal, the alien shall be given notice of intent to terminate, with the reasons therefor, at least 30 days prior to the interview specified in paragraph (a) of this section before an asylum officer. The alien shall be provided the opportunity to present evidence showing that he or she is still eligible for asylum or withholding of deportation or removal. If the asylum officer determines that the alien is no longer eligible for asylum or withholding of deportation or removal, the alien shall be given written notice

that asylum status or withholding of deportation or removal and any employment authorization issued pursuant thereto, are terminated.

(d) *Termination of derivative status.* The termination of asylum status for a person who was the principal applicant shall result in termination of the asylum status of a spouse or child whose status was based on the asylum application of the principal. Such termination shall not preclude the spouse or child of such alien from separately asserting an asylum or withholding of deportation or removal claim.

(e) *Termination of asylum or withholding of deportation or removal by the Executive Office for Immigration Review.* An immigration judge or the Board of Immigration Appeals may reopen a case pursuant to § 3.2 or § 3.23 of this chapter for the purpose of terminating a grant of asylum or withholding of deportation or removal made under the jurisdiction of an immigration judge. In such a reopened proceeding, the Service must establish, by a preponderance of evidence, one or more of the grounds set forth in paragraphs (a) or (b) of this section. In addition, an immigration judge may terminate a grant of asylum or withholding of deportation or removal made under the jurisdiction of the Service at any time after the alien has been provided a notice of intent to terminate by the Service. Any termination under this paragraph may occur in conjunction with an exclusion, deportation or removal proceeding.

(f) *Termination of asylum for arriving aliens.* If the Service determines that an applicant for admission who had previously been granted asylum in the United States falls within conditions set forth in section 208(c)(2) of the Act and is inadmissible, the Service shall issue a notice of intent to terminate asylum and initiate removal proceedings under section 240 of the Act. The alien shall present his or her response to the intent to terminate during proceedings before the immigration judge.

### §§ 208.23–208.29   [Reserved]

## Subpart B—Credible Fear of Persecution

### § 208.30   Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

(a) *Jurisdiction.* The provisions of this subpart apply to aliens subject to sections 235(a)(2) and 235(b)(1) of the Act. Pursuant to section 235(b)(1)(B) of the Act, the Service has exclusive jurisdiction to make credible fear determinations, and the Executive

Office for Immigration Review has exclusive jurisdiction to review such determinations. Except as otherwise provided in this subpart, paragraphs (b) through (e) of this section are the exclusive procedures applicable to credible fear interviews, determinations, and review under section 235(b)(1)(B) of the Act.

(b) *Interview and procedure.* The asylum officer, as defined in section 235(b)(1)(E) of the Act, will conduct the interview in a nonadversarial manner and separate and apart from the general public. At the time of the interview, the alien may be required to register his or her identity electronically or through any other means designated by the Attorney General. The alien may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, and may present other evidence when available. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process. Any person or persons with whom the alien chooses to consult may be present at the interview and may be permitted, in the discretion of the asylum officer, to present a brief statement at the end of the interview. The asylum officer, in his or her discretion, may place reasonable limits on the number of such persons who may be present at the interview and on the length of statement or statements made. If the alien is unable to proceed in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. The interpreter may not be a representative or employee of the applicant's country of nationality or, if the applicant is stateless, the applicant's country of last habitual residence.

(c) *Authority.* Asylum officers conducting credible fear interviews shall have the authorities described in § 208.9(c).

(d) *Referral for an asylum hearing.* If an alien, other than an alien stowaway, is found to have a credible fear of persecution, the asylum officer will so inform the alien, arrange for his or her detention, and issue a Form I–862, Notice to Appear, for full consideration of the asylum claim in proceedings under section 240 of the Act. Parole of the alien may only be considered in accordance with section 212(d)(5) of the Act and § 212.5 of this chapter. If an alien stowaway is found to have a credible fear of persecution, the asylum officer will so inform the alien, arrange for his or her detention, and issue a Form I–863, Notice to Referral to

Immigration Judge, for full consideration of the asylum claim in proceedings under § 208.2(b)(1).

(e) *Removal of aliens with no credible fear of persecution.* If an alien, other than an alien stowaway, is found not to have a credible fear of persecution, the asylum officer shall order the alien removed and issue a Form I–860, Notice and Order of Expedited Removal. If an alien stowaway is found not to have a credible fear of persecution, the asylum officer shall order the alien removed from the United States in accordance with section 235(a)(2) of the Act. The asylum officer shall also advise the alien of his or her right to request that an immigration judge review the negative decision.

(f) *Review by immigration judge.* The asylum officer's negative decision regarding credible fear shall be subject to review by an immigration judge upon the applicant's verbal or written request, in accordance with section 235(b)(1)(B)(iii)(III) of the Act. If the alien requests such review, the asylum officer shall arrange for the detention of the alien and serve him or her with a Form I–863, Notice of Referral to Immigration Judge. Copies of the Form I–863, the asylum officer's notes, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination. Upon review of the asylum officer's negative credible fear determination:

(1) If the immigration judge concurs with the determination of the asylum officer that the alien does not have a credible fear of persecution, the case shall be returned to the Service for removal of the alien.

(2) If the immigration judge finds that the alien, other than an alien stowaway, possesses a credible fear of persecution, the immigration judge shall vacate the order of the asylum officer issued on Form I–860 and the Service may commence removal proceedings under section 240 of the Act, during which time the alien may file an asylum application in accordance with § 208.4(b)(3)(i).

(3) If the immigration judge finds that an alien stowaway possesses a credible fear of persecution, the alien shall be allowed to file an asylum application before the immigration judge in accordance with § 208.4(b)(3)(iii). The immigration judge shall decide the asylum application as provided in that section. Such decision may be appealed by either the stowaway or the Service to the Board of Immigration Appeals. If and when a denial of the asylum application becomes final, the alien shall be removed from the United States

in accordance with section 235(a)(2) of the Act. If and when an approval of the asylum application becomes final, the Service shall terminate removal proceedings under section 235(a)(2) of the Act.

## PART 209—ADJUSTMENT OF STATUS OF REFUGEES AND ALIENS GRANTED ASYLUM

42. The authority citation for part 209 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1157, 1158, 1159, 1228, 1252, 1282; 8 CFR part 2.

### § 209.1   [Amended]

43. In § 209.1, paragraph (a)(1) is amended in the first sentence by revising the reference to '', 236, and 237'' to read ''and 240''.

44. In § 209.2, the last sentence of paragraph (c) is revised to read as follows:

### § 209.2   Adjustment of status of alien granted asylum.

\*    \*    \*    \*    \*

(c) *Application.* \* \* \* If an alien has been placed in deportation, exclusion, or removal proceedings under any section of this Act (as effective on the date such proceedings commenced), the application can be filed and considered only in those proceedings.

\*    \*    \*    \*    \*

## PART 211—DOCUMENTARY REQUIREMENTS; IMMIGRANTS; WAIVERS

45. The authority citation for part 211 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1181, 1182, 1203, 1225, 1257; 8 CFR part 2.

46. Part 211 is revised to read as follows:

Sec.
211.1   Visas.
211.2   Passports.
211.3   Expiration of immigrant visas, reentry permits, refugee travel documents, and Forms I–551.
211.4   Waiver of documents for returning residents.
211.5   Alien commuters.

### § 211.1   Visas.

(a) *General.* Except as provided in paragraph (b) of this section, each arriving alien applying for admission (or boarding the vessel or aircraft on which he or she arrives) into the United States for lawful permanent residence, or as a returning lawful permanent resident, shall present one of the following:

(1) A valid, unexpired immigrant visa;

(2) A valid, unexpired Form I–551, Alien Registration Receipt Card, if seeking readmission after a temporary

absence of less than one year, or in the case of a crewmember regularly serving on board a vessel or aircraft of United States registry seeking readmission after any job-connected absence;

(3) A valid, unexpired Form I–327, Permit to Reenter the United States;

(4) A valid, unexpired Form I–571, Refugee Travel Document, properly endorsed to reflect admission as a lawful permanent resident;

(5) An expired Form I–551, Alien Registration Receipt Card, accompanied by a filing receipt issued within the previous six months for either a Form I–751, Petition to Remove the Conditions on Residence, or Form I–829, Petition by Entrepreneur to Remove Conditions, if seeking admission or readmission after a temporary absence of less than one year;

(6) A Form I–551, whether or not expired, presented by a civilian or military employee of the United States Government, who was outside the United States pursuant to official orders, or the spouse or child of such employee who is preceding, accompanying or following to join within four months the employee, returning to the United States; or

(7) Form I–551, whether or not expired, or a transportation letter issued by an American consular officer, presented by an employee of the American University of Beirut, returning temporarily to the United States before resuming employment with the American University of Beirut, or resuming permanent residence in the United States.

(b) *Waivers.* (1) A waiver of the visa required in paragraph (a) of this section shall be granted without fee by the district director, upon presentation of the child's birth certificate, to a child born subsequent to the issuance of an immigrant visa to his or her accompanying parent who applies for admission during the validity of such a visa; or a child born during the temporary visit abroad of a mother who is a lawful permanent resident alien, or a national, of the United States, provided that the child's application for admission to the United States is made within two years of birth, the child is accompanied by the parent who is applying for readmission as a permanent resident upon the first return of the parent to the United States after the birth of the child, and the accompanying parent is found to be admissible to the United States.

(2) For an alien described in paragraph (b)(1) of this section, recordation of the child's entry shall be on Form I–181, Memorandum of Creation of Record of Admission for Lawful Permanent Residence. The carrier of such alien shall not be liable for a fine pursuant to section 273 of the Act.

(3) If an immigrant alien returning to an unrelinquished lawful permanent residence in the United States after a temporary absence abroad believes that good cause exists for his or her failure to present an immigrant visa, Form I–551, or reentry permit, the alien may file an application for a waiver of this requirement with the district director in charge of the port-of-entry. To apply for this waiver, the alien must file Form I–193, Application for Waiver of Passport and/or Visa, with the fee prescribed in § 103.7(b)(1) of this chapter, *except* that if the alien's Form I–551 was lost or stolen, the alien shall instead file Form I–90, Application to Replace Alien Registration Receipt Card, with the fee prescribed in § 103.7(b)(1) of this chapter. In the exercise of discretion, the district director in charge of the port-of-entry may waive the alien's lack of an immigrant visa, Form I–551, or reentry permit and admit the alien as a returning resident, if the district director is satisfied that the alien has established good cause for the alien's failure to present an immigrant visa, Form I–551, or reentry permit.

(c) *Immigrants having occupational status defined in section 101(a)(15) (A), (E), or (G) of the Act.* An immigrant visa, reentry permit, or Form I–551 shall be invalid when presented by an alien who has an occupational status under section 101(a)(15) (A), (E), or (G) of the Act, unless he or she has previously submitted, or submits at the time he or she applies for admission to the United States, the written waiver required by section 247(b) of the Act and 8 CFR part 247.

(d) *Returning temporary residents.* (1) Form I–688, Temporary Resident Card, may be presented in lieu of an immigrant visa by an alien whose status has been adjusted to that of a temporary resident under the provisions of § 210.1 of this chapter, such status not having changed, and who is returning to an unrelinquished residence within one year after a temporary absence abroad.

(2) Form I–688 may be presented in lieu of an immigrant visa by an alien whose status has been adjusted to that of a temporary resident under the provisions of § 245a.2 of this chapter, such status not having changed, and who is returning to an unrelinquished residence within 30 days after a temporary absence abroad, provided that the aggregate of all such absences abroad during the temporary residence period has not exceeded 90 days.

### § 211.2   Passports.

(a) A passport valid for the bearer's entry into a foreign country at least 60 days beyond the expiration date of his or her immigrant visa shall be presented by each immigrant except an immigrant who:

(1) Is the parent, spouse, or unmarried son or daughter of a United States citizen or of an alien lawful permanent resident of the United States,

(2) Is entering under the provisions of § 211.1(a)(2) through (a)(7), or § 211.1(b)(1),

(3) Is a stateless person or a person who because of his or her opposition to Communism is unwilling or unable to obtain a passport from the country of his or her nationality, or is the accompanying spouse or unmarried son or daughter of such immigrant,

(4) Is a member of the Armed Forces of the United States,

(b) If an alien seeking admission as an immigrant with an immigrant visa believes that good cause exists for his or her failure to present a passport, the alien may file an application for a waiver of this requirement with the district director in charge of the port-of-entry. To apply for this waiver, the alien must file Form I–193, Application for Waiver of Passport and/or Visa, with the fee prescribed in § 103.7(b)(1) of this chapter. In the exercise of discretion, the district director in charge of the port-of-entry may waive the alien's lack of passport and admit the alien as an immigrant, if the district director is satisfied that the alien has established good cause for the alien's failure to present a passport.

### § 211.3   Expiration of immigrant visas, reentry permits, refugee travel document, and Form I–551.

An immigrant visa, reentry permit, refugee travel document, or Form I–551 shall be regarded as unexpired if the rightful holder embarked or enplaned before the expiration of his immigrant visa, reentry permit, or refugee travel document, or, with respect to Form I–551, before the first anniversary of the date on which he departed from the United States: provided, that the vessel or aircraft on which he so embarked or enplaned arrives in the United States or foreign contiguous territory on a continuous voyage. The continuity of the voyage shall not be deemed to have been interrupted by scheduled or emergency stops of the vessel or aircraft en route to the United States or foreign contiguous territory, or by a layover in foreign contiguous territory necessitated solely for the purpose of effecting a transportation connection to the United States.

### §211.4   Waiver of documents for returning residents.

(a) Pursuant to the authority contained in section 211(b) of the Act, an alien previously lawfully admitted to the United States for permanent residence who, upon return from a temporary absence was inadmissible because of failure to have or to present a valid passport, immigrant visa, reentry permit, border crossing card, or other document required at the time of entry, may be granted a waiver of such requirement in the discretion of the district director if the district director determines that such alien:

(1) Was not otherwise inadmissible at the time of entry, or

(2) Having been otherwise inadmissible at the time of entry is with respect thereto qualified for an exemption from deportability under section 237(a)(1)(H) of the Act, and

(3) Is not otherwise subject to removal.

(b) Denial of a waiver by the district director is not appealable but shall be without prejudice to renewal of an application and reconsideration in proceedings before the immigration judge.

### §211.5   Alien commuters.

(a) *General.* An alien lawfully admitted for permanent residence or a special agricultural worker lawfully admitted for temporary residence under section 210 of the Act may commence or continue to reside in foreign contiguous territory and commute as a special immigrant defined in section 101(a)(27)(A) of the Act to his or her place of employment in the United States. An alien commuter engaged in seasonal work will be presumed to have taken up residence in the United States if he or she is present in this country for more than six months, in the aggregate, during any continuous 12-month period. An alien commuter's address report under section 265 of the Act must show his or her actual residence address even though it is not in the United States.

(b) *Loss of residence status.* An alien commuter who has been out of regular employment in the United States for a continuous period of six months shall be deemed to have lost residence status, notwithstanding temporary entries in the interim for other than employment purposes. An exception applies when employment in the United States was interrupted for reasons beyond the individual's control other than lack of a job opportunity or the commuter can demonstrate that he or she has worked 90 days in the United States in the aggregate during the 12-month period preceding the application for admission into the United States.

(c) *Eligibility for benefits under the immigration and nationality laws.* Until he or she has taken up residence in the United States, an alien commuter cannot satisfy the residence requirements of the naturalization laws and cannot qualify for any benefits under the immigration laws on his or her own behalf or on behalf of his or her relatives other than as specified in paragraph (a) of this section. When an alien commuter takes up residence in the United States, he or she shall no longer be regarded as a commuter. He or she may facilitate proof of having taken up such residence by notifying the Service as soon as possible, preferably at the time of his or her first reentry for that purpose. Application for issuance of a new alien registration receipt card to show that he or she has taken up residence in the United States shall be made on Form I–90.

### PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

47. The authority citation for part 212 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1187, 1225, 1226, 1227, 1228, 1252; 8 CFR part 2.

48. Section 212.5 is amended by:

a. Revising paragraph (a) and (b);

b. Revising introductory text in paragraph (c);

c. Revising paragraph (c)(1); and by

d. Revising paragraph (d)(2)(i), to read as follows:

### §212.5   Parole of aliens into the United States.

(a) The parole of aliens within the following groups who have been or are detained in accordance with §235.3 (b) or (c) of this chapter would generally be justified for "urgent humanitarian reasons" or "significant public benefit," provided the aliens present neither a security risk nor a risk of absconding:

(1) Aliens who have serious medical conditions in which continued detention would not be appropriate;

(2) Women who have been medically certified as pregnant;

(3) Aliens who are defined as juveniles in §236.3(a) of this chapter. The district director or chief patrol agent shall follow the guidelines set forth in §236.3(a) of this chapter in determining under what conditions a juvenile should be paroled from detention;

(i) Juveniles may be released to a relative (brother, sister, aunt, uncle) not in Service detention who is willing to sponsor a minor and the minor may be released to that relative notwithstanding that the juvenile has a relative who is in detention.

(ii) If a relative who is not in detention cannot be located to sponsor the minor, the minor may be released with an accompany relative who is in detention.

(iii) If the Service cannot locate a relative in or out of detention to sponsor the minor, but the minor has identified a nonrelative in detention who accompanied him on arrival, the question of releasing the minor and the accompanying nonrelative adult shall be addressed on a case-by-case basis.

(4) Aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; or

(5) Aliens whose continued detention is not in the public interest as determined by the district director or chief patrol agent.

(b) In the case of all other arriving aliens, except those detained under §235.3 (b) or (c) of this chapter and paragraph (a) of this section, the district director or chief patrol agent may, after review of the individual case, parole into the United States temporarily in accordance with section 212(d)(5)(A) of the Act, any alien applicant for admission, under such terms and conditions, including those set forth in paragraph (c) of this section, as he or she may deem appropriate. An alien who arrives at a port-of-entry and applies for parole into the United States for the sole purpose of seeking adjustment of status under section 245A of the Act, without benefit of advance authorization as described in paragraph (e) of this section shall be denied parole and detained for removal in accordance with the provisions of §235.3 (b) or (c) of this chapter. An alien seeking to enter the United States for the sole purpose of applying for adjustment of status under section 210 of the Act shall be denied parole and detained for removal under §235.3 (b) or (c) of this chapter, unless the alien has been recommended for approval of such application for adjustment by a consular officer at an Overseas Processing Office.

(c) *Conditions.* In any case where an alien is paroled under paragraph (a) or (b) of this section, the district director or chief patrol agent may require reasonable assurances that the alien will appear at all hearings and/or argue the United States when required to do so. Not all factors listed need be present for parole to be exercised. The district director or chief patrol agent should apply reasonable discretion. The

consideration of all relevant factors includes:

(1) The giving of an undertaking by the applicant, counsel, or a sponsor to ensure appearances or departure, and a bond may be required on Form I–352 in such amount as the district director or chief patrol agent may deem appropriate;

\* \* \* \* \*

(d) \* \* \*

(2)(i) *On notice.* In cases not covered by paragraph (d)(1) of this section, upon accomplishment of the purpose for which parole was authorized or when in the opinion of the district director or chief patrol agent in charge of the area in which the alien is located, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien and he or she shall be restored to the status that he or she had at the time of parole. When a charging document is served on the alien, the charging document will constitute written notice of termination of parole, unless otherwise specified. Any further inspection or hearing shall be conducted under section 235 or 250 of the Act and this chapter, or any order of exclusion, deportation, or removal previously entered shall be executed. If the exclusion, deportation, or removal order cannot be executed by removal within a reasonable time, the alien shall again be released on parole unless in the opinion of the district director or the chief patrol agent the public interest requires that the alien be continued in custody.

\* \* \* \* \*

49. In § 212.6 paragraph (a)(2) is revised to read as follows:

### § 212.6   Nonresident alien border crossing cards.

(a) \* \* \*

(2) *Mexican border crossing card, Form I–186 or I–586.* The rightful holder of a nonresident alien Mexican border crossing card, Form I–186 or I–586, may be admitted under § 235.1(f) of this chapter if found otherwise admissible. However, any alien seeking entry as a visitor for business or pleasure must also present a valid passport and shall be issued Form I–94 if the alien is applying for admission from:

(i) A country other than Mexico or Canada, or

(ii) Canada if the alien has been in a country other than the United States or Canada since leaving Mexico.

\* \* \* \* \*

## PART 213—ADMISSION OF ALIENS ON GIVING BOND OR CASH DEPOSIT

50. The authority citation for part 213 is revised to read as follows:

**Authority:** 8 U.S.C. 1103; 8 CFR part 2.

### § 213.1   [Amended]

51. Section 213.1 is amended in the last sentence by revising the term "part 103" to read "§ 103.6".

## PART 214—NONIMMIGRANT CLASSES

52. The authority citation for part 214 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282; 8 CFR part 2.

53. Section 214.1 is amended by revising paragraph (c)(4)(iv) to read as follows:

### § 214.1   Requirements for admission, extension, and maintenance of status.

\* \* \* \* \*

(c) \* \* \*

(4) \* \* \*

(iv) The alien is not the subject of deportation proceedings under section 242 of the Act (prior to April 1, 1997) or removal proceedings under section 240 of the Act.

\* \* \* \* \*

## PART 215—[REMOVED]

54. Part 215 is removed.

## PART 216—CONDITIONAL BASIS OF LAWFUL PERMANENT RESIDENCE STATUS

55. The authority citation for part 216 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1154, 1184, 1186a, 1186b, and 8 CFR part 2.

Section 216.3 is revised to read as follows:

### § 216.3   Termination of conditional resident status.

(a) *During the two-year conditional period.* The director shall send a formal written notice to the conditional permanent resident of the termination of the alien's conditional permanent resident status if the director determines that any of the conditions set forth in section 216(b)(1) or 216A(b)(1) of the Act, whichever is applicable, are true, or it becomes known to the government that an alien entrepreneur who was admitted pursuant to section 203(b)(5) of the Act obtained his or her investment capital through other than legal means (such as through the sale of illegal drugs). If the Service issues a notice of intent to terminate an alien's conditional resident status, the director shall not adjudicate Form I–751 or Form

I–829 until it has been determined that the alien's status will not be terminated. During this time, the alien shall continue to be a lawful conditional permanent resident with all the rights, privileges, and responsibilities provided to persons possessing such status. Prior to issuing the notice of termination, the director shall provide the alien with an opportunity to review and rebut the evidence upon which the decision is to be based, in accordance with § 103.2(b)(2) of this chapter. The termination of status, and all of the rights and privileges concomitant thereto (including authorization to accept or continue in employment in this country), shall take effect as of the date of such determination by the director, although the alien may request a review of such determination in removal proceedings. In addition to the notice of termination, the director shall issue a notice to appear in accordance with 8 CFR part 239. During the ensuing removal proceedings, the alien may submit evidence to rebut the determination of the director. The burden of proof shall be on the Service to establish, by a preponderance of the evidence, that one or more of the conditions in section 216(b)(1) or 216A(b)(1) of the Act, whichever is applicable, are true, or that an alien entrepreneur who was admitted pursuant to section 203(b)(5) of the Act obtained his or her investment capital through other than legal means (such as through the sale of illegal drugs).

(b) *Determination of fraud after two years.* If, subsequent to the removal of the conditional basis of an alien's permanent resident status, the director determines that an alien spouse obtained permanent resident status through a marriage which was entered into for the purpose of evading the immigration laws or an alien entrepreneur obtained permanent resident status through a commercial enterprise which was improper under section 216A(b)(1) of the Act, the director may institute rescission proceedings pursuant to section 246 of the Act (if otherwise appropriate) or removal proceedings under section 240 of the Act.

57. Section 216.4 is amended by:

a. Revising paragraphs (a)(6) and (b)(3);

b. Revising paragraph (c)(4);

c. Removing the unnumbered paragraph immediately after paragraph (c)(4); and by

d. Revising paragraph (d)(2) to read as follows:

**§ 216.4   Joint petition to remove conditional basis of lawful permanent resident status for alien spouse.**

(a) * * *

(6) *Termination of status for failure to file petition.* Failure to properly file Form I–751 within the 90-day period immediately preceding the second anniversary of the date on which the alien obtained lawful permanent residence on a conditional basis shall result in the automatic termination of the alien's permanent residence status and the initiation of proceedings to remove the alien from the United States. In such proceedings the burden shall be on the alien to establish that he or she complied with the requirement to file the joint petition within the designated period. Form I–751 may be filed after the expiration of the 90-day period only if the alien establishes to the satisfaction of the director, in writing, that there was good cause for the failure to file Form I–751 within the required time period. If the joint petition is filed prior to the jurisdiction vesting with the immigration judge in removal proceedings and the director excuses the late filing and approves the petition, he or she shall restore the alien's permanent residence status, remove the conditional basis of such status and cancel any outstanding notice to appear in accordance with § 239.2 of this chapter. If the joint petition is not filed until after jurisdiction vests with the immigration judge, the immigration judge may terminate the matter upon joint motion by the alien and the service.

(b) * * *

(3) *Termination of status for failure to appear for interview.* If the conditional resident alien and/or the petitioning spouse fail to appear for an interview in connection with the joint petition required by section 216(c) of the Act, the alien's permanent residence status will be automatically terminated as of the second anniversary of the date on which the alien obtained permanent residence. The alien shall be provided with written notification of the termination and the reasons therefor, and a notice to appear shall be issued placing the alien under removal proceedings. The alien may seek review of the decision to terminate his or her status in such proceedings, but the burden shall be on the alien to establish compliance with the interview requirements. If the alien submits a written request that the interview be rescheduled or that the interview be waived, and the director determines that there is good cause for granting the request, the interview may be rescheduled or waived, as appropriate.

If the interview is rescheduled at the request of the petitioners, the Service shall not be required to conduct the interview within the 90-day period following the filing of the petition.

(c) * * *

(4) A fee or other consideration was given (other than a fee or other consideration to an attorney for assistance in preparation of a lawful petition) in connection with the filing of the petition through which the alien obtained conditional permanent residence. If derogatory information is determined regarding any of these issues, the director shall offer the petitioners the opportunity to rebut such information. If the petitioners fail to overcome such derogatory information the director may deny the joint petition, terminate the alien's permanent residence, and issue a notice to appear to initiate removal proceedings. If derogatory information not relating to any of these issues is determined during the course of the interview, such information shall be forwarded to the investigations unit for appropriate action. If no unresolved derogatory information is determined relating to these issues, the petition shall be approved and the conditional basis of the alien's permanent residence status removed, regardless of any action taken or contemplated regarding other possible grounds for removal.

(d) * * *

(2) *Denial.* If the director denies the joint petition, he or she shall provide written notice to the alien of the decision and the reason(s) therefor and shall issue a notice to appear under section 239 of the Act and 8 CFR part 239. The alien's lawful permanent residence status shall be terminated as of the date of the director's written decision. The alien shall also be instructed to surrender any Alien Registration Receipt Card previously issued by the Service. No appeal shall lie from the decision of the director; however, the alien may seek review of the decision in removal proceedings. In such proceedings the burden of proof shall be on the Service to establish, by a preponderance of the evidence, that the facts and information set forth by the petitioners are not true or that the petition was properly denied.

58. Section 216.5 is amended by revising paragraphs (a)(1), (d), (e)(1), (e)(3)(ii), and (f) to read as follows:

**§ 216.5   Waiver of requirement to file joint petition to remove conditions by alien spouse.**

(a) * * *

(1) Removal from the United States would result in extreme hardship;

* * * * *

(d) *Interview.* The service center director may refer the application to the appropriate local office and require that the alien appear for an interview in connection with the application for a waiver. The director shall deny the application and initiate removal proceedings if the alien fails to appear for the interview as required, unless the alien establishes good cause for such failure and the interview is rescheduled.

(e) *Adjudication of waiver application.* (1) *Application based on claim of hardship.* In considering an application for a waiver based upon an alien's claim that extreme hardship would result from the alien's removal from the United States, the director shall take into account only those factors that arose subsequent to the alien's entry as a conditional permanent resident. The director shall bear in mind that any removal from the United States is likely to result in a certain degree of hardship, and that only in those cases where the hardship is extreme should the application for a waiver be granted. The burden of establishing that extreme hardship exists rests solely with the applicant.

* * * * *

(3) * * *

(ii) A conditional resident or former conditional resident who has not departed the United States after termination of resident status may apply for the waiver. A conditional resident who is in exclusion, deportation, or removal proceedings may apply for the waiver only until such time as there is a final order of deportation or removal. The conditional resident may apply for the waiver regardless of his or her present marital status. The conditional resident may still be residing with the citizen or permanent resident spouse, or may be divorced or separated.

* * * * *

(f) *Decision.* The director shall provide the alien with written notice of the decision on the application for waiver. If the decision is adverse, the director shall advise the alien of the reasons therefore, notify the alien of the termination of his or her permanent residence status, instruct the alien to surrender any Alien Registration Receipt Card issued by the Service and issue a notice to appear placing the alien in removal proceedings. No appeal shall lie from the decision of the director, however, the alien may seek review of such decision in removal proceedings.

## PART 217—VISA WAIVER PILOT PROGRAM

59. The authority citation for part 217 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1187; 8 CFR part 2.

60. Section 217.1 is revised to read as follows:

### § 217.1  Scope.

The Visa Waiver Pilot Program (VWPP) described in this section is established pursuant to the provisions of section 217 of the Act.

61. Section 217.2 is revised to read as follows:

### § 217.2  Eligibility.

(a) *Definitions.* As used in this part, the term:

*Carrier* refers to the owner, charterer, lessee, or authorized agent of any commercial vessel or commercial aircraft engaged in transporting passengers to the United States from a foreign place.

*Designated country* refers to Andorra, Argentina, Australia, Belgium, Brunei, Denmark, Finland, France, Germany, Iceland, Italy, Japan, Liechtenstein, Luxembourg, Monaco, the Netherlands, New Zealand, Norway, San Marino, Spain, Sweden, Switzerland, and the United Kingdom. The United Kingdom refers only to British citizens who have the unrestricted right of permanent abode in the United Kingdom (England, Scotland, Wales, Northern Ireland, the Channel Islands and the Isle of Man); it does not refer to British overseas citizens, British dependent territories' citizens, or citizens of British Commonwealth countries. Effective April 1, 1995, until September 30, 1998, or the expiration of the Visa Waiver Pilot Program, whichever comes first, Ireland has been designated as a Visa Waiver Pilot Program country with Probationary Status in accordance with section 217(g) of the Act.

*Return trip ticket* means any return trip transportation ticket presented by an arriving Visa Waiver Pilot Program applicant on a participating carrier valid for at least 1 year, airline employee passes indicating return passage, individual vouchers for return passage, group vouchers for return passage for charter flights, and military travel orders which include military dependents for return to duty stations outside the United States on U.S. military flights. A period of validity of 1 year need not be reflected on the ticket itself, provided that the carrier agrees that it will honor the return portion of the ticket at any time, as provided in § 217.6(b)(2)(v).

(b) *Special program requirements.* (1) *General.* In addition to meeting all of the requirements for the Visa Waiver Pilot Program specified in section 217 of the Act, each applicant must posses a valid, unexpired passport issued by a designated country and present a completed, signed Form I–94W, Nonimmigrant Visa Waiver Arrival/Departure Form.

(2) *Persons previously removed.* Aliens who have been deported or removed from the United States, after having been determined deportable, require the consent of the Attorney General to apply for admission to the United States pursuant to section 212(a)(9)(A)(ii) of the Act. Such persons may not be admitted to the United States under the provisions of this part notwithstanding the fact that the required consent of the Attorney General may have been secured. Such aliens must secure a visa in order to be admitted to the United States as nonimmigrants, unless otherwise exempt.

(c) *Restrictions on manner of arrival.* (1) *Applicants arriving by air and sea.* Applicants must arrive on a carrier signatory to an agreement specified in § 217.6 and at the time of arrival must be in possession of a return trip ticket that will transport the traveler out of the United States to any other foreign port or place as long as the trip does not terminate in contiguous territory or an adjacent island; except that the return trip ticket may transport the traveler to contiguous territory or an adjacent island, if the traveler is a resident of the country of destination.

(2) *Applicants arriving at land border ports-of-entry.* Any Visa Waiver Pilot Program applicant arriving at a land border port-of-entry must provide evidence to the immigration officer of financial solvency and a domicile abroad to which the applicant intends to return. An applicant arriving at a land-border port-of-entry will be charged a fee as prescribed in § 103.7(b)(1) of this chapter for issuance of Form I–94W, Nonimmigrant Visa Waiver Arrival/Departure Form. A round-trip transportation ticket is not required of applicants at land border ports-of-entry.

(d) *Aliens in transit.* An alien who is in transit through the United States is eligible to apply for admission under the Visa Waiver Pilot Program, provided the applicant meets all other program requirements.

62. Section 217.3 is revised to read as follows:

### § 217.3  Maintenance of status.

(a) *Satisfactory departure.* If an emergency prevents an alien admitted under this part from departing from the United States within his or her period of authorized stay, the district director having jurisdiction over the place of the alien's temporary stay may, in his or her discretion, grant a period of satisfactory departure not to exceed 30 days. If departure is accomplished during that period, the alien is to be regarded as having satisfactorily accomplished the visit without overstaying the allotted time.

(b) *Readmission after departure to contiguous territory or adjacent island.* An alien admitted to the United States under this part may be readmitted to the United States for the balance of his or her Visa Waiver Pilot Program admission period if he or she is otherwise admissible.

63. Section 217.4 is amended by:

a. Revising the section heading;

b. Removing paragraph (a);

c. Redesignating paragraphs (b), (c), and (d) as paragraphs (a), (b), and (c) respectively;

d. Revising newly redesignated paragraph (a)(1);

e. Adding a new paragraph (a)(3);

f. Revising newly redesignated paragraph (b); and by

g. Revising newly redesignated paragraph (c) to read as follows:

### § 217.4  Inadmissibility and deportability.

(a) *Determinations of inadmissibility.* (1) An alien who applies for admission under the provisions of section 217 of the Act, who is determined by an immigration officer not to be eligible for admission under that section or to be inadmissible to the United States under one or more of the grounds of inadmissibility listed in section 212 of the Act (other than for lack of a visa), or who is in possession of and presents fraudulent or counterfeit travel documents, will be refused admission into the United States and removed. Such refusal and removal shall be made at the level of the port director or officer-in-charge, or an officer acting in that capacity, and shall be effected without referral of the alien to an immigration judge for further inquiry, examination, or hearing, except that an alien who presents himself or herself as an applicant for admission under section 217 of the Act, who applies for asylum in the United States must be issued a Notice of Referral to Immigration Judge for a proceeding in accordance with § 208.2(b)(1) of this chapter.

\*   \*   \*   \*   \*

(3) Refusal under paragraph (a)(1) of this section shall not constitute removal for purposes of section 212(a)(9)(A) of the Act.

(b) *Determination of deportability.* (1) An alien who has been admitted to the United States under the provisions of section 217 of the Act and of this part who is determined by an immigration officer to be deportable from the United States under one or more of the grounds of deportability listed in section 237 of the Act shall be removed from the United States to his or her country of nationality or last residence. Such removal shall be determined by the district director who has jurisdiction over the place where the alien is found, and shall be effected without referral of the alien to an immigration judge for a determination of deportability, except that an alien admitted as a Visa Waiver Pilot Program visitor who applies for asylum in the United States must be issued a Notice of Referral to Immigration Judge for a proceeding in accordance with § 208.2(b)(1) of this chapter.

(2) Removal under paragraph (b)(1) is equivalent in all respects and has the same consequences as removal after proceedings conducted under section 240 of the Act.

(c)(1) *Removal of inadmissible aliens who arrived by air or sea.* Removal of an alien from the United States under this section may be effected using the return portion of the round trip passage presented by the alien at the time of entry to the United States as required by section 217(a)(7) of the Act. Such removal shall be on the first available means of transportation to the alien's point of embarkation to the United States. Nothing in this part absolves the carrier of the responsibility to remove any inadmissible or deportable alien at carrier expense, as provided in § 217.6(b).

(2) *Removal of inadmissible and deportable aliens who arrived at land border ports-of-entry.* Removal under this section will be by the first available means of transportation deemed appropriate by the district director.

§ 217.5   [Removed and reserved]

64. Section 217.5 is removed and reserved.

65. Section 217.6 is revised to read as follows:

§ 217.6   Carrier agreements.

(a) *General.* The carrier agreements referred to in section 217(e) of the Act shall be made by the Commissioner on behalf of the Attorney General and shall be on Form I–775, Visa Waiver Pilot Program Agreement.

(b) *Agreement provisions.* (1) To be authorized to transport an alien to the United States pursuant to section 217 of the Act and this part, a carrier must enter into an agreement on Form I–775 to transport as an applicant for admission under section 217 of the Act and this chapter, only an alien who:

(i) Is a national of and in possession of a valid passport issued by a country listed in § 217.2;

(ii) Is in possession of a completed and signed Form I–94W, Nonimmigrant Visa Waiver Arrival/Departure Form, prior to inspection;

(iii) Seeks admission into the United States for 90 days or less;

(iv) Is in possession of a round trip ticket; and

(v) Appears otherwise admissible.

(2) The carrier further agrees to:

(i) Submit to the Immigration and Naturalization Service the Form I–94 was required by 8 CFR part 231 and section 217(e)(1)(B) of the Act;

(ii) Remove from the United States any alien transported by the carrier to the United States for admission under the Visa Waiver Pilot Program, in the event that the alien is determined by an immigration officer at the port-of-entry to be inadmissible or is determined to have remained unlawfully beyond the 90-day period of admission under the program;

(iii) Reimburse within 30 days of notice (not pay as a penalty) the Service for any and all expenses incurred in the transportation (from the point of arrival in the United States to the place of removal) of any alien found inadmissible or deportable under this program;

(iv) Retain the responsibilities and obligations enumerated in this part should the alien under the Visa Waiver Pilot Program depart temporarily for a visit to foreign contiguous territory during the period of authorized stay in the United States and be readmitted pursuant to § 217.3(b);

(v) Transport an alien found inadmissible to the United States or deportable from the United States after admission under the Visa Waiver Pilot Program, by accepting as full payment for return passage the return portion of the transportation ticket as required in paragraph (b)(1)(iv) of this section from the original port of arrival in the United States to point of embarkation or to the country of nationality or last residence.

(c) *Termination of agreements.* The Commissioner, on behalf of the Attorney General, may terminate any carrier agreement under this part, with 5 days notice to a carrier, for the carrier's failure to meet the terms of such agreement. As a matter of discretion, the Commissioner may notify a carrier of the existence of a basis for termination of a carrier agreement under this part and allow the carrier a period not to exceed 15 days within which the carrier may bring itself into compliance with the terms of the carrier agreement. The agreement shall be subject to cancellation by either party for any reason upon 15 days' written notice to the other party.

PART 221—ADMISSION OF VISITORS OR STUDENTS

66. The authority citation for part 221 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1201; 8 CFR part 2.

§ 221.1   [Amended]

67. Section 221.1 is amended in the last sentence by revising the term ''part 103'' to read ''§ 103.6''.

PART 223—REENTRY PERMITS, REFUGEE TRAVEL DOCUMENTS, AND ADVANCE PAROLE DOCUMENTS

68. The authority citation for part 223 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1181, 1182, 1186a, 1203, 1225, 1226, 1227, 1251; Protocol Relating to the Status of Refugees, November 1, 1968, 19 U.S.T. 6223 (TIAS) 6577; 8 CFR part 2.

69. In § 223.1, paragraph (b) is revised to read as follows:

§ 223.1   Purpose of documents.

*  *  *  *  *

(b) *Refugee travel document.* A refugee travel document is issued pursuant to this part and article 28 of the United Nations Convention of July 29, 1951, for the purpose of travel. Except as provided in § 223.3(d)(2)(i), a person who holds refugee status pursuant to section 207 of the Act, or asylum status pursuant to section 208 of the Act, must have a refugee travel document to return to the United States after temporary travel abroad unless he or she is in possession of a valid advance parole document.

70. In § 223.2, paragraph (b)(2) is revised to read as follows:

§ 223.2   Processing.

*  *  *  *  *

(b)  *  *  *

(2) *Refugee travel document.* (i) *General.* Except as otherwise provided in this section, an application may be approved if filed by a person who is in the United States at the time of application, and either holds valid refugee status under section 207 of the Act, valid asylum status under section 208 of the Act, or is a permanent resident and received such status as a direct result of his or her asylum or refugee status.

(ii) *Discretionary authority to accept an application from an alien not within the United States.* As a matter of discretion, a district having jurisdiction over a port-of-entry or a preinspection station where an alien is an applicant for admission, or an overseas district director having jurisdiction over the place where an alien is physically present, may accept and adjudicate an application for a refugee travel document from an alien who previously had been admitted to the United States as a refugee, or who previously had been granted asylum status in the United States, and who had departed from the United States without having applied for such refugee travel document, provided:

(A) The alien submits a Form I–131, Application for Travel Document, with the fee required under § 103.7(b)(1) of this chapter.

(B) The district director is satisfied that the alien did not intend to abandon his or her refugee status at the time of departure from the United States;

(C) The alien did not engage in any activities while outside the United States that would be inconsistent with continued refugee or asylum status; and

(D) The alien has been outside the United States for less than 1 year since his or her last departure.

\*    \*    \*    \*    \*

71. In § 223.3, paragraph (d)(2) is revised to read as follows:

### § 223.3   Validity and effect on admissibility.

\*    \*    \*    \*    \*

(d) \*  \*  \*

(2) *Refugee travel document.* (i) *Inspection and immigration status.* Upon arrival in the United States, an alien who presents a valid unexpired refugee travel document, or who has been allowed to file an application for a refugee travel document and this application has been approved under the procedure set forth in § 223.2(b)(2)(ii), shall be examined as to his or her admissibility under the Act. An alien shall be accorded the immigration status endorsed in his or her refugee travel document, or (in the case of an alien discussed in § 223.2(b)(2)(ii)) which will be endorsed in such document, unless he or she is no longer eligible therefor, or he or she applies for and is found eligible for some other immigration status.

(ii) *Inadmissibility.* If an alien who presents a valid unexpired refugee travel document appears to be inadmissible, he or she shall be referred for proceedings under section 240 of the Act. Section 235(c) of the Act shall not be applicable.

## PART 232—DETENTION OF ALIENS FOR PHYSICAL AND MENTAL EXAMINATION

72. The heading for part 232 is revised to read as set forth above.

73. The authority citation for part 232 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1222, 1224, 1252; 8 CFR part 2.

### § 232.1   Redesignated as 232.3 and revised]

74. Section 232.1 is redesignated as § 232.3, and is revised to read as follows:

### § 232.3   Arriving aliens.

When a district director has reasonable grounds for believing that persons arriving in the United States should be detained for reasons specified in section 232 of the Act, he or she shall, after consultation with the United States Public Health Service at the port-of-entry, notify the master or agent of the arriving vessel or aircraft of his or her intention to effect such detention by serving on the master or agent Form I–259 in accordance with § 235.3(a) of this chapter.

### § 234.1 and § 234.2   [Redesignated as §§ 232.1 and 232.2 respectively]

75. Sections 234.1 and 234.2 are redesignated as §§ 232.1 and 232.2 respectively.

## PART 234—[REMOVED]

76. Part 234 is removed.

77. The following parts are redesignated as set forth in the table below:

| Old part | New part |
|---|---|
| Part 238 .................... | Part 233. |
| Part 239 .................... | Part 234. |

## PART 233—CONTRACTS WITH TRANSPORTATION LINES

78. The authority citation for newly redesignated part 233 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1228; 8 CFR part 2.

79. Newly redesignated § 233.1 is revised to read as follows:

### § 233.1   Contracts.

The contracts with transportation lines referred to in section 233(c) of the Act may be entered into by the Executive Associate Commissioner for Programs, or by an immigration officer designated by the Executive Associate Commissioner for Programs on behalf of the government and shall be documented on Form I–420. The

contracts with transportation lines referred to in section 233(a) of the Act shall be made by the Commissioner on behalf of the government and shall be documented on Form I–426. The contracts with transportation lines desiring their passengers to be preinspected at places outside the United States shall be made by the Commissioner on behalf of the government and shall be documented on Form I–425; except that contracts for irregularly operated charter flights may be entered into by the Associate Commissioner for Examinations or an immigration officer designated by the Executive Associate Commissioner for Programs and having jurisdiction over the location where the inspection will take place.

80. In newly redesignated § 233.3, paragraph (b) is revised to read as follows:

### § 233.3   Aliens in immediate and continuous transit.

\*    \*    \*    \*    \*

(b) *Signatory lines.* A list of currently effective Form I–426 agreements is maintained by the Service's Headquarters Office of Inspections and is available upon written request.

81. Newly redesignated § 233.4 is revised to read as follows:

### § 233.4   Preinspection outside the United States.

(a) *Form I–425 agreements.* A transportation line bringing applicants for admission to the United States through preinspection sites outside the United States shall enter into an agreement on Form I–425. Such an agreement shall be negotiated directly by the Service's Headquarters Office of Inspections and the head office of the transportation line.

(b) *Signatory lines.* A list of transportation lines with currently valid transportation agreements on Form I–425 is maintained by the Service's Headquarters Office of Inspections and is available upon written request.

82. Newly redesignated § 233.5 is revised to read as follows:

### § 233.5   Aliens entering Guam pursuant to section 14 of Public Law 99–396, "Omnibus Territories Act."

A transportation line bringing aliens to Guam under the visa waiver provisions of § 212.1(e) of this chapter shall enter into an agreement on Form I–760. Such agreements shall be negotiated directly by the Service's Headquarters and head offices of the transportation lines.

## PART 234—DESIGNATION OF PORTS OF ENTRY FOR ALIENS ARRIVING BY CIVIL AIRCRAFT

83. The heading for newly redesignated part 234 is revised as set forth above.

84. The authority citation for newly redesignated part 234 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1221, 1229; 8 CFR part 2.

### § 234.3 [Amended]

85. Newly redesignated § 234.3 is amended by removing the last sentence.

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

86. The authority citation for part 235 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1183, 1201, 1224, 1225, 1226, 1227, 1228, 1252; 8 CFR part 2.

87. Section 235.1 is revised to read as follows:

### § 235.1  Scope of examination.

(a) *General.* Application to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection, or as otherwise designated in this section.

(b) *U.S. citizens.* A person claiming U.S. citizenship must establish that fact to the examining officer's satisfaction and must present a U.S. passport if such passport is required under the provisions of 22 CFR part 53. If such applicant for admission fails to satisfy the examining immigration officer that he or she is a U.S. citizen, he or she shall thereafter be inspected as an alien.

(c) *Alien members of United States Armed Forces and members of a force of a NATO country.* Any alien member of the United States Armed Forces who is in the uniform of, or bears documents identifying him or her as a member of, such Armed Forces, and who is coming to or departing from the United States under official orders or permit of such Armed Forces is not subject to the removal provisions of the Act. A member of the force of a NATO country signatory to Article III of the Status of Forces Agreement seeking to enter the United States under official orders is exempt from the control provision of the Act. Any alien who is a member of either of the foregoing classes may, upon request, be inspected and his or her entry as an alien may be recorded. If the alien does not appear to the examining immigration officer to be clearly and beyond a doubt entitled to enter the United States under the provisions of the Act, the alien shall be so informed and his or her entry shall not be recorded.

(d) *Alien applicants for admission.* (1) Each alien seeking admission at a United States port-of-entry shall present whatever documents are required and shall establish to the satisfaction of the immigration officer that he or she is not subject to removal under the immigration laws, Executive Orders, or Presidential Proclamations and is entitled under all of the applicable provisions of the immigration laws and this chapter to enter the United States. A person claiming to have been lawfully admitted for permanent residence must establish that fact to the satisfaction of the inspecting immigration officer and must present proper documents in accordance with § 211.1 of this chapter.

(2) An alien present in the United States who has not been admitted or paroled or an alien who seeks entry at other than an open, designated port-of-entry, except as otherwise permitted in this section, is subject to the provisions of section 212(a) of the Act and to removal under section 235(b) or 240 of the Act.

(3) An alien who is brought to the United States, whether or not to a designated port-of-entry and regardless of the means of transportation, after having been interdicted in international or United States waters, is considered an applicant for admission and shall be examined under section 235(b) of the Act.

(4) An alien stowaway is not an applicant for admission and may not be admitted to the United States. A stowaway shall be removed from the United States under section 235(a)(2) of the Act. The provisions of section 240 of the Act are not applicable to stowaways, nor is the stowaway entitled to further hearing or review of the removal, except that an alien stowaway who indicates an intention to apply for asylum shall be referred to an asylum officer for a determination of credible fear of persecution in accordance with section 235(b)(1)(B) of the Act and § 208.30 of this chapter. An alien stowaway who is determined to have a credible fear of persecution shall have his or her asylum application adjudicated in accordance with § 208.2(b)(2) of this chapter. Nothing in this section shall be construed to require expedited removal proceedings in accordance with section 235(b)(1) of the Act. A stowaway who absconds either prior to inspection by an immigration officer or after being ordered removed as a stowaway pursuant to section 235(a)(2) of the Act is not entitled to removal proceedings under section 240 of the Act and shall be removed under section 235(a)(2) of the Act as if encountered upon arrival. A stowaway who has been removed pursuant to section 235(a)(2) of the Act and this section shall be considered to have been formally removed from the United States for all purposes under the Act.

(e) *U.S. citizens, lawful permanent residents of the United States, Canadian nationals, and other residents of Canada having a common nationality with Canadians, entering the United States by small craft.* Upon being inspected by an immigration officer and found eligible for admission as a citizen of the United States, or found eligible for admission as a lawful permanent resident of the United States, or in the case of a Canadian national or other resident of Canada having a common nationality with Canadians being found eligible for admission as a temporary visitor for pleasure, a person who desires to enter the United States from Canada in a small pleasure craft of less than 5 net tons without merchandise may be issued, upon application and payment of a fee prescribed under § 103.7(b)(1) of this chapter, Form I–68, Canadian Border Boat Landing Card, and may thereafter enter the United States along with the immediate shore area of the United States on the body of water designated on the Form I–68 from time to time for the duration of that navigation season without further inspection. In the case of a Canadian national or other resident of Canada having a common nationality with Canadians, the Form I–68 shall be valid only for the purpose of visits not to exceed 72 hours and only if the alien will remain in nearby shopping areas, nearby residential neighborhoods, or other similar areas adjacent to the immediate shore area of the United States. If the bearer of Form I–68 seeks to enter the United States by means other than small craft of less than 5 net tons without merchandise, or if he or she seeks to enter the United States for other purposes, or if he or she is an alien, other than a lawful permanent resident alien of the United States, and intends to proceed beyond an area adjacent to the immediate shore area of the United States, or remains in the United States longer than 72 hours, he or she must apply for admission at a United States port of entry.

(f) *Form I–94, Arrival Departure Record.* (1) Unless otherwise exempted, each arriving nonimmigrant who is admitted to the United States shall be issued, upon payment of a fee prescribed in § 103.7(b)(1) of this chapter for land border admissions, a Form I–94 as evidence of the terms of

admission. A Form I–94 issued at a land border port-of-entry shall be considered issued for multiple entries unless specifically annotated for a limited number of entries. A Form I–94 issued at other than a land border port-of-entry, unless issued for multiple entries, must be surrendered upon departure from the United States in accordance with the instructions on the form. Form I–94 is not required by:

(i) Any nonimmigrant alien described in § 212.1(a) of this chapter and 22 CFR 41.33 who is admitted as a visitor for business or pleasure or admitted to proceed in direct transit through the United States;

(ii) Any nonimmigrant alien residing in the British Virgin Islands who was admitted only to the U.S. Virgin Islands as a visitor for business or pleasure under § 212.1(b) of this chapter;

(iii) Any Mexican national in possession of a valid nonresident alien Mexican border crossing card, or a valid Mexican passport and a multiple-entry nonimmigrant visa issued under section 101(a)(15)(B) of the Act, who is admitted as a nonimmigrant visitor at a Mexican border port of entry for a period not to exceed 72 hours to visit within 25 miles of the border;

(iv) Bearers of Mexican diplomatic or official passports described in § 212.1(c–1) of this chapter.

(2) *Paroled aliens.* Any alien paroled into the United States under section 212(d)(5) of the Act, including any alien crewmember, shall be issued a completely executed Form I–94, endorsed with the parole stamp.

88. Section 235.2 is revised to read as follows:

**§ 235.2   Deferred inspection.**

(a) A district director may, in his or her discretion, defer the inspection of any vessel or aircraft, or of any alien, to another Service office or port-of-entry. Any alien coming to a United States port from a foreign port, from an outlying possession of the United States, from Guam, Puerto Rico, or the Virgin Islands of the United States, or from another port of the United States at which examination under this part was deferred, shall be regarded as an applicant for admission at that onward port.

(b) An examining immigration officer may defer further examination and refer the alien's case to the district director having jurisdiction over the place where the alien is seeking admission, or over the place of the alien's residence or destination in the United States, if the examining immigration officer has reason to believe that the alien can overcome a finding of inadmissibility by:

(1) Posting a bond under section 213 of the Act;

(2) Seeking and obtaining a waiver under section 211 or 212(d)(3) or (4) of the Act; or

(3) Presenting additional evidence of admissibility not available at the time and place of the initial examination.

(c) Such deferral shall be accomplished pursuant to the provisions of section 212(d)(5) of the Act for the period of time necessary to complete the deferred inspection.

(d) Refusal of a district director to authorize admission under section 213 of the Act, or to grant an application for the benefits of section 211 or section 212(d)(3) or (4) of the Act, shall be without prejudice to the renewal of such application or the authorizing of such admission by the immigration judge without additional fee.

(e) Whenever an alien on arrival is found or believed to be suffering from a disability that renders it impractical to proceed with the examination under the Act, the examination of such alien, members of his or her family concerning whose admissibility it is necessary to have such alien testify, and any accompanying aliens whose protection or guardianship will be required should such alien be found inadmissible shall be deferred for such time and under such conditions as the district director in whose district the port is located imposes.

89. Section 235.3 is revised to read as follows:

**§ 235.3   Inadmissible aliens and expedited removal.**

(a) *Detention prior to inspection.* All persons arriving at a port-of-entry in the United States by vessel or aircraft shall be detained aboard the vessel or at the airport of arrival by the owner, agent, master, commanding officer, person in charge, purser, or consignee of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service. Notice or order to detain shall not be required. The owner, agent, master, commanding officer, person in charge, purser, or consignee of such vessel or aircraft shall deliver every alien requiring examination to an immigration officer for inspection or to a medical officer for examination. The Service will not be liable for any expenses related to such detention or presentation or for any expenses of a passenger who has not been presented for inspection and for whom a determination has not been made concerning admissibility by a Service officer.

(b) *Expedited removal.* (1) *Determination of inadmissibility.* An alien who is arriving in the United States or other alien as designated pursuant to paragraph (b)(2)(ii) of this section who is determined to be inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act (except an alien for whom documentary requirements are waived under § 211.1(b)(3) or § 212.1 of this chapter), shall be ordered removed from the United States in accordance with section 235(b)(1) of the Act. The examining immigration officer shall serve the alien with Form I–860, Notice and Order of Expedited Removal. Except as otherwise provided in this section, such alien is not entitled to a hearing before an immigration judge in proceedings conducted pursuant to section 240 of the Act, or to an appeal of the expedited removal order by the Board of Immigration appeals. An alien whose inadmissibility is being considered under this section or who has been ordered removed pursuant to this section shall be detained pending determination and removal, except that parole of such alien, in accordance with section 212(d)(5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

(2) *Applicability.* The expedited removal provisions shall apply to the following classes of aliens who are determined to be inadmissible under section 212(a)(6)(C) or (7) of the Act:

(i) Arriving aliens, as defined in § 1.1(q) of this chapter, except for citizens of Cuba arriving at a United States port-of-entry by aircraft;

(ii) As specifically designated by the Commissioner, aliens who arrive in, attempt to enter, or have entered the United States without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and who have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the 2-year period immediately prior to the date of determination of inadmissibility. The Commissioner shall have the sole discretion to apply the provisions of section 235(b)(1) of the Act, at any time, to any class of aliens described in this section. The Commissioner's designation shall become effective upon publication of a notice in the **Federal Register.** However, if the Commissioner determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of

the United States or the effective enforcement of the immigration laws, the Commissioner's designation shall become effective immediately upon issuance, and shall be published in the **Federal Register** as soon as practicable thereafter. When these provisions are in effect for aliens who enter without inspection, the burden of proof rests with the alien to affirmatively show that he or she has the required continuous physical presence in the United States. Any absence from the United States shall serve to break the period of continuous physical presence. An alien who was not inspected and admitted or paroled into the United States but who establishes that he or she has been continuously physically present in the United States for the 2-year period immediately prior to the date of determination of inadmissibility shall be detained in accordance with section 235(b)(2) of the Act for a proceeding under section 240 of the Act.

(3) *Additional charges of inadmissibility.* In the expedited removal process, the Service may not charge an alien with any additional grounds of inadmissibility other than section 212(a)(6)(C) or 212(a)(7) of the Act. if an alien appears to be inadmissible under other grounds contained in section 212(a) of the Act, and if the Service wishes to pursue such additional grounds of inadmissibility, the alien shall be detained and referred for a removal hearing before an immigration judge pursuant to sections 235(b)(2) and 240 of the Act for inquiry into all charges. Once the alien is in removal proceedings under section 240 of the Act, the Service is not precluded from lodging additional charges against the alien. Nothing in this paragraph shall preclude the Service from pursuing such additional grounds of inadmissibility against the alien in any subsequent attempt to reenter the United States, provided the additional grounds of inadmissibility still exist.

(4) *Claim of asylum or fear of persecution.* If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, a fear of persecution, or a fear of return to his or her country, the inspecting officer shall, before proceeding further with the case, detain the alien and refer him or her for an interview by an asylum officer in accordance with § 208.30 of this chapter to determine if the alien has a credible fear of persecution. The referring officer shall provide information to the alien concerning the nature and purpose of the credible fear interview and shall advise the alien that he or she may, prior to the interview, consult with a person or person of his

or her choosing, at no expense to the Government and without unreasonably delaying the process. Pending the credible fear determination, the alien shall be detained. Parole of such alien in accordance with section 212(d)(5) of the Act may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

(5) *Claim to lawful permanent resident, refugee, or asylee status.* (i) *Verification of status.* If an applicant for admission who is subject to expedited removal pursuant to section 235(b)(1) of the Act claims to have been lawfully admitted for permanent residence, admitted as a refugee under section 207 of the Act, or granted asylum under section 208 of the Act, the immigration officer shall attempt to verify the alien's claim. Such verification shall include a check of all available Service data systems and any other means available to the officer. An alien whose claim to lawful permanent resident, refugee, or asylee status cannot be verified will be advised of the penalties for perjury, and will be placed under oath or allowed to make a declaration as permitted under 28 U.S.C. 1746, concerning his or her lawful permanent residence, admission as a refugee under section 207 of the Act, or grant of asylum status under section 208 of the Act. Whenever practicable, a written statement shall be taken from the alien. The immigration officer shall issue an expedited order of removal under section 235(b)(1)(A)(i) of the Act and refer the alien to the immigration judge for review of the order in accordance with paragraph (b)(5)(iv) of this section and § 235.6(a)(2)(ii).

(ii) *Claimed lawful permanent residents.* If the claim to lawful permanent resident status is verified, and such status has not been terminated in exclusion, deportation, or removal proceedings, the examining immigration officer shall not order the alien removed pursuant to section 235(b)(1) of the Act. The examining immigration officer will determine in accordance with section 101(a)(13)(C) of the Act whether the alien is considered to be making an application for admission. If the alien is determined to be seeking admission and the alien is otherwise admissible, except that he or she is not in possession of the required documentation, a discretionary waiver of documentary requirements may be considered in accordance with section 211(b) of the Act and § 211.1(b)(3) of this chapter or the alien's inspection may be deferred to an onward office for presentation of the

required documents. If the alien appears to be inadmissible, the immigration officer may initiate removal proceedings against the alien under section 240 of the Act.

(iii) *Claimed refugees and asylees.* If a check of Service records or other means indicates that the alien has been granted refugee status or asylee status, and such status has not been terminated in deportation, exclusion, or removal proceedings, the immigration officer shall not order the alien removed pursuant to section 235(b)(1) of the Act. If the alien is not in possession of a valid, unexpired refugee travel document, the examining immigration officer may accept an application for a refugee travel document in accordance with § 223.2(b)(2)(ii) of this chapter. If accepted, the immigration officer shall readmit the refugee or asylee in accordance with § 223.3(d)(2)(i) of this chapter. If the alien is determined not to be eligible to file an application for a refugee travel document the immigration officer may initiate removal proceedings against the alien under section 240 of this Act.

(iv) *Review of order for claimed lawful permanent residents, refugees, or asylees.* When an alien whose status has not been verified but who is claiming under oath or under penalty of perjury to be a lawful permanent resident, refugee, or asylee is ordered removed pursuant to section 235(b)(1) of the Act, the case will be referred to an immigration judge for review of the expedited removal order under section 235(b)(1)(C) of the Act and § 235.6(a)(2)(ii). If the immigration judge determines that the alien has never been admitted as a lawful permanent resident or as a refugee, or granted asylum status, the order issued by the immigration officer will be affirmed and the Service will remove the alien. There is no appeal from the decision of the immigration judge. If the immigration judge determines that the alien was once so admitted as a lawful permanent resident or as a refugee, or was granted asylum status, and such status has not been terminated by final administrative action, the immigration judge will terminate proceedings and vacate the expedited removal order. The Service may initiate removal proceedings against such an alien in proceedings under section 240 of the Act. During removal proceedings, the immigration judge may consider any waivers, exceptions, or requests for relief for which the alien is eligible.

(6) *Opportunity for the alien to establish that he or she was admitted or paroled into the United States.* If the Commissioner determines that the

expedited removal provisions of section 235(b)(1) of the Act shall apply to any or all aliens described in paragraph (b)(2)(ii) of this section, such alien will be given a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she was admitted or paroled into the United States following inspection at a port-of-entry. The alien will be allowed to present evidence or provide sufficient information to support the claim. Such evidence may consist of documentation in the possession of the alien, the Service, or a third party. The examining immigration officer will consider all such evidence and information, make further inquiry if necessary, and will attempt to verify the alien's status through a check of all available Service data systems. The burden rests with the alien to satisfy the examining immigration officer of the claim of lawful admission or parole. If the alien establishes that he or she was lawfully admitted or paroled, the case will be examined to determine if grounds of deportability under section 237(a) of the Act are applicable, or if paroled, whether such parole has been, or should be, terminated, and whether the alien is inadmissible under section 212(a) of the Act. An alien who cannot satisfy the examining officer that he or she was lawfully admitted or paroled will be ordered removed pursuant to section 235(b)(1) of the Act.

(7) *Review of expedited removal orders.* Any removal order entered by an examining immigration officer pursuant to section 235(b)(1) of the Act must be reviewed and approved by the appropriate supervisor before the order is considered final. Such supervisory review shall not be delegated below the level of the second line supervisor, or a person acting in that capacity. The supervisory review and approval of an expedited removal order for an alien described in section 235(b)(1)(A)(iii) of the Act must include a review of any claim of lawful admission or parole and any evidence or information presented to support such a claim, prior to approval of the order. In such cases, the supervisor may request additional information from any source and may require further interview of the alien.

(8) *Removal procedures relating to expedited removal.* An alien ordered removed pursuant to section 235(b)(1) of the Act shall be removed from the United States in accordance with section 241(c) of the Act and 8 CFR part 241.

(9) *Waivers of documentary requirements.* Nothing in this section limits the discretionary authority of the Attorney General, including authority

under sections 211(b) or 212(d) of the Act, to waive the documentary requirements for arriving aliens.

(10) *Applicant for admission under section 217 of the Act.* The provisions of § 235.3(b) do not apply to an applicant for admission under section 217 of the Act.

(c) *Other inadmissible aliens.* Any alien applicant for admission, as included in sections 101(a)(13) and 235(a)(1) of the Act and § 235.1(d) of this chapter, who appears to the inspecting officer to be inadmissible, but who does not fall within paragraph (b) of this section, may be detained, paroled, or paroled for deferred inspection by the inspecting officer. In determining whether or not an alien shall be detained, paroled, or paroled for deferred inspection, the inspecting officer shall consider the likelihood that the alien will abscond or pose a security risk.

(d) *Service custody.* The Service will assume custody of any alien subject to detention under paragraph (b) or (c) of this section. In its discretion, the Service may require any alien who appears inadmissible and who arrives at a land border port-of-entry from Canada or Mexico, to remain in that country while awaiting a removal hearing. Such alien shall be considered detained for a proceeding within the meaning of section 235(b) of the Act and may be ordered removed in absentia by an immigration judge if the alien fails to appear for the hearing.

(e) *Detention in non-Service facility.* Whenever an alien is taken into Service custody and detained at a facility other than at a Service Processing Center, the public or private entities contracted to perform such service shall have been approved for such use by the Service's Jail Inspection Program or shall be performing such service under contract in compliance with the Standard Statement of Work for Contract Detention Facilities. Both programs are administered by the Detention and Deportation section having jurisdiction over the alien's place of detention. Under no circumstances shall an alien be detained in facilities not meeting the four mandatory criteria for usage. These are:

(1) 24-Hour supervision,

(2) Conformance with safety and emergency codes,

(3) Food Service, and

(4) Availability of emergency medical care.

(f) *Privilege of communication.* The mandatory notification requirements of consular and diplomatic officers pursuant to § 236.1(e) of this chapter

apply when an inadmissible alien is detained for removal proceedings.

90. Section 235.4 is revised to read as follows:

**§ 235.4   Withdrawal of application for admission.**

(a) The Attorney General may, in his or her discretion, permit any alien applicant for admission to withdraw his or her application for admission in lieu of removal proceedings under section 240 of the Act or expedited removal under section 235(b)(1) of the Act. The alien's decision to withdraw his or her application for admission must be made voluntarily, but nothing in this section shall be construed as to give an alien the right to withdraw his or her application for admission. Permission to withdraw an application for admission should not normally be granted unless the alien intends and is able to depart the United States immediately. An alien permitted to withdraw his or her application for admission shall normally remain in carrier or Service custody pending departure, unless the district director determines that parole of the alien is warranted in accordance with § 212.5(a) of this chapter.

(b) An immigration judge may allow only an arriving alien to withdraw an application for admission. Once the issue of inadmissibility or deportability has been resolved, permission to withdraw an application for admission should ordinarily be granted only with the concurrence of the Service. An immigration judge shall not allow an alien to withdraw an application for admission unless the alien, in addition to demonstrating that he or she possesses both the intent and the means to depart immediately from the United States, establishes that factors directly relating to the issue of inadmissibility indicate that the granting of the withdrawal would be in the interest of justice. In addition, during the pendency of an appeal from the order of removal, permission to withdraw an application for admission must be obtained from the immigration judge or the Board.

91. Section 235.5 is revised to read as follows:

**§ 235.5   Preinspection.**

(a) *In United States territories and possessions.* In the case of any aircraft proceeding from Guam, Puerto Rico, or the United States Virgin Islands destined directly and without touching at a foreign port or place, to any other of such places, or to one of the States of the United States or the District of Columbia, the examination of the passengers and crew required by the Act

may be made prior to the departure of the aircraft, and in such event, final determination of admissibility shall be made immediately prior to such departure. The examination shall be conducted in accordance with sections 232, 235, and 240 of the Act and 8 CFR parts 235 and 240. If it appears to the examining immigration officer that any person in the United States being examined under this section is prima facie removable from the United States, further action with respect to his or her examination shall be deferred and further proceedings regarding removability conducted as provided in section 240 of the Act and 8 CFR part 240. When the foregoing inspection procedure is applied to any aircraft, persons examined and found admissible shall be placed aboard the aircraft, or kept at the airport separate and apart from the general public until they are permitted to board the aircraft. No other person shall be permitted to depart on such aircraft until and unless he or she is found to be admissible as provided in this section.

(b) *In foreign territory.* In the case of any aircraft, vessel, or train proceeding directly, without stopping, from a port or place in foreign territory to a port-of-entry in the United States, the examination and inspection of passengers and crew required by the Act and final determination of admissibility may be made prior to such departure at the port or place in the foreign territory and shall have the same effect under the Act as though made at the destined port-of-entry in the United States.

92. Section 235.6 is revised to read as follows:

### § 235.6 Referral to immigration judge.

(a) *Notice.* (1) *Referral by Form I–862, Notice to Appear.* An immigration officer or asylum officer will sign and deliver a Form I–862 to an alien in the following cases:

(i) If, in accordance with the provisions of section 235(b)(2)(A) of the Act, the examining immigration officer detains an alien for a proceeding before an immigration judge under section 240 of the Act; or

(ii) If, in accordance with section 235(b)(1)(B)(ii) of the Act, an asylum officer determines that an alien is expedited removal proceedings has a credible fear of persecution and refers the case to the immigration judge for consideration of the application for asylum.

(iii) If, in accordance with section 235(b)(1)(B)(iii)(III) of the Act, the immigration judge determines that an alien in expedited removal proceedings has a credible fear of persecution and

vacates the expedited removal order issued by the asylum officer pursuant to section 235(b)(1)(B)(iii) of the Act.

(iv) If an immigration officer verifies that an alien subject to expedited removal under section 235(b)(1) of the Act has been admitted as a lawful permanent resident refugee, or asylee, or upon review pursuant to § 235.3(b)(5)(iv) an immigration judge determines that the alien was once so admitted, provided that such status has not been terminated by final administrative action, and the Service initiates removal proceedings against the alien under section 240 of the Act.

(2) *Referral by Form I–863, Notice of Referral to Immigration Judge.* An immigration officer will sign and deliver a Form I–863 to an alien in the following cases:

(i) If, in accordance with section 235(b)(1)(B)(iii)(III) of the Act, an asylum officer determines that an alien does not have a credible fear of persecution, and the alien requests a review of that determination by an immigration judge; or

(ii) If, in accordance with section 235(b)(1)(C) of the Act, an immigration officer refers an expedited removal order entered on an alien claiming to be a lawful permanent resident, refugee, or asylee for whom the officer could not verify such status to an immigration judge for review of the order.

(iii) If an immigration officer refers an applicant described in § 208.2(b)(1) of this chapter to an immigration judge for an asylum hearing under § 208.2(b)(2) of this chapter.

(b) *Certification for mental condition; medical appeal.* An alien certified under sections 212(a)(1) and 232(b) of the Act shall be advised by the examining immigration officer that he or she may appeal to a board of medical examiners of the United States Public Health Service pursuant to section 232 of the Act. If such appeal is taken, the district director shall arrange for the convening of the medical board.

### § 235.7 [Removed]

93. Section 235.7 is removed.

### § 235.13 [Redesignated as § 235.7]

94. Section 235.13 is redesignated as § 235.7.

95. Section 235.8 is revised to read as follows:

### § 235.8 Inadmissibility on security and related grounds.

(a) *Report.* When an immigration officer or an immigration judge suspects that an arriving alien appears to be inadmissible under section 212(a)(3)(A) (other than clause (ii), (B), or (C) of the

Act, the immigration officer or immigration judge shall order the alien removed and report the action promptly to the district director who has administrative jurisdiction over the place where the alien has arrived or where the hearing is being held. The immigration officer shall, if possible, take a brief sworn question-and-answer statement from the alien, and the alien shall be notified by personal service of Form I–147, Notice of Temporary Inadmissibility, of the action taken and the right to submit a written statement and additional information for consideration by the Attorney General. The district director shall forward the report to the regional director for further action as provided in paragraph (b) of this section.

(b) *Action by regional director.* (1) In accordance with section 235(c)(2)(B) of the Act, the regional director may deny any further inquiry or hearing by an immigration judge and order the alien removed by personal service of Form I–148, Notice of Permanent Inadmissibility, or issue any other order disposing of the case that the regional director considers appropriate.

(2) If the regional director concludes that the case does not meet the criteria contained in section 235(c)(2)(B) of the Act, the regional director may direct that:

(i) An immigration officer shall conduct a further examination of the alien, concerning the alien's admissibility; or,

(ii) The alien's case be referred to an immigration judge for a hearing, or for the continuation of any prior hearing.

(3) The regional director's decision shall be in writing and shall be signed by the regional director. Unless the written decision contains confidential information, the disclosure of which would be prejudicial to the public interest, safety, or security of the United States, the written decision shall be served on the alien. If the written decision contains such confidential information, the alien shall be served with a separate written order showing the disposition of the case, but with the confidential information deleted.

(c) *Finality of decision.* The regional director's decision under this section is final when it is served upon the alien in accordance with paragraph (b)(3) of this section. There is no administrative appeal from the regional director's decision.

(d) *Hearing by immigration judge.* If the regional director directs that an alien subject to removal under this section be given a hearing or further hearing before an immigration judge, the hearing and all further proceedings in

the matter shall be conducted in accordance with the provisions of section 240 of the Act and other applicable sections of the Act to the same extent as though the alien had been referred to an immigration judge by the examining immigration officer. In a case where the immigration judge ordered the alien removed pursuant to paragraph (a) of this section, the Service shall refer the case back to the immigration judge and proceedings shall be automatically reopened upon receipt of the notice of referral. If confidential information, not previously considered in the matter, is presented supporting the inadmissibility of the alien under section 212(a)(3)(A) (other than clause (ii)), (B), or (C) of the Act, the disclosure of which, in the discretion of the immigration judge, may be prejudicial to the public interest, safety, or security, the immigration judge may again order the alien removed under the authority of section 235(c) of the Act and further action shall be taken as provided in this section.

(e) *Nonapplicability.* The provisions of this section shall apply only to arriving aliens, as defined in § 1.1(q) of this chapter. Aliens present in the United States who have not been admitted or paroled may be subject to proceedings under Title V of the Act.

### § 235.9 [Removed]

96. Section 235.9 is removed.

### § 235.12 [Redesignated as § 235.9 and revised]

97. Section 235.12 is redesignated as § 235.9 and is revised to read as follows:

### § 235.9 Northern Marianas identification card.

During the two-year period that ended July 1, 1990, the Service issued Northern Marianas Identification Cards to aliens who acquired United States citizenship when the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States entered into force on November 3, 1986. These cards remain valid as evidence of United States citizenship. Although the Service no longer issues these cards, a United States citizen to whom a card was issued may file Form I–777, Application for Issuance or Replacement of Northern Marianas Card, to obtain replacement of a lost, stolen, or mutilated Northern Marianas Identification Card.

98. Section 235.10 is revised to read as follows:

### § 235.10 U.S. Citizen Identification Card.

(a) *General.* Form I–197, U.S. Citizen Identification Card, is no longer issued by the Service but valid existing cards will continue to be acceptable documentation of U.S. citizenship. Possession of the identification card is not mandatory for any purpose. A U.S. Citizen Identification Card remains the property of the United States. Because the identification card is no longer issued, there are no provisions for replacements cards.

(b) *Surrender and voidance.* (1) *Institution of proceeding under section 240 or 342 of the Act.* A U.S. Citizen Identification Card must be surrendered provisionally to a Service office upon notification by the district director that a proceeding under section 240 or 342 of the Act is being instituted against the person to whom the card was issued. The card shall be returned to the person if the final order in the proceeding does not result in voiding the card under this paragraph. A U.S. Citizen Identification Card is automatically void if the person to whom it was issued is determined to be an alien in a proceeding conducted under section 240 of the Act, or if a certificate, document, or record relating to that person is canceled under section 342 of the Act.

(2) *Investigation of validity of identification card.* A U.S. Citizen Identification Card must be surrendered provisionally upon notification by a district director that the validity of the card is being investigated. The card shall be returned to the person who surrendered it if the investigation does not result in a determination adverse to his or her claim to be a United States citizen. When an investigation results in a tentative determination adverse to the applicant's claim to be a United States citizen, the applicant shall be notified by certified mail directed to his or her last known address. The notification shall inform the applicant of the basis for the determination and of the intention of the district director to declare the card void unless within 30 days the applicant objects and demands an opportunity to see and rebut the adverse evidence. Any rebuttal, explanation, or evidence presented by the applicant must be included in the record of proceeding. The determination whether the applicant is a United States citizen must be based on the entire record and the applicant shall be notified of the determination. If it is determined that the applicant is not a United States citizen, the applicant shall be notified of the reasons, and the card deemed void. There is no appeal from the district director's decision.

(3) *Admission of alienage.* A U.S. Citizen Identification Card is void if the person to whom it was issued admits in a statement signed before an immigration officer that he or she is an alien and consents to the voidance of the card. Upon signing the statement the card must be surrendered to the immigration officer.

(4) *Surrender of void card.* A void U.S. Citizen Identification Card which has not been returned to the Service must be surrendered without delay to an immigration officer or to the issuing office of the Service.

(c) *U.S. Citizen Identification Card previously issued on Form I–179.* A valid Form I–179, U.S. Citizen Identification Card, continues to be valid subject to the provisions of this section.

99. Section 235.11 is revised to read as follows:

### § 235.11 Admission of conditional permanent residents.

(a) *General.* (1) *Conditional residence based on family relationship.* An alien seeking admission to the United States with an immigrant visa as the spouse or son or daughter of a United States citizen or lawful permanent resident shall be examined to determine whether the conditions of section 216 of the Act apply. If so, the alien shall be admitted conditionally for a period of 2 years. At the time of admission, the alien shall be notified that the alien and his or her petitioning spouse must file a Form I–751, Petition to Remove the Conditions on Residence, within the 90-day period immediately preceding the second anniversary of the alien's admission for permanent residence.

(2) *Conditional residence based on entrepreneurship.* An alien seeking admission to the United States with an immigrant visa as an alien entrepreneur (as defined in section 216A(f)(1) of the Act) or the spouse or unmarried minor child of an alien entrepreneur shall be admitted conditionally for a period of 2 years. At the time of admission, the alien shall be notified that the principal alien (entrepreneur) must file a Form I–829, Petition by Entrepreneur to Remove Conditions, within the 90-day period immediately preceding the second anniversary of the alien's admission for permanent residence.

(b) *Correction of endorsement on immigrant visa.* If the alien is subject to the provisions of section 216 of the Act, but the classification endorsed on the immigrant visa does not so indicate, the endorsement shall be corrected and the alien shall be admitted as a lawful permanent resident on a conditional basis, if otherwise admissible. Conversely, if the alien is not subject to the provisions of section 216 of the Act, but the visa classification endorsed on the immigrant visa indicates that the

alien is subject thereto (e.g., if the second anniversary of the marriage upon which the immigrant visa is based occurred after the issuance of the visa and prior to the alien's application for admission) the endorsement on the visa shall be corrected and the alien shall be admitted as a lawful permanent resident without conditions, if otherwise admissible.

(c) *Expired conditional permanent resident status.* The lawful permanent resident alien status of a conditional resident automatically terminates if the conditional basis of such status is not removed by the Service through approval of a Form I–751, Petition to Remove the Conditions on Residence or, in the case of an alien entrepreneur (as defined in section 216A(f)(1) of the Act), Form I–829, Petition by Entrepreneur to Remove Conditions. Therefore, an alien who is seeking admission as a returning resident subsequent to the second anniversary of the date on which conditional residence was obtained (except as provided in § 211.1(b)(1) of this chapter) and whose conditional basis of such residence has not been removed pursuant to section 216(c) or 216A(c) of the Act, whichever is applicable, shall be placed under removal proceedings. However, in a case where conditional residence was based on a marriage, removal proceedings may be terminated and the alien may be admitted as a returning resident if the required Form I–751 is filed jointly, or by the alien alone (if appropriate), and approved by the Service. In the case of an alien entrepreneur, removal proceedings may be terminated and the alien admitted as a returning resident if the required Form I–829 is filed by the alien entrepreneur and approved by the Service.

100–101. Part 236 is revised to read as follows:

## PART 236—APPREHENSION AND DETENTION OF INADMISSIBLE AND DEPORTABLE ALIENS; REMOVAL OF ALIENS ORDERED REMOVED

### Subpart A—Detention of Aliens Prior to Order of Removal

Sec.
236.1   Apprehension, custody, and detention.
236.2   Confined aliens, incompetents, and minors.
236.3   Detention and release of juveniles.
236.4   Removal of S–5, S–6, and S–7 nonimmigrants.
236.5   Fingerprints and photographs.

### Subpart B—Family Unity Program

236.10   Description of program.
236.11   Definitions.
236.12   Eligibility.
236.13   Ineligible aliens.
236.14   Filing.
236.15   Voluntary departure and eligibility for employment.
236.16   Travel outside the United States.
236.17   Eligibility for Federal financial assistance programs.
236.18   Termination of Family Unity Program benefits.

**Authority:** 8 U.S.C. 1103, 1182, 1224, 1225, 1226, 1227, 1362; 8 CFR part 2.

## Subpart A—Detention of Aliens Prior to Order of Removal

### § 236.1  Apprehension, custody, and detention.

(a) *Detainers.* The issuance of a detainer under this section shall be governed by the provisions of § 287.7 of this chapter.

(b) *Warrant of arrest.* (1) *In general.* At the time of issuance of the notice to appear, or at any time thereafter and up to the time removal proceedings are completed, the respondent may be arrested and taken into custody under the authority of Form I–200, Warrant of Arrest. A warrant of arrest may be issued only by those immigration officers listed in § 287.5(e)(2) of this chapter and may be served only by those immigration officers listed in § 287.5(e)(3) of this chapter.

(2) If, after the issuance of a warrant of arrest, a determination is made not to serve it, any officer authorized to issue such warrant may authorize its cancellation.

(c) *Custody issues and release procedures.* (1) After expiration of the Transition Period Custody Rules under Pub. L. 104–208, no alien described in section 236(c)(1) of the Act shall be released from custody during removal proceedings except pursuant to section 236(c)(2) of the Act.

(2) Any officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236 (a)(2) and (3) of the Act; *provided* that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.

(3) When an alien who, having been arrested and taken into custody, has been released, such release may be revoked at any time in the discretion of the district director, acting district director, deputy district director, assistant district director for investigations, assistant district director for detention and deportation, or officer in charge (except foreign), in which event the alien may be taken into physical custody and detained. If

detained, unless a breach has occurred, any outstanding bond shall be revoked and canceled.

(4) The provisions of § 103.6 of this chapter shall apply to any bonds authorized. Subject to the provisions of this section, the provisions of § 3.19 of this chapter shall govern availability to the respondent of recourse to other administrative authority for release from custody.

(5) An immigration judge may not exercise authority provided in this section and the review process described in paragraph (d) of this section shall not apply with respect to:

(i) Inadmissible aliens in removal proceedings,

(ii) Arriving aliens, as described in § 1.1(q) of this chapter, including aliens paroled pursuant to section 212(d)(5) of the Act, in removal proceedings,

(iii) Aliens described in section 237(a)(4) of the Act, or

(iv) After the expiration of section 303(b)(3) of Pub. L. 104–208, aliens described in section 236(c)(1) of the Act.

(d) *Appeals from custody decisions.* (1) *Application to immigration judge.* After an initial custody determination by the district director, including the setting of a bond, the respondent may at any time before an order under 8 CFR part 240 becomes final, request amelioration of the conditions under which he or she may be released. Prior to such final order, and except as otherwise provided in this chapter, the immigration judge is authorized to exercise the authority in section 236 of the Act to detain the alien in custody, release the alien, and determine the amount of bond, if any, under which the respondent may be released, as provided in § 3.19 of this chapter. If the alien has been released from custody, an application for amelioration of the terms of release must be filed within 7 days of release. Once a removal order becomes administratively final, determinations regarding custody and bond are made by the district director.

(2) *Application to the district director.* (i) After expiration of the 7-day period in paragraph (d)(1) of this section, the respondent may request review by the district director of the conditions of his or her release.

(ii) After an order becomes administratively final, the respondent may request review by the district director of the conditions of his or her release.

(3) *Appeal to the Board of Immigration Appeals.* An appeal relating to bond and custody determinations may be filed within 10 days of the decision, to the Board of

Immigration Appeals in the following circumstances:

(i) In accordance with § 3.38 of this chapter, the alien or the Service may appeal the decision of an immigration judge pursuant to paragraph (d)(1) of this section.

(ii) The alien may appeal from the district director's decision under paragraph (d)(2)(i) of this section.

(iii) The alien may appeal from the district director's decision under paragraph (d)(2)(ii) of this section, except that no appeal shall be allowed when the Service notifies the alien that it is ready to execute an order of deportation and takes the alien into custody for that purpose.

(4) *Effect of filing an appeal.* The filing of an appeal from a determination of an immigration judge or district director under this paragraph shall not operate to delay compliance with the order, nor stay the administrative proceedings or removal.

(e) *Privilege of communication.* Every detained alien shall be notified that he or she may communicate with the consular or diplomatic officers of the country of his or her nationality in the United States. Existing treaties with the countries listed below require immediate communication with appropriate consular or diplomatic officers whenever nationals of the following countries are detained in removal proceedings, whether or not requested by the alien and even if the alien requests that no communication be undertaken in his or her behalf. When notifying consular or diplomatic officials, Service officers shall not reveal the fact that any detained alien has applied for asylum or withholding of removal.

Albania [1]
Antigua
Armenia
Azerbaijan
Bahamas
Barbados
Belarus
Belize
Brunei
Bulgaria
China (People's Republic of) [2]
Costa Rica
Cyprus
Czech Republic

Dominica
Fiji
Gambia, The
Georgia
Ghana
Grenada
Guyana
Hungary
Jamaica
Kazakhstan
Kiribati
Kuwait
Kyrgyzstan
Malaysia
Malta
Mauritius
Moldova
Mongolia
Nigeria
Philippines
Poland
Romania
Russian Federation
St. Kitts/Nevis
St. Lucia
St. Vincent/Grenadines
Seychelles
Sierra Leone
Singapore
Slovak Republic
South Korea
Tajikistan
Tanzania
Tonga
Trinidad/Tobago
Turkmenistan
Tuvalu
Ukraine
United Kingdom [3]
U.S.S.R. [4]
Uzbekistan
Zambia

(f) *Notification to Executive Office for Immigration Review of change in custody status.* The Service shall notify the Immigration Court having administrative control over the Record of Proceeding of any change in custody location or of release from, or subsequent taking into, Service custody of a respondent/applicant pursuant to § 3.19(g) of this chapter.

### § 236.2   Confined aliens, incompetents, and minors.

(a) *Service.* If the respondent is confined, or if he or she is an incompetent, or a minor under the age of 14, the notice to appear, and the warrant of arrest, if issued, shall be

served in the manner prescribed in § 239.1 of this chapter upon the person or persons specified by § 103.5a(c) of this chapter.

(b) *Service custody and cost of maintenance.* An alien confined because of physical or mental disability in an institution or hospital shall not be accepted into physical custody by the Service until an order of removal has been entered and the Service is ready to remove the alien. When such an alien is an inmate of a public or private institution at the time of the commencement of the removal proceedings, expenses for the maintenance of the alien shall not be incurred by the Government until he or she is taken into physical custody by the Service.

### § 236.3   Detention and release of juveniles.

(a) *Juveniles.* A juvenile is defined as an alien under the age of 18 years.

(b) *Release.* Juveniles for whom bond has been posted, for whom parole has been authorized, or who have been ordered released on recognizance, shall be released pursuant to the following guidelines:

(1) Juveniles shall be released, in order of preference, to:

(i) A parent;

(ii) Legal guardian; or

(iii) An adult relative (brother, sister, aunt, uncle, grandparent) who is not presently in Service detention, unless a determination is made that the detention of such juvenile is required to secure his or her timely appearance before the Service or the Immigration Court or to ensure the juvenile's safety or that of others. In cases where the parent, legal guardian, or adult relative resides at a location distant from where the juvenile is detained, he or she may secure release at a Service office located near the parent, legal guardian, or adult relative.

(2) If an individual specified in paragraphs (b)(1) (i) through (iii) of this section cannot be located to accept custody of a juvenile, and the juvenile has identified a parent, legal guardian, or adult relative in Service detention, simultaneous release of the juvenile and the parent, legal guardian, or adult relative shall be evaluated on a discretionary case-by-case basis.

(3) In cases where the parent or legal guardian is in Service detention or outside the United States, the juvenile may be released to such person as is designated by the parent or legal guardian in a sworn affidavit, executed before an immigration officer or consular officer, as capable and willing to care for the juvenile's well-being. Such person must execute an agreement

---

[1] Arrangements with these countries provide that U.S. authorities shall notify responsible representatives within 72 hours of the arrest or detention of one of their nationals.

[2] When Taiwan nationals (who carry "Republic of China" passports) are detained, notification should be made to the nearest office of the Taiwan Economic and Cultural Representative's Office, the unofficial entity representing Taiwan's interests in the United States.

[3] British dependencies are also covered by this agreement. They are: Anguilla, British Virgin Islands, Hong Kong, Bermuda, Montserrat, and the Turks and Caicos Islands. Their residents carry British passports.

[4] All U.S.S.R. successor states are covered by this agreement. They are: Armenia, Azerbaijan, Belarus, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Russian Federation, Tajikistan, Turkmenistan, Ukraine, and Uzbekistan.

to care for the juvenile and to ensure the juvenile's presence at all future proceedings before the Service or an immigration judge.

(4) In unusual and compelling circumstances and in the discretion of the district director or chief patrol agent, a juvenile may be released to an adult, other than those identified in paragraphs (b)(1) (i) through (iii) of this section, who executes an agreement to care for the juvenile's well-being and to ensure the juvenile's presence at all future proceedings before the Service or an immigration judge.

(c) *Juvenile coordinator.* The case of a juvenile for whom detention is determined to be necessary should be referred to the "Juvenile Coordinator," whose responsibilities should include, but not be limited to, finding suitable placement of the juvenile in a facility designated for the occupancy of juveniles. These may include juvenile facilities contracted by the Service, state or local juvenile facilities, or other appropriate agencies authorized to accommodate juveniles by the laws of the state or locality.

(d) *Detention.* In the case of a juvenile for whom detention is determined to be necessary, for such interim period of time as is required to locate suitable placement for the juvenile, whether such placement is under paragraph (b) or (c) of this section, the juvenile may be temporarily held by Service authorities or placed in any Service detention facility having separate accommodations for juveniles.

(e) *Refusal of release.* If a parent of a juvenile detained by the Service can be located, and is otherwise suitable to receive custody of the juvenile, and the juvenile indicates a refusal to be released to his or her parent, the parent(s) shall be notified of the juvenile's refusal to be released to the parent(s), and shall be afforded an opportunity to present their views to the district director, chief patrol agent, or immigration judge before a custody determination is made.

(f) *Notice to parent of application for relief.* If a juvenile seeks release from detention, voluntary departure, parole, or any form of relief from removal, where it appears that the grant of such relief may effectively terminate some interest inherent in the parent-child relationship and/or the juvenile's rights and interests are adverse with those of the parent, and the parent is presently residing in the United States, the parent shall be given notice of the juvenile's application for relief, and shall be afforded an opportunity to present his or her views and assert his or her interest to the district director or

immigration judge before a determination is made as to the merits of the request for relief.

(g) *Voluntary departure.* Each juvenile, apprehended in the immediate vicinity of the border, who resides permanently in Mexico or Canada, shall be informed, prior to presentation of the voluntary departure form or being allowed to withdraw his or her application for admission, that he or she may make a telephone call to a parent, close relative, a friend, or to an organization found on the free legal services list. A juvenile who does not reside in Mexico or Canada who is apprehended shall be provided access to a telephone and must in fact communicate either with a parent, adult relative, friend, or with an organization found on the free legal services list prior to presentation of the voluntary departure form. If such juvenile, of his or her own volition, asks to contact a consular officer, and does in fact make such contact, the requirements of this section are satisfied.

(h) *Notice and request for disposition.* When a juvenile alien is apprehended, he or she must be given a Form I–770, Notice of Rights and Disposition. If the juvenile is less than 14 years of age or unable to understand the notice, the notice shall be read and explained to the juvenile in a language he or she understands. In the event a juvenile who has requested a hearing pursuant to the notice subsequently decides to accept voluntary departure or is allowed to withdraw his or her application for admission, a new Form I–770 shall be given to, and signed by the juvenile.

### §236.4   Removal of S–5, S–6, and S–7 nonimmigrants.

(a) *Condition of classification.* As a condition of classification and continued stay in classification pursuant to section 101(a)(15)(S) of the Act, nonimmigrants in S classification must have executed Form I–854, Part B, Inter-agency Alien Witness and Informant Record, certifying that they have knowingly waived their right to a removal hearing and right to contest, other than on the basis of an application for withholding of deportation or removal, any removal action, including detention pending deportation or removal, instituted before lawful permanent resident status is obtained.

(b) *Determination of deportability.* (1) A determination to remove a deportable alien classified pursuant to section 101(a)(15)(S) of the Act shall be made by the district director having jurisdiction over the place where the alien is located.

(2) A determination to remove such a deportable alien shall be based on one or more of the grounds of deportability listed in section 237 of the Act based on conduct committed after, or conduct or a condition not disclosed to the Service prior to, the alien's classification as an S nonimmigrant under section 101(a)(15)(S) of the Act, or for a violation of, or failure to adhere to, the particular terms and conditions of status in S nonimmigrant classification.

(c) *Removal procedures.* (1) A district director who determines to remove an alien witness or informant in S nonimmigrant classification shall notify the Commissioner, the Assistant Attorney General, Criminal Division, and the relevant law enforcement agency in writing to that effect. The Assistant Attorney General, Criminal Division, shall concur in or object to that decision. Unless the Assistant Attorney General, Criminal Division, objects within 7 days, he or she shall be deemed to have concurred in the decision. In the event of an objection by the Assistant Attorney General, Criminal Division, the matter will be expeditiously referred to the Deputy Attorney General for a final resolution. In no circumstances shall the alien or the relevant law enforcement agency have a right of appeal from any decision to remove.

(2) A district director who has provided notice as set forth in paragraph (c)(1) of this section and who has been advised by the Commissioner that the Assistant Attorney General, Criminal Division, has not objected shall issue a Warrant of Removal. The alien shall immediately be arrested and taken into custody by the district director initiating the removal. An alien classified under the provisions of section 101(a)(15)(S) of the Act who is determined, pursuant to a warrant issued by a district director, to be deportable from the United States shall be removed from the United States to his or her country of nationality or last residence. The agency that requested the alien's presence in the United States shall ensure departure from the United States and so inform the district director in whose jurisdiction the alien has last resided. The district director, if necessary, shall oversee the alien's departure from the United States and, in any event, shall notify the Commissioner of the alien's departure.

(d) *Withholding of removal.* An alien classified pursuant to section 101(a)(15)(S) of the Act who applies for withholding of removal shall have 10 days from the date the Warrant of Removal is served upon the alien to file an application for such relief with the

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 56 of 688   PageID 1713

district director initiating the removal order. The procedures contained in §§ 208.2 and 208.16 of this chapter shall apply to such an alien who applies for withholding of removal.

(e) *Inadmissibility.* An alien who applies for admission under the provisions of section 101(a)(15)(S) of the Act who is determined by an immigration officer not to be eligible for admission under that section or to be inadmissible to the United States under one or more of the grounds of inadmissibility listed in section 212 of the Act and which have not been previously waived by the Commissioner will be taken into custody. The district director having jurisdiction over the port-of-entry shall follow the notification procedures specified in paragraph (c)(1) of this section. A district director who has provided such notice and who has been advised by the Commissioner that the Assistant Attorney General, Criminal Division, has not objected shall remove the alien without further hearing. An alien may not contest such removal, other than by applying for withholding of removal.

### § 236.5  Fingerprints and photographs.

Every alien 14 years of age or older against whom proceedings based on deportability under section 237 of the Act are commenced under this part by service of a notice to appear shall be fingerprinted and photographed. Such fingerprints and photographs shall be made available to Federal, State, and local law enforcement agencies upon request to the district director or chief patrol agent having jurisdiction over the alien's record. Any such alien, regardless of his or her age, shall be photographed and/or fingerprinted if required by any immigration officer authorized to issue a notice to appear. Every alien 14 years of age or older who is found to be inadmissible to the United States and ordered removed by an immigration judge shall be fingerprinted, unless during the preceding year he or she has been fingerprinted at an American consular office.

### §§ 236.6—236.9   [Reserved]

## Subpart B—Family Unity Program

### § 236.10  Description of program.

The family unity program implements the provisions of section 301 of the Immigration Act of 1990, Pub. L. 101–649. This Act is referred to in this section as ''IMMACT 90''.

### § 236.11  Definitions.

In this subpart, the term:

*Eligible immigrant* means a qualified immigrant who is the spouse or unmarried child of a legalized alien.

*Legalized alien* means an alien who:

(1) Is a temporary or permanent resident under section 210 or 245A of the Act; or

(2) Is a permanent resident under section 202 of the Immigration Reform and Control Act of 1986 (Cuban/Haitian Adjustment).

### § 236.12  Eligibility.

(a) *General.* An alien who is not a lawful permanent resident is eligible to apply for benefits under the Family Unity Program if he or she establishes:

(1) That he or she entered the United States before May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), and has been continuously residing in the United States since that date; and

(2) That on May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), he or she was the spouse or unmarried child of a legalized alien, and that he or she has been eligible continuously since that time for family-sponsored second preference immigrant status under section 203(a)(2) of the Act based on the same relationship.

(b) *Legalization application pending as of May 5, 1988 or December 1, 1988.* An alien whose legalization application was filed on or before May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), but not approved until after that date will be treated as having been a legalized alien as of May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), for purposes of the Family Unity Program.

### § 236.13  Ineligible aliens.

The following categories of aliens are ineligible for benefits under the Family Unity Program:

(a) An alien who is deportable under any paragraph in section 237(a) of the Act, except paragraphs (1)(A), (1)(B), (1)(C), and (3)(A); provided that an alien who is deportable under section 237(a)(1)(A) of such Act is also ineligible for benefits under the Family Unity Program if deportability is based upon a ground of inadmissibility described in section 212(a) (2) or (3) of the Act;

(b) An alien who has been convicted of a felony or three or more misdemeanors in the United States; or

(c) An alien described in section 241(b)(3)(B) of the Act.

### § 236.14  Filing.

(a) *General.* An application for voluntary departure under the Family Unity Program must be filed at the service center having jurisdiction over the alien's place of residence. A Form I–817, Application for Voluntary Departure under the Family Unity Program, must be filed with the correct fee required in § 103.7(b)(1) of this chapter and the required supporting documentation. A separate application with appropriate fee and documentation must be filed for each person claiming eligibility.

(b) *Decision.* The service center director has sole jurisdiction to adjudicate an application for benefits under the Family Unity Program. The director will provide the applicant with specific reasons for any decision to deny an application. Denial of an application may not be appealed. An applicant who believes that the grounds for denial have been overcome may submit another application with the appropriate fee and documentation.

(c) *Referral of denied cases for consideration of issuance of notice to appear.* If an application is denied, the case will be referred to the district director with jurisdiction over the alien's place of residence for consideration of whether to issue a notice to appear. After an initial denial, an applicant's case will not be referred for issuance of a notice to appear until 90 days from the date of the initial denial, to allow the alien the opportunity to file a new Form I–817 application in order to attempt to overcome the basis of the denial. However, if the applicant is found not to be eligible for benefits under § 236.13(b), the Service reserves the right to issue a notice to appear at any time after the initial denial.

**§ 236.15   Voluntary departure and eligibility for employment.**

(a) *Authority.* Voluntary departure under this section implements the provisions of section 301 of IMMACT 90, and authority to grant voluntary departure under the family unity program derives solely from that section. Voluntary departure under the family unity program shall be governed solely by this section, notwithstanding the provisions of section 240B of the Act and 8 CFR part 240.

(b) *Children of legalized aliens.* Children of legalized aliens residing in the United States, who were born during an authorized absence from the United States of mothers who are currently residing in the United States under voluntary departure pursuant to the Family Unity Program, may be granted voluntary departure under section 301 of IMMACT 90 for a period of 2 years.

(c) *Duration of voluntary departure.* An alien whose application for benefits under the Family Unity Program is approved will receive voluntary departure for 2 years, commencing with the date of approval of the application. Voluntary departure under this section shall be considered effective from the date on which the application was properly filed.

(d) *Employment authorization.* An alien granted benefits under the Family Unity Program is authorized to be employed in the United States and may apply for an employment authorization document on Form I–765, Application for Employment Authorization. The application may be filed concurrently with Form I–817. The application must be accompanied by the correct fee required by § 103.7(b)(1) of this chapter. The validity period of the employment authorization will coincide with the period of voluntary departure.

(e) *Extension of voluntary departure.* An application for an extension of voluntary departure under the Family Unity Program must be filed by the alien on Form I–817 along with the correct fee required in § 103.7(b)(1) of this chapter and the required supporting documentation. The submission of a copy of the previous approval notice will assist in shortening the processing time. An extension may be granted if the alien continues to be eligible for benefits under the Family Unity Program. However, an extension may not be approved if the legalized alien is a lawful permanent resident, and a petition for family-sponsored immigrant status has not been filed in behalf of the applicant. In such case the Service will notify the alien of the reason for the denial and afford him or her the opportunity to file another Form I–817

once the petition, Form I–130, has been filed in behalf of him or her. No charging document will be issued for a period of 90 days.

(f) *Supporting documentation for extension application.* Supporting documentation need not include documentation provided with the previous application(s). The extension application need only include changes to previous applications and evidence of continuing eligibility since the date of the prior approval.

**§ 236.16   Travel outside the United States.**

An alien granted Family Unity Program benefits who intends to travel outside the United States temporarily must apply for advance authorization using Form I–131, Application for Travel Document. The authority to grant an application for advance authorization for an alien granted Family Unity Program benefits rests soley with the district director. An alien who is granted advance authorization and returns to the United States in accordance with such authorization, and who is found not to be inadmissible under section 212(a) (2) or (3) of the Act, shall be inspected and admitted in the same immigration status as the alien had at the time of departure, and shall be provided the remainder of the voluntary departure period previously granted under the Family Unity Program.

**§ 236.17   Eligibility for Federal financial assistance programs.**

An alien granted Family Unity Program benefits based on a relationship to a legalized alien as defined in § 236.11 is ineligible for public welfare assistance in the same manner and for the same period as the legalized alien who is ineligible for such assistance under section 245A(h) or 210(f) of the Act, respectively.

**§ 236.18   Termination of Family Unity Program benefits.**

(a) *Grounds of termination.* The Service may terminate benefits under the Family Unity Program whenever the necessity for the termination comes to the attention of the Service. Such grounds will exist in situations including, but not limited to, those in which:

(1) A determination is made that Family Unity Program benefits were acquired as the result of fraud or willful misrepresentation of a material fact;

(2) The beneficiary commits an act or acts which render him or her inadmissible as an immigrant or who are ineligible for benefits under the Family Unity Program;

(3) The legalized alien upon whose status benefits under the Family Unity Program were based loses his or her legalized status;

(4) The beneficiary is the subject of a final order of exclusion, deportation, or removal issued subsequent to the grant of Family Unity benefits unless such final order is based on entry without inspection; violation of status; or failure to comply with section 265 of the Act; or inadmissibility at the time of entry other than inadmissibility pursuant to section 212(a)(2) or 212(a)(3) of the Act, regardless of whether the facts giving rise to such ground occurred before or after the benefits were granted; or

(5) A qualifying relationship to a legalized alien no longer exists.

(b) *Notice procedure.* Notice of intent to terminate and of the grounds thereof shall be served pursuant to the provisions of § 103.5a of this chapter. The alien shall be given 30 days to respond to the notice and may submit to the Service additional evidence in rebuttal. Any final decision of termination shall also be served pursuant to the provisions of § 103.5a of this chapter. Nothing in this section shall preclude the Service from commencing exclusion or deportation proceedings prior to termination of Family Unity Program benefits.

(c) *Effect of termination.* Termination of benefits under the Family Unity Program, other than as a result of a final order of removal, shall render the alien amenable to removal proceedings under section 240 of the Act. If benefits are terminated, the period of voluntary departure under this section is also terminated.

**PART 237—[REMOVED AND RESERVED]**

102. Part 237 is removed and reserved.

103. Part 238 is added to read as follows:

**PART 238—EXPEDITED REMOVAL OF AGGRAVATED FELONS**

**§ 238.1   Proceedings under section 238(b) of the Act.**

(a) *Definitions.* As used in this part:
*Deciding Service officer* means a district director, chief patrol agent, or another immigration officer designated by a district director or chief patrol agent, who is not the same person as the issuing Service officer.

*Issuing Service officer* means any Service officer listed in § 239.1 of this chapter as authorized to issue notices to appear.

(b) *Preliminary consideration and Notice of Intent to Issue a Final*

*Administrative Deportation Order; commencement of proceedings.* (1) *Basis of Service charge.* An issuing Service officer shall cause to be served upon an alien a Form I–851, Notice of Intent to Issue a Final Administrative Deportation Order (Notice of Intent), if the officer is satisfied that there is sufficient evidence, based upon questioning of the alien by an immigration officer and upon any other evidence obtained, to support a finding that the individual:

(i) Is an alien;

(ii) Has not been lawfully admitted for permanent residence, or has conditional permanent resident status under section 216 of the Act;

(iii) Has been convicted (as defined in section 101(a)(48) of the Act and as demonstrated by any of the documents or records listed in § 3.41 of this chapter) of an aggravated felony and such conviction has become final; and

(iv) Is deportable under section 237(a)(2)(A)(iii) of the Act, including an alien who has neither been admitted nor paroled, but who is conclusively presumed deportable under section 237(a)(2)(A)(iii) by operation of section 238(c) of the Act (''Presumption of Deportability'').

(2) *Notice.* (i) Removal proceedings under section 238(b) of the Act shall commence upon personal service of the Notice of Intent upon the alien, as prescribed by §§ 103.5a(a)(2) and 103.5a(c)(2) of this chapter. The Notice of Intent shall set forth the preliminary determinations and inform the alien of the Service's intention to issue a Form I–851A, Final Administrative Removal Order, without a hearing before an immigration judge. This Notice shall constitute the charging document. The Notice of Intent shall include allegations of fact and conclusions of law. It shall advise that the alien: has the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing, as long as counsel is authorized to practice in deportation proceedings; may inspect the evidence supporting the Notice of Intent; and may rebut the charges within 10 calendar days after service of such Notice (or 13 calendar days if service of the Notice was by mail).

(ii) The Notice of Intent also shall advise the alien that he or she may designate in writing, within the rebuttal period, the country to which he or she chooses to be deported in accordance with section 241 of the Act, in the event that a Final Administrative Removal Order is issued, and that the Service will honor such designation only to the extent permitted under the terms, limitations, and conditions of section 241 of the Act.

(iii) The Service must determine that the person served with the Notice of Intent is the person named on the Notice.

(iv) The Service shall provide the alien with a list of available free legal services programs qualified under 8 CFR part 3 and organizations recognized pursuant to 8 CFR part 292, located within the district or sector where the Notice of Intent is issued.

(v) The Service must either provide the alien with a written translation of the Notice of Intent or explain the contents of the Notice of Intent to the alien in the alien's native language or in a language that the alien understands.

(c) *Alien's response.* (1) *Time for response.* The alien will have 10 calendar days from service of the Notice of Intent, or 13 calendar days if service is by mail, to file a response to the Notice of Intent. In the response, the alien may: designate his or her choice of country for removal; submit a written response rebutting the charge and/or requesting the opportunity to review the Government's evidence; and/or request in writing an extension of time for response, stating the specific reasons why such an extension is necessary. Alternatively, the alien may, in writing, choose to accept immediate issuance of a Final Administrative Removal Order. The deciding Service officer may extend the time for response for good cause shown. A request for extension of time for response will not automatically extend the period for the response. The alien will be permitted to file a response outside the prescribed period only if the deciding Service officer permits it. The alien must send the response to the deciding Service officer at the address provided in the Notice of Intent.

(2) *Nature of rebuttal or request to review evidence.* (i) If an alien chooses to rebut the allegations contained in the Notice of Intent, the alien's written response must indicate which finding(s) are being challenged and should be accompanied by affidavit(s), documentary information, or other specific evidence supporting the challenge.

(ii) If an alien's written response requests the opportunity to review the Government's evidence, the Service shall serve the alien with a copy of the evidence in the record of proceeding upon which the Service is relying to support the charge. The alien may, within 10 calendar days following service of the Government's evidence (13 calendar days if service is by mail), furnish a final response in accordance with paragraph (c)(1) of this section. If the alien's final response is a rebuttal of the allegations, such a final response should be accompanied by affidavit(s), documentary information, or other specific evidence supporting the challenge.

(d) *Determination by deciding Service officer.* (1) *No response submitted or concession of deportability.* If the deciding Service officer does not receive a timely response and the evidence in the record of processing establishes deportability by clear, convincing, and unequivocal evidence, or if the alien concedes deportability, then the deciding Service officer shall issue and cause to be served upon the alien a Final Administrative Removal Order that states the reasons for the deportation decision. The alien may, in writing, knowingly and voluntarily waive the 14-day waiting period before execution of the final order of removal provided in a paragraph (f) of this section.

(2) *Response submitted.* (i) *Insufficient rebuttal; no genuine issue of material fact.* If the alien timely submits a rebuttal to the allegations, but the deciding Service officer finds that deportability is established by clear, convincing, and unequivocal evidence in the record of proceeding, the deciding Service officer shall issue and cause to be served upon the alien a Final Administrative Removal Order that states the reasons for the decision of deportability.

(ii) *Additional evidence required.* (A) If the deciding Service officer finds that the record of proceeding, including the alien's timely rebuttal, raises a genuine issue of material fact regarding the preliminary findings, the deciding Service officer may either obtain additional evidence from any source, including the alien, or cause to be issued a notice to appear to initiate removal proceedings under section 240 of the Act. The deciding Service officer may also obtain additional evidence from any source, including the alien, if the deciding Service officer deems that such additional evidence may aid the officer in the rendering of a decision.

(B) If the deciding Service officer considers additional evidence from a source other than the alien, that evidence shall be made a part of the record of proceeding, and shall be provided to the alien. If the alien elects to submit a response to such additional evidence, such response must be filed with the Service within 10 calendar days of service of the additional evidence (or 13 calendar days if service is by mail). If the deciding Service officer finds, after considering all

additional evidence, that deportability is established by clear, convincing, and unequivocal evidence in the record of proceeding, the deciding Service officer shall issue and cause to be served upon the alien a Final Administrative Deportation Order that states the reasons for the decision of deportability.

(iii) *Conversion to proceedings under section 240 of the Act.* If the deciding Service officer finds that the alien is not amenable to removal under section 238 of the Act, the deciding Service officer shall terminate the expedited proceedings under section 238 of the Act and shall, where appropriate, cause to be issued a notice to appear for the purpose of initiating removal proceedings before an immigration judge under section 240 of the Act.

(3) *Termination of proceedings by deciding Service officer.* Only the deciding Service officer may terminate proceedings under section 238 of the Act, in accordance with this section.

(e) *Proceedings commenced under section 240 of the Act.* In any proceeding commenced under section 240 of the Act which is based on deportability under section 237 of the Act, if it appears that the respondent alien is subject to removal pursuant to section 238 of the Act, the immigration judge may, upon the Service's request, terminate the case and, upon such termination, the Service may commence administrative proceedings under section 238 of the Act. However, in the absence of any such request, the immigration judge shall complete the proceeding commenced under section 240 of the Act.

(f) *Executing final removal order of deciding Service officer.* (1) *Time of execution.* Upon the issuance of a Final Administrative Removal Order, the Service shall issue a Warrant of Removal in accordance with § 241.2 of this chapter; such warrant shall be executed no sooner than 14 calendar days after the date the Final Administrative Removal Order is issued, unless the alien knowingly, voluntarily, and in writing waives the 14-day period.

(2) *Country to which alien is to be removed.* The deciding Service officer shall designate the country of removal in the manner prescribed by section 241 of the Act.

(g) *Arrest and detention.* At the time of issuance of a Notice of Intent or at any time thereafter and up to the time the alien becomes the subject of a Warrant of Removal, the alien may be arrested and taken into custody under the authority of a Warrant of Arrest issued by an officer listed in § 287.5(e)(2) of this chapter. The

decision of the Service concerning custody or bond shall not be administratively appealable during proceedings initiated under section 238 of the Act and this part.

(h) *Record of proceeding.* The Service shall maintain a record of proceeding for judicial review of the Final Administrative Removal Order sought by any petition for review. The record of proceeding shall include, but not necessarily be limited to: the charging document (Notice of Intent); the Final Administrative Removal Order (including any supplemental memorandum of decision); the alien's response, if any; all evidence in support of the charge; and any admissible evidence, briefs, or documents submitted by either party respecting deportability. The executed duplicate of the Notice of Intent in the record of proceedings shall be retained as evidence that the individual upon whom the notice for the proceeding was served was, in fact, the alien named in the notice.

**Authority:** 8 U.S.C. 1228; 8 CFR part 2.

104. Part 239 is added to read as follows:

## PART 239—INITIATION OF REMOVAL PROCEEDINGS

Sec.
239.1  Notice to appear.
239.2  Cancellation of notice to appear.
239.3  Effect of filing notice to appear.

**Authority:** 8 U.S.C. 1103, 1221, 1229; 8 CFR part 2.

### § 239.1  Notice to appear.

(a) *Commencement.* Every removal proceeding conducted under section 240 of the Act to determine the deportability or inadmissibility of an alien is commenced by the filing of a notice to appear with the Immigration Court. Any immigration officer performing an inspection of an arriving alien at a port-of-entry may issue a notice to appear to such an alien. In addition, the following officers, or officers acting in such capacity, may issue a notice to appear:

(1) District directors (except foreign);

(2) Deputy district directors (except foreign);

(3) Assistant district directors for investigations;

(4) Deputy assistant district directors for investigations;

(5) Assistant district directors for deportation;

(6) Deputy assistant district directors for deportation;

(7) Assistant district directors for examinations;

(8) Deputy assistant district directors for examinations;

(9) Officers in charge (except foreign);

(10) Assistant officers in charge (except foreign);

(11) Chief patrol agents;

(12) Deputy chief patrol agents;

(13) Associate chief patrol agents;

(14) Assistant chief patrol agents;

(15) Patrol agents in charge;

(16) The Assistant Commissioner, Investigations;

(17) Service center directors;

(18) Deputy center directors;

(19) Assistant center directors for examinations;

(20) Supervisory asylum officers; or

(21) Institutional Hearing Program directors.

(b) *Service of notice to appear.* Service of the notice to appear shall be in accordance with section 239 of the Act.

### § 239.2  Cancellation of notice to appear.

(a) Any officer authorized by § 239.1(a) to issue a notice to appear may cancel such notice prior to jurisdiction vesting with the immigration judge pursuant to § 3.14 of this chapter provided the officer is satisfied that:

(1) The respondent is a national of the United States;

(2) The respondent is not deportable or inadmissable under immigration laws;

(3) The respondent is deceased;

(4) The respondent is not in the United States;

(5) The notice was issued for the respondent's failure to file a timely petition as required by section 216(c) of the Act, but his or her failure to file a timely petition was excused in accordance with section 216(d)(2)(B) of the Act; or

(6) The notice to appear was improvidently issued.

(b) A notice to appear issued pursuant to section 235(b)(3) of the Act may be canceled under provisions in paragraphs (a)(2) and (a)(6) of this section only by the issuing officer, unless it is impracticable for the issuing officer to cancel the notice.

(c) *Motion to dismiss.* After commencement of proceedings pursuant to § 3.14 of this chapter, any officer enumerated in paragraph (a) of this section may move for dismissal of the matter on the grounds set out under paragraph (a) of this section. Dismissal of the matter shall be without prejudice to the alien or the Service.

(d) *Motion for remand.* After commencement of the hearing, any officer enumerated in paragraph (a) of this section may move for remand of the

matter to district jurisdiction on the ground that the foreign relations of the United States are involved and require further consideration. Remand of the matter shall be without prejudice to the alien or the Service.

(e) *Warrant of arrest.* When a notice to appear is canceled or proceedings are terminated under this section any outstanding warrant of arrest is canceled.

(f) *Termination of removal proceedings by immigration judge.* An immigration judge may terminate removal proceedings to permit the alien to proceed to a final hearing on a pending application or petition for naturalization when the alien has established prima facie eligibility for naturalization and the matter involves exceptionally appealing or humanitarian factors; in every other case, the removal hearing shall be completely as promptly as possible notwithstanding the pendency of an application for naturalization during any state of the proceedings.

### § 239.3 Effect of filing notice to appear.

The filing of a notice to appear shall have no effect in determining periods of unlawful presence as defined in section 212(a)(9)(B) of the Act.

### §§ 240.1–240.20 Redesignated as §§ 244.3–244.22]

105. Sections 240.1 through 240.20 are redesignated as §§ 244.3 through 244.22.

106. Part 240 is revised to read as follows:

## PART 240—PROCEEDINGS TO DETERMINE REMOVABILITY OF ALIENS IN THE UNITED STATES

### Subpart A—Removal Proceedings

Sec.
240.1   Immigration judges.
240.2   Attorney for the Service.
240.3   Representation by counsel.
240.4   Incompetent respondents.
240.5   Interpreter.
240.6   Postponement and adjournment of hearing.
240.7   Evidence in removal proceedings under section 240 of the Act.
240.8   Burdens of proof in removal proceedings.
240.9   Contents of record.
240.10  Hearing.
240.11  Ancillary matters, applications.
240.12  Decision of the immigration judge.
240.13  Notice of decision.
240.14  Finality of order.
240.15  Appeals.
240.16  Application of new procedures or termination of proceedings in old proceedings pursuant to section 309(c) of Pub. L. 104–208.

### Subpart B—Cancellation of Removal

240.20  Cancellation of removal and adjustment of status under section 240A(a) and 240A(b) of the Act

### Subpart C—Voluntary Depature

240.25  Voluntary departure—authority of the Service.
240.26  Voluntary departure—authority of the Executive Office for Immigration Review.

### Subpart D—Exclusion of aliens (for proceedings commenced prior to April 1, 1997)

240.30  Proceedings prior to April 1, 1997.
240.31  Authority of immigration judges.
240.32  Hearing.
240.33  Applications for asylum or withholding of deportation.
240.34  Renewal of application for adjustment of status under section 245 of the Act.
240.35  Decision of the immigration judge; notice of the applicant.
240.36  Finality of order.
240.37  Appeals.
240.38  Fingerprinting of excluded aliens.
240.39  Reopening or reconsideration.

### Subpart E—Proceedings to determine deportability of aliens in the United States: Hearing and Appeal (for proceedings commenced prior to April 1, 1997)

240.40  Proceedings commenced prior to April 1, 1997.
240.41  Immigration judges.
240.42  Representation by counsel.
240.43  Incompetent respondents.
240.44  Interpreter.
240.45  Postponement and adjournment of hearing.
240.46  Evidence.
240.47  Contents of record.
240.48  Hearing.
240.49  Ancillary matters, applications.
240.50  Decision of the immigration judge.
240.51  Notice of decision.
240.52  Finality of order.
240.53  Appeals.
240.54  Proceedings under section 242(f) of the Act.

### Subpart F—Suspension of deportation and voluntary departure (for proceedings commenced prior to April 1, 1997)

240.55  Proceedings commenced prior to April 1, 1997.
240.56  Application.
240.57  Extension of time to depart.

### Subpart G—Civil penalties for failure to depart [Reserved]

**Authority:** 8 U.S.C. 1103; 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note, 1252a, 1252b, 1362; 8 CFR part 2.

## Subpart A—Removal Proceedings

### § 240.1 Immigration judges.

(a) *Authority:* In any removal proceeding pursuant to section 240 of the Act, the immigration judge shall have the authority to: determine removability pursuant to section 240(a)(1) of the Act; to make decisions,

including orders of removal as provided by section 240(c)(1)(A) of the Act; to determine applications under sections 208, 212(a)(2)(F), 212(a)(6)(F)(ii), 212(a)(9)(B)(v), 212(d)(11), 212(d)(12), 212(g), 212(h), 212(i), 212(k), 237(a)(1)(E)(iii), 237(a)(1)(H), 237(a)(3)(C)(ii), 240A(a) and (b), 240B, 245, and 249 of the Act; to order withholding of removal pursuant to section 241(b)(3) of the Act; and to take any other action consistent with applicable law and regulations as may be appropriate. In determining cases referred for further inquiry, immigration judges shall have the powers and authority conferred upon them by the Act and this chapter. Subject to any specific limitation prescribed by the Act and this chapter, immigration judges shall also exercise the discretion and authority conferred upon the Attorney General by the Act as is appropriate and necessary for the disposition of such cases. An immigration judge may certify his or her decision in any case under section 240 of the Act to the Board of Immigration Appeals when it involves an unusually complex or novel question of law or fact. Nothing contained in this part shall be construed to diminish the authority conferred on immigration judges under sections 101(b)(4) and 103 of the Act.

(b) *Withdrawal and substitution of immigration judges.* The immigration judge assigned to conduct the hearing shall at any time withdraw if he or she deems himself or herself disqualified. If an immigration judge becomes unavailable to complete his or her duties, another immigration judge may be assigned to complete the case. The new immigration judge shall familiarize himself or herself with the record in the case and shall state for the record that he or she has done so.

(c) *Conduct of hearing.* The immigration judge shall receive and consider material and relevant evidence, rule upon objections, and otherwise regulate the course of the hearing.

### § 240.2 Attorney for the Service.

(a) *Authority.* The attorney for the Service shall present on behalf of the government evidence material to the issues of deportability or inadmissibility and any other issues that may require disposition by the immigration judge. The duties of the Service attorney include, but are not limited to, the presentation of evidence and the interrogation, examination, and cross-examination of the respondent or other witnesses. Nothing contained herein diminishes the authority of an immigration judge to conduct proceedings under this part. The Service

attorney is authorized to appeal from a decision of the immigration judge pursuant to § 3.38 of this chapter and to move for reopening or reconsideration pursuant to § 3.23 of this chapter.

(b) *Assignment.* In a removal proceeding, the Service shall assign an attorney to each case within the provisions of § 240.10(d), and to each case in which an unrepresented respondent is incompetent or is under 18 years of age, and is not accompanied by a guardian, relative, or friend. In a case in which the removal proceeding would result in an order of removal, the Service shall assign an attorney to each case in which a respondent's nationality is in issue. A Service attorney shall be assigned in every case in which the Commissioner approves the submission of non-record information under § 240.11(a)(3). In his or her discretion, whenever he or she deems such assignment necessary or advantageous, the General Counsel may assign a Service attorney to any other case at any stage of the proceeding.

### § 240.3   Representation by counsel.

The respondent may be represented at the hearing by an attorney or other representative qualified under 8 CFR part 292.

### § 240.4   Incompetent respondents.

When it is impracticable for the respondent to be present at the hearing because of mental incompetency, the attorney, legal representative, legal guardian, near relative, or friend who was served with a copy of the notice to appear shall be permitted to appear on behalf of the respondent. If such a person cannot reasonably be found or fails or refuses to appear, the custodian of the respondent shall be requested to appear on behalf of the respondent.

### § 240.5   Interpreter.

Any person acting as an interpreter in a hearing before an immigration judge under this part shall be sworn to interpret and translate accurately, unless the interpreter is an employee of the United States Government, in which event no such oath shall be required.

### § 240.6   Postponement and adjournment of hearing.

After the commencement of the hearing, the immigration judge may grant a reasonable adjournment either at his or her own instance or, for good cause shown, upon application by the respondent or the Service.

### § 240.7   Evidence in removal proceedings under section 240 of the Act.

(a) *Use of prior statements.*

The immigration judge may receive in evidence any oral or written statement that is material and relevant to any issue in the case previously made by the respondent or any other person during any investigation, examination, hearing, or trial.

(b) *Testimony.* Testimony of witnesses appearing at the hearing shall be under oath or affirmation administered by the immigration judge.

(c) *Depositions.* The immigration judge may order the taking of depositions pursuant to § 3.35 of this chapter.

### § 240.8   Burdens of proof in removal proceedings.

(a) *Deportable aliens.* A respondent charged with deportability shall be found to be removable if the Service proves by clear and convincing evidence that the respondent is deportable.

(b) *Arriving aliens.* In proceedings commenced upon a respondent's arrival in the United States or after the revocation or expiration of parole, the respondent must prove that he or she is clearly and beyond a doubt entitled to be admitted to the United States and is not inadmissible as charged.

(c) *Aliens present in the United States without being admitted or paroled.* In the case of a respondent in the United States without being admitted or paroled, the Service must first establish the alienage of the respondent. Once alienage has been established, unless the respondent demonstrates by clear and convincing evidence that he or she is lawfully in the United States pursuant to a prior admission, the respondent must prove that he or she is clearly and beyond a doubt entitled to be admitted to the United States and is not inadmissible as charged.

(d) *Relief from removal.* The respondent shall have the burden of establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion. If the evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

### § 240.9   Contents of record.

The hearing before the immigration judge, including the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, and all written orders, motions, appeals, briefs, and other papers filed in the proceedings shall constitute the record in the case. The hearing shall be

recorded verbatim except for statements made off the record with the permission of the immigration judge. In his or her decision, the immigration judge may exclude from the record any arguments made in connection with motions, applications, requests, or objections, but in such event the person affected may submit a brief.

### § 240.10   Hearing.

(a) *Opening.* In a removal proceeding, the immigration judge shall:

(1) Advise the respondent of his or her right to representation, at no expense to the government, by counsel of his or her own choice authorized to practice in the proceedings and require the respondent to state then and there whether he or she desires representation;

(2) Advise the respondent of the availability of free legal services provided by organizations and attorneys qualified under 8 CFR part 3 and organizations recognized pursuant to § 292.2 of this chapter, located in the district where the removal hearing is being held;

(3) Ascertain that the respondent has received a list of such programs, and a copy of appeal rights;

(4) Advise the respondent that he or she will have a reasonable opportunity to examine and object to the evidence against him or her, to present evidence in his or her own behalf and to cross-examine witnesses presented by the government (but respondent shall not be entitled to examine such national security information as the government may proffer in opposition to the respondent's admission to the United States or to an application by the respondent for discretionary relief);

(5) Place the respondent under oath;

(6) Read the factual allegations and the charges in the notice to appear to the respondent and explain them in non-technical language; and

(7) Enter the notice to appear as an exhibit in the Record of Proceeding.

(b) *Public access to hearings.* Removal hearings shall be open to the public, except that the immigration judge may, in his or her discretion, close proceedings as provided in § 3.27 of this chapter.

(c) *Pleading by respondent.* The immigration judge shall require the respondent to plead to the notice to appear by stating whether he or she admits or denies the factual allegations and his or her removability under the charges contained therein. If the respondent admits the factual allegations and admits his or her removability under the charges and the immigration judge is satisfied that no

issues of law or fact remain, the immigration judge may determine that removability as charged has been established by the admissions of the respondent. The immigration judge shall not accept an admission of removability from an unrepresented respondent who is incompetent or under the age of 18 and is not accompanied by an attorney or legal representative, a near relative, legal guardian, or friend; nor from an officer of an institution in which a respondent is an inmate or patient. When, pursuant to this paragraph, the immigration judge does not accept an admission of removability, he or she shall direct a hearing on the issues.

(d) *Issues of removability.* When removability is not determined under the provisions of paragraph (b) of this section, the immigration judge shall request the assignment of an assistant district counsel, and shall receive evidence as to any unresolved issues, except that no further evidence need be received as to any facts admitted during the pleading. The alien shall provide a court certified copy of a Judicial Recommendation Against Deportation (JRAD) to the immigration judge when such recommendation will be the basis of denying any charge(s) brought by the Service in the proceedings against the alien. No JRAD is effective against a charge of deportability under former section 241(a)(11) of the Act or if the JRAD was granted on or after November 29, 1990.

(e) *Additional charges in removal hearings.* At any time during the proceeding, additional or substituted charges of inadmissibility and/or deportability and/or factual allegations may be lodged by the Service in writing. The alien in removal proceedings shall be served with a copy of these additional charges and allegations. The immigration judge shall read the additional factual allegations and charges to the and explain them to him or her. The immigration judge shall advise the alien, if he or she is not represented by counsel, that the alien may be so represented, and that he or she may be given a reasonable continuance to respond to the additional factual allegations and charges. Thereafter, the provision of § 240.6(b) relating to pleading shall apply to the additional factual allegations and charges.

(f) *Country of removal.* The immigration judge shall notify the alien that if he or she is finally ordered removed, the country of removal will in the first instance be directed pursuant to section 241(b) of the Act to the country designated by the alien, unless section 241(b)(2)(C) of the Act applies, and shall afford him or her an opportunity then and there to make such designation. The immigration judge shall then specify and state for the record the country, or countries in the alternative, to which the alien's removal will be directed pursuant to section 241(b) of the Act if the country of his or her designation will not accept him or her into its territory, or fails to furnish timely notice of acceptance, or if the alien declines to designate a country.

(g) In the event that the Service is unable to remove the alien to the specified or alternative country or countries, the Service may remove the alien to any other country as permitted by section 241(b) of the Act.

§ 240.11  Ancillary matters, applications.

(a) *Creation of the status of an alien lawfully admitted for permanent residence.* (1) In a removal proceeding, an alien may apply to the immigration judge for cancellation of removal under section 240A of the Act, adjustment of status under section 245 of the Act, adjustment of status under section 1 of the Act of November 2, 1996 (as modified by section 606 of Pub. L 104–132) or under section 101 or 104 of the Act of October 28, 1977, or for the creation of a record of lawful admission for permanent residence under section 249 of the Act. The application shall be subject to the requirements of § 240.20, and 8 CFR parts 245 and 249. The approval of any application made to the immigration judge under section 245 of the Act by an alien spouse (as defined in section 216(g)(1) of the Act) or by an alien entrepreneur (as defined in section 216A(f)(1) of the Act) shall result in the alien's obtaining the status of lawful permanent resident on a conditional basis in accordance with the provisions of section 216 or 216A of the Act, whichever is applicable. However, the Petition to Remove the Conditions on Residence required by section 216(c) of the Act, or the Petition by Entrepreneur to Remove Conditions required by section 216A(c) of the Act shall be made to the director in accordance with 8 CFR part 216.

(2) In conjunction with any application for creation of status of an alien lawfully admitted for permanent residence made to an immigration judge, if the alien is inadmissible under any provision of section 212(a) of the Act, and believes that he or she meets the eligibility requirements for a waiver of the ground of inadmissibility, he or she may apply to the immigration judge for such waiver. The immigration judge shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make application during the hearing.

(3) In exercising discretionary power when considering an application for status as a permanent resident under this chapter, the immigration judge may consider and base the decision on information not contained in the record and not made available for inspection by the alien, provided the Commissioner has determined that such information is relevant and is classified under the applicable Executive Order as requiring protection from unauthorized disclosure in the interest of national security. Whenever the immigration judge believes that he or she can do so while safeguarding both the information and its source, the immigration judge should inform the alien of the general nature of the information in order that the alien may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state that the information is material to the decision.

(b) *Voluntary departure.* The alien may apply to the immigration judge for voluntary departure in lieu of removal pursuant to section 240B of the Act and subpart C of this part.

(c) *Applications for asylum and withholding of removal.* (1) If the alien expresses fear of persecution or harm upon return to any of the countries to which the alien might be removed pursuant to § 240.10(f), and the alien has not previously filed an application for asylum or withholding of removal that has been referred to the immigration judge by an asylum officer in accordance with § 208.14 of this chapter, the immigration judge shall:

(i) Advise the alien that he or she may apply for asylum in the United States or withholding of removal of those countries;

(ii) Make available the appropriate application forms; and

(iii) Advise the alien of the privilege of being represented by counsel at no expense to the government and of the consequences, pursuant to section 208(d)(6) of the Act, of knowingly, filing a frivolous application for asylum. The immigration judge shall provide to the alien a list of persons who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis.

(2) An application for asylum or withholding of removal must be filed with the Immigration Court, pursuant to § 208.4(c) of this chapter. Upon receipt of an application that has not been referred by an asylum officer, the Immigration Court shall forward a copy

to the Department of State pursuant to § 208.11 of this chapter and shall calendar the case for a hearing. The reply, if any, from the Department of State, unless classified under the applicable Executive Order, shall be given to both the alien and to the assistant district counsel representing the government.

(3) Applications for asylum and withholding of removal so filed will be decided by the immigration judge pursuant to the requirements and standards established in 8 CFR part 208 of this chapter after an evidentiary hearing to resolve factual issues in dispute. An evidentiary hearing extending beyond issues related to the basis for a mandatory denial of the application pursuant to § 208.14 or § 208.16 of this chapter is not necessary once the immigration judge has determined that such a denial is required.

(i) Evidentiary hearings on applications for asylum or withholding of removal will be open to the public unless the alien expressly requests that the hearings be closed pursuant to § 3.27 of this chapter. The immigration judge shall inquire whether the alien requests such closure.

(ii) Nothing in this section is intended to limit the authority of the immigration judge to properly control the scope of any evidentiary hearing.

(iii) During the removal hearing, the alien shall be examined under oath on his or her application and may present evidence and witnesses in his or her own behalf. The alien has the burden of establishing that he or she is a refugee as defined in section 101(a)(42) of the Act pursuant to the standards set forth in § 208.13 of this chapter.

(iv) The assistant district counsel may call witnesses and present evidence for the record, including information classified under the applicable Executive Order, provided the immigration judge or the Board has determined that such information is relevant to the hearing. When the immigration judge receives such classified information, he or she shall inform the alien. The agency that provides the classified information to the immigration judge may provide an unclassified summary of the information for release to the alien, whenever it determines it can do so consistently with safeguarding both the classified nature of the information and its sources. The summary should be as detailed as possible, in order that the alien may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state whether such information is material to the decision.

(4) The decision of an immigration judge to grant or deny asylum or withholding of removal shall be communicated to the alien and to the assistant district counsel. An adverse decision shall state why asylum or withholding of removal was denied.

(d) *Application for relief under sections 237(a)(1)(H) and 237(a)(1)(E)(iii) of the Act.* The respondent may apply to the immigration judge for relief from removal under sections 237(a)(1)(H) and 237(a)(1)(E)(iii) of the Act.

(e) *General.* An application under this section shall be made only during the hearing and shall not be held to constitute a concession of alienage or deportability in any case in which the respondent does not admit his or her alienage or deportability. However, nothing in this section shall prohibit the Service from using information supplied in an application for asylum or withholding of deportation or removal submitted to the Service on or after January 4, 1995, as the basis for issuance of a charging document or to establish alienage or deportability in a case referred to an immigration judge under § 208.14(b) of this chapter. The alien shall have the burden of establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion. Nothing contained herein is intended to foreclose the respondent from applying for any benefit or privilege that he or she believes himself or herself eligible to receive in proceedings under this part. Nothing in this section is intended to limit the Attorney General's authority to remove an alien to any country permitted by section 241(b) of the Act.

(f) *Fees.* The alien shall not be required to pay a fee on more than one application within paragraphs (a) and (c) of this section, provided that the minimum fee imposed when more than one application is made shall be determined by the cost of the application with the highest fee.

## § 240.12  Decision of the immigration judge.

(a) *Contents.* The decision of the immigration judge may be oral or written. The decision of the immigration judge shall include a finding as to inadmissibility or deportability. The formal enumeration of findings is not required. The decision shall also contain reasons for granting or denying the request. The decision shall be concluded with the order of the immigration judge.

(b) *Summary decision.* Notwithstanding the provisions of paragraph (a) of this section, in any case where inadmissibility or deportability is determined on the pleadings pursuant to § 240.10(b) and the respondent does not make an application under § 240.11, the alien is statutorily ineligible for relief, or the respondent applies for voluntary departure only and the immigration judge grants the application, the immigration judge may enter a summary decision or, if voluntary departure is granted, a summary decision with an alternate order of removal.

(c) *Order of the immigration judge.* The order of the immigration judge shall direct the respondent's removal, or the termination of the proceedings, or such other disposition of the case as may be appropriate. When removal is ordered, the immigration judge shall specify the country, or countries in the alternate, to which respondent's removal shall be directed. The immigration judge is authorized to issue orders in the alternative or in combination as he or she may deem necessary.

## § 240.13  Notice of decision.

(a) *Written decision.* A written decision shall be served upon the respondent and the service counsel, together with the notice referred to in § 3.3 of this chapter. Service by mail is complete upon mailing.

(b) *Oral decision.* An oral decision shall be stated by the immigration judge in the presence of the respondent and the service counsel, if any, at the conclusion of the hearing. A copy of the summary written order shall be furnished at the request of the respondent or the service counsel.

(c) *Summary decision.* When the immigration judge renders a summary decision as provided in § 240.12(b), he or she shall serve a copy thereof upon the respondent at the conclusion of the hearing.

(d) *Decision to remove.* If the immigration judge decides that the respondent is removable and orders the respondent to be removed, the immigration judge shall advise the respondent of such decision, and of the consequences for failure to depart under the order of removal, including civil and criminal penalties described at sections 274D and 243 of the Act. Unless appeal from the decision is waived, the respondent shall be furnished with Form EOIR–26, Notice of Appeal, and advised of the provisions of § 240.15.

## § 240.14  Finality of order.

The order of the immigration judge shall become final in accordance with § 3.39 of this chapter.

## § 240.15  Appeals.

Pursuant to 8 CFR part 3, an appeal shall lie from a decision of an immigration judge to the Board of Immigration Appeals, except that no appeal shall lie from an order of removal entered in absentia. The procedures regarding the filing of a Form EOIR 26, Notice of Appeal, fees, and briefs are set forth in §§ 3.3, 3.31, and 3.38 of this chapter. An appeal shall be filed within 30 calendar days after the mailing of a written decision, the stating of an oral decision, or the service of a summary decision. The filing date is defined as the date of receipt of the Notice of Appeal by the Board of Immigration Appeals. The reasons for the appeal shall be stated in the Notice of Appeal in accordance with the provisions of § 3.3(b) of this chapter. Failure to do so may constitute a ground for dismissal of the appeal by the Board pursuant to § 3.1(d)(1–a) of this chapter.

## § 240.16  Application of new procedures or termination of proceedings in old proceedings pursuant to section 309(c) of Pub. L. 104–208.

The Attorney General shall have the sole discretion to apply the provisions of section 309(c) of Pub. L. 104–208, which provides for the application of new removal procedures to certain cases in exclusion or deportation proceedings and for the termination of certain cases in exclusion or deportation proceedings and initiation of new removal proceedings. The Attorney General's application of the provisions of section 309(c) shall become effective upon publication of a notice in the **Federal Register**. However, if the Attorney General determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws, the Attorney General's application shall become effective immediately upon issuance, and shall be published in the **Federal Register** as soon as practicable thereafter.

## §§ 240.17–240.19  [Reserved]

## Subpart B—Cancellation of Removal

## § 240.20  Cancellation of removal and adjustment of status under section 240A of the Act.

(a) *Jurisdiction.* An application for the exercise of discretion under section 240A of the Act shall be submitted on Form EOIR–42, Application for Cancellation of Removal, to the Immigration Court having administrative control over the Record of Proceeding of the underlying removal proceeding under section 240 of the Act.

(b) *Filing the application.* The application may be filed only with the immigration Court after jurisdiction has vested pursuant to § 3.14 of this chapter.

## §§ 240.21–240.24  [Reserved]

## Subpart C—Voluntary Departure

## § 240.25  Voluntary departure—authority of the Service.

(a) *Authorized officers.* The authority contained in section 240B(a) of the Act to permit aliens to depart voluntarily from the United States may be exercised in lieu of being subject to proceedings under section 240 of the Act or prior to the completion of such proceedings by district directors, assistant district directors for investigations, assistant district directors for examinations, officers in charge, chief patrol agents, service center directors, and assistant center directors for examinations.

(b) *Conditions.* The Service may attach to the granting of voluntary departure any conditions it deems necessary to ensure the alien's timely departure from the United States, including the posting of a bond, continued detention pending departure, and removal under safeguards. The alien shall be required to present to the Service, for inspection and photocopying, his or her passport or other travel documentation sufficient to assure lawful entry into the country to which the alien is departing. The Service may hold the passport or documentation for sufficient time to investigate its authenticity.

(c) *Periods of time.* The authorized officer, in his or her discretion, shall specify the period of time permitted for voluntary departure, and may grant extensions thereof, except that the total period allowed, including any extensions, shall not exceed 120 days.

(d) *Application.* Any alien who believes himself or herself to be eligible for voluntary departure under this section may apply therefor at any office of the Service. After the commencement of removal proceedings, the application may be communicated through the Service attorney. If the Service agrees to voluntary departure after proceedings have commenced, it may either:

(1) Join in a motion to terminate the proceedings, and if the proceedings are terminated, grant voluntary departure; or

(2) Join in a motion asking the immigration judge to permit voluntary departure in accordance with § 240.26.

(e) *Appeals.* An appeal shall not lie from a denial of an application for voluntary departure under this section, but the denial shall be without prejudice to the alien's right to apply to the immigration judge for voluntary departure in accordance with § 240.26 or for relief from removal under any provision of law.

(f) *Revocation.* If, subsequent to the granting of an application for voluntary departure under this section, it is ascertained that the application should not have been granted, that grant may be revoked without notice by any officer authorized to grant voluntary departure under § 240.25(a).

## § 240.26  Voluntary departure—authority of the Executive Office for Immigration Review.

(a) *Eligibility; general.* An alien previously granted voluntary departure under section 240B of the Act, including by the Service under § 240.25, and who fails to depart voluntarily within the time specified, shall thereafter be ineligible, for a period of ten years, for voluntary departure or for relief under sections 240A, 245, 248, and 249 of the Act.

(b) *Prior to completion of removal proceedings.* (1) *Grant by the immigration judge.* (i) An alien may be granted voluntary departure by an immigration judge pursuant to section 240B(a) of the Act only if the alien:

(A) Makes such request prior to or at a master calendar hearing;

(B) Makes no additional request for relief (or if such requests have been made, such requests are withdrawn prior to any grant of voluntary departure pursuant to this section);

(C) Concedes removability; and

(D) Waives appeal of all issues.

(ii) The judge may not grant voluntary departure under section 240B(a) of the Act beyond 30 days after the case has been calendared for a merits hearing, except pursuant to a stipulation under paragraph (b)(2) of this section.

(2) *Stipulation.* At any time prior to the completion of removal proceedings, the Service attorney may stipulate to a grant of voluntary departure under section 240B(a) of the Act.

(3) *Conditions.* (i) The judge may impose such conditions as he or she deems necessary to ensure the alien's timely departure from the United States, including the posting of a voluntary departure bond to be canceled upon proof that the alien has departed the United States within the time specified. The alien shall be required to present to

the Service, for inspection and photocopying, his or her passport or other travel documentation sufficient to assure lawful entry into the country to which the alien is departing, unless:

(A) A travel document is not necessary to return to his or her native country or to which country the alien is departing; or

(B) The document is already in the possession of the Service.

(ii) The Service may hold the passport or documentation for sufficient time to investigate its authenticity. If such documentation is not immediately available to the alien, but the immigration judge is satisfied that the alien is making diligent efforts to secure it, voluntary departure may be granted for a period not to exceed 120 days, subject to the condition that the alien within 60 days must secure such documentation and present it to the Service. The Service in its discretion may extend the period within which the alien must provide such documentation. If the documentation is not presented within the 60-day period or any extension thereof, the voluntary departure order shall vacate automatically and the alternate order of deportation will take effect, as if in effect on the date of issuance of the immigration judge order.

(c) *At the conclusion of the removal proceedings.* (1) *Required findings.* An immigration judge may grant voluntary departure at the conclusion of the removal proceedings under section 240B(b) of the Act, if he or she finds that:

(i) The alien has been physically present in the United States for period of at least one year preceding the date the Notice to Appear was served under section 239(a) of the Act;

(ii) the alien is, and has been, a person of good moral character for at least five years immediately preceding the application;

(iii) the alien is not deportable under section 237(a)(2)(A)(iii) or 237(a)(4) of the Act; and

(iv) the alien has established by clear and convincing evidence that the alien has the means to depart the United States and has the intention to do so.

(2) *Travel documentation.* Except as otherwise provided in paragraph (b)(3) of this section, the clear and convincing evidence of the means to depart shall include in all cases presentation by the alien of a passport or other travel documentation sufficient to assure lawful entry into the country to which the alien is departing. The Service shall have full opportunity to inspect and photocopy the documentation, and to challenge its authenticity or sufficiency before voluntary departure is granted.

(3) *Conditions.* The judge may impose such conditions as he or she deems necessary to ensure the alien's timely departure from the United States. In all cases under section 240B(b) of the Act, the alien shall be required to post a voluntary departure bond, in an amount necessary to ensure that the alien departs within the time specified, but in no case less than $500. The voluntary departure bond shall be posted with the district director within 5 business days of the immigration judge's order granting voluntary departure, and the district director may, at his or her discretion, hold the alien in custody until the bond is posted. If the bond is not posted within 5 business days, the voluntary departure order shall vacate automatically and the alternate order of removal will take effect on the following day. In order for the bond to be canceled, the alien must provide proof of departure to the district director.

(d) *Alternate order of removal.* Upon granting a request made for voluntary departure either prior to the completion of proceedings or at the conclusion of proceedings, the immigration judge shall also enter an alternate order of removal.

(e) *Periods of time.* If voluntary departure is granted prior to the completion of removal proceedings, the immigration judge may grant a period not to exceed 120 days. If voluntary departure is granted at the conclusion of proceedings, the immigration judge may grant a period not to exceed 60 days.

(f) *Extension of time to depart.* Authority to extend the time within which to depart voluntarily specified initially by an immigration judge or the Board is within the sole jurisdiction of the district director. An immigration judge or the Board may reinstate voluntary departure in a removal proceeding that has been reopened for a purpose other than solely making an application for voluntary departure if reopening was granted prior to the expiration of the original period of voluntary departure. In no event can the total period of time, including any extension, exceed 120 days or 60 days as set forth in section 240B of the Act.

(g) *Administrative Appeals.* (1) *Grants of requests made prior to the completion of the section 240 removal proceeding.* A Service appeal of a grant of voluntary departure prior to the completion of section 240 removal proceedings shall be limited to the issue of whether the alien merits the grant of voluntary departure as a matter of discretion. Such an appeal shall not challenge the number of days of voluntary departure granted.

(2) *At the conclusion of the section 240 removal proceeding.* An appeal of a grant or denial of voluntary departure at the conclusion of the section 240 removal proceeding shall be limited to the issues of whether the alien is eligible for a grant of voluntary departure under the Act and this chapter and whether the alien merits a grant of voluntary departure as a matter of discretion. Such an appeal shall not challenge the number of days of voluntary departure granted.

(h) *Reinstatement of voluntary departure.* An immigration judge or the Board may reinstate voluntary departure in a removal proceeding that has been reopened for a purpose other than solely making application for voluntary departure, if reopening was granted prior to the expiration of the original period of voluntary departure. In no event can the total period of time, including any extension, exceed 120 days or 60 days as set forth in section 240B of the Act and paragraph (a) of this section.

**§§ 240.27–240.29   [Reserved]**

## Subpart D—Exclusion of Aliens (for Hearings Commenced Prior to April 1, 1997)

### § 240.30   Proceedings prior to April 1, 1997.

Subpart D of 8 CFR part 240 applies to exclusion proceedings commenced prior to April 1, 1997, pursuant to the former section 236 of the Act. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

### § 240.31   Authority of immigration judges.

In determining cases referred for further inquiry as provided in section 235 of the Act, immigration judges shall have the powers and authority conferred upon them by the Act and this chapter. Subject to any specific limitation prescribed by the Act and this chapter, immigration judges shall also exercise the discretion and authority conferred upon the Attorney General by the Act as is appropriate and necessary for the disposition of such cases.

### § 240.32   Hearing.

(a) *Opening.* Exclusion hearings shall be closed to the public, unless the alien at his or her own instance requests that the public, including the press, be permitted to attend; in that event, the hearing shall be open, provided that the alien states for the record that he or she is waiving the requirement in section 236 of the Act that the inquiry shall be kept separate and apart from the public.

Case 2:21-cv-00067-Z Document 61 Filed 06/22/21 Page 66 of 688 PageID 1723

When the hearing is to be open, depending upon physical facilities, reasonable limitation may be placed upon the number in attendance at any one time, with priority being given to the press over the general public. The immigration judge shall ascertain whether the applicant for admission is the person to whom Form I–122 was previously delivered by the examining immigration officer as provided in 8 CFR part 235; enter a copy of such form in evidence as an exhibit in the case; inform the applicant of the nature and purpose of the hearing; advise him or her of the privilege of being represented by an attorney of his or her own choice at no expense to the Government, and of the availability of free legal services programs qualified under 8 CFR part 3 and organizations recognized pursuant to § 292.2 of this chapter located in the district where his or her exclusion hearing is to be held; and shall ascertain that the applicant has received a list of such programs; and request him or her to ascertain then and there whether he or she desires representation; advise him or her that he or she will have a reasonable opportunity to present evidence in his or her own behalf, to examine and object to evidence against him or her, and to cross-examine witnesses presented by the Government; and place the applicant under oath.

(b) *Procedure.* The immigration judge shall receive and adduce material and relevant evidence, rule upon objections, and otherwise regulate the course of the hearing.

(c) *Attorney for the Service.* The Service shall assign an attorney to each case in which an applicant's nationality is in issue and may assign an attorney to any case in which such assignment is deemed necessary or advantageous. The duties of the Service attorney include, but are not limited to, the presentation of evidence and the interrogation, examination, and cross-examination of the applicant and other witnesses. Nothing contained herein diminishes the authority of an immigration judge to conduct proceedings under this part.

(d) *Depositions.* The procedures specified in § 240.48(e) shall apply.

(e) *Record.* The hearing before the immigration judge, including the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, and all written orders, motions, appeals, and other papers filed in the proceeding shall constitute the record in the case. The hearing shall be recorded verbatim except for statements made off the record with the permission of the immigration judge.

## § 240.33 Applications for asylum or withholding of deportation.

(a) If the alien expresses fear of persecution or harm upon return to his or her country of origin or to a country to which the alien may be deported after a determination of excludability from the United States pursuant to this subpart, and the alien has not been referred to the immigration judge by an asylum officer in accordance with § 208.14(b) of this chapter, the immigration judge shall:

(1) Advise the alien that he may apply for asylum in the United States or withholding of deportation to that other country; and

(2) Make available the appropriate application forms.

(b) An application for asylum or withholding of deportation must be filed with the Immigration Court, pursuant to § 208.4(c) of this chapter. Upon receipt of an application that has not been referred by an asylum officer, the Immigration Court shall forward a copy to the Department of State pursuant to § 208.11 of this chapter and shall calendar the case for a hearing. The reply, if any, from the Department of State, unless classified under the applicable Executive Order, shall be given to both the applicant and to the trial attorney representing the government.

(c) Applications for asylum or withholding of deportation so filed will be decided by the immigration judge pursuant to the requirements and standards established in 8 CFR part 208 after an evidentiary hearing that is necessary to resolve material factual issues in dispute. An evidentiary hearing extending beyond issues related to the basis for a mandatory denial of the application pursuant to § 208.13(c) of this chapter is not necessary once the immigration judge has determined that such denial is required.

(1) Evidentiary hearings on applications for asylum or withholding of deportation will be closed to the public unless the applicant expressly requests that it be open pursuant to § 236.3 of this chapter.

(2) Nothing in this section is intended to limit the authority of the immigration judge properly to control the scope of any evidentiary hearing.

(3) During the exclusion hearing, the applicant shall be examined under oath on his or her application and may present evidence and witnesses on his or her own behalf. The applicant has the burden of establishing that he or she is a refugee as defined in section 101(a)(42) of the Act pursuant to the standard set forth in § 208.13 of this chapter.

(4) The trial attorney for the government may call witnesses and present evidence for the record, including information classified under the applicable Executive Order, provided the immigration judge or the Board has determined that such information is relevant to the hearing. The applicant shall be informed when the immigration judge receives such classified information. The agency that provides the classified information to the immigration judge may provide an unclassified summary of the information for release to the applicant whenever it determines it can do so consistently with safeguarding both the classified nature of the information and its source. The summary should be as detailed as possible, in order that the applicant may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state that such information is material to the decision.

(d) The decision of an immigration judge to grant or deny asylum or withholding of deportation shall be communicated to the applicant and to the trial attorney for the government. An adverse decision will state why asylum or withholding of deportation was denied.

## § 240.34 Renewal of application for adjustment of status under section 245 of the Act.

An adjustment application by an alien paroled under section 212(d)(5) of the Act, which has been denied by the district director, may be renewed in exclusion proceedings under section 236 of the Act (as in effect prior to April 1, 1997) before an immigration judge under the following two conditions: first, the denied application must have been properly filed subsequent to the applicant's earlier inspection and admission to the United States; and second, the applicant's later absence from and return to the United States must have been under the terms of an advance parole authorization on Form I–512 granted to permit the applicant's absence and return to pursue the previously filed adjustment application.

## § 240.35 Decision of the immigration judge; notice to the applicant.

(a) *Decision.* The immigration judge shall inform the applicant of his or her decision in accordance with § 3.37 of this chapter.

(b) *Advice to alien ordered excluded.* An alien ordered excluded shall be furnished with Form I–296, Notice to Alien Ordered Excluded by Immigration Judge, at the time of an oral decision by

the immigration judge or upon service of a written decision.

(c) *Holders of refugee travel documents.* Aliens who are holders of valid unexpired refugee travel documents may be ordered excluded only if they are found to be inadmissible under section 212(a)(2), 212(a)(3), or 212(a)(6)(E) of the Act, and it is determined that on the basis of the acts for which they are inadmissible there are compelling reasons of national security or public order for their exclusion. If the immigration judge finds that the alien is inadmissible but determines that there are no compelling reasons of national security or public order for exclusion, the immigration judge shall remand the case to the district director for parole.

### § 240.36  Finality of order.

The decision of the immigration judge shall become final in accordance with § 3.37 of this chapter.

### § 240.37  Appeals.

Except for temporary exclusions under section 235(c) of the Act, an appeal from a decision of an Immigration Judge under this part may be taken by either party pursuant to § 3.38 of this chapter.

### § 240.38  Fingerprinting of excluded aliens.

Every alien 14 years of age or older who is excluded from admission to the United States by an immigration judge shall be fingerprinted, unless during the preceding year he or she has been fingerprinted at an American consular office.

### § 240.39  Reopening or reconsideration.

Except as otherwise provided in this section, a motion to reopen or reconsider shall be subject to the requirements of § 103.5 of this chapter. The immigration judge may upon his or her own motion, or upon motion of the trial attorney or the respondent, reopen or reconsider any case in which he or she had made a decision, unless jurisdiction in the case is vested in the Board of Immigration Appeals under 8 CFR part 3. An order by the immigration judge granting a motion to reopen may be made on Form I–328. A motion to reopen will not be granted unless the immigration judge is satisfied that evidence sought to be offered is material and was not available and could not have been discovered or presented at the hearing; nor will any motion to reopen for the purpose of providing the respondent with an opportunity to make an application under § 242.17 of this chapter be granted if respondent's right to make such application were fully explained to him or her by the immigration judge and he or she was afforded an opportunity to do so at the hearing, unless circumstances have arisen thereafter on the basis of which the request is being made. The filing of a motion under this section with an immigration judge shall not serve to stay the execution of an outstanding decision; execution shall proceed unless the immigration judge who has jurisdiction over the motion specifically grants a stay of deportation. The immigration judge may stay deportation pending his or her determination of the motion and also pending the taking and disposition of an appeal from such determination.

## Subpart E—Proceedings To Determine Deportability of Aliens in the United States: Hearing and Appeal (for Proceedings Commenced Prior to April 1, 1997)

### § 240.40  Proceedings commenced prior to April 1, 1997.

Subpart E of 8 CFR part 240 applies only to deportation proceedings commenced prior to April 1, 1997. All references to the Act contained in this subpart pertain to the Act as in effect prior to April 1, 1997.

### § 240.41  Immigration Judges.

(a) *Authority.* In any proceeding conducted under this part the immigration judge shall have the authority to determine deportability and to make decisions, including orders of deportation, as provided by section 242(b) and 242B of the Act; to reinstate orders of deportation as provided by section 242(f) of the Act; to determine applications under sections 208, 212(k), 241(a)(1)(E)(iii), 241(a)(1)(H), 244, 245, and 249 of the Act; to determine the country to which an alien's deportation will be directed in accordance with section 243(a) of the Act; to order temporary withholding of deportation pursuant to section 243(h) of the Act; and to take any other action consistent with applicable law and regulations as may be appropriate. An immigration judge may certify his or her decision in any case to the Board of Immigration Appeals when it involves an unusually complex or novel question of law or fact. Nothing contained in this part shall be construed to diminish the authority conferred on immigration judges under section 103 of the Act.

(b) *Withdrawal and substitution of immigration judges.* The immigration judge assigned to conduct the hearing shall at any time withdraw if he deems himself disqualified. If an immigration judge becomes unavailable to complete his or her duties within a reasonable time, or if at any time the respondent consents to a substitution, another immigration judge may be assigned to complete the case. The new immigration judge shall familiarize himself or herself with the record in the case and shall state for the record that he has done so.

### § 240.42  Representation by counsel.

The respondent may be represented at the hearing by an attorney or other representative qualified under 8 CFR part 292.

### § 240.43  Incompetent respondents.

When it is impracticable for the respondent to be present at the hearing because of mental incompetency, the guardian, near relative, or friend who was served with a copy of the order to show cause shall be permitted to appear on behalf of the respondent. If such a person cannot reasonably be found or fails or refuses to appear, the custodian of the respondent shall be requested to appear on behalf of the respondent.

### § 240.44  Interpreter.

Any person acting as interpreter in a hearing before an immigration judge under this part shall be sworn to interpret and translate accurately, unless the interpreter is an employee of the United States Government, in which event no such oath shall be required.

### § 240.45  Postponement and adjournment of hearing.

After the commencement of the hearing, the immigration judge may grant a reasonable adjournment either at his or her own instance or, for good cause shown, upon application by the respondent or the Service.

### § 240.46  Evidence.

(a) *Sufficiency.* A determination of deportability shall not be valid unless it is found by clear, unequivocal, and convincing evidence that the facts alleged as grounds for deportation are true.

(b) *Use of prior statements.* The immigration judge may receive in evidence any oral or written statement that is material and relevant to any issue in the case previously made by the respondent or any other person during any investigation, examination, hearing, or trial.

(c) *Testimony.* Testimony of witnesses appearing at the hearing shall be under oath or affirmation administered by the immigration judge.

(d) *Depositions.* The immigration judge may order the taking of depositions pursuant to § 3.35 of this chapter.

### § 240.47   Contents of record.

The hearing before the immigration judge, including the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, and all written orders, motions, appeals, briefs, and other papers filed in the proceedings shall constitute the record in the case. The hearing shall be recorded verbatim except for statements made off the record with the permission of the immigration judge. In his or her discretion, the immigration judge may exclude from the record any arguments made in connection with motions, applications, requests, or objections, but in such event the person affected may submit a brief.

### § 240.48   Hearing.

(a) *Opening.* The immigration judge shall advise the respondent of his or her right to representation, at no expense to the Government, by counsel of his or her own choice authorized to practice in the proceedings and require him or her to state then and there whether he desires representations; advise the respondent of the availability of free legal services programs qualified under 8 CFR part 3 and organizations recognized pursuant to § 292.2 of this chapter, located in the district where the deportation hearing is being held; ascertain that the respondent has received a list of such programs, and a copy of Form I–618, Written Notice of Appeal Rights; advise the respondent that he or she will have a reasonable opportunity to examine and object to the evidence against him, to present evidence in his or her own behalf and to cross-examine witnesses presented by the Government; place the respondent under oath; read the factual allegations and the charges in the order to show cause to the respondent and explain them in nontechnical language, and enter the order to show cause as an exhibit in the record. Deportation hearings shall be open to the public, except that the immigration judge may, in his or her discretion and for the purpose of protecting witnesses, respondents, or the public interest, direct that the general public or particular individuals shall be excluded from the hearing in any specific case. Depending upon physical facilities, reasonable limitation may be placed upon the number in attendance at any one time, with priority being given to the press over the general public.

(b) *Pleading by respondent.* The immigration judge shall require the respondent to plead to the order to show cause by stating whether he or she admits or denies the factual allegations and his or her reportability under the charges contained therein. If the respondent admits the factual allegations and admits his or her deportability under the charges and the immigration judge is satisfied that no issues of law or fact remain, the immigration judge may determine that deportability as charged has been established by the admissions of the respondent. The immigration judge shall not accept an admission of deportability from an unrepresented respondent who is incompetent or under age 16 and is not accompanied by a guardian, relative, or friend; nor from an officer of an institution in which a respondent is an inmate or patient. When, pursuant to this paragraph, the immigration judge may not accept an admission of deportability, he or she shall direct a hearing on the issues.

(c) *Issues of deportability.* When deportability is not determined under the provisions of paragraph (b) of this section, the immigration judge shall request the assignment of a trial attorney, and shall receive evidence as to any unresolved issues, except that no further evidence need be received as to any facts admitted during the pleading. The respondent shall provide a court certified copy of a Judicial Recommendation Against Deportation (JRAD) to the special inquiry officer when such recommendation will be the basis of denying any charge(s) brought by the Service in the proceedings against the respondent. No JRAD is effective against a charge of deportability under section 241(a)(11) of the Act or if the JRAD was granted on or after November 29, 1990.

(d) *Additional charges.* The Service may at any time during a hearing lodge additional charges of deportability, including factual allegations, against the respondent. Copies of the additional factual allegations and charges shall be submitted in writing for service on the respondent and entry as an exhibit in the record. The immigration judge shall read the additional factual allegations and charges to the respondent and explain them to him or her. The immigration judge shall advise the respondent if he or she is not represented by counsel that he or she may be so represented and also that he or she may have a reasonable time within which to meet the additional factual allegations and charges. The respondent shall be required to state then and there whether he or she desires a continuance for either of these reasons. Thereafter, the provisions of paragraph (b) of this section shall apply to the additional factual allegations and lodged charges.

### § 240.49   Ancillary matters, applications.

(a) *Creation of the status of an alien lawfully admitted for permanent residence.* The respondent may apply to the immigration judge for suspension of deportation under section 244(a) of the Act; for adjustment of status under section 245 of the Act, or under section 1 of the Act of November 2, 1966; or under section 101 or 104 of the Act of October 28, 1977; or for the creation of a record of lawful admission for permanent residence under section 249 of the Act. The application shall be subject to the requirements of 8 CFR parts 240, 245, and 249. The approval of any application made to the immigration judge under section 245 of the Act by an alien spouse (as defined in section 216(g)(1) of the Act) or by an alien entrepreneur (as defined in section 216A(f)(1) of the Act), shall result in the alien's obtaining the status of lawful permanent resident on a conditional basis in accordance with the provisions of section 216 or 216A of the Act, whichever is applicable. However, the Petition to Remove the Conditions on Residence required by section 216(c) of the Act or the Petition by Entrepreneur to Remove Conditions required by section 216A(c) of the Act shall be made to the director in accordance with 8 CFR part 216. In conjunction with any application for creation of status of an alien lawfully admitted for permanent residence made to an immigration judge, if the respondent is inadmissible under any provision of section 212(a) of the Act and believes that he or she meets the eligibility requirements for a waiver of the ground of inadmissibility, he or she may apply to the immigration judge for such waiver. The immigration judge shall inform the respondent of his or her apparent eligibility to apply for any of the benefits enumerated in this paragraph and shall afford the respondent an opportunity to make application therefor during the hearing. In exercising discretionary power when considering an application under this paragraph, the immigration judge may consider and base the decision on information not contained in the record and not made available for inspection by the respondent, provided the Commissioner has determined that such information is relevant and is classified under the applicable Executive Order as requiring protection from unauthorized disclosure in the interest of national security. Whenever the immigration judge believes that he or she can do so while safeguarding both the information and its source, the immigration judge should inform the respondent of the general nature of the information in

order that the respondent may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state that the information is material to the decision.

(b) *Voluntary departure.* The respondent may apply to the immigration judge for voluntary departure in lieu of deportation pursuant to section 244(e) of the Act and § 240.56.

(c) *Applications for asylum or withholding of deportation.* (1) The immigration judge shall notify the respondent that if he or she is finally ordered deported, his or her deportation will in the first instance be directed pursuant to section 243(a) of the Act to the country designated by the respondent and shall afford him an opportunity then and there to make such designation. The immigration judge shall then specify and state for the record the country, or countries in the alternative, to which respondent's deportation will be directed pursuant to section 243(a) of the Act if the country of his or her designation will not accept him or her into its territory, or fails to furnish timely notice of acceptance, or if the respondent declines to designate a country.

(2) If the alien expresses fear of persecution or harm upon return to any of the countries to which the alien might be deported pursuant to paragraph (c)(1) of this section, and the alien has not previously filed an application for asylum or withholding of deportation that has been referred to the immigration judge by an asylum officer in accordance with § 208.14(b) of this chapter, the immigration judge shall:

(i) Advise the alien that he may apply for asylum in the United States or withholding of deportation to those countries; and

(ii) Make available the appropriate application forms.

(3) An application for asylum or withholding of deportation must be filed with the Immigration Court, pursuant to § 208.4(b) of this chapter. Upon receipt of an application that has not been referred to an asylum officer, the Immigration Court shall forward a copy to the Department of State pursuant to § 208.11 of this chapter and shall calendar the case for a hearing. The reply, if any, of the Department of State, unless classified under the applicable Executive Order, shall be given to both the applicant and to the trial attorney representing the government.

(4) Applications for asylum or withholding of deportation so filed will be decided by the immigration judge pursuant to the requirements and standards established in 8 CFR part 208 after an evidentiary hearing that is necessary to resolve factual issues in dispute. An evidentiary hearing extending beyond issues related to the basis for a mandatory denial of the application pursuant to § 208.13 or § 208.16 of this chapter is not necessary once the immigration judge has determined that such a denial is required.

(i) Evidentiary hearings on applications for asylum or withholding of deportation will be open to the public unless the applicant expressly requests that it be closed.

(ii) Nothing in this section is intended to limit the authority of the immigration judge properly to control the scope of any evidentiary hearing.

(iii) During the deportation hearing, the applicant shall be examined under oath on his or her application and may present evidence and witnesses in his or her own behalf. The applicant has the burden of establishing that he or she is a refugee as defined in section 101(a)(42) of the Act pursuant to the standard set forth in § 208.13 of this chapter.

(iv) The trial attorney for the government may call witnesses and present evidence for the record, including information classified under the applicable Executive Order, provided the immigration judge or the Board has determined that such information is relevant to the hearing. When the immigration judge receives such classified information he or she shall inform the applicant. The agency that provides the classified information to the immigration judge may provide an unclassified summary of the information for release to the applicant, whenever it determines it can do so consistently with safeguarding both the classified nature of the information and its source. The summary should be as detailed as possible, in order that the applicant may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state whether such information is material to the decision.

(5) The decision of an immigration judge to grant or deny asylum or withholding of deportation shall be communicated to the applicant and to the trial attorney for the government. An adverse decision will state why asylum or withholding of deportation was denied.

(d) *Application for relief under sections 241(a)(1)(H) and 241(a)(1)(E)(iii) of the Act.* The respondent may apply to the immigration judge for relief from deportation under sections 241(a)(1)(H) and 241(a)(1)(E)(iii) of the Act.

(e) *General.* An application under this section shall be made only during the hearing and shall not be held to constitute a concession of alienage or deportability in any case in which the respondent does not admit his alienage or deportability. However, nothing in this section shall prohibit the Service from using information supplied in an application for asylum or withholding of deportation submitted to an asylum officer pursuant to § 208.2 of this chapter on or after January 4, 1995, as the basis for issuance of an order to show cause or a notice to appear to establish alienage or deportability in a case referred to an immigration judge under § 208.14(b) of this chapter. The respondent shall have the burden of establishing that he or she is eligible for any request benefit or privilege and that it should be granted in the exercise of discretion. The respondent shall not be required to pay a fee on more than one application within paragraphs (a) and (c) of this section, provided that the minimum fee imposed when more than one application is made shall be determined by the cost of the application with the highest fee. Nothing contained herein is intended to foreclose the respondent from applying for any benefit or privilege which he or she believes himself or herself eligible to receive in proceedings under this part.

## § 240.50   Decision of the immigration judge.

(a) *Contents.* The decision of the immigration judge may be oral or written. Except when deportability is determined on the pleadings pursuant to § 240.48(b), the decision of the immigration judge shall include a finding as to deportability. The formal enumeration of findings is not required. The decision shall also contain the reasons for granting or denying the request. The decision shall be concluded with the order of the immigration judge.

(b) *Summary decision.* Notwithstanding the provisions of paragraph (a) of this section, in any case where deportability is determined on the pleadings pursuant to § 240.48(b) and the respondent does not make an application under § 240.49, or the respondent applies for voluntary departure only and the immigration judge grants the application, the immigration judge may enter a summary decision on Form EOIR–7, Summary Order of Deportation, if deportation is

ordered, or on Form EOIR–6, Summary Order of Voluntary Departure, if voluntary departure is granted with an alternate order of deportation.

(c) *Order of the immigration judge.* The order of the immigration judge shall direct the respondent's deportation, or the termination of the proceedings, or such other disposition of the case as may be appropriate. When deportation is ordered, the immigration judge shall specify the country, or countries in the alternate, to which respondent's deportation shall be directed. The immigration judge is authorized to issue orders in the alternative or in combination as he or she may deem necessary.

### § 240.51   Notice of decision.

(a) *Written decision.* A written decision shall be served upon the respondent and the trial attorney, together with the notice referred to in § 3.3 of this chapter. Service by mail is complete upon mailing.

(b) *Oral decision.* An oral decision shall be stated by the immigration judge in the presence of the respondent and the trail attorney, if any, at the conclusion of the hearing. Unless appeal from the decision is waived, the respondent shall be furnished with Form EOIR–26, Notice of Appeal, and advised of the provisions of § 240.53. A typewritten copy of the oral decision shall be furnished at the request of the respondent or the trial attorney.

(c) *Summary decision.* When the immigration judge renders a summary decision as provided in § 240.51(b), he or she shall serve a copy thereof upon the respondent at the conclusion of the hearing. Unless appeal from the decision is waived, the respondent shall be furnished with Form EOIR–26, Notice of Appeal, and advised of the provisions of § 240.54.

### § 240.52   Finality of order.

The decision of the immigration judge shall become final in accordance with § 3.39 of this chapter.

### § 240.53   Appeals.

(a) Pursuant to 8 CFR part 3, an appeal shall lie from a decision of an immigration judge to the Board, except that no appeal shall lie from an order of deportation entered in absentia. The procedures regarding the filing of a Form EOIR–26, Notice of Appeal, fees, and briefs are set forth in §§ 3.3, 3.31, and 3.38 of this chapter. An appeal shall be filed within 30 calendar days after the mailing of a written decision, the stating of an oral decision, or the service of a summary decision. The filing date is defined as the date of receipt of the

Notice of Appeal by the Board. The reasons for the appeal shall be stated in the Form EOIR–26, Notice of Appeal, in accordance with the provisions of § 3.3(b) of this chapter. Failure to do so may constitute a ground for dismissal of the appeal by the Board pursuant to § 3.1(d)(1–a) of this chapter.

(b) *Prohibited appeals; legalization or applications.* An alien respondent defined in § 245a.2(c)(6) or (7) of this chapter who fails to file an application for adjustment of status to that of a temporary resident within the prescribed period(s), and who is thereafter found to be deportable by decision of an immigration judge, shall not be permitted to appeal the finding of deportability based solely on refusal by the immigration judge to entertain such an application in deportation proceedings.

### § 240.54   Proceedings under section 242(f) of the Act.

(a) *Order to show cause.* In the case of an alien within the provisions of section 242(f) of the Act, the order to show cause shall charge him or her with deportability under section 242(f) of the Act. The prior order of deportation and evidence of the execution thereof, properly identified, shall constitute prima facie cause for deportability under this section.

(b) *Applicable procedure.* Except as otherwise provided in this section, proceedings under section 242(f) of the Act shall be conducted in general accordance with the rules prescribed in this part.

(c) *Deportability.* In determining the deportability of an alien alleged to be within the purview of paragraph (a) of this section, the issues shall be limited to solely to a determination of the identity of the respondent, i.e., whether the respondent is in fact an alien who was previously deported, or who departed while an order of deportation was outstanding; whether the respondent was previously deported as a member of any of the classes described in section 241(a)(2),(3) or (4) of the Act; and whether respondent has unlawfully reentered the United States.

(d) *Order.* If deportability as charged in the order to show cause is established, the Immigration Judge shall order that the respondent be deported under the previous order of deportation in accordance with section 242(f) of the Act.

(e) *Service counsel; additional charges.* When Service counsel is assigned to a proceeding under this section and additional charges are lodged against the respondent, the

provisions of paragraphs (c) and (d) of this section shall cease to apply.

## Subpart F—Suspension of Deportation and Voluntary Departure (for Proceedings Commenced Prior to April 1, 1997)

### § 240.55   Proceedings commenced prior to April 1, 1997.

Subpart F of 8 CFR part 240 applies to deportation proceedings commenced prior to April 1, 1997. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

### § 240.56   Application.

Notwithstanding any other provision of this chapter, an alien who is deportable because of a conviction on or after November 18, 1988, for an aggravated felony as defined in section 101(a)(43) of the Act, shall not be eligible for voluntary departure as prescribed in 8 CFR part 240 and section 244 of the Act. Pursuant to subpart F of this part and section 244 of the Act, an immigration judge may authorized the suspension of an alien's deportation; or, if the alien established that he or she is willing and has the immediate means with which to depart promptly from the United States, an immigration judge may authorized the alien to depart voluntarily from the United States in lieu of deportation within such time as may be specified by the immigration judge when first authorizing voluntary departure, and under such conditions as the district director shall direct. An application for suspension of deportation shall be made on Form EOIR–40.

### § 240.57   Extension of time to depart.

Authority to reinstate or extend the time within which to depart voluntarily specified initially by an immigration judge or the Board is within the sole jurisdiction of the district director, except that an immigration judge or the Board may reinstate voluntary departure in a deportation proceeding that has been reopened for a purpose other than solely making an application for voluntary departure. A request by an alien for reinstatement or an extension of time within which to depart voluntarily shall be filed with the district director having jurisdiction over the alien's place of residence. Written notice of the district director's decision shall be served upon the alien and no appeal may be taken therefrom.

**Subpart G—Civil Penalties for Failure To Depart [Reserved]**

107. Part 241 is revised to read as follows:

# PART 241—APPREHENSION AND DETENTION OF ALIENS ORDERED REMOVED

**Subpart A—Post-Hearing Detention and Removal**

Sec.
241.1   Final order of removal.
241.2   Warrant of removal.
241.3   Detention of aliens during removal period.
241.4   Continued detention beyond the removal period.
241.5   Conditions of release after removal period.
241.6   Administrative stay of removal.
241.7   Self-removal.
241.8   Reinstatement of removal orders.
241.9   Notice to transportation line of inadmissible alien's removal.
241.10   Special care and attention of removable aliens.
241.11   Detention and removal of stowaways.
241.12   Nonapplication of costs of detention and maintenance.

**Subpart B—Deportation of Excluded Aliens (for Hearings Commenced Prior to April 1, 1997).**

241.20   Proceedings commenced prior to April 1, 1997.
241.21   Stay of deportation of excluded alien.
241.22   Notice to surrender for deportation.
241.23   Cost of maintenance not assessed.
241.24   Notice to transportation line of alien's exclusion.
241.25   Deportation.

**Subpart C—Deportation of Aliens in the United States (for Hearings Commenced Prior to April 1, 1997)**

241.30   Proceedings commenced prior to April 1, 1997.
241.31   Final order of deportation.
241.32   Warrant of deportation.
241.33   Expulsion.

Authority: 8 U.S.C. 1103, 1223, 1227, 1251, 1253, 1255, and 1330; 8 CFR part 2.

**Subpart A—Post-hearing Detention and Removal**

### § 241.1   Final order of removal.

An order of removal made by the immigration judge at the conclusion of proceedings under section 240 of the Act shall become final:

(a) Upon dismissal of an appeal by the Board of Immigration Appeals;

(b) Upon waiver of appeal by the respondent;

(c) Upon expiration of the time allotted for an appeal if the respondent does not file an appeal within that time;

(d) If certified to the Board or Attorney General, upon the date of the subsequent decision ordering removal;

(e) If an immigration judge orders an alien removed in the alien's absence, immediately upon entry of such order; or

(f) If an immigration judge issues an alternate order of removal in connection with a grant of voluntary departure, upon overstay of the voluntary departure period except where the respondent has filed a timely appeal with the Board. In such a case, the order shall become final upon an order of removal by the Board or the Attorney General, or upon overstay of any voluntary departure period granted or reinstated by the Board or the Attorney General.

### § 241.2   Warrant of removal.

(a) *Issuance of a warrant of removal.* A Form I–205, Warrant of Removal, based upon the final administrative removal order in the alien's case shall be issued by a district director. The district director shall exercise the authority contained in section 241 of the Act to determine at whose expense the alien shall be removed and whether his or her mental or physical condition requires personal care and attention en route to his or her destination.

(b) *Execution of the warrant of removal.* Any officer authorized by § 287.5(e) of this chapter to execute administrative warrants of arrest may execute a warrant of removal.

### § 241.3   Detention of aliens during removal period.

(a) *Assumption of custody.* Once the removal period defined in section 241(a)(1) of the Act begins, an alien in the United States will be taken into custody pursuant to the warrant of removal.

(b) *Cancellation of bond.* Any bond previously posted will be canceled unless it has been breached or is subject to being breached.

(c) *Judicial stays.* The filing of (or intention of file) a petition or action in a Federal court seeking review of the issuance or execution of an order of removal shall not delay execution of the Warrant of Removal except upon an affirmative order of the court.

### § 241.4   Continued detention beyond the removal period.

(a) *Continuation of custody for inadmissible or criminal aliens.* The district director may continue in custody any alien inadmissible under section 212(a) of the Act or removable under section 237(a)(1)(C), 237(a)(2), or 237(a)(4) of the Act, or who presents a significant risk of noncompliance with the order of removal, beyond the removal period, as necessary, until removal from the United States. If such an alien demonstrates by clear and convincing evidence that the release would not pose a danger to the community or a significant flight risk, the district director may, in the exercise of discretion, order the alien released from custody on such conditions as the district director may prescribe, including bond in an amount sufficient to ensure the alien's appearance for removal. The district may consider, but is not limited to considering, the following factors:

(1) The nature and seriousness of the alien's criminal convictions;

(2) Other criminal history;

(3) Sentence(s) imposed and time actually served;

(4) History of failures to appear for court (defaults);

(5) Probation history;

(6) Disciplinary problems while incarcerated;

(7) Evidence of rehabilitative effort or recidivism;

(8) Equities in the United States; and

(9) Prior immigration violations and history.

(b) *Continuation of custody for other aliens.* Any alien removable under any section of the Act other than section 212(a), 237(a)(1)(C), 237(a)(2), or 237(a)(4) may be detained beyond the removal period, in the discretion of the district director, unless the alien demonstrates to the satisfaction of the district director that he or she is likely to comply with the removal order and is not a risk to the community.

### § 241.5   Conditions of release after removal period.

(a) *Order of supervision.* An alien released pursuant to § 241.4 shall be released pursuant to an order of supervision. A district director, acting district director, deputy district director, assistant district director for investigations, assistant district director for detention and deportation, or officer in charge may issue an order of supervision on Form I–220B. The order shall specify conditions of supervision including, but not limited to, the following:

(1) A requirement that the alien report to a specified officer periodically and provide relevant information under oath as directed;

(2) A requirement that the alien continue efforts to obtain a travel document and assist the Service in obtaining a travel document;

(3) A requirement that the alien report as directed for a mental or physical examinations as directed by the Service;

(4) A requirement that the alien obtain advance approval of travel beyond previously specified times and distances; and

(5) A requirement that the alien provide the Service with written notice of any change of address within five days of the change.

(b) *Posting of bond.* An officer authorized to issue an order of supervision may require the posting of a bond in an amount determined by the officer to be sufficient to ensure compliance with the conditions of the order, including surrender for removal.

(c) *Employment authorization.* An officer authorized to issue an order of supervision may, in his or her discretion, grant employment authorization to an alien released under an order of supervision if the officer specifically finds that:

(1) The alien cannot be removed because no country will accept the alien; or

(2) The removal of the alien is impracticable or contrary to public interest.

### § 241.6   Administrative stay of removal.

Any request of an alien under a final order of deportation or removal for a stay of deportation or removal shall be filed on Form I–246, Stay of Removal, with the district director having jurisdiction over the place where the alien is at the time of filing. The district director, in his or her discretion and in consideration of factors such as are listed in § 212.5 of this chapter and section 241(c) of the Act, may grant a stay of removal or deportation for such time and under such conditions as he or she may deem appropriate. Neither the request nor the failure to receive notice of disposition of the request shall delay removal or relieve the alien from strict compliance with any outstanding notice to surrender for deportation or removal. Denial by the district director of a request for a stay is not appealable, but such denial shall not preclude an immigration judge or the Board from granting a stay in connection with a motion to reopen or a motion to reconsider as provided in 8 CFR part 3. The Service shall take all reasonable steps to comply with a stay granted by an immigration judge or the Board. However, such a stay shall cease to have effect if granted (or communicated) after the alien has been placed aboard an aircraft or other conveyance for removal and the normal boarding has been completed.

### § 241.7   Self-removal.

A district director may permit an alien ordered removed (including an

alien ordered excluded or deported in proceedings prior to April 1, 1997) to depart at his or her own expense to a destination of his or her own choice. Any alien who has departed from the United States while an order of deportation or removal is outstanding shall be considered to have been deported, excluded and deported, or removed, except that an alien who departed before the expiration of the voluntary departure period granted in connection with an alternate order of deportation or removal shall not be considered to have been so deported or removed.

### § 241.8   Reinstatement of removal orders.

(a) *Applicability.* An alien who illegally reenters the United States after having been removed, or having departed voluntarily, while under an order of exclusion, deportation, or removal shall be removed from the United States by reinstating the prior order. The alien has no right to a hearing before an immigration judge in such circumstances. In establishing whether an alien is subject to this section, the immigration officer shall determine the following:

(1) Whether the alien has been subject to a prior order of removal. The immigration officer must obtain the prior order of exclusion, deportation, or removal relating to the alien.

(2) The identity of the alien, i.e., whether the alien is in fact an alien who was previously removed, or who departed voluntarily while under an order of exclusion, deportation, or removal. In disputed cases, verification of identity shall be accomplished by a comparison of fingerprints between those of the previously excluded, deported, or removed alien contained in Service records and those of the subject alien. In the absence of fingerprints in a disputed case the alien shall not be removed pursuant to this paragraph.

(3) Whether the alien unlawfully reentered the United States. In making this determination, the officer shall consider all relevant evidence, including statements made by the alien and any evidence in the alien's possession. The immigration officer shall attempt to verify an alien's claim, if any, that he or she was lawfully admitted, which shall include a check of Service data systems available to the officer.

(b) *Notice.* If an officer determines that an alien is subject to removal under this section, he or shall provide the alien with written notice of his or her determination. The officer shall advise the alien that he or she may make a written or oral statement contesting the

determination. If the alien wishes to make such a statement, the officer shall allow the alien to do so and shall consider whether the alien's statement warrants reconsideration of the determination.

(c) *Order.* If the requirements of paragraph (a) of this section are met, the alien shall be removed under the previous order of exclusion, deportation, or removal in accordance with section 241(a)(5) of the Act.

(d) *Exception for withholding of removal.* If an alien whose prior order of removal has been reinstated under this section expresses a fear of returning to the country designated in that order, the alien shall be immediately referred to an asylum officer to determine whether the alien's removal to that country must be withheld under section 241(b)(3) of the Act. The alien's claim will be granted or denied by an asylum officer in accordance with § 208.16 of this chapter. If the alien has previously had a claim to withholding of deportation or removal denied, then that decision shall prevail unless the alien can establish the existence of changed circumstances that materially affect the alien's eligibility for withholding. The alien's case shall not be referred to an immigration judge, and there is no appeal from the decision of the asylum officer. If the alien is found to merit withholding of removal, the Service shall not enforce the reinstated order.

(e) *Execution of reinstated order.* Execution of the reinstated order of removal and detention of the alien shall be administered in accordance with this part.

### § 241.9   Notice to transportation line of alien's removal.

(a) An alien who has been ordered removed shall, immediately or as promptly as the circumstances permit, be offered for removal to the owner, agent, master, commanding officer, person in charge, purser, or consignee of the vessel or aircraft on which the alien is to be removed, as determined by the district director, with a written notice specifying the cause of inadmissibility or deportability, the class of travel in which such alien arrived and is to be removed, and with the return of any documentation that will assist in effecting his or her removal. If special care and attention are required, the provisions of § 241.10 shall apply.

(b) Failure of the carrier to accept for removal an alien who has been ordered removed shall result in the carrier being assessed any costs incurred by the Service for detention after the carrier's failure to accept the alien for removal, including the cost of any transportation

as required under section 241(e) of the Act. The User Fee Account shall not be assessed for expenses incurred because of the carrier's violation of the provisions of section 241 of the Act and this paragraph. The Service will, at the carrier's option, retain custody of the alien for an additional 7 days beyond the date of the removal order. If, after the third day of this additional 7-day period, the carrier has not made all the necessary transportation arrangements for the alien to be returned to his or her point of embarkation by the end of the additional 7-day period, the Service will make the arrangements and bill the carrier for its costs.

**241.10   Special care and attention of removable aliens.**

When, in accordance with section 241(c)(3) of the Act, a transportation line is responsible for the expenses of an inadmissible or deportable alien's removal, and the alien requires special care and attention, the alien shall be delivered to the owner, agent, master, commanding officer, person in charge, purser, or consignee of the vessel or aircraft on which the alien will be removed, who shall be given Forms I–287, I–287A, and I–287B. The reverse of Form I–287A shall be signed by the officer of the vessel or aircraft to whom the alien has been delivered and immediately returned to the immigration officer effecting delivery. Form I–287B shall be retained by the receiving officer and subsequently filled out by the agents or persons therein designated and returned by mail to the district director named on the form. The transportation line shall at its own expense forward the alien from the foreign port of disembarkation to the final destination specified on Form I–287. The special care and attention shall be continued to such final destination, except when the foreign public officers decline to allow such attendant to proceed and they take charge of the alien, in which case this fact shall be recorded by the transportation line on the reverse of Form I–287B. If the transportation line fails, refuses, or neglects to provide the necessary special care and attention or comply with the directions of Form I–287, the district director shall thereafter and without notice employ suitable persons, at the expense of the transportation line, and effect such removal.

**§ 241.11   Detention and removal of stowaways.**

(a) *Presentation of stowaways.* The owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft (referred to in this section as the carrier) bringing any alien stowaway to the United States is required to detain the stowaway on board the vessel or aircraft, at the expense of the owner of the vessel or aircraft, until completion of the inspection of the alien by an immigration officer. If detention on board the vessel or aircraft pending inspection is not possible, the carrier shall advise the Service of this fact without delay, and the Service may authorize that the carrier detain the stowaway at another designated location, at the expense of the owner, until the immigration officer arrives. No notice to detain the alien shall be required. Failure to detain an alien stowaway pending inspection shall result in a civil penalty under section 243(c)(1)(A) of the Act. The owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft must present the stowaway for inspection, along with any documents or evidence of identity or nationality in the possession of the alien or obtained by the carrier relating to the alien stowaway, and must provide any available information concerning the alien's boarding or apprehension.

(b) *Removal of stowaways from vessel or aircraft for medical treatment.* The district director may parole an alien stowaway into the United States for medical treatment, but the costs of detention and treatment of the alien stowaway shall be at the expense of the owner of the vessel or aircraft, and such removal of the stowaway from the vessel or aircraft does not relieve the carrier of the requirement to remove the stowaway from the United States once such medical treatment has been completed.

(c) *Repatriation of stowaways.* (1) *Requirements of carrier.* Following inspection, an immigration officer may order the owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft bringing any alien stowaway to the United States to remove the stowaway on the vessel or aircraft of arrival. If the owner, agent, master, commanding officer, cahrterer, or consignee requests that he or she be allowed to remove the stowaway by other means, the Service shall consider any such request, provided the carrier has obtained, or will obtain in a timely manner, any necessary travel documents and has made or will make all transportation arrangements. The owner, agent, master, commanding officer, charterer, or consignee shall transport the stowaway or arrange for secure escort of the stowaway to the vessel or aircraft of departure to ensure that the stowaway departs the United States. All expenses relating to removal shall be borne by the owner. Other than requiring compliance with the detention and removal requirements contained in section 241(d)(2) of the Act, the Service shall not impose additional conditions on the carrier regarding security arrangements. Failure to comply with an order to remove an alien stowaway shall result in a civil penalty under section 243(c)(1)(A) of the Act.

(2) *Detention of stowaways ordered removed.* If detention of the stowaway is required pending removal on other than the vessel or aircraft of arrival, or if the stowaway is to be removed on the vessel or aircraft of arrival but departure of the vessel or aircraft is not imminent and circumstances preclude keeping the stowaway on board the vessel or aircraft, the Service shall take the stowaway into Service custody. The owner is responsible for all costs of maintaining and detaining the stowaway pending removal, including costs for stowaways seeking asylum as described in paragraph (d) of this section. Such costs will be limited to those normally incurred in the detention of an alien by the Service, including, but not limited to, housing, food, transportation, medical expenses, and other reasonable costs incident to the detention of the stowaway. The Service may require the posting of a bond or other surety to ensure payment of costs of detention.

(d) *Stowaways claiming asylum.* (1) *Referral for credible fear determination.* A stowaway who indicates an intention to apply for asylum or a fear of persecution shall be removed from the vessel or aircraft of arrival in accordance with § 208.5(b) of this chapter. The immigration officer shall refer the alien to an asylum officer for a determination of credible fear in accordance with section 235(b)(1)(B) of the Act and § 208.18 of this chapter. The stowaway shall be detained in the custody of the Service pending the credible fear determination and during any consideration of the asylum application.

(2) *Costs of detention of asylum-seeking stowaways.* The owner of the vessel or aircraft that brought the stowaway to the United States shall reimburse the Service for the costs of maintaining and detaining the stowaway pending a determination of credible fear under section 235(b)(1)(B) of the Act, up to a maximum period of 72 hours. The owner is also responsible for the costs of maintaining and detaining the stowaway during the period in which the stowaway is pursuing his or her asylum application, for a maximum period of 15 working days, excluding Saturdays, Sundays,

and holidays. The 15-day period shall begin on the day following the day in which the alien is determined to have a credible fear of persecution by the asylum officer, or by the immigration judge if such review was requested by the alien pursuant to section 235(b)(1)(B)(iii)(III), but not later than 72 hours after the stowaway was initially presented to the Service for inspection. Following the determination of credible fear, if the stowaway's application for asylum is not adjudicated within 15 working days, the Service shall pay the costs of detention beyond this time period. If the stowaway is determined not to have a credible fear of persecution, or if the stowaway's application for asylum is denied, including any appeals, the carrier shall be notified and shall arrange for repatriation of the stowaway at the expense of the owner of the vessel or aircraft on which the stowaway arrived.

### § 241.12   Nonapplication of costs of detention and maintenance.

The owner of a vessel or aircraft bringing an alien to the United States who claims to be exempt from payment of the costs of detention and maintenance of the alien pursuant to section 241(c)(3)(B) of the Act shall establish to the satisfaction of the district director in charge of the port of arrival that such costs should not be applied. The district director shall afford the line a reasonable time within which to submit affidavits and briefs to support its claim. There is no appeal from the decision of the district director.

### §§ 241.13–241.19   [Reserved]

## Subpart B—Deportation of Excluded Aliens (for hearings commenced prior to April 1, 1997)

### § 241.20   Proceedings commenced prior to April 1, 1997.

Subpart B of 8 CFR part 241 applies to exclusion proceedings commenced prior to April 1, 1997. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

### § 241.21   Stay of deportation of excluded alien.

The district director in charge of the port of arrival may stay the immediate deportation of an excluded alien pursuant to sections 237 (a) and (d) of the Act under such conditions as he or she may prescribe.

### § 241.22   Notice to surrender for deportation.

An alien who has been finally excluded pursuant to 8 CFR part 240,

subpart D may at any time surrender himself or herself to the custody of the Service and shall surrender to such custody upon notice in writing of the time and place for his or her surrender. The Service may take the alien into custody at any time. An alien taken into custody either upon notice to surrender or by arrest shall not be deported less than 72 hours thereafter without his or her consent thereto filed in writing with the district director in charge of the place of his or her detention. An alien in foreign contiguous territory shall be informed that he or she may remain there in lieu of surrendering to the Service, but that he or she will be deemed to have acknowledged the execution of the order of exclusion and deportation in his or her case upon his or her failure to surrender at the time and place prescribed.

### § 241.23   Cost of maintenance not assessed.

A claim pursuant to section 237(a)(1) of the Act shall be established to the satisfaction of the district director in charge of the port of arrival, from whose adverse decision no appeal shall lie. The district director shall afford the line a reasonable time within which to submit affidavits and briefs to support its claim.

### § 241.24   Notice to transportation line of alien's exclusion.

(a) An excluded alien shall, immediately or as promptly as the circumstances permit, be offered for deportation to the master, commanding officer, purser, person in charge, agent, owner, or consignee of the vessel or aircraft on which the alien is to be deported, as determined by the district director, with a written notice specifying the cause of exclusion, the class of travel in which such alien arrived and is to be deported, and with the return of any documentation that will assist in effecting his or her deportation. If special care and attention are required, the provisions of § 241.10 shall apply.

(b) Failure of the carrier to accept for removal an alien who has been ordered excluded and deported shall result in the carrier being assessed any costs incurred by the Service for detention after the carrier's failure to accept the alien for removal including the cost of any transportation. The User Fee Account shall not be assessed for expenses incurred because of the carrier's violation of the provisions of section 237 of the Act and this paragraph. The Service will, at the carrier's option, retain custody of the excluded alien for an additional 7 days

beyond the date of the deportation/exclusion order. If, after the third day of this additional 7-day period, the carrier has not made all the necessary transportation arrangements for the excluded alien to be returned to his or her point of embarkation by the end of the additional 7-day period, the Service will make the arrangements and bill the carrier for its costs.

### § 241.25   Deportation.

(a) *Definitions of terms.* For the purposes of this section, the following terms mean:

(1) Adjacent island—as defined in section 101(b)(5) of the Act.

(2) Foreign contiguous territory—any country sharing a common boundary with the United States.

(3) Residence in foreign contiguous territory or adjacent island—any physical presence, regardless of intent, in a foreign contiguous territory or an adjacent island if the government of such territory or island agrees to accept the alien.

(4) Aircraft or vessel—any conveyance and other mode of travel by which arrival is affected.

(5) Next available flight—the carrier's next regularly scheduled departure to the excluded alien's point of embarkation regardless of seat availability. If the carrier's next regulatory scheduled departure of the excluded aliens point of embarkation is full, the carrier has the option of arranging for return transportation on other carrier which service the excluded aliens point of embarkation.

(b) *Place to which deported.* Any alien (other than an alien crew member or an alien who boarded an aircraft or vessel in foreign contiguous territory or an adjacent island) who is ordered excluded shall be deported to the country where the alien boarded the vessel or aircraft on which the alien arrived in the United States. If that country refuses to accept the alien, the alien shall be deported to:

(1) The country of which the alien is a subject, citizen, or national;

(2) The country where the alien was born;

(3) The country where the alien has a residence; or

(4) Any country willing to accept the alien.

(c) *Contiguous territory and adjacent islands.* Any alien ordered excluded who boarded an aircraft or vessel in foreign contiguous territory or in any adjacent island shall be deported to such foreign contiguous territory or adjacent island is the alien is a native, citizen, subject or national of such foreign contiguous territory or adjacent

island, or if the alien has a residence in such foreign contiguous territory or adjacent island. Otherwise, the alien shall be deported, in the first instance, to the country in which is located the port at which the alien embarked for such foreign contiguous territory or adjacent island.

(d) *Land border pedestrian arrivals.* Any alien ordered excluded who arrived at a land border on foot shall be deported in the same manner as if the alien had boarded a vessel or aircraft in foreign contiguous territory.

### §§ 241.26–241.29   [Reserved]

### Subpart C—Deportation of Aliens in the United States (For Hearings Commenced Prior to April 1, 1997)

### § 241.30   Proceedings commenced prior to April 1, 1997.

Subpart C of 8 CFR part 241 applies to deportation proceedings commenced prior to April 1, 1997. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

### § 241.31   Final order of deportation.

Except as otherwise required by section 242(c) of the Act for the specific purposes of that section, an order of deportation, including an alternate order of deportation coupled with an order of voluntary departure, made by the immigration judge in proceedings under 8 CFR part 240 shall become final upon dismissal of an appeal by the Board of Immigration Appeals, upon waiver of appeal, or upon expiration of the time allotted for an appeal when no appeal is taken; of, if such an order is issued by the Board or approved by the Board upon certification, it shall be final as of the date of the Board's decision.

### § 241.32   Warrant of deportation.

A Form I–205, Warrant of Deportation, based upon the final administrative order of deportation in the alien's case shall be issued by a district director. The director shall exercise the authority contained in such 243 of the Act to determine at whose expense the alien shall be deported and whether his or her mental or physical condition requires personal care and attention en route to his or her destination.

### § 241.33   Expulsion.

(a) *Execution of order.* Except in the exercise of discretion by the district director, and for such reasons as are set forth in § 212.5(a) of this chapter, once an order of deportation becomes final, an alien shall be taken into custody and the order shall be executed. For the

purposes of this part, and order of deportation is final and subject to execution upon the date when any of the following occurs:

(1) A grant of voluntary departure expires;

(2) An immigration judge enters an order of deportation without granting voluntary departure or other relief, and the alien respondent waives his or order right to appeal;

(3) The Board of Immigration Appeals enters and order of deportation on appeals, without granting voluntary departure or other relief; or

(4) A Federal district or appellate court affirms an administrative order of deportation in a petition for review or habeas corpus action.

(b) *Service of decision.* In the case of an order entered by any of the authorities enumerated above, the order shall be executed no sooner than 72 hours after service of the decision, regardless of whether the alien is in Service custody, provided that such period may be waived on the knowing and voluntary request of the alien. Nothing in this paragraph shall be construed, however, to preclude assumption of custody by the Service at the time of issuance of the final order.

### PART 242—[REMOVED AND RESERVED]

108. Part 242 is removed and reserved.

### PART 243—[REMOVED AND RESERVED]

109. Part 243 is removed and reserved.

### PART 244—TEMPORARY PROTECTED STATUS FOR NATIONALS OF DESIGNATED STATES

110. The heading for part 244 is revised as set forth above.

111. The authority citation for part 244 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1254, 1254a note.

### §§ 244.1 and 244.2   [Removed]

112. Sections 244.1 and 244.2 are removed.

### §§ 244.3 through 244.22   [Redesignated as §§ 244.1 through 244.20]

113. Newly redesignated §§ 244.3 through 244.22 are further redesignated as §§ 244.1 through 244.20, respectively.

### PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE

114. The authority citation for part 245 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1255; 8 CFR part 2.

115. Section 245.1 is amended by:

a. Removing the word "and" at the end of the paragraph (c)(3);

b. Removing the "." at the end of paragraphs (c)(4) through (c)(7), and replacing it with a ";";

c. Redesignating paragraph (c)(8) as paragraph (c)(9);

d. Adding a new paragraph (c)(8);

e. Revising newly redesignated paragraph (c)(9) introductory text,

f. Revising newly redesignated paragraphs (c)(9)(i) through (c)(9)(iii); and by

g. Revising paragraph (f), to read as follows:

### § 245.1   Eligibility.

\*    \*    \*    \*    \*

(c)  \*  \*  \*

(8) Any arriving alien who is in removal proceedings pursuant to section 235(b)(1) or section 240 of the Act; and

(9) Any alien who seeks to adjust status based upon a marriage which occurred on or after November 10, 1986, and while the alien was in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto.

(i) *Commencement of proceedings.* The period during which the alien is in deportation, exclusion, or removal proceedings or judicial proceedings relating thereto, commences:

(A) With the issuance of the Form I–221, Order to Show Cause and Notice of Hearing prior to June 20, 1991;

(B) With the filing of a Form I–221, Order to Show Cause and Notice of Hearing, issued on or after June 20, 1991, with the Immigration Court;

(C) With the issuance of Form I–122, Notice to Applicant for Admission Detained for Hearing Before Immigration Judge, prior to April 1, 1997,

(D) With the filing of a Form I–862, Notice to Appear, with the Immigration Court, or

(E) With the issuance and service of Form I–860, Notice and Order of Expedited Removal.

(ii) *Termination of proceedings.* The period during which the alien is in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto, terminates:

(A) When the alien departs from the United States while an order of exclusion, deportation, or removal is outstanding or before the expiration of the voluntary departure time granted in connection with an alternate order of deportation or removal;

(B) When the alien is found not to be inadmissible or deportable from the United States;

(C) When the Form I–122, I–221, I–860, or I–862 is canceled;

(D) When proceedings are terminated by the immigration judge or the Board of Immigration Appeals; or

(E) When a petition for review or an action for habeas corpus is granted by a Federal court on judicial review.

(iii) *Exemptions.* This prohibition shall no longer apply if:

(A) The alien is found not to be inadmissible or deportable from the United States;

(B) Form I–122, I–221, I–860, or I–862, is canceled;

(C) Proceedings are terminated by the immigration judge or the Board of Immigration Appeals;

(D) A petition for review or an action for habeas corpus is granted by a Federal court on judicial review;

(E) The alien has resided outside the United States for 2 or more years following the marriage; or

(F) The alien establishes the marriage is bona fide by providing clear and convincing evidence that the marriage was entered into in good faith and in accordance with the laws of the place where the marriage took place, was not entered into for the purpose of procuring the alien's entry as an immigrant, and no fee or other consideration was given (other than to an attorney for assistance in preparation of a lawful petition) for the filing of a petition.

\*    \*    \*    \*    \*

(f) *Concurrent applications to overcome grounds of inadmissibility.* Except as provided in 8 CFR parts 235 and 249, an application under this part shall be the sole method of requesting the exercise of discretion under sections 212 (g), (h), (i), and (k) of the Act, as they relate to the inadmissibility of an alien in the United States. No fee is required for filing an application to overcome the grounds of inadmissibility of the Act if filed concurrently with an application for adjustment of status under the provisions of the Act of October 28, 1977, and of this part.

\*    \*    \*    \*    \*

116. Section 245.2 is amended by:

a. Revising paragraph (a)(1);

b. Revising paragraph (a)(4)(ii);

c. Revising paragraph (a)(5) (ii) and (iii); and by

d. Revising paragraph (c), to read as follows:

**§ 245.2   Application.**

(a) *General.* (1) *Jurisdiction.* An alien who believes he or she meets the eligibility requirements of section 245 of the Act or section 1 of the Act of November 2, 1966, and § 245.1 shall

apply to the director having jurisdiction over his or her place of residence unless otherwise instructed in 8 CFR part 245, or by the instruction on the application form. After an alien, other than an arriving alien, is in deportation or removal proceedings, his or her application for adjustment of status under section 245 of the Act or section 1 of the Act of November 2, 1966 shall be made and considered only in those proceedings. An arriving alien, other than an alien in removal proceedings, who believes he or she meets the eligibility requirements of section 245 of the Act or section 1 of the Act of November 2, 1966, and § 245.1 shall apply to the director having jurisdiction over his or her place of arrival. An adjustment application by an alien paroled under section 212(d)(5) of the Act, which has been denied by the Director, may be renewed in removal proceedings under 8 CFR part 240 only if:

(i) The denied application must have been properly filed subsequent to the applicant's earlier inspection and admission to the United States; and

(ii) The applicant's later absence from and return to the United States was under the terms of an advance parole authorization on Form I–512 granted to permit the applicant's absence and return to pursue the previously filed adjustment application.

\*    \*    \*    \*    \*

(4) \*    \*    \*

(ii) *Under section 245 of the Act.* The departure from the United States of an applicant who is under exclusion, deportation, or removal proceedings shall be deemed an abandonment of the application constituting grounds for termination of the proceeding by reason of the departure. The departure of an applicant who is not under exclusion, deportation, or removal proceedings shall be deemed an abandonment of his or her application constituting grounds for termination, unless the applicant was previously granted advance parole by the Service for such absence, and was inspected upon returning to the United States. If the application of an individual granted advance parole is subsequently denied, the applicant will be treated as an applicant for admission, and subject to the provisions of sections 212 and 235 of the Act.

\*    \*    \*    \*    \*

(5) \*    \*    \*

(ii) *Under section 245 of the Act.* If the application is approved, the applicant's permanent residence shall be recorded as of the date of the order approving the adjustment of status. An application for adjustment of status, as a preference

alien, shall not be approved until an immigrant visa number has been allocated by the Department of State, except when the applicant has established eligibility for the benefits of Public Law 101–238. No appeal lies from the denial of an application by the director, but the applicant, if not an arriving alien, retains the right to renew his or her application in proceedings under 8 CFR part 240. Also, an applicant who is a parolee and meets the two conditions described in § 245.2(a)(1) may renew a denied application in proceedings under 8 CFR part 240 to determine admissibility. At the time of renewal of application, an applicant does not need to meet the statutory requirement of section 245(c) of the Act, or § 245.1(g), if, in fact, those requirements were met at the time the renewed application was initially filed with the director. Nothing in this section shall entitle an alien to proceedings under section 240 of the Act who is not otherwise so entitled.

(iii) *Under the Act of November 2, 1966.* If the application is approved, the applicant's permanent residence shall be recorded in accordance with the provisions of section 1. No appeal lies from the denial of an application by the director, but the applicant, if not an arriving alien, retains the right to renew his or her application in proceedings under 8 CFR part 240. Also, an applicant who is a parolee and meets the two conditions described in § 245.2(a)(1) may renew a denied application in proceedings under 8 CFR part 240 to determine admissibility.

\*    \*    \*    \*    \*

(c) *Application under section 214(d) of the Act.* An application for permanent resident status pursuant to section 214(d) of the Act shall be filed on Form I–485 with the director having jurisdiction over the applicant's place of residence. A separate application shall be filed by each applicant. If the application is approved, the director shall record the lawful admission of the applicant as of the date of approval. The applicant shall be notified of the decision and, if the application is denied, of the reasons therefor. No appeal shall lie from the denial of an application by the director but such denial shall be without prejudice to the alien's right to renew his or her application in proceedings under 8 CFR part 240.

117. Section 245.5 is amended by revising the first sentence to read as follows:

**§ 245.5   Medical examination.**

Pursuant to section 232(b) of the Act, an applicant for adjustment of status

shall be required to have a medical examination by a designated civil surgeon, whose report setting forth the findings of the mental and physical condition of the applicant, including compliance with section 212(a)(1)(A)(ii) of the Act, shall be incorporated into the record.* * *

118. Section 245.8 is amended by revising paragraph (e), to read as follows:

**§ 245.8   Adjustment of status as a special immigrant under section 101(a)(27)(K) of the Act.**

*       *       *       *       *

(e) *Removal provisions of section 237 of the Act.* If the Service is made aware by notification from the appropriate executive department or by any other means that a section 101(a)(27)(K) special immigrant who has already been granted permanent residence fails to complete his or her total active duty service obligation for reasons other than an honorable discharge, the alien may become subject to the removal provisions of section 237 of the Act, provided the alien is in one or more of the classes of deportable aliens specified in section 237 of the Act. The Service shall obtain current Form DD–214, Certificate of Release or Discharge from Active Duty, from the appropriate executive department for verification of the alien's failure to maintain eligibility.

*       *       *       *       *

119. Section 245.9 is amended by revising paragraphs (d) and (m), to read as follows:

**§ 245.9   Adjustment of Status of Certain Nationals of the People's Republic of China under Public Law 102–404.**

*       *       *       *       *

(d) *Waivers of inadmissibility under section 212(a) of the Act.* An applicant for the benefits of the adjustment of status provisions of Pub. L. 102–404 is automatically exempted from compliance with the requirements of sections 212(a)(5) and 212(a)(7)(A) of the Act. A Pub. L. 102–404 applicant may also apply for one or more waivers of inadmissibility under section 212(a) of the Act, except for inadmissibility under section 212(a)(2)(C), 212(a)(3)(A), 212(a)(3)(B), 212(a)(3)(C) or 212(a)(3)(E) of the Act.

*       *       *       *       *

(m) *Effect of enactment on family members other than qualified family members.* The adjustment of status benefits and waivers provided by Pub. L. 102–404 do not apply to a spouse or child who is not a qualified family member as defined in paragraph (c) of this section. However, a spouse or child whose relationship to the principal

alien was established prior to the approval of the principal's adjustment of status application may be accorded the derivative priority date and preference category of the principal alien, in accordance with the provisions of section 203(d) of the Act. The spouse or child may use the priority date and category when it becomes current, in accordance with the limitations set forth in sections 201 and 202 of the Act. Persons who are unable to maintain lawful nonimmigrant status in the United States and are not immediately eligible to apply for adjustment of status may request voluntary departure pursuant to 8 CFR part 240.

120. Section 245.10 is amended by:
a. Revising paragraphs (a)(3) and (6); and by

b. Revising introductory text in paragraph (b), to read as follows:

**§ 245.10   Adjustment of status upon payment of additional sum under Public Law 103–317.**

(a) * * *
(3) Is not inadmissible from the United States under any provision of section 212 of the Act, or all grounds for inadmissibility have been waived;

*       *       *       *       *

(6) Remits the sum specified in section 245(i) of the Act, unless payment of the sum is waived under section 245(i) of the Act; and

*       *       *       *       *

(b) *Payment of additional sum.* An applicant filing under the provisions of section 245(i) of the Act must pay the standard adjustment of status filing fee, as shown on Form I–485 and contained in § 103.7(b)(1) of this chapter. The applicant must also pay the additional sum specified in section 245(i) of the Act, unless at the time the application for adjustment of status is filed, the alien is:

*       *       *       *       *

121. Section 245.11 is amended by:
a. Revising paragraph (a)(4)(ii)(B);
b. Revising paragraph (b)(1)(iii);
c. Revising the introductory text in paragraph (c); and by
d. Revising paragraphs (h) and (i), to read as follows:

**§ 245.11   Adjustment of aliens in S nonimmigrant classification.**

(a) * * *
(4) * * *
(ii) * * *
(B) Be admissible to the United States as an immigrant, unless the ground of inadmissibility has been waived;

*       *       *       *       *

(b) * * *
(1) * * *
(iii) The family member is not inadmissible from the United States as

a participant in Nazi persecution or genocide as described in section 212(a)(3)(E) of the Act;

*       *       *       *       *

(c) *Waivers of inadmissibility.* An alien seeking to adjust status pursuant to the provisions of section 101(a)(15)(S) of the Act may not be denied adjustment of status for conduct or a condition that:

*       *       *       *       *

(h) *Removal under section 237 of the Act.* Nothing in this section shall prevent an alien adjusted pursuant to the terms of these provisions from being removed for conviction of a crime of moral turpitude committed within 10 years after being provided lawful permanent residence under this section or for any other ground under section 237 of the Act.

(i) *Denial of application.* In the event the district decides to deny an application on Form I–485 and an approved Form I–854 to allow an S nonimmigrant to adjust status, the Assistant Attorney General, Criminal Division, and the relevant LEA shall be notified in writing to that effect. The Assistant Attorney General, Criminal Division, shall concur in or object to that decision. Unless the Assistant Attorney General, Criminal Division, objects within 7 days, he or she shall be deemed to have concurred in the decision. In the event of an objection by the Assistant Attorney General, Criminal Division, the matter will be expeditiously referred to the Deputy Attorney General for a final resolution. In no circumstances shall the alien or the relevant LEA have a right of appeal from any decision to deny. A denial of an adjustment application under this paragraph may not be renewed in subsequent removal proceedings.

**PART 246—RESCISSION OF ADJUSTMENT OF STATUS**

122. The authority citation for part 246 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1254, 1255, 1256, 1259; 8 CFR part 2.

**§ 246.8   [Removed]**

123. Section 246.8 is removed.

**PART 248—CHANGE OF NONIMMIGRANT CLASSIFICATION**

124. The authority citation for part 248 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1184, 1187, 1258; 8 CFR part 2.

125. Section 248.1 is amended by revising paragraph (b)(4) to read as follows:

**§ 248.1   Eligibility.**

\* \* \* \* \*

(b) \* \* \*

(4) The alien is not the subject of removal proceedings under 8 CFR part 240.

\* \* \* \* \*

## PART 249—CREATION OF RECORDS OF LAWFUL ADMISSION FOR PERMANENT RESIDENCE

126. The authority citation for part 249 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1259; 8 CFR part 2.

127. Section 249.2 is amended by revising the first sentence in paragraph (a) and by revising paragraph (b), to read as follows:

**§ 249.2   Application.**

(a) *Jurisdiction.* An application by an alien, other than an arriving alien, who has been served with a notice to appear or warrant of arrest shall be considered only in proceedings under 8 CFR part 240. \* \* \*

(b) *Decision.* The applicant shall be notified of the decision and, if the application is denied, of the reasons therefor. If the application is granted, a Form I–551, showing that the applicant has acquired the status of an alien lawfully admitted for permanent residence, shall not be issued until the applicant surrenders any other document in his or her possession evidencing compliance with the alien registration requirements of former or existing law. No appeal shall lie from the denial of an application by the district director. However, an alien, other than an arriving alien, may renew the denied application in proceedings under 8 CFR part 240.

## PART 251—ARRIVAL MANIFESTS AND LISTS: SUPPORTING DOCUMENTS

128. The authority citation for part 251 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1221, 1281, 1282, 8 CFR part 2.

129. Section 251.1 is revised to read as follows:

**§ 251.1   Arrival manifests and lists.**

(a) *Vessels.* (1) *General.* The master or agent of every vessel arriving in the United States from a foreign place or an outlying possession of the United States shall present to the immigration officer at the port where the immigration inspection is performed a manifest of all crewmen on board on Form I–418, Passenger List and Crew List, in accordance with the instructions contained thereon.

(2) *Longshore work notations.* The master or agent of the vessel shall indicate in writing immediately below the name of the alien listed on the Form I–418 whether or not crewmen aboard the vessel will be used to perform longshore work at any United States port before the vessel departs the United States.

(i) If no longshore work will be performed, no further notation regarding longshore work is required.

(ii) If longshore work will be performed, the master or agent shall note which exception listed in section 258 of the Act permits the work. The exceptions are:

(A) The hazardous cargo exception;

(B) The prevailing practice exception in accordance with a port's collective bargaining agreements;

(C) The prevailing practice exception in a port where there is no collective bargaining agreement, but for which the vessel files an attestation;

(D) The prevailing practice exception for automated vessels; and

(E) The reciprocity exception.

(iii) If longshore work will be performed under the hazardous cargo exception, the vessel must either be a tanker or be transporting dry bulk cargo that qualifies as hazardous. All tankers qualify for the hazardous cargo exception, except for a tanker that has been gas-freed to load non-hazardous dry bulk commodities.

(A) To invoke the exception for tankers, the master or agent shall note on the manifest that the vessel is a qualifying tanker.

(B) If the vessel is transporting dry bulk hazardous cargo, the master or agent shall note on the manifest that the vessel's dry bulk cargo is hazardous and shall show the immigration officer the dangerous cargo manifest that is signed by the master or an authorized representative of the owner, and that under 46 CFR 148.02 must be kept in a conspicuous place near the bridge house.

(iv) If longshore work will be performed under the prevailing practice exception, the master or agent shall note on the manifest each port at which longshore work will be performed under this exception. Additionally, for each port the master or agent shall note either that:

(A) The practice of nonimmigrant crewmen doing longshore work is in accordance with all collective bargaining agreements covering 30 percent or more of the longshore workers in the port;

(B) The port has no collective bargaining agreement covering 30 percent or more of the longshore

workers in the port and an attestation has been filed with the Secretary of Labor;

(C) An attestation that was previously filed is still valid and the continues to comply with the conditions stated in that attestation; or

(D) The longshore work consists of operating an automated, self-unloading conveyor belt or a vacuum-actuated system.

(v) If longshore work will be performed under the reciprocity exception, the master or agent shall note on the manifest that the work will be done under the reciprocity exception, and will note the nationality of the vessel's registry and the nationality or nationalities of the holders of a majority of the ownership interest in the vessel.

(3) *Exception for certain Great Lakes vessels.* (i) A manifest shall not be required for a vessel of United States, Canadian, or British registry engaged solely in traffic on the Great Lakes or the St. Lawrence River and connecting waterways, herein designated as a Great Lakes vessel, unless:

(A) The vessel employs nonimmigrant crewmen who will do longshore work at a port in the United States; or

(B) The vessel employs crewmen of other than United States, Canadian, or British citizenship.

(ii) In either situation, the master shall note the manifest in the manner prescribed in paragraph (a)(2) of this section.

(iii) After submission of a manifest on the first voyage of a calendar year, a manifest shall not be required for subsequent arrivals unless a nonimmigrant crewman of other than Canadian or British citizenship is employed on the vessel who was not aboard and listed on the last prior manifest, or a change has occurred regarding the performance of longshore work in the United States by nonimmigrant crewmen, or a change has occurred in the exception that the master or agent of the vessel wishes to invoke which was not noted on the last prior manifest.

(4) The master or agent of a vessel that only bunkers at a United States port en route to another United States port shall annotate Form I–418 presented at the onward port to indicate the time, date, and place of bunkering.

(5) If documentation is required to support an exception, as described in § 258.2 of this chapter, it must accompany the manifest.

(b) *Aircraft.* The captain or agent of every aircraft arriving in the United States from a foreign place or from an outlying possession of the United States, except an aircraft arriving in the United

States directly from Canada on a flight originating in that country, shall present to the immigration officer at the port where the inspection is performed a manifest on United States Customs Service Form 7507 or on the International Civil Aviation Organization's General Declaration of all the alien crewmembers on board, including alien crewmembers who are returning to the United States after taking an aircraft of the same line from the United States to a foreign place or alien crewmembers who are entering the United States as passengers solely for the purpose of taking an aircraft of the same line from the United States to a foreign port. The captain or agent of an aircraft that only refuels at the United States en route to another United States port must annotate the manifest presented at the onward port to indicate the time, date, and place of refueling. The surname, given name, and middle initial of each alien crewman listed also shall be shown on the manifest. In addition, the captain or agent of the aircraft shall indicate the total number of United States citizen crewmembers and total number of alien crewmembers.

(c) *Additional documents.* The master, captain, or agent shall prepare as a part of the manifest, when one is required for presentation to an immigration officer, a completely executed set of Forms I–95, Conditional Landing Permit, for each nonimmigrant alien crewman on board, except:

(1) A Canadian or British citizen crewman serving on a vessel plying solely between Canada and the United States; or

(2) A nonimmigrant crewman who is in possession of an unmutilated Form I–184, Alien Crewman Landing Permit and Identification Card, or an unmutilated Form I–95 with space for additional endorsements previously issued to him or her as a member of the crew of the same vessel or an aircraft of the same line on his or her last prior arrival in the United States, following which he or she departed from the United States as a member of the crew of the same vessel or an aircraft of the same line.

130. Section 251.2 is revised to read as follows:

### § 251.2   Notification of illegal landings.

As soon as discovered, the master or agent of any vessel from which an alien crewman has illegally landed or deserted in the United States shall inform the immigration officer in charge of the port where the illegal landing or desertion occurred, in writing, or the name, nationality, passport number and, if known, the personal description,

circumstances and time of such illegal landing or desertion of such alien crewman, and furnish any other information and documents that might aid in his or her apprehension, including any passport surrendered pursuant to § 252.1(d) of this chapter. Failure to file notice of illegal landing or desertion and to furnish any surrendered passport within 24 hours of the time of such landing or desertion becomes known shall be regarded as lack of compliance with section 251(d) of the Act.

131. Section 251.3 is revised to read as follows:

### § 251.3   Departure manifests and lists for vessels.

(a) *Form I–418, Passenger List-Crew List.* The master or agent of every vessel departing from the United States shall submit to the immigration officer at the post from which such vessel is to depart directly to some foreign place or outlying possession of the United States, except when a manifest is not required pursuant to § 251.1(a), a single Form I–418 completed in accordance with the instructions on the form. Submission of a Form I–418 that lacks any required endorsement shall be regarded as lack of compliance with section 251(c) of the Act.

(b) *Exception for certain Great Lakes vessels.* The required list need not be submitted for Canadian or British crewmembers of Great Lakes vessels described in § 251.1(a)(3).

132. Section 251.4 is revised to read as follows:

### § 251.4   Departure manifests and lists for aircraft.

(a) *United States Customs Service Form 7507 or International Civil Aviation Organization's General Declaration.* The captain or agent of every aircraft departing from the United States for a foreign place or an outlying possession of the United States, except on a flight departing for and terminating in Canada, shall submit to the immigration officer at the port from which such aircraft is to depart a completed United States Customs Service Form 7507 or the International Civil Aviation Organization's General Declaration. The form shall contain a list of all alien crewmen on board, including alien crewmen who arrived in the United States as crewmen on an aircraft of the same line and who are departing as passengers. The surname, given name, and middle initial of each such alien crewman listed shall be shown. In addition, the captain or agent of the craft shall indicate the total number of alien crewmembers and the

total number of United States citizen crewmembers.

(b) *Notification of changes in employment for aircraft.* The agent of the air transportation line shall immediately notify in writing the nearest immigration office of the termination of employment in the United States of each alien employee of the line furnishing the name, birth date, birthplace, nationality, passport number, and other available information concerning such alien. The procedure to follow in obtaining permission to pay off or discharge an alien crewman in the United States after initial immigration inspection, other than an alien lawfully admitted for permanent residence, is set forth in § 252.1(f) of this chapter.

133. Section 251.5 is revised to read as follows:

### § 251.5   Exemptions for private vessels and aircraft.

The provisions of this part relating to submission of arrival and departure manifests and lists shall not apply to a private vessel or a private aircraft not engaged directly or indirectly in the carriage of persons or cargo for hire.

## PART 252—LANDING OF ALIEN CREWMEN

134. The authority citation for part 252 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1184, 1258, 1281, 1282; 8 CFR part 2.

135. Section 252.1 is amended by revising paragraphs (a) through (c) to read as follows:

### § 252.1   Examination of crewmen.

(a) *Detention prior to examination.* All persons employed in any capacity on board any vessel or aircraft arriving in the United States shall be detained on board the vessel or at the airport of arrival by the master or agent of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service.

(b) *Classes of aliens subject to examination under this part.* The examination of every nonimmigrant alien crewman arriving in the United States shall be in accordance with this part except that the following classes of persons employed on vessels or aircraft shall be examined in accordance with the provisions of 8 CFR parts 235 and 240:

(1) Canadian or British citizen crewmen serving on vessels plying solely between Canada and the United States; or

(2) Canadian or British citizen crewmen of aircraft arriving in a State of the United States directly from

Canada on flights originating in that country. The crew of a vessel arriving at a United States port that may not require inspection by or clearance from the United States Customs Service is, nevertheless, subject to examination under this part; however, the master of such a vessel is not required to present Form I–95 for any crewman who is not an applicant for a conditional landing permit.

(c) *Requirements for landing permits.* Every alien crewman applying for landing privileges in the United States must make his or her application in person before an immigration officer, present whatever documents are required, be photographed and fingerprinted as the district director may require, and establish to the satisfaction of the immigration officer that he or she is not inadmissible under any provision of the law and is entitled clearly and beyond doubt to landing privileges in the United States.

136. Section 252.2 is revised to read as follows:

### § 252.2  Revocation of conditional landing permits; removal.

(a) *Revocation and removal while vessel is in the United States.* A crewman whose landing permit is subject to revocation pursuant to section 252(b) of the Act may be taken into custody by any immigration officer without a warrant of arrest and be transferred to the vessel of arrival, if the vessel is in any port in the United States and has not departed foreign since the crewman was issued his or her conditional landing permit. Detention and removal of the crewman shall be at the expense of the transportation line on which the crewman arrived. Removal may be effected on the vessel of arrival or, if the master of the vessel has requested in writing, by alternate means if removal on the vessel of arrival is impractical.

(b) *Revocation and removal after vessel has departed the United States.* A crewman who was granted landing privileges prior to April 1, 1997, and who has not departed foreign on the vessel of arrival, or on another vessel or aircraft if such permission was granted pursuant to § 252.1(f), is subject to removal proceedings under section 240 of the Act as an alien deportable pursuant to section 237(a)(1)(C)(i) of the Act. A crewman who was granted landing privileges on or after April 1, 1997, and who has not departed foreign on the vessel of arrival, or on another vessel or aircraft if such permission was granted pursuant to § 252.1(f), shall be removed from the United States without a hearing. In either case, if the alien is

removed within 5 years of the date of landing, removal of the crewman shall be at the expense of the owner of the vessel. In the case of a crewman ordered removed more than 5 years after the date of landing, removal shall be at the expense of the appropriation for the enforcement of the Act.

137. Section 252.3 is revised to read as follows:

### § 252.3  Great Lakes vessels and tugboats arriving in the United States from Canada; special procedures.

(a) *United States vessels and tugboats.* An immigration examination shall not be required of any crewman aboard a Great Lakes vessel of United States registry or a tugboat of United States registry arriving from Canada at a port of the United States who has been examined and admitted by an immigration officer as a member of the crew of the same vessel or tugboat or of any other vessel or tugboat of the same company during the current calendar year.

(b) *Canadian or British vessels or tugboats.* An alien crewman need not be presented for inspection if the alien crewman:

(1) Serves aboard a Great Lakes vessel of Canadian or British registry or aboard a tugboat of Canadian or British registry arriving at a United States port-of-entry from Canada;

(2) Seeks admission for a period of less than 29 days;

(3) Has, during the current calendar year, been inspected and admitted by an immigration officer as a member of the crew of the same vessel or tugboat, or of any other vessel or tugboat of the same company;

(4) Is either a British or Canadian citizen or is in possession of a valid Form I–95 previously issued to him or her as a member of the crew of the same vessel or tugboat, or of any vessel or tugboat of the same company;

(5) Does not request or require landing privileges in the United States beyond the time the vessel or tugboat will be in port; and,

(6) Will depart to Canada with the vessel or tugboat.

138. Section 252.4 is revised to read as follows:

### § 252.4  Permanent landing permit and identification card.

A Form I–184 is valid until revoked. It shall be revoked when an immigration officer finds that the crewman is in the United States in willful violation of the terms and conditions of his or her permission to land, or that he or she is inadmissible to the United States. On revocation, the Form I–184 shall be

surrendered to an immigration officer. No appeal shall lie from the revocation of Form I–184.

139. Section 252.5 is revised to read as follows:

### § 252.5  Special procedures for deserters from Spanish or Greek ships of war.

(a) *General.* Under E.O. 11267 of January 19, 1966 (31 FR 807) and 28 CFR 0.109, and E.O. 11300 of August 17, 1966 (31 FR 11009), and 28 CFR 0.110, the Commissioner and immigration officers (as defined in § 103.1(j) of this chapter) are designated as "competent national authorities" on the part of the United States within the meaning of Article XXIV of the 1903 Treaty of Friendship and General Relations between the United States and Spain (33 Stat. 2105, 2117), and "local authorities" and "competent officers" on the part of the United States within the meaning of Article XIII of the Convention between the United States and Greece (33 Stat. 2122, 2131).

(b) *Application for restoration.* On application of a Consul General, Consul, Vice-Consul, or Consular-Agent of the Spanish or Greek Government, made in writing pursuant to Article XXIV of the treaty, or Article XIII of the Convention, respectively, stipulating for the restoration of crewmen deserting, stating that the person named therein has deserted from a ship of war of that government, while in any port of the United States, and on proof by the exhibition of the register, crew list, or official documents of the vessel, or a copy or extract therefrom, duly certified, that the person named belonged, at the time of desertion, to the crew of such vessel, such person shall be taken into custody by any immigration officer without a warrant of arrest. Written notification of charges shall be served on the alien when he or she is taken into custody or as soon as practical thereafter.

(c) *Examination.* Within a reasonable period of time after the arrest, the alien shall be accorded an examination by the district director, acting district director, or the deputy district director having jurisdiction over the place of arrest. The alien shall be informed that he or she may have the assistance of or be represented by a counsel or representative of his or her choice qualified under 8 CFR part 292 without expense to the Government, and that he or she may present such evidence in his or her behalf as may be relevant to this proceeding. If, upon the completion of such examination, it is determined that:

(1) The individual sought by the Spanish or Greek authorities had

deserted from a Spanish or Greek ship of war in a United States port;

(2) The individual actually arrested and detained is the person sought;

(3) The individual is not a citizen of the United States; and

(4) The individual had not previously been arrested for the same cause and set at liberty because he or she had been detained for more than 3 months, or more than 2 months in the case of a deserter from a Greek ship of war, from the day of his or her arrest without the Spanish or Greek authorities having found an opportunity to send him or her home, the individual shall be served with a copy of the findings, from which no appeal shall lie, and be surrendered forthwith to the Spanish or Greek authorities if they are prepared to remove him or her from the United States. On written request of the Spanish or Greek authorities, the individual shall be detained, at their expense, for a period not exceeding 3 months or 2 months, respectively, from the day of arrest to afford opportunity to arrange for his or her departure from the United States.

(d) *Timely departure not effected.* If the Spanish authorities delay in sending the individual home for more than 3 months, or if the Greek authorities delay in sending the individual home for more than 2 months, from the day of his or her arrest, the individual shall be dealt with as any other alien unlawfully in the United States under the removal provisions of the Act, as amended.

(e) *Commission of crime.* If the individual has committed any crime or offense in the United States, he or she shall not be placed at the disposal of the consul until after the proper tribunal having jurisdiction in his or her case shall have pronounced sentence, and such sentence shall have been executed.

## PART 253—PAROLE OF ALIEN CREWMEN

140. The authority citation for part 253 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1282, 1283, 1285; 8 CFR part 2.

141. In § 253.1, paragraph (f) is revised to read as follows:

### § 253.1   Parole.

\* \* \* \* \*

(f) *Crewman, stowaway, or alien removable under section 235(c) alleging persecution.* Any alien crewman, stowaway, or alien removable under section 235(c) of the Act who alleges that he or she cannot return to his or her country of nationality or last habitual residence (if not a national of any country) because of fear of persecution

in that country on account of race, religion, nationality, membership in a particular social group, or political opinion, is eligible to apply for asylum or withholding of removal under 8 CFR part 208. Service officers shall take particular care to ensure the provisions of § 208.5(b) of this chapter regarding special duties toward aliens aboard certain vessels are closely followed.

\* \* \* \* \*

## PART 274A—CONTROL OF EMPLOYMENT OF ALIENS

142. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 8 CFR part 2.

143. Section 274a.12 is amended by:
a. Revising paragraphs (a)(10) and (12);

b. Revising paragraphs (c)(8) and (10);
c. Removing and reserving paragraph (c)(12); and by

d. Revising paragraph (c)(18), to read as follows:

### § 274a.12   Classes of aliens authorized to accept employment.

(a) \* \* \*

(10) An alien granted withholding of deportation or removal for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

\* \* \* \* \*

(12) An alien granted Temporary Protected Status under section 244 of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service; or

\* \* \* \* \*

(c) \* \* \*

(8) An alien who has filed a complete application for asylum or withholding of deportation or removal pursuant to 8 CFR part 208, whose application has not been decided, and who is eligible to apply for employment authorization under § 208.7 of this chapter because the 150-day period set forth in that section has expired. Employment authorization may be granted according to the provisions of § 208.7 of this chapter in increments to be determined by the Commissioner and shall expire on a specified date;

\* \* \* \* \*

(10) An alien who has filed an application for suspension of deportation under section 243 of the Act or cancellation of removal pursuant to section 240A of the Act. Employment authorization shall be granted in increments not exceeding one year during the period the application is

pending (including any period when an administrative appeal or judicial review is pending) and shall expire on a specified date;

\* \* \* \* \*

(12) [Reserved]

\* \* \* \* \*

(18) An alien against whom a final order of deportation or removal exists and who is released on an order of supervision under the authority contained in section 241(a)(3) of the Act may be granted employment authorization in the discretion of the district director only if the alien cannot be removed due to the refusal of all countries designated by the alien or under section 241 of the Act to receive the alien, or because the removal of the alien is otherwise impracticable or contrary to the public interest. Additional factors which may be considered by the district director in adjudicating the application for employment authorization include, but are not limited to, the following:

(i) The existence of economic necessity to be employed;

(ii) The existence of a dependent spouse and/or children in the United States who rely on the alien for support; and

(iii) The anticipated length of time before the alien can be removed from the United States.

\* \* \* \* \*

## PART 286—IMMIGRATION USER FEE

144. The authority citation for part 286 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1356; 8 CFR part 2.

145. In § 286.9, paragraph (b)(3) is revised to read as follows:

### § 286.9   Fee for processing applications and issuing documentation at land border Ports-of-Entry.

\* \* \* \* \*

(b) \* \* \*

(3) A Mexican national in possession of a valid nonresident alien border crossing card or nonimmigrant B–1/B–2 visa who is required to be issued Form I–94, Arrival/Departure Record, pursuant to § 235.1(f) of this chapter, must remit the required fee for issuance of Form I–94 upon determination of admissibility.

\* \* \* \* \*

## PART 287—FIELD OFFICERS; POWERS AND DUTIES

146. The authority citation for part 287 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1225, 1226, 1251, 1252, 1357; 8 CFR part 2.

147. Section 287.3 is revised to read as follows:

### § 287.3  Disposition of cases of aliens arrested without warrant.

(a) *Examination.* An alien arrested without a warrant of arrest under the authority contained in section 287(a)(2) of the Act will be examined by an officer other than the arresting officer. If no other qualified officer is readily available and the taking of the alien before another officer would entail unnecessary delay, the arresting officer, if the conduct of such examination is a part of the duties assigned to him or her, may examine the alien.

(b) *Determination of proceedings.* If the examining officer is satisfied that there is prima facie evidence that the arrested alien was entering, attempting to enter, or is present in the United States in violation of the immigration laws, the examining officer will refer the case to an immigration judge for further inquiry in accordance with 8 CFR parts 235, 239, or 240, order the alien removed as provided for in section 235(b)(1) of the Act and § 235.3(b) of this chapter, or take whatever other action may be appropriate or required under the laws or regulations applicable to the particular case.

(c) *Notifications and information.* Except in the case of an alien subject to the expedited removal provisions of section 235(b)(1)(A) of the Act, all aliens arrested without warrant and placed in formal proceedings under section 238 or 240 of the Act will be advised of the reasons for his or her arrest and the right to be represented at no expense to the Government. The examining officer will provide the alien with a list of the available free legal services provided by organizations and attorneys qualified under 8 CFR part 3 and organizations recognized under § 292.2 of this chapter that are located in the district where the hearing will be held. The examining officer shall note on Form I–862 that such a list was provided to the alien. The officer will also advise the alien that any statement made may be used against him or her in a subsequent proceeding.

(d) *Custody procedures.* Unless voluntary departure has been granted pursuant to subpart C of 8 CFR part 240, a determination will be made within 24 hours of the arrest whether the alien will be continued in custody or released on bond or recognizance and whether a notice to appear and warrant of arrest as prescribed in 8 CFR parts 236 and 239 will be issued.

148. In § 287.4, paragraph (d) is revised to read as follows:

### § 287.4  Subpoena.

\*    \*    \*    \*    \*

(d) *Invoking aid of court.* If a witness neglects to appear and testify as directed by the subpoena served upon him or her in accordance with the provisions of this section, the officer or immigration judge issuing the subpoena shall request the United States Attorney for the district in which the subpoena was issued to report such neglect or refusal to the United States District Court and to request such court to issue an order requiring the witness to appear and testify and to produce the books, papers, or documents designated in the subpoena.

149. In § 287.5, paragraphs (b) through (f) are revised to read as follows:

### § 287.5  Exercise of power by immigration officers.

\*    \*    \*    \*    \*

(b) *Power and authority to patrol the border.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power to patrol the border conferred by section 287(a)(3) of the Act:

(1) border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Immigration inspectors (seaport operations only);

(4) Adjustments officers and deportation officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections (seaport operations only);

(5) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(6) Immigration officers who need the authority to patrol the border under section 287(a)(3) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commission.

(c) *Power and authority to arrest.* (1) *Arrests of aliens under section 287(a)(2) of the Act for immigration violations.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the arrest power conferred by section 287(a)(2) of the Act and in accordance with § 287.8(c):

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Immigration inspectors;

(v) Adjudications officers;

(vi) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(vii) Immigration officers who need the authority to arrest aliens under section 287(a)(2) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner.

(2) *Arrests of persons under section 287(a)(4) of the Act for felonies regulating the admission or removal of aliens.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the arrest power conferred by section 287(a)(4) of the Act and in accordance with § 287.8(c):

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Immigration inspectors;

(v) Adjudications officers;

(vi) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(vii) Immigration officers who need the authority to arrest persons under section 287(a)(4) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(3) *Arrests of persons under section 287(a)(5)(A) of the Act for any offense against the United States.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the arrest power conferred by section 287(a)(5)(A) of the Act in accordance with § 287.8(c):

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Immigration inspectors (permanent full-time immigration inspectors only);

(v) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(vi) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(vii) Immigration officers who need the authority to arrest persons under

section 287(a)(5)(A) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(4) *Arrests of persons under section 287(a)(5)(B) of the Act for any felony.* (i) Section 287(a)(5)(B) of the Act authorizes designated immigration officers, as listed in paragraph (c)(4)(iii) of this section, to arrest persons, without warrant, for any felony cognizable under the laws of the United States if:

(A) The immigration officer has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony;

(B) The immigration officer is performing duties relating to the enforcement of the immigration laws at the time of the arrest;

(C) There is a likelihood of the person escaping before a warrant can be obtained of his or her arrest; and

(D) The immigration officer has been certified as successfully completing a training program that covers such arrests and the standards with respect to the enforcement activities of the Service as defined in § 287.8.

(ii) The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the arrest power conferred by section 287(a)(5)(B) of the Act and in accordance with § 287.8(c):

(A) Border patrol agents, including aircraft pilots;

(B) Special agents;

(C) Deportation officers;

(D) Immigration inspectors (permanent full-time immigration inspectors only);

(E) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(F) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(G) Immigration officers who need the authority to arrest persons under section 287(a)(5)(B) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(iii) Notwithstanding the authorization and designation set forth in paragraph (c)(4)(ii) of this section, no immigration officer is authorized to make an arrest for any felony under the authority of section 287(a)(5)(B) of the

Act until such time as he or she has been certified by the Director of Training as successfully completing a training course encompassing such arrests and the standards for enforcement activities as defined in § 287.8. Such certification shall be valid for the duration of the immigration officer's continuous employment, unless it is suspended or revoked by the Commissioner or the Commissioner's designee for just cause.

(5) *Arrests of persons under section 274(a) of the Act who bring in, transport, or harbor certain aliens, or induce them to enter.*

(i) Section 274(a) of the Act authorizes designated immigration officers, as listed in paragraph (c)(5)(ii) of this section, to arrest persons who bring in, transport, or harbor aliens, or induce them to enter the United States in violation of law. When making an arrest, the designated immigration officer shall adhere to the provisions of the enforcement standard governing the conduct of arrests in § 287.8(c).

(ii) The following immigration officers who have successfully completed basic immigration law enforcement training are authorized and designated to exercise the arrest power conferred by section 274(a) of the Act:

(A) Border patrol agents, including aircraft pilots;

(B) Special agents;

(C) Deportation officers;

(D) Immigration inspectors;

(E) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(F) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(G) Immigration officers who need the authority to arrest persons under section 274(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(6) *Custody and transportation of previously arrested persons.* In addition to the authority to arrest pursuant to a warrant of arrest in paragraph (e)(2)(i) of this section, detention enforcement officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to take and maintain custody of and transport any person who has been arrested by an immigration officer pursuant to paragraphs (c)(1) through (c)(5) of this section.

(d) *Power and authority to conduct searches.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power to conduct searches conferred by section 287(c) of the Act:

(1) Border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Deportation officers;

(4) Immigration inspectors;

(5) Adjudications officers;

(6) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(7) Immigration officers who need the authority to conduct searches under section 287(c) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner.

(e) *Power and authority to execute warrants.* (1) *Search warrants.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power conferred by section 287(a) of the Act to execute a search warrant:

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(iv) Immigration officers who need the authority to execute search warrants under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(2) *Issuance of arrest warrants for immigration violations.* A warrant of arrest may be issued only by the following immigration officers:

(i) District directors (except foreign);

(ii) Deputy district directors (except foreign);

(iii) Assistant district directors for investigations;

(iv) Deputy assistant district directors for investigations;

(v) Assistant district directors for deportation;

(vi) Deputy assistant district directors for deportation;

(vii) Assistant district directors for examinations;

(viii) Deputy assistant district directors for examinations;

(ix) Officers in charge (except foreign);

(x) Assistant officers in charge (except foreign);

(xi) Chief patrol agents;

(xii) Deputy chief patrol agents;

(xiii) Associate chief patrol agents;

(xiv) Assistant chief patrol agents;

(xv) Patrol agents in charge;

(xvi) The Assistant Commissioner, Investigations;

(xvii) Institutional Hearing Program Directors;

(xviii) Area Port Directors;

(xix) Port Directors; or

(xx) Deputy Port Directors.

(3) *Service of warrant of arrests for immigration violations.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power pursuant to section 287(a) of the Act to execute warrants of arrest for administrative immigration violations issued under section 236 of the Act or to execute warrants of criminal arrest issued under the authority of the United States:

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Detention enforcement officers (warrants of arrest for administrative immigration violations only);

(v) Immigration inspectors;

(vi) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(vii) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(viii) Immigration officers who need the authority to execute arrest warrants for immigration violations under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner, for warrants of arrest for administrative immigration violations, and with the approval of the Deputy Attorney General, for warrants of criminal arrest.

(4) *Service of warrant of arrests for non-immigration violations.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power to execute warrants of criminal arrest for non-immigration violations issued under the authority of the United States:

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(v) Immigration officers who need the authority to execute warrants of arrest for non-immigration violations under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(f) *Power and authority to carry firearms.* The following immigration officers who have successfully completed basic immigration enforcement training are hereby authorized and designated to exercise the power conferred by section 287(a) of the Act to carry firearms provided that they are individually qualified by training and experience to handle and safely operate the firearms they are permitted to carry, maintain proficiency in the use of such firearms, and adhere to the provisions of the enforcement standard governing the use of force in § 287.8(a):

(1) Border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Deportation officers;

(4) Detention enforcement officers;

(5) Immigration inspectors;

(6) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(7) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(8) Immigration officers who need the authority to carry firearms under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

150. Section 287.7 is revised to read as follows:

### § 287.7   Detainer provisions under section 287(b)(3) of the Act.

(a) *Detainers in general.* Detainers are issued pursuant to sections 236 and 287 of the Act and this chapter. Any authorized Service official may at any time issue a Form I–247, Immigration Detainer-Notice of Action, to any other Federal, State, or local law enforcement agency. A detainer serves to advise another law enforcement agency that the Service seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. The detainer is a request that such agency advise the Service, prior to release of the alien, in order for the Service to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible.

(b) *Authority to issue detainers.* The following officers are authorized to issue detainers:

(1) Border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Deportation officers;

(4) Immigration inspectors;

(5) Adjudications officers;

(6) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(7) Immigration officers who need the authority to issue detainers under section 287(d)(3) of the Act in order to effectively accomplish their individual missions and who are designated individually or as a class, by the Commissioner.

(c) *Availability of records.* In order for the Service to accurately determine the propriety of issuing a detainer, serving a notice to appear, or taking custody of an alien in accordance with this section, the criminal justice agency requesting such action or informing the Service of a conviction or act that renders an alien inadmissible or removable under any provision of law shall provide the Service with all documentary records and information available from the agency that reasonably relates to the alien's status in the United States, or that may have an impact on conditions of release.

(d) *Temporary detention at Service request.* Upon a determination by the Service to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Service.

(e) *Financial responsibility for detention.* No detainer issue as a result of a determination made under this chapter shall incur any fiscal obligation on the part of the Service, until actual assumption of custody by the Service, except as provided in paragraph (d) of this section.

## PART 299—IMMIGRATION FORMS

151. The authority citation for part 299 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103; 8 CFR part 2.

152. Section 299.1 is amended by:

a. Revising the entries for Forms "I–147", "I–205", "I–246", "I–247", "I–259", "I–284", "I–286", "I–291", "I–296", "I–310", "I–408", "I–426", "I–541", "I–589", "I–775", "I–851", and "I–851A";

b. Removing the entries for Forms "I–122", "I–221", "I–259C", "I–290A", and "I–444", and by

c. Adding the entries for Forms "I–94T", "I–99", "I–148", "I–160", "I–210", "I–213", "I–217", "I–220A", "I–220B", "I–241", "I–261", "I–270", "I–275", "I–294", "I–407", "I–546", "I–

701", "I–770", "I–771", "I–826", "I–827A", "I–827B", "I–860", "I–862", and "I–863", in proper numerical sequence, to the listing of forms, to read as follows:

### § 299.1   Prescribed forms.

\*      \*      \*      \*      \*

| Form No. | | Edition date | Title |
|---|---|---|---|
| \* | \* | \* | \*            \*            \*            \*            \* |
| I–94T ................................. | | 09–22–87 | Arrival-Departure Record (Transit without visa). |
| \* | \* | \* | \*            \*            \*            \*            \* |
| I–99 .................................... | | 04–01–97 | Notice of Revocation and Penalty. |
| \* | \* | \* | \*            \*            \*            \*            \* |
| I–147 .................................. | | 04–01–97 | Notice of Temporary Inadmissibility to U.S. |
| I–148 .................................. | | 04–01–97 | Notice of Permanent Inadmissibility. |
| \* | \* | \* | \*            \*            \*            \*            \* |
| I–160 .................................. | | 04–01–97 | Notice of Parole/Lookout Intercept. |
| \* | \* | \* | \*            \*            \*            \*            \* |
| I–205 .................................. | | 04–01–97 | Warrant of Removal. |
| I–210 .................................. | | 04–01–97 | Voluntary Departure Notice. |
| \* | \* | \* | \*            \*            \*            \*            \* |
| I–213 .................................. | | 04–01–97 | Record of Deportable/Inadmissible Alien. |
| I–217 .................................. | | 04–01–97 | Information for Travel Document or Passport. |
| I–220A ............................... | | 04–01–97 | Order of Release on Recognizance. |
| I–220B ............................... | | 04–01–97 | Order of Supervision. |
| \* | \* | \* | \*            \*            \*            \*            \* |
| I–241 .................................. | | 04–01–97 | Request for Travel Document to Country Designated by Alien. |
| \* | \* | \* | \*            \*            \*            \*            \* |
| I–246 .................................. | | 04–01–97 | Application for Stay of Removal. |
| I–247 .................................. | | 04–01–97 | Immigration Detainer—Notice of Action. |
| I–259 .................................. | | 04–01–97 | Notice to Detain, Deport, Remove, or Present Aliens. |
| \* | \* | \* | \*            \*            \*            \*            \* |
| I–261 .................................. | | 04–01–97 | Additional Charges of Removability. |
| \* | \* | \* | \*            \*            \*            \*            \* |
| I–270 .................................. | | 04–01–97 | Request for Consent to Return Person to Canada. |
| I–275 .................................. | | 04–01–97 | Withdrawal of Application/Consular Notification. |
| I–284 .................................. | | 04–01–97 | Notice to Transportation Line Regarding Deportation and Detention Expenses of Detained Alien. |
| I–286 .................................. | | 04–01–97 | Notification to Alien of Conditions of Release or Detention. |
| \* | \* | \* | \*            \*            \*            \*            \* |
| I–291 .................................. | | 04–01–97 | Decision on Application for Status as Permanent Resident. |
| \* | \* | \* | \*            \*            \*            \*            \* |
| I–294 .................................. | | 04–01–97 | Notice of Country to Which Deportation has been Directed and Penalty for Reentry without Permission. |
| I–296 .................................. | | 04–01–97 | Notice to Alien Ordered Removed. |
| \* | \* | \* | \*            \*            \*            \*            \* |
| I–310 .................................. | | 04–01–97 | Bond for Payment of Sums and Fines Imposed under Immigration and Nationality Act (Term or Single Entry). |
| \* | \* | \* | \*            \*            \*            \*            \* |
| I–407 .................................. | | 04–01–97 | Abandonment by Alien of Status as Lawful Permanent Resident. |
| I–408 .................................. | | 04–01–97 | Application to Pay Off or Discharge Alien Crewman. |
| \* | \* | \* | \*            \*            \*            \*            \* |
| I–426 .................................. | | 04–01–97 | Immediate and Continuous Transit Agreement Between a Transportation Line and United States of America (special direct transit procedure). |
| \* | \* | \* | \*            \*            \*            \*            \* |
| I–541 .................................. | | 04–01–97 | Order of Denial of Application for Extension of Stay or Student Employment or Student Transfer. |

| Form No. | | Edition date | Title | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |
| I–546 .......................................................... | | 04–01–97 | Order to Appear—Deferred Inspection. | | | |
| * | * | * | * | * | * | * |
| I–589 .......................................................... | | 04–01–97 | Application for Asylum and Withholding of Removal. | | | |
| * | * | * | * | * | * | * |
| I–701 .......................................................... | | 04–01–97 | Detainee Transfer Worksheet. | | | |
| * | * | * | * | * | * | * |
| I–770 .......................................................... | | 04–01–97 | Notice of Rights and Request for Disposition. | | | |
| I–771 .......................................................... | | 04–01–97 | Bond Computation Worksheet. | | | |
| I–775 .......................................................... | | 04–01–97 | Visa Waiver Pilot Program Agreement. | | | |
| * | * | * | * | * | * | * |
| I–826 .......................................................... | | 04–01–97 | Notice of Rights. | | | |
| I–827A .......................................................... | | 04–01–97 | Request for Disposition. | | | |
| * | * | * | * | * | * | * |
| I–827B .......................................................... | | 04–01–97 | Request for Disposition. | | | |
| I–851 .......................................................... | | 04–01–97 | Notice of Intent to Issue Final Administrative Removal Order. | | | |
| I–851A .......................................................... | | 04–01–97 | Final Administrative Removal Order. | | | |
| * | * | * | * | * | * | * |
| I–860 .......................................................... | | 04–01–97 | Notice and Order of Expedited Removal. | | | |
| I–862 .......................................................... | | 04–01–97 | Notice to Appear. | | | |
| I–863 .......................................................... | | 04–01–97 | Notice of Referral to Immigration Judge. | | | |
| * | * | * | * | * | * | * |

153. Section 299.5 is amended by:
a. Removing the entry for Form ''I–259C''; and by
b. Revising the entries for Forms ''I–246'' and ''I–589'', and to read as follows:

**§ 299.5   Display of control numbers.**

| | * | * | * | * | * | |

| INS form No. | | INS form title | | | | Currently assigned OMB control no. |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |
| I–246 .......................................................... | | Application for Stay of Removal ......................... | | | | 1115–0055 |
| * | * | * | * | * | * | * |
| I–589 .......................................................... | | Application for Asylum and Withholding of Removal ................................... | | | | 1115–0086 |
| * | * | * | * | * | * | * |

## PART 316—GENERAL REQUIREMENTS FOR NATURALIZATION

154. The authority citation for part 316 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1181, 1182, 1443, 1447; 8 CFR part 2.

155. Section 316.5 is amended by revising paragraph (c)(3) to read as follows:

### § 316.5   Residence in the United States.

* * * * *

(c)  * * *

(3) *Removal and return.* Any departure from the United States while under an order of removal (including previously issued orders of exclusion or deportation) terminates the applicant's status as a lawful permanent resident and, therefore, disrupts the continuity of residence for purposes of this part.

* * * * *

## PART 318—PENDING REMOVAL PROCEEDINGS

156. The heading for part 318 is revised as set forth above.

157. The authority citation for part 318 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1252, 1429, 1443; 8 CFR part 2.

158. Section 318.1 is revised to read as follows:

### § 318.1   Warrant of arrest.

For the purposes of section 318 of the Act, a notice to appear issued under 8 CFR part 239 (including a charging document issued to commence proceedings under sections 236 or 242 of the Act prior to April 1, 1997) shall be regarded as a warrant of arrest.

## PART 329—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: NATURALIZATION BASED ON ACTIVE DUTY SERVICE IN THE UNITED STATES ARMED FORCES DURING SPECIFIED PERIODS OF HOSTILITIES.

159. The authority citation for part 329 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1440, 1443; 8 CFR part 2.

160. Section 329.2 is amended by revising paragraph (e)(3) to read as follows:

**§ 329.2   Eligibility.**

\*     \*     \*     \*     \*

(e) \*  \*  \*

(3) The applicant may be naturalized even if an outstanding notice to appear pursuant to 8 CFR part 239 (including a charging document issued to commence proceedings under sections 236 or 242 of the Act prior to April 1, 1997) exists.

Dated: December 24, 1996.

**Janet Reno,**

*Attorney General.*

[FR Doc. 96–33166 Filed 12–27–96; 12:10 pm]

**BILLING CODE 4410–10–M**

Appendix I

# Memorandum



| Subject: | | Date: |
|---|---|---|
| Implementation of Expedited Removal | | MAR 3 1 1997 |

**To:**  Management Team
Regional Directors
Regional Administrators
District Directors (incl. foreign)
Officers-in-Charge (incl. foreign)
Chief Patrol Agents
Asylum Office Directors
Service Center Directors
Port Directors
ODTF Glynco
ODTF Artesia

**From:**  Office of the Deputy Commissioner

The expedited removal provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) become effective April 1, 1997. These provisions provide immigration officers the exclusive authority to order removed from the United States, without further hearing or review, arriving aliens who attempt entry by fraud or who arrive without proper documents.  A proposed rule was published on January 3, and interim implementing regulations were published in the Federal Register on March 6, to be effective April 1.

From February 27 - March 5, the Training Division conducted a train-the-trainer session at Jekyll Island, Georgia, to train almost 300 Immigration and Naturalization Service (INS) trainers in many of the provisions of IIRIRA, including expedited removal.  All Service officers are to have received this training by April 1.

In addition to the interim regulations, the Service has completed a draft of the Inspector's Field Manual (IFM), the first in a series of officer field manuals that will eventually replace the Service Operations Instructions.  Each of these field manuals will eventually be carried on INSERTS, the INS Easy Research and Transmittal System.  Several advance chapters of the IFM particularly affected by IIRIRA are being distributed to field offices for use in implementing these new provisions.  Chapter 17.15 of the IFM contains the expedited removal provisions.

The expedited removal provisions present a tremendous challenge and responsibility to INS officers, and will be the subject of close scrutiny by Congress, the Department of Justice, advocacy groups, and others.  Every officer must adhere strictly to required procedures to ensure that the rights of aliens are protected, particularly those who express a fear of persecution, at the same time ensuring that aliens who clearly seek to violate the immigration laws are quickly removed from the United States in a professional, fair, and objective manner.

Appendix I, continued

Although the general expedited removal procedures are contained in Chapter 17.15 of the IFM and the IIRIRA training materials, following are additional instructions relating to implementation of these provisions.

1.  Arriving aliens who are inadmissible under section 212(a)(6)(C) or (7) are subject to expedited removal under section 235(b)(1) of the new Act. If 212(a)(6)(C) and 212(a)(7) are the only charges lodged, the alien must be processed under expedited removal and may not be referred for an immigration hearing under section 240. If additional charges are lodged, the alien may be referred for a section 240 hearing, but this should only occur in extraordinary circumstances. Generally speaking, if an alien is inadmissible under 212(a)(6)(C) or (7), additional charges should not be brought and the alien should be placed in expedited removal. Aliens charged with grounds other than 212(a)(6)(C) or (7) should be referred for a hearing under section 240.

2.  Any immigration officer issuing an expedited removal order and any designated supervisory officer concurring on an expedited removal order must have completed Phase I of the official 96 Act Training Program prepared by the Training Division.

3.  All expedited removal orders require supervisory approval before service upon the alien. By regulation, this approval authority is not to be delegated below the level of a second line supervisor. Each district may determine at what level this review authority should be delegated. All districts must report the names and titles of designated approving officials through channels to the Headquarters Office of Field Operations no later than April 1.

4.  When an unaccompanied minor or mentally incompetent alien appears to be subject to expedited removal, and the case cannot be resolved under existing guidelines by granting a waiver, deferring the inspection, or by other discretionary means, an expedited removal order may be issued, but the order must by reviewed by the district director or the deputy district director, or person officially acting in that capacity, before the alien is removed from the United States.

5.  The Service retains the discretion to permit withdrawal of application for admission in lieu of issuing an expedited removal order. Provisions for withdrawal are now contained in both statute and regulation, with specific guidance in the IFM and should be followed by all officers with authority to permit withdrawals. As an example, in cases where a lack of proper documents is the result of inadvertent error, misinformation, or where no fraud was intended (e.g. an expired nonimmigrant visa), Service officers may consider, on a case-by-case basis and at the discretion of the Service, any appropriate waivers, withdrawal of application for admission, or deferred inspection to resolve the ground of inadmissibility rather than issuing an expedited removal order.

6.  Numerous Service forms have been revised or newly created to conform with IIRIRA. The revised forms are listed in 8 CFR 299.1 and 299.5 of the interim regulations. A separate IIRIRA wire details the list of forms and how to obtain them. Districts may request these forms from the Service Forms Centers. In addition, the forms are being

Appendix I. continued

incorporated in electronic format into numerous automated forms-generation systems.

7.      When recording answers to the closing questions on Form I-867B, Jurat for Record of
Sworn Statement in Proceedings under Section 235(b)(1) of the Act, if the alien indicates
an intention to apply for asylum or a fear of harm or concern about returning home, the
inspector should ask enough follow-up questions to ascertain the general nature of the fear
or concern.  If the alien indicates an intention to apply for asylum or a fear of persecution,
the alien should be referred to an asylum officer.  Inspectors should consider verbal as well
as non-verbal cues given by the alien.  If an alien asserts a fear or concern which is clearly
unrelated to an intention to seek asylum or a fear of persecution, then the case should not
be referred to an asylum officer.  In determining whether to refer the alien, inspectors
should not make eligibility determinations or weigh the strength of the claims, nor should
they make credibility determinations concerning the alien's statements.  The inspector
should err on the side of caution and apply the criteria generously, referring to the asylum
officer any questionable cases, including cases which might raise a question about whether
the alien faces persecution.  Immigration officers processing aliens for expedited removal
may contact the asylum office point(s) of contact when necessary to obtain guidance on
questionable cases involving an expression of fear or a potential asylum claim.

8.      It is the responsibility of the referring officer to provide the alien being referred for a
credible fear interview with both a Form M-444, Information about Credible Fear
Interview, and a list of free legal services, as provided in 8 CFR parts 3 and 292.

9.      Credible fear interviews will normally take place at Service or contract detention facilities.
Each port-of-entry and detention facility will be provided with a point or points of contact
at the asylum office having responsibility for that geographical area.  It is the responsibility
of the detention or deportation officer to notify the appropriate Asylum office point of
contact when an alien subject to the expedited removal process requires a credible fear
interview, and is being detained in Service custody pending this interview.  That officer
should also provide any additional information or requirements of the alien, such as
whether the alien requires an interpreter or other special requests or considerations.  When
aliens are detained in non-Service facilities or at remote locations, the referring officer
must notify the appropriate Asylum Office.  If the alien is subsequently transferred to
another detention site, the detention or deportation officer must ensure that the
appropriate Asylum Office has been notified.

10.     Normally the credible fear interview will not take place sooner than 48 hours after the
alien arrives at the detention facility.  If the alien requests that the interview be conducted
sooner, the referring officer, or any other officer to whom the alien makes the request,
should immediately convey that information to the appropriate Asylum office.

11.     Aliens placed into expedited removal proceedings must be detained until removed from
the United States.  Parole may be authorized only for medical emergencies or for a
legitimate law enforcement objective.  Once an alien has established a credible fear of
persecution or is otherwise referred (as provided by regulation) for a full removal
proceeding under section 240, release of the alien may be considered under normal parole

Appendix I, continued

criteria.

12. If there is insufficient detention space to detain an alien in expedited removal who is arriving at a land port-of-entry and who claims a fear of persecution, that alien may be required to wait in Canada or Mexico pending a final determination of his or her claim. This option should be taken only as a last resort and should only be used for aliens who claim a fear of persecution that is unrelated to Canada or Mexico. Aliens who make false claims to U.S. citizenship, or false or unverified claims to lawful permanent resident, asylee, or refugee status, and aliens who claim a fear of persecution that is related to Canada or Mexico must be detained. Aliens arriving at a land border port-of-entry who do not claim lawful status in the United States or a fear of persecution should normally be processed immediately and either returned to Canada or Mexico or detained until removed. These aliens should not be required to wait in Canada or Mexico pending issuance of an expedited removal order.

13. Every case in which an expedited removal order is issued must be entered into the Deportable Alien Control System (DACS). Entry of data for those aliens detained by the Service will be handled by the Detention and Deportation section responsible for the detention facility. Entry of data for aliens not requiring detention who are removed directly from the port-of-entry is the responsibility of the Inspections section. A separate memorandum issued by the Office of Field Operations on March 18 details the procedures for entry of data into DACS for expedited removal cases. Cases initiated at the ports-of-entry and referred for removal proceedings under section 240 will continue to be entered into DACS by Detention and Deportation.

14. The expedited removal process will be the subject of extensive inquiry and will require appropriate tracking of specific case data. A separate memorandum regarding tracking of expedited removal cases at ports-of-entry explains how this data collection will be accomplished.

15. Unless an "A" number already exists for an alien placed into expedited removal, an "A" number must be assigned to every expedited removal case at the port-of-entry in order to ensure proper tracking of the case from the onset.

16. New codes are being considered for entry of expedited removal cases into the Central Index System (CIS). Field offices will be notified once these codes are finalized. Entry of cases into CIS should be accomplished as quickly as possible in accordance with district policy. To ensure prompt data entry, "A" files for expedited removal cases should be separated from other files and flagged as expedited removal cases.

17. New codes are also being created to designate expedited removal cases in the National Automated Immigration Lookout System (NAILS) and the Interagency Border Inspection System (IBIS). The new IBIS disposition codes have recently been posted in the IBIS Daily News. Field offices will be notified as new codes are finalized.

18. The Inspections Workload Report, Form G-22.1 is being revised to include data relating

Appendix I, continued

to expedited removal cases, and is expected to be available October 1.

19.     The expedited removal provisions are not applicable in preclearance or preinspection operations.   If the Service wishes to proceed with expedited removal of an alien inspected during an en route inspection of a vessel, action on the case will be deferred until the vessel has arrived in the United States.   The alien may then be processed as an expedited removal case.

20.     Port directors are responsible for ensuring that all U.S. Customs officers who are cross-designated to perform immigration inspections are adequately trained in the expedited removal provisions.   Customs officers shall not issue expedited orders of removal, even in ports where there is only a Customs officer on duty.   Such cases must be referred to an INS officer if a decision is made to pursue expedited removal.

        Questions regarding this memorandum may be addressed to Linda Loveless, Office of Inspections, at (202) 616-7489; Patrice Ward, Office of Inspections, at (202) 514-0964; Charlie Fillinger, Office of Asylum, at (202) 305-2666; Kelly Ryan, Office of General Counsel, at (202) 514-3211, and Ken Elwood, Office of Field Operations, at (202) 307-1983.

Chris Sale
Deputy Commissioner



HQINS 50/5.12 96 Act .066

| Subject: Withdrawal of Application for Admission (IN 98-05) | Date: DEC 22 1997 |
|---|---|

To:  Management Team
     Regional Directors
     District Directors
     Officers-in-Charge
     Chief Patrol Agents
     Asylum Office Directors
     Port Directors
     ODTF Glynco
     ODTF Artesia

From:  Office of Programs

This memorandum is being issued as a review and revision of Chapter 17.2 of Inspector's Field Manual (IFM), relating to withdrawal of application for admission.

Section 235(a)(4) of the Immigration and Nationality Act (INA), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), gives the Attorney General the express authority to permit an alien to withdraw his or her application for admission in lieu of being placed in formal removal proceedings. In the past, the alternative to withdrawal was a full exclusion hearing before an immigration judge. With the implementation of expedited removal in which some inadmissible aliens are not entitled to a full removal hearing, the judicious and uniform exercise of this discretionary authority has become increasingly important. Accordingly, Chapter 17.2 of the IFM is revised to read as follows:

**17.2 Withdrawal of Application for Admission.**

(a) General. A nonimmigrant applicant for admission who does not appear to the inspecting officer to be admissible may be offered the opportunity to withdraw his or her application for admission rather than be detained for a removal hearing before an immigration judge or placed in expedited removal. An alien cannot, as a matter of right, withdraw his or her application for admission, but may be permitted to withdraw if it is determined to be in the best interest of justice that a removal order not be issued. Before allowing an alien to withdraw, you must be sure that the alien has both the intent and the means to depart immediately from the United States. See section 235(a)(4) of the Act and 8 CFR 235.4.

Withdrawal is strictly voluntary and should not be coerced in any way. It may only be considered as an alternative to removal proceedings when the alien is not clearly admissible. Occasionally, POE workload, personnel resources, and availability of detention space may affect whether you will allow withdrawal or pursue removal proceedings before an immigration judge. However, in cases where the alternative to withdrawal is expedited removal, workload and detention space are less significant considerations.

In exercising your discretion to permit withdrawal, you should carefully consider all facts and circumstances related to the case to determine whether permitting withdrawal would be in the best interest of justice, or conversely, that justice would be ill-served if an order of removal were issued. In light of the serious consequences of issuing an expedited removal order, which includes a 5-year bar to re-entry, the decision of whether to permit withdrawal should be based on a careful balancing of relevant favorable and unfavorable factors in order to reach an equitable decision. Such factors might include, but are not limited to:

(1) The seriousness of the immigration violation;

(2) Previous findings of inadmissibility against the alien;

(3) Intent on the part of the alien to violate the law;

(4) Ability to easily overcome the ground of inadmissibility (i.e., lack of documents);

(5) Age or poor health of the alien; and

(6) Other humanitarian or public interest considerations.

An expedited removal order should ordinarily be issued, rather than permitting withdrawal, in situations where there is obvious, deliberate fraud on the part of the applicant. For example, where counterfeit or fraudulent documents are involved, an expedited removal order is normally the appropriate response. On the other hand, in a situation where the alien may have innocently or through ignorance, misinformation, or bad advice obtained an inappropriate visa but has not concealed information during the course of the inspection, withdrawal should ordinarily be permitted. Where an immigration violation has not yet occurred, and the determination of inadmissibility is based on the alien's ignorance of permissible activities or on a judgment of the alien's future intent, the factors cited above should be carefully weighed in deciding whether to permit withdrawal or issue an expedited removal order. Where the travel documents presented are prima facie valid, you should consider whether the violation warrants the serious consequences of a formal removal. If the alien may readily overcome the inadmissibility by obtaining proper documents, the alien may be permitted to withdraw his or her application for admission and should also be appropriately advised of the necessary forms and requirements to overcome the grounds of inadmissibility.

Under section 222(g) of the INA, as amended by IIRIRA, when an alien has remained in the United States beyond the period of his or her authorized stay, the alien's visa is considered to be void, even though no action may have been taken to physically cancel the visa. In a case when an alien could not have been reasonably expected to know that his or her visa is void, but the alien is otherwise admissible except for the lack of valid nonimmigrant visa, withdrawal of application for admission may be considered. However, if the facts of the case indicate particularly egregious immigration violations, such as long-term or repeated previous overstays, unauthorized employment in the United States, or that the alien is again likely to remain beyond his or her authorized stay or otherwise violate his or her status, an expedited removal order may be appropriate.

An applicant who withdraws his or her application for admission is not considered formally removed and therefore does not require permission to reapply for admission to the United States. Once the reason for the inadmissibility is overcome, the alien may be eligible to apply for a new visa or admission to reenter the United States.

(b) Jurisdiction. Generally, a withdrawal will be taken at the port-of-entry or following a deferred inspection. However, there will be instances where a detained alien, prior to or during the expedited removal credible fear process, is permitted to withdraw his or her application for admission. Any INS officer involved in the continuing processing of an arriving alien may, after obtaining authorization in accordance with local procedures, offer withdrawal if the situation warrants. Withdrawal during the later stages of the expedited removal and credible fear process should be the exception rather than the normal course of action. All facts, circumstances, and factors relating to the case should be carefully considered. In expedited removal cases, several units within INS may have already invested considerable time and

resources in pursuing expedited removal of the alien. In order to preserve a unified expedited removal process and uniformity of decision, asylum officers may wish to consult with other units involved to obtain any additional information concerning the case which may affect the decision to permit withdrawal.

(c) Withdrawal procedures. If, after obtaining supervisory concurrence in accordance with local procedures, you decide to permit an applicant to withdraw, complete the necessary paperwork. Once an applicant is granted permission to withdraw, prepare Form I-275, Withdrawal of Application for Admission/Consular Notification. The I-275 must clearly state the reasons for inadmissibility in the remarks block. A sworn statement should be taken and attached to the I-275. If the alien is inadmissible under section 212(a)(6)(C) or (7) and would have been subject to expedited removal if not permitted to withdraw, the sworn statement should be taken using Form I-867A&B. Check any appropriate boxes on the I-275. The alien must sign the I-275, acknowledging that the action is entirely voluntary. The alien should be given a copy of the I-275 and any sworn statement taken, unless the Form I-275 contains classified or sensitive information. Prepare and serve an I-259 on the appropriate carrier to effect removal. Complete the I-94, endorsing both sections with: "WD - Application for Admission Withdrawn. (Stamp number), (Port), and (Date)." On the reverse of the I-94, indicate the file number, if appropriate, in Block 20. In Block 26, under Itinerary/Comments, write the grounds of inadmissibility, and "I-275 served". To be removed via (flight number) on (date)". Also include removal flight information on the front of the departure portion of the I-94. Cancel the nonimmigrant visa, and note the visa page "22 CFR 41.122(h)(3)." In a case where the alien may, through ignorance, bad advice, or misinformation, have inadvertently arrived with inadequate documents or an improper visa, and there was no fraud involved and you are satisfied that the alien will depart in order to comply with admissibility requirements, a visa may be left intact for future use.

Prepare a packet in a sealed envelope for immigration officials in the country to which the alien is being returned, containing the alien's travel document and a copy of the Form I-275 or other relevant information that may be needed by the immigration officials in the ongoing country. Where practical, advise INS offices overseas by phone or fax of aliens moving through their jurisdiction. Forward the original of the I-275 and sworn statement to the consulate where the visa was issued. Route the arrival I-94 for data entry and deliver the departure I-94 to the carrier to be submitted with other departure I-94s for the outbound flight. Maintain a copy of all relating documents, including the pertinent passport pages and other evidence at the port of arrival for 6 months. Refer to Chapter 21.2 for special Canadian border procedures and to Chapter 17.15(f) for specific instructions relating to withdrawal of application for admission by minors.

(d) Return transportation arrangements. An alien who is permitted to withdraw must depart immediately from the United States, or as soon as return transportation can be arranged. If the alien arrived at an airport or seaport, arrange for departure on the next available transportation either back to the country where the alien boarded the flight or vessel, or to another country if the alien is entitled to enter that country. In instances where the alien is being returned to a third country through a foreign transit point, every possible effort must be made to ensure that an immediate and continuous transit will be ensured. If the alien does not have either a return ticket or the carrier has not otherwise agreed to transport the alien, removal proceedings should be instituted. If the alien has an open ticket, make sure satisfactory confirmed return transportation arrangements are made. If the alien arrived at a land border port-of-entry, he or she is not permitted to enter the United States, and is simply returned to the contiguous territory from which he or she arrived.

The above revisions to the IFM will be incorporated into future releases of the INS Easy Research and Transmittal System (INSERTS).

Paul Virtue
Executive Associate
Commissioner, Programs

**8478** Federal Register / Vol. 64, No. 33 / Friday, February 19, 1999 / Rules and Regulations

## DEPARTMENT OF JUSTICE

### Immigration and Naturalization Service

**8 CFR Parts 3, 103, 208, 235, 238, 240, 241, 253, and 507**

**[INS No. 1976–99; AG Order No. 2207–99]**

**RIN 1115–AF39**

### Regulations Concerning the Convention Against Torture

**AGENCY:** Immigration and Naturalization Service, and Executive Office for Immigration Review, Justice.

**ACTION:** Interim rule with request for comments.

**SUMMARY:** This interim rule amends Department of Justice regulations by establishing procedures for raising a claim for protection from torture, as directed by the Foreign Affairs Reform and Restructuring Act of 1998. Section 2242 of that Act requires the heads of appropriate agencies to prescribe regulations for implementing United States obligations under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (Convention Against Torture or Convention). Under Article 3 of the Convention Against Torture (Article 3), the United States has agreed not to ''expel, return ('refouler') or extradite'' a person to another state where he or she would be tortured. The interim rule establishes procedures for ensuring compliance with Article 3 with respect to removal of aliens from the United States by integrating many Convention Against Torture requests into the present scheme governing asylum and withholding determinations before the Immigration Court. For persons subject to reinstatement, administrative removal, expedited removal, or other streamlined proceedings, excluding those relating to aliens inadmissible on security and related grounds, the rule establishes a screening mechanism followed by Immigration Court review that is similar to the screening procedure currently used in determining credible fear under expedited removal. The rule also establishes ''deferral of removal,'' a new, limited form of protection that will be accorded aliens who would be tortured in the country of removal but who are barred from withholding of removal. Finally, this interim regulation serves as notice to the public that, upon the effective date of this rule, the informal procedure currently in place for considering Convention Against Torture requests will end and those persons who have raised a claim under the

informal procedure will be given an opportunity, as prescribed by this rule, to have their cases reviewed under the new procedures.

**DATES:** *Effective date:* This interim rule is effective March 22, 1999.

*Comment date:* written comments must be submitted on or before April 20, 1999.

**ADDRESSES:** Please submit written comments in original and three copies to the Director, Policy Directives and Instructions Branch, Immigration and Naturalization Service, 425 I Street, NW, Room 5307, Washington, DC 20536. To ensure proper handling, please reference INS No. 1976–99 on your correspondence. Comments are available for public inspection at the above address by calling (202) 514–3048 to arrange for an appointment.

**FOR FURTHER INFORMATION CONTACT:** For matters relating to the Immigration and Naturalization Service: Dorothea Lay, 425 I Street, NW, Washington, DC 20536, telephone number (202) 514–2895. For matters relating to the Executive Office for Immigration Review: Margaret M. Philbin, General Counsel, Executive Office for Immigration Review, Suite 2400, 5107 Leesburg Pike, Falls Church, Virginia, 22041, telephone number (703) 305–0470.

**SUPPLEMENTARY INFORMATION:**

### Background

On October 21, 1998, the President signed into law legislation which requires that ''[n]ot later than 120 days after the date of enactment of this Act, the heads of the appropriate agencies shall prescribe regulations to implement the obligations of the United States under Article 3 of the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention.'' Section 2242(b) of the Foreign Affairs Reform and Restructuring Act of 1998 (Pub. L. 105–277, Division G, Oct. 21, 1998).

Obligations under the Convention Against Torture have been in effect for the United States since November 20, 1994. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/39/51 (1984) [hereinafter Convention or Convention Against Torture]. On October 21, 1994, President Clinton deposited the United States instrument of ratification of the Convention with the Secretary General

of the United Nations. Consistent with its terms, the Convention Against Torture entered into force for the United States 30 days later. Under Article 3, the United States had agreed not to ''expel, return ('refouler') or extradite'' a person to another state where he or she would be tortured. The Department of State is responsible for carrying out extradition requests and will promulgate regulations to ensure compliance with Article 3 in those cases. In other cases, the Attorney General is charged with expelling or returning aliens from the United States to other countries. This rule is published pursuant to this mandate to implement United States obligations under Article 3 in the context of the Attorney General's removal of aliens Article 3 provides as follows:

1. No State Party shall expel, return, (''refouler'') or extradite a person to another State where there are substantial grounds for believing that he or she would be in danger of being subjected to torture.

2. For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant, or mass violations of human rights.

This Article is similar in some ways to Article 33 of the 1951 Convention relating to the Status of Refugees. The Convention relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 137 [hereinafter Refugee Convention). Article 33 provides that ''[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of race, religion, nationality, membership of a particular social group or political opinion.'' The United States currently implements Article 33 of the Refugee Convention through the withholding of removal provision in section 241(b)(3) (formerly section 243(h)) of the Immigration and Nationality Act (INA or the Act). That provision, as interpreted by the courts, requires the Attorney General to withhold an alien's removal to a country where it is more likely than not that the alien's life or freedom would be threatened on account of one of the five grounds mentioned above. *See INS* v. *Stevic,* 467 U.S. 407, 429–30 (1984).

However, there are some important differences between withholding of removal under section 241(b)(3) of the Act and Article 3 of the Convention Against Torture. First, several categories of individuals, including persons who

assisted in Nazi persecution or engaged in genocide, persons who have persecuted others, persons who have been convicted of particularly serious crimes, persons who are believed to have committed serious non-political crimes before arriving in the United States, and persons who pose a danger to the security of the United States, are ineligible for withholding of removal. *See* INA section 241(b)(3)(B). Article 3 of the Convention Against Torture does not exclude such persons from its scope. Second, section 241(b)(3) applies only to aliens whose life or freedom would be threatened on account of race, religion, nationality, and membership in a particular social group or political opinion. Article 3 covers persons who fear torture that may not be motivated by one of those five grounds. Third, the definition of torture does not encompass all types of harm that might qualify as a threat to life or freedom. Thus, the coverage of Article 3 is different from that of section 241(b)(3): broader in some ways and narrower in others.

Until the October 21, 1998 legislation, there was no statutory provision to implement Article 3 of the Convention Against Torture in United States domestic law. When the United States Senate gave advice and consent to ratification of the Convention Against Torture, it made a declaration that Articles 1 through 16 were not self-executing. Recognizing, however, that ratification of the Convention represented a statement by the United States to the international community of its commitment to comply with the Convention's provisions to the extent permissible under the Constitution and existing federal statutes, the Department of Justice sought to conform its practices to the Convention by ensuring compliance with Article 3 in the case of aliens who are subject to removal from the United States.

In order to conform to the Convention before the enactment of implementing legislation, the Immigration and Naturalization Service (INS or Service) adopted a pre-regulatory administrative process to assess the applicability of Article 3 to individual cases in which an alien is subject to removal. Under this pre-regulatory administrative process, upon completion of deportation, exclusion, or removal proceedings and prior to execution of a final order of removal, the INS has considered whether removing an alien to a particular country is consistent with Article 3. If it is determined that the alien could not be removed to the country in question consistent with Article 3, the INS has used its existing discretionary authority to ensure that the alien is not removed to that country for so long as he or she is likely to be tortured there. *See* INA § 103(a); 8 CFR 2.1.

In formulating its pre-regulatory administrative process to conform to Article 3 in the context of the removal of aliens, the INS has been careful not to expand upon the protections that Article 3 grants. Only execution of an order of removal to a country where an alien is more likely than not to be tortured would violate the Convention. Therefore, the INS has not addressed the question of whether Article 3 prohibits removal in an individual case until there is a final administrative order of removal to a place where an alien claims that he or she would be tortured, and until all appeals, requests for review, or other administrative or judicial challenges to execution of that order have been resolved. This approach has allowed the INS to address the applicability of Article 3 to a case only when actually necessary to comply with the Convention. It has also allowed an individual alien to exhaust all avenues for pursuing any other more extensive benefit or protection for which he or she may be eligible before seeking the minimal guarantee provided by Article 3 that he or she will not be returned to a specific country where it is likely that he or she would be tortured. At the same time, this approach has allowed the INS, the agency responsible for executing removal orders, to ensure that no order is executed under circumstances that would violate the Convention.

**Goals of Interim Rule**

Pursuant to statutory mandate, the Department of Justice now publishes this rule in order to implement the United States' Article 3 obligations in the context of the removal of aliens by the Attorney General. The rule is published as an interim rule, effective 30 days after the date of publication. This rule is intended to create fair and efficient provisions to implement Article 3 within the overall regulatory framework for the issuance of removal orders and decisions about the execution of such orders.

The primary goals of this rule are to establish procedures that ensure that no alien is removed from the United States under circumstances that would violate Article 3 without unduly disrupting the issuance and execution of removal orders consistent with Article 3. To this end, we have designed a system that will allow aliens subject to the various types of removal proceedings currently afforded by the immigration laws to seek, and where eligible, to be accorded protection under Article 3. At the same time, we have created mechanisms to quickly identify and resolve frivolous claims to protection so that the new procedures cannot be used as a delaying tactic by aliens who are not in fact at risk.

In cases subject to streamlined, expedited removal processes under current law, the rule employs screening mechanisms to quickly identify potentially meritorious claims to protection and to resolve frivolous ones with dispatch. For example, the rule allows for the screening of aliens arriving at ports of entry to determine whether they establish a credible fear of torture. This screening will be conducted in conjunction with the existing credible fear of persecution screening process, so that it will not complicate or delay the expedited removal process established by Congress for arriving aliens. If an alien passes this threshold-screening standard, his or her claim for protection under Article 3 will be further examined by an immigration judge in the context of removal proceedings under section 240 of the Act. The screening mechanism also allows for the expeditious review by an immigration judge of a negative screening determination and the quick removal of an alien with no credible claim to protection.

Furthermore, the rule establishes a new screening process to rapidly identify and assess both claims for withholding of removal under section 241(b)(3) of the Act and for protection under the Convention by either aliens subject to administrative removal for aggravated felons under section 238(b) of the Act or to reinstatement of a previous order of removal under section 241(a)(5) of the Act. Modeled on the credible fear screening mechanism, this screening process will also allow for the fair and expeditious resolution of such claims without unduly disrupting the streamlined removal processes applicable to these aliens.

The cases of alien terrorists and other aliens subject to administrative removal under section 235(c) of the Act will be handled through the administrative process in which the INS issues and executes the removal order. Cases handled under section 235(c) are only a few each year, and typically involve highly sensitive issues and adjudication based on classified information under tight controls. Thus, by retaining the ability to assess the applicability of Article 3 through the administrative removal process, the INS will both maintain a workable process and ensure U.S. compliance with Article 3 in these unusual cases. Similarly, the regulations

provide that an alien whose removal has been ordered by the Alien Terrorist Removal Court under the special procedures set forth in Title V of the Act shall not be removed to a particular country if the Attorney General determines, in consultation with the Secretary of State, that removal to that country would violate Article 3.

For aliens subject to removal proceedings under section 240 of the Act, exclusion proceedings, or deportation proceedings, a claim to protection under the Convention Against Torture will be raised and considered, along with any other applications, during removal proceedings before an immigration judge. Both the alien and the INS will have the ability to appeal decisions of the immigration judge to the Board of Immigration Appeals (the Board). This will allow the alien to seek review of this important decision, and will also allow the INS to use the review mechanism to ensure that decisions about the applicability of Article 3 are made consistently and according to the high standards of proof required by Article 3 itself. At the same time, the availability of review will not expand the process already available to aliens in proceedings under section 240, who under current law already have the opportunity to seek Board review of decisions of the immigration judge.

Nor does this rule expand the availability of judicial review for aliens who make claims to protection under the Convention Against Torture. The statute requiring regulatory implementation of obligations under Article 3 explicitly provides that it does not authorize judicial review of these regulations. Section 2242(d) of the Foreign Affairs Reform and Restructuring Act of 1998. The rule restates at § 208.18(e) the statutory mandate that the only available judicial review for Convention Against Torture claims is when such claims are heard as part of the review of a final order of removal pursuant to section 242 of the Act. Such review remains subject to the requirements and limitations of section 242. Where a court has jurisdiction to consider a Convention Against Torture claim, it may not, except as authorized by section 242, consider other claims regarding the alien's removal.

**Structure of Rule**

Generally, the rule creates two separate provisions for protection under Article 3 for aliens who would be tortured in the country of removal. The first provision establishes a new form of withholding of removal under § 208.16(c). This type of protection is only available to aliens who are not barred from eligibility for withholding of removal under section 241(b)(3)(B) of the Act. The second provision, under § 208.17(a), concerns aliens who would be tortured in the country of removal but who are subject to the bars contained in section 241(b)(3)(B) of the Act. These aliens may only be granted deferral of removal, a less permanent form of protection than withholding of removal and one that is more easily and quickly terminated if it becomes possible to remove the alien consistent with Article 3. Deferral of removal will be granted based on the withholding of removal application to an alien who is likely to be tortured in the country of removal but who is barred from withholding of removal. Section 208.17(d) sets out a special, streamlined procedure through which the INS may seek to terminate deferral of removal when appropriate.

**Withholding of Removal Under the Convention Against Torture**

Revised § 208.16(c) creates a new form of withholding of removal, which will be granted to an eligible alien in removal proceedings who establishes that he or she would be tortured in the proposed country of removal. This section references new § 208.18(a), which contains the definition of torture, and provides that this definition will be applied in all determinations about eligibility for this new form of withholding, or for deferral of removal.

An alien granted withholding under new § 208.16(c) would be treated similarly to an alien granted withholding of removal under § 208.16(b), the regulatory provision implementing section 241(b)(3) of the Act. The rule provides at § 208.16(c)(2) that, in order to be eligible for withholding of removal under Article 3, a alien must establish that it is more likely than not that he or she would be tortured in the country in question. Imposition of this burden of proof on the alien gives effect to one of the Senate understandings upon which ratification was conditioned, which provides that "the United States understands that the phrase, 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.'" The ratification history makes clear that this understanding was intended to ensure that the standard of proof for Article 3 would be the same standard as that for withholding of removal under section 241(b)(3) of the Act, then section 243(h) of the Act. *See,*

*e.g.,* Convention Against Torture, *submitted to the Senate,* May 20, 1988, S. Treaty Doc. No. 100–20, at 6 (1988) (hereinafter S. Treaty Doc. No. 100–20).

Section 208.16(c)(3) also directs that all evidence relevant to the possibility of future torture should be considered when making the determination as to whether the alien is more likely than not to be tortured. It specifically provides that evidence of past torture inflicted on the applicant should be considered, because evidence of past torture may be probative as to whether future torture is likely.

Section 208.16(c)(3) also requires that, in determining whether the applicant has met his or her burden of proof, the decision-maker may consider any evidence that the alien may be able to relocate to an area of the country of removal where he or she is not likely to be tortured. Consideration of this factor is consistent with long-established precedent in the context of the adjudication of requests for asylum and withholding of removal under section 241(b)(3) of the Act, and is relevant to the likelihood that an alien would be tortured if returned to a specific country. This section also provides that, where applicable, the adjudicator will consider evidence of gross, flagrant, or mass violations of human rights committed within the country in question. This requirement is drawn directly from clause 2 of Article 3. The words "where applicable" indicate that, in each case, the adjudicator will determine whether and to what extent evidence of human rights violations in a given country is in fact a relevant factor in the case at hand. Evidence of the gross and flagrant denial of freedom of the press, without more, for example, may not tend to show that an alien would be tortured if returned to that country. *See, e.g.,* S. Treaty Doc. No. 100–20, at 20. The rule further directs that any other relevant information about country conditions in the country of removal be considered.

Applicants for withholding under § 208.16(c) will be subject to the mandatory bars to withholding contained in section 241(b)(3)(B) of the Act. Section 241(b)(3)(B) of the Act bars from withholding of removal aliens: who have assisted in Nazi persecution or engaged in genocide; who have ordered, incited, assisted or otherwise participated in the persecution of others; and who, having been convicted of a particularly serious crime, pose a danger to the community of the United States. The section 241(b)(3)(B) bar also applies when there are serious reasons to believe that the alien has committed a serious non-political crime outside the

United States before arriving in the United States or there are reasonable grounds to believe that the alien is a danger to the security of the United States. The legislation implementing Article 3 provides that "[t]o the maximum extent consistent with the obligations of the United States under the Convention, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention, the regulations described in subsection (b) [mandating promulgation of regulations to implement Article 3] shall exclude from the protection of such regulations aliens described in section 241(b)(3)(B) of the Immigration and Nationality Act (8 U.S.C. 1231(b)(3)(B))." Section 2242(c) of the Foreign Affairs Reform and Restructuring Act of 1998. Thus, consistent with the statutory directive, the advantages of a grant of withholding of removal will not be available to such aliens. Rather, their protection from return to a country where they would be tortured, as required by the Convention, will be effected through a less extensive form of protection, i.e., deferral of removal, established in § 208.17(a).

**Deferral of Removal Under the Convention Against Torture**

Although aliens who are barred from withholding of removal under § 241(b)(3)(B) of the Act are not eligible for withholding under 208.16(c), the Article 3 implementing statute directs that any exclusion of these aliens from the protection of these regulations must be consistent with United States obligations under the Convention, subject to United States reservations, understandings, declarations, and provisos conditioning ratification. Section 2242(c) of the Foreign Affairs Reform and Restructuring Act of 1998. Article 3 prohibits returning any person to a country where he or she would be tortured, and contains no exceptions to this mandate. Nor do any of the United States reservations, understandings, declarations, or provisos contained in the Senate's resolution of ratification provide that the United States may exclude any person from Article 3's prohibition on return because of criminal or other activity or for any other reason. Indeed, the ratification history of the Convention Against Torture clearly indicates that the Executive Branch presented Article 3 to the Senate with the understanding that it "does not permit any discretion or provide for any exceptions * * *." Convention Against Torture: Hearing Before the Senate Comm. on Foreign Relations, 101st Cong., 18 (1990)

(statement of Mark Richard, Deputy Assistant Attorney General for the Criminal Division, DOJ).

Wherever possible, subsequent acts of Congress must be construed as consistent with treaty obligations. *See e.g., Cook* v. *United States,* 288 U.S. 102, 120 (1933) ("[a] treaty will not be deemed to have been abrogated or modified by a later statute, unless such purpose on the part of Congress has been clearly expressed."). Here, Congress has not indicated an intent to modify the obligations imposed by Article 3. In fact, Congress has clearly expressed its intent that any exclusion of aliens described in section 241(b)(3)(B) of the Act from the protection of these regulations must be consistent with Article 3. The obligation not to return such an alien to a country where he or she would be tortured remains in effect. Thus, while this rule does not extend the advantages associated with a grant of withholding of removal to aliens barred under section 241(b)(3)(B) of the Act, it does ensure that they are not returned to a country where they would be tortured.

To this end, the rule creates a special provision under § 208.17(a) for deferral of removal when an alien described in section 241(b)(3)(B) of the Act has been ordered removed to a country where it has been determined that he or she would be tortured. The process is as follows: Before determining whether the bars described in section 241(b)(3)(B) of the Act apply to withholding removal of an alien under the Convention Against Torture, the immigration judge is required to find whether the alien is likely to be tortured in the country of removal. Only after this finding is made does the immigration judge decide, as required by § 208.16(d), whether the statutory bars to withholding of removal apply. If the bars do not apply, the immigration judge will grant withholding of removal to an alien who has been determined to be likely to be tortured in the country of removal. If the immigration judge finds that the bars apply, § 208.17(a) requires the immigration judge to defer removal of an alien to a country where the alien is likely to be tortured. The alien need not apply separately for deferral because this form of protection will be accorded automatically, based on the withholding application, to an alien who is barred from withholding but is likely to be tortured in the country of removal. While the order of deferral is in effect, the alien will not be returned to the country in question.

Section 208.17(a) is subject to the same standard of proof and definitional provisions as § 208.16(c). This will

ensure that compliance with Article 3 is complete and consistent in the cases of aliens who are barred from withholding as well as in the cases of aliens who are not barred from withholding. However, an order of deferral provides a much more limited form of protection than does a grant of withholding of removal. An order of deferral would not confer upon the alien any lawful or permanent immigration status in the United States and would be subject to streamlined and expeditious review and termination if it is determined that it is no longer likely that the alien would be tortured in the country to which he or she has been ordered removed. Further, like withholding, deferral of removal is effective only with respect to the particular country in question and does not alter the government's ability to remove the alien to another country where he or she would not be tortured. The rule requires the immigration judge to inform the alien of the limited nature of the deferral order at the time such order is entered.

In addition, an order deferring removal to a particular country will not alter INS authority to detain an alien who is otherwise subject to detention. Section 241(a)(6) of the Act provides a variety of grounds for INS in its discretion to detain beyond the removal period an alien under a final order who cannot be removed. These include, most importantly, the discretion to detain an alien granted deferral of removal under Article 3 who is removable based on security grounds, based on certain criminal offenses, or who has been determined to pose a risk to the community. This is consistent with the Article 3 implementing statute, which provides that "[n]othing in this section shall be construed as limiting the authority of the Attorney General to detain any person under any provision of law, including, but not limited to, any provision of the Immigration and Nationality Act." Section 2242(e) of the Foreign Affairs Reform and Restructuring Act of 1998. Section 208.17(c) of the interim rule provides that decisions about the detention of detainable aliens who have been granted deferral of removal will be made according to standard procedures under 8 CFR part 241.

**Termination of Deferral of Removal**

The most important distinction between withholding of removal and deferral of removal is the mode of termination. Section 208.17(d) will provide for a streamlined termination process for deferral of removal when it is no longer likely that an alien would be tortured in the country of removal.

Under existing regulations, withholding can only be terminated when the government moves to reopen the case, meets the standards for reopening, and meets its burden of proof to establish by a preponderance of the evidence that the alien is not eligible for withholding. The termination process for deferral of removal is designed to be much more accessible, so that deferral can be terminated quickly and efficiently when appropriate.

At any time while the order of deferral is in effect, the INS District Counsel for the district with jurisdiction over an alien granted deferral of removal may move the immigration court to schedule a hearing to determine whether the deferral order can be terminated. The INS motion will not be subject to the normal motion to reopen requirement that the moving party seek to offer evidence that was previously unavailable (i.e., could not have been discovered and presented at the previous hearing) and that establishes a *prima facie* case for termination. Rather, the Service's motion will be granted and a termination hearing will be scheduled on an expedited basis if the Service meets a lower threshold, which requires only that the evidence was not considered at the previous hearing and is relevant to the possibility that the alien would be tortured in the country of removal. This will allow the Service to monitor cases in which an order of deferral is in effect, and to bring such cases for termination hearings when it appears that the alien may no longer face likely torture in the country in question.

The Immigration Court will provide the alien with notice of the time, place, and date of the termination hearing, and will have the opportunity to submit evidence to supplement his or her initial application for withholding, which was the basis for the deferral order. As is the case with initial asylum and withholding applications, the original application, along with any supplemental information submitted by the alien, will be forwarded to the Department of State, which may comment on the case at its option. At the termination hearing, it will be the alien's burden to establish that it is more likely than not that he or she would be tortured in the country of removal. The immigration judge will make a *de novo* determination about the alien's likelihood of torture in the country in question. If the immigration judge determines that the alien is more likely than not to be tortured in the country to which removal has been deferred, the order of deferral shall remain in place. If the alien fails to meet

the burden of proof, the deferral order will be terminated. If the alien establishes that he or she still requires protection under the Convention Against Torture, the deferral order will remain in effect. Appeal of the immigration judge's decision shall lie to the Board.

Deferral of removal may also be terminated at the alien's written request under § 208.17(e). For termination on this basis, the rule requires that the immigration judge determine whether the alien's request is knowing and voluntary. If necessary, the immigration judge may conduct a hearing to make this determination. If it is determined that the alien's request for termination is not knowing and voluntary, deferral will not be terminated on this basis.

**Implementation of the Convention Against Torture**

Section 208.18 sets out a number of provisions governing the implementation of the Convention Against Torture provisions. This section contains the definition of torture that will apply in both the withholding and deferral contexts, rules about the applicability of the new provisions, and a section clarifying that this rule does not expand the availability of judicial review to aliens who assert claims to protection under the Convention Against Torture.

**Definition of Torture**

Section 208.18(a) provides the definition of torture and of terms within that definition. Initially, consistent with the statute, it provides that the regulatory definition of torture incorporates the definition in Article 1 of the Convention, as interpreted and modified by United States reservations, understandings, declarations and provisos. The remainder of the definition section is drawn directly from the language of the Convention, the language of the reservations, understandings and declarations contained in the Senate resolution ratifying the Convention, or from ratification history.

Section 208.18(a)(1) contains the first sentence of Article 1, providing the basic contours of the definition of torture. It does not attempt to list the types of acts that would constitute torture, but rather expresses basic elements that must be present in order for an act to be torture: It must be an act causing severe pain or suffering, whether physical or mental, intentionally inflicted on a person. Article 16, which refers to "other acts of cruel, inhuman or degrading treatment or punishment, which do not amount to

torture," confirms that, as provided in § 208.18(a)(2), torture is an extreme form of cruel and inhuman treatment. *See, e.g.,* S. Treaty Doc. No. 100–20 at 23.

Section 208.18(a)(3) provides that torture "does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions." This is drawn from the second sentence of Article 1. The Senate adopted an understanding providing that "with reference to article 1 of the Convention, the United States understands that 'sanctions' includes judicially-imposed sanctions and other enforcement actions authorized by United States law or by judicial interpretation of such law. Nonetheless, the United States understands that a State Party could not through its domestic sanctions defeat the object and purpose of the Convention to prohibit torture." 136 Cong. Rec. 36198 (1990). Therefore § 208.18(a)(3) also provides that "[l]awful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty, but do not include sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture." This paragraph does not require that, in order to come within the exception, an action must be one that would be authorized by United States law. It must, however, be legitimate, in the sense that a State cannot defeat the purpose of the Convention to prohibit torture.

Senate understandings also provide that "the United States understands that international law does not prohibit the death penalty, and does not consider this Convention to restrict or prohibit the United States from applying the death penalty consistent with the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States, including any constitutional period of confinement prior to the imposition of the death penalty." This understanding is embodied in § 208.18(a)(3)'s inclusion of the death penalty in the description of lawful sanctions that do not constitute torture. The purpose of the Senate's understanding on the death penalty is to clarify that the Convention does not prohibit the United States from applying the death penalty consistent with United States constitutional standards. This concept will likely have limited application in the context of Article 3 implementation. It means simply that the constitutionally sufficient imposition of the death penalty in the United States is not torture. The understanding does not mean, however, that any imposition of the death penalty by a foreign state that fails to satisfy United States

constitutional requirements constitutes torture. Any analysis of whether the death penalty is torture in a specific case would be subject to all requirements of the Convention's definition, the Senate's reservations, understandings, and declarations, and the regulatory definitions. Thus, even if imposition of the death penalty would be inconsistent with United States constitutional standards, it would not be torture if it were imposed in a legitimate manner to punish violations of law. Similarly, it would not be torture if it failed to meet any other element of the definition of torture.

The definition of torture can, in limited circumstances, include severe mental pain and suffering. Section 208.18(a)(4) provides a detailed and restrictive definition of the type of severe mental harm that can constitute torture. This language is drawn directly from the Senate's understandings. *See* 136 Cong. Rec. 36198.

Section 208.18(a)(5) requires that, in order to qualify as torture, an act must be specifically intended to inflict severe pain or suffering, a requirement clearly imposed by United States understandings. *Id.* Thus, an act that results in unanticipated or unintended severity of pain and suffering is not torture. *See, e.g.*, S. Treaty Doc. No. 100–20, at 19.

Section 208.18(a)(6) provides that, for an act to constitute torture, the victim of the act must be in the custody or physical control of the perpetrator. Thus, harm, even severe pain and suffering, inflicted on a person who is not within the perpetrator's custody or physical control, would not qualify as torture. Again, the language of this regulatory provision is taken directly from the Senate understandings. *See* 136 Cong. Rec. 36198.

Article 1 of the Convention Against Torture requires that torture must be inflicted "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." Senate understandings provide that "the term 'acquiescence' requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his legal responsibility to intervene to prevent such activity." 136 Cong. Rec. 36198. Section 208.18(a)(7) mirrors this requirement. Thus the definition of torture includes only acts that occur in the context of governmental authority. *See, e.g.*, S. Treaty Doc. No. 100–20, at 19.

Section 208.18(a)(8) provides that noncompliance with applicable legal procedural standards does not *per se* constitute torture. Again, this provision mirrors Senate understandings. 136 Cong. Rec. 36198.

**Applicability of New Provisions**

Section 208.18(b)(1) provides that aliens who are in exclusion, deportation, or removal proceedings as of the effective date of this rule may seek withholding under the Convention Against Torture, and if applicable be considered for deferral under the Convention, through the procedures established by this rule. Section 208.18(b)(2) also establishes special procedures to provide a reasonable opportunity to request consideration for protection under Article 3 for aliens who were either ordered removed prior to the effective date of this rule, or whose removal orders become final prior to the effective date of the rule. Such aliens will be given a 90-day window of time in which to file a motion to reopen before the immigration court or before the Board of Immigration Appeals, to apply for protection under this rule. Any motion filed by such an alien within 90 days of the effective date of this rule, March 22, 1999, will not be subject to the normal requirement that the motion must seek to present new evidence that was unavailable and could not have been presented at the previous hearing. Nor will such a motion be subject to the normal time and numerical limitations on motions to reopen under §§ 3.2 and 3.23. Such a motion will, however, be subject to the other requirements set out in the regulations for a motion to reopen. Therefore it will not be granted unless the evidence sought to be offered establishes a prima facie case that the alien's removal would violate Article 3 of the Convention Against Torture. Similarly, like other motions to reopen, such a motion will not automatically stay the alien's removal. Rather, the alien must request a stay of removal at the time of filing the motion to reopen.

**Aliens Who Requested Protection Under the Convention Through the INS Pre-regulatory Administrative Process To Ensure Compliance With Article 3**

As explained previously, the INS has, prior to the effective date of this rule, conducted a pre-regulatory administrative process to comply with Article 3 of the Convention Against Torture until implementing legislation was enacted and obligations under that Article could be implemented by this rule. Section 208.18(b)(3) of this rule provides that, after the effective date of this rule, the INS pre-regulatory administrative process for ensuring compliance with Article 3 will end.

After the effective date of this rule, except as otherwise provided, the INS will no longer stay an alien's removal based only on a request for protection under Article 3, nor will it consider the applicability of Article 3 to an individual case under its pre-regulatory administrative process.

Section 208.18(b)(4) provides that the new procedures established by this rule to provide for the consideration of claims to protection under the Convention Against Torture do not apply to cases in which the Service, prior to the effective date of this rule, has made a final administrative determination about the applicability of Article 3. This section provides that, if the Service has determined under its pre-regulatory administrative process that an alien cannot be removed to a particular country consistent with Article 3, the alien is considered to have been granted withholding of removal under § 208.16(c), unless the alien is subject to mandatory denial of withholding under § 208.16(d) (2) or (3). If such an alien is barred from withholding of removal, he or she will be considered to have been granted deferral of removal under § 208.17(a). Similarly, if an alien was determined under the pre-regulatory administrative process not to require protection under Article 3, that alien will be considered to have been finally denied withholding of removal under § 208.16(c) and deferral of removal under § 208.17(a). This paragraph applies only to cases in which the Service actually reached a final determination about the applicability of Article 3 to an individual case.

A different regime will apply to aliens who requested protection under the pre-regulatory administrative process but did not receive a final determination from the Service. The Service will provide notice about the end of the pre-regulatory administrative process to such aliens. This notice will inform the alien of the new regulatory process through which Article 3 claims will be processed. The notice will also explain that an alien who was ordered removed or whose removal order became final prior to the effective date of this rule may obtain consideration of a claim under Article 3 only through the procedures set out in this rule. An alien under a final removal order issued by EOIR may obtain consideration of the Article 3 claim by filing a motion to reopen with the immigration court or the Board of Immigration Appeals. In order to provide a reasonable opportunity to file such a motion, an alien who has a request for Article 3 protection pending with the Service on

the date this rule becomes effective will be granted a stay of removal effective until 30 days after the notice is served on the alien. Any motion filed by such an alien will not be subject to the normal requirements for motions to reopen. The immigration judge or the Board shall grant such a motion if it is accompanied by a copy of the notice provided by the Service or by other convincing evidence that the alien requested protection under Article 3 from the Service through the pre-regulatory administrative process and did not receive a final administrative determination prior to the effective date of this rule. The filing of such a motion shall extend the stay of removal pending the adjudication of the motion. This special provision ensures that those who requested protection under the INS pre-regulatory administrative process and did not get a ruling will have a full and fair opportunity to pursue their claims for protection under the new regulatory process.

For an alien under a removal order issued by the Service under section 238(b) of the Act or an alien under an exclusion, deportation, or removal order that has been reinstated by the Service, the Service will consider any claim to protection that is pending on the effective date of this rule through the process set out in section 208.31. For an alien ordered removed by the Service under section 235(c) of the Act, the Service will decide under section 235.8(b)(4) any Article 3 claim that is pending on the effective date of this rule. Such a claim will not be subject to the procedures set out for consideration of Article 3 claims by an immigration judge, the Board of Immigration Appeals, or an asylum officer.

## Cases in Which Diplomatic Assurances Are Considered

Section 208.18(c) sets out special procedures for cases in which the Secretary of State forwards to the Attorney General assurances that the Secretary has obtained from the government of a specific country that an alien would not be tortured if returned there. In some cases, it may be possible for the United States to actually reduce the likelihood that an alien would be tortured in a particular country. The nature and reliability of such assurances, and any arrangements through which such assurances might be verified, would require careful evaluation before any decision could be reached about whether such assurances would allow an alien's removal to that country consistent with Article 3. This paragraph sets out special procedures under which the Attorney General, in

consultation with the Secretary of State, will assume responsibility for assessing the adequacy of any such assurances in appropriate cases. Cases will be handled under this provision only if such assurances are actually forwarded to the Attorney General by the Secretary of State for consideration under this special process. It is anticipated that these cases will be rare.

In cases in which the Secretary has forwarded assurances under this provision, the procedures for administrative consideration of claims under the Convention Against Torture set out elsewhere in this rule will not apply. Further, the rule provides that the Attorney General's authority to make determinations about the applicability of Article 3 in such a case may be exercised by the Deputy Attorney General or by the Commissioner, but may not be further delegated. Thus the rule ensures that cases involving the adequacy of diplomatic assurances forwarded to the Attorney General by the Secretary of State will receive consideration at senior levels within the Department of Justice, which is appropriate to the delicate nature of a diplomatic undertaking to ensure that an alien is not tortured in another country. Under § 208.17(f), these special procedures may also be invoked in appropriate cases for considering whether deferral of removal should be terminated.

## Cases Involving Aliens Ordered Removed Under Section 235(c) of the Act

Section 208.18(d) provides, as discussed previously in the supplementary information, that an alien ordered removed pursuant to section 235(c) of the Act will not be removed under circumstances that would violate section 241(b)(3) of the Act or Article 3 of the Convention Against Torture. Any claim by an alien for protection against removal to a country where the alien claims he or she would be tortured will be considered by the Service under the standards applicable to protection under the Convention Against Torture, in light of the special circumstances of each case.

Because these determinations will be made by the Service, the procedural provisions in Part 208 for consideration or decision of an alien's claims by an immigration judge, the Board, or an asylum officer do not apply in such cases. Thus, although this rule amends 8 CFR 253.1(f) to provide that an alien removable under section 235(c) of the Act may apply for protection under the Convention Against Torture under 8 CFR Part 208, such an alien's claim

would be considered by the Service as provided in § 208.18(d), and not by an immigration judge or asylum officer.

Similarly, although § 208.2(b)(1)(C)(v) provides that an immigration judge shall have exclusive jurisdiction over any asylum application filed on or after April 1, 1997, by an alien who has been ordered removed under section 235(c) of the Act, that provision by its express terms is only applicable ''[a]fter Form I–863, Notice of Referral to Immigration Judge, has been filed with the Immigration Court.'' When the alien is found to be removable as provided in section 235(c)(2)(B) of the Act, the Service issues a removal order without referring the case to an immigration judge. Thus this provision relating to the authority of the immigration judge will apply to an alien who is subject to removal under section 235(c) of the Act only if the Service makes a determination to refer the case to an immigration judge for consideration as provided in sections 235.8(b)(2)(ii) and (d).

## Expedited Removal and the Credible Fear Process

The credible fear screening provisions at § 208.30 are amended to ensure that arriving aliens who are subject to the statutory provisions for expedited removal at ports of entry will, when necessary, be considered for protection under Article 3 as well as for asylum under section 208 of the Act and withholding under section 241(b)(3)(B) of the Act. Under current procedures, an alien subject to expedited removal who expresses a fear of persecution in his or her country of origin is interviewed by an asylum officer to determine whether the alien has a credible fear of persecution. Under the amended procedures, an alien who expresses such a fear will also be examined to determine whether he or she has a credible fear of torture. An alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture. If the alien has a credible fear of torture, he or she will be referred to an immigration judge for removal proceedings under section 240 of the Act, just as in the current credible fear of persecution process. In these proceedings, the alien will be able to assert a claim to withholding of removal under the Convention Against Torture or under section 241(b)(3) of the Act, or to deferral of removal in the case of an alien barred from withholding, or to asylum under section 208 of the Act. Similarly, consistent with current

procedures in the expedited removal context, upon the alien's request, an asylum officer's negative credible fear of torture determination will be subject to expeditious review by an immigration judge, with no appeal of this screening review. Thus, the interim rule provides for fair resolution of claims to protection under the Convention Against Torture in the expedited removal context, without disrupting the streamlined process established by Congress to circumvent meritless claims.

**Reasonable Fear Screening Process for Aliens in Administrative Removal Proceedings for Aggravated Felons and Aliens Subject to Reinstated Orders**

Section 208.31 creates a new screening process to evaluate torture claims for aliens subject to streamlined administrative removal proceedings for aggravated felons under section 238(b) of the Act and for aliens subject to reinstatement of a previous removal order under section 241(a)(5) of the Act. This new screening process is modeled on the credible fear screening process, but requires the alien to meet a higher screening standard. Similar to the credible fear screening process, § 208.31 is intended to provide for the fair resolution of claims both to withholding under section 241(b)(3) of the Act, and to protection under the Convention Against Torture without unduly disrupting the operation of these special administrative removal processes.

Unlike the broad class of arriving aliens who are subject to expedited removal, these two classes of aliens are ineligible for asylum. They may, however, be entitled to withholding of removal under either section 241(b)(3) of the Act, or under the Convention Against Torture, or to deferral of removal under § 208.17(a). Because the standard for showing entitlement to these forms of protection (a probability of persecution or torture) is significantly higher than the standard for asylum (a well-founded fear of persecution), the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher. In fact, the ''reasonable fear'' screening standard is the same standard of proof used in asylum eligibility determinations. That is, the alien must show that there is a ''reasonable possibility'' that he or she would be persecuted or tortured in the country of removal.

Under the new screening process, aliens in these streamlined administrative removal proceedings who express a fear of persecution or torture will be interviewed by an asylum officer to determine whether they have a reasonable fear of persecution or torture. If they are determined to have such a fear, they will be referred to an immigration judge for a determination only as to their eligibility for withholding of removal under either section 241(b)(3) of the Act or under the Convention Against Torture, or for deferral of removal. Either the alien or the Service may appeal the immigration judge's decision about eligibility for withholding or deferral of removal to the Board of Immigration Appeals. The Board will have jurisdiction to review only the issue of eligibility for withholding or deferral of removal and may not review issues related to the administratively issued order of removal or to the reinstatement of the previous order of removal.

If the asylum officer determines that the alien does not have a reasonable fear of persecution or torture, the alien will be afforded the opportunity for an expeditious review of the negative screening determination by an immigration judge. A new form I–898, Record of Negative Reasonable Fear Finding and Request for Review by the Immigration Judge, will be created on which the alien may request review of a negative asylum officer screening determination. If the immigration judge upholds the negative screening determination, the alien may be removed without further review. If the immigration judge reverses the asylum officer's screening determination, however, the immigration judge will proceed to a determination only as to eligibility for withholding of removal under section 241(b)(3) of the Act or under the Convention Against Torture, or if applicable, deferral of removal. Again, either the alien or the INS may appeal the immigration judge's decision about withholding or deferral to the Board of Immigration Appeals.

This reasonable fear screening process provides a formal mechanism, previously unavailable, to make determinations under section 241(b)(3) of the Act for aliens who are subject to administrative removal as aggravated felons under section 238(b) of the Act, but who were sentenced to an aggregate term of imprisonment of less than five years, and thus are not conclusively barred from withholding under section 241(b)(3)(B) of the Act. This same mechanism will provide for consideration of applications for withholding of removal under the Convention Against Torture, and for consideration for deferral of removal when necessary, in these cases. Thus the new screening process will unify any consideration of applications for withholding of removal under section 241(b)(3) of the Act and under the Convention Against Torture in these cases.

Similarly, the new reasonable fear of persecution or torture screening process will ensure proper consideration of applications for withholding under section 241(b)(3) of the Act and under the Convention Against Torture, and of deferral of removal when appropriate, in cases subject to reinstatement of a previous removal order. Thus it replaces current regulatory provisions at § 241.8(d) for the consideration of applications for withholding of removal under section 241(b)(3) of the Act.

Form I–589 as application form for withholding of removal under the Convention Against Torture

The Form I–589, Application for Asylum and for Withholding of Removal, will serve as an application form for withholding of removal under the Convention Against Torture, as well as for withholding of removal under section 241(b)(3) of the Act. Supplemental instructions for the Form I–598 will be issued to explain how an alien may use this form to seek withholding of removal under the Convention. Under this rule, consideration for deferral of removal must be undertaken when an alien's application for withholding has been denied because of a bar to withholding. Therefore, the Form I–589 will automatically trigger deferral of removal where appropriate.

Use of the Form I–589 will avoid confusion by allowing aliens who believe they are at risk of harm to apply for asylum, as well as these other risk-based forms of protection, at the same time, using the same form. It will also help to ensure that these claims are presented at one time, thereby allowing resolution of these issues in the normal course of proceedings.

Additionally, use of the Form I–589 will obviate the need for two separate forms that, in many cases, will elicit similar information. In many cases in which the alien applies both for asylum and withholding of removal under the Act and for withholding under the Convention Against Torture, the underlying facts supporting these claims will be the same. Thus use of the I–589 will reduce the burden on the applicant while also simplifying the adjudication process for the Service and EOIR. In all cases, the same biographical background information will be necessary. Additionally, the Form I–589 already contains questions that would elicit the facts underlying an alien's fear of torture as well as his or her fear of persecution.

For example, the form specifically asks the applicant whether he or she fears torture upon return to a country, and also asks open-ended questions designed to elicit any information about past mistreatment or fear of mistreatment in the future. Thus the existing form can easily be used for the adjudication of claims to protection under the Convention Against Torture.

**Good Cause Exception**

The interim rule is effective 30 days from the date of publication in the **Federal Register**, although the Department invites public comment for 60 days from the date of publication. For the following reasons, the Department finds that good cause exists under 5 U.S.C. 553(b)(B) and (d)(3) for implementing this rule as an interim rule without the prior notice and comment period ordinarily required under that provision. First, section 2242(b) of the Foreign Affairs Reform and Restructuring Act of 1998 requires that "[n]ot later than 120 days after the date of the enactment of this Act, the heads of the appropriate agencies shall prescribe regulations to implement the obligations of the United States under Article 3 of the [Convention Against Torture]." In order to comply with this statutory requirement, it was necessary to dispense with the usual period of public notice and comment; however, the Department will consider carefully all public comments submitted in the course of preparation of a final rule. Second, this rule provides a formal mechanism for requesting protection from torture, and must be implemented expeditiously in order to allow aliens who may require protection under the Convention Against Torture to seek such protection under a regulatory system. While the current informal procedure will remain in place during the next 30 days, it allows for consideration of such requests only at the end of the removal process, after all other avenues of appeal have been exhausted. The interim rule will permit most aliens to raise their claims during the course of regular removal proceedings, and thus many individuals currently in proceedings before the immigration court will have the opportunity to have their request for protection resolved more expeditiously than under the current informal procedure. Therefore, early implementation will be advantageous to those persons seeking protection under the Convention Against Torture, and it is contrary to the intent of the statute and the public interest to delay the implementation of this rule until after a notice and comment period.

**Regulatory Flexibility Act**

The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and, by approving it, certifies that this rule will not have a significant economic impact on a substantial number of small entities because of the following reason: This rule involves the process for adjudication of certain requests for withholding of removal. This process affects individuals and not small entities.

**Unfunded Mandates Reform Act of 1995**

This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one-year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the Provisions of the Unfunded Mandates Reform Act of 1995.

**Small Business Regulatory Enforcement Fairness Act of 1996**

This rule is not a major rule as defined by section 251 of the Small Business Regulatory Enforcement Act of 1996. 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of the United States-based companies to compete with foreign-based companies in domestic and export markets.

**Executive Order 12866**

This rule is considered by the Department of Justice to be a "significant regulatory action" under Executive Order 12866, Regulatory Planning and Review. Accordingly, this regulation has been submitted to the Office of Management and Budget for review.

**Executive Order 12612**

The regulation adopted herein will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibility among the various levels of government. Therefore, in accordance with Executive Order 12612, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a Federalism Assessment.

**Executive Order 12988—Civil Justice Reform**

This interim rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

**Paperwork Reduction Act**

The information collection requirement contained in this rule has been approved for use by the Office of Management and Budget (OMB) under the Paperwork Reduction Act. The OMB control number for this collection is contained in 8 CFR part 299.5, Display of control numbers.

**List of Subjects**

*8 CFR Part 3*

Administrative practice and procedure, Immigration, Organization and functions (Government agencies).

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of information, Privacy, Reporting and recordkeeping requirements, Surety bonds.

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 238*

Air Carriers, Aliens, Government contracts, Maritime carriers.

*8 CFR Part 240*

Administrative practice and procedure, Immigration.

*8 CFR Part 241*

Aliens, Immigration.

*8 CFR Part 253*

Air carriers, Airmen, Aliens, Maritime carriers, Reporting and recordkeeping requirements, Seamen.

*8 CFR Part 507*

Aliens, Terrorists.

Accordingly, chapter I of title 8 of the Code of Federal Regulations is amended as follows:

**PART 3—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**

1. The authority citation for part 3 continues to read as follows:

**Authority:** 5 U.S.C. 301; 8 U.S.C. 1103, 1252 note, 1252b, 1324b, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100.

2. In § 3.23, revise the paragraph heading and the first sentence in paragraph (b)(4)(i) to read as follows:

**§ 3.23  Reopening or Reconsideration before the Immigration Court.**

\*    \*    \*    \*    \*

(b) \* \* \*

(4) \* \* \*

(i) *Asylum and withholding of removal.* The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply if the basis of the motion is to apply for asylum under section 208 of the Act or withholding of removal under section 241(b)(3) of the Act or withholding of removal under the Convention Against Torture, and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous proceeding. \* \* \*

3. In § 3.42, revise paragraphs (d) and (f) to read as follows:

**§ 3.42  Review of credible fear determination.**

\*    \*    \*    \*    \*

(d) *Standard of review.* The immigration judge shall make a *de novo* determination as to whether there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the immigration judge, that the alien could establish eligibility for asylum under section 208 of the Act or withholding under section 241(b)(3) of the Act or withholding under the Convention Against Torture.

\*    \*    \*    \*    \*

(f) *Decision.* If an immigration judge determines that an alien has a credible fear of persecution or torture, the immigration judge shall vacate the order entered pursuant to section 235(b)(1)(B)(iii)(I) of the Act. Subsequent to the order being vacated, the Service shall issue and file Form I–862, Notice to Appear, with the Immigration Court to commence removal proceedings. The alien shall have the opportunity to apply for asylum and withholding of removal in the course of removal proceedings pursuant to section 240 of the Act. If an immigration judge determines that an alien does not have a credible fear of persecution or torture, the immigration

judge shall affirm the asylum officer's determination and remand the case to the Service for execution of the removal order entered pursuant to section 235(b)(1)(B)(iii)(I) of the Act. No appeal shall lie from a review of an adverse credible fear determination made by an immigration judge.

\*    \*    \*    \*    \*

## PART 103—POWERS AND DUTIES OF SERVICE OFFICERS; AVAILABILITY OF SERVICE RECORDS

4. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 552, 552(a); 8 U.S.C. 1101, 1103, 1201, 1252 note, 1252b, 1304, 1356; 31 U.S.C. 9701; E.O. 12356; 47 FR 14874, 15557; 3 CFR, 1982 Comp., p 166; 8 CFR part 2.

5. In § 103.12, revise paragraph (a)(5) to read as follows:

**§ 103.12  Definition of the term "lawfully present" aliens for purposes of applying for Title II social security benefits under Public Law 104–193.**

(a) \* \* \*

(5) Applicants for asylum under section 208(a) of the Act and applicants for withholding of removal under section 241(b)(3) of the Act or under the Convention Against Torture who have been granted employment authorization, and such applicants under the age of 14 who have had an application pending for at least 180 days.

\*    \*    \*    \*    \*

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

6. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1226, 1252, 1282; 8 CFR part 2.

7. Revise § 208.1 to read as follows:

**§ 208.1  General.**

(a) *Applicability.* Unless otherwise provided in this chapter, this subpart shall apply to all applications for asylum under section 208 of the Act or for withholding of deportation or withholding of removal under section 241(b)(3) of the Act, or under the Convention Against Torture, whether before an asylum officer or an immigration judge, regardless of the date of filing. For purposes of this chapter, withholding of removal shall also mean withholding of deportation under section 243(h) of the Act, as it appeared prior to April 1, 1997, except as provided in § 208.16(d). Such applications are hereinafter referred to as "asylum applications." The

provisions of this part shall not affect the finality or validity of any decision made by a district director, an immigration judge, or the Board of Immigration Appeals in any such case prior to April 1, 1997. No asylum application that was filed with a district director, asylum officer, or immigration judge prior to April 1, 1997, may be reopened or otherwise reconsidered under the provisions of this part except by motion granted in the exercise of discretion by the Board of Immigration Appeals, an immigration judge, or an asylum officer for proper cause shown. Motions to reopen or reconsider must meet the requirements of sections 240(c)(5) and (c)(6) of the Act, and 8 CFR parts 3 and 103, where applicable.

(b) *Training of asylum officers.* The Director of International Affairs shall ensure that asylum officers receive special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles. The Director of International Affairs shall also, in cooperation with the Department of State and other appropriate sources, compile and disseminate to asylum officers information concerning the persecution of persons in other countries on account of race, religion, nationality, membership in a particular social group, or political opinion, torture of persons in other countries, and other information relevant to asylum determinations, and shall maintain a documentation center with information on human rights conditions.

8. In § 208.2, revise paragraphs (a), (b)(1)(ii), and (b)(3), to read as follows:

**§ 208.2  Jurisdiction.**

(a) *Office of International Affairs.* Except as provided in paragraph (b) of this section, the Office of International Affairs shall have initial jurisdiction over an asylum application filed by, or a credible fear determination pertaining to, an alien physically present in the United States or seeking admission at a port-of-entry. The Office of International Affairs shall also have initial jurisdiction to consider applications for withholding of removal under § 208.31. An application that is complete within the meaning of § 208.3(c)(3) shall either be adjudicated or referred by asylum officers under this part in accordance with § 208.14. An application that is incomplete within the meaning of § 208.3(c)(3) shall be returned to the applicant.

(b) \* \* \*

(1) \* \* \*

(ii) An alien stowaway who has been found to have a credible fear of

persecution or torture pursuant to the procedures set forth in subpart B of this part;

*   *   *   *   *

(3) *Other aliens.* Immigration judges shall have exclusive jurisdiction over asylum applications filed by an alien who has been served Form I–221, Order to Show Cause; Form I–122, Notice to Applicant for Admission Detained for a Hearing before an Immigration Judge; or Form I–862, Notice to Appear, after a copy of the charging document has been filed with the Immigration Court. Immigration judges shall also have jurisdiction over any asylum applications filed prior to April 1, 1997, by alien crewmembers who have remained in the United States longer than authorized, by applicants for admission under the Visa Waiver Pilot Program, and by aliens who have been admitted to the United States under the Visa Waiver Pilot Program. Immigration judges shall also have the authority to review reasonable fear determinations referred to the Executive Office for Immigration Review under § 208.31.

9. In § 208.4, revise paragraph (a) introductory text and paragraph (b)(2) to read as follows:

**§ 208.4   Filing the application.**

*   *   *   *   *

(a) *Prohibitions on filing.* Section 208(a)(2) of the Act prohibits certain aliens from filing for asylum on or after April 1, 1997, unless the alien can demonstrate to the satisfaction of the Attorney General that one of the exceptions in section 208(a)(2)(D) of the Act applies. Such prohibition applies only to asylum applications under section 208 of the Act and not to applications for withholding of removal under § 208.16 of this part. If an applicant submits an asylum application and it appears that one or more of the prohibitions contained in section 208(a)(2) of the Act apply, an asylum officer or an immigration judge shall review the application to determine if the application should be rejected or denied. For the purpose of making determinations under section 208(a)(2) of the Act, the following rules shall apply:

*   *   *   *   *

(b) *   *   *

(2) *With the asylum office.* Asylum applications shall be filed directly with the asylum office having jurisdiction over the matter in the case of an alien who has received the express consent of the Director of Asylum to do so or in the case of an alien whose case has been referred to the asylum office for purposes of conducting a reasonable

fear determination under § 208.31 of this part.

*   *   *   *   *

10. In § 208.5, revise paragraph (b)(1) introductory text to read as follows:

**§ 208.5   Special duties toward aliens in custody of the Service.**

*   *   *   *   *

(b) *   *   *

(1) If an alien crewmember or alien stowaway on board a vessel or other conveyance alleges, claims, or otherwise makes known to an immigration inspector or other official making an examination on the conveyance that he or she is unable or unwilling to return to his or her country of nationality or last habitual residence (if not a national of any country) because of persecution or a fear of persecution in that country on account of race, religion, nationality, membership in a particular social group, or political opinion, or if the alien expresses a fear of torture upon return to that country, the alien shall be promptly removed from the conveyance. If the alien makes such fear known to an official while off such conveyance, the alien shall not be returned to the conveyance but shall be retained in or transferred to the custody of the Service.

*   *   *   *   *

11. In § 208.11, revise paragraph (b)(2) to read as follows:

**§ 208.11   Comments from the Department of State.**

*   *   *   *   *

(b) *   *   *

(2) Information about whether persons who are similarly situated to the applicant are persecuted or tortured in his or her country of nationality or habitual residence and the frequency of such persecution or torture; or

*   *   *   *   *

12. In § 208.12, revise paragraph (a) to read as follows:

**§ 208.12   Reliance on information compiled by other sources.**

(a) In deciding an asylum application, or in deciding whether the alien has a credible fear of persecution or torture pursuant to § 208.30 of this part, or a reasonable fear of persecution or torture pursuant to § 208.31, the asylum officer may rely on material provided by the Department of State, the Office of International Affairs, other Service offices, or other credible sources, such as international organizations, private voluntary agencies, news organizations, or academic institutions.

*   *   *   *   *

13. Section 208.13 revise paragraph (c)(1) to read as follows:

**§ 208.13   Establishing asylum eligibility.**

*   *   *   *   *

(c) *   *   *

(1) *Applications filed on or after April 1, 1997.* For applications filed on or after April 1, 1997, an applicant shall not qualify for asylum if section 208(a)(2) or 208(b)(2) of the Act applies to the applicant. If the applicant is found to be ineligible for asylum under either section 208(a)(2) or 208(b)(2) of the Act, the applicant shall be considered for eligibility for withholding of removal under section 241(b)(3) of the Act. The applicant shall also be considered for eligibility for withholding of removal under the Convention Against Torture if the applicant requests such consideration or if the evidence presented by the alien indicates that the alien may be tortured in the country of removal.

14. Section 208.16 is amended as follows:

A. Revise the section heading;

B. Revise paragraph (a);

C. Revise paragraph (b) introductory test;

D. Redesignate paragraphs (c) and (d), as (d) and (e) respectively;

E. Add a new paragraph (c);

F. Revise newly redesignated paragraphs (d) and (e); and

G. Add a new paragraph (f) to read as follows:

**§ 208.16   Withholding of removal under section 241(b)(3)(B) of the Act and withholding of removal under the Convention Against Torture.**

(a) *Consideration of application for withholding of removal.* An asylum officer shall not decide whether the exclusion, deportation, or removal of an alien to a country where the alien's life or freedom would be threatened must be withheld, except in the case of an alien who is otherwise eligible for asylum but is precluded from being granted such status due solely to section 207(a)(5) of the Act. In exclusion, deportation, or removal proceedings, an immigration judge may adjudicate both an asylum claim and a request for withholding of removal whether or not asylum is granted.

(b) *Eligibility for withholding of removal under section 241(b)(3) of the Act; burden of proof.* The burden of proof is on the applicant for withholding of removal under section 241(b)(3) of the Act to establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion. The testimony of the applicant, if credible, may be sufficient to sustain the burden

**Federal Register** / Vol. 64, No. 33 / Friday, February 19, 1999 / Rules and Regulations

of proof without corroboration. The evidence shall be evaluated as follows:

\*　　\*　　\*　　\*　　\*

(c) *Eligibility for withholding of removal under the Convention Against Torture.*

(1) For purposes of regulations under Title II of the Act, "Convention Against Torture" shall refer to the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention, as implemented by section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 (Pub. L. 105–277, 112 Stat. 2681, 2681–821). The definition of torture contained in § 208.18(a) of this part shall govern all decisions made under regulations under Title II of the Act about the applicability of Article 3 of the Convention Against Torture.

(2) The burden of proof is on the applicant for withholding of removal under this paragraph to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.

(3) In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:

(i) Evidence of past torture inflicted upon the applicant;

(ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;

(iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and

(iv) Other relevant information regarding conditions in the country of removal.

(4) In considering an application for withholding of removal under the Convention Against Torture, the immigration judge shall first determine whether the alien is more likely than not to be tortured in the country of removal. If the immigration judge determines that the alien is more likely than not to be tortured in the country of removal, the alien is entitled to protection under the Convention Against Torture. Protection under the Convention Against Torture will be

granted either in the form of withholding of removal or in the form of deferral of removal. An alien entitled to such protection shall be granted withholding of removal unless the alien is subject to mandatory denial of withholding of removal under paragraphs (d)(2) or (d)(3) of this section. If an alien entitled to such protection is subject to mandatory denial of withholding of removal under paragraphs (d)(2) or (d)(3) of this section, the alien's removal shall be deferred under § 208.17(a).

(d) *Approval or denial of application.* (1) *General.* Subject to paragraphs (d)(2) and (d)(3) of this section, an application for withholding of deportation or removal to a country of proposed removal shall be granted if the applicant's eligibility for withholding is established pursuant to paragraphs (b) or (c) of this section.

(2) *Mandatory denials.* Except as provided in paragraph (d)(3) of this section, an application for withholding of removal under section 241(b)(3) of the Act or under the Convention Against Torture shall be denied if the applicant falls within section 241(b)(3)(B) of the Act or, for applications for withholding of deportation adjudicated in proceedings commenced prior to April 1, 1997, within section 243(h)(2) of the Act as it appeared prior to that date. For purposes of section 241(b)(3)(B)(ii) of the Act, or section 243(h)(2)(B) of the Act as it appeared prior to April 1, 1997, an alien who has been convicted of a particularly serious crime shall be considered to constitute a danger to the community. If the evidence indicates the applicability of one or more of the grounds for denial of withholding enumerated in the Act, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

(3) *Exception to the prohibition on withholding of deportation in certain cases.* Section 243(h)(3) of the Act, as added by section 413 of Pub. L. 104–132 (110 Stat. 1214), shall apply only to applications adjudicated in proceedings commenced before April 1, 1997, and in which final action had not been taken before April 24, 1996. The discretion permitted by that section to override section 243(h)(2) of the Act shall be exercised only in the case of an applicant convicted of an aggravated felony (or felonies) where he or she was sentenced to an aggregate term of imprisonment of less than 5 years and the immigration judge determines on an individual basis that the crime (or crimes) of which the applicant was convicted does not constitute a particularly serious crime. Nevertheless,

it shall be presumed that an alien convicted of an aggravated felony has been convicted of a particularly serious crime. Except in the cases specified in this paragraph, the grounds for denial of withholding of deportation in section 243(h)(2) of the Act as it appeared prior to April 1, 1997, shall be deemed to comply with the Protocol Relating to the Status of Refugees, Jan. 31, 1967, T.I.A.S. No. 6577.

(e) *Reconsideration of discretionary denial of asylum.* In the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal under this section, thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her, the denial of asylum shall be reconsidered. Factors to be considered will include the reasons for the denial and reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country.

(f) *Removal to third country.* Nothing in this section or § 208.17 shall prevent the Service from removing an alien to a third country other than the country to which removal has been withheld or deferred.

15. Section 208.17 is revised to read as follows:

### § 208.17  Deferral of removal under the Convention Against Torture.

(a) *Grant of deferral of removal.* An alien who: has been ordered removed; has been found under § 208.16(c)(3) to be entitled to protection under the Convention Against Torture; and is subject to the provisions for mandatory denial of withholding of removal under § 208.16(d)(2) or (d)(3), shall be granted deferral of removal to the country where he or she is more likely than not to be tortured.

(b) *Notice to Alien.* (1) After an immigration judge orders an alien described in paragraph (a) of this section removed, the immigration judge shall inform the alien that his or her removal to the country where he or she is more likely than not to be tortured shall be deferred until such time as the deferral is terminated under this section. The immigration judge shall inform the alien that deferral of removal:

(i) Does not confer upon the alien any lawful or permanent immigration status in the United States;

(ii) Will not necessarily result in the alien being released from the custody of the Service if the alien is subject to such custody;

(iii) Is effective only until terminated; and

(iv) Is subject to review and termination if the immigration judge determines that it is not likely that the alien would be tortured in the country to which removal has been deferred, or if the alien requests that deferral be terminated.

(2) The immigration judge shall also inform the alien that removal has been deferred only to the country in which it has been determined that the alien is likely to be tortured, and that the alien may be removed at any time to another country where he or she is not likely to be tortured.

(c) *Detention of an alien granted deferral of removal under this section.* Nothing in this section shall alter the authority of the Service to detain an alien whose removal has been deferred under this section and who is otherwise subject to detention. In the case of such an alien, decisions about the alien's release shall be made according to part 241 of this chapter.

(d) *Termination of deferral of removal.*

(1) At any time while deferral of removal is in effect, the INS District Counsel for the District with jurisdiction over an alien whose removal has been deferred under paragraph (a) of this section may file a motion with the Immigration Court having administrative control pursuant to § 3.11 of this chapter to schedule a hearing to consider whether deferral of removal should be terminated. The Service motion shall be granted if it is accompanied by evidence that is relevant to the possibility that the alien would be tortured in the country to which removal has been deferred and that was not presented at the previous hearing. The Service motion shall not be subject to the requirements for reopening in §§ 3.2 and 3.23 of this chapter.

(2) The Immigration Court shall provide notice to the alien and the Service of the time, place, and date of the termination hearing. Such notice shall inform the alien that the alien may supplement the information in his or her initial application for withholding of removal under the Convention Against Torture and shall provide that the alien must submit any such supplemental information within 10 calendar days of service of such notice (or 13 calendar days if service of such notice was by mail). At the expiration of this 10 or 13 day period, the Immigration Court shall forward a copy of the original application, and any supplemental information the alien or the Service has submitted, to the

Department of State, together with notice to the Department of State of the time, place and date of the termination hearing. At its option, the Department of State may provide comments on the case, according to the provisions of § 208.11 of this part.

(3) The immigration judge shall conduct a hearing and make a *de novo* determination, based on the record of proceeding and initial application in addition to any new evidence submitted by the Service or the alien, as to whether the alien is more likely than not to be tortured in the country to which removal has been deferred. This determination shall be made under the standards for eligibility set out in § 208.16(c). The burden is on the alien to establish that it is more likely than not that he or she would be tortured in the country to which removal has been deferred.

(4) If the immigration judge determines that the alien is more likely than not to be tortured in the country to which removal has been deferred, the order of deferral shall remain in place. If the immigration judge determines that the alien has not established that he or she is more likely than not to be tortured in the country to which removal has been deferred, the deferral of removal shall be terminated and the alien may be removed to that country. Appeal of the immigration judge's decision shall lie to the Board.

(e) *Termination at the request of the alien.*

(1) At any time while deferral of removal is in effect, the alien may make a written request to the Immigration Court having administrative control pursuant to § 3.11 of this chapter to terminate the deferral order. If satisfied on the basis of the written submission that the alien's request is knowing and voluntary, the immigration judge shall terminate the order of deferral and the alien may be removed.

(2) If necessary the immigration judge may calendar a hearing for the sole purpose of determining whether the alien's request is knowing and voluntary. If the immigration judge determines that the alien's request is knowing and voluntary, the order of deferral shall be terminated. If the immigration judge determines that the alien's request is not knowing and voluntary, the alien's request shall not serve as the basis for terminating the order of deferral.

(f) *Termination pursuant to § 208.18(c).* At any time while deferral of removal is in effect, the Attorney General may determine whether deferral should be terminated based on diplomatic assurances forwarded by the

Secretary of State pursuant to the procedures in § 208.18(c).

**§§ 208.18 through 208.22   [Redesignated as §§ 208.19 through 208.23]**

16. Sections 208.18 through 208.22 are redesignated as §§ 208.19 through 208.23 respectively.

17. Section 208.18 is added to read as follows:

**§ 208.18   Implementation of the Convention Against Torture.**

(a) *Definitions.* The definitions in this subsection incorporate the definition of torture contained in Article 1 of the Convention Against Torture, subject to the reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention.

(1) Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

(2) Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture.

(3) Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions. Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty, but do not include sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture.

(4) In order to constitute torture, mental pain or suffering must be prolonged mental harm caused by or resulting from:

(i) The intentional infliction or threatened infliction of severe physical pain or suffering;

(ii) The administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

(iii) The threat of imminent death; or

(iv) The threat that another person will imminently be subjected to death,

severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the sense or personality.

(5) In order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering. An act that results in unanticipated or unintended severity of pain and suffering is not torture.

(6) In order to constitute torture an act must be directed against a person in the offender's custody or physical control.

(7) Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity.

(8) Noncompliance with applicable legal procedural standards does not *per se* constitute torture.

(b) *Applicability of §§ 208.16(c) and 208.17(a).*

(1) *Aliens in proceedings on or after March 22, 1999.* An alien who is in exclusion, deportation, or removal proceedings on or after March 22, 1999 may apply for withholding of removal under § 208.16(c), and, if applicable, may be considered for deferral of removal under § 208.17(a).

(2) *Aliens who were ordered removed, or whose removal orders became final, before March 22, 1999.* An alien under a final order of deportation, exclusion, or removal that became final prior to March 22, 1999 may move to reopen proceedings to seek protection under § 208.16(c). Such motions shall be governed by §§ 3.23 and 3.2 of this chapter, except that the time and numerical limitations on motions to reopen shall not apply and the alien shall not be required to demonstrate that the evidence sought to be offered was unavailable and could not have been discovered or presented at the former hearing. The motion to reopen shall not be granted unless:

(i) The motion is filed within June 21, 1999; and

(ii) The evidence sought to be offered establishes a prima facie case that the applicant's removal must be withheld or deferred under §§ 208.16(c) or 208.17(a).

(3) *Aliens who, on March 22, 1999, have requests pending with the Service for protection under Article 3 of the Convention Against Torture.*

(i) Except as otherwise provided, after March 22, 1999, the Service will not:

(A) Consider, under its pre-regulatory administrative policy to ensure compliance with the Convention Against Torture, whether Article 3 of

that Convention prohibits the removal of an alien to a particular country, or

(B) Stay the removal of an alien based on a request filed with the Service for protection under Article 3 of that Convention.

(ii) For each alien who, on or before March 22, 1999, filed a request with the Service for protection under Article 3 of the Convention Against Torture, and whose request has not been finally decided by the Service, the Service shall provide written notice that, after March 22, 1999, consideration for protection under Article 3 can be obtained only through the provisions of this rule.

(A) The notice shall inform an alien who is under an order of removal issued by EOIR that, in order to seek consideration of a claim under §§ 208.16(c) or 208.17(a), such alien must file a motion to reopen with the immigration court or the Board of Immigration Appeals. This notice shall be accompanied by a stay of removal, effective until 30 days after service of the notice on the alien. A motion to reopen filed under this paragraph for the limited purpose of asserting a claim under §§ 208.16(c) or 208.17(a) shall not be subject to the requirements for reopening in §§ 3.2 and 3.23 of this chapter. Such a motion shall be granted if it is accompanied by a copy of the notice described in paragraph (b)(3)(ii) or by other convincing evidence that the alien had a request pending with the Service for protection under Article 3 of the Convention Against Torture on March 22, 1999. The filing of such a motion shall extend the stay of removal during the pendency of the adjudication of this motion.

(B) The notice shall inform an alien who is under an administrative order of removal issued by the Service under section 238(b) of the Act or an exclusion, deportation, or removal order reinstated by the Service under section 241(a)(5) of the Act that the alien's claim to withholding of removal under § 208.16(c) or deferral of removal under § 208.17(a) will be considered under § 208.31.

(C) The notice shall inform an alien who is under an administrative order of removal issued by the Service under section 235(c) of the Act that the alien's claim to protection under the Convention Against Torture will be decided by the Service as provided in § 208.18(d) and 235.8(b)(4) and will not be considered under the provisions of this part relating to consideration or review by an immigration judge, the Board of Immigration Appeals, or an asylum officer.

(4) *Aliens whose claims to protection under the Convention Against Torture*

were finally decided by the Service prior to March 22, 1999. Sections 208.16(c) and 208.17 (a) and paragraphs (b)(1) through (b)(3) of this section do not apply to cases in which, prior to March 22, 1999, the Service has made a final administrative determination about the applicability of Article 3 of the Convention Against Torture to the case of an alien who filed a request with the Service for protection under Article 3. If, prior to March 22, 1999, the Service determined that an applicant cannot be removed consistent with the Convention Against Torture, the alien shall be considered to have been granted withholding of removal under § 208.16(c), unless the alien is subject to mandatory denial of withholding of removal under § 208.16(d)(2) or (d)(3), in which case the alien will be considered to have been granted deferral of removal under 208.17(a). If, prior to March 22, 1999, the Service determined that an alien can be removed consistent with the Convention Against Torture, the alien will be considered to have been finally denied withholding of removal under § 208.16(c) and deferral of removal under § 208.17(a).

(c) *Diplomatic assurances against torture obtained by the Secretary of State.*

(1) The Secretary of State may forward to the Attorney General assurances that the Secretary has obtained from the government of a specific country that an alien would not be tortured there if the alien were removed to that country.

(2) If the Secretary of State forwards assurances described in paragraph (c)(1) of this section to the Attorney General for consideration by the Attorney General or her delegates under this paragraph, the Attorney General shall determine, in consultation with the Secretary of State, whether the assurances are sufficiently reliable to allow the alien's removal to that country consistent with Article 3 of the Convention Against Torture. The Attorney General's authority under this paragraph may be exercised by the Deputy Attorney General or by the Commissioner, Immigration and Naturalization Service, but may not be further delegated.

(3) Once assurances are provided under paragraph (c)(2) of this section, the alien's claim for protection under the Convention Against Torture shall not be considered further by an immigration judge, the Board of Immigration Appeals, or an asylum officer.

(d) *Cases involving aliens ordered removed under section 235(c) of the Act.* With respect to an alien terrorist or other alien subject to administrative

removal under section 235(c) of the Act who requests protection under Article 3 of the Convention Against Torture, the Service will assess the applicability of Article 3 through the removal process to ensure that a removal order will not be executed under circumstances that would violate the obligations of the United States under Article 3. In such cases, the provisions of Part 208 relating to consideration or review by an immigration judge, the Board of Immigration Appeals, or an asylum officer shall not apply.

(e) *Judicial review of claims for protection from removal under Article 3 of the Convention Against Torture.*

(1) Pursuant to the provisions of section 2242(d) of the Foreign Affairs Reform and Restructuring Act of 1998, there shall be no judicial appeal or review of any action, decision, or claim raised under the Convention or that section, except as part of the review of a final order of removal pursuant to section 242 of the Act; provided however, that any appeal or petition regarding an action, decision, or claim under the Convention or under section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 shall not be deemed to include or authorize the consideration of any administrative order or decision, or portion thereof, the appeal or review of which is restricted or prohibited by the Act.

(2) Except as otherwise expressly provided, nothing in this paragraph shall be construed to create a private right of action or to authorize the consideration or issuance of administrative or judicial relief.

18. Newly redesignated 208.19 is revised to read as follows:

### § 208.19   Determining if an asylum application is frivolous.

For applications filed on or after April 1, 1997, an applicant is subject to the provisions of section 208(d)(6) of the Act only if a final order by an immigration judge or the Board of Immigration Appeals specifically finds that the alien knowingly filed a frivolous asylum application. For purposes of this section, an asylum application is frivolous if any of its material elements is deliberately fabricated. Such finding shall only be made if the immigration judge or the Board is satisfied that the applicant, during the course of the proceedings, has had sufficient opportunity to account for any discrepancies or implausible aspects of the claim. For purposes of this section, a finding that an alien filed a frivolous asylum application shall not preclude the alien from seeking withholding of removal.

19. Newly redesignated § 208.21 is revised to read as follows:

### § 208.21   Effect on exclusion, deportation, and removal proceedings.

(a) An alien who has been granted asylum may not be deported or removed unless his or her asylum status is terminated pursuant to § 208.23 of this part. An alien in exclusion, deportation, or removal proceedings who is granted withholding of removal or deportation or deferral of removal may not be deported or removed to the country to which his or her deportation or removal is ordered withheld or deferred unless the withholding order is terminated pursuant to § 208.23 or deferral is terminated pursuant to § 208.17(d) or (e).

(b) When an alien's asylum status or withholding of removal or deportation is terminated under this part, the Service shall initiate removal proceedings under section 235 or 240 of the Act, as appropriate, if the alien is not already in exclusion, deportation, or removal proceedings or subject to a final order of removal. Removal proceedings may also be in conjunction with a termination hearing scheduled under § 208.23(e).

20. Section 208.30 is amended by:
A. Revising paragraphs (b), (d) and (e); and by
B. Revising paragraphs (f)(1), and (f)(2), and (f)(3), to read as follows:

### § 208.30   Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

*       *       *       *       *

(b) *Interview and procedure.* The asylum officer, as defined in section 235(b)(1)(E) of the Act, will conduct the interview in a nonadversarial manner, separate and apart from the general public. At the time of the interview, the asylum officer shall verify that the alien has received Form M–444, Information about Credible Fear Interview in Expedited Removal Cases. The officer shall also determine that the alien has an understanding of the credible fear determination process. The alien may be required to register his or her identity electronically or through any other means designated by the Attorney General. The alien may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, and may present other evidence, if available. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process. Any person or persons with whom the alien chooses to consult may be present at the interview

and may be permitted, in the discretion of the asylum officer, to present a statement at the end of the interview. The asylum officer, in his or her discretion, may place reasonable limits on the number of such persons who may be present at the interview and on the length of statement or statements made. If the alien is unable to proceed effectively in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. The interpreter may not be a representative or employee of the applicant's country of nationality or, if the applicant is stateless, the applicant's country of last habitual residence. The asylum officer shall create a summary of the material facts as stated by the applicant. At the conclusion of the interview, the officer shall review the summary with the alien and provide the alien with an opportunity to correct errors therein. The asylum officer shall create a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officer, and the officer's determination of whether, in light of such facts, the alien has established a credible fear of persecution or torture. The decision shall not become final until reviewed by a supervisory asylum officer.

*       *       *       *       *

(d) *Referral for an asylum hearing.* If an alien, other than an alien stowaway, is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue a Form I–862, Notice to Appear, for full consideration of the asylum and withholding of removal claim in proceedings under section 240 of the Act. Parole of the alien may only be considered in accordance with section 212(d)(5) of the Act and § 212.5 of this chapter. If an alien stowaway is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue a Form I–863, Notice to Referral to Immigration Judge, for full consideration of the asylum and withholding of removal claim in proceedings under § 208.2(b)(1).

(e) *Removal of aliens with no credible fear of persecution or torture.* If an alien is found not to have a credible fear of persecution or torture, the asylum officer shall provide the alien with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative decision, using Form I–869, Record of Negative Credible Fear Finding and

Request for Review by Immigration Judge, on which the alien shall indicate whether he or she desires such review. If the alien is not a stowaway, the officer shall also order the alien removed and issue a Form I–860, Notice and Order of Expedited Removal. If the alien is a stowaway and the alien does not request a review by an immigration judge, the asylum officer shall also refer the alien to the district director for completion of removal proceedings in accordance with section 235(a)(2) of the Act.

(f) * * *

(1) If the immigration judge concurs with the determination of the asylum officer that the alien does not have a credible fear of persecution or torture, the case shall be returned to the Service for removal of the alien. The immigration judge's decision is final and may not be appealed.

(2) If the immigration judge finds that the alien, other than an alien stowaway, possesses a credible fear of persecution or torture, the immigration judge shall vacate the order of the asylum officer issued on Form I–860 and the Service may commence removal proceedings under section 240 of the Act, during which time the alien may file an application for asylum and withholding of removal in accordance with § 208.4(b)(3)(i).

(3) If the immigration judge finds that an alien stowaway possesses a credible fear of persecution or torture, the alien shall be allowed to file an application for asylum and withholding of removal before the immigration judge in accordance with § 208.4(b)(3)(iii). The immigration judge shall decide the application as provided in that section. Such decision may be appealed by either the stowaway or the Service to the Board of Immigration Appeals. If and when a denial of the application for asylum or withholding of removal becomes final, the alien shall be removed from the United States in accordance with section 235(a)(2) of the Act. If and when an approval of the application for asylum or withholding of removal becomes final, the Service shall terminate removal proceedings under section 235(a)(2) of the Act.

21. In Subpart B, § 208.31 is added to read as follows:

**§ 208.31   Reasonable fear of persecution or torture determinations involving aliens ordered removed under section 238(b) of the Act and aliens whose removal is reinstated under section 241(a)(5) of the Act.**

(a) *Jurisdiction.* This section shall apply to any alien ordered removed under section 238(b) of the Act or whose deportation, exclusion, or removal order

is reinstated under section 241(a)(5) of the Act who, in the course of the administrative removal or reinstatement process, expresses a fear of returning to the country of removal. The Service has exclusive jurisdiction to make reasonable fear determinations, and EOIR has exclusive jurisdiction to review such determinations.

(b) *Initiation of reasonable fear determination process.* Upon issuance of a Final Administrative Removal Order under § 238.1 of this chapter, or notice under § 241.8(b) of this chapter that an alien is subject to removal, an alien described in paragraph (a) of this section shall be referred to an asylum officer for a reasonable fear determination. In the absence of exceptional circumstances, this determination will be conducted within 10 days of the referral.

(c) *Interview and Procedure.* The asylum officer shall conduct the interview in a non-adversarial manner, separate and apart from the general public. At the time of the interview, the asylum officer shall determine that the alien has an understanding of the reasonable fear determination process. The alien may be represented by counsel or an accredited representative at the interview, at no expense to the Government, and may present evidence, if available, relevant to the possibility of persecution or torture. The alien's representative may present a statement at the end of the interview. The asylum officer, in his or her discretion, may place reasonable limits on the number of persons who may be present at the interview and the length of the statement. If the alien is unable to proceed effectively in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. The interpreter may not be a representative or employee of the applicant's country or nationality, or if the applicant is stateless, the applicant's country of last habitual residence. The asylum officer shall create a summary of the material facts as stated by the applicant. At the conclusion of the interview, the officer shall review the summary with the alien and provide the alien with an opportunity to correct errors therein. The asylum officer shall create a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officers, and the officer's determination of whether, in light of such facts, the alien has established a reasonable fear of persecution or torture. The alien shall

be determined to have a reasonable fear of persecution or torture if the alien establishes a reasonable possibility that he or she would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal. For purposes of the screening determination, the bars to eligibility for withholding of removal under section 241(b)(3)(B) of the Act shall not be considered.

(d) *Authority.* Asylum officers conducting screening determinations under this section shall have the authority described in § 208.9(c).

(e) *Referral to Immigration Judge.* If an asylum officer determines that an alien described in this section has a reasonable fear of persecution or torture, the officer shall so inform the alien and issue a Form I–863, Notice of Referral to the Immigration Judge, for full consideration of the request for withholding of removal only. Such cases shall be adjudicated by the immigration judge in accordance with the provisions of § 208.16 within 10 days of the issuance of the I–863. Appeal of the immigration judge's decision shall lie to the Board of Immigration Appeals.

(f) *Removal of aliens with no reasonable fear of persecution or torture.* If the asylum officer determines that the alien has not established a reasonable fear of persecution or torture, the asylum officer shall inform the alien in writing of the decision and shall inquire whether the alien wishes to have an immigration judge review the negative decision, using Form I–898, Record of Negative Reasonable Fear Finding and Request for Review by Immigration Judge, on which the alien shall indicate whether he or she desires such review.

(g) *Review by immigration judge.* The asylum officer's negative decision regarding reasonable fear shall be subject to review by an immigration judge upon the alien's request. If the alien requests such review, the asylum officer shall serve him or her with a Form I–863. The record of determination, including copies of the Form I–863, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination. Upon review of the asylum officer's negative reasonable fear determination:

(1) If the immigration judge concurs with the asylum officer's determination that the alien does not have a reasonable

fear of persecution or torture, the case shall be returned to the Service for removal of the alien. No appeal shall lie from the immigration judge's decision.

(2) If the immigration judge finds that the alien has a reasonable fear of persecution or torture, the alien may submit Form I–589, Application for Asylum and Withholding of Removal.

(i) The immigration judge shall consider only the alien's application for withholding of removal under § 208.16 and shall determine whether the alien's removal to the country of removal must be withheld or deferred.

(ii) Appeal of the immigration judge's decision whether removal must be withheld or deferred lies to the Board of Immigration Appeals. If the alien or the Service appeals the immigration judge's decision, the Board shall review only the immigration judge's decision regarding the alien's eligibility for withholding or deferral of removal under § 208.16.

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

22. The authority citation for part 235 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1183, 1201, 1224, 1225, 1226, 1227, 1228, 1252; 8 CFR part 2.

23. Section 235.1 is amended by revising paragraph (d)(4) to read as follows:

### § 235.1   Scope of examination.

\*    \*    \*    \*    \*

(d) \*  \*  \*

(4) An alien stowaway is not an applicant for admission and may not be admitted to the United States. A stowaway shall be removed from the United States under section 235(a)(2) of the Act. The provisions of section 240 of the Act are not applicable to stowaways, nor is the stowaway entitled to further hearing or review of the removal, except that an alien stowaway who indicates an intention to apply for asylum, or expresses a fear of persecution, a fear of torture, or a fear of return to the country of proposed removal shall be referred to an asylum officer for a determination of credible fear of persecution or torture in accordance with section 235(b)(1)(B) of the Act and § 208.30 of this chapter. An alien stowaway who is determined to have a credible fear of persecution or torture shall have his or her asylum application adjudicated in accordance with § 208.2(b)(2) of this chapter.

\*    \*    \*    \*    \*

24. In section 235.3, revise paragraph (b)(4) introductory text and paragraph (b)(4)(i)(D) to read as follows:

### § 235.3   Inadmissible aliens and expedited removal.

\*    \*    \*    \*    \*

(b) \*  \*  \*

(4) *Claim of asylum or fear of persecution or torture.* If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution, a fear of torture, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with § 208.30 of this chapter to determine if the alien has a credible fear of persecution or torture. The examining immigration officer shall record sufficient information in the sworn statement to establish and record that the alien has indicated such intention, fear, or concern, and to establish the alien's inadmissibility.

(i) \*  \*  \*

(D) The consequences of failure to establish a credible fear of persecution or torture.

\*    \*    \*    \*    \*

25. In § 235.6, revise paragraphs (a)(1)(ii) and (iii), and paragraph (a)(2)(i) to read as follows:

### § 235.6   Referral to immigration judge.

(a) \*  \*  \*

(1) \*  \*  \*

(ii) If an asylum officer determines that an alien in expedited removal proceedings has a credible fear of persecution or torture and refers the case to the immigration judge for consideration of the application for asylum.

(iii) If the immigration judge determines that an alien in expedited removal proceedings has a credible fear of persecution or torture and vacates the expedited removal order issued by the asylum officer.

\*    \*    \*    \*    \*

(2) \*  \*  \*

(i) If an asylum officer determines that an alien does not have a credible fear of persecution or torture, and the alien requests a review of that determination by an immigration judge; or

\*    \*    \*    \*    \*

26. In § 235.8, add a new paragraph (b)(4), to read as follows:

### § 235.8   Inadmissibility on security and related grounds.

\*    \*    \*    \*    \*

(b) \*  \*  \*

(4) The Service shall not execute a removal order under this section under circumstances that violate section 241(b)(3) of the Act or Article 3 of the Convention Against Torture. The provisions of part 208 of this chapter relating to consideration or review by an immigration judge, the Board of Immigration Appeals, or an asylum officer shall not apply.

\*    \*    \*    \*    \*

## PART 238—EXPEDITED REMOVAL OF AGGRAVATED FELONS

27. The authority citation for part 238 continues to read s follows:

**Authority:** 8 U.S.C. 1228; 8 CFR part 2.

28. In § 238.1, revise paragraphs (b)(2)(i) and (c)(1), and add new paragraph (f)(3) to read as follows:

### § 238.1   Proceeding under section 238(b) of the Act.

\*    \*    \*    \*    \*

(b) \*  \*  \*

(2) *Notice.*

(i) Removal proceedings under section 238(b) of the Act shall commence upon personal service of the Notice of Intent upon the alien, as prescribed by §§ 103.5a(a)(2) and 103.5a(c)(2) of this chapter. The Notice of Intent shall set forth the preliminary determinations and inform the alien of the Service's intent to issue a Form I–851A, Final Administrative Removal Order, without a hearing before an immigration judge. The Notice of Intent shall constitute the charging document. The Notice of Intent shall include allegations of fact and conclusions of law. It shall advise that the alien: has the privilege of being represented, at no expense to the government, by counsel of the alien's choosing, as long as counsel is authorized to practice in removal proceedings; may request withholding of removal to a particular country if he or she fears persecution or torture in that country; may inspect the evidence supporting the Notice of Intent; may rebut the charges within 10 calendar days after service of such Notice (or 13 calendar days if service of the Notice was by mail).

\*    \*    \*    \*    \*

(c) \*  \*  \*

(1) *Time for response.* The alien will have 10 calendar days from service of the Notice of Intent or 13 calendar days if service is by mail, to file a response to the Notice of Intent. In the response, the alien may: designate his or her choice of country for removal; submit a written response rebutting the allegations supporting the charge and/or requesting the opportunity to review the Government's evidence; and/or submit a statement indicating an intention to request withholding of removal under 8 CFR 208.16 of this chapter, and/or request in writing an extension of time

for response, stating the specific reasons why such an extension is necessary.

\* \* \* \* \*

(f) \* \* \*

(3) *Withholding of removal.* If the alien has requested withholding of removal under § 208.16 of this chapter, the deciding officer shall, upon issuance of a Final Administrative Removal Order, immediately refer the alien's case to an asylum officer to conduct a reasonable fear determination in accordance with § 208.31 of this chapter.

\* \* \* \* \*

## PART 240—PROCEEDINGS TO DETERMINE REMOVABILITY OF ALIENS IN THE UNITED STATES

29. The authority citation for part 240 continues to read as follows:

**Authority:** 8 U.S.C. 1103; 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note, 1252a, 1252b, 1362; sec. 202, Pub. L. 105–100 (111 Stat. 2160, 2193); 8 CFR part 2.

30. In § 240.1, revise paragraph (a) to read as follows:

### § 240.1   Immigration Judges.

(a) *Authority.* (1) In any removal proceeding pursuant to section 240 of the Act, the immigration judge shall have the authority to:

(i) Determine removability pursuant to section 240(a)(1) of the Act; to make decisions, including orders of removal as provided by section 240(c)(1)(A) of the Act;

(ii) To determine applications under sections 208, 212(a)(2)(F), 212(a)(6)(F)(ii), 212(a)(9)(B)(v), 212(d)(11), 212(d)(12), 212(g), 212(h), 212(i), 212(k), 237(a)(1)(E)(iii), 237(a)(1)(H), 237(a)(3)(C)(ii), 240A(a) and (b), 240B, 245, and 249 of the Act and section 202 of Pub. L. 105–100;

(iii) To order withholding of removal pursuant to section 241(b)(3) of the Act and pursuant to the Convention Against Torture; and

(iv) To take any other action consistent with applicable law and regulations as may be appropriate.

(2) In determining cases referred for further inquiry, immigration judges shall have the powers and authority conferred upon them by the Act and this chapter. Subject to any specific limitation prescribed by the Act and this chapter, immigration judges shall also exercise the discretion and authority conferred upon the Attorney General by the Act as is appropriate and necessary for the disposition of such cases. An immigration judge may certify his or her decision in any case under section 240 of the Act to the Board of Immigration Appeals when it involves an unusually complex or novel question of law or fact. Nothing contained in this part shall be construed to diminish the authority conferred on immigration judges under sections 101(b)(4) and 103 of the Act.

\* \* \* \* \*

## PART 241—APPREHENSION AND DETENTION OF ALIENS ORDERED REMOVED

31. The authority citation for part 241 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1223, 1227, 1251, 1253, 1255, and 1330; 8 CFR part 2.

32. In § 241.8, revise paragraph (d) to read as follows:

### § 241.8   Reinstatement of removal orders.

\* \* \* \* \*

(d) *Exception for withholding of removal.* If an alien whose prior order of removal has been reinstated under this section expresses a fear of returning to the country designated in that order, the alien shall be immediately referred to an asylum officer for an interview to determine whether the alien has a reasonable fear of persecution or torture pursuant to § 208.31 of this chapter.

\* \* \* \* \*

33. In § 241.11, revise paragraph (d)(1) to read as follows:

### § 241.11   Detention and removal of stowaways.

\* \* \* \* \*

(d) *Stowaways claiming asylum*— (1) *Referral for credible fear determination.* A stowaway who indicates an intention to apply for asylum or a fear of persecution or torture upon return to his or her native country or country of last habitual residence (if not a national of any country) shall be removed from the vessel or aircraft of arrival in accordance with § 208.5(b) of this chapter. The immigration officer shall refer the alien to an asylum officer for a determination of credible fear in accordance with section 235(b)(1)(B) of the Act and § 208.30 of this chapter. The stowaway shall be detained in the custody of the Service pending the credible fear determination and any review thereof. Parole of such alien, in accordance with section 212(d)(5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective. A stowaway who has established a credible fear of persecution or torture in accordance with § 208.30 of this chapter may be detained or paroled pursuant to § 212.5 of this chapter during any consideration of the asylum application. In determining whether to detain or parole the alien, the Service shall consider the likelihood that the alien will abscond or pose a security risk.

\* \* \* \* \*

## PART 253—PAROLE OF ALIEN CREWMEN

34. The authority citation in part 253 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1282, 1283, 1285; 8 CFR part 2.

35. In § 253.1, revise paragraph (f) to read as follows:

### § 253.1   Parole.

\* \* \* \* \*

(f) *Crewman, stowaway, or alien removable under section 235(c) alleging persecution or torture.* Any alien crewman, stowaway, or alien removable under section 235(c) of the Act who alleges that he or she cannot return to his or her country of nationality or last habitual residence (if not a national of any country) because of fear of persecution in that country on account of race, religion, nationality, membership in a particular social group, or political opinion, or because of fear of torture is eligible to apply for asylum or withholding of removal under 8 CFR part 208. Service officers shall take particular care to ensure that the provisions of § 208.5(b) of this chapter regarding special duties toward aliens aboard certain vessels are closely followed.

\* \* \* \* \*

36. Add a new part 507 to read as follows:

## PART 507—ALIEN TERRORIST REMOVAL PROCEDURES

### § 507.1  Eligibility for Protection under the Convention Against Torture.

A removal order under Title V of the Act shall not be executed in circumstances that would violate Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention, as implemented by section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. 105–277. Convention-based claims by aliens subject to removal under this Title shall be determined by the Attorney General, in consultation with the Secretary of State.

**Authority:** Pub. L. 105–277, 112 Stat. 2681.

Dated: February 13, 1999.

**Janet Reno,**

*Attorney General.*

[FR Doc. 99–4140 Filed 2–18–99; 8:45 am]

**BILLING CODE 4410–10–P**

**U.S. Department of Justice**
Immigration and Naturalization Service

HQOPS (DDP) 50/10-C

*Office of the Executive Associate Commissioner*                    *425 I Street NW*
                                                                     *Washington, DC 20536*

OCT - 7 1998

MEMORANDUM FOR REGIONAL DIRECTORS

FROM:          Michael A. Pearson
               Executive Associate Commissioner
               Office of Field Operations

SUBJECT:       Detention Guidelines Effective October 9, 1998

As you know, the Immigration and Naturalization Service (INS) supported a legislative proposal for extension of the Transition Period Custody Rules (TPCR). This extension will allow us to continue the exercise of discretion in custody determinations. However, we expect that it will be some time before this discretion is granted with the result that as of October 9, 1998, TPCR discretionary authority will no longer be in effect. Attached with this memorandum are the detention guidelines which will be in effect as of October 9.

I recognize that 100 percent compliance with these guidelines will be virtually impossible to achieve immediately. Furthermore, 100 percent adherence to the guidelines would have major impacts on other program operations which are critical to the overall INS mission. We have met with Congressional staff to advise them of the impacts on our operations resulting from the expiration of TPCR. We have been advised that we may get future Congressional support for some type of discretionary relief from mandatory detention, but only if we can document and demonstrate that a maximum effort to comply with the detention mandates has been made. Shortly, we will provide you with guidance concerning additional data that we will need to collect and provide to Congress.

At this time, I am directing that, to the extent possible, you adhere to the detention scheme outlined in the attached and work toward utilizing 80 percent of your bedspace for mandatory detention cases. In the event that a District Director, Chief Patrol Agent, or Officer In Charge makes a custody determination which is not in keeping with the guidelines (e.g., a Category 1 case is released to make detention space for a Category 2 or 3), the reasons for the decision must be clearly documented in writing and placed in the alien's file. At any time the mandatory detention occupancy falls below 80 percent of available bedspace, the responsible field manager must notify the Regional Director.

In the event that your District Directors have released someone prior to October 9, who is now subject to detention, nothing in this memorandum should be construed as requiring their rearrest/detention. However, if conditions have changed or circumstances warrant, nothing should preclude you from exercising your authority to rearrest and detain.

AR109

ase 2:31-cv-00067-z   Document      Filed 06/22/98   Page 116 of 688   PageID 17

Additionally, each Regional Director is directed to prepare a written monthly summary
of custody determinations made by field offices within your respective jurisdictions which are
inconsistent with the attached detention guidelines. The monthly summaries will be used to
justify our need for continued discretion in detention decisions in our ongoing discussions with
the Department of Justice, the Administration, and the Congress. The first monthly summary
will be for the month ending October 31. Regions should forward the summaries to this office
not later than 1 week after the end of the month.

Attachment



**U.S. Department of Justice**
Immigration and Naturalization Service

HQOPS 50/10

*425 I Street NW*
*Washington, DC 20536*

OCT - 7 1998

**INS DETENTION USE POLICY**
**October 9, 1998**

**I.   INTRODUCTION**

This policy governs the detention of aliens and supercedes, the
Detention Use Policy issued July 14, 1997.  The purpose of this
policy is to revise the detention priorities of the Immigration
and Naturalization Service (INS) in light of the expiration of
the Transition Period Custody Rules (TPCR).  Section 236(c) of
the Immigration and Nationality Act (INA) is now in full force
and effect.  With the expiration of the TPCR, certain portions
of 8 C.F.R. § 3.19 and § 236.1, as noted in those sections, no
longer apply.

Under this policy, the four categories of alien detention are:
(1) required (with limited exceptions), (2) high priority, (3)
medium priority, and (4) lower priority.  Aliens in category 1--
required detention--must be detained, with a few exceptions.
Aliens in categories 2, 3, and 4 may be detained depending on
the availability of detention space and the facts of each case.
Aliens in category 2 should be detained before aliens in
categories 3 or 4, and aliens in category 3 should be detained
before aliens in category 4.  The District Director or Sector
Chief retains the discretion, however, to do otherwise if the
facts of a given case require.

These instructions do not apply to the detention and release of
juveniles, which is covered in other INS policies.

## II.   DEFINITIONS

- *Required detention:* Detention of certain classes of aliens required by the INA or applicable regulations. With few exceptions, aliens subject to required detention must be detained and are not eligible for release.

- *Discretionary detention:* Detention of aliens authorized but not required by the INA or applicable regulations. All aliens in proceedings are subject to discretionary detention unless they fit into one of the categories covered by required detention. Aliens subject to discretionary detention are eligible to be considered individually for release.

- *Final order of removal:* Final removal order issued by an immigration officer, an immigration judge (IJ), the Board of Immigration Appeals, or a Federal judge to an alien placed in proceedings on or after April 1, 1997. INS officers should consult District counsel on issues regarding the finality of removal orders.

- *Final order of deportation or exclusion:* Final deportation or exclusion order issued by an immigration officer, an immigration judge, the Board of Immigration Appeals, or a Federal judge to an alien placed in proceedings before April 1, 1997. INS officers should consult District counsel on issues regarding the finality of deportation or exclusion orders.

## III.   DETENTION CATEGORIES

A.   Arriving Aliens: Expedited Removal under INA § 235.

Category 1: Required detention (with exceptions)

- *Aliens in Expedited Removal.* Arriving aliens at Ports-of-Entry who are inadmissible under INA § 212(a)(6)(C) or 212(a)(7) are subject to expedited removal proceedings pursuant to INA § 235(b)(1). Any alien placed into expedited Removal must be detained until

removed from the United States and may not be released
from detention unless (1) parole is required to meet a
medical emergency or legitimate law enforcement
objective, or (2) the alien is referred for a full
removal proceeding under § 240 (for example, upon a
finding of "credible fear of persecution"). Although
parole is discretionary in all cases where it is
available, it is INS policy to favor release of aliens
found to have a credible fear of persecution, provided
that they do not pose a risk of flight or danger to the
community. See INA §§ 235(b)(1), 8 C.F.R. § 235.3.

Aliens who are ordered removed under expedited removal
and who make an unverified claim to United States
citizenship, or to lawful permanent resident, refugee,
or asylee status, are referred to an IJ for a status
review under 8 C.F.R. § 235.3(b)(5)(iv). Such aliens
must be detained pending this review, unless parole is
required to meet a medical emergency or legitimate law
enforcement objective.

If there is insufficient detention space to detain an
alien in expedited removal who arrived at a land border
Port-of-Entry and claims a fear of persecution unrelated
to Canada or Mexico, that alien may be required to wait
in Canada or Mexico pending a final determination of his
or her asylum claim. If an alien expresses a fear of
persecution related to Canada or Mexico, the alien must
be detained for proceedings and may not be required to
wait in that country for a determination of the claim.

Aliens subject to expedited removal who arrive at a land
border Port-of-Entry, but do not claim lawful status in
the United States or a fear of persecution, should be
processed immediately and detained until removed. These
aliens should not be required to wait in Mexico or
Canada pending the issuance of an expedited removal
order.

The INS may permit an alien in expedited removal to
withdraw his or her application for admission.

Note that the INS maintains approximately 1,100 User Fee beds, which are funded by the User Fee Account. The INS can only use these beds for aliens arrested in support of airport operations.

B.   Aliens in Proceedings: INA § 240 (Removal), § 238 (Expedited Removal of Criminal Aliens), Former INA § 236 (Exclusion), and Former INA § 242 (Deportation).

  1.   Category 1: Required detention (with exceptions)

  •   *Aliens subject to required detention in removal and deportation proceedings.* Pursuant to INA § 236(c), the INS must take into custody all aliens who are chargeable as terrorists, and virtually all aliens who are chargeable as criminals, upon their release from criminal incarceration or custody. § 236(c) does <u>not</u> apply to the following groups of aliens who are removable as criminals: (a) aliens who are removable under § 237 for a single crime involving moral turpitude, if they were sentenced to less than a year; (b) aliens who are removable under § 237 for a conviction for high-speed flight from an immigration checkpoint (18 U.S.C. § 758); and (c) aliens who are removable under § 237 for crimes relating to domestic violence, stalking, and the abuse or neglect of children.

    § 236(c) applies to aliens in both removal proceedings under § 240 and deportation proceedings under former § 242. Therefore, under § 236(c) the INS must continue to detain aliens who are described in that section (by their § 237 equivalents) if (a) they were previously taken into custody while in deportation proceedings (i.e., charged under § 241 in proceedings commenced prior to April 1, 1997) and (b) they are still in custody upon the expiration of the TPCR. Note that current § 236(c) does <u>not</u> apply to aliens in exclusion proceedings under former § 236.

Once in INS custody, the alien may be released during proceedings only if the Attorney General determines that it is necessary to protect a witness, a person cooperating with an investigation, or a family member of such a person. To be considered for release in the exercise of discretion, the alien must also demonstrate that release would not pose a danger to persons or property and that the alien does not pose a flight risk. See the requirements set forth at INA § 236(c)(2).

- *Aliens with aggravated felony convictions in exclusion proceedings.* The INS must detain any alien in exclusion proceedings under former § 236 (i.e., charged under § 212 in proceedings commenced prior to April 1, 1997) who has been convicted of an aggravated felony, as currently defined under INA § 101(a)(43). The INS may not parole such an alien during exclusion proceedings. Note that the expiration of the TPCR has no effect on these aliens since the TPCR did not apply to them.

2.  **Category 2: High Priority**

- Aliens removable on security and related grounds, if not subject to required detention.

- Other criminal aliens not subject to required detention.

- Aliens who are a danger to the community or a flight risk, if not subject to required detention.

- Aliens whose detention is essential for border enforcement but are not subject to required detention.

- Aliens engaged in alien smuggling, if not subject to required detention.  AR114

3.  Category 3: Medium Priority

*   Inadmissible, non-criminal arriving aliens who are not
    in expedited removal proceedings and are not subject
    to required detention.

*   Aliens who have committed fraud before the INS, if not
    subject to required detention.

*   Aliens apprehended at the worksite who have committed
    fraud in obtaining employment, if not subject to
    required detention.

4.  Category 4: Low Priority

*   Other removable aliens, if not subject to required
    detention.

*   Aliens originally placed in expedited removal who have
    been referred for a full removal proceeding under §
    240 upon a finding of a "credible fear of
    persecution." See the discussion at section A.1 above
    regarding the INS policy favoring release.

C.  Aliens with Final Orders of Removal, Deportation, or
    Exclusion.

    1.  Category 1: Required detention (with exceptions)

    *   All aliens who have final orders of removal and all
        aliens who have final orders of deportation and are
        subject to required detention. This category includes
        all aliens ordered removed under revised § 240,
        whether or not they are terrorists or criminals, and
        all criminal aliens ordered removed under revised §
        238. It also includes all terrorist and criminal
        aliens ordered deported under former § 242 if subject
        to required detention under § 236(c).

        Revised INA § 241(a) requires the INS to remove within
        90 days any of the aliens in this category. The alien

may not be released during this 90-day period.   See
INA § 241(a)(2).

Aliens whom INS is unable to remove within 90 days
should be released under an order of supervision.   See
INA § 241(a)(3).   However, the INS may continue to
detain certain aliens, including, among others, those
who are inadmissible on any ground; deportable or
removable on criminal or security grounds; dangerous;
or flight risks.   See INA § 241(a)(6).

● *Aliens with final orders under expedited removal.*   The
INS must detain aliens who have been issued final
orders under expedited removal (revised § 235(b)(1))
on grounds of being inadmissible under INA §
212(a)(6)(C) or § 212(a)(7).   Pending immediate
removal, the INS must detain such an alien.   However,
the INS may stay the removal of such an alien if
removal is not practicable or proper, or if the alien
is needed to testify in a criminal prosecution.   See
INA § 241(c)(2).

● Aliens convicted of aggravated felonies with final
orders of exclusion.   The INS must continue to detain
until removal any alien with a final order of
exclusion (i.e., charged under section 212 in
proceedings commenced prior to April 1, 1997) who has
been convicted of an aggravated felony, as currently
defined under INA § 101(a)(43).   The INS may not
parole such an alien unless the alien is determined to
be unremovable pursuant to old INA § 236(e)(2) and the
alien meets the criteria for release under that
provision.   See former INA § 236(e) (as designated
prior to April 1, 1997) and the Mariel Cuban parole
regulations at 8 C.F.R. §§ 212.12 and 212.13.

2.   Category 2: High Priority

● *Aliens with final orders of deportation (if not
terrorists or criminals subject to required detention
under § 236(c) and § 241(a)) or exclusion (if not
aggravated felons).* AR1165 placed into proceedings

prior to April 1, 1997, who were or are ordered
deported or excluded, are only subject to required

- detention if terrorists or convicted of certain
  crimes.  See part C.1 above.  Otherwise, they are
  subject to discretionary detention and, once they have
  a final order of deportation or exclusion, their
  detention should ordinarily be a high priority.

  Please note that the 6-month rule of former INA
  § 242(c) and (d), which regards detention and release,
  continues to apply to these non-terrorist and non-
  criminal aliens with final orders of deportation.
  Non-aggravated felon aliens with final orders of
  exclusion may be paroled from custody in the
  discretion of the INS.

## IV.   GENERAL DIRECTIONS

## A.   Category 1

- Aliens subject to required detention shall have first
  priority for all available[1] INS detention space.

- With the exceptions noted above, category 1 aliens
  shall be detained.

- Each Region should ensure that it maintains sufficient
  non-criminal detention space to provide basic support
  for its full spectrum of law enforcement objectives.
  However, with the exception of this basic level of
  non-criminal detention space, each Region, District,

---

[1] Available detention space means space that is both available and
suitable for the detention of the alien in question.  For example, an
alien terrorist subject to required detention would have first
priority for all INS beds suitable for the detention of terrorists.
No alien should be detained in an INS bed unsuitable for that alien's
detention (regardless of the detention category).

- and Sector must seek to comply with the detention priorities outlined above.

  If a category 1 alien comes into INS custody but no detention space is available locally, the responsible office should pursue the following options in rank order:

  1) acquire additional detention space locally, securing funds from the Region if necessary;

  2) transfer the alien to another INS District or Region where space or funding is available;

  3) release an alien in local INS custody who is not subject to required detention (i.e., an alien in category 2, 3, or 4) to make space for the category 1 alien; or

  4) release an alien in INS custody in another District who is not subject to required detention (i.e., an alien in category 2, 3, or 4) to make space for the category 1 alien.

- If a category 1 alien comes into INS custody when all INS criminal beds nationwide (i.e., beds not reserved for juveniles, User Fee operations, or non-criminal detention) are occupied by other category 1 aliens and there are no additional detention funds available, the responsible office should contact its Regional Director to arrange for the release of a lower-priority category 1 alien in order to permit the detention of a higher-priority category 1 alien.

- INA § 236(c) does not require the INS to arrest any alien who is described in that section but was released from criminal incarceration or custody previously. However, if the INS later encounters such an alien in a non-custodial setting and elects to initiate immigration proceedings, the alien is subject to required detention. ART118

• INA § 236(c) does not require the INS to re-arrest any alien who is described in that section but was released from INS custody under the TPCR.

However, the INS may re-arrest such an alien under INA § 236(b) if conditions have changed or if circumstances otherwise warrant.

## B.   Categories 2, 3, and 4

• Aliens in categories 2, 3, or 4 should generally be detained according to rank, higher priorities before lower priorities. Exceptions to this general rule may be made as follows:

   1) The District Director or Sector Chief may make an exception in individual cases if local circumstances require.

   2) The Regional Director, with the concurrence of the Executive Associate Commissioner for Field Operations, may make an exception to accommodate special regional enforcement initiatives.

   3) The Executive Associate Commissioner for Field Operations may make an exception to accommodate special national enforcement initiatives or to address an emergency.

## C.   Juvenile Aliens

• This Detention Use Policy does not apply to juvenile aliens or juvenile detention space. Please refer to the instructions for the detention and release of juvenile aliens issued previously.

AR119

June 10, 2005                                         IPP 05 1562

MEMORANDUM FOR:      DIRECTORS, FIELD OPERATIONS
                     DIRECTOR, PRECLEARANCE OPERATIONS

FROM:                Assistant Commissioner
                     Office of Field Operations

SUBJECT:             Treatment of Cuban Asylum Seekers at Land Border
                     Ports of Entry

This memorandum amends current policy with respect to Cubans who arrive at
land border ports of entry and seek asylum, and provides that such aliens should
be placed in proceedings pursuant to section 240 of the Immigration and
Nationality Act (INA) rather than in expedited removal proceedings. To that
extent, it revises the procedures set forth in a January 29, 2002 memorandum
issued by the former Immigration and Naturalization Service (INS) and entitled
"Aliens Seeking Asylum at Land Border Ports-of-Entry". The revision brings the
treatment of Cubans arriving at land border ports of entry in line with that of
Cubans arriving at airports, by sea, or between ports of entry at specified
locations.

The differential treatment of Cubans dates back to the passage of the Cuban
Adjustment Act of 1966, Pub. L. No. 89-732, 80 Stat. 1161 (1966). Under the
Cuban Adjustment Act of 1966, natives or citizens of Cuba are eligible for
adjustment of status to lawful permanent resident provided they meet the
following criteria. First, a native or citizen of Cuba must be inspected and
admitted or paroled into the United States. Second, he or she must apply for
adjustment of status and be eligible for admission as an immigrant. Finally, a
native or citizen of Cuba must be physically present in the United States for one
year prior to submitting an application for adjustment of status.

Natives or citizens of Cuba do not have to be refugees in order to qualify for legal
permanent resident status under the Cuban Adjustment Act of 1966. See Matter
of Mason, 12 I & N Dec. 699 (BIA 1968). In other words, the refugee status of
natives or citizens of Cuba has been determined to be irrelevant to their eligibility
for adjustment. See General Counsel Opinion 91-85 (July 24, 1991). However,
as a practical matter, natives or citizens of Cuba often seek asylum at land

border ports of entry in order to obtain parole and to document their physical presence in the United States.

The January 29, 2002 memorandum established procedures for the processing of third-country nationals who present themselves at land border ports of entry and seek asylum in the United States. It instructed immigration inspectors to treat all such aliens as applicants for admission. Furthermore, the memorandum instructed them to place asylum-seekers at land border ports of entry into expedited removal proceedings and to detain them pending a final determination of credible fear in accordance with section 235(b) of the INA.

Accordingly, immigration inspectors placed all Cubans found to be inadmissible under section 212(a)(6)(C) or (7) of the INA at land border ports of entry into expedited removal proceedings, referred them for a credible fear interview, and detained them pending a final determination. Most Cubans interviewed by asylum officers were determined to have a credible fear of persecution or torture, placed in section 240 proceedings, and paroled until the date of their removal hearing before an immigration judge. With regard to natives and citizens of Cuba, this policy has resulted in an inefficient use of detention space at land border ports of entry.

This memorandum amends the policy of the former INS in that it addresses circumstances in which expedited removal may not be appropriate for aliens eligible for relief under the Cuban Adjustment Act. Natives or citizens of Cuba who arrive at land border ports of entry should now be processed for section 240 proceedings without lodging additional charges as required by 8 CFR § 235.3 for aliens of other nationalities. They may apply for adjustment of status under the Cuban Adjustment Act in section 240 proceedings or pursue their claim of asylum before the immigration judge. See Matter of Artigas, 23 I & N Dec. 99 (BIA 2001) (holding that an Immigration Judge has jurisdiction to adjudicate an application for adjustment of status under the Cuban Adjustment Act).

A native or citizen of Cuba may be paroled from the land border port of entry while awaiting section 240 proceedings provided three conditions have been met: (1) CBP has firmly established the identity of the alien; (2) CBP has conducted all available background checks; and (3) CBP determines that the alien does not pose a terrorist or criminal threat to the United States. Except in exceptional circumstances, a CBP Officer should not parole a native or citizen of Cuba into the United States for the sole purpose of applying for adjustment under the Cuban Adjustment Act without initiating section 240 proceedings.

Pursuant to section 235(b)(2)(C) of the INA, a native or citizen of Cuba may also be returned to contiguous territory pending section 240 proceedings. A CBP Officer should consider this option only if: (1) the alien can not demonstrate eligibility for the exercise of parole discretion; (2) the alien has valid immigration status in Canada or Mexico; (3) Canadian or Mexican border officials express a

willingness to accept the returning alien; and (4) the alien's claim of fear of persecution or torture does not relate to Canada or Mexico.

The attached field guidance contains detailed instructions regarding the processing of natives or citizens of Cuba at land border ports of entry.   In addition, it lays out procedures developed in the January 2002 memorandum for handling the withdrawal of an application for admission in lieu of initiating expedited removal proceedings.

If you have any questions, please contact Linda Loveless, Director, Immigration Policy, at (202) 344-1438.

/S/ William S. Heffelfinger III for

Jayson P. Ahern

ATTACHMENT

**Chapter 17.15(a) of the Inspector's Field Manual is revised to read as follows:**

(5) <u>Aliens seeking asylum at land border ports of entry</u>.

Section 235(b) of the INA does not provide for an affirmative asylum application process at a port of entry. Therefore, an officer should consider an alien who arrives at a land border port-of-entry and seeks asylum to be an applicant for admission by operation of law. The alien will most likely be inadmissible under section 212(a)(7)(A)(i) of the INA as an intending immigrant without proper documentation or under section 212(a)(6)(C) of the INA as an immigration violator with fraudulent documents. As a result, he or she will be subject to expedited removal proceedings.

Except as noted below, the alien, if otherwise subject, should be placed in expedited removal proceedings, referred for a credible fear interview, and detained pending a final determination of a credible fear of persecution or torture. See INA § 235(b)(1)(B)(iii)(IV); 8 CFR § 235.3(b)(4)(ii). Once it has been determined that an alien has a credible fear of persecution or torture, DHS may continue to detain the alien or parole the alien from custody, as appropriate.

(6) <u>Cuban asylum seekers at land border ports-of-entry</u>.

Natives or citizens of Cuba arriving at land border ports of entry, whose immediate removal from the United States is highly unlikely, should be placed directly into section 240 proceedings in lieu of expedited removal, without lodging additional charges. These aliens may be paroled directly from the port of entry while awaiting removal proceedings if identity is firmly established, all available background checks are conducted, and the alien does not pose any terrorist or criminal threat. Pursuant to section 235(b)(2)(C) of the INA, they may also be returned to contiguous territory pending removal proceedings under section 240 of the INA. This option should only be considered if the alien is not eligible for the exercise of parole discretion, the alien has valid status in Canada or Mexico, Canadian or Mexican border officials are willing to accept the alien back, and the claim of fear of persecution is unrelated to Canada or Mexico.

An officer should not parole a native or citizen of Cuba from a land border port of entry for the sole purpose of allowing the alien to apply for adjustment under the Cuban Adjustment Act of 1966, Pub. L. 89-732, 80 Stat. 1161 (1966), without initiating section 240 proceedings. The Cuban Adjustment Act (CAA) provides that any native or citizen of Cuba who has been admitted or paroled into the United States, *and who is otherwise admissible as an immigrant*, may adjust status to that of a lawful permanent resident after being physically present in the United States for at least one year. It does not, however, require an officer to

parole a native or citizen of Cuba at a port of entry without regard to public safety.  Therefore, an officer should grant parole to a native or citizen of Cuba only if the alien does not pose a criminal or terrorist threat to the United States.

**Chapter 17.15(c) of the Inspector's Field Manual is revised to read as follows:**

(c)  <u>Withdrawal of application for admission in lieu of an expedited removal order.</u>

DHS has the discretion to allow an inadmissible alien to voluntarily withdraw his or her application for admission and to depart the United States in accordance with section 235(a)(4) of the INA.  This discretion applies to aliens subject to expedited removal, and should be applied carefully and consistently, since an officer's decision to allow withdrawal or issue a removal order is final.  Officers should keep in mind that an order of expedited removal carries with it all the penalties of an order of removal issued by an immigration judge (including a bar to reentry of at least 5 years following removal pursuant to section 212(a)(9)(A)(i)).

Follow the guidelines contained in Chapter 17.2 to determine whether an alien's withdrawal of an application for admission or asylum claim best serves the interest of justice.  An officer's decision to permit withdrawal of an application for admission must be properly documented by means of a Form I-275, Withdrawal of Application for Admission/Consular Notification, to include the facts surrounding the voluntary withdrawal and the withdrawal of the asylum claim.  In addition, an officer should prepare a new sworn statement, or an addendum to the original sworn statement on Form I-867A&B, covering the facts pertaining to the alien's withdrawal of the asylum claim.

An alien may not be pressured into withdrawing his or her application for admission or asylum claim under any circumstances.  An officer must provide adequate interpretation to ensure that the alien understands the expedited removal process and the effects of withdrawing an application for admission or an asylum claim.  Furthermore, an asylum officer must be consulted before an alien who has expressed a fear of return to his or her home country may be permitted to withdraw an asylum claim.

If an officer permits an alien to withdraw his or her application for admission and elects to return the alien to Canada or Mexico, the Form I-275 should indicate the alien's status in Canada or Mexico and the basis for determination of that status.  This determination may be based on contacts with Canadian or Mexican authorities, stamps in the alien's passport, or other available documentation.  The narrative on Form I-275 should also indicate

- 6 -

that the alien has not expressed concern about returning to Canada or Mexico.

If the alien expresses any concern or reluctance about returning to Canada or Mexico and wishes to pursue the asylum claim in the United States, the officer should advise the alien that he or she will be placed in the expedited removal process, unless subject to section 240 proceedings by statute, regulation, or policy, and will be detained pending the credible fear determination.  The alien should not be given the Form I-589, Application for Asylum and for Withholding of Removal, nor should an affirmative asylum interview be scheduled at the port of entry.

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**
**Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture**

| | |
|---|---|
| **DISTRIBUTION:** | ICE |
| **DIRECTIVE NO.:** | 11002.1 |
| **ISSUE DATE:** | December 8, 2009 |
| **EFFECTIVE DATE:** | January 4, 2010 |
| **SUPERSEDES:** | See section 3. |
| **FEA NUMBER:** | 601-05 |

1. **PURPOSE.** The purpose of this ICE policy directive is to ensure transparent, consistent, and considered ICE parole determinations for arriving aliens seeking asylum in the United States. This directive provides guidance to Detention and Removal Operations (DRO) Field Office personnel for exercising their discretion to consider the parole of arriving aliens processed under the expedited removal provisions of section 235 of the Immigration and Nationality Act (INA) who have been found to have a "credible fear" of persecution or torture by U.S. Citizenship and Immigration Services (USCIS) or an immigration judge of the Executive Office for Immigration Review. This directive establishes a quality assurance process that includes record-keeping requirements to ensure accountability and compliance with the procedures set forth herein.

1.1. This directive does not apply to aliens in DRO custody under INA § 236. This directive applies only to arriving aliens who have been found by USCIS or an immigration judge to have a credible fear of persecution or torture.

2. **AUTHORITIES/REFERENCES.**

2.1. INA §§ 208, 212(d)(5), 235(b), and 241(b)(3); 8 U.S.C. §§ 1158, 1182(d)(5), 1225(b), and 1231(b)(3); 8 C.F.R. §§ 1.1(q), 208.30(e)-(f), 212.5 and 235.3.

2.2. Department of Homeland Security Delegation Number 7030.2, "Delegation of Authority to the Assistant Secretary for the Bureau of Immigration and Custom Enforcement" (Nov. 13, 2004).

2.3. ICE Delegations of Authority to the Directors, Detention and Removal and Investigations and to Field Office Directors, Special Agents in Charge and Certain Other Officers of the Bureau of Immigration and Customs Enforcement, No. 0001 (June 6, 2003).

3. **SUPERSEDED POLICIES AND GUIDANCE.** The following ICE directive is hereby superseded:

3.1. ICE Policy Directive No. 7-1.0, "Parole of Arriving Aliens Found to Have a 'Credible Fear' of Persecution or Torture" (Nov. 6, 2007).

4.    **BACKGROUND.**

4.1.    Arriving aliens processed under the expedited removal provisions of INA §235(b) may pursue asylum and related forms of protection from removal if they successfully demonstrate to USCIS or an immigration judge a credible fear of persecution or torture.

4.2.    Arriving aliens who establish a credible fear of persecution or torture are to be detained for further consideration of the application for asylum. INA § 235(b)(1)(B)(ii). Such aliens, however, may be paroled on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit," provided the aliens present neither a security risk nor a risk of absconding. 8 C.F.R. § 212.5(b); *see also* 8 C.F.R. § 235.3(c) (providing that aliens referred for INA § 240 removal proceedings, including those who have a credible fear of persecution or torture, may be paroled under § 212.5(b) standards).

4.3.    The applicable regulations describe five categories of aliens who may meet the parole standards based on a case-by-case determination, provided they do not present a flight risk or security risk: (1) aliens who have serious medical conditions, where continued detention would not be appropriate; (2) women who have been medically certified as pregnant; (3) certain juveniles; (4) aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; and (5) aliens whose continued detention is not in the public interest. *See* 8 C.F.R. § 212.5(b). *But compare* 8 C.F.R. § 235.3(b)(4)(ii) (stating that arriving aliens who have not been determined to have a credible fear will not be paroled unless parole is necessary in light of a "medical emergency or is necessary for a legitimate law enforcement objective").

4.4.    While the first four of these categories are largely self-explanatory, the term "public interest" is open to considerable interpretation. This directive explains how the term is to be interpreted by DRO when it decides whether to parole arriving aliens determined to have a credible fear. The directive also mandates uniform record-keeping and review requirements for such decisions. Parole remains an inherently discretionary determination entrusted to the agency; this directive serves to guide the exercise of that discretion.

5.    **DEFINITIONS:**

5.1.    **Arriving Alien.** For purposes of this directive, "arriving alien" has the same definition as provided for in 8 C.F.R. § 1.1(q) and 1001.1(q).

5.2.    **Credible Fear.** For purposes of this directive, with respect to an alien processed under the INA § 235(b) "expedited removal" provisions, "credible fear" means a finding by USCIS or an immigration judge that, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts

2

as are known to the interviewing USCIS officer or immigration judge, there is a significant possibility that alien could establish eligibility for asylum under INA § 208, withholding of removal under INA § 241(b)(3), or protection from removal under the Convention Against Torture.

5.3.   **Parole.** For purposes of this directive, "parole" is an administrative measure used by ICE to temporarily authorize the release from immigration detention of an inadmissible arriving alien found to have a credible fear of persecution or torture, without lawfully admitting the alien. Parole does not constitute a lawful admission or a determination of admissibility, *see* INA §§ 212(d)(5)(A), 101(a)(13)(B), and reasonable conditions may be imposed on the parole, *see* 8 C.F.R. § 212.5(d). By statute, parole may be used, in the discretion of ICE and under such conditions as ICE may prescribe, only for urgent humanitarian reasons or for significant public benefit. As interpreted by regulation, "urgent humanitarian reasons" and "significant public benefit" include the five categories set forth in 8 C.F.R. § 212.5(b) and listed in paragraph 4.3 of this directive, including the general category of "aliens whose continued detention is not in the public interest."

## 6.   POLICY.

6.1.   As soon as practicable following a credible fear determination by USCIS for an arriving alien detained by DRO, DRO shall provide the alien with the attached *Parole Advisal and Scheduling Notification*. This form informs the alien that he or she will be interviewed for potential parole from DRO custody and notifies the alien of the date of the scheduled interview and the deadline for submitting any documentary material supporting his or her eligibility for parole. The contents of the notification shall be explained to such aliens in a language they understand. In determining whether detained arriving aliens found to have a credible fear should be paroled from custody, DRO shall proceed in accordance with the terms of this directive.

6.2.   Each alien's eligibility for parole should be considered and analyzed on its own merits and based on the facts of the individual alien's case. However, when an arriving alien found to have a credible fear establishes to the satisfaction of DRO his or her identity and that he or she presents neither a flight risk nor danger to the community, DRO should, absent additional factors (as described in paragraph 8.3 of this directive), parole the alien on the basis that his or her continued detention is not in the public interest. DRO Field Offices shall uniformly document their parole decision-making processes using the attached *Record of Determination/Parole Determination Worksheet*.

6.3.   Consistent with the terms of this directive, DRO shall maintain national and local statistics on parole determinations and have a quality assurance process in place to monitor parole decision-making, as provided for in sections 7 and 8 of this directive.

3

6.4.    In conducting parole determinations for arriving aliens in custody after they are found to have a credible fear of persecution or torture, DRO shall follow the procedures set forth in section 8 of this directive.

6.5.    DRO shall provide every alien subject to this directive with written notification of the parole decision, including a brief explanation of the reasons for any decision to deny parole. When DRO denies parole under this directive, it should also advise the alien that he or she may request redetermination of this decision based upon changed circumstances or additional evidence relevant to the alien's identity, security risk, or risk of absconding. DRO shall ensure reasonable access to translation or interpreter services if notification is provided to the alien in a language other than his or her native language and the alien cannot communicate effectively in that language.

6.6.    Written notifications of parole decisions shall be provided to aliens subject to this directive and, if represented, their representative within seven days of the date an alien is initially interviewed for parole or the date the alien requests a parole redetermination, absent reasonable justification for delay in providing such notification.

6.7.    A decision to grant or deny parole shall be prepared by a DRO officer assigned such duties within his or her respective DRO Field Office. The decision shall pass through at least one level of supervisory review, and concurrence must be finally approved by the Field Office Director (FOD), Deputy FOD (DFOD), or Assistant FOD (AFOD), where authorized by the FOD.

7.    **RESPONSIBILITIES.**

7.1.    The **DRO Director** is responsible for the overall management of the parole decision-making process for arriving aliens in DRO custody following determinations that they have a credible fear of persecution or torture.

7.2.    The **DRO Assistant Director for Operations** is responsible for:

1)  Ensuring considered, consistent DRO parole decision-making and recordkeeping nationwide in cases of arriving aliens found to have a credible fear;

2)  Overseeing monthly tracking of parole statistics by all DRO Field Offices for such cases; and

3)  Overseeing an effective national quality assurance program that monitors the Field Offices to ensure compliance with this directive.

7.3.    **DRO Field Office Directors** are responsible for:

1)  Implementing this policy and quality assurance processes;

4

2) Maintaining a log of parole adjudications for credible fear cases within their respective geographic areas of responsibility, including copies of the *Record of Determination/Parole Determination Worksheet*;

3) Providing monthly statistical reports on parole decisions for arriving aliens found to have a credible fear;

4) Making the final decision to grant or deny parole for arriving aliens found to have a credible fear within their respective areas of responsibility or, alternatively, delegating such responsibility to their DFODs or AFODs (in which case, FODs nevertheless retain overall responsibility for their office's compliance with this directive regardless of delegating signatory responsibility to DFODs or AFODs); and

5) Ensuring that DRO field personnel within their respective areas of responsibility who will be assigned to make parole determinations are familiar with this directive and corresponding legal authorities.

7.4.    **DRO Deputy Field Office Directors** are responsible for reviewing, and forwarding for their respective FODs' approval, parole decisions prepared by their subordinates in the cases of arriving aliens found to have a credible fear of persecution or torture. Alternatively, DFODs delegated responsibility under paragraph 7.3 of this directive are responsible for discharging final decision-making authority over parole determinations in such cases within their respective areas of responsibility.

7.5.    **Assistant Field Office Directors** are responsible for reviewing, and forwarding for their respective DFODs' or FODs' approval, parole decisions prepared by their subordinates in the cases of arriving aliens found to have a credible fear of persecution or torture. Alternatively, AFODs delegated responsibility under paragraph 7.3 of this directive are responsible for discharging final decision-making authority over parole determinations in such cases within their respective areas of responsibility.

7.6.    As applicable, **DRO field personnel** so assigned by their local chains-of-command are responsible for providing detained arriving aliens found to have a credible fear with the attached *Parole Advisal and Scheduling Notification* and for fully and accurately completing the attached *Record of Determination/Parole Determination Worksheet* in accordance with this directive and corresponding legal authorities.

## 8.    PROCEDURES.

8.1.    As soon as practicable following a finding that an arriving alien has a credible fear, the DRO Field Office with custody of the alien shall provide the attached *Parole Advisal and Scheduling Notification* to the alien and explain the contents of the notification to the alien in a language he or she understands, through an interpreter if

5

necessary. The Field Office will complete the relevant portions of the notification, indicating the time when the alien will receive an initial interview on his or her eligibility for parole and the date by which any documentary evidence the alien wishes considered should be provided, as well as instructions for how any such information should be provided.

8.2     Unless an additional reasonable period of time is necessary (e.g., due to operational exigencies or an alien's illness or request for additional time to obtain documentation), no later than seven days following a finding that an arriving alien has a credible fear, a DRO officer familiar with the requirements of this directive and corresponding legal authorities must conduct an interview with the alien to assess his or her eligibility for parole. Within that same period, the officer must complete the *Record of Determination/Parole Determination Worksheet* and submit it for supervisory review. If the officer concludes that parole should be denied, the officer should draft a letter to this effect for the FOD's, DFOD's, or AFOD's signature to be provided to the alien or the alien's representative and forward this letter for supervisory review along with the completed *Record of Determination/Parole Determination Worksheet*. The letter must include a brief explanation of the reasons for denying parole and notify the alien that he or she may request redetermination of parole based upon changed circumstances or additional evidence relevant to the alien's identity, security risk, or risk of absconding.

8.3.    An alien should be paroled under this directive if DRO determines, in accordance with paragraphs (1) through (4) below, that the alien's identity is sufficiently established, the alien poses neither a flight risk nor a danger to the community, and no additional factors weigh against release of the alien.

1) Identity.

   a) Although many individuals who arrive in the United States fleeing persecution or torture may understandably lack valid identity documentation, asylum-related fraud is of genuine concern to ICE, and DRO must be satisfied that an alien is who he or she claims to be before releasing the alien from custody.

   b) When considering parole requests by an arriving alien found to have a credible fear, Field Office personnel must review all relevant documentation offered by the alien, as well as any other information available about the alien, to determine whether the alien can reasonably establish his or her identity.

   c) If an alien lacks valid government-issued documents that support his or her assertion of identity, Field Office personnel should ask whether the alien can obtain government-issued documentation of identity.

6

d) If the alien cannot reasonably provide valid government-issued evidence of identity (including because the alien reasonably does not wish to alert that government to his or her whereabouts), the alien can provide for consideration sworn affidavits from third parties. However, third-party affiants must include copies of valid, government issued photo-identification documents and fully establish their own identities and addresses.

e) If government-issued documentation of identity or third-party affidavits from reliable affiants are either not available or insufficient to establish the alien's identity on their own, Field Office personnel should explore whether the alien is otherwise able to establish his or her identity through credible statements such that there are no substantial reasons to doubt the alien's identity.

2) Flight Risk.

a) In order to be considered for release, an alien determined to have a credible fear of persecution or torture must present sufficient evidence demonstrating his or her likelihood of appearing when required.

b) Factors appropriate for consideration in determining whether an alien has made the required showing include, but are not limited to, community and family ties, employment history, manner of entry and length of residence in the United States, stability of residence in the United States, record of appearance for prior court hearings and compliance with past reporting requirements, prior immigration and criminal history, ability to post bond, property ownership, and possible relief or protection from removal available to the alien.

c) Field Office personnel shall consider whether setting a reasonable bond and/or entering the alien in an alternative-to-detention program would provide reasonable assurances that the alien will appear at all hearings and depart from the United States when required to do so.

d) Officers should exercise their discretion to determine what reasonable assurances, individually or in combination, are warranted on a case-by-case basis to mitigate flight risk. In any event, the alien must be able to provide an address where he or she will be residing and must timely advise DRO of any change of address.

7

3) Danger to the Community.

   a) In order for an alien to be considered for parole, Field Office personnel must make a determination whether an alien found to have a credible fear poses a danger to the community or to U.S. national security.

   b) Information germane to the determination includes, but is not limited to, evidence of past criminal activity in the United States or abroad, of activity contrary to U.S. national security interests, of other activity giving rise to concerns of public safety or danger to the community (including due to serious mental illness), disciplinary infractions or incident reports, and any criminal or detention history that shows that the alien has harmed or would likely harm himself or herself or others.

   c) Any evidence of rehabilitation also should be weighed.

4) Additional Factors.

   a) Because parole remains an inherently discretionary decision, in some cases there may be exceptional, overriding factors that should be considered in addition to the three factors discussed above. Such factors may include, but are not limited to, serious adverse foreign policy consequences that may result if the alien is released or overriding law enforcement interests.

   b) Field Office personnel may consider such additional factors during the parole decision-making process.

8.4.   Assigned DRO officers should, where appropriate, request that parole applicants provide any supplementary information that would aid the officers in reaching a decision. The *Record of Determination/Parole Determination Worksheet* should be annotated to document the request for supplementary information and any response from the detainee.

8.5.   After preparing and signing the *Record of Determination/Parole Determination Worksheet*, and in the case of a denial of parole, drafting a written response to the alien, the assigned DRO officer shall forward these materials and the parole request documentation to his or her first-line supervisor for review and concurrence.

8.6.   Upon his or her concurrence, the first-line supervisor shall sign the *Record of Determination/Parole Determination Worksheet* where indicated and forward it, along with any related documentation, to the FOD (or, where applicable, the DFOD or AFOD) for final approval.

8.7.   The FOD (or, where applicable, the DFOD or AFOD) shall review the parole documentation, consult with the preparing officer and supervisor as necessary, and

8

either grant or deny parole by signing the *Record of Determination/Parole Determination Worksheet* where indicated and, in the case of a denial, signing the written response to the alien.

8.8.   Following a final decision by the FOD to deny parole (or, where applicable, the DFOD or AFOD), the Field Office shall provide the written response to the alien or, if represented, to the alien's legal representative, indicating that parole was denied. If parole is granted, the Field Office shall provide the alien with a date-stamped I-94 Form bearing the following notation: **"Paroled under 8 C.F.R. § 212.5(b). Employment authorization not to be provided on this basis."**

8.9.   If an alien makes a written request for redetermination of an earlier decision denying parole, the Field Office may, in its discretion, reinterview the alien or consider the request based solely on documentary material already provided or otherwise of record.

8.10.  The supporting documents and a copy of the parole decision sent to the alien (if applicable), the completed *Record of Determination/Parole Determination Worksheet*, and any other documents related to the parole adjudication should be placed in the alien's A-file in a record of proceeding format. In addition, a copy of the *Record of Determination/Parole Determination Worksheet* shall be stored and maintained under the authority of the FOD for use in preparing monthly reports.

8.11.  On a monthly basis, FODs shall submit reports to the Assistant Director for Operations, or his or her designee, detailing the number of parole adjudications conducted under this directive within their respective areas of responsibility, the results of those adjudications, and the underlying basis of each Field Office decision whether to grant or deny parole. The Assistant Director for Operations, or his or her designee, in conjunction with appropriate DRO Headquarters components, will analyze this reporting and collect individual case information to review in more detail, as warranted. In particular, this analysis will rely on random sampling of all reported cases for in-depth review and will include particular emphasis on cases where parole was not granted because of the presence of additional factors, per paragraph 8.3(4) of this directive. Any significant or recurring deficiencies identified during this monthly analysis should be explained to the affected Field Office, which will take appropriate corrective action.

8.12.  At least once every six months, the Assistant Director for Operations, or his or her designee, shall prepare a thorough and objective quality assurance report, examining the rate at which paroled aliens abscond and the Field Offices' parole decision-making, including any noteworthy trends or corrective measures undertaken based upon the monthly quality assurance analysis required by paragraph 8.11 of this directive.

9

9.    **ATTACHMENTS.**

- *Parole Advisal and Scheduling Notification.*
- *Record of Determination/Parole Determination Worksheet.*

10.   **NO PRIVATE RIGHTS CREATED.**  This directive is an internal policy statement of ICE.  It is not intended to, shall not be construed to, may not be relied upon to, and does not create, any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

**Approved:**   _____

John Morton
Assistant Secretary
U.S. Immigration and Customs Enforcement

Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture

AR135

# OFFICE OF INSPECTOR GENERAL

# U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract (Redacted)



**November 30, 2017**

**OIG-18-22**

FOR OFFICIAL USE ONLY

# DHS OIG HIGHLIGHTS

## *U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract*

### November 30, 2017

## Why We Did This Audit

Representative Raúl M. Grijalva requested that we review U.S. Immigration and Customs Enforcement's (ICE) decision to award GEO Care, LLC a contract to establish a Family Case Management Program (FCMP). We sought to determine whether ICE awarded the FCMP contract in accordance with laws, regulations, and guidance. We also conducted a limited review of post-award contract modifications.

## What We Recommend

We did not make any recommendations in this report.

**For Further Information:**

Contact our Office of Public Affairs at (202) 254-4100, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov

# What We Found

FCMP is an alternative to detention that uses case managers to ensure participants comply with their release conditions, such as attending court hearings, while allowing them to remain in their community as they move through immigration proceedings. In September 2015, ICE awarded the first contracts for case management services in five cities to GEO Care, LLC, a subsidiary of The GEO Group, Inc.

We determined that ICE properly awarded FCMP contracts. Specifically, ICE complied with Federal requirements for open competition; evaluated each vendor's proposal based on technical capabilities, past performance, and price; and supported its determination that GEO Care's proposals represented the best value for the Government.

Price was the determining factor in this acquisition, which is consistent with the evaluation methodology established in ICE's request for proposals.

Losing bidders' pricing was redacted from the report to protect proprietary information pursuant to FAR 3.104-4.

FOR OFFICIAL USE ONLY

**OFFICE OF INSPECTOR GENERAL**

Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

NOV 30 2107

MEMORANDUM FOR:     Matthew Albence
                    Executive Associate Director
                    Enforcement and Removal Operations
                    U.S. Immigration and Customs Enforcement

                    Bill Weinberg
                    Chief Acquisition Officer
                    U.S. Immigration and Customs Enforcement

FROM:               John E. McCoy II
                    Acting Assistant Inspector General for Audits

SUBJECT:            *U.S. Immigration and Customs Enforcement's
                    Award of the Family Case Management
                    Program Contract*

Attached for your information is our final report, *U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract.* ICE provided technical comments, which we incorporated into the report as appropriate. The report contains no recommendations.

Consistent with our responsibility under the *Inspector General Act*, we will provide copies of our report to congressional committees with oversight and appropriation responsibility over the Department of Homeland Security. We will post a redacted version of the report on our website.

You may call me with any questions, or your staff may contact Donald Bumgardner, Deputy Assistant Inspector General for Audits, at (202) 254-4100.

Attachment

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Background

The Family Case Management Program (FCMP) is an alternative to detention that uses case managers to ensure participants comply with immigration obligations, such as check-ins with U.S. Immigration and Customs Enforcement (ICE) and attendance at immigration court hearings, while allowing them to remain in their community as they move through immigration proceedings. FCMP facilitates access to holistic community-based services tailored to each family's needs, including:

- orientation and education about participants' rights and responsibilities;
- individualized family service plans;
- assistance with transportation logistics; and
- safe repatriation and reintegration planning for participants who are returning to their home countries.

In September 2015, ICE awarded five indefinite delivery indefinite quantity (IDIQ)[1] contracts to establish the Family Case Management Program. The contracts were awarded to GEO Care, LLC (GEO Care), a division of The GEO Group, Inc. The GEO Group is a provider of correctional, detention, and community re-entry services, which operates several detention centers under separate ICE contracts.

During the early stages of the acquisition, ICE Enforcement and Removal Operations planned to enroll a maximum of 1,500 families (300 families per location) in each of five targeted metropolitan locations: Baltimore, MD/Washington, DC; Los Angeles, CA; New York City, NY/Newark, NJ; Miami, FL; and Chicago, IL. Enforcement Removal Operations later modified the contract to reflect the maximum enrollment of 800 families in total, approximately 160 families in each of the five locations.

We initiated this audit at the request of Representative Raúl M. Grijalva, who was concerned that the FCMP contract may have been improperly awarded to GEO Care. This report presents the results of our audit, which we conducted to determine whether ICE awarded the FCMP contracts in accordance with laws, regulations, and guidance.

---

[1] According to the Federal Acquisition Regulation (FAR), an indefinite-quantity contract provides for an indefinite quantity, within stated limits, of supplies or services during a fixed period. The Government places orders for individual requirements. See 48 CFR 16.504.

FOR OFFICIAL USE ONLY

AR139

FOR OFFICIAL USE ONLY

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Results of Audit

ICE properly awarded the FCMP contracts and complied with applicable laws, regulations, and guidance during the acquisition process. Specifically, ICE promoted open vendor competition during the family case management services solicitation process by publicly issuing notices and requests for proposals (RFP). In addition, ICE evaluated vendor proposals in accordance with established criteria and selected the vendor based on a comparative evaluation of proposals, which were adequately documented in the contract file.

Solicitation and RFP

ICE's Office of Acquisition Management adequately promoted vendor competition by publicly posting solicitations and allowing sufficient response time. ICE posted pre-solicitation notices on February 4, 2015, and 15 days later it issued five RFPs[2] for the provision of family case management services in the following metropolitan locations: Baltimore, MD/Washington, DC; Los Angeles, CA; New York City, NY/Newark, NJ; Miami, FL; and Chicago, IL. Four vendors submitted proposals: GEO Care; Lutheran Immigration and Refugee Service (LIRS); MVM, Inc.; and Baptist Child Family Services. Each vendor had prior experience in providing services either for immigrants or for non-profit organizations.

Evaluation of Vendor Proposals and Selection

ICE evaluated the vendor proposals according to applicable guidelines and regulations.[3] ICE established two separate committees that independently evaluated each vendor proposal (see appendix A for evaluation factors and ratings). One committee evaluated the proposals for technical and management capabilities without any knowledge of the proposed cost or vendors' past performance. The other committee reviewed only the vendors' past performance and the cost proposals. ICE's ultimate goal was to select a vendor that represented the overall best value for the Government.

LIRS received the highest technical rating (excellent), as well as the highest rating for past performance (substantial confidence). According to the evaluation committee reports, the LIRS proposal demonstrated "excellent"

---

[2] The RFP included information such as the instructions, the Government's requirement based on statement of objectives, seven evaluation factors, and the evaluation methodology. Vendors were required to submit their proposals in three volumes with each volume relating to a specific evaluation factor(s) as shown in appendix A.
[3] FAR, 48 C.F.R. part 15.

FOR OFFICIAL USE ONLY

AR140

FOR OFFICIAL USE ONLY

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

capabilities in the areas of case management and had established community ties.

GEO Care received the second highest technical rating of "good" and the highest rating of "substantial confidence" for past performance. The evaluation committee concluded that GEO Care demonstrated case management capability through its work experience from other contracts and "clearly demonstrated that it has the resources to take on a project of this size, scope and complexity." According to the committee report, GEO Care's Quality Control Plan helped mitigate the committee's concerns about GEO Care's limited experience in the field of social services.

ICE fully documented the independent government cost estimate for the acquisition of family case management services, as required by the *Homeland Security Acquisition Manual*. The independent government cost estimate determined a cost of $17.3 million per location and $86.7 million for all five locations for the full performance period. As shown in table 1, all the vendors' proposals were less than the independent government cost estimate, except for LIRS, which was ███[4] million more than the independent government cost estimate.

As required by FAR 15.304 and 15.305, ICE's evaluation of proposals included a documented review of a cost price analysis to establish price reasonableness. ICE compared the prices proposed by GEO Care, LIRS, MVM, and Baptist Child Family Services for all five program location sites for the full period of performance. Although Baptist Child Family Services proposed the lowest price of ███ million, it was ineligible for the award because its technical proposal was rated "unacceptable." Of the remaining vendors, GEO Care was priced the lowest at $72.7 million, followed by MVM at ███ million, and LIRS at ███ million.

**Table 1. Vendor Evaluation Ratings and Proposed Price**

| Vendor | Technical Rating | Past Performance | Price for Full Performance Period *(in millions)* |
|---|---|---|---|
| LIRS | Excellent | Substantial confidence | ███ |
| GEO Care | Good | Substantial confidence | $72.7 |
| MVM | Acceptable | Satisfactory confidence | ███ |
| BCFS | Unacceptable | Satisfactory confidence | ███ |

*Source:* ICE

[4] Losing bidders' pricing was redacted to protect proprietary information pursuant to FAR 3.104-4.

FOR OFFICIAL USE ONLY

AR141

FOR OFFICIAL USE ONLY

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Price was the determining factor in this acquisition, which is consistent with the evaluation methodology established in the RFP. Although LIRS received a technical rating of "excellent," its price proposal was ███ percent more than GEO Care's, which was the second highest rated proposal and the lowest priced. According to the RFP, the combination of technical capability and past performance "are more important than price…. However, the Government will not make an award at a significantly higher overall cost to the Government to achieve only slightly superior technical capability." As such, ICE could not justify the substantially higher proposal cost over a slightly higher technical rating.

ICE's Office of Acquisition Management documented its determination that GEO Care's proposals represented the best value for the government. On September 16, 2015, ICE awarded all five IDIQ contracts in the amount of $72.7 million to GEO Care to establish the FCMP. Each contract has a total potential performance period of 5 years and 6 months.

<u>Contract Modifications</u>

We reviewed five contract modifications that occurred between November 2015 and May 2016, which were properly documented and justified. Reasons for the contract modifications included:

- incorporation of a 5 percent discount offered by GEO Care if the company was awarded four or more of the contracts, which decreased the contract price by $3.6 million to $69.1 million;
- a change in the maximum number of participants to be enrolled; and
- accommodation for community-based organization subcontractor participation. (ICE directed GEO Care to partner with various community-based organizations to maximize local faith-based provider participation in FCMP services.)

<u>Program Costs and Performance Metrics</u>

As of March 30, 2017, ICE reported that it expended $17.5 million in program costs to enroll 781 active participants in FCMP across all five locations. According to ICE, overall program compliance for all five regions is an average of 99 percent for ICE check-ins and appointments, as well as 100 percent attendance at court hearings. Since the inception of FCMP, 23 out of 954 participants (2 percent) were reported as absconders.

FOR OFFICIAL USE ONLY

AR142

FOR OFFICIAL USE ONLY

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Objective, Scope, and Methodology

We conducted this audit to determine whether ICE awarded the FCMP contract in accordance with laws, regulations, and guidance.

To accomplish our objective we reviewed laws, regulations, and guidance applicable to the contract pre-award and award processes. We interviewed ICE personnel from Enforcement and Removal Operations and the Office of Acquisition Management to obtain an understanding of the program and the acquisition process for the FCMP. In addition, we reviewed contract file documentation, including acquisition planning documents, contract solicitations, vendor requests for proposals, and ICE evaluation reports to determine whether contract pre-award and award procedures were conducted in accordance with laws, regulations, and guidance. We also conducted a limited review of post-award contract modifications and performance metrics. We did not rely on computer-processed data to materially support findings, conclusions, or recommendations in this report.

We conducted this performance audit between January 2016 and April 2017 pursuant to the *Inspector General Act of 1978*, as amended, and according to generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based upon our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based upon our audit objective.

Office of Audits major contributors to this report are: Lisa Vonder Haar, Audit Director; Modupe Ogunduyile, Audit Manager; Gloria Medina-Ortiz, Auditor-in-Charge; Garrick Greer, Auditor; Jason Kim, Auditor; Nedra Rucker, Auditor; Kevin Dolloson, Communications Analyst; and Jeffrey Wilson, Independent Referencer.

FOR OFFICIAL USE ONLY

AR143

FOR OFFICIAL USE ONLY

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix A
## Evaluation Factors and Ratings

**Exhibit 1. Proposals by Volume and Evaluation Factors**

| Volume | Evaluation Factors |
|---|---|
| **I. Demonstrated Technical/ Management Capabilities Proposal** | 1.  Performance work statement |
| | 2.  Key personnel and staffing plan |
| | 3.  Corporate experience |
| | 4.  Quality control plan |
| | 5.  Management plan |
| **II. Past Performance** | 6.  Past performance |
| **III. Price/Cost Proposal** | 7.  Price |

*Source: ICE*

**Exhibit 2. Proposal Ratings for Technical and Past Performance**

| Volume I Technical | Volume II Past Performance |
|---|---|
| Excellent | Substantial confidence |
| Good | Satisfactory confidence |
| Acceptable | Limited confidence |
| Marginal | No confidence |
| Unacceptable | Unknown confidence (Neutral) |

*Source: ICE*

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

---

## Appendix B
## Report Distribution

### Department of Homeland Security

Secretary
Deputy Secretary
Chief of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Assistant Secretary for Office of Policy
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
ICE Audit Liaison

### Office of Management and Budget

Chief, Homeland Security Branch
DHS OIG Budget Examiner

### Congress

Congressional Oversight and Appropriations Committees
Raúl M. Grijalva, U.S. House of Representatives

FOR OFFICIAL USE ONLY

## Additional Information and Copies

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

> Department of Homeland Security
> Office of Inspector General, Mail Stop 0305
> Attention: Hotline
> 245 Murray Drive, SW
> Washington, DC 20528-0305



# SRE

**Subsecretaría para América del Norte**

Ciudad de México, 20 de diciembre de 2018.

**Sr. John Creamer**
**Encargado de Negocios**
**Embajada de Estados Unidos en México**

A continuación se transcribe el posicionamiento del Gobierno de México ante la decisión del Gobierno de Estados Unidos de implementar la sección 235(b)(2)(c) de su Ley de Inmigración y Nacionalidad:

"A las ocho de la mañana, el Gobierno de Estados Unidos comunico al Gobierno de México que el Departamento de Seguridad Interna de los Estados Unidos de América (DHS por sus siglas en inglés) tiene la intención de implementar una sección de su ley migratoria que le permitiría devolver a extranjeros, no mexicanos, a nuestro país para que aguarden aquí el desarrollo de su proceso migratorio en Estados Unidos.

México reafirma su derecho soberano de admitir o rechazar el ingreso de extranjeros a su territorio, en ejercicio de su política migratoria. Por ello, el Gobierno de México ha decidido tomar las siguientes acciones en beneficio de las personas migrantes, en particular a los menores de edad, estén acompañados o no, así como para proteger el derecho de aquellos que desean iniciar y seguir un procedimiento de asilo en territorio de los Estados Unidos de América:

1.      Autorizará, por razones humanitarias y de manera temporal, el ingreso de ciertas personas extranjeras provenientes de Estados Unidos que hayan ingresado a ese país por un puerto de entrada o que hayan sido aprehendidas entre puertos de entrada, hayan sido entrevistadas por las autoridades de contro migratorio de ese país, y hayan recibido un citatorio para presentarse ante un Juez Migratorio. Lo anterior con base en la legislación mexicana vigente y los compromisos internacionales suscritos, como la Convención sobre el Estatuto de los Refugiados, su Protocolo, así como la Convención Contra la Tortura y otros Tratos o Penas Crueles, Inhumanos o Degradantes, entre otros.

2.      Permitirá que as personas extranjeras que hayan recibido un citatorio soliciten su internación a territorio nacional por razones humanitarias en los lugares destinados al tránsito internacional de personas, permanezcan en territorio nacional bajo la condición de "estancia



**SRE**

SECRETARÍA DE RELACIONES
EXTERIORES



**Subsecretaría para América del Norte**

Ciudad de México, 20 de diciembre de 2018.

por razones humanitarias", y puedan realizar entradas y salidas múltiples del territorio nacional.

3.    Garantizará que las personas extranjeras que hayan recibido su citatorio gocen plenamente de los derechos y libertades reconocidos en la Constitución, en los tratados internacionales de los cuales es parte el Estado mexicano, así como en la Ley de Migración. Tendrán derecho a un trato igualitario sin discriminación alguna y con el debido respeto a sus derechos humanos, así como la oportunidad de solicitar un permiso para trabajar a cambio de una remuneración, lo que les permitirá solventar sus necesidades básicas.

4.    Procurará que la implementación de las medidas que tome cada gobierno se coordine a nivel técnico-operativo con la finalidad de desarrollar mecanismos que permitan la participación de las personas migrantes con citatorio en su audiencia ante un Juez Migratorio estadounidense, el acceso sin interferencias a información y servicios legales, así como para prevenir fraudes y abusos.

Las acciones que tomen los gobiernos de México y de Estados Unidos no constituyen un esquema de Tercer País Seguro, en el que se obligaría a las personas migrantes en tránsito a solicitar asilo en México. Están dirigidas a facilitar el seguimiento de las solicitudes de asilo en los Estados Unidos, sin que eso implique obstáculo alguno para que cualquier persona extranjera pueda solicitar refugio en México.

El Gobierno de México reitera que toda persona extranjera deberá observar la Ley mientras se encuentre en territorio nacional."

Atentamente,

Julián Escutia Rodríguez
Coordinador de Asesores del Subsecretario para América del Norte

Courtesy translation

**Press Release No. 14**
Mexico City, December 20, 2018

## Statement of the Government of Mexico regarding the decision of the United States Government to implement section 235 (b) (2) (c) of its Immigration and Nationality Law

At eight in the morning, the Government of the United States informed the Government of Mexico that the Department of Homeland Security of the United States of America (DHS) intends to implement a section of its immigration law that allows returning non-Mexican foreigners to our country so that they can wait for the development of their United States' immigration process.

Mexico reaffirms its sovereign right to admit or reject the entry of foreigners into its territory, in the exercise of its migration policy. Therefore, the Government of Mexico has decided to take the following actions for the benefit of the migrants, in particular of minors whether accompanied or not and to protect the right of those who wish to initiate an asylum procedure in the territory of the United States of America:

Mexico will authorize, for humanitarian reasons and in a temporarily fashion, the entry of certain foreign persons from within the United States who have entered that country through a port of entry or who have been apprehended between ports of entry and interviewed by the authorities of migration authorities of that country, and have received a notice to attend a hearing before a judge. This is based on the current Mexican legislation and the international commitments thereby signed, such as the Convention on the Status of Refugees, its Protocol, as well as the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment, among others.

Mexico will allow foreigners with a notice to attend a hearing to request their admission to the national territory for humanitarian reasons in the posts designated to the international transit of persons, with the right to stay in national territory under the humanitarian reasons stay condition and make multiple entries from the national territory.

Mexico will guarantee that foreigners who have received their notice fully enjoy the rights and freedoms recognized in the Constitution, in the international treaties to which the Mexican State is a party, as well as in the current Migration Law. They will be entitled to equal treatment without any discrimination and with due respect to their human rights, as well as the opportunity to apply for a work permit in exchange for remuneration, which will allow them to meet their basic needs.

Mexico will ensure that the implementation of the measures taken by each government is coordinated at the technical-operational level in order to develop mechanisms that allow the participation of migrants with notice to attend a hearing before an immigration judge, the right to access information and legal services without interference, as well as to prevent fraud and abuse.

The actions taken by the governments of Mexico and the United States do not represent the

Courtesy translation

scheme of a Third Secure Country, in which migrants in transit are forced to seek asylum in Mexico. They are aimed at facilitating the follow-up of asylum applications in the United States without any impediment to such matter.

The Government of Mexico stresses the need that every foreigner must respect domestic law while it is located in the national territory.

Follow us on Twitter: @SRE_mx

Plaza Juárez 20, P.B. Col. Centro
Del. Cuauhtémoc, Ciudad de México, 06010
Tel. 36865214
www.gob.mx/sre

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



January 25, 2019

**ACTION**

MEMORANDUM FOR:    L. Francis Cissna
Director
U.S. Citizenship and Immigration Services

Kevin K. McAleenan
Commissioner
U.S. Customs and Border Protection

Ronald D. Vitiello
Deputy Director and Senior Official Performing the Duties of
Director
U.S. Immigration and Customs Enforcement

FROM:    Kirstjen M. Nielsen
Secretary

SUBJECT:    Policy Guidance for Implementation of the Migrant Protection
Protocols

On December 20, 2018, I announced that the Department of Homeland Security (DHS),
consistent with the Migrant Protection Protocols (MPP), will begin implementation of
Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) on a large-scale basis to
address the migration crisis along our southern border.  In 1996, Congress added Section
235(b)(2)(C) to the INA.  This statutory authority allows the Secretary of Homeland Security to
return certain applicants for admission to the contiguous country from which they are arriving on
land (whether or not at a designated port of entry) pending removal proceedings under Section
240 of the INA.  Consistent with the MPP, citizens and nationals of countries other than Mexico
("third-country nationals") arriving in the United States by land from Mexico—illegally or
without proper documentation—may be returned to Mexico pursuant to Section 235(b)(2)(C) for
the duration of their Section 240 removal proceedings.

## Section 235(b)(2)(C) and the MPP

The United States issued the following statement on December 20, 2018, regarding implementation of the Migrant Protection Protocols:

> [T]he United States will begin the process of implementing Section 235(b)(2)(C) . . . with respect to non-Mexican nationals who may be arriving on land (whether or not at a designated port of entry) seeking to enter the United States from Mexico illegally or without proper documentation. Such implementation will be done consistent with applicable domestic and international legal obligations. Individuals subject to this action may return to the United States as necessary and appropriate to attend their immigration court proceedings.
>
> The United States understands that, according to the Mexican law of migration, the Government of Mexico will afford such individuals all legal and procedural protection[s] provided for under applicable domestic and international law. That includes applicable international human rights law and obligations as a party to the 1951 Convention relating to the Status of Refugees (and its 1967 Protocol) and the Convention Against Torture.
>
> The United States further recognizes that Mexico is implementing its own, sovereign, migrant protection protocols providing humanitarian support for and humanitarian visas to migrants.
>
> The United States proposes a joint effort with the Government of Mexico to develop a comprehensive regional plan in consultation with foreign partners to address irregular migration, smuggling, and trafficking with the goal of promoting human rights, economic development, and security.[1]

The Government of Mexico, in response, issued a statement on December 20, 2018. That statement provides, in part, as follows:

1. For humanitarian reasons, [the Government of Mexico] will authorize the temporary entrance of certain foreign individuals coming from the United States who entered that country at a port of entry or who were detained between ports of entry, have been interviewed by U.S. immigration authorities, and have received a notice to appear before an immigration judge. This is based on current Mexican legislation and the international commitments Mexico has signed, such as the Convention Relating to the Status of Refugees, its Protocol, and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, among others.

---

[1] Letter from Chargé d'Affaires John S. Creamer to Sr. Jesús Seade, Subsecretaría para América del Norte, Secretaría de Relaciones Exteriores (Dec. 20, 2018).

2

2. It will allow foreigners who have received a notice to appear to request admission into Mexican territory for humanitarian reasons at locations designated for the international transit of individuals and to remain in national territory. This would be a "stay for humanitarian reasons" and they would be able to enter and leave national territory multiple times.

3. It will ensure that foreigners who have received their notice to appear have all the rights and freedoms recognized in the Constitution, the international treaties to which Mexico is a party, and its Migration Law. They will be entitled to equal treatment with no discrimination whatsoever and due respect will be paid to their human rights. They will also have the opportunity to apply for a work permit for paid employment, which will allow them to meet their basic needs.

4. It will ensure that the measures taken by each government are coordinated at a technical and operational level in order to put mechanisms in place that allow migrants who have receive[d] a notice to appear before a U.S. immigration judge have access without interference to information and legal services, and to prevent fraud and abuse.[2]

### Prosecutorial Discretion and *Non-Refoulement* in the Context of the MPP

In exercising their prosecutorial discretion regarding whether to place an alien arriving by land from Mexico in Section 240 removal proceedings (rather than another applicable proceeding pursuant to the INA), and, if doing so, whether to return the alien to the contiguous country from which he or she is arriving pursuant to Section 235(b)(2)(C), DHS officials should act consistent with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees[3] (1951 Convention) and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).[4]  Specifically, a third-country national should not be involuntarily returned to Mexico pursuant to Section 235(b)(2)(C) of the INA if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the

---

[2] Secretaría de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018).

[3] The United States is not a party to the 1951 Convention but is a party to the 1967 Protocol Relating to the Status of Refugees, which incorporates Articles 2 to 34 of the 1951 Convention. Article 33 of the 1951 Convention provides that: "[n]o Contracting State shall expel or return ('*refouler*') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

[4] Article 3 of the CAT states, "No State Party shall expel, return ('*refouler*') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *See also* Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, Title XXII, § 2242(a) (8 U.S.C. § 1231 note) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.").

3

INA), or would more likely than not be tortured, if so returned pending removal proceedings. The United States expects that the Government of Mexico will comply with the commitments articulated in its statement of December 20, 2018.

U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and U.S. Immigration and Customs Enforcement will issue appropriate internal procedural guidance to carry out the policy set forth in this memorandum.[5]

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

---

[5] A DHS immigration officer, when processing an alien for Section 235(b)(2)(C), should refer to USCIS any alien who has expressed a fear of return to Mexico for a *non-refoulement* assessment by an asylum officer.

1300 Pennsylvania Avenue NW
Washington, DC 20229



**U.S. Customs and Border Protection**

January 28, 2019

MEMORANDUM FOR:    Directors, Field Operations
                   Office of Field Operations

                   Director, Field Operations Academy
                   Office of Training and Development

FROM:              Todd A. Hoffman
                   Executive Director
                   Admissibility and Passenger Programs
                   Office of Field Operations

SUBJECT:           Guidance on Migrant Protection Protocols

Effective January 28, 2019, in accordance with the Commissioner's Memorandum of January 28, 2019, and subject to the terms of policy, the Office of Field Operations (OFO) San Diego Field Office will, consistent with its existing discretion and authorities, implement Section 235(b)(2)(C) of the Immigration and Nationality Act (INA).

Under this implementation of section 235(b)(2)(C), referenced as the Migrant Protection Protocols (MPP), DHS is authorized to return certain applicants for admission who arrive via land at the San Ysidro Port of Entry, and who are subject to removal proceedings under Section 240 of the INA, to Mexico pending removal proceedings. Certain aliens, including vulnerable aliens, criminal aliens, or aliens of interest to the Government of Mexico (GoM) or the United States, will not be placed into MPP, in accordance with the Guiding Principles for Migrant Protection Protocols issued today by the Enforcement Programs Division (HQ) (Guiding Principles).

The Guiding Principles outline which aliens may be amenable to MPP. As part of the determination of whether an alien is amenable to MPP, OFO will refer aliens who are potentially amenable, but who affirmatively state fear of return to Mexico, whether before or after they are processed for MPP or other disposition, to United States Citizenship and Immigration Services (USCIS) for screening following the affirmative statement of fear of return to Mexico. Please see the Guiding Principles for MPP.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Please ensure that this memorandum is disseminated to all ports of entry within your jurisdiction.

AR155

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Washington, DC 20529



**January 28, 2019**                                        **PM-602-0169**


# Policy Memorandum

SUBJECT:     **Guidance for Implementing Section 235(b)(2)(C) of the Immigration and
Nationality Act and the Migrant Protection Protocols**

## Purpose

This memorandum provides guidance to immigration officers in U.S. Citizenship and
Immigration Services (USCIS) regarding the implementation of the Migrant Protection Protocols
(MPP), including supporting the exercise of prosecutorial discretion by U.S. Customs and Border
Protection (CBP).  This memorandum follows the Secretary of Homeland Security's January 25,
2019, memorandum, *Policy Guidance for Implementation of the Migrant Protection Protocols*.

## Background

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) provides that aliens arriving
by land from a foreign contiguous territory (i.e., Mexico or Canada)—whether or not at a
designated port of entry—generally may be returned, as a matter of enforcement discretion, to
the territory from which they are arriving pending a removal proceeding under Section 240 of the
INA.

On December 20, 2018, Secretary of Homeland Security Kirstjen M. Nielsen announced that the
Department of Homeland Security (DHS) will begin the process of implementing Section
235(b)(2)(C) of the INA on a large scale.  That statutory provision allows for the return of certain
aliens to a contiguous territory pending Section 240 removal proceedings before an immigration
judge.  Under the MPP, aliens who are nationals and citizens of countries other than Mexico
(third-country nationals) arriving in the United States by land from Mexico—illegally or without
proper documentation—may be returned to Mexico for the duration of their immigration
proceedings as a matter of prosecutorial discretion.  *Accord* 8 C.F.R. § 235.3(d).

In her January 25, 2019, memorandum, Secretary Nielsen issued general policy guidance
concerning DHS's implementation of Section 235(b)(2)(C) at the southern border consistent with
the MPP.  Memorandum from Kirstjen M. Nielsen, Secretary of Homeland Security, *Policy*

*PM-602-0169: Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*
Page 2

*Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019) (Jan. 25, 2019, Memorandum). The Secretary advised that such authority should be implemented consistent with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees (1951 Convention)—as incorporated in the 1967 Protocol Relating to the Status of Refugees[1]—and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).[2]

The Secretary specifically advised that, consistent with those principles, "a third-country national should not be involuntarily returned to Mexico pursuant to Section 235(b)(2)(C) of the INA if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA), or would more likely than not be tortured, if so returned pending removal proceedings." Jan. 25, 2019, Memorandum at 3-4. Article 33 of the 1951 Convention and Article 3 of the CAT require that the individual demonstrate that he or she is "more likely than not" to face persecution on account of a protected ground or torture, respectively.[3] That is the same standard used for withholding of removal and CAT protection determinations. *See* 8 C.F.R. § 208.16(b)(2), (c)(2); Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8480 (1999).

At the same time, under the MPP, the United States "understands that, according to the Mexican law of migration, the Government of Mexico will afford such individuals all legal and procedural protection[s] provided for under applicable domestic and international law," including the 1951 Convention and the CAT. Letter from Chargé d'Affaires John S. Creamer to Sr. Jesús Seade, Subsecretaría para América del Norte, Secretaría de Relaciones Exteriores (Dec. 20, 2018). Further, "[t]he United States expects that the Government of Mexico will comply with the commitments articulated in its statement of December 20, 2018."[4]

---

[1] The United States is not a party to the 1951 Convention Relating to the Status of Refugees but is a party to the 1967 Protocol Relating to the Status of Refugees, which incorporates Articles 2 to 34 of the 1951 Convention. Article 33 of the 1951 Convention provides that: "[n]o Contracting State shall expel or return ('*refouler*') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

[2] Article 3 of the CAT states, "No State Party shall expel, return ('*refouler*') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *See also* Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, Title XXII, § 2242(a) (8 U.S.C. § 1231 note) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.").

[3] *See INS v. Stevic*, 467 U.S. 407, 429-30 (1984); *Auguste v. Ridge*, 395 F.3d 123, 132-33 (3d Cir. 2005); *Pierre v. Gonzales*, 502 F.3d 109, 115 (2d Cir. 2007); *see also* Senate Resolution of Advice and Consent to Ratification of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Treaty Doc. No. 100-20, II(2), *available at* https://www.congress.gov/treaty-document/100th-congress/20/resolution-text; Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8480 (1999).

[4] Jan. 25, 2019, Memorandum at 4.

*PM-602-0169:  Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*
Page 3

The Secretary also advised that, where an alien affirmatively states a concern that he or she may face a risk of persecution on account of a protected ground or torture upon return to Mexico, CBP should refer the alien to USCIS, which will conduct an assessment to determine whether it is more likely than not that the alien will be subject to persecution or torture if returned to Mexico.  The Secretary directed USCIS to issue appropriate internal procedural guidance to carry out this policy.  That guidance is explained below.

**Guidance**

Upon a referral by a DHS immigration officer of an alien who could potentially be amenable to the MPP, the USCIS asylum officer should interview the alien to assess whether it is more likely than not that the alien would be persecuted in Mexico on account of his or her race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA),[5] or that the alien would be tortured in Mexico.  The process or procedures described in INA Sections 208, 235(b)(1), (3), and 241(b)(3) and their implementing regulations, as well as those in the CAT regulations, do not apply to the MPP assessments.

### A.  Interview

Upon receipt of such a referral, the USCIS officer should conduct the MPP assessment interview in a non-adversarial manner, separate and apart from the general public.  The purpose of the interview is to elicit all relevant and useful information bearing on whether the alien would more likely than not face persecution on account of a protected ground, or torture, if the alien is returned to Mexico pending the conclusion of the alien's Section 240 immigration proceedings.

The officer should conduct the assessment in person, via video teleconference, or telephonically.  At the time of the interview, the USCIS officer should verify that the alien understands that he or she may be subject to return to Mexico under Section 235(b)(2)(C) pending his or her immigration proceedings.  The officer should also confirm that the alien has an understanding of the interview process.  In addition, provided the MPP assessments are part of either primary or secondary inspection, DHS is currently unable to provide access to counsel during the assessments given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals.[6]

In conducting the interview, the USCIS officer should take into account the following and other such relevant factors as:

---

[5] The disqualifying grounds for *non-refoulement* vis-à-vis the 1951 Convention and 1967 Protocol are reflected in Section 241(b)(3)(B) of the INA.  However, the reference to Section 241(b)(3)(B) should not be construed to suggest that Section 241(b)(3)(B) applies to MPP.
[6] *See* 8 C.F.R. § 292.5(b).

www.uscis.gov

*PM-602-0169:  Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*
Page 4

1. The credibility of any statements made by the alien in support of the alien's claim(s) and such other facts as are known to the officer.  That includes whether any alleged harm (i.e., the alleged persecution or torture) could occur in the region in which the alien would reside in Mexico, pending their removal proceedings, or whether residing in another region of Mexico to which the alien would have reasonable access could mitigate against the alleged harm;

2. Commitments from the Government of Mexico regarding the treatment and protection of aliens returned under Section 235(b)(2)(C) (including those set forth in the Government of Mexico's statement of December 20, 2018),[7] the expectation of the United States Government that the Government of Mexico will comply with such commitments,[8] and reliable assessments of current country conditions in Mexico (especially those provided by DHS and the U.S. Department of State); and

3. Whether the alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA.

### B.  Assessment

Once a USCIS officer assesses whether the alien, if returned to Mexico, would be more likely than not persecuted in Mexico on account of a protected ground (or has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA), or would be more likely than not tortured in Mexico, the assessment shall be reviewed by a supervisory asylum officer, who may change or concur with the assessment's conclusion.  DHS staff should inform the alien of the outcome of the final assessment.  USCIS should then provide its assessment to CBP for purposes of exercising prosecutorial discretion in connection with one or more of the decisions as to whether to place the alien in expedited removal or to issue a Notice to Appear for the purpose of placement directly into Section 240 removal proceedings, and if the latter, whether to return the alien to Mexico pending the conclusion of Section 240  proceedings under Section 235(b)(2)(C) pursuant to the MPP, and, when appropriate, to U.S. Immigration and Customs Enforcement for purposes of making discretionary custody determinations for aliens who are subject to detention and may be taken into custody pending removal proceedings.

If an officer makes a positive MPP assessment (i.e., that an alien is more likely than not either to be persecuted in Mexico on account of a protected ground and has not engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA, or to be tortured in Mexico), USCIS is *not* granting withholding of removal or protection from removal under the CAT regulations.  Nor shall there be further administrative review, reopening, or reconsideration of the assessment by USCIS.  The purpose of the assessment is simply to assess whether the alien meets one of the eligibility criteria under the MPP, pursuant to Section 235(b)(2)(C).

---

[7] Secretaría de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018); *see* Jan. 25, 2019, Memorandum at 2-3.

[8] *See* Jan. 25, 2019, Memorandum at 4.

*PM-602-0169:  Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*
Page 5

**Disclaimer**

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

**Contact Information**

Questions relating to this memorandum must be directed through the appropriate channels to the Asylum Division Headquarters point of contact.

**<u>MPP Guiding Principles</u>**

**Date:**                          January 28, 2019

**Topic:**                         Guiding Principles for Migrant Protection Protocols

**HQ POC/Office:**        Enforcement Programs Division

- Effective January 28, 2019, in accordance with the Commissioner's Memorandum of January 28, 2019, the Office of Field Operations, San Diego Field Office, will, consistent with its existing discretion and authorities, begin to implement Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) through the Migrant Protection Protocols (MPP).
    - To implement the MPP, aliens arriving from Mexico who are amenable to the process (see below), and who in an exercise of discretion the officer determines should be subject to the MPP process, will be issued an Notice to Appear (NTA) and placed into Section 240 removal proceedings.  They will then be transferred to await proceedings in Mexico.

- Aliens in the following categories are not amenable to MPP:
    - Unaccompanied alien children,
    - Citizens or nationals of Mexico,
    - Aliens processed for expedited removal,
    - Aliens in special circumstances:
        - Returning LPRs seeking admission (subject to INA section 212)
        - Aliens with an advance parole document or in parole status
        - Known physical/mental health issues
        - Criminals/history of violence
        - Government of Mexico or USG interest,
    - Any alien who is more likely than not to face persecution or torture in Mexico, or
    - Other aliens at the discretion of the Port Director

- Nothing in this guidance changes existing policies and procedures for processing an alien under procedures other than MPP, except as specifically provided. Thus, for instance, the processing of aliens for expedited removal is unchanged. Once an alien has been processed for expedited removal, including the supervisor approval, the alien may not be processed for MPP.
- Officers, with appropriate supervisory review, retain discretion to process aliens for MPP or under other procedures (e.g., expedited removal), on a case-by-case basis.  Adverse factors precluding placement in the MPP process include, but are not limited to, factors such as prior removal, criminal history, it is more likely than not that the alien will face persecution or torture in Mexico, and permanent bars to readmission.
- If an alien who is potentially amenable to MPP affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, whether before or after they are processed for MPP or other disposition, that alien will be referred to a USCIS asylum officer for screening following the affirmative statement of fear of persecution or

torture in, or return to, Mexico, so that the asylum officer can assess whether it is more likely than not that the alien will face persecution or torture if returned to Mexico.

- If USCIS assesses that an alien who affirmatively states a fear of return to Mexico is more likely than not to face persecution or torture in Mexico, the alien may not be processed for MPP. Officers retain all existing discretion to process (or re-process) the alien for any other available disposition, including expedited removal, NTA, waivers, or parole.
- Aliens at the POE who are processed for MPP will receive a specific immigration court hearing date and time. Every effort will be made to schedule similar MPP alien populations (e.g. single adult males, single adult females, family units) for the same hearing dates.
- OFO and USBP will be sharing court dates using only one existing Immigration Scheduling System (ISS) queue.
- Any alien who is subject to MPP will be documented in the appropriate system of records, SIGMA, and the proper code will be added.
- POEs will provide aliens subject to MPP a tear sheet containing information about the process, as well as a list of free or low-cost legal service providers.
- Aliens who return to the POE for their scheduled hearing and affirmatively state a fear of return to Mexico will be referred to USCIS for screening prior to any return to Mexico. If USCIS assesses that such an alien is more likely than not to face persecution or torture in Mexico, CBP Officers should coordinate with ICE Enforcement and Removal Operations (ERO) to determine whether the alien may be maintained in custody or paroled, or if another disposition is appropriate. Such an alien may not be subject to expedited removal, however, and may not be returned to Mexico to await further proceedings.

*Hearing date and processing*
- POEs will establish scheduling for the arrival of aliens returning for their hearing to permit efficient transportation, according to applicable policy.
- Returning aliens who arrive at the POEs for proceedings will be biometrically identified, screened to ensure they have requisite documents, and turned over to ICE ERO.
- POEs will coordinate with ICE ERO to establish transfer of custody and expeditious transportation from the POE to the hearing. ERO is responsible for the transportation of aliens between the POE and court location, as well as the handling of the alien during all court proceedings.
- If the alien receives a final order of removal from an immigration judge, the alien will be processed in accordance with ERO operations.
- If the alien's INA section 240 removal proceedings are ongoing ERO will transport the alien back to the POE and CBP officers will escort the alien to the United States/Mexico limit line.



# Pentagon announces nearly 4, additional troops heading to U Mexico border

BY **BRETT SAMUELS** · 02/03/19 04:06 PM EST

**14,207** SHARES

SHARE                                    TW

## Just In...

**Florida high school draws backlash after altering girls' yearbook photos to add clothing**
STATE WATCH — 9S AGO

**Michigan governor apologizes after photo shows her violating state's health order**
STATE WATCH — 1M 52S AGO

**Harris to 2021 grads: Pandemic prepared you for 'pretty much anything'**
IN THE KNOW — 1H 8M AGO

**Senate Armed Services chair throws support behind changing roles of military commanders in sexual assault prosecutions**
DEFENSE — 2H 2M AGO

**Blinken condemns 'shocking act' of Belarus forcing plane carrying opposition journalist to land**
INTERNATIONAL — 2H 19M AGO

**Three in five say more changes needed to give Black Americans equal rights: poll**
BLOG BRIEFING ROOM — 2H 37M AGO

**Cheney dodges on link between Trump election claims and GOP voting laws**


© Getty Images

Nearly 4,000 additional U.S. troops will be deployed to the southern border to assist Customs and Border Protection, the Pentagon announced Sunday.

According to a statement released by the Defense Department, 3,750 troops will head to the border for 90 days to aid in placing razor wire along the border, as well as with mobile surveillance operations. The deployment will bring the number of active-duty forces in the area supporting Customs and Border Protection to roughly 4,350.

Acting Defense Secretary Patrick Shanahan said last week that the department would send "several thousand" additional troops to the border, but declined to be more specific.

Rep. Adam Smith (D-Wash.), the chairman of the House Armed Services Committee, chastised Shanahan last Thursday over the lack of transparency surrounding how many troops were being sent to the border.

The additional troop deployment comes amid a standoff between President Trump and congressional Democrats over funding for his desired wall along the southern border. The president has demand $5.7 billion for the structure, which Democrats have staunchly opposed. The stalemate triggered a partial government shutdown that lasted 35 days.

AR163

HOUSE HOMELAND SECURITY

**NSF funding choice: Move forward or fall behind**

OPINION — 3H 17M AGO

**VIEW ALL**

Trump signed legislation to reopen the government until Feb. 15 that did not include money for the wall, but allowed for a bipartisan group of lawmakers to negotiate over border security funding.

The president has expressed doubts that the final agreement will be to his liking, raising the prospect of another government shutdown or that he could declare a national emergency to secure money for the wall. The latter measure would likely prompt swift legal challenges.

Trump tweeted last Thursday that more troops were being sent to the border, but that building a wall would be "soooo much easier and less expensive."

Trump last year ordered thousands of troops be sent to secure the southern border in anticipation of the arrival a caravan of Central American migrants that the president had portrayed as a horde of criminals. Critics decried the use of the military as a political stunt.

*Updated at 5:15 p.m.*

TAGS   PATRICK SHANAHAN   DONALD TRUMP   ADAM SMITH

SHARE                TWEET



THE HILL 1625 K STREET, NW SUITE 900 WASHINGTON DC 20006 | 202-628-8500 TEL | 202-628-8503 FAX
THE CONTENTS OF THIS SITE ARE ©2021 CAPITOL HILL PUBLISHING CORP., A SUBSIDIARY OF NEWS COMMUNICATIONS, INC.

FEA Number: 306-112-002b

U.S. Department of Homeland Security
500 12th Street SW
Washington, DC 20536



## U.S. Immigration and Customs Enforcement

February 12, 2019

MEMORANDUM FOR:     Executive Associate Directors
Principal Legal Advisor

FROM:                            Ronald D. Vitiello
Deputy Director and
Senior Official Performing the Duties of the Director

SUBJECT:                      Implementation of the Migrant Protection Protocols

On January 25, 2019, Secretary Nielsen issued a memorandum entitled *Policy Guidance for Implementation of the Migrant Protection Protocols*, in which she provided guidance for the implementation of the Migrant Protection Protocols (MPP) announced on December 20, 2018, an arrangement between the United States and Mexico to address the migration crisis along our southern border. Pursuant to the Secretary's direction, this memorandum provides guidance to U.S. Immigration and Customs Enforcement (ICE) about its role in the implementation of the MPP.

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) allows the Department of Homeland Security (DHS), in its discretion, with regard to certain aliens who are "arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, . . . [to] return the alien[s] to that territory pending a proceeding under [INA] section 240." Consistent with the MPP, third-country nationals (i.e., aliens who are not citizens or nationals of Mexico) who are arriving in the United States by land from Mexico may be returned to Mexico pursuant to INA section 235(b)(2)(C) for the duration of their INA section 240 removal proceedings. DHS will not use the INA section 235(b)(2)(C) process in the cases of unaccompanied alien children, aliens placed into the expedited removal (ER) process of INA section 235(b)(1), and other aliens determined, in the exercise of discretion, not to be appropriate for such processing (which may include certain aliens with criminal histories, individuals determined to be of interest to either Mexico or the United States, and lawful permanent residents of the United States).

The direct placement of an alien into INA section 240 removal proceedings (and, in DHS's discretion, returning the alien to Mexico pursuant to INA section 235(b)(2)(C) pending those proceedings) is a separate and distinct process from ER. Processing determinations, including whether to place an alien into ER or INA section 240 proceedings (and, as applicable, to return an alien placed into INA section 240 proceedings to Mexico under INA section 235(b)(2)(C) as

www.ice.gov

SUBJECT: Implementation of the Migrant Protection Protocols
Page 2 of 2

part of MPP), or to apply another processing disposition, will be made by U.S. Customs and Border Protection (CBP), in CBP's enforcement discretion.

MPP implementation began at the San Ysidro port of entry on or about January 28, 2019, and it is intended that MPP implementation will expand eventually across the southern border.  In support of MPP, ICE Enforcement and Removal Operations (ERO) will provide appropriate transportation when necessary, for aliens returned to Mexico under the MPP, from the designated port of entry to the court facility for the scheduled removal hearings before an immigration judge and back to the port of entry for return to Mexico by CBP after such hearings.  ERO also will be responsible for effectuating removal orders entered against aliens previously processed under INA section 235(b)(2)(C), including post-removal order detention.  ICE attorneys will represent DHS in the related removal proceedings pursuant to 6 U.S.C. § 252(c).

As instructed by the Secretary, in exercising prosecutorial discretion concerning the potential return of third-country nationals to Mexico under INA section 235(b)(2)(C), DHS officials should act consistently with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.  Specifically, a third-country national who affirmatively states a fear of return to Mexico (including while in the United States to attend a removal hearing) should not be involuntarily returned under INA section 235(b)(2)(C) if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless described in INA section 241(b)(3)(B) as having engaged in certain criminal, persecutory, or terrorist activity), or would more likely than not be tortured, if so returned pending removal proceedings.  *Non-refoulement* assessments will be made by U.S. Citizenship and Immigration Services (USCIS) asylum in accordance with guidance issued by the Director of USCIS.

Within ten (10) days after this memorandum, relevant ICE program offices are directed to issue further guidance to ensure that MPP is implemented in accordance with the Secretary's memorandum, this memorandum, and policy guidance and procedures, in accordance with applicable law.

This document provides internal ICE policy guidance, which may be modified, rescinded, or superseded at any time without notice.  This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.  Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigative prerogatives of DHS.

Attachment:
DHS Secretary Memorandum, *Policy Guidance for Implementation of Migrant Protection Protocols*, dated January 25, 2019.

*Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration
and Customs
Enforcement**

February 12, 2019

MEMORANDUM FOR:     Field Office Directors
                    Enforcement and Removal Operations

FROM:               Nathalie R. Asher *Nathalie R. Asher*
                    Acting Executive Associate Director

SUBJECT:            Migrant Protection Protocols Guidance

Purpose

This memorandum provides operational guidance to impacted Enforcement and Removal
Operations (ERO) field offices to ensure that the Migrant Protection Protocols (MPP) are
implemented in accordance with applicable law, the Secretary's January 25, 2019, memorandum,
*Policy Guidance for Implementation of the Migrant Protection Protocols*, Acting Director
Vitiello's February 12, 2019, memorandum of the same title, and other applicable policies and
procedures.

Background

On January 25, 2019, Secretary Nielsen issued a memorandum entitled *Policy Guidance for
Implementation of the Migrant Protection Protocols*, in which she provided guidance for the
implementation of the MPP, an arrangement between the United States and Mexico to address
the migration crisis along our southern border announced on December 20, 2018. Thereafter, on
February 12, 2019, Deputy Director and Senior Official Performing the Duties of the Director
Vitiello issued U.S. Immigration and Customs Enforcement (ICE) Policy Memorandum 11088.1,
*Implementation of the Migrant Protection Protocols*, announcing that operational
implementation of MPP began at the San Ysidro port of entry on or about January 28, 2019, and
directing that ICE program offices issue further guidance to ensure that the MPP is implemented
in accordance with the Secretary's memorandum, applicable law, and policy guidance and
procedures.

Discussion

Under section 235(b)(2)(C) of the Immigration and Nationality Act (INA), the U.S. Department
of Homeland Security (DHS) may, in its discretion, with regard to certain applicants for
admission who are "arriving on land (whether or not at a designated port of arrival) from a
foreign territory contiguous to the United States, . . . return the alien[s] to that territory pending a
proceeding under [INA section] 240."

AR167

Migrant Protection Protocols Guidance
Page 2

return the alien to Mexico pending removal proceedings pursuant to section 235(b)(2)(C) of the INA, as detailed in ICE Policy Memorandum 11088.1.  Aliens processed under the MPP will be issued a Notice to Appear (NTA) by CBP and returned by CBP to Mexico to await their removal proceedings.

Aliens returned to Mexico under the MPP pursuant to section 235(b)(2)(C) of the INA will be required to report to a designated POE on their scheduled hearing dates and will be paroled into the United States by CBP for purposes of their hearings.  As further explained in the next section, CBP will then transfer the aliens to ERO custody for transportation to designated Executive Office for Immigration Review (EOIR) court locations for their hearings.

If the alien is granted relief or protection from removal by the immigration judge or is ordered removed from the United States, and appeal is not reserved by either party, the alien will be processed in accordance with standard procedures applicable to final order cases.  If the immigration judge continues proceedings or enters an order upon which either party reserves appeal, ERO will transport the alien back to the POE, whereupon CBP officers will take custody of the alien to return the alien to Mexico to await further proceedings.

MPP implementation began at the San Ysidro port of entry (POE) on or about January 28, 2019, and it is intended that MPP implementation will expand to additional locations along the southern border.  This memorandum provides general procedural guidance applicable to ERO personnel in the implementation of the MPP.  Field Office Directors should each assign a lead POC for MPP issues arising within their AORs and issue local operational guidance applicable to their individual areas of responsibility as the MPP is phased in.

*Hearing Transportation and Custody*

Before returning an alien to Mexico under the MPP to await his or her removal proceedings, CBP will provide the alien instructions explaining when and to which POE to report to attend his or her hearing.  On the day of the hearing, an alien returned to Mexico under the MPP will arrive at the POE at the time designated—generally, a time sufficient to allow for CBP processing, pre-hearing consultation with counsel (if applicable), and timely appearance at hearings.  Once CBP conducts POE processing (including verification of identity and a brief medical screening), for hearings set at immigration courts located in the interior of the United States, CBP will parole the alien into ICE's custody under INA section 212(d)(5)(A), and ERO will maintain physical custody of the alien during transportation of the alien from the POE to the designated immigration court location, making appropriate use of contract support and complying with applicable requirements concerning the transportation of aliens.

In cases in which ICE performs that transportation function between the POE and an inland immigration court, the alien is detained in ICE custody as an arriving alien.[1]  ERO should coordinate locally with CBP officials at POEs where the MPP has been implemented, so that the

---

[1] Aliens participating in the MPP who CBP initially encounters at a POE are "arriving aliens" within the meaning of 8 C.F.R. §§ 1.2 and 1001.1(q) (defining "arriving alien" to include "an applicant for admission coming … into the United States at a port-of-entry").  Moreover, on their hearing dates before an immigration judge, aliens who CBP initially encountered *between* the POEs will come *to* a POE to attend their hearings, placing them within the "arriving alien" definition, as well.

Migrant Protection Protocols Guidance
Page 3

daily volume of MPP cases can be monitored and any transportation needs may be properly met. ERO should also coordinate locally with EOIR concerning security arrangements at the immigration court location. While EOIR is responsible for security inside the courtroom, and ERO should generally defer to immigration judges' wishes concerning their presence in the courtroom, DHS is ultimately responsible for maintaining custody of the alien. If an alien is ordered released by an immigration judge, ERO should coordinate closely with the ICE Office of the Principal Legal Advisor (OPLA) regarding how to proceed with the case. After an alien's removal hearing is over, ERO will transport him or her back to the POE for return to Mexico or to retrieve property, as applicable. If the alien has received a final grant of relief or an administratively final order of removal, ERO will coordinate with CBP and make appropriate custody determinations.

*Access to Counsel*

Section 240(b)(4)(A) of the INA provides that an alien in removal proceedings before an immigration judge "shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings." Similarly, section 292 provides that "[i]n any removal proceedings . . . the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel . . . as he shall choose." Accordingly, in order to facilitate access to counsel for aliens subject to return to Mexico under the MPP who will be transported to their immigration court hearings by ERO, ERO will depart from the POE with the alien at a time sufficient to ensure arrival at the immigration court not later than one hour before his or her scheduled hearing time in order to afford the alien the opportunity to meet in-person with his or her legal representative.

*Non-Refoulement Considerations*

In accordance with Secretary Nielsen's January 25, 2019, memorandum, DHS should implement the MPP consistent with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees (1951 Convention) and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT). Specifically, an alien should not be involuntarily returned to Mexico under the MPP if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in section 241(b)(3)(B) of the INA), or would more likely than not be tortured, if so returned pending removal proceedings.

If an alien subject to the MPP affirmatively states to an ERO officer that he or she has a fear of persecution or torture *in Mexico*, or a fear of return *to Mexico*, at any point while in ERO custody, ERO will notify CBP of the alien's affirmative statement so that CBP officials at the POE may refer the alien to a U.S. Citizenship and Immigration Services (USCIS) asylum officer for screening before any return to Mexico to assess whether it is more likely than not that the alien will face persecution or torture if returned to Mexico in accordance with guidance issued by the Director of USCIS.

Migrant Protection Protocols Guidance
Page 4

If USCIS assesses that such an alien is more likely than not to face persecution or torture in Mexico, ERO will determine whether the alien may be maintained in custody or paroled, or if another disposition is appropriate.  Such an alien may not be subject to expedited removal; however, and may not be returned to Mexico to await further proceedings.[2]

*Recordkeeping and Reporting*

MPP aliens booked in and out of ICE custody must be appropriately documented in the Enforce Alien Detention Module (EADM) and monitored per a final Form I-216, *Record of Person and Property Transfer*.  For MPP aliens booked into ICE custody, the comment "out to court pursuant to MPP," must be added to the comments section of EADM.

EADM records for MPP aliens booked out of ICE custody will need to reflect the appropriate court dispositions.  Comments in EADM should reflect "MPP, Returned to the POE for Future Hearing;" "MPP, Granted Relief, Released from Custody;" "MPP, Claimed Fear of Mexico, returned to the POE;" or "MPP, Ordered Removed," or similar comments indicating an MPP disposition as appropriate.

*Disclaimers*

Except as specifically provided in relation to the MPP, existing policies and procedures for processing and removing aliens remain unchanged.  That applies to record-keeping responsibilities as well as removal authority and responsibility.  The MPP does not change ERO's removal operations, and removable aliens will be processed in accordance with standard practices and procedures.

This document is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Likewise, this guidance places no limitations on the otherwise lawful enforcement or litigative prerogatives of DHS.

---

[2] In MPP cases where an immigration judge grants withholding or deferral of removal *to Mexico* and appeal is reserved, ERO should confer with OPLA about appropriate next steps prior to any return under INA section 235(b)(2)(C).

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 177 of 688   PageID 1834

This is historical material "frozen in time". The website is no longer updated and links to external websites and some internal pages may not work.



**PROCLAMATIONS**

# Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States

**NATIONAL SECURITY & DEFENSE**

Issued on: **February 15, 2019**

★ ★ ★

The current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency.  The southern border is a major entry point for criminals, gang members, and illicit narcotics.  The problem of large-scale unlawful migration through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years.  In particular, recent years have seen sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending.  If not detained, such aliens are often released into the country and are often difficult to remove from the United States because they fail to appear for hearings, do not comply with orders of removal, or are otherwise difficult to locate.  In response to the directive in my April 4, 2018, memorandum and subsequent requests for support by the Secretary of Homeland Security, the Department of Defense has provided support and resources to the Department of Homeland Security at the southern border. Because of the gravity of the current emergency situation, it is necessary for the Armed Forces to provide additional support to address the crisis.

NOW, THEREFORE, I, DONALD J. TRUMP, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 201 and 301 of the National Emergencies Act (50 U.S.C. 1601 *et seq.*), hereby declare that a national emergency exists at the southern border

AR171

of the United States, and that section 12302 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretaries of the military departments concerned, subject to the direction of the Secretary of Defense in the case of the Secretaries of the Army, Navy, and Air Force. To provide additional authority to the Department of Defense to support the Federal Government's response to the emergency at the southern border, I hereby declare that this emergency requires use of the Armed Forces and, in accordance with section 301 of the National Emergencies Act (50 U.S.C. 1631), that the construction authority provided in section 2808 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretary of Defense and, at the discretion of the Secretary of Defense, to the Secretaries of the military departments. I hereby direct as follows:

Section 1. The Secretary of Defense, or the Secretary of each relevant military department, as appropriate and consistent with applicable law, shall order as many units or members of the Ready Reserve to active duty as the Secretary concerned, in the Secretary's discretion, determines to be appropriate to assist and support the activities of the Secretary of Homeland Security at the southern border.

Sec. 2. The Secretary of Defense, the Secretary of the Interior, the Secretary of Homeland Security, and, subject to the discretion of the Secretary of Defense, the Secretaries of the military departments, shall take all appropriate actions, consistent with applicable law, to use or support the use of the authorities herein invoked, including, if necessary, the transfer and acceptance of jurisdiction over border lands.

Sec. 3. This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this fifteenth day of February, in the year of our Lord two thousand nineteen, and of the Independence of the United States of America the two hundred and forty-third.

DONALD J. TRUMP

AR172

Case 2:21-cv-00067-Z　Document 61　Filed 06/22/21　Page 179 of 688　PageID 1836

The White House

President Donald J. Trump

Vice President Mike Pence

First Lady Melania Trump

Mrs. Karen Pence

The Cabinet

Administration Accomplishments

News

Remarks

Articles

Presidential Actions

Briefings & Statements

About The White House

Economy & Jobs

Budget & Spending

Education

Immigration

National Security & Defense

Healthcare

AR173

Case 2:21-cv-00067-Z    Document 61    Filed 06/22/21    Page 180 of 688    PageID 1837

Council of Economic Advisers

Council of Environmental Quality

National Security Council

Office of Management and Budget

Office of National Drug Control Policy

Office of Science and Technology Policy

Copyright    Privacy Policy

AR174



# Trump declares national emerg at border

BY **JORDAN FABIAN** · 02/15/19 10:50 AM EST

**4,485** SHARES

SHARE                    TW

## Just In...

**Florida high school draws backlash after altering girls' yearbook photos to add clothing**
STATE WATCH — 5M 10S AGO

**Michigan governor apologizes after photo shows her violating state's health order**
STATE WATCH — 6M 53S AGO

**Harris to 2021 grads: Pandemic prepared you for 'pretty much anything'**
IN THE KNOW — 1H 13M AGO

**Senate Armed Services chair throws support behind changing roles of military commanders in sexual assault prosecutions**
DEFENSE — 2H 7M AGO

**Blinken condemns 'shocking act' of Belarus forcing plane carrying opposition journalist to land**
INTERNATIONAL — 2H 24M AGO

**Three in five say more changes needed to give Black Americans equal rights: poll**
BLOG BRIEFING ROOM — 2H 42M AGO

**Cheney dodges on link between Trump election claims and GOP voting laws**

This video file cannot be played.
(Error Code: 232011)

**President Trump** on Friday declared a national emergency to bypass Congress and spend roughly $8 billion on barriers along the southern border, a big step toward building his long-promised wall that also comes with significant political and legal risk.

Trump's move, announced in a rambling, improvised address from the Rose Garden shortly after signing the declaration, will launch a fierce constitutional battle in the courts with lawmakers and outside groups who say the president overstepped his authority.

"I am going to be signing a national emergency," Trump said after a long introduction that touched on trade, China, Syria and the caravans of immigrants that Trump made a political issue of ahead of last fall's midterm elections.

> **Kayleigh McEnany 45 Archived** ✔
> @PressSec45
>
> President @realDonaldTrump signs the Declaration for a National Emergency to address the national security and humanitarian crisis at the Southern Border.

AR175

HOUSE CALENDAR

**NSF funding choice: Move forward or fall behind**
OPINION — 3H 22M AGO

VIEW ALL

11:02 AM · Feb 15, 2019 ⓘ

♡ 35.6K 💬 8K ⬆ Share this Tweet

"It's a great thing to do because we have an invasion of drugs, invasion of gangs, invasion of people," the president said in seeking to justify the need for an emergency declaration.

Trump predicted the move will be challenged in federal court, but said he would eventually prevail.

"I could do the wall over a long period of time. I didn't need to do this, but I'd rather do it much faster," Trump said, a concession his critics seized upon to argue an emergency does not exist on the southern border.

Speaker Nancy Pelosi (Calif.) and Senate Minority Leader Charles Schumer (N.Y.), the top two Democrats in Congress, said they would use "every available remedy" to overturn the emergency declaration.

"The president's unlawful declaration over a crisis that does not exist does great violence to our Constitution and makes America less safe," they said in a joint statement. "The president is not above the law. The Congress cannot let the president shred the Constitution."

Trump is separately set to sign legislation approved by Congress that funds the government and prevents a new shutdown set to begin on Saturday.

But that legislation fell far short of his demands for $5.7 billion in wall funding, with Trump saying he tried his best to work with lawmakers to secure additional border security but "on the wall, they skimped."

Trump also claimed "I've already done a lot of wall for the election — 2020," even existing construction has repaired and replaced existing barriers instead of building new ones.

Trump plans to redirect $3.6 billion in military construction funding toward the border project, according to White House officials. Trump will also take separate executive action repurposing about $2.5 billion from the Defense Department's drug-interdiction program and $600 million from the Treasury Department's asset-forfeiture fund.

Officials said the goal is to ultimately build roughly 234 miles of barriers along the border, including bollard-style wall.

An administration official did not identify which military construction projects would be affected but said funding would be taken from "lower-priority construction projects," such as funding to fix or repair existing structures, and not from flood-mitigation efforts or projects that would affect military readiness. Disaster-relief funds will also not be touched.

AR176

Lawmakers in both parties have criticized Trump's decision to declare an emergency, though Senate Majority Leader Mitch McConnell (R-Ky.) did offer his support.

McConnell on Friday called Trump's decision "the predictable and understandable consequence of Democrats' decision to put partisan obstruction ahead of the national interest" and called on lawmakers to approve more border funding.

But House Democrats instead plan to introduce legislation that would block the declaration, which could pass both chambers and reach the president's desk if Republicans who have criticized Trump's decision vote for it.

That would force Trump to potentially veto the first piece of legislation as president, a move that could further divide his own party in the lead-up to the 2020 elections.

Democrats and liberal advocacy groups have said they also plan to file lawsuits to stop the move in federal court.

Pelosi, speaking Thursday on the anniversary of the Parkland, Fla., school shootings, said it could lead a new president to declare a national emergency on guns. Such a scenario is exactly what some GOP lawmakers have feared.

"A Democratic president can declare emergencies, as well," Pelosi told reporters in the Capitol. "So the precedent that the president is setting here is something that should be met with great unease and dismay by the Republicans."

Sen. Marco Rubio (R-Fla.) made a similar argument, warning on Thursday that "a future president may use this exact same tactic to impose the Green New Deal."

"I will wait to see what statutory or constitutional power the president relies on to justify such a declaration before making any definitive statement. But I am skeptical it will be something I can support," he said.

In a call to reporters preceding Trump's announcement, acting White House chief of staff Mick Mulvaney pushed back against Democrats' claims Trump's move would allow a president from their party to declare an emergency over an issue like climate change and gun violence, saying it "actually creates zero precedent" and calling the claim "completely false."

"This is authority given to the president in law already," he said. "It's not as if he just didn't get what he wanted so he's waving a magic wand and taking a bunch of money."

Trump's decision to sign the spending bill ends three weeks of uncertainty over whether he would trigger another shutdown over his demand for wall money.

The president reopened closed government agencies on Jan. 25 after a 35-day shutdown that resulted in a major blow to his approval ratings and no financing for a wall.

A bipartisan group of lawmakers on Capitol Hill spent the ensuing weeks hammering out a proposal that includes $1.375 billion in wall funding, only a fraction of the $5.7 billion Trump demanded.

AR177

Case 2:21-cv-00067-Z Document 61 Filed 06/22/21 Page 184 of 688 PageID 1841

Trump's acceptance of the compromise marks a defeat for a president who touted his negotiating skills during the 2016 campaign, and it showed Democrats' increased leverage under divided government.

*The story was updated at 12:50 p.m.*

**TAGS   MITCH MCCONNELL   CHARLES SCHUMER   MICK MULVANEY   NANCY PELOSI   DONALD TRUMP   MARCO RUBIO   IMMIGRATION   BORDER WALL   SHUTDOWN**

SHARE          TWEET



**THE HILL 1625 K STREET, NW SUITE 900 WASHINGTON DC 20006 | 202-628-8500 TEL | 202-628-8503 FAX**
**THE CONTENTS OF THIS SITE ARE ©2021 CAPITOL HILL PUBLISHING CORP., A SUBSIDIARY OF NEWS COMMUNICATIONS, INC.**

AR178

1300 Pennsylvania Avenue NW
Washington, DC 20229

HQBOR 50/1-C



**U.S. Customs and
Border Protection**

**MAR 0 1 2019**

MEMORANDUM FOR:    All Chief Patrol Agents
                             All Directorate Chiefs

FROM:                    Carla L. Provost
                             Chief
                             U.S. Border Patrol

SUBJECT:              Guidance on Migrant Protection Protocols

Effective immediately, in accordance with the Commissioner's guidance dated January 28, 2019, the U.S. Border Patrol (USBP), San Diego Sector (SDC) will remain consistent with its existing discretion and authorities in implementing Section 235(b)(2)(C) of the Immigration and Nationality Act (INA). Under this implementation of Section 235(b)(2)(C), referenced as the Migrant Protection Protocols (MPP), the Department of Homeland Security is authorized to return certain applicants for admission, who arrive on land from Mexico to the SDC, and who are subject to removal proceedings under INA Section 240, to Mexico pending removal proceedings. Implementation will begin in SDC and is expected to expand to other southern border sectors.

Under section 235(b)(2)(C), aliens may be processed for the MPP if they are "arriving on land" between the ports of entry. In general, and on an individualized basis, USBP agents may consider an alien to be "arriving on land" for purposes of the MPP if the alien is encountered within 96 hours of the alien's crossing of the land border.[1] Agents should make these determinations based on the facts and circumstances presented by a particular case when determining whether an alien is amenable to the MPP.

Certain aliens; including unaccompanied alien children, aliens with criminal or violent history, aliens with known serious physical or mental health issues, and aliens of interest to Mexico or the United States, will not be amenable to the MPP. The attached Guiding Principles Muster for the MPP outlines in more detail which aliens may be amenable to the MPP. As part of the determination for MPP, USBP will refer aliens who are potentially amenable to the MPP; but who affirmatively state fear of return to Mexico, whether before or after they are processed for the MPP or other disposition, to U.S. Citizenship and Immigration Services for screening following such an affirmative statement.

---

[1] Section 235(b)(2)(C) applies to applicants for admission who are "arriving on land." This term thus clearly constitutes a reference to both an alien's location (in the act of "arriving") and manner of entry (on land, rather than by sea or air). "Arriving on land," in this context, refers both to those in the process of crossing the land border, as well as those encountered reasonably proximate to crossing the land border between the ports of entry. Over the past several fiscal years, approximately 90% of aliens apprehended by the U.S. Border Patrol along the southwest border have been apprehended within 96 hours of crossing the land border. USBP agents, however, also should consider unique circumstances in which an alien apprehended in that period has credibly demonstrated that he or she has reached his or her intended destination in the United States.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Please ensure that this memorandum is distributed to all stations within your jurisdiction.

Attachments

2

 **REUTERS**    **World**    **Business**    **Markets**    **Breakingviews**    **Video**    **More**      🔍

**U.S. LEGAL NEWS**

APRIL 16, 2019 / 10:15 PM / UPDATED 2 YEARS AGO

# Trump attorney general's ruling expands indefinite detention for asylum seekers

By Mica Rosenberg, Kristina Cooke



NEW YORK/SAN FRANCISCO (Reuters) - The U.S. Attorney General on Tuesday struck down a decision that had allowed some asylum seekers to ask for bond in front of an immigration judge, in a ruling that expands indefinite detention for some migrants who must wait months or years for their cases to be heard.



down on the flow of migrants at the u.s. Southern border

Minutes to touchdown: the moment a Belarusian dissident knew his time was up

Th.............................................................................y

General William Barr is in keeping with the administration's moves to clamp down on the

AR181

asylum process as tens of thousands of mostly Central Americans cross into the United States asking for refuge. U.S. immigration courts are overseen by the Justice Department and the Attorney General can rule in cases to set legal precedent.

Barr's ruling is the latest instance of the Trump administration taking a hard line on immigration. This year the administration implemented a policy to return some asylum seekers to Mexico while their cases work their way through backlogged courts, a policy which has been challenged with a lawsuit.

Several top officials at the Department of Homeland Security were forced out this month over Trump's frustrations with an influx of migrants seeking refuge at the U.S. southern border.

Barr's decision applies to migrants who crossed illegally into the United States.

Typically, those migrants are placed in "expedited removal" proceedings - a faster form of deportation reserved for people who illegally entered the country within the last two weeks and are detained within 100 miles (160 km) of a land border. Migrants who present themselves at ports of entry and ask for asylum are not eligible for bond.

But before Barr's ruling, those who had crossed the border between official entry points and asked for asylum were eligible for bond, once they had proven to asylum officers they had a credible fear of persecution.

Minutes to touchdown: the moment a Belarusian dissident knew his time was up

AR182

Slideshow（3 images）

"I conclude that such aliens remain ineligible for bond, whether they are arriving at the border or are apprehended in the United States," Barr wrote.

Barr said such people can be held in immigration detention until their cases conclude, or if the Department of Homeland Security（DHS）decides to release them by granting them "parole." DHS has the discretion to parole people who are not eligible for bond and frequently does so due to insufficient detention space or other humanitarian reasons.

Barr said he was delaying the effective date by 90 days "so that DHS may conduct the necessary operational planning for additional detention and parole decisions."

The decision's full impact is not yet clear, because it will in large part depend on DHS' ability to expand detention, said Stephen Yale-Loehr, a professor at the University of Texas

Minutes to touchdown: the moment a Belarusian dissident knew his time was up

AR183

"The number of asylum seekers who will remain in potentially indefinite detention pending disposition of their cases will be almost entirely a question of DHS's detention capacity, and not whether the individual circumstances of individual cases warrant release or detention," Vladeck said.

DHS officials did not immediately respond to a request for comment on the decision. The agency had written in a brief in the case arguing that eliminating bond hearings for the asylum seekers would have "an immediate and significant impact on...detention operations."

Slideshow（3 images）

In early March, Immigration and Customs Enforcement（ICE）, the DHS agency responsible for detaining and deporting immigrants in the country illegally, said the average daily population of immigrants in detention topped 46,000 for the 2019 fiscal year, the highest level since the program started in 2001. In a same Reuters reported that ICE had modified the pool offi~~ Minutes to touchdown: the moment a Belarusian dissident knew his time was up ~~ or released on bond, making the process more restrictive.

AR184

The decision will have no impact on unaccompanied migrant children, who are exempt from expedited removal. Most families are also paroled because of a lack of facilities to hold parents and children together.

Michael Tan, from the American Civil Liberties Union, said the rights group intended to sue the Trump administration over the decision, and immigrant advocates decried the decision.

Barr's decision came after former Attorney General Jeff Sessions decided to review the case in October. Sessions resigned from his position in November, leaving the case to Barr to decide.

Reporting by Mica Rosenberg in New York and Kristina Cooke in San Francisco; additional reporting by Yeganeh Torbati in Washington; Editing by Lisa Shumaker

*Our Standards: <u>The Thomson Reuters Trust Principles.</u>*

---

Apps　　Newsletters　　Advertise with Us　　Advertising Guidelines　　Cookies　　Terms of Use　　Privacy

Do Not Sell My Personal Information



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2021 Reuters. All Rights Reserved.

Minutes to touchdown: the moment a Belarusian dissident knew his time was up

AR185



**U.S. Department of Homeland Security**
Washington, DC 20528

June 12, 2019

MEMORANDUM FOR:     David P. Pekoske
                    Senior Official Performing the Duties of the Deputy Secretary

FROM:               Kevin K. McAleenan
                    Acting Secretary

SUBJECT:            Review of Migrant Protection Protocols Policy and Implementation

---

As Acting Secretary, it is my priority that our enforcement of the law is done with integrity, transparency, and respect for all people we encounter.  In light of the ongoing humanitarian and border security crisis along the Southwest Border, we are employing all of the legal tools provided by Congress, including the provision of the Immigration and Nationality Act that provides that migrants who are inadmissible to the United States may remain in Mexico during the pendency of their removal proceedings.  The Department has carefully crafted a policy regime to lawfully implement what we have called the Migrant Protection Protocols, and has done so to protect those involved from harm as well as provide for due process under the law.  As we move forward with the expansion of MPP, I request that you form a committee of senior leaders in the Department to do a top-down review of MPP's policies and implementation strategy, and provide overall recommendations to increase the effectiveness of the program.

I ask you to chair the committee and include senior leaders from the Office of Management, the Office of Civil Rights and Civil Liberties, the Office of General Counsel, the Privacy Office, the Judge Advocate General and Chief Counsel Office, U.S. Coast Guard, and any other senior leader that you deem appropriate.  While some of these entities were involved with the planning and implementation of MPP, committee members should have had little to no involvement developing policy or with implementing MPP to date.

In order to ensure a thorough review, the committee is advised to conduct interviews with subject matter experts from the Office of Strategy, Policy, and Plans, and employees from DHS operational components with first-hand knowledge and experience of the program's implementation.  Headquarters and operational components are directed to fully comply with the committee's requests for interviews and supporting documents.  John Gountanis will act as Headquarters' liaison and will provide support to the committee as needed.

Given the urgency of this matter, I look forward to reviewing the committee's summary of findings and recommendations for improvement within 30 days of the committee's formation and initial meeting.  Thank you in advance for your work on this review and associated recommendations for improvement.


politics        **LIVE TV**

# Immigration court backlog exceeds 1 million cases, data group says

By <u>Priscilla Alvarez</u>, CNN

Updated 5:42 PM EDT, Wed September 18, 2019



Sketches by Bill Hennessy

 **(CNN)** — The <u>immigration court backlog </u>now exceeds 1 million cases, according to Syracuse University's Transactional Records Access Clearinghouse, which <u>tracks immigration court data</u>.

Immigration courts, which fall under the Justice Department and decide whether to deport immigrants, have been bogged down over the years as more cases are added to the docket that can be addressed at any given time.

"If nothing else, the continuing rise of the backlog shows that the immigration court is broken," said Judge Ashley Tabaddor, president of the National Association of

AR187

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 194 of 688   PageID 1851

Immigration Judges. "Until we fix the design defect of having a court in a law enforcement agency, we will not be able to address the backlog in a fair and effective manner."

President Donald Trump has repeatedly criticized the nation's immigration system, specifically taking issue with the practice of releasing immigrants while they await their court dates. To remedy that, his administration has sought to hire more immigration judges in the hopes of unclogging the court. Even so, the number of cases has continued to tick upward.

During the last partial government shutdown, for example, the only cases that moved forward were those of immigrants in detention. All others were postponed.

In January, the Transactional Records Access Clearinghouse estimated that more than 42,000 immigration court hearings had been canceled as a result of the shutdown – exacerbating an issue Trump had pledged to resolve.

"The latest case-by-case court records through the end of August 2019 show the court's active case backlog was 1,007,155," according to the clearinghouse's report released Wednesday. "If the additional 322,535 cases which the court says are pending but have not been placed on the active caseload rolls are added, then the backlog now tops 1.3 million."

While a Justice Department spokesman said in a statement to CNN that the department "does not certify data from third parties," the spokesman added: "This report and DOJ's own data further confirms there is a crisis at the border. This Administration is taking aggressive steps to increase productivity, close loopholes, and hire a record number of judges to address the backlog with our existing authorities."

While the clearinghouse doesn't attribute the backlog to any one factor, the American Bar Association has previously proposed a major overhaul of the US immigration system, calling the courts "irredeemably dysfunctional."

"The state of the U.S. immigration court system has worsened considerably since our 2010 Report," that March report noted, mentioning an unprecedented backlog of cases, increased wait times, policy changes that aim to accelerate cases without allocating enough funding, overreliance on video teleconferencing during court proceedings and possible bias in the hiring of judges.

The Justice Department had previously addressed some of the issues the bar association report raised.

The administration has acknowledged the massive immigration court backlog and has, at times, placed blame on unfounded asylum claims, which have to work their way

AR188

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 195 of 688   PageID 1852

through their court system.

This month, the administration opened tent courts along the Texas border to hear the cases of migrants who have been returned to Mexico to await their immigration proceedings as part of the Migrant Protection Protocols program. Around 42,000 migrants have been sent back under the program.

In Wednesday's report, the Transactional Records Access Clearinghouse notes that the Migrant Protection Protocols cases still make up a small share of the court's active backlog.

CNN's Catherine E. Shoichet contributed to this report.

Search CNN...

US

World

Politics

Business

Opinion

Health

Entertainment

Tech

AR189

Style

Travel

Sports

Videos

Audio

Coupons

Weather

More



**FOLLOW CNN POLITICS**

   

Terms of Use    Privacy Policy    Do Not Sell My Personal Information    Accessibility & CC    About    Newsletters

Transcripts

© 2021 Cable News Network. A Warner Media Company. All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

AR190

AR191

*DHS Office of Operations Coordination*
**Deliberative Document**
November 16, 2019



# The Migrant Protection Protocols Red Team Report

*October 25, 2019*

*DHS Office of Operations Coordination*
**Deliberative Document**
November 16, 2019

1                               **Executive Summary**

2

3    The U.S. implemented the *Migrant Protection Protocols* (MPP) in January 2019 to address the
4    security and humanitarian crisis on the Southern border resulting from an unprecedented number of
5    migrants seeking asylum.  MPP was implemented under Section 235(b)(2)(C) of the Immigration
6    and Nationality Act (INA), which gives the Secretary of Homeland Security the authority to
7    return certain applicants for admission to the contiguous country from which they are arriving on
8    land (whether or not at a designated port of entry) pending removal proceedings under Section
9    240 of the INA.  The MPP is designed to support a safe and orderly immigration process,
10   decrease the number of migrants who take advantage of the immigration system, decrease
11   smugglers and traffickers' ability to prey on vulnerable populations, and reduce threats to life,
12   national security, and public safety, while ensuring that migrants (particularly vulnerable
13   population members) receive appropriate protections.

14

15   The Department established a multi-Component Red Team, composed of members from the
16   Offices of Privacy, Management, Civil Rights and Civil Liberties, and United States Coast Guard,
17   under the oversight of the DHS Acting Deputy Secretary to review and provide a report on the
18   Department's implementation of the MPP.  This team examined the execution of the MPP across
19   the Department to identify recommendations to increase the effectiveness of the program.

20

21   The DHS MPP Red Team identified 16 recommendations organized under the following areas:

22

23        •   Initial Screening and Processing.
24        •   Access to Counsel and Due Process.
25        •   Protection Claims.
26        •   Treatment in Mexico.
27        •   Administration and Logistics.

28   Each recommendation is designed to correct a shortfall or improve the overall program
29   efficiency.  The two attachments provide an overview of the MPP process (Attachment 1) and a
30   consolidated summary of the MPP Recommendations (Attachment 2).

31

32

33

*DHS Office of Operations Coordination*
**Deliberative Document**
November 16, 2019

34                                    **Table of Contents**
35          1.  Introduction
36
37          2.  DHS MPP Red Team Approach
38
39          3.  DHS MPP Red Team Recommendations
40                     a.  Initial Screening and Processing
41                     b.  Access to Counsel and Due Process
42                     c.  Protection Claims
43                     d.  Treatment in Mexico
44                     e.  Administration and Logistics
45
46          4.  DHS MPP Red Team Summary
47
48                     a.  Summary
49                     b.  Points of Contact
50
51          ATTACHMENTS:
52          Attachment 1: MPP Flow Chart
53          Attachment 2: MPP Recommendations Matrix Summary (T)
54
55
56
57
58
59
60
61
62
63
64
65
66

**FOR OFFICIAL USE ONLY**
*Pre-decisional internal working document*

*DHS Office of Operations Coordination*
**Deliberative Document**
November 16, 2019

## 1. Introduction

The U.S. implemented the MPP in January 2019 to address the security and humanitarian crisis on the Southern border.  These protocols pertain to certain foreign individuals, entering or seeking admission to the U.S. from Mexico, illegally or without proper documentation, and evaluates them for return to Mexico to wait outside of the U.S for the duration of their U.S. immigration proceedings.  The Government of Mexico (GOM) provides all appropriate humanitarian protections for the duration of their waiting period.  The MPP are designed to support a safe and orderly immigration process, decrease the number of migrants taking advantage of the immigration system, decrease smugglers and traffickers' ability to prey on vulnerable populations, and reduce threats to life, national security, and public safety, while ensuring that vulnerable populations receive the protections they need.

The Deputy Secretary of Homeland Security was directed to establish a Red Team to conduct a top-down review of the MPP policies and implementation strategy.  The team examined the way the Department executes the MPP to produce findings and recommendations to increase program effectiveness.  This report contains the results of this analysis with specific recommendations for the Department's senior leadership to consider.  DHS should consider these recommendations to enhance the effectiveness and implementation of the MPP program.

## 2. DHS MPP Red Team Approach

Acting Deputy Secretary Pekoske organized the *DHS MPP Red Team* in July 2019.  The members began by reviewing key MPP background documents (Secretary Nielsen's *Policy Guidance Memorandum*, CBP's *Implementation of Migrant Protection Protocols*, USCIS Policy Memorandum *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols, etc.)* and engaging with DHS Components implementing the MPP along the U.S. Southwest Border.  The Red Team did not formally engage with migrants, Non-government Organizations (NGOs), academics, attorneys, GOM officials or other experts outside the Department.  The Red Team then developed specific recommendations to improve the Department's implementation of MPP in the following areas:

     a.   Initial Screening and Processing
     b.   Access to Counsel and Due Process
     c.   Protection Claims
     d.   Treatment in Mexico
     e.   Administration and Logistics

DHS Components provided feedback on the initial draft, and the Red Team consolidated the input into a single draft report.  The draft report was then redistributed and discussed by all Red Team members, the Office of General Counsel, and the Office of Strategy, Policy, and Plans before additional revisions were incorporated into the final report.  The recommendations are presented below.

*DHS Office of Operations Coordination*
**Deliberative Document**
November 16, 2019

**3. DHS MPP Red Team Recommendations**

Based on information obtained through dozens of interviews, site visits, and extensive research, the *DHS MPP Red Team* identified the 16 recommendations below:

    **a. *Initial Screening and Processing.***

- *Enhance initial screening and processing of migrants where MPP is operational.*
  - Standardize the information posted/provided at each facility regarding individual migrant rights (signage should also notify indigenous language speakers of the availability of interpretation services).
  - Provide forms, including informational notices such as the "Notice to Appear" (NTA), in multiple languages (English and Spanish at a minimum) to increase migrants' ability to comprehend their individual rights.
  - Improve identification of each migrant's primary language, particularly those indigenous language speakers for whom English and Spanish are not the primary language, prior to issuance of the NTA, and ensure interpreter availability.
  - Standardize DHS MPP forms and ensure they are consistently used at all MPP locations, Border Patrol stations, and ports of entry.
  - Standardize procedures for vulnerable populations, including pregnant women, LGBTQ, disabled, minors, and the elderly.
- *Clarify the interview process.*
  - Publish a unified standard operating procedure to ensure consistent application of operational MPP procedures across the Department.[1]
  - Modify *DHS I-213 Form* to record whether migrants are traveling with relatives or partners and any relevant phone numbers for the migrant and their family.
  - Address situations where families are placed in MPP and returned to Mexico despite having at least one immediate family member who is Mexican (e.g. the child was born in Mexico to a non-Mexican mother).  Some families are placed in the MPP program where the parents are not citizens of Mexico but their child has Mexican citizenship. While one or both parents may have claimed fear, some are returned to Mexico along with their child because they did not pass the asylum officer's screening process. At some locations, DHS sends pregnant women back to Mexico under MPP. It is unclear how DHS will treat families who claim fear of persecution or torture in Mexico when they return to the U.S. with a child who was born in Mexico (and may have Mexican citizenship).
- *Ensure migrants who have asserted "fear" understand the details and scope of the fear screening process.*
  - Add specific protocols during the "fear screening process" to determine the best-spoken language to communicate with indigenous-language speakers, to ensure the migrant understands the questions asked and can make informed decisions.

---

[1] This would include, but is not limited to: specific authorities, references, best practices, and procedures to ensure a standardized approach to the MPP processes across the Department.

*DHS Office of Operations Coordination*
**Deliberative Document**
November 16, 2019

147     •   *Set standards on non-adversarial interviews.*
148       o   Develop and provide guidance to train components on what constitutes "non-
149         adversarial" interviews.  These guidelines would include: who can be present at the
150         interview, who may assist with substantiating a claim of fear, the appropriate use
151         of restraints during interviews, guidelines for participation of counsel or a
152         representative, and how to conduct the interview "separate and apart" from persons
153         not related to the claim.
154     •   *Ensure the consistent application of the fear screening process.*
155       o   Modify fear screening process protocols to clarify the role of CBP officers and
156         agents versus USCIS officers in making determinations on MPP amenability based
157         on the migrant's claimed fear of persecution or torture in Mexico.  At some
158         locations, CBP uses a pre-screening process that preempts or prevents a role for
159         USCIS to make its determination. Interviewees also indicated that some CBP
160         officials pressure USCIS to arrive at negative outcomes when interviewing
161         migrants on their claim of fear of persecution or torture.
162     •   *Collect new information during screenings (e.g. affirmative statement regarding fear of*
163       *returning to Mexico).*
164       o   Modify current processes to include fear of "persecution or torture in Mexico" as
165         an additional piece of personal information that will be noted in ICE, CBP, or
166         USCIS data systems.
167       o   Review current processes for migrants not amenable to MPP to ensure that
168         personal information is not inappropriately shared with Mexico.  When an
169         individual asserts a fear of returning to Mexico, and USCIS determines that the
170         individual has met the threshold of "more likely than not that the individual will be
171         persecuted or tortured" if returned to Mexico, a filter in the Office of Biometric
172         Identification Management System's Automated Biometric Identification System
173         should prevent the individual's biometrics from being shared with Mexico.  This
174         would ensure DHS is consistently applying confidentiality protections to asylum
175         seekers.
176
177    **b.**   *Access to Counsel and Due Process.* [2]
178     •   *Facilitate migrant access to counsel.*
179       o   Engage with external stakeholders to provide options for multiple communication
180         forums to facilitate early interaction between MPP attorneys and their clients, as
181         much as practical.
182       o   Engage with external stakeholders to provide migrants who are not in the U.S.
183         access to "Know Your Rights" training, and pre-trial hearing advice, as much as
184         practical.  This would include, leveraging the internet, video teleconference, and
185         other communication forums to bridge geographic and security concerns.  This

---

[2] Due process does not necessarily mean 5th Amendment due process but refers to the administration of due process generally, as noted in the Secretary's June 2019 Memorandum directing a review of MPP policy and implementation.

*DHS Office of Operations Coordination*
**Deliberative Document**
November 16, 2019

| | |
|---|---|
| 186 | support would be formalized through a Memorandum of Agreement or similar |
| 187 | document. |
| 188 | • *Facilitate meeting locations/logistics surrounding pre-hearing meeting locations.* |
| 189 | o In collaboration with the Government of Mexico (GOM), ensure a comprehensive |
| 190 | standardized documentation package is used and recognized by all authorities to |
| 191 | facilitate migrant travel, hearing scheduling, processing, and to protect personal |
| 192 | information. Ensure this package can be replaced in Mexico if it is lost or stolen. |
| 193 | o During site visits, the team noted some migrants must give up shelter space in |
| 194 | Mexico when they come to the US for a hearing (particularly when in the US for |
| 195 | 24-48 hours or more), leaving them without an address to allow for follow up. |
| 196 | CBP should create a reliable method of communication (such as an email contact |
| 197 | for each migrant) to allow for communication from USG to migrants during their |
| 198 | wait in Mexico. The usage of a more reliable communication method, will allow |
| 199 | outreach to migrants in Mexico, but will also ensure access to counsel, and |
| 200 | communication between migrant families (such as those cases when family |
| 201 | members were not all processed at the same time/location, or when juveniles were |
| 202 | sent to ORR). |
| 203 | |
| 204 | **c.  *Protection Claims.*** |
| 205 | • *Enhance understanding of credible fear.* |
| 206 | o Continue engaging with external stakeholders to foster a shared understanding of |
| 207 | the elevated MPP standard of fear of return to Mexico from "a significant |
| 208 | possibility" to "more likely than not," to help address current confusions about |
| 209 | credible fear determinations. |
| 210 | o Continue to document and analyze migrant "credible fear" claims to address |
| 211 | potential *non-refoulement*[3] concerns. |
| 212 | |
| 213 | **d.  *Treatment in Mexico.*** |
| 214 | • *Support GOM, NGOs, and community service groups to ensure sufficient, safe, and secure* |
| 215 | *living conditions for returnees in Mexico.* |
| 216 | o Recommend Department of State (DOS) coordinate with Mexico to obtain the |
| 217 | GOM's written assurance they will comply with *non-refoulement* obligations. |
| 218 | o Continue to support safe/confidential housing for vulnerable populations remaining |
| 219 | in Mexico through MPP. |

---

[3] Non-refoulement is a fundamental principle of international law that forbids a country receiving asylum seekers from returning them to a country in which they would be in likely danger of persecution based on "race, religion, nationality, membership of a particular social group or political opinion".

220   • *Periodically monitor and evaluate whether Mexico is meeting its basic obligations under*
221     *international law for migrants returning to Mexico under MPP.*[4]

222

223   **e. Administration and Logistics.**
224   • *Establish protocols to ensure regular communication with migrants during their stay in*
225     *Mexico.*
226     o Create an integrated mechanism to share information between migrants and
227       DHS/Department of Justice (DOJ)/Health and Human Services (HHS) throughout
228       removal proceedings.
229   • *The Chief Privacy Officer will determine if DHS needs to conduct a Privacy Impact*
230     *Assessment (PIA) on the MPP.*
231     o Take appropriate action to mitigate privacy risks identified in any potential DHS
232       MPP PIA.
233   • *Examine internal and external information sharing considerations.*
234     o Standardize intradepartmental information sharing between MPP Component
235       stakeholders (CBP, ICE, USCIS, and OBIM) to memorialize agreed upon
236       processes and procedures.
237     o Standardize information sharing between external MPP stakeholders (DOJ/EOIR,
238       GOM, HHS) through a memorandum of agreement or other formal documentation.
239     o Engage with the GOM to negotiate a formal information sharing agreement to
240       govern the collection, use, retention, and dissemination of any MPP related
241       information shared between DHS and GOM.
242     o In collaboration with EOIR, review/update the *MOU between DHS and EOIR*
243       *Regarding the Sharing of Information on Immigration Cases*, approved in October
244       2012.
245   • *Develop MPP regulations.*
246     o Develop regulations for the MPP program.
247   • *Establish MPP Measures of Effectiveness.*
248     o Establish, implement, and assess specific measures of effectiveness (MOE) to
249       evaluate the MPP's effectiveness and scope. These MOE would include: the
250       incoming flow of migrants per day (both for initial screening and for subsequent
251       MPP proceedings); number and percentage of incoming migrants amenable to
252       MPP; flow-rate and backlog associated with removal adjudication proceedings by
253       outcome; number of MPP proceedings scheduled compared to number not held
254       due to no-shows; number of applicants asserting fear per day; number and
255       percentage of MPP applicants having to remain overnight in the U.S.; and the
256       number of Entry Without Inspection migrants apprehended who were previously
257       issued an order of removal from an immigration judge.

---

[4] The evaluation may include adoption of relevant data sets for trends, surveys, use of a NGO, or engagement with an entity or agency
independent of DHS (e.g. State Department or USAID) or some combination thereof.

*DHS Office of Operations Coordination*
**Deliberative Document**
November 16, 2019

258    o   Develop joint plans with DOJ to sustain the capability to conduct MPP
259        proceedings near Southwest Border ports of entry, as needed.

260    **4. DHS MPP Red Team Summary**

261

262    *a.  Summary*

263    Implementation of the DHS MPP Red Team recommendations will continue to improve
264    the Department's ability to secure the Southwest Border, improve the USG immigration
265    process, and ensure that the MPP are implemented in accordance with the January 25,
266    2019 Secretarial memorandum, applicable law, and policy guidance and procedures.
267    This will be an iterative process that the Department will reevaluate and refine over
268    time.  Attachment 1 provides an overview of the MPP process and Attachment 2
269    provides a summary of DHS MPP Red Team Recommendations.

270

271    *b.  Points of Contact*

272    Questions or subsequent coordination for this report should be directed to
273    Sam Kaplan, DHS Deputy Chief of Staff, 202-447-4583; sam.kaplan@hq.dhs.gov.

274

275    **ATTACHMENTS:**

276    **Attachment 1: MPP Flow Chart**

277    **Attachment 2: MPP Recommendations Matrix Summary (Published Separately)**

278

**FOR OFFICIAL USE ONLY**
*Pre-decisional internal working document*

AR200

*DHS Office of Operations Coordination*
**Deliberative Document**
November 16, 2019

279 **Attachment 1: MPP Flow Chart**
280
281 **MIGRANT PROTECTION PROTOCOLS**
282 **FLOW CHART OVERVIEW**
283



284



285



Secretary

**U.S. Department of Homeland Security**
Washington, DC 20528

# Homeland Security

November 8, 2019

MEMORANDUM FOR:   Acting Commissioner
U.S. Customs and Border Protection

Acting Director
U.S. Immigration and Customs Enforcement

Acting Director
U.S. Citizenship and Immigration Services

FROM:   Kevin K. McAleenan
Acting Secretary

SUBJECT:   Review of Migrant Protection Protocols Policy and
Implementation - Final Recommendations

---

As Acting Secretary, it is my priority that our enforcement of the law is done with integrity, transparency, and respect for all people we encounter. With this in mind, earlier this year I directed the Acting Deputy Secretary to form a committee of senior leaders in the Department to conduct a top-down review of MPP's policies and implementation strategy, and provide overall recommendations to increase the effectiveness of the program. It is critical to the success of this program that we periodically review our policies and procedures.

The Acting Deputy Secretary convened a group of dedicated officials who did not have involvement in the implementation of MPP. These officials reviewed relevant policy and implementation documentation, conducted multiple interviews, and participated in site visits at various locations where MPP is implemented. The committee produced a number of thoughtful recommendations that highlighted areas where the program may become more effective and efficient, while maintaining the integrity of the program and safeguarding the rights of aliens who are in removal proceedings. I am grateful to the committee for their efforts.

I find that these detailed recommendations fall into three categories:

1. Screening, Processing, and Assessing the Amenability of Aliens for MPP;
2. Facilitating Access to Counsel and Safeguards Throughout the MPP Process; and

Subject:  Review of Migrant Protection Protocols Policy and Implementation - Final Recommendations
Page 2

   3.  Fear Screenings, Information Sharing, and Measuring Success of the Program.[1]

Within 30 days of the date of this memorandum, I direct your Components to deliver one unified
action plan outlining how the Department will enhance the implementation of MPP in
accordance with these recommendations.  Within 90 days, I direct the completion of action items
contained within that plan.

Attachment

---

[1] For those recommendations that fall outside the purview of the Department and are within the jurisdiction of our
inter-agency partners, I direct the Acting Deputy Secretary to forward those recommendations to our partners for
consideration and action.

[House Hearing, 116 Congress]
[From the U.S. Government Publishing Office]

EXAMINING THE HUMAN RIGHTS AND LEGAL IMPLICATIONS
OF DHS'S ``REMAIN IN MEXICO'' POLICY

=======================================================================

HEARING

before the

SUBMITTEE ON
BORDER SECURITY, FACILITATION,
AND OPERATIONS

of the

COMMITTEE ON HOMELAND SECURITY
HOUSE OF REPRESENTATIVES

ONE HUNDRED SIXTEENTH CONGRESS

FIRST SESSION

_____

NOVEMBER 19, 2019

_____

Serial No. 116-50

_____

Printed for the use of the Committee on Homeland Security

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

Available via the World Wide Web: http://www.govinfo.gov

_____

U.S. GOVERNMENT PUBLISHING OFFICE
40-466 PDF            WASHINGTON : 2020

COMMITTEE ON HOMELAND SECURITY

Bennie G. Thompson, Mississippi, Chairman
Sheila Jackson Lee, Texas          Mike Rogers, Alabama
James R. Langevin, Rhode Island    Peter T. King, New York

AR204

```
Cedric L. Richmond, Louisiana           Mark Walker, North Carolina
Donald M. Payne, Jr., New Jersey        John Katko, New York
Kathleen M. Rice, New York              Mark Walker, North Carolina
J. Luis Correa, California              Clay Higgins, Louisiana
Xochitl Torres Small, New Mexico        Debbie Lesko, Arizona
Max Rose, New York                      Mark Green, Tennessee
Lauren Underwood, Illinois              Van Taylor, Texas
Elissa Slotkin, Michigan                John Joyce, Pennsylvania
Emanuel Cleaver, Missouri               Dan Crenshaw, Texas
Al Green, Texas                         Michael Guest, Mississippi
Yvette D. Clarke, New York              Dan Bishop, North Carolina
Dina Titus, Nevada
Bonnie Watson Coleman, New Jersey
Nanette Diaz Barragan, California
Val Butler Demings, Florida
```

                    Hope Goins, Staff Director
                Chris Vieson, Minority Staff Director
                            ------

        SUBCOMMITTEE ON BORDER SECURITY, FACILITATION, AND OPERATIONS

                   Kathleen M. Rice, New York, Chairwoman

```
Donald M. Payne, Jr., New Jersey        Clay Higgins, Louisiana, Ranking
J. Luis Correa, California                 Member
Xochitl Torres Small, New Mexico        Debbie Lesko, Arizona
Al Green, Texas                         John Joyce, Pennsylvania
Yvette D. Clarke, New York              Michael Guest, Mississippi
Bennie G. Thompson, Mississippi (ex     Mike Rogers, Alabama (ex officio)
   officio)
```

          Alexandra Carnes, Subcommittee Staff Director
       Emily Trapani, Minority Subcommittee Staff Director

                    C O N T E N T S

                      ----------

                                                          Page

                      Statements

The Honorable Kathleen M. Rice, a Representative in Congress From
   the State of New York, and Chairwoman, Subcommittee on Border
   Security, Facilitation, and Operations:
   Oral Statement................................................     1
   Prepared Statement...........................................     3
The Honorable Clay Higgins, a Representative in Congress From the
   State of Louisiana, and Ranking Member, Subcommittee on Border
   Security, Facilitation, and Operations:
   Oral Statement................................................     4
   Prepared Statement...........................................     6
The Honorable Bennie G. Thompson, a Representative in Congress
   From the State of Mississippi, and Chairman, Committee on
   Homeland Security:
   Oral Statement................................................     7
   Prepared Statement...........................................     8
The Honorable Mike Rogers, a Representative in Congress From the
   State of Alabama, and Ranking Member, Committee on Homeland
   Security:
   Oral Statement................................................     8
   Prepared Statement...........................................     9

                      Witnesses

Ms. Laura Pena, Pro Bono Counsel, American Bar Association
   Commission On Immigration:
   Oral Statement................................................    17
   Prepared Statement...........................................    19
Ms. Erin Thorn Vela, Staff Attorney, Racial and Economic Justice
   Program, Texas Civil Rights Project:
   Oral Statement................................................    24
   Prepared Statement...........................................    26
Mr. Todd Schneberk, MD, Assistant Professor of Emergency

                                                AR205

Medicine, Director, Human Rights Clinic, Keck School
of Medicine of the University of Southern California; Asylum
Network Clinician, Physicians for Human Rights:
    Oral Statement.............................................    34
    Prepared Statement.........................................    36
Mr. Michael A. Knowles, President, AFGE Local 1924, Special
Representative AFGE National CIS Council 119:
    Oral Statement.............................................    39
    Prepared Statement.........................................    41
Mr. Thomas D. Homan, Former Acting Director, U.S. Immigration and
Customs Enforcement, Department of Homeland Security:
    Oral Statement.............................................    50
    Prepared Statement.........................................    52


                            For the Record


The Honorable Kathleen M. Rice, a Representative in Congress From
the State of New York, and Chairwoman, Subcommittee on Border
Security, Facilitation, and Operations:
    Statement of AFL-CIO.......................................    80
    Statement of the American Immigration Lawyers Association......    81
    Report From American Friends Service Committee.................    85
    Statement of the American Immigration Council.................    87
    Statement of Amnesty International...........................    91
    Statement of Cheasty Anderson, M.A., Ph.D., Senior Policy
        Associate, Children's Defense Fund--Texas.....................    95
    Statement of the Center for Victims of Torture.................    96
    Statement of Columban Center for Advocacy and Outreach.........    99
    Statement of Church World Service (CWS)......................   100
    Statement of Families Belong Together.........................   101
    Statement of Laura Belous, Esq., Advocacy Attorney, Florence
        Immigrant and Refugee Rights Project.........................   104
    Statement of Jodi Goodwin, Esq., Law Office of Jodi Goodwin,
        Harlingen, TX................................................   104
    Statement of Marsha R. Griffin, MD, Border Pediatrician, Member
        of the American Academy of Pediatrics' Council on Immigrant
        Child and Family Health, Brownsville, Texas.................   110
    Statement of HIAS...........................................   112
    Joint Letter From Miscellaneous Organizations.................   113
    Statement of Human Rights Watch..............................   120
    Statement of the International Refugee Assistance Project
        (IRAP)......................................................   122
    Statement of the Latin American Working Group.................   128
    Statement of Krish O'Mara Vignarajah, LIRS.....................   131
    Statement of the Mexican American Legislative Caucus (MALC) of
        the Texas House of Representatives.............................   138
    Statement of the National Immigrant Justice Center (NIJC)......   139
    Statement of Yael Schacher, Senior U.S. Advocate, Refugees
        International................................................   141
    Statement of San Antonio Region Justice For Our Neighbors
        (SARJFON)...................................................   143
    Statement of Todd Schulte, President, FWD.us...................   143
    Statement of Karla Barber, Dallas, TX.........................   145
    Statement of Janice Zitelman, Fredericksburg, TX..............   145
    Statement of Marguerite D. Scott, LCSW-S, Kerrville, TX........   145
    Statement of Douglas Stephens, Esq., Government Accountability
        Project......................................................   146
    Statement of Irena Sullivan, Senior Immigration Policy Counsel,
        Tahirih Justice Center.......................................   153
    Statement of Texas Impact/Texas Interfaith Center for Public
        Policy......................................................   154
    TRAC Immigration Report......................................   164
The Honorable Sheila Jackson Lee, a Representative in Congress
From the State of Texas:
    Photos.....................................................    75
The Honorable Clay Higgins, a Representative in Congress From the
State of Louisiana:
    Assessment of the Migration Protection Protocols (MPP)...........    10
    Executive Office for Immigration Review Adjudication Statistics   162

EXAMINING THE HUMAN RIGHTS AND LEGAL IMPLICATIONS OF DHS'S ``REMAIN IN
MEXICO'' POLICY

----------

Tuesday, November 19, 2019

U.S. House of Representatives,
Committee on Homeland Security,
Subcommittee on Border Security,
Facilitation, and Operations,
Washington, DC.

The subcommittee met, pursuant to notice, at 10:06 a.m., in
room 310, Cannon House Office Building, Hon. Kathleen M. Rice
[Chairwoman of the subcommittee] presiding.

Present: Representatives Rice, Payne, Correa, Torres Small,
Green, Barragan, Thompson; Higgins, Lesko, Joyce, Guest, and
Rogers.

Also present: Representative Escobar.

Miss Rice. The Subcommittee on Border Security,
Facilitation, and Operations will come to order.

The subcommittee is meeting today to receive testimony on
examining the human rights and legal implications of DHS's
Remain-in-Mexico Policy.

Without objection, the Chair is authorized to declare the
subcommittee in recess at any point.

Good morning. Today we will examine the implementation of
the Migrant Protection Protocols more commonly known as the
Remain-in-Mexico program. This morning we will hear the
perspective of practitioners who witness the program's impact
on the ground.

Since this program went into effect on January 18, 2019,
the Remain-in-Mexico Policy has forced tens of thousands of
asylum seekers to wait in Mexico while their claims are
processed. However, this brief summary does not even begin to
touch on the devastating and destructive impact that this
policy has had on countless lives.

Prior to this program's implementation, asylum seekers were
permitted to stay in the United States while their cases moved
through the courts, a policy based on the humane and common-
sense premise that refugees should be given temporary safe
haven while it is decided whether or not they may remain in our
country.

Under Remain-in-Mexico, however, when migrants who arrive
at our Southern Border inform a U.S. official that they are
seeking asylum, they are provided a court date and sent back
into Mexico until their initial hearing.

These migrants are mostly from Central and South America,
having fled their homes to escape gang violence and government
oppression. They are almost always strangers to Mexico, with no
friends or family to rely on as they wait on a decision from
the United States. The cities in which they are forced to wait
are some of the most dangerous in Mexico. Cartels are active.
Jobs are hard to come by. Even local Government officials have
been known to engage in violence and exploitation. As a result,
these migrants, who are fleeing violence and oppression, are
now being forced to wait in conditions that are just as
dangerous as the ones they fled, if not more so. Families
waiting in Mexico under this policy face kidnapping, sexual
assault, and extortion.

In addition to provoking yet another humanitarian crisis,
Remain-in-Mexico presents a serious threat to our National
security. The program has created a newly-vulnerable population
left completely exposed to exploitation by drug cartels,
allowing these criminal organizations to remain active along
our border, and even expand their reach.

The administration assured lawmakers and the public that
the program would be carefully applied, making exceptions for
Mexican nationals, non-Spanish speakers, pregnant women, the
LGBTQ community, and people with disabilities. However,

AR207

investigations and revolving door officials and retaliation from every protected category are frequently turned away and left to fend for themselves in Mexican cities that the U.S. State Department has marked as too dangerous for travel.

Meanwhile, on August 2019, DHS notified Congress that it would build large temporary immigration hearing facilities to conduct Remain-in-Mexico-related proceedings. Located in Brownsville and Laredo, these temporary facilities are functioning as virtual immigration courtrooms, with judges appearing via video conference from brick-and-mortar courtrooms all across the country.

These facilities have become a significant cause for alarm. Lack of public information about the proceedings, limited access to translators and attorneys, and a complete disregard for migrant legal rights are just some of the many problems emerging from this court system. Reports have described secretive assembly line proceedings in the facilities to conduct hundreds of hearings per day. CBP, ICE, and DHS have provided little information on the functioning of these port courts, despite numerous inquiries from news outlets and Congressional staff.

The lack of available information on their operations is exacerbated by the severe restrictions on who can even access the facilities. With barbed wire fences and security managed by private companies, they are closed to the public, news outlets, and legal advocacy organizations. Despite the clear legal standard that all immigration proceedings are to be open to the public, CBP has rejected request after request for access.

These facilities dramatically worsen the chaotic nature of the program by removing any ability for migrants to access legal aid.

Furthermore, the prohibitions on oversight expose migrants to violations of the due process rights established for asylum seekers in U.S. law. We have invited our witnesses here to shed light on this disgraceful and untenable situation, and I thank them for joining us today.

Our asylum laws emerged after the Second World War, as our Nation faced the shameful truth that we failed to provide safe haven to refugees fleeing the Nazis. Since then we have granted asylum to desperate communities fleeing danger all over the world and, in doing so, saved an untold number of lives. The Remain-in-Mexico Policy is a reprehensible step backward, and a continuation of this administration's abandonment of our Nation's long-standing and bipartisan tradition of protecting asylum seekers and refugees.

We hope today to build public awareness of this policy and improve our own understanding, so that we can find a way toward stopping this needless harm inflicted on the men, women, and children seeking safety in our great country.

[The statement of Chairwoman Rice follows:]

                    Statement of Chairwoman Kathleen M. Rice
                              November 19, 2019

Today the Subcommittee on Border Security, Facilitation, and Operations will examine the implementation of the Migrant Protection Protocols (MPP), more commonly known as the ``Remain in Mexico'' program. This morning we will hear the perspective of practitioners who witness the program's impact on the ground. Since this program went into effect on January 18, 2019, the Remain in Mexico policy has forced tens of thousands of asylum seekers to wait in Mexico while their claims are processed. However, this brief summary does not even begin to touch on the devastating and destructive impact that this policy has had on countless lives. Prior to this program's implementation, asylum seekers were permitted to stay in the United States while their cases moved through the courts, a policy based on the humane and common-sense premise that refugees should be given temporary safe haven while it is decided whether or not they may remain in our country.

Under Remain in Mexico however, when migrants who arrive at our Southern Border inform a U.S. official that they are seeking asylum, they are provided a court date and sent back into Mexico until their initial hearing. These migrants are mostly from Central and South America, having fled their homes to escape gang violence and government

AR208

oppression they are currently fleeing. Mexico has no friends
or family to rely on as they wait on a decision from the United States.
The cities in which they are forced to wait are some of the most
dangerous in Mexico. Cartels are active, jobs are hard to come by, and
even local government officials have been known to engage in violence
and exploitation. As a result, these migrants--who were fleeing
violence and oppression--are now being forced to wait in conditions
that are just dangerous as the ones they fled. If not more so. Families
waiting in Mexico under this policy face kidnapping, sexual assault,
and extortion. In addition to provoking yet another humanitarian
crisis, Remain in Mexico presents a serious threat to our National
security. The program has created a newly vulnerable population left
completely exposed to exploitation by drug cartels, allowing these
criminal organizations to remain active along our border and even
expand their reach.

   The administration assured lawmakers and the public that the
program would be carefully applied, making exceptions for Mexican
nationals, non-Spanish-speakers, pregnant women, the LGBTQ community,
and people with disabilities. However, investigations and reporting
have revealed that individuals from every protected category are
frequently turned away and left to fend for themselves in Mexican
cities that the U.S. State Department has marked as too dangerous for
travel. Meanwhile, in August 2019, DHS notified Congress that it would
build large temporary immigration hearing facilities to conduct Remain-
in-Mexico-related proceedings. Located in Brownsville and Laredo, these
temporary facilities are functioning as virtual immigration courtrooms,
with judges appearing via video conference from brick-and-mortar
courtrooms across the country.

   These facilities have become a significant cause for alarm. Lack of
public information about the proceedings, limited access to translators
and attorneys, and a complete disregard for migrant legal rights are
just some of the many problems emerging from this court system. Reports
have described ``secretive, assembly line'' proceedings in the
facilities to conduct hundreds of hearings per day. CBP, ICE, and DHS
have provided little information on the functioning of these ``Port
Courts'' despite numerous inquiries from news outlets and Congressional
staff. The lack of available information on their operations is
exacerbated by the severe restrictions on who can even access the
facilities. With barbed wire fences and security managed by private
companies, they are closed to the public, news outlets, and legal
advocacy organizations. Despite the clear legal standard that all
immigration proceedings are to be open to the public, CBP has rejected
request after request for access. These facilities dramatically worsen
the chaotic nature of the program by removing any ability for migrants
to access legal aid.

   Furthermore, the prohibitions on oversight expose migrants to
violations of the due process rights established for asylum seekers in
U.S. law. We have invited our witnesses here to shed light on this
disgraceful and untenable situation. And I thank them for joining us
today. Our Asylum laws emerged after the Second World War, as our
Nation faced the shameful truth that we failed to provide safe haven to
refugees fleeing the Nazis. Since then, we have granted asylum to
desperate communities fleeing danger all over the world and in doing so
saved an untold number of lives. The Remain-in-Mexico policy is a
reprehensible step backwards, and a continuation of this
administration's abandonment of our Nation's longstanding--and
bipartisan--tradition of protecting asylum seekers and refugees.

   We hope today to build public awareness of this policy and improve
our own understanding so that we can find a way toward stopping this
needless harm inflicted on the men, women, and children seeking safety
in our great country.

   Miss Rice. The Chair now recognizes the Ranking Member of
the subcommittee, the gentleman from Louisiana, Mr. Higgins,
for an opening statement.
   Mr. Higgins. Thank you, Madam Chair, and thank you to our
witnesses for being here today. While I look forward to hearing
your testimony, I also would like to voice that I am
disappointed that no DHS officials actually responsible for
negotiating and implementing the Migrant Protection Protocols
agreement with the Government of Mexico were invited to testify

today by the majority.

I am also concerned by the partisan preconceptions surrounding the hearing title. This past year we saw crisis at the border, which was referred to by some as a fake emergency. It virtually exploded, as over 977,000 people attempted to illegally enter the United States through our Southwest Border. That is more than we encountered in 2017 and 2018, combined. It is larger than the population of the entire State of Delaware.

Historically, most illegal immigrants have been single adults from Mexico looking for temporary work. During fiscal year 2000, Border Patrol was able to repatriate the majority of those detained within hours. Today most illegal immigrants are family units and unaccompanied minors from Guatemala, Honduras, and El Salvador. In fiscal year 2019, Customs and Border Protection encountered 473,682 families. That is nearly a 3,200 percent increase from fiscal year 2013.

This change is directly tied to criminal organizations exploiting loopholes in our immigration laws as propaganda to convince people to bring children to the border. Migrants are giving up their life savings--in many cases, mortgaging homes, and properties, farms, perhaps handing over their children to smugglers because they are falsely being told that children are visas to get into this country. Even the Guatemalan Ministry of Foreign Affairs has publicly confirmed this.

Smugglers don't care about the well-being of migrants. They only care about turning a profit. In fiscal year 2019 Customs and Border Protection averaged 71 hospital visits per day for the migrants who arrived at our border in deteriorating health. The Border Patrol conducted over 4,900 rescues of immigrants who smugglers left to die.

Former Acting DHS Secretary McAleenan testified in July that more than 5,500 fraudulent family cases have been uncovered where the adult is not the parent of the child. One thousand of those have already resulted in prosecutions. Worse, the cartels are sending children back on commercial airlines to their home country, and then returning to the border with different adults. Agents call this practice ``recycling children.'' ICE identified 600 children who have gone through this. One child told investigators he was forced to make the trip 8 times.

There is a common misconception that most people illegally crossing our border are seeking asylum. However, less than 20 percent of immigrants in Customs and Border Protection custody are found to have, ``credible fear'' to return to their home country. In fiscal year 2018 that number was 18 percent.

For those saying everyone is turning themselves in, that is not the case. According to Customs and Border Protection, last year more than 150,000 migrants who illegally entered this country got away from authorities, evading capture, and making their way into the interior.

The Trump administration has been forced to act alone and has taken several important actions to mitigate the crisis as gridlock over immigration reform continues in Congress.

DHS implemented the Migrant Protection Protocols, MPP, program to cut down on the overcrowding of migrants in DHS custody and the number of migrants being released into U.S. communities due to immigration court backlog. At one point this year, CBP had almost 20,000 people in custody. Now they are averaging less than 3,500.

DHS has invested in temporary courtrooms near Southwest Border ports of entry to help expedite immigration hearings for MPP individuals. MPP ends the economic incentive of making a meritless asylum claim, considering only 20 percent of asylum claims get favorable final judgment, but every asylum applicant released in the interior is provided with work authorization.

Department of Justice statistics point to more than 89,000 orders of removal in absentia for fiscal year 2019 for those who were not detained. MPP mitigates the risk that those ordered removed will disappear into the United States' interior.

This month, DHS, the State Department, and the

AR210

International organizations or migrant-serving shelters operated by faith-based organizations and the Government of Mexico that houses MPP individuals. These shelters were found to have a persistent law enforcement presence, adequate medical care, and access to food and water.

Today's hearing could have been an opportunity to bring in the Department to ask about that visit and discuss the implementation of the MPP program in greater detail. We have seemingly foregone a fact-finding mission for something that might resemble a show trial.

Nevertheless, I want to thank our witnesses for appearing before us today, and I look forward to your testimony.

[The statement of Ranking Member Higgins follows:]

Statement of Ranking Member Clay Higgins

Nov. 19, 2019

Thank you, Madam Chair, and thank you to our witnesses for being here today.

While I look forward to hearing your testimony, I also want to voice that I am disappointed that no DHS officials responsible for negotiating and implementing the Migrant Protection Protocols agreement with the government of Mexico were invited to testify by the majority.

I am also concerned by the partisan pre-conceptions surrounding the hearing title.

This past year we saw what some Democrats on this committee called a ``Fake Emergency'' explode as over 977,000 people attempted to illegally enter the United States through our Southwest Border.

That's more than fiscal year 2017 and fiscal year 2018 combined, and larger than the population of the entire State of Delaware.

Historically, most illegal immigrants have been single adults from Mexico looking for temporary work. During fiscal year 2000, Border Patrol was able to repatriate the majority of those detained within hours.

Today, most illegal immigrants are family units and unaccompanied minors arriving from Guatemala, Honduras, and El Salvador. In fiscal year 2019, CBP encountered 473,682 families, nearly a 3,200 percent increase from fiscal year 2013.

This change is directly tied to criminal organizations exploiting loopholes in our immigration laws as propaganda to convince people to bring children to the border.

Migrants are giving up their life savings, mortgaging their homes and farms, and handing over their children to smugglers, because they are falsely being told that children are ``visas'' to get into this country. Even the Guatemalan Ministry of Foreign Affairs has publicly confirmed this.

Smugglers don't care about the well-being of migrants, just about turning a profit. In fiscal year 2019, CBP averaged 71 hospital visits per day for migrants who arrived at our border in deteriorating health. The Border Patrol conducted over 4,900 rescues of migrants who smugglers left to die.

Former Acting DHS Secretary McAleenan testified in July that more than 5,500 fraudulent family cases have been uncovered where the adult is not the parent of the child. One thousand of those have already resulted in prosecutions.

Worse, cartels are sending children back on commercial airlines to their home country to then return at the border with different adults. Agents call this practice ``recycling children''. ICE identified 600 children who have gone through this. One child told investigators he was forced to make the trip 8 times.

There's a common misconception that most people illegally crossing our border are seeking asylum. However, less than 20 percent of migrants in CBP custody actively claim they have a ``credible fear'' of return to their home country while in custody. In fiscal year 2018 that number was 18 percent.

And for those saying everyone is turning themselves in, that is not the case. According to CBP, last year more than 150,000 migrants who illegally entered this country got away from authorities, evading capture and making their way into the interior.

The Trump administration has been forced to act alone and has taken several important actions to mitigate the crisis as gridlock over immigration reform continues in Congress.

DHS implemented the Migrant Protection Protocols (MPP) program to

AR211

cut down on everything or migrants being held in large number of migrants being released into U.S. communities due to immigration court backlog. At one point this year, CBP had almost 20,000 people in custody. Now they are averaging less than 3,500.

DHS has invested in temporary courtrooms near Southwest Border ports of entry to help expedite immigration hearings for MPP individuals.

MPP ends the economic incentive of making a meritless asylum claim, considering only 20 percent of asylum claims get favorable final judgment but every asylum applicant released in the interior is provided with work authorization. Department of Justice statistics point to more than 89,000 orders of removal in absentia in fiscal year 2019 for those who were not detained. MPP mitigates the risk that those ordered removed will disappear into the interior.

This month, DHS, the State Department, and the International Organization for Migration visited several shelters operated by faith-based organizations and the government of Mexico that house MPP individuals. Those shelters were found to have a persistent law enforcement presence, adequate medical care, and access to food and water.

Today's hearing is a missed opportunity to bring in the Department to ask about that visit and discuss the implementation of the MPP program in greater detail. We've forgone a fact-finding mission for nothing short of a show trial.

Nevertheless, I want to again thank our witnesses for appearing before us today and I look forward to your testimony. I yield back.

Mr. Higgins. Madam Chairwoman, I yield back.

Miss Rice. Thank you, Mr. Higgins. The Chair now recognizes the Chairman of the full committee, the gentleman from Mississippi, Mr. Thompson, for an opening statement.

Mr. Thompson. Thank you very much, Chairman Rice. Today the subcommittee will hear about how the Trump's administration Remain-in-Mexico Policy has distorted our immigration system by effectively closing the door to people seeking safety in this country.

I share Chairwoman's--Rice's concerns about the legal and humanitarian implications of this misguided policy and thank her for calling this hearing.

While the Department of Homeland Security officials have argued Remain-in-Mexico has allowed U.S. Customs and Border Protection to regain operational control of our border with Mexico, we actually know better. In fact, the policy has raised serious legal questions and created a new humanitarian crisis along our Southern Border.

Moreover, it runs contrary to our American values. Returning migrants with known physical, mental, and developmental disabilities in Mexico is unacceptable. Sending pregnant women into Mexico, where there is no safe housing or basic medical care for them, is unacceptable. Establishing secretive courts that DHS uses to process asylum seekers forced to return to Mexico runs contrary to our values.

Indeed, immigration court proceedings are generally open to the public for the sake of transparency. The American Immigration Lawyers Association, ACLU, and Amnesty International, among others, regularly observe these proceedings. However, these organizations have been repeatedly denied access to the new temporary port courts in Brownsville and Laredo.

For those of you who are familiar with the Rio Grande Valley, you know about the work of--Sister Norma of Catholic Charities carries out to assist migrants in that region. Sister Norma has also been denied entry to the port courts multiple times, with no real explanation as to why. These observers are desperately needed.

Attorneys who have been able to get into the port courts uniformly talk about court operations that run roughshod over basic due process rights. Paperwork is filled out with wrong information, or certain information sections are purposely left blank, for example. Every step that can be taken to limit the amount of time an attorney can meet with their client is taken.

AR212

CBP has even allegedly fabricated future hearing dates for
migrants who are granted asylum in order to return them to
Mexico. The administration appears intent on cutting off access
to the lawful asylum process, even if their actions are legally
questionable, or force vulnerable adults and children into
danger.

I look forward to hearing from our panelists about their
first-hand observation and experience with the Remain-in-Mexico
Policy and the temporary port courts. Their testimony will help
inform the committee's future oversight work.

Efficient and effective border security has long been a
bipartisan priority of this committee. But blocking the asylum
process for vulnerable people and risking their lives by
putting them in harm's way does not make us any safer; it just
makes us less than the America we have held ourselves out to
be.

Again, I thank the Chairwoman for holding today's hearing,
and the Members of the committee for their participation.

I yield back.

[The statement of Chairman Thompson follows:]

                Statement of Chairman Bennie G. Thompson
                          November 19, 2019

Today, the subcommittee will hear about how the Trump
administration's ``Remain in Mexico'' policy has distorted our
immigration system by effectively closing the door to people seeking
safety in this country. I share Chairwoman Rice's concerns about the
legal and humanitarian implications of this misguided policy and thank
her for calling this hearing. While Department of Homeland Security
officials have argued ``Remain in Mexico'' has allowed U.S. Customs and
Border Protection to regain operational control of our border with
Mexico, we know better. In fact, the policy has raised serious legal
questions and created a new humanitarian crisis along our Southern
Border. Moreover, it runs contrary to our American values.

Returning migrants with known physical, mental, and developmental
disabilities to Mexico is unacceptable. Sending pregnant women in to
Mexico, where there is no safe housing or basic medical care for them
is unacceptable. Establishing secretive courts that DHS uses to process
asylum seekers forced to return to Mexico runs contrary to our values.
Indeed, immigration court proceedings are generally open to the public
for the sake of transparency. American Immigration Lawyers Association,
ACLU, and Amnesty International, among others regularly observe
proceedings. However, these organizations have been repeatedly denied
access to the new temporary port courts in Brownsville and Laredo.

For those of you who are familiar with the Rio Grande Valley, you
know about the work Sister Norma of Catholic Charities carries out to
assist migrants in that region. Sister Norma has also been denied entry
to the port courts multiple times with no real explanation as to why.
These observers are desperately needed. Attorneys who have been able to
get in to the port courts uniformly talk about ``court'' operations
that run roughshod over basic due process rights. Paperwork is filled
out with wrong information or certain sections are purposely left
blank, for example. Every step that can be taken to limit the amount of
time an attorney can meet with their clients is taken. CBP has even
allegedly fabricated future hearing dates for migrants who were granted
asylum in order to return them to Mexico. The administration appears
intent on cutting off access to the lawful asylum process, even if
their actions are legally questionable or force vulnerable adults and
children into danger.

I look forward to hearing from our panelists about their first-hand
observations and experience with the Remain in Mexico policy and the
temporary port courts. Their testimony will help inform the committee's
future oversight work. Efficient and effective border security has long
been a bipartisan priority of this committee. But blocking the asylum
process for vulnerable people and risking their lives by putting them
in harm's way does not make us any safer. It just makes us less than
the America we have held ourselves out to be.

Miss Rice. Thank you, Mr. Chairman. The Chair now
recognizes the Ranking Member of the full committee, the
gentleman from Alabama, Mr. Rogers, for an opening statement.

Mr. Rogers. Thank you, Chairman Rice. Let me say for the

AR213

record I ask unanimous support that the Mexican security--I think it is an essential policy, and it is in no way inhumane.

This past year nearly 1 million illegal immigrants were encountered attempting to cross our Southwest Border. It led to an unprecedented humanitarian crisis. CBP facilities were overwhelmed and overrun, leading to dangerous conditions, both for migrants and law enforcement officers. Every day up to 50 percent of Border Patrol agents were taken off the line to process and care for immigrants.

For months the administration requested emergency funds for new authorities to deal with this crisis. For months my colleagues ignored the crisis as a fake emergency. Finally, Congress acted and provided critical emergency funding. While the funding helped, it did nothing to address the root cause of the crisis, and that is loopholes in our asylum laws.

Democrats have yet to move any legislation to close those loopholes. In the face of Congressional inaction, the Trump administration has been forced to act on its own. The administration has secured agreements with Mexico, Guatemala, Honduras, and El Salvador to improve security cooperation across the region and reduce exploitation of our immigration laws.

After negotiations with Mexico, DHS also implemented the Migrant Protection Protocols Program as a part of a regional strategy to prevent abuse of our asylum laws, while protecting those with legitimate claims. MPP discourages non-meritorious or false asylum claims, and actually helps decrease the wait time for immigrant court hearings. Migrants under the MPP program wait months, compared to years for those currently within the interior.

Congress should focus on reforming our immigration laws, instead of holding messaging hearings.

Thank you, Mr. Chairman. I will yield back.

[The statement of Ranking Member Rogers follows:]

            Statement of Ranking Member Mike Rogers
                      November 19, 2019

This past year nearly 1 million illegal immigrants were encountered attempting to cross our Southwest Border illegally.

It led to an unprecedented humanitarian and security crisis.

CBP facilities were overwhelmed and overrun, leading to dangerous conditions both for migrants and law enforcement officers.

Every day, up to 50 percent of Border Patrol agents were taken off the line to process and care for migrants.

For months, the administration requested emergency funds and new authorities to deal with the crisis.

For months, my colleagues ignored the crisis calling it a ``Fake Emergency''.

Finally, Congress acted and provided critical emergency funding.

While the funding helped, it did nothing to address the root cause of the crisis--the loopholes in our asylum laws.

Democrats have yet to move any legislation to close these loopholes.

In the face of Congressional inaction, the Trump administration has been forced to act on its own.

The administration has secured agreements with Mexico, Guatemala, Honduras, and El Salvador to improve security cooperation across the region and reduce exploitation of our immigration laws.

After negotiations with Mexico, DHS also implemented the Migrant Protection Protocols program as part of a regional strategy to prevent abuse of our asylum laws, while protecting those with legitimate claims.

MPP discourages non-meritorious or false asylum claims and actually helps decrease wait times for immigration court hearings.

Migrants under the MPP program wait months compared to years for those currently within the interior. Congress should focus on reforming our immigration laws instead of holding messaging hearings.

Mr. Higgins. Madam Chair.

Miss Rice. Thank you.

Yes?

Mr. Higgins. I would like to seek unanimous consent to

AR214

submit the Department of Homeland security's October 2019
assessment of MPP program for the record.
    Miss Rice. Yes. So ordered.
    [The information follows:]
        Assessment of the Migrant Protection Protocols (MPP)
                        October 28, 2019
                    i. overview and legal basis
    The Department of Homeland Security (DHS) remains committed to
using all available tools to address the unprecedented security and
humanitarian crisis at the Southern Border of the United States.
    At peak of the crisis in May 2019, there were more than
        4,800 aliens crossing the border daily--representing an average
        of more than 3 apprehensions per minute.
    The law provides for mandatory detention of aliens who
        unlawfully enter the United States between ports of entry if
        they are placed in expedited removal proceedings. However,
        resource constraints during the crisis, as well as other court-
        ordered limitations on the ability to detain individuals, made
        many releases inevitable, particularly for aliens who were
        processed as members of family units.
    Section 235(b)(2)(C) of the Immigration and Nationality Act (INA)
authorizes the Department of Homeland Security to return certain
applicants for admission to the contiguous country from which they are
arriving on land (whether or not at a designated port of entry),
pending removal proceedings under INA 240.
    Consistent with this express statutory authority, DHS began
        implementing the Migrant Protection Protocols (MPP) and
        returning aliens subject to INA 235(b)(2)(C) to Mexico, in
        January 2019.
    Under MPP, certain aliens who are nationals and citizens of
        countries other than Mexico (third-country nationals) arriving
        in the United States by land from Mexico who are not admissible
        may be returned to Mexico for the duration of their immigration
        proceedings.
    The U.S. Government initiated MPP pursuant to U.S. law, but has
implemented and expanded the program through on-going discussions, and
in close coordination, with the Government of Mexico (GOM).
    MPP is a core component of U.S. foreign relations and
        bilateral cooperation with GOM to address the migration crisis
        across the shared U.S.-Mexico border.
    MPP expansion was among the key ``meaningful and
        unprecedented steps'' undertaken by GOM ``to help curb the flow
        of illegal immigration to the U.S. border since the launch of
        the U.S.-Mexico Declaration in Washington on June 7, 2019.''\1\
------------------------------------------------------------------------
    \1\ https://www.whitehouse.gov/briefings-statements/readout-vice-
president-mike-pences-meeting-mexican-foreign-secretary-marcelo-ebrard/

------------------------------------------------------------------------
    On September 10, 2019, Vice President Pence and Foreign
        Minister Ebrard ``agree[d] to implement the Migrant Protection
        Protocols to the fullest extent possible.''\2\
------------------------------------------------------------------------
    \2\ https://www.whitehouse.gov/briefings-statements/readout-vice-
president-mike-pences-meeting-mexican-foreign-secretary-marcelo-ebrard/

------------------------------------------------------------------------
    Therefore, disruption of MPP would adversely impact U.S.
        foreign relations--along with the U.S. Government's ability to
        effectively address the border security and humanitarian crisis
        that constitutes an on-going National emergency.\3\
------------------------------------------------------------------------
    \3\ https://www.whitehouse.gov/presidential-actions/presidential-
proclamation-declaring-national-emergency-concerning-southern-border-
united-states/.
------------------------------------------------------------------------
            ii. mpp has demonstrated operational effectiveness
    In the past 9 months--following a phased implementation, and in
close coordination with GOM--DHS has returned more than 55,000 aliens
to Mexico under MPP. MPP has been an indispensable tool in addressing
the on-going crisis at the Southern Border and restoring integrity to

                            AR215

the immigration system.

Apprehensions of Illegal Aliens are Decreasing

Since a recent peak of more than 144,000 in May 2019, total
enforcement actions--representing the number of aliens
apprehended between points of entry or found inadmissible at
ports of entry--have decreased by 64 percent, through September
2019.

Border encounters with Central American families--who were
the main driver of the crisis and comprise a majority of MPP-
amenable aliens--have decreased by approximately 80 percent.

Although MPP is one among many tools that DHS has employed
in response to the border crisis, DHS has observed a connection
between MPP implementation and decreasing enforcement actions
at the border--including a rapid and substantial decline in
apprehensions in those areas where the most amenable aliens
have been processed and returned to Mexico pursuant to MPP.

MPP is Restoring Integrity to the System

Individuals returned to Mexico pursuant to MPP are now at
various stages of their immigration proceedings: Some are
awaiting their first hearing; some have completed their first
hearing and are awaiting their individual hearing; some have
received an order of removal from an immigration judge and are
now pursuing an appeal; some have established a fear of return
to Mexico and are awaiting their proceedings in the United
States; some have been removed to their home countries; and
some have withdrawn claims and elected to voluntarily return to
their home countries.

MPP returnees with meritorious claims can be granted relief
or protection within months, rather than remaining in limbo for
years while awaiting immigration court proceedings in the
United States.

The United States committed to GOM to minimize the time
that migrants wait in Mexico for their immigration
proceedings. Specifically, the Department of Justice (DOJ)
agreed to treat MPP cases such as detained cases so that
they are prioritized according to longstanding guidance for
such cases.

The first 3 locations for MPP implementation--San Diego,
Calexico, and El Paso--were chosen because of their close
proximity to existing immigration courts.

After the June 7, 2019, Joint Declaration between GOM and
the United States providing for expansion of MPP through
bilateral cooperation, DHS erected temporary, dedicated MPP
hearing locations at ports of entry in Laredo and
Brownsville, in coordination with DOJ, at a total 6-month
construction and operation cost of approximately $70
million.

Individuals processed in MPP receive initial court
hearings within 2 to 4 months, and--as of October 21,
2019--almost 13,000 cases had been completed at the
immigration court level.

A small subset of completed cases have resulted in grants
of relief or protection, demonstrating that MPP returnees
with meritorious claims can receive asylum, or any relief
or protection for which they are eligible, more quickly via
MPP than under available alternatives.

Individuals not processed under MPP generally must wait
years for adjudication of their claims. There are
approximately 1 million pending cases in DOJ immigration
courts. Assuming the immigration courts received no new
cases and completed existing cases at a pace of 30,000 per
month--it would take several years, until approximately the
end of 2022, to clear the existing backlog.

MPP returnees who do not qualify for relief or protection
are being quickly removed from the United States. Moreover,
aliens without meritorious claims--which no longer constitute a
free ticket into the United States--are beginning to
voluntarily return home.

According to CBP estimates, approximately 20,000 people
are sheltered in northern Mexico, near the U.S. border,
awaiting entry to the United States. This number--along

AR216

With the growing participation in the Assisted Voluntary
Return (AVR) program operated by the International
Organization for Migration (IOM), as described in more
detail below--suggests that a significant proportion of the
55,000+ MPP returnees have chosen to abandon their claims.

iii. both governments endeavor to provide safety and security for
migrants

The Government of Mexico (GOM) has publicly committed to protecting
migrants.

A December 20, 2018, GOM statement indicated that ``Mexico
will guarantee that foreigners who have received their notice
fully enjoy the rights and freedoms recognized in the
Constitution, in the international treaties to which the
Mexican state is a party, as well as in the current Migration
Law. They will be entitled to equal treatment without any
discrimination and due respect to their human rights, as well
as the opportunity to apply for a work permit in exchange for
remuneration, which will allow them to meet their basic
needs.''

Consistent with its commitments, GOM has accepted the
return of aliens amenable to MPP. DHS understands that MPP
returnees in Mexico are provided access to humanitarian
care and assistance, food and housing, work permits, and
education.

GOM has launched an unprecedented enforcement effort
bringing to justice transnational criminal organizations
(TCOs) who prey on migrants transiting through Mexico--
enhancing the safety of all individuals, including MPP-
amenable aliens.

As a G-20 country with many of its 32 states enjoying low
unemployment and crime, Mexico's commitment should be taken in
good faith by the United States and other stakeholders. Should
GOM identify any requests for additional assistance, the United
States is prepared to assist.

Furthermore, the U.S. Government is partnering with international
organizations offering services to migrants in cities near Mexico's
northern border.

In September 2019, the U.S. Department of State Bureau of
Population, Refugees, and Migration (PRM) funded a $5.5 million
project by IOM to provide shelter in cities along Mexico's
northern border to approximately 8,000 vulnerable third-country
asylum seekers, victims of trafficking, and victims of violent
crime in cities along Mexico's northern border.

In late September 2019, PRM provided $11.9 million to IOM to
provide cash-based assistance for migrants seeking to move out
of shelters and into more sustainable living.

The U.S. Government is also supporting options for those
individuals who wish to voluntarily withdraw their claims and receive
free transportation home. Since November 2018, IOM has operated its AVR
program from hubs within Mexico and Guatemala, including Tijuana and
Ciudad Juarez. PRM has provided $5 million to IOM to expand that
program to Matamoros and Nuevo Laredo and expand operations in other
Mexican northern border cities. As of mid-October, almost 900 aliens in
MPP have participated in the AVR program.

The United States' on-going engagement with Mexico is part of a
larger framework of regional collaboration. Just as United Nations High
Commissioner for Refugees has called for international cooperation to
face the serious challenges in responding to large-scale movement of
migrants and asylum seekers traveling by dangerous and irregular means,
the U.S. Government has worked with Guatemala, El Salvador, and
Honduras to form partnerships on asylum cooperation (which includes
capacity-building assistance), training and capacity building for
border security operations, biometrics data sharing and increasing
access to H-2A and H-2B visas for lawful access to the United States.

iv. screening protocols appropriately assess fear of persecution or
torture

When a third-country alien states that he or she has a fear
of persecution or torture in Mexico, or a fear of return to
Mexico, the alien is referred to U.S. Citizenship & Immigration
Services (USCIS). Upon referral, USCIS conducts an MPP fear-
assessment interview to determine whether it is more likely

AR217

than not that the alien will be tortured or that he will face
persecution on account of a protected ground if returned to
Mexico.

MPP fear assessments are conducted consistent with U.S.
law implementing the non-refoulement obligations imposed on
the United States by certain international agreements and
inform whether an alien is processed under--or remains--in
MPP.

As used here, ``persecution'' and ``torture'' have
specific international and domestic legal meanings distinct
from fear for personal safety. Fear screenings are a well-
established part of MPP. As of October 15, 2019, USCIS
completed over 7,400 screenings to assess a fear of return
to Mexico.

That number included individuals who express a fear upon
initial encounter, as well as those who express a fear of
return to Mexico at any subsequent point in their
immigration proceedings, including some individuals who
have made multiple claims.

Of those, approximately 13 percent have received positive
determinations and 86 percent have received negative
determinations.

Thus, the vast majority of those third-country aliens who
express fear of return to Mexico are not found to be more
likely than not to be tortured or persecuted on account of
a protected ground there. This result is unsurprising, not
least because aliens amenable to MPP voluntarily entered
Mexico en route to the United States.

                    v. summary and conclusion

In recent years, only about 15 percent of Central American
nationals making asylum claims have been granted relief or protection
by an immigration judge. Similarly, affirmative asylum grant rates for
nationals of Guatemala, El Salvador, and Honduras were approximately 21
percent in fiscal year 2019. At the same time, there are--as noted
above--over 1 million pending cases in DOJ immigration courts, in
addition to several hundred thousand asylum cases pending with USCIS.

These unprecedented backlogs have strained DHS resources and
challenged its ability to effectively execute the laws passed by
Congress and deliver appropriate immigration consequences: Those with
meritorious claims can wait years for protection or relief, and those
with non-meritorious claims often remain in the country for lengthy
periods of time.

This broken system has created perverse incentives, with damaging
and far-reaching consequences for both the United States and its
regional partners. In fiscal year 2019, certain regions in Guatemala
and Honduras saw 2.5 percent of their population migrate to the United
States, which is an unsustainable loss for these countries.

MPP is one among several tools DHS has employed effectively to
reduce the incentive for aliens to assert claims for relief or
protection, many of which may be meritless, as a means to enter the
United States to live and work during the pendency of multi-year
immigration proceedings. Even more importantly, MPP also provides an
opportunity for those entitled to relief to obtain it within a matter
of months. MPP, therefore, is a cornerstone of DHS's on-going efforts
to restore integrity to the immigration system--and of the United
States' agreement with Mexico to address the crisis at our shared
border.

Appendix A: Additional Analysis of MPP Fear-Assessment Protocol
U.S. Citizenship and Immigration Services (USCIS) strongly believes
that if DHS were to change its fear-assessment protocol to
affirmatively ask an alien amenable to MPP whether he or she fears
return to Mexico, the number of fraudulent or meritless fear claims
will significantly increase. This prediction is, in large part,
informed by USCIS's experience conducting credible fear screenings for
aliens subject to expedited removal. Credible fear screenings occur
when an alien is placed into expedited removal under section 235(b)(1)
of the Immigration and Nationality Act--a streamlined removal mechanism
enacted by Congress to allow for prompt removal of aliens who lack
valid entry documents or who attempt to enter the United States by
fraud--and the alien expresses a fear of return to his or her home
country or requests asylum. Under current expedited removal protocol,

<div align="center">AR218</div>

the examining immigration officer. Customs and Border
Protection officers at a port of entry or Border Patrol agents--read 4
questions, included on Form I-867B, to affirmatively ask each alien
subject to expedited removal whether the alien has a fear of return to
his or her country of origin.\4\
------------------------------------------------------------------------
    \4\ See 8 C.F.R.§ 235.3(b)(2).
------------------------------------------------------------------------

    The percentage of aliens subject to expedited removal who claimed a
fear of return or requested asylum was once quite modest. However, over
time, seeking asylum has become nearly a default tactic used by
undocumented aliens to secure their release into the United States. For
example, in 2006, of the 104,440 aliens subjected to expedited removal,
only 5 percent (5,338 aliens) were referred for a credible fear
interview with USCIS. In contrast, 234,591 aliens were subjected to
expedited removal in 2018, but 42 percent (or 99,035) were referred to
USCIS for a credible fear interview, significantly straining USCIS
resources.

    TABLE A1: ALIENS SUBJECT TO EXPEDITED REMOVAL AND SHARE MAKING FEAR CLAIMS, FISCAL YEAR 2006-2018

| Fiscal Year | Subjected to Expedited Removal | Referred for a Credible Fear Interview | Percentage Referred for Credible Fear |
|---|---|---|---|
| 2006............................................... | 104,440 | 5,338 | 5 |
| 2007............................................... | 100,992 | 5,252 | 5 |
| 2008............................................... | 117,624 | 4,995 | 4 |
| 2009............................................... | 111,589 | 5,369 | 5 |
| 2010............................................... | 119,876 | 8,959 | 7 |
| 2011............................................... | 137,134 | 11,217 | 8 |
| 2012............................................... | 188,187 | 13,880 | 7 |
| 2013............................................... | 241,442 | 36,035 | 15 |
| 2014............................................... | 240,908 | 51,001 | 21 |
| 2015............................................... | 192,120 | 48,052 | 25 |
| 2016............................................... | 243,494 | 94,048 | 39 |
| 2017............................................... | 178,129 | 78,564 | 44 |
| 2018............................................... | 234,591 | 99,035 | 42 |

    Transitioning to an affirmative fear questioning model for MPP-
amenable aliens would likely result in a similar increase. Once it
becomes known that answering ``yes'' to a question can prevent prompt
return to Mexico under MPP, DHS would experience a rise in fear claims
similar to the expedited removal/credible fear process. And,
affirmatively drawing out this information from aliens rather than
reasonably expecting them to come forward on their own initiative could
well increase the meritless fear claims made by MPP-amenable aliens.
    It also bears emphasis that relatively small proportions of aliens
who make fear claims ultimately are granted asylum or another form of
relief from removal. Table A2 describes asylum outcomes for aliens
apprehended or found inadmissible on the Southwest Border in fiscal
years 2013-2018. Of the 416 thousand aliens making fear claims during
that 6-year period, 311 thousand (75 percent) had positive fear
determinations, but only 21 thousand (7 percent of positive fear
determinations) had been granted asylum or another form of relief from
removal as of March 31, 2019, versus 72 thousand (23 percent) who had
been ordered removed or agreed to voluntary departure. (Notably, about
70 percent of aliens with positive fear determinations in fiscal year
2013-2018 remained in EOIR proceedings as of March 31, 2019.)

    TABLE A2: ASYLUM OUTCOMES, SOUTHWEST BORDER ENCOUNTERS, FISCAL YEAR 2013-2018

| Year of Encounter | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|
| Total Encounters............. | 490,093 | 570,832 | 446,060 | 560,432 | 416,645 | 522,626 | 3,006,688 |
| Subjected to ER.............. | 225,426 | 222,782 | 180,328 | 227,382 | 160,577 | 214,610 | 1,231,105 |
| Fear Claims *................ | 39,648 | 54,850 | 50,588 | 98,265 | 72,026 | 100,756 | 416,133 |
| Positive Fear Determinations | 31,462 | 36,615 | 35,403 | 76,005 | 55,251 | 75,856 | 310,592 |

AR219

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Asylum Granted or Other Relief | 3,687 | 4,192 | 3,956 | 4,775 | 2,377 | 2,168 | 21,155 |
| ***....................... | 11.7% | 11.4% | 11.2% | 6.3% | 4.3% | 2.9% | 6.8% |
| Removal Orders ****.......... | 9,980 | 11,064 | 9,466 | 17,700 | 12,130 | 11,673 | 72,013 |
| | 31.7% | 30.2% | 26.7% | 23.3% | 22.0% | 15.4% | 23.2% |
| Asylum Cases Pending......... | 17,554 | 21,104 | 21,737 | 53,023 | 40,586 | 61,918 | 215,922 |
| | 55.8% | 57.6% | 61.4% | 69.8% | 73.5% | 81.6% | 69.5% |
| Other....................... | 241 | 255 | 244 | 507 | 158 | 97 | 1,502 |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.
Notes for Table A2: Asylum outcomes are current as of March 31, 2019.
* Fear claims include credible fear cases completed by USCIS as well as individuals who claimed fear at the time
  of apprehension but who have no record of a USCIS fear determination, possibly because they withdrew their
  claim.
** Positive fear determinations include positive determinations by USCIS as well as negative USCIS
   determinations vacated by EOIR.
*** Asylum granted or other relief includes withholding of removal, protection under the Convention Against
    Torture, Special Immigrant Juvenile status, cancelation of removal, and other permanent status conferred by
    EOIR.
**** Removal orders include completed repatriations and unexecuted orders of removal and grants of voluntary
     departure.

    Implementing MPP assessments currently imposes a significant
resource burden to DHS. As of October 15, 2019, approximately 10
percent of individuals placed in MPP have asserted a fear of return to
Mexico and have been referred to an asylum officer for a MPP fear
assessment. The USCIS Asylum Division assigns on average approximately
27 asylum officers per day to handle this caseload Nation-wide. In
addition, the Asylum Division must regularly expend overtime resources
after work hours and on weekends to keep pace with the same-day/next-
day processing requirements under MPP. This workload diverts resources
from USCIS's affirmative asylum caseload, which currently is
experiencing mounting backlogs.
    Most importantly, DHS does not believe amending the process to
affirmatively ask whether an alien has a fear of return to Mexico is
necessary in order to properly identify aliens with legitimate fear
claims in Mexico because under DHS's current procedures, aliens subject
to MPP may raise a fear claim to DHS at any point in the MPP process.
Aliens are not precluded from receiving a MPP fear assessment from an
asylum officer if they do not do so initially upon apprehension or
inspection, and many do. As of October 15, 2019,\5\ approximately 4,680
aliens subject to MPP asserted a fear claim and received an MPP fear-
assessment after their initial encounter or apprehension by DHS, with
14 percent found to have a positive fear of return to Mexico.
Additionally, Asylum Division records indicate as of October 15,
2019,\6\ approximately 618 aliens placed into MPP have asserted
multiple fear claims during the MPP process (from the point of
placement into MPP at the initial encounter or apprehension) and have
therefore received multiple fear assessments to confirm whether
circumstances have changed such that the alien should not be returned
to Mexico. Of these aliens, 14 percent were found to have a positive
fear of return to Mexico.
------------------------------------------------------------------------
    \5\ USCIS began tracking this information on July 3, 2019.
    \6\ USCIS began tracking this information on July 3, 2019.
------------------------------------------------------------------------
    Additionally, asylum officers conduct MPP fear assessments with
many of the same safeguards provided to aliens in the expedited
removal/credible fear context. For example, DHS officers conduct MPP
assessment interviews in a non-adversarial manner, separate and apart
from the general public, with the assistance of language interpreters
when needed.\7\
------------------------------------------------------------------------
    \7\ USCIS Policy Memorandum PM-602-0169, Guidance for Implementing
Section 235(b)(2)(C) of the Immigration and Nationality Act and the
Migrant Protection Protocols, 2019 WL 365514 (Jan. 28, 2019).
------------------------------------------------------------------------
    In conducting MPP assessments, asylum officers apply a ``more
likely than not'' standard, which is a familiar standard. ``More likely
than not'' is equivalent to the ``clear probability'' standard for
statutory withholding and not unique to MPP. Asylum officers utilize

AR220

the same standard in removal proceedings to adjudicate claims
for statutory withholding of removal and protection under the
Convention Against Torture (CAT).\8\ The risk of harm standard for
withholding (or deferral) of removal under the Convention Against
Torture (CAT) implementing regulations is the same, ``more likely
than not.''\9\ In addition to being utilized by asylum officers in
other protection contexts, the ``more likely than not'' standard
satisfies the U.S. Government's non-refoulement obligations.
------------------------------------------------------------------------
    \8\ See INA ⯑ 241(b)(3); 8 C.F.R. ⯑ 1208.16(b)(2) (same); See 8
C.F.R. ⯑ 1208.16(c)(2).
    \9\ See 8 C.F.R. ⯑ 1208.16(c)(2); Regulations Concerning the
Convention Against Torture, 64 Fed. Reg. 8478, 8480 (Feb. 19, 1999)
(detailing incorporation of the ``more likely than not'' standard into
U.S. CAT ratification history); see also Matter of J-F-F-, 23 I&N Dec.
912 (BIA 2006).


    Miss Rice. Other Members of the committee are reminded
that, under the committee rooms--rules, opening statements may
be submitted for the record.
    Without objection, Members not sitting on the committee
will be permitted to participate in today's hearing. Today we
welcome our colleague from Texas, Ms. Escobar.
    I now welcome our panel of witnesses.
    Our first witness, Ms. Laura Pena, is pro bono counsel at
the American Bar Association's Commission on Immigration. She
is a native of the Rio Grande Valley, and was previously
appointed as a foreign policy advisor at the U.S. State
Department under the Obama administration, and later served as
an immigration trial attorney at the U.S. Department of
Homeland Security. Prior to joining the ABA she served as a
visiting attorney with the Texas Civil Rights Project to assist
family reunification efforts after the zero tolerance policy
went into effect last summer along the U.S.-Mexico border.
    Our second witness is Ms. Erin Thorn Vela, a staff attorney
at the Texas Civil Rights Project who advocates on behalf of
immigrants and low-income individuals. Though Ms. Thorn Vela
was a front-line volunteer during the family separation crisis
last year, much of her recent efforts have focused on assisting
asylum seekers forced to wait in Mexico under the Trump
administration's Remain-in-Mexico policy.
    Next, Dr. Todd Schneberk is an assistant professor of
emergency medicine at the University of Southern California,
and an asylum clinician with Physicians for Human Rights. He
has worked with displaced persons in Tijuana, Mexico for the
last 5 years, and performed forensic evaluations for asylum
cases on both sides of the border, including on numerous
individuals in the Remain-in-Mexico program who are waiting in
Tijuana.
    We also have Mr. Michael Knowles, the president of the
American Federation of Government Employees Local 1924, the CIS
Council 119 affiliate representing more than 2,500 USCIS
employees in the D.C. region. Mr. Knowles began working with
refugee communities in 1975, both in the United States and
abroad, in countries such as Afghanistan, Indonesia, and
Thailand. He has served as an asylum officer since 1992 but is
here in his capacity as special representative for refugees'
asylum and international operations, representing the views of
the union and its members.
    Our final witness this morning is Mr. Thomas Homan, the
former acting director of Immigration and Customs Enforcement.
Mr. Homan began his career as a police officer in West
Carthage, New York, before joining what was then called the
Immigration and Naturalization Service. Mr. Homan has since
served as a Border Patrol agent, investigator, and eventually
an executive associate director. In January 2017, President
Trump named Mr. Homan the acting director of ICE, where he
served until June 2018.
    Without objection, the witnesses' full statements will be
inserted in the record.
    I now ask each witness to summarize his or her statement

AR221

for 5 minutes, beginning with Ms. Pena.

STATEMENT OF LAURA PENA, PRO BONO COUNSEL, AMERICAN BAR
ASSOCIATION COMMISSION ON IMMIGRATION

Ms. Pena. Thank you, Chairman--Chairwoman Rice, Ranking Member Higgins, and Members of this subcommittee. My name is Laura Pena. I am pro bono counsel for the American Bar Association Commission on Immigration. I am pleased to testify today on behalf of ABA president, Judy Perry Martinez. Thank you for this opportunity to share our views with the subcommittee.

The ABA is deeply concerned about the Migrant Protection Protocols, also known as Remain-in-Mexico, which discriminates against Spanish-speaking asylum seekers, and deprives them of full and fair access to the American justice system.

We are further concerned about the personal safety of the more than 55,000 asylum seekers who have been subjected to this policy, and returned to await in dangerous conditions in Mexico, particularly along the Texas border and cities of Juarez, Nuevo Laredo, Reynosa, and Matamoros, the latter in which there is a refugee tent encampment.

To date the ABA is the only non-governmental organization that has had a tour of the Brownsville Tent Court, a soft-sided facility erected near the port of entry, where MPP hearings take place, and which remains closed to the public. I am based in the Rio Grande Valley, and I have represented individuals placed into MPP proceedings. I will briefly identify the primary issues that have led to the erosion of legal protections for asylum seekers under the Migrant Protection Protocols.

First, asylum seekers are being returned to dangerous cities where organizations have documented hundreds, hundreds of incidents of kidnappings and violence. The ABA is concerned that DHS's efforts to comply with its non-refoulement obligations--that is, the legal obligation to refrain from sending refugees to countries where they could suffer persecution or torture--has failed. Asylum seekers must affirmatively request an non-refoulement interview to be removed from the MPP program, placing the burden on the applicant, when it is a legal obligation of the U.S. Government. Moreover, the legal standard is so high that only a small percentage of applicants actually pass the interview to be allowed to pursue their claims in the United States.

Second, the Brownsville Tent Court, a DHS-run facility managed by CBP, serves as a major obstacle to basic due process protections. To appear for their hearings, asylum seekers with early morning hearings travel through dangerous border cities in the middle of the night and have to wait on the bridge before they are processed for their hearing. Once at the tent court, immigration judges, interpreters, and Government counsel appear via video teleconference, while respondents appear at the tent court, most without an attorney.

The technology can be unreliable, leading to disruptive delays that can further traumatize vulnerable asylum seekers. When the technology does function, no simultaneous interpretation is provided during the hearings, with the exception of procedural matters, and as directed by the judge. The procedures for hearings at the tent court result in unfairness and a lack of due process.

The tent court also frustrates meaningful access to counsel. Asylum seekers do have the statutory right to counsel in immigration proceedings. Although there are many attorney-client meeting rooms available in this particular tent court, these rooms are greatly under-utilized, due to restricted access managed by CBP.

Attorneys may enter the tent courts only to appear at the hearing for an asylum seeker the attorney already represents. Attorneys cannot enter this facility to screen potential clients. Once an attorney-client relationship is somehow created, attorneys can only consult with their clients 1 hour

AR222

prior to the commencement of a hearing, and is rarely available after the hearing. Attorneys are often prohibited from meeting with their clients after the end of the hearing, simply to explain what transpired during the hearing where there was insufficient interpretation.

This all means that U.S. lawyers must go to their clients in Mexico, a dangerous proposition that many attorneys will not take. Each time I need to meet with my client I must take precautions to ensure my personal safety while in Mexico. I cross only during the day and must coordinate my visits with humanitarian groups or other colleagues.

During one legal visit into Matamoros, several convoys of heavily-armed Mexican military officials rolled into the refugee encampment. Several U.S. attorneys and humanitarian aid workers evacuated the encampment out of fear that the military would begin forcibly removing the refugees. My legal consultation that day was cut short, and I returned days later to consult with my client again, and had to consult along a narrow sidewalk along the port of entry during a heavy rainstorm, where my client's 4-year-old son was crying because he was scared of the thunderstorm.

This is not meaningful access to counsel, and attorneys should not have to endure such dangerous conditions to fulfil their professional responsibilities. For these reasons, the ABA urges that the Migrant Protection Protocols be rescinded, and that procedures be put in place to ensure fair treatment and due process for all asylum seekers.

Thank you for your time.

[The prepared statement of Ms. Pena follows:]

                    Prepared Statement of Laura Pena

Chairwoman Rice, Ranking Member Higgins, and Members of the subcommittee: My name is Laura Pena and I am pro bono counsel for the American Bar Association Commission on Immigration. Thank you for the opportunity to participate in this hearing on ``Examining the Human Rights and Legal Implications of DHS's `Remain in Mexico' Policy.''

Prior to my current position, I have worked at the Department of State on issues relating to Latin America, human rights, and human trafficking; as well as a trial attorney for the Department of Homeland Security, Immigration and Customs Enforcement; at a private law firm specializing in business immigration; and as a visiting attorney at the Texas Civil Rights Project leading family reunification efforts. I also am a native of the Rio Grande Valley of South Texas.

The American Bar Association (ABA) is the largest voluntary association of lawyers and legal professionals in the world. As the national voice of the legal profession, the ABA works to improve the administration of justice, promotes programs that assist lawyers and judges in their work, accredits law schools, provides continuing legal education, and works to build public understanding around the world of the importance of the rule of law. The ABA's Commission on Immigration develops recommendations for modifications in immigration law and policy; provides continuing education to the legal community, judges, and the public; and develops and assists in the operation of pro bono legal representation programs.

The ABA is deeply concerned that the Migrant Protection Protocols (MPP), also known as the ``Remain in Mexico'' policy, discriminate against Spanish-speaking asylum seekers and deprive them of full and fair access to the American justice system, including meaningful access to counsel. We also are concerned about the personal safety of the more than 55,000 individuals who have been subjected to this policy. This concern is not theoretical. We have seen the practical effects of this policy first-hand.

The ABA has 2 pro bono representation projects--the South Texas Pro Bono Asylum Representation Project in Harlingen, Texas and the Immigration Justice Project in San Diego, California--that provide legal assistance to detained adult migrants and unaccompanied children. When MPP began in the Rio Grande Valley this past summer, we initiated an assessment of the issues surrounding the rendering of immigration legal services to this vulnerable population. Based on that assessment, we recently expanded our services to include legal assistance to asylum seekers living in Matamoros, Mexico while their U.S. immigration proceedings are pending.

                                AR223

Traditionally, asylum seekers at the United States' at the
Southern Border, whether at or between official ports of entry, were
apprehended by Customs & Border Protection (CBP) and subsequently
detained by Immigration & Customs Enforcement (ICE). The asylum seekers
remained in detention while presenting their claims for relief or,
alternatively, were released into the United States to pursue their
claims in regular immigration court.

    The establishment of MPP was announced on December 20, 2018 and the
Department of Homeland Security began implementation of the policy on
January 25, 2019.\1\ Under MPP, CBP officials return Spanish-speaking
nationals from non-contiguous countries back to Mexico after they seek
to enter the United States unlawfully or without proper documentation.
In the Rio Grande Valley, DHS returns the great majority of non-
Mexican, Spanish-speaking adults and family units who do not have
criminal records or immigration histories to Mexico. This includes
pregnant women, and members of other vulnerable groups--such as
individuals with mental and physical disabilities, and LGBTQ+
individuals--who are supposed to be given special consideration under
the program.
--------------------------------------------------------------------
    \1\ See Kirstjen M. Nielsen, Policy Guidance for Implementation of
the Migrant Protection Protocols 1 (Jan. 25, 2019), https://
www.dhs.gov/sites/default/files/publications/- 19_0129_OPA_migrant-
protection-protocols-policy-guidance.pdf (``Nielsen Policy Guidance'').
--------------------------------------------------------------------

    Individuals processed under MPP are issued a Notice to Appear
(``NTA'') in an immigration court in the United States at a future
date, and returned to Mexico until that time, unless they affirmatively
express a fear of return to Mexico. If an individual expresses a fear
of return to Mexico, an asylum officer conducts a non-refoulement
interview \2\ to determine whether she is more likely than not to be
persecuted or tortured in Mexico. The policy does not allow attorney
representation during these interviews, but at least one Federal court
has issued an injunction instructing DHS to allow attorneys access
during this critical interview.\3\ If the asylum officer determines the
individual does not show she is more likely than not to be persecuted
or tortured in Mexico, the asylum seeker must wait in Mexico during her
immigration proceedings, a process that is likely to take months.
--------------------------------------------------------------------
    \2\ Generally, a non-refoulement interview is DHS's procedural
attempt to comply with international obligations to refrain from
sending refugees back to dangerous countries where they could suffer
persecution of torture. See infra at page 3 for a legal assessment of
non-refoulement interviews.
    \3\ The ACLU Foundation of San Diego & Imperial Counties recently
filed a class-action lawsuit demanding that MPP asylum seekers who have
expressed a fear of return be given access to retained counsel before
and during these screening interviews. See Doe et al. v. McAleenan,
3:19cv2119-DMS-AGS (S.D. Cal.). On November 12, 2019, U.S. District
Judge Dana Sabraw granted the individual plaintiffs' request for a
temporary restraining order, but has not ruled on the class claims.
See Order Granting Motion for Temporary Restraining Order, Doe et al.
v. McAleenan, 3:19cv2119-DMS-AGS (S.D. Cal. Nov. 12, 2019).
--------------------------------------------------------------------

    The MPP program subjects migrants and asylum seekers to extremely
dangerous conditions in Mexican border cities. The Department of State
advises U.S. citizens not to travel to Tamaulipas State, where
Matamoros and Nuevo Laredo are located, due to ``crime and
kidnapping.'' It has assigned Tamaulipas the highest travel advisory
level, Level 4--the same level assigned to countries such as Syria and
Yemen.\4\
--------------------------------------------------------------------
    \4\ U.S. Dep't of State, Mexico Travel Advisory, https://
travel.state.gov/content/travel/en/traveladvisories/traveladvisories/
mexico-travel-advisory.html. (``Violent crime, such as murder, armed
robbery, carjacking, kidnapping, extortion, and sexual assault, is
common. Gang activity, including gun battles and blockades, is
widespread. Armed criminal groups target public and private passenger
buses as well as private automobiles traveling through Tamaulipas,
often taking passengers hostage and demanding ransom payments. Federal
and State security forces have limited capability to respond to

AR224

violence many parts of the state. (Nielsen Policy Guidance No. 17, 2019).

------------------------------------------------------------------------

    ABA staff, including myself, have provided legal assistance to MPP
asylum seekers, observed MPP hearings, and appeared on behalf of MPP
clients. The ABA is committed to ensuring that all individuals are
afforded due process rights guaranteed by U.S. law. Based on our
experience and observations, the MPP/Remain in Mexico policy fails to
comport with fundamental legal protections required under the law.

                         non-refoulement

    The ABA is concerned that DHS's efforts to comply with its non-
refoulement obligations do not adequately protect the legal rights of
MPP asylum seekers who fear that they will be subjected to persecution
or torture in Mexico. The United States is a party to the 1967 Protocol
Relating to the Status of Refugees, which incorporates Articles 2-34 of
the 1951 Convention Relating to the Status of Refugees.\5\ Article 33
of the 1951 Convention provides that ``[n]o contracting state shall
expel or return (``refouler'') a refugee in any manner whatsoever to
the frontiers of territories where his life or freedom would be
threatened on account of his race, religion, nationality, membership of
a particular social group or political opinion.''\6\ The United States
is also bound by Article 3 of the Convention Against Torture and Other
Cruel, Inhuman, or Degrading Treatment or Punishment (``CAT''), which
provides that ``No state Party shall expel, return (``refouler'') or
extradite a person to another state where there are substantial grounds
for believing that he would be in danger of being subjected to
torture.''\7\ Congress subsequently codified these obligations into
law.\8\

------------------------------------------------------------------------

    \5\ Nielsen Policy Guidance at 3 n3.
    \6\ Protocol Relating to the Status of Refugees, art. I, Jan. 31,
1967, 19 U.S.T. 6223, 6225, 6276.
    \7\ CAT art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20
(1988).
    \8\ I.N.S. v. Aguirre-Aguirre, 526 U.S. 415, 427 (1999) (noting
that one of the primary purposes in enacting the Refugee Act of 1980
was to implement the principles agreed to in the 1967 Protocol, and
that the withholding of removal statute, now codified at 8 U.S.C. ⊠
1231(b)(3), mirrors Article 33); Foreign Affairs Reform and
Restructuring Act of 1998 (FARRA) ⊠ 2242(a), Pub. L. No. 105-277, Div.
G Title XXII, 112 Stat. 2681 (codified at 8 U.S.C. ⊠ 1231 note) (``It
shall be the policy of the United States not to expel, extradite, or
otherwise effect the involuntary return of any person to a country in
which there are substantial grounds for believing the person would be
in danger of being subjected to torture, regardless of whether the
person is physically present in the United States.'').

------------------------------------------------------------------------

    Despite widespread danger faced by asylum seekers in Mexico,\9\ DHS
does not affirmatively ask individuals subjected to MPP whether they
fear persecution or torture if returned there. Where asylum seekers do
express a fear of return to Mexico on their own, something they should
not be required to do under applicable law, they are supposed to be
afforded a telephonic screening interview with an asylum officer.\10\
However, asylum seekers do not have the right to consult with counsel
before the interview, or to have an attorney represent them in the
interview itself. According to DHS only 13 percent of the individuals
who have received these screenings have been given positive
determinations.\11\

------------------------------------------------------------------------

    \9\ Human Rights First, Orders from Above: Massive Human Rights
Abuses Under Trump Administration Return to Mexico Policy 3-8 (Oct.
2019), available at https://www.humanrightsfirst.org/resource/orders-
above-massive-human-rights-abuses-under-trump-administration-return-
mexico-policy (``Orders from Above'') (discussing violence suffered by
hundreds of asylum seekers living in Mexican border cities, including
rape, kidnapping, and assault); U.S. Immigration Policy Ctr., Seeking
Asylum: Part 2 3-5, 9-10 (Oct. 29, 2019) (``Seeking Asylum'') (based on
interviews with more than 600 asylum seekers subjected to MPP, finding
that approximately 1 out of 4 had been threatened with physical
violence, and that over half of those who had been threatened with
physical violence had experienced physical violence). The numbers
reported by the U.S. Immigration Policy Center likely underestimate the

                              AR225

dangers faced by asylum-seekers—subjecting them to security
conditions in Tijuana and Mexicali, Mexico, where the interviews were
conducted, are less dangerous than other parts of the border. Seeking
Asylum at 9.

\10\ The ABA is concerned by reports that, even when asylum seekers
express a fear of return to Mexico, they often are not provided with
the screening interviews required under MPP. See Seeking Asylum at 4
(Only 40 percent of individuals who were asked whether they feared
return to Mexico and responded in the affirmative were interviewed by
an asylum officer, and only 4 percent of individuals who were not asked
whether they feared return to Mexico, but nevertheless expressed a
fear, were interviewed); Orders from Above at 8-9. Reports also
indicate that asylum seekers routinely fail to pass these interviews
even when they already have been victims of violent crime, including
rape, kidnapping, and robbery in Mexico. Orders from Above at 10.
\11\ Dep't of Homeland Security, Assessment of the Migrant
Protection Protocols (MPP) 5 (Oct. 28, 2019), https://www.dhs.gov/
sites/default/files/publications/assessment_of_the-
_migrant_protection_protocols_mpp.pdf.
------------------------------------------------------------------------

    In addition, to be removed from the MPP program and either be
detained or released in the United States, an individual must
demonstrate, in the screening interview, that she is more likely than
not to be persecuted or tortured in Mexico. This is the same standard
as the individual would be required to meet to be granted withholding
of removal or relief under the Convention Against Torture by an
immigration judge. It also is higher than the standard used for asylum
eligibility or for initial interviews in expedited removal and
reinstatement of removal proceedings, where asylum seekers are screened
to determine whether they will be able to present their claim before an
immigration judge.\12\ And, unlike in MPP, in those summary proceedings
a DHS official must affirmatively ask the individual whether she has a
fear of being returned to her home country or removed from the United
States.\13\ Individuals also are permitted to consult with an attorney
and can be represented at the interview, and are entitled to
immigration judge review of any negative determination.\14\ The ABA
encourages DHS to implement robust procedures to ensure that asylum
seekers who have a genuine fear of persecution or torture in Mexico are
removed from the MPP program.
------------------------------------------------------------------------

    \12\ Individuals placed in expedited removal must show a ``credible
fear'', or a significant possibility that they could establish
eligibility for relief, whereas individuals in reinstatement
proceedings must demonstrate a ``reasonable possibility'' that they are
eligible for relief. 8 U.S.C. ⊠ 1225(b)(1)(A)(ii), (b)(1)(B)(v); 8
C.F.R. ⊠⊠ 208.30(e)(3), 208.31(c), 235.3(b)(4).
    \13\ 8 C.F.R. ⊠ 235.3(b)(2)(i) (discussing form I-867B).
    \14\ 8 C.F.R. ⊠⊠ 208.30(d)(4), (g);208.31(c), (g).
------------------------------------------------------------------------

                access to counsel and court proceedings
    To ensure that MPP asylum seekers are afforded due process in their
immigration proceedings, they must be provided with meaningful access
to counsel, and a meaningful opportunity to participate in the
proceedings. In our experience, the MPP program endangers these
protections.
    For asylum seekers returned to the Mexican border cities of Nuevo
Laredo and Matamoros, hearings take place in soft-sided tent courts
that are adjacent to the International Bridges that connect Laredo and
Brownsville, Texas to the Mexican cities of Nuevo Laredo and Matamoros,
respectively. ABA president Judy Perry Martinez, along with myself and
other ABA staff, toured the tent court in Brownsville, Texas in late
August, prior to its opening. To date, we are the only non-governmental
organization provided with a tour of the facility. Unlike regular
immigration courts, the tent courts are closed to the public, including
to members of the media. This is concerning because public access to
judicial proceedings helps to further public confidence in the justice
system. Even immigration judges are not physically present for hearings
that occur at the tent courts; in such hearings the immigration judge
and government counsel appear via video conference.
    Meaningful access to legal counsel is an essential component of due
process, and noncitizens, including those seeking humanitarian

                              AR226

protections have a statutory right to legal representation in such
proceedings.\15\ But for MPP asylum seekers, it is nearly impossible to
exercise this right from Mexico. During our tour of the tent court
facility in Brownsville, we were told that the facility had 60 small
rooms for lawyers to meet with their clients; but, in my personal
experience, these rooms are not able to be utilized. Attorneys may
enter the tent courts only to appear at a hearing for an asylum seeker
the attorney already represents. Attorneys are not permitted to enter
the tent courts to screen potential clients or provide general legal
information about the very hearings in which the asylum seeker will
participate. Nor are asylum seekers permitted to enter the United
States to consult with their attorneys, other than for 1 hour preceding
their scheduled hearings. When I tried to challenge these restrictions
in one of my cases, the immigration judge ruled that he did not have
jurisdiction to consider my request because the facility is controlled
by DHS. On another occasion, I sought access for a legal team to enter
the facility to observe a hearing. I was told CBP controls all access
to the tent facility. It is troubling that CBP, which is charged with
apprehending, detaining, and removing noncitizens, controls when
lawyers can access their clients in immigration court. On yet another
occasion, members of the ABA Commission on Immigration attempted to
observe MPP hearings from where the immigration judges sat at the Port
Isabel Detention Center. First, the courts told us DHS had to approve
the request. DHS then told us the courts had to approve the request.
Only after escalating the issue was the group permitted to observe the
hearings.
------------------------------------------------------------------------
    \15\ 8 USC ⸿ 1362 (``In any removal proceedings before an
immigration judge . . . the person concerned shall have the privilege
of being represented (at no expense to the Government) by such counsel,
authorized to practice in such proceedings, as he shall choose.''); 8
USC ⸿ 1229a(b)(4)(A) (in removal proceedings, the noncitizen ``shall
have the privilege of being represented, at no expense to the
Government, by counsel of the [non-citizen's] choosing who is
authorized to practice in such proceedings'').
------------------------------------------------------------------------

    To render legal services to MPP asylum seekers, U.S.-licensed
attorneys either must travel into Mexican border cities, or try to
fulfill their professional obligations by preparing complicated asylum
cases without a meaningful opportunity to consult in person with their
clients. I have faced this dilemma myself. Each time I want to meet
with my client, I must take precautions to ensure my personal safety
while in Matamoros. I cross only during the day, and try to minimize
the length of each visit. I coordinate my visits with humanitarian
groups or other colleagues. During one legal visit into Matamoros,
several armed convoys of the Mexican military rolled into the refugee
encampment of approximately 1,500 individuals and families subjected to
MPP. The military officials were heavily armed and showed surveillance
equipment on their body armor. Several U.S. attorneys and humanitarian
aid workers evacuated the encampment out of fear that the military
would begin forcibly removing the refugees. My legal consultation was
abruptly cut short, and I returned days later to consult with my client
along the narrow sidewalk of the port of entry during a heavy
rainstorm. This is not meaningful access to counsel, and attorneys
should not have to risk their lives or liberty to fulfill their
professional responsibilities. The limited ability to access counsel
under these conditions delivers a further harm: Individuals and
families subject to MPP may decline to seek legal assistance even when
offered because they now fear that they will be singled out or fear for
their own safety if they do so.
    In Matamoros and other border cities, private attorneys and non-
profit organizations have formed groups of volunteers to provide pro se
assistance to asylum seekers, but they can only help a small portion of
the individuals who need assistance. They face persistent logistical
challenges when helping asylum seekers to fill out applications for
relief and translate supporting evidence into English. The data
confirms that the barriers MPP places on meaningful access to counsel
are nearly insurmountable. As of September 2019, only 2 percent of
asylum seekers subjected to MPP had secured legal representation.\16\
------------------------------------------------------------------------
    \16\ TRAC Immigration, ``Details on Remain in Mexico (MPP)

Deportation Proceedings, https://www.aba.org/advocacy/governmental_legislative_work/priorities_policy/immigration/mpp/ (last visited Nov. 16, 2019) (showing that, through September 2019, 1,109 of 47,313 MPP cases had legal representation).

-----------------------------------------------------------------------

barriers to meaningful participation

The hearing process for MPP asylum seekers also does not comport with fundamental notions of due process. MPP asylum seekers are handed notices to appear while in CBP custody in the United States before being returned to Mexico. But because most do not have stable shelter in Mexico, the Government is not able to reliably serve them with notice if their hearing date changes or is canceled. Notices to appear served on MPP asylum seekers often contain addresses of shelters that asylum seekers never access, or no address at all. Paperwork that accompanies the notices to appear instructs MPP asylum seekers to present themselves at international bridges 4 hours before their hearings. For asylum seekers with early morning hearings, this means traveling through dangerous border cities and waiting at bridges in the middle of the night, putting them at even more risk of kidnapping or assault. If they are unable to make the dangerous journey or fail to receive notification of changes in their hearing date, asylum seekers risk being ordered removed in absentia.

In late October, a small delegation of ABA members and staff traveled to our ProBAR project in South Texas for a week-long visit to provide legal assistance to detained migrants at Port Isabel Detention Center, observe MPP proceedings, and provide humanitarian assistance to asylum seekers waiting in Matamoros. During the visit, the group requested to observe a morning session of master calendar hearings for MPP asylum seekers at the Port Isabel Detention Center. After being denied access twice, the group was eventually allowed into the courtroom with the immigration judge, the Government attorney, and the interpreter. The asylum seekers appeared via video from the temporary tent court facility in Brownsville. Approximately 50 asylum seekers were scheduled for hearings that day, but more than 20 of them were not present. Only 3 of the asylum seekers had attorneys. Many of the cases were reset for a later date.

During the hearings, no simultaneous interpretation was provided for MPP asylum seekers who were not fluent in English. Generally, the interpreter, who is present with the immigration judge via video conference, interprets only procedural matters and questions spoken by and directed to the asylum seeker by the immigration judge. The interpreter does not offer simultaneous translation of the entirety of the proceedings. Examples of what is not interpreted include critical information others are able to absorb in the on-going hearing including legal argument by the Government and questions the immigration judge may pose to Government counsel. The ABA has long supported the use of in-person language interpreters in all courts, including in all immigration proceedings, to ensure parties can fully and fairly participate in the proceedings. This is especially important for noncitizens, who are unfamiliar with the U.S. legal system, and face additional unique barriers to accessing information regarding their legal rights and responsibilities. In addition to the lack of full interpretation of the hearing, video conferencing technology can also be unreliable, leading to disruptive delays that can further traumatize vulnerable asylum seekers. In October, when our group observed MPP master calendar hearings, the proceedings started more than 90 minutes late because the internet connectivity at the tent court facility in Brownsville was not functioning.

Even these few examples demonstrate that the conditions and procedures for hearings at the temporary tent courts result in unfairness and a lack of due process for asylum seekers subject to MPP, and create inefficiencies for the immigration court system.

dangerous humanitarian conditions

Finally, we also have witnessed first-hand the dangerous humanitarian conditions in these border cities. ABA president Judy Perry Martinez, immediate past president Bob Carlson, members of the ABA Commission on Immigration, and ABA staff have crossed the International Gateway Bridge into Matamoros to meet asylum seekers living in a tent encampment steps from the international border. The stories ABA staff have heard are consistent with reports issued by human rights organizations that document dismal conditions, when the stated premise of the MPP program is that the Mexican government would

AR228

provide humanitarian protection. Where, as here, individuals are not
being delivered and the United States, while having delegated the
provision of aid, cannot delegate its humanitarian and legal
responsibility to these asylum seekers. There also are hundreds of
incidents of violence suffered by asylum seekers living in Mexico.\18\
To date, there are approximately 1,500 individuals living at the tent
encampment in Matamoros, without access to adequate shelter, food,
water, or medical care.\19\ Subjecting families and individuals who are
fleeing violence and persecution to seek protection at our borders to
these conditions is inconsistent with our values as a country.
------------------------------------------------------------------------
    \17\ Nielsen Policy Guidance at 2 (quoting from December 20, 2018
statement regarding MPP, which noted the U.S. Government's recognition
that Mexico would be implementing protocols ``providing humanitarian
support for and humanitarian visas to migrants'').
    \18\ See note 8, supra.
    \19\ Nomaan Merchant, Tents, stench, smoke: Health risks are
gripping migrant camp, Associated Press, Nov. 14, 2019, https://
apnews.com/337b139ed4fa4d208b93d491364e04da.
------------------------------------------------------------------------
                               conclusion
    The ABA repeatedly has emphasized that our Government must address
the immigration challenges facing the United States by means that are
humane, fair, and effective--and that uphold the principles of due
process. In our experience, the MPP program fails to meet these
objectives and creates an unstable humanitarian crisis at our border.
We urge that this policy be rescinded and that procedures be put in
place to ensure fair treatment and due process for all asylum seekers.

    Miss Rice. Thank you for your testimony. I now recognize
Ms. Thorn Vela to summarize her statement for 5 minutes.

    STATEMENT OF ERIN THORN VELA, STAFF ATTORNEY, RACIAL AND
      ECONOMIC JUSTICE PROGRAM, TEXAS CIVIL RIGHTS PROJECT

    Ms. Thorn Vela. Ms. Chairman and committee, thank you for
inviting me here to testify about my experience working with
individuals that DHS has forcibly removed to Matamoros, Mexico
under the Migrant Protection Protocols, or Remain-in-Mexico
Policy.
    I am a staff attorney at the Texas Civil Rights Project.
For the last 2 years I have volunteered and worked with people
seeking asylum in the United States. For the last 5 years I
have lived and worked along the Texas-Mexico border, and all of
my work with asylum seekers is on a pro bono basis.
    Since August, I have spent at least 200 hours providing pro
bono legal advice to asylum seekers forcibly removed to
Matamoros. The horrors in Matamoros are almost endless. I want
to share with you the fear, the risks, and the despair that we
attorneys and our clients feel every single day.
    No one should be in this program. Asylum seekers in
Matamoros survive in flimsy tents and under tarps. They do not
have adequate food or medicine, because volunteers and a few
humanitarian aid groups are the only regular providers of aid.
Of the over 1,000 people screened by advocates, more than half
report being kidnapped, assaulted, extorted, or raped since
being returned to Matamoros. These stories break my heart, but
no more than stories of children tortured and assaulted that
play over in my mind.
    One mother and her small child were kidnapped less than 1
hour after the U.S. Government forcibly returned them to
Matamoros. They were tortured for 8 days.
    In another case 2 sisters, aged 7 and 9, were sent by our
Government to Mexico, and then targeted by a local Mexican
national who sexually abused them. Mexican authorities detained
this person for 1 night and let him go. He returned to the
tents the next day.
    Neither we nor our partners have been successful in having
even these young victims removed from this program. The fact
that the U.S. Government knowingly permits abuse and torture to
be the norm sends a strong message. Anyone can target asylum

                               AR229

seekers that are injured by and no longer trust them.

   This program design puts people in life-threatening conditions, and we have seen DHS routinely ignore its own safeguards. The agency claims that anyone who has fear of persecution or torture will be taken out of Matamoros, yet almost no one has passed the non-refoulement interview.

   The threshold for non-refoulement is required by international law to be low. The person must have a reasonable fear of torture or persecution. I have seen this fear. I have seen asylum seekers shake and break down and sob. Their fears are genuine and confirmed by the U.S. Government's own reports about what is happening in this region. Yet at interviews, asylum seekers report that officers threaten them, ignore them, lie to them, and send them back without any explanation or notice about what has happened in the interview.

   DHS's policies say that certain groups of particularly vulnerable people should be categorically barred from being sent to the streets of one of the most dangerous areas in the hemisphere. Some are people with physical disabilities that are apparent by just looking at the person. We have seen cancer survivors, pregnant women, and children with autism and Down's Syndrome who are still in the camp today.

   We represent a deaf non-verbal woman. Not once was she given an interpreter for any interaction with Federal officers, a blatant violation of her civil rights. Because she is non-verbal, she could not even scream for help when her family was being followed by two men. At the end of her first week there, DHS admitted it had erred in placing her in the program. However, it took presenting her 3 times to the bridge director, a demand letter, and the threat of litigation to get her taken out of Matamoros.

   What would have happened if we hadn't had been there? Why won't the agency fix these violations of policy and of law that place particularly vulnerable people in harm's way?

   We constantly find people who should be protected under the agency's own policies. I listened with horror as a lesbian woman in the camp told me that men had punched her in the face and threatened to rape her to turn her straight. This woman's story is not an anomaly for the LGBT people that we work with.

   I am horrified that all I can say to asylum seekers in Matamoros is this: Hold on and stay safe. That statement feels so empty when I know how often people are kidnapped directly from their tents, abused, and tortured. It haunts me when I walk back across that bridge to the United States that I have only these words to console my clients.

   They should be able to seek safety in safety. That safety is their right by international treaty, the Constitution, and the core principles of our humanity that are enshrined in our immigration laws.

   Thank you for your time.

   [The prepared statement of Ms. Thorn Vela follows:]

                Prepared Statement of Erin Thorn Vela
                          November 19, 2019

   Thank you for this opportunity to testify about the Department of Homeland Security's Remain in Mexico Policy. The implementation of this unlawful policy has destroyed any semblance of due process in removal proceedings. The processes developed under the Remain in Mexico Policy serve to persecute--not protect--thousands of asylum seekers, becoming the next in the wave of continued attacks against the international right to seek asylum by the Trump administration. I thank the committee for inviting me to share the stories of asylum seekers subjected to one of the worst humanitarian crises that we and our partnering immigration and civil rights advocates in the Rio Grande Valley have ever seen.

   My testimony this morning is based on my work as a staff attorney at the Racial and Economic Justice Program at the Texas Civil Rights Project (``TCRP''), a non-governmental and non-profit organization.\1\ We are Texas lawyers and advocates for Texas communities, serving the rising movement for equality and justice. Our Racial and Economic Justice Program fights against discriminatory policies and practices based on immutable characteristics and immigration status. Along the Texas-Mexico border, our team works tirelessly to defend landowners

<center>AR230</center>

whose lands are federally condemned to construct a border wall, bring separated families back together, and ensure that the civil rights of immigrants are a reality. Through litigation, education, and advocacy, TCRP has fought for almost 30 years to ensure that the most vulnerable communities in our State can live with dignity and free from fear.

--------------------------------------------------------------------------

    \1\ Texas Civil Rights Project, https://texascivilrightsproject.org/about-us/.

--------------------------------------------------------------------------

    With this testimony, my hope is to bring to Congress the capricious, discriminatory, and punitive manner in which the Trump administration is implementing the Remain in Mexico policy to dismantle the fundamental human right to seek asylum.
                    i. dismantling the right to asylum
    People arriving at the U.S.-Mexico border have a right to petition for asylum. The U.S. Government cannot lawfully enact a forcible transfer program that strips a person of that right. Yet, when asylum seekers arrive at the border in the Rio Grande Valley, the Government now forcibly transfers them to a dangerous place in a process that disregards any fundamental due process rights. This forcible transfer program is the most recent in a long series of efforts by the Trump administration to dismantle the right to seek asylum.
A. The Right to Seek Asylum is Established, Binding, and Fundamental
    The right to seek asylum is a core human right and a central principle of immigration laws. It is enshrined in Article 14 of the 1948 Universal Declaration of Human Rights, a document created when last there were this many people seeking safety across the globe.\2\ The Universal Declaration of Human Rights provides that ``[e]veryone has the right to seek and to enjoy in other countries asylum from persecution.'' To protect that right, 146 countries--including the United States--signed the 1967 Protocol Relating to the Status of Refugees. In 1980, Congress codified the United States' obligation to receive persons ``unable or unwilling to return to'' their home countries ``because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.''\3\

--------------------------------------------------------------------------

    \2\ Press Release, Global Forced Displacement Tops 50 Million for the First Time Since World War II--UNHCR Report, UNHCR (June 20, 2014), https://www.unhcr.org/en-us/news/press/2014/6/53999cf46/global-forced-displacement-tops-50-million-first-time-since-world-war-ii.html.
    \3\ 8 U.S.C. §§ 1101(a)(42), 1158(b)(1).

--------------------------------------------------------------------------

    These and other laws prohibit also the United States from returning asylum seekers to countries where they face persecution or torture.\4\ This right to non-refoulement is incorporated into United States law. The United States cannot remove an individual to any country when the person's ``life or freedom would be threatened'' due to persecution.\5\

--------------------------------------------------------------------------

    \4\ Article 33 of the 1951 Convention Relating to the Status of Refugees--which the United States is bound to comply with--provides: No Contracting State shall expel or return (``refouler'') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion. Similarly, Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment--to which the United States is also bound--provides: No State Party shall expel, return (``refouler'') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.
    \5\ 8 U.S.C. § 1231(b)(3)(A) (The five protected grounds are race, religion, nationality, membership in a particular group, or political opinion).

--------------------------------------------------------------------------

    A state that sets up an agreement to send asylum seekers to a third country will violate its non-refoulement obligations unless the agreement meets certain standards. The agreement must be formal and enforceable, provide procedural safeguards for every individual, and permit appeals.\6\ A state ``cannot en masse transfer asylum seekers to

AR231

a third country to seek asylum--provided that it has a fair and certate
screening process--prior to transfer--that allow each person to present
their views on aspects such as risk factors in the receiving country,
to maintain family unity, and to screen for any threat of
persecution.\8\ UNHCR has emphasized that the threshold in these
screenings must be low enough to prevent refoulement.\9\ The burden is
on the state to screen for refoulement, not the asylum seeker to
affirmatively claim fear of persecution.\10\ The United States would
violate its international obligations if the Government created a
transfer agreement that did not include any of these elements.\11\

------------------------------------------------------------------------

    \6\ Brief for the United Nations High Commissioner for Refugees in
Support of Appellees' Answering Brief at 11-12, Innovation Law Lab v.
McAleenan, 394 F.Supp.3d 1168 (S.D. Cal. 2019) (No. 19-15716).
    \7\ Id. at 17.
    \8\ Id. at 18.
    \9\ Id. at 19.
    \10\ Id. at 20.
    \11\ Id. at 22.

------------------------------------------------------------------------

    The reality on the ground is that the United States is violating
each of these obligations through its implementation of the Remain in
Mexico Policy.
B. Government Policies Prevent Asylum Seekers from Seeking Safety
    From what I and my colleagues at TCRP have personally witnessed,
the Remain in Mexico program is part of the pattern to dismantle the
right to seek asylum.
    Since 2017, we have seen how the Trump administration has callously
enacted multiple policies that deter black and brown migrants from
seeking protection in the United States. In 2017, at the
administration's very beginning, it sought to issue a ``Muslim Ban,'' a
discriminatory policy that kept families apart on the basis of their
religion.\12\ The Trump administration formalized the ``Turnback
Policy,'' also known as ``metering,'' requiring CBP officers to
directly or constructively keep asylum seekers from entering the United
States, such as by claiming the processing centers were ``full.''\13\
In some cases, officers have sworn to our clients that the facilities
are ``full'' only to later swear before a judge that those facilities
were empty.\14\ In 2018, the Trump administration began a secret
``pilot project'' in Texas to separate migrant children from their
families.\15\ TCRP began to document the family separations here in
McAllen. For the past year-and-a-half, TCRP has met thousands of
separated parents and seen their struggles to seek safety when their
children were and continue to be used to punish the parents.\16\

------------------------------------------------------------------------

    \12\ See Executive Order 13,760, Protecting the Nation from Foreign
Terrorist Entry into the United States (Jan. 27, 2017); Executive Order
13,780, Protecting the Nation from Foreign Terrorist Entry into the
United States (Mar. 06, 2017); & Presidential Proclamation 9, 645,
Presidential Proclamation Enhancing Vetting Capabilities and Processes
for Detecting Attempted Entry into the United States by Terrorists or
Other Public-Safety Threats (Sept. 24, 2017).
    \13\ See Al Otro Lado v. McAleenan, 394 F.Supp.3d 1168, 1187, 1208
(S.D. Cal. 2019).
    \14\ Customs and Border Protections officials testified under oath
that, as of early September 2019, CBP facilities in the Rio Grande
Sector were at 30 percent capacity. Transcript of Oral Argument at 40-
41, Rosa v. McAleenan, 2019 WL 5191095 (S.D. Tex. 2019).
    \15\ U.S. GOV'T ACCOUNTABILITY OFFICE, UNACCOMPANIED CHILDREN:
AGENCY EFFORTS TO REUNIFY CHILDREN SEPARATED FROM PARENTS AT THE
BORDER, GAO-19-163, 15-16 (Oct. 2018).
    \16\ LAURA PENA, THE REAL NATIONAL EMERGENCY: ZERO TOLERANCE & THE
CONTINUING HORRORS OF FAMILY SEPARATION AT THE BORDER, TEXAS CIVIL
RIGHTS PROJECT (Feb. 2019), https://texascivilrightsproject.org/wp-
content/uploads/2019/02/FamilySeparations-Report-FINAL.pdf.

------------------------------------------------------------------------

    In December 2018, the Department of Homeland Security announced the
``Migration Protection Protocols,''\17\ known colloquially as the
``Remain in Mexico'' Policy. In January 2019, the policy was started in
California, then rolled out along the border in phases. Around the end
of July 2019, the Government started forcibly removing asylum seekers

AR232

who arrived in the Rio Grande Valley sector alone, and by the end
of September 2019, the Government had forcibly transferred more than
10,000 people to Matamoros,\18\ making it the location with the second-
largest population to be subjected to the Remain in Mexico program.\19\
------------------------------------------------------------------------
    \17\ Department of Homeland Security, Secretary Kirstjen M. Nielsen
Announces Historic Action to Confront Illegal Immigration (Dec. 20,
2018), https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-
historic-action-confront-illegal-immigration. The Government's
implementation of its Remain in Mexico policy came months after the
family separation policy was found to be unconstitutional. Former
National security experts have raised serious concerns about the
``unsupported claims'' upon which the administration has used to
justify the Remain in Mexico Program. Brief for Former U.S. Government
Officials Amici Curiae in Support of Appellees and Affirmance at 13,
Innovation Law Lab v. McAleenan, 394 F.Supp.3d 1168 (S.D. Cal. 2019)
(No. 19-15716).
    \18\ Id.
    \19\ TRAC Immigration, https://trac.syr.edu/phptools/immigration/
mpp/.
------------------------------------------------------------------------
C. Seeking Safety from a Life-Threatening Situation
    In the Rio Grande Valley, the Remain in Mexico program sparked a
humanitarian crisis that is rapidly worsening. This crisis was
foreseeable. Indeed, given what we know about Matamoros, it was
practically inevitable. Matamoros does not have the infrastructure to
receive thousands of people. It has few shelters,\20\ let alone housing
that is appropriate to keep safe people at-risk of kidnapping,
trafficking, and abuse.\21\ The city has inadequate water and medical
services.\22\
------------------------------------------------------------------------
    \20\ Doctors Without Borders, US Migration Policy Endangers Lives
of Asylum Seekers in Tamaulipas State (Sept. 06, 2019), https://
www.msf.org/us-migration-policy-endangers-lives-asylum-seekers-
tamaulipas-state-mexico.
    \21\ In the 2019 Trafficking in Persons Report, the State
Department found that groups most vulnerable to trafficking were
``women, children, indigenous persons, persons with mental and physical
disabilities, migrants, and LGBTI individuals.'' U.S. STATE DEPARTMENT,
TRAFFICKING IN PERSONS REPORT: MEXICO 236 (2019).
    \22\ Id.
------------------------------------------------------------------------
    Disturbingly, the U.S. State Department lists the area as a ``Level
4,'' the highest travel advisory warning, due to the prevalence of
kidnapping and other violent crimes.\23\ Advocates and service
providers, such as TCRP, Team Brownsville, Angry Tias and Abuelas,
Project Dignity, Lawyers for Good Government, and others, must
disregard the risks to our lives to represent asylum seekers there.
Migrants waiting in Matamoros must constantly navigate these dangers.
------------------------------------------------------------------------
    \23\ State Department, Mexico Travel Advisory, (Apr. 9, 2019),
https://travel.state.gov/content/travel/en/traveladvisories/
traveladvisories/mexico-travel-advisory.html.
------------------------------------------------------------------------
    In Matamoros, we support our partners who run a pro bono legal
clinic to help asylum seekers prepare their refugee applications for
the port court. To-date, approximately 1,100 asylum seekers have signed
up for the legal clinic. Of those, more than half reported that, since
the U.S. Government forcibly transferred them, they have been
kidnapped, assaulted, extorted, raped, or experienced other types of
violent crime.\24\ The following are just 3 examples of what asylum
seekers forced into the Remain in Mexico program have suffered in
Matamoros:
------------------------------------------------------------------------
    \24\ Human Rights First has documented similar stories and
frequencies of kidnapping, torture, and rape in multiple locations
where people are subjected to the Remain in Mexico Policy and similar
refusals to remove people from the Remain in Mexico program after they
are victimized. HUMAN RIGHTS FIRST, ORDERS FROM ABOVE: MASSIVE HUMAN
RIGHTS ABUSES UNDER THE TRUMP ADMINISTRATION RETURN TO MEXICO POLICY 8
(Oct. 2019).

AR233

``The U.S. Government forcibly transferred an El Salvadoran mother and her 4-year-old son to Matamoros in the evening and released them at 1 am. Suddenly homeless, they walked to the refugee tents. Less than 1 hour after they were released, an organized criminal group kidnapped them. For the next 8 days, the mother and child were tortured, deprived of food, water, and sleep, sexually abused, and threatened with
------------------------------------------------------------------------
dismemberment and death.

``While in Mexico trying to flee to the United States, a young Nicaraguan man was kidnapped. He was released. Yet, when the U.S. Government forcibly returned him to Matamoros, he was kidnapped from the refugee tents 2 days later. When he was released, the hospital had to stitch together the crisscross of cuts on his arms.

``A family from Honduras and their 2 daughters--ages 7 and 9 forcibly transferred to Matamoros. There, the girls were targeted by a pedophile and sexually abused. The parents reported the person to the Mexican authorities. The Mexican authorities detained the person for 24 hours, then released him. Unprotected by the authorities, the girls continue to be at-risk of abuse.''

    U.S. officials denied each of these individual's non-refoulement interviews, despite the risk to their lives. Each developed serious health issues. Yet, the U.S. Government refuses to remove them from Matamoros.
    The Trump administration has stripped legal pathways to safety, driving more people to cross the border illegally. As policies to bar asylum seekers stranded many in Mexico, desperate people make desperate choices. I have counseled asylum seekers with incredibly strong claims--struggling to survive the horrible realities of Matamoros--who ask themselves every day whether crossing the border is worth it. These are law-abiding people who cannot wait for months in an area like Matamoros for one simple reason: If they do, they will likely die.
    ii. arbitrary life-and-death decisions in violation of the agency's
        policies, civil rights statutes, and the constitution
A. Conditions in Matamoros
    First, I want to share the conditions in Matamoros. Nobody can better capture the experiences of the people we represent than the people themselves. Here is one of our client's experiences in the words he wanted to share with Congress members:

``After spending 7 days in a freezing cold cell, sleeping on the concrete floor, with the lights on 24 hours a day, I was boarded on a bus along with other migrants. When we descended from the bus, a Mexican official informed us that we were in Matamoros, Mexico, and that the United States had placed us in the MPP or Remain in Mexico program. That was the first time I had heard of the program or my placement in it.

``During my 100 days in Matamoros, I have been extorted and assaulted physically and verbally due to my migrant status and sexual orientation. I live in constant fear of organized crime, by a group who call themselves the `Gulf Cartel'. I have been sleeping on the street, surviving the heat of the day and cold of the night. I have explained the abuses I have suffered to 2 U.S. asylum officials. Both informed me that, while they had compassion for my situation, they were not authorized to allow me to seek safety in the United States.

``How has MPP affected me? It has made me feel abused, dejected, humiliated, abandoned, confused, disoriented, mistreated, and fearful.''
--A.E.C.L., an LGBTQ Guatemalan asylum seeker in the Remain in Mexico Program in Matamoros.\25\
------------------------------------------------------------------------
    \25\ We have not provided our clients' names due to concerns for their safety.

    Asylum seekers in Matamoros survive incredibly difficult situations without adequate shelter, food, medical attention, or other basic

AR234

necessitate the generation of a list of the harrowing conditions can feel
endless to those of us who witness the bravery and resilience of people
in Matamoros:

        After being forced out of the United States, asylum seekers
            are delivered into Matamoros with little other than the
            clothing on their backs;
    Many survive homeless, either in the plaza in one of the
            hundreds of thin and flimsy tents or in informal arrangements
            to sleep in a crowded private room;
    Food aid in Matamoros is mostly provided by Team
            Brownsville, a volunteer group that feeds hundreds of people a
            day. Children show signs of severe malnutrition;
    Children have no access to education;
    In the city, there are few medical services for these
            migrants, although Doctors Without Borders and local doctors
            work tirelessly. Many asylum seekers have already experienced
            severe trauma, conditions often exacerbated in the tents where
            they survive. There simply are not enough doctors to treat
            them;
    There is inadequate water and sanitation, placing people at-
            risk of preventable diseases; and
    Asylum seekers are kidnapped, assaulted, tortured, and
            extorted while they wait for their day in court.
    These examples are the norm, not the exception. The Government's
decision to send someone to Matamoros is a life-and-death decision for
the almost 10,000 people sent there--a number we believe will be much
higher now.\26\
------------------------------------------------------------------------
    \26\ TRAC Immigration, https://trac.syr.edu/phptools/immigration/
mpp/ (based on the charging document issued by DHS, data shows 10,646
people subjected to have their case heard in the ``MPP court'' in
Brownsville across from Matamoros as of September 2019).

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

B. The Unlawful Placement of Particularly Vulnerable Groups in
        Matamoros
    On December 20, 2018, then-DHS Secretary Nielsen announced the
Remain in Mexico policy, a policy to be implemented consistent with
``domestic and international legal obligations.''\27\
------------------------------------------------------------------------
    \27\ Department of Homeland Security, Secretary Kirstjen M. Nielsen
Announces Historic Action to Confront Illegal Immigration (Dec. 20,
2018), https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-
historic-action-confront-illegal-immigration.
------------------------------------------------------------------------

    Several guidance documents lay out the core implementation features
of the Remain in Mexico program, including which migrants are
``amenable'' to be forcibly returned to Mexico.\28\ Representatives of
DHS stated that immigration officers may exercise their discretion to
forcibly return only those migrants determined ``amenable'' to the
Remain in Mexico program.\29\ However, as representatives stated, DHS
determined that certain groups of people were categorically ineligible
to be placed in the Remain in Mexico program, including unaccompanied
children or migrants with ``known physical or mental health
issues.''\30\ These people were not ``amenable'' to the Remain in
Mexico program.\31\ Additionally, in July 2019, the agency sent a
letter to Representative Grijalva to ``reiterate DHS's commitment to
the responsible implementation of this program as it applies to all
populations, including LGBTQ asylum seekers and other vulnerable
populations.''\32\ On the ground in Matamoros, the reality has starkly
contrasted with the agency's stated policy.
------------------------------------------------------------------------
    \28\ Office of Field Operations, San Diego Field Office, Guiding
Principles for Migrant Protection Protocols, (Jan. 28, 2018), https://
www.cbp.gov/sites/default/files/assets/documents/2019Jan/
MPP%20Guiding%20Principles%201-28-19.pdf.
    \29\ Innovation Law Lab v. McAleenan, Brief for Appellants, 2019 WL
2290420 *13 (N.D. Cal. 2019).
    \30\ Id.
    \31\ Id.

**AR235**

Office of Strategy, Policy, and Plans of the Department of Homeland
Security, to the Honorable Raul M. Grijalva (July 19, 2019).
------------------------------------------------------------------------

    In August 2019, I began to meet and be contacted about people with
apparent disabilities who the U.S. Government had subjected to Remain
in Mexico and forcibly sent to Matamoros.
    In September 2019, I met B.G.P., a deaf and non-verbal woman who
the Government had forcibly transferred to Matamoros with her mother,
minor sister, and young child. CBP officials had already violated many
of B.G.P.'s civil rights. Officials never provided her a translator or
any other aid so she could effectively communicate with the Government
agents. One day, CBP officers arrived at the detention cell that they
had placed her in at around 4 in the morning and tried to force her on
the bus. They did not tell her that she would be sent to Mexico.
Although B.G.P.'s mother pleaded that her daughter would face danger
and discrimination, the officers told the mother to lie back down and
refused to provide a non-refoulement interview. Luckily, medical staff
intervened and persuaded officers to return B.G.P. and her young child
to the cell with her mother and sister. Two days later, without warning
or explanation, officers again came in the early morning to take B.G.P.
and her whole family to Matamoros.
    Once in Matamoros, B.G.P. and her family struggled with
homelessness, food insecurity, lack of medical care, and
discrimination. They were followed by men to the place they stayed and
the men left only when neighbors intervened on their behalf.
    In September 2019, another advocate introduced us to B.G.P. She
tried to present B.G.P. to the port officials for a re-determination of
her placement in the Remain in Mexico program. Port officials agreed
that the placement was an error. Nevertheless, the agent refused to re-
process B.G.P. The officer first stated B.G.P. would have to travel
back to where she had originally entered, regardless of the fact that
the State Department warns against any travel there. Then, the officer
said that the processing facility was full. After the advocate
explained that the officer had discretion to parole the family in, the
officer just refused, without giving a reason or alternative.
    On B.G.P.'s behalf, we again presented her to ask for parole or,
alternatively, a non-refoulement interview. We were not permitted to be
present for the interview. B.G.P.'s mother said that, before the
interview started, the officers told the group of people there for
interviews that they would be sent back to Mexico no matter what. In
the interview, the agency again violated its own regulations, refusing
to provide an interpreter or other aid for B.G.P. After just an hour-
and-a-half, B.G.P. and her family were sent back to Mexico. B.G.P.'s
mother cried all night.
    We next drafted a legal complaint, which we included with a demand
letter to the agency. Only then was the family paroled into the United
States. Even after agents admitted DHS broke its own policy, it took
over a month and the threat of legal action for the agency to fix their
violation of their policy. Our organization is small. We cannot
represent the many people with disabilities who should not be placed in
the program, so these violations are wide-spread and on-going.
    Since then, TCRP staff and our partners have met many other
particularly vulnerable people whom the U.S. Government has sent back
to Mexico. Here are some examples:
    Two children with Down syndrome were sent to Matamoros. The
        Government has paroled one of these children. While in Mexico,
        the other child was kidnapped, held for ransom, and released.
        The Government still has not paroled that child;
    A child with a recently amputated leg was not given medical
        treatment, but sent to Matamoros. The child is now hiding
        in a shelter that forbids visits, even from lawyers, due to
        safety risks;
    A 2-year-old child has severe epilepsy. As their medication
        is not available in Matamoros, the child suffered seizures that
        drastically impacted their brain;
    A forcibly-removed person with cancer now cannot find
        treatment in Matamoros;
    A 38-week pregnant woman was forcibly given medicine to stop
        her contractions so the Government could remove her to Mexico.
        She gave birth to her child in a tent and, after, suffered

At least 12 LGBTQ people were sent to Matamoros, where many
face physical and verbal abuse, such as death threats and
threats of ``corrective'' rape. After multiple non-refoulement
interviews, only 1 transgender individual was paroled.

Under the agency's own policies, none of these people should have
been forcibly removed to Mexico in the first place. Yet, many spent and
continue to spend months in dangerous conditions in Matamoros. I know
that advocates filed complaints with DHS's Office of Civil Rights and
Civil Liberties about similar cases. There are not enough lawyers
willing to risk their lives to screen people in Matamoros, so there are
likely many more people with similar health and safety issues that we
have not yet met. The agency says it categorically excludes
particularly vulnerable groups; the reality shows otherwise, revealing
an arbitrary and capricious system.

C. The Refusals to Remove People Who Have Become Vulnerable

Due to the conditions in Matamoros, many people who may not
initially be considered categorically excluded from the Remain in
Mexico policy become too vulnerable to remain in Matamoros. Over the
past months, there has been no story more emblematic for us than this
one:

``A toddler was subjected to Remain in Mexico with her family. While
unaccompanied children should be categorically excluded, the government
routinely sends families back who have small infants or toddlers. This
toddler was already so malnourished that she looked like an infant.

``On November 13, 2019, after spending time in Matamoros, she developed
signs that showed she likely had sepsis. As her joints swelled and she
became listless, her family rushed her to get her treatment, contacting
our partner with an office in Matamoros. With supplies too limited to
treat the child, a volunteer emergency room doctor went with the family
and our partner to the bridge to confirm to U.S. officials that the
child had a serious medical condition and needed to instantly be taken
to a hospital in the United States.

``Federal officers kept the family standing on the bridge for around
3\1/2\ hours in the freezing rain. They refused to permit the family to
wait in the processing center. They refused to let the family stand in
an area on the bridge where they would not be in the rain. The two
officers refused to even allow the family to move the child close to
the heater that was behind the agents.

``Stuck on the bridge, in freezing and rainy conditions, our partner
reached out to us for help. TCRP instantly responded, amplifying their
situation through our social media to allies. Soon, the agents let the
family in. The child was hospitalized and is in serious
condition.''\33\
------------------------------------------------------------------------
    \33\ This story was reported on by local news. See Valerie
Gonzalez, Sick Honduran Toddler Admitted into US After Hours-Long Wait,
KRGV (Nov. 14, 2019), https://www.krgv.com/news/honduran-child-treated-
after-emergency-arises-while-waiting-on-int-l-bridge.
------------------------------------------------------------------------

We have seen other threats as well. For example, parents are now
threatened by the Mexican government with family separations
paralleling those that our Government carried out.\34\ The uncertainty
and fear that asylum seekers face in these moments can cause further
emotional trauma. We see new risks develop every day that make people
vulnerable to severe health issues.
------------------------------------------------------------------------
    \34\ Reynaldo Leanos, Mexican Official Tries to Move Asylum-Seekers
Stuck in Tent Camps, NPR (Nov. 09, 2019), https://www.npr.org/2019/11/
09/777686672/mexican-official-tries-to-move-asylum-seekers-stuck-in-
tent-camps.
------------------------------------------------------------------------

In our experience, people can rapidly develop serious health issues
in Matamoros. When someone becomes too vulnerable to remain in
Matamoros, agents are too slow to respond to the sudden, severe medical
or safety needs of the person. I have seen how our clients have become
severely at-risk because port-of-entry officials are uncoordinated at
best and, at worst, try to mislead advocates about what is necessary to
parole people into the United States.

D. Unethical and Discriminatory Treatment by DHS Officials at the

AR237

Throughout the past month, myself and our partners have witnessed various unethical and discriminatory behaviors by CBP officials, such as incidences where CBP officials:

Threatened to report as terrorists those asylum seekers who petitioned for a non-refoulement interview;

Told asylum seekers that the asylum seekers could complete the non-refoulement interview but, regardless of the outcome, the officers would still send them back to Mexico;\35\

--------------------------------------------------------------------

\35\ BuzzFeed has stated it recently obtained a report in which a DHS investigation found that CBP officers sometimes interfered with USCIS officer's ability to determine whether an asylum seeker should be excluded or removed from the Remain in Mexico program on the basis of fear of persecution or torture. Hamed Aleaziz, US Border Officials Pressured Asylum Officers to Deny Entry to Immigrants Seeking Protection, A Report Finds, BUZZFEED (Nov. 14, 2019), https://www.buzzfeednews.com/article/hamedaleaziz/dhs-asylum-report-mpp-immigration-remain-mexico.

--------------------------------------------------------------------

Used homophobic slurs to refer to LGBTQ asylum seekers;

Forced an indigenous young woman to translate for official Government interviews all-day without providing her food, breaks, or pay;

Tried for 5 hours to pressure an indigenous family to conduct a non-refoulement interview in Spanish, a language that they do not speak. Officers kept threatening that, if the family did not do the interview in Spanish, then the family would be forcibly returned to Mexico without receiving a non-refoulement interview.

I have witnessed the psychological toll that this behavior has taken on asylum seekers. For example, although B.G.P.'s family was unlawfully placed in the program, their treatment by CBP officers at the port of entry caused both B.G.P.'s minor sister and mother to suffer severe panic attacks that required hospitalization. Other asylum seekers have despaired, considering giving up their strong asylum claims, afraid that they would face retaliation by CBP officials.

E. Abuses Against Lawyers Assisting Asylum Seekers

For the past 3 months, TCRP lawyers and our partners have tried to save lives by advocating for the most vulnerable people in Matamoros. I spoke with our partners about how they have been treated as they endeavored to serve asylum seekers subjected to Remain in Mexico. They shared that Federal officials at the Brownsville-Matamoros port of entry have:

Told lawyers that CBP processing facilities were too full to process their client after having sworn in court shortly beforehand that the facilities were empty;

Told lawyers that a supervisor was not present when the supervisor was clearly visible;

Misled lawyers that an asylum seeker needed to go before an immigration judge and refused to correct their erroneous opinion that a judge was necessary to permit them into the processing center;

Ordered lawyers to leave before the lawyers could return paperwork to their clients and then become visibly hostile when lawyers asked how to return the paperwork; and

Grabbed a lawyer by their backpack and shoved them.

As lawyers, civility is at the core of our profession, even as we zealously advocate for our clients. To protect the rights of those people whom the Government has forcibly transferred, myself and my colleagues enter into some of the most dangerous areas on this continent: The State Department has issued a Level 4 Travel advisory to Tamaulipas, an advisory that is given for countries like Afghanistan, Syria, and Yemen. One of our partners has been threatened 3 times in Matamoros and continues to receive threats via phone and email. Lawyers rapidly left Matamoros at least 3 times due to safety concerns. Some partners developed ``extraction'' protocols to manage the risks, such as carrying safety whistles and taking pictures of volunteers before entering to have in case someone is kidnapped. To do our jobs and to keep safe, we need to be able to rely on the honesty and civility of Federal employees.

AR238

Sadly, the reality is that Monica's father and lawyer told me
that they had been worried about their safety at various times due to
the actions of Federal officials. The concern that Federal employees
will harm us or lie to us makes an already difficult job that much
tougher, deterring people from joining the already small group of
lawyers willing to enter Matamoros.

### iii. recommendations

As advocates on the ground for more than 30 years, TCRP's expertise
spans decades of administrations and policies. In the Rio Grande
Valley, never before have we seen such cruel policies. Organizations
and volunteers were already expending tremendous effort to respond to
the attacks on asylum; now, we spread ourselves even further to make
sure asylum seekers have at least some services and legal advice. As
one of our partners said, this work is ``soul-crushing.''

I have seen the resilience of the people in Matamoros. An
overwhelming sense of community permeates the refugee tent encampment.
People watch out for each other. Single mothers group their tents so
they can help each other with the children. They sleep in rotations so
that someone is awake to notice if anything is happening. As a person,
I am horrified that all I can say to them is to hold on and stay safe,
a statement that feels empty when I know how often people are
kidnapped, abused, and tortured.

The Remain in Mexico Policy is not a cornerstone of a reformed
immigration system. Instead, this policy shatters the right to asylum,
creating a chaotic, capricious, and un-Constitutional crisis. This
humanitarian crisis threatens the lives of tens of thousands of people
who are attempting to seek safety in safety and sets a horrific
precedent on the international stage.

In light of the above, we recommend that Congress take the
following steps:

1. Conduct searching oversight about the degradations of asylum due
   to Remain in Mexico, such as the conditions in Mexico, the
   failure to exclude particularly vulnerable groups, the lack of
   due process or open access to port courts, and the impact of
   the transit ban. Efforts could include further committee
   hearings, a select investigative committee, Congressional
   visits to Mexico and the port courts, oversight letters,
   resolutions of inquiry, and requests for inspections by the
   inspectors general.
2. Visit Matamoros and other areas where people subjected to RIM
   are forcibly transferred and request meetings with port of
   entry directors to discuss administrative processes for
   discretionary removals from Mexico.
3. Adopt formal expressions of censure or condemnation for
   officials overseeing the Remain in Mexico policy for failing to
   follow the vulnerable group protections.
4. Foster transparency by making public all policies and guidance
   related to the program. Publish data on the use of
   discretionary removals by region and disaggregated by gender
   identity, age, country of origin, and vulnerabilities.
5. Provide emergency, life-saving aid to asylum seekers, including
   funds for USAID programs and legal representation.
6. Pass legislation to end the Remain in Mexico policy.


Miss Rice. Thank you for your testimony. I now recognize
Dr. Schneberk to summarize his statement for 5 minutes.

     STATEMENT OF TODD SCHNEBERK, MD, ASSISTANT PROFESSOR OF
  EMERGENCY MEDICINE, CO-DIRECTOR, HUMAN RIGHTS COLLABORATIVE,
    KECK SCHOOL OF MEDICINE OF THE UNIVERSITY OF SOUTHERN
   CALIFORNIA; ASYLUM NETWORK CLINICIAN, PHYSICIANS FOR HUMAN
                            RIGHTS


Dr. Schneberk. Thank you for the opportunity to speak. My
name is Todd Schneberk. I am an emergency physician in Los
Angeles, California. I also provide care in Tijuana, Mexico, to
indigent patients, many of whom have been deported from the
United States, including young people and some veterans.

Today I speak as a medical expert for Physicians for Human
Rights. For more than 30 years PHR has carried out forensic
evaluations that assess the degree to which physical and

AR239

psychological findings corroborate allegations of abuse and play a key role in the adjudication of asylum claims in the United States.

My work has changed dramatically since the Trump administration rolled out MPP, and my colleagues and I now face an increasing demand to carry out these forensic evaluations across the border. As a medical expert I regularly witness the dire impacts of MPP, and I am here to share my assessment that this program should be halted and de-funded immediately.

First, I would like to share how my medical assessment of the state in which thousands of asylum seekers arrive at the border. In February of this year I was part of a PHR team that documented the cases of asylum seekers in Tijuana. These findings later formed the basis of a PHR report entitled, ``If I Went Back, I Would Not Survive.'' We medically evaluated dozens of asylum seekers who share harrowing stories of extreme brutality, and whose physical and psychological scars bore out their narratives. Not surprisingly, the majority screened positive for post-traumatic stress disorder. Many screened positive for depression, experiencing significant fear and hyper vigilance.

I would like to share some of the examples of the physical and psychological signs and symptoms that PHR's medical team documented among asylum seekers at the U.S. border. All names have been changed for security reasons.

Jimena, a 21-year-old mother from Honduras, who was raped because her husband refused to join a gang, told us how armed men entered her house, threw her face down on the kitchen floor. One of the men held her down, while the other man raped her. She described her physical state afterwards: ``I had bruises on my shoulders where they held me down. I had pain in my abdomen for 3 days and in my stomach throughout my pregnancy. It hurt to sit down.'' PHR medical experts noted signs of severe depression and hyper vigilance. Having to wait in Tijuana only compounded her fear and anxiety.

Perhaps the most distressing cases PHR documented concerned children. Antonio, an 8-year-old Honduran boy, was attacked by 2 paramilitary men with a machete. Since the attack his parents told PHR that he cries often and must hold his mother's hand to be at ease. Since they arrived in Tijuana, Antonio defecates in his bed and suffers from nightmares where he yells, ``Mom, hurry, hurry. The guy is going to kill us.'' Antonio himself reported symptoms of PTSD and anxiety disorder, as well as somatization, whereby a psychological distress manifests as physical ailments and attention problems. As most asylum seekers stuck in Tijuana, Antonio did not have access to mental health care, or adequate medication, or therapy for his attention deficit hyperactivity disorder, which likely exacerbated his condition.

Since the completion of PHR's investigations, I have completed--I have participated in multiple forensic evaluations of MPP returnees through our network of both Mexican and U.S. physicians and attorneys. Here are snapshots of some of these cases.

Alec is a Honduran evangelical pastor who was assaulted multiple times and shot in the leg for opposing gangs trying to recruit youth. Gang members then raped his wife, threatening that it would keep happening unless he left the area. Alec fled after his wife was raped a second time. In addition to his physical scars, Alec screened positive for depression and PTSD. Although he was granted asylum in immigration court, it was immediately appealed.

Martin is a young man who fled Honduras due to pressure to join a gang. He was diagnosed with epilepsy as a boy, for which he was prescribed a combination of medications. After being forced to wait in Tijuana, Martin suffered several seizures that caused significant head and facial trauma. Although a charity helped him find medications, U.S. border officials confiscated these every time he crossed into the United States to attend his hearings, despite medical letters from myself and others attesting to the importance of these medications.

While I continue to work with patients in Tijuana, I
also provide emergency care in Los Angeles. Like any other
doctor, I first try to make the patient feel safe and in
control of their environment, so that we can comfortably
discuss and address their needs and fears. For the thousands
who wait in Tijuana, however, the standard of safety and basic
health needs are impossible to meet.

Since this program began in February, I have seen first-
hand how MPP puts the mental and physical health of asylum
seekers at grave risk, harming a population that has already
experienced severe trauma. The stress and constant
vigilance required to survive in an under-resourced border town
like Tijuana exposes these asylum seekers to further violence
and exploitation. Each day that they are forced to wait
compounds the trauma that forced them to seek safe haven.

I urge Congress to take action by directing DHS to
immediately de-fund MPP and abolish metering, as well as any
policies that negatively impact the right to seek asylum or
risk re-traumatization of this vulnerable population, such as
programs intended to authorize officials other than trained
USCIS asylum officers to conduct credible fear interviews.

I also urge Congress to pass new legislation to safeguard
against policies or directives that effectively restrict
individuals' access to asylum protection in the United States.

Thank you.

[The prepared statement of Dr. Schneberk follows:]

Prepared Statement of Todd Schneberk

November 19, 2019

Thank you for the opportunity to speak here today. My name is Todd
Schneberk and I am an emergency physician who works in a large public
county hospital taking care of underserved populations in Los Angeles,
California. In addition to my clinical work, I conduct research and
teach in a residency-training program as assistant professor of
emergency medicine at L.A. County USC Medical Center. For the last 4
years, I also have been working on the other side of the U.S.-Mexico
border, in Tijuana, in free mobile clinics for indigent patients,
including many people who have been deported from the United States.
Many of these deportees are young people and veterans.

Today I speak as a medical expert for Physicians for Human Rights
(PHR). For more than 30 years, PHR has provided forensic evaluations
for asylum seekers in the United States. Based on the Istanbul Protocol
\1\--the international standard for documenting alleged torture and
other cruel, inhuman, and degrading treatment--these forensic
evaluations assess the degree to which physical and psychological
findings corroborate allegations of abuse, and play a key role in the
adjudication of asylum claims in the United States.

------------------------------------------------------------------------

\1\ The Istanbul Protocol is the international standard to assess,
investigate, and document alleged instances of torture and other cruel,
inhuman, and degrading treatment. ``Istanbul Protocol: Manual on
Effective Investigation and Documentation of Torture and Other Cruel,
Inhuman, or Degrading Treatment or Punishment,'' OHCHR, 2004. https://
phr.org/issues/torture/international-torture/istanbul-protocol.html.

------------------------------------------------------------------------

In the last 3 years, I have provided dozens of forensic medical
affidavits for asylum seekers and I have trained several other
physicians and residents in Los Angeles to perform these evaluations
and produce affidavits. However, my work has changed dramatically this
past year, ever since the Trump administration rolled out the Migrant
Protection Protocols, also known as MPP or the ``Remain in Mexico
Policy.'' With thousands of people now waiting in Mexico for a chance
to seek asylum in the United States, my colleagues and I face an
increasing demand to carry out these forensic evaluations on the other
side of the border, and we have been doing so in Tijuana.

The Department of Homeland Security (DHS) has stated that the MPP
was created so ``vulnerable populations receive the protections they
need.''\2\ However, the MPP clearly puts asylum seekers at risk and
violates the principle of non-refoulement, which simply states that
countries, including the United States, cannot return asylum seekers to
a place where they could be subjected to grave risk, irreparable harm,
or persecution.\3\ The requirements of non-refoulement should not be

AR241

new to the United States given the prohibitions under both international and domestic
law,\4\ as well as the Convention against Torture,\5\ which the United
States has signed and ratified.

--------------------------------------------------------------------

    \2\ ``Migrant Protection Protocols,'' DHS, news release, January
24, 2019, accessed July 15, 2019, https://www.dhs.gov/news/2019/01/24/
migrant-protection-protocols.
    \3\ The Principle of Non-Refoulement under International Human
Rights Law, OHCHR, https://www.ohchr.org/Documents/Issues/Migration/
GlobalCompactMigration/ThePrincipleNon-Re-
foulementUnderInternationalHumanRightsLaw.pdf.
    \4\ Title 8--Aliens and Nationality, U.S. Code (2011),  1158.
Asylum. Page 109.
    \5\ David Weissbrodt and Isabel Hortreiter, ``The Principle of Non-
Refoulement: Article 3 of the Convention against Torture and Other
Cruel, Inhuman or Degrading Treatment or Punishment in Comparison with
the Non-Refoulement Provisions of Other International Human Rights
Treaties,'' Scholarship Repository: University of Minnesota Law School,
1999, https://scholarship.law.umn.edu/cgi/
viewcontent.cgi?article=1366&context=faculty_articles.

--------------------------------------------------------------------

    As a medical expert, I regularly witness the dire impacts of the
MPP. I am here today to share my assessment that the MPP--which daily
puts migrant women, children, and men directly in harm's way--should be
halted and defunded immediately. I have seen how the MPP puts the
mental and physical health of asylum seekers at grave risk, allowing
harm to be inflicted upon a population that has already experienced
severe levels of trauma. Many of the people we see have escaped extreme
violence in their countries of origin. Instead of finding the safety
they so desperately seek, they are forced back into under-resourced
border towns like Tijuana, where they are exposed to further violence
and exploitation. Each day that asylum seekers are forced to wait in
these precarious settings compounds the massive trauma that forced them
to flee their homes to seek safe haven within our borders. This
situation can quite literally be a threat to their lives.
        physical and psychological health of asylum seekers
    First, I would like to share my medical assessment of the state in
which thousands of asylum seekers arrive at our ports of entry. In
February this year, I was part of a PHR team of researchers and medical
experts who documented the cases of asylum seekers in Tijuana. These
findings later formed the basis of a PHR report named ``If I went back,
I would not survive.''\6\

--------------------------------------------------------------------

    \6\ ``If I went back, I would not survive:'' Asylum Seekers Fleeing
Violence in Mexico and Central America, Physicians for Human Rights,
October 2019, https://phr.org/our-work/resources/asylum-seekers-
fleeing-violence-in-mexico-and-central-america/#_ftnref61.

--------------------------------------------------------------------

    At migrant shelters and other safe havens, we interviewed and
medically evaluated dozens of asylum seekers who shared harrowing
stories of the extreme brutality they had experienced in their home
countries--and whose physical and psychological scars bore out their
narratives. These individuals and families were fleeing various forms
of extortion, rape, torture, and killings. Not surprisingly, the
majority screened positive for post-traumatic stress disorder (PTSD).
Additionally, many screened positive for depression and also
experienced significant fear and hypervigilance. Many were afraid they
had been followed to the border by the very gangs they had fled, and
some had been attacked even as they waited in Tijuana for their chance
to cross to safety into the United States. Returning traumatized asylum
seekers who are already in a particularly vulnerable situation to a
place where they risk further violence directly violates the United
States' commitment, under international and domestic law, to uphold
human rights.
    While I'm sure that these accounts are not new to you, I would like
to share some of the physical and psychological signs and symptoms that
PHR's medical team documented among asylum seekers at the U.S. border.
(All names I refer to throughout this testimony have been changed for
security reasons.)
    Javier,* a 36-year-old man who was extorted and beaten by a gang in
El Salvador, reported symptoms of PTSD, severe depression, and anxiety.

<div align="center">AR242</div>

His inability to sleep and physical exhaustion aside, he also felt constantly on guard and watchful. He told PHR, ``Having seen so much violence, sometimes I start shaking . . . a kind of fear,'' he said. ``My body begins shaking and I go cold.''

Jimena* is a 21-year-old mother of 2 from Honduras who was raped because her husband refused to join a gang. She told us how armed men entered her home and threw her face-down on the kitchen floor. As she fought back, one of the men held her down while the other man raped her. She described to PHR her physical state afterwards: ``I had bruises on my shoulders where they held me down. I had pain in the abdomen for 3 days and in my stomach throughout the pregnancy; it hurt to sit down.'' Throughout PHR's medical evaluation, Jimena demonstrated signs of severe depression and hypervigilance. Having to wait in Tijuana only compounded her fear and anxiety.

Perhaps the most distressing cases PHR documented concerned young children. In Tijuana, we interviewed Antonio,* an 8-year-old Honduran boy who was attacked by 2 men with a machete after his parents ran afoul of the local paramilitaries. Before the ordeal, Antonio's favorite school subject was writing, and he enjoyed playing ball with his friends. Since the attack and his family's flight to the border he has become sad and cries often. His parents told PHR that he holds his breath when he is afraid and often must hold his mother's hand to be at ease. Since he arrived in Tijuana, Antonio also defecates in his bed and suffers from nightmares where he yells in his sleep, ``Mom, hurry! Hurry! The guy is going to kill us!'' Antonio himself reported symptoms of PTSD and anxiety disorder as well as somatization, whereby psychological distress manifests as physical ailments and attention problems.

As most asylum seekers stuck in Tijuana, Antonio did not have access to mental health care. His parents also did not have access to adequate medication or therapy for his attention deficit hyperactivity disorder, which likely exacerbated his condition. When reflecting on what the future held for her son, Antonio's mother said, ``I still don't see it [ending] . . . I want my children to be OK in a safe place . . . but we have not found that [safety] yet. Our hope is that they will give us asylum, so my kids will be safe on the other side.''

        the impact of the migrant protection protocols (mpp)

Asylum seekers who arrive at U.S. ports of entry--including many bearing serious psychological and physicial consequences of the trauma they have suffered--are now met at our border with the Migrant Protection Protocols--a brutal response to their appeal in good faith to await the processing of their asylum claim within the safety of the United States. Since the completion of PHR's investigations, I have participated in multiple forensic evaluations of MPP returnees through a network of both Mexican and U.S. physicians and attorneys who serve this population. As my colleagues today will speak to other aspects of the implementation of the MPP, I would like to provide a series of short snapshots of some of the cases for which I have provided my medical expertise. I want it to be crystal clear who the people are that are being returned to Mexico under the MPP.

Gerald is a gay schoolteacher from Ghana, which still has a law that criminalizes adult consensual same-sex conduct. When local community members discovered that he was gay, they tied a noose around his neck and dragged him by it behind a car. His larynx was crushed so badly that he had nearly lost his voice completely. He now speaks in a hoarse, barely audible whisper, in stark contrast to the booming voice he reported using to teach his 4th-graders at school. Gerald still bears ligature marks on his neck. Despite his strong claim for asylum, he has been unable to find legal counsel in Tijuana and struggles to make a viable life there while he waits.

Alec is a Honduran evangelical pastor who organized youth groups and a Christian anti-gang movement that opposed the recruitment of youth. One day, gang members assaulted him multiple times and ultimately shot him in the leg. They told Alec to stop trying to influence young men to join the church instead of the gangs. Gang members then raped his wife, with the ultimatum that this would keep happening unless he left the area. Alec fled after his wife was raped a second time. In addition to his physical scars, Alec was profoundly psychologically wounded, screening positive for depression and PTSD. Although he was initially granted asylum in immigration court, this decision was immediately appealed.

Martin is a young male from Honduras, afraid of being pressing to
join a gang. At a young age, he was diagnosed with epilepsy, and had
seizures repeatedly until he was finally placed on a combination of
medications. He fled to the border but was unable to find the right
medicine for his seizures when he was in Tijuana. Martin then suffered
several seizures that caused significant head and facial trauma and
also made him unable to keep a job there. Although a local charity
helped him find medications, these were confiscated by U.S. border
officials every time he crossed into the United States to attend his
hearings, despite medical letters attesting to the importance of these
medications. Each time he was returned to Mexico under MPP, he was sent
back across the border without his medications, which posed a risk to
his health.

Lydia is a woman from Honduras who is seeking asylum with her
toddler, Jaime, and hoping to be reunited with her sister and niece who
reside in the United States. She is fleeing domestic abuse, kidnapping,
child abuse, and rape at the hands of gang members. Upon reaching
Tijuana, she was alerted through her family connections that the gang
had sent members to Tijuana to kill her. Lydia and her son remain
indoors for fear of being seen. They have had difficulty finding any
legal counsel; Jaime does not have access to routine pediatric care,
and Lydia has had no access to mental health assistance to address the
trauma of the sexual violence she suffered.

concluding remarks

These 4 cases represent a small fraction of the roughly 50,000
asylum seekers \7\ have been returned to Mexico under MPP. Another
26,000 wait, due to metering practices that limit the number of people
allowed to cross every day, to pursue their legal right to seek safety
in the United States for themselves and their family members. This is a
total of 76,000 people affected by these 2 policies alone.

------------------------------------------------------------------------

\7\ ``Orders from Above: Massive Human Rights Abuses Under Trump
Administration Return to Mexico Policy,'' Human Rights First, October
2019, https://www.humanrightsfirst.org/sites/default/files/
hrfordersfromabove.pdf.

------------------------------------------------------------------------

While I continue to return to Tijuana to provide MPP returnees with
needed medical and psychological evaluations, I also continue to
provide care to traumatized people every day in the emergency room in
Los Angeles. Like any ER doctor, the first thing I do is try to make a
patient feel safe. I control their environment as much as possible so
that we can comfortably discuss and address their needs and fears. For
the thousands who wait in Tijuana, however, this standard of safety is
not being met; nor is access to basic medical and mental health needs.
These needs include things like prenatal, obstetric, and routine
pediatric care, such as vaccines and nutritional screening, but also
expands to mental health services which are so desperately needed by
this population.

This is especially true as our evaluations of the mental health of
asylum seekers show that U.S. policies have stranded thousands of
women, men, and children in places like Tijuana and made them
vulnerable to violence, theft, and extortion by cartels, gangs, and
police authorities. Clearly, current U.S. policies that restrict asylum
seekers' right to enter the United States is inflicting further trauma
on them every day they must wait. The stress and constant vigilance
required to survive in an under-resourced border town like Tijuana is a
massive strain on already traumatized people. It harms their livelihood
and well-being and is literally a threat to their lives.

recommendations

All asylum seekers we interviewed sought protection due to targeted
violence and intimidation from gangs and other non-state actors as well
as violence by and/or denied protection by state authorities. While
they represent a small sample of the thousands of asylum seekers
currently waiting their turn to seek protection in the United States,
their cases indicate that they have strong grounds to seek asylum and
that their claims should be heard in a prompt and fair manner.

While the Obama administration implemented troubling policies
regarding detention and deportation, since 2016, the Trump
administration has undermined the integrity of the U.S. asylum system,
introducing a series of restrictive policies that defy both
international and U.S. law and egregiously obstruct the right to seek

AR244

asylum. Those policies, under the guise of protecting America--
have placed people who are already in vulnerable situations--asylum
seekers fleeing violence and trauma in their home countries--at further
risk. Physicians for Human Rights' findings point to the urgent need to
protect the right of individuals to seek asylum in accordance with
Federal and international laws by implementing the following
recommendations.
    Congress should:
    Direct the Department of Homeland Security to immediately
        abolish and defund the MPP and ``metering,'' as has already
        been proposed in Representative Veronica Escobar's Asylum
        Seeker Protection Act (H.R. 2662).
    Defund any policies that may negatively impact the right to
        seek asylum, such as pilot programs intended to authorize law
        enforcement officials other than trained U.S. Citizenship and
        Immigration Services (USCIS) asylum officers to conduct initial
        screenings known as ``credible fear interviews'' (CFIs).
    Propose and pass new legislation to affirm the full range of
        rights guaranteed to asylum seekers to counteract any executive
        or Departmental policies or directives that effectively
        restrict individuals' access to asylum protection.
    Provide adequate funding to ensure USCIS has sufficient
        resources to appropriately conduct CFIs.
    Publicly support the work of individuals and organizations
        defending the rights of asylum seekers on the U.S. and Mexican
        sides of the border and monitor any threats to their ability to
        carry out this work.
    Pursue policies that seek to create a safe, stable
        environment for asylum seekers to fulfill their right to pursue
        their asylum claims within the protection of the United States,
        and that meaningfully guard against the re-traumatization of
        this vulnerable population.

    Miss Rice. Thank you, Doctor. I now recognize Mr. Knowles
to summarize his statement for 5 minutes.

    STATEMENT OF MICHAEL A. KNOWLES, PRESIDENT, AFGE LOCAL 1924,
      SPECIAL REPRESENTATIVE AFGE NATIONAL CIS COUNCIL 119

    Mr. Knowles. I wish to thank the committee for giving me
the opportunity to testify here today.
    I want to reiterate that I am here in my capacity as the
union representative for USCIS employees, and not in my
official capacity as an asylum officer. I am not authorized to
speak on behalf of the agency, but I speak on behalf of our
members.
    I have an extensive written statement, which is submitted
for the record, and I would like to draw attention to some of
the exhibits, one being our amicus friend-of-the-court brief
that we submitted in the 9th Circuit in June in support of a
lawsuit brought against DHS on its MPP policy, and we
extensively document the objections of our members to this
policy in that amicus brief.
    We have also submitted a very important news story,
documents regarding the much-publicized resignation of one of
our asylum officers from San Francisco, Mr. Douglas Stephens.
He was the subject of some news stories in both print and in
the radio over the last weekend, and we have included the
transcript of the radio broadcast and his own statement of
resignation, in which he outlines legal objections.*
------------------------------------------------------------------------
    * Attachments 1-3 have been retained in committee files.
------------------------------------------------------------------------
    We just want to say for the record that the union stands
firmly behind Mr. Stephens and other asylum officers who have
bravely raised their voices.
    As indicated in my bio, I am well-acquainted with this
field, having served as an asylum officer since 1992, the
second year of the program's inception, and before that worked
for many years abroad. I am well-acquainted with crisis. I am
well-acquainted with conflict, having worked in war zones

<center>AR245</center>

ranging from internment, torture, rights abuses, and refugee
camps across western and southeast Asia, as well as refugee
camps here in the United States.

I mention that because many of my asylum officer colleagues
are just like me, they bring extensive experience, they are
subject-matter experts in the field. They were hired by the
Government to conduct some of the most difficult and
complicated work of the Immigration Service, and they do so
proudly as patriotic citizens and public servants. Many of them
are attorneys. Many of them have advanced degrees and extensive
experience in the human rights field.

We are very dismayed that statements in this
administration's leadership, our own agency leadership, has
disparaged this loyal work force, and going so far as to
question their integrity, their competence, and their loyalty
to the United States. I ask that this committee, regardless of
party or inclination on this matter, would do its utmost to
uphold the good name and the loyalty of these brave men and
women.

My colleagues here on the panel have eloquently testified
to the effect of these programs on the migrants and asylum
seekers. I am here today to talk about the effect, the very
serious effect, on the officers that have to carry out the
work.

Many of them have expressed their concerns internally, some
publicly, all in good conscience, none out of disloyalty. We
have had disparaging remarks indicating that they just don't
agree with policies, or that they are politically motivated. We
categorically deny those allegations. We are nonpartisan,
professional civil servants. We took an oath to uphold the
Constitution and laws of the United States. Our objection to
the policies like MPP, which is only one of many egregious
policies that are being implemented, our objections are based
in our oath and in our commitment to uphold the law.

These policies are blatantly illegal, they are immoral,
and, indeed, are the basis for some egregious human rights
violations by our own country.

We have been threatened with retaliation, with
investigations of leakers and whistleblowers. We have had some
of our members threatened with discipline and, most shockingly,
we witnessed the precipitous removal of Mr. John Lafferty, the
chief of the asylum program, who is one of the most highly
respected civil servants I have had the honor to serve with. He
was summarily dismissed and transferred with no explanation.

I have no insight into that action, but my members and I
have reason to believe it was because of his devotion to the
program, to its integrity, and to its work force, and he was
seen as an obstacle to carrying out some of these policies.

So in closing, I would ask this committee to have more
hearings like this. We need more exposure of these situations.

MPP is only one of many serious abuses in this field. We
filed a brief on the so-called third-country transit bar. As
you have read in the news, we are on the eve of yet another
egregious abuse by our country, whereby asylum seekers will be
transported to have asylum cases heard in Guatemala, not by our
own country, but by a country that produces many refugees
itself.

Our officers are dismayed. They are--they remain committed
to the job. But they ask me to implore this committee to please
intervene, to put a stop to this injustice.

Thank you for your time, and I look forward to answering
your questions.

[The prepared statement of Mr. Knowles follows:]
            Prepared Statement of Michael A. Knowles
                      November 19, 2019

Chairwoman Rice, Ranking Member Higgins, and other Members of the
subcommittee: Thank you for inviting me to submit this statement for
the record.

                         introduction

I have proudly served in the United States Asylum Officer Corps
since 1992, 1 year after its creation. Prior to that, I served for many

years as a case-worker, program manager, and policy advisor with various non-governmental organizations responsible for refugee protection, resettlement, and humanitarian assistance in the United States and abroad (Afghanistan, Cambodia, Indonesia, Pakistan, Malaysia, Singapore, and Thailand).

I appear here in my capacity as the special representative for refugee asylum and international operations for the National Citizenship and Immigration Services Council 119 of the American Federation of Government Employees (AFGE)--the labor organization that represents over 13,500 bargaining unit employees of the U.S. Citizenship and Immigration Services (USCIS) world-wide. As special representative, I report directly to the council president, Danielle Spooner, on all matters related to asylum and refugee matters.

Concurrently, I serve as the elected president of AFGE Local 1924-- the Council 119 affiliate that represents 2,500 USCIS employees in the National Capitol Region. My views represent the Union and its members. They are not official positions of the U.S. Government.

Today's hearing shines critical Congressional light on the Migrant Protection Protocols (MPP) ``Remain in Mexico'' policy rolled out by the Trump administration this year. I expect my co-panelists to produce significant evidence demonstrating why MPP is an unmitigated disaster for everyone involved. My testimony focuses on how MPP is affecting-- and hurting--my fellow Asylum Officers, who must either carry out orders and run the program they reasonably believe violate the law and endanger asylum seekers or leave their jobs.

Unless otherwise noted, my testimony is based on public source information. In particular, I recommend to the subcommittee the report published late last week by the office of U.S. Senator Jeff Merkley (D-OR).\1\ It describes the extensive efforts by the Trump administration to deter and prevent asylum seekers from legally claiming asylum within the United States. It also reveals how programs like MPP are part of a larger, systematic effort undermining the functioning of the U.S. asylum system. I urge you to review its detailed findings and adopt its recommendations.

--------------------------------------------------------------------

\1\ Shattered Refuge--A U.S. Senate Investigation into the Trump Administration Gutting of Asylum (Nov. 2019), available at https:// www.merkley.senate.gov/imo/media/doc/SHATTERED%20RE- FUGE%20-520A%20US%20Senate%20Investigation%20into%20the%20Trump%20Ad-ministration%20Gutting%20of%20Asylum.pdf (Merkley Report).

--------------------------------------------------------------------

                    about asylum officers

To begin, my Union has taken and continues to take stands against policies we consider illegal. We actively support our members who exercise their lawful rights to report abusive policies, programs, and practices to Congress and other agencies, as well as their first amendment rights.

We have filed Amicus Curiae briefs in 4 major court cases challenging the Trump administration's illegal and dangerous policies regarding the U.S. Refugee and Asylum programs: (i) The 2017 travel ban that suspended most overseas refugee processing; (ii) the MPP policy; (iii) the substantive changes to USCIS training and guidance materials for Asylum Officers; and (iv) the so-called ``third-country transit bar''--the insidious rule barring migrants arriving at the Southern Border from receiving asylum if they transited through a third country and did not apply for and were denied asylum while there.\2\ Because of the relevance of our MPP Amicus brief to today's hearing, it is attached here as Exhibit 1 and is incorporated into my testimony.

--------------------------------------------------------------------

\2\ Trump v. International Refugee Assistance Project, Nos. 16-1436 & 16-1540 (S.Ct.) (2017 travel ban Amicus brief filed Sept. 7, 2017); Innovation Law Lab v. McAleenan, No. 19-15716 (9th Cir.) (MPP Amicus brief filed June 26, 2019); Kiakombua v. McAleenan, No. 19-cv-01872-KBJ (D.D.C.) (USCIS training and guidance materials Amicus brief filed Sept. 20, 2019); East Bay Sanctuary Covenant v. Barr, No. 19-16487 (9th Cir.) (third country transit bar Amicus brief filed Oct. 15, 2019).

--------------------------------------------------------------------

Asylum Officers have tough jobs. We make decisions that have life or death consequences. Most of us consider the work a calling; we make significant personal sacrifices to carry out the Nation's founding mission--to serve as a beacon to the persecuted across the globe.

<div align="center">AR247</div>

Frankly, I think we are living in troubled times.

But we are now far from the best of times. Since the start of the current administration, policies and procedures have been imposed that I and many of my colleagues believe to be illegal. More importantly, they are fundamentally wrong and threaten to shred the moral fabric of our society.

### what asylum officers do

For good reason, we are focused today on the Southern Border. There, Asylum Officers are the ones who have to decide in an initial screening interview whether persons seeking refuge in the United States have shown a credible fear of persecution in the countries from which they have fled. By law, the standard we apply at this early stage in the asylum process is a low one--intended to weed out patently false allegations and identify those who have a significant possibility of making a valid asylum claim. If they pass our screening, they then proceed to Federal immigration court. They are not returned to the dangers they face in the countries from which they are fleeing-- consistent with the obligation of non-refoulment that are enshrined in our laws and ratified international treaties. The screening is intended to be a ``safety net;'' it is not a final adjudication of asylum claims.

In immigration court, a judge conducts a full hearing of the evidence and applies a higher standard: Whether the evidence shows that the individual has suffered past persecution or has a well-founded fear of future persecution in their home countries.\3\ The standards applied by Asylum Officers and immigration judges are not the same. The passing rate in immigration court in immigration court is, by design, far lower.

-------------------------------------------------------------------
\3\ Congressional Research Service (CRS), Asylum and Related Protections for Aliens Who Fear Gang and Domestic Violence, 2 (2018).
-------------------------------------------------------------------

### what now happens under mpp

MPP turns the process upside down. Now, many asylum applicants are referred to the immigration courts by Customs and Border Patrol (CBP) Agents without a credible/reasonable fear screening by USCIS Asylum Officers--but are first returned to wait on the Mexico side of the border, pending their court hearings. It is no secret that the towns and cities at the Southern Border are among the most dangerous in Mexico--the State Department warns everyone not to travel to the region around Matamoros, for instance, because carjacking, and sexual assault are common, gang gun battles are wide-spread and it has one of the highest kidnapping rates in the country.\4\ Yet applicants are made to wait in Mexico unless they affirmatively assert a fear of serious harm and can prove to an Asylum Officer under the higher, ``more likely than not'' standard that they would face persecution in that country. Now, over 57,000 refugees have been returned to wait in perilous conditions in Mexico under this cruel policy.

-------------------------------------------------------------------
\4\ U.S. Department of State, Mexico Travel Advisory (April 9, 2019), available at https://travel.state.gov/content/travel/en/ traveladvisories/traveladvisories/mexico-travel-advisory.html.
-------------------------------------------------------------------

The dangers of waiting in Mexico under MPP were graphically illustrated this past weekend on an episode of the This American Life podcast/radio show devoted to MPP. A transcript is attached as Exhibit 1.\5\

-------------------------------------------------------------------
\5\ This American Life, The Out Crowd, Episode 688 (Air Date Nov. 15, 2019), transcript available at https://www.thisamericanlife.org/ 688/transcript.
-------------------------------------------------------------------

One woman from Honduras, who has been waiting in Matamoros for 3 months for her court date said she, her husband, and daughter were kidnapped by a Mexican cartel for 15 days.
In Nuevo Laredo, across the Rio Grande from Laredo, Texas, kidnapping is so prevalent that men living inside a shelter for migrants are terrified to go outside. One family from Honduras, a father and 11-year-old son, were kidnapped and held for ransom for 4 days. According to the father, on the day of the kidnapping he and 100 other asylum applicants sent back under

were taken across the immigration bridge crossing the Rio
Grande to the local Mexican immigration office for processing.
After that a man wearing a Mexican immigration officer uniform
agreed to take him and his son to the bus station so they could
go to a safer city. But as soon as they got to the station the
father and son were grabbed and taken to a normal-looking house
holding more than 20 other migrants. While there, the boss told
the father that his son's organs were good for selling because
he was only 11 years old. The father and son were released
after the father's sister paid a ransom, by wiring the money to
a bank account connected to the Mexican immigration officer.

Other reporting has similarly documented wide-spread violence and
inhumane conditions facing migrants stranded in Mexico.\6\

--------------------------------------------------------------------

\6\ See, e.g., Human Rights First, Orders from Above: Massive Human
Rights Abuses Under Trump Administration Return to Mexico Policy (Oct.
2019), available at https://www.humanrightsfirst.org/sites/default/
files/hrfordersfromabove.pdf (``More than one thousand children,
families, and adults are sleeping on the streets in front of the
Matamoros port of entry without adequate access to water or proper
sanitation, too afraid to enter the city because of the extreme
violence there. An American nurse, visiting as a volunteer, told Human
Rights First researchers that many of the children were suffering from
diarrhea and dehydration.''); Los Angeles Times, Molly O'Toole,
Borderline: Trump's Immigration Crackdown, Los Angeles Times (August 5,
2019), available at https://www.latimes.com/politics/story/2019-08-05/
borderline-trumps-immigration-crackdown.

--------------------------------------------------------------------

              action by asylum officers and their union
    In the face of this my Union, its members and other USCIS employees
have not been idle. Here are 3 recent examples of tangible action in
opposition to MPP. And to be clear: Hundreds of current and former
USCIS employees share the views expressed through these actions.
    Union Action: Lawsuits.--Based on the kind of horrific reports
described above (along with many others), my Union argues in our Amicus
brief supporting the challenge to MPP, attached as Exhibit 1, that the
policy is contrary to America's long-standing tradition of providing
safe haven to people fleeing persecution, and that it violates our
Nation's legal obligations to not return asylum seekers to where they
may face persecution. In our Amicus brief supporting the challenge to
the Trump administration's transit bar we argue that it is inconsistent
with our asylum law and that it is contrary to the Nation's long-
standing asylum framework and produces absurd results.
    Individual Action: Documented Resignation.--Brave Asylum Officers
have done much more. In the last 7 days alone, Senator Merkley
disclosed and the Washington Post, CNN, the Los Angeles Times and This
American Life reported on an Asylum Officer in San Francisco who
resigned rather than participate in MPP.\7\

--------------------------------------------------------------------

\7\ Merkley Report, at 51-52; Washington Post, Greg Sargent, In
Scathing Manifesto, An Asylum Officer Blasts Trump's Cruelty to
Migrants (Nov. 12, 2019), available at https://www.washingtonpost.com/
opinions/2019/11/12/scathing-manifesto-an-asylum-officer-blasts-trumps-
cruelty-migrants/; CNN, Priscilla Alvarez, Senate Report:
Whistleblowers Blast Trump Administration's Immigration Policies (Nov.
14, 2019), available at https://www.cnn.com/2019/11/14/politics/
merkley-asylum-report/index.html; Los Angeles Times, Molly O'Toole,
Asylum Officers Rebel Against Trump Policies They Say Are Immoral and
Illegal (Nov. 15, 2019), available at https://www.latimes.com/politics/
story/2019-11-15/asylum-officers-revolt-against-trump-policies-they-
say-are-immoral-illegal; This American Life, The Out Crowd, Episode 688
(Air Date Nov. 15, 2019), transcript available at https://
www.thisamericanlife.org/688/transcript. See also Vox, Dara Lind,
Exclusive: Civil Servants Say They're Being Used as Pawns in a
Dangerous Asylum Program (May 2, 2019), available at https://
www.vox.com/2019/5/2/18522386/asylum-trump-mpp-remain-mexico-lawsuit.

--------------------------------------------------------------------

    As recounted on This American Life, in June 2019, Doug Stephens was
assigned to MPP interview duty. His first interview was father-and-son
asylum applicants from Honduras. The father described encountering
criminal cartels, witnessing other migrants being murdered and

AR249

tortured--after being in custody getting their money being
shouted at him. And the father said they had been stopped by the
police--who took their money and cell phones. But the father failed to
say the magic words: ``they threatened me because I'm Honduran.'' Doug
sent them back to Mexico--under MPP protocol the father had to state,
flat-out, those words. He hadn't.

    Two days and 4 interviews later, Doug had enough. A trained
lawyer, he researched the law and identified 7, separate legal problems
with MPP. He told his supervisor he would do no more MPP interviews.
The supervisor said that Doug would be subject to discipline and that
disciplinary proceedings would begin. USCIS management's position is
that their lawyers have said MPP is legal (notwithstanding pending
legal challenges), that Doug received a ``lawful'' order to work on
MPP, and that Doug's refusal to follow a lawful order constituted
insubordination.\8\
------------------------------------------------------------------------
    \8\ This American Life recorded acting head of USCIS Ken Cuccinelli
saying: ``I do expect that the professional employees at USCIS will
implement the policies in place. They're part of the Executive branch,
and so long as we're in the position of putting in place what we
believe to be legal policies that haven't been found to be otherwise,
we fully expect them to implement those faithfully and sincerely and
vigorously.''
------------------------------------------------------------------------

    Doug responded by drafting a legal memorandum that he initially
sent to USCIS management justifying his decision. He also sent the memo
to Senator Merkley's office and to the Union. The Federal Whistleblower
Protection Act allows Federal employees to lawfully make such
disclosures to Congress (as well as the Office of Special Counsel, to
the agency's inspector general and to agency employees designated to
receive such disclosures).\9\ After receiving no response from
management, he quit. On his last day, he sent his memorandum to the 80
employees in the San Francisco Asylum office.
------------------------------------------------------------------------
    \9\ See 5 U.S.C. 2302(c)(2)(C)(iii).
------------------------------------------------------------------------

    Doug's memo is reprinted in Senator Merkley's report and a copy is
attached here as Exhibit 2.\10\ He points out that MPP is not supported
under existing law, was illegally implemented without following
required Federal rulemaking procedures and violates international law.
He states:
------------------------------------------------------------------------
    \10\ At the time he sent his memo to Senator Merkley, Doug was
identified an anonymous whistleblower. He later decided to identify
himself in reporting by the Los Angeles Times and This American Life.
------------------------------------------------------------------------

    [T]he MPP both discriminates and penalizes. Implementation
        of the MPP is clearly designed to further this administration's
        racist agenda of keeping Hispanic and Latino populations from
        entering the United States. This is evident in the arbitrary
        nature of the order, in that it only applies to the Southern
        Border. It is also clear from the half-hazard implementation
        that appears to target populations from specific Central
        American countries . . .
    [I]t is a punitive measure intended to punish individuals
        who attempt to request protection in the United States.
    [T]he MPP practically ensures violation of our international
        obligation of non-refoulment.
    [The MPP] process places on the applicants the highest
        burden of proof in civil proceedings in the lowest quality
        hearing available. This is a legal standard not previously
        implemented by the Asylum Office and reserved for an
        Immigration Judge in a full hearing.
    [E]ven if all the above were remedied, the process is still
        morally objectionable and contrary to the [USCIS Asylum Office]
        mission of protection. The Asylum Office would still be
        complicit in returning individuals to an unsafe and
        unreasonable situation.
    I understand that Doug will be submitting today for the record
today written testimony. Council 119 stands firmly behind his
insightful statements. Should additional hearings be held we believe

that you can find new ways to complete our mission.\10\

    Union Action: Public Media.--I and other Union leaders have
exercised our First Amendment rights to express our opinion on behalf
of our members. For instance, in a Washington Post opinion article
submitted on behalf of our Union, Local 1924 vice president and union
steward Charles ``Chuck'' Tjersland said: ``the standards for
demonstrating [fear of waiting in Mexico] are almost impossibly tough.
When I went to San Ysidro, Calif., to conduct interviews for [MPP], I
spoke with people whose heartbreaking stories, I knew, wouldn't be good
enough.''\11\ He went on to say:
------------------------------------------------------------------------
    \11\ Washington Post, Charles Tjersland, I Became an Asylum Officer
to Help People. Now I put Them Back in Harm's Way (July 12, 2019),
available at https://www.washingtonpost.com/outlook/i-became-an-asylum-
officer-to-help-people-now-i-put-them-back-in-harms-way/2019/07/19/
1c9f98f0-a962-11e9-9214-246e594de5d5_story.html.

``When I started working as an asylum officer more than 26 years ago,
it seemed like a dream job. At the time, hundreds of thousands of
Central Americans were fleeing horrific political repression by their
governments, which had the backing of the United States. I was a law
student in Washington, working at an aid center for recent immigrants.
Most of my friends and colleagues were pretty skeptical of the Federal
Government. But I thought that this could be a way to help people,
while fighting for what I thought America should be: A beacon of
freedom, offering refuge to those in need.
``The Trump administration's policies have turned the process into a
Kafkaesque nightmare. My colleagues and I have interviewed thousands of
asylum seekers from Guatemala, El Salvador, and Honduras and told them
that they had to return to Mexico while their cases were processed--
knowing all the while that they might be kidnapped, assaulted, or
killed. Under MPP, also known as `Remain in Mexico,' we're not allowed
to let them stay here. We're forced to put them back in danger.''

    Chuck was subsequently interviewed by Steve Inskeep, the host of
National Public Radio's (NPR's) Morning Edition.\12\ Again speaking in
his capacity as a Union leader he said:
------------------------------------------------------------------------
    \12\ NPR Morning Edition, Asylum Officers Are Being Used As An
Immigration Deterrent, Tjersland Says (Aug.19, 2019), available at
https://www.npr.org/2019/08/16/751672742/asylum-officers-are-being-
used-as-an-immigration-deterrent-tjersland-says.
------------------------------------------------------------------------
    INSKEEP: Do you get messages from your superiors, explicit
        or implicit, to basically send everyone to Mexico?
    TJERSLAND: It's implicit. It's not--there's no explicit order
        saying that. But by rigging the standards as has been done,
        that's exactly how it comes across.
    INSKEEP: Is there a story of someone you sent back to Mexico
        that you had trouble getting out of your head when you went
        home that night?
    TJERSLAND: Oh, yeah, yeah, yeah. I mean, not knowing where, you
        know, where, you know, a man or a woman was going to be keeping
        their children safe, literally--where are they going to be?
    INSKEEP: Would she ask you, what am I supposed to do when I
        get to Mexico?
    TJERSLAND: Well, you know, this is my--these are the questions
        we're supposed to ask. We're supposed to ask, so if you were to
        go back today, where would you be going? Where are you going to
        go? And they're really--they are at their wit's end. They're
        saying, the shelter is full. We've been told we can't go back
        there.
    INSKEEP: Do you have colleagues who've quit?
    TJERSLAND: We've had colleagues that have quit. We're driving away
        some of the brightest minds, most motivated hearts. Many still
        remain. Don't get me wrong. But it's really a shame.
                        dhs actions and reactions
    The current political leadership of the Department of Homeland
Security (DHS) and USCIS has aggressively--and wrongfully--reacted to
these actions. They have also taken prohibited retaliatory measures.
    Partisan Broadcasts to Employees.--Ken Cuccinelli was publicly

                            AR251

named act... USCIS director on June 1, 2019, he has since been
named acting deputy secretary of DHS. On June 10, he sent the following
email to USCIS staff:
------------------------------------------------------------------------
    \13\ USCIS Press Release, Cuccinelli Named Acting Director of USCIS
(June 10, 2019), available at https://www.uscis.gov/news/news-releases/
cuccinelli-named-acting-director-uscis.

    ``We must work hand-in-hand with our colleagues within DHS along with
our other Federal partners to address challenges to our legal
immigration system and enforce existing immigration law. Together we
will continue to work to stem the crisis at our Southwest Border . . .
We will also work to find long-term solutions to close asylum loopholes
that encourage many to make the dangerous journey into the United
States so that those who truly need humanitarian protections and meet
------------------------------------------------------------------------
the criteria under the law receive them . . . ''

    Mr. Cuccinelli's first-day-of-work statement was not well-received
by the workforce. According to the media report quoting the email,
``one DHS official said the announcement was dropped on employees
suddenly and could be distracting during an already tumultuous time.
`My concern is with employees and their morale,' the official said . .
. Former USCIS officials said the email sent by Cuccinelli . . . was
concerning . . . `Everything in that email suggests he is more
interested in enforcement than in services, which is the agency's
mission,' said Ur Jaddou, former chief counsel at the agency.''\14\
------------------------------------------------------------------------
    \14\ BuzzFeed News, Hamed Aleaziz, Trump's New Immigration Services
Chief Took a Hard Line on Immigrants' Children (June 10, 2019),
available at https://www.buzzfeednews.com/article/hamedaleaziz/trump-
has-appointed-an-immigration-hardliner-to-run-an.
------------------------------------------------------------------------
    Mr. Cuccinelli then went further. Eight days after his start, he
sent on June 18, 2019 a highly partisan broadcast email to Asylum
Division employees. According to a contemporaneous media report:

``Cuccinelli began the message by relaying the number of apprehensions
at the southwest border and that the system had reached a breaking
point. He told staffers that USCIS needed to do its `part to help stem
the crisis and better secure the homeland.'
`` `Asylum officers, you took an oath to support and defend the
constitution of the United States. As a public servant your role as an
asylum officer requires faithful application of the law.'
``The acting director cited statistics used by the Trump administration
about the individuals who do not show up for their immigration court
hearings and those who do not end up being granted asylum.
``Cuccinelli then told staffers, in an apparent warning, that the gulf
between the number of individuals granted passage under the screening
and those who are granted asylum by an immigration judge was wider than
the `two legal standards would suggest.'
`` `Therefore, USCIS must, in full compliance with the law, make sure
we are properly screening individuals who claim fear but nevertheless
do not have a significant possibility of receiving a grant of asylum or
another form of protection available under our nation's laws,' he said.
``Cuccinelli added that officers have tools to combat `frivolous
claims' and to `ensure that [they] are upholding our nation's laws by
only making positive credible fear determinations in cases that have a
significant possibility of success.
``One official at the Department of Homeland Security--of which USCIS
is a part--said the email was `insane,' while former officials said the
email was clearly a threat.''\15\
------------------------------------------------------------------------
    \15\ BuzzFeed News, Hamed Aleaziz, A Top Immigration Official
Appears to Be Warning Asylum Officers About Border Screenings (June 18,
2019), available at https://www.buzzfeednews.com/article/hamedaleaziz/
uscis-director-asylum-officers-email.

    Needless to say, we regarded such messages as an affront to the
professionalism and loyalty of the Asylum Officer Corps. We have always
been fervently committed to upholding our oath to defend the

Constitution and this country; we are the United States of
America; and we have served with great distinction so doing for almost
3 decades. I can confirm that Mr. Cuccinelli's harsh admonishment of
USCIS Asylum Officers has had an intimidating effect upon employee
morale and performance.

    Attacking the Union.--Mr. Cuccinelli continued on this course in
ensuing days. On June 26, 2019, we filed our Amicus brief supporting
the legal challenge to MPP.\16\ Late that evening, Mr. Cuccinelli, a
prolific Twitter user, tweeted ``[t]his lawsuit is an attempt by the
union to score short-term political points.''
---------------------------------------------------------------------------
    \16\ Innovation Law Lab v. McAleenan, No. 19-15716 (9th Cir.)
(Amicus brief filed June 26, 2019).

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

    Minutes later, he tweeted ``[t]his demonstrates the complaining
union leaders are choosing to deny reality.'

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

    The next day, USCIS issued a press release quoting Mr. Cuccinelli
accusing me and my leadership of ``playing games'' and engaging in a
``cheap political stunt.''\17\ That night, Mr. Cuccinelli was
interviewed on CNN by Erin Burnett.\18\ When asked whether we were
right when we said in our Amicus brief (at page 24) that Asylum
Officers ``should not be forced to honor departmental directives that
are fundamentally contrary to the moral fabric of our Nation and our
international and domestic legal obligations,'' he said:
---------------------------------------------------------------------------
    \17\ Press Release, USCIS Acting Director Cuccinelli Response to
Amicus Brief Filed by AFGE Local 1924 Leadership (June 27, 2019),
available at https://www.uscis.gov/news/news-releases/uscis-acting-
director-cuccinelli-response-Amicus-brief-filed-afge-local-1924-
leadership. Mr. Cuccinelli is quoted in more detail as follows: ``Union
leadership continues to play games while the border crisis intensifies.
Lives are being lost, detention facilities are unsustainably
overcrowded, and illegal aliens with frivolous claims continue to
overwhelm our system. The fact of the matter remains that our officers
signed up to protect the truly vulnerable, our asylum system, and most
importantly, our country. A cheap political stunt helps no one and
certainly does not help to contain this crisis.''
    \18\ CNN, Erin Burnett Out Front (June 27, 2019), available at
https://podcasts.apple.com/us/podcast/biden-sanders-about-to-take-
center-stage-as-democrats/id475738195?i=1000443007137.

``Absolutely not. If you look at the rest of their filing, you'll also
see that they say there isn't a problem basically on the border. We can
handle this. We don't need to institute special considerations, things
like MPP that's being worked on with Mexico and expanded. They're in
denial of reality.
``And thankfully most of our asylum officers don't think that. The
union has gone ahead and filed this Amicus brief, but it clearly
doesn't represent the state of play at the border or that we are
dealing with in our agency as it relates to asylum.''

    Mr. Cuccinelli's words were chilling and intimidating then; they
are chilling and intimidating now. That should be obvious when coming
from the head of the agency--who very publicly castigates a Union for
exercising its lawful rights on behalf of its members.
    Union Reaction: Grievance Filed \19\.--AFGE Council 119 reacted to
the foregoing by filing a National-level grievance against Mr.
Cuccinelli. The grievance alleged Mr. Cuccinelli violated multiple
provisions of the Collective Bargaining Agreement of 2016 between USCIS
and Council 119 and the Federal Labor Relations Act (FLRA) by
committing one or more egregious unfair labor practices.\20\ More
specifically, it charged Mr. Cuccinelli with making hostile and
unfounded statements about our Amicus brief filing by denouncing the
Union for a brief he believes does not represent the views of our
members, and by challenging the legitimacy of the USCIS employees who
have exercised their First Amendment rights and who have exercised

AR253

their rights to participate with--and the Union has at times have had the effect of interfering with the Union's effective representation of the bargaining unit--and hindered the employees from exercising their first amendment rights through their Union's advocacy on their behalf.

------------------------------------------------------------------------
\19\ Some of the information found in this section is not currently in the public domain. AFGE, the party that sent or received the information discussed here, now consents to its publication.
\20\ The grievance alleged that Mr. Cuccinelli's statements were unfair labor practices inasmuch as the FLRA makes it an unfair labor practice for an agency ``to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter.'' 5 U.S.C. ⌐ 7116(a)(1).
------------------------------------------------------------------------

As required under the Collective Bargaining Agreement, Council 119 submitted the grievance to USCIS on August 1, 2019; it was rejected on August 29, 2019. USCIS justified its decision on the grounds that Mr. Cuccinelli was merely expressing his personal opinion and ``[t]here is simply nothing hostile about [his] statements.'' To continue defend our freedom of expression and the rights of USCIS employees we invoked our right to third-party arbitration on September 29, 2019. Council 119 and Agency representatives are seeking the assistance of the Federal Mediation and Conciliation Service to select an arbitrator and schedule a hearing in the matter.

Mr. Cuccinelli Refuses to Meet with the Union.--Mr. Cuccinelli has repeatedly rebuffed the Union's requests to meet and address the concerns of our members. At his first and only town hall meeting with USCIS employees on October 23, 2019, I asked Mr. Cuccinelli if he would meet with the Union. According to a media report, he said: ``I believe the day you tried to get on my calendar was the day you went on CNN and had some things to say, and I didn't want to legitimize some of what you were saying there . . . Maybe another day, but it's hard to meet with people who are suing you.''\21\ His refusal is particularly disturbing in view of the contentious negotiations that occurred between the Union and the Agency over our term collective bargaining agreement (it has been sent to our membership for ratification).

------------------------------------------------------------------------
\21\ BuzzFeed News, Hamed Aleaziz, There Was a Tense Exchange Between One of Trump's Top Immigration Officials and an Asylum Officer (Oct. 23, 2019), available at https://www.buzzfeednews.com/article/hamedaleaziz/ken-cuccinelli-uscis-meeting-tense-exchange.
------------------------------------------------------------------------

Hunting for Whistleblowers.--Mr. Cuccinelli has made finding and punishing ``leakers'' a top priority. He boasted about it during a November 3, 2019 TV interview.

``[I]n my first 100 days here we disciplined 27 leakers. We have a handful more still in the pipeline for discipline. I have had confrontations unfortunately with employees instigated by them, not by me, on policy matters that our agency is engaged in, and I think those discussions, frankly, are more appropriate to the political arena than to an employee-management relationship.''\22\

------------------------------------------------------------------------
\22\ Full Measure, Immigration Battles (Nov. 3, 2019), available at http://fullmeasure.news/news/immigration/immigration-battles.
------------------------------------------------------------------------

Of course, this kind of talk is chilling and intimidating for everyone, particularly whistleblowers. The work of Asylum Officers has come under increased scrutiny; many are fearful for their jobs. Regular notices warn employees of disciplinary action for those who ``leak'' internal policy and procedural guidance documents to outside parties. Moreover, the anxiety is now even higher because, other than Mr. Cuccinelli's boast, USCIS has provided the Union with no formal notification of such a high number of disciplinary actions having been taken against ``leakers.'' This subcommittee can and should demand answers.

Leadership ``Reassignment''.--In late September 2019, Acting Director Cuccinelli took the highly unusual step of reassigning the Asylum Division's long-time and highly-respected chief to a lower-level management position. As described in Senator Merkley's report:

AR254

``The reassignment of John L. Lafferty, an experienced career manager, delivered a harsh message to USCIS staff . . . Whistleblowers have reported that Mr. Lafferty was told he was being reassigned just days before it was announced. It took the form of a `rubber-stamped' letter from Acting Director Cuccinelli. Mr. Lafferty reluctantly accepted the transfer--albeit by informing management that he considered it `involuntary.'

``It is not apparent whether there are specific actions that cost Mr. Lafferty his job, but whistleblowers report that his firing is perceived as the result of acting as a committed, civil servant who played it by the book. In other words, he was too neutral. His reassignment was intended to send a message, and that message was received. Rank-and-file officers drew their own obvious conclusion: That Lafferty was fired for applying asylum law as written rather than skewing it to meet the administration's political goals.''\23\

-------------------------------------------------------------------
    \23\ Merkley Report, at 41-42 (footnotes omitted). See also CNN, Geneva Sands, US Asylum Chief Reassigned After Critical Email Publicized (Sept. 4, 2019), available at https://www.cnn.com/2019/09/04/politics/uscis-asylum-john-lafferty/index.html.

    I want to elaborate and confirm that Mr. Lafferty's removal dealt a tremendous blow to the morale of the workforce, which took this adverse action as a warning to all concerned. The exact reasons for Mr. Lafferty's transfer remain unknown to the Union. However, our members believe it was because of his ardent defense of the integrity of the Asylum Program, his insistence on proper application of the law--as well as his passionate devotion to the Asylum Officer Corps which has come under attack by the Trump administration.
    Retaliatory Investigation.--Despite the legal right of Union officials to speak freely to Congress, the media and the public about matters that affect the morale, working conditions and welfare of our members, I and my Union colleagues have continuing concerns about possible retaliation instigated by political leadership.
    A notable current example is an on-going internal investigation USCIS is conducting of Local 1924 Vice President Chuck Tjersland, discussed above, who has been formally warned for having expressed his opinions--in his official Union capacity--to the Washington Post and NPR.\24\ That is wrong. It again sends a chilling and intimidating message to everyone. Again, this subcommittee can and should demand answers.

-------------------------------------------------------------------
    \24\ The information in this section about Chuck is not currently in the public domain. He now consents to its publication.

-------------------------------------------------------------------
                    what can congress do?
    I close with four recommendations about what you and your colleagues can and should do.
    1. More Hearings Like This.--Over the past 3 years we have repeatedly seen how bad publicity causes Trump administration policy to veer and reverse course. The evidence we are providing to today is shocking. Congressional hearings uniquely provide a forum for receiving such evidence.
    2. Investigations.--By law, Congress is in a special position when it comes to unearthing and analyzing evidence. As noted above, the Federal Whistleblower Protection Act allows Federal employees to lawfully make disclosures to Congress.\25\ Congress can and should leverage such authority to gather evidence from whistleblowers and others. The evidence can and should be used as a basis for legislation, hearings and further investigation. Senator Merkley's report is a good example.

-------------------------------------------------------------------
    \25\ See 5 U.S.C. 2302(c)(2)(C)(iii).

-------------------------------------------------------------------
    3. Appropriations.--Because Congress controls appropriations, it has and should continue to insert agency mandates into spending bills. For example, the Consolidated Appropriations Act of 2019, enacted in February 2019, specifically prohibited DHS from using information obtained by the Department of Health and Human Services to apprehend, detain, or remove sponsors of unaccompanied minors.\26\ Such mandates

AR255

should continue to be imposed on ...

--------------------------------------------------------------------
\26\ H.J. Res. 31, Consolidated Appropriations Act 2019 ⌐ 224 (Feb. 25, 2019), https://www.congress.gov/116/plaws/publ6/PLAW-116publ6.pdf.
--------------------------------------------------------------------

4. Improved Whistleblower Protections.--We know that whistleblowers provide vital information used to combat waste, fraud, and abuse. But law to protect them is missing and imperfect. Much is still left to be done. We need legislation which establishes stronger, more effective consequences for wrongful retaliation and disclosures of confidential identities, and which further enshrines the independence of offices of inspector generals, the Office of Special Counsel, and the Congress.

                      conclusion

Asylum officers take their oaths to preserve, protect, and defend the Constitution seriously. They are now under daily attack from the White House, political appointees, and extremist media. Their safety, careers, and reputation are all at risk.

You are helping with his hearing today. Please keep helping.

Thank you.

Miss Rice. Thank you, Mr. Knowles. I now recognize Mr. Homan to summarize his statement for 5.

    STATEMENT OF THOMAS D. HOMAN, FORMER ACTING DIRECTOR, U.S.
    IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND
                            SECURITY

Mr. Homan. Charwoman Rice, Ranking Member Higgins, and Members of the subcommittee, the Migrant Protection Protocol is an important step in regaining control of the Southern Border.

When the MPP was implemented, the numbers of illegal aliens crossing our border illegally was at unprecedented levels. The MPP requires that certain foreign individuals entering or seeking admission to the United States from Mexico may be returned to Mexico and wait outside the United States for the duration of their immigration proceedings.

Our country is still facing a security and humanitarian crises on the Southern Border, and I applaud DHS for using all appropriate resources and authorities to address the crisis.

Over 70 percent of all illegal entrants in the United States this fiscal year are family units and unaccompanied children, and mostly from Central America. Even though over 85 percent of all Central Americans that arrive at the border claim fear, less than 20 percent get relief from our courts, because they simply don't qualify for asylum, or they don't show up for their case.

The last numbers I saw of the immigration court reports that are on-line showed almost half, 46 percent, of those that claimed fear at the border don't file a case with EOIR. Once they are released in the United States, which is their primary goal, they disappear and wait for the next DACA or amnesty to roll around. Misguided court decisions, outdated laws, and the failure of Congress to close the loopholes that have caused this unprecedented surge has made it easier for illegal aliens to enter and remain in the United States.

The most recent 100,000 family units have been ordered removed after due process. Less than 2 percent have left. In June of this year, just 5 months ago, Acting Secretary McAleenan testified that 90 percent of all family units in a most recent pilot study failed to show up in court after being released from the border.

The MPP will help to ensure that those who claim asylum and want to see a judge and get due process will actually see a judge. I hear from many, including some here today, that these migrants have a right to claim asylum, they have the right to see a judge, and they demand due process. I agree. But there is the flip side of that coin. After due process, if ordered removed by a judge, that order needs to be followed and executed, or there is absolutely no integrity in the entire process.

The loopholes that Congress has failed to close, along with

AR256

the numerous entitlements, such as a more expeditious path to immigration detention, and free health care for aliens, sanctuary cities, a pathway to citizenship for those here illegally all encourage more people to make that dangerous journey, which continues to bankroll criminal cartels, the same cartels that are smuggling drugs in this country at alarming rates.

ICE seized enough opioids last year to kill every man, woman, and child in this country twice. Thirty-one percent of women are being sexually assaulted making this journey, and children are dying. Border Patrol agents rescued over 4,000 migrants who may have died, if they weren't found and saved by Border Patrol agents. But you don't hear a lot about that, because people are too busy calling the Border Patrol racists and Nazis.

Now there is a crisis on the border. Even though many said there were no caravans, there were, and we saw them. Others said it was a manufactured crisis, and now we know it wasn't. Their President has been right from Day 1 on this, and has done everything he can, but--within the law in trying to secure our border and protect our sovereignty.

As a matter of fact, on May 7 of this year the 9th Circuit Court of Appeals stayed an injunction against MPP and has allowed it to continue. The significant gains made on this issue are because of our President and the men and women of the CBP and ICE.

Again, MPP is based on the laws written by Congress and upheld by the 9th Circuit.

I am here at another hearing today that will examine a policy implemented by the administration in an attempt to secure our Nation. However, I have seen no hearings in the House regarding the 3 loopholes that are causing the crisis, such as the abuse of the asylum process, the Flores settlement agreement, or the TVPRA, Trafficking Victims Act; no hearing on sanctuary cities or the numerous victims of crimes at the hands of those released back into the street, rather than being turned over to ICE; no hearings on the willful or disgusting attacks against the men and women who served within the Border Patrol and ICE; no hearing about securing our border.

The Border Patrol has said that 40 to 50 percent of their manpower is no longer on the front line defending our border because they are dealing with these families and UACs. When half of our Border Patrol is not on the line, the Border Patrol is more vulnerable to drug smuggling and the smuggling of bad operators such as cartel members, gang members, and those who want to come to this country to do us harm.

If you are someone in this world that wants to come to the United States and do us harm, our border is vulnerable. It is hard to buy a plane ticket to the United States or get a visa here, because after 9/11 we have all sorts of security checks and derog searches are conducted. If you want to get here and do us harm, you are going to come here the same way 12 to 20 million others did, illegally through our Southern Border, especially now, because half the border is unguarded.

The President recognized this and has taken unprecedented actions to address this crisis. I applaud him for doing it. Now it is time for this body to legislate and address this crisis and protect our Nation. I look forward to answering your questions today. Thank you.

[The prepared statement of Mr. Homan follows:]

Prepared Statement of Thomas D. Homan

Chairwoman Rice, Ranking Member Higgins and Members of the subcommittee: The Migrant Protection Protocols (MPP) is an important step in regaining control of our Southern Border. When the MPP was implemented, the numbers of illegal aliens crossing our border illegally was at unprecedented levels. The MPP requires that certain foreign individuals entering or seeking admission to the United States from Mexico--illegally or without proper documentation--may be returned to Mexico and wait outside of the United States for the duration of their immigration proceedings, where Mexico will provide them with all appropriate humanitarian protections for the duration of their stay.

AR257

Our country's — fighting security threats arising from the
Southern Border. I applaud DHS for using all appropriate resources and
authorities to address the crisis and execute our mission to secure the
borders, enforce immigration and customs laws, facilitate legal trade
and travel, counter traffickers, smugglers and transnational criminal
organizations, and interdict drugs and illegal contraband. That is
their job and that is their mission as dictated by Congress in the
enactment of laws that CBP and ICE enforce.

Reading straight from the DHS website that is available for all to
see, I will quote. The MPP will help restore a safe and orderly
immigration process, decrease the number of those taking advantage of
the immigration system, and the ability of smugglers and traffickers to
prey on vulnerable populations, and reduce threats to life, National
security, and public safety, while ensuring that vulnerable populations
receive the protections they need. As a 34-year veteran of immigration
enforcement who has served in the Border Patrol, the INS, ICE from the
front line and on the street all the way to the first acting director
of ICE who came through the ranks. I agree with the DHS assessment
because I have seen the border crisis and the exploitation of our laws
first-hand.

Historically, the majority of illegal aliens that came here were
single adult males from Mexico who could be quickly processed and
removed to Mexico in less than an hour. As a Border Patrol Agent, you
could process an alien from Mexico within 20 minutes and after
accepting a voluntary return would be returned to Mexico through a Port
of Entry within minutes. However, those dynamics have changed where we
now have over 70 percent of all illegal entrants into the United States
this fiscal year being family units and unaccompanied children and
mostly from Central America. Even though over 85 percent of all Central
Americans that arrive at our border claim fear, less than 10-15 percent
get relief from our courts because they simply don't qualify for asylum
or they don't show up for their case. The last numbers I saw for the
Immigration Court reports showed almost half of those that claim fear
at the border don't file a case with EOIR. Once they are released into
the United States, which is their primary goal, they disappear and wait
for the next DACA or Amnesty to roll around.

Misguided court decisions and outdated laws and the failure of
Congress to close the loopholes that have caused this unprecedented
surge has made it easier for illegal aliens to enter and remain in the
United States if they are adults who arrive with children,
unaccompanied alien children, or individuals who fraudulently claim
asylum. There are only about 3,000 designated family beds to deal with
the almost 14,000 family unit arrests during the peak months which mean
most will be released and never spend a day in custody. Out of the most
recent 100,00 family units that have been ordered removed after due
process, less than 2 percent have left. In June of this year, just 5
months ago, the Acting Secretary of DHS testified that 90 percent of
all family units in the most recent pilot study failed to show up in
court after being released from the border. The MPP will help to ensure
that those who claim asylum and want to see a judge and get due process
will actually see a judge. I hear from many, including some here today,
that these migrants have the right to claim asylum and they have the
right to see a judge and they demand due process. I agree. But there is
a flip side to that coin. After due process, if ordered removed by a
judge, that order needs to be followed up and executed or there would
be no integrity in the entire process. Ninety-five percent of everyone
ICE removes from this country after due processes are removed from a
bed. Those that are not detained and released are seldom returned to
their country because they are in flight and hiding.

While we may not be at record highs right now because of the
actions of this President and not this legislative body, the numbers
are still at a crisis level and overwhelming the U.S. immigration
system, leading to a ``system'' that enables smugglers and traffickers
to flourish and often leaves aliens in limbo for years. This has been a
prime cause of our over 800,00 case backlog in immigration courts and
delivers no consequences to aliens who have entered illegally.

The loopholes that Congress has failed to close along with the
numerous enticements such as abolish ICE, no more immigration
detention, free health care for aliens, sanctuary cities, a pathway to
citizenship for those here illegally, all encourage more people to make
that dangerous journey which will bankroll criminal cartels. The same

AR258

cartels that are smuggling drugs into our country and killing families.
ICE seized enough opioids last year to kill every man, woman, and child
in this country twice. Thirty-one percent of women are being sexually
assaulted making that journey and children are dying. Border Patrol
rescued over 4,000 migrants who may have died if they were not found
and saved by our Border Patrol Agents. You don't hear a lot about that
because some people are too busy calling them racists and Nazis.

The MPP will provide a safer and more orderly process that will
discourage individuals from attempting illegal entry and making false
claims to stay in the United States, and allow more resources to be
dedicated to individuals who legitimately qualify for asylum.

I am not an attorney as those seated next to me are. But I have
enforced immigration laws for over 34 years. According to the
Government attorneys and again available on the DHS website it reads
that Section 235 of the Immigration and Nationality Act (INA) addresses
the inspection of aliens seeking to be admitted into the United States
and provides specific procedures regarding the treatment of those not
clearly entitled to admission, including those who apply for asylum.
Section 235(b)(2)(C) provides that ``in the case of an alien . . . who
is arriving on land (whether or not at a designated port of arrival)
from a foreign territory contiguous to the U.S.,'' the Secretary of
Homeland Security ``may return the alien to that territory pending a
[removal] proceeding under ⬚ 240 of the INA.'' Mexico is our partner in
MPP along with the United Nation's IOM.

With certain exceptions, MPP applies to aliens arriving in the
United States on land from Mexico (including those apprehended along
the border) who are not clearly admissible and who are placed in
removal proceedings under INA ⬚ 240. This includes aliens who claim a
fear of return to Mexico at any point during apprehension, processing,
or such proceedings, but who have been assessed not to be more likely
than not to face persecution or torture in Mexico. Unaccompanied alien
children and aliens in expedited removal proceedings will not be
subject to MPP. Other individuals from vulnerable populations may be
excluded on a case-by-case basis.

DHS has set up the system in a way that I think makes sense. This
again is explained clearly on their website. Certain aliens attempting
to enter the United States illegally or without documentation,
including those who claim asylum will no longer be released into the
country, where they often fail to file an asylum application and/or
disappear before an immigration judge can determine the merits of any
claim. Instead, these aliens will be given a ``Notice to Appear'' for
their immigration court hearing and will be returned to Mexico until
their hearing date.

While aliens await their hearings in Mexico, the Mexican government
has made its own determination to provide such individuals the ability
to stay in Mexico, under applicable protection based on the type of
status given to them.

Aliens who need to return to the United States to attend their
immigration court hearings will be allowed to enter and attend those
hearings. Aliens whose claims are found meritorious by an immigration
judge will be allowed to remain in the United States. Those determined
to be without valid claims will be removed from the United States to
their country of nationality or citizenship.

DHS is working closely with the U.S. Department of Justice's
Executive Office for Immigration Review to streamline the process and
conclude removal proceedings as expeditiously as possible. Consistent
with the law, aliens in removal proceedings can use counsel of their
choosing at no expense to the U.S. Government. Aliens subject to MPP
will be afforded the same right and provided with a list of legal
services providers in the area, which offer services at little or no
expense to the migrant.

Again, this program makes sense. MPP will reduce the number of
aliens taking advantage of U.S. law and discourage false asylum claims.
Aliens will not be permitted to disappear into the United States before
a court issues a final decision on whether they will be admitted and
provided protection under U.S. law. Instead, they will await a
determination in Mexico and receive appropriate humanitarian
protections there. This will allow DHS to more effectively assist
legitimate asylum seekers and individuals fleeing persecution, as
migrants with non-meritorious or even fraudulent claims will no longer
have an incentive for making the journey. Moreover, MPP will reduce the

extraordinary strain on our overburdened immigration system,
freeing up personnel and resources to better protect our sovereignty
and the rule of law by restoring integrity to the American immigration
system.

Now, there is a crisis on our border. Even though many said that
there were no caravans, there were and we saw them. Others said that it
was a manufactured crisis and now we know it wasn't. The President has
been right from Day 1 on this and has done everything he can, thinking
out of the box but within the law and trying to secure our border and
protect our sovereignty. As a matter of fact, on May 7 of this year the
9th Circuit stayed an injunction against the MPP and has allowed it to
continue. Illegal crossings are down considerably from the high in May
but we are still at high numbers beyond last year. The significant
gains made on this issue are because of our President and the men and
women of CBP and ICE not because of anyone in this room.

I am here at another hearing that will again push a false narrative
about this administration and the men and women that work for it.
Another hearing that will examine a policy implemented by the
administration in an attempt to secure our Nation. However, I have seen
no hearings in the House regarding the 3 loopholes that are causing
this crisis such as the abuse of the asylum process, the Flores
agreement, or the TVPRA. No hearing on sanctuary cities and the
numerous victims of crimes at the hands of those released back into the
street rather than being turned over to ICE. No hearing on the obvious
wide-spread fraud surrounding the asylum process. No hearings on the
willful and disgusting attacks against the men and women who serve
within the Border Patrol and ICE. No hearing about how we secure our
border. Why is this important? Because this is not just a humanitarian
issue in our border. The Border Patrol has said that 40-50 percent of
their manpower is no longer on the front line, defending our border
because they are dealing with these families and UACs. When half of our
Border Patrol is not on the line, the border is more vulnerable to drug
smuggling and the smuggling of bad operators such as cartel members,
gang members, and those who want to come to this country to do us harm.
If you are someone in this world that wants to come to this country to
blow up a building, our border is vulnerable. It's hard to buy a plane
ticket to the United States or get a visa to the United States after 9-
11 because of all the security checks and derog searches conducted. If
you want to get here quickly and easily you will come the same way 12-
20 million others did, illegally through our Southern Border,
especially now because half of the border is unguarded. The President
recognized this and has taken unprecedented actions to address this
crisis. I applaud him for doing it. Now it is time for this body to
legislate and address this crisis and protect our Nation.

    Miss Rice. Thank you. I thank all the witnesses for their
testimony. I will remind each Member that he or she will have 5
minutes to question the panel. I will now recognize myself for
questions.
    Mr. Knowles, I would like to start with you. So there have
been news reports, or at least one issued late last week, that
seemed to indicate that asylum officers were pressured by
Border Patrol agents to deny certain migrants' entry into the
United States. To your knowledge, has this happened?
    What have your members shared with you about the directives
they are asked to carry out under the Remain-in-Mexico Policy?
    Mr. Knowles. Am I on speaker?
    Miss Rice. Yes.
    Mr. Knowles. All right. I have no direct knowledge of the--
what you just mentioned in the news report, although I have
read the news report of Border Patrol agents directing asylum
officers to make certain decisions.
    I did not get the last part of your question.
    Miss Rice. What have your members shared with you about the
directives they are asked to carry out under the Remain-in-
Mexico Policy?
    Mr. Knowles. Well, they have shared--I--first of all, I
don't know a single asylum officer in the country--and I speak
to them all over the country--who believes that this is a good
policy. Most of them have been very vocal in talking to me
about how it is illegal, and it places them feeling that they

AR260

6/22/2021                  - EXAMINING THE HUMAN RIGHTS AND LEGAL IMPLICATIONS OF DHS'S ``REMAIN IN MEXICO'' POLICY
Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 267 of 688   PageID 1924
are compliance in carrying out rights about

They are sworn to carry out our laws, which guarantee due process for asylum seekers. Not every asylum seeker is guaranteed asylum, but they are guaranteed due process and humane treatment. Under MPP the asylum officer is not even allowed to ask them about their asylum claim, they can only ask them about their fear of remaining in Mexico. That process is carried out at a very high standard, which is almost impossible for the applicant to meet.

Moreover, we have had asylum officers who, in applying very rigorously the flawed MPP rules, tried to make positive decisions, and they were overruled by their supervisors and headquarters monitors saying no, that doesn't meet the standard, with no real legal explanation, other than the front office has eyes on this.

Miss Rice. So you mentioned also that people who felt threatened with retaliation--and also how whistleblowers were being treated. I have very limited time, so I would like to follow up with you on those specific issues.

But you also said that MPP was one of many programs that should be either revised or done away with. You also mentioned the asylum hearings being held in Guatemala, and not even being supervised by officers, American officers.

What other programs were you talking about when you--that you would include in that category?

Mr. Knowles. So we have written 4 amicus briefs that I would urge your committee to look at; the first was opposing the travel ban and the suspension of the refugee program in 2017; the second was on MPP; the third was on very questionable changes that came, we believe, from the White House to our training and policy guidance manuals that officers must use, which had the effect of substantially changing and altering the way that we do credible fear screening in ways that we believe were unlawful; the fourth brief we filed a month ago, opposing the so-called interim final rule, which imposes a bar on asylum seekers, an absolute bar to asylum seekers who pass through other countries and did not seek asylum there.

Over the weekend there was published in the Federal record a new rule that will, as I understand, be implemented this week, and our officers are to be trained today. In fact, I am supposed to attend the training myself on how cases will be adjudicated, who will these--asylum seekers will be transported to Guatemala to have their asylum cases heard in Guatemala----

Miss Rice. Correct.

Mr. Knowles [continuing]. By the Guatemalans----

Miss Rice. Right.

Mr. Knowles [continuing]. Not by the United States.

Miss Rice. Thank you for pointing that out. Dr. Schneberk, with the remaining time I have, I mean, the trauma that is done to these people--and it sounds like a large portion of them are women and children and other vulnerable populations--what are the long-term consequences on their mental, emotional, and physical health? What is the likelihood that they are going to be able to recover from that?

Dr. Schneberk. Briefly, you know, there is a whole area of medicine called trauma-informed care. Trying to figure out how we do a better job taking care of these folks is an on-going study.

I mean, but to start with, you know, trying to create safety is kind-of rule No. 1. Long-term outcomes, you know, there is a lot--you could imagine the amount of mental health effects as a result of these types of experiences.

But, I mean, there is not only just mental health issues, you know, there is actually higher morbidity and mortality, as in people die at younger ages because of adverse childhood events. There is a famous study called the ACES Study that basically documented a lot of these adverse childhood events, one of them being, you know, incarceration of a parent. There is a lot of extrapolatable--all types of experiences that you look at what is going on with kids and younger people that are subjected to these policies, and it is pretty easy to say there

AR261

is going to pose a risk of their ... health of the children.

Miss Rice. I want to thank you all for being here today, and I now recognize the Ranking Member of the subcommittee, the gentleman from Louisiana, Mr. Higgins, for questions.

Mr. Higgins. Thank you, Madam Chairwoman. Mr. Homan, under the Migrant Protection Protocols, an international agreement between the United States and Mexico--just clarify for America, please. America is watching. The Mexican government provides migrants with humanitarian protections for the duration of their stay. Both the government of Mexico and faith-based shelters are housing migrants who have been returned as part of MPP.

Just to put a number on this to clarify for America, as of November, the count is 57,430 illegal immigrants have been returned to Mexico to be housed by Mexican government and faith-based shelters under this program. I am sure we all recall very recent history: We were facing 150,000 crossings a month. So, just to put this in perspective, a certain percentage of illegal crossings are intercepted, processed, and returned to Mexico, while their asylum due process moves forward. We have done our best to accommodate court systems to give them access for more rapid resolution.

Is that a--generally, a good description of this program, Mr.----

Mr. Homan. Yes, sir, you are accurate.

Mr. Higgins. OK. Do you have personal knowledge of what is identified as faith-based shelters that are being used?

Mr. Homan. No. I know the U.S. Government, along with IOM, a division of the United Nations, is helping to oversee that process.

We are also--there is actually funding from the United States flowing into Mexico to help pay for the expenses of these facilities.

Mr. Higgins. Thank you, sir. Ms. Vela, are you familiar with the faith-based shelters?

Ms. Thorn Vela. I am familiar----

Mr. Higgins. Generally speaking. We are not trying to----

Ms. Thorn Vela. Yes, Congressman, there are faith-based shelters.

Mr. Higgins. OK. Are these generally--the children of God that occupy those shelters, are they generally of Hispanic origin?

Ms. Thorn Vela. Yes.

Mr. Higgins. They speak Spanish?

Ms. Thorn Vela. Yes.

Mr. Higgins. All right. Your opening statement--and thank you for your very thorough opening statement--essentially accuses the United States of purposefully sending MPP illegal immigrants, which--we are just trying to handle the due process. It is quite a situation down there. You are essentially accusing the United States of purposefully sending these immigrants into a horrendous situation where, based upon your testimony, you essentially indicate that those Mexican government officials and faith-based organization workers, primarily volunteer workers that are occupying these shelters and running them, that they don't care about these MPP folks, that they have no--they have no compassion for them.

Is that your position, that these folks down there have no compassion for the MPP?

Ms. Thorn Vela. I understand that the government of Mexico has said that they are providing aid, but our--from the ground, what we see every day, we don't see that aid. Certainly, anyone----

Mr. Higgins. All right, so just to clarify, you have the right to your opinion. I would defend your right to have your opinion, good lady. I just want to clarify.

You seem to be indicating that the United States has set up some system where we are knowingly sending MPP illegal immigrants into shelters that are run by folks that don't love them and care for them. In fact, they are quite hateful toward them.

<div align="center">AR262</div>

Ms. Thorn Vela. I have explained and I think, Representative, Congressman, they are not--the individuals being sent back to MPP are not being sent back to shelters. They are living in the streets in a 2,000-person refugee camp that does not have any shelter for them. The only aid, the only compassion that they are getting, are from volunteers that are----

Mr. Higgins. So that would be an indication, just in the interest of time--you are stating that the Mexican Government is not living up to its agreement with--under MPP.

Ms. Thorn Vela. I have not seen that promise fulfilled on the ground in Matamoros.

Mr. Higgins. All right, one final question. Thank you for your candor, Madam. You have made courageous statements, and this committee cares about these things.

But I ask you, regarding MPP illegal immigrants being knowingly returned to Mexico to be tortured, that is quite an accusation. Do you have any proof of that?

Ms. Thorn Vela. We have partners on the ground that worked with the young mother and her child that were tortured and released. The young child----

Mr. Higgins. You are referring to 1 case out of almost 58,000?

Ms. Thorn Vela. I personally am only aware of that case, but I have partners that work not only in Matamoros, but throughout the border where MPP is rolled out. My partners can tell dozens and dozens and dozens of stories of very similar conduct.

Mr. Higgins. Thank you all for your testimony.

Madam Chairwoman, my time has expired.

Miss Rice. Thank you, Mr. Higgins. The Chair recognizes for 5 minutes the gentleman from Mississippi, Mr. Thompson.

Mr. Thompson. Thank you very much. Those of us who have been in the area where the Remain in Mexico policy is being implemented have real questions about the health and safety and sanitary conditions of people who are there. I don't think those standards are the standards that we hold dear as Americans in this country.

I think our concern, more than anything else, is when you implement a policy that lowers your standard as a country, then that is changing the values of who we are as a country.

So when you put the burden on changing the policy in terms of returning people to Mexico in a dangerous situation, that is not who we are as a country. I think the more important part for us is why change a policy that put people at risk? That is one of the reasons we are here today.

We have heard from 2 attorneys, a doctor, and a practitioner that some of those policies we put in place have, in fact, changed the lives of the people who are coming to this country, seeking asylum.

As a--somebody whose ancestors came to this country as slaves who were absolutely mistreated, I think I have a sensitivity--and some others here--that we don't want our country to ever be a part to anything that mistreat people.

So the goal of why we are here today is to make sure that, as the American Government does its immigration policies, that we still see people as human beings.

We are a Nation of laws. We have values that we have to uphold. So that is why we are here. That is why I complimented the Chairwoman for having the courage to hold a hearing like this. It is a tough situation. I am a grandfather. The last thing I would want is for somebody to mistreat my grandchildren just because they don't look like them. I don't want that.

I voted for the Affordable Care Act because I think, in America, everybody ought to have an opportunity, if they are sick, to go to the doctor. Those are the American values that we hold as Americans. I think we have to be mindful of that.

So with that preface, Ms. Pena, do you think our standards of jurisprudence are being upheld with this Remain-in-Mexico Policy?

Ms. Pena. Thank you for the question, Representative Thompson.

AR263

This is the law passed by Congress. I appreciate the question, because I want to bring us back to the legal obligations and jurisprudence which is being circumvented and violated through the MPP protocols.

My job is pro bono counsel at the American Bar Association, and I often train non-immigration attorneys in immigration law. In fact, sometimes I have tax attorneys tell me this is very complicated law.

The way I describe this law, particularly these specific statutory provisions which are being utilized to implement the Remain-in-Mexico policy, is as such. Please bear with me, Representative. Imagine section 235, which is the expedited removal statute, is a mountain, all right? Two-forty proceedings, which are full 240 proceedings, is another mountain directly across from it. There is a valley in between. To get out of summary removal proceedings and into full immigration proceedings, 240 proceedings, there is a narrow bridge.

What Remain-in-Mexico has done is taken a small pebble of law in section 235 and created a wrecking ball with it. It has demolished this narrow bridge that included legal protections. The credible fear process has been--interview process has been completely annihilated, and Mr. Knowles has testified to some of the challenges that the asylum officers are frequently raising.

Now, 240 proceedings--I heard earlier, you know, the proceedings are expedited. Instead of several years, it is months. Well, what good is a proceeding, if it is rendered virtually meaningless? There is no lawyer; 2 percent of MPP respondents have lawyers. One attorney utilized University of Texas data and analyzed that, if MPP did not exist, the number of respondents in MPP that would have attorneys would be over 15,000 people. So there is no meaningful right to an attorney.

There is also no meaningful proceeding. At least in the tent court you can see the judge on a video. But you can't understand the judge. You can't effectively communicate with the judge, because the interpreter is not simultaneously translating the hearing. There are no legal service providers. In San Diego I observed an MPP hearing in the brick-and-mortar courts in San Diego, and the judge asked the pro se respondent's father speaking on his--behalf of his family, ``Did you receive the notice from the Department of Homeland Security, which includes a list of pro bono legal survivors?'' Providers, excuse me.

The father said, ``Yes, I received that. However, I called all the numbers, and none of them will provide us services. None of us [sic] will represent us, because we are in Mexico.''

So there is, effectively, nobody who can help these individuals to translate their applications into English, to make sure that they can file it with the court.

Of course, all the meanwhile, the--trying to go through this proceeding, they are subjected to horrendous conditions, dangerous conditions.

So, Representative, thank you for the question. I believe we are circumventing our international obligations, which are which are codified in U.S. law. Thank you.

Mr. Thompson. Thank you. I yield back, Madam Chair.

Miss Rice. Thank you, Mr. Chairman. The Chair now recognizes for 5 minutes the gentleman from Alabama, Mr. Rogers.

Mr. Rogers. Thank you, Madam Chairman. Ms. Vela, is it your position that the entire country of Mexico is dangerous?

Ms. Thorn Vela. For asylum seekers, yes.

Mr. Rogers. The entire country?

Ms. Thorn Vela. I would say that asylum seekers are at a very heightened risk for danger in Mexico.

Mr. Rogers. Why is that?

Ms. Thorn Vela. Because throughout the journey in Mexico, migrants are facing these same conditions that the United States is returning them to in MPP.

AR264

Mr. Rogers. So I think we were reading--I think you—I think you gave an example of a gang member who--or gang members who raped a young lady if her husband didn't join a gang. Was that you that gave us----

Ms. Thorn Vela. No, that was not me, Congressman.

Mr. Rogers. Well, that example was given. So let's say that a migrant was escaping Honduras for that reason, and they went to Mexico City. Your view is they would be in danger in Mexico City?

Ms. Thorn Vela. I would say migrants there are at a heightened risk for being targeted, yes.

Mr. Rogers. In Mexico City?

Ms. Thorn Vela. I would say yes.

Mr. Rogers. OK. Well, here is my concern. I understand that you have described the encampments on the northern border as being overcrowded, and maybe not as healthy as you would like them to be. But I find it impossible to believe that the entire country of Mexico is dangerous for migrants. The country of Mexico has offered asylum to all these asylum seekers who are escaping Guatemala, Honduras, Venezuela, whatever.

You know, as well as I do, the overwhelming majority of the asylum seekers that reach the United States are not approved. Eighty-seven percent are not approved. They are economic. They are seeking economic advantage. I don't blame them, but they are not in danger. Certainly, once they get out of Honduras and are in Mexico, they are no longer in danger. So we need to be recognizing that people are coming up here for economic opportunities, and they have been overwhelming our system.

Mr. Knowles, you talked about the interview process. When was the last time you personally conducted an interview of an asylum seeker under the MPP program?

Mr. Knowles. It should be known that I am almost a full-time union representative, so I am excused from my regular duties. I have not personally conducted MPP interviews, although I am in daily contact with those who do.

Mr. Rogers. But you haven't----

Mr. Knowles. It has been about 4 years since I have adjudicated, personally, asylum cases. But I have adjudicated many in the almost 30 years that I have served.

Mr. Rogers. In this crisis, though, you have not carried out any interviews in recent years to know the abuses that you described in your statement.

Mr. Knowles. I am sorry, could you repeat that?

Mr. Rogers. You described abuses in the process during your statement a while ago.

Mr. Knowles. Yes.

Mr. Rogers. Those are just being related to you through other individuals. You haven't personally conducted those interviews, to speak of----

Mr. Knowles. No, I have not, personally.

Mr. Rogers. That is my point.

Mr. Homan, now you have described in your statement that MPP will help deter those who are seeking to exploit loopholes in our immigration system. Can you describe for us some of the loopholes that you think are driving this train?

Mr. Homan. Well, there is 3 loopholes that--when I was still the ICE director, I worked with Secretary Nielsen, trying to work with the Congress.

The 3 loopholes are--the Flores settlement agreement. In fiscal year 2014 and 2015 under the Obama administration, we detained families. It took about 40 days to see a judge. Ninety percent lost their cases. We put them on an airplane and sent them home. Guess what? The numbers across the board have drastically decreased. But then the 9th circuit said you can only hold them for 20 days, and they got released. We are asking Congress to look at that, and let us detain families for, like, 40, 45 days, so they can see a judge. In a family residential center, not a jail.

The second issue is the asylum process, itself, where, you know, practically 90 percent will pass the first fear interview, because the thresholds are put--and I understand why

under statute first, they said, you get an interview and in
court, 87 percent lose. So there is too big of a delta. So that
first interview, that threshold needs to be raised, so it makes
more sense with the judiciary threshold.

The last thing would be the TVPRA Trafficking Victims
Protection Act, because if you are a child from Mexico, and you
enter the country illegally, and it is ascertained you are not
a victim of trafficking, you can be returned to Mexico
immediately. But if you are from Central America, you can't be
returned immediately, you got a whole new immigration process
that takes years. So we are asking that children from Central
America be treated the same as children from Mexico. TVPRA had
a great intention of identifying trafficking and preventing it,
but this is being exploited now by the cartels and the criminal
groups.

Mr. Rogers. Finally, Ms. Vela, do you know how many
immigrants who were allowed into this country awaiting their
hearings were removed this year alone in absentia?

Ms. Thorn Vela. I am not familiar with that statistic.

Mr. Rogers. Eighty-nine thousand just this year. The
overwhelming majority of people do not show up for these
hearings once they get in this country. That is not a situation
that we can continue to allow.

Madam Chairman, my time has expired. Thank you very much
for your patience.

Miss Rice. Thank you, Mr. Ranking Member. The Chair now
recognizes the gentlewoman from New Mexico, Ms. Torres Small.

Ms. Torres Small. Thank you, Madam Chair. Ms. Vela, you
testified about the real harm that clients have experienced
while waiting to pursue their legal claims for asylum. I have
spoken with a local pastor in the district that I represent
that has a sister church in Juarez. Their church, they provide
shelter. They have been targeted in robberies, and they don't
have the resources to protect these individuals from being
targeted by the cartels.

My question for you is whether you believe that Remain-in-
Mexico, or MPP, can create a disincentive for migrants to
legally present themselves at ports of entry to pursue their
legal claims for asylum and, instead, attempt to cross
undetected to the United States.

Ms. Thorn Vela. Thank you, Congresswoman. Yes, I do believe
that it creates an incentive for people to not get a--present
themselves at the bridge to request asylum.

I know many individuals at Matamoros who, even before MPP
was rolled out into Matamoros, were--presented themselves at
the bridge, and they were placed on the metering line that was
there prior to the MPP rollout. Those people waited in line,
followed the law, wanted to present their case there at the
bridge. Then, once MPP was rolled out into Matamoros, they
ended up being placed in MPP.

So many individuals see this now, that--you know, they want
to follow the law, they want to do this the right way, and they
end up getting placed right back in Matamoros.

Ms. Torres Small. Thank you. I have also heard from CBP
individuals that have seen--had to process the numerous
crossings back and forth for their proceedings in the United
States. That has also added a strain, just on our ports of
entry.

Ms. Vela, have you--do you believe that MPP has been cost-
effective, or yielded a more efficient processing of asylum
seekers?

Ms. Thorn Vela. I don't believe that it is more efficient.
The ports of entry are very busy places. Many people cross
every day, U.S. citizens, Mexican residents. So it has really
congested the ports of entries in the morning when they are
lining asylum seekers up. People are having to go very, very
early in the morning, 4 a.m. for an 8 a.m. hearing. So it has
really caused a lot of delay there at the ports of entry.

Ms. Torres Small. Thank you, Ms. Vela.

Mr. Knowles, I appreciate your testimony, and would like to
hear, based on your experience representing asylum officers.

AR266

How has the broader CIS staff and morale of asylum officers been impacted by Remain-in-Mexico, or MPP?

Mr. Knowles. Well, I would like to say, historically, our morale has been extremely high, because people are drawn to the protection work, which is also protection of our country. We have done a very good job, and we have received very high marks from every administration except this one.

The morale under this administration has plummeted, not because of people's political views, but because of the way that we have been treated, and the way that we have been required to carry out very questionable programs. We have not been consulted, either the union or the work force, on the advisability of various methodologies or procedures. We are just told to carry it out, and if we don't like it, you can go work somewhere else.

Ms. Torres Small. Thank you----

Mr. Knowles. So that has a big hit on morale.

Ms. Torres Small. Thank you. Mr. Knowles, I have also heard from local Catholic Charities attorneys that these fear hearings and the new rules and consequent training that is necessary for that can actually have a negative impact on the docket. What effect have you seen, or the asylum officers you represent seen, that the Remain-in-Mexico, or MPP, policy has had on their--other EOR--EOIR dockets?

Mr. Knowles. I am not sure I understand the question.

Ms. Torres Small. So my question is whether you think the increased number of fear hearings and back and forth, as well as the constant changes in rules has impacted other cases, other than asylum cases in the EOIR dockets.

Mr. Knowles. I wouldn't be able to answer about the EOIR docket because I am just representing people who do the asylum interviews here at USCIS.

Ms. Torres Small. OK, thank you. I want to turn to Ms. Pena in my last quick moment.

You mentioned that only 13 percent of individuals who receive the fear screenings have received positive determinations. Do you feel like, if there was meaningful access to legal representation, this number would be different?

Ms. Pena. Yes--excuse me. Thank you for the question, Congresswoman. Yes. We are seeing at least 1 Federal judge has enjoined DHS from disallowing attorneys access to those non-refoulement interviews. So just in the past week or so, attorneys have started having access. So we will see how the numbers change with access to attorneys.

I will say, as a practical matter, it is very, very difficult, because CBP often doesn't allow attorneys access, period, to these areas.

Ms. Torres Small. Thank you, Ms. Pena. My time has expired.

Miss Rice. The Chair recognizes for 5 minutes the gentlewoman from Arizona, Mrs. Lesko.

Mrs. Lesko. Thank you, Madam Chair. My first question is for Mr. Homan.

You know, we have talked about these loopholes in previous hearings, as well. You have eloquently talked about them just now. I have said before, and I will repeat again, I think these loopholes actually incentivize people to travel thousands of miles, pay cartels huge amounts of money. A lot of the women are getting raped. We have had evidence how children are being abused by the cartels. So changing some of these loopholes and clearing them, I think, is--will help mitigate the entire problem.

I think all of us care about people that are being abused. If somebody is being raped by cartels, or children being abused by cartels, of course, none of us up here would want to ignore that. But there is a difference in how we should mitigate the problem.

So, Mr. Homan, I have 6 bills that I have introduced and sponsored that would try to clean up these loopholes to stop incentivizing people from coming here. One of them is to raise the credible fear standard for asylum, because, as you said, the initial standard is too low, as evidenced by the numbers. I

mean, like, we go to--go in front of them now, that's fine.
But then, you know, a huge number--what is it, 86, 87 percent--when they finally go in front of a court, don't.

So if we solve that problem with the loopholes, how would that affect this going back to Mexico, the MPP protocol? Could we get rid of it, do you think?

Mr. Homan. Well, certainly you will be able to have an effect on it, because if we had a meaningful asylum bar that people couldn't come up and just claim to say 2 or 3 key lines to get approval, they stop coming.

Because, look, the bottom line is the data at the immigration courts are clear that 87 percent of these people do not qualify, or fail to show up. So if they know before they leave their homeland, spend their life savings making this dangerous journey, that the chance of getting approved--because they know they are not escaping fear and persecution from the government because of race, religion, political beliefs--they will stop coming.

In--enforcement law has a meaningful effect. You look at consequence, deterrence. It means something.

A couple of things I just want to add to this is I have heard a lot of testimony here today, but, you know, I am hearing today that people think the system is rigged against the immigrant now. But the approval rates and the denial rates have not changed from fiscal year 2014, 2015 to today. So if there is a fix put in, the denial rates back in 2014 and 2015, under our first family detention center, we are still about 87, 90 percent.

So the denial rate remains the same. So I don't see the correlation in this fix, then. As far as representation, does representation make a difference? If you are looking at year-old data, the approval rate is anywhere from 10 percent to--high to 20 percent. Representation rate has not changed beyond 20 percent, even the represented by attorney. That is tracked in the ERO datasheet.

So representation really doesn't make a difference because they don't qualify, and the representation is not going to change the facts of the case. This is all available on the immigration court database.

Mrs. Lesko. Thank you, Mr. Homan. Another question I have for you, Mr. Homan, is it fair to say that right now the immigrants that are seeking asylum that are in Mexico, waiting, are they able to say that, ``Oh, I am afraid to be in Mexico,'' and have--you know, get a hearing on that?

I think my data says that yes, they are. Fear screenings are an established part of the program. As of October 15, 2019, USCIS completed over 7,400 screenings to assess the fear of return to Mexico. So people that are in Mexico under this program can actually say, ``I am afraid,'' and go in front of someone.

Mr. Homan. Well, that interview is in the beginning, when they enter the United States. If--they cannot be returned to Mexico if they establish a clear danger to return to Mexico, that they would be, you know, in harm's way. So that is in the front. They can't be sent back to Mexico without that interview occurring that there is no fear to return to Mexico.

Mrs. Lesko. I----

Mr. Homan. That is on the front end of that.

Mrs. Lesko. All right. And----

Mr. Homan. I want to add one thing.

Mrs. Lesko. Sure.

Mr. Homan. I do think there are some in Central America that qualify for asylum. So, you know, I am not painting with a broad stroke saying it is all fraud. But based on the data and the findings of the judges across this country, 80 percent, 87 percent do not.

There are certainly people who certainly do fear return to the homeland. But the problem is, when you got 80 percent rate of denial and fraud, you are backing up the system for the people in this world that are really escaping fear and persecution from their homeland, such as some of the African

AR268

nations, these nations are not the nationality that we are
help. The system is being--it is--the--so asylum claims are up
over, you know, 2,000 percent last couple years. It is
troubling for the ones that really do need our help.
    Mrs. Lesko. I agree. I yield back.
    Miss Rice. Thank you. I just want to take note that, you
know, there are a lot of numbers being thrown around. Eighty-
seven percent of people don't show up for their first hearing.
There is other DoJ information that says that that number is
actually 85 percent of people who do show up.
    If you look at our TRAC, which is the system that is housed
at Syracuse University that more closely tracks EOIR
immigration court proceedings, they note that DoJ is starting
to limit the access to the database.
    There was just a recent story in The Washington Post that
did a long fact check--and I know we can disagree about the
accuracy of The Washington Post. This is just for future
discussion. The Washington Post did a long fact check story on
the numbers that Republicans use when talking about this
issue.** The 90 percent no-show rate that that is referred to
consistently was--that number was actually quoted by the former
Acting Secretary McAleenan in a Senate Judiciary hearing a few
months ago that he ultimately had to walk back. He was
referring to a pilot program being used on only 7,000 cases.
------------------------------------------------------------------
    ** The information has been retained in committee files and is
available at https://www.washingtonpost.com/politics/2019/06/26/how-
many-migrants-show-up-immigration-hearings.
------------------------------------------------------------------
    So my point is that I think for us to have a real
conversation about this, we have to get real numbers. I think
Democrats and Republicans, especially on this committee, we
should be able to agree with an accurate number. I think maybe
we can--I am hoping the Ranking Member would agree that maybe
we could kind-of work on that as a project so that we don't
have these--back-and-forth numbers, where we are saying--you
are saying 85, we are saying 80, and it is just back and forth,
and we are not really getting to any problem solving.
    Thank you for that. I mean I thank myself for giving me 2
minutes to say that.
    The Chair now recognizes for 5 minutes the gentleman from
California, Mr. Correa.
    Mr. Correa. Thank you, Madam Chair. I hope you don't take
those 2 minutes off of my 5. Thank you very much.
    Let me, first of all, thank the witnesses that are here
today.
    I had a chance, over the last year or so, to visit some of
the refugee camps in Tijuana. There are some very good faith-
based refugee camps providing excellent services. There I saw a
doctor from Colombia, and doctors from all over the world
providing for those refugees. Then I went later on, when they
closed after 9 p.m., 10 p.m., I saw a lot of people outside the
faith-based refugee camps. There is just not enough room for
the services.
    So, yes, some services, but not enough. I know the mayor of
Tijuana is screaming, because he is overwhelmed and does not
have the resources to address refugees, not just from Central
America, but from all over the world. That is the challenge at
the Southern Border.
    I also went and I visited--I talked to the person who is
keeping a so-called list, not controlled by the United States.
But picture this: A refugee come to the border and they are
turned away, and they said--they say, ``You have to sign up for
a number so you can be heard.'' Well, where do I sign up? Well,
that person over there.
    I asked that person over there, ``Who do you work for, the
U.S. Government?'' No. ``Do you work for the Mexicans?'' No.
``Who do you work for?'' Just a person that set up. He is
giving out numbers. Return when your number is called. Give us
your cell number. A very questionable way of doing business.
But none the way--that is the way it is being taken care of.

Also, I had the chance of going to Guadalajara a few months ago, as well, driving down the street and I saw a homeless person barefoot. I happened to pull over and I asked them some questions. He said, ``Yes, I am from Guatemala. That is as far as I have gotten, I have no food.'' My point to you is the refugee crisis is also hitting throughout all of Mexico, not just the border area.

I am going to make it very quick. But, Mr. Homan, you talked a little bit about the work permits. You mentioned that these folks come to the United States, whatever the percentage of people that show up, and what they want is a work permit, and waiting for the next amnesty. I don't think we have passed an amnesty in a very long time.

I am thinking also to that raid in Mississippi in the Chairman's region, where 400 or 500 individuals were picked up. I got a phone call from one of the representatives of that poultry plant called me and saying, ``We need to do something,'' he said. ``Most of the workers here--all the workers here are refugees, and they are taking jobs the locals will not take. They are taking jobs that the children of the refugees will not take. We need to have the jobs back.''

According to the Chairman--I heard him speak--oh, he is gone, darn it. But the raid essentially disrupted the whole economy of the area.

So my point to you, Mr. Homan, would you support some kind of a--not only change in the loopholes, which I would consider to be not loopholes, but the law, but would you support some kind of an adjustment to the law so that more folks can come to the United States and work legally? Because right now we have this gray market in this country of workers that are contributing to this economy, yet they are working in the gray area because they can't get an adjustment of status.

Mr. Homan. OK. To your first question about the amnesty question, these family groups started coming across in fiscal year 2013 and 2014. That was our first surge.

Mr. Correa. OK.

Mr. Homan. That was on the heels of DACA. So these family units coming across now--that is your next DACA population, because they are going to say these children were brought to the country through no fault of their own--34 years in business----

Mr. Correa. To qualify for DACA----

Mr. Homan [continuing]. They are not----

Mr. Correa [continuing]. You have to follow the law; you have to have a job. You have the, essentially, a clean record, correct?

Mr. Homan. When you throw out something like that, when you--for instance, when you start talking about--let's talk about an amnesty program. You are going to see the numbers on the border go up. It is an enticement.

So these family groups coming across now, the 200,000 that came across the last 2 years, I don't know what is going to happen with DACA with the Supreme Court, but this is your next 200,000 people who say, ``How about us? We came''----

Mr. Correa. Get to my----

Mr. Homan. My point was----

Mr. Correa. I have got 30 seconds. So----

Mr. Homan. The second issue is, sir, I do understand if there is a need for labor in this country because the unemployment rate is so low, then yes, I think Congress should legislate something. As a matter of fact, when I was the ICE director, I tried to get----

Mr. Correa. Let me just say----

Mr. Homan [continuing]. Program, because----

Mr. Correa. Economic factors are a great motivator for people. They have been for the last 200 years. Would you support some kind of a Marshall Plan for Central America to stabilize that region, and to address the needs of those folks?

Mr. Homan. I think the Secretary--when I was ICE director, Secretary Kelly, I went with him into Miami and met with leadership from Central America, along with American businesses

AR270

and big banks, trying to seek opportunities for them in their own homeland. I certainly would support creating opportunities for Central Americans in their own country.

Mr. Correa. Madam Chair, I am out of time. Thank you very much.

Miss Rice. Thank you. The Chair recognizes for 5 minutes the gentleman from Mississippi, Mr. Guest.

Mr. Guest. Thank you, Madam Chairman.

Mr. Homan, first I want to thank you for your 34 years of service to our country. In reading your testimony, the written statements that you prepared, on the first page you kind-of talk a little bit about historically what we are seeing today versus what we have seen in years past. Could you expand on that just a little bit, please, sir?

Mr. Homan. I think what we are seeing today could have been prevented if Congress was to close the loopholes we have asked them to close.

I mean, we proved back in fiscal year 2014 and 2015, when I worked for Secretary Jay Johnson, whom I respect greatly, you know, he let us build family detention to hold family units in the family residential center along--to see a judge. It took about 40, 45 days. Most of them, 90 percent, lost their cases and we sent them home. The numbers went down. It worked.

So we are asking Congress, look, we have already proved this worked under the Obama administration. How come we are not doing it now?

You know, so I think Congress needs to fix this loophole. Let us detain--if they are really escaping fear and persecution and death, I don't see a problem in being in a family residential center with medical care, pediatricians, child psychologists on staff, 3 squares a day, 6 sets of new clothes, access to lawyers, access to families. These are open-air campus facilities.

If it saves a life--and that is what I have been testifying the last 4 times. This isn't just about securing our border. This isn't just about enforcing laws. It is about saving lives. It is about 31 percent of women being raped.

If we close these loopholes, we are going to save women from being sexually assaulted. We are going save children from dying. We are going to stop bankrolling criminal cartels who are making millions of dollars a day because of the laziness of this country not to fix the loopholes.

Mr. Guest. You quote our--give several statistics there in your written testimony. I think that those are very important. Are those statistics that you give, are they supported by your 34 years of service to our country?

Mr. Homan. Absolutely. One caveat the Chairwoman mentioned, the 87 percent. I did not say 87 percent did not show up at a hearing. I said 80 percent lost their case. So that rate varies, but every number I quoted today in my testimony, and the numbers I just recently quoted, came off the Executive Office of Immigration Review, the Immigration Court website. They are open to the public. I printed these up last night. So these are the immigration court's own data. This is not my data. This is data coming from the immigration judges.

Mr. Guest. Let me ask you about a couple of those statistics that I pulled from your report, and just tell me if they are accurate, to the best of your knowledge.

Seventy percent of illegal immigrants coming into the country now are family units. Is that accurate, to the best of your recollection or best of your knowledge?

Mr. Homan. Seventy to 72 percent. It varies every month.

Mr. Guest. All right. Then it says here, as I see, that roughly 90 percent of all family units fail to show up for court proceedings.

Mr. Homan. That was--I quoted the Acting Secretary McAleenan when he made that statement.

That number does vary, depending on when you look at it, and what city you look at. It can go anywhere from 90 percent not showing up to 40 percent not showing up. It depends on what court you look at. So that number fluctuates so much. So that

AR271

90 percent number I was, I quoted earlier, as the Chairwoman mentioned few minutes ago, in his testimony 6 months ago.

Mr. Guest. What about 85 to 90 percent don't qualify--for those that do show up, then, or 85 to----

Mr. Homan. That is----

Mr. Guest. Ninety percent don't qualify for asylum.

Mr. Homan. That is immigration court data. It shows that it is anywhere from 13 percent, 12 percent, 13 to 15 percent for the 3 Central American countries that do not--that get a meritorious claim, 13 to 15 percent, which means 87 to 85 percent lose their case.

Mr. Guest. Then those that are ordered to be removed, less than 2 percent actually were removed or left the country. Is that correct?

Mr. Homan. Actually, it is closer to 1 percent, but I was generous saying 2 percent. It is actually--it is 1.6 just recently, but it has been 1.2 to 1.6.

So it is, yes, most do not leave. That is another enticement. That is why more people keep coming, because families in Central America, even though they know most will lose their case, they are not going home.

Mr. Guest. There is, as I understand from your reporting, an 800,000-case backlog in the immigration court. Is that correct?

Mr. Homan. It is now over a million. There was 800,000, but I went to the website last night and they are reporting a million.

Mr. Guest. Would you agree that these figures are staggering, Mr. Homan?

Mr. Homan. Absolutely. I mean, the--when I was the ICE director the backlog was already near 600,000. So what has happened in the last 2 years? Yes, it sounds right to me.

Mr. Guest. You say on page 3 of your report, you say illegal crossings are down, consistent from the high in May, but we are still at high numbers beyond last year.

Then this is the sentence I want to highlight: ``The significant gains made on this issue are because of our President and the men and women of CBP and ICE, and not because of anyone in this room.''

First of all, I want to apologize to you that Congress has failed the American people. I would ask for you to deliver a message. Please tell the men and women of CBP and the men and women of ICE that we appreciate their hard work and what they do, and that there are still Members of Congress who want to solve this problem.

Thank you, Madam Chairman. I yield back.

Miss Rice. Well, I would agree with that statement. I think every person on this panel, on either side of the aisle, agrees that every CBP officer should be commended for the hard work. I don't think that is even an issue. We all want to come to a solution, obviously.

The Chair now recognizes for 5 minutes the gentleman from New Jersey, Mr. Payne.

Mr. Payne. Thank you, Madam Chair. I have some questions I want to answer, but I think I want to go to Ms. Vela.

In reference to the questions and the comments made by the honorable Ranking Member, when we talk about torture and the incident of torture that you were privy to, I don't think that we can make light of just 1. One is 1 too many. Normally, if there has been 1, there has been more than 1. It opens a can of worms and a prospect of that becoming a norm with respect to torture, because I have a family, I have a--triplets and a wife, and just the prospect of thinking they were subjected to that is horrific. So 1 is 1 too many.

Can you elaborate any more on that issue?

Ms. Thorn Vela. Certainly. Thank you, Congressman. Yes. It is very prolific in--throughout the country of Mexico, particularly at the northern border, that cartels will often kidnap individuals and extort family members for money. It is a practice that the U.S. Government has also detailed in other

years.

So MPP is providing people--very often people will be kidnapped and tortured on their way up, and then the U.S. Government will return them south for them to be subjected to a second round of kidnapping and torture. It is an extremely common occurrence. Every person that I know at the camp has told me that they live in fear of that happening.

Mr. Payne. Thank you. The doctor, Schneberk. How, in your view, does the Remain-in-Mexico place vulnerable individuals and families at risk of the type of harm your organization identified as commonly affecting immigrants?

Dr. Schneberk. So what is the question, again?

Mr. Payne. How does the Remain-in-Mexico Policy place vulnerable individuals and families at risk of the type of harm your organization has identified as commonly affecting immigrants?

Dr. Schneberk. Thank you for the question, Representative. So a number of ways.

No. 1, the safety issue of, you know, these people, who have been through so much, are already at heightened risk of further mental health decline or mental health kind of effects, hits they can take from being in an unsafe environment or having to live with that fear has numerous--both manifesting mentally, as well as physically.

In addition to that, putting them in a situation where they are not able to feed themselves, house themselves, be able to access, you know, things that make a person able to be healthy is especially difficult and, obviously, has health effects. There is just a litany of things you could talk about.

But one of the main things is really just how can they live being unsafe, considering what they have already gone through.

Mr. Payne. OK. I lost my place. All right. Ideally, what type of medical care and resources would be most important for these people?

Dr. Schneberk. So, starting from a standpoint of putting them in a safe environment where they can address their needs, from the standpoint of just being able to speak about what has gone on, what has happened to them, the state they are in, and their ability to answer questions from the standpoint of having PTSD, having depression, anxiety, and really, starting with that kind of baseline floor of kind of what they call in trauma-informed care just a safe environment, then moving on into, you know, as far as mental health evaluations, mental health therapy, treatment, medication, as well as physical care, basic primary care, all the things that we hold dear in public health and medicine to keep people safe, healthy.

Mr. Payne. Well, thank you. Thank you for your time. Madam Chair, I yield back.

Miss Rice. Thank you. The Chair now recognizes for 5 minutes the gentleman from Texas, Mr. Green.

Mr. Green. Thank you, Madam Chair. Thank you, Madam Chair. My microphone seems to be weak today, but I trust that you can hear me. I would like to focus on something that has happened as of late.

There is an organization styled Save the Children. It has been around for 100 years, and it has been involved in the business. It has been involved in the business of saving children. Thank you very much. This organization has indicated to us that, since January 2019, 13,000 children have been returned, that 400 of them are infants. This is about children. So I have a few questions.

The first is--and I would like for you to raise your hand if you agree with this policy--the first is do you approve of family separation, as a policy? If so, raise your hand.

Let the record reflect that no one approves.

If you approve of holding children in cages, raise your hand.

Let the record reflect that no one approves.

If you approve of de-funding aid to the countries that migrants are fleeing, raise your hand.

Let the record reflect that no one approves.

AR273

There was something about wet foot, dry foot that you
may be familiar with wet foot, dry foot. If you are familiar
with what was called the wet foot, dry foot policy as it
related to Cubans, would you raise your hand, please?

All of the members, let the record reflect, are familiar
with wet foot, dry foot.

Wet foot, dry foot required that a person emigrating from
Cuba get one foot on dry land. With one foot on dry land you
could walk right on into Florida, usually, and you would be on
a pathway to citizenship with one foot on dry land. I am not
saying that we have to have a wet foot, dry foot policy, but I
do believe that we have to have a humane policy that respects
children, that does not harm children.

This is what Save the Children is all about.

I would just simply ask Mr.--let me make sure that I have
your name correct, sir.

Mr. Homan, sir, what type of policy do you envision that
will help children, children who are fleeing harm's way with
their parents, usually, or some significant person in their
lives, have the opportunity to be in a safe, secure, wholesome
environment?

Mr. Homan. Well, first of all, if I can--your question
about raise your hands, if you would have said if I support
zero tolerance, I would have raised my hand. Not family
separation. Zero tolerance. We seem to confuse those two
issues.

Mr. Green. OK. Well, if you would, I am going to ask that
you kindly address my question.

But since you raised zero tolerance, I am not sure what you
mean by zero tolerance. Are you saying zero tolerance that no
one ever coming to the United States? Is that your zero
tolerance policy?

Mr. Homan. No. You are referring to family separations that
have happened under numerous Presidents, not just this
President.

Mr. Green. OK, so----

Mr. Homan. But a zero tolerance, what you are referring to
is family separation, zero tolerance. That was put in place by
Attorney General Jeff Sessions. It was zero tolerance to
prosecute those who knowingly and intentionally violate our
laws.

Mr. Green. So--and supporting that policy, you would
support family separation, then.

Mr. Homan. Whenever someone gets arrested for a crime, they
get booked into a jail. Their child can't go with them, just
like if I got arrested tonight, my child couldn't go with me.
So it is not about family separation, it is----

Mr. Green. Well, the interesting thing about your argument
is that these people committed no crimes.

Mr. Homan. You enter the United States illegally, it is a
crime. Is a 8USC----

Mr. Green. Hold on.

Mr. Homan [continuing]. Eight United States Code 1325, it
is a crime to enter the United States illegally.

Mr. Green. It is not a crime; it is a civil offense.

Mr. Homan. No, sir, it is not. It is a violation of the
criminal code. Title 8, United States--in the United States
Code, 1325, illegal entry in the United States. The first
offense is a misdemeanor. Second offense, if you have been
ordered removed and returned, is a felony.

Mr. Green. I agree with that. I don't differ with you on
that point. But you would then separate the children.

Mr. Homan. If--someone is being no option. If someone is being
prosecuted and getting sent to U.S. Marshal's custody or to the
local jail, the child can't go with them. It happens to U.S.
families every day across the country.

Mr. Green. All right. Let's have Mr. Knowles's response,
please.

Mr. Knowles. What would you like me to answer, sir?

Mr. Green. The separation of children based upon policy
that was in place.

AR274

Mr. Knowles. No, I care asking the view of our members.

Mr. Green. Yes.

Mr. Knowles. I believe I said earlier that our members are trained asylum officers, we are not law enforcement, but we believe that our mandate is to ensure that asylum seekers have due process and are treated humanely during the pendency of their claims. It is well-known in the law and in the international conventions that an asylum seeker has the right to due process, regardless of their manner of entry.

They--we do not believe that it is correct to separate families or to prosecute individuals who are seeking asylum. They ought to have their asylum cases heard. If they prevail, they should be allowed to remain. If they don't prevail, then there are legal processes for their removal. But we don't support the separation of families under any circumstances.

Mr. Green. Is there anyone else who would like to respond?

Miss Rice. There is no--I am sorry. I am sorry, we have 3 other people, I am so sorry.

Mr. Green. Thank you, Madam Chair.

Miss Rice. Thank you. The Chair now recognizes for 5 minutes the gentlewoman from Texas, Ms. Jackson Lee.

Ms. Jackson Lee. Madam Chair, first of all, I want to thank you for holding this hearing. I echo your words, which were we have to find a solution and a resolution.

I also echo your words, for someone who served on this committee for a very long time, and you have been here, and others, that we do not quarrel with the service of the men and women in this Department. What I do say is that they are being impacted by untoward policies, which makes it very difficult to do, I think, the duty under the values of this Nation.

I have stated early on that this is a country of immigrants and a country of laws. No one negates the idea of laws. So I am going to raise these questions and pose them to a number of witnesses.

The Remain-in-Mexico and the port courts are the latest legally questionable step in the Trump administration's anti-immigrant agenda, i.e. the Muslim ban, another untoward action, I believe, as relates to immigration policies. Rather than deter asylum seekers, these policies promote cruel and human rights violations.

So I would like to raise that question--and my time is short--raise that question with Laura Pena with the pro bono American Bar Association. Do these policies create cruelty and human rights violations?

Ms. Pena. Yes. Thank you for the question, Congresswoman. Particularly, when it comes to issues regarding the tent courts that you raised, attorneys have very limited restricted access to these tent courts. Asylum seekers who are appearing in these tent courts do not have access to simultaneous interpretations. So they quite often have no idea what is going on in these proceedings.

The ABA has long believed and promoted access to in-person interpreters for proceedings, and especially when it pertains to non-citizens. Any video conferencing for non-citizens should be done with their consent. Thank you.

Ms. Jackson Lee. I thank you. Ms. Vela, would you comment on the idea of creating cruel and human rights violations?

Ms. Thorn Vela. Yes, Congresswoman. From everything that we see on the ground--we work in a 2,000-person encampment at the foot of the Gateway Bridge that is across from Brownsville. There is not enough food. There is not running water. Until very recently, immigrants had to get into the Rio Grande to wash their clothes and wash their children. We see this camp growing at an alarming rate. We have only had MPP since August, and it is grown three- or four-fold.

Ms. Jackson Lee. You are not arguing against having a country that has immigration laws. What you are saying is the MPP program creates an atmosphere and an actuality of cruelty. Is that correct?

Ms. Thorn Vela. Yes, Congresswoman. There is no question that this particular policy has eroded everybody's access to

AR275

asylum, a safe place to seek asylum, and safety while
they await their court date.

Ms. Jackson Lee. You can't see this, but I am looking at a
visual of squalor that is probably not even in the places where
they have come from. That is tents and tarps. Have you all seen
this on the other side of the border?

Ms. Thorn Vela. Yes, Congresswoman. That is--I can't see
the photo, but certainly tents and tarps for 2,000-plus people
is what we work with every day.

Ms. Jackson Lee. I see a person walking with a face mask. I
know you can't see it--and clothes hanging over.

So let me quickly go to the doctor. By forcing asylum
seekers to wait for months in Mexico border cities where
cartels and other criminal groups are highly active, the Trump
administration subjecting men and women and children to a
greater risk of kidnapping, assault, and extortion, which, as a
physician, also impacts the quality of life of these
individuals, Doctor, if you would?

[No response.]

Ms. Jackson Lee. Doctor? I am sorry, I am calling you--yes,
doctor. Dr. Schneberk, did you hear the question?

OK. Let me just go on. Through--DHS is providing asylum
seekers with incomplete or inaccurate paperwork, including
wrong addresses or dates for hearings, which further
complicates matters, and could lead to people's claims being
rejected through no fault of their own.

Could one of the lawyers answer that question?

Doctor, I was asking you does the squalid conditions
generate--that are creating risk for kidnapping, assault, and
extortion impact health. But can you--let me have the question
about the inaccurate paperwork, if one of the lawyers would
respond to that, and maybe you could respond to the other
question. Thank you.

Ms. Pena. Thank you, Congressman. The notice to appears,
which are the charging documents issued by Department of
Homeland Security, have several legal inefficiencies--
insufficiencies, including the address. So individuals cannot
get proper service of their notice to appears because the
address is incorrect. The address is shelters that they have
never even been to.

In addition, the NTAs are incomplete. There are no boxes
checked, which are required, which establish how the individual
entered the United States.

Moreover, there is manufactured charges. So individuals who
entered between ports of entry are being charged as removable
as arriving aliens. That is a legal fiction that is being
created on these notices to appear.

Moreover, improper courts are being issued on these notices
to appear. For example, where we practice in South Texas, the
Harlingen court is the court where individuals are supposed to
appear. That is--it is actually incorrect. They appear in
Brownsville. Thank you.

Ms. Jackson Lee. Doctor.

Dr. Schneberk. So, yes, real quick. I mean, I participated
in a forensic evaluation of a patient just last week that--she
is in her house, she is fleeing abuse, rape. She is afraid to
leave that place she is renting. She leaves maybe once a week
just to get groceries with her--she is sitting there with her
two kids. Can you imagine the kind of psychological harm that
is causing to her? Because she knows, through family that have
sent her a message, that the perpetrators have sent somebody
after her to Tijuana.

Ms. Jackson Lee. I thank the Chair, and I thank you all.

I just want to put into the record, ask unanimous consent
the conditions that are being considered--the conditions that
exist pursuant to the MPP program on the other side of the
border, and the doctor's comments of the fear of death because
cartels are sending people after the people who are fleeing
evidences that they are being stalled on their asylum process.
Thank you.

Miss Rice. They will be received into the record.

AR276

[The information follows:]

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

Miss Rice. The Chair now recognizes the gentlewoman from California for 5 minutes, Ms. Barragan.

Ms. Barragan. Thank you, Madam Chair. Let me start by—I want to—echoing some of the comments from my colleagues about the outrage that should be happening over the return of migrants into dangerous places.

Ms. Thorn Vela, I understand that you have visited some of these facilities. Out of the 6 locations that have been implemented, the Remain-in-Mexico Policy, 2 of them are across from Tamaulipas, an area of Mexico that the State Department has designated as a level 4, do-not-travel location. I understand you have been there. Could you please describe the danger of violence and crime migrants and those in the encampments near ports of entry in this area are at risk of being subjected to?

Ms. Thorn Vela. Yes. The cities in Tamaulipas were the last cities to get roll-out of MPP. A partner of ours that works in Ciudad Juarez told us that she was horrified when she heard that people would be removed to Tamaulipas.

Particularly in the city of Nuevo Laredo—I don't work there, personally, but advocates on the ground there have told me that people have walked out of Mexican migration and literally been kidnapped on the doorstep of Mexican migration offices.

Individuals in the early days were moved to the city of Reynosa before they decided to have tent courts in Matamoros, which is about an hour away. There are people still today in Reynosa that are terrified to make the hour journey south to their court hearings. They don't know what to do. They have heard so many stories of people being kidnapped again, possibly right out front of the door of a shelter that they stayed there to try to work through their case. They have no way to get even an hour down the border.

The state of Tamaulipas asked the government to stop sending people to Reynosa because it had no way to get people to Matamoros.

Ms. Barragan. It is really horrifying, when you read some of the accounts of what is happening, and in some instances, where you have officials, Mexican officials, turning over people to the cartels, and what is happening to them, and the danger, it is just outrageous.

It feels to me as though our Government is saying, well, as long as it doesn't happen on our land, as long as it doesn't happen here, it is OK. Let's go take them back to wherever we want to take them back to. We are just ignoring the harms.

When we had Secretary McAleenan come in, it was clear that the United States didn't bother to assess any type of the risk and the harm that would be done to migrants if they were being sent back to these level 4 places, which is the equivalent of sending them back to Syria. I mean, it is outrageous.

Ms. Pena, I know that you provide—you know lawyers that are working to provide services to people. Can you tell us a little bit? Have you represented migrants in merit hearings?

Ms. Pena. Yes. Thank you for the question, Congresswoman. I actually have a merit scheduled for this Friday.

If I may explain some of the challenges that I faced in representing individuals placed into MPP proceedings, to find my client, first of all, I participated in a volunteer asylum workshop. We are in a hot sun, in a plaza just across the port of entry. Volunteer attorneys conducted asylum workshops to screen applicants. That is how I met my client. It was in a volunteer capacity in Matamoros.

To get access to the tent court I also filed a motion with the immigration judge to ask him, ``Please allow my client to come into this multimillion-dollar tent court a couple of days before the hearing, so we can prepare in a safe environment.''

That judge sentenced myclient, they used to assess jurisdiction, because DHS controls the tent court facility.

Although I--this will be my first merit--local attorneys who have won cases--imagine winning your asylum case, and then having your client sent back to Mexico after winning. It causes attorneys to go to extreme measures to protect their clients. Even after winning their proceedings, after having meritorious claims to not be sent back to dangerous situations--it is horrendous.

Ms. Barragan. Well, thank you. As somebody who actually--long ago, when I practiced law--represented a woman and child in an asylum case, a lot of work goes into it, a lot of prep. Not having access to your client prevents you from doing that very necessary preparation.

We know, we have seen the statistics from--people who have access to counsel and legal representation have a much higher ability to get--have a successful claim. So it feels as though this is just another attempt to make sure that people don't have that access, don't have that ability, so that they can succeed, because this administration is doing everything they can to end legal immigration. Asylum is legal immigration.

Thank you all for your work and what you are doing. We will continue to highlight the horrors of the Remain-in-Mexico Policy and the MPP program.

Thank you. I yield back.

Miss Rice. Thank you, Ms. Barragan. The Chair recognizes for 5 minutes the gentlewoman from Texas, Ms. Escobar.

Ms. Escobar. Madam Chairwoman, thank you so much for having this hearing. This is so critical, so that the American public understands what is happening at the hands of the American Government. Thank you for allowing me the opportunity to address our panel and ask questions.

Thank you for coming to the border and coming to El Paso. You and many of your distinguished colleagues, our distinguished colleagues, have made the journey so that you can see for yourself what is happening through your own eyes in order to help change what is an important policy.

To our panelists, thank you so much for being here today. I cannot tell you how profoundly moving your testimony was earlier. I can't imagine anyone listening to your testimony, listening to what is happening at the hands of the American Government, and believing that this policy should continue, this anti-American, deeply harmful policy.

I know full well about MPP because I represent El Paso, Texas. Our lawyers, our advocates, our community members have, unfortunately, had to bear witness to what is happening at the hands of the American Government. Almost 20,000 vulnerable lives have been pushed back, either through metering or through MPP.

What we have seen happen--I have described as a new ecosystem of criminal activity created by this policy on the other side of our ports of entry, an ecosystem where the American Government's policy is literally sending vulnerable migrants into the hands of cartels, so that cartels can extort money after they have kidnapped people.

We have had lawyers tell us about clients who have been raped multiple times. We have had lawyers tell us about clients who have disappeared altogether, people who are in the legal asylum process. These are people who have been denied due process and, indeed, have put--have been put in danger.

Earlier one of our colleagues expressed concern about the Department of Homeland Security personnel not being here today. I have, Madam Chair, sat through hearings where we have DHS leadership at the highest levels, essentially deny--tell Congress that none of this is happening. So it is important to hear from the people who are here to speak the truth and tell us what is happening.

Mr. Knowles, is there any way that DHS leadership at the highest levels, at the Secretary level, is there any way that they would not know that these atrocities are happening in the Mexican cities where we are sending back migrants?

<div align="center">AR278</div>

Mr. Knowles. I can imagine -- no, I cannot. But our own agency, USCIS, has a country of condition, country of origin research unit. They have produced many reports documenting the conditions in the Northern Triangle and in Mexico.

I believe there was--there have been many investigations by the Department of those conditions. Certainly these things are well known.

Ms. Escobar. Ms. Pena--thank you, sir. Ms. Pena, do you think there is--and Ms. Vela, do you think there is any way that the Secretary of the Department of Homeland Security or anyone in leadership or in the White House could be unaware of these atrocities?

Ms. Pena. Thank you for the question. A number of organizations have come down to the border in south Texas and have escalated their request for--one example, for access to the tent court. They have been denied that access at the highest levels.

So, as we understand it, it is at the highest levels that these directives are coming from.

Ms. Thorn Vela. Yes, and we work with our clients to present them to CBP officials at the bridge when people are erroneously placed in MPP, or they have developed a condition that makes them, you know, extremely vulnerable in Mexico, and we have also raised that issue with port directors and people higher up. You know, we--there is very little chance that doesn't get back.

Ms. Escobar. Thank you. This is why I have introduced H.R. 2662, the Asylum Seeker Protection Act, to de-fund MPP.

Madam Chair, I would like to introduce--I would like to ask for unanimous consent to introduce 3 articles: An article by the LA Times, Vice News, and a series of stories on--in NPR detailing the heinous occurrences happening at the hands of the American Government.

Miss Rice. They will be accepted into the record.***

------------------------------------------------------------------------

*** The information has been retained in committee files and is available at https://www.latimes.com/politics/story/2019-11-15/asylum-oficers-revolt-against-trump-policies-they-say-are-immoral, https://www.vice.com/en_us/article/pa7kkg/trumps-asylum-policies-sent-him-back-to-mexico-he-was-kidnapped-five-hours-later-by-a-cartel, and https://www.thisamericanlife.org/688/transcript, respectively.

------------------------------------------------------------------------

Ms. Escobar. Then, just a final show of hands. There has been so much publicity around the atrocities of MPP, there is absolutely no way that the highest levels of DHS leadership could be unaware of what is happening. Since all of this has blown wide open, have you all seen any improvements to the lives of these vulnerable migrants, the Government reversing any of what it has done? A show of hands.

Let the record reflect no one has seen any improvement since the publicizing of MPP.

Madam Chairman, thank you so much. I yield back.

Miss Rice. Thank you, Ms. Escobar. I would like to recognize Mr. Green for a clarification.

Mr. Green. Thank you, Madam Chair. I promise to be terse.

Madam Chair, Mr. Homan has brought us to the heart of the problem, and that is this administration concludes that asylum seekers are criminals. They are not criminals. It is not a crime to seek asylum in the United States of America. When you treat them as criminals, somehow you conclude that it is OK to lock their children up in cages. But they are not criminals. We have a criminal mentality as it relates to the people who are coming to this country from south of the border. That is what we have to confront. That is the gravamen of this circumstance: A criminal mentality for people who are seeking a lawful process called asylum.

I thank you, and I yield back.

Mr. Homan. Can I respond?

Miss Rice. This was just a clarification.

Thank you, Mr. Green.

AR279

Mr. Nadler. Without objection, so ordered.

Miss Rice. No, the--I believe the clarification the gentleman was making was that he was not claiming that claiming asylum was--what he was saying was not that crossing the border was not criminal, but that claiming asylum was not criminal. That is the clarification that I believe the gentleman made.

I want to thank the witnesses for their valuable testimony, and the Members for their questions.

I ask unanimous consent to enter into the record statements of support from a number of relevant organizations, including among others the American Immigration Lawyers Association; the American Immigration Council; the Children's Defense Fund; and Refugees International.

[The information follows:]

<div align="center">

Statement of AFL-CIO
Tuesday, November 19, 2019

</div>

America's welcome mat, long a beacon of hope for immigrants, refugees, and asylum seekers, is being bulldozed and paved over, replaced with a clear message: ``You're not welcome here.'' The labor movement vehemently opposes the inhumane policies being inflicted on families at our Southern Border and insists that uplifting worker rights and standards throughout the region should be a key aspect of humane border policy.

This October, the AFL-CIO coordinated a high-level labor delegation to El Paso and Ciudad Juarez to witness first-hand the impact of ``Remain in Mexico'' and other punitive border policies. Union leaders from all sectors of the economy and all parts of the country heard directly from asylum seekers, deported veterans, and Mexican workers who are organizing for basic rights and standards. Their stories inform our statement for this hearing.

In addition to violating core values and democratic principles, our Government's policies are now generating a large pool of vulnerable migrant workers in Mexican border communities. We therefore urge the subcommittee to consider not only the significant human rights and legal implications of the ``Remain in Mexico'' policy, but also its economic, labor, and trade-related ramifications.

``Remain in Mexico'' is yet another prong of an ever-escalating agenda of criminalization, family separation, detention, deportation, and exclusion being pursued by this administration. Rather than cruelly detaining asylum-seeking families, our Government is now denying them entrance to our country and forcing them to wait without shelter or sustenance for indefinite periods of time in Mexican border communities. There were already more than 20,000 asylum seekers of all ages sleeping in the streets in Juarez when our delegation visited, and these families are enduring conditions that are by most measures even more dangerous than detention.

Compounding the harm of these inhumane policies, companies are now actively recruiting asylum seekers trapped in Mexico for manufacturing jobs in maquiladoras with a history of worker exploitation. There are a reported 50,000 openings for positions in factories in northern Mexico. Forcing migrant families to remain in these border communities creates a large and growing source of workers desperate enough to accept jobs under nearly any conditions as a means of survival.

Viewed in the context of USMCA negotiations, the use of anti-migrant policies to generate a vulnerable pool of workers for low-wage border industries becomes even more problematic. Such strategies seriously undermine efforts to raise wages and standards in Mexico, and further increase the challenges of implementing ambitious labor law reforms meant to improve working conditions and level the playing field for workers in the region.

Families in Central America and Mexico continue to face acute risks due to violence, lawlessness, and lack of decent work opportunities. Labeling their homelands as safe third countries denies the lived realities of working people. Instead of forcing migrants to remain in these dangerous environments, U.S. policy measures should focus on job creation and meaningful protection of labor and human rights in the region. An approach that actually addresses the root causes of forced migration would help reduce the push factors that breed desperation and drive people away from their homes and communities.

The labor movement categorically rejects the notion that only some working people deserve rights and respect, while others can be

<div align="center">AR280</div>

dehumanize undermines what is our government doing to immigrants and asylum seekers at our Southern Border.

The forces of bigotry and white supremacy want to keep workers poor, weak, and divided. Union leaders travelled to the border last month to demand an end to the politics of division and hate that are fueling inequality and violence. Solidarity among working people is the best tool we have to overcome bigotry and promote equality in our workplaces and our society.

We urge Congress to denounce the ``Remain in Mexico'' policy and restore our Nation's commitment to humanitarian immigration pathways, including robust asylum and refugee resettlement programs. Families fleeing violence and persecution must not be returned to harm's way, nor is it appropriate to channel them into abusive temporary labor programs. Humane immigration policies should be aligned with a broader economic, trade, and foreign policy agenda focused on the development of decent work and shared prosperity for all, so that migration becomes a choice rather than a necessity.

Real security can only be achieved through humane approaches, and we will continue to demand justice for long-term members of our communities, our workforce, and our unions, as well as for those who newly seek refuge in our country.

————

Statement of the American Immigration Lawyers Association
November 19, 2019

As the national association of more than 15,000 attorneys and law professors who practice and teach immigration law, the American Immigration Lawyers Association (AILA) is deeply concerned with the Remain in Mexico policy, also known as the Migrant Protection Protocols, which requires asylum seekers at our Southern Border to wait in Mexico until their requests for humanitarian protection are decided.\1\

------------------------------------------------------------------------

\1\ DHS Releases Policy Guidance for Implementation of the Migrant Protection Protocols, AILA Doc. No. 19012907 (January 25, 2019), available at https://www.aila.org/infonet/dhs-implementation-migrant-protection-protocols.

------------------------------------------------------------------------

Remain in Mexico dramatically alters the processing of asylum claims at the U.S. Southern Border, making it far more difficult for asylum seekers to receive a fair and meaningful review of their claims. In January, AILA expressed grave concerns that the policy effectively denies asylum seekers their right to be represented by counsel and curtails their ability to receive a fair and meaningful review of their claims.\2\ Additionally, the well-documented violence and instability that migrants face in Mexico exposes returned asylum seekers to severe risk of further trauma while they wait for their hearings.\3\ AILA has urged the administration to terminate Remain in Mexico and return to the long-standing practice of allowing asylum seekers to wait in the United States while their cases are being reviewed. In addition, many Remain in Mexico cases are heard in massive tent facilities in Laredo and Brownsville, Texas that function as virtual immigration courtrooms.\4\ These tent courts mount significant roadblocks to access to counsel, due process, and transparency.

------------------------------------------------------------------------

\2\ Trump Administration Unveils More Severe Restrictions on Due Process and Asylum in ``Remain in Mexico,'' AILA Doc. No. 19012842 (January 28, 2019), available at https://www.aila.org/advo-media/press-releases/2019/trump-administration-unveils-more-severe-restrict; AILA Sends Letter to DHS Acting Secretary Detailing MPP's Barriers to Counsel, AILA Doc. No. 19060336 (June 3, 2019), available at https://www.aila.org/infonet/aila-sends-letter-to-dhs-acting-secretary-mpp.

\3\ Human Rights First, Delivered to Danger: Illegal Remain in Mexico Policy Imperils Asylum Seekers' Lives and Denies Due Process (August 2019), available at https://www.humanrightsfirst.org/sites/default/files/Delivered-to-Danger-August-2019%20.pdf; see also AILA and Advocates Send Letter Urging Secretary Nielsen to End the Migrant Protection Protocols Policy, AILA Doc. No. 19020631 (February 6, 2019), available at https://www.aila.org/advo-media/aila-correspondence/2019/aila-and-advocates-send-letter-urging-secretary.

\4\ See www.aila.org/portcourts; Haley Willis, Christoph Koettl,

AR281

Caroline Cash and Oren Root, Trump Administration Built
Along the Border. Here's What They Look Like., New York Times available
at https://www.nytimes.com/video/us/politics/100000006681200/border-
immigration-tent-courthouses.html.
--------------------------------------------------------------------------

     While there are many troubling aspects of the Remain in Mexico
policy, this statement focuses on how the policy effectively denies
asylum seekers' right to be represented by counsel. The collective
experience of AILA members who represent asylum seekers subject to this
and other policies makes us well-qualified to offer views on their
harmful impact. In addition to being in touch with AILA members
practicing on the Southern Border, in September and November AILA sent
delegations to observe the effects of these policies in Brownsville,
Laredo, and San Antonio, Texas, as well as Matamoros, Mexico.
                    background on tent courts
     In September, DHS opened massive tent facilities in Laredo and
Brownsville, Texas that serve as virtual immigration courtrooms for
Remain in Mexico cases.\5\ During the hearings, asylum seekers are held
in tents at the ports of entry while judges appear remotely via video
teleconference from traditional brick-and-mortar courtrooms elsewhere.
DHS chose to open these courts without meaningful notice to the public
or the legal community and provided almost no information about even
basic operations and procedures at the tent courts once they were
operational. The location of these tent courts forces asylum seekers to
wait for their proceedings in extreme danger in Nuevo Laredo and
Matamoros, which have both been designated by the U.S. State Department
with a level four ``Do Not Travel'' warning due to high rates of crime
and kidnapping.\6\
--------------------------------------------------------------------------

     \5\ Id.
     \6\ Patrick McDonnell, Pastor's kidnapping underscores threat to
migrants returned to Mexican border towns, LA Times (September 2,
2019), available at https://www.latimes.com/world-nation/story/2019-09-
01/kidnapping-of-pastor-in-mexican-border-town-dramatizes-threats-to-
migrants; Department of State, Mexico Travel Advisory (April 9, 2019),
available at https://travel.state.gov/content/travel/en/
traveladvisories/traveladvisories/mexico-travel-advisory.html.
--------------------------------------------------------------------------

  harsh conditions in mexico present nearly insurmountable barriers to
                            legal services
     To understand the impact of Remain in Mexico on the right to
counsel, it is important first to understand the conditions that asylum
seekers are subjected to while in Mexico, and how those conditions make
it more difficult for them to access the few legal resources that may
be available. Asylum seekers subject to Remain in Mexico must be able
to present at ports of entry when they are scheduled for immigration
court hearings, which means they must wait in Mexico's northern border
region for months.
     While in Mexico, asylum seekers--an increasingly large proportion
of which are mothers, children, and families \7\--often must stay in
shelters or temporary camps set up by local nonprofit organizations
with limited resources. These camps have been unable to keep up with
the demand for housing and basic services, and the conditions in the
camps are deteriorating.\8\ When space is full at shelters and camps,
asylum seekers are forced to find alternative housing, even though they
may not speak Spanish and often do not have any local family or other
ties. Many end up sleeping on the streets. In addition, asylum seekers
stuck in the Mexico may not have regular access to food or clean water.
--------------------------------------------------------------------------

     \7\ See Migration Policy Institute, Eight Key U.S. Immigration
Policy Issues, Doris Meissner and Julia Gelatt, May 2019, available at
https://www.migrationpolicy.org/research/eight-key-us-immigration-
policy-issues.
     \8\ See Patrick Timmons, Squalid migrant shantytowns forms in
Mexican border city, May 14, 2019, available at https://www.upi.com/
Top_News/World-News/2019/05/14/Squalid-migrant-shantytown-forms-in-
Mexican-border-city/5501557701209/.
--------------------------------------------------------------------------

     Those waiting in Mexico frequently experience violence. In fact,
the Dilley Pro Bono Project, a collaboration run by AILA and other
organizations, found that 90.3 percent of the 500 respondents they

AR282

surveyed in January over January 2019 survey, 57 percent felt unsafe in
Mexico, and 46 percent reported that they or their child had
experienced at least one type of harm while in Mexico.\9\

------------------------------------------------------------------------

    \9\ AILA and Advocates Send Letter Urging Secretary Nielsen to End
the Migrant Protection Protocols Policy, AILA Doc. No. 19020631
(February 6, 2019), available at https://www.aila.org/advo-media/aila-
correspondence/2019/aila-and-advocates-send-letter-urging-secretary.
See also Human Rights First, Delivered to Danger: Illegal Remain in
Mexico Policy Imperils Asylum Seekers' Lives and Denies Due Process
(August 2019), available at https://www.humanrightsfirst.org/sites/
default/files/Delivered-to-Danger-August-2019%20.pdf.

------------------------------------------------------------------------

    Without regular access to basic life necessities like food, water,
shelter, and safety, asylum seekers often do not have the ability to
seek out the few legal services that may be available. They may not
have cell phones or regular access to landlines to call organizations
to request representation, much less the money to make international
calls to organizations in the United States. They are particularly
vulnerable to notaries and other bad actors in the area who prey on
these exact vulnerabilities. Additionally, the trauma suffered by these
families and the on-going dangers they face in Mexico would make it
even more difficult for survivors to relay their stories clearly and
concisely to a legal services provider in a consultation, much less an
asylum officer or judge.
    By contrast, if asylum seekers could wait in the United States
while their claims are reviewed, they would live in comparatively safe
and sanitary detention conditions and have better access to legal and
social services. Additionally, non-profit organizations would be able
to provide legal orientation programs and some limited legal
representation free of charge.
  few legal services providers are able to represent asylum seekers in
                                 mexico
    Even if an asylum seeker has the resources to seek legal
representation, legal services providers are scarce and cannot possibly
meet the need presented by the thousands of people subject to Remain in
Mexico.\10\ According to DHS, asylum seekers subject to the policy are
``provided with a list of legal services providers in the area which
offer services at little or no expense to the migrant.''\11\ This is
the same list given to respondents who are located in the United States
and consists solely of organizations based on the U.S. side of the
border near the immigration court where their hearings will take
place.\12\ The list is not tailored for asylum seekers marooned in
Mexico and contains organizations that are not able to travel to Mexico
and conduct consultations or provide legal representation. It is also
incredibly difficult for attorneys to represent asylum seekers subject
to Remain in Mexico involved with representing someone outside of the
country. Frequent travel to Mexico for U.S.-based attorneys is often
not possible or unsustainable due to the exorbitant travel costs and
disruption to their representation of other clients in the United
States. The result is that most attorneys simply cannot represent
asylum seekers subject to Remain in Mexico.

------------------------------------------------------------------------

    \10\ Over 55,000 people have been subject to the Remain in Mexico
policy. Maria Verza, Migrants thrust by US officials into the arms of
the cartels, Washington Post (November 16, 2019), available at https://
www.washingtonpost.com/world/the_americas/migrants-thrust-by-us-
officials-into-the-arms-of-the-cartels/2019/11/16/92003c6e-08ba-11ea-
ae28-7d1898012861_sto- ry.html.
    \11\ Department of Homeland Security, https://www.dhs.gov/news/
2019/01/24/migrant-protection-protocols.
    \12\ See EOIR, List of Pro Bono Legal Services Providers, available
at https://www.justice.gov/eoir/list-pro-bono-legal-service-providers.

------------------------------------------------------------------------

   remain in mexico impedes communications between asylum seekers and
                            their attorneys
    If an asylum seeker subject to Remain in Mexico is able to find an
attorney in the United States who can represent them, the mere fact
that the migrant is located in Mexico with so few resources means that
the effectiveness of that representation could be compromised.
Competent and ethical representation of an asylum seeker is an involved

and lengthy process that communicates distrust between the
client and the attorney. The Model Code of Professional Responsibility
requires that attorneys reasonably communicate with and zealously
represent their clients.\13\

------------------------------------------------------------------------

    \13\ Rule 1.4, Communications (2018), In American Bar Association,
Center for Professional Responsibility, Model Rules of Professional
Conduct, available at https://www.americanbar.org/groups/
professional_responsibility/publications/
model_rules_of_professional_conduct/
model_rules_of_professional_conduct_table_of_contents/; Preamble
(2018), American Bar Association, Center for Professional
Responsibility, Model Rules of Professional Conduct, available at
https://www.americanbar.org/groups/professional_responsibility/
publications/model_rules_of_professional_conduct/
model_rules_of_professional_conduct_table_of_- contents/.

------------------------------------------------------------------------

    AILA's Asylum and Refugee Committee estimated that representing an
asylum seeker in immigration court takes between 40-80 hours of work,
with an estimated 35 hours of face-to-face communication with the
client.\14\ By marooning asylum seekers in Mexico, Remain in Mexico
makes it significantly more difficult for attorneys to communicate with
their clients: Face-to-face meetings are expensive and thus either rare
or impossible; video conferencing is rare, as is the internet speeds
needed to support it; a client may not have regular access to a phone,
and if they are able to find one, do not have space where they can have
a confidential conversation; and international phone calls are
expensive and phone coverage can be spotty.\15\

------------------------------------------------------------------------

    \14\ These averages are the result of a survey completed between
March 11, 2019 to March 15, 2019 of the members of the AILA Asylum and
Refugee Committee, who, collectively, have represented thousands of
asylum seekers. See AILA Sends Letter to DHS Acting Secretary Detailing
MPP's Barriers to Counsel, AILA Doc. No. 19060336 (June 3, 2019),
available at https://www.aila.org/infonet/aila-sends-letter-to-dhs-
acting-secretary-mpp.
    \15\ See Patrick Timmons, Squalid migrant shantytowns forms in
Mexican border city, May 14, 2019, available at https://www.upi.com/
Top_News/World-News/2019/05/14/Squalid-migrant-shantytown-forms-in-
Mexican-border-city/5501557701209/.

------------------------------------------------------------------------

    One of the most critical aspects of representing an individual in
asylum proceedings is being able to build trust between the client and
the attorney. Most asylum seekers have experienced severe trauma and
suffer from some form of psychological distress, making face-to-face
communication essential for building trust. This type of relationship
is necessary for clients to feel comfortable disclosing sensitive
information and traumatic details to the attorney. Such specific,
detailed information is required for asylum officers and judges to find
an individual credible and ultimately grant relief. Again, frequent
travel to Mexico for U.S.-based attorneys is unsustainable, which means
the ability of attorneys to build trust will be compromised. Given
these circumstances, U.S. attorneys may refuse to take on cases subject
to Remain in Mexico out of legitimate concerns about being able to
fulfill their ethical duties of competence.
    Without the opportunity to travel to Mexico and consult with their
clients, attorneys are typically required to wait until moments before
a scheduled immigration court hearing to meet them face-to-face for the
first time. Clients often speak languages other than English, and
additional time and resources are required for interpretation services.
Given these factors, it is extremely difficult for asylum seekers to
relay their story in a full and comprehensible fashion, especially in
initial meetings. Waiting until hours--in many circumstances, minutes--
before a scheduled immigration court hearing to have direct contact
with the client is not enough time for an attorney to build the type of
trust discussed above and elicit the necessary details. Additionally,
there are practical obstacles to building a case in the moments before
court--attorneys and clients may not have access to a private room
where they can discuss the case confidentially, or even the ability to
use a computer and printer to ensure any last-minute information is
included in court filings.

AR284

In addition to the aforementioned counsel, migrants subject
to Remain in Mexico at the tent courts have even greater hurdles to
accessing legal counsel. For example, in the few cases where a migrant
is able to find representation, AILA has found that some attorneys of
record have not been able to meet with their clients for more than 30
minutes on the day of the hearing, despite the fact that clients are
required to show up at the ports of entry hours prior to the
hearing.\16\

------------------------------------------------------------------------

    \16\ Camilo Montoya-Galvez, ``Farce of due process'': Lawyers
denounce new border tent courts for migrants, CBS News (September 19,
2019), available at https://www.cbsnews.com/news/asylum-seeker-tent-
courts-at-border-denounced-by-attorneys-as-farce-of-due-process/.

------------------------------------------------------------------------

    denial of observer and legal orientation access to secretive tent
                                  courts

    DHS had stated that it will allow public access to the tent courts,
subject to some restrictions such as requiring requests for access to
be submitted 5 days in advance. In September 2019, for example, then-
Acting Department of Homeland Security Secretary Kevin McAleenan
tweeted that the public and media would have access to the facility.
However, as detailed in an October 7, 2019 letter sent by AILA and
several other organizations, DHS has consistently denied access to
attorney observers and non-governmental organizations (NGO's).

    DHS has restricted access to the port courts to clients and their
attorneys of record that have a representation agreement on file. At
one time, even support staff for attorneys of record (i.e. interpreters
and paralegals) were restricted from entering the tent court
hearings.\17\ As a result, DHS is preventing nonprofit organizations
from interviewing migrants for potential pro bono services, and even
preventing nonprofits from providing basic legal orientation programs
to migrants. Similarly, DHS has refused tent court access to attorney
observers from non-governmental organizations (NGO's) seeking to tour
the facilities and observe hearings from inside the tent facilities. As
far as we are aware, only 1 NGO has been allowed inside the tent
facilities for a tour before the courts were functioning.

------------------------------------------------------------------------

    \17\ Laura Lynch and Leidy Perez-Davis, Searching for Fairness and
Transparency--A Firsthand Look at the Port Courts in Laredo and
Brownsville, Think Immigration (September 16, 2019), https://
thinkimmigration.org/blog/2019/09/16/due-process-disaster-in-the-
making-a-firsthand-look-at-the-port-courts-in-laredo-and-brownsville/.

------------------------------------------------------------------------

    During the week of September 16, representatives from AILA, the
National Immigrant Justice Center, Women's Refugee Commission, and
Amnesty International attempted to observe proceedings inside the
facilities and were denied entrance by ICE officers and/or contractors.
Some officers indicated that the denial of access was due to orders
from ICE headquarters, and others indicated that CBP was responsible.
Following the September visit, AILA sent a letter to DHS, ICE, CBP,
DOJ, and EOIR requesting information about the tent courts and access
to the tent court, to which DHS has not responded.\18\

------------------------------------------------------------------------

    \18\ AILA Sends Letter Requesting Information and Access to Port
Courts, AILA Doc. No. 19092600 (September 26, 2019), available at
https://www.aila.org/port-courts-letter.

------------------------------------------------------------------------

    Prior to AILA representatives traveling to Brownsville last week,
AILA once again contacted CBP and ICE to request access to the tent
facilities. ICE indicated that CBP controlled all access to the tent
courts, and that they did not have a contact at CBP that could help
AILA request access. Despite several phone calls and emails to CBP over
a 14-day period leading up to the delegation's trip, AILA only received
a reply from CBP the day before AILA representatives were scheduled to
visit the tent facilities. CBP denied access to AILA and stated that
the ``facility is not available for in-person public access at this
time.''\19\

------------------------------------------------------------------------

    \19\ AILA Sends Letter to Congress Demanding Public Access to Tent
Courts, AILA Doc. No. 19111233 (November 12, 2019), available at
https://www.aila.org/advo-media/aila-correspondence/2019/aila-sends-

6/22/2021                        - EXAMINING THE HUMAN RIGHTS AND LEGAL IMPLICATIONS OF DHS'S ``REMAIN IN MEXICO'' POLICY
letter-to-congress-demanding-publi...

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 292 of 688   PageID 1949

--------------------------------------------------------------------------

    Observing Remain in Mexico hearings from the court locations where
the judges are sitting is not an adequate substitute for being allowed
to access the tent facilities holding the migrants. Observation from a
courtroom that is hundreds of miles away from the actual location of
the proceedings will not provide meaningful comprehension of how
proceedings are operating from the migrant's point of view.
Furthermore, remote observers will not be able to bear witness to any
rights violations that may occur when the video teleconference system
is malfunctioning or shut off.
 inaccurate and incomplete notices to appear in remain in mexico cases
    Notices to Appear (NTAs) issued by DHS in Remain in Mexico cases
have contained inaccurate information, including incorrect hearing
locations and inaccurate addresses for migrants. One NTA even listed
``Facebook'' as the respondent's address.\20\ Additionally, some NTAs
are incomplete and fail to specify whether the respondent is being
charged as an ``arriving alien,'' an ``alien present in the United
States who has not been admitted or paroled,'' or an alien ``admitted
to the United States'' who is removable. These charges on the NTA are
vital to the proceedings because they impact the legal recourses
available to the migrant. Despite these serious problems, DHS still
pushes for immigration judges to order individuals subject to Remain in
Mexico removed in absentia. Immigration judges have also said that DOJ
has instructed them to order those who do not appear at their hearing
to be removed in absentia.\21\
--------------------------------------------------------------------------

    \20\ Adolfo Flores, Border Patrol Agents Are Writing ``Facebook''
As A Street Address For Asylum-Seekers Forced To Wait In Mexico,
Buzzfeed News (September 26, 2019), available at https://
www.buzzfeednews.com/article/adolfoflores/asylum-notice-border-appear-
facebook-mexico.
    \21\ Gaby Del Valle, Trump's Remain in Mexico Policy Is Causing
Asylum-Seekers to Miss Court Dates--and Get Deported, Vice News
(September 24, 2019), available at https://www.vice.com/en--us/article/
gyzdp9/trumps-remain-in-mexico-policy-is-causing-asylum-seekers-to-
miss-court-dates-and-get-deported.
--------------------------------------------------------------------------

    documents falsely indicating a future hearing date
    CBP has sent people who have been granted asylum back to Mexico
with documents that falsely indicate that they have an upcoming court
hearing.\22\ The Mexican government has stated that it will not accept
people whose cases have been decided and who do not have a future
hearing date. This has also happened to migrants who had their cases
terminated--meaning a judge closed the case without making a formal
decision, usually on procedural grounds. In addition to the safety and
due process problems that these fake hearing dates pose, they also pose
logistical hurdles, including questions around how and when the
migrants will return to the United States.
--------------------------------------------------------------------------

    \22\ Gustavo Solis, CBP agents wrote fake court dates on paperwork
to send migrants back to Mexico, records show, The San Diego Union-
Tribune (November 7, 2019), available at https://
www.sandiegouniontribune.com/news/immigration/story/2019-11-07/cbp-
fraud.
--------------------------------------------------------------------------

 dhs should immediately end remain in mexico and the use of tent courts
    Given the deeply troubling nature of the Remain in Mexico policy
and its implementation, as well as the potential life-or-death
consequences for the migrants, AILA urges DHS to end the Remain in
Mexico program and the use of tent courts.
                                _____


            Report From American Friends Service Committee
  between walls: asylum seekers under the migrant protection protocols
Full original report available in Spanish at afsc.org/saveasylum
Executive Summary
    Migrants traveling through Mexico intending to seek asylum in the
United States are being forced to wait out the duration of their asylum
process in Mexico under the Migrant Protection Protocols (MPP)
established by the United States Government.

                                AR286

Because of a lack of transparency, the actual number of asylum petitioners returned to Mexico is unknown. Nevertheless, several sources have suggested that between January and August 2019, the number of asylum seekers made to remain in Mexico ranged anywhere between 31,000 to 35,000. In the case of Baja, California, it is estimated that up until October the number of petitioners who were returned reached 13,000.

Returning people who are requesting asylum under the MPP program to Mexico creates a tremendous challenge for civil organizations at the U.S.-Mexico border and Government authorities. Poor shelter conditions and lack of economic support previously provided by past Government through migrant funds are key causes of the challenges faced.

The returnee population under MPP finds themselves bewildered, desperate, and uncertain over what the future holds. Additionally, they live with fear of what could happen to them in Mexican territory because they have been victims of organized crimes and law enforcement. Some migrants have been robbed, extorted, kidnapped, and sexually assaulted during their journey and stay in Mexico. Their fear is justified.

Migrants have no safety net or support. Their lack of familiarity with the cities they are being returned to in Mexico and the inability to guarantee employment that will allow them to satisfy necessities like shelter and food leaves them incredibly vulnerable. They are also unaware of the asylum process and have access to little or no legal advice allowing them to continue the process.

As a result, the Coalition of Immigrant Defense, with the support of American Friends Service Committee, regional Latin America and Caribbean office (AFSC LAC) in collaboration with the National Commission of Human Rights, have taken initiative to develop a report that documents the experiences of the population returned under MPP from the United States through Baja California, characterized through profiles, conditions, necessities, and expectations. This report also seeks results in the proposal of care and protection options for the population that has migrated to the northern border states of Mexico.

A survey was applied to a sample of 360 applicants returned under the Migrant Protection Protocols (MPP) in 15 shelters in Tijuana and Mexicali, during the period from July to August 2019. This survey was supported with semi-structured interviews of key respondents.

The results show that the returnee population is made up of a slight majority of women, but there are also families. Five out of 10 people surveyed are between 19 and 35 years old. Seven out of 10 have completed only the most basic levels of study (primary and secondary). An important fact is that 7 out of 10 did have some form of employment in their country, but they fled because of insecurity and low wages. It should be noted that a significant number of people come from rural areas. At least half left their country because of the violence and dangers they were facing, but there were also applicants who fled for political reasons and domestic violence.

More than 90 percent have never applied for asylum in the United States and 80 percent are unaware of the legal procedures and lack the legal representation that allows them to prepare their cases. The majority also do not consider seeking legal advice because they cannot afford it. Only 15 percent are aware of the need for legal advice and plan to use those services.

Eight out of 10 respondents who had been held in detention centers in the United States talked about the lack of respect for human dignity in these facilities. For 80 percent of returnees, the food was insufficient and of poor quality, and 7 out of 10 cited overpopulation.

Nine out of 10 returnees were granted credible fear interviews by the U.S. Government, but 12 percent of people surveyed were not interviewed. More than 80 percent of people surveyed stated that their only interaction with U.S. agents was signing documents, which were usually not in Spanish.

Returnees are in a situation of extreme vulnerability; they don't know anyone, nor do they have personal contacts that provide humanitarian support. A significant percentage of the people surveyed consider that the Mexican population discriminates against them, so they are worried about staying in places where they do not have personal contacts or social networks.

Many applicants returned under these protocols have given up on the process and decided to return to their countries of origin despite the

AR287

risks that it presents, we want to raise three parts: the lack of legal representation, uncertainty, and fear of having to stay in Mexico for an undefined amount of time. Approximately half will have to wait for 1 to 3 months, and 40 percent will have to wait for 3 to 6 months.

Irregularities that violate due process are also committed in the return process. A third of the returnees who were in the detention centers were not notified that they would be returned to Mexican territory. Many applicants were not returned through the same city where the proceedings began and a quarter suffered family separation, violating international treaties.

In the process of returning to Mexico, the monitoring of returnees is irregular, and their personal security is not guaranteed. The Mexican authorities must respect and protect those who apply for asylum, as they committed to in agreements with the United States, but the practices show otherwise. Two-thirds of people surveyed were not approached by the Mexican authorities to interview them. Half of the returnee applicants had information about the existence of shelters in the cities where they were returned, but more than 90 percent had to go on their own because the authorities did not provide adequate support or guidance.

The expectations of these people are uncertain. Sixty percent say they will wait as long as necessary to carry out their process, while the remaining 40 percent say they will only wait a few months.

As for what will happen if they fail to gain access to asylum, half of the people surveyed do not have an action plan, a third will ask for refuge in Mexico, and 20 percent will be obliged to return to their country of origin.

_____

Statement of the American Immigration Council
November 19, 2019

The American Immigration Council (``Council'') is a non-profit organization that has worked to increase public understanding of immigration law and policy--and the role of immigration in American society--for over 30 years. We write to thank the subcommittee for scheduling this hearing to discuss the so-called Migrant Protection Protocols (``MPP'') and their impact on asylum seekers and on the rule of law in the United States.

Since MPP was first announced, the Council has sought to draw attention to this dangerous and unlawful program. We have documented the risks that asylum-seeking families face in Mexico. We have visited the border to talk to people who have been sent back to Mexico, observed MPP court hearings in El Paso and Harlingen, and participated in briefings on MPP. Today, we write to highlight our experience with the problems that MPP has created both for asylum seekers and for the system of humanitarian protections that has existed in the United States for decades.

We also write to elevate the voices of people who have been subject to MPP, through the stories of Lucia, Camila, and Rosalia,\1\ mothers currently detained in the South Texas Family Residential Center (``STFRC'') in Dilley, Texas. We hope that our experience with these issues may provide the subcommittee with additional insight and context to inform this debate.

--------------------------------------------------------------------

\1\ Given the sensitivity of the issues discussed, we have given these mothers pseudonyms. Their stories were collected through the Council's presence at Dilley through the Dilley Pro Bono Project.

--------------------------------------------------------------------

mpp has placed tens of thousands of vulnerable people at significant risk of harm in mexico

When MPP was first announced on December 20, 2018, the Council immediately had serious concerns about the prospect of requiring vulnerable families to wait in Mexico. In response to the announcement, through our partnership in the Dilley Pro Bono Project, we undertook a study of 500 asylum-seeking mothers who were then detained at the STFRC. We asked the mothers whether they had been afraid for their lives in Mexico and whether they or their family had faced harm in Mexico during the journey to the United States. Our study showed conclusively that Mexico was not a safe place for asylum-seeking families to wait months at the border:

90.3 percent of respondents said that they did not feel safe

AR288

46 percent of respondents reported that they or their child experienced at least one type of harm while in Mexico.
38.1 percent of respondents stated that Mexican police mistreated them.

Nearly 30 percent of mothers reported that they had been robbed in Mexico on their way to the United States, while 17 percent reported that a member of their family had been physically harmed while traveling to the border. Widespread corruption among Mexican law enforcement officers also amplified fears held by the mothers, as 28 percent expressed that a Mexican official had demanded a bribe, and 9.5 percent reported that a Mexican official had threatened them with physical harm at some point during the journey to the border.

The Council, along with the American Immigration Lawyers Association (AILA) and the Catholic Legal Immigration Network (CLINIC), sent a letter to then-DHS Secretary Kirstjen Nielsen, detailing the results of our study and urging her to abandon the plans to expand MPP.\2\ Unfortunately, Secretary Nielsen did not heed our warning.

------------------------------------------------------------------------

\2\ Letter to The Honorable Kirstjen M. Nielsen, Secretary, Department of Homeland Security, Substantial Evidence Demonstrating Catastrophic Harms That Will Befall Migrants in Mexico with Continued Implementation and Further Expansion of Migrant Protection Protocols, Feb. 6, 2019, https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/letter_urges_sec_nielsen_end_migrant_protection_protocols_policy.pdf.

------------------------------------------------------------------------

One woman profiled in the letter, Concepcion,\3\ reported that she was kidnapped and raped by a cartel member, who threatened to kill her 5-year-old child and sell his organs if she reported him to the police. Two women, Aracely and Fatima, were kidnapped by Mexican police officers and then sold to members of a cartel, who held them for ransom in a stash house where they observed gang members torturing other migrants. Another woman, Carolina, was extorted by men wearing Mexican Federal police uniforms, who entered the house she was staying in and demanded money. She observed them sexually assaulting another woman who could not pay.

------------------------------------------------------------------------

\3\ These names are also pseudonyms.

------------------------------------------------------------------------

Since we sent our letter in February, other organizations have documented the harms that occur to people subject to MPP. A study of 607 asylum seekers in Tijuana and Mexicali who had been sent back to Mexico found that 23.1 percent of asylum seekers, and 21.9 percent of asylum-seeking families, had ``been threatened with physical violence while in Mexico as they await[ed] their immigration court dates.''\4\

------------------------------------------------------------------------

\4\ U.S. Immigration Policy Center, UC San Diego, Seeking Asylum: Part 2 (Oct. 29, 2019), https://usipc.ucsd.edu/publications/usipc-seeking-asylum-part-2-final.pdf, at 4.

------------------------------------------------------------------------

Similarly, the organization Human Rights First documented more than 340 instances of rape, kidnapping, extortion, and assault against people in MPP through September 2019.\5\

------------------------------------------------------------------------

\5\ Human Rights First, Orders from Above: Massive Human Rights Abuses Under Trump Administration Return to Mexico Policy, Oct. 1, 2019, https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf, at 2.

------------------------------------------------------------------------

The stories of mothers currently detained at the STFRC highlight the continued harms that people sent back under MPP face. These extraordinary stories demonstrate the extreme harm that women and children face after being sent back under MPP, and how USCIS's fear screening process is patently inadequate.

lucia's story: the horrific consequences of mpp--violations of cbp policy and inadequate fear screenings lead to a nightmare for a mother and her daughter

Lucia is a mother from Ecuador who first sought asylum at the Nogales, Arizona port of entry in July, 2019 along with her 9-year-old daughter, who is deaf and mute. When she attempted to request asylum,

Customs and Border Protection (CBP) officer physically prevented her from entering, grabbing her and her daughter and dragging them away from the port of entry. A kind stranger bought her a bus ticket to Mexicali, where they again sought asylum. This time, she was permitted to enter and begin the asylum process.

After 3 days in CBP custody, Lucia and her daughter were returned to Mexicali to wait for an MPP hearing on August 23, 2019 in Tijuana. This occurred even though Lucia's daughter is deaf and mute and should have been exempt from MPP as a vulnerable individual in ``special circumstances.''

After Lucia and her daughter were returned to Mexico, they briefly found a shelter in which to stay but were forced to leave when the shelter demanded payment, which Lucia could not pay. A man, ``Chino,'' offered to let her and her daughter live with his family and do domestic work for pay. However, when Lucia and her daughter went to his house, they learned he lived alone. He locked them in the house and left a huge dog outside the door. Chino forced Lucia to do all of his housework and did not pay her. He kissed Lucia's daughter and inappropriately touched her sexually. Chino only let Lucia attend her court hearing on August 23 after Lucia asked a friend for help through the window. This friend begged Chino to let Lucia go. Chino threatened to kill Lucia and her daughter if she did not return after the court hearing.

Terrified for her life, at the court hearing on August 23, Lucia begged to be taken out of MPP to protect herself and her daughter. But despite having been kidnapped and sexually assaulted in Mexico, Lucia did not pass USCIS's fear interview and was sent back to Mexico a second time to await a new court hearing.

As before, Lucia and her daughter were sent back under MPP even though they should have been exempt from MPP because Lucia's daughter is deaf and mute. In direct violation of the MPP guiding principles, CBP officers sent them back to Mexico anyway. This time, the consequences were even more severe. Just a few blocks from the port of entry in Tijuana, men with knives stopped Lucia and her daughter and abducted them.

Lucia describes the horrors that followed:

``The men drove us in a car overnight. They took us to a place that I believe was Hermosillo, Mexico and kept us there for 13 days. They didn't give us food or water. They tied my daughter up in a sheet so she could not move. They beat us repeatedly. They took off all of our clothes, touched us sexually, raped us, and masturbated in front of us. They often would not let us go to the bathroom. When they did let us, they would grab us and walk us to the bathroom and we would have to go in front of them. The men told me that I did not have rights because I am Ecuadorian, called me a dog and trash, and said they would light me on fire.''

During the time Lucia and her daughter were subjected to this horrific ordeal, her kidnappers extorted thousands of dollars from family members in the United States under threat of her death. When her family managed to pay, the kidnappers drove Lucia and her daughter to the border. They took Lucia's daughter into their hands and dragged her over the border wall. They then demanded that Lucia cross as well or the men would abandon her daughter in the desert. Lucia climbed over the wall but injured herself doing so.

Immigration officials eventually found Lucia and her daughter and took them to the STFRC after she begged that they not be taken back to Mexico. At the STFRC, she learned she had been given a deportation order because she missed her second court date while she was kidnapped. She is currently seeking to reopen her case. The experience has utterly traumatized her daughter:

``My daughter's emotional state has completely changed since these terrifying experiences. She stays in our room and cries. She does not want to go to school. She thinks that everyone is going to abuse her. She is very afraid to return to Ecuador or Mexico.''

    camila's story: homelessness, vulnerability, and an attempted
             kidnapping lead to a family missing court

Camila is a mother from El Salvador who, along with her 14-year-old son, fled death threats in her home country to seek asylum in the

United States. In July 2019, Camila and her son sought asylum after crossing the Rio Grande river into El Paso, TX. Camila was sent back to Ciudad Juarez along with her son and told to wait 3 months for a hearing on October 7.

After being sent back to Ciudad Juarez, Camila and her son faced homelessness. She describes the dangerous instability they faced over the next 3 months as they waited for their court hearings:

``My son and I were very afraid in Ciudad Juarez and had nowhere to go. We slept outside of gas stations or in the bus station. I never slept well because of how dangerous it was. I told my son to sleep and would stay awake watching. After a week, we met a woman who said we could come to her house at night to sleep. We had to be in the street during the day. Three times, we were robbed of the little money we had. We were dependent on people giving us food or very small amounts of money for working at a taco stand or cleaning a house. We often went hungry.''

On October 7, Camila and her son called a cab to take them to the port of entry, where they were required to arrive far before dawn. After a long time driving in the dark, Camila became afraid. As it got closer to dawn, Camila realized they were nowhere near the port of entry. When she asked the driver what was going on, he told her ``not to ask questions or yell or else he would hurt [Camila] or [her] son.'' After driving for a long time, the taxi driver parked outside of a house and ran off. Camila and her son immediately took the opportunity to flee. After walking for a long time, they found themselves near the border and encountered Mexican police officers. Camila describes what happened next.

``I found Mexican police officers in the street and told them what had happened to me. The police laughed and told me that I was an immigrant, so if I wanted to cross the border, why didn't I just go do that. They did not write down my report or offer to investigate my case.''

Camila and her son eventually made their way to the port of entry later in the day on October 7, where she was told that she had missed her court date and had been ordered removed in absentia.

Camila and her son were then taken into CBP custody, where they were held for a staggering 18 days in total. She states that ``we were treated worse than animals'' and that she was frequently separated from her son. Only on the last 3 days in custody was she allowed to be in the same cell as her son. In late October, they were transferred to the STFRC to be deported. Camila is currently seeking to reopen her case.

  rosalia's story: language problems, vulnerability, hunger, and how
  transportation problems and cbp's requirement to arrive at court at
                3:30 am led to a family missing court

Rosalia is a mother from Guatemala who, along with her 2-year-old daughter, fled her country to seek asylum in the United States. Rosalia's first language is Mam, and she does not speak Spanish fluently. In June, 2019 Rosalia and her daughter arrived at the Calexico port of entry, where they requested asylum.

After 2 days in CBP custody, Rosalia and her daughter were sent back to Mexicali with a notice to appear for court in Tijuana on October 7, telling her she needed to arrive at 3:30 AM. Although they had arrived at the port of entry with a suitcase full of clothing, CBP officers confiscated the suitcase, leaving them without any spare clothing or the rest of their belongings.\6\
------------------------------------------------------------------------
  \6\ The Office of Inspector General has documented similar practices of CBP disposing of people's belongings at the El Paso Del Norte Processing Center, see Dep't of Homeland Security, Office of Inspector General, Management Alert--DHS Needs to Address Dangerous Overcrowding Among Single Adults at El Paso Del Norte Processing Center (Redacted), May 30, 2019, https://www.oig.dhs.gov/sites/default/files/assets/2019-05/OIG-19-46-May19.pdf, at 6.
------------------------------------------------------------------------
    For days after Rosalia and her daughter were released, they were barely able to obtain food to eat and experienced near-starvation, to the point that Rosalia was afraid her daughter would die. She describes the agonizing situation after being sent back under MPP:

<div align="center">AR291</div>

``I had no money but I found a migrant shelter that allowed us to stay there for 3 nights for free. They then started to charge 35 pesos per night. A woman gave me 50 pesos, which I used for the shelter. I wanted to buy food but I was afraid that my daughter would be harmed if we slept in the street. My daughter barely ate for 3 days. Sometimes people would give us cookies, but I had nothing else to give her. She was sick and weak and cried a lot. Sometimes she fainted.''

``I was afraid that she would die. After 3 days, I was able to call my sister, who was planning on receiving me here in the United States. She sent me a little money for food.''

For the next 4 months, Rosalia lived in the shelter in Mexicali, waiting for their October court date. She lived the entire time in fear of being kidnapped. Men followed her every time she left the shelter to get groceries and would ask her to go with them. Others in the shelter told her those men would force her into prostitution if she went with them.

On the day before her hearing, Rosalia and her daughter went to the bus station in Mexicali to take a bus to Tijuana. Because the first bus was full, she had to wait for a second bus. Unfortunately, this meant she arrived at the Tijuana port of entry at 4 o'clock AM, not 3:30 AM.

Because Rosalia and her daughter arrived half an hour late, the CBP officers told her it was too late for her to go to court. A CBP officer told her that he would contact the judge to reschedule a court date and told her to come back on October 10. When she returned 3 days later, the CBP officers told her there was nothing they could do and told her to go away.

Desperate, afraid, and unsure what to do, Rosalia and her daughter crossed between ports of entry a week later. They turned themselves in to Border Patrol officers and asked for asylum again. She was eventually transferred to SFTRC, where she received a reasonable fear interview. She is currently waiting for an immigration judge to review the decision she received.

       mpp does damage to the rule of law and must be ended

As the stories of Lucia, Camila, and Rosalia show, MPP actively prevents asylum seekers from having their day in court, exposes families and children to homelessness and hunger, and puts them at grave risk of harm.

Lucia's story demonstrates the most extreme problems with MPP. CBP repeatedly violated its procedures by sending her and her daughter back under MPP, given her daughter's clear medical problems. CBP violated this ``guiding principle'' of MPP both when it sent her back the first time and when it sent her back after her first court hearing. In addition given that Lucia and her daughter were sent back to Mexico after they had already been kidnapped and sexually assaulted there certainly calls into question the adequacy of the fear screening. The fact that Lucia was then ordered removed for missing a hearing that she could not attend because she had been kidnapped a second time demonstrates the way that MPP interferes with people's opportunities to have a day in court.

Camila's story demonstrates the ways in which people in MPP are often forced into homelessness for months at a time as they seek asylum. It also shows how the dangers in Mexico, including kidnappings, prevent people from attending their court hearings, which often leads to an order of removal in absentia. Further, it demonstrates how Mexican police have often failed to provide protection for vulnerable asylum seekers.

Rosalia's story demonstrates the ways that MPP strips people of opportunities and puts them at risk even when they are not the victims of violence. Although Rosalia was not the target of physical harm in Mexico, she did not have food for several days, causing her daughter to faint repeatedly. She also missed her 3:30 AM court hearing, despite efforts to appear on time.

America has always provided refuge for those seeking to flee persecution. But with MPP, our Government has abandoned the basic principles of humanitarian protection that are enshrined in our laws and damaged the ideals of due process that underly our system of justice. As these stories show, even people who are desperately trying to follow all of the Government's rules find themselves unable to do so because of the dangerous conditions resulting from MPP.

<div align="center">AR292</div>

In light of the foregoing facts, we urge this subcommittee to take steps to end this dangerous and ill-advised program. We thank you for the opportunity to submit this statement, and for the subcommittee's efforts to engage in a thoughtful conversation.

————

Statement of Amnesty International
November 18, 2019.

Rep. Kathleen Rice,
Chair, House Homeland Security Committee, Subcommittee on Border
    Security, Facilitation, and Operations.
Rep. Clay Higgins,
Ranking Member, House Homeland Security Committee, Subcommittee on
    Border Security, Facilitation, and Operations.
RE: Amnesty International Statement for Hearing on ``Examining the
Human Rights and Legal Implications of DHS's `Remain in Mexico'
Policy''

On behalf of Amnesty International USA and our members and supporters in the United States, we hereby submit this statement for the record. Amnesty International is an international human rights organization with national and regional offices in more than 70 countries, including in the United States. A top priority of our organization is the human right to seek asylum at the Mexico/U.S. border.

Amnesty International is alarmed by the human rights violations inherent in the misleadingly named ``Migrant Protection Protocols'' (MPP), informally known as ``Remain in Mexico.'' Since January, nearly 60,000 people have been forcibly returned to Mexico under the program.\1\ The program has made a mockery of the right to seek asylum as enshrined in domestic and international law, forcibly returned tens of thousands of individuals to potential grave danger, and operated with a dangerous lack of transparency.

---------------------------------------------------------------------
\1\ Molly O'Toole, ``Asylum Officers Revolt Against Trump Policies They Say Are Immoral and Illegal,'' L.A. TIMES, Nov. 15, 2019, https://www.latimes.com/politics/story/2019-11-15/asylum-officers-revolt-against-trump-policies-they-say-are-immoral-illegal.
---------------------------------------------------------------------

In this statement, we wish to share some of our gravest and most immediate concerns about the policy. We thank the subcommittee for holding this important hearing and hope it is the first of several oversight efforts by Congress of this dangerous and unlawful program.
                    mpp violates the right to seek asylum
The concept of territorial asylum--the ability of people seeking refuge at U.S. borders to request protection here--is a bedrock principle of international and domestic law. Under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol, the latter of which the United States has signed and incorporated into domestic law through the 1980 Refugee Act,\2\ governments must not forcibly return individuals to a place where they would fear persecution--not just their countries of origin, but any other place where a person would face risk of serious harm.\3\ To ensure this obligation is met, the U.S. Government has codified in domestic law the right to seek asylum both at and between ports of entry along the U.S. border.\4\

---------------------------------------------------------------------
\2\ See text of 1980 Refugee Act, available at https://www.govinfo.gov/content/pkg/STATUTE-94/pdf/STATUTE-94-Pg102.pdf.
\3\ Amnesty International, ``Halt the `Remain in Mexico' Plan,'' April 15, 2019, https://www.amnesty.org/en/documents/amr51/0172/2019/en/.
\4\ 8 U.S.C. ⍰ 1158.
---------------------------------------------------------------------

Historically, people seeking asylum at the border were given the opportunity to articulate a ``credible fear'' of return to their home countries; if they established such a fear, they were placed into removal proceedings and allowed to apply for asylum and related protections from within the United States, based on their fear of return to their countries of origin.\5\

---------------------------------------------------------------------
\5\ 8 U.S.C. ⍰ 1182.
---------------------------------------------------------------------

AR293

MPP has upended this process by instead forcibly returning people, including asylum seekers, to dangerous and precarious situations in Mexico for the duration of their asylum proceedings, which can last several months, if not years. Only after these individuals win relief are they allowed to enter United States--and even after they win relief, the Government frequently sends them back to Mexico, reportedly by falsifying court documents.\6\

------------------------------------------------------------------------
    \6\ Gustavo Solis, ``U.S. border agents wrote fake court dates on paperwork to send migrants back to Mexico,'' Nov. 7, 2019, L.A. TIMES, https://www.latimes.com/world-nation/story/2019-11-07/u-s-border-agents-wrote-fake-court-dates-on-paperwork-to-send-migrants-back-to-mexico.
------------------------------------------------------------------------

    MPP appears designed to discourage individuals from seeking asylum by making it as difficult as possible to do so.\7\ Not only are asylum seekers exposed to grave harm as they await their proceedings in Mexico (as described in greater detail below), but they are also effectively cut off from legal services essential to securing relief.

------------------------------------------------------------------------
    \7\ Jason Kao and Denise Lu, ``How Trump's Asylum Policies Are Leaving Thousands of Asylum Seekers Waiting in Mexico,'' N.Y. TIMES, Aug. 18, 2019, https://www.nytimes.com/interactive/2019/08/18/us/mexico-immigration-asylum.html.
------------------------------------------------------------------------

    In one study, asylum seekers who appeared with attorneys were found to be 5 times as likely to obtain relief as those who represented themselves.\8\ Yet, because MPP maroons asylum seekers far from legal service providers, only between 1-2 percent of returnees are represented by counsel.\9\ Because of restrictions on who may access new, secretive tent courts built at ports of entry, people subject to MPP are not able to access basic legal orientations and thus lack even minimal information about their proceedings. These hurdles make asylum all but impossible to access.

------------------------------------------------------------------------
    \8\ Asylum Representation Rates Have Fallen Among Rising Denial Rates,'' TRAC Immigration, available at https://trac.syr.edu/immigration/reports/491/ (last accessed Nov. 18, 2019).
    \9\ See ``Details on MPP (Remain in Mexico) Deportation Proceedings,'' available at https://trac.syr.edu/phptools/immigration/mpp/ (last accessed Nov. 18, 2019).
------------------------------------------------------------------------

              mpp returns people seeking safety to harm's way
    By returning vulnerable individuals to some of the most dangerous places along the Mexico/U.S. border, MPP has directly resulted in grievous harms--including kidnappings, sexual assaults, extortion attempts, and other violent attacks--against people seeking protection. As of October 1, 343 individuals subjected to MPP had reportedly faced violent attacks or threats in Mexico, including on their way to their court dates in the United States.\10\ Service providers working with MPP returnees have reported that anywhere from ``half'' \11\ to ``over 70 percent'' \12\ of individuals they've worked with have described facing serious harm in Mexico. These include:

------------------------------------------------------------------------
    \10\ Human Rights First, ``Orders From Above: Massive Human Rights Abuses Under Trump Administration's Return to Mexico Policy,'' Oct. 1, 2019, available at https://www.humanrightsfirst.org/resource/orders-above-massive-human-rights-abuses-under-trump-administration-return-mexico-policy.
    \11\ Mireya Villareal, ``An Inside Look at Trump's `Remain in Mexico' Policy,'' CBS NEWS, Oct. 8, 2019, https://www.cbsnews.com/news/remain-in-mexico-donald-trump-immigration-policy-nuevo-laredo-mexico-streets-danger-migrants-2019-10-08/.
    \12\ Conversation with legal services provider in Laredo, Texas (Sept. 16, 2019).
------------------------------------------------------------------------

    A female asylum seeker from Honduras: ``[The Federal police]
        asked me what nationality I was, I told them I was from
        Honduras then they say: `Come with me.' They grab my head, bend
        me over, and take me out of the house and put me in a black

<div align="center">AR294</div>

they were forced at gunpoint. She was then kidnapped
by the police for ransom and raped multiple times. She stated
that although her eyes were covered with tape, she managed to
see because her tears soaked through the glue.\13\

------------------------------------------------------------------------

    \13\ ``Secuestraron Federales a Migrante Hondurena [Honduran
Migrant Kidnapped by Federal Police],'' El Diario, June 18, 2019,
https://www.eldiariodechihuahua.mx/estado/secuestraron-Federales-a-
migrante-hondurena-20190618-1528964.html.

------------------------------------------------------------------------

    A male asylum seeker from El Salvador traveling with his
baby daughter: ``I was kidnapped in Mexico while waiting to
come to court. We were headed to court over here. But we got
stopped. They pulled us down. Mexican patrol cars were there, I
thought they would help us. But they kidnapped us for 3 days.
They let me go because of my family, because I didn't have any
money, but I don't know what happened to the other men.''\14\

------------------------------------------------------------------------

    \14\ Remote observation of court proceedings in San Antonio, Texas
(from the Laredo, Texas port of entry) (Sept. 17, 2019).

------------------------------------------------------------------------

    These stories of harm are so commonplace that one attorney who
works with returnees in Matamoros commented to Amnesty International
that ``for people returned under the program, it's not a question of if
they'll get kidnapped--it's a question of when.''\15\ The Mexican State
of Tamaulipas, which abuts south Texas, carries a ``Level 4--Do Not
Travel'' warning from the U.S. Department of State because of risks of
kidnapping and other violent crime by cartels.\16\ The forcible return
of tens of thousands vulnerable migrants and asylum seekers to this
area has constituted a veritable stimulus package for cartels operating
in this region, which routinely kidnap returnees and extort their
families for ransom, in some cases preventing them from being able to
appear in court.\17\ Yet, despite these documented harms, immigration
judges have publicly stated that they are pressured to issue in
absentia removal orders in every instance in which an MPP returnee does
not appear.

------------------------------------------------------------------------

    \15\ Conversation with legal services provider in Brownsville,
Texas (Oct. 23, 2019).
    \16\ ``Mexico Travel Advisory,'' U.S. Dep't of State, https://
travel.state.gov/content/travel/en/traveladvisories/traveladvisories/
mexico-travel-advisory.html (last accessed Nov. 18, 2019).
    \17\ Emily Green, ``Trump's Asylum Policies Sent Him Back to
Mexico. He was Kidnapped Five Hours Later,'' VICE NEWS, Sept. 16, 2019,
https://www.vice.com/en_us/article/pa7kkg/trumps-asylum-policies-sent-
him-back-to-mexico-he-was-kidnapped-five-hours-later-by-a-cartel.

------------------------------------------------------------------------

    Even those returnees who have faced grave harm are typically unable
to escape from MPP once they are placed in the program. Though the
Department of Homeland Security (DHS) has instituted a fear-of-return-
to-Mexico screening as part of MPP, called a ``non-refoulement
interview,'' in practice, these screenings are a sham. First, they are
available only to those individuals who affirmatively manifest a fear
of harm in Mexico, violating a threshold principle of non-refoulement
that all individuals must be screened for fear of harm in a given place
before being forcibly sent there. Furthermore, the threshold is
exceedingly high--higher than the showing required to win asylum on the
merits.\18\ Asylum officers have spoken openly about how they are
pressured to issue negative determinations, even when they believe
returnees will be subject to grave harm in Mexico.\19\ Returnees have
described how these interviews are cursory, in some cases lasting no
more than 10 minutes.\20\ Even those few returnees who have lawyers are
generally unable to bring those attorneys to these interviews.\21\
Returning asylum seekers to any country without an adequate screening
process is a flagrant violation of the U.S. obligation against
refoulement.

------------------------------------------------------------------------

    \18\ Dep't of Homeland Security, ``Migrant Protection Protocols,''
Jan. 24, 2019, https://www.dhs.gov/news/2019/01/24/migrant-protection-
protocols.
    \19\ Molly O'Toole, ``Asylum Officers Revolt Against Trump Policies

AR295

They Say Are Immoral, Illegal,'' Nov. 15, 2019, https://
www.latimes.com/politics/story/2019-11-15/asylum-officers-revolt-
against-trump-policies-they-say-are-immoral-illegal.
    \20\ Conversation with legal services provider in Harlingen, Texas
(Sept. 20, 2019).
    \21\ ACLU of San Diego & Imperial Counties, ``Class-Action Lawsuit
Demands Access to Legal Representation for Detained Migrants Who Have
Expressed a Fear of Being Returned to Mexico,'' Nov. 5, 2019, https://
www.aclusandiego.org/aclu-asylum-seekers-subject-to-trumps-remain-in-
mexico-policy-must-be-given-access-to-counsel/. On Nov. 14, 2019, a
district court issued a temporary restraining order requiring a
Guatemalan family the ability to consult with counsel in preparation
for and during their non-refoulement interview. A hearing on whether
that holding will be expanded to all MPP returnees will take place in
December. See ACLU of San Diego & Imperial Counties, ``Family Subjected
to MPP Will Not Be Returned to Mexico to Pursue Their Asylum Claim,''
Nov. 14, 2019, https://www.aclusandiego.org/family-subjected-to-mpp-
will-not-be-returned-to-mexico-to-pursue-their-asylum-claim/.
------------------------------------------------------------------------

    Furthermore, returnees subject to MPP routinely face homelessness
due to the lack of available shelter space and difficulty accessing
work, which further exposes them to risks of violent crime. Returnees
have reported having their identity documentation confiscated by
Customs and Border Protection (CBP) agents prior to return \22\ and are
not provided any identity documentation demonstrating their lawful
status in Mexico, potentially exposing them to potential detention and
deportation there. Without access to work or steady shelter, many are
relegated to living in precarious conditions, often in squalor, in
border shelters packed to the brim \23\ and in open-air tent camps.\24\
------------------------------------------------------------------------

    \22\ Julia Love & Kristina Cooke, ``Asylum seekers say U.S.
officials returned them to Mexico but kept their IDs,'' REUTERS, May
31, 2019, https://www.reuters.com/article/us-usa-immigration-returns/
asylum-seekers-say-u-s-officials-returned-them-to-mexico-but-kept-
their-ids-idUSKCN1T115L.
    \23\ Rebecca Plevin, ``Mexicali Residents Protest Shelter for
Asylum-Seekers Returned to Mexico Under U.S. Policy,'' USA Today, Oct.
15, 2019, https://www.usatoday.com/story/news/world/2019/10/15/
mexicali-protest-shelter-asylum-seekers-us-policy/3983901002/.
    \24\ Nomaan Merchant, ``Tents, Stench, Smoke: Health Risks Are
Gripping Migrant Camp,'' ASSOCIATED PRESS, Nov. 14, 2019, https://
apnews.com/337b139ed4fa4d208b93d491364e04da.
------------------------------------------------------------------------

    Finally, even individuals whose vulnerabilities should except them
from MPP are nevertheless placed in the program--including individuals
with disabilities,\25\ pregnant and nursing women,\26\ and Indigenous
language speakers.\27\ LGBTI+ identifying individuals are also placed
in the program, despite the well-documented risks of harm they face in
Mexico.\28\
------------------------------------------------------------------------

    \25\ Human Rights Watch, ``Mexico: Risks at Border for Those with
Disabilities,'' Oct. 2019, https://www.hrw.org/news/2019/10/29/mexico-
risks-border-those-disabilities.
    \26\ Rochelle Garza, ``Trump's War on Asylum-Seekers is Endangering
Pregnant Women,'' Oct. 3, 2019, https://www.aclu.org/blog/immigrants-
rights/trumps-war-asylum-seekers-endangering-pregnant-women.
    \27\ Gustavo Solis, ``Trump Administration Appears to Violate Law,
Pushes Thousands to Mexico to Await Asylum Cases,'' L.A. TIMES, Aug.
28, 2019, https://www.latimes.com/politics/story/2019-08-28/trump-
administration-pushes-thousands-to-mexico-to-await-asylum-cases.
    \28\ ``Julian Castro Helps LGBTQ Migrants Subject to Trump's Remain
in Mexico Policy,'' Oct. 7, 2019, L.A. TIMES, https://www.latimes.com/
politics/story/2019-10-07/julian-castro-helps-lgbtq-migrants-trump-
remain-in-mexico-plan-cross-border; Amnesty International, ``No Safe
Place,'' Nov. 2017, https://www.amnestyusa.org/wp-content/uploads/2017/
11/No-Safe-Place-Briefing-ENG-1.pdf.
------------------------------------------------------------------------
MPP Operates with a Chilling Lack of Transparency
    A new and alarming expansion of MPP occurred in September, when the
U.S. Government opened secretive tent courts at the ports of entry in
Laredo and Brownsville, Texas, where proceedings take place entirely

via video conference. CBP announced plans that it would raid $155 million
of disaster relief funding to build these courts.\29\

------------------------------------------------------------------------

    \29\ Amnesty International USA, ``Trump Administration Uses
Disaster Relief Funding to Fund a Disaster of Its Own Making,'' Aug.
27, 2019, https://www.amnestyusa.org/press-releases/trump-
administration-uses-disaster-relief-to-fund-a-disaster-of-its-own-
making/.

------------------------------------------------------------------------

    The tent courts are due process black holes in DHS's complete
control: Not a single public observer has been permitted to access the
tent courts to view proceedings taking place there, even though
immigration courts are generally required to be open to the public.\30\
Amnesty International has consistently requested access to the courts,
including multiple times in person in Laredo and Brownsville in
September and October. In September, an Amnesty International
delegation was told variously that the tent courts were a ``zero access
area, by order of the President of the United States,'' that attendees
would need to be ``vetted'' by CBP in order to access the courts, and
that the organization would be able to access the facilities for a tour
``in upcoming weeks.'' In October, Amnesty's formal request for access
went unanswered for weeks, until the organization was eventually told
that observation of proceedings would not be allowed, but that at some
future date, rights groups would be offered a tour. Two months since
the courts have opened, and despite repeated requests, neither Amnesty
International nor other rights groups have been granted access to the
courts.

------------------------------------------------------------------------

    \30\ 8 C.F.R. ⸹ 1003.27.

------------------------------------------------------------------------

    This lack of transparency is chilling, especially considering that
individuals appearing at the tent courts are being sent to some of the
most dangerous areas along the Mexico/U.S. border and are likely to be
in particular need of immediate assistance. The closed-off nature of
these courts also means that asylum seekers are cut off from any kind
of legal orientation or assistance, as only attorneys who have entered
appearances in individual cases are permitted in the tent courts.
    The tent courts exacerbate and compound existing problems with MPP:
Returnees appearing in tent courts face even more barriers to the full
and fair hearings to which they're entitled under law, particularly
given that judges are appearing via videoconference, sometimes from
hundreds of miles away. They are designed to keep asylum seekers away
from vital legal help and MPP proceedings out of the public eye. Unless
Congress moves to act, these secretive courts could represent the
future of asylum adjudication in the United States.
                            recommendations
    Given the serious human rights violations occurring as a result of
MPP's continued operation, Amnesty International respectfully requests
that Congress:
    Defund MPP in the fiscal year 2020 appropriations cycle.--
        Congress must halt MPP in its tracks by ensuring that no
        Federal funds are used to implement this unlawful program.
        Amnesty International urges Congress to retain Section 534 of
        H.R. 3931, the DHS Appropriations Act of 2020, which defunds
        unlawful asylum programs, including MPP. Congress must also
        demand a full accounting of the $155 million of disaster relief
        funding it unlawfully reprogrammed toward the building of tent
        courts along ports of entry and must ensure that no more such
        courts are built.
    Urge DHS and DOJ to allow public access to secretive tent
        courts.--While MPP continues to operate, Congress must ensure
        that the administration abide by its own obligations to ensure
        that immigration proceedings are generally kept open to the
        public. DHS must be held to account for its deliberate failure
        to allow members of the public, including legal observers, to
        access tent courts and observe proceedings taking place there.
    Undertake Congressional delegations to areas where MPP is
        actively in operation.--Amnesty International urges Members of
        Congress to witness first-hand the human rights violations
        taking place as a result of MPP, including proceedings taking
        place in the secretive tent courts in south Texas and living

                              AR297

conditions in the camp in Matamoros and border shelters
along the Mexico/U.S. border.
    For more information, please contact Charanya Krishnaswami,
Americas Advocacy Director[.]
            Sincerely,

                        Charanya Krishnaswami,
            Americas Advocacy Director, Amnesty International USA.

                        _____

    Statement of Cheasty Anderson, M.A., Ph.D., Senior Policy Associate,
                    Children's Defense Fund--Texas
                        Nov 18, 2019
    For 20 years, Children's Defense Fund has worked to level the
playing field for all children in Texas who cannot vote, lobby, or
speak for themselves. We champion policies and programs that lift
children out of poverty, protect them from abuse and neglect, and
ensure their access to health care, quality education, and a moral and
spiritual foundation. We thank the subcommittee for the chance to
submit a statement on the Migrant Protection Protocols (MPP) policy.
    We believe that the policies this administration has implemented
are illegal. They also deliberately exposing children and their
families to danger, and are actively causing additional trauma to
people already deeply traumatized. CDF-TX strongly believes that this
is not a policy that Congress should endorse, or even passively allow.
We urge this subcommittee to push for the immediate end to MPP, and to
demand that DHS return to admitting asylum seekers to the United States
while their applications are processed, in keeping with centuries of
historical practice.
            mpp violates international and u.s. law
    The United States, as a global leader, is expected to follow
international regulations regarding asylum seekers and refugees. As
parties to the 1967 U.N. Protocol on Refugees, and the U.N. Convention
Against Torture, the United States has a legal obligation to accept and
process asylum applicants. It also has an obligation to do so under its
own domestic law.
    MPP violates the most basic right of non-refoulement. Though the
justification for MPP rests on the idea that asylum seekers would be
safe in Mexico, this is not the case. Numerous reports detail the
extreme vulnerability of those forced to remain in Mexico under MPP.
Kidnappings, murder, lack of access to medical care, and unsafe housing
are just the beginning of the numerous ways in which MPP forces asulym
seekers into conditions which they are fleeing.
    MPP also violates U.S. laws and regulations. Customs and Border
Patrol is legally bound to provide special protections to groups
recognized as vulnerable. However, by participating in MPP, CBP is
knowingly sending children, pregnant women, sick people, and LGBTQ+
applicants back across the border, where they are vulnerable to
violence and persecution. Additionally, USCIS is not following their
obligations regarding due process. Ample evidence shows that applicants
are being hurried through rushed procedures with judges seeing upwards
of hundreds of cases per day. The number of negative decisions has
skyrocketed, while the basic profile of applicants has not changed. In
addition, USCIS has begun sending only positive (rather than negative)
decisions on for further processing by supervisors, in the hope of
overturning an applicant's positive credible fear interview decision.
What's more, USCIS credible fear policies have been changed, making it
much more difficult for an asylum seeker to pass their interviews.
These policies are, by design, making it almost impossible for an
asylum seeker to have an asylum claim accepted by the U.S. Government.
            mpp exacerbates asylum seeker trauma
    Numerous reports outline the trauma that MPP is creating. Asylum
seekers are being subject to kidnappings, violence, and deplorable
living conditions. MPP has created squalid camps on the Mexican side of
the border without providing the rights that asylum seekers and
refugees are legally entitled to. The people living in these camps have
no access to potable water, no stable shelter, and little access to
food. They are forced to wait months in order to have their first
interaction with the U.S. legal system, and frequently then asked to
wait months more for a second hearing with the court. Asylum seekers
are not showing up to their appointments at the courts, not because
they lack valid cases, but rather because they are forced to travel
                        AR298

many miles present themselves, in desperation in order to enter the United States. The administration creates unspeakable trauma by denying asylum seekers safety, and then also asking them to accomplish difficult feats with little to no resources. The Remain in Mexico policy is another step the administration is taking to dismantle the U.S.'s asylum system.

                    mpp undermines the values of our nation

    This administration has been open about its intentions regarding immigration, writ large, and asylum policy, as a subset of that overarching goal to end immigration from poor countries. Stephen Miller, the architect of the Trump administration's immigration policy, has been transparent about his goal of ending legal immigration by any means possible. But rather than working through the Congress to enact policy changes in line with the administration's political goals, they have instead ruled by fiat, bullying, and intimidating when necessary, firing career leadership and replacing those leaders with political ideologues, and tightening restrictions to the point of impenetrability for those seeking asylum from danger and violence in their country of origin.

    In doing so, they have caused children and their parents to suffer and to die. CDF-TX believes that the United States should be working to protect children and vulnerable populations, no matter where they come from. We urge the subcommittee to take the strongest possible action to shut down MPP (and the host of attendant policies) as soon as possible, and return us to a place of compassion and sanity in our treatment of those seeking safety and security within our borders.

    Thank you for your time, and for looking into this matter.

                              _____


              Statement of the Center for Victims of Torture
                          November 19, 2019

    The Center for Victims of Torture (CVT) commends the House Homeland Security Subcommittee on Border Security, Facilitation, and Operations for holding an oversight hearing on the Trump administration's ``Remain in Mexico'' policy, the implementation of which has acted as a catalyst for the humanitarian crisis taking place at the U.S. Southern Border. We appreciate the opportunity to submit this statement for the record.\1\
------------------------------------------------------------------------
    \1\ For questions or for more information about CVT's work in this area and on related issues, please contact Andrea Carcamo, senior policy counsel at the Center for Victims of Torture at acarcamo@cvt.org.
------------------------------------------------------------------------

    Founded in 1985 as an independent non-governmental organization, the Center for Victims of Torture is the oldest and largest torture survivor rehabilitation center in the United States and 1 of the 2 largest in the world. Through programs operating in the United States, the Middle East, and Africa--involving psychologists, social workers, physical therapists, physicians, psychiatrists, and nurses--CVT annually rebuilds the lives of more than 25,000 primary and secondary survivors, including children. CVT also conducts research, training, and advocacy, with each of those programs rooted in CVT's healing services. The organization's policy advocacy leverages the expertise of 5 stakeholder groups: Survivors, clinicians, human rights lawyers, operational/humanitarian aid providers, and refugee policy experts. The vast majority of CVT's clients in the United States are asylum seekers. Indeed, based on research studies the Department of Health and Human Services Office of Refugee Resettlement estimates that 44 percent of asylum seekers, asylees and refugees now living in the United States are torture survivors.\2\
------------------------------------------------------------------------
    \2\ Office of Refugee Resettlement. Survivors of Torture Program. Retrieved from https://www.acf.hhs.gov/orr/programs/survivors-of-torture.
------------------------------------------------------------------------

    the ``remain in mexico'' policy exacerbates the trauma faced by families fleeing persecution

    A significant number of the Central American families who come to the United States are survivors of torture,\3\ and many more are fleeing persecution. Because of the nature of trauma, oftentimes

                              AR299

children who accompany traumatized experience symptoms as
secondary survivors (even if they have not been directly harmed
previously). These highly traumatized populations are particularly
vulnerable to harm and to becoming re-traumatized.

--------------------------------------------------------------------
    \3\ Meyer and Pachico (Feb 1, 2018). Washington Office on Latin
America. Fact Sheet: U.S. Immigration and Central American Asylum
Seekers. Retrieved from https://www.wola.org/analysis/fact-sheet-
united-states-immigrationcentral-american-asylum-seekers/.
--------------------------------------------------------------------

    There are certain minimum requirements necessary for effective
rehabilitation for torture survivors and survivors of similarly
significant trauma, one of which is a felt-sense of safety.
    Before the Trump administration took steps to end access to asylum
in the United States, many asylum seekers would be able to stay with
family and/or friends during the pendency of their immigration
proceedings after passing a credible fear interview. This would allow
them a modicum of stability and a chance at beginning the healing
process. The Migration Protection Protocols (``MPP'') achieve precisely
the opposite, placing asylum seekers in further danger, which
exacerbates their trauma.
    According to a recent report from Human Rights First (HRF), ``[a]s
of November 19, 2019, there are at least 400 publicly-reported cases of
rape, torture, kidnapping, and other violent assaults against asylum
seekers and migrants forced to return to Mexico by the Trump
administration under this illegal scheme.''\4\ After visiting what has
become a migrant camp in Matamoros, HRF observed:

--------------------------------------------------------------------
    \4\ https://www.humanrightsfirst.org/campaign/remain-mexico.
--------------------------------------------------------------------

``More than 1,000 children, families, and adults are sleeping on the
streets in front of the Matamoros port of entry without adequate access
to water or proper sanitation, too afraid to enter the city because of
the extreme violence there. An American nurse, visiting as a volunteer,
told Human Rights First researchers that many of the children were
suffering from diarrhea and dehydration.''\5\

--------------------------------------------------------------------
    \5\ https://www.humanrightsfirst.org/sites/default/files/
hrfordersfromabove.pdf.
--------------------------------------------------------------------

    Dr. Sondra Crosby, MD, a Physicians for Human Rights (PHR) medical
expert and associate professor of medicine and public health at the
Boston University School of Medicine and Public Health, made similar
observations after visiting Matamoros:\6\

--------------------------------------------------------------------
    \6\ https://phr.org/news/phr-statement-on-migrant-protection-
protocols/.
--------------------------------------------------------------------

``As a medical professional, I am extremely alarmed by the unsafe,
unsanitary, and inhumane conditions in the large and growing migrant
encampment in Matamoros. This is a refugee camp in the making, mere
steps from the United States--but one with no form of medical services,
security, or reliable food and potable water supply for the more than

--------------------------------------------------------------------
500 people living there.''

    ``The conditions I witnessed at the Matamoros encampment include:
Lack of access to medical care, including prenatal or
        obstetric care;
Insufficient access to food and increasing risk of anemia
        and malnutrition;
Inadequate access to clean, potable water, which places
        pregnant women especially at increased risk of dehydration,
        heat stroke, and diarrheal diseases;
Insufficient infrastructure, such as latrines, to ensure
        basic sanitary conditions; and
Overcrowded living conditions in the open air that increase
        the risk of infectious diseases (respiratory diseases, measles,
        rubella, tuberculosis, and diarrheal diseases).
    ``While there are supposed to be certain protections for groups
that are in particularly vulnerable situations,'' she continued, ``what

                              AR300

I saw at Matamoros show that this is not the case. No human being should be subjected to these types of conditions.''\7\

------------------------------------------------------------------------
    \7\ https://phr.org/news/phr-statement-on-migrant-protection-protocols/.
------------------------------------------------------------------------

                     family separation as a result of mpp
    Women's Refugee Commission ``has received and confirmed numerous reports of family separation through [Remain in Mexico]. This is especially concerning given the danger involved to those returned to Mexico, the difficulty in communicating or reunifying after such a separation, and the additional potential risk of trafficking this practice creates. The separation of families in this manner is a violation of due process and presents both logistical and safety issues.''\8\

------------------------------------------------------------------------
    \8\ file:///C:/Users/Andre/Downloads/Chaos_confusion_and_danger-Remain-in-Mexico_1-.pdf.[sic]
------------------------------------------------------------------------

    This practice is cruel and will have long-lasting negative consequences for families' health and well-being, especially children. As Susan Jasko MSW, LICSW, a CVT therapist with over 20 years of clinical experience working with children and families, has explained:

    ``When children are young, they are bonding with their parents, and good bonding leads to positive relationships with other people in adolescence and adulthood. Breaking that bond can have consequences in the child's ability to socialize with others. When children come from an area where they experienced violence, it teaches them that the world is not safe. Then, when they are separated from their parent, this idea is solidified, which can have a profound effect on the development of the child. If a child lives in a state of trauma, as children fleeing conflict areas that are separated from their families do, it can affect their brain development at a biological level as well.''

    Many of the children Ms. Jasko has treated over the years were struggling with separation from or loss of parents, and all presented severe symptoms, including nightmares, fears, anxiety and depression.
    Ms. Jasko's experience is far from unique. Indeed, over 20,000 medical and mental health professionals and researchers working in the United States have previously made clear--directly to the DHS--that ``[t]he relationship of parents and children is the strongest social tie most people experience, and a threat to that tie is among the most traumatic events people can experience.''\9\ They further explained that separating a child from a parent causes an effect known as adverse childhood experience (ACE), which can lead to multiple forms of impairment and increased risk of serious mental health conditions including post-traumatic stress disorder (PTSD).

------------------------------------------------------------------------
    \9\ Physicians for Human Rights (June 14, 2018). Letter to Secretary Nielsen and Attorney General Sessions. Retrieved from https:/ /s3.amazonaws.com/PHR_other/Separation_Letter_FINAL.pdf.
------------------------------------------------------------------------

                        conclusion and recommendations
    MPP is fueling the crisis at our Southern Border, and is having a profound impact on the lives of some of the world's most vulnerable people, torture survivors among them. The practice of returning asylum seekers to Mexico and separating families must be stopped, those responsible should be held accountable, victims deserve redress, and preventive mechanisms need to be adopted.

                                _____


              Statement of Columban Center for Advocacy and Outreach
                           November 19, 2019
    As the national advocacy office representing the Missionary Society of St. Columban, the Columban Center for Advocacy and Outreach stands in solidarity with marginalized people whom Columban missionaries serve in 16 countries throughout the world. We appreciate the opportunity to submit a statement for today's hearing on the human rights and legal implications of the ``Remain in Mexico'' policy.
    Since our founding as a Catholic missionary society over 100 years

                                AR301

ago, we have welcomed through different ministries through
ministries, Columbans have accompanied and defended the rights of
migrants across the globe and in our communities and congregations here
at home. In the United States specifically, we have accompanied and
served migrants arriving at the U.S.-Mexico border for over 25 years.

Throughout the past year-and-a-half, communities of faith all along
the U.S.-Mexico border have consistently mobilized to accompany the
increase in children and families from Central America seeking safety
in the United States. They welcomed them into shelters where they
provided them with support, shelter, and responded to their trauma.

Columbans opened their arms and buildings in El Paso, TX to provide
support and shelter to those children and families. Those shelters are
now almost empty. We know, however, that this is not because people
have stopped seeking safety in the United States. Instead, Columbans in
Ciudad Juarez, Mexico are now mobilizing to provide humanitarian
services to the dramatic increase in people being forced to wait in
Mexico while their asylum claim is adjudicated.

As people of faith, we affirm the inherent dignity of every person
and the ability to seek security and safety. It is not a crime to seek
asylum. The ``Remain in Mexico'' policy operates in direct
contradiction to these moral and legal standards. It not only endangers
the lives of asylum seekers but also the credibility of our asylum
system itself.

We see the detrimental impact of this policy on people seeking
asylum through our daily ministry in Ciudad Juarez, MX. For these
reasons, we stand opposed to the policy and believe it should be
terminated immediately. While it continues to be implemented, however,
we are called to respond to the immediate needs of the people subjected
to this policy.

    human rights implications of ``remain in mexico''
When ``Remain in Mexico'' was expanded to include the El Paso
sector in February 2019, the civil society community in Ciudad Juarez,
MX were among the first to respond to the steady increase in people
returned to Mexico. Columbans began working on the ground to respond to
the immediate needs of people being returned. Our work includes efforts
such as:
  Expanding access to safe shelter space
  Coordinating transportation to ensure people have a safe way
      to return to the ports of entry for their hearings
  Coordinating donations and resources for waiting asylum
      seekers
  Assisting asylum seekers in accessing Mexican work permits
      and limited health care
  Providing emotional and spiritual support as families
      navigate increasingly complex decisions.
    Based on our experiences responding to the needs of asylum seekers
subjected to ``Remain in Mexico'', we have identified a number of
challenges faced by both humanitarian service providers and asylum
seekers themselves in the Ciudad Juarez area:
  Lack of safe and stable shelter space.--Ex. There does not
      exist adequate shelter space in Ciudad Juarez to serve all
      people subjected to ``Remain in Mexico.'' Not only is there not
      enough space but the official shelters that exist are not
      designed for long-term stays. With the wait times for asylum
      seekers under ``Remain in Mexico'' stretching into mid-2020, a
      lack of long-term shelter space presents multiple obstacles to
      safely remaining in Ciudad Juarez, especially for women and
      children, while awaiting their hearings.
    Barriers also exist to establishing safe, long-term
          shelters as the threats of violence against waiting asylum
          seekers create a chilling effect on accessing available
          buildings. Case example: Columbans are responding to the
          needs of traumatized women in ``Remain in Mexico'' by
          trying to expand access to safe, long-term, humane shelters
          where the women can create community and have access to
          support systems. These efforts are becoming increasingly
          difficult, however, as they are unable to find landlords
          willing to rent their space to migrants due to fears of
          being targeted by traffickers and cartels.
  Threats of violence.--Ex. Lack of access to safe shelter
      space, the unknown nature of the program and wait times, and
                              AR302

lack of commitment to support human rights of
asylum seekers under ``Remain in Mexico.'' Asylum seekers are
considered ``dollar signs'' by traffickers and cartels waiting
to exploit their vulnerability. Columbans provide support
services to those who have been subjected to these types of
violence, especially women and children.

Not only do asylum seekers face the possibility of
kidnapping, trafficking, and physical violence on the Mexican
side, but they are subject to violence in CBP custody as well.
Case example: Maria is a 15-year-old asylum seeker from
Guatemala. She arrived in Ciudad Juarez with her brother and
mother. When the family initially presented themselves to CBP
officers and were processed into ``Remain in Mexico,'' Maria
was subjected to physical abuse from a CBP officer that
resulted in a hand-shaped bruise on her stomach. The family now
await their next hearing date under ``Remain in Mexico'' in
fear of interacting with CBP officers again.

Lack of access to due process.--Ex. All official forms
provided by CBP are in English. This creates an obstacle to
claiming asylum as there are a lack of translation resources
available for waiting asylum seekers. This means they are
unable to both understand the forms and unable to adequately
fill them out.

Forcing people to wait in Mexico while their asylum claims are
adjudicated places them in incredibly dangerous and vulnerable
situations--which can lead to people abandoning their rightful claim to
asylum. Providing humanitarian services for people subjected to
``Remain in Mexico'' is incredibly challenging in the context of a lack
of services and infrastructure available to serve such high numbers of
people and the increasingly dangerous conditions in northern Mexico.

This change in asylum policy is not intended to process people more
humanely and efficiently or offer them better ``protection''. It is,
instead, intended to increase the danger, wait time, and level of
difficulty that must be overcome to access this life-saving protection.

The ``Remain in Mexico'' program should be terminated and instead,
resources should be focused on strengthening our existing asylum system
and Family-Based Case Management alternatives to detention. We ask that
Congress ensure no funding is available for the Department of Homeland
Security to implement this policy in the fiscal year 2020 Homeland
Security appropriations bills.

If you have any questions about this statement, please contact
Rebecca Eastwood, Advocacy Coordinator[.]

————

Statement of Church World Service (CWS)
Tuesday, November 19, 2019

As a 73-year old humanitarian organization representing 37
Protestant, Anglican, and Orthodox communions and 24 refugee
resettlement offices across 17 States, Church World Service (CWS) urges
the committee to affirm the legal right of all people to seek
protection where they feel safe and to condemn the administration's
latest anti-asylum policies that are immoral, illegal, and cruel.

CWS urges Congress to defund the administration's deadly Migrant
Protection Protocol (MPP) policy, which violates U.S. and international
legal and moral obligations.--In September 2019, the Trump
administration's policy of returning asylum seekers to Mexico was
expanded, sending men, women, and children from Cuba, El Salvador,
Guatemala, Honduras, Nicaragua, Venezuela, and other countries to wait
in the notoriously dangerous state of Tamaulipas and opening secretive
tent courts in Laredo and Brownsville, Texas, for MPP hearings. CBP
officers have sent late-term pregnant women back to Mexico under the
MPP policy, despite the fact that individuals with known health issues
are supposed to be exempted from the program. In one case, doctors gave
a woman who was already experiencing contractions medication to stop
the contractions so that she could be sent back across the border to
Mexico. This policy delivers nearly 50,000 children, their families,
and other asylum seekers to areas so plagued by violence that the State
Department has designated the state of Tamaulipas a Level 4 threat
risk--the same warning as Afghanistan, Iraq, Syria, Somalia, North
Korea, and Yemen. Some 26,000 are stranded in Mexico due to metering--
the illegal policy of turning back asylum applicants at ports of entry.

<div align="center">AR303</div>

The Trump administration's continued attacks on asylum seekers and immigrants and choke off access to the asylum system, including through family separation and child and family detention.--DHS detention is plagued with systemic abuse and inadequate access to medical care. Numerous reports have revealed the systemic human rights abuses, sexual assaults, and dehumanizing conditions that exist in the detention facilities. These exceedingly overcrowded detention centers are unsanitary, unhealthy, unsafe, and are leading to extreme, and sometimes fatal, mental and physical health outcomes for children. At least 7 Central American children died in U.S. custody between September 2018 and May 2019. Between fiscal year 2016 and fiscal year 2020, the administration nearly doubled immigration-related detention, from 30,539 beds in 2016 to 54,000 beds in 2020. CWS demands that Congress reject any proposal that would expand family, child, or immigrant detention--or violate the Flores agreement's long-standing consensus that children should not be detained for longer than 20 days.

CWS condemns the administration's dangerous asylum ban and urges Congress to protect individuals' legal right to seek asylum in the United States.--The administration announced an interim final rule that bans those who seek safety at the U.S. border from asylum protections if they travel through another country en route to the United States, known as the Third-Country Transit Bar that went into effect September 2019. This asylum ban is immoral, illegal, and cruel--and is diametrically opposed to our Nation's values of compassion and welcome. This policy requires asylum seekers to stay in the very same unsafe countries that many migrants are fleeing, banning virtually all asylum seekers entering the United States by the Southern Border, including those in MPP from receiving asylum. This bar applies to all non-Mexican asylum seekers, even those who are fleeing the most horrid circumstances and those in protected categories.

CWS is equally troubled by proposals that would weaken or eliminate provisions in the Trafficking Victims Protection Reauthorization Act (TVPRA), which provides important procedural protections for unaccompanied children in order to accurately determine if they are eligible for relief as victims of trafficking or persecution.-- Weakening existing legal protections, especially for children, undermines the United States' moral authority as a leader in combating human trafficking and increases vulnerabilities for trafficking victims by curtailing access to due process, legal representation, and child-appropriate services.

As a faith-based organization, we urge Congress to hold the administration accountable to respecting the humanity and dignity of all immigrant families, asylum seekers, and unaccompanied children seeking protection.

————

Statement of Families Belong Together
November 19, 2019

Chairwoman Rice, Ranking Member Higgins, and Members of the subcommittee, Families Belong Together respectfully requests that this statement made be part of the record for the November 19, 2019 hearing, ``Examining the Human Rights and Legal Implications of DHS's ``Remain in Mexico'' Policy.

Led by the National Domestic Workers Alliance (NDWA), Families Belong Together was formed in June 2018 in response to the Trump administration's zero tolerance immigration policy that cruelly separated migrant children and families who have arrived at the U.S.-Mexico border seeking asylum. The Families Belong Together coalition includes nearly 250 organizations representing Americans from all backgrounds across the country who have come together to end family separation and detention and to reunite all families who remain torn apart. We have mobilized hundreds of thousands of people across the country to take action to promote dignity, unity, and compassion for all children and families and to ensure that the Flores Agreement, a decades-old settlement that provides standards for detention and treatment of migrant children in immigration custody, is not gutted by the administration.

This year, Families Belong Together opened an office in Tijuana, Mexico to provide much-needed services to asylum seekers who are languishing in Tijuana as a result of such policies as ``Remain in Mexico'' (formerly known as ``Migrant Protection Protocols'') and

AR304

metering. Other critical services our project provides include legal support, counseling, and delivery of material goods such as tents, clean drinking water, and mattresses.

``Remain in Mexico'' policy exposes asylum seekers to the very harm and violence from which they are fleeing, violates due process and international legal obligations, and causes irreparable psychological harm to vulnerable children and families.

          ``remain in mexico'' policy forcibly subjects asylum-seekers to the
                    same kind of harm and violence from which they fled

Since January 2019, over 55,000 people seeking asylum in the United States, of which 15,500 are children and 500 infants, have been forcibly returned to Mexico under ``Remain in Mexico'' policy.\1\ In addition, some 26,000 are stranded in Mexico due to metering, an illegal policy that turns back asylum applicants at ports of entry.\2\ These policies have forcibly subjected vulnerable children and families to the same kind of violence and other life-threatening conditions in Mexico from which they fled with extremely limited access to legal and humanitarian support. According to one estimate, nearly 400 people have faced kidnapping, extortion, sexual assault, and violent crimes as a result of ``Remain in Mexico'' policy.\3\ Many of the asylum seekers we serve in Tijuana have shared their own fears of persecution, violence, and extortion as they await their hearings in Mexico border cities. These border cities are so plagued by violence that the U.S. State Department has designated the state of Tamaulipas a Level 4 threat risk and warned that ``[v]iolent crime, such as murder, armed robbery, carjacking, kidnapping, extortion, and sexual assault, is common. Gang activity, including gun battles and blockades, is widespread.''\4\
--------------------------------------------------------------------
    \1\ ``Assessment of the Migrant Protection Protocols (MPP)'', Dept of Homeland Security. 28 Oct. 2019. https://bit.ly/2OebkaY.
    \2\ ``Orders from Above: Massive Human Rights Abuses Under Trump Administration Return to Mexico Policy'' Human Rights First. 1 Oct. 2019. https://bit.ly/2Ksn0ps.
    \3\ ``Remain in Mexico'' LAWG. 15 Nov. 2019. https://bit.ly/2CNYHOr.
    \4\ ``Deliver to Danger'' Human Rights First. Aug. 2019. https://bit.ly/2rQRiM4.
--------------------------------------------------------------------
    Another study found that between 21 percent and 24 percent of migrants in the Remain in Mexico program report receiving threats of violence while in Mexico, and of those, over 50 percent report that the threats turned into actual violence, including beatings, robbery, and extortion.\5\ According to a recent report by U.S. Immigration Policy Center, the length of time spent waiting in Mexico is statistically significantly related to being threatened with physical violence. At 88.6 days spent waiting in Mexico, which is the average length of time in between being processed by U.S. immigration officials (i.e., being returned to Mexico) and the immigration court dates of surveyed respondents, the predicted probability of being threatened with physical violence is 32.0 percent.\6\ During these prolonged wait periods, families are often homeless, unemployed, and do not have access to basic material goods, making them more susceptible to extortion and kidnapping.
--------------------------------------------------------------------
    \5\ Wong, Tom. ``Seeking Asylum Part 2'' US Immigration Policy Center. (2019) https://bit.ly/2KtzKvV.
    \6\ Ibid.
--------------------------------------------------------------------
    In short, ``Remain in Mexico'' policy is punitive, punishing instead of protecting vulnerable and desperate children and families.
``remain in mexico'' policy causes irreparable trauma to asylum seekers

          ``Remain in Mexico'' policy has caused irreparable harm and trauma to children and families as they wait in limbo for upwards of 2 years for their next court date. Every day our Tijuana team provides counseling to families who express a profound sense of hopelessness for their future and are deeply distressed that they will continue to live in dangerous and precarious conditions.

          For instance, one family we have been counseling has been living in peril in Tijuana for more than 8 months, and they have only had 2 court hearings. This family had fled violence and extreme poverty in their home country and is experiencing trauma again and again as they face

AR305

on-going poverty and violence in fear of remain uncertainty that
they will find safety and stability in their lives.

     Many of the women we provide counseling to have escaped gender-
based and sexual violence and are desperate for their lives as they
seek protection in a safe haven.

     One such case is of Laura, a young mother of 3 who fled violence in
Honduras only to face similar conditions in Tijuana. Laura*\7\ was
stranded in the desert with her 3 children, including a young daughter
who is only 8 years old. After walking for nearly 6 hours, they were
picked up by Customs and Border Protection (CBP) officers. Laura and
her children were taken into ``La Hielera'' or a detention center where
she was detained in overcrowded facility for 9 days with no access to
natural light, showers, or medical care. During this time CBP officers
attempted to separate Laura from her 16-year-old son but he was able to
remain with his mother due to a previous medical condition. After 9
long days, Laura and her children were flown to the San Ysidro port of
entry and then returned to Tijuana, Mexico with no money or information
as to next steps. Since then, Laura and her family live in unstable
conditions at shelters not knowing what will come next. Concerns of a
chickenpox outbreak and unhygienic conditions at the shelter are a
concern for the mother of 3. Laura's first hearing was in October 2019
and the next hearing date will not be until February 2020. Laura
remains anxious for her children's safety in Tijuana and whether she
will be forced to return to gang violence in Honduras.
--------------------------------------------------------------------
     \7\ * Name changed for privacy.
--------------------------------------------------------------------

     Women and children remain vulnerable to sexual violence and harm
while waiting for their cases in Mexico. We have met several women with
small children who, after waiting nearly 6 months under the policy,
have decided to voluntarily return to their home countries unsure of
whether they will survive the violence and harm. The Remain in Mexico
policy has caused irreparable trauma to thousands of children and
families. Remain in Mexico is an inhumane and cruel policy and no
family should live in the constant fear of being returned to
persecution and violence.
  ``remain in mexico'' policy impedes asylum seekers' due process rights
     The Remain in Mexico policy impedes asylum seekers' due process
rights, including access to counsel by barring them from entering the
country and thus making it virtually impossible for them to find a
lawyer for their cases. Approximately 98 percent of the 47,313 asylum-
seekers in the Remain in Mexico program were unrepresented as of
September 2019.\8\ Our Tijuana team works with legal organizations to
run legal clinics, where we help asylum seekers to fill out the I-589
asylum application form. However, this legal clinic is not a substitute
for legal representation to navigate the complicated asylum process,
and the demand for such assistance is overwhelming, where we are
experiencing challenges to meet such demand every day.
--------------------------------------------------------------------
     \8\ ``Details on MPP (Remain in Mexico) Deportation Proceedings'',
TRAC IMMIGRATION (Sep. 2019), https://trac.syr.edu/phptools/
immigration/mpp/ (``Measure'' as ``Current Status;'' check ``Graph Time
Scale'' as ``by Month and Year;'' select ``Hearing Location'' on left-
most drop-down menu; select ``Represented'' on center drop-down menu;
check ``Represented'' on right-most drop-down menu).
--------------------------------------------------------------------

     The policy further impedes asylum seekers' access to due process as
vulnerable children and families are forced to travel hundreds of
miles, in extremely dangerous conditions, to attend their court
hearings in the United States. Since March 2019, the Tijuana team has
provided transportation for over 1,500 individuals to ports of entry
for their hearings in the United States.

     In one such case, an Indigenous family of 7 made an arduous, 6-
hour-long, 250-mile journey from Mexicali to San Diego to attend their
asylum hearing:

``An Indigenous family with 5 minor children requested asylum at the
Calexico port of entry and were sent back to Mexicali. In order to
attend their hearings at the San Diego court, the family bought 7 bus
tickets and traveled 3 hours from Calexico to the city of Tijuana. For
a 9 o'clock a.m. asylum hearing, the family woke up at 3 o'clock a.m.

AR306

and arrived at the government port of entry to enlist. Once they entered the United States they were transported to the court and remained there for almost the entire day. After their hearing, they returned to Tijuana in the late evening, a place not only unknown but extremely unsafe for them, especially during late hours. From there they took a midnight bus to their shelter in Mexicali. Despite the dangerous conditions, the parents and small children continue to make this perilous journey each time they have a hearing, which range between every 1 to 4 months.''

The policy also impedes access to due process by sending asylum seekers to temporary tent facilities which serve as virtual immigration courtrooms for Remain in Mexico cases. This is a sham: The judges appear remotely via video from traditional courtrooms; and it is reported that the unreliable wifi makes communication and language interpretation between the judge and asylum seekers near impossible, which is a detriment for all affirmative asylum cases.

                              recommendations

Remain in Mexico is a dangerous and unlawful policy which undermines domestic and international legal protections and forcibly subjects asylum seekers to life-threatening violence and trauma. We urge Congress to take the necessary steps to:

    Defund the Remain in Mexico policy and restore due process
        rights for asylum seekers.
    Allow the public access to tent court facilities until the
        Remain in Mexico policy is halted to ensure fairness and
        transparency for asylum seekers.
    Conduct oversight of and direct U.S. Customs and Border
        Protection (CBP) to restore timely and orderly asylum
        processing at ports of entry and ensure humane conditions for
        those held temporarily under CBP custody, meeting all legal
        standards, including the Flores Settlement Agreement and DHS
        internal detention policies.

We appreciate the opportunity to submit our statement to the subcommittee on this topic. If you have any questions regarding our statement please contact Haeyoung Yoon, Senior Immigration Policy Director[.]

                              _____

Statement of Laura Belous, Esq., Advocacy Attorney, Florence Immigrant
                    and Refugee Rights Project

The Florence Immigrant and Refugee Rights Project is a 501(c)(3) non-profit organization that provides free legal and social services to the nearly 6,600 immigrant men, women, and children detained in immigration custody in Arizona on any given day. As the only non-profit organization in Arizona providing free legal services to people in immigration detention, our vision is to ensure that every person facing removal proceedings has access to counsel, understands their rights under the law, and is treated fairly and humanely.

The Florence Project was founded in 1989 to provide free legal services in a remote immigration detention center in Florence, Arizona. We have expanded significantly since that time, and now provide free legal services to unaccompanied children facing removal proceedings in Arizona. The Florence Project represents children before the USCIS and EOIR on a wide variety of applications, including I-360 Special Immigrant Juvenile Status (SIJ) Petitions and I-485 Application for Adjustment of Status, among others.

The Florence Project is concerned that young people are not receiving full and fair hearings under the MPP program. As a result, some of our clients have forced by necessity to leave their parents and enter the United States as unaccompanied minors. This is deeply traumatic to these children and parents and a very ineffective way to process these cases. Forcing a child to choose between staying with his parents and seeking safety is fundamentally unfair.

To illustrate the desperation that our clients experience, we share the following client story. Names and some identifying information have been changed in order to protect his privacy.

Juan and his mother came to the United States to flee gang violence in El Salvador. Gang members were actively trying to recruit 16-year-old Juan and threatened him multiple times. He refused to join or work for them. A few days later, they came to his house to look for him.

AR307

Although Juan and his mother's one gang member attacked his mother and left her bruised and with a bloody nose.

Juan and his mother fled to the United States. When they arrived at the border, agents told them that the laws had changed and they now had to wait in Mexico.

Juan and his mother filed for asylum and submitted the police report they made, as well as the hospital records showing that Juan's mother required treatment for the assault.

Juan and his mother were taken to Tijuana, then to Mexicali, and back to Tijuana to wait for their court hearings. They stayed in a migrant shelter that was so overcrowded it had to start turning people away. They went to court in San Diego 3 times. Juan estimates there were about 18 days between the first and second hearings, and about 3 weeks between the second and third.

Juan and his mother had their final hearing in October. The judge denied their claim.

Juan and his mother knew that there was no future for him in Tijuana. The shelter was overcrowded and his mother became increasingly desperate because she felt that there was no way to support her son there or for him to continue his education. Juan and his mother made the decision for Juan to come to the United States alone where they hoped that he could receive protection from the gangs threatening to kill him in El Salvador. He entered the United States as an unaccompanied child and left his mother in Mexico.

For the reasons stated above, the Florence Project strongly objects to MPP because it results in family separation, fundamentally unfair hearings, and unnecessary detention of children.

————

Statement of Jodi Goodwin, Esq., Law Office of Jodi Goodwin, Harlingen, TX
Monday, November 18, 2019

Chairwoman Rice, Ranking Member Higgins, and subcommittee Members, I am an immigration attorney in private practice in the Rio Grande Valley along the Texas border with Mexico. I have been an immigration lawyer here for more than 20 years. From this perspective, I am submitting reflections on what I have witnessed regarding the Remain in Mexico ``Migrant Protection Protocols'' in Brownsville and Harlingen, Texas, and Matamoros, Tamaulipas, Texas. These are my public Facebook posts that I have collected. Please excuse the informal nature of these writings. However, I feel it is necessary for the subcommittee to know as much about the actual reality of MPP as possible. This is an account of how MPP has unfolded in just one location among many. Thank you for the opportunity to be heard.
September 15, 2019
https://www.facebook.com/
        photo.php?fbid=10217008037407814&set=a.1231099932310&type=3&thea
ter

Long post . . . please read. Especially if you are an immigration Judge or an ICE attorney.

Two days. 100 degrees. And a beautiful rainbow to start our second day this weekend in Matamoros with Project MPP Matamoros. We saw about 80 plus principal applicants (that means we didn't count spouses and children so the real reach is much higher) to help them understand immigration court proceedings and asylum applications.

But not just that . . . today I met with 5 pregnant or just had their babies in the last week women. One thrown back into Mexico after CBP had taken her to hospital to stop her contractions, one so heavily pregnant she spent 7 days in the hielera only to be sent to Mexico to give birth less than 12 hours after CBP threw her back. Another 13 weeks along dehydrated, sick, living in inhumane conditions on the streets of Mexico that she fainted and then began vomiting. No one from the Mexican authorities came to assist. Myself and some other refugees grabbed some chairs to make a makeshift bed, had her drink rehydration salts and used peppermint oil to bring her back after the fainting spell. More electrolytes, water, and a granola bar I had in my bag. It took about 40 minutes until her pupils returned to normal. Luckily, a Cuban refugee with some EMT training was barking orders for us to try to find the various things he thought could help her all while checking her vitals super old school style with a watch to count her pulse and

listening to her drivel about New Hampshire beer. I guess
street lawyering means you are also a nurse/EMT.

There are so many stories I can tell. MPP is wrong on a moral
level. MPP is wrong legally.

Then there are all the court documents that have fake addresses
where CBP puts in an address to a shelter that no one can get in. They
are homeless. But the judges buy those fake addresses and use them to
deport people. The ``tear sheets'' which are supposed to instruct
refugees how to appear to court are either not given at all or given
with wrong information telling them to appear at the bridge at the same
time their hearing is supposed to start which ensures they will not
make it to their hearing on time. Then there are those thrown back
without even giving them their court documents. When they go to the
bridge to ask about their paperwork they are told CBP doesn't handle
that . . . when in fact it is CBP who does! How in the world are
refugees supposed to know when and where to go to court when CBP won't
even give them the court documents. And of course I cannot fail to
mention all the defects in the court charging documents . . . it goes
on and on.

We are better than this. The humanitarian crisis has not gone away.
It is just south of the border and worse than ever. In 24 years as a
lawyer I have never seen so much extreme cruelty. If you are a lawyer
and have some time to work remotely on document preparation contact me.
If you are a Spanish Speaking Immigration lawyer with asylum law
experience, we could use you for 4 days of your life from Friday to
Monday.
September 7, 2019
https://www.facebook.com/jodi.goodwin.5/posts/10217021837512808

My client was told to show up at the bridge at 4:30 am for a 12:30
pm hearing. Why? What does it take 8 hours to let a mom and her 2
children into the tent courts?

They took their shoelaces . . . again.

That waiting room for children they showed off in tours that was
filled with colorful shelves of toys, books, and crayons . . . nah the
4 year old and 10 year old didn't get to play for the hours they
waited.

No breakfast, no lunch. One bottle of water for each and some
Sabritas.

Fake addresses on documents the government filed in court.

No simultaneous interpretation.

Can't talk to your client after court . . . CBP says it is not
allowed but has nothing to show what the rules are.

The port o potties already stink . . . Lord knows what that place
will smell like when they start running 3 full master dockets at a time
next week. Gross.

And don't think of walking into the CBP office at the bridge to say
you are there for court. No one knows where to tell you to go. Here's a
little pro tip . . . skip the CBP office and just walk down the street
to the second Sally port gate with razor wire . . . you just stand in
front of it until someone comes. That is the lawyer entrance.

And this is for someone that has counsel . . .

MPP is a farce and mockery of the immigration court system, of
justice, and so many stand by idly as if there is nothing to see,
nothing wrong, nothing unjust. Errors and lies are just overlooked . .
. meanwhile more people die.

History will write this story.
October 1, 2019
https://www.facebook.com/jodi.goodwin.5/posts/10217127856283211
                Tales from MPP

Sleep deprivation is a form of torture and has serious effects on
the cognitive ability to understand and process thoughts. It affects a
human body's core biological functions.

MPP is torture. Waking at 2:30 am or not sleeping at all due to the
dangers on the streets of a level 4 security threat zone and then being
required to show up in the middle of the night to present yourself for
court is torture. After you present at the border you are shuffled
through processing, medical screenings, waiting areas, and finally
taken to court where you are expected to understand everything.

But the court is not a real court. It is a giant screen. And no one
interprets what is being said in that courtroom unless you are lucky
enough to have a lawyer demand it. Otherwise only direct questions are

AR309

interpreter to you. You are tired, lonely, and confused.

You leave the ``court'' and have no idea what just happened. And they make you wait and shuffle you from waiting areas for hours. You are forced (not ``allowed'' as one judge puts it) back to another country where you live on the streets. No sleep still.

Back in Mexico you have to get a permit to be there and they make you wait again for hours.

My clients were up for over 24 hours just to be at their hearings. They are all questioning what in the world happened at those hearings. For them, they are lucky I can explain. What about those, the overwhelming majority, without lawyers. Without the ability to ask questions and get answers from the judicial system supposedly hearing their claims? How can anyone be expected to fully comprehend what is happening in court?

Oh . . . and imagine that you are a child . . . MPP tortures you, too.

October 2, 2019
https://www.facebook.com/jodi.goodwin.5/posts/10217135616237205
        Tales from MPP

It is 11:44 am. I have already been to Brownsville twice, Mexico once, and back to Harlingen again.

MPP affects the regular docket of the immigration courts, too. Judges are quick to reset cases because they have to finish their regular docket to be able to start the MPP docket on time. In my case, we could have resolved an issue if the court had one copy of a document for the government attorney (he wasn't prepared with enough copies). But making the copy and letting me review it so we could resolve the issue would have taken too many minutes I suppose. So we got pushed down the road for another 5 months for something that might have taken 10 minutes tops.

No worries . . . judge will be able to make his case completion goal for his performance review by ordering all those in MPP deported in their absence. Immigration ``Courts'' belong in the Department of INjustice.

I am not so sure that Immigration Judges are disinterested parties any longer . . . their job depends on numbers not the impartial imparting of justice.

October 9, 2019
https://www.facebook.com/
        photo.php?fbid=10217198533850106&set=a.1487242295709&type=3&thea
        ter
        Tales from MPP

MPP has created the largest refugee crisis in the Western Hemisphere since the mass exodus of Cuba.

Let's just call a spade a spade. No spin, the photo below shows a portion of a refugee camp that houses about 1,000 people so far. It grows each day as 120 or so people arrive daily at the camp. There is NO international presence of NGO's to operate this refugee camp. In a matter of weeks it will swell to 1,500 and then 2,000. The growth outpaces the capacity of local humanitarian aid organizations and legal service providers.

Intentional infliction of human suffering is not good. Abiding by and saying or doing nothing because you are ``following orders'' makes you no different from the Nazi Doctor's who threw aside their Hypocratic Oath to ``do no harm.''

MPP is a Refugee Camp full of human suffering.

October 10, 2019
https://www.facebook.com/
        photo.php?fbid=10217206767695947&set=a.1487242295709&type=3&thea
        ter#
        Tales from MPP

MPP is human suffering on scales not seen the United States for decades. It is intentional aforethought by operatives within our government.

MPP is the Migrant Protection Protocol. Protection, you ask, from who?

Protection from brown babies. This picture taken by a Mexican journalist tells the entire MPP story in one image. The entire might and power of a government that is run by fear mongering racists against the tiny brown babies of the world.

But what you don't know is THAT is my brown baby. That is your

<div align="center">AR310</div>

brown baby that is your neighbor . . . maybe that is the brown baby
of the ``good illegal'' that cares for your kids, cuts your yard,
cleans your home and cooks your meals.

We have a shared privileged responsibility to stand up,speak up,
for the brown babies of the world.

MPP is straight up systematic institutional racism.
October 21, 2019
https://www.facebook.com/jodi.goodwin.5/posts/10217312137050115
        Tales from MPP

It's almost 2 am and there is a tornado warning. Rain comes down
sideways and the electricity just went off. I just woke up to the
thunder.

Meanwhile, my homeless client with 2 children is expected to make
her way to the bridge in about an hour to be processed to make it to
court for 8:30 am. I hope she can get there. I hope she can find
shelter out of the rain. I hope her children's clothes and shoes being
wet in the frigid temperatures of the CBP holding tent won't get them
sick. I hope her clothes will dry out before court. I hope she will be
able to focus because I know she nor her children will have slept
tonight.

She and the children have a place to go where there is a warm bed,
a bathroom, and loving family. A safe place. In the US. Away from the
dangers of street life in Matamoros.

How many people won't make it to court tomorrow morning? Is the
weather an exceptional circumstance? Or will the judges just rack up
points for their performance review quotas and order them all removed?

MPP is misguided and cruel.
October 21, 2019
https://www.facebook.com/jodi.goodwin.5/posts/10217316085988836
        Tales from MPP

You won't believe the sham that is MPP court process. Seriously, I
can't make this stuff up!

I am a lawyer so I know my way around the court, around CBP, around
DHS and FPS . . . this is a sampling of one half of 1 day. Now imagine
you are not a lawyer and do not speak the language of the court. Read
on.

My clients do everything right, the legal way. They wait their turn
to apply for asylum at the bridge . . . wait for months due to
metering. They are sent back to Mexico to wait for court. They wait for
months. They prepare their asylum application and try to file it with
the court only to be rejected over and over again because CBP has never
filed the charges with the court.

Sitting in a tent in a refugee camp they were able to do their job.
Why can't CBP? They lost the paperwork and need to redo it. I send the
clients back to the bridge to redo it. CBP still doesn't file. My
clients' asylum application is rejected again.

But wait, the papers they were given say there is court on the 1st
of November, the court says the hearing is on the 6th. How will they be
notified? Will the court send a carrier pigeon into the refugee camp
with notice? I ask and the Court Administrator just shrugs her
shoulders. IDK

Next . . . go to the tents. Five officers tell me my clients did
not appear which I know to be false. I have to keep insisting. Court is
about to start. They still don't even know my clients are in their
custody. Just like family separation, CBP doesn't even know who they
have. They are found but only after I insist. What about those that
don't have a lawyer which is most . . . will CBP just lose them and not
take them to court?

My client's son is squirming and crying. He just turned 4. He is
starving having been in CBP custody since the wee hours of the morning
and not being given anything to eat. I am incredulous to hear this.
When will CBP learn they are required by law to provide milk, juice and
snacks to children! No food was given to his mother or sister either.
Sleepy, cold, and hungry . . . that is how they are expected to go to a
court that determines life or death to them.

Then I find out that the entire 12:30 docket was reset to 8:30 in
the morning . . . 4 hours earlier. How in the world would refugees in
the refugee camp every know this? I suppose the same carrier pigeons
from above would rush over I. The [sic] middle of the night to tell
them to come to court early. Nah . . . no notice or anything, the court
just goes ahead and orders those without telepathic capabilities

AR311

removed because they got no notice their hearings would be 24 hours earlier.

Fundamental fairness requires that proceedings be translated. We already know the court has no ability to conduct simultaneous translation . . . but today the court would not even do consecutive translation opting instead to just summarize everything at the end of the hearing.

MPP is a sham at all levels.
October 30, 2019
https://www.facebook.com/
photo.php?fbid=10217392656463050&set=a.1231099932310&type=3&thea
ter

Tales from MPP

MPP brings amazing souls together for one goal: justice.

This is a pro bono asylum case for a family of four from Venezuela. Uncountable hours of work went into crossing into a Level 4 Security Threat assessment zone just to be able to get their story, their evidence, and prepare them for courts.

Even more uncountable hours by pro bono translators to assist in the multitude of documents that needed translation. Hundreds and hundreds of copies (we had to change the toner in the copier in the middle of it).

All this . . . so that there is a chance for justice and due process to prevail.

But do not fret dear Immigration Judge and ICE Trial Attorney, the index makes it all clear with succinct summaries and selected portions of the supporting documents detailed with countless hours put in by our law school intern, too.

So many people coming together to make justice happen . . . hope the judge is on our side.

MPP brings amazing souls together.
November 2, 2019
https://www.facebook.com/
photo.php?fbid=10217421993716463&set=a.1487242295709&type=3&thea
ter

Tales from MPP

MPP is unfair.

I have always wanted to write a legal brief where my argument was simply, this is unfair. I have never done it, but certainly thought about it many times.

Imagine this, you are an asylum seeker living on the streets in a Level 4 Security Threat Assessment zone. You cannot be sure when is the next time you will get food. You have no sanitary place to use the restroom. There are only a handful of extremely brave lawyers that are willing to cross into the dangerous place you live to help you with your asylum case.

When the lawyers go to Mexico hundreds of people line up to talk to them. The lawyers have to leave and go back to the United States when it gets dark because it is unsafe. You have tried each time to get a moment to speak to the lawyers, but with so many people you turn has not come up yet. You are trying your best to survive and to get legal help.

Now imagine this, you sleep comfortably, had a hot breakfast, went to you air conditioned office and began your day. You have court that day and instead of showing empathy for the situation of those appearing before you and the awful inhumane conditions in which they live in a make-shift refugee camp, you scold those that did not come before you with all their documents in order missing translations or simply not ready yet. You tell those appearing before you that you will deport them. Scold is the only word I can think of to translate what the refugees in Matamoros have told me has happened to them in court. They use the word reganar. It reminds me of being talked down to as a kindergartener. They leave court not exactly knowing what the judge wants from them, but desperately seeking help.

Dear Immigration Judge, please do not scold (reganar) those who are trying their best in some really awful conditions. Please understand that there are only two lawyers that regularly (weekly) cross to Mexico to assist thousands. Please understand that the process of MPP makes it incredibly difficult to represent a person. We are trying to recruit other lawyers to take cases either for hire or pro bono, but it is hard . . . not everyone is willing to put their life in danger. Please

AR312

understand that those who are awakened from their sleep in the night and didn't get to have breakfast. Please understand that this is not traffic court, these are death penalty cases. You see the picture below, that is one lawyer, for hundreds.

But yet . . . when the government presents documents that are incorrectly filled out, contain falsities, or they don't bother to bring their file or be prepared with the correct documents, they don't get scolded (reganado). There is a double standard that is so tilted it is unfair.

How about delivering justice, fair and impartial justice? Is it too much to ask that everyone actually has a fair shake in court? Ya no los regana.

MPP is unfair.

November 10, 2019
https://www.facebook.com/jodi.goodwin.5/posts/10217487309029305
        Tales from MPP

MPP is state created danger.

When you ask for asylum in the US it means you seek protection not further harm. The treatment of individuals in MPP is intentional harm at the hands of various agencies of the US government including CBP, ICE and EOIR.

As I was answering legal questions and helping prepare people for their upcoming court dates, a visibly shaken and tortured woman approached. She was just released from her kidnappers of 8 days. She was returned to Mexico by CBP when she and her 4 years son asked for asylum in the US. Upon return, she waited for hours in Mexican immigration to be given a permit to remain in Mexico until her court date in the illegal tent courts. Within an hour of being released from Mexican immigration, and just outside of the immigration building on the plaza where the refugee camp is . . . she and her son were picked up by evil kidnappers.

The next 8 days are a blur of torture and awful treatment by organized crime in Mexico. Thousands of dollars later, she is released to relatives from the US that travel to Mexico to save her. Those same relatives that could have cared for her and her son in the US while waiting for court for their asylum claim.

This is just one story that unfolded before me today in Mexico. Perhaps later I will have the strength to write about the 7 year old girl kidnapped and raped in front of her parents. Kidnapped from the same plaza where the refugee camp is located. They, too, have a place to go to be safe in the US.

Much like the intentional emotional harm inflicted on parents and children that are separated by CBP, MPP causes purposeful harm. One court has already ordered the US government to make reparations for the harm caused by family separation.

MPP is state created danger.

November 18, 2019
https://www.facebook.com/jodi.goodwin.5/posts/10217558216961959
        Tales from MPP

It has been a while. Things are shifting. The last week has been a roller coaster.

A sweet hoard of children group-hugging me . . . ``usted es la abogada Jodi?'' Si, yo soy!

A wholesale stonewall by CBP to process refugees for non-refoulement interviews, illegal of course.

A trial attorney that, again, has not done their job and showed up in court without background checks despite their duty to do so and the fact they can do these checks with the touch of a button. So a family stays in Mexico for yet another week despite the fact the judge intends to grant asylum to them.

A good judge quits. A judge that has a heart. A judge that is smart. A judge that was not a yes man. And will certainly be replaced by yet another judge with no experience in immigration law and only out to meet some BS quotas to make their boss happy and get a great performance review for completing cases. Well doesn't that just suck?

A sick baby is left on the bridge in frigid weather in an act of extreme cruelty by CBP despite being with a doctor and despite bringing CBP's own medical staff out in the cold to evaluate the baby on the bridge. All agreed she needed to be treated. Yet it was 3.5 hours in the cold and 1.5 hours processing them before we could rush the baby to the Emergency Room at the nearest hospital.

AR313

An encounter with a woman and her son who was being released moments earlier after 8 days of being kidnapped. Shock, signs of torture, extreme fear, looking back across her shoulder. Scared to death I gave her options of either trying to cross immediately to ask for an NRI or go to the Mexican authorities. She went to talk to a family member waiting on the other side of the plaza to ask for their opinion, she disappeared. That boy . . . 4 tiny little years . . . that boy! I cry at night thinking of that boy.

Transcribing phone conversations of ransom negotiations between organized crime kidnappers and loving family in the U.S. Do I really do this? Our government is complicit in kidnapping . . . plain and simple. Those people were kidnapped just outside of the Mexican immigration building less than an hour after they were sent back under MPP.

So many in the refugee camp are set for trial now. It seems the government has some type of orders to reserve appeal on all cases no matter the strength of the claim. Reason and rule of law be damned.

A mom approaches me . . . she sent her 3 and 5 year old to the bridge by themselves. She hopes they will be released to their father. But hasn't heard from the children for 4 days . . . no one will tell her nor their father where the children are. Read that again . . . 3 and 5 year old!

A government submission so far slanted regarding the conditions in Venezuela that even the State Department Report refutes it. What kind of instructions are these TAs being given?

People need lawyers to represent them in their cases before the judges. There are so many that will simply be railroaded by complicit judges and TAs despite the fact that the claims are valid and strong.

A badass lawyer comes with me to tent court and to the Refugee Camp to see for himself, to try to understand and help us use technology to help many. I am so hopeful this technology will work.

Refugees themselves, local volunteers, and volunteers from afar all beg for me to do individual cases . . . to represent them. The need is so great and the hours in each day are so few.

My last thoughts as I leave the Refugee Camp . . . I don't feel well, I need to lay down. I need strength for another day . . . another week. And then the King of the Camp appears to give me one of his signature squeeze hugs. It hurts my abdomen.

————

Statement of Marsha R. Griffin, MD, Border Pediatrician, Member of the American Academy of Pediatrics' Council on Immigrant Child and Family Health, Brownsville, Texas

Greetings from all of us on the border, physicians, attorneys, advocates, and friends, all of us fighting like you for basic human rights and dignity for asylum-seeking families and children.

Last summer, a fury of protests were lifted against the conditions within the Customs and Border Protection processing centers, commonly referred to as ``Las Hieleras''. The facilities were overcrowded and dirty, children separated from their parents and packed into chain-link cages. Families went days without a shower or change of clothes, even those who were forced to sleep outside in the parking lot of the facility, with no protection from the rain. The lights inside the processing centers were kept on 24 hours a day, and there was no way to tell day from night. There were no clocks, and so no way to mark the time. Children did not sleep; parents worried, rightly, that they might have their children taken from them.

The detainees, men, women, and children, were fed the same meal: A cookie and an apple in the morning, a semi-defrosted bologna sandwiches on white bread at lunch, a half-frozen burrito in the evening. Mothers who were permitted to be with their newborns and infants did not have access to clean water to wash the babies' bottles.

These families were being held for far longer periods of time than permitted in the Flores Settlement Agreement. In many ways, it was worse than being jailed, for no phone calls were allowed, there was no access to attorneys, and there was no telling when they might get out.

For the first half of the year, medical care for the detained children and families and pregnant was deficient to the point that children died.

The Federal Government's response to these horrors was the creation of a program called ``the Migrant Protection Protocols,'' otherwise known as ``Remain in Mexico''. Under this plan, families seeking asylum

AR314

are processed into Customs and Border Protection custody, and then returned to Mexico where they are expected to stay until their asylum hearings.

In our area, beginning in mid-July (this past summer) between 100 and 250 moms and dads and their children were taken to Matamoros, Mexico, a city that the State Department considers as dangerous as Aleppo, Syria. Soon, over 1,500 people were living in small pup tents at the foot of the international bridge in Matamoros.

The Federal Government erected makeshift tent courts on Customs and Border Protection property. Daily, parents and their children are told to line up on the international bridge at 4am on the day of their first hearing. A judge, sitting far from site, entertains the case, and if the asylum seeker wishes to continue to pursue their case, are assigned a date for a follow-up hearing. They are then returned to Mexico, where they continue their wait in the tent cities, often for months into the future.

What do the children do in the mean time? They sit and sleep in the small, individual tents (churches have donated individual small tents for each family) jammed together at the foot of the bridge. This is no small group of people. Last night, for instance, there were more than 1,500 families at the bridge in Matamoros. Within each tent there are children huddled inside. These are tents designed for camping, meant to hold 2-3 people for a short time, not a family with 3 or 4 children who will be living in this tent for months on end.

In the Matamoros camp there are only 10 porta-potties for the 1,500 people. Unsurprisingly, camp residents find themselves forced to urinate and defecate in the area surrounding the tent cities.

And then it rains . . . and the rainwater is now contaminated with fecal matter and urine. The tents are awash in this contaminated water. Children slip and slide and slosh and sleep in it.

There are no places to play. There is no school. Volunteer teachers from the United States come once a week and hold English classes for a few hours with the children. But this is not school, it is entertainment.

Daily, volunteers from Brownsville bring meals to the families. They can feed perhaps 800 people, but not the 1,500 folks living there. Infrequently, the Mexican government will feed up to 200 people.

Practically speaking, there is no food, there is no drinking water, there is no system in place to deal with human waste.

The Migrant Protocol (MPP) was predicated on an agreement that Mexico would provide shelter and protection for these families. This was an impossible condition for Mexico to fulfill, given its inability to protect its own citizens from organized crime. The immigrants are completely vulnerable to the gangs, and, oft times, to the police, who can be one and the same. In Tamaulipas, for example, amongst an uncountable tally of examples, I would cite:

Nuevo Laredo--a woman left a shelter for food and never returned.

Three adult Venezuelan women with a child asked for help getting to a shelter in Nuevo Laredo, but were dragged away by armed men.

Another man ran screaming into an office in Nuevo Laredo asking for help but was dragged away by men with heavy tattoos.

A gang tried to raid a shelter, and the pastor who ran the shelter tried to resist. He was taken away 3 months ago and there is no news of his whereabouts.

In Reynosa (across the river from McAllen), a couple was kidnapped and threatened with being sold for their organs. They managed to escape and crossed the river into the USA but were returned under MPP. They are terrified of being caught by the same local gang.

In Matamoros, 2 young women with young sons were sent to Nuevo Laredo and immediately kidnapped and held in a stash house. Since they had no relatives in the USA to pay ransom, the gangs dumped them out and told them, that if they ever return to Nuevo Laredo, they will be killed. They are waiting in Matamoros in tents for their court hearings. They have no idea what happened to the others in the stash house.

A young mother sent back to Matamoros, Mexico under MPP was gang-raped multiple times this past week in front of her 3-year-old son. She suffered internal injuries from the sexual assault.

I evaluated a 3-year old girl in Matamoros, who had quit talking and was no longer potty-trained following the trauma witnessed in her home country and the 3-month-long journey across Mexico constantly

hiding in the grass away from gangs, cartels, and Mexico immigration officials. She had signs of malnutrition.

So, what have we done as a country to solve the problem of overcrowded, unsanitary, cold processing centers? We have dumped them in Mexico in overcrowded, unsanitary tent cities, even as winter bears down upon us. Only emergency medical care being provided by the Mexican Red Cross. While there are new volunteer medical organizations in the area, they are not connected with the Mexican health officials, clinics, or hospitals. It is a recipe for disaster.

The solution is simple: Reverse the Migrant Protection Protocol. Let the children and their families come into the United States to live with their family and friends as they process their legitimate claims for asylum. Do this before we as a Nation are yet, once again, responsible for the entirely preventable deaths of the innocents who thought that they could trust us.

Keep the Faith and the Fight!

———

Statement of HIAS
November 19, 2019

HIAS, the American Jewish Community's global refugee organization, remains deeply opposed to the Migrant Protection Protocols, the ``Remain in Mexico'' policy, and all other efforts to keep asylum seekers away from our border and out of our asylum system. The right to seek asylum stems from the 1951 Refugee Convention and has been the law in this country since the 1980 Refugee Act. In the year since the Migrant Protection Protocols were first announced by the Department of Homeland Security, nearly 50,000 asylum seekers have been sent back to Mexico to wait weeks--or in some cases months--for their court hearings. In Mexico, these asylum seekers are facing a devastating humanitarian crisis that has been caused by the U.S. Government's policies that show a complete disregard for the safety and humanity of people fleeing violence and persecution in our region, many of whom are children.

Many refugees returned to Mexico find themselves in cities that have Department of State Travel Advisory warnings on par with countries like Syria. With little money, no opportunity for work, and unstable shelter, returned asylum seekers become targets for organized criminal groups and corrupt law enforcement agents who routinely kidnap, torture, rape, and extort them. In Ciudad Juarez, Mexico, women told HIAS staff that they feared leaving the migrant shelter because they could see their persecutors from their home countries standing outside of the gates. For thousands who are not able to find shelter and protection at all, sleeping on the streets in front of ports of entry, without adequate access to water, food, or proper sanitation is their best option.

HIAS is concerned that as numbers of migrants placed in MPP continues to grow, the backlog for court dates will increase, leading to longer wait times and more strain on shelters and assistance providers in Mexico. With little support from the U.S. and Mexican governments, and NGOs unable to meet the enormous needs, asylum seekers endure even more threatening and dire conditions. HIAS urges significant oversight of the Remain in Mexico policy, with special attention to the devastating humanitarian impact of this policy. We call on Congress to enact legislation that reinforces and strengthens laws that protect the right to seek asylum and reject the administration's policies to deter, harm, and punish refugees at our Southern Border seeking safety.

———

Joint Letter From Miscellaneous Organizations
November 18, 2019.

The Honorable Jerrold Nadler,
Chair, House Committee on the Judiciary,
The Honorable Bennie G. Thompson,
Chair, House Committee on Homeland Security,
The Honorable Jamie Raskin,
Chair, House Subcommittee on Civil Rights and Civil Liberties,
The Honorable Zoe Lofgren,
Chair, House Judiciary Immigration & Citizenship Subcommittee,
The Honorable Kathleen Rice,

AR316

Chair, House Subcommittee on Security, Facilitation, and
Operations, U.S. House of Representatives, Washington, DC
20515.


Re: Request for Action to End ``Remain in Mexico'' Program


    Dear Members of Congress: We are immigration, human rights, and
civil rights organizations and academics, and we write to request that
you take action to end the Trump administration's ``Remain in Mexico''
program, formally referred to by the administration as the ``Migrant
Protection Protocols'' (``MPP''). The Remain in Mexico policy places
asylum seekers in great danger, violates U.S. law, due process, and
international legal obligations, and operates with surgical precision
to ensure that Latin American asylum seekers will almost never be
granted humanitarian relief and protection from the violence they are
fleeing. We urge you to take action to oversee, investigate, and
introduce measures to defund and end this unprecedented policy; we
understand that oversight hearings will be conducted tomorrow.
    The Department of Homeland Security (``DHS'') announced Remain in
Mexico in December 2018 and implementation began in January 2019.\1\ As
of October 28, 2019, there are 6 cities along the U.S.-Mexico border
where Remain in Mexico is in effect--San Ysidro, Calexico, El Paso,
Eagle Pass, Laredo, and Brownsville.\2\ Remain in Mexico violates and
evades U.S. asylum law and betrays the core values of asylum policy--to
provide safety and due process to people seeking U.S. refugee
protection.
--------------------------------------------------------------------
    \1\ Policy Guidance for Implementation of the Migrant Protection
Protocols, Kirstjen Nielson, Secretary, Dept. of Homeland Sec., at 1
(Jan. 29, 2019) [Hereinafter ``Policy Guidance''] (on file with
author). See also Letter from Members of Congress to DHS Office of
Inspector General, seeking investigation into the ``Remain in Mexico''
program, Oc. 17, 2019, https://cdn.vox-cdn.com/uploads/chorus_asset/
file/19297475/MPP_letter_to_IG.pdf.
    \2\ HUMAN RIGHTS FIRST, ORDERS FROM ABOVE: MASSIVE HUMAN RIGHTS
ABUSES UNDER TRUMP ADMINISTRATION RETURN TO MEXICO POLICY 3, 12 (2019),
https://www.humanrightsfirst.org/sites/default/files/
hrfordersfromabove.pdf.
--------------------------------------------------------------------
    For decades prior to implementation of the Remain in Mexico policy,
asylum seekers who arrived at the Southern U.S. border pursued their
asylum claims from within the United States. Typically asylum seekers
were paroled into the United States, placed into an alternatives-to-
detention program, or detained within the United States while their
case proceeded before the immigration courts (assuming they passed a
Credible Fear Interview, for those individuals subject to expedited
removal).\3\ Under Remain in Mexico, asylum seekers are ``made to wait
in Mexico until an immigration judge resolves their asylum claims.''\4\
This ``wait'' can take many months.\5\ Despite the overwhelming and
ever-present dangers targeting migrants in Northern Mexico, fewer than
1,000 of the over 55,000 migrants placed in the Remain in Mexico
program have been allowed to stay in the United States while pursuing
their cases.\6\ USCIS asylum officers attest that the fear-screening
standard and procedures currently in place ``virtually guarante[e] a
violation'' of international treaty obligations.\7\
--------------------------------------------------------------------
    \3\ Innovation Law Lab v. McAleenan, 924 F.3d 503, 506 (9th Cir.
2019) (per curiam) (staying the preliminary injunction; that injunction
is once again before the Ninth Circuit and oral argument took place on
Oct. 1, 2019).
    \4\ Id.
    \5\ See HUMAN RIGHTS FIRST, supra note 2 at 4, 6 (recounting
months-long wait times).
    \6\ See Dep't of Homeland Sec., Assessment of the Migrant
Protection Protocols (MPP) 5 (Oct. 28, 2019), https://www.dhs.gov/
sites/default/files/publications/assessment_of_the_mi-
grant_protection_protocols_mpp.pdf (``As of October 15, 2019, USCIS
completed over 7,400 screenings to assess a fear of return to Mexico .
. . Of those, approximately 13 percent have received positive
determinations.'').
    \7\ Brief of Amicus Curiae Local 1924 at 18, Innovation Law Lab v.

AR317

McAleenan, it is ``very'' (sic) (representing the interests of union-members, including numerous USCIS employees).

---

Migrants forced to remain in Mexico face violence and kidnappings as well as threats to life, health, and well-being. One study found that between 21 percent and 24 percent of migrants in the Remain in Mexico program report receiving threats of violence while in Mexico, and of those, over 50 percent report that the threats turned into actual violence, including beatings, robbery, and extortion.\8\ Journalistic accounts indicate that the actual rate of systematic violence faced by asylum seekers is higher, especially in Northern Mexican cities along the Texas border where kidnappings are common.\9\ As the administration is well aware, drug and criminal cartels operate with impunity in Northern Mexican cities including Matamoros and Nuevo Laredo, and they have systematically targeted migrants.\10\ In addition, because cities in Northern Mexico long ago ran out of shelter space, thousands of migrants live in encampments on the streets, without regular access to food, potable water, or sanitation facilities.\11\ Despite the best efforts of faith-based and civic organizations, thousands of migrants are homeless and destitute,\12\ lacking access to necessary health care.\13\ The longer an asylum seeker must ``wait'' in Mexico, the higher their risk of violence, homelessness, and discrimination.\14\

---

\8\ TOM K. WONG, U.S. IMMIGRATION POLICY CTR., SEEKING ASYLUM: PART 2, at 9 (2019), https://usipc.ucsd.edu/publications/usipc-seeking-asylum-part-2-final.pdf.
\9\ Id.
\10\ Mexico Travel Advisory, U.S. DEP'T OF STATE (Apr. 9, 2019), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html (``Violent crime, such as murder, armed robbery, carjacking, kidnapping, extortion, and sexual assault, is common [in Tamaulipas State].''); HUMAN RIGHTS FIRST, supra note 2, at 4 (2019), https://www.humanrightsfirst.org/sites/default/files/hrforderfromabove.pdf.
\11\ HUMAN RIGHTS WATCH, ``WE CAN'T HELP YOU HERE'': U.S. RETURNS OF ASYLUM SEEKERS TO MEXICO 18-20 (2019).
\12\ Despite earlier promises to the contrary, the Mexican government has failed to provide migrants with humanitarian visas or work authorization, leaving them ``stranded for prolonged periods . . . with no way to support themselves.'' Id. at 2, 6.
\13\ U.S. `Remain in Mexico' Policy Endangers Lives of Asylum Seekers in Tamaulipas State, MEDECINS SANS FRONTIERES/DOCTORS WITHOUT BORDERS (Sept. 5, 2019), https://www.doctorswithoutborders.org/what-we-do/news-stories/news/us-remain-mexico-policy-endangers-lives-asylum-seekers-tamaulipas.
\14\ WONG, supra note 8, at 9-10.

---

Further, Remain in Mexico has been used as a tool in the administration's separation of more than 1,000 children from their families, even after a Federal court and the President ended family separation as a policy in June 2018. In multiple cases, children arrived at the U.S.-Mexico border with a parent but were separated, rendered unaccompanied by DHS officials, and transferred to ORR facilities across the country, while their parents were subjected to Remain in Mexico.\15\ It is nearly impossible to advocate for these children or secure their reunification when the location of their parents and family members is unknown or unstable due to conditions in Mexico.\16\

---

\15\ See Letter from Women's Refugee Comm'n to Cameron Quinn, Office of Civil Rights & Civil Liberties, and Joseph Cuffari, Inspector Gen., Dep't of Homeland Sec. (Aug. 16, 2019), https://www.womensrefugeecommission.org/images/zdocs/Separation-of-families-via-the_Migrant-Protection-Protocols_WRC-complaint-to-DHS.pdf.
\16\ See US: Family Separation Harming Children, Families, HUMAN RIGHTS WATCH (July 11, 2019), https://www.hrw.org/news/2019/07/11/us-family-separation-harming-children-families (explaining that children's family in Mexico may not have access to cell phones or other forms of communication).

---

AR318

In addition, the Remain in Mexico subjects asylum seekers
to numerous due process violations,\17\ making it almost impossible for
them to pursue their asylum cases. As a result, many will be unfairly
denied asylum and returned to situations of extreme danger in their
home countries.
------------------------------------------------------------------
    \17\ See U.S. CONST. amend V; 8 U.S.C. ▯ 1101(a)(42) (defining
``refugee''). Remain in Mexico also violates principles of
international human rights law. See International Covenant on Civil and
Political Rights, Art. 6, 7, 13, 14, Dec. 9, 1966, 999 U.N.T.S. 171
(ratified June 8, 1992) (establishing a right to life, to freedom from
torture, and to due process, particularly for migrants); Convention
Relating to the Status of Refugees, Art. 31, Apr. 22, 1954, 189
U.N.T.S. 150 (delineating international obligation to accept refugees
who unlawfully entered the country of refuge); Inter-American
Commission on Human Rights (IACHR), American Declaration of the Rights
and Duties of Man, Art. I. XI, XVI, XVIII, XXVII, 2 May 1948, https://
www.cidh.oas.org/Basicos/English/Basic2.American%20Declaration.htm
(declaring rights to life, liberty, personal safety, health and
wellbeing, fair trial, and the right to asylum).
------------------------------------------------------------------
    First, despite knowing the dangers to migrants in Northern Mexico,
DHS officials at ports of entry fail to ask asylum seekers whether they
will face danger if they are made to wait in Mexico, in violation of
binding principles of non-refoulement.\18\
------------------------------------------------------------------
    \18\ WONG, supra note 8, at 8.
------------------------------------------------------------------
    Second, DHS fails to provide safe and assured transportation to and
from removal proceedings for those who are made to wait in Mexico.
Rather, DHS requires migrants to navigate through border areas
controlled by deadly cartels seeking to kidnap and extort them, in
order to make it to a port of entry--often at 4 o'clock AM, only to
wait in line for several hours, often with minor children in tow, for
court hearings that begin at 8 o'clock AM or later.\19\ As a result,
cartels in Northern Mexico have kidnapped migrants in MPP on their way
to and from the port of entry.
------------------------------------------------------------------
    \19\ Molly Hennessy-Fiske, Tent Courts Open as Latest Hurdle for
Migrants Seeking Asylum in the U.S., LA TIMES (Sept. 16, 2019), https:/
/www.latimes.com/world-nation/story/2019-09-16/secretive-tent-courts-
latest-hurdle-for-asylum-seekers.
------------------------------------------------------------------
    Third, DHS provides no exceptions for asylum seekers who are unable
to make it to the port of entry on time because of cartel threats,
kidnapping, or assault.\20\ DHS seeks in absentia removal orders for
all Remain in Mexico migrants who fail to appear for their court
hearings, without exception.
------------------------------------------------------------------
    \20\ See Delivered to Danger: Illegal Remain in Mexico Policy
Imperils Asylum Seekers' Lives and Denies Due Process, HUMAN RIGHTS
FIRST 16 (2019), https://www.humanrightsfirst.org/sites/default/files/
Delivered-to-Danger-August-2019%20.pdf (``[A]sylum seeker[s] . . .
missed their initial immigration court hearing in early July because
they had been kidnapped and were being held for ransom in Ciudad Juarez
at the time. A judge at El Paso immigration court ordered them removed
in absentia.'').
------------------------------------------------------------------
    Fourth, the Remain in Mexico program impedes access to counsel by
placing asylum seekers in Mexico, at great distance from the vast
majority of immigration attorneys. People with cases in immigration
court have the right to counsel at their own expense.\21\ However,
approximately 98 percent of the 47,313 asylum seekers in the Remain in
Mexico program were unrepresented as of September 2019.\22\ Outside of
Remain in Mexico, about 63 percent of immigrants in removal proceedings
are unrepresented.\23\ Because Remain in Mexico asylum seekers are
barred from entering the United States except for brief appearances at
immigration court hearings, they are unable to meet with U.S.-based
immigration attorneys, making it virtually impossible to obtain
counsel. Asylum success rates drastically increase for migrants who
secure counsel. For those migrants who are miraculously able to secure

AR319

counsel, attorneys are ethically bound to limit the services they
can provide--given the complex legal standards and the trauma
experienced by asylum seekers, meaningful representation requires many
hours of client interviews and preparation, and this work simply cannot
take place when lawyer and client are separated by an international
border.\24\

--------------------------------------------------------------------

    \21\ See 8 C.F.R. ⯈ 1240.10(a) (``Advise the respondent of his or
her right to representation, at no expense to the government, by
counsel of his or her own choice authorized to practice in the
proceedings and require the respondent to state then and there whether
he or she desires representation.'').
    \22\ Details on MPP (Remain in Mexico) Deportation Proceedings,
TRAC IMMIGRATION (Sep. 2019), https://trac.syr.edu/phptools/
immigration/mpp/ (follow these steps: check ``Measure'' as ``Current
Status''; check ``Graph Time Scale'' as ``by Month and Year''; select
``Hearing Location'' on leftmost dropdown menu; select ``Represented''
on center dropdown menu; check ``Represented'' on rightmost dropdown
menu) (last visited Nov. 3, 2019).
    \23\ INGRID EAGLY & STEVEN SHAFER, ACCESS TO COUNSEL IN IMMIGRATION
COURT 2 (2016). Migrants with representation are 4 times more likely to
be released from detention, and 11 times more likely to seek asylum
than those without counsel. Id. Migrants with representation are much
more likely to obtain the relief they seek. Id. at 3.
    \24\ See HUMAN RIGHTS WATCH, supra note 11, at 35 (``[T]here are
limited opportunities for the communication required to prepare asylum
seekers' cases, according to attorneys and shelter operators.'').

--------------------------------------------------------------------

    U.S.-based immigration attorneys hesitate to take cases if they
cannot meet face-to-face with their clients to discuss sensitive facts
in their asylum cases. These attorneys hesitate to travel to
notoriously dangerous areas of Mexico, including Matamoros or Nuevo
Laredo, because the U.S. State Department designates the Mexican state
of Tamaulipas, where these cities are located, a Level 4 ``Do Not
Travel'' zone due to ``crime and kidnapping.''\25\ Attorneys are
understandably unwilling to risk their lives to take on Remain in
Mexico clients.\26\ Additionally, cartels and criminal organizations
who target asylum seekers are acutely aware of any U.S. contacts
migrants have. Having counsel in the United States actually increases
the risk of danger for a migrant since it adds visibility through in-
person meetings or phone contact.

--------------------------------------------------------------------

    \25\ Mexico Travel Advisory, U.S. DEP'T OF STATE (Apr. 9, 2019)
https://travel.state.gov/content/travel/en/traveladvisories/
traveladvisories/mexico-travel-advisory.html.
    \26\ See HUMAN RIGHTS WATCH, supra note 11, at 34 (describing the
danger to attorneys who cross the border to represent migrants).

--------------------------------------------------------------------

    Fifth, the immigration court hearings themselves, conducted by
Executive Office of Immigration Review (``EOIR'') judges, subject
Remain in Mexico migrants to further violations of procedural due
process. Many of the hearings are conducted by video, often with the
asylum seeker sitting in a portable trailer in a hastily-constructed
temporary tent compound. Court observers have noted that lapses in
video connectivity prohibit judges located remotely from conducting
effective hearings for asylum seekers in the Remain in Mexico program.
Inaccuracies in translation further compound the errors. In addition,
EOIR judges do not provide consistent information about the process to
asylum seekers (e.g., how to turn in the application for asylum, and
the consequences of missing a court date) and do not ask every asylum
seeker if they are afraid to return to Mexico. Sometimes DHS provides
asylum seekers with a Notice to Appear (the charging document)
indicating the wrong date or location of the hearing. DHS only provides
court documents (such as the Notice to Appear and the asylum
application) in English, and asylum seekers must submit all
applications and evidence in English, although they are trapped in
Mexico without U.S. attorneys to assist them.
    The Remain in Mexico policy violates fundamental due process
principles.\27\ We implore the U.S. Congress to respond accordingly. We
ask that you take the necessary steps to defund and end this policy
that undermines domestic and international legal protections for asylum

6/22/2021 - EXAMINING THE HUMAN RIGHTS AND LEGAL IMPLICATIONS OF DHS'S ``REMAIN IN MEXICO'' POLICY

seekers. Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 327 of 688   PageID 1984

---

```
    \27\ See supra note 17 and accompanying text.
```

---

```
      Sincerely,

               organizations
```

Alabama Coalition for Immigrant Justice
Advocate Visitors with Immigrants in Detention in the Chihuahuan Desert
Al Otro Lado
Alianza Americas
American Civil Liberties Union
American Gateways
American Immigration Lawyers Association
Americans for Immigrant Justice
Arab American Family Services
Asian Americans Advancing Justice/Chicago
ASISTA Immigration Assistance
Asylum Seeker Advocacy Project (ASAP)
Bay Area Sex Worker Advocacy Network (BAYSWAN)
Bellevue Program for Survivors of Torture
Beyond Legal Aid
Border Crit Institute
Boston University School of Law, Immigrants' Rights and Human
Trafficking Program
Brighton Park Neighborhood Council
Capital Area Immigrants' Rights Coalition
Catholic Migration Services
Center for Gender & Refugee Studies
Center for Justice and International Law (CEJIL)
Centro Legal de La Raza
Children's Defense Fund--National Office
Children's Defense Fund--Texas
Christian Community Development Association
Christian Reformed Church Office of Social Justice
Cien Amigos
Club Taji Ciudad Hidalgo
Coalicion de Derechos Humanos
Coalition for Humane Immigrant Rights--CHIRLA
Colectivo Mujeres Transnacionales
Columbia Law School Immigrants' Rights Clinic
Congregation of Our Lady of Charity of the Good Shepherd, U.S.
Provinces
Cornell Law School's Asylum and Convention Against Torture Appellate
Clinic
DC-MD Justice For Our Neighbors
Ecuandureo Unido
End Streamline Coalition
Equal Justice Center
Familias Unidas en Accion
Families Belong Together Mexico
Families Belong Together
Federacion de Clubes Michoacanos en Illinois
Federacion de Clubes Unidos Zacatecanos en Illinois
Freedom for Immigrants
Government Accountability Project
Grassroots Leadership
Guatemala Solidarity Boston
Hispanic Liaison/El Vinculo Hispano
Houston Immigration Legal Services Collaborative
Tahirih Justice Center, Houston Office
Human Rights Coalition
Human Rights Initiative of North Texas
Illinois Coalition for Immigrant and Refugee Rights
Immigrant Families Together
Immigrant Legal Advocacy Project
Immigrant Legal Resource Center
Indivisible Sacramento
IRCSGV
Jefferson County Immigrant Rights Advocates (JCIRA)
Jesus Nebot International
Kids in Need of Defense

<div align="center">AR321</div>

La 72, Hogar-Refugio para Personas Migrantes
Lake County Immigrant Advocacy
Latin America Working Group (LAWG)
Legal Aid Justice Center
Living Hope Wheelchair Association
Lowcountry Immigration Coalition
Lutheran Immigration and Refugee Service
Mano a Mano Family Resource Center
Migrant Center for Human Rights
National Advocacy Center of the Sisters of the Good Shepherd
National Center for Youth Law
National Immigrant Justice Center
National Immigration Project of the National Lawyers Guild
National Korean American Service and Education Consortium, Illinois
Coalition for Immigrant and Refugee Rights
National Network for Immigrant and Refugee Rights
National Partnership for New Americans (NPNA)
NETWORK Lobby
New Mexico Immigrant Law Center
Northern Manhattan Coalition for Immigrant Rights (NMCIR)
Pangea Legal Services
PASO--West Suburban Action Project
Priests of the Sacred Heart, USA Province
Project IRENE
Project On Government Oversight
Quixote Center
Refugee and Immigrant Center for Education and Legal Services (RAICES)
Refugee Solidarity Network
Refugees International
Religious of the Sacred Heart of Mary, Western American Province
Safe Passage Project
School Sisters of Notre Dame--Central Pacific Province
Sisters of St. Francis of Philadelphia
Sisters of St. Joseph of Orange
South Texas Human Rights Center
Southern Poverty Law Center
Southwest Suburban Immigrant Project
Still Waters Anti-Trafficking Program
Student Action with Farmworkers
The Alliance
The Chelsea Collaborative
The Rhizome Center for Migrants
T'ruah: The Rabbinic Call for Human Rights
Texas Center for Community Services
U.S. Committee for Refugees and Immigrants (USCRI)
UNC School of Law Clinical Programs
Unitarian Universalist Association
Unitarian Universalist Service Committee
University of Maryland Carey Immigration Clinic
University of Tulsa College of Law Legal Clinic
US Human Rights Network
Washington Office on Latin America
WESPAC Foundation
WITNESS
Women in Migration Network (WIMN)
Young Center for Immigrant Children's Rights
                        academics and scholars
Affiliations are for identification purposes are.
Raquel Aldana, Associate Vice Chancellor for Academic Diversity and
Professor of Law, UC Davis
Jon Bauer, Clinical Professor of Law and Richard D. Tulisano 1969
Scholar in Human Rights, University of Connecticut School of Law
Bill Beardall, Clinical Professor of Law, University of Texas School of
Law
Galya Ben-Arieh, Professor, Northwestern University
Lenni Benson, Distinguished Professor of Immigration Law and Human
Rights, New York Law School
Jacqueline Bhabha, Director of Research, Harvard FXB Center for Health
and Human Rights
Kaci Bishop, Clinical Associate Professor of Law, UNC School of Law
Clinical Programs

AR322

Deborah A. Boehm, Professor of Anthropology and Gender, Race, and Identity, University of Nevada, Reno

Emily Bosk, Assistant Professor of Social Work, Rutgers University

Stella Burch Elias, Professor and Chancellor, William Gardiner Hammond Fellow in Law, University of Iowa College of Law

Jason A. Cade, J. Alton Hosch Associate Professor of Law; Director, Community Health Law Partnership, University of Georgia School of Law

Kristina M. Campbell, Jack & Lovell Olender Professor of Law and Co-Director, Immigration & Clinic Rights Clinic, UDC David A. Clarke School of Law

Stephanie L Canizales, Assistant Professor of Sociology, UC Merced

Lauren Carasik, Clinical Professor of Law, Director of the International Human Rights Clinic, Western New England University School of Law

Jodi Berger Cardoso, Associate Professor, University of Houston

Jennifer M. Chacon, Professor of Law, UCLA School of Law

Linus Chan, Associate Clinical Professor of Law, University of Minnesota

Michael J Churgin, Raybourne Thompson Centennial Professor in Law, University of Texas at Austin

Jenny-Brooke Condon, Professor of Law, Center for Social Justice, Seton Hall Law School

Laurie Cook Heffron, Assistant Professor, St. Edward's University

Erin B. Corcoran, Executive Director, Kroc Institute for International Peace Studies

Ivan de la Rosa, Associate Professor, New Mexico State University

Jennifer Chappell Deckert, Associate Professor of Social Work, Bethel College

Kate Evans, Director, Immigrant Rights Clinic, Duke University School of Law

Jill E. Family, Commonwealth Professor of Law and Government, Widener Law Commonwealth

Monica Faulkner, Director, Texas Institute for Child and Family Wellbeing, University of Texas at Austin School of Social Work

Rebecca Feldmann, Visiting Assistant Professor, Villanova University Charles Widger School of Law

Megan Finno-Velasquez, Assistant Professor, New Mexico State University

Paula Galowitz, Clinical Professor of Law Emerita, New York University School of Law

Lauren Gilbert, Professor of Law, St. Thomas University School of Law

Denise Gilman, Clinical Professor, University of Texas School of Law

Valeria Gomez, Clinical Teaching Fellow, University of Connecticut School of Law

Anju Gupta, Professor of Law & Director of the Immigrant Rights Clinic, Rutgers Law School

Susan Gzesh, Senior Lecturer, University of Chicago--Pozen Center for Human Rights

Lindsay M. Harris, Associate Professor & Co-Director of Immigration and Human Rights Clinic, University of the District of Columbia David A. Clarke School of Law

Kayleen Hartman, Supervising Attorney/Clinical Teaching Fellow, Loyola Immigrant Justice Clinic

Susan Hazeldean, Associate Professor of Law, Brooklyn Law School

Geoffrey Heeren, Visiting Clinical Professor, University of Iowa College of Law

Laura A. Hernandez, Professor of Law, Baylor Law School

Robin Hernandez-Mekonnen, Associate Professor, Child Welfare Education Institute

Josiah Heyman, Endowed Professor of Border Trade and Director, Center for Inter-American and Border Studies, University of Texas at El Paso

Barbara Hines, Clinical Professor (Retired), University of Texas School of Law

Laila L. Hlass, Professor of Practice, Tulane University School of Law

Geoffrey Hoffman, Director, University of Houston Law Center

Madeline Hsu, Professor, University of Texas at Austin

Alan Hyde, Distinguished Professor, Rutgers Law School

Kit Johnson, Associate Professor of Law, The University of Oklahoma College of Law

Lynn Kalinauskas, Lecturer, University of Colorado Denver

Elizabeth Keyes, Associate Professor, University of Baltimore

Jennifer Lee Koh, Visiting Professor of Law, UC Irvine School of Law

Jonathan ... , Graduate Coordinator
Krista Kshatriya, Lecturer, UC San Diego
Jennifer Lee, Associate Clinical Professor of Law, Temple Law School
Stephanie Leutert, Director, Central America and Mexico Policy Initiative, University of Texas at Austin
Alysse Loomis, Assistant Professor, University of Utah College of Social Work
Karen Pita Loor, Associate Dean of Experiential Education & Associate Clinical Professor of Law, Boston University Law School
James Loucky, Professor, Western Washington University
Beth Lyon, Clinical Professor of Law, Cornell Law School
Peter Margulies, Professor of Law, Roger Williams University School of Law
Peter Markowitz, Professor of Law, Cardozo School of Law
Fatma Marouf, Professor of Law and Director of the Immigrant Rights Clinic, Texas A&M University School of Law
Susan Martin, Donald G. Herzberg Professor Emerita in International Migration, Georgetown University
Jose L. Martinez, South Texas College of Law Houston--Legal Clinics
Miriam Marton, Associate Dean of Experiential Learning, University of Tulsa College of Law Legal Clinic
Elizabeth McCormick, Associate Clinical Professor of Law, The University of Tulsa College of Law
Thomas M. McDonnell, Professor of Law, Elisabeth Haub School of Law at Pace University
Estelle M McKee, Clinical Professor, Cornell Law School's Asylum and Convention Against Torture Appellate Clinic
Vanessa Merton, Professor of Law, Immigration Justice Clinic, Elisabeth Haub School of Law at Pace University
Katie Herbert Meyer, Assist. Prof. of Practice & Director, Washington University Immigration Law Clinic
Jennifer Moore, Professor of Law, University of New Mexico School of Law
Craig B. Mousin, Adjunct Faculty, DePaul University College of Law
Karen Musalo, Professor of Law, U.C. Hastings
Jennifer Nagda, Policy Director, Young Center for Immigrant Children's Rights
Natalie Nanasi, Assistant Professor, Southern Methodist University Dedman School of Law
Ranjana Natarajan, Clinical Professor, University of Texas School of Law
Ruth Needleman, Professor Emeritus, Indiana University
Joan Neuberger, Professor, University of Texas at Austin
Emily Torstveit Ngara, Assistant Clinical Professor, Georgia State University College of Law
Kerrie Ocasio, Assistant Professor, West Chester University of Pennsylvania
Helena Olea-Rodriguez, Lecturer, University of Illinois at Chicago
Michael A. Olivas, Bates Distinguished Chair in Law, University of Houston Law Center
John Palmer, Professor, Pompeu Fabra University
Sarah H. Paoletti, Practice Professor of Law and Director, Transnational Legal Clinic, University of Pennsylvania School of Law
Mark Peters, Director of Justice, Peace and Reconciliation, Priests of the Sacred Heart, USA Province
Nina Rabin, Director, Immigrant Family Legal Clinic, UCLA School of Law
Jaya Ramji-Nogales, Professor, Temple University
Shruti Rana, Professor, Indiana University, Bloomington
Victor Romero, Professor of Law, Penn State Law--University Park
Carrie Rosenbaum, Lecturer & Visiting Scholar, UC Berkeley
Lory Rosenberg, Appellate Immigration Judge (Retired), Immigrant Defenders Law Group
Rachel E. Rosenbloom, Professor of Law, Northeastern University School of Law
Abigail M Ross, Assistant Professor, Fordham University Graduate School of Social Service
Ruben G. Rumbaut, Distinguished Professor, UC Irvine
Daniel G Saunders, Professor Emeritus, University of Michigan
Irene Scharf, Professor of Law, University of Massachusetts School of Law
Anne Schaufele, Practitioner-in-Residence, International Human Rights

AR324

Law Clinic, American University, Washington College of Law
Erica Schommer, Clinical Professor of Law, St. Mary's University
Immigration and Human Rights Clinic
Philip G. Schrag, Delaney Family Professor of Public Interest Law,
Georgetown University
Barbara Schwartz, Clinical Professor Emeritus, University of Iowa
College of Law
Jaime Sepulveda, Distinguished Professor, Global Health, UC San
Francisco
Ragini Shah, Clinical Professor of Law, Suffolk University Law School
Rebecca Sharpless, Professor, University of Miami School of Law,
Immigration Clinic
Sarah Sherman-Stokes, Associate Director, Immigrants' Rights and Human
Trafficking Program, Boston University School of Law
Shawn Sidhu, University of New Mexico School of Medicine, James D.
Simon
Assistant Professor, California State University, San Bernardino
Jeremy Slack, Assistant Professor, University of Texas at El Paso
Elissa Steglich, Clinical Professor, University of Texas School of Law
Christopher Strawn, Director, Immigration Law Clinic, University of
Washington
Maureen Sweeney, Law School Professor, Carey Immigration Clinic,
University of Maryland
Margaret Taylor, Professor of Law, Wake Forest University School of Law
Susan Terrio, Professor Emerita of Anthropology, Georgetown University
Claire R. Thomas, Director, Asylum Clinic, New York Law School
David B. Thronson, Alan S. Zekelman Professor of International Human
Rights Law, Michigan State University College of Law
Veronica T. Thronson, Clinical Professor of Law, Michigan State
University College of Law
Yolanda Vazquez, Professor of Law, University of Cincinnati College of
Law
Margaret Brown Vega, College Assistant Professor, New Mexico State
University
Rosemary Vega, Clinical Lecturer, UHLC Immigration Clinic
Shoba Sivaprasad Wadhia, Samuel Weiss Faculty Scholar and Clinical
Professor of Law, Penn State Law in University Park
Jonathan Weinberg, Associate Dean for Research & Faculty Development
and Professor of Law, Wayne State University Law School
Deborah M. Weissman, Reef C. Ivey II Distinguished Professor of Law
Anna Welch, Clinical Professor, Refugee and Human Rights Clinic, Maine
Law
Luis H. Zayas, Dean and Professor, The University of Texas at Austin
Katie Zeiders, Associate Professor, University of Arizona
Lauris Wren, Clinical Professor of Law, Maurice A. Deane School of Law,
Hofstra University

————

Statement of Human Rights Watch
November 19, 2019

Chairman Thompson, Chairwoman Rice, Ranking Member Rogers, Ranking
Member Higgins, and distinguished Members of the Border Security,
Facilitation, and Operations Subcommittee, thank you for the
opportunity to submit a written statement into the record for today's
hearing, ``Examining the Human Rights and Legal Implications of DHS's
`Remain in Mexico' Policy.''

Human Rights Watch is a non-profit, independent organization that
investigates allegations of human rights violations in more than 90
countries around the world, including the United States. We document
human rights violations, issue detailed reports, and advocate for
changes in law, policy, and practice to address the harms.

In July 2019, Human Rights Watch released a report entitled, ``We
Can't Help You Here'': US Returns of Asylum Seekers to Mexico, on the
Migrant Protection Protocols (``MPP'') program.\1\ In September and
October 2019, we released updates on the escalating abuses of the
program.\2\ As part of our investigations into the human rights impact
of this program, we have interviewed dozens of asylum seekers in Ciudad
Juarez, Matamoros, and Reynosa, Mexico, as well as Mexican officials,
U.S. attorneys, U.S. immigration court workers, advocates, and others.
We have heard first-hand the testimonies of people who have described

AR325

being kidnapped, raped, or assaulted; children who lack
adequate shelter; and asylum seekers who face high if not
insurmountable barriers receiving due process on their asylum claims.

------------------------------------------------------------------------
\1\ Human Rights Watch, ``We Can't Help You Here:'' US Returns of
Asylum Seekers to Mexico, July 2, 2019, https://www.hrw.org/report/
2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico.
\2\ Human Rights Watch, ``Mexico: Risks at Border for Those With
Disabilities,'' October 29, 2019, https://www.hrw.org/news/2019/10/29/
mexico-risks-border-those-disabilities; Human Rights Watch, ``US Move
Puts More Asylum Seekers at Risk,'' September 25, 2019, https://
www.hrw.org/news/2019/09/25/us-move-puts-more-asylum-seekers-risk.
------------------------------------------------------------------------

    Since the start of the MPP program in January 2019, over 55,000
asylum seekers, including at least 16,000 children, have been returned
to Mexico. Customs and Border Protection (``CBP'') continues to return
asylum seekers with disabilities or other chronic health conditions to
Mexico, despite the Department of Homeland Security's initial guidance
that no one with ``known physical/mental health issues'' would be
placed in the program. In Ciudad Juarez, Human Rights Watch documented
6 such cases, 4 of them children, in August and September alone. Human
Rights Watch has also found that the Mexican government does not have a
proper system in place there to screen and identify asylum seekers with
disabilities and chronic health conditions. The authorities have not
ensured physical accessibility in shelters, even new ones. Nor are they
consistently providing information about and access to health care for
asylum seekers with disabilities or chronic health conditions.
    A program that was initially limited to Tijuana and Mexicali now
includes Ciudad Juarez, Matamoros, Reynosa, and Nuevo Laredo, some of
the most dangerous cities in Mexico.
    Matamoros, Reynosa, and Nuevo Laredo are in the state of
Tamaulipas, for which the U.S. State Department Travel Advisory is ``Do
Not Travel,'' the same as for Afghanistan and Syria.
    The inherently inhumane ``Remain in Mexico'' program is getting
more abusive by the day. The program's rapid growth in recent months
has put even more individuals and families in danger in Mexico while
they await an increasingly unfair legal process in the United States.
          asylum seekers stranded with no means to survive
    Asylum seekers who spoke to Human Rights Watch expressed fear and
confusion at the prospect of being made to wait in a city where they
did not have social ties, legal authorization to work, and access to
shelter, since the number of asylum seekers in the city already far
exceeded available free shelter space.
    In the MPP program, those who can't afford to pay for a hotel room
or private residence sleep on the streets or stay in churches or
abandoned homes. Most asylum seekers fleeing Central America have
extremely limited means and often cannot pay for shelter, food, water,
or other necessities. In particular, in Matamoros, Mexico, as many as
1,500 migrants are living in a tent encampment near the Brownsville
port of entry amid deteriorating medical and sanitary conditions.\3\ If
these asylum seekers were pursuing their cases in the United States,
they would more likely be able to access support to sustain themselves
while their claims are pending through personal networks. Although
asylum seekers are not legally eligible to apply for work in the United
States until their cases have been won or 150 days have passed, nearly
84 percent of the asylum seekers in the MPP program reported having
relatives in the United States, according to the Mexican government.
------------------------------------------------------------------------
\3\ Nomaan Merchant, Tents, stench, smoke: Health risks are
gripping migrant camp, The Associated Press, November 14, 2019, https:/
/apnews.com/337b139ed4fa4d208b93d491364e04da.
------------------------------------------------------------------------
      returned asylum seekers facing physical violence, threats
    The precarious existence of asylum seekers and their identity as
non-Mexicans in northern Mexico increases their vulnerability to
physical harm.
    According to the Mexican government, the country is currently
facing a violent public security crisis. Mexico recorded more
intentional homicides in 2018 than it has since the country began
keeping records in 1997, and 3 of the states to which asylum seekers
are being returned under MPP, Baja California, Chihuahua, and

<div align="center">AR326</div>

Tamaulipas are among the most violent in the country.

Among those asylum seekers Human Rights Watch interviewed, several reported attacks on themselves or others, including kidnapping, sexual violence, and other violent assaults. For example:

Delfina M. (pseudonym), 20, an asylum seeker who fled Guatemala with her 4-year-old son, said that after she was returned to Ciudad Juarez, two men grabbed her in the street and sexually assaulted her, which her son witnessed. They told her not to scream and threatened to kill her son. ``I can still feel the dirtiness of what they did in my body,'' she said.

Rodrigo S. (pseudonym), 21, who fled El Salvador, told a judge in immigration court proceedings that he was robbed at knifepoint and stabbed in the back. He said he went to the police, but the Mexican officers wouldn't help him because he wasn't a Mexican citizen. He told the judge that although he is recovering physically, he's afraid to be sent back.

Esteban G. (pseudonym), 19, said in immigration court he was robbed when he left his room to go to the store for food. He told police he suspected a neighbor of stealing his cell phone. When police investigated the neighbor, they recovered his cell phone, but after that, the neighbor's family threatened to hurt him.

Kimberlyn, a 23-year-old Honduran, told Human Rights Watch she had been kidnapped by a taxi driver along with her 5-year-old daughter upon returning to Ciudad Juarez after her first court hearing in the United States in April. The driver released them within hours but said he would kill them if her family did not pay a ransom. She showed Human Rights Watch deposit receipts for $800 in payments made by relatives in Honduras.

Human Rights Watch additionally spoke with two asylum seeker mothers with small children who said they were kidnapped in Nuevo Laredo in early October on their way to present themselves at the Laredo port of entry for a court hearing. Upon their release, the kidnappers told them they had to leave town or die. They consequently missed their court hearing in Laredo and were likely ordered removed in absentia. The Mexico City-based Institute for Women in Migration has documented 212 kidnappings of migrants in the State of Tamaulipas from mid-July through October 15 with 197 occurring in Nuevo Laredo.\4\

------------------------------------------------------------------------

\4\ Maria Verza, Migrants thrust by US officials into the arms of the cartels, November 15, 2019, https://www.washingtonpost.com/world/the_americas/migrants-thrust-by-us-officials-into-the-arms-of-the-cartels/2019/11/15/84770670-07e5-11ea-ae28-7d1898012861_story.html.

------------------------------------------------------------------------

Despite these risks, the program's ``nonrefoulement'' screening process administered by U.S. Citizenship and Immigration Services asylum officers to determine whether a migrant faces harm in Mexico has come under criticism from U.S. officials involved in administering interviews or who have reviewed the process.\5\ According to Buzzfeed News, a team of senior Department of Homeland Security (``DHS'') officials who examined the Remain in Mexico program found that asylum officers face pressure in at least some locations along the border to ``arrive at negative outcomes when interviewing migrants on their claim of fear of persecution or torture.''\6\

------------------------------------------------------------------------

\5\ Greg Sargent, In scathing manifesto, an asylum officer blasts Trump's cruelty to migrants, The Washington Post, November 12, 2019, https://www.washingtonpost.com/opinions/2019/11/12/scathing-manifesto-an-asylum-officer-blasts-trumps-cruelty-migrants/.

\6\ Hamed Aleaziz, U.S. Border Officials Pressured Asylum Officers To Deny Entry To Immigrants Seeking Protection, A Report Finds, BuzzFeed News, November 14, 2019, https://www.buzzfeednews.com/article/hamedaleaziz/dhs-asylum-report-mpp-immigration-remain-mexico.

------------------------------------------------------------------------

severely limited access to attorneys, chaotic, closed court hearings

Meanwhile, asylum seekers forced to remain in Mexico have no meaningful due process. Immigration attorneys and advocates in the United States indicate the need for legal services for returned asylum seekers in Mexico is overwhelming and that attorneys working to provide low-cost or free representation face serious barriers to providing that

<div align="center">AR327</div>

representation, including unaccompanied children, with U.S.
addresses and telephone numbers. According to the Transactional Records
Access Clearinghouse at Syracuse University, a research center that
examined U.S. immigration court records through September 2019, only 2
percent of returnees have legal representation.\7\

------------------------------------------------------------------------

\7\ TRAC Immigration, Access to Attorneys Difficult for Those
Required to Remain In Mexico, https://trac.syr.edu/immigration/reports/
568/.

------------------------------------------------------------------------

In recent months, the U.S. Government has raised new barriers to
obtaining representation and accessing counsel and the immigration
courts are increasingly closed to the public. During the week of
September 9, the Trump administration began conducting hearings for
asylum seekers returned to Mexico in makeshift tent courts in Laredo
and Brownsville, where judges are expected to preside via
videoconference. Citing ``heightened security measures'' since the
courts are located near the border, DHS has denied attorneys without a
signed representation agreement, as well as journalists, entry to these
port-of-entry courts.\8\ Obtaining a signed representation agreement
outside of court for attorneys seeking to represent clients who are
part of the Remain in Mexico program implies difficult and potentially
dangerous travel to Mexico.

------------------------------------------------------------------------

\8\ Bianca Seward, Mariana Atencio and Daniella Silva, Tent court
hearings for migrants ramp up in Texas as lawyers decry lack of access,
NBC News, September 16, 2019, nbcnews.com/news/latino/tent-court-
hearings-migrants-ramp-texas-lawyers-decry-lack-access-n1054991.

------------------------------------------------------------------------

The United States should immediately cease returning asylum seekers
to Mexico and instead ensure them access to humanitarian support,
safety, and due process in asylum proceedings here in the United
States. Congress should urgently act to prohibit using Government funds
to continue this program. The United States should manage asylum-seeker
arrivals through a genuine humanitarian response that includes a fair
determination of an asylum seeker's protection claim in a safe and
dignified environment that enables that person to seek legal and social
support while their claim is pending so they will not be forced to
abandon their claims for protection because of fear or destitution.

                              _____

       Statement of the International Refugee Assistance Project (IRAP)
                            November 18, 2019
                about the international refugee assistance project
    The International Refugee Assistance Project (IRAP) provides
comprehensive legal services to refugees and displaced persons. Since
our establishment, we have provided legal assistance to thousands of
displaced persons seeking legal pathways from conflict zones to safe
countries. IRAP provides pro bono legal representation, legal advice,
and expert referrals to refugees all over the world.
    IRAP's goal is to ensure that available services and legal
protections go to those who are most in need. Our clients include LGBTI
individuals, religious minorities subject to targeted violence,
survivors of sexual and gender-based violence, children with medical
emergencies for which local treatment is not available, and
interpreters being hunted down by the Islamic State, militias, and the
Taliban in retaliation for their work with the United States and NATO.
Our clients also include individuals who are seeking asylum in the
United States and individuals in the United States who are seeking
family reunification with members of their family still outside of the
country.
                      the ``remain in mexico'' policy
    The Department of Homeland Security (DHS) began instituting in
January 2019 the ``Migrant Protection Protocols'' (MPP)--i.e., the
``Remain in Mexico'' Policy--whereby certain immigrants entering or
seeking admission to the United States from Mexico without proper
documentation ``may be returned to Mexico and wait outside of the
United States for the duration of their immigration proceedings, where
Mexico will provide them with all appropriate humanitarian protections
for the duration of their stay.''\1\ This includes asylum seekers,
persons seeking protection under withholding of or protection from

AR328

removal, for persons who claim at some time or at any
point during apprehension, processing, or such proceedings, but who
have been assessed not to be more likely than not to face persecution
or torture in Mexico.''\2\

------------------------------------------------------------------------

    \1\ Department of Homeland Security, ``Migrant Protection
Protocols,'' Jan. 24, 2019, https://www.dhs.gov/news/2019/01/24/
migrant-protection-protocols [``DHS, `Migrant Protection Protocols'
''].
    \2\ DHS, ``Migrant Protection Protocols.''

------------------------------------------------------------------------

    Such individuals will be given a ``Notice to Appear'' for their
immigration court hearing, will be returned to Mexico until their
hearing date, and are to be allowed to return to the United States to
enter and attend immigration court hearings if necessary, before
returning to Mexico to await a final determination.\3\

------------------------------------------------------------------------

    \3\ Id.

------------------------------------------------------------------------

    As motivation for MPP, DHS has stated that ``will help restore a
safe and orderly immigration process, decrease the number of those
taking advantage of the immigration system, and the ability of
smugglers and traffickers to prey on vulnerable populations, and reduce
threats to life, National security, and public safety, while ensuring
that vulnerable populations receive the protections they need.'' DHS
has repeatedly stated that immigrants waiting in Mexico will be provide
with appropriate humanitarian protection for the duration of their stay
there.
    MPP is one component of a multi-pronged attempt to undermine and
dismantle the long-standing American asylum system and American
tradition of providing safe haven to those fleeing persecution in their
countries of origin. This includes proposed and/or implemented policies
like the November 2018 asylum ban on those who crossed the southern
U.S. border between official ports of entry;\4\ ``safe third country''
asylum ban of July 2019 on those who passed through a third country en
route to seeking safety in the United States;\5\ and increasing the use
of immigration detention for families.\6\ Alongside these efforts, MPP
violates U.S. international legal obligations and the Congressionally-
created U.S. asylum system; puts at serious risk vulnerable individuals
who have fled life-threatening danger in their home countries and are
returned to dangerous conditions in Mexico rather than being allowed to
pursue their asylum claims in the United States; and undermines due
process and creates obstacles to representation for asylum seekers.

------------------------------------------------------------------------

    \4\ Department of Homeland Security and the Department of Justice's
Notice of Proposed Rulemaking on Aliens Subject to a Bar on Entry Under
Certain Presidential Proclamations; Procedures for Protection Claims,
EOIR Docket No. 18-0501, A.G. Order No. 4327-2018, 83 F.R. 55934,
issued Nov. 9, 2018, https://www.govinfo.gov/content/pkg/FR-2018-11-09/
pdf/2018-24594.pdf.
    \5\ Department of Justice and the Department of Homeland Security,
Notice of an Interim Final Rule and Request for Comment on Asylum
Eligibility and Procedural Modifications, EOIR Docket No. 19-0504, A.G.
Order No. 4488-2019, 84 F.R. 33829, issued July 16, 2019, https://
www.govinfo.gov/content/pkg/FR-2019-07-16/pdf/2019-15246.pdf.
    \6\ See, e.g., Department of Homeland Security, Notice of Proposed
Rulemaking on the Aprehension, Processing, Care, and Custody of Alien
Minors and Unaccompanied Alien Children, DHS Docket No. ICEB-2018-0002,
83 F.R. 45486, issued September 7, 2019, https://www.govinfo.gov/
content/pkg/FR-2018-09-07/pdf/2018-19052.pdf.

------------------------------------------------------------------------

``remain in mexico'' violates u.s. international legal obligations and
            the congressionally-created u.s. asylum system
    The Refugee Act of 1980, including the provisions of the U.S. code
relevant to asylum, were enacted by Congress ``to bring United States
refugee law into conformance with the 1967 United Nations Protocol
Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. 6577, to
which the United States acceded in 1968.''\7\ The 1967 Protocol amends
the 1951 Refugee Convention, and together they create a legal framework
to establish the definition and rights of refugees.\8\ By becoming
signatories, the 148 countries that are party to one or both of these

legal instruments, including the unequivocal, nonderogation obligation to individuals who ``suffer such serious violations of their human rights that they have to leave their homes, their families, and their communities to find sanctuary in another country.''\9\ Although a Federal court has ruled \10\ that the Protocol is not self-executing,\11\ the Protocol was given domestic legal force by the Refugee Act of 1980, which provides ``a useful guide in determining Congressional intent in enacting the Refugee Act.''\12\

------------------------------------------------------------------------

    \7\ East Bay Sanctuary Covenant v. Trump, United States District Court, Northern District of California, ``Order Granting Temporary Restraining Order; Order to Show Cause Re Preliminary Injunction,'' Nov. 19, 2018, p. 20 (citing to I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 436-37 (1987)).
    \8\ UNHCR, ``The 1951 Convention Relating to the Status of Refugees and its 1967 Protocol,'' Sept. 2011, p. 1, https://www.unhcr.org/en-us/about-us/background/4ec262df9/1951-convention-relating-status-refugees-its-1967-protocol.html.
    \9\ Id. at p. 2.
    \10\ Khan v. Holder, 583 F.3d 773, 783 (9th Cir. 2009).
    \11\ ``Self-executing'' has been defined ``at a general level . . . as a treaty that may be enforced in the courts without prior legislation by Congress, and a non self-executing treaty, conversely, as a treaty that may not be enforced in the courts without prior legislative `implementation.' '' Carlos Manuel Vazquez, Georgetown Law Faculty Publications and Other Works, ``The Four Doctrines of Self-Executing Treaties,'' p. 1016, 1995, https://scholarship.law.georgetown.edu/facpub/1016.
    \12\ East Bay Sanctuary Covenant v. Trump, United States District Court, Northern District of California, ``Order Granting Temporary Restraining Order; Order to Show Cause Re Preliminary Injunction,'' Nov. 19, 2018, p. 20 (citing to Khan v. Holder, 583 F.3d 773, 783 (9th Cir. 2009)).

------------------------------------------------------------------------

    Article 33 of the Convention provides that:

``No Contracting State shall expel or return (``refouler'') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.''\13\

------------------------------------------------------------------------

    \13\ U.N. General Assembly, Convention Relating to the Status of Refugees, 28 July 1951, United Nations, Treaty Series, vol. 189, p. 137, July 28, 1951, at Art. 33.

------------------------------------------------------------------------

    As the United Nations High Commissioner for Refugees noted in an amicus curiae brief in litigation of MPP, the core of the Convention and Protocol is this principle of non-refoulement--which means that, in addition to protecting individuals from being sent to a state where they would face persecution, refugees are protected ``from being transferred to a state in which they might not face persecution, but from where that state would send the individual on to persecution in a third country, referred to here as `chain refoulement.' ''\14\

------------------------------------------------------------------------

    \14\ The United Nations High Commissioner for Refugees' Amicus Curiae Brief in Support of Appellees' Answering Brief, Innovation Law Lab v. McAleenan, No. 19-15715, available at https://www.aclu.org/legal-document/innovation-law-lab-v-mcaleenan-amicus-brief-un-high-commissioner-refugees.

------------------------------------------------------------------------

    The High Commissioner noted that any arrangement involving the return of people who may be in need of international protection from one country to another must ``encompass key refugee protection safeguards in order to avoid placing individuals at risk of refoulement. This is so even if the purpose of the transfer is for the asylum seeker to await their asylum determination by the transferring state in the receiving state.'' For such arrangement to be legitimate under international law, ``it needs to be governed by a legally binding instrument, challengeable and enforceable in a court of law by affected asylum seekers,'' and must provide for an individual assessment by the

AR330

transfer the state investigation; whether the receiving
state will admit the person, permit the person to stay pending
determination of their case, and ``accord the person standards of
treatment commensurate with the 1951 Convention and international human
rights standards, including--but not limited to--protection from
refoulement.''\15\
------------------------------------------------------------------------
    \15\ Id. at p. 5-6.
------------------------------------------------------------------------

    The Migrant Protection Protocols violate not only the international
law, but also the domestic law into which U.S. international legal
obligations are incorporated, ⧉ ⧉ which form the basis of the 1980 Refugee Act.\16\
Under the Immigration and Nationality Act (INA) ⧉ 208(a)(1), ``[a]ny
alien who is physically present in the United States or who arrives in
the United States (whether or not at a designated port of arrival . . .
), irrespective of such alien's status, may apply for asylum.''\17\
Congress has established in ⧉ 208 several statutory exceptions to this
general eligibility for asylum, including: Persecuting others on
account of their race, religion, nationality, membership in a
particular social group, or political opinion; constituting a danger to
the United States on account of having been convicted by final judgment
of a particularly serious crime; being believed to have committed a
serious nonpolitical crime outside of the United States prior to
arrival; being reasonably regarded as a danger to the United States;
and having been firmly resettled in another country prior to arriving
in the United States.\18\
------------------------------------------------------------------------
    \16\ ``Refugee Act of 1980,'' Public Law 96-212, 94 STAT. 102-118,
Mar. 17, 1980 (see ⧉ 208, ``Asylum Procedures,'' and ⧉ 209,
``Adjustment of Status of Refugees).
    \17\ 8 U.S.C. 1158, Immigration and Nationality Act (INA) ⧉
208(a)(1).
    \18\ 8 U.S.C. 1158, Immigration and Nationality Act (INA) ⧉
208(b)(2).
------------------------------------------------------------------------

    This legal framework for asylum was carefully designed by Congress
to balance our National security with the importance of keeping the
United States a safe haven for those who flee persecution. Accordingly,
people claiming asylum at a port of entry must demonstrate a ``credible
fear'' of persecution to initiate their asylum claim. This threshold
accounts for the reality that a vulnerable asylum seeker may not be
able to present their strongest case in a single, high-pressure
interview--and that the stakes of denying someone the opportunity to
present their case more fully, if they have at least a credible fear,
are literally life-and-death. If there is even a small chance that
someone's past experience or fear of persecution is well-founded,
better to give them the opportunity to present that case fully than
take the risk that they will be tortured or killed by their persecutors
upon a forced return to their country of origin--or a pushback to a
third country that may not be safe for them either, such as Mexico.
    As noted above, Congress incorporated the 1967 United Nations
Protocol Relating to the Status of Refugees into the Refugee Act of
1980. Congress has expressly legislated that ``[a]ny alien who is
physically present in the United States or who arrives in the United
States (whether or not at a designated port of arrival . . . )'' may
apply for asylum.\19\ The United States may create a ``safe third
country agreement, or a formal agreement with a third country to which
a noncitizen might be removed, with a country ``in which the alien's
life or freedom would not be threatened on account of race, religion,
nationality, membership in a particular social group, or political
opinion, and where the alien would have access to a full and fair
procedure for determining a claim to asylum or equivalent temporary
protection.''\20\ But in a leaked memorandum of the Departments of
Homeland Security and Justice, the agencies responsible for MPP admit
that returning asylum seekers to Mexico does not meet these
statutorily-required criteria. The memo noted that a safe third-country
agreement with Mexico is ``years'' away because Mexico must ``improve
its capacity to accept and adjudicate asylum claims and improve its
human rights situation.''\21\
------------------------------------------------------------------------
    \19\ 8 U.S.C. 1158, Immigration and Nationality Act (INA) ⧉

208(a)(1).
    \20\ 8 U.S.C. 1158, Immigration and Nationality Act (INA) ☐
208(a)(2)(A).
    \21\ Human Rights First, ``A Sordid Scheme: The Trump
Administration's Illegal Return of Asylum Seekers to Mexico,'' Mar.
2019, at p. 3, https://www.humanrightsfirst.org/sites/default/files/
A_Sordid_Scheme.pdf.
--------------------------------------------------------------
    One U.S. asylum officer and attorney, whose email to U.S.
Citizenship and Immigration Services refusing to implement MPP was
published by the Washington Post, wrote that `` `[t]he MPP is illegal.
The program exists without statutory authority [under the Immigration
and Nationality Act], violates normal rulemaking procedures under the
[Administrative Procedure Act], and violates international law. The
program's execution impairs the fair implementation of our laws and
runs directly counter to the values of [the Refugee, Asylum, and
International Operations Directorate].' ''\22\
--------------------------------------------------------------
    \22\ Sasha Abramsky, The Nation, ``Trump's `Remain in Mexico'
Policy Isn't Just Cruel, It's Illegal,'' Nov. 15, 2019, https://
www.thenation.com/article/trumps-remain-in-mexico-policy-isnt-just-
cruel-its-illegal/.
--------------------------------------------------------------
    ``remain in mexico'' endangers the health and safety of vulnerable
                          asylum seekers
    Although the intended effect of MPP is to ``help restore a safe and
orderly immigration process . . . decrease the number of those taking
advantage of the immigration system . . . reduce threats to life,
National security, and public safety, while ensuring that vulnerable
populations receive the protections they need,''\23\ its practical
effect is to aggravate existing backlogs at near ports of entry and to
force asylum seekers to wait in difficult and dangerous conditions.
--------------------------------------------------------------
    \23\ DHS, ``Migrant Protection Protocols.''
--------------------------------------------------------------
    As one journalist has stated, ``The basic fact is that too many
people are waiting to seek asylum `the right way' in the US. In theory,
they have a legal right to it; in practice, it's by no means a
guarantee they'll be allowed to exercise it . . . The question is how
long they can wait before it becomes functionally indistinguishable
from being turned away--or before they simply get fed up with being in
limbo.''\24\ There are already significant backlogs of asylum seekers
at the border.\25\
--------------------------------------------------------------
    \24\ Dara Lind, Vox, ``The U.S. has made migrants at the border
wait months to apply for asylum. Now the dam is breaking,'' Nov. 28,
2018, https://www.vox.com/2018/11/28/18089048/border-asylum-trump-
metering-legally ports.
    \25\ In late November 2018, a senior Customs and Border Protection
official reportedly estimated that there was a 5-6-week backlog at the
Southern Border. See, e.g., CNN Wire and Kasia Gregorczyk, Fox 5 San
Diego, ``Migrants may have to wait 6 weeks at border to claim asylum,
official says,'' Nov. 27, 2018, https://fox5sandiego.com/2018/11/27/
migrants-may-have-to-wait-6-weeks-at-border-to-claim-asylum-official-
says/.
--------------------------------------------------------------
    With Customs and Border Protection aggressively using a
``metering'' system to limit the number of people who are processed for
asylum each day to between 40 and 100 persons,\26\ backlogs along the
Southern Border are several weeks-long and several thousand asylum
seekers-wide.\27\ As the 9th Circuit noted in November 2018 with
respect to another agency measure designed to curtail asylum rights,
``the record establishes that, while the Rule is in effect, these
asylum seekers experience lengthy or even indefinite delays waiting at
designated ports of entry along the southern border.''\28\
--------------------------------------------------------------
    \26\ Ron Nixon, New York Times, ``Asylum Claims Jump Despite
Trump's Attempt to Limit Immigration,'' Dec. 10, 2018, https://
www.nytimes.com/2018/12/10/us/politics/trump-asylum-border-.html.
    \27\ Jonathan Blitzer, New Yorker, ``Long Wait for Tijuana's
Migrants to Process Their Own Asylum Claims,'' Nov. 29, 2018, https://

AR332

www.newyorker.com/news/dispatch/the-long-wait-for-tijuanas-migrants-to-process-their-own-asylum-claims.

\28\ East Bay Sanctuary Covenant v. Trump, United States District Court, Northern District of California, ``Order Granting Temporary Restraining Order; Order to Show Cause Re Preliminary Injunction,'' Nov. 19, 2018, p. 30.

------------------------------------------------------------------

As of October 2019, nearly 50,000 asylum seekers and migrants had been pushed back by DHS to wait in danger in Mexico--on top of around 26,000 who are stranded there due to the ``metering'' policy \29\ by which asylum applicants are turned back at ports of entry to ``wait their turn'' to apply.

------------------------------------------------------------------

\29\ Human Rights First, ``Orders from Above: Orders from Above: Massive Human Rights Abuses Under Trump Administration Return to Mexico Policy,'' Oct. 2019, at p. 1, https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf [``HRF, Orders from Above Report''].

------------------------------------------------------------------

This forces individuals and families already traumatized by what they have experienced in their countries of origin, as well as exhausted from the physical demands of a long journey to the U.S. border, to wait in difficult and dangerous conditions. Shelters are overflowing; municipal services in nearby Mexican cities like Tijuana are breaking down under the strain, and charity and relief workers are struggling to meet demand.\30\ CNN reporters ``found hopeful asylum seekers living amid mud, open sewage, sickness, and piles of trash.''\31\

------------------------------------------------------------------

\30\ Jonathan Blitzer, New Yorker, ``Long Wait for Tijuana's Migrants to Process Their Own Asylum Claims,'' Nov. 29, 2018, https://www.newyorker.com/news/dispatch/the-long-wait-for-tijuanas-migrants-to-process-their-own-asylum-claims.
\31\ Bob Ortega, CNN, ``US asylum seekers face long waits or risky crossings, thanks to supposed capacity crunch,'' Dec. 20, 2018, https:/www.cnn.com/2018/12/20/us/us-asylum-seeker-southwest-border-capacity-invs/index.html.

------------------------------------------------------------------

In addition to these material conditions, Mexico is often just as unsafe for these asylum seekers as the countries they have left behind. The current backlog has pushed many asylum seekers to wait in Tijuana, which Business Insider ranked the fifth most dangerous city in the world based on its murder rate of over 100 homicides per 100,000 residents. This is a murder rate even higher than that of the dangerous Northern Triangle countries in Central America from which many of these asylum seekers have fled.\32\ The 9th Circuit noted that ``asylum seekers experience high rates of violence and harassment while waiting to enter, as well as the threat of deportation to the countries from which they have escaped.''\33\ In December 2018, two minor boys staying in a Tijuana migrant shelter were murdered, their bodies found stabbed and strangled in an alleyway in the city.\34\

------------------------------------------------------------------

\32\ Christopher Woody, Business Insider, ``These were the 50 most violent cities in the world in 2017,'' Mar. 16, 2018, https://www.businessinsider.com/most-violent-cities-in-the-world-2018-3.
\33\ East Bay Sanctuary Covenant v. Trump, United States District Court, Northern District of California, ``Order Granting Temporary Restraining Order; Order to Show Cause Re Preliminary Injunction,'' Nov. 19, 2018, p. 30.
\34\ Eliot C. McLaughlin and Nicole Chavez, CNN, ``3 arrested in slayings of Honduran teens in Tijuana, prosecutor says,'' Dec. 19, 2018, https://www.cnn.com/2018/12/19/americas/honduran-migrant-teens-killed-tijuana/index.html.

------------------------------------------------------------------

Human Rights First has documented numerous cases of asylum seekers who faced kidnappings and assaults upon being forced to return to Mexico. For example, a child and his father were kidnapped the same day that DHS returned them to Nuevo Laredo; the kidnappers threatened to take the child's kidneys, and they beat and shot other members of the kidnapped group.\35\ In September 2019, thee armed men broke into a shelter in Ciudad Juarez, where they robbed and assaulted Cuban asylum

seekers returned there found them in need of urgent care at a local
hospital for treatment. A Honduran asylum seeker was targeted for being
a lesbian, and was assaulted and threatened in Matamoros in July after
being returned by DHS.\36\

------------------------------------------------------------------------

    \35\ HRF, Orders from Above Report at p. 5.
    \36\ HRF, Orders from Above Report at p. 6.

------------------------------------------------------------------------

    Indeed, the U.S. State Department has assigned several states in
Mexico the same travel classification of Level 4, or ``Do not travel,''
and states that ``[v]iolent crime, such as homicide, kidnapping,
carjacking, and robbery, is widespread.''\37\ As the Washington Post
has noted, this Level 4 classification puts Mexico in the same category
as war-torn countries like Syria, Yemen, and Afghanistan in terms of
danger to travelers.\38\ If unsafe for ordinary travelers, then Mexico
is especially unsafe for asylum seekers who have already fled
persecution and are typically vulnerable--including families, LGBTQ
individuals, and others who have been persecuted due to some aspect of
their identity.\39\

------------------------------------------------------------------------

    \37\ U.S. Department of State--Bureau of Consular Affairs, ``Mexico
Travel Advisory,'' Nov. 15, 2018, https://travel.state.gov/content/
travel/en/traveladvisories/traveladvisories/mexico-travel-
advisory.html.
    \38\ Alex Horton, Washington Post, ``Why the U.S. considers parts
of Mexico just as dangerous to visit as Syria and Yemen,'' Jan. 11,
2018, https://www.washingtonpost.com/news/worldviews/wp/2018/01/11/why-
the-u-s-considers-parts-of-mexico-just-as-dangerous-to-visit-as-syria-
and-yemen/?noredirect=on&utm_term=.e7acbc5db661.
    \39\ Jonathan Blitzer, New Yorker, ``How the U.S. Asylum System is
Keeping Migrants at Risk in Mexico,'' Oct. 1, 2019, https://
www.newyorker.com/news/dispatch/how-the-us-asylum-system-is-keeping-
migrants-at-risk-in-mexico.

------------------------------------------------------------------------

    These individuals and families face an impossible situation, unable
to return home to the persecution they fled but also without hope to
move forward. Returned to Mexico despite having followed the
appropriate procedures to seek asylum in the United States, they
struggle to survive amid conditions often similar to those they fled in
their home country and remain at risk of refoulement to their home
country.
  returning asylum seekers to mexico undermines due process and asylum
    seekers' access to legal representation, jeopardizing their asylum
                                  cases
    The Migrant Protection Protocols create what Human Rights First has
called a ``due process charade'': Asylum seekers face extreme obstacles
to accessing counsel and legal information, and to attending and
participating in their immigration hearings.\40\ Rather than utilizing
normal immigration court facilities, DHS has begun utilizing tent
courts at multiple sites in Texas, which are closed to media, public
observers, and legal service providers offering legal information
sessions and screenings for potential representation.\41\ Even where
normal immigration court facilities are used, these courts often create
obstacles as well. For example, Human Rights Watch found that the
immigration court in El Paso prevented lawyers from meeting with
clients prior to MPP hearings.\42\

------------------------------------------------------------------------

    \40\ HRF, Orders from Above Report at p. 12.
    \41\ Id.
    \42\ Human Rights Watch, ``US Move Puts More Asylum Seekers at
Risk: Expanded `Remain in Mexico' Program Undermines Due Process,''
Sept. 25, 2019, https://www.hrw.org/news/2019/09/25/us-move-puts-more-
asylum-seekers-risk.

------------------------------------------------------------------------

    Being forced to wait in Mexico, moreover, can make it near-
impossible for asylum seekers to attend their immigration court
hearings. They may miss hearings because they have been kidnapped,
because it is too dangerous to make the journey to the port of entry to
the United States, or because they are unable to obtain transportation
to travel the long distance. For example, Human Rights First has
documented a case in which a Honduran man was kidnapped while traveling

between Monterrey and Nuevo Laredo--kidnapped immigrants during a hearing
September;\43\ taxi drivers and Uber drivers are reportedly refusing to
pick up immigrants at Mexican shelters because of the danger that
kidnappers and extortionists will target such passengers.\44\ As of the
end of September, about 38 percent of asylum seekers subjected to MPP
had missed a court hearing,\45\ which can put them at risk of being
ordered removed in absentia and losing the opportunity to finish making
their asylum claim.

---------------------------------------------------------------------

    \43\ HRF, Orders from Above Report at p. 15.
    \44\ Gaby Del Valle, Vice, ``Trump's Remain in Mexico Policy Is
Causing Asylum-Seekers to Miss Court Dates--and Get Deported,'' Sept.
24, 2019, https://www.vice.com/en_us/article/gyzdp9/trumps-remain-in-
mexico-policy-is-causing-asylum-seekers-to-miss-court-dates-and-get-
deported.
    \45\ TRAC Immigration, Transactional Records Access Clearinghouse,
``Details on MPP (Remain in Mexico) Deportation Proceedings,'' through
Sept. 2019, https://trac.syr.edu/phptools/immigration/mpp/ [last
accessed Nov. 18, 2019].

---------------------------------------------------------------------

    Being forced to wait in Mexico also makes it extremely difficult
for asylum seekers to obtain legal counsel--to which they have a right
under Section 292 of the Immigration and Nationality, and on which the
success of their case often depends. The stakes in an asylum case can
be literally life-or-death: A successful asylum case wins safety in the
United States, while a negative decision results in deportation back to
the country of origin, in which the applicant had faced persecution. As
a past president of the American Immigration Lawyers Association has
noted, the time and difficulty of preparing an asylum case relates not
to the strength of the case, but to the difficulty of accessing
evidence to meet the particular and specific standards of U.S. asylum
law.\46\ In addition to the complexity of U.S. immigration law,
language barriers \47\ and experiences of trauma add layers of
difficulty to asylum seekers accessing a full and fair consideration of
their asylum case.

---------------------------------------------------------------------

    \46\ Philip Bump, Washington Post, ``Most migration to the U.S.
costs money. There's a reason asylum doesn't,'' Apr. 30, 2019, https://
www.washingtonpost.com/politics/2019/04/30/most-migration-us-costs-
money-theres-reason-asylum-doesnt/.
    \47\ Jennifer Medina, New York Times, ``Anyone Speak K'iche' or
Mam? Immigration Courts Overwhelmed by Indigenous Languages,'' Mar. 19,
2019, https://www.nytimes.com/2019/03/19/us/translators-border-wall-
immigration.html.

---------------------------------------------------------------------

    Legal representation is likely the most outcome-determinative
factor in a U.S. asylum case: The Transactional Records Access
Clearinghouse at Syracuse University analyzed U.S. immigration court
records and found that the odds of gaining asylum are 5 times higher
for asylum seekers with legal representation. Without representation,
``the deck is stacked against an asylum seeker. Statistically, only 1
out of every 10 win their case.''\48\ But when an asylum seeker is
returned to Mexico, U.S. attorneys must either face serious danger
traveling to meet their clients or attempt difficult remote
representation. As of the end of August 2019, nearly 99 percent of MPP
returnees did not have lawyers, making it unlikely that meritorious
asylum cases will succeed in the U.S. asylum system.\49\

---------------------------------------------------------------------

    \48\ TRAC Immigration, Transactional Records Access Clearinghouse,
``Asylum Representation Rates Have Fallen Amid Rising Denial Rates,''
Nov. 28, 2017, https://trac.syr.edu/immigration/reports/491/.
    \49\ TRAC Immigration, Transactional Records Access Clearinghouse,
``Details on MPP (Remain in Mexico) Deportation Proceedings,'' through
Sept. 2019, https://trac.syr.edu/phptools/immigration/mpp/ [last
accessed Nov. 18, 2019].

---------------------------------------------------------------------

                          _____

              Statement of the Latin American Working Group
                          November 18, 2019.

Rep. Bennie G. Thompson,

                          AR335

Chair, House Homeland Security Committee.
Rep. Mike Rogers,
Ranking Member, House Homeland Security Committee.
Rep. Kathleen Rice,
Chair,
Rep. Clay Higgins,
Ranking Member,
Border Security, Facilitation & Operations Subcommittee.
Re: LAWG Statement for Nov. 19th House Homeland Security Border
Security, Facilitation & Operations Subcommittee Hearing, ``Examining
the Human Rights and Legal Implications of DHS' Remain in Mexico
Policy''

    The Latin America Working Group (LAWG) hereby submits this
statement for the record. LAWG advocates for just U.S. policies toward
Latin America and the Caribbean. One of LAWG's priority areas is to
call for protections for migrants and refugees from Mexico and Central
America and to ensure fair access to asylum at the U.S.-Mexico border
and in the Latin American region. LAWG welcomes this oversight effort
by the House Homeland Security Committee on the human rights and legal
implications of the Department of Homeland Security (DHS)'s Remain in
Mexico policy.
    Through our on-going research on the human rights situation across
Mexico, close collaboration and monitoring with civil society
organizations along the U.S.-Mexico border and at Mexico's southern
border, and through a November 2019 trip to the San Diego border
region, LAWG has confirmed that the Remain in Mexico policy is
returning asylum seekers, including pregnant women, unaccompanied
children, and members of the LGBTQ+ population, to situations of
extreme danger and exposing them to human rights violations. With over
55,000 asylum seekers returned to Mexico to date at 6 ports of entry
along the border to wait throughout the duration of their U.S. asylum
proceedings, we remain extremely concerned about the rapid
implementation of this policy. We are also concerned about the
establishment of secretive ``tent courts'' in Laredo and Brownsville,
Texas to which the public has had no access and which present serious
due process violations to asylum seekers. We urge the committee to
expand its oversight efforts on this policy, including by conducting
monitoring visits to the ports of entry and courtrooms where the policy
is being implemented, and requesting information from DHS on the
policy's implementation and funding. Moreover, we urge the committee to
ask DHS to end the implementation of this policy immediately.
    The Remain in Mexico policy is compounded by a series of other
policies that the Trump administration has undertaken to shut the door
to asylum seekers at the U.S.-Mexico border, including the illegal
practice of metering, a recently enacted ``Interim Final Rule'' that
bans all individuals who have traveled through another country first to
reach the United States from receiving asylum with extremely limited
exceptions, and the ``Asylum Cooperation Agreements,'' or safe third-
country agreements, signed between the United States and Guatemala,
Honduras, and El Salvador which may forcibly return asylum seekers who
have no previous connection to any of these countries or who many not
even have transited through them to seek protections there. We urge the
committee to also conduct oversight on these policies and their
implementing guidance as it relates to the implementation of the Remain
in Mexico policy.
    There is sufficient evidence, including from the U.S. State
Department and other sources, to demonstrate that asylum seekers are
being returned to danger by being forced to wait in Mexico. Tijuana has
seen a dramatic increase in the level of homicides for the last 5
years, reaching record levels in 2018, making it one of the deadliest
cities in the world.\1\ Total homicides in Ciudad Juarez for 2019 have
already exceeded the total for 2018.\2\ Mexico's northern border
states, such as Tamaulipas, Coahuila, Nuevo Leon, and Chihuahua, also
continue to rank among the states with the highest number of registered
disappearances in the country.\3\ The U.S. State Department currently
has travel warnings on all 6 of Mexico's northern border states, urging
citizens not to travel to Tamaulipas, to reconsider travel to Coahuila,
Chihuahua, Nuevo Leon, and Sonora, and to exercise increased caution in
travel to Baja California, all due to high levels of violent crime.\4\
These states now encompass all 6 ports of entry where the policy is

<div align="center">AR336</div>

being implemented.

------------------------------------------------------------------------

    \1\ Kate Linthicum, ``Meth and murder: A new kind of drug has made
Tijuana one of the deadliest cities on Earth'', January 30, 2019,
https://www.latimes.com/world/mexico-americas/la-fg-mexico-tijuana-
drug-violence-20190130-htmlstory.html.
    \2\ https://ficosec.org/homicidios-dolosos-2019/.
    \3\ Lily Folkerts, Annie Gallivan, Latin America Working Group,
Trouble for Turn Backs: Risks for Migrants in Mexico's Northern Border
States, 2018, https://www.lawg.org/trouble-for-turn-backs-risks-for-
migrants-in-mexicos-northern-border-states/.
    \4\ U.S. Department of State, Mexico International Travel
Information, November 15, 2018, https://travel.state.gov/content/
travel/en/international-travel/International-Travel-Country-
InformationPages/Mexico.html.

------------------------------------------------------------------------

    The violence perpetuated in these cities comes not only from
organized crime but also from systemic corruption and abuses within
Mexican law and migration enforcement agencies which at times work in
collusion with criminal groups. Over 30 disappearances were attributed
to the Mexican Navy, for example, in Nuevo Laredo, Tamaulipas in
2018.\5\ In addition, the 2017 U.S. State Department human rights
country report on Mexico highlighted collusion between the state
government of Coahuila and organized crime in carrying out
disappearances.\6\ While the information above demonstrates a broader
situation of violence, corruption, and impunity along some of Mexico's
northern border states and cities, asylum seekers and migrants, in
particular, have long faced human rights violations and crimes in their
transit through Mexico. Civil society organizations and migrant
shelters have documented multiple cases of torture, murder,
disappearances, kidnappings, robbery, extortion, and sexual and gender-
based violence that migrants and asylum seekers suffer at the hands of
criminal groups in Mexico. The perpetrators of this persecution often
act in collusion with Mexican migration and law enforcement. Multiple
reports issued by U.S. and Mexican organizations and migrants shelters
in Mexico illustrate that, while many crimes against migrants occur in
the southern part of Mexico, migrants are victims of abuse throughout
the country, including in northern border states.\7\ The Inter-American
Commission on Human Rights (IACHR) has previously noted crimes against
migrants in its reports and NGO's have noted the specific risks
migrants face in each of Mexico's border states in documents submitted
to the IACHR.\8\ As the MPP would force asylum seekers to wait in
Mexico for prolonged periods of time, it is likely that more migrants
would be exposed to such risks and violence, or would turn to smugglers
to cross the border between ports of entry and in more precarious
conditions.

------------------------------------------------------------------------

    \5\ Office of the U.N. High Commissioner for Human Rights, Zeid
urges Mexico to act to end wave of disappearance in Nuevo Laredo, May
30, 2018, https://www.ohchr.org/EN/NewsEvents/Pages/
DisplayNews.aspx?NewsID=23157&LangID=E.
    \6\ U.S. Department of State, Country Reports on Human Rights
Practices for 2017, 2017, https://www.state.gov/j/drl/rls/hrrpt/
humanrightsreport/index.htm#wrapper.
    \7\ Red Migrante Sonora (RMS), Y la impunidad continua. Segundo
informe de la Red Migrante Sonora, June 2017, https://
www.kinoborderinitiative.org/wp-content/uploads/2017/12/Informe-
RMS.pdf, and Jose Knippen, Clay Boggs, and Maureen Meyer, An Uncertain
Path, November 2015 https://www.wola.org/sites/default/files/
An%20Uncertain%20Path_- Nov2015.pdf.
    \8\ Daniella Burgi-Palomino, Latin America Working Group (LAWG),
Maureen Meyer, Washington Office on Latin America (WOLA), Joanna
Williams, Kino Border Initiative, Situation of Impunity and Violence in
Mexico's Northern Border Region, March 2017, https://www.wola.org/wp-
content/uploads/2017/04/Situation-of-Impunity-and-Violence-in-Mexicos-
northern-border-LAWG-WOLA-KBI.pdf and Inter-American Commission on
Human Rights (IACHR), Organization of American States (OAS), The Human
Rights Situation in Mexico, December 31, 2015, http://www.oas.org/en/
iachr/reports/pdfs/Mexico2016-en.pdf.

------------------------------------------------------------------------

    Waiting in Mexico for months under this policy has particularly

AR337

negative implications for LGBTQ+ women, children, and
members of the LGBTQ+ population. In some cases, these situations have
led to death for asylum seekers who have taken more dangerous border
crossings after having grown frustrated by the wait and desperate by
the lack of access to services while in Mexico. Such is the tragic case
of the Salvadoran man Oscar and his daughter, Valeria, who were subject
to the policy and who drowned crossing the Rio Grande.\9\

---

\9\ ``The father and daughter who drowned at the border were
desperate for a better life, family says,'' https://wapo.st/2qO3ehb.

---

LGBTQ asylum seekers may have a specifically hard time gaining
access to the already extremely limited housing, employment, health
services available to asylum seekers in Mexico due to on-going
xenophobia and discrimination specifically aimed at this population.
There are already a limited number of civil society shelters available
to asylum seekers on the Mexican side of the border and many may not
have specific spaces in which LGBTQ+ asylum seekers can feel
comfortable in. LGBTQ+ asylum seekers may not want to frequent shelters
set up by local authorities for fear of discrimination by law
enforcement officials, organized crime, or other migrants.

On a recent trip to San Diego, LAWG heard of a few cases of babies
being born to women from Central America during the duration of their
wait in Tijuana under this policy. As the Mexican constitution states
that individuals born in Mexican territory are Mexicans, these children
are Mexicans and should not be returned to Mexico under the Remain in
Mexico policy. Yet it did not appear that either the U.S. or Mexican
governments were taking any action to ensure that the children were not
subjected to the policy, effectively leaving the children in a
situation of near statelessness. There is no comprehensive information
on the total number of children born to asylum seekers in the duration
of their wait in Mexico under this policy. This is another concerning
impact that the policy is having on families and pregnant women, by
forcing them to wait for extended periods of time and thus exposing
them to carry out their pregnancy and subsequent childbirth in
conditions of serious risks along Mexico's northern border.

The policy has had secondary effects of returning asylum seekers as
far south as Mexico's southern border due to the Mexican government's
inability or unwillingness to protect asylum seekers in Mexico. Through
its close collaboration with civil society organizations across Mexico,
LAWG has come across at least 3 cases of families who were returned to
Mexico under the policy and were bussed by the Mexican government to
Mexico's southern border.\10\ In one case, an entire Honduran family of
2 adults and 3 children from Honduras were returned by Mexico's
migration enforcement agency, INM, to the city of Tapachula along
Mexico's southern border from the U.S.-Mexico border. As the family was
left to wait in Nuevo Laredo, Mexico under Remain in Mexico in August
and had no network to turn to there for protection, they felt like they
had no choice but to take a bus offered to them by the INM. They
initially thought the bus was going to Mexico City but later realized
it went to the city of Tapachula. There they were told the paperwork
initially granted to them by INM along Mexico's northern border was
invalid and they were held in a detention center. They were left with
no way to return to their court hearing in early November 2019 in the
United States and lacked information on how to pursue their case from
Tapachula. They also feared being returned to Honduras by Mexican
migration enforcement agents. While the Mexican government claims that
these returns of asylum seekers under MPP are voluntary,\11\ this
example demonstrates that often families lack information about their
rights, and the overall process under Remain in Mexico and face a false
choice between waiting in danger along Mexico's northern border or
moving elsewhere in Mexico where they might also have no protections.
Thus, through the Remain in Mexico policy the U.S. Government is
sending asylum seekers to face harm across Mexico and placing them in
situations whereby the Mexican government could return them to their
home country, in violation of non-refoulement under international
refugee law.

---

\10\ Documentation or notification of cases provided to LAWG by
staff from the Center for Human Rights Fray Matias de Cordova and the
Jesuit Network for Migrants in Mexico between Sept. 2019 and Nov. 2019.

AR338

\11\ LA Times, Buses to Nowhere, Mexico Transports
Migrants with U.S. Court Dates far South, https://www.latimes.com/
world-nation/story/2019-10-15/buses-to-nowhere-mexico-transports-
migrants-with-u-s-court-dates-to-its-far-south.

--------------------------------------------------------------

    Finally, the Remain in Mexico policy continues to present asylum
seekers with serious due process violations, preventing asylum seekers
from having their fair day in court and access to legal counsel.
According to the latest TRAC statistics through the end of Sept. 2019,
98 percent of asylum seekers under MPP lack access to legal
counsel.\12\ The establishment of the tent courts in Laredo and
Brownsville, Texas as of Sept. 2019 with judges videoconferencing into
courtrooms to hear asylum cases present a serious due process violation
for asylum seekers. Thus far the public has not had access to any of
these hearings and asylum seekers must present themselves at 4:30 am at
the ports of entry to attend their court hearings in the tent courts,
which exposes them to serious risks along this part of the border.

--------------------------------------------------------------

    \12\ Details on MPP (Remain in Mexico) Deportation Proceedings,
TRAC Immigration, https://bit.ly/2OmU5V9.

--------------------------------------------------------------

    When LAWG observed the Remain in Mexico court hearings in San Diego
in early Nov. 2019 we noted similar trends. Almost the entire
immigration court was dedicated to holding only Remain in Mexico
hearings given the high volume of cases in this sector of the border.
Only about 10 percent of individuals presenting cases had a lawyer
accompanying them. Many individuals referred to having been informed
that they had to pay up to $8,000 for a lawyer. Even if some
individuals had managed to prepare their asylum application with the
support of NGO's on the Mexican side of the border, they still lacked
general information on the whole process, their applications were often
not complete, and they were not accompanied by a lawyer in court. Often
they only managed to begin their asylum applications and find support
from some organizations months after their arrival and after several
initial hearing dates. Individuals in the court hearings observed were
never asked if they feared returning to Mexico. The general process
observed in the court itself seemed like it was meant to dissuade
asylum seekers from continuing the process. Similar to what occurs in
many ports of entry where Remain in Mexico is being implemented,
individuals have to present themselves at 4:30 am at the port of entry
for a 9 am court hearing sessions and at 9 am for a 1 pm session. Upon
arrival to the courts, it takes hours for the judges to hear all of the
MPP cases so that asylum seekers are returned together to the port of
entry at least 3 hours later, all just to come back in months. Most of
the cases observed received hearing dates to return in early 2020 after
having begun the process between July and September 2019.
    Even in such a short period, many serious issues with due process
violations were observed because of the Remain in Mexico policy.
Congressional oversight is urgently needed moving forward.

_____

    Statement of Krish O'Mara Vignarajah, LIRS
           Tuesday, November 19, 2019
                i. introduction
    As a faith-based organization with 80 years of experience providing
the long welcome to refugees fleeing inescapable violence from conflict
and persecution in their home countries, LIRS is deeply concerned with
the numerous attempts by the administration to end asylum and the
devastating human cost that its policies are having on the vulnerable
populations that we serve. For over 20 years, LIRS has provided caring
homes and trauma informed services to unaccompanied children. We
vehemently oppose the Remain in Mexico policy because it deliberately
jeopardizes the health, safety, and well-being of children and their
families.
    We appreciate the House Homeland Security Subcommittee on Border
Security, Facilitation and Operations, for holding this critical
hearing, ``Examining the Human Rights and Legal Implications of DHS
`Remain in Mexico Policy.' '' And we thank you for the opportunity to
submit this statement for the record in which we share our expertise
and experience working with refugees and children to relay our concerns
and recommendations with respect to the Migrant Protection Protocols

AR339

(MPP) or Remain in Mexico policy.

80 Years of Welcoming the Stranger: LIRS Expertise and Experience

2019 marks LIRS's 80th anniversary of working with refugees who
have fled persecution and were brought to the United States either
through the refugee admissions program or through our Southern Border.
Our devoted National network of affiliates provide a range of services,
such as: Providing unaccompanied children transitional foster care in
small congregate home-like environments, family reunification services,
respite and welcome, offering legal information and support to migrants
so that they understand their legal rights and obligations throughout
their immigration court proceedings and integration services so that
migrants are empowered with the ability to manage their finances,
secure employment, and other services that help migrants successfully
adjust to their new home country.

Our policy, child welfare, and refugee expertise and presence
across the Nation means that LIRS has an expansive view and first-hand
knowledge of the impact of immigration policies at the border and
beyond. For instance, prior to the formal announcement of the ``Zero
Tolerance Policy'' by former Attorney General Sessions in May 2018,
LIRS was aware of a change in policy because our foster care program
recognized an atypical increase in unaccompanied children.

During the height of the family separation crisis, LIRS and United
States Conference of Catholic Bishops (USCCB), were the only
organizations called upon by the Government to assist with family
reunification efforts.\1\ Without hesitation, LIRS agreed to assist. To
facilitate speedy reunifications, LIRS raised funds, provided respite
and welcome, and worked day and night to reunite children with parents
detained across the country. At no time during or after our
reunification efforts did we receive financial compensation from the
Government.

------------------------------------------------------------------------

\1\ The United States Council of Catholic Bishops/Migration and
Refugee Service and Lutheran Immigration and Refugee Service. 2018.
``Serving Separated and Reunited Families: Lessons Learned and the Way
Forward to Promote Family Unity.'' Available online at: https://
www.lirs.org/wp-content/uploads/2018/10/Serving-Separated-and-Reunited-
Families_Final-Report-10.16.18-updated.pdf).

------------------------------------------------------------------------

In this statement for the record, LIRS provides analysis of the
reasons why we are concerned with: (1) The administration's attempt to
end asylum; (2) children and their families being returned to Mexico;
and (3) the on-going due process violations. Having played a major role
in the family separation crisis, LIRS recognizes that Remain in Mexico
places children in harm's way unnecessarily and is being been
implemented prior to protocols being put in place to ensure that asylum
seekers humanitarian and legal protections are safeguarded. Overall, we
seek the immediate termination of the policy.

ii. efforts to end asylum: impact on children

LIRS objects to the varying ways that the administration has been
attempting to hermetically seal the Southern Border through physical
and invisible walls, in breach of domestic and international laws. We
serve many refugees and unaccompanied children from the Northern
Triangle (Guatemala, Honduras, El Salvador) where gang, domestic, and
other forms of violence from non-state and state actors makes it
impossible for them to stay. Having worked with refugees and asylum
seekers, LIRS knows that individuals and families that flee their home
country to seek asylum in America do so as a life-saving measure of
last resort.

We are disheartened to hear and object to Border Patrol officers
hastily dismissing individuals claims of fear of return to Mexico. As
it is currently being implemented, the Remain in Mexico program treats
asylum seekers as criminals, when in fact and in accordance with U.S.
and international law, seeking asylum is lawful.

Remain in Mexico, officially referred to as Migrant Protection
Protocols (MPP) is not the only policy that the administration has
created to end asylum. In addition to MPP there is the informal policy
of metering, third-country transit ban and the end to so-called,
``catch and release''. Individually and collectively these policies are
designed by the administration to discourage and force refugees from
seeking asylum in American.

LIRS calls for the Government to adopt a more humane and

compassionate approach. We must demand that our own
Government to stop its policies that deny refugees their legal rights.
After all, seeking asylum is not only a legal right; it is inextricably
tied to life-death consequences.

Asylum Policies are Harmful to Unaccompanied Children and Violate Due
          Process

    Published as an interim final rule in the Federal Register,
allowing the rule to go into effect immediately without public comment
on July 16, 2019, the third-country transit ban effectively ends
asylum. The rule stipulates that Border Patrol Agents can turn away
asylum seekers at the border if they have not applied for asylum in
another country.\2\ This policy was initially blocked by a Federal
judge, but the Supreme Court reversed this decision, allowing the
policy to continue while being challenged in court.\3\
------------------------------------------------------------------------
    \2\ Asylum Eligibility and Procedural Modifications (``Third-
Country Transit Ban''). July 16, 2019. Federal Register. Available on-
line at: https://www.federalregister.gov/documents/2019/07/16/2019-
15246/asylum-eligibility-and-procedural-modifications.
    \3\ Jonathan Blitzer, October 3, 2019. ``Does Asylum Have a Future
at the Southern Border?'' The New Yorker Online, available on-line at:
https://www.newyorker.com/news/daily-comment/does-asylum-have-a-future-
at-the-southern-border.
------------------------------------------------------------------------
    There are many concerns that LIRS has with respect to how the
administration is implementing the Remain in Mexico and Third-Country
Transit ban policies, 2 interrelated concerns are: (1) The impact on
unaccompanied children; (2) the absence of DHS and DOJ policy guidance
with respect to how the Remain in Mexico policy and the third-country
transit ban are going to be implemented.
    In the first instance, LIRS is concerned by the fact that the
third-country transit ban on asylum does not include an exemption for
unaccompanied children. As CLINIC explains, ``any unaccompanied child
arriving at the Southern Border will be barred from asylum unless they
meet the severe trafficking exception or have applied for and been
denied asylum in a third country in transit to the United States.''\4\
Sending children back to their home countries is like a death sentence.
------------------------------------------------------------------------
    \4\ ``Asylum Ban Part 2: Third-Country Transit Regulations FAQs.
CLINIC. Available on-line at: https://cliniclegal.org/resources/asylum-
ban-part-2-third-country-transit-regulations-faqs.
------------------------------------------------------------------------
    ``Central American youth are 10 times more likely to be killed when
compared to children in the United States as they become victims to
gangs, state security forces, and organized crime. Gangs especially
seek out young recruits, as they can more discreetly smuggle drugs and
weapons, or collect extortion payments.''\5\
------------------------------------------------------------------------
    \5\ Tamaryn Nelson and Hajar Habbach. ``If I went back, I would not
survive.'' Asylum Seekers Fleeing Violence in Mexico and Central
America. Physicians for Human Rights. Pg. 6. Available on-line at:
https://phr.org/our-work/resources/asylum-seekers-fleeing-violence-in-
mexico-and-central-america/.
------------------------------------------------------------------------
    Second, we are deeply disturbed by the fact that immigration judges
and officials have not received clear guidance as to how to implement
both policies. As the new rule is written, anyone who seeks to enter
and apply for asylum on or after the rule took effect on July 16, 2019,
will be barred from seeking asylum unless they applied in another
country. The complication, as ProPublica explains is that, ``the asylum
ban applies to migrants who ``enter'' the United States after July 16.
Technically, a migrant who has already come to the United States to ask
for asylum, been sent to Mexico to wait, and comes back into the United
States to attend his or her court date is ``entering'' again. The text
of the regulation isn't clear about whether the ban only applies to a
first entry, or to any entry into the United States after that
date.''\6\
------------------------------------------------------------------------
    \6\ Dara Lind. October 22, 2019. ``Trump's Asylum Ban Could Apply
Retroactively to Thousands of Migrants Even Though Officials Promised
it Wouldn't,'' ProPublica. Available on-line at: https://

AR341

www.propublica.org/article/trumps-remain-in-mexico-policy-is-starting-to-apply-retroactively-
to-thousands-of-migrants-even-though-officials-promised-it-wouldnt.

------------------------------------------------------------------------

    When the rule took effect, DHS stated that the new rule would not
apply to immigrants who were part of MPP and were returning to the
United States for their court hearings, however, DHS and DOJ have
failed to create policy guidance for immigration judges to follow. In
cases that ProPublica has tracked, it has found that Judges and
prosecutors have been given free reign to interpret the regulation.\7\
Moreover, ``according to data from TRAC, 99 percent of asylum seekers
sent to wait in Mexico don't have lawyers. The final hearings for
unrepresented Remain in Mexico returnees are typically closed to the
public. That makes it impossible to know how many other asylum seekers
are currently waiting in limbo for Herbert's decision \8\--or whether
any have already been denied asylum by another judge, due to a ban they
were told they were exempt from.''\9\

------------------------------------------------------------------------

    \7\ Id.
    \8\ ``Herbert'' refers to Immigration Judge Herbert who has
presided over hearings on Remain in Mexico.
    \9\ Lind supra note 6.

------------------------------------------------------------------------

    It is irresponsible that there is no clarity on whether the third-
country transit ban will apply retroactively to individuals who are
part of MPP. Moreover, LIRS is adamantly opposed to sending
unaccompanied children back to their home countries, as the practice
seems to be given our sources on the ground. Children are highly
vulnerable, which is why they leave, and by returning them back to
their home countries they will be revictimized. We cannot turn our
backs and allow our Government to deliberately jeopardize the safety of
unaccompanied children. We are a Nation that is better than this.
Remain in Mexico Impacts All of Us
    It is a misnomer to believe that Remain in Mexico impacts
``others'', it impacts us all. Equally disturbing is the threat that
Remain in Mexico policy has with respect to sending vulnerable
populations to the already crime-ridden, violent-prone fragile border
towns across the U.S.-Mexico border. Essentially, the build-up of
vulnerable, homeless individuals at the border has extended an
invitation to smugglers and criminal gangs whose numbers we can expect
to grow. Therefore, until the Remain in Mexico policy is ended and
asylum seekers are permitted to pursue their asylum claims in the
United States, we have a ticking time bomb that threatens our National
security at the border.
  iii. turning our backs: how ``remain in mexico'' abandons the human
 rights of thousands of children, families, and vulnerable populations
    The Remain in Mexico policy ostensibly excludes unaccompanied
children and vulnerable populations, however, LIRS believes that these
standards do not go far enough, and we are extremely concerned by the
fact that thousands of children, hundreds of toddlers and babies have
been returned to Mexico.\10\ Of equal concern to LIRS are reports that
the vulnerable populations that purportedly should not be returned to
Mexico, such as, pregnant women and refugees with medical ailments,
have been returned.\11\

------------------------------------------------------------------------

    \10\ Gustavo Solis. October 14, 2019. ``Remain in Mexico: Migrants
Who May not be Subject to Policy Continue to End up in Mexico,'' The
San Diego Union-Tribune. Available on-line at: https://
www.sandiegouniontribune.com/news/border-baja-california/story/2019-10-
14/remain-in-mexico-migrants-who-should-not-be-subject-to-policy-
continue-to-end-up-in-mexico. Remain in Mexico permits CBP agents to
return children who arrive with their parents at the Southern Border to
Mexico.
    \11\ Id.

------------------------------------------------------------------------

    On October 11, 2019, Reuters News was the first to report the
following data collected by the Executive Office Immigration Review
(EOIR) on children returned to Mexico since January 2019:
    16,000 children under 18 years of age
    4,300 children under 5 years of age
    481 toddlers
    500 infants.\12\

                                 AR342

\12\ Kristina Cooke, Mica Rosenberg, and Reade Levinson. October 11, 2019.''Exclusive: U.S. Migrant Policy Sends Thousands of Children, Including Babies, Back to Mexico'' Reuters News On-line: https://www.reuters.com/article/us-usa-immigration-babies-exclusive/exclusive-u-s-migrant-policy-sends-thousands-of-children-including-babies-back-to-mexico-idUSKBN1WQ1H1.

------------------------------------------------------------------------

    To put the data in perspective, as of October 3, 2019, one-third of the 50,000 immigrants who were returned to Mexico were children.\13\ While the sheer volume of children that have been sent to Mexico is disturbing, LIRS is appalled by the dangerous and unhygienic living conditions that children are subjected to while having to wait for their immigration court hearings, which can take weeks to months. Doctors from Physicians for Human Rights have met children with Post Traumatic Stress Disorder (PTSD) and have been able to collaborate asylum claims while spending time with children and families in Mexico.\14\ LIRS finds the casual disregard for child endangerment by the administration deplorable and we encourage Congress to conduct more oversight and investigate the plight of children returned to Mexico and urge DHS to end the policy.

------------------------------------------------------------------------

    \13\ Id.
    \14\ Nelson and Habbach, Physicians for Human Rights supra note 5.

------------------------------------------------------------------------

LIRS demands more protections for children returned to Mexico
    As it is currently being implemented, the ``Remain in Mexico'' policy is harmful to children in that it:
    Exposes them to actual and threats of violence,
    Increases their likelihood of catching life-threatening
        illness,
    Denies them educational opportunities,
    Compounds the trauma that they have experienced in their
        home country, and
    Fails to ensure that children's basic needs are met like
        clean water, food, and shelter.
    LIRS is of the opinion that time is of the essence and that the Government must take immediate action by ending the Remain in Mexico policy. We should not wait until a child dies to take action. It is a well-established fact that Mexico is notoriously dangerous and the level of violence has increased in tandem with the Remain in Mexico policy.
    As an expert in trauma, LIRS is also very concerned about the trauma that Remain in Mexico inflicts on children which will most certainly have life-long consequences. Our concerns are reinforced by doctors from Physicians for Human Rights who met with children and their families in Mexico and found that: ``2 out of the 3 children interviewed reported symptoms of PTSD, and 1 boy also showed signs of anxiety disorder and somatization, whereby psychological distress manifests as physical ailments and attention problems.''\15\

------------------------------------------------------------------------

    \15\ Id. at pg. 2-3.

------------------------------------------------------------------------

    Additionally, there is no public medical care available in Mexico which is disturbing considering that many children are living in overly crowded shelters and/or tents where infections and diseases can easily spread.\16\ Indeed, ``[d]octors and nurses visiting shelters and camps in Mexican border towns, . . . told Reuters they have seen cases of chicken pox, scabies, respiratory infections, skin rashes, eye infections, and gastrointestinal issues among children and adults.''\17\ Furthermore, the U.S. Centers for Disease Control finds that ``children under 5, and especially under the age of 2, are at high risk of serious flu complications, . . . and the flu season is about to start.''\18\

------------------------------------------------------------------------

    \16\ Id at pg. 36.
    \17\ Cooke, Rosenberg, and Levinson supra note 12.
    \18\ Id.

------------------------------------------------------------------------

    What qualifies as a medical exemption under Remain in Mexico is unclear, yet it is critical that DHS make public and/or establishes a

AR343

protocol for making a positive determination under this requirement to ensure that children and other vulnerable populations are not subjected to unnecessary health risks. The plight of Jennifer Jimenez, an El Salvadoran mother that Reuters interviewed, highlights the urgent need for standards to be put in place:

``Jennifer Jimenez, a 30-year-old Salvadoran, said she arrived at the border in July with 11-year-old twins and her 8-month-old son Jacob, who was born with lungs that had not fully developed.
``Although she explained Jacob's condition to border agents, she said, the agents sent her and her children back to Ciudad Juarez, where the family ended up sleeping on the floor of a crowded shelter.
``Recently she managed to find a doctor who noted in Jacob's medical records--seen by Reuters--that living in the shelter had complicated his health care. U.S. officials recently admitted the family to stay with relatives in the United States, a rare occurrence.''\19\
------------------------------------------------------------------------
    \19\ Id.

    The basic human rights needs of children are not being met and LIRS urges the Government to stop turning its back on children and/or do more to empower Mexican authorities to provide access to education, health care, shelter so that children do not have to suffer another day.

            iv. due process is not for some, it is for all
    Syracuse University conducted a review of immigration court records from January 2019 to the end of June 2019 and reports that its researchers found that a meagre 1.2 percent of refugees enrolled in the Remain in Mexico program had legal representation or 14 out of the 1,155 14 decided cases.\20\ LIRS believes that this is unacceptable, along with other clear violations of due process that have been occurring since the Remain in Mexico policy was launched at the end of January 2019. Some of the violations are prescribed by the policy, such as, requiring refugees to affirmatively state to CBP officers that they fear returning to Mexico and providing English-language only immigration documents that instruct refugees to fill out in English. Other violations that have been reported include: CBP officers providing inaccurate Notices to Appear (NTA) and conducting hearings in secretive tent courts.
------------------------------------------------------------------------
    \20\ ``Access to Attorneys Difficult for Those Required to Remain in Mexico,'' July 29, 2019. TRAC Immigration, Syracuse University. Available on-line at: https://trac.syr.edu/immigration/reports/568/.
------------------------------------------------------------------------
    The Remain in Mexico policy imposes higher standards of proof during credible fear interviews and asks refugees to affirmatively state that they fear return to Mexico. Under the higher burden of proof refugees must meet, ``reasonable fear standard'', sets a high bar that is nearly impossible for refugees to meet. To meet this legal standard, refugees would have to provide documentation to support their asylum claims at the border.
    It is general knowledge that refugees flee in haste and with only the clothes on their back. Therefore, the typical burden of proof standard that asylum seekers must meet at the border is referred to as `credible fear'. Under this standard, as long as refugees' asylum claims are deemed credible they are allowed to enter the United States until the conclusion of their immigration court proceedings. This standard is fairer than then one being applied under MPP in that it does not require asylum seekers to present documentation and other evidence of their persecution.
    The MPP policy also places the onus on refugees to affirmatively state that they have a fear of return to Mexico. This requirement is problematic in two main ways. First, it expects that refugees understand the MPP policy and then places the burden on refugees to affirmatively express their fear to border officials. Considering that most immigration attorneys and Government officials do not fully comprehend MPP, asking refugees to understand it is absurd. Furthermore, the overwhelming majority of refugees do not have access to legal counsel.
    Second, when refugees have expressed to border officials that they fear return to Mexico, instead of following the policy protocol--which

AR344

requires other agency referring agents to process them and asses
Asylum Officers--border officials have instead, returned individuals to
Mexico where they have been met by violence, threats of violence,
kidnapping, and extortion.

According to a draft DHS report obtained by BuzzFeed News:

``At some locations, CBP uses a pre-screening process that preempts
or prevents a role for USCIS to make its determination. Interviewees
also indicated that some CBP officials pressure USCIS to arrive at
negative outcomes when interviewing migrants on their claim of fear of
persecution or torture.''\21\

------------------------------------------------------------------

\21\ Hamed Aleaziz, November 15, 2019. ``U.S. Border Officials
Pressured Asylum Officers to Deny Entry to Immigrants Seeking
Protection, A Report Finds,'' BuzzFeed News. Available on-line at:
https://www.buzzfeednews.com/article/hamedaleaziz/dhs-asylum-report-
mpp-immigration-remain-mexico.

At the very least, border officials should notify Mexican
authorities of refugees expressed concerns of fear of return, however
this has not occurred. Instead, our Government is turning its back to
the dire human consequences and human rights violations that are
directly linked to the malfeasance of border officials and ill-
conceived policies.

DHS has implemented the Remain in Mexico policy without
establishing operating procedures to track and communicate with
refugees who have been returned to Mexico. This is highly problematic
when taking into account that numerous reports have revealed that DHS
has been providing Notices to Appear (NTA) that contain inaccurate
court dates and information and/or have sent NTA's to shelters in
Mexico where they are no longer staying.\22\

------------------------------------------------------------------

\22\ Tom K. Wong. October 29, 2019. ``Seeking Asylum: Part 2,'' UC
San Diego, U.S. Immigration Policy Center. Available on-line at:
https://usipc.ucsd.edu/publications/usipc-seeking-asylum-part-2-
final.pdf.

------------------------------------------------------------------

DHS officials found that some immigrants have had to give up their
shelter space in Mexico when they depart for the United States for a
court hearing and are then left without an address to follow up on
their cases. The officials recommend CBP create a ``reliable method of
communication'' so immigrants can be reached during their wait. This
will allow, they said, access to counsel and communication between
migrant families--including cases when family members were not
processed at the same time or when children are separated.\23\

------------------------------------------------------------------

\23\ Aleaziz supra note 21.

------------------------------------------------------------------

DHS began to hold MPP Hearings in Tent courts along the Southern
Border in September 2019. One of the major problems LIRS has with the
tent courts is that hearings are conducted in secrecy. It is never a
good sign when attorneys and other observers are denied access to
courtrooms. Conducting secretive hearings may be permissible when
National security is at stake, however, this is not the case as asylum
seekers are not National security threats. Therefore, the use of
secretive tent courts is clearly an unacceptable and unnecessary due
process violation.

In the DHS draft report obtained by BuzzFeed News, DHS officials
back up the due process concerns that have been expressed by refugees,
immigration advocates and academics and officials have put forward the
following recommendation asking:

``agencies within DHS, including CBP, to provide immigration court
hearing notices in multiple languages, improve language access for
immigrants and ensure that they understand the `questions asked and can
make informed decisions,' standardize procedures for screening
vulnerable populations like children and people with disabilities, and
clarify the role of CBP officers in the process.''\24\

------------------------------------------------------------------

\24\ Id.

------------------------------------------------------------------

<div align="center">AR345</div>

v. lirs retrospective look at immigration between tolerance and
remain in mexico and offers recommendations

``The big takeaway from it is that MPP is not working,'' said a
former DHS official.\25\ Albeit, much remains unknown, but what is
known about the human rights and due process violations that have been
occurring since the launch of Remain in Mexico on children and families
is deeply disturbing. LIRS topline recommendation is for the Remain in
Mexico to end immediately and that our asylum system is restored.
--------------------------------------------------------------------------
    \25\ Id.
--------------------------------------------------------------------------
Applying Key Lessons Learned from Zero Tolerance to Remain in Mexico
    In many respects, the latest assaults on asylum seekers is
reminiscent of ``zero tolerance policy'' and for this reason, LIRS is
extremely concerned with allowing Remain in Mexico policy to continue.
    Remain in Mexico like zero tolerance policy has been justified by
the administration through legal gymnastics, or the twisting and
interpreting of immigration law to suit its deterrence approach to
immigration.
    Similar to the ``zero tolerance policy'', Remain in Mexico lacks
transparency and accountability mechanisms for holding Government
agencies and the Mexican government accountable for their actions. For
instance, DHS has failed to instruct immigration judges, Asylum
Officers Customs and Border Patrol agents, and immigration attorneys on
how to implement the policy and how the policy relates to metering and
the third-country transit ban. Moreover, Mexico's role and obligations
under the policy are unclear.
    Remain in Mexico policy has been implemented without taking into
account the innumerable human rights violations that it creates,
particularly for children, families, and vulnerable populations.
    From what we know, the Remain in Mexico policy appears to be
another ill-conceived and misguided policy with far-reaching human and
legal impacts. This begs the question, have any lessons been learned?
Considering that our Nation is still attempting to reunify children and
remedy the chaos and human rights and legal impacts from ``zero
tolerance policy,'' which the OIG and Government officials have
confirmed to be an ill-conceived policy with far reaching human costs
that continue to amount, followed by Remain in Mexico, the answer
appears to be, no.
                        lirs recommendations
    LIRS finds that the administration's deterrence approach to asylum
is the anthesis to our asylum legal and moral obligations. Given that
Mexico border cities are notoriously dangerous and migrants in the MPP
program have indeed been threatened, subjected to violent attacks,
targeted for extortion and kidnapping, more needs to be done with
ensuring that the individuals we send to Mexico are not place in harms
way. The harm that migrants are experiencing was predictable and
although the administration is turning its back on vulnerable
populations and the law, LIRS cannot, and we recommend the following:
    1. Immediate end to Migrant Protection Protocols and a restoration
       of our asylum system.
    2. Increased Congressional oversight and investigations at the
       border to assess the human rights and due process violations.
    3. Congressional Hearings that Address the Impact of Asylum
       Policies on Children and Families.
    4. DHS should be prevented from denying child welfare and
       immigration advocates and attorneys full access to observe and
       intervene in MPP interviews.
    5. Children, families, and other vulnerable populations must not be
       returned to Mexico.
    6. DHS must cease implementing MPP until it establishes a method
       for tracking and communicating with migrants who have been
       returned to Mexico.
    7. Until MPP ends and/or litigation prevents it from being
       implemented, at minimum, LIRS would like to see the following
       measures put in place at the border:
     Access to legal counsel and/or legal advocates made
            available to asylees so that they can be informed of U.S.
            law and have assistance with preparing asylum cases;
     An immediate end to interviews conducted by Customs and
            Border Patrol agents. Asylum Officers should be the only

<center>AR346</center>

government's critical tasks with conducting credible fear
        interviews;
   Full transparency for MPP trials and an end to tent
        courts.
8. More transparency with respect to the Remain in Mexico Policy
     and the interplay between asylum policies at the border. In
     this regard, DHS must:
   Make public the criteria it uses for determining who
        qualifies for a medical exemption under MPP.
   Clearly define and make public CPB and Asylum Officer's
        roles with respect to conducting credible fear interviews
        and implementing MPP.
   Clearly define and make public the protocol and procedures
        provided to CBP agents for implementing MPP and the third-
        country transit ban.
   Clearly define and make public the protocols and
        procedures provided to immigration judges conducting MPP
        trials.
   Make public the agreement between U.S.-Mexico on
        implementing Remain in Mexico and any subsequent amendments
        to the agreement.

                        _____

   Statement of the Mexican American Legislative Caucus (MALC) of the
                    Texas House of Representatives
                      Tuesday, November 19, 2019
      Asylum is a legal process under U.S. and international law through
which individuals with an imminent fear of violence or persecution can
ask for protection in another country. Current asylum laws in the
United States were enacted as a response to the genocides of the
Holocaust and represent the best of America's values as a ``land of
opportunity''. The legal right to seek asylum is being limited,
however, by current efforts under the Trump administration. Migrant
Protection Protocols (MPP), otherwise known as the ``Remain in Mexico''
policy, betray the core value of asylum: To provide safety and due
process to the most vulnerable international migrants.
      Though the Department of Homeland Security (DHS) concedes that MPP
should not apply to individuals who demonstrate a reasonable fear of
harm while in Mexico, fewer than 1,000 of the over 55,000 migrants
placed in the Remain in Mexico program have been allowed to remain in
the United States while pursuing their cases, despite the overwhelming
and ever-present dangers targeting migrants in Northern Mexico.\1\
Migrants forced to remain in Mexico face violence, kidnappings, and
threats to life, health, and well-being. One study found that between
21 percent and 24 percent of migrants in the ``Remain in Mexico''
program report receiving threats of violence while in Mexico and, of
those, over 50 percent report that the threats turned into actual
violence, including beatings, robbery, and extortion.\2\ Since cities
in Northern Mexico ran out of shelter space long ago, thousands of
migrants live on the streets in encampments without regular access to
food, potable water, or sanitation facilities.
------------------------------------------------------------------------
     \1\ See Dept of Homeland Sec., Assessment of the Migrant Protection
Protocols (MPP), https://www.dhs.gov/sites/default/files/publications/
assessment_of_the_migrant_protection_pro- tocols_mpp.pdf (``As of
October 15, 2019, USCIS completed over 7,400 screenings to assess a
fear of return to Mexico. . . .Of those, approximately 13 percent have
received positive determinations'').
     \2\ HUMAN RIGHTS WATCH, ``WE CAN'T HELP YOU HERE'': U.S. RETURNS OF
ASYLUM SEEKERS TO MEXICO 18-20 (2019).
------------------------------------------------------------------------
      Additionally, placing asylum seekers in Mexico--at a great distance
from the vast majority of immigration attorneys--undermines the ability
to guarantee that MPP complies with a person's 6th or 14th Amendment
rights to due process. Even though migrants with representation are 4
times more likely to be released from detention and 11 times more
likely to seek asylum than those without counsel, approximately 98
percent of the 47,313 asylum seekers in the Remain in Mexico program
were unrepresented as of September 2019.\3\
------------------------------------------------------------------------
     \3\ Details on MPP (Remain in Mexico) Deportation Proceedings, TRAC
                              AR347

IMMIGRATION/2019/09/25/1069357/-/1/immigration/mpp/ ).
(follow these steps: check ``Measure'' as ``Current Status;'' check
``Graph Time Scale'' as ``by Month and Year;'' select ``Hearing
Location'' on left-most drop-down menu; select ``Represented'' on
center drop-down menu; check ``Represented'' on right-most drop-down
menu).
------------------------------------------------------------------------
    MPP places asylum seekers in great danger, violates due process and
international legal obligations, and operates with surgical precision
to ensure that Spanish-speaking asylum seekers will almost never be
granted humanitarian relief and protection from the violence they are
fleeing. For that reason, the Mexican American Legislative Caucus
respectfully requests that the U.S. Congress take action to oversee,
investigate, and introduce measures to end this unprecedented policy
that undermines domestic and international legal protections for asylum
seekers.
    If you have any questions about the content of this statement
please contact Irma Reyes[.]
                            _____

        Statement of the National Immigrant Justice Center (NIJC)
                        November 19, 2019
       The United States has a moral and legal obligation to administer
asylum laws properly. Over the course of the last 3 years, the
administration has gone to extreme measures to violate therights of
asylum seekers; to not only turn away those in need, but to vilify and
mistreat them ininhumane ways.\1\ The perversely named ``Migrant
Protection Protocols'' (MPP), also known as the ``Remain in Mexico''
policy, is the latest iteration of these efforts to dismantle the U.S.
asylum system.\2\ Rather than protect, this program does the opposite--
it sends asylum-seeking families back to Mexico to await their
proceedings where they have no support, no place to live, and are
regularly extorted, kidnapped, threatened, and attacked by cartels and
other criminal groups. The Mexican government is unable to control
violence against migrants and is sometimes complicit or even involved
in the harm.\3\ A recent survey of more than 600 asylum seekers subject
to MPP found that 9 out of 10 respondents expressed fear of being
returned to Mexico.\4\ Since the program was implemented in January
2019, it has impacted an estimated 50,000 asylum seekers.\5\ The well-
documented risk of violence to individuals forced to remain in Mexico,
coupled with the geographic and technological challenges of securing
counsel while outside the United States, has resulted in a mere 41
percent of Remain in Mexico asylum seekers finding attorneys to
represent them before the immigration court.\6\
------------------------------------------------------------------------
    \1\ HUMAN RIGHTS WATCH, ``We Can't Help You Here''--US Returns of
Asylum Seekers to Mexico, July 02, 2019, https://www.hrw.org/report/
2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico.
    \2\ U.S. DEPARTMENT OF HOMELAND SECURITY, Migrant Protection
Protocols, Jan. 24, 2019, https://www.dhs.gov/news/2019/01/24/migrant-
protection-protocols.
    \3\ ``We Can't Help You Here''--US Returns of Asylum Seekers to
Mexico, supra note 1.
    \4\ Tom Wong and Vanessa Cecena, Seeking Asylum: Part 2, Oct. 29,
2019, US IMMIGRATION POLICY CENTER https://usipc.ucsd.edu/publications/
usipc-seeking-asylum-part-2-final.pdf.
    \5\ Juan Aguilar, Trump's Controversial ``Remain in Mexico''
Immigration Policy Expands Along Texas' Southern Border, TEXAS TRIBUNE,
Oct. 28, 2018, https://www.texastribune.org/2019/10/28/trump-remain-
mexico-immigration-policy-expands-texas-mexico-border/.
    \6\ TRAC IMMIGRATION, Access to Attorneys Difficult for Those
Requires to Remain in Mexico, July 29, 2019, https://trac.syr.edu/
immigration/reports/568/.
------------------------------------------------------------------------
    NIJC's Observations and Experiences with the Remain in Mexico
Policy in Laredo, Texas.--In Laredo, Texas, NIJC has represented asylum
seekers and observed Remain in Mexico hearings since the launch of that
``court'' in September 2019. The Laredo tent facility is a series of
tents and shipping container-sized trailers erected on the northern
bank of the Rio Grande, surrounded by barbed wire and guarded by agents
with guns.\7\ Traumatized, desperate, beleaguered asylum seekers are

                            AR348

required to appear before the judge in person around 4:30 a.m.
in order to be let into the United States for their hearings. Most
sleep on the bridge the night before their hearings, because traveling
through Nuevo Laredo in the middle of the night and early morning is
too dangerous. After they are escorted from the bridge into the tent
facility, the asylum seekers wait in a freezing cold room for hours
until their hearings begin around 8:30 a.m.

------------------------------------------------------------------------

\7\ Cedar Attansaio, Tent Courts Set to Open on Border for US
Asylum Seekers, SAN DIEGO UNION-TRIBUNE, Sept. 10, 2019, https://
www.sandiegouniontribune.com/news/nation-world/sns-bc-us-immigration-
tent-courts-20190911-story.html.

------------------------------------------------------------------------

    Once called to speak in court, asylum seekers attempt to explain
why they cannot return to their home countries to judges and Government
prosecutors who appear by video teleconference from a courtroom
hundreds of miles away. In the room where the initial hearings are
held, there are typically around 25 or more men, women, and children
waiting to see the judge, nearly all of whom do not have lawyers. They
sit on the opposite side of the courtroom from any attorneys who are
present and the attorneys are not allowed to talk to them. Their belts
and shoelaces have been taken from them. Their eyes are bloodshot from
exhaustion and, to a person, they look confused and afraid. Their
children--and there are many children--sleep in their arms. When the
asylum seekers express their fear of returning to Mexico or ask
questions about being forced to remain in Mexico, the judges frequently
get agitated and hurry along the proceedings or shrug in defeat,
reporting they have no power to order people out of the Remain in
Mexico process.
    Below are 6 examples of what NIJC attorneys have witnessed in the
Laredo tent facilities and through speaking with asylum seekers who are
subject to the Remain in Mexico policy in Nuevo Laredo:
    NIJC met an asylum seeker who travelled with a family member
        by bus from another part of Mexico to Nuevo Laredo for their
        hearings under the Remain in Mexico policy. As one family
        member disembarked, he was forced into a vehicle by waiting
        cartels and kidnapped. The other family member managed to
        escape and, despite this terrifying experience, waited at the
        bridge to attend her hearing in Laredo, Texas, the next day. At
        the hearing, the remaining family member described the attack
        and kidnapping to the judge to explain why her family member
        was unable to attend his hearing. Despite her eyewitness
        testimony about the kidnapping, the U.S. Government attorney
        argued strenuously that the missing family member be ordered
        deported for failing to appear.
    NIJC attorneys participated in the representation of a Cuban
        political dissident who slept on the bridge the night before
        his asylum trial. He reported that though the sheltered area
        where he slept was overseen by Mexican border officials,
        Mexican cartel members came into the space at will and
        kidnapped people from the shelter.
    Following this Cuban man's asylum hearing, the immigration
        judge indicated he was inclined to grant protection. Despite
        the strength of the claim, the Government lawyer indicated she
        would reserve appeal, which meant the judge was required to
        adjourn the proceeding in order to write a lengthy decision to
        be issued by mail. The judge declined to set the asylum seeker
        for another hearing, which should have meant that he could not
        be returned to Mexico while waiting for the decision because
        only individuals who are scheduled for future hearings are to
        be accepted back into Mexico. To side-step this procedural
        obstacle, the Department of Homeland Security issued a hearing
        notice with a fake hearing date, which resulted in the asylum
        seeker being returned to Mexico.
    NIJC attorneys participated in the representation of a large
        Central American family. While more than a dozen members of the
        family were allowed entry into the United States to seek asylum
        after passing credible fear interviews, 4 family members who
        arrived later were subjected to the Remain in Mexico policy and
        returned to Nuevo Laredo. Because all of the family members
        present asylum claims that arise from the same nucleus of facts

attorney on the evidence, but attorneys requested that Immigration and Customs Enforcement (ICE) agree to consolidate the proceedings of all family members and parole the 4 family members in Mexico into the United States. ICE refused, thus requiring that separate judges on separate dates hear the nearly identical cases. Moreover, while subject to Remain in Mexico, the 4 family members in Mexico were threatened by cartels and evicted from the hotel in Nuevo Laredo where they had been staying.

NIJC attorneys observed the sham nonrefoulement process in Laredo. Asylum seekers subject to the Remain in Mexico policy may request exemption from the program if they establish they face harm in Mexico on account of a protected characteristic. A gay, HIV-positive Central American man requested a non-refoulement interview after he was persecuted in Mexico and denied access to the life-saving medications he needs. His attorneys provided him with country conditions documents and a written legal argument in support of his claim. The officer who administered the non-refoulement interview by telephone refused to review his evidence, spoke with him for approximately 20 minutes, and summarily returned him to Mexico without an explanation for the denial.

While tent facility hearings are supposed to be no different from hearings in brick-and-mortar immigration courts across the country, authority and control over the hearing process differs dramatically. ICE officials--not immigration judges--control access and operations. When attorneys request access to cell phones or to hearing spaces large enough to accommodate legal teams, ICE officials determine the outcome of the requests. ICE officials decide whether attorneys may meet with their clients after court and for how long. ICE officials decide whether attorneys may bring interpreters to meet with their clients and assist with communication during court hearings. The reality that ICE officials, who are opposing counsel in immigration court, determine when and how attorneys for asylum seekers conduct representation is deeply troubling.

Asylum is a critical safeguard against tyranny and persecution that the United States has extended to those in need throughout American history. Offering asylum protection is also something we owe to ourselves as Americans; to remain tethered to the foundations of our country as a place of religious and political freedom and a place where those who have been persecuted because they possess a characteristic they cannot change can be safe. The concerted efforts by our Government to close off access to asylum were conceived in cruelty and implemented for superficial political gain. We must do better.

For more information, please contact Lisa Koop, associate director of legal services, at lkoop@heartlandalliance.org; Jesse Franzblau, senior policy analyst, at jfranzblau@heartlandalliance.org; or Joann Bautista, policy associate, at jbautista@heartlandalliance.org.

————

Statement of Yael Schacher, Senior U.S. Advocate, Refugees International
November 19, 2019

Thank for you for the opportunity to submit this written statement for this important hearing today.

Refugees International (RI) is a non-Governmental organization that advocates for lifesaving assistance and protection for displaced people and promotes solutions to displacement crises. We conduct fact-finding missions to research and report on the circumstances of displaced populations in countries such as Bangladesh, Colombia, Turkey, and Mozambique, among many others. RI does not accept Government or United Nations funding, which helps ensure that our advocacy is impartial and independent.

In testimony and reports over the past 10 months, RI has criticized ways that the Remain in Mexico policy has violated due process and led to great suffering. Rather than allow asylum seekers to pursue their claims in the United States, the policy returns them to Mexico, where there is little access to counsel, no provision for their basic needs, and no security to ensure their safety while their claims are adjudicated. This statement focuses on 3 ways that the policy raises

AR350

legal and human rights consequences that I have learned about from meeting with asylum seekers returned to Mexico; from observing Remain in Mexico immigration hearings relayed via video from port courts; and from speaking to migrants subject to Remain in Mexico who have returned to their home countries in Central America.

First, Department of Homeland Security (DHS) officials have not adequately fulfilled their obligations to screen asylum seekers regarding their fear of return to Mexico. In Tijuana, RI spoke to a Honduran woman who, without telling her where she was going, DHS flew from the Rio Grande Valley to San Diego in June 2019. When, at the port of San Ysidro, she objected to being returned to Mexico, U.S. Customs and Border Protection (CBP) forced her to sign the form by grabbing her arm, which she said still hurt weeks later. In Matamoros, RI spoke to men from Nicaragua and Honduras who told Customs and Border Protection officials that they had been kidnapped with the complicity of the state police in Reynosa before seeking asylum in the United States. A Honduran woman told RI of being trafficked into prostitution in Reynosa. Her body was covered in bug bites from being left by her traffickers, unconscious, in the desert, where CBP found her--but still returned her to Mexico, though she told them what had happened to her. None of these people had been referred by CBP to asylum officers for fear screenings about what happened to them in Mexico.

If referred to asylum officers at all, the fear screenings asylum seekers receive are inadequate and seem arbitrary. In one case RI followed for several weeks in El Paso/Juarez, a woman and her son were released from the Remain in Mexico program after their third fear screening despite absolutely no new facts in her case since the first one; the incident that made her scared to return to Mexico--an attempted kidnapping of her son--occurred before her first court hearing months earlier and had been mentioned in previous interviews with asylum officers. The end result is that this mother and child--who were traumatized, having witnessed the murder of their husband and father in Honduras--spent several unnecessary months in fear in Juarez and separated from family in the United States.

Second, DHS is interfering with the ability of asylum seekers to get meaningful hearings on their asylum claims in immigration court. Asylum seekers who are returned to Mexico wait there for many weeks until they return to the port of entry to be escorted to their initial hearings with an immigration judge. This is the day they have been waiting for, their chance to tell a judge about why they fled their home countries to ask for refuge in the United States. Almost none of them have attorneys to tell them what to expect. What happens is devastating for them and devastating to witness. RI watched one hearing in El Paso at which a Q'anjob'al speaker, who clearly had not been able to say anything in her own language for weeks, pled through a court-arranged interpreter for help: ``In Mexico, I am afraid and what hurts me most is that nobody wants to help me. Please put me in a cell,'' she begged. When she told the judge that she had documents attesting to abuse by her stepfather in Guatemala, the judge said now was not the time to address that. ``Please can I tell you now?'' she asked, to no avail.

Those brought to the port courts in Laredo and Brownsville see a judge on a television screen. According to policy guidelines, DHS (CBP and asylum officers) not the Executive Office of Immigration Review (the section of the Justice Department that employs immigration judges) controls who is exempted from the Remain in Mexico program. Asylum seekers learn quickly that the judge is powerless to take them out of the program, powerless to unite them with spouses and children in detention or otherwise in the United States, powerless to help them find counsel to represent them or a translator to help with their asylum application and evidentiary documents. If any start telling the judge about persecution they have faced, the judge silences them. At one hearing, a judge in Harlingen left the courtroom while the attorney for DHS and the officer in the port court determined who would be referred to an interview with an asylum officer about their fear of return to Mexico; it was, in the judge's words, to DHS and not to her that fear needed to be expressed. When the judge returned, she told all the asylum seekers that the one thing that was certain was that, if they did not return to a hearing in 4 weeks with their asylum applications completed in English, they would be deported in their absence.

AR351

Despite some obstacles, some asylum seekers are able to pursue their cases: Find attorneys or represent themselves, submit their applications, and return for individual hearings on the merits of their asylum cases. Yet obstacles, both physical and technical, abound. In September, Refugees International met one Nicaraguan father and son reporting to the port of entry in Nuevo Laredo at 4:30 a.m. as is required for morning court hearings. They had just been released by men who had kidnapped them on their way to the port. In early November, Refugees International was in a courtroom in Harlingen with a judge and a translator while a Cuban asylum seeker appeared for her merits hearing at the port court in Brownsville. Due to pressure to expedite cases, only 2 hours had been allotted for a merits hearing that typically takes all day, but would certainly take longer since simultaneous translation is not possible when using video technology conferencing. The woman was still testifying when the court had to close. This meant that both she and the other asylum seeker that was to appear that afternoon had to have their hearings reset and would have to wait in Mexico until late February. They must return to Matamoros-- where an unofficial refugee camp lacking sufficient clean water, food, schooling, and security is home to thousands of waiting asylum seekers.

Many asylum seekers feel they cannot wait it out and therefore ask to be sent back to their home countries or just return on their own, the third major problem with the Remain in Mexico policy. These asylum seekers have not yet had a chance to seek protection and may be at risk upon return to their home countries. In the spring, RI was in the court room in El Paso when a Guatemalan woman told a judge that she had no money and was afraid to wait and travel through Mexico on her own, especially without her own and children's identification documents, and insisted on deportation. She told the judge that though she was very afraid to return to Guatemala, she would rather be killed there, where there would be people to take care of her children, than in Mexico, where she knew nobody. Another woman returned to Guatemala in September, after a man threatened her and her children while they were waiting in Tijuana for their next court date. In October, RI spoke to this woman on the phone. She feared for her life in Guatemala--the partner she fled originally was still threatening her--and wanted to know how she might reunite with her elder daughter, who had been separated from her at the border, detained for 3 months, and then released to relatives while she pursued her asylum claim. Since the mother had missed her September Remain in Mexico court date in San Diego, however, she had been deported in her absence and is barred from relief in the United States for a decade.

The Remain in Mexico policy thus cuts off the right to seek asylum and returns asylum seekers to danger in violation of U.S. and international law. It also separates families and makes a sham of the idea of justice in immigration court.

_____

Statement of San Antonio Region Justice For Our Neighbors (SARJFON)
November 18, 2019

San Antonio Region Justice For Our Neighbors strongly urges Congress to reassert legislative authority over our Nation's immigration policy and end the violation of human dignity and human rights being perpetrated by our Government at our Southern Border. As a 501(c)3 faith-driven provider of immigration legal services to border communities from Brownsville to Laredo to Eagle Pass, we have significant exposure with asylum seekers adversely impacted by the Migrant Protection Protocol/Remain in Mexico Policy.

Our first engagement with clients struggling to survive MPP started shortly after its implementation in Texas and these words (Google translated and abbreviated from an email received July 26, 2019) requesting legal representation speak for themselves:

``Hello madam blessings. Yesterday several girls who were in the tents with me went to the first court. From here . . . she did not want to return to [Mexico] because she explained to the judge the dangers here and the judge allowed her to go to the detention center. Madam, I know that this first court depends on the judge's decision but first of all on God. I need please that if I am not allowed to speak you ask the judge to take me to a detention center . . . 5 days ago they kidnapped a . . . girl near here and her family is desperate. Yesterday at 9 pm

AR352

several police officers arrived and shouted, and knocked on
the door, we locked ourselves here in the room and turned off the light
because we were very afraid. Because here the police are corrupt . . .
Here we have no security of any kind. Please help me, I will thank you
infinitely and God will bless you. Madam I prefer to be in a tent as I
was, without taking a bath, going hungry, without brushing my teeth,
almost without communication, with bad treatment. I feel SAFE in the
United States, here in this country [Mexico] there is no security of
any kind. Please help me. God bless you.''

    Please let this plea for safety stand as testimony for the many
asylum seekers our staff are working to assist in each of the Texas
border communities impacted by MPP. We believe her words echoed by
countless others being prevented from lawfully pursuing their asylum
claims ought to compel elected officials to take steps immediately to
end MPP.
    Our staff/attorneys would be happy to answer any questions you
might have and shed light on the unimaginable conditions those
religated to MPP are being forced to endure. We also extend an
invitation to the committee to facilitate direct video conference
communication with asylum seekers with whom we are working. We
appreciate the opportunity to share this information and we look
forward to learning of positive steps toward restoring justice for
those seeking asylum.

                            ———

            Statement of Todd Schulte, President, FWD.us
                        November 19, 2019
    The tents start a few feet from the U.S.-Mexico border--and in some
places, the tents press up against the building directly at the border.
When you walk over the short bridge from Brownsville, Texas to
Matamoros, Mexico, you immediately walk into what is best described as
a tent city, filled with approximately 3,000 people who are blocked
from applying for asylum in the United States and awaiting the results
of their process in the safety of America. You see dozens of children:
Some playing, some sitting, some nursing, and some bathing in the dirty
water of the Rio Grande. You smell the camp because the Mexican
government refuses to allow more than a handful of portable toilets for
a few thousand people, leaving people to need to relieve themselves on
the outskirts of the camp.
    And because it is just over the border, and just a little harder
for the U.S. public to see than the horrors of the 2018 zero tolerance
family separation crisis (which continues) or the awful conditions of
confinement we say dominate headlines in 2019, we have not yet seen the
outrage over the Remain in Mexico policy, which when layered with a
series of other policies, has resulted in the unprecedented attack on
the basic decency of families attempting to seek asylum at the United
States and Mexico border.
    The assaults on America's system of asylum and the basic decency
deserved by these families are no less, and that is why today we are
submitting this statement for the record.
    Why do approximately 3,000 people sit in these horrible conditions,
sleeping in old tents, bathing in dirty water, without clean water or
toilets, and subject to harsh weather? Because they're making a
rational decision that these awful conditions are better than the risks
that come with moving away from the border, where regular kidnappings
and other serious--and deadly--risks exist at terrible rates.
    Over the last few months, the most powerful country in the history
of the world has sent back over 60,000 people--mostly families, often
women and children--back to Mexico to wait in terrible, deeply
dangerous conditions for months and perhaps years for their day in
court on their asylum hearings. The United States sends these families
back to areas its own State Department says are too dangerous for
travellers. No one should repeat the Orwellian label of ``Migrant
Protection Protocols'' that has been given to this policy.
    And so instead of living in shelters away from the relative safety
of the border and access to basic health and legal services, people
have chosen to live in camps within view of the United States.
    People do not have a right to automatically receive asylum, but
they do have a legal right to request asylum and should have the right
to a fair process and to await this process in safety. The Remain in

                            AR353

Mexico pending processes—almost threats to their safety and actually at
the border. The judges are often dozens or hundreds of miles away.
Almost none have attorneys. After their hearings, they are sent back to
dangerous conditions where they are targeted for kidnapping.

Over the last year-and-a-half, the Government of the United States
of America has pursued a series of intersecting policy goals designed
to essentially eliminate the entire asylum system of Southern Border.
That is, through policies such as ``metering,'' Remain in Mexico, the
various asylum bans and ``Safe Third Country''-like agreements combined
with the intentionally cruel and chaotic treatment of families and
children--including babies--they seek to nearly eliminate the ability
of anyone to avail themselves of their legal right to seek asylum.

For the constant, misleading rhetoric about how this must be about
unauthorized immigration and how ``The Wall'' is the answer to a
falsely-defined problem, in fact this is part of a pattern of assaults
on nearly every legal immigration avenue. The refugee program has been
slashed to near extinction. High-skilled immigration avenues are under
attack. Regulatory and administrative hurdles are being thrown up to
make everything from a U.S. citizen petitioning for a spouse to come to
the United States to a global manufacturer getting that world-class
engineer harder, more expensive, and ultimately less likely.

In Matamoros, you can see the United States from every corner of
the tent camp--and in Matamoros, you see the result of these multi-
pronged, chaotic, and cruel assault on immigration and asylum channels.

Two months ago, there were a few hundred people in tents. Today,
approximately half of the 3,000 are children. In the absence of either
the Mexican or U.S. Government as well as major international
organizations like the United States or the Red Cross, there is an
amazing contingent of volunteer-led organizations who work daily to do
what they can to provide basic humanitarian services, a sense of
humanity and--where they can--some legal services to these
organizations. The volunteers from Team Brownsville prepare and walk
food for hundreds over the bridge every night, while Angry Tias and
Abuelas provides donated basic humanitarian needs like clothes. Private
attorneys volunteer their time and non-profits send volunteer
attorneys. Volunteers with Global Response Management who previously
worked in war zones like Yemen and served in the U.S. military provide
basic medical support under a tent. Attorneys and staffers with civil
rights organizations like Texas Civil Rights Project and LUPE fight
tirelessly to show the world what is happening. We need policy change,
but in the mean time we encourage others to support these and other
great groups and are deeply thankful to them.

This is the result of the policy choices made by the United States
of America, and just because it exists outside of the United States, it
makes it no less awful or devastating to tens of thousands of people
who look to the United States for a chance to survive threats to their
lives--a chance that the United States is denying them today. We urge
the Government of the United States to reverse these policies and
uphold the best of what this country can be by ending the Remain in
Mexico policies and related attacks to essentially eliminate the asylum
system.

————

Statement of Karla Barber, Dallas, TX

I am submitting this statement for the Congressional hearings on
Migrant Protection Protocols (MPP) scheduled to begin on November 19,
2019.

I have just finished a trip to visit the Mexico border towns of
Matamoras and Ciudad Juarez to see for myself the effects of MPP.

What I saw in Matamoras is horrifying. Over 2,500 asylum seekers in
an encampment right at the bridge living in tents. A handful of porta-
potties provided by the volunteer group Team Brownsville overflowing
with human waste. People forced to bath in the very polluted Rio
Grande. Children without shoes. Sick children, sick adults. All living
in tents crammed together. They rely on the donations brought over by
volunteers in Brownsville to survive.

In Juarez I saw approximately 200 refugees in a tent encampment by
the Santa Fe bridge and another 800 near the Free Bridge. I met a 7-
year-old girl; she told me about the ``list''; ``they are on number 33;
my family is number 183''.

I visited 2 shelters. At one, I met a boy with Down's syndrome

AR354

whose faces froze from the frostbite box). He and his mother
sent back to wait in a shelter that has no heat.

I talked to a family (a mother, a father, a young daughter) who
were kidnapped and held captive in an abandoned church. Held for 3
days, they broke a window to escape, and found their way to the shelter
where they share a 2-bedroom ``house'' with 7 other families; a total
of 25 people. They have family in the U.S. ready and willing to sponsor
them.

I heard stories about kidnappings and murders.

All of this because of a manufactured crisis caused by MPP. This
practice needs to end.

Thank you,

Karla Barber,
[]Dallas, TX 75219.

————

Statement of Janice Zitelman, Fredericksburg, TX

Good Morning,

I am writing to ask that you do all that is possible to end the
Remain in Mexico policy. My husband and I have been volunteering with
the Interfaith Welcome Coalition based in San Antonio for over a year.
We have heard personal stories from the asylum seekers about their
difficult journeys. All whom we have met just want a life for
themselves and their children where they do not fear for their lives.
The U.S.A. has treated them poorly even though they have a legal right
to seek asylum. With the ``Remain'' policy they are suffering great
hardship. Volunteers seek to assist them with food, clothing, and
shelter on the Mexico side but it is totally inadequate. Our country is
rich in resources and there is no need to try to keep them out when
they are just following the law. They have sponsors who welcome them.
``No one leaves home unless there is the mouth of a shark''.

Our country has a responsibility to assist the asylum seekers since
we played a great role in creating the unstable government and economic
situation of the Central American countries.

Thank you for you service to our country,
Janice Zitelman,
[]Fredericksburg, TX 78624.

————

Statement of Marguerite D. Scott, LCSW-S, Kerrville, TX
November 17, 2019

Re: Statement Regarding MPP

Honorable Members of the House Homeland Border Security
Subcommittee,

In the hearing you will hear from competent professionals about the
effect of trauma on children and adults. Listen to them.

In my clinical practice, I have for decades treated adults
survivors of childhood trauma. Such trauma is costly emotionally and
financially to the individuals, their families, and their communities,
to us all.

Do what you know is in alignment with basic American values of
respect, ``all men are created equal'', and what is in the best
interest of the children--our future.

Move beyond fear.

Sincerely,

Marguerite D. Scott, LCSW-S,
[]Kerrville, TX 78028.

————

Statement of Douglas Stephens, Esq., Government Accountability Project
November 18, 2019.

The Honorable Kathleen Rice,
Chairwoman, Subcommittee on Border Security, Facilitation, &
Operations, U.S. House Committee on Homeland Security,
Washington, DC 20515.
The Honorable Clay Higgins,
Ranking Member, Subcommittee on Border Security, Facilitation, &
Operations, U.S. House Committee on Homeland Security,
Washington, DC 20515.

Dear Committee Chairs: Below please find a written statement for

AR355

the record from our oversight investigation, is presented here, in support of the U.S. House Committee on Homeland Security's Subcommittee on Border Security, Facilitation, & Operations November 19, 2019 Hearing, Examining the Human Rights and legal Implications of DHS's ``Remain in Mexico'' Policy.

Mr. Stephens is a former Asylum Officer who resigned from USCIS in August 2019. While serving as an Asylum Officer, Mr. Stephens, after conducting 5 interviews under the Migrant Protection Protocols (MPP or ``Remain in Mexico'' program), refused to conduct further interviews, believing that implementing MPP violates numerous laws and treaty obligations and poses significant threat of harm to asylum seekers forced to remain in Mexico. After facing retaliation, he documented in writing the reasons for his concerns to his superiors in a 7-point memo.

Mr. Stephens shared his concerns with Senator Jeff Merkley (D-OR), which became an integral part of a report issued by Senator Merkley on November 14, 2019, ``Shattered Refuge: A U.S. Senate Investigation into the Trump Administration's Gutting of Asylum.'' Mr. Stephens has since spoken on the record to the press, including the Los Angeles Times and This American Life, motivated to shed light on MPP as an illegal, dangerous, and destructive policy, and to support his former Asylum Officer colleagues who remain in the untenable position of having to implement a policy that is illegal and dangerous. This same motivation prompts his statement to this committee.

Thank you for holding this important hearing and for the opportunity to submit his written statement regarding his decision to engage in protected whistleblowing based on his experience as an Asylum Officer seeing first-hand the illegal and inhumane effects of the Remain in Mexico policy.

          Sincerely,

                         Dana L. Gold,
     Counsel for Mr. Douglas Stephens, Senior Counsel & Director of
               Education, Government Accountability Project.
          Attachment.--Statement of Douglas Stephens, Esq.
               November 19, 2019

Chairwoman Rice, Ranking Member Higgins, and other Members of the subcommmittee, thank you for providing the opportunity to provide a written statement relevant to this hearing on Examining the Human Rights and Legal Implications of DHS's ``Remain in Mexico'' Policy.

My name is Douglas Stephens.\1\ I was an Asylum Officer in the San Francisco Asylum Office from September 2017 until August 31, 2019. Prior to my service in the asylum corps, I was a Department of Justice (DOJ) staff attorney for the San Francisco Immigration Court from September 2015 to September 2017. While at the Immigration Court, I reviewed 195 cases and drafted 96 judicial decisions. In my 2 years as an Asylum Officer, I conducted and adjudicated more than 350 Affirmative Asylum interviews, Credible Fear screenings, and Reasonable Fear screenings. I conducted 5 Migrant Protection Protocol (MPP) interviews, also known as Remain in Mexico interviews.

------------------------------------------------------------------------
\1\ I, Douglas Stephens, am an attorney admitted to the practice of law in California. I received my Juris Doctor and a cross-disciplinary certificate in Human Rights from Emory University School of Law in May 2015. I received my Bachelor of Arts in International Affairs and Peace and Conflict Studies from the University of Colorado in 2007.
------------------------------------------------------------------------

In late 2018, the Trump administration announced the Remain in Mexico policy. Under the policy, Asylum Officers are tasked with conducting an interview of non-Mexican migrants attempting to enter the United States by the Southern Border, nominally for the purpose of assessing the likelihood of harm the migrant would face if forced to remain in Mexico during the pendency of his or her removal proceedings before an Immigration Judge. As I am sure you are aware, the policy was slow to be implemented and is subject to on-going litigation. The San Francisco Asylum Office began conducting MPP interviews on or about June 2019, after the Ninth Circuit Court of Appeals lifted a temporary injunction on the policy. The San Francisco Asylum Office was assigned all MPP interviews originating for migrants that cross the Mexico-Arizona border.

To the best of my recollection, Asylum Officers in San Francisco received two ``trainings'' on the policy during the office's weekly,

all-hands training meetings. Both meetings merely existed and
consisted of nothing more than Training Officers and a Section Chief
reviewing a PowerPoint presentation disseminated from RAIO (Refugee,
Asylum and International Operations) headquarters. The first training
occurred sometime in early 2019 before the program was enjoined. The
second training occurred around June 2019, after the injunction was
lifted.

    At both trainings, the mood was tense and morale low. Officers
raised numerous objections and concerns, including but not limited to
the programs legality, the manner of implementation, the office's
jurisdiction to conduct the interviews, and our ethical obligations as
Government officials and as licensed attorneys. In both trainings,
those concerns went largely unanswered. The local San Francisco
administration, including the director and section chiefs, appeared
empathetic with the concerns raised but could provide no answers,
maintaining an ``I'm just the messenger'' attitude. Notably, despite
concerns being raised early in the year, there were still no answers or
resolution to those concerns by the second training some 4 months
later.

    In tacit recognition of the validity of the objections, the San
Francisco Asylum Office first attempted to implement MPP interviews on
a rotating volunteer schedule. However, the number of interviews
quickly exceeded the number of volunteers, and the interviews became
mandatory for all staff. When I left the office at the end of August,
MPP interviews were given priority over all other interviews and
programs. If there were insufficient officers to meet demand from the
border, the officers were pulled out of credible fear and affirmative
asylum interviews to do MPP interviews. Additionally, mandatory
overtime on nights and weekends was implemented. To my knowledge, that
is still the situation in San Francisco, while other offices, like the
Los Angeles office, have been able to operate on a volunteer basis.

    I was assigned MPP interviews the week of August 5, immediately
upon return to San Francisco from a detail to Dilley, Texas, and 1 week
after I had applied for a supervisor position within the office. I was
assigned 3 MPP interviews on August 6, and 2 on August 7. It is my firm
belief that the Remain in Mexico program is illegal, violating the
Immigration and Nationality Act and international law. I refused to
conduct any more MPP interviews on August 8, 2019.

    During those 2 days that I conducted MPP interviews, and over the
following weeks, I had numerous conversations with the other asylum
officers in San Francisco. These conversations were always furtive, and
behind closed doors. Nobody I spoke to was comfortable with the MPP
interviews. Officers who had not yet conducted an MPP interview were
generally thankful and were hoping to somehow avoid the assignment.
People would volunteer for otherwise undesirable work details so they
could avoid being placed on the MPP schedule. A number of officers had
already quit due to MPP before I was tasked with the interviews. Many
more have left since. My impression was that the majority of the
officers who left did so by transferring elsewhere within the agency.
Although MPP was the motivation for leaving the asylum office, they
often remained quiet about this fact, not wishing to jeopardize their
careers. Individuals like myself, who ultimately chose to leave
Government service entirely, were more vocal about the reason they were
quitting. I know of at least one individual who took a demotion in
order accelerate the transfer and avoid any complicity with MPP. I know
of only 1 officer who has both refused to conduct MPP and maintained
their employment at the asylum office.

    The officers who had done MPP interviews were frustrated, angry,
and demoralized. Where the previous Credible Fear interviews averaged 1
to 2 hours, MPP interviews could take 3 hours or longer--longer than a
normal affirmative asylum interview. However, nobody I spoke to had
been able to get approval for a positive \2\ determination, regardless
of the facts being presented to them or the level of past harm in
Mexico. In the rare instances that an asylum officer in the San
Francisco office did make a positive determination, that determination
was overridden by supervisors and changed to a negative.

------------------------------------------------------------------------
    \2\ The term ``positive'' determinations refers to individuals who
``pass'' an MPP interview and are not sent back to Mexico; ``negative''
determinations refers to those who were returned.
------------------------------------------------------------------------
                                AR357

Every officer I talked to, from entry-level to supervisor, discussed at length with a senior asylum officer and fellow lawyer why MPP felt significantly worse than other types of interviews and negative decisions we issue. That was the question I was asking myself when I decided to look into issue of legality for myself.

Asylum Officers have two fundamental jobs: (1) Identify whether or not someone qualifies for asylum protection under the law and provide protection to those individuals; (2) identify potential National security concerns and fraudulent claims to safeguard the security of the United States and maintain the integrity of the asylum program. MPP does none of these things. While under the previous rubric of Credible Fear, both Asylum Officers and CBP were running background checks on applicants; Asylum Officers do not perform any background checks on individuals under MPP. Additionally, the program does nothing to eliminate fraud in the system, which occurs mostly in populations largely unaffected by MPP.

More egregiously, the program actively places asylum seekers in exceptionally dangerous situations. Asylum Officers must be well-versed on the political, social, and economic situation in an asylum seekers home country, or in the case of MPP, in Mexico. Every Officer conducting MPP was aware of the situation in Mexico and danger to migrants being reported, not only in the media but in expert reports from the State Department and the Asylum Corps' own research unit. However, under MPP, instead of offering protection, officers hear credible stories of past harm and feared future harm in Mexico, and then return the asylum seekers to Mexico--returning them to locations that the officer knows will put the migrant at risk of the exact harms Officers used to protect against.

This is the discomfort felt by every officer I have spoken to: Under MPP we are affirmatively and intentionally harming those same individuals we previously protected. In so doing, we are complicit in the persecution, torture, and other human rights abuses these individuals will face back in Mexico.

Drawing on my experience at the asylum office, the immigration court, and my training as a lawyer, I was able to quickly identify at least 7 ways that the MPP program violates the law, my oath to office, or the principles of the refugee program. The obvious illegality of MPP and the resulting harm to asylum seekers is what motivated me to refuse to continue doing the interviews. Had the only problem been a narrow legal question already being litigated, I am not sure I would have refused and would likely have waited for a judicial ruling. However, the scope of the illegality, the numerous violations across multiple sections of the INA and international treaty obligations, leads me to believe that whoever designed the policy was either ignorant of, or willfully blind to, the law. In addition, because the policy is actively causing harm to tens of thousands of individuals, it felt imperative to raise these concerns quickly.

On August 8, I refused to conduct any more MPP interviews or otherwise be involved in the program. I informed my supervisor that I was refusing because I believe the program is illegal in multiple aspects, and that by participating in the program Officers were breaking the law and violating their oath to office. I memorialized my objections and concerns in a memo. On Monday, August 12, I sent that memo as the body of an email to the management of the San Francisco Asylum Office, including the director, section chiefs, and the 2 supervisors who had reviewed my MPP interviews. I also included my union representative, because management had begun disciplinary proceedings against me for insubordination. I do not know if my concerns were discussed or elevated. Management never responded to my email, addressed my concerns in person, or even acknowledged receipt of my objections. Although I was not present, I was told by other asylum officers that management emphasized that MPP interviews are mandatory work at the next all staff meeting.

Through the union, I was put in touch with Senator Merkley's office because he was conducting a special investigation into possible legal violations within the asylum program. Having received no response from my superiors in USCIS, I decided I should share my concerns with the Senator. Senator Merkley ultimately utilized much of my memo in a report on the destruction of the asylum program, which he published last Thursday, November 14.\3\ Ultimately, I decided to leave USCIS, feeling that my continued employment there was not in my best interest.

AR358

Before leaving, I reviewed my memo with many San Francisco
colleagues in an attempt to support those individuals who were actively
struggling with the ethical dilemma of being forced to implement the
policy. It is that same motivation--to shed light on an illegal,
dangerous, and destructive policy, and to support my former
colleagues--that compelled me to speak out publicly.
------------------------------------------------------------------------
    \3\ Office of Sen. Jeff Merkley, Shattered Refuge, A U.S. Senate
Investigation into the Trump Administration's Gutting of Asylum
(November 2019), Appendix N: Confidential Whistleblower Email to USCIS
Management Regarding Migrant Protection Protocols (August 12, 2019),
pp. 77-80, available at https://www.merkley.senate.gov/imo/media/doc/
SHATTERED%20-
REFUGE%20%20A%20US%20Senate%20Investigation%20into%20the%20Trump%20Admin
i- stration%20Gutting%20of%20Asylum.pdf.
------------------------------------------------------------------------
    I now have the privilege of sharing these concerns about the
illegal and dangerous effects of MPP with this committee.
        specific concerns about the legality & adverse humanitarian
                        consequences of mpp
    MPP has been operating in the following manner. If, and only if, a
an asylum seeker expresses a fear of returning to Mexico to Customs and
Border Patrol (CBP) Agents, CBP notifies the San Francisco Office.
Interviews are conducted telephonically that same day. Officers remain
in their home office and conduct a 3-way call with migrants being held
in a CBP detention facility on the border and a third-party
interpreter. The telephone connections are bad; the line is often fuzzy
or had static, and calls are frequently dropped. The asylum seeker is
denied access to legal representation during the interview and the
interview will not be postponed to give the applicant an opportunity to
find and confer with counsel.\4\
------------------------------------------------------------------------
    \4\ The outright denial of representation for an individual in
removal proceedings also violates the INA, although I did not
explicitly note this objection in my memo.
------------------------------------------------------------------------
    The purpose of the MPP interview is nominally to comply with our
country's international obligation to the principal of non-refoulment--
to not return someone to a country where it is more likely than not
that the migrant be persecuted on account of their race, religion,
nationality, political opinion, or membership in a particular social
group, or where it is more likely than not they would be subjected to
torture. The principal of non-refoulment has been accepted as a jus
cogens within international law and has been codified in the 1952
Convention of Refugees and the 1967 protocol. It is an essential
protection under humanitarian, refugee, international human rights, and
customary law. It is codified within our domestic laws at INA 
241(b)(3), and referred to as Withholding of Removal. However, as I
explain below, the MPP program almost ensures violation of this
principal.
    The MPP interviews are also unique from other tasks assigned to the
Asylum Corps in a few key ways. First, the interviews are not
contemplated in the INA and there are no implementing regulations.
Second, an applicant can only be subject to MPP interviews if they are
already in removal proceedings under INA  240. Previously only
Immigration Judges adjudicated claims arising from removal proceedings
under INA  240. Third, the burden of proof for a migrant to pass MPP
interviews is ``more likely than not,''\5\ which is substantially
higher than any other interview adjudicated by Asylum Officers. By way
of reference, affirmative asylum interviews are to determine if there
is a ``well-founded fear of harm,'' which is usually quantified as a 1
in 10 chance of harm.\6\ Credible Fear interviews are referred to as
asylum pre-screening interviews and have an even lower burden of proof,
asking if there is a significant possibility an applicant could
establish a well-founded fear at a full hearing.\7\ Finally, while in
all other contexts an asylum applicant can have their claim reviewed or
renew their petition before an Immigration Judge, a negative
determination in MPP is unreviewable and results in the immediate
removal of the applicant to Mexico.
------------------------------------------------------------------------
    \5\ This is the same as a ``preponderance of the evidence''

AR359

standard in most credible fear cases.

    \6\ See, INS v. Cardoza-Fonseca, 480 U.S. 421, 440 (1987).
    \7\ 8 C.F.R. ☐ 208.3(e)(2).
------------------------------------------------------------------
    With that in mind, I have concluded MPP is illegal for the
following reasons, outlined below and with excerpts from the memo I
sent to management and the San Francisco Asylum Office staff explaining
my objections to conducting interviews under MPP:
    1. There is no statutory authority for the MPP, and the program
violates U.S. immigration law. What proceedings are to be given to a
migrant when they arrive at the border is addressed in INA ☐ 235(b). A
careful reading of the statute makes it clear that the provision relied
upon the administration to justify MPP is inapplicable to the
population being subject to MPP. Instead, those individuals must be
placed in expedited removal proceedings and given a Credible Fear
screening. They should not be forced to leave the United States
territory while in removal proceedings. The short statutory analysis I
provided in my memo is as follows:

The legal question at issue is whether the 2 provisions governing
inspection for applications for admissions--expedited removal under INA
☐ 235(b)(1) and ``other aliens'' un INA ☐ 235(b)(2)--are mutually
exclusive or if CBP can proceed under section (b)(2) even when an
applicant falls within the requirements of expedited removal.\8\ The
administration has claimed legal authority to implement the MPP
pursuant to INA ☐ 235(b)(2)(C), which allows for the return to a
contiguous territory of an alien who is subject to admission and
inspection procedures under (b)(2). However, section 235(b)(2)(B)
provides explicit exceptions to individuals subject to section
235(b)(2) and specifically states that (b)(2) does not apply to aliens
subject to inspection under (b)(1). Similarly, section (b)(1) provides
an explicit exception for individuals who would otherwise be subject to
expedited removal, which is referenced multiple times while describing
expedited removal proceedings. INA ☐ 235(b)(1)(F); see also, INA ☐
235(b)(1)(A)(i), (ii). The exclusion language under each provision
makes clear that Congress considered and specifically determined who
would be excepted from inspection under provision. Individuals subject
to inspection under (b)(1) are not subject to provisions of (b)(2). The
separation of the 2 processes for admission, 235(b)(1) and (b)(2), has
been recognized by both the Supreme Court and the Attorney General.
Jennings v. Rodriguez, 138 S. Ct. 830, 837 (2018); Matter of M-S-, 27
I&N Dec. 509, 510 (BIA April 16, 2019).
------------------------------------------------------------------
    \8\ Individuals are subject to expedited removal only if they are
removable under ☐☐ 212(a)(6)(C) or 212(a)(7).

Furthermore, [ . . . ] whether an applicant for admission is subject to
inspection under (b)(1) and (b)(2) is not discretionary. If an
immigration officer determines that an individual is removable under
INA ☐☐ 212(a)(6)(C) or 212(a)(7) ``the officer shall order the alien
removed'' pursuant to expedited removal proceedings. INA ☐☐
235(b)(1)(A)(i) (emphasis added). The mandatory nature of expedited
removal has not been disputed and conforms with the Congressional
intent of deterring undocumented migrations. Once an applicant
expresses an intent to apply for asylum or a fear of persecution ``the
officer shall refer the alien for an interview by an asylum officer''
for credible fear screenings. INA Sec. ☐ 235(b)(1)(A)(ii) (emphasis
added). In other words, individuals who apply for admission in the
United States who are removable under INA Sec. ☐ 212(a)(6)(C) or
212(a)(7) must be placed in expedited removal and must be given a
credible fear interview if they request asylum or claim a fear of
persecution. The MPP violates the INA because it inappropriately
removes individuals who must be inspected and processed under expedited
removal and credible fear, and places them in removal proceedings under
------------------------------------------------------------------
section (b)(2).

    2. The Asylum Office never had jurisdiction to do any of the MPP
interviews that I conducted, or, to my knowledge any of the interviews
conducted by any other officer at the San Francisco Office. This was a
concern I had raised at the trainings and it was reaffirmed as soon as

<div align="center">AR360</div>

I began MPP interviews before I was ever given a `Notice to Appear (NTA) which is the charging document that places someone in removal proceedings under INA § 240. Nor did the file contain any other charging document that would confer authority to the Asylum Office to conduct interviews. When I was discussing paperwork with an applicant at the end of one interview I learned that she had not been given an NTA or any other paperwork from CBP prior to her interview. This raises serious due process concerns, as the NTA is the document required for removal proceedings to begin and MPP interviews can only occur if someone is already in removal proceedings. Additionally, both statute and regulations require that the NTA provide the individual with a list of warnings if they fail to appear in court and notify them of their rights in removal proceedings, including the right to an attorney and an interpreter. Based on the lack of service to the asylum seekers before their MPP interviews and the speed at which MPP interviews were being conducted after someone arrived at the border, I seriously doubt that any NTAs were served on an immigration court prior to the interviews. This would, quite literally, make the entire MPP interview extrajudicial.

3. MPP interviews violate our international treaty obligations by discriminating against a particular class of migrants. At the time I objected, the policy targeted specifically individuals from Guatemala, Honduras, Nicaragua, and El Salvador. Although the policy has been expanded to other Latin American countries, the implementation solely on the Southern Border highlights the discriminatory intent. If the administration truly believes this policy is legal and justified, there is no explanation that I can think of, other than intent to keep out a certain class of migrants and discriminate based on national origin, race, and financial status, to not also implement MPP on northern land borders, sea borders, and all ports of entry including airports.

MPP violates our country's obligation under the 1967 Protocol. By ratifying the Protocol, the United States, among other things, agreed to not discriminate against refugees on the basis of their race, religion, or nationality, and to not penalize refugees for their undocumented entry into the country. However, the MPP both discriminates and penalizes. Implementation of the MPP is clearly designed to further this administration's racist agenda of keeping Hispanic and Latino populations from entering the United States. This is evident in the arbitrary nature of the order, in that it only applies to the Southern Border. It is also clear from the half-hazard [sic] implementation that appears to target populations from specific Central American countries even though a much broader range of international migrants cross the Southern Border. It is also demonstrated by the exempting from MPP interviews certain populations from those countries who have a high likelihood of receiving a positive finding.

4. The policy also violates our international obligations under the 1967 Protocol by punishing asylum seekers for requesting protection. MPP is punitive in that it is clearly calculated to limit the future ability of a would-be asylum seeker from ever obtaining immigration status or protection in the United States by significantly increasing the odds they will receive a removal order and thereby be barred from entering the United States or applying for immigration benefits, including possibly, future asylum claims.

Failure of an individual to appear for their Immigration Court dates carries serious consequences, including receiving a removal order without being present in court. It is important to note that one of the frequently-cited justifications for making a negative MPP determination and claiming a migrant would be safe in Mexico is their supposed ability to internally relocate in Mexico. In other words, supervisors are enforcing negative MPP decisions because of lack of certainty that persecutors who previously harmed an applicant elsewhere in Mexico would find the applicant at the U.S.-Mexico border, or that a feared persecutor at the border would find the applicant if they moved elsewhere in Mexico. Although this logic strictly complies with non-refoulment, it runs directly counter to the premise that we expect people to wait in Mexico for the pendency of their section 240 removal proceedings, which require their presence in the United States for various hearings over a period of months or years.

<div align="center">AR361</div>

[T]he implementation is calculated to prevent individuals from receiving any type of protection or immigration benefits in the future. There is no clearly-established policy and system for notifying applicants of changes to hearing dates and times, or for the applicants to provide change of addresses to the courts and Border Patrol. Without a highly functional notice system, the administration has ensured that a high number of applicants will miss their court dates. In such cases, immigration judges are required to order the applicant removed in absentia, thereby barring them from entering the United States for 5 to 10 years, subjecting them to reinstated orders of removal if the applicant again seeks protection in the United States, and thereby preventing them from applying from asylum.

5. MPP, as it is currently implemented, also violates the law, in that it severely limits the protected grounds for which an applicant could possibly receive a positive decision and not be returned to Mexico. Critically, along with race, religion, nationality, and political opinion, asylum seekers can receive asylum or protection under non-refoulment for their ``membership in a particular social group,'' commonly referred to as ``PSGs.'' Determining whether someone is a member in a particular social group requires a tri-part analysis. The sad irony of MPP is that by returning large numbers of vulnerable migrants to Mexico, we have created exactly the type of group contemplated by the refugee convention and INA.

For example, during the course of 1 of my 5 MPP interviews, it became readily apparent that the applicant had experienced significant harm in Mexico on account of his membership in one such potential PSG. I discussed the situation in the middle of the interview with a supervisor and was explicitly told that I was not allowed to make a positive determination on that protected ground and that I should not continue that line of inquiry.

By requiring asylum officers to disregard a critical part of the law, the administration is forcing asylum officers to break the law and violate their oath to office. As I wrote in my memo:

Participation in the MPP violates our oath to office. As Asylum Officers we have sworn to ``well and faithfully discharge the duties of the office.'' SF 61. Those duties include ``proper administration of our immigration laws.'' See, USCIS/RAIO Mission and Core Values, available on the ECN. Assuming that we did have statutory authority and proper jurisdictions for these interviews, policy is preventing us from complying with our sworn duty to properly administer the laws. Individuals subject to MPP are almost certainly members of a particular social group consisting of ``non-Mexican migrants traveling through Mexico'' or some alternatively phrased variant. Such a group shares an immutable past experience, is particular, and the evidence suggests is socially distinct in Mexico. However, CIS policy regarding which social groups are considered cognizable and the constraint on individual analysis, prohibits officers from analyzing whether such a group is cognizable and if an MPP applicant would be persecuted for their membership in such a group. These arbitrarily imposed restrictions on factual and legal analysis prevent us as officers from faithfully discharging the duties of our office.

6. The manner in which MPP was created and implemented, and in particular the circumvention of the Administrative Procedures Act, assures we are violating our obligations of non-refoulment and are sending individuals back where it is likely they will be harmed. Beyond all of the illegalities already discussed, I believe a significant part of the reason so many individual are being forced into Mexico stems from an inappropriate and misapplied legal standard in the interviews, combined with an interview structure that makes it impossible for an asylum seeker to meet their burden. Although someone could supposedly pass an MPP interview if they showed it was ``more likely than not'' they would be persecuted or tortured in Mexico, in reality the standard being applied to the interviews is much higher. I objected:

MPP complies with our obligations of non-refoulment in name only. Assuming that statue does delegate DHS authority to implement MPP-type interviews, we have no implementing regulations. The current system is ad hoc and not been subject to notice and comment making or any type of

<div align="center">AR362</div>

review. If regulatory procedures such as administrative hearings such as the MPP does not commit the numerous legal violations already noted. The current process place on the applicants the highest burden of proof available in civil proceedings in the lowest quality hearing available. This is a legal standard heretofore reserved for an immigration judge in a full hearing. However, here we are conducting the interviews telephonically, often with poor telephone connections, while at the same time denying applicants any time to rest, gather evidence, witnesses, or other relevant information and, most egregious of all denying them access to legal representation. The description of the MPP read at the beginning of the interview does not even explain what a ``protected ground'' is or what the applicant is required to prove. The ad hoc implementation, lack of regulations, and high legal standard all but ensure that an applicant is unable to meet his or her burden. Participating in such a clearly biased system further violates our oath of office.

7. Finally, I objected on moral grounds because, as I mentioned previously, the policy makes Asylum Officers complicit the future harm of asylum seekers:

[E]ven if all the above were remedied, the process is still morally objectionable and contrary to the RAIO mission of protection. The Asylum Office would still be complicit in returning individuals to an unsafe and unreasonable situation. One where we would likely find internal relocation unavailable were it the applicant's home country, and in fact regularly do make that determination for Mexican applicants. RAIO research recently reported the high levels of violence and crime specifically targeting migrant communities in Mexico, returned from the MPP. See RAIO Research Unit, News Summary Bulletin July 2019. Additionally, it is unreasonable to make individuals, often without financial resources and caring for small children, to wait an indefinite period of time without employment. The unreasonableness of such a requirement is why the law mandates the application clock and issuance of employment documents if the U.S. Government cannot process a request for protection in a timely manner. Assurances by the Mexican government that persons returned to Mexico under the MPP would receive work permits and protection were a key reason that the injunction was stayed. Innovation Law Lab v. McAleenan, No. 19-15716, 924, F. 3d 503 (9th Cir. 2019). However, the Mexican government has not fulfilled its promise of providing work permits and protection. See RAIO Research Unit, News Summary Bulletin July 2019.

While other immigration processes may result in returning someone to a place where they face true risk of harm because they do not qualify for protection or an immigration benefit, such instances occur only after the applicant has received substantially more due process. Even then, those individuals are returned to their countries of nationality, not an arbitrary third country to which they likely have no ties. The MPP is substantively and morally distinct from other aspects of our work.

conclusion

I do not claim to speak for all Asylum Officers, but I have good reason to believe my concerns are widespread and shared. I have not encountered a single officer that believes we should performing MPP interviews. Every officer I spoke to regarding MPP before I left USCIS, around a dozen officers, disagrees with the policy and the implementation. After sending my memo to the office, I was contacted or spoke with another dozen or so officers who thanked me and supported my decision. Since my name and objections were published in the National media last week, I have been contacted by even more officers.\9\ In total I would estimate I have been in contact with 2 dozen officers or more, from the San Francisco, Los Angeles, New York, and D.C. offices. One individual thanked me for being willing to be the public face for the officers. I have yet to receive a single negative comment from an Officer.

------------------------------------------------------------------------

\9\ Molly O'Toole, Asylum Officers Rebel Against Trump Policies They Say are Immoral and Illegal, Los Angeles Times, Nov. 15, 2019, available at https://www.latimes.com/politics/story/2019-11-15/asylum-officers-revolt-against-trump-policies-they-say-are-immoral-illegal;

AR363

The Out Crowd, THIS AMERICAN LIFE, Nov. 15, 2019, available at https://
www.thisamericanlife.org/688/the-out-crowd.

------------------------------------------------------------------------

To conclude, MPP is an illegal program, violating multiple aspects of our laws, endangering the safety of thousands, and placing asylum officers in an impossible position. As an attorney and an officer of the Federal Government, I had a duty to uphold the law. I urge Congress to protect other Government employees who also have the obligation to oppose this policy but do not feel safe coming forward publicly as I have. Asylum is an echo of the core values of our Nation: Freedom of religion, political opinion, and identity. Our ability and willingness to protect those individuals fleeing persecution and torture establishes us as a leader in human rights and a beacon of hope. I urge you to take steps to end the egregious legal violations that are eviscerating the asylum program, resulted in a humanitarian crises of our own making, and greatly eroded our integrity as a Nation.

————

Statement of Irena Sullivan, Senior Immigration Policy Counsel, Tahirih Justice Center
November 19, 2019

The Tahirih Justice Center (``Tahirih'') respectfully submits this statement to the U.S. House Committee on Homeland Security, Subcommittee on Border Security, Facilitation, and Operations, as the subcommittee examines the human rights and legal implications of the United States (U.S.) Department of Homeland Security's (DHS) ``Remain in Mexico'' (RIM) policy implemented in January 2019.

Tahirih is a national, nonpartisan advocacy and direct services organization that has assisted over 25,000 immigrant survivors of gender-based violence (GBV) over the past 22 years. The women and girls we serve endure horrific abuses such as rape, domestic violence, forced marriage, and human trafficking and are in dire need of humanitarian relief.

Tahirih remains deeply concerned about the administration's implementation of the RIM policy earlier this year. It is well-documented that the policy, which forces asylum seekers to remain in Mexico while awaiting court dates in the United States, has proven extremely dangerous for the most vulnerable asylum seekers. While waiting in Mexico, survivors of GBV have faced horrors on par with the persecution they fled at home, while perpetrators of violent crime are emboldened and allowed to inflict grave human suffering with impunity.

Last December, just prior to implementation of the RIM policy, Tahirih attorneys met with survivors of GBV in Mexico who were staying at a temporary shelter. They had tried to request asylum at the U.S. port of entry as permitted by law, but were turned away. One woman we spoke with described how she fled Central America after suffering years of abuse by her husband. She endured regular beatings and rapes, with her husband becoming increasingly violent toward both her and their children. She fled to Mexico and applied for humanitarian relief there. However, several weeks later, her husband was able to locate her from thousands of miles away. He had an associate violently attack her and their children near the shelter in Mexico.

While en route to seek safety in the United States, women and girls also face alarming threats of rape, kidnapping, and other crime in Mexico unrelated to prior persecution. Below are only a few examples of our clients' stories:

A 20-year-old Honduran woman seeking asylum in the United States was raped in Mexico after fleeing her country with her 2 young sons, ages 2 and 4;

A 19-year-old Salvadoran asylum seeker fleeing with her younger brother was kidnapped in Mexico by the Gulf Cartel, and was sexually assaulted by one of her kidnappers;

A 16-year-old Honduran girl was raped and sex trafficked in Mexico and is seeking relief in the United States as a survivor of human trafficking; and

A 17-year-old Honduran girl, a 16-year-old Guatemalan girl, and a 15-year-old Guatemalan girl, who all qualified for asylum, were raped in Mexico after fleeing their home countries.

In addition to basic safety, survivors are also in dire need of trauma-informed mental health services and meaningful access to

AR364

counsel. Survivors of mass atrocities remain in Mexico to assist them in navigating the complexities of asylum law. Without counsel, the majority will lose their cases even if they qualify under the law. Waiting months in Mexico without access to mental health services prolongs the healing process for both survivors and their children, delays their ability to make informed decisions about their legal options and next steps, and, as described above, risks compounding existing trauma by exposing them to additional threats of violence.

Thank you for the opportunity to submit this statement, and we are grateful to the subcommittee for bringing to light the dire consequences that the RIM policy is having on traumatized asylum seekers through this hearing.

———

Statement of Texas Impact/Texas Interfaith Center for Public Policy
three keys to stabilizing the southern border
Stop the criminalization of migration.
  End zero tolerance, ``Migrant Protection Program'' (Remain in Mexico), and port ``metering.''
  Fund the civil immigration system to process migrants timely.
  Invest in upgrades to ports of entry along the border that would include additional scanning technology to better facilitate cross-border movement of people and goods.
  Adequately staff ports of entry to maintain efficient cross-border travel and require robust training for CBP officers to properly and efficiently process migrants at ports of entry.
Stop the separation of families and the detention of children.
  Reject proposals that would permit indefinite detention of families or children or that would limit Flores protections for any child.
  Fund local government agencies and NGO's to provide humanitarian assistance, case management, and community-based alternatives to detention.
Make all aspects of the asylum process transparent.
  Permit international and domestic human and civil rights observers, including attorneys, and child welfare and medical professionals, to inspect and monitor CBP detention facilities and interact with detainees to assess the needs of families and children and recommend the best ways to process them.
  Make publicly available regular DHS reports on the number of processing centers in operation, the population size in each center, the average length of stay in each center, and the average length of stay in all Border Patrol short-term detention facilities.
        faith-based border policy recommendations
  The Interfaith Immigration Coalition (IIC) is a partnership of faith-based organizations committed to enacting fair and humane immigration reform that reflects our mandate to welcome the stranger and treat all human beings with dignity and respect. Coalition members work together to advocate for just and equitable immigration policies, educate faith communities, and serve immigrant populations around the country.

  Representing more than 50 faith-based organizations, we believe our moral standing as a society can be measured by our actions toward those most vulnerable among us. A deterrence and enforcement-only strategy at our border has had chaotic and devastating impacts on arriving asylum seekers and is, in many ways, fueling the very migration it seeks to reduce. We call on the administration and Congress to enact humane, efficient, consistent, and just policies that will uphold the dignity of all God's people.
Address the root causes of forced migration and displacement
  Increase support for effective programs that strengthen justice systems, spur economic opportunities, and safeguard communities from climate displacement so that people do not need to flee in search of safety or survival.
  Use principled and strong diplomacy to urge governments to

AR365

guarantees tangible reform and improvement in protecting
human rights and strengthening rule of law, including by
enforcing human rights and anti-corruption conditions on aid as
well as levying sanctions on corrupt officials.

Ensure U.S. foreign assistance does not go toward supporting
human rights violators, increasing militarization, or otherwise
exacerbating existing push factors which drive people to leave
their homes

Improve and expand access to refugee protections in the United States

Restore the original Central American Minors (CAM) program
that offered a chance for children to find safety in the United
States and reunify with a parent--without undermining access to
asylum in the United States or at a U.S. border.

Increase refugee resettlement to provide Central American
refugees with much-needed alternatives to making the long
journey north to claim asylum at the U.S./Mexico border.

Strengthen Mexico's refugee system by providing assistance
to international and civil society organizations such as UNHCR
in order to strengthen Mexico's capacity to process asylum
claims.

Invest in critical U.S. programs that aid unaccompanied
children by fully funding the Department of Health and Human
Services (HHS) Office of Refugee Resettlement (ORR) to ensure
that the agency can provide the full continuum of care and
community-based services, as well as to reunify children with
their family members, from whom they were separated, and
sponsors, for all populations in its care.

Uphold access to asylum in a manner that offers a genuine humanitarian
response and upholds U.S. and international law

Expeditiously process all asylum seekers at--and between--
ports of entry.

End the Remain in Mexico (``Migration Protection
Protocols'') and ``metering'' policies that push people to
cross between ports of entry and put the lives of asylum
seekers at risk as they wait in what are often dangerous
situations in Mexico.

Reverse Department of Justice rulings that deny protection
to those who have fled domestic violence and gang violence and
that deny bond hearings to asylum seekers who entered between
ports of entry.

Resist proposals to remove protections for vulnerable
children provided by the Trafficking Victims Protection
Reauthorization Act (TVPRA) and the Flores Settlement
Agreement. Allowing unaccompanied children to be deported more
quickly risks returning them to the very violence and
exploitation they fled. Undermining the Flores agreement would
wrongfully expand family and child detention in jail-like
conditions.

Reject policies that charge a fee or restrict work
authorization for people seeking safety from violence and
persecution.

Ensure only asylum officers conduct credible fear interviews
(CFIs) and that they receive the proper training and support to
uphold access to asylum protections. This includes the
necessary translation services available for CFIs. Prioritize
real humanitarian support for asylum seekers, immigrants, and
other vulnerable populations.

Invest in legal representation initiatives to ensure all
asylum seekers have the resources they need to meaningfully
seek protection at the earliest stages of the process.

Institute universal Legal Orientation Programs (LOPs)--
including for families released from DHS or CBP custody--to
explain appearance obligations, the legal system, and how to
secure counsel. Such programs have been proven to increase
court appearance rates.

Improve partnerships with and increase resources for non-
governmental organizations (NGO's) and other service providers
to ensure a robust humanitarian response. This includes
providing DHS with grant-making authority to financially
support service providers during periods of influx and ensuring
NGO's can provide the necessary humanitarian support and

AR366

address the migration issues; for fear of or retaliation
and harassment from CBP or ICE officials.

Ensure humane, just, and orderly treatment of all asylum seekers,
migrants, and people seeking safety

Ensure access to lawyers and humanitarian services and
ensure all people are released with correct documents. Allow
legal and humanitarian service providers access to all CBP
facilities in order to administer Legal Orientation Programs/
Know Your Rights presentations, to properly represent clients,
and to coordinate travel and family reunification for asylum
seekers. Ensure all people are processed and released with
correct and full documentation and with full knowledge of the
next steps of their claim.

Establish more orderly and humane release procedures between
DHS and local NGO's by providing ample, regular notice before
releases and ensuring safe release conditions.

Ensure short-term processing facilities adhere to strict
standards in order to maintain the safety and well-being of
those in DHS custody. Facilities must have licensed child
welfare professionals, medical professionals, and interpreters
and must be fully equipped with potable water, appropriate
food, separate and enclosed bathrooms/showers, and individual
beds/cots. Short-term processing centers must not exceed
custody time limits and must not function as additional child/
family detention centers. All processing centers must provide
timely medical screenings conducted by licensed medical care
providers.

Fully restore the Family Case Management Program (FCMP)
which supports court appearance and compliance. This casework
should be operated by non-profit entities.

End family detention immediately and redirect resources into
humane alternatives for asylum seekers and other vulnerable
populations. Children should never be incarcerated or
needlessly separated from a parent.

End criminal prosecution of asylum seekers (such as unlawful
entry, 8 U.S.C. Sec. 1325, and reentry, 8 U.S.C. Sec. 1326)
which have skyrocketed over the past decade and made us less
safe by diverting resources from real public safety threats and
overwhelming Federal courts.

Rescind the April 2018 Memorandum of Agreement (MOA) between
DHS and the Department of Health and Human Services (HHS) which
requires HHS to share the immigration status of potential
sponsors for UACs with DHS, leading the population of UACs in
shelters to increase significantly as sponsors fear coming
forward.

Make publicly available regular DHS reports on the number of
processing centers in operation, the population size in each
center, the average length of stay in each center, and the
average length of stay in all Border Patrol short-term
detention facilities.

Invest in upgrades to ports of entry along the border that
would include additional scanning technology to better
facilitate cross-border movement of people and goods.

Adequately staff ports of entry to maintain efficient cross-
border travel and require robust training for CBP officers to
properly and efficiently process migrants at ports of entry.

sources

Latin America Working Group, ``Recommendations for U.S. Engagement to
Address Migration from and Displacement within the Northern Triangle of
Central America,'' https://www.lawg.org/centamrecs19
The New Yorker, ``How Climate Change Is Fuelling the U.S. Border
Crisis,'' https://www.newyorker.com/news/dispatch/how-climate-change-
is-fuelling-the-us-border-crisis
U.S. Citizenship and Immigration Services, ``In-Country Refugee/Parole
Processing for Minors in Honduras, El Salvador and Guatemala (Central
American Minors--CAM),'' https://www.uscis.gov/CAM American Immigration
Council, ``Legal Orientation Program Overview,'' https://
www.americanimmigrationcouncil.org/research/legal-orientation-program-
overview
far better ways to use federal tax dollars, in line with our values and
human dignity

AR367

The Interfaith Immigration Coalition is a partnership of faith-based organizations committed to enacting fair and humane immigration reform that reflects our mandate to welcome the stranger and treat all human beings with dignity and respect. Coalition members work together to advocate for just and equitable immigration policies, educate faith communities, and serve immigrant populations around the country.

prioritize investments that respect human dignity

Congress should fund the following programs, services, and structures to insert humanity, compassion, and dignity into U.S. immigration and border policy.

Enact responsible border policy and involve local communities in decisions that impact their lives.--Proposals impacting border communities must include true partnerships with border communities in decision making; recognize the dignity and humanity of people who are migrating; honor the principle of non-discrimination; strive for social cohesion and inclusion; and uphold the inalienable human rights of life, liberty, and the pursuit of happiness. Responsible policies train border authorities in global best practices, including limiting the use of force, and training that prioritizes saving people's lives and avoiding tactics that endanger them. It is equally critical that the United States wholly welcomes asylum seekers and immigrants; provides access to interpretation in a language they understand, along with information about their rights, freedoms, protections, cultural liaisons, and legal assistance. SOURCES: Southern Border Communities Coalition (SBCC); Faith-Based Border Policy Recommendations

Invest in critical U.S. programs that aid unaccompanied children.--The Department of Health and Human Services (HHS) Office of Refugee Resettlement (ORR) bears responsibility for the care and custody of immigrant children who arrive in the United States unaccompanied (or are forcibly separated from their parents) pending their immigration court proceedings, many of whom are later reunified with a loved one. ORR is in the best position to ensure that unaccompanied children under the protection of the U.S. Government receive the full continuum of care they deserve, including: Proper shelter and care in the best interest of the child while in ORR custody; community-based services once released; and access to legal assistance. ORR must be fully funded to ensure the agency can provide the full continuum of care, as well as to reunify children with their family members, from whom they were separated, and sponsors. SOURCES: U.S. Conference of Catholic Bishops (USCCB); Catholic Church Teachings; National Immigrant Justice Center; Kids In Need of Defense (KIND); Women's Refugee Commission (WRC); Interfaith Immigration Coalition

Treat immigrants detained at the border and in the interior humanely.--Passing the Dignity for Detained Immigrants Act (H.R. 2415, S. 697) would increase oversight over ICE immigration detention and ensure access to health screenings, medical care, nutrition, water, and sanitation services. It is equally important that the same oversight and access to services is exerted over CBP facilities and processing. SOURCES: Friends Committee on National Legislation

Fund community-based alternatives to immigrant detention, which have proved to be ``safer than a detention-based approach, vastly less expensive, and far more effective at ensuring compliance with government-imposed requirements,'' according to the National Immigrant Justice Center. Passing the Dignity for Detained Immigrants Act (H.R. 2415, S. 697) would also expand access to these programs. SOURCES: National Immigrant Justice Center; U.S. Conference of Catholic Bishops; Friends Committee on National Legislation (FCNL)

Support communities providing care to newcomers and asylum seekers.--Communities from San Diego to Brownsville are caring for and providing the welcome our administration refuses to extend.--Congress should be investing resources to allow community-based, non-governmental organizations to work alongside Federal agencies to care for and provide support to families and individuals navigating legal proceedings. SOURCES: Columban Fathers Missionary Society of St. Columban;

AR368

Provide access to refugee protections for Central
    Americans.--The U.S. Government should restore the original
    Central American Minors (CAM) program that offered a chance for
    children to find safety in the United States and reunify with a
    parent--without undermining access to asylum in the United
    States or at a U.S. border. In addition, the administration
    should expand refugee resettlement programs to provide Central
    American refugees with much-needed alternatives to making the
    long journey north to claim asylum at the U.S./Mexico border.
    SOURCES: Church World Service; International Refugee Assistance
    Project (IRAP)
Fund ORR to assist all vulnerable populations the agency is
    mandated to serve.--For multiple years, ORR has reprogrammed
    funding for refugee resettlement services to meet the needs of
    unaccompanied children. Congress must ensure adequate funding
    for all populations within ORR's mandate, including refugees,
    trafficking survivors, asylees, torture survivors,
    unaccompanied children, Special Immigration Visa (SIV) holders,
    and others. SOURCES: Church World Service; Offices of Senator
    Murphy, Sen. Van Hollen, and Rep. DeLauro
Restore U.S. moral leadership in refugee protection.--The
    world is experiencing the worst crisis of displaced people in
    history, with over 68 million people pushed from their homes,
    and 25 million refugees world-wide. Yet, the Trump
    administration has reduced the number of refugees resettled in
    the United States by 75 percent, and set this year's admissions
    goal at 30,000--the lowest level in U.S. history. Congress
    should pass the GRACE Act (S. 1088/H.R. 2146), preventing the
    President from setting a refugee admissions goal at a level
    below 95,000--the historic average. Congress should also use
    the power of the purse to hold the administration to meeting
    its very low admissions goal of 30,000 and restore refugee
    admissions to 95,000 in fiscal year 2020. SOURCES: Church World
    Service; Refugee Council USA; Oxfam America
Provide international aid for community-building programs
    that ``counter violence, strengthen justice systems, spur
    economic opportunities, and safeguard communities from climate
    displacement, so that people do not need to flee in search of
    safety or survival,'' in the words of Human Rights First.
    SOURCES: Latin America Working Group; Alianza Americas; Human
    Rights First; Evangelical Lutheran Church in America (ELCA)
        stop funding tools that disregard migrants' humanity
    Federal spending on border and immigration enforcement has
skyrocketed since the 1990's. Border militarization, mass incarceration
of immigrants, and an abhorrent lack of oversight have led to
unspeakable human tragedies, including the recent deaths of children
and transgender migrants in U.S. custody and the misuse of solitary
confinement.
    U.S. taxpayers should know what immigration restrictions their
hard-earned paychecks are funding, how the administration is
mismanaging Federal tax dollars, and the consequences for human lives.
    This summer's funding debate begins with the following policies and
structures already in place:
20k border agents.--In 1993, the United States had just over
    4,000 U.S. Border Patrol agents. In fiscal year 2018, there
    were nearly 20,000. The vast majority (16,000) operate along
    the Southern Border. (Source: American Immigration Council)
8k deportation agents.--In fiscal year 2003, there were just
    over 2,700 deportation agents working for ICE. In fiscal year
    2018, that number had grown to 8,000. (Source: American
    Immigration Council)
6,500 ``special'' agents for criminalizing workers.--ICE
    also has 6,500 agents within their Homeland Security
    Investigations (HSI) unit. HSI has been involved in massive
    workplace immigration raids and other initiatives aimed at
    criminalizing work. (Sources: American Immigration Council,
    Immigrant Legal Resource Center)
ICE spending +103 percent.--Spending on ICE functions,
    including immigrant detention and deportation, has increased
    from $3.3 to $6.7 billion since the creation of DHS. (Source:

AR369

American Immigration Council)

CBP spending +149 percent.--Likewise, funding for Customs
    and Border Protection, which includes the Border Patrol, also
    skyrocketed between fiscal year 2003 and fiscal year 2009, from
    $5.9 billion to $14.7 billion. (Source: American Immigration
    Council)
 the mass incarceration of immigrants deserves separate attention
Immigrant detention +600 percent, largest level in
    history.--The Government is currently incarcerating 152,000
    immigrants in more than 200 jails across the United States.
    This is the largest number of immigrants detained for civil
    immigration cases in history, up from 7,000 in fiscal year
    2004. (Sources: Buzzfeed News; The Marshall Project)
This is 10k more humans than the number Congress
    authorized.--Congress appropriated money to detain 40,520
    immigrants, which is already too high, but this was not enough
    for ICE. In fiscal year 2008, ICE took money from other
    programs to expand immigration detention far beyond what
    Congress authorized. (Source: National Immigrant Justice
    Center)
This is actually human warehousing.--It is called ``civil
    detention,'' but in reality, it is jail, with all the same
    restrictions on liberty and conditions of confinement. ICE
    consistently opposes release of any and all immigrants eligible
    for bond. The agency even fights the release of asylum seekers
    who have won their cases. The goal is to break people's spirits
    so that they give up and accept deportation. Congress should
    not participate in this tactic of abuse by funding it. (Source:
    ACLU)
The deaths in CBP and ICE custody and recent DHS Inspector
    General reports point to the need for more oversight of
    detention and the robust use of alternatives to
    incarceration.--The administration must be held accountable for
    abuse and poor conditions in immigration jails, both public and
    private. Functioning alternatives to detention should be the
    default policy rather than incarceration. (Sources: Detention
    Watch Network, Freedom For Immigrants)
Mass incarceration of immigrants is big business for private
    prison industry.--Over 60 percent of detained immigrants are
    held in private prisons, and U.S. taxpayers pay 52 percent more
    to detain immigrants in these jails as compared to Government-
    run facilities. (Source: Freedom For Immigrants). A day after
    the 2016 Presidential election, stock prices rose 21 percent
    for GEO Group and 43 percent for CoreCivic. In fiscal year
    2017, the two companies raked in a combined $4 billion in
    revenue. (Source: Migration Policy Institute).
 humanitarian upgrades to manage and assist our nation's enforcement
                        (humane) act of 2019
Founded in 1982, the National Immigration Forum advocates for the value
of immigrants and immigration to our Nation. In service to this
mission, the Forum promotes responsible Federal immigration policies,
addressing today's economic and National security needs while honoring
the ideals of our Founding Fathers, who created America as a land of
opportunity. For 30 years, the Forum has worked to advance sound
Federal immigration solutions through its policy expertise,
communications outreach and coalition building work, which forges
powerful alliances of diverse constituencies across the country to
build consensus on the important role of immigrants in America.
    Sen. John Cornyn (R-Texas) and Rep. Henry Cuellar (D-Texas)
introduced the Humanitarian Upgrades to Manage and Assist our Nation's
Enforcement (HUMANE) Act of 2019 (S. 1303/H.R. 2522) on May 2, 2019.\1\
This bicameral bill attempts to resolve the current humanitarian
challenge at the Southern Border.
------------------------------------------------------------------------
    \1\ Sen. Cornyn and Rep. Cuellar previously introduced the HUMANE
Act (S. 2611/H.R. 5114) on July 5, 2014, though a significant portion
of the bill's provisions have changed.
------------------------------------------------------------------------

    The bill would permit longer-term family detention, expanding the
amount of time that migrant children can remain in immigration
facilities with their parents, and permit expedited departures of

AR370

unaccompanied migrant children from countries other than the United States from countries other than Mexico and Canada, reversing existing limitations on that practice. The bill would also make it harder for individuals to apply for asylum, among other provisions. This document provides a summary of the bill's key provisions.

Migrant Children

Changes Treatment of Migrant Children in Family Units.--The bill would permit the indefinite detention of migrant children and their parents by requiring the Department of Homeland Security (DHS) to hold family units during the pendency of their immigration proceedings, which can take years. (Section 2).

Establishes that the Flores Settlement Agreement, which governs the conditions of children held in immigration detention, does not apply to migrant children who are apprehended with their parents along the Southern Border. (Section 2).

Requires DHS to verify the relationship between migrant children and their parents or other family members by photographing and collecting biometric information from apprehended migrant children, and provides for the use of DNA analysis. (Sections 2 and 11).

Provides that migrant children apprehended with family members who are not their parents are to be treated as unaccompanied migrant children. (Section 2).

Directs DHS and the Department of Justice (DOJ) to prioritize immigration court proceedings for migrant families in detention ``[t]o the maximum extent practicable.'' (Section 2).

Changes Protections for Unaccompanied Migrant Children.--The bill would amend the William Wilberforce Trafficking Victims Protection Reauthorization Act (TVPRA) to require that all unaccompanied migrant children (UACs) be subject to the contiguous country (i.e., Mexico and Canada) screening. As a result, migrant children may withdraw their requests for admission to the United States without understanding the full consequences and with no immigration court hearing. Currently, migrant children from non-contiguous countries cannot be returned on an expedited basis and must be placed into the custody of the Office of Refugee Resettlement (ORR) during the pendency of proceedings (Section 3)

Provides that U.S. Customs and Border Protection (CBP) would screen all UACs within 48 hours of being apprehended to determine whether they are a trafficking victim, have fear of return and/or are otherwise admissible to the United States. UACs that do not fit into those protected categories and are able to make an independent decision to withdraw their admission to the United States would be able to choose to return home without an immigration court hearing. (Section 3).

Requires mandatory expedited removal for UACs who have committed a broad range of offenses, including entering the United States without documentation more than once when he or she knew the entry was unlawful. (Section 3).

Directs DHS and DOJ to ensure immigration court proceedings for UACs are ``prioritized and expeditiously adjudicated.'' (Section 3).

Limits Release of UACs to Sponsors.--The bill would limit the ability to place an UAC who is in removal proceedings with a non-Governmental sponsor unless the sponsor is the biological or adoptive parent of the child and is legally present in the United States (i.e., not undocumented), among other requirements. The bill also establishes new requirements to conduct home studies to prevent UACs from being placed in the custody of dangerous individuals. (Section 6).

Obligates HHS to provide DHS and DOJ with ``any relevant information'' about a UAC and his or her sponsor for law enforcement purposes, upon request, including immigration enforcement. (Section 4).

Requires HHS to notify the Governor of a State before placing an UAC into the care of a facility or sponsor in such State and to provide a monthly report to the Governor on the number of UACs in the State by locality and age. (Section 8).

Asylum Seekers

Requires Arriving Asylum Seekers to Apply at Ports of Entry.--The

AR371

bill would amend existing law by allowing arriving migrants to apply for asylum at a designated port of entry. The bill makes individuals who arrived in the United States anywhere other than at a designated port of entry ineligible for asylum under most circumstances. (Section 10).

Establishes Regional Processing Centers.--The bill directs DHS to establish at least 4 regional processing centers to process migrant families in ``high-traffic sectors'' of the Border Patrol along the Southern Border. (Section 13).

Establishes that DHS would ``expeditiously'' transport all migrant families apprehended by CBP in such sectors to the nearest regional processing center for criminal history checks, DNA analysis, medical screenings, and asylum interviews and credible fear determinations, among other activities. (Section 13).

Requires DOJ to assign at least 2 immigration judges to each regional processing center to adjudicate immigration proceedings of migrant families held in the centers. (Section 13).

Border Security and Immigration Enforcement

Authorizes Additional CBP and ICE Personnel.--The bill would authorize CBP to hire more than 600 Office of Field Operations (OFO) officers for the ports of entry each year until the total number of OFO officers equals the staffing levels recommended each year in CBP's Workload Staffing Model. The bill also authorizes Immigration and Customs Enforcement (ICE) to hire no fewer than 1,000 new Enforcement and Removal Operations (ERO) officers, 665 ERO support personnel, and 128 attorneys in the Office of the Principal Legal Advisor to assist with removal, asylum, and custody determination proceedings. (Section 14).

Improves Port of Entry Infrastructure.--The bill would provide DHS with authority to construct new ports of entry along the Southern and Northern Borders. The bill also requires DHS to modernize the top 10 high-priority ports of entry on the Southern Border by September 30, 2021. (Section 15).

Imposes New Bars on Visa Overstays.--The bill would make all individuals with nonimmigrant visas, such as tourist visas, ineligible for all immigration benefits or relief if they overstay their visa for a period of more than 30 days, with few exceptions, and to sign an acknowledgement confirming that they have been notified of such provisions. The bill directs DHS to detain individuals who subsequently overstay their visa and deport them through expedited removal within 90 days from the date they were detained. These provisions do not apply retroactively. (Section 17).

Other Provisions

Engagement with Mexico and Guatemala.--Within 270 days after the bill's enactment, DHS would be required to submit a strategy to Congress detailing how the United States should engage with the governments of Mexico and Guatemala regarding cooperation to secure the Mexico-Guatemala border. (Section 16).

Reports to Congress.--The bill requires the Federal Government to submit a set of reports to Congress on UACs no later than September 30, 2020. One of the reports, to be submitted by HHS, must include a detailed summary of ORR facilities and contractors being used to house UACs, the number of UACs released to a sponsor with undocumented status, and an assessment of the extent to which HHS is making efforts to educate UACs about their legal rights and provide them access to pro bono counsel, along with other information. (Section 9).


Miss Rice. The Members of this subcommittee may have additional questions for the witnesses, and we ask that you respond expeditiously in writing to those questions.

I believe that the Ranking Member would like to say something.

Mr. Higgins. Thank you, Madam Chair. I would like to ask for unanimous consent to submit the DoJ statistics that Mr. Homan and Congresswoman Lesko referenced. I would like them submitted for the record, please.

Then I have a brief follow-up question.

Miss Rice. Yes, they will both be admitted into the record, as will a 2-page document that I am holding, which--it is a

TRAC immigration document that contains the most recent
information regarding appearances by people appearing at the
border.
    [The information follows:]

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

    Miss Rice. Yes, Mr. Ranking Member.
    Mr. Higgins. Thank you, Madam Chairwoman.
    Ms. Vela, you have been asked many questions today. You
have sat there with poise and dignity and answered to the best
of your ability. So I commend you and the panelists that joined
you today. My brother of the Thin Blue Line, thank you for
being here today.
    We all struggle as a Nation to deal with the challenge of
what we face at the Southern Border. It is good that our
Chairwoman is courageous and called this hearing, and that
testimony was offered based upon the various opinions. It is
our job to consider these opinions with respect for each other,
with a common goal of finding some righteous solution.
    I would like to point out that it has been stated several
times that the State Department has indicated the too dangerous
to travel classification for some of the areas in northern
Mexico. Obviously, these are some of the areas where these
illegal immigrants are being sent for--while they await
processing through the--their asylum claim.
    Let me just state that it is indicated that the alternative
is to send them into the interior of the United States. But Mr.
Homan has clarified, you know, what happens there. You know, a
lot of those folks just disappear. They are going to stay here.
    Let me share with America and with all of us that the
following cities have something in common: St. Louis, Detroit,
Memphis, Milwaukee, Baltimore, Oakland, Kansas City.
    All of these cities have something in common. The citizens
therein are more likely to be subject to violent crime than the
citizens of Mexico City. Crime stats from Mexico City are about
the same as Washington, DC, so it is intellectually unsound to
indicate to the American people that, just generally speaking,
we are placing these immigrants in some greater harm's way by
having them await their processing in Mexico.
    Miss Rice. Well----
    Mr. Higgins. Madam Chair, I just thank you so much for
holding this hearing. I think we have received excellent
testimony today, and I yield back.
    Miss Rice. Mr. Ranking Member, thank you so much for that,
and for your comments.
    What I can do is assure everyone here that we are going to
continue to have hearings about what is going on at the border,
because we have to honor the people who are sitting here, all 5
of you who are bearing witness to what is happening there. We
have to hold true to our democratic values as to who we are as
a country. That is what these hearings are about, transparency
and accountability.
    I want to thank all of the witnesses so very much for their
testimony here. It was a very long hearing. I think you can
tell by the amount of Members who showed up today how important
this issue is. So I want to thank you all for participating.
    Without objection, the subcommittee record shall be kept
open for 10 days.
    Hearing no further business, the subcommittee stands
adjourned.
    [Whereupon, at 12:20 p.m., the subcommittee was adjourned.]

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 380 of 688   PageID 2037

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 2/14/19 | police extortion | 1 | Mexican police detained Plaintiff Ian Doe several times and demanded his immigration documents. About a month ago, officers required him to pay a bribe of 1,500 pesos to avoid being arrested and taken to jail. | https://www.aclu.org/sites/default/files/field_document/2019.02.14.0001_compl._for_decl._and_inj._relief.pdf |
| 2/14/19 | robbery | 1 | Plaintiff Howard Doe was robbed at gunpoint by two Mexican men in Tijuana just days before he presented himself at the port of entry. The robbers said they knew that he was Honduran, and that if they saw him again, they would kill him. Plaintiff Howard Doe was kidnapped and held for more than two weeks by members of a Mexican drug cartel until he and several others were able to escape | https://www.aclu.org/sites/default/files/field_document/2019.02.14.0001_compl._for_decl._and_inj._relief.pdf |
| 2/14/19 | armed mob threats | 1 | Plaintiff Gregory Doe was staying at a shelter in Tijuana when a mob of young men wielding sticks surrounded the shelter and threatened the residents. | https://www.aclu.org/sites/default/files/field_document/2019.02.14.0001_compl._for_decl._and_inj._relief.pdf |
| 2/14/19 | assault | 1 | Plaintiff Alex Doe was staying in the Playas neighborhood of Tijuana when he and other asylum seekers were forced to flee in the middle of the night after a group of Mexicans threw stones at them and additional attackers began to gather with sticks and other weapons. | https://www.aclu.org/sites/default/files/field_document/2019.02.14.0001_compl._for_decl._and_inj._relief.pdf |
| 2/14/19 | unlawful deportation | 1 | Plaintiff Dennis Doe first entered Mexico en route to the United States, he was apprehended by Mexican officials who deported him without asking him if he wished to apply for asylum or if he feared returning to his home country. | https://www.aclu.org/sites/default/files/field_document/2019.02.14.0001_compl._for_decl._and_inj._relief.pdf |
| 3/21/19 | robbery | 2 | Gelin, a 29-year-old woman from Honduras who came with her 13-year-old son, was evaluated by an asylum officer after explaining to CBP that she had been robbed in Mexico two weeks before asking for asylum. She, too, was returned. | https://www.sandiegouniontribune.com/news/immigration/sd-me-cbp-questions-20190321-story.html |
| 3/27/19 | kidnapping | 1 | R.T., 31, who asked that his full name not be used out of concern for his safety, said through tears during an interview in Tijuana after his hearing that someone in a black van without license plates followed him one morning in the city and tried to kidnap him; he's known migrants who were taken for ransom money. But the next day, he was returned to Mexico, with a piece of paper that said in English that he "did not establish a clear probability of persecution or torture in Mexico." | https://www.nbcnews.com/news/latino/asylum-seekers-forced-wait-tijuana-fear-their-lives-n988081 |
| 4/8/19 | assault by Mexican police | 1 | Pamela (Salvadoran asylum-seeker): "Since I've been attacked and assaulted by the Mexican police in Mexico City, I wouldn't feel safe going to the police if I were attacked by people here in Tijuana | Interview by Amnesty International with Forced Returnee, in Tijuana |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z  Document 61  Filed 06/22/21  Page 381 of 688  PageID 2038

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 4/10/19 | threats | 1 | Luis Alvarado is one of about 200 immigrants who were sent to Juárez from El Paso under the Trump administration's Migrant Protection Protocols since the policy began here in mid-March. "Before the record, before the judge, they made a commitment that he won't go back to Mexico, which was ultimately our priority given that he's already faced threats in Mexico," said Nicolas Palazzo, a lawyer who took on Alvarado's case Wednesday. | https://www.elpasotimes.story/news/2019/04/10/el-paso-asylum-seeker-hearing-remain-in-mexico-policy/3426588002/?cid=twitter_elpasotimes |
| 4/11/19 | gang threats | 1 | One man, for example, stated that the same persecutors he was fleeing from in Honduras managed to pursue him in Mexico, and even located his whereabouts at a Tijuana migrant shelter. | Interview by Amnesty International with Forced Returnee, in San Diego |
| 4/25/19 | kidnapping | 4 | The day before, the two young fathers, Edwin Escobar from El Salvador and Ronaldo Garcia from Guatemala, said that after leaving their church shelter for food, they had been kidnapped by three men at gunpoint, held for three hours, beaten, and robbed. The men broke Garcia's finger and stole the five pesos—about 25 cents—that he had to his name. | https://www.texasmonthly.com/politics/im-in-danger-migrant-parents-face-violence-in-mexico-under-new-trump-policy/ |
| 4/25/19 | kidnapping | 2 | "Yesterday, I stepped out [from a Ciudad Juárez shelter] to buy my lunch, and a man tried to take my son," said Riccy, a 24-year-old Honduran woman who held her 4-year-old, Binsel. | https://www.texasmonthly.com/politics/im-in-danger-migrant-parents-face-violence-in-mexico-under-new-trump-policy/ |
| 5/1/19 | rape | 1 | One woman said she was the victim of an attempted rape in Juarez; | https://twitter.com/BobMooreNews/status/1123697012275384320 |
| 5/1/19 | robbery | 1 | Another said men tried to kick down the door to their shelter and threatened to kill and rape them if they didn't open the door. | https://twitter.com/BobMooreNews/status/1123697012275384320 |
| 5/9/19 | robbery, assault | 1 | Rene, a man from El Salvador, said on March 29 he was robbed and stabbed in Ciudad Juarez. He went to the police but was told they couldn't help him because he wasn't Mexican. | https://twitter.com/BobMooreNews/status/1126609660486856706 |
| 5/9/19 | robbery | 1 | Esdras, a man from Guatemala, was robbed twice at a church shelter. He went to police with suspicions he was being victimized by a neighbor of the church and police recovered his stolen cell phone. He was then threatened by the neighbor's family | https://twitter.com/BobMooreNews/status/1126610204777381888 |
| 5/9/19 | robbery | 1 | Elvia, also from Guatemala, said she was robbed at a church shelter. | https://twitter.com/BobMooreNews/status/1126611527958704128 |
| 5/16/19 | kidnapping | 1 | A 21-year-old Salvadoran woman told Judge Herbert: "I was on my way to the store when men in a car tried to take me." That's been another common theme at MPP hearings in El Paso: people facing kidnapping when they leave shelters to buy food or supplies. | https://twitter.com/BobMooreNews/status/1129094829835735040 |

AR375

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 382 of 688   PageID 2039

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 6/20/19 | kidnapping, rape | 1 | A migrant woman from Honduras was kidnapped and sexually assaulted after federal police agents in the Mexican border town of Ciudad Juárez abducted her and handed her over to a criminal group in the early morning hours of June 10, El Diario de Juárez reported. | https://www.insightcrime.org/news/brief/mexico-police-collude-criminals-kidnap-migrant/ |
| 6/26/19 | Mexican police extortion / deportatio n | 3 | While on the street with two other Guatemalan women in Ciudad Juárez, Mexican police approached her and attempted to extort her; when she refused to pay, the police took her and the other women to the airport. Although the woman expressed a fear of return to Guatemala and even showed the Mexican police her U.S. immigration court papers, she was nevertheless forcibly returned to Guatemala | https://www.splcenter.org/sites/default/files/documents/2019.06.26_0044_amnesty_international_amicus_brief198883.1.pdf |
| 6/26/19 | kidnapping | 1 | Juan and Marisa were kidnapped in Nuevo Laredo, Mexico by the Zetas cartel and held for over two months; Juan is in MPP while Marisa was released to the United States | https://www.splcenter.org/sites/default/files/documents/2019.06.26_-_049_-_brief_of_amicus_curiae_human_rights_first_iso_plfs-appellees.pdf |
| 6/26/19 | police harrassme nt / sexual abuse | 2 | During their journey to the United States, they suffered harassment from Mexican federal police, who insulted them and would not let them rest. / After a short time, he began demanding to have sex with her and when she refused, he sexually abused her. | https://www.splcenter.org/sites/default/files/documents/2019.06.26_-_049_-_brief_of_amicus_curiae_human_rights_first_iso_plfs-appellees.pdf |
| 7/1/19 | robbery, assault | 1 | "We are all afraid when we go out," says a Cuban migrant named Serafin Aguilera Perez. He says he was returned to Juárez last month after spending more than 40 days in U.S. custody. His sister in Miami wired him money to help him find shelter and food in Juárez, he told NPR. But when he went to a convenience store, Aguilera says, he was jumped from behind by two attackers who knocked him down and tried to take his money. | https://www.kacu.org/post/fear-confusion-and-separation-trump-administration-sends-migrants-back-mexico |
| 7/2/19 | assault, rape, robbery | 29 | Human Rights Watch documented at least 29 reports of harm to asylum seekers in Ciudad Juárez, including violent attacks, sexual assault, and kidnapping, in interviews and court observations. | https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico#page |
| 7/2/19 | attempted kidnapping, assault | (counted within 29 reported by HRW) | Delfina M. (pseudonym), 20, an asylum seeker who fled Guatemala with her 4-year-old son, said that after she was returned to Ciudad Juárez, two men grabbed her in the street and sexually assaulted her. They told her not to scream and threatened to kill her son. "I can still feel the dirtiness of what they did in my body," she said | https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico#page |
| 7/2/19 | robbery, stabbing | (counted within 29 reported by HRW) | Rodrigo S. (pseudonym), 21, who fled El Salvador, told a judge in immigration court proceedings that he was robbed at knifepoint and stabbed in the back. He said he went to the police, but the Mexican officers wouldn't help him because he wasn't a Mexican citizen. He told the judge that although he is recovering physically, he's afraid to be sent back | https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico#page |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 383 of 688   PageID 2040

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 7/2/19 | robbery, threats | (counted within 29 reported by HRW) | Esteban G. (pseudonym), 19, said in immigration court he was robbed when he left his room to go to the store for food. He told police he suspected a neighbor of stealing his cellphone. When police investigated the neighbor, they recovered his cellphone, but after that, the neighbor's family threatened to hurt him | https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico#page |
| 7/2/19 | kidnapping | (counted within 29 reported by HRW) | Two families who had been forced to remain in Mexico told the immigration judge in court that family members had been "express-kidnapped," or abducted for a short period of time and extorted, prior to their preliminary hearing in El Paso, according to local lawyers and news reports | https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico#page |
| 7/2/19 | kidnapping | (counted within 29 total reported by HRW) | Central Americans Rafael M. (pseudonym) and Gerald H. (pseudonym), who said they planned to seek asylum in the US, reported that after they had been in Ciudad Juárez for 21 days around April, they were kidnapped at gunpoint in Parque de las Tortugas, which runs along the border just north of the Santa Fe Bridge.[74] Some cars pulled up and men got out with guns. Rafael said he tried to run, but they grabbed him, tearing his shirt. They put a jacket over Rafael's head, told the two not to scream, and forced them into cars. The kidnappers accused the two of being rival smugglers working their territory. The kidnappers interrogated them and searched Rafael's phone to confirm they were in fact asylum seekers. They let them go, but not before taking photos of their faces. They also recorded information on where they were staying. The abductors told the two that if they reported the incident, they would kill them. Rafael reported he was hit about 30 times; Gerald reported being hit in the back of the head so hard he could taste blood in his mouth | https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico#page |
| 7/11/19 | kidnapping | 4 | Another family that was lured into this made up "alternative shelters" was kidnapped and they had to pay money in order to be released at the border where they were able to then turn themselves into Border Patrol custody. Due to the lack of financial resources, this family was released at different times by kidnappers. Wife and two children were released before the implementation of the MPP between borders so they were released into the United States.  Father and son had to stay behind with the kidnappers. When father was able to pay the kidnapper more money, kidnappers released them. When they turned themselves in to border patrol, they were returned to Mexico under the MPP program. This family continues to be separated. Father and son are currently sleeping at construction sites where father occasionally works. Father does not have the money to pay for a hotel and the shelters are at capacity in Tijuana, their only option is to sleep at construction sites. | Email from Jewish Family Services in San Diego |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 7/14/19 | persecutors | 1 | The man, whom I will call Franklin to protect him from retaliation, said he was being pursued by assassins. Back in his home country months earlier, covered from head to toe to conceal his identity, he had given testimony against cartel bosses who had extorted his and his common-law wife's businesses. The extortionists were convicted and imprisoned, but the witness's disguise had fooled no one. Post-trial, two of the bosses' armed underlings pursued Franklin, first in his home country in Central America. Then, after he fled, they threatened his niece back home with death if she did not say where he had gone. "Juárez, Mexico," the terrified woman told the hit men. But Franklin's first MPP court date in El Paso was over four months away. Meanwhile, he'd seen the hit men near a monument to Benito Juárez, staring intently. They'd seen Franklin, too, even though he was on a bus, and they yelled, "Get him! Kill him!" The bus driver sped away. Franklin was certain his pursuers would not give up. CBP allowed Franklin to walk into the United States. He was soon given a non-refoulement interview. He passed, was removed from the MPP, and was sent to an ICE detention center, where he passed his credible fear interview. A Las Americas-affiliated immigration lawyer has vowed to bond Franklin out, pending resolution of his asylum claim. | https://theintercept.com/2019/07/14/trump-remain-in-mexico-policy/ |
| 7/14/19 | kidnapping | (also discussed in HRF report - not counted here ) | In July, I learned from an immigration lawyer in California that a distraught client had called to report that her sister, a Salvadoran woman, with a 14-year-old, 10-year-old, and 3-year-old, were kidnapped in Juárez. The California family scraped together $4,000 for a ransom payment, and after several days, the family was freed near a church in downtown Juárez. The mother said that she and her children had been captured after the kidnappers had spotted them wandering into Juárez disoriented, after being dumped there following their enrollment into MPP. When I met them by the church, the family told me that during their captivity they'd had almost nothing to eat, and they barely slept. After being freed, they made it to a migrant assistance organization that operates behind locked doors. A psychologist there told me that the family was suffering from shock, including the kids.  the kidnapped and ransomed Salvadoran mother and her three psychologically traumatized children. On July 9, Rivas crossed that family into El Paso. But they did not pass their non-refoulement interviews, and on July 11 they were dumped into Juárez for a second time. | https://theintercept.com/2019/07/14/trump-remain-in-mexico-policy/ |
| 7/14/19 | kidnapping, rape | (also discussed in HRF report - not counted here ) | Two young Cuban women, and the husband of one of them, were hailing a taxi when a van drove up and men with assault rifles forced them inside. The group was taken to a house and told they could choose to carry drugs across the border in backpacks or pay $500 a piece to be freed. The women told me, during an interview at a migrant assistance office in Juárez, that they declined both options and the husband was taken to a separate room. The women were then raped repeatedly until the victims paid their ransoms. | https://theintercept.com/2019/07/14/trump-remain-in-mexico-policy/ |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 385 of 688   PageID 2042

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 7/14/19 | kidnapping | (also discussed in HRF report - not counted here ) | Katy describes being kidnapped by a taxi driver and his accomplices, who demanded $1,000 from her family in the U.S. They paid most of the ransom, and she was freed. But the kidnappers said they knew where she was staying, and they gave her a warning: "If you file a report, you know how people die in Juárez." Later, Katy tells Herbert that she was trying to sleep and saw a knife being inserted into the doorjamb of her room. She chokes up at the memory. Katy, for example — the woman who was kidnapped in the taxi and later saw the knife pushing through her door — described those experiences during a non-refoulement interview. She was sent back to Juárez anyway. | https://theintercept.com/2019/07/14/trump-remain-in-mexico-policy/ |
| 7/14/19 | kidnapping | 2 | Two other women in the courtroom, who were also kidnapped, begin to wail. | https://theintercept.com/2019/07/14/trump-remain-in-mexico-policy/ |
| 7/22/19 | kidnapping | 2 | In early June, "immediately upon leaving the custody of immigration officials on the Mexican side of the border," R.G.A.M. and his 17-year-old daughter were kidnapped in Ciudad Juárez, held for a month while the kidnappers demanded ransom from family members and forced them to work. After being trafficked into the United States, R.G.A.M. and his daughter again requested asylum but DHS sent them to the Berks County family detention center, according to documents filed by attorneys. | Request for TRO and habeas petition filed in E.D. Penn District Court (19-cv-03194-EGS July 22, 2019) |
| 7/25/19 | kidnapping | 1 | One woman came to court in El Paso on July 25th with her leg in a cast and said it was broken when she was kidnapped after being returned to Juarez. | https://www.refugeesinternational.org/reports/2019/8/28/remain-in-mexico-policy-is-undermining-asylum-and-endangering-asylum-seekers |
| 7/29/19 | extortion | 1 | Genesis Reyes waited three months in Mexico to see an immigration judge in San Diego. When her day in court finally arrived, extortionists posing as immigration officials asked her parents for hundreds of dollars claiming the money would release her from a detention center. As her parents frantically struggled to put the money together, they called Reyes dozens of times. Reyes wasn't in a detention center. She was sitting on the eighth floor of an office building downtown waiting for an immigration judge to call her name. Her phone was turned off. "When I turned my phone back on, I had so many messages," said Reyes, 25, from Honduras. "My mother wanted to know where I was. People called her and said, 'We have your daughter and you need to deposit the money to bail her out.'" | https://www.sandiegouniontribune.com/news/immigration/story/2019-07-27/asylum-seekers-targeted-by-kidnappers-extortionists-and-traffickers-while-waiting-in-mexico |
| 8/5/19 | attempted kidnapping | 1 | Single woman from Honduras kidnapped but escaped, after return to Ciudad Juarez under MPP (additional information provider by attorney) | https://twitter.com/cbrownimmlaw/status/1158396364037902336 |
| 8/6/19 | kidnapping, assault | 3 | Couple from Guatemala kidnapped with 12 year old child by Mexican federal police and cartel members. They saw their persecutors put plastic bags over other migrants' heads and duct tape them in place. They were abused, separated, and threatened. | https://twitter.com/cbrownimmlaw/status/1158596077995479040 |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 386 of 688   PageID 2043

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/8/19 | | 42 | Human Rights First researchers documented the cases of 42 individuals returned under MPP to Mexico who were raped, kidnapped, assaulted, and/or pursued by persecutors there. | https://www.humanrightsfirst.org/resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due |
| 8/8/19 | rape, kidnapping | (counted within 42 reported in HRF report) | A Honduran woman who DHS returned to Ciudad Juárez was reportedly kidnapped in June by a group of men in federal police uniforms and repeatedly sexually assaulted. According to her attorney, Linda Rivas of Las Americas Immigrant Advocacy Center in El Paso, the woman is part of the Afro-Caribbean Garifuna minority and was vulnerable to targeting in Mexico because of her race, gender and nationality. | https://www.humanrightsfirst.org/resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due |
| 8/8/19 | rape, sexual exploitation | (counted within 42 reported in HRF report) | When CBP officials returned Gisela*, a 28-year-old-asylum seeker from Honduras, to Ciudad Juárez from the El Paso port of entry, a trafficker kidnapped her as she left a Mexican migration office. She was raped and forced into sexual slavery for three months and escaped only when one of her captors offered to assist her to leave in exchange for sex. Now hiding at a Juárez church shelter, she is not safe. The parish priest told her that an unknown man recently came to the church looking for her. | https://www.humanrightsfirst.org/resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due |
| 8/8/19 | kidnapping, extortion | (counted within 42 reported in HRF report) | Irma*, a Salvadoran asylum seeker, was kidnapped in late June with her three children, ages 3, 10, and 14, after being returned to Ciudad Juárez by CBP. Irma and two other women who had just been returned to Mexico under MPP flagged down a passing minibus to ask for help because they had nowhere to stay. The three women and three children were instead kidnapped and held hostage for days with little to eat. Irma's 14-year-old son said one of the men shouted "that he was tired of so many migrants. He said [to us], 'why did you stay in this country?'" In early July, Irma's family in the United States was forced to make a $2800 ransom payment after the kidnappers sent threatening messages to Irma's sister. | https://www.humanrightsfirst.org/resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due |
| 8/8/19 | attempted rape, labor exploitation | (counted within 42 reported in HRF report) | After DHS returned Sarai* and her 18 year-old-daughter, Maya*, asylum seekers from Honduras, to Mexico under MPP they were coerced to work by the owner of a migrant hotel in Ciudad Juárez where they had been staying. When the owner tried to rape Maya, Sarai and her daughter fled the hotel but were penniless. They spent three nights sleeping on the streets without eating before they were able to beg for enough money to reach an NGO on the Mexican side of the El Paso port of entry in early July to ask for help. | https://www.humanrightsfirst.org/resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due |
| 8/8/19 | assault | (counted within 42 reported in HRF report) | In her first hours after DHS returned her to Ciudad Juárez under MPP, Blanca*, an LGBTQ asylum seeker from Guatemala, was walking with other asylum seekers when a group of men followed and robbed them. She sought safety at the main migrant shelter in the city, but it was at capacity, so she ended up in a rented room with other asylum seekers at a hotel catering to migrants. Later, Blanca and other asylum seekers were again attacked, and some were beaten by a group of men. "After what happened, I hardly ever go out," she said. "I'm really scared of the situation here." | https://www.humanrightsfirst.org/resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 387 of 688   PageID 2044

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/8/19 | threats | (counted within 42 reported in HRF report) | Fredi*, a 20-year-old Salvadoran asylum seeker, and his five-year-old daughter were returned to Mexico after CBP officers refused to refer them for a fear screening and did not allow Fredi to explain that gang members had followed him from El Salvador and were threatening him in Mexico. Fredi tried to describe his fear of remaining in Mexico, but a CBP officer ignored him and instead accused Fredi and his daughter of being a "fake family" even though Fredi's name appears on his daughter's birth certificate. Fredi was only able to request a fear screening, which he passed, during his first immigration court hearing in mid-July after months of living in fear in Ciudad Juárez. | https://www.humanrightsfirst.org /resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due |
| 8/8/19 | threats | (counted within 42 reported in HRF report) | Karla*, a Honduran asylum-seeker, was returned to Mexicali despite presenting evidence that she and her three-year-old son were receiving threats in Mexico. According to Karla, CBP officers refused to accept a printout of the threatening messages, and she was unable to present this crucial evidence to the asylum officer who interviewed her by telephone. Karla does not know what to do to protect herself and her son: "No parent wants something to happen to their child." | https://www.humanrightsfirst.org /resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due |
| 8/8/19 | assault | (counted within 42 reported in HRF report) | Javier*, a 48-year-old Salvadoran asylum seeker, failed his fear screening and was returned to Mexico by CBP under MPP even though he had twice been assaulted in Mexico and had a copy of a police report he had made about the incident. Javier also feared remaining in Ciudad Juárez because the day prior to Human Rights First's visit to the church-run shelter where he was staying, a man was shot dead outside on the street in broad daylight. | https://www.humanrightsfirst.org /resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 388 of 688   PageID 2045

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/10/19 | kidnapping | 8 | Under the Trump administration policy called the Migrant Protection Protocols, the family — Victor Esquivel, his wife, Maria, and their sons Anderson, 10, and Ryan, 4 — were sent back to the Mexican state of Tamaulipas to await their first hearing, scheduled for October. On July 24, U.S. officials dropped the family off at the international bridge that connects Laredo, Tex., to the city of Nuevo Laredo, in Tamaulipas. They were given a pile of immigration paperwork and escorted to the parking lot of the Mexican immigration office, 20 yards south of the Rio Grande. For the first three nights, they slept on the ground outside the office in the 100-degree heat. Exhausted and hungry, they arranged through a family friend to pay for a small apartment where they could wait for their October hearing. On July 27, Victor and Maria walked outside the immigration office in the early afternoon, they said, holding the hands of their two sons. They made it two blocks, toward a car that was supposed to take them to the apartment. Then a truck pulled up next to them and a group of men jumped out, screaming at them. "They yelled, 'Get into the truck!'" Victor said. "It all happened really quickly." The Esquivels say they were taken to an abandoned house where migrants from Cuba and Guatemala were also being held. They were led to a room without furniture and told to sit on the ground. The Esquivels were moved between three different houses in and around Nuevo Laredo. They were held with about 10 different migrants, including a Nicaraguan family with two small children, Victor said. That family said they, too, had been returned to Mexico to wait for their asylum hearings. The father of the Nicaraguan family wrote the telephone number of relatives back home on the front page of Victor's Bible, in case he was released first. The kidnappers took their phones and used them to send messages to Esquivel's relatives in El Salvador and Wisconsin demanding $7,500 per person. | https://www.washingtonpost.com/world/the_americas/when-they-filed-their-asylum-claim-they-were-told-to-wait-in-mexico-there-they-say-they-were-kidnapped/2019/08/09/6133c2d6-b95f-11e9-8e83-4e6687e99814_story.html |
| 8/10/19 | kidnapping | 3 | Two Venezuelan and one Cuban asylum seeker who were sent back to Nuevo Laredo by U.S. officials in July also told The Washington Post of their ordeal. They were at a bus station when two men approached them, asked where they were from and where they were going. Within minutes, and without weapons, the men physically forced the Venezuelans into a car. They were taken to a small house and told to put all their possessions on a table. Three migrants from Nicaragua and Honduras were already there, according to the Venezuelans. They said they had also been kidnapped that morning. "I just started crying," one of the Venezuelan men said. They spoke on the condition of anonymity for fear of reprisals. The Cuban man and one of the Venezuelans scraped together around $400 in cash from an ATM and were released six hours later. The other Venezuelan was held for four more days. | https://www.washingtonpost.com/world/the_americas/when-they-filed-their-asylum-claim-they-were-told-to-wait-in-mexico-there-they-say-they-were-kidnapped/2019/08/09/6133c2d6-b95f-11e9-8e83-4e6687e99814_story.html |
| 8/12/19 | assault, robbery | 1 | Jeff Mendoza "lives in a high-crime part of [Tijuana], and shows two fresh scars on his forearm — knife wounds from when a group of men stole his phone. He says he has been robbed here several times, including by the police." | https://www.pri.org/stories/2019-08-12/mexico-waiting-room-thousands-migrants-trying-get-us |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 389 of 688   PageID 2046

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/13/19 | assault, robbery | 1 | While she waited in Ciudad Juárez, Cindis said she was robbed, assaulted and targeted with anti-immigrant slurs. | https://www.cbsnews.com/news/remain-in-mexico-asylum-seekers-forced-to-wait-in-mexico-face-danger-and-desperation/ |
| 8/13/19 | robbery, threats | 2 | On July 31, Francisco Chavez Raymundo, 43, and Gaspar Cobo Coria, 31 were placed in the Migrant Protection Protocol (MPP) program and returned to Mexico by U.S. Customs and Border Protection. On their way to the United States, the two were robbed by a Mexican policeman who allegedly hurled racial insults at them; they were later threatened with jail by other officers when they tried to file a complaint in Juarez, according to affidavits filed with the Chihuahua State Human Rights Commission. | https://www.ktsm.com/news/border-report/too-afraid-to-go-home-texas-lawyer-stands-up-for-two-mayan-migrants/ |
| 8/14/19 | kidnapping | 2 | La mujer hondureña y su hijo de 8 años ya habían sido guiados por tres coyotes y estaban a punto de cruzar el río Bravo pero terminaron secuestrados en Reynosa por el crimen organizado. Después de que su familia pagara el rescate de $12,000, pudieron llegar a EEUU, pero el gobierno los envió de vuelta a México mientras avanza su caso de asilo. | https://www.univision.com/noticias/inmigracion/decian-que-si-no-pagabamos-al-nino-le-iban-a-sacar-los-organos-la-angustia-de-una-madre-migrante-secuestrada-por-el-cartel-del-golfo |

AR383

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 390 of 688   PageID 2047

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/20/19 | kidnapping | 2 | with his girlfriend and her son. They planned to wait their turn on the list after being assigned No. 2400, but the lack of security scared them. "After a week when they didn't call anyone, a group of Venezuelans decided to cross. We did it because of fear, out of desperation. That day, about 42 people crossed. There were many who nearly drowned," he told el Nuevo Herald in an interview at a park in Matamoros, where he sleeps under the open skies. When they reached the U.S. side of the river they were separated by authorities. He was put into one of the cold holding cells known as "freezers," along with about 80 other migrants. He spent a day there, was taken that night to a detention center in McAllen, Texas, and later to Laredo.  "They put me in another 'freezer.' The only food they gave us was a burrito and water. I was detained five days. They never turned off the lights. They did a roll call three times a day. It was very hard," he recalled. After the officials reviewed his documentation, he was released in Mexico, in a dangerous part of Nuevo Laredo. "They freed us in an empty terminal with other people. Afterward, no one wanted to leave there because there was talk that there were kidnappings. They had kidnapped two Cubans and a Honduran," he said. They slept on the floor. The next day, a truck took away many people, and the migrants were told that it would be the last truck to leave that week. He and a friend decided to pay a taxi to take them to a bus terminal from where they could go on to Matamoros, where they learned that their families had been taken. "We were kidnapped when we were buying the tickets. It was a bad scene, because everyone there saw what was happening and no one did anything. They took us far away, to a house where they searched us, took away everything and put us in a room with other people kidnapped that same day," the young man said. "All were immigrants." One of the kidnappers interrogated them, looking for information that could help draw a ransom payment from relatives. But neither of the Venezuelans had relatives in the United States, and the contact lists on their cellphones had been damaged when they crossed the river. When the kidnappers realized the two had no relatives who could pay a ransom, they were taken to a different room. "We spent two hours there, praying, begging God," the young man said. "When they told us we were going to be released, we could not believe it. They told us not to go back. They put us in a car, took us to a terminal, put us on a bus to Matamoros, with nothing, because they took what little we still had." This Venezuelan migrant now faces another great obstacle: He must return to Nuevo Laredo, so he can be transported to the U.S. side of the border for a September hearing before an immigration judge who is considering his asylum | https://www.miamiherald.com/news/nation-world/world/americas/venezuela/article234175802.html |
| 8/22/19 | attempted kidnapping | 4 | Misael Palacio, 37, from San Rafael, El Salvador is determined to appear for his court date on Oct. 23. He brought his two sons, ages 3 and 12, to the U.S. border, he said, after he was threatened by gang members at home. The day after he was released back into Nuevo Laredo from the United States under the "Remain in Mexico" policy," he and his kids were nearly kidnapped by four men who tried to force them into a vehicle. Palacio escaped by holding onto his kids and running into oncoming traffic, he said. | https://www.deseret.com/2019/8/22/20828880/nuevo-loredo-mexico-border-crisis-immigration |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 391 of 688   PageID 2048

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/19 | kidnapping | 2 | Liceth Morales -  "It's dangerous in Nuevo Laredo. Lots of things can happen," she says, her lip trembling. She says they fled out-of-control crime in Honduras, thinking they could find refuge in the United States. But when she arrived at the Nuevo Laredo bus station, she says young men with tattoos and ball caps grabbed her and her son and held them prisoner for three weeks in safe houses. Ultimately, she says, her family in San Antonio paid $8,000 for her freedom. Finally, she crossed the Rio Grande to the U.S., asked for asylum and was sent right back to Nuevo Laredo. | https://www.npr.org/2019/08/23/753660088/migrants-in-mexico-seeking-u-s-asylum-wait-amid-dangerous-conditions |
| 8/26/19 | attempted kidnapping, extortion | 1 | Even though Danilo explained to a CBP officer that he had escaped from armed men attempting to kidnap him, he was returned to Mexico through MPP without a fear screening. In late May, Danilo placed his name on the wait "list" in Reynosa to seek asylum at the U.S. port of entry. While searching for a shelter, two armed men hunted Danilo and another asylum seeker throughout Reynosa trying to kidnap them. A Good Samaritan hid the two in a car trunk and spirited them to another part of town, but the kidnappers found them. Danilo managed to escape and hid in a shelter for 40 days. Danilo had previously been abducted by Mexican police officers who demanded a $1,500 payment from his family to release him. In early July, as CBP severely reduced the number of people permitted to ask for asylum at the port of entry, Danilo crossed the border in desperation to request protection. CBP did not refer Danilo for a fear screening despite his attempts to express his fear: "I explained what had happened in Mexico, but [the CBP officer] insisted that I had to return to Mexico." | https://www.humanrightsfirst.org/resource/complaint-office-inspector-general-concerning-rape-kidnapping-assault-and-other-attacks |
| 8/26/19 | armed robbery | 1 | CBP returned Yerson*, an asylum seeker from Cuba, to Mexico where he had been robbed three times in the five days before he crossed the border to seek asylum. As Yerson arrived in Reynosa in early July, a group of armed men stopped the vehicle he and other asylum seekers were traveling in and robbed them. Days later Yerson was robbed in the street by two men who threatened to kidnap him. Yerson tried to seek asylum by crossing the bridge that links Reynosa to Hidalgo, Texas but was turned back by U.S. officials. After learning that the "list" to seek asylum in Reynosa would require him to remain there in danger for months, Yerson decided to cross the border to seek asylum. But at the Rio Grande a group of more than a dozen tattooed men robbed him before he could cross the river and turn himself in to the Border Patrol. Yerson was returned to Mexico without a fear screening: "I told [the CBP officer processing him for MPP] that I had been robbed three time in Reynosa, but he didn't pay attention to me. . . . He only told me that I was going to be brought to the bridge in Nuevo Laredo. | https://www.humanrightsfirst.org/resource/complaint-office-inspector-general-concerning-rape-kidnapping-assault-and-other-attacks |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 392 of 688   PageID 2049

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/26/19 | armed robbery | 1 | Edwin*, a Cuban asylum seeker, was returned by CBP under MPP to Mexico, where he had been extorted by corrupt police officers and robbed at gun point. After being forced to pay police officers in Reynosa $300 because they threatened to deport him, Edwin tried to request asylum at the U.S. port of entry in Hidalgo, Texas, but learned that he would have to place his name on a months-long "list." While waiting in Reynosa two men, one armed with a pistol, robbed Edwin including a backpack that contained important evidence for his asylum case. Afraid to remain in Reynosa, Edwin crossed the river to seek asylum. CBP officers processing Edwin for MPP did not explain his legal rights, including the need to affirmatively request a fear screening. Returned by CBP to Nuevo Laredo, Edwin left for Monterrey in search of safer accommodation, but there two men pursued Edwin in the street late at night as he left a job washing dishes. | https://www.humanrightsfirst.org/resource/complaint-office-inspector-general-concerning-rape-kidnapping-assault-and-other-attacks |
| 8/27/19 | kidnapping, extortion | 14 | According to a witness account, several pickups full of mafiosos recently screeched to a stop in front of a government-contracted bus that had just left the central bus station. They ordered a dozen migrants off the bus, ordered them into their vehicles, and drove off, leaving the rest of the passengers shocked and frantic. "It's dangerous here. Lots of things can happen," says Liceth Morales, her lip trembling.<br><br>The 40-year-old Honduran woman fled the city of Choluteca with her 6-year-old son, Leytan, when thugs repeatedly robbed her small store. Then, as she tells it, when they arrived at the Nuevo Laredo bus station last month, young men with tattoos and ball caps grabbed her and her son and held them prisoner for three weeks in a succession of safe houses. Ultimately, she says, her family in San Antonio paid $8,000 in ransom for her freedom.<br><br>"When they released us, we immediately crossed the bridge to the U.S. to ask for asylum," she says. "But they sent me right back over here." | https://www.npr.org/2019/08/27/754489426/criminals-target-migrants-in-mexico-seeking-u-s-asylum? |
| 8/28/19 | assault, robbery | 1 | Un grupo de 17 migrantes cubanos fue asaltado por policías estatales en el hotel donde se hospedaban en Ciudad Juárez, frontera mexicana con Estados Unidos, según declaraciones y videos a los que tuvo acceso Efe. A los cubanos, que se encuentran en Ciudad Juárez para pedir asilo en Estados Unidos, y al encargado del hotel, los policías estatales de Chihuahua, estado del norte de México, les despojaron de más de 2.000 dólares, entre dinero y bienes. | https://www.radiotelevisionmarti.com/a/polic%C3%ADas-asaltan-a-migrantes-cubanos-en-hotel-de-ciudad-ju%C3%A1rez/246305.html |

AR386

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 393 of 688   PageID 2050

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/29/19 | kidnapping | 4 | Taylor Levy, a pro bono immigration attorney in El Paso, said one client and her children had been kidnapped twice in Juárez. The woman managed to pay both ransoms, and though she showed asylum officers evidences of the ransom payments, the government still sent her back, saying just because she'd been kidnapped twice in the past does not mean she's likely to be kidnapped again. Levy said she once watched a group of men snatch a family right before her eyes. When she tried to intervene, the kidnappers threatened her as well. So Levy thought of her two adopted daughters and stood, helpless and devastated, as the kidnappers dragged the family away: "I can't stop thinking about them, ever. There's just rampant, rampant amounts of kidnapping [in Juárez]. I know my life is in danger every time I go over there." | https://world.wng.org/2019/08/no_safe_haven |
| 9/2/19 | kidnapping, extortion | 8 | Three Honduran migrant families who returned to Mexico under the Migrant Protection Protocols recently recounted in interviews with the Los Angeles Times how gangsters kidnapped them, obliging relatives in the United States to pay ransoms. All three said they had alerted U.S. immigration officials that they had been abducted in Mexico — but were nonetheless sent back to Mexico. | https://www.latimes.com/world-nation/story/2019-09-01/kidnapping-of-pastor-in-mexican-border-town-dramatizes-threats-to-migrants |
| 9/3/19 | kidnapping | 2 | One woman in the United States called Cargioli on behalf of a family member under MPP in Tijuana. The woman said her family—a mother and child—had been kidnapped in Tijuana, and thus the mother probably couldn't make it to her court date. She asked how she could explain to the judge what happened, and Cargioli encouraged her to report it to Mexican authorities. "But she was too afraid," Cargioli recalled. "She said, 'How do you know the police there will actually help?' She never called back." | https://world.wng.org/2019/09/a_bad_day_in_court |
| 9/3/19 | robbery, assault | 38 | Three armed masked men burst into a Juarez shelter at night to assault and rob migrants of their documents, phones, money and even clothes and hygiene products - El asalto ocurrió aproximadamente a las 8:30 de la noche, en un albergue ubicado en el poniente de la ciudad, donde actualmente viven 52 cubanos, pero unos 14 de ellos se encontraban fuera del lugar, al igual que el pastor Rodolfo Barraza, quien había salido a comprar cena para algunos de ellos. Ocho de los migrantes fueron golpeados, tres de los cuales fueron trasladados en una ambulancia a un hospital de la ciudad para descartar que tuvieran alguna fractura, pero debido a que sólo fueron lesiones leves fueron dados de alta la misma noche del domingo. | https://diario.mx/juarez/asaltan-en-albergue-a-migrantes-cubanos-20190902-1557808.html |
| 9/5/19 | kidnapping | 2 | I have a family (clients) in CBP custody, going through a legal process (a non-refoulement interview) for which they should have access to counsel. They were kidnapped in Mexico. I know nothing about what has happened and cannot access them | https://twitter.com/cbrownimmlaw/status/1169640214421102592 |
| 9/8/19 | rape | 1 | I met a woman who was raped in (Juarez) Mexico and was so traumatized she couldn't write her name on a pad of paper. She trembled so much it was just scribbles. The woman is now pregnant. | https://twitter.com/cbrownimmlaw/status/1170554328098078721 |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 394 of 688   PageID 2051

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/9/19 | kidnapping | 2 | father and daughter were kidnapped while waiting in Reynosa - El padre y su pequeña hija fueron secuestrados mientras esperaban para solicitar asilo en Reynosa, Tamaulipas, México. Se escaparon de sus secuestradores y cruzaron a los Estados Unidos para buscar alivio. El padre y la niña fueron enviados de regreso a Tamaulipas bajo MPP. | https://www.elmanana.com/viven-en-el-limbo-entre-dos-paises-migrantes-frontera-esperanza/4913398 |
| 9/10/19 | rape | 1 | "This man had informed someone that he had picked up two people, but he didn't know we were trans," the Salvadoran woman said. "I was kidnapped in Mexico with a gun to my head. I was raped. I also knew my friend was being raped because of her screams."She said they were able to escape one night when the men got drunk. They returned home but then they tried again. That second time, they made it to the U.S. But she was deported, and so she tried again. That time she was told to wait in Mexico because the Remain in Mexico program, also known as the Migrant Protection Protocols, or MPP, was in effect. | https://www.keranews.org/post/lgbtq-migrants-face-unique-dangers-when-us-rejects-and-returns-them-mexico |
| 9/11/19 | kidnapping | 2 | One young couple was so traumatized after being kidnapped they spoke in a whisper our entire consultation. | https://twitter.com/L_Toczylowski/status/1172037061622108160?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1172037061622108160&ref_url=https%3A%2F%2Famericasvoice.org%2Fblog%2Fscotus-asylum-ban-tweets%2F |
| 9/14/19 | kidnapping | 3 | However, as they neared Reynosa, a city about an hour's drive west of Matamoros, a man apparently known to the guide pulled them off a bus and took them to a site where dozens of other people were being forcibly held, the couple said. They said they escaped, sleeping in ditches until finally crossing the Rio Grande and surrendering to U.S. authorities. | https://www.reuters.com/article/us-usa-immigration-mexico/after-us-court-ruling-honduran-newlyweds-among-migrants-clinging-to-asylum-dream-idUSKBN1VZ0N7 |
| 9/15/19 | kidnapping, extortion | 1 | Melissa fled Venezuela in late July seeking asylum in the United States. As a critic of Venezuela's disputed President Nicolas Maduro, she feared retribution from the government. Along her route, she says she was kidnapped and extorted by smugglers in Reynosa, Mexico, who forced her to cross into the U.S. between ports of entry, where she was detained. Melissa was returned to the International Bridge spanning the Rio Grande river to Nuevo Laredo, Puente 1, lacking laces in her shoes, a change of clothes, food or shelter. Her pleas to remain in the U.S. to await her Oct. 22 court hearing were denied. "I thought this would be, as they say, the American dream. But for me, it's only been an American nightmare." | https://www.irishsun.com/news/262423121/us-bound-migrants-asylum-seekers-wait-out-policy-changes |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 395 of 688   PageID 2052

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/16/19 | kidnapping | 12 | He said when he and another dozen or so asylum seekers who had been returned that day to Mexico arrived at the bus station in Nuevo Laredo, a group of 20 men were already waiting for them. Immediately, the men forced David, his child, and the other migrants into trucks, as an immigration official looked their way but did nothing. | https://www.vice.com/en_us/article/pa7kkg/trumps-asylum-policies-sent-him-back-to-mexico-he-was-kidnapped-five-hours-later-by-a-cartel |
| 9/16/19 | kidnapping | 4 | One woman, whom VICE News is calling Ana to protect her identity, was kidnapped with her husband and two children the day after the U.S. sent them back. She said they were at the bus terminal buying a ticket for a nearby city when a group of men surrounded them and said the family needed to go with the men. | https://www.vice.com/en_us/article/pa7kkg/trumps-asylum-policies-sent-him-back-to-mexico-he-was-kidnapped-five-hours-later-by-a-cartel |
| 9/16/19 | kidnapping, rape | 1 | I learned last night about an 18-year-old girl separated from her little sister by CBP and forced back to Nuevo Laredo with a Feb. 2020 court date. She was kidnapped and raped. | https://twitter.com/ReichlinMelnick/status/1173559391582326787 |
| 9/16/19 | robbery | 1 | and then, in southern Mexico, bought phony immigration papers that landed her in a detention center. "The food was not fit for dogs—not even for rats," she says of the facility. "I was there eight days, and if I stayed one more, I would have died or gone crazy." In April, Dana was among 600 migrants who escaped. By the time she reached Juárez, she'd been robbed so often that she carried the remains of her cash, $20, wrapped in a condom stuffed in her crotch. | https://www.theatlantic.com/international/archive/2019/09/us-mexico-mpp-ciudad-juarez/597796/?utm_source=twitter&utm_medium=social&utm_campaign=the-atlantic&utm_content=edit-promo&utm_term=2019-09-16T10%3A00%3A09 |
| 9/16/19 | kidnapping | 1 | For the migrants who made it, the judge set another court hearing for October 16. As she was wrapping up, one father, there with his wife and young son, rose from his chair in Laredo to ask whether he had to return to Mexico. "I'm not in a position to demand anything, but I want to say, I'm with my family, and I'm very afraid of returning to Mexico," he said through the video screen. He said that he had been kidnapped. | https://www.texasobserver.org/migrants-at-laredo-tent-court-tell-stories-of-kidnappings-and-violence-while-pleading-not-to-be-returned-to-mexico/ |
| 9/16/19 | kidnapping | 2 | Before court Monday, Honduran asylum seeker Yudy Pagoaga said that days after she and her 7-year-old daughter Allison were returned to Nuevo Laredo in July, they were kidnapped with four other migrants. They escaped and met a local pastor who took them in until their hearing. Pagoaga, 30, a single mother who ran a small store in Honduras, said she fled extortion and gang threats and couldn't return home. | https://www.latimes.com/world-nation/story/2019-09-16/secretive-tent-courts-latest-hurdle-for-asylum-seekers |

AR389

16

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z Document 61 Filed 06/22/21 Page 396 of 688 PageID 2053

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/17/19 | kidnapping | 1 | Gonzalez said she would address him afterward. Then a second person asked to speak and also said he was afraid. Eventually, eight people spoke. One woman said she had to pay someone to bring her back for her hearing. Another person said she had been kidnapped and mugged. | https://www.japantimes.co.jp/news/2019/09/17/world/social-issues-world/texas-tent-courtrooms-open-process-migrants-waiting-mexico/#.XYDkqChKiUk |
| 9/17/19 | attempted kidnapping | 5 | A family with four young children from Nicaragua described how they were nearly kidnapped at the bus terminal as they were heading to court, their children almost separated from them. | https://twitter.com/charanya_k/status/1174080750943166466 |
| 9/17/19 | kidnapping | 2 | A Salvadoran father wept while his little girl slept in his lap. He was kidnapped with others while traveling to court via bus. The police cars he thought were there to help them instead kidnapped the group. He was released because he had no money. The others remain missing. | https://twitter.com/charanya_k/status/1174080751878516736 |
| 9/17/19 | kidnapping | 2 | Young Honduran mom was kidnapped after returning to Nuevo Laredo. The kidnappers realized she had no family in the United States and no money so they dumped her back on the street with her kid, took photos of her and told her to get out of town in an hour or else. Many people were being held in the house with the family. | Report to HRF by U.S. immigration attorney working with MPP returnees in Nuevo Laredo |
| 9/17/19 | extortion | 2 | A Cuban couple had been extorted in Mexico and made to pay $1500, which they had to do with the help of family at home. Several of their friends had been kidnapped. One of them told the judge: "We want to ask for your pardon for entering illegally, but please don't send us back." | https://twitter.com/charanya_k/status/1174080756882268160 |
| 9/18/19 | kidnapping | 2 | Was @ Laredo bridge 3:30 a.m. today talking to migrants in "Remain in Mexico" before tent court, about 20 from Cuba, Honduras, Venezuela and El Salvador. Nicaraguan father w/16 year-old son said they had been kidnapped on their way there for a few hours; they didn't have a lawyer | https://twitter.com/mollyhf/status/1174480795525877760?s=12 |
| 9/18/19 | robbery | 1 | Honduran client in Monterrey was robbed, needs to travel to Juarez for hearing | MPP FB group post |
| 9/19/19 | kidnapping | 1 | An asylum seeker I worked with in #Matamoros sent me a message tonight. He had been kidnapped and extorted already in Matamoros while in #MPP. He was kidnapped again, and the armed men who did it burned his body with lit cigarettes. | https://twitter.com/vwesg/status/1174837816783712262 |
| 9/20/19 | kidnapping | 1 | I do not envy at all the job of interpreting by video for 3 hours straight. But still I noticed a number of errors that caused confusion. At one point a man even said he'd been kidnapped and it was left out of translation. | https://twitter.com/bova_gus?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 397 of 688   PageID 2054

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/21/19 | kidnapping, assault | 3 | Escuchaba cómo golpeaban a mi marido con unos bates y le daban toques eléctricos. Lo escuchaba gritar", cuenta Ángeles, una hondureña que fue secuestrada con su familia en Nuevo Laredo, Tamaulipas, en la frontera entre México y Estados Unidos. Ella, de 24 años, y su hijo, de tres, fueron liberados a los 8 días. Pero, no sabe si su esposo está vivo o muerto. Describe cómo el autobús en el que viajaban había apenas llegado a la estación cuando fue abordado por ocho criminales. Su intento de lograr el sueño americano se convirtió en una pesadilla. "Nos tuvieron encerrados en tres casas diferentes donde había más gente secuestrada. Me pedían que le llamara a mi familia para que les pagaran 11 mil dólares. Mi familia me dijo que lo sentía mucho, pero que no tenían dinero. El mundo se me iba haciendo cada vez más pequeño. Y ellos me amenazaban con matarme". La última vez que vio a su esposo fue cuando uno de los secuestradores la acompañó al baño y pasó por la habitación donde él estaba, tendido en el suelo, boca abajo. Tenía esposas y las manos amarradas hacia atrás. Sus pies estaban amarrados con cinta de aislar. Estaba muy golpeado y ensangrentado. "Me vio y me dijo: `amor, nos van a matar`. Yo solo pude asentir", dice en voz baja y tragando sus lágrimas. | https://diario.mx/usa/actualidad/nos-mandaron-a-la-boca-del-lobo-a-sufrir-secuestros-y-extorsiones-inmigrantes-20190921-1565325.html |
| 9/21/19 | kidnapping, extortion | 2 | "Yo le dije a un oficial de la patrulla fronteriza que por favor me encarcelaran en EU, pero que no me regresaran esperar a México, que es como la boca del lobo. Allí me secuestraron, me extorsionaron y me amenazaron de muerte", dice entre lágrimas de desesperación Daniel, un migrante de Honduras. "Para obligarme que regresara, me amenazaron con separarme de mi hijo", continua. asegura que le dijeron que en el país latinoamericano él y su hijo de 8 años iban a estar en un albergue, con protección. Sin embargo, es uno de los cientos de migrantes que ahora duermen al ras del suelo, en la calle en Matamoros. No se atreven a moverse más de algunos metros de la línea fronteriza marcada por el Río Bravo, porque tienen miedo del crimen organizado, que está al acecho. "Es muy cruel lo que nos hacen. México ni siquiera puede proteger a sus ciudadanos, ¿cómo va a proteger a los migrantes?", se pregunta Daniel, que tenía un buen trabajo en Honduras, pero migró porque las maras querían que su hijo introdujera droga en su escuela primaria. | https://diario.mx/usa/actualidad/nos-mandaron-a-la-boca-del-lobo-a-sufrir-secuestros-y-extorsiones-inmigrantes-20190921-1565325.html |
| 9/24/19 | kidnapping | 1 | Christina Brown, a Colorado-based immigration lawyer representing a handful of migrants forced to wait out their asylum cases in Mexico, told VICE News one of her clients was also kidnapped shortly after arriving in Juarez and had her kidnapper paperwork taken by her kidnapper. "She has a court date coming up, and the person who kidnapped her knows when it is," Brown said. "She's so afraid to even present at the port of entry because they have her information. She's terrified that they will be there waiting for her at the port of entry when she goes and that she won't make it to court." Christina also told us: Guatemalan woman HMR in MPP was kidnapped in Juarez on her way back from court. The kidnapper took her court documents. He got her number from the documents and has been texting her threats. She later woke up to find him standing over her bed. Nonetheless, she didn't pass her non-refoulement interview. | https://www.vice.com/en_us/article/gyzdp9/trumps-remain-in-mexico-policy-is-causing-asylum-seekers-to-miss-court-dates-and-get-deported |
| 9/26/19 | assault, robbery | 2 | My 23-year-old clients (brother and sister from Cuba) were beaten and robbed yesterday in Matamoros | https://twitter.com/Kou_Sua/status/1177206159033405441 |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z Document 61 Filed 06/22/21 Page 398 of 688 PageID 2055

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/26/19 | kidnapping | 2 | Y.C.F.F. (A# XXX-XXX-XXX) of Honduras is 8 months pregnant and was returned to Matamoros, Tamaulipas, Mexico on or about August 18, 2019. In April 2019, prior to entering the United States, she and her five-year-old daughter were kidnapped in Mexico but managed to escape. While detained in CBP custody, a "white, tall, blue-eyed woman," wearing a green uniform told her that she should abort her baby because "Trump didn't want there to be any more pregnant people here." She was held in overcrowded conditions for three days. She has had no prenatal care in Matamoros | https://www.aclutx.org/sites/default/files/aclu_oig_complaint_preg_mpp.pdf |
| 9/26/19 | attempted kidnapping | 3 | G.M.H.M. (A# XXX-XXX-XXX) of Honduras, age 25, is 5.5 months pregnant and was returned to Matamoros, Tamaulipas, Mexico on September 3, 2019. She along with her two young daughters, ages 5 and 2, were victims of an attempted kidnapping in Mexico prior to their entering the United States at the end of August 2019. | https://www.aclutx.org/sites/default/files/aclu_oig_complaint_preg_mpp.pdf |
| 9/26/19 | kidnapping | 1 | L.E.L.P. (A# XXX-XXX-XXX) of Ecuador, age 18, is 4 months pregnant and was returned to Nuevo Laredo, Mexico on September 23, 2019 for a second time under MPP. Despite repeated attempts by U.S. advocates to intervene, Border Patrol sent her back to Mexico. Previously returned to Nuevo Laredo under MPP, the young woman was subsequently kidnapped, and her family extorted for her release. Upon re-entering the United States, she expressed her fear of return to Mexico to Border Patrol officers, who failed to refer her for a screening interview. Once back in Mexico, her and other women could not leave the Mexican side of the port of entry due to known cartel scouts waiting to identify returning migrants for kidnapping. After extensive efforts by U.S. advocates, a local contact was able to transport the women to a local church. Despite not sharing their location with anyone, unknown individuals identifying themselves as local journalists appeared at the church the following day demanding to speak with the women. | https://www.aclutx.org/sites/default/files/aclu_oig_complaint_preg_mpp.pdf |
| 9/26/19 | extortion | 4 | F.Y.C.H. (A#: XXX-XXX-XXX) of Honduras, age 28, is 2.5 months pregnant and was returned to Tijuana, Baja California, Mexico on May 25, 2019, along with her husband and two small children. Upon return to Mexico, F.Y.C.H. and her family suffered threats and extortion from smugglers in Tijuana. The family fled to Mexicali, where she experienced bleeding due to her pregnancy and received limited emergency medical care. In her past two pregnancies, F.Y.C.H. endured medical difficulties, including preeclampsia and a hernia that required surgery. She has lost weight during this pregnancy as she cannot eat regularly and suffers from high blood pressure. In early September 2019, when in CBP custody during her initial immigration court hearing, F.Y.C.H. informed CBP officers of her pregnancy but was ignored. She also requested diapers for her three-year-old child. CBP agents told her she should potty train her son and did not provide diapers. Due to ongoing threats against the family in Baja California, F.Y.C.H. and her family have fled south to another state in Mexico. | https://www.aclutx.org/sites/default/files/aclu_oig_complaint_preg_mpp.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 399 of 688   PageID 2056

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/29/19 | kidnapping | 2 | David was aware of migrant shelters at that point and was desperate to find refuge in the closest one, about five blocks away. "Papi, I'm scared," Edin said as they started walking. "Just start walking. God will protect us," David told him, putting his arm around his son. "We'll be fine." They were fine for three or four blocks until a group of gang members appeared. Edin began to cry. They asked David for his password. He told them: "Pancho mini mi." "Good, he's with us," they said. And they kidnapped them anyway. After more than a week in captivity, David's family in Guatemala paid the kidnappers $15,000 to free them. | https://www.msn.com/en-us/news/world/kidnapped-and-attacked-in-mexico-migrants-are-giving-up-their-asylum-claims/ar-AAI0XAw |
| 9/29/19 | robbery, attempted kidnapping | 2 | Ten-year-old Anthony sat cross-legged on the floor eating soupy white rice while his mother recounted the day when 20 gang members stormed the migrant shelter where they stayed. She said the men, dressed in black and wearing ski masks, yelled "Get to the ground!" and pointed their guns at them. Dozens of parents and children screamed and cried as the gang took their phones and money. "We can't stay here," said Sandra, Anthony's mother, as she held him at the Good Samaritan shelter here. "It's not safe." | https://www.expressnews.com/news/local/article/Gangs-profit-from-Trump-s-Remain-in-14474477.php |
| 9/29/19 | assault, robbery, attempted kidnapping | 4 |  Noelia and her two daughters, migrants from Honduras, arrived at the bridge that crosses the river to Laredo for their court hearing out of breath — after running from kidnappers, Noelia said. Another woman wound her way toward the bridge wearing a jacket that hides a ripped yellow shirt and knife markings on her breasts. She said she was attacked that morning on her way to work. Men stole her purse, emptied it and then returned it to her rented room. The implied message: We know where you live. And Axel, a 40-year-old Venezuelan migrant, has scars on his upper back and arms. He said the one on his back is from a bullet shot at him during an anti-government protest in Venezuela. The scars on his arms are from gang attacks here. "In Venezuela, I was a dead man," said Axel, who has spent six months at the Barrio Para Dios shelter in Nuevo Laredo, waiting for his court hearing. "Here, I'm a dead man walking." Because the region has suffered cartel violence for years, the U.S. State Department has issued a "Do Not Travel" advisory for the state of Tamaulipas, where Nuevo Laredo is located. | https://www.expressnews.com/news/local/article/Gangs-profit-from-Trump-s-Remain-in-14474477.php |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 400 of 688   PageID 2057

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/30/19 | assault, robbery | 1 | Mario Rodríguez, a 27-year-old from Nicaragua, was in the southern Mexican state of Chiapas in May when he was attacked the first time. According to a police report, he was knocked unconscious and robbed of $70 by an unknown assailant. He experienced a second attack in late July, when he was in Matamoros, a Mexican border city across from Brownsville, waiting his turn to request asylum legally at the bridge under the Trump policy known as "metering." One evening, Rodríguez—who, like the other migrants in this story, requested a pseudonym for his protection—walked downtown to buy some churros. Night fell, so he decided to take a taxi back to the bridge, where he lived in a migrant encampment.<br><br>By Rodríguez's account, the taxi driver recognized him as a foreigner, pulled a crescent wrench from the floorboard, and slammed him over the head three times in an attempt to knock him unconscious. The driver grabbed Rodríguez's cell phone and said he was going to turn him over to the local Gulf Cartel. Rodríguez, an ex-cop, says he fought back, wresting away the wrench and fleeing on foot, blood pouring down his face. He reached the bridge's midpoint, where Customs and Border Protection (CBP) officials stand guard, and begged to be let through. But, he says, the agents just confiscated the bloody wrench from him and turned him away. About two weeks later, it was his turn to request asylum at the bridge. Though he told a CBP officer he was afraid of Mexico, the agent said nothing could be done, and Rodríguez was returned to Matamoros under MPP. Now he rarely leaves the area right by the bridge. "I feel a fear here," he told me in August. "I have this premonition that something's going to happen to me." Though he'd later decide against it, he told me then that he was thinking of returning to Nicaragua. His reasoning? He'd heard it costs thousands of dollars to repatriate a body.<br><br>Cheaper to die at home, he calculated, than to die in Mexico. | https://www.texasobserver.org/attacked-in-mexico-returned-to-mexico-trump-policy-ignores-danger-to-asylum-seekers/ |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 401 of 688   PageID 2058

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/30/19 | assault, kidnapping | 1 | Eduardo Águila, a 33-year-old also from Nicaragua, has had it even worse. According to police reports he filed with Mexican authorities, a man stabbed him in his right side in March in Chiapas; four months later, in Mexico City, two men kidnapped him, tied his hands with a cable, beat him, and burned him in an attempt to extort ransom. He then managed to escape the kidnappers and flee to Tijuana. There, a group of men began chasing him and one slashed his right arm with a knife. Running for his life, Águila climbed the border wall and turned himself in to Border Patrol agents, who took him to a hospital in nearby Chula Vista. Later, he tried to explain what had happened to him to the agents, but, he says, they wouldn't listen. They put him in MPP and returned him to Tijuana, with fresh stitches in his arm and medical paperwork that says he "sustained laceration to right elbow during entry." Now he lives in a shelter that he almost never leaves. He's already overstayed his allotted time there and will likely be kicked out soon. Águila, the Nicaraguan attacked three times in Mexico, has copies of police reports for every incident, but when he finally got an interview after his first court date in early September, he spoke to an officer through an interpreter by phone and was not even able to present the evidence. He was returned to Tijuana again. | https://www.texasobserver.org/attacked-in-mexico-returned-to-mexico-trump-policy-ignores-danger-to-asylum-seekers/ |
| 9/30/19 | kidnapping | 2 | Denise Gilman, director of the University of Texas at Austin's immigration clinic, told me she also knows of at least two cases in which migrants were unable to attend their court hearings in Laredo because they were being held for ransom at the time. | https://www.texasobserver.org/attacked-in-mexico-returned-to-mexico-trump-policy-ignores-danger-to-asylum-seekers/ |
| 9/30/19 | kidnapping | 2 | Carlos and his 17-year-old son sit in a migrant shelter run by the Mexican government here, their days tethered to ever slimming hopes that their appeals to the U.S. for asylum will somehow give them passage to a better life across the border.

On July 1, they fled what Carlos, 41, describes as an untenable life in Nicaragua, hounded by gangs who beat them and attempted to extort money. He left his job in a gold mine, and his wife and seven other children remained back home as he and Carlos Jr. struggled over the next month making their way north.

The journey became perilous in Mexico, where they were kidnapped and held for ransom, although they had no money. Carlos feels it's a miracle that they were released, and his son chokes up when his father describes the sacrifices in their quest for a fresh start in the United States.But when they arrived at a port of entry near El Paso in early August, they were quickly swept up in the Trump administration's Migration Protection Protocols program, also known as the Remain in Mexico program. Established in January, the MPP program ushered in a host of changes to U.S. immigration rules, none approved by Congress. | https://pulitzercenter.org/reporting/borderline-despair-how-us-warehousing-asylum-seekers |
| 10/1/19 | | 55 | During its most recent research, Human Rights First researchers identified an additional 54 unreported cases of individuals returned under MPP who were harmed in Mexico. | |

AR395

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 402 of 688   PageID 2059

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | Two young women were abducted in Nuevo Laredo from a group of asylum seekers who had just been returned there by DHS following an immigration court hearing in late September at the Laredo tent "court." An asylum seeker in the group reported that they had been forced to sleep on the street because no transportation had been provided to return the group to Monterrey where they had previously been bussed by Mexican government officials. During the night unknown men kidnapped the young women while the others managed to escape. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | Five Cuban asylum seekers returned by DHS to Nuevo Laredo were kidnapped there, as reported by an attorney representing clients in Nuevo Laredo. Even after they were released, the Cubans continue to receive threat from individuals they suspect are related to the cartels that control the area. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | Four Venezuelan women and a girl were kidnapped in Nuevo Laredo in July, according to a declaration provided to Human Rights First from a Cuban asylum seeker who reported witnessing the kidnappings which occurred just outside the INM offices there. He reported that a group of men stopped a taxi an INM employee had arranged to take the four Venezuelan women and girl to a local shelter and kidnapped them. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | The men who kidnapped a Guatemalan asylum-seeking family, including children ages 4 and 6, in Nuevo Laredo specifically targeted them because they had been expelled by DHS under MPP. The family was released after several days in captivity but told they could be kidnapped again at any time and that they would be required to pay extortion calculated based on the number of days they were in Nuevo Laredo. The kidnappers reviewed the family's MPP court documents to determine the date they had been returned by DHS and the date of their upcoming court hearing. They are living in terror waiting for their next hearing, afraid they could easily be kidnapped again going to or returning from court. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | In late September, a Honduran asylum seeker was kidnapped while travelling from Monterrey to Nuevo Laredo to attend an MPP hearing at the Laredo tent "court" facility with his 16-year-old son. Another asylum-seeking family brought the boy to the port of entry where CBP processed him as an unaccompanied minor given his father's disappearance. According to attorneys familiar with the case, the man remains missing. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | A 3-month-old baby and her asylum-seeking mother from Honduras were nearly kidnapped in Matamoros after being returned there by DHS. The woman told researchers from Human Rights First in September that men had attempted to force the family into a car but were prevented from abducting them by the owner of a nearby laundromat who intervened. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 403 of 688   PageID 2060

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | A Central American family with three children were abducted by men wearing Mexican police uniforms after being returned by DHS to Ciudad Juárez in August. An attorney assisting the family reported that photos sent with ransom demands to the family's relatives in the United States showed the family in what appeared to be a government office. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | A Guatemalan family with two children were kidnapped for ransom by men in Mexican federal police uniforms after DHS returned them to Ciudad Juárez in July under MPP. The family told an immigration attorney that the kidnappers tortured some of the migrants held with them, duct-taping plastic bags over their heads to suffocate them. They and others managed to escape when their abductors unexpectedly left. However, the family later saw the same men who had kidnapped them near the shelter where they were hiding. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping, torture | (counted within 55 reported in HRF report) | A Honduran asylum seeker, who had previously been kidnapped in Mexico with his son, was kidnapped again after DHS returned them to Matamoros. He told his attorney, Veronica Walther, that the armed men who abducted him "burned me with lit cigarettes"  because he could not meet their extortion demands | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | assault, threats | (counted within 55 reported in HRF report) | An asylum seeker from Honduras sent by DHS to Matamoros in July was assaulted and threatened with rape for being a lesbian. In an interview recorded by the Texas Civil Rights Project and shared with Human Rights First, the woman said that a few blocks from the makeshift tent camp in Matamoros passers-by who discovered she was a lesbian hit her in the face, leaving her with a busted lip. In September, men at the camp told her they would "teach us [lesbians] to like men," a statement she understand to be a threat to rape her. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | assault | (counted within 55 reported in HRF report) | A Salvadoran asylum seeker returned by DHS to Tijuana was attacked, threatened, and abused with slurs calling Salvadorans "trash" and "leeches." The incident exacerbated the woman's already precarious mental state. A therapist evaluating the woman found her to be acutely suicidal, according to her attorney. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | assault | (counted within 55 reported in HRF report) | A Cuban woman who was seeking asylum, but turned back to Matamoros by DHS, told Human Rights First researchers that she had been threatened and assaulted during the nearly five months she had already been waiting in Matamoros.  She said that other Cuban women returned to Matamoros had been raped, but women have "only two options, you are quiet, or they kill you." | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | assault | (counted within 55 reported in HRF report) | A teenage Guatemalan asylum seeker was attacked and beaten in the street in Mexicali, according to attorneys from a legal services organization that visited Mexicali in September. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z  Document 61  Filed 06/22/21  Page 404 of 688  PageID 2061

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | Three children, all under the age of ten, and their mother sought asylum in the United States but were sent by DHS to Matamoros. They were returned to Mexico even though they had previously been abducted in Villahermosa. The family was held by kidnappers for nearly a month and only managed to escape when other migrants held with them helped the family to escape when the woman's youngest daughter became gravely ill. When the mother told CBP about the kidnapping and her fears her family would be harmed if returned to Mexico, the officer told her that "we have orders from above to return all." | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | A 12-year-old girl and her father, asylum seekers from Honduras, were kidnapped in southern Mexico, an experience that further traumatized the girl who had already been traumatized by a brutal attack on her family in Honduras. When her father told CBP about the kidnapping, a CBP officer said that he did not believe the man because he had not filed a police report. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping, torture | (counted within 55 reported in HRF report) | A Honduran asylum seeker and his 9-year-old son were expelled to Matamoros without a fear screening even though the man explained to CBP officers that he and his son had been kidnapped and that he was subsequently tortured by Mexican law enforcement officers in Tamaulipas who burned him with lit cigarettes. The man showed Human Rights First researchers several small circular scars on his stomach that appeared consistent with his account. He said a CBP officer threatened to separate him from his son if he persisted in insisting that he feared return to Mexico. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping | (counted within 55 reported in HRF report) | CBP officers returned a Nicaraguan political activist seeking asylum in the United States to Mexico even though corrupt Mexican police officers in Reynosa had handed him over to kidnappers in mid-August. He was held along with a group of about 24 other migrants – including about ten non-Spanish speaking black migrants, several other Central American migrants, and a Russian man who had been tortured by the abductors after apparently attempting to escape. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |
| 10/1/19 | kidnapping, rape | (counted within 55 reported in HRF report) | An asylum seeking woman who was kidnapped in Mexico with her son, repeatedly raped, and pursued by the kidnapper to Tijuana, did not pass an MPP fear screening. Even though the woman had a video sent to her by the kidnapper proving that he was in the same city as her and she had reported the kidnapping, rape and threats to local police, she and her son were returned to Tijuana, according to the attorneys representing the family. | https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z  Document 61  Filed 06/22/21  Page 405 of 688  PageID 2062

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/1/19 | kidnapping | 3 | Denis was especially nervous. A few months earlier, his wife had left the city of San Pedro Sula with the couple's two other children, including the eldest, who, at seventeen, was being targeted to join a local gang; after he resisted, gang members began threatening the entire family. Denis stayed behind to earn a bit more money before following with the couple's other children. His wife arrived at a port of entry in El Paso, and immigration agents allowed her and the children to enter the U.S. while their asylum case was pending. Denis planned to use the same process. But, shortly after he and the two children reached Juárez, in mid-August, a group of local gangsters kidnapped them and held them for five days in an abandoned church on the outskirts of town. They eventually escaped and travelled directly to the U.S. border crossing. "It doesn't make sense to try to cross illegally," he told me. "The smugglers will just take your money and then abandon you." By the time they arrived in El Paso, the asylum process had changed: Denis and his children were briefly detained, given a court date in December, and then sent back to Mexico to wait, under a U.S. policy called the Migrant Protection Protocols (M.P.P.). | https://www.newyorker.com/news/dispatch/how-the-us-asylum-system-is-keeping-migrants-at-risk-in-mexico |
| 10/1/19 | robbery | 2 | The other woman, Betty, was from Guatemala City. Her seventeen-year-old daughter, Marielos, followed quietly behind her. After arriving, in early August, the two of them had been given a court date for late October, but they'd been robbed immediately after returning to Juárez. Betty had kept their court documents and identification in her purse, which was now gone. | https://www.newyorker.com/news/dispatch/how-the-us-asylum-system-is-keeping-migrants-at-risk-in-mexico |

AR399

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 406 of 688   PageID 2063

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/1/19 | rape, kidnapping, assault | previously counted in tally | Earlier this summer, I spoke with a twenty-year-old woman from northern Honduras named Tania. In early April, she and her fourteen-year-old sister were separated at an El Paso port of entry. Her sister was sent to a children's shelter run by the Department of Health and Human Services and eventually placed with their mother, who lives in Boston. Tania spent six days in detention in the U.S., in a frigid holding cell known among migrants as a hielera, before Mexican immigration agents picked her up and took her back across the border, into Mexico. They dropped her off at a migrant shelter that was already full. She roamed the streets, looking for another place to stay. Her tattered clothes and accent marked her as foreign, and her race—she's black and belongs to an indigenous community called the Garifuna—led to several episodes of public abuse. "People would shout and spit at me when I was on the street," she said. "If I sat down somewhere, people would get up and move away." ...Back in Mexico, she decided that it was pointless to wait any longer. She and another woman from Honduras hired a smuggler to help them cross into the U.S. Neither of the women realized it at the time, but the smuggler was in league with a cadre of Mexican federal policemen. For two nights, she and the other woman were driven to different stash houses along the border. On the last night before they expected to cross, they were taken to yet another house, where there were four other women and a group of armed men, including policemen in uniforms, keeping watch. That night, one of the policeman held a gun to Tania's head and ordered her to perform oral sex on him. "I could hear the other women getting beat up in the background," she said. Early the following morning, Tania and another woman were transported to a separate location, where they were repeatedly raped. A week passed before local authorities found them and took them to a hospital. | https://www.newyorker.com/news/dispatch/how-the-us-asylum-system-is-keeping-migrants-at-risk-in-mexico |
| 10/1/19 | sexual assault | 1 | A Nicaraguan woman I met this past weekend in Matamoros told me that she had been sexually assaulted by Mexican police and was afraid to tell CBP for fear they'd share the information with Mexican authorities and she would be retaliated against while she's in Mexico. | https://twitter.com/mariaaleote/status/1179170242058174465 |
| 10/7/19 | kidnapping | 1 | The Remain in Mexico policy is hurting people: My friend's family is being extorted after her cousin (Salvadoran) was kidnapped because he was sent back to Mexico to file for asylum. Let's venmo @ Karol-Jalpay to get him back! (later correction specified the cousin is Honduran) | https://twitter.com/_danalvarenga/status/1181240055869952001 |
| 10/7/19 | assault | 1 | Dany and other LGBTQ asylum seekers said that while they waited in Mexico they had been threatened and intimidated for being gay. Melisa, a 27-year-old from Honduras, said she was hit in the face by a stranger as she stood talking to friends outside a nearby pharmacy. | https://www.latimes.com/politics/story/2019-10-07/julian-castro-helps-lgbtq-migrants-trump-remain-in-mexico-plan-cross-border |
| 10/8/19 | assault, threats | 1 | Mari, a Cuban asylum seeker, said two men had threatened her and her partner, Dany, when they went to buy cigarettes. One of the men also grabbed her during the altercation, Mari said. They also faced discrimination from fellow asylum seekers. | https://www.motherjones.com/politics/2019/10/trump-asylum-seekers-lgbtq-pregnant-women-matamoros/ |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 407 of 688   PageID 2064

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/8/19 | threats | previously counted in tally | On Thursday, Mayela, the only trans women at the encampment, told me she feared for her life as she waited for her December court date across the Rio Grande in Brownsville, Texas.Mayela had similar experiences to the other LGBTQ women in Matamoros. In late September, a woman came to her tent and threatened to cut out her guts with a knife, according to a complaint Mayela submitted to the Mexican government. In the line for food at the camp, fellow migrants told her she had to wait in the men's line and sometimes used slurs. Goodwin learned the next day that the Department of Homeland Security was taking Mayela out of MPP. Mayela had passed her screening interview. It was the first and only time Goodwin has seen that happen in Brownsville. | https://www.motherjones.com/politics/2019/10/trump-asylum-seekers-lgbtq-pregnant-women-matamoros/ |
| 10/10/19 | kidnapping, rape | 3 | Also on the bridge was Jilma, a 26-year-old Honduran asylum-seeker who was sent to Nuevo Laredo after presenting herself at the US border. Along with a group of other immigrants, she was transported to a shelter at the direction of Mexican immigration agents.<br><br>Along the way, the bus was stopped by federal police, Jilma said, who ordered all of the immigrants off the vehicle. Moments later the group was boarded onto trucks at gunpoint by men who took them to a large house with about 300 kidnapped immigrants. When Jilma and two other women couldn't provide phone numbers for family members who could pay a ransom, some of the men took them to another room and took turns raping them, she said."While they raped us they told us they would do the same things to our children," Jilma told BuzzFeed News. "They let us go, but before they left they took photos of us and told us to never return to Nuevo Laredo."<br><br>Jilma has since made her way to Matamoros where she hopes she will be safe, but is fearful of returning to Nuevo Laredo in January for her court hearing on the other side of the border. | https://www.buzzfeednews.com/article/adolfoflores/asylum-seekers-protesting-bridge-close-matamoros-texas |
| 10/12/19 | kidnapping | 1 | "CBS This Morning" spoke to a Honduran woman, who is part of MPP, who said that her husband was kidnapped when they got sent back to Mexico. He was eventually released because the couple couldn't afford the ransom. | https://www.cbsnews.com/news/remain-in-mexico-doctors-decry-trump-policy-of-sending-more-than-51000-migrants-back-to-mexico/ |

AR401

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 408 of 688   PageID 2065

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/15/19 | kidnapping | 2 | "At this point, I'm so frightened I just want to go home," said Beti Suyapa Ortega, 36, from Honduras, who crossed the border into Texas intending to seek political asylum and surrendered to the Border Patrol. She, along with her son, 17, were among two dozen or so Remain in Mexico returnees waiting recently for a southbound bus in a spartan office space at the Mexican immigration agency compound in Nuevo Laredo, across the Rio Grande from Laredo, Texas. Ortega and others said they were terrified of venturing onto the treacherous streets of Nuevo Laredo — where criminal gangs control not only drug trafficking but also the lucrative enterprise of abducting and extorting from migrants. "We can't get out of here soon enough. It has been a nightmare," said Ortega, who explained that she and her son had been kidnapped and held for two weeks and only released when a brother in Atlanta paid $8,000 in ransom. "I can never come back to this place." | https://www.latimes.com/world-nation/story/2019-10-15/buses-to-nowhere-mexico-transports-migrants-with-u-s-court-dates-to-its-far-south |
| 10/15/19 | kidnapping | 2 | But some, including Flores Reyes, said they were terrified of returning to Matamoros, where they had been subjected to robbery or kidnapping. Nor did they want to return across the Rio Grande to Texas, if it required travel back through Matamoros. Flores Reyes said kidnappers held her and her daughter for a week in Matamoros before they managed to escape with the aid of a fellow Honduran. The pair later crossed into Texas, she said, and they surrendered to the U.S. Border Patrol. On Sept. 11, they were sent back to Matamoros with a notice to appear Dec. 16 in immigration court in Harlingen. "When they told us they were sending us back to Matamoros I became very upset," Flores Reyes said. "I can't sleep. I'm still so scared because of what happened to us there." Fearing a second kidnapping, she said, she quickly agreed to take the transport back to southern Mexico. | https://www.latimes.com/world-nation/story/2019-10-15/buses-to-nowhere-mexico-transports-migrants-with-u-s-court-dates-to-its-far-south |
| 10/15/19 | robbery | 1 | Christian Gonzalez, 23, a native of El Salvador who was also among those recently returned here, said he had been mugged in Matamoros and robbed of his cash, his ID and his documents, among them the government notice to appear in U.S. immigration court in Texas in December. | https://www.latimes.com/world-nation/story/2019-10-15/buses-to-nowhere-mexico-transports-migrants-with-u-s-court-dates-to-its-far-south |

AR402

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 409 of 688   PageID 2066

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/16/19 | kidnapping, robbery | 1 | Even after he was kidnapped and robbed outside the makeshift migrant camp where he had slept for two weeks, Luis Osorto decided his only chance for eventual asylum in the United States was to stay put along the border just inside Mexico. But the 37-year-old Honduran made a pact with himself: not to leave the enclave of tents at the end of a bridge between Matamoros and Brownsville, Texas - not even to buy a bottle of water or to collect money transfers from his family back home. After what is commonly known as an "express kidnapping" last month by men waiting in a van for him outside a convenience store where he was collecting a $100 transfer from relatives, Osorto promised himself he would only leave the camp to cross the bridge to Texas for his December court date with U.S. immigration authorities. | https://www.nytimes.com/reuters/2019/10/16/world/americas/16reuters-usa-immigration-mexico-matamoros.html |
| 10/16/19 | kidnapping | 5 | Kristin Clarens, a U.S. attorney who advises asylum-seekers at the border, said she had come across five cases of migrants in Matamoros awaiting MPP hearings who were kidnapped briefly. They were taken to an ATM to clear out their accounts or forced to phone relatives to send cash transfers to a nearby convenience store. | https://www.nytimes.com/reuters/2019/10/16/world/americas/16reuters-usa-immigration-mexico-matamoros.html |
| 10/16/19 | kidnapping, extortion | 6 | Reuters spoke to six asylum seekers at Osorto's camp who said they had been kidnapped or extorted, and several more who had brushes with suspected criminals near the border or elsewhere within Mexico. | https://www.reuters.com/article/us-usa-immigration-mexico-matamoros-feat/asylum-seekers-cling-to-hope-safety-in-camp-at-us-mexico-border-idUSKBN1WV1DY |
| 10/16/19 | kidnapping | 2 | I have clients who are waiting in Juarez for the MCH hearings in December. They have been kidnapped once, family paid the ransom, they are now staying in a shelter, but their kidnappers have continued to drive by and threaten to kidnap again. They want to present at the POE to request a non-refoulement interview, but are afraid to leave the shelter by themselves. Does anyone know of any agency or organization that they could reach out to accompany them to the POE? | MPP Facebook group post; posted by Guillermo Hernández |
| 10/16/19 | kidnapping, assault | 2 | respondent asked if she would be returned to México to wait until 12/16 and explained to judge that they had been kidnapped and assaulted in Nuevo Laredo and said, "if I don't return for court on 12/16, it's because something happened to me in Nuevo Laredo." | According to reports by human rights monitors at San Antonio immigration court as shared with HRF |
| 10/16/19 | assault | 2 | she said Nuevo Laredo is dangerous and she would like to avoid going back—people harass her kids, throw rocks at them and call them "mentally retarded" | According to reports by human rights monitors at San Antonio immigration court as shared with HRF |

AR403

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 410 of 688   PageID 2067

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/21/19 | rape | 1 | Constance Wannamaker wanted to scream and cry at the same time. The Texas immigration attorney had just heard what should have been great news: Her client, a 21-year-old Guatemalan woman, was getting released from the El Paso Processing Center after weeks in detention. But that's just a sliver of the story. When the asylum seeker first tried to come to the United States in April, she was returned to Mexico to await a hearing in the U.S. She crossed the border again in May but was later sent away once more to a dangerous city far from home. While she was forced to shelter in Ciudad Juárez, a stranger broke into her hotel room and raped her, her lawyer said. After she was let back into the U.S. and detained, she discovered she was pregnant. And once immigration authorities found out, they decided to remove her from their care with almost no notice...As both a woman and a migrant, Wannamaker's client was already in jeopardy. But she is also a lesbian — a factor for which her attorney suggested the U.S. government failed to screen — and because of her sexuality, she could have been exempted from the program. | https://www.nbcbayarea.com/news/national-international/Asylum-Seeker-Migrant-Protection-Protocols-Raped-Pregnant-563171401.html |
| 10/22/19 | kidnapping | 2 | "Like most of the families she assists that day, a 23-year-old man from Honduras and his toddler have been living in the plaza next to the Brownsville & Matamoros International Bridge.The site is just an hour from the place where they were kidnapped en route to the US and held for ransom. "He was petrified at being in Matamoros, living in constant fear that his kidnappers were looking for him and could find him," Zavala says. "He was out in the open and staying at the plaza. He didn't have shelter, family, or any form of protection for him and his daughter."" | https://intercontinentalcry.org/theyre-treated-like-animals-the-us-government-is-abusing-asylum-seekers-including-indigenous-migrants-but-people-are-fighting-back/ |
| 10/26/19 | kidnapping | 3 | was in Juarez driving to a shelter when I gave this quote. Picked up a couple & little boy who had been kidnapped & released after paying thousands of $. they saw the same kidnappers circling their shelter & requested help getting to the bridge to beg to be taken out of #MPP | https://twitter.com/taylorklevy |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 411 of 688   PageID 2068

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 11/5/19 | assault, robbery | 7 | Today, the ACLU Foundation of San Diego & Imperial Counties (ACLUF-SDIC) filed a class-action lawsuit against the U.S Department of Homeland Security. The suit demands that people seeking asylum who have been subjected to the Trump administration's dangerous Remain in Mexico policy – referred to by the government as the "Migrant Protection Protocols" (MPP) – and who have expressed a fear of being returned to Mexico must be given access to their lawyers while awaiting critical interviews in U.S. Customs and Border Protection (CBP) custody…The plaintiffs in the case are a Guatemalan family who fled their home in April 2019 after they were extorted, and the couple's 17-year-old daughter was raped and threatened with death. The couple's nine-year-old son has symptoms consistent with leukemia. While traveling through Mexico, the couple and their five children were assaulted by men in government uniforms at gunpoint and forced to take off their clothes during the attack. One of the assailants choked the 17-year-old daughter while she was completely undressed.<br><br>In August 2019, the family requested asylum in the United States but under MPP they were returned to Tijuana to await their immigration proceedings. During this time, there have been shootings outside the place where the family is temporarily staying.<br><br>When the family expressed a fear of being returned to Mexico, the father was separated from the family, handcuffed and given a "non-refoulement interview" via telephone and without legal representation. The rest of the family was interviewed separately, also without representation.<br><br>After the interview, the family was returned to Tijuana without an explanation. The father has since been robbed at gunpoint while on his way to work.<br><br>The family is now being represented in their immigration case pro bono by Jewish Family Service of San Diego, which is one of only two organizations in the San Diego region providing legal representation and counsel to asylum seekers subjected to MPP. | https://www.aclusandiego.org/aclu-asylum-seekers-subject-to-trumps-remain-in-mexico-policy-must-be-given-access-to-counsel/ |

AR405

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z Document 61 Filed 06/22/21 Page 412 of 688 PageID 2069

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 11/6/19 | assault | 1 | A Salvadoran woman seeking asylum in the United States spends her days sequestered in her cousin's cramped house in Mexico, too scared to leave after being savagely beaten three weeks ago when strolling back from a convenience store. The attack came after she spent four months in captivity, kidnapped into prostitution on her journey through Mexico.<br><br>The woman is one of 55,000 migrants who have been returned to Mexico by the Trump administration to wait for their cases to wind through the backlogged immigration courts, and her situation offers a glimpse into some of the problems with the program...As he heard the case last week of the immigrant from El Salvador, immigration Judge Lee O'Connor made no secret of his disdain for the program.<br><br>The judge said she was ineligible for the program because, in his view, the law only allows it for people who present themselves at official border crossings, not for immigrants like her who enter illegally.<br><br>But the U.S. still sent her back to Mexico with a notice that her next court date was Dec. 16, even though her case was terminated by the judge. | https://apnews.com/0746f2a9cc5745b387d795081a9c7691 |
| 11/6/19 | kidnapping | 1 | A mother appeared in court with her eight-year-old son and tearfully told the judge her husband couldn't be there because he disappeared in Mexico and has been missing for months. DHS asked that he be ordered deported for not appearing at his hearing. | https://twitter.com/becky_gendelman/status/1192260613461958656 |
| 11/6/19 | kidnapping | 2 | Observed Laredo MPP hearings in San Antonio Immigration Court this week. An asylum seeker who had been kidnapped in Mexico with her 2-year-old baby said it was horrible and begged the court: "If I am to be deported, I would like to be deported to my own country, not Mexico." | https://twitter.com/becky_gendelman/status/1192260611364851714 |
| 11/6/19 | kidnapping | 3 | Heart wrenching cries for help in Laredo MPP tent courts today. 16 yo girl and 12 yo boy crying, begging judge not to return them w/dad to Mexico where they were kidnapped after the last hearing in Sept (as seen by my colleague & Yale Law fellow @becky_gendelman from San Antonio) | https://twitter.com/KennjiKizuka/status/1192200730213593088 |
| 11/7/19 | attempted kidnapping, assault | 3 | Ghazialam first noticed this in September, when three of his clients were sent back to Mexico after their cases were terminated on Sept. 17. After being returned to Mexico, the mother was stabbed in the forearm while protecting her children from an attempted kidnapping. She still has stitches from the knife wound, Ghazialam said. | https://www.sandiegouniontribune.com/news/immigration/story/2019-11-07/cbp-fraud |

AR406

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 413 of 688   PageID 2070

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 11/8/19 | kidnapping | 2 | "Mommy, I don't want to die!" That's what a 7-year-old child cried to her mother on hearing their kidnappers plan to murder migrants held with them at a cartel safe house in Nuevo Laredo. The cartel abducted the family after CBP returned them to Mexico following an MPP hearing. Cartel members were in the Nuevo Laredo office of Mexican migration openly abducting asylum seekers just returned by CBP from their court hearings at the US port of entry. This woman managed to hide in the bathroom w/ her daughter to call a local pastor for help. When the pastor bravely tried to drive away w/the woman & her daughter, cartel members blocked the road forcing them to stop just blocks from the port of entry. They were pulled from the car & taken to a house where other migrants were being held - some of them tied up with ropes. At one point, the family witnessed cartel members carrying away two young men, discussing that they would be killed because their families had failed to pay their ransom. They saw another person beaten by the abductors for failing to pay. | https://twitter.com/KennjiKizuka/status/1192907065955667969 |
| 11/9/19 | kidnapping | | Jonathan (no es su nombre real), joven padre de familia de Nicaragua, . . . Jonathan, su mujer y dos hijos pequeños fueron devueltos a México, concretamente a la franja fronteriza del estado de Tamaulipas, un territorio sin ley que poco tiene que envidiar a las ciudades centroamericanas en lo que se refiere a la violencia atroz. Abandonada por la policía estadounidense en un descampado al otro lado del puesto fronterizo, la familia vio acercarse un autobús que supuestamente los llevaría a un lugar seguro. Pero el conductor se dirigió directamente a la casa segura de uno de los grupos de delincuentes que se dedican a extorsionar a los migrantes. Secuestraron a la familia y amenazaron con asesinarlos si desde Nicaragua no les pagaban 3.000 dólares. Una semana después fueron puestos en libertad. | https://www.lavanguardia.com/internacional/20191109/471459892472/mexico-eeuu-migracion-extorsiones.html |
| 11/13/19 | kidnapping | 1 | One pregnant 18 y/o was sent to Nuevo Laredo via MPP, kidnapped by the Cartel Noreste, dropped back in US (presumably as a decoy as the group moved drugs elsewhere), taken to the hospital by Border Patrol, did an interview asking to leave MPP, & then was sent back to Nuevo Laredo | https://twitter.com/Sleutert/status/1194644878384349190 |
| 11/15/19 | kidnapping | 4 | Yohan, a 31-year-old Nicaraguan security guard, trudged back across the border bridge from Laredo, Texas, in July with his wife and two children in tow, clutching a plastic case full of documents including one with a court date to return and make their asylum claim to a U.S. immigration judge two months later. On their way to the bus station, two strange men stopped Yohan while another group grabbed his loved ones. At least one of them had a gun. They were hustled into a van, relieved of their belongings and told they had a choice: Pay thousands of dollars for their freedom, or for another illegal crossing. | https://madison.com/news/world/migrants-thrust-by-us-officials-into-the-arms-of-the/article_3485698f-1327-522b-8ab6-5659a0ff96a6.html |

AR407

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 414 of 688   PageID 2071

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 11/18/19 | kidnapping, robbery | 2 | Along the road in Mexico, Damian added, he and his son were robbed and kidnapped and he was tortured until the boy's mother paid a $5,000 ransom – a not unusual experience for many other migrants.<br>But when he crossed the bridge to apply for asylum, US officials returned him to Matamoros, where he said he was again robbed when he tried to withdraw money sent by friends. His son suffered another kidnapping attempt while living in the tent camp. The fear for the boy's safety drove Damian to decide to send him alone to the United States, after a US immigration judge denied his own asylum application. "I don't know what to do, because I have nothing in my country. My mother is dead, my father is dead and my two sons are in the United States," he said. "I have no options other than to send my son across the bridge. At least he can be saved." | https://www.univision.com/univision-news/immigration/at-least-he-can-be-saved-migrants-trapped-in-mexico-are-sending-their-children-alone-to-the-united-states |
| 11/18/19 | kidnapping | 2 | Xiomara* and her teenaged daughter Jenny* are from Honduras...once they entered the United States, Customs and Border Patrol officials placed them under MPP and returned them to Ciudad Juarez, Mexico, to wait for their initial master calendar hearing in January 2020. In Juarez, members of organized crime kidnapped the mother and daughter for five days and six nights. They were forced to stay in a small room in a house where people came and went, music always played loudly and drugs were strewn in plain sight. Jenny remembers seeing a man snorting white powder. She said she saw very bad things — things she never had imagined before. They were able to escape, but had nowhere to go or any idea where they were. They crawled through desert-like empty lots and hid in a ditch before reaching a public area where they sought help. They are now staying in a shelter, but rarely leave out of fear that they could be kidnapped again. Xiomara does not know what will become of them — but understands that they are easy prey and never safe. | https://cliniclegal.org/news/seven-migrant-protection-protocols-stories-estamos-unidos-asylum-project |
| 11/18/19 | kidnapping | 1 | Elizabeth,* 24, fled gang violence with her 2-year-old toddler, was placed under MPP and waited months for her hearing before immigration courts in El Paso. Days before the hearing, her child was taken from her. She did not appear for her Master Calendar Hearing in El Paso because she was searching for her child. As a result, the immigration judge entered an order of removal in absentia — or in absence — against her and her child. The very system meant to protect asylum seekers like Elizabeth, instead, put her and her daughter in harm's way. | https://cliniclegal.org/news/seven-migrant-protection-protocols-stories-estamos-unidos-asylum-project |
| 11/18/19 | kidnapping attempt | 3 | Nicole* fled Honduras with her husband Wilmer* and their young child. Her father was recently murdered and most of their family is either dead or fleeing for their lives. She is a strong woman, but when asked if she fears being in Juarez, she does her best to hold back tears. The men that have been hunting down her family have tried to find them in Mexico as well. They have tried to find a safe place to wait for their hearing, but she knows they will never be safe amongst organized crime in Mexico. They have already escaped two kidnapping attempts. In the most recent attempt against their lives, however, she fell trying to escape one of the men and suffered a miscarriage. She prays for her family to stay alive and be able to appear before a U.S. immigration court in December. | https://cliniclegal.org/news/seven-migrant-protection-protocols-stories-estamos-unidos-asylum-project |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 415 of 688   PageID 2072

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 11/18/19 | assault, sexual assault | 3 | A family of three — father, son and daughter — fled Venezuela to Panama due to political persecution, after they opposed the ruling party. Upon arrival to Panama, they applied for protection, but were harassed, abused and constantly targeted because of increased xenophobia against Venezuelan nationals. Local residents threatened the son and beat him badly. In addition, officials denied the family access to education and health care. As a result, they fled Panama, traveling through Central America and Mexico to seek asylum in the United States. Upon arrival, Mexican authorities mistreated and extorted them by unlawfully retaining their passports. Both father and son survived beatings, abuse and attempted kidnapping in Mexico. The teenaged daughter experienced an attempted sexual assault, from which she suffers continued signs of trauma and possible mental health complications. Eventually, they crossed the border to the United States, and immigration authorities placed them under MPP. Fearing more persecution and violence, they now spend all their time at a shelter in Ciudad Juarez. | https://cliniclegal.org/news/seven-migrant-protection-protocols-stories-estamos-unidos-asylum-project |
| 11/21/19 | kidnapping, rape | 2 | After Lucia and her daughter were returned to Mexico, they briefly found a shelter in which to stay but were forced to leave when the shelter demanded payment, which Lucia could not pay. A man offered to let Lucia and her daughter live with his family and do domestic work for pay. However, when Lucia and her daughter went to his house, they learned he lived alone and works for a dangerous Mexican cartel. He locked them in the house, forced Lucia to do all of his housework for no pay, and inappropriately touched Lucia's daughter sexually. After much pleading and the intervention of a third party, the man let Lucia attend her MPP hearing, but threatened to kill Lucia and her daughter if they did not return after the court hearing. As before, Lucia and her daughter were sent back under MPP even though they should have been exempt from MPP because Lucia's daughter is disabled. In direct violation of the MPP guiding principles, CBP officers sent them back to Mexico anyway. This time, the consequences were even more severe. Just a few blocks from the port of entry in Tijuana, men with knives stopped Lucia and her daughter and abducted them. Lucia describes the horrors that followed: The men drove us in a car overnight. They took us to a place that I believe was [redacted], Mexico and kept us there for thirteen days. They didn't give us food or water. They tied my daughter up in a sheet so she could not move. They beat us repeatedly. They took off all of our clothes, touched us sexually, raped us, and masturbated in front of us. They often would not let us go to the bathroom. When they did let us, they would grab us and walk us to the bathroom and we would have to go in front of them. The men told me that I did not have rights because I am [redacted], called me a dog and trash, and said they would light me on fire. | http://americanimmigrationcouncil.org/sites/default/files/general_litigation/statement_for_the_house_migrant_protection_protocols_11_21_19.pdf |
| 11/24/19 | rape | 1 | Attorney reported to immigration attorney Taylor Levy that a client had been raped in Juarez. | https://twitter.com/taylorklevy/status/1198707918197198849 |
| 11/27/19 | kidnaping | 1 | At the shelter, a woman from Guatemala who did not want her name published out of fear, explained how she had been kidnapped in Mexico. For eight days along with other migrants she was tied up with tape over her mouth. She managed to get free, climb out a window and find her way to this shelter. | https://www.hppr.org/post/migrants-nuevo-laredo-remain-mexico-means-remain-danger |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 416 of 688   PageID 2073

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/1/19 | kidnapping | 2 | One migrant, Tere, wrote that she and her 7-year-old son were kidnapped once they reached the US border and were held for nine days without food. They were only released after her family paid a ransom, she wrote.<br><br>"I thank God for freeing me from that terrible experience," wrote Tere, who says her asylum court date in the US is next February. | https://www.cnn.com/2019/12/01/world/mexico-asylum-seekers-letters/index.html |
| 12/2/19 | kidnapping, rape | 5 | "We represented a young woman and her daughter who were victimized not once but three times in Ciudad Juarez, robbed and then kidnapped for ransom and then an attempted break-in into their hotel room," Rivas said. Rivas said most recently they represented a migrant woman who had been raped during her trek to the United States and they have medical documentation that her seven-year-old daughter was also raped. The advocate also said their organization represented a young migrant woman who denounced Mexican state police that she was raped by members of the Mexican military. She added that they have "proof of all of this." | https://www.urdupoint.com/en/world/migrants-face-extortion-in-mexico-awaiting-as-777274.html |
| 12/5/19 | kidnapping | 201 | Seven and ten year-old-girls were threatened with rape by kidnappers who also abducted their brother and father, an asylum seeker from Honduras, after DHS returned the family to Nuevo Laredo. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | attempted kidnapping | (counted within 201 reported in HRF report) | A 12-year-old Salvadoran girl was nearly abducted from her mother in Monterrey after they were sent by DHS to Nuevo Laredo under MPP then dumped by Mexican authorities in Monterrey. Armed men chased the family and grabbed the girl, but her mother managed to wrestle her back and escape. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | A seven-year-old Honduran girl returned by DHS to Nuevo Laredo told her asylum-seeking mother "Mommy, I don't want to die" after overhearing the men who kidnapped them discussing murdering migrants who could not pay ransom. In mid-September, cartel members openly kidnapped returned asylum seekers inside the INM building in Nuevo Laredo following U.S. immigration court hearings, including the seven-year-old Honduran girl and her mother mentioned above. The woman overheard a Mexican migration officer tell the kidnappers the number of migrants returned from court that day and the men counting victims to abduct. The family tried to escape in the car of local pastor, but cartel members forced the vehicle to stop a few blocks away, abducted them, and held them in a house with some 20 other kidnapped migrants. A cartel member threatened to kill the woman if she reported the kidnapping to the police and bragged "the man from migration gave you to us." | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 417 of 688   PageID 2074

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | robbery, threats | (counted within 201 reported in HRF report) | an LGBT Cuban woman who had been robbed and threatened in Nuevo Laredo while waiting on the metering list, and a gay asylum seeker from Cuba who was robbed and threatened in Mexico but subsequently returned to Matamoros | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | A Honduran asylum seeker and his two children, a 12-year-old boy and a 16-year-old girl, were kidnapped while returning from a Laredo MPP tent court hearing in September. During another hearing in November, observed by a Human Rights First researcher, the family begged not to be sent to Mexico. The girl, sobbing, said that when they return to court "bad people" approach them. The boy said to the judge, "I hope you can help us, please. I don't want to return to Mexico. We run a lot of risk." | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | In late October, a Venezuelan asylum seeker was kidnapped while returning to Nuevo Laredo for an MPP hearing at the port of entry tent court in Laredo. Immediately after getting off of a bus from Monterrey five men approached him and a Guatemalan asylum seeker traveling with him. The two were taken from the bus station in separate vehicles. "I started to cry in the truck. One guy told me to calm down and shut up or he would beat me." The man was taken to two different houses where the cartel held a dozen other migrants including a Colombian man with a toddler and Nicaraguan family with a nine-month-old baby. The kidnappers punched the Nicaraguan mother in the neck, as they forced her to call family members to beg for a ransom to be paid. The kidnappers released the man after several days of captivity. He fears returning to Nuevo Laredo for his next hearing in December, as his abductors recorded his details from his passport into a notebook and took a photograph of him. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | attempted kidnapping | (counted within 201 reported in HRF report) | A 13-year-old boy and his mother were nearly kidnapped in Nuevo Laredo while walking from the bus station toward the port of entry to attend an MPP hearing in Laredo in late September. An armed man and woman approached the family, took photos of them and tried to force them into a waiting vehicle. They escaped on foot to the office of the Instituto Nacional de Migración (National Migration Institute – INM) but so feared leaving that they missed the hearing. A Mexican migration officer eventually ordered the family to get out, saying "it wasn't [INM's] problem." A local pastor, who happened to arrive, hid the family in the back of a passenger van and spirited them from the parking lot of INM building to a shelter. A Salvadoran asylum seeker, who had nearly been kidnapped in Nuevo Laredo, indicated that the officer conducting her 15-minute-long interview principally asked about the route she and her children took to the United States and "why they had come illegally." The aggressive questioning made her afraid to fully recount what had happened, in part, because she feared her responses might be shared with Mexican migration officials who she had seen speaking to one of the men who tried to kidnap her. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

AR411

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 418 of 688   PageID 2075

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | assault | (counted within 201 reported in HRF report) | A Venezuelan refugee returned by DHS to Mexico after an immigration judge granted him withholding of removal at the Laredo MPP tent court was nearly kidnapped in November while returning to the port of entry to request to be allowed to enter the United States. At the Nuevo Laredo bus station, a group of around ten men surrounded the Venezuelan man. He managed to push his way through, jump into a waiting taxi, and immediately walk onto the international bridge to Laredo, Texas, to escape. A Venezuelan asylum seeker in MPP, who was later granted withholding of removal at the Laredo tent court facility, was beaten by a group of men with sticks in Monterrey. On another occasion armed men in a vehicle nearly kidnapped him while he was traveling in a taxi in Monterrey. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping, assault | (counted within 201 reported in HRF report) | In mid-October, a Honduran asylum seeker and her daughter told an immigration judge at the Laredo MPP tent court that they had been kidnapped and assaulted in Nuevo Laredo. According to a court monitor attending the hearing from San Antonio, the woman said that if she didn't return for her next court hearing, "[i]t's because something happened to me in Nuevo Laredo." | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | robbery | (counted within 201 reported in HRF report) | A Cuban asylum seeker returned by DHS to Mexico stated that in August cartel members had robbed him inside of a church offering shelter to migrants in Nuevo Laredo. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | A 25-year-old Honduran woman and her three young children – all under 5 – who crossed the border near Piedras Negras were kidnapped upon exiting a taxi in front of a shelter in Nuevo Laredo after DHS returned them there in mid-October. Men in white vans intercepted the family, held them captive for five days, and demanded money from family members, according to an academic researcher who spoke with the relatives. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | robbery, assault | (counted within 201 reported in HRF report) | In September, armed, masked men attacked a church-based shelter in Ciudad Juárez housing mainly Cuban migrants, according to a Cuban asylum seeker who was sleeping in the shelter with his partner and nine-year-old daughter at the time. The men shouted: "asshole Cubans, open up," as they forced their way into the shelter. The armed men threatened to "kill one of these asshole Cubans" and fired their weapons indiscriminately, nearly hitting the Cuban man. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 419 of 688   PageID 2076

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | attempted kidnapping | (counted within 201 reported in HRF report) | At another shelter on the outskirts of Ciudad Juárez, a Honduran asylum seeker who DHS had returned under MPP was nearly abducted by four masked men in a black van who repeatedly came to the shelter where she was staying and interrogated other migrants about her whereabouts. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | attempted sexual assault | (counted within 201 reported in HRF report) | A 12-year-old Salvadoran girl was nearly raped after she, her father, and younger brother were returned by DHS to Ciudad Juárez under MPP. After the Casa Migrante told the family that they could not extend their stay due to limited capacity at the shelter, the family rented a room in a local home. While the girl's father was out purchasing food, the husband of the house's owner tried to rape the girl. The man threatened to have the girl's father arrested and deported, if she reported him to the police. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | assault, robbery | (counted within 201 reported in HRF report) | In early July, armed cartel members attacked a home where several Cubans were renting rooms while waiting for permission to approach the port of entry at Laredo to request asylum. The cartel members announced they were searching for "foreigners," roughed up the elderly Mexican couple renting out the home, beat several of the men and placed rifles to their heads, robbed the group, took their photos and ordered them to leave the city. DHS returned these asylum seekers to Nuevo Laredo through MPP, telling one man that his fear of the cartel was "outside their [CBP's] jurisdiction." | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | robbery | (counted within 201 reported in HRF report) | An asylum-seeking Venezuelan family with 16- and 11-year-old girls and 10- and 3-year-old boys were robbed in a migrant hotel after DHS returned them to Nuevo Laredo. A hotel manager said he was powerless to stop the cartel from entering the hotel. Men had previously tried to kidnap one of the girls, as the family passed through the Nuevo Laredo bus station. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | disappearance | (counted within 201 reported in HRF report) | A 28-year-old Salvadoran asylum seeker sent to Nuevo Laredo by DHS under MPP went missing in September after leaving a shelter in Nuevo Laredo to work for the day. The man was still missing at the time his 8-year-old son and wife, who was due to give birth in mid-November, appeared at their master calendar hearing in early November at the Laredo MPP tent court. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | In November, a Salvadoran asylum seeker and her two young children, who DHS returned to Matamoros, were abducted in a taxi while trying to reach a nearby store to purchase food. The taxi driver handed the family over to kidnappers who held them for seven days while attempting to extort the woman's relatives, according to Charlene D'Cruz, an immigration attorney heading the Lawyers for Good Government project at the Matamoros tent encampment. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

AR413

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 420 of 688   PageID 2077

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | robbery, kidnapping, threats | (counted within 201 reported in HRF report) | A Cuban asylum-seeking couple were robbed and pushed to the ground while walking to a store in Mexicali, where the pair had moved after DHS returned them to Nuevo Laredo. The couple had previously been abducted, robbed, and threatened in Reynosa. Another couple seeking asylum from Cuba were abducted from the street in Mexicali in August, according to their attorney Margaret Cargioli from the Immigrant Defenders Law Center. The family is afraid to venture outside now because the kidnappers took their phones and recorded their biographical information. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | assault | (counted within 201 reported in HRF report) | A 51-year-old member of a Cuban opposition party said that he and his adult sons, who were returned to Nuevo Laredo by DHS, have been repeatedly targeted because of their nationality. In one incident, men shouted at them on the street: "asshole Cubans, you're fucked." Then in late October, a group of men cornered the family in the street, beating the older man with a board. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | robbery | (counted within 201 reported in HRF report) | After being returned to Ciudad Juárez by DHS, a Venezuelan asylum seeker was robbed while walking in downtown Juárez. The assailant used the woman's stolen phone to threaten and extort her family members in the United States claiming he knew where the woman lived. When the woman's family stopped answering the calls, a man with a photo of the woman appeared near her home in Juárez asking about her. She reported the incident to authorities, but the police did not conduct any investigation. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | assault | (counted within 201 reported in HRF report) | Armed men cut a 33-year-old Venezuelan asylum seeker with a knife as he was searching for a migrant shelter in Nuevo Laredo when the man refused to get in their truck. DHS later returned the man under MPP despite the attack. A former police officer, the man stated that fears going outside the shelter where he is staying. "You cannot understand how bad it is," he said. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | In November, a female asylum seeker from Honduras returned by DHS to Matamoros was kidnapped near the tent camp just feet from the local INM office and the building where Lawyers for Good Government is assisting MPP returnees with asylum applications, according to attorney Charlene D'Cruz. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | attempted kidnapping | (counted within 201 reported in HRF report) | In September, the 18-year-old son of a Venezuelan asylum seeker returned by DHS to Nuevo Laredo was nearly kidnapped while working at a fruit and vegetable stand where he and his mother had found work. A passerby intervened to stop five men from kidnapping the young man when they began interrogating him about whether he was a foreigner. The young man had previously received a graze wound on his neck during a shooting near the stand. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

AR414

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 421 of 688   PageID 2078

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | Kidnappings of asylum seekers in MPP from the bus station in Nuevo Laredo are common, including: a family seeking asylum from Venezuela with daughters ages seven and two; two Honduran asylum-seeking sisters and their three children held captive for five days and threatened with death if their family did not pay ransom; and, a Guatemalan family with two boys who were kidnapped from the station while waiting for a bus to Monterrey while on the port of entry asylum metering list. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | A 4-year-old Honduran boy and his 23-year-old asylum seeker mother were kidnapped in Monterrey after being bused there following their return to Nuevo Laredo by DHS. On the second night of their captivity, one of the kidnappers began to sexually assault the woman but was interrupted by another of the kidnappers who set the family free. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | A 3-year-old Salvadoran boy and his mother were kidnapped while attempting to reach Monterrey after DHS returned them to Nuevo Laredo. Family members were forced to pay a ransom to secure their release. The family went into hiding in the house of Good Samaritan who is providing them with food because they fear going outside. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | threats | (counted within 201 reported in HRF report) | A group of men stopped and threatened a Venezuelan asylum seeker traveling from Nuevo Laredo, where she had been returned by DHS under MPP, to Toluca. The men asked whether the woman was Venezuela or Cuban and gave a "first warning" to the minister traveling with the woman at the time. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | An asylum seeker from Ecuador was abducted in September while traveling to Monterrey after being returned to Nuevo Laredo by DHS. The kidnappers removed her from a car and took her to a series of houses where they demanded money for her release. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | robbery, assault | (counted within 201 reported in HRF report) | A group of men beat and robbed a Salvadoran asylum seeker returned by DHS to Nuevo Laredo in July when he stepped out of the migrant shelter in Monterrey to purchase food for himself and his daughter. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 422 of 688   PageID 2079

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | assault, threats | (counted within 201 reported in HRF report) | Cartel members in Monterrey sent extortion demands and threatening messages to a Cuban asylum seeker placed in MPP by DHS and returned to Nuevo Laredo in July. The man was forced to relocate again to another part of Mexico. He had previously been assaulted three times while in Reynosa. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | Another Cuban asylum seeker sent by DHS to Nuevo Laredo who had moved to Monterrey was kidnapped there and released only after he and his family paid a significant ransom. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | In late July, a woman with a baby girl in her arms, who DHS had just returned to Mexico under MPP, were abducted from the parking lot behind the INM building in Nuevo Laredo. According to a Venezuelan asylum seeker returned the same day, armed men entered the parking lot, which is enclosed by a concrete wall and metal fencing, and forced the family into their vehicle. INM officials and a patrol of Mexican soldiers who passed by shortly afterwards did nothing to investigate or respond to the abduction. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | DHS returned a Salvadoran asylum seeker, her husband, and three young children to Mexico in October even though they had been kidnapped and threatened by Mexican federal police in Ciudad Juárez. The officers brought the family to what appeared to be a police station, demanded ransom from the woman's family in the United States saying that they "would never see them again," if they failed to pay, and even threatened to take away the woman's children and put them up for adoption. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | assault, robbery | (counted within 201 reported in HRF report) | In Ciudad Juárez, Mexican police attacked a Salvadoran asylum seeker, throwing him to the ground, kicking and robbed him in front of his two children as they approached the port of entry to attend an MPP court hearing in August. The man was walking with his children in the early morning hours to report to CBP at the port of entry by 4:30 am for their hearing. When the man was able to show the police his MPP court documents, they released him but stole his money. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

AR416

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 423 of 688   PageID 2080

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | Mexican migration agents in Nuevo Laredo also appear to have been involved in the near kidnapping of a Honduran asylum seeker, her husband, and son in late September after DHS sent them to Nuevo Laredo. As the family and other migrants were walking from the INM building after Mexican migration told them to leave or get on a bus for the southern Mexican border, men in vans abducted more than a dozen migrants, including the Honduran woman. Her husband and son managed to run back to the INM office. Mexican immigration officers were either directly participating in or permitting the men to kidnap asylum seekers from the INM building because the kidnappers showed the woman a photo of her family crying inside the building to pressure her to convince them to come out. The family managed to escape with a pastor who spirited them to a shelter in Monterrey, according to an academic researcher who interviewed migrant families in Monterrey in mid-October. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | attempted kidnapping | (counted within 201 reported in HRF report) | In mid-October, a Venezuelan asylum-seeking family of five including two girls ages eight and ten were nearly kidnapped at the Nuevo Laredo airport while returning for an MPP hearing. The family had moved to another Mexican city after nearly being kidnapped outside of a shelter in Nuevo Laredo. As they passed through internal migration controls, a Mexican migration official took photos of the family and their documents with what appeared to be her personal cell phone. When the family challenged the official, they were allowed to proceed. However, upon exiting the terminal a group of men immediately approached them and tried to force the family into a waiting vehicle – indicating to the family that the migration official had sent their photos to the kidnappers. The family narrowly managed to escape abduction by pushing their way back into the terminal. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | assault | (counted within 201 reported in HRF report) | Mexican police asked for a bribe when a former judge seeking asylum from Cuba and her husband attempted to report an assault against the man in southern Mexico, according to their immigration attorney Natalie Cadwalader-Schultheis of Justice for Our Neighbors. The couple refused to pay and the police failed to investigate the attack even though it had been captured on a film by a nearby security camera. The couple were also robbed and threatened at gunpoint with other Cuban asylum seekers in Reynosa, but DHS returned them to Matamoros under MPP nonetheless. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | extortion | (counted within 201 reported in HRF report) | Mexican police have repeatedly threatened, wrongfully detained, and extorted the clients of Constance Wannamaker, an immigration attorney representing asylum seekers returned to Ciudad Juárez under MPP. Police there threatened to beat a Honduran asylum-seeking client and demanded money from him. Two Cuban asylum-seeking clients, one of whom was pregnant, were also repeatedly detained and extorted by Mexican police in Juárez and in Tapachula in southern Mexico. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | assault | (counted within 201 reported in HRF report) | Lisa Knox, an immigration attorney who represents asylum seekers in MPP said she had been alerted by her clients to multiple instances of physical assault and abuse by Mexican police in Tijuana against returned asylum seekers. One Honduran asylum seeker told her that he been attacked in Tijuana, and in another incident, Mexican police had detained him and called him a "dirty Honduran." | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 424 of 688   PageID 2081

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | robbery | (counted within 201 reported in HRF report) | A Cuban asylum-seeking client of Kenna Giffen, an immigration attorney working with asylum seekers returned to Matamoros, told Giffen that Mexican police had entered a church in Reynosa sheltering migrants and demanded money. The police detained those who refused to pay from the church. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | An Ecuadoran asylum seeker kidnapped in September in Nuevo Laredo with her daughter, told her attorney Esmeralda Sosa, that she was asked only a few questions even though she had presented evidence in the form of text messages from the kidnappers during an MPP screening Sosa was not permitted to attend or monitor. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | rape, kidnapping | (counted within 201 reported in HRF report) | A Cuban woman kidnapped and gang raped in Nuevo Laredo when she first arrived there to seek asylum at the port of entry did not pass an MPP fear-screening interview. The attackers said, "this is what we do to Cubans here." After DHS initially returned her to Nuevo Laredo, the women lived in hiding, only leaving to receive treatment for her trauma and to attend an MPP court hearing. During a fear-screening interview in November after that hearing, an asylum officer asked the woman for proof that "the attackers believed they were targeting [her] because [she is] Cuban" and concluded that despite the serious harm she suffered in Mexico that her fear of return to Mexico was insufficient to justify removing her from MPP. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | attempted kidnapping | (counted within 201 reported in HRF report) | A Guatemalan man and his nine-year-old son, who were twice nearly kidnapped in Mexico, did not pass an MPP fear screening after aggressive questioning of the boy by an asylum officer. The officer questioned the nine-year-old child about details of the kidnapping attempts, one of which occurred just a day after the family was returned to Mexico, resulting in the nine-year-old becoming confused, overwhelmed, and crying, according to an attorney who spoke with Human Rights First. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping, robbery | (counted within 201 reported in HRF report) | An asylum seeker from El Salvador and his six-year-old son who were kidnapped, robbed, and extorted multiple times, including by Mexican police, were returned by DHS to Mexico after failing to pass an MPP fear screening, according to their attorney Constance Wannamaker. Though the family's account was deemed credible, as indicated by the interview worksheet, the asylum officer found that they did not meet the standard to establish a more likely than not probability of harm in Mexico. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 425 of 688   PageID 2082

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | rape, kidnapping | (counted within 201 reported in HRF report) | A Cuban asylum seeker, who was the victim of two kidnappings in Reynosa and who was physically abused and sexually assaulted after being returned under MPP, did not pass a fear screening in November, according to her attorney Kenna Giffen. The woman who was referred for interview following a hearing in the Brownsville tent court fainted in terror of being returned to Mexico and was put into a wheelchair. DHS did not permit the woman to be represented by counsel during the interview. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | assault, threats | (counted within 201 reported in HRF report) | A Honduran asylum seeker who did not pass an MPP fear screening had been repeatedly stripped and searched for money by men in Mexican police uniforms who threatened to kidnap her older son and had been followed and threatened by men in Mexicali. The woman was found not credible and the family returned to Mexico. The woman reported to her attorney Troy Elder of Immigrant Defenders Law Center, who DHS did not allow to be present during the interview, that the asylum officer interviewing her and her sons questioned the boys about whether they "like" Mexico in what appeared to her to be an attempt to contradict her fear of remaining there. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | rape, kidnapping | (counted within 201 reported in HRF report) | An asylum-seeking woman was not referred by CBP for an MPP fear interview before being sent to Matamoros even though she was kidnapped and raped in front of her three-year-old son. The woman was still bleeding days after the attack and in need of additional medical attention when she met with attorney Jennifer Harbury in November. Before being returned to Mexico, the woman had tried to explain that she and her son had been kidnapped in Reynosa before crossing into the United States to seek asylum, but CBP sent them back without referring them to an asylum officer for an MPP screening. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | CBP officers in Laredo failed to refer a Guatemalan family with two children for a fear-screening interview even though they explained that they had been kidnapped from the Nuevo Laredo bus station, held for days, and threatened that they would have to pay to remain in the city. The CBP officer processing the family when they were allowed to enter the port of entry after waiting on a metering list said kidnapping was immaterial to fear of Mexico unless the person was raped or seriously injured. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | assault | (counted within 201 reported in HRF report) | Immigration attorney Lisa Knox reported that CBP officers refused to refer her asylum-seeking client from Honduras for an MPP fear-screening interview after he had been attacked and robbed in Mexicali by men with machetes. The man also informed the private security guards transporting him back to Mexico from the immigration court that he feared return but was not referred for an MPP fear interview. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

AR419

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z  Document 61  Filed 06/22/21  Page 426 of 688  PageID 2083

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | Similarly, a Salvadoran asylum seeker who had been kidnapped in Ciudad Juárez and escaped by climbing out of a window after DHS sent her to Juárez under MPP was not referred for a fear-screening interview even though she specifically requested one. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | rape, kidnapping | (counted within 201 reported in HRF report) | CBP officers accused a 32-year-old Nicaraguan woman fleeing political persecution of lying about having been kidnapped and raped by cartel members in Nuevo Laredo after DHS returned her there in July. After a ransom was paid, the cartel had forced her to cross the river. When she attempted to express her fear of return to Mexico, a CBP officer accused her of lying and sent her to Nuevo Laredo. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | A Salvadoran asylum seeker abducted with her three children in Monterrey was not referred by CBP for an MPP screening despite the woman describing hear fear of being returned to Mexico. A CBP officer told the woman that, "everyone has to go back." After being returned by DHS to Tijuana in October, the woman received a death threat in November from men involved in her family's kidnapping. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | attempted sexual assault | (counted within 201 reported in HRF report) | A teenage Venezuelan girl was returned with her father and brother to Ciudad Juárez even though she had been the victim of an attempted sexual assault in Mexico, which has left her symptoms of continued trauma, according to attorney Tania Guerrero of CLINIC. Despite explaining their fear of return to Mexico, CBP sent them to Ciudad Juárez in September. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | An asylum-seeking woman from Cuba reported that CBP refused to listen when she recounted having been kidnapped with her husband in Nuevo Laredo and held with other migrants who were being beaten by cartel members. After being forced to wait on the metering wait list at the Laredo port of entry, a CBP officer told the woman in response to her fear of Mexico: "I don't want to hear it. You can tell it to the judge at your hearing." | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | sexual assault | (counted within 201 reported in HRF report) | The children and mother of a Colombian asylum seeker who did not appear at the Laredo MPP court with her for their hearing in December were ordered removed in absentia. The woman explained that she could not afford to bring her family from Guadalajara because she had to hire an attorney to file charges against a man who had sexually abused her daughter and that she could not even afford to see a doctor for cancer treatment. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |

Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols" as compiled by Human Rights First

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 427 of 688   PageID 2084

| Date Published | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | Two Venezuelan men – who were kidnapped as they attempted to approach the Laredo port of entry to seek asylum, beaten, ransomed, forced across the border by their abductors, and again threatened with kidnapping by the same men on the bridge just after DHS returned them to Nuevo Laredo – are so afraid for their lives that they have been forced to abandon their U.S. asylum claims. According to immigration attorney David Robledo who unsuccessfully requested that DHS provide the men a remote MPP fear screening, the men have relocated to another city in the interior of Mexico but are too afraid to return to the border region to attend MPP court. | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| 12/5/19 | kidnapping | (counted within 201 reported in HRF report) | In November, a Honduran woman with a two-year-old boy, who DHS returned to Nuevo Laredo under MPP, told an immigration judge during a hearing monitored by a Human Rights First researcher that she had been kidnapped with her baby, and said, "If I am to be deported, I would like to be deported to my own country, not Mexico." | https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDecember2019.pdf |
| **Total victims of attacks** | | **636** | | |



≡ MENU

# Report: Crimes against migrants waiting in Mexico to seek U.S. asylum continue to climb

More than 630 violent crimes against asylum seekers affected by the Migrant Protection Protocols program have been reported in Mexico, according to a new report by Human Rights First.

BY **JULIÁN AGUILAR**　　DEC. 5, 2019　5 PM CENTRAL

COPY LINK



Migrants walk across an international bridge from the United States to Nuevo Laredo, Mexico, after requesting asylum in the U.S. 📷 Miguel Gutierrez Jr./The Texas Tribune

More than 600 migrants seeking asylum in the United States have been the victims of violent crimes in Mexico after being sent there under a controversial immigration policy, according to a report by Human Rights First.

There have been at least 636 reports of crimes like rape, kidnapping and torture since January, when the Trump administration's Migrant Protection Protocols program was implemented. Some of the alleged incidents involved more than one victim.

The watchdog organization said the latest tally is an increase of nearly 300 incidents since their report in October.

The program, also known as "remain in Mexico," requires asylum seekers to stay in Mexico until their court hearings in the United States. In Texas, MPP is in effect in the border cities of El Paso, Eagle Pass, Laredo and Brownsville, whose sister cities in Mexico have all seen sustained or increased violence this year.

The group said the report's sourcing includes interviews with asylum seekers, attorneys, court monitors, researchers, Mexican officials and media reports.

"The extensive and escalating public accounts of kidnappings and attacks on asylum seekers turned back to remain in Mexico are highly alarming," said Kennji Kizuka, the group's senior researcher and policy analyst. "What's worse is that many more men, women and children have certainly suffered attacks; the numbers we have are just cases that have been reported."

The Department of Homeland Security did not respond to a request for comment about Human Rights First's findings.

About 55,000 people have been sent back to Mexico under the program, and thousands of others are in Mexico under the Trump administration's metering policy, which requires asylum seekers to wait weeks or months before even applying.

The report said 130 children have been kidnapped or victims of attempted kidnappings. It also cites instances in which Department of Homeland Security officials apparently broke the agency's own rules by returning vulnerable

AR423

Case 2:21-cv-00067-Z    Document 61    Filed 06/22/21    Page 430 of 688    PageID 2087

populations, like pregnant women, the seriously ill, LGBTQ migrants or Mexican nationals.

Despite the pushback, the Department of Homeland Security has defended the

| Critical Race Theory | Unemployment Benefits | New Abortion Law | Texas Bill Tracker | Vacci |

Officials have also said the program has helped reduce fraudulent claims and alleviated overcrowding in Border Patrol and Immigration and Customs Enforcement facilities.

"It's one of our most successful initiatives," acting DHS Secretary Chad Wolf said last month in El Paso. "It's critical to what [the agents] do to control the flow. … We are able to do in a matter of months what would take years to do."

During a press briefing in Washington, D.C., last month, acting Customs and Border Protection Commissioner Mark Morgan said that safety was "ok" in Mexico and that reports of violence were "anecdotal," according to the report and attached transcript of the commissioner's remarks. He also said that during a recent State Department-led trip to Mexico, some shelters had continuous law enforcement protection.

But in recent trips to shelters or tent camps in the border cities of Ciudad Juárez and Matamoros, Texas Tribune reporters did not see security or law enforcement near the facilities. In Ciudad Juarez, some asylum seekers were told by shelter operators to limit the time they spend outdoors.

The MPP program is under review by the 9th Circuit Court of Appeals in California and has been allowed to continue while the case is pending.

## Quality journalism doesn't come free

Perhaps it goes without saying — but producing quality journalism isn't cheap. At a time when newsroom resources and revenue across the country are declining, The Texas Tribune remains committed to sustaining our mission: creating a more engaged and informed Texas with every story we cover, every event we convene and every newsletter we send. As a nonprofit newsroom, we rely on members to help keep our stories free and our events open to the public. Do you value our journalism? Show us with your support.

**YES, I'LL DONATE TODAY**

AR424



Donate

Contact Us

Advertise

© 2021 The Texas Tribune

**SOCIAL MEDIA**

Facebook

Twitter

YouTube

Instagram

LinkedIn

Reddit

Join our Facebook Group, This Is Your Texas.

**INFO**

About Us

Our Staff

Jobs

Who Funds Us?

Strategic Plan

Republishing Guidelines

Code of Ethics

Terms of Service

Privacy Policy

Send us a confidential tip

Corrections

Feeds

Newsletters

Audio

Video

AR425



# DISMANTLING ASYLUM:

## A YEAR INTO THE MIGRANT PROTECTION PROTOCOLS



American Friends
Service Committee

AR426

## AUTHOR

Vanessa Ceceña

## PHOTOGRAPHS

Pedro Rios

## ABOUT THE PROGRAM

The U.S.-Mexico Border Program advances human rights and self-determination of migrant communities through base-building, alliance-building, documentation and policy-impact. We support local community-based organizing campaigns, train and accompany community-based leadership to educate, advocate, mobilize, and organize constituents to secure just and humane immigration policies. Using a human rights framework and in collaboration with community partners, we advance policies affecting immigration and border issues and build alliances to protect migrant and non-migrant rights. Our goal is to engage community partners and leaders to monitor and document instances of civil and human rights abuses by law enforcement agencies. The objective of documenting law enforcement activity is to change policies and practices that violate human rights, and change the public discourse away from militarization of border communities, towards just and humane immigration policies that benefit workers and their families.

## US-MEXICO BORDER PROGRAM STAFF

Pedro Rios, Program Director

Adriana Jasso, Program Coordinator

Benjamin Prado, Program Coordinator

Vanessa Ceceña, Human Rights Program Associate

## JANUARY 2020

# INTRODUCTION

With the increase of migrants arriving at the US-Mexico border, the current administration met migrants with excessive force and with policies that have placed those seeking refuge and protection in harm's way. The Trump Administration implemented the Migrant Protection Protocols (MPP), also known as Remain in Mexico, on January 24, 2019 as a deterrent to migration flows and as a form of systemic discrimination towards a specific group of migrants, those from Spanish-speaking countries. This policy violates the non-refoulement commitment as set forth by international laws[1] and hinders a migrants access to legal representation.

The following analysis looks at how the journey towards seeking asylum in the US has become more onerous due to policies the US government has orchestrated during the last year, specifically since the enactment of MPP. The migrant's experience is shared through observations of immigration court hearings in San Diego conducted by AFSC staff and volunteers. A total of 483 cases were observed from June 2019 to January 2020. In addition, partners in Mexico and court observers offer reflections to provide an additional perspective into the effects of an unjust and inhumane immigration system.



**Figure 1:** On November 25, 2018, migrants were met on the border in San Ysidro, CA by heavy militarization and force. (AFSC)

# MIGRANT PROTECTION PROTOCOLS

On January 24, 2019, the US Department of Homeland Security implemented the Migrant Protection Protocols (MPP), also known as Remain in Mexico, as a pilot program at the San Ysidro Port of Entry in San Diego[2]. The policy would allow border enforcement officers at the port of entry, specifically officers from Customs and Border Protection's Office of Field Operations (OFO), to send asylum-seeking migrants back to Mexico to wait for the immigration court, the Executive Office of Immigration Review (EOIR), to make a decision on their asylum claim. MPP is currently enforced along the entire southern border by both OFO and the US Border Patrol.

| | | | |
|---|---|---|---|
| Honduras | 21,786 | Hong Kong | 3 |
| Guatemala | 15,009 | Gabon | 2 |
| Cuba | 7,709 | Guinea | 2 |
| El Salvador | 7,668 | Namibia | 2 |
| Ecuador | 3,114 | Argentina | 2 |
| Venezuela | 2,046 | Haiti | 2 |
| Nicaragua | 1,414 | Oman | 2 |
| Peru | 136 | Malawi | 1 |
| Colombia | 127 | Cyprus | 1 |
| Mexico | 72 | Paraguay | 1 |
| Dominican Republic | 43 | San Marino | 1 |
| Guadeloupe | 12 | Croatia | 1 |
| Spain | 11 | Afghanistan | 1 |
| Belize | 11 | Vanuatu | 1 |
| Costa Rica | 11 | Democratic Republic of Congo | 1 |
| Holland | 9 | Sudan | 1 |
| Bolivia | 9 | St. Christopher-Nevis | 1 |
| Chile | 8 | Egypt | 1 |
| Brazil | 6 | Laos | 1 |
| Panama | 6 | Macedonia | 1 |
| Uruguay | 5 | Burundi | 1 |
| | | ALL | 59,241 |

**Table 1**: Total number of migrants by nationality returned to Mexico as of December 2019 released by TRAC. The information is based on data obtained from the Executive Office of Immigration Review (EOIR) which oversees Immigration Court operations.

The development and implementation of this policy was the government's response to the growing number of people arriving at the US-Mexico border fleeing persecution, economic uncertainty, and crime. It is important to note that these push factors are caused by the US government's role in destabilizing Central American countries throughout decades through its foreign policy, trade agreements, and its "war on drugs"[3].

Under the guidelines for the MPP, migrants that are unaccompanied minors, pregnant women or those that have a severe medical condition are not to be returned to Mexico. The public information about the program does not include information on whether or not those with mental health conditions should be excluded from MPP. As of November 2019, there have been 56,004 migrants returned to Mexico, with many waiting in Mexican border towns to be able to present themselves to immigration officials (*See* table 1)[4].

## FLAWED IMPLEMENTATION

According to the then-Secretary of Homeland Security, Kirstjen Nielsen, the MPP was a humanitarian proposal that was developed with a "commonsense approach". In a stakeholder meeting with CBP at the San Ysidro Port of Entry attended by AFSC and other organizations the day prior to the implementation of MPP, it was obvious that important details were not well thought out and that the "pilot" would in fact achieve the opposite of protecting migrants. CBP leadership at the San Ysidro Port of Entry indicated that the MPP would, eventually, be expanded to include all asylum-seekers. During this meeting, organizations and attorneys raised the multitude of concerns including violations to the non-refoulement policy, access to legal counsel and the limited housing and social services available in Mexico. When questioned about the support and guidance migrants would receive in Mexico, CBP's implied that that portion of the implementation was the responsibility of the Mexican government, and that they could not tell the Mexican government what to do.

Initially the MPP was only applied to single adults from Central America, but was quickly expanded to also include families regardless of their basis for seeking protection. Later the program was expanded to include asylum-seeking migrants from any Spanish-speaking country. At first, the MPP was only applicable to those migrants arriving at ports of entry and processed by CBP's Office of Field Operations. However, it was soon expanded to grant the US Border Patrol authority to return migrants who were apprehended in between the ports of entry[5].

> "We have implemented an unprecedented action that will address the urgent humanitarian and security crisis at the Southern border. This humanitarian approach will help to end the exploitation of our generous immigration laws. The Migrant Protection Protocols represent a methodical commonsense approach, exercising long-standing statutory authority to help address the crisis at our Southern border."
>
> – Secretary of Homeland Security Kirstjen M. Nielsen

While the program was piloted in the San Diego Sector, it was ultimately implemented throughout the entire southern US-Mexico border. The

Nogales, Arizona port of entry became the seventh port of entry to process migrants under the MPP on January 2, 2020[6].

## THE JOURNEY TO ASYLUM

A migrant's journey to the US border is arduous and lives are at risk when seeking of refuge and security. While crossing through southern Mexico has historically been a challenge, with stories of migrants being targeted by local police and organized crime, we recently have witnessed an increase in Mexican immigration officials, the National Guard, and federal police making all efforts to block migrants from entering Mexico through its southern border with Guatemala, and from entering the US in the northern border. In June 2019, the Mexican government agreed to increase its immigration enforcement and to increase the number of migrants accepted under MPP, after President Trump threatened to impose additional tariffs[7]. Mexican President Andres Manuel Lopez Obrador responded by deploying thousands of National Guard members to the southern and northern border, an increase in checkpoints, raids of the freight train, *La Bestia*, and most alarmingly, the targeting of migrant shelters by the National Guard.



Q: Were you ever been a victim of violence or extortion?
A: Yes, that's is why I left El Salvador. We had a business. We had a convenience store and some young guys who are gang members began asking us for money at a weekly basis. They initially asked us for a quote and then they began increasing the quote. Then, the quote got greater and I began to have to cover that amount with my own money. Then, one day when we could not pay, they took my 18 year old daughter and they sexually abused her. My daughter got pregnant but then got a miscarriage.

**Figure 2**: Part of a migrant's initial interview with immigration officers that was recorded in the Record of Sworn Statement

Once a migrant arrives at the US-Mexico border and makes the decision to seek entry at a port of entry, she is not allowed to simply approach a CBP officer and claim fear of being in her country of origin. Migrants are required to put their name on an informal list in a notebook that allows them to obtain a number that indicates when they can present themselves to CBP to begin their claim to asylum. This process is currently regulated in Tijuana by Grupo Beta, a group established by the Mexican government in 1990. While Grupo Beta was established to protect migrants heading to the US through Mexico, the group has been widely criticized for violating the rights of migrants. This process is known as "metering"; it began in 2016 when there was a surge of Haitian migrants at the border[8]. During this time, the US government, along with the Mexican government and Grupo Beta, created this metering system.

Advocacy groups expressed their concerns with this new process to CBP, and soon after, CBP claimed that it was not their doing, wiping their hands clean. They argued that they could not control what the Mexican government did on Mexican territory. The metering system has forced migrants to wait months, at times, to present themselves to CBP, subjecting them to precarious housing and violence in Mexican border towns. While unaccompanied minors and those with significant health conditions should be granted priority for processing, there have been numerous cases of CBP and contracted security officers turning migrants away from ports of entry until they "get in line". There have also

been cases of corruption in which migrants had to pay some amount in order to have their name added to the list, as well as cases of discrimination against black migrants[9].

This metering process has pushed migrants to seek entry in between ports of entry, often times by jumping the border wall or by taking dangerous routes through the desert or across the Rio Grande, as occurs in the Texas border region. As a result, we have seen the increase in migrant deaths.

Once in immigration custody, the migrant will be interviewed and processed. Migrants are interviewed and asked about whether or not they are scared to return back to their country of origin. They are fingerprinted and briefly screened for communicable diseases. Credible fear interviews are conducted by asylum officers that are part of US Citizenship and Immigration Services (USCIS). These interviews are conducted in-person or over the phone depending on the availability of asylum officers. This single interview determines whether or not a migrant can move forward with seeking asylum or other immigration relief. While all migrants should be granted a credible fear interview, 12% of migrants interviewed for a study reported not receiving a credible fear interview. The study conducted by AFSC's Latin America and the Caribbean region, in collaboration with the *Coalición Pro Defense del Migrante , A.C.*, found that 80% of migrants interviewed were not afforded in-depth interviews by immigration officials during their initial processing; their "interview" primarily consisted of signing documents[10].

Custody determinations, whether the migrant will be released into the US, placed in the MPP or transferred to an ICE detention center, are made within days or weeks. For those subject to the MPP, they are given additional documents and returned to Mexico where they are then processed by Mexican immigration officials. It is unclear to what extent CBP explains to migrants that they will be sent back to Mexico. Based on anecdotal information from migrants and organizations in Mexico, most



migrants are confused and are unsure as to why they are returned. AFSC was present in Tijuana, Mexico when the first adult, a Honduran migrant, was returned to Mexico. In an interview with Carlos Gomez Perfomo it was clear that he was confused and did not understand why he was being sent back to Mexico.

Migrants returned to Mexico are given paperwork specifically for MPP that explain the process, in addition to the common removal proceeding documents such as the Notice to Appear (NTA). One document instructs them to arrive at a specified port of entry four hours before their immigration hearing to be processed

and transported to immigration court.

For those initially processed at the California border they are required to present themselves at the San Ysidro-Tijuana port of entry and are scheduled for court in downtown San Diego. This is especially challenging for migrants residing outside of Tijuana. For example, migrants that are processed by immigration officials in the Calexico-Mexicali area, either by OFO or by the US Border Patrol, are scheduled for court in San Diego, either for a morning or afternoon hearing. If a migrant family staying in Mexicali, for example, is scheduled for court at 8 am in San Diego, they would have to be at the San Ysidro port of entry by 4 am. Mexicali is approximately 1.5 hours from Tijuana, therefore the majority of migrants travel to Tijuana from Mexicali a day prior to their hearing, adding an additional burden on migrants and on groups providing support. This can be extremely challenging for families with young children.

Today, I went down to the San Diego Immigration Court to observe some of the MPP proceedings. As I walked into the waiting area and through the metal detector, the officers greeted me and they were surprisingly nice. Dozens of people sat in the waiting area, waiting for their turn in immigration court. I saw about a dozen children in their parents' arms, waiting to see where they'll go next.

Heading into the courtroom, it was so much smaller than I had imagined. But the proceedings are just as intimidating, confusing, and frustrating as I thought it would be. Sitting in court and listening to all the questions from the judge to the respondents and then to the government lawyer, it was a challenge to keep up with the exchanges. I can't imagine being one of the respondents, not being familiar with the system, laws, or language, and having to navigate their cases without any representation. Many of the respondents simply couldn't find a lawyer that's willing to take their case while they're in Mexico.

After observing for nearly three hours, I felt a bit overwhelmed. It's one thing to learn about the immigration court and MPP, but to see the people that this policy affects is devastating. It is especially hard to see families with young children trying to figure out whether or not they have to be in Mexico while waiting for their immigration case. To see them so worried over the uncertainty of their situation and their helplessness, it reminded me of my own parents who came to the U.S. as refugees from Vietnam.

I think we all need to remember the humanity behind this so called "immigration crisis." As I was leaving, I peeked into another courtroom and I saw an officer handing out candy to little kids awaiting their families' turn in court. It reminded me of the importance of seeing the human faces of the people that are stuck in our broken immigration system."

-Minh, AFSC Intern

Migrants under the MPP must undergo this process for every scheduled hearing until a final decision on their case is reached, which can take at least 6 months from the time of initial processing by immigration officers. Therefore, many migrants will wait in Mexican border towns for at least 8 months to a year waiting to see if they will be granted the protections that are afforded to them based on international laws.

Returning migrants back to Mexico is in a way sending them to be raped or murdered, as an Asylum Officer explained[11]. Under the guidelines for the implementation of MPP, immigration officers are not required to ask migrants if they fear being returned to Mexico. However, if migrants express this fear,

they will be scheduled for a non-refoulement interview, in which an Asylum Officer makes a determination about the credibility of their fear.

## NAVIGATING IMMIGRATION COURT

Removal proceedings, also known as deportation proceedings, are civil and not criminal proceedings. These are initiated when an immigration enforcement officer arrests an individual for being present in the US without status or for attempting to enter the US without the proper documentation and issues a Notice to Appear (NTA). The NTA provides information about when and where the person was apprehended, what the government is charging the person with, and the date and location of the person's initial immigration court hearing. Additional information listed on the NTA include the name and position of the processing officer and information on the interpreter used (when applicable).

Initial court hearings tend to be brief, and include an explanation of court procedures, a person's rights during proceedings and a brief explanation of why the person is in court. Some judges go into detail about the need to submit a change of address form, stressing that the court must have a valid mailing address at all times. The judge provides the EOIR pro bono or low-cost immigration services list and encourages the person to hire an attorney.



**Figure 4**: A portion of the first page of a Notice to Appear (NTA) given to a Salvadoran migrant at the San Ysidro

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are under removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 3.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents, which you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing.

At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear and that you are inadmissible or removable on the charges contained in the Notice to Appear. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge.

You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of departure voluntarily. You will be given a reasonable opportunity to make any such application to the immigration judge.

**Failure to appear:** You are required to provide the DHS, in writing, with your full mailing address and telephone number. You must notify the Immigration Court immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to one of the offices listed in 8 CFR 241.16(a). Specific addresses on locations for surrender can be obtained from your local DHS office or over the internet at http://www.ice.gov/about/dro/contact.htm. You must surrender within 30 days from the date the order becomes administratively final, unless you obtain an order from a Federal court, immigration court, or the Board of Immigration Appeals staying execution of the removal order. Immigration regulations at 8 CFR 241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Act.

## Request for Prompt Hearing

To expedite a determination in my case, I request an immediate hearing. I waive my right to a 10-day period prior to appearing before an immigration judge.

Before: _____                        _____
                                                                   *(Signature of Respondent)*

                                                            Date: _____
_____
*(Signature and Title of Immigration Officer)*

### Certificate of Service

This Notice To Appear was served on the respondent by me on <u>March 24, 2019</u>, in the following manner and in compliance with section 239(a)(1)(F) of the Act.

[x] in person           [ ] by certified mail, returned receipt requested          [ ] by regular mail

[ ] Attached is a credible fear worksheet.

[x] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the          **SPANISH**          language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

                                                            JANETH ARGUELLES
                                                            CBPO

X _____               _____
*(Signature of Respondent if Personally Served)*       *(Signature and Title of officer)*

                                                            Form I-862 Page 2 (Rev. 08/01/07)

**Figure 5:** The second page of a Notice to Appear (NTA) given to a Salvadoran migrant at the San Ysidro Port of Entry

## Migrant Protection Protocols

### Initial Processing Information

- You have been identified for processing under the Migrant Protection Protocols and have been issued a Form I-862 Notice to Appear (NTA) for proceedings before an immigration court where you may apply for all forms of relief available under the Immigration and Nationality Act. Pursuant to U.S. law, including section 240 of the Immigration and Nationality Act and implementing regulations, an immigration judge will determine whether you are removable from the United States, and if you are, whether you are eligible for relief or protection from removal. While you will be able to pursue such relief or protection under the same terms and conditions as any alien in section 240 proceedings, pursuant to U.S. law, you will be returned to Mexico and may not attempt to enter the United States until you return to the appropriate port of entry on the date of your hearing before an immigration judge.
- The NTA provides the date and time of your first hearing before an immigration judge in the United States at the court identified on your NTA. On the date of your hearing, you must report to the _____ **SYS / Pedwest** _____ port of entry, located at Port of entry _____ **El Chaparral** _____, at the date and time listed below. If your case cannot be completed in one hearing, the immigration court will provide you with a Notice of Hearing in Removal Proceedings, indicating the date and time for any subsequent hearings. ○ You may call the immigration court at 1-800-898-7180 to obtain case status information 24 hours a day, 7 days a week. If you are calling from outside of the United States, you should dial 001-880-898-7180.
- You should arrive at the port of entry listed above at _____ **0900** _____ a.m./p.m. on _____ **03/19/2019** _____ to ensure that you have time to be processed, transported to your hearing and meet with attorney or accredited representative (if you arrange to be represented during your removal proceedings). The U.S. Government will provide transportation for you from the designated port of entry to the court on the day of your hearing. If you fail to arrive at the appropriate date and time, you may be ordered removed in absentia.
  - ○ When you arrive at the designated port of entry for your hearing, you should bring your NTA or Notice of Hearing in Removal Proceedings and any available government-issued identification and/or travel documents.
  - ○ When you arrive at the designated port of entry for your hearing, you should bring any minor children or other family members who arrived with you to the United States and received an NTA for the same date and time.

You have the statutory privilege of being represented by an attorney or accredited representative of your choosing who is authorized to practice before the immigration courts of the United States, at no expense to the U.S. Government. ○ You have been provided with a List of Legal Service Providers, which has information on low cost or free legal service providers practicing near the immigration court where your hearing(s) will take place.

  - ✦ A list of legal service providers is also available on the Executive Office for Immigration Review website at https://www.justice.gov/eoir/list-pro-bono-legal-service-providers.

If you choose to be represented, you may consult with counsel at no expense to the U.S. Government through any available mechanism, including the following, as applicable: ○ You may consult with your counsel by telephone, email, video conference, or any other remote communication method of your choosing.

  - ○ You may arrange to consult with your counsel in person at a location in Mexico of your choosing.
  - ○ On the day of your immigration hearing, you may arrange to meet with your counsel in-person, in the United States, at your assigned court facility, prior to that hearing.

**Figure 6**: Migrants that are returned to Mexico are given this document every time they are returned to Mexico. It lists information about when and where they need to present themselves on the day of their court hearing.

During Master Calendar hearings (MCH), pleadings are entered (response to the factual allegations listed on the NTA) and applications for relief are submitted. The number of MCHs depends on how many continuances are granted. Judges may grant continuances to give the person more time to retain an attorney. Individuals in proceedings may request to be returned back to their country of origin at any time if they choose.

The merits hearing or individual hearing is when the judge and the government attorney (also referred to as a trial attorney) cross examine the person seeking relief, questioning the information provided in the application for relief, which usually includes the person's declaration, country conditions and supporting documents that corroborate the claim for relief. During this hearing, the migrant is able to explain why they should be allowed to stay in the US. This is when the migrant states why they had to flee their country of origin and why they fear being sent back. These individual hearings last a few hours. At the end of the hearing, the judge may give an oral decision or may state that they will issue a decision by writing or schedule another hearing where the decision will be issued. Once a decision is given, the trial attorney and the migrant or their attorney can appeal the decision. If a person is granted the relief sought, then they are allowed to remain in the US and released from custody. If relief is denied, then the person will be deported to their country of origin unless they state that they will appeal the decision.

If a person decides to appeal the judge's initial ruling on the case, they would need to file an appeal to the Board of Immigration Appeals (BIA) within 30 days from the decision. When filing an appeal to the BIA, new information on the case or new arguments may not be submitted. One has to prove that they were eligible and should have been granted the relief sought and that the judge made an erroneous decision. It takes approximately 6 months to receive the decision from the BIA.

## AFSC COURT OBSERVATIONS

AFSC's US-Mexico Border program began observing MPP court hearings in June 2019. Hearings in both the morning and afternoon dockets were observed by office staff and community volunteers in which they completed observation forms and documented their reflections. Whenever possible, in absentia hearings were also observed. From June 2019 to January 10, 2020, hearings for 483 asylum-seekers were observed. This includes single adult and family hearings for migrants from Honduras, El Salvador, Guatemala, Cuba, and Venezuela.

## DUE PROCESS VIOLATIONS

Since the initiation of the controversial policy, advocates noticed procedural and administrative issues that could adversely affect a migrant's case. The most apparent was the erroneous address listed on the Notices to Appear given to migrants. Immigration officers wrote "*Domicilio Conocido,* Tijuana, Baja California", which translates to "Known Address, Tijuana, Baja California", on the formal government document. This incorrect address is the place of residence listed in the migrant's immigration file, and also the mailing address. Other variations of inaccurate addresses have also been used[12]. Even though this issue has been raised by advocacy organizations and has received media attention, it is an ongoing

I will share a story of a teenager from Honduras who speaks English. He spoke for his family in court. They did not have a lawyer. He completed all the forms! He told the judge that when he and his family had arrived at the border on the day of their hearing to be transported to court, they were told they had the wrong day. He knew how to call the court hotline number. He had the correct number. He was able to confirm that he had the correct court date and advocated for himself and his family; he was able to make it to court. He told the judge what happened to them and the judge then excused all absentees fearing that many were being given misinformation at the port of entry. But, only one judge did this.

How many other migrants are being told that they have the wrong court date and are not able  to check? This teenager had all of his forms in order. The judge was astounded and delighted. When I visited weeks later, he and his family appeared again and were one of very few who progressed in the system during my visits. This young man will "make it" wherever he goes. The judge actually demonstrated a commitment to providing asylum. This is a wonderful story, but seems all too rare. The majority of the migrants I observed do not speak English, can not read in English, do not have phones or access to making calls to the US. This teenager stands out for his effectiveness. Many others would be just as qualified for asylum, but few make it. Thousands are turned away

I am from a past generation who believed in this country. I am ashamed and bow my head."

-Mary Jo, AFSC volunteer and a San Diego Friend

practice. Having an incorrect address on record for a person in removal proceedings (it is also problematic for anyone that has any open immigration case with DHS, including USCIS) can lead to a person not receiving notices from the court. Correspondence from immigration court can include notification of a change in hearing date or information about the decision on their case.

During court observations, AFSC's court observers witnessed two judges question the trial attorney as to why Border Patrol agents were categorizing migrants that they apprehended as "Arriving Aliens", a category that is usually reserved for people seeking entry at ports of entry, as defined by the Immigration Nationality Act (INA). One attorney representing an adult male argued that his client was not an "arriving alien" and should therefore be granted a bond hearing. This attorney also stated that he believed that Border Patrol was purposely categorizing migrants as such to ensure that they were not released from custody via a bond hearing. While migrants under MPP are not being held in a detention center, they are in DHS custody when they are brought into the US to attend their court hearing. The immigration judge presiding over this case, granted the migrant bond. It was clear that the judge did not agree with DHS's actions and even went on to ask the trail attorney if he (the judge) could also do "whatever he wanted" like immigration officers. With a large percentage of migrants being initially processed by Border Patrol, and with only 4% being represented by an attorney, it is safe to say that many migrants could be potentially granted bond and released from custody (taken out of MPP) if they had an experienced immigration attorney advocating for them[13].

Migrants returned to Mexico have also been issued NTAs that are incomplete. Most commonly the three boxes at the beginning of the NTA, which provides information on the proceedings and allegations of removability or inadmissibility, have been left blank. In addition, immigration officials have been found to write fictitious court dates on forms in order to return migrants to Mexico when

they should be allowed to remain in the US either by being released into the community or by being held in immigration custody[14].

> "The migrant asylum-seeking community that are in Mexico waiting to be processed are faced with different scenarios and civil organizations face challenges in providing care according to their needs. Among the main challenges are insecurity, physical danger, a lack of mental health care, bad practices (malas prácticas), and lack of housing.
>
> Many times when leaving their appointments in the United States, asylum-seekers are returned to Tijuana at night, and they must look for shelter or return to the shelter where they are staying. Similarly, they are asked to appear at the port of entry very early, even at 4 am, to attend their court hearings. This causes them to be exposed to danger and insecurity. We had a case of a family that experienced an attempted kidnapping due to this situation.
>
> Having to wait for months in Tijuana makes it easier for their perpetrators to find them. We have had people receiving threats from their countries of origin, indicating that their aggressor already knows their location in Tijuana. We have also heard of people who have come across their perpetrators in Tijuana and have suffered physical violence and threats. Still they must wait in Tijuana, while their lives are in danger.
>
> The process of resilience of migrants, given the current context, requires psychological and sometimes psychiatric support to generate stability while waiting for their asylum cases to be processed, and in order to avoid events that may jeopardize their safety or life
>
> Asylum-seekers are faced with constant raids from Mexican immigration agents (INM) and the National Guard, as well as arbitrary detentions by the Municipal Police. All of these interactions with law enforcement involve acts of extortion, destruction of documents, mistreatment.
>
> Asylum-seekers must wait in Tijuana, or in different border cities for months. The waiting time we have seen varies between 8 to 12 months. Most shelters have a time limit, varying between a couple of days, weeks or months, and sometimes there is no space at the shelters. Migrants often have to rent hotel rooms or apartments in unsafe places, and because they do not have a fixed income, it is difficult for them."
>
> - Espacio Migrant, Tijuana-based migrant shelter and community center

## MIGRANTS INSINUATED OR EXPRESSED FEAR OF RETURN TO MEXICO

At several hearings, migrants expressed fear of returning to Mexico. Others insinuated it based on statements made to the judge. It is important to note that the MPP guidance does not require for judges or immigration officials to ask migrants whether they fear being returned to Mexico. Below are some of the observations highlighting this concern:

- A father described that at a shelter where he and his daughter were staying, a man attempted to rape his daughter while they were sleeping. The man had climbed into the area where they

were sleeping and told the father that he wanted to have intercourse with his minor daughter. The father was outraged and immediately notified the shelter manager.

- A family (two adults and three children) described being held at gunpoint in Tijuana while staying with a family friend. They were targeted for being Central American. The father explained to the judge that he did file a police report and took proof to the PedWest port of entry with the goal of demonstrating his fear of being in Mexico to US immigration officials, but he was turned away.

- Observers witnessed migrants express concerns about the violence in Mexico. One father shared with the judge that he knew someone that had been kidnapped, and he was now scared of leaving the shelter with his son. Another mother stated that there was a high level of violence in the area that they were living in.

- Migrants that express fear of being returned back to Mexico are supposed to be interviewed by an Asylum Officer, part of the US Citizenship and Immigration Services (USCIS). However, AFSC observed cases in which individuals attempted to share their fear with the judge, but their case was not flagged for an additional interview with an Asylum Officer.

## MIGRANTS EXPRESSED CHALLENGES IN OBTAINING LEGAL REPRESENTATION

In most cases observed, migrants did not have legal representation. Judges continued many of the cases for a future date to allow migrants more time to obtain legal representation. Many migrants complained of not being able to afford an attorney, not being able to reach legal organizations listed on the EOIR pro bono list, as well as not having calls answered or returned. Some complained that organizations listed on the EOIR pro bono list could not help them because they are in Mexico, or that the waiting list is long. Some migrants stated not knowing how to make international calls.

- A single mother stated she had attempted to contact all the legal services provided on the EOIR form, without having success. She stated she had called multiple times and received no answers or numbers were busy. The judge made a comparison, as in other cases, that other Respondents have been successful in finding legal support, so she should expect to have the same success. When asked if she had a question, she asked, *"Yo que no tengo ayuda de nadie, yo no puedo pagar un abogado, ¿que debo hacer?"* She stated she migrated because she was fleeing not because she wanted to. The judge provided her with four sets of asylum applications. The mother was confused about when she needed to submit the applications. She initially thought she would have to fill them out that same day. The judge clarified and emphasized that it all had to be done in English.

- A father, accompanied by his son, explained to a judge that he made attempts to reach one of legal service providers on the EOIR list, but that they did not answer. The judge did not believe the man's explanation because "they have full-time people". He asked the man "Why

would I give you more time if you haven't done anything [to help yourself]?" The father continued by explaining that he could not dedicate all his time to finding an attorney because he had to work in order to provide for his family.

"In one case a man who was accompanied by his young son provided the Judge his package of completed paperwork. The Judge looked over the documents and advised the man he needed to complete one section. The man returned to the waiting area inside the courtroom. I heard whispering that he did not have a pen. I tapped the person in front of me to pass my pen down to the man. He completed the document and turned to return the pen. The Detention Officer standing in the back of the courtroom apparently observed this activity. I told the person who went to return the pen to me that the man could keep it. I looked toward the Detention Officer for her consent. She stated to me that they weren't allowed to have pens. No pens for taking notes in one of the most important court hearings of your life during which Judges give extensive information and when you have arrived at the border at 4:00 a.m. traveling usually with a child or two or three. Having practiced law for 30 years it is nearly incomprehensible to me that a person would be expected to attend such a court hearing without the ability to take notes. In addition, I have never heard any statistics about injuries caused by a pen.

So the Immigration Court Judges generally are dealing with immigrants who are not represented by an attorney, who are fatigued, who are living in difficult and sometimes dangerous circumstances in Mexico and who are appearing in a courtroom at hearings that are of the utmost significance to their future. Added to these challenges are what I have observed are apparent blatant and repeated failures of due process by border patrol agents.

In almost every court hearing I observed the Judges advised the attorney representing the Homeland Security that the paperwork presented in at least some of the cases was insufficient to show adequate notice had been given. The Judges typically give applicants for asylum additional time to see if they can find an attorney to represent them. In one courtroom, case after case involved the Judge telling the person appearing that the notice of the court hearing failed to identify how the person had come to the attention of the border agent. The form to identify this information is a check the correct box form.  No box was checked.  The Judge informed the attorney for Homeland Security and the applicant that the failure to complete the form properly meant the type of jurisdiction, and thus the law applicable to the particular hearing, could not be identified resulting in the possibility that the Judge had no jurisdiction at all in the case and the person might legitimately be entitled to be released in the United States.  The response of the Homeland Security attorney to these obvious deficiencies was at best obfuscation.

Reflecting on all of my observations my fervent wish for our border community and our beloved country is that one of the generous, forward looking philanthropists in our border county will find a way to fund legal services through a responsible nonprofit entity to provide free legal counsel for immigrants seeking asylum. With effective legal counsel laws may be followed to move us toward humane action we can be proud of instead of actions we are shocked by."

- Ellen, AFSC volunteer, retired attorney, a San Diego Friend

## MIGRANTS EXPERIENCED DISRESPECTFUL OR DENIGRATING TREATMENT AT THE HEARINGS

Migrants placed into the MPP process encounter various law enforcement authorities and legal personnel. This can be an intimidating experience. It was clear that many migrants were overwhelmed and didn't understand the court proceedings, and others believed the immigration judge was going to hear out their asylum claim at the initial hearings. In some cases, the judges expressed annoyance with the overwhelming court docket. Some Detention Officers also seemed overwhelmed at needing to keep track of the children with their parents or needing to keep the children quiet at the hearings. Clearly, those most impacted by everyone's frustration were the migrants themselves, who were at the highest state of vulnerability. Below are examples that migrants experienced disrespect or denigrating treatment at the hearings:

- A judge admonished a woman for over 10 minutes about her language of preference. At a previous hearing, she had indicated her language of preference to be Spanish, while at the hearing observed she indicated her language of preference was Kanjobal. She clearly did not speak Spanish well, and stated she was confused about the questions posed to her.

- A verbal exchange between a judge and a migrant:

    IJ: "State your true name?"

    IJ: "Why are you hesitating?"

    R: "I'm cold and nervous."

    IJ: "People that are cold and nervous don't forget their name."

- A Detention Officer forcibly pulled the hoodie from a child's head in a room where 15 children and 12 adults were waiting to have their cases heard. The Detention Officer appeared to be acting out of frustration for not being able to keep the children quiet. Most minors present were under 10 years old and they were segregated from their parents in the courtroom.

## IMMIGRATION JUDGES AND MIGRANTS DEMONSTRATED CONFUSION ABOUT MPP AND COURT PROCESSES

The American Civil Liberties Union, the Southern Poverty Law Center, and the Center for Gender & Refugee Studies have challenged the MPP program for violating United States immigration and administrative laws, as well as for the Administration's apparent intent to not meet its international obligations of safeguarding those seeking asylum in the United States. Consequently, how it has rolled out has caused confusion. At least two judges expressed frustration with how Border Patrol places migrants in the program even though the migrants turned themselves over to them in areas in between the ports of entry, and with the fact that they were categorized as "arriving aliens." Migrants



**Figure 7**: Migrants being initially processed by CBP's OFO at the San Ysidro Port of Entry (AFSC)

experience the greatest amount of confusion about how MPP is supposed to work. Below are some case highlights of that confusion:

- A single mother with two teenage children believed at the initial court hearing, that the judge would determine the asylum case for her and her children at that hearing. She was surprised and upset to learn that she would be returned to Tijuana. She expressed she and her daughters did not have a place to return to.

- During an initial hearing a father accompanied by his son thought that his case for asylum would be heard at a follow-up hearing. He asked the judge "If I win, will I stay in the US?". The judge appeared to not understand the father's question and asked the father, "What do you mean, if you 'win'?"

- One single female asked the judge if she could remain in the US while fighting her case. In response the judge asked the government attorney if it was the government's "intention" to return the woman to Mexico, to which the trial attorney responded that it was. The judge proceeded to tell the woman that he did not have the power to allow her to stay in the country. His advice to her was to find an attorney that could submit a parole request for her.

- Two adult siblings, a brother and sister, believed they could convince the judge that they should be permitted to stay in the US. They provided the judge with a letter written by their aunt and uncle, requesting that they be permitted to stay with them in the US.  The judge replied by stating it wasn't up to him, but rather, it was the government's decision on whether

to allow them to stay in the US. The judge turned to the government's attorney and asked him about the process, and the government's attorney responded by stating the siblings would need to make their case at the port.

- A mother with two teenage daughters was confused about the MPP process. Upon learning that she would be returned to Tijuana, she was surprised and insisted she and her daughters could not return to Tijuana.  She said this while becoming visibly emotional.

## INCONSISTENCY BETWEEN IMMIGRATION JUDGES IN HOW THEY DETERMINE OUTCOMES AND CONDUCT COURT HEARINGS

Immigration judges have the responsibility of applying immigration laws as stated in the Immigration Nationality Act (INA) in an unbiased manner and one would imagine, uniformly. However, judges can issue rulings using their own discretion. Judges can also amend administrative court processes to their preference, as was frequently observed. The examples shared below are a few of the many differences observed amongst courtrooms:

- One judge decided to terminate cases instead of removing them in absentia when individuals did not appear in court stating that the government provided migrants with instructions on a non-official form. The judge argued that a Notice to Appear is the only formal document that can be given to migrants per regulations. Migrants placed in MPP are given a form that lists the time and date for them to arrive at a port of entry to be transported to court. Other judges ordered removals in absentia for those who did not appear in court.

- One judge conducted group hearings for all initial hearings on his docket while other judges held individual initial hearings. Another judge held a group hearing, but only because his previous cases took longer than expected and he was short on time.

- Three out of the five judges observed provided migrants with a blank I-589 application, the application used to seek asylum and/or withholding of removal, during initial hearings. The other two judges did not hand out blank applications in the hearings observed.

- One judge instructed migrants to have completed asylum application by the next hearing, if they did not, he warned, they would be deported. Judges can continue cases for a reasonable time, however there is no clear guidance on what constitutes "reasonable".

"Border Kindness has provided comprehensive services to asylum-seekers "returned" to Mexico since the first day the Migrant Protection Protocols policy was instituted. We have provided asylum-seekers returned to Mexico with over 100,000 meals, clothing, medical care, legal and administrative services and transportation.  We have also provided more than 1,000 asylum-seekers with transportation from Mexicali to the San Ysidro Point of Entry – for many of them we have provided transportation numerous times. Border Kindness has purchased bus tickets that exceed 300,000 miles.

[US immigration policies] are an administrative wall. It's a bureaucratic wall. It denies people the ability to legally seek asylum. When they do seek asylum, when they present themselves at a point of entry, they almost immediately or within days are sent back to Mexico to wait for hearings. And then this dance begins, this dance of hearings and court dates and such, in different locations far away, that basically allows the United States to out wait these people, to stall. From the moment they leave Central America, someone is trying to exploit them, for every one person trying to help them, there's 100 trying to exploit them."

-Kelly, Founder of Border Kindness

## ARBITRARY PROTOCOLS APPEAR TO CREATE GREATER UNCERTAINTY FOR MIGRANTS

The MPP process presents serious missteps in ensuring migrants are afforded due process rights protections. Migrants must follow a cumbersome process to get to court, that includes being at the port of entry four hours before their scheduled hearing. They must interact with various security personnel that can have implications on whether they get to attend their court hearings. Equally troubling is the lack of clear guidelines for judges on how to adjudicate MPP cases. Judges have expressed frustration about the MPP process in general and about information Customs and Border Protection officers write on official government documents about migrants. They also have been annoyed at migrants who seem to not be informed about court proceedings.

- In at least one case, a Detention Officer told a migrant that her hearing date was incorrect and that she did not have to present herself to the hearing. She nearly missed her court appearance.  When she disclosed this to the judge, the judge terminated the following 5 cases of migrants who did not appear in court out of abundance of caution, expressing that the Detention Officer might also have given them misinformation about their court dates. Meanwhile, the government attorney wanted to have them removed in absentia.

- In one case, a migrant stated he had missed his first court hearing because a CBP officer would not grant him entry to appear at his hearing.

- A pregnant minor was placed in MPP even though the policy guidance states that no minors traveling without a parent or legal guardian would be subject to MPP, or that pregnant women would be placed into the program. During her hearing, the TA attempted to justify why she was placed in MPP by arguing that immigration officials *assumed* she was married since she was traveling with her partner.

- During an initial hearing on August 19, 2019 a Honduran woman shared that she had a miscarriage on August 6, 2019 and was close to losing her life when she was hospitalized. It

can be assumed that the woman was pregnant at the time that she was processed for MPP, a clear violation of the program's guidance. The woman was accompanied by her son, who she described as having mental health issues. The child was visibly upset during the hearing and the judge instructed him to not bite his mother and to not interfere. Individuals with significant health issues, including mental health issues, are presumably exempt from MPP.

## ADDITIONAL CHALLENGES

In addition to challenges observed in court, migrants subject to MPP are faced with additional obstacles to obtaining protection. The majority of migrants apprehended at the border are from the Northern Triangle, with over 15,000 of them from Guatemala. It is estimated that approximately 40% of Guatemalans speak an indigenous language[15]. Therefore, it is safe to say that for many of those subject to the MPP, Spanish is not their primary language. It is most likely that indigenous migrants are not obtaining all of the information presented to them during their initial processing with in a language that they fully understand. Immigration documents are provided primarily in English and asylum applications, along with their supporting documents, must be submitted in English. With only approximately 4% of migrants obtaining legal representation, those that go unrepresented most likely experience difficulties in advocating for an interpreter when interacting with immigration officers or



**Figure 8**: The result of a migrant's non-refoulement, or fear of returning to Mexico, interview.

judges[16]. It is also likely that they have a limited understanding of why they were not allowed into the US and returned to Mexico.

Access to attorney representation is one of the main concerns from the advocacy community. There is pending litigation challenging the policy due to the fact that it limits access to legal representation[17]. While there are immigration attorneys and nonprofit legal service providers wanting to provide representation to migrants returned to Mexico, needing to travel to another country to meet with migrants is a challenging especially for US nonprofit legal service providers. Advocates are also challenging the DHS practice of not allowing attorneys present during non-refoulement interviews, which has led to migrants being returned to Mexico regardless of the violence and threats they have received. Human Rights First has documented 816 cases as of January 21, 2020 in which migrants have experienced brutal attacks, which include kidnappings and extortions, while in Mexico[18].



**Figure 9**: March and rally at the San Ysidro border on November 25, 2018 (AFSC)

## CONCLUSION

MPP has achieved the goal of deterring migrants from entering the US and from exercising their right to seek international protection. While data shows that 89% of migrants allowed into the country show up to all of their court hearings, only 50% of migrants under MPP show up to their court hearings[19]. This low rate is not a reflection of the migrants themselves, but a clear indication that being forced to wait in Mexican border for months, or a year in some cases, without access to adequate social services is detrimental and dangerous. For those that do attend all of their court hearings and apply for immigration relief, the approval rate it 0.1% for migrants subject to MPP. This is compared to

a 20% approval rate for removal cases outside of MPP[20]. The low approval rate is in part due to the changes in asylum policy and procedural errors committed by immigration officers.

Given the low rates of asylum approval and court attendance, the Administration continues to create policies to further hinder migrants from fleeing to the US. The Administration has proposed charging $50 per asylum application and will begin conducting DNA testing for all migrants in detention. We have also seen the development of "safe third country" agreements with Guatemala, which makes the claim that migrants have the ability to safely apply for asylum and be granted the protection[21]. In November 2019, the US government began sending Honduran and Salvadoran migrants to Guatemala, explaining, in some cases, that their case was being transferred[22].

The US government has failed to protect migrants seeking protections afforded to them based on US and international laws. There needs to be a shift towards creating just laws and towards defunding the immigration enforcement components of the US Department of Homeland Security[23].

---

[1] United Nations High Commissioner for Refugees, "Advisory opinion on the extraterritorial application of *non-refoulement* obligations under the 1951 Convention relating to the status of refugees and its 1967 protocol", available at https://www.unhcr.org/4d9486929.pdf

[2] US Department of Homeland Security, "Migrant Protection Protocols Announcement", January 24, 2019, available at https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols

[3] Kathryn Johnson, "Why the US should welcome all migrants with compassion and humanity", American Friends Service Committee, February 28, 2018, available at https://refresh19-afsc-1917.pantheonsite.io/blogs/news-and-commentary/why-us-should-welcome-all-migrants-compassion-and-humanity#

[4] TRAC Immigration, Details on MPP (Remain in Mexico) Deportation Proceedings, Syracuse University, available at https://trac.syr.edu/phptools/immigration/mpp/

[5] Jonathan Blitzer, "How the US Asylum System is Keeping Migrants at Risk in Mexico", *The New Yorker*, October 1, 2019, available at https://www.newyorker.com/news/dispatch/how-the-us-asylum-system-is-keeping-migrants-at-risk-in-mexico

[6] US Department of Homeland Security, "DHS begins MPP returns at Nogales for of entry in Arizona", January 2, 2020, available at https://www.dhs.gov/news/2020/01/02/dhs-begins-mpp-returns-nogales-port-entry-arizona

[7] James Fredrick, "How Mexico beefs up immigration enforcement to meet Trump's terms", *NPR*, July 13, 2019, available at https://www.npr.org/2019/07/13/740009105/how-mexico-beefs-up-immigration-enforcement-to-meet-trumps-terms

[8] Stephanie Leutert, Ellie Ezzell, Savitri Arvey, Gabriella Sanchez, Caitlin Yates, and Paul Kuhne, "Asylum Processing and Waitlists at the US-Mexico Border", Mexico Security Initiative, the Center for US-Mexican Studies, and the Migration Policy Centre, December 2018, available at https://www.strausscenter.org/images/MSI/AsylumReport_MSI.pdf

[9] *Ibid*

[10] Rosa María Avendaño Millán, "Entre Muros: Solicitantes de Asilo bajo los Protocolos de Protección a Migrantes", American Friends Service Committee, América Latina y el Caribe, Coalición Pro Defensa del Migrante, October 2019, available at https://www.afsc.org/document/entre-muros-solicitantes-de-asilo-bajo-los-protocolos-de-protecci%C3%B3n-migrantes. An executive summary of the report is also available in English at https://www.afsc.org/document/between-walls-asylum-seekers-under-migrant-protection-protocols

[11] Molly O'Toole, "Aslyum officers rebel against Trump policies they say are immoral and illegal", *Los Angeles Times*, November 25, 2019, available at https://www.latimes.com/politics/story/2019-11-15/asylum-officers-revolt-against-trump-policies-they-say-are-immoral-illegal

[12] Krista Kshatriya, JD, S. Deborah Kang, PhD, "Walls to Protection: The Grim Reality of Trump's "Remain in Mexico" Policy", UCSD's US Immigration and Policy Center, October 29, 2019, available at http://usipc.ucsd.edu/publications/usipc-walls-to-protection-final.pdf

[13] TRAC Immigration, "Contrasting Experiences: MPP vs. Non-MPP Immigration court cases", Syracuse University, December 19, 2019, available at https://trac.syr.edu/immigration/reports/587/

[14] Gustavo Solis, "CBP's explanation for writing fake court dates on migrant's paperwork doesn't make sense, lawyers say", *The San Diego Union-Tribune*, November 13, 2019, available at https://www.sandiegouniontribune.com/news/immigration/story/2019-11-13/cbps-explanation-for-writing-fake-court-dates-on-migrants-paperwork-doesnt-make-sense-lawyers-say

[15] Tom Jawetz and Scott Shuchart, "Language Access Has Life-or-Death Consequences for Migrants", Center for American Progress, February 20, 2019, available at https://www.americanprogress.org/issues/immigration/reports/2019/02/20/466144/language-access-life-death-consequences-migrants/

[16] TRAC Immigration, "Contrasting Experiences: MPP vs. Non-MPP Immigration court cases", Syracuse University, December 19, 2019, available at https://trac.syr.edu/immigration/reports/587/

[17] Wendy Fry, "ACLU sues over detained immigrants' access to attorneys", *The San Diego Union-Tribune*, November 5, 2019, available at https://www.sandiegouniontribune.com/news/border-baja-california/story/2019-11-05/aclu-sues-over-detained-immigrants-access-to-attorneys

[18] Human Rights First has created a database that is regularly updated with reported cases of attacks on migrants in Mexico. It can be accessed at https://www.humanrightsfirst.org/sites/default/files/PubliclyReportedMPPAttacks-21Jan2020.pdf

[19] TRAC Immigration, "Contrasting Experiences: MPP vs. Non-MPP Immigration court cases", Syracuse University, December 19, 2019, available at https://trac.syr.edu/immigration/reports/587/

[20] Gustavo Solis, "Remain in Mexico has a 0.1 percent asylum grant rate", *The San Diego Union-Tribune*, December 15, 2019, available at https://www.sandiegouniontribune.com/news/border-baja-california/story/2019-12-15/remain-in-mexico-has-a-0-01-percent-asylum-grant-rate

[21] Susan Fratzke, "International experience suggests safe third-country agreement would not solve the US-Mexico border crisis", Migration Policy Institute, June 2019, available at https://www.migrationpolicy.org/news/safe-third-country-agreement-would-not-solve-us-mexico-border-crisis

[22] Kevin Sieff, "The US is putting asylum seekers on planes to Guatemala — often without telling them where they're going", *The Washington Post,* January 13, 2020, available at https://www.washingtonpost.com/world/the_americas/the-us-is-putting-asylum-seekers-on-planes-to-guatemala--often-without-telling-them-where-theyre-going/2020/01/13/0f89a93a-3576-11ea-a1ff-c48c1d59a4a1_story.html

[23] AFSC, along with other organizations, created the Defund Hate Campaign that calls on legislators to eliminate federal funding that supports immigration enforcement and detention. Information the Defund Hate campaign is available at https://www.afsc.org/defund-hate





American Friends
Service Committee

AR451



Homeland Security

U.S. Department of Homeland Security
Washington, DC 20528

January 14, 2020

MEMORANDUM FOR THE ACTING SECRETARY

FROM:                         Mark A. Morgan
                              Acting Commissioner
                              U.S. Customs and Border Protection

                              Matthew T. Albence
                              Deputy Director and
                              Senior Official Performing the Duties of the Director
                              U.S. Immigration and Customs Enforcement

                              Mark Koumans
                              Acting Director
                              U.S. Citizenship and Immigration Services

SUBJECT:                      Response to the Migration Protection Protocols
                              Red Team Report

---

We appreciate the DHS Senior Leadership-led effort to conduct a top-down review of the Migrant Protection Protocols (MPP) policies and implementation strategies. As was the case with then-Acting Secretary Kevin McAleenan, we welcome the thoughtful recommendations. In the former Acting Secretary's November 8, 2019 memorandum that accompanied the recommendations, we were directed to deliver a plan outlining how "the Department will enhance the implementation of the MPP in accordance with these recommendations" within thirty days, and then, within ninety days, to complete the actions identified in this plan. This memorandum is intended to meet that direction.

Upon careful review of the Migrant Protection Protocols Red Team Report, we note that many of the identified recommendations have already been or are being addressed by one or more Components. That said, the spirit of the Report is to find ways for increasing the effective and efficient implementation of MPP—that is something to which we are collectively committed.

With the intent to make MPP more effective and efficient, the following are items identified by the Report that we are already taking steps to address. For each item, we have identified ongoing activities:

**Subject: Thirty-Day Response to the MPP Red Team Report**
**Page 2**

*Recommendation*: Make every effort to ensure that migrants can access information and speak with Department of Homeland Security (DHS) officials in their preferred language.

*Ongoing Activities:*
- U.S. Customs and Border Protection (CBP) currently utilizes CBP employees, the U.S. Citizenship and Immigration Services (USCIS) Language Line Services, and contract language interpreters and translators to communicate with individuals who have limited English proficiency. Additionally, CBP uses numerous job aids to ensure language access is provided to individuals who have limited or no English proficiency.
- DHS Components have access to a 24/7/365 language contract with Lionbridge Technologies, Inc. to ensure that employees can communicate effectively with all individuals in custody.
- CBP will continue to review what languages other than Spanish, if any, are the primary means of communication for individuals amenable to MPP, and make available translations of the MPP tear sheet in those languages.

*Recommendation:* Reinforce the avenues by which family members, attorneys, witnesses, non-governmental and international organizations, the press, and relevant stakeholders can view MPP proceedings, meet with migrants (if appropriate), or visit temporary hearing locations.

*Ongoing Activities:*
- Currently, consistent with Executive Office for Immigration Review (EOIR) policy and practice, individuals interested in observing immigration court proceedings for individuals processed under the MPP can do so at either the physical court location in the case of San Diego and El Paso, or at the location from which the immigration judge video teleconferences into the immigration hearing facilities (IHFs) in Laredo and Brownsville.
- On December 20, our Components approved joint guidance to emphasize that it will continue to be the case that anyone has access to the IHFs, consistent with operational constraints and EOIR rules, with preference given to those involved in legal proceedings (lawyers, witnesses, etc.), and lawyers will continue to have time and space to meet with clients prior to hearings.
  - ➢ The guidance states that credentialed media, and other members of the public may be admitted, after those that are critical for the individual to receive a full and fair hearing are admitted. Moreover, individuals admitted to the IHFs must abide by EOIR rules pertaining to courtroom decorum, as well as DHS facility rules.
- CBP, ICE, the Federal Protective Service (FPS), and EOIR will continue to coordinate to allow appropriate access to immigration proceedings on a manageable scale that allows for safe and orderly court operations.
- USCIS will generally accommodate a request by an alien to have an attorney or accredited representative present (in-person or via telephone) during MPP non-refoulement assessment interviews that occur at the IHFs in Laredo and Brownsville, if the attorney or representative filed or intends to file a Form G-28.

*Recommendation:* Standardize and ensure the consistency of the information individuals are provided regarding "migrant rights" building on recent efforts to show "Know Your Rights" videos at temporary hearing locations.

**Subject:  Thirty-Day Response to the MPP Red Team Report**
**Page 3**

*Ongoing Activities:*
- CBP is updating the tear sheet provided to migrants enrolled in MPP with additional information about the operation of MPP during appeals to the Board of Immigration Appeals.
- "Know Your Rights" videos are being played in the waiting areas at the IHFs (in Laredo and Brownsville), and a script of the "Know Your Rights" video is also available.

*Recommendation:*  Advocate with the Government of Mexico (GOM), the Department of State (DOS), and trusted international organizations to improve the safety and security of MPP migrants while they wait in Mexico.

*Ongoing Activities:*
- DHS regularly advocates with GOM and DOS colleagues for increased security at shelters and MPP return locations.  DHS is also regularly engaged both directly and indirectly with the International Organization for Migration (IOM) and the United Nations High Commissioner for Refugees (UNHCR) on similar topics.  DHS will continue the efforts to engage with our partners on this issue.

*Recommendation:*  Reinforce training and standards for those involved in non-adversarial interviewing.

*Ongoing Activities:*
- All credible and reasonable fear screenings, and non-refoulement interviews as a part of the MPP, are to be conducted in a non-adversarial manner.  DHS continues to provide extensive training to its officers on how to conduct non-adversarial interviews.  In addition, USCIS also provides specific trainings on interviewing techniques and best practices.
- As noted above, USCIS will generally accommodate a request by an alien to have an attorney or an accredited representative present during MPP non-refoulement assessment interviews that occur at IHFs in Laredo and Brownsville, if the attorney or representative filed or intends to file a Form G-28.

In addition to the ongoing activities identified above, we intend to work together over the next ninety days to further enhance implementation of MPP through the following activities.  These are organized under broadly the same categories identified in the November 8, 2019 memorandum:

*Assessing and Processing the Amenability of Aliens for MPP*
- Reinforcing the MPP "Guiding Principles" to agents and officers regarding the categories of individuals not amenable to MPP, specifically "Aliens in special circumstances" such as those with "known physical/mental health issues."
- Examining current guidance to determine whether additional documents, including Standard Operating Procedures, would be appropriate for items such as application of amenability guidance, the roles of various actors in the MPP intake/screening process, when restraints are appropriate, and information-sharing standards and expectations.

**Subject:  Thirty-Day Response to the MPP Red Team Report**
**Page 4**

- Exploring whether additional, standardized information should accompany the service of MPP-related documentation.
- Developing plans with the Department of Justice (DOJ) to conduct all MPP proceedings at or near POEs to speed up case processing.

*Facilitating Access to Counsel and Safeguards through the MPP process*
- In addition to a list of free or low cost legal services provided to aliens subject to MPP upon enrollment, coordinating with GOM, DOS, and DOJ to make all reasonable efforts so that MPP migrants have access to information about the U.S. immigration system and are provided the opportunity to seek legal representation.
- Exploring issues related to, and identifying common practices for, family units of mixed nationalities.
- Creating an integrated mechanism to share MPP information among DHS and DOJ.

*Non-refoulement Assessment Interviews, Information Sharing, and Measuring the Success of the Programs*
- Reviewing and updating relevant arrangements between DHS and EOIR tied to information sharing about immigration cases.
- Developing with DOJ a "dashboard" to track, at the macro level, the outcomes of MPP cases, in connection with efforts tied to the Unified Immigration Portal.
- Working with DOJ to establish and implement MPP effectiveness measures in areas such as no-show rates, the timeline for case adjudication, the number of parents or legal guardians returned to Mexico pursuant to MPP who subsequently send minor children across the border to qualify as unaccompanied alien children (UACs), and tracking relevant trends in the number of unlawful entries of non-Mexicans along the Southern Border.
- Consistent with international agreements and arrangements and the U.S. Government's existing foreign assistance programs and processes, supporting GOM activities to address crime and insecurity in locations in Mexico where those in MPP are returned.
- Continuing regular contact with Mexican counterparts—daily at the local level and weekly between capitals—discussing whether GOM continues to fulfill the assurances it provided during the initiation of MPP, including GOM's commitment to fulfilling its international non-refoulement obligations.

Recognizing ongoing litigation with respect to MPP, USCIS, CBP, and ICE will closely consult with our respective legal teams going forward.

cc:   James W. McCament
      Senior Official Performing the Duties of the Under Secretary
      Office of Strategy, Policy, and Plans

Home > What we do > News & stories

# The devastating toll of "Remain in Mexico" one year later

US government's Migrant Protection Protocols put tens of thousands at risk

**JAN 29, 2020**

SHARE THIS

**Mexico City/New York, January 29, 2020—**One year since the United States implemented its "Remain in Mexico" policy, tens of thousands of asylum seekers are trapped in danger in Mexico, facing daily violence and dealing with the mental health toll of constant risk and uncertainty, the international medical humanitarian organization Doctors Without Borders/Médecins Sans Frontières (MSF) said Wednesday.

"The US continues to send asylum seekers back into danger and into the hands of the cartels that control the migration routes in Mexico," said Sergio Martin, general coordinator for MSF in Mexico. "Just steps from the US border in Matamoros, there are thousands of asylum seekers now living in makeshift camps with limited access to shelter or basic health care. In Nuevo Laredo, we have patients who won't set foot outside of shelters because they know they are targeted to be kidnapped, held for ransom, or killed."

AR456



THE FACTS ABOUT THE HUMANITARIAN CRISIS IN MEXICO AND CENTRAL AMERICA

READ MORE

Implemented in January 2019, "Remain in Mexico"—officially called the Migrant Protection Protocols (MPP) by the US government—forces asylum seekers back to Mexico to await their asylum proceedings, making them vulnerable to kidnapping and violence. Approximately 60,000 people have been returned to Mexico due to MPP. MSF works along the migration route in Mexico, and at border locations in Nuevo Laredo, Matamoros, Mexicali, and Reynosa, and witnesses the devastating humanitarian consequences of MPP and new rules that have essentially ended asylum at the US southern border.

Approximately 80 percent of the migrants treated by MSF teams in Nuevo Laredo during the first nine months of 2019 reported having suffered at least one violent incident. Another 43.7 percent of patients said they had been victims of violence during the seven days prior to the consultation.

In September 2019, 43 percent of MSF´s patients who were sent to Nuevo Laredo through MPP had been kidnapped recently. Twelve percent of patients reported being victims of a failed kidnapping attempt. In October 2019, the percentage of MSF patients who were in Nuevo Laredo due to MPP who had been kidnapped rose to 75 percent. These figures only represent MSF programs and do not capture the massive scope of violence migrants are facing.

> **"Many of our patients are escaping high levels of violence in Guatemala, Honduras, and El Salvador. It is preposterous that the US would send people back to the very same Central American countries people are fleeing in the first place."**
>
> — Marcelo Fernandez, regional coordinator for MSF programs in Central America

In Nuevo Laredo, MSF patients face severe anxiety, depression, and post-traumatic stress due to the danger of being returned to Mexico and uncertainty of their future. "Our patients are living in a state of limbo and constant fear," said Martin. "They are traumatized and in need of mental health support."

MPP is just one in a litany of new extremely harmful asylum restrictions enacted by the US in cooperation with governments in the region that risk people's lives and purposefully send people back to danger.

In 2019 the US negotiated migration agreements with the governments of Guatemala, Honduras, and El Salvador that would allow them to send asylum seekers to these countries.

"Many of our patients are escaping high levels of violence in Guatemala, Honduras, and El Salvador," said Marcelo Fernandez, regional coordinator for MSF programs in Central America. "It is preposterous that the US would send people back to the very same Central American countries people are fleeing in the first place."

In addition to being unsafe, these countries do not have the necessary infrastructure, protection mechanisms, or funding in place to begin receiving asylum seekers. There is limited information about the exact terms of these deals, how they will be implemented, or what the timing will be, said MSF.

"The people we are seeing along the migration route are well aware of the dangers they will face along the way, but they are desperate to escape violence and poverty back home and they will continue to seek refuge in the United States," said Fernandez. "A year since Remain in Mexico was implemented, there's no question of the toll it has taken and the risks it creates for extremely vulnerable people. The United States must end this cruel and inhumane policy that forces people to risk their lives to seek asylum."

*In Mexico, MSF provides medical and mental health care in shelters Tapachula, Tenosique, Coatzacoalcos, Nuevo Laredo, Mexicali, Reynosa, and Matamoros. In Mexico City, MSF runs a specialized therapeutic center for migrants and asylum seekers who are victims of extreme violence.*

# Monthly supporters keep us going

Our teams' needs can vary dramatically as we work to provide care in more than 70 countries around the world. Giving monthly:

- Helps sustain our lifesaving care in the face of an emergency—and continue when the headlines fade.

- Allows our doctors, nurses, logistics experts, and other staff to plan for future challenges.

- Ensures our teams can adapt as ground conditions change and medical needs evolve.

Become a monthly donor

## RELATED ARTICLES

AR459



## Puerto Rico: Getting COVID-19 vaccines where they're needed

MAY 21, 2021





## MSF: US must commit to sharing more surplus COVID-19 vaccine doses

**MAY 17, 2021**

AR461

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 468 of 688   PageID 2125

# Video: What do you look forward to after getting the COVID-19 vaccine?

**MAY 17, 2021**

## Stay informed

Get the latest updates on our work

email address                                                        SIGN UP

**The Washington Post**

*Democracy Dies in Darkness*

# Supreme Court says Trump administration may continue 'Remain in Mexico' policy for asylum seekers

By Robert Barnes

March 11, 2020 at 4:59 p.m. EDT

 2023

The Supreme Court on Wednesday said the Trump administration may continue its "Remain in Mexico" policy for asylum seekers while lower-court challenges continue, after the federal government warned that tens of thousands of immigrants amassed at the southern border could overwhelm the immigration system.

The justices reversed a decision of a panel of the U.S. Court of Appeals for the 9th Circuit that had ordered the policy be suspended Thursday along parts of the border. As is usual in emergency rulings, the court's unsigned, one-paragraph order did not provide the majority's reasoning. Only Justice Sonia Sotomayor noted her dissent.

The Trump administration had warned the justices of a dire situation without their intervention.

"Substantial numbers of up to 25,000 returned aliens who are awaiting proceedings in Mexico will rush immediately to enter the United States," Solicitor General Noel Francisco wrote in a brief. "A surge of that magnitude would impose extraordinary burdens on the United States and damage our diplomatic relations with the government of Mexico."

The program — officially known as the Migrant Protection Protocols, or MPP — is among the tools the Trump administration has used to curb mass migration from Central America and elsewhere across the southern U.S. border.

| **wp** NEWSLETTER | EVERY WEEKDAY |
| --- | --- |

A 5-minute breakdown to track a new president    Sign Up

AR463

massive immigration court backlog, the administration implemented MPP to stop that practice.

The American Civil Liberties Union, representing immigration groups and individuals, called it an "unprecedented policy that fundamentally changed the nation's asylum system, contrary to Congress's design and the United States' treaty obligations."

After the ruling, ACLU lawyer Judy Rabinovitz said in a statement: "The Court of Appeals unequivocally declared this policy to be illegal. The Supreme Court should as well. Asylum seekers face grave danger and irreversible harm every day this depraved policy remains in effect."

A spokeswoman for the Justice Department said the administration was "gratified" by the court's action.

"The Migrant Protection Protocols, implemented pursuant to express authority granted by Congress decades ago, have been critical to restoring the government's ability to manage the Southwest border and to work cooperatively with the Mexican government to address illegal immigration," the department's statement said.

The 9th Circuit panel last month said implementation of the policy should be halted in California and Arizona, states within the court's authority. The order would not have affected the other border states, New Mexico and Texas.

Judges William A. Fletcher and Richard A. Paez, both appointed by President Bill Clinton, agreed with a lower-court judge in California that MPP probably violated federal immigration law by ousting undocumented asylum seekers who should be allowed to apply for protection in the United States.

The judges also said the program probably violated the administration's "non-refoulement" obligations under international and domestic law, which prohibit the government from sending people to countries where they face danger. The 57-page ruling cited asylum seekers who feared kidnapping, threats and violence in Mexico.

"There is a significant likelihood that the individual plaintiffs will suffer irreparable harm if the MPP is not enjoined," Fletcher wrote in the opinion. "Uncontested evidence in the record establishes that non-Mexicans returned to Mexico under the MPP risk substantial harm, even death, while they await adjudication of their applications for asylum."

Judge Ferdinand F. Fernandez, a President George H.W. Bush appointee, dissented, arguing that the panel should have adhered to a prior appeals court decision that allowed MPP to take effect.

The MPP issue could return to the Supreme Court for a decision on whether it violates federal statutes.

The court's action marks another case in which the Trump administration has asked the high court to immediately intervene after an adverse ruling from a regional appeals court.

 **NEWSLETTER** | EVERY WEEKDAY

A 5-minute breakdown to track a new president   Sign Up

the high court.

"Claiming one emergency after another, the Government has recently sought stays in an unprecedented number of cases, demanding immediate attention and consuming limited court resources in each" she wrote in a solo opinion. "And with each successive application, of course, its cries of urgency ring increasingly hollow."

*Maria Sacchetti contributed to this report.*

**wp** NEWSLETTER | EVERY WEEKDAY

A 5-minute breakdown to track a new president    Sign Up >



   

## News Archive

Blog Archive   Events & Media Advisories Archive

Fact Sheets Archive   Press Release Archive

Speeches Archive

### Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Joint DHS/EOIR Statement on MPP Rescheduling



**Release Date:**  March 23, 2020

Due to circumstances resulting from COVID-19, all Migrant Protection Protocol (MPP) master calendar and merit hearings presently scheduled through April 22 will be rescheduled. Neither the MPP program nor any hearings will be cancelled.

Any individual with an MPP hearing date through April 22 should present themselves at their designated port of entry on their previously scheduled date to receive a tear sheet and hearing notice containing their new hearing dates. DHS and EOIR are deeply committed to ensuring that individuals 'have their day in court' while also ensuring the health and safety of aliens, our frontline officers, immigration court professionals, and our citizens.

Topics: [Border Security](#)
Keywords: [Homeland Security](#), [Migrant Protection Protocols (MPP)](#)

Last Published Date: March 23, 2020

> [Archive](#)   > [News Archive](#)   > Joint DHS/EOIR Statement on MPP Rescheduling

AR466

Site Links Privacy FOIA Accessibility Plug-ins



**DONATE NOW**

June 2, 2020 10:00AM EDT

## DHS OIG Formal Complaint Regarding 'Remain in Mexico'

*Via Email*

Joseph Cuffari

Inspector General

U.S. Department of Homeland Security

254 Murray Lane SW

Washington, D.C. 20528

Cameron Quinn

Officer for Civil Rights and Civil Liberties

U.S. Department of Homeland Security

Building 410, Mail Stop #0190

Washington, D.C. 20528

**Re: Asylum seekers sent to Tamaulipas, Mexico under DHS Migrant Protection Protocols are systematically targeted by criminal organizations, yet DHS continues to endanger people in violation of its own policies and legal obligations**

Dear Mr. Cuffari and Ms. Quinn:

Human Rights Watch submits this complaint and requests that the Department of Homeland Security (DHS) Office of Inspector General (OIG) and Office for Civil Rights and Civil Liberties (CRCL) investigate and report on the Migrant Protection Protocols (MPP) program and hold DHS accountable for knowingly subjecting asylum seekers to situations of persecution and other serious harm in the Mexican state of Tamaulipas in violation of its own policies and its obligations under US and international law. The dangers asylum seekers in the MPP program face are now even more acute during the Covid-19 pandemic, as asylum seekers are forced to wait for delayed hearings in crowded camps and shelters with limited and rudimentary sanitation facilities.

Human Rights Watch is an international, nonprofit, non-governmental organization that investigates and reports on abuses around the world, based on accurate factfinding and impartial reporting. This complaint is based on research Human Rights Watch conducted in the

AR468

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 475 of 688   PageID 2132

Mexican cities of Matamoros and Reynosa, Tamaulipas, in November 2019; Monterrey, Nuevo León, in December 2019; and San Luis Potosí, San Luis Potosí, in January 2020. Human Rights Watch researchers spoke to 43 adult asylum seekers (23 women and 20 men) who had been placed in the MPP program, many of whom had traveled with families, including 42 children. Over half of those children were under the age of 10. Human Rights Watch researchers also reviewed documents provided by asylum seekers and immigration attorneys including court documents, police reports, sworn declarations, and detailed notes taken by immigration attorneys present during nonrefoulement interviews.

These interviews and our review of documents illustrate the risk of serious harm US asylum seekers face in Tamaulipas:

- Human Rights Watch identified 32 separate instances of kidnapping or attempted kidnapping of asylum seekers subject to the MPP program – mostly by criminal organizations but at least once by a Mexican federal official – in Tamaulipas between November 2019 and January 2020.

- At least 80 asylum seekers were kidnapped in the incidents we identified.

- A further 19 asylum seekers described kidnapping attempts.

- At least 38 children were kidnapped or subjected to kidnapping attempts in these incidents.

- Eight people said they were robbed outside of these kidnappings or kidnapping attempts.

- Four people said they were sexually assaulted during a kidnapping incident.

- In five additional cases, Mexican police abducted asylum seekers for a short period of time and extorted them, a practice known as "express kidnapping."

In addition to reports from people who had themselves been kidnapped or subjected to a kidnapping attempt, these numbers include accounts from asylum seekers Human Rights Watch interviewed of other asylum seekers they witnessed being held in captivity while they themselves were kidnapped, as well as secondhand accounts of friends or family members they knew to have been kidnapped. While some of these cases could be verified by reviewing text or audio message communications between persons known to the kidnapped asylum seeker, at times the kidnapped person remained disappeared and the asylum seeker Human Rights Watch spoke to was a friend unsure of how to contact that person's family members. In such cases, verification was not possible.

Human Rights Watch has previously notified DHS of the serious rights consequences for asylum seekers subjected to the MPP across the US-Mexico border and urged the United States to immediately end the MPP program across the entire border, cease returning asylum seekers to Mexico, and instead ensure them access to humanitarian support, safety, and access to counsel from within the United States, where many have family members or others who can support them while their asylum cases are heard.[1] Despite attempts by Human Rights Watch to share findings and recommendations in the past, DHS has failed to respond to or address these harms.

Asylum seekers sent to the Mexican state of Tamaulipas under the MPP are at increased risk of life-threatening violence, including kidnapping, extortion, and sexual assault. During the pandemic, they are now also at heightened risk of infection in crowded shelters and camps where social distancing is impossible, sometimes without sufficient clean running water[2] to follow the basic hygiene recommendations put forward by the Centers for Disease Control and Prevention (CDC), the World Health Organization (WHO), other public health entities, and human rights experts.[3]

**The MPP Program**

Under the MPP program – known as "Remain in Mexico" – non-Mexican asylum seekers in the United States are sent to border towns in Mexico while awaiting asylum hearings in US immigration court.[4]

On February 28, 2020, the US Court of Appeals for the Ninth Circuit upheld a preliminary injunction of the MPP, noting that "uncontested evidence in the record establishes that non-Mexicans returned to Mexico under the MPP risk substantial harm, even death." [5]

AR469

The court later stayed its injunction pending the government's appeal to the Supreme Court, which then issued its own stay of the injunction.[6] At time of writing, the program remains intact, but the appellate court's finding that people sent to Mexico under the MPP "risk substantial harm, even death, so long as the directives of the MPP are followed"[7] is consistent with Human Rights Watch's findings.

When launching the MPP program, then-Secretary of Homeland Security Kirstjen Nielsen said the US government would implement the program in a manner consistent with domestic and international law, including US humanitarian commitments.[8] The 1951 Convention relating to the Status of Refugees and its 1967 Protocol prohibit the expulsion or return of refugees to "territories where [their] life or freedom would be threatened on account of [their] race, religion, nationality, membership of a particular social group or political opinion."[9] In addition, under the UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Convention against Torture), the United States is obligated not to return anyone to a country "where there are substantial grounds for believing that [they] would be in danger of being subjected to torture."[10] The screening process set up under the MPP fails in several material ways to ensure compliance with the international obligation of nonrefoulement.

**Nonrefoulement Screenings Under MPP Lack Necessary Protections**

A nonrefoulement screening procedure should be designed to ensure asylum seekers are not returned to countries where they would likely face the threat of persecution or torture or cruel, inhuman or degrading treatment.[11]

Existing statutory and regulatory procedures aim to implement the United States' nonrefoulement obligations in other contexts. Asylum is a discretionary form of relief that may be granted to individuals with a well-founded fear of persecution on account of a protected ground—i.e., their race, religion, nationality, membership in a particular social group, or political opinion.[12] Withholding of removal under 8 U.S.C § 1231(b)(3) must be granted to noncitizens who demonstrate that their "life or freedom would be threatened" on account of a protected ground in the country to which they face removal. Relief under the Convention against Torture must be granted to noncitizens who demonstrate that are more likely than not to be tortured in the country to which they face removal.[13] Before claims for these forms of protections are fully assessed, credible fear and reasonable fear interview protocols established by regulation aim to screen for eligibility for these protections.[14]

However, under the MPP, DHS agents send migrants to Mexico without the benefit of established procedures for evaluating whether they have a credible fear or reasonable fear of persecution in Mexico. DHS instead purports to comply with the United States' international and humanitarian obligations by providing "nonrefoulement" interviews. But these MPP nonrefoulement interviews employ procedures and standards that drastically differ from credible fear or reasonable fear interviews and in effect make it all but impossible for migrants to avoid placement in the MPP program.

First, DHS sets an almost impossibly high standard for these interviews, requiring migrants to remain in the MPP unless they establish they are "more likely than not" to face persecution on account of a protected ground or torture — a standard much higher than "reasonable fear," arbitrarily implemented by DHS, and not provided for in law or even in regulation. In fact, "more likely than not" is the same as the standard required to win withholding of removal in front of an immigration judge after a full hearing.

Second, DHS's decision to return a noncitizen to Mexico is unilateral. Unlike in the reasonable fear or other summary removal contexts, a noncitizen who fears persecution in Mexico receives no review by an immigration judge.

Third, most asylum seekers in the MPP program are not guaranteed access to attorneys in nonrefoulement interviews.[15] In an exception to this rule, on January 14, 2020, a US District Court judge issued a preliminary injunction requiring DHS to give asylum seekers placed in the MPP program along the California-Mexico border access to an attorney before and during nonrefoulement hearings. [16] The court found that some families who had been denied access to their retained legal counsel by US Customs and Border Protection (CBP) before and during their nonrefoulement interviews and who received a negative finding by the interviewing asylum officer, subsequently received a positive finding once CBP gave those same families access to their attorneys during a second nonrefoulement interview.[17] "Given the stakes of a nonrefoulement interview—the return to a country in which one may face persecution and torture—and the interview's fact-intensive nature, it is undeniable that access to counsel is important," Judge Sabraw said in the order.[18] That injunction does not apply to nonrefoulement interviews conducted with asylum seekers placed into the MPP program along other parts of the border, including Tamaulipas.

AR470

Fourth, DHS now allows CBP agents to conduct nonrefoulement interviews with the expectation that they will be "tougher" on asylum seekers[19] – a motivation at odds with Congress' original purpose in implementing screenings to guard against nonrefoulement in other contexts.[20] CBP agents are immigration enforcement officers and not neutral asylum officers, and they have far less training in asylum law. Asylum officers have alleged that CBP agents have committed serious errors in the process.[21]

Fifth, under the MPP program, CBP agents are not required to ask asylum seekers placed in the program if they are afraid to be sent to Mexico.[22] Instead, asylum seekers subject to the program must "affirmatively" – or without being questioned or prompted – express fear of harm in Mexico in order to be referred for a nonrefoulement interview. Asylum seekers who are not from Mexico may lack knowledge of the harms they are likely to face in Mexico, may not be aware that voluntarily expressing fear of return to Mexico is required to trigger an interview that would assess whether they can be sent there, and may not even expect they could be sent to Mexico under the MPP program in the first place.[23]

Indeed, many of the asylum seekers Human Rights Watch spoke to had no prior understanding of the existence or purpose of nonrefoulement interviews, let alone knowledge about how they could trigger such interviews.[24]

As of mid-October, the US Citizenship and Immigration Services had completed screenings to assess a fear of return to Mexico for only about 13.5 percent of asylum seekers placed in the MPP program at that time, or about 7,400 out of 55,000 asylum seekers.[25] As of October, only 13 percent of the small fraction of those referred for nonrefoulement interviews prevailed and were subsequently removed from the program, according to DHS.[26] Even when asylum seekers do pass the nonrefoulement interview, affirmative decisions are often reviewed — and blocked or overturned — by asylum headquarters, an asylum officer told *Vox*, an online news source, while negative decisions did not appear to be subjected to the same review.[27]

Some asylum seekers told Human Rights Watch that they were aware of how difficult it is to prevail in the nonrefoulement interviews and said they did not want to spend time in frigid CBP border detention facilities only to be sent again to Mexico.[28] Nearly all of the asylum seekers Human Rights Watch spoke to expressed a fear of being forced to remain in Mexico.[29]


**Nonrefoulement Interviews Are Not Given Even When Requested Affirmatively**

Human Rights Watch found that CBP agents failed to refer asylum seekers to nonrefoulement interviews even when they affirmatively expressed a fear of return to Mexico in violation of DHS policy.

Acting CBP Commissioner Mark Morgan in a November 14, 2019 press briefing said that reports of violence against asylum seekers along the Mexico border were merely anecdotal and that anybody in the MPP program who feared for their safety could approach a port of entry, tell CBP agents of their fear, and be given a nonrefoulement interview.[30]

But asylum seekers who had been placed in the MPP program in Tamaulipas told Human Rights Watch that when they affirmatively expressed fear, CBP agents ignored them, even when Mexican government officials had been implicated in the harm:

- Nina V., who fled domestic violence in Guatemala with her 12- and 8-year-old sons, said CBP agents told the family they had two options: "go to Mexico or go home." She said she told agents that they had been kidnapped from a Mexico City bus terminal for ransom, but she said the agents "did not care." She was placed into the MPP program and sent to Matamoros without being given a nonrefoulement interview.[31]

- Daniel G., who fled Cuba, was kidnapped and extorted by Mexican federal police in southern Mexico and pursued through Reynosa by armed men, according to a sworn declaration. When he turned himself into Border Patrol agents, he was held for four days in a series of CBP border jails before finally being brought to speak to an official, he said. "It was difficult to understand her because she spoke very little Spanish, and I do not speak English," Daniel said. "She explained that I was going to be returned to Mexico to wait for my day in court on Sept. 20, 2019. I explained to her what had happened in Mexico, but she insisted that I had to return to Mexico. . . She never explained my rights, nor did I get a [nonrefoulement] interview."[32]

- An asylum-seeking family consisting of a mother, father and their two children who fled Guatemala were kidnapped for ransom in Nuevo Laredo by cartel operatives while they were on their way to the US-Mexico border to ask for asylum, according to attorney

notes from the interview made available to Human Rights Watch. While in captivity, the father was beaten with a wooden plank, and cartel operatives threatened the family with death. The family told the DHS official conducting their nonrefoulement interview that when they first arrived "at the bridge, we tried to tell all of this to the CBP officer. And they told us that this was not important."[33]

- Yago R., who fled Cuba, was assaulted 3 times in the 5 days he spent in Reynosa, according to a sworn declaration. "One day, I went to buy food when two men accosted me and robbed me of all my money," Yago said. "US officials were not permitting anyone to cross the bridge to ask for asylum." Faced with the prospect of waiting months in the dangerous city as the result of illegal turnbacks by CBP agents at the port of entry,[34] Yago decided to cross the Rio Grande away from the port of entry and seek asylum. There, a group of around 15 men surrounded him and stole his watch, cellphone, and backpack, which contained important evidence of his asylum claim. Only then did they allow him to swim across. He immediately sought out Border Patrol agents to turn himself in and ask for asylum. Yago said he told agents of all the harm he had suffered in Tamaulipas, but that they paid no attention to him, and he was not given a nonrefoulement interview.[35]

- According to a federal lawsuit filed by the American Civil Liberties Union (ACLU) of Massachusetts, DHS returned a Guatemalan father, Hanz Minoldo Morales Barrera, and his 9-year-old son to Nuevo Laredo under the MPP without a nonrefoulement interview in July 2019 despite his affirmative expression of fear. According to the complaint, Mr. Morales "was so afraid [to enter Nuevo Laredo] that he refused to cross. He sat down on the bridge in the hot sun and told H.E.M.C. (name withheld for fear of retribution) to sit next to him. He begged officials to do anything with him—including taking him to jail—as long as they did not send him and [his son] to Mexico. Mr. Morales and [his son] were crying. An official told Mr. Morales and [his son] that because they did not cooperate, they would be separated—Mr. Morales would be sent to jail for a long time, and [his son] would be sent to a facility for minors—and they would never see each other again. [Mr. Morales' son] heard this and was inconsolable."[36] In early February 2020, DHS reportedly agreed to a settlement of the lawsuit that included removing Mr. Morales and his son from the MPP program and allowing them to pursue their asylum claims while living in the United States.[37]

More recently under the Covid-19 pandemic, a CBP official said that nonrefoulement interviews are now only being given to asylum seekers in the MPP on a case-by-case basis after the agency began using an order from the Centers for Disease Control and Prevention to turn away asylum seekers.[38]

Human Rights Watch also found that asylum seekers subject to the MPP program may lack access to nonrefoulement interviews because they are too afraid to travel to the border after receiving threats from or being harmed by criminal organizations:

- Fabiola B., who fled El Salvador with her 4-year-old son, told Human Rights Watch she was sexually assaulted in front of her child after being kidnapped in Nuevo Laredo for the second time. Fabiola was on her way to the port of entry with her friend Beatriz A. and Beatriz' 10-year-old son, who also fled El Salvador, so that the two families could attend their US immigration court hearings. When they stepped off of the bus they had taken from a Reynosa shelter to Nuevo Laredo, a group of men encircled the women and children and began asking them where they were from and why they were in Nuevo Laredo. The men then kidnapped the asylum seekers, separating the two families and taking Fabiola and her son to an empty store where they sexually assaulted her. When the criminal organization released them, telling them never to return, Fabiola and Beatriz fled Nuevo Laredo, missing both their court date and the opportunity for a nonrefoulement interview.[39]

- Walter P. and his 11-year-old daughter, who together fled El Salvador, spent their first night in Nuevo Laredo after being placed in the MPP program sleeping on the floor at the Mexican immigration office. Mexican immigration officials warned him and other asylum seekers of the frequent kidnappings of asylum seekers that have been taking place there. The next day, they sought to leave Nuevo Laredo to find somewhere safer to live but were kidnapped from the bus terminal after two men walked up and asked where they are from. Walter said one of the members of the criminal operation identified as the leader told him, "There is no asylum in the United States. But we can get you across safely." After Walter and his daughter were released several hours later, they fled Nuevo Laredo, and the 11-year-old begged her father never to return. They subsequently missed both their immigration court hearing and the opportunity for a nonrefoulement interview. They are now hiding out in Mexico, waiting to see if there is a policy change that would allow them to safely pursue asylum in the future. Walter's wife and 18-year-old son left El Salvador separately, and planned on traveling to the US-Mexico border to ask for asylum. After they learned of their family's kidnapping, they decided against approaching the border and are also hiding in Mexico.[40]

**Nonrefoulement Interviews Under the MPP Program Apply an Excessively Stringent Standard for Assessing Likelihood of Harm in Mexico and Fail to Comport with Guidelines Under International Law**

When asylum seekers are given nonrefoulement interviews under the MPP program, the evidentiary standard they must meet to pass those interviews is extremely high. DHS officials must find it is "more likely than not" an applicant will be tortured or persecuted in Mexico.[41] An asylum officer who had been administering interviews for asylum seekers in the MPP program told *Vox* that in practice the standard for prevailing on claims of fear of return to Mexico was "all but impossible for applicants to meet."[42] Asylum rights groups challenging the MPP have argued the nonrefoulement interview "imposes a significantly higher evidentiary standard"[43] than the traditional "well-founded fear" standard applied otherwise.[44]

US asylum officers acting through their union condemned the MPP program in an amicus ("friend of the court") brief filed June 26, 2019, in a lawsuit against the program, saying the interview process under the MPP "virtually guarantees a violation of the nonrefoulement obligation" because it lacks the safeguards and protections that asylum seekers need to meet the high burden of proof required.[45] The "more likely than not" standard is typically reserved for full-scale removal proceedings in front of an immigration judge, officers explained, whereas asylum officers typically apply lower standards to determine if someone has a "well-founded fear" in the reasonable fear interview context since outside of the MPP context an asylum seeker who has passed the officer's interview would then go before a judge where the higher "more likely than not" standard would be applied.[46] In that process, asylum seekers are given time to find an attorney and gather evidence. In the context of the MPP program, asylum seekers' nonrefoulement claims will never go before a judge, and they are not given sufficient time to seek out counsel or gather evidence.

The UN Committee against Torture, which provides authoritative guidance on the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, has stressed the need for a high level of due process protection to comply with the principle of nonrefoulement.[47] We have found that:

- The nonrefoulement interview practice fails to meet the need for an examination of each case "individually, impartially and independently"[48] insofar as CBP agents are now conducting some interviews.

- While access to a lawyer, free of charge if necessary, for the nonrefoulement hearing is required under the convention,[49] asylum seekers are not given consistent access to an attorney.

- Though the nonrefoulement interview should be a procedure conducted in a language the person understands,[50] asylum seekers were given interviews in a language other than their first language.

- The MPP program violates the convention in that there should be no "dissuasive measures" such as prolonged asylum processes or poor detention conditions.[51]

- The nonrefoulement process should take into account prior cruel, inhuman, and degrading treatment in the state to which the person would be returned, considering such treatment "an indication that the person is in danger of being subjected to torture" in that state,[52] but asylum seekers in the MPP program who have suffered prior harm have been sent to Mexico again and again (see following section). This presumption should apply in cases where the person "has been or would be a victim of violence, including gender-based or sexual violence, in public or in private, gender-based persecution or genital mutilation, amounting to torture, without the intervention of the competent authorities of the State concerned for the protection of the victim."[53]

- Finally, the principle of nonrefoulement also applies to returns to torture or other ill-treatment at the hands of nonstate actors "over which the receiving State has no or only partial de facto control, or whose acts it is unable to prevent or whose impunity it is unable to counter."[54] Criminal organizations in Mexico routinely operate with impunity.[55]

**Asylum Seekers in the MPP Program Who Have Already Suffered Harm Are Nevertheless Returned Again to Mexico**

Even when asylum seekers Human Rights Watch spoke to described persecution or torture in Tamaulipas to DHS officials in the nonrefoulement interview, they were still unable to prevail and were returned to Mexico.

AR473

Asylum seekers who described being kidnapped, physically harmed, or sexually assaulted – some on multiple occasions – based on one or more of the protected grounds and even with the involvement of Mexican government officials failed their nonrefoulement interviews and were sent again to the same cities in which they had been harmed.

- Julio L., who said he fled Honduras with his 11-year-old daughter when members of a militia working for local politicians beat, raped and murdered his sister and then brutally beat him almost to death, told Human Rights Watch he was kidnapped for 12 days with his daughter for ransom in Veracruz along with a group of migrants, including a cousin and a friend, both of whom were also traveling with their young daughters. He said they were targeted because they were migrants. "The girls are very upset," Julio said. "[The men who kidnapped them] would grab the girls, get really close to them. They would watch the girls while they showered." After Julio, his cousin, his friend, and their children were placed into the MPP program and sent to Matamoros, criminal operatives attempted to kidnap the group yet again, succeeding in kidnapping at least one parent-child pair. At his first immigration court hearing, he expressed a fear of return to Mexico and was given a nonrefoulement interview. Though interviews are required to be non-adversarial, Julio said the DHS official who performed the interview over the telephone was very aggressive in both his tone of voice and in the language he used, at one point ordering Julio to "stop being emotional." The nonrefoulement decision notice said he "did not establish a clear probability of persecution or torture in Mexico," and he and his daughter were sent back to Mexico."[56] "Everyone fails these interviews the same way," Julio said, remarking on what he has seen among other asylum seekers at the sprawling makeshift encampment where he and his daughter were living. "The same box is always checked." Julio and his daughter eventually won protection under the Convention Against Torture and now reside in the United States, meaning he successfully showed that it is more likely than not he will be tortured with government acquiescence if returned to Honduras.[57]

- Yohan P., who fled political persecution in Nicaragua with his wife, 2-year-old son, and 10-year-old daughter, told Human Rights Watch he and his family were kidnapped at gunpoint from the Nuevo Laredo bus terminal shortly after being sent there under the MPP program. They were held for 11 days along with several other asylum seekers. Throughout that time, criminal operatives continuously called Yohan "Nica" in reference to his nationality, a protected ground in US asylum law. When the family showed up for their first immigration court hearing, they expressed a fear of return to Mexico and were given a nonrefoulement interview. Even though the family presented a Mexican police report detailing the incident, evidence most asylum seekers lack because they are often too fearful of corruption among police in Mexico and retaliation to file reports, they were sent back to Nuevo Laredo because they "did not establish a clear probability of persecution or torture in Mexico," according to the explanation contained in the nonrefoulement decision notice.[58] The family is now in hiding, too afraid to approach the US border again and have since missed their US immigration court hearings.[59]

- An asylum seeker from Cuba who was placed in the MPP program and sent to Matamoros told the DHS official conducting her nonrefoulement interview that when she first arrived in Reynosa, she was kidnapped by a Mexican immigration official based on her status as a migrant, held in a room for 42 days and told she would be deported if she did not pay $3,500, according to notes taken by her attorney during the interview and turned over to Human Rights Watch. She told the official that in another incident in Reynosa, she was kidnapped and sexually assaulted by three men who pulled up in a van after she'd collected money from a wire transfer and pulled her inside in broad daylight. Afterward, they told her "not to report them to the police because they knew where I lived and they would find me," according to the attorney notes. The men threatened to kill her. When asked whether she thought the police could have helped her, the asylum seeker explained that the Mexican police are corrupt and that federal police officers had robbed her on a bus while she was traveling through Mexico on her way to the US-Mexico border. She affirmed that she had been harmed in Mexico after being identified as a Cuban migrant on account of both her race and nationality, both protected grounds under US asylum law. She was failed on her nonrefoulement interview and sent back to Mexico.[60]

- An asylum seeker traveling, who was traveling with her daughter after fleeing Honduras, told a DHS official during a nonrefoulement interview that in Tamaulipas she had suffered attempted rape by cartel members who verbally identified the woman as a migrant while they ripped off her clothes, and on another occasion was extortion by Mexican police officers who also identified her as a migrant, according to notes taken by her attorney during the interview and turned over to Human Rights Watch. They were failed on their nonrefoulement interview and sent back to Tamaulipas.[61]

- Eric M., who fled El Salvador with his 3-year-old son and pregnant partner, told a DHS official during a nonrefoulement interview that the family was kidnapped and that his partner suffered a miscarriage as the result of a physical assault targeted at her abdomen in Tamaulipas, according to notes taken by the family's attorney during the interview and given to Human Rights Watch. Members of a cartel kidnapped the family for ransom in Reynosa, beating Eric and threatening to kill their toddler and harvest his organs for sale if they did not come up with the money the cartel operatives were demanding. After they were placed in the MPP program and

returned to Matamoros, those cartel operatives threatened to kidnap the family again because they wanted more money, according to attorney notes from the interview. On two other occasions, Eric was assaulted and robbed, he told the DHS official. He explained they had been targeted for being asylum seekers because they "talk differently and do not wear shoelaces." CBP agents routinely take asylum seekers' shoelaces while they are in detention to prevent them from harming themselves. When CBP agents send asylum seekers in the MPP program to Mexico, they do not give them their shoelaces back. Five days before the nonrefoulement interview, some men assaulted the asylum seekers during a robbery, hitting Eric in the head with a pistol and punching his wife in her stomach even though Eric pleaded with the men to leave his pregnant partner alone, according to the notes. The men verbally identified the family as migrants. The family said that even though they reported two of the incidents to Mexican police officers, the officers failed to assist or protect them, and that, in another incident, police officers extorted them, threatening to turn them over to the cartel if they did not pay. Though they brought evidence to their nonrefoulement interview, including hospital documents they obtained after Eric's wife sought medical treatment for the miscarriage. The DHS official nonetheless failed Eric and his family on their nonrefoulement interview and sent them back to Tamaulipas.[62]

**DHS Knows or Should Know that Asylum Seekers Are at Risk of Serious Harm in Tamaulipas**

Human Rights Watch, other civil society organizations and the media have documented risks of violence to asylum seekers sent to Mexico under the MPP since the program began in Tijuana early 2019.[63] In July 2019, despite warnings from Human Rights Watch, other human rights defenders, and federal asylum officers, DHS expanded the MPP in the Texas Rio Grande Valley, returning vulnerable asylum seekers to cities in the Mexican state of Tamaulipas, which is on the US State Department's "do not travel" list.[64]

That State Department notice warns:

Criminal groups target public and private passenger buses as well as private automobiles traveling through Tamaulipas, often taking passengers hostage and demanding ransom payments. Heavily armed members of criminal groups often patrol areas of the state in marked and unmarked vehicles and operate with impunity particularly along the border region from Reynosa northwest to Nuevo Laredo.

Tamaulipas has long been known as a particularly dangerous place for migrants. It is one of two Mexican Gulf states where officials and human rights defenders have discovered more than 1,300 mass graves since 2007, including those of murdered migrants. There have also been multiple reports of bus kidnappings of migrants attempting to reach the US border.[65] For many years, kidnapping for ransom and human trafficking have been a main source of income for transnational criminal organizations operating in Tamaulipas.[66] A study released in June 2018 by the Robert Strauss Center for International Security and Law estimated that such groups can earn over $134 million annually from crimes against migrants and identified the state of Tamaulipas as having "the highest incidence of crime against migrants."[67]

In both November and January, the US Consulate issued security alerts warning US government employees in Nuevo Laredo to shelter in place and observe a curfew after a series of open gunfights and blockades of burning vehicles.[68]

In late December 2019, the ACLU and the Center for Gender and Refugee Studies wrote a letter to the Department of Homeland Security calling on DHS to immediately stop returning asylum seekers in MPP to Tamaulipas.[69] A May 2020 report by Human Rights First tracked more than 1,100 publicly reported abuses, including murder, rape, and kidnapping, a figure that includes many of the cases presented in this complaint.[70]

Instead, DHS has continued sending asylum seekers to Tamaulipas, even though the government was alerted to the life-threatening conditions there. Those sent to Tamaulipas have included people who ask for asylum anywhere in the Rio Grande Valley sector, including Reynosa, Mexico, and McAllen, Texas, and other cities.[71] In practice, this means CBP agents at times have gone out of their way to drive asylum seekers placed in the MPP program more than 150 miles to Laredo, Texas, where they are then expelled to Nuevo Laredo, one of the most dangerous cities in Mexico, despite the significant risk that asylum seekers in the MPP program will suffer abuse, persecution, or torture there.[72]

As of December 31, 2019, more than 28,000 asylum seekers had been expelled to Tamaulipas under the MPP program, according to the Mexican National Institute of Migration.[73]

Given the well-documented history of abuse of migrants in that region by both criminal organizations and Mexican law enforcement,[74] as well as longstanding US State Department warnings against travel to the state due to "crime and kidnapping," [75] the threats to asylum seekers sent to Tamaulipas are entirely foreseeable.

**Asylum Seekers' Consistent Accounts Suggest Routine Targeting on the Basis of Protected Grounds**

The UN Human Rights Committee, in its general comment on the prohibition against torture and other ill-treatment, stated that governments "must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to another country by way of their extradition, expulsion or refoulement."[76]

Yet, DHS continues to implement the MPP program even though it knows or should know that Central Americans and other migrants subjected to MPP face likely abuse in Mexico or persecution on account of their race, national origin, and particular social group. Asylum seekers in MPP are easily identifiable in Mexico and often appear foreign, speak with noticeable accents, or do not speak Spanish at all. [77] Additionally, CBP agents routinely expel asylum seekers in the MPP program to Mexico without shoelaces and with plastic folders containing their notice to appear in court and other important documents, making these asylum seekers even easier for criminal actors to immediately identify. Criminal organizations that routinely kidnap migrants operate on the assumption that the majority of asylum seekers placed in the MPP program have US family members who can be extorted for thousands of dollars. One asylum seeker reported that while he was kidnapped, one of his captors told him the cartel had been hiring new members to respond to the increased number of migrants sent to Mexico under MPP. "Since the United States is deporting so many through here, we are capturing them and that has meant more work," the captor told him. "We're saturated."[78]

Instead of safely pursuing their US asylum cases from within the United States, asylum seekers expelled by DHS to Tamaulipas have become commodities in a growing market exploiting vulnerable migrants and their US-based families and fueling the profits of transnational criminal organizations.[79]

A report by Doctors Without Borders (MSF) in early February 2020 corroborates Human Rights Watch's concern that migrants are frequently victimized in Tamaulipas. MSF found that nearly 80 percent of the 670 patients they treated in Nuevo Laredo, Tamaulipas from January to October 2019 had suffered from violence, including assault, sexual violence, torture, extortions, or threats, and in October 2019 the percentage of their new patients in Nuevo Laredo who had been kidnapped reached 75 percent (33 of 44 new patients). [80] According to monitoring of publicly reported cases of kidnapping and other abuse of asylum seekers in the MPP program by Human Rights First, there were 265 cases of children returned to Mexico who were kidnapped or nearly kidnapped as of May 13, 2020. It is ultimately impossible to know how many people are kidnapped at a given time or how many asylum seekers have been killed after their families failed to pay the ransom because asylum seekers are often afraid to report crimes to Mexican authorities, citing corruption and impunity.[81]

The accounts of kidnapping that Human Rights Watch documented repeatedly described having been kidnapped from bus terminals, while riding in taxis, or from in front of or within Mexican immigration offices near US ports of entry.[82] Their descriptions of events during their abductions were highly consistent:

Asylum seeker accounts related that kidnappers routinely made reference to the fact that asylum seekers were "migrants," "refugees," or "foreigners"; referred to asylum seekers by their country of origin; or asked asylum seekers where they were from prior to attack.[83] Armed cartel or other criminal operatives quickly confiscated cellphones, sometimes placing them in airplane mode, and transported asylum seekers to a stash house where they frequently saw other asylum seekers who had also been kidnapped. Asylum seekers reported being put through a standardized intake process – photos of each person were taken, identity and court documents inspected, and identifying information logged into a notebook.

Criminal organizations set an extortion amount and began looking through asylum seekers' phone contacts in search of a US-based number to call.[84] According to data collected by the Mexican National Institute of Migration through mid-June 2019, nearly 84 percent

of asylum seekers in the MPP program reported having family members in the United States.[85] Criminal organizations are aware of the familial ties asylum seekers have with US residents and seek to exploit them for profit by threatening to harm or kill their asylum-seeking relatives.[86]

According to attorney notes from a nonrefoulement interview, when a DHS official asked one asylum seeker from El Salvador traveling with his wife and young son how many times he was punched after having been kidnapped for ransom, he said, "Several times. Two times whenever I was on the phone [with] my mother-in-law asking about the money. They would hit me to make me scream and convince her to send the money."

The ransom amounts ranged from $2,000 to more than $20,000 per person.

**Mexican Government is Unable or Unwilling to Provide Protection as Required by DHS Policy**

The MPP program policy guidance claims that "the Government of Mexico will afford such individuals all legal and procedural protection[s] provided for under applicable domestic and international law. That includes applicable international human rights law and obligations as a party to the 1951 Convention relating to the Status of Refugees (and its 1967 Protocol) and the Convention Against Torture."[87]

Mexican government officials, including police and immigration officers, have been implicated in some reports of persecution or torture against asylum seekers in the MPP program, while in others, officials did nothing to prevent harm to asylum seekers.[88]

DHS has not made any meaningful efforts to monitor the conditions for asylum seekers in Tamaulipas.

Contrary to Acting CBP Commissioner Mark Morgan's October 2019 statements in a press briefing defending the MPP program,[89] most shelters that Human Rights Watch researchers visited do not have security guards and are not capable of ensuring asylum seekers expelled to Mexico under the MPP program remain safe. Shelters where asylum seekers are known to stay have been targeted by criminal organizations, which had been reported in the media prior to Morgan's misleading statement.[90]

For example, on August 3, 2019, kidnappers showed up at a migrant shelter in Nuevo Laredo, but when Pastor Aaron Méndez refused to let them take any asylum seekers, they took Méndez instead, along with Alfredo Castillo, who also worked at the shelter.[91] Both men remain missing, and the United Nations High Commissioner for Human Rights and the Inter-American Commission on Human Rights have since called on the Mexican government to intensify efforts to find and protect both men.[92]

Asylum seekers have also reported being targeted directly outside of shelters.[93] Expecting asylum seekers to never leave shelters, as Morgan suggested, is unreasonable considering the fact that they are ordered by DHS to show up to US ports of entry as early as 3 a.m. multiple times to appear for their immigration court hearings.[94] They must also leave to purchase personal hygiene products, to work, or for other necessary reasons.

Morgan continued to defend the MPP program in a February 2020 press briefing, where he claimed that when visiting migrant shelters in Mexico, he had not heard the kinds of reports of violence to asylum seekers in the program that so many journalists and nongovernmental organizations have reported on.[95]

"When Morgan visited El Paso, I ran into his staffers at one of the shelters by accident," immigration attorney Taylor Levy responded on Twitter. "I took them aside and told them I had represented a woman the day before who was kidnapped *outside of that very shelter.* They told me (per my memory), 'That's what everyone has been telling us.'" She said Morgan's staff looked "truly impacted."[96] She said she warned them that asylum seekers had been kidnapped from within the shelter and that "masked men had entered the unsecured compound on multiple occasions screaming while riding in the backs of pick-up trucks with semi-automatic rifles, as a scare tactic. They heard all of this."[97]

Almost none of the asylum seekers interviewed for this complaint reported crimes against them to the police in Mexico. Not only have some asylum seekers been persecuted by Mexican police or immigration authorities, but the high level of impunity in Mexico often deters asylum seekers from risking their safety knowing they are not likely to receive protection.[98]

Asylum seekers continue to face a severe shortage of shelter space in cities in Tamaulipas. Many asylum seekers have extremely limited financial means and often have no ability to pay for shelter, food, water, or other necessities. This further increases their vulnerability to criminal organizations aiming to exploit them.

In Matamoros, thousands of asylum seekers in the MPP have been forced to live in a makeshift refugee camp with little to no support from the Mexican government. What little access asylum seekers have there to potable water, medical care, showers or bathrooms has mainly been provided by volunteers and is insufficient. Asylum seekers have had to bathe and wash clothes in the nearby Rio Grande, causing irritated skin rashes, and have had to defecate on the open ground in close proximity to where they sleep. Medical professionals volunteering in the camp told Human Rights Watch they have documented outbreaks of chickenpox, parasites such as lice and intestinal worms, as well as respiratory and gastrointestinal problems. Asylum seekers forced to wait in Tamaulipas also often suffer from anxiety, post-traumatic stress disorder, and depression.[99]

Encampments are also unsafe. Asylum seekers told Human Rights Watch that cartel members are constantly surveilling them. Many parents live in constant fear that their children will be raped, kidnapped, or otherwise harmed.

- Hugo O., an asylum seeker living in the makeshift camp in Matamoros who fled Honduras with his 15-year-old daughter after members of a gang tried to forcibly recruit her, said he is constantly afraid his daughter will be kidnapped or raped in the camp. When we talked to him, he was thinking about sending his daughter across alone and had written a letter to US immigration officials. It read:

My daughter is desperate. I am trying to be strong so that she does not see that I'm afraid. But inside I am destroyed by what is happening. We live in a little tent here near the repatriation place in Matamoros, but that does not matter. The sad thing is the fear that we experience because of the threats. My daughter is traumatized. We cannot leave here. They say they [the cartel] control everything. Please help us.[100]

- A young woman returned to a crowded refugee area in Tamaulipas under the MPP fled the threat of death in Central America with her toddler. Her child needed to go to the bathroom in the middle of the night, but there were no facilities available, so she took the toddler to some nearby shrubs. Three men subsequently accosted them, forced them into a vehicle, and violently raped the young woman in front of her child. The following day, when Human Rights Watch researchers met the young asylum seeker, she was still suffering from injuries caused by the abuse and had to return to the hospital.[101]

The Matamoros camp is situated directly next to the port of entry and along the Rio Grande partly because asylum seekers are afraid to seek shelter in the interior of the city and partly because if it were located elsewhere, asylum seekers would no longer have access to the few US attorneys and volunteers serving asylum seekers in the camp.

**During Pandemic, Asylum Seekers in the MPP Face a Prolonged Wait in Danger**

All of the dangers described above, as well as the heightened risk of infection in crowded, unsanitary settings, have increased asylum seekers' vulnerability in the MPP program. Currently, MPP hearings have been delayed until June 19, 2020,[102] due to the pandemic and could be further delayed. Asylum seekers are now therefore forced to wait even longer than previously for their day in court.

Many of those waiting for their US immigration court hearings are homeless in Mexico and have little access to health care. For example, Human Rights Watch found that in Matamoros, Mexico, just across from a US port of entry, about 2,500 asylum seekers live back-to-back in tents holding up to five people each with only a handful of outdoor showers and portable restrooms that have at times overflowed with human waste.

Health workers have said that an outbreak of COVID-19 in camps and shelters is inevitable, meaning asylum seekers face a real risk of life-threatening disease.[103]

**Conclusion**

In its implementation of the MPP in the Mexican state of Tamaulipas, DHS is knowingly and willingly returning asylum seekers to harm, as well as violating US asylum law, international human rights law, and its own policies associated with the program.

AR478

Despite the significant risk that asylum seekers will face persecution or torture in Tamaulipas, the nonrefoulement screening process implemented by DHS has proven ineffective at protecting against these harms, and, even when applied, is implemented incorrectly or not at all.

DHS should end the MPP program, or at a minimum, DHS should immediately cease sending asylum seekers to Tamaulipas State.

Asylum seekers in the MPP program should be paroled into the United States and allowed to continue their immigration court proceedings in communities where they have existing networks of support. To achieve this, the US government should ensure those who have been subjected to the MPP program are given a change of venue to the immigration court nearest to their destination.

Asylum seekers who have been sent to Mexico under the MPP program and who have been issued orders *in absentia* should be given the opportunity to reopen their cases, and DHS should be required to properly notify such persons, as well as facilitate transportation and entry into the United States.

So long as MPP is in place, DHS should not apply the onerous "more likely than not" standard during nonrefoulement interviews, and asylum seekers should have access to an attorney before and during such interviews across the border. Those interviews should be conducted for all asylum seekers DHS intends to place in the MPP program, rather than requiring asylum seekers to affirmatively express fear of Mexico.

CBP agents should not perform any nonrefoulement interviews. Fear of return assessments should only be conducted by properly trained asylum officers.

We look forward to learning what action you have taken in regard to this matter. Thank you for your time and attention.

Sincerely,

Nicole Austin-Hillery

[1] Human Rights Watch, *"We Can't Help You Here": US Returns of Asylum Seekers to Mexico*, July 2, 2019, https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico; Human Rights Watch, *US Move Puts More Asylum Seekers at Risk*, September 25, 2019, https://www.hrw.org/news/2019/09/25/us-move-puts-more-asylum-seekers-risk#; Human Rights Watch, *Mexico: Risks at Border for Those With Disabilities*, October 29, 2019, https://www.hrw.org/news/2019/10/29/mexico-risks-border-those-disabilities; Human Rights Watch, *US: 'Remain in Mexico' Program Harming Children*, February 12, 2020, https://www.hrw.org/news/2020/02/12/us-remain-mexico-program-harming-children.

[2] Mikael Wolfe, "Mexico has some of the best water laws around. So why are its rivers so contaminated?" April 26, 2018, https://www.washingtonpost.com/news/made-by-history/wp/2018/04/26/mexico-has-some-of-the-best-water-laws-around-so-why-are-its-rivers-so-contaminated/ (accessed May 28, 2020).

[3] Centers for Disease Control and Prevention, "How to Protect Yourself and Others," April 24, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (accessed May 28, 2020.; World Health Organization, "Water, sanitation, hygiene, and waste management for the COVID-19 virus: interim guidance," April 23, 2020, https://www.who.int/publications-detail/water-sanitation-hygiene-and-waste-management-for-covid-19 (accessed May 28, 2020).; United Nations Human Rights Office of the High Commissioner, "COVID-19 will not be stopped without providing safe water to people living in vulnerability – UN experts," News Release, March 23, 2020, https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=25738&LangID=E (accessed May 28, 2020).

AR479

[4] Human Rights Watch, Q&A: *Trump's Remain in Mexico Program*, January 29, 2020, https://www.hrw.org/news/2020/01/29/qa-trump-administrations-remain-mexico-program

[5] *Innovation Law Lab v. Wolf*, No. 19-15716 (9th Cir. February 28, 2020), op. at 7, available at https://cdn.ca9.uscourts.gov/datastore/opinions/2020/02/28/19-15716.pdf (viewed March 16, 2020).

[6] *Wolf v. Innovation Law Lab*, Order in Pending Case, No. 19A960 (U.S. March 11, 2020), available at https://www.supremecourt.gov/orders/courtorders/031120zr_19m2.pdf (viewed March 16, 2020).

[7] *Innovation Law Lab v. Wolf*, No. 19-15716, op. at 49.

[8] US Department of Homeland Security, "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration," press release, December 20, 2018, https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration (viewed March 16, 2020).

[9] Convention Relating to the Status of Refugees, 189 U.N.T.S. 150, *entered into force* April 22, 1954, article 33.

[10] Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), *entered into force* June 26, 1987, article 3(1). The US ratified the convention in 1994. The convention defines

torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." Ibid., art. 1. The UN Committee against Torture, which provides authoritative guidance on states' obligations under the Convention against Torture, has determined that "'substantial grounds' exist whenever the risk of torture is 'foreseeable, personal, present and real.'" Committee against Torture, General Comment No. 4, U.N. Doc. CAT/C/GC/4 (September 4, 2018), para. 11.

[12] 8 U.S.C. §§ 1101(a)(42)(A), 1158.

[13] 8 C.F.R. §§ 208.16-208-18.

[14] 8 C.F.R §§ 208.30; 8 C.F.R 1208.31

[15] Memorandum from US Department of Homeland Security to US Citizenship and Immigration Services, "MPP Guiding Principles," January 28, 2019, https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/MPP%20Guiding%20Principles%201-28-19.pdf (accessed February 17, 2019); Letter from Human Rights First to https://www.humanrightsfirst.org/sites/default/files/OIG-CRCL-Complaint-MPP.pdf (accessed February 20, 2020).

[16] *Doe v. Wolf*, Order Granting Motion for Classwide Preliminary Injunction, No. 19-cv-2119-DMS (S.D. Cal. January 14, 2020), https://www.aclusandiego.org/wp-content/uploads/2020/01/ORDER-GRANTING-MOTION-FOR-CLASSWIDE-PRELIMINARY-INJUNCTION.pdf (viewed March 16, 2020).

[17] Ibid., op. at 16.

[18] Ibid.

[19] Dara Lind, "Exclusive: Civil Servants Say They're Being Used as Pawns in a Dangerous Asylum Program," Vox, May 2, 2019, https://www.vox.com/2019/5/2/18522386/asylum-trump-mpp-remain-mexico-lawsuit (accessed February 20, 2020); Debbie Nathan, "An Asylum Officer Speaks Out Against the Trump Administration's 'Supervillian' Attacks On Immigrants," *Intercept*, September 13, 2019, https://theintercept.com/2019/09/13/asylum-interview-immigration-trump/ (accessed February 20, 2020).

AR480

[20] Congressional Record – Senate, September 27, 1996, Asylum and Summary Exclusion Provisions, https://www.govinfo.gov/content/pkg/CREC-1996-09-27/pdf/CREC-1996-09-27-pt1-PgS11491-2.pdf (accessed February 20, 2020).

[21] Debbie Nathan, "An Asylum Officer Speaks Out Against the Trump Administration's 'Supervillian' Attacks On Immigrants," *Intercept*, September 13, 2019, https://theintercept.com/2019/09/13/asylum-interview-immigration-trump/ (accessed February 20, 2020).

[22] Memorandum from US Department of Homeland Security to US Citizenship and Immigration Services, "MPP Guiding Principles," January 28, 2019, https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/MPP%20Guiding%20Principles%201-28-19.pdf (accessed February 17, 2019); Dara Lind, "Exclusive: Civil Servants Say They're Being Used as Pawns in a Dangerous Asylum Program," Vox, May 2, 2019, https://www.vox.com/2019/5/2/18522386/asylum-trump-mpp-remain-mexico-lawsuit (accessed February 20, 2020).

[23] Dara Lind, "Exclusive: Civil Servants Say They're Being Used as Pawns in a Dangerous Asylum Program," *Vox*, May 2, 2019, https://www.vox.com/2019/5/2/18522386/asylum-trump-mpp-remain-m (accessed June 24, 2019).

[24] Human Rights Watch interviews with asylum seekers (names withheld), Monterrey, Mexico, December 9-13, 2019. When Human Rights Watch asked asylum seekers in Monterrey whether they'd requested or been given an interview to discuss potential fear of return to or harms in Mexico, they consistently responded with confusion, and many followed up with questions about the purpose of such interviews and how they could be accessed.

[25] US Department of Homeland Security, "Assessment of the Migrant Protection Protocols (MPP)," October 28, 2019, https://www.dhs.gov/sites/default/files/publications/assessment_of_the_migrant_protection_protocols_mpp.pdf (accessed February 21, 2020).

[26] Ibid.

[27] Dara Lind, "Exclusive: Civil Servants Say They're Being Used as Pawns in a Dangerous Asylum Program," *Vox*, May 2, 2019, https://www.vox.com/2019/5/2/18522386/asylum-trump-mpp-remain-mexico-lawsuit(accessed June 5, 2019).

[28] Human Rights Watch, *In the Freezer: Abusive Conditions for Women and Children in US Immigration Holding Cells*, February 28, 2018, https://www.hrw.org/report/2018/02/28/freezer/abusive-conditions-women-and-children-us-immigration-holding-cells

[29] US Department of Homeland Security, "Assessment of the Migrant Protection Protocols (MPP)," October 28, 2019, available at https://www.dhs.gov/sites/default/files/publications/assessment_of_the_migrant_protection_protocols_mpp.pdf

[30] Transcript of press briefing, Acting Customs and Border Protection Commissioner Mark Morgan, Washington D.C., November 14, 2019, https://www.whitehouse.gov/briefings-statements/press-briefing-acting-cbp-commissioner-mark-morgan-2/ (accessed February 21, 2020).

[31] Human Rights Watch interview with Nina V. (name withheld), Matamoros, Mexico, November 8, 2019.

[32] Sworn declaration by Daniel G., (name withheld), taken by Jennifer Harbury, Monterrey, Mexico, August 4, 2019 (on file with Human Rights Watch).

[33] Attorney notes from nonrefoulement interview (names and date withheld), Laredo, Texas, (on file with Human Rights Watch).

[34] Human Rights Watch, *US: Mexican Asylum Seekers Ordered to Wait*, December 23, 2019, https://www.hrw.org/news/2019/12/23/us-mexican-asylum-seekers-ordered-wait.

[35] Sworn declaration by Yago R., (name withheld), taken by Jennifer Harbury, Monterrey, Mexico, August 4, 2019, (on file with Human Rights Watch).

[36] *Constanza Lemus et al v. Wolf et al. US District Court*, No. 20-cv-10009 (D. Mass. filed January 3, 2020), available at https://www.aclum.org/sites/default/files/field_documents/1_complaint.pdf.

AR481

[37] Philip Marcelo, "Guatemalan family seeking asylum reunited after suing feds," *Associated Press*, February 7, 2020, https://www.milforddailynews.com/news/20200207/guatemalan-family-seeking-asylum-reunited-after-suing-feds (accessed February 21, 2020).

[38] Mallory Falk, "Asylum Seekers In Mexico Worry About Waiting Longer In Dangerous Conditions Due To COVID-19," *KERA News*, April 28, 2020, https://www.keranews.org/post/asylum-seekers-mexico-worry-about-waiting-longer-dangerous-conditions-due-covid-19 (accessed May 27, 2020).

[39] Human Rights Watch interview with Fabiola B., (name withheld), Reynosa, Mexico, November 6, 2019.

[40] Human Rights Watch interview with Walter P., (name withheld), San Luis Potosi, Mexico, January 17, 2020.

[41] Memorandum from US Department of Homeland Security to US Citizenship and Immigration Services, "MPP Guiding Principles," January 28, 2019, https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/MPP%20Guiding%20Principles%201-28-19.pdf (accessed June 10, 2019).

[42] Dara Lind, "Exclusive: Civil Servants Say They're Being Used as Pawns in a Dangerous Asylum Program," *Vox*, May 2, 2019, https://www.vox.com/2019/5/2/18522386/asylum-trump-mpp-remain-mexico-lawsuit(accessed June 5, 2019).

[43] Brief of Amicus Curiae Local 1924, pp. 21-22, *Innovation Law Lab v. McAleenan*, No. 19-15716 (9th Cir. June 26, 2019).

[44] Ibid. p. 21.

[45] Ibid. pp. 18-20.

[46] Ibid.

[47] UN Committee against Torture, General Comment No. 4, U.N. Doc. CAT/C/GC/4 (September 4, 2018), para. 13.

[48] Ibid.

[49] Ibid. para. 18(b).

[50] Ibid. para. 18(c).

[51] Ibid. para. 14.

[52] Ibid. para. 28.

[53] Ibid. para. 29(c).

[54] Ibid. para. 30.

[55] "Level 4: Do Not Travel" advisory for the state of Tamaulipas warning that "Organized crime activity – including gun battles, murder, armed robbery, carjacking, kidnapping, forced disappearances, extortion, and sexual assault – is common along the northern border," that criminal groups "operate with impunity particularly along the border region from Reynosa northwest to Nuevo Laredo," and that "local law enforcement has limited capability to respond to crime incidents," US Department of State, Mexico Travel Advisory, December 17, 2019, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html (accessed February 17, 2020).

[56] Nonrefoulement interview decision notice reviewed by Human Rights Watch, Matamoros, Mexico, November 6, 2019.

[57] Human Rights Watch interview with Julio L., (name withheld), Matamoros, Mexico, November 6, 2019.

[58] Nonrefoulement interview decision notice reviewed by Human Rights Watch, Monterrey, Mexico, December 11, 2019.

AR482

[59] Human Rights Watch Interview with Yohan P., (name withheld), Monterrey, Mexico, December 11, 2019.

[60] Attorney notes from nonrefoulement interview, (name withheld), on file with Human Rights Watch, Brownsville, Texas, December 16, 2019.

[61] Attorney notes from nonrefoulement interview, (names withheld), on file with Human Rights Watch, Brownsville, Texas.

[62] Attorney notes from nonrefoulement interview, (names withheld), on file with Human Rights Watch, Brownsville, Texas, December 11, 2019.

[63] Human Rights Watch, *"We Can't Help You Here" US Returns of Asylum Seekers to Mexico*, July 2, 2019, https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico; Human Rights Watch, *US Move Puts More Asylum Seekers at Risk*, September 25, 2019, https://www.hrw.org/news/2019/09/25/us-move-puts-more-asylum-seekers-risk#; Human Rights Watch, *US: 'Remain in Mexico' Program Harming Children*, February 12, 2020, https://www.hrw.org/news/2020/02/12/us-remain-mexico-program-harming-children.

[64] Human Rights Watch, *"We Can't Help You Here" US Returns of Asylum Seekers to Mexico*, July 2, 2019, https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico. ; Letter from Center for Gender and Refugee Studies and the American Civil Liberties Union to Acting Secretary of Homeland Security Chad F. Wolf, et al., December 9, 2019, https://www.aclu.org/other/re-implementation-migrant-protection-protocols-mpp-tamaulipas-state (accessed February 20, 2020);

Letter from Human Rights First to https://www.humanrightsfirst.org/sites/default/files/OIG-CRCL-Complaint-MPP.pdf (accessed February 20, 2020); Innovation Law Lab v. Nielsen, US District Court, Northern District of California, Case No. 19-00807, order granting preliminary injunction, April 8, 2019; Innovation Law Lab v. Nielsen, US Court of Appeals for the Ninth Circuit, Case No. 19-15716, stay order, May 7, 2019.

[65] Nick Miroff, "Migrant Caravan: One Reason Central Americans Are Going All the Way to Tijuana to Reach the U.S. Border? El Chapo," *Washington Post*, November 15, 2018, https://www.washingtonpost.com/world/2018/10/24/migrant-caravan-updates/?utm_term=.dda236d09ed6 (accessed on June 24, 2019); "At Least 4,000 Migrant on Way to US Have Died of Gone Missing in Last Four Years," *Associated Press*, December 5, 2018, https://www.nbcnews.com/news/latino/least-4-000-migrants-way-u-s-have-died-or-n944046 (accessed June 17, 2019); Kate Linthicum, "Mexico Launching Search for Migrants Pulled Off Bus by Gunmen Near the US Border," *Los Angeles Times*, March 13, 2019, https://www.latimes.com/world/la-fg-mexico-missing-migrants-20190313-story.html (accessed June 17, 2019).

[66] Arthur Brice, "Human Trafficking Second Only to Drugs in Mexico," *CNN*, August 27, 2010, https://edition.cnn.com/2010/WORLD/americas/08/26/mexico.human.trafficking/index.html (accessed February 20, 2020); Ioan Grillo, "The Mexico Drug Cartels' Other Business: Sex Trafficking," *Time*, July 31, 2013, https://world.time.com/2013/07/31/the-mexican-drug-cartels-other-business-sex-trafficking/ (accessed February 20, 2020).

[67] Stephanie Leutert, "Organized Crime and Central American Migration in Mexico," Robert Strauss Center for International Security and Law, June 2018, http://strausscenter.org/images/pdf/MSI/MSI-2017-2018_PoliciaPRP.pdf (accessed February 20, 2020).

[68] Tweet posted by US Consulate General Nuevo Laredo, Twitter, November 16, 2019, https://twitter.com/USAConNVL/status/1195785512176386048?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1195785514822991872&ref_url=https%3A%2F%2Fwww.borderreport.com%2Fhtopics%2Fborder-crime%2Famericans-warned-against-traveling-to-nuevo-laredo-curfew-imposed-on-us-government-employees%2F (accessed February 20, 2020); US Consulate General Nuevo Laredo, Security Alert Update, January 2, 2020, https://mx.usembassy.gov/security-alert-update-u-s-consulate-general-nuevo-laredo-january-2-2020/ (accessed February 20, 2020); López Dóriga Digital, "En Nuevo Laredo, Tamaulipas, civiles armados incendiaron varios vehículos para crear bloqueos en distintos puntos de la localidad (In Nuevo Laredo, Tamaulipas, armed civilians light various vehicles on fire to create blockades at different points in the city)," November 15, 2019, https://lopezdoriga.com/nacional/disparos-y-quema-de-vehiculos-en-nuevo-laredo-tras-enfrentamientos/ (accessed February 20, 2020).

<div align="center">AR483</div>

[69] Center for Gender and Refugee Studies and the American Civil Liberties Union to Acting Secretary of Homeland Security Chad F. Wolf, et al., December 9, 2019, https://www.aclu.org/other/re-implementation-migrant-protection-protocols-mpp-tamaulipas-state (accessed February 20, 2020).

[70] Human Rights First, "Delivered to Danger," May 13, 2020, https://www.humanrightsfirst.org/campaign/remain-mexico (accessed May 27, 2020).

[71] Human Rights Watch interviews with asylum seekers, (names withheld), Matamoros and Reynosa, Mexico, November 4-8, 2019, and Monterrey, Mexico, December 9-13, 2019.

[72] Ibid.

[73] Estados Unidos Mexicanos Secretaría de Gobernación, Instituto Nacional de Migracion, MPP totals at all ports of entry, (Copy on file with Human Rights Watch), Dec 31, 2019.

[74] Asylum seekers sometimes choose to take a longer route more than twice as long to the US-Mexico border, crossing near Tijuana in part so that they can avoid cartels that prey upon migrants as a means to make money ever since El Chapo and the Sinaloa Cartel dominated the drug trafficking industry in the west, forcing other cartels to diversify into other illegal activities such as kidnapping and extortion, human trafficking and smuggling, Nick Miroff, "Migrant Caravan: One Reason Central Americans Are Going All the Way to Tijuana to Reach the U.S. Border? El Chapo," Washington Post, November 15, 2018, (accessed on February 17, 2020) https://www.washingtonpost.com/world/2018/10/24/migrant-caravan-updates/?arc404=true; "At Least 4,000 Migrant on Way to US Have Died of Gone Missing in Last Four Years," Associated Press, December 5, 2018, (accessed February 17, 2020) Drug trafficking and gang violence have led to migrant deaths in Mexico as they travel northward, especially in the state of Tamaulipas, https://www.nbcnews.com/news/latino/least-4-000- migrants-way-u-s-have-died-or-n944046; In February 2019, 25 migrants were pulled off a bus in Tamaulipas state, and their whereabouts remain unknown, Kate Linthicum, "Mexico Launching Search for Migrants Pulled Off Bus by Gunmen Near the US Border," Los Angeles Times, March 13, 2019, (accessed February 17, 2020) https://www.latimes.com/world/la-fg-mexico-missing-migrants-20190313-story.html?; declassified documents show Mexican police helped kidnap and massacre hundreds of migrants, most of whom were Central Americans en route to the United States, in a Tamaulipas city and further show how cartels control police in parts of Mexico, Michael Evans, "Mexico: Los Zetas Drug Cartel Linked San Fernando Police to Migrant Massacres," The National Security Archive, December 22, 2014, (accessed February 17, 2020) https://nsarchive2.gwu.edu/NSAEBB/NSAEBB499/; Mexican police helped the Zetas Cartel in the "intercepting of" migrants, after which the migrants were forced to work as drug mules or killed – in three massacres, at least 314 migrants were killed, Associated Press, "Mexican Police Helped Cartel Massacre 193 Migrants, Documents Show," NPR, December 22, 2014, (accessed February 17, 2020) https://www.npr.org/2014/12/22/372579429/mexican-police-helped-cartel-massacre-193-migrants-documents-show; on March 7, masked gunmen kidnapped 19 migrants from a bus along a northern highway in Tamaulipas, Catherine E. Shoichet, "Investigators are Scrambling to Solve a Mystery Just Miles from the US-Mexico Border" CNN, March 16, 2019, (accessed February 17, 2020) https://edition.cnn.com/2019/03/16/americas/mexico-bus-migrants-missing/index.html; Debbie Nathan, "Trump's 'Remain in Mexico' Policy Exposes Migrants to Rape, and Murder in Dangerous Border Cities," The Intercept, July 14, 2019, (accessed February 20, 2020) https://theintercept.com/2019/07/14/trump-remain-inmexico-policy/; report documenting harms to asylum seekers, including those in the state of Tamaulipas, Human Rights First, "Trump Administration Delivers Asylum Seekers to Grave Danger in Mexico: 200+ publicly reported cases of rape, kidnapping, and assault just the tip of the iceberg," September 17, 2019, https://www.humanrightsfirst.org/resource/trump-administration-delivers-asylum-seekers-grave-danger-mexico-200-publicly-reported (accessed February 20, 2020); Asylum seekers face rape, kidnap, and assault in Tamaulipas and other parts of Mexico, Human Rights First, Complaint letter to the Office of the Inspector General, August 26, 2019, https://www.humanrightsfirst.org/resource/complaint-office-inspector-general-concerning-rape-kidnapping-assault-and-other-attacks (accessed February 20, 2020); Mexican authorities rescued 34 Central Americans migrants being held captive in Tamaulipas while continuing to search for two other large groups who were kidnapped in a bus while traveling there, Kristy V. Siegfried, The Refugee Brief, UNHCR, March 14, 2019, https://www.unhcr.org/refugeebrief/the-refugee-brief-14-march-2019/ (accessed February 20, 2020).

[75] "Level 4: Do Not Travel" advisory for the state of Tamaulipas warning that "Organized crime activity – including gun battles, murder, armed robbery, carjacking, kidnapping, forced disappearances, extortion, and sexual assault – is common along the northern border," that criminal groups "operate with impunity particularly along the border region from Reynosa northwest to Nuevo Laredo," and that "local law enforcement has limited capability to respond to crime incidents," US Department of State, Mexico Travel Advisory, December 17, 2019, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html (accessed February 17, 2020);

AR484

Tamaulipas has the most disappeared people at 5,657, U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, "Country Reports on Human Rights Practices – 2017, Mexico," https://www.state.gov/reports/2017-country-reports-on-human-rights-practices/mexico/ (accessed February 20, 2020); "Level 4: Do Not Travel" advisory for the state of Tamaulipas "due to crime and kidnapping," "[v]iolent crime, such as murder, armed robbery, carjacking, kidnapping, extortion, and sexual assault, is common," and warning that "[f]ederal and state security forces have limited capability to respond to violence in many parts of the state," Overseas Security Advisory Council, US Department of State Mexico Travel Advisory, April 10, 2019, https://www.osac.gov/Country/Mexico/Content/Detail/Report/bf2179c1-3f43-48c5-87fe-15f4aec6836d (accessed February 20, 2020); see also similar travel advisories from November 16, 2018, https://www.osac.gov/Country/Mexico/Content/Detail/Report/31f43935-a417-4854-b88f-15f4ad0fc3b6, and September 10, 2018, https://www.osac.gov/Country/Mexico/Content/Detail/Report/851120dd-8981-44de-a490-15f4ae86ad18 (accessed February 20, 2020).

[76] UN Human Rights Committee, General Comment No. 20, Article 7 (Forty-fourth session, 1992), Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI/GEN/1/Rev.1 at 30 (1994).

[77] Jennifer Medina, "Anyone Speak K'iche' or Mam? Immigration Courts Overwhelmed by Indigenous Languages," *New York Times*, March 19, 2019, https://www.nytimes.com/2019/03/19/us/translators-border-wall-immigration.html (accessed February 21, 2020); Camilo Montoya-Galvez, "U.S. to require Brazilian asylum-seekers to wait in Mexico for court hearings," *CBS News*, January 29, 2020, https://www.cbsnews.com/news/remain-in-mexico-expansion-us-to-require-brazilian-asylum-seekers-to-wait-in-mexico-for-hearings/

[78] Maria Verza, "In Nuevo Laredo and elsewhere, many migrants are stuck in Tamaulipas' lawless limbo," Associated Press, November 18, 2019, https://www.post-gazette.com/news/world/2019/11/17/Nuevo-Laredo-Mexico-migrants-border-US/stories/201911170222 (accessed February 20, 2020).

[79] Maria Verza, "Migrants Stuck in Lawless Limbo Within Sight of America," Associated Press, November 17, 2019, https://abcnews.go.com/International/wireStory/migrants-stuck-lawless-limbo-sight-america-67091445 (accessed February 21, 2020).

[80] Doctors Without Borders (MSF), "No Way Out: The Humanitarian Crisis for Migrants and Asylum Seekers Trapped Between the United States, Mexico and the Northern Triangle of Central America," February 2020, https://www.msf.org/report-no-way-out-central-american-migration (accessed February 20, 2020). MSF found that eight out of every 10 people (80%) they treated in Nuevo Laredo during the first nine months of 2019 reported being a victim of violence. About 44% of patients said they had experienced violence in the seven days prior to their consultation; 19% of the people seen by the MSF mental health program in Nuevo Laredo between January and September 2019 had been victims of kidnapping, and 63% of those said they had been abducted in the seven days prior to the consultation. In September 2019, out of 41 patients in Nuevo Laredo who were returned to Mexico by the US under the Migrant Protection Protocols (MPP), 18 had been kidnapped recently (44%) and an additional five patients (12%) had been the victim of an attempted kidnapping. In October, the percentage of kidnappings among those sent to Mexico under the MPP program increased to 75% (33 of the 44 new MSF patients). Doctors Without Borders email message to Human Rights Watch, March 11, 2020.

[81] UN Commission on Human Rights, Report of the Special Rapporteur on the Situation of Human Rights Defenders, Michel Forst, Mission to Mexico, February 12, 2018, https://www.ohchr.org/_layouts/15/WopiFrame.aspx?sourcedoc=/Documents/Issues/Defenders/A_HRC_37_51_Add%202.docx&action=default&DefaultItemOpen=1 (accessed February 21, 2020).

[82] Human Rights Watch interviews with asylum seekers, (names withheld), Matamoros and Reynosa, Mexico, November 4-8, 2019, and Monterrey, Mexico, December 9-13, 2019; Sworn declarations by Daniel G., Yago R., and Enrique H., (names withheld), taken by Jennifer Harbury, Monterrey, Mexico, August 4, 2019 (on file with Human Rights Watch); Attorney notes from nonrefoulement interview, (names withheld), on file with Human Rights Watch, Laredo and Brownsville, Texas.

[83] Human Rights Watch interviews with asylum seekers, (names withheld), Matamoros and Reynosa, Mexico, November 4-8, 2019, and Monterrey, Mexico, December 9-13, 2019; sworn declarations by Daniel G., Yago R., and Enrique H., (names withheld), taken by Jennifer Harbury, Monterrey, Mexico, August 4, 2019 (on file with Human Rights Watch); attorney notes from nonrefoulement interview, (names withheld), on file with Human Rights Watch, Laredo and Brownsville, Texas.

[84] Human Rights Watch interviews with asylum seekers, (names withheld), Matamoros and Reynosa, Mexico, November 4-8, 2019, and Monterrey, Mexico, December 9-13, 2019.

[85] Estados Unidos Mexicanos Secretaría de Gobernación, Instituto Nacional de Migración, MPP Program–Chihuahua, June 18, 2019, and MPP Program–Tijuana and Mexicali, June 13, 2019, (copies on file with Human Rights Watch).

[86] Maria Verza, "In Nuevo Laredo and elsewhere, many migrants are stuck in Tamaulipas' lawless limbo," Associated Press, November 18, 2019, https://www.post-gazette.com/news/world/2019/11/17/Nuevo-Laredo-Mexico-migrants-border-US/stories/201911170222 (accessed February 20, 2020).

[87] Memorandum from Kirstjen Nielsen, secretary, Department of Homeland Security, to L. Francis Cissna, director, US Citizenship and Immigration Services, Kevin McAleenan, commissioner, US Customs and Border Protection, Ronald Vitiello, deputy director and senior official performing the duties of director, US Immigration and Customs Enforcement, January 25, 2019, https://www.dhs.gov/sites/default/files/publications/19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf (accessed February 21, 2020).

[88] Human Rights Watch interviews (names withheld), Monterrey and Matamoros, Mexico, November 5-8 and December 9-13, 2019; Sworn declarations, taken by Jennifer Harbury, on file with Human Rights Watch, Monterrey, Mexico, August 4, 2019; Attorney notes from nonrefoulement interview, (names withheld), on file with Human Rights Watch, Laredo and Brownsville, Texas.

[89] Transcript of press briefing, Acting Customs and Border Protection Commissioner Mark Morgan, Washington D.C., November 14, 2019, https://www.whitehouse.gov/briefings-statements/press-briefing-acting-cbp-commissioner-mark-morgan-2/ (accessed February 21, 2020).

[90] Erica Evans, "A pastor was kidnapped. White tents go up. In Nuevo Laredo, the border crisis is reaching a tipping point," *Deseret News*, August 22, 2019, https://www.deseret.com/2019/8/22/20828880/nuevo-loredo-mexico-border-crisis-immigration (accessed February 21, 2020); Julian Resendiz, "Gunmen beat and rob Cuban migrants inside Juarez shelter," KVEO, September 4, 2019, https://www.kveo.com/news/gunmen-beat-and-rob-cuban-migrants-inside-juarez-shelter/ (Accessed February 21, 2020); Silvia Forster-Frau, "Gangs profit from Trump's 'Remain in Mexico' policy," *San Antonio Express-News*, September 29, 2019, https://www.expressnews.com/news/local/article/Gangs-profit-from-Trump-s-Remain-in-14474477.php (accessed May 27, 2020).

[91] Patrick J. McDonnell, "Pastor's kidnapping underscores threat to migrants returned to Mexican border towns," *Los Angeles Times*, September 2, 2019, https://www.latimes.com/world-nation/story/2019-09-01/kidnapping-of-pastor-in-mexican-border-town-dramatizes-threats-to-migrants (accessed February 21, 2020); "La ONU-DH llama a intensificar la búsqueda de dos defensores de derechos de migrantes desaparecidos en Nuevo Laredo (The UN-DH calls to intensify the search for two missing migrant rights defenders in Nuevo Laredo)," United Nations High Commissioner for Human Rights press release, September 5, 2019, https://www.hchr.org.mx/index.php?option=com_k2&view=item&id=1319:la-onu-dh-llama-a-intensificar-la-busqueda-de-dos-defensores-de-derechos-de-migrantes-desaparecidos-en-nuevo-laredo&Itemid=265 (accessed February 21, 2020).

[92] "Aaron Casimiro Méndez Ruíz y Alfredo Castillo respecto de México," Inter-American Commission on Human Rights resolution 51/2019, October 4, 2019, https://www.oas.org/es/cidh/decisiones/pdf/2019/51-19MC870-19-MX.pdf (accessed February 21, 2020); "La ONU-DH llama a intensificar la búsqueda de dos defensores de derechos de migrantes desaparecidos en Nuevo Laredo (The UN-DH calls to intensify the search for two missing migrant rights defenders in Nuevo Laredo)," United Nations High Commissioner for Human Rights press release, September 5, 2019, https://www.hchr.org.mx/index.php?option=com_k2&view=item&id=1319:la-onu-dh-llama-a-intensificar-la-busqueda-de-dos-defensores-de-derechos-de-migrantes-desaparecidos-en-nuevo-laredo&Itemid=265 (accessed February 21, 2020).

[93] Tweet posted by Taylor Levy, Twitter, February 11, 2020, https://twitter.com/taylorklevy/status/1227300091838394368?s=20 (accessed February 21, 2020); Human Rights First, "Delivered to Danger," May 13, 2020, https://www.humanrightsfirst.org/campaign/remain-mexico (accessed May 27, 2020).

[94] Transcript of press briefing, Acting Customs and Border Protection Commissioner Mark Morgan, Washington D.C., November 14, 2019, https://www.whitehouse.gov/briefings-statements/press-briefing-acting-cbp-commissioner-mark-morgan-2/ (accessed February 21, 2020); Immigration court notices to appear on file with Human Rights Watch.

[95] Tweet posted by Michelle Hackman, Twitter, February 11, 2020, https://twitter.com/MHackman/status/1227254791220473858 (accessed February 21, 2020).

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 493 of 688   PageID 2150

[96] Tweet posted by Taylor Levy, Twitter, February 11, 2020, https://twitter.com/taylorklevy/status/1227300093142816816 (accessed February 21, 2020).

[97] Tweet posted by Taylor Levy, Twitter, February 11, 2019, https://twitter.com/taylorklevy/status/1227300094006849537 (accessed February 21, 2020).

[98] UN Commission on Human Rights, Report of the Special Rapporteur on the Situation of Human Rights Defenders, Michel Forst, Mission to Mexico, February 12, 2018, https://www.ohchr.org/_layouts/15/WopiFrame.aspx?sourcedoc=/Documents/Issues/Defenders/A_HRC_37_51_Add%202.docx&action=default&DefaultItemOpen=1 (accessed February 21, 2020).

[99] Human Rights Watch interviews (names withheld) and observations at Matamoros encampment, November 5-8, 2019; Reynaldo Leaños Jr., "Mental Health Crisis Grows In Border Camps Filled With Hopeless, Depressed Migrants," *Texas Public Radio*, January 19, 2020, https://www.tpr.org/post/mental-health-crisis-grows-border-camps-filled-hopeless-depressed-migrants (accessed February 21, 2020); Doctors Without Borders, "Hopelessness and anxiety: the consequences of waiting for US asylum," December 18, 2019, https://www.msf.org/reality-asylum-seekers-mexico-us-border (accessed February 21, 2020).

[100] Human Rights Watch interview with Hugo O. in Matamoros, Mexico, November 6, 2019.

[101] Human Rights Watch interview with Jennifer Harbury, Reynosa, Mexico, November 6, 2019.

[102] US Department of Justice, EOIR Operational Status During Coronavirus Pandemic, https://www.justice.gov/eoir/eoir-operational-status-during-coronavirus-pandemic, (viewed May 27, 2020).

[103] "Widespread outbreak of coronavirus is 'inevitable,' health authorities say," *Mexico News Daily*, March 12, 2020, https://mexiconewsdaily.com/news/coronavirus/widespread-outbreak-of-coronavirus-inevitable/ (accessed May 27, 2020).

Your tax deductible gift can help stop human rights violations and save lives around the world.

**$50**                                   **$100**

$250                                       **$500**

**$1000**                                 **Other**

DONATE NOW

Region / Country Immigration, US Poverty and Economic Inequality, Racial Discrimination

Tags Coronavirus

Topic Refugees and Migrants, Refugees and Migrants, Asylum Seekers

**MORE READING**

AR487

May 20, 2020 | Blog

## US Should Rescind Guatemala Agreement that Compels Asylum-Seekers to Abandon Claims

### REPORTS

February 5, 2020 | Report

#### Deported to Danger

United States Deportation Policies Expose Salvadorans to Death and Abuse

July 2, 2019 | Report

#### "We Can't Help You Here"

US Returns of Asylum Seekers to Mexico

### MOST VIEWED

1  April 27, 2021 | Report

**A Threshold Crossed**



2  May 21, 2021 | Dispatches

**A Gold Medal for Homophobia in Japan**



3  May 20, 2021 | Dispatches

**Abandoned Corpses in Rural India Indicate Surge in Covid-19 Deaths**



4  April 27, 2021 | News Release

**Abusive Israeli Policies Constitute Crimes of Apartheid, Persecution**



5  May 12, 2020 | Report

**Covid-19 Fueling Anti-Asian Racism and Xenophobia Worldwide**



## Protecting Rights, Saving Lives

Human Rights Watch defends the rights of people in 90 countries worldwide, spotlighting abuses and bringing perpetrators to justice

**DONATE NOW**

AR488

## Get Updates On Rights Issues From Around The Globe

Enter an email address        Sign Up

## Connect With Us

Contact Us                                                                                    |

Corrections                                                                                   |

Privacy Policy                                                                                |

Permissions                                                                                   |

Blackbaud Security Incident

© 2021 Human Rights Watch

**Human Rights Watch** | 350 Fifth Avenue, 34th Floor | New York, NY 10118-3299 USA | **t** 1.212.290.4700

**Human Rights Watch** is a 501(C)(3) nonprofit registered in the US under EIN: 13-2875808

AR489

Official website of the Department of Homeland Security



**U.S. Department of
Homeland Security**

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Migrant Protection Protocols (Archive)

En español (/los-protocolos-de-protecci-n-migrantes)

The Migrant Protection Protocols (MPP) are a U.S. Government (USG) action whereby citizens and nationals of countries other than Mexico arriving in the United States by land from Mexico -- whether or not at a port of entry -- may be returned to Mexico pursuant to Section 235(b)(2) (C) of the Immigration and Nationality Act (INA) while their U.S. removal proceedings are pending under Section 240 of the INA. The Government of Mexico (GOM) has committed to provide aliens placed into MPP with appropriate humanitarian protections, including immigration documentation and access to education, healthcare and employment. (DHS Press Release - January 24, 2019 (/news/2019/01/24/migrant-protection-protocols) ). (U.S.-Mexico Joint Declaration - June 7, 2019 (https://2017-2021.state.gov/u-s-mexico-joint-declaration/index.html) )

*The U.S. Department of Homeland Security (DHS) and the U.S. Department of Justice (DOJ) remain committed to resuming removal hearings for aliens subject to MPP as expeditiously as possible. To lend greater certainty in a fluid COVID-19 environment, DHS has maintained close contact with the Department of State (DOS) and GOM and worked with DOJ to identify public health criteria to determine when hearings may resume swiftly and safely. For additional information see the DHS Press Release - July 17, 2020 (/news/2020/07/17/department-homeland-security-and-department-justice-announce-plan-restart-mpp) .*

# What gives DHS the authority to implement MPP? (#)

Section 235 of the INA addresses the inspection of aliens seeking admission into the United States and provides specific procedures regarding the treatment of those not clearly entitled to admission. Section 235(b)(2)(C) provides that "[i]n the case of an alien...who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the [U.S.}," the Secretary of Homeland Security "may return the alien to that territory pending a [removal] proceeding under [Section 240 of the INA]." Individuals in such removal proceedings have the ability to seek relief or protection from removal, including asylum.

## How does the MPP process work? (#)

Aliens subject to MPP are placed into removal proceedings under Section 240 of the INA before an immigration judge, just like any other alien in removal proceedings pursuant to Section 240 of the INA. Aliens generally remain in Mexico throughout the duration of their removal proceedings.

When aliens are placed into MPP, they are served with a notice to appear (NTA) with the time and location of their initial court hearing, in addition to an informational "tear sheet" -- provided in English, Spanish, or Portuguese, as appropriate -- instructing them of the *date* and *time* to appear at the designated port of entry (POE) where they will be transported or escorted to their immigration court hearing. Aliens placed in Section 240 proceedings, including those in MPP, are provided with a list of pro bono legal service providers specific to the court where their hearings will take place, and aliens in MPP can, at no expense to the government, contact the counsel of their choice.

Since DHS has already served aliens in MPP with NTAs that clearly state which day they are scheduled for court, it is unnecessary for them to wait at or near POEs. Aliens are informed on the tear sheets that they may not attempt to enter the identified POE for their hearings before the designated time on the tear sheets. Aliens are responsible for their own transportation to reach the POE to attend their removal hearings.

At the conclusion of their removal proceedings, aliens who receive final orders of removal are turned over to U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO). Aliens who are granted relief or protection from removal, including asylum, will be allowed to remain in the United States consistent with existing laws and policies.

DHS and the DOJ Executive Office for Immigration Review (EOIR) seek to conclude removal proceedings as expeditiously as possible.

# Why did DHS institute MPP? (#)

During Fiscal Year (FY) 2019, the United States faced a security and humanitarian crisis across the U.S. Southwest Border when nearly a million aliens who entered the United States illegally or without proper documentation were apprehended or encountered by U.S. Customs and Border Protection (CBP). To address this crisis, DHS used all appropriate resources and authorities to secure the borders; enforce immigration and customs laws; facilitate legal trade and travel; counter traffickers, smugglers, and transnational criminal organizations; and interdict drugs and contraband. (DHS Press Release - August 27, 2019 (/news/2019/08/27/dhs-reprogram-and-transfer-271-million-support-humanitarian-and-security-emergency) )

MPP is a program that helps restore a safe and orderly immigration process by reducing the incentive for aliens to attempt illegal entry and/or make meritless claims for relief or protection from removal in order to be released into the interior of the United States for the pendency of removal proceedings, for which many fail to appear. MPP also ensures that aliens who merit protection receive the relief or protection they need in a timely manner.

# Who is subject to MPP? (#)

With certain exceptions, MPP applies to citizens and nationals of countries other than Mexico arriving in the United States on land from Mexico, who are not clearly admissible and who are placed in removal proceedings under Section 240 of the INA.

# Are there any exclusions to who is subject to MPP? (#)

Aliens in the following categories are not amenable to MPP:

- Unaccompanied alien children (UACs),
- Citizens or nationals of Mexico,
- Aliens processed for expedited removal,
- Aliens in special circumstances:

- Returning lawful permanent residents (LPRs) seeking admission (subject to INA Section 212)

- Aliens with an advance parole document or in parole status

- Known physical/mental health issues

- Criminals/history of violence

- GOM or USG interest,

- Any alien who is more likely than not to face persecution or torture in Mexico, or

- Other aliens at the discretion of the Port Director or Chief Patrol Agent.

(Guiding Principles for Migrant Protection Protocols – January 28, 2019 (https://www.cbp.gov/document/guidance/migrant-protection-protocols) )

# Are mixed-nationality family units amenable to MPP? (#)

Non-Mexican national or citizen members of mixed-nationality family units may be considered for processing through MPP if doing so maintains family unity. This applies even if one or more member(s) of the family unit might be a nationality that is otherwise not generally amenable to MPP. Every effort is made to maintain the integrity of family units pending completion of removal proceedings, consistent with applicable law and policy. (Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols – December 7, 2020 (/publication/supplemental-policy-guidance-implementation-migrant-protection-protocols) )

# Are Mexican citizens or nationals amenable to MPP? (#)

Mexican citizens or nationals are not amenable to MPP. (Guiding Principles for Migrant Protection Protocols – January 28, 2019 (https://www.cbp.gov/document/guidance/migrant-protection-protocols) )

In the case of a family member who is a Mexican citizen or national, in order to maintain family unity, the Mexican citizen or national would be allowed to voluntarily withdraw his/her application for admission through a Form I-275 or be voluntarily returned to Mexico with the rest of the non-Mexican citizen/national family unit.

Case 2:21-cv-00067-Z Document 61 Filed 06/22/21 Page 500 of 688 PageID 2157

If a Mexican citizen or national (or a parent or legal guardian on behalf of a Mexican citizen or national child) expresses fear of return to Mexico, that individual must no longer be voluntarily returned to Mexico with the rest of the family unit. In that instance, and because the family unit cannot be separated pursuant to MPP, the entire family unit must not be processed for MPP or, if previously processed for MPP, the family unit must be removed from MPP and reprocessed as appropriate. (Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols – December 7, 2020 (/publication/supplemental-policy-guidance-implementation-migrant-protection-protocols) )

# Who is not amenable to MPP based on known physical or mental health issues? (#)

Generally, aliens who are determined not to be fit to travel by medical personnel should be excluded from MPP.

# How is non-amenability for known physical or mental health issues determined? (#)

Exemptions from MPP for aliens with known physical or mental health issues are decided on a case-by-case basis.

Following CBP's medical evaluation process -- which should consider potential physical and/or mental health issues related to an alien's disclosure of personal history -- determinations as to whether an alien is exempt from MPP due to known physical or mental health issues are generally to be made on a case-by-case basis at the local level with supervisory review. The Port Director or Chief Patrol Agent of each location should use his/her discretion to determine amenability on a case-by-case basis considering the totality of the circumstances. Aliens who receive medical clearance and are fit for travel, as determined by medical personnel, are amenable under MPP guidelines unless the Chief Patrol Agent or Port Director determines otherwise. (Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols – December 7, 2020 (/publication/supplemental-policy-guidance-implementation-migrant-protection-protocols) )

Though a particular situation may not in and of itself be considered a physical or mental health issue, conditions related to an alien's disclosed personal history (e.g., pregnancy, prior illness, or any other disclosed medical condition) should be taken into account during the

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 501 of 688   PageID 2158

medical assessment process, and may, on a case-by-case basis, constitute grounds for an alien to be excluded from MPP. (Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols – December 7, 2020 (/publication/supplemental-policy-guidance-implementation-migrant-protection-protocols) ) (Guiding Principles for Migrant Protection Protocols–MPP Amenability – December 7, 2020 (https://www.cbp.gov/document/guidance/migrant-protection-protocols)

# What if an alien processed for MPP needs medical attention while in CBP custody? (#)

If at any time an alien expresses a need for medical attention, or if a U.S. Customs and Border Protection (CBP) agent or officer observes that medical attention is warranted, that alien will be referred to on-site medical staff. The on-site medical staff will both screen the alien and make the determination about his/her immediate medical needs and whether emergent care is required. In this situation, CBP is to follow the guidance issued in its "Enhanced Medical Support Directive." (CBP Enhanced Medical Support Directive – December 30, 2019) (https://www.cbp.gov/sites/default/files/assets/documents/2019-Dec/CBP_Final_Medical_Directive_123019.pdf)

# What if an alien expresses a fear of return to Mexico? (#)

If an alien who is potentially subject to MPP, or has already been returned to Mexico pursuant to MPP, affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, at any time while he/she is in the United States, U.S. Customs and Border Protection (CBP) refers the alien to U.S. Citizenship and Immigration Services (USCIS) for an MPP assessment interview conducted by an asylum officer.

Aliens continue to have the ability to have retained counsel participate telephonically in USCIS's MPP non-refoulement assessments – where it does not delay the interview, or as required by court order.

Following the interview, the asylum officer assesses whether it is more likely than not that the alien will face persecution on account of a protected ground (i.e., race, religion, nationality, membership in a particular social group or political opinion), or torture, if returned to Mexico. The asylum officer's assessment is subject to review by a supervisory asylum officer.

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 502 of 688   PageID 2159

If USCIS makes a positive assessment that the individual is more likely than not to face persecution on account of a protected ground or torture in Mexico, the alien is not processed for MPP and may be processed/re-processed for any other available disposition. An alien who has already been placed into MPP with pending Section 240 proceedings will not be returned to Mexico, but will remain in Section 240 proceedings and will await their immigration court hearings in the United States. Pursuant to the INA and applicable regulations, U.S. Immigration and Customs Enforcement (ICE) determines whether aliens who are not eligible for return to Mexico under MPP are to be maintained in custody or paroled, or if another disposition is appropriate. ICE makes custody determinations for such aliens on a case-by-case basis, considering the facts and circumstances unique to each particular case. An alien who does not establish that it is more likely than not that he or she will face persecution on account of a protected ground or torture in Mexico may be returned to Mexico pending his/her removal proceedings.

# What if a member of a family unit in MPP expresses a fear of returning to Mexico? (#)

If any member of a family unit in MPP expresses a fear of returning to Mexico, then the entire family unit will await the adjudication of that claim before any return to Mexico can proceed, so long as there is not an independent basis to separate members of a family unit. If any member of a family unit establishes that he/she is more likely than not to suffer persecution on account of a protected ground or torture in Mexico, the entire family unit must not be processed for MPP or, if currently in MPP and in the United States together, must be removed from MPP and reprocessed as appropriate.

# What if a member of a family unit in MPP is granted relief or protection from removal? (#)

If any member(s) of a family unit processed under MPP is/are granted relief or protection from removal, the family member(s) (regardless of nationality) not granted relief or protection should be taken into ICE custody. A determination will be made regarding whether to detain or release the alien(s) into the United States pending completion of removal proceedings (including an administrative appeal) of all members of the family unit. (Supplemental Policy

Guidance for Implementation of the Migrant Protection Protocols – December 7, 2020

(/publication/supplemental-policy-guidance-implementation-migrant-protection-protocols) )

# Do aliens in MPP have access to counsel for their Section 240 removal proceedings? (#)

Yes, aliens may choose to retain their own legal counsel for their Section 240 removal proceedings. Section 240(b)(4)(A) of the INA provides that an alien in removal proceedings before an Immigration Judge "shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings." Similarly, Section INA 292 provides that "[i]n any removal proceedings . . . the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel . . . as he shall choose."

All aliens in MPP are given a list of pro bono legal service providers (whom aliens may contact if they choose) when initially processed. To facilitate access to counsel, aliens in MPP are instructed to arrive at the designated port of entry (POE) at the time and date indicated on the tear sheet, which is a time early enough to be processed at the POE and arrive at court before their scheduled hearings to provide time to meet with their retained attorneys or accredited representatives. Aliens can also communicate with their counsel of choice on their own accord at any other time.

# How do aliens in MPP access legal information if they do not have a lawyer? (#)

In addition to the resources on this website, the necessary forms from the DOJ Executive Office for Immigration Review (EOIR) are available in immigration court and on the EOIR website (https://www.justice.gov/eoir/self-help-materials) . Additionally, DHS understands that several migrant shelters in Northern Mexican cities make the EOIR forms and other Know Your Rights information available.

# How long will MPP court hearings take? (#)

The length of time needed for a removal hearing is subject to each Immigration Judge's discretion considering the circumstances of each case. However, aliens should plan to spend

AR497

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 504 of 688   PageID 2161

the entire day being processed for and attending court. If processes are not concluded that same day, some aliens may have to spend the night in U.S. Customs and Border Protection (CBP) custody and will be returned to Mexico as soon as all processes are concluded.

Immigration courts hear cases involving different aliens. There are other aliens who have court hearings on the same day, so it is not uncommon for aliens to wait for others to be processed at the port of entry (POE) and for other cases to be heard. Aliens will have access to food and water during the time they attend court and are in CBP or U.S. Immigration and Customs Enforcement (ICE) custody.

Aliens should generally expect to have a minimum of two court hearings on different days. However, it is common to have even more court hearings depending on the specific circumstances of each case.

## What services are provided in Mexico for aliens in MPP? (#)

GOM committed to providing documentation for aliens waiting in Mexico under MPP that provides access to education, healthcare and employment. GOM, as well as international and non-governmental organizations, have previously highlighted their efforts to establish new, or further equip existing, migrant shelters to which aliens in MPP also have access. (U.S.-Mexico Joint Declaration - June 7, 2019 (https://2017-2021.state.gov/u-s-mexico-joint-declaration/index.html) ).

## How does the public gain access to the Immigration and Hearing Facilities (IHFs) in Laredo and Brownsville? (#)

Consistent with DOJ Executive Office for Immigration Review (EOIR) policy and practice, individuals interested in observing immigration court proceedings can do so at either the physical court locations where the immigration judge is located, or at the IHFs in Laredo and Brownsville. Anyone can request access to the IHFs in Laredo and Brownsville by appearing in person at those facilities. Access will be granted on a case-by-case basis and, if at an IHF, in accordance with DHS rules and guidelines, as well as EOIR rules, orders and regulations.

Removal proceedings are generally open to the public in all immigration courts, with limited exceptions, as specified by law. Notably, an alien may be presenting issues in his/her case that

relate to sensitive matters that the alien may not want to be made public and are subject to privacy protections. As in any federal building, there are access control measures to ensure the safety of those who appear for official business. Attorneys and accredited representatives are provided the time and private space to meet with clients prior to hearings. (General Services Administration Rules and Regulations Governing Conduct on Federal Property – November 2005 (http://www.gsa.gov/cdnstatic/GSA_Rules_Reg_1105.pdf) ) (DOJ Immigration Court Practice Manual (https://www.justice.gov/eoir/file/1205666/download) ) (DOJ EOIR Fact Sheet – February 2017 (http://www.justice.gov/eoir/observing-immigration-court-hearings) )

## How does media gain access to the IHFs in Laredo and Brownsville? (#)

DHS may accommodate press requests to visit IHFs that are coordinated through DHS's Office of Public Affairs and consistent with existing procedures for access to U.S. Customs and Border Protection (CBP) ports of entry (POEs). Access will be granted on a case-by-case basis and, if at an IHF, in accordance with DHS rules and guidelines, as well as DOJ Executive Office for Immigration Review (EOIR) rules, orders and regulations. As in any federal building, there are access control measures to ensure the safety of those who appear for official business. (General Services Administration Rules and Regulations Governing Conduct on Federal Property – November 2005 (http://www.gsa.gov/cdnstatic/GSA_Rules_Reg_1105.pdf) ) (DOJ Immigration Court Practice Manual (https://www.justice.gov/eoir/file/1205666/download) ) (DOJ Executive Office for Immigration Review Fact Sheet – February 2017 (http://www.justice.gov/eoir/observing-immigration-court-hearings) )

## Are there resources for aliens who do not speak English? (#)

Yes. This is a long-standing DHS practice regardless of whether the alien has been processed pursuant to MPP.

For MPP, if the officer/agent is not fluent in the alien's preferred language, he/she should utilize in-person or telephonic interpretation to complete and serve documentation to the alien, including any explanation of the documents. (Migrant Protection Protocols Guiding Principles – Initial Document Service – December 7, 2020) (https://www.cbp.gov/document/guidance/migrant-protection-protocols) (Supplemental Policy Guidance

AR499

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 506 of 688   PageID 2163

for Implementation of the Migrant Protection Protocols – December 7, 2020 (/publication/supplemental-policy-guidance-implementation-migrant-protection-protocols) )

If an MPP-enrolled alien affirmatively states a fear of returning to Mexico while he/she is in the United States, the alien is referred to a U.S. Citizenship and Immigration Services (USCIS) asylum officer for an MPP assessment interview. When the asylum officer conducts the MPP assessment interview, the same protocols apply for language accommodation as in other USCIS fear screenings or *non-refoulement* interviews. If the alien is unable to proceed effectively in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview.

# Important Reminders for Aliens in MPP (#)

- The "alien number" is a nine-digit number that begins with the letter "A" and is found in the upper right-hand corner of the notice to appear (NTA). This is how the USG tracks each case. Aliens should have this number available when interacting with U.S. officials.

- Aliens should retain all documents received from U.S. officials. These documents contain important case information.

- Aliens will be allowed to enter the United States to attend immigration court on the date and at the location listed on the NTA or notice of hearing and on the tear sheet. There is no need to wait at or near the port of entry (POE). Aliens will not be allowed to enter for their hearing before this time, and those with an NTA or notice of hearing will not need to wait in line if they report at the designated time and location.

- Aliens may have to return to court for several hearings or may have their hearings rescheduled as part of normal court processes.

- Aliens may inquire with a GOM official about how to access education, employment and healthcare while in Mexico.

- In the event aliens in MPP have an address change while in Mexico, aliens should mail a completed Form EOIR-33, Alien's Change of Address, to the court where the case is assigned or bring a physical copy to their hearings. (DOJ Form EOIR-33 Immigration Court Listing (https://www.justice.gov/eoir/form-eoir-33-eoir-immigration-court-listing) )

- If an alien believes that DHS policies and activities have violated their civil rights or civil liberties, the alien may file a complaint with the DHS Office for Civil Rights and Civil Liberties (CRCL). More information can be found on the CRCL Compliance Branch website (/compliance-branch) .

**AR500**

# MPP Guidance Documentation (#)

- Policy Guidance for Implementation of the Migrant Protection Protocols – January 25, 2019 (/publication/policy-guidance-implementation-migrant-protection-protocols)

- Guiding Principles for Migrant Protection Protocols – January 28, 2019 (https://www.cbp.gov/document/guidance/migrant-protection-protocols)

- Implementation of the Migrant Protection Protocols (CBP Implementation Memorandum) – January 28, 2019 (https://www.cbp.gov/document/guidance/migrant-protection-protocols)

- Guidance on Migrant Protection Protocols (CBP OFO Implementation Memorandum) – January 28, 2019 (https://www.cbp.gov/document/guidance/migrant-protection-protocols)

- Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols (USCIS Implementation Memorandum) – January 28, 2019 (https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2019/2019-01-28-Guidance-for-Implementing-Section-35-b-2-C-INA.pdf)

- Implementation of the Migrant Protection Protocols (ICE Implementation Memorandum) – February 12, 2019 (https://www.ice.gov/factsheets/migrant-protection-protocols-mpp)

- Migrant Protection Protocols Guidance (ICE ERO Implementation Memorandum) – February 12, 2019 (https://www.ice.gov/factsheets/migrant-protection-protocols-mpp)

- Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols - December 7, 2020 (/publication/supplemental-policy-guidance-implementation-migrant-protection-protocols)

- Guiding Principles for Migrant Protection Protocols - Initial Document Service - December 7, 2020 (https://www.cbp.gov/document/guidance/migrant-protection-protocols)

- Guiding Principles for Migrant Protection Protocols - MPP Amenability - December 7, 2020 (https://www.cbp.gov/document/guidance/migrant-protection-protocols)

# Resources for Aliens in MPP (#)

*Self-Help Guides to Removal Proceedings and Common Forms of Relief*

Guides on the topics below related to removal proceedings can be found on EOIR's Self-Help Materials site in both English and Spanish (http://www.justice.gov/eoir/self-help-materials) .

- Notice to Appear
- Accessing an Attorney
- Fraud
- Change of Address and Change of Venue
- Bond
- Missed Hearing
- Asylum
- Voluntary Departure
- Appeal

# Additional "Know Your Rights" Information (In English, en Español and em Português) (#)

- Know Your Rights Pamphlet (in English) (/redirect?url=https%3A%2F%2Fwww.americanbar.org%2Fcontent%2Fdam%2Faba%2Fadministrative%2Fimmigration%2Fyour-rights%2Fknow_your_rights_english.pdf)

- Know Your Rights Video (in English) (/redirect?url=https%3A%2F%2Fwww.americanbar.org%2Fgroups%2Fpublic_interest%2Fimmigration%2Fprojects_initiativyour-rights%2F)

- Conozca sus derechos- folleto (en Español) (/redirect?url=https%3A%2F%2Fwww.americanbar.org%2Fcontent%2Fdam%2Faba%2Fadministrative%2Fimmigration%2Fyour-rights%2Fknow_your_rights_spanish.pdf)

- Conozca sus derechos- video (en Español) (/redirect?url=https%3A%2F%2Fwww.americanbar.org%2Fgroups%2Fpublic_interest%2Fimmigration%2Fprojects_initiativyour-rights%2F)

- Conheça seus direitos- panfleto (em Português) (/redirect?url=https%3A%2F%2Fwww.americanbar.org%2Fcontent%2Fdam%2Faba%2Fadministrative%2Fimmigration%2Fyour-rights%2Fknow_your_rights_portuguese.pdf)

AR502

# Press Release Archive (#)

- DHS Statement on the Suspension of New Enrollments in the Migrant Protection Protocols Program (/news/2021/01/20/dhs-statement-suspension-new-enrollments-migrant-protection-protocols-program) - January 20, 2021

- Department of Homeland Security Announces Supplemental Guidance for MPP Implementation (/news/2020/12/07/dhs-announce-supplemental-guidance-mpp-implementation) - December 7, 2020

- Migrant Protection Protocols (CBP Statistics) (https://www.cbp.gov/newsroom/stats/migrant-protection-protocols) - August 7, 2020

- Department of Homeland Security and Department of Justice Announce Plan to Restart MPP Hearings (/news/2020/07/17/department-homeland-security-and-department-justice-announce-plan-restart-mpp) – July 17, 2020

- Joint DHS/EOIR Statement on MPP Rescheduling (/news/2020/06/16/joint-dhseoir-statement-mpp-rescheduling) – June 16, 2020

- Joint DHS/EOIR Statement on the Rescheduling of MPP Hearings (/news/2020/05/10/joint-dhseoir-statement-rescheduling-mpp-hearings) – May 10, 2020

- Weekly Update: DHS Response to COVID-19 (/news/2020/05/04/weekly-update-dhs-response-covid-19) – May 4, 2020

- Joint DHS/EOIR Statement on MPP Rescheduling (/news/2020/04/30/joint-dhseoir-statement-mpp-rescheduling) – April 30, 2020

- Joint DHS/EOIR Statement on MPP Rescheduling (/news/2020/04/01/joint-dhseoir-statement-mpp-rescheduling) – April 1, 2020

- Joint Statement on MPP Rescheduling (/news/2020/03/23/joint-statement-mpp-rescheduling) – March 23, 2020

- DHS Expands MPP To Brazilian Nationals (/news/2020/01/29/dhs-expands-mpp-brazilian-nationals) – January 29, 2020

- DHS Begins MPP Returns at Nogales Port of Entry in Arizona (/news/2020/01/02/dhs-begins-mpp-returns-nogales-port-entry-arizona) – January 2, 2020

- DHS Expands MPP Operations to Eagle Pass (/news/2019/10/28/dhs-expands-mpp-operations-eagle-pass) – October 28, 2019

- Assessment of the Migrant Protection Protocols (/sites/default/files/publications/assessment_of_the_migrant_protection_protocols_mpp.pdf) – October 28, 2019

**AR503**

- Statement from the Department of Homeland Security following the Acting Secretary's appearance at Georgetown University this morning (/news/2019/10/07/statement-department-homeland-security-following-acting-secretary-s-appearance) – October 7, 2019

- Acting Secretary McAleenan Announces End to Widespread Catch and Release (/news/2019/09/23/acting-secretary-mcaleenan-announces-end-widespread-catch-and-release) – September 23, 2019

- DHS to Reprogram and Transfer $271 Million to Support Humanitarian and Security Emergency Response (/news/2019/08/27/dhs-reprogram-and-transfer-271-million-support-humanitarian-and-security-emergency) – August 27, 2019

- Transcript: Press Conference in Yuma, AZ on August 8, 2019 (/news/2019/08/09/transcript-press-conference-yuma-az-august-8-2019) – August 9, 2019

- Secretary Nielsen, President Trump Assess Humanitarian and Security Emergency Response in Calexico, CA (/news/2019/04/07/secretary-nielsen-president-trump-assess-humanitarian-and-security-emergency) – April 7, 2019

- Secretary Nielsen Orders CBP to Surge More Personnel to Southern Border, Increase Number of Aliens Returned to Mexico (/news/2019/04/01/secretary-nielsen-orders-cbp-surge-more-personnel-southern-border-increase-number) – April 1, 2019

- Secretary Nielsen Meets with Mexican Officials on Border Emergency, Travels to Honduras to Meet with Northern Triangle Governments to Address Crisis at Source (/news/2019/03/26/secretary-nielsen-meets-mexican-officials-border-emergency-travels-honduras-meet) – March 26, 2019

- Readout from Secretary Nielsen's Trip to San Diego (/news/2019/01/29/readout-secretary-nielsen-s-trip-san-diego) – January 29, 2019

- Migrant Protection Protocols (/news/2019/01/24/migrant-protection-protocols) – January 24, 2019

- Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration (/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration) – December 20, 2018

# Metrics and Measures (#)

DHS remains committed to using all available tools to address the unprecedented security and humanitarian crisis at the southern border of the United States. At the peak of the crisis in May 2019, there were more than 4,800 undocumented aliens attempting to cross the border into the United States daily.

AR504

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 511 of 688   PageID 2168

MPP is a core component of the U.S. Government's efforts to address the migration crisis along the U.S.-Mexico border. MPP streamlines existing avenues for aliens in removal proceedings who qualify for humanitarian protection in the United States to receive it in order to support an orderly and timely completion of U.S. immigration processes. At the same time, MPP provides a deterrent to illegal entry into the United States, and it prevents "catch and release" from DHS custody, including for those whose claims of fear to return to their home countries prove not to be merit relief or protection from an immigration judge.

Further information about how DHS is meeting the intended goals of MPP can be found on the MPP Metrics and Measures Publication Page (/publication/metrics-and-measures) .

Last Published Date: April 14, 2020

AR505

**OFFICE OF INSPECTOR GENERAL**

# CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry

Homeland Security

AR506

**October 27, 2020**

**OIG-21-02**

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

October 27, 2020

MEMORANDUM FOR:    Mark A. Morgan
Senior Official Performing the Duties of the
Commissioner
U.S. Customs and Border Protection

FROM:    Joseph V. Cuffari, Ph.D.
Inspector General

JOSEPH V
CUFFARI

Digitally signed by JOSEPH
V CUFFARI
Date: 2020.10.27 14:48:03
-04'00'

SUBJECT:    *CBP Has Taken Steps to Limit Processing of
Undocumented Aliens at Ports of Entry*

For your action is our final report, *CBP Has Taken Steps to Limit Processing
of Undocumented Aliens at Ports of Entry*.  We incorporated the formal
comments provided by U.S. Customs and Border Protection (CBP).

The report contains three recommendations aimed at bringing CBP operations
in line with long-established practices and promoting the efficient processing of
undocumented aliens.  CBP concurred with two of the three recommendations.
Based on information provided in the response to the draft report, we consider
one recommendation unresolved and open and two recommendations resolved
and open.  Once your office has fully implemented the recommendations,
please submit a formal closeout letter to us within 30 days so that we may
close the recommendations.  The memorandum should be accompanied by
evidence of completion of agreed-upon corrective actions.  Please send your
response or closure request to OIGSREFollowup@oig.dhs.gov.

Consistent with our responsibility under the *Inspector General Act*, we will
provide copies of our report to congressional committees with oversight and
appropriation responsibility over the Department of Homeland Security.  We
will post the report on our website for public dissemination.

Please call me with any questions, or your staff may contact Thomas Kait,
Assistant Inspector General for Special Reviews and Evaluations,
at (202) 981-6000.



# DHS OIG HIGHLIGHTS

### *CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry*

**October 27, 2020**

## Why We Did This Review

We conducted this review to determine whether U.S. Customs and Border Protection (CBP) was turning away asylum seekers at the Southwest Border ports of entry.

## What We Recommend

We made three recommendations aimed at bringing CBP operations in line with long-established practices and promoting the efficient processing of undocumented aliens.

**For Further Information:**
Contact our Office of Public Affairs at (202) 981-6000, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov

## What We Found

In May 2018, DHS and CBP leaders anticipated an increase in undocumented aliens seeking entry at the southern border. In response, the leaders urged undocumented aliens seeking protection under U.S. asylum laws ("asylum seekers") to enter the United States legally at ports of entry rather than illegally between ports. At the same time, the leaders asked CBP for "the number of [undocumented aliens] that would likely be turned away" if all ports conducted "Queue Management," a practice that posts CBP officers at or near the U.S.-Mexico border to control the number of undocumented aliens entering U.S. ports of entry. After learning that 650 aliens would be prevented from entering ports every day, in June 2018, then-DHS Secretary Kirstjen Nielsen authorized the practice. Nielsen also informed CBP ports that while processing undocumented aliens is a component of its mission, they should focus on other priorities, including detection and apprehension of narcotics and currency smugglers.

We found CBP took several additional actions to limit the number of undocumented aliens processed each day at Southwest Border land ports of entry. For instance, without prior public notice, seven ports of entry stopped processing virtually all undocumented aliens, including asylum seekers. Instead, CBP redirected them to other port locations. This redirection contravenes CBP's longstanding practice to process all aliens at a "Class A" port of entry or reclassify the port of entry. Moreover, although asylum seekers legally must be processed once physically within the United States, we found CBP staff turned away asylum seekers at four ports *after* they had already entered the United States. After waiting in Queue Management lines or being redirected to other ports, some asylum seekers and other undocumented aliens crossed the border illegally between ports of entry.

## CBP Response

CBP concurred with all recommendations, except one.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Table of Contents

Introduction ................................................................................ 3

Background ................................................................................. 3

Results of Review ........................................................................ 6

    DHS Urged Asylum Seekers to Come to Ports of Entry, But Reassigned
    Staff away from Asylum Processing ....................................... 7

    Without Notice to the Public, CBP Stopped Routine Processing of Most
    Undocumented Aliens, Including Asylum Seekers, at Seven Ports and
    Redirected Them to Other Ports .......................................... 10

    CBP Returned to Mexico Asylum Seekers Who Had Already Entered the
    United States ................................................................... 15

    CBP Did Not Use All Available Detention Space .................... 16

Conclusion ................................................................................ 18

Recommendations ...................................................................... 19

### Appendixes

    Appendix A:  Objective, Scope, and Methodology ................. 23
    Appendix B:  CBP Comments to the Draft Report ................. 25
    Appendix C:  Timeline of Asylum Processing Significant
                    Events in 2018 ........................................... 31
    Appendix D:  Office of Special Reviews and Evaluations Major
                    Contributors to This Report ........................... 32
    Appendix E:  Report Distribution ....................................... 33

### Abbreviations

| | |
|---|---|
| AUSA | Assistant United States Attorney |
| CBP | U.S. Customs and Border Protection |
| C.F.R. | Code of Federal Regulations |
| ICE | U.S. Immigration and Customs Enforcement |
| INA | Immigration and Nationality Act |
| MPP | Migrant Protection Protocol |



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

| | |
|---|---|
| NTA | Notice to Appear |
| OFO | Office of Field Operations |
| OIG | Office of Inspector General |
| POE | Port of Entry |
| TEDS | CBP National Standards on Transport, Escort, Detention, and Search |
| U.S.C. | United States Code |

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

# Introduction

From May through June 2018, in response to a surge of undocumented aliens attempting to enter the United States DHS senior leaders publicly urged those seeking asylum to lawfully present themselves at U.S. ports of entry, where U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) officers would process them.  However, DHS and CBP leadership did not take steps to maximize CBP's processing capability at ports of entry.  Instead, they instituted policies and took actions that limited the number of undocumented aliens, including asylum seekers, processed at the ports.

# Background

The *Immigration and Nationality Act* (INA) allows individuals who have fled their home countries because of persecution on account of their race, religion, nationality, membership in a particular social group, or political opinion to apply for asylum or other humanitarian protections in the United States.[1] These individuals may express fear of persecution or torture, a fear of return to their country, or an intent to seek asylum to the CBP OFO officers they encounter when they arrive at U.S. ports of entry, or to U.S. Border Patrol agents if these individuals are apprehended after crossing illegally between ports.

## CBP Processing of Asylum Seekers at Southwest Border Ports of Entry

CBP refers to aliens who are not in possession of documents allowing them entry into the United States — e.g., a travel visa — as "undocumented aliens." This category of aliens includes asylum seekers,[2] who generally arrive without visas or other legal documentation that authorize entry to the United States.[3] When an undocumented alien arrives at a land port of entry and is processed for expedited removal, CBP OFO officers ask specific questions during processing[4] to determine whether the alien has a fear of persecution or torture in his or her home country or intends to seek asylum, such that the individual

---

[1] *See* 8 U.S.C. §§ 1158, 1225(b)(1)(A)(ii), 1231(b)(3)(A) & note.

[2] Throughout this report, we refer to undocumented aliens who express a fear of returning to their home country or intention to apply for asylum in the United States as asylum seekers.

[3] Other undocumented aliens could potentially include individuals who seek temporary humanitarian entry to attend a funeral or obtain medical care.

[4] CBP's processing includes verifying the alien's identity, checking databases for outstanding warrants or criminal history, searching the alien for drugs or contraband, taking statements from the alien, and requesting follow-on placement with U.S. Immigration and Customs Enforcement.  CBP also refers asylum seekers to U.S. Citizenship and Immigration Services for further processing of their asylum claims.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

should be placed in the asylum adjudication process.  In fiscal year 2018, CBP Southwest Border ports processed 38,269 undocumented aliens seeking asylum, representing approximately one-third of the nearly 125,000 undocumented aliens who arrived at U.S. ports of entry that year.

After processing, CBP OFO holds asylum seekers and other undocumented aliens at the port of entry until U.S. Immigration and Customs Enforcement (ICE) takes custody of the aliens and determines whether to place them in immigration detention or release them.  ICE maintains detention centers for single adults and families, but transfers unaccompanied or separated alien children to the Department of Health and Human Services, Office of Refugee Resettlement, for placement pending adjudication of the asylum claim.

From 2014 through 2018, surges, or "caravans," of undocumented aliens sought to enter the United States through the Southwest Border.  For example, CBP experienced a surge of unaccompanied alien children in 2014, and a surge of Haitian migrants in 2016.  Some came through the ports, while others entered illegally, between the ports of entry.[5]  In 2018, the caravans consisted of more families and unaccompanied alien children, and a greater number of asylum seekers, than in the past.

At times, these surges created overcrowded conditions at CBP port of entry holding facilities, which presented health and safety concerns to both officers and aliens.  The increase in families and unaccompanied children posed additional challenges for ports of entry because CBP national standards require holding vulnerable populations, such as families and children, separately and generally for no longer than 72 hours.[6]  Most ports were designed before the standards were established and before CBP OFO experienced surges of asylum seekers, especially families.  As a result, many ports do not have enough room to hold vulnerable populations separately.[7]  Similarly, ICE has limited detention bed space available to hold families.

---

[5] CBP's U.S. Border Patrol is responsible for processing aliens who have crossed into the United States illegally, between the ports of entry, including those who express an intent to seek asylum.

[6] U.S. Customs and Border Protection, *National Standards on Transport, Escort, Detention, and Search* (TEDS), October 2015. For example, TEDS, 5.0, requires CBP to hold families, unaccompanied children, single adults, and transgender individuals in separate spaces. TEDS, 4.1, also provides that "[d]etainees should generally not be held for longer than 72 hours in CBP hold rooms or holding facilities.  Every effort must be made to hold detainees for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and as operationally feasible."

[7] As reported in *Results of Unannounced Inspections of Conditions for Unaccompanied Alien Children in CBP Custody,* OIG-18-87, in the past, some CBP ports converted offices and conference rooms to hold rooms to accommodate more people in the processing areas.

AR512



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

In 2016, during the surge of Haitian asylum seekers, CBP's San Ysidro port of entry in California, in cooperation with the Mexican government, developed a new approach for preventing overcrowding and health and safety concerns. CBP officers and Mexican government officials began stopping asylum seekers and other undocumented aliens from crossing the international boundary into the U.S. port of entry.  Instead, those aliens were required to put their names on a waiting list until CBP had space and staff to process them.  The asylum seekers and other undocumented aliens waited in Mexico until CBP notified the Mexican government of the number of aliens CBP could take, and the Mexican government then delivered that number to the port.  This practice became known as "Queue Management," though it is also referred to as "metering" or establishing a "limit line."[8]

Since 2016, CBP has used Queue Management at various times to control the flow of undocumented aliens into ports of entry.  Most recently, in 2018, as migrant caravans arrived to the Southwest Border and the number of undocumented aliens seeking to enter the United States increased, CBP again began assigning officers to the limit line in an effort to control the number of aliens entering the ports.  Since July 2018, Queue Management has become standard practice, with all Southwest Border ports implementing limit lines.

We initiated this review in response to two congressional requests and significant public interest in how CBP processes asylum seekers at ports of entry.  Additionally, the U.S. Office of Special Counsel forwarded a whistleblower complaint related to similar issues at one port of entry.  In 2018, we conducted unannounced site visits to 12 of the 24 land ports of entry across the four CBP field offices along the Southwest Border, where we interviewed CBP staff and observed port operations.[9]  We also evaluated CBP's policies and procedures for processing asylum seekers and other undocumented aliens.[10]

---

[8] At the time of our fieldwork, CBP OFO was piloting another initiative.  On January 28, 2019, the San Diego Field Office started the Migrant Protection Protocol (MPP).  Under the MPP, certain undocumented aliens arriving from Mexico are required to stay in Mexico to await future immigration proceedings in the United States (e.g., hearing before a U.S. immigration court).

[9] CBP operates 24 land ports of entry along the Southwest Border comprising 46 crossing points; some ports have multiple crossing points or gates, e.g., the Nogales port of entry has three crossing points: DeConcini, Mariposa, and Morley Gate.  Four field offices oversee the ports: San Diego in California; Tucson in Arizona; and El Paso and Laredo in Texas.

[10] Some laws and policies apply specifically to asylum seekers, while others apply to the broader category of undocumented aliens, which includes both asylum seekers and other aliens attempting to enter the country without valid documents.  Throughout this report, we

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Some of the issues we discuss in this report are similar to or the same as issues raised in lawsuits filed by a non-governmental organization and state governments. Specifically, the legality of CBP's Queue Management practice — i.e., the practice of CBP officers standing at a "limit line" position at or near the U.S.-Mexico border to control the number of undocumented aliens entering U.S. ports of entry — currently is being litigated in the court system. See *Al Otro Lado, Inc. v. Nielsen*, 17-cv-2366 (S.D. Cal. 2017).[11]

Accordingly, DHS Office of Inspector General (OIG) does not take a position on the legality of this practice, and will await a final determination by the courts.

# Results of Review

In May 2018, DHS and CBP leaders anticipated an increase in undocumented aliens seeking entry at the southern border. In response, the leaders urged asylum seekers to present their claims at ports of entry rather than presenting the claims after the individuals crossed the border illegally. However, a few weeks later, then-Secretary Kirstjen Nielsen asked CBP for the estimated "number of [undocumented aliens] that would likely be turned away" if all ports conducted "Queue Management." After learning that CBP could turn away 650 undocumented aliens every day, - the Secretary instructed ports to implement Queue Management. This involved CBP officers standing at a "limit line" position at or near the U.S.-Mexico border to control the flow of undocumented aliens entering CBP ports for processing. Further, the Secretary told the ports that processing inadmissible aliens (who include asylum seekers) was not one of CBP's main priorities, and they should consider re-assigning staff away from processing such aliens to focus instead on detection and apprehension of narcotics and currency smugglers.[12]

In addition, we found CBP took several actions to limit the number of undocumented aliens who could be processed each day at the Southwest Border land ports of entry. Seven ports effectively stopped processing undocumented aliens, despite being designated as Class A ports, which are "Port[s] of Entry for all aliens," not just those with documents, according to 8

---

refer to asylum seekers and undocumented aliens, both together and separately as appropriate.

[11] The plaintiffs allege violations of 8 U.S.C. §§ 1158, 1225, 1229; 8 C.F.R. Parts 208, 235; U.S. Const. Amend. V; the *1951 Convention on the Rights of Refugees*; and section 706 of the *Administrative Procedure Act*.

[12] June 5, 2018 Memorandum from Secretary Nielsen, "Prioritization-Based Queue Management."



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

C.F.R. § 100.4.  CBP broke with a longstanding practice by changing the categories of aliens it would process at these seven ports without changing the ports' classification.  When asylum seekers and other undocumented aliens appeared at these seven ports, CBP officers redirected them to other ports, some of which were more than 30 miles away.  We observed CBP officers telling aliens the port was at capacity and did not have the capability to process them, regardless of actual capacity and capability at the time.  Further, four CBP ports turned away asylum seekers who had already stepped into the United States, telling them to return to Mexico.  Also, at two other ports we visited, CBP had stopped using blocks of available holding cells, allowing those cells to sit empty while asylum seekers and other undocumented aliens waited in the Queue Management lines in Mexico.  As the lines grew longer, some asylum seekers and other undocumented aliens may have crossed the border illegally, between ports of entry, where U.S. Border Patrol is responsible for apprehending and holding them.

## DHS Urged Asylum Seekers to Come to Ports of Entry, But Reassigned Staff away from Asylum Processing

Following the April 2018 announcement of the Zero Tolerance Policy, DHS and CBP began urging asylum seekers in May 2018 to come to ports of entry rather than attempt to enter the United States illegally between ports of entry.  At the same time, DHS and CBP directed ports to assign staff away from processing undocumented aliens, including asylum seekers, to other duties at the ports.  Appendix C provides a brief timeline of significant events from April to August 2018 related to CBP's asylum processing.

On April 6, 2018, then-Attorney General Jeff Sessions announced a "Zero Tolerance Policy,"[13] which, as implemented by DHS, required CBP to refer for prosecution every adult who entered the United States illegally, including those

---

[13] In an April 6, 2018 memo, the Attorney General directed United States Attorney's Offices along the Southwest Border, in consultation with the Department of Homeland Security, to adopt a Zero Tolerance Policy for all Improper Entry by Alien offenses, and refer them for prosecution under 8 United States Code (U.S.C.) § 1325(a).  In a press release announcing the "Zero Tolerance Policy," the Department of Justice said, "The implementation of the Attorney General's zero-tolerance policy comes as the Department of Homeland Security reported a 203 percent increase in illegal border crossings from March 2017 to March 2018, and a 37 percent increase from February 2018 to March 2018—the largest month-to-month increase since 2011." https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

AR515



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

traveling with their children.  As a result, parents who entered illegally were separated from their children upon referral for prosecution.[14]

After implementation of the Zero Tolerance Policy, then-DHS Secretary Nielsen and OFO Executive Assistant Commissioner Todd Owen made several public statements urging asylum seekers to come to the ports of entry instead of crossing illegally and risking separation from family members.  For instance, on May 8, 2018, Secretary Nielsen testified before Congress, "Help me message: If you are fleeing and coming to the United States please come to the ports of entry.  [We] will process your claim there."[15]  On June 18, 2018, at a White House Press Briefing, Secretary Nielsen also told reporters, "As I said before, if you're seeking asylum, go to a port of entry.  You do not need to break the law of the United States to seek asylum."[16]  When reporters noted media accounts of families turned away at ports of entry, the Secretary described that reporting as "incorrect."  Further, on July 9, 2018, OFO Executive Assistant Commissioner Owen said during a press conference:

> The lawful way is to claim asylum, present yourself for inspection at the port of entry.  We will keep the family unit together, again, absent concerns for the well-being of the child, absent criminal history for the adult.

However, despite encouraging asylum seekers to enter the United States through the ports of entry, DHS and CBP took actions that limited the number of undocumented aliens, including asylum seekers, CBP could process each day at the Southwest Border land ports of entry.[17]

On April 27, 2018, OFO Executive Assistant Commissioner Owen emailed a memorandum authorizing Southwest Border land ports of entry to establish Queue Management lines[18] when appropriate to facilitate "safe and orderly

---

[14] We assessed CBP's implementation of the policy in our report, *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy,* OIG-18-84, September 27, 2018.

[15] *Homeland Security Secretary Nielsen on Fiscal Year 2019 Budget.*  Testimony before the Senate Appropriations Subcommittee on Homeland Security, May 8, 2018.

[16] White House Press Conference, June 18, 2018, "DHS Secretary Nielsen's Remarks on the Illegal Immigration Crisis."  *See* transcript at https://www.dhs.gov/news/2018/06/18/dhs-secretary-nielsens-remarks-illegal-immigration-crisis.

[17] Numerous factors affect CBP's ability to process undocumented aliens at ports of entry.  The exact number of asylum seekers who were unable to enter the United States because of CBP's Queue Management actions could not be stated with certainty.

[18] The memorandum specified ports "may not create a line specifically for asylum seekers," but could create lines "based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents."



processing of travelers" based on the ports' processing capacity. Shortly thereafter, on May 24, 2018, DHS Chief of Staff Chad Wolf, on behalf of Secretary Nielsen's Office, asked CBP officials to determine "the number of [undocumented aliens] that would likely be turned away" every day if ports ran Queue Management operations full-time. Then-CBP Commissioner Kevin McAleenan instructed OFO Executive Assistant Commissioner Owen to report to the Secretary that if CBP assigned 200 officers to work limit lines, they would turn away approximately 650 undocumented aliens per day.

On June 5, 2018, Secretary Nielsen signed a memorandum authorizing port directors to establish Queue Management lines at all the Southwest Border ports.[19] The memorandum also informed port directors that processing inadmissible arriving aliens[20] (which may include asylum seekers) was not a priority,[21] and authorized port directors to reassign staff away from processing inadmissible arriving aliens, stating:

> CBP personnel and resources that would otherwise be deployed to process inadmissible arriving aliens can focus on the detection and apprehension of narcotics and currency smugglers.

Following this directive, the number of undocumented aliens waiting in Mexico to enter U.S. ports increased from 942 on June 20, 2018, to more than 2,000 on October 1, 2018.[22] In an October 5, 2018 email addressing the surge of aliens seeking asylum at the ports, then-DHS Deputy Secretary Claire Grady told senior CBP staff, "Business as usual, no matter how outstanding your officers are[,] isn't going to be a match for what we are facing." Nevertheless, CBP officials did not allocate additional resources to increase processing

---

[19] We made multiple requests to CBP for policies and guidance related to the "Queue Management" program. Despite the memorandum's title, "Prioritization-Based Queue Management," and the Secretary's initiation of an accompanying pilot program, CBP did not provide the document in response to our requests and none of the CBP staff we interviewed informed us of the memorandum's existence. DHS OIG only learned about the document through forensic email analysis.

[20] Documents we reviewed such as the "Prioritization-Based Queue Management" memorandum and CBP staff with whom we spoke use the term "inadmissible aliens" interchangeably with "undocumented aliens."

[21] The memorandum reiterated four superseding missions for the ports: 1) National security; 2) Counter-narcotics operations; 3) Economic security; and 4) Trade and travel facilitation.

[22] We derived this number from CBP daily Queue Management reports, which list the number of aliens awaiting processing on the Mexican side of the border. During OIG site visits and interviews, we learned CBP officials obtain these numbers from sources such as Mexican government officials, non-governmental organizations, and CBP officers' estimates of aliens in line. CBP does not track the number of aliens arriving at ports who are redirected to another port or told to place their names on a waiting list in Mexico.

capability at ports of entry.  For instance, in response to an October 18, 2018 email suggesting ways for CBP to mitigate the growing surge of undocumented aliens, a CBP executive told his staff that expanding the operating hours of ports was "too resource intensive just to help the migrants."  In the same email, the executive wrote:

> We might consider adding officers when the port is closed to help secure against breaches [*sic*], but don't want to add extra hours to process more migrants.

In other emails, the executive declined to consider establishing temporary detention facilities for undocumented aliens, or increasing the number of aliens released with Notices to Appear (NTA).[23]  In a March 2019 DHS OIG interview with a senior CBP official on the Southwest Border, the official summarized CBP's response to the surge of undocumented aliens by stating, "We are hoping this thing just goes away."

Thus, while DHS leadership urged asylum seekers to present themselves at ports of entry, the agency took deliberate steps to limit the number of undocumented aliens who could be processed each day at Southwest Border land ports of entry.  By October 30, 2018, the number of undocumented aliens waiting outside the ports to be processed grew to more than 3,000.

## Without Notice to the Public, CBP Stopped Routine Processing of Most Undocumented Aliens, Including Asylum Seekers, at Seven Ports and Redirected Them to Other Ports

During our fieldwork, we learned CBP had stopped the routine processing of most undocumented aliens[24] — including asylum seekers — at 7 of the 24 Southwest Border land ports of entry.[25]  At these seven ports, CBP staff at the limit line do not simply control the flow of undocumented aliens into the port

---

[23] A Notice to Appear (NTA) is a legal document placing an alien in removal proceedings before the U.S. Department of Justice, Executive Office for Immigration Review.  Typically, ICE determines whether to release an individual from DHS custody with an NTA.  Although CBP OFO also has authority to issue NTAs, according to CBP officials, CBP OFO does not exercise that authority routinely.

[24] CBP officials said they make exceptions for some vulnerable populations, such as unaccompanied alien children or pregnant asylum seekers.  This exception does not appear to be documented in CBP policy, and OIG did not independently corroborate CBP's claim.

[25] The seven ports are Otay Mesa, Tecate, Calexico East, and Andrade, which fall under the San Diego field office; and Roma, Rio Grande City, and Progreso, which fall under the Laredo field office.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

facility; rather, they "redirect"[26] undocumented aliens who approach the limit line to different ports, telling the aliens the other port can process them more quickly.  "Redirected" aliens must then travel through Mexico to another port and take their place behind others already waiting in the Queue Management line at that port.

The seven ports are designated as Class A ports, "Port[s] of Entry for all aliens," according to 8 C.F.R. § 100.4.[27]  CBP has authority to change a port's classification[28] and has done so in the past to restrict, expand, open and close specific ports.[29]  Designation of a port of entry is a formal DHS action.[30]  When changing a port's classification, CBP has published a final rule in the Federal Register.[31]  In a break from these longstanding practices, CBP has redirected undocumented aliens appearing at the seven ports yet has not redesignated those ports from Class A to another classification.

As discussed previously, DHS leadership made public pronouncements encouraging undocumented aliens to arrive at ports of entry, but never notified the public of its decision to stop processing aliens at the seven ports of entry.  When DHS OIG asked a senior CBP official at one of the field offices about the lack of notification to the public, the official expressed concern about the legality of the redirection practice.  At the Tecate port of entry in California, several officers also questioned the legality of the redirecting practice and said

---

[26] In this report, "redirect" means the practice of intercepting asylum seekers at a port's limit line position and instructing them to go to another port to apply for asylum.

[27] 8 C.F.R. § 100.4 regulates the type of individuals and cargo that ports process: "Class A means that the port is a designated Port-of-Entry for all aliens."  The regulation also designates other classes of ports that do not process most undocumented aliens.  For example, Class B ports process only certain aliens who are exempt from specific document requirements, in lawful possession of Lawful Permanent Resident cards, or who meet other eligibility requirements.

[28] The Regulation provides, "The designation of such a Port–of–Entry may be withdrawn whenever, in the judgment of the Commissioner, such action is warranted."

[29] *See, e.g.*, CBP, Closing the Jamieson Line, New York Border Crossing, 79 Fed. Reg. 42,449-01 (July 22, 2014); *see also* INS, DOJ, *Freedom of Information Act*, 32 Fed. Reg. 9,616, 9,618 (July 4, 1967) (quoting 8 C.F.R. § 100.4 that Class A ports are "for all aliens" and that designation may be withdrawn by Commissioner whenever warranted).  CBP has added a Class B port and terminated one, after providing the public with notice and a period for commenting on the proposed changes.

[30] *United States v. Nunez-Soberanis*, 406 F. Supp. 3d. 835, 841 (S.D. Cal. 2019).

[31] Statement of Organization; Ports of Entry for Aliens Arriving by Vessel or by Land Transportation, and by Aircraft, 54 Fed. Reg. 47,673 (Nov. 16, 1989) (redesignating St. Aurelie, Maine, from a "Class A" port of entry to "Class B"); Statement of Organization; Ports of Entry for Aliens Arriving by Vessel or by Land Transportation, 49 Fed. Reg. 31,054 (Aug. 3, 1984) (redesignating Fort Hancock, Texas from a "Class B" port of entry to "Class A"); Statement of Organization; Field Service Realignment, 49 Fed. Reg. 30,057-01 (July 26, 1984) (redesignating Richford, Vermont station to a substation).



they were unwilling to work the limit line position.  These officers addressed their concerns with port management and their union representatives, which in turn led to a modification in the redirecting practice — i.e., port management instituted a protocol allowing limit line officers to contact a supervisor to come to the line and assume responsibility for redirecting aliens.  Although Tecate now has this protocol in place, the union representative is still unclear whether the practice is legal.

At these seven ports, which fall within the Laredo and San Diego field offices, CBP routinely told undocumented aliens at the limit line that the port currently lacked the capacity (holding space) or capability (staffing and resources) to process them, regardless of the port's actual capacity and capability.[32]  For instance, CBP's daily Queue Management reports indicated that from June 20, 2018, until November 8, 2018, all seven ports redirected undocumented aliens to other ports every day for which data was available, even though these records also show the ports did not detain a single undocumented alien in their available hold rooms on 80 percent of those days.[33]

Meanwhile, the ports to which CBP staff redirected the undocumented aliens range from a few miles to more than 30 miles away.  Often, this required traversing difficult desert terrain and potentially placed undocumented aliens at risk of encountering criminals who may exploit them, as areas in Mexico along the border with the United States are known to be controlled by criminal cartels.  Figures 1 and 2 illustrate the distance redirected undocumented aliens had to travel to a port that might process them.

---

[32] Reports emailed to CBP headquarters indicate the policy of redirecting was known at least to the level of then-CBP Commissioner Kevin McAleenan.

[33] We obtained this data from CBP's daily Queue Management reports, which track how many ports engage in redirecting and how many aliens each port has in its hold rooms.  CBP did not provide this data to OIG despite multiple requests, necessitating a forensic analysis of key CBP staff members' emails.  CBP OFO did not always generate a daily Queue Management report; however, we were able to obtain and analyze reports for 95 of the 141 days that fall between June 20, 2018, the date of the first report we obtained, and November 8, 2018, the date of the last report we obtained.

# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

**Figure 1.  San Diego Field Office Redirecting Ports**



*Source*: OIG depiction of CBP data

**Figure 2.  Laredo Field Office Redirecting Ports**



*Source*: OIG depiction of CBP data

Moreover, because CBP officers at the limit line do not generally ask migrants where they are from before redirecting them to another port, Mexican nationals

AR521



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

seeking asylum may be redirected along with asylum seekers from other countries.  Redirected Mexican nationals must therefore remain in and travel through the very country in which they claim they are subject to persecution.

Our fieldwork indicated other destination ports have long lines of undocumented aliens already waiting to be processed.  Accordingly, those who are redirected from one port must then go to the end of the Queue Management line at another port.  For example, the Otay Mesa and Tecate ports of entry routinely redirected undocumented aliens to the San Ysidro port of entry.  Once there, the aliens must enter the Queue Management line by putting their names on a list that often contains thousands of names, meaning they will wait in Mexico for weeks, if not months, before being granted access to the port to be processed by CBP.[34]

As shown in the following examples, creating barriers to entry at ports of entry may incentivize undocumented aliens to attempt to cross into the United States illegally, between ports of entry.  For example, we interviewed 17 aliens who either were in detention or were recently released, 5 of whom said after growing frustrated with Queue Management and redirection practices at ports of entry, they decided to enter the United States illegally.  We interviewed representatives from several non-profit and non-governmental organizations who stated they had similar concerns.  We also learned of one case in which an asylum seeker crossed the border illegally after waiting in a Queue Management line for 2 days.  When U.S. Border Patrol referred the asylum seeker's case to an Assistant United States Attorney (AUSA) for prosecution, the AUSA refused to prosecute given the long wait to which the asylum seeker was subjected.[35]

While temporarily holding aliens at ports of entry, CBP must directly supervise detained aliens and provide access to appropriate medical care, as detailed in TEDS.[36]  CBP OFO leadership stated they implemented the redirecting procedure at these seven ports because they are remote ports with few staff and outdated facilities.  For example, they said these ports closed at night and are far from medical care.  Before implementing the redirecting procedure, CBP staff drove undocumented aliens to other ports for overnight holds and to medical facilities when necessary.  We found four of the seven redirecting ports close at night, and one is more than 50 minutes away from medical care.  Most

---

[34] CBP officials said they do not have direct access to the list, which is maintained in Mexico.  In order to obtain the number of aliens waiting outside each port, CBP port officials and Mexican government officials communicate regularly to identify and schedule waiting aliens for entry and processing.
[35] We learned about this incident during our forensic email analysis.
[36] *See* TEDS, 4.6; TEDS, 4.10.



of the ports' holding capacity is less than 20, but Tecate and Otay Mesa have capacity for 35 and 31, respectively.  Table 1 shows the capacity, distance from a medical center, and hours of operation for each redirecting port.

**Table 1.  Redirecting Ports of Entry Capacity, Distance to Medical Facilities, and Hours of Operation**

| Port | Capacity | Drive Time to Nearest Hospital | Port Hours of Operation |
|------|----------|-------------------------------|-------------------------|
| Tecate | 35 | Sharp Grossmont Hospital (53 min) | 5:00 am–11:00 pm, Daily |
| Calexico East | 10 | El Centro Medical Center (25 min) | 6:00 am–8:00 pm, Mon–Fri 10:00 am–6:00 pm, Sat |
| Andrade | 10 | Yuma Regional Medical Center (21 min) | 6:00 am–10:00 pm Daily |
| Otay Mesa | 31 | Sharp Chula Vista Medical Center (20 min) | 24 hours/7 days a week |
| Roma | 16 | Star County Memorial Hospital (15 min) | 24 hours/7 days a week |
| Rio Grande | 10 | Star County Memorial Hospital (10 min) | 7:00 am–12:00 am, Daily |
| Progreso | 17 | Knapp Medical Center (15 min) | 24 hours/7 days a week |

*Source:* OIG analysis of information CBP provided and information we identified from CBP.gov

## CBP Returned to Mexico Asylum Seekers Who Had Already Entered the United States

Despite provisions in the INA, CBP guidance, and statements from CBP senior leaders requiring CBP staff to process asylum seekers once they have physically entered the United States, at least four CBP ports returned to Mexico some asylum seekers who had crossed the international border and entered the United States.

The INA states any alien who is physically in the United States may apply for asylum.[37]  Consistent with this provision, CBP's April 27, 2018 Queue Management guidance states that once a traveler has entered the United States, he or she must be fully processed by CBP.  DHS also communicated its position on this matter to the public when, on June 18, 2018, it posted on its website:

> Myth: DHS is turning away asylum seekers at ports of entry;
> FACT: CBP processes all aliens arriving at all ports of entry without documents as expeditiously as possible....[38]

---

[37] 8 U.S.C. § 1225 requires CBP to inspect aliens who are seeking admission to the United States and 8 U.S.C. § 1158 states that any alien who is physically present or arrives in the United States may apply for asylum.

[38] https://www.dhs.gov/news/2018/06/18/myth-vs-fact-dhs-zero-tolerance-policy.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Similarly, on July 9, 2018, OFO Executive Assistant Commissioner Owen said in a press conference, "...despite what you may have heard, we never turn away individuals seeking asylum at port[s] of entry."

However, we found that, at four ports of entry — Otay Mesa, San Ysidro, Tecate, and Nogales' Morley Gate — CBP did not process asylum seekers who had entered the United States, returning them to Mexico instead. For instance, our fieldwork indicated, CBP officers at San Ysidro and Tecate ports returned to Mexico asylum seekers who had not only crossed over the international boundary into the United States, but also had entered the ports' buildings.

In addition, all four ports established their limit lines inside the boundary line on the U.S. side of the international border. As a result, asylum seekers and other undocumented aliens stepped into the United States to reach the Queue Management line, where they were instructed either to go to another port, or to return to Mexico to wait in line.[39] Two of the ports, San Ysidro and Otay Mesa, eventually moved their limit lines to the border, but as of August 2019, the Tecate and Nogales' Morley Gate limit lines had not moved, and remained inside the United States. Asylum seekers and other undocumented aliens who approach those limit lines are physically present in the United States at the time CBP turns them away by redirecting them to another port.

## CBP Did Not Use All Available Detention Space

We found two ports had stopped using available detention space, even though undocumented alien families were waiting in Queue Management lines. Management at those ports said staffing was insufficient to monitor the rooms. However, other staff we interviewed disagreed with that assessment. Although CBP is short-staffed at Southwest Border ports, fiscal year 2018 staffing had improved from FY 2016, when larger numbers of aliens were processed.

On June 18, 2018, field offices began sending daily summaries from the ports of entry to CBP headquarters, detailing the number of aliens in custody, the number waiting to be processed, and available holding capacity.[40] The reports

---

[39] CBP officers at the San Ysidro Pedestrian East entry would tell asylum seekers they had to put their names on the Queue Management list and wait for their turn to be processed.
[40] Available holding capacity does not always reflect the ability of a port to accommodate additional detainees. CBP detention standards mandate aliens be segregated by gender and age, and other factors to protect at risk detainees. For example, if a port has only 2 cells, each able to hold 10 detainees, and CBP encounters 10 adult male aliens and 1 unaccompanied alien child, the adult males will all be placed in one cell, while the unaccompanied alien child will be placed in the other cell. The port is then unable to process more adult male aliens, despite being at only 55 percent capacity.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

show increasing numbers of aliens waiting to be processed on the Mexican side of the border, yet they also indicate the ports were not using all available detention capacity.

For example, we observed this scenario during our visit to the San Luis port of entry in Arizona.  At the San Luis port, which has the capacity to hold 48 detainees, we found at the time of our visit in October 2018 that CBP was detaining only 5 undocumented aliens while a line of at least 30 more waited along the international border.[41]  Yet, we observed several empty holding cells and an empty trailer fully equipped to hold undocumented families, even though there was a line of waiting aliens.  We later learned from CBP's daily Queue Management Report that 105 aliens were in the queue to enter the port that day.

When interviewed by DHS OIG, staff at the San Luis port said they could process more asylum seekers than they were processing.[42]  When we asked why the San Luis port elected not to process the undocumented aliens waiting at the Queue Management line, we received a range of answers.  The senior port official said the undocumented aliens waiting outside were not real asylum seekers, but rather came to seek economic opportunity.  However, this assumption on the part of the official is not an appropriate basis for CBP to refuse to process the individuals, as CBP officials do not have the authority to evaluate the credibility of asylum claims and must process all claiming to seek asylum, regardless of the officials' opinions about the strength of their claims.  Alternatively, two staff members at the San Luis port of entry said management "above" the port sets limits on the numbers of undocumented aliens the port should process.  One of these officers told us, "I know from what came down from HQ, we are trying to process the least amount of people."

During our visit in November 2018, we observed a similar situation at the Nogales port of entry, which consists of three separate crossing points close to each other geographically:  the Mariposa facility, DeConcini crossing, and Morley Gate.  CBP added family unit holding cells to the Mariposa facility when it renovated the port in 2014, but CBP was not using those cells during our fieldwork.  We observed at least six hold rooms and office space that were either empty or used for storage.  A port official said the staff had used these hold rooms during the 2016 surge of Haitian migrants, but did not recall the last time they were used since then.

---

[41] CBP provided us with internal reports stating the port's capacity is 48 aliens.  However, in an interview, a senior port official told us the port's capacity was 35 aliens.
[42] We visited the San Luis port of entry on October 30, 2018 to observe operations, including the Queue Management line, and to interview CBP employees familiar with processing undocumented aliens.

According to the official, the port does not use the hold rooms because it does not have enough staff to monitor aliens in the rooms, and the facility closes at night.  The official told us when his staff encounter undocumented aliens, they drive them a short distance to the DeConcini crossing.  However, on the day of our visit, the DeConcini crossing's hold rooms were full.  As a result, the 20 or more aliens waiting outside the DeConcini facility would not be processed until the DeConcini crossing's hold rooms became available.  In the meantime, the hold rooms in the Mariposa facility, 3 miles away, were empty.

It is unclear why officials at the Nogales port assigned staff to transport undocumented aliens to other CBP facilities rather than assigning the officers to monitor these aliens at the Nogales port.  Additionally, by assigning staff to operate the limit line, the port reduced its capability to process undocumented aliens.

Although CBP has been attempting to hire more officers to fill vacant positions, many ports of entry are not at full staffing.  According to CBP OFO's port of entry staffing data, shown in Table 2, overall staffing rates at four field offices' ports have improved since FY 2016, when three of four CBP field offices processed more undocumented aliens than in FYs 2017 and 2018.

**Table 2.  Southwest Border Land Port of Entry CBP OFO Staffing Levels and Numbers of Undocumented Aliens Processed in FYs 2016 – 2018**

| Field Office | FY 16 Staff % | Aliens Processed in FY 2016 | FY 17 Staff % | Aliens Processed in FY 2017 | FY 18 Staff % | Aliens Processed in FY 2018 |
|---|---|---|---|---|---|---|
| El Paso | 98.4% | *23,787* | 101.2% | *17,308* | 99.7% | *23,509* |
| Laredo | 90.0% | *68,957* | 94.5% | *48,524* | 99.2% | *48,059* |
| San Diego | 83.1% | *49,075* | 86.5% | *31,252* | 90.3% | *35,288* |
| Tucson | 73.9% | *12,105* | 71.9% | *13,885* | 78.7% | *17,303* |
| **All Southwest Border** | **87.1%** | ***153,924*** | **90.0%** | ***110,969*** | **93.6%** | ***124,159*** |

*Source*: CBP

# Conclusion

In 2018, as surges of undocumented aliens sought asylum in the United States, the DHS Secretary and CBP leadership urged asylum seekers to come to ports of entry to be processed.  However, DHS and CBP took actions to reduce the number of asylum seekers CBP processed daily.  Under the INA, the

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

U.S. Government must process all those who are physically in the United States and express fear of persecution in their home country or an intention to seek asylum.  The law does not set limits as to the number of asylum seekers the Government can or must process.  Nevertheless, the Secretary and CBP have effectively limited access for undocumented aliens wishing to claim asylum in the United States, sometimes without notice to the public.  As a result, the numbers of asylum seekers in Queue Management lines grew.  As the lines grew and asylum seekers were redirected to other ports, some undocumented aliens attempted to enter the United States illegally, exacerbating the very problem DHS sought to solve.

## Recommendations

We recommend the CBP Acting Commissioner:

**Recommendation 1:** Resume processing undocumented aliens at the seven ports of entry currently redirecting them to other ports, or formally redesignate the ports to exclude undocumented aliens.

**Recommendation 2:** Provide written guidance and training to CBP personnel at ports of entry relating to the proper handling of aliens who are physically present in the United States and indicate an intention to apply for asylum.

**Recommendation 3:** Evaluate whether CBP can more efficiently use available holding spaces to process undocumented aliens, including asylum seekers.

## Management Comments and OIG Analysis

We have included a copy of CBP's Management Response in its entirety in Appendix B.  We also received technical comments from CBP and incorporated them into the report where appropriate.  CBP did not concur with Recommendation 1, but concurred with Recommendations 2 and 3.  We consider Recommendation 1 unresolved and open.  Recommendations 2 and 3 are resolved and open.  A summary of CBP's responses and our analysis follows.

In its response to our report, CBP expressed concerns that the report "demonstrates a fundamental misunderstanding of Office of Field Operations (OFO) holding capacity holding capacity [*sic*] compared to its operational capacity."  CBP said its capacity to detain individuals in its short-term facilities depends on many factors, including:
- Demographics of the individual in custody;
- Medical or other needs of individuals in custody;

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

- Ability of ICE ERO or HHS to transfer individuals out of CBP custody;
- OFO's available resources to process and hold individuals;
- Competing priority missions; and
- Availability of staff, room, and resources.

In our report, we acknowledge the difference between holding and operational capacity, though we use the terms capacity and capability. The report explains that capacity (holding space) and capability (staffing and resources) were the reasons for CBP's stated limitations to process undocumented aliens. However, our evidence also indicates that CBP OFO used these reasons regardless of the port's actual capacity and capability, as detailed on page 10 of the report.

Moreover, throughout the report, we address the confluence of factors that affect the capability/operational capacity of a given port. For example, we explain in footnote 40,

> Available holding capacity does not always reflect the ability of a port to accommodate additional detainees. CBP detention standards mandate aliens be segregated by gender and age. For example, if a port has only 2 cells, each able to hold 10 detainees, and CBP encounters 10 adult male aliens and 1 unaccompanied alien child, the adult males will all be placed in one cell, while the unaccompanied alien child will be placed in another cell. The port is then unable to process more adult male aliens, despite being at only 55 percent capacity.

The report also recognizes the constraints facing CBP. As described on page 12, we detail that while temporarily holding aliens at ports of entry, CBP must directly supervise detained aliens and provide access to appropriate medical care. The report explains how and why CBP OFO leadership implemented the redirecting procedure at some ports. Finally, the report's background provides historical context for how challenging it has been for CBP to manage the surges of undocumented aliens in its facilities given CBP OFO's complex mission.

As the report describes, DHS leadership directed ports to focus resources and staff on all other OFO missions other than processing inadmissible aliens despite improved levels of staffing in every field office since 2016 and available holding capacity. The 2018 queue management reports showed that the redirecting ports rarely reported anyone in custody. Finally, the report details that staff at the ports we visited received instructions to redirect all asylum seekers, and port staff were not checking the port's capability or capacity before doing so. These findings were further corroborated by the OIG's



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

previous review, *Investigation of Alleged Violations of Immigration Laws at the Tecate, California, Port of Entry by U.S. Customs and Border Protection Personnel (OSC File No. DI-18-5034).*

In its response, CBP also raised concerns about OIG's analysis and conclusions regarding 8 CFR § 100.4., stating "...it is not within OIG's mission or authority to provide legal advice to the Department." We note that the IG is duty-bound to promote efficiency and prevent and detect abuse within agency programs and operations.

**Recommendation 1:** Resume processing undocumented aliens at the seven ports of entry currently redirecting them to other ports, or formally redesignate the ports to exclude undocumented aliens.

**CBP Response:** CBP did not concur with the recommendation. CBP officials said their decision to redirect the processing of undocumented aliens at the seven ports of entry to other ports depended on operational capacity and the resources available to execute its primary mission of securing the border. Additionally, CBP stated that specific dynamics at each port of entry affect the port's capacity to process and hold aliens without documents and each port director must maintain a discretionary balance between processing aliens and facilitating trade, travel, and counter-narcotics missions. CBP requested that OIG consider this recommendation resolved and closed.

**OIG Response:** We consider this recommendation unresolved and open. The intent of the recommendation is for CBP to address the "discretionary balance" of missions at the seven redirecting ports. We understand that port directors consider many factors when prioritizing port resources and missions, however, these seven ports have effectively ceased processing aliens without regard to other missions. The recommendation will remain unresolved and open until CBP can show it is processing undocumented aliens at the seven ports of entry currently redirecting them to other ports, or CBP has formally reclassified those ports consistent with long-established procedures.

**Recommendation 2:** Provide written guidance and training to CBP personnel at ports of entry relating to the proper handling of aliens who are physically present in the United States and indicate an intention to apply for asylum.

**CBP Response:** CBP concurred with the recommendation. In its response, CBP said it has issued the following guidance to its employees:

1. *Processing of Expedited Removal Cases*, October 2, 2014
2. *Metering Guidance*, April 27, 2018

AR529

3. *Metering Guidance*, April 30, 2020

CBP requested that OIG consider this recommendation resolved and closed as implemented.

**OIG Analysis:**  We consider these actions responsive to the intent of the recommendation, which is resolved and open.  CBP issued two of the three documents before we initiated our fieldwork, and based on our findings, those documents alone may be insufficient for training.  CBP's April 30, 2020 "Metering Guidance" memorandum restates CBP policy on metering to Directors of Field Offices, however, it does not address officer training or provide any indication the guidance was disseminated to the OFO's line officers.  We will close this recommendation when we receive documentation showing that CBP employees have received training on how to follow the metering guidance.

**Recommendation 3:**  Evaluate whether CBP can more efficiently use available holding spaces to process undocumented aliens, including asylum seekers.

**CBP Response:**  CBP concurred with the recommendation.  CBP said its port directors use discretion in balancing mission requirements with respect to activities occurring at the port as well as available resources when evaluating the operational capacity to ensure the most efficient use of resources.  CBP requested that OIG consider this recommendation resolved and closed as implemented.

**OIG Analysis:**  We consider this action responsive to our recommendation, which is resolved and open.  However, the intent of the recommendation is for CBP to assess the use of each port's available holding spaces to identify areas where port directors could address capacity and capability issues to enable more flexibility in balancing mission needs.  CBP did not provide any documentation showing that it conducted an evaluation of available holding spaces.  We will close this recommendation when we receive documentation that CBP has performed such an evaluation of more efficient use of available holding spaces to process undocumented aliens.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix A
## Objective, Scope, and Methodology

The Department of Homeland Security Office of Inspector General was established by the *Homeland Security Act of 2002* (Public Law 107−296) by amendment to the *Inspector General Act of 1978*.

We initiated this review in response to 2 congressional requests signed by 53 members that our office received in June 2018, with the following objectives, to determine whether CBP's OFO is: (1) turning away those who present themselves for asylum at ports of entry; and (2) separating family units seeking asylum and documenting this practice appropriately. We have split discussion of our findings into two separate reports. This report addresses the first objective, whether CBP's ports of entry are turning away asylum-seeking aliens. We are issuing a second report, which addresses the second objective, separation of family units at CBP OFO ports of entry.

To answer our objectives, we conducted unannounced site visits to 12 land ports of entry across 4 field offices along the Southwest Border, listed below, where we interviewed CBP staff and observed port operations. We also interviewed officials in CBP headquarters, Washington D.C.

<u>Laredo, Texas, Field Office and ports of entry:</u>
1. Brownsville
   a. Brownsville and Matamoros Bridge
   b. Gateway International Bridge
2. Hidalgo

<u>El Paso, Texas, Field Office and ports of entry:</u>
3. Paso Del Norte Bridge

<u>Tucson, Arizona, Field Office and ports of entry:</u>
4. Nogales
   a. DeConcini crossing
   b. Mariposa facility
   c. Morley Gate
5. Douglas
6. Lukeville
7. Naco
8. San Luis

<u>San Diego, California, Field Office and ports of entry:</u>
9. Calexico

AR531

# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

10. Otay Mesa
11. San Ysidro
12. Tecate

To obtain a different perspective of the issues, we spoke with representatives of six non-governmental organizations.

We used forensic means to gather and search CBP emails because we had not received complete and accurate information from CBP during our fieldwork. Early in the review, we asked CBP for policies, procedures, and training related to CBP's asylum processing at the ports of entry, and received few, marginally related documents in response.  We did not receive any policies or procedures for conducting Queue Management lines or redirecting undocumented aliens. During our interviews in the field, we heard conflicting accounts of CBP policies and procedures, and learned of policies CBP had not provided to us, despite their relevance to our work.  As a result, we requested the email accounts of 49 senior OFO officials at Headquarters, Field Offices, and ports of entry from April 2018 through November 8, 2018.  CBP provided the emails and because of this search, we identified the Secretary's June 5, 2018 announcement of the Prioritization-based Queue Management pilot program, preparations for it, and subsequent actions at the ports, such as Queue Management lines and redirecting procedures.

We conducted the preliminary research for this review between June and October 2018, and conducted fieldwork between November 2018 and April 2019, under the authority of the *Inspector General Act of 1978*, as amended, and according to the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.

AR532

# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

**Appendix B**
**CBP Comments to the Draft Report**



1300 Pennsylvania Avenue NW
Washington, DC 20229

**U.S. Customs and Border Protection**

September 8, 2020

MEMORANDUM FOR:  Joseph V. Cuffari, Ph.D.
Inspector General

FROM:  Henry A. Moak, Jr.
Senior Component Accountable Official
U.S. Customs and Border Protection

X _____  9/8/2020
Signed by: HENRY A MOAK JR

SUBJECT:  Management Response to Draft Report: "CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry" (Project No. 18-122-ISP-CBP)

Thank you for the opportunity to comment on this draft report. U.S. Customs and Border Protection (CBP) appreciates the work of the Office of Inspector General (OIG) in planning and conducting its review and issuing this report.

CBP is pleased that the OIG's draft report recognizes that CBP has taken disciplinary action against CBP Officers (CBPO) found, in violation of asylum-processing policies, to have returned individuals physically present in the U.S. and who expressed a fear of return to Mexico. Integrity is one of CBP's Core Values and it is essential to the effective functioning of the Agency. As an Agency charged with law enforcement activities, it is imperative that all CBP employees demonstrate high standards.

CBP is concerned, however, that the draft report demonstrates a fundamental OIG misunderstanding of the Office of Field Operations (OFO) holding capacity **holding capacity** compared to its **operational capacity**. Title 6, United States Code (U.S.C.) Section 211(g), assigns CBP OFO its multifaceted mission set to coordinate enforcement activities at air, land, and sea ports of entry (POEs); safeguard the United States from illegal entry of persons; and facilitate the flow of legitimate travelers and trade. As part of its mission to secure the border and facilitate lawful trade and travel, CBP OFO takes steps, as needed, to regulate the flow of travelers into the POEs. Regulating the flow ensures that each POE has enough operational capacity to safely process all individuals, as well as execute its priority mission sets. In recent years, CBP has seen an increasing number of aliens presenting at POEs who do not possess appropriate travel and identification documents required by law. Processing these aliens requires a substantial amount of time and resources that, if not carefully managed, negatively affects the flow

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

of trade and other travel.  Thus, CBP must carefully balance its space and resources to ensure that the POEs have enough capacity to address all aspects of its mission set, including the safety of all travelers accessing the POE.

In 2016, there was a significant influx of aliens, without appropriate documents, seeking entry into the United States along the U.S.-Mexico border.  The demographics of the inadmissible applicants for admission also began evolving from single adults to include families.  In addition, the number of individuals who presented themselves at the border exceeded CBP OFO's operational capacity to safely process, and hold, these individuals in its short-term detention facilities.  It also strained the resources of U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) long-term custodial facilities.  Regardless, upon completion of the inspection of an inadmissible applicant for admission, the U.S. Government is statutorily required to detain the inadmissible applicant for admission in accordance with the provisions of Sections 235(b)(1) and (2) of the Immigration and Nationality Act (INA) [8 U.S.C. 1225(b)(1)-(2)].

CBP's capacity to detain individuals in its short-term facilities depends on many factors, including:
- Demographics of the individuals in custody;
- Medical or other needs of individuals in custody;
- Ability of ICE ERO (or, if an unaccompanied alien child, the U.S. Department of Health and Human Services) to transfer individuals out of CBP custody; and
- OFO's available resources to safely process and hold individuals.

The operational capacity of a POE also depends largely on the resources available to the POE to execute its primary mission of securing the border.  CBP's capacity to process and hold aliens without documents sufficient for lawful entry is dependent on more than the amount of available physical holding space.  It is also dependent on other activities occurring at the POE, including:
- Encounters with individuals who have terrorist, criminal, or gang ties;
- Volume of trade and trade enforcement issues;
- Detection of contraband; and
- Volume of other travelers seeking entry into the United States.

Regarding OIG's analysis and conclusions that CBP actions were inconsistent with 8 CFR § 100.4, it is important to note that it is not within OIG's mission or authority to provide legal advice to the Department.  It is also inappropriate for the OIG to infer that the Department must act in accordance with OIG's conclusions.  To ensure that CBP maintains a safe inspectional environment for personnel, as well as all travelers and goods processed at POEs, CBP may engage, as necessary, in steps to regulate the flow of

2

AR534

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

travelers without documents sufficient for lawful entry. Queue management (also known as "metering") allows CBP to engage in all aspects of its multifaceted mission set at POEs along the U.S.-Mexico border. During queue management, CBPOs are required to stand at, or as close as operationally possible, to the international boundary, also known as the "limit line," to determine whether travelers approaching the POE have documents sufficient for lawful entry to the United States. If an alien does not have the requisite documents to apply for admission to the United States, the alien may be required to wait in Mexico until resources and capacity allows for processing.

CBP must have enough operational capacity, including personnel, space, and technology, to execute its full mission set of protecting national security, interdicting narcotics and other contraband, protecting the country's economic security and facilitating lawful trade and travel. When a POE lacks operational capacity to safely process and hold aliens without documents sufficient for lawful entry and execute its full mission set, queue management, which is consistent with principles of determining when, where, and how aliens may apply for admission to the United States may be required. This ensures CBP resources are efficiently balancing its multifaceted mission set until resources to process aliens without documents sufficient for lawful entry are operationally available.

CBP policy prohibits personnel from taking any steps to discourage travelers from waiting at the international border to be processed from claiming fear of return to another country or from seeking any other protections. On April 27, 2018, CBP's OFO issued guidance on metering, which states in part, "Once a traveler is in the United States, he or she must be fully processed …." Therefore, it is CBP policy that upon an individual's arrival at a POE that individual shall be inspected and processed. If, upon arrival in the United States, an individual (of any nationality) expresses an intention to apply for asylum, a fear of return to their home country, or a fear of persecution or torture in their home country, that individual's claim is referred to an asylum officer or an immigration judge for further consideration. CBP OFO holds its managers, supervisors, and CBPOs accountable to correctly follow the laws, regulations, and procedures in the processing of inadmissible applicants for admission, including those who express a fear of return or a desire to seek asylum. DHS and CBP have repeatedly provided CBPOs guidance to reinforce the correct laws, regulations, and help ensure procedures are adhered to in the processing of inadmissible applicants for admission. And, as recognized by the OIG, personnel that violate CBP's asylum-processing policies have been disciplined.

The draft report contained three recommendations, including two with which CBP concurs (Recommendations 2 and 3) and one with which CBP non-concurs (Recommendation 1). Attached find our detailed response to each recommendation. CBP previously submitted technical comments under a separate cover for OIG's consideration.

3

AR535

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Again, thank you for the opportunity to review and comment on this draft report.  Please feel free to contact me if you have any questions.

Attachment

4

AR536

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Attachment:  Management Response to Recommendations
Contained in 18-122-ISP-CBP**

OIG recommended that the CBP Acting Commissioner:

**Recommendation 1:**  Resume processing undocumented aliens at the seven ports of entry currently redirecting them to other ports, or formally redesignate the ports to exclude undocumented aliens.

**Response:  Non-concur.**  CBP will ensure public notification, as necessary, when POEs make changes to better align with operational capacity.  However, CBP's decision to redirect the processing of undocumented aliens at the seven ports of entry to other posts was dependent on operational capacity, and the resources available to the POEs to execute its primary mission of securing the border.  CBP's capacity to process and hold aliens without documents sufficient for lawful entry is dependent on many factors, not just on the amount of available holding space.  It is also contingent on other POE specific dynamics, including:

- Operating hours;
- Access to medical facilities/personnel to comply with screening requirements;
- Isolation and quarantine requirements for certain individuals and those with communicable diseases;
- Encounters of individuals with terrorist, criminal, or gang ties;
- Volume of trade and other trade enforcement issues;
- Detection of contraband; and,
- Volume of other travelers seeking entry to the United States.

There is a discretionary balance by port directors assessing their mission requirements to process lawful trade and travel, to address CBP's counter-narcotics mission, and to process people arriving without documents.  This balance must be maintained.

CBP requests that the OIG consider this recommendation resolved and closed.

**Recommendation 2:**  Provide written guidance and training to CBP personnel at ports of entry relating to the proper handling of aliens who are physically present in the United States and indicate an intention to apply for asylum.

**Response:  Concur.**  On October 2, 2014, CBP OFO issued a memorandum "Processing of Expedited Removal Cases," which has been in effect through the period of OIG's audit and which outlines the requirement that once an alien expresses a fear of return or a

5

**AR537**

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

desire to apply for asylum, the alien must be processed accordingly. Additionally, on April 27, 2018, CBP OFO issued a memorandum "Metering Guidance," which emphasizes that once a traveler is in the United States, he or she must be processed. CBP OFO reiterated these requirements on April 30, 2020, with the issuance of second memorandum titled "Metering Guidance." Copies of these memorandums were previously provided to the OIG under separate cover.

CBP requests that the OIG consider this recommendation resolved and closed, as implemented.

**Recommendation 3:** Evaluate whether CBP can more efficiently use available holding spaces to process undocumented aliens, including asylum seekers.

**Response:** Concur. CBP port directors evaluate operational capacity daily at the POEs to ensure the most efficient use of resources. The assessment of operational capacity is based on the activities occurring at a POE at any given time, as well as the resources necessary to balance national security, and facilitating legitimate travel and trade. There is a discretionary balance by the port director assessing their mission requirements to process lawful trade and travel, to address our counter-narcotics mission, and to process people arriving without documents.

CBP requests that the OIG consider this recommendation resolved and closed, as implemented.

6



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

## Appendix C
## Timeline of Asylum Processing Significant Events in 2018





**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Appendix D**
**Office of Special Reviews and Evaluations Major Contributors to This Report**

Tatyana Martell, Chief Inspector
Elizabeth Kingma, Team Lead
Adam Brown, Senior Inspector
Stephen Farrell, Senior Inspector
Paul Lewandowski, Senior Inspector
Jason Wahl, Senior Inspector
Jon Goodrich, Investigative Counsel
Gregory Flatow, Program Analyst
Michael Brooks, Independent Reference Reviewer

AR540



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix E
## Report Distribution

### **Department of Homeland Security**

Secretary
Deputy Secretary
Chief of Staff
Deputy Chiefs of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Assistant Secretary for Office of Strategy, Policy, and Plans
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
Commissioner, CBP
CBP Component Liaison

### **Office of Management and Budget**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

### **Congress**

Congressional Oversight and Appropriations Committees

## Additional Information and Copies

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

Department of Homeland Security
Office of Inspector General, Mail Stop 0305
Attention: Hotline
245 Murray Drive, SW
Washington, DC 20528-0305

**UNCLASSIFIED//FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE**

U.S. Department of Homeland Security
Washington, DC 20528



# Homeland Security

## ACTION

MEMORANDUM FOR THE ACTING SECRETARY

FROM:               U.S. Customs and Border Protection

U.S. Immigration and Customs Enforcement

U.S. Citizenship and Immigration Services

Office of Operations Coordination

Office of Strategy, Policy, and Plans

SUBJECT:            **Closing out the Migrant Protection Protocols Red Team Report Evaluation Process**

**Purpose:** To seek concurrence on a series of actions that will close out the Migrant Protection Protocols (MPP) Red Team Report evaluation process.

**Background:** Since its inception in January 2019, MPP has been a critical tool in managing irregular migrant flows at the U.S.-Mexico border. We have carefully considered the recommendations in the "The Migrant Protection Protocols Red Team Report" (October 25, 2019). Building on the items highlighted in the January 14, 2020 memorandum "Response to the Migrant Protection Protocols Red Team Report," in which we identified areas where we had already begun making improvements to MPP, we have identified additional action items to improve the program:

- Develop a DHS.gov MPP Landing Page—DHS recently created and published MPP landing pages on DHS.gov—available in both English and Spanish—on which DHS makes information about MPP, including measures and metrics, as available and updated as practicable.

- Issue a Departmental-level Guidance Memo—This memorandum, which would be issued by the Office of Strategy, Policy, and Plans, would articulate a broad policy vision on several topics identified as part of our review process on which further clarity is warranted. It would

Case 2:21-cv-00067-Z Document 61 Filed 06/22/21 Page 550 of 688 PageID 2207
**Subject: Closing out the MPP Red Team Report Evaluation Process**
Page 2

seek to bring greater consistency to MPP operations to ensure the long-term viability of the program.

- Issue U.S. Customs and Border Protection (CBP) Guidance on Document Service—This memorandum, which would be issued by CBP, would provide additional guidance on the completion and service of documents related to MPP enrollment.

- Issue CBP Guidance on MPP Amenability—This memorandum, which would be issued by CBP, would intend to clarify how CBP Office of Field Operations (OFO) officers and U.S. Border Patrol (USBP) agents may exercise their discretion in determining whether individuals are amenable to be returned to Mexico under Section 235(b)(2)(C) of the Immigration and Nationality Act (INA), as implemented through MPP, and to standardize CBP's application of MPP to amenable aliens.

These items taken together, alongside previous improvements, would broadly implement the Red Team Report recommendations by way of increased transparency, updated guidance, and clearly articulated policy perspectives. We recommend that, as with previous practice, these memoranda be made publicly available on the new DHS.gov MPP landing page and that these programmatic improvements be accompanied by thoughtful and organized engagement with Congress, the media, and other relevant stakeholders. With your concurrence on these items, and with our commitment to continual reassessment and programmatic development of MPP, we would consider the Red Team Report evaluation process concluded.

**Signature Level Justification:** Because the MPP is founded on Secretary-level policy guidance, your approval of these steps is required.

**Timeliness:** We recommend implementing these actions as soon as practicable.

**Subject: Closing out the MPP Red Team Report Evaluation Process**
Page 3

**Recommendation:** Proceed with the issuance of the three memoranda and their publication on the DHS.gov MPP landing page, as described above:

Approve/date ⟨signature⟩                    Disapprove/date _____

        **DEC 0 7 2020**

Modify/date _____          Needs discussion/date _____

Attachments:

A. "Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols"
B. "Supplemental Migrant Protection Protocols Guidance, Initial Document Service"
C. "Supplemental Migrant Protection Protocols Guidance, MPP Amenability"



**Supplemental Policy Guidance for Additional Improvement of the Migrant Protection Protocols (December 7, 2020)**

**Background**:  Since its inception in January 2019, the Migrant Protection Protocols (MPP) remain a critical tool in managing irregular migrant flows at the U.S-Mexico border.  Building on former Acting Secretary McAleenan's direction to ensure that MPP is the most effective and efficient program possible, Acting Secretary Wolf requested that the Department of Homeland Security (DHS) Components continue to refine processes and implement best practices related to MPP.

**Purpose:**  As a continuation of efforts to improve MPP, several principles have been identified that either enshrine developments implemented after MPP's inception or provide further enhancement and clarity for the MPP process.

Therefore, having secured Acting Secretary Wolf's approval, and without prejudice to previous policy guidance, U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), and the Office of Operations Coordination (OPS), with support from other offices as needed, should take necessary action to ensure that MPP operations reflect these principles:

## Access to Information About MPP

**Actions to Provide Program Information**
DHS should continue to make every reasonable effort to ensure that aliens in MPP have access to information about the program.  This includes, but is not limited to, a plain-language indication by CBP personnel of pertinent information in an alien's service packet in the alien's preferred language (using interpretation resources, as needed) and maintaining the MPP landing page on DHS.gov in English and Spanish which consolidates MPP-related information and resources. Additionally, as local infrastructure, resources, and processing allow this could also include "Know Your Rights" presentations and videos, etc.

**Information Regarding Access to Counsel**
Components should continue to ensure the ability to have retained counsel participate telephonically in USCIS's MPP *non-refoulement* assessments -- where it does not delay the

interview, or as required by court order.[1]  Aliens subject to MPP continue to have a right to be represented by counsel in removal proceedings before an immigration judge at no cost to the government.

**Regular Release of Statistics**
Next, DHS should make every reasonable effort to regularly release DHS's MPP-related statistics.  To that end, DHS and/or its Components should continue to provide publicly-available information regarding MPP.

## Appeals

As is currently the practice, where an immigration judge grants an MPP alien relief or protection from removal, but ICE has reserved appeal to the Board of Immigration Appeals, ICE will take custody of the alien and will determine whether to detain or release the alien into the United States pending the administrative appeal[2].

## Family Units

**Definition of Family Unit**
For the purposes of MPP, DHS defines a family unit as a group of two or more aliens consisting of a minor or minors accompanied by his/her/their adult parent(s) or legal guardian(s).  Every effort should continue to be made to maintain the integrity of family units pending completion of removal proceedings, consistent with applicable law and policy.

**Consolidation of Individual Cases of Family Unit Members**
If, for any reason, the individual cases of family unit members processed pursuant to MPP have not already been consolidated, DHS entities should work with DOJ, to the extent possible, to identify and link cases of these individuals.  DHS and DOJ may also consider case consolidations in other reasonable instances, such as domestic partnerships, on a case-by-case basis.

**Adjudication of Expressions of Fear of Return to Mexico**
If any member of a family unit in MPP expresses a fear of returning to Mexico, then the entire family unit will await the adjudication of that claim before any return to Mexico can proceed, so long as there is not an independent basis to separate members of a family unit.  If any member of a family unit establishes that he/she is more likely than not to suffer persecution on account of a protected ground or torture in Mexico, the entire family unit must not be processed for MPP or, if currently in MPP and in the United States together, must be removed from MPP and reprocessed as appropriate.

---

[1] This policy both updates and supersedes in part section *A. Interview* of USCIS' January 28, 2019 Policy Memorandum PM-602-0169 which notes, "DHS is currently unable to provide access to counsel during the assessments."

[2] If an immigration judge grants an MPP alien's application for relief or protection from removal or orders the alien removed from the United States, and appeal is not reserved by either party, the alien should be processed in accordance with standard procedures applicable to final order cases.

**Grants of Relief or Protection from Removal**

If any member(s) of a family unit processed under MPP is/are granted relief or protection from removal, the family member(s) (regardless of nationality) not granted relief or protection should be taken into ICE custody.  A determination will be made regarding whether to detain or release the alien(s) into the United States pending completion of removal proceedings (including an administrative appeal) of all members of the family unit.

## Mixed-Nationality Family Units

Non-Mexican national or citizen members of mixed-nationality family units may be considered for processing through MPP if doing so maintains family unity.  This applies even if one or more member(s) of the family unit might be of a nationality that is otherwise not generally amenable to MPP.

**Mexican Citizen/National Family Member**

In the case of a family member who is a Mexican citizen or national, in order to maintain family unity, the Mexican citizen/national would be allowed to voluntarily withdraw his/her application for admission through a Form I-275 or be voluntarily returned to Mexico with the rest of the non-Mexican citizen/national family unit.

**Mexican Citizen/National Family Member Expressing Fear of Return to Mexico**

If the Mexican citizen/national (or a parent or legal guardian on behalf of a Mexican citizen/national child) expresses fear of return to Mexico, that individual must no longer be voluntarily returned to Mexico with the rest of the family unit.  Any withdrawal or return of such an individual to Mexico would not be voluntary given that the individual expressed a fear of return to Mexico.  In that instance, and because the family unit cannot be separated pursuant to MPP, the entire family unit must not be processed for MPP or, if previously processed for MPP, the family unit must be removed from MPP and reprocessed as appropriate.

## Unaccompanied Alien Children (UACs)

**CBP Processing of UACs**

Any child who arrives at the border and is determined to be a UAC will be processed as such by CBP in accordance with existing UAC processing procedures, including transfer to the Department of Health and Human Services (HHS) and generally processed for removal proceedings pursuant to Section 240 of the Immigration and National Act (INA).  UACs are not amenable to MPP.

**CBP Providing of UAC Information to HHS**

When CBP encounters a UAC who it can confirm was, in fact, previously processed as part of a family unit and returned to Mexico under MPP, CBP should provide HHS's Office of Refugee Resettlement (ORR) with all relevant identifying information for the UAC and those previously processed into MPP with him/her (e.g. full name(s), alien number(s), and processing location) when ORR assumes custody of the UAC.  Providing this information will ensure that ORR has all options available when considering UAC placement and appearances at hearings.

## Known Physical and Mental Health Issues

In an instance where there is any doubt as to whether an alien should be included in MPP owing to a known physical or mental health issue, CBP should err on the side of exclusion.

**Aliens Determined Not Fit to Travel**

Generally, aliens who are determined not to be fit to travel by medical personnel should be excluded from MPP.  Exemptions from MPP for aliens with known physical or mental health issues are decided on a case-by-case basis.  DHS officials should carefully evaluate and provide appropriate responses for those in special circumstances, which could include exclusion from MPP.

**Expressions of Need for Medical Attention**

If at any time an alien expresses a need for medical attention, or if a CBP agent or officer observes that medical attention is warranted, that alien will be referred to on-site medical staff.  The on-site medical staff will both screen the alien and make the determination about his/her immediate medical needs and whether emergent care is required.  In this situation, CBP is to follow the guidance issued in its "Enhanced Medical Support Directive."[3]

**Case-by-Case Determination of Exemption from MPP**

Following CBP's medical evaluation process -- which should consider potential physical and/or mental health issues related to an alien's disclosure of personal history -- determinations as to whether an alien is exempt from MPP due to known physical or mental health issues are generally to be made on a case-by-case basis at the local level with supervisory review.  The Port Director or Chief Patrol Agent of each location should use his/her discretion to determine amenability on a case-by-case basis considering the totality of the circumstances.  Aliens who receive medical clearance and are fit for travel, as determined by medical personnel, are amenable under MPP guidelines unless the Chief Patrol Agent or Port Director determines otherwise.

## Use of Restraints

Aliens subject to MPP are not a detained population, including during transportation to and from immigration court hearings.

To the extent CBP is required to use restraints during MPP processing, CBP should continue to follow the National Standards on Transport, Escort, Detention and Search (TEDS).  To the extent ICE or contract staff is required to use restraints during MPP processing or transportation, ICE or contract staff should continue to follow the Performance-Based National Detention Standards (PBNDS) 2011 and relevant supplemental guidance, including the ICE Enforcement and Removal Operations (ERO) Memorandum on Use of Restraints (ERO 11155.1).

---

[3] https://www.cbp.gov/document/directives/cbp-enhanced-medical-efforts

## Interagency Collaboration

**Collaboration with DOS**
Recognizing that DHS does not have the statutory authority to provide foreign assistance and deferring to DOS's internal regulations and procedures, DHS should, to the greatest extent possible, regularly collaborate with DOS to identify programs or other efforts that support MPP aliens' options to access safe shelters and MPP-related information during their time in Mexico.

**Collaboration with DOJ and HHS**
Further, DHS should also regularly collaborate with DOJ and HHS to exchange appropriate case-related and statistical information tied to the implementation of MPP and related processes.

## Ongoing Improvement

Notwithstanding the above-mentioned items, DHS should continue to evaluate MPP operations and effectiveness and make continued adjustments, as needed, to improve the integrity and operation of the MPP program including in areas not specifically articulated in this memorandum.

As further potential improvements are identified by CBP, ICE, USCIS, the Office of Strategy, Policy and Plans (PLCY), the Office of Operations Coordination (OPS), the Office of the General Counsel (OGC), the Office of Civil Rights and Civil Liberties (CRCL), etc., all interested parties, including interagency partners, should collaborate to find the most appropriate outcome to reinforce the integrity of MPP.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

## **Supplemental Migrant Protection Protocols Guidance**

**Date:**                              December 7, 2020

**Topic:**                             Initial Document Service

**HQ POC/Office:**              Enforcement Programs Division

- Effective immediately, in accordance with the January 28, 2019 Commissioner's Memorandum, and consistent with existing discretion and authorities in implementing Section 235(b)(2)(C) of the Immigration and Nationality Act, when placing an amenable alien into the Migrant Protection Protocols (MPP), U.S. Customs and Border Protection (CBP) Office of Field Operations Officers or U.S. Border Patrol Agents must also take the following actions, in addition to previously issued guidance, regarding service packet issuance:

  1. **Completing, Serving and Explaining the Documents to the Alien.** If the officer/agent is not fluent in the alien's preferred language, he/she should utilize in-person or telephonic interpretation to complete and serve the documents to the alien, including any explanation of the documents.

  2. **Completing the Form I-862 Notice to Appear (NTA).** When filling out the NTA for aliens being placed into MPP, officers/agents should affirmatively inquire as to whether the alien has an address in Mexico. DHS is obligated to record the alien's answer to this question on the NTA filed with the immigration court. If the alien cannot provide an address in Mexico, the officer/agent should notate on the NTA that the alien "failed to provide address" and advise the alien of the need to update this information with the court by filling out and mailing in or bringing to court the EOIR-33 form* once an address is secured.

  3. **Completing the CBP Form 838 and Form 839 Tear Sheets.** There is no need to read the tear sheet to the alien, as each alien should be presented a copy for his/her records. However, pertinent information in the service packet should be verbally identified for the alien in plain language.

- The following documents should be served to the alien before transferring them to Mexico through the applicable port of entry to the National Migration Institute:
  - ➢ Form I-862 Notice to Appear
  - ➢ CBP Form 838 or Form 839 Initial Processing Information
  - ➢ EOIR List of Pro Bono Legal Service Providers*
  - ➢ EOIR-33 Change of Address*

*The version of each of these forms provided to the MPP aliens should correspond to the immigration court where the NTA is issued.

## Supplemental Migrant Protection Protocols Guidance

Date:                          December 7, 2020

Topic:                         MPP Amenability

HQ POC/Office:                 Enforcement Programs Division

- In accordance with the Commissioner's Memorandum of January 28, 2019 and the *Supplemental Policy Guidance for Additional Improvement of the Migrant Protection Protocols (December 7, 2020)*, and consistent with existing discretion and authorities in implementing Section 235(b)(2)(C) of the Immigration and Nationality Act (INA), this guidance intends to clarify how U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Officers and U.S. Border Patrol (USBP) Agents may exercise their discretion in determining whether individuals are amenable to be returned to Mexico under INA Section 235(b)(2)(C) and to standardize CBP's application of the Migrant Protection Protocols (MPP) to amenable aliens.

- The categories of individuals identified in the Guiding Principles for Migrant Protection Protocols issued on January 28, 2019 by the OFO Enforcement Program Division as not amenable to MPP remain unchanged.  CBP should continue to follow the existing practice of referring to U.S. Citizenship and Immigration Services (USCIS) any alien, whether before or after they are processed under MPP, who expresses a fear of persecution, torture, or return to Mexico.

- Though a particular situation may not in and of itself be considered a physical or mental health issue, conditions related to an alien's disclosed personal history (e.g. pregnancy, prior illness, or any other disclosed medical condition) should be taken into account during the medical assessment process, and may, on a case-by-case basis, constitute grounds for an alien to be excluded from MPP.

*Mental and Physical Health Issues*

- For the purposes of MPP, an "emergent medical condition" is defined as a medical issue such as injury, illness, or infection posing an immediate threat to life, limb, or eyesight requiring immediate medical attention.  Any aliens with an emergent medical condition will be transported to receive appropriate care, consistent with current practice.  Aliens who receive medical clearance and are fit for travel, as determined by medical personnel, remain amenable under MPP guidelines unless the Chief Patrol Agent or Port Director determine otherwise.

- For the purposes of MPP, a "pre-existing medical condition" is defined as a current medical issue such as injury, illness, or infection not requiring immediate, significant medical attention.  Aliens with pre-existing medical conditions determined not to require ongoing, emergent medical care, and who are fit for travel, as determined by medical personnel,

remain amenable under MPP guidelines unless the Chief Patrol Agent or Port Director determine otherwise.

- For the purposes of MPP, a "significant disability" is defined as a physical or mental impairment that substantially limits the alien from meaningfully participating in removal proceedings. Individual aliens with a significant disability, not traveling as a part of a family unit with a caregiver, are to be excluded from MPP. Aliens with a significant disability who are traveling with a caregiver as a part of a family unit, and who are fit for travel, as determined by medical personnel, remain amenable under MPP guidelines unless the Chief Patrol Agent or Port Director determine otherwise.

*Other Situations*

- Pregnant females are generally amenable under the MPP Guiding Principles. Pregnancy in and of itself does not preclude an alien from remaining amenable under MPP guidelines.

- In cases where an alien self-identifies as gay, lesbian, bisexual, transgender, intersex, or gender nonconforming, CBP documents this self-identification on the Detainee Assessment for National Standards on Transport, Escort, Detention, and Search (TEDS). Sexual orientation in and of itself does not preclude an alien from remaining amenable under MPP guidelines. Officers and agents are reminded that if an alien expresses a fear of return to Mexico for any reason, including based on sexual orientation, they are to refer the individual to USCIS.

*Additional Case Review*

- Officers and agents make determinations based on the facts and circumstances known to the officer or agent at the time. Local offices should use their judgement to determine which cases should be referred to OFO and USBP Headquarters for further consideration.

- In all cases, when considering amenability, the Chief Patrol Agent or Port Director of each individual location maintains their discretion to review each case on an individualized basis.

# Migrant Protection Protocols Metrics and Measures

The Migrant Protection Protocols (MPP) are a U.S. Government (USG) action whereby citizens and nationals of countries other than Mexico arriving in the United States by land from Mexico -- whether or not at a port of entry (POE) -- may be returned to Mexico pursuant to Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) while their U.S. removal proceedings are pending under Section 240 of the INA.

DHS remains committed to using all available tools to address the unprecedented security and humanitarian crisis at the southern border of the United States. At the peak of the crisis in May 2019, there were more than 4,800 undocumented aliens attempting to cross the border into the United States daily. MPP is a core component of the USG's efforts to address the migration crisis along the U.S.-Mexico border.

The following are the intended goals of MPP and measurements of how those goals are currently being met.

1. **Goal: MPP streamlines existing avenues for aliens in removal proceedings who qualify for humanitarian protection in the United States to receive it.**

   o **Metric:** MPP provides a streamlined pathway for aliens to defensively apply for protection or relief from removal, while upholding *non-refoulement* obligations through screenings of fear in Mexico.

   ▪ **Data measurement:** Number of INA Section 240 removal proceedings for aliens subject to MPP which resulted in a grant of relief.

   | MPP Aliens Granted Relief |
   |---|
   | 531 |

   *As of December 31, 2020.
   ** "Relief" in this context refers to asylum, statutory withholding of removal and withholding of removal under the Convention Against Torture.

   ▪ **Data measurement:** Number of MPP aliens referred to U.S. Citizenship and Immigration Services (USCIS) for *non-refoulement* assessment interviews based on the alien's assertion of a fear of persecution or torture in, or returning to, Mexico.

   | Number of MPP Aliens Referred to USCIS for Non-Refoulement Assessments |
   |---|
   | 19,707 |

   * As of December 31, 2020
   ** If USCIS assesses that an alien who affirmatively states a fear of return to Mexico is more likely than not to face persecution on a protected ground or torture in Mexico, the alien is no longer amenable for MPP.

AR554

2. **Goal:** **MPP supports an orderly and timely completion to U.S. immigration processes.**

   o **Metric:** MPP provides a pathway for aliens to proceed efficiently through the U.S. immigration court processes, as compared to non-detained dockets.

      ▪ **Data measurement:** The number of cases completed by immigration judges since MPP's inception.

| MPP Case Completion | | |
|---|---|---|
| **Total Enrolled in MPP** | **Total Cases Completed** | **Case Completion Percentage** |
| 68,039 | 44,014 | 65% |

      \* As of December 31, 2020.
      \*\* "Total Enrolled" includes only cases in which the notice to appear (NTA) was filed.
      \*\*\* "Cases Completed" includes only initial case completions, i.e. it excludes cases that were "completed" a second time due to a motion to reopen or a remand.

3. **Goal:** **MPP prevents "catch and release" into the United States, including for those whose claims are later found to be non-meritorious.**

   o **Metric:** MPP decreases the number of aliens released into the interior of United States for the duration of their U.S. removal proceedings.

      ▪ **Data measurement:** Number of aliens enrolled in MPP by Customs and Border Protection (CBP) across the Southwest Border (SWB).

| Number of Aliens Enrolled in MPP |
|---|
| 68,039 |

      \* As of December 31, 2020.
      \*\* "Total Enrolled" includes only cases in which the NTA was filed.

4. **Goal:** MPP provides a deterrent to illegal entry.

   o **Metric:** MPP implementation contributes to decreasing the volume of inadmissible aliens arriving in the United States on land from Mexico (including those apprehended between the POEs).

■ **Data measurement:** Number of enforcement encounters along the SWB.





# Measuring *In Absentia* Removal in Immigration Court

By Ingrid Eagly, Esq. and Steven Shafer, Esq.

**SPECIAL REPORT | JANUARY 2021**



American Immigration Council

AR557

# ABOUT THE AUTHORS

**Ingrid Eagly** is a Professor of Law at the UCLA School of Law. An expert on immigration law, Eagly is an affiliated faculty member of the UCLA Center for the Study of International Migration. She earned an A.B. from Princeton University and a J.D. from Harvard Law School.

**Steven Shafer** is a managing attorney at the Esperanza Immigrant Rights Project in Los Angeles. Before pursuing law, Shafer spent a decade as a social scientist at Princeton University and the Harvard Business School. Shafer earned a B.A. from Yale University, a M.A. in sociology from Princeton University, and a J.D. from UCLA School of Law.

# ABOUT THE AMERICAN IMMIGRATION COUNCIL

The American Immigration Council works to strengthen America by shaping how America thinks about and acts towards immigrants and immigration and by working toward a more fair and just immigration system that opens its doors to those in need of protection and unleashes the energy and skills that immigrants bring. Through its research and analysis, the American Immigration Council provides policymakers, the media, and the general public with information about how the immigration system works, the impact of policy proposals, and the crucial role that immigration plays in our communities and workplaces.

Visit us at www.AmericanImmigrationCouncil.org and www.ImmigrationImpact.com.

# CONTENTS

**Executive Summary** ...................................................................................................... 4

**Introduction** .................................................................................................................. 6

**The Overwhelming Majority of Immigrants Appear
for Their Immigration Court Hearing** ....................................................................... 7

**The Majority of Immigrants Came to Court if Given a Second Chance** ............... 10

**Immigrants Were More Likely to Miss Court in the Early Stages of the
Removal Process** ......................................................................................................... 11

**A Significant Portion of Immigrants Ordered Removed for Missing Court
Later Overturned That Order** ................................................................................... 12

**Higher Rates of Appearance in Court Were Associated with Having a
Lawyer, Applying for Relief from Removal, and Court Location** .......................... 13

**Conclusion** .................................................................................................................. 19

**Endnotes** ..................................................................................................................... 22

# Executive Summary

Do immigrants attend their immigration court hearings? This question is central to current debates about the immigration court system. Contrary to claims by the government that most immigrants fail to appear in immigration court, our analysis of data provided by the federal government reveals that 83% of all nondetained immigrants with completed or pending removal cases from Fiscal Years (FY) 2008 through 2018 attended all of their court hearings. Among those who were represented by counsel during the same time period, 96% attended all of their court hearings. Moreover, we reveal that 15% of those who were ordered deported because they didn't appear in court successfully reopened their cases and had their removal orders rescinded. This crucial finding suggests that many individuals who fail to appear in court wanted to attend their hearings but never received notice or faced hardship in getting to court.

## Key Findings

- 83% of nondetained immigrants with completed or pending removal cases attended all their hearings from 2008 to 2018.

- 96% of nondetained immigrants represented by a lawyer attended all of their hearings from 2008 to 2018.

- 15% of all removal orders for failure to appear issued from 2008 to 2018 were successfully overturned. In some years, as many as 20% of all orders of removal for missing court were later overturned.

- Individuals who appliedy for relief from removal hadve especially high rates of appearance.

- Appearance rates variedy strongly based on the immigration court's location.

- The Executive Office for Immigration Review's method for measuring the rate at which immigrants fail to appear in court presents a limited picture of the frequency of missed court appearances.

AR560

This report presents these and other key findings from a recent study of the rate at which immigrants appear for hearings in U.S. immigration court. The findings stand in marked contrast to the bold and inconsistent claims made by former President Donald Trump and members of his administration about purportedly dismal court appearance rates. Indeed, former President Trump repeatedly shared misinformation that noncitizens never or rarely appear in court. Policymakers have relied on these assertions about purported failures to appear to drive key decisions, including to expand reliance on immigration detention and to reduce access to asylum. Appearance rates have also been pivotal to the debate about building a border wall, which the Trump administration sought to justify by claiming that those who cross the southern border simply "vanish" into the country and never come to court.

This report provides accurate information, based on independent analysis of government data, of the rate at which immigrants attend court. It sheds light on the concerted effort made by immigrants to comply with the law so as to increase transparency to policymakers and the public. The report provides a detailed analysis of the frequency of *in absentia* orders and discusses the important relationship between appearance rates and representation by counsel, applications for relief, and court location. Taken together, this data-driven report lays bare the lie that noncitizens never appear in court. It also serves as a necessary guide for the newly elected administration of President Joe Biden, which has the opportunity to take a fresh look at immigration policy and implement the data-driven policy recommendations discussed in the report's conclusion.

## About the Data

This report analyzes the government's own court records in immigration cases. Using the Freedom of Information Act (FOIA), these court records were obtained from the Executive Office for Immigration Review (EOIR), the division of the Department of Justice (DOJ) that conducts immigration court proceedings. EOIR periodically updates these data, and we analyzed data tables made available by EOIR as of November 2, 2018. These data included 8,253,223 immigration court proceedings, with completed and pending cases dating back to 1951.

To conduct the analysis, we limited our data to 2,797,437 nondetained removal proceedings from the period between fiscal years 2008 and 2018. These proceedings included both individuals who were never detained and those who were released from detention. Each of these immigration court proceedings contained one or more hearings.

For more information regarding the data and methodology used in this analysis, see Ingrid Eagly and Steven Shafer, "Measuring *In Absentia* Removal in Immigration Court," *University of Pennsylvania Law Review* 168, no. 4 (2020): 817-876.

AR561

# Introduction

Throughout much of the 20th century, immigrants that the United States sought to deport were required to present themselves to "Special Inquiry Officers" for the former Immigration and Naturalization Service (INS), who in 1973 were authorized to wear judicial robes and use the title of "immigration judge." At those hearings, immigration judges would choose whether to issue a deportation order. In 1983, immigration judges became part of the Department of Justice (DOJ) and housed within a new agency, the Executive Office for Immigration Review (EOIR).

Prior to 1990, immigration judges had discretion over how to handle missed court appearances. For example, they could hold a hearing and dismiss, continue, or administratively close the case. In 1990 the law was amended to require immigration judges to order a noncitizen who missed even one court hearing deported. This type of deportation without the individual being present in court is called *in absentia* removal, based on the Latin phrase meaning "in the absence of."

Today, immigration judges must order removal *in absentia* if the noncitizen is not in court at the scheduled hearing, provided the government can first establish by "clear, unequivocal, and convincing evidence" that the noncitizen is subject to removal and that written notice of the hearing was provided. Those subject to *in absentia* removal are generally barred from seeking admission to the United States or relief from removal for a period of years.

Since the 1990 law took effect, U.S. government officials have routinely relied on a purported rise in the prevalence of *in absentia* removal orders to support major policy shifts to the immigration system and buttress legal arguments defending those changes. For example, in 1995 Congress relied on government-produced statistics showing a "high rate of no-shows for those criminal aliens released on bond" to change the immigration law to require noncitizens with certain convictions be mandatorily detained pending deportation without access to a bond hearing. In 2002, the solicitor general cited those same government *in absentia* statistics as persuasive authority in defending against a challenge to the constitutionality of mandatory detention. The U.S. Supreme Court later relied on the government's statistical claims to uphold the constitutionality of mandatory detention for immigrants with criminal convictions as reasonable to prevent "an unacceptable rate of flight."

More recently, DOJ officials have repeatedly told the public that many asylum seekers "simply disappear and never show up at their immigration hearings," thus justifying tighter restrictions on the asylum law and even criminal prosecution of asylum seekers to prevent the court system from being "gamed." Claims about failures to appear have also been relied upon by the Department of Homeland Security (DHS) to justify the so-called Migrant Protection Protocols (MPP) program that requires migrants to remain in Mexico to await their immigration court hearings. The Department of Health and Human Services and DHS have also prominently relied on purportedly high *in absentia* rates to argue in favor of radically restructuring the established system that protects children against long-term detention.

<div align="center">AR562</div>

Summary entry of a removal order when someone does not appear for a hearing—without the opportunity for the individual to respond and without regard to the merits of the individual's eligibility for relief—has been controversial and raises serious due process concerns. The practice also differs markedly from the criminal system, where failure to appear at trial is generally treated with issuance of an arrest warrant, not adjudication of the criminal charges without the defendant present in court. For example, pursuant to Federal Rule of Criminal Procedure 43, a defendant's presence in court is required to begin a trial and cannot be waived. This is very different from the immigration court system, where there is no requirement that a noncitizen be present before concluding the hearing with the entry of a removal order.

Although much is at stake, government officials offer no verifiable empirical support for their claims that migrants "never" or rarely come to court. Therefore, scholars, members of the press, and other experts have turned to the annual report published by the statistical division of EOIR. The EOIR's annual statistics yearbook has typically included a measurement of the *in absentia* removal rate but has offered only a sparse description of the method used to reach their measurement. This report offers an independent analysis of EOIR's method for calculating *in absentia* removal and discusses the policy implications of these findings.

## The Overwhelming Majority of Immigrants Appear for Their Immigration Court Hearings

This report relies on the government's own court data to provide reliable measurements of *in absentia* removal orders. Specifically, to calculate the rate at which immigrants have been ordered removed for failing to appear in court, we analyzed data released by EOIR, the agency within DOJ that contains the immigration courts. Because almost all *in absentia* orders take place in nondetained cases, we limited our analysis to those cases where the immigrant was never detained by ICE or had been detained and then released. In total, we analyzed 2,797,437 nondetained removal proceedings from the period between fiscal years 2008 and 2018.

We examined these data using three different analytical methods for calculating *in absentia* removal.

First, we replicated the method of calculating the *in absentia* rate generally used by EOIR in its annual statistics reports, which divides the number of *in absentia* removals issued at the initial case completion stage of a case by the total number of initial immigration judge decisions issued during the fiscal year. Initial immigration judge decisions are the first on-the-merits decisions by the immigration judge to order removal, grant relief, or terminate the case. This report refers to EOIR's approach to measuring the *in absentia* rate as the "IJ decisions" method.

Second, we analyzed the rate at which immigrants were ordered removed for failure to appear among all cases which reached an initial case completion of any kind, including both initial immigration judge decisions and other immigration judge completions, such as administrative closures. Administrative closure is a discretionary docket-management

AR563

tool that immigration judges have used for decades. Through this practice, a judge removes a case from the active docket, thereby putting the case on indefinite hold and allowing the noncitizen to remain in the United States. We call this the "all completions" method.

Third, we analyzed the rate at which immigrants were ordered removed for failure to appear as a percentage of both all initial case completions (including initial immigration judge decisions and other immigration judge completions) and pending cases. Pending cases are not yet resolved and have ongoing hearings to rule on motions and applications for relief. Pending cases ballooned from 156,714 in 2008 to 707,147 in 2018. This report calls this approach that includes pending cases the "all matters" method.

### Table 1: *In Absentia* Removal Rate (Initial Case Completions), by Method (Nondetained Only)

| Fiscal Year | IJ Decisions | | Other | | *In Absentia* Removal Rate (Among . . .) | | |
| | *In Absentia* | Not *In Absentia* | Other IJ Completions | Pending | IJ Decisions | All Completions | All Matters |
|---|---|---|---|---|---|---|---|
| 2008 | 24,882 | 60,337 | 8,020 | 144,996 | 29% | 27% | 8% |
| 2009 | 22,071 | 57,640 | 6,803 | 178,156 | 28% | 26% | 6% |
| 2010 | 23,852 | 64,357 | 7,883 | 212,053 | 27% | 25% | 6% |
| 2011 | 21,739 | 65,417 | 5,235 | 246,153 | 25% | 24% | 5% |
| 2012 | 18,990 | 60,344 | 14,994 | 275,132 | 24% | 20% | 4% |
| 2013 | 20,940 | 56,727 | 27,243 | 303,015 | 27% | 20% | 4% |
| 2014 | 25,587 | 46,655 | 29,845 | 372,884 | 35% | 25% | 5% |
| 2015 | 37,994 | 45,467 | 41,003 | 393,651 | 46% | 31% | 6% |
| 2016 | 33,896 | 47,579 | 47,071 | 443,658 | 42% | 26% | 5% |
| 2017 | 41,374 | 45,684 | 28,055 | 559,855 | 48% | 36% | 5% |
| 2018 | 44,764 | 63,975 | 9,046 | 673,580 | 41% | 38% | 5% |
| *Summary Statistics* | | | | | | | |
| Total | 316,089 | 614,182 | 225,198 | 673,580 | 34% | 27% | 17% |
| Average | 28,735 | 55,835 | 20,473 | 345,739 | 34% | 27% | 5% |
| (SD) | (9,092) | (7,990) | (14,877) | (163,990) | (8%) | (6%) | (1%) |

**Source: Authors' analysis of Executive Office for Immigration Review data, FY 2008–2018**

Table 1 provides the findings from this analysis. Each of these three methods yielded a different *in absentia* rate for nondetained immigrants during the period from 2008 to 2018.

- First, using the government's IJ decisions method, the *in absentia* rate was 34%.

- Second, using the all completions method, the *in absentia* rate was 27%.

- Third, using the all matters method, the *in absentia* rate was 17%.

When the same data were analyzed using the government's IJ decisions method, nondetained immigrants appear to miss court much more often. The government measurement is twice as high as the all matters approach—34% of the time compared to just 17% of the time. That means that under the all matters approach, immigrants have appeared for all scheduled hearings in 83% of all pending and completed cases over an 11-year period.

Of the three methods, the all matters method is the most reliable measurement of the rate at which immigrants appear in court. First, unlike the government's IJ decisions method, the all matters method includes all judicial decisions, including decisions to administratively close a case, in its analysis. Because administrative closure reached a rate as high as one-fourth of all initial case completions from 2008–2018, the failure to include such closures makes the government method significantly less inclusive of what is happening in immigration court.

Second, unlike the government's IJ decisions method, the all matters method includes pending cases. If immigration cases were quickly decided on their merits, excluding pending cases when measuring the *in absentia* removal rate—as EOIR does—might make sense. But given the immense and growing backlog in the immigration courts, cases can drag on for many years before a decision is reached. During this time, immigrants who diligently are attending all of their court hearings should not be excluded from calculations of appearance rates.

Because the government's IJ decisions method excludes pending cases, it does not account for the hundreds of thousands of cases each year in which immigrants appear for a hearing while their case wends its way through the lengthy court process. Given the flaws with the government's IJ decisions method, and its tendency to overstate the rate at which immigrants fail to appear in court, we recommend against the method's use whenever possible.

**Figure 1:** *In Absentia* **Removal Rate, by Calculation Method (Nondetained Only)**



Source: Authors' analysis of Executive Office for Immigration Review data, FY 2008–2018

# The Majority of Immigrants Came to Court if Given a Second Chance

The immigration court compliance rates discussed above reveal that the vast majority of immigrants have attended their court hearings. For those who do miss their hearings, a crucial question is whether they were made aware of their court date and time in accordance with due process. Indeed, court appearance rates must be considered against the backdrop of a pervasive failure of DHS to include the time and date of hearings in the charging documents given to individuals in removal proceedings. In a 2018 oral argument before the U.S. Supreme Court, counsel for the government admitted that "almost 100%" of notices to appear issued over the previous three years had omitted the time and date of the court proceeding. These pervasive defects in notice are part of the reason why noncitizens do not appear in court. This reality has made it hard for individuals— particularly if they do not speak English, are unfamiliar with the court system, or do not have lawyers—to figure out when and where to go to court.

To address these notice deficits, we evaluated how often immigration judges identified failures to appear that occurred because of notice issues. Looking at the cases of individuals who were never detained, we found that immigration judges adjourned fewer than 1% of initial hearings due to potential notice issues. However, when judges did adjourn these missed hearings due to notice issues, we found that 54% of these individuals appeared in court at the next hearing.

<div align="center">AR566</div>

This is an essential data point. First, it reveals that, although notice issues were prevalent during the time period of this study and the government has the burden to prove proper service of notice, notice issues were rarely identified or challenged by immigration judges. Second, it demonstrates that when immigration judges did pay attention to notice issues, the majority of noncitizens made it to court after the notice issue was addressed.

## Immigrants Were More Likely to Miss Court in the Early Stages of the Removal Process

Each immigration proceeding contains one or more hearings. The first hearings in a case are generally referred to as "initial master" hearings (also commonly known as "master calendar" hearings), which are scheduled to allow for general administration of the case, including the taking of pleadings, requests for time to find an attorney or time to prepare a case, and the filing of applications for relief. Some cases proceed on to an "individual" hearing (also commonly known as "merits" hearing) in which the immigration judge adjudicates the substance of the claim for relief, such as asylum or cancellation of removal.

As seen in Figure 2, 47% of *in absentia* removal orders occurred at the very first hearing in the case. The pattern was very different among initial case completions that did not result in an *in absentia* order. Less than 9% of non-*in absentia* decisions were completed at the first hearing. These patterns, along with the other data reported above, suggest that some immigrants who fail to appear at their first hearing may not have received notice about the court proceeding.

Figure 2 also reveals that once individuals have begun the court process, they were more likely to appear in court. In other words, the more an immigrant becomes invested in the court process through awareness of how the system works and familiarity with the procedural requirements, the less likely the person is to fail to appear.

### Figure 2: Number of Hearings Before Initial Case Completion, by Decision Type (Nondetained Only)



Source: Authors' analysis of Executive Office for Immigration Review data, FY 2008–2018

AR567

# A Significant Portion of Immigrants Ordered Removed for Missing Court Later Overturned That Order

Immigrants may overturn a removal order for failure to appear in court in two specific circumstances, both of which require the immigrant to prove they did not intentionally or negligently fail to appear:

- When a motion to reopen is filed within 180 days of the order of removal, demonstrating that "exceptional circumstances" prevented the immigrant from appearing in court and led to the failure to appear.

- When the immigrant can prove that they never received notice of the scheduled hearing.

We relied on the EOIR data to examine what happened after the initial *in absentia* order was entered. From 2008 to 2018, nearly 20% of all *in absentia* removal orders were challenged through a motion to reopen. These motions were overwhelmingly successful, and fully 15% of those who were ordered removed *in absentia* during that period successfully reopened their cases and had their deportation orders rescinded (see Figure 3 & Table 2). This crucial finding suggests that many individuals who failed to appear in court wanted to attend their hearings but never received notice or faced hardship in getting to court.

**Figure 3: Rate at Which *In Absentia* Orders Are Overturned, by Fiscal Year Order of Removal Order Entered (Nondetained Only)**



Source: Authors' analysis of Executive Office for Immigration Review data, 2008–2018

**Table 2: Reopening of *In Absentia* Removal Orders,
by Fiscal Year (Nondetained Only)**

| Fiscal Year | *In Absentia* Removal at Initial Completion | Successful Motion to Reopen | Reopened (Percent) |
|---|---|---|---|
| 2008 | 24,882 | 4,716 | 19% |
| 2009 | 22,071 | 4,560 | 21% |
| 2010 | 23,852 | 4,651 | 19% |
| 2011 | 21,739 | 4,331 | 20% |
| 2012 | 18,990 | 3,464 | 18% |
| 2013 | 20,940 | 3,799 | 18% |
| 2014 | 25,587 | 4,188 | 16% |
| 2015 | 37,994 | 5,558 | 15% |
| 2016 | 33,896 | 4,589 | 14% |
| 2017 | 41,374 | 4,812 | 12% |
| 2018 | 44,764 | 3,284 | 7% |
| *Total* | 316,089 | 47,952 | 15% |

Source: Authors' analysis of Executive Office for Immigration Review data, FY 2008–2018

In reviewing Figure 3, note how older cases had a higher rate of reopening than newer cases. For cases that received an *in absentia* order in 2008, 19% were reopened by the end of our study period. In contrast, only 7% of *in absentia* orders entered in 2018 had been reopened at the end of 2018. This outcome makes sense given that many individuals with *in absentia* orders may not yet be aware that they were ordered removed and need time to make a motion to reopen in immigration court. Given the legal complexity of such a motion, individuals may also need time to find and retain counsel. Over time, therefore, we can expect the percentage of *in absentia* cases that are reopened to rise.

## Higher Rates of Appearance in Court Were Associated with Having a Lawyer, Applying for Relief from Removal, and Court Location

We also analyzed three factors associated with showing up in immigration court: having a lawyer, applying for relief from removal, and court location.

### Attorney Involvement

Noncitizens have a right to be represented by counsel in immigration proceedings, but generally not at the expense of the government. To evaluate the relationship between representation and *in absentia* removal rates, we examined the rate of *in absentia* removals among those who had counsel between 2008 and 2018.

The data reveal that individuals with counsel rarely failed to show up in court. Even using the government's IJ decision method, persons with counsel were ordered removed *in absentia* just 8% of them time. When using the all matters method, those with counsel were ordered removed *in absentia* in just 4% of cases (see Figure 4).

**Figure 4: *In Absentia* Removal Rate for Individuals Represented by Counsel, by Calculation Method (Nondetained Only)**



Source: Authors' analysis of Executive Office for Immigration Review data, FY 2008–2018

We also find that most cases with failures to appear involved unrepresented litigants. Overall, only 15% of those who were ordered removed *in absentia* during our study period had an attorney. By contrast, 86% of those with an initial completion not ending *in absentia* had counsel (see Figure 4).

We also find that the ability to reopen an *in absentia* removal case is mainly reserved for those who find a lawyer. That is, among those who were able to successfully reopen their case after an *in absentia* removal order, 84% had a lawyer representing them.

As these striking statistics suggest, attorneys play a vital supporting role in ensuring that their clients make it to court. Attorneys can make sure their client knows when and where to appear and how to keep the court updated on any change of address. Without a lawyer, some immigrants attend their check-in appointments with ICE believing erroneously that it is their court date and then miss their actual court date. Others have reported missing their hearings after being given Notices to Appear (NTAs) with no court date or with a fake court date at an erroneous location. Unrepresented litigants may also encounter challenges in completing the necessary court documents to reschedule an immigration court hearing or to notify the court about a change of address. For example, despite policy to the contrary, immigration courts do not always accept notifications of changes of address before proceedings have formally begun, making it impossible to receive notice at a new address.

<div align="center">AR570</div>

**Applying for Relief**

Immigration removal proceedings are best understood as occurring in two stages. In the first stage, the immigration judge decides whether to sustain the charge of removability alleged by DHS in the NTA against the individual, who is referred to in immigration court as the "respondent." If the charge is sustained and the respondent is found to be subject to removal, the respondent can seek relief from removal in the second stage. There are numerous forms of relief in immigration court. The most commonly sought are asylum, cancellation of removal, and adjustment of status. To qualify for relief, a respondent must satisfy the applicable statutory eligibility requirements and convince the judge that the case merits the favorable exercise of discretion. A respondent who wins relief will be able to remain lawfully in the United States.

Across the 11 years of our study period, 48% of individuals in removal proceedings who were not detained sought some form of relief prior to the initial completion in their cases. Among these individuals who sought relief, 72% submitted an asylum application; 28% applied for cancellation of removal for lawful permanent residents or non-lawful permanent residents; and 10% applied for adjustment of status.

Overall, 95% of all litigants with completed or pending applications for relief attended all of their court hearings between 2008 and 2018. This result makes sense: individuals pursuing claims for relief in court have a strong incentive to fight for permission to remain in the United States.

Figure 5 presents the *in absentia* rates for nondetained respondents who sought relief in immigration court, organized by the most common types of relief (asylum, cancellation of removal, and adjustment of status). We present these findings using all three possible measurements for *in absentia* removal: as percentages of all initial immigration judge decisions on the merits, all initial case completions, and all matters. Focusing on the all matters approach, only 6% of those seeking asylum failed to appear during the study period, while only 3% of those seeking cancellation of removal and 2% of those seeking adjustment of status did.

**Figure 5: *In Absentia* Removal Rate,
by Application Type and Calculation Method (Nondetained Only)**



Source: Authors' analysis of Executive Office for Immigration Review data, FY 2008–2018

AR571

These findings are noteworthy because they reveal that immigrants seeking relief are highly likely to come to court. Such statistics have not traditionally been released by the federal government, which generally provides only overall rates—not rates among those seeking relief from removal.

**Court Location**

The *in absentia* rate also varied by court location. Currently, there are more than 60 different cities in the United States that host immigration courts, and approximately 460 immigration judges appointed by the attorney general of the United States. As seen in Table 3, the variation in *in absentia* removal rates by city was striking, ranging from a high of 54% in Harlingen, Texas, to a low of 15% in New York City. The three courts that handled the highest numbers of cases involving individuals who were not detained—San Francisco, Los Angeles, and New York—also had among the lowest *in absentia* removal rates.

Some of these differences across jurisdictions no doubt reflect different migrant populations at these court locations. In column 3 of Table 3 we calculate by jurisdiction the percentage of nondetained initial case completions that involved respondents who were never detained (as opposed to being released from detention). In Harlingen, Texas, for example, only 20% of initial case completions were for never-detained respondents; the remaining 80% were for individuals who were released from detention. Interestingly, however, there was still wide variation in the *in absentia* removal rates across cities with similar proportions of never-detained cases. For example, approximately two-thirds of the dockets in both San Francisco and Dallas were composed of cases of individuals who were never detained, but the *in absentia* removal rate in San Francisco was 19%, compared to 41% in Dallas.

This deviation in appearance rates may also reflect differences in local court practices. For example, some local courts may have better and more timely systems in place for scheduling court hearings and notifying respondents about their upcoming court hearings. A 2017 DOJ on-site review of the immigration court in Baltimore, Maryland, found that the court was so understaffed as caseloads grew that administrators were unable to enter change-of-address paperwork sent to the court into their computer system. This problem means that respondents would not receive their court notices, which the report warned "can result in respondents being ordered removed [for failure to appear in court] through no fault of their own." As our data reveal, 33% of respondents in the Baltimore court were ordered removed for failure to appear.

AR572

**Table 3: *In Absentia* Removal as a Percentage of Initial Case Completions, by Court Location (Nondetained Only)**

| City | Initial Case Completions | Never-Detained (% of total) | Active IJs (2008—2018) | *In Absentia* Rate |
|------|--------------------------|------------------------------|-------------------------|---------------------|
| Harlingen, TX | 16,535 | 20% | 8 | 54% |
| Houston, TX | 46,691 | 56% | 17 | 46% |
| New Orleans, LA | 17,633 | 53% | 12 | 45% |
| Charlotte, NC | 36,619 | 78% | 4 | 44% |
| San Antonio, TX | 26,444 | 19% | 16 | 42% |
| Dallas, TX | 34,193 | 69% | 9 | 41% |
| Chicago, IL | 41,253 | 60% | 13 | 38% |
| Memphis, TN | 26,225 | 75% | 7 | 36% |
| Atlanta, GA | 37,845 | 66% | 10 | 35% |
| Arlington, VA | 41,022 | 67% | 15 | 33% |
| Baltimore, MD | 33,407 | 76% | 9 | 33% |
| Orlando, FL | 39,334 | 79% | 9 | 29% |
| Philadelphia, PA | 20,015 | 73% | 8 | 28% |
| Kansas City, MO | 17,862 | 57% | 13 | 28% |
| Cleveland, OH | 14,423 | 60% | 11 | 28% |
| Newark, NJ | 30,641 | 65% | 18 | 27% |
| Miami, FL | 85,383 | 77% | 37 | 26% |
| Boston, MA | 33,517 | 73% | 12 | 24% |
| Denver, CO | 18,722 | 57% | 10 | 23% |
| Los Angeles, CA | 135,393 | 74% | 54 | 23% |
| Seattle, WA | 22,113 | 61% | 5 | 19% |
| San Francisco, CA | 59,257 | 68% | 31 | 19% |
| San Diego, CA | 18,583 | 50% | 10 | 17% |
| Phoenix, AZ | 25,140 | 42% | 5 | 16% |
| New York, NY | 149,444 | 76% | 48 | 15% |

Source: Authors' analysis of Executive Office for Immigration Review data, FY 2008–2018

Another court practice that is associated with whether respondents came to court is the length of delay between the issuance of the NTA and the initial court date. Looking only at all initial case completions among never detained, we found that the average time between the filing of the NTA and the initial hearing was 239 days for cases that ended with *in absentia* orders. By comparison, on average there were only 167 days between the filing of the NTA and the first hearing in never-detained cases that did not end with *in absentia* removals. The median number of days showed similar patterns: 153 days median for cases ending *in absentia*, compared to 101 days median for cases not ending *in absentia*. This finding suggests that, on average, long delays can make it harder for people to receive proper notice, remember their court hearings, and remain in contact with the court.

The availability of counsel in different jurisdictions may be an additional contributing factor to variation in failures to appear. In previous work, we found that some cities have very few practicing immigration attorneys. These problems were most acute in smaller cities where detained courts tend to be located. For example, we found that Lumpkin, Georgia, where the Stewart Detention Center is located did not have a single practicing immigration lawyer in 2015, and Oakdale, Louisiana, had only four. As a result, the rate of attorney representation also varies dramatically between immigration courts.

AR573

Notably, those cities with the highest *in absentia* removal rates using the all case completions method also had the lowest representation rates (Table 3). For example, in Harlingen, Texas, where 54% of nondetained respondents were ordered removed for failing to appear, only 41% of nondetained respondents had counsel. In sharp contrast, 85% of nondetained respondents in New York City's immigration court had counsel, and only 15% were removed for not appearing in court.

In summary, attorney representation, seeking relief, and court assignment were all associated with variation in *in absentia* removal rates. Individuals who filed claims for relief (such as asylum or cancellation of removal) were very unlikely to miss court: 95% attended all of their court hearings over the 11 years of our study in pending and completed nondetained cases. Those who obtained lawyers also almost always came to court: 96% attended all court hearings in pending and completed nondetained cases. In addition, the prevalence of *in absentia* removals varied widely based on court location, ranging from a low of 15% of all initial case completions in New York City, to a high of 54% in Harlingen, Texas.

## Conclusion

A key insight of this report is that the method chosen for measuring failures to appear in court matters. As we have set forth, the method adopted by the government to measure annual rates of *in absentia* removals—as a percentage of initial immigration judge decisions on the merits—ignores a large number of court cases in which respondents have not missed any court hearings. In particular, the government's measurement ignores cases that are administratively closed, an essential tool that has been used by immigration judges over the past decade to remove cases indefinitely from the immigration court's docket. The government's measurement also ignores the historically high number of backlogged cases pending in immigration courts today. These backlogs matter because nondetained deportation cases now take many court hearings and several years to resolve, and during this time immigrants continue to appear for their court hearings. This report has argued that counting administrative completions and pending cases in the *in absentia* removal measurement is a necessary complement to the government's measurement that enhances public understanding of the rate at which noncitizens are complying with their court dates. We recommend that future statistical reporting by EOIR include these measurements.

The analysis of over a decade of government data presented here also has immediate relevance to the consideration of policy questions in which statistics on failures to appear in court play a central role. The findings presented in this report are particularly important as the new administration of President Joe Biden considers how to reform the immigration system, including the immigration courts. The "timely and fair" adjudication of asylum and other cases by immigration judges is a vital component of the Biden plan "for securing our values as a nation of immigrants."

In particular, this report supports four meaningful policy reforms:

1. reducing reliance on detention and programs such as the Migrant Protection Protocols (MPP) that keep asylum seekers in Mexico while awaiting court hearings;

2. ensuring access to counsel for individuals in removal proceedings;

3. reforming the *in absentia* law and enhancing judicial training; and

4. establishing an independent Article I immigration court.

First, our finding that the vast majority of nondetained respondents attended their court hearings supports releasing far more people from custody rather than creating stricter detention rules and expanded detention capacity. Further improvement in court appearance rates could also be attained by learning from the proven success of other court systems in providing reminder calls, postcards, and text messages with the accurate time and date of the hearing. In addition, ICE could ensure that individuals who are scheduled for agency check-ins are educated on the court process and provided transportation assistance to court if necessary. Our analysis showing that asylum seekers are very likely to attend their court hearings similarly undermines arguments that asylum seekers should be prevented from entering the country out of a fear they will not come to court.

Second, further enhancements in appearance rates could be fostered by expanding funding for pro bono lawyers and know-your-rights programs. Our data show that individuals with attorneys have near-perfect attendance rates. Over the 11 years of our study, 96% of represented individuals in completed or pending courts attended all of their court hearings (Figure 4).

Third, this report's findings support giving immigration judges greater independence and training to give individuals a second chance to come to court. Our independent analysis of federal data reveals that in those cases where individuals were given another opportunity to come to court, more than half did show up at the next hearing. One significant reform along these lines would be to amend the immigration law to give judges greater discretion to provide immigrants more chances to come to court, as the law allowed prior to 1990. Even if the law is not changed, EOIR could work to train judges to more carefully scrutinize notice issues at the first hearing to ensure that proper notice was provided before issuing any removal orders, making sure that DHS has met its burden to prove by clear, unequivocal, and convincing evidence that a person has received proper notice.

Finally, this report supports the creation of an independent structure for the immigration courts. The federal tax and bankruptcy courts provide precedent for creating specialized federal courts under Article I of the United States Constitution. Such an independent court structure would help to reduce the prevalence of unwarranted *in absentia* removal orders by giving immigration judges more authority over their dockets and individual case decisions. As an independent court, judges would feel less pressure to meet case quotas and approve removal orders, allowing them to focus proper attention on notice deficiencies. Judges would also have more flexibility to use court continuances to give respondents further opportunity to come to court.

AR575

# Endnotes

1. The findings in this report were first published in Ingrid Eagly and Steven Shafer, "Measuring *In Absentia* Removal in Immigration Court," *University of Pennsylvania Law Review* 168, no. 4 (2020): 817-876.

2. In the final presidential campaign debate in 2020, President Trump claimed that "less than 1%" of immigrants "come back" to court. "Debate Transcript: Trump, Biden Final Presidential Debate Moderated by Kristen Welker," *USA Today*, October 23, 2020, https://www.usatoday.com/story/news/politics/elections/2020/10/23/debate-transcript-trump-biden-final-presidential-de-bate-nashville/3740152001/ [https://perma.cc/8VWA-G443]. President Trump made similar remarks throughout his term in office. See e.g., Remarks During a Roundtable Discussion on Tax Reform in Cleveland, Ohio, 2018 Daily Compilation of Presidential Documents, May 5, 2018, 2 ("Our immigration laws are a disgrace . . . . We give them, like, trials. That's the good news. The bad news is, they never show up for the trial. . . . Nobody ever shows up."); Remarks Prior to a Working Lunch with President Kersti Kaljulaid of Estonia, President Raimonds Vejonis of Latvia, and President Dalia Grybauskaite of Lithuania and an Exchange with Reporters, 2018 Daily Compilation of Presidential Documents, April 3, 2018, 3 ("We cannot have people flowing into our country illegally, disappearing, and, by the way, never showing up to court."); Remarks at the American Farm Bureau Federation's 100th Annual Convention in New Orleans, Louisiana, 2019 Daily Compilation of Presidential Documents, January 14, 2019, 6 ("Tell me, what percentage of people come back [for their trial]? Would you say 100 percent? No, you're a little off. Like, how about 2 percent? [Laughter] . . . Two percent come back. Those 2 percent are not going to make America great again, that I can tell you. [Laughter]"); Remarks at the National Federation of Independent Businesses 75th Anniversary Celebration, 2018 Daily Compilation of Presidential Documents, June 19, 2018, 5 ("Do you know, if a person comes in and puts one foot on our ground . . . they let the person go; they say show back up to court in 1 year from now. One year. . . . But here's the thing: That in itself is ridiculous. Like 3 percent come back.").

3. For example, amid claims that migrants will not come to court, President Trump called for $4.2 billion in additional funding to dramatically increase the federal government's capacity to detain immigrants. See "President Donald J. Trump Calls on Congress to Secure Our Borders and Protect the American People," White House, January 8, 2019, https://trumpwhitehouse.archives.gov/briefings-statements/president-donald-j-trump-calls-congress-secure-our-borders-protect-american-people/ [https://perma.cc/M7EG-RZ98].

4. On November 9, 2018, President Trump issued a proclamation drastically reducing access to asylum, supported in part by a claim that "many released aliens fail to appear for hearings." Proclamation No. 9822, 83 Fed. Reg. 57,661 (November 9, 2018).

5. See, e.g., "Remarks by President Trump in Cabinet Meeting," White House, January 2, 2019, https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-cabinet-meeting-12/ [https://perma.cc/6WJH-M6J7] (arguing that "[t]he United States needs a physical barrier, needs a wall, to stop illegal immigration" and claiming that without a wall asylum seekers will enter the country and instead of coming to court will "vanish[] and escape[] the law").

6. "Evolution of the U.S. Immigration Court System: Pre-1983," Executive Office for Immigration Review, U.S. Department of Justice, April 30, 2015, https://www.justice.gov/eoir/evolution-pre-1983 [https://perma.cc/QCT8-SHHV].

7. "Evolution of the U.S. Immigration Court System: Post-1983," Executive Office for Immigration Review, U.S. Department of Justice, April 30, 2015, https://www.justice.gov/eoir/evolution-post-1983 [https://perma.cc/ZJF2-VR4J].

8. Immigration and Nationality Act (I.N.A.) § 242(B)(c)(3), 8 U.S.C. § 1252(b) (1988); see also William R. Robie, Chief Immigration Judge, Executive Office for Immigration Review, to All Immigration Judges, Operating Policy and Procedure Memorandum 84-2: Cases in Which Respondents/Applicants Fail to Appear for Hearing, March 7, 1984, 1, http://libguides.law.ucla.edu/ld.php?content_id=38258649 [https://perma.cc/W2WH-WDP9] (describing operating policy and procedures for how immigration judges may proceed if a respondent fails to appear).

9. See Immigration Act of 1990, Pub. L. No. 101-649, § 545(a), 104 Stat. 4978, 5063 (codified as amended at 8 U.S.C. § 1229a(b)(5)(a) (2018)) (providing that any noncitizen "who . . . does not attend a proceeding under section 242, shall be ordered deported under section 242(b)(1) in absentia").

10. The term removal has been used since 1997 to refer to the decision of an immigration judge to order an individual removed from the United States. Prior to April 1997, removal proceedings were separated into distinct procedures for exclusion and deportation. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 308(d)(4)(B), 110 Stat. 3009-546, 3009-585 (amending a section of the immigration law by "striking 'exclusion or deportation' and inserting 'removal'").

11. Executive Office for Immigration Review, U.S. Department of Justice, *FY 2013 Statistics Yearbook*, 2014, Glossary of Terms, 7, https://www.justice.gov/sites/default/files/eoir/legacy/2014/04/16/fy13syb.pdf [https://perma.cc/U3WF-W7S3]   [hereinafter *EOIR 2013 Yearbook*].

12. I.N.A. § 240(b)(5)(A), 8 U.S.C. § 1229a(b)(5)(A) (2018); see also 8 C.F.R. § 1003.26 (2019) (defining *in absentia* hearings and identifying factors sufficient to order a respondent deported *in absentia*). EOIR defines an *in absentia* order as "[a]n order issued when an immigration judge determines that a removable alien received the required notice about their removal hearing and failed to appear." *EOIR 2013 Yearbook*, 7.

13. See generally I.N.A. § 212(a)(6)(B), 8 U.S.C. § 1182(a)(6)(B) (providing that failure to appear without reasonable cause renders a noncitizen inadmissible for five years); I.N.A. § 240(b)(7), 8 U.S.C. § 1229a(b)(7) (stating that failure to appear for a removal hearing bars a noncitizen from relief for ten years).

14. S. Rep. No. 104-48, 32 (1995); see also ibid. ("Congress should consider requiring that all aggravated felons be detained pending deportation. Such a step may be necessary because of the high rate of no-shows for those criminal aliens released on bond."). The resulting mandatory detention rules for those with convictions are codified at I.N.A. § 236(c), 8 U.S.C. § 1226(c).

15. Brief for Petitioners at 19, Demore v. Kim, 538 U.S. 510 (2003) (No. 01-1491), 2002 WL 31016560 (arguing that "more than 20% of criminal aliens who were released on bond or otherwise not kept in custody throughout their deportation proceedings failed to appear for those proceedings").

AR576

16. Demore v. Kim, 538 U.S. 510, 519-20 (2003); see also ibid. at 519 ("Once released, more than 20% of deportable criminal aliens failed to appear for their removal hearings.").

17. "Attorney General Jeff Sessions Delivers Remarks to the Executive Office for Immigration Review," U.S. Department of Justice, October 12, 2017, https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review [https://perma.cc/675Y-TW7U].

18. Ibid. See also "Attorney General Sessions Delivers Remarks on Immigration Enforcement," U.S. Department of Justice, April 11, 2018, https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-immigration-enforcement [https://perma.cc/ZBN7-55FZ] (claiming that "loopholes in our laws [are] being exploited by illegal aliens" who, after release from detention, "simply disappear[—]never show[] up for their hearings in immigration court").

19. In announcing the MPP on December 20, 2018, then-DHS Secretary Kirstjen Nielsen claimed that without the new program asylum seekers would simply "disappear into the United States, where many skip their court dates." U.S. Department of Homeland Security, "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration," press release, December 20, 2018, https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration [https://perma.cc/ZSS3-3SWB] (internal quotation marks omitted); see also U.S. Department of Homeland Security, "Migrant Protection Protocols," press release, January 24, 2019, https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols [https://perma.cc/KZH4-D3SR] (justifying the Trump administration's MPP program based in part on the claim that migrants released into the country "disappear before an immigration judge can determine the merits of any claim").

20. See, e.g., Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 83 Fed. Reg. 45,486, 45,494 (proposed September 7, 2018) (codified at 8 C.F.R. pts. 212, 236; 45 C.F.R. pt. 410) ("While statistics specific to family units have not been compiled, the reality is that a significant number of aliens who are not in detention either fail to appear at the required proceedings or never actually seek asylum relief, thus remaining illegally in the United States."); see also "Acting Secretary of Homeland Security Kevin K. McAleenan on the DHS-HHS Federal Rule on Flores Agreement," U.S. Department of Homeland Security, August 21, 2019, https://www.dhs.gov/news/2019/08/21/acting-secretary-mcaleenan-dhs-hhs-federal-rule-flores-agreement [https://perma.cc/82YS-V9E4] (quoting the Acting Secretary of Homeland Security Kevin K. McAleenan claiming that the majority of removal orders issued to families have been issued in absentia, thus benefitting those with "meritless claims" for asylum).

21. See, e.g., Matter of Lei, 22 I. & N. Dec. 113, 121 (B.I.A. 1998) (Rosenberg, Board Member, concurring in part and dissenting in part) ("It is difficult to imagine what could be more prejudicial to a respondent charged with being deportable from the United States than denial of an opportunity to be present at his deportation hearing where he might provide any defenses to the charges against him, or advance any claims he may have for relief from deportation."); Matter of Villalba-Sinaloa, 21 I. & N. Dec. 842, 847-48 n.2 (B.I.A. 1997) (Rosenberg, Board Member, dissenting) (urging the majority to consider constitutional concerns when interpreting the statutory provision for in absentia removal).

22. Failure to appear is often treated in state court systems as a misdemeanor crime to be adjudicated separately from the merits of the underlying case. See, e.g., Ariz. Rev. Stat. Ann. § 13-2506(A)(1), (B) (2019); Cal. Penal Code § 1320(a) (2019).

23. Fed. R. Crim. P. 43(a); see also Crosby v. United States, 506 U.S. 255, 262 (1993) ("The language, history, and logic of Rule 43 support a straightforward interpretation that prohibits the trial in absentia of a defendant who is not present at the beginning of trial."). If, however, the defendant fails to appear after already appearing at the beginning of the trial, the trial may continue under certain circumstances. Fed. R. Crim. P. 43(c).

24. See Jennifer Lee Koh, "Removal in the Shadows of Immigration Court," *Southern California Law Review* 90, no. 2 (2017): 181, 218 (explaining that unlike in criminal court, a respondent's failure to appear in immigration court constitutes an "automatic loss for the noncitizen").

25. See generally "Statistics Yearbook," Executive Office for Immigration Review, U.S. Department of Justice, updated August 30, 2019, https://www.justice.gov/eoir/statistical-year-book [https://perma.cc/X6GZ-BGQ4] (containing links to Statistics Yearbooks from fiscal year 2000 through fiscal year 2018).

26. We note that the EOIR's 2018 Yearbook included measurements of total in absentia removals, but for the first time eliminated a calculation of the in absentia removal rate. Compare Executive Office for Immigration Review, U.S. Department of Justice, *Statistics Yearbook: Fiscal Year 2018*, 2019, 33, https://www.justice.gov/eoir/file/1198896/download [https://perma.cc/EVP7-SN2D] (providing data on the number of in absentia orders issued in fiscal years 2014–2018), with Executive Office for Immigration Review, U.S. Department of Justice, *Statistics Yearbook: Fiscal Year 2017*, 2018, 33, https://www.justice.gov/eoir/page/file/1107056/download [https://perma.cc/DC4B-YUDQ] (reporting in absentia rates in addition to the numbers of in absentia orders).

27. The authors acknowledge the foundational work of other researchers that has also contributed to public understanding of appearance rates in immigration court, including the Transactional Records Access Clearinghouse (TRAC), the Catholic Legal Immigration Network, the Asylum Seeker Advocacy Project, and the Vera Institute of Justice. See, e.g., "Details on Deportation Proceedings in Immigration Court," TRAC Immigration, updated December 2020, https://trac.syr.edu/phptools/immigration/nta [https://perma.cc/D2KV-UVQ5] (select "Hearing Attendance," "Immigration Court State," and "Month and Year Case Began," and click link for "Not Present at Last Hearing (Absentia Decision)") (organizing in absentia totals by state and time period); "Priority Immigration Court Cases: Women with Children," TRAC Immigration, updated May 2018, https://trac.syr.edu/phptools/immigration/mwc [https://perma.cc/6THA-MWUX]; Asylum Seeker Advocacy Project and Catholic Legal Immigration Network, Inc., *Denied a Day in Court: The Government's Use of In Absentia Removal Orders Against Families Seeking Asylum*, 2019, 15, https://asylumadvocacy.org/wp-content/uploads/2018/04/Denied-a-Day-in-Court-2019-Update.pdf [https://perma.cc/96EB-CTR8] [hereinafter *Denied a Day in Court*] (discussing how families may miss court hearings in part due to lack of notice); Eileen Sullivan, et al., *Testing Community Supervision for the INS: An Evaluation of the Appearance Assistance Program* (Vera Institute of Justice, 2000), 33, 36, https://www.vera.org/publications/testing-community-supervision-for-the-ins-an-evaluation-of-the-appearance-assistance-program [https://perma.cc/2AWQ-66ML] (finding that roughly 90% of noncitizens who were supervised appeared in court, compared with 71% of nonparticipants); Vera Institute of Justice, "Evidence Shows That Most Immigrants Appear for Immigra-

tion Court Hearings," October 2020, https://www.vera.org/publications/immigrant-court-appearance-fact-sheet [https://perma.cc/LD7B-25TG] (summarizing research on appearance rates).

28.  These data were made available for download to researchers by EOIR. See "Executive Office for Immigration Review," U.S. Department of Justice, accessed January 23, 2021, https://www.justice.gov/eoir [https://perma.cc/L2AV-VLYR] (providing a link to download court data under the heading "EOIR Case Data"). We analyzed data tables made available by EOIR as of November 2, 2018.

29.  EOIR defines an "initial case completion" as the first dispositive decision issued by the immigration judge in a case. *EOIR 2013 Yearbook*, 7. Under this approach, EOIR does not count decisions to change venue or transfer a case as an initial case completion.

30.  Ibid., P1 (calculating the "*in absentia* rate" as the percentage of initial immigration judge completions that end in *in absentia* removal); see also Executive Office for Immigration Review, U.S. Department of Justice, *FY 2014 Statistics Yearbook*, 2015, P1, https://www.justice.gov/sites/default/files/eoir/pages/attachments/2015/03/16/fy14syb.pdf [https://perma.cc/U8DF-4JVS]; Executive Office for Immigration Review, U.S. Department of Justice, *FY 2015 Statistics Yearbook*, 2016, P1, https://www.justice.gov/eoir/page/file/fysb15/download [https://perma.cc/WH27-CH6J]; Executive Office for Immigration Review, U.S. Department of Justice, *FY 2016 Statistics Yearbook*, 2017, B2 & tbl.4, https://www.justice.gov/eoir/page/file/fysb16/download [https://perma.cc/VT6Z-P5UM]. Note that while the EOIR 2017 Yearbook uses a similar approach, EOIR narrowed its definition of relevant case types and its calculation of relevant immigration judge completions.

31.  Brian M. O'Leary, Chief Immigration Judge, Executive Office for Immigration Review, to All Immigration Judges, All Court Administrators, All Attorney Advisors and Judicial Law Clerks, and All Immigration Court Staff, Operating Policies and Procedures Memorandum 13-01: Continuances and Administrative Closure 2-3, March 7, 2013, https://libguides.law.ucla.edu/ld.php?content_id=38258569 [https://perma.cc/643J-CE6J].

32.  Ibid., 2 (instructing immigration judges to grant requests for administrative closure "in appropriate circumstances"); see also Executive Office for Immigration Review, U.S. Department of Justice, *Immigration Court Practice Manual*, 2018, 86, https://www.justice.gov/eoir/page/file/1084851/download [https://perma.cc/57QL-C32K] ("Once a case has been administratively closed, the court will not take any action on the case until a request to recalendar is filed by one of the parties."). In 2018, the Attorney General issued a decision to greatly restrict the practice of administrative closure. Castro-Tum, 27 I. & N. Dec. 271 (A.G. 2018). However, on August 29, 2019, the Fourth Circuit Court of Appeals abrogated *Castro-Tum*, finding that the immigration law unambiguously permits immigration judges to control their own dockets. Romero v. Barr, 937 F.3d 282, 286, 292-94 (4th Cir. 2019).

33.  See U.S. Government Accountability Office, *Immigration Courts: Actions Needed to Reduce Case Backlog and Address Long-Standing Management and Operational Challenges*, GAO-17-438, 2017, 22, https://www.gao.gov/assets/690/685022.pdf [https://perma.cc/54GQ-LE2C] (finding that EOIR's case backlog more than doubled between fiscal years 2006 and 2015).

34.  Transcript of Oral Argument at 52, Pereira v. Sessions, 138 S. Ct. 2105 (2018) (No. 17-459) (Frederick Liu, Assistant to the Solicitor General, Department of Justice, responding to Justice Anthony M. Kennedy).

35.  Each time a hearing ends, the immigration court enters an "adjournment code" that describes the reason why the hearing was adjourned. One of these codes indicates that notice was sent or served incorrectly. See MaryBeth Keller, Chief Immigration Judge, Executive Office for Immigration Review, to All Immigration Judges, All Court Administrators, All Attorney Advisors and Judicial Law Clerks, All Support Staff, Operating Policies and Procedures Memorandum 17-02: Definitions and Use of Adjournment, Call-Up, and Case Identification Codes, October 5, 2017, 3, https://libguides.law.ucla.edu/ld.php?content_id=38258359 [https://perma.cc/LTH2-DE7A] (including Adjournment Code 10, to be used when an "[a]ttorney and/or alien does not appear at the scheduled hearing due to the notice of hearing containing inaccurate information, or, alien/attorney appears but has not received adequate notice of hearing of the proceedings").

36.  Analyzing never-detained cases, we found that 11,121 out of a total of 1,285,947 initial hearings, or .86%, were adjourned due to lack of notice. This calculation measures the number of hearings that were adjourned with code 10, "Notice Sent/Served Incorrectly." Use of adjournment code 10 in the EOIR data dates back to the 1980s.

37.  Analyzing both completed and pending cases, we found that 5,981 out of the 11,121 hearings adjourned for lack of notice at the initial-hearing stage did not end in *in absentia*, compared to 5,140 that did result in an *in absentia* order.

38.  I.N.A. § 240(b)(5)(A), 8 U.S.C. § 1229a(b)(5)(A) (2018).

39.  Of the 1,155,469 initial completions in our All Custody Removal Sample, only 4,344 cases (0.37%) were excluded from the analysis due to lack of hearing-level data.

40.  I.N.A. § 240(b)(5)(C), 8 U.S.C. § 1229a(b)(5)(C).

41.  Of the 316,089 cases where initial completion occurred through an *in absentia* removal order, 18% (*n* = 56,877) of those respondents sought to reopen their cases by filing motions to reopen.

42.  Judges granted 84% of these motions (*n* = 47,952). Overall, 15% of those ordered removed *in absentia* had a successful motion to reopen (*n* = 47,952 of 316,089).

43.  A motion to reopen based on lack of notice of the hearing can be brought at any time. See I.N.A. § 240(b)(5)(C), 8 U.S.C. § 1229a(b)(5)(C); 8 C.F.R. § 1003.23(b)(4)(ii) (2019) (noting that an alien can file a motion to reopen at "any time"). Of course, individuals who do not obtain counsel or otherwise learn about the motion to reopen process may never bring such a motion in court. Additionally, although cases with *in absentia* orders may be reopened, *in absentia* orders cannot be appealed. Matter of Guzman-Arguera, 22 I. & N. Dec. 722 (B.I.A. 1999) (holding that the Board of Immigration Appeals has no jurisdiction over direct appeals of *in absentia* orders).

44.  See I.N.A. § 240(b)(4)(A), 8 U.S.C. § 1229a(b)(4)(A) ("[T]he alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings."); Orantes-Hernandez v. Thornburgh, 919 F.2d 549, 554 (9th Cir. 1990) ("[A]liens have a due process right to obtain counsel of their choice at their own

<div align="center">AR578</div>

expense.").

45.   Of the 316,089 *in absentia* orders issued in removal proceedings at the initial case completion over the 11-year period of our study, only 47,350 were represented by counsel.

46.   Of the 839,380 immigration judge initial case completions not issued *in absentia* in removal proceedings over the 11-year period of our study, 719,226 were represented by counsel.

47.   Of the 47,952 respondents who successfully reopened their cases after an initial *in absentia* order, 40,303 were represented by counsel at their most recent proceeding.

48.   Individuals motivated to fight their case may also be more likely to seek out an attorney. Yet serious notice deficits and confusion about immigration court would suggest that even motivated individuals may not get the chance to engage the process.

49.   Persons released awaiting their immigration court hearings are often told to report periodically to a deportation officer.

50.   See, e.g., Tatiana Sanchez, "Confusion Erupts as Dozens Show Up for Fake Court Date at SF Immigration Court," *San Francisco Chronicle*, January 31, 2019, https://www.sfchronicle.com/bayarea/article/Confusion-erupts-as-dozens-show-up-for-fake-13579045.php [https://perma.cc/BHJ2-CQ3X] (reporting that some attorneys contend that ICE is sending notices to appear "with court dates it knows are not real").

51.   See *Denied a Day in Court*, 15.

52.   Mark Pasierb, Chief Clerk of Immigration Court, to All Immigration Judges, All Court Administrators, All Attorney Advisors and Judicial Law Clerks, and All Immigration Court Staff, memorandum, June 17, 2008, 6, https://libguides.law.ucla.edu/ld.php?_content_id=52153727 [https://perma.cc/3CUT-QHWZ] ("EOIR-33/ICs are accepted even if no Notice to Appear has been filed.").

53.   See, e.g., "AILA-EOIR Liaison Meeting Agenda Questions and Answers" (October 21, 2008), 3, https://www.justice.gov/sites/default/files/eoir/legacy/2009/01/29/eoiraila102108.pdf [https://perma.cc/D8SK-8NEL] (reporting rejections of changes of address forms in cases where the notice to appear had not yet been filed with the court).

54.   Asylum is a form of discretionary relief available to individuals who qualify as refugees by demonstrating past persecution or a "well-founded fear of persecution" based on the noncitizen's race, religion, nationality, political opinion, and/or membership in a particular social group. I.N.A. § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A) (2018); I.N.A. § 208(b)(1)(A), 8 U.S.C. § 1158(b)(1)(A). Applicants for asylum may also be considered for relief under withholding of removal and protection under the United Nations Convention Against Torture by satisfying more stringent standards. See I.N.A. § 241(b)(3), 8 U.S.C. § 1231(b)(3) (providing statutory requirements for demonstrating eligibility for withholding of removal); 8 C.F.R. §§ 1208.16, 1208.17, 1208.18 (discussing the standards for withholding of removal and deferral of removal under the Convention Against Torture).

55.   Cancellation of removal is a form of relief available to both lawful permanent residents and undocumented individuals who have lived for a minimum number of years in the United States and who satisfy certain requirements. I.N.A. § 240A(a)-(b), 8 U.S.C. § 1229b(a)-(b).

56.   Adjustment of status is a form of relief available to any noncitizen who is determined eligible for lawful permanent resident status based on a visa petition approved by the United States Citizenship and Immigration Services. I.N.A. § 245, 8 U.S.C. § 1255.

57.   I.N.A. § 240(c)(4), 8 U.S.C. § 1229a(c)(4).

58.   EOIR Form I-589 includes an application for asylum and withholding of removal, and also offers the opportunity for an application of withholding of removal under the Convention Against Torture. See U.S. Citizenship and Immigration Services, Department of Homeland Security, and Executive Office for Immigration Review, U.S. Department of Justice, "I-589, Application for Asylum and for Withholding of Removal," updated September 30, 2019, https://www.uscis.gov/i-589 [https://perma.cc/6MJU-W5NY] (listing the information that an applicant is required to provide to apply for asylum and withholding of removal). We use the term "asylum application" to refer to all three forms of relief.

59.   For purposes of our analysis, we did not consider voluntary departure to be a form of relief.

60.   During the study period, there were 829,083 completed and pending cases with applications for relief on file (*n* = 549,053 initial completions with such applications, and *n* = 431,752 initial immigration judge decisions with filed applications). Of these individuals, only 43,250 had an *in absentia* removal order, leading to *in absentia* rates of 5% for all matters, 8% for initial case completions, and 10% for immigration judge decisions.

61.   See Oren Root, National Director, Appearance Assistance Program, Vera Institute of Justice, "The Appearance Assistance Program: An Alternative to Detention for Noncitizens in U.S. Immigration Removal Proceedings," April 2000, 2, https://www.vera.org/publications/appearance-assistance-program-alternative-to-detention [https://perma.cc/T7FW-WXYA] (arguing that individuals with claims for relief are "good candidates for supervised release, as they have an incentive to appear at their hearings").

62.   In 2018, EOIR began to occasionally report in press releases and other documents statistics on *in absentia* rate among those seeking asylum. See, e.g., U.S. Department of Justice, "Executive Office for Immigration Review Releases Court Statistics, Announces Transparency Initiative," press release, May 9, 2018, https://www.justice.gov/opa/pr/executive-office-for-immigration-review-releases-court-statistics-announces-transparency [https://perma.cc/T3EA-3JAK].

63.   "EOIR Immigration Court Listing," Executive Office of Immigration Review, U.S. Department of Justice, updated January 22, 2001, https://www.justice.gov/eoir/eoir-immigration-court-listing [https://perma.cc/T69X-KN6C].

64.   "Office of the Chief Immigration Judge," Executive Office of Immigration Review, U.S. Department of Justice, updated December 7, 2020, https://www.justice.gov/eoir/office-of-the-chief-immigration-judge [https://perma.cc/GWA9-P86E].

65.   Ani Ucar, "Leaked Report Shows the Utter Dysfunction of Baltimore's Immigration Court," *Vice News*, October 3, 2018, https://news.vice.com/en_us/article/xw94ea/leaked-report-shows-the-utter-dysfunction-of-baltimores-immigration-court [https://

perma.cc/K6J6-DGWT].

66. Ibid. (internal quotation marks omitted).

67. To address the potential relationship between delays in court scheduling and *in absentia* removal, we narrowed our analysis from all initial case completions to only never-detained initial case completions with no prior change of venue or transfer (*n* = 745,031 of 1,155,469). Of the remaining 745,031 initial case completions, we excluded 4,678 cases (less than 1%) with missing or erroneous NTAs. Finally, to focus on more active cases, we narrowed the analysis further, excluding the 3% of remaining cases (*n* = 21,638) with NTAs dated prior to 2006. By taking these steps, we attempt to better isolate the potential impact of delays in receiving a hearing notice on court appearances.

68. Ingrid V. Eagly and Steven Shafer, "A National Study of Access to Counsel in Immigration Court," *University of Pennsylvania Law Review* 164, no. 1 (2015): 42.

69. Ibid., 40 ("In the busiest twenty nondetained court jurisdictions, representation rates reached as high as 87% in New York City and 78% in San Francisco. At the low end of these twenty high-volume nondetained jurisdictions, only 47% of immigrants in Atlanta and Kansas City secured representation.").

70. Ingrid Eagly and Steven Shafer, "Measuring *In Absentia* Removal in Immigration Court," *University of Pennsylvania Law Review* 168, no. 4 (2020): 870–71 & fig.6.

71. This high representation rate reflects the 2014 establishment of a project known as the New York Immigrant Family Unity Project, which provides free legal representation to any individual in New York's immigration court who is unable to afford counsel. "New York Immigrant Family Unity Project," Bronx Defenders, accessed January 23, 2021, https://www.bronxdefenders.org/programs/new-york-immigrant-family-unity-project [https://perma.cc/DZ26-62X3].

72. Ingrid Eagly and Steven Shafer, "Measuring *In Absentia* Removal in Immigration Court," *University of Pennsylvania Law Review* 168, no. 4 (2020): 870–71 & fig.6.

73. Ibid., 869.

74. Ibid., 865.

75. Ibid., 869.

76. "The Biden Plan for Securing Our Values as a Nation of Immigrants," Biden-Harris, accessed January 23, 2021, https://joebiden.com/immigration/ [https://perma.cc/Y2Y9-HWVD].

77. Alissa Fishbane, Aurelie Ouss, and Anuj K. Shah, "Behavioral Nudges Reduce Failure to Appear for Court," *Science* 370, no. 6517 (2020).

78. See note 37, *supra*.

79. See generally Iris Gomez, "The Consequences of Nonappearance: Interpreting New Section 242B of the Immigration and Nationality Act," *San Diego Law Review* 30, no. 1 (1993): 75, 78-80 (explaining how the immigration law gave judges greater discretion on how to treat missed court appearances prior to 1990).

80. In 2018, Senators Mazie K. Hirono, Kirsten Gillibrand, and Kamala Harris introduced the Immigration Court Improvement Act, a bill that would insulate immigration judges from top-down political interference. "Sen. Mazie K. Hirono, Hirono, Gillibrand, Harris Introduce Bill to Insulate Immigration Judges from Political Interference," press release, April 18, 2018, 1, https://hirono.senate.gov/news/press-releases/hirono-gillibrand-harris-introduce-bill-to-insulate-immigration-judges-from-political-interference [https://perma.cc/CPR4-748M].

81. The Federal Bar Association (FBA) recently completed a report proposing model legislation to establish an Article I immigration court. See Federal Bar Association, *Congress Should Establish an Article I Immigration Court*, accessed January 23, 2021, https://www.fedbar.org/government-relations/policy-priorities/article-i-immigration-court [https://perma.cc/CQ5D-C2AU]. The FBA proposal is supported by the union representing immigration judges, the National Association of Immigration Judges. See Hon. A. Ashley Tabaddor, President, National Association of Immigration Judges, to Elizabeth Stevens, President, Federal Bar Association, Immigration Law Section, letter,  March 15, 2018, https://www.naij-usa.org/images/uploads/publications/NAIJ_endorses_FBA_Article_I_proposal_3-15-18.pdf [https://perma.cc/LC29-BVH3] (endorsing the Federal Bar Association's proposed legislation due to the "proven . . . conflicts of interest" that arise when immigration courts can be used as "political pawn[s] by various administrations on both sides of the aisle").

82. Although the creation of an Article I immigration court would solve many problems within the court system, as Amit Jain has warned, such a change must be accompanied by other procedural and substantive forms. Amit Jain, "Bureaucrats in Robes: Immigration 'Judges' and the Trappings of 'Courts,'" *Georgetown Immigration Law Journal* 33, no. 2 (2019): 324.

AR580

U.S. Department of Homeland Security
Washington, DC 20528


## Homeland Security

January 20, 2021

**MEMORANDUM FOR:**   Troy Miller
Senior Official Performing the Duties of the Commissioner
U.S. Customs and Border Protection

Tae Johnson
Acting Director
U.S. Immigration and Customs Enforcement

**FROM:**   David Pekoske
Acting Secretary

**SUBJECT:**   **Suspension of Enrollment in the Migrant Protection Protocols Program**

---

Effective January 21, 2021, the Department will suspend new enrollments in the Migrant Protection Protocols (MPP), pending further review of the program.  Aliens who are not already enrolled in MPP should be processed under other existing legal authorities.

Federal Register

Vol. 86, No. 23

Friday, February 5, 2021

# Presidential Documents

---

Title 3—

The President

Executive Order 14010 of February 2, 2021

## Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* it is hereby ordered as follows:

**Section 1**. *Policy.* For generations, immigrants have come to the United States with little more than the clothes on their backs, hope in their hearts, and a desire to claim their own piece of the American Dream. These mothers, fathers, sons, and daughters have made our Nation better and stronger.

The United States is also a country with borders and with laws that must be enforced. Securing our borders does not require us to ignore the humanity of those who seek to cross them. The opposite is true. We cannot solve the humanitarian crisis at our border without addressing the violence, instability, and lack of opportunity that compel so many people to flee their homes. Nor is the United States safer when resources that should be invested in policies targeting actual threats, such as drug cartels and human traffickers, are squandered on efforts to stymie legitimate asylum seekers.

Consistent with these principles, my Administration will implement a multipronged approach toward managing migration throughout North and Central America that reflects the Nation's highest values. We will work closely with civil society, international organizations, and the governments in the region to: establish a comprehensive strategy for addressing the causes of migration in the region; build, strengthen, and expand Central and North American countries' asylum systems and resettlement capacity; and increase opportunities for vulnerable populations to apply for protection closer to home. At the same time, the United States will enhance lawful pathways for migration to this country and will restore and strengthen our own asylum system, which has been badly damaged by policies enacted over the last 4 years that contravened our values and caused needless human suffering.

**Sec. 2**. *United States Strategies for Addressing the Root Causes of Irregular Migration and for Collaboratively Managing Migration in the Region.* (a) The Assistant to the President for National Security Affairs (APNSA), in coordination with the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the heads of any other relevant executive departments and agencies, shall as soon as possible prepare:

(i) the United States Strategy for Addressing the Root Causes of Migration (the ''Root Causes Strategy''); and

(ii) the United States Strategy for Collaboratively Managing Migration in the Region (the ''Collaborative Management Strategy'').

(b) The Root Causes Strategy shall identify and prioritize actions to address the underlying factors leading to migration in the region and ensure coherence of United States Government positions. The Root Causes Strategy shall take into account, as appropriate, the views of bilateral, multilateral, and private sector partners, as well as civil society, and it shall include proposals to:

(i) coordinate place-based efforts in El Salvador, Guatemala, and Honduras (the "Northern Triangle") to address the root causes of migration, including by:

(A) combating corruption, strengthening democratic governance, and advancing the rule of law;

(B) promoting respect for human rights, labor rights, and a free press;

(C) countering and preventing violence, extortion, and other crimes perpetrated by criminal gangs, trafficking networks, and other organized criminal organizations;

(D) combating sexual, gender-based, and domestic violence; and

(E) addressing economic insecurity and inequality;

(ii) consult and collaborate with the Office of the United States Trade Representative, the Secretary of Commerce, and the Secretary of Labor to evaluate compliance with the Dominican Republic-Central America Free Trade Agreement to ensure that unfair labor practices do not disadvantage competition; and

(iii) encourage the deployment of Northern Triangle domestic resources and the development of Northern Triangle domestic capacity to replicate and scale efforts to foster sustainable societies across the region.

(c) The Collaborative Management Strategy shall identify and prioritize actions to strengthen cooperative efforts to address migration flows, including by expanding and improving upon previous efforts to resettle throughout the region those migrants who qualify for humanitarian protection. The Collaborative Management Strategy should focus on programs and infrastructure that facilitate access to protection and other lawful immigration avenues, in both the United States and partner countries, as close to migrants' homes as possible. Priorities should include support for expanding pathways through which individuals facing difficult or dangerous conditions in their home countries can find stability and safety in receiving countries throughout the region, not only through asylum and refugee resettlement, but also through labor and other non-protection-related programs. To support the development of the Collaborative Management Strategy, the United States Government shall promptly begin consultations with civil society, the private sector, international organizations, and governments in the region, including the Government of Mexico. These consultations should address:

(i) the continued development of asylum systems and resettlement capacities of receiving countries in the region, including through the provision of funding, training, and other support;

(ii) the development of internal relocation and integration programs for internally displaced persons, as well as return and reintegration programs for returnees in relevant countries of the region; and

(iii) humanitarian assistance, including through expansion of shelter networks, to address the immediate needs of individuals who have fled their homes to seek protection elsewhere in the region.

**Sec. 3**. *Expansion of Lawful Pathways for Protection and Opportunity in the United States*. (a) The Secretary of State and the Secretary of Homeland Security shall promptly review mechanisms for better identifying and processing individuals from the Northern Triangle who are eligible for refugee resettlement to the United States. Consideration shall be given to increasing access and processing efficiency. As part of this review, the Secretary of State and the Secretary of Homeland Security shall also identify and implement all legally available and appropriate forms of relief to complement the protection afforded through the United States Refugee Admissions Program. The Secretary of State and Secretary of Homeland Security shall submit a report to the President with the results of the review.

(b) As part of the review conducted pursuant to section 3(a) of this order, the Secretary of Homeland Security shall:

AR583

(i) consider taking all appropriate actions to reverse the 2017 decision rescinding the Central American Minors (CAM) parole policy and terminating the CAM Parole Program, *see* "Termination of the Central American Minors Parole Program," 82 FR 38,926 (August 16, 2017), and consider initiating appropriate actions to reinstitute and improve upon the CAM Parole Program; and

(ii) consider promoting family unity by exercising the Secretary's discretionary parole authority to permit certain nationals of the Northern Triangle who are the beneficiaries of approved family-sponsored immigrant visa petitions to join their family members in the United States, on a case-by-case basis.

(c) The Secretary of State and the Secretary of Homeland Security shall promptly evaluate and implement measures to enhance access for individuals from the Northern Triangle to visa programs, as appropriate and consistent with applicable law.

**Sec. 4**. *Restoring and Enhancing Asylum Processing at the Border.* (a) *Resuming the Safe and Orderly Processing of Asylum Claims at United States Land Borders.*

(i) The Secretary of Homeland Security and the Director of the Centers for Disease Control and Prevention (CDC), in coordination with the Secretary of State, shall promptly begin consultation and planning with international and non-governmental organizations to develop policies and procedures for the safe and orderly processing of asylum claims at United States land borders, consistent with public health and safety and capacity constraints.

(ii) The Secretary of Homeland Security, in consultation with the Attorney General, the Secretary of Health and Human Services (HHS), and the Director of CDC, shall promptly begin taking steps to reinstate the safe and orderly reception and processing of arriving asylum seekers, consistent with public health and safety and capacity constraints. Additionally, in furtherance of this goal, as appropriate and consistent with applicable law:

(A) The Secretary of HHS and the Director of CDC, in consultation with the Secretary of Homeland Security, shall promptly review and determine whether termination, rescission, or modification of the following actions is necessary and appropriate: "Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists," 85 FR 65,806 (October 13, 2020); and "Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes," 85 FR 56,424 (September 11, 2020) (codified at 42 CFR 71.40).

(B) The Secretary of Homeland Security shall promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols (MPP), including by considering whether to rescind the Memorandum of the Secretary of Homeland Security titled "Policy Guidance for Implementation of the Migrant Protection Protocols" (January 25, 2019), and any implementing guidance. In coordination with the Secretary of State, the Attorney General, and the Director of CDC, the Secretary of Homeland Security shall promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subjected to MPP for further processing of their asylum claims.

(C) The Attorney General and the Secretary of Homeland Security shall promptly review and determine whether to rescind the interim final rule titled "Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims," 83 FR 55,934 (November 9,

2018), and the final rule titled "Asylum Eligibility and Procedural Modifications," 85 FR 82,260 (December 17, 2020), as well as any agency memoranda or guidance that were issued in reliance on those rules.

(D) The Attorney General and the Secretary of Homeland Security shall promptly review and determine whether to rescind the interim final rule titled "Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act," 84 FR 63,994 (November 19, 2019), as well as any agency memoranda or guidance issued in reliance on that rule. In the interim, the Secretary of State shall promptly consider whether to notify the governments of the Northern Triangle that, as efforts to establish a cooperative, mutually respectful approach to managing migration across the region begin, the United States intends to suspend and terminate the following agreements:

(1) "Agreement Between the Government of the United States of America and the Government of the Republic of Guatemala on Cooperation Regarding the Examination of Protection Claims," 84 FR 64,095 (July 26, 2019).

(2) "Agreement Between the Government of the United States of America and the Government of the Republic of El Salvador for Cooperation in the Examination of Protection Claims," 85 FR 83,597 (September 20, 2019).

(3) "Agreement Between the Government of the United States of America and the Government of the Republic of Honduras for Cooperation in the Examination of Protection Claims," 85 FR 25,462 (September 25, 2019).

(E) The Secretary of Homeland Security shall promptly cease implementing the "Prompt Asylum Case Review" program and the "Humanitarian Asylum Review Program" and consider rescinding any orders, rules, regulations, guidelines or policies implementing those programs.

(F) The following Presidential documents are revoked:

(1) Executive Order 13767 of January 25, 2017 (Border Security and Immigration Enforcement Improvements).

(2) Proclamation 9880 of May 8, 2019 (Addressing Mass Migration Through the Southern Border of the United States).

(3) Presidential Memorandum of April 29, 2019 (Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System).

(4) Presidential Memorandum of April 6, 2018 (Ending "Catch and Release" at the Border of the United States and Directing Other Enhancements to Immigration Enforcement).

(5) Presidential Memorandum of April 4, 2018 (Securing the Southern Border of the United States).

(G) The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take steps to rescind any agency memoranda or guidance issued in reliance on or in furtherance of any directive revoked by section 4(a)(ii)(F) of this order.

(b) *Ensuring a Timely and Fair Expedited Removal Process.*

(i) The Secretary of Homeland Security, with support from the United States Digital Service within the Office of Management and Budget, shall promptly begin a review of procedures for individuals placed in expedited removal proceedings at the United States border. Within 120 days of the date of this order, the Secretary of Homeland Security shall submit a report to the President with the results of this review and recommendations for creating a more efficient and orderly process that facilitates timely adjudications and adherence to standards of fairness and due process.

(ii) The Secretary of Homeland Security shall promptly review and consider whether to modify, revoke, or rescind the designation titled "Designating Aliens for Expedited Removal," 84 FR 35,409 (July 23, 2019), regarding the geographic scope of expedited removal pursuant to INA section

235(b)(1), 8 U.S.C. 1225(b)(1), consistent with applicable law. The review shall consider our legal and humanitarian obligations, constitutional principles of due process and other applicable law, enforcement resources, the public interest, and any other factors consistent with this order that the Secretary deems appropriate. If the Secretary determines that modifying, revoking, or rescinding the designation is appropriate, the Secretary shall do so through publication in the *Federal Register*.

(c) *Asylum Eligibility*. The Attorney General and the Secretary of Homeland Security shall:

(i) within 180 days of the date of this order, conduct a comprehensive examination of current rules, regulations, precedential decisions, and internal guidelines governing the adjudication of asylum claims and determinations of refugee status to evaluate whether the United States provides protection for those fleeing domestic or gang violence in a manner consistent with international standards; and

(ii) within 270 days of the date of this order, promulgate joint regulations, consistent with applicable law, addressing the circumstances in which a person should be considered a member of a "particular social group," as that term is used in 8 U.S.C. 1101(a)(42)(A), as derived from the 1951 Convention relating to the Status of Refugees and its 1967 Protocol.

**Sec. 5.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 2, 2021.*

[FR Doc. 2021–02561

Filed 2–4–21; 8:45 am]

Billing code 3295–F1–P

🇺🇸 Official website of the Department of Homeland Security

 **U.S. Department of Homeland Security**

# DHS Announces Process to Address Individuals in Mexico with Active MPP Cases

**Release Date:** February 11, 2021

En español (/news/2021/02/11/departamento-de-seguridad-nacional-dhs-anuncia-proceso-para-atender-individuos-en-m)

WASHINGTON – Building on a series of Executive Orders last week, the Biden Administration is announcing another step in our phased strategy to reform the nation's immigration system. Beginning on February 19, the Department of Homeland Security (DHS) will begin phase one of a program to restore safe and orderly processing at the southwest border. DHS will begin processing people who had been forced to "remain in Mexico" under the Migrant Protection Protocols (MPP). Approximately 25,000 individuals in MPP continue to have active cases.

Individuals should not take any action at this time and should remain where they are to await further instructions.  We will soon announce a virtual registration process that will be accessible from any location. Once registered, eligible individuals will be provided additional information about where and when to present themselves. Individuals should not approach the border until instructed to do so.

"As President Biden has made clear, the U.S. government is committed to rebuilding a safe, orderly, and humane immigration system," said Secretary of Homeland Security Alejandro Mayorkas. "This latest action is another step in our commitment to reform immigration policies that do not align with our nation's values. Especially at the border, however, where capacity constraints remain serious, changes will take time. Individuals who are not eligible under this initial phase should wait for further instructions and not travel to the border.  Due to the current pandemic, restrictions at the border remain in place and will be enforced."

Through a whole-of-government approach, DHS, the Department of State, and the Department of Justice will collaborate with international partners—including the Government

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 594 of 688   PageID 2251

of Mexico and international and non-governmental organizations—to safely process eligible individuals to pursue their cases in the United States.

This new process applies to individuals who were returned to Mexico under the MPP program and have cases pending before the Executive Office for Immigration Review (EOIR). Individuals outside of the United States who were not returned to Mexico under MPP or who do not have active immigration court cases will not be considered for participation in this program and should await further instructions. Similarly, those individuals in the United States with active MPP cases will receive separate guidance at a later date.

This announcement should not be interpreted as an opening for people to migrate irregularly to the United States. Eligible individuals will only be allowed to enter through designated ports of entry at designated times. We will provide instructions in the coming days for how individuals with active MPP cases may remotely register for in-processing. We will continue to enforce U.S. immigration law and border security measures throughout this process.

The United States and our partners will employ all necessary safety precautions in accordance with the Centers for Disease Control and Prevention (CDC) guidance, including mandatory face coverings and social distancing. Individuals processed through this program will be tested for COVID-19 before entering the United States. DHS will only process individuals consistent with its capacity to safely do so while fully executing its important national security and trade and travel facilitation missions.

A Fact Sheet announcing the process to address individuals outside the United States with active MPP cases (/news/2021/02/18/fact-sheet-dhs-announces-process-address-individuals-outside-united-states-active) is also available.

Topics: Border Security (/topics/border-security) , Citizenship and Immigration Services (/topics/immigration-and-citizenship-services) , Homeland Security Enterprise (/topics/homeland-security-enterprise) , Immigration and Customs Enforcement (/topics/immigration-enforcement) , Secretary of Homeland Security (/topics/secretary-homeland-security)

Keywords: Asylum (/keywords/asylum-applications) , Immigration (/keywords/immigration) , Immigration Enforcement (/keywords/immigration-enforcement) , Immigration Reform (/keywords/immigration-reform) , Migrant Protection Protocols (MPP) (/keywords/migrant-protection-protocols-mpp) , President Biden (/keywords/president-biden) , Secretary Alejandro Mayorkas (/keywords/secretary-alejandro-mayorkas)

Last Published Date: February 19, 2021

AR588

# #SaveAsylum

REPORT ABUSES

TAKE ACTION

MORE RESOURCES

AR589

# Delivered to Danger

Trump Administration sending asylum seekers and migrants to danger

AR590

# FORCED RETURNS TO MEXICO: AT LEAST 1,544 PUBLICLY REPORTED CASES OF MURDER, RAPE, TORTURE, KIDNAPPING & OTHER VIOLENT ASSAULTS

Current as of February 19, 2021

SHARE     

# TRUMP ADMINISTRATION SENDING ASYLUM SEEKERS AND MIGRANTS TO DANGER



Mario Tama/Getty Images

Case 2:21-cv-00067-Z    Document 61    Filed 06/22/21    Page 599 of 688    PageID 2256



Joe Raedle/Getty Images



John Moore/Getty Images

The U.S. government is forcing asylum seekers and migrants, including at least 16,000 children and nearly 500 infants (https://www.reuters.com/article/us-usa-immigration-babies-exclusive/exclusive-u-s-migrant-policy-sends-thousands-of-children-including-babies-back-to-mexico-idUSKBN1WQ1H1) under the age of one, to return to Mexico under the "Migrant Protection Protocols"—better known as the "Remain in Mexico" policy.

In Mexico, waiting months for immigration court hearings in the United States, these families and other returned asylum seekers and migrants face grave dangers.

AR594

**As of February 19, 2021, there are at least 1,544 publicly reported cases of murder, rape, torture, kidnapping, and other violent assaults against asylum seekers and migrants forced to return to Mexico by the Trump Administration under this illegal scheme. Among these reported attacks are 341 cases of children returned to Mexico who were kidnapped or nearly kidnapped.**

DOWNLOAD THE LIST (HTTPS://WWW.HUMANRIGHTSFIRST.ORG/SITES/DEFAULT/FILES/PUBLICLYREPORTED

These figures are likely only the tip of the iceberg, as the vast majority of the more than 68,000 (https://trac.syr.edu/phptools/immigration/mpp/) individuals already returned to Mexico have not been interviewed by reporters or human rights researchers, let alone spoken to an attorney. Nintety-four percent (https://trac.syr.edu/phptools/immigration/mpp/) of the individuals stranded by the Trump Administration in Mexico lack a U.S. lawyer to help them apply for asylum.

#StopMPP | MPP Explained



**MPP Explained** RAICES

U.S. government officials know that these regions of the border are extremely dangerous. The U.S. State Department's travel advisories warn U.S. citizens not to travel to some of the same Mexican border towns where U.S. authorities send asylum seekers to wait for immigration court hearings. These areas are designated as level 4 threats—the same danger assessment as for Afghanistan, Iraq, and Syria.

Senior Trump Administration officials claim that they don't believe (https://www.texastribune.org/2019/09/18/texas-border-tent-courts-erected-virtual-asylum-hearings/) that the refugees and migrants the U.S. has returned to Mexico are being kidnapped and attacked there. But this willful blindness is no defense for a policy that clearly jeopardizes the safety and very lives of the children, women, and men sent back to Mexico.

## HOLD THE TRUMP ADMINISTRATION ACCOUNTABLE

Report human rights abuses against people forced by the Trump Administration to remain in danger.

SUBJECT=REPORT%20OF%20HUMAN%20RIGHTS%20ABUSE%20AGAINST%20RETURNE

# #DeliveredToDanger: Eduardo's Kidnapping



**Eduardo\*, a Nicaraguan political activist seeking asylum in the U.S. was kidnapped in Mexico, the Trump Administration sent him back there anyway.** Human Rights First

## MOMMY, I DON'T WANT TO DIE.

*— A 7-year-old girl to her mother after the Trump Administration returned them to Nuevo Laredo, where they were kidnapped*

The Trump Administration falsely claims this dangerous policy is an alternative to separating families at the border and holding them in detention centers. In reality, the program is yet another move by President Trump and his administration's leadership to block, ban, and frighten asylum seekers from asking for protection in the United States—even if those policies cost refugees their lives.

**The following are just a few of their stories —**

# MURDERED

**A Salvadoran father returned to Mexico by the Trump Administration was brutally stabbed to death and possibily tortured in Tijuana** in November 2019. The man and his wife and two children had reportedly repeatedly (https://www.latimes.com/california/story/2019-12-12/attorney-central-american-in-mpp-program-murdered-in-tijuana) told immigration officers, an immigration judge and asylum officers that they feared being returned to Mexico but they were not removed from the program. The man's widow said (https://www.telemundo20.com/noticias/local/migrante-muere-en-espera-de-asilo/1971748/): "I told the judge that I was afraid for my children because we were in a horrible, horrible place, and we didn't feel safe here."

# KIDNAPPED AND RAPED

**Two Cuban women were repeatedly raped in Mexico, then returned there by the Trump Administration to more danger.** In April 2019, armed men (https://www.humanrightsfirst.org/sites/default/files/Delivered-to-Danger-August-2019 .pdf) abducted three Cuban asylum seekers–Lilia*, Yasmin* and Yasmin's partner–while waiting for a taxi near Ciudad Juárez. **Imprisoned for a week, Lilia and Yasmin were repeatedly raped by multiple men.** Eventually ransomed, the three spent weeks in hiding until they were finally able to request asylum at the El Paso port of entry, where they had placed their names on the asylum wait "list" three weeks prior to the kidnapping. However, U.S. border officers returned Lilia and Yasmin to Ciudad Juárez without giving them a chance to explain their fear of being returned there. Back in Mexico, Yasmin said, "we feel totally destroyed." She added, **"I'm afraid of the men who kidnapped and raped us… we almost never go out.… We're still in hiding. Everyone here can tell that we're Cuban**

AR598

because of the way that we dress, the way that our faces and bodies look, and the way that we talk. I'm afraid that what happened to me before will happen to me again."

# YOU'RE LITERALLY SENDING PEOPLE BACK TO BE RAPED AND KILLED.

-Former U.S. asylum officer

**An Afro-Honduran woman returned to Mexico by the Trump Administration was kidnapped and raped.** After the U.S. government sent a Honduran woman back to Mexico, she was reportedly (https://diario.mx/juarez/secuestraron-federales-a-migrante-20190618-1528960.html) kidnapped by a group of men in Mexican federal police uniforms and repeatedly raped. According to her attorney, Linda Rivas of Las Americas Immigrant Advocacy Center in El Paso, she is a member of the Afro-Caribbean Garifuna minority. Customs and Border Protection officers returned her to Ciudad Juárez even though she told them she "had a target on her back" because of her race. They expelled her without giving her an opportunity to explain her fear to an asylum officer.

**Another Honduran asylum seeker returned to Mexico was kidnapped, raped, and forced into sexual slavery**: After U.S. border officials returned Gisela* (https://www.humanrightsfirst.org/sites/default/files/Delivered-to-Danger-August-2019 .pdf) to Mexico, a trafficker kidnapped her as she left a migration office. She was raped and forced into sexual slavery for three months. She escaped only when one of her captors assisted her in exchange for sex. Forced into hiding at a Juárez church shelter, she was not safe even there. The parish priest told her that an unknown man had come looking for her.

# I'M AFRAID OF THE MEN WHO KIDNAPPED AND RAPED US... WE ALMOST NEVER GO OUT. WE'RE STILL IN HIDING.

— Yasmin*, Cuban asylum seeker returned by Trump Administration to Ciudad Juárez

## TORTURED

**A Honduran boy and his parents were kidnapped, and the father was tortured and disappeared**: According to El Diario (https://diario.mx/usa/actualidad/nos-mandaron-a-la-boca-del-lobo-a-sufrir-secuestros-y-extorsiones-inmigrantes-20190921-1565325.html), a three-year-old boy from Honduras and his parents were kidnapped after U.S. border officials returned them to Nuevo Laredo. The boy's parents were separated, and the woman reported hearing the kidnappers beat and electrocute her husband. When she last saw him lying on the ground, beaten and bleeding, he told her, "Love, they're going to kill us." The woman and her three-year-old son were released but she does not know if her husband is alive.

# LOVE, THEY'RE GOING TO KILL US.

— A Honduran asylum seeker returned by the Trump Administration to Mexico tells his wife after being tortured by their kidnappers

## TAKE ACTION

AR600

Tell the incoming Biden Administration to end the illegal forced return of asylum seekers
and migrants to danger.

### TAKE ACTION
### (HTTPS://HUMANRIGHTSFIRST.QUORUM.US/CAMPAIGN/29629/)



(https://www.humanrightsfirst.org)



(https://www.wola.org)



(https://www.imumi.org)



(https://womensrefugeecommission.org)



(https://www.lawg.org)



(https://www.aila.org)



(https://www.phr.org/)



(https://www.refugeesinternational.org/)



(https://www.immigrationequality.org/)



(https://www.hrw.org/)



(http://www.hias.org)



(http://www.immdef.org)

**ACCOUNTABILITY**

**FILE A COMPLAINT WITH THE DEPARTMENT OF HOMELAND SECURITY**

## OFFICE OF INSPECTOR GENERAL
### (HTTPS://HOTLINE.OIG.DHS.GOV/#STEP-1)

## OFFICE FOR CIVIL RIGHTS AND CIVIL LIBERTIES
### (HTTPS://WWW.DHS.GOV/PUBLICATION/FILE-CIVIL-RIGHTS-COMPLAINT)

**REPORT ABUSES AGAINST RETURNED ASYLUM SEEKERS AND MIGRANTS TO HUMAN RIGHTS INVESTIGATORS**

- Send an email with information on human rights abuses under the Remain in Mexico policy to report@humanrightsfirst.org. Investigators will contact you to follow up on your report.

**REPORTS OF HUMAN RIGHTS ABUSES UNDER THE REMAIN IN MEXICO POLICY**

- Physicians for Human Rights, "Forced into Danger (https://phr.org/wp-content/uploads/2021/01/PHR-Report-Forced-into-Danger_Human-Rights-Violations-and-MPP-January-2021.pdf): Human Rights Violations Resulting from the U.S. Migrant Protection Protocols" (January 2021)

- Human Rights Watch, " 'Like I'm Drowning (https://www.hrw.org/report/2021/01/06/im-drowning/children-and-families-sent-harm-us-remain-mexico-program)': Children and Families Sent to Harm by the US 'Remain in Mexico' Program" (January 2021)

- Human Rights First, "Humanitarian Disgrace (https://www.humanrightsfirst.org/resource/humanitarian-disgrace-us-continues-illegally-block-expel-refugees-danger): U.S. Continues to Illegally Block, Expel Refugees to Danger" (December 2020)  (en español (https://www.humanrightsfirst.org/sites/default/files/UnaDesgraciaHumanitaria.pdf))

- IMUMI, "En la boca del lobo (https://imumi.org/attachments/2020/Informe-En-la-boca-del-lobo-Protocolo-Quedate-en-Mexico.pdf)" (December 2020)

AR603

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 610 of 688   PageID 2267

- American Friends Service Committee, Center for Reproductive Rights, Human Rights First, Women's Refugee Commission, "Pregnant Immigrants and Asylum Seekers During COVID-19 (https://www.womensrefugeecommission.org/wp-content/uploads/2020/09/Pregnant-Immigrants-Asylum-Seekers-during-COVID-19.pdf)" (September 2020)

- Strauss Center, "Migrant Protection Protocols: Implementation and Consequences (https://www.strausscenter.org/wp-content/uploads/PRP-218_-Migrant-Protection-Protocols.pdf) for Asylum Seekers in Mexico" (May 2020) (en español (https://www.strausscenter.org/wp-content/uploads/PRP-218_-Protocolos-de-Proteccio%CC%81n-a-Migrantes.pdf))

- Human Rights First, "Pandemic as Pretext (https://www.humanrightsfirst.org/resource/pandemic-pretext-trump-administration-exploits-covid-19-expels-asylum-seekers-and-children): Trump Administration Exploits COVID-19, Expels Asylum Seekers and Children to Escalating Danger" (May 2020) (en español (https://www.humanrightsfirst.org/sites/default/files/PandemiaComoPretexto.pdf))

- Doctors Without Borders, "No Way Out (https://www.doctorswithoutborders.org/sites/default/files/documents/Doctors%20Withou The Humanitarian Crisis for Migrants and Asylum Seekers Trapped Between the United States, Mexico and the Northern Triangle of Central America" (February 2020)

- Human Rights Watch, "'Remain in Mexico' Program Harming Children (https://www.hrw.org/news/2020/02/12/us-remain-mexico-program-harming-children)" (February 2020)

- Refugees International "Remain in Mexico: A Year of Deliberate Endangerment and Evasion (https://www.refugeesinternational.org/reports/2020/1/29/remain-in-mexico-a-year-of-deliberate-endangerment-and-evasion)" (January 2020)

- American Friends Service Committee, "Dismantling Asylum (https://www.afsc.org/sites/default/files/documents/MPP_Final_Jan2020-300hi.pdf): A Year into the Migrant Protection Protocols" (January 2020)

- Mills Legal Clinic, Stanford Law School, "Violations of Human Rights (https://7dac4932-ebde-4b1a-96f5-fac5c6bec362.filesusr.com/ugd/e07ba9_b0e2d1ff662c41308737555d7d245572.pdf) Occurring in Mexico as a Result of the Remain in Mexico Program" (January 2020)

AR604

- HOPE Border Institute, "2020 Situation Report: Remain in Mexico
  (https://7dac4932-ebde-4b1a-96f5-
  fac5c6bec362.filesusr.com/ugd/e07ba9_42dc2e4ae15b49e5a833d297491fae6d.pdf)"
  (January 2020)

- Human Rights First, "A Year of Horrors
  (https://www.humanrightsfirst.org/sites/default/files/MPP-aYearofHorrors-
  UPDATED.pdf): The Trump Administration's Illegal Returns of Asylum Seekers to
  Danger in Mexico" (January 2020)

- Global Response Management "Medical Summary
  (https://www.humanrightsfirst.org/sites/default/files/GRM%20Report%20on%20Conditions
  for Refugee Camp: Matamoros" (January 2020)

- Human Rights First, "Human Rights Fiasco
  (https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDec19.pdf):
  The Trump Administration's Dangerous Asylum Returns Continue" (December
  2019) (en español
  (https://www.humanrightsfirst.org/sites/default/files/Fiasco%20de%20derechos%20human

- American Immigration Council, Statement
  (http://americanimmigrationcouncil.org/sites/default/files/general_litigation/statement_for
  the Migrant Protection Protocols to the House Homeland Security Subcommittee on
  Border Security (November 2019) (en

- Catholic Legal Immigration Network, Inc., "Seven Migrant Protection Protocols
  Stories (https://cliniclegal.org/news/seven-migrant-protection-protocols-stories-
  estamos-unidos-asylum-project) from Estamos Unidos: Asylum Project"
  (November 2019)

- IMUMI, Kidnappings (http://bit.ly/2XvkSCB) of Asylum Seekers along the Northern
  Mexican Border (November 2019)

- U.S. Immigration Policy Center, "Seeking Asylum
  (https://usipc.ucsd.edu/publications/usipc-seeking-asylum-part-2-final.pdf)"
  study on fear of return and harm to returned asylum seekers in Mexico (October
  2019)

- Human Rights Watch, "Risks at Border for Those with Disabilities
  (https://www.hrw.org/news/2019/10/29/mexico-risks-border-those-disabilities)"
  (October 2019)

<div align="center">AR605</div>

- Physicians for Human Rights, "If I went back, I would not survive (https://phr.org/our-work/resources/asylum-seekers-fleeing-violence-in-mexico-and-central-america/#close-modal).' Asylum Seekers Fleeing Violence in Mexico and Central America" (October 2019)

- Human Rights First, "Orders from Above (https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf): Massive Human Rights Abuses under Trump Administration Return to Mexico Policy" (October 2019) (en español (https://www.humanrightsfirst.org/sites/default/files/resources/Ordenes%20de%20Arriba_

- Human Rights Watch, "US Move Puts More Asylum Seekers at Risk (https://www.hrw.org/news/2019/09/25/us-move-puts-more-asylum-seekers-risk): Expanded 'Remain in Mexico' Program Undermines Due Process" (September 2019)

- Doctors Without Borders, "US 'Remain in Mexico' Policy Endangers Lives of Asylum Seekers (https://www.doctorswithoutborders.org/what-we-do/news-stories/news/us-remain-mexico-policy-endangers-lives-asylum-seekers-tamaulipas) in Tamaulipas State" (September 2019)

- WOLA, Six Points (https://www.wola.org/analysis/migration-agreement-mexico-border-migrant-arrests/) About the U.S.-Mexico Migration Agreement and the Latest Border Apprehension Numbers (September 2019)

- Human Rights First, "Delivered to Danger (https://www.humanrightsfirst.org/resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due): Illegal Remain in Mexico Policy Imperils Asylum Seekers' Lives and Denies Due Process" (August 2019)

- Human Rights Watch, "'We Can't Help You Here' (https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico): US Returns of Asylum Seekers to Mexico" (July 2019)

- Human Rights First, "The Trump Administration's Migrant Persecution Protocols (https://www.humanrightsfirst.org/blog/trump-administration-s-migrant-persecution-protocols)" (June 2019)

- HOPE Border Institute, Remain in Mexico Updates (https://www.hopeborder.org/remain-in-mexico-052219) (June 2019)

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 613 of 688   PageID 2270

- Refugees International, "Remain in Mexico Policy Pushes Asylum Seekers into Grave Dangers (https://www.refugeesinternational.org/reports/2019/5/30/remain-in-mexico-policy-pushes-asylum-seekers-into-grave-danger)" (May 2019)

- Women's Refugee Commission, "Chaos, Confusion, and Danger (https://www.womensrefugeecommission.org/rights/resources/1763-chaos-confusion-and-danger): The Remain in Mexico Program in El Paso" (May 2019)

- Human Rights First, "Congress and Courts Mislead (https://www.humanrightsfirst.org/resource/courts-and-congress-misled-about-trump-administration-policy-forcing-asylum-seekers-remain) About Trump Administration Policy Forcing Asylum Seekers to "Remain in Mexico" (May 2019)

- ACLU, "Trump's New Policy is Stranding Asylum Seekers (https://www.aclu.org/issues/immigrants-rights/trumps-new-policy-stranding-asylum-seekers-mexico) in Mexico" (March 2019)

- Human Rights First, "A Sordid Scheme (https://www.humanrightsfirst.org/resource/sordid-scheme-trump-administration-s-illegal-return-asylum-seekers-mexico): The Trump Administration's Illegal Return of Asylum Seekers to Mexico" (February/March 2019)

- American Immigration Council, American Immigration Lawyers Association, CLINIC, "Substantial Evidence Demonstrating Catastrophic Harms That Will Befall Migrants in Mexico (https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/letter_u with Continued Implementation and Further Expansion of Migrant Protection Protocols" (February 2019)

## INVESTIGATIONS, LAWSUITS AND OTHER LITIGATION

- *E.A.R.R. v. DHS*
  - Complaint (https://creeclaw.org/wp-content/uploads/2020/11/E.A.R.R.-v.-US-Department-of-Homeland-Security-Class-Action-Complaint.pdf) (November 2020)

- *Diocesan Migrant & Refugee Services v. ICE*
  - FOIA document production (http://www.dmrs-ep.org/wp-content/uploads/2020/11/2019-ICLI-00062.pdf) (October 2020)

- *Immigrant Defenders Law Center v. Wolf*

AR607

- Complaint (https://www.splcenter.org/sites/default/files/complaint_dkt_1-_immigrant_defenders_law_center_et_al_v._wolf_et_al.pdf) (October 2020)

- BIA case on MPP notice and advisals
  - Amicus Brief (https://www.humanrightsfirst.org/sites/default/files/BorderLegalServiceProvidersBIAA of Border Legal and Humanitarian Service Providers (October 2020)
  
  - Amicus Brief (https://www.tahirih.org/quotes/page/2/?cpt=pubs) of Tahirih Justice Center, the American Immigration Council, the American Immigration Lawyers Association, HIAS, the Fred T. Korematsu Center for Law and Equality, and Human Rights First (October 2020)
  
  - Amicus Invitation (https://www.justice.gov/eoir/page/file/1313321/download) (September 2020)

- *Salim-Adrianza v. Trump*
  - Complaint (https://www.nyclu.org/sites/default/files/field_documents/complaint_0.pdf) (August 2020)

- *Matter of M-D-C-V-*
  - Amicus Brief (https://1ttls613brjl37btxk4eg60v-wpengine.netdna-ssl.com/wp-content/uploads/2020/10/M-D-C-V-Amicus-Brief_Redacted.pdf) of CLINIC, HIAS, Human Rights First, Immigrant Defenders Law Center, Jewish Family Service of San Diego, Public Counsel, and Tahirih Justice Center (October 2020)
  
  - BIA Decision (https://www.justice.gov/eoir/page/file/1293971/download) (July 2020)

- *Turcios v. Wolf*
  - Order (https://www.humanrightsfirst.org/sites/default/files/TurciosvWolfOrder.10.16.20.pdf) (October 2020)
  
  - Complaint (https://www.humanrightsfirst.org/sites/default/files/TurciosvWolfComplaint.06.04.20.p (June 2020)

- *American Immigration Council v. USCIS*

AR608

○ Complaint
(https://www.americanimmigrationcouncil.org/sites/default/files/litigation_documents/

- *Nora v. Wolf*
  ○ Complaint
  (https://www.acludc.org/sites/default/files/field_documents/nora_v_wolf_complaint.pdf
  (April 2020)

- *Bollat Vasquez v. Wolf*
  ○ Amicus Brief
  (https://www.aclum.org/sites/default/files/field_documents/2020_08_03_council_119_a
  of Asylum Officers' Union (August 2020)

  ○ Amicus Brief
  (https://www.aclum.org/sites/default/files/field_documents/2020_08_03_former_officia
  Former Government Officials (August 2020)

  ○ Amicus Brief (https://cliniclegal.org/resources/litigation/amicus-brief/clinic-
  joins-amicus-brief-case-challenging-mpp) of Immigration and Refugee Legal
  Services Providers, LawSchool Clinics, and Community Organizations (August
  2020)

  ○ Order
  (https://www.aclum.org/sites/default/files/field_documents/45._memorandum_and_ord
  (May 2020)

  ○ Complaint
  (https://www.aclum.org/sites/default/files/field_documents/1_complaint_0.pdf)
  (March 2020)

- *Constanza Lemus v. Wolf*
  ○ Complaint
  (https://www.aclum.org/sites/default/files/field_documents/1_complaint.pdf) (January
  2020)

- *Doe v. McAleenan*
  ○ Preliminary Injunction and Class Certification
  (https://www.courtlistener.com/recap/gov.uscourts.casd.654553/gov.uscourts.casd.654
  (January 2020)

  ○ Temporary Restraining Order (https://www.aclusandiego.org/wp-
  content/uploads/2019/11/434704150-Sabraw-Order.pdf) (November 2019) -

requiring government to allow access to counsel before and during fear screening interviews

- ○ Complaint (https://www.aclusandiego.org/wp-content/uploads/2019/11/2019-11-05-MPP-Non-R-Complaint-FILED.pdf) (November 2019)

- *Innovation Law Lab v. McAleenan*
  - ○ Complaint (https://www.aclu.org/legal-document/innovation-law-lab-v-nielsen-complaint) (February 2019)

  - ○ Amicus Brief (https://www.aclu.org/legal-document/innovation-law-lab-v-mcaleenan-amicus-brief-labor-union-local-1924) of Asylum Officers' Union (June 2019)

  - ○ Amicus Brief (https://www.aclu.org/legal-document/innovation-law-lab-v-mcaleenan-amicus-brief-amnesty-international) of Amnesty International (June 2019)

  - ○ Amicus Brief (https://www.aclu.org/legal-document/innovation-law-lab-v-mcaleenan-amicus-brief-human-rights-first) of Human Rights First (June 2019)

  - ○ Amicus Brief (https://www.aclu.org/legal-document/innovation-law-lab-v-mcaleenan-amicus-brief-un-high-commissioner-refugees) of UNHCR (June 2019)

  - ○ Amicus Brief (https://www.aclu.org/legal-document/innovation-law-lab-v-mcaleenan-amicus-brief-former-government-officials) of Former Government Officials (June 2019)

- Letter (https://www.humanrightsfirst.org/sites/default/files/CBPBlockingMPPFearScreeningLetter to DHS regarding CBP blocking MPP fear screenings (June 2020)

- Letter (https://www.humanrightsfirst.org/sites/default/files/LetterfromMPPServiceProvidersonCO to DHS from 27 service providers regarding MPP and COVID-19, and urging DHS to end MPP and parole asylum seekers into the United States (April 2020)

- Letter (https://www.humanrightsfirst.org/sites/default/files/Letter%20from%20Service%20Provide %20UPDATED.pdf) to DHS from 23 legal, faith-based, humanitarian, and community organizations providing legal and other assistance to asylum seekers

AR610

and migrants subjected to MPP urging the policy's immediate termination (January 2020)

- ACLU and the Center for Gender & Refugee Studies, Letter to DHS Demanding Immediate Halt (https://www.aclu.org/other/re-implementation-migrant-protection-protocols-mpp-tamaulipas-state) of MPP Returns to Tamaulipas, Mexico (December 2019)

- AILA, Letter to Congress Demanding Public Access (https://www.aila.org/advo-media/aila-correspondence/2019/aila-sends-letter-to-congress-demanding-public) to Tent Courts (November 2019)

- Refugees International, Statement (https://www.refugeesinternational.org/reports/2019/11/19/examining-the-human-rights-and-legal-implications-of-dhs-remain-in-mexico-policy) to House Committee on Homeland Security (November 2019)

- NGOs Urge Congress to Conduct Significant Oversight (https://www.aila.org/advo-media/aila-correspondence/2019/organizations-urge-congress-to-conduct-significant) of Remain in Mexico and Use of Tent Courts by DHS and DOJ (October 2019)

- ACLU, Complaint to DHS OIG/CRCL regarding "Pregnant women (https://www.aclutx.org/sites/default/files/aclu_oig_complaint_preg_mpp.pdf) returned to Mexico under the 'Migration Protection Protocols' (MPP)" (September 2019)

- Human Rights First, Complaint to DHS OIG/CRCL regarding "Rape, Kidnapping, Assault (https://www.humanrightsfirst.org/resource/complaint-office-inspector-general-concerning-rape-kidnapping-assault-and-other-attacks) and Other Attacks on Asylum Seekers and Migrants Returned to Mexico Under the 'Migrant Protection Protocols'; Returns of Other Vulnerable Individuals" (August 2019)

- Women's Refugee Commission, Complaint to DHS OIG/CRCL regarding "Separation of Families (https://www.womensrefugeecommission.org/rights/resources/1824-separation-of-families-via-the-migrant-protection-protocols) via the 'Migrant Protection Protocols'" (August 2019)

- Testimony of Yael Schacher, Refugees International (https://www.refugeesinternational.org/reports/2019/8/28/remain-in-mexico-policy-is-undermining-asylum-and-endangering-asylum-seekers), to the Inter-

AR611

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 618 of 688   PageID 2275

American Commission on Human Rights (IACHR) regarding "Remain in Mexico" (August 2019)

- AILA, Letter to DHS Acting Secretary Detailing MPP's Barriers to Counsel (https://www.aila.org/infonet/aila-sends-letter-to-dhs-acting-secretary-mpp? utm_source=Recent%20Postings%20Alert&utm_medium=Email&utm_campaign=RP%20Da 2019)

## U.S. GOVERNMENT WARNINGS AND REPORTS OF DANGER IN MEXICO

- U.S. State Department, Mexico 2018 Human Rights Report (https://www.state.gov/wp-content/uploads/2019/03/MEXICO-2018.pdf)

- U.S. State Department, Travel Advisory (https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html) on Mexico

- U.S. State Department, OSAC, Mexico 2019 Crime & Safety Report: Ciudad Juarez (https://www.osac.gov/Content/Report/767346f9-d5f4-40e0-bc0e-15f4aeb82c35)

- U.S. State Department, OSAC, Mexico 2019 Crime & Safety Report: Matamoros (https://www.osac.gov/Content/Report/03b73ba8-0cd3-4772-bc97-15f4aebfc985)

- U.S. State Department, OSAC, Mexico 2019 Crime & Safety Report: Nuevo Laredo (https://www.osac.gov/Content/Report/4811d231-eea0-4a49-b25c-15f4aec0eb64)

- U.S. State Department, OSAC, Mexico 2019 Crime & Safety Report: Tijuana (https://www.osac.gov/Country/Mexico/Content/Detail/Report/72d11598-3cfa-4ff4-a9bc-15f4aec22ce4)

## U.S. LAW AND TREATIES VIOLATED BY TRUMP ADMINISTRATION RETURN POLICIES

- Immigration and Nationality Act Section 208 (https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1158&num=0&edition=prelim)

- Immigration and Nationality Act Section 235 (https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim)

- Convention and Protocol Relating to the Status of Refugees (https://www.unhcr.org/en-us/3b66c2aa10)

- Convention Against Torture (https://www.ohchr.org/EN/ProfessionalInterest/Pages/CAT.aspx)

**STATEMENTS BY INTERNATIONAL BODIES**

- IACHR (http://www.oas.org/en/iachr/media_center/PReleases/2020/179.asp), "IACHR Concerned About Restrictions of the Rights of Migrants and Refugees in the United States During COVID-19 Pandemic"

- IACHR (https://www.oas.org/en/iachr/media_center/PReleases/2019/228.asp), "IACHR conducted visit to the United States' Southern Border" (September 2019)

- IACHR (https://www.oas.org/en/iachr/media_center/PReleases/2019/180.asp), "IACHR Expresses Deep Concern about the Situation of Migrants and Refugees in the United States, Mexico, and Central America" (July 2019)

- Special rapporteur on the human rights of migrants (file:///C:/â€¢%09https/::www.ohchr.org:Documents:Issues:SRMigrants:Comments:OL_USA_4-2019.pdf), Letter of concern regarding the "Remain in Mexico" policy (March 2019)

AR613

Case 2:21-cv-00067-Z    Document 61    Filed 06/22/21    Page 620 of 688    PageID 2277

 REUTERS    **World**    **Business**    **Markets**    **Breakingviews**    **Video**    **More** 

AMERICAS-TEST-2

MARCH 7, 2021 / 10:46 AM / UPDATED 3 MONTHS AGO

# Mexican camp that was symbol of migrant misery empties out under Biden

By Laura Gottesdiener



MATAMOROS, Mexico (Reuters) - A sprawling camp in the Mexican city of Matamoros, within sight of the Texan border, has since 2019 been one of the most powerful reminders of the human toll of former President Donald Trump's efforts to keep migrants out of the United States.

**Migrant camp, once a symbol of misery, empties out**

01:57

FDA approves Biogen's Alzheimer's drug despite controversy over mixed clinical trial ...

finally allowed to cross the border to press their claim to stay in the United States.

AR614

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 621 of 688   PageID 2278

President Joe Biden last month rolled back the program - known as the Migrant Protection Protocols (MPP) - that had forced asylum seekers to wait in Mexico.

Biden's wife, Jill, visited the camp during last year's presidential campaign to witness the difficult conditions first hand.

"If it hadn't been for this camp, I don't think they would have ever ended MPP," said Honduran asylum seeker Oscar Borjas, one of the few remaining residents who has not yet been permitted to cross.

The last few people remaining in the camp were relocated to more secure locations identified by international aid groups where they could complete required paperwork, a U.S. official told Reuters late on Saturday.

Like hundreds of asylum seekers expelled from the United States to this crime-ridden town, Borjas began sleeping near the foot of the international bridge across the Rio Grande out of fear and necessity.

But the migrants also intended to make a statement, he said: a visible reminder of the human toll of the MPP program. "We were there so that people would see us; see it wasn't fair what they were doing to us."

As of Friday, some 1,127 people in the MPP program across Mexico have been permitted to enter the United States since Biden rescinded the policy last month. More than half of those were from the Matamoros camp, according to the U.N. refugee agency. More than 700 enrolled in the program have been processed across the border in Brownsville, Texas, according to officials.

Once home to more than 3,000 people, the camp now stands deserted, as nearly all remaining residents left voluntarily for shelters over the weekend after receiving assurances from the United Nation's refugee agency that their asylum cases would still be considered

FDA approves Biogen's Alzheimer's drug despite controversy over mixed clinical trial ...

AR615

Case 2:21-cv-00067-Z Document 61 Filed 06/22/21 Page 622 of 688 PageID 2279

On Saturday, agents from Mexican migration agents began dismantling the camp's ramshackle structures.

"I don't know what I'll do now. I can't go back," said Borjas, who said he faces the threat of murder in Honduras for supporting an opposition party.

"LET'S UNITE"

Slideshow（7 images）

The Trump administration touted the MPP program as part of its successful efforts to reduce immigration and cut down on what it called fraudulent asylum claims.

Since 2019, the policy pushed more than 65,000 migrants back into Mexico as their asylum cases wound through U.S. courts. The majority gave up waiting and left Mexico. Thousands

FDA approves Biogen's Alzheimer's drug despite controversy over mixed clinical trial …

AR616

Case 2:21-cv-00067-Z    Document 61    Filed 06/22/21    Page 623 of 688    PageID 2280

But in Matamoros, which had scant resources for migrants, families opted to sleep in the plaza at the foot of the bridge.

"We said 'Let's unite' and that's how the camp in Matamoros began," said Honduran asylum seeker Josue Cornejo, who was returned to Matamoros along with his wife and their children in August 2019.

Parents scavenged cardboard to stop the summer heat radiating off the pavement from burning their children's skin. The men formed a guard watch.

Aid workers arrived. So did Matamoros' criminal groups, which doled out beatings and siphoned off donations, migrants say.

As the camp population ballooned, the tents sprawled from the plaza to the wooded banks of the Rio Grande, where residents braved contamination and undercurrents to bathe and wash their clothes.

The migrants resisted federal government efforts to house them in a makeshift shelter miles from the border.

Life took root in a way migrants say they had never expected, making the lengthy wait in Mexico slightly more bearable.

They formed church groups, supply distribution tents and kitchens with handmade earthen ovens and stoves improvised from old washing machines.

Nicaraguan asylum seeker Perla Vargas and other migrants launched a tent school that provided music, dance, English and Spanish classes to dozens of children each day, including her two grandchildren.

There were quinceaneras, romances, and at least one wedding.

FDA approves Biogen's Alzheimer's drug despite controversy over mixed clinical trial ...

Consuelo Tomas, an indigenous Q'anjob'al Guatemalan asylum seeker, gave birth inside the

AR617

6/7/2021
Mexican camp that was symbol of migrant misery empties out under Biden | Reuters
Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 624 of 688   PageID 2281

Slideshow（7 images）

camp and named her newborn Andrea in honor of the child's grandmother, who died years earlier trying to cross the Sonoran desert to reach the United States.

Insecurity and hardship reigned.

The weather whiplashed between scorching heat and freezing cold. Human rights groups documented kidnappings and rape of asylum seekers in Matamoros. Occasionally, migrants' bodies washed up along the river bank.

Some mothers, including Salvadoran asylum seeker Sandra Andrade, sent their children to cross the U.S. border alone illegally out of concern for their safety.

FDA approves Biogen's Alzheimer's drug despite controversy over mixed clinical trial ...

AR618

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 625 of 688   PageID 2282

## MATAMOROS TO WASHINGTON

At times, the camp served as the launch pad for protests: from a blockade of the international bridge that halted traffic for hours to demonstrations and all-night vigils opposing Trump's re-election.

Aaron Reichlin-Melnick, policy counsel at the American Immigration Council, said that MPP program might have succeeded in obscuring the plight of these migrants from the American public if it were not for the Matamoros camp.

"It was the one place where you couldn't deny that what we were doing was inflicting harm on people," he said.

Last month, the Biden administration said it would allow about 25,000 migrants in MPP to enter the United States to pursue their cases. Matamoros camp residents were to be among the first in line, it added.

Buoyed by the news, migrants had prepared for their departure in late February: snapping farewell photographs and snipping haircuts for fellow migrants. The sound of bachata music rang out as children hopped about, rehearsing for their final dance recital. Andrade packed up her remaining protest signs and distributed donated pairs of tiny sneakers.

"It's so the kids can cross into the United States in brand new shoes," she said.

Reporting by Laura Gottesdiener in Matamoros, Mexico; Editing by Daniel Flynn and Alistair Bell

*Our Standards: The Thomson Reuters Trust Principles.*

---

Apps     Newsletters     Advertise with Us     Advertising Guidelines     Cookies     Terms of Use     Privacy

FDA approves Biogen's Alzheimer's drug despite controversy over mixed clinical trial ...



AR619

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2021 Reuters. All Rights Reserved.

FDA approves Biogen's Alzheimer's drug despite controversy over mixed clinical trial ...

AR620

5/23/2021    Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border | Homeland Security

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 627 of 688   PageID 2284

Official website of the Department of Homeland Security



U.S. Department of
Homeland Security

# Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border

**Release Date:** March 16, 2021

There is understandably a great deal of attention currently focused on the southwest border.  I want to share the facts, the work that we in the Department of Homeland Security (DHS) and across the government are doing, and our plan of action.  Our personnel remain steadfast in devotion of their talent and efforts in the service of our nation.

The situation at the southwest border is difficult.  We are working around the clock to manage it and we will continue to do so.  That is our job.  We are making progress and we are executing on our plan.  It will take time and we will not waver in our commitment to succeed.

We will also not waver in our values and our principles as a Nation.  Our goal is a safe, legal, and orderly immigration system that is based on our bedrock priorities: to keep our borders secure, address the plight of children as the law requires, and enable families to be together. As noted by the President in his Executive Order, "securing our borders does not require us to ignore the humanity of those who seek to cross them." We are both a nation of laws and a nation of immigrants.  That is one of our proudest traditions.

## The Facts

We are on pace to encounter more individuals on the southwest border than we have in the last 20 years.  We are expelling most single adults and families.  We are not expelling unaccompanied children.  We are securing our border, executing the Centers for Disease

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 628 of 688   PageID 2285

Control and Prevention's (CDC) public health authority to safeguard the American public and the migrants themselves, and protecting the children.  We have more work to do.

This is not new. We have experienced migration surges before – in 2019, 2014, and before then as well. Since April 2020, the number of encounters at the southwest border has been steadily increasing. Border Patrol Agents are working around the clock to process the flow at the border and I have great respect for their tireless efforts. To understand the situation, it is important to identify who is arriving at our southwest border and how we are following the law to manage different types of border encounters.

## Single Adults

The majority of those apprehended at the southwest border are single adults who are currently being expelled under the CDC's authority to manage the public health crisis of the COVID-19 pandemic.  Pursuant to that authority under Title 42 of the United States Code, single adults from Mexico and the Northern Triangle countries of El Salvador, Guatemala, and Honduras are swiftly expelled to Mexico.  Single adults from other countries are expelled by plane to their countries of origin if Mexico does not accept them.  There are limited exceptions to our use of the CDC's expulsion authority.  For example, we do not expel individuals with certain acute vulnerabilities.

The expulsion of single adults does not pose an operational challenge for the Border Patrol because of the speed and minimal processing burden of their expulsion.

## Families

Families apprehended at the southwest border are also currently being expelled under the CDC's Title 42 authority.  Families from Mexico and the Northern Triangle countries are expelled to Mexico unless Mexico does not have the capacity to receive the families.  Families from countries other than Mexico or the Northern Triangle are expelled by plane to their countries of origin.  Exceptions can be made when a family member has an acute vulnerability.

Mexico's limited capacity has strained our resources, including in the Rio Grande Valley area of Texas.  When Mexico's capacity is reached, we process the families and place them in immigration proceedings here in the United States.  We have partnered with community-based organizations to test the family members and quarantine them as needed under COVID-19 protocols.  In some locations, the processing of individuals who are part of a family unit has strained our border resources.  I explain below additional challenges we have encountered and the steps we have taken to solve this problem.

Case 2:21-cv-00067-Z    Document 61    Filed 06/22/21    Page 629 of 688    PageID 2286

**Unaccompanied Children**

We are encountering many unaccompanied children at our southwest border every day. A child who is under the age of 18 and not accompanied by their parent or legal guardian is considered under the law to be an unaccompanied child. We are encountering six- and seven-year-old children, for example, arriving at our border without an adult. They are vulnerable children and we have ended the prior administration's practice of expelling them.

An unaccompanied child is brought to a Border Patrol facility and processed for transfer to the Department of Health and Human Services (HHS). Customs and Border Protection is a pass-through and is required to transfer the child to HHS within 72 hours of apprehension. HHS holds the child for testing and quarantine, and shelters the child until the child is placed with a sponsor here in the United States. In more than 80 percent of cases, the child has a family member in the United States. In more than 40 percent of cases, that family member is a parent or legal guardian. These are children being reunited with their families who will care for them.

The children then go through immigration proceedings where they are able to present a claim for relief under the law.

The Border Patrol facilities have become crowded with children and the 72-hour timeframe for the transfer of children from the Border Patrol to HHS is not always met. HHS has not had the capacity to intake the number of unaccompanied children we have been encountering. I describe below the actions we have taken and the plans we are executing to handle this difficult situation successfully.

**Why the Challenge is Especially Difficult Now**

Poverty, high levels of violence, and corruption in Mexico and the Northern Triangle countries have propelled migration to our southwest border for years. The adverse conditions have continued to deteriorate. Two damaging hurricanes that hit Honduras and swept through the region made the living conditions there even worse, causing more children and families to flee.

The COVID-19 pandemic has made the situation more complicated. There are restrictions and protocols that need to be followed. The physical distancing protocol, for example, imposes space and other limitations on our facilities and operations.

The prior administration completely dismantled the asylum system. The system was gutted, facilities were closed, and they cruelly expelled young children into the hands of traffickers.

AR623

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 630 of 688   PageID 2287

We have had to rebuild the entire system, including the policies and procedures required to administer the asylum laws that Congress passed long ago.

The prior administration tore down the lawful pathways that had been developed for children to come to the United States in a safe, efficient, and orderly way.  It tore down, for example, the Central American Minors program that avoided the need for children to take the dangerous journey to our southwest border.

The previous administration also cut foreign aid funding to the Northern Triangle.  No longer did we resource efforts in El Salvador, Guatemala, and Honduras to tackle the root causes of people fleeing their homes.

And, there were no plans to protect our front-line personnel against the COVID-19 pandemic.  There was no appropriate planning for the pandemic at all.

As difficult as the border situation is now, we are addressing it.  We have acted and we have made progress.  We have no illusions about how hard it is, and we know it will take time.  We will get it done.  We will do so adhering to the law and our fundamental values.  We have an incredibly dedicated and talented workforce.


## Actions We Have Taken

In less than two months, Customs and Border Protection stood-up an additional facility in Donna, Texas to process unaccompanied children and families.  We deployed additional personnel to provide oversight, care, and transportation assistance for unaccompanied minors pending transfer to HHS custody.

We are standing up additional facilities in Texas and Arizona to shelter unaccompanied children and families.  We are working with Mexico to increase its capacity to receive expelled families.  We partnered with community-based organizations to test and quarantine families that Mexico has not had the capacity to receive.  We have developed a framework for partnering with local mayors and public health officials to pay for 100% of the expense for testing, isolation, and quarantine for migrants.  ICE has also developed additional facilities to provide testing, local transportation, immigration document assistance, orientation, travel coordination in the interior, and mechanisms to support oversight of the migrant families who are not expelled.

Working with Mexico and international organizations, we built a system in which migrants who were forced to remain in Mexico and denied a chance to seek protection under the previous administration can now use a virtual platform – using their phones – to register.

AR624

They do not need to take the dangerous journey to the border. The individuals are tested, processed, and transported to a port of entry safely and out of the hands of traffickers. We succeeded in processing the individuals who were in the Matamoros camp in Mexico. This is the roadmap going forward for a system that is safe, orderly, and fair.

To protect our own workforce, we launched Operation Vaccinate Our Workforce (VOW) in late January. At the beginning of this administration, less than 2 percent of our frontline personnel were vaccinated. Now more than 25 percent of our frontline personnel have been vaccinated.

We directed the Federal Emergency Management Agency (FEMA) to assist HHS in developing the capacity to meet the surge of unaccompanied children. FEMA already established one new facility for HHS to shelter 700 children. They have identified and are currently adding additional facilities. We are working with HHS to more efficiently identify and screen sponsors for children. In two days, we recruited more than 560 DHS volunteers to support HHS in our collective efforts to address the needs of the unaccompanied children.

We are restarting and expanding the Central American Minors program. It creates a lawful pathway for children to come to the United States without having to take the dangerous journey. Under this expansion, children will be processed in their home countries and brought to the United States in a safe and orderly way.

In addition, DHS and HHS terminated a 2018 agreement that had a chilling effect on potential sponsors – typically a parent or close relative – from coming forward to care for an unaccompanied child placed in an HHS shelter. In its place, DHS and HHS signed a new Memorandum of Agreement that promotes the safe and timely transfer of children. It keeps safeguards designed to ensure children are unified with properly vetted sponsors who can safely care for them while they await immigration proceedings.


## The Path Forward

We are creating joint processing centers so that children can be placed in HHS care immediately after Border Patrol encounters them. We are also identifying and equipping additional facilities for HHS to shelter unaccompanied children until they are placed with family or sponsors. These are short-term solutions to address the surge of unaccompanied children.

Longer term, we are working with Mexico and international organizations to expand our new virtual platform so that unaccompanied children can access it without having to take the

dangerous journey to our border.  As mentioned, we are expanding the Central American Minors program to permit more children to be processed in their home countries and if eligible, brought to the United States in a safe and orderly way.

We are developing additional legal and safe pathways for children and others to reach the United States.  While we are building a formal refugee program throughout the region, we are working with Mexico, the Northern Triangle countries, and international organizations to establish processing centers in those countries so that individuals can be screened through them and brought to the United States if they qualify for relief under our humanitarian laws and other authorities.

For years, the asylum system has been badly in need of reengineering.  In addition to improving the process by which unaccompanied children are placed with family or sponsors, we will be issuing a new regulation shortly and taking other measures to implement the long-needed systemic reforms.  We will shorten from years to months the time it takes to adjudicate an asylum claim while ensuring procedural safeguards and enhancing access to counsel.

President Biden laid out a vision of a "multi-pronged approach toward managing migration throughout North and Central America that reflects the Nation's highest values." To that end, we are working with the Departments of Health and Human Services, Justice, and State in an all-of-government effort to not only address the current situation at our southwest border, but to institute longer-term solutions to irregular migration from countries in our hemisphere that are suffering worsening conditions.  This is powerfully exemplified by the President's goal to invest $4 billion in the Northern Triangle countries to address the root causes of migration.


## Conclusion

The situation we are currently facing at the southwest border is a difficult one.  We are tackling it.  We are keeping our borders secure, enforcing our laws, and staying true to our values and principles. We can do so because of the incredible talent and unwavering dedication of our workforce.

I came to this country as an infant, brought by parents who understood the hope and promise of America.  Today, young children are arriving at our border with that same hope.  We can do this.

Topics: Border Security (/topics/border-security) , Citizenship and Immigration Services (/topics/immigration-and-citizenship-services) , Homeland Security Enterprise (/topics/homeland-security-enterprise) , Secretary of Homeland Security

AR626

Keywords: Family (/keywords/family) , Immigration (/keywords/immigration) , Immigration Reform (/keywords/immigration-reform) , Secretary Alejandro Mayorkas (/keywords/secretary-alejandro-mayorkas) , Southwest Border (/keywords/southwest-border) , Unaccompanied Children (UC) (/keywords/unaccompanied-children) (/topics/secretary-homeland-security)

Last Published Date: March 16, 2021

 

HOME    ARTICLES ▼    ASK A QUESTION ▼    DONATE    TOPICS ▼    ABOUT US ▼    SEARCH    MORE ▼

FACTCHECK POSTS > FEATURED POSTS

# The Facts on the Increase in Illegal Immigration

*By Lori Robertson*

*Posted on March 23, 2021 | Updated on March 23, 2021*

   

Democrats and Republicans are pointing fingers over an increase in illegal immigration at the southern border, and notably an increase in children traveling alone.

While Democrats argue the surge began before President Joe Biden took office, Republicans argue Biden's welcoming policies are to blame. A rise in border apprehensions did begin prior to the election under then–President Donald Trump. But the increase in unaccompanied children has spiked significantly in the first full month of the Biden administration.

The unaccompanied children are being held in custody in large numbers while the administration tries to catch up with a backlog in housing and processing them.

We'll take a look at the immigration statistics and facts behind the recent increase.

**How many people are trying to cross the border illegally?**

Let's start with a look at the big picture: Apprehensions on the southwest border peaked in 2000 at 1.64 million and have generally declined since, with some fluctuations. In 2017, apprehensions hit the lowest level since 1972, but they spiked in fiscal year 2019 at 851,508 and fell back down to 400,651 in fiscal 2020.

## Total Southwest Border Apprehensions



Data by fiscal year.
Source: U.S. Customs and Border Protection



On a monthly basis over the past year, apprehensions plummeted to 16,182 in April 2020, as the coronavirus pandemic and economic shutdowns gripped both the U.S. and Mexico. But then, apprehensions started ticking up again, increasing noticeably in late summer and fall. By October, 69,022 people were apprehended on the southwest border, up 79% from July. In February, the figure was 96,974.

While the bulk of the increase comes from single adults, the number of children arriving at the border without an adult has gone up as well. Here's a breakdown of the type of apprehensions by month — for single adults, unaccompanied children and those traveling in a family unit — dating back to 2013, the earliest point of data for family units.

## Monthly Southwest Border Apprehensions

### January 2013 - January 2021



Source: U.S. Customs and Border Protection

Share



[Tony Payan](), director of the Center for the United States and Mexico at Rice University's Baker Institute for Public Policy, [wrote]() in a March 15 blog post that "the current situation at the border is neither a unique crisis nor the result (yet) of Biden's policy changes."

In a phone interview, he told us that while the apprehension numbers are spiking now, "this is not a new crisis." Instead, it has been going on since 2014, "when we first saw unaccompanied minors and family units arriving at the border and turning themselves in," and the problem has plagued each administration since.

As the chart above shows, apprehension spikes under the past two presidents in 2014 and 2019 similarly included sizable increases in family units and unaccompanied children arriving at the border.

Other immigration experts, writing in the *Washington Post*, [agree]() that "the current increase in apprehensions fits a predictable pattern of seasonal changes in undocumented immigration combined with a backlog of demand because of 2020's coronavirus border closure." It's "not a surge," they said.

Overall, Payan said, "The patterns of migration do not seem to correlate to any specific U.S. immigration policy. The numbers seem to go up and down on a logic of their own." People leave their home countries for reasons other than U.S. policy, such as deteriorating economic, political or public safety conditions.

**How does this increase in unaccompanied children crossing the border compare with past increases?**

The recent numbers are on track to rival or surpass the spike of unaccompanied children apprehended in 2019.

A [report]() from the nonpartisan Congressional Research Service sums up the trends in what the government calls UAC — "unaccompanied alien children" — this way: "In FY2014, the Department of Homeland Security (DHS), Customs and Border Protection (CBP) apprehended 68,541 UAC, a record at that time. Since FY2014, UAC apprehensions have fluctuated considerably, declining to 39,970 in FY2015, increasing to 59,692 in FY2016, declining to 41,435 in FY2017, and increasing to 50,036 in FY2018."

In fiscal year 2019, the number of unaccompanied children who were apprehended — [76,020]() — surpassed 2014's total, a new yearly record. And in fiscal 2020, which ended on Sept. 30, the total dropped considerably to 30,557.

At just five months into this fiscal year, the number is already at [29,010](). The number of unaccompanied children being apprehended at the southern border did start trending up in October, but also jumped 63% from January to February, when the total was 9,297.

As Payan said, the issue started in 2014, and it has been a problem for each administration.

[Theresa Cardinal Brown](#), managing director of immigration and cross-border policy at the Bipartisan Policy Center, told us that 2014 was not only the first time there was a dramatic increase in unaccompanied children, but migrants also came from Central America, not Mexico.



*Immigrants walk along the U.S.–Mexico border on March 17 after crossing the shallow Rio Grande between El Paso and Ciudad Juarez, Mexico. Photo by John Moore/Getty Images.*

"The border facilities and the system of processing unaccompanied minors under law were designed for the time when the vast majority of encounters at the border were single adult Mexican males who were processed and returned across the border very quickly, often within a day," Brown said in an email. "But Central Americans could not be sent back across to Mexico and if they applied for asylum, or were UACs would have to be taken into custody and provided an opportunity to make their case in immigration court."

[Sarah Pierce](#), a policy analyst with the Migration Policy Institute, said the increases of families and unaccompanied children in 2014 and 2019 "overwhelmed U.S. resources." In both of those years, the flow of immigrants "were driven primarily by longstanding push and pull factors."

Those "push and pull factors" include poverty and violence in migrants' home countries, and economic opportunity in the U.S., family ties and border policies on children and families, as the Migration Policy Institute outlined in a [2019 report](#).

In 2019, another factor was a "chaotic implementation of restrictive southern border policies" under Trump, Pierce told us.

The difference this year is that the increase overwhelming U.S. resources "has been entirely driven by unaccompanied child migrants," Pierce said. The flow is also due to push and pull factors, as well as the coronavirus pandemic–caused economic crisis and recent hurricanes.

All three experts we spoke with told us there may be a perception that the Biden administration is more welcoming to migrants, but "Biden has not significantly changed operations at the border since Trump as of yet," as Brown said.

In mid-February, the administration [announced](#) it would [begin processing](#) non-Mexican asylum seekers who have been waiting in Mexico for their U.S. court dates under a Trump-era program to keep those individuals on the other side of the border. But that policy doesn't concern new arrivals or those without pending asylum cases, the administration said.

One notable change for unaccompanied children, however, is that they are "the only population that is officially exempt from the CDC's Title 42 order," Pierce said.

**What is Title 42 and how has it affected immigration flows?**

[Title 42](#) is a public health law the Trump administration [began invoking](#) in March 2020 to immediately expel, due to the coronavirus pandemic, those apprehended on the southern border. In November, a federal judge [ordered](#) a halt to such deportations of minors. While the Biden administration has continued to use the law to expel adults and some families, it has stopped expelling children.

"We are expelling most single adults and families," Department of Homeland Security Secretary Alejandro Mayorkas [said in a March 16 statement](#). "We are not expelling unaccompanied children."

While that's certainly the case for single adults, CBP [data show](#), the administration expelled 41% of family units in February, down from 62% who were expelled in January. The *Washington Post* [wrote about](#) the discrepancy.

Brown noted that migration started to increase in April 2020 and "continued to rise through the Biden inauguration. So it is not true that the increase started under Biden." But the decision not to expel unaccompanied children "sped up the increase."

"A somewhat new phenomenon, being reported by attorneys for migrants in the region, is that it seems that some unaccompanied children actually arrived in Northern Mexico with family members who sent them into the US alone since the U.S. was letting them in, and then the adults would try to come in later," she said.

At the same time, Title 42 may have artificially inflated the problem of single adults being apprehended, because some are trying to cross repeatedly in short time frames.

"We know that single adults have driven the majority of the total increase in encounters at the border," Brown said in an email. "But we also have been told by CBP that as many as 1/3 of those are repeat encounters with the same person. We believe that because Title 42 results in rapid expulsion of migrants back to Mexico within a very short period of time, and no immigration process (and therefore no immigration bars being applied), the opportunity cost of migrants to repeatedly try to cross the border is low."

Brown said there are reports that smuggling operations "are charging rates for 'up to 3 attempts.'"

The increase in single adults also could be due to people sending children ahead of them and attempting to follow separately. "But there are not detailed statistics on that," she told us.

**What's the process for these unaccompanied kids? How many unaccompanied children are being held in Customs and Border Protection custody?**

Unaccompanied children are generally referred to the Department of Health and Human Services' Office of Refugee Resettlement. Some from Mexico can be returned home, a Congressional Research Service report explains, but the vast majority of these kids in recent years are from Guatemala, Honduras and El Salvador. While that referral process is taking place, they are held in Customs and Border Protection custody.

A backlog, due to the increase in unaccompanied children arriving at the border and policies in place due to the coronavirus pandemic, has led to a crush of kids being held in border facilities. One lawmaker released images of kids sleeping on cots on the floor.

A CBP spokesperson wouldn't tell us how many children are now in custody, saying that it doesn't provide daily numbers "as they are considered operationally sensitive because CBP's in-custody numbers fluctuate on a constant basis. The number it shares one morning may be different by the afternoon and the next day."

CNN reported on March 20 that more than 5,000 unaccompanied children were in CBP custody, "according to documents obtained by CNN, up from 4,500 children days earlier."

The children are only supposed to be in CBP custody for up to 72 hours, before being transferred to the Office of Refugee Resettlement. CNN reported that the children were being held an average of five days and that more than 600 of them had been held in CBP custody for more than 10 days.

"Unfortunately HHS waited until March 5 to start bringing beds back that were taken offline during the pandemic," Pierce told us of the problem. "While HHS is making efforts to expand their capacity by bringing these beds back online and acquire new influx facilities, their lack of bed space has led to the current back up of children in CBP custody."

The CBP spokesperson told us the agency's "ability to move children out of its care is directly tied to available space at HHS ORR" and that "everybody's focus is on moving UACs through as quickly as we can."

Past administrations have also struggled to get unaccompanied minors out of CBP custody.

In a November 2019 report, for instance, the Department of Homeland Security wrote: "One of the most visible and troubling aspects of this humanitarian crisis, one that manifested itself in April, May and early June 2019, was young children (sometimes for a week or more) being held by CBP's Border Patrol, not because it wanted to hold them, but because HHS had run out of funds to house them."

A July 2019 DHS Office of Inspector General report warned of "dangerous overcrowding" of kids held in five border facilities. It said CBP data showed 2,669 children, some who arrived at the border alone and some with families, had been held for more than 72 hours, with some children younger than 7 years old held for more than two weeks.

Once with the Office of Refugee Resettlement, children stay in shelters while awaiting immigration proceedings, including asylum, before being placed with a sponsor, who could be a parent, another relative or a non-family member. In fiscal year 2019, 69,488 children were referred to the Office of Refugee Resettlement, which has cared for 409,550 children since 2003. The HHS press office told us there are currently about 11,350 children in ORR care.

Data from HHS from fiscal year 2012 through 2020 show that at least 66% of referred children each year have been male. They are primarily from Guatemala, Honduras and El Salvador, and most are age 15 and older.

The Biden administration has tasked the Federal Emergency Management Agency with assisting HHS in housing the children.

*Update, March 23: We updated this story with the number of children now in the care of the Office of Refugee Resettlement.*

Case 2:21-cv-00067-Z   Document 61   Filed 06/22/21   Page 639 of 688   PageID 2296

*Editor's note: FactCheck.org does not accept advertising. We rely on grants and individual donations from people like you. Please consider a donation. Credit card donations may be made through our "Donate" page. If you prefer to give by check, send to: FactCheck.org, Annenberg Public Policy Center, 202 S. 36th St., Philadelphia, PA 19104.*

**Categories**  FactCheck Posts    Featured Posts

**Issue**  Illegal Immigration    Immigration

---

PREVIOUS STORY
Posts Misrepresent Columbia's Multicultural Graduation Ceremonies

NEXT STORY
Three False Claims About the Federal Voting Rights Bill

ARCHIVES        PRIVACY        COPYRIGHT POLICY        CONTACT US

REPORT ACCESSIBILITY ISSUES AND GET HELP

© Copyright 2021 FactCheck.org ®

A Project of The Annenberg Public Policy Center of the University of Pennsylvania

**From:**
**To:**
**Cc:**
**Subject:** MPP Data
**Date:** Monday, March 29, 2021 6:39:42 PM
**Attachments:** image001.png
Total MPP in absentia removal orders.pdf
Total MPP removal orders.pdf
Total MPP in person Removal orders.pdf
Total MPP Termination Order.pdf

---

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

Good evening. Please see the attached below. This is an update to the data provided last Thursday. Please let me know if you have any questions. Thank you.

| MPP Cases Terminated | 9,992 |
|---|---|

| Removal Orders Issued in absentia | 27,802 |
|---|---|
| Removal Orders Issued after a hearing (in person) | 4522 |
| **Total Removal Orders** | 32324 |



This communication, along with any attachments, is covered by Federal and State law governing electronic communications, and may contain sensitive or legally privileged information. If the reader is not the intended recipient, you are hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please notify the sender immediately and delete or destroy this message.

as of Mar 29, 2021

| Base City Code | Hearing Loc Code | Total |
|---|---|---|
| ELP | ENP | 10,722 |
| ELP - Total | | 10722 |
| HLG | MPB | 7,844 |
| HLG - Total | | 7844 |
| SNA | MPL | 8,069 |
| SNA - Total | | 8069 |
| SND | CIX | 1,167 |
| | SYP | 1,167 |
| SND - Total | | 1167 |
| Overall - Total | | 27802 |

AR635

as of Mar 29, 2021

| Base City Code | Hearing Loc Code | Total |
|---|---|---|
| ELP | ENP | 287 |
| ELP - Total | | 287 |
| HLG | MPB | 1,780 |
| HLG - Total | | 1780 |
| SNA | MPL | 1,451 |
| SNA - Total | | 1451 |
| SND | CIX | 1,004 |
| | SYP | 1,004 |
| SND - Total | | 1004 |
| Overall - Total | | 4522 |

AR636

as of Mar 29, 2021

| Base City Code | Hearing Loc Code | Total |
|---|---|---|
| ELP | ENP | 11,009 |
| ELP - Total | | 11009 |
| HLG | MPB | 9,624 |
| HLG - Total | | 9624 |
| SNA | MPL | 9,520 |
| SNA - Total | | 9520 |
| SND | CIX | 2,171 |
| | SYP | 2,171 |
| SND - Total | | 2171 |
| Overall - Total | | 32324 |

AR637

as of Mar 29, 2021

| Base City Code | Hearing Loc Code | Total |
|----------------|------------------|-------|
| ELP | ENP | 374 |
| ELP - Total | | 374 |
| HLG | MPB | 437 |
| HLG - Total | | 437 |
| SNA | MPL | 506 |
| SNA - Total | | 506 |
| SND | CIX | 8,605 |
| | SYP | 8,605 |
| SND - Total | | 8605 |
| Overall - Total | | 9922 |

AR638

**human rights first**

American ideals. Universal values.

APRIL 2021

# Protection Postponed: Asylum Office Backlogs Cause Suffering, Separate Families, and Undermine Integration

The Biden Administration has inherited a large and growing backlog of asylum claims. As of September 2020, more than 386,000 applications were awaiting adjudication by the Asylum Division of U.S. Citizenship and Immigration Services (USCIS). This backlog exploded under the Obama Administration, which increased the use of expedited removal and redirected asylum officers from adjudicating asylum cases to instead conduct fear screenings. Over the past four years, the backlog continued to grow as the Trump Administration diverted Asylum Division resources to block and turn back refugees seeking U.S. asylum protection – in violation of U.S. laws and treaty obligations.

As a result, refugees face catastrophic, years-long delays to receive an asylum interview. Although U.S. law requires the government to conduct asylum interviews within 45 days of filing, many asylum seekers – including those who filed applications under the Obama Administration – have waited years. They are trapped in legal limbo without permanent status and are often subjected to prolonged separation from their families, including many who are living in danger abroad. While waiting, asylum seekers are often unable to pursue educational opportunities or secure employment, all the while living in fear that they could be deported to persecution or torture.

The backlog coincides with record levels of global refugee displacement. At the end of 2020, the U.N. Refugee Agency (UNHCR) reported that more than 26 million refugees were displaced worldwide, including refugees from Cameroon, Central African Republic, China, El Salvador, Eritrea, Guatemala, Honduras, Nicaragua, Russia, Syria, South Sudan, Venezuela, and Yemen, as political repression, civil conflicts, and other violence forced people to flee their homes in search of protection. For instance, since 2014, political violence in Venezuela has led to an 8,000 percent increase in the number of Venezuelans seeking refugee protection worldwide, with over 100,000 Venezuelans seeking refuge in the United States. Since September 2016, Venezuelans have filed more affirmative asylum applications each month with USCIS than asylum seekers of any other nationality.

Despite these acute needs, U.S. policies and practices are forcing more asylum seekers to wait even longer to receive protection as Asylum Division resources are diverted to implement harsh and flawed border policies, including the expansive use of expedited removal. In fiscal years (FY) 2016 and 2019, an astounding 89 percent of asylum officers were temporarily reassigned from adjudicating affirmative asylum to other duties, including screenings for asylum seekers placed in expedited removal as well as those subjected to the Trump Administration's illegal policies to block refugees at the southern border, such as the Migrant Protection Protocols (MPP) and Asylum Cooperative Agreements (ACA).

At the same time, USCIS's decision to prioritize more recent applicants – the so-called "last in, first out" (LIFO) policy – has failed to reduce the backlog, essentially freezing those already waiting for interviews while adding new asylum seekers to the backlog each year. During the COVID-19 pandemic, the backlog has continued to expand and wait times have grown even longer.

This report, which builds on Human Rights First's prior research, examines the human impact of the backlog through interviews with our asylum clients who have been waiting years for asylum office interviews. It also

analyzes government policies and data to explain underlying causes of the backlog, challenges it poses, and opportunities to resolve it.

*Key findings:*

☑ **The affirmative asylum backlog grew under the Trump Administration, reaching a historic high of more than 386,000** pending applications at the end of FY 2020. Among the asylum seekers stuck in the backlog are thousands from Venezuela, who since September 2016 have filed more affirmative asylum applications than people of any other nationality, with many seeking protection from persecution by the repressive Venezuelan government.

☑ **Asylum seekers wait for years in the backlog for their claims to be adjudicated.** Without a change in the Asylum Division's interview scheduling priorities, USCIS's plan to eliminate the backlog in six years would leave many asylum seekers waiting years – some waiting potentially more than a decade. Asylum seekers who filed applications during the Obama Administration – and who are now at the end of the line due to the adoption of the "last in, first out" scheduling policy in January 2018 – continue to wait for asylum officer interviews. The large majority of interviews currently scheduled are for applications submitted in the last three months; for example, only four percent of asylum interviews scheduled in April/May 2020 were from cases pending more than 100 days. The Bellevue Program for Survivors of Torture (PSOT) reported that only 18 percent of its clients whose cases were pending in the affirmative asylum backlog prior to January 2018 had received interviews as of 2020. Of the more than 300 Human Rights First clients stranded in the affirmative backlog, 80 percent have been waiting for more than two years for an interview, with average wait time of more than four years, as of April 2021. In addition, years-long, post-interview delays have become increasingly common for refugees from Iran, Iraq, Syria, Yemen and other nationalities who are eventually granted asylum, as USCIS takes extreme amounts of time to conclude security and background vetting and additional reviews.

☑ **Harsh and flawed border policies, including the expansive use of expedited removal, worsen the backlog by diverting Asylum Division resources away from resolving affirmative asylum claims.** During the Obama and Trump Administrations (FY 2016 to FY 2019), an astounding 89 percent of the 535 asylum officers in the Asylum Division were temporarily diverted from adjudicating affirmative asylum cases to other duties, including screenings for asylum seekers placed in expedited removal as well as those subjected to illegal Trump Administration policies – MPP and ACA – to block refugees at the southern border.

☑ **Despite efforts to hire new staff, the Asylum Division continues to lack sufficient asylum officers.** USCIS was authorized to employ up to 1,296 asylum officers in FY 2020, but as of April 2020 it had only 866 on staff. In addition, low retention of experienced asylum officers is a problem. Many retired, transferred to other USCIS divisions, or quit to avoid implementing, or being complicit in, the Trump Administration's illegal asylum policies.

☑ **The human consequences of the backlog are devastating.** The backlog prolongs family separation, leaving many children and spouses in danger for years. Delays also undercut pro bono legal representation and harm asylum seekers' mental health, leaving them in limbo and potentially compounding their trauma from persecution and torture experienced in their home countries. Meanwhile employment and education are often placed on hold while asylum seekers are forced to wait for years without permanent legal status. Those caught in the backlog include: A father, who has been separated from his children for six years and had his request to expedite his asylum case denied despite his brother's political imprisonment in Yemen and efforts by a local militia to target his teenage son; an asylum seeker from the Central African Republic who has not seen his three daughters or wife in more than four years; and an Iranian asylum seeker, who has suffered homelessness during a more than five-year wait for an asylum interview.

☑ **Fraud and security screenings have grown unchecked and surpassed their necessary roles as fraud and security checks.** USCIS components tasked with implementing the Trump Administration's rhetoric of "extreme vetting" have drained substantial agency resources to pre-screen asylum applications that could, and should, be more effectively devoted to conducting interviews with asylum seekers. The post-interview vetting and background check process has also ballooned in a discriminatory fashion that affects some nationalities, including asylum applicants from Iran, Iraq, Syria, and Yemen, more than others.

*Human Rights First urges the Biden Administration to:*

**U.S. Citizenship and Immigration Services and its Asylum Division**

☑ Address the backlog of pending asylum applications.

  o Prioritize applications pending the longest for interview, while the Asylum Division also schedules interviews for child applicants and other recently filed applications, and consider authorizing overtime for asylum officers who volunteer to help clear the backlog of affirmative cases.

  o Create an effective process to advance asylum interviews for applicants with medical, humanitarian or other pressing concerns, including family members in danger abroad, and ensure access to advance parole for applicants with emergent reasons to travel abroad temporarily.

☑ Modernize and improve asylum office processes to promote efficiency.

  o Ramp up hiring and establish initiatives to boost retention of asylum officers, including encouraging experienced asylum officers who quit or transferred out of the Asylum Division to return.

  o Ensure cases are accurately resolved and unnecessary referrals to immigration court minimized through hiring of qualified asylum officers, appropriate and accurate training and oversight, and review of all referrals and denials while Trump administration policies and rulings remain under review.

  o Establish a process for individuals to apply directly to USCIS for cancellation of removal, such as through a separate USCIS application and adjudication unit, so that applicants for this humanitarian relief can be referred for assessment and these cases do not add to asylum backlogs.

  o Allow electronic filings, establish online interview scheduling and rescheduling, create a uniform short notice list, and provide longer interview notice periods to reduce rescheduling.

  o Assess application processing and vetting efforts, such as the Asylum Vetting Center (AVC) and Fraud Detection and National Security (FDNS) Directorate, to identify ways to improve efficiency and effectiveness of USCIS resources.

☑ Revoke illegal Trump Administration policies, including unprecedented asylum application fees, new and increased fees for initial and renewed work authorization, and other rules that prevent, limit, or delay refugees from supporting themselves and their families while waiting for asylum decisions.

☑ Promote transparency by providing regular, public updates on asylum officer interview schedules, as recommended by the USCIS Ombudsman and agreed to by USCIS, reinstating quarterly national stakeholder meetings, and releasing quarterly data fully disaggregated by nationality and other characteristics.

**Department of Homeland Security (DHS)**

☑ Withdraw expansions of expedited removal to the interior of the United States and between ports of entry, and exercise DHS's discretion at and between ports of entry to reject the use of expedited removal to avoid diverting substantial asylum office staffing and resources to screen people likely to be entitled to apply for

asylum. USCIS has noted that high volumes of expedited removal screenings "place[] great strain on the resources of the USCIS Asylum Division."

☑ End the Migrant Protection Protocols and the misuse of Title 42 public health authority to summarily expel asylum seekers and fully rescind the asylum cooperative agreements, entry and third-country transit asylum bans, and other illegal policies that block refugees from requesting U.S. asylum protection, weaponize expedited removal, and divert asylum officers from adjudicating affirmative asylum claims.

**United States Attorney General**

☑ Vacate Attorney General and Board of Immigration Appeals rulings that rig asylum adjudications against refugees, including *Matter of A-B-*, *Matter of A-C-A-A-*, and *Matter of L-E-A-*, which purport to limit asylum for survivors of domestic violence, people persecuted on account of their family relationships and other particular social groups.

**United States Congress**

☑ Provide appropriations to hire additional asylum officers to clear the backlog of affirmative asylum applications and ensure that new applications are timely adjudicated.

# USCIS's Role in Asylum Adjudication

Seeking asylum in the United States is a complex process. Individuals present in the United States who are not in immigration removal proceedings can apply for asylum with the USCIS Asylum Division by voluntarily filing an "affirmative" asylum application. Generally, asylum seekers can be barred from asylum if they do not apply within one year of their arrival unless they meet certain limited exceptions – a harsh ban that denies asylum to refugees and separates refugee families. Asylum seekers who apply affirmatively are usually not detained while they wait to present their claim.

Affirmative asylum applicants receive a non-adversarial interview with an Asylum Division officer to determine whether they meet the legal definition of a "refugee"—a person unable or unwilling to return to her country of origin because of persecution or a well-founded fear of persecution on account of race, religion, nationality, political opinion, or membership in a particular social group. Applicants must present evidence to support their case and convince the asylum officer of their credibility, a process that may be made difficult by the lingering effects of persecution, torture, or other trauma. Although U.S. law requires that asylum interviews generally be conducted within 45 days of filing, wait times for the scheduling of asylum interviews, as discussed below, may extend for years.

If the officer does not grant the asylum application and the applicant does not otherwise have valid immigration status, the case will be "referred" to the immigration court, where an attorney from U.S. Immigration and Customs Enforcement (ICE) will argue for the person's removal from the United States and an immigration judge will consider the asylum case or other available forms of relief from removal. Between FY 2013 and 2017, **most affirmative asylum claims referred from the asylum office and decided by immigration judges were ultimately granted,** according to DOJ data. Thus, referrals to court do not necessarily indicate that an asylum claim lacks merit.

In addition, the Asylum Division considers asylum applications of unaccompanied children who are subject to immigration court removal proceedings. While an unaccompanied child's asylum claim is being considered, the immigration judge may adjourn the hearing to allow time for the Asylum Division to issue a decision. The judge will consider the merits of an unaccompanied child's case only if it is not granted by the asylum officer and is "referred" to the court.

Although affirmative asylum applicants and unaccompanied children may present their cases directly to an asylum officer, asylum seekers who seek protection upon arrival at a port of entry without valid travel documents or enter without inspection are currently unable to apply for affirmative asylum if they are placed in expedited removal. DHS has discretion in many cases to parole these asylum seekers into the United States and to refer them to regular immigration court removal proceedings. However, DHS tends to place these asylum seekers in expedited removal or, for those who have a prior removal order, in reinstatement of removal proceedings.

When DHS uses expedited removal, Section 235 of the Immigration and Nationality Act (INA) requires asylum officers to conduct protection screening interviews—known as credible fear interviews (CFI) and reasonable fear interviews (RFI)—with people subject to expedited removal or reinstatement of removal, respectively. These screenings determine whether the United States can immediately deport them to their country of origin or whether they must be referred to the immigration court for a hearing. While the Trump Administration has repeatedly attempted to unlawfully raise the standards applied during these interviews, the INA requires that during a credible fear interview, an asylum officer must determine whether there is a "significant possibility" that a person could establish an asylum, withholding of removal, or torture protection claim before an immigration judge. In a reasonable fear interview the officer determines if there is a "reasonable possibility" of future persecution based on one of the five protected grounds under the refugee definition and for potential eligibility for protection under the Convention Against Torture.

## The Human Impact of the Asylum Backlog

Long wait times for adjudication of asylum claims have devastating effects on refugees and their families. Delays prolong the separation of families—by years—leaving children and spouses of many refugees stranded in danger abroad. Mental health experts warn that extended anxiety due to delays and temporary status hinders asylum seekers' ability to recover from past trauma. Limited access to employment and educational opportunities impede asylum seekers' ability to support themselves and their families and to rebuild their lives in the United States. **Of the more than 300 Human Rights First clients stranded in the affirmative backlog, 80 percent have been waiting for more than two years for an interview, with average wait time of more than four years, as of April 2021.**

### Prolonged Family Separation

Many asylum seekers stuck in the backlog are separated from spouses, children, and other family members, many of whom are stuck in danger abroad. Once individuals are granted asylum, they may petition for their children and spouse to join them in the United States. But asylum seekers awaiting adjudication cannot sponsor qualifying family members under a pending application. While it is possible to request expedited scheduling of an asylum interview based on urgent humanitarian concerns, including danger to family abroad, the process for doing so is opaque to unrepresented asylum applicants, and the Asylum Office has in recent years been unreliable in responding to such requests even when made by lawyers.

Long waits are often destructive to asylum seekers' mental health and relationships with family members left behind. As Dr. Asher Aladjem, Chief Psychiatrist at the Bellevue Program for Survivors of Torture, told Human Rights First, asylum seekers struggle with "the sense that their own lives aren't only in limbo, but the whole family and the children and the whole [familial] system that they're part of is impacted." The Center for Victims of Torture recently noted that "prolonged uncertainty" for asylum seekers in the backlog separated from family members in danger "can cause such acute feelings of hopeless[ness] and depression that it can result in suicidality." In addition, researchers find that lengthy family separations caused by asylum adjudication backlogs often leave asylum seekers in "a state of fear and guilt due to their sense of having made family members targets of persecution." Asylum seekers in the backlog whose families remain stranded abroad include:

- **Ibrahim[1], a Pakistani human rights activist, has waited for his asylum interview since 2015 while his wife and children remain in danger in Pakistan due to his work on behalf of marginalized groups.** USCIS denied his request to expedite his asylum interview despite credible threats against his family. Ibrahim's youngest daughter was just three years old when he fled Pakistan. As Ibrahim's wait continues to grow, he laments the time separated from his children as they grow up without him. "I have lost my children – even if I see them again, I will never have those years back."

- **Jean, an opposition party activist from the Central African Republic, has not seen his wife and three daughters for more than four years.** He fled in 2016 after government authorities arrested, imprisoned, and tortured him for his political views. Because Jean was unable to bring his family with him as he fled, his wife and children are stranded alone in Cameroon. "I miss my family every day. Whenever I feel hopeless or tired, I think of my children. When I think of them, it gives me the courage to continue."

- **Aaron, an Ethiopian refugee waiting in the backlog for over five years, saw his relationship with his fiancée break down due to their separation.** "I met someone who I fell in love with. I thought we would be able to get married, and she could come from Ethiopia to live with me." But without asylum Aaron lacked the immigration status to bring his fiancée to the United States. "After more than a year of waiting, she had to move on with her life and married someone else. It crushed me."

- **Ali, who fled political persecution in Yemen, has been separated from his wife and children for nearly six years as he waits for an interview**. His wife, children, and other family in Yemen are in grave danger due to Ali's former business dealings with the U.S. government. Since Ali fled Yemen, the authorities detained his brother after they discovered WhatsApp messages from Ali on his phone. "They took him because of me. No one in my family knows where he is or when he will be released, or even if he is alive. . . . If they do that to him, what could happen to me or other members of my family?"

Refugees reunited with their families after receiving asylum continue to deal with the trauma of long-term family separation caused by the asylum backlog, including:

- **Syed, a Bangladeshi journalist who received asylum in 2018, was separated from his family for three years while in the asylum backlog.** His wife and three children finally joined him in the United States in late 2019 after USCIS approved their derivative asylee petitions. "My daughter was an infant when I was imprisoned, and when I was released, she didn't remember me. I was forced to leave the country to save my life while my wife was pregnant. My two youngest children had no memories of me ever living with them in Bangladesh." Now Syed and his family are working to build relationships and recover the years they lost. "Our separation is something we are still trying to heal together."

- **Maya, a Pakistani asylum seeker, was separated from her two children for three years while waiting in the asylum backlog.** Her children recently escaped from their abusive father and rejoined their mother in the United States. "I still feel shaky and weak when I think about those years apart. It was traumatizing for all of us."

## Mental Health Consequences

Many asylum seekers have endured severe persecution and faced further trauma during dangerous journeys to the United States. After arriving in the United States, they may experience even more suffering resulting from family separation, the inability to work, discrimination, and the anxiety of waiting for the outcome of their asylum case.

---

[1] All names are pseudonyms to ensure the confidentiality and safety of asylum seekers and their families.

Case delays impede asylum seekers' ability to overcome trauma and may compound it. As Dr. Melba Sullivan, a staff psychologist at the Bellevue Program for Survivors of Torture (PSOT), underline explained to Human Rights First, prolonged delays in the adjudication of asylum claims is an "ongoing stressor," causing asylum seekers to experience prolonged exposure to the trauma trigger of uncertainty of future protection. These delays also increase "clinical service backlogs" for mental health providers, such as PSOT, and "diminish[ their] ability to take in new cases." Asylum seekers who have experienced significant mental health consequences as a result of their prolonged wait in the backlog include:

- **Rita, an asylum seeker from Kosovo, has been waiting more than two years to learn whether she has received asylum.** An award-winning journalist, Rita is suffering from post-traumatic stress disorder (PTSD) exacerbated by her wait for a decision in her case and the lack of support for asylum seekers. "I cannot describe the feeling of uncertainty when I came here. I had many dark moments during the first six months here when I didn't have permission to work."

- **Farah, an asylum seeker from Bahrain, has been struggling since applying for asylum in April 2015.** When Farah began experiencing depression, she was unable to receive psychological treatment because, without permanent legal status, she did not qualify for medical insurance and could not afford treatment.

- **Paul, an LGBT asylum seeker from Cameroon, suffers from depression, which he attributes to persecution he endured due to his sexual orientation and trauma he continues to experience while separated from his family.** "My last romantic partner was arrested and killed. I was so afraid that I would be next, or my family would be hurt. So, I had to flee. But now I feel sad when I am not able to speak to my children or see their faces."

- **Ali, a Yemeni asylum seeker, has felt suicidal and despondent.** "I think about killing myself. I see my kids grow up so far from me. My son only knows his father on the phone – he doesn't remember me." For Ali, the delay in receiving an asylum interview feels as difficult as leaving his family behind. "Applying for asylum means you've already lost everything. My family, security, community, country. And now you just keep waiting. Waiting, waiting, waiting. This is almost the hardest part because there is absolutely nothing you can do."

- **Yusuf, a gay man seeking asylum from Tajikistan, faced a mental health crisis when his asylum case went from the front of the line to the back in 2018.** "It was catastrophic for me. I felt overwhelmed and depressed. The hardest part was that my whole life was upended . . . I felt that I had no control over my life at all." Yusuf still finds it difficult to cope as he sees more recent applicants have their cases resolved. "I haven't even had my interview. It has been so hard."

- **Sophie, an asylum seeker from Burkina Faso who was subjected to female genital mutilation and years of domestic violence, has struggled to maintain her mental health after her asylum interview was cancelled and subsequently pushed to the back of the backlog line following the switch to "last in, first out" in 2018.** Sophie's depression, PTSD, anxiety, and insomnia have at times been so severe that she has been unable to work. "Today, I'm not sure if I am distressed because of my abuse or because I have been waiting for an answer in my case for so long. It is difficult for me to know whether my panic attacks are due to bad memories from the past or due to anxieties I have about my current situation."

- **Teresa, who fled severe domestic violence in Honduras, wants to move on with her life but remains in limbo waiting for a decision.** Unaware of the arbitrary requirement to file an asylum application within a year of her arrival in the United States and suffering the effects of the trauma she experienced in Honduras, Teresa filed her asylum application outside of the one-year-filing deadline. In the backlog for

three years before finally receiving an interview in 2020, Teresa has been experiencing severe anxiety as she has waited months for the asylum office to decide whether she qualifies for asylum protection.

## Asylum Seekers Left Vulnerable, Integration Delayed by Barriers to Economic Stability

Under U.S. law, refugees who are granted asylum are automatically authorized to work, but asylum seekers must apply for and may only receive work authorization after their case has been pending for at least 180 days. Asylum seekers may be required to renew work permits each year, at a cost of $495, while their cases are pending. Frequent delays in processing initial and renewal applications by USCIS mean that work permits often take many months to arrive, placing asylum seekers in perilous financial situations while they wait.

The Trump Administration, through a series of administrative rules, sought to increase the period asylum seekers must wait to apply for work authorization to 365 days, bar asylum seekers from authorization who apply more than one year after last arriving in the country, and charge a prohibitive $580 fee for initial employment authorization as well as similarly high fees for work authorization renewals. The rules also eliminated fee waivers for indigent asylum seekers. Federal courts have partially enjoined the changes to work authorization eligibility and preliminarily enjoined the USCIS fee changes. In June 2020, USCIS eliminated a requirement that initial work authorization for asylum seekers be processed within 30 days.

Even without these new restrictions, the inability to work for at least six months after applying for asylum leaves many asylum seekers, already vulnerable and traumatized, in precarious situations. Those without means to survive must rely on friends, family, or local communities for support. But many lack support networks and face further difficulties in informal or illicit labor markets and tenuous housing. With no support from the federal government for housing or basic necessities, many asylum seekers experience homelessness, including:

- **Leila, a 56-year-old Iranian asylum seeker, has struggled to find secure housing, at times sleeping in subway cars.** For a period, Leila was forced to live at a homeless shelter. "There was a time when I no longer felt safe at the shelter, so I went to stay with friends, then a church acquaintance, then with other people in my community." But when COVID-19 hit, Leila's friends could longer take her in. "**I was sleeping on the subway because no one could house me.** These are the moments when you realize you truly are an immigrant – you don't have family, resources, or belongings."

- **Mary, who fled Kenya to protect herself from being forcibly subjected to female circumcision, has repeatedly experienced homelessness.** Mary has resided in the United States for nearly two years and has not yet received her work authorization. She has at times had to resort to sleeping in homeless shelters. Mary is now living with a family who informally employs her as a nanny, but she is afraid that she could once again be on the streets without a job before she receives permission to work.

- **Alexander, Nadia, and their two sons, who fled race-based attacks in Russia, were evicted from their apartment and are now facing homelessness as they struggle to find support services.** The homeless shelter where the family stays is closing, and they have only weeks to find new housing. But very limited support is available to asylum seekers. As Alexander noted, some "programs require an interview date or a green card to be eligible for assistance – **but the reason I need assistance is because I don't have an interview date or a green card.** The system is set up for me to fail, and to never be able to access the basic programs I need to be able to keep my family fed, housed, and healthy on my own."

- **Yusuf was homeless for a year after applying for asylum in 2016.** He often went days without eating and sometimes slept in airport waiting areas. Harassed in homeless shelters because of his sexuality, Yusuf said that he "would sometimes sleep in the subway for safety."

Asylum seekers without work authorization or who experience delays in renewing work permits often face difficulty in obtaining or maintaining employment. Those who do secure employment can find themselves working under exploitative circumstances and dangerous conditions, such as:

- **Maria and Jorge, who fled government persecution in Venezuela in 2014, have encountered significant barriers to housing, work, and health care in the United States without permanent status.** When the couple first arrived, they depleted their savings and Jorge took dangerous informal work to survive. When Jorge was injured on the job, the family could not afford the $1,500 treatment he needed. Maria told Human Rights First: "I had to convince the doctor to teach me how to care for him at home instead of receiving care in the office." Even now, as they remain in limbo without asylum status, Maria reported, "we cannot buy a home, return to school, or get a credit card because of our status."

Asylum seekers who were professionals in their home countries can often find only lower-skilled jobs with employers who are willing to hire asylum seekers with temporary work authorization. They include:

- **Latif worked as a software engineer in Libya but has been unable to find work in his profession while he waits for his asylum interview.** Instead, he has been teaching software engineering at a nonprofit. "Many of my students come into my classes without any expertise, then they receive full-time jobs that I also have applied for. It is very frustrating." **Latif's wife, Melissa, is a doctor, but she cannot return to school to obtain U.S. medical credentials because she is ineligible for federal financial aid as an asylum seeker.** She has also been unable to find full-time work in the medical field despite multiple unpaid internships and stints as a volunteer.

- **In the Central African Republic, Jean worked as a computer programmer but is now struggling to earn enough to survive and support his wife and daughters who were forced to flee to Cameroon.** Jean now works as a rideshare driver, but COVID-19 has dramatically reduced his earnings. "I am lucky if I earn $100 each day. I have to pay my car lease, rent, electricity, internet, insurance – and I have to eat and send money to my wife. It isn't working at all."

Without permanent legal status, many asylum seekers struggle to continue their education, as do their children who are with them in the United States and included in their claims. Thirty-one states do not provide in-state tuition rates to certain categories of immigrants, including asylum seekers. As a result, few asylum seekers qualify for in-state tuition or financial aid for higher education. Indeed, some states will not offer in-state tuition rates even after a person is granted asylum, either delaying in-state consideration until one year after the asylum grant or until the person is granted permanent residence, depending on the state. The lack of permanent status also impedes access to basic services that require official identification, including opening a bank account, renting a vehicle, or establishing a credit history to rent an apartment. Asylum seekers struggling to pursue educational opportunities in the United States include:

- **Usman, a Yemeni medical student, has not been able continue his medical studies while waiting nearly five years for an interview.** He fled Yemen in his fifth year of medical school and cannot afford to continue his education because he is not eligible for loans or other financial support. "I was doing really well in school. But you do what you have to do." Usman now works as a driver for a ride-sharing service and has struggled even to open a checking account. Banks refuse to accept the temporary state ID card he was issued because its period of validity is tied to his temporary work permit.

- **Amal, an activist in Yemen, has not been able to return to school to continue her work as a community organizer and human rights activist.** "I can't go because I am working so much [and] because it is so expensive." Without permanent status, Amal does not qualify for financial aid. She was also

recently rejected from leasing a car because of her immigration status. "These small things could make our lives easier, but asylum seekers waiting for their interview can't access them. I am in limbo."

■ **Amir, who applied for asylum in 2016 after fleeing Egypt, may be suspended from his dentistry program if he does not soon receive renewal of his work authorization.** The human resources office at his dental residency program notified him that if he does not receive an extension of his work authorization before April 2021, he will be placed on leave from his dental residency.

■ **Maya's son, Isaac, was unable to attend the university where he was accepted because he does not qualify for financial aid.** "We could not find a scholarship to provide funding for tuition. We tried our best but couldn't afford it. I know my son will work hard and be professionally successful, but I sometimes worry that he has lost out on opportunities and experiences because of our status."

■ **By the time Samer and his family, asylum seekers from Syria, were finally granted asylum in 2021, after a nearly seven-year wait, their older child had been forced to miss a year of college due to her lack of eligibility for financial aid.** After filing for asylum, the family waited three years for an asylum interview and a further three and a half years for a decision after the case disappeared into USCIS's security and background checks and centralized review peculiar to the cases of Syrians and certain other nationalities. This delay created many hardships for the family. They had to put plans of home ownership on hold due to their lack of permanent status. After the family's oldest child graduated high school, she could not qualify for financial aid to attend college. Samer has now been granted asylum, but his daughter will still have to wait an additional year to qualify for in-state tuition rates, as the state where the family resides does not consider non-citizens to be residents for tuition purposes until a year after they are granted asylum or permanent residency.

The COVID-19 pandemic has left asylum seekers, who already struggle to build economic stability while forced to wait months for work authorization and have limited access to education and training opportunities, even more vulnerable. Asylum seekers are rarely able to access state and local safety net programs and are not eligible for Medicaid in nearly all states. Because many asylum seekers work part-time or in positions where they are not treated as employees, they may not qualify for protections awarded to full-time employees. Asylum seekers in the backlog who have suffered the economic and health consequences of the pandemic include:

■ **Isabelle, a Salvadoran asylum seeker, lost her job as a housekeeper and went two months without pay when she fell sick with COVID-19.** In El Salvador, Isabelle faced death threats by the MS-13 gang that controls large parts of the country as well as severe domestic violence. She has been waiting for an asylum office interview since applying in 2016. Because of her status as an asylum seeker, Isabelle was ineligible for unemployment benefits when she was fired.

■ **Mahmoud, an asylum seeker from Bahrain, went without pay for weeks when he contracted COVID-19 while working for a major online retailer.** Even though Mahmoud was working full-time when he fell ill, he was not provided health insurance and could not afford to pay for a COVID-19 test. Because he could not officially confirm that he had COVID-19, his employer refused to give him paid leave. Instead, he was forced to take time off without pay. "I was sick for three weeks, twenty-four hours a day. I was terrified."

■ **Luis, a Venezuelan asylum seeker, contracted COVID-19 likely while working as ride-share driver.** Hospitalized in intensive care for sixteen days, Luis convalesced at home for another three months. Luckily, Luis and his wife, Manuela, had purchased health insurance through an exchange. But Luis was out of work for nearly six months. Without permanent legal status, Luis and Manuela were ineligible for federal government relief and they are still reeling financially from Luis' time out of work. "It sometimes feels more difficult to survive in the United States than in Venezuela."

## Impaired Access to Counsel

Legal representation can vastly improve asylum seekers' chances of receiving protection. In 2020, asylum seekers with legal representation were nearly twice as likely to receive asylum protection in immigration court compared to asylum seekers without an attorney. Access to counsel also improves system efficiency. The U.S. Commission on International Religious Freedom noted that "lack of counsel not only disadvantaged detainees but also burdens the system, since unrepresented cases are more difficult and time consuming for adjudicators to decide." Despite the undisputed importance of legal counsel, the government does not generally fund legal representation in asylum proceedings. Indigent asylum seekers must rely on the limited resources of nonprofit organizations, law school clinics, and law firm pro bono programs.

Long delays at the Asylum Division impair the ability of pro bono legal providers to accept cases for representation and create obstacles for private immigration attorneys. A survey of 24 pro bono coordinators at major law firms conducted by Human Rights First in 2016 found that over 60 percent of pro bono professionals view delays at the asylum office as a negative factor in their firm's ability to take an affirmative asylum cases. Because associates at major law firms generally do not remain at the firm for more than a few years, years-long case delays mean cases must be reassigned – sometimes repeatedly. Moreover, many attorneys who take on a pro bono case will not take on other pro bono matters until the pending case is resolved. Similarly, law school clinics, whose students generally rotate each year, waste resources and worry about putting clients through retraumatizing interviews as wait times become prolonged. For private attorneys, managing cases in the backlog often without taking concrete steps on the asylum application for many years can create both logistical and financial difficulties. Years-long delays in adjudicating the asylum application also increase the sheer volume of work required of advocates over the life of the asylum case, due to the need to update asylum applications to deal with evolving conditions in the home country or changes in applicants' personal circumstances, and the need to apply to renew work permits—several times, in many cases—for the principal applicant and all included family members, and to deal with the many challenges the lack of lasting status poses for asylum applicants.

## The Backlog Stagnates

As of September 2020, the number of asylum applications pending before the ten USCIS asylum offices was more than 386,000. According to the USCIS Ombudsman the affirmative asylum backlog has continued to grow even as the number of applications received has fallen. USCIS has noted that high volumes of expedited removal screenings "place[] great strain on the resources of the USCIS Asylum Division." The current backlog began to grow under the Obama Administration, which increased the use of expedited removal and diverted asylum officers from adjudicating full asylum claims to conducting expedited removal fear screenings. Using expedited removal against refugee populations diverts asylum office resources toward screening individuals who are overwhelmingly entitled to full assessments of their eligibility for humanitarian protection. In 2015, for instance, 88 percent of asylum-seeking families who were placed in expedited removal passed credible fear interviews, demonstrating the redundancy and wastefulness of channeling limited asylum office resources to screen

| Fiscal Year | Affirmative Asylum Applications Filed | New Reasonable Fear Requests | New Credible Fear Requests | Total Affirmative Applications Pending at End of Fiscal Year |
|---|---|---|---|---|
| 2012 | 46,659 | 5,053 | 13,880 | 20,143 |
| 2013 | 45,403 | 7,733 | 36,035 | 38,345 |
| 2014 | 57,840 | 9,084 | 51,101 | 71,152 |
| 2015 | 84,182 | 8,015 | 48,052 | 116,774 |
| 2016 | 115,926 | 9,632 | 94,048 | 209,806 |
| 2017 | 142,818 | 10,273 | 78,564 | 303,513 |
| 2018 | 107,803 | 11,048 | 99,035 | 319,563 |
| 2019 | 84,312 | 13,197 | 105,439 | 339,836 |
| 2020 | 93,134 | 8,721 | 30,839 | 386,014 |
| Sources: 2018, 2019 & 2020 USCIS Ombudsman reports and USCIS statistics. | | | | |

asylum seekers. Even with variations in grant rates at different times, the vast majority of asylum seekers subjected to these screenings qualify for full asylum hearings. Positive credible fear rates during the Obama and George W. Bush administrations averaged nearly 80 percent.

The backlog's rate of growth slowed after the last-in, first-out policy was implemented in January 2018, but the LIFO policy has failed to reduce the size of the backlog, and most newly filed asylum applications continue to be placed into the growing backlog. In its response to the 2020 USCIS Ombudsman report, USCIS acknowledged in December 2020 that LIFO and other restrictive Trump Administration policies aimed at limiting access to the U.S. asylum system have not reduced "the number of pending [affirmative] cases."[2] The temporary closure of asylum offices on March 18, 2020 due to the COVID-10 pandemic and resulting reductions in interview volume since offices began to re-open on June 4, 2020 has caused the backlog to expand further; nearly 50,000 cases were added to the affirmative asylum backlog in FY 2020. According to the Trump Administration's proposed USCIS budget for FY 2021, "[u]nder current assumptions . . . USCIS is aiming to eliminate the [affirmative asylum] backlog within six years." Without a change in the Asylum Division's priorities, **USCIS' six-year timeline would leave many asylum seekers waiting for substantial periods – some potentially for as many as ten years – just to receive an interview with an asylum officer**.

The volume of asylum applications received by USCIS corresponds with high levels of global refugee displacement. Targeted violence by transnational criminal organizations and human rights abuses by government forces in El Salvador, Guatemala, and Honduras has led to a significant increase in asylum requests in the United States, as well as in other countries in the region. Since 2014, political repression in Venezuela has led to an 8,000 percent increase in the number of Venezuelans seeking refugee protection worldwide, with over 100,000 Venezuelans seeking refuge in the United States. Since September 2016, Venezuelans have filed more asylum applications each month with USCIS than any other nationality and, as of March 2019, account for nearly one-third of all new USCIS asylum applications. A continuing authoritarian crackdown in Egypt and a deepening human rights crisis in Turkey have led thousands to seek asylum in the United States. In FY 2019, refugees from Egypt and Turkey were the third and fourth largest recipients of asylum by nationality at the asylum office, respectively. Widespread human rights abuses by government forces and armed groups in Cameroon have led to the displacement of nearly one million people, roughly 10,000 of whom have sought asylum at the southern U.S. border. The Chinese government's crackdown on political dissent in Hong Kong, repression of ethnic Uighurs, and other state violence has driven thousands of Chinese citizens to seek refuge abroad. Many refugees have also sought protection from violence in Yemen, where political dissidents have fled atrocities committed by U.S.-backed Saudi forces.

The Trump Administration's diversion of significant Asylum Division resources away from conducting asylum interviews and toward expedited removal was a major impediment to addressing the affirmative asylum backlog. The expansive use of expedited removal and reinstatement of removal and the corresponding increases in credible and reasonable fear interviews, which peaked in FY 2019 with nearly 120,000 fear interview requests, prevented asylum officers from addressing backlogged cases. In addition, deploying asylum officers to weaponize screening interviews to deny refugees access to U.S. asylum hearings undercuts the Asylum Division's ability to adjudicate pending claims. Asylum officers have, for instance, carried out nearly 20,000 screening interviews for individuals subject to MPP who fear being returned to Mexico and over 1,000 interviews for asylum seekers transferred to Guatemala under an asylum cooperative agreement between the United States and Guatemala.

---

[2] USCIS also acknowledged that Trump Administration policies aimed at increasing asylum fees, delaying and limiting work authorization, regulations to severely limit asylum eligibility, the third-country transit asylum ban, and the ACAs are intended to disincentivize refugees from applying for asylum in the United States with the effect of "significantly chang[ing] the inflow of affirmative applications."

Even as the number of asylum officers has increased in recent years, the diversion of resources to carry out border enforcement policies meant to block refugees from the U.S. asylum system has prevented the Asylum Division from effectively addressing the backlog of asylum seekers awaiting interviews. According to the USCIS Ombudsman's 2020 report, "between FY 2016 and FY 2019, the Asylum Division . . . temporarily assign[ed] on average 475 asylum officers each year in response to other program needs within USCIS" including "to conduct fear screenings at the border" – meaning that **an astounding 89 percent of the 535 asylum officers employed on average each year were temporarily diverted from adjudicating affirmative asylum applications**.

As the backlog continues to grow, thousands of asylum seekers have been made to wait for years to have their applications for protection adjudicated. Since January 2018, USCIS has not made public the average wait time for backlogged cases, but the 2018 USCIS Ombudsman report indicated that, **as of March 2018, the average waiting time from application to interview was well over two years at several asylum offices and nearly three years for some applications pending before the Newark asylum office.** Many asylum seekers caught in the backlog at that time are still waiting for an interview with an asylum officer. The hundreds of asylum seekers represented by Human Rights First with backlogged affirmative asylum claims have been waiting, on average, more than four years for an interview. The Bellevue Program for Survivors of Torture (PSOT) similarly reported that only 18 percent of its clients whose were pending in the affirmative asylum backlog prior to January 2018 had been scheduled for interview as of 2020.

## Asylum Backlog: Causes and Challenges

Several factors are responsible for the continued growth of the asylum backlog. Chief among these are decisions to use expedited removal expansively and the Trump Administration's illegal border policies that imposed a substantial burden on the asylum office to screen individuals under policies intended to block asylum seekers from accessing the U.S. asylum system. In addition, staffing challenges, shifting scheduling priorities, and the impacts of the COVID-19 pandemic have undercut USCIS's ability to adjudicate new cases and begin to address the still growing backlog, leaving thousands of asylum seekers waiting many years for an interview.

### Expansive Use of Expedited Removal

As the USCIS Ombudsman has noted, expedited removal and attendant fear screenings for asylum seekers placed into these proceedings "impact USCIS' available resources and inhibit the agency's ability to reduce the affirmative asylum backlog."

In its 2015 Report, the USCIS Ombudsman wrote, "[s]pikes in requests for reasonable and credible fear determinations, which have required the agency to redirect resources away from affirmative asylum adjudications, along with an uptick in new affirmative asylum filings, are largely responsible for the backlog and processing delays." This increase in the use of expedited removal originated under the Obama Administration. Through FY 2019, the number of credible and reasonable fear screenings continued to grow under the Trump Administration's use of expedited removal, as escalating violence and persecution in Cameroon, El Salvador, Guatemala, Honduras, Nicaragua, Venezuela and elsewhere led increasing numbers of refugees to seek protection at the southern border.

The Trump Administration hailed expanded expedited removal as an important tool to improve efficiency in asylum processing and "reduce the significant costs to the government associated with full removal proceeding before an immigration judge." However, it has had the opposite effect, contributing to an overwhelming backlog of asylum cases and redirecting hundreds of asylum officers to the border to conduct screening interviews of people whose cases overwhelmingly warranted a full asylum assessment.

Successive administrations have expanded the geographic and temporal implementation of expedited removal. Originally, expedited removal was applied only at ports of entry, [3] but in 2004, DHS expanded its use to areas within a 100-mile border zone and within two weeks of an individual's entry to the United States. In July 2019, the Trump Administration announced a vast expansion of expedited removal to apply to non-citizens apprehended anywhere in the United States up to two years after they arrived. Although this expansion of expedited removal was temporarily enjoined, the preliminary injunction was lifted in June 2020, and expanded expedited removal remains in place as of March 2021.

In addition to the geographic and temporal expansion of expedited removal, the Trump Administration's "Humanitarian Asylum Review Process" (HARP) and "Prompt Asylum Case Review" (PACR) programs also diverted significant asylum office resources to conduct fear screenings. Under these programs, first introduced in October 2019, asylum seekers were forced to undergo credible fear screenings while detained in notoriously cold and inhumane Customs and Border Patrol (CBP) facilities at the border where they are unable to meet with attorneys. This "streamlined" process not only made it extremely difficult for asylum seekers to consult with a lawyer or prepare for their interviews, but also required additional asylum office staffing to conduct fear interviews on very short notice. Through mid-March 2020, when the Trump Administration paused the use of PACR and HARP, approximately 5,290 individuals had been placed into these removal programs. In a February 2021 executive order, the Biden Administration directed DHS to "cease implementing" PACR and HARP.

The Trump Administration's repeated attempts to change the credible fear screening standard established by Congress and impose additional requirements have made screening interviews increasingly complex and time consuming. The administration's third-country transit asylum ban, which USCIS asylum officers applied in more than 43,000[4] screening interviews between July 2019 and June 2020, required officers to determine whether asylum seekers qualified for an exception to the transit ban before then conducting the fear screening interview at the heightened reasonable fear standard. The policy, which was vacated by a federal court in June 2020 but was re-issued by the Trump administration as a final rule in December 2020, was subsequently enjoined again in February 2021. The Trump administration also finalized rules to apply criminal and public health bars at fear screening stage that would further complicate these preliminary interviews. In addition, USCIS has repeatedly attempted to heighten the credible and reasonable fear screening standards, including 2019 alterations that were vacated by a federal court in November 2020.

In May 2019, Border Patrol agents began conducting credible fear interviews after receiving a two-week limited training on asylum. Efforts to deputize CBP staff to conduct fear screenings, a task historically conducted by specialized asylum officers, have resulted in major discrepancies in the rate of positive determinations compared to interviews conducted by trained USCIS asylum officers. Analysis by the Migration Policy Institute of USCIS data shows that between May 2019 and May 2020, **CBP officers determined that asylum seekers had a credible fear of persecution at half the rate compared to screenings carried out by trained USCIS asylum officers – meaning that they acted to deny these asylum seekers the ability to even have a full asylum hearings**. In August 2020, a federal court blocked the use of CBP officers to conduct fear screenings, finding that the two-to-five-week training CBP officers received was "in no way comparable" to the formal training for USCIS asylum officers and that the government's contention the trainings were equivalent was "poppycock." The USCIS Ombudsman noted in June 2020 that "CBP officers' competing law enforcement duties" limited their

---

[3] Immigration officers however retain discretion to apply expedited removal or place an individual in full immigration court removal proceedings. *See Matter of E-R-M & L-R-M*, 25 I&N Dec. 520 (BIA 2011). Finding that "Congress' use of the term 'shall' in section 235(b)(1)(A)(i) of the Act does not carry its ordinary meaning, namely, that an act is mandatory. It is common for the term 'shall' to mean 'may' when it relates to decisions made by the Executive Branch of Government on whether to charge an individual and on what charges to bring."

[4] According to USCIS data, 25,096 people were subjected to the third-country transit ban during screenings between July and September 2019, and 18,124 between October 2019 and June 2020.

ability to conduct temporary assignments as asylum officers, but did not consider whether law enforcement officers were well-positioned to fairly and impartially protect the rights of asylum seekers.

Overall, the number of credible and reasonable fear screenings declined by 65 percent in FY 2020 compared to 2019, as new Trump Administration policies including MPP, ACA transfers to Guatemala, and expulsions under a Centers for Disease Control and Prevention (CDC) order effectively eliminated humanitarian protections at the border and blocked the vast majority of refugees from requesting U.S. protection at ports of entry. At the same time, significant asylum office resources were diverted to "screen" asylum seekers who were ultimately returned, transferred, or expelled under these new illegal policies.

## Border Policies to Block Refugees

Trump Administration border policies diverted asylum officers from conducting affirmative asylum interviews to conduct screenings not established by Congress, but instead designed to deny asylum seekers access to the U.S. asylum system. In February 2021, the Biden Administration issued an executive order instructing DHS and other agencies to promptly review several of these policies which had worsened the asylum backlog as Asylum Office resources were syphoned off to conduct screening interviews. In late January 2021, the Biden Administration suspended placing new individuals into MPP and has now begun to parole asylum seekers returned to Mexico to the United States to continue their asylum proceedings. Following the executive order, the U.S. Department of State also announced that it had "suspended and initiated the process to terminate" the asylum cooperative agreements.

- "**Migrant Protection Protocols**": Significant asylum office resources were devoted to implementing MPP, which was used by the Trump Administration beginning in January 2019 to forcibly return tens of thousands of asylum seekers and migrants to dangerous border regions of Mexico to await U.S. immigration court hearings. People placed in the MPP program who fear return to Mexico are entitled to a fear screening interview conducted by a USCIS asylum officer. Although many individuals have been blocked by CBP officers and Border Patrol agents from even requesting such interviews, nearly 20,000 MPP fear screening interviews were conducted by USCIS asylum officers, as of December 2020. DHS has imposed an impermissibly high burden on asylum seekers to establish that they fear return to Mexico. Asylum seekers must prove that it is "more likely than not" that they would face persecution or torture in Mexico. This standard is equivalent to that required to receive withholding of removal protection in immigration court, i.e. a standard higher than for asylum and far higher than the standard to establish a reasonable or credible fear of persecution, the standard asylum officers normally apply in screenings.

  As of February 2021, when the Biden Administration's wind down of MPP began, there had been at least 1,544 publicly reported cases of murder, rape, torture, kidnapping, and other violent assaults against individuals DHS sent to Mexico under MPP. Yet very few of those placed in MPP have been determined to have a fear of Mexico. According to DHS, only 13 percent of individuals who received screenings were found to have sufficient fear of being returned to Mexico to be removed from MPP, as of October 2019. *Vox* reported that in some cases asylum officers' positive MPP fear determinations were overruled by DHS officials. Asylum officers wrote in an amicus brief in support of a case challenging the MPP policy that "MPP diverts the limited resources of asylum officers to carry out a task they did not perform before," and "exacerbates the backlog."

- **Asylum Cooperative Agreements**: Asylum officers were also diverted from adjudicating affirmative asylum applications to screen asylum seekers transferred to Guatemala under the ACA the United States signed with Guatemala in July 2019. Under the agreement, the Trump Administration sent asylum seekers from El Salvador and Honduras to Guatemala even though the country lacks the asylum infrastructure to accommodate them as a "safe third country," often resulting in the forced abandonment of asylum claims

and the return of asylum seekers who have a well-founded fear of persecution to their home countries. The rule implementing the ACA requires asylum officers to determine whether an asylum seeker is subject to transfer to Guatemala under the ACA. Officers are only required to screen for a fear of persecution in Guatemala if the asylum seeker affirmatively states a fear of being sent there. Acting CBP Commissioner Mark Morgan testified that approximately 1,000 individuals had been sent to Guatemala under the ACA, as of February 2020. In mid-March 2020, Guatemala suspended ACA transfers from the United States in order to curb the spread of COVID-19 to the country after deportees from the United States repeatedly tested positive on arrival. As noted above, the Biden Administration has suspended the ACAs.

## Staffing Challenges

The Asylum Division continues to face hiring and staff turnover challenges that contribute to the backlog. In FY 2020, USCIS was authorized to employ 1,296 asylum officers, but only 866 asylum officers were on board as of April 2020 – meaning that hundreds of authorized positions were vacant. Despite a significant increase in asylum officers from the 528 employed by the Asylum Division in early January 2017, USCIS continues to identify staffing shortages as one of the primary causes of the affirmative asylum backlog.

Retaining experienced asylum officers, which has long been an issue, became an even greater problem as the Trump Administration implemented a series of illegal policies that returned refugees to harm including the transit ban, MPP, and the ACA with Guatemala. As the union for USCIS asylum officers wrote in an amicus brief opposing MPP, that policy "places [asylum officers] at risk of participation in the widespread violation of international treaty and domestic legal obligations—something that they did not sign up to do when they decided to become asylum and refugee officers for the United States government."

The *Los Angeles Times* reported that in response to MPP and other Trump Administration asylum policies, asylum officers were "retiring earlier than planned and quitting." One asylum officer noted that while the "stresses of the job" often lead asylum officers to leave after two to three years, working under "an agency head who routinely bashes the program and a president who bashes the program" has resulted in even higher turnover.[5] Replacing experienced staff requires substantial training resources and time. USCIS estimates that it takes "a minimum of 6 months on the job for an asylum officer to be proficient enough to adjudicate asylum applications" at the pace of an experienced officer. Trump Administration policies that completely diverged from the fear screening and affirmative asylum process enacted by Congress, such as MPP and the third-country transit asylum ban, not only diverted asylum staff but also pulled training officers preparing new asylum officers to adjudicate affirmative adjudications.

The turnover in asylum officer staff during the Trump Administration is likely to have continued consequences for asylum adjudications. For instance, a former asylum officer, who quit in protest of the MPP policy, has raised concerns about the hiring of asylum office staff "who tend to favor the [Trump] administration's policies," and whose continued tenure, "even in a new administration . . . will affect institutional norms and capacity at the Asylum Office,"[6] which already needlessly referred many cases to immigration court that should have been decided by the asylum office.

## Scheduling and Interview Policies

Modifications to asylum interview scheduling priorities have significantly impacted asylum seekers' wait times.

---

[5] Asylum officer attrition rates are difficult to quantify, since the numbers reported by USCIS do not include asylum officers who transfer from the Asylum Division to other divisions within the agency.

[6] Comments by Douglas Stevens, 17th Annual Immigration Law and Policy Conference, Migration Policy Institute, "Protection in Disarray: The Dismantling of the U.S. Asylum System" (Sept. 22, 2020).

In January 2018, USCIS began processing the most recently filed affirmative asylum applications – a reversion to an earlier policy known as "last in, first out" (LIFO). Prior to LIFO, USCIS processed asylum cases in the order in which they were filed. In instituting the LIFO policy, USCIS stated that its "aim [was] to deter individuals from using asylum backlogs solely to obtain employment authorization by filing frivolous, fraudulent or otherwise non-meritorious asylum applications" and that LIFO would "allow[] USCIS to decide qualified applications in a more efficient manner." However, the change in policy has left many refugees with bona fide asylum claims languishing in a years-long limbo waiting for an asylum interview.

When LIFO was adopted in 2018, USCIS announced that it would schedule asylum interviews under a tiered priority system. **First Priority** cases include applicants whose interview had to be rescheduled; **Second Priority** is made up of new applications pending for 21 days or less; and the catch-all **Third Priority** category covers "all other pending affirmative asylum applications . . . starting with newer filings and working back towards older filings." As a result, overnight, USCIS shifted the longest pending applications from the front of the backlog line to the very end.

The 2020 USCIS Ombudsman report indicates that, since at least April 2020, USCIS has created a **Fourth Priority** area that encompasses "[a]ll pending affirmative asylum applications that are over 100 days old." USCIS has not, however, publicly announced the creation of a fourth priority category nor included it in its description of the affirmative asylum process on its website. It is unclear whether the creation of this category has had much impact on the scheduling of backlogged cases, as "most interview slots are taken by the first and second priorities, giving little movement to the Third Priority and older cases," according to the USCIS Ombudsman report. Only four percent of asylum interviews scheduled in April/May 2020 were from the fourth priority.

USCIS' asylum scheduling creates needless rescheduling requests and slows adjudication of asylum claims. Asylum offices often provide only two or three weeks' notice when scheduling interviews. With worsening delays in mail delivery, asylum seekers and their attorneys may receive notice of an interview just days before it is scheduled. Given this lack of notice, many applicants or their attorneys will be compelled to request to reschedule the date of their interview, leaving affirmative asylum interview slots unused. In addition, the automatic USCIS scheduling system does not allow for prior coordination of interview dates with applicants' lawyers, who in many cases are forced to reschedule due to conflicts with other client matters. In the past, before the asylum office had any backlogged cases, interviews were consistently filed a set number of days following the receipt date, so legal representatives and their clients could reliably anticipate the interview date based on the date of filing. Now, even in the case of interviews that are timely scheduled, the timing is unpredictable, leading to the need to reschedule interviews. While some asylum offices have so-called "short notice" lists to fill last-minute interview openings, the Asylum Division has not, to date, adopted a more formal or uniform policy for all asylum offices. Some asylum offices previously overbooked asylum interviews to fill interview slots of applicants who missed their interviews. However, to enforce social distancing at asylum offices and in waiting rooms, USCIS reduced the number of scheduled in-person interviews, leading to longer wait times.

The Asylum Division's efforts to address pending affirmative applications filed more than 10 years after the individual's last entry to the United States have removed some cases from the backlog but also created additional inefficiencies. Currently, the only way to receive the form of humanitarian relief known as cancellation of removal is during removal proceedings before an immigration judge. However, there is no application route for individuals who may be eligible for this relief, and some individuals (or their attorneys) are believed to have filed applications for asylum anticipating that the case could then be referred into removal proceedings to seek this relief. The Asylum Division identified 50,000 cases where individuals had filed for asylum more than 10 years after arriving in the country (though of course, many of these persons may just have been late-filing asylum seekers), and began a pilot project to notify these applicants of an option to waive their asylum interviews and proceed directly to immigration court. As of May 2019, approximately 26 percent of the 6,500 individuals who

received notices for the pilot waived an asylum interview. As a result, these cases were simply forwarded into removal proceedings, without the need to waste asylum office time. However, with respect to the remaining applicants, rather than conducting full asylum interviews, the Asylum Division scheduled these asylum seekers for interviews solely to determine whether the individual qualified for an exception to the one-year-filing deadline. Those found to qualify for an exception were often required to then attend a second interview scheduled weeks later, creating additional inefficiencies in scheduling. As of May 2019, 30,000 cases in which the applicant filed an asylum application more than 10 years after arrival in United States remain in the backlog. Establishing an alternative mechanism to allow individuals to apply for cancellation affirmatively with USCIS, as recommended above, would help to avoid these cases needlessly adding to the asylum office and immigration court backlogs.

## COVID-19 Impacts on the Backlog

During the COVID-19 pandemic, both the size of backlog and the wait that asylum seekers face has continued to grow. On March 18, 2020, asylum processing came to a standstill as USCIS temporarily closed its offices. Although asylum offices began a staggered reopening on June 4, 2020, the number of daily appointments has been reduced to ensure social distancing. USCIS estimates that at least 4,000 and as many as 12,000 asylum interview slots were lost during the closure, and that affirmative asylum completions may be reduced by as much as 50 percent until offices reopen at normal capacity. Indeed, the asylum office backlog expanded by over 15,000 cases during the third quarter of FY 2020 during the asylum office closure, compared to an increase of fewer than 5,000 cases during the second quarter of FY 2020 when the asylum office received a similar number of new affirmative applications. Given the limited number of asylum interviews conducted since asylum offices began to reopen, the backlog is likely to continue to increase.

## Misuse of Limited Resources in Additional Screenings

The U.S. asylum system is rigorous, requiring detailed interviews, as well as extensive background vetting. Screening asylum applications to detect the small number of cases that raise security and fraud concerns during asylum adjudications is an important safeguard for the integrity of the U.S. asylum system. However, in recent years, the Fraud Detection and National Security (FDNS) Directorate and other USCIS components tasked with implementing the Trump Administration's rhetoric of "extreme vetting" – part of a broader effort to falsely portray immigration and asylum cases as lacking in merit – have drained substantial agency resources to pre-screen asylum applications that could, and should, be more effectively devoted to conducting interviews with asylum seekers. While some fraud issues may be identifiable on review of the application itself, DHS has long acknowledged that the credibility determination made by the interviewing asylum officer is the "determining factor" in fraud detection. The post-interview vetting and background check process has also ballooned in a discriminatory fashion that affects some nationalities, including asylum applicants from Iran, Iraq, Syria, and Yemen, more than others. It poses a major challenge to securing protection for asylum seekers and their families within a reasonable timeframe.

The expansion of pre-interview screening and vetting mechanisms predates the Trump Administration. A 2015 Government Accountability Office (GAO) report concluded that while USCIS has "mechanisms to investigate fraud in individual applications," the agency had not "assessed fraud risks across the asylum process, in accordance with leading practices of managing fraud risks" and recommended that USCIS take several targeted steps to assess fraud risks and detect fraud in individual cases, including developing and implementing additional trainings, mechanisms to collect reliable data on FDNS's efforts to combat fraud, asylum-specific guidance for FDNS officers, and pre-screening of asylum applications for indicators of fraud, to the extent that these fraud detection tools are "relevant or cost-effective." In response, USCIS began planning in 2017 for a substantial centralized pre-screening center for asylum applications through the Asylum Vetting Center (AVC), currently under construction in Atlanta, GA. While USCIS has stated that it anticipates the AVC will enhance its

ability to address "systemic" fraud concerns and, through pre-screening, free up regional asylum office resources to reduce the asylum backlog, given the agency's substantial budgetary and personnel investment, the AVC raises questions about whether it meets the GAO report's recommendation to implement only "relevant or cost-effective" fraud detection tools. It remains unclear whether the AVC is the most efficient and cost-effective method for addressing fraud, as it substantially diverts resources from asylum adjudications, which are themselves an important tool in assessing credibility and identifying potential fraud. The AVC will ultimately be staffed by some 300 personnel, including asylum officers who could otherwise be deciding backlogged asylum cases.

The data made public by USCIS on FDNS's effectiveness reveals that the vast sums spent on FDNS have resulted in very limited improvements to USCIS's fraud analysis and detection processes. In FY 2018, for instance, USCIS budgeted 67 million dollars for FDNS activities and that year used its ATLAS tool to screen 15.5 million immigration filings and biometrics enrollments, but detected fraud or security concerns in just 0.03 percent of cases. Of the 1,400 credible and reasonable fear cases referred to FDNS for review in FY 2017 and FY 2018, FDNS made a formal finding of a fraud or safety concern in less than one percent of referred cases. Despite the GAO's recommendations that USCIS collect data on and assess FDNS's progress, since the 2015 GAO report, no public reports have been released on the effectiveness of FDNS screening of affirmative asylum applications. The union for USCIS asylum officers has called for an audit of FDNS and a "re-examination" of its role, saying it "has grown beyond its original designation as a support service to adjudicators."

In addition, last year USCIS implemented other unnecessary interviews that divert asylum office resources away from adjudicating pending cases. In November 2020, USCIS announced that it would begin to systematically interview all resettled refugees and asylees (individuals granted asylum in the United States) who are applying to bring a qualifying spouse or child to the United States through an I-730 petition. These interviews are not required by law or regulation and are generally not needed to resolve I-730 petitions since the petitioning refugee/asylee has already been interviewed in connection with their resettlement case or asylum application and undergone security and fraud screenings. USCIS has acknowledged that the additional interview requirement "may lengthen the overall adjudicative process" for I-730 relative petitions. Requiring such interviews may also contribute to the affirmative asylum backlog as the agency diverts asylum officers to conduct them, which Human Rights First attorneys in Los Angeles have already reported occurring for some asylee clients. As of September 2020, nearly 26,000 I-730 petitions were pending adjudication – a steep increase from June 2016 when fewer than 9,000 were awaiting decision.  Further delays in the I-730 process are particularly devastating since USCIS was already taking close to two years to adjudicate these petitions, which are then subject to additional, often lengthy wait times before spouses and children receive appointments for interviews with U.S. consulates abroad.

## Attorney General Rulings Rig Adjudications Against Refugees

Any effort to resolve the asylum backlog must address the Trump Administration's weaponization of the U.S. asylum adjudication system, including the Asylum Division, to deny refugees protection. Asylum grant rates plummeted in the wake of Trump Administration policies and Attorney General asylum rulings that attempt to limit asylum eligibility for survivors of domestic violence and individuals persecuted because of their family relationships, including *Matter of A-B-* and *Matter of L-E-A*. As a result, the asylum office has referred increasing numbers of affirmative cases to the immigration court, where judges determine the asylum seeker's claim. The asylum referral rate grew by 35 percent from FY 2015, when about 50 percent of asylum claims were referred by asylum officers to the immigration court, compared to FY 2019, when nearly 70 percent were sent to the courts. These referrals needlessly subject asylum seekers to additional years-long delays for adjudication of their requests for protection in immigration court, where judges ultimately grant most asylum claims referred from the asylum office. The Biden Administration announced in its February executive order that it would issue

new regulations on particular social group claims within 270 days and conduct a comprehensive review to evaluate whether U.S. protections "for those fleeing domestic or gang violence" are consistent with international law.

## Hope Beyond the Interview

Despite the hardships and trauma inflicted by years in the asylum backlog, many of the asylum seekers interviewed remain hopeful that the United States will welcome and protect refugees and reunite their families.

- **Manuela, a Venezuelan asylum seeker who has been in the backlog since 2016, sought refugee protection in the United States to safeguard her family.** "We felt that our rights would be valued here. . . . If we receive asylum, our lives would change completely. We would have calm. We would be secure knowing we would not be thrown out of the United States and returned to Venezuela. It would change everything for us."

- **Mahmoud, a Bahraini journalist who has waited for his asylum interview since April 2015 is hopeful that receiving asylum will help him feel in control of his life again and build a new life.** "I know it is not going to be a magical event where everything improves in a single moment. But at least I could move forward – at least I could put all of this behind me."

- **Alexander, a Russian asylum seeker who has faith that the United States will protect him and his family, despite waiting more than five years for his asylum interview.** "I still believe the United States is a country of laws, and the laws will work for the good of the people. I hope that politicians will prioritize the needs of asylum seekers. . . . I hope no other families will have to endure what we have experienced."

- **Paul, a Cameroonian asylum seeker, expressed thanks to the organizations and individuals that have helped him survive during his wait in the backlog.** "[A]lthough I was surprised by the lack of aid from the [U.S.] government, I was impressed by the generosity of people. I was very afraid when I first came. I felt hopeless. But people made me feel welcome when I needed it most. I received free clothes and meals from churches and shelters. Those necessities allowed me to get to where I am today."

PROTECTION POSTPONED

**ON HUMAN RIGHTS**, the United States must be a beacon. Activists fighting for freedom around the globe continue to look to us for inspiration and count on us for support. Upholding human rights is not only a moral obligation; it's a vital national interest. America is strongest when our policies and actions match our values.

Human Rights First is an independent advocacy and action organization that challenges America to live up to its ideals. We believe American leadership is essential in the struggle for human rights so we press the U.S. government and private companies to respect human rights and the rule of law. When they don't, we step in to demand reform, accountability, and justice. Around the world, we work where we can best harness American influence to secure core freedoms.

We know that it is not enough to expose and protest injustice, so we create the political environment and policy solutions necessary to ensure consistent respect for human rights. Whether we are protecting refugees, combating torture, or defending persecuted minorities, we focus not on making a point, but on making a difference. For over 40 years, we've built bipartisan coalitions and teamed up with frontline activists and lawyers to tackle issues that demand American leadership.

*Human Rights First is a nonprofit, nonpartisan international human rights organization based in Los Angeles, New York, and Washington D.C.*

© 2021 Human Rights First All Rights Reserved.
This report is available online at humanrightsfirst.org

**ACKNOWLEDGEMENTS**

*This report was written and researched by Anika Ades and Kennji Kizuka. Ana Ortega assisted in the research. Eleanor Acer, Charlotte Finegold, Becky Gendelman, Anwen Hughes, David Mizner, and Jennifer Quigley contributed edits to the report. Our thanks to the many Human Rights First colleagues who assisted in referring asylum seekers for interview. We are grateful for the support of the Masiyiwa-Bernstein Fellowship. Human Rights First thanks the donors and foundations who provide invaluable support for the organization's research on access to asylum and representation of asylum seekers. We thank the numerous asylum seekers and asylees who bravely shared their stories in hopes of bettering the system for all those who seek protection and refuge in the United States.*

AR659

**Final or Most Current Outcomes, Total SW Border Encounters by MPP cases**

| MOST CURRENT OUTCOMES | TOTAL | | | MPP | | | NON-MPP | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| **Total Encounters** | 977,229 | 458,066 | 216,681 | 44,280 | 20,146 | 2,574 | 932,949 | 437,920 | 214,107 |
| Repatriations | 514,855 | 364,051 | 199,873 | 10,599 | 7,066 | 991 | 303,836 | 356,985 | 198,882 |
| Title 42 Expulsion | 1 | 102,234 | 111,175 | 1 | 1 | - | 1 | 102,234 | 111,174 |
| Removals | | | | | | | | | |
| Expedited | 294,317 | 128,063 | 6,437 | 545 | 45 | - | 293,772 | 128,020 | 6,437 |
| Reinstatement | 142,713 | 70,786 | 2,953 | 17 | 7 | - | 142,696 | 70,779 | 2,953 |
| Administrative removals | 91,362 | 54,075 | 3,405 | 22 | 1 | - | 91,340 | 54,074 | 3,405 |
| Other removals[1] | 685 | 272 | 5 | 24 | - | - | 661 | 272 | 5 |
| Returns | 39,587 | 21,090 | 4,086 | 24 | 5 | - | 39,563 | 21,087 | 4,086 |
| Re-encounters[2] | 20,950 | 112,664 | 78,175 | 10,429 | 7,020 | 990 | 10,521 | 105,644 | 77,185 |
| No confirmed departure | 662,374 | 94,015 | 16,808 | 33,281 | 13,080 | 1,583 | 629,093 | 80,935 | 15,225 |
| Being processed | 528,445 | 77,011 | 14,917 | 10,073 | 6,202 | 1,585 | 518,368 | 68,809 | 13,334 |
| Being processed by DHS | 163,766 | 27,322 | 10,598 | 207 | 284 | 206 | 163,559 | 27,038 | 10,192 |
| In EOIR proceedings[3] | 287,962 | 34,913 | 3,658 | 4,699 | 7,543 | 1,377 | 283,263 | 27,568 | 2,281 |
| EOIR case completed - additional DOJ action[4] | 76,715 | 14,778 | 863 | 5,169 | 375 | - | 71,546 | 14,403 | 863 |
| Final order/voluntary departure | 94,780 | 9,807 | 430 | 18,007 | 4,399 | - | 76,773 | 5,498 | 430 |
| Unexecuted removal orders | 93,265 | 9,864 | 434 | 18,007 | 4,397 | - | 75,258 | 5,467 | 434 |
| In absentia | 75,061 | 6,655 | - | 16,006 | 4,171 | - | 59,055 | 2,484 | - |
| Not in absentia | 18,204 | 3,209 | 434 | 2,001 | 226 | - | 16,203 | 2,983 | 434 |
| Unexecuted voluntary departure | 1,515 | 33 | 5 | - | 2 | - | 1,515 | 31 | 5 |
| Relief | 28,473 | 2,107 | 33 | 3,199 | 479 | - | 25,274 | 1,628 | 33 |
| SIJ or affirmative asylum | 5,709 | 178 | - | 6 | 3 | - | 5,703 | 175 | - |
| LPR status granted by DHS | 4,244 | 224 | 10 | 5 | - | - | 4,239 | 224 | 10 |
| EOIR relief[5] | 6,873 | 944 | 5 | 561 | 48 | - | 6,312 | 896 | 5 |
| EOIR termination | 11,332 | 717 | 7 | 4,625 | 427 | - | 6,707 | 290 | 7 |
| Other[6] | 315 | 44 | 13 | 2 | 1 | - | 313 | 43 | 13 |
| Parole | 7,055 | 4,285 | 788 | - | - | - | 7,055 | 4,285 | 788 |
| No Subsequent Event[7] | 3,623 | 715 | 631 | - | - | - | 3,623 | 715 | 631 |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so

[1] Other removals include removals executed pursuant to an INA §240 proceeding.
[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.
[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.
[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.
[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.
[6] Includes aliens granted cancellation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.
[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

**Final or Most Current Outcomes, Total SW Border Encounters by MPP Cases**

| MOST CURRENT OUTCOMES | TOTAL | | | MPP | | | NON-MPP | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| **Total Encounters** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Repatriations | 52.2% | 79.5% | 92.2% | 24.0% | 35.1% | 38.5% | 32.6% | 81.5% | 92.9% |
| Title 42 Expulsion | 0.0% | 22.3% | 51.3% | 0.0% | 0.0% | 0.0% | 0.0% | 23.3% | 51.9% |
| Removals | | | | | | | | | |
| Expedited | 26.0% | 28.0% | 3.0% | 1.2% | 0.2% | 0.0% | 27.2% | 29.2% | 3.0% |
| Reinstatement | 14.6% | 15.5% | 1.4% | 0.0% | 0.0% | 0.0% | 15.3% | 16.2% | 1.4% |
| Administrative removals | 10.2% | 11.8% | 1.6% | 0.0% | 0.0% | 0.0% | 10.6% | 12.3% | 1.6% |
| Other removals[1] | 0.1% | 0.1% | 0.0% | 0.1% | 0.0% | 0.0% | 0.1% | 0.1% | 0.0% |
| Returns | 1.2% | 0.6% | 0.0% | 1.1% | 0.2% | 0.0% | 1.2% | 0.7% | 0.0% |
| Re-encounters[2] | 4.1% | 4.6% | 1.9% | 0.1% | 0.0% | 0.0% | 4.2% | 4.8% | 1.9% |
| No confirmed departure | 2.1% | 24.6% | 36.1% | 23.6% | 34.8% | 38.5% | 1.1% | 24.1% | 36.0% |
| Being processed | 54.1% | 16.9% | 22.8% | 40.7% | 61.5% | 55.6% | 13.7% | 6.2% | |
| Being processed by DHS | 16.8% | 4.8% | | 1.4% | 8.0% | 17.5% | 6.2% | 4.8% | |
| In EOIR proceedings[3] | 29.5% | 7.6% | 1.7% | 10.6% | 37.4% | 53.5% | 30.4% | 6.2% | 1.1% |
| EOIR case completed - additional DOJ action[4] | 7.9% | 3.2% | 0.4% | 11.7% | 1.9% | 0.0% | 7.7% | 3.3% | 0.4% |
| Final order/voluntary departure | 9.7% | 2.2% | 0.2% | 40.7% | 21.8% | 0.0% | 8.2% | 1.3% | 0.2% |
| Unexecuted removal orders | 9.5% | 2.2% | 0.2% | 40.7% | 21.8% | 0.0% | 8.1% | 1.2% | 0.2% |
| In absentia | 7.7% | 1.5% | 0.0% | 36.1% | 20.7% | 0.0% | 6.3% | 0.6% | 0.0% |
| Not in absentia | 1.9% | 0.7% | 0.2% | 4.5% | 1.1% | 0.0% | 1.7% | 0.7% | 0.2% |
| Unexecuted voluntary departure | 0.2% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.0% | 0.0% |
| Relief | 2.9% | 0.5% | 0.0% | 7.2% | 2.4% | 0.0% | 2.7% | 0.4% | 0.0% |
| SIJ or affirmative asylum | 0.6% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.6% | 0.0% | 0.0% |
| LPR status granted by DHS | 0.4% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.5% | 0.1% | 0.0% |
| EOIR relief[5] | 0.7% | 0.2% | 0.0% | 1.3% | 0.2% | 0.0% | 0.7% | 0.2% | 0.0% |
| EOIR termination | 1.2% | 0.2% | 0.0% | 10.4% | 2.1% | 0.0% | 0.7% | 0.1% | 0.0% |
| Other[6] | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Parole | 0.7% | 0.9% | 0.4% | 0.0% | 0.0% | 0.0% | 0.8% | 1.0% | 0.4% |
| No Subsequent Event[7] | 0.4% | 0.2% | 0.3% | 0.0% | 0.0% | 0.0% | 0.4% | 0.2% | 0.3% |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter.

[1] Other removals include removals executed pursuant to an INA §240 proceeding.
[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.
[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.
[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.
[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.
[6] Includes aliens granted cancellation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.
[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

| | Total | | | | | | Non ER | | | | | ER | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 81,716 | | | | 20,177 | | | | | 58,325 | | | | |
| 448,786 | 381,055 | 829,841 | 34,205 | 11,944 | 46,149 | 43.7% | 34,144 | 11,927 | 46,071 | 252,868 | 293,671 | 546,539 | 11% |

**MOST CURRENT OUTCOMES**

| | TOTAL | | | MPP | | | NON-MPP | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021Q | 2019 | 2020 | 2021Q | 2019 | 2020 | 2021Q |
| **Total Encounters** | 977,229 | 458,066 | 216,681 | 44,280 | 20,146 | 2,574 | 932,949 | 437,920 | 214,107 |
| **Repatriations** | 314,855 | 364,051 | 199,873 | 12,999 | 7,266 | 991 | 303,856 | 356,985 | 198,882 |
| Title 42 Expulsion | 1 | 102,234 | 111,175 | 1 | 0 | 0 | 0 | 102,233 | 111,175 |
| **Removals** | 254,317 | 128,063 | 6,437 | 0 | 253,772 | 128,020 | 6,437 | | |
| Expedited | 142,713 | 70,786 | 2,953 | 17 | 7 | 0 | 142,696 | 70,779 | 2,953 |
| Reinstatement | 99,362 | 54,075 | 3,405 | 22 | 1 | 0 | 99,340 | 53,949 | 3,403 |
| Administrative removals | 685 | 272 | 3 | 24 | 0 | 0 | 661 | 272 | 3 |
| Other removals[3] | 11,557 | 2,930 | 76 | 482 | 35 | 0 | 11,075 | 2,895 | 76 |
| **Returns** | 39,587 | 21,090 | 4,086 | 24 | 3 | 0 | 39,563 | 21,087 | 4,086 |
| Re-execution[4] | 20,950 | 112,664 | 78,175 | 10,429 | 7,020 | 990 | 10,521 | 105,644 | 77,185 |
| **No confirmed departure** | 662,374 | 94,015 | 16,808 | 33,281 | 13,080 | 1,583 | 629,093 | 80,935 | 15,225 |
| **Being processed** | 528,441 | 77,011 | 14,937 | 10,075 | 8,202 | 1,583 | 518,366 | 68,809 | 13,354 |
| Being processed by DHS | 163,766 | 27,322 | 10,398 | 207 | 284 | 206 | 163,559 | 27,038 | 10,192 |
| In EOIR proceedings[5] | 287,962 | 34,911 | 3,658 | 4,699 | 7,543 | 1,377 | 283,263 | 27,368 | 2,281 |
| EOIR case completed - additional DOJ[6] | 76,715 | 14,778 | 861 | 5,169 | 375 | 0 | 71,546 | 14,403 | 861 |
| Final order/voluntary departure | 94,780 | 9,897 | 439 | 18,007 | 4,399 | 0 | 76,773 | 5,498 | 439 |
| Unexecuted removal orders | 93,265 | 9,864 | 434 | 18,007 | 4,367 | 0 | 75,258 | 5,467 | 434 |
| In absentia | 75,061 | 6,655 | 0 | 16,006 | 4,171 | 0 | 59,055 | 2,484 | 0 |
| Not in absentia | 18,204 | 3,209 | 434 | 2,001 | 226 | 0 | 16,203 | 2,983 | 434 |
| Unexecuted voluntary departures | 1,515 | 33 | 5 | 0 | 2 | 0 | 1,515 | 31 | 5 |
| **Relief[7]** | 28,473 | 2,107 | 33 | 5,199 | 479 | 0 | 23,274 | 1,628 | 33 |
| SIJ or affirmative asylum | 5,709 | 178 | 0 | 6 | 3 | 0 | 5,703 | 175 | 0 |
| LPR status granted by DHS | 4,244 | 224 | 10 | 5 | 0 | 0 | 4,239 | 224 | 10 |
| EOIR relief[8] | 6,873 | 944 | 3 | 561 | 48 | 0 | 6,312 | 896 | 3 |
| EOIR termination | 11,332 | 717 | 7 | 4,625 | 427 | 0 | 6,707 | 290 | 7 |
| Other[9] | 315 | 44 | 13 | 2 | 1 | 0 | 313 | 43 | 13 |
| **Parole** | 7,055 | 4,285 | 788 | 0 | 0 | 0 | 7,055 | 4,285 | 788 |
| **No Subsequent Event[1]** | 3,623 | 715 | 631 | 0 | 0 | 0 | 3,623 | 715 | 631 |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Enforcement includes USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter.

[1] Other removals include removals executed pursuant to an INA §240 proceeding.
[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.
[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.
[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a reinstate or recordual or who appeal their case to the Board of Immigration Appeals.
[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.
[6] Includes aliens granted exclusion of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.
[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

**Final or Most Current Outcomes, Total SW Border Encounters, MPP by Legal Representation**

| MOST CURRENT OUTCOMES | TOTAL | | | Legal Representation | | | No Legal Representation | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| Total Encounters | 44,280 | 20,146 | 2,574 | 30,896 | 5,735 | - | 13,306 | 14,252 | 2,552 |
| Repatriations | 10,999 | 7,066 | 993 | 2,322 | 483 | - | 8,418 | 6,491 | 973 |
| Title 42 Expulsion | | 1 | 1 | | | | | | |
| Removals | 545 | 45 | - | 533 | 36 | - | 12 | 5 | - |
| Expedited | 17 | 7 | - | 13 | 4 | - | 4 | 5 | - |
| Reinstatement | 22 | 1 | - | 21 | - | - | 1 | 1 | - |
| Administrative removals | | - | - | 24 | - | - | - | - | - |
| Other removals[1] | 482 | 35 | - | 475 | 34 | - | 7 | 1 | - |
| Returns | 24 | 3 | - | 22 | 1 | - | 2 | 2 | - |
| Re-encounters[2] | 10,429 | 7,020 | 990 | 1,966 | 444 | - | 8,404 | 6,484 | 973 |
| No confirmed departure | 33,281 | 13,080 | 1,585 | 28,574 | 5,252 | - | 4,888 | 7,761 | 1,579 |
| Being processed | 10,075 | 8,202 | 1,585 | 5,369 | 574 | - | 4,887 | 7,761 | 1,579 |
| Being processed by DHS | 207 | 284 | 206 | | | - | 188 | 217 | 202 |
| In EOIR proceedings[3] | 4,699 | 7,545 | 1,377 | | | - | 4,699 | 7,545 | 1,377 |
| EOIR case completed - additional DOJ action[4] | 5,169 | 373 | - | 5,169 | 374 | - | - | 1 | - |
| Final order/voluntary departure | 18,007 | 4,399 | - | 18,006 | 4,399 | - | 1 | - | - |
| Unexecuted removal orders | 18,007 | 4,397 | - | 18,006 | 4,397 | - | 1 | - | - |
| In absentia | 16,006 | 4,171 | - | 16,006 | 4,171 | - | - | - | - |
| Not in absentia | 2,001 | 226 | - | 2,000 | 226 | - | 1 | - | - |
| Unexecuted voluntary departure | | 2 | - | | 2 | - | - | - | - |
| Relief | 5,199 | 479 | - | 5,199 | 479 | - | - | - | - |
| SIJ or affirmative asylum | 6 | 5 | - | 6 | 5 | - | - | - | - |
| LPR status granted by DHS | 5 | - | - | 5 | - | - | - | - | - |
| EOIR relief[5] | 561 | 48 | - | 561 | 48 | - | - | - | - |
| EOIR termination | 4,625 | 427 | - | 4,625 | 427 | - | - | - | - |
| Other[6] | 2 | 1 | - | 2 | 1 | - | - | - | - |
| Parole | | - | - | | - | - | - | - | - |
| No Subsequent Event[7] | - | - | - | - | - | - | - | - | - |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2019. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so

[1] Other removals include removals executed pursuant to an INA §240 proceeding.

[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.

[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.

[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.

[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.

[6] Includes aliens granted cancellation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.

[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

**Final or Most Current Outcomes, Total SW Border Encounters, MPP by Legal Representation**

| MOST CURRENT OUTCOMES | TOTAL | | | MPP | | | NON-MPP | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| Total Encounters | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | #DIV/0! | 100.0% | 100.0% | 100.0% |
| Repatriations | 24.8% | 35.1% | 38.5% | 8.2% | 8.4% | #DIV/0! | 63.3% | 45.5% | 38.1% |
| Title 42 Expulsion | | 1.2% | 0.2% | | | | | | |
| Removals | 1.2% | 0.2% | 0.0% | 1.7% | 0.7% | #DIV/0! | 0.1% | 0.0% | 0.0% |
| Expedited | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Reinstatement | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Administrative removals | 0.1% | 0.0% | 0.0% | 0.1% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Other removals[1] | 1.1% | 0.2% | 0.0% | 1.5% | 0.6% | #DIV/0! | 0.1% | 0.0% | 0.0% |
| Returns | 0.1% | 0.0% | 0.0% | 0.1% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Re-encounters[2] | 23.6% | 34.8% | 38.5% | 6.4% | 7.7% | #DIV/0! | 63.2% | 45.5% | 38.1% |
| No confirmed departure | 75.2% | 64.9% | 61.5% | 91.8% | 91.6% | #DIV/0! | 36.7% | 54.5% | 61.9% |
| Being processed | 22.8% | 40.7% | 61.5% | 16.7% | 6.3% | #DIV/0! | 36.7% | 54.5% | 61.9% |
| Being processed by DHS | 0.5% | 1.4% | 8.0% | 0.0% | 0.0% | #DIV/0! | 1.4% | 1.5% | 7.9% |
| In EOIR proceedings[3] | 10.6% | 37.4% | 53.5% | 0.0% | 0.0% | #DIV/0! | 35.3% | 52.9% | 54.0% |
| EOIR case completed - additional DOJ action[4] | 11.7% | 1.9% | 0.0% | 16.7% | 6.5% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Final order/voluntary departure | 40.7% | 21.8% | 0.0% | 58.3% | 76.7% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Unexecuted removal orders | 40.7% | 21.8% | 0.0% | 58.3% | 76.7% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| In absentia | 36.1% | 20.7% | 0.0% | 51.8% | 72.7% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Not in absentia | 4.5% | 1.1% | 0.0% | 6.5% | 3.9% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Unexecuted voluntary departure | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Relief | 11.7% | 2.4% | 0.0% | 16.8% | 8.4% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| SIJ or affirmative asylum | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| LPR status granted by DHS | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| EOIR relief[5] | 1.3% | 0.2% | 0.0% | 1.8% | 0.8% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| EOIR termination | 10.4% | 2.1% | 0.0% | 15.0% | 7.4% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Other[6] | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| Parole | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |
| No Subsequent Event[7] | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | #DIV/0! | 0.0% | 0.0% | 0.0% |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2019. Encounters include USBP apprehensions and OFO

[1] Other removals include removals executed pursuant to an INA §240 proceeding.

[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.

[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.

[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.

[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.

[6] Includes aliens granted cancellation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.

[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

**Final or Most Current Outcomes, Total SW Border Encounters for Non-MPP by Legal Representation**

| MOST CURRENT OUTCOMES | TOTAL | | | Legal Representation | | | No Legal Representation | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| Total Encounters | 932,949 | 437,920 | 214,207 | 189,231 | 28,919 | 1,087 | 715,020 | 194,831 | 24,172 |
| Repatriations | 303,836 | 356,985 | 198,882 | 32,466 | 8,286 | 88 | 264,132 | 145,752 | 12,310 |
| Title 42 Expulsion | | 102,234 | 111,174 | | | | | 854 | 1,345 |
| Removals | 253,772 | 129,020 | 6,437 | 28,446 | 7,336 | 69 | 224,856 | 120,469 | 6,365 |
| Expedited | 142,096 | 70,779 | 2,953 | 15,472 | 4,710 | 37 | 127,224 | 66,069 | 2,916 |
| Reinstatement | 99,340 | 54,074 | 3,405 | 2,864 | 659 | 5 | 96,476 | 53,415 | 3,400 |
| Administrative removals | 661 | 272 | 5 | 33 | 11 | — | 158 | 66 | |
| Other removals [1] | 11,075 | 2,895 | 76 | 10,077 | 1,956 | 27 | 998 | 939 | 49 |
| Returns | 39,563 | 21,087 | 4,086 | 3,368 | 541 | 18 | 36,192 | 20,542 | 4,068 |
| Re-encounters [2] | 10,521 | 105,644 | 77,185 | 632 | 469 | 1 | 3,084 | 3,867 | 532 |
| No confirmed departure | 629,093 | 80,935 | 15,225 | 156,765 | 20,633 | 999 | 450,888 | 49,079 | 11,862 |
| Being processed | 518,568 | 68,809 | 13,334 | 71,457 | 14,382 | 860 | 432,544 | 47,478 | 10,898 |
| Being processed by DHS [3] | 165,303 | 27,038 | 10,152 | | | | 149,172 | 20,089 | 8,616 |
| In EOIR proceedings [3] | 283,263 | 27,568 | 2,281 | 5 | | | 283,258 | 27,568 | 2,281 |
| EOIR case completed - additional DOJ action [4] | 71,346 | 14,403 | 861 | 71,432 | 14,382 | 860 | 114 | 21 | 1 |
| Final order/voluntary departure | 76,773 | 5,498 | 439 | 69,726 | 5,020 | 129 | 7,047 | 478 | 310 |
| Unexecuted removal orders | 75,258 | 5,467 | 434 | 68,223 | 4,993 | 124 | 7,035 | 474 | 310 |
| In absentia | 59,055 | 2,484 | — | 59,049 | 2,484 | — | 6 | | |
| Not in absentia | 16,203 | 2,983 | 434 | 9,174 | 2,509 | 124 | 7,029 | 474 | 310 |
| Unexecuted voluntary departure | 1,515 | 31 | 5 | 1,503 | 27 | 5 | 12 | 4 | — |
| Relief [5] | 23,274 | 1,628 | 33 | 15,602 | 1,231 | 10 | 7,669 | 397 | 23 |
| SIJ or affirmative asylum | 5,703 | 175 | — | 1,373 | 44 | — | 4,330 | 131 | — |
| LPR status granted by DHS | 4,239 | 224 | 10 | 1,155 | — | — | 3,084 | 224 | 10 |
| EOIR relief [5] | 6,312 | 896 | 5 | 6,310 | 895 | 5 | 2 | 1 | — |
| EOIR termination | 6,707 | 290 | 7 | 6,701 | 290 | 7 | 6 | — | — |
| Other [6] | 313 | 43 | 13 | 63 | 2 | — | 247 | 41 | 13 |
| Parole | 7,055 | 4,285 | 788 | | | | 3,625 | 713 | 631 |
| No Subsequent Event [7] | 3,625 | 713 | 631 | — | — | — | 3,625 | 713 | 631 |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.
Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so...
[1] Other removals include removals executed pursuant to an INA §240 proceeding.
[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.
[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.
[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.
[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.
[6] Includes aliens granted cancellation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.
[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

**Final or Most Current Outcomes, Total SW Border Encounters Non-MPP by Legal Representation**

| MOST CURRENT OUTCOMES | TOTAL | | | MPP | | | NON-MPP | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 | 2019 | 2020 | 2020Q1 |
| Total Encounters | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Repatriations | 32.6% | 81.5% | 92.9% | 17.2% | 28.7% | 8.1% | 36.9% | 74.8% | 50.9% |
| Title 42 Expulsion | 0.0% | 23.3% | 51.9% | 0.0% | 0.0% | 0.0% | 0.0% | 0.4% | 5.6% |
| Removals | 27.2% | 29.2% | 3.0% | 15.0% | 25.4% | 6.3% | 31.4% | 61.8% | 26.3% |
| Expedited | 15.3% | 16.2% | 1.4% | 8.2% | 16.3% | 3.4% | 17.8% | 33.9% | 12.1% |
| Reinstatement | 10.6% | 12.3% | 1.6% | 1.5% | 2.3% | 0.5% | 13.5% | 27.4% | 14.1% |
| Administrative removals | 0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other removals [1] | 1.2% | 0.7% | 0.0% | 5.3% | 6.8% | 2.5% | 0.1% | 0.5% | 0.2% |
| Returns | 4.2% | 4.8% | 1.9% | 1.8% | 1.9% | 1.7% | 5.1% | 10.5% | 16.8% |
| Re-encounters [2] | 1.1% | 24.1% | 36.0% | 0.3% | 1.4% | 0.1% | 0.4% | 2.0% | 2.2% |
| No confirmed departure | 67.4% | 18.5% | 7.1% | 82.8% | 71.3% | 91.9% | 63.1% | 25.2% | 49.1% |
| Being processed | 55.6% | 15.7% | 6.2% | 37.8% | 49.7% | 79.1% | 60.5% | 24.4% | 45.1% |
| Being processed by DHS [3] | 17.5% | 6.2% | 4.8% | 0.0% | 0.0% | 0.0% | 20.9% | 10.3% | 35.6% |
| In EOIR proceedings [3] | 30.4% | 6.2% | 1.1% | 0.0% | 0.0% | 0.0% | 39.6% | 14.0% | 9.4% |
| EOIR case completed - additional DOJ action [4] | 7.7% | 3.3% | 0.4% | 37.7% | 49.7% | 79.1% | 0.0% | 0.0% | 0.0% |
| Final order/voluntary departure | 8.2% | 1.3% | 0.2% | 36.8% | 17.4% | 11.9% | 1.0% | 0.2% | 1.3% |
| Unexecuted removal orders | 8.1% | 1.2% | 0.2% | 36.1% | 17.3% | 11.4% | 1.0% | 0.2% | 1.3% |
| In absentia | 6.3% | 0.6% | 0.0% | 31.2% | 8.6% | 0.0% | 0.0% | 0.0% | 0.0% |
| Not in absentia | 1.7% | 0.7% | 0.2% | 4.8% | 8.7% | 11.4% | 1.0% | 0.2% | 1.3% |
| Unexecuted voluntary departure | 0.2% | 0.0% | 0.0% | 0.8% | 0.1% | 0.5% | 0.0% | 0.0% | 0.0% |
| Relief [5] | 2.5% | 0.4% | 0.0% | 8.2% | 4.3% | 0.9% | 1.1% | 0.2% | 0.1% |
| SIJ or affirmative asylum | 0.6% | 0.0% | 0.0% | 0.7% | 0.2% | 0.0% | 0.6% | 0.1% | 0.0% |
| LPR status granted by DHS | 0.5% | 0.1% | 0.0% | 0.6% | 0.0% | 0.0% | 0.4% | 0.1% | 0.0% |
| EOIR relief [5] | 0.7% | 0.2% | 0.0% | 3.3% | 3.1% | 0.5% | 0.0% | 0.0% | 0.0% |
| EOIR termination | 0.7% | 0.1% | 0.0% | 3.5% | 1.0% | 0.6% | 0.0% | 0.0% | 0.0% |
| Other [6] | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Parole | 0.8% | 1.0% | 0.4% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No Subsequent Event [7] | 0.4% | 0.2% | 0.3% | 0.0% | 0.0% | 0.0% | 0.5% | 0.4% | 2.6% |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.
Notes: Results based on source data as of June 30, 2020 and OIS Enforcement Lifecycle methodology as of November 30, 2020. Encounters include USBP apprehensions and OFO
[1] Other removals include removals executed pursuant to an INA §240 proceeding.
[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.
[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.
[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.
[5] Includes aliens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.
[6] Includes aliens granted cancellation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.
[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

Case 2:21-cv-00067-Z    Document 61    Filed 06/22/21    Page 670 of 688    PageID 2327



Official website of the Department of Homeland Security

**f** (https://www.facebook.com/CBPgov/)    (https://www.instagram.com/cbpgov/)    (https://www.flickr.com/photos/cbpphotos/)

(https://twitter.com/cbp)    (https://www.linkedin.com/company/2997?trk=tyah)    (https://www.youtube.com/user/customsborderprotect)

U.S. Customs and
Border Protection (https://public.govdelivery.com/accounts/USDHSCBP/subscriber/new)
(/)

# Southwest Land Border Encounters

Demographics for U.S. Border Patrol (USBP) and Office of Field Operations (OFO) include:

- Accompanied Minors
- Family Unit Apprehensions (FMUA)
- Single Adults
- Unaccompanied Children (UC)

For a breakdown of encounters by USBP Sector and OFO Field Office, visit **Southwest Land Border Encounters (By Component) (/newsroom/stats/southwest-land-border-encounters-by-component)**.

*Note: Internet Explorer has problems displaying the following charts. Please use another browser (Chrome, Safari, Firefox, Edge) to view. When using a mobile device, the charts are best displayed in landscape mode.*

AR664

Case 2:21-cv-00067-Z　Document 61　Filed 06/22/21　Page 671 of 688　PageID 2328

AR665

l
Rate

# U.S. Border Patrol and Office of Field Operations Encounters[1] FY2021

Source: USBP and OFO official statistics.

APR FY21

OFO

All; **Title of Authority:** All

PERCENT CHANGE

4,135

5,162

▲24.8%



1  Beginning in March FY2020, USBP and OFO Encounter statistics include both Title 8 Apprehensions, Title 8 Inadmissibles, and Title 42 Expulsions. To learn more, visit: **Title 8 and Title 42 Statistics (/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics)**

**Last modified:** May 11, 2021

**Tags:**   **Statistics**

Share This Page.

**U.S. Customs and Border Protection (CBP) Encounters**
US Border Patrol (USBP) Title 8 Apprehensions,
Office of Field Operations (OFO) Title 8 Inadmissible Volumes,
and Title 42 Expulsions by Fiscal Year (FY)



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021 (FYTD) | 71,951 | 72,111 | 74,018 | 78,443 | 101,120 | 173,348 | 178,622 | | | | | | 749,613 |
| 2020 | 45,139 | 42,643 | 40,565 | 36,585 | 36,687 | 34,460 | 17,106 | 23,237 | 33,049 | 40,929 | 50,014 | 57,674 | 458,088 |
| 2019 | 60,781 | 62,469 | 60,794 | 58,317 | 76,545 | 103,731 | 109,415 | 144,116 | 104,311 | 81,777 | 62,707 | 52,546 | 977,509 |
| 2018 | 34,871 | 39,051 | 40,519 | 35,905 | 36,751 | 50,347 | 51,168 | 51,862 | 43,180 | 40,149 | 46,719 | 50,568 | 521,090 |

**Source:** USBP and OFO official year end reporting for FY18-FY20; USBP and OFO month end reporting for FY21 to date. Data is current as of 5/4/2021.

UNCLASSIFIED // FOR OFFICIAL USE ONLY

*USBP SBO Planning Profile for Remainder of FY*
*CBP Data Warehouse as of May 8, 2021*



### USBP Total Enforcement Encounter FY21 Planning Profile
*based on data through May 8, 2021*

Data through April is actual and reconciled for the FYTD.
Projection 1: May through September trends are a hybrid based on current trends from this FY influenced by previous surges.  Projected total: 1,575,324
Projection 2: May through September is based on the monthly rate of change observed FY16.  Projected total: 1,624,867



U.S. Customs and
Border Protection

UNCLASSIFIED // FOR OFFICIAL USE ONLY



CBP STAT Division
Operations Support

UNCLASSIFIED // FOR OFFICIAL USE ONLY

*USBP SBO Planning Profile for Remainder of FY*
*CBP Data Warehouse as of May 8, 2021*



**USBP Total Unaccompanied Children Enforcement Encounter FY21 Planning Profile**
*based on data through May 8, 2021*

Legend: — FY21 Actual  — Based on Hybrid  — Based on FY16

Data through April is actual and reconciled for the FYTD.
Projection 1: May through September trends are a hybrid based on current trends from this FY influenced by previous surges.  Projected total: 141,497
Projection 2: May through September is based on the monthly rate of change observed FY16.  Projected total: 152,673



U.S. Customs and
Border Protection

UNCLASSIFIED // FOR OFFICIAL USE ONLY



CBP STAT Division
Operations Support

UNCLASSIFIED // FOR OFFICIAL USE ONLY

*USBP SBO Planning Profile for Remainder of FY*
*CBP Data Warehouse as of May 8, 2021*



### USBP Total Individuals in a Family Enforcement Encounter FY21 Planning Profile
*based on data through May 8, 2021*

Data through April is actual and reconciled for the FYTD.

<u>Projection 1</u>: May through September trends are a hybrid based on current trends from this FY influenced by previous surges.  Projected total: 405,961

<u>Projection 2</u>: May through September is based on the monthly rate of change observed FY16.  Projected total: 483,776



U.S. Customs and
Border Protection

UNCLASSIFIED // FOR OFFICIAL USE ONLY



CBP STAT Division
Operations Support

UNCLASSIFIED // FOR OFFICIAL USE ONLY

*USBP SBO Planning Profile for Remainder of FY*
*CBP Data Warehouse as of May 8, 2021*



### USBP Total Single Adult Enforcement Encounter FY21 Planning Profile
*based on data through May 8, 2021*

Legend: — FY21 Actual — Based on Hybrid — Based on FY16

Data through April is actual and reconciled for the FYTD.

<u>Projection 1</u>: May through September trends are a hybrid based on current trends from this FY influenced by previous surges.  Projected total: 1,027,865

<u>Projection 2</u>: May through September is based on the monthly rate of change observed FY16.  Projected total: 988,418



U.S. Customs and Border Protection

UNCLASSIFIED // FOR OFFICIAL USE ONLY



CBP STAT Division
Operations Support

Federal Register

Vol. 86, No. 97

Friday, May 21, 2021

# Presidential Documents

Title 3—

The President

**Memorandum of May 18, 2021**

## Restoring the Department of Justice's Access-to-Justice Function and Reinvigorating the White House Legal Aid Interagency Roundtable

### Memorandum for the Heads of Executive Departments and Agencies

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to increase meaningful access to our legal system and an array of Federal programs, it is hereby ordered as follows:

**Section 1**. *Policy*. This Nation was founded on the ideal of equal justice under the law. Everyone in this country should be able to vindicate their rights and avail themselves of the protections that our laws afford on equal footing. Whether we realize this ideal hinges on the extent to which everyone in the United States has meaningful access to our legal system. Legal services are crucial to the fair and effective administration of our laws and public programs, and the stability of our society.

Recognizing the importance of access to justice and the power of legal aid, the Department of Justice (DOJ) in 2010 launched an access-to-justice initiative. In 2016, DOJ formally established the Office for Access to Justice. This office worked in partnership with other DOJ components to coordinate policy initiatives on topics including criminal indigent defense, enforcement of fines and fees, language barriers in access to the courts, and civil legal aid. The DOJ and the White House Domestic Policy Council also launched the Legal Aid Interagency Roundtable (LAIR) in 2012 to work with civil legal aid partners to advance Federal programs; create and disseminate tools to provide information about civil legal aid and Federal funding opportunities; and generate research to inform policy that improves access to justice.

The LAIR's successes prompted President Obama to issue the memorandum of September 24, 2015 (Establishment of the White House Legal Aid Interagency Roundtable), which formally established LAIR as a White House initiative. Using the White House's convening power, LAIR examined innovative and evidence-based solutions for access to justice, from medical-legal partnerships to improve health outcomes and decrease health costs to better procedures in court hearings for individuals representing themselves.

But there is much more for the Federal Government to do. According to a 2017 study by the Legal Services Corporation, low-income Americans receive inadequate or no professional legal assistance with regard to over 80 percent of the civil legal problems they face in a given year. All too often, unaddressed legal issues push people into poverty. At the same time, in the criminal legal system, those who cannot afford private counsel often receive a lower-quality defense because public defender caseloads are overburdened.

The coronavirus disease 2019 (COVID–19) pandemic has further exposed and exacerbated inequities in our justice system, as courts and legal service providers have been forced to curtail in-person operations, often without the resources or technology to offer remote-access or other safe alternatives. These access limitations have compounded the effects of other harms wrought by the pandemic. These problems have touched the lives of many persons in this country, particularly low-income people and people of color.

With these immense and urgent challenges comes the opportunity to strengthen access to justice in the 21st century. Through funding, interagency collaboration, and strategic partnerships, the Federal Government can drive development of new approaches and best practices that provide meaningful access to justice today, and into the future, consistent with our foundational ideal of equal justice under the law.

**Sec. 2.** *The Department of Justice's Access-to-Justice Function.* (a) My Administration is committed to promoting equal access to justice and addressing access limitations throughout the criminal and civil legal systems. The DOJ has a critical role to play in improving the justice delivery systems that serve people who cannot afford lawyers, and I am committed to reinvigorating that work.

(b) The Attorney General shall consider expanding DOJ's planning, development, and coordination of access-to-justice policy initiatives, including in the areas of criminal indigent defense, civil legal aid, and pro bono legal services. As soon as practicable, and no later than 120 days from the date of this memorandum, the Attorney General shall—in coordination with the Director of the Office of Management and Budget—submit a report to the President describing the Department's plan to expand its access-to-justice function, including the organizational placement of this function within the Department, expected staffing and budget, and, if necessary, the timeline for notifying the Congress of any reorganization.

**Sec. 3.** *Reinvigorating the White House Legal Aid Interagency Roundtable.* My Administration is committed to ensuring that all persons in this country enjoy the protections and benefits of our legal system. Reinvigorating LAIR as a White House initiative is a key step in this direction.

Accordingly, I direct as follows:

(a) The LAIR is hereby reconvened as a White House initiative in furtherance of the vision set forth in the memorandum of September 24, 2015, by which it was established and in light of today's most pressing challenges. The September 2015 memorandum is superseded to the extent that it is inconsistent with this memorandum.

(b) The LAIR shall work across executive departments, agencies, and offices to fulfill its mission, including to:

(i) improve coordination among Federal programs, so that programs are more efficient and produce better outcomes by including, where appropriate, legal services among the range of supportive services provided;

(ii) increase the availability of meaningful access to justice for individuals and families, regardless of wealth or status;

(iii) develop policy recommendations that improve access to justice in Federal, State, local, Tribal, and international jurisdictions;

(iv) assist the United States with implementation of Goal 16 of the United Nation's 2030 Agenda for Sustainable Development to promote peaceful and inclusive societies for sustainable development, provide access to justice for all, and build effective, accountable, and inclusive institutions at all levels; and

(v) advance relevant evidence-based research, data collection, and analysis of civil legal aid and indigent defense, and promulgate best practices.

(c) The Attorney General and the Counsel to the President, or their designees, shall serve as the Co-Chairs of LAIR, which shall also include a representative or designee from each of the following executive departments, agencies, and offices:

(i) the Department of State;

(ii) the Department of the Treasury;

(iii) the Department of Defense;

(iv) the Department of Justice;

(v) the Department of the Interior;

(vi) the Department of Agriculture;

(vii) the Department of Labor;

(viii) the Department of Health and Human Services;

(ix) the Department of Housing and Urban Development;

(x) the Department of Transportation;

(xi) the Department of Education;

(xii) the Department of Veterans Affairs;

(xiii) the Department of Homeland Security;

(xiv) the Environmental Protection Agency;

(xv) the Equal Employment Opportunity Commission;

(xvi) the Corporation for National and Community Service;

(xvii) the Office of Management and Budget;

(xviii) the United States Agency for International Development;

(xix) the Administrative Conference of the United States;

(xx) the National Science Foundation;

(xxi) the United States Digital Service;

(xxii) the Domestic Policy Council;

(xxiii) the Office of the Vice President; and

(xxiv) such other executive departments, agencies, and offices as the Co-Chairs may, from time to time, invite to participate.

(d) The Co-Chairs shall invite the participation of the Bureau of Consumer Financial Protection, the Federal Communications Commission, the Federal Trade Commission, the Legal Services Corporation, and the Social Security Administration, to the extent consistent with their respective statutory authorities and legal obligations.

(e) The LAIR shall report annually to the President on its progress in fulfilling its mission. The report shall include data from participating members on the deployment of Federal resources to foster this mission. The LAIR's 2021 report shall be due no later than 120 days from the date of this memorandum.

(f) In light of the mission and function set forth in section 3(b) of this memorandum, LAIR shall focus its first annual report on the impact of the COVID–19 pandemic on access to justice in both the criminal and civil legal systems. Moreover, the first convening of LAIR shall, at a minimum, address access-to-justice challenges the pandemic has raised and work towards identifying technological and other solutions that both meet these challenges and fortify the justice system's capacity to serve the public and be inclusive of all communities.

(g) The Attorney General shall designate an Executive Director of LAIR who shall, as directed by the Co-Chairs, convene regular meetings of LAIR and supervise its work. The DOJ staff designated to support the Department's access-to-justice function under section 2 of this memorandum shall serve as the staff of LAIR.

(h) The DOJ shall, to the extent permitted by law and subject to the availability of appropriations, provide administrative services, funds, facilities, staff, equipment, and other support services as may be necessary for LAIR to carry out its mission.

(i) The LAIR shall hold meetings at least three times per year. In the course of its work, LAIR should conduct outreach to Federal, State, local, Tribal, and international officials, technical advisors, and nongovernmental organizations, among others, as necessary to carry out its mission (including public defender organizations and offices and legal aid organizations and providers).

(j) The LAIR members are encouraged to provide support, including by detailing personnel, to LAIR. Members of LAIR shall serve without any additional compensation for their work.

**Sec. 4**. *General Provisions.* (a) Nothing in this memorandum shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) Independent agencies are strongly encouraged to comply with the provisions in this memorandum.

(d) This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(e) The Attorney General is authorized and directed to publish this memorandum in the *Federal Register*.

THE WHITE HOUSE,
*Washington, May 18, 2021*

[FR Doc. 2021–10973
Filed 5–20–21; 11:15 am]
Billing code 4410–19–P



**NUMBER OF PERSONS ENTERING THE U.S. UNDER
THE END OF MPP OPERATION AS OF MAY 21, 2021**

| PoE | New entries (May 21, 2021) | Cumulative total (Feb 19 – May 21, 2021) |
|---|---|---|
| Tijuana | 24 | 2,413 |
| Matamoros | - | 2,295 |
| Ciudad Juarez | 69 | 4,480 |
| Reynosa | - | 845 |
| Nuevo Laredo | - | 483 |
| Piedras Negras | - | 626 |
| TOTAL | 93 | 11,142 |

Source: IOM End of MPP Daily Monitoring, May 21, 2021.



NUMBER OF PERSONS ENTERING THE U.S. UNDER
THE END OF MPP OPERATION AS OF MAY 25, 2021

| PoE | New entries (May 25, 2021) | Cumulative total (Feb 19 – May 25, 2021) |
|---|---|---|
| Tijuana | - | 2,413 |
| Matamoros | 8 | 2,303 |
| Ciudad Juarez | - | 4,523 |
| Reynosa | - | 845 |
| Nuevo Laredo | - | 483 |
| Piedras Negras | - | 626 |
| TOTAL | 8 | 11,193 |

Source: IOM End of MPP Daily Monitoring, May 25, 2021.

Official website of the Department of Homeland Security



**U.S. Department of
Homeland Security**

# DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings

**Release Date:** May 28, 2021

WASHINGTON – Today, Secretary of Homeland Security Alejandro N. Mayorkas and Attorney General Merrick B. Garland announced a new Dedicated Docket process to more expeditiously and fairly make decisions in immigration cases of families who arrive between ports of entry at the Southwest Border.  This new process should significantly decrease the amount of time it takes for migrants to have their cases adjudicated while still providing fair hearings for families seeking asylum at the border.

"Families arriving at the border who are placed in immigration proceedings should have their cases decided in an orderly, efficient, and fair manner," **said Secretary of Homeland Security Alejandro N. Mayorkas.**  "Families who have recently arrived should not languish in a multi-year backlog; today's announcement is an important step for both justice and border security."

"The mission of the Department of Justice's immigration courts is to decide the cases that come before them promptly and fairly," said **Attorney General Merrick B. Garland**.  "This new program for certain newly arriving families will help achieve that critically important goal."

Under this new process, certain recently arrived families may be placed on the Dedicated Docket.  Families may qualify if they are apprehended between ports of entry on or after Friday, May 28, 2021, placed in removal proceedings, and enrolled in Alternatives to Detention (ATD).  DHS, in partnership with the Department of Justice (DOJ) Executive Office for Immigration Review (EOIR), will make available information services to help families understand the immigration system and refer families to pro bono legal service providers for possible representation.

AR680

EOIR has identified immigration courts in 10 cities with established communities of legal services providers and available judges to handle the cases.  The designated cities are Denver, Detroit, El Paso, Los Angeles, Miami, Newark, New York City, San Diego, San Francisco, and Seattle.

Under the Dedicated Docket, EOIR's immigration judges will work generally to issue a decision within 300 days of the initial master calendar hearing, subject to the unique circumstances of each case including allowing time for families to seek representation where needed.  While the goal of this process is to decide cases expeditiously, fairness will not be compromised.

Topics: Immigration and Customs Enforcement (/topics/immigration-enforcement)

Keywords: Immigration and Customs Enforcement (ICE) (/keywords/ice), Secretary Alejandro Mayorkas (/keywords/secretary-alejandro-mayorkas)

Last Published Date: May 28, 2021

AR681

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 22, 2021, I electronically filed this Administrative Record with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.


/s/ *Brian C. Ward*
BRIAN C. WARD
U.S. Department of Justice