**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

|  |  |  |
|---|---|---|
| STATE OF TEXAS, STATE OF MISSOURI, | ) ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) | Civil Action No. 2:21-cv-00067-Z |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, | ) ) ) ) ) | |
| *Defendants.* | ) ) ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

ARGUMENT ................................................................................................................ 4

    I.   This Court lacks jurisdiction to grant the preliminary injunction Plaintiffs seek..............5

        A.   Texas and Missouri cannot demonstrate standing, let alone irreparable harm, traceable to the termination of MPP.................................................................. 5

    II.  Plaintiffs cannot succeed on the merits of any of their claims. .......................................10

        A.   Plaintiffs' APA claims are not reviewable ............................................... 10

        B.   Plaintiffs' APA claims fail on the merits. ............................................... 24

        C.   Plaintiffs cannot succeed on the merits of their claim that the June 1 memorandum violates § 1225. ............................................................... 36

        D.   Plaintiffs cannot state a claim under the Take Care Clause. .................................. 39

        E.   The purported agreement with Texas is invalid, unenforceable, and cannot be a basis for relief.......................................................................................... 41

    III.  The remaining factors weigh strongly against granting a preliminary injunction..........46

    IV.  If the Court grants relief, it must be sharply limited. .......................................48

CONCLUSION............................................................................................................. 50

# TABLE OF AUTHORITIES

## Cases

*A.L. Pharma, Inc. v. Shalala*,
  62 F.3d 1484 (D.C. Cir. 1995) ............................................................................................... 47

*Abraham v. United States*,
  81 Fed. Cl. 178 (2008) ........................................................................................................... 45

*Adams v. Vance*,
  570 F.2d 950 (D.C. Cir. 1978) ............................................................................................... 47

*Ala. Rural Fire Ins. Co. v. Naylor*,
  530 F.2d 1221 (5th Cir. 1976) ............................................................................................... 42

*Alabi v. DHS-ICE*,
  No. 3:19-CV-2717-X-BN, 2020 WL 2529379 (N.D. Tex. Apr. 29, 2020) ............................ 39

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
  458 U.S. 592 (1982) ............................................................................................................... 10

*Amino Bros. Co. v. United States*,
  372 F.2d 485 (Ct. Cl. 1967) ................................................................................................... 44

*Arizona v. United States*,
  567 U.S. 387 (2012) ......................................................................................................... passim

*Arpaio v. Obama*,
  27 F. Supp. 3d 185 (D.D.C. 2014) ........................................................................................... 7

*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015) .................................................................................... 6, 7, 8, 10

*Ass'n v. Reno*,
  199 F.3d 1352 (D.C. Cir. 2000) ............................................................................................. 21

*Avoyelles Sportsmen's League, Inc. v. Marsh*,
  715 F.2d 897 (5th Cir. 1983) ................................................................................................. 24

*Ayuda, Inc. v. Reno*,
  7 F.3d 246 (D.C. Cir. 1993) ................................................................................................... 20

*Baker v. Carr*,
  369 U.S. 186 (1962) ............................................................................................................... 40

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................................................ 15, 19

*Biodiversity Assocs. v. Cables*,
    357 F.3d 1152 (10th Cir. 2004) ...................................................................................... 43

*Block v. Cmty. Nutrition Inst.*,
    467 U.S. 340 (1984) ............................................................................................ 20, 21

*Bowen v. Public Agencies Opposed to Social Security Entrapment*,
    477 U.S. 41 (1986) .......................................................................................................... 44

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
    419 U.S. 281 (1974) ...................................................................................................... 29

*CACI, Inc. v. Stone*,
    990 F.2d 1233 (Fed. Cir. 1993) ................................................................................... 44

*California v. Azar*,
    911 F.3d 558, 584 (9th Cir. 2018) ) ............................................................................ 50

*Camp v. Pitts*,
    411 U.S. 138 (1973) ................................................................................................ 26, 27

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ...................................................................................................... 11

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2014) .................................................................................................... 5, 7

*Clarke v. Secs. Indus. Ass'n*,
    479 U.S. 388 (1987) ...................................................................................................... 22

*Clean Water Action v. E.P.A.*,
    936 F.3d 308 (5th Cir. 2019) ....................................................................................... 36

*Cohen v. United States*,
    578 F.3d 1 (D.C. Cir. 2009*)* ........................................................................... 15, 26, 33

*Contributors to Pa. Hospital v. City of Philadelphia*,
    245 U.S. 20 (1917) ........................................................................................................ 44

*Crane v. Johnson*,
    783 F.3d 244 (5th Cir. 2015) ................................................................................... 7, 12

*Cruz v. DHS*,
   19-CV-2727, 2019 WL 8139805 (D.D.C. Nov. 21, 2019) ..................................................... 16

*Czyzewski v. Jevic Holding Corp.*,
   137 S. Ct. 973 (2017) ........................................................................................................... 9

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ........................................................................................................ 9, 10

*Dalton v. Specter*,
   511 U.S. 462 (1994) .......................................................................................................... 39

*Davidson v. Glickman*,
   169 F.3d 996 (5th Cir. 1999) ............................................................................................ 45

*Delta Constr. Co. v. EPA*,
   783 F.3d 1291 (D.C. Cir. 2015) .......................................................................................... 9

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
   140 S. Ct. 1891 (2020) .............................................................................................. passim

*DHS v. New York*,
   140 S. Ct. 599 (2020) ........................................................................................................ 50

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) ................................................................................................. 30, 31

*F.C.C. v. Fox Television Stations*,
   556 U.S. 502 (2009) .......................................................................................................... 29

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
   141 S. Ct. 1150 (2021) ................................................................................................. 28, 33

*Fed. Crop Ins. Corp. v. Merrill*,
   332 U.S. 380 (1947) .......................................................................................................... 45

*Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*,
   93 F.3d 897 (D.C. Cir. 1996) ........................................................................................ 23, 24

*Fiallo v. Bell*,
   430 U.S. 787 (1977) .......................................................................................................... 47

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) .......................................................................................................... 49

*Floyd Acceptances*,
    74 U.S. 666 (1868) ........................................................................................ 44

*Flue–Cured Tobacco Cooperative Stabilization Corp. v. EPA*,
    313 F.3d 852 (4th Cir. 2002) ....................................................................... 19

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ................................................................................ 50

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. DHS*,
    490 F.3d 940 (Fed. Cir. 2007) ...................................................................... 42

*Green Valley Special Util. Dist. v. City of Schertz, Texas*,
    969 F.3d 460 (5th Cir. 2020) ....................................................................... 39

*Gupta v. McGahey*,
    709 F.3d 1062 (11th Cir. 2013) .................................................................... 21

*Hamama v. Adducci*,
    946 F.3d 875 (6th Cir. 2020) ....................................................................... 48

*Hamama v. Adducci*,
    912 F.3d 869 (6th Cir. 2018) ....................................................................... 48

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952) .................................................................................... 12

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................ 11, 12, 13, 14

*Holmes v. United States*,
    657 F.3d 1303 (Fed. Cir. 2011) .................................................................... 43

*I.N.S. v. Legalization Assistance Project*,
    510 U.S. 1301 (1993) .................................................................................. 24

*Innovation Law Lab v. McAleenan*,
    924 F.3d 503 (9th Cir. 2019) ................................................... 16, 18, 21, 37

*Innovation Law Lab v. Wolf*,
    951 F.3d 1073 (9th Cir. 2020) ....................................................................... 3

*Jama v. Immigr. & Customs*,
    *Enf't*, 543 U.S. 335 (2005) ...................................................... 11, 17, 37

*Jean v. Nelson*,
    727 F.2d 957 (11th Cir. 1984) ............................................................ 38

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018).................................................... 18, 36, 37, 38

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
    335 F.3d 357 (5th Cir. 2003) ............................................................ 4

*Kiobel v. Royal Dutch Petroleum*,
    569 U.S. 108 (2013)............................................................ 47

*Knauff v. Shaughnessy*,
    338 U.S. 537 (1950)........................................................ 2, 12

*Kucana v. Holder*,
    558 U.S. 233 (2010)............................................................ 22

*Lane v. Pena*,
    518 U.S. 187 (1996)............................................................ 42

*Liberty Ammunition, Inc. v. United States*,
    835 F.3d 1388 (Fed. Cir. 2016) ...................................................... 45

*Lincoln v. Vigil*,
    508 U.S. 182 (1993)............................................................ 11

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973)............................................................ 10

*Loa-Herrera v. Trominski*,
    231 F.3d 984 (5th Cir. 2000) ..................................................... 22, 39

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983).............................................................. 7

*Louisiana State v. Army Corps of Engineers*,
    834 F.3d 574 (5th Cir. 2016) ...................................................... 19

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)......................................................... 6, 40

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994)............................................................ 50

*Maldonado v. Macias*,
    150 F. Supp. 3d 788 (W.D. Tex. 2015)............................................................. 38, 39

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923)..................................................................................... 10

*Mathews v. Diaz*,
    426 U.S. 67 (1976)..................................................................................... 13, 47

*Matter of E-R-M- & L-R-M-*,
    25 I. & N. Dec. 520 (BIA 2011) ...................................................................... 2

*Merrion v. Jicarilla Apache Tribe*,
    455 U.S. 130 (1982)..................................................................................... 44

*Mississippi v. Johnson*,
    71 U.S. 475 (1866)..................................................................................... 40, 41

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................................. 33, 34, 36

*N.L.R.B. v. Bell Aerospace Co. Div. of Textron*,
    416 U.S. 267 (1974)..................................................................................... 29, 31

*Nat'l Ass'n of Home Builders v. E.P.A.*,
    682 F.3d 1032 (D.C. Cir. 2012)....................................................................... 35, 36

*Nat'l Min. Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014)........................................................................ 17

*Neb. Pub. Power Dist. v. United States*,
    590 F.3d 1357 (Fed. Cir. 2010)....................................................................... 43

*New Jersey v. United States*,
    91 F.3d 463 (3d Cir. 1996)............................................................................ 47

*Nken v. Holder*,
    556 U.S. 418 (2009)..................................................................................... 47

*Norton v. S. Utah Wilderness, All.*,
    *All.*, 542 U.S. 55 (2004) ............................................................................ 41, 49

*O'Shea v. Littleton*,
    414 U.S. 488 (1974)..................................................................................... 7

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ................................................................................................. 24

*Perales v. Casillas*,
    903 F.2d 1043 (5th Cir. 1990) ................................................................................ 14

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ................................................................................................... 30

*Plyler v. Doe*,
    457 U.S. 202 (1982) ................................................................................................. 47

*Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*,
    400 U.S. 62 (1970) ................................................................................................... 19

*Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*,
    324 F.3d 726 (D.C. Cir. 2003) ................................................................................ 19

*Renal Physicians Ass'n v. U.S. HHS*,
    489 F.3d 1267 (D.C. Cir. 2007) ................................................................................ 9

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ............................................................................ 12, 20, 21, 46

*Ring Precisions, Inc. v. Jones*,
    722 F.3d 711 (5th Cir. 2013) .................................................................................. 35

*Sanders v. United States*,
    252 F.3d 1329 (Fed. Cir. 2001) .............................................................................. 42

*Simmat v. U.S. Bureau of Prisons*,
    413 F.3d 1225 (10th Cir. 2005) .............................................................................. 39

*Stone v. Mississippi*,
    101 U.S. 814 (1880) ................................................................................................. 44

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*,
    480 F.3d 1116 (Fed. Cir. 2007) .............................................................................. 42

*Sugar Cane Growers Coop. v. Veneman*,
    289 F.3d 89 (D.C. Cir. 2002) ................................................................................... 47

*Sure-Tan, Inc. v. NLRB*,
    467 U.S. 883 (1984) .......................................................................................... 10, 24

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) .................................................................................. 5

*Sw. Elec. Power Co. v. EPA,*
  920 F.3d 999 (5th Cir. 2019) ........................................................ 24, 25, 26

*Syncor Int'l Corp. v. Shalala,*
  127 F.3d 90 (D.C. Cir. 1997) .................................................................. 16

*Tex. Oil & Gas Ass'n v. EPA,*
  161 F.3d 923 (5th Cir. 1998) ............................................................. 24, 29

*Texas v. California,*
  No. 19-1019, 2021 WL 2459255 (U.S. June 17, 2021) ......................... 6, 8

*Texas v. Equal Emp. Opportunity Comm'n,*
  933 F.3d 433 (5th Cir. 2019) ............................................................. 16, 17

*Texas v. United States,*
  106 F.3d 661 (5th Cir. 1997) ............................................................. 13, 41

*Texas v. United States,*
  328 F. Supp. 3d 662 (S.D. Tex. 2018) .................................................... 18

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) ......................................................... passim

