**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| STATE OF TEXAS, ) | |
| STATE OF MISSOURI, ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| v. ) | Civil Action No. 2:21-cv-00067-Z |
| ) | |
| JOSEPH R. BIDEN, JR., ) | |
| in his official capacity as ) | |
| President of the United States, *et al.,* ) | |
| ) | |
| *Defendants.* ) | |

**APPENDIX TO DEFENDANTS' RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**DOCUMENT**                                                                 **PAGE**

1. Declaration of David Shahoulian……………………………………………………………1

2. Declaration of Emily Mendrala…………………………………………………………..11

Dated: June 25, 2021                          Respectfully submitted,

PRERAK SHAH                                   BRIAN M. BOYNTON
*Acting United States Attorney*               *Acting Assistant Attorney General*

BRIAN W. STOLZ                                WILLIAM C. PEACHEY
*Assistant United States Attorney*            *Director*
                                              Office of Immigration Litigation
                                              District Court Section

                                              EREZ REUVENI
                                              *Assistant Director*

                                              FRANCESCA GENOVA
                                              JOSEPH A. DARROW
                                              *Trial Attorneys*

                                              /s/ *Brian C. Ward*
                                              BRIAN C. WARD
                                              *Senior Litigation Counsel*
                                              U.S. Department of Justice
                                              Civil Division
                                              Office of Immigration Litigation
                                              District Court Section
                                              P.O. Box 868, Ben Franklin Station
                                              Washington, DC 20044
                                              Tel.: (202) 616-9121
                                              brian.c.ward@usdoj.gov

                                              *Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| STATE OF TEXAS,<br>STATE OF MISSOURI,<br><br>    *Plaintiffs,*<br><br>    v.<br><br>JOSEPH R. BIDEN, JR.,<br>in his official capacity as<br>President of the United States, *et al.*,<br><br>    *Defendants.* | Civil Action No. 2:21-cv-00067-Z |

## DECLARATION OF DAVID SHAHOULIAN

I, David Shahoulian, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge, and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

*Introduction*

1.  I am the Assistant Secretary for Border Security and Immigration at the Department of Homeland Security (DHS) and have been in this role since January 20, 2021. I previously served at DHS as Deputy General Counsel from June 29, 2014 to January 19, 2017.

2.  In Mexico, as in the United States, migration is a politically and emotionally charged issue, in part because of the profound impact that migration-related policies and operations have on individuals and communities. As a result, discussions between the U.S. and Mexican governments regarding migration management in the region and at our shared border are

fluid, sensitive, and iterative.  The United States and Mexico have maintained a close, delicate, and dynamic conversation on this issue for many years.

3.  Critical to these conversations is the ability of each country to (1) alter policies or operations as circumstances change, and (2) trust that the other country will follow through with its commitments.  Over the course of the past five months, in response to changing circumstances and given the change in administration, the U.S. Government has undertaken a review of various migration-related policies as it pursues a series of new strategies, both unilaterally and in partnership with foreign partners and international organizations.  The decisions to first suspend new enrollments into the Migrant Protection Protocols (MPP) program, and then to terminate MPP following close review of the program, are part of the Department's new strategies in response to changing circumstances.

4.  As discussed further below, an injunction interfering with the U.S. Government's ability to proceed with the termination of MPP would undermine the Administration's overall strategy for managing migration in the region, complicate the U.S. Government's bilateral relationship with Mexico, divert limited government resources and detract from important DHS missions, and hinder the Department's ongoing efforts to build its capacity to process individuals at ports of entry and adjudicate asylum claims in a safe, orderly, and humane manner consistent with our laws.

*Governments need the ability to change policies and operations in response to changing circumstances*

5.  As regional migration trends evolve, governments need the ability to react and adjust their policy and operational responses as necessary, consistent with their overall strategic visions for migration management and humanitarian protection.  In December 2018, DHS announced plans to utilize its authority under Section 235(b)(2)(C) of the Immigration and

Nationality Act (INA) to create a new program—the Migrant Protection Protocols

(MPP)—aimed at returning certain non-Mexican applicants for admission to Mexico for

the duration of their U.S. removal proceedings.[1]  Because MPP required such individuals to

temporarily reside in Mexico, implementation of MPP required close collaboration and

negotiation with the Government of Mexico.  Shortly after the DHS announcement,

Mexico reaffirmed its sovereign right to manage migration in its territory—including

whether to admit or deny entry to foreign nationals—and committed to a number of steps

that were important to the functioning of MPP.  Such steps included utilizing federal

resources (personnel and infrastructure) to receive individuals returned to Mexico under

