# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' REPLY IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

TABLE OF CONTENTS

Table of Contents .............................................................................................................. ii

Table of Authorities ........................................................................................................ iii

Introduction ...................................................................................................................... 1

Argument .......................................................................................................................... 1

I.     Plaintiffs Are Likely to Succeed on the Merits ................................................... 1

     A.     The June 1 Memorandum Violates the APA ............................................. 2

           1.     The Administrative Record Confirms that Defendants Ignored Their Own Previous Analyses ........................................... 2

           2.     Defendants Cannot Justify Ignoring MPP's Benefits .................... 3

           3.     Defendants Cannot Justify Ignoring the Costs of Terminating MPP ................................................................................ 4

           4.     Defendants Unreasonably Relied on Meaningless Data ................ 5

     B.     The June 1 Memorandum Violates Section 1225 ...................................... 6

     C.     The June 1 Memorandum Violates the Take Care Clause .......................... 7

     D.     The June 1 Memorandum Violates the Agreement with Texas .................. 9

           1.     DHS Legitimately Signed the Agreement ...................................... 9

           2.     The Agreement Is Valid and Enforceable ..................................... 10

     E.     No Procedural Issue Precludes this Court's Review ................................. 12

           1.     Plaintiffs Have Standing to Bring These Claims ......................... 12

           2.     The June 1 Memorandum Is Subject to Judicial Review ............. 16

                 a.     No Statute Precludes Review under Section 701(a)(1) ...................................................................... 16

                 b.     The Termination of MPP Was Not Committed to Agency Discretion under Section 701(a)(2) .................... 19

           3.     The June 1 Memorandum is final agency action ......................... 21

           4.     Plaintiffs Are within the Zone of Interests .................................... 22

II.     The Non-Merits Factors Favor Plaintiffs ......................................................... 23

     A.     Texas and Missouri Face Irreparable Harm ........................................... 23

     B.     Relief Would Not Harm Defendants or the Public .................................. 24

III.     Both Mandatory and Prohibitory Relief Are Appropriate Nationwide ............... 24

Conclusion ...................................................................................................................... 25

Certificate of Service ...................................................................................................... 27

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraham v. United States*,
   81 Fed. Cl. 178 (2008) ...................................................................................................9

*Al-Joudi v. Bush*,
   No. 1:05-cv-301, 2005 WL 774847 (D.D.C. Apr. 4, 2005)....................................................24

*American School of Magnetic Healing v. McAnnulty*,
   187 U.S. 94 (1902)........................................................................................................7

*Arbid v. Holder*,
   700 F.3d 379 (9th Cir. 2012) (per curiam)................................................................19

*Bowen v. Public Agencies Opposed to Social Security Entrapment*,
   477 U.S. 41 (1986)........................................................................................................9

*C&L Enters., Inc. v. Citizen Band of Potawatomi Indian Tribe of Okla.*,
   532 U.S. 411 (2001)......................................................................................................12

*CACI, Inc. v. Stone*,
   990 F.2d 1233 (Fed. Cir. 1993)......................................................................................9

*Califano v. Yamasaki*,
   442 U.S. 682 (1979)......................................................................................................25

*California v. Texas*,
   No. 19-840, 2021 WL 2459255 (U.S. June 17, 2021) .........................................................15

*Chamber of Commerce of U.S. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) .....................................................................................7, 12

*Clarke v. Sec. Indus. Ass'n*,
   479 U.S. 388 (1987).....................................................................................................23

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
   527 U.S. 666 (1999)......................................................................................................12

*Cruz v. DHS*,
   No. 1:19-cv-2727, 2019 WL 8139805 (D.D.C. Nov. 21, 2019).............................................21

*Cruz-Miguel v. Holder*,
   650 F.3d 189 (2d Cir. 2011)...........................................................................................7

*Dalton v. Specter*,
   511 U.S. 462 (1994)..................................................................................7, 8

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
   710 F.3d 579 (5th Cir. 2013) ..................................................................24

*Dart v. United States*,
   848 F.2d 217 (D.C. Cir. 1988)..................................................................7

*Delgado v. Holder*,
   648 F.3d 1095 (9th Cir. 2011) ................................................................18

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019)......................................................................15, 19

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020)................................................................5, 17, 19, 20

*Doe v. United States*,
   37 Fed. Cl. 74 (1996) ..............................................................................11

*E.O.H.C. v. Sec'y U.S. DHS*,
   950 F.3d 177 (3d Cir. 2020)....................................................................18

*The Floyd Acceptances*,
   74 U.S. 666 (1868)....................................................................................9

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
   805 F.2d 1050 (D.C. Cir. 1986)................................................................3

*Hamama v. Adducci*,
   912 F.3d 869 (6th Cir. 2018) ..................................................................25

*Innovation Law Lab v. McAleenan*,
   924 F.3d 503 (9th Cir. 2019) (per curiam)..............................................21

*Jennings v. Rodriguez*,
   138 S. Ct. 830 (2018)..............................................................................17

*Kania v. United States*,
   650 F.2d 264 (Ct. Cl. 1981) ....................................................................11

*Kendall v. United States ex rel. Stokes*,
   37 U.S. (12 Pet.) 524 (1838)....................................................................8

*Kucana v. Holder*,
   558 U.S. 233 (2010)................................................................................18

*Larson v. Domestic & Foreign Commerce Corp.*,
    337 U.S. 682 (1949)..................................................................................................12

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)............................................................................................22, 23

*Liberty Ammunition, Inc. v. United States*,
    835 F.3d 1388 (Fed. Cir. 2016)..............................................................................9

*Loa-Herrera v. Trominski*,
    231 F.3d 984 (5th Cir. 2000) ................................................................................19

*Make the Rd. N.Y. v. Pompeo*,
    475 F. Supp. 3d 232 (S.D.N.Y. 2020)....................................................................8

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)..............................................................................................16

*Massachusetts v. Melon*,
    262 U.S. 447 (1923)..............................................................................................16

*Merchants Fast Motor Lines, Inc. v. ICC*,
    5 F.3d 911 (5th Cir. 1993) ....................................................................................21

*Michigan v. EPA*,
    576 U.S. 743 (2015)..........................................................................................20, 21

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1867) .................................................................................8

*Morton v. Ruiz*,
    415 U.S. 199 (1974)..............................................................................................10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..................................................................................................3

*Nat'l Res. Def. Council v. EPA*,
    643 F.3d 311 (D.C. Cir. 2011)..............................................................................22

*Nora v. Wolf*,
    No. 1:20-cv-993, 2020 WL 3469670 (D.D.C. June 25, 2020) ..............................18

*Office of Communication of United Church of Christ v. FCC*,
    707 F.2d 1413 (D.C. Cir. 1983)..............................................................................7

