**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

|  |  |  |
|---|---|---|
| STATE OF TEXAS,<br>STATE OF MISSOURI,<br><br>    *Plaintiffs,*<br><br>v.<br><br>JOSEPH R. BIDEN, JR.,<br>in his official capacity as<br>President of the United States, *et al.*,<br><br>    *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 2:21-cv-00067-Z |

## <u>DEFENDANTS' SUPPLEMENTAL BRIEF</u>

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

    I.   Standard Governing Court's Merits Determination Under Rule 65(a)(2)........................1

    II.  Standard Governing Plaintiffs' Burden in Establishing Standing. ...................................4

    III. Proper Remedy ...........................................................................................................7

CERTIFICATE OF SERVICE ......................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

### CASE LAW

*aaiPharma v. Thompson,*
  296 F.3d 227 (4th Cir. 2002) ............................................................................ 3

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) .......................................................................... 7

*A.L. Pharma, Inc. v. Shalala,*
  62 F.3d 1484 (D.C. Cir. 1995) .......................................................................... 8

*Am. Biosci., Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001) ........................................................................ 3

*Am. Hosp. Ass'n v. Azar,*
  348 F. Supp. 3d 62 (D.D.C. 2018) .................................................................... 3

*Avoyelles Sportsmen's League, Inc. v. Marsh,*
  715 F.2d 897 (5th Cir. 1983) ............................................................................ 4

*Blue Ocean Inst. v. Gutierrez,*
  585 F. Supp. 2d 36 (D.D.C. 2008) .................................................................... 2

*Brackeen v. Haaland,*
  994 F.3d 249 (5th Cir. 2021) ............................................................................ 2

*Cent. & S. W. Servs., Inc. v. U.S. E.P.A.,*
  220 F.3d 683 (5th Cir. 2000) ...................................................................... 7, 11

*Chicago & S. Air Lines v. Waterman S. S. Corp.,*
  333 U.S. 103 (1948) ........................................................................................ 11

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) .......................................................................................... 5

*Dresser-Rand Co. v. Virtual Automation Inc.,*
  361 F.3d 831 (5th Cir. 2004) .......................................................................... 12

*Fla. Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985) .......................................................................................... 7

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) .................................................................................... 12

*Gladstone, Realtors v. Village of Brentwood,*
441 U.S. 91 (1979) ................................................................................................. 5

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,*
527 U.S. 308 (1999) ............................................................................................. 13

*Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.,*
288 F. Supp. 2d 7 (D.D.C. 2003) ......................................................................... 8

*In re Deepwater Horizon,*
739 F.3d 790 (5th Cir. 2014) ........................................................................... 5, 6

*Los Angeles Haven Hospice, Inc. v. Sebelius,*
638 F.3d 644 (9th Cir. 2011) ............................................................................. 13

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) .......................................................................................... 5, 6

*Madsen v. Women's Health Ctr., Inc.,*
512 U.S. 753 (1994) ........................................................................................... 13

*March for Life v. Burwell,*
128 F.Supp.3d 116 (D.D.C. 2015) ....................................................................... 3

*Marshall County Health Care Auth. v. Shalala,*
988 F.2d 1221 (D.C. Cir. 1993) ....................................................................... 1, 3

*Monsanto Co. v. Geertson Seed Farms,*
561 U.S. 139 (2010) ........................................................................................... 12

*Nat'l Ass'n for Advancement of Colored People v. DeVos ("NAACP"),*
485 F. Supp. 3d 136 (D.D.C. 2020) .................................................................. 2, 3

*Nat'l Propane Gas Ass'n v. U.S. Dep't of Transp.,*
43 F. Supp. 2d 665 (N.D. Tex. 1999) ................................................................... 1

*New Lifecare Hospitals of Chester Cty. LLC v. Azar,*
417 F. Supp. 3d 31 (D.D.C. 2019) ....................................................................... 2

*DHS v. New York,*
140 S. Ct. 599 (2020) ......................................................................................... 13

*O'Reilly v. U.S. Army Corps of Engineers,*
477 F.3d 225 (5th Cir. 2007) ............................................................................... 7

*Scott v. Schedler,*
   826 F.3d 207 (5th Cir. 2016) .......................................................................... 13

