**Assessment of the Migrant Protection Protocols (MPP)**
**October 28, 2019**

## I.   Overview and Legal Basis

The Department of Homeland Security (DHS) remains committed to using all available tools to address the unprecedented security and humanitarian crisis at the southern border of the United States.

- At peak of the crisis in May 2019, there were more than 4,800 aliens crossing the border daily—representing an average of more than *three apprehensions per minute*.

- The law provides for mandatory detention of aliens who unlawfully enter the United States between ports of entry if they are placed in expedited removal proceedings. However, resource constraints during the crisis, as well as other court-ordered limitations on the ability to detain individuals, made many releases inevitable, particularly for aliens who were processed as members of family units.

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) authorizes the Department of Homeland Security to return certain applicants for admission to the contiguous country from which they are arriving on land (whether or not at a designated port of entry), pending removal proceedings under INA § 240.

- Consistent with this express statutory authority, DHS began implementing the Migrant Protection Protocols (MPP) and returning aliens subject to INA § 235(b)(2)(C) to Mexico, in January 2019.

- Under MPP, certain aliens who are nationals and citizens of countries other than Mexico (third-country nationals) arriving in the United States by land from Mexico who are not admissible may be returned to Mexico for the duration of their immigration proceedings.

The U.S. government initiated MPP pursuant to U.S. law, but has implemented and expanded the program through ongoing discussions, and in close coordination, with the Government of Mexico (GOM).

- MPP is a core component of U.S. foreign relations and bilateral cooperation with GOM to address the migration crisis across the shared U.S.-Mexico border.

- MPP expansion was among the key "meaningful and unprecedented steps" undertaken by GOM "to help curb the flow of illegal immigration to the U.S. border since the launch of the U.S.-Mexico Declaration in Washington on June 7, 2019."[1]

---

[1] https://www.whitehouse.gov/briefings-statements/readout-vice-president-mike-pences-meeting-mexican-foreign-secretary-marcelo-ebrard/

- On September 10, 2019, Vice President Pence and Foreign Minister Ebrard "agree[d] to implement the Migrant Protection Protocols to the fullest extent possible."[2]

- Therefore, disruption of MPP would adversely impact U.S. foreign relations—along with the U.S. government's ability to effectively address the border security and humanitarian crisis that constitutes an ongoing national emergency.[3]

## II.   MPP Has Demonstrated Operational Effectiveness

In the past nine months—following a phased implementation, and in close coordination with GOM—DHS has returned more than 55,000 aliens to Mexico under MPP. MPP has been an indispensable tool in addressing the ongoing crisis at the southern border and restoring integrity to the immigration system.

### *Apprehensions of Illegal Aliens are Decreasing*

- Since a recent peak of more than 144,000 in May 2019, total enforcement actions—representing the number of aliens apprehended between points of entry or found inadmissible at ports of entry—have decreased by 64%, through September 2019.

- Border encounters with Central American families—who were the main driver of the crisis and comprise a majority of MPP-amenable aliens—have decreased by approximately 80%.

- Although MPP is one among many tools that DHS has employed in response to the border crisis, DHS has observed a connection between MPP implementation and decreasing enforcement actions at the border—including a rapid and substantial decline in apprehensions in those areas where the most amenable aliens have been processed and returned to Mexico pursuant to MPP.

### *MPP is Restoring Integrity to the System*

- Individuals returned to Mexico pursuant to MPP are now at various stages of their immigration proceedings: some are awaiting their first hearing; some have completed their first hearing and are awaiting their individual hearing; some have received an order of removal from an immigration judge and are now pursuing an appeal; some have established a fear of return to Mexico and are awaiting their proceedings in the United States; some have been removed to their home countries; and some have withdrawn claims and elected to voluntarily return to their home countries.

