**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' SUPPLEMENTAL BRIEF REGARDING APPROPRIATE RELIEF**

## TABLE OF CONTENTS

Table of Contents...................................................................................................... ii

Table of Authorities .................................................................................................. iii

I.      The Court Should Vacate, *i.e.*, "Set Aside" the June 1 Memorandum. .................. 2

II.     The Court Should Grant Properly Tailored Injunctive Relief. ............................ 12

    A.      An injunction would provide a properly tailored, non-intrusive remedy.  12

    B.      Injunctive relief is necessary to provide Plaintiffs with complete relief. . 15

    C.      Injunctive relief should be nationwide in scope to grant complete relief. 17

III.    The Court Should Grant Vacatur and Injunctive Relief on Count III.................. 18

IV.     The Court Should Vacate the June 1 Memorandum and Grant Injunctive
    Relief on Count IV.............................................................................................. 18

Conclusion ............................................................................................................... 19

Certificate of Service ............................................................................................... 21

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985)................................................................................4

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993)................................................................4

*Am. Bioscience, Inc. v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001)..............................................................2

*Armstrong v. Exceptional Child Center, Inc.*,
    575 U.S. 320 (2015)..............................................................................12

*Cent. & S. W. Servs., Inc. v. U.S. E.P.A.*,
    220 F.3d 683 (5th Cir. 2000) .............................................................5, 6

*Franciscan All., Inc. v. Azar*,
    414 F. Supp. 3d 928 (N.D. Tex. 2019) (O'Connor, J.)..........................6

*Gen. Chem. Corp. v. United States*,
    817 F.2d 844 (D.C. Cir. 1987)................................................................3

*Missouri v. Jenkins*,
    515 U.S. 70 (1995)...........................................................................14, 15

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139, 165–66 (2010)................................................................16

*Nat. Res. Def. Council v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020)................................................................19

*O'Reilly v. U.S. Army Corps of Eng'rs*,
    477 F.3d 225 (5th Cir. 2007) ................................................................3

*Texas v. United States*,
    2021 WL 3022434 (S.D. Tex. July 16, 2021)......................................11

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ......................................................*passim*

*Texas v. United States*,
    No. 1:18-cv-68, 2021 WL 3025857 (S.D. Tex. July 16, 2021) .........2, 13

*Texas v. United States*,
    No. 6:21-cv-3, 2021 WL 2096669 (S.D. Tex. Feb. 23, 2021)....................................14, 16, 18

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019)........................................................................................2

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) (per curiam)...................................................................15, 18

**Statutes**

5 U.S.C. § 706(2)(A)....................................................................................................................2, 12

8 U.S.C. § 1225................................................................................................................................5, 12

On July 22, 2021, this Court directed the parties to file supplemental briefs by July 27, 2021 at 5:00 pm regarding "the appropriate relief for Plaintiffs if the Court determines they should prevail on any of their claims."  ECF No. 86.  Here, Plaintiffs Texas and Missouri respectfully submit that appropriate relief would be to:

- Vacate the June 1 Memorandum in its entirety;

- Issue injunctive relief restoring the status quo ante by (1) prohibiting the enforcement or implementation of the June 1 Memorandum, (2) compelling the enforcement and implementation of MPP in good faith until such time as it has been lawfully rescinded in compliance with the APA and DHS's agreement with Texas, and (3) compelling the enforcement and implementation of MPP in good faith until such time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory-detention requirements without releasing any such aliens (whether by parole or otherwise) due to a lack of detention resources;

- Declare that neither the January 20 Memorandum nor the June 1 Memorandum remains in effect and that both memoranda are invalid.

This relief is appropriate for several reasons.  First, contrary to Defendants' ("DHS") argument, the Court should vacate the June 1 Memorandum terminating MPP, because DHS's proposal of remanding without vacating would be manifestly insufficient to grant effectual relief. Second, the Court should also grant injunctive relief, because DHS effectively concedes that it will not meaningfully reinstate MPP without an injunction.  The injunctions should be properly tailored to grant complete relief without forcing the Court to engage in micromanagement or detailed oversight of DHS's ongoing implementation of MPP.  On Count I,[1] the Court should enter an injunction ordering DHS to restore the status quo before January 20, 2021, and implement MPP in

---

[1] In the interest of clarity, this brief numbers the counts as the Court did during trial, not as the complaint did. Thus, "Count I" refers to Plaintiffs' argument that the June 1 Memorandum is arbitrary and capricious under the APA. "Count II" refers to Plaintiffs' argument that the June 1 Memorandum causes Defendants to violate 8 U.S.C. § 1225. "Count III" refers to Plaintiffs' argument that the June 1 Memorandum violates the Take Care Clause. And "Count IV" refers to Texas's argument that the June 1 Memorandum violates DHS's agreement with Texas.

