IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

After a bench trial, and having considered the submissions of the parties, the evidence, and arguments of counsel, the Court makes the following findings of fact and enters the following conclusions of law:

PROPOSED FINDINGS OF FACT

I.      **Plaintiffs have standing to challenge the termination of MPP.**

     A.      **The termination of MPP harms Texas and Missouri.**

        **1.**      When MPP was in effect, Defendants required certain illegal aliens to remain in Mexico pending their asylum claims. AR491.

        **2.**      While MPP was in effect, more than 68,000 illegal aliens remained in Mexico. AR555; AR004.

        **3.**      MPP decreased the number of aliens released into the interior of the United States compared to what it would have been without MPP. AR555; Trial Tr. 147:23–25 (Defendants conceding: "I think it's fair to say that [MPP] probably deterred some individuals

1

from coming to the United States."); Trial Tr. 182:2–12 (Plaintiffs noting import of this concession).

      4.     The termination of MPP will lead to additional aliens being present in the United States. AR555; AR587–588.

      5.     The termination of MPP will lead to additional illegal aliens being present in Texas and Missouri. AR555; AR587–588; App.006 ¶ 27; App.289–290; App.293; App.294; App.362–363; App.372; App.376; ECF No. 11 at 2.

      6.     "[T]he largest percentage of apprehensions and inspections of noncitizens and enrollments in MPP occurr[ed] in Texas." ECF No. 11 at 2.

      7.     There were 50,214 aliens enrolled in MPP in Texas. ECF No. 11 at 2.

      8.     Career employees at DHS specifically warned Biden transition officials that the suspension of MPP would lead to an increase in illegal aliens attempting to enter the United States. App.399 ¶¶ 31–33.

      9.     Defendants are directly releasing aliens into Texas who would have been enrolled in MPP if the program had not been terminated. ECF No. 11 at 2; AR587–588.

      10.     Defendants are directly releasing aliens into Missouri who otherwise would have been enrolled in MPP and thus not released into the interior of the United States.  App.006 ¶ 31 ("Of the [former MPP] cases admitted into the United States thus far, 56 were transferred to the immigration court in Kansas City, MO.").

      11.     Some aliens who would have otherwise been enrolled in MPP will travel to Missouri. App.006 ¶ 27; AR587–588.

12.     The termination of MPP alters the incentives for aliens considering crossing the border, including by making it more likely that an alien can use a false claim of asylum to enter the United States. App.309; App.312.

13.     The termination of MPP contributes to increasing the number of illegal aliens arriving in the United States on land from Mexico. AR555.

**B.     Texas and Missouri have established significant injuries due to increased costs of providing driver's licenses.**

14.     Some aliens who would have otherwise been enrolled in MPP will obtain Texas driver's licenses. AR555; AR587–588.

15.     Texas provides driver's licenses to aliens so long as their presence in the United States is authorized by the federal government. App.426 ¶¶ 3–5.

16.     Each additional customer seeking a Texas driver's license imposes a cost on Texas. App.427 ¶ 8.

17.     Because "driving is a practical necessity in most of" Texas, "there is little doubt that many" aliens present in Texas because of MPP's termination would apply for driver's licenses. *Texas*, 809 F.3d at 156.

18.     Sheri Gipson, the Chief of the Texas Department of Public Safety's Driver License Division, provided reasonable estimates of the costs of providing additional driver's licenses:

| Customer Volume Scenario | Additional Employees Required | Additional Office Space Required (SqFt) (96 per employee) | Biennial Cost for Additional Employees, Leases, Facilities and Technology | Biennial Cost for Verification Services | Biennial Cost for Card Production | Total Cost to DPS |
|---|---|---|---|---|---|---|
| 10,000 | 9.4 | 902.4 | $1,978,859.60 | $9,011.20 | $27,000.00 | $2,014,870.80 |
| 20,000 | 18.8 | 1,804.8 | $3,957,719.20 | $18,022.40 | $54,000.00 | $4,029,741.60 |
| 30,000 | 28.2 | 2,707.2 | $5,936,578.80 | $27,033.60 | $81,000.00 | $6,044,612.40 |
| 40,000 | 37.6 | 3,609.6 | $7,915,438.40 | $36,044.80 | $108,000.00 | $8,059,483.20 |
| 50,000 | 46.9 | 4,502.4 | $9,894,298.00 | $45,056.00 | $135,000.00 | $10,074,354.00 |
| 100,000 | 93.9 | 9,014.4 | $19,788,596.01 | $90,112.00 | $270,000.00 | $20,148,708.01 |
| 150,000 | 140.8 | 13,516.8 | $29,682,894.01 | $135,168.00 | $405,000.00 | $30,223,062.01 |
| 200,000 | 187.8 | 18,028.8 | $39,577,192.01 | $180,224.00 | $540,000.00 | $40,297,416.01 |

App.428.

19.     "[W]ithout additional funding or support," providing additional driver's licenses as a result of MPP's termination "will substantially burden driver license resources" in Texas. App.428 ¶ 10.

20.     Missouri faces a cost of verifying lawful immigration status for each additional customer seeking a Missouri driver's license. App.006 ¶¶ 29–30.

21.     Missouri paid over $30,000 in FY 2020 for inquiries related to verifying individuals' lawful immigration status.  App.006 ¶ 29.

22.     Missouri "must annually request appropriations from the state legislature to cover the[se] costs[.]" App.006 ¶ 30.

C.     **Texas and Missouri have established significant injuries due to increased education costs.**

23.     Some aliens who would have otherwise been enrolled in MPP are school-age children. AR423; AR431; AR496; AR547; AR555; AR587–588; AR617.

24.     Texas estimates that the average funding entitlement for 2021 will be $9,216 per student in attendance for an entire school year. For students qualifying for bilingual education services, it would cost Texas $11,432 for education per child for attendance for an entire school year. App.440 ¶ 3.

4

25.     Texas and Missouri currently spend millions of dollars educating thousands of illegal aliens in their public schools. App.006 ¶¶ 25–26; App.440–441 ¶ 4.

26.     The total costs to Texas of providing public education for illegal alien children will rise in the future as the number of illegal alien children present in the State increases. App.442 ¶ 9.

**D.     Texas and Missouri have established significant injuries due to increased healthcare costs.**

27.     Some aliens who would have otherwise been enrolled in MPP will use state-funded healthcare services or benefits in Texas and Missouri. AR555; AR587–588; App.006 ¶ 27.

28.     Texas funds three healthcare programs that require significant expenditures to cover illegal aliens: the Emergency Medicaid Program, the Family Violence Program, and the Texas Children's Health Insurance Program. App.450 ¶ 6.

29.     Between 2007 and 2019, Texas spent an estimated $62–$90 million annually on Medicaid services for illegal aliens, including an estimated $80 million in FY 2019. App.450–451 ¶ 7.

30.     Texas spends over $1 million annually providing services to illegal aliens through the Family Violence Program. App.451 ¶ 8.

31.     Texas spends millions of dollars annually on the Children's Health Insurance Program for prenatal coverage for illegal aliens, including an estimated $38 million in 2013 and $6 million in 2019. App.451–452 ¶ 9.

