**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | |
|---|---|
| STATE OF TEXAS,<br>STATE OF MISSOURI,<br><br>    *Plaintiffs,*<br><br>v.<br><br>JOSEPH R. BIDEN, JR.,<br>in his official capacity as<br>President of the United States, *et al.*,<br><br>    *Defendants.* | Civil Action No. 2:21-cv-00067-Z |

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to the Court's Order of July 22, 2019, ECF No. 86, Defendants respectfully submit their Proposed Findings of Fact and Conclusions of Law for the Court's determination on the merits of this action.

I.    **Proposed Findings of Fact**

    **A.  Justiciability**

1.    The Migrant Protection Protocols ("MPP") were announced on December 20, 2018, and the Secretary of the Department of Homeland Security ("DHS") issued Policy Guidance for Implementation of the Migrant Protection Protocols on January 25, 2019. See ECF No. 61, Administrative Record ("AR") 151.

1

2.       New enrollments in MPP declined beginning in March 2020 as the government transitioned to other measures for managing arrivals at the border in response to the COVID-19 pandemic. Since April 2020, expulsions under Title 42 in response to COVID-19 have overtaken immigration enforcement actions under Title 8, which include MPP returns under § 1225(b)(2)(C). *See* U.S. Border Patrol Monthly Enforcement Encounters 2020: Title 42 Expulsions and Title 8 Apprehensions (last modified Nov. 20, 2020), https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics-fy2020 (showing Title 8 apprehensions on Southwest Border dropped to approximately between 1,179 to 6,444 a month in light of increase in Title 42 expulsions from roughly 7,000 in March 2020 to roughly 48,000 in September 2020); Monthly Enforcement Encounters 2021 (last accessed May 11, 2021), https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics (showing bulk of enforcement encounters in FY 2021 have been Title 42 expulsions).

3.       New enrollments in MPP were suspended on January 21, 2021. AR581 ("Suspension of Enrollment in the Migrant Protection Protocols Program").

4.       MPP was terminated on June 1, 2021. AR001-007 ("Termination of the Migrant Protection Protocols Program").

5.       MPP did not apply to "[u]naccompanied alien children." AR161 ("MPP Guiding Principles").

6.       MPP did not apply to "[c]itizens or nationals of Mexico." AR161.

7.       MPP did not apply to "[a]liens processed for expedited removal." AR161.

8.       MPP did not apply to "[a]liens in special circumstances," including "[r]eturning LPRs seeking admission," "[a]liens with an advance parole document or in parole status,"

"[k]nown physical/mental health issues," "[c]riminals/history of violence," or "Government of Mexico or USG interest." AR161.

9.      MPP did not apply to "[a]ny alien who is more likely than not to face persecution or torture in Mexico." AR161.

10.     MPP did not apply to "[o]ther aliens at the discretion of the Port Director." AR161.

11.     The initial guidance implementing MPP made clear that DHS officials retained "prosecutorial discretion" with respect to whether to return a noncitizen to Mexico under MPP even when amenable for the program. AR153; see also AR161.

12.     The evidence does not establish that relevant border crossings or encounters will be higher following the termination of MPP than in previous years. Speculative evidence of potential border encounters in 2021 proposed by Plaintiffs is not limited to individuals who would have been amenable for MPP, and includes non-amenable groups such as individuals from Mexico and "unaccompanied children." ECF No. 54, Appendix in Support of Plaintiffs' Motion for Preliminary Injunction ("App.") 45-47. Plaintiffs' proposed evidence also speculates on a number of border encounters this year (one million) that is lower or not significantly different than earlier years, including years when MPP was in place. *See* App. 45-57, 59-60, 63-65, 78 (showing 1,676,438 border apprehensions in FY 2000; 1,266,214 in FY 2001; 1,160,395 in FY 2004; 1,189,075 in FY 2005; 1,089,092 in FY 2006; 859,501 in FY 2019); AR669 (showing increase in southwest land border encounters from 521,090 in 2018, prior to MPP, to 977,509 in 2019, after MPP was in place).

13.     U.S. Customs and Border Protection ("CBP") encounters of noncitizens on the southwest land border sharply increased in the months after MPP was initially announced, from January 2019 through June 2019. AR669; *see also* App.392-93 (noting "apprehensions spiked" in

FY 2019 and "continued to climb" in the first half of 2019, representing a "skyrocketing number of apprehensions" after MPP was in place, and that historically the "majority of migrants" entering along the southwest border were "primarily from Mexico").

14.   Many factors that affect migration are unrelated to to the creation, implementation or termination of MPP. Plaintiffs' evidence confirms that, for effects on the migration of undocumented noncitizens, "the biggest factor driving such flows" is "the willingness and ability of American employers to hire untold millions of unauthorized immigrants." App.106-07.

15.   After MPP was in place, President Trump nonetheless declared a national emergency at the southern border in 2019 based on continuing "large-scale unlawful migration through the southern border," "despite the executive branch's exercise of existing statutory authorities." AR171; see AR172-78.

16.   After MPP was in place, President Trump sent 4,000 U.S. troops to the southern border in 2019 to assist CBP. AR163-64.

17.   Evidence in the record undermines Plaintiffs' assertion that the number of noncitizens arriving at the southern border is sufficiently traceable to the announcement and implementation, or the termination of MPP. AR669, 163-64, 172-78.

18.   Plaintiffs' evidence related to victims of labor trafficking or labor exploitation shows that the overwhelming majority are from Mexico and would not be amenable to MPP, and thus would not be influenced by changes to MPP. App. 244.

19.   Evidence in the record shows that noncitizens experienced significant criminal activity along the southern border while waiting for their cases to proceed during the time MPP was in place. AR374-425, 590-620.

20.     In 2016, 73 percent of the unauthorized immigrants in Texas were from Mexico, and 45 percent of the unauthorized immigrants in Missouri were from Mexico. App.286-87.

21.     Only one percent of individuals in Texas of "Hispanic or Latino origin" moved to Texas "from a different state." App.363. Because this data would include individuals who could not be subject to MPP—e.g., U.S. citizens and lawful permanent residents, Mexican citizens and nationals, unaccompanied children, other categories of individuals not subject to MPP—there is no evidence that any individual who may have been subject to MPP would enter the United States at a location other than the Texas border and then relocate to Texas.

22.     The evidence Plaintiffs submitted to establish harm to Texas and Missouri from the termination of MPP does not show an increase in noncitizens present in Missouri or Texas following the decline in MPP enrollments in 2020 or suspension of new enrollments on January 21, 2021, or any increase in State costs in the same time period.

23.     Information provided by the Anti-Human Trafficking Task Force for the Missouri Attorney General's Office, App. 403-13, identifies no increase in trafficking or costs to the State in 2020 or 2021, cites an increase in 2014, well before MPP, speculates that the increase was related to immigration policies that, unlike MPP, dealt with unaccompanied children, App.409-10, and cites example cases involving an unaccompanied child, App.411, and additional cases from 2016 and two in 2009, App.412-13.

24.     Information provided by the Texas Attorney General's Human Trafficking and Transnational Organized Crime Section, Texas Human Trafficking Prevention Taskforce, and the Texas Human Trafficking Coordination Council, App. 415-23, identifies no increase in trafficking or costs to the State in 2020 or 2021, indicates that traffickers "frequently target" "children," App. 416, that the highest percentage "of trafficking victims in the United States came from Mexico,"

App. 417, and reports more trafficking arrests in 2020, when MPP was in place, than any prior year, including the years 2007 to 2018, before the announcement of MPP. App. 421-22.

25.     Information provided by the Texas Department of Public Safety Driver License Division, App. 425-29, identifies no increase in costs to the State in 2020 or 2021, nor that Texas was required to "hire employees, purchase equipment, [or] obtain office space," as required to establish standing based on a "driver's-license theory," *Texas v. United States*, 809 F.3d 134, 161-62 (2015).

26.     Information provided by the Texas Education Agency, App.439-47, identifies no increase in costs to the State in 2020 or 2021, speculates that there may be additional costs if the number of unaccompanied children—who are not subject to MPP—increases, App.440, and speculates that, if the "rate" of unaccompanied children "released to sponsors in Texas" remains the same for the remainder of 2021 as it was in the first half of 2021, then 4,778 unaccompanied children "would be released to sponsors in Texas for that period," App.441, which would be a significant decrease from the 9,900 unaccompanied children that "were released to sponsors during the 12-month period covering October 2018 through September 2019" during which MPP was in place beginning January 2019, App.440.

27.     Information provided by the Texas Health and Human Services Commission's Center for Analytics and Decision Support, identifies no increase in costs to the State in 2020 or 2021 from Texas Emergency Medicaid, the Texas Family Violence Program, or the Texas Children's Health Insurance Program Perinatal Coverage. App. 449-57. The data provided ends in 2017, before MPP existed, and provides only an "estimate" of costs for FY 2019, when MPP was first implemented. App.450-51.

28.     Information provided by the Texas Department of Criminal Justice, App.459-61, identifies no increase in costs to the State in 2020 or 2021 for the detention of "undocumented criminal aliens," App.460, and acknowledges that the most recent data provided ends on "June 30, 2018," App.460, before MPP existed.

29.     Plaintiffs submitted no other evidence purporting to show costs to the States after MPP enrollments declined in 2020, or after new enrollments were suspended in January 2021.

30.     Plaintiffs identify no steps or actions they took or additional costs they incurred in from reliance on MPP or its continuation.

31.     In December 2018, Mexico "reaffirmed its sovereign right to admit or reject the entry of foreigners into its territory, in the exercise of its migration policy," such that MPP could not be implemented without Mexico's agreement to admit noncitizens the United States would return there under the program. AR149 (Statement of the Government of Mexico).

32.     In 2018, Mexico agreed to allow the return of certain noncitizens to the United States who had been returned to Mexico under MPP, and to take additional steps necessary to make MPP function, including a "guarantee that foreigners who" were returned to Mexico under MPP would receive temporary status and associated rights and freedoms under Mexican law, including "the opportunity to apply for a work permit in exchange for remuneration, which will allow them to meet their basic needs." AR149.

33.     In 2018, Mexico agreed to "ensure the implementation of the measures taken by each government is coordinated at the technical-operational level in order to develop mechanisms that allow the participation of migrants with notice to attend a hearing before an immigration judge, the right to access information and legal services without interference, as well as to prevent fraud and abuse." AR149.

