**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

|  |  |  |
|---|---|---|
| STATE OF TEXAS,<br>STATE OF MISSOURI,<br><br>*Plaintiffs,*<br><br>v.<br><br>JOSEPH R. BIDEN, JR.,<br>in his official capacity as<br>President of the United States, *et al.*,<br><br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 2:21-cv-00067-Z |

**<u>DEFENDANTS' SUPPLEMENTAL BRIEF ON REMEDY</u>**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ......................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

CONCLUSION ............................................................................................................................ 14

CERTIFICATE OF SERVICE .................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

### Cases

*A.L. Pharma, Inc. v. Shalala*,
   62 F.3d 1484 (D.C. Cir. 1995) ................................................................................. 3

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ................................................................................. 3

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ................................................................................. 12

*Cardenas v. Smith*,
   733 F.2d 909 (D.C. Cir. 1984) ................................................................................. 9

*Cent. & S. W. Servs., Inc. v. U.S. E.P.A.*,
   220 F.3d 683 (5th Cir. 2000) ............................................................................. 3, 6

*Chicago & S. Air Lines v. Waterman S. S. Corp.*,
   333 U.S. 103 (1948) ................................................................................................ 6

*Dellums v. U.S. Nuclear Regulatory Comm'n*,
   863 F.2d 968 (D.C. Cir. 1988) ................................................................................. 9

*DHS v. New York*,
   140 S. Ct. 599 (2020) .............................................................................................. 9

*Dresser-Rand Co. v. Virtual Automation Inc.*,
   361 F.3d 831 (5th Cir. 2004) ................................................................................. 8

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ............................................................................................ 2, 3

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ............................................................................................ 8

*Greater Tampa Chamber of Com. v. Goldschmidt*,
   627 F.2d 258 (D.C. Cir. 1980) ................................................................................. 9

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
   527 U.S. 308 (1999) ................................................................................................ 9

*Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.*,
    288 F. Supp. 2d 7 (D.D.C. 2003) ................................................................ 3, 4, 5, 6

*Lin v. United States*,
    690 F. App'x 7 (D.C. Cir. 2017) .................................................................. 7, 9, 11

*Los Angeles Haven Hospice, Inc. v. Sebelius*,
    638 F.3d 644 (9th Cir. 2011) ........................................................................... 8

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..................................................................................... 9, 10

*Made in the USA Found. v. United States*,
    56 F. Supp. 2d 1226 (N.D. Ala. 1999) ............................................................ 10

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ........................................................................................ 8

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ........................................................................................ 7

*O'Reilly v. U.S. Army Corps of Engineers*,
    477 F.3d 225 (5th Cir. 2007) .......................................................................... 2

*Scott v. Schedler*,
    826 F.3d 207 (5th Cir. 2016) .......................................................................... 8

*Sugar Cane Growers Coop. v. Veneman*,
    289 F.3d 89 (D.C. Cir. 2002) ................................................................... 3, 4, 5

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009) ........................................................................................ 8

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) .......................................................................... 7

*Talenti v. Clinton*,
    102 F.3d 573 (D.C. Cir. 1996) ........................................................................ 10

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021) ....................................................................... 2, 7

*Texas v. United States Env't Prot. Agency*,
    389 F. Supp. 3d 497 (S.D. Tex. 2019) ............................................................. 7

*Texas v. United States*,
  809 F.3d 134, 166 (5th Cir. 2015) ........................................................................ 12

*Three Expo Events, L.L.C. v. City of Dallas, Texas*,
  907 F.3d 333 (5th Cir. 2018) ............................................................................... 10

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ..................................................................................... 9, 10

*Virginia Society for Human Life, Inc. v. Federal Election Commission*,
  263 F.3d 379 (4th Cir. 2001) ............................................................................ 8, 10

*Warth v. Seldin*,
  422 U.S. 490 (1975) ............................................................................................... 8

*Wirtz v. Baldor Electric Company*,
  337 F.2d 518 (D.C. Cir. 1963) ............................................................................. 11

**Statutes**

5 U.S.C. § 703 ........................................................................................................ 10

5 U.S.C. § 706(2) .................................................................................................... 10

8 U.S.C. § 1252(b)(9) ............................................................................................. 11

8 U.S.C. § 1252(f)(1) .............................................................................................. 11

## INTRODUCTION

On July 22, 2021, the Court ordered the parties to "file briefs regarding the appropriate relief for Plaintiffs if the Court determines they should prevail on any of their claims." ECF No. 86. The Court should not grant any relief to Plaintiffs in this case, but if it does, any relief should be sharply limited.

