# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| STATE OF TEXAS,<br>STATE OF MISSOURI,<br><br>*Plaintiffs,*<br><br>v.<br><br>JOSEPH R. BIDEN, JR.,<br>in his official capacity as<br>President of the United States, *et al.,*<br><br>*Defendants.* | Civil Action No. 2:21-cv-00067-Z |

**DECLARATION OF DAVID SHAHOULIAN**

I, David Shahoulian, pursuant to 28 U.S.C. § 1746 and based upon my personal knowledge, and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

*Introduction*

1. I am the Assistant Secretary for Border Security and Immigration at the Department of Homeland Security (DHS or Department) and have been in this role since January 20, 2021. I previously served at DHS as Deputy General Counsel from June 29, 2014 to January 19, 2017. I am familiar with the Court order in the above-captioned case.

2. Managing migration in a safe, effective, and durable manner that comports with a country's laws and values is a profoundly complicated enterprise, particularly because the forces driving migration are constantly shifting. As with all law enforcement matters, the government must make choices within the boundaries of the law and in

light of the fiscal limits imposed by Congress that require federal agencies to prioritize resources. Migration management also implicates important matters of foreign relations entrusted to the federal government.

3. On January 20, 2021, DHS suspended new enrollments into the Migrant Protection Protocols (MPP) program. Due to the ongoing COVID-19 pandemic, MPP hearings had been suspended since April 2020, and even by January 2021 it was unclear when such hearings could resume. While new enrollments into the program were suspended, DHS began to pursue alternative strategies domestically and throughout the region, working with U.S. and international partners, to manage migration. On June 1, 2021, after a review of the MPP program required by presidential directive,[1] DHS announced the termination of the program as it existed, for the multiple reasons specified in a memorandum issued by Secretary Alejandro N. Mayorkas on that date.[2]

4. The permanent injunction issued by the federal court in this matter would undo that termination decision. It requires the government to restart MPP in seven days, and to administer the program until the government has sufficient detention capacity to "detain all aliens subject to mandatory detention under Section [1225 of Title 8 of the U.S. Code] without releasing any aliens *because of* lack of detention resources."

5. There are three key problems with the injunction. First, the Department simply does not now have—and, to my knowledge, has never had under any prior administration—

---

[1] Executive Order 14,010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, 86 Fed. Reg. 8267 (Feb. 2, 2021), *available at* https://www.federalregister.gov/documents/2021/02/05/2021-02561/creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration (last visited August 16, 2021).

[2] *See* Secretary Alejandro N. Mayorkas, "Termination of The Migrant Protection Protocols Program," June 1, 2021, available at https://www.dhs.gov/publication/dhs-terminates-mpp-and-continues-process-individuals-mpp-united-states-complete-their (last visited Aug. 14, 2021).

sufficient detention capacity to maintain in custody every single person described in 8 U.S.C. § 1225. Additionally, the Court's conclusion that the discretionary use of the contiguous territory return authority is mandatory so long as the Department does not have adequate resources to detain everyone described in Section 1225 is inconsistent with the practices of every previous administration to administer the statute. Second, it would be near-impossible for the U.S. Government to comply with the Court's injunction in the time period provided. And third, to the extent that the Administration were capable of implementing any portion of the MPP program as directed by the order, it could not possibly operate in a safe, orderly, and humane manner in the time given by the order.

*The District Court Order Disregards Longstanding Practices and Creates an Impossible Standard for Terminating MPP*

6. To my knowledge, no administration has ever detained all inadmissible applicants for admission or even the subset of those individuals who could be eligible for expedited removal, nor has Congress appropriated the Department (or the former Immigration and Naturalization Service) the amount of resources that would be needed to accomplish this. Moreover, even if the Department had sufficient detention capacity, there are other limitations on the ability to detain, including significant medical and humanitarian concerns, particularly in the midst of a global pandemic.

7. In July 2021, CBP encountered a total of approximately 199,777 individuals seeking to cross along the southwest border. *See* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics (last visited Aug. 16, 2021). Even with approximately 93,781 expelled pursuant to the Center for Disease Control and Prevention's (CDC) Title 42 authorities, approximately 105,996 were processed under

Title 8 authorities. Pursuant to the Court's order, the Administration would be bound to implement MPP unless *all* of those individuals processed under Title 8 could be detained without the possibility of release based upon the lack of detention capacity.

8. The current and historic appropriations by Congress for detention is multiple times smaller than the size of the population that DHS would be mandated to either hold in custody or return to Mexico under the Court's order. ERO is currently appropriated sufficient funding for approximately 34,000 detention beds nationwide, including approximately 31,000 single adult beds and 3,000 family unit beds, to support its mission to enforce immigration law across the entire country.

