U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG 19 2021

CLERK, U.S. DISTRICT COURT
By_____
Deputy

# United States Court of Appeals
# for the Fifth Circuit

_____

No. 21-10806

_____

United States Court of Appeals
Fifth Circuit
**FILED**
August 19, 2021
Lyle W. Cayce
Clerk

STATE OF TEXAS; STATE OF MISSOURI,

*Plaintiffs—Appellees,*

*versus*

JOSEPH R. BIDEN, JR., IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES OF AMERICA; UNITED
STATES OF AMERICA; ALEJANDRO MAYORKAS, SECRETARY,
U.S. DEPARTMENT OF HOMELAND SECURITY; UNITED STATES
DEPARTMENT OF HOMELAND SECURITY; TROY MILLER,
ACTING COMMISSIONER, U.S. CUSTOMS AND BORDER
PROTECTION; UNITED STATES CUSTOMS AND BORDER
PROTECTION; TAE D. JOHNSON, ACTING DIRECTOR, U.S.
IMMIGRATION AND CUSTOMS ENFORCEMENT; UNITED STATES
IMMIGRATION AND CUSTOMS ENFORCEMENT; TRACY RENAUD,
IN HER OFFICIAL CAPACITY AS ACTING DIRECTOR OF THE
UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES;
UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,

*Defendants—Appellants.*

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 2:21-cv-67

_____

No. 21-10806

Before ELROD, OLDHAM, and WILSON, *Circuit Judges*.

PER CURIAM:

This case concerns the Migrant Protection Protocols ("MPP") created by the Secretary of the Department of Homeland Security on December 20, 2018, and purportedly rescinded by DHS in a memorandum on June 1, 2021 ("June 1 Memorandum").[1] After a full bench trial and 53 pages of findings of fact and conclusions of law, the district court concluded that DHS's purported rescission of MPP violated, *inter alia*, the Administrative Procedure Act ("APA"). DHS seeks a stay pending appeal. After carefully considering full briefing from the parties, we hold DHS failed to satisfy the four stay factors. *See Nken v. Holder*, 556 U.S. 418 (2009). The motion is denied.

I.

A.

On December 20, 2018, the Trump Administration implemented MPP in response to an immigration surge at the southern border. D. Ct. Op. at 7. The statutory authority for MPP is found in 8 U.S.C. § 1225(b)(2)(C), which authorizes the Government to return certain third-country nationals arriving in the United States to Mexico or Canada for the duration of their removal proceedings under 8 U.S.C. § 1229a. *Id.* at 8. Also on December 20, 2018, the United States obtained Mexico's agreement to permit entry of MPP enrollees. *Id.* The goal of MPP was to ensure that "[c]ertain aliens attempting to enter the U.S. illegally or without documentation . . . will no longer be released into the country, where they often fail to file an asylum

---

[1] We refer to the Secretary's actions as those of "DHS" unless otherwise stated.

application and/or disappear before an immigration judge can determine the merits of any claim." *Id.* (quotation omitted).

In January 2019, "DHS began implementing MPP, initially in San Diego, California, then El Paso, Texas, and Calexico, California, and then nationwide." *Id.* (citing AR.155–56, AR.684). In February 2019, U.S. Immigration and Customs Enforcement issued guidance on MPP to its field offices, anticipating the expansion of MPP across the border. *Id.* at 9 (citing AR.165–70). By December 31, 2020, DHS had enrolled 68,039 aliens in MPP. *Id.* at 12 (citing AR.555).

DHS and Texas entered into a Memorandum of Understanding (the "Agreement"), which the parties finalized on January 8, 2021. *Id.* at 13 (citing Compl., Ex. B at 8). The Agreement required Texas to provide information and assist DHS to "perform its border security, legal immigration, immigration enforcement, and national security missions." *Id.* (quoting Compl., Ex. B at 2). In return, DHS agreed to consult Texas and consider its views before taking actions that could modify immigration enforcement. *See id.* at 13–14 (citing Compl., Ex. B at 2). DHS also agreed to "'[p]rovide Texas with 180 days' written notice . . . of any proposed action' subject to the consultation requirement," *id.* at 14 (quoting Compl., Ex. B at 3), so that Texas would have an opportunity to comment on the proposal. The Agreement further required DHS to consider Texas's input "in good faith" and, if it decided to reject Texas's input, "provide a detailed written explanation" of its reasons for doing so. *Id.* (emphasis omitted) (quoting Compl., Ex. B at 3).

On Inauguration Day, the Biden Administration announced that it would suspend further enrollments in MPP. The Acting Secretary of DHS wrote that "[e]ffective January 21, 2021, the Department will suspend new enrollments in the Migrant Protection Protocols (MPP), pending further

No. 21-10806

review of the program. Aliens who are not already enrolled in MPP should be processed under other existing legal authorities." *Id.* at 15 (quoting AR.581).

On February 2, 2021, DHS sent a letter to Texas purporting to terminate the Agreement "effective immediately." *Id.* at 14. Because it believed that the letter did not comply with the Agreement's required procedures, Texas interpreted the letter "as a notice of intent to terminate" the Agreement. *Id.* (citing ECF No. 53 at 21).

On April 13, 2021, Texas and Missouri (the "States") sued, challenging the temporary suspension of MPP. *Id.* at 1 (citing ECF No. 1). The States alleged that DHS's January 20 Memorandum violated the APA, the Immigration and Nationality Act ("INA"), the Constitution, and the Agreement. *See id.* at 2 (citing ECF No. 1 at 4; ECF No. 45). On May 14, the States moved for a preliminary injunction that would enjoin the Government from enforcing and implementing the January 20 Memorandum. Prelim. Inj. Mot., ECF No. 30.

On June 1, before briefing on the preliminary injunction had concluded, DHS issued a new memorandum permanently terminating MPP. D. Ct. Op. at 2. The district court concluded that the June 1 Memorandum mooted the States' complaint, and the court allowed the States to amend their complaint and file a new preliminary injunction motion. *Id.* The parties agreed to consolidate the preliminary injunction hearing with the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). *Id.* at 3.

B.

