```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT  OF TEXAS
 2                         AMARILLO DIVISION

 3    THE STATE OF TEXAS and          §
      THE STATE OF MISSOURI           §            CIVIL ACTION
 4                                    §
      VS.                             §            NO. 2:21-CV-067-Z
 5                                    §
      JOSEPH R. BIDEN, JR., et al     §
 6
      ==============================================================
 7                TRANSCRIPT OF CONSOLIDATED HEARING ON
            PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
 8                    AND TRIAL ON THE MERITS
            BEFORE THE HONORABLE MATTHEW J. KACSMARYK
 9                 UNITED STATES DISTRICT JUDGE

10                         JULY 22, 2021

11                        AMARILLO, TEXAS
      ==============================================================
12                     A-P-P-E-A-R-A-N-C-E-S

13    FOR PLAINTIFF, STATE OF    MR. WILLIAM THOMAS THOMPSON and
      TEXAS:                     MR. PATRICK K. SWEETEN
14                               Office of the Attorney General
                                 Special Litigation Unit
15                               P.O. Box 12548 (MC-076)
                                 Austin, TX 78711-2548
16
      FOR PLAINTIFF, STATE OF    MR. JESUS A. OSETE
17    MISSOURI:                  Missouri Attorney General
                                 207 W High St
18                               Jefferson City, MO 65101

19    FOR THE DEFENDANTS:        MR. BRIAN C. WARD and
                                 MR. JOSEPH ANTON DARROW
20                               U.S. Department of Justice
                                 P.O. Box 868, Ben Franklin Station
21                               Washington, DC 20044

22    COURT REPORTER:            MS. STACY MAYES MORRISON
                                 Official Court Reporter
23                               205 E. 5th, LB #F13263
                                 Amarillo, Texas  79101
24
      Proceedings reported by mechanical stenography; transcript
25    produced by computer.
```

VOLUME I (PAGES 1 - 196)

PAGE

CAPTION/APPEARANCES.................................................   1

INDEX..............................................................   2

PROCEEDINGS FOR JULY 22, 2021......................................   3

HOUSEKEEPING MATTERS...............................................   4

DEFENDANTS' EVIDENTIARY OBJECTIONS.................................   8

PLAINTIFF MISSOURI'S RESPONSE TO OBJECTIONS........................  20

PLAINTIFF TEXAS' RESPONSE TO OBJECTIONS............................  25


PLAINTIFF TEXAS CASE-IN-CHIEF

PLAINTIFF TEXAS ARGUMENT...........................................  31


PLAINTIFF MISSOURI CASE-IN-CHIEF

PLAINTIFF MISSOURI ARGUMENT........................................  74


DEFENDANTS UNITED STATES CASE-IN-CHIEF

DEFENDANTS UNITED STATES ARGUMENT.................................. 101


PLAINTIFF TEXAS REBUTTAL

PLAINTIFF TEXAS REBUTTAL........................................... 181


PLAINTIFFS REST AND CLOSE.......................................... 194

REPORTER'S CERTIFICATE............................................. 196

1          <u>PROCEEDINGS FOR JULY 22, 2021</u>

2          **(The following took place in open court with all parties**

3     **present.)**

4               **THE COURT**:  Please be seated.  The Court calls

5     Civil Action No. 2:21-CV-067, the State of Texas and Missouri

6     versus President Joseph R. Biden, et al for a consolidated

7     hearing on Plaintiffs' Motion for Preliminary Injunction and

8     a trial on the merits under Rule 65(a)(2).

9               Are the parties ready to proceed?

10              **MR. THOMPSON**:  Yes, Your Honor.

11              **MR. WARD**:  Yes, Your Honor.

12              **THE COURT**:  Okay.  Counsel for the Plaintiff is

13    present.  Counsel for the Government is present.

14              Mr. Thompson, I'll ask that you introduce yourself

15    and state your full name for the record.

16              Will you be lead counsel for the purpose of this

17    hearing and trial?

18              **MR. THOMPSON**:  Yes, Your Honor.

19              **THE COURT**:  Okay.  If you'll state your full name

20    for the record so the court reporter may take that down.

21              **MR. THOMPSON**:  Thank you.  William Thomas Thompson

22    representing the Plaintiff State of Texas and the Plaintiff

23    State of Missouri.

24              **THE COURT**:  And for the United States of America?

25              **MR. WARD**:  Yes, Your Honor.  Brian Ward for the

1    Department of Justice representing the Defendants.

2         **THE COURT**:  Okay.  We'll go through a couple of

3    housekeeping matters.  Nobody is on the clock at this point,

4    and then we'll proceed.

5         As a reminder to the parties, the Court did adopt

6    the parties' proposal for this sequence of argument.  One and

7    a half hours for Plaintiffs' opening presentation.  Two hours

8    of Defendants' presentation, and half hour reserved for

9    Plaintiffs' rebuttal presentation.

10        Additionally, the Court did approve the parties'

11   agreement to admit evidentiary materials without a sponsoring

12   witness, so there's no need to go through that process.

13        The Court has ruled upon Defendants' Motion to

14   Strike in an order filed Monday.  The Court understands

15   Defendants may still object to the use of extra record

16   evidence.  At the appropriate time, Defendants may object to

17   Plaintiffs' use of evidence for record purposes and to

18   preserve appellate review.  The Court will defer ruling on

19   the objection and will take the objection under advisement

20   and will issue a ruling on the objection in the Court's

21   written opinion to follow.  And we'll do this pursuant to

22   Rule 52.

23        Now, regarding breaks, the Court will break for

24   lunch after Plaintiffs' opening presentation and will break

25   again for fifteen minutes after the close of Defendants'

1   presentation.

2          Now, did both parties receive copies of ECF No. 85,

3   the Order Denying Plaintiffs' Motion to Exclude Defendants'

4   Exhibits?

5          **MR. THOMPSON**:  Yes, Your Honor.

6          **MR. WARD**:  Yes, Your Honor.

7          **THE COURT**:  Okay.  So we will be governed by the

8   Court's ruling in that case.  If there's any argument

9   necessary to preserve appellate review, I'll let you make

10  that at that time, and then, as I mentioned, will carry

11  forward the Court's ruling in the written order.

12         Now, the Court did compile a glossary of terms for

13  the benefit of the court reporter, and I'll just briefly ask

14  lead counsel to review those terms.  I know that there are

15  distinct case names.  There are some abbreviated terms.

16  There are statutes that are recurring throughout the record.

17  I want to make sure that the court reporter has those.  If

18  you'll review those glossary of terms, we can add to that

19  anything you think should be added.

20         So we have here the Administrative Procedures Act,

21  APA; Department of Homeland Security abbreviated DHS;

22  Immigration and Nationality Act abbreviated INA; Migrant

23  Protection Protocols abbreviated MPP; the Northern Triangle,

24  which the Court will state for the record refers to Honduras,

25  Guatemala, and El Salvador; *parens patriae*, a Latin term;

1    the Naturalization Clause; the Take Care Clause.  And then

2    I've identified it -- I've identified case names that may

3    recur throughout the hearing.

4            Are there any additional glossary terms that should

5    be added to that so that we can have -- have that on the

6    record and also so that we can produce an expedited

7    transcript, if necessary?

8            **MR. THOMPSON:**  This looks fine to us, Your Honor.

9            **THE COURT:**  Okay.

10           **MR. WARD:**  This looks fine to us as well, Your

11   Honor.

12           **THE COURT:**  Okay.  Now, one last item ⸺ and it is

13   tangentially related to that glossary term ⸺ there are

14   myriad *Texas versus United States* cases that you can find

15   when you enter the Westlaw search, so if we need to identify

16   that with particularity, I'll just ask that you give the

17   citation, and, that way, I can pull it up on Westlaw, and we

18   can also have it for the record.

19           At this point, with those housekeeping matters, are

20   there any additional items on logistics, glossary terms, any

21   questions that need to be addressed before we proceed?

22           **MR. THOMPSON:**  Your Honor, I understand the Court's

23   ruling on the lack of need for a sponsoring witness.  I'm

24   interpreting that ruling to mean there's no need to formally

25   move to admit the exhibits because they're already in.

1      **THE COURT**:  That's correct.

2      **MR. THOMPSON**:  Thank you, Your Honor.

3      **THE COURT**:  And is that the Government's

4  understanding as well?

5      **MR. DARROW**:  Your Honor, I'm Joseph Darrow on

6  behalf of the Government as well.  If Your Honor doesn't

7  mind, I was going to handle the evidentiary objections for my

8  colleague, Mr. Ward.

9      **THE COURT**:  Okay.

10      **MR. DARROW**:  And that's also our understanding that

11  there's no need to formally admit.  We had a question about

12  the timing of the objections.

13      Does Your Honor want us to make them in the middle

14  of their argument or kind of, you know, as they're referring

15  to a piece of evidence, or wait until the end, or do them all

16  at --

17      **THE COURT**:  We can take up -- we didn't have a

18  pretrial conference in this matter because of the scheduling.

19  If you have a list of objections that you want to enter for

20  record purposes and to preserve appellate review, we can have

21  a brief hearing, a hearing before the actual trial on the

22  merits where we can take up each of those.  You can make your

23  objections.  You can preserve that for ruling.

24      Would you prefer to do that at the outset?

25      I would -- my preference is not to interrupt

1    counsel in the middle of argument.

2         **MR. DARROW**:  Yes, Your Honor, that's fine.  We can

3    do it at the outset or at the end, however you prefer.

4         **THE COURT**:  Okay.  Is the State of Texas and State

5    of Missouri amenable to that idea?

6         **MR. THOMPSON**:  That's fine with us, Your Honor.

7         **THE COURT**:  Okay.  So I will allow you to proceed

8    on these objections.  You can do so from counsel table or the

9    podium.  We can take those up at this time.

10        You can enter -- please identify the exhibits or

11   the documents that you are objecting to, state the basis of

12   the objection, citing rules or cases, and then I will rule at

13   the end of that -- I will note at the end of that that the

14   Court is carrying those forward for final adjudication in the

15   written Memorandum Opinion and Order to follow.

16        Does that satisfy the Government's need to preserve

17   that?

18        **MR. DARROW**:  Yes, Your Honor.

19        **THE COURT**:  Okay.  So if you will proceed with

20   those objections, we'll get those on the record.

21        I will afford the Government of Texas and Missouri

22   a brief opportunity to respond.  We'll preserve those for the

23   record, and then we'll begin.

24        **MR. DARROW**:  Thank you very much, Your Honor.  And

25   I apologize for the length and onerousness of this list, but,

1   you know, just to get them all on the record.

2          So the Government's evidentiary objections are as

3   follows:

4          To Exhibit A-7, the Fox News Article, "Border

5   Patrol official expects more than 1 million migrant

6   encounters this year."  The Government objects on the basis

7   of Rule 401.  It's irrelevant and also relies on hearsay.

8          THE COURT:  And is there a particular case law that

9   you would cite for application of those principles to that

10  type of news article?

11         It's just the rule, and you're just doing it by

12  rule.  There's no particular case that you would invoke

13  explaining when news articles are relevant or in violation of

14  401 or hearsay.  You're just using the rules.

15         MR. DARROW:  I was just going to use the rules,

16  Your Honor.

17         THE COURT:  Okay.  That's fine.

18         MR. DARROW:  Just because there's a long list,

19  and --

20         THE COURT:  Okay.  Go ahead.

21         MR. DARROW:  Next document, Exhibit A-8, U.S.

22  Customs and Border Protection Encounters, Southwest Land

23  Border Encounters for Fiscal Year 2021.  Also, Rule 403.

24  It's irrelevant.  That is an outdated website, and it was

25  inaccurate and has been updated.

1          And if the Court doesn't find that's irrelevant,

2     then on the basis of Rule 403 that the risk of prejudice and

3     confusion does not -- is not substantially outweighed by the

4     probative value.

5          **THE COURT:**  I have your argument.  Next exhibit.

6          **MR. DARROW:**  Exhibit A-9, Associated Press Article

7     dated April 1st, 2021, "Migrants freed without court notice –

8     sometimes no paperwork."  Again, the Government argues it's

9     irrelevant under 401, not substantially -- the probative

10    value does not substantially outweigh the risk of confusion

11    or prejudice under Rule 403, and it relies on hearsay.

12         **THE COURT:**  I have your argument.  Next exhibit.

13         **MR. DARROW:**  Exhibit A-10, NPR Article dated March

14    23rd, 2021, "Ex-DHS Chief Says Biden Was Warned About

15    Dismantling Trump's Border Policies."  Again, irrelevant

16    under Rule 401.  Probative value does not substantially

17    outweigh the risk of confusion and prejudice under Rule 403,

18    relies on hearsay.

19         And, additionally, with this one, it reveals

20    conversation that is potentially subject to deliberative

21    process privilege.

22         **THE COURT:**  Next exhibit.

23         **MR. DARROW:**  A-11.  And should I read the name of

24    the exhibit too or --

25         **THE COURT:**  Oh, I have -- I have what's labeled as

1    Document No. 54.  It's an Appendix in Support of Plaintiffs'

2    Motion for Preliminary Injunction.  I'm using that exhibit

3    list and descriptions, so I'm following with you using that

4    as a checklist.  So I have the descriptions, at least as

5    provided by the Plaintiffs.  Is that adequate?

6              MR. DARROW:  Yes, yes.  All right.  Then to

7    expedite things, I won't, you know, read the full name of

8    everything.

9              So Exhibit A-11, Government objects on the basis of

10   irrelevance under Rule 401.  The probative value does not

11   substantially outweigh the risk of confusion and prejudice

12   under Rule 403.  And the article relies on hearsay.

13             THE COURT:  Okay.  Next objection.

14             MR. DARROW:  To Exhibit A-12, similar, same three

15   objections.  Irrelevant under Rule 401, not outweighed under

16   Rule 403, and relies on hearsay.

17             THE COURT:  I have your objection.  Next.

18             MR. DARROW:  The Government objects to Exhibit

19   A-13.  This one also on the basis of lack of relevance under

20   Rule 401.  And, specifically, here, those statistics are

21   outdated and only ran through 2016 before MPP, the Migrant

22   Protection Protocols was even implemented, and includes and

23   relies on hearsay statements.

24             THE COURT:  I have your objection.  Next exhibit.

25             MR. DARROW:  To A-15, the Polaris Project Report.

1   This document is also irrelevant under Rule 401, not

2   substantially outweighed under Rule 403, and relies on

3   hearsay testimony.

4            THE COURT:  I have your objection.  Next exhibit.

5            MR. DARROW:  To Exhibit A-16, and the objection

6   there is that it's irrelevant under Rule 401.

7            THE COURT:  I have your objection.  Next exhibit.

8            MR. DARROW:  Document A-17, and the objection is

9   irrelevant under Rule 401, and the probative value does not

10  substantially outweigh the risk of confusion or prejudice

11  under Rule 403.

12           THE COURT:  I have your objection.  Next exhibit.

13           MR. DARROW:  Would be to A-18, Exhibit A-18, which

14  the same two objections; irrelevant under Rule 401, and not

15  substantially outweighed under Rule 403.

16           THE COURT:  I have your objection.  Next exhibit.

17           MR. DARROW:  A-19, and the objections there are

18  also Rule 401 and Rule 403.

19           THE COURT:  I have your objection.  Next exhibit.

20           MR. DARROW:  To A-20, and the objections are also

21  Rule 401 and 403.

22           THE COURT:  I have your objection.  Next exhibit.

23           MR. DARROW:  A-21, and the objections are also

24  Rule 401 and Rule 403.

25           And just to note, Your Honor, on the Rule 401

1    objection there specifically, again, those are outdated

2    statistics that run through 2016 before MPP was even

3    implemented, let alone terminated.

4              THE COURT:  And 2016 is the relevant year for that

5    analysis?  The statistics terminate in December 2016?

6              MR. DARROW:  Yes.

7              THE COURT:  Okay.  I have your objection.  Next

8    exhibit.

9              MR. DARROW:  Is A-22, and that is also an objection

10   under Rule 401 and 403, and lacks foundation as well.

11             THE COURT:  I have your objection.  Next exhibit.

12             MR. DARROW:  To Document B-4, and the Government's

13   objection is that it's also irrelevant under Rule 401 due to

14   being outdated, and those statistics have been updated and

15   replaced, and also under Rule 403 as probative value does not

16   substantially outweigh the risk of confusion and prejudice.

17             THE COURT:  I have your objection.  Next exhibit.

18             MR. DARROW:  Exhibit B-5.

19             THE COURT:  B-5 or E?

20             MR. DARROW:  B.  B, Your Honor.

21             THE COURT:  B.  Okay.  B-5?

22             MR. DARROW:  B-5.

23             THE COURT:  Please proceed.

24             MR. DARROW:  The objections are also, under Rule

25   401, it's irrelevant, and under Rule 403 as not substantially

1   outweighed.

2          THE COURT:  I have your objection.  Next exhibit.

3          MR. DARROW:  To Exhibit B-7, and the objections

4   there are also Rule 401 and Rule 403.

5          THE COURT:  I have your objection.  Next exhibit.

6          MR. DARROW:  Exhibit B-8, and that's also Rule 401

7   and 403.

8          THE COURT:  I have your objection.  Next exhibit.

9          MR. DARROW:  Exhibit B-9, Your Honor, and the

10   objections are also Rule 401 and 403.

11          THE COURT:  I have your objection.  Next exhibit.

12          MR. DARROW:  B-10, and the objections are also 401

13   and 403.

14          THE COURT:  I have your objection.  Next exhibit.

15          MR. DARROW:  To Exhibit C, and the objections there

16   are, reveals conversations that are potentially subject to

17   attorney/client or deliberative process privilege.  Also, the

18   probative value does not substantially outweigh the risk of

19   confusion and prejudice under Rule 403.

20          It states and relies extensively on hearsay,

21   particularly the discussions of the back briefings of the new

22   administration, and its conclusion offers expert testimony

23   without qualification as an expert.

24          THE COURT:  I have your objection.  Next exhibit.

25          MR. DARROW:  It would be to Exhibit D.  And the

1    objections there are also Rule 401 and 403, and also that the

2    conclusion of the declaration there offers expert testimony

3    without qualification or foundation for such expert

4    testimony.

5           THE COURT:  I have your objection.  Next exhibit.

6           MR. DARROW:  To Exhibit E, any objections there are

7    the same, Rule 401 and 403, and also this declaration offers

8    expert testimony without qualification as an expert or a

9    foundation laid for expert testimony.

10          THE COURT:  And an assertion of privilege?

11          MR. DARROW:  No assertion of privilege there, Your

12    Honor.

13          THE COURT:  Not on Exhibit --

14          MR. DARROW:  Yes.

15          THE COURT:  -- E?

16          MR. DARROW:  Yeah.  The assertion of privilege was

17    just on --

18          THE COURT:  For the declaration --

19          MR. DARROW:  -- the declaration of Mr. Morgan.

20          THE COURT:  Mr. Mark Morgan, Exhibit C?

21          MR. DARROW:  Yes.

22          THE COURT:  Okay.  So I have the distinction.  I

23    have your objection.  Next exhibit.

24          MR. DARROW:  And that would be to Exhibit F and the

25    attached exhibit to that, F-1.  And the objection there is

1  that also irrelevant under Rule 401, objection under

2  Rule 403, and the conclusion offers expert testimony without

3  qualification or foundation.

4          **THE COURT**:  I have your objection.  Next exhibit.

5          **MR. DARROW**:  To Exhibit G and the attachment, G-1,

6  and the objections there are also Rule 401, 403, and that the

7  conclusion offers expert testimony without qualification or

8  foundation.

9          And just to elaborate briefly on the Rule 401

10  argument there -- I mean, we could have elaborated on all the

11  401 arguments, but just because of the laundry list, I want

12  to just point out the -- the most glaring, in our opinion,

13  ones.

14          This declaration refers to school finance, school

15  finances related to unaccompanied alien children, UACs, and

16  those are categorically excluded from the Migrant Protection

17  Protocol eligibility.

18          **THE COURT**:  Do you need no expound further on that?

19          That does deviate from the form of the objections

20  that have preceded up to that point.  Do you need any further

21  elaboration on that point?

22          Because that does seem to be a particular argument.

23  You can elaborate on that to greater detail to the extent you

24  think is necessary.

25          **MR. DARROW**:  Certainly, Your Honor.  And so in that

1   declaration, Mr. Lopez discusses impact on local school

2   finances based on providing for the unaccompanied alien

3   minors that are sometimes placed in the state under the

4   Office of Refugee Resettlement.

5          But the way the MPP program was set up, there are

6   certain classes of non-citizens who were categorically

7   excluded from being returned to Mexico under that program,

8   and one of those classes was these unaccompanied alien

9   minors, who were, you know, generally taken and placed in

10  foster care in the United States.

11         **THE COURT**:  Okay.  I have your argument.  Next

12  exhibit.

13         **MR. DARROW**:  To Exhibit H and the attachment, H-1,

14  and the objections there are also irrelevant under Rule 401.

15  The probative value doesn't substantially outweigh the risk

16  of confusion or prejudice under Rule 403.  The conclusion

17  offers expert testimony without qualification or foundation.

18         And, also, there, it's unclear how much of the

19  declaration is not based on personal knowledge as the

20  declarant states that she's using a declaration that her

21  predecessor used, and it refers to -- she just started in

22  2020, and the declaration refers to activities that took

23  place in the preceding years.

24         **THE COURT**:  And this is Exhibit H, Declaration

25  of --

1      **MR. DARROW:**  Yes.

2      **THE COURT:**  -- Lisa Kalakanis?

3      **MR. DARROW:**  Uh-huh.

4      **THE COURT:**  Okay.  Do you need to further develop

5   that argument?  That does seem to be an additional wrinkle to

6   the form objections up to this point.

7      **MR. DARROW:**  Yes.  Although, honestly, it's unclear

8   to the Federal Government what parts of the declaration are

9   based on her personal knowledge and what parts are just based

10  on kind of the -- this form declaration that it sounds like

11  she copied over that had been commonly used by her

12  predecessor.

13     **THE COURT:**  Okay.  I have your objection.  Next

14  exhibit.

15     **MR. DARROW:**  And, finally, we're at the end, to

16  Exhibit I, and the Government's objections there are also

17  under Rule 401, 403, and the conclusion offers expert

18  testimony without qualification or foundation.

19     **THE COURT:**  Okay.  And I did serve in the Appellate

20  Division as an AUSA.  I understand the necessity of

21  preserving things for record purposes.

22          Are there any arguments that require additional

23  explication for that appellate purpose?

24          The Court does intend to carry these forward.  I'll

25  give the Plaintiffs an opportunity to respond.

1           Is there any argument that deviates from form in

2    such a way that you need to flesh it out with any additional

3    particularity?

4           **MR. DARROW:**  If I may briefly just on the two

5    arguments that invoked deliberative process privilege, both

6    of those pertained to documents relating to former DHS

7    officials who were speaking after the fact.  The one was the

8    declaration of Mr. Morgan, and the other was the news article

9    about Ex-DH -- A-10, Ex-DH chief, who was Chad Wolf.  And

10   both are discussing conversations that they allegedly have

11   had with the incoming administration.

12          And in the Government's view, such conversations

13   would be -- to the extent that they were not privileged under

14   the attorney/client privilege, because they were discussing

15   policy that was about to be created and potential lawsuits

16   with lawyers, they would have been shielded by the

17   deliberative process privilege because they were talking

18   about the formulation of the administration's new policy on

19   MPP and other immigration matters.

20          **THE COURT:**  Okay.  And so the deliberative process

21   privilege is particular to Exhibit C, the Declaration of Mark

22   Morgan, and the conversations reflected in Exhibit A-10?

23          **MR. DARROW:**  Yes, Your Honor.

24          **THE COURT:**  Okay.  I have the Government's

25   objections.

1          I guess I'm going to have to use -- I'm in criminal

2     court mostly.  I'm going to have to use a term different than

3     "government" since we have --

4          **MR. DARROW**:  Yeah.

5          **THE COURT**:  -- two governments today in court.

6       **(Laughter.)**

7          **THE COURT**:  So I have -- I have the objections of

8     the United States.  I find that they are preserved for

9     appellate review purposes.

10         I will now hear a brief response from the State of

11    Texas and the State of Missouri.

12         **MR. DARROW**:  Thank you, Your Honor.

13         **THE COURT**:  Mr. Thompson, whoever is taking the

14    evidentiary objections may respond either from the podium or

15    counsel table.

16         **MR. THOMPSON**:  With Your Honor's permission, I'll

17    let my colleague from Missouri, Mr. Osete, respond to the

18    objections related to the Missouri witness, and I'll address

19    the Texas witnesses.

20         **THE COURT**:  Okay.  So let's take those up in the

21    order in which they were raised, and I'll give both states an

22    opportunity to respond.

23         **MR. OSETE**:  Thank you, Your Honor.  Jesus Osete,

24    Deputy Solicitor General for the State of Missouri.

25         And, as Mr. Thompson indicated, I will take the

1   objections to the A exhibits, and he will take the objections

2   to the B exhibits.

3          I'll just note for the Court at the outset, these

4   objections that the Government has made to the A exhibits are

5   for the most part -- well, I would actually say all of them

6   are pretty much public records.  The Court can take judicial

7   notice of public records, even for background purposes, which

8   some of these exhibits serve beyond evidentiary value as

9   well.

10          On the judicial notice aspect of it for public

11   records, I cite to the Court the *Balogun v. Dimon* case.

12   That's B-A-L-O-G-U-N.  And that's actually from this Court

13   from 2013, 2013 Westlaw 12128673.  And it's well established

14   in the Fifth Circuit that the Court can take judicial notice

15   of public records, whether it be background or evidentiary

16   matters.

17          I'll go quickly on the 401 and 403 stuff.  I think

18   they're -- they're pretty related.  As I understand, Mr.

19   Darrow had objections from A-7 through A-13, nothing about

20   A-14, and then 15 through 22.

21          These documents, just briefly, Your Honor, they are

22   relevant.  They do go directly to the issues in this case,

23   creating incentives for programs like MPP, terminating MPP,

24   create incentives, perverse incentives for illegal

25   immigration that affect these states.  Many of these

1    documents, like the articles, do provide critical background

2    to that.

3         The objections to 403 prejudice, we do think the

4    probative value of these documents, aside from, again, you

5    know, general background judicial notice that the Court can

6    take, they do have substantial probative value that the Court

7    can take into consideration.  The Court does have discretion

8    to consider those documents.

9         We don't think the Government would be unduly

10   prejudiced by admitting them into evidence, again, beyond

11   just the judicial notice aspect for background purposes.

12        In particular, on the -- there was a foundational

13   objection made to -- I think it was the A-22.  Yeah, A-22.

14   This is the Transactional Access Records Clearinghouse.  This

15   is a program out at Syracuse University.  And essentially

16   what they're doing in that document -- and that's going to be

17   at Appendix 288 to 296.

18        **THE COURT**:  Yes.  And this is -- in addition to the

19   form objection on 401 and 403, this -- here, the Government

20   raised a foundation objection, so if you would address that.

21        **MR. OSETE**:  That's correct.  Yeah, and all I'll say

22   about foundation, it is a pretty low standard.  In this case,

23   if you look at those -- what those individuals are saying in

24   that TRAC report, they're just taking information from the

25   Executive Office of Immigration Review.  For the court

1     reporter's sake, that's EOIR.  They're taking data from MPP

2     cases that were initially processed in Brownsville and some

3     of the other divisions along the southern border and are now

4     being transferred to places like Kansas City and places

5     outside of the border in Texas.

6              They're just -- they're just looking at that data

7     that the government has collected, EOIR has collected and

8     just explaining what it says.  And they're very up front

9     about that at their report.  I believe that's right at 296

10    where they explain their methodology.  That's where they're

11    getting it from.  We've met foundation.  It's a low

12    threshold.

13             And I -- I think -- other than that, I think there

14    was -- there was a point made about generally some of these

15    documents being outdated.  Look, a lot of these documents,

16    they are estimates.  For example, like the Pew Research Study

17    from 2016 about how -- you know, roughly how many illegal

18    aliens are present in the country in places like Missouri —

19    I think it's about 56 — there's no question the study itself

20    was performed in 2016 or it's dated in 2016.  They are

21    estimates.

22             We have other evidence in the record in the

23    appendices about the numbers of illegal aliens that are

24    actually coming into the country.  Them being just simple

25    estimates that maybe are outdated, and folks are still

1    collecting those kind of numbers even today, I think -- I

2    think that's irrelevant to there being an issue with these

3    dates, but, otherwise, I think it's a pretty low threshold on

4    these studies.

