UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § § § | |
| THE STATE OF MISSOURI, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 2:21-cv-00067-Z |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.*, | § § § § § | |
| Defendants. | § § | |

**PLAINTIFFS' MOTION TO ENFORCE PERMANENT INJUNCTION
AND FOR EXPEDITED DISCOVERY**

**INTRODUCTION**

On August 13, this Court permanently enjoined enforcement of Defendants' June 1 Memorandum, which purported to terminate the Migrant Protection Protocols ("MPP"), and required Defendants to implement and enforce MPP in good faith. ECF No. 94. They are not.

When they originally rolled out MPP, Defendants took the perfectly reasonable approach of phasing in implementation, getting immediate results without unnecessary delay that would have flowed from requiring all aspects of the program to be online at once. They now report to the Court, however, that they must first reach an agreement with Mexico; second, contract for infrastructure for immigration hearings at the border; and, finally, finish that infrastructure—and only then will they *begin* to implement MPP.

Their sloth in implementing MPP is especially salient with the crisis in Del Rio, Texas, where thousands of Haitian migrants—who would have been subject to MPP had it been in effect—have been camping after illegally entering the country from Mexico. Defendants must explain to Plaintiffs and this Court why they have not even begun implementing MPP through the

staggered approach they followed when creating the program. The crisis in Del Rio provides another timely need for information from Defendants, given the lack of clarity as to what the Administration is doing with these migrants. ECF No. 94.

## BACKGROUND

**I.     The Haitian Migrant Crisis.**

Since the Court issued its injunction, a humanitarian crisis has developed in Del Rio: On Friday, September 17, the mayor of that small border community declared a disaster.[1] The disaster stems from a number of migrants' crossing the border and establishing a makeshift camp under the Del Rio International Bridge—a number, as of Saturday, September 18, that has ballooned to more than 14,600.[2] Most migrants at the camp are Haitian, with Venezuelans, Cubans, and Nicaraguans constituting a significant minority.[3] Many of these individuals followed instructions circulated on WhatsApp to travel from Brazil, Chile, and other South American countries, where they had been residing for several years.[4]

Beginning in January 2021, encounters with Haitian migrants have skyrocketed, both nationally and within CBP's Del Rio Sector.[5] Nationwide, CBP encountered more Haitian migrants in January–March 2021 than it encountered in all of FY2020. In the Del Rio Sector, CBP encountered more Haitian migrants in each of June, July, and August than in the entirety of

---

[1] *See* CITY OF DEL RIO, *Emergency Local Disaster Declaration* (Sept. 17, 2021), https://www.cityofdelrio.com/home/showpublisheddocument/6590/637674846959119902.

[2] *See* Lomi Kriel & Uriel J. Garcia, TEXAS TRIBUNE, *Biden administration speeds up deportation flights for Haitians in growing Texas migrant camp*, https://www.texastribune.org/2021/09/18/texas-immigration-border-deportations (Sept. 18, 2021).

[3] *See* BBC, *US immigration: Thousands gather under bridge at US-Mexico border in growing crisis*, https://www.bbc.com/news/world-us-canada-58593632 (Sept. 16, 2021).

[4] *See* Alexandra Ulmer, REUTERS, *WhatsApp instructions, Mexican struggles: How Haitians ended up in Texas camp* (Sept. 17, 2021) (available at https://www.reuters.com/world/whatsapp-instructions-mexican-struggles-how-haitians-ended-up-texas-camp-2021-09-17/).

[5] The statistics in this paragraph are drawn from U.S. CUSTOMS AND BORDER PROT., *Nationwide Encounters*, https://www.cbp.gov/newsroom/stats/nationwide-encounters (last visited Sept. 23, 2021).

FY2020. These numbers began to truly spike in May, when the number of encounters nationally more than doubled before doubling again from May to June. That increase followed DHS's May 22, 2021, announcement that it was extending temporary protected status for the 150,000 Haitians already living in the country.[6] Based only on the numbers of migrants under Del Rio International Bridge, those numbers are set to have more than doubled again in September, following the Biden Administration's cancellation of repatriation flights to Haiti over the summer.[7]

According to news reports, Mexico's government has not agreed to accept the return of migrants from countries other than Honduras, Guatemala, and El Salvador.[8] However, as the Fifth Circuit observed, MPP "permit[s] DHS to simply refuse admission at ports of entry in the first place." *Texas v. Biden*, . And while one would expect Mexico's purported refusal to accept these migrants to sharpen the need for stronger controls of who is admitted into the nation, reports indicate that "U.S. officers [are] observing the crossings, but taking no steps to stop them."[9] Further, while the Del Rio Port of Entry has been closed, traffic is being rerouted to Eagle Pass, where migrants presumably may still enter the United States.[10] Given the credible reports that tens

---

[6] *See* U.S. DEPT. OF HOMELAND SEC., *Secretary Mayorkas Designates Haiti for Temporary Protected Status for 18 Months* (May 22, 2021) (available at https://www.dhs.gov/news/2021/05/22/secretary-mayorkas-designates-haiti-temporary-protected-status-18-months).

