UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| THE STATE OF TEXAS and<br><br>THE STATE OF MISSOURI,<br><br>　　　Plaintiffs,<br><br>v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.*,<br><br>　　　Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§　Case No. 2:21-cv-00067-Z<br>§<br>§<br>§<br>§<br>§<br>§ |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE**

**DECLARATION OF MARK MORGAN**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| THE STATE OF TEXAS AND<br>THE STATE OF MISSOURI,<br><br>       *Plaintiffs*,<br><br>v.<br><br>JOSEPH R. BIDEN, JR.,<br>in his official capacity as<br>President of the United States of<br>America, *et al.*,<br><br>       *Defendants*. | )<br>)<br>)<br>)<br>)<br>)   Case No. 2:21-cv-00067-Z<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF MARK MORGAN

I, Mark Morgan, am over the age of 18 and fully competent in all respects to make this declaration. Pursuant to 28 U.S.C.§ 1746, I testify that:

1. I make this declaration on the basis of my own personal and professional knowledge. I have almost 30 years of combined law enforcement experience at the local, county, and federal levels, as well as, more than ten years of service with the United States Marine Corps.

2. Since February 2021, I have been a Senior Fellow for the Federation for American Immigration Reform, a non-partisan public interest organization evaluating immigration policies and seeking solutions to reduce the negative impact of uncontrolled immigration on the Nation's security, economy, workforce, education, healthcare, and environment.

3. From July 5, 2019 to January 20, 2021, I was Acting Commissioner of U.S. Customs and Border Protection ("CBP"). In this position, I oversaw 60,000 employees at the largest law enforcement agency and the second-largest revenue-collecting source in the federal government. I managed a budget of over $13 billion and ensured the effective operations of CBP's

1

mission to protect national security while promoting economic prosperity. I directed CBP's five core missions of counterterrorism, combatting transnational crime, border security, facilitation of lawful trade and travel, and revenue enforcement, including $4 trillion in trade and the travel of over 410 million people through ports of entry.

4. From March 28, 2019 to July 5, 2019, I was Acting Director of U.S. Immigration and Customs Enforcement ("ICE"). During my leadership of ICE, I was responsible for overseeing an organization of approximately 19,000 employees with a budget of more than $7.5 billion. ICE is the lead federal agency responsible for enforcing federal laws related to immigration, border control, customs, and trade. In addition to enforcing our immigration laws, ICE's law enforcement responsibilities include investigating financial and cybercrimes as well as intellectual property and commercial fraud; human rights violations; weapons, narcotics, and human smuggling; transnational gang activity; and enforcing our export laws.

5. From January 2017 to January 2018, I served as the Executive Director of the FBI's National Academy Associates, a non-profit, international organization of more than 16,500 senior law enforcement professionals dedicated to providing communities and profession with the highest degree of law enforcement expertise, training, and education.

6. From October 12, 2016 to January 26, 2017, I was Chief of U.S. Border Patrol, a component of CBP within the Department of Homeland Security ("DHS"), after having begun to serve in that position in an acting capacity in July 2016. In this position, I had oversight of nearly 21,000 Border Patrol Agents. The mission of Border Patrol is preventing the illegal trafficking of people and contraband and is specifically responsible for patrolling nearly 6,000 miles of Mexican and Canadian international land borders and over 2,000 miles of coastal waters surrounding the Florida Peninsula, as well as the island of Puerto Rico.

7. From August of 1996 to August of 2016, I served as a Special Agent with Federal Bureau of Investigation. Over the span of 20 years, I served in a variety of positions including supervisor of an MS-13 Gang Task Force; Assistant Special Agent In-Charge of the New Haven Division; Deputy On-Scene Commander in Baghdad, Iraq; Special Agent In-Charge of the El Paso Division; and Assistant Director of the FBI's Training Division, Quantico. I was a member of the Special Weapons and Tactics Team, certified Firearms Instructor, and Tactical Medic.

8. From 1995 to 1996 I served as a Police Officer with the Los Angeles Police Department where I was assigned to the 77th Division as a patrol officer.

9. From 1992 to 1995 I attended the University of Missouri–Kansas City, School of Law. I earned a Juris Doctor degree in 1995 and passed the Missouri Bar. While attending law school I served as a Reserve Deputy Sheriff in Platte County, Missouri.

10. I served in the United States Marine Corps, active duty and reserves, from August of 1984 until my Honorable Discharge in September of 1996.

