UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| THE STATE OF TEXAS and <br><br> THE STATE OF MISSOURI, <br><br> Plaintiffs, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.*, <br><br> Defendants. | Case No. 2:21-cv-00067-Z |

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION TO ENFORCE PERMANENT INJUNCTION
AND FOR EXPEDITED DISCOVERY

The crisis at the border continues, in no small part because Defendants are not complying in good faith with this Court's permanent injunction and promptly implementing the Migrant Protection Protocols ("MPP"). Plaintiffs have explained how MPP could have alleviated the Haitian migrant crisis in Del Rio, Texas. *See* ECF No. 107 at 1–4. Now, yet another migrant caravan is headed toward our border. Without MPP in place, the members of this caravan—estimated at up to 4,000—have reason to think they can freely enter the United States:[1]

> The widespread perception is that caravan members intend to eventually make their way to the United States. An earlier group of Haitians–12,000 according to Tapachula activists–departed Tapachula in early September and wound up in Del Rio, Texas a few days later.[2]

When caravan members arrive at the border and claim asylum, Defendants will apparently let many of them enter the country. If Defendants were implementing the permanent injunction in good faith, however, many of those individuals would remain in Mexico—either by Defendants refusing admission at ports of entry before they are on U.S. soil or by being enrolled in MPP while their asylum claims are processed.

Defendants now state that they anticipate MPP being operational in the middle of November—if Mexico does not exercise a veto. But Mexico has no veto over who Defendants allow into the country at ports of entry in the first place, as this Court has already determined. Plaintiffs and their citizens should not be forced to continue suffering irreparable harm from Defendants' failure to comply in good faith with this Court's order. Plaintiffs respectfully request a status conference during the weeks of November 1 or November 8 to ensure the Defendants do not further delay.

---

[1] *See* Edgar H. Clemente, *Migrant caravan grows as it heads through southern Mexico*, Associated Press (Oct. 27, 2021), available at https://apnews.com/article/immigration-mexico-guatemala-ca873be4730bfa07dfd1237c8d33747d.

[2] *See* Julian Resendiz, *Migrant caravan breaks through National Guard roadblock in Mexico*, KXAN (Oct. 23, 2021), available at https://www.kxan.com/border-report/migrant-caravan-breaks-through-national-guard-roadblock-in-mexico.

**ARGUMENT**

**I.    Defendants are not complying with the permanent injunction in good faith.**

Defendants maintain that no portion of MPP can be implemented without the approval of Mexico. ECF No. 110 at 2, 5, 7–9; ECF No. 110-1 at ¶¶ 5–13. This Court's permanent injunction rejected this feigned helplessness:

> At various points, Defendants argue that the Court is unable to redress Plaintiffs' injuries because any relief would be dependent on Mexico's cooperation. This is not correct . . . even if Mexico's cooperation may be required to return an alien who has already been admitted, nothing prevents DHS from refusing to admit asylum applicants at ports of entry in the first place—before they ever enter the United States.

ECF No. 94 at 49 n.15 (internal citations omitted). The Fifth Circuit agreed:

> [T]he Government argues there is no redressability because aliens cannot be returned to Mexico without Mexico's consent. This argument fails because for at least some aliens, MPP would permit DHS to simply refuse admission at ports of entry in the first place.

*Texas v. Biden*, 10 F.4th 538, 548 (5th Cir. 2021) (per curiam) (citing 8 U.S.C. § 1225(b)(2)(C), other citation omitted). This contrasts with the Defendants' crabbed view of their authority. *See* ECF No. 110 at 8–9. The Court's findings weren't limited to MPP itself; it also found that Defendants are violating their duties under 8 U.S.C. § 1225 to detain aliens pending their asylum proceedings and that terminating MPP aggravated that violation by increasing the number of asylum claimants who were neither detained nor returned to Mexico. ECF No. 94 at 42–44. MPP combines with the Defendants' inherent authority to regulate the flow of aliens into ports of entry[3]—refusing admission at the ports and thereby reducing the number of aliens paroled into the country—to increase Defendants' ability to comply with their duties to detain aliens pending their immigration proceedings.

---

[3] This practice is known as "metering" or "queue management." *See* Hillel R. Smith, *The Department of Homeland Security's "Metering" Policy: Legal Issues*, Congressional Research Service Report LSB10295 (2021), available at https://sgp.fas.org/crs/homesec/LSB10295.pdf.