*Texas v. United States,*
  --- F. Supp. 3d ---, 2021 WL 2096669 ................................................... 10

*Texas v. United States,*
  No. 6:21-CV-00003, 2021 WL 247877 (S.D. Tex. Jan. 26, 2021)........... 21

*Thompson v. N. Am. Stainless, LP,*
  562 U.S. 170 (2011).................................................................................. 22

*DHS v. Thuraissigiam,*
  140 S. Ct. 1959 (2020).............................................................................. 2

*Total Med. Mgmt., Inc. v. United States,*
  104 F.3d 1314 (Fed. Cir. 1997)................................................................ 46

*Town of Castle Rock v. Gonzales,*
  545 U.S. 748 (2005).................................................................................. 12

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision*,
    967 F.2d 598 (D.C. Cir. 1992) ................................................................ 43

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) .............................................................. 13, 14, 50

*Trump v. IRAP*,
    137 S. Ct. 2080 (2017) ........................................................................ 49

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
    136 F.3d 641 (9th Cir. 1998) ............................................................... 43

*U.S. Telecom Ass'n v. F.C.C.*,
    359 F.3d 554 (D.C. Cir. 2004) ............................................................. 45

*U.S. Trust Co. of N.Y. v. New Jersey*,
    431 U.S. 1 (1977) ........................................................................... 43, 44

*United States Dep't of Def. v. Meinhold*,
    510 U.S. 939 (1993) ............................................................................ 49

*United States v. Fausto*,
    484 U.S. 439 (1988) ....................................................................... 20, 21

*United States v. Jeong*,
    624 F.3d 706 (5th Cir. 2010) ............................................................... 40

*United States v. Jones*,
    131 U.S. 1 (1889) ............................................................................... 42

*United States v. King*,
    395 U.S. 1 (1969) ............................................................................... 43

*United States v. Penn. Indus. Chem. Corp.*,
    411 U.S. 655 (1973) ....................................................................... 30, 31

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996) ............................................................................ 42

*University of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ............................................................................ 50

*Valley v. Rapides Parish Sch. Bd.*,
    118 F.3d 1047 (5th Cir. 1997) ............................................................. 46

*Vazquez Perez v. Decker*,
  No. 18-CV-10683, 2019 WL 4784950 (S.D.N.Y. Sept. 30, 2019)......................................... 48

*Washington v. Trump*,
  302 F. Supp. 3d 127 (D.D.C. 2018) ................................................................. 40

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)................................................................................ 46

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).............................................................................. 4, 5

**Statutes**

5 U.S.C. § 701(a)(1) ....................................................................... 20

5 U.S.C. § 701(a)(2) .................................................................. 11, 13

5 U.S.C. § 702 ...................................................................... 22, 42, 43

5 U.S.C. § 704 ......................................................................... 15, 42

5 U.S.C. § 706 ......................................................................... 26, 49

6 U.S.C. § 361(b)(4) ......................................................................... 45

8 U.S.C. § 1103(a)(3) ........................................................................ 45

8 U.S.C. § 1182(d)(5)(A) .................................................................... 2, 37

8 U.S.C. § 1225 ............................................................................ 2, 35

8 U.S.C. § 1225(b)(1) ............................................................................ 2

8 U.S.C. § 1225(b)(2)(A) ............................................................... 18, 37, 38

8 U.S.C. § 1225(b)(2)(C) ................................................................ passim

8 U.S.C. § 1252(f)(1) ........................................................................ 48

8 U.S.C. § 1252(g) ........................................................................... 21

8 U.S.C. §§ 1226(e) .......................................................................... 20

28 U.S.C. § 1346(a)(2) ....................................................................... 42

## INTRODUCTION

This Court should deny Plaintiffs' request for a preliminary injunction setting aside a June 1, 2021 memorandum terminating the Migrant Protection Protocols ("MPP"), a program implementing the Secretary of the Department of Homeland Security's ("DHS") discretionary enforcement authority under 8 U.S.C. § 1225(b)(2)(C) to return certain noncitizens to Canada or Mexico pending a removal proceeding. Plaintiffs, the States of Texas and Missouri, cannot meet the high burden for a preliminary injunction requiring DHS to restart an entirely discretionary program, and this Court should reject the States' attempt to restrain an agency decision that Congress explicitly made discretionary by statute.

*First*, the States cannot demonstrate standing to challenge the termination of MPP based on speculative assertions about anticipated results that are not supported by the record, or are based on actions of third parties. *Second*, Plaintiffs' claims under the Administrative Procedure Act ("APA") are not reviewable because MPP was a discretionary program implementing DHS's discretionary statutory enforcement authority, and the decision to end it is not a reviewable final agency action. To the extent Plaintiffs claim that the June 1 memorandum is inconsistent with provisions of the Immigration and Nationality Act ("INA"), States cannot raise a claim under the APA based on the INA. *Third*, even if the Court could hear Plaintiffs' claims that terminating MPP violates the APA, § 1225, the Take Care Clause, and a purported agreement with Texas, the States fail to state any claim on which they can succeed on the merits. *Fourth*, all the remaining factors weigh strongly against granting a preliminary injunction requiring DHS to implement this discretionary program. Finally, even if the States could satisfy the requirements for a preliminary injunction, Congress has limited injunctive relief in this context, and basic principles of equity and administrative law require that any relief be sharply limited.

Plaintiffs cannot establish any legal basis to enjoin discretionary agency choices,

1

particularly complex immigration questions related to managing the border, responding to the COVID-19 pandemic, or foreign relations and the management of regional migration. In short, these complex decisions should be left to the discretion and expertise of the agency. Accordingly, this Court should refuse Plaintiffs' extraordinary request for a preliminary injunction.

## **BACKGROUND**

The Executive Branch has broad constitutional and statutory power to determine who may enter the country, and on what terms. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950). The Executive Branch also has authority and prosecutorial discretion to prioritize which noncitizens to remove, and through what type of enforcement proceedings. *See Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 523 (BIA 2011). In 8 U.S.C. § 1225, Congress delegated to the Executive Branch the authority and discretion to manage the flow of noncitizens arriving in the United States.[1] First, Congress has authorized DHS to initiate expedited removal proceedings in 8 U.S.C. § 1225(b)(1). Under that provision, an "applicant for admission" to the United States who lacks valid entry documentation or misrepresents his identity shall be "removed from the United States without further hearing or review unless" he "indicates either an intention to apply for asylum ... or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i). Alternatively, Congress has provided that DHS can place an applicant who is seeking admission into removal proceedings before an immigration judge under 8 U.S.C. § 1229a, and shall detain the noncitizen pending such proceedings if he is not "clearly and beyond a doubt entitled to be admitted." *Id.* § 1225(b)(2)(A). Congress also provided DHS with various alternatives to detention. Among other things, (1) DHS may release applicants for admission on parole "for urgent humanitarian reasons or significant public benefit," 8 U.S.C. § 1182(d)(5)(A), or, as most relevant here, (2) "[i]n the case of an alien described in

---

[1] Section 1225 refers to the Attorney General, but those functions have been transferred to the Secretary of Homeland Security. *See DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1965 n.3 (2020).

[§ 1225(b)(2)(A)] who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the [Secretary of Homeland Security] may return the alien to that territory pending a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(C).

In December 2018, then-Secretary Kirstjen Nielsen announced that DHS would "begin implementation of" the contiguous-territory-return authority in § 1225(b)(2)(C), 84 Fed. Reg. 6811 (Feb. 28, 2019), one of many discretionary enforcement authorities available to DHS in prioritizing enforcement of the immigration laws. Secretary Nielsen issued policy guidance implementing MPP on January 25, 2019. *See* ECF No. 61, Administrative Record ("AR"), at 151. Under MPP, it was DHS policy that certain "citizens and nationals of countries other than Mexico … arriving in the United States by land from Mexico—illegally or without proper documentation—may be returned to Mexico pursuant to" § 1225(b)(2)(C) "for the duration of their Section [1229a] removal proceedings." *Id*. If an immigration officer determined that a noncitizen was eligible for return to Mexico and that MPP should be applied, the person would be issued a Notice to Appear ("NTA") and placed into § 1229a removal proceedings, and then transferred to Mexico to await those proceedings. *Id*.; AR490-91.

MPP was temporarily enjoined in connection with legal challenges to the program, though the injunction was later stayed. *See Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1077-80, 1095 (9th Cir. 2020) (setting out history of initial challenges to MPP). After March 2020, when the Centers for Disease Control issued an order temporarily suspending entry of certain individuals traveling from Canada or Mexico in response to the COVID-19 pandemic, MPP enrollments began to decline. *See Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease*

*Exists*, 85 Fed. Reg. 17060-02, 2020 WL 1445906 (March 26, 2020); AR3, 6, 466.

Upon President Biden taking office on January 20, 2021, the Acting Secretary directed that DHS would "suspend new enrollments in [MPP], pending further review of the program." AR581. President Biden subsequently issued an Executive Order directing DHS to "promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subjected to MPP for further processing of their asylum claims," and "to promptly review and determine whether to terminate or modify the program known as [MPP]." *See* Executive Order 14010, 86 Fed. Reg. 8267, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border (Feb 2, 2021); AR584; *see also* AR587. On June 1, 2021, the Secretary announced that DHS had completed its review and issued a memorandum that terminated MPP, and rescinded the January 20, 2021 memorandum suspending new enrollments into MPP and the January 25, 2019 memorandum creating MPP. AR1-7.

## ARGUMENT

A "preliminary injunction is an extraordinary remedy which should only be granted if" Plaintiffs have "clearly carried the burden of persuasion on all four requirements." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003). To obtain a preliminary injunction, Plaintiffs must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Plaintiffs cannot meet this standard.

I.      **This Court lacks jurisdiction to grant the preliminary injunction Plaintiffs seek.**

A.  **Texas and Missouri cannot demonstrate standing, let alone irreparable harm, traceable to the termination of MPP.**

The States assert standing based on speculation that terminating MPP "will lead to additional illegal aliens being present in the Plaintiff States," and increase expenditures for social services, driver's licenses, and human trafficking programs. Mot. 18. But they have not shown that noncitizens who are not subject to MPP will be paroled into the United States and will use those services, have not identified a non-speculative injury-in-fact, and cannot demonstrate causation or redressability based on actions of third parties in response to the termination of MPP. "[T]he states have the burden of establishing standing," *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015), by showing "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). The injury must be "certainly impending"—"*possible* future injury" is not sufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2014). Plaintiffs cannot satisfy this standard for multiple reasons.

First, Plaintiffs fail to allege a cognizable, non-speculative injury in fact. The States contend that terminating "MPP will lead to additional illegal aliens being present in Texas and Missouri." Mot. 21. Most of their allegations—increased driver's license costs, public education, and healthcare costs—rest on this assumption. *Id.* at 21-25. But Plaintiffs cannot show that terminating MPP will increase illegal immigration. *See id.* at 21 (asserting only that Texas is a border state and that 56 of 1,000 noncitizens unlawfully present end up in Missouri). Indeed, since March 2020, expulsions under Title 42 in response to COVID-19 have overtaken immigration enforcement actions under Title 8, like MPP returns under § 1225(b)(2)(C). *See* U.S. Border Patrol Monthly Enforcement Encounters 2020: Title 42 Expulsions and Title 8 Apprehensions (Nov. 20,

2020), https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics-fy2020 (showing Title 8 apprehensions on Southwest Border dropped to approximately 1,000-6,000 a month in light of increase in Title 42 expulsions from roughly 7,000 in March 2020 to roughly 48,000 in September 2020); Monthly Enforcement Encounters 2021 (May 11, 2021), https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics (showing bulk of enforcement encounters in FY 2021 have been Title 42 expulsions). Given the significant decline in MPP enrollments prior to January 2021, it is purely speculative to conclude that terminating MPP will increase migration or have a non-negligible effect on states. *See* Southwest Border Enrollments in MPP, Migrant Protection Protocols FY2021, U.S. Customs and Border Protection, https://www.cbp.gov/newsroom/stats/migrant-protection-protocols (last visited May 31, 2021); *see also Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015) (rejecting argument that announcement of immigration policy changes led to immigration surge); *see also* AR664, 669 (showing border encounters dramatically *increased* in the months after MPP was announced).

Second, Plaintiffs fail to show that any of the alleged harms, based on third-party actions and likely influenced by multiple factors, would be fairly traceable to terminating MPP. "[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party … 'standing is not precluded, but it is ordinarily 'substantially more difficult' to establish.'" *Texas v. California*, No. 19-1019, 2021 WL 2459255, at *7 (U.S. June 17, 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). A "state official has not suffered an injury in fact to a legally cognizable interest" when "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources" because this is simply a generalized grievance that would improperly "permit nearly all state officials to challenge a host of Federal laws." *Arpaio v. Obama*, 27 F. Supp.