MPP; granting temporary, humanitarian status to persons enrolled in MPP; ensuring that

such individuals received equal treatment and protection from discrimination, as well as the

right to request work authorization; and providing MPP enrollees with the ability to access

selected social services.[2]

6.   After MPP was initiated, the United States and Mexico coordinated closely in response to

changing conditions, including substantial operational challenges that surfaced during the

program's implementation.  One such challenge—the onset of the COVID-19 pandemic—

required significant coordination and flexibility to protect public health and address other

changes in the border environment.  In March 2020, for example, the Department of Justice

suspended removal hearings for MPP enrollees due to the pandemic.  This suspension

fundamentally altered the situation at the border given that one of MPP's principal

---

[1] *See Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration,* Dec. 20, 2018 *available at* https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration (last visited June 23, 2021).

[2] *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act,* Dec. 20, 2018 *available at* https://www.gob.mx/sre/en/articulos/position-of-mexico-on-the-decision-of-the-u-s-government-to-invoke-section-235-b-2-c-of-its-immigration-and-nationality-act-185795?idiom=en  (last visited June 23, 2021)

objectives was to promptly process the claims of MPP enrollees returned to Mexico. Without court hearings, the MPP program was unable to deliver on this objective, leaving MPP enrollees with no way to have their claims considered.  And as the months passed, more and more MPP enrollees found themselves in challenging circumstances in Mexico for a prolonged—and frankly indefinite—length of time with no avenue for relief.

7.      Moreover, the fact that tens of thousands of individuals remained in Mexico for long periods with no movement in their immigration cases placed a strain on community resources along Mexico's northern border.  This contributed to instability and insecurity in some communities, which complicated US-Mexico bilateral relations and undermined the ability of some MPP enrollees to wait for adjudications to resume.

8.      Additionally, and just as important, the lack of court hearings violated the premise under which the Government of Mexico agreed to provide temporary status in Mexico to MPP enrollees in the first place: namely, that the United States would have a functioning, rapid immigration court process in which MPP enrollees could participate.  Mexican officials made clear that providing temporary status (and relatedly, the ability to access select social services in Mexico) was to be provided only to those "involved in immigration proceedings."[3]  But with the closure of the non-detained immigration courts due to COVID-19, there were no such proceedings.  Even now, after more than a year, it is still unclear when many of those enrolled in MPP would have had their cases heard.  This challenge required a new solution and a change in policy and operations.

---

[3] *See Press Conference with Legal Counsel Alejandro Alday on the Bilateral Relationship with the United States*, Dec. 20, 2018 *available at* https://www.gob.mx/sre/prensa/press-conference-with-legal-counsel-alejandro-alday-on-the-bilateral-relationship-with-the-united-states (last visited June 23, 2021).

APP 4

9.      On February 2, 2021, President Biden issued Executive Order (EO) 14010, 86 Fed. Reg.

8267, *Creating a Comprehensive Regional Framework to Address the Causes of Migration,*

*to Manage Migration Throughout North and Central America, and to Provide Safe and*

*Orderly Processing of Asylum Seekers at the United States Border.*[4]  In this EO, President

Biden directed the Secretary of Homeland Security to review and determine whether to

modify or terminate MPP.  Furthermore, the President directed the Secretary to consider a

phased strategy for the safe and orderly entry into the United States of those individuals

who were placed in MPP.

10.     Upon the completion of the required review, the Secretary announced his decision to

terminate MPP.[5]  Among the reasons provided, the Secretary noted that MPP required a

significant amount of diplomatic engagement with the Government of Mexico that the

Department would like to now devote to other strategic initiatives that will allow for better

and more consistent border management.  From DHS's perspective, it is simply not a wise

use of taxpayer resources to continue to focus bilateral energy on a program that cannot

operate as intended in the current border environment, and that, even if continued, would

involve significant and complicated burdens on border security personnel and resources

that would detract from important DHS mission sets.  As the internal review of MPP

showed, significant modifications to the current operational and policy structure of MPP

---

[4] *See* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border,* 86 Fed. Reg. 8267 (Feb. 2, 2021), *available at* https://www.federalregister.gov/documents/2021/02/05/2021-02561/creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration (last visited June 23, 2021)

[5] *See* Secretary Alejandro N. Mayorkas, "Termination of The Migrant Protection Protocols Program," June 1, 2021 *available at* https://www.dhs.gov/publication/dhs-terminates-mpp-and-continues-process-individuals-mpp-united-states-complete-their (last visited June 23, 2021).

would have been required to restart the program and to ensure that participants can remain in Mexico pending their immigration proceedings.