*Oglala Sioux Tribe of Indians v. Andrus*,
    603 F.2d 707 (8th Cir. 1979) ................................................................................10

*R.I.L-R v. Johnson,*
    80 F. Supp. 3d 164 (D.D.C. 2015) ........................................................................24

*Singh v. U.S. Dep't of Justice,*
    461 F.3d 290 (2d Cir. 2006).................................................................................10

*Stark v. Wickard,*
    321 U.S. 288 (1944)...............................................................................................7

*Sure-Tan, Inc. v. NLRB,*
    467 U.S. 883 (1984).............................................................................................16

*Sw. Elec. Power Co. v. EPA,*
    920 F.3d  999 (5th Cir. 2019) ...........................................................................4, 5

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) .........................................................................21, 22

*Texas v. United States,*
    106 F.3d 661 (5th Cir. 1997) ...............................................................................8

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ................................................................... *passim*

*Texas v. United States,*
    86 F. Supp. 3d 591 (S.D. Tex. 2015), *aff'd*, 809 F.3d 134 (5th Cir. 2015) ...........................16

*Texas v. United States,*
    No. 6:21-cv-3, 2021 WL 2096669 (S.D. Tex. Feb. 23, 2021)...................................... *passim*

*Texas v. United States,*
    No. 6:21-cv-3, 2021 WL 247877 (S.D. Tex. Jan. 26, 2021).....................................17

*TikTok Inc. v. Trump,*
    No. 1:20-cv-2658, 2020 WL 7233557 (D.D.C. Dec. 7, 2020) ................................24

*U.S. Telecom Ass'n v. FCC,*
    359 F.3d 554 (D.C. Cir. 2004).........................................................................9, 10

*Wells Fargo Bank, Nat'l Ass'n v. Se. N.M. Affordable Hous. Corp.,*
    877 F. Supp. 2d 1115 (D.N.M. 2012) ....................................................................12

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
    139 S. Ct. 361 (2018)...........................................................................................19

*Wong Wing Hang v. INS,*
    360 F.2d 715 (2d Cir. 1966)...........................................................................19, 20

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ...........................................................................18

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017) .......................................................................24

**Statutes**

5 U.S.C.
   § 553(a)(1) .........................................................................................24
   § 553(b)(A) .........................................................................................10
   § 701(a)(2) .........................................................................................19
   § 704 ...................................................................................................21
   § 706(2)(A) .........................................................................................19

6 U.S.C.
   § 202(5) ................................................................................................9
   § 361(b)(4) ...........................................................................................9

8 U.S.C.
   § 1103(a)(3) ........................................................................................20
   § 1103(a)(3) ..........................................................................................9
   § 1103(a)(5) ........................................................................................20
   § 1225 ........................................................................................ *passim*
   § 1225(b)(1)(A)(iii)(I) .........................................................................20
   § 1225(b)(2)(C) ...................................................................................20
   § 1226(e) ............................................................................................19
   § 1252(a)(2)(B)(i) ...............................................................................18
   § 1252(a)(2)(B)(ii) .........................................................................17, 19
   § 1252(b)(9) ........................................................................................17
   § 1252(f)(1) .........................................................................................24
   § 1252(g) .............................................................................................17

28 U.S.C. § 1491 ............................................................................................11

Tex. Educ. Code § 25.085 ..............................................................................14

**Other Authorities**

Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations;
   Procedures for Protection Claims, 83 Fed. Reg. 55934 (Nov. 9, 2018) ...................................4

Antonin Scalia & Bryan A. Garner, *Reading Law* 107 (2012) ....................................17

INTRODUCTION

Before the Migrant Protection Protocols ("MPP") went into effect, meritless claims of asylum gave illegal aliens "a free ticket into the United States." App.309. To its great credit, the federal government responded to this problem by establishing MPP. It was a breakthrough. "MPP decrease[d] the number of aliens released into the interior" and "decreas[ed] the volume of inadmissible aliens arriving in the United States." ECF No. 61 at AR555. It even reduced the wait time for aliens with meritorious claims. *See* App.309.

But then the new Administration terminated MPP without even considering the relevant factors, including its own previous assessments of the program's effectiveness. Defendants ignored the benefits MPP was providing. They ignored the costs terminating the program would impose on States. For these and other reasons, Defendants' June 1 Memorandum terminating MPP was unlawful.

Defendants' decision imposes significant harms on Texas, Missouri, their citizens, and vulnerable migrants. To avoid further irreparable injury, the Court should grant injunctive relief.

ARGUMENT

## I.      Plaintiffs Are Likely to Succeed on the Merits

The June 1 Memorandum cannot stand for four reasons. First it violated the APA by arbitrarily and capriciously terminating MPP. Second, it necessarily leads to violations of Section 1225's mandatory-detention provision. Third, it is inconsistent with the President's constitutional obligation to enforce Congress's immigration laws. Fourth, DHS promulgated the memorandum without completing the procedural steps required by its binding agreement with Texas. Defendants ask the Court to avoid the merits, but Plaintiffs have standing to challenge this reviewable final agency action.

A.      **The June 1 Memorandum Violates the APA**

Defendants' response confirms that the June 1 Memorandum was arbitrary and capricious. Defendants ignored not only their own previous analyses of MPP's effectiveness but also the main benefits provided by MPP and important costs of terminating the program. Instead, Defendants focused on meaningless and irrelevant considerations.

1.      **The Administrative Record Confirms that Defendants Ignored Their Own Previous Analyses**

Defendants acted arbitrarily and capriciously by ignoring key issues that any reasoned analysis would have considered. Defendants have now submitted "the administrative record the agency considered in issuing the memorandum," ECF No. 61 (certification), but they did not include DHS's 2019 assessment of MPP's effectiveness, App.308–12, or the transition briefing materials about MPP from agency career staff. *See* App.398 ¶ 29.

DHS's own 2019 assessment emphasized the success of MPP in achieving key policy goals, including: (1) allowing DHS to avoid releasing tens of thousands of aliens into the United States and (2) deterring aliens from Central America from attempting to cross the border in the first place. *See* App.308–09. DHS found that there was a direct causal connection with MPP: "DHS has observed a connection between MPP implementation and decreasing enforcement actions at the border—including a rapid and substantial decline in apprehensions in those areas where the most amenable aliens have been processed and returned to Mexico pursuant to MPP." *Id.* But the June 1 Memorandum does not discuss the effects terminating MPP would have on the number of illegal aliens released into the United States or the incentives surrounding illegal border crossings. This assessment was too important for Defendants to ignore.[1]

---

[1] To be sure, the June 1 Memorandum says DHS "evaluated . . . prior DHS assessments of the program," App.468, but that seemingly does not include the 2019 assessment in light of its omission from the administrative record's "certified index." ECF No. 61 at 2. In any event, "[s]tating that a factor was considered . . . is not a substitute

So too for the transition briefing materials. Career staff briefed transition officials "concerning implementation of MPP, its effectiveness, and the consequences if the policy were suspended." App.399 ¶ 31. But neither the June 1 Memorandum nor the administrative record gives any hint that Defendants considered these materials. That is especially problematic because materials produced by DHS career staff are Defendants' *own* materials.