*Sierra Club v. Mainella,*
   459 F. Supp. 2d 76 (D.D.C. 2006) .................................................................... 3

*Sugar Cane Growers Coop. v. Veneman,*
   289 F.3d 89 (D.C. Cir. 2002) ........................................................................ 8, 9

*Summers v. Earth Island Institute,*
   555 U.S. 488 (2009) ...................................................................................... 13

*Sw. Elec. Power Co. v. EPA,*
   920 F.3d 999 (5th Cir. 2019) ........................................................................ 12

*Tex. Oil & Gas Ass'n v. EPA,*
   161 F.3d 923 (5th Cir. 1998) .......................................................................... 4

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n,*
   989 F.3d 368 (5th Cir. 2021) ..................................................................... 7, 11

*Texas Comm. on Nat. Res. v. Van Winkle,*
   197 F. Supp. 2d 586 (N.D. Tex. 2002) ........................................................ 2, 4

*Texas v. United States Env't Prot. Agency,*
   389 F. Supp. 3d 497 (S.D. Tex. 2019) ....................................................... 2, 11

*Trump v. Hawaii,*
   138 S. Ct. 2392 ........................................................................................ 13, 14

*Virginia Society for Human Life, Inc. v. Federal Election Commission,*
   263 F.3d 379 (4th Cir. 2001) .................................................................... 13, 14

*Warth v. Seldin,*
   422 U.S. 490 (1975) ...................................................................................... 12

*Wirtz v. Baldor Electric Company,*
   337 F.2d 518 (D.C. Cir. 1963) ...................................................................... 14

## FEDERAL STATUTES

5 U.S.C. § 706 ........................................................................................................ 3

5 U.S.C. § 706(2) .................................................................................................. 14

5 U.S.C. § 706(2)(A) .......................................................................................... 3, 4

8 U.S.C. § 1252(b)(9) ................................................................................ 15

8 U.S.C. § 1252(f)(1) ................................................................................ 14

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 65(a)(2) ........................................................................... 1, 2

## MISCELLANEOUS

Samuel L. Bray, Multiple Chancellors: Reforming the National Injunction,
   131 Harv. L. Rev. 417, 438, n.121 (2017) ............................................ 14

## INTRODUCTION

Defendants hereby submit the following supplemental brief pursuant to the Court's Order of June 29, 2021, ECF No. 66, to address matters related to the Court's consolidation of Plaintiffs' motion for a preliminary injunction with a determination on the merits under Federal Rule of Civil Procedure 65(a)(2). Specifically, Defendants explain: (1) even were the Court to determine that it may review the merits of Plaintiffs' claims, the Court's merits determination should be governed by the summary judgment standard particular to Administrative Procedures Act (APA) cases; (2) Plaintiffs bear a heightened evidentiary burden to establish standing at this final stage of the litigation, a burden they fail to meet; and (3) any remedy should be limited, at most, to remand to the agency for further explanation, not vacatur or entry of an injunction.

## I.      Standard Governing Court's Merits Determination Under Rule 65(a)(2).

The appropriate standard following consolidation of a preliminary-injunction motion with a merits determination under Rule 65(a)(2) is that of summary judgment, where the Court engages in APA review as an appellate tribunal determining only whether, as a matter of law, the record supports the agency's action. *See, e.g.*, *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1225-26 (D.C. Cir. 1993) (explaining "the role the district court plays when it reviews agency action" under the APA).

This District has previously recognized this standard in *Nat'l Propane Gas Ass'n v. U.S. Dep't of Transp.*, 43 F. Supp. 2d 665 (N.D. Tex. 1999) (Fitzwater, J.). There, the plaintiffs brought an APA challenge and sought a preliminary injunction against a rule promulgated by the U.S. Department of Transportation. *Id.* at 673. The court "consolidated plaintiffs' motion for a preliminary injunction with adjudication of the merits, pursuant to Fed. R. Civ. P. 65(a)(2)," and proceeded to have the parties "file[] cross-motions for summary judgment," *id.*, and then engaged in "review of the agency's decision … [to] determin[e] whether it was based on a consideration of