---

[2] https://www.whitehouse.gov/briefings-statements/readout-vice-president-mike-pences-meeting-mexican-foreign-secretary-marcelo-ebrard/
[3] https://www.whitehouse.gov/presidential-actions/presidential-proclamation-declaring-national-emergency-concerning-southern-border-united-states/

- MPP returnees with meritorious claims can be granted relief or protection within months, rather than remaining in limbo for years while awaiting immigration court proceedings in the United States.

  o The United States committed to GOM to minimize the time that migrants wait in Mexico for their immigration proceedings. Specifically, the Department of Justice (DOJ) agreed to treat MPP cases such as detained cases such that they are prioritized according to longstanding guidance for such cases.

  o The first three locations for MPP implementation—San Diego, Calexico, and El Paso—were chosen because of their close proximity to existing immigration courts.

  o After the June 7, 2019, Joint Declaration between GOM and the United States providing for expansion of MPP through bilateral cooperation, DHS erected temporary, dedicated MPP hearing locations at ports of entry in Laredo and Brownsville, in coordination with DOJ, at a total six-month construction and operation cost of approximately $70 million.

  o Individuals processed in MPP receive initial court hearings within two to four months, and—as of October 21, 2019—almost 13,000 cases had been completed at the immigration court level.

  o A small subset of completed cases have resulted in grants of relief or protection, demonstrating that MPP returnees with meritorious claims can receive asylum, or any relief or protection for which they are eligible, more quickly via MPP than under available alternatives.

  o Individuals not processed under MPP generally must wait years for adjudication of their claims. There are approximately one million pending cases in DOJ immigration courts. Assuming the immigration courts received no new cases and completed existing cases at a pace of 30,000 per month—it would take several years, until approximately the end of 2022, to clear the existing backlog.

- MPP returnees who do not qualify for relief or protection are being quickly removed from the United States. Moreover, aliens without meritorious claims—which no longer constitute a free ticket into the United States—are beginning to voluntarily return home.

  o According to CBP estimates, approximately 20,000 people are sheltered in northern Mexico, near the U.S. border, awaiting entry to the United States. This number—along with the growing participation in an Assisted Voluntary Return (AVR) program operated by the International Organization for Migration (IOM), as described in more detail below—suggests that a significant proportion of the 55,000+ MPP returnees have chosen to abandon their claims.

**III.    Both Governments Endeavor to Provide Safety and Security for Migrants**

- The Government of Mexico (GOM) has publicly committed to protecting migrants.

  o A December 20, 2018, GOM statement indicated that "Mexico will guarantee that foreigners who have received their notice fully enjoy the rights and freedoms recognized in the Constitution, in the international treaties to which the Mexican State is a party, as well as in the current Migration Law.  They will be entitled to equal treatment without any discrimination and due respect to their human rights, as well as the opportunity to apply for a work permit in exchange for remuneration, which will allow them to meet their basic needs."

    ▪ Consistent with its commitments, GOM has accepted the return of aliens amenable to MPP.  DHS understands that MPP returnees in Mexico are provided access to humanitarian care and assistance, food and housing, work permits, and education.

    ▪ GOM has launched an unprecedented enforcement effort bringing to justice transnational criminal organizations (TCOs) who prey on migrants transiting through Mexico—enhancing the safety of all individuals, including MPP-amenable aliens.

  o As a G-20 country with many of its 32 states enjoying low unemployment and crime, Mexico's commitment should be taken in good faith by the United States and other stakeholders.  Should GOM identify any requests for additional assistance, the United States is prepared to assist.

- Furthermore, the U.S. government is partnering with international organizations offering services to migrants in cities near Mexico's northern border.

  o In September 2019, the U.S. Department of State Bureau of Population, Refugees, and Migration (PRM) funded a $5.5 million project by IOM to provide shelter in cities along Mexico's northern border to approximately 8,000 vulnerable third-country asylum seekers, victims of trafficking, and victims of violent crime in cities along Mexico's northern border.

  o In late September 2019, PRM provided $11.9 million to IOM to provide cash-based assistance for migrants seeking to move out of shelters and into more sustainable living.

- The U.S. Government is also supporting options for those individuals who wish to voluntarily withdraw their claims and receive free transportation home.  Since November 2018, IOM has operated its AVR program from hubs within Mexico and Guatemala, including Tijuana and Ciudad Juarez.  PRM has provided $5 million to IOM to expand that program to Matamoros and Nuevo Laredo and expand operations in other Mexican

northern border cities.  As of mid-October, almost 900 aliens in MPP have participated in the AVR program.