1

good faith unless and until DHS can terminate the program consistent with the APA.  On Count II, the Court should enter an injunction ordering DHS to restore the status quo before January 20, 2021, and implement MPP in good faith unless and until DHS can terminate MPP without exacerbating its violation of its mandatory detention obligations under Section 1225.  If the Court reaches Count III, the Take Care Clause count, the Court should order identical relief as it does in Count II.  On Count IV, regarding Texas's binding agreement with DHS, the Court should vacate the June 1 Memorandum and enjoin DHS not to terminate MPP unless and until it has complied with its contractual obligations to Texas.

## I.   The Court Should Vacate, *i.e.*, "Set Aside" the June 1 Memorandum.

The Administrative Procedure Act (APA) provides that "[t]he reviewing court *shall …* hold unlawful and *set aside* agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (emphasis added).  Thus, an order vacating (*i.e.*, "set[ting] aside," *id.*) the unlawful agency action is the standard remedy for an action held to be arbitrary and capricious, and it is required by the plain language of the statute.  *See id.*  Courts routinely vacate administrative actions that fail to comply with the APA, particularly in the immigration context.  *See, e.g., Texas v. United States*, No. 1:18-cv-68, 2021 WL 3025857, at *41 (S.D. Tex. July 16, 2021) (Hanen, J.) ("The DACA Memorandum and the DACA program that it created are hereby vacated and remanded to DHS for further consideration….").  Indeed, due to the mandatory nature of the statutory language ("shall … set aside"), courts have emphasized that the "ordinary practice" is to vacate unlawful agency action.  *See, e.g., United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."); *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (a party with standing who prevails on APA

claim "is entitled to relief under that statute, which normally will be a vacatur of the agency's order"); *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 848 (D.C. Cir. 1987) ("The APA requires us to vacate the agency's decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'").

Notwithstanding the plain language of the APA, DHS argues that this Court should remand without vacating the June 1 Memorandum, leaving the termination of MPP intact while the agency reconsiders it. *See, e.g.*, ECF No. 70, at 7-11 (requesting "an order remanding to the agency *without vacating the memorandum*") (emphasis added). On the contrary, a remand without vacatur would be manifestly insufficient to grant Plaintiffs effectual relief. It would allow DHS to maintain its unlawful termination of MPP, continue to inflict irreparable injury on Texas and Missouri, and undermine the public interest indefinitely.

Notably, the principal cases cited by Defendants in support of their request for remand without vacating actually address whether the court should remand *at all*, not whether it should remand without first vacating or setting aside the unlawful agency action. *See id.* For example, *O'Reilly v. U.S. Army Corps of Engineers* held that the question whether an Environmental Impact Statement should be prepared under NEPA should be remanded to the agency for consideration in the first instance, after the unlawfully issued permit was vacated and enjoined. *See O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 240 (5th Cir. 2007) (holding that "[w]e amend the district court's injunction order *to enjoin the issuance of the permit* pending our remand of the case to the Corps for further proceedings consistent with this opinion and the instructions set forth below") (emphasis added). Likewise, the Supreme Court's discussion in *Florida Power & Light Co. v. Lorion* addressed whether the reviewing court should typically conduct *its own* hearing on the merits or remand to the agency once the underlying agency decision was deemed unlawful and

3

set aside: "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation*." Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985).  The immediately following sentence of the opinion, not quoted by DHS, makes this distinction clear: "The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Id.  Florida Power & Light* stated that remanding to the agency typically occurs after the agency action has been set aside, as first "courts are to decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review." *Id.*  DOJ's principal cases, therefore, provide no support for its argument that the Court should remand without first setting aside the June 1 Memorandum as unlawful.

To be sure, some courts have remanded to the agency without vacating an unlawful action in limited circumstances, when two factors are present: (1) the deficiencies in the agency action are minor and may be readily corrected, and (2) vacating the agency action would be unduly disruptive.  *See, e.g., Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) ("An inadequately supported rule, however, need not necessarily be vacated.  The decision whether to vacate depends on [1] the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and [2] the disruptive consequences of an interim change that may itself be changed.") (cleaned up).  Thus, in *Central & South West Services*, the Fifth Circuit remanded to the EPA without vacating the challenged rule where the underlying rule was fundamentally sound, and EPA had merely failed to explain its refusal to grant a limited exception to that fundamentally sound rule: "EPA gave ample reasons for its application of the

Rule to the members of the regulated community in general.  It simply failed to explain why it refused to grant the national variance to the electric utilities." *Cent. & S. W. Servs., Inc. v. U.S. E.P.A.*, 220 F.3d 683, 692 n.6 (5th Cir. 2000).  Under these circumstances, the court "conclude[d] that it would be disruptive to vacate application of the Rule *to other segments of the industry*." *Id.* (emphasis added).