32.     Texas incurs costs for uncompensated care provided to illegal aliens by state public hospital districts, with estimated costs between 2006 and 2008 ranging from $597 million to $717 million. App.452 ¶ 10.

33.     Each of Texas's programs has some positive cost to the State due to utilization by illegal aliens. App.452 ¶ 11.

34.     The total costs to Texas of providing services to illegal aliens through its healthcare services and benefits will increase as the population of illegal aliens in Texas increases. App.452 ¶ 12.

35.     In FY 2020 alone, Missouri spent $5,427,715 in healthcare costs for treatment of illegal aliens. App.006 ¶ 28.

**E.     Texas and Missouri have established significant injuries due to increased law enforcement and correctional costs.**

36.     Some aliens who would have otherwise been enrolled in MPP commit crimes in Texas and Missouri. AR555; AR587–588; App.006 ¶ 27; App.362–363; App.372; App.388.

37.     Texas law enforcement has arrested tens of thousands of illegal aliens over the past decade. App.349–357.

38.     In one year alone, the Texas Department of Criminal Justice housed 8,951 illegal alien criminals for a total of 2,439,110 days at a cost of over $150 million, with less than $15 million reimbursed by the federal government. App.460 ¶¶ 6–7.

39.     "[T]o the extent the number of aliens in [Texas Department of Criminal Justice] custody increases, TDCJ's unreimbursed expenses will increase as well." App.460 ¶ 8.

40.     Missouri is a destination and transit State for human trafficking of migrants from Central America who have crossed the border illegally. App.409–410 ¶¶ 19–22.

41.     Some aliens who would have otherwise been enrolled in MPP are victimized by human traffickers in Texas and Missouri. AR555; AR587–588; App.006 ¶ 27; App.362–363; App.372; App.388.

42.     Aliens "are particularly susceptible to being trafficked." App.419 ¶ 9. Increasing the number of aliens "present in the United States, including those claiming asylum, is likely to increase human trafficking." App.423 ¶ 14; *see also* App.409 ¶ 18 (discussing the "relationship between the prevalence of human trafficking in the United States and activity on the US-Mexico border").

43.     Human trafficking causes fiscal harm to Texas and Missouri. App.418–419 ¶ 7.

**F.     Texas and Missouri have established *parens patriae* standing due to significant injuries from distorted labor markets.**

44.     Aliens who would have otherwise been enrolled in MPP are being paroled into the United States. App.307; App.330 n.7; AR 183–84.

45.     Aliens paroled into the United States are eligible for work authorization. App.337.

46.     By paroling aliens into the United States instead of enrolling them in MPP, Defendants are increasing the supply of workers. App.337; App.555.

47.     Some aliens who would have otherwise been enrolled in MPP work for employers in Texas or Missouri. AR555; AR587–588; App.362–363; App.372; App.388.

**II.     The termination of MPP is final agency action.**

48.     The June 1 Memorandum took effect immediately upon its issuance. AR.007; App.472.

49.     The June 1 Memorandum purports to be binding on DHS personnel. AR.007; App.472.

50.     The June 1 Memorandum prevents federal officers and DHS itself from using MPP, an option they previously had. AR006–007; AR151; AR490-491.

**III.     The termination of MPP was arbitrary and capricious.**

    **A.     DHS ignored critical factors when terminating MPP.**

    51.     In the June 1 Memorandum, Secretary Mayorkas claimed to "hav[e] reviewed all relevant evidence and weighed the costs and benefits of either continuing MPP, modifying it in certain respects, or terminating it altogether." AR.006; App.471.

    52.     Secretary Mayorkas's statement is not credible and is contradicted by the limited nature of the analysis in the June 1 Memorandum, the administrative record, and the plaintiffs' evidentiary appendix.

    53.     Without MPP, Defendants' policies create "perverse incentives" to falsely claim asylum because asylum applicants "with non-meritorious claims often remain in the country for lengthy periods of time." App.312.

    54.     MPP discouraged aliens from falsely claiming asylum. App.304; App.309.

    55.     The June 1 Memorandum does not consider any benefits of MPP relating to the discouragement of non-meritorious asylum claims or disincentivizing illegal border crossings.

    56.     The June 1 Memorandum does not consider any costs that would be borne by the States, or any of their reliance interests that would be affected, due to the termination of MPP.

    57.     The June 1 Memorandum does not consider any policies more limited than either the complete retention of MPP or its total termination.

    **B.     DHS's reasons for terminating MPP were arbitrary.**

    58.     In the June 1 Memorandum, Secretary Mayorkas concluded that "the high percentage of [MPP] cases completed through the entry of *in absentia* removal orders (approximately 44 percent, based on DHS data) raises questions for me about the design and operation of the program, whether the process provided enrollees an adequate opportunity to

appear for proceedings to present their claims for relief, and whether conditions faced by some MPP enrollees in Mexico, including the lack of stable access to housing, income, and safety, resulted in the abandonment of potentially meritorious protection claims." AR.004; App.469.

59.    The June 1 Memorandum provides no reason to think that 44 percent is an unusually high percentage of cases to be completed through entry of *in absentia* removal orders.

60.    Publicly available data from the Executive Office for Immigration Review shows that similar percentages for *in absentia* removals occurred before MPP was implemented. *See* Executive Office for Immigration Review: Adjudication Statistics, Comparison of *In Absentia* Rates, https://www.justice.gov/eoir/page/file/1153866/download. The Court takes judicial notice of this official data. *See* Fed. R. Evid. 201.

61.    Moreover, to the extent 44 percent is a higher-than-usual rate for *in absentia* removals, the June 1 Memorandum provides no reason to think that MPP was the cause of any such increase.

62.    Likewise, the June 1 Memorandum provides no reason to think that an increase in the rate of *in absentia* removals represents a problem with MPP instead of "[a]liens without meritorious claims" deciding "to voluntarily return home," as DHS previously believed. App.309.

63.    In the June 1 Memorandum, Secretary Mayorkas decided to terminate MPP prospectively in part because of his concern that "immigration courts designated to hear MPP cases were closed for public health reasons between March 2020 and April 2021." AR004; App.469.

64.    The June 1 Memorandum provides no reason to think that the past closure of immigration courts, which are now open again, is relevant to a cost-benefit analysis of prospectively terminating MPP.

**C.    DHS ignored the effect terminating MPP would have on compliance with Section 1225.**

  **65.** The termination of MPP is likely to adversely affect Defendants' ability to comply with their mandatory-detention obligations under 8 U.S.C. § 1225. *See infra* Findings 67–70.

  **66.** There is nothing in the June 1 Memorandum or the administrative record that indicates Secretary Mayorkas considered the effects that termination of MPP would have on Defendants' capability to comply with the mandatory-detention obligations of 8 U.S.C. § 1225. Trial Tr. 115:10–15 (Defendants conceding that "the [administrative] record doesn't contain any information about detention capacity or numbers of individuals versus detained versus paroled").

**IV.    Terminating MPP causes violations of Defendants' mandatory detention obligations under Section 1225.**

  **67.** DHS releases from custody aliens covered by 8 U.S.C. § 1225's mandatory-detention provisions due to lack of detention resources. App.307; App.330 n.7; AR 183–84.