7

34.     Re-implementing MPP would require Mexico's agreement to accept individuals returned through the program and re-establish infrastructure that was essential to operationalize MPP. These efforts would require pulling resources that have been redeployed to other collaborative efforts with the United States on new, broader initiatives to manage migration from Central America and disrupt international trafficking, smuggling, and other criminal networks, and undermine trust in the United States that it will carry out commitments made to foreign nations. *See generally* ECF No. 64, Appendix to Defendants' Response.

### B. Merits

#### i.     Implementation of MPP

1.     On December 20, 2018, the Secretary of Homeland Security announced the MPP, under which DHS would begin the process of invoking the authority provided at 8 U.S.C. § 1225(b)(2)(C) to return to Mexico certain third-country nationals arriving in the United States from Mexico illegally or without valid entry documentation for the duration of their removal proceedings under 8 U.S.C. § 1229a. AR 151.

2.     On December 20, 2018, the United States obtained the Government of Mexico's agreement to temporarily "permit entry of certain foreign persons from within the United States who have entered that country through a port of entry or who have been apprehended between ports of entry and interview by the authorities of migration authorities of that country [sic], and have received a notice to attend a hearing before a judge." Mexico agreed to participate in international cooperative efforts "to allow the participation of migrants with notice to attend a hearing before an immigration judge, the right to access information and legal services without interference, as well as to prevent fraud and abuse." AR 149, 152-53.

3.      On January 25, 2019, DHS issued guidance for implementation of MPP and on January 28, 2019, began implementing MPP, initially in San Diego, California, then El Paso, Texas, and Calexico, California, and then nationwide. AR 155, 156, 684.

4.      Under MPP, certain third-country nationals arriving from Mexico who a DHS officer determined through an exercise of discretion should be amenable to the MPP process, and who did not affirmatively demonstrate a fear of persecution or torture in Mexico, were issued a Notice to Appear (NTA), placed into removal proceedings under section 1229a, and then returned to Mexico to await their proceedings. AR 161.

5.      The following categories of noncitizens were not amenable to MPP: unaccompanied alien children (as defined in 6 U.S.C. § 279(g)); citizens or nationals of Mexico; noncitizens processed for expedited removal under 8 U.S.C. § 1225(b)(1); noncitizens "in special circumstances"; returning lawful permanent residents (LPRs) seeking admission; noncitizens with an advance parole document or in parole status; noncitizens with known physical or mental health issues; noncitizens with a criminal history or a history of violence; noncitizens of interest to the Government of Mexico or the United States; any noncitizen who demonstrates that they are more likely than not to face persecution or torture in Mexico; and other noncitizens at the discretion of the Port Director or Border Patrol counterpart. AR 161.

6.      If a noncitizen affirmatively stated a concern that he or she may face a risk of persecution on account of a protected ground or torture upon return to Mexico, CBP referred the alien to U.S. Citizenship and Immigration Services (USCIS), which conducted an assessment to determine whether it is more likely than not that the alien will be subject to persecution or torture if returned to Mexico.  If a USCIS asylum officer determined that a noncitizen demonstrated that he or she was more likely than not to face persecution or torture in Mexico, the noncitizen would

9

not be processed for MPP and DHS officers retained discretion to process (or re-process) the noncitizen for other available disposition, including expedited removal, NTA, waivers, or parole. AR 162.

7.      DHS officers were responsible for transporting the noncitizens placed in MPP back into the United States to attend immigration hearings, and then back to the border upon the conclusion of the hearings. AR 162.

8.      On February 12, 2019, U.S. Immigration and Customs Enforcement (ICE) issued guidance on MPP to its field offices, in anticipation of expansion of MPP across the border. AR 165-170.

9.      The ICE guidance on MPP recognized the legal obligation "to facilitate access to counsel for aliens subject to return to Mexico under the MPP." AR 169.

10.     After June 7, 2019, DHS began constructing temporary structures at the southern border in Brownsville and Laredo, Texas, to hold immigration hearings for noncitizens subject to MPP, and notified Congress of their completion in August 2019. These temporary facilities functioned as virtual courtrooms, with immigration judges appearing by video connection from their courthouses within the United States. AR 208, 684.

11.     On October 25, 2019, DHS released a Migrant Protection Protocols Red Team Report.  The report found several issues with implementation of the program and recommended related improvements, including the need to do the following: (1) provide forms, such as NTAs, in multiple languages; (2) standardize procedures for vulnerable populations; (3) clarify and ensure the consistent application of the nonrefoulement screening process by clarifying the role of CBP officers compared to USCIS asylum officers in making determinations on MPP amenability based on a noncitizen's claimed fear of persecution or torture in Mexico; (4) better address circumstances

where noncitizens fear persecution in Mexico; (5) ensure noncitizens' personal information is not inappropriately shared with Mexico; (6) provide for greater interaction between attorneys and noncitizen clients; (7) ensure noncitizens receive "Know Your Rights" training and are able to receive pretrial advice from their counsel; (8) ensure a comprehensive standardized documentation package is used and recognized by all authorities to facilitate migrant travel, hearing scheduling, processing, and the protection of personal information, and to ensure this package could be replaced in Mexico if lost or stolen; (9) obtain Mexico's written assurance they will comply with the *non-refoulement* obligation and not return MPP enrollees to countries where they face persecution or torture; (10) create an integrated mechanism for federal agencies to share information with MPP enrollees, and standardize such information; and (11) develop regulations and effectiveness metrices to guide MPP.  AR 192-201

12.    On October 28, 2019, DHS released an Assessment of the Migrant Protection Protocols (MPP), finding DHS returned more than 55,000 noncitizens to Mexico in the first nine months of the program's phased implementation. The assessment also found that there was an initial spike of apprehensions at the border to 144,000 in May 2019, but apprehensions then decreased by 64% through September 2019, and border encounters with Central American families fell by 80%. The assessment further found that individuals processed in MPP received initial court hearings within two to four months, and—as of October 21, 2019—almost 13,000 cases had been completed at the immigration court level; however, it noted that only a small subset of cases had resulted in grants of relief. AR 682-691.

ii.    Impact of MPP

13.    Investigations and reporting suggested that, under MPP, many noncitizens, including those falling into all the categories excluded from MPP, were improperly turned away

at the border and forced to fend for themselves in localities in Mexico designated by the U.S. State Department as unsafe for travel. Investigations and reporting also suggested that the virtual immigration court system erected under MPP led to lack of public information about the immigration court proceedings, limited access to translators and lawyers, and interference with noncitizens' legal right of access to asylum procedures. AR 209.

14.    Immigration lawyers for noncitizens in MPP often had to cross the border into Mexico to meet with their clients outside of court, a dangerous trip that many attorneys refused to make. Further, facilities for meeting with clients were severely limited in the temporary court facilities. AR 222-23, 448.

15.    Noncitizens in MPP were subject to potentially dangerous conditions in Mexican border cities, particularly those in the state of Tamaulipas. The U.S. Department of State assigned its highest level of travel advisory, Level 4, to Tamaulipas, and advises U.S. citizens to avoid the region due to high incidents of crime and kidnapping. AR 224.

16.    Noncitizens subject to MPP reported hundreds of incidents of violence while living in Mexico. AR 229. Of the 1,100 noncitizens returned to Mexico pursuant to MPP who requested legal aid from a pro bono legal clinic in Matamoros affiliated with the Texas Civil Rights Project, more than half reported they were targets of kidnapping, assault, rape, extortion, or other types of violent crime. AR 233.

17.    Immigration lawyers were not permitted to enter the temporary MPP courts to screen potential clients or provide general information about the proceedings in which the noncitizen was about to have their claim to asylum determined. Noncitizens were not permitted to enter the United States to consult with their attorneys, with the exception of a single hour prior to their immigration court hearing. AR 227.

18.     As of September 2019, only two (2) percent of noncitizens subject to MPP had secured legal representation. AR 227.

19.     Noncitizens in MPP were initially served with NTAs while in DHS custody before being returned to Mexico. But because most of those noncitizens did not have stable shelter in Mexico, the Government of Mexico was unable to reliably notify them if their hearing date was changed. NTAs often reflected addresses of shelters that the noncitizens never accessed, or reflected no addresses at all. AR 228, 438-39.

20.     Paperwork accompanying the NTAs instructed noncitizens to present themselves at the international border four hours prior to their hearing. Those with early morning hearings had to travel through dangerous border cities and wait during dark hours, placing them at greater risk of kidnapping and other crimes. If they were unable to make the dangerous trip or did not receive notice of a change in their hearing date, they risked being ordered removed in absentia. AR 228.

21.     According to medical testimony, MPP placed the physical and mental health of noncitizens seeking asylum at grave risk, creating the potential for additional violence and harm to a population that has already experienced severe levels of trauma. AR 242.

22.     The USCIS employees union filed multiple amicus briefs and testified to Congress that, as a result of the dangerous conditions that MPP subjected noncitizens to in Mexico, MPP violated the United States' legal obligation not to return asylum seekers to a country where they face persecution. AR 249.

23.     According to Human Rights Watch, noncitizens placed in MPP who could not afford a hotel or a private residence slept on the street, in churches, or in abandoned homes. Most asylum-seekers fleeing Central America have extremely limited means and often cannot afford to pay for shelter, food, water, or other necessities. In Matamoros, as many as 1,500 noncitizens in

13

MPP were living in a tent encampment near the Brownsville Port of Entry amid deteriorating medical and sanitary conditions. Nearly 84 percent of noncitizens in MPP reported having relatives in the United States, but could not rely on those relatives for shelter or support because of the requirement to remain out of the United States during the pendency of proceedings. AR 326, 468-89.

24.     Multiple news outlets reported hundreds of violent crimes against noncitizens after their return to Mexico under MPP. As of February 2021, there had been at least 1,544 publicly reported cases of murder, rape, torture, kidnapping, and other violent assaults against noncitizens returned to Mexico under MPP. AR 374-425, 448, 456-62, 653.

25.     Although approximately 20% noncitizens in removal proceedings within the United States obtain relief, only 0.1% of noncitizens in MPP obtained relief in their removal proceedings. AR 448-49.

26.     Due to the COVID-19 pandemic, MPP removal proceedings began to be postponed as of April 22, 2020. AR 466.

27.     83 percent of nondetained noncitizens in removal proceedings within the United States, including 96% of nondetained noncitizens with attorneys, attended all of their immigration court hearings from 2008 through 2018. The average annual in-absentia removal order rate over this period for noncitizens within the United States was 17% pursuant to the most accurate and comprehensive statistical method for measuring in-absentia rates. AR 560, 564-65.