MPP was a massively consequential government program affecting thousands of noncitizens and their immigration proceedings, requiring a huge volume of government resources, and carrying dramatic consequences for United States foreign policy. It cannot simply be restarted by vacating the June 1 memorandum terminating the program. Among other things, restarting MPP would require the United States government to seek and obtain the agreement of the government of Mexico to accept any noncitizens who may be returned under MPP. Accordingly, it would be inappropriate for a federal district court to order the government to send asylum applicants to Mexico, and the United States would potentially be unable to comply with any such order. An order requiring the Executive Branch to restart MPP would thus cause significant disruption to foreign relations, including ongoing diplomatic efforts that are well underway to advance the Executive's current efforts to address the root causes of migration, manage regional migration, reduce the burden on the border, border communities, and DHS resources, and work with Mexico and other countries to disrupt and dismantle international criminal networks. It would also cause disruption to DHS operations within the United States by requiring DHS to re-establish the infrastructure, staffing, and resources necessary to operate MPP at the expense of other initiatives on which DHS has focused since the wind-down of MPP began. Accordingly, vacatur or an injunction directing the Executive Branch to reinstate MPP, and limiting the Executive's authority to engage in foreign affairs, would be egregiously inappropriate.

If the Court determines that Plaintiffs prevail on any of their claims, the only appropriate

remedy would be, at most, a remand to the agency to reconsider and further address whatever factor or issue the Court determines the agency failed to adequately address in the June 1 memorandum, without vacating that memorandum or requiring DHS to restart MPP in the interim. Any additional relief would be broader than necessary to address the alleged injuries of the Plaintiffs before the Court, and would impermissibly place the Court in the position of overseeing discretionary policy choices that implicate foreign relations and must be left to the discretion and expertise of the Executive Branch.

## ARGUMENT

If the Court rules in Plaintiffs' favor on any of Plaintiffs' claims challenging the agency's actions, the proper remedy is to remand to the agency for further consideration or explanation. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").[1]

---

[1] The limitations on relief discussed in this brief encompass all of Plaintiffs' claims, which each identify the APA or its "arbitrary and capricious" standard of review as their cause of action, *see* ECF No. 48 ¶¶ 95-141, including Plaintiffs' statutory and Take Care claims, which are also raised under the APA, *id.* ¶ 129 (Count IV "Violation of Section 1225," arising under the APA, 5 U.S.C. § 706(2)(A), (C)); ¶ 140 (Count VII, "Failure to Take Care that the Laws be Faithfully Executed," arguing that "[u]nconstitutional agency action or inaction violates the APA. *See* 5 U.S.C. § 706"). Indeed, the APA itself subsumes within it limitations not just claims that agency action is "arbitrary and capricious," but also claims that such action is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," which by definition encompass constitutional and statutory claims. 5 U.S.C. § 706(2)(A)-(C). *See, e.g.*, *Jobs, Training & Servs., Inc. v. E. Texas Council of Governments*, 50 F.3d 1318, 1323, 1324-25 (5th Cir. 1995) (holding that claims styled as "statutory or constitutional challenges to" agency's "method of [ ] enforcement" were bound by the APA's limitation of review to final agency action); *Am. Stewards of Liberty v. Dep't of the Interior*, 370 F. Supp. 3d 711, 730 (W.D. Tex. 2019) (applying limitations on APA review to summary judgment

To the extent the Court finds any defect in the June 1 memorandum, the appropriate course of action would be an order remanding to the agency without vacating the memorandum. Where a challenge to agency action alleges that the agency failed to engage in reasoned decision-making or adequately explain its decision, as Plaintiffs do here, ECF No. 48 ¶¶ 95-123, the agency should be given the opportunity to correct any procedural defects on remand. "Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389–90 (5th Cir. 2021). "Only in 'rare circumstances' is remand for agency reconsideration not the appropriate solution." *O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d 225, 239 (5th Cir. 2007) (quoting *Fla. Power & Light*, 470 U.S. at 744) (overturning district court's "decision to issue a permanent injunction" that was based on finding that agency action was arbitrary and capricious under the APA); *Cent. & S. W. Servs., Inc. v. U.S. E.P.A.,* 220 F.3d 683, 692 (5th Cir. 2000) (holding that "failure to explain … does not require vacatur" where it is possible the agency can "substantiate its decision" on remand); *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Remanding without