9. Importantly, due to the COVID-19 pandemic, bed space is even more limited than usual. Pursuant to guidance from the CDC, ICE now requires detention facilities that house ICE detainees to undertake efforts to reduce maintain population levels to approximately 75% of rated capacity.[3] In addition, the U.S. District Court for the Central District of California has also issued a preliminary injunction with nationwide application recognizing the 75% capacity limit, and ordering ICE to maintain strict standards to reduce the risk of COVID-19 infection. *See Fraihat v. ICE*, 445 F. Supp. 3d 709 (C.D. Cal. Apr. 20, 2020). The currently detained population of approximately 25,671 noncitizens as of August 16, 2021 constitutes approximately 75% of the 34,000 funded capacity.

10. In addition to *Fraihat*, the Department is also bound by the *Flores* Settlement Agreement (FSA) and subsequent court orders interpreting the FSA. *See Flores v. Garland*, No. CV

---

[3] ICE's Enforcement and Removal Operations COVID-19 Pandemic Response Requirements, Version 6.0 (Mar. 16, 2021), at p. 35, https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf (last visited Aug. 14, 2021).

85-4544 (C.D. Cal). Pursuant to those court orders, the Department generally cannot detain accompanied minors for more than approximately twenty days in ICE family unit facilities.

11. This Court further suggests that, except for those returned to Mexico pursuant to MPP, DHS must detain all inadmissible applicants for admission, including the subset of those individuals eligible for expedited removal proceedings. To my knowledge, no administration, including the former administration that initiated MPP, has ever implemented the law in this way. No administration has ever been funded for or had the detention capacity to detain all individuals who potentially could be placed into expedited removal proceedings under Section 1225(b)(1).

12. Nor has any administration, to my knowledge, had sufficient personnel to process all such individuals through expedited removal proceedings. Individuals processed under expedited removal who indicate an intent to apply for asylum or express a fear of persecution are entitled to a credible fear screening by an asylum officer, and, if requested, review of a denial by an immigration judge. There has never been a sufficient number of asylum officers to do such screenings for all individuals who may be encountered at the border. And there are not now. Between Fiscal Year 1999 and 2021, for example, only 11 percent of the total number of individuals eligible for expedited removal were processed under that authority. And in no fiscal year have the majority of such individuals been processed pursuant to expedited removal.

13. For these and other reasons, since expedited removal was first created in 1996, the Department has never detained all inadmissible applicants for admission, nor the subset of those who are subject to expedited removal, and it has never been funded by Congress

to do so. Nor could the Department reasonably detain the hundreds of thousands, and potentially millions, of individuals encountered at the border and subject to expedited removal in a given year. Indeed, the Department has long understood that it retains discretion to place noncitizens who may be amenable to processing under Section 1225 directly into removal proceedings under Section 1229a, *see Matter of E-R-M- & L-R-M-*, and that limitations on available detention resources require the Department to prioritize those resources consistent with its enforcement priorities and may warrant release in certain circumstances. By mandating that the government implement MPP until DHS has sufficient detention capacity to hold all noncitizens subject to mandatory detention under Section 1225, the order effectively requires the Department to implement MPP—a program that did not exist prior to January 2019 and that relies on statutory authority that entrusts the Secretary with *discretion* to effectuate contiguous territory returns[4]—in perpetuity.

14. In short, the Department has nowhere near the capacity or personnel—nor the billions needed in appropriated funds—to detain all noncitizens described in 8 U.S.C. § 1225. Although the Department has the ability to reprogram a modest amount of funds from other accounts to support increased detention capacity, doing so would both diminish the Department's ability to accomplish other priorities of critical importance to protecting the safety of the nation, and would do little to meet the impossible standard set by the district court.

---

[4] 8 U.S.C. § 1225(b)(2)(C) ("In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the [Secretary] *may* return the alien to that territory pending a proceeding under section 240.") (emphasis added).

*Re-Establishing MPP Within Seven Days Is Nearly Impossible*

15. Implementation of MPP cannot be done without significant coordination with, and cooperation from, the Government of Mexico. When the Department first put MPP in place, the Government of Mexico took a number of key steps critical to the functioning of the program.[5] This included arranging for personnel and infrastructure to receive individuals returned to Mexico under MPP; allowing MPP enrollees returned to Mexico to remain in Mexico pending resolution of their immigration proceedings; providing a mechanism for enrollees to request work authorization; and ensuring that enrollees were considered eligible for select social services. Putting these minimal pieces back in place, even without adopting additional measures to address the concerns identified following the Department's recent review of the program—including, but not limited to, the lack of access to stable housing, income, and safety that some MPP enrollees experienced— would require negotiations with the Government of Mexico and, eventually, its support and cooperation. The Department simply cannot implement the MPP program unilaterally.