Following the bench trial, the district court issued a 53-page memorandum opinion and order, concluding that the States were entitled to relief on their APA and statutory claims. *See* D. Ct. Op. at 1. The district court made many findings of fact that are relevant here. Among other things, the district court found that MPP had significant benefits before DHS

No. 21-10806

purported to rescind it. For example, DHS's October 2019 Assessment of MPP concluded that "aliens without meritorious claims—which no longer constitute[d] a free ticket into the United States—[were] beginning to voluntarily return home." D. Ct. Op. at 10. And the court noted that DHS also found MPP effective in addressing the prior "perverse incentives" created by allowing "those with non-meritorious claims . . . [to] remain in the country for lengthy periods of time." *Id.* The court found that this caused a significant decrease in immigration-enforcement encounters along the southern border. *Id.* And more directly, the court found that caused a decrease in "the number of aliens released into the interior of the United States for the duration of their U.S. removal proceedings." *Id.* at 11 (citing AR.554). These benefits, DHS emphasized, were a "cornerstone" of the agency's prior immigration policy. D. Ct. Op. at 12.

The court made specific (and largely uncontested) factual findings that "[t]he termination of MPP has [increased] and will continue to increase the number of aliens being released into the United States," and that this increase "has [imposed] and will continue to impose harms on Plaintiff States Texas and Missouri." *Id.* at 17. On the basis of its factual findings, the district court determined that the States had Article III standing, that the court had jurisdiction to review the agency action, and that the States were within the zone of interests of the INA. *Id.* at 21–34. The court then concluded that DHS's termination of MPP was unlawful under the APA because the action was arbitrary and capricious and contrary to the INA. *Id.* at 34–44. Based on those conclusions, the district court "permanently enjoined and restrained [DHS] from implementing or enforcing the June 1 Memorandum" and ordered DHS "to enforce and implement MPP in good faith until such a time as it has been lawfully rescinded in compliance with the APA and until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section 1255 without

No. 21-10806

releasing any aliens because of a lack of detention resources." *Id.* at 52–53 (emphases omitted).

DHS noticed an appeal. On August 17, 2021, the Government requested an emergency stay under Federal Rule of Appellate Procedure 8. The States opposed that request on August 18. On August 19, the Government filed a reply. The Government requested that we rule the same day, August 19. In considering the Government's request, we must consider four factors: (1) whether the Government makes a strong showing that it is likely to succeed on the merits; (2) whether the Government will be irreparably injured in the absence of a stay; (3) whether other interested parties will be irreparably injured by a stay; and (4) where the public interest lies. *See Nken*, 556 U.S. at 426.

II.

We begin with whether the Government has made a strong showing that it is likely to succeed on the merits. The Government makes two merits arguments: (A) the case is not justiciable, and (B) DHS's rescission of MPP did not violate federal law. The Government is likely wrong on both.

A.

The Government first argues that it is likely to succeed on the merits because two justiciability doctrines—standing and non-reviewability—operate as insuperable obstacles to the States' suit. We consider and reject each argument in turn.

1.

First, the States' standing. To establish standing, the States "must show an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015) (quoting *Clapper v.*

No. 21-10806

*Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). "Only one of the [appellants] needs to have standing to permit us to consider the [complaint]."[2] *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *accord Nat'l Rifle Ass'n Am., Inc. v. McCraw*, 719 F.3d 338, 344 n.3 (5th Cir. 2013). Because the Government is seeking a stay, we must ask whether it has made a strong showing that the States lack standing. *See Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020).

After a bench trial, we review the district court's factual determinations for clear error. *See, e.g., Texas*, 809 F.3d at 171–72 (reviewing a factual finding for clear error); *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 367 (5th Cir. 2020) ("Because this case was tried, Plaintiffs needed to prove standing by a preponderance of the evidence. A factual finding that a plaintiff met that burden is reviewed for clear error." (citation omitted)). And any argument not raised on appeal (including a challenge to a district court's factual finding) is forfeited. *See, e.g., United States v. Edwards*, 303 F.3d 606, 647 (5th Cir. 2002) ("Many of the 'errors' cited by the defendants are unbriefed. These issues have been [forfeited]."); *cf.* Fed. R. App. P. 28(a)(9)(A) ("The appellant's brief must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.").

We begin with (a) the district court's uncontested factual findings. Then we hold that the Government fails to make a strong showing that it is likely to succeed on appeal because it has not shown that the States lack (b) an injury-in-fact that is (c) traceable and (d) redressable. Finally, any doubt

---

[2] For this reason, we focus on Texas's standing. We note, however, that Missouri brings largely similar arguments with respect to driver's-license, educational, healthcare, and other costs.

No. 21-10806

about the States' standing is resolved by (e) the special solicitude guaranteed to sovereign States in our federal system.

a.

The district court found eight facts central to the standing issue. These include:

1. The court found that because of MPP's termination, the Government has been "forced to release and parole aliens into the United States because [the Government] simply [does] not have the resources to detain aliens as mandated by statute." D. Ct. Op. at 17; *see also id.* at 18 (finding that Texas's "border state" status means some of those aliens have ended up in Texas).

2. The court found that DHS previously acknowledged that "MPP implementation contributed to decreasing the volume of inadmissible aliens arriving in the United States on land from Mexico." *Id.* at 17 (quotation and alteration omitted).

3. The court found that "the termination of MPP has contributed to the current border surge." *Id.*

4. The court found that "[s]ince MPP's termination, the number of enforcement encounters on the southwest border has skyrocketed." *Id.*; *see also id.* at 18 n.7 (noting "the sworn statement of David Shahoulian, Assistant Secretary for Border and Immigration Policy at DHS," including Shahoulian's statement that "[b]ased on current trends, the Department expects that total encounters this fiscal year are likely to be the highest ever recorded" (emphasis omitted)).

5. The court found that many "aliens present in Texas because of MPP's termination would apply for driver's licenses," the granting of which would impose a cost on Texas. *Id.* at 19.

No. 21-10806

6. The court found that "[s]ome school-age child aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States," and that (according to state estimates) Texas will expend an average of $9,216 per additional student in the 2021 school year. *Id.* at 19.

7. The court found that "[s]ome aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States and will use state-funded healthcare services or benefits in Texas," imposing a cost on the state. D. Ct. Op. at 19–20 (citing AR.555, AR.587–88).

8. Finally, the court found that "[s]ome aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States and [some] will commit crimes in Texas," imposing costs on the state's correctional apparatus. *Id.* at 20.