5            So I don't want to go on too much on that one, but

6    essentially they're just preliminary estimates.  Ms. Pierce

7    already indicated that these kind of -- trying to get numbers

8    for human-trafficking victims is already inherently difficult

9    because of fear of deportation and other external factors as

10   well.  These are just attempts to try to get these documents

11   and this information.

12           And some of these other documents -- for example,

13   on -- you know, I think there was an objection to the DESE

14   study.  This is A-19, the State Report Card for the state

15   finances.  Those are routinely collected by state agencies in

16   Missouri, among some of these others costs that we put

17   forward for purposes of our standing.

18           Again, these are routine documents that are also

19   relevant to our standing.  So I think we've met the 401, 403

20   threshold, and the specific objections that Mr. Darrow had, I

21   believe I've also adequately addressed them as well.

22           So if the Court doesn't have any questions for me

23   on that, I'm happy to yield to Mr. Thompson on the -- on part

24   B.

25           THE COURT:  Okay.  So I have the State of Missouri

1   responses to the objections of the United States.  I find

2   that those responses are preserved for appellate review, that

3   they are preserved in the record.

4            I'll now allow the State of Texas to proceed with

5   its responses to the evidentiary objections.

6            **MR. OSETE**:  Thank you, Your Honor.

7            **MR. THOMPSON**:  Thank you, Your Honor.  Will

8   Thompson for the State of Texas.  I will endeavor not to

9   repeat what Mr. Osete had said.  I will just incorporate by

10  reference his points, especially with regard to 401 and 403.

11           I'll just add:  This is a bench trial.  I think the

12  best place to see our arguments for any relevance and

13  probative value of these evidentiary submissions are in our

14  briefs.  And I'll note that the text of 403 talks about the

15  danger of misleading the jury, and we have no jury.

16           **THE COURT**:  When there is no jury, yes.

17           **MR. THOMPSON**:  I'll note that a couple of their

18  objections with regard to relevance appeared to be that they

19  believe the evidence to be wrong or inaccurate.

20           I think the best way to deal with that would be to

21  introduce contrary evidence.  And, you know, the Government

22  has put in some evidence through the Administrative Record,

23  and we can fight that one out.

24           With regard to the privilege, I think it's notable

25  that -- I mean, all of these objections we're hearing about

1    for the first time.  We didn't hear about them in the papers

2    when they were submitted for the PI, but particularly with

3    regard to privilege assertions, you know, some of these

4    things are already out in the public record.  They're

5    complaining about information that is, you know, public in

6    news articles and information that was on a PI docket and has

7    been publicly disclosed without objection for weeks or

8    months.

9              With regard to the relevance objection to Mr.

10   Lopez's declaration ── this is the edu -- Texas Education

11   Agency information ── counsel on the other side says that

12   UACs are categorically irrelevant.

13             But, of course, Mr. Lopez's declaration goes well

14   beyond that.  It discusses how Texas incurs costs for the

15   education of illegal alien children who attend public

16   schools.  That is true of UACs and non-UACs alike.  It, of

17   course, discusses the UAC data because that is the data that

18   is available publicly.

19             But even if they were able to establish that the

20   UACs were categorically irrelevant, the principle would

21   stand, and Mr. Lopez's declaration explains all of that, I

22   think.

23             **THE COURT**:  And this is Exhibit G?

24             **MR. THOMPSON**:  Yes, I'm sorry, that's Exhibit G.

25             **THE COURT**:  Declaration of Leonardo Lopez.  Yeah,

1    so this -- in additional to the Government -- I mean, the

2    United States' form objection to 401 and 403, they had an

3    expert objection there.

4           And is there anything else that you need to do to

5    flesh out your response to that particular objection?

6           **MR. THOMPSON:**  With regard to the expert

7    objections, I guess two points, Your Honor.  One is that I

8    think they are really offering lay testimony.  You know, this

9    is information from TEA files, for example, from HHSC files,

10   from TDCJ files.  I don't think it requires expertise to give

11   the information they have.

12          But to the extent it did require that, each

13   declaration does lay out their qualifications, their job

14   histories, things like that.  I think they could qualify.

15          With regard to Exhibit H, this is the -- I believe

16   this one is the HHSC declaration.  My friend on the other

17   side says that he's concerned it's not based on personal

18   knowledge even though the declaration says it's based on

19   personal knowledge.

20          My understanding of the source of his concern is a

21   paragraph saying that the declaration was originally drafted

22   by a previous staff member at HHSC.  I think that paragraph

23   was really meant to just say, I'm not committing plagiarism.

24   You will notice that there's information in this declaration

25   that previous people have sworn to, and she looked at that,

1    developed personal knowledge based on the internal HHSC data,

2    and then swore to it in the declaration.

3           She's not saying, you know, someone else wrote

4    this, and I haven't -- and I don't know what it means.  She's

5    saying, I have personal knowledge of this, but this -- the

6    older numbers are the same as the numbers provided by

7    previous declarants in previous cases.

8           And we'll get to this, Your Honor.  You'll notice

9    that many of our declarations are updated versions of

10   declarations that have been offered in the DAPA case, the

11   DACA case, the 100-day pause litigation.  So I don't think

12   there should be anything surprising about a witness

13   acknowledging that.

14           **THE COURT**:  Okay.  And I think the sole

15   remaining -- unless this overlaps the exhibits addressed by

16   the State of Missouri, I think the only remaining substantive

17   objection that should be addressed by the State of Texas is

18   the deliberative process privilege as it relates to any

19   exhibits on the Texas inventory.  I think I have the State of

20   Missouri argument on that point.

21           Are there any exhibits where that particular

22   privilege objection should be addressed by the State of

23   Texas?

24           **MR. THOMPSON**:  I'll agree with what Mr. Osete said,

25   and perhaps add that I believe, if I understand the Federal

1    Government's objection correctly, one of the complaints is

2    that Mr. Morgan has revealed the fact that DHS staff gave

3    certain warnings to the Biden transition team.

4         Even if one were not to consider the substance of

5    the warnings but merely the fact that the warnings were made

6    without disclosing anything that could even arguably be

7    privileged, I think that would still support our point on the

8    merits.

9         The idea here is, as we put in our reply brief for

10   the PI, this was important information that they have not

11   disputed was actually given, but even though it was given to

12   high-level officials, they addressed it not at all in the

13   June 1 Memorandum, and that goes to the importance of

14   considering critical factors under arbitrary and capricious.

15        **THE COURT:**  So I anticipate the Court's order

16   adjudicating all of these objections and responses will tie

17   those to particular claims, and on that particular privilege,

18   I find already that it's most relevant to the arbitrary and

19   capricious APA arguments, and the arguments that are already

20   well briefed by both sides on that.

21        So the State of Texas agrees with the Court that

22   that particular objection is most relevant to the APA claim.

23        **MR. THOMPSON:**  That's how I'm understanding it,

24   Your Honor.

25        **THE COURT:**  All right.  So is there anything

1   additional from the State of Texas?

2          MR. THOMPSON:  (Shakes head.)

3          THE COURT:  Anything additional from the State of

4   Missouri to preserve the State of Texas and State of Missouri

5   responses to the evidentiary objections lodged?

6          MR. OSETE:  The only other one I would offer a very

7   minor point, Your Honor, is, if you look at Rule 902, there's

8   an exception for self-authentication for documents that

9   purport to be issued by a public entity, which is another

10  basis to also admit the -- some of these records that we've

11  introduced.

12         THE COURT:  Okay.

13         MR. OSETE:  And that's all.

14         THE COURT:  I have the argument of Texas.  I have

15  the argument of Missouri.  The Court finds that they're

16  preserved for purposes of the record and appellate review.

17         And, Mr. Thompson, you may return to counsel table.

18  I will now briefly confer with my law clerks and make sure

19  that I have all of the correct exhibit numbers, objections,

20  and responses, and then we'll proceed with the hearing and

21  trial.

22     (Court/law clerks sotto-voce conference.)

23         THE COURT:  Okay.  So we've compared notes.  We can

24  also order an expedited transcript, if necessary.

25         The Court will issue an order on all evidentiary

1   objections lodged at the hearing that will precede the

2   Memorandum Opinion and Order on the merits.  So those will

3   intersect so that you have the Court's ruling and where the

4   Court is relying on particular exhibits.  It will be clear

5   through the combination of those two orders what the Court is

6   and is not relying upon.

7          So, at this time, I will allow the State of Texas

8   and the State of Missouri to proceed with their

9   case-in-chief.

10                **PLAINTIFF TEXAS CASE-IN-CHIEF**

11          **MR. THOMPSON:**  Thank you, Your Honor.  Will

12   Thompson again for the State of Texas.  And with Your Honor's

13   permission, I'm going to use the ClickShare technology here

14   to put a slide deck on the screen.  I believe everyone,

15   including opposing counsel, can see it.

16          **THE COURT:**  And I just -- I just want to make

17   certain that the United States can view what the Court is

18   viewing.  Are you able to view the screen as projected on

19   courtroom technology?

20          **MR. WARD:**  Yes, Your Honor.

21          **THE COURT:**  Okay.  So these are just demonstrative

22   exhibits?

23          **MR. THOMPSON:**  Yes, Your Honor.

24          **THE COURT:**  Okay.  You may proceed with those.  And

25   I have a screen here.  My law clerks have a screen.  If at

1    any point, the Government needs to see or view a particular

2    frame, let us know, and we can accommodate that request.

3            You may proceed.

4            **MR. THOMPSON**:  Thank you, Your Honor.  Your Honor

5    clearly is well versed in the briefs of this case, and I will

6    endeavor not to repeat things that the Court already knows.

7            But I do want to address kind of three buckets of

8    issues today.  The first are threshold questions related to

9    standing, final agency action, and reviewability.  These go

10   to jurisdiction in the APA cause of action.

11           The next bucket are the merits issues related to

12   our four claims of the Administrative Procedure Act, the

13   Immigration and Nationality Act, the Constitution, and the

14   binding agreement between DHS and Texas.

15           The final bucket of issues relates to remedies.

16   And with the Court's permission, Mr. Osete will, after I'm

17   finished with the merits, address remedial questions as well

18   as Missouri-specific questions like Missouri's standing.

19           And, Your Honor, I'll say up front that I, of

20   course, have a presentation here that I'm intending to walk

21   through, but I want to be helpful to the Court, and if at any

22   point the Court has heard enough about a topic or would like

23   to hear more about a different topic, I'm happy to be

24   flexible on that.

25           **THE COURT**:  Well, we'll do this like the Fifth

1  Circuit does.  You'll get through your introduction, and then

2  I -- the Judge will just interrupt you whenever.

3      **(Laughter.)**

4          **MR. THOMPSON**:  Very well.  Well, Your Honor,

5  starting with standing, courts consistently find that Texas

6  has standing in these kinds of immigration cases.  We've seen

7  it time and again.

8          And you'll see these cases are the ones we'll be

9  relying on primarily.  The DACA case from the Fifth Circuit.

10  The DACA opinion; this is the most recent DACA opinion in the

11  PI DACA opinion from Judge Hanen, not to be confused with the

12  Supreme Court's DACA opinion in *Regents*, and, of course, the

13  100-day pause litigation in front of Judge Tipton.

14          And it's not surprising the courts in this state,

15  in this circuit consistently find that we have standing.  As

16  the Supreme Court itself has recognized, the problems posed

17  to the state by illegal immigration must not be

18  underestimated.  These are real and serious problems that

19  have financial and other consequences for the State of Texas.

20          The kind of first point under standing is that the

21  termination of MPP seriously increases the number of illegal

22  aliens in Texas.  There are two ways in which this is true,

23  and I understood the Government's PI response to really only

24  be disputing one of them.  I think either is sufficient but

25  both are relevant.

1          The first way is that aliens are released into the

2   United States who would have been enrolled in MPP but for its

3   termination.  So you might call this like a primary effect,

4   right?  There's someone who comes to the border who under MPP

5   would have remained in Mexico, but, with MPP being

6   terminated, that person is instead released into Texas.

7          But there's also a secondary effect that is also

8   well supported by DHS's own documents, and that's that the

9   termination of MPP, or the lack of MPP, encourages aliens to

10  make more border crossings, so more people come to the

11  border, and we would have fewer border crossings if MPP were

12  back in place.

13         And these are serious numbers we're talking about.

14  It's not just a few people here or there.  We have had

15  68,000-plus enrollees in MPP.  And you'll see that I have

16  citations at the bottom of this screen and many similar

17  screens.  AR555, for example, refers to the Government's

18  Administrative Record at Page 555.

19         And the government itself has previously concluded

20  that MPP decreases the number of aliens released into the

21  interior of the United States.  That's the facts underlying

22  our standing.  And we know that a lot of these releases are

23  occurring in Texas.  More than 50,000 of those 68,000 have

24  been in Texas, according to the Government's own Motion to

25  Transfer Venue.

1          The government concluded this was -- that MPP was

2     effective in changing these numbers too.

3          So here is the 2019 Assessment.  MPP returnees who

4     do not qualify for relief or protection are being quickly

5     removed, and aliens without meritorious claims, which no

6     longer constitute a free ticket, are beginning to voluntarily

7     return home.  This is exactly the kind of causal connection

8     that establishes standing because it shows that, when MPP is

9     in place, the aliens are behaving differently.

10          Now, the Government makes a big deal about the idea

11     that standing depends in part on the reactions of third

12     parties, the aliens.  But, of course, that's not unusual in

13     these types of cases.  It always happens in immigration

14     cases, for example, so DAPA, DACA, the 100-day pause, the

15     courts found it was proper there.

16          And the Supreme Court has found it in very similar

17     circumstances, like in the *Census Bureau* case where the same

18     objection was raised, I believe, by the federal government

19     saying the State of New York couldn't have standing, because

20     its theory that illegal aliens wouldn't answer the census

21     questionnaire if there was a citizenship question included

22     very much depended, not only on the idea that third parties

23     would react in a certain way, but that they would react in a

24     criminal way.  And the Court nonetheless said, it's not

25     categorically improper to rely on the reactions of third

 1     parties.  It's quite proper when there are predictable

 2     results.

 3             And that's what they are here; they're quite

 4     predictable, as the previous courts addressing these issues

 5     have found.

 6             Again, we have more quotes from the government.

 7     This one is in the Administrative Record as well saying that

 8     MPP contributes to decreasing the volume of inadmissible

 9     aliens.

10             And so here is some of the precedent that -- I'm

11     sorry, here are the categories of injuries that have been

12     previously accepted by courts in Texas and the Fifth Circuit.

13     I can walk through them individually, tend to be longer with

14     regard to the earlier ones, and skip ahead through the later

15     ones, but I'm happy to adjust that according to Your Honor's

16     preferences.

17             The first is driver's licenses.  Next, education

18     costs, healthcare costs, law enforcement costs, and the

19     *parens patriae* injury based on labor market distortion to

20     both Texans and Missourians.

21             And, again, we have these five independent

22     theories, but any one of them would be sufficient.  They also

23     work together in combination.  So I -- the Court really has

24     options there on how to review that issue.

25             So with regard to driver's licenses, when DHS

1    releases aliens in the United States, they become eligible

2    for driver's licenses under Texas law.  This is addressed by

3    Ms. Sheri Gipson from the Texas Department of Public Safety,

4    which issues driver's licenses.  It was also addressed by the

5    Fifth Circuit.  These licenses cost the state a fair amount

6    of money.

7              Here is a table which is included in our Appendix

8    estimating the cost to the State of Texas for different

9    driver's license scenarios.

10             So we have these, you know, relatively large

11   numbers here for large numbers of people, but, of course,

12   that is not -- that is sufficient, but it is not required for

13   standing.  You know, any kind of financial injury will

14   suffice.  And this is what the Fifth Circuit approved in

15   DAPA.

16             On to the education point, under *Plyler versus Doe*,

17   the Supreme Court has declared that Texas, and all other

18   states, are required to pay for the public educations of

19   illegal alien children.  And that costs the state a fair

20   amount of money.  Obviously, public education generally costs

21   quite a bit of money.  It costs quite a bit more when dealing

22   with bilingual issues.

23             And so Mr. Lopez -- we had this discussion with

24   regard to the UACs.  This quote is about the UACs, but what

25   he says in the declaration apply to non-UAC students as well,

1    and this is showing the acceptance of this theory in Judge

2    Hanen's recent DACA opinion.

3            Judge Tipton accepted it as well in the 100-day

4    pause litigation.

5            Healthcare is a very similar story.  We have a

6    number of programs in Texas that address the healthcare needs

7    of illegal aliens.  Some of them are, in fact, required by

8    federal law to cover illegal aliens, such as emergency

9    Medicaid.  The HHSC declarant has explained what these

10   programs are, what the numbers are, but they are very high,

11   and here is a table explaining them.

12           So we have 80 million dollars for emergency

13   Medicaid alone in 2019, very similar numbers in previous

14   years.  We can see that there is a reason that Judge Tipton

15   accepted this theory with regard to the 100-day pause

16   litigation.  It is quite a bit of money, even from the other

17   programs as well, and, again, emergency Medicaid is the one

18   we're under federal regulations; it must cover -- it must

19   cover illegal aliens.

20           I should add a note on that point, which is -- I

21   think it is particularly compelling with regard to the injury

22   that it is required by federal law, but it is not at all

23   required for the injury.

24           As Judge Smith put it in the DAPA opinion, there's

25   kind of a twin injury if you require -- if you -- if the

1   federal government changes a fact that increases Texas' costs

2   under its own statutes, because they either have to -- the

3   state either has to incur that financial cost — here, you

4   know, a million dollars for the family violence program — or

5   it has to change its laws, which is not something it has --

6   it can be required to do by the federal government.  That

7   represents kind of the back-stop injury that Judge Smith

8   found in DAPA.

9        And, of course, like all of our declarants on these

10  topics, our HHSC declarant has explained that this is not

11  just true of the past, but it's true going forward.  As the

12  number of illegal aliens in Texas changes, the costs to the

13  State of Texas will change as well.

14       And, of course, here are quotes from sister courts

15  accepting this theory of standing, including Judge Hanen just

16  last week, I believe.

17       With regard to law enforcement, we have the same

18  story again, Your Honor, basically.  It is that we

19  incarcerate illegal aliens who have found their way to Texas.

20  It costs quite a bit of money.  In the last reporting period,

21  it was 150 million dollars, and the federal government

22  generously reimbursed us about 10 percent of that money, so,

23  you know, 90 percent of that represents an injury to the

24  State of Texas every time it happens.

25       Now, as we go on from here, I think it's important

1    to note that the Government says there's some speculation

2    afoot, that we don't know whether a particular alien will, in

3    fact, commit a crime and be incarcerated by TDCJ.  And that's

4    true insofar as it goes, but it's really beside the point,

5    because what we do know is that under the law of large

6    numbers it is going to be true that some of the aliens will

7    commit crimes and be incarcerated or enroll in public schools

8    or enroll in these healthcare programs or get a driver's

9    license.  We know that some of it will happen.

10           It doesn't have to be true that every alien

11   released into Texas because of MPP will cause a financial

12   injury to the State of Texas; though, that is relatively

13   likely as the Fifth Circuit has pointed out in the DAPA

14   opinion, for example.  Getting a driver's license is a

15   practical necessity in most, if not all, portions of this

16   state.  The same thing is true for people who don't have

17   health insurance and things like that.

18           But as long as it is true of some of them, we have

19   the standing.  It doesn't have to be that every single one of

20   them falls into these buckets.  If any of them fall into any

21   of these buckets, that is a sufficient injury-in-fact.

22           As the Supreme Court pointed out, it has decided

23   major constitutional questions, the constitutionality of a

24   poll tax based on a financial injury of $1.50.  It's not --

25   it's not a big injury requirement.  It just has to be a real

1     injury.

2            As to *parens patriae* standing, this is the same

3     thing that was going on in DACA with Judge Hanen's opinion.

4     The idea here is that illegal aliens distort the labor market

5     because they drive down wages for Texans and Missourians who

6     are lawfully allowed to work in the state.

7            I don't understand the Federal Government to be

8     disputing, you know, the law of supply and demand.  I think

9     their main point seems to be that they believe states should

10    not have *parens patriae* standing against the federal

11    government ever.

12           I don't think I can improve on Judge Hanen's

13    response to that point, which is that there's an important

14    distinction between cases in which states are trying to

15    challenge a statute and when -- and cases in which states are

16    trying to get a statute enforced because the Executive Branch

17    has gone rogue.

18           Here's Judge Hanen's opinion accepting *parens*

19    *patriae* standing last week.

20           Now, unless Your Honor has questions about

21    standing --

22           **THE COURT**:  I do have -- I have two follow-up

23    questions about standing.  And we'll go back to the beginning

24    when you were distinguishing your primary effects' argument,

25    your secondary effects' argument.

1            And I want to particularize the inquiry to the

2    persons creating the effects on Texas and also the perverse

3    incentives.  Is this caused by the increased number of

4    parolees, as that terminology is used in immigration context,

5    because the number of illegal aliens surpasses the

6    government's detention capacity or because the termination of

7    MPP caused a surge in illegal crossings?

8            So particularizing the inquiry to parolees and some

9    of the MPP statuses that are at issue in this case, should

10   the Court focus on sort of an overall effects test, or is

11   there a particularized inquiry relevant to parolees?

12           **MR. THOMPSON**:  So I think it is both.  If I

13   understand Your Honor's question correctly, there are -- the

14   primary effect are the aliens who are released into the

15   United States and the State of Texas in particular because of

16   the lack of MPP.

17           The State of Texas' understanding is that those

18   people are being paroled in unlawfully, but whether they are

19   paroled or not is not necessary, I think, for standing.  If

20   they are released without papers at all, as some news

21   articles have suggested, then that is equally applicable to

22   our standing.

23           **THE COURT**:  So especially as to secondary effects

24   and incentivizing additional crossings, this Court is not

25   invited to distinguish between the percentage of those

1    additional persons who are parolee status and those who

2    simply evade detection or detention?

3            MR. THOMPSON:  I'm not suggesting the Court can't

4    distinguish between them.  I think --

5            THE COURT:  Okay.

6            MR. THOMPSON:  I just mean both are sufficient, I

7    suppose is what I mean to say.

8            THE COURT:  Okay.  And they are both -- it's the

9    Government's argument that they are both related to the

10   termination of MPP?

11           MR. THOMPSON:  Yes, very much so.

12           THE COURT:  All right.  Now, regarding *parens*

13   *patriae* standing, on Page 27 of your motion and also in your

14   presentation today, you have referenced this labor market

15   distortion theory.  You've also referenced binding Fifth

16   Circuit precedent that will guide the Court.

17           Again, I'm taking the general to the particular.

18   What number should I look for to satisfy the Court's analysis

19   that this distortion has, in fact, occurred?

20           So I'm -- I am bound by Fifth Circuit precedent.  I

21   am considering the Government's general theory of labor

22   market distortion, but is there a particularized number that

23   presents a tipping point for standing and injury analysis?

24   Is it 10?  Is it 100?  Is it 1,000?  Is it 10,000?  Again,

25   this is another particularization question.

1          Looking at the other cases that have been decided

2     in the Fifth Circuit, is there a number that presents sort of

3     a definitive tipping point beyond which the United States

4     cannot really argue that there is no distortion?

5          MR. THOMPSON:  Right.  If I understand the question

6     correctly, Your Honor, I believe the answer is:  I don't know

7     exactly what the number would be in some other case, but I do

8     believe that we are well above it here.  We're talking

9     about --

10         THE COURT:  "Pornography, I know it when I see it."

11        (Laughter.)

12         MR. THOMPSON:  Well, I would hate to bind myself in

13    a future case --

14         THE COURT:  I think it's "obscenity" actually, but

15    go ahead.

16         MR. THOMPSON:  Right.  The -- I think it is true

17    that, when we're talking about the tens of thousands of

18    people, that it's going to be very likely to be sufficient.

19         And it's important to note that there's kind of a

20    tense question here, which is past effect versus future

21    effect.  Because we're looking for prospective relief, I

22    think the standard should be:  Is there a substantial

23    likelihood, under Susan B. Anthony List, for example, that

24    this distortion will happen in the future?

25         And so I think at the bare minimum we're talking

1   about, you know, 50,000 people, which the Government has

2   conceded were released in Texas, but I think, in reality,

3   we're talking about significantly more than that, in part

4   because of the, you know, people moving from other states,

5   but also the secondary effect of the termination of MPP

6   causing more people to cross the border.

7           So when we say that there is a -- you know, there's

8   back to being a free ticket in the United States, that it

9   creates perverse incentives, as the Government said, I think

10  that means that we shouldn't expect the number of people

11  distorting labor market to be the mere 50,000.  I think we

12  can expect it to be significantly higher than that.

13          THE COURT:  Okay.

14          MR. THOMPSON:  And I guess the last point is, I

15  think as a general matter of economics, all of these things

16  operate on the margin.  And so there is no tipping point at

17  which, you know, there is a distortion because there are

18  10,000 people, but there wouldn't have been a distortion at

19  5,000 people.  It's -- you know, there's twice the distortion

20  at 10,000 than there was at 5,000.  It's a continuous

21  variable rather than a binary one.

22          THE COURT:  Right.  And, you know, the Supreme

23  Court has given recent guidance in a different context with

24  First Amendment pro bono litigation that nominal damages are

25  sufficient for standing analysis, things like that.

1            I'm just -- I want to make sure that I'm using the

2     correct numerator and denominator in deciding this.  And it

3     would be the State of Texas and State of Missouri argument

4     that whatever that threshold is, it's easily met in this case

5     based on the evidentiary record which reflects tens of

6     thousands, not one or two persons?

7            **MR. THOMPSON:**  Right.

8            **THE COURT:**  Okay.  You may proceed.  I have your

9     argument on standing, if you want to move to your next

10    argument.

11           **MR. THOMPSON:**  Thank you, Your Honor.  As to final

12    agency action, this is another threshold requirement as to

13    the APA claims.  So, under 5 U.S.C. Section 704, states and

14    other plaintiffs are allowed to challenge final agency

15    action.  That is a term of art that the Supreme Court has

16    interpreted a little bit atextually.

17           So, in *Bennett versus Spear*, we have two elements

18    as to final agency action.  The first element is that the

19    action has to be, you know, final rather than tentative or

20    interlocutory.  It has to be the end of the decision-making

21    process.

22           I don't think there's any dispute about that here.

23    The June 1st Memorandum, as you'll see on your screen says:

24    I hereby rescind effective immediately.  I further direct DHS

25    personnel effective immediately.  This isn't a tentative

1   decision that will be, you know, reviewed by some higher

2   power within DHS.

3          The second element is that the action must be one

4   by which rights or obligations have been determined or from

5   which legal consequences will flow.  Now, we have -- we have

6   a number of arguments on this point in our briefs, but I

7   think the easiest way to resolve this question is to look at

8   *Texas versus EEOC*, a relatively recent Fifth Circuit opinion.

9   There, the Court held, if the agency's action binds its

10  staff, if that is true, demonstrates that legal consequences

11  flow from it.

12         Now, we just saw on two slides ago that the June 1

13  Memorandum directs DHS staff to take certain actions.  That

14  is, of course, binding.  It's an order from a superior, and

15  under *Texas versus EEOC*, that satisfies the second *Bennett*

16  *versus Spear* prong.

17         And unless Your Honor has questions about finality,

18  I'll move on to reviewability, a topic addressed in 5 U.S.C.

19  701(a).

20         **THE COURT**:  You may proceed.  No questions on

21  finality.

22         **MR. THOMPSON**:  So there are two -- two ways that

23  the Government can try to rebut the presumption of

24  reviewability.  They can show that a statute precludes

25  judicial review or that agency action is committed to agency

1    discretion by law.

2         I know -- I think the starting point for this

3    analysis has to be the presumption that I mentioned.  It's

4    in, you know, many of the Supreme Court's opinions, including

5    *Regents* about the DACA recision.

6         But the DAPA opinion from the Fifth Circuit is

7    particularly clear and gathers a lot of the citations.

8    Establishing unreviewability is a heavy burden, and where

9    substantial doubt about the congressional intent exists, the

10   general presumption in favor of judicial review is

11   controlling.

12        I think that's important here, because, as we walk

13   through the individual factors, we'll see that, you know,

14   there's nothing clear about any kind of intent to preclude

15   review here.

16        First, as to statutes precluding judicial review,

17   as I understand the argument from my friends on the other

18   side, there's no dispute that the statutes in question don't

19   say states can't sue about this.  Most of the statutes they

20   cite are limiting review by aliens themselves.