[7] *See* Adam Shaw & Bill Melugin, FOX NEWS, *Texas Rep. Gonzales calls squalid migrant camp under Del Rio bridge 'gut-wrenching' as numbers soar*, https://www.foxnews.com/politics/texas-rep-gonzales-migrant-camp-del-rio-bridge-gut-wrenching (Sept. 16, 2021).

[8] *See* Rafael Bernal, THE HILL, *Advocates 'in utter disbelief' after Biden resumes Haitian repatriations* (Sept. 16, 2021) (available at https://thehill.com/latino/572588-advocates-in-utter-disbelief-after-biden-resumes-haitian-repatriations).

[9] *See* ASSOCIATED PRESS, *US closes part of Texas border, begins flying Haitians home* (Sept. 19, 2021) (available at https://www.nbcnews.com/news/world/us-closes-part-texas-border-begins-flying-haitians-home-n1279537).

[10] *See* U.S. CUSTOMS AND BORDER PROT., *CBP Temporarily Re-Routing Trade, Travel Traffic From Del Rio Port of Entry to Eagle Pass Port of Entry* (Sept. 17, 2021) (available at https://www.cbp.gov/newsroom/local-media-release/cbp-temporarily-re-routing-trade-travel-traffic-del-rio-port-entry).

of thousands more migrants may be on their way,[11] it is essential that MPP be implemented before those migrants set foot in the United States.

## II. Defendants' Failure to Implement MPP in Good Faith.

The Court ordered Defendants to reinstitute MPP. They haven't. This would be excusable if Defendants, as the Court ordered them to do, were proceeding in good faith to reinstitute the program. They aren't. Defendants' recent report regarding their compliance with the Court's permanent injunction asserts that they cannot reimplement much of the program until they receive assent from Mexico. This is simply untrue.

Defendants have a ready playbook for implementing MPP; they have, after all, implemented it once before. When implementing the program on their own timetable, Defendants did so in stages, as would be expected for a program that is itself conducted in stages separated by weeks or months. They have inexplicably refused to follow that path now that the Court has ordered the program back into place—a path that, as attested to by Mark Morgan, who oversaw the original implementation of MPP while Acting Commissioner of CBP, remains available. Defendants could right now be refusing entry to non-Mexican aliens who are claiming asylum from their non-Mexican governments. They aren't. They could be issuing notices of asylum hearings to those claimants while they rebuild the facilities where those proceedings occur. They aren't. And they could be undertaking the same scope and intensity of discussions with the Mexican government as they did when they first won Mexico's partnership in MPP. They aren't.

Defendants' original implementation of MPP demonstrated what good faith looks like. But what they say they are doing now looks nothing like that. The Court should compel Defendants to live up to their duties by following the blueprint they previously followed.

---

[11] *See* Adam Shaw, FOX NEWS, *CBP shuts down Del Rio port of entry, border checkpoints in response to Haitian migrant surge* (Sept. 17, 2021) (available at https://www.foxnews.com/politics/cbp-del-rio-port-of-entry-checkpoints-response-migrant-surge).

STANDARD

Plaintiffs need to show only three things to demonstrate that an injunction is warranted: that a Court order is in effect; that the order requires certain conduct from Defendants; and that Defendants aren't complying with those requirements. *Petroleos Mexicanos v. Crawford Enters., Inc.*, 826 F.2d 392, 401 (5th Cir. 1986) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949)). If Plaintiffs make those showings clearly and convincingly, the Court may in its discretion render whatever orders will "protect the sanctity of its decrees and the legal process." *Test Masters Educ. Svcs., Inc. v. Singh*, 428 F.3d 559, 581–82 (5th Cir. 2005).

ARGUMENT

I. **Defendants must implement MPP in good faith.**

There is no question that the permanent injunction is in effect. This Court, the Fifth Circuit, and the Supreme Court all refused to stay that injunction pending appeal. ECF Nos. 100, 102, *Biden v. Texas*, 2021 WL 3732667 (U.S., Aug. 24, 2021). Nor is there any question that the injunction requires the federal government to act in good faith to reimplement the Migrant Protection Protocols. The injunction explicitly says so, ECF No. 94 at 52, and the Fifth Circuit in denying Defendants' stay request explicitly noted that requirement. ECF No. 102 at 29.