**The Implementation of the Migrant Protection Protocols**

11. In Fiscal Year ("FY") 2018, CBP experienced a steady increase in total apprehensions along the Southwest Border ("SWB"). In FY 2019, DHS announced the Migrant Protection Protocols ("MPP") as part of its network of polices to assist with addressing the crisis at the border. The MPP declared migrants who illegally enter our borders or otherwise were deemed inadmissible, may be removed to Mexico while the illegal alien continues to participate in immigration proceedings conducted in the U.S. Illegal aliens enrolled in MPP and removed to Mexico are not barred from claiming asylum or fully participating in the U.S. immigration proceedings but rather are required to do so while remaining in Mexico.

12. DHS implemented MPP, as part of the network of policies and tools, to manage

this crisis at the border. By allowing CBP to directly remove illegal aliens to Mexico it not only ended "catch and release," but it simultaneously sent a powerful message to the smugglers and immigrants themselves that we had closed a significant loophole. Bringing a child with you to the border was no longer your passport into the United States. Not only did the MPP enable DHS to stop releasing illegal aliens into the United States, but just as important, it acted to deter aliens from paying smugglers, risking their lives, and attempting to illegally cross the southern border. This policy created a powerful disincentive for aliens to arrive at the southern border to seek entry with meritless claims of asylum.

13. MPP played a critical role in addressing the border crisis. By removing migrants to Mexico to await their asylum proceedings, MPP reduced the ability of illegal aliens to remain in the U.S. in defiance of their court ordered removals; deterred aliens from attempting illegal entry or making meritless asylum claims in the hope of staying inside the United States; and shut down the driving force behind the FY 2019 illegal migration crisis by closing the FSA generated loophole. An additional benefit to MPP is that it allowed the government to better focus its resources on individuals who have legitimate asylum claims. To illustrate MPP's effectiveness, the underlying demographic driving the crisis–families from Central America was significantly mitigated by February of FY 2020 when CBP saw a decline of families from the previous year of 66%. And families decreased from the height of May FY 2019 by 92%. In FY 2019, because of the FSA and other loopholes, CBP alone had released more than 230,000 illegal aliens and inadmissible migrants into the United States. In FY 2020, in large part directly related to MPP, CBP released fewer than 1,000.

**Comparing MPP's Original Implementation with Defendants' Actions to Comply with this Court's Order**

14. I have reviewed the September 15, 2021, filings of Defendants in this case that

report their efforts to enforce and implement MPP in good faith. *See* ECF Nos. 105, 105-1, 106, 106-1, 106-2, 106-3.

15. I personally oversaw CBP's "phased-in" implementation strategy area by area along the SWB over several months during FY 2019, to ensure a smooth and safe implementation of MPP. By the beginning of FY 2020 MPP had been initiated along the entire SWB.

16. The Defendants claim that they cannot implement MPP until they "rebuild the infrastructure needed for MPP and redeploy resources as needed." ECF No. 105-1, Declaration of Blas Nuñez-Neto at ¶¶ 7–8.

17. The Defendants describe in detail "foundational matters" which have not yet been agreed upon by the Government of Mexico ("GOM"). While I concur that each of the four topics enumerated in the Defendants' filing are "foundational," I do not believe their attempt to deflect the lack of progress by citing the failure of the GOM to concur with each of the foundational matters as justifying their delay in implementation. In 2019, following extensive diplomatic and logistical coordination, an agreement was obtained between the two countries specifically addressing each of the topics mentioned in the Defendants' filing.

18. Over the course of 2019, field components from both countries with the direct responsibility for implementing MPP were in daily contact. There was constant and ongoing coordination involving the Department of State, Department of Homeland Security, as well as senior leadership at Customs and Border Protection with their appropriate colleagues within GOM which allowed the two countries to further refine and streamline our collective ongoing implementation of MPP. Countless career officials were an integral part of the design, coordination, and implementation of MPP. Many of these career officials remain employed by their respective agencies and could easily provide guidance, education, and historical background

to assist the DHS Secretary with expeditiously reinstating MPP.