As the rulings of this Court and the Fifth Circuit recognize, Defendants have ample authority to regulate the flow of aliens into the ports of entry. *See, e.g.*, 19 U.S.C. § 2 (authorizing the Secretary "to rearrange, by consolidation or otherwise, the several customs-collection districts and to discontinue ports of entry by abolishing the same or establishing others in their stead"); *id.* § 1318(b)(2) (authorizing the CBP Commissioner "to close temporarily any Customs office or port of entry or take any other lesser action that may be necessary to respond to the specific threat."); 8 C.F.R. § 100.4 (establishing different classes of ports of entry as open to only certain classes of aliens and authorizing the Commissioner to alter designations when "such action is warranted"). Defendants themselves have previously recognized their authority to refuse entry to aliens at a port of entry. In opposing a motion for preliminary injunction in *Al Otro Lado v. McAleenan*, No. 17-CV-02366 (S.D. Cal.), Defendants argued that "metering" the flow of aliens into ports of entry did not violate any duties under Section 1225 because that provision "does not impose any duties on CBP with regard to an alien standing in Mexico." *Al Otro Lado*, No. 17-CV-02366, ECF No. 307 at 17 (available unpaginated at 2019 WL 8357065). This, Defendants argued, was because aliens approaching a port of entry are not within the United States:

> [A]liens standing in Mexico are simply not "applicants for admission," nor are they "seeking admission" in the manner that would trigger CBP's duties. *See* 8 U.S.C. § 1225(a)(1) ("An alien present *in the United States* who has not been admitted or who arrives *in the United States* . . . shall be deemed for purposes of this chapter an applicant for admission." (emphasis added)); 8 C.F.R. § 235.1(a) (application "to lawfully enter the United States shall be made in person to a U.S. immigration officer *at a U.S. port-of-entry*" (emphasis added)). Section 1225(b) does not apply either, because an alien cannot be placed in expedited removal if he is not in the United States.

*Id.* at 17–18. Defendants argued that "If Congress intended to extend the Executive's inspection and processing duties to aliens standing in another country, it would have said so." *Id.* at 18 (citing *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)). Just as then, the United States does not now need Mexico's permission to refuse aliens entry across its border at a port of entry. Doing so does not send aliens present in the United States into Mexico; it exercises a sovereign right to refuse entry.

Defendants state that "[t]he majority of individuals who were previously placed in MPP were individuals who had already entered the United States between ports of entry," ECF No. 110 at 9 n.5. It is true that most aliens previously enrolled in MPP were apprehended between ports of entry, but it is also true that aliens who have presented themselves at ports of entry have been enrolled. While the Border Patrol apprehends illegal aliens crossing *between* ports of entry, CBP's Office of Field Operations ("OFO") processes the aliens who present themselves *at* ports of entry. *See* ECF No. 112-3 at ¶ 2. The statistics cited by Defendants, ECF No. 110 at 9 n. 5, demonstrate that aliens have been enrolled in MPP at ports of entry. While the Border Patrol was responsible for most enrollments, OFO was responsible for 907 enrollments in FY 2020[4] and 25 enrollments in FY 2021.[5]

Defendants make much of Mexico's sovereignty. ECF No. 110 at 6; ECF No. 110-1 at ¶ 5 ("As a sovereign nation, Mexico decides who it allows to cross its borders."). But the United States also has this right. *Carroll v. United States*, 267 U.S. 132, 154 (1925) (travelers may be stopped at the border "because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in"). Controlling travel into the ports of entry is "a fundamental act of sovereignty." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).

This is why the Haitian migrant crisis in Del Rio and the caravan of foreign nationals traveling through Mexico are relevant to compliance with the permanent injunction. Because Mexico's consent is not necessary to stop aliens at ports of entry, Defendants could have immediately implemented MPP and used their inherent authority to control the flow of aliens into the ports to increase their capacity to detain the aliens—rather than release them into the country—and therefore increase their compliance with Section 1225's mandatory-detention duties. If this combined metering of entry at the ports and enrollment of eligible aliens into MPP had been used to manage the Haitian migrant crisis—

---

[4] *See* https://www.cbp.gov/newsroom/stats/migrant-protection-protocols-fy-2020.

[5] *See* https://www.cbp.gov/newsroom/stats/migrant-protection-protocols.

or were in place to deal with the approaching caravan—Defendants would be in good-faith compliance with this Court's permanent injunction. The failure to use that sovereign authority demonstrates the opposite.

## II. The Court can consider the testimony of the former Acting CBP Commissioner.

Nor is the Court prohibited from considering the declaration of Mark Morgan, CBP's former acting commissioner. ECF No. 108. The power to keep house does not confer a right to silence a former government employee, yet that is what the Defendants seek. "[T]he Court should disregard Morgan's opinions," they say, "because federal regulations preclude him from offering them . . . ." ECF No. 110 at 6 n. 2 (citing 6 C.F.R. § 5.49(a)–(b)). Not so.