3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015). Generalized information showing "*illegal immigration* is costing the state money" is thus insufficient to confer standing. *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015). Without "concrete evidence" that state "costs had increased or will increase as a result" of a particular action, the alleged injury is "purely speculative," *id.*, and there is no traceability if the "record reveals only speculation about the complex decisions made by non-citizens" "before they risked life and limb to come here," *Arpaio*, 797 F.3d at 20. "While immigration policies might have played into that calculus, so, too, might the myriad economic, social, and political realities in the United States and in foreign nations." *Id*. The Supreme Court has "rejected theories that rest on speculation about the decisions of independent actors," *Clapper*, 568 U.S. at 414, and standing based on speculative future unlawful conduct, *Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). The States' alleged human-trafficking harms are similarly speculative and not fairly traceable to the federal government's actions—the government is plainly not seeking to encourage criminal activity, *see* AR6, 588, and there is no reasonable dispute that DHS is not directly encouraging trafficking or other criminal activity. Even if the Court were to "assume" that a policy change "increase[s] unlawful immigration," it "cannot further infer that [it] increase[s] crime." *Arpaio*, 797 F.3d at 22; *see O'Shea v. Littleton*, 414 U.S. 488, 497 (1974); *Clapper*, 568 U.S. at 414; *Lyons*, 461 U.S. at 105.[2]

Plaintiffs do not point to any specific fiscal injuries from the *termination of MPP*, as opposed to generalized concerns about illegal immigration. They allege only that 56 of every 1,000 noncitizens reside in Missouri, Mot. 21, noncitizens may apply for driver's licenses, attend school, or receive healthcare, *id.* 22-24, and that they may need to spend money combatting illegal activity,

---

[2] Evidence in the record also shows that criminal activity along the border increased while MPP was in effect, AR374, 422, 589, 614, undermining the assertion that ending MPP will increase trafficking or other criminal activity.

*id.* 25-27. The Supreme Court just rejected Texas and Missouri's similar allegations of standing based on declarations claiming that the Affordable Care Act's individual mandate cost the States money in administering their health care systems because they failed to trace any increased costs to the specific portion of the law at issue. *California v. Texas*, --- S. Ct. ---, 2021 WL 2459255, at *8 (2021). The Supreme Court emphasized that any increased costs could not be traced to the challenged provision where other factors likely motivated individual decisions to obtain health insurance. *Id.* at *9 Plaintiffs' allegations here are no more specifically tied to the termination of MPP than their allegations were tied to the provision they challenged in that case. For instance, Missouri's citation to 2016 data that 56 out of every 1,000 noncitizens reside in Missouri, Mot. 21, but cite nothing indicating additional noncitizens would enter Missouri without MPP, and it would be pure speculation to assume a meaningful number would be school-aged children, seek driver's licenses, or sign up for healthcare.

Meanwhile, Texas bases its driver's-license rationale on the speculation that: "*[i]f* Defendants' termination of MPP results in tens of thousands of additional aliens seeking licenses" it would "cost Texas millions of dollars." Mot. 22 (emphasis added); *see* App.427-28 (estimating state would need to hire new staff "[f]or every 10,000 additional customers above the 10,000-customer threshold"). But there is no basis to conclude that an additional 10,000 noncitizens would settle in Texas without MPP, much less apply for driver's licenses. *Texas v. United States* is distinguishable because the Fifth Circuit held that "DAPA would be the primary cause and likely the only one" of Texas's increased driver's license expenses because it would confer eligibility for those licenses to otherwise ineligible "unlawfully present aliens," 809 F.3d at 149, 155, 160, and the court held that Texas had shown that "DAPA would have a major effect on the states' fiscs." 809 F.3d at 152. Here, Plaintiffs have not shown increased costs since new MPP enrollments were

suspended. The States cite the Fifth Circuit's "special solicitude" jurisprudence, Mot. 21, but even under that unduly broad standard with which the government disagrees, a state cannot predicate standing on limited expenditures: "it would be difficult to establish standing to challenge a grant of asylum to a single alien based on the driver's-license theory." *Texas*, 809 F.3d at 162-63. A state's "'quasi-sovereign' interest" is not harmed sufficiently to confer standing if an increase in population would not require it to "hire employees, purchase equipment, and obtain office space" or "impose little pressure to change state law." *Id.*[3]

Third, the States do not show that the injunction they seek will redress their alleged harms. Reinstating MPP would not *require* DHS to return anyone to Mexico; it would merely authorize line-level officers to do so in their discretion. Moreover, Plaintiffs make no attempt to show that an injunction would result in a decrease in crime levels in their States, or the number of noncitizens who use healthcare or education resources. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006) (finding "redressability [that] requires speculat[ion]" insufficient). As the D.C. Circuit explained in a similar case, where "the undoing of the [challenged] governmental action will not undo the harm" because the alleged harm is caused "by other forces," the claims are not redressable. *Renal Physicians Ass'n v. U.S. HHS*, 489 F.3d 1267, 1276 (D.C. Cir. 2007); *see Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1296 (D.C. Cir. 2015). Plaintiffs cannot show that reinstating MPP would resolve their alleged harms. Texas claims harm from "detaining criminal aliens," Mot. 25, but cannot show a direct connection between terminating MPP, a consequent rise in crime by noncitizens, and an increased need to detain individuals who would not otherwise be in its custody.

---

[3] Plaintiffs' assertion that "a loss of even a small amount of money is ordinarily an 'injury'" does not square with the Fifth Circuit's holding in *Texas*, 809 F.3d 134, which recognized that states lack standing to challenge minimal financial harms. *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017), is distinguishable because it involved a direct injury in the context of bankruptcy litigation, rather than the nebulous, attenuated harms asserted here.

Unlike Texas's challenge to policies related to removal of noncitizens who have already been convicted of crimes, where standing was based on a showing of "unanticipated costs it would incur by having to detain aliens who have been convicted of a crime ... who would otherwise be removed but for the 100-day pause," *Texas v. United States*, --- F. Supp. 3d ---, 2021 WL 2096669, at *12, its theory of standing here is far more attenuated, based both on speculation that additional noncitizens will enter Texas and also that they will necessarily commit crimes, *see Arpaio*, 797 F.3d at 22 ("At base, [plaintiff's] contention is that more immigrants mean more crime. ... [b]ut the reality is that crime is notoriously difficult to predict" and "affected by numerous factors."). Moreover, to the extent the States argue for *parens patriae* standing to sue based on speculative concern for "distorted labor markets," Mot. 27, states have no *parens patriae* standing against the federal government. *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 (1982); *see also Arizona v. United States*, 567 U.S. 387, 394 (2012) (discussing how the federal government has "broad, undoubted power over the ... status of aliens"); *Texas*, 809 F.3d at 150 (not considering *parens patriae* standing).[4]

In sum, the States' standing allegations are speculative, their alleged harms are not fairly traceable to the termination of MPP, and they have not shown that setting aside the June 1 memorandum would redress their alleged harms. Therefore, they lack standing.

## II.      Plaintiffs cannot succeed on the merits of any of their claims.

### A.      Plaintiffs' APA claims are not reviewable

Even if Plaintiffs had standing, they still could not raise APA claims. The APA does not

---

[4] States similarly have "no judicially cognizable interest in procuring enforcement of the immigration laws" against someone else. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984). Parties generally lack standing to challenge the government's provision (or denial) of benefits to a third party, *see DaimlerChrysler Corp*, 547 U.S. at 342-46, or "standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution," *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).

permit review of actions that are committed to agency discretion, limits review to final agency actions, and does not provide a cause of action for States to raise claims based on the INA.

The challenged action is committed to agency discretion. The APA precludes review "of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Texas*, 809 F.3d at 165 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); *see* 5 U.S.C. § 701(a)(2). Whether and how to use the contiguous-territory-return authority is a textbook example of a wholly discretionary decision that is not subject to judicial review. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

First, Congress was clear that the statutory authority for MPP is entirely discretionary: "In the case of an alien described in subparagraph (A) [*i.e.*, not clearly and beyond a doubt entitled to admission] who is arriving on land … from a foreign territory contiguous to the United States, [DHS] *may* return the alien to that territory pending a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(C) (emphasis added). Congress's use of the term "may" confers discretion on DHS to choose whether to return noncitizens to contiguous countries, and the statute offers no criteria or standard for when the government must or should employ that discretion. *See Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 346 (2005) ("The word 'may' customarily connotes discretion."); *see also Heckler*, 470 U.S. at 831. This unbounded discretion distinguishes this case from cases where APA review was permitted because a statute provided "clear and specific directives" governing agency conduct by using the term "shall." *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 411 (1971). [5]

---

[5] The Fifth Circuit has noted that agency decisions are "completely unreviewable under the 'committed to agency discretion by law' exception" if "the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised." *Texas*, 809 F.3d at 168. Section 1225 fits these circumstances as no other provision

Second, even if Congress had not explicitly committed use of this authority to DHS's discretion in the statute, deciding whether to engage in this type of immigration enforcement falls within the traditional scope of actions committed to agency discretion. Executive "[r]efusals to take enforcement steps" are presumptively not subject to review because deciding whether to enforce a law in particular instances "involves a complicated balancing of a number of factors which are peculiarly within [the Executive's] expertise," including "whether agency resources are best spent on this violation or another" and "whether the particular enforcement action requested best fits the agency's overall policies." *Heckler*, 470 U.S. at 831. These exercises of prosecutorial discretion are inherent to the Executive power that the Constitution confers on the President, and are especially important in the immigration context. "[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). A "principal feature of the removal system," therefore, "is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396; *see also Shaughnessy*, 338 U.S. at 543 (emphasizing Executive's broad discretion over "decisions[s] to admit or to exclude an alien" and that such discretion is particularly important in the immigration context where "flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program"). The Executive must consider a host of issues not present even in ordinary enforcement decisions,

---

directs or even references how the authority in § 1225(b)(2)(C) used to create MPP should be exercised. Moreover, courts have held that even statutory provisions that use "shall" or other mandatory language can still implicate unreviewable agency discretion. *See, e.g.*, *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) (the "deep-rooted nature of law-enforcement discretion" persists "even in the presence of seemingly mandatory commands"); *Crane*, 783 F.3d at 247 (explaining that "the concerns justifying criminal prosecutorial discretion are 'greatly magnified in the deportation context'" (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.* ("AADC"), 525 U.S. 471, 490 (1999)).

such as the "dynamic nature of relations with other countries" and the need for enforcement policies to be "consistent with this Nation's foreign policy with respect to these and other realities." *Id.* at 397. "Because decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2418-19 (2018) (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)). It is no surprise then that Congress has specifically empowered the Executive to exercise broad discretion in this field.

The discretionary nature of the challenged conduct and its inextricable connection to sensitive foreign policy determinations precludes any APA claim; the statute "commits enforcement of the INA to" the agency's "discretion," and the exercise of that discretion "is not subject to judicial review." *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997); *see Chaney*, 470 U.S. at 831; 5 U.S.C. § 701(a)(2). In this case, the Secretary exercised both his explicit statutory discretion whether to invoke § 1225(b)(2)(C)'s return authority and inherent nonenforcement authority to cease conducting returns under MPP based on its impact on border management and communities, burdens on border security personnel and resources, foreign relations, and other considerations discussed further below. The decision whether to return noncitizens under § 1225(b)(2)(C) requires careful balancing of many competing priorities, as Plaintiffs concede. Mot. 11-12 (discussing various domestic factors DHS might consider in its decision to pursue MPP); *see also* Gov't App. 2-8. The statute "provides absolutely no guidance as to how that" balance is to be struck and "discretion is to be exercised," *Texas*, 809 F.3d at 168; *see also Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990); *Heckler*, 470 U.S. at 830 (no basis for review "if no judicially manageable standards are available for judging how and when an

agency should exercise its discretion"). And this exercise of discretion necessarily impacts foreign relations with countries to which noncitizens are returned under MPP, *see Arizona*, 567 U.S. at 396, which falls outside the judiciary's expertise and is more appropriately assessed by the Executive Branch, *see Hawaii*, 138 S. Ct. at 2418-19. *See* Gov't App. 1, ¶¶ 2-10, 13-16, 18; App. 12, ¶¶ 4-18.