11. For instance, restarting the MPP program would have required the United States, in partnership with Mexico, to provide information about updated hearing times and locations to up to 26,000 individuals in Mexico with active cases.  Before the pandemic, MPP relied on in-person document service during initial encounter, or follow-up in-person interactions, with MPP enrollees.  However, now that all previously scheduled hearings have lapsed due to court closures, the United States would need to devise a new way to contact the 26,000 MPP enrollees with active cases.  The United States would also likely need to process each of these individuals at a port of entry, reschedule each of their hearings, service required court documents, and then return them to Mexico once again.  The United States would also need to reestablish the process for bringing these individuals into and out of the United States to attend their future hearings.

12. Additionally, even before COVID-19 forced the suspension of immigration hearings for MPP enrollees—and throughout the time that immigration courts have been shuttered—some program participants experienced inadequate and unstable access to housing, income, and safety, which made it challenging for some to remain in Mexico for the time required to complete their proceedings.  In order to address these matters, including security-related concerns along the border, the United States would need to devote significant foreign assistance to counterparts operating in Mexico.  The level of financial and diplomatic engagement that would be required to address these concerns would detract from this Administration's broader goal of establishing a comprehensive regional strategy for managing migration.

13.   Rather than devote efforts to reestablishing and overhauling the MPP program, DHS seeks to refocus efforts to address the root causes of migration from Central America, improve regional migration management, enhance protection and asylum systems throughout North and Central America, expand cooperative efforts to combat smuggling and trafficking networks, and pursue other initiatives.  These efforts are part of a broader strategy to address irregular migration in a more sustainable and effective way.  Many of those efforts will require engagement with Mexico and, as is the President's prerogative, DHS can choose to focus on these efforts with Mexico rather than negotiations over MPP.  This kind of evolution in response to new dynamics at the border should not be impeded.

*Governments need the ability to trust that each country will uphold the actions to which it commits*

14.   Policy and operational decisions on migration matters are often the subject of intense scrutiny and criticism.  In the case of U.S.-Mexico negotiations on these matters, both governments have been willing to endure domestic criticism for policies or operational decisions taken jointly, because each has believed these actions were ultimately in their country's best interests.  However, if either party is prevented from upholding commitments made in the course of negotiations, the foundation of trust upon which these negotiations are premised erodes.  In fact, as noted above, it is partly because of the necessary closure of immigration courts, which impeded the U.S. commitment to provide MPP enrollees with meaningful access to immigration court proceedings, that DHS has been required to develop *new* policy and operational options.  To maintain a trusted relationship with Mexico, DHS must have the ability to negotiate a new approach to address migration-related issues, including when that means moving away from MPP.

15. Just as DHS worked closely with and made a series of commitments to the Government of Mexico to initiate MPP, DHS has similarly negotiated closely with Mexico on the recent steps the Department has taken, including the ongoing phased approach to processing certain MPP enrollees into the United States and the decision to terminate MPP.  The U.S. and Mexican governments continue to work together to look for more robust regional solutions to manage migration.  If Mexico cannot trust the United States to keep its commitments in these negotiations, the result would be the inability to negotiate in good faith or make hard decisions.  This is especially important when it comes to issues of migration management, which are inherently multinational in nature.

16. An order interfering with DHS's termination of MPP, or otherwise requiring DHS to re-institute the program, would wreak havoc on the Administration's approach to managing migration in the region, including by undermining the Government's ability to engage in the delicate bilateral (and multilateral) discussions and negotiations required to achieve a comprehensive solution.  Such an order would require the United States to renege on the reasoned—and I believe more effective—strategy being developed with Mexico.  Moreover, restarting MPP operations would require new and costly investments from both governments to re-establish the infrastructure that sat dormant for more than a year due to COVID-19.