Failing to consider these documents and issues violated the APA. Reversing course, without any discussion of the agency's previous, contrary assessment, is by definition arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (requiring "a reasoned analysis for the change"). These omissions are fatal to the June 1 Memorandum because "the reviewing court should not attempt itself to make up for such deficiencies: [it] may not supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43 (quotation marks omitted).

Defendants' only response is to change the level of generality. They do not deny that they failed to consider these particular materials or explain why they were abandoning their previous positions. Instead, Defendants say "that there were serious questions about the effectiveness of MPP" generally. ECF No. 63 at 29. But general questions about a program's effectiveness are a reason Defendants should have considered the 2019 assessment and the transition briefing materials, not an excuse for ignoring them.

### 2.    Defendants Cannot Justify Ignoring MPP's Benefits

The June 1 Memorandum ignored MPP's crucial benefits. According to DHS itself, MPP removed "perverse incentives" that encouraged aliens not entitled to asylum to illegally cross the border. ECF No. 53 at 11 (citing App.312); *see also* Aliens Subject to a Bar on Entry Under Certain

---

for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986).

Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934, 55935, 55941, 55944, 55947, 55950 (Nov. 9, 2018).

Similarly, MPP allowed DHS to more often meet its statutory obligation to detain aliens seeking asylum. *See* ECF No. 53 at 16. DHS previously recognized its "mandatory detention" obligation in Section 1225 but noted that "resource constraints" "made many releases inevitable." App.307. MPP addressed those resource constraints by ensuring DHS could avoid unlawfully releasing aliens without having to detain them. In part of 2019 alone, it allowed the agency to avoid unlawfully releasing at least 55,000 aliens into the interior of the United States. App.309. As discussed below, discontinuing MPP will result in systematic violations of the detention requirements in Section 1225. *See infra* Part I.B.

But the June 1 Memorandum "entirely failed to consider [those] important aspect[s] of the problem." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). It did not discuss the incentives created by the termination of MPP or the effect terminating MPP would have on DHS's ability to detain aliens covered by Section 1225. Defendants focus on the fact that they provided an almost 700-page administrative record, ECF No. 63 at 37–38, 41, but quantity is no substitute for quality. A long record ignoring important factors is no better than a short one. Because a court "may uphold agency action only on the grounds that the agency invoked when it took the action," the June 1 Memorandum cannot be upheld. *Sw. Elec. Power Co.*, 920 F.3d at 1014.

### 3.    Defendants Cannot Justify Ignoring the Costs of Terminating MPP

The June 1 Memorandum also ignored serious problems with terminating MPP, including the costs to States and the States' reliance interests in federal immigration enforcement. *See* ECF No. 53 at 13–14. Defendants insist that terminating MPP will not, in fact, impose costs on the States. *See* ECF No. 63 at 31. The costs to States are well established, *see infra* Part I.E.1, but even putting that dispute aside, the June 1 Memorandum is still arbitrary and capricious. The

agency did not conclude that there will be no costs to States. It simply ignored the possibility of such costs.

Costs to States are "one factor to consider" even if the agency might ultimately conclude that "other interests and policy concerns outweigh" concerns about costs. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914 (2020). Considering such issues "was the agency's job, but the agency failed to do it." *Id.* Even if DHS had decided that costs to States were outweighed, it should have at least considered whether it could accommodate the States' reliance interests. As Judge Tipton recently explained, "a sudden shift in the government's immigration policy" is "arbitrary and capricious" when "the government 'failed to address whether there was legitimate reliance' on the former immigration policy." *Texas v. United States*, No. 6:21-cv-3, 2021 WL 2096669, at *11 (S.D. Tex. Feb. 23, 2021) (describing *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913). "[T]he financial harm to States from sudden shifts in their population due to federal immigration policies are not nebulous, but rather, serious and well recognized." *Id.* (cleaned up).

### 4.      Defendants Unreasonably Relied on Meaningless Data

The June 1 Memorandum rests on Defendants' misunderstanding of data about *in absentia* removals. It unreasonably relied on a standalone figure, the rate of in absentia removals under MPP, without determining whether that figure was attributable to MPP or comparing it to any non-MPP data. *See* ECF No. 53 at 14–15. Defendants' response is to argue that data omitted from the June 1 Memorandum and the administrative record supports Defendants' conclusion. *See* ECF No. 63 at 32–33. Even if that were true, it would not help Defendants here because they did not invoke this ground when issuing the June 1 Memorandum. *See Sw. Elec. Power Co.*, 920 F.3d at 1014.

In any event, a higher rate of *in absentia* removals is consistent with the fact that MPP reduced a key incentive to pursue meritless asylum applications. Neither the June 1 Memorandum

nor Defendants' brief provides any reason to think that in absentia removal orders resulted from aliens abandoning meritorious, rather than unmeritorious, asylum claims. *See* App.469 (concluding only that the data "raises questions").

Finally, the June 1 Memorandum was arbitrary because it prospectively terminated MPP based on superseded events. Past closures of immigration courts that are now open again are irrelevant to whether MPP should be continued going forward, even if they posed a problem during the closures. *See* ECF No. 53 at 15. Defendants' brief offers no response to this argument.

\*     \*     \*

For all of these reasons, the June 1 Memorandum is arbitrary and capricious.

### B.     The June 1 Memorandum Violates Section 1225

Section 1225 imposes mandatory-detention obligations on Defendants. *See* ECF No. 53 at 16–17. Even they acknowledge that. *See* App.307. But Defendants say they cannot meet that statutory obligation because of "resource constraints" like a limited detention space. App.307 (describing "many releases" as "inevitable"); *see also* App.330 n.7 (declaring "[c]ontinued detention" of certain migrants "not in the interest of resource allocation"). To "prevent[] 'catch and release' into the United States," Defendants established MPP. ECF No. 61 at AR555; *see* App.302 (discussing aliens who "cannot be detained and timely removed"); App.304 ("MPP will reduce the extraordinary strain on our border security and immigration system.").

By terminating MPP, Defendants are ensuring that they will commit additional violations of Section 1225's mandatory-detention provision. Without MPP, Defendants face even more illegal aliens who they cannot detain due to "resource constraints" but cannot release without violating Section 1225. Defendants' response has been to unlawfully release classes of aliens on parole. *See* ECF No. 53 at 17–18 (citing App.330 n.7). Congress "specifically narrowed the executive's discretion" to grant parole due to "concern that parole . . . was being used by the

executive to circumvent congressionally established immigration policy." *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011). In these circumstances, terminating MPP necessarily violates Section 1225, even though Defendants would have more discretion if they could otherwise comply with their mandatory-detention obligations.