the relevant factors and whether there has been a clear error of judgment," *id.* at 676. The court proceeded this way because, "[i]n the context of a challenge under the APA, '[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review.'" *Texas v. United States Env't Prot. Agency*, 389 F. Supp. 3d 497, 503 (S.D. Tex. 2019) (quoting *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008); *see Brackeen v. Haaland*, 994 F.3d 249, 267 (5th Cir. 2021) (en banc) (explaining that the district court resolved the constitutional and APA challenge to federal agency action by "grant[ing] Plaintiffs summary judgment in part, declaring that ICWA and the Final Rule contravene multiple constitutional provisions and the [APA]"). In sum, as this District recognized in another case, in "reviewing administrative agency decisions, the function of the district court is to determine whether as a matter of law, evidence in the administrative record permitted the agency to make the decision it did …." *Texas Comm. on Nat. Res. v. Van Winkle*, 197 F. Supp. 2d 586, 595 (N.D. Tex. 2002) (internal quotation omitted).

Courts in the District of Columbia, where agency action is frequently challenged, hold the same. The "consolidation of the motion for injunctive relief with a hearing on the merits pursuant to Fed. R. Civ. P. 65(a)(2), thereby convert[s] plaintiffs' motion to one for summary judgment." *New Lifecare Hosps. of Chester Cty. LLC v. Azar*, 417 F. Supp. 3d 31, 41 (D.D.C. 2019). For example, in *Nat'l Ass'n for Advancement of Colored People v. DeVos*, 485 F. Supp. 3d 136 (D.D.C. 2020) ("*NAACP*"), the court consolidated the preliminary injunction motion into a merits determination under Rule 65(a)(2). *Id.* at 140. The plaintiffs there brought claims under the U.S. Constitution and APA,[1] and the court noted that the appropriate standard to make the post-

---

[1] The standard of review and remedy discussions in this brief encompass all of Plaintiffs' claims, which each identify sections of the APA and/or its "arbitrary and capricious" review as their cause,

consolidation determination was "summary judgment," explaining that because the case "was reviewing agency action, summary judgment 'serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'" *NAACP*, 485 F. Supp. 3d at 141 (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)); *see Am. Hosp. Ass'n v. Azar*, 348 F. Supp. 3d 62, 83–84 (D.D.C. 2018), *rev'd on other grounds*, 967 F.3d 818 (D.C. Cir. 2020) ("In determining whether a decision on the merits is appropriate, a court must consider whether, at this stage, 'the record is sufficient for a determination on the merits under the summary judgment standard ….'") (quoting *March for Life v. Burwell*, 128 F.Supp.3d 116, 124 (D.D.C. 2015)).

Under the APA summary judgment standard, "[t]he entire case ... is a question of law" and the district court "sits as an appellate tribunal." *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "The district court sits as an appellate tribunal, not as a court authorized to determine in a trial-type proceeding whether the [agency's] study was factually flawed," and the "entire case is … *only* a question of law." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1225-26 (D.C. Cir. 1993) (emphasis added); *see, e.g.*, *aaiPharma Inc. v. Thompson*, 296 F.3d 227, 235 (4th Cir. 2002) (holding that, although the district court erred in consolidating preliminary injunction with final judgment due to lack of notice, the court could still affirm the district court's summary rejection of plaintiff's challenge to administrative action, because "the case turns wholly on the legal question of whether the FDA's refusal to police the correctness of Orange Book listings violates the APA").

---

*see* ECF No. 48 ¶¶ 95-141, including Plaintiffs' Immigration and Nationality Act and Take Care Clause claims, which also are raised under the APA. *Id.* ¶ 129 (Count IV "Violation of Section 1225," raising claim under APA, 5 U.S.C. § 706(2)(A), (C)); ¶ 140 (Count VII, "Failure to Take Care that the Laws be Faithfully Executed," arguing that "[u]nconstitutional agency action or inaction violates the APA. See 5 U.S.C. § 706").

Accordingly, given the Court's consolidation of Plaintiffs' motion for a preliminary injunction with a merits determination in this case, the case law from this District and elsewhere indicates that the appropriate standard to govern that determination is the summary judgment standard applicable in an administrative action challenge – i.e., where this Court will sit as an appellate tribunal and determine as a matter of law, on the basis of the administrative record, ECF No. 61, whether that "record permitted the agency to make the decision it did …." *Texas Comm. on Nat. Res.*, 197 F. Supp. 2d at 595. As Plaintiffs have challenged the MPP termination as arbitrary and capricious under 5 U.S.C. § 706(2)(A), *see, e.g.*, ECF No. 48 ¶ 96, the APA standard governing the Court's review of the merits is "highly deferential." *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983). That is, "[i]f the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998).