- The United States' ongoing engagement with Mexico is part of a larger framework of regional collaboration.  Just as United Nations High Commissioner for Refugees has called for international cooperation to face the serious challenges in responding to large-scale movement of migrants and asylum-seekers travelling by dangerous and irregular means, the U.S. Government has worked with Guatemala, El Salvador, and Honduras to form partnerships on asylum cooperation (which includes capacity-building assistance), training and capacity building for border security operations, biometrics data sharing and increasing access to H-2A and H-2B visas for lawful access to the United States.

## IV.    Screening Protocols Appropriately Assess Fear of Persecution or Torture

- When a third-country alien states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, the alien is referred to U.S. Citizenship & Immigration Services (USCIS).  Upon referral, USCIS conducts an MPP fear-assessment interview to determine whether it is more likely than not that the alien will be subject to torture or persecution on account of a protected ground if returned to Mexico.

  - MPP fear assessments are conducted consistent with U.S. law implementing the *non-refoulement* obligations imposed on the United States by certain international agreements and inform whether an alien is processed under—or remains—in MPP.

  - As used here, "persecution" and "torture" have specific international and domestic legal meanings distinct from fear for personal safety.

- Fear screenings are a well-established part of MPP.  As of October 15, 2019, USCIS completed over 7,400 screenings to assess a fear of return to Mexico.

  - That number included individuals who express a fear upon initial encounter, as well as those who express a fear of return to Mexico at any subsequent point in their immigration proceedings, including some individuals who have made multiple claims.

  - Of those, approximately 13% have received positive determinations and 86% have received negative determinations.

  - Thus, the vast majority of those third-country aliens who express fear of return to Mexico are not found to be more likely than not to be tortured or persecuted on account of a protected ground there.  This result is unsurprising, not least because aliens amenable to MPP voluntarily entered Mexico en route to the United States.

## V.     Summary and Conclusion

In recent years, only about 15% of Central American nationals making asylum claims have been granted relief or protection by an immigration judge.  Similarly, affirmative asylum grant rates for nationals of Guatemala, El Salvador, and Honduras were approximately 21% in Fiscal Year 2019.  At the same time, there are—as noted above—over one million pending cases in DOJ immigration courts, in addition to several hundred thousand asylum cases pending with USCIS.

These unprecedented backlogs have strained DHS resources and challenged its ability to effectively execute the laws passed by Congress and deliver appropriate immigration consequences: those with meritorious claims can wait years for protection or relief, and those with non-meritorious claims often remain in the country for lengthy periods of time.

This broken system has created perverse incentives, with damaging and far-reaching consequences for both the United States and its regional partners.  In Fiscal Year 2019, certain regions in Guatemala and Honduras saw 2.5% of their population migrate to the United States, which is an unsustainable loss for these countries.

MPP is one among several tools DHS has employed effectively to reduce the incentive for aliens to assert claims for relief or protection, many of which may be meritless, as a means to enter the United States to live and work during the pendency of multi-year immigration proceedings. Even more importantly, MPP also provides an opportunity for those entitled to relief to obtain it within a matter of months.  MPP, therefore, is a cornerstone of DHS's ongoing efforts to restore integrity to the immigration system—and of the United States' agreement with Mexico to address the crisis at our shared border.

**Appendix A: Additional Analysis of MPP Fear-Assessment Protocol**

U.S. Citizenship and Immigration Services (USCIS) strongly believes that if DHS were to change its fear-assessment protocol to affirmatively ask an alien amenable to MPP whether he or she fears return to Mexico, the number of fraudulent or meritless fear claims will significantly increase. This prediction is, in large part, informed by USCIS's experience conducting credible fear screenings for aliens subject to expedited removal. Credible fear screenings occur when an alien is placed into expedited removal under section 235(b)(1) of the Immigration and Nationality Act – a streamlined removal mechanism enacted by Congress to allow for prompt removal of aliens who lack valid entry documents or who attempt to enter the United States by fraud – and the alien expresses a fear of return to his or her home country or requests asylum. Under current expedited removal protocol, the examining immigration officer – generally U.S. Customs and Border Protection officers at a port of entry or Border Patrol agents – read four questions, included on Form I-867B, to affirmatively ask each alien subject to expedited removal whether the alien has a fear of return to his or her country of origin.[4]