Here, neither of these two factors are present.  The deficiencies in the June 1 Memorandum are not simply minor, technical deficiencies that the agency can easily correct on remand.  *Id.*  On the contrary, those deficiencies are glaring and egregious; they affect every aspect of the agency's decision; and they render it extremely unlikely that the agency could lawfully reach the same conclusion again on remand.  Indeed, as Plaintiffs have alleged and proven in Count II, it would be unlawful to terminate MPP unless and until other factors change DHS's capacity and willingness to detain unlawful immigrants claiming asylum under Section 1225.  *See infra* Part II. As Plaintiffs have alleged and proven, the June 1 Memorandum reached its decision only by refusing to consider absolutely central, critical features of the MPP program, including: (1) the fact, previously acknowledged by DHS, that MPP discourages Northern Triangle and other illegal aliens from attempting illegal border crossings[2]; (2) the fact that MPP permits DHS to avoid, at least in significant part, its systematic violation of its detention obligations for aliens claiming asylum under Section 1225[3]; and (3) the fact that DHS's release of tens of thousands of unlawful aliens imposes significant burdens on States like Texas and Missouri—an issue that DHS has

---

[2] At oral argument, DHS did not dispute that MPP does, in fact, discourage and deter aliens from attempting illegal entry, stating: "I think it's fair to say that [MPP] probably deterred some individuals from coming to the United States."  Trial Tr. 147.

[3] At oral argument, DHS's counsel candidly admitted that, to this day, DHS has no idea what impact terminating MPP had on its detention obligations.  As DHS's counsel stated: "the [administrative] record doesn't contain any information about detention capacity or numbers of individuals versus detained versus paroled."  Trial Tr. 114; *see also id.* 115-16.

repeatedly litigated against Texas in recent years, yet refused to even consider in the June 1 Memorandum.  These factors go to the heart of MPP, and the failure to consider them vitiates the June 1 Memorandum in its entirety, in every possible application.  This case, therefore, bears no resemblance to *Central & South West Services*, where the Fifth Circuit remanded without vacating a rule that was fundamentally sound, to allow EPA to reconsider whether to create an exception to that rule.  *See* 220 F.3d at 692 n.6.  To the extent that the statute even permits remand without vacating, *but see Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 945 (N.D. Tex. 2019) (O'Connor, J.) (holding that "district courts have a duty to vacate unlawful agency actions"), any such action would be plainly inappropriate in this case, where the unlawfulness goes to the very heart of the agency action.

Perhaps for this reason, DHS does not even discuss this first factor, and DHS does not seriously contend that the unlawfulness of the June 1 Memorandum is merely a minor deficiency that affects only a limited number of applications and could be easily corrected on remand.  *See* ECF No. 70 at 7-11.  Instead, DHS argues only that setting aside the June 1 Memorandum would be unduly disruptive because it would supposedly cause "chaos" and "disruptive consequences" for the current Administration's border policies.  *Id.* at 8 (quoting *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 97-98 (D.C. Cir. 2002)).  This argument cannot bear scrutiny.

First, the words "chaos" and "disruption" properly describe the massive humanitarian crisis at the border caused by DHS's *termination* of MPP—not the consequences of *reinstating* MPP. *See generally* ECF No. 54-2 (Phillips Declaration).  In light of the hundreds of thousands of illegal border crossings, the tens of thousands of unaccompanied minors, the explosion of human trafficking and criminal cartel activity, and the chaos and disruption at the border—all invited by the suspension of MPP—DHS's suggestion that *resuming* MPP would cause "chaos" and

"disruption" borders on farce.  The prospect of further chaos and disruption at the border decisively favors setting aside June 1 Memorandum and enjoining the agency to reinstate MPP.

Second, the "chaos" and "disruption" predicted by DHS are entirely self-inflicted, because DHS relies on the premise that (contrary to what it said in its public memoranda) DHS actually made the decision to permanently terminate MPP back in January 2021, and it has been aggressively dismantling the program ever since.  ECF No. 7-11.  DHS argues that it began acting "to unwind MPP and its infrastructure," *id.* at 8, long *before* the June 1 Memorandum terminating MPP, which is less than two months old.  *See id.* (stating that "new initiatives" to replace MPP have been "in place for nearly six months"); *id.* at 9 (reporting vaguely that "MPP has been terminated for some time"); *id.* at 10-11 (hailing the "wind-down of MPP" that began in January 2021); *id.* at 11 (citing "more than four months of diplomatic and programmatic engagement" focused on terminating MPP); *see also* ECF No. 64, at 20 (alluding to Mexico's participation in "the wind-down process [for MPP] *since February*") (emphasis added).  DHS contends that "DHS cannot easily 'restore the status quo ante' that existed prior to January 2021 now that new initiatives have been in place for *nearly six months* and relations with Mexico have significantly evolved."  ECF No. 70 at 8 (emphasis added).  In other words, DHS argues that it has been dismantling MPP ever since late January 2021, and it has gone too far to stop now.  *Id.*