  **68.** Defendants are paroling aliens who would have otherwise been enrolled in MPP into the interior of the United States pending their immigration proceedings. App.307; App.330 n.7; AR 183–84.

  **69.** MPP helped avoid at least some of such releases. AR555; App.397 ¶ 24.

  **70.** Present conditions at the border are similar to or worse than those during May of 2019, constraining DHS resources and again making releases inevitable in the absence of the MPP. AR669 (showing border encounters for the entire month of April 2021 to be 178,622); App. 307 (stating May of 2019 reflected 4,800 crossings daily).

**V.    Terminating MPP in these circumstances violates the Take Care Clause of the Constitution.**

  **71.** *See supra* Findings 67–70.

**VI.     DHS violated the Agreement with Texas by terminating MPP without providing notice and an opportunity for consultation.**

72.     DHS has signed immigration-related agreements with multiple States, including Texas (the "Agreement"). App.317–326.

73.     DHS purported to terminate the Agreement "effective immediately" by letter on February 2, 2021. App.347–348.

74.     DHS did not comply with the provision of the Agreement governing termination. As a result, the Agreement remains binding until August 1, 2021. App.347–348.

75.     The Agreement requires that DHS "[p]rovide Texas with 180 days' written notice . . . of any proposed action" subject to the consultation requirement, App.320 § III.A.3, and gives Texas "an opportunity to consult and comment on the proposed action," App.320 § III.A. In promulgating the January 20 Memorandum and the June 1 Memorandum, DHS did not comply with these requirements. ECF No. 67 at 5; App.347–348.

**VII.    Plaintiffs are entitled to relief.**

76.     Aliens released into other States are likely to travel to Texas. App.362–363 (showing almost 3 million noncitizens residing in Texas, 1.8 percent of whom moved from another State within the last year); App.372 ("[D]omestic migration accounts for almost 40 percent of the growth in the State's foreign-born population."); App.388 (showing net migration to Texas from other States).

77.     A geographically limited injunction would not fully redress Plaintiffs' injuries.

78.     Injunctive relief is necessary to fully redress Plaintiffs' injuries. Trial Tr. 110:3–5 (Defendants arguing that "any order that MPP be reinstated . . . would essentially be

11

unenforceable"); Trial Tr. 185:9–186:1 (Plaintiffs noting the import of this concession for the necessity of injunctive relief).

## PROPOSED CONCLUSIONS OF LAW

I.    **Plaintiffs Have Standing to Challenge the Biden Administration's Abrupt Discontinuance of the MPP.**

A.    **General Legal Standards for Article III Standing.**

1.    "As the parties invoking federal jurisdiction, the states have the burden of establishing standing." *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015).

2.    The parties agree that "factual disputes related to standing should be resolved by the 'preponderance of the evidence.'" ECF No. 71 at 5. The Court agrees. *Accord Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*, 173 F. Supp. 3d 363, 384 n.9 (N.D. Tex. 2016), *aff'd as modified and remanded*, 725 F. App'x 256 (5th Cir. 2018).

3.    It is not necessary for all Plaintiffs to demonstrate standing; rather, "[t]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement. *Texas*, 809 F.3d at 151 (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n. 2 (2006)).

4.    "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560. A plaintiff must demonstrate: (1) that it has suffered an injury-in-fact; (2) that its injury is fairly traceable to the defendant's challenged actions; and (3) that its injury likely will be redressed by a favorable decision. *Id.* at 560–61; *accord Delta Commercial Fisheries Ass'n v. Gulf of Mex. Fishery Mgmt. Council*, 364 F.3d 269, 272 (5th Cir. 2004).

5.    "Each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof"—"with the manner and degree of

evidence required at the successive stages of the litigation" *Lujan*, 504 U.S. at 561 (1992)). Where, as here, the district court has properly consolidated the preliminary injunction hearing with trial on the merits, the preponderance of evidence standard applies. *See Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 367 (5th Cir. 2020).

**B.      The Record Establishes That Texas and Missouri Have Suffered a Concrete, Non-Speculative Injury-In-Fact That Is Traceable to Defendants' Conduct and Redressable.**

6.      Texas and Missouri have both shown that they have suffered and will continue to suffer "concrete and particularized" injuries attributable to the Defendant's actions. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *cf. Arizona v. United States*, 567 U.S. 387, 397 (2012) (noting that States "bear[] many of the consequences of unlawful immigration").

7.      Plaintiffs have established that the termination of MPP will increase the cost of providing driver's licenses, inflicting on the States an actual and imminent financial injury. *See Texas*, 809 F.3d at 155 (noting that because "Texas subsidizes its licenses," it "would lose" money "on each one it issued to" an alien present because of a change in federal immigration policy). Plaintiffs' reliance on the driver's-license rationale "does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).

8.      The Fifth Circuit has approved "the driver's-license rationale" as a basis for standing. *Texas*, 809 F.3d at 150.

9.       Plaintiffs have established that the discontinuance of the MPP will increase Plaintiffs' healthcare costs, education costs, and enforcement and correctional costs, inflicting on the States an actual and imminent financial injury. *See California v. Texas*, 141 S. Ct. 2104, 2118 (2021) (using both "logic and "intuition" to conclude that practical "benefits" gave individuals

13

sufficient "incentive" to enroll in government programs). Plaintiffs have also shown that terminating the MPP will increase the number of instances of human trafficking in both states, obliging Plaintiffs to devote more funding towards liberating survivors and aiding in their recovery.

10.     Multiple courts have upheld standing on these grounds. *See Texas*, 2021 WL 2096669, at *12, 17–18; *Texas*, 328 F. Supp. 3d at 700.

11.     Plaintiffs' injuries are "fairly traceable to the challenged action" and can be redressed by this Court vacating the June 1 Memorandum or enjoining its implementation. *DeOtte v. Azar*, 332 F.R.D. 173, 179 (N.D. Tex. 2019); *see Texas,* 809 F.3d at 161 (noting that an injunction "could prompt DHS to reconsider the program, which is all a plaintiff must show when asserting a procedural right"). At the very least, enjoining the change in policy would authorize line-level officers to return illegal aliens to Mexico while their asylum claims remain pending. ECF No. 63 at 9 (acknowledging that reinstating the MPP would give line-level officers discretion). Based on past practice, providing line-level officers with that authority will significantly reduce the number of illegal aliens that enter each State.

12.     The Court finds that Texas satisfies the requirements of Article III standing.

13.     The Court finds that, because Texas has standing, it need not address whether Missouri has standing too. *Texas v. United States*, No. 1:18-CV-00068, 2021 WL 3025857, at *18 (S.D. Tex. July 16, 2021) (Hanen, J.) ("Texas has standing.  Since one of the Plaintiff States has standing, this Court need not analyze the standing of any other plaintiff.") (citing *Town of Chester v. Laroe Ests., Inc*., 137 S. Ct. 1645, 1651 (2017)).

14.     However, as explained above, the Court alternatively finds that Missouri also satisfies the requirements of Article III standing.