28.     As of March 29, 2021, of the 32,324 total removal orders issued to MPP enrollees, only 4,522 were issued following hearings; the remaining 27,802 removal orders, or 86% of all removal orders, were entered in absentia. AR 634.

iii.     **Wind-down of MPP**

14

29.     Effective January 21, 2021, DHS suspended new enrollments in MPP, pending further review of the program. DHS undertook a review of the MPP program, consistent with the President's Directive. AR 581, 584.

30.     DHS began processing MPP enrollees back into the United States for the course of their proceedings. By the beginning of March 2021, 1,127 such noncitizens were permitted to enter the country. AR 614-15.

31.     In response to the COVID-19 pandemic, beginning in March 2020, DHS has assisted in the enforcement of the authority under Title 42 of the United States Code to expel certain amenable noncitizens from Mexico and the Northern Triangle countries back to Mexico, and certain amenable noncitizens from other countries to their countries of origin if Mexico will not accept them, with limited exceptions. AR 621-22, 631.

32.     Title 42 expulsions accounted for 102,234 and 111,175 repatriations in 2020 and the first quarter of 2021, respectively, whereas returns under MPP accounted for only 3 repatriations in 2020 and none in the first quarter of 2021. AR 660, 661.

33.     In a memorandum dated June 1, 2021, the Secretary of DHS terminated the MPP program. AR 001-007.

34.     In conducting his review of MPP, the Secretary carefully evaluated several factors, including: (1) the program's implementation guidance and programmatic elements; (2) prior DHS assessments of the program, including reviews of the program conducted in 2019 by senior DHS officials – such as the "Assessment of the Migrant Protection Protocols (MPP)," October 28, 2019, and the Migrant Protection Protocols Red Team Report, October 25, 2019, and associated implementation reviews, which inconsistently found positive and negative consequences of MPP -- and the effectiveness of related efforts by DHS to address identified challenges; (3) the personnel

15

and resource investments required of DHS to implement the program; and (4) MPP's performance against the anticipated benefits and goals articulated at the outset of the program and over the course of the program. The Secretary also considered the Department's experience to date carrying out its phased strategy for the safe and orderly entry into the United States of certain individuals enrolled in MPP. AR 003.

35.     The Secretary, in weighing whether to terminate or modify the program, considered whether and to what extent MPP is consistent with: (1) the Administration's broader strategy and policy objectives for creating a comprehensive regional framework to address the root causes of migration; (2) managing migration throughout North and Central America; (3) providing alternative protection solutions in the region; (4) enhancing lawful pathways for migration to the United States; and (5) processing asylum seekers at the United States border in a safe and orderly manner consistent with the United States' highest values. AR 003.

36.     The Secretary's review confirmed that MPP had only "mixed effectiveness" in achieving several of its central goals, and that the program "experienced significant challenges." AR 003.

37.     The Secretary determined that MPP does not adequately or sustainably enhance border management in such a way as to justify the program's extensive operational burdens and other shortfalls. The Secretary noted that, contrary to the program's stated purpose of deterring immigration, border encounters actually increased during certain periods over the course of the program. Further, the Secretary concluded that the United States can only manage migration in an effective, responsible, and durable manner if the country approaches the issue comprehensively, looking well beyond its own borders. AR 003.

16

38.     The Secretary concluded that MPP had not succeeded in its original goal to adjudicate legitimate asylum claims and clear asylum backlogs quicker. While some removal proceedings conducted pursuant to MPP were completed more expeditiously than is typical for non-detained cases, the occasional speed came with significant drawbacks that undermined confidence in the reliability of the expedited proceedings. The focus on speed did not accompany sufficient efforts to ensure that conditions in Mexico enabled migrants to attend their immigration proceedings. The Secretary found that the high percentage of cases completed through the entry of in absentia removal orders threw into question: the design and operation of the program; whether the process provided enrollees an adequate opportunity to appear for proceedings to present their claims for relief; and whether conditions faced by some MPP enrollees in Mexico, including the lack of stable access to housing, income, and safety, resulted in the abandonment of potentially meritorious protection claims. AR 004.

39.     The Secretary also found that, during the course of MPP, the backlog of asylum matters increased before both the USCIS Asylum Offices and the immigration courts, rather than decrease as intended. AR 004.

40.     MPP was also intended to reduce burdens on border security personnel and resources. However, the Secretary found, the program imposed additional responsibilities that detracted from the Department's critically important mission sets and exacerbated those burdens. MPP required that DHS: devote resources and personnel to building, managing, staffing, and securing specialized immigration hearing facilities to support the Executive Office of Immigration Review; facilitate the parole of individuals into and out of the United States multiple times in order to attend immigration court hearings; and provide transportation to and from ports of entry in certain locations related to such hearings. AR 004.

17

41.     Additionally, the Secretary found, more than one-quarter of individuals enrolled in MPP were subsequently reencountered attempting to enter the United States between ports of entry, requiring that substantial border security resources be devoted to these re-encounters, AR 004, and undermining any predicted disincentive against such crossings.

42.     As a result of these identified factors – MPP's failures to fully achieve its stated goals, exacerbation of the strain on DHS resources, effect of undermining the confidence in the reliability of the procedural outcomes for noncitizens in MPP, and increase of backlogs, among others -- the Secretary concluded, any benefits the program may have offered are "far outweighed" by the challenges, risks, and costs that MPP's continued operation presents. AR 004.

43.     The Secretary found that DHS was considering alternatives to MPP, designed to shorten the time it takes to adjudicate asylum cases, while ensuring adequate procedural safeguards and increasing access to counsel. AR 004.

44.     The Secretary determined the Dedicated Docket program aims to complete removal proceedings within 300 days for certain families apprehended crossing the Southwest border between ports of entry. The goal would represent a marked improvement over the current case completion rate for non-detained cases, while ensuring those families receive access to legal orientation and other supports, including potential referrals for pro bono legal services. By placing noncitizens in Dedicated Dockets in Alternatives to Detention programs, the Secretary found, DHS would promote compliance with and increase appearances in immigration proceedings. AR 004-05.

45.     Dedicated Dockets and other reforms that DHS is implementing, the Secretary found, will improve border management and reduce migration surges more effectively and more sustainably than MPP, while better ensuring procedural safeguards and enhancing noncitizens'

access to counsel. He found that DHS plans to closely monitor the outcomes of these reforms, and make adjustments, as needed, to ensure they operate fairly and expeditiously. AR 005.

46.     The Secretary explained that, in arriving at his decision to terminate MPP, he considered various alternatives, including maintaining the status quo or resuming new enrollments in the program. However, he found, for the reasons articulated in the June 1, 2021 memorandum, continuing MPP in this manner would not be consistent with the United States' values and would be a poor use of DHS's resources. AR 005.

47.     The Secretary also considered whether MPP could be continued in a modified fashion. However, he determined that addressing the deficiencies in the program would require a total redesign and significant additional investments in personnel and resources, thereby undermining the efficiency goals of MPP. Further, redesigning and continuing MPP would come at tremendous opportunity cost, detracting from DHS's work on other programs promoting migration management and humanitarian protection more effectively than MPP. AR 005.

48.     The Secretary carefully considered and weighed the possible impacts of a decision to terminate MPP, including the steps that were underway to mitigate any potential negative consequences of the termination. AR 005.

49.     The Secretary considered the impact such a decision could have on border management and border communities, among other potential stakeholders. AR 005.

50.     To that end, the Secretary considered DHS's experience designing and operating a phased process, together with interagency and nongovernmental partners, to facilitate the safe and orderly entry into the United States of certain noncitizens who had been placed in MPP. Throughout this effort, the Secretary found, DHS has innovated and achieved greater efficiencies that will enhance port processing operations in other contexts. He found that DHS has also worked

19

in close partnership with nongovernmental organizations and local officials in border communities to connect migrants with short-term supports that have facilitated their onward movement to final destinations away from the border. He found that DHS's partnership with the Government of Mexico has been an integral part of that phased process's success. AR 005.

51.     The Secretary found that, to maintain the integrity of this safe and orderly entry process for individuals enrolled in MPP and to encourage its use, DHS has communicated the terms of the process clearly to all stakeholders and has continued to occasionally use, where appropriate, the return-to-contiguous-territory authority in 8 U.S.C. § 1225(b)(2)(C) for MPP enrollees who attempt to enter between ports of entry instead of through the established process. AR 005.

52.     The Secretary considered other, more effective tools DHS may utilize in MPP's absence to address future migration flows, including at such time when the introduction of certain noncitizens is no longer being limited by Title 42. The Secretary found that the Administration has been—and will continue to be—unambiguous that the immigration laws of the United States will be enforced. The Secretary found that DHS has at its disposal various options that can be tailored to the needs of individuals and circumstances, including detention, alternatives to detention, and case management programs that provide sophisticated wraparound stabilization services. The Secretary found that many of these detention alternatives have been shown to be successful in promoting compliance with immigration requirements. AR 006.

53.     The Secretary further found that the Executive Branch's broader strategy for managing border processing and adjudicating claims for immigration relief—which includes the Dedicated Docket program and additional anticipated regulatory and policy changes—will further

20

address multifaceted border dynamics by facilitating both timely and fair final determinations in immigration proceedings. AR 006.

54.     The Secretary also considered the Administration's important bilateral relationship with the Government of Mexico. The Secretary found that over the two-and-a-half years before the program's termination, MPP played an outsized role in DHS's engagement with Mexico. Given the mixed results produced by the program, the Secretary determined, MPP cannot deliver adequate return for the significant attention that it draws away from other elements that necessarily must be more central to the relationship with Mexico.  AR 006.

55.     The Secretary found that a significant amount of recent DHS and U.S. diplomatic engagement with Mexico focused on port processing programs and plans, including MPP. But the Secretary found that DHS should expand the focus of the relationship with Mexico to address broader issues related to migration to and through Mexico, including: collaboratively addressing the root causes of migration from Central America; improving regional migration management; enhancing protection and asylum systems throughout North and Central America; and expanding cooperative efforts to combat smuggling and trafficking networks, to provide a non-exhaustive list. The Secretary determined that terminating MPP will help broaden U.S. engagement with Mexico, which will more effectively and sustainably address migration. AR 006.