---

review of "Commerce Clause, the Necessary and Proper Clause, and Tenth Amendment" claims in APA case); *accord Bellion Spirits, LLC v. United States*, 335 F. Supp. 3d 32, 43 (D.D.C. 2018) (collecting cases). And that is especially so where the constitutional or statutory claim turns on the same facts and evidentiary record as the APA claims. *See, e.g.*, *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 582 (1979) ("Before deciding the constitutional question, it was incumbent on th[e] courts to consider whether the statutory grounds might be dispositive.").

To the extent Plaintiffs argue they can also raise claims independent of the APA, they cite no waiver of sovereign immunity for any such claims. A waiver of sovereign immunity must be enacted by statute, be construed in the government's favor, and unambiguously extend to the type of relief sought. *Lane v. Pena*, 518 U.S. 187, 192 (1996); *see also, e.g.*, *Ala. Rural Fire Ins. Co. v. Naylor,* 530 F.2d 1221, 1229-30 (5th Cir. 1976). Since Plaintiffs have not identified any waiver of sovereign immunity outside the APA's cause of action, and because the APA's waiver must be narrowly construed in the government's favor, any relief must be limited, at most, to relief permitted by the APA.

vacating or issuing injunctive relief is particularly appropriate where doing otherwise would cause disruption or chaos. *See, e.g.*, *Cent. & S. W. Servs*, 220 F.3d at 692 (remand without vacatur appropriate "when vacating would be disruptive"); *accord Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 288 F. Supp. 2d 7 (D.D.C. 2003), *appeal dismissed,* 2004 WL 1052989 (D.C. Cir. 2004) (staying vacatur when it would cause "serious disruptions"); *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 97-98 (D.C. Cir. 2002) (remand without vacatur appropriate at summary judgment stage where vacating decision would have "disruptive consequences" and be "an invitation to chaos"); *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995).

Here, vacating the June 1 memorandum or issuing injunctive relief would severely disrupt management of the border and foreign affairs. DHS has already taken substantial steps to unwind MPP and its infrastructure. When President Biden took office on January 20, 2021, the then-Acting DHS Secretary directed that DHS would suspend new enrollments in MPP pending further review of the program. *See* ECF No. 63 at 4. The President subsequently issued an Executive Order directing DHS to promptly consider a phased strategy for the safe and orderly entry, consistent with public health and safety and capacity constraints, of individuals who had been placed in MPP. *Id.* DHS has already made significant progress to implement this strategy. *See* ECF No. 61, Administrative Record ("AR"), at 2-3, 5-7, 587-88; *see also* https://www.dhs.gov/news/2021/06/23/dhs-announces-expanded-criteria-mpp-enrolled-individuals-who-are-eligible-processing. DHS cannot easily "restore the status quo ante" that existed prior to January 2021 now that new initiatives have been in place for nearly six months and relations with Mexico have significantly evolved. *Veneman*, 289 F.3d at 97.

Restarting MPP would be no small task. MPP required individuals to reside temporarily in Mexico, which required "close collaboration and negotiation with the Government of Mexico."

4

*See* ECF No. 64, Gov't App. 2, ¶ 5. Implementing MPP required that Mexico take certain "steps that were important to the functioning of MPP," including "utilizing federal resources (personnel and infrastructure) to receive individuals returned to Mexico under MPP; granting temporary, humanitarian status to persons enrolled in MPP; ensuring that such individuals received equal treatment and protection from discrimination, as well as the right to request work authorization; and providing MPP enrollees with the ability to access selected social services." *Id.* Requiring DHS to re-implement MPP—after new enrollments have been suspended since January 2021, and MPP has been terminated for some time—would require the United States to persuade Mexico to reestablish that infrastructure after acting in reliance on the United States' representation that MPP had ended. *Id.* at 14, ¶ 9 (noting that "Mexico has already begun taking actions" to redeploy resources and advance new initiatives to better manage migration); 15, ¶ 10 (discussing new efforts already underway "to address the root causes of irregular migration" and "disable human trafficking and human smuggling organizations"); 16, ¶ 13-14. Similarly, MPP required substantial DHS resources, and restarting it would "involve significant and complicated burdens on border security personnel and resources that would detract from important DHS mission sets," and "significant modifications" to the operational structure of MPP would be "required to restart the program and ensure that participants can remain in Mexico pending their immigration proceedings." *Id.* at 5, ¶ 10; *see also id.* at 6, ¶ 11. In short, there is no clear "way to restore the status quo ante" that existed prior to January 20, 2021. *See Veneman*, 289 F.3d at 97.