16. Re-implementing the MPP program would additionally require that the United States reestablish the entire infrastructure upon which the program was built. The program, for example, utilized specialized immigration court hearing facilities that had been erected in key locations along the southwest border. These facilities were scaled down and repurposed to address other inadmissible populations; reconstituting these facilities and staffing them for the purpose of holding immigration hearings cannot possibly be

---

[5] *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act,* Dec. 20, 2018 *available at* https://www.gob.mx/sre/en/articulos/position-of-mexico-on-the-decision-of-the-u-s-government-to-invoke-section-235-b-2-c-of-its-immigration-and-nationality-act-185795?idiom=en (last visited August 15, 2021).

accomplished in seven days. Re-implementing the MPP program would also require DHS to find and relocate personnel to operationalize MPP, including to provide necessary protection screenings prior to return to Mexico; create systems and protocols for facilitating each enrollee's entry into and out of the United States for multiple immigration court hearings; and arrange for transportation to and from ports of entry to attend such hearings. All of this work would require significant time, resources, and personnel—particularly given the current COVID-19 environment—including resources and personnel that cannot be reallocated without affecting other departmental missions. None of this is possible to do within seven days.

17. The fact that specialized immigration court hearing facilities for use by MPP enrollees do not now exist and would require time to be reconstituted highlights both logistical and foreign-relations concerns with the Court order. Between the time the last Administration suspended court hearings for MPP enrollees in April 2020 through the time the current Administration began to re-process noncitizens who had previously been returned to Mexico under MPP, tens of thousands of individuals remained in Mexico for long periods with no movement in their immigration cases. In addition to placing a strain on community resources along Mexico's northern border, this contributed to instability and insecurity in some communities, which complicated U.S.-Mexico bilateral relations. Moreover, the lack of court hearings violated the premise under which the Government of Mexico allowed MPP enrollees returned to Mexico to remain in Mexico pending resolution of their immigration proceedings: namely, that the United States would have a functioning, rapid immigration court process in which MPP enrollees could participate. Mexican officials made clear at the time that allowing MPP enrollees to remain in

Mexico temporarily (and relatedly, the ability to access select social services in Mexico) was to be provided only to those "involved in immigration proceedings."[6] Given current COVID-19 protocols and the amount of time it will take to rebuild infrastructure and processes to resume court proceedings in the United States for MPP enrollees, restarting MPP precipitously, without sufficient time for the needed consultation, risks replicating the challenges that existed previously and may complicate foreign relations with Mexico now and in the future.

*Re-Establishing MPP within Seven Days Could Not be Done in a Safe, Orderly, or Humane Manner*

18. In order for a implementation of the Secretary's return authority to operate in a safe, orderly, and humane manner—and to achieve its statutory goal of facilitating the ability of people returned to a contiguous country to participate in removal proceedings under 8 U.S.C. § 1229a—much more has to take place beyond simply effectuating returns.

19. As the 2021 review of MPP and the October 25, 2019 Red Team Report documented, there were several problems with the program as put in place that need to be addressed. For some MPP enrollees, inadequate access to stable food and housing and a range of safety concerns undercut the effectiveness of the program. To re-establish a program using the Secretary's return authority responsibly, the Department would need to address these concerns.

20. A responsible program implementing section 1225(b)(2)(C) would also require the Department to create electronic or other systems to better track and communicate with

---

[6] *See* Press Conference with Legal Counsel Alejandro Alday on the Bilateral Relationship with the United States, Dec. 20, 2018, available at https://www.gob.mx/sre/prensa/press-conference-with-legal-counsel-alejandro-alday-on-the-bilateral-relationship-with-the-dunited-states (last visited Aug. 16, 2021).

individuals enrolled in that program. The Department also would need to dedicate resources, build infrastructure, and establish protocols to better ensure access to counsel and legal orientation. As mentioned above, reestablishing MPP would require a combination of diplomatic engagement and financial investment to ameliorate problems identified previously, including the lack of adequate or available housing, food, and safety for some MPP enrollees in Mexico. A forced restart in just seven days would exacerbate the problems that had been identified.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief. Executed on this 16th day of August, 2021

*David Shahoulian*
David Shahoulian
Assistant Secretary for Border and Immigration Policy
Department of Homeland Security