The Government does not challenge *any* of these findings.[3] But even if it did, we would not find any of them clearly erroneous in the light of the record as a whole. *See, e.g., United States v. Ismoila*, 100 F.3d 380, 396 (5th Cir. 1996) ("[A]s long as the determination is plausible in light of the record as a whole, clear error does not exist.").

b.

Texas's injuries are actual and imminent. As just described, MPP's termination has caused an increase in immigration into Texas. And as

---

[3] On one reading of the Government's brief, it does contest the fifth finding. *See* Stay Mot. at 7 (discussing "speculation about an increase in the number of aliens released and paroled who will seek driver's licenses" (quotation omitted)). But in any case, neither our precedent nor the district court's record allows us to conclude the Government is likely to show the finding is clearly erroneous. *See Texas*, 809 F.3d at 156 (making a similar inference about driver's license applications).

No. 21-10806

discussed at length in *Texas v. United States*, Texas law requires the issuance of a license to any qualified person—including noncitizens who "present . . . documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States." 809 F.3d at 155–56 (alteration in original) (quoting TEX. TRANSP. CODE § 521.142(a)); *see also id.* (discussing other Texas requirements for a driver's license). Of course, unlike in the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program, the challenged action here does not *ipso facto* guarantee that a given alien will satisfy that requirement. Yet the district court's uncontested findings of fact likely compel the conclusion that MPP's termination has led to an increase in the number of aliens in Texas, many of whom will apply for driver's licenses. And the district court found that Texas incurs a cost every time it *inquires* into whether an alien satisfies the requirements for a license—even if the person does not in fact qualify for a license. D. Ct. Op. at 19 ("Each additional customer seeking a Texas driver's license imposes a cost on Texas."); *see also* Decl. of Sheri Gipson, Chief of the Texas Department of Public Safety Driver License Division, ¶ 8 ("DPS estimates that for an additional 10,000 driver['s] license customers *seeking* a limited term license, DPS would incur a biennial cost of approximately $2,014,870.80." (emphasis added)). So Texas has shown imminent injury in this case. *See Texas*, 809 F.3d at 156 (reaching the same conclusion on similar facts). Driver's licenses aside, the district court's unchallenged factual findings regarding educational, healthcare, and correctional costs provide equally strong bases for finding cognizable, imminent injury.

The Government's counterargument (limited to the driver's-license theory) is that the district court's analysis was "primarily based on speculation about an increase in the number of aliens released and paroled who will seek driver's licenses." Stay Mot. at 7 (quotation omitted). But the

No. 21-10806

Government has done nothing to show that district court's findings of fact about the increased number of aliens were clearly erroneous. And it is grounded in our precedent. *Texas*, 809 F.3d at 156 ("[T]here is little doubt that many [DAPA beneficiaries] would [apply for driver's licenses] because driving is a practical necessity in most of the state.").

### c.

Texas's injury is also traceable to the Government's termination of MPP. The district court's uncontested factual findings establish as much: MPP's termination has caused an increase in unlawful immigration into Texas. Many new immigrants are certain to apply for driver's licenses—and evaluating each application will impose costs on Texas. *Cf. Texas*, 809 F.3d at 160 (noting that new immigrants—in that case, DAPA recipients—"have strong incentives to obtain driver's licenses, and it is hardly speculative that many would do so if they became eligible."). Likewise, at least some MPP-caused immigrants will certainly seek educational and healthcare services from the state. And the States have incurred and will continue to incur costs associated with the border crisis, at least part of which the district court found is traceable to rescinding MPP. The causal chain is easy to see, and the Government does not meaningfully contest this point. *See also Massachusetts v. EPA*, 549 U.S. at 523 (finding traceability where the EPA's challenged action may have caused people to drive less fuel-efficient cars, which may in turn contribute to a prospective rise in sea levels, which may in turn cause the erosion of Massachusetts's shoreline).

### d.

An injunction would remedy Texas's injury by requiring reinstatement of MPP. And with MPP back in place, immigration officers would once again have discretion to return (some) aliens to Mexico. The Government gives two arguments that it says undercut redressability. First,

No. 21-10806

the Government contends, an injunction would provide no redress because immigration officers under MPP would have discretion about whether to return any given immigrant to Mexico. Stay Mot. at 8. This argument ignores the fact that, during MPP's operative period, immigration agents did in fact order over 50,000 aliens back to Mexico from the Texas border. ECF 11 at 2. The Government offers no basis to conclude that a renewed MPP would have any different impact.

Second, the Government argues there is no redressability because aliens cannot be returned to Mexico without Mexico's consent. Stay Mot. at 8. This argument fails because for at least some aliens, MPP would permit DHS to simply refuse admission at ports of entry in the first place. *See* 8 U.S.C. § 1225(b)(2)(C) (allowing the Attorney General to "return [an] alien" "who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States . . . to that territory pending a" removal proceeding). Further, Mexico issued a statement in 2018 consenting to admit aliens excluded from the United States under MPP— and nothing in the record suggests Mexico has since retracted that consent. *See* AR.153 (Secretaría do Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018)).

e.

To eliminate any doubt as to standing, we emphasize that the States are entitled to "special solicitude" in the standing analysis. *Massachusetts v. EPA*, 549 U.S. at 520; *see also Texas*, 809 F.3d at 151 (beginning with the special-solicitude question). Such special solicitude has two requirements: (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests. *Texas*, 809 F.3d at 151–52 (citing *Massachusetts*, 549 U.S. at 516–

12

20). In both *Massachusetts* and *Texas*, the first prong was satisfied where a State challenged an agency action as invalid under a statute. 549 U.S. at 516–17 (Clean Air Act); 809 F.3d at 152–53 (APA). And in both cases, the second prong was satisfied where a State's challenge involved an agency's alleged failure to protect certain formerly "sovereign prerogatives [that] are now lodged in the Federal Government." *Massachusetts*, 549 U.S. at 520; *see Texas*, 809 F.3d at 152–54. Particularly relevant here is *Texas*, where this Court held that DAPA, by authorizing the presence of many previously unlawful aliens in the United States, affected "quasi-sovereign interests by imposing substantial pressure on them to change their laws, which provide for issuing driver's licenses to some aliens and subsidizing those licenses." 809 F.3d at 153 (quotation omitted).