21        So, you know, there will be -- there are -- of

22   course, Your Honor probably knows all of this, but there are

23   options for illegal aliens to have administrative and then

24   judicial review of their proceedings in front of DHS.

25        And what these provisions do that the Government

1    cites is kind of limit and guide how that review occurs.

2    They just don't have anything to do with this situation here,

3    where we're not aliens, and we're not in removal proceedings.

4            The Government, I think, if I understand them,

5    says, well, the fact that there's a detailed review scheme

6    for other people in other circumstances shows that you

7    shouldn't be able to sue in these circumstances.

8            I don't think that's right, Your Honor.  I think

9    they're massively over-reading the -- I suppose the

10   partial-implied repeal of the APA by the INA.  That would

11   render all of the recent immigration cases wrong, I think,

12   not just the ones that Texas has won, DAPA, DACA, 100-day

13   pause, but I think *Regents* would be wrong.

14           The Supreme Court would have been wrong to consider

15   a California state entity challenging immigration decisions,

16   because, of course, the regents of the University of

17   California are not immigrants in review proceedings either.

18           But, you know, that is not how any of these cases

19   have turned out.

20           As to the second point, agency action is committed

21   to agency discretion by law, that is similarly a high

22   standard.  The same presumption applies, and we cited those

23   cases in our brief.

24           As I understand the Government's argument, the main

25   point here is that the statute says "may," which it's true;

1    the statute says "may," but that just means there is some

2    level of discretion in some circumstances.  That doesn't

3    mean, one, that there's discretion in these circumstances,

4    or, two, that when there is discretion, it is unreviewable.

5           So taking those in that order, the first point is,

6    we, of course, have a substantive argument under 1225 that

7    the government lacks discretion in these circumstances.  If

8    that's true, then it is necessarily not committed to agency

9    discretion by law.  That's how Judge Tipton proceeded in the

10   100-day pause opinion, for example.

11          But, even without the 1225 argument, the Government

12   is failing to distinguish between the type of discretion that

13   is reviewable and can be abused from the type of discretion

14   that can't be.

15          Judge -- Justice Gorsuch addressed this in the

16   *Weyerhaeuser* opinion that we cited.  The statute itself,

17   5 U.S.C. 706 talks about holding unlawful and setting aside

18   agency action for an abuse of discretion.

19          The Government's argument would render that

20   statutory language superfluous, because if any amount of

21   discretion just from the word "may" rendered everything

22   unreviewable, then there would be no circumstances in which a

23   court could hold unlawful and set aside anything as an abuse

24   of discretion.

25          I think the clearest example of this is the *Regents*

1    opinion from the Supreme Court.  There, the Supreme Court

2    said everyone acknowledges that the DHS administration can

3    rescind DACA.  It's within their power to do.  They have the

4    discretion in some sense.  And, yet, it wasn't unreviewable.

5    The Court looked at it extensively, held it was reviewable,

6    and held that it, in fact, was arbitrary and capricious.

7            So the point there is, there's a large difference,

8    as Judge Friendly pointed out in that Second Circuit opinion

9    we cited.  There is a type of discretion that is

10   unreviewable.  For example, elsewhere in 1225, if the fed --

11   the Congress said that DHS shall have sole and unreviewable

12   discretion, that's the kind of thing where we can't overcome

13   the reviewability bar.

14           But where Congress just happens to use the word

15   "may," then, of course, we can overcome it, because all

16   arbitrary and capricious review is about things like what if

17   the government, in exercising its discretion, failed to

18   consider some important factor.

19           So, I mean, that's where we are on reviewability.

20   Unless Your Honor has further questions on that, I will turn

21   to the merits of our claims.

22           **THE COURT**:  Okay.  You may proceed.

23           **MR. THOMPSON**:  Thank you, Your Honor.  Under the

24   APA —— so we'll do arbitrary and capricious first —— the

25   reviewing court shall hold unlawful and set aside agency

1  action that is arbitrary, capricious, abuse of discretion, or

2  otherwise not in accordance with law.

3          One of our main points in the arbitrary and

4  capricious section is that DHS ignored critical factors when

5  terminating MPP, and that's arbitrary and capricious under

6  cases like *State Farm*.

7          Before MPP, there was a very serious problem.

8  Asylum applicants without meritorious claims remained in the

9  country for lengthy periods of time.  It created perverse

10  incentives, according to DHS in October of 2019, and MPP was

11  the solution.  MPP, according to the DHS, was going to reduce

12  the number of aliens taking advantage of U.S. law and

13  discourage false asylum claims.

14          And then when DHS reviewed it after implementing

15  MPP for awhile, they found it was effective.  MPP returnees

16  that don't qualify for relief being quickly removed, no

17  longer a free ticket.  They're beginning to voluntarily

18  return home.  That's exactly what we want to have happen.

19          But DHS ignored all of that.  They didn't address

20  anything about perverse incentives.  They didn't address

21  anything about the free ticket that would be created to

22  illegally enter the United States without MPP.  They didn't

23  discuss the 2019 Assessment.

24          Now, we've obviously had some recent dealings about

25  the 2019 Assessment, and we respect Your Honor's opinion that

1    it is part of the Administrative Record, but I think that the

2    end of Your Honor's opinion is what's crucial here.  There is

3    no indication that the federal government actually considered

4    it or discussed these factors in the June 1 Memorandum.

5         So the fact that it's added after the fact to the

6    AR, I don't think tells us anything precisely because the

7    June 1 Memorandum explains its own rationales and doesn't say

8    anything about the assessment or the facts that underlie it.

9    Nor do they say anything about the transition warning from

10   career employees, just as we discussed with regard to the

11   evidentiary issues.  The point here is, if the federal

12   government receives serious and credible warnings that very

13   bad things are going to happen if they take a course of

14   action, they need to address that possibility when issuing

15   agency action, and they did not do so here.

16        Stating that a factor was considered is not a

17   substitute for considering it as the D.C. Circuit has held,

18   and, of course, the D.C. Circuit has considerable expertise

19   in administrative law.

20        DHS also ignored the cost to the states, including

21   Texas and Missouri here.  This is something that Judge Tipton

22   found important and dispositive in the 100-day pause

23   litigation.  He called it a clear and obvious responsibility

24   to consider the relevant factors, which by all intents and

25   purposes included Texas' expenses and costs.

1          It's worth noting, Your Honor, that this is the

2    second memo we have gotten on MPP.  And, of course, we had a

3    preliminary -- we had a complaint and a preliminary

4    injunction complaining about this very fact.  We said, DHS

5    declines to consider Texas' costs once again.  And DHS went

6    back, wrote a new memo.

7          Parts of it seemed like it were -- they were meant

8    to address things we had said in our complaint, but they seem

9    to have consciously chosen not to address Texas' costs again

10   despite the precedent from Judge Tipton.  So I think it's a

11   glaring omission in the June 1 Memo.

12         Moving from what they ignored to what they said,

13   I'm afraid it doesn't get any better.  DHS's stated reasons

14   were facially arbitrary.  Two points here:  The in absentia

15   removal rates as well as court closures.

16         So as to the removal rates, DHS puts this

17   incredible focus on the idea that there's an allegedly high

18   percentage of in absentia removals, 44 percent.  They say it

19   raises questions.  They don't answer any of those questions

20   despite reviewing the program, but they say it raises

21   questions.

22         But there's no way to say whether it raises

23   questions without knowing the answers to other questions,

24   like:  Is 44 percent actually high?  If so, is it -- the move

25   to 44 percent based on MPP at all?  That's not something that

1    DHS addresses in the June 1 Memo.

2            And, as it turns out, in absentia removal rates are

3    always high, and they jump around for reasons completely

4    unrelated to MPP.

5            So you can see this from the federal government's

6    own website.  We see in absentia removal rates that range

7    from the mid 30s to the low -- to the high 40s, excuse me,

8    and we see things like an eight-point jump between 2014 and

9    2015.  That obviously has nothing to do with MPP.  These

10   numbers just move around.  There are clearly other causes at

11   play.

12           And we see that, you know, some of these rates get

13   up to 43 percent in 2017, which the Government says, you

14   know, is -- you know, 44 percent is the real problem, but

15   apparently 43 percent is just fine.  I have a hard time

16   believing that a one-percentage point change has any real

17   effect here, much less that it can be attributed to MPP.

18           And the last point on this topic is, there's

19   nothing nefarious about in absentia removal rates even if

20   they did go up and even if it did go up as a result of MPP.

21   MPP was designed to encourage people who made false asylum

22   claims to abandon them and no longer make those types of

23   claims.

24           So the fact that someone who wanted to get a free

25   ticket into the United States based on a false claim of

1    asylum then says, oh, you're not going to let me into the

2    United States; I'm instead going to have to remain in Mexico;

3    well, then I guess I'll just give up on this process and go

4    back home, that's not a problem.  That's a feature, and it's

5    exactly the feature that DHS itself recognized in October

6    of 2019 saying that they were beginning to voluntarily return

7    home.  A significant portion have chosen to abandon their

8    claims.

9           Now, the federal government has many options, of

10   course, in many situations about how to deal with these types

11   of policy considerations.  They always have the option of

12   saying under arbitrary and capricious review, well, you know,

13   sure, we think that's a problem, but we think it's outweighed

14   for these reasons, but we don't have that here.

15          It's just like the *Regents* case where, sure, the

16   Trump Administration could have said, according to Chief

17   Justice Roberts, yes, there are reliance interests, but we

18   think they aren't as important on these facts because they're

19   outweighed by some other consideration.  But they didn't, and

20   that was enough to set it aside.

21          The same thing's true here.  Perhaps DHS could try

22   to reweigh the factors.  We would have to address that when

23   it happened, if it happened.  Of course, we don't know the

24   answer to that on the front end.

25          But they didn't even do any of that.  They didn't

1    say, oh, it's okay that they're abandoning meritless claims.

2    We want -- but, you knows, it's overcome by some other

3    reason.  They just misinterpreted the data and applied

4    logical fallacies.

5            Now, in the response brief to our PI, counsel for

6    the other side has, you know, put up a valiant defense of the

7    numbers; said that, you know, we're misinterpreting them;

8    that actually the comparative should be something else other

9    than what we've cited.

10           I will confess that I was not able to recreate the

11   numbers in their brief from their citations in their brief,

12   but just even assuming that it did work out in some way, it

13   would remain counsel's post hoc rationalization and

14   inappropriate under *Chenery*.  So, even if everything my

15   friend on the other side said were fully persuasive as to the

16   relevance of the in absentia removal rate, it's still not

17   something that Secretary Mayorkas said in the June 1 Memo.

18           The last point on this is that the -- the previous

19   court closures.  So in the June 1 Memo, Secretary Mayorkas

20   refers to problems that stemmed from COVID basically.  COVID

21   led to immigration courts being closed, and that, as with all

22   processes throughout the country, really threw a wrench in

23   the gears apparently.

24           But that's irrelevant, because the memo itself says

25   they reopened in April of 2021.  So it's not clear how the

1   federal government can rely on superseded past events that

2   are no longer causing effects to say that it should

3   prospectively terminate a program.  I think that's arbitrary

4   and capricious for the same reasons.

5           Lastly, I'll note that we have some carryover

6   between our arbitrary and capricious argument and our

7   substantive 1225 argument.  The idea here is that DHS ignored

8   the effect of terminating MPP on its ability to comply with

9   Section 1225's mandatory detention requirements.

10          And I think it makes the most sense to discuss that

11  in the substantive section, but I'll just note that it is, in

12  fact, a part of our arbitrary and capricious claim as well.

13          So, under the INA, Section 1225 offers Defendants a

14  choice.  One, the Defendant can detain as required by

15  1225(b)(2)(A) if the alien is in the United States, or, under

16  paragraph (C), DHS can let the alien remain in Mexico under a

17  MPP-like program.

18          Now, the Defendants say that they can't use these

19  two options -- or, excuse me, they say they can't detain

20  everyone because of resource constraints.  There are a number

21  of citations for this.  We've put them in our brief.  But

22  App.307 is talking about resource constraints.  We have the

23  custody and transfer statistics pointing out the same

24  problem.  They say, continued detention is not in the

25  interest of resource allocation or justice.

1          This is from the Administrative Record.  I'll note

2     that the Court has heard evidentiary objections to news

3     articles that were contained in our evidentiary appendix.

4     The Defendants also include news articles in their

5     Administrative Record, so the Reuters' article at AR183 notes

6     that DHS has the discretion to parole people who are not

7     eligible for bond and frequently does so due to insufficient

8     detention space.

9          The same article quotes Professor Vladeck from UT

10    for the proposition that the number of asylum seekers who

11    will remain in detention will almost certainly be a question

12    of detention capacity and not whether the individual

13    circumstances of individual cases weren't release or

14    detention.

15         Now, these are things that Defendants themselves

16    chose to put in the record.

17         **THE COURT**:  And the Court is carrying forward

18    evidentiary objections in ruling on those objections.  The

19    order on those objections will be paired with the Memorandum

20    Opinion and Order, so that the parties are clear on which

21    documents the Court relied on or excluded.

22         But I do want to address just briefly, and I don't

23    want this to descend into an evidentiary hearing — I vastly

24    prefer this oral argument design that we've set up — Page 6

25    of the Motion to Strike though, Defendants note in that

1    motion that the CBP website no longer contains the footnote

2    that supported Plaintiffs' initial argument that parole was

3    being granted on a class-wide basis.

4          Given this extant or missing footnote, how should

5    the Court evaluate the now missing footnote moving forward

6    and what weight should the Court give to that?

7          **MR. THOMPSON**:  So I think the footnote deserves all

8    the weight it bears as a result of just reading its text.  It

9    was on the government's website.  It is a self-authenticating

10   document.

11         Usually, these government websites are subject to

12   judicial notice as well.  And now it is true that counsel has

13   said -- I guess that counsel believes it to be inaccurate,

14   but as far as I know, we don't have any evidence that it's

15   inaccurate.  We don't have a declaration or something that

16   says, no, I typed the footnote, and I was mistaken for some

17   reason.  Instead, what we have is I think independently

18   sufficient but also confirming evidence from the things that

19   we've just put on the screen and other things cited in our

20   brief.

21         So I suspect the footnote -- or, excuse me, my

22   position is that the footnote is entitled to evidentiary

23   weight, but I don't think it's required.  I think the same

24   fact-finding is supported by other evidence.

25         **THE COURT**:  Okay.  And just I will instruct the

1    United States, whether through Mr. Ward or Mr. Darrow, if you

2    reach a point where those motion to strike issues are

3    relevant and that CBP website is relevant to your argument,

4    I'll hear any response to that now missing footnote.

5         I know that that featured prominently in the

6    motions practice on strike, so if there is any response from

7    the Government, I would just ask that you supplement your

8    presentation to include that.

9         So you may proceed.

10    **MR. THOMPSON**:  Thank you, Your Honor.  So MPP

11    lowered the number of aliens who needed to be detained

12    relative to the detention space available.

13         The point here is that, when the government says we

14    don't have the resources to detain everybody, then that --

15    that raises the question:  Well, what is the ratio of people

16    who need detention to the detention space available?

17         MPP made that ratio more favorable to compliance

18    with the law by giving the government the option of letting

19    people remain in Mexico and thereby reducing the number of

20    people who needed detention in the United States.  So it was

21    a lawful option that helped the government comply with its

22    obligations of mandatory detention under Section 1225.  And

23    the Government itself acknowledged this point.

24         So this is from the metrics and measures document

25    in the Administrative Record that the Secretary says he

1    relied on in his June 1 Memorandum.  The goal of MPP, one of

2    the goals was to prevent catch and release, including for

3    people who turn out to be filing false asylum claims.  And

4    they found that MPP, in fact, reduces the number of aliens

5    released into the interior of the United States.  So that was

6    the goal, and it was being effectuated.

7            According to Mr. Morgan, in FY -- fiscal year 2019,

8    CBP was releasing more than 200,000 illegal aliens, and then

9    in 2020, in large part directly related to MPP, CBP released

10   fewer that 1,000.  This is a big deal.

11           The compliance with federal statutes, of course,

12   matters, and we shouldn't -- the courts know that a child who

13   murders his parents can't plead for sympathy on the basis

14   that he's an orphan.

15           **THE COURT**:  Chutzpah.

16       **(Laughter.)**

17       **MR. THOMPSON**:  So neither can the federal

18   government, which has tied its own hands, saying, oh, we

19   couldn't possibly comply with our detention obligations

20   because we're letting so many people in without MPP that we

21   can't detain them all, and say, but don't worry about it,

22   because it's a completely separate problem; we just can't do

23   it; it's resource problems.

24           They can solve their own resource problems by not

25   enacting the unlawful memorandum terminating MPP.  And even

1    if it didn't completely solve their resource problems, it

2    would at the very least lessen them.  It would certainly lead

3    to fewer violations of Section 1225.

4            And while we would strongly prefer the federal

5    government to fully comply with Section 1225, partial

6    compliance would at least be an improvement.

7            **THE COURT**:  Okay.  So we are -- we're at a point

8    where the Court will interrupt to ask a question about

9    termination of MPP and how this does intersect with prior

10   court rulings at the District Court level and above on DACA,

11   so that's D-A-C-A.

12           The termination of MPP does not itself, unlike

13   DACA, create affirmative benefits.  It is the government's

14   decision to parole illegal alien detainees into the United

15   States that creates affirmative benefits and burdens the

16   state.

17           Isn't Plaintiffs' case truly a challenge to the

18   government's parole practices and not the termination of MPP?

19           **MR. THOMPSON**:  No, Your Honor.  We're not

20   challenging, you know, any kind of individual grant of parole

21   or even the parole policies.  What the parole policies

22   provide are the legal context for understanding how the

23   termination of MPP plays out in practice.

24           So I think the key sticking point between the

25   parties is that everyone agrees that under some circumstances

1    MPP is voluntary.  It's a discretionary option of the federal

2    government.  And so if the government were going to detain

3    everyone who it doesn't enroll in MPP, as required by 1225,

4    that would be fine.  We -- then, you know, the termination of

5    MPP wouldn't violate Section 1225.

6         But the problem is, they're not doing that.  They

7    agree they're not doing that.  I think the evidence about

8    resource constraints shows they're not doing that, but

9    another piece of the evidence showing that they're not doing

10   that is the parole evidence, showing that what they are doing

11   is releasing a -- releasing on parole a class of individuals

12   based on the, you know, class-wide ground that DHS lacks

13   resources to detain everyone.  Whereas, what parole was

14   supposed to be, both originally and especially after Congress

15   clarified the statute, is a case-by-case humanitarian

16   program.

17        All right.  So you're supposed to look at a

18   particular alien and say, ah, well, you can be paroled in the

19   United States because you need to get a medical service

20   provided by a doctor here or something like that.  It is not

21   nearly the same thing as saying, well, you know, everyone who

22   comes in on Tuesday has to be released because we don't have

23   any more beds.

24        **THE COURT**:  It's a -- you know, we -- you know,

25   everybody's fond of quoting Justice Scalia these days and his

1   books on canons.  We can cite canons distinguishing the

2   general from the particular, a case-by-case adjudication

3   versus a categorical determination.  We can pick our favorite

4   Latin to explain this difference, but I think I understand

5   the Government's response here.

6          This bleeds in to the section of your presentation

7   on Take Care, but I think it's also relevant to the INA

8   claim, whether review is limited by statutory text itself.

9   So does 8 U.S.C. Sections 1226(e) —— and that's the judicial

10  review provision there —— 1252(a)(2)(B)(ii) —— and that's a

11  judicial review section —— 1182(d)(5)(A), as instructed by

12  the *Trominksi* opinion by the Fifth Circuit, or any other

13  statute or cases interpreting same, prohibit this Court's

14  judicial review of Defendants' parole practices as compared

15  to individual parole determinations?

16         So, in addition to sort of the theoretical question

17  that I just presented, I want to take it to the particulars

18  of the statutory language of the judicial review provisions,

19  and then pair that with any case -- case law.

20         Do you know of any other statutory provision or

21  case interpreting same that would hold that those judicial

22  review sections prohibit this Court from reviewing those

23  decisions, or do I have the universe of statutes and cases I

24  should consider, the aforementioned sections and *Trominksi*?

25         **MR. THOMPSON:**  I think Your Honor has it.  I think

1   there may be two conceptual distinctions, and I just want to

2   make sure we have them both clearly explained.

3          So one is the difference between a challenge, like,

4   to a particular grant of parole, right?  So that's clearly

5   different than what we're doing.  But it's also different

6   than a challenge to a hypothetical agency memo about parole.

7   We're also not challenging a final agency action that's, you

8   know, here are our parole practices, right?  All we're

9   using --

10          THE COURT:  Which would sound more in prosecutorial

11   discretion and be within the purview of the Article II Branch

12   and all that.

13          You're not -- I don't take the State of Texas or

14   the State of Missouri to challenge that sort of triage

15   prioritization that the Executive Branch has to make.

16          MR. THOMPSON:  No, we've not challenged that, and

17   there's another reason, Your Honor.  I don't have a final

18   agency action to put before you.  I mean, if we get one,

19   perhaps there will be a different case where we can raise

20   those arguments.

21          But, no, the -- the way these statutes work in

22   terms of review is, I think the focus has to be on what is

23   the Court potentially setting aside.

24          THE COURT:  Right.

25          MR. THOMPSON:  And we're not talking about setting

1    aside particular grants of parole.  We're not talking about

2    even setting aside a practice about parole.

3           It's just a background fact about the law and about

4    the world that informs the Court's review of the June 1 Memo.

5           **THE COURT**:  Right.

6           **MR. THOMPSON**:  And since none of the statutes

7    prohibit review of the June 1 Memo, the statutes have no

8    application in this case.

9           **THE COURT**:  And in thinking about metaphors and

10   analogy for this judicial review question and how this

11   Court's review intersects with those statutory provisions on

12   judicial review and *Trominksi*, I thought of a toll booth.

13          Let's say this is a toll-booth law.  And there's an

14   individual particularized assessment at that toll booth.  The

15   light turns green based on certain internal memoranda.  The

16   light turns red based on internal memoranda.

17          The Governments of Texas and Missouri are not

18   asking this Court to adjudicate any of those individual

19   particularized decision to turn the light green and allow the

20   truck to pass or to drop the arm, turn the light red and to

21   stop it, because there's an infrared scanning policy or

22   something internal to the agency operation.

23          Instead, we're talking about the termination of a

24   memorandum involving toll booths in a categorical sense and

25   whether that is adjudicable in this court pursuant either to

1   the APA, the Take Care claim, or even the INA claim.

2           Do I understand the distinction?  And I know you're

3   not bound to use toll-booth analogies, but --

4           **MR. THOMPSON:**  I think I can go --

5           **THE COURT:**  -- have I correctly --

6           **MR. THOMPSON:**  -- with toll booths.

7           **THE COURT:**  Have I correctly understood the nature

8   of the Texas and Missouri arguments against these judicial

9   review tensions that inhere in the statutory text and also in

10  the structure of our Constitution?

11          **MR. THOMPSON:**  I think that's true.  Now, I'll

12  hazard an extension of the toll-booth --

13          **THE COURT:**  Please do.

14          **MR. THOMPSON:**  -- metaphor.  So if there were a

15  case about whether a driver were speeding, there might be a

16  relevant fact of what time did he go past the toll booth and

17  when did he enter this.  And you might need to establish that

18  the toll booth can turn from red to green, and it, in fact,

19  did so on this date at this time.

20          Even if for some reason you weren't allowed to

21  review anything about, you know, whether the light should

22  have been green or red or anything like that, it could still

23  establish the facts that showed when he entered, and that

24  fact contributes to a finding that he was speeding.

25          **THE COURT:**  Okay.  I think I have your argument.  I

1    do not bind the State of Texas, the State of Missouri or the

2    United States of America to toll-booth metaphors.  You do not

3    need to follow that metaphor to every terminus.

4         **(Laughter.)**

5         **THE COURT**:  So you may proceed with your next

6    point.

7         **MR. THOMPSON**:  Thank you, Your Honor.  Very -- I

8    have only just a couple of slides here.  Our constitutional

9    claim is under the Take Care Clause.  This is, of course, a

10   typo.  It is not in Article III.  Sorry about that.  He shall

11   take care that the laws be faithfully executed.

12        We could have endless scholarly debates about what

13   the outer bounds are of the Take Care Clause, and many

14   scholars do have those debates.

15        But what I think is indisputably not taking care

16   that the laws be faithfully executed is taking affirmative

17   action that systematically prevents the Executive Branch from

18   complying with a statutory command.

19        As to the agreement, there's -- there's not much

20   factual dispute here, Your Honor.  The agreement requires

21   that DHS consult with Texas, allow us the opportunity to

22   comment on changes like this.  It's very similar to a notice

23   and comment regime under the APA.

24        And Defendants don't dispute that they didn't do

25   that.  Their defense is that the agreement is just per se

1     invalid.  They say they didn't have authority to sign it.

2           In our view, DHS certainly did have authority to

3     sign it.  Not only did it represent it had that authority, of

4     course, in the agreement, but Congress has authorized DHS to

5     develop a process for receiving meaningful input from state

6     and local governments to assist the development of the

7     national strategy for combating terrorism and other Homeland

8     Security activities.  This is, of course, a Homeland Security

9     activity, immigration enforcement.

10          And if the question is what did Congress have in

11    mind for permissible processes for receiving meaningful

12    input, I think a notice and comment-like regime must be, you

13    know, the core of what's permitted, because that is what

14    Congress has, in fact, compelled in some circumstances.

15          So with that, Your Honor, I will turn over the

16    podium to Mr. Osete, who will address the third question,

17    unless Your Honor has further questions.

18          **THE COURT**:  One question.  So we're now to Claim 4,

19    which is what I have termed the agreement claim.

20          What is the limit of using agreements with notice

21    and consultation-like clauses to slow incoming

22    administrations?

23          For example, what if the agreement in this case

24    required four years and one day instead of 180 days; is there

25    an inherent reasonableness requirement that the Court should

1  infer in conducting that analysis?

2           MR. THOMPSON:  I think that would be fair.  I think

3  it's fair to say that there is some things that the

4  government simply could not agree to because it would violate

5  either an explicit or an implicit --

6           THE COURT:  It's kind of like when the Texas

7  Supreme Court declares something void as against public

8  policy, like, there would -- there would be instances where

9  agreements were so beyond the pale that --

10          MR. THOMPSON:  I think that's right.  Now, the

11 Texas Supreme Court also holds that public policy is declared

12 by the legislature, so I think that in -- in this instance,

13 to determine whether an agreement is, you know, so beyond the

14 pale that it cannot be upheld would be a question of

15 statutory interpretation.  We'd be looking at the agency's

16 powers.  And then there would be -- of course, be a second

17 back-end limit, I think, which would be -- if it were an

18 agency action subject to APA review itself, you know, there

19 could be a case about that.

20          There's not a case about that.  No plaintiff has

21 sued the federal government or Texas trying to set aside that

22 agreement.  The federal government has not, you know, raised

23 a counterclaim or done any -- anything like that seeking

24 relief to set aside the agreement.

25          I believe there might have been a footnote in their

1    brief, but it certainly wasn't developed enough for me to

2    call it an argument that the -- that the Court should set

3    aside the agreement on that ground.

4              THE COURT:  As you might imagine, we did not find a

5    lot of case law on the sorts of agreements deemed binding or

6    not binding on subsequent administrations, especially where

7    there's a change of political party.

8              So I would assume that at some point this Court and

9    courts above this Court have got to infer some reasonableness

10   requirement, whether it's under equitable authority or just

11   in the separation of powers, but at some point these sorts of

12   alleged binding agreements just would violate how succession

13   of administrations is to occur.

14             MR. THOMPSON:  I think that's right.  Certainly an

15   agreement could be arbitrary and capricious and could be

16   reviewed as such.  I don't think we're -- we're in that fact

17   pattern.

18             We're talking about something very similar to how

19   the APA works, right?  So if Congress gets to decide kind of

20   the public policy by analogy for this reasonableness inquiry,

21   the fact that this is so similar to the APA is relevant.  And

22   the term is, of course, not four years; I believe it was up

23   to 180 days in the agreement.

24             THE COURT:  Right.

25             MR. THOMPSON:  It's not uncommon for regulatory

1   processes to take longer than that.  We are more than

2   180 days into the administration.  We know there are various

3   high-profile rulemakings the Biden Administration is pursuing

4   that have not yet come to a conclusion.

5           So I don't think in our system, which includes the

6   APA, there's any kind of implicit limit saying the government

7   must be able to effectuate all of its changes within 180

8   days.