Thus, the only question before the Court is whether Defendants are complying with that obligation. They are not.

II. **The original implementation of MPP demonstrates how to implement the program in good faith.**

When Defendants originally implemented MPP, they were not doing so under coercion; they were bringing the program online in the manner they chose on the timetable they chose. Good-faith implementation of this Court's injunction requires proceeding at least as quickly as Defendants did the first time they implemented MPP. The objectively unreasonable delays in implementing even a portion of MPP demonstrate their lack of good faith. *See In re Montgomery*, 518 F.2d 1174, 1175 (4th Cir. 1975) (deviation from past practice was evidence that "transaction lacked the requisite good faith"); *United Mine Workers of Am. v. Rag Am. Coal Co.*, 392 F.3d

1233, 1240 (10th Cir. 2004) (affirming jury instruction that past practice was relevant to whether sale was made in good faith).

### A.   Defendants do not need an agreement with Mexico.

Defendants continue to assert that they "cannot implement MPP without [Mexico's] concurrence," ECF No. 105-1, Declaration of Blas Nuñez-Neto at ¶ 3, and that they must wait "to rapidly implement MPP once an agreement is reached with [Mexico]." *Id*. at ¶ 6.

But this Court's injunction noted that DHS instituted MPP unilaterally—without an agreement with Mexico. ECF No. 94 at 49 & n.15. And in rejecting Defendants' stay request, the Fifth Circuit rejected their argument that "aliens cannot be returned to Mexico without Mexico's consent" because "at least for some aliens, MPP would permit DHS to simply refuse admission at ports of entry in the first place." ECF No. 102 at 12 (citing 8 U.S.C. § 1225(b)(2)(C)). Defendants cannot simply ignore the courts' rejection of their theory that Mexico has a veto over the MPP; that they are doing so shows that they are not implementing MPP in good faith.

And to the extent that certain portions of MPP do depend on Mexico's assent, Defendants again miss the mark. The negotiations between Defendants and the Mexican government during the initial implementation involved "long-time career officials" in both the American and Mexican governments who "were an integral part of the design, coordination, and implementation of MPP. Many of these career officials remain employed by their respective agencies and could easily provide guidance, education, and historical background to assist … with expeditiously reinstating MPP." Appx. 7 at ¶ 21; Appx. 5–6 at ¶ 18.

### B.   Defendants do not need to wait for facilities to be completed.

Defendants claim that they cannot implement MPP until they "rebuild the infrastructure needed for MPP and redeploy resources as needed,"[12] ECF No. 105-1 at ¶¶ 7–8, and then stack

---

[12] This infrastructure consists of temporary soft-sided "Immigration Hearing Facilities" or "IHFs." ECF No. 105-1 at ¶ 7. *See also* ECF No. 94 at 9 (finding of fact relating to "[t]hese temporary facilities function[ing] as virtual courtrooms, with immigration judges appearing by video connection from their courthouses within the United States") (citing Administrative Record, ECF No. 61, at 208, 684).

this delay on top of the delay they attribute to the Mexican government. *See* ECF No. 105-1 at ¶ 8 ("DHS plans to execute the contact for IHFs as soon as an agreement is reached with [Mexico]."). They attempt to excuse themselves by comparing the current lack of IHF's to the previous implementation, when "the IHFs were not built until after the June 7, 2019 joint declaration between the U.S. Government and the Government of Mexico [that] permitted further expansion of MPP." *Id*. at ¶ 8 n.1. But MPP had in fact been implemented months before that "expansion;" as the Court has noted, MPP was first implemented on January 28, 2019, even though temporary structures were not completed until August of that year. ECF No. 94 at 8–9; *see also* Appx. 6–7 at ¶ 20. Then, as now, the choice was between "set[ting] back the program's effectiveness for months" or "immediate[ly] act[ing] as a deterrent, for the smugglers and immigrants themselves…." Appx. 6–7 at ¶ 20. Defendants do not explain why they have changed course.

A good-faith re-implementation of MPP would explain why Defendants decided to wait until they have built IHFs "before enrolling a single amenable alien," which allows human traffickers to "connive the migrants [that] their window of opportunity [is] closing—increasing the numbers of those entering our country illegally." Appx. 6–7 at ¶ 20. It would explain why circumstances have changed such that MPP's existence no longer deters migrants from coming to the border by removing the "perverse incentives" attending to "a free ticket into" the interior of the United States. *See* ECF No. 94 at 17. It would explain why this deterrence itself no longer reduces the need for more hearing facilities. Defendants' implementation does not.