19. The basic concept of the implementation strategy was to use a "phased" approach rather than delay implementation of the program until both countries had acquired the requisite logistical support to operationalize MPP along the entire 2,000 miles of our shared border. We narrowed and concentrated our efforts to a single geographical area in the beginning. As we fully operationalized MPP in one geographical area, we were simultaneously coordinating with GOM to expand MPP to additional geographical areas. This allowed both governments the opportunity and time to acquire the needed resources on a "rolling" basis, and also provided an opportunity to make needed adjustments prior to expanding MPP into additional areas. Although this "phased" approach took several months during 2019 to fully implement along the entire SWB, the key aspect of the strategy allowed us to immediately begin to enroll illegal aliens in MPP on a small scale and in limited geographical areas while we continued to build additional capacity. The effectiveness of this "phased" approach enabled us to close the significant loophole created by the Flores Settlement Agreement and immediately end "catch and release" within the geographic area MPP was being implemented. This led to an immediate and dramatic reduction in families attempting to illegal enter the border in those geographical areas. We became better positioned to shape the behaviors of the smuggling organizations rather than them shaping ours.

20. Another significant element of our collective phased strategy with GOM was the timing with respect to the removal of amenable illegal aliens under MPP to Mexico and when the U.S. government would begin the process of formal immigration proceedings in the United States. To wait until the United States had constructed Immigration Hearing Facilities ("IHFs") across the entire SWB, or even in a single geographical area, before enrolling a single amenable illegal alien into MPP, would have set back the program's effectiveness for months and only serve to

exacerbate the flow of illegal immigration. Rather than immediately act as a deterrent, for the smugglers and immigrants themselves, it would have been used as an alarm by the smugglers to connive the migrants their window of opportunity was closing—increasing the numbers of those entering our country illegally. Our strategy called for the immediate removal of aliens to Mexico under MPP with the agreement we would initiate the immigration process in the United States at a designated IHF within 60-90 days.  This approach allowed us to immediately close the loophole which mandated we release families into the United States while waiting for their immigration proceedings and sent a clear deterrence message that illegally entering our border with a minor would no longer be their "passport" into the United States. This approach was utilized with each expansion into a new geographical area.

21.     The Defendants' filing fails to mention or acknowledge these past practices or the benefit of utilizing any aspect of a phased approach. Nor do they acknowledge the fact each of the topics included in their "foundational matters" had been previously addressed through extensive diplomatic and logistical coordination with GOM. It is a matter of coordinating with the long-time career officials within their own department who participated in the development of these past practices and re-engaging GOM to continue the agreement which had been in place for almost two years prior to the Biden Administration unilaterally rescinding it. There is no "new" agreement needing to be negotiated.

22.     Just as we did in 2019, this Administration could begin to remove a select group of aliens in a limited geographical area immediately, utilizing the previous agreement with GOM as the foundation and giving DHS ample opportunity to reconfigure pre-existing IHFs to receive MPP enrollees within 60-90 days. They should not wait, as they suggested, until they have the resources to build IHFs along the entire SWB before they enroll a single alien in MPP. This will allow both

countries to build capacity, make needed operational adjustments, while simultaneously initiating a rolling implementation of the court's order. The failure to acknowledge the past practices, prior agreements with GOM, and the successful aspects of the phased strategy, is not good-faith compliance with this Court's order.

23. Defendants also claim that delay is justified by the need to develop protocols relating to COVID-19. ECF No. 105-1, Declaration of Blas Nuñez-Neto at ¶¶ 9–10

24. The CBP personnel have been navigating how to balance fulfilling their statutory responsibilities of protecting our Nation's borders while simultaneously protecting the workforce, as well as those they come into contact against COVID-19 for more than year and a half. It's a part of every aspect of their mission. The Defendants' filing, again, infers the need to restructure the IHFs with robust COVID mitigation strategies as a justification for their delays. They fail to provide this Court essential historical context.

25. During my time as Acting CBP Commissioner we had numerous strategic discussions concerning the future status of both MPP and Title 42. There was a real possibility we could lose the use of Title 42, as well as be mandated to continue to utilize MPP. By mid-2020 we began to collectively discuss "robust mitigation measures for COVID-19" impacting IHF operations. To suggest to the Court DHS and CBP, knowing the ongoing litigation, was not already prepared to quickly initiate "robust" mitigation strategies" or plan to reconfigure a single IHF in anticipation of this Court's ruling is remarkable.

26. With the historical discussions and planning done in 2020, there is simply no rationale to utilize this as a justification for their delay. Ironically, they reconfigured the IHFs to serve as detention facilities, including "robust mitigation measures for COVID-19," with unprecedented speed. There is no doubt they can reconfigure them back to IHFs with the same

sense of urgency. They do not need to wait until every IHF has been reconfigured and fully staffed or they have the full complement of IHFs they believe they need along the entire SWB.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23rd day of September 2021.

*Mark A. Morgan*

_____
MARK A. MORGAN