The statute underlying DHS's Touhy[6] regulations, 6 C.F.R. §§ 5.41–5.49, is "commonly referred to as the 'housekeeping statute.'" *Chrysler Corp. v. Brown*, 441 U.S. 281, 309 (1979) (citing 5 U.S.C. § 301). By its very terms, the housekeeping statute does not extend to Morgan; it empowers the head of an agency to "prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use and preservation of its records, papers, and property." 5 U.S.C. § 301. This is "simply a grant of authority to the agency to regulate its own affairs," not "a substantive grant of legislative power[.]" *Chrysler*, 441 U.S. at 309–310. "[T]he regulations simply set forth administrative procedures to be followed when demands for information are made." *Kwan Fai Mak v. FBI*, 252 F.3d 1089, 1092 (9th Cir. 2001) (discussing parallel DOJ regulations). This has not stopped agencies from trying "to find statutory authority for substantive regulations in the Housekeeping Statute," and this case "is simply one more attempt to

---

[6] Named after *Touhy v. Ragen*, 340 U.S. 462, 469 (1951), in which the Supreme Court held that a federal employee following a regulation that restricted him from disclosing information could not be held in contempt for refusing to disclose information demanded in a subpoena.

twist this simple administrative statute . . . ." *U.S. ex rel. O'Keefe v. McDonnell Douglas Corp.*, 132 F.3d 1252, 1255 (8th Cir. 1998) (collecting cases).

The plain language of the statute "compel[s] the conclusion that the phrase 'conduct of its employees' refers to current employees alone and, thus, that [DHS's] regulations regulating when 'employees' may testify are invalid to the extent they purport to apply to former employees." *Koopman v. U.S. Dep't of Transp.*, 335 F. Supp. 3d 556, 562 (S.D.N.Y. 2018) (citing *La. Dep't of Transp. & Dev. v. U.S. Dep't of Transp.*, No. 15-CV-2638, 2015 WL 7313876 (W.D. La. Nov. 20, 2015) (other citations omitted)). The "term 'employees' is not ambiguous, and, thus, [DHS] has no authority to extend that definition to the conduct of former employees." *La. Dep't of Transp. & Dev.*, 2015 WL 7313876, at *7.

Even if the regulation could apply to Morgan's testimony, it would not preclude his declaration here. The regulation cited by Defendants excepts testimony that "involves only general expertise gained while employed at the Department." 6 C.F.R. § 5.49(b). That is what Morgan provided in his declaration—as he was not employed by Defendants when they were working to comply with this Court's permanent injunction, his testimony regarding those actions could not have been "opinion or expert testimony based upon information which [he] acquired in the scope and performance of [his] official Department duties." *Id.* § 5.49(a). Instead, he used his knowledge of how the program had operated in the past—which was "general expertise gained while employed" there. *Id.* § 5.49(b).

Finally, even if the regulation applied, the federal government has forfeited its right to complain that Morgan is testifying. Defendants have known that Morgan is testifying on behalf of Texas and Missouri for months. His original declaration supported both the original preliminary-injunction motion and the renewed motion. ECF No. 31 at Appx. 389–400; ECF No. 54-2 at Appx. 389–400. Yet Defendants' only complaint about that declaration was that it wasn't part of the administrative record. *See* ECF No. 62. They complained at trial that Morgan might have revealed privileged information, relied on hearsay, and hadn't been qualified as an expert—but they never

6

complained about the fact of his submitting a declaration at all. Trial Tr. at 14:15–24, 15:16–21, 19:4–25; *see also* Fed. R. Civ. P. 46 (party must state grounds for its objection); Fed. R. Evid. 103(a) (party may not claim error in admitting evidence unless it states specific grounds to exclude). The Court specifically found Morgan's declaration admissible in the face of objections and overruled any other evidentiary objections not addressed in the opinion. ECF No. 94 at 5. Having forfeited this objection by not raising it in the first instance, Defendants cannot relitigate the issue.

### III.     Plaintiffs are entitled to take the depositions of the agency officials.

Plaintiffs are entitled to take the deposition of the agency officials.[7] Discovery extends to "any nonprivileged matter that is relevant" to the issues and proportional to the needs of the case, Fed. R. Civ. P. 26(b)(1), and what Plaintiffs seek easily fits within this standard.