To the extent Plaintiffs rely on *Texas*, the Fifth Circuit recognized that decisions not to take enforcement actions in the immigration realm are *presumptively* discretionary decisions not subject to APA review. *Texas* rejected the application of this bar to review only because it held that deferred action "is much more than nonenforcement: It would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens." 809 F.3d at 166. Plaintiffs do not and cannot claim that a decision not to invoke MPP confers lawful presence or any associated benefits on noncitizens who might otherwise be placed in MPP, as they still face removal if they do not receive relief through the immigration process. Nor is Plaintiffs reliance on *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020), correct. There, the Supreme Court recognized that generally, "when an agency refuses to act there is no action to provide a focus for judicial review," but held that the agency memorandum rescinding the deferred action program *was* subject to judicial review because that rescission was "not simply a non-enforcement policy," such as is at issue here. 140 S. Ct. at 1906 (internal quotation marks and citation omitted). Rather, that rescission created a process of "adjudications" by which noncitizens who met certain criteria could receive a period of forbearance. *Id*. As a result, that rescission memorandum did "not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration relief." 140 S. Ct. at 1906. In contrast, terminating MPP is at most a simple nonenforcement action that is committed to agency discretion.

Plaintiffs nevertheless contend that terminating MPP is not simply a nonenforcement policy, but they do not explain how doing so creates the type of affirmative immigration benefit or lawful status that *Texas* and *Regents* held allowed for review. *See* Mot. 29-30.[6] Terminating MPP does not create any affirmative benefit or status, nor does it limit DHS's authority to continue to return eligible noncitizens to contiguous countries under § 1225(b)(2)(C), as it did before MPP. AR2. Plaintiffs also argue that there is a meaningful standard by which to judge the agency's discretion, but they do not—because they cannot—cite or explain what that standard would be. Mot. 30. Accordingly, because the decision whether to invoke the return authority in § 1225(b)(2)(C) is committed to agency discretion, it is unreviewable under the APA.

The June 1 memorandum is not final agency action. To state an APA claim, Plaintiffs must challenge "final" agency action, 5 U.S.C. § 704, and agency action is "final" under the APA only if it both "consummate[es] the agency's decisionmaking process" and also determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

At the threshold, the January 2019 memorandum creating MPP and the June 1 memorandum that rescinds it, are both general statements of policy and, by definition, not final agency actions. "A substantive rule constitutes a binding final agency action and is reviewable," while a "general statement of policy, on the other hand, … is not a 'final agency action,' rendering it unreviewable." *Cohen v. United States*, 578 F.3d 1, 6 (D.C. Cir. 2009*), reh'g en banc granted in part, opinion vacated in part*, 599 F.3d 652 (D.C. Cir. 2010), *and on reh'g en banc in part*, 650 F.3d 717 (D.C. Cir. 2011), *cited by Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 441

---

[6] Plaintiffs assert "allowing aliens without credible claims of asylum to skip their court dates, remain in the country unlawfully, and escape removal is not 'committed to agency discretion by law.'" Mot. at 29. This framing is inaccurate and unsupported: Plaintiffs challenge the termination of MPP, and there is no evidence in the record that doing so allows "aliens without credible claims" to "skip their court dates, remain in the country unlawfully, and escape removal." *Id*.

(5th Cir. 2019). "By issuing a policy statement, an agency simply lets the public know its current enforcement or adjudicatory approach" and the "agency retains the discretion and the authority to change its position—even abruptly." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). "[B]ecause [under MPP] immigration officers designate applicants for return on a discretionary case-by-case basis," "MPP qualifies as a general statement of policy." *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 509 (9th Cir. 2019); *see Cruz v. DHS*, No. 19-CV-2727, 2019 WL 8139805, at *6 (D.D.C. Nov. 21, 2019) (similar). The memorandum implementing MPP merely stated an approach to implementing the discretionary authority in § 1225(b)(2)(C) but did not itself bind DHS to any particular course with respect to any individual or class of noncitizens— those binding determinations were still made in individual officials' decisions whether to return a particular noncitizen. *See Innovation Law Lab*, 924 F.3d at 508. Because the announcement of MPP was only a general statement of policy, *see id.*, *a fortiori*, revoking that announcement and ending MPP's particular approach to implementing § 1225(b)(2)(C) is also a general statement of policy, and, therefore, not a reviewable final agency action. *See Syncor Int'l Corp.*, 127 F.3d at 94. The June 1 memorandum terminating MPP does not eliminate DHS's discretion with regard to how it may otherwise implement the return authority under § 1225(b)(2)(C) in the future, including where appropriate on an *ad hoc* basis. AR2. *See Texas,* 933 F.3d at 441.

The June 1 memorandum expressly precludes any such effect, stating it "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person." AR7; *see also id.* ("The termination of MPP does not impact the status of individuals who were enrolled in MPP at any stage of their proceedings before EOIR or the phased entry process describe above."). It thus does not create any right for anyone

to enter or remain in the United States, or obtain any immigration benefit. And it is textbook law that a "statement of policy" like this is not "final agency action" unless and until it is applied "in a particular situation" to a regulated entity. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (Kavanaugh, J.); *Equal Emp. Opportunity Comm'n*, 933 F.3d at 441 (similar).

Further, contrary to Plaintiffs' assertion, Mot. 27, the memorandum does not impose any new legal obligations on the agency or noncitizens. As explained, and as Plaintiffs concede, Mot. 17 (conceding that "the INA does not mandate the creation of MPP," and employing the statutory return authority "is, by definition, optional"), DHS has unfettered discretion over whether and when to return noncitizens to contiguous countries under § 1225(b)(2)(C), and whether to do so with all eligible noncitizens, some, or none at all. Terminating one exercise of that discretion does not legally obligate or bind the agency with respect to its authority to use § 1225(b)(2)(C), or decline to do so, now or in the future. *See* 8 U.S.C. § 1225(b)(2)(C) (the agency "may return" the noncitizen); *Jama*, 543 U.S. at 346; AR2. Terminating MPP while not limiting the uses to which § 1252(b)(2)(C) may be put "leaves the agency the discretion and the authority to change its position ... in any specific case," such as its traditional *ad hoc* uses of the return authority, AR2, "and does not seek to impose or elaborate or interpret a legal norm," *i.e.*, the scope of authority afforded by § 1225(b)(2)(C). *Equal Emp. Opportunity Comm'n*, 933 F.3d at 442. The June 1 memorandum created no new obligations: DHS has the same discretion with respect to its statutory return authority as it had prior to June 1, 2021, and noncitizens may be returned on a case-by-case basis, as authorized by statute. *See* 8 U.S.C. § 1225(b)(2)(C).

Plaintiffs nevertheless contend that terminating MPP "immediately obligated [federal officials] to allow otherwise removable aliens to be released into the United States, where many will disappear, rather than enrolled in MPP," and that "[t]he June 1 Memorandum also relieves

illegal aliens from the prospect of being removed and thus constitutes a significant benefit to them." Mot. 30-31. Plaintiff's contention misrepresents the law. All noncitizens who otherwise would be eligible for MPP face potential removal and detention. Whether a noncitizen is returned to Mexico to pursue relief from removal, or does so within the United States, is a separate issue from whether the noncitizen is potentially removable and in removal proceedings—which is the case for all inadmissible or deportable noncitizens eligible for return under § 1225(b)(2)(C) and MPP. *See* 8 U.S.C. § 1225(b)(2)(A), (C); *Innovation Law Lab*, 924 F.3d at 509. Not enrolling a noncitizen in MPP also does not mean the individual will be released. For noncitizens to be eligible for return under § 1225(b)(2)(C), they must first have been placed into removal proceedings under § 1225(b)(2)(A), *see* 8 U.S.C. § 1225(b)(2)(C); *Innovation Law Lab*, 924 F.3d at 508-09, and these noncitizens can be, by the terms of that same statute, detained for the duration of their removal proceedings. *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) (citing 8 U.S.C. § 1182(d)(5)(A)). Plaintiffs' argument confuses DHS's prerogative to return certain noncitizens to Mexico during removal proceedings with separate questions related to a noncitizen's ability to obtain relief from removal or release into the United States pending that removal determination—questions on which the termination of MPP has absolutely no bearing.

Finally, even assuming "Plaintiffs will be obligated to provide social services to illegal aliens who remain unlawfully in the United States," Mot. 31, their presumption is causally and legally unrelated to the termination of MPP. Any such obligations are imposed by other federal or state laws, as the very precedent Plaintiffs cite indicates. *See Texas v. United States*, 328 F. Supp. 3d 662, 736 (S.D. Tex. 2018) (addressing Texas and other plaintiffs' "claim that they are paying millions of dollars annually to provide for uncompensated healthcare expenses and *other state-provided benefits*") (emphasis added)). The June 1 memorandum imposes no obligations or legal

consequences on Plaintiffs and, therefore, Plaintiffs' argument fails to show that it constitutes final agency action. Again, to be final, "the action must be one by which 'rights or obligations have been determined,'" or "'from which *legal* consequences will flow.'" *Bennett*, 520 U.S. at 178 (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)) (emphasis added). The possibility of incurring additional expenditures from other pre-existing legal obligations vis-a-vis noncitizens in their States are, at most, indirect practical consequences that do not constitute the requisite direct *legal* consequences to make terminating MPP a final agency action. *See Louisiana State v. Army Corps of Engineers*, 834 F.3d 574, 583 (5th Cir. 2016) (rejecting possibility of state incurring costly delay due to pressure from agency decision as indicating final agency action because "any such consequences are practical, as opposed to legal, ones") (citing *Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003) (distinguishing between practical and legal harms for purposes of APA review) and *Flue–Cured Tobacco Cooperative Stabilization Corp. v. EPA*, 313 F.3d 852, 859 (4th Cir. 2002) (noting that agency report "carrie[d] no legally binding authority" and "coercive pressures" produced by report were not "direct and appreciable legal consequences")). Nor does the June 1 memorandum create any civil or criminal liability for Plaintiffs, and "[j]udicially reviewable agency actions normally affect a regulated party's possible legal liability; these consequences tend to expose parties to civil or criminal liability for non-compliance with the agency's view of the law." *Louisiana State*, 834 F.3d at 583. Thus, the June 1 memorandum is not final agency action reviewable under the APA.

Plaintiffs lack a cause of action under the APA. Congress has made clear that only noncitizens may challenge immigration enforcement actions, precluding States from raising claims under the APA based on the INA. The APA does not provide a cause of action when another

"statute[] preclude[s] judicial review." 5 U.S.C. § 701(a)(1). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). A detailed review scheme that allows some parties, but not others, to challenge certain executive actions is "strong evidence that Congress intended to preclude [other parties] from obtaining judicial review." *United States v. Fausto*, 484 U.S. 439, 448 (1988). Judicial review of immigration enforcement decisions is subject to a carefully reticulated scheme; Congress has enacted many provisions "aimed at protecting the Executive's discretion from the courts." *AADC*, 525 U.S. at 486-87; *see* 8 U.S.C. §§ 1226(e); 1226a(b)(1); 1229c(f); 1231(h); 1252(a)(2)(A), (B), (C), (b)(4)(D), (b)(9), (d), (f), (g).

Congress in the INA created a detailed and limited path for judicial review of removal-related decisions for noncitizens placed in § 1229a removal proceedings that sets out exclusive procedures governing decisions related to whether they may be admitted to the United States, *id*., and specifically limits "[j]udicial review of all questions of law and fact" "arising from any action taken or proceeding" related to removal from the United States to the special review procedures provided for individual noncitizens to challenge such decisions, § 1252(b)(9). Plaintiffs cannot invoke this statutory review mechanism, which limits review to claims raised by individual noncitizens. *Id.*; *cf. Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (organizational plaintiff could not challenge INS policies "that bear on an alien's" removal). Congress's decision to allow noncitizens, but not States, to invoke these review mechanisms is "strong evidence that Congress intended to preclude" sovereign entities "from obtaining judicial review" of removal and detention decisions. *Fausto*, 484 U.S. at 448; *see Am. Immigr. Laws. Ass'n v. Reno*, 199 F.3d 1352, 1359–

60 (D.C. Cir. 2000) ("One cannot come away from reading [§ 1252(g)] without having the distinct impression that Congress meant to allow litigation challenging the new system by, and only by, aliens against whom the new procedures had been applied."); *AADC*, 525 U.S. at 482-83, 485 (explaining that § 1252(b)(9) sets out a "general jurisdictional limitation" channeling review of all "decisions and actions leading up to or consequent upon" removal into these specific review provisions).