17. An order to delay termination of MPP or to restart the program would also draw resources from other efforts aimed at more effectively and sustainably addressing irregular migration in the region, such as the creation of a dedicated court docket to hear cases in a more timely fashion, other efforts to streamline the adjudication of asylum cases coming from the border, the expansion of alternative lawful migration pathways in the region, and regional

efforts to address the underlying causes of migration.[6]  Instead of focusing on these efforts, the Department would be forced to implement a discretionary program that the Department's recent review concluded would require a total redesign involving significant additional investments in personnel and resources.  This redesign would come at tremendous opportunity cost and would detract from the work taking place to advance the vision for migration management and humanitarian protection articulated in Executive Order 14010.[7]  In sum, such an order would undermine the Executive's ability to operationalize its considered policy vision with respect to an issue that is central to both domestic and foreign policy interests.

---

[6] *Id.*
[7] *Id.*

18. To be successful, migration management requires collective and coordinated policy and operational actions among regional governments. Undermining the ability of the Federal Government to make commitments will create doubt about the reliability of the United States as a negotiating partner. This doubt will hamstring the Federal Government's ability to conduct the foreign policy discussions that are part and parcel of migration-related negotiations. Without the ability to secure regional action, in part by making and keeping our own commitments, the United States will be forced to go-it-alone, which will have significant resource implications and be damaging to our national and economic security.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief. Executed on this 24 day of June, 2021

*David Shahoulian*

David Shahoulian
Assistant Secretary for Border Security and Immigration
Department of Homeland Security

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS,<br>STATE OF MISSOURI,<br><br>    *Plaintiffs,*<br><br>v.<br><br>JOSEPH R. BIDEN, JR.,<br>in his official capacity as<br>President of the United States, *et al.*,<br><br>    *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 2:21-cv-00067-Z |

### DECLARATION OF EMILY MENDRALA

I, Emily Mendrala, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me in the course of my employment, hereby make the following declaration with respect to the above-captioned matter:

1. I am currently Deputy Assistant Secretary in the Bureau of Western Hemisphere Affairs at the U.S. Department of State and have held this position since January 20, 2021. Prior to this appointment, I was a member of President-Elect Biden's transition, serving on the Agency Review Team for the Department of State with a focus on the Bureau of Western Hemisphere Affairs. From 2017 to 2021, I was Executive Director of the Center for Democracy in Americas, promoting U.S. policies of engagement toward the Americas. During my tenure with the Center, I became very familiar with the issues we are confronting at the U.S. southern border and led educational travel delegations to the

1

border for policy leaders and other stakeholders. In addition, I have served as Director for Legislative Affairs in the National Security Council and as a Special Adviser to the Coordinator for Cuban Affairs and in the Office of Central American Affairs in the State Department. I was also a Professional Staff Member on the Senate Foreign Relations Committee, where I worked on Western Hemisphere policy matters for the Committee.

2. As Deputy Assistant Secretary, I oversee the Department's work on regional migration and Cuban affairs. I engage regularly with interlocutors throughout the Department and interagency to advance the U.S. government's regional migration policy.

3. I am familiar with the lawsuit that the States of Texas and Missouri have filed in the United States District Court in the Northern District of Texas seeking to enjoin the U.S. government from enforcing or implementing the discontinuance of the Migrant Protection Protocols (MPP) either through the Acting Secretary of Homeland Security's January 20, 2021 memorandum suspending enrollment in the MPP,[1] or the Secretary of Homeland Security's June 1, 2021 memorandum formally terminating MPP.[2] Granting this injunction will have a significant adverse impact on U.S. foreign policy, including our relationship with the governments of El Salvador, Guatemala and Honduras (the "northern Central American countries") and Mexico.

4. Addressing regional irregular migration and its root causes is a top U.S. foreign policy priority. To sustainably reduce irregular migration in, from, and through North and Central America, the United States must establish long-term strategic partnerships with the governments in the region to catalyze structural change to root out corruption and

---

[1] Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Suspension of Enrollment in the Migrant Protection Protocols Program* (Jan. 20, 2021).

[2] Memorandum from Alejandro Mayorkas, Sec'y of Homeland Sec., *Termination of the Migrant Protection Protocols Program* (Jun. 1, 2021).