Defendants insist that parole is "outside the scope of this case," ECF No. 63 at 38, but Plaintiffs are not challenging any particular parole determinations. Defendants' parole practices simply provide relevant context for understanding Defendants' decision to terminate MPP. *See Office of Communication of United Church of Christ v. FCC*, 707 F.2d 1413, 1440-42 (D.C. Cir. 1983) (finding agency action arbitrary and capricious when evaluated in light of a "concurrent proceeding" by the agency).

### C.     The June 1 Memorandum Violates the Take Care Clause

Defendants deny that there is an equitable cause of action against federal officials for violating the law, ECF No. 63 at 39, but they ignore the long history of federal courts granting relief on such claims. *See, e.g.*, *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902); *Stark v. Wickard*, 321 U.S. 288, 310 (1944). "Nothing in the subsequent enactment of the APA altered the *McAnnulty* doctrine of review. It does not repeal the review of *ultra vires* actions recognized long before, in *McAnnulty*." *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988). "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Id.* Thus, Plaintiffs can bring a "non-statutory review action," and courts have authority to review federal executive action that violates statutory commands. *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327–32 (D.C. Cir. 1996).

Contrary to Defendants' suggestion, *see* ECF No. 63 at 39 (citing *Dalton v. Specter*, 511 U.S. 462 (1994)), Plaintiffs' constitutional claim is not "that the President simply did not fully comply with a congressionally prescribed process" but "that the President's actions affirmatively

displaced a congressional[] mandate[.]" *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 258 (S.D.N.Y. 2020). It therefore implicates "constitutional separation of powers concerns not present in *Dalton*" and should be "appropriately considered as [a] constitutional claim[] subject to judicial review." *Id.* at 258–59.

*Mississippi v. Johnson* does not preclude review because Plaintiffs do not seek an order directing the President's "exercise of judgment." 71 U.S. (4 Wall.) 475, 499 (1867). Instead, Plaintiffs seek an injunction prohibiting implementation of an unlawful agency action. Because Congress has removed any discretion the Executive Branch might have previously had to decline detention of aliens claiming asylum in these circumstances, there is no "exercise of judgment" with which an injunction could interfere.

Courts can and do enforce the presidential duty to faithfully execute congressional commands through relief granted against his subordinates. Because the termination of MPP necessarily causes Defendants to violate the law, terminating MPP is, in these circumstances, to claim "a dispensing power, which has no countenance for its support in any part of the constitution." *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838). "To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible." *Id.*

*Texas v. United States,* 106 F.3d 661 (5th Cir. 1997), is not to the contrary. When a plaintiff challenges an entire programmatic scheme of enforcement, rather than a specific agency action, there may be "no workable standard against which to judge the agency's exercise of discretion." *Id*. at 667. But that does not apply here. The workable standard is that the Executive Branch cannot take steps that prevent its compliance with congressional mandates.

### D.    The June 1 Memorandum Violates the Agreement with Texas

Defendants do not dispute that they violated the agreement between DHS and Texas ("the Agreement"). *See* App.318. Their only defense is to attack the legitimacy of the Agreement itself.

### 1.    DHS Legitimately Signed the Agreement

Defendants maintain that DHS lacked statutory authority to enter the Agreement, ECF No. 63 at 44–45, but Congress granted DHS broad authority to implement cooperative policies with the States. Congress specifically authorized DHS to "develop a process for receiving meaningful input from State and local government to assist the development of the national strategy for combating terrorism and other homeland security activities." 6 U.S.C. § 361(b)(4). The notice-and-comment process for receiving input created in the Agreement provides a legitimate mechanism for receiving that meaningful input. More generally, the Secretary is empowered to "perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter," 8 U.S.C. § 1103(a)(3), and to "[e]stablish[] national immigration enforcement policies," 6 U.S.C. § 202(5).[2]

Defendants hyperbolically contend that DHS contracted away its sovereign authority to Texas, *see* ECF No. 63 at 43, but the federal government maintains its authority over immigration policy. The Agreement does not grant Texas a veto over federal immigration policy or substantively limit Defendants' authority. Instead, it is analogous to the APA's notice-and-comment requirements, which no one contends are an abdication of federal sovereignty to States, interest groups, and individuals merely because those procedures can delay agency action.[3]

---

[2] Defendants repeatedly cite cases about commercial contracts, but they do not apply where the agreement at issue is a rule that provides additional procedures on agency decisionmaking pursuant to statutory authority. ECF No. 63 at 44 (citing *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52 (1986) ("commercial contract"); *The Floyd Acceptances*, 74 U.S. 666, 674 (1868) ("bills of exchange"); *CACI, Inc. v. Stone*, 990 F.2d 1233 (Fed. Cir. 1993) ("procurement contract"); *Abraham v. United States*, 81 Fed. Cl. 178 (2008) (taxes); *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1391 (Fed. Cir. 2016) ("non-disclosure agreement").

[3] Defendants also cite *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004), as prohibiting agency

Agencies frequently adopt procedural rules not required by statute, and federal courts enforce those rules. *See, e.g., Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (overturning agency action in part because the agency had failed to comply with an informal rule detailing internal procedures that agency was to follow); *Singh v. U.S. Dep't of Justice*, 461 F.3d 290, 295 (2d Cir. 2006) (holding that INS regulations permit consideration of factors relevant to extreme hardship that statute did not make relevant); *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 717 (8th Cir. 1979) (Bureau of Indian Affairs personnel decision reversed when agency failed to consult with tribe before transferring federal agent from one area office to another in violation of agency commitment to engage in such consultation). Agencies can legitimately bind themselves to more rigorous procedures, including by agreeing to consult with relevant stakeholders. And when an agency fails to live up to its commitments, federal courts enforce them.

The manner that DHS entered into the Agreement was also consistent with the APA. Defendants' drive-by, footnoted assertion that the Agreement was subject to notice-and-comment rulemaking is wrong because it does not "constrain[] the agency from making future changes to immigration policy," ECF 63 at 45 n.12, but merely sets "rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A).

## 2. The Agreement Is Valid and Enforceable

Defendants contradictorily claim both (1) that Texas has an "adequate remedy" in the Court of Federal Claims—a claim under the Tucker Act's waiver of sovereign immunity—and (2) that

---

subdelegations of authority to outside parties. ECF No. 63 at 45. But the Agreement is not a prohibited subdelegation. Contrasting illicit subdelegations of agency power with permitted cooperative arrangements, the court "recognize[d] three specific types of legitimate outside party input into agency decision-making processes: (1) establishing a reasonable condition for granting federal approval; (2) fact gathering; and (3) advice giving." *Id.* at 566. The court explained that "a federal agency may turn to an outside entity for advice and policy recommendations, provided the agency makes the final decisions itself." *Id.* at 567. Under the Agreement, DHS continues to "make[] the final decisions itself." It simply follows a process for receiving "advice and policy recommendations" from Texas.

the Tucker Act would not allow Texas to file its claim in the Court of Federal Claims. *See* ECF No. 63 at 42–43. Defendants are only partly right: Texas could not sue in the Court of Federal Claims. As a result, it has no other adequate remedy, and nothing precludes this Court from hearing this claim.