As explained already, ECF No. 63, Defendants' determination easily meets this standard. The agency fully explained its decision and considered possible alternatives, but found that MPP had achieved only limited effectiveness and that diplomatic relations and other significant consequences of MPP weighed against continuing the program. *See* ECF No. 63 at 24-36. The agency's explanation was comprehensive, considered all relevant factors, and more than "conform[s] to minimum standards of rationality." *Tex. Oil & Gas Ass'n*, 161 F.3d at 934.

Accordingly, the appropriate standard governing the Court's merits determination is the essentially appellate review of the administrative record that it would apply where the parties move for summary judgment in an APA case. Under this deferential standard, Defendants' action is readily supported by the record and not arbitrary and capricious, and must be upheld.

## II.     Standard Governing Plaintiffs' Burden in Establishing Standing.

Defendants explained in their opposition to Plaintiffs' preliminary injunction motion that

4

Plaintiffs lacked standing for their suit. ECF No. 63 at 5-10. That argument applies with even greater force for the Court's final merits determination, because Plaintiffs' contention that they have standing must now be analyzed under a much more stringent evidentiary standard. As the Supreme Court has explained, "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *accord In re Deepwater Horizon*, 739 F.3d 790, 799 (5th Cir. 2014) "[T]he elements of Article III standing are constant throughout litigation: injury in fact, the injury's traceability to the defendant's conduct, and the potential for the injury to be redressed by the relief requested." *In re Deepwater Horizon*, 739 F.3d 790, 799 (5th Cir. 2014). "[H]owever, the standard used to establish these three elements is not constant but becomes gradually stricter as the parties proceed through 'the successive stages of the litigation.'" *Id.* (quoting *Lujan*, 504 U.S. at 561). "[A]t the final stage" of litigation, such as this final merits determination, facts purporting to show standing "(if controverted) must be 'supported adequately by the evidence adduced at trial.'" *Lujan*, 504 U.S. at 561 (quoting *Gladstone, Realtors v. Village of Brentwood*, 441 U.S. 91, 115 n.31 (1979)); *Deepwater Horizon*, 739 F.3d at 799.

Plaintiffs' standing arguments rely on several factual contentions that they cannot adequately support with evidence at this final merits determination. *See Lujan*, 504 U.S. at 561. Plaintiffs' claimed injury rests on their contention that terminating "MPP will lead to additional illegal aliens being present in Texas and Missouri." ECF No. 53 at 21. However, the evidence fails to establish in a non-speculative manner that ending MPP will increase illegal immigration. *See* ECF No. 63 at 5-6. This allegation failed to carry Plaintiff's burden at the preliminary injunction stage, *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013), and necessarily fails to be an

injury "adequately supported" by a preponderance of the evidence to support standing at this final stage. *See Lujan*, 504 U.S. at 561. Further, Plaintiffs have failed to show that increased human trafficking and economic costs to the States are traceable to the termination of MPP. *See Deepwater Horizon*, 739 F.3d at 799. For the former, they provide no evidence to support the nonsensical implication that the Government is actively encouraging human trafficking. *Id.* at 7. For the latter, Plaintiffs do not show that terminating MPP, as opposed to other causes or third-party choices, would cause additional noncitizens to settle in Plaintiff States and seek social services, increasing the cost of those services. *Id.* at 8. The evidence also fails to suggest, let alone establish, that reinstating MPP would redress Plaintiffs' alleged harms by, for example, reducing crime in their States or the number of noncitizens who use healthcare or education resources. *Id.* at 9-10. Finally, no evidence establishes that terminating MPP would distort labor markets, which is what Plaintiffs claim would support *parens patriae* standing, were that a possibility. *Id.* at 10.