The percentage of aliens subject to expedited removal who claimed a fear of return or requested asylum was once quite modest. However, over time, seeking asylum has become nearly a default tactic used by undocumented aliens to secure their release into the United States. For example, in 2006, of the 104,440 aliens subjected to expedited removal, only 5% (5,338 aliens) were referred for a credible fear interview with USCIS. In contrast, 234,591 aliens were subjected to expedited removal in 2018, but 42% (or 99,035) were referred to USCIS for a credible fear interview, significantly straining USCIS resources.

Table A1: Aliens Subject to Expedited Removal and Share Making Fear Claims, FY 2006 - 2018

| Fiscal Year | Subjected to Expedited Removal | Referred for a Credible Fear Interview | Percentage Referred for Credible Fear |
|---|---|---|---|
| 2006 | 104,440 | 5,338 | 5% |
| 2007 | 100,992 | 5,252 | 5% |
| 2008 | 117,624 | 4,995 | 4% |
| 2009 | 111,589 | 5,369 | 5% |
| 2010 | 119,876 | 8,959 | 7% |
| 2011 | 137,134 | 11,217 | 8% |
| 2012 | 188,187 | 13,880 | 7% |
| 2013 | 241,442 | 36,035 | 15% |
| 2014 | 240,908 | 51,001 | 21% |
| 2015 | 192,120 | 48,052 | 25% |
| 2016 | 243,494 | 94,048 | 39% |
| 2017 | 178,129 | 78,564 | 44% |
| 2018 | 234,591 | 99,035 | 42% |

---

[4] *See* 8 C.F.R.§ 235.3(b)(2).

Transitioning to an affirmative fear questioning model for MPP-amenable aliens would likely result in a similar increase. Once it becomes known that answering "yes" to a question can prevent prompt return to Mexico under MPP, DHS would experience a rise in fear claims similar to the expedited removal/credible fear process. And, affirmatively drawing out this information from aliens rather than reasonably expecting them to come forward on their own initiative could well increase the meritless fear claims made by MPP-amenable aliens.

It also bears emphasis that relatively small proportions of aliens who make fear claims ultimately are granted asylum or another form of relief from removal. Table A2 describes asylum outcomes for aliens apprehended or found inadmissible on the Southwest Border in fiscal years 2013 – 2018. Of the 416 thousand aliens making fear claims during that six-year period, 311 thousand (75 percent) had positive fear determinations, but only 21 thousand (7 percent of positive fear determinations) had been granted asylum or another form of relief from removal as of March 31, 2019, versus 72 thousand (23 percent) who had been ordered removed or agreed to voluntary departure. (Notably, about 70 percent of aliens with positive fear determinations in FY 2013 – 2018 remained in EOIR proceedings as of March 31, 2019.)

Table A2: Asylum Outcomes, Southwest Border Encounters, FY 2013 – 2018

| Year of Encounter | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|
| Total Encounters | 490,093 | 570,832 | 446,060 | 560,432 | 416,645 | 522,626 | 3,006,688 |
| Subjected to ER | 225,426 | 222,782 | 180,328 | 227,382 | 160,577 | 214,610 | 1,231,105 |
| Fear Claims[1] | 39,648 | 54,850 | 50,588 | 98,265 | 72,026 | 100,756 | 416,133 |
| Positive Fear Determinations[2] | 31,462 | 36,615 | 35,403 | 76,005 | 55,251 | 75,856 | 310,592 |
| Asylum Granted or Other Relief[3] | 3,687 *11.7%* | 4,192 *11.4%* | 3,956 *11.2%* | 4,775 *6.3%* | 2,377 *4.3%* | 2,168 *2.9%* | 21,155 *6.8%* |
| Removal Orders[4] | 9,980 *31.7%* | 11,064 *30.2%* | 9,466 *26.7%* | 17,700 *23.3%* | 12,130 *22.0%* | 11,673 *15.4%* | 72,013 *23.2%* |
| Asylum Cases Pending | 17,554 *55.8%* | 21,104 *57.6%* | 21,737 *61.4%* | 53,023 *69.8%* | 40,586 *73.5%* | 61,918 *81.6%* | 215,922 *69.5%* |
| Other | 241 | 255 | 244 | 507 | 158 | 97 | 1,502 |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.
Notes for Table A2: Asylum outcomes are current as of March 31, 2019.
[1] Fear claims include credible fear cases completed by USCIS as well as individuals who claimed fear at the time of apprehension but who have no record of a USCIS fear determination, possibly because they withdrew their claim.
[2] Positive fear determinations include positive determinations by USCIS as well as negative USCIS determinations vacated by EOIR.
[3] Asylum granted or other relief includes withholding of removal, protection under the Convention Against Torture, Special Immigrant Juvenile status, cancelation of removal, and other permanent status conferred by EOIR.
[4] Removal orders include completed repatriations and unexecuted orders of removal and grants of voluntary departure.