To be sure, DHS did not notify the States or this Court that it was permanently terminating MPP until June 1, 2021—less than two months ago, and two months *after* Texas and Missouri sued to reinstate MPP.  DHS's lack of candor on this point provides reason enough to reject this argument.  Moreover, in the DAPA case, the Fifth Circuit correctly rejected DHS's reliance on such self-inflicted injuries.  In that case, as here, DHS argued that the injunction against implementing DAPA would be disruptive because DHS had already taken substantial steps to

7

implement DAPA, including that "DHS has already leased office space and begun hiring employees to implement DAPA." *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), as revised (Nov. 25, 2015).   The Fifth Circuit rejected this argument, noting that "[s]uch inconveniences are common incidental effects of injunctions, and *the government could have avoided them by delaying preparatory work until the litigation was resolved*." *Id.* (emphasis added).   So also here, DHS "could have avoided" any putative disruption to its engagement with Mexico by informing its Mexican counterparts that this litigation was ongoing and that any suspension or termination of MPP would be subject to judicial review "until the litigation was resolved." *Id.*   Instead, DHS apparently took the opposite course—it tried to dismantle MPP as quickly as possible while this case was pending, and then claimed in this case that the program is too dismantled to revive.   This Court should not countenance this inequitable argument.

Moreover, DHS's claim of "chaos" and "disruption" focus exclusively on its diplomatic engagement with Mexico and (to a lesser extent) the Northern Triangle countries.   *See* ECF No. 70 at 7-11 (citing Declaration of David Shahoulian, ECF No. 64 at 3-12, Gov. App. 1-10; and Declaration of Emily Mendrala, *id.* at 13-22, Gov. App. 11-19).   The Court should give this argument little no weight, given that DHS gave no consideration whatsoever to the costs and burdens that terminating MPP would impose on the States of the United States, including Texas and Missouri, in the June 1 Memorandum.   DHS's extreme solicitude for its "close, delicate, and dynamic conversation" with Mexico, ECF No. 64 at 4 ¶ 2, rings hollow when compared with its decision to run roughshod over the interests of our Nation's own constituent States—without even consulting them.   DHS had no "conversation" whatsoever with Texas and Missouri before dismantling MPP—even though it was required to do so by law and by binding agreement.

Moreover, this argument rests on a category mistake.   As Plaintiffs pointed out at trial,

Trial Tr. 186-87, the United States initiated MPP unilaterally pursuant to U.S. law, not pursuant to bilateral agreement or treaty with Mexico. *Id.* (citing App. 307). The program was then "implemented and expanded … through ongoing discussions with Mexico." *Id.* In other words, MPP was adopted and launched unilaterally, just as it was later terminated unilaterally. App.307; *see also* App.303 (noting that the U.S. merely notified Mexico that it was implementing MPP, without prior diplomatic engagement or agreement with Mexico). Mexico's cooperation was involved in its expansion, not its implementation. *See id.* In significant part, therefore, DHS concedes that the decision to implement MPP does not depend on the agreement and cooperation with Mexico. Even if Mexico's cooperation may be required to return an alien who has already been admitted, nothing prevents DHS from refusing to admit asylum applicants in the first place. *See* Trial Tr. 187 ("When they show up at a port of entry … and say, I'm here to apply for asylum, can I enter the United States, the government certainly retains the option of saying, no, you should remain in Mexico without any kind of treaty or negotiations with Mexico."). Thus, even if Mexico were to decline to cooperate, DHS retains significant authority to continue to implement MPP.