**C. Plaintiffs Have *Parens Patriae* Standing to Protect Their Citizens' Economic and Commercial Interests from Labor-Market Distortions Caused by The Discontinuance of MPP.**

15.     Texas and Missouri have *parens partriae* standing based on their quasi-sovereign interests in the economic and physical wellbeing of their residents, specifically protecting their work force from disruptions the labor-market caused by the federal government's termination of MPP. *See Texa*s, 328 F. Supp. 3d at 695–96.

16.     *Parens patriae* standing allows a state to sue a defendant to protect the interests of its citizens at large. *Texas*, 328 F. Supp. 3d at 694. It applies when the state has its own specific type of interest, separate from that of its citizens, that has been injured—what is known as a "quasi-sovereign" interest. *Id.*

17.     The courts recognize two general categories of quasi-sovereign sufficient to confer *parens patriae* standing: a state's interest "in the health and well-being—both physical and economic—of its residents" and a state's "interest in not being discriminatorily denied its rightful status within the federal system." *Id.* (quoting A*lfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982)).

18.     Defendants' termination of MPP "injures the economic well-being of [Texas and Missouri] citizens because those citizens are forced to compete in distorted labor markets in which it is more difficult to obtain a job." *Texas*, 328 F. Supp. 3d at 694–95; *accord Texas*, 2021 WL 3025857, at *11 ("Texas seeks to protect its legal residents' economic and commercial interests from labor market distortion caused by DACA."); *id.* ("The very existence of a larger eligible workforce, … necessarily contributes to a more competitive labor market, which makes it more difficult for legal residents of Texas to obtain work. Thus, Texas, … has sufficiently shown that DACA conflicts with its own quasi-sovereign interest in the economic and commercial well-being of its legal residents."); *see also DeCanas v. Bica*, 424 U.S. 351, 356–57 (1976)

15

(explaining that "[e]mployment of illegal aliens in times of high unemployment deprives citizens and legally admitted aliens of jobs").

19.     "Unemployment among [Texas and Missouri] residents is surely a legitimate object of the [States'] concern" *Alfred L. Snapp & Son*, 458 U.S. at 609.

20.     Texas and Missouri, "if [they] could, would likely attempt to address through [their] sovereign lawmaking powers" the harm they suffer from the large influx of illegal aliens arriving within their borders. *Id.* at 607. The States' powers over immigration, however, are limited. *See generally Arizona v. United States*, 567 U.S. 387 (2012) (discussing the ways in which federal immigration law preempts state law). Texas and Missouri therefore "rely on the federal government to protect their interests." *Texas*, 328 F. Supp. 3d at 694.

21.     Texas and Missouri "are not barred outright from suing the federal government based on a *parens patriae* theory"; rather, because "the [S]tates are seeking to *enforce*—rather than prevent the enforcement of—a federal statute a *parens patriae* suit between these parties may be maintained." *Texas v. United Sates*, 86 F. Supp. 3d 591, 626 (S.D. Tex. 2015) (citing *Texas*, 809 F.3d at 154); *see* ECF No. 48 ¶¶ 129–135.

22.     Plaintiffs are entitled to "to assure [Texas and Missouri] residents that they will have the full benefit of federal laws designed to address th[e] problem" of labor-market distortion from unlawfully present aliens. *Alfred L. Snapp*, 458 U.S. at 609–10.

**D.  Plaintiffs are Entitled to "Special Solicitude" in the Court's Standing Analysis.**

23.     Texas and Missouri, like other States, "are not normal litigants for the purposes of invoking federal jurisdiction," *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007), but are instead entitled to "special solicitude" in the court's standing analysis on account "of their unique position in the federal system." *Texas*, 328 F. Supp. 3d at 691.

24.     Plaintiffs qualify for special solicitude because: (1) Texas and Missouri have both demonstrated a quasi-sovereign interest in the economic well-being of its citizens, and (2) "[i]n enacting the APA, Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse." *Texas*, 809 F.3d at 152 (quoting 5 U.S.C. § 702); *see also Massachusetts*, 549 U.S. at 520.

25.     The Fifth Circuit has interpreted special solicitude as lessening the certainty needed in the traditional causation and redressability analysis. *See Texas*, 809 F.3d at 159 ("[T]he government theorizes that Texas's injury is not fairly traceable to DAPA because it is merely an incidental and attenuated consequence of the program. But *Massachusetts v. EPA* establishes that the causal connection is adequate. Texas is entitled to the same 'special solicitude' as was Massachusetts, and the causal link is even closer here.").

26.     Texas and Missouri do not need special solicitude to establish standing on any of the grounds covered above, but the application of special solicitude removes any doubt that Plaintiffs meet all Article III requirements necessary to invoke the jurisdiction of this Court.

## II.     The termination of MPP is final agency action.

27.     The APA provides a cause of action for challenging "final agency action." 5. U.S.C. § 704.

28.     Binding precedent has "long" required "a pragmatic approach to finality, viewing the APA's finality requirement as flexible." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (cleaned up).

29.     Agency action is "final" for the purposes of judicial review if two conditions are met: "First, the action must mark the consummation of the agency's decision making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by

17

which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

30.     "'[D]iscretion' to reverse course, by itself, is insufficient to convert an action that is final to one that is nonfinal." *Texas v. United States*, No. 6:21-cv-3, 2021 WL 2096669, \*31 (S.D. Tex. Feb. 23, 2021).

31.     A "policy statement" can be "final agency action" within the meaning of the APA. *Merchants Fast Motor Lines, Inc. v. ICC*, 5 F.3d 911, 919–20 (5th Cir. 1993).

32.     Where agency action withdraws an entity's previously held discretion, that action alters the legal regime and binds the entity and, thus, qualifies as "final agency action" under the APA. *Texas v. EEOC,* 933 F.3d 433, 442 (5th Cir. 2019) (quoting *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 56 (D.C. Cir. 2016)).

33.     As a result of the June 1 Memorandum, federal officials were immediately obligated to allow otherwise removable aliens to be released into the United States, rather than enrolled in MPP. *See Texas v. United States*, No. 6:21-cv-3, 2021 WL 723856, \*32 (S.D. Tex. Feb. 23, 2021) (finding final agency action where a memorandum "alters DHS's obligation").

34.     As a result of the termination of MPP, Plaintiffs will be obligated to provide social services to illegal aliens who remain unlawfully in the United States. *See Texas v. United States*, 328 F. Supp. 3d 662, 731, 737 (S.D. Tex. Aug. 31, 2018) (DACA "impacts the obligations of the individual States" because "the program requires states to spend money on various social services" and "the program affects the obligations of the United States Government" because "it obligates the Government to forebear from implementing immigration enforcement proceedings").

35.     The June 1 Memorandum had the immediate legal effect of "terminating the MPP program." AR002.

18

36.     The June 1 Memorandum had the immediate legal effect of "direct[ing] DHS personnel to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives issued to carry out MPP." AR007.

37.     The memorandum "rescind[ed], effective immediately," two other memoranda. AR007.

38.     The June 1 memorandum is final agency action.

## III.     The termination of MPP is subject to judicial review.

### A.     No statute precludes review.

39.     "The APA establishes a basic presumption of judicial review for one suffering legal wrong because of agency action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (cleaned up). "That presumption can be rebutted by a showing that the relevant statute precludes review, or that the agency action is committed to agency discretion by law." *Id.* (cleaned up). Neither exception applies in the current action.