56.     Overall, the Secretary found, having reviewed all relevant evidence and weighing the costs and benefits of either continuing MPP, modifying it in certain respects, or terminating it altogether, on balance, any benefits of maintaining or modifying MPP are far outweighed by the benefits of terminating the program. Furthermore, the Secretary found, termination is most consistent with the Administration's broader objectives for immigration management and DHS's

operational needs, and alternative options to termination would not sufficiently address either of those considerations. AR 006.

57.    In conclusion, the Secretary determined that MPP was no longer a necessary or viable tool for DHS and, accordingly, rescinded the program. AR 006-07.

58.    The "Agreement Between Department of Homeland Security and State of Texas" by its own terms provides that the Agreement may be terminated on 180 day's written notice. Pls. App. 317-326.

59.    DHS sent a letter to the State of Texas, dated February 2, 2021, rescinding the Agreement effective immediately. Pls. App. 347-48.

### C. Remedy

1.    An order requiring the Executive Branch to restart MPP would cause significant disruption to ongoing diplomatic efforts to manage regional migration, disrupt international criminal networks, and reduce the burden on the border, border communities, and DHS resources. Restarting MPP would also disrupt DHS operations within the United States by requiring DHS to re-establish the infrastructure, staffing, and resources necessary to operate MPP at the expense of other initiatives on which DHS has focused since the wind-down of MPP began.

2.    New enrollments in MPP were suspended on January 21, 2021. AR581.

3.    On February 2, 2021, the President issued an Executive Order directing DHS to "promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subjected to MPP for further processing of their asylum claims," and "to promptly review and determine whether to terminate or modify the program known as [MPP]." Executive Order 14010, 86 Fed. Reg. 8267, Creating a Comprehensive Regional Framework To Address the Causes

22

of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border (Feb 2, 2021).

4.      DHS has already made significant progress winding down MPP since the President's Executive Order, and cannot easily restore the status quo ante that existed prior to January 2021 now that new initiatives have been in place for more than six months and relations with Mexico have significantly evolved. AR002-03, 005-07, 587-88; https://www.dhs.gov/news/2021/06/23/dhs-announces-expanded-criteria-mpp-enrolled-individuals-who-are-eligible-processing.

5.      MPP required that individuals reside temporarily in Mexico, so "implementation of MPP required close collaboration and negotiation with the Government of Mexico." See ECF No. 64, Gov't App. 2, ¶ 5.

6.      Before MPP was terminated, Mexico had taken certain "steps that were important to the functioning of MPP," including "utilizing federal resources (personnel and infrastructure) to receive individuals returned to Mexico under MPP; granting temporary, humanitarian status to persons enrolled in MPP; ensuring that such individuals received equal treatment and protection from discrimination, as well as the right to request work authorization; and providing MPP enrollees with the ability to access selected social services." Gov't App. 2, ¶ 5.

7.      Requiring DHS to re-implement MPP would require the United States to obtain Mexico's agreement to reestablish that infrastructure, in contradiction to its previous representation to Mexico that MPP had been terminated. Gov't App. 14, ¶ 9 (noting that "Mexico has already begun taking actions" to redeploy resources and advance new initiatives to better manage migration); 15, ¶ 10 (discussing new efforts already underway "to address the root causes

of irregular migration" and "disable human trafficking and human smuggling organizations"); 16, ¶ 13-14.

8.      MPP also required DHS to devote substantial resources to operating the program, and restarting MPP would "involve significant and complicated burdens on border security personnel and resources that would detract from important DHS mission sets," and "significant modifications" to the operational structure of MPP would be "required to restart the program and ensure that participants can remain in Mexico pending their immigration proceedings." Gov't App. 5, ¶ 10; see also id. at 6, ¶ 11.

9.      Ordering MPP to restart would undermine ongoing negotiations and diplomatic efforts to manage regional migration and combat smuggling and trafficking networks by refocusing diplomatic efforts on restarting MPP at the expense of other intiatives and provoking doubt in the United States' ability to carry out its promises generally. Gov't App. 6, ¶ 12 (noting that restarting MPP would require significant "financial and diplomatic engagement" with Mexico, including providing "significant foreign assistance to counterparts operating in Mexico," to, among other things, address "security-related concerns along the border" made worse by MPP, and "would detract from this Administration's broad goal of establishing a comprehensive regional strategy for managing migration"); 7, ¶ 13 (noting agency's refocused "efforts to address the root causes of migration from Central America, improve regional migration management, enhance protection and asylum systems throughout North and Central America, expand cooperative efforts to combat smuggling and trafficking networks"); 7, ¶ 14 (if United States "is prevented from upholding commitments made in the course of negotiations, the foundation of trust upon which these negotiations are premised erodes"); 8, ¶ 15.

10.      DHS submitted evidence that: "An order interfering with DHS's termination of MPP, or otherwise requiring DHS to reinstitute the program, would wreak havoc on the Administration's approach to managing migration in the region, including by undermining the Government's ability to engage in the delicate bilateral (and multilateral) discussions and negotiations required to achieve a comprehensive solution. Such an order would require the United States to renege on the reasoned—and … more effective—strategy being developed with Mexico." Moreover, restarting MPP operations would require new and costly investments from both governments to re-establish the infrastructure that sat dormant for more than a year due to COVID-19. Gov't App. 8, ¶ 16; *see also id.* at 8-10, ¶¶ 17-18 (noting that restarting MPP would "come at tremendous opportunity cost," "draw resources from other efforts," "create doubt about the reliability of the United States as a negotiating partner," "hamstring the Federal Government's ability to conduct the foreign policy discussions" necessary to manage migration, and "have significant resource implications and be damaging to our national and economic security").

11.      For example, reinstating MPP would potentially divert resources away from the Dedicated Docket program, which aims to more effectively expedite the immigration proceedings of noncitizen families apprehended at the border. AR 004-05.

12.      The State Department submitted evidence that an order requiring MPP to restart "will have a significant adverse impact on U.S. foreign policy, including our relationship with the governments of El Salvador, Guatemala, and Honduras," "and Mexico." Gov't App. 12, ¶ 3.

13.      "From a foreign policy perspective, the MPP wind-down was a crucial initial step in implementing" new diplomatic efforts and addressing concerns that the Mexican government had about challenges created by MPP. Gov't App. at 17, ¶ 15. The Mexican government

"applauded" the "wind-down of the MPP policy" and has already committed to work with the United States on new efforts to regularize migration. *Id.* ¶ 16.

14.    Reinstating MPP or stopping the wind-down of the program "would undercut current U.S. foreign policy," "nullify more than four months of diplomatic and programmatic engagement" to better manage the southern border, and divert resources and diplomatic efforts away from these ongoing efforts. Gov't App. at 18, ¶ 17. D

15.    Restarting MPP would "be harmful to our bilateral relationships with Mexico and the northern Central American countries, as well as our partner international organizations" by undermining trust in the United States as well as "the U.S. government's efforts to stem the flow of irregular migration." Gov't App. at 18, ¶ 18.

16.    There is no evidence that noncitizens amenable to MPP would enter the United States at locations other than the Texas border and travel to Texas or Missouri. Plaintiffs submitted evidence asserting that only 1 percent of individuals in Texas of "Hispanic or Latino origin" moved to Texas "from a different state." App.363. Because this data would include individuals who are could not be amenable to MPP—e.g., U.S. citizens and lawful permanent residents, Mexican citizens and nationals, unaccompanied children, other categories of individuals not amenable to MPP—there is no evidence that any individual who may have been amenable to MPP would enter the United States at a location other than the Texas border and then relocate to Texas, nor is there any evidence that such individuals would relocate to Missouri.

17.    Missouri did not have an "agreement" with DHS, so Plaintiffs' claim based on the purported agreement with Texas is not a basis to provide any relief to Missouri.

18.    On February 2, 2021, DHS sent a letter to the Texas Attorney General, notifying him that DHS viewed the purported agreement as "void, not binding, and unenforceable." The

letter also explicitly provided notice of termination of the purported agreement with Texas, effective immediately. App.347.

19.     By its own terms, the purported agreement with Texas permitted either party to unilaterally terminate the agreement within 180 days of notice of termination. App.324. At a minimum the agreement terminates on August 1, 2021, 180 days after DHS's written notice, and offers no basis for claims seeking affirmative relief based on the purported agreement beyond that date.

## II.     Proposed Conclusions of Law

### A.  Evidence

1.     The Court declines to consider Plaintiff's Exhibits A10 and C because these exhibits include information protected by the deliberative process privilege, *N. L. R. B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975), rely on hearsay without a valid exception, *see* Fed. R. Evid. 802; *United States v. Montes-Salas,* 669 F.3d 240, 251 (5th Cir. 2012), and any probative value is substantially outweighed by the danger of unfair prejudice and confusing the issues, Fed. R. Evid. 403.

2.     The Court declines to consider Plaintiff's Exhibits A7, A9, A11, A12, A13, and A15 because these articles and third-party reports: rely on hearsay without a valid exception, *see* Fed. R. Evid. 802; *United States v. Montes-Salas,* 669 F.3d 240, 251 (5th Cir. 2012), are irrelevant to the facts of consequence and issues presented in this case, Fed. R. Evid. 401, and any probative value is substantially outweighed by the danger of unfair prejudice and confusing the issues, Fed. R. Evid. 403.

3.     The Court declines to consider Plaintiff's Exhibits A8, A16, A17, A18, A19, A20, A21, A22, B4, B5, B7, B8, B9, and B10 because these documents are irrelevant to the facts of

consequence and issues presented in this case, Fed. R. Evid. 401, and any probative value is substantially outweighed by the danger of unfair prejudice and confusing the issues, Fed. R. Evid. 403.

4.      The Court declines to consider Plaintiff's Exhibits D, E. F, F-1, G, G-1, H, H-1, and I because these declarations (and their associated exhibits) impermissibly offer expert testimony without qualification as an expert or foundation establishing the reliability or relevance of the expert opinion, Fed. R. Evid. 702; *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002), are irrelevant to the facts of consequence and issues presented in this case, Fed. R. Evid. 401, and any probative value is substantially outweighed by the danger of unfair prejudice and confusing the issues, Fed. R. Evid. 403.

### B.  Justiciability

#### i.      Standing

1.      "[T]he states have the burden of establishing standing," *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015), by showing "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). The injury must be "certainly impending"—"*possible* future injury" is not sufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2014).