Vacating the June 1 memorandum would also undermine ongoing efforts to manage migration and combat smuggling and trafficking networks because it would require refocusing diplomatic efforts on restarting MPP at the expense of other efforts, and would undermine trust in the United States' ability to carry out its promises generally. Gov't App. 6, ¶ 12 (noting that

restarting MPP would require significant "financial and diplomatic engagement" with Mexico, including providing "significant foreign assistance to counterparts operating in Mexico," to, among other things, address "security-related concerns along the border" made worse by MPP, and "would detract from this Administration's broad goal of establishing a comprehensive regional strategy for managing migration"); 7, ¶ 13 (noting refocused "efforts to address the root causes of migration from Central America, improve regional migration management, enhance protection and asylum systems throughout North and Central America, expand cooperative efforts to combat smuggling and trafficking networks"); 7, ¶ 14 (if United States "is prevented from upholding commitments made in the course of negotiations, the foundation of trust upon which these negotiations are premised erodes"); 8, ¶ 15. As DHS explained:

> An order interfering with DHS's termination of MPP, or otherwise requiring DHS to reinstitute the program, would wreak havoc on the Administration's approach to managing migration in the region, including by undermining the Government's ability to engage in the delicate bilateral (and multilateral) discussions and negotiations required to achieve a comprehensive solution. Such an order would require the United States to renege on the reasoned—and I believe more effective— strategy being developed with Mexico. Moreover, restarting MPP operations would require new and costly investments from both governments to re-establish the infrastructure that sat dormant for more than a year due to COVID-19.

Gov't App. 8, ¶ 16; *see also id.* at 8-10, ¶¶ 17-18 (noting that restarting MPP would "come at tremendous opportunity cost," "draw resources from other efforts," "create doubt about the reliability of the United States as a negotiating partner," "hamstring the Federal Government's ability to conduct the foreign policy discussions" necessary to manage migration, and "have significant resource implications and be damaging to our national and economic security").

The State Department has similarly noted that ordering DHS to restart MPP "will have a significant adverse impact on U.S. foreign policy, including our relationship with the governments of El Salvador, Guatemala, and Honduras," "and Mexico." Gov't App. 12, ¶ 3. They added,

"[f]rom a foreign policy perspective, the MPP wind-down was a crucial initial step in implementing" new diplomatic efforts and addressing concerns of the Mexican government had about challenges created by MPP. *Id*. at 17, ¶ 15. The Mexican government "applauded" the "wind-down of the MPP policy" and has already committed to work with the United States on new efforts to regularize migration. *Id*. ¶ 16. Reinstating MPP, or stopping its wind-down, "would undercut current U.S. foreign policy," "nullify more than four months of diplomatic and programmatic engagement" to better manage the southern border, and divert resources and diplomatic efforts away from these ongoing efforts to instead re-implement MPP. *Id*. at 18, ¶ 17. Moreover, doing so would "be harmful to our bilateral relationships with Mexico and the northern Central American countries, as well as our partner international organizations" by undermining trust in the United States as well as "the U.S. government's efforts to stem the flow of irregular migration." *Id*. ¶ 18; *see, e.g., Chicago & S. Air Lines v. Waterman S. S. Corp.,* 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial.").