Texas is indeed entitled to special solicitude. First, just as in the DAPA suit, Texas is asserting a procedural right under the APA to challenge an agency action. *See id.* at 152 ("In enacting the APA, Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, and the states fall well within that definition." (quoting 5 U.S.C. § 702)). And second, Texas asserts precisely the same driver's-license-based injury here that it did there. *See id.* at 153–54 (explaining that DAPA, by greatly increasing the class of people to whom existing Texas law would entitle a subsidized driver's license, pressured Texas to change its own law—thus affecting a quasi-sovereign interest). Thus, Texas is entitled to special solicitude in the standing inquiry.

That solicitude means redressability is easier to establish for certain state litigants than for other litigants—and this should remove any lingering doubt as to that prong. *See Massachusetts*, 549 U.S. at 517–18 (holding a State "can assert [its] right[s] without meeting all the normal standards for redressability and immediacy" (quotations and citations omitted)). Texas would be able to establish redressability without this special solicitude—but

No. 21-10806

it reinforces our conclusion that the States have standing and that the Government has failed to make a strong showing to the contrary.

2.

The Government next argues this suit is non-justiciable under the APA. The Government makes three arguments on this score. None is persuasive.

a.

First, the Government argues that its termination of MPP is not a "final agency action" under the APA. The APA allows judicial review for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. And for an agency action to qualify as final, the action must (1) mark[] the consummation of the agency's decisionmaking process," and (2) either determine "rights or obligations" or produce "legal consequences." *Texas v. EEOC*, 933 F.3d 433, 441 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

The Government does not contest that the June 1 Memorandum was the consummation of the decisionmaking process. As for the second prong, the Government simply asserts the Memorandum is a general policy statement—and therefore can neither determine rights nor produce obligations or legal consequences. Stay Mot. at 10–11. This argument ignores Circuit precedent establishing that a "policy statement" can nonetheless be "final agency action" under the APA. *See Merchs. Fast Motor Lines, Inc. v. ICC*, 5 F.3d 911, 919–20 (5th Cir. 1993). It also ignores the principle that "where agency action withdraws an entity's previously-held discretion, that action alters the legal regime, binds the entity, and thus qualifies as final agency action" under the APA. *EEOC*, 933 F.3d at 442 (quotation omitted). As the district court ably explained, the Memorandum withdrew DHS officers' previously existing discretion when it directed "DHS personnel,

14

No. 21-10806

effective immediately, to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives issued to carry out MPP." D. Ct. Op. at 27 (emphasis omitted) (quoting AR.7).

b.

Second, the Government argues that the decision to terminate MPP is unreviewable under 5 U.S.C. § 701(a). Stay Mot. at 8. The APA creates a "basic presumption of judicial review." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quotation omitted). And to vindicate that presumption, the Supreme Court has read § 701(a)(2) "quite narrowly." *Id.* (quotation omitted). The presumption can be overcome "by a showing that the relevant statute precludes review, § 701(a)(1), or that the agency action is committed to agency discretion by law, § 701(a)(2)." *Id.* (quotations and alterations omitted). Here, the Government has tried but failed to make both showings.

The Government argues that 8 U.S.C. § 1225(b)(2)(C) is a "statute[] [that] preclude[s] judicial review." 5 U.S.C. § 701(a)(1). Section 1225(b)(2)(C) provides:

> In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

That provision does confer the discretion to choose among various detention and non-detention options for aliens placed in § 1229a removal proceedings. But the question presented in the States' complaint is *not* whether a particular alien is subject to detention in any particular set of circumstances. The States are instead challenging DHS's June 1 decision to rescind MPP—

which is a government program that creates rules and procedures for *entire classes* of aliens. It remains true—with or without MPP—that DHS has discretion to make individualized detention and non-detention decisions in accordance with the strictures of § 1225. What DHS cannot do, the States allege, is rescind the MPP program in a way that is arbitrary, capricious, and contrary to law. DHS cites nothing to suggest that latter decision is committed to agency discretion. In fact, cases like *Regents* prove it is not. *See* 140 S. Ct. at 1905–06 (decision to rescind DACA not committed to agency discretion); *Texas*, 809 F.3d at 168–69 (decision to implement DAPA not committed to agency discretion).

The Government's argument that the decision to rescind MPP is "committed to agency discretion by law" fails for similar reasons. 5 U.S.C. § 701(a)(2); *see Regents*, 140 S. Ct. at 1905. This form of non-reviewability occurs where a statute is "drawn so that it furnishes no meaningful standard by which to judge the [agency's] action." *Dep't of Commerce v. New York*, 139 S. Ct. 2251, 2568 (2019); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (holding a decision is committed to agency discretion when there is "no law to apply" (quotation omitted)). The Government argues that § 1225 provides no standard by which to evaluate DHS's action in this case. Stay Mot. at 8–9.

Once again, Supreme Court precedent undercuts the Government's argument. Even a statute that "leave[s] much to [an agency's] discretion" does not necessarily "leave [that] discretion unbounded." *Dep't of Commerce*, 139 S. Ct. at 2567–68 (holding a statute granting the Secretary of Commerce broad discretion to take the census "in such form and content as he may determine" did not commit the decision to reinstate a citizenship question to the Secretary's discretion (quotation omitted)). So too here. Section 1225(b)(2)(C) certainly confers discretion, but there is no reason to think that discretion is infinite—just as there is no reason to think the

discretion extends beyond the bounds of individualized, case-by-case determinations to begin with. And like the statute in *Department of Commerce*, which included provisions that meaningfully restrained the Secretary of Commerce, *see* 139 S. Ct. at 2568–69, § 1225 includes provisions restraining the DHS in this case. *See* § 1225(b)(1)(B)(iii)(IV) (an alien subject to expedited removal, but without a credible fear of persecution, "shall be detained pending a final determination of credible fear of persecution"); § 1225(b)(1)(B)(ii) (an alien with a credible fear of persecution "shall be detained for further consideration of the application for asylum"); § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."); § 1225(b)(2)(C) (Attorney General "may return" an alien not subject to expedited removal as an alternative to detention). We conclude that this is not a "case in which there is no law to apply." *Dep't of Commerce*, 139 S. Ct. at 2569 (quotation omitted).

c.