9           **THE COURT**:  Okay.

10          **MR. THOMPSON**:  And, of course, they may have been

11  able to do it faster than 180 days if they'd have complied.

12  It's just an outer limit.  It's not a requirement that it

13  last that long.

14          **THE COURT**:  Yes.  And I have the Government's

15  argument.  I think, of the four claims, this is the most

16  theoretical.  It's the most without analogue to previous

17  agreements or cases, and so I didn't see the reasonableness

18  sort of factor teased out by either party, but I do not

19  understand the Governments of Texas or Missouri to argue that

20  these are strictly enforced without any sort of outer bound

21  for reasonableness.

22          **MR. THOMPSON**:  That's right.  We're not saying that

23  every hypothetical agreement would certainly be valid.  I

24  think they have to be evaluated on a case-by-case basis.

25          **THE COURT**:  Okay.  I have your argument.  I'll

1    allow the State of Missouri to proceed.

2            Mr. Osete, before -- as you approach, I'm going to

3    consult with my clerks, and I will give you a time check so

4    that you know what time is available.

5            **MR. OSETE:**  Thank you, Your Honor.

6        **(Court/law clerks sotto-voce conference.)**

7            **THE COURT:**  Okay.  One day I'm going to buy a chess

8    clock, and we'll just put it up there, and you'll be able to

9    monitor this, but, right now, we're relying on staff.  By our

10   calculation, the States of Texas and Missouri have 35 minutes

11   left, and, of course, you have held 30 minutes for rebuttal

12   after the Defendants present their case-in-chief.

13           You may proceed.

14               **PLAINTIFF MISSOURI CASE-IN-CHIEF**

15           **MR. OSETE:**  Yes, Your Honor.  May it please the

16   Court?  And I will note that, unless the Court has extensive

17   questions about remedies, I don't anticipate my presentation

18   to go beyond 15 or 20 minutes.  And Mr. Thompson will be

19   handling the rebuttal aspect after the Government proceeds.

20           I will admit I haven't had the pleasure of arguing

21   in the Fifth Circuit.  I hope to one day, but I can say that,

22   at the Eighth Circuit, and in particular Judge Stras, is not

23   shy about interrupting me at oral argument, so I welcome the

24   Court's colloquy in that respect.

25           Just as a threshold matter, I don't think I'm going

1    to have anything to add on standing.  I thought Mr. Thompson

2    did a very good job as an honorary Missourian today to

3    represent our -- our standing in this case and the written

4    submissions and evidence that we have submitted that supports

5    that.

6            THE COURT:  We're all about to be in the same SEC

7    Conference together, so we might as well get --

8        (Laughter.)

9            THE COURT:  We might as well get used to the

10   pleasure of each other's company.

11           MR. OSETE:  Sure.  I think that -- I think that's

12   right.  And, of course, I would be remiss if I didn't say

13   that we do believe that we have independent standing,

14   independent from Texas.

15           That being said, if the Court believes that we do

16   not, based on Judge Hanen's opinion last week, as long as one

17   state has standing, we have standing as well.  So unless the

18   Court wants something else further on Missouri-specific

19   standing, I'm happy to --

20           THE COURT:  I'll deem --

21           MR. OSETE:  -- address remedies.

22           THE COURT:  I'll deem it incorporated by reference,

23   and I'll deem it adequately briefed in the materials before

24   the Court.  And it would be cumulative at this point, so I'll

25   allow you to incorporate those written and oral arguments by

1  reference.

2          You may proceed on what remains --

3          MR. OSETE:  Sure.

4          THE COURT:  -- for both Texas and Missouri.

5          MR. OSETE:  That's correct.  And, of course, Mr.

6  Thompson can address anything else in rebuttal that I do not

7  address, but I'm going to handle the remedies aspect.

8          So I think on the remedies one thing to start off

9  with is, just to be very clear with the Court, as to the --

10  what the states believe is a warranted, a full remedy for

11  these Plaintiffs in this case, and that is, if the Court

12  concludes that the June 1 Memorandum is, in fact, unlawful,

13  then under the APA, Section 702, it shall set it aside.

14  That's the vacatur aspect of the remedy.

15          And we believe that's a warranted remedy here.

16  It's the same remedy that Judge Hanen, for example, found

17  last week in the DACA case.  That's one aspect of it.

18          But, in addition to that, we believe in this

19  context in this case an injunction is appropriate for many of

20  the reasons that we submitted on the papers, and I will go

21  through them right now.  And I think -- I think the reason

22  it's appropriate here, it really goes to the *Monsanto* case

23  about whether or not an injunction is going to have, quote,

24  "any meaningful practical effect independent of vacatur."

25          And I think based on the context of this case, as

 1    Mr. Thompson said so vigorously about the resource

 2    constraints, the systematic violations of 1225 that we've

 3    alleged, we actually believe that an injunction for the

 4    government to implement MPP is a critical aspect of our

 5    relief.

 6           So not only setting aside the June 1 Memorandum,

 7    but also insuring -- you know, unless -- unless the

 8    government decides to adopt a significant -- or enlarge their

 9    detention capacity and adopt significant measures to address

10    these violations of 1225, we believe that, absent that, a

11    full remedy here is both vacatur and injunction.

12           Judge Hanen also found those two remedies were

13    appropriate last week.  There are some distinctions.

14           But to be very clear, the Government has suggested

15    that a mere remand is the warranted remedy here.  We don't

16    believe it is a full remedy here.  Certainly an injunction in

17    the DACA case and in the DAPA case and the 100-day pause

18    case, a geographically-limited injunction wasn't enough.  I

19    don't see how a mere remand is enough.

20           And, of course, here one point I will make is that

21    the memo itself in our view is -- substantively violates the

22    APA, and it's not just insufficiently explained.  The

23    government has now had two opportunities to explain the

24    termination of the June 1 Memo.  There is a 700-page

25    Administrative Record.

1          Again, we think that they didn't consider relevant

2    factors like these perverse incentives to causing illegal --

3    illegal immigration, but we don't believe that a mere remand

4    in and of itself is enough.

5          And if the Court were to conclude that a remand is

6    warranted, it has to be a remand in addition to other relief,

7    vacatur or some kind of injunction pending the remand for the

8    government to address those issues.

9          But just to be clear, the States of Missouri and

10   Texas are asking for vacatur and an injunction, and we

11   believe that's consistent with *Monsanto*.  And if I may --

12         **THE COURT**:  So I understand that now.  That was one

13   of my questions, if Texas and Missouri perceive that there is

14   a functional difference between the remedy provided by

15   vacatur and what is requested in injunctive relief.

16         I'll now give you wide latitude to explain the

17   latter.  Explain to this Court what it should enjoin, how

18   that is materially distinct and different from the relief you

19   would receive through vacatur.

20         **MR. OSETE**:  Sure.

21         **THE COURT**:  So I don't mean to force you out of

22   your outline or itinerary, but I'm interested in that --

23         **MR. OSETE**:  Sure.

24         **THE COURT**:  -- distinction, and then if you could

25   just tell this Court what remains and what should be

1  enjoined.

2         **MR. OSETE**:  So if the June 1 Memorandum is aside --

3  is set aside and we vacate it, we know that the January 20th

4  Memo won't spring back to life.  This Court has already

5  concluded in its prior order that that's already expired by

6  its own terms.

7         So it means that the program itself would be

8  revived.  It would be -- it would come back to life, if you

9  will, but what's -- what's critical about that program and

10  why an injunction we believe is appropriate is, without the

11  government actually implementing that program, it's

12  effectively a defunct program or a program that is a -- has

13  been de facto terminated without the agency actually taking

14  new agency action and actually taking steps to comply with

15  the APA.

16         So, essentially, you have a program that's MPP, but

17  without it actually being implementing and these folks who we

18  believe should be sent to Mexico pending their removal

19  proceedings, if that's not happening, then I think we're just

20  right back at the same place, which is they've terminated it

21  through the June 1 Memorandum.

22         Absent an injunction, I don't see what really

23  causes them to implement the MPP program.  They could just --

24  I mean, it exists, but if it's not implemented, we would

25  submit that it's effectively a defunct program.

1          So we believe, for that reason, it's enough of a

2     meaningful practical effect under *Monsanto* to warrant both

3     vacatur and an injunction.

4          Now, just -- just in full candor to the Court, to

5     the extent that that -- the Court sees no practical

6     difference between those two, we're not saying that, you

7     know, we won't be okay just with vacatur.  Obviously, we're

8     fine with just vacatur as well.

9          We're just saying that in this case we believe

10    under *Monsanto* there is a meaningful practical effect to

11    setting aside the June 1 Memorandum and ensuring that the

12    systematic violations -- if they're not going to be detaining

13    these folks, the systematic violations of 1225 are not

14    happening; they are, in fact, complying with the program; and

15    it's not essentially just a program on the -- on paper.

16         That's what I would submit as the meaningful

17    practical effect.  We think we satisfy *Monsanto* on that

18    basis.

19         But, again, just to be clear, it's -- it's -- the

20    first remedy that we ask for, if the Court does not believe

21    that -- if the Court believes that vacatur in and of itself

22    is enough, we have no -- no objection to proceeding with

23    that.  We just want -- we're just concerned that, because of

24    these resource constraints that DHS has already put forward

25    and Mr. Thompson has already explained much better than I

1   could, we are concerned that that is a problem we're going to

2   run into again, and here we are, you know, six months from

3   now trying to relitigate this.

4           So we think it's enough practical difference for

5   that -- for that reason, Your Honor.

6           **THE COURT:**  Okay.  And there will come a point

7   where I instruct the parties to submit proposed findings of

8   facts and conclusions of law.

9           **MR. OSETE:**  Sure.

10          **THE COURT:**  And that order may also include

11  proposed relief for particularized injunctive --

12          **MR. OSETE:**  Sure.

13          **THE COURT:**  -- language and relief.  You have to

14  realize I took Constitutional Law from Lino Graglia at the

15  University of Texas.  The assigned book was *Disaster By*

16  *Decree*, and there are several horror stories about district

17  judges managing school districts and --

18          **MR. OSETE:**  Yeah.

19          **THE COURT:**  -- ordering nat -- the construction of

20  billion-dollar natatoriums, auditoriums, and planetariums.

21          **MR. OSETE:**  Yeah.

22          **THE COURT:**  I think that's a Kansas City case, so I

23  am loathe to engage in that sort of micromanagement --

24          **MR. OSETE:**  Right.

25          **THE COURT:**  -- given separation of powers and how

1    the Article III Branch intersects with the Article II Branch.

2              So when we speak of injunctive relief, you can

3    expect this Court to require guidance of both parties on the

4    scope and how narrow or broad that should be.

5              **MR. OSETE**:  Absolutely, Your Honor.  And if I may

6    just on that point, I think that's absolutely right; that

7    *Missouri v. Jenkins*, and in particular Justice Thomas'

8    concurrence in that case as well, has really provided a lot

9    of guidance for the courts.

10             I will say that, in this case, part of the reason

11   we think -- and, obviously, there's Fifth Circuit precedent

12   that binds this Court, and there's Judge Tipton's opinion

13   from earlier this spring, that in this context an injunction

14   would be appropriate.

15             But I do want to highlight at the very least, aside

16   from that binding precedent from the Fifth Circuit and Judge

17   Tipton's persuasive opinion, you know, if you go back to

18   Justice Thomas' concurrence in *Trump v. Hawaii*, I thought he

19   made two very critical points there.  The first point in

20   terms of scope -- and to be clear, I'm not so sure that the

21   Government is actually arguing that this injunction should

22   somehow be, you know, limited by geography or geographical

23   scope, but I -- I don't think they're making that argument,

24   and I don't think they should be making that argument because

25   Justice Thomas, who they extensively rely on in their papers,

1   rejected that the notion that an injunction that is broad in

2   scope as a matter of geographical standpoint is invalid per

3   se.  I mean, he rejected that.

4           As long as it's providing full relief to the

5   parties in the case, which we submit that is what we're

6   asking for here, it doesn't matter whether it extends past

7   Texas, past Missouri, past Arkansas, et cetera, and he's

8   making that point.

9           So I think that's consistent with the Article III

10  power.  It's consistent with what he's written on this topic,

11  which has been very extensive, along with Professor Bray.

12  And -- but on top of that, I think he makes another critical

13  point as to scope and what the appropriate remedy is, and

14  that is --

15          THE COURT:  I'm less -- I'm less concerned about

16  geography and sort of the reach of the order.  I'm more

17  concerned about the particularity of ordering federal agents,

18  agencies, Article II Executives to do X, like the sort of

19  affirmative relief that is different in kind from mere

20  vacatur of the memorandum and reinstating MPP, the sort of

21  lengthy marching decrees and orders that you saw in some of

22  those cases I referenced.

23          MR. OSETE:  Sure.

24          THE COURT:  What does Texas and Missouri require or

25  request in injunctive relief and the language of that

Plaintiffs' Motion for Argument

1    injunction and its binding effect on the federal officers,

2    you know, DHS, ICE, all of the different agencies?  That's

3    what I -- that's the portion of the analysis that I'm most --

4           **MR. OSETE**:  Sure.

5           **THE COURT**:  -- interested in.

6           **MR. OSETE**:  And I think, of course, with our

7    proposed findings and conclusions that we can get a lot more

8    specific about it, but I think that the key point here is,

9    when MPP was in effect and these individuals who presented

10   themselves at the border for admission and were claiming

11   asylum, there's a whole process about credible fear

12   assessments and the interview process and all of that that

13   happens.

14          But what's interesting about when MPP was in place

15   —— and this is also in our record materials as well —— is,

16   it's the -- MPP was the difference between 68,000 folks

17   staying in Mexico and not being released in the United States

18   and effectively none of them or a very small number of them

19   actually staying here.

20          So in terms of language, it's following MPP.  They

21   can present themselves.  If they do not pass a credible-fear

22   test, that they do send them back to Mexico, which is what

23   the program required.

24          And it's, again, trying to avoid these systematic

25   violations of 1225 where they are letting these folks come

1    in; there are capacity restraints that do not allow them to

2    be detained; and they then, you know, make their way across

3    the country.

4          So I think a -- sort of a specific language, and,

5    again, we can provide the Court with much more specific

6    language to -- to that effect, but I think an injunction that

7    ensures or at least requires them to implement this program,

8    not just -- because that's the concern here is, they can have

9    a program, but if it's not being implemented, I'm not so sure

10   what the sort of practical -- I'm not sure we have a full

11   remedy there, at least for us, because we get back to

12   systematic violations of 1225.  We get harms to the states.

13         So I think something to that effect, and we can

14   certainly come up with something in our papers to submit to

15   the Court, but I think that's the concern here, is, they can

16   just go back to doing what they're doing.  It's effectively a

17   program on paper, and it doesn't get enforced, or it

18   doesn't -- it's not implemented at all.

19         And I'm not -- none of us are suggesting that --

20   certainly not in our writings or here I'll tell you, I don't

21   think any of us are suggesting that the Court adopt, you

22   know, joint status reports or sort of update them like in the

23   desegregation cases.

24         This is really just a full remedy -- like Justice

25   Thomas said in *Trump v. Hawaii* in his concurring opinion, a

1     full remedy under the Article III power is to provide these

2     Plaintiffs, not nonparties, but these Plaintiffs with a full

3     remedy.  And, as I stated earlier, based on the nature of

4     this case, that is a full remedy.

5           The situation where -- or just because there is a

6     sort of benefit that extends to nonparties, Justice Thomas

7     himself rejected that as also being insufficient to not issue

8     this remedy.  The fact that there are other benefits to other

9     nonparties, for example, beyond the Plaintiffs in and of

10    itself is also not enough to -- to not exercise this

11    extraordinary remedy.

12          So I think to that point, Your Honor, I -- this is

13    exactly what Article III allows us to request.  It alleviates

14    our harms.  It provides us with a specific remedy.  And, in

15    that case, again, we can come up with specific language as to

16    what exactly injunction is, but that's the concern here is,

17    it's just a program on paper if they don't implement it.  At

18    the very least they have a duty to avoid these statutory

19    violations as Congress has laid them out in statutes.

20         **THE COURT**:  I just -- you know, I would admonish

21    both Texas and Missouri to appreciate that it is -- it's like

22    the difference between a negative and a positive.

23         **MR. OSETE**:  Sure.

24         **THE COURT**:  It's easier to enjoin action and order

25    that things be stopped than for the Court to make affirmative

1   decrees that things start or that certain facilities or

2   detention --

3           MR. OSETE:  Sure.

4           THE COURT:  -- detention capacity be built and

5   expanded.  So it will be clear in the Court's order to both

6   parties for submission of findings of fact and conclusions of

7   law and potential injunctive language, but I would just ask

8   that you be mindful of that.

9           MR. OSETE:  Yes.

10          THE COURT:  And I'll allow the parties to make

11  their arguments on scope and the reach of any potential

12  injunction, but I do instruct all of the parties to be

13  mindful of that.

14          MR. OSETE:  Yes.

15          THE COURT:  I think some of those cases involving

16  courts micromanaging things for decades are a cautionary tale

17  and potentially run afoul of all sorts of separation of

18  powers problems, so --

19          MR. OSETE:  Absolutely.

20          THE COURT:  -- I am looking at requested relief and

21  eyeing the statutory language as well as the design of MPP.

22  And so if anything requested is tailored to that, I'm more

23  responsive -- I'm more amenable to those sorts of

24  recommendations than ordering troops to cross borders and do

25  things like that, so that's the tension; that's the concern.

1   **MR. OSETE**:  Absolutely.

2   **THE COURT**:  I know that you're appreciative of

3 that, and you may -- you may proceed with any remedies --

4   **MR. OSETE**:  Sure.  And just on that --

5   **THE COURT**:  -- analysis.

6   **MR. OSETE**:  Yes.  Just on that final point, just

7 one more point on that, yes, anything we come up with would

8 be consistent with *Missouri v. Jenkins*, with what Justice

9 Thomas has written on this topic, and, for that matter, will

10 be consistent with what these prior judges have already done

11 in this context as well, Judge Hanen, Judge Smith in the DAPA

12 case, and Judge Tipton as well just this past spring.

13   We are mindful of that, and we are as well going to

14 consider that as we -- as we propose specific relief to the

15 Court as it relates to an injunction.

16   And I guess the last thing I'll close with just

17 kind of running quickly through these factors — I'm mindful

18 of the Court's time — is the *eBay* factors that Judge Hanen

19 analyzed last week.  Irreparable harm, public interest, and

20 balancing of the equities.

21   I submit that the balancing test and the public

22 interest tend to merge together, so I'll run quickly just

23 through irreparable harm.  I think, like Judge Hanen, really

24 as long as the states have standing, and here we do because

25 we have costs that we cannot recover from the federal

1    government, there's ongoing irreparable harm here.  I think

2    we've established irreparable harm in that aspect, and I

3    think Judge Hanen's analysis provides the Court with guidance

4    in that respect.

5         I think in terms of the public interest, to be

6    quite -- the primary one I would say is that the enforcement

7    of federal statutes that Defendants are violating is a public

8    interest.  It's ensuring that the laws that Congress has

9    written are, in fact, enforced.  And I think that's a public

10   interest.  Justice Thomas has also weighed in on that as a

11   public interest as well, and we've submitted that in our

12   papers.

13        In this context, the public interest will be served

14   by restoring integrity to the immigration system, as Mr.

15   Thompson said earlier, avoiding these free tickets into the

16   United States, and ensuring that our immigration laws are --

17   are followed, that Congress' laws as written are followed,

18   and, more importantly, that the immigration laws -- that

19   folks aren't gaming the immigration system, and that in and

20   of itself as well is a public interest.

21        The other public interest that we have put forward

22   through our evidence as well is the fact that you have the

23   ongoing victimization of these migrants in our borders.  An

24   egg farm in Chicago, tomato farm in Florida, you know, a blue

25   grove in Michigan, blueberry grove in Michigan.  In Missouri,

1   in Springfield, in Branson and other places, these migrants

2   are being victimized.

3          We've stated the labor trafficking.  We've stated

4   the sex trafficking.  We've stated the abuse.  The fact that

5   they're not reporting these things.  They don't think they're

6   victims for that matter, because they are brought into the

7   country through these perverse incentives, and they don't

8   think they're victims.  They're not -- they're not -- they

9   don't see themselves as victims.  They just see this as a

10  run-of-the-mill thing.

11         And that too is in the public interest to avoid

12  that victimization of the migrants, and that is another

13  reason why we believe that injunctive relief would be proper

14  in this case, considering those public interest factors.

15         The only thing I'll comment in terms of the

16  balancing, I think the equities do favor us in this case.  I

17  will note that the Government made a contention at one point

18  on the -- on the public interest of the balancing side --

19  I'll put it this way, the government has no interest in

20  enforcing an unlawful memorandum.

21         Congress' laws as written must be enforced, and

22  that's a public interest that outweighs whatever legitimate

23  interest the government has in implementing an unlawful

24  memorandum or violating the law, essentially with 1225, so we

25  don't think that's enough.

1           I've only really identified one consideration that

2      the Government has put forward, and I believe they submitted

3      some affidavits from some State Department officials to this

4      effect, and it's really this notion that, if you -- if you

5      terminate MPP and you issue an injunction here, it's going to

6      be disruptive with diplomatic relationships with Mexico.

7           And we've submitted extensive cases, and the one

8      case that I will point out for the Court is the *TikTok* case,

9      which I don't think I need to put the citation of that one,

10     but it's *TikTok v. Trump* from the District of -- District of

11     Columbia District Court, and that's one also where there were

12     these issues of foreign policy and injunction, you know,

13     would be affecting national security interest.

14          And I think Judge Randolph in that case still found

15     that an injunction was proper particularly as it relates to

16     enforcing the law as written.

17          You know, these sort of diplomatic concerns, I'm

18     not trying to dismiss them, but at the end of the day, we are

19     a sovereign nation.  We have laws on the books that we need

20     to enforce.

21          I will submit that MPP started off as a matter of

22     U.S. policy and U.S. law, and eventually, you know, Mexico

23     was brought into it in the summer of 2019 to sort of say,

24     hey, we're going to -- we're going to send these migrants to

25     Mexico; is that okay.  And we -- we did cooperate with them,

1    and it was all great, but we still have an interest here in
2    ensuring that our laws are enforced, our sovereignty as a
3    nation is upheld, and that's exactly what the history of our
4    country and the text of these statutes show.
5         And I would also note just from a technical
6    standpoint, it's my understanding under the APA there is a
7    foreign policy and military affairs exception.  This is in
8    our brief.  But I believe it relates as to the notice and
9    comment requirements for the APA.  As Your Honor is well
10   aware, we're not asserting a procedural APA violation here.
11   It's purely substantive.
12        So I suppose going back to some of the -- the
13   canons that you mentioned earlier with Justice Scalia, you
14   know, Congress did not preclude an injunction in this context
15   when it came to the substantive violations.  It did so for
16   procedural violations but not for substantive, and I think
17   any foreign policy concerns would fit within that exception,
18   but they're clearly not at issue here.
19        So I think for all of those reasons, we believe
20   looking at the *eBay* factors, just as much as Judge Hanen did
21   last week, a vacatur of the June 1 Memorandum and a permanent
22   injunction are a full -- they are full remedies in this case
23   for these Plaintiffs.
24        And for those reasons, Your Honor, and for the
25   reasons that we've submitted in the papers, we ask that Your

```
 1    Honor award that relief to these states.  And I'm happy to
 2    field any questions if Your Honor has any.
 3              THE COURT:  I don't mean to bombard you with all of
 4    the remedies questions.
 5              MR. OSETE:  Sure.
 6              THE COURT:  Which is really where the rubber meets
 7    the road --
 8              MR. OSETE:  Sure.
 9              THE COURT:  -- as the Court is looking forward to
10    fashioning orders and the rest.
11              I know Mr. Thompson did an admirable job of walking
12    through the claims.  It just happens that we're at the
13    remedies' portion of the States' presentation, so I'm not
14    throwing fastballs and chin music just because it's Missouri
15    and not Texas.
16              MR. OSETE:  Absolutely.
17              THE COURT:  So two follow-up questions on remedies.
18    Will an injunction -- and it really -- it really dovetails
19    your last point about foreign relations and what happens at
20    the water's edge and how the Court should look to those
21    arguments by the Government.
22              If the injunctive relief includes a requirement to
23    increase detention capacity, which may affect facilities on
24    either side of the border, does that -- how does that -- how
25    do the states respond to the foreign relation arguments
```

1   presented by the Government, that that sort of injunctive

2   relief sort of violates the Article II Branch and the

3   Executive's prerogative to sort of speak with one voice on

4   foreign relations and diplomatic relations?

5           MR. OSETE:  Well, so on the -- we don't believe we

6   are depriving the government from speaking with one voice on

7   diplomatic efforts.  I would actually view it or I would

8   submit that what the states are asking the Court to do here

9   is ensure that the systematic violations of a co-equal branch

10  of government in this country that they are not being

11  violated; that they're actually being enforced.

12          To the extent there's some spillover effect into

13  the Executive's power to speak as the Executive with foreign

14  nations, again, I will -- I will say that MPP started off as

15  a U.S. policy, U.S. law.  It's been on the books for a long

16  time, at least the contiguous territory aspect has been on

17  the books for a long time.  It has been exercised in the past

18  with Mexico with and without their consent.

19          And so the notion that somehow this is going to

20  categorically affect those relationships, I just don't find

21  that very plausible, particularly in light of the history and

22  in light of the practice of this actual program being

23  implemented.

24          And, again, if that were -- if that were a problem,

25  I suspect it would be something that Congress could have

1    written into the statutes, could have actually addressed

2    directly, but other than that, Your Honor, I -- I don't think

3    there are any -- there's not a lot of --

4         **THE COURT**:  This is -- this is intrinsic to

5    immigration as it intersects with a bordering nation.  This

6    is resolved at least at the constitutional level in the

7    Article I plenary power that's reserved to Congress.

8         **MR. OSETE**:  Uh-huh.

9         **THE COURT**:  This is not the States of Texas or

10   Missouri interfering with the President's ability to serve as

11   chief diplomat in treaties or --

12        **MR. OSETE**:  Sure.

13        **THE COURT**:  -- to intersect with the Senate or any

14   of those functions here.

15        This is just really intrinsic to some of the

16   effects of immigration policy, and it's just intrinsic to

17   Texas/Mexico relations and the border there.

18        This is not -- this Court doesn't need to do a deep

19   dive into all the cases that deal with the Chief Executive's

20   prerogative to be the voice of the United States when working

21   abroad.

22        **MR. OSETE**:  I don't think so.  And, in fact, in the

23   meantime, you know, the Executive is, in fact, as the

24   Government -- I'll let the Government speak for themselves on

25   this, but there are still efforts between the two countries

1    to talk about how to address, you know, this migrant crisis.

2         It's on the record, but I believe Vice President

3    Harris -- while this litigation was pending, there was a

4    national human-trafficking task force set up.  They

5    understand what these issues are, and I don't think we're --

6    we're not saying that they are somehow precluded from

7    speaking with one voice.  They can speak.

8         All we're ensuring is, as states, as the Founders'

9    role for the states and for Congress' ability to pass laws

10   and for them to be enforced, that's what we're focusing on

11   here.  We're not trying to take away the Executive's power

12   under Article II to exercise these sort of functions.

13        We're just simply asking that, as a sovereign

14   nation with our laws, that they be enforced, especially when

15   they are mandatory, which we submit in this case, and I just

16   don't believe that any of those considerations are really at

17   play here.

18        **THE COURT**:  I understand.  I understand the

19   arguments of Texas and Missouri as well.  There are a lot of

20   *Texas versus United States* cases where we get into Hague

21   Conventions and other things like that.  I --

22        **MR. OSETE**:  Sure.

23        **THE COURT**:  I wanted to make certain that it is

24   not -- it is not the argument of either Missouri or Texas

25   that this Court really needs to engage that jurisprudence.

     1              Now, the last question on remedies.

     2         MR. OSETE:  Sure.

     3         THE COURT:  So as I have labeled the claims —— and

     4    I think this is consistent with Mr. Thompson's presentation

     5    —— Claim 1 is the APA claim, arbitrary and capricious.  Claim

     6    2 is the INA claim.

     7         MR. OSETE:  Uh-huh.

     8         THE COURT:  That's Section 1225.  Claim 3 is the

     9    Take Care Clause claim.  That's the constitutional claim.

    10         MR. OSETE:  Uh-huh.

    11         THE COURT:  And then Claim 4 is what I call the

    12    contract claim, the agreement claim.