Further, the lengthy delays between a migrant's receipt of a notice to appear and the actual hearing have not vanished. *See* ECF No. 60 at 684 ("Individuals processed in MPP receive initial court hearings within two to four months"). Just as in the initial implementation, initial processing in the re-implemented MPP will take place well before an IHF is needed. Just as MPP was initially rolled out in stages to reduce the logistical strain on Defendants, *see* Argument § IIC, the delay between the initial enrollment of aliens into MPP and the first hearings on MPP asylum claims creates weeks, if not months, of additional window for the construction of necessary facilities. Yet Defendants do not explain why they have decided not to take advantage of this natural lag.

### C. Defendants do not need to wait until the entire border is ready.

When MPP was initially implemented, Defendants used a phased approach rather than wait until they could start the program along the entire border. Appx. 6, at ¶ 19. This was deliberate: As MPP became operational in one area, Defendants could coordinate its expansion into additional areas, acquire needed resources on a rolling basis rather than all at once, and adjust the program's details based on evaluations of its actual performance. *Id.* And this strategy allowed Defendants to begin reaping the benefits of MPP immediately, if not fully: Defendants could enroll aliens in MPP on a small scale as they built up to a larger scale, immediately creating incentives for changes in behavior rather than reacting to situations on the border as they developed. *Id.*

Yet now, Defendants claim, without explanation, that they cannot re-implement MPP because facilities have not been constructed along the entire border. ECF No. 105-1 at ¶¶ 7–8.

### D. Defendants do not need to delay due to COVID-19 or Title 42.

Defendants additionally assert that they cannot implement MPP because they need additional time to plan to implement COVID-19 protocols and account for the operation of the Title 42 rapid-expulsion program. ECF No. 105-1 at ¶ 9–12. This is a red herring. First, they do not account for the time built into the staged rollout that Defendants previously conducted or the natural lag between implementation and facility need described above. Second, this ignores the "numerous strategic discussions concerning" MPP, Title 42, and COVID mitigation that Defendants undertook when MPP was first operational. Appx. 8 at ¶ 25. Indeed, Defendants by mid-2020 had already begun "discuss[ing] 'robust mitigation measures for COVID-19'" in MPP facilities; Defendants' suggestion now that they have "no plan to reconfigure a single IHF in anticipation of" a need to operate during the COVID-19 pandemic "is remarkable." *Id.* The "historical discussions and planning" that Defendants can pull off the shelf from 2020, not to mention their experience in "reconfigure[ing] the IHFs to serve as detention facilities, including 'robust mitigation measures for COVID-19,'" are "no justification for their delay" in re-implementing MPP. *Id.*

\*\*\*

Good-faith re-implementation of MPP is best measured by Defendants' original implementation of MPP—implementation on a rolling basis. They now propose to delay *any* implementation of MPP until *every* aspect of MPP is in place. That is not good-faith compliance with this Court's order, and the effects are evident with the present Haitian-migrant crisis.

### III.     Plaintiffs are entitled to discovery on defendants' compliance efforts.

At a minimum, Plaintiffs are entitled to expedited discovery on two fronts.

*First*, Plaintiffs are entitled to discovery relating to the facts articulated in Defendants' recently filed compliance report, ECF No. 105:

- The report relies on statements from Blas Nuñez-Neto. ECF No. 105-1. Plaintiffs should be allowed to examine Mr. Nuñez-Neto regarding the full scope of and basis for Defendants' actions (or lack thereof).

- Defendants' stay motions were premised on the difficulties of complying with an order to re-implement MPP. ECF No. 98 at 5–6. Plaintiffs should be allowed to depose those declarants—Assistant Secretary David Shahoulian, Principal Deputy Chief Immigration Judge Daniel H. Weiss, and Senior Bureau Official Ricardo Zúniga—on the actions that have actually been undertaken to implement MPP.

- Finally, Plaintiffs should be allowed to take the depositions of two other officials. CBP's Acting Deputy Commissioner Benjamine "Carry" Huffman is a relevant witness regarding CBP procurement. Deputy Undersecretary for Management Randolph D. "Tex" Alles has overseen DHS's procurement since July 2019 and has knowledge of how current MPP-implementation procurement compares to the original MPP-implementation procurement.