*First*, the requested depositions are relevant.[8] Defendants have long maintained that they could not reimplement MPP until every aspect of that program is in place. *See* ECF No. 98, 105. Though Defendants now concede that they can implement *some* aspects of MPP in the interim (ECF No. 111), Plaintiffs are entitled to conduct discovery on the basis of Defendants' noncompliance with the injunction. Each of the four agency officials have relevant information in that regard. As explained in the Motion to Enforce, Nuñez-Neto, Shahoulian, Weiss, and Zúniga all testified by declaration to purported difficulties in reimplementing MPP. ECF No. 107 at 9; *see also* ECF Nos. 110-1 (Nuñez-Neto), 98-1 (Shahoulian), 98-2 (Weiss), and 98-3 (Zúniga). But evidence suggests the opposite: that

---

[7] Plaintiffs originally sought the depositions of six officials: Blas Nuñez-Neto, David Shahoulian, Daniel H. Weiss, Ricardo Zúniga, Benjamine "Carry" Huffman, and Randolph D. "Tex" Alles. The Huffman and Alles depositions were sought primarily to seek information on procurement issues regarding efforts to construct Immigration Hearing Facilities. In light of Defendants' representation that it has entered into contracts for that purpose (ECF No. 111), Plaintiffs withdraw their request to depose Huffman and Alles.

[8] Defendants assert that discovery regarding their parole practices are not relevant because they filed an appeal (and a failed emergency stay motion) challenging this Court's finding that the termination of MPP caused them to violate the limits on their parole authority. ECF No. 110 at 18 & n.11. Their disagreement with this Court's legal reasoning cannot excuse them from complying with an unstayed permanent injunction that is in effect.

Defendants are fully capable of reimplementing MPP without delay. ECF No. 107 at 5–9; ECF No. 108. A party is ordinary entitled to depose an opposing party's declarant, *see, e.g.*, *Worsham v. B.G. Prop. Mgmt., LLC*, No. 4:16-cv-2712, 2020 WL 7353906, at *7 (S.D. Tex. Sep. 4, 2020) and Defendants offer no reason why Plaintiffs are not entitled to test the accuracy of the declarants' contrary statements. Despite Defendants' contentions to the contrary, *see* ECF No. 110 at 12–13, determining the reasons for the contradictions between the facts Defendants are currently representing and the facts as they were represented by these declarants is a more than adequate basis for seeking discovery.

*Second*, these depositions would not "intrude on the deliberative process privilege," *see* ECF No. 110 at 13–14, because the information sought is not privileged. The declarants testified as to Defendants' supposed inability to comply with the permanent injunction. To the extent they contained privileged information, Defendants waived any privilege by filing them. To the extent that Plaintiffs seek information on Defendants' compliance with the permanent injunction, that information isn't subject to the privilege, which protects communications through which an agency arrives at a decision on which policy to adopt. *See, e.g., NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151–152 (1975). Here, the policy—MPP—and the reasons for it were already announced by the agency, and Plaintiffs seek only information to determine whether Defendants are complying with the Court's order to put that policy back into effect.

More, a party cannot avoid a deposition by making a "blanket assertion" of privilege. *See, e.g.*, *Advanced Tech. Incubator, Inc. v. Sharp Corp.*, 263 F.R.D. 395, 398–99 (W.D. Tex. 2009); *Nguyen v. Excel Corp.*, 197 F.3d 200, 206 n.16 (5th Cir. 1999). Defendants must specifically identify how the privilege applies. *See In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001). Yet Defendants cite only general concerns that Plaintiffs might "probe internal agency deliberations with respect to foreign relations." ECF No. 110 at 14.

8

*Third*, these are not depositions of "high-ranking government officials." *See* ECF No. 110 at 14–16. A different standard for deposability applies to "top executive department officials." *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985) (citation omitted). And indeed, the cases Defendants cite to support that assertion involve officials such as the EPA Administrator, the Vice President's Chief of Staff, the Attorney General, and the Deputy Attorney General. ECF No. 110 at 15. *See also Lederman v. New York City Dep't of Parks & Recreation*, 731 F.3d 199, 203–04 (2d Cir. 2013) (Mayor of New York City); *In re United States*, 542 F. App'x 944, 947 (Fed. Cir. 2013) (Chairman of the Federal Reserve Board). By contrast, the proposed deponents here are an Acting Assistant Secretary (Nuñez-Neto), a former Assistant Secretary (Shahoulian), a Principal Deputy Chief Immigration Judge (Weiss), and a Principal Deputy Assistant Secretary (Zúniga)—each of whom is targeted not simply because of position, but because of specific, superior knowledge about the deposition topics demonstrated through *having offered a declaration* on the deposition topics.