Moreover, Congress also provided that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary] to commence proceedings." 8 U.S.C. § 1252(g). Contrary to Plaintiffs' conclusory contention, Mot. 29, deciding whether to return a noncitizen is properly considered an "action" that is part of DHS's "commence[ment] [of] proceedings" within the meaning of § 1252(g). Under MPP, in order to return a noncitizen to Mexico under § 1225(b)(2)(C), DHS first had to decide to use § 1225(b)(2)(A) to place into § 1229a removal proceedings noncitizens, some of whom "could otherwise have been placed in the more streamlined expedited removal process." *Innovation Law Lab*, 924 F.3d at 508. The decision to return is thus intertwined with the decision to commence proceedings. *See, e.g.*, *Gupta v. McGahey*, 709 F.3d 1062, 1065 (11th Cir. 2013).[7] Review of decisions to invoke the discretionary return authority in § 1225(b)(2)(C) is also barred by § 1252(a)(2)(B)(ii). Under that provision, "[n]otwithstanding any other provision of law," "no

---

[7] Plaintiffs' argument that they do not bring their action "on behalf of" any noncitizen and therefore § 1252(g) does not apply misses both points. Mot. 29; *accord Texas v. United States*, No. 6:21-CV-00003, 2021 WL 247877, at *3 (S.D. Tex. Jan. 26, 2021). Section 1252(g) does not apply directly here but rather provides statutory evidence that Congress intended to preclude a separate APA cause of action outside of its comprehensive immigration framework. *See Fausto*, 484 U.S. at 448. Further, that the States are not and do not represent noncitizens does not mean they have a cause of action where the statutory framework indicates that Congress did not intend for entities who are not affected noncitizens an avenue for APA review. *See Block*, 467 U.S. at 345.

court shall have jurisdiction to review . . . any other decision or action of the . . . Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the . . . Secretary." This provision applies when the relevant decision is "specified by statute to be in the discretion of the [Secretary]." *Kucana v. Holder*, 558 U.S. 233, 248 (2010). That is the case here. The Secretary "may return" certain noncitizens, § 1225(b)(2)(C), and the word "may" indicates such decisions are discretionary, implicating the bar to review in § 1252(a)(2)(B)(ii). *See Kucana*, 558 U.S. at 248. As the Fifth Circuit has held, if a decision is discretionary, neither the "discretionary judgment," nor "the manner in which that discretionary judgment is exercised," is "subject to review." *Loa-Herrera v. Trominski*, 231 F.3d 984, 991 & n.12 (5th Cir. 2000).[8]

The States also cannot raise APA claims based on § 1225(b) because States are not in the relevant zone of interests. The APA does not "allow suit by every person suffering injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987). It provides a cause of action only to one "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. A plaintiff "may not sue unless he falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint," *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177 (2011). Plaintiffs never argue that they are in the zone of interests of § 1225(b), though they base their claims on this statute, and nothing in § 1225(b) indicates that Congress intended States to be able to sue to enforce its provisions.

The States frame their interests in terms of the costs they speculate may result from entry of more noncitizens. Even if they could show that the June 1 memorandum had such an effect, however, an interest in a particular level of immigration does not bring Plaintiffs within the zone

---

[8] Plaintiffs do not directly challenge DHS's use of parole in this lawsuit, but if they did, § 1252(a)(2)(B)(ii) would similarly foreclose review of any claim that parole authority is being misused. *See infra*; *Loa-Herrera*, 231 F.3d at 991 & n.12.

of interests of the immigration statutes. In *Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*, 93 F.3d 897 (D.C. Cir. 1996), the D.C. Circuit rejected a similar claim by an organization that argued it was in the zone of interests of immigration statutes based on its "general interest in limiting immigration," and more specifically an "interest in limiting immigration to impacted regions," *id*. at 901. FAIR alleged primarily that the federal government's "scheme for parole" of arriving noncitizens violated statutory limits on parole authority and argued injury on the theory that "a rush of immigrants adversely affects the welfare of the Federation's members by generating unemployment and wage reductions and by placing burdens on public services such as hospitals and schools" in their area. *Id* at 900. The D.C. Circuit rejected that argument and held that FAIR was not within the zone of interests of the INA provisions on which its claims were based because there was nothing in the "language of the statutes on which it relies" nor the "legislative history that even hints at a concern about regional impact" of immigration, and to the extent they alleged a general "interest that legal residents throughout the United States may have in preventing immigration" and any resulting "stresses on the provision of government services," the "injury (if any)" "from admission of an alien is an injury common to the entire population, and for that reason seems particularly well-suited for redress in the political rather than the judicial sphere." *Id*. at 901.

Here, the States similarly allege a general interest in the government implementing immigration statutes in a particular way, and allege strain on public services and the labor market, but there is nothing in § 1225(b) that indicates Congress intended States could sue to enforce this statute or require it be implemented in a particular manner. "The immigration context suggests the comparative improbability of any congressional intent to embrace as suitable challengers in court all who successfully identify themselves as likely to suffer from the generic negative features of immigration." *FAIR*, 93 F.3d at 902. Even if Plaintiffs could show some marginal relationship

between immigration and increased costs to public services, "it cannot reasonably be assumed that Congress intended to permit [a] suit," where Plaintiffs' interests are, at best, "marginally related to" the purposes of the statutes they cite. *Patchak*, 567 U.S. at 225; *see also I.N.S. v. Legalization Assistance Project*, 510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in chambers) (explaining that "[t]he fact that the [immigration] regulation may affect the way an organization allocates its resources—or, for that matter, the way an employer who currently employs illegal aliens or a landlord who currently rents to illegal aliens allocates its resources—does not give standing to an entity which is not within the zone of interests the statute meant to protect"); *cf. Sure-Tan*, 467 U.S. at 897 (finding "no judicially cognizable interest in procuring enforcement of the immigration laws"). Because States are outside the zone of interests of § 1225(b), they cannot raise APA claims seeking review of DHS's implementation of § 1225(b).

###    B.    Plaintiffs' APA claims fail on the merits.

Even if the States could raise challenges to the June 1 memorandum, their APA claims would nonetheless fail on the merits. Plaintiffs argue that the memorandum is arbitrary and capricious because it did not adequately consider relevant factors, data, and possible alternatives, and lacks a reasoned analysis, *see* Mot. 10-16, but there is no merit to any of these assertions.

Review under the APA's arbitrary and capricious standard is "highly deferential," *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983), which "places a 'considerable burden' on the challenger to overcome the [agency's] chosen course of action." *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998). Indeed, "[i]f the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Id*. at 934; *see also Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). The June 1 memorandum easily meets this standard. Based on a careful consideration of, among other things, prior assessments of MPP and its performance compared to its intended goals,

the Secretary concluded that "MPP had mixed effectiveness in achieving several of its central goals and that the program experienced significant challenges." AR3; *see also* 192-203, 426-58, 468-487, 543-50, 589-621, 651-53. DHS considered possible alternatives, such as maintaining MPP or modifying it, and carefully weighed possible impacts of terminating MPP against steps the agency is taking that would mitigate any potential negative consequences, including diplomatic engagement with Mexico to, among other things, collaboratively address the root causes of migration, improve regional migration management, and expand cooperative efforts to combat smuggling and trafficking networks. AR5. And the agency fully explained its decision, noting that the Secretary, "having reviewed all relevant evidence and weighed the costs and benefits of either continuing MPP, modifying it in certain respects, or terminating it altogether," thereafter determined that, "on balance, any benefits of maintaining or now modifying MPP are far outweighed by the benefits of terminating the program." AR6. Further, the agency explained that "termination is most consistent with the Administration's broader policy objectives and the Department's operational needs," and that "[a]lternative options would not sufficiently address either consideration." *Id*. Nothing more is required.

Plaintiffs' contrary arguments are not persuasive. They argue that DHS ignored MPP's main purpose and benefits, which they assert was discouraging false asylum claims and discouraging those with such claims from traveling to the United States so the agency could "devote appropriate resources to individuals who are legitimately fleeing persecution." Mot. 11-12. They further argue that the memorandum does not adequately address prior DHS assessments about MPP's effectiveness or indicate that DHS considered whether individuals who travel to the United States to seek asylum will "place themselves at greater risk of victimization by human traffickers and other criminals." *Id*. But the memorandum, and the lengthy record that supports it,

amply refute these points.[9] As noted in the memorandum, DHS evaluated "prior DHS assessments of the program, including a top-down review conducted in 2019," and "MPP's performance against the anticipated benefits and goals articulated at the outset of the program and over the course of the program." AR3, 151, 192-203, 452, 490, 543, 554-56. The agency noted that it "originally intended the program to more quickly adjudicate legitimate asylum claims and clear asylum backlogs," but that, to the extent some proceedings were "completed more expeditiously," this caused "certain significant drawbacks" that the agency viewed as "cause for concern." *Id.* at 4.

First, the agency determined that the "focus on speed was not always matched with sufficient efforts to ensure that conditions in Mexico enabled migrants to attend their proceedings," and the "percentage of cases completed through the entry of *in absentia* removal orders (approximately 44 percent, based on DHS data)" raised questions "about the design and operation of the program." AR4; *see* AR557-80, 634-38, 660-63. For proceedings completed through MPP, only 1.4 % of those proceedings ended with a grant of relief, AR554-55, 660-63, indicating that MPP may not have successfully met its intended purpose of focusing resources on meritorious claims while discouraging non-meritorious ones. In addition, "more than one-quarter of individuals enrolled in MPP were subsequently reencountered attempting to enter the United States," undermining the argument that MPP discouraged individuals from trying to reach the United States and would allow DHS to shift resources to focus more on individuals legitimately fleeing persecution. AR4, *see* AR660-73. Second, relatedly, MPP was "intended to reduce burdens on border security personnel and resources," but "over time the program imposed additional

---

[9] Plaintiffs' arguments in this section, and others, improperly rely on information that is not contained in the administrative record and should be disregarded for the reasons set out in Defendants' motion to strike. An agency decision must be judged by the record provided by the agency, not some new record created by Plaintiffs for purposes of litigation. *See* 5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

responsibilities that detracted from the Department's critically important mission sets," because it required "building, managing, staffing and securing specialized immigration hearing facilities" at a cost of "millions of dollars each month"; "facilitating the parole of individuals into and out of the United States multiple times in order to attend immigration court hearings"; "providing transportation to and from ports of entry"; and, devoting "substantial border security resources" to the large number of individuals who attempted to enter the United States even after being placed in MPP. AR4, 220, 452-55, 660-73. Third, "rather than helping to clear asylum backlogs, over the course of the program backlogs increased before both the USCIS Asylum Offices and EOIR." AR4, *see* AR187, 653. The agency also noted that it was in the process of implementing other options that might better achieve MPP's intended goals, such as implementing reforms to the asylum system to shorten the time it takes for asylum seekers to have their cases adjudicated in ways that would "increase appearances throughout proceedings," "improve border management," and "reduce migration surges more effectively and more sustainably than MPP." AR4-5, 582, 680.

As to Plaintiffs' claim that the "memorandum gives no indication that Defendants considered" the risk to asylum seekers posed "by human traffickers and other criminals," Mot. 11, beyond the reforms noted above, the memorandum specifically explains that, over the last several years "MPP played an outsized role in the Department's engagement with the Government of Mexico" and that "DHS and U.S. diplomatic engagement" with Mexico would now be able to shift to focus on addressing "broader issues related to migration to and through Mexico." AR6. This includes "improving regional migration management" and "expanding cooperative efforts to combat smuggling and trafficking networks." AR6. DHS also noted that, under MPP, "safety" was an issue for "some MPP enrollees in Mexico," AR4, and that, "[i]n considering the impact" terminating MPP "could have on border management and border communities," DHS considered

its experience designing and operating, with the help of various interagency and nongovernmental partners, a process "to facilitate the safe and orderly entry into the United States of certain individuals" and "worked in close partnership with nongovernmental organizations and local officials in border communities to connect migrants with short-term supports that have facilitated their onward movement to final destinations away from the border." AR5, 587-88, 674.

The States next present a strawman argument that the memorandum is "arbitrary and capricious because it reverses Defendants' position on the importance of deterring meritless asylum applications." Mot. 12. The memorandum does not, however, reflect a change of DHS's position on deterring meritless claims, but rather concludes that MPP did not adequately achieve its purported goals to deter attempts to cross the border, discourage non-meritorious claims, or allow DHS to focus resources on meritorious claims. *See, e.g.*, AR171-78, 187, 374, 589. Plaintiffs argue the memorandum does not "provide any data to dispute the prior Administration's assessment that MPP deterred and discouraged Northern Triangle migrants" from coming to the border. Mot. 11. This argument is not based on any actual DHS assessment in the record, but rather on a statement by a former government employee, which should be disregarded because it is outside the record and does not cite any data. Moreover, the memorandum does cite data on the number of border encounters and re-encounters while MPP was in place as evidence relating to the program's effectiveness, and it cites other reforms the agency is undertaking to improve border management and more effectively "reduce migration surges." AR5, 670-73. Finally, Plaintiffs' insistence that DHS prove through data that migrants were not deterred by MPP is not a requirement of the APA, which "imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1160 (2021) (noting it "is not unusual in day-to-day agency

decisionmaking" for an agency to lack "empirical or statistical data").