2

impunity, improve security and the rule of law, and increase economic opportunity. These efforts must be coordinated in a comprehensive foreign policy framework to address regional migration that includes adequate protection, expanded legal pathways and regional solutions.

5. President Biden introduced such a framework on February 2, 2021 through Executive Order 14010, 86 Fed. Reg. 8267, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*. Among other things, Executive Order 14010 outlines a new comprehensive, multi-pronged foreign policy approach toward collaboratively managing migration throughout North and Central America. The two main prongs are the Root Causes Strategy and the Collaborative Migration Management Strategy.

6. The Root Causes Strategy focuses on the three main challenges that drive irregular migration: governance and anticorruption, economic opportunity, and security, to rebuild hope in the region. Through this strategy, the United States seeks to partner with Mexico and the northern Central American countries to promote accountability and advance a safe, democratic and prosperous region, where people can advance economically, live in safety, and create futures for themselves and their families instead of embarking on dangerous and often futile journeys to the United States.

7. The Collaborative Migration Management Strategy is devoted to fostering the international cooperation and partnership with Mexico and Central American countries necessary to focus resources and energy on collective action that will enhance safety and economic opportunity, strengthen legal pathways for those who choose to migrate or are

3

forcibly displaced from their homes, and reduce irregular migration. As Secretary of State Blinken stated on February 2, 2021, "The United States remains committed to working with governments in the region to address irregular migration and ensure safe, orderly, and humane migration. We are working to establish and expand a cooperative, mutually respectful approach to managing migration across the region that aligns with our national values and respects the rights and dignity of every person."

8. Mexico is an essential partner for the United States in the implementation of both the Root Causes Strategy and the Collaborative Migration Management Strategy. On March 1, 2021, Presidents Biden and López Obrador issued the U.S.-Mexico Joint Declaration, in which they committed to immigration policies that recognize the dignity of migrants and the imperative of orderly, safe and regular migration. They further committed to collaborate on a joint effort to address the root causes of regional migration, improve migration management, and develop legal pathways for migration. They also directed the Secretariat of Foreign Relations and the Department of State, respectively, to engage with the governments of the northern Central American countries, as well as with civil society and private sectors, through policies that promote equitable and sustainable economic development, combat corruption, and improve law enforcement cooperation against transnational criminal smuggling networks.

9. As Acting Assistant Secretary of State Chung stated in her remarks before the U.S. House Foreign Affairs Subcommittee on Western Hemisphere, Civilian Security, Migration and International Economic Policy on April 28, 2021, Mexico has already begun taking actions to advance these commitments. It has reinforced its efforts to reduce irregular northbound movements through its territory – launching a major enforcement action in

4

APP 14

southern Mexico in March with over 10,000 personnel. It has further committed to increasing its enforcement personnel strength to 12,000. The Mexican government continues to look for ways to invest in and develop its own communities as well as contribute to stronger Central American economies and engage with regional and international partners to share the burden. In addition, Mexico continues to be a leader in the region in offering international protection for those fleeing persecution.

10. On June 8, Vice President Harris met with President López Obrador during her first foreign trip as Vice President, reflecting the priority the Administration is placing on addressing irregular migration. Together they announced a new partnership to work jointly in Central America to address the root causes of irregular migration to Mexico and the United States, as well as efforts to disable human trafficking and human smuggling organizations. During this visit, the U.S. and Mexican governments signed a memorandum of understanding to establish a strategic partnership between the two countries to address the lack of economic opportunities in the northern Central American countries, which will include fostering agricultural development and youth empowerment programs, and co-creating and managing a partnership program enabling them to better deliver, measure and communicate about assistance to the region.

11. The United States has likewise worked to secure key commitments from the governments of the northern Central American countries to advance both the Root Causes Strategy and the Collaborative Migration Management Strategy. Both Secretary Blinken and Vice President Harris have been engaged on these issues throughout the region, as has Special Envoy for the Northern Triangle Zúñiga.

5

12. For example, on June 1, 2021, Secretary Blinken met with foreign ministers from Costa Rica, Guatemala, Honduras, El Salvador, Nicaragua, Panama and Mexico in San José, Costa Rica at a meeting of the Central America Integration System (SICA) – the economic and political organization of the region's states. The leaders discussed the U.S. strategy to address the root causes of migration, including generating economic opportunities for Central Americans and advancing the essential work of reducing violence and addressing the COVID-19 pandemic and climate change. Secretary Blinken emphasized that Central America can be a stronger region if the people and countries cooperate to jointly tackle these challenges. Vice President Harris has had several conversations with the president of Guatemala about migration issues, and on June 7, 2021, she met with President Giammattei in Guatemala City. Both leaders acknowledged the need to work as partners to address irregular migration from Central America.