Under the Tucker Act, contract actions against the federal government seeking money damages over $10,000 are within the exclusive jurisdiction of the Court of Federal Claims. 28 U.S.C. § 1491. However, the Court of Federal Claims' "jurisdiction over contract claims turns on whether the Government was acting in its sovereign or proprietary capacity when it entered into the contract or agreement at issue." *Doe v. United States*, 37 Fed. Cl. 74, 77–78 (1996). "The contract liability which is enforceable under the Tucker Act consent to suit does not extend to every agreement, understanding, or compact which can semantically be stated in terms of offer and acceptance or meeting of minds." *Kania v. United States*, 650 F.2d 264, 268 (Ct. Cl. 1981). The Tucker Act applies "where the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves." *Id.*

The Agreement at issue here is nothing like an agency's contract with a supplier of office supplies: It involves DHS receiving input on the exercise of the federal government's sovereign authority over immigration. This case is not within the jurisdiction of the Court of Federal Claims.

Sovereign immunity is not a bar here. Texas is not seeking damages. Nor, contrary to Defendants' assertion, *see* ECF No. 63 at 42, is it seeking specific performance to affirmatively require DHS to provide notice and follow the procedures in the Agreement. Rather, Texas seeks the standard remedies for unlawful agency action, holding unlawful and setting aside the challenged June 1 Memorandum. *See* ECF No. 48 at 46.

The distinction between relief "ordering the cessation of the conduct complained of" and relief "requir[ing] affirmative action by the sovereign" is the basis for the long-standing rule that *ultra vires* suits against federal officers (and analogous *Ex parte Young* suits against state officers) do not implicate sovereign immunity. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949). "[I]f the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit. There is no sovereign immunity to waive—it never attached in the first place." *Chamber of Commerce*, 74 F.3d at 1329 (cleaned up).

The remedies sought here—setting aside as null the agency actions that failed to comply with the terms of the Agreement—are the standard remedies for unlawful agency action. Defendants present no valid reason this Court cannot consider them.

Finally, Defendants waived sovereign immunity not only in the APA but also in the Agreement itself by expressly calling for "injunctive relief, including specific performance, to enforce" its terms and authorizing "adjudicat[ion] in a United States District Court located in Texas." App.322. "The Supreme Court has recognized that a waiver of sovereign immunity can take a contractual form." *Wells Fargo Bank, Nat'l Ass'n v. Se. N.M. Affordable Hous. Corp.*, 877 F. Supp. 2d 1115, 1140 (D.N.M. 2012); *see C&L Enters., Inc. v. Citizen Band of Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 423 (2001); *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999).

### E.     No Procedural Issue Precludes this Court's Review

#### 1.     Plaintiffs Have Standing to Bring These Claims

Defendants' response ignores the simplest argument in favor of Plaintiffs' standing: (1) MPP increases the number of illegal aliens in Texas and Missouri; (2) the presence of those

aliens imposes financial burdens the States; and (3) this Court can redress those injuries by vacating the June 1 Memorandum or enjoining its implementation. *See* ECF No. 53 at 21–28.

First, Defendants argue "Plaintiffs cannot show that terminating MPP will increase illegal immigration," ECF No. 63 at 5, but Defendants miss the point. Defendants' termination of MPP necessarily increases the number of illegal aliens present in the United States regardless of whether it increases the number of would-be immigrants. MPP required certain illegal aliens to remain in Mexico. *See* App.024. Defendants acknowledge there were "tens of thousands of MPP enrollees" who remained "in Mexico." App.469. As a result, "MPP decrease[d] the number of aliens released into the interior of the United States." ECF No. 61 at AR555. Now, Defendants are releasing into the United States aliens who would have been enrolled in MPP. Indeed, that is their goal. Defendants seemingly wanted aliens to avoid the "conditions faced by some MPP enrollees in Mexico." App.469.

Defendants appear to be focused on a different question: whether the suspension and termination of MPP is contributing to the border surge. *See* ECF No. 63 at 5–6. As an initial matter, the Court need not resolve that question because Plaintiffs have standing either way. Even if the number of attempted border crossings were not rising, the termination of MPP would still increase the number of illegal aliens present in the United States. That is sufficient.

In any event, Defendants' suspension and termination of MPP has also directly led to the border surge because MPP was an important deterrent. DHS itself acknowledged that "MPP implementation contribute[d] to decreasing the volume of inadmissible aliens arriving in the United States on land from Mexico." ECF No. 61 at AR 555. Without MPP, asylum applicants, including those "without meritorious claims," had "a free ticket into the United States." App.011. "[C]areer employees" in DHS "fully briefed the Biden transition officials on the importance of

MPP and the consequences that would follow a suspension of MPP." App.399 ¶ 31. That briefing "specifically warned that the suspension of the MPP, along with other policies, would lead to a resurgence of illegal aliens attempting to illegally enter" the United States. *Id.* ¶ 33. The warning proved accurate. Defendants' own data show enforcement encounters jumped from about 75,000 in January, when Defendants suspended MPP, to about 173,000 in April. ECF No. 61 at AR670. Defendants' newfound skepticism in a legal brief deserves no weight.

Second, increasing the number of illegal aliens increases the financial burden on Texas and Missouri. Multiple state officials explained that state expenditures would increase as the number of illegal aliens increased. The Chief of the Driver License Division in the Texas Department of Public Safety explained that "[e]ach additional customer seeking a limited term driver license or personal identification certificate [as illegal aliens do] imposes a cost on DPS." App.427 ¶ 8. Similarly, other state officials explained that illegal aliens increase state expenses by using state services. *See, e.g.*, App.442 ¶ 9; App.452 ¶¶ 11–12; App.459–60 ¶¶ 3, 8.

Defendants argue that only "speculation" supports the notion that aliens will use these services. ECF No. 63 at 8. Not so. Aliens released into the United States pursuant to the termination of MPP "have strong incentives to obtain driver's licenses," just like the DAPA beneficiaries considered in *Texas*, 809 F.3d at 160. As the Fifth Circuit has recognized, "driving is a practical necessity in most of" Texas. *Id.* at 156. Aliens similarly have incentives to use subsidized healthcare programs and public schools. Indeed, attending school is legally required. *See* Tex. Educ. Code § 25.085. Thus, it is no surprise that Texas has previously incurred expenses attributable to illegal aliens in the past. *See, e.g.*, App.440–41 ¶ 4 (education); App.450–52 ¶¶ 7–9 (healthcare). Plaintiffs' theory is not that all aliens who enter Texas and Missouri due to MPP's termination "will necessarily commit crimes," as Defendants suggest. ECF No. 63 at 10.