Plaintiffs failed to offer sufficient non-speculative evidence to establish these elements of standing under the more relaxed preliminary-injunction standard, and, therefore, necessarily fail to support their arguments at the merits stage with evidence to resolve the matter, as opposed to merely raising a disputed issue of fact to be resolved at some later stage, which is no longer sufficient. *See Lujan*, 504 U.S. at 561. Even had Plaintiffs met their burden required at the preliminary injunction stage, they still fail to causally connect in any significant and non-speculative way, by a preponderance of the evidence, the termination of MPP to their alleged sources of injury. *See id.* Moreover, Plaintiffs would still fail to show that these injuries were the result of Defendants' action to terminate MPP and not third party decisions. *See id.* at 561-62.

In sum, Plaintiffs unequivocally fail to meet the heightened evidentiary burden at the final merits stage of showing that their standing contentions are "supported adequately by the evidence,"

*Lujan*, 504 U.S. at 561. Plaintiffs' claims should be rejected at this stage for lack of standing.

## III.    Proper Remedy

If the Court grants summary judgment on any of Plaintiffs' APA claims, the proper remedy is to remand to the agency for further consideration or explanation. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

To the extent the Court finds any defect in the June 1 memorandum, the appropriate course of action would be an order remanding to the agency without vacating the memorandum. Where a challenge to agency action alleges that the agency failed to engage in reasoned decision-making or adequately explain its decision, as Plaintiffs do here, ECF No. 48 ¶¶ 95-123, the agency should be given the opportunity to correct any procedural defects on remand. "Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389–90 (5th Cir. 2021). "Only in 'rare circumstances' is remand for agency reconsideration not the appropriate solution." *O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d 225, 239 (5th Cir. 2007) (quoting *Fla. Power & Light*, 470 U.S. at 744) (overturning district court's "decision to issue a permanent injunction" that was based on finding that agency action was arbitrary and capricious under the APA); *Cent. & S. W. Servs., Inc. v. U.S. E.P.A.*, 220 F.3d 683, 692 (5th Cir. 2000) (holding that "failure to explain … does not require vacatur" where it is possible the agency can "substantiate its decision" on remand); *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Remanding without vacating or issuing injunctive relief is particularly appropriate where doing otherwise would cause

disruption or chaos. *See, e.g.*, *Cent. & S. W. Servs*, 220 F.3d at 692 (remand without vacatur appropriate "when vacating would be disruptive"); *accord Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 288 F. Supp. 2d 7 (D.D.C. 2003), *appeal dismissed,* 2004 WL 1052989 (D.C. Cir. 2004) (staying vacatur when it would cause "serious disruptions"); *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 97-98 (D.C. Cir. 2002) (remand without vacatur appropriate at summary judgment stage where vacating decision would have "disruptive consequences" and be "an invitation to chaos"); *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995).

Here, vacating the June 1 memorandum or issuing injunctive relief would severely disrupt management of the border and foreign affairs. DHS has already taken substantial steps to unwind MPP and its infrastructure. When President Biden took office on January 20, 2021, the Acting DHS Secretary directed that DHS would suspend new enrollments in MPP pending further review of the program. *See* ECF No. 63 at 4. The President subsequently issued an Executive Order directing DHS to promptly consider a phased strategy for the safe and orderly entry, consistent with public health and safety and capacity constraints, of individuals who had been placed in MPP. *Id.* DHS has already made significant progress to implement this strategy. *See* ECF No. 61, Administrative Record ("AR"), at 2-3, 5-7, 587-88; *see also* https://www.dhs.gov/news/2021/06/23/dhs-announces-expanded-criteria-mpp-enrolled-individuals-who-are-eligible-processing. DHS cannot easily "restore the status quo ante" that existed prior to January 2021 now that new initiatives have been in place for nearly six months and relations with Mexico have significantly evolved. *Veneman*, 289 F.3d at 97.