Implementing MPP assessments currently imposes a significant resource burden to DHS.  As of October 15, 2019, approximately 10% of individuals placed in MPP have asserted a fear of return to Mexico and have been referred to an asylum officer for a MPP fear assessment.  The USCIS Asylum Division assigns on average approximately 27 asylum officers per day to handle this caseload nationwide.  In addition, the Asylum Division must regularly expend overtime resources after work hours and on weekends to keep pace with the same-day/next-day processing requirements under MPP. This workload diverts resources from USCIS's affirmative asylum caseload, which currently is experiencing mounting backlogs.

Most importantly, DHS does not believe amending the process to affirmatively ask whether an alien has a fear of return to Mexico is necessary in order to properly identify aliens with legitimate fear claims in Mexico because under DHS's current procedures, aliens subject to MPP **may raise a fear claim to DHS at any point in the MPP process**.  Aliens are not precluded from receiving a MPP fear assessment from an asylum officer if they do not do so initially upon apprehension or inspection, and many do.  As of October 15, 2019[5], approximately 4,680 aliens subject to MPP asserted a fear claim and received an MPP fear-assessment **after** their initial encounter or apprehension by DHS, with 14% found to have a positive fear of return to Mexico.  Additionally, Asylum Division records indicate as of October 15, 2019[6], approximately 618 aliens placed into MPP have asserted **multiple** fear claims during the MPP process (from the point of placement into MPP at the initial encounter or apprehension) and have therefore received multiple fear assessments to confirm whether circumstances have changed such that the alien should not be returned to Mexico.  Of these aliens, 14% were found to have a positive fear of return to Mexico.

Additionally, asylum officers conduct MPP fear assessments with many of the same safeguards provided to aliens in the expedited removal/credible fear context.  For example, DHS officers conduct MPP assessment interviews in a non-adversarial manner, separate and apart from the general public, with the assistance of language interpreters when needed.[7]

In conducting MPP assessments, asylum officers apply a "more likely than not" standard, which is a familiar standard.  "More likely than not" is equivalent to the "clear probability" standard for statutory withholding and not unique to MPP.  Asylum officers utilize the same standard in the reasonable fear screening process when claims for statutory withholding of removal and protection under the Convention Against Torture (CAT).[8]  The risk of harm standard for withholding (or deferral) of removal under the Convention Against Torture (CAT) implementing regulations is the same, i.e., "more likely than not."[9]  In addition to being utilized by asylum

---

[5] USCIS began tracking this information on July 3, 2019.
[6] USCIS began tracking this information on July 3, 2019.
[7] USCIS Policy Memorandum PM-602-0169, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*, 2019 WL 365514 (Jan. 28, 2019).
[8] See INA § 241(b)(3); 8 C.F.R. § 1208.16(b)(2) (same); See 8 C.F.R. § 1208.16(c)(2).
[9] *See* 8 C.F.R. § 1208.16(c)(2); Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8480 (Feb. 19, 1999) (detailing incorporation of the "more likely than not" standard into U.S. CAT ratification history); *see also Matter of J-F-F-*, 23 I&N Dec. 912 (BIA 2006).

officers in other protection contexts, the "more likely than not" standard satisfies the U.S. government's *non-refoulement* obligations.