Furthermore, DHS's actual evidence simply does not support its argument that reinstating MPP will introduce "chaos" and "disruption" into its diplomatic relations with Mexico. DHS's evidence on this point, like many of its assertions, consists of vague, non-committal assertions that fail to support any specific finding of harm. For example, the Shahoulian Declaration speaks vaguely of "a close, delicate, and dynamic conversation" on immigration issues, *id.* ¶ 2; an ill-defined need "to react and adjust their policy and operational responses as necessary," *id.* ¶ 5; a vague desire to "work together to look for more robust regional solutions to manage migration," *id.* ¶ 15; and a lofty allusion to "delicate bilateral (and multilateral) discussions and negotiations," *id.* ¶ 16. Likewise, the Mendrala Declaration, ECF No. 64, at 13-21 (Gov. App. 11-19), relies on

vague invocations of "long-term strategic partnerships," *id.* ¶ 4; "focus[ing] energy and resources on collective action," *id.* ¶ 7; "address[ing] root causes," *id.* ¶ 12; and improving "bilateral relationships" with countries south of the border—and it even uses the Orwellian locution "irregular migration" to describe the current border crisis, *id.* ¶ 10. But, other than stating that Mexico approved the shut-down of a migrant camp in Mexico where migrants faced violence and sexual abuse, *id.* ¶ 15—an allegation that supports *Plaintiffs'* claims here—the Mendrala Declaration does not allege that Mexico either opposed the initiation of MPP, refused to cooperate in its implementation, or lobbied for its termination. Indeed, notably absent from DHS's evidence is any specific allegation that Mexico requested the termination of MPP at any point, or that Mexico will be unwilling to cooperate in implementing MPP if and when it is reinstated. *See* ECF No. 64, at 3-21 (Gov. App. 1-19).

On the contrary, to the extent it addresses the question at all, DHS's evidence (correctly) portrays Mexico as a willing participant in MPP and admits that the cancellation of MPP was a unilateral decision of the Biden Administration. DHS admits that, "[s]hortly after the DHS announcement," Mexico promptly "committed to a number of steps that were important to the functioning of MPP." ECF No. 64 at 5 (Shahoulian Decl. ¶ 5). DHS concedes that "[a]fter MPP was initiated, the United States and Mexico coordinated closely in response to changing conditions" in implementing MPP. *Id.* ¶ 6. DHS's own evidence emphasizes that the decision to terminate MPP came from President Biden and DHS alone, not from the Mexican government. *See id.* ¶ 10 (noting that MPP was cancelled, not because of Mexican objections, but because "the Department would like to now devote" diplomatic resources "to other strategic initiatives," and that "from DHS's perspective," MPP "is simply not a wise use of taxpayer resources"). DHS recites that MPP's implementation was disrupted by the COVID-19 pandemic (like virtually every

10

other government program), but even there DHS does not allege that the Mexican government ever objected to MPP or sought its termination, or that Mexico is unwilling to cooperate in its reinstatement.  *See id.* ¶ 6.  Thus, DHS's evidence contradicts its argument that injunctive relief could be ineffective because Mexico might not cooperate in the reinstatement of MPP.  *See* Trial Tr. 109-110.

DHS also alleges that it wishes to "refocus efforts to address the root causes of migration from Central America" and "expand cooperative efforts to combat smuggling and human trafficking networks," among "other initiatives." *Id.* ¶ 13.  But DHS does not provide any specific explanation why MPP would supposedly interfere with these other efforts—and the States' evidence shows that the cancellation of MPP has resulted in an explosion of human trafficking and smuggling at the border.  *See, e.g.,* ECF No. 54-2.

Finally, DHS argues that it must have the unilateral authority to cancel MPP if it is "to maintain a trusted relationship with Mexico." *Id.* ¶ 14.  On the contrary, the Mexican government is capable of understanding that DHS's termination of MPP is subject to U.S. law and its Constitution, and that the termination of MPP is subject to judicial review in American courts. Simply put, the fact that DHS communicates with Mexico about terminating MPP does not give DHS a blank check to violate the APA, Section 1225, the Take Care Clause, and its binding agreement with Texas.  Compliance with the law is DHS's first responsibility, even if it has some incidental impact on its discussions with Mexico.  As Justice Thomas and others have noted, "[t]he public interest of the nation is always served by the cessation of a program that was created in violation of law and whose existence violates the law." *Texas v. United States*, 2021 WL 3022434, at *1 (S.D. Tex. July 16, 2021) (citing *Trump v. Hawaii*, 138 S. Ct. 2392, 2429 (Thomas, J., concurring) (recognizing that there is a "public interest in having congressional enactments

11

properly interpreted and applied")).   DHS's duty to comply with American law, and its responsibilities to *American* States like Texas and Missouri, overwhelm its vaguely couched concerns about its diplomatic engagement with Mexico and Central American nations.

Under 5 U.S.C. § 706(2)(A), this Court "shall … hold unlawful and set aside" the June 1 Memorandum if the Court holds that it violated the APA.   DHS's arguments that this Court should disregard this statutory command are plainly unconvincing.   In the end, they merely assert that the current Administration does not wish to pursue MPP as a policy matter, and that their legal obligations under the APA and Section 1225 present inconvenient obstacles in their ability to pursue that policy—including in their discussions with Mexico.   "But those are burdens that Congress knowingly created, and it is not our place to second-guess those decisions."  *Texas v. United States*, 809 F.3d at 187.   The June 1 Memorandum should be vacated.