40.     "Establishing unreviewability is a heavy burden, and where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *Texas*, 809 F.3d at 164 (cleaned up). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Id.* (*quoting Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984)).

41.     Based on their text and structure, none of the provisions in the INA prohibit judicial review; nor does any other statute. 8 U.S.C. § 1252(b)(9) and 8 U.S.C. § 1252(g) preclude illegal aliens from challenging their own removal proceedings, but as the Supreme Court recently held, the provisions are "not aimed at this sort of case." *Regents of the Univ. of Cal.*, 140 S. Ct. at

1907. "[W]here, as here, the parties are not challenging any removal proceedings," the INA "is certainly not a bar." *Id.*

42.     Moreover, Plaintiffs' claims do not "aris[e] from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g). Their claims instead arise from Defendants' abrupt termination of MPP. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1907 (holding the rescission of DACA reviewable); *Texas*, 809 F.3d at 164 (holding DAPA was reviewable).

43.     Far from supporting an inference in favor of a broader bar on judicial review, the express preclusion of certain claims is evidence that Congress did not intend to prevent Plaintiffs from challenging and ultimately enjoining DHS's final agency action, implicitly or otherwise. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) (holding that an "express exception . . . implies that there are no other[s]"); Antonin Scalia & Bryan A. Garner, *Reading Law* 107 (2012) ("The expression of one thing implies the exclusion of others (expressio unius est exclusio alterius.).").

**A.     The agency actions here are not committed to agency discretion by law.**

44.     Defendants cannot have discretion in these circumstances because the June 1 Memorandum violates Section 1225, and "regulatory agencies have no discretion to violate the command of federal statutes or regulations." *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 534, 542–43 (1988) (refusing to apply the discretionary function exception where agency acted unlawfully); *see also Inst. of Marine Mammal Studies v. Nat'l Marine Fisheries Serv.*, 23 F. Supp. 3d 705, 720 (S.D. Miss. 2014) (concluding that "the agency's discretion d[id] not extend so far that the permit terms may violate the law).

45.     However, even if the illegality of Defendants' actions was put aside, the June 1 Memorandum is still subject to judicial review.

46.     "To honor the presumption of review," courts "read the exception in § 701(a)(2) quite narrowly, confining it to those rare administrative decisions traditionally left to agency discretion." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1905 (cleaned up). The June 1 Memorandum is not within that "limited category." *Id.*

47.     Although "an agency's decision not to institute enforcement proceedings" is often not reviewable, the June 1 Memorandum is not "simply a non-enforcement policy." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1905–07. It governs whether aliens will be in the United States or Mexico while enforcement proceedings are concluded.

48.     Although DHS has some level of discretion in creating or terminating MPP, *see* 8 U.S.C. § 1225(b)(2)(C), that does not mean that DHS has boundless discretion or that it is not "required to engage in 'reasoned decisionmaking.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (citing *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). The agency action can still be set aside under the APA "if it [is] made without a rational explanation, inexplicably depart[s] from established policies, or rest[s] on an impermissible basis." *Wong Wing Hang v. Immigration & Naturalization Serv.*, 360 F.2d 715, 719 (2d Cir. 1966) (Friendly, J.).

49.     That agency action can be "held unlawful and set aside" for "an abuse of discretion," 5 U.S.C. § 706(2)(A), proves that the mere presence of discretion does not make agency action unreviewable as "committed to agency discretion by law." *Id.* § 701(a)(2); *see Dep't of Commerce*, 139 S. Ct. at 2568; *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018). INA provisions, after all, "do not leave [DHS's] discretion unbounded," even if they "leave much to [DHS's] discretion," *Dep't of Commerce*, 139 S. Ct. at 2568.

50.     This Court can apply the "reasoned decisionmaking" standard as informed by Defendants' obligations under the INA. Because there is a "meaningful standard by which to

judge [Defendants'] action," the June 1 Memorandum is reviewable. *Dep't of Commerce*, 139 S. Ct. at 2568.

51.     Even assuming the June 1 Memorandum were not reviewable under the APA, that would not preclude the Court from considering claims under other causes of action. For claims properly before the Court without the APA, Section 701 cannot be an obstacle. *See* 5 U.S.C. § 701(a).

**IV.     Plaintiffs are within the zone of interests**.

52.     Texas and Missouri satisfy the zone-of-interests test because their interests are "arguably within the zone of interests to be protected or regulated by the statute that they say was violated." *Texas*, 809 F.3d at 162 (cleaned up).

53.     In arguing to the contrary, Defendants focus too narrowly on Section 1225(b). *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 401 (1987) ("In considering whether the 'zone of interest' test provides or denies standing," an argument fails if it "focuses too narrowly on [a particular section], and does not adequately place [that section] in the overall context of the [act as a whole]."). Under the zone-of-interests test, the Fifth Circuit's "historic treatment of APA claims in the immigration context" has been to "consider[] 'the INA' as a whole," not individual provisions. *Texas*, 2021 WL 2096669, at *22.

54.     Section 1225(b)(2), even considered alone, protects the States' interests here.

55.     The zone-of-interests "test is not especially demanding" in the APA context. *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 130 (2014) (quotation marks omitted). The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id.*

56.    Texas and Missouri's interests in not "spending millions of dollars to subsidize" illegal aliens are within the zone of interests protected by the INA. *Texas*, 809 F.3d at 163; *see also Texas*, 2021 WL 2096669, at *22–*23 (holding that Texas's arbitrary-and-capricious claim was within the INA's zone of interests). By mandating detention or return to Mexico, that provision ensures that aliens are not released into the United States to impose costs on American citizens and taxpayers. Plaintiffs' injuries flow from just that problem.

## V.    The termination of MPP was arbitrary and capricious.

57.    Actions of administrative agencies are to be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

58.    "Federal administrative agencies are required to engage in reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (internal quotation marks omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.*

59.    Although agencies are entitled to deference, "the arbitrary and capricious standard of review . . . is by no means a rubber stamp." *Texas*, 2021 WL 2096669, at *39 (quoting *United States v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985)).

### A.    DHS ignored critical factors when terminating MPP.

60.    "[A]gency action is lawful only if it rests on a consideration of the relevant factors." *Michigan*, 576 U.S. at 750 (internal quotation marks omitted). Defendants ignored several relevant factors when they terminated MPP in the June 1 Memorandum.

61.    As an initial matter, the Court considers the June 1 Memorandum's statement that Defendants "reviewed all relevant evidence and weighed the costs and benefits of" terminating MPP. AR 006. This conclusory statement is not sufficient to ward off challenges to an agency action on the ground that it failed to consider all relevant factors. "Stating that a factor was

23

considered . . . is not a substitute for considering it," *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986), and courts "do not defer to the agency's conclusory or unsupported suppositions." *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) (cleaned up).

      62.    Defendants failed to consider one of the main benefits that justified MPP: that "aliens without meritorious claims—which no longer constitute[d] a free ticket into the United States—[were] beginning to voluntarily return home." AR684. MPP addressed the "perverse incentives" created by allowing "those with non-meritorious claims . . . [to] remain in the country for lengthy periods of time." AR687; *see also* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934, 55935, 55941, 55944, 55947, 55950 (Nov. 9, 2018).