2.      "[T]he standard used to establish these three elements is not constant but becomes gradually stricter as the parties proceed through 'the successive stages of the litigation.'" *In re Deepwater Horizon*, 739 F.3d 790, 799 (5th Cir. 2014) (quoting *Lujan v. Def's of Wildlife*, 504 U.S. 555, 561 (1992)).

3.      "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561; *accord In re Deepwater Horizon*, 739 F.3d at 799. "[A]t the final stage" of litigation, such as this final merits determination, facts purporting to show standing "must be 'supported adequately by the evidence adduced at trial.'" *Lujan*, 504 U.S. at 561 (quoting *Gladstone, Realtors v. Village of Brentwood*, 441 U.S. 91, 115 n.31 (1979)); *Deepwater Horizon*, 739 F.3d at 799.

4.      Plaintiffs have failed to meet their burden to establish standing.

5.      Plausible assumptions are not sufficient to establish standing at the merits stage. *Lujan*, 504 U.S. at 561. Plaintiffs have failed to meet their burden to prove a concrete injury in fact. Plaintiffs' argument for injury depends on the assumptions that (1) terminating MPP will lead to an increase of noncitizens in Texas and Missouri who would otherwise be subject to MPP, and (2) that those noncitizens would necessarily increase State costs. Plaintiffs have put forth no proof sufficient to establish either of these assertions, including no evidence that any State costs actually increased in 2020, as MPP enrollments began to decline, or since January 21, 2021, when new enrollments in MPP were suspended.

6.      Plaintiffs' lack of evidence of injury stands in stark contrast to the evidence in *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015), which found that Texas had put forth evidence that "DAPA would enable at least 500,000 illegal aliens in Texas" to obtain "lawful presence," and lead directly to costs to the state related to providing driver's licenses of "several million dollars" even under a "modest estimate." Plaintiffs have not provided evidence that they would "need to hire employees, purchase equipment, and obtain office space," which the Fifth Circuit cited as a basis for finding standing in that case on a "driver's-license theory." *Id*. at 162. The

Fifth Circuit's decision in *Texas*, 809 F.3d 134 (5th Cir. 2015), also involved an appeal of a preliminary injunction, *id*. at 146, meaning Texas had a lower burden of proof in that case than Plaintiffs have here, *see Lujan*, 504 U.S. at 561.

7.    A "state official has not suffered an injury in fact to a legally cognizable interest" when "a federal government program is anticipated to produce an increase in that state's population or a concomitant increase in the need for the state's resources" because this is simply a generalized grievance that would improperly "permit nearly all state officials to challenge a host of Federal laws." *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015).

8.    Plaintiffs are not entitled to "special solicitude" in assessing their standing. Special solicitude requires that Congress "created a procedural right to challenge the" decision. *Texas*, 809 F.3d at 151. Plaintiffs have not identified any procedural right Congress provided states to sue to enforce the provisions of 8 U.S.C. § 1225. *See Texas*, 809 F.3d at 152 (explaining that in *Massachusetts v. EPA*, 549 U.S. 497 (2007) that Congress has "authorized" that "type of challenge" in the relevant statute and "[t]hat authorization is of critical importance to the standing inquiry"); *id.* at 162 ("a state likely must be exercising a procedural right created by Congress"). Plaintiffs have not argued that terminating MPP "grant[s] lawful presence to a broad class of illegal aliens," as the Fifth Circuit held in granting Texas special solicitude to challenge DAPA. *Texas*, 809 F.3d at 153. Nor do Plaintiffs identify a procedural right under the APA that applies here because they do not argue that terminating MPP was the type of agency action that required DHS to provide an opportunity for notice and comment under the APA. *See* 5 U.S.C. § 553(b).

9.    Plaintiffs cannot establish *parens patriae* standing to bring suit against the federal government. The Supreme Court has broadly held that "[a] State does not have standing as *parens*

30

*patriae* to bring an action against the Federal Government," and did not limit that holding to any particular type of claim. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n.16 (1982); *see also Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923) ("It cannot be conceded that a state, as parens patriae, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof. … it is no part of its duty or power to enforce their rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as parens patriae, when such representation becomes appropriate; and to the former, and not to the latter, they must look for such protective measures as flow from that status.").

10.     Plaintiffs have failed to show that their alleged injury is traceable to the termination of MPP.

11.     "[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party … 'standing … is ordinarily 'substantially more difficult' to establish.'" *Texas v. California*, 141 S. Ct. 2104, 2117 (2021) (quoting *Lujan*, 504 U.S. at 562).

12.     There is no traceability if the "record reveals only speculation about the complex decisions made by non-citizens" "before they risked life and limb to come here," *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015). "While immigration policies might have played into that calculus, so, too, might the myriad economic, social, and political realities in the United States and in foreign nations." *Id*. The Supreme Court has "rejected theories that rest on speculation about the decisions of independent actors," *Clapper*, 568 U.S. at 414, and standing based on speculative future unlawful conduct, *Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

13.     Generalized information showing "*illegal immigration* is costing the state money" is insufficient to confer standing. *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015). A state

31

must put forth "concrete evidence" that state "costs had increased or will increase as a result" of the particular challenged action, otherwise traceability is "purely speculative." *Id.*; *see also California*, 141 S. Ct. at 2119 (holding that "theory of standing" that "rests on a highly attenuated chain of possibilities" is insufficient—"would require far stronger evidence than the States have offered here to support their counterintuitive theory of standing").

14.     If the Court were to "assume" that a policy change "increase[s] unlawful immigration," it "cannot further infer that [it] increase[s] crime." *Arpaio*, 797 F.3d at 22; *see O'Shea v. Littleton*, 414 U.S. 488, 497 (1974); *Clapper*, 568 U.S. at 414; *Lyons*, 461 U.S. at 105. The States' alleged human-trafficking harms are speculative and not fairly traceable to the federal government's actions.

15.     The Fifth Circuit's ruling on traceability in *Texas*, 809 F.3d 134, is distinguishable because the Fifth Circuit held there that "DAPA would be the primary cause and likely the only one" of Texas's increased driver's license expenses because it would confer eligibility for those licenses to otherwise ineligible "unlawfully present aliens," *id.* at 149, 155, 160.  The court held that Texas had shown that "DAPA would have a major effect on the states' fiscs." 809 F.3d at 152. Here, Plaintiffs have not shown increased costs since new MPP enrollments were suspended, nor identified any reason why terminating MPP would lead directly to increased eligibility for State benefits or increased state costs.

16.     Plaintiffs have failed to show that their alleged injury is redressable by a favorable decision.

17.     A noncitizen who was amenable to being placed in MPP was not necessarily subjected to return under MPP. Plaintiffs do not dispute this fact. *See* Mot. 17; ECF No. 48, ¶ 74 (acknowledging that even if "an alien was eligible for MPP, the policy did not mandate return"

and that there was "discretion to process aliens for MPP or under other procedures"). An order requiring the government to reinstate MPP therefore would not necessarily require that any noncitizens be returned to Mexico under MPP.

18.     The United States cannot return any noncitizens to Mexico under MPP without Mexico's agreement. An order requiring the government to reinstate MPP, therefore, would not necessarily lead to any noncitizens being returned to Mexico.

19.     Redressability is more difficult to show in the immigration context where control over immigration is not just a congressional power, but also implicates the Executive Branch's inherent constitutional authority to manage the international border and conduct foreign relations, and thus any relief would depend on the agreement of foreign powers over which the Court lacks jurisdiction. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) ("[T]he power of exclusion of aliens is also inherent in the executive department of the sovereign."); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power."); *Trump v. Hawaii*, 138 S. Ct. 2392, 2418-19 (2018) ("Because decisions in these matters may implicate 'relations with foreign powers,'" "such judgments 'are frequently of a character more appropriate to … the Executive.'"); *Arizona*, 567 U.S. at 396-97 ("[T]he dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy.").

20.     Plaintiffs fail to show redressability where their relief depends on the "'unfettered choices made by independent actors'"—here, the Government of Mexico—"'not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'" *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 656 (5th

33

Cir. 2019) (quoting *Lujan*, 504 U.S. at 562). That rule has even greater force in the context of immigration and foreign affairs "Plaintiffs' injury can only be redressed by foreign nations not before the court." *Lin v. United States*, 690 F. App'x 7, 9 (D.C. Cir. 2017). Federal courts "have been particularly reluctant to find standing where the third party upon whose conduct redressability depends is a foreign sovereign." *Cierco v. Mnuchin*, 857 F.3d 407, 419 (D.C. Cir. 2017); *accord, e.g.*, *Dellums v. U.S. Nuclear Regulatory Comm'n*, 863 F.2d 968, 976 (D.C. Cir. 1988) (noting that "[o]ur own decisions ... have declined to recognize standing when the effectiveness of the relief requested depends on the unforeseeable actions of a foreign nation"); *Cardenas v. Smith*, 733 F.2d 909, 914 (D.C. Cir. 1984) (holding that plaintiff lacked standing because "the relief in the present case could be obtained only through the consent of the Swiss government"); *Greater Tampa Chamber of Com. v. Goldschmidt*, 627 F.2d 258, 263 (D.C. Cir. 1980) (finding no redressability because relief depended on the actions of the United Kingdom, "the United Kingdom completely controls landing rights within its boundaries," and "[t]he complaint proffers no evidence that . . . the United Kingdom would" act as necessary to provide relief); *Made in the USA Found. v. United States*, 56 F. Supp. 2d 1226, 1250 (N.D. Ala. 1999) ("the plaintiffs' reliance on the predicted actions of independent actors—the governments of Mexico and Canada and the heads of businesses—makes a finding of redressability impossible").

21.     Choices by the Mexican government in accepting returns to Mexico under MPP if the program is reinstated are "essential to Plaintiffs' standing," and Plaintiffs have not "introduce[d] facts showing that the [Mexican government's" choices 'have been or will be made in such manner as to . . . permit redressability of injury." *Three Expo Events, L.L.C. v. City of Dallas, Texas*, 907 F.3d 333, 341 (5th Cir. 2018) (quoting *Lujan*, 504 U.S. at 562); *cf. Talenti v. Clinton*, 102 F.3d 573, 578 (D.C. Cir. 1996) (rejecting a claim that a withdrawal of aid by the

United States might cause the Italian government to redress the plaintiff's injury, as it "seem[ed] equally plausible" that Italy would react in a contrary manner). The absence of any such evidence is fatal to Plaintiffs' assertion of redressability, and accordingly, Plaintiffs lack Article III standing. *Rimi v. Obama*, No. CIV.05-2427 (RJL), 2009 WL 4251097, at *2 (D.D.C. Nov. 23, 2009), *aff'd*, 608 F. App'x 4 (D.C. Cir. 2015) ("[T]he harm [plaintiffs] complain of is not redressable by a judicial action. Simply put, this Court has no authority over the foreign governments.").