Given these clear consequences stemming from any vacatur, Fifth Circuit precedent requires the Court to avoid disruption and, at most, remand without vacatur or other injunctive relief because the agency can remedy any APA defect by providing further explanation. *See, e.g.*, *Cent. & S. W. Servs.*, 220 F.3d at 692 ("remand, without vacatur" is appropriate where "it would be disruptive to vacate a rule that applies to other" groups beyond the plaintiffs and where the agency "may well be able to justify its decision" with further explanation); *Texas v. United States Env't Prot. Agency*, 389 F. Supp. 3d 497, 506 (S.D. Tex. 2019) (finding "remand, not vacatur of the Final Rule … is the appropriate remedy" where vacatur "would be disruptive" and agency could fix defects that violated the APA on remand); *Texas Ass'n of Mfrs.,* 989 F.3d at 389 (similar). This rule has even greater force in the context of immigration and foreign affairs where any

additional relief could take effect only with the agreement of "foreign nations not before the court." *Lin v. United States*, 690 F. App'x 7, 9 (D.C. Cir. 2017), and implicate issues "intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952).

Even if the Court does not remand without vacatur, it should limit relief to remedying the injuries of the parties before the Court. Relief should be, at most, vacatur of the portions of the memorandum found insufficient as applied to Plaintiffs, remand for further consideration or explanation, and not include injunctive relief for Plaintiffs or nationwide. The common remedy in an APA case where a rule or policy is found arbitrary or capricious, is to vacate the part of the rule or policy that is unlawful. *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1022 (5th Cir. 2019). Injunctive relief is inappropriate in such circumstances. Indeed, the Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction, and would commit reversible error in doing so unless an injunction would "have [a] meaningful practical effect independent of its vacatur." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (reversing injunction in APA case where vacatur provided sufficient relief). This Court would invite error because "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course," or where "a less drastic remedy such as partial or complete vacatur … [is] sufficient to redress" the plaintiffs' injury. *Id*. To obtain a permanent injunction, a plaintiff must not only prevail on the claims on the merits, but must also, "establish that equitable relief is appropriate in all other respects," including that there is no other remedy that would be adequate to address the alleged injury. *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 847 (5th Cir. 2004). Here, vacatur as to Plaintiffs based on the specific claims the Court finds have merit, and remand to the agency to consider those issues anew, would more than redress any injury

Plaintiffs assert. *See, e.g.*, *N. Air Cargo v. United States Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) ("It was quite anomalous [for the district court] to issue an injunction. When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is to identify a legal error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal.").

If the Court nonetheless concludes some form of injunctive relief is appropriate, that relief must be limited to the actual parties before the Court. Article III requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (citation omitted); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally."). Granting Plaintiffs relief that would extend to circumstances "apart from any concrete application that threatens imminent harm to [their] interests" would "fly in the face of Article III's injury-in-fact requirement." *Summers v. Earth Island Institute*, 555 U.S. 488, 494 (2009). Moreover, even apart from Article III's jurisdictional constraints, injunctions that go beyond a plaintiff's own injuries exceed the power of a court sitting in equity. An injunction thus must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *see, e.g.*, *Scott v. Schedler*, 826 F.3d 207, 214 (5th Cir. 2016) ("injunction may not encompass more conduct than was requested or exceed the legal basis of the lawsuit"); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) ("[I]njunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification.") (alteration in original; quotation marks omitted)); *Virginia Society for Human Life, Inc. v. Federal Election Commission*, 263 F.3d 379, 393 (4th Cir. 2001)

("[p]reventing the [agency] from enforcing [the regulation] against other parties in other circuits does not provide any additional relief to [the plaintiff]").

Longstanding practice confirms that injunctions are limited to what is necessary to remedy a plaintiff's injury. The scope of a court's statutory authority to enter injunctive relief is circumscribed by the type of relief that was "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999). But the tradition of equity inherited from English law was premised on "providing equitable relief only to parties" because the fundamental role of a court was to "adjudicate the rights of 'individual[s].'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2427-28 (2018) (Thomas, J., concurring) (quoting The Federalist No. 78, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961)); *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) (same). As a result, "a plaintiff could not sue to vindicate the private rights of someone else." *Id*. at 2428.