The Government's final justiciability argument is that the MPP-termination decision is nothing more than a non-enforcement decision, unreviewable under *Heckler v. Chaney*, 470 U.S. 821 (1985). This argument fails for two reasons. The first is that the termination of MPP is more than a non-enforcement policy, just like the DACA program at issue in *Regents* and the DAPA program at issue in *Texas*. As the district court explained, the termination of MPP will necessarily lead to the release and parole of aliens into the United States. And that will "create affirmative benefits for aliens such as work authorization." D. Ct. Op. at 31; *see also Texas*, 809 F.3d at 167 ("Likewise, to be reviewable agency action, DAPA need not directly confer public benefits—removing a categorical bar on receipt of those benefits and

No. 21-10806

thereby making a class of persons newly eligible for them 'provides a focus for judicial review.'" (quoting *Chaney*, 470 U.S. at 832)).

Second and independently, the termination of MPP was simply not a non-enforcement decision. MPP was a government program—replete with rules procedures and dedicated infrastructure. It is precisely because MPP was a government program—and *much more* than a non-enforcement decision—that the Government now claims that it will be difficult to resume it. *See infra* Part III. And the Government cites nothing to suggest that the elimination of a such a program can be dismissed as mere "non-enforcement." The Government therefore has failed to make a strong showing that the States' claims are non-justiciable.

### B.

The Government next argues that it is likely to succeed on appeal because the June 1 Memorandum accords with federal law. The district court held otherwise on two independent grounds. First, the district court determined that the termination of MPP violated the APA because the June 1 Memorandum was arbitrary and capricious. D. Ct. Op. at 34–42. Second, the district court concluded that in "these particular circumstances," the termination violated 8 U.S.C. § 1225. *Id.* at 42–44 (emphasis removed). We hold the Government has not come close to showing that it is likely to succeed in challenging either conclusion, let alone both.

### 1.

First, the APA. The APA directs courts to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). While applying this "deferential" standard, we must not

"substitute" our "own policy judgment for that of the agency." *Id.* But we must ensure that "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.*; *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'" (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962))). "Put simply, we must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). This review "is not toothless." *Sw. Elec. Power Co. v. United States Env't Prot. Agency*, 920 F.3d 999, 1013 (5th Cir. 2019). And in all events, we can consider only the reasoning "articulated by the agency itself"; we cannot consider *post hoc* rationalizations. *State Farm*, 463 U.S. at 50; *see also Regents*, 140 S. Ct. at 1909 ("An agency must defend its actions based on the reasons it gave when it acted.").

The Government has not shown a strong chance of success on appeal. That is because when terminating MPP in the June 1 Memorandum, the Secretary failed to consider several "relevant factors" and "'important aspect[s] of the problem.'" *Michigan v. E.P.A.*, 576 U.S. 743, 750, 752 (2015) (quotations omitted); *see also Regents*, 140 S. Ct. at 1910. These include (a) the States' legitimate reliance interests, (b) MPP's benefits, (c) potential alternatives to MPP, and (d) § 1225's implications. These four omissions likely doom the Government's appeal. The Governments counterarguments (e) are unpersuasive.

No. 21-10806

a.

DHS "failed to address whether there was 'legitimate reliance' on" MPP. *Regents*, 140 S. Ct. at 1913 (quoting *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996)). In its seven-page June 1 Memorandum, DHS does not directly mention any reliance interests, especially those of the States. The closest the June 1 Memorandum gets is a reference to "the impact [terminating MPP] could have on border management and border communities." AR5. But the Memorandum makes clear that "border communities" do not include border states. *See id.* ("referring only to "nongovernmental organizations and local officials"). And the vague reference to "border management" is insufficient to show specific, meaningful consideration of the States' reliance interests.

In response, the Government concedes that it failed to consider the States' reliance interests. But it argues that is irrelevant because "the States have no cognizable reliance interest in a *discretionary* program." Stay Mot. at 18. We reject that argument for several reasons.

Most importantly, the Government's contention is squarely foreclosed by *Regents*. There, the Supreme Court acknowledged that the Deferred Action for Childhood Arrivals ("DACA") program was a discretionary program. 140 S. Ct. at 1910. Still, the Court faulted DHS for not considering reliance interests, including in particular those of the states. As the Supreme Court explained, "[w]hen an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* at 1913 (quotation omitted). Those reliance interests included states' interests. *See id.* at 1914 (highlighting assertions that "[s]tates and local governments could lose $1.25 billion in tax revenue each year"). So if the termination of DACA—a discretionary, immigration program—must consider states' "potential

20

reliance interests," then so does termination of MPP. *Id.* at 1913. That is particularly true here because the district court found as a matter of fact—and the Government does not contest—that states like Texas face fiscal harm from the termination of MPP. *See* D. Ct. Op. at 18–20.

The district court also found that the "termination of MPP has and will continue to increase the number of aliens being released into the United States." *Id.* at 17. The Supreme Court has recognized that border states "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). It therefore follows that a "potential reliance interest" that DHS must consider includes Texas.

The DHS-Texas Agreement reinforces the Government's awareness of the State's reliance interests. In that Agreement, DHS stipulated:

- "Texas, like other States, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement." Compl., Ex. B at 1.

- "The harm to Texas is particularly acute where its budget has been set months or years in advance and it has no time to adjust its budget to respond to DHS policy changes." *Id.*

- "[A]n aggrieved party will be irreparably damaged." *Id.* at 5.

The Agreement further states that it "establishes a binding and enforceable commitment between DHS and Texas." *Id.* at 2. Texas therefore could reasonably rely on the Agreement. And Texas did in fact rely on the Agreement by including DHS's breach as a cause of action in its complaint—filed months before the June 1 Memorandum. And then—despite these reliance interests and despite being on notice of the Agreement from the States' complaint—the June 1 Memorandum said not one word about the Agreement. A "reasonable and reasonably explained" decision would have

No. 21-10806

said *something. Prometheus*, 141 S. Ct. at 1158. That is why this "omission alone [likely] renders [the Secretary's] decision arbitrary and capricious." *Regents*, 140 S. Ct. at 1913.[4]

b.

The June 1 Memorandum also failed to consider DHS's prior factual findings on MPP's benefits. In its October 2019 Assessment of MPP, DHS found that "aliens without meritorious claims—which no longer constitute[d] a free ticket into the United States—[were] beginning to voluntarily return home." D. Ct. Op. at 10. DHS also found that MPP addressed the "perverse incentives" created by allowing "those with non-meritorious claims . . . [to] remain in the country for lengthy periods of time." *Id.* These benefits, DHS emphasized, were a "core component" or "cornerstone" of the agency's prior immigration policy. *Id.* at 12.