    13         MR. OSETE:  Uh-huh.

    14         THE COURT:  So in looking forward to fashioning

    15    potential relief, if the Court grants -- and, you know,

    16    there's no rule of orderliness among district judges here,

    17    but I do read other opinions and what has happened in similar

    18    litigation.

    19         MR. OSETE:  Sure.

    20         THE COURT:  If the Court grants the Plaintiffs' APA

    21    claim and does vacate the June 1 Memorandum, is there a need

    22    to rule on the statutory or constitutional claims?

    23              I understand your argument on the necessity of

    24    injunctive relief --

    25         MR. OSETE:  Uh-huh.

1          **THE COURT**:  -- but is there a case from Texas or

2     Missouri that this Court necessarily need reach the statutory

3     and constitutional claim if it determines you have prevailed

4     on your APA claim?

5          **MR. OSETE**:  In full candor, Your Honor, in terms of

6     a direct case that I can give you right now, I don't have one

7     in particular.

8          I think what I can say and why I think that perhaps

9     the -- I understand that the Doctrine of Constitutional

10    Avoidance, the Court, you know, should try to avoid these

11    constitutional questions if it can address it on

12    nonconstitutional grounds.  And, again, I understand that's a

13    doctrine, and the Court is free to do that.

14         I will say for this -- for this particular context

15    and for this case, the reason I think -- and certainly I'm --

16    if Mr. Thompson has anything else to add in rebuttal, he can

17    address it, but I think in this context the reason why the

18    1225 claim perhaps goes along with the APA claim and the Take

19    Care Clause claim is that the 1225 claim is really the

20    obligation for them to set up this mandatory detention

21    program.  And they're not complying with that.

22         And we're alleging that an injunction would

23    certainly help trying to avoid these systematic violations of

24    1225.  So I think, for that reason, even if the June 1

25    Memorandum is set aside, you get back into the situation

1    where you still have a program.  Let's say -- and, again, I

2    don't want to speak for the government, but assuming the

3    government does not actually implement MPP if it does spring

4    back to life, then what do you do about the systematic

5    violations?

6         And I'm -- we're just concerned that those

7    violations could still occur.  And so to the extent the Court

8    concludes that there is, in fact, a duty, there are, in fact,

9    systematic violations, it's just -- for importing context, I

10   think the 1225 claim goes hand in hand with the APA claim.

11   And that's what I would say to that.

12        Again, on the constitutional claim, I submit that

13   if Your Honor rules in our favor on the APA claim and the

14   1225 claim, it doesn't necessarily need to rule on the Take

15   Care Clause claim.

16        With that being said, I think if Your Honor does

17   find merit to our Take Care Clause claim, then I think that

18   only strengthens the need for an injunction, but it also

19   perhaps diminishes the Government's request for a mere

20   remand.

21        And so for those reasons, I -- we believe, or at

22   least certainly the State of Missouri, and Mr. Thompson can

23   speak otherwise if he disagrees, but we submit that the Court

24   can and should reach those other claims as well.

25        **THE COURT**:  Okay.  I have your argument, the

1    arguments of Texas and Missouri.  I remind everyone that

2    those states have reserved 30 minutes for rebuttal.

3           At this point, we will take our lunch break, and

4    because we have out-of-towners present from D.C., Missouri,

5    and Austin, I don't want to deprive you of the marvelous beef

6    options that are available in Amarillo.  Most of the beef

7    that you eat probably started here at some point.

8           So I'm going to give the parties until 1:30.  So

9    I'll instruct both the Plaintiffs and Defendants to arrive

10   back at this court at 1:30.

11          We will then begin with the Defendants'

12   case-in-chief.  And if there are any technical questions that

13   you need resolved regarding your presentation, I would just

14   refer those to my courtroom deputy.  So if you need access to

15   the ELMO, to the projector, to the screen, anything like

16   that, this is a good time to resolve some of those technical

17   questions.  I would just direct you to my courtroom deputy.

18          So, at this time, the Court stands in recess.  The

19   parties, counsel are instructed to re-arrive at 1:30.

20          **MR. OSETE**:  Thank you, Your Honor.

21          **COURT SECURITY OFFICER**:  All rise.

22       **(Lunch recess.)**

23          **COURT SECURITY OFFICER**:  All rise.

24          **THE COURT**:  Please be seated.  The Court is back on

25   the record in the State of Texas and Missouri versus

1   President Joseph R. Biden, et al, Civil Action

2   No. 2:21-CV-067.

3         At this point, I'll invite the United States as

4   Defendants to present their case-in-chief.  You may do so

5   from the podium.

6         <u>**DEFENDANTS UNITED STATES CASE-IN-CHIEF**</u>

7         **MR. WARD**:  Thank you, Your Honor.  Brian Ward on

8   behalf of Defendants.

9         Your Honor, the Court should reject Plaintiffs'

10  attempt here to restrict the authority and discretion of the

11  federal government and the Executive Branch to make decisions

12  about how to best manage the border, how to best enforce our

13  immigration laws, and how to engage in foreign affairs,

14  including negotiations that are well underway with Mexico and

15  other foreign countries about other broader initiatives that

16  the current administration believes will better and more

17  sustainably manage migration, reduce the strain on the

18  border, and address some of the goals that were initially set

19  out in MPP in better and more sustainable ways than that

20  program was able to do.

21        Now, both the Supreme Court and Congress have

22  recognized that the Executive Branch has broad discretion in

23  this area.  So the Supreme Court said in the *Arizona* case

24  that broad discretion of immigration officials is a principal

25  feature of the immigration system, and the Supreme Court in

1    other cases have repeatedly said that that discretion extends

2    to Executive Branch, Department of Homeland Security choices

3    about what type of proceedings to place individuals in and

4    what type of proceedings authorized under the statute to

5    prioritize in carrying out their view about how to best

6    enforce the immigration laws.

7         And Congress has similarly indicated that the

8    Executive Branch has broad authority in this area, both in

9    Section 1225(b)(2)(C) -- that's the provision of the INA that

10   authorizes the Department of Homeland Security to return an

11   individual temporarily to Mexico while their removal

12   proceedings are ongoing.  That provision provides authority

13   for DHS to use that authority, but it sets no standard; it

14   has no mandatory language.  Nothing in that provision

15   requires the agency to use that in any set of circumstances.

16        There's also a number of other provisions within

17   the INA that are aimed at protecting the Executive's

18   discretion over choices about what type of procedures to use.

19   Most of those are contained in 8 U.S.C. Section 1225.

20        We can talk about those a little bit more later,

21   but these are provisions that Justice Scalia said in his

22   opinion in *Arab-American Anti-Discrimination League v. Reno*,

23   these are provisions of the INA that Congress specifically

24   aimed at protecting the discretion of executive agencies in

25   making choices with respect to immigration and protecting

1    them from precisely the type of lawsuit that the Plaintiffs

2    seek to bring here to restrain the authority of the Executive

3    in this area.

4          Now, this broad discretion of the Executive and of

5    DHS in the area of immigration prevents Plaintiffs from being

6    able to succeed on any of their claims on the merits, even if

7    the Court could reach the merits of those claims, but there's

8    also a number of barriers to Plaintiffs being able to even

9    bring suit here.

10         And the first of which, which is the first -- the

11   first issue that Plaintiffs addressed as well, is that they

12   lack standing to put forth any of the claims they seek to

13   advance here.

14         Now, this case is not no longer at a preliminary

15   stage.  It's not a preliminary injunction case anymore.  It's

16   not a case like some of the other *Texas* decisions that have

17   been discussed so far today that was decided at the

18   preliminary injunction or motion to dismiss cage -- stage.

19   We're now resolving this case on the merits.

20         So as the Supreme Court set out in the *Lujan*

21   decision, it's not enough at this stage for them to put forth

22   plausible allegations of injury or harm, and since this whole

23   case is being resolved on the merits at this point, there's

24   not some subsequent trial where in some circumstances at

25   summary judgment it might be enough to raise facts that

1    create a disputed issue of fact for trial.

2            At this stage, Plaintiffs actually have to put

3    forth evidence that establishes every element of standing,

4    including injury-in-fact, and tracing that injury to the

5    challenged action here.  They have to show that the injury

6    that they have proven relates directly to the termination of

7    MPP, and they can't do that here.  None of their evidence

8    shows that the termination of MPP has led to a concrete

9    particular injury for either of the states.

10           Their allegations are essentially that Texas is a

11   border state, and that a certain number of individuals, if

12   allowed into the United States, will either end up in Texas

13   or will travel to Missouri, and that additional individuals

14   within those states will impose costs on the states in terms

15   of the services they provide.

16           Well, that's precisely the theory of standing that

17   the Fifth Circuit rejected in the *Crane* case.  And the *Crane*

18   case, this is the 2015 decision, the same year as the

19   decision in the DAPA case, but the 2015 decision addressing

20   deferred action.

21           And, in that case, the State of Mississippi brought

22   a claim, and they put forth evidence and argued that illegal

23   immigration was costing the State of Mississippi 25 million

24   dollars a year.  There was evidence in the record.  They put

25   forth a study.  And they allege that illegal -- because

 1    illegal immigration was causing this impact or increased cost

 2    to the states, that they had standing to challenge DACA.

 3            What the Fifth Circuit said is that, generalized

 4    information showing illegal immigration is costing the state

 5    money is insufficient to confer standing.  What you need is

 6    concrete evidence that state costs had increased or will

 7    increase as a result of a particular action.  Otherwise, the

 8    traceability argument is purely speculative.

 9            And that's what we have here.  Similarly, the

10    states here are arguing that, if there are -- if there is an

11    increase in individuals in the states, that will lead to

12    increased costs, but they've pointed to nothing that shows in

13    particular that terminating MPP will necessarily lead to any

14    increased costs for these states.

15            And, again, as we set out in our briefing and as is

16    shown in the record, the number of individuals enrolled in

17    MPP began declining some -- at some point in 2020, so we're

18    well -- we're a year past that point now.  New enrollments in

19    MPP were suspended in January of 2021.

20            Plaintiffs filed this suit four months after that,

21    and we're now a bit after that as well.  And even though

22    we're well past the point in which a large number of

23    individuals were being regularly enrolled in MPP, they've

24    pointed to no particular evidence that shows there has been

25    an increase in state costs or even an increase in individuals

1    in the states as a result of the termination of MPP.

2         The Supreme Court just rejected a similar argument

3    on standing in the Affordable Care Act case, *California v.*

4    *Texas*, just this term in which the Supreme Court said that

5    the states lack standing because, even if they could show an

6    injury — and their alleged injury there was increase in

7    healthcare costs — they hadn't shown that it was tied or

8    traceable to the particular provision of the law that they

9    were challenging, and because they couldn't tie those things

10   together, they hadn't satisfied their burden to establish

11   standing.

12        And, again, those cases, unlike this one, were

13   cases decided -- *Crane* was a case decided at the motion to

14   dismiss stage, where a lower standard of evidence might be

15   sufficient, where plausible allegations of injury, harm,

16   traceability might be enough, and still the courts found

17   insufficient evidence of standing.

18        Here, we're resolving this case on the merits, and

19   so Plaintiffs have to meet a higher standard in order to

20   establish standing.

21        A couple of other just points on traceability, as

22   my co-counsel noted earlier, some of their evidence relates

23   to allegations that terminating MPP will lead to an increase

24   in the number of unaccompanied children that are in the

25   states.  As he noted, MPP didn't apply to unaccompanied

1   children, so whether MPP is in place or not has no effect or

2   bearing on whether -- on the number of unaccompanied children

3   that are in the states.

4        MPP also didn't apply to individuals from Mexico.

5   It only applied to individuals that were transiting through

6   Mexico to the southern border from other places.  I think the

7   determination was made that, if individuals are from Mexico

8   and are claiming they have a fear of being in Mexico, that we

9   shouldn't return them to Mexico while awaiting that claim.

10  It's only if their fear isn't in Mexico; it's from other

11  places.

12       And so while Plaintiffs put forth allegations that

13  there's been a -- terminating MPP might lead to an increase

14  in individuals arriving at the border or some sort of surge

15  in immigration, they haven't identified where those

16  individuals are from.

17       And, in fact, the evidence they cite in their

18  Appendix that they refer to as saying 56 out of every 1,000

19  unauthorized immigrants in the country end up in Missouri,

20  that evidence shows -- specifically, if you look at it, it

21  shows the majority of individuals in Texas and Missouri who

22  are here without authorization come from Mexico.  And so

23  those are individuals that wouldn't be amenable or couldn't

24  be returned to Mexico under MPP anyway.  That undermines

25  their traceability argument.

1          Another point that undermines their -- their

2     argument of standing or injury that is traced to the

3     termination of MPP is that MPP didn't actually require anyone

4     to be returned to Mexico.  It's a point I take Plaintiffs not

5     to dispute, is that, even when MPP was in place, it didn't

6     require every individual that was potentially eligible to be

7     returned under it.

8          MPP left discretion to individual immigration

9     officials at the border to first determine whether an

10    individual was eligible to be placed in MPP, but then also

11    had the discretion not to place that individual in MPP.  So

12    it's not clear that, even if MPP was in place, that any

13    individuals will necessarily be returned to Mexico under that

14    policy.

15         So that undermines their theory of traceability,

16    but also any argument on redressability.  If their harm is

17    tied to the idea that having MPP back in place will prevent

18    individuals from being present in these states, since MPP

19    didn't require any individuals actually to be returned to

20    Mexico, setting aside the memorandum terminating MPP won't

21    necessarily decrease that.

22         The same is true of the evidence related to whether

23    the presence of MPP deterred individuals from coming to the

24    border.  The evidence in the record shows that, in the months

25    after MPP was announced in December of 2018, there was a

1    sharp spike in the number of individuals arriving at the

2    southern border.  January, February, March of 2019, the first

3    three months that MPP was in place, arrivals at the

4    southern -- encounters at the southern border increased

5    substantially.

6           So that undercuts their argument that the

7    announcement of MPP or the termination of MPP will

8    necessarily have a direct impact on the number of individuals

9    arriving in the United States.  And that's what the cases say

10   as well; that the decision to leave another country and come

11   to the United States depends on a range of factors that

12   individuals might consider, and tying that to any particular

13   announcement one way or the other on immigration policy of

14   the current administration requires -- is just pure

15   speculation.

16          One final point on redressability, in order for MPP

17   to operate in the way that I think the states hope it will if

18   it was reinstated, individuals have to be returned to Mexico.

19   That's not something that the United States can do

20   unilaterally.  In order to have MPP function properly, there

21   would have to be negotiations with the Government of Mexico

22   and agreement that they would take individuals returned under

23   MPP from the United States, agree that we can send those

24   people back to Mexico.  The United States doesn't have

25   authority to take anyone out of the United States and send

1    them to Mexico without Mexico's specific agreement to take

2    those individuals in.

3            So any order that MPP be reinstated wouldn't --

4    wouldn't redress their alleged harm, because it would

5    essentially be unenforceable.  It would require the

6    government to take substantial steps and refocus negotiations

7    with other countries, particularly Mexico, about what the

8    current administration wants to do in terms of its

9    immigration enforcement priorities and its initiatives for

10   managing regional migration and get Mexico to re-agree both

11   to take the individuals and to the other agreements that were

12   in place that made MPP -- that were intended to make MPP

13   work, and that Mexico would have to agree to provide these

14   people some sort of temporary status and help protect them

15   and support them while they were waiting in Mexico, so they

16   could be able to attend their hearings in the United States.

17           Just one point on the 2015 decision, *Texas v.*

18   *United States* decision, the DAPA decision, that was a case in

19   which I think is distinguishable from this one.  Again, there

20   you had a clear injury.  The Court there found that, as a

21   result of the DAPA policy, there would be 500,000 individuals

22   in the State of Texas that would acquire lawful status, and

23   that DAPA would be the sole and direct cause of them having

24   the lawful status within the state.

25           There's no such evidence like that here, that

1    there's this large number of individuals, and certainly no

2    evidence or argument that MPP does anything to provide

3    individuals with some sort of lawful status within the United

4    States.  So, here, we have much -- much less of a tie between

5    the actual policy and the number of individuals that would be

6    present in the state, and also just no evidence that

7    additional evidence -- individuals would be present in the

8    state.

9         And the Fifth Circuit's decision in that case was

10   based on a finding that it would -- having that many

11   individuals within the state who would not only be allowed to

12   obtain driver's license but would be encouraged to do so

13   under the DAPA policy, that that would be a -- directly cause

14   a substantial increase in the costs to the state.

15        The Fifth Circuit said there that it's not enough

16   to put forth allegations that show maybe a few asylum seekers

17   would show up in the state.  You need the type of dramatic

18   increase in costs that Texas had shown there that would cause

19   them to have to get more building space, hire more

20   individuals, buy office equipment, things of that nature.

21   They called it a dramatic increase in costs in millions of

22   dollars.  It was not incidental or attenuated, but was a

23   direct cause of the DAPA policy being in place.

24        So substantially different than what we have here,

25   where MPP or its termination doesn't affect the lawful status

 1     of any individuals within the United States and does not --

 2     there's no evidence in the record that shows that there have

 3     been a substantial increase in costs.

 4              And, again, the DAPA case, unlike this one, was a

 5     case involving a preliminary injunction, so in early stage of

 6     the case in which plausible allegations of standing might be

 7     sufficient, and, there, there was obviously more evidence

 8     than here, but on a lower standard than --

 9              THE COURT:  And this is *Texas versus United States*,

10     the Fifth Circuit 2015 opinion?  I know we have about six or

11     seven versions of *Texas versus United States*.  This is 809

12     F.3d 134 where the Court uses the language "dramatic

13     increase?"

14              MR. WARD:  Yes, Your Honor.

15              THE COURT:  Okay.  All right.  I just want to make

16     sure I'm tracking with the right *Texas versus United States*.

17     You may proceed.

18              MR. WARD:  Yes, Your Honor.  And then just one

19     other point on standing, standing in that case, that *Texas*

20     case, was based on a determination of special solicitude with

21     respect to the states that we think does not apply here.  As

22     the Court said in that case, that what you need in order to

23     apply the Supreme Court's law on special solicitude is you

24     need some sort of procedural right or indication in the

25     statute that Congress intended to create a procedural right

1    for the individuals to sue, or states to be able to sue.

2            Plaintiffs here haven't pointed to any sort of

3    procedural right like that.

4            The Fifth Circuit in *Texas* applied sort of a looser

5    analysis to the procedural right that's required in that

6    case, because they distinguished DACA and DAPA as not just a

7    nonenforcement policy but also as a policy that provided

8    affirmative benefits, provided lawful status within the

9    United States.

10           And they said that distinguished it from situations

11   in which an agency just makes a decision to -- a

12   prosecutorial discretion decision or a nonenforcement

13   decision to prioritize one aspect of a statute versus

14   another.  There, the stat -- there, the program provided

15   affirmative status and benefits to individuals, which

16   distinguished it from prior cases where they had found no

17   standing to sue.

18           If the Court -- if the Court has any other

19   questions on standing, I can move on to other topics.

20           **THE COURT**:  Okay.  So to your point on the

21   particularity of the data marshaled by the States of Missouri

22   and Texas, I've already asked multiple questions of those

23   states regarding the sorts of numbers necessary to tip the

24   scales to satisfy the standards set forth by the Supreme

25   Court and the Fifth Circuit.

1          What is the government's detention capacity?  So I

2     see a lot of briefing about the surge of persons, how, you

3     know, even things like the pandemic and political

4     environments of host countries have overwhelmed federal

5     resources for various reasons.

6          Has the United States ascertained even an

7     approximated detention capacity in real numbers?  So if I'm

8     going to require particularity of the States of Texas and

9     Mexico [*sic*], what is -- what's the baseline that I can

10    compare that to?  What is the detention capacity as the

11    United States understands it?

12         **MR. WARD**:  I don't know the answer to that, Your

13    Honor.  It's possible that the Department of Homeland

14    Security has an understanding or a baseline of its overall

15    detention capacity, but that's -- I'm not aware of what that

16    number is.

17         **THE COURT**:  And, you know, given the voluminous

18    records that have been supplied both by the United States in

19    support of its defense of the APA claim and by the States of

20    Texas and Missouri in response, is there any disaggregation

21    of that data that would reflect the number of aliens detained

22    versus paroled?  Has that been disaggregated anywhere in the

23    record for the Court's reference?

24         Since MPP specifically deals with that parolee

25    category of persons, is there -- is that reduced to absolute

1    number or even approximate number?

2           **MR. WARD:**  Not in the record, Your Honor.

3           **THE COURT:**  Okay.

4           **MR. WARD:**  I'm not aware of any particular numbers.

5    And, again, the MPP policy or the termination of the policy

6    doesn't say anything in particular about parole.  It

7    doesn't -- it doesn't provide any benefits or any

8    determination or even any guidance to the agency on how it

9    should or should not use parole.

10          And so the record -- the record doesn't contain any

11   information about detention capacity or numbers of

12   individuals versus detained versus paroled.  It's possible,

13   again, that the Department of Homeland Security has that

14   information, but it's not, as far as I'm aware, in the

15   record.

16          **THE COURT:**  Okay.  So -- and I understand, and I

17   have the Government's argument on the stressed resources, you

18   know, in some of the affected border regions and even into

19   the interior.

20          As a categorical question, is it the position of

21   the United States that the government does or does not have

22   the capacity to detain or expel every illegal alien required

23   by 1225, subject to the government's discretionary authority

24   to parole?

25          Like, are you able to ascertain if this is a

1  temporary surge, but the government otherwise has capacity,

2  or, instead, that it is the position of the United States

3  that they just do not have capacity for the numbers involved?

4        **MR. WARD:**  I don't know the answer to that

5  definitively, Your Honor.

6        I believe that there is -- there are times in which

7  there are surges which go beyond the capacity of the

8  government to detain individuals or detain individuals in a

9  particular region.  There obviously is parole authority in

10 those circumstances.

11       And there's some indication, as set out in the

12 Secretary's memo, that it's been an unusual time, in that,

13 with the coronavirus and individuals being on the other side

14 of the border for a substantial amount of time, even when

15 they were in MPP, that there's some effort to deal with this

16 surge or pent-up group of individuals.

17       So that could indicate a temporary surge, which

18 might place an additional burden on the detention ability of

19 the government, but -- so I -- I think it's possible that

20 there is -- there is surges that affect the ability of the

21 government to detain everyone in certain circumstances, but I

22 wouldn't -- I don't have a definitive answer that that's

23 currently the case.

24       **THE COURT:**  So neither -- I've neither heard from

25 the Plaintiff -- I should say I've -- I've heard neither from

1    the Plaintiffs nor the Defendants absolute numbers on

2    capacity and how far above capacity we are.

3            At this point, the Court, when doing the

4    particularity analysis and the standing analysis, is dealing

5    with approximated numbers, estimates, allegations of

6    extraordinary surge numbers, but I'm not going to be able to

7    sort of define the denominator in absolute end terms either

8    way, as to capacity or the excess.

9            Is that your understanding of the record?  We're

10   just dealing with approximations start to finish.

11           **MR. WARD**:  In terms of that question, yes, Your

12   Honor, I think that's correct; that the record, as

13   constituted, doesn't answer that question.

14           **THE COURT**:  Okay.  And did the Secretary

15   consider -- as you understand the record, did the Secretary

16   consider the possible shortage of detention capacity when he

17   terminated MPP?  What does the record reflect on that?

18           **MR. WARD**:  Yes, Your Honor.  So the Secretary says

19   in his memo that --

20           **THE COURT**:  And if you could give me a record cite.

21   Understanding that there are pending objections and responses

22   subject to adjudication at this point, you can refer to

23   anything that's before the Court.  I'll make those

24   determinations before issuing the final ruling.  But is there

25   a particular record cite?

1            **MR. WARD**:  Yes, Your Honor.  It's in the memo

2    itself, so the memo is at record cites 1 through 7.  So, in

3    the record -- in the memo itself, the Secretary says, the

4    administration has been and will continue to be unambiguous

5    that the immigration laws will be enforced, and has various

6    tools at its disposal to do that, including detention and

7    various alternatives to detention, and case management

8    programs that have shown to be successful.

9            So the Secretary said in the memo that he was

10   considering the various other options that the INA provides

11   the Secretary in order to deal with individuals coming into

12   the United States.

13           I don't have the record cites in front of me, but

14   there are in the record things that he referred to related to

15   other support programs and alternatives to detention that the

16   agency uses to ensure individuals show up for their

17   proceedings, other initiatives that the agency is taking

18   including dedicated docket in immigration court for

19   individuals arriving at the southern border to ensure that,

20   if those individuals are brought into the United States,

21   whether detained or not, that those proceedings can be

22   expedited so that these aren't individuals being in the

23   United States for a long length of time.

24           **THE COURT**:  Okay.  And I believe the Bates labels

25   range is in the Administrative Record AR001 through AR007.

1    This is relevant both to the Plaintiffs' claim on APA,

2    arbitrary and capricious, and then also particularity of the

3    data regarding the harm or loss alleged by Plaintiffs.

4         So the Government agrees that this document on the

5    termination of the Migrant Protection Protocols program is

6    relevant as an admission by the Government on the effect of

7    MPP at least when aligned alongside other various

8    alternatives?

9         **MR. WARD**:  Yes, Your Honor.  That document

10   represents the Secretary's view on MPP's effectiveness.

11        **THE COURT**:  Okay.  All right.  You may proceed.  I

12   think -- I think that is the only question I have regarding

13   standing.

14        I know we're -- both parties are being considerate

15   in following sort of the order laid out in the posed

16   questions, so the --

17        There's one other question on causation.  So it's

18   not expressly a factor, but it does relate to some of the

19   factors that the Court must consider on standing.

20        Regarding cause, and traceability specifically,

21   what is the United States' position on whether MPP caused the

22   government to parole more illegal aliens than it would have

23   if MPP were still in effect?

24        So, again, I understand I asked earlier if there

25   had been a disaggregation of parolees versus people who had

1    simply evaded detection, and it doesn't seem like that

2    disaggregation in that particularity is available in the

3    record yet.

4              But regarding the losses alleged in the various

5    different categories set forth by Texas and Missouri, does

6    the Government have a position on whether the MPP caused the

7    government to parole more illegal aliens than it would have

8    had MPP remained in effect?

9              MR. WARD:  I think the Government's position is

10   that that has not been established one way or the other by

11   the record presented in this case or the evidence in the

12   record.

13             Again, it's -- even if there are additional

14   individuals, it's not clear that anyone would necessarily --

15   even if there are additional individuals arriving at the

16   southern border or who are being brought into the United

17   States, whether detained or otherwise, it's not clear that

18   MPP is the driver of that or would necessarily affect that.

19             So, again, for instance, if there's a surge, and

20   that surge involves Mexican nationals, again, the individuals

21   who are the majority of the individuals --

22             THE COURT:  And MPP doesn't affect them?

23             MR. WARD:  It doesn't apply them.  The same --

24             THE COURT:  I have the Government --

25             MR. WARD:  -- thing with --

1      THE COURT:  I have the Government's argument on

2  that, and I understand, you know, the Government's position

3  that immigration patterns and alleged surge data is a

4  multivariable prong such that the Government -- such that the

5  Governments of Texas and Missouri can't just point to MPP as

6  sort of the dispositive decisive event.

7      But does the United States take a position on

8  whether it would be paroling the same number of illegal

9  aliens if MPP were an option still in place?

10      MR. WARD:  I don't know the answer to that, Your

11  Honor.

12      THE COURT:  Okay.  I was searching the memo -- you

13  know, the various memoranda in this case, and I couldn't

14  ascertain if there was a definitive decision on that, and I

15  think it may be a function of the data set.  We just don't

16  have the hard, concrete data on parolees versus the various

17  different categories at this point.

18      But the United States does not take a position on

19  whether it would be paroling the same number of illegal

20  aliens if MPP were still an option for those illegal

21  immigrants who hail from Honduras, Guatemala, and El

22  Salvador?

23      MR. WARD:  It's possible, Your Honor.  I can't take

24  a definitive position on that.  I just don't know, and the

25  record doesn't establish it.