*Second*, despite the Administration's opaque public statements, news reports have indicated that Defendants are releasing Haitian migrants into the interior of the United States by the thousands.[13] The Haitian migrants—non-Mexican nationals entering the United States from Mexico—would be amenable to MPP if it were operational. Plaintiffs are entitled to two classes of discovery specifically relating to that situation:

---

[13] *See* Elliott Spagat, Maria Verza & Juan A. Lozano, Associated Press, *Officials: Many Haitian migrants are being released in US* (Sept. 22, 2021) (available at https://apnews.com/article/haiti-migrants-del-rio-texas-mexico-border-931593e957bf0a8a4cfd691ecedd8211).

- Defendants are tracking the information the Court has required for monthly reports, but Plaintiffs need that information broken down on a monthly basis beginning January 21, 2021: (1) the total number of encounters of migrants, including Haitian migrants, at the southwest border; (2) the number of migrants, including Haitian migrants, expelled under Title 42, Section 1225, or under any other statute; (3) Defendants' total detention capacity as well as current usage rate, including usage for Haitian migrants; (4) the total number of migrant "applicants for admission" under Section 1225 migrants, including Haitian migrants; and (5) the total number of migrant "applicants for admission," including Haitian migrants, under Section 1225 paroled or otherwise released into the United States. *See* ECF No. 94 at 52–53.

- This Court has ruled that MPP's termination has caused Defendants "to release and parole aliens into the United States because [they] simply do not have the resources to detain aliens as mandated by statute," ECF No. 94 at 17, even though the law require that parole be granted case-by-case, not on a categorical basis. *Id*. at 43 n.11. Defendants did not contest this finding when seeking a stay in the Court of Appeals. ECF No. 102 at 9. Plaintiffs are entitled to know if Defendants are violating these limits on parole in relation to migrants, including Haitian migrants, as a result of their unlawful termination of MPP.

## CONCLUSION

Texas and Missouri respectfully request that the Court issue an order (1) finding that Defendants are not in compliance with the permanent injunction, (2) commanding concrete steps to comply; and (3) allowing expedited discovery relating to compliance and specifically to the current crisis at the border with Haitian migrants.

| | |
|---|---|
| Date: September 23, 2021 | Respectfully submitted, |
| | |
| ERIC S. SCHMITT | KEN PAXTON |
| Attorney General of Missouri | Attorney General of Texas |
| | |
| D. JOHN SAUER, #58720MO* | BRENT WEBSTER |
| Solicitor General | First Assistant Attorney General |
| | |
| /s/ Jesus A. Osete | JUDD E. STONE II |
| JESUS A. OSETE, #69267MO* | Solicitor General |
| Deputy Solicitor General & | Texas Bar No. 24076720 |
| Deputy Attorney General for | |
| Special Litigation | PATRICK K. SWEETEN |
| | Deputy Attorney General for Special Litigation |
| OFFICE OF THE ATTORNEY GENERAL | Texas Bar No. 00798537 |
| Supreme Court Building | |
| 207 West High Street | WILLIAM T. THOMPSON |
| P.O. Box 899 | Deputy Chief, Special Litigation Unit |
| Jefferson City, Missouri 65102 | *Attorney-in-Charge* |
| Tel. (573) 751-8870 | Texas Bar No. 24088531 |
| Fax (573) 751-0774 | |
| John.Sauer@ago.mo.gov | /s/ Ryan D. Walters |
| | RYAN D. WALTERS |
| *Counsel for Plaintiff State of Missouri* | Special Counsel |
| | Texas Bar No. 24105085 |
| *Admitted pro hac vice | |
| | OFFICE OF THE ATTORNEY GENERAL |
| | SPECIAL LITIGATION UNIT |
| | P.O. Box 12548 (MC-009) |
| | Austin, Texas 78711-2548 |
| | Tel.: (512) 463-2100 |
| | Fax: (512) 457-4410 |
| | patrick.sweeten@oag.texas.gov |
| | will.thompson@oag.texas.gov |
| | ryan.walters@oag.texas.gov |
| | |
| | *Counsel for Plaintiff State of Texas* |

## CERTIFICATE OF CONFERENCE

I certify that, on September 23, 2021, I conferred with Defendants' counsel, who represented that Defendants oppose this motion.

<u>/s/ Ryan D. Walters</u><br>
RYAN D. WALTERS

## CERTIFICATE OF SERVICE

I certify that on September 23, 2021, a true and accurate copy of the foregoing document was filed by CM/ECF and served on all counsel of record.

<u>/s/ Ryan D. Walters</u><br>
RYAN D. WALTERS