Even if the different standard applies, Plaintiffs have met it. A deposition of a high-level official may proceed under "exceptional circumstances," *In re FDIC*, 58 F.3d 1055, 1060 (5th Cir. 1995) (quotation omitted), which turn on three elements: "the high-ranking status of the deponents, the potential burden that the depositions would impose upon them, [and] the substantive reasons for taking the depositions." *Id.* These officials are not top executive officials, meaning that agency business is not likely to be substantially disrupted—if that were the case, Defendants should not have opened the door to their depositions by having them submit declarations in this case. The depositions would impose no extraordinary burden—at least, none that Defendants have identified. And Plaintiffs have a compelling substantive reason for seeking the depositions: to ensure that declarants offered by the federal government are, in the face of contradicting evidence, being candid about the federal government's efforts to comply with the Court's permanent injunction. The closest Defendants come to a substantive argument in support is the assertion that depositions would "impede the exercise of

9

official duties, including those related to implementing the injunction and managing the border." ECF No. 110 at 16. But determining whether they are actually doing so is the entire point of the depositions.

*Finally*, Defendants cannot escape discovery by arguing that Plaintiffs "have not made any showing of bad faith." ECF No. 110 at 15–16. As a preliminary matter, a showing of bad faith or improper conduct is only required where the movant affirmatively seeks to inquire into the agency official's deliberative process and decision-making. *See In re FDIC*, 58 F.3d at 1062. But, as explained above, Plaintiffs seek *factual*, not decisional, information on Defendants' supposed inability to comply with the permanent injunction and on its now-asserted compliance efforts. Plaintiffs do not seek information on the thought-process motivating Defendants' (in)actions. But even if a showing of improper conduct is required, Plaintiffs have shown it. To reiterate, Defendants wrongly contend that they cannot reimplement most of MPP until they receive assent from Mexico. ECF No. 107 at 4–9; *see also* ECF No. 108. Defendants can take steps to reimplement MPP but are not. That is bad faith.

Nor do the efforts described in Defendants' supplemental report, ECF No. 111, remedy the situation. Although the Defendants have taken *some* efforts to reimplement MPP, they still fail to explain, for example, why they cannot refuse migrants at ports of entry to increase their compliance with the Court's order regarding their duty to detain aliens pending their asylum claims under Section 1225, why they cannot conduct initial processing of aliens while IHFs are being constructed, and why they cannot reimplement MPP at some portions of the border rather than wait for the entire border to be ready. *See* ECF No. 107 at 6–9 (listing these and other issues).

## Conclusion

Plaintiffs respectfully request that the Court (1) hold a status conference prior to Defendants' targeted mid-November deadline for reimplementing MPP; (2) find that Defendants are not in compliance with the permanent injunction and clarify the requirements of its order; and (3) permit discovery of Defendants' compliance efforts.

10

| | |
|---|---|
| Dated: October 28, 2021 | Respectfully submitted, |
| ERIC S. SCHMITT<br>Attorney General of Missouri | KEN PAXTON<br>Attorney General of Texas |
| D. JOHN SAUER, #58720MO*<br>Solicitor General | BRENT WEBSTER<br>First Assistant Attorney General |
| /s/ JESUS A. OSETE<br>JESUS A. OSETE, #69267MO*<br>Deputy Solicitor General | JUDD E. STONE II<br>Solicitor General<br>Texas Bar No. 24076720 |
| OFFICE OF THE ATTORNEY GENERAL<br>Supreme Court Building<br>207 West High Street<br>P.O. Box 899<br>Jefferson City, Missouri 65102<br>Tel. (573) 751-8870<br>Fax (573) 751-0774<br>John.Sauer@ago.mo.gov | PATRICK K. SWEETEN<br>Deputy Attorney General for Special Litigation<br>Texas Bar No. 00798537<br><br>WILLIAM T. THOMPSON<br>Deputy Chief, Special Litigation Unit<br>*Attorney-in-Charge*<br>Texas Bar No. 24088531 |
| *Counsel for Plaintiff State of Missouri* | /s/ RYAN D. WALTERS<br>RYAN D. WALTERS |
| *Admitted pro hac vice | Special Counsel<br>Texas Bar No. 24105085 |
| | OFFICE OF THE ATTORNEY GENERAL<br>SPECIAL LITIGATION UNIT<br>P.O. Box 12548 (MC-009)<br>Austin, Texas 78711-2548<br>Tel.: (512) 463-2100<br>Fax: (512) 457-4410<br>patrick.sweeten@oag.texas.gov<br>will.thompson@oag.texas.gov<br>ryan.walters@oag.texas.gov |
| | *Counsel for Plaintiff State of Texas* |

11

## CERTIFICATE OF SERVICE

I certify that on October 28, 2021, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

/s/ *Ryan D. Walters*
Ryan D. Walters