There is thus no merit to Plaintiffs' claim that DHS failed to provide a reasoned analysis for the change in approach. Mot. 12. DHS rationally determined that there were serious questions about the effectiveness of MPP and terminated it after concluding it could undertake other reforms to more effectively and sustainably achieve the same goals. *See Tex. Oil & Gas Ass'n*, 161 F.3d at 934 (under APA agency action "must be upheld" if "agency's reasons and policy choices conform to minimal standards of rationality"). And the seven-page memorandum, supported by an almost 700-page record, provides more than adequate explanation for the agency's decision, easily satisfying the APA's requirements for reasoned analysis. *See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc*., 419 U.S. 281, 286 (1974) (Courts must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."); *see also F.C.C. v. Fox Television Stations*, 556 U.S. 502, 515-16 (2009) (agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute [and] that there are good reasons for it").

Next, the States raise, but do not meaningfully develop, an argument that DHS "failed to consider whether there was legitimate reliance on the prior Administration's method of using MPP as a tool to address the migration crisis." Mot. 12. Plaintiffs do not explain whose reliance interests DHS should have considered in reaching its decision, but acknowledge that only "serious" and "legitimate" reliance interests may be relevant. *Id.* (quoting *Regents*, 140 S. Ct. at 1913). There are no such interests here. Cases requiring agency consideration of reliance interests have traditionally limited this requirement to cases where a new policy would lead to some unexpected civil or criminal liability for the regulated industry or individuals—not potential incidental effects on third parties or States. *See, e.g.*, *N.L.R.B. v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267,

295 (1974) (noting that industry reliance on past agency decisions did not limit subsequent agency action where there were no "fines or damages involved" and no "new liability sought to be imposed on individuals for past actions which were taken in good-faith reliance" on prior agency pronouncements). The States do not argue that they were regulated by MPP, or that they have incurred some additional legal liability as a result of any actions they took in reliance on MPP.

The Supreme Court's opinion in *Regents*, which Plaintiffs cite, Mot. 12, did not alter this rule in holding that the agency's decision to terminate DACA did not adequately address the "reliance interests of DACA recipients"—the individuals regulated by DACA and directly impacted by its rescission. 140 S. Ct. at 1914-15 (noting "need for DACA recipients to reorder their affairs" because these individuals were, based on the "reliance interests engendered by DACA," potentially "caught in the middle of a time-bounded commitment," and may need additional time to "graduate from their course of study, complete their military service, or finish a medical treatment regimen"). The cases on which *Regents'* holding is based are similarly limited to the type of legitimate reliance of a regulated entity that is inapplicable here. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (addressing regulatory change that would upset "decades of industry reliance" and potentially result in "substantial" and potentially "retroactive" legal "liability"); *United States v. Penn. Indus. Chem. Corp.*, 411 U.S. 655, 670-75 (1973) (addressing whether regulated corporation could assert reliance on longstanding agency interpretation of statute as defense to criminal liability under a new agency interpretation); *see also, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 105-06 (2015) (describing this "constraint[ ] on agency decisionmaking" as applying in the context of "regulated entities" with "settled reliance interests" based on "previous agency interpretations" who may now face

"liability" under the agency's new interpretation or approach).[10]

The States next contend that DHS failed to discuss the costs ending MPP would impose on the States and the "significant burdens that Defendants' policy will impose on state budgets." Mot. 13. As noted above, however, there is no reason to believe that ending MPP will necessarily impose costs on States, and there is no evidence that they have borne additional costs since April 2020 when MPP enrollments declined. Moreover, the June 1 memorandum notes that DHS *did* consider "the impact such a decision could have on border management and border communities, among other potential stakeholders," and "worked in close partnership with nongovernmental organizations and local officials in border communities" to identify avenues to support migrants and facilitate their onward movement to final destinations away from the border." AR5. Plaintiffs do not explain what specific costs they think the agency should consider, and instead quibble with whether DHS's consideration of border communities and others encompassed consideration of "border *States*" and others. Mot. 13. But, assuming Plaintiffs believe that there are costs imposed by illegal migration and that MPP deterred such migration, DHS concluded that the data did not necessarily support that assumption, and reasonably decided that other anticipated regulatory and policy changes might better address border management, reduce surges in immigration, address root causes of immigration, and prevent trafficking and smuggling. AR5-6, 582, 680.

Plaintiffs cite *Arizona* to argue that the States bear some of the "consequences of unlawful

---

[10] The States also fail to allege they took any particular actions in reliance on MPP, and any reliance would not be reasonable given that MPP was a discretionary program and it is well established that State interests must give way to the federal choices on immigration enforcement. *See Arizona*, 567 U.S. at 396-97, 401-02; *cf. Penn.*, 411 U.S. at 675 ("reliance" must be "reasonable under the circumstances"). Further, MPP was a novel program that was only briefly in effect, not the type of long-standing agency practice that can lead to reliance interests. *See Regents*, 140 S. Ct. at 1913 (discussing "longstanding policies"); *Encino Motorcars*, 136 S. Ct. at 2126 ("decades of industry reliance"); *Bell Aerospace*, 416 U.S. at 275, 289; *Penn. Indus. Chem. Corp.*, 411 U.S. at 675.

immigration." Mot. 13 (citing *Arizona*, 567 U.S. at 397). However, the Supreme Court was clear that States nonetheless have no legally cognizable interest in how the federal government exercises its discretionary authority over immigration enforcement, that DHS has "broad discretion" with respect to the removal system, and that State interests with respect to immigration must ultimately give way completely to the federal government's choices on how to best enforce immigration law. *Arizona*, 567 U.S. at 396-97, 401-02 ("States may not enter, in any respect, an area the Federal Government has reserved for itself."). Again, Plaintiffs do not dispute that this program, which applied at the international border, was discretionary, even when a noncitizen was eligible to be placed in MPP. *See* Mot. 17; ECF No. 48, ¶ 74 (acknowledging that even if "an alien was eligible for MPP, the policy did not mandate return" and that there was "discretion to process aliens for MPP or under other procedures"). DHS has simply exercised its discretion to use alternatives, permitted by the same statute, that it believes will more effectively achieve the agency's goals and better align with ongoing diplomatic efforts to manage regional migration. *See Arizona*, 567 U.S. at 396-97 ("[T]he dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy.").

The States next challenge DHS's conclusion that the high rate of *in absentia* removal orders raised questions about the effectiveness of MPP. Mot. 14. Plaintiffs take issue with the conclusion that the high rate of *in absentia* removal orders, 44 percent, "is attributable to MPP" without "consider[ing] any relevant comparator for determining whether the rate of *in absentia* removal orders under MPP was unusual." Mot. 15. Plaintiffs point to data showing high rates—albeit lower than 44%—of *in absentia* removal orders at other time periods. *Id*. But in doing so, Plaintiffs commit the error they complain of, and cherry pick data from incomparable time periods to make their argument. The relevant data shows that 44 percent of MPP cases resulted in *in absentia*

removal orders, while only 11 percent of non-MPP cases resulted in *in absentia* orders in the same time period. AR660-63. The evidence thus shows that MPP cases, in which relief was granted only 1.4 percent of the time, *id.*, had a much higher *in absentia* rate and lower grant rate than similar cases during the same time period, raising questions about the effectiveness of the program at deterring fraudulent claims while prioritizing meritorious ones. Plaintiffs also take issue with the agency noting that this data raised questions about the effectiveness of MPP because the agency, in their view, was "supposed to answer such questions." Mot. 14. But again, the APA "imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies," and it "is not unusual in day-to-day agency decisionmaking" for an agency to lack "empirical or statistical data." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1160 (2021); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) ("Rescission of [agency action] would not be arbitrary and capricious simply because there was no evidence in direct support of the agency's conclusion. It is not infrequent that the available data does not settle a regulatory issue and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion.").

The States next contend that the June 1 memorandum is arbitrary and capricious because it does not "consider more limited policies." Mot. 15. They argue that DHS only "considered implementing MPP and not implementing MPP," but failed to consider other "potential middle-ground policies." *Id*. at 16. But the memorandum itself easily refutes this argument by making clear that the Secretary "considered various alternatives." AR5. As Plaintiffs acknowledge, this "includ[ed] maintaining the status quo or resuming new enrollments," with DHS deciding that preserving MPP "in this manner would not be consistent with this Administration's vision and values and would be a poor use of the Department's resources." *Id.* But contrary to Plaintiffs'

assertion, this was not the only option that the agency considered. DHS "also considered whether the program could be modified in some fashion," but "believe[d] that addressing the deficiencies identified in [the Secretary's] review would require a total redesign that would involve significant additional investments in personnel and resources" and "that approach would come at tremendous opportunity cost, detracting from the work taking place to advance the vision for migration management and humanitarian protection articulated in Executive Order 14010." *Id*. DHS thus considered alternative approaches that would maintain MPP in some fashion and other alternatives that the agency ultimately determined would more effectively achieve the same goals.

Even if DHS had not done so, there is no requirement that the agency consider a particular alternative approach that the States might prefer. An agency need not "consider all policy alternatives in reaching [a] decision." *State Farm*, 463 U.S. at 51. Plaintiffs cite *Regents* to argue that when "an agency rescinds a prior policy its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." Mot. 15 (citing *Regents*, 140 S. Ct. at 1912). *Regents* made "clear," however, that "DHS was not required … to 'consider all policy alternatives in reaching [its] decision,'" and that "DHS has considerable flexibility in carrying out its responsibility" when deciding how to "wind-down" a program. *Regents*, 140 S. Ct. at 1914-15 (quoting *State Farm*, 463 U.S. at 51). Moreover, *Regents* addressed a policy, DACA, with two "legally distinct" portions—deferred action and benefits—that could "be decoupled," and emphasized that the recession memo gave reasons for rescinding benefits but did not address why deferred action should be rescinded. 140 S. Ct. at 1913 (noting that rescission memo "contain[ed] no discussion of forbearance or the option of retaining forbearance without benefits"). *Regents* thus merely stands for the unremarkable proposition that, if a policy consists of multiple and severable policies, an agency should explain why it has decided to end each or cannot retain a

34

severable portion that has generated legitimate reliance interests. Plaintiffs do not argue that MPP contained multiple severable policies; they merely request that the agency continue to apply MPP to at least some individuals. Mot. 16. DHS considered that option and determined that the benefits of that approach were minimal and far outweighed by other options the agency can pursue. Nothing more is required. *Cf. 10 Ring Precisions, Inc. v. Jones*, 722 F.3d 711, 724 (5th Cir. 2013) (noting that failure "to consider other feasible alternatives" or "fact that [agency] could have narrowed the scope of the [agency action] does not mean that its failure to do so was arbitrary and capricious").

Finally, Plaintiffs argue that the memorandum is arbitrary and capricious because "DHS failed to consider the effect terminating MPP would have on its ability to comply with its obligation to detain aliens under 8 U.S.C. § 1225." Mot. 16. This argument is premised on an incorrect contention, discussed further below, that not using MPP violates § 1225. Plaintiffs point to nothing in § 1225 indicating that an ability to detain asylum seekers is a factor Congress intended DHS to consider in implementing the discretionary return authority in § 1225(b)(2)(C). Moreover, DHS noted that "the Administration has been—and will continue to be—unambiguous that the immigration laws of the United States will be enforced," and that DHS "has at its disposal various options that can be tailored to the needs of individuals and circumstances, including detention, alternatives to detention, and case management programs that provide sophisticated wraparound stabilization services." AR6, *see* 8-146, 560, 563, 569-75, 675-76. Following its review, DHS concluded that these alternatives "have been shown to be successful in promoting compliance with immigration requirements." AR6.

Ultimately, the States' challenges boil down to a policy disagreement with DHS's discretionary decisions, and that is not a basis to overturn agency action under the APA. *See Nat'l Ass'n of Home Builders v. E.P.A.*, 682 F.3d 1032, 1043 (D.C. Cir. 2012) ("[A]n agency to which

Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely on the incumbent administration's views of wise policy to inform its judgments."). Agencies have "significant discretion" to reevaluate policy choices following a "change in administration." *Clean Water Action v. E.P.A.*, 936 F.3d 308, 315 (5th Cir. 2019) (quoting *Nat'l Ass'n of Home Builders*, 682 F.3d at 1038, and *State Farm*, 463 U.S. at 59). Absent a clear statutory directive requiring the agency to implement MPP—and it is undisputed that there is no such directive—"[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *Nat'l Ass'n of Home Builders*, 682 F.3d at 1043. "As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." *Id.*; *see State Farm*, 463 U.S. at 59 (Rehnquist, J. concurring) (same); *see also Arizona*, 567 U.S. at 396 (noting agency's "broad discretion" is "[a] principal feature of the removal system").