13. As a result of these and other U.S. diplomatic efforts, the northern Central American countries have engaged in migration management, and the governments make decisions about humane enforcement in ways that are appropriate for each country. We have seen the result in increased access to protection, apprehensions of irregular migrants, and greater numbers of checkpoints.

14. For example, the United States and Guatemala are collaborating to deepen bilateral law enforcement cooperation to combat migrant smugglers, human traffickers, and narcotics traffickers including through the reconstitution of a Mobile Tactical Interdiction Unit focused on dismantling transnational criminal activities in Guatemala, by providing U.S. law enforcement personnel to train and advise Guatemalan border security and law enforcement, and by the Guatemalan government identifying and seizing the illicit assets

6

of those criminal organizations. The Guatemalan government has also committed to collaborate with the United States to establish Migration Resource Centers in Guatemala that will provide protection screening and referrals for people in need of protection, others seeking lawful pathways to migrate, as well as returning migrants in need of reintegration support in Guatemala. The first Migration Resource Center has already become operational.

15. For its part, the United States has already taken several actions to advance the administration's efforts to enact a comprehensive approach to regional migration. One of the first was to commence the wind-down of the MPP policy. From a foreign policy perspective, the MPP wind-down was a crucial initial step in implementing the new policy. As a result of the U.S. "Remain in Mexico" policy, an informal camp had formed in Matamoros, Tamaulipas along the U.S.-Mexico border consisting of thousands of migrants primarily from Central America living in squalid conditions for extended periods while, for some, they were awaiting the commencement or completion of their U.S. immigration proceedings. This camp was located in a dangerous area where the migrants faced the risk of murder, sexual and gender-based violence, kidnaping or extortion on a daily basis. The governments of the northern Central American countries expressed concern for the safety of their nationals residing in the camp as well as elsewhere along the U.S.-Mexico border where migrants faced similar conditions while awaiting their immigration proceedings. The Government of Mexico shared these concerns.

16. After the U.S. government announced the wind-down of the MPP policy on February 11, 2021, President López Obrador applauded this move and welcomed the United States'

7

commitment to "regularize the situation of migrants." Since the announcement of the MPP wind-down process, the Mexican and U.S. governments have worked together to implement this process, including determining the prioritization of the intake. Through the MPP wind-down process, the informal migrant camp in Matamoros was closed in early March 2021, and Mexican officials welcomed its closure. On May 7, 2021, during a telephone conversation with Vice President Harris, President López Obrador stated, "We agree with the migration policies you are developing and we are going to help, you can count on us." International Organization partners, such as the United Nations High Commissioner for Refugees (UNHCR), International Organization for Migration (IOM), and others, responded positively to the decision to wind down and terminate MPP, and some acted as partners in the wind-down effort.

17. Reversing the MPP wind-down and termination process would undercut current U.S. foreign policy. The Mexican government and our international organization partners have been essential partners in the wind-down process since February. Re-implementing MPP would nullify more than four months of diplomatic and programmatic engagement with them to restore safe and orderly processing at the U.S. southern border. It would also require the U.S. government to divert attention and limited resources away from its current U.S. foreign policy goals mentioned above towards negotiating with Mexico the re-implementation of MPP.

18. In addition, reversing the wind-down and termination of MPP at this stage would be harmful to our bilateral relationships with Mexico and the northern Central American countries, as well as with our partner international organizations, as it would diminish their trust that the United States follows through on its commitments. As a result, these

8

countries and international organizations will be less inclined to cooperate with the United States in implementing its broader, long-term foreign policy goals, including the Root Causes Strategy and the Collaborative Migration Management Strategy, and this in turn would adversely impact the U.S. government's efforts to stem the flow of irregular migration in the region.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this 25th day of June, 2021

Emily Mendrala
Deputy Assistant Secretary
Bureau of Western Hemisphere Affairs
U.S. Department of State

9

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 25, 2021, I electronically filed this appendix with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Brian C. Ward*
BRIAN C. WARD
U.S. Department of Justice