Defendants' termination of MPP injures Plaintiffs so long as at least some of those aliens will get a driver's license, attend a public school, enroll in a healthcare program, or become incarcerated. Defendants provide no reason to doubt that some portion of the numerous illegal aliens allowed into the United States as a result of MPP will use these costly services. *See Texas*, 809 F.3d at 159–60. With so many illegal aliens coming to the United States, the idea that none of them will impose those costs on Plaintiffs is implausible. *See* ECF No. 61 at AR669–73.

As a result, Plaintiffs' "theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019). Defendants focus on *California v. Texas*, No. 19-840, 2021 WL 2459255 (U.S. June 17, 2021), *see* ECF No. 63 at 8, but it supports Plaintiffs here. The Supreme Court relied on both "logic and intuition" to conclude that practical "benefits" gave individuals sufficient "incentive" to enroll in a healthcare program. *California*, 2021 WL 2459255, at *8. Here, that shows that aliens allowed into the United States due Defendants' termination of MPP will likely use costly state services.

Third, this Court can redress Plaintiffs' injuries. Defendants strangely suggest that there is no difference between terminating and reinstating MPP because "[r]einstating MPP would not require DHS to return anyone to Mexico; it would merely authorize line-level officers to do so in their discretion." ECF No. 63 at 9. Defendants thereby concede the difference. When line-level officers were authorized to return aliens to Mexico, they did so tens of thousands of times. *See* App.469. Indeed, Defendants previously highlighted the more than twenty thousand aliens enrolled into MPP in the Rio Grande Valley Sector alone. *See* ECF No. 12 ¶ 6. Defendants cannot now claim that MPP makes no difference to the number of illegal aliens in Texas and throughout the United States.

Regarding *parens patriae* standing, Defendants "ignore[] an established line of cases that have held that states may rely on the doctrine of *parens patriae* to maintain suits against the federal government," just as they did in the DAPA case. *Texas v. United States*, 86 F. Supp. 3d 591, 626 (S.D. Tex. 2015), *aff'd*, 809 F.3d 134 (5th Cir. 2015). As in the DAPA case, Defendants rely on *Massachusetts v. Melon*, but that case applies only when a state tries to enjoin "the operation of [federal] statutes." 262 U.S. 447, 485 (1923). Here, the "important distinction" is that Texas and Missouri "are bringing suit to *enforce* the rights guaranteed by a federal statute." *Texas*, 86 F. Supp. 3d at 626.

Defendants argue that Texas and Missouri "have 'no judicially cognizable interest in procuring enforcement of the immigration laws' against someone else," ECF No. 63 at 10 n.4, but it is only "private persons" who "have no judicially cognizable interest." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984). States "are not normal litigants for the purposes of invoking federal jurisdiction." *Texas*, 809 F.3d at 152 (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)). Defendants' position contradicts every recent case in which Texas has challenged the federal government's failure to enforce the immigration laws. *See Texas*, 809 F.3d at 150–62; *Texas*, 2021 WL 2096669, at *10–*21; *Texas*, 86 F. Supp. 3d at 614–44.

2.     **The June 1 Memorandum Is Subject to Judicial Review**

a.     **No Statute Precludes Review under Section 701(a)(1)**

Defendants argue that Congress implicitly precluded States from challenging agency action under the APA by providing a separate scheme by which illegal aliens could seek judicial review of their own removal proceedings. *See* ECF No. 63 at 19–21. The connection between those two types of review is too tenuous to support an inference that Congress impliedly barred Plaintiffs' claims here. Regardless, any such inference would be too weak to carry the "heavy burden" of

presenting "clear and convincing evidence" to overcome "the general presumption favoring judicial review of administrative action." *Texas*, 809 F.3d at 163–64.

Defendants do not appear to dispute that the specific statutory provisions they cite do not directly apply here. Far from supporting an inference in favor of a broader bar on judicial review, the express preclusion of certain claims shows that Congress knows how to preclude claims when it wants to. That forecloses any inference that Congress meant to implicitly preclude Plaintiffs' claims here. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) (holding that an "express exception . . . implies that there are no other[s]"); Antonin Scalia & Bryan A. Garner, *Reading Law* 107 (2012) ("The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*).").

First, Defendants cite 8 U.S.C. § 1252(b)(9), which "specifically limits" certain claims, *see* ECF No. 63 at 20, but as the Supreme Court recently held, that provision "is not aimed at this sort of case." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1907. "[W]here, as here, the parties are not challenging any removal proceedings," Section 1252(b)(9) "is certainly not a bar." *Id.*

Second, Defendants rely on 8 U.S.C. § 1252(g), but Defendants expressly concede that it "does not apply directly here." ECF No. 63 at 21 n.7. This is not a "cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g); *see Texas v. United States*, No. 6:21-cv-3, 2021 WL 247877, at *3 (S.D. Tex. Jan. 26, 2021).

Third, Defendants point to Section 1252(a)(2)(B)(ii), but that provision does not apply because the termination of MPP is not "specified under this subchapter [of the Immigration and Nationality Act ("INA")] to be in the discretion of . . . the Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B)(ii). To interpret Section 1252(a)(2)(B)(ii), courts turn to its neighbor,

17

Section 1252(a)(2)(B)(i). *See Kucana v. Holder*, 558 U.S. 233, 246–48 (2010). Clause (i) bars judicial review of "any judgment regarding the granting of relief under" enumerated statutory provisions, each of which authorizes the Attorney General to grant a discretionary benefit to an individual alien. 8 U.S.C. § 1252(a)(2)(B)(i). Thus, Clause (i) prevents aliens from challenging the federal government's refusal to grant discretionary relief "as a matter of grace." *Kucana*, 558 U.S. at 247. Clause (ii) "shield[s] from court oversight" decisions "of a like kind." *Id.* at 248. It also prevents individual aliens from challenging the denial of discretionary benefits under the INA in individual cases. It does not prevent States from challenging DHS's unlawful termination of an entire program, much less one like MPP, which was not a benefit given to individual aliens "as a matter of grace." *Id.* at 247. For similar reasons, courts have held that Clause (ii) does bar APA challenges to MPP as a program. *See Nora v. Wolf*, No. 1:20-cv-993, 2020 WL 3469670, at *7 (D.D.C. June 25, 2020) (distinguishing "the decision to 'expand' MPP implementation" from "the individual decisions made to return each plaintiff to Mexico").