Restarting MPP would be no small task. MPP required individuals to reside temporarily in Mexico, which required "close collaboration and negotiation with the Government of Mexico." *See* ECF No. 64, Gov't App. 2, ¶ 5. Implementing MPP required that Mexico take certain "steps

that were important to the functioning of MPP," including "utilizing federal resources (personnel and infrastructure) to receive individuals returned to Mexico under MPP; granting temporary, humanitarian status to persons enrolled in MPP; ensuring that such individuals received equal treatment and protection from discrimination, as well as the right to request work authorization; and providing MPP enrollees with the ability to access selected social services." *Id*. Requiring DHS to re-implement MPP - after new enrollments have been suspended since January 2021, and MPP has been terminated for some time - would require Mexico to reestablish that infrastructure after acting in reliance on the United States' representation that MPP had ended. *Id*. at 14, ¶ 9 (noting that "Mexico has already begun taking actions" to redeploy resources and advance new initiatives to better manage migration); 15, ¶ 10 (discussing new efforts already underway "to address the root causes of irregular migration" and "disable human trafficking and human smuggling organizations"); 16, ¶ 13-14. Similarly, MPP required substantial DHS resources, and restarting it would "involve significant and complicated burdens on border security personnel and resources that would detract from important DHS mission sets," and "significant modifications" to the operational structure of MPP would be "required to restart the program and ensure that participants can remain in Mexico pending their immigration proceedings." *Id*. at 5, ¶ 10; *see also id.* at 6, ¶ 11. In short, there is no clear "way to restore the status quo ante" that existed prior to January 20, 2021. *See Veneman*, 289 F.3d at 97.

Setting aside the June 1 memorandum would also undermine ongoing efforts to manage migration and combat smuggling and trafficking networks because it would require refocusing diplomatic efforts on restarting MPP at the expense of other efforts, and would undermine trust in the United States' ability to carry out its promises generally. Gov't App. 6, ¶ 12 (noting that restarting MPP would require significant "financial and diplomatic engagement" with Mexico,

including providing "significant foreign assistance to counterparts operating in Mexico," to, among other things, address "security-related concerns along the border" made worse by MPP, and "would detract from this Administration's broad goal of establishing a comprehensive regional strategy for managing migration"); 7, ¶ 13 (noting refocused "efforts to address the root causes of migration from Central America, improve regional migration management, enhance protection and asylum systems throughout North and Central America, expand cooperative efforts to combat smuggling and trafficking networks"); 7, ¶ 14 (if United States "is prevented from upholding commitments made in the course of negotiations, the foundation of trust upon which these negotiations are premised erodes"); 8, ¶ 15. As DHS explained:

> "An order interfering with DHS's termination of MPP, or otherwise requiring DHS to reinstitute the program, would wreak havoc on the Administration's approach to managing migration in the region, including by undermining the Government's ability to engage in the delicate bilateral (and multilateral) discussions and negotiations required to achieve a comprehensive solution. Such an order would require the United States to renege on the reasoned—and I believe more effective—strategy being developed with Mexico. Moreover, restarting MPP operations would require new and costly investments from both governments to re-establish the infrastructure that sat dormant for more than a year due to COVID-19.

Gov't App. 8, ¶ 16; *see also id.* at 8-10, ¶¶ 17-18 (noting that restarting MPP would "come at tremendous opportunity cost," "draw resources from other efforts," "create doubt about the reliability of the United States as a negotiating partner," "hamstring the Federal Government's ability to conduct the foreign policy discussions" necessary to manage migration, and "have significant resource implications and be damaging to our national and economic security").

The State Department has similarly noted that ordering DHS to restart MPP "will have a significant adverse impact on U.S. foreign policy, including our relationship with the governments of El Salvador, Guatemala, and Honduras," "and Mexico." Gov't App. 12, ¶ 3. They added, "[f]rom a foreign policy perspective, the MPP wind-down was a crucial initial step in

implementing" new diplomatic efforts and addressing concerns of the Mexican government had about challenges created by MPP. *Id*. at 17, ¶ 15. The Mexican government "applauded" the "wind-down of the MPP policy" and has already committed to work with the United States on new efforts to regularize migration. *Id*. ¶ 16. Reinstating MPP, or stopping its wind-down, "would undercut current U.S. foreign policy," "nullify more than four months of diplomatic and programmatic engagement" to better manage the southern border, and divert resources and diplomatic efforts away from these ongoing efforts to instead re-implement MPP. *Id*. at 18, ¶ 17. Moreover, doing so would "be harmful to our bilateral relationships with Mexico and the norther Central American countries, as well as our partner international organizations" by undermining trust in the United States as well as "the U.S. government's efforts to stem the flow of irregular migration." *Id*. ¶ 18; *see, e.g., Chicago & S. Air Lines v. Waterman S. S. Corp.,* 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial.").