## II.     The Court Should Grant Properly Tailored Injunctive Relief.

In addition, under both Count I and Count II, the Court should enter an injunction that restores the status quo ante prior to the suspension of MPP on January 20, 2021, and requires DHS to implement MPP unless and until (1) it can terminate MPP consistent with the requirements of the APA (Count I); (2) it can terminate MPP without violating its mandatory detention obligations for asylum-seekers under Section 1225 (Counts II and III); and (3) it complies with its contractual obligations to Texas (Count IV).   The Court has authority to issue an injunction against ongoing illegal action by DHS.  *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers … reflects a long history of judicial review of illegal executive action").   The Court should do so here.

### A.     An injunction would provide a properly tailored, non-intrusive remedy.

On all Counts, the Court should enter properly crafted injunctions that would direct the

agency to resume implementing a program that it was already implementing successfully before the program's unlawful termination, until it can cease doing so in a manner consistent with its legal obligations. Such injunctions would not require the Court to engage in micromanagement or oversight of the agency's ongoing implementation of the program, and any non-compliance could be policed, if necessary, by motions to enforce and/or for sanctions brought by Plaintiffs.[4]

Recent case-law provides sound examples of such carefully crafted, non-intrusive injunctive relief. For example, in the DACA case, Judge Hanen ordered that "[f]rom this date forward, the United States of America, its departments, agencies, officers, agents, and employees are hereby enjoined from administering the DACA program and from reimplementing DACA *without compliance with the APA*." Order of Permanent Injunction, ECF No. 576 in No. 1-18-cv-00068 (S.D. Tex. July 16, 2021) (emphasis added). In so holding, Judge Hanen explicitly stated that he was not interfering with DHS's enforcement discretion in individual cases: "To be clear, neither this order nor the accompanying injunction requires DHS or the Department of Justice to take any immigration, deportation, or criminal action against any DACA recipient, applicant, or any other individual that it would not otherwise take." *Texas*, 2021 WL 3025857, at \*42.

Judge Tipton took a similar approach in the recent 100-day-pause litigation. Noting that "the Government argues that this Court may not rely on caselaw noting a need for uniform enforcement of immigration law because removal decisions are inherently discretionary and non-uniform," Judge Tipton held that "[t]he Court finds that is not the case. *Individual* removal

---

[4]  *See* Trial Tr. 186 ("Texas: I think the injunctive relief in that respect ... would be to reinstate the status quo ante. We do know that there was a huge practical difference and legal difference between MPP being in effect and then it being terminated or suspended. It was a difference of at least, I think, 68,000 aliens being enrolled. So that's the process we should be getting back to, where the line officers are, as my friends on the other side admit, able to enroll people in MPP and create those same kinds of protections for the states' fiscs.").

decisions, as explained in this Order, are indeed inherently discretionary and non-uniform since the Government has discretion in determining an individual's deportation status through a lengthy immigration removal process per the requirements of the INA and corresponding regulations." *Texas v. United States*, No. 6:21-cv-3, 2021 WL 2096669, at *51 (S.D. Tex. Feb. 23, 2021) (quotation marks omitted). He continued: "But this injunction does not enjoin *individual* removal decisions. As described above, it enjoins a *blanket* policy that is contrary to law." *Id.* "The Government makes much of its discretion in individual matters…. But nothing in this preliminary injunction changes that." *Id.* "The Government may still conduct an individualized assessment and afford discretionary relief to that alien if circumstances and the law allow. Or it may not. What it cannot do is 'pause' the removal process for nearly every individual with a final order of removal in contravention of the INA and the APA." *Id.* So also here—an injunction reinstating MPP would preserve the discretion DHS exercised in the administration of the program while it was previously in place. But it would not permit DHS to continue its "blanket policy," *id.*, of refusing to implement MPP.

The injunctions entered by Judge Hanen in the DACA case and Judge Tipton in the 100-day-pause case provide models of injunctions that avoid the pitfalls of more sweeping, intrusive injunctions. Among other things, these injunctions bear no resemblance to the intrusive injunctive relief ordered in cases like *Missouri v. Jenkins*, 515 U.S. 70 (1995), which the Court noted for comparison at oral argument. Trial Tr. 82-88. In *Missouri v. Jenkins*, the federal district court presided over a desegregation plan that "ha[d] been described as the most ambitious and expensive remedial program in the history of school desegregation," which involved "massive expenditures" that had financed

> high schools in which every classroom will have air conditioning, an alarm system, and 15 microcomputers; a 2,000–square–foot planetarium; green houses and vivariums; a 25-acre

> farm with an air-conditioned meeting room for 104 people; a Model United Nations wired for language translation; broadcast capable radio and television studios with an editing and animation lab; a temperature controlled art gallery; movie editing and screening rooms; a 3,500–square–foot dust-free diesel mechanics room; 1,875-square-foot elementary school animal rooms for use in a zoo project; swimming pools; and numerous other facilities.