      63.    The June 1 Memorandum never mentioned these benefits, much less explain why it would discount them. It failed to consider the warnings by career DHS personnel that "the suspension of the MPP, along with other policies, would lead to a resurgence of illegal aliens attempting to illegally" cross the border. App.399 ¶ 33. It also failed to consider DHS's own prior assessment that "approximately 9 out of 10 asylum claims from Northern Triangle countries are ultimately found non-meritorious by federal immigration judges," App.303; *see also* App.005 ¶ 21; App.271 (noting that only 14 percent of aliens who claimed credible fear were granted asylum), or that having so many "fraudulent asylum claims" makes "it harder for the U.S. to devote appropriate resources to individuals who are legitimately fleeing persecution." App.303. Defendants' failure to consider these benefits of MPP, or to justify their changed policy, or consider reliance interests on MPP, were arbitrary and capricious. *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913.

64.      The June 1 Memorandum also failed to consider the costs terminating MPP would have on the States. This absence is even more pronounced by the explicit reference to consideration of impacts of termination on "nongovernmental organizations and local officials" in "border communities." AR005. And the limitation to "border communities" ignores any costs on States in the interior. App.006 ¶ 27.

65.      States "bear[] many of the consequences of unlawful immigration," and "[t]he problems posed to the State by illegal immigration must not be underestimated." *Arizona v. United States*, 567 U.S. 387, 397, 398 (2012). "[A] sudden shift in the government's immigration policy" is "arbitrary and capricious" when "the government 'failed to address whether there was legitimate reliance' on the former immigration policy." *Texas v. United States*, No. 6:21-cv-3, 2021 WL 2096669, at *11 (S.D. Tex. Feb. 23, 2021) (describing *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913). Defendants had a "clear and obvious responsibility to consider . . . Texas's expenses and costs." *Texas*, 2021 WL 2096669, at *41. The same is true for Missouri and other States. Their failure to do so was arbitrary and capricious.

66.      The June 1 Memorandum also failed to consider more limited policies than total termination of MPP. "[W]hen an agency rescinds a prior policy its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *Regents of Univ. of Cal.*, 140 S. Ct. at 1913 (cleaned up). While the June 1 Memorandum asserts that Defendants considered "maintaining the status quo"—which was no enrollments due to the January 20 suspension of new enrollments—or "resuming new enrollments into" MPP, AR005, there was no consideration of any middle position, such as continuing MPP for certain categories of aliens.  This failure to consider alternatives was arbitrary and capricious.

**B.      DHS's reasons for terminating MPP were arbitrary.**

67.     The June 1 Memorandum was concerned about the rate of *in absentia* removals (44 percent) under MPP. AR004. But Defendants do not reasonably attribute that rate to MPP as they did not consider how other factors could influence that rate. Although Defendants now argue that evidence outside the administrative record supports their inference, ECF No. 63 at 32–33, this *post hoc* explanation cannot justify the agency action. *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013–14 (5th Cir. 2019). The Court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).

68.     Even if it could, the high rate of *in absentia* removals cannot justify Defendants' action here. This data is consistent with the fact that MPP reduced a key incentive for migrants to pursue meritless asylum applications.

69.     The June 1 Memorandum does not provide any reason for the agency to believe that the *in absentia* removals resulted from aliens abandoning meritorious asylum claims. Indeed, the June 1 Memorandum does not claim otherwise. It states only that this data "raises questions." AR004. The presence of such "questions" provides no "justification for rescinding [MPP] before engaging in a search for further evidence" that could answer those questions. *State Farm*, 463 U.S. at 52; *see also Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 44 (D.C. Cir. 2020) (finding agency action arbitrary when the agency "took no position whatsoever on the actual effects that a [policy change] would have").

70.     Indeed, the data that Defendants failed to consider shows similarly high rates of removals *in absentia* prior to implementation of MPP. *See* App.005 ¶ 20; App.271; *see also Executive Office for Immigration Review, Adjudication Statistics: Comparison of* In Absentia *Rates*, https://www.justice.gov/eoir/page/file/1153866/download. This failure to examine the data

is itself arbitrary and capricious. *See State Farm*, 463 U.S. at 43 (explaining that "the agency must examine the relevant data").

71.     Another reason that Defendants use to justify the termination of MPP is based on the closure of immigration courts "between March 2020 and April 2021" due to the pandemic. AR004. Reliance on superseded events—the immigrations courts were reopened well before the June 1 Memorandum was issued—to justify terminating MPP's future operation is arbitrary and capricious.

## C.      DHS ignored the effect terminating MPP would have on compliance with Section 1225.

72.     The June 1 Memorandum failed to consider the incentives created by the termination of MPP or the effect terminating MPP would have on DHS's ability to detain aliens subject to mandatory detention by 8 U.S.C. § 1225.

73.     DHS previously recognized its "mandatory detention" obligation in Section 1225 but noted that "resource constraints" "made many releases inevitable." AR682.

74.     MPP addressed those resource constraints by reducing the number of aliens Defendants would be unlawfully releasing into the United States. *See* AR684.

75.     The failure of the June 1 Memorandum to consider this factor was arbitrary and capricious.

## VI.     Terminating MPP causes violations of Defendants' mandatory detention obligations under Section 1225.

76.     Section 1225 of the INA provides that if an immigration officer determines that an alien subject to expedited removal does not have a credible fear of persecution, the alien "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." 8 U.S.C. § 1225(b)(1)(B)(iii)(IV).

27

77.    Under Section 1225, an alien subject to expedited removal and determined by an immigration officer to have a credible fear of persecution "shall be detained for further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii).

78.    An alien seeking admission and not subject to expedited removal, whom an examining immigration officer determines is not clearly and beyond a doubt entitled to be admitted, shall be detained for removal proceedings. 8 U.S.C. § 1225(b)(2)(A).

79.    Aliens who are not subject to expedited removal and arrive on land from a foreign territory contiguous to the United States may be returned by the government to that territory pending asylum proceedings as an alternative to detention. 8 U.S.C. § 1225(b)(2)(C); AR682.

80.    MPP implemented this option under the INA to return aliens to a contiguous territory. pending removal proceedings. AR682.

81.    To comply with Section 1225, the government has two options regarding aliens seeking asylum: (1) mandatory detention; or (2) return to a contiguous territory. *See* 8 U.S.C.§§ 1225(b)(2)(A); 1225(b)(2)(C). Thus, Section 1225 imposes mandatory-detention obligations on defendants. 8 U.S.C.§ 1225(b)(2)(A). Failing to detain aliens pending their immigration proceedings—and releasing them into the interior of the United States—violates Section 1225.

82.    Termination of the MPP prevents defendants from implementing the sole lawful alternative to detention—of "return[ing] the alien to" "foreign territory contiguous to the United States." 8 U.S.C. § 1225 (b)(2)(C). In the absence of MPP, Defendants are limited to exercise of their only remaining option under Section 1225: mandatory detention. *See* 8 U.S.C. §§ 1225(b)(1)(B)(iii)(IV), (1)(B)(ii), (2)(A), (2)(C).