22.    MPP did not apply to unaccompanied children, Mexican citizens, and other groups, so MPP, even if reinstated, would not necessarily apply to all noncitizens arriving at the border.

23.    "[R]edressability [that] requires speculat[ion]" is insufficient. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006).

## ii.    Nonjusticiability Doctrines

1.    The APA precludes review "of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Texas*, 809 F.3d at 165 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); *see* 5 U.S.C. § 701(a)(2). Whether and how to use the contiguous-territory-return authority is a textbook example of a wholly discretionary decision that is not subject to judicial review. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

2.    Plaintiffs cannot obtain review under the Administrative Procedure Act (APA) because they challenge an action, DHS's decision how to use the contiguous-territory-return authority in section 1225(b)(2)(C), that is committed to agency discretion by law. *See* 5 U.S.C. § 701(a)(2).

3.    Congress's use of the term "may" in section 1225(b)(2)(C) confers discretion on DHS to choose whether to return noncitizens to contiguous countries, *see Jama v. Immigr. &*

*Customs Enf't*, 543 U.S. 335, 346 (2005), and the statute offers no criteria or standard for when the government must or should employ that discretion, *see Heckler*, 470 U.S. at 831.

4.      DHS's decision not to invoke section 1225(b)(2)(C) in the MPP context falls within the traditional scope of nonenforcement actions committed to agency discretion. See *Heckler*, 470 U.S. at 831. This decision not to use discretionary authority is akin to a simple one of nonenforcement, because it does not create affirmative benefits or lawful presence for beneficiaries. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1906 (2020).

5.      Because DHS's decision not to invoke the return authority in § 1225(b)(2)(C) is committed to agency discretion, it is unreviewable under the APA.

6.      Plaintiffs also may not obtain APA review because they do not challenge "final" agency action. 5 U.S.C. § 704.

7.      Agency action is "final" under the APA only if it both "consummate[es] the agency's decisionmaking process" and also determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

8.      The June 1, 2021 Memorandum terminating MPP is a general statement of policy and by definition not a final agency action. *See Cohen v. United States*, 578 F.3d 1, 6 (D.C. Cir. 2009*), reh'g en banc granted in part, opinion vacated in part*, 599 F.3d 652 (D.C. Cir. 2010), *and on reh'g en banc in part*, 650 F.3d 717 (D.C. Cir. 2011), *cited by Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 441 (5th Cir. 2019).

9.      "MPP qualifies as a general statement of policy." *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 509 (9th Cir. 2019); *see Cruz v. DHS*, No. 19-CV-2727, 2019 WL 8139805, at *6 (D.D.C. Nov. 21, 2019) (similar). Therefore, the decision to terminate MPP also

36

qualifies as a general statement of policy and is unreviewable under the APA. *See Cohen*, 578 F.3d at 6.

10.     A "statement of policy" such as the June 1, 2021 Memorandum is not "final agency action" unless and until it is applied "in a particular situation" to a regulated entity. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (Kavanaugh, J.); *Equal Emp. Opportunity Comm'n*, 933 F.3d at 441 (similar).

11.     The June 1, 2021 Memorandum also does not constitute final agency action because it does not create any right for any noncitizen to enter or remain in the United States or obtain any other immigration benefit, and does not impose any obligation on DHS or third parties. *See Bennett*, 520 U.S. at 178. DHS has the same discretion with respect to its statutory return authority as it had prior to June 1, 2021, and noncitizens may be returned case-by-case, as authorized by statute. *See* 8 U.S.C. § 1225(b)(2)(C). Terminating MPP while not limiting the uses to which § 1225(b)(2)(C) may be put "leaves the agency the discretion and the authority to change its position ... in any specific case," such as its traditional *ad hoc* uses of the return authority, "and does not seek to impose or elaborate or interpret a legal norm," *i.e.*, the scope of authority afforded by § 1252(b)(2)(C). *Equal Emp. Opportunity Comm'n*, 933 F.3d at 442.

12.     The June 1, 2021 Memorandum imposes no obligations on Plaintiffs. Any obligations are imposed by other federal or state laws, as the precedent Plaintiffs cite indicates. *See Texas v. United States*, 328 F. Supp. 3d 662, 736 (S.D. Tex. 2018) (addressing Texas and other plaintiffs "claim that they are paying millions of dollars annually to provide for uncompensated healthcare expenses and *other state-provided benefits*") (emphasis added)).

13.     The possibility of Plaintiffs incurring additional expenditures from other pre-existing legal obligations *vis a vis* noncitizens in their States is at most an indirect practical

consequence that does not constitute the requisite direct *legal* consequences to make terminating MPP a final agency action. *See Louisiana State v. Army Corps of Engineers*, 834 F.3d 574, 583 (5th Cir. 2016).

14.     Plaintiffs lack a cause of action under the APA because the APA does not provide a cause of action when another "statute[] preclude[s] judicial review." 5 U.S.C. § 701(a)(1).

15.     "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). A detailed review scheme that allows some parties, but not others, to challenge certain executive actions is "strong evidence that Congress intended to preclude [other parties] from obtaining judicial review." *United States v. Fausto*, 484 U.S. 439, 448 (1988).

16.     Judicial review of immigration enforcement decisions is subject to such a carefully reticulated scheme precluding APA review; Congress has enacted many provisions "aimed at protecting the Executive's discretion from the courts." *Reno v. Am.-Arab Anti-Discrimination Comm.* ("AADC"), 525 U.S. 471, 486-87 (1999); *see* 8 U.S.C. §§ 1226(e); 1226a(b)(1); 1229c(f); 1231(h); 1252(a)(2)(A), (B), (C), (b)(4)(D), (b)(9), (d), (f), (g).

17.     Plaintiffs cannot invoke the INA's statutory review mechanism, which limits review to claims raised by individual noncitizens. *Id.; cf. Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (organizational plaintiff could not challenge INS policies "that bear on an alien's" removal). Congress's decision to allow noncitizens, but not States, to invoke these review mechanisms is "strong evidence that Congress intended to preclude" sovereign entities "from obtaining judicial review" of removal and detention decisions. *Fausto*, 484 U.S. at 448; *see Am.*

*Immigr. Laws. Ass'n v. Reno*, 199 F.3d 1352, 1359–60 (D.C. Cir. 2000) ("One cannot come away from reading this section [1252(g)] without having the distinct impression that Congress meant to allow litigation challenging the new system by, and only by, aliens against whom the new procedures had been applied."); *AADC*, 525 U.S. at 482-83, 485 (explaining that § 1252(b)(9) sets out a "general jurisdictional limitation" channeling review of all "decisions and actions leading up to or consequent upon" removal into these specific review provisions).

18.     Congress also provided that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary] to commence proceedings." 8 U.S.C. § 1252(g). Deciding whether to return a noncitizen is properly considered an "action" that is part of DHS's "commence[ment] [of] proceedings" within the meaning of § 1252(g).

19.      "Notwithstanding any other provision of law," "no court shall have jurisdiction to review . . . any other decision or action of the . . . Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the . . . Secretary." 8 U.S.C. § 1252(a)(2)(B)(ii). This provision bars review over DHS's discretionary decision whether to employ MPP to return noncitizens to Mexico under § 1225(b)(2)(C).

20.     Plaintiffs also cannot obtain APA review because the States are not in the relevant zone of interests that section 1225(b) protects.

21.     The APA does not "allow suit by every person suffering injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987). It provides a cause of action only to one "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. A plaintiff "may not sue unless he falls within the zone of interests sought to be protected by the

statutory provision whose violation forms the legal basis for his complaint," *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177 (2011).

22.    Plaintiffs base their claims on section 1225(b), but nothing in section 1225(b) indicates that Congress intended States to be able to sue to enforce its provisions.

23.    Plaintiffs' stated interest in limiting immigration to limit their costs from such does not bring them within the zone of interests of section 1225(b) or the immigration statutes generally. *See Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*, 93 F.3d 897, 901 (D.C. Cir. 1996). "The immigration context suggests the comparative improbability of any congressional intent to embrace as suitable challengers in court all who successfully identify themselves as likely to suffer from the generic negative features of immigration." *Id.* at 902.

24.    Further, Plaintiffs here are not within the zone of interests of the Immigration and Nationality Act's (INA) parole provisions, which they mention, because there was nothing in the "language of the statutes on which [they] rely" nor the "legislative history that even hints at a concern about regional impact" of immigration due to allegedly improper parole practices. *Id.* at 901.

25.    Even if Plaintiffs had demonstrated a marginal relationship between immigration and increased costs to public services, "it cannot reasonably be assumed that Congress intended to permit [a] suit," where Plaintiffs' interests are, at best, "marginally related to" the purposes of the statutes they cite. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

26.    Plaintiff States are outside the zone of interests of § 1225(b), and cannot raise APA claims seeking review of DHS's implementation of § 1225(b).

      **iii.**    **Merits**

1.      The Court's review of the merits of Plaintiffs' claims is confined to the administrative record supplied by the agency. *Lousiana ex rel. Guste v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988). "[T]he designation of the administrative record, like any established administrative procedure, is entitled to a presumption of administrative regularity." *City of Dallas, Tex. v. Hall*, No. 3:07- CV-060-P, 2007 WL 3257188, at *4 (N.D. Tex. Oct. 29, 2007).

### i.      APA Claims

1.      Review under the APA's arbitrary and capricious standard is "highly deferential." *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983).

2.      The arbitrary and capricious standard "places a 'considerable burden' on the challenger to overcome the [agency's] chosen course of action." *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998).

3.      When evaluating an arbitrary and capricious claim under the APA, "[i]f the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Id*. at 934; *see also Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). Courts should uphold a "decision [of] less than ideal clarity… if the agency's path may reasonably be discerned." *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004).