The Court's ability to enter injunctive relief is also circumscribed where, as here, the relief Plaintiffs seek "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). An order requiring noncitizens be returned to foreign countries or enjoining DHS to restart MPP or to reinstate the prior memoranda governing MPP is improper because it would require actions by and cooperation of "foreign nations not before the court." *Lin*, 690 F. App'x  at 9 (D.C. Cir. 2017); *see also Dellums v. U.S. Nuclear Regulatory Comm'n*, 863 F.2d 968, 976 (D.C. Cir. 1988) (rejecting request for relief where "the effectiveness of the relief requested depends on the unforeseeable actions of a foreign nation"); *Cardenas v. Smith*, 733 F.2d 909, 914 (D.C. Cir. 1984) (rejecting relief that "could be obtained only through the consent of the Swiss government"); *Greater Tampa Chamber*

10

*of Com. v. Goldschmidt*, 627 F.2d 258, 263 (D.C. Cir. 1980) (denying relief that depended on actions of the United Kingdom, which "completely controls landing rights within its boundaries," where the "complaint proffers no evidence that … the United Kingdom would" act as necessary to provide relief); *Made in the USA Found. v. United States*, 56 F. Supp. 2d 1226, 1250 (N.D. Ala. 1999) (cannot grant relief based "on the predicted actions of independent actors—the governments of Mexico and Canada"). Here, Plaintiffs have not "introduce[d] facts showing that the" Mexican government's "choices 'have been or will be made in such manner as to'" allow the relief they seek. *Three Expo Events, L.L.C. v. City of Dallas, Texas*, 907 F.3d 333, 341 (5th Cir. 2018) (quoting *Lujan*, 504 U.S. at 562); *cf. Talenti v. Clinton*, 102 F.3d 573, 578 (D.C. Cir. 1996) (rejecting assertion that the United States could obtain the Italian government's agreement to redress the plaintiff's injury because it was "equally plausible" that Italy would react in a contrary manner). So it would far exceed the Court's authority under Article III to nevertheless issue an injunctive remedy that requires the United States to engage in diplomatic negotiations with and persuade Mexico to reestablish MPP infrastructure.

Even in cases where parties challenge agency rulemaking, as opposed to the discretionary policy decision at issue here, the APA does not affirmatively authorize a universal injunction or nationwide relief. *Cf. Trump*, 138 S. Ct. at 2425 (Thomas, J. concurring) ("No statute expressly grants district courts the power to issue universal injunctions."). The APA provides only that a court may, at most, "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). That provision does not address remedies at all, which are governed by 5 U.S.C. § 703. But even assuming it did, nothing in § 706(2)'s text specifies whether a rule, if found invalid, should be set aside on its *face* or *as applied* to the challenger, let alone that injunctive relief should extend beyond application to the plaintiffs in a particular case. In the absence of a clear statement in the APA, that it displaces

traditional rules of equity, the court should adopt the narrower reading of the "set aside" language. *See Virginia Society for Human Life*, 263 F.3d at 393 ("Nothing in the language of the APA, however, requires us to exercise such far-reaching power."). The historical backdrop to the APA's enactment lends further support to this reading. The absence of nationwide injunctions prior to Congress' enactment of the APA in 1946 (and for over 15 years thereafter) suggests that the APA was not originally understood to authorize courts to issue such broad relief. *See* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV. 417, 438 & n.121 (2017) (noting that the first nationwide injunction issued in the U.S. occurred in 1963 in *Wirtz v. Baldor Electric Company*, 337 F.2d 518 (D.C. Cir. 1963)).

Even assuming the APA could be interpreted to authorize universal relief, § 702 provides that "[n]othing herein: (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." As Defendants explained, 8 U.S.C. § 1252(f)(1) expressly forbids the injunctive relief Plaintiffs seek, which would rewrite § 1225(b)(2)(C) to limit the discretion Congress provided with respect to use of the contiguous-territory-return authority, conditioning that discretion in ways not found in the statute and restraining its operation in precisely the way § 1252(f)(1) forecloses. *See* ECF No. 63 at 48-49. Likewise, § 1252 forecloses universal "set aside" relief as to noncitizens in removal proceedings under § 1229a, the individuals to whom MPP applied. ECF No. 63 at 2-3, 20-21. As the government has explained, Congress provided that challenges arising from any decision or action related to those proceedings may be raised, if at all, only though individual claims raised by the individuals placed in those removal proceeding. *Id*. at 20-21 (discussing 8 U.S.C. § 1252(b)(9), (g)). The same Congress that sought

to bar noncitizens from procuring an injunction of § 1225 would not have authorized an injunction that would reach such noncitizens at the behest of third parties. *See United States v. Fausto*, 484 U.S. 439, 448 (1988) (explaining that Congress's establishment of a detailed review scheme that allows some parties, but not others, to challenge certain executive actions is "strong evidence that Congress intended to preclude [other parties] from obtaining judicial review"); *cf. Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (organizational plaintiff could not challenge INS policies "that bear on an alien's" removal).