Nonetheless, the June 1 Memorandum did not expressly mention, let alone meaningfully discuss, DHS's prior factual findings. Instead, the Secretary changed policies based on his own findings that contradict DHS's October 2019 findings. But an agency must provide "a more detailed justification" when a "new policy rests upon factual findings that contradict those which underlay its prior policy." *FCC v. Fox Television Stations, Inc.*,

---

[4] As the D.C. Circuit has emphasized in a different APA context, "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) (Sentelle, C.J.) (quotation omitted). We do not suggest that DHS needed notice-and-comment rulemaking to rescind MPP. But it did need to consider "relevant factors" to that rescission decision. *Id.* And you might reasonably think that one "relevant factor[]" to that decision was DHS's pledge "to consult Texas and consider its views before taking any action, adopting or modify[ing] a policy or procedure, or making any decision that" affects MPP. Compl., Ex. B at 2. Perhaps DHS has a good reason for its action. But it is likely arbitrary and capricious for DHS not even to acknowledge its agreement—let alone do anything to consult Texas or consider its views.

No. 21-10806

556 U.S. 502, 515 (2009). The Secretary did not provide the required "more detailed justification." *Id.* This further indicates that the termination of MPP was arbitrary and capricious.

c.

The June 1 Memorandum also insufficiently addressed alternatives to terminating MPP. "[W]hen an agency rescinds a prior policy[,] its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *Regents*, 140 S. Ct. at 1913 (quotation omitted). While considering alternatives, DHS "*was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 1915. As explained above, DHS did not adequately assess reliance interests. So it would be impossible for the June 1 Memorandum to properly weigh the relevant interests against competing policy concerns while considering alternatives.

The June 1 Memorandum offers a single conclusory sentence addressing potential modifications to MPP: "I also considered whether the program could be modified in some fashion, but I believe that addressing the deficiencies identified in my review would require a total redesign that would involve significant additional investments in personnel and resources." AR.5. But "belief" that a "total redesign" was required, *id.*, is no substitute for a "reasonable and reasonably explained" decision. *Prometheus*, 141 S. Ct. at 1158.

Of course, "DHS was not required . . . to consider *all* policy alternatives in reaching [its] decision," and the agency has "considerable flexibility" to "wind-down" a program. *Regents*, 140 S. Ct. at 1914 (emphasis added) (quotation omitted). But the problem is that the Secretary failed to mention *any* modification to MPP as a possible alternative, even though "the alternatives . . . are within the ambit of the existing policy." *Id.* at 1913

23

No. 21-10806

(quotations omitted). And merely stating that an alternative was considered is not enough to show reasoned analysis. *Cf. United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) ("We do not defer to the agency's conclusory or unsupported suppositions." (quotation omitted)).

The Government's principal counterargument is that DHS considered an alternative *outside* "the ambit of the existing policy." *Regents*, 140 S. Ct. at 1913. Specifically, the June 1 Memorandum pointed to a "Dedicated Docket" program designed to provide counsel to aliens in removal proceedings. AR.4–5 & n.6; *see* Stay Mot. at 16; Reply at 7. This argument is unpersuasive for at least two reasons. First, by the Government's own admission, the "Dedicated Docket" is outside the ambit of MPP—and hence it does not count as a reasoned consideration of alternatives "*within* the ambit of the existing policy." *Regents*, 140 S. Ct. at 1913 (emphasis added). And second, neither the June 1 Memorandum nor the Government in its stay motion explains why MPP and the "Dedicated Docket" are mutually exclusive.

d.

The June 1 Memorandum also failed to consider the legal implications of terminating the policy. After the Government suspended MPP—but before it rescinded the program—Texas filed this lawsuit. In its original complaint, and in its initial motion for preliminary injunction, Texas argued that the suspension of MPP violated § 1225. *See* Compl. at 36–38; Prelim. Inj. Mot., ECF No. 30. About a month and a half later, the Secretary issued the memorandum terminating MPP. So the government was on notice of the legal implications. Yet in the memorandum, the Secretary does not mention the lawfulness concerns involving § 1225—even though, the "natural response" to this "newly identified problem" would be to consider the problem. *Regents*, 140 S. Ct. at 1916. This further indicates that "the process

No. 21-10806

by which" the Secretary reached that result was neither "logical" nor "rational." *Michigan*, 576 U.S. at 750.

e.

The Government offers a hodgepodge of counterarguments to justify the June 1 Memorandum's omissions. None is persuasive.

The Government repeatedly argues that DHS's statement that it considered this or that factor is enough to avoid any arbitrary-and-capricious problems. *See* Stay Mot. at 16. The law says otherwise. "Stating that a factor was considered . . . is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986); *see also Corrosion Proof Fittings v. E.P.A.*, 947 F.2d 1201, 1226 (5th Cir. 1991) ("The EPA's failure to consider the regulatory alternatives, however, cannot be substantiated by conclusory statements . . . ."); *United Techs.*, 601 F.3d at 562 ("We do not defer to the agency's conclusory or unsupported suppositions." (quotation omitted)); *cf. Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) ("And stating that a factor was considered—or found—is not a substitute for considering or finding it." (quotation omitted)); *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020) ("Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking."). This well-established principle makes sense. After all:

> [A]n agency's "experience and expertise" presumably enable the agency to provide the required explanation, but they do not substitute for the explanation, any more than an expert witness's credentials substitute for the substantive requirements applicable to the expert's testimony under Fed. R. Evid. 702. The requirement of explanation presumes the expertise and experience of the agency and still demands an adequate explanation in the particular matter.

No. 21-10806

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016) (citations omitted).