1          Again, the Secretary's view is that, in order to --
2     and this is set out in the memorandum again, in order to
3     manage regional migration and address individuals arriving at
4     the southern border, that efforts to prevent surges and to
5     manage that need to start well before individuals arrive at
6     the border.
7          And so there are ongoing negotiations about -- with
8     other foreign countries, Mexico, and the Northern Triangle
9     countries, on initiatives that the current administration
10    thinks will get -- better get at the root causes of
11    immigration and reduce overall the number of individuals.  So
12    I think the hope is that overall they'll be -- the
13    individuals that arrive in the United States will have --
14    there will be fewer of those; we'll have better capacity to
15    manage those.  There won't be surges in the same way if the
16    current administration is successful.
17         And there's already -- I think this is set out in
18    our declarations and in our Appendix, there's already been
19    efforts to get Mexico to, instead of supporting these camps
20    that have sprung up on -- on just the Mexican side of the
21    southern border, is to work on intercepting and working with
22    individuals who are fleeing -- fleeing their countries
23    further down in Mexico, and to address -- address this
24    problem where it starts in the Northern Triangle countries by
25    working with those governments through other initiatives.

1      So I think the hope is that it will address this

2    problem more broadly and at its source, but the record

3    doesn't -- again, it's a little bit hypothetical about what

4    would be happening if MPP was in place; we can't say for

5    sure.  But the record -- the evidence in the record

6    doesn't -- I don't think resolves that question one way or

7    the other.

8         **THE COURT:**  As we're trying to ascertain standing

9    in this case, you're using the loss amounts, and Mr.

10   Thompson, during his presentation, he had several categories

11   that have sufficed to find standing in other immigration

12   cases.

13        The consistent theme is that we're looking for a

14   delta that might reflect the injury-in-fact suffered by

15   Missouri and by Texas.  There is data that does reflect a

16   current increase in parolees.

17        And does the Government for the United States have

18   an explanation for the data that does reflect an increase in

19   the number of parolees since the suspension of MPP?

20        So I understand that there are other variables, and

21   I have the Government's argument that it shouldn't just turn

22   on one dispositive parolee category that immigration surges

23   and numbers and the stress on the federal government's

24   resources is a multivariable project, but as to the increase

25   in parolees, does the Government have an explanation for that

1   and how it correlates to MPP?

2         MR. WARD:  I don't know that the record nec -- I'd

3   agree that the record establishes that there's necessarily

4   been an increase in MPP, but, yes, Your Honor, the

5   Government's position is that that's not traceable to MPP.

6         THE COURT:  Okay.  So that's a traceability

7   argument from the Defense perspective?

8         MR. WARD:  Yes, Your Honor.  Nothing -- nothing

9   about the June 1 Memorandum says -- again, says anything

10  whatsoever about how the government will use or not use its

11  parole authority.  It's just -- it's just something that's

12  not affected by the June 1 Memorandum either way.

13        THE COURT:  Okay.

14        MR. WARD:  And so in terms of -- I would just say

15  on the healthcare and other costs that have been found

16  sufficient to find standing in other cases, those are, again,

17  the deferred action cases.  So those are cases, again, where

18  judges, including judges on the Fifth Circuit, found that the

19  provision of lawful status provided by DACA or DAPA would

20  allow them to directly access social services, licenses,

21  other benefits.

22        Nothing about -- again, MPP doesn't say anything

23  about parole one way or the over.  It certainly doesn't

24  provide any sort of affirmative lawful status.

25        And then just in terms of -- I think Plaintiffs'

1    counsel brought up the 100-day pause suspension, there, that

2    was a -- that finding was based on detention space, and so

3    what the finding there was based on is that there are

4    provisions that say the United States shall remove certain

5    individuals, individuals with final removal orders.

6         And what the judge found there is that not removing

7    them meant that they had to be detained in the United States.

8    There's no dispute about that in that case, which meant that,

9    if they had to be detained in, say, Texas' detention space,

10   that was a direct cause directly traceable to that action.

11   So, again, we're not talking about just general alle --

12        **THE COURT**:  And this -- and this goes back to your

13   argument that the *Texas versus United States* case from 2015

14   at the Fifth Circuit sort of distinguishes this argument for

15   standing from those cases involving those affirmative

16   benefits and things like that.  I do -- I have the

17   Government's argument on that.

18        I'm just trying to identify the relative deltas

19   which might bear upon the costs, the displacement effects,

20   all of the harms alleged by Missouri and Texas, and I want to

21   make sure that I have the Government's case on which data and

22   which deltas I should refer to.  I think I have this at that

23   point.

24        So that concludes the Court's line of questioning

25   on standing for the United States.

1    So you may proceed on a claim-by-claim basis with

2    the perspective of the United States on the four claims

3    pending.

4        **MR. WARD**:  Yes, Your Honor.  So in terms of

5    challenges to agency action, there are a number of other

6    barriers — and some of them were discussed earlier — to

7    bringing a challenge to a federal agency that are implicated

8    here.  A number of them are located in 5 U.S.C. Section 701

9    of the APA, provisions (a)(1) and (a)(2) that Plaintiffs'

10   counsel talked about this morning.

11       So provision -- Section 5 U.S.C. 701(a)(2) is a

12   provision that says, if agency action is -- there's no review

13   of agency action that is committed to agency discretion by

14   law.

15       So this is an action that the authority for

16   implementing MPP is based in 8 U.S.C. 1225(b)(2)(C).  That's

17   a provision that provides the authority for the federal

18   government to temporarily return someone to a contiguous

19   territory while awaiting their removal proceedings in

20   immigration court.

21       That provision says that the government may use

22   that authority, but provides no standard for when it has to

23   use that authority.  There's no mandatory language in that

24   provision.

25       And courts have recognized that, even in the

1    context of mandatory language where a statute says "shall" or

2    has other mandatory language like that, that the --

3            THE COURT:  It's amazing how many of these cases

4    turn on the difference between "may" and "shall."

5        (Laughter.)

6            MR. WARD:  It's a lot, Your Honor.  But even with

7    mandatory language, that deeply-rooted tradition of

8    prosecutorial discretion remains.

9            So the Supreme Court said in the *Castle Rock* case

10   that prosecutorial discretion remains even in the presence of

11   seemingly mandatory commands in a statute.

12           And the Fifth Circuit said, again, in the *Crane*

13   case that the concerns justifying criminal prosecutorial

14   discretion are greatly magnified in the deportation context.

15           So those apply even more greatly here, and that's

16   because a lot of these cases trace back to the Supreme

17   Court's decision in *Heckler v. Chaney*, which addressed

18   discretionary and unreviewable agency decisions.  The

19   language in *Heckler* says that refusals to take enforcement

20   steps are presumptively discretionary and not subject to

21   review because they involve a complicated balancing of a

22   number of factors, peculiarly within the Executive's

23   expertise; whether agency resources are best spent on this

24   violation or another, whether the particular enforcement

25   action requested best fit the agency overall policy choices.

1          So that's precisely what we're dealing with here.

2     We have a statute that provides a range of different options

3     for the administration to use with respect to individuals

4     arriving in the United States.

5          Plaintiffs don't dispute that there are options

6     under the statute, and because the statute sets no particular

7     standard that can be applied for when it -- when the agency

8     must or should use that, that authority, it's an unreviewable

9     discretionary decision.

10          The Fifth Circuit specifically addressed this type

11     of decision in the 2015 DAPA decision.  It said, again,

12     quote:  We reiterate that DAPA is much more than a

13     nonenforcement policy which would presumptively -- which

14     presumptively would be committed to agency discretion.  The

15     Secretary has broad discretion to decide whether it makes

16     sense to pursue removal at all.  The general exception to

17     reviewability provided by 701(a)(2) for action committed to

18     agency discretion remains a narrow one, but within that

19     exception are included agency refusals to institute

20     enforcement proceedings.  That's at Page 165 to 166.

21          So the Court there -- again, as a lot of

22     distinction, I think, comes up a lot in these cases between

23     the deferred action cases and this case, that the Fifth

24     Circuit said explicitly, if this was just the nonenforcement

25     part of DACA, that that wouldn't be reviewable, and the

1    states didn't even try and challenge that aspect of it if

2    it's a nonenforcement decision.

3            It was the affirmative benefits that created a

4    focus for judicial review and action there and brought it

5    with outside -- outside this exception in 701(a)(2).

6            Plaintiffs' counsel cited *Regents* this morning.

7    *Regents* said exactly the same thing; said, when an agency

8    refuses to act, there's no action to provide a focus for

9    judicial review.  But DACA did not announce a passive

10   nonenforcement policy; it created a program for conferring

11   affirmative immigration relief.

12           So this distinction between affirmative relief and

13   just the discretionary decision not to enforce or use a

14   particular statutory provision in favor of a different one

15   run throughout these cases.

16           And then just one other, I think in here is another

17   Texas decision, the Texas -- the Fifth Circuit's decision in

18   *Texas v. United States* from 1997.  This is 106 F.3d 666.

19   There, the Fifth Circuit said:  The INA commits enforcement

20   of the INA to the Secretary's discretion, and the allegation

21   that defendants have failed to enforce the immigration laws

22   or pay the costs resulting therefrom is not subject to

23   judicial review.  This is because an agency's decision not to

24   take enforcement actions is unreviewable under the

25   Administrative Procedure Act because a court has no workable

1    standard against which to judge the agency's exercise of

2    discretion.

3           Again, that's -- the Court was citing the *Heckler*

4    case there, which comes up in all of these decisions on

5    discretionary determinations an agency might make.

6           But, again, as the Supreme Court said in that case,

7    where the statute doesn't provide a particular standard to

8    judge whether or when or how an agency should use a statutory

9    provision, there's essentially no law to apply, and so it

10   falls within this exception to reviewable agency actions for

11   agency actions that are committed to agency discretion by

12   law.

13          There's another provision -- unless Your Honor has

14   any questions about that particular provision.

15          **THE COURT**:  No, I have your argument on that, and I

16   know the 1225(b)(2)(C) argument that the Government makes,

17   there are multiple references to *Heckler*, so I think the

18   Court has the argument of the United States on that point.

19          And this Court will be tasked with distinguishing

20   between a line of authority on cases that imply some

21   affirmative benefit and turn -- and turns on that sort of

22   distinction, and then also the amount of discretion that

23   inheres in the Executive's authority to administer

24   immigration policy.  And then, of course, that must be

25   balanced alongside the arguments that the Plaintiffs make in

1    turn.

2          So I have that argument.  You may move either to a

3    sub-argument of the APA claim or to the next claim.

4          MR. WARD:  Yes, Your Honor.  So another bar that

5    prevents a challenge to agency action here is the one in

6    5 U.S.C. 701(a)(1).  That says that there's no agency review

7    where other statutes preclude review.  I think there are a

8    number of statutes that are relevant here.

9          Plaintiffs' counsel said this morning that the

10   Government doesn't argue that any of these provisions apply

11   directly.  That's not exactly correct, Your Honor.  There are

12   a number of provisions within the INA that directly apply and

13   limit jurisdiction to consider challenges related to the way

14   the process by which an individual's removability is

15   determined.

16         THE COURT:  I feel a toll booth approaching.

17         MR. WARD:  A toll booth.

18      (Laughter.)

19         THE COURT:  But you don't have to use that

20   metaphor, I understand.

21         MR. WARD:  So the first provision — and I think

22   this one applies directly here — is 8 U.S.C. 1252(b)(9).

23   That's a provision that says:  Judicial review of all

24   questions of law and fact arising from any action taken or

25   proceeding brought to remove an alien may be brought only

1    through the petition for review process, which is a process
2    by which only the individual alien can bring a claim
3    challenging the way in which their removability was
4    determined.
5            The statute says in sub -- that stat -- 1252(a)(5)
6    says that's the sole and exclusive means of judicial review
7    for those questions.  And, again, that's not just questions
8    of removability or that arise in the immigration proceedings
9    or the proceedings before the immigration judge.  It says
10   any -- any claims or questions arising from those proceedings
11   arising from any action.
12           So Justice Scalia said -- again, in the
13   *Arab-American Anti-Discrimination* case said that this
14   provision is a general jurisdictional limitation channeling
15   review of all decisions and actions leading up to and
16   consequent upon removal.
17           The Plaintiffs cited the decision in *Regents*, but,
18   again, *Regents* is distinguishable on the basis of considering
19   affirmative benefits versus considering deferred action.  So
20   if you are addressing deferred action or whether someone was
21   going to be removed, then you're more in the context of a
22   determination related to removability that falls under
23   1252(b)(9).
24           And what the Supreme Court said in *Regents* is, it
25   distinguished that and acknowledged its earlier holding in

1 the *Jennings* case that 1252(b)(9) applies to any part of the

2 process by which removal is determined.

3   So this is plainly a part of -- 1252(b)(2) is part

4 of the process by which removability is determined.  DHS has

5 to determine whether they're going to put someone in the type

6 of proceedings that leads to return to another country or a

7 detention within the United States or expedited removal.

8 There's a range of options.  And the Supreme Court has said

9 that 1252 provides a general jurisdictional limitation that

10 channels all claims related to that through the --

11   **THE COURT**:  And counsel -- counsel for the United

12 States was present when the Court engaged in a prolonged

13 colloquy on general versus particular, the various Latin

14 canons that can be used to make the distinction.

15   I think during that line of questioning I asked the

16 question about the judicial review provisions of 8 U.S.C.

17 Section 1226(e), 1252(a)(2)(B)(ii), and then 1182(d)(5)(A).

18   Do I understand the Government's argument on that

19 statutory construction to be that *Arab-American* and *Regents*

20 both counsel that those should be given general

21 jurisdictional bar construction?

22   **MR. WARD**:  Yes, Your Honor.

23   **THE COURT**:  Okay.  I think I have the Government's

24 argument on that point.  I think that's well briefed by both

25 sides.

1          So I do understand it is this Court who must decide

2     whether we're dealing with a general jurisdictional bar or

3     something that is more akin to a particular case-by-case

4     adjudication.

5          So I do understand the parties' arguments on that.

6     I do find that it's been well briefed by both Texas and

7     Missouri and the United States.

8          So you may move forward unless there's a subpart

9     that you need to address.

10          MR. WARD:  Just very briefly, also 1252(g) is

11     another provision that applies here.  Again, that's a

12     provision that Plaintiffs have argued that's a specific,

13     applies to particular actions and applies to individual

14     noncitizen claims.

15          I think Justice Scalia's discussion in the *Reno*

16     case, Anti -- *Arab-American Anti-Discrimination* --

17          THE COURT:  I think I referred to it as

18     Arab-American, but it's actually the Anti-American -- or Anti

19     Arab-American League, or something like that, so I failed to

20     put an "anti" --

21          MR. WARD:  Yeah, that's --

22          THE COURT:  -- in front.

23          MR. WARD:  So Justice Scalia in there, in that

24     case, I think sets out the -- explains this, I think, very

25     well and says that, yes, 1252(g) talks about particular

1    individual actions along the road to removal, and so it's --

2    that provision is not a general jurisdictional limitation

3    because it identified particular actions it covers.

4         But he also said that how do we know it's not a

5    general jurisdictional limitation.  He said because Congress

6    plainly knew how to create general jurisdictional limitation

7    when it wants to, because you just have to look a few

8    sections down in that same statute to 1252(b)(9).  1252(b)(9)

9    represents a type of general jurisdictional limitation.

10        And then, again, just briefly, Your Honor, the

11   cases we cite in our brief from the Supreme Court *Block*, in

12   *Fausto*, there is, of course, a presumption of review of

13   agency action where the Supreme Court has said again and

14   again that evidence that Congress created a particular scheme

15   for certain individuals to be able to challenge types of

16   issues or claims but didn't provide that right to other

17   people or other groups or states, that's strong evidence to

18   rebut the presumption of judicial review by other

19   individuals.

20        **THE COURT**:  I had Justice Scalia as a professor,

21   and, for that reason, I have several books on canons and

22   textualism and statutory construction.  And I understand I

23   have good arguments on both sides, whether to give sort of a

24   general construction to this or whether this is a particular

25   judicial review provision that should be read as a

1    case-by-case adjudication bar or relevant to those

2    case-by-case adjudications, so I think this was well briefed

3    by both sides.

4           Do I understand your best cases for giving that

5    juris -- that general jurisdictional bar arguments are

6    *Regents*, *Reno*, and *Block*, and I think that's reflected in

7    your brief.

8           **MR. WARD**:  I don't know about *Regents*, Your Honor.

9    *Regents* is sort of one we distinguish, but *Block*, Fausto.

10          **THE COURT**:  *Fausto* was the case that I was missing.

11   Okay.

12          **MR. WARD**:  *Anti-Arab*.  And then I would just also

13   say that the Fifth Circuit's decision in *Loa-Herrera*.  So, in

14   that case, the Fifth Circuit talked not about -- it said,

15   when an individual decision is discretionary -- and there it

16   was talking about parole, but it says, when an individual

17   decision is discretionary under the statute, that, not only

18   the decision itself is discretionary and unreviewable, but

19   the manner in which the agency reaches the decision.  The

20   statute -- the overall statutory structure and guidance and

21   whether that complies with statutory and constitutional

22   requirements, those are similarly discretionary when the

23   individual statutory determination is discretionary.  So I

24   think that case provides some helpful guidance on that

25   specific versus general jurisdictional question.

1        THE COURT:  Okay.  So I -- and, again, the Court

2   does find that this issue was well briefed both by the

3   Plaintiffs and the Defendants.  I think I have the relevant

4   jurisprudence, the relevant statutes.  These all guide the

5   Court's construction of the various judicial review

6   subsections within the INA.  It's that statutory construction

7   that's relevant to multiple arguments.

8        Is there anything else from the Government on those

9   judicial review sections and what sort of guidance should be

10  gleaned from that?  Is there any additional argument, or does

11  the Government stand on its paper and argument at the bench?

12       MR. WARD:  On the bar, those bar --

13       THE COURT:  Right.  Yeah.  So various statutes have

14  these.  I'm thinking in particular, I think, it's 1225(e) --

15  or 1252(e), there are these judicial review sections.  We're

16  having a fight about whether that is a case-by-case

17  determination that is subject to Article III review or

18  whether those are jurisdictional bars.  And I'm getting

19  competing case law from both sides.

20       Is there anything else from the Government other

21  than what's on the paper or presented in court today?

22       MR. WARD:  Not on those particular bars.  There's

23  just a couple other --

24       THE COURT:  Okay.

25       MR. WARD:  -- bars I want to talk about briefly.

1          THE COURT:  You may proceed.

2          MR. WARD:  One of which is the zone-of-interests

3    test, is that the Supreme Court has said that the APA does

4    not allow suit by every person suffering an injury-in-fact;

5    that the plaintiff has to be -- the plaintiff must fall

6    within the zone of interest sought to be protected by the

7    statutory provision whose violation forms the legal basis for

8    his complaint.

9          So, here, the 1225(b)(2)(C) is the basis of the

10   complaint.  There's nothing in that statutory provision that

11   anticipates or considers that states might be able to bring a

12   suit to enforce it.

13         And there's -- the cases cited in our brief sort of

14   set out similar circumstances in which courts have found

15   individuals trying to argue they were within the zone of

16   interests of the immigration statutes because they want to

17   contest a particular level of immigration or a particular

18   impact of immigration on a certain region, they -- that's not

19   enough to get within the stat -- within the zone of

20   interests.

21         What the test the Supreme Court has set out is

22   whether an intent to bar suit by the individual, the

23   plaintiffs in a particular case is fairly discernible from

24   the overall statutory scheme.  So I think this relates

25   somewhat to the 1252(b)(9), 1252(g), 1252(a)(2)(B)(ii)

1    provisions.  That those indicate that -- those are provisions

2    within the Immigration and Nationality Act which limit review

3    and indicate that Congress had a particular view about who

4    could bring those types of suits.

5          The final barrier to review here, I think, is in

6    5 U.S.C. 704.  That limits agency review to final agency

7    actions.  So as cases have held in previous challenges

8    challenging the legality of MPP itself, MPP was just general

9    policy guidance.  It was not a -- it was not the type of

10   announcement that set final rights or legal consequences.

11         I think the parties agree that the relevant test is

12   the one set out in the Supreme Court's *Bennett v. Spear* case

13   where, in order to be a final agency action, the action has

14   to be one that determines legal rights or legal consequences

15   and consummates the agency's decision-making process.

16         What other courts have held is that MPP did not do

17   that because it left discretion to the individual officers to

18   determine whether or not to return an individual.  So that

19   individual determination was what consummated the agency's

20   decision-making process, and what, if anything, determined

21   the legal rights and consequences for that individual.

22         It's standard agency law that, when an agency puts

23   forth guidance that will affect the scope or how an agency

24   approaches a decision but won't take any effect, any concrete

25   effect until its applied in a particular adjudication or

1    case, it's that adjudication or case that's the final agency

2    action, not the intermediate steps and guidance.

3            And so the memo -- if the memo itself was not a

4    final agency action, then the rescission of it similarly is

5    an unreviewable -- is unreviewable as not being a final

6    agency action.

7            **THE COURT**:  Okay.  And that goes to your briefing

8    on finality and the analysis the Court should apply there as

9    well?

10           **MR. WARD**:  Yes, Your Honor.

11           **THE COURT**:  Okay.  I have the Government's

12   argument.  I have the United States' argument on that point.

13           Any additional arguments on Claim 1, the APA

14   arbitrary and capricious claim?

15           **MR. WARD**:  Yes, on the merits, Your Honor.

16           **THE COURT**:  Yes.  You may proceed with that.

17           **MR. WARD**:  So on the merits, the APA standard of

18   review is highly differential.

19           Here's what the Fifth Circuit said in *Texas Oil &*

20   *Gas Association v. EPA:*  If the agency's reasons and policy

21   choices conform to minimal standards of rationality, then its

22   actions are reasonable and must be upheld.

23           It's a very differential standard, and the June 1

24   Memorandum easily meets that standard here.  The Secretary

25   said that he considered the -- all the announcements for when

1   MPP first came out and the guidance for MPP, the goals that

2   MPP was designed to achieve, the reviews of the program,

3   including a top-down review of the program in 2019,

4   considered the costs and benefits of maintaining MPP as it

5   was, the costs and benefits of terminating it, and the costs

6   and benefits of alternatives, retaining it in some form,

7   putting more resources or -- into reworking or redesigning

8   the program to try and make it work better.

9           And, ultimately, the Secretary determined that the

10   costs of making MPP work in the way it should were far

11   outweighed by the benefits of other initiatives that the

12   agency and the Secretary and the current administration

13   believe will better manage migration and achieve the goals of

14   MPP.

15          So, in doing that, the Secretary addressed the

16   specific goals that were set out in MPP itself, addressed the

17   goals that were set out in those reviews of the program, and

18   including the 2019 review of the program that Plaintiffs were

19   talking about this morning.

20          The first goal of MPP, as set out, was that it was

21   in -- this is what the Secretary says, is that it was

22   originally intended to more quickly adjudicate legitimate

23   asylum claims.  The Secretary reviewed the evidence in the

24   record of whether that had actually happened and determined

25   that there were real questions about whether it was

1    successful in prioritizing agency resources on legitimate

2    asylum claims.

3            In particular, the Secretary noted the high rate of

4    in absentia orders as raising questions about whether it was

5    effective.  So 40 -- the Secretary found that there were --

6    44 percent of the cases that were conclu -- that went through

7    MPP and reached a final decision, got a conclusion ended in

8    absentia orders.

9            Plaintiffs say that there's been times, other time

10   periods where there were high rates of in absentia removal

11   orders, but the evidence in the record supports that, if you

12   look at, say, 2020, when sort of the core time period -- or

13   2019 or 2020 when MPP was in place, there's evidence in the

14   record at -- I believe it's AR660 to 663 that shows higher

15   rates of in absentia removal orders during that time period

16   for individuals in MPP as compared to non-MPP individuals.

17           So the overall in absentia rate as compared to

18   earlier time periods or before MPP isn't necessarily

19   determinative of what effect MPP was having, but I think that

20   the record supports that, if there were higher rates of in

21   absentia orders for non-MPP individuals than there were for

22   MPP individuals, then that undermines the conclusion somewhat

23   that MPP was really focusing on legitimate claims.  If it's

24   really focusing resources on legitimate claims, then it

25   should be deterring individuals with frivolous claims from

1    coming.  And it's only people who are ultimately going to get

2    relief through MPP that would still go through the entire

3    program to its inclusion.

4            And, again, there's nothing -- I've seen no

5    argument, I'm aware of no basis to conclude, if MPP was

6    successful in deterring individuals from coming to the United

7    States at all, those individuals don't know whether they're

8    going to necessarily be subject to MPP before they arrive or

9    not.

10           So there's no reason why the in absentia removal

11   rate should be so much higher for MPP individuals than

12   non-MPP individuals if the program was functioning as it was

13   intended, to prioritize legitimate claims.

14           And the Secretary said in his memo that this raised

15   questions about whether the individuals that were waiting in

16   Mexico to pursue legitimate asylum claims, whether they had

17   access to resources, housing, and support, they needed to see

18   those claims through.

19           And I think this is further supported by the

20   outcome of those claims.  So there's in the record at -- this

21   is AR -- at AR554 to 555.  There's a document called MPP

22   Metrics and Measures.  That document shows the outcomes of

23   proceedings for individuals that were in MPP.  And the data

24   goes through December 31st of 2020, so the end of last year.

25           And what that document says is that, as of the end

1   of last year, 44,000 -- over 44,000 cases had been completed

2   through MPP, and 531 individuals had been granted relief.  So

3   out of the cases that were actually completed through MPP,

4   only 531 individuals received asylum.  A rate of

5   approximately 1.4 percent of individuals actually got relief

6   as they went through MPP.

7          So, again, the Secretary determined that, based on

8   this evidence in the record, that there were real questions

9   about whether MPP was hitting its intended goal of allowing

10   the agency to focus its resources on legitimate asylum

11   claims.

12          Now, Plaintiffs argue that raising questions is not

13   enough, but the evidence in the record supports that

14   conclusion.

15          And, as the Supreme Court said in the *Prometheus*

16   *Radio* case just this year that we cite in our brief, it's not

17   uncommon for agencies not to have a complete empirical study

18   or complete evidence; that agency action often requires the

19   Secretary or someone within the agency to look at the

20   evidence before the agency and determine based on that what

21   their best view of sound policy is.

22          Explicitly, the Supreme Court said that there is --

23   the APA imposes no requirement for an agency to conduct

24   scientific or empirical studies before reaching a conclusion.

25          And so the Secretary's conclusion that MPP was

1    maybe not that successful in reaching its intended goal of

2    more quickly adjudicating legitimate asylum claims, it's

3    supported by the record.

4            The second goal that the Secretary talked about is

5    that MPP was designed to clear asylum backlogs.  The evidence

6    in the record shows that asylum backlogs both for cases

7    before asylum officers within U.S. Citizenship and

8    Immigration Services or the backlog of cases in immigration

9    court, those both increased during the course that MPP was in

10   place.

11           The next goal was to deter individuals from

12   attempting to come to the U.S. and allow DHS to focus more --

13   resources better on meritorious claims.  The Secretary noted

14   that more than one-quarter of the individuals enrolled in MPP

15   were subsequently re-encountered attempting to enter the U.S.

16           And so he determined from that that it's not clear

17   that MPP was deterring individuals from actually trying to

18   come to the United States.  We were returning them to the

19   other side of the border where they would continually try and

20   enter the United States.  Many were re-encountered multiple

21   times.

22           And, obviously, we don't know for sure whether they

23   were able to capture or identify everyone who was placed in

24   MPP and tried to come back into the United States.  And so

25   it's possible that what MPP actually did was build up a group

1    of individuals just outside the border who continued to try

2    and come into the United States in a way a program that might

3    be more less successful at ensuring individuals weren't

4    getting into the United States than other --

5              THE COURT:  The Court here followed counsel's

6    argument referring to record Document 61, AR554 and AR555.  I

7    do have and find that the Government has well briefed its

8    argument on the data, and the Supreme Court's guidance that

9    not every cause-and-effect analysis needs to be reduced to

10   metaphysical certitude.

11             But I've now heard — and I see this reflected in

12   the Secretary's memorandum — that the data analysis raises

13   questions.  There's sort of a fog-of-war terminology that

14   goes into the Secretary's analysis of MPP up to this date.

15             But relevant to the APA claims and this Court's

16   task of determining whether it was arbitrary and capricious,

17   all of this vernacular about the data set raising questions

18   — this appears in the memorandum; this has appeared in the

19   Government's argument today — are there answers to those

20   questions anywhere in the record, or is it just that the

21   government cannot ascertain one way or the other the

22   effectiveness of MPP?