**C.    Plaintiffs cannot succeed on the merits of their claim that the June 1 memorandum violates § 1225.**

Plaintiffs also cannot succeed on the merits of their claim that terminating MPP violates § 1225. *See* Mot. 16-18. They do not dispute that MPP is only one option DHS has discretion to use under § 1225, but argue that DHS should nonetheless be required to use MPP because they disagree with the government's use of parole, another option permitted by § 1225, based on evidence that is not part of the record. The June 1 memorandum is fully consistent with § 1225, however. Plaintiffs' tangential complaints about DHS's use of parole—which they do not actually challenge in their complaint—are beyond the scope of this case and the Court's jurisdiction.

For noncitizens seeking to enter the United States, "the [g]overnment must determine" at the outset whether they are "admissible." *Jennings*, 138 S. Ct. at 836. If an "applicant for

admission" is "not clearly and beyond a doubt entitled to be admitted," then he or she "shall be detained for a proceeding under section 1229a of this title" to determine removability. 8 U.S.C. § 1225(b)(2)(A). When DHS places an applicant for admission into § 1229a removal proceedings pursuant to § 1225(b), the noncitizen may be subject to detention during the proceedings. 8 U.S.C. § 1225(b)(2)(A); *Jennings*, 138 S. Ct. at 844-46. Alternatively, noncitizens placed in removal proceedings through § 1225(b)(2)(A) may be temporarily released on parole during their proceedings "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A); *Jennings*, 138 S. Ct. at 837. Congress also provided in § 1225 that, for "an alien described in" § 1225(b)(2)(A) who is arriving "from a foreign territory contiguous to the United States," DHS "may return the alien to that territory pending a proceeding under section 1229a." 8 U.S.C. § 1225(b)(2)(C). MPP is an iteration of this discretionary return authority in § 1225(b)(2)(C). *Innovation Law Lab*, 924 F.3d at 507. Section 1225(b) thus offers DHS various options for applicants for admission placed in removal proceedings, including returning them to a contiguous country, and the option to "detain or parole the individual until her asylum claim could be heard before an immigration judge." *Id.* at 506.

Plaintiffs do not dispute that DHS has full discretion over whether to place individuals in MPP and return them to a contiguous country under § 1225(b)(2)(C). Mot. 17 (conceding that "the INA does not mandate the creation of MPP" and returning noncitizens is entirely "optional"). And Congress's decision not to mandate returns or set out any circumstances when DHS is required to use such authority in § 1225(b), but rather to only make it one option the agency "may" use, makes the decisions to create or terminate MPP entirely discretionary under the statute. *See* 8 U.S.C. § 1225(b)(2)(C); *Jama*, 543 U.S. at 346 ("may" connotes discretion). Since § 1225(b) does not mandate creating MPP, terminating it cannot violate § 1225.

Plaintiffs' only rationale for why terminating MPP would violate the INA is based on their (factually incorrect) allegation that DHS automatically paroles noncitizens who are not returned. Mot. 17-18. However, the June 1 memorandum does not govern how DHS should use its parole authority; that issue falls outside the scope of this case. Even if that issue were presented here, deciding not to return a noncitizen is a separate decision from whether to parole the noncitizen during proceedings, and a decision not to return does not necessitate release. "Congress has delegated remarkably broad discretion to executive officials under the INA, and these grants of statutory authority are particularly sweeping in the context of parole." *Jean v. Nelson*, 727 F.2d 957, 977 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985). As Plaintiffs concede, DHS has the authority to deny parole and detain noncitizens while their removability is determined. 8 U.S.C. § 1225(b)(2)(A); *Jennings*, 138 S. Ct. at 844-46; *Jean*, 727 F.2d at 977 ("Logically, of course, the obverse of the grant of discretionary authority in § 1182(d)(5) to parole an excluded alien is a grant of authority to deny parole.") (internal quotation marks omitted). Conversely, DHS has no statutory obligation to detain any or every noncitizen processed under § 1225(b)(2)(A). Rather, "the granting of parole is clearly a discretionary decision under the statute," *Maldonado v. Macias*, 150 F. Supp. 3d 788, 794 (W.D. Tex. 2015), and DHS has full authority to grant release from § 1225(b)(2)(A) detention under § 1182(d)(5)(A) for what it deems humanitarian or public purposes. *See Jennings*, 138 S. Ct. at 837.

Further, were it at issue here, DHS's decision whether to invoke the parole authority to release a noncitizen is beyond this Court's authority to review. As already mentioned, the INA precludes judicial review of discretionary decisions or actions, *see* § 1252(a)(2)(B)(ii), and the Fifth Circuit has held that both "[t]he Attorney General's discretionary judgment regarding the application of" parole" and "the manner in which that discretionary judgment is exercised, and

whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints" are "not ... subject to review." *Loa-Herrera*, 231 F.3d at 991 & n.12 (internal quotation marks and citation omitted); *see also Alabi v. DHS-ICE*, No. 3:19-CV-2717-X-BN, 2020 WL 2529379, at *3 (N.D. Tex. Apr. 29, 2020), *report and recommendation adopted*, No. 3:19-CV-02717-X-BN, 2020 WL 2527198 (N.D. Tex. May 15, 2020) (citing *Maldanado*, 150 F. Supp. 3d at 794-95 (collecting cases)). Thus, even if it were squarely presented in this case, Fifth Circuit precedent clearly bars this Court from hearing a claim that DHS is improperly granting parole.

### D.     Plaintiffs cannot state a claim under the Take Care Clause.

The States next argue that terminating MPP violates the Take Care Clause because it "contradicts federal law" and "Congress's command," Mot. 18, but this is not a basis for a viable claim. Plaintiffs argue that they can state a claim under the Take Care Clause either under the APA, or independently "at equity" as a claim "to enjoin federal officers from violating the Constitution," Mot. 19, but they point to no cases recognizing an equitable cause of action to enforce the Take Care Clause. To the extent a cause of action exists "at equity," as the cases they cite show, such an action is generally limited to claims against a *state* official violating an individual right under the Constitution, *see id.* (citing *Green Valley Special Util. Dist. v. City of Schertz, Texas*, 969 F.3d 460, 471, 475 (5th Cir. 2020) (stating a cause of action "*at equity*" must "name individual state officials" engaged in "an ongoing violation of federal law"); *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1231-32 (10th Cir. 2005) (courts, "in a proper case in equity, may enjoin a State officer from executing a State law in conflict with the Constitution")). Moreover, Plaintiffs' claim is not a constitutional claim. The Supreme Court has explained that claims alleging an "executive official" is acting "in excess of his statutory authority" are *statutory* claims, "not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 472 (1994) ("The distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of

the Constitution, on the other, is too well established to permit this sort of evisceration.").

In any case, as either an APA claim or an equitable one, the States' claim cannot succeed because the Take Care Clause is not a basis for affirmative relief in an Article III court. The Supreme Court long ago made clear that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866). The Take Care Clause falls under "the general principles which forbid judicial interference," and a claim to restrain executive action through this clause is not only "without a precedent," but there is "much weight against it." *Id*. at 499-500; *see also Citizens for Responsibility & Ethics in Washington v. Trump*, 302 F. Supp. 3d 127, 139 (D.D.C. 2018), *aff'd*, 924 F.3d 602 (D.C. Cir. 2019) (noting that "*Johnson* can be fairly read to suggest that a Take Care Clause claim is outright non-justiciable" and finding no cases holding otherwise). For the Judicial Branch to superintend how the Executive Branch performs discretionary executive functions would express a "lack of the respect due" to the Nation's highest elected official. *Baker v. Carr*, 369 U.S. 186, 217 (1962). The Take Care Clause thus places no justiciable restraints on executive action and cannot be a basis for a claim by states or private parties. *Cf. Lujan*, 504 U.S. at 577 (rejecting attempt to "convert the undifferentiated public interest in executive officer's compliance with the law into an 'individual right' vindicable in the court" as such a claim would impermissibly "transfer from the President to the Court's" the Executive Branch's authority "to 'take Care that the Laws be faithfully executed'"); *United States v. Jeong*, 624 F.3d 706, 713 (5th Cir. 2010) (noting the Executive's "broad discretion" to "discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed'").

Accordingly, whether viewed as an APA claim, or an equitable one, the Take Care Clause claim must fail because the clause provides no justiciable standards to apply. The limitations on

review in the APA "were derived" from "the traditional limitations" on equitable relief designed "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004). The APA "carried forward the traditional practice prior to its passage" where attempts to compel agency action were limited to enforcing "a specific, unequivocal command" over which an agency "had no discretion whatever." *Id.* at 63; *see Mississippi*, 71 U.S. at 499 (distinguishing non-discretionary duties, which might be subject to mandamus claim, from the "[v]ery different" "purely executive and political" "duty of the President in the exercise of the power to see that the laws are faithfully executed"). Plaintiffs do not dispute the statutory authority for MPP is just one option the statute authorizes, so even if they could raise a claim that DHS is not faithfully executing the laws, it could not be based on a choice Plaintiffs do not dispute is discretionary. MPP is not a law, nor is there any requirement that DHS use the statutory authority on which it was based, and "[r]eal or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty." *Texas*, 106 F.3d at 667 (finding unreviewable "State's allegation that defendants have failed to enforce the immigration laws and refuse to pay the costs resulting therefrom").

### E. The purported agreement with Texas is invalid, unenforceable, and cannot be a basis for relief.

Plaintiffs also suggest that Defendants violated an agreement that Ken Cuccinelli purported to enter on DHS's behalf by issuing the memoranda without first allowing Texas a 180-day period to review and comment on it. Mot. 19-21. However, the  purported agreement is void and unenforceable, and the Court lacks jurisdiction to set aside the June 1 memorandum on this basis.

First, the United States has not waived sovereign immunity for specific enforcement of contracts. The Court thus need not address whether the purported agreement is valid, because the

relief Texas seeks here is improper and this Court lacks jurisdiction to set aside the June 1 memorandum on the basis of the purported agreement. Texas seeks specific performance of the purported agreement's requirement that DHS abstain from making any policy adjustments without allowing for a 180-day conferral period. Mot. 20. But specific performance is unavailable against the federal government. A waiver of sovereign immunity must be enacted by statute, be construed in the government's favor, and unambiguously extend to the type of relief sought. *Lane v. Pena*, 518 U.S. 187, 192 (1996). The Fifth Circuit has recognized that the United States has not waived sovereign immunity for contract claims seeking specific performance. *See Ala. Rural Fire Ins. Co. v. Naylor,* 530 F.2d 1221, 1229-30 (5th Cir. 1976); *see also United States v. Jones*, 131 U.S. 1, 18 (1889) (Tucker Act did not authorize specific performance against the federal government); *Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. DHS*, 490 F.3d 940, 945 (Fed. Cir. 2007).

Texas cannot rely on the APA to circumvent this basic principle. For agency action to be subject to APA review, there must be "no other adequate remedy in a court." 5 U.S.C. § 704; *see id.* § 702 ("Nothing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."). Here, to the extent the purported agreement is enforceable at all for the amount Texas suggests is at issue,[11] the Tucker Act provides the proper remedy—in the Court of Federal Claims. *See Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev*., 480 F.3d 1116, 1128 (Fed. Cir. 2007). At most, if there were a valid contract, Texas might possess a contract claim for money damages, because "damages are always the default remedy for breach of contract." *Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001) (quoting *United States v. Winstar Corp*., 518 U.S. 839, 885 (1996) (plurality

---

[11] *See* 28 U.S.C. § 1346(a)(2) (permitting claims for breach of contract against the United States in district court if the Plaintiff alleges damages not more than $10,000).

opinion)); *accord Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011). The Tucker Act "impliedly forbids declaratory and injunctive relief and precludes a § 702 waiver of sovereign immunity" under the APA, as any duty to consult Texas, "if it exists, derives from the contract." *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646-47 (9th Cir. 1998) (citing *United States v. King*, 395 U.S. 1, 3 (1969) (recognizing that the Supreme Court has repeatedly acknowledged that the Court of Federal Claims only has jurisdiction over claims for monetary relief)). To be sure, "a case is not a 'contract case' that is subject to the 'impliedly forbids' limitation . . . simply because it involves contractual issues." *Neb. Pub. Power Dist. v. United States*, 590 F.3d 1357, 1375 (Fed. Cir. 2010) (en banc) (*quoting Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992)). Rather, "the question whether the Tucker Act impliedly forbids a district court from acting in a case depends on 'whether, despite the presence of a contract, plaintiffs' claims are founded only on a contract, or whether they stem from a statute or the Constitution.'" *Id.* Here, Texas's claimed right to a consultation period is based entirely on the purported agreement. That is a contract claim, entirely distinct from their other claims, and therefore this Court lacks jurisdiction to consider it. *See id.*

Second, the provision of the purported agreement Texas relies on lies beyond the power of contract. An outgoing administration cannot contract away the federal government's plenary power over the enforcement of immigration law. *See Biodiversity Assocs. v. Cables*, 357 F.3d 1152, 1172 (10th Cir. 2004) ("The executive branch does not have authority to contract away the enumerated constitutional powers of Congress or its own successors…."); *see also U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23 (1977) ("[T]he Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty"). A long line of authority establishes that "[t]he Government cannot make a binding contract that it will not

exercise a sovereign power." *Amino Bros. Co. v. United States*, 372 F.2d 485, 491 (Ct. Cl. 1967), *cert. denied*, 389 U.S. 846 (1967). In *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52 (1986), the Supreme Court reaffirmed that "we have declined in the context of commercial contracts to find that a 'sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in' the contract." (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982)); *see also Contributors to Pa. Hospital v. City of Philadelphia*, 245 U.S. 20 (1917). DHS could not contract away the sovereign's right to alter Federal immigration policy.