Moreover, Clause (ii) does not apply when a plaintiff "challenge[s] the extent of the [official's] authority" because "the extent of that authority is not a matter of discretion." *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001). Just as this rule meant Clause (ii) did not preclude a challenge to MPP, it also means that Clause (ii) does not preclude a challenge to the termination of MPP. *See E.O.H.C. v. Sec'y U.S. DHS*, 950 F.3d 177, 191 (3d Cir. 2020). Nor does Clause (ii) apply "unless the statute explicitly refers to the discretion of the Attorney General." *Delgado v. Holder*, 648 F.3d 1095, 1100 (9th Cir. 2011). Merely empowering a federal official to make a decision does not satisfy that requirement. *See id.* Thus, a "decision can still be discretionary without

triggering § 1252(a)(2)(B)(ii)'s discretionary review bar." *Arbid v. Holder*, 700 F.3d 379, 384 (9th Cir. 2012) (per curiam).[4]

> **b.      The Termination of MPP Was Not Committed to Agency Discretion under Section 701(a)(2)**

Defendants also argue that the June 1 Memorandum "is committed to agency discretion" and therefore unreviewable under Section 701(a)(2). ECF No. 63 at 11. To begin, Defendants cannot have discretion in these circumstances because the June 1 Memorandum violates Section 1225. But even putting that aside, Defendants completely ignore the strong "presumption of review" and the binding precedent "read[ing] the exception in § 701(a)(2) quite narrowly, confining it to those rare administrative decisions traditionally left to agency discretion." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1905. As a result, Defendants conflate ordinary discretion with the type of discretion that precludes judicial review. That agency action can be "held unlawful and set aside" for "an abuse of discretion," 5 U.S.C. § 706(2)(A), proves that the mere presence of discretion does not make agency action unreviewable as "committed to agency discretion by law." *Id.* § 701(a)(2); *see Dep't of Commerce*, 139 S. Ct. at 2568; *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018).

Judge Friendly explained these two types of discretion by pointing to "the distinction . . . between a discretion that 'is not subject to the restraint of the obligation of reasoned decision and hence of reasoned elaboration of a fabric of doctrine governing successive decisions' and discretion of the contrary and more usual sort." *Wong Wing Hang v. INS*, 360 F.2d 715, 718 (2d Cir. 1966). "[O]nly in the rare—some say non-existent—case where discretion of the former type has been vested, may review for 'abuse' be precluded." *Id.* When Congress wants to grant "sole

---

[4] Plaintiffs cite *Loa-Herrera v. Trominski*, 231 F.3d 984 (5th Cir. 2000), *see* ECF No. 63 at 22, but that case did not consider Section 1252(a)(2)(B)(ii). It analyzed 8 U.S.C. § 1226(e)'s bar to challenging "the application of" Section 1226, which is not at issue here.

and unreviewable discretion," it knows how, as it did elsewhere in Section 1225. 8 U.S.C. § 1225(b)(1)(A)(iii)(I). But when Congress grants only ordinary discretion, as through the use of "may" in Section 1225(b)(2)(C), agency action can still be set aside under the APA "if it [is] made without a rational explanation, inexplicably depart[s] from established policies, or rest[s] on an impermissible basis." *Wong Wing Hang*, 360 F.2d at 718.

That is how the Supreme Court applied the APA in the DACA case. Everyone agreed that "DHS may rescind DACA." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1905. That DHS had some level of discretion was undisputed. But the rescission was still reviewable, *see id.* at 1905–07, and the Court reviewed "whether DHS's decision to rescind DACA was arbitrary and capricious" because DHS did not "provide a reasoned explanation for its action." *Id.* at 1910, 1916.

The same analysis applies here. True, in some circumstances, DHS has some level of discretion in creating or terminating MPP. *See* 8 U.S.C. § 1225(b)(2)(C). But that does not mean that DHS has boundless discretion or that it is not "required to engage in 'reasoned decisionmaking.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015).

Defendants suggest there is no "meaningful standard by which to judge the agency's discretion," ECF No. 63 at 15, but this Court can apply the "reasoned decisionmaking" standard as informed by Defendants' obligations under the INA. In addition to the obligations of Section 1225, *see supra* Part I.B, the INA imposes a "duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). It also empowers DHS to "issue such instructions" and "perform such other acts" only "as [the Secretary] deems necessary for carrying out . . . the provisions of this chapter." 8 U.S.C. § 1103(a)(3). Even "capacious[]" statutes that "leave[] agencies with flexibility" impose sufficient restraints to allow review by federal courts. *Michigan*, 576 U.S. at 752. For example, the Supreme Court has held

that a statutory instruction to regulate only if "the Agency finds regulation 'appropriate and necessary'" was sufficient to allow review of whether an agency had "entirely fai[led] to consider an important aspect of the program" under arbitrary-and-capricious review. *Id.*

### 3.      The June 1 Memorandum is final agency action

The June 1 Memorandum is final agency action under the APA. *See* ECF No. 53 at 30–31. Defendants' approach contradicts binding precedent that has "long" required "a pragmatic approach to finality, viewing the APA's finality requirement as flexible." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (cleaned up).

First, Defendants' argument rests on cases that do not even consider the "final agency action" requirement from 5 U.S.C. § 704. *See, e.g.*, *Innovation Law Lab v. McAleenan*, 924 F.3d 503 (9th Cir. 2019) (per curiam); *Cruz v. DHS*, No. 1:19-cv-2727, 2019 WL 8139805, at *2 (D.D.C. Nov. 21, 2019) (labeling MPP "agency action"). Defendants use these cases to argue that MPP was promulgated through a policy statement and then argue that policy statements are never final agency actions. *See* ECF No. 63 at 15–16. But in the Fifth Circuit, a "policy statement" can be "'final agency action' within the meaning of" the APA. *Merchants Fast Motor Lines, Inc. v. ICC*, 5 F.3d 911, 919–20 (5th Cir. 1993).[5]

In any event, the June 1 Memorandum is not a mere policy statement. By its own terms, it had the immediate legal effect of "terminating the MPP program." App.467. It also "direct[ed] DHS personnel to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives or policy guidance issued to

---

[5] Defendants' position appears to be of recent vintage. In the DAPA case, for example, they argued that DAPA was "a policy statement," *Texas*, 809 F.3d at 171, but they did "not dispute that DAPA [wa]s a 'final agency action.'" *Id.* at 163 n.82.

implement the program." *Id.*; *accord* App.472. The memorandum itself "rescind[ed], effective immediately," two other memoranda. App.472.

Defendants insist that the June 1 Memorandum does not totally prevent DHS from using its authority under Section 1225(b)(2)(C) in some future cases. *See* ECF No. 63 at 16. But they do not and cannot deny that it prevents federal officers and DHS itself from using MPP, an option they previously had. The June 1 Memorandum is "a final agency action because it withdrew agency employees' discretion" to exercise that option. *Texas*, 933 F.3d at 443 citing (*Nat'l Res. Def. Council v. EPA*, 643 F.3d 311, 319–20 (D.C. Cir. 2011)). Because the June 1 Memorandum withdraws DHS's "previously-held discretion" to use MPP, it "alters the legal regime, binds [DHS], and thus qualifies as final agency action." *Id.* at 442.