Given these clear consequences stemming from any vacatur, Fifth Circuit precedent requires the Court to avoid disruption and, at most, remand without vacatur or other injunctive relief because the agency can remedy any APA defect by providing further explanation. *See, e.g.*, *Cent. & S. W. Servs.*, 220 F.3d at 692 ("remand, without vacatur" is appropriate where "it would be disruptive to vacate a rule that applies to other" groups beyond the plaintiffs and where the agency "may well be able to justify its decision" with further explanation); *Texas v. United States Env't Prot. Agency*, 389 F. Supp. 3d 497, 506 (S.D. Tex. 2019) (finding "remand, not vacatur of the Final Rule … is the appropriate remedy" where vacatur "would be disruptive" and agency could fix defects that violated the APA on remand); *Texas Ass'n of Mfrs.,* 989 F.3d at 389 (similar).

Even if the Court does not remand without vacatur, it should limit relief to remedying the injuries of the parties before the Court. Relief should be, at most, vacatur of the portions of the

memorandum found insufficient as applied to Plaintiffs, remand for further consideration or explanation, and not include injunctive relief for Plaintiffs or nationwide. The common remedy in an APA case where a rule or policy is found arbitrary or capricious, is to "set aside that part" of the rule or policy that is unlawful. *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1022 (5th Cir. 2019). Injunctive relief is inappropriate in such circumstances. Indeed, the Supreme Court has cautioned that a district court vacating an agency action under the APA, should not issue an injunction, and would commit reversible error in doing so unless an injunction would "have [a] meaningful practical effect independent of its vacatur." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (reversing injunction in APA case where vacatur provided sufficient relief). This Court would invite error because "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course," or where "a less drastic remedy such as partial or complete vactur … [is] sufficient to redress" the plaintiffs' injury. *Id*. To obtain a permanent injunction, a plaintiff must not only prevail on the claims on the merits, but must also, "establish that equitable relief is appropriate in all other respects," including that there is no other remedy that would be adequate to address the alleged injury. *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 847 (5th Cir. 2004). Here, vacatur based on the specific claims Plaintiffs prevail on, and remand to the agency to consider those issues anew, would redress any injury Plaintiffs assert.

If the Court nonetheless concludes some form of injunctive relief is appropriate, that relief must be limited to the actual parties before the Court. Article III requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (citation omitted); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally."). Granting

Plaintiffs relief that would extend to circumstances "apart from any concrete application that threatens imminent harm to [their] interests" would "fly in the face of Article III's injury-in-fact requirement." *Summers v. Earth Island Institute*, 555 U.S. 488, 494 (2009). Moreover, even apart from Article III's jurisdictional constraints, injunctions that go beyond a plaintiff's own injuries exceed the power of a court sitting in equity. An injunction thus must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *see, e.g.*, *Scott v. Schedler*, 826 F.3d 207, 214 (5th Cir. 2016) ("injunction may not encompass more conduct than was requested or exceed the legal basis of the lawsuit"); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) ("[I]njunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification.") (alteration in original; quotation marks omitted)); *Virginia Society for Human Life, Inc. v. Federal Election Commission*, 263 F.3d 379, 393 (4th Cir. 2001) ("[p]reventing the [agency] from enforcing [the regulation] against other parties in other circuits does not provide any additional relief to [the plaintiff]").

Longstanding practice confirms that injunctions are limited to what is necessary to remedy a plaintiff's injury. The scope of a court's statutory authority to enter injunctive relief is circumscribed by the type of relief that was "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999). But the tradition of equity inherited from English law was premised on "providing equitable relief only to parties" because the fundamental role of a court was to "adjudicate the rights of 'individual[s].'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2427-28 (Thomas, J., concurring) (quoting The Federalist No. 78, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961)); *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) (same). As a result, "a plaintiff could not sue to vindicate the

private rights of someone else." *Id*. at 2428.