*Missouri v. Jenkins*, 515 U.S. 70, 79 (1995) (quoting *Missouri v. Jenkins*, 495 U.S. 33, 77 (1990) (Kennedy, J., concurring in part and concurring in judgment)).

In contrast to this example of detailed oversight, the injunction Plaintiffs request here is modest and straightforward. It would require DHS to resume and continue operating in good faith a program that it was successfully operating until January 20, 2021, when it was abruptly suspended, and to do so unless and until DHS can terminate the program in a manner that (1) complies with the APA, (2) avoids violating DHS's mandatory detention obligations under Section 1225, and (3) complies with DHS's agreement with Texas. This would mirror the injunctive relief provided by Judge Hanen in the DACA case discussed above, as well as other recent immigration cases.

Finally, such injunctive relief is particularly appropriate where, as here, "the Government has not proposed a workable alternative form of" relief that would "protect the proprietary interests of the States at issue here…." *Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017) (per curiam). DHS's proposed alternatives, such as remanding without vacating, appear tailor-made to allow DHS to continue violating the law as long as possible, even indefinitely. Injunctive relief is appropriate under such circumstances.

**B.      Injunctive relief is necessary to provide Plaintiffs with complete relief.**

In the alternative, citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), DHS argues that injunctive relief is unnecessary because vacatur would provide Plaintiffs with complete relief. ECF No. 70 at 11-12. This argument lacks merit. In recent cases, courts in the

Fifth Circuit and elsewhere have granted injunctive relief in addition to vacatur in immigration cases, and this case should be no different.  *See, e.g.*, *Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015); *Texas v. United States*, 2021 WL 2096669, at *51–52.  If anything, the reasons for injunctive relief are more compelling here.

In *Monsanto*, the Supreme Court stated that injunctive relief would be unnecessary in review of an agency action "[i]f a less drastic remedy (such as partial or complete vacatur of APHIS's deregulation decision) was sufficient to redress respondents' injury."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010).  The Supreme Court held that vacatur was sufficient in that case because "respondents ha[d] represented to this Court that the District Court's injunction against planting does not have any *meaningful practical effect* independent of its vacatur."  *Id.* at 165 (emphasis added); *see also id.* (quoting respondents as conceding that vacatur would "independently prohibit[] the growth and sale of almost all RRA").  Here, the opposite is true.  Defendants here have repeatedly indicated—through agency statements, statements of counsel, evidence, and legal arguments—that, absent an injunction, they will not meaningfully reinstate MPP.  As the States' counsel noted at oral argument, vacating the June 1 Memorandum without enjoining DHS to continue implementing MPP in good faith as it did prior to January 20, 2021, would provide limited and partial relief, at best.  Trial Tr. 79-81, 185-86.

Unlike *Monsanto*, where the defendants represented that an injunction was unnecessary, here Defendants have argued the opposite.  They have argued, specifically, that Plaintiffs' claims lack redressability because vacating the June 1 Memorandum will not necessarily result in their continuing to enroll illegal entrants into MPP.  ECF No. 67 at 9 (arguing that "[r]einstating MPP would not *require* DHS to return anyone to Mexico," and thus Plaintiffs' claims are supposedly non-redressable) (emphasis in original).  DHS doubled down on this point during oral argument

on July 22, contending that the redressability requirement of Article III is not satisfied because, even if MPP is ordered to be reinstated, DHS may simply decline to enroll any individual asylum applicants into MPP.  Trial Tr. 109-10, 179; *see also id.* 185-86.  The proper response to these concerns is not to conclude that Plaintiffs' claims are not redressable, but to conclude that an injunction is necessary to require DHS to reinstate MPP on the same footing as it was implemented prior to January 20, 2021—when the operation of the program resulted in tens of thousands of enrollees.

Further, as discussed in detail above, DHS shows no willingness to continue enrolling asylum applicants into MPP, even if the program is reinstated.  On the contrary, DHS contends that any such enrollments will undermine its and the President's policy objectives and disrupt its negotiations with Mexico and Northern Triangle countries.  ECF No. 70 at 7-11.  These arguments indicate that, unless DHS is enjoined to restore the status quo ante, it will simply decline to enroll illegal aliens in MPP even if the June 1 Memorandum is vacated.  And these concerns are fully consistent with DHS's litigation conduct in this case, which has not been geared toward prompt resolution of this case, and has even come "perilously close to undermining the presumption of administrative regularity."  ECF No. 85, at 3.