28

83. After a preliminary finding of a credible fear, defendants "convert" an alien's initial disposition status from "Expedited Removal" to "Notice to Appear," altering an alien's custody status to "released on recognizance." App. 330 n.7. The Defendants regard an alien's "[l]egal status while out of custody" as "parole until asylum is granted." App.330 n.7.

84. Parole is available "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," not on a class-wide basis. 8 U.S.C. § 1182(d)(5)(A).

85. Parole is not intended "to replace established refugee processing channels." App. 336.

86. Congress "specifically narrowed the executive's discretion" to grant parole due to "concern that parole . . . was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011).

87. Under resource constraints where Defendants cannot meet their obligations to detain aliens pending their immigration proceedings, terminating MPP necessarily increases the extent of their violations of their statutory detention duties.

## VII. Terminating MPP in these circumstances violates the Take Care Clause of the Constitution.

88. The Take Care Clause commands that the President and those who work for him in the Executive Branch are obligated to "take Care that the Laws be faithfully executed." U.S. Const. art. II. § 3.

89. A violation of the Constitution is also a violation of the APA. 5 U.S.C. § 706 (2)(B).

90. Under the June 1 Memorandum, "the President's actions affirmatively displaced a congressional [] mandate[.]" *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 258 (S.D.N.Y. 2020). Those actions therefore implicate "constitutional separation of powers concerns

29

not present in *Dalton v. Specter*, 511 U.S. 462 (1994)]" and should be "appropriately considered as [a] constitutional claim[] subject to judicial review." *Id.* at 258–59.

91.     Terminating the MPP in these circumstances necessarily causes Defendants to violate the mandatory-detention obligations under 8 U.S.C. § 1225 and claim "a dispensing power, which has no countenance for its support in any part of the constitution." *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838). The President's obligation to see the laws faithfully executed cannot imply a power to forbid their execution. *Id.*

92.     In addition to a claim pursuant to the APA, Plaintiffs have a cause of action "at equity." *Green Valley Special Util. Dist. V. City of Schertz*, 969 F.3d 460, 475 (5th Cir. 2020) (en banc). "Equity thus provides the basis for relief – the cause of action, so to speak"—when a plaintiff seeks prospective relief for a constitutional violation committed by a federal official. *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1232 (10th Cir. 2005) (McConnell, J.). *See also Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) (discussing "a long history of judicial review of illegal executive action, tracking back to England"); *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902); *Stark v. Wickard*, 321 U.S. 288, 310 (1994).

93.     Under *Dart v. United States*, "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Dart v. United States*, 848 F. 2d 217, 224 (D.C. Cir. 1988). "Nothing in the subsequent enactment of the APA altered the *McAnnulty* doctrine of review. It does not repeal the review of *ultra vires* actions that was recognized long before, in *McAnnulty*." *Id.* Plaintiffs can bring a "non-statutory review action," and courts have authority to review federal executive action that violates statutory commands, *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327-32 (D.C. Cir. 1996), and such an action need not

satisfy the requirements of proceeding under the APA. *See Simmat*, 413 F.3d at 1233 n.9 (allowing the plaintiff's constitutional claim to proceed even though he "appear[ed] to concede that his claim does not satisfy the APA's requirement of 'final agency action'").

94.     Because Plaintiffs do not seek an order directing the President's "exercise of judgment," *Mississippi v. Johnson* does not preclude review. 71 U.S. (4 Wall.) 475, 499 (1867). *Texas v. United States* does not apply because the Executive Branch cannot take steps that prevent its compliance with congressional mandates, which is a workable standard against which this Court may judge the agency's exercise of discretion. 106 F.3d 661, 667 (5th Cir. 1997).

## VIII.   DHS violated the Agreement with Texas by terminating MPP without providing notice and an opportunity for consultation.

95.     Congress specifically authorized DHS to "develop a process for receiving meaningful input from State and local government to assist the development of the national strategy for combating terrorism and other homeland security activities." 6 U.S.C. § 361(b)(4).

96.     The notice-and-consultation process created in the Agreement provides a legitimate mechanism for receiving that meaningful input.

97.     Agencies frequently adopt procedural rules not required by statute, and federal courts enforce those rules. *See, e.g.*, *Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *Singh v. U.S. Dep't of Justice*, 461 F.3d 290, 295–96 (2d Cir. 2006); *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 717 (8th Cir. 1979).

98.     The Agreement was not subject to notice-and-comment rulemaking under 5 U.S.C. § 553(b)(A) because it does not "constrain[] the agency from making future changes to immigration policy," but merely sets "rules of agency organization, procedure, or practice."

99.     Under the Tucker Act, contract actions against the federal government seeking money damages over $10,000 are within the exclusive jurisdiction of the Court of Federal Claims. 28 U.S.C. § 1491.

100.    The Court of Federal Claims' "jurisdiction over contract claims turns on whether the Government was acting in its sovereign or proprietary capacity when it entered into the contract or agreement at issue." *Doe v. United States*, 37 Fed. Cl. 74, 77 (1996).

101.    The Tucker Act applies "where the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves." *Kania v. United States*, 650 F.2d 264, 268 (Ct. Cl. 1981).

102.    "The contract liability which is enforceable under the Tucker Act consent to suit does not extend to every agreement, understanding, or compact which can semantically be stated in terms of offer and acceptance or meeting of minds." *Id.*. The Tucker Act is inapplicable here. As a result, this case is not within the jurisdiction of the Court of Federal Claims.

103.    The distinction between relief "ordering the cessation of the conduct complained of" and relief "requir[ing] affirmative action by the sovereign" is the basis for the long-standing rule that *ultra vires* suits against federal officers (and analogous *Ex parte Young* suits against state officers) do not implicate sovereign immunity. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–90, 691 n.11 (1949).

104.    "[I]f the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit. There is no sovereign immunity to waive—it never attached in the first place." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) (cleaned up).

105.    Texas is not seeking damages or seeking performance to affirmatively require DHS to provide notice and follow the procedures in the Agreement. Therefore, sovereign immunity is not a bar here. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949).

106.    "The Supreme Court has recognized that a waiver of sovereign immunity can take a contractual form." *Wells Fargo Bank, Nat'l Ass'n v. Se. N.M. Affordable Hous. Corp.*, 877 F. Supp. 2d 1115, 1140 (D.N.M. 2012); *see C&L Enters., Inc. v. Citizen Band of Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 423 (2001); *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999).

107.    Defendants waived sovereign immunity in the Agreement itself by expressly calling for "injunctive relief, including specific performance, to enforce" its terms and authorizing "adjudicat[ion] in a United States District Court located in Texas." App.322.

108.    The Agreement establishes a binding and enforceable commitment. App.319 § II.

109.    The Agreement provides that a party must "provid[e] 180 days' notice of intent to terminate," so "[t]he termination will be effective 180 days after the written termination request was submitted." App.324 § XV.

110.    The Agreement provides that "Texas will provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions in exchange for DHS's commitment to consult Texas and consider [its] views before taking" certain administrative actions. App.319 § II.