4.      The June 1, 2021 memorandum terminating MPP, at the least, "conform[s] to minimal standards of rationality … and must be upheld." *Tex. Oil & Gas Ass'n*, 161 F.3d at 934. The Secretary considered all relevant factors – including, but not limited to, prior assessments MPP and its performance compared to its intended goals; possible alternatives, such as maintaining MPP or modifying it; the balance of the possible impacts of terminating MPP against steps the agency is taking that would mitigate any potential negative consequences; the diplomatic costs of

41

continuing MPP versus diplomatic engagement with Mexico to collaboratively address the root causes of migration, improve regional migration management, and expand cooperative efforts to combat smuggling and trafficking networks; the impact of MPP's termination on border communities impacted by migration; the availability of detention and detention-alternatives programs to ensure noncitizens' appearance in proceedings; and the need to use limited agency resources for programs that more effectively expedite immigration proceedings without undermining the reliability of procedural outcomes – in determining that, on balance, any benefits of maintaining or continuing a modified form of MPP are far outweighed by the benefits of terminating the program.

5.      Plaintiffs' insistence that DHS prove through data that migrants were not deterred by MPP is not a requirement of the APA, which "imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1160 (2021).

6.      DHS "need not demonstrate to [the] court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute [and] that there are good reasons for it," as is the case here. *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 515-16 (2009).

7.      Plaintiff States have not proffered any legally cognizable reliance interests that DHS failed to consider. Cases requiring agency consideration of reliance interests have traditionally limited this requirement to cases where a new policy would lead to some unexpected civil or criminal liability for the regulated industry or individuals—not potential incidental effects on third parties or States. *See, e.g.*, *N.L.R.B. v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 295 (1974).

8.      The authority for MPP is purely discretionary, *see* 8 U.S.C. § 1225(b)(2)(C), and the Supreme Court has made clear that States have no legally cognizable interest in how the federal government exercises its discretionary authority over immigration enforcement, that DHS has "broad discretion" with respect to the removal system, and ultimately that State interests with respect to immigration must give way completely to the federal government's choices on how to best enforce immigration law. *Arizona v. United States*, 567 U.S. 387, 396-97, 401-02 (2012); *accord Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984) (there is "no judicially cognizable interest in procuring enforcement of the immigration laws" against someone else).

9.      The Secretary's determination that available data and experience raised concerns of pragmatically problematic and legally questionable consequences of MPP, without empirically definitive conclusions on these points, was sufficient to support his decision. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) ("Rescission of [agency action] would not be arbitrary and capricious simply because there was no evidence in direct support of the agency's conclusion. It is not infrequent that the available data does not settle a regulatory issue and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion.").

10.     Even if DHS had considered alternatives to terminating MPP, which the Secretary in fact did, there is no requirement that the agency consider a particular alternative approach that Plaintiffs might prefer. *See State Farm*, 463 U.S. at 51.

11.     "[A]n agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984); *accord Motor Vehicle Manufacturers Association v. State Farm Mutual*

*Automobile Insurance Co.*, 463 U.S. 29, 59 (1984) (Rehnquist, J., concurring in part and dissenting in part) ("As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration."); *Nat'l Ass'n of Home Builders v. E.P.A.*, 682 F.3d 1032, 1043 (D.C. Cir. 2012). Agencies have "significant discretion" to reevaluate policy choices following a "change in administration." *Clean Water Action v. E.P.A.*, 936 F.3d 308, 315 (5th Cir. 2019).

12.     Given the absence of any statutory directive requiring DHS to implement MPP, "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *Nat'l Ass'n of Home Builders*, 682 F.3d at 1043. Because, here, DHS "remain[ed] within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." *Id.* (quoting *Motor Vehicle Manufacturers Association*, 463 U.S. at 59 (1984) (Rehnquist, J.).

13.     Plaintiffs fail to demonstrate that DHS's determination to terminate MPP was arbitrary and capricious under the APA.

14.     Plaintiffs' Count I fails because DHS engaged in reasoned decision-making and considered the relevant factors in deciding to terminate MPP. *See Michigan v. EPA*, 576 U.S. 743, 750 (2015). That Plaintiffs disagree with the decision does not matter; it "suffices that the new policy is permissible under the statute [and] that there are good reasons for it." *Fox Television Stations*, 556 U.S. at 515-16.

15.     Plaintiffs' Count II fails because Plaintiffs do not demonstrate any legally cognizable State reliance interests that DHS failed to consider in terminating MPP. *See, e.g.*, *Bell Aerospace Co. Div. of Textron*, 416 U.S. at 295.

16.     Plaintiffs' Count III fails because DHS considered alternative and "more limited" approaches to terminating MPP, such as continuing it in present or modified form. AR005-006. Further, there is no requirement that the agency consider a particular alternative approach that Plaintiffs might prefer. *See State Farm*, 463 U.S. at 51.

17.     Plaintiffs' Count IV fails because DHS provided extensive explanation for its decision to terminate MPP.  AR 002-007.

### ii.     Section 1225 Claim

1.     MPP operated pursuant to 8 U.S.C. § 1225(b)(2)(C), which provides that, for "an alien described in" § 1225(b)(2)(A) who is arriving "from a foreign territory contiguous to the United States," DHS "may return the alien to that territory pending a proceeding under section 1229a." 8 U.S.C. § 1225(b)(2)(C).

2.     Congress's use of the term "may" confers discretion on DHS to choose whether to return amenable noncitizens to contiguous countries, and the statute offers no criteria or standard for when the government must or should employ that discretion. *See Jama,* 543 U.S. at 346 ("The word 'may' customarily connotes discretion.").

3.     Section 1225(b)(2)(C) provides DHS with full discretion whether to maintain a return program under its authority such as MPP, or to terminate it.

4.     Plaintiffs concede that DHS had no obligation to pursue MPP or return any specific individual to Mexico under section 1225(b)(2)(C). PI Mot. 17., Reply 7.

5.     If an immigration officer "determine[s]" that an "applicant for admission" is "not clearly and beyond a doubt entitled to be admitted," then he or she "shall be detained for a proceeding under section 1229a of this title" to determine removability. 8 U.S.C. § 1225(b)(2)(A). However, the officer may also invoke the overlapping authority in section 1226 to "arrest[] and

detain[] pending a decision on whether the alien is to be removed from the United States," and to release such individuals on bond or conditional parole. 8 U.S.C. § 1226(a). *See Jennings v. Rodriguez*, 138 S. Ct. 830, 836-38 (2018) (explaining that the immigration officer initially determines whether a noncitizen is admissible to or removable from the United States under sections 1225 or 1226).

6.      The Supreme Court has read section 1225 in conjunction with another INA provision, under which noncitizens subject to § 1225(b)(2)(A) may be released on parole during their proceedings "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A); *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018). The Supreme Court recognized that Congress provided "a specific provision authorizing release from § 1225(b) detention," i.e., section 1182(d)(5)(A). *Id.* The Supreme Court has also explained that section 1226—which overlaps with section 1225—may be applied to noncitizens "present in the United States." *Jennings*, 138 S. Ct. at 837.

7.      Plaintiffs do not challenge DHS parole or bond policies in this lawsuit. Nor could they. Section 1182(d)(5)(A) provides DHS full discretion whether and when to release noncitizens on parole for humanitarian reasons or public benefit. 8 U.S.C. § 1182(d)(5)(A); *Maldonado v. Macias*, 150 F. Supp. 3d 788, 794 (W.D. Tex. 2015). And Section 1226 authorizes DHS to release (with limited exceptions concerning certain criminal noncitizens) any eligible noncitizens on bond or conditional parole. 8 U.S.C. § 1226(a). DHS's discretionary parole determinations fall outside of this Court's jurisdiction. *See* 8 U.S.C. § 1252(a)(2)(B)(ii). Likewise, the Secretary's "discretionary judgment regarding the application of [§ 1226] shall not be subject to review." 8 U.S.C. § 1226(e); *see also Loa-Herrera v. Trominski*, 231 F.3d 984, 990 (5th Cir. 2000) (reading section 1226(e) to bar review of decisions to apply section 1226, including "the manner in which

that discretionary judgment is exercised, and whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints").

8.      Further, under Fifth Circuit precedent, the Court lacks jurisdiction over any challenges by Plaintiffs not just to "discretionary judgment regarding the application of parole," but also "the *manner* in which that discretionary judgment is exercised, and whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints." *Loa-Herrera*, 231 F.3d at 991.

9.      Plaintiffs' claim that DHS is impermissibly releasing noncitizens who could have been amenable to MPP into the United States is meritless as a matter of law. DHS retains discretion to detain or release all noncitizens inspected for admission under section 1225(b)(2)(A) or arrested while present in the United States under section 1226. And Congress has clearly eliminated the Court's jurisdiction over any such claim. Accordingly, Plaintiffs fail to demonstrate that DHS's decision to terminate MPP violates section 1225.

### iii.     Take Care Clause Claim

1.      The Take Care Clause is not a basis for affirmative relief in an Article III court. The Supreme Court long ago made clear that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866).

2.      The Take Care Clause falls under "the general principles which forbid judicial interference," and a claim to restrain executive action through this clause is not only "without a precedent," but there is "much weight against it." *Id*. at 499-500; *see also Citizens for Responsibility & Ethics in Washington v. Trump*, 302 F. Supp. 3d 127, 139 (D.D.C. 2018), *aff'd*,

924 F.3d 602 (D.C. Cir. 2019) (noting that "*Johnson* can be fairly read to suggest that a Take Care Clause claim is outright non-justiciable" and finding no cases holding otherwise).

3.      In addition, to the extent that Plaintiffs purport to bring a claim at equity, such an action would exist only against a *state* official violating an individual right under the Constitution, and, therefore, would be inapplicable here. *See Green Valley Special Util. Dist. v. City of Schertz, Texas*, 969 F.3d 460, 471, 475 (5th Cir. 2020) (stating a cause of action "*at equity*" must "name individual state officials" engaged in "an ongoing violation of federal law"); *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1231-32 (10th Cir. 2005) (courts, "in a proper case in equity, may enjoin a State officer from executing a State law in conflict with the Constitution")).

4.      An ultra vires claim based on *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949), is unsupportable here because Plaintiffs' case falls within the APA's waiver of sovereign immunity. The House of Representatives report accompanying the 1976 amendment to the APA stated that "the time [has] now come to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity." *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989) (quoting H.R. Rep. No. 94-1656, at 9 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6121, 6129). "The principal purpose of this amendment was to do away with the ultra vires doctrine and other fictions surrounding sovereign immunity." *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985). "[S]ince 1976 federal courts have looked to [5 U.S.C.] § 702 ... to serve the purposes of the [*Larson* exceptions] in suits against federal officers." *E. V. v. Robinson*, 906 F.3d 1082, 1092 (9th Cir. 2018) (internal quotation omitted).