Regardless, because nothing in the APA or the Court's equitable authority displaces Article III limitations or traditional principles of equity, *see* 8 U.S.C. § 702, any injunction must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction," *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 313 (1982), which are especially salient in the context of immigration decisions impacting foreign affairs. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) ("[T]he power of exclusion of aliens is also inherent in the executive department of the sovereign."); *Harisiades*, 342 U.S. at 588-89 ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power."); *Trump v. Hawaii*, 138 S. Ct. 2392, 2418-19 (2018) ("Because decisions in these matters may implicate 'relations with foreign powers,'" "such judgments 'are frequently of a character more appropriate to … the Executive.'"). Any injunction, but particularly the broad injunction Plaintiffs seek requiring reinstatement of MPP, that dictates that the Executive must continue a discretionary program that it determines is contrary to its foreign policy goals is a major and "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 109 (2013), and should be rejected for that reason as well.

**CONCLUSION**

In sum, even if the Court grants summary judgment to Plaintiffs on any of their claims, the appropriate remedy is remand to the agency for further consideration, without vacating the June 1 memorandum or granting injunctive relief. Doing otherwise would severely damage management of the border and foreign affairs, and a universal or nationwide injunction would be broader than necessary to address Plaintiffs' alleged harms and violate principles of Article III, equity, and administrative law. *See* ECF No. 63 at 49-50. Should the Court disagree, relief should be limited to vacatur tailored to Plaintiffs' specific claims, as applied to Plaintiffs only, and remand for further explanation.

Alternatively, if this Court determines injunctive relief is appropriate, such relief must be limited to Plaintiffs' injuries and must account for the weighty government interests in the conduct of foreign affairs. It is Plaintiffs' burden to establish that an injunction limited to the Texas border would be insufficient to address their alleged harm and, offering only pure speculation about where noncitizens might travel, Plaintiffs fail to meet this burden. Because  terminating MPP does not "affirmatively confer 'lawful presence' and associated benefits" on a nationwide class, *Texas v. United States*, 809 F.3d 134, 166 (5th Cir. 2015), but rather governs the treatment of noncitizens at the border, which can be geographically limited, a nationwide injunction goes beyond what would be necessary to remedy Plaintiffs' alleged harms. *See California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (noting "scope of the remedy must be no broader … than necessary to redress the injury shown" by plaintiffs and narrowing injunction "to the plaintiff states").

Finally, given the disruption both domestically and abroad an order requiring the federal government to reinstate MPP would cause, and particularly the impact on foreign affairs, if the Court issues an order granting relief to Plaintiffs on any of their claims, Defendants respectfully

request that the Court stay any such order for 7 days to allow the Federal Government time to determine whether to seek emergency relief from the court of appeals.

//

//

Dated: July 27, 2021                    Respectfully submitted,


PRERAK SHAH                             BRIAN M. BOYNTON
*Acting United States Attorney*         *Acting Assistant Attorney General*

BRIAN W. STOLZ                          WILLIAM C. PEACHEY
*Assistant United States Attorney*      *Director*
                                        Office of Immigration Litigation
                                        District Court Section

                                        EREZ REUVENI
                                        *Assistant Director*

                                        BRIAN C. WARD
                                        *Senior Litigation Counsel*

                                        /s/ *Joseph A. Darrow*
                                        JOSEPH A. DARROW
                                        *Trial Attorney*
                                        U.S. Department of Justice
                                        Civil Division
                                        Office of Immigration Litigation
                                        District Court Section
                                        P.O. Box 868, Ben Franklin Station
                                        Washington, DC 20044
                                        Tel.: (202) 598-7537
                                        Joseph.a.darrow@usdoj.gov

                                        *Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2021, I electronically filed this supplemental brief with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
U.S. Department of Justice

17