The Government also points to the June 1 Memorandum's observations on MPP's shortcomings. *See* Stay Mot. at 16–17. Even if creditable, these observations cannot justify the other omissions discussed above. But in any event, many of those observations are neither "logical" nor "rational." *Michigan*, 576 U.S. at 750. Take DHS's termination justification based on *in absentia* removal orders. DHS observed that "the high percentage of cases completed through the entry of *in absentia* removal orders (approximately 44 percent, based on DHS data) *raises questions* for me about the design and operation of the program." AR.4 (emphasis added). The district court found that "[t]he federal government's data shows similarly high rates of *in absentia* removals *prior* to implementation of MPP." D. Ct. Op. at 40. The Government has not said one word to suggest the district court's factual finding was clearly erroneous.[5] We therefore cannot conclude that the Secretary "examine[d] the relevant data and articulate[d] a satisfactory explanation" with "a rational connection between the facts found and the choice" to terminate MPP. *State Farm*, 463 U.S. at 43 (quotation omitted). And even on the Government's own terms— considering *only* half the statistics and ignoring the district court's factual finding—the June 1 Memorandum only said that *in absentia* statistics "raise[d] questions for [DHS] about the design and operation of the

---

[5] In its reply brief, the Government argues that it need not have commissioned an "in-depth empirical analysis" of the *in absentia* statistics before rescinding MPP. Reply at 9. Of course that is true. But it is equally true that the Government cannot cherry-pick only the statistics it likes in the administrative record. Nor can the Government fail to address statistics that already exist in that record. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (holding "an unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice" (quotation omitted)).

program." AR.4. But the process required by the APA requires agencies to *seek answers* and reasonably explain the outcome of that effort, including its conclusions.

The June 1 Memorandum places much weight on COVID-19. According to the Memorandum, the pandemic "compounded" "challenges faced by MPP" when "immigration courts designated to hear MPP cases were closed for public health reasons between March 2020 and April 2021." AR.4. But DHS issued its memorandum terminating MPP at least one month *after* courts reopened. As the district court explained: "*Past* problems with *past* closures are irrelevant to the decision to *prospectively* terminate MPP in June 2021. This is especially true when the Secretary admits DHS had maintained the facilities during the pandemic." D. Ct. Op. at 41. The Government challenges this conclusion on the ground that "infrastructure used for MPP remains shuttered." Stay Mot. at 19 n.4. But the Government provides no indication that the facilities are not maintained or are shuttered because of the pandemic—as opposed to the choice the Government itself made when it suspended MPP in January 2021.

2.

In addition to the APA, the district court also relied on 8 U.S.C. § 1225. The Government claims that the district court determined that "the Secretary is *required* to return any noncitizen he fails to detain" and that the district court's "core legal analysis" is that DHS has "a binary choice between detention or return to Mexico for noncitizens arriving from Mexico." Stay Mot. at 11–13. In essence, the Government characterizes the district court's decision and injunction as removing the Government's ability to use its discretion under 8 U.S.C. §§ 1182(d)(5)(A) and 1226. But as we explain in Part III, *infra*, the Government has mischaracterized the district

No. 21-10806

court's order. This matters because all of the Government's § 1225 arguments hinge on an incorrect premise.

Therefore, we cannot conclude that the Government is likely to succeed on either its APA arguments or its § 1225 arguments—let alone that the Government is likely to succeed on both. The Government therefore has not come close to a "strong showing" that it is likely to succeed on the merits. *Nken*, 556 U.S. at 426.

### III.

The Government also has not shown that it will be irreparably injured absent a stay pending appeal. The Government's arguments are largely built on two strawmen. We consider and reject those before turning to the Government's other arguments.

First, the Government complains that it will be irreparably harmed absent a stay because DHS is incapable of reinstating MPP "in a matter of days." Stay Mot. at 21; *see also* Decl. of David Shahoulian ¶ 16 (Aug. 16, 2021) (arguing DHS cannot immediately "reestablish the entire infrastructure upon which [MPP] was built"). This is a strawman. The district court did not order the Government to restore MPP's infrastructure overnight. It ordered that, once the injunction takes effect on August 21, DHS must "enforce and implement MPP *in good faith*." D. Ct. Op. at 52. DHS does not argue that good faith is an unreasonably high standard to meet.

Second, the Government asserts it will be irreparably injured because the injunction obligates DHS to detain "every single person described in 8 U.S.C. § 1225," which DHS cannot do because it lacks "sufficient detention capacity." Decl. of David Shahoulian ¶ 5 (Aug. 16, 2021). This is a second strawman. The injunction does not require the Government to detain every alien subject to § 1225. Nor does it order the Government to "build or obtain" additional detention facilities. Stay Mot. at 21. Instead, it requires

No. 21-10806

the Government to "enforce and implement MPP *in good faith . . . until such a time* as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention." D. Ct. Op. at 52 (second emphasis added).

And far from ordering the Government to detain "every single person described in 8 U.S.C. § 1225," Decl. of David Shahoulian ¶ 5 (Aug. 16, 2021), the district court specifically acknowledged that the Government has other options. Under § 1225(b)(2)(A), which provides the statutory authority for MPP, an alien arriving on land from a contiguous foreign territory can be returned to that territory. *See* D. Ct. Op. at 43 & n.11 (noting this discretion). Under 8 U.S.C. § 1182(d)(5)(A), DHS can parole an alien into the United States "on a *case-by-case basis* for urgent humanitarian reasons or significant public benefit." (Emphasis added); *see* D. Ct. Op. at 43 & n.11 (noting this discretion). Under 8 U.S.C. § 1226, DHS can release on "bond" or "conditional parole" an alien arrested on a warrant and detained "pending a decision on whether the alien is to be removed." *See also* Stay Mot. at 12; D. Ct. Op. at 51 (noting this discretion). Last but not least, of course, the Government can choose to detain an alien in accordance with § 1225. *See* D. Ct. Op. at 43 (noting this discretion).

What the Government cannot do, the district court held, is simply release every alien described in § 1225 *en masse* into the United States. The Government has not pointed to a single word anywhere in the INA that suggests it can do that. And the Government cannot claim an irreparable injury from being enjoined against an action that it has no statutory authorization to take.

Third and finally, we turn to the Government's non-strawmen arguments for its irreparable injuries. Most of these are self-inflicted and therefore do not count. *See* 11A CHARLES ALAN WRIGHT, ET AL.,

29

FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2021) ("[A] party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted"). For example, the Government notes that "DHS has been in the process of unwinding MPP and its infrastructure for months," such that restarting the program now would be difficult. Stay Mot. at 21. But as the district court noted, "Texas filed suit challenging the suspension of enrollments in MPP ... nearly two months *before* DHS purported to terminate the program entirely in the June 1 Memorandum." D. Ct. Op. at 47. Therefore, DHS could have avoided this problem by waiting to unwind MPP until this litigation was resolved. The self-inflicted nature of the government's asserted harm "'severely undermines' its claim for equitable relief." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (quoting *Hirschfeld v. Bd. of Elections in City of N.Y.*, 984 F.2d 35, 39 (2d Cir. 1993)); *accord Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) ("[S]elf-inflicted wounds are not irreparable injury."); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) ("If the harm complained of is self-inflicted, it does not qualify as irreparable.").