23             MR. WARD:  So I think --

24             THE COURT:  So, here, you know, we have enough data

25   to ascertain that 531 MPP aliens were granted relief.  We

```
 1    have on Page AR555 —— actually, this is just the second page
 2    of that same document —— the goal of MPP is to provide a
 3    deterrent to illegal entry.  That's followed by this
 4    statement:  Metric MPP implementation contributes to
 5    decreasing the volume of inadmissible aliens arriving in the
 6    United States on land from Mexico.
 7            I see in the Government's written arguments and
 8    oral arguments today a lot of questions raised, and I
 9    understand, you know, particularly early in administration
10    you may not have the data set to give with particularity an
11    answer to the cause-and-effect analysis that we're all doing
12    here.
13            But is there any point in this record where those
14    questions raised about the effectiveness of MPP are answered
15    in any sort of conclusion from the Secretary that reflects
16    his consideration of all of these data points and all the
17    questions raised?
18            Where would you point the Court to to identify the
19    answer to those raised questions?
20            MR. WARD:  So I think the proper way to frame the
21    question is not whether or not ultimately MPP was completely
22    successful, or there's a lot of ways in which you can assess
23    success.  It obviously wasn't completely successful.  It -- I
24    think it's fair to say that it probably deterred some
25    individuals from coming to the United States.
```

1          What's the actual answer to that, I'm not sure it's

2     known from this record, but I don't think the Secretary's job

3     is necessarily just to determine whether MPP was successful.

4     The Secretary's job is to determine what initiatives does DHS

5     or the current administration want to take in order to manage

6     migration and comply with our obligations under the statute.

7          And I think what the memorandum says clearly is

8     that the Secretary determined that, for whatever successes

9     MPP may have had, that the current administration believes

10    that there are other ways to better and more effectively

11    achieve those same goals; that MPP required a tremendous

12    amount of DHS resources even when it was in effect in order

13    to manage, staff these immigration courts along the border,

14    in order to constantly be paroling individuals back and forth

15    into the United States, and in order to continue to negotiate

16    with Mexico about supporting the individuals that were going

17    to be in Mexico while they awaited their removal proceedings.

18         And so what I think the Secretary definitively

19    determined is that MPP is not as successful in the current

20    administration's view as other things the agency and the

21    United States can do to manage migration; that freeing up

22    diplomatic resources that were used to negotiate and support

23    MPP, those resources could be used for other initiatives.

24    Mexico could redeploy individuals that were dealing with the

25    individuals that were living in these camps that sprung up

1    along Mexico's northern border to dealing with individuals

2    when they were transiting through Mexico; that those

3    resources could be put to other -- other initiatives that

4    would better achieve the same goals of managing regional

5    migration, deterring frivolous asylum claims, but also making

6    sure that DHS could focus their limited resources on

7    legitimate claims.

8            I think the -- the couple cases from the Supreme

9    Court that address this are help here.  I think Justice

10   Rehnquist's concurrence in the *State Farm* case, which we cite

11   a few times throughout our brief, says that, as long as an

12   agency remains within the bounds established by Congress, it

13   is entitled to assess administrative records and evaluate

14   priorities in light of the philosophy of the administration.

15           And also the Supreme Court's decision in *FCC*

16   *Television v. Fox* [*sic*], which said that an agency need not

17   demonstrate to a court's satisfaction that the reasons for a

18   new policy are better than the reasons for the old one; it

19   suffices that the policy is permissible under the statute,

20   and there are good reasons for it.

21           So I think the determination about whether MPP was

22   successful is -- is in the memorandum in the form of the

23   Secretary determining it was not as successful as what the

24   administration believes it's now undertaking and needs some

25   time to undertake to better achieve those same goals.

1    **THE COURT**:  Okay.  And I think I have the

2    Government's argument there.  And, obviously, the June 1

3    Memorandum reflects some of those points as a factual matter,

4    and I also will pair that with the legal arguments and cases

5    cited by the United States.

6           You may move on to your next point.

7           **MR. WARD**:  Does Your Honor have any additional

8    questions on the merits of the APA argument, or should I move

9    on to the INA argument?

10          **THE COURT**:  Yeah.  Unless there is anything -- if

11   it would just be cumulative of your briefing, you may move

12   forward to what I've identified as Claim 2, the statutory INA

13   argument.

14          **MR. WARD**:  Yes, Your Honor.  So the statutory

15   argument, or 1225(b)(2)(C), their -- Plaintiffs' argument

16   that terminating MPP violates Section 1225, this overlaps

17   somewhat with the APA claims and the arguments I made earlier

18   about the discretionary nature.

19          But nothing in 1225, again, says that the agency

20   has to use this contiguous return authority, and nothing in

21   it sets any particular standard for when the agency has to

22   use it.

23          I think Plaintiffs' claim here, and their briefing

24   focuses heavily on the use of parole, nothing in

25   1225(b)(2)(C) talks about parole or sets it out as a required

1   factor the agency has to consider in determining whether or

2   when it's going to use this return authority that was the

3   basis of MPP.

4        There is -- and, again, there's nothing in MPP

5   itself that says anything about narrows or requires the

6   agency to use parole in a particular way.  It doesn't say,

7   we're terminating MPP, and we're necessarily going to parole

8   these individuals.  Parole remains a case-by-case

9   determination of the agency in individual cases about whether

10  parole is appropriate that involves a lot of factors.  The

11  June 1 Memorandum says nothing about how those factors should

12  be weighed or resolved.

13       So I think if -- Plaintiffs' claim here is really a

14  challenge to parole, and if they -- if they believe that

15  there is evidence that the government is misusing parole or

16  they want to challenge the parole authority, then they should

17  bring that case.

18       I took them this morning to say that they're not

19  directly challenging the government's use of the parole

20  authority.  I think that's in part perhaps because there's a

21  lot of decisions that say that's a discretionary

22  determination, and that the government has discretion to use

23  that parole authority, again, *Loa-Herrera.*

24       It's a discretionary judgment, including whether

25  the procedural apparatus supplied satisfies regulatory,

 1   statutory, constitutional constraints are not subject to

 2   review.  That's the Fifth Circuit in *Loa-Herrera*.

 3          Other cases, the Eleventh Circuit's decision in

 4   *Jean v. Nelson* said, quote:  Congress has delegated

 5   remarkably broad discretion to executive officials under the

 6   Immigration and Nationality Act, and these grants of

 7   statutory authority are particularly sweeping in the context

 8   of parole.

 9          So there's a lot of judicial decisions out there

10   addressing the breadth of the discretion and scope of

11   discretion of the agency with respect to its parole

12   authority, but, again, parole is not something they're

13   squarely challenging here.  It's not squarely implicated by

14   1225, and so I think if -- since -- since nothing in

15   1225(b)(2)(C) requires the consideration of parole, and

16   nothing in 1225(b)(2)(C) requires the creation of MPP

17   whatsoever, the termination of MPP itself can't violate

18   Section 1225(b)(2)(C).

19          **THE COURT**:  Okay.  Understanding that 1225(b)(2) --

20   and this was reflected in Mr. Thompson's presentation to the

21   Court.  There's essentially a binary choice there, and one of

22   those provisions, the (2)(A) provision, says, aliens shall be

23   detained.  And, again, we're back to the disputed meaning of

24   "may" or "shall" in giving construction to these various

25   statutes.

1          Particular to capacity and some of the Government's

2     explanations of being overwhelmed and taxed, does the federal

3     government have capacity to fill -- fulfill that statutory

4     mandate for those aliens who shall be detained?

5          Unlike some of the other provisions and Fifth

6     Circuit cases distinguishing discretionary authority from

7     mandates, I understand those statutory construction

8     arguments, but now particular to the facts reflected in the

9     record before the Court, does -- is it the position of the

10     United States that they have sufficient capacity to fulfill

11     the 1225(b)(2)(A) mandate to detain those aliens that shall

12     be detained?

13          **MR. WARD:**  Well, again, Your Honor, I think this

14     comes back to my earlier point that the Secretary believes

15     that the other initiatives the agency is undertaking will

16     reduce the burden on the agency and surges of migration to

17     the southern border that will help address that.

18          I don't have a definitive answer on what the

19     current -- right today or this month, what the influx of

20     individuals arriving at the border is and how that compares

21     to our detention space.  That's a -- those are both fluid

22     issues, and I don't have numbers on that.

23          But, again, I'd say that's not an issue that's

24     squarely before the Court here.  Plaintiffs don't directly

25     challenge the parole authority or the use of 1252(b)(2)(A).

1    And while that provision may have mandatory language in it,

2    there's no language between 1252(b)(2)(A) and 1252(b)(2)(B),

3    1252(b)(2)(C), there's nothing -- there's no language in

4    there that sets these out as the only alternatives or sets

5    them as factors that must be considered together on when to

6    use the contiguous return authority.

7            So for -- to put it another way, there's nothing in

8    1252(b)(2) that says Congress intends for the Secretary to

9    either use the contiguous return authority or use the

10   detention parole authority under 1252(b)(2)(A).  There's

11   nothing in there that sets those out.  They're different

12   options the Secretary can use, but nothing about what

13   1252(b)(2)(A) says or nothing about what's in 1252(a)

14   necessarily sets any standard for when the government must

15   use the contiguous return authority or create a program like

16   MPP.

17           **THE COURT**:  Okay.  And, you know, I would guess

18   that's almost like a compound question, because it's one part

19   statutory construction, one part a question about the facts,

20   and the denominator of capacity this Court must consider, and

21   this goes back to some of the standing analysis.

22           You know, if there's an absolute denominator --

23   that's probably the wrong word.  If there's one million beds

24   available for persons detained, and the government

25   experiences a surge of 1.5 million, I would know exactly the

1    delta to apply to that number.

2         But, thus far, I don't see anything from the

3    government in the Administrative Record that sort of

4    aggregates all of those different categories so that I can

5    ascertain detention capacity and thereby give absolute

6    certitude to how much that capacity has been exceeded, and

7    whether the government is using parolee status as a safety

8    valve to that.

9         I understand the Government's argument on this.

10   That question is one part statutory construction, one part

11   data Administrative Record.  And I think you've answered this

12   question probably twice now or an iteration of it, so I

13   have -- I have the Government's response on that.

14        **MR. WARD**:  Thank you, Your Honor.  Just one other

15   point that I think might be relevant here or it may be

16   relevant to some other point, is that earlier you asked that

17   we address the question with respect to the footnote in the

18   document --

19        **THE COURT**:  Yes.

20        **MR. WARD**:  -- in the Motion to Strike.

21        So, again, I think that goes sort of to our broader

22   arguments on the Motion to Strike, that this is sort of a

23   risk when you start looking at evidence outside of the

24   Administrative Record or outside of evidence that the agency

25   says is relevant to its determination.

1          But, essentially, what happened there, my

2    understanding of what happened there is that that footnote

3    was inaccurate; that it didn't come to our attention or the

4    attention of the attorneys with our client until it was cited

5    in the Appendix.  When it was cited in the Appendix, we -- we

6    pointed that out to our clients who corrected it.

7          And so the website no longer reflects that point.

8    It's not an accurate representation of the agency's position,

9    and so it would inappropriate to give weight to something

10   that the agency said was an error and corrected as soon as it

11   was brought to their attention.

12         **THE COURT**:  I have the Government's argument on

13   that, and I do understand that argument.

14         Does that complete any oral argument supplement to

15   the Government's briefing on Claim 2, the INA claim arising

16   under 8 U.S.C. 1225?

17         **MR. WARD**:  Yes, Your Honor.

18         **THE COURT**:  Okay.  You may proceed with your

19   argument on the Take Care Clause claim.  I've identified this

20   as Claim 3.  Anything that's not cumulative of the written

21   material before the Court?

22         **MR. WARD**:  Yes, Your Honor.  Just I think our

23   briefing covers this well, but essentially the cases have

24   long said that this is not a basis for a judicial --

25   justiciable claim.

1            *Mississippi v. Johnson* from 1866 says that this

2    doesn't provide any power for private litigants or other

3    individuals to sue to oversee the President's authority.

4    It's essentially more like a grant of authority to the

5    President, but it doesn't -- like some of the other things

6    we've talked about today, it doesn't provide any standard to

7    apply.

8            More recent cases that we've cited in our brief,

9    the *CREW v. Trump* case out of D.D.C., affirmed by the D.C.

10   Circuit noted that you can read this early line of cases from

11   the 1800s addressing this constitutional provision is -- as

12   reading it as being completely non-justiciable and finding no

13   recent cases finding that's a valid claim that can be stated.

14           And I think, again, the *Texas v. U.S.* decision from

15   1997 of the Fifth Circuit said that -- there, plaintiffs

16   argued that defendants had failed to enforce the immigration

17   laws and pay the costs thereof.  The Fifth Circuit held that

18   real or perceived inadequate immigration enforce -- real or

19   perceived inadequate enforcement of the immigration laws does

20   not constitute a reviewable abdication of duty.

21           So there's no -- the cases -- all the cases that

22   have addressed this, and there's not a lot of them honestly,

23   Your Honor, but all of them have come to the conclusion that

24   the Take Care Clause does not itself provide any standard by

25   which to judge or review the Executive Branch's decisions.

1          The only source of law here to take care that the

2     laws be faithfully executed would be the law itself, so in a

3     way this overlaps completely with their 1225 claim.  And as

4     courts have said, including Judge Hanen just last week, when

5     there's an overlap of claims --

6          And I think they're even greater here.  This is

7     just an attempt to constitutionalize their 1225 claim.  The

8     claim, at least as I read it, is the same, either the

9     Plaintiffs claim that the government is not following 1225

10    and that they're not taking care that the laws be faithfully

11    executed by following 1225.

12         I think particularly, when there's a complete

13    overlap of claims here, I don't -- I don't see how the Court

14    could resolve the claims going in different directions, so I

15    think it just resolves to how the Court rules on the INA

16    claim, the 1225 claim.

17         And that's what Judge Hanen said just last week,

18    that given the lack of authority finding that this is a

19    valid -- a valid basis for a claim, and the overlap with APA

20    claims, that it's not appropriate to reach that claim.

21         And, again, just this claim in Plaintiffs' briefing

22    they articulate it as -- the standard is that the Executive

23    Branch cannot take steps that prevent its compliance with

24    congressional mandates.  At the argument this morning, they

25    said that the government can't take steps that conflict with

1    a statutory command.

2          But, again, the Government's position here is the

3    same thing as under Section 1225.  There is no particular

4    mandate to use the contiguous territory return authority or

5    to create MPP.  There's no statutory mandate that's being

6    violated.  And so this -- Plaintiffs have -- the Government's

7    position is the Plaintiffs have failed to state a claim here

8    whatsoever.

9          **THE COURT**:  Okay.  And I'm sure counsel for

10   Missouri, Texas, and the United States have had an experience

11   similar to this Court.  Lots of law review articles on the

12   Take Care Clause, not a lot of jurisprudence.

13         **(Laughter.)**

14         **THE COURT**:  So we're all in a way flirting with a

15   case of first impression when trying to give application to

16   the Take Care Clause.

17         What about -- lurking in sort of those -- in those

18   briefs is the difference between the Larson Doctrine, which

19   sounds in equity, and the Take Care Clause, which is a

20   constitutional claim, is there a functional difference

21   between a Larson Doctrine approach to the question and what

22   the Plaintiffs have asserted in their Take Care Clause claim?

23         **MR. WARD**:  So I'm not sure I understand the

24   question, Your Honor.  So the Larson Doctrine, as I take it,

25   is a doctrine that relates to sovereign immunity and whether

1    sovereign immunity is a bar to a claim where an executive

2    official is acting outside of their authority or beyond their

3    authority, so essentially --

4             THE COURT:  So the jurisprudence does reflect

5    courts -- there's not much case law, but the federal courts

6    have generally affirmed, you know, equitable authority under

7    that doctrine to give litigants a basis for challenging

8    executive agency action.

9             There's not the same resistance to that as the Take

10   Care Clause claims that ask this Court to invoke a similar

11   authority.

12            Is it just that they are drawing from different

13   wells, but they're conceptually the same?

14            As I consider this Court's authority to review

15   agency action, if I get to the same result, but I draw upon

16   the jurisprudential well of the Larson Doctrine or the

17   constitutional text of the Take Care Clause, does it much

18   matter to the United States if the effect is the same?

19            MR. WARD:  Well, I think there's a problem under

20   either formulation, and I think it's --

21            THE COURT:  This was not briefed by either side,

22   but, you know, in reviewing as many cases as we could find,

23   this Larson Doctrine lurks in footnotes and in other courts'

24   opinions.

25            I just wanted to know -- and you're not -- this

1    isn't directly briefed by either side, but as a conceptual

2    matter and whether this Court can assert authority over

3    agency action and, in essence, force a separate branch of

4    government to execute and ensure that laws are faithfully

5    executed, does it much matter if the Court invokes the Larson

6    Doctrine, which sounds in equity, or the Take Care Clause,

7    which sounds in statute?

8            It may matter to separation of powers questions and

9    things like that, but if the effect is the same, does the

10   United States have a position on the Larson Doctrine?

11           **MR. WARD**:  Well, I think -- and, again, I probably

12   need to think about this some more, Your Honor, but I think

13   the position is that under the Larson Doctrine --

14           So this would be the doctrine where courts have

15   power in equity to restrain an executive official acting in

16   some way that violates the Constitution.  Is that -- am I

17   understanding that correctly?

18           **THE COURT**:  Yes.  That's a nice nutshell of it,

19   yes.

20           **MR. WARD**:  And I think in that sort of -- that --

21   so the Larson and the line of cases that came out of that

22   came from this period of jurisprudence around sovereign

23   immunity, which is why I think this often gets connected with

24   sovereign immunity, that pre-dates the APA.  So the APA in a

25   way ended up -- the APA includes a waiver of sovereign

1   immunity, in which the Supreme Court -- in which Congress

2   intended to sort of get around all of this complicated

3   jurisprudence about what was reviewable and what wasn't and

4   determined that we'll waive sovereign immunity for particular

5   claims under the APA and set out provisions for how that

6   review should go.  So we'll waive it for APA claims, but it

7   should follow the APA standard.

8            I think there's a -- there's a number of law review

9   articles about this by Justice Scalia as well before he was

10  Justice Scalia talking about how the Sovereign Immunity

11  Doctrine preceding the enactment of the APA was -- is sort of

12  hard to follow and inconsistent, even when you look at the

13  Supreme Court cases.

14           But I think this line of cases about sort of ultra

15  vires action that violates a constitutional right and whether

16  the Court would have power to restrain an executive official

17  of violating a right, I think that line of cases is still out

18  there, and it's uncertain how it interacts with the existing

19  APA authority.

20           But I think the Government's position would be

21  that, there, still you need to point to a particular

22  individual constitutional right that might be violated.  So

23  if you say that some sort of executive official is going to

24  violate a Fourth Amendment right in some -- some fashion,

25  that they're acting outside of their scope of their

1    authority, and the Court might have authority to restrain

2    that.

3         We're not talking about any sort of individual

4    constitutional right here.  We're talking about that -- the

5    only constitutional claim that the states bring here is the

6    Take Care Clause.  The Take Care Clause, again, all the cases

7    that I've been able to find on it say it doesn't set any

8    particular standard.

9         So it's unclear what -- how exactly a court would

10   even apply that to say that this -- I guess it would require

11   finding that Secretary Mayorkas was not acting in his

12   official capacity; he was acting as a -- in his personal

13   capacity because he didn't have authority to violate the

14   Constitution by violating the Take Care Clause.

15        I think that's a -- I don't know that that -- I

16   think the problem there with the Take Care Clause or with the

17   Larson Doctrine is that we're not dealing with the type of

18   individual constitutional right that provides this standard

19   to apply.

20        **THE COURT**:  Okay.  So the individualized right

21   response of the Government would apply with equal force to

22   either the Larson Doctrine as it appears pre-APA and then

23   certainly what the Government has argued in this case under

24   APA standards and the rest.  So I think I understand your

25   point.

1          That was a bit of an unfair question, so you gave

2     it the law-school try, and I understand the Government's

3     point on that.

4          If the Court requires additional briefing, I'll

5     certainly issue an order, and I'll have brief page limits on

6     that, but you may proceed.

7          Does that represent the sum and substance of the

8     Government's position on the Take Care Clause claim?

9          **MR. WARD**:  Yes, Your Honor.  And thank you for your

10    patience with my rambling while I thought that one out out

11    loud.

12         **THE COURT**:  Yeah.  It's -- you know, it's like a

13    federal courts class.  Like, it comes up in -- you know, this

14    Court in particular deals with a lot of qualified immunity

15    cases arising from the prison system that's here in this

16    section of the country, so it's always lurking in the

17    footnote, but it's almost never briefed or addressed by the

18    courts.

19         So I didn't see it here.  I didn't know if the

20    United States took a view of that, but I think I understand

21    your argument.

22         If any additional briefing is required, it will

23    come in the form of a written order from the Court.  So you

24    have discharged your duty to this point.

25         **(Laughter.)**

1          **MR. WARD:**  Thank you, Your Honor.

2          **THE COURT:**  Okay.  So now we have -- thank you for

3     giving it the old law-school try.

4          We will now turn to the fourth claim, and this is

5     what the Court has termed the contract claim or the agreement

6     claim.  And I'll hear any argument from the Government at

7     this point.

8          And, again, the briefing was excellent from both

9     parties.  I'd ask that you restrict your argument to anything

10    that's not cumulative.

11         **MR. WARD:**  Yes, Your Honor.  Just a couple basic

12    points that are included in our brief just for context, but,

13    again, the Government's position is that there's no waiver of

14    sovereign immunity for this claim or at least not the way

15    they seek to -- Plaintiffs seek to articulate it here.

16         The *Lane v. Pena* case, a waiver of sovereign

17    immunity must be enacted by statute, construed narrowly in

18    the government's favor, and unambiguously extend to the type

19    of relief sought.

20         So there's been no -- to the extent there's been

21    any waiver of sovereign immunity for contract claims against

22    the federal government, it's the Tucker Act, but that limits

23    relief.  The type of relief is limited to damages, the

24    typical remedy for contract violations, and it's limited to

25    the Federal Court of Claims.

1          As the Fifth Circuit said in the *Alabama Rural Fire*

2     *Insurance Company v. Naylor* case — this is 530 F.2d 1221 at

3     1229 — that, quote:  Little imagination is needed to foresee

4     the consequence of holding that such claims as this may be

5     reviewed either in a court having power to grant equitable

6     relief against the United States or in one having none.  We

7     refuse to believe that Congress intended in enacting the APA

8     so to destroy the Court of Claims by implication.

9          And I think that's essentially what we're talking

10    about here.  Congress has waived sovereign immunity, but in a

11    particular forum and for a particular type of relief, and to

12    hold that parties could bring claims in other courts for

13    injunctive or other types of relief would essentially --

14    everyone would do both or choose the forum that was more

15    preferential to them.  It would undermine the limits in the

16    Tucker Act for the proper forum to bring those claims.

17         Also, it's, I think, a problem for Plaintiffs that

18    they don't cite any -- any waiver of sovereign immunity for

19    this particular type of claim here.  They allege that,

20    because the former Secretary entered into this contract,

21    they've waived immunity for this type of claim here, but they

22    don't cite any cases showing that, particularly without any

23    statutory authorization to do so, that an executive official

24    could waive immunity for the entirety of the United States

25    for such a claim.

1          And the cases that they cite to the contrary dealt

2     with states or tribal authorities, cases in which I don't

3     think there was any dispute about whether the individual who

4     entered the contract or purported to waive immunity was

5     speaking for the relevant sovereign there.  So, here, we're

6     dealing with something a little bit different.

7          I think also just in terms of -- I just wanted to

8     make one point that I think came up in the Court's ruling on

9     the Motion to Strike, I believe, about the holding or the

10    Fifth Circuit's ruling in *Naylor*.  I believe the Court said

11    that the agreement -- the agreement in this case is allegedly

12    authorized by the Secretary's power to perform such other

13    acts as he deems necessary for carrying out his authority

14    under the provisions of this chapter.

15         That's in -- and cites 8 U.S.C. 1103(a)(3).  So

16    that's a provision, again, that says that the Secretary can

17    carry out other acts necessary to his perform -- or he deems

18    necessary to carry out his responsibility under the INA.

19         I think the Government disputes that this provides

20    the power to enter a contract with a state to not exercise a

21    sovereign authority, but to the extent that that statutory

22    authorization allows the Secretary to enter the contract,

23    there's no limitation in that statutory authority to rescind

24    the contract.

25         And so as I -- as I took a look at *Naylor* again, I

1    think its holding talks about whether, if there is some sort

2    of statutory limit on the authority of the individual to

3    rescind a contract or violate a contract, then that might be

4    a circumstance when you could say the individual was acting

5    outside of their authority, and maybe the bar to sovereign

6    immunity wouldn't apply.

7            But the Fifth Circuit said explicitly in *Naylor* —

8    this is at 1226 — it says:  A suit is not violative of the

9    Doctrine of Sovereign Immunity if the officer's powers are

10   limited by statute, and he acts in excess of that authority.

11           And then again at -- this is at Page 1227, quote,

12   the Fifth Circuit said, quote:  Given the authority of the

13   appellants to award the contract, and the appellee's failure

14   to cite any specific statutory limitation on the appellants'

15   authority as government-contracting officers, it must follow

16   that appellants, as contracting agents, had the authority to

17   rescind the award of the contract.

18           And then a little bit further down:  Even assuming

19   that the appellants' decision and action in rescinding the

20   award of the contract was legally wrong, it was nonetheless

21   within their authority as agents of the government to make

22   the decision and to take the necessary action; thus, the

23   effort to enjoin it must fail as an effort to enjoin the

24   United States.

25           So what I take that to say is that, if there's

1    statutory authorization for a contract, if there was some

2    limit in the statute itself, not in the contract, but in the

3    statute itself, to the authority to rescind the contract,

4    it's possible you could argue that the executive was --

5    had -- was operating beyond that authority, and that

6    sovereign immunity wasn't a bar.

7            Here, if 1103 provides the authority for the

8    contract, Plaintiffs point to no limit in 1103 to rescinding

9    the contract or any other limit on the statutory authority,

10   so I think this falls plainly within what the Fifth Circuit

11   said that, even if rescinding the contract was wrong, if

12   there's no statutory limit, then sovereign immunity is a bar.

13           And so if they want to bring a claim to challenge

14   the enforcement of the contract, their remedy and their right

15   and the waiver of sovereign immunity is limited to the Tucker

16   Act.

17           And then just one other point on 1103, this

18   provision is that the -- the Fifth Circuit addressed this, I

19   believe, in the *Crane* case, and this just goes back to my

20   point that the statutory provisions don't -- I'm sorry, Your

21   Honor.

22           **THE COURT**:  And this is *Crane v. Johnson*?

23           **MR. WARD**:  Yes.  But, actually, I meant the 1997

24   decision in *Texas*.  That decision says -- that's, again,

25   106 F.3d 661.  That says at the end at 667:  Section 1103

1    places no substantive limits on the Attorney General and

2    commits enforcement of the INA to her discretion.  So, again,

3    I think this is a provision that neither authorizes or

4    restricts the ability to rescind a contract, but, under

5    either -- it either does both or neither here.  And so I

6    think this claim is clearly barred by sovereign immunity.

7                 **THE COURT**:  Okay.  I have your argument there.

8                 And, at this point, I'll instruct the Government to

9    turn to remedies.  I understand the nature of your briefing

10   and your position that these Plaintiffs should lose on all

11   four claims, but to the extent the Court is tasked with

12   considering and fashioning relief, any argument on scope,

13   application, the nature of injunctive relief vis-à-vis the

14   Executive's authority to act in diplomatic and foreign

15   relations, anything relevant to remedies?

16               **MR. WARD**:  Yes, Your Honor.  And I think here

17   there's a particular provision in the INA that we cite in our

18   brief that's relevant here that might not be relevant in some

19   of the other cases Plaintiffs cite involving affirmative

20   cases, deferred action applying -- again, applying --

21   providing some sort of lawful status or affirmative right to

22   remain in the United States.

23               And that's the provision, the Immigration and

24   Nationality Act, at 8 U.S.C. Section 1252(f)(1).  That's a

25   provision that says:  No court other than the Supreme Court

 1    shall have jurisdiction or authority to enjoin or restrain

 2    the operation of, and then it lists a set of statutory

 3    provisions within that range of provisions at Section 1225,

 4    1225(b)(2).

 5          No court shall have jurisdiction to restrain or

 6    enjoin the operation of those provisions other with -- other

 7    than with respect to the application of such provisions to an

 8    individual against whom proceedings under such part have been

 9    initiated.

10          So I think here any sort of injunctive relief

11    requiring the agency to use 1252(b)(2)(C) would restrain the

12    operation of that provision.  Again, the Government's

13    position is that that provision says "may."  It leaves

14    discretion to the agency about when or whether to use it.  It

15    sets no standard.