Further, Texas fails to identify any permissible legal basis for DHS entering into a contract to grant states power to review and delay agency policy decisions. Indeed, it has long been a principle of federal government contract law that an individual entering a contract on behalf of the federal government must have statutory authority to do so: "Our statute books are filled with acts authorizing the making of contracts with the government through its various officers and departments, but, in every instance, the person entering into such a contract must look to the statute under which it is made, and see for himself that his contract comes within the terms of the law." *The Floyd Acceptances*, 74 U.S. 666, 679-80 (1868); *see also CACI, Inc. v. Stone*, 990 F.2d 1233, 1237 (Fed. Cir. 1993) ("[T]here cannot be a contract when the government agent lacks actual authority to create one."); *U.S. Trust Co. of N.Y.*, 431 U.S. at 23 (1977) ("[T]he Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty"); *Stone v. Mississippi*, 101 U.S. 814, 817 (1880) ("[T]he legislature cannot bargain away the police power of a State."). None of the statutory authorities cited in the agreement provides the authority for the agreement Texas purportedly entered into with DHS; all applicable

statutes preserve federal prerogatives.[12]

Texas may suggest that Congress created the Office for State and Local Government Coordination within DHS to "develop a process for receiving meaningful input from State and local government to assist the development of the national strategy for combating terrorism and other homeland security activities." 6 U.S.C. § 361(b)(4). Or that the Secretary may "perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter," 8 U.S.C. § 1103(a)(3). But "[a]n employee of the Government possesses *express authority* to obligate the Government *only* when the Constitution, a statute, or a regulation grants it to that employee in unambiguous terms." *Abraham v. United States*, 81 Fed. Cl. 178, 186 (2008). Nor has Texas alleged that Cuccinelli had implied authority to enter the purported agreement. *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1402 (Fed. Cir. 2016) ("[A]n employee of the Government has implied actual authority to enter an agreement only when that authority is an 'integral part of the duties assigned to [the] government employee.'").[13]

Not only was the purported agreement executed without statutory authority, it runs afoul of the subdelegation doctrine. *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 565 (D.C. Cir. 2004) ("subdelegations to outside parties are assumed to be improper absent an affirmative showing of

---

[12] Relatedly, an agency cannot use its contracting authority to constrain the agency from making future changes to immigration policy. Any such constraint would be a legislative rule that binds an agency and would be subject to the requirements of the APA. *See, e.g., Davidson v. Glickman*, 169 F.3d 996, 999 (5th Cir. 1999).

[13] Texas assumed the risk that Cuccinelli lacked authority to enter the purported agreement. Anyone entering into an arrangement with the government takes the risk of having accurately ascertained that he who purports to act for the government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority. *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947).

congressional authorization"). Had Congress intended to authorize such an extraordinary agreement, it would have done so expressly. *Cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The purported agreement is, therefore, unauthorized by statute. And to the extent it limits existing statutory authority and discretion and is inconsistent with regulatory obligations, it is void, even if it meets all the other elements of a binding contract. *See Total Med. Mgmt., Inc. v. United States*, 104 F.3d 1314, 1320 (Fed. Cir. 1997).[14]

## III.   The remaining factors weigh strongly against granting a preliminary injunction.

The balance of equities weighs strongly against granting an injunction. Plaintiffs cannot establish any injury that outweighs the harm to Defendants or the public interest. *See Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). As described *supra*, Plaintiffs' allegations are too speculative to support standing. Hence, they are too speculative to show that Plaintiffs face the type of imminent and irreparable harm necessary to secure a preliminary injunction. *Winter*, 555 at 22. Their speculative harms do not rise to the level of requiring "special solicitude," because they cannot successfully argue that they would need to change laws, open new offices, or hire new staff in the absence of MPP, let alone before this case can be resolved on the merits. *See supra* at 8-9.

Even if these highly speculative and, at most, minor financial harms to Plaintiffs could be credited, they are easily outweighed by the severe burden an injunction would place on core Article II authority. As the Supreme Court has emphasized, challenges to immigration enforcement discretion "invade a special province of the Executive." *AADC*, 525 U.S. at 489. An injunction that dictates that the Executive must continue a discretionary program that it does not desire to

---

[14] If the purported agreement was ever litigated in the Court of Federal Claims, there is also a question as to whether Texas even provided requisite consideration given that the stated obligations appear to be more focused on what DHS must do.

undertake at this time would interfere with a core constitutional power conferred on the Executive, which is irreparable harm. *See, e.g.*, *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978). An injunction would infringe upon the Executive Branch's constitutional and statutory authority to control the Nation's borders, would undermine foreign-policy judgments committed to the Executive Branch, and would constitute a major and "unwarranted judicial interference in the conduct of foreign policy," as MPP requires diplomatic relations with Mexico, and this Court cannot order Mexico to accept noncitizens that might be returned in the event MPP were reinstated. *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 109 (2013); *see also Fiallo v. Bell*, 430 U.S. 787, 792 (1977); *Plyler v. Doe*, 457 U.S. 202, 225 (1982); AR149; Gov't App. 2, ¶¶ 5-8, 11-12, 14-18, App. 17, ¶¶ 16-18. Decisions involving immigration "implicate our relations with foreign powers" and must account for "changing political and economic circumstances." *Mathews*, 426 U.S. at 81.

Because of the need for "flexibility in [immigration] policy choices," such choices are typically "more appropriate to either the Legislature or the Executive than to the Judiciary." *Id.*; *see also New Jersey v. United States*, 91 F.3d 463, 470 (3d Cir. 1996). This is particularly true where injunctive relief is likely to cause disruption or chaos, *see, e.g.*, *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 97- 98 (D.C. Cir. 2002); *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995), as would be the case here if the Court were to require DHS to unexpectedly restart MPP, an action that requires diplomatic efforts and cooperation with Mexico, and could have serious foreign-affairs consequences, *see* Gov't App. 8, ¶¶ 16-18, App. 17, ¶¶ 16-18.[15]

Accordingly, an injunction would cause direct, irreparable injury to the interests of the government and the public, which "merge" in suits against the federal government. *Nken v. Holder*,

---

[15] DHS has already taken significant steps to wind down MPP, adding to the disruption that would result from an injunction. *See* https://www.dhs.gov/news/2021/06/23/dhs-announces-expanded-criteria-mpp-enrolled-individuals-who-are-eligible-processing.

556 U.S. 418, 435 (2009). Therefore, the balance of equities weighs strongly against an injunction.

**IV.    If the Court grants relief, it must be sharply limited.**

Even if the Court found some merit to Plaintiffs' claims, the INA specifically bars jurisdiction to grant what they seek, "injunctive relief requiring Defendants nationwide to continue implementing the MPP." ECF No. 48 at 46. Under § 1252(f), "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter … other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). With this provision, "Congress stripped all courts, save for the Supreme Court, of jurisdiction to enjoin or restrain the operation of 8 U.S.C. §§ 1221-1232 on a class-wide basis." *Hamama v. Adducci*, 946 F.3d 875, 877 (6th Cir. 2020).

Plaintiffs do not dispute that they request classwide injunctive relief limiting how DHS implements § 1225(b)(2)(C), or that this provision is covered by the bar to granting injunctive relief in § 1252(f). *See* Mot. 29. They argue only that they "are not seeking to enjoin operation of" § 1225(b), but rather "want Defendants to comply with federal statutes." *Id*. Courts have rightly rejected such attempts to avoid § 1252(f). *See Hamama*, 946 F.3d at 877. Section 1225(b)(2)(C) grants DHS discretion over whether to use the return authority it provides, and injunctive relief removing that discretion from the statute would necessarily "restrain the operation of" the statute as written, in violation of § 1252(f)(1). *See Hamama*, 912 F.3d at 879-80 (rejecting argument that § 1252(f)(1) did not apply to request for injunctive relief related to INA provisions "to ensure they are correctly enforced" as implausible, noting that, if placing "limitations on what the government can and cannot do under the removal and detention provisions are not 'restraints,' it is not at all clear what would qualify as a restraint."); *see also Vazquez Perez v. Decker*, No. 18-CV-10683, 2019 WL 4784950, at *6 (S.D.N.Y. Sept. 30, 2019) (where "Congress, in its judgment, choose not

48

to mandate" a particular approach under INA, "an injunction imposing one where the statute is *silent* would displace that judgment in a way that would enjoin or restrain" the statute's functioning and is barred by § 1252(f)(1)).

Moreover, "traditional limitations" on equitable relief bar orders directing an agency to take a particular course of action, such as restarting MPP, absent a clear statutory mandate to do so. These limits were designed "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton*, 542 U.S. at 66. Courts thus are not empowered "to enter general orders compelling compliance with broad statutory mandates"—to hold otherwise "would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management." *Id*. at 66-67; *see also id*. at 63 (agency action can be compelled only where statute provides "a specific, unequivocal command" giving agency "no discretion whatever"); 5 U.S.C. § 706(1). Granting a mandatory injunction would also provide greater relief than Plaintiffs could obtain on the merits at the conclusion of this case, as the proper remedy for a successful APA claim is to remand to the agency for further consideration or explanation. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

Finally, even if the Court were to conclude that it had authority to issue a mandatory injunction, a nationwide injunction would be vastly overbroad. Any injunction should be strictly

49

limited to the Texas border. *See Trump v. IRAP*, 137 S. Ct. 2080, 2088 (2017) (narrowing overbroad injunction); *United States Dep't of Def. v. Meinhold*, 510 U.S. 939, 939 (1993) (same). Article III demands that a remedy "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018); *see DHS v. New York*, 140 S. Ct. 599 (2020) (Gorsuch, J., concurring); *Hawaii*, 138 S. Ct. at 2429 (Thomas, J., concurring). Bedrock rules of equity support the same requirement that injunctions be no broader than "necessary to provide complete relief to the plaintiff[]." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). This principle applies with even greater force to a preliminary injunction, which is an equitable tool designed merely to preserve the status quo during litigation. *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). A limit to nationwide injunctions ensures that courts resolve actual cases and controversies rather than entering into disputes that are constitutionally delegated to the other two branches of government.

Against these concerns, Plaintiffs merely allege that immigration law requires uniformity and that noncitizens "would be free to move among states." Mot. 35. But the principles set out above apply equally in the immigration context, and Plaintiffs' concerns are particularly unwarranted here, where terminating MPP does not "affirmatively confer 'lawful presence' and associated benefits" on a nationwide class, *Texas*, 809 F.3d at 166, but rather governs the treatment of noncitizens at ports of entry, which can be geographically limited. A nationwide injunction goes beyond what would be necessary to remedy Plaintiffs' alleged harms. *See California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (noting "scope of the remedy must be no broader … than necessary to redress the injury shown" by plaintiffs and narrowing injunction "to the plaintiff states").

## **CONCLUSION**

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: June 25, 2021                        Respectfully submitted,

PRERAK SHAH                                 BRIAN M. BOYNTON
*Acting United States Attorney*             *Acting Assistant Attorney General*

BRIAN W. STOLZ                              WILLIAM C. PEACHEY
*Assistant United States Attorney*          *Director*
                                            Office of Immigration Litigation
                                            District Court Section

                                            EREZ REUVENI
                                            *Assistant Director*

                                            FRANCESCA GENOVA
                                            JOSEPH A. DARROW
                                            *Trial Attorneys*

                                            /s/ *Brian C. Ward*
                                            BRIAN C. WARD
                                            *Senior Litigation Counsel*
                                            U.S. Department of Justice
                                            Civil Division
                                            Office of Immigration Litigation
                                            District Court Section
                                            P.O. Box 868, Ben Franklin Station
                                            Washington, DC 20044
                                            Tel.: (202) 616-9121
                                            brian.c.ward@usdoj.gov


                                            *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 25, 2021, I electronically filed this response with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ <i>Brian C. Ward</i>
BRIAN C. WARD
U.S. Department of Justice