Finally, the June 1 Memorandum is final agency action because it has the effect of increasing Plaintiffs' legally required expenditures on illegal aliens. *See* ECF No. 53 at 31. Defendants argue that those are "indirect practical consequences" rather than "direct *legal* consequences." ECF No. 63 at 19. But that distinction applies only when agency action is narrowly focused "on a single" entity and does "not . . . commit the administrative agency to a specific course of action." *Texas*, 933 F.3d at 445. Here, Defendants acted with a much broader scope and committed themselves to the termination of MPP.

### 4.    Plaintiffs Are within the Zone of Interests

Texas and Missouri satisfy the zone-of-interests test because their interests are "arguably within the zone of interests to be protected or regulated by the statute that they say was violated." *Texas*, 809 F.3d at 162 (cleaned up). "[I]n the APA context," the zone-of-interests "test is not especially demanding." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (quotation marks omitted). The Supreme Court has "often conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff" and has "said

that the test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id.* (quotation marks omitted).

The States' interests in not "spending millions of dollars to subsidize" illegal aliens are within the zone of interests protected by the INA. *Texas*, 809 F.3d at 163; *see Texas*, 2021 WL 2096669, at *22–*23 (holding that Texas's arbitrary-and-capricious claim was within the INA's zone of interests).

Defendants' argument to the contrary focuses too narrowly on Section 1225(b). *See* ECF No. 63 at 22–24. "In considering whether the 'zone of interest' test provides or denies standing," an argument fails if it "focuses too narrowly on [a particular section], and does not adequately place [that section] in the overall context of the [act as a whole]." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 401 (1987). Under the zone-of-interests test, the Fifth Circuit's "historic treatment of APA claims in the immigration context" has been to "consider[] 'the INA' as a whole," not individual provisions. *Texas*, 2021 WL 2096669, at *22. In any event, Section 1225(b)(2), even considered alone, protects the States' interests here. By mandating detention or return to Mexico, that provision ensures that aliens are not released into the United States to impose costs on American citizens and taxpayers. Plaintiffs' injuries flow from just that problem.

## II.     The Non-Merits Factors Favor Plaintiffs

### A.     Texas and Missouri Face Irreparable Harm

Plaintiffs previously explained why their injuries are irreparable. *See* ECF No. 53 at 31–32. Instead of disputing those arguments, Defendants combine their discussions of irreparable injury and standing. Because Defendants are wrong about standing, they are wrong about irreparable injury as well. *See supra* Part I.E.1. The administrative record confirms the significance

of Plaintiffs' injuries: Defendants themselves predict a huge and increasing number of border crossings resulting in enforcement encounters in the coming months. *See* ECF No. 61 at AR670.

### B.    Relief Would Not Harm Defendants or the Public

Defendants assert that an injunction would be a "severe burden . . . on core Article II authority" because it would restrain their discretion in an area touching on foreign policy. ECF No. 63 at 46–47. But Defendants have no legitimate interest in unlawful agency action. "The Government cannot suffer harm from an injunction that merely ends an unlawful practice." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (cleaned up). Relief also serves the public interest because "'the public is served when the law is followed,' and the public will indeed be served if DHS is enjoined from suspending the law." *Texas*, 2021 WL 2096669, at *50 (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)).

Defendants cannot use "foreign policy" concerns as a get-out-of-jail-free card. *See Al-Joudi v. Bush*, No. 1:05-cv-301, 2005 WL 774847, at *5 (D.D.C. Apr. 4, 2005) (discounting "vague premonitions" that injunctive relief would harm the executive's ability to conduct foreign policy). After all, Congress exempted "military or foreign affairs function[s]" from certain APA requirements, 5 U.S.C. § 553(a)(1), but not the requirements Plaintiffs invoke here. Deference to the Executive Branch should not upset Congress's balancing of foreign-policy and rule-of-law interests. *See TikTok Inc. v. Trump*, No. 1:20-cv-2658, 2020 WL 7233557, at *17 (D.D.C. Dec. 7, 2020) (granting injunction against arbitrary-and-capricious agency action despite evidence of a "national security threat"); *cf. Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 (2017). ("[N]ational-security concerns must not become a talisman used to ward off inconvenient claims.").

### III.    Both Mandatory and Prohibitory Relief Are Appropriate Nationwide

Defendants attempt to artificially limit the relief available to remedy their unlawful conduct. *See* ECF No. 63 at 49–50. First, Defendants invoke 8 U.S.C. § 1252(f)(1), but that

provision applies when a plaintiff tries to prevent the operation of certain federal laws, not ensure compliance with those laws. *Cf. Hamama v. Adducci*, 912 F.3d 869, 879 (6th Cir. 2018).

Second, Defendants claim they should not be enjoined because the law gives them "discretion." ECF No. 63 at 48. But as Plaintiffs explained above, in these circumstances, Defendants do not have discretion to terminate MPP. *See supra* Parts I.B, I.E.2.

Third, Defendants try to limit the geographic scope of any injunctive relief, but that is inconsistent with binding precedent. *See* ECF No. 53 at 34–35. Aliens released in other States would still harm Texas and Missouri "because aliens are 'free to move' among the States. The Fifth Circuit has articulated and approved that rationale, and the Court is therefore bound by it." Texas, 2021 WL 2096669, at *51 (quoting *Texas*, 809 F.3d at 188). "[A] geographically-limited injunction would be ineffective" for fully redressing Plaintiffs' injuries. *Id.* The "scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

## CONCLUSION

Plaintiffs respectfully request that the Court prevent Defendants from implementing the June 1 Memorandum.

Respectfully submitted,

ERIC S. SCHMITT
Attorney General of Missouri

/S/ D. JOHN SAUER
D. JOHN SAUER, #58720MO*
Solicitor General

JESUS A. OSETE, #69267MO*
Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-8870
Fax (573) 751-0774
John.Sauer@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

*Admitted pro hac vice

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JUDD E. STONE II
Solicitor General
Texas Bar No. 24076720

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Texas Bar No. 00798537

/s/ William T. Thompson
WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
*Attorney-in-Charge*
Texas Bar No. 24088531

RYAN D. WALTERS
Special Counsel
Texas Bar No. 24105085

OFFICE OF THE ATTORNEY GENERAL
SPECIAL LITIGATION UNIT
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov

*Counsel for Plaintiff State of Texas*

**CERTIFICATE OF SERVICE**

I certify that on June 30, 2021, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

/s/ William T. Thompson
WILLIAM T. THOMPSON