Even when parties challenge agency rulemaking, as opposed to the discretionary policy decision at issue here, the APA does not affirmatively authorize nationwide relief in the form of a universal injunction. *Cf. Trump*, 138 S. Ct. at 2425 (Thomas, J. concurring) ("No statute expressly grants district courts the power to issue universal injunctions."). The APA provides only that a court may, at most, "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). That provision does not address remedies at all, which are governed by 5 U.S.C. § 703. But even assuming it did, nothing in § 706(2)'s text specifies whether a rule, if found invalid, should be set aside on its *face* or *as applied* to the challenger, let alone that injunctive relief should extend beyond application to the plaintiffs in a particular case. In the absence of a clear statement in the APA, that it displaces traditional rules of equity, the court should adopt the narrower reading of the "set aside" language. *See Virginia Society for Human Life*, 263 F.3d at 393 ("Nothing in the language of the APA, however, requires us to exercise such far-reaching power."). The historical backdrop to the APA's enactment lends further support to this reading. The absence of nationwide injunctions prior to Congress' enactment of the APA in 1946 (and for over 15 years thereafter) suggests that the APA was not originally understood to authorize courts to issue such broad relief. *See* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV. 417, 438 & n.121 (2017) (noting that the first nationwide injunction issued in the U.S. occurred in 1963 in *Wirtz v. Baldor Electric Company*, 337 F.2d 518 (D.C. Cir. 1963)).

Even assuming the APA could be interpreted to authorize universal relief, § 702 provides that "[n]othing herein: (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or

impliedly forbids the relief which is sought." As Defendants explained, 8 U.S.C. § 1252(f)(1) expressly forbids the injunctive relief Plaintiffs seek, which would rewrite § 1225(b)(2)(C) to limit the discretion Congress provided with respect to use of the contiguous-territory-return authority, conditioning that discretion in ways not found in the statute and restraining its operation in precisely the way § 1252(f)(1) forecloses. *See* ECF No. 63 at 48-49. Likewise, § 1252 forecloses universal "set aside" relief as to noncitizens in removal proceedings under § 1229a, the individuals to whom MPP applied. ECF No. 63 at 2-3, 20-21. As the government has explained, Congress provided that challenges arising from any decision or action related to those proceedings may be raised, if at all, only though individual claims raised by the individuals placed in those removal proceeding. *Id*. at 20-21 (discussing 8 U.S.C. § 1252(b)(9), (g)). The same Congress that sought to bar noncitizens from procuring an injunction of § 1225 would not have authorized an injunction that would reach such noncitizens at the behest of third parties.

In sum, even if the Court grants summary judgment to Plaintiffs on any of their claims, the appropriate remedy is remand to the agency for further consideration, without setting aside the June 1 memorandum or granting injunctive relief. Doing otherwise would severely damage management of the border and foreign affairs, and a universal or nationwide injunction would be broader than necessary to address Plaintiffs' alleged harms and violate principles of Article III, equity, and administrative law. *See* ECF No. 63 at 49-50. Should the Court disagree, relief should be limited to vacatur of the Plaintiffs' specific claims, as applied to Plaintiffs only, and remand for further explanation. Alternatively, if this Court determines injunctive relief is appropriate, such relief must be limited to Plaintiffs' injuries. It is Plaintiffs' burden to establish that an injunction limited to the Texas border would be insufficient to address their alleged harm and, offering only pure speculation about where noncitizens might travel, Plaintiffs fail to meet this burden.

15

Dated: July 7, 2021                    Respectfully submitted,

PRERAK SHAH                            BRIAN M. BOYNTON
*Acting United States Attorney*        *Acting Assistant Attorney General*

BRIAN W. STOLZ                         WILLIAM C. PEACHEY
*Assistant United States Attorney*     *Director*
                                       Office of Immigration Litigation
                                       District Court Section

                                       EREZ REUVENI
                                       *Assistant Director*

                                       BRIAN C. WARD
                                       *Senior Litigation Counsel*

                                       FRANCESCA GENOVA
                                       *Trial Attorney*

                                       /s/ *Joseph A. Darrow*
                                       JOSEPH A. DARROW
                                       *Trial Attorney*
                                       U.S. Department of Justice
                                       Civil Division
                                       Office of Immigration Litigation
                                       District Court Section
                                       P.O. Box 868, Ben Franklin Station
                                       Washington, DC 20044
                                       Tel.: (202) 598-7537
                                       Joseph.a.darrow@usdoj.gov

                                       *Counsel for Defendants*

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 7, 2021, I electronically filed this supplemental brief with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
U.S. Department of Justice

17