### C.    Injunctive relief should be nationwide in scope to grant complete relief.

DHS also argues for a geographically limited injunction, ECF No. 70 at 12-14, but that argument contradicts governing Fifth Circuit precedent.  In the DAPA case, the United States "claim[ed] that the nationwide scope of the injunction is an abuse of discretion and requests that it be confined to Texas or the plaintiff states."  *Texas*, 809 F.3d at 187.  The Fifth Circuit rejected this argument: "But the Constitution requires 'an *uniform* Rule of Naturalization'; Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and

17

*uniformly*'; and the Supreme Court has described immigration policy as 'a comprehensive and *unified* system.'" *Id.* at 187-88 (emphases added by the Fifth Circuit) (citing U.S. CONST art. I, § 8, cl. 4; Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 3384; and *Arizona v. United States*, 567 U.S. 387, 401 (2012)); *see also Texas*, 2021 WL 2096669, at *51-52. "Partial implementation of DAPA would detract from the integrated scheme of regulation created by Congress, and there is a substantial likelihood that a geographically-limited injunction would be ineffective because DAPA beneficiaries would be free to move among states. *Texas*, 809 F.3d at 188 (quotation marks omitted); *see also Washington v. Trump*, 847 F.3d at 1166-67 (holding that "a fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy"). The same concerns for a nationally uniform immigration policy, and the problem that the mobility of immigrants would render narrower relief ineffective, are equally applicable here.

## III.   The Court Should Grant Vacatur and Injunctive Relief on Count III.

Count III, based on the Take Care Clause, challenges agency action that is unlawful for reasons similar to Count II, and it seeks similar relief. To the extent that the Court reaches Count III, it should grant the same relief on Count III as it grants on Count II.

## IV.   The Court Should Vacate the June 1 Memorandum and Grant Injunctive Relief on Count IV.

Under Count IV, Plaintiffs claim that DHS cancelled MPP without complying with its binding agreement with Texas, which requires, among other things, DHS to engage in a 180-day consultation process with Texas that is closely akin to the notice-and-comment procedure of the APA before taking such an action. The Court should model its relief under this Count on the relief that it would grant in an analogous procedural claim under the APA: it should vacate the June 1 Memorandum and enjoin DHS from suspending or terminating MPP without first complying with

18

the requirements of its binding agreement with Texas (or waiting until the agreement has expired).

As in procedural APA cases, Defendants' failure to follow the notice-and-consultation process

required by agreement "is a fundamental flaw that normally requires vacatur of the rule." *Nat.*

*Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020) (quoting *Heartland Reg'l Med.*

*Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009)) (vacating due to lack of notice and comment).

And injunctive relief is also appropriate under this Count for the same reasons discussed above.

## CONCLUSION

For the reasons stated, Plaintiffs Texas and Missouri respectfully request that this Court

- Vacate the June 1 Memorandum in its entirety;

- Issue injunctive relief restoring the status quo ante by (1) prohibiting the enforcement or implementation of the June 1 Memorandum, (2) compelling the enforcement and implementation of MPP in good faith until such time as it has been lawfully rescinded in compliance with the APA and DHS's agreement with Texas, and (3) compelling the enforcement and implementation of MPP in good faith until such time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory-detention requirements without releasing any such aliens (whether by parole or otherwise) due to a lack of detention resources; and

- Declare that neither the January 20 Memorandum nor the June 1 Memorandum remains in effect and that both memoranda are invalid.

Dated: July 27, 2021

ERIC S. SCHMITT
Attorney General of Missouri

/s/ *D. John Sauer*
D. JOHN SAUER, #58720MO*
Solicitor General

JESUS A. OSETE, #69267MO*
Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-8870
Fax (573) 751-0774
John.Sauer@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

*Admitted pro hac vice

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JUDD E. STONE II
Solicitor General
Texas Bar No. 24076720

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Texas Bar No. 00798537

/s/ *William T. Thompson*
WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
*Attorney-in-Charge*
Texas Bar No. 24088531

RYAN D. WALTERS
Special Counsel
Texas Bar No. 24105085

OFFICE OF THE ATTORNEY GENERAL
SPECIAL LITIGATION UNIT
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov

*Counsel for Plaintiff State of Texas*

**CERTIFICATE OF SERVICE**

I certify that on July 27, 2021, a true and accurate copy of the foregoing document was

filed electronically (via CM/ECF) and served on all counsel of record.

*/s/ William T. Thompson*
WILLIAM T. THOMPSON

21