111.    DHS must "[c]onsult with Texas before taking any action or making any decision that could reduce immigration enforcement" or "increase the number of removable or

33

inadmissible aliens in the United States." App.320 § III.A.2. That "includes policies, practices, or procedures which have as their purpose or effect . . . increasing or declining to decrease the number of lawful, removable, or inadmissible aliens residing in the United States." App.320 § III.A.2.f.

112.    The Agreement requires DHS to "[p]rovide Texas with 180 days' written notice . . . of any proposed action" subject to the consultation requirement. App.320 § III.A.3. That gives Texas "an opportunity to consult and comment on the proposed action." *Id*.

113.    After it submits its views, "DHS will in good faith consider Texas's input and provide a detailed written explanation of the reasoning behind any decision to reject Texas's input before taking any action" covered by the Agreement. *Id*.

114.    DHS violated the Agreement when it issued the June 1 Memorandum without following these procedures.

115.    DHS's violation of the Agreement entitles Texas to injunctive relief. App.322 § VI.

IX.    **Plaintiffs are entitled to relief.**

    A.    **Injunctive relief is warranted.**

116.    Plaintiffs have shown that they face a significant threat of injury from the discontinuance of MPP and the large influx of illegal immigration the policy has engendered within their borders. Plaintiffs face ongoing and future irreparable injuries. Plaintiffs are therefore entitled to injunctive relief. *See Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986).

117.    Texas and Missouri "bear[] many of the consequences of unlawful immigration" and will suffer irreparable harm if this court declines to issue an injunction. *Arizona*, 567 U.S. at 397. The upsurge in illegal immigration will inflict significant financial costs on the

Plaintiffs, including but not limited to healthcare, education, as well as enforcement and correctional services.

118.     Texas and Missouri are unable to recover the additional expenditures from the federal government. *Texas*, 2021 WL 2096669, at *48 ("[N]o Party has suggested that Texas could recover any of its likely financial injury here, and the Court cannot conceive of any path for Texas to pierce the federal government's usual sovereign immunity or contrive a remedial cause of action sufficient to recover from its budgetary harm."); *see also Texas*, 328 F. Supp. 3d at 737 (deeming an injury irreparable because "there [was] no source of recompense").

119.     The equities overwhelmingly favor an injunction.

120.     The threat of injury to Missouri and Texas outweighs any potential harm to Defendants.

121.     Defendants face no cognizable harm from injunctive relief as they have no legitimate interest in the implementation of an unlawful memorandum. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *Texas*, 2021 WL 2096669, at *50.

122.     The public interest strongly favors Plaintiffs. The Biden Administration's termination of MPP has contributed to a massive humanitarian crisis at the border.

123.     "'[T]he public is served when the law is followed,' and the public will indeed be served if DHS is enjoined from suspending the law." *Texas*, 2021 WL 2096669, at *50 (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)).

124.     Accordingly, the equities overwhelmingly favor an injunction.

125.     Plaintiffs are entitled to injunctive relief (1) prohibiting Defendants from enforcing or implementing the June 1 Memorandum, (2) compelling Defendants to enforce and implement MPP in good faith until such time as it has been lawfully rescinded, and (3) compelling Defendants to enforce and implement MPP in good faith until such time as they have sufficient detention capacity to detain all aliens subject to mandatory-detention requirements without releasing any such aliens (whether by parole or otherwise) due to a lack of detention resources.

**B.     Vacatur is warranted.**

126.     The June 1 Memorandum terminating MPP is unlawful and invalid and should be vacated in its entirety as a result.

127.     The APA provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action" that violates the standard in Section 706. 5 U.S.C. § 706(2) (emphasis added). Applying this provision, this Court has concluded that "district courts have a duty to vacate unlawful agency actions." *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 945 (N.D. Tex. 2019) (O'Connor, J.).

128.     Plaintiffs are entitled to vacatur.

**C.     Declaratory relief is warranted.**

129.     Declaratory relief is available under 28 U.SC. §§ 2201–02.

130.     This Court has authority to issue declaratory relief in cases over which the otherwise have jurisdiction. *See Harris County v. MERSCORP Inc.*, 791 F.3d 545, 553 (5th Cir. 2015). "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57.

131.     Plaintiffs have properly invoked the jurisdiction of this Court and have established that Defendant's discontinuance of the MPP was unlawful as well as arbitrary and capricious.

36

**132.**     Plaintiffs are entitled to declaratory relief.

**D.     Remand is warranted.**

**133.**     The finding to discontinue the MPP "is not sustainable on the administrative record made," so the Secretary's "decision must be vacated and the matter remanded to [it] for further consideration." *Camp v. Pitts*, 411 U.S. 138, 143 (1973).

**134.**     Remand is an appropriate remedy, but precedent supports remand in addition to other relief, not remand alone. *See O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d 225, 240 (5th Cir. 2007) (affirming an injunction as amended and remanding to the agency); *Texas v. U.S. Env't Prot. Agency*, 389 F. Supp. 3d 497, 499-500 (S.D. Tex. 2019) (granting summary judgment and remanding to agency but leaving injunction "in place pending the proceedings on remand").

**135.**     Remand without vacatur would be particularly inappropriate here because the June 1 Memorandum is substantively unlawful and not just insufficiently explained.

**136.**     Plaintiffs are entitled to remand, as well as other remedies.

**E.     The Court should award nationwide relief.**

**137.**     In accordance with Fifth Circuit precedent, Plaintiffs' claims warrant nationwide relief. *See Texas*, 2021 WL 2096669, at * 52; *Texas*, 2021 WL 247877, at *7–8. A geographically limited injunction would be improper because federal immigration law must be uniform. *Texas*, 809 F.3d at 187–88; *see also Arizona*, 567 U.S. at 401 (explaining that federal law contemplates a "comprehensive and unified" immigration policy). A geographically limited injunction would also be "ineffective" for redressing Plaintiffs' injuries "because [aliens] would be free to move among states." *Texas*, 809 F.3d at 188.

**138.**     The "scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Califano v. Yamasaki*, 442 U.S.

682, 702 (1979). Because Defendants' unlawful conduct extends throughout out the country, and because a more injunction would fail to remedy Plaintiffs' injury, nationwide relief is appropriate.

Dated: July 27, 2021

ERIC S. SCHMITT
Attorney General of Missouri

/s/ D. JOHN SAUER
D. JOHN SAUER, #58720MO*
Solicitor General

JESUS A. OSETE, #69267MO*
Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-8870
Fax (573) 751-0774
John.Sauer@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

*Admitted pro hac vice

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JUDD E. STONE II
Solicitor General
Texas Bar No. 24076720

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Texas Bar No. 00798537

/s/ William T. Thompson
WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
*Attorney-in-Charge*
Texas Bar No. 24088531

RYAN D. WALTERS
Special Counsel
Texas Bar No. 24105085

OFFICE OF THE ATTORNEY GENERAL
SPECIAL LITIGATION UNIT
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov

*Counsel for Plaintiff State of Texas*

**CERTIFICATE OF SERVICE**

I certify that on July 27, 2021, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

*/s/ William T. Thompson*
WILLIAM T. THOMPSON

40