5.      Plaintiffs fail to demonstrate a cognizable claim against the termination of MPP under the Take Care Clause or "at equity."

### iv.     Contract Claim

1.      The purported Agreement at issue is unenforceable and no longer in effect regardless, as it was rescinded by DHS, and even under its own terms expired on August 1, 2021.

2.      Plaintiffs' contract claim is barred by the doctrine of sovereign immunity.

3.      The Fifth Circuit has recognized that the United States has not waived sovereign immunity for contract claims seeking specific performance. *See Ala. Rural Fire Ins. Co. v. Naylor*, 530 F.2d 1221, 1229-30 (5th Cir. 1976).

4.      Even if *Larson* could apply following the enactment of the APA, it would not apply here where Plaintiffs "fail[ed] to cite any specific *statutory* limitation" on DHS's authority to rescind the purported agreement. *Naylor*, 530 F.2d at 1227 (emphasis added). "Even assuming that the [ ] decision and action in rescinding" the "contract was legally wrong, it was nonetheless within their authority" and "the effort to enjoin it must fail as an effort to enjoin the United States" absent a waiver of sovereign immunity for the specific type of relief Plaintiffs seek. *Id.* at 1227-28.

5.      To the extent that any remedy in contract could be available to Plaintiffs, the remedy would be governed by the Tucker Act. *See Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1128 (Fed. Cir. 2007); *see also Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001) (quoting *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996) (plurality opinion)) ("damages are *always* the default remedy for breach of contract") (emphasis added).

6.      The Tucker Act "impliedly forbids declaratory and injunctive relief and precludes a § 702 waiver of sovereign immunity" under the APA, as any duty to consult Texas, "if it exists, derives from the contract." *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646-47 (9th Cir. 1998) (citing *United States v. King*, 395 U.S. 1, 3 (1969) (recognizing that the Supreme

49

Court has repeatedly acknowledged that the Court of Federal Claims only has jurisdiction over claims for monetary relief)).

7.      The then-Senior Official Performing the Duties of Deputy Secretary of DHS lacked statutory authority to enter the Agreement, and, therefore, it is unenforceable. *CACI, Inc. v. Stone*, 990 F.2d 1233, 1237 (Fed. Cir. 1993) ("[T]here cannot be a contract when the government agent lacks actual authority to create one."); *cf. The Floyd Acceptances*, 74 U.S. 666, 679-80 (1868) (Plaintiffs' lack of knowledge no defense).

8.      An outgoing administration cannot contract away the federal government's plenary power over the enforcement of immigration law. *See Biodiversity Assocs. v. Cables*, 357 F.3d 1152, 1172 (10th Cir. 2004) ("The executive branch does not have authority to contract away the enumerated constitutional powers of Congress or its own successors…."); *cf. U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23 (1977) ("[T]he Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty").

9.      Plaintiffs fail to identify any legal authority that contemplates DHS entering into a contract to grant states power to review and delay agency policy decisions. A long line of authority establishes that "[t]he Government cannot make a binding contract that it will not exercise a sovereign power." *Amino Bros. Co. v. United States*, 372 F.2d 485, 491 (Ct. Cl. 1967), *cert. denied*, 389 U.S. 846 (1967). Neither 6 U.S.C. § 361(b)(4) nor 8 U.S.C. § 1103(a)(3) expressly authorizes the Senior Official Performing the Duties of Deputy Secretary to enter into this Agreement on behalf of the United States.

10.      "An employee of the Government possesses *express authority* to obligate the Government *only* when the Constitution, a statute, or a regulation grants it to that employee in unambiguous terms." *Abraham v. United States*, 81 Fed. Cl. 178, 186 (2008) (emphasis added).

11.     The Agreement violates the subdelegation doctrine, as there is no affirmative showing of Congressional authorization for such an agreement. *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 565 (D.C. Cir. 2004) ("subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization").

12.     Finally, an Agreement placing an unreasonable restriction on the executive power of a future Administration would be contrary to public policy, and therefore unenforceable. *See Evans v. Jeff D.*, 475 U.S. 717, 759 (1986).

13.     Plaintiffs fail to demonstrate a cognizable claim under the rescinded Agreement.

## C.  Remedy

1.     To the extent the Court has granted judgment in Plaintiffs' favor on any of their claims, the proper remedy is to remand to the agency for further consideration or explanation. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

2.     DHS must be given the opportunity to correct any defects in the June 1, 2021 Memorandum on remand. "Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389–90 (5th Cir. 2021); *Cent. & S. W. Servs., Inc. v. U.S. E.P.A.,* 220 F.3d 683, 692 (5th Cir. 2000) (holding that "failure to explain … does not require vacatur" where it is possible the agency can "substantiate its decision" on remand).

3. Remanding without vacating or issuing injunctive relief is particularly appropriate here because doing otherwise would cause disruption or chaos. *See, e.g.*, *Cent. & S. W. Servs*, 220 F.3d at 692 (remand without vacatur appropriate "when vacating would be disruptive"); *accord Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 288 F. Supp. 2d 7 (D.D.C. 2003), *appeal dismissed,* 2004 WL 1052989 (D.C. Cir. 2004) (staying vacatur when it would cause "serious disruptions"); *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 97-98 (D.C. Cir. 2002) (remand without vacatur appropriate at summary judgment stage where vacating decision would have "disruptive consequences" and be "an invitation to chaos"); *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995).

4. Vacatur or an order that DHS re-implement MPP would be extremely disruptive. See *Cent. & S. W. Servs*, 220 F.3d at 692. Since the program's suspension in January 2021, DHS and the Government of Mexico have taken substantial steps to dismantle the physical, administrative, and diplomatic infrastructure required for MPP. Reversing course would require costly investments in infrastructure and technology. Further, DHS and Mexico have redirected resources necessary for MPP to other initiatives aimed at addressing regional migration more comprehensively. DHS cannot easily "restore the status quo ante" that existed prior to January 2021 now that new initiatives have been in place for nearly six months and relations with Mexico have significantly evolved. *See Veneman*, 289 F.3d at 97.

5. Restarting MPP would be disruptive to the United States' relationship with Mexico because MPP cannot be unilaterally maintained without Mexico's cooperation. *See Cent. & S. W. Servs*, 220 F.3d at 692. Overturning DHS's decision would frustrate efforts Mexico has taken in reliance on the United States' representation that MPP was terminated, and would require the United States to persuade Mexico to once again agree to accept returned third-party citizens and

uphold its non-refoulement obligations toward them. This reversal would have negative consequences on securing Mexico's cooperation toward multinational efforts to address immigration and would undermine trust in the United States' ability to carry out its promises generally.

6.      Reversing course on MPP's termination would also have a disruptive and chaotic impact on the United States' foreign relations. *See Cent. & S. W. Servs*, 220 F.3d at 692. Restarting MPP would draw resources from other international efforts to address immigration, create doubt about the reliability of the United States as a negotiating partner, hamstring the Executive Branch's ability to conduct the foreign policy discussions necessary to manage migration, and have significant resource implications and be damaging to U.S. national and economic security.

7.      Ordering DHS to restart MPP would have a significant adverse impact on U.S. foreign policy generally, including on the United States' relationship with the governments of El Salvador, Guatemala, Honduras, and Mexico. Reinstating MPP would undercut current U.S. foreign policy, nullify more than four months of diplomatic and programmatic engagement to better manage the southern border, and divert resources and diplomatic efforts away from these ongoing efforts. Reversal of the United States' representations regarding MPP would undermine trust in the United States and the Executive Branch's ability to engage in international efforts to address irregular migration. *See Chicago & S. Air Lines v. Waterman S. S. Corp.,* 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial.").

8.      The Supreme Court has cautioned that a district court vacating an agency action under the APA, should not issue an injunction, and would commit reversible error in doing so unless an injunction would "have [a] meaningful practical effect independent of its vacatur."

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (reversing injunction in APA case where vacatur provided sufficient relief).

9.     To obtain a permanent injunction, Plaintiffs must "establish that equitable relief is appropriate in all other respects," including that there is no other remedy that would be adequate to address the alleged injury. *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 847 (5th Cir. 2004). Remand to the agency for reconsideration would redress any injury Plaintiffs assert.

10.     Under section 1252(f), "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter … other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). Section 1252(f)(1) expressly forbids the injunctive relief Plaintiffs seek, which would rewrite section 1225(b)(2)(C) to limit the discretion Congress provided with respect to use of the contiguous-territory-return authority, conditioning that discretion in ways not found in the statute and restraining its operation in precisely the way section 1252(f)(1) forecloses.

11.     Congress specifically limited "[j]udicial review of all questions of law and fact" "arising from any action taken or proceeding" related to removal from the United States to immigration review procedures provided for individual noncitizens to challenge such decisions. 8 U.S.C. § 1252(b)(9). Section 1252 forecloses universal "set aside" relief as to noncitizens in removal proceedings under § 1229a, the individuals to whom MPP applied.

12.     Any injunctive relief must be limited to Plaintiff States and not apply nationwide. Article III requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (citation omitted); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect

against injury to the complaining party, even though the court's judgment may benefit others collaterally."); *Virginia Society for Human Life, Inc. v. Federal Election Commission*, 263 F.3d 379, 393 (4th Cir. 2001) ("[p]reventing the [agency] from enforcing [the regulation] against other parties in other circuits does not provide any additional relief to [the plaintiff]").

13.     Plaintiffs fail to demonstrate that vacatur or other injunctive relief, let alone with nationwide effect, would be appropriate here, because DHS could readily address any defects in the June 1, 2021 Memorandum on remand, and vacatur – or an order requiring DHS to reinstate MPP -- would have severely disruptive consequences on international relations and the United States' ongoing efforts to manage the border.

Date:  July 27, 2021

Respectfully submitted,

PRERAK SHAH
*Acting United States Attorney*

BRIAN M. BOYNTON
*Acting Assistant Attorney General*

BRIAN W. STOLZ
*Assistant United States Attorney*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

EREZ REUVENI
*Assistant Director*

BRIAN WARD
*Senior Litigation Counsel*

*/s/ Joseph A. Darrow*
JOSEPH A. DARROW
*Trial Attorney*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 598-7537
Joseph.a.darrow@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2021, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

<div style="margin-left: 3em;">

*/s/ Joseph A. Darrow*
JOSEPH A. DARROW
Trial Attorney
United States Department of Justice
Civil Division

</div>