Before the district court, the Government also suggested that it began unwinding MPP four or more months *before* the June 1 Memorandum. *See* D. Ct. Op. at 48. That understandably would make it harder for DHS to restart MPP on Saturday. But it also makes DHS's legal position dramatically weaker. It is a fundamental precept of administrative law that an administrative agency cannot make its decision first and explain it later. *See, e.g.*, *Regents*, 140 S. Ct. at 1908-10. Insofar as DHS concedes that its June 1 Memorandum is a *post hoc* rationalization for a decision that it made many months earlier, it has conceded that the June 1 Memorandum is arbitrary, capricious, and not a good faith explanation for its decision. Such inequitable conduct is "sufficient to deny" DHS's request for an equitable stay pending

No. 21-10806

appeal. *See In re GGW Brands, LLC*, No. 2:13-bk-15130, 2013 WL 6906375, at *26–*27 (Bankr. C.D. Cal. Nov. 15, 2013).

The Government also asserts that reinstating MPP will cause harm because "DHS cannot restart MPP without significant cooperation with Mexico," and the injunction implicates "delicate and ongoing discussions with Mexico." Stay Mot. at 21. There are at least four problems with that. First, as the district court noted, DHS created MPP unilaterally and without any previous agreement with Mexico. *See* D. Ct. Op. at 49 & n.15. DHS does not explain why it cannot likewise restart MPP unilaterally. Second, the Government does not point to any evidence that Mexico has withdrawn its support for MPP. *See* AR.152–53 (Mexico's December 20, 2018 statement of support). Third, the Government "'could have avoided' any disruptions by simply informing Mexico that termination of MPP would be subject to judicial review." D. Ct. Op. at 47 (quoting *Texas*, 809 F.3d at 187). Insofar as the Government failed to do that, again, its injury is self-inflicted. Fourth, even assuming Mexico's support is required, assuming Mexico has withdrawn its support, and assuming Mexico will not support a new MPP, the injunction *still* does not irreparably harm the Government. The injunction only requires good faith on the part of the United States—if the Government's good-faith efforts to implement MPP are thwarted by Mexico, it nonetheless will be in compliance with the district court's order, so long as it also adheres to the rest of the statutory requirements.

Finally, because the Government has requested a stay pending completion of appellate proceedings, the relevant question is whether the Government will be irreparably harmed *during the pendency of the appeal*. Even if the Government were correct that long-term compliance with the district court's injunction would cause irreparable harm, it presents no reason to think that it cannot comply with the district court's requirement of good faith

while the appeal proceeds. Therefore, the Government has failed to demonstrate that it will be irreparably injured absent a stay pending appeal.

## IV.

The final two *Nken* factors also do not warrant a stay. *See Nken*, 556 U.S. at 434.

The district court concluded that the States have suffered, and will continue to suffer, harms as a result of the termination of MPP. *See* D. Ct. Op. at 17 ("The termination of MPP has [increased] and will continue to increase the number of aliens being released into the United States and has [imposed] and will continue to impose harms on Plaintiff States Texas and Missouri."). We agree. *See supra* Part II.A.1 (standing). A stay "would enable" aliens released into the interior "to apply for driver's licenses and other benefits, and it would be difficult for the states to retract those benefits or recoup their costs even if they won on the merits." *Texas*, 787 F.3d at 768.

Likewise, the "public interest [is] in having governmental agencies abide by the federal laws that govern their existence and operations." *Washington v. Reno*, 35 F.3d 1093, 1102 (6th Cir. 1994). Here, the Government has failed to carry its burden to show that its conduct comports with federal law. And "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

The Government is also wrong to say that a stay would promote the public interest by preserving the separation of powers. All the district court's injunction requires of the Government is that it act in accordance with the INA. And in all events, "it is the resolution of the case on the merits, not whether the injunction is stayed pending appeal, that will affect" principles of "separation of powers and federalism." *Texas*, 787 F.3d at 768.

No. 21-10806

The DHS-Texas Agreement also suggests the public interest counsels against issuing a stay. That Agreement expressly acknowledged that if DHS failed to comply with the Agreement's terms, Texas would "be irreparably damaged" and would "not have an adequate remedy at law." Compl., Ex. B at 4. The Agreement remained binding until August 1, 2021, and the parties agree DHS violated its terms. *See* D. Ct. Op. at 14 ("The parties agree DHS did not follow the[] procedures" required by the Agreement.). The district court concluded that the expiration of the Agreement mooted Texas's claim under it. *See id.* at 44. As noted in Part II above, however, the States' likelihood of success on the merits of their APA claims means that DHS will have to consider all relevant factors before attempting to rescind MPP— including its effects on the States. The public interest plainly lies in not allowing DHS to circumvent those federalism concerns.

## V.

Finally, the Government argues a stay is warranted because the district court should have remanded without vacating the June 1 Memorandum or issuing an injunction. Stay Mot. at 22; *see also* Reply at 12. "Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas Ass'n of Manufacturers v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021). But it is unclear how DHS can substantiate its decision on remand. Neither in its opening stay motion nor in its reply does the Government suggest how it can. *See generally* Stay Mot. at 22–23; Reply at 12. And Supreme Court precedent suggests that any later memorandum on remand elaborating on the June 1 Memorandum would be irrelevant to an arbitrary-and-capricious analysis because it is a *post hoc* rationalization. *See Regents*, 140 S. Ct. at 1907–09. So at this stage, without any argument whatsoever to the contrary, it appears that DHS would have to issue "a *new* rule implementing a *new* policy" that

33

No. 21-10806

"compl[ies] with the procedural requirements for new agency action." *Id.* at 1908 (emphases added).

Vacatur, by contrast, would not cause "disruptive consequences". *See United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (also considering "the disruptive consequences of vacatur" (internal quotation marks omitted)). The Government makes no argument materially different from its irreparable-injury argument. So we reject the Government's arguments here for the same reasons we rejected them in Part III, *supra*.

\*     \*     \*

The Government has failed to make the requisite showing for all four *Nken* factors. The Government's motion for a stay pending appeal is therefore DENIED. The Government's appeal is hereby EXPEDITED for consideration before the next available oral argument panel.