16          Any type of injunctive relief requiring the agency

17    to use that -- that provision would insert a standard or

18    leave the discretion out, would remove the "may" term from

19    it.

20          And so as -- I think the Sixth Circuit in the

21    *Hamama* decision we cite in our brief sets this out well, but

22    we set a couple of other cases as well that, if placing

23    limitations on what the government can and cannot do under

24    the removal and detention provisions are not restraints, it's

25    not clear at all what would qualify as a restraint.

1           And I think that's what any sort of injunctive

2      relief here would do.  It would restrain the operation of

3      1225(b)(2)(C) as -- as written to require the agency to use

4      MPP.

5           Again, I think there's no dispute that MPP was a

6      creation of the last administration.  No prior administration

7      had an MPP program.  This was a new program implementing that

8      statutory authority, which had been there, and used

9      occasionally, but been there for some number of years.

10          So I think there's -- again, the Government's

11     position is it's discretionary, and it would be improper or

12     violate the -- violate the terms of the INA to grant

13     injunctive relief.

14          And I think also the cases we cited in our brief

15     just about general oversight of day-to-day agency operations,

16     *Norton*, and that line of cases we cite in our brief, says

17     that it's improper for courts to insert themselves in the

18     day-to-day operation or oversight of an agency; to direct

19     that an agency should take certain enforcement proceedings or

20     exercise its prosecutorial discretion in a particular way;

21     that the proper remedy in the case where -- where a court

22     finds an agency violated the APA by failing to consider

23     relevant factors is to remand to the agency to allow them to

24     correct those and to use their expertise in doing so, to use

25     their expertise and to -- say, the Court determines that

1    there's a particular factor that the agency didn't consider,

2    it should be left to the agency's expertise to consider that

3    factor, see if it changes its determination, or to address it

4    using their expertise.

5           I think we cited a number of Fifth Circuit cases in

6    our brief.  In *Texas Association of Manufacturers v. U.S.*

7    *Consumer Protection Safety Commission* and *O'Reilly*, those are

8    Fifth Circuit cases from 2007 and 2021 that say only in rare

9    circumstances is remanding to the agency to allow them to

10   consider any deficiencies not the proper remedy.  And this is

11   particularly true when there are deficiencies, the type of

12   deficiencies like failure to address particular factors,

13   failure to consider particular evidence or factors, that the

14   agency could correct on remand.

15          Again, I don't -- I don't think Plaintiffs dispute

16   that the contiguous return authority is only one option under

17   the statute.  There's no -- I don't think there's any mandate

18   here that this administration has to use that provision when

19   others in the past haven't necessarily done so.

20          And so the question is just whether the Secretary

21   considered the relevant factors in reaching that, and that's

22   something the Secretary can correct on --

23          **THE COURT**:  And so the Government would pair those

24   Fifth Circuit cases with *Norton* and *Florida Power & Light* to

25   argue, should this Court find a violation particularly on the

1    first APA claim, the relief is to remand to the agency for

2    additional investigation or review?

3            MR. WARD:  Yes, Your Honor.

4            THE COURT:  All right.

5            MR. WARD:  And I think that's particularly true

6    given the declarations we've submitted both from the

7    Department of Homeland Security and the State Department with

8    our responsive briefing that said it would wreak havoc on

9    ongoing and -- ongoing agency efforts and diplomatic efforts

10   with foreign countries on how the countries are going to work

11   together collaboratively and use resources to address

12   regional migration, to put resources and invest funds and

13   initiatives in other foreign countries.

14           It would cause chaos to require all of a sudden for

15   those diplomats to have to go back to Mexico and say, you

16   know, we've represented that we want to move in a different

17   direction and focus on these other initiatives.  Now, we want

18   to go back and start up MPP again.

19           The cases we cite in our brief say that, when

20   relief in addition to just remand for further consideration

21   will cause that kind of disruption or chaos, it's appropriate

22   to just remand in order to allow the agency to address that

23   and to use, again, their expertise to determine about what's

24   the best path forward given, you know, reliance interests of

25   foreign countries in ongoing negotiations with the U.S., and,

1    again, just the damage to international relationships.

2           If -- if the government is working with the

3    Northern Triangle countries or Mexico and has represented

4    that the current administration believes these are efforts

5    that are going to help all of these countries with their

6    migration issues, all of a sudden having to reverse course

7    and saying -- the administration having to go back and say,

8    we -- we've been enjoined; we don't have the authority to

9    engage in those type of foreign affairs or negotiations

10   undermine -- will undermine trust in the U.S. -- U.S.'s

11   ability to follow through on their commitments or on their

12   representations about the path that the United States will

13   take going forward.

14          That's, again, set out in those declarations

15   attached to our briefing.  And when that type of disruption

16   will be caused by injunctive relief, that that's not the

17   appropriate remedy.

18          **THE COURT**:  In the Supreme Court cases counseling

19   against judicial entanglement and recommending remand

20   instead, whether it's *Norton*, *Florida Power & Light*, are any

21   of those line of cases particular to immigration?

22          So when the Article II Executive is acting in

23   foreign diplomacy realms or national security realms, you

24   sort of see the Executive at its very apex of its authority

25   acting outside the water's edge.

1          Immigration is different because it is -- it's an

2     Article I function.  What is the Government's position on how

3     this Court should read the repeated and unbroken admonishment

4     against judicial entanglement in these abstract policy

5     disagreements in this context of immigration, which arises

6     under Article I, which is reserved to Congress and the

7     statutes that it promulgates?

8          Do they apply with equal force to this immigration

9     context in this case, and should the Court distinguish the

10    immigration context and case law from the cases counseling

11    against meddling in other areas where the Article II Branch

12    is obviously primary?

13          **MR. WARD**:  I think in --

14          **THE COURT**:  So in considering -- and we're just

15    talking remedies and relief granted, and I understand the

16    Government's argument on *Norton*, *Florida Power*, these lines

17    of cases.  These are all post-APA cases counseling against

18    meddling in agency action.  Instead, why don't you just

19    remand and allow for further deliberation or investigation or

20    explanation.

21          So these all rise after the APA.  There are

22    established procedures, NPRM sort of process that you go

23    through.  Article III District Court, you should be mindful

24    of those procedures, how that's been delegated, and remand

25    where you are confused about the potential relief and its

1     interference with those -- with those protocols.

2              Does that make less sense in an Article I

3     contract -- context where immigration is specifically

4     reserved to a different branch of the government, and

5     immigration policy is then conferred by statute so that this

6     Court may have additional leeway in construing immigration

7     laws and statutes in an Article I contract -- context where

8     it may not have the same sort of reach where the Article II

9     Branch is so clearly the primary actor?

10             MR. WARD:  So, respectfully, I disagree with the

11     assertion that this is solely an Article I issue.  So I think

12     cases going back to the 1800s, *Knauff v. Shaughnessy*, and we

13     cite a few of them in our brief, but didn't deeply get into

14     the sort of plenary power --

15             THE COURT:  Well, I appreciate --

16             MR. WARD:  -- doctrine to --

17             THE COURT:  I appreciate that every argument didn't

18     descend into a law review 100 pages long, so --

19             MR. WARD:  It was lengthy --

20             THE COURT:  -- as I've said --

21             MR. WARD:  -- as is.

22             THE COURT:  As I've said multiple times, both sides

23     briefed this case well.  I don't need a law review on every

24     footnote, so I understand that there's additional cases, and

25     you can fight the question if you choose to do so.

 1          So I'll hear your argument on why this

 2   Article I/Article II distinction and the cases arising

 3   therefrom might not counsel the way the Court views it.

 4          MR. WARD:  Yes, Your Honor.  So I think that the

 5   power over immigration is a shared power of the political

 6   branches of both the President and of Congress.

 7          So I think that -- we were talking earlier about

 8   the *Trump v. Hawaii* case, that's a case in which we were

 9   talking about the President's authority to bar individuals

10   from coming in from a foreign -- foreign country.

11          And so one of the issues in that case was, Congress

12   had delegated authority to the President to make

13   determinations with respect to that, but the Supreme Court

14   also says he has inherent authority in dealing with entry of

15   individuals to the United States under his foreign affairs

16   power.

17          That's part of -- whenever we're dealing with

18   immigration, we're necessarily dealing with discussions with

19   foreign nations about their individuals traveling here or

20   returning them.  And I think that's particularly acute here

21   where the policy at issue would involve and require the

22   agreement of Mexico to take those individuals back.

23          So I think it -- it might actually be heightened in

24   this circumstance.  So I don't know that *Norton* or those line

25   of cases are necessarily immigration cases.  Those are -- we

1    cited those because those are the cases that set out the

2    standard I think more best, but I think it's heightened here

3    where you're dealing with relations with foreign countries

4    and where the Executive is implementing authority set out in

5    the INA, set out by Congress, but where the individual

6    discretionary determinations require negotiations with

7    foreign countries.

8            I think that weighs more strongly against granting

9    injunctive relief than it would, say, in a run-of-the-mill

10   APA case in which the impact would be also under a statute or

11   the agency's failure to consider relevant factors, or

12   something of that nature, and interpreting a statute or

13   issuing a policy pursuant to a statute that only had a

14   domestic effect.

15           Here, there's a plain international effect.  If the

16   Court -- if the Court were to enter an injunction saying,

17   reinstitute MPP, begin returning to -- individuals to Mexico,

18   that order is essentially unenforceable.  Now, the government

19   would have to make efforts and talk to Mexico to make that

20   happen, but the United States Government doesn't have the

21   authority to just return individuals to Mexico without their

22   agreement.

23           So I think that, because this necessarily

24   implicates foreign affairs powers and negotiations with other

25   countries in executing this, even if -- even if following

1   whatever Plaintiffs' or the Court's view might be of what

2   1252 -- 1225(b)(2)(C) requires, it would -- to implement it

3   necessarily requires the Executive using foreign affairs

4   powers to negotiate with foreign countries.

5           And I think that -- again, chaos in general is

6   enough, but that's a particular type of chaos, and intrusion

7   on the Executive foreign affairs powers that counsels against

8   any form of injunctive relief here.

9           **THE COURT**:  So a mixed question of branch and

10  authority between Article I and Article II, much like the

11  Senate has a role in Senate negotiations, ratification of

12  treaties, but it's sort of mixed with the Article II Branch,

13  so it's a mixed question of branch and authority.

14          Okay.  I understand the Government's argument

15  there.  I advise you that you have about eight minutes, so

16  any concluding remarks or anything that you need to clean up,

17  you should do it at this time.

18          **MR. WARD**:  No, Your Honor.  If that -- if the Court

19  has no further questions, we'd beyond that just rest on our

20  briefs.

21          **THE COURT**:  Okay.  Thank you for excellent briefing

22  from the United States, excellent oral argument.

23          At this point, the States of Missouri and Texas

24  have reserved 30 minutes.  As the Plaintiff in this action,

25  they may speak last to the Court, and I will defer to

1    Missouri and Texas on the allocation of that time.  You may

2    speak through both counsel or just one.

3          So you may approach now for any rebuttal.  I think

4    I may have promised a 15-minute break.  Would that

5    benefit Tex --

6          MR. THOMPSON:  Only if Your Honor would like a

7    break, that's fine with us.

8          THE COURT:  Does Texas or Missouri want a break?

9          MR. SWEETEN:  I think with plane schedules, Your

10   Honor, I think we --

11         MR. THOMPSON:  Yeah.

12         MR. SWEETEN:  -- might want to go forward.

13         THE COURT:  Okay.  Let's go ahead and proceed, and

14   you may take 30 minutes.  You may allocate your time using

15   whatever metric you deem necessary.  Please proceed.

16                 PLAINTIFF TEXAS REBUTTAL

17         MR. THOMPSON:  Thank you, Your Honor.  Will

18   Thompson for the Plaintiff states.  We're planning on

19   allocating the time to me here, and I'm hoping not to take up

20   30 more minutes of the Court's time.

21         With re -- oh, start -- just kind of going in the

22   chronological order that the other side followed unless Your

23   Honor has a different preference.  However, I will say at the

24   beginning with regard to standing that I think one of the

25   most important things that my friend on the other side said

1    was concession maybe halfway through.

2           The Government agrees, if I got the transcript

3    right, that MPP probably deterred some individuals from

4    coming to the United States.  I think that's crucial to us,

5    right?

6           We already have evidence in the record that we

7    think establishes that, but if the Defendants agree with

8    that, I think that establishes, under preponderance of the

9    evidence scheme, that MPP is having this effect on the number

10   of illegal aliens who enter the United States, and that's

11   exactly the condition that triggers all the financial harms

12   that we discussed in our opening presentation, Your Honor.

13          With regard to a couple of specific cases that were

14   mentioned, *Crane versus Johnson*, which is at 783 F.3d 244, I

15   believe that that case contains a footnote explaining that

16   the Plaintiffs waived the driver's license theory of standing

17   that we've asserted here.

18          If Your Honor reviews both the DAPA opinion from

19   the Fifth Circuit and Judge Tipton's opinion from the 100-day

20   pause litigation, we'll see that both of those courts

21   rejected the government's same reliance on *Crane versus*

22   *Johnson*.  This is not a new argument.  It's one that has been

23   dealt with in all of these cases.

24          And I was told that the court reporter would

25   appreciate the spellings for judge names.  That Tipton was

  1    T-I-P-T-O-N.  The --

  2              **THE COURT**:  And this is Judge Tipton, Southern

  3    District of Texas, correct?

  4              **MR. THOMPSON**:  Yes.  That is correct, Your Honor.

  5              **THE COURT**:  Okay.  Yeah.  Let the record so

  6    reflect.

  7              **MR. THOMPSON**:  The Federal Government also referred

  8    to the number of individuals enrolled in MPP declining over

  9    time.  My understanding of the Government's argument from its

 10    briefs is that this is a reference to basically the COVID

 11    Pandemic; that the federal government has what is called

 12    Title 42 authority, which is kind of a separate way for

 13    processing illegal aliens who cross the border, and that --

 14    but, importantly, it is tied to like a temporary finding from

 15    the CDC.  This is not something that's going to continue

 16    indefinitely.  I believe the administration has made public

 17    notes about preparing to rescind the Title 42 authority.

 18              So it is true, of course, that with Title 42 taking

 19    a front seat in immigration enforcement, the numbers did

 20    change for MPP.  They obviously didn't go to zero, but that

 21    will be undone going forward.

 22              And so just like the Secretary was arbitrary and

 23    capricious to worry about superseded events, like previous

 24    court closures with regard to prospective effects of

 25    terminating MPP, I think the same thing is true here.  The

```
 1    Court should not rely on an inherently transitory Title 42
 2    process that Defendants have said they're going to eventually
 3    get rid of when the claim here is for prospective relief
 4    going forward, including for time periods when Title 42 will
 5    not be in place.
 6              My friends on the other side mentioned the Obama
 7    Care case, which I believe was styled California versus Texas
 8    in the Supreme Court.  That just doesn't apply here.  I
 9    believe we addressed it in the reply brief, but the key
10    distinction is -- at least according to the Supreme Court's
11    majority opinion, in the Obama Care statute, we have these
12    two separate classes of provisions that don't really interact
13    to create the injury.  According to the majority opinion, I
14    believe by Justice Breyer, the same injury would have been in
15    place even without the challenged provision.
16              That's a completely different situation than what
17    we have in this case, which is different laws combine to
18    create an injury, where it is, of course, the government's
19    policy to let someone into the country, and the government's
20    separate policy that we then have to pay for things for that
21    individual.  Either one is a -- is a necessary cause, and
22    combined they create that injury completely different than
23    California versus Texas.
24              With regard to traceability, this is, of course,
25    the area where the Supreme Court and the Fifth Circuit have
```

1    blessed special solicitude for state plaintiffs.  One piece

2    that came up under the rubric of traceability and

3    redressability in the other side's argument, but I think is

4    crucial to understanding remedial questions as well, is the

5    Government said, the Federal Government said, it's not clear

6    that getting rid of the termination memo would actually

7    result in anyone being enrolled in MPP and remaining in

8    Mexico.

9            This is exactly why my friend, Mr. Osete, was

10   asking for injunctive relief.  He said, if we -- if the Court

11   vacates the June 1 Memorandum, then at least in a certain

12   sense MPP is back, but if the Government is saying that MPP

13   being back in that sense isn't sufficient for anyone to ever

14   actually have to remain in Mexico, then it's not really a

15   full remedy for the Plaintiffs' harm here.

16           I think the injunctive relief in that respect, just

17   to jump around a bit, Your Honor, would be to reinstate the

18   status quo ante.  We do know that there was a huge practical

19   difference and legal difference between MPP being in effect

20   and then it being terminated or suspended.  It was a

21   difference of at least, I think, 68,000 aliens being

22   enrolled.

23           So that's the process we should be getting back to,

24   where the line officers are, as my friends on the other side

25   admit, able to enroll people in MPP and create those same

1   kinds of protections for the states' fiscs.

2        The Government on behalf of the United States has

3   argued that they cannot reinstate MPP unilaterally.  I think

4   that is contradicted by the record.  I'm thinking

5   specifically of Appendix Page 307, which says:  The U.S.

6   Government initiated MPP pursuant to U.S. law.  And then it

7   goes on to say:  It has implemented and expanded the program

8   through ongoing discussions with Mexico.  So there was an

9   initial part that was unilaterally done by U.S. law, and then

10  there's an additional part that involved some level of

11  cooperation with the Government of Mexico.

12        The same thing is shown on Page 303 of the Appendix

13  where right after -- this is a DHS memo.  Right after DHS

14  explains how it established MPP pursuant to U.S. law, it then

15  concludes the paragraph somewhat curtly:  The U.S. has

16  notified the Government of Mexico that it is implementing

17  these procedures under U.S. law.  It doesn't say, we engaged

18  in extensive diplomatic negotiations, and that was a

19  necessary prerequisite for us implementing MPP.  It just

20  says, we did it under U.S. law.  We notified Mexico that it

21  was happening.

22        And I think one of the reasons this is permissible

23  is, I -- I could be misunderstanding my friend on the other

24  side, but he seems to be focused on the ability to remove

25  someone from the United States and send that person to a

1    third country.  That, I think, is different than simply not

2    letting that person into the United States on the front end.

3    When they show up at a port of entry or something and say,

4    I'm here to apply for asylum; can I enter the United States,

5    the government certainly retains the option of saying, no,

6    you should remain in Mexico without any kind of treaty

7    negotiations with Mexico.

8         The Federal Government also says that the June 1

9    Memo considered the effect of terminating MPP on detention

10   capacity.  I don't think its citations support that

11   proposition.

12        The memo in relevant part — and this is AR006 —

13   simply says:  The department has at its disposal various

14   options, including detention, alternatives to detention, and

15   case management programs, et cetera.

16        So if the government did in the memo note the

17   possibility of detention, we might disagree with the federal

18   government about when detention is required versus merely an

19   option, but, sure, it noted that detention as an option it

20   has at least in some cases.

21        It didn't say anything about the feasibility of

22   detention or the feasibility of complying with Section 1225

23   in light of the termination of MPP.  Just as we discussed

24   earlier, Your Honor, that D.C. Circuit opinion saying that,

25   to note the existence of a factor is not the same thing as to

1      weigh the factor.  This isn't even noting the existence of

2      the factor.  It's noting a necessary fact that could give

3      rise to consideration of a factor but didn't on this memo.

4              With regard to reviewability, the Federal

5      Government talks about *Heckler versus Chaney*.  I think the

6      premise of that entire discussion is that the termination of

7      MPP is a nonenforcement policy.  I don't think that's

8      accurate.  We're not talking about a situation where the

9      federal government says, here's an alien, but I don't want to

10     remove him.

11             The federal government is, in fact, pursuing

12     removal proceedings during the MPP process or without the MPP

13     process.  Really either way, the premise of all of these

14     things is that the government thinks the alien is not

15     entitled to be admitted to the United States.  The government

16     issues perhaps a notice to appear or takes the alien into

17     custody, but, either way, there are supposed to be

18     enforcement proceedings, and the alien uses as a defense to

19     removal this claim of asylum.

20             The claim of asylum is not -- there is no

21     nonenforcement.  There's just a question of how the

22     government is going about enforcing, and so the difference

23     here is not, shall the government enforce or not enforce, at

24     least as a matter of law.  The question is, where shall the

25     alien be while the government is pursuing enforcement.  So I

1  don't think this triggers any of the kind of historic

2  concerns about prosecutorial discretion.

3          There was also some discussion of the, I believe,

4  1997 Fifth Circuit opinion, *Texas versus United States*.  I

5  believe that is 106 F.3d 166.  And, admittedly, I'm doing

6  this from memory, Your Honor, but my recollection is that

7  case was not about particular failings to adhere to

8  particular congressional commands.  It is more of a

9  generalized objection that the federal government was just

10  not very good at enforcing the federal immigration laws.

11          I think that kind of generic generalized grievance

12  is completely different than the sorts of cases that have

13  arisen in more recent years involving, you know, here's a

14  particular statutory violation.

15          **THE COURT**:  If you can keep track of the *Texas*

16  *versus United States* cases by memory, that is impressive.

17      **(Laughter.)**

18          **MR. THOMPSON**:  Well, I hope I'm right, Your Honor.

19          Oh, and the last point on nonenforcement policies

20  is that the *Heckler versus Chaney* case only sets up a

21  presumption.  It, in fact, in its own discussion talks about

22  at least two exceptions where nonenforcement policies are

23  reviewable, and I think the best recent discussion of those

24  exceptions is Judge Tipton's order in the Southern District

25  of Texas in the 100-day pause litigation.  That's the same

1    judge who was mentioned earlier.

2           With regard to statutes precluding review, I think

3    we'll rest on our briefs.  I think we addressed each one in

4    particular, but if Your Honor has a particular question about

5    them, we'll, of course, address it.

6           Zone of interests, I don't think I addressed that

7    in my opening presentation.  It is not a high bar, Your

8    Honor.  The Fifth Circuit has repeatedly said that the

9    presence of the adverb "arguably" in the standard is

10   meaningful.

11          Judge Tipton's order, again the same one from the

12   100-day pause litigation, rejected this very same argument

13   because the INA was meant to help protect state fiscs.  It's

14   also worth noting that, if the federal government were right

15   about the zone-of-interests test, I think this would make

16   every recent major immigration case wrongly decided.

17          And I'll acknowledge that not all of those cases

18   raise the issue, but it would be awfully surprising if the

19   United States Solicitor General, for example, just missed

20   this killer argument in *Regents*.

21          The Federal Government also mentions —— and I

22   believe this gets more into the merits —— that about one

23   percent of MPP enrollees got relief.  I think the Federal

24   Government wants us to infer something nefarious from that,

25   that more of them deserved relief or something.

1          But it's, or course, equally consistent with the

2     possibility that MPP is doing an excellent job of keeping

3     people who are not entitled to be in the United States from

4     being in the United States.

5          If only one percent of the people going through the

6     process are ultimately found to be entitled to asylum, it

7     would sure be strange for us to conclude from that that we

8     should let the other 99 percent into the United States'

9     interior in order to disappear only to ultimately have their

10    claims not adjudicated because they disappeared or rejected

11    on the merits.

12         With regard to which claims the Court should

13    address, the Court earlier asked, I believe a hypothetical,

14    if the Court rules for the Plaintiffs on an arbitrary and

15    capricious claim, should the Court address the Section 1225

16    claim?

17         It is certainly within the Court's discretion.  I'm

18    not aware of any authority saying the Court has to or cannot,

19    but I think the most applicable discussions of this principle

20    come from, again, the DAPA and DACA cases.

21         So my recollection is that, in DAPA, Judge Hanen,

22    H-A-N-E-N, from the Southern District of Texas, in the

23    District Court only addressed the procedural argument under

24    notice and comment.  He did not address the substantive

25    argument.

1          And then, on appeal, Judge Smith, writing for the

2   Fifth Circuit, decided to address the substantive argument as

3   well.  And I don't think there was any criticism of Judge

4   Hanen in that.  It was just he thought it would be useful,

5   because the scope of relief can at least arguably be altered

6   by that.

7          What the federal government could or should do on

8   any kind of remand is, of course, affected by whether its

9   policy choice was only unlawful because of the way it

10  explained it or it was also unlawful because of the

11  substantive outcome reached.

12         And it's worth noting that Judge Hanen decided in

13  the DACA case, he then addressed both the procedural and

14  substantive arguments in his more recent order from last

15  week.

16         With regard to remedies, I think the key point here

17  is to restore the status quo ante.  We need to get back to a

18  place where the federal government has a real MPP program in

19  place because the termination of it was unlawful.

20         I think an injunction -- the scope of the

21  injunctive relief depends in part on how the Court rules on

22  the various claims and whether the Court addresses those

23  claims, but, by analogy, in some of these procedural cases

24  that, say, involve notice and comment, the injunction will

25  say:  The federal government may not implement this memo at

1   least unless or until it is reenacted following notice and

2   comment procedures.

3          So with regard to an arbitrary and capricious

4   challenge, similar relief will say something like:  The

5   government may not enforce this memo unless and until it, you

6   know, goes through the process again and does it in a

7   nonarbitrary way.

8          Of course, if the Court finds that the Plaintiffs

9   prevail on a Section 1225 theory, then it becomes a little

10  bit different, because a mere going through the motions

11  again, even non-arbitrarily, wouldn't satisfy the substantive

12  concerns there.

13         I think that concludes everything I wanted to say

14  in rebuttal unless the Court wanted me to address the Larson

15  point that it raised.

16         **THE COURT**:  No.  One law review response is

17  sufficient for the day.

18    **(Laughter.)**

19         **MR. THOMPSON**:  Very well.

20         **THE COURT**:  I do not think this case will rise and

21  fall on the Larson Doctrine, but it's a nagging question.

22         So I think the Government credibly provided its

23  point or perspective on that, and I don't anticipate it will

24  play an outsize role in adjudicating any of the four claims.

25         So, with that, does the Government rest and close

1    its case?

2         MR. THOMPSON:  We do, Your Honor.  We thank Your

3    Honor for your attention to this matter and ask --

4         THE COURT:  Okay.  And I did want to note for the

5    record that this Court does find that Texas Solicitors

6    General do not routinely miss killer arguments.

7         (Laughter.)

8         THE COURT:  Without commenting on the current

9    argument, I don't find that the Texas SG routinely misses

10   killer arguments.

11        So, at this point, the Court has heard the evidence

12   and the arguments presented by both Plaintiffs and Defendants

13   and will issue an Order Memorandum Opinion in the coming

14   weeks.

15        The parties will be ordered to submit proposed

16   findings of fact and conclusions of law and proposed remedy

17   language, if applicable, by 5:00 p.m. Central Time on

18   Tuesday, July 27, 2021.  I'm ordering that from the bench,

19   but that will also be followed by written order on ECF.  So

20   you'll have that particular date on the docket.

21        I will also instruct Texas to provide a courtesy

22   copy of its demonstrative exhibit.  That will not be made

23   part of the record, but I was furiously taking notes on some

24   of the citations.  I could rely on the transcript, of course,

25   but I think a quicker way to get some of those citations

1    would be to those slides.  I'll just ask that you provide a

2    courtesy copy to my courtroom deputy.

3           And regarding transcripts, if either the States or

4    the United States request an expedited transcript, please

5    process that request through my courtroom deputy, and I'll

6    make instructions and accommodations for that.

7           Bear in mind that we have a heavy criminal docket

8    and one court reporter, so we may need to modify any

9    expedited transcript request to accommodate bandwidth issues.

10          Other than that, I think that's it for

11   housekeeping.

12          Anything else that should be addressed while I have

13   all the parties and attorneys present?

14          **MR. THOMPSON:**  Not from Plaintiffs, Your Honor.

15          **THE COURT:**  Anything from the United States?

16          **MR. WARD:**  Nothing further from the United States,

17   Your Honor.

18          **THE COURT:**  This Court is adjourned.  The Court

19   stands in recess for the remainder of the day.

20          Counsel and parties are excused.

21          **COURT SECURITY OFFICER:**  All rise.

22      **(End of proceedings for 07/22/2021.)**

23

24                  *   *   *   *   *   *

25

Stacy Mayes Morrison
Official Court Reporter

1        I certify that the foregoing is a correct transcript

2    from the record of proceedings in the above-entitled matter.

3    I further certify that the transcript fees format comply with

4    those prescribed by the Court and the Judicial Conference of

5    the United States.

6

7    s/Stacy Mayes Morrison          7/26/2021
     Stacy Mayes Morrison            Date
8    Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25