**FILED**

**February 4, 2022**

KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

REVISED 12/21/2021

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 13, 2021

Lyle W. Cayce
Clerk

No. 21-10806

STATE OF TEXAS; STATE OF MISSOURI,

*Plaintiffs—Appellees*,

*versus*

JOSEPH R. BIDEN, JR., IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES OF AMERICA; UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, ACTING COMMISSIONER, U.S. CUSTOMS AND BORDER PROTECTION; UNITED STATES CUSTOMS AND BORDER PROTECTION; TAE D. JOHNSON, ACTING DIRECTOR, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; UR M. JADDOU, DIRECTOR OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 2:21-cv-67

Before Barksdale, Engelhardt, and Oldham, *Circuit Judges*.

Andrew S. Oldham, *Circuit Judge*:

This case concerns the Migrant Protection Protocols ("MPP" or the "Protocols"), which the Secretary of the Department of Homeland Security ("DHS") created on December 20, 2018. On January 20, 2021, DHS suspended the MPP program (the "Suspension Decision"). On June 1, 2021, DHS permanently terminated MPP (the "Termination Decision"). DHS explained these two decisions in a series of increasingly lengthy memoranda; the first contained just a few sentences, while the last spanned 39 single-spaced pages. Texas and Missouri (the "States") challenged both the Suspension Decision and the Termination Decision in federal court.

After a full bench trial, the district court determined that the Termination Decision violated both the Administrative Procedure Act (the "APA") and an immigration statute, 8 U.S.C. § 1225. The district court therefore vacated the Termination Decision and ordered DHS to implement the Protocols in good faith or to take a new agency action that complied with the law.

DHS chose not to take a new agency action. It instead chose to notice an appeal and defend its Termination Decision in our court. DHS also asked us to stay the district court's injunction while the appeal was pending. We denied that motion, and the Supreme Court affirmed our denial. The Government thereafter vigorously defended the Termination Decision before our court.

Then, on the Friday before oral argument—October 29, 2021—DHS issued *two more* memoranda (the "October 29 Memoranda" or "Memoranda") to explain the Termination Decision. These much longer documents purported to "re-terminate" MPP—or at the very least, promised to do so after the lifting of the district court's injunction. A few hours later, the Government informed our court that, in its view, the October 29 Memoranda had mooted this case. Never mind that a case is moot only

No. 21-10806

when the controversy between the parties is dead and gone, and the controversy between these parties is very much not dead and not gone. Never mind that the new memoranda simply reaffirmed the Termination Decision that the States had been challenging all along. And never mind that the Government's theory of mootness would allow an administrative agency to permanently avoid judicial review by issuing an endless litany of new memos to "moot" every adverse judicial ruling. The Government boldly proclaimed that DHS's unilateral decision to issue new memoranda *required* us to give DHS the same relief it had previously hoped to win on appeal—namely, vacatur of the district court's injunction and termination of MPP.

DHS's proposed approach is as unlawful as it is illogical. Under Supreme Court and Fifth Circuit precedent, this case is nowhere near moot. And in any event, the vacatur DHS requests is an equitable remedy, which is unavailable to parties with unclean hands. The Government's litigation tactics disqualify it from such equitable relief.

The Government also raises a slew of reviewability arguments, contending that no court may *ever* review the Termination Decision. DHS claims the power to implement a massive policy reversal—affecting billions of dollars and countless people—simply by typing out a new Word document and posting it on the internet. No input from Congress, no ordinary rulemaking procedures, and no judicial review. We address and reject each of the Government's reviewability arguments and determine that DHS has come nowhere close to shouldering its heavy burden to show that it can make law in a vacuum.

On the merits, the Termination Decision was arbitrary and capricious under the APA. That Act, among other things, requires courts to set aside agency actions that overlook relevant issues or inadequately explain their conclusions. We anchor our analysis to a recent Supreme Court decision that

3

No. 21-10806

applied this doctrine in the immigration context. Under that precedent, this is not a close case.

The Termination Decision is independently unlawful because it violates 8 U.S.C. § 1225. That statute (among other things) requires DHS to detain aliens, pending removal proceedings, who unlawfully enter the United States and seek permission to stay. It's true that DHS lacks the capacity to detain all such aliens. Congress, however, created a statutory safety valve to address that problem. Another part of § 1225 allows DHS to return aliens to contiguous territories, like Mexico, while removal proceedings are pending. That safety valve was the statutory basis for the Protocols. DHS's Termination Decision was a refusal to use the statute's safety valve. That refusal, combined with DHS's lack of detention capacity, means DHS is not detaining the aliens that Congress required it to detain.

The Government insists that a third provision (in § 1182) lets DHS parole aliens into the United States on a case-by-case basis. The idea seems to be that DHS can simply parole every alien it lacks the capacity to detain. But that solves nothing: The statute allows only case-by-case parole. Deciding to parole aliens *en masse* is the opposite of *case-by-case* decisionmaking.

\*     \*     \*

This opinion has five parts. Part I.A, *infra* pages 6–10, addresses this case's factual background. Part I.B, *infra* pages 10–13, summarizes its statutory background.

Part II addresses our jurisdiction. We start with final agency action. Part II.A, *infra* pages 13–29, pinpoints the final agency action under review. The final agency action is DHS's June 1 Termination Decision. We have jurisdiction to review that Termination Decision, rather than one or the other of DHS's ever-growing collection of MPP memos.

4

No. 21-10806

Then we turn to mootness in Part II.B, *infra* pages 29–46. The October 29 Memoranda have no present legal effect, so they can't moot the case. *See* Part II.B.1, *infra* pages 30–32. Independently, the Government has not shown they do anything to cure the Termination Decision's unlawfulness, so again, they can't moot the case. *See* Part II.B.2, *infra* pages 32–39. And they constitute (at most) voluntary cessation, so yet again, they can't moot the case. *See* Part II.B.3, *infra* pages 39–45. And ordinary appellate principles bar our review of the merits of the October 29 Memoranda in any event. *See* Part II.B.4, *infra* pages 45–46.

Part II.C, *infra* pages 46–63, addresses the States' standing. The district court based its standing analysis on factual findings that were not clearly erroneous. *See* Part II.C.1, *infra* pages 46–52. Given those findings and the States' entitlement to special solicitude in the analysis, we hold the States have standing. *See* Part II.C.2, *infra* pages 52–63.

Part III then addresses and rejects a host of non-jurisdictional objections to the reviewability of the Termination Decision. Part III.A, *infra* pages 63–65, holds the States have a cause of action. Part III.B, *infra* pages 65–88, holds the APA does not preclude our review of the Termination Decision. Part III.B.1, *infra* pages 66–68, holds the immigration statutes don't insulate the Termination Decision from review. Part III.B.2, *infra* pages 68–88, holds that *Heckler v. Chaney*, 470 U.S. 821 (1985), does not bar review either. That's largely because *Heckler*, far from forbidding judicial review of agency rules, powerfully supports it. Background principles of English and American law, the Supreme Court's precedents, and our own court's precedents all point toward that same conclusion. *See* Part III.B.2.a, *infra* pages 69–85. Even if *Heckler* applied to some rules, it wouldn't apply to the Termination Decision. *See* Part III.B.2.b, *infra* pages 85–87. And even if *Heckler* were *presumed* to apply, that presumption would be rebutted by the clear statutory text at play in this case. *See* Part III.B.2.c, *infra* pages 87–88.

No. 21-10806

Part IV, *infra* pages 88–106, evaluates the merits. The Termination Decision was arbitrary and capricious under the APA for all sorts of reasons, and the Government's arguments to the contrary are meritless. *See* Part IV.A, *infra* pages 88–97. And the Decision was contrary to 8 U.S.C. § 1225. *See* Part IV.B, *infra* pages 98–106.

Part V, *infra* pages 106–17, considers the remedy. Because the case is not moot, we will deny the Government's motion to vacate the district court's judgment. Even if the case were moot, the Government's litigation tactics would require the same result. *See* Part V.A, *infra* pages 106–09. And the district court didn't abuse its discretion by vacating the Termination Decision. *See* Part V.B, *infra* pages 109–11. Nor did it abuse its discretion by imposing a permanent injunction. *See* Part V.C, *infra* pages 111–17.

In sum, we hold that the Termination Decision violates both the Administrative Procedure Act and the immigration statutes. The Government's motion to vacate the judgment and remand for further proceedings is DENIED. The district court's judgment is AFFIRMED.

## I.

## A.

This story began on December 20, 2018. On that day, DHS implemented the MPP program in response to a surge of unlawful entries along the Nation's southern border. *See Texas v. Biden* (*Biden I*), ___ F. Supp. 3d ___, 2021 WL 3603341, at *4 (N.D. Tex. Aug. 13, 2021). Before MPP, resource constraints forced DHS to release thousands of undocumented aliens into the United States and to trust that those aliens would voluntarily appear for their removal proceedings. Under MPP, DHS instead returned certain undocumented aliens to Mexico for the duration of their removal proceedings. MPP's goal was "to ensure that certain aliens attempting to enter the U.S. illegally or without documentation . . . will no longer be

No. 21-10806

released into the country, where they often fail to file an asylum application and/or disappear before an immigration judge can determine the merits of any claim." *Id.* at *5 (quotation omitted). Congress expressly authorized the MPP program by statute. *See* 8 U.S.C. § 1225(b)(2)(C).

In December 2018, Mexico agreed to admit MPP enrollees so such aliens could be held outside the United States pending their removal proceedings. *Biden I*, 2021 WL 3603341, at *5. In January 2019, "DHS began implementing MPP, initially in San Diego, California, then El Paso, Texas, and Calexico, California, and then nationwide." *Ibid.* In February 2019, U.S. Immigration and Customs Enforcement issued guidance on MPP to its field offices, anticipating the expansion of MPP across the border. *Ibid.* "By December 31, 2020, DHS had enrolled 68,039 aliens in . . . MPP." *Ibid.*

On January 8, 2021, DHS and Texas finalized a Memorandum of Understanding (the "Agreement"). *Id.* at *6–7. The Agreement required Texas to provide information and assist DHS to "perform its border security, legal immigration, immigration enforcement, and national security missions." *Id.* at *6 (quotation omitted). In return, DHS agreed to consult Texas and consider its views before taking actions that could modify immigration enforcement. *See id.* at *6–7. DHS also agreed to "provide Texas with 180 days' written notice of any proposed action subject to the consultation requirement," *id.* at *7 (quotation omitted), so that Texas would have an opportunity to comment on the proposal. The Agreement further required DHS to consider Texas's input "in good faith" and, if it decided to reject Texas's input, to "provide a detailed written explanation" of its reasons for doing so. *Ibid.* (emphasis omitted).

On Inauguration Day, the Biden Administration announced its Suspension Decision. In it, DHS stated that it would suspend further enrollments in MPP. DHS's Acting Secretary wrote, "[e]ffective January 21,

No. 21-10806

2021, the Department will suspend new enrollments in the Migrant Protection Protocols (MPP), pending further review of the program. Aliens who are not already enrolled in MPP should be processed under other existing legal authorities." *Ibid.* (quotation omitted).

On February 2, 2021, DHS sent a letter to Texas purporting to terminate the Agreement "effective immediately." *Ibid.* Because it believed that the letter did not comply with the Agreement's required consultation-and-explanation procedures, Texas interpreted the February 2 letter "as a notice of intent to terminate" the Agreement. *Ibid.*

On April 13, 2021, the States sued, challenging DHS's Suspension Decision. *Id.* at *1. The States claimed that the Suspension Decision violated the APA, the Immigration and Nationality Act ("INA"), the Constitution, and the Agreement. *See ibid.* On May 14, the States moved for a preliminary injunction that would enjoin DHS from enforcing and implementing the Suspension Decision. *Ibid.*

On June 1, 2021, before briefing on the preliminary injunction had concluded, DHS announced its Termination Decision. The district court concluded that the Termination Decision mooted the States' complaint about the Suspension Decision, and the court allowed the States to amend their complaint and to file a new preliminary injunction motion. *Ibid.* The parties agreed to consolidate the preliminary injunction hearing with the trial on the merits under Federal Rule of Civil Procedure 65(a)(2). *Id.* at *2.

Following the bench trial, the district court issued a 53-page memorandum opinion and order, concluding that the States were entitled to relief on their APA and statutory claims. *Biden I*, 2021 WL 3603341. The court made many findings of fact that will be relevant here. *See* Part II.C.1, *infra* pages 46–52. Based on those findings, the court concluded that the States had Article III standing, that the Termination Decision constituted

8

No. 21-10806

final and reviewable agency action under the APA, and that the States were within the INA's zone of interests. *Biden I*, 2021 WL 3603341, at *11, 13, 17. The court then concluded that DHS's Termination Decision was arbitrary and capricious, and therefore unlawful, under the APA. *Id.* at *17–18. It also concluded terminating MPP, in circumstances where DHS lacked adequate detention capacity, caused DHS to violate 8 U.S.C. § 1225(b). *Id.* at *22–23. Based on those conclusions, the district court vacated the Termination Decision, "permanently enjoined and restrained [DHS] from implementing or enforcing" it, and ordered DHS "to enforce and implement MPP in good faith until such a time as it has been lawfully rescinded in compliance with the APA and until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section [1225] without releasing any aliens because of a lack of detention resources." *Id.* at *27 (emphases omitted).

DHS appealed. On August 17, 2021, the Government requested an emergency stay. *See* Fed. R. App. P. 8. A panel of our court denied that request and expedited the appeal. *Texas v. Biden (Biden II)*, 10 F.4th 538, 560–61 (5th Cir. 2021) (per curiam). The Supreme Court affirmed that denial. *Biden v. Texas (Biden III)*, ___ S. Ct. ___, 2021 WL 3732667 (Aug. 24, 2021) (mem.).

On September 29, DHS announced its intention "to issue [a] new memo terminating MPP." Dep't of Homeland Sec., DHS Announces Intention to Issue New Memo Terminating MPP (2021), https://perma.cc/MM95-6KUD, screenshotted at *infra* page 25. On October 29, on the Friday before our court was set to hear oral argument, DHS issued two new memoranda (collectively, the "October 29 Memoranda" or "Memoranda"). *See* Dep't of Homeland Sec., Termination of the Migrant Protection Protocols (2021) ("October 29 Cover Memorandum"), https://perma.cc/45CS-DRHR;

No. 21-10806

Dᴇᴘ'ᴛ ᴏғ Hᴏᴍᴇʟᴀɴᴅ Sᴇᴄ., Exᴘʟᴀɴᴀᴛɪᴏɴ ᴏғ ᴛʜᴇ Dᴇᴄɪsɪᴏɴ ᴛᴏ Tᴇʀᴍɪɴᴀᴛᴇ ᴛʜᴇ Mɪɢʀᴀɴᴛ Pʀᴏᴛᴇᴄᴛɪᴏɴ Pʀᴏᴛᴏᴄᴏʟs (2021) ("October 29 Explanation Memorandum"), https://perma.cc/4KT6-T82Z. The October 29 Memoranda did not purport to alter the Termination Decision in any way; they merely offered additional reasons for it.

Hours after the release of the October 29 Memoranda, the Government filed a 26-page Suggestion of Mootness and Opposed Motion to Vacate the Judgment Below and Remand for Further Proceedings ("Suggestion of Mootness"). It argued the October 29 Memoranda mooted this appeal, and it moved our court to vacate the district court's judgment (and injunction) and remand for further proceedings. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39–40 (1950) (explaining the propriety of this remedy for certain cases mooted on appeal). In the alternative, the Government asked us to hold this appeal in abeyance with respect to the § 1225 claim and remand the APA portion of the appeal to the district court, with instructions to vacate and reconsider that part of the opinion. We carried those motions with the case and gave each party additional time at oral argument to address the issue. We deny the Government's motions in Part II.B, *infra* pages 29–46, and Part V.A, *infra* pages 106–109.

B.

The two statutory provisions at the heart of this case come from 8 U.S.C. § 1225(b)(2). Section 1225(b)(2)(A) provides:

> Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

Section 1225(b)(2)(C) provides:

No. 21-10806

> In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

These provisions apply, by their terms, to "applicant[s] for admission"—that is, to aliens who are seeking entry into the United States. The former provides the default rule: Aliens who are "not clearly and beyond a doubt entitled to be admitted . . . shall be detained" while removal proceedings are pending. § 1225(b)(2)(A); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) ("Read most naturally, §§ 1225(b)(1) and (b)(2) thus mandate detention of applicants for admission until certain proceedings have concluded."). And the latter explains one permissible alternative to detention—return to a contiguous foreign territory. § 1225(b)(2)(C).

Parole is also relevant to this case. Section 1182(d)(5) both grants discretion to parole certain aliens and limits that discretion in important ways. *See Jennings*, 138 S. Ct. at 837 (explaining the connection between this provision and § 1225(b) detention). Parole began as an administrative invention that allowed aliens in certain circumstances to remain on U.S. soil without formal admission. *See* T. Alexander Aleinikoff et al., Immigration and Citizenship: Process and Policy 299 (9th ed. 2021). Congress codified the practice when it initially enacted the Immigration and Nationality Act (the "INA") in 1952, giving the Attorney General discretion to "parole into the United States temporarily under such conditions as he may prescribe . . . any alien applying for admission to the United States." Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163, 188 (1952).

Throughout the mid-twentieth century, the executive branch on multiple occasions purported to use the parole power to bring in large groups

No. 21-10806

of immigrants. *See* Aleinikoff et al., *supra*, at 300. In response, Congress twice amended 8 U.S.C. § 1182(d)(5) to limit the scope of the parole power and prevent the executive branch from using it as a programmatic policy tool. First, in the Refugee Act of 1980, Congress added § 1182(d)(5)(B), which prevents the executive branch from paroling refugees unless "compelling reasons in the public interest with respect to that particular alien require" parole. Pub. L. No. 96-212, 94 Stat. 102, 108. Second, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Congress amended § 1182(d)(5)(A) by providing that parole may be granted "*only* on a case-by-case basis for urgent humanitarian reasons or significant public benefit." Pub. L. No. 104-208, 110 Stat. 3009, 3009–689 (emphasis added).

As it stands today, then, the § 1182(d)(5) parole power gives the executive branch a limited authority to permit incoming aliens to stay in the United States without formal authorization when their particular cases demonstrate an urgent humanitarian need or that their presence will significantly benefit the public. The power must be exercised on a case-by-case basis. Quintessential modern uses of the parole power include, for example, paroling aliens who do not qualify for an admission category but have an urgent need for medical care in the United States and paroling aliens who qualify for a visa but are waiting for it to become available. Aleinikoff et al., *supra*, at 299. Parole terminates "when the purposes of . . . parole shall, in the opinion of the Attorney General, have been served." 8 U.S.C. § 1182(d)(5)(A). At that point, DHS must treat the former parolee "in the same manner as . . . any other applicant for admission to the United States." *Ibid.*

The second source of parole power is in § 1226(a). Section 1226(a) provides its own detention-and-parole scheme that applies to aliens who have *already* entered the United States—in contradistinction to the *applicants for*

No. 21-10806

*admission* covered by § 1225(b)(2) and § 1182(d)(5). *See Jennings*, 138 S. Ct. at 837 (explaining § 1226 "generally governs the process of arresting and detaining" inadmissible aliens who are already "inside the United States"); *see also* Part IV.B, *infra* pages 98–106 (explaining the distinction). This provision generally requires DHS to obtain an administrative warrant before arrest. *See* § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."). DHS may release such "arrested alien[s]" on either bond (at least $1,500) or conditional parole (subject to restrictions). § 1226(a)(2)–(3).

## II.

We start, as always, with jurisdiction. First, we hold DHS's June 1 Termination Decision constitutes "final agency action." Second, we hold DHS's October 29 Memoranda did not moot this case. Third, we hold the States have standing to sue.

## A.

The APA allows judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. For an agency action to qualify as final, the action must (1) "mark[] the consummation of the agency's decisionmaking process" and (2) either determine "rights or obligations [or produce] legal consequences." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). Our circuit considers this "a jurisdictional prerequisite of judicial review." *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 584 (5th Cir. 2016).

We begin by analyzing the June 1 Termination Decision on its own terms. We conclude the Decision was final agency action. Then, we address a new finality argument—based on the October 29 Memoranda—that the Government raises for the first time in its Suggestion of Mootness.

No. 21-10806

1.

The Government says the Termination Decision didn't consummate DHS's decisionmaking process. That's because a policy statement isn't final until the agency applies it "in a particular situation" to an affected person or entity. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (quotation omitted). And the Government hints DHS has not yet made "the return decision" in any "individual case." It's hard to tell what this means. Perhaps the Government is suggesting that, somehow, DHS's Termination Decision has not affected a single undocumented alien. But that would be absurd: DHS enrolled over 68,000 aliens in MPP when it was in effect and returned more than 55,000 of those to Mexico. *Biden I*, 2021 WL 3603341, at *5–6. As the district court found, MPP's termination altered that status quo and caused DHS to return fewer aliens to Mexico (and to instead release and/or parole them into the United States). *Id.* at *8. If MPP's termination did *nothing at all* to change the outcome in any given case, one can only imagine why the Government bothered to appeal a district court decision about an entirely nugatory policy choice. We therefore conclude that the Termination Decision was the consummation of the agency's decisionmaking process.

Likewise with the second finality prong. The Termination Decision is final agency action under the principle that, "where agency action withdraws an entity's previously-held discretion, that action alters the legal regime, binds the entity, and thus qualifies as final agency action" under the APA. *EEOC*, 933 F.3d at 442 (quotation omitted). DHS withdrew its officers' previously existing discretion on June 1 when it directed "DHS personnel, effective immediately, to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives issued to carry out MPP." DHS also explicitly refused to "maintain[] the status quo or [to resume] new enrollments in the program."

14

No. 21-10806

The Termination Decision thus bound DHS staff by forbidding them to continue the program in any way from that moment on. *See id.* at 441 (reiterating that binding effect upon the agency is the key inquiry and explaining that "[w]hether an action binds the agency is evident if it either appears on its face to be binding[] or is applied by the agency in a way that indicates it is binding" (quotation omitted)).

The Government again responds by wishing the law said otherwise. On its view, terminating MPP can't be final agency action because the termination "did not end DHS's statutory authority under Section 1225(b)(2)(C) to conduct returns." So the Government doesn't seem to contest that the Termination Decision binds DHS staff. Instead, the idea seems to be that agency action is never final in virtue of its binding effect on agency staff—but instead is final only if the agency as a whole permanently swears off the entirety of its statutory discretion. We are aware of no case from any court that supports that sweeping proposition.

And our decision in *EEOC* forecloses it. That case explicitly centered its finality analysis on whether "the agency's action binds *its staff.*" 933 F.3d at 442 (emphasis added). Thus, our court based its holding ("that the Guidance binds EEOC") largely on the fact that the "Guidance" in question, despite its name, bound EEOC staff. *See id.* at 443. The court also discussed the Guidance's *de facto* creation of safe harbors for private parties. *Ibid.* What it did *not* consider is whether the EEOC could revoke its Guidance in the future. As we explained in the *Heckler* context in *Texas v. United States (DAPA)*, 809 F.3d 134 (5th Cir. 2015), "[r]evocability . . . is not the touchstone for whether agency action is reviewable." *Id.* at 167.

And for good reason. The Government's rule would render any agency action nonreviewable so long as the agency retained its power to undo that action or otherwise alter it in the future. That accords with neither

15

No. 21-10806

common sense nor the law. *See Sackett v. EPA*, 566 U.S. 120, 127–28 (2012) (concluding the EPA's issuance of a compliance order was final agency action and noting, "[t]he mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal"); *cf. FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–18 (2009) (reviewing an agency action, without discussing finality, in precisely a situation where the agency *had* taken the opposite stance in the past). Thus, the mere fact the Termination Decision left intact DHS's statutory authority to return aliens to contiguous territories does not undercut its finality.

The Government also asserts the Termination Decision is a general policy statement—and therefore can neither determine rights nor produce obligations or legal consequences. Even if the Termination Decision is merely a "policy statement," this argument ignores our precedent establishing that such statements can nonetheless constitute "final agency action" under the APA. *See Merchs. Fast Motor Lines, Inc. v. ICC*, 5 F.3d 911, 919–20 (5th Cir. 1993). The Government counters that *Fast Motor Lines* was a case about APA ripeness and "provided no analysis on this issue." To the contrary, however, *Fast Motor Lines* reached the ripeness issue precisely because it had already concluded the agency action in question was final (despite simultaneously being a statement of policy). *Id.* at 920 (concluding the policy statement was final "within the meaning of 5 U.S.C. §§ 551(13) & 704" (emphasis added)). The inquiry in our circuit does not focus on labels, and it does not rely on a sharp (and false) dichotomy between statements announcing policies and final statements. The inquiry instead centers on whether the action in question determines "rights or obligations" or creates "legal consequences." *Bennett*, 520 U.S. at 178 (quotation omitted). And one way an agency can do that is by binding its own staff. That is exactly what

No. 21-10806

DHS did in the Termination Decision by commanding staff to stop enrolling aliens in MPP and to terminate the program immediately.

2.

In its Suggestion of Mootness, the Government now argues that the October 29 Memoranda change the picture. Even if the June 1 Termination Decision was final agency action at the time, says the Government, it lost that status when DHS issued its new Memoranda.

To begin, we note that the Government could have, but did not, make this argument in its brief. The briefing obviously concluded before October 29. But the Government's brief includes an introductory footnote that reads: "DHS has authorized us to report that the Secretary is reviewing the June 1 Memorandum and evaluating policy options regarding MPP. The result of that review could have an impact on this appeal." So the Government knew DHS was considering a new memorandum. This would lend itself quite naturally, one would think, to an argument of the same sort the Government makes now. Yet the Government omitted the argument from its brief and instead raises it for the first time in its Suggestion of Mootness. That gives us pause. *See U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 27 (1994) ("To allow a party . . . to employ the secondary remedy of vacatur as a refined form of collateral attack on the judgment would—quite apart from any considerations of fairness to the parties—disturb the orderly operation of the federal judicial system.").[1]

─────────────

[1] The Government also argues that the June 1 Termination Decision is no longer ripe for judicial review. The Suggestion of Mootness devotes one sentence to this issue, which was not in the Government's brief. *See La. Power & Light Co. v. Federal Power Comm'n*, 526 F.2d 898, 910 (5th Cir. 1976) (the Government's best case, holding that "matters still pending" before the agency are not ripe for review). We reject this argument. If the States were now attempting to challenge the October 29 Memoranda, then perhaps it would make

No. 21-10806

Even so, we will consider the argument. That's partly because the finality of agency action is a jurisdictional issue. And it's partly because the October 29 Memoranda, which were merely possible at the briefing stage, now actually exist.

First, we explain that the Government misunderstands the States' challenge. The States are challenging DHS's *Termination Decision*—not any particular memo that DHS might have written in the past or might write in the future. Second, we hold that DHS's October 29 Memoranda did not reopen the actionable Termination Decision and are therefore not themselves final agency action. Third, we hold subsequent events can't render a final agency action retroactively nonfinal.

a.

Begin with the Government's framing of the issue. The Government treats the June 1 Memorandum as the challenged action. It then assumes that the October 29 Memoranda are a final agency action of their own. Thus, it says, the new Memoranda "demonstrate that the June 1 memorandum no longer represents the consummation of the agency's decisionmaking process." So even if the June 1 Memorandum was final at the moment of issuance, the October 29 Memoranda have since supplanted it as DHS's final action under 5 U.S.C. § 704.

---

sense to argue about the ripeness of that *new* challenge. But the States are challenging the same Termination Decision they have been challenging all along. Further, it's nonsensical to suggest, as the Government does, that the Termination Decision is at once moot (*i.e.*, the time for review has come and gone) *and* unripe (*i.e.*, the time for review has not yet arrived).

No. 21-10806

For one thing, that framing misunderstands the nature of the challenged action.[2] The States are challenging the *Termination Decision*—not the June 1 Memorandum, the October 29 Memoranda, or any other memo. DHS's Termination Decision is analogous to the judgment of a court, and its memos are analogous to a court's opinion explicating its judgment. A judgment, not the opinion announcing that judgment, has a binding effect that settles the dispute before the court. *See* William Baude, *The Judgment Power*, 96 Geo. L.J. 1807, 1844 (2008) (describing the "historical answer" to this question: "*Judgments* become binding law, not *opinions*. Opinions merely explain the grounds for judgments, helping other people to plan and order their affairs."). In the same way, DHS's June 1 decision to terminate MPP had legal effect. The June 1 Memorandum—just like the October 29 Memoranda and any other subsequent memos—simply *explained* DHS's decision.

Thus, as common sense would indicate, the Termination Decision itself (not a memo) consummated the agency's decisionmaking process by permanently terminating MPP. *See Bennett*, 520 U.S. at 177–78. The Termination Decision (not a memo) created legal consequences by stripping preexisting discretion from DHS's own staff. *See ibid.*; *EEOC*, 933 F.3d at 443. And so the Termination Decision (not a memo) is the "final agency action" reviewable in court. 5 U.S.C. § 704.

---

[2] To be fair, both the States and the district court appear at times to fall into this same trap. But final agency action is a jurisdictional inquiry. *See Louisiana*, 834 F.3d at 584. And because we're obligated to get jurisdiction right, we are not constrained by the parties' misunderstanding of the issue. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) (noting we must decide jurisdiction first, even when the parties concede it). Nor are we constrained by the district court's misunderstanding. *See, e.g.*, *Cranor v. 5 Star Nutrition, LLC*, 998 F.3d 686, 689 (5th Cir. 2021) (review of a district court's ruling on subject-matter jurisdiction is *de novo*).

No. 21-10806

b.

The October 29 Memoranda did not constitute a new and separately reviewable "final agency action." Our holding to that effect is dictated by the well-established reopening doctrine.

The D.C. Circuit developed the reopening doctrine as a way to pinpoint an agency's final action in cases where the agency has addressed the same issue multiple times. Suppose, for example, "an agency conducts a rulemaking or adopts a policy on an issue at one time, and then in a later rulemaking restates the policy or otherwise addresses the issue again without altering the original decision." *Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*, 158 F.3d 135, 141 (D.C. Cir. 1998). What happens if the petitioner's challenge to the agency's action would be untimely if measured from the first agency action but timely if measured from the second?[3]

The reopening doctrine provides the answer. If "the agency opened the issue up anew, and then reexamined and reaffirmed its prior decision," the agency's second action (the reaffirmance) is reviewable. *NRDC v. EPA*, 571 F.3d 1245, 1265 (D.C. Cir. 2009) (per curiam) (quotation omitted); *see also Wash. All. of Tech. Workers v. DHS*, 892 F.3d 332, 342 (D.C. Cir. 2018) (tying reopening to final agency action); *Impro Prods., Inc. v. Block*, 722 F.2d 845, 850–51 (D.C. Cir. 1983) (similar). In that event, the reaffirmance, rather than the original decision, starts the limitation period. *See NRDC*, 571 F.3d

---

[3] Challenges to agency actions are subject to various statutes of limitations. *See, e.g.*, 28 U.S.C. § 2401 (six-year limit on "every civil action commenced against the United States"); *id.* § 2344 (sixty-day limit on petitions for review of agency actions under the Hobbs Act). Section 2401(a)'s six-year limit, for instance, starts ticking when "the right of action first accrues." And "[t]he right of action first accrues on the date of the final agency action." *Wash. All. of Tech. Workers v. DHS*, 892 F.3d 332, 342 (D.C. Cir. 2018) (quoting *Harris v. FAA*, 353 F.3d 1006, 1010 (D.C. Cir. 2004)). Thus, the key step in the timeliness inquiry is to determine when the agency took its "final action."

No. 21-10806

at 1265; *Impro*, 722 F.2d at 850–51. But if the agency merely reaffirmed its decision without *really* opening the decision back up and reconsidering it, the agency's initial action is the only final agency action to review—so the limitation period runs from the first decision by the agency. *See, e.g.*, *Growth Energy v. EPA*, 5 F.4th 1, 21–22 (D.C. Cir. 2021) (per curiam). A reopening has occurred *only* if "the entire context demonstrates that the agency has undertaken a serious, substantive reconsideration of the existing rule." *Id.* at 21 (quotation omitted).

*Reversionary Property Owners v. Surface Transportation Board*, 158 F.3d 135 (D.C. Cir. 1998), is the seminal case. *See, e.g.*, *CTIA—The Wireless Ass'n v. FCC*, 466 F.3d 105, 110 (D.C. Cir. 2006) (treating it as such). *Reversionary Property Owners* concerned the Interstate Commerce Commission (the "ICC") and its successor agency, the Surface Transportation Board (the "STB"). 158 F.3d at 137–40. Rather than owning whole railroad corridors in fee simple, railroads often hold mere rights-of-way that allow them to run tracks over others' property. *Id.* at 137–38. Sometimes, railroads abandon those rights-of-way. *Ibid.* Before they can do so, they must get agency permission and notify the public at large by filing a "Notice of Intent." *Ibid.* Sometimes, abandonments cause reversionary property interests to vest in third parties. *Id.* at 137, 139.

In 1986, after notice and comment, the ICC adopted a "rails to trails" rule that allowed some otherwise-abandonable corridors to become public trails instead. *Id.* at 139. Turning a right-of-way into a trail extinguishes third-party reversionary interests in it. *Ibid.* (explaining this is a compensable taking). Even so, the 1986 rule didn't require anyone to notify the holders of reversionary interests directly beforehand. *Id.* at 138–39. Instead, it simply required railroads to publicize a generalized notice in the Federal Register. *See id.* at 139.

No. 21-10806

The National Association of Reversionary Property Owners ("NARPO") believed each owner of a reversionary interest should get individualized notice before an abandonment or a rails-to-trails conversion. So NARPO asked the ICC to reopen the 1986 notice-and-comment rulemaking and reconsider that issue. *Id.* at 139–40. The ICC did so, but it decided not to implement the change. *Ibid.* And in 1990, the ICC denied NARPO's petition for reconsideration. *Ibid.* All sides agreed: That was a final agency action. *See id.* at 141.

But in 1996, after the ICC had denied NARPO's request for a new rulemaking on the individualized-notice issue, the STB took the reins from the now-defunct ICC and issued a new Notice of Proposed Rulemaking ("NPRM") regarding abandonment procedures. *See id.* at 140–41. After notice and comment, the STB's Final Rule made some changes—but it refused to implement an individualized-notice requirement. *Id.* at 145–46.

Thus, the D.C. Circuit had to determine whether the 1996 NPRM reopened the individualized-notice issue. The court considered three factors and held the 1996 NPRM was not a reopening. First, the court asked whether the NPRM contained either "[a]n explicit invitation to comment on a previously settled matter" or at least "[a]mbiguity" about whether the individualized-notice issue was on the table. *Id.* at 142. The court acknowledged the NPRM had proposed three changes to abandonment-notice procedures—including one that would require railroads to *directly* notify NARPO (and one other group) before abandoning a right-of-way. *Id.* at 141–44. It also noted the NPRM's specific invitation for comments on "improving notice to the public." *Id.* at 145 (quotation omitted). And the court acknowledged the NPRM's broader invitation for "public comments on these proposals, and on any other areas where changes might be made . . . to streamline our abandonment regulations." *Ibid.* (quotation omitted). Despite all that, the court concluded the NPRM's text *unambiguously*

No. 21-10806

*excluded* the issue of individualized notice. *See ibid.*; *see also Growth Energy*, 5 F.4th at 21–22 (an NPRM inviting comments on "any aspect of [the] rulemaking . . . did not suggest that the agency was undertaking a reconsideration of the relevant matter" (quotation omitted)).

Second, the court considered the "agency's response to comments filed by parties during [the] rulemaking." *Reversionary Prop. Owners*, 158 F.3d at 142. When an agency's "discussion of its policies and rules" regarding a given topic comes "only in response to . . . unsolicited comments," there has likely been no reopening. *Id.* at 143 (quotations omitted). This is especially true when the response "merely reiterate[s]" the agency's "longstanding policies." *Ibid.* (quotation omitted) (discussing *United Transp. Union-Ill. Legis. Bd. v. Surface Transp. Bd.*, 132 F.3d 71 (D.C. Cir. 1998)). Accordingly, the court noted that STB's Final Rule offered "basically the same rationale" the ICC and STB had given multiple times before. *Id.* at 145. For that reason, the Final Rule's response to NARPO's comments did not "reflect a genuine reconsideration" of the individualized-notice issue. *Ibid.*; *see also CTIA*, 466 F.3d at 112 (reaching the opposite conclusion because, among other things, the final order in question offered "two new justifications" that "constituted the [agency's] first legal rationales for its action to date").

The third factor, and arguably the court's most important, was "the entire context of the rulemaking." *Reversionary Prop. Owners*, 158 F.3d at 144 (quotation omitted) (explaining the preeminence of this consideration); *see also Growth Energy*, 5 F.4th at 21 ("entire context" includes "all relevant proposals and reactions of the agency" (quotation omitted)). Taken as a whole, the context did not suggest the STB was genuinely reconsidering the individualized-notice issue. Instead, the context "was one of making incremental adjustments to existing regulations and updating in light of a statute that did not call the STB's notice provisions into question." *Reversionary Prop. Owners*, 158 F.3d at 145; *see also Am. Rd. & Transp. Builders*

No. 21-10806

*Ass'n v. EPA*, 588 F.3d 1109, 1115 (D.C. Cir. 2009) (conducting a similarly commonsense inquiry into "the entire context of the rulemaking" and finding no reopening (quotation omitted)).

The conclusion: There was no reopening, the 1996 Final Rule wasn't a final agency action on the individualized-notice issue, and NARPO's suit was untimely. *See Reversionary Prop. Owners*, 158 F.3d at 146.

Under *Reversionary Property Owners* and the reopening doctrine, the October 29 Memoranda did not come close to reopening DHS's Termination Decision. First, we look for "ambiguity" in the closest thing this case has to an NPRM: DHS's September 29 announcement of an intention to issue a new memorandum. *See id.* at 141–45; *P & V Enters. v. U.S. Army Corps of Eng'rs*, 516 F.3d 1021, 1023–27 (D.C. Cir. 2008) (demonstrating the flexibility of the *Reversionary Property Owners* factors by adapting them to the combination of an Advance Notice of Proposed Rulemaking and a press release). Here is a screenshot for reference:

No. 21-10806



This was DHS's first public announcement since June 1 intimating an intention to issue any new document about MPP. The title leaves nothing to the imagination, and neither does the text: Rather than announcing an intention to *reconsider* its Termination Decision, the announcement set forth DHS's *conclusion* in unmistakable terms. The *Reversionary Property Owners* court found no ambiguity in an NPRM that both suggested open-mindedness about issues closely related to the one at hand and contained an explicit, broadly worded request for comments from the public. *See* 158 F.3d at 141–45. So how could there be any ambiguity about DHS's September 29 announcement, which did neither? *See ibid*.

The outcome is the same even if, *arguendo*, we take into account the Government's brief. The brief notified our court on September 20 "that the Secretary is reviewing the June 1 Memorandum and evaluating policy options

No. 21-10806

regarding MPP." That's just the kind of broad language that does *not* suggest a reopening. *See Growth Energy*, 5 F.4th at 21–22.

Second, if we could, we would consider the October 29 Memoranda's response to comments. *See Reversionary Prop. Owners*, 158 F.3d at 142. We can't do that because DHS never *asked* for comments. That alone is enough to conclude this factor weighs against a finding of reopening. *See ibid.* True, the new Memoranda did respond to the *Biden I* court's criticisms. *See* October 29 Explanation Memorandum 11–29, 36–38 (responding to the district court's reasoning). But even if we pretended those responses were addressing comments rather than a judicial opinion, the first and third factors would outweigh this one. *Cf. Am. Rd. & Transp. Builders Ass'n*, 588 F.3d at 1115 (agency response given "in answer to comments received pursuant to the publication of petitioner's own call for revisions . . . is not, without much more, sufficient to trigger the reopener doctrine" (emphasis omitted) (quotation omitted)).

Third, the overall context establishes beyond doubt that DHS didn't reopen the Termination Decision. The district court remanded to DHS "for further consideration" and went on to hold that DHS must "enforce and implement MPP . . . *until such a time as it has been lawfully rescinded in compliance with the APA*," among other things. *Biden I*, 2021 WL 3603341, at *27 (emphasis added). In light of that decretal language, DHS announced its unambiguous intention to re-terminate MPP—without a hint of an intention to put the Termination Decision back on the chopping block and rethink things. Then its October 29 Memoranda followed through. Thus, all of DHS's "proposals and reactions" in this case, *see Growth Energy*, 5 F.4th at 21–22, establish that DHS never reopened its Termination Decision—it just further defended what it had previously decided, *see Reversionary Prop. Owners*, 158 F.3d at 145–46.

No. 21-10806

Because the October 29 Memoranda merely continued, rather than reopened, the Termination Decision, they did not embody final agency action as to that Decision. *See Wash. All. of Tech. Workers*, 892 F.3d at 342; *Impro*, 722 F.2d at 850–51. So DHS's latest memos cannot render the June 1 Termination Decision nonfinal.

c.

Independently, subsequent events can't un-finalize a final agency action. An action is either final or not, and the mere fact that the agency could—or actually does—reverse course in the future does not change that fact. Were it otherwise, only irrevocable agency actions would be final. That is exactly the rule we rejected, at the Supreme Court's behest, just above. *See* Part II.A.1, *supra* pages 14–17; *Sackett*, 566 U.S. at 127–28 ("The mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal."); *see also Wash. All. of Tech. Workers*, 892 F.3d at 342 (explaining that even if the agency's reconsideration is a final action of its own under the reopening doctrine, the agency's original "[r]ule was unquestionably final agency action").

The Government's contrary view would never allow a court to make a final determination that any given agency action is final. We would be stuck in eternal limbo, waiting for the agency to give some carved-in-stone sign that the action in question is here to stay for good. That would have absurd jurisdictional consequences: Because our court views finality as a prerequisite of subject-matter jurisdiction, *see Louisiana*, 834 F.3d at 584, any post-judgment agency action would retroactively deprive the district court of subject-matter jurisdiction. No matter how final an agency action may appear, and no matter how sure the court's jurisdiction to review it, the

slightest agency vicissitude could destroy both finality and jurisdiction at any moment.

This case illustrates the absurdity of the Government's position. As we've already explained, the Termination Decision was final on June 1. *See* Part II.A.1, *supra* pages 14–17. The Termination Decision remained final when the district court reviewed it and held it unlawful on August 13. *See Biden I*, 2021 WL 3603341. The Termination Decision remained final when we refused to stay the district court's decision on August 19. *See Biden II*, 10 F.4th 538. The Termination Decision remained final when the Supreme Court likewise refused a stay. *See Biden III*, 2021 WL 3732667. This tripartite judicial rebuke then prompted DHS to explain the Termination Decision anew by way of the October 29 Memoranda.[4] And those October 29 Memoranda somehow *retroactively* unfinalized the Termination Decision, the finality of which previously gave rise to the entire case (including the October 29 Memoranda themselves). The upshot of it all, the Government says, is that we should go back in time and hold that the district court did not have jurisdiction to start this chain of events by invaliding the Termination Decision in the first place because the future retroactively unfinalized that decision. *Cf.* BACK TO THE FUTURE (Universal Pictures & Amblin Ent.

---

[4] *See, e.g.*, October 29 Cover Memorandum 2 (framing itself as issuing "[p]ursuant to the District Court's remand"); October 29 Explanation Memorandum 11 (noting that DHS wrote the October 29 Memoranda in response to "the decisions of the *Texas* district court, Fifth Circuit, and Supreme Court"); *id.* at 2, 4, 11–12 (similar); *id.* at 26–29 (responding directly to the district court's 8 U.S.C. § 1225 reasoning); *id.* at 11–29, 36–38 (addressing considerations the district court had faulted DHS for failing to address in the June 1 Memorandum); Oral Argument at 6:34–6:55 ("There was one memorandum in June, and that would have been the only memorandum, had the district court not identified issues it had with that memorandum. . . . And so the . . . new memorandum is based entirely and solely on the district court's findings under the APA and its remand . . . to the agency.").

No. 21-10806

1985). We are aware of no case from any court that supports the Government's theory. Today we reject it.[5]

### B.

Our jurisdictional inquiry also requires us to consider whether this case is moot. *See Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78 (1990) (holding mootness destroys subject-matter jurisdiction). It's not.

The Government's Suggestion of Mootness—operating on the mistaken assumption that the agency action under review is the June 1 *Memorandum* rather than the underlying *Termination Decision*—argues as follows. The States' supposed harms were caused by the legal defects (if any) of the June 1 Memorandum. The October 29 Memoranda superseded and rescinded the June 1 Memorandum. Just as a legislature can moot a pending appeal by amending a statute in a way that cures the statute's defect, *see id.* at 478–82, so too did DHS's October 29 Memoranda cure any legal defects in the June 1 Memorandum. *See United States v. Microsoft Corp.*, 138 S. Ct. 1186, 1187–88 (2018) (per curiam) (holding, like *Lewis*, that an intervening change in a statute mooted a case). So any challenge to the June 1

---

[5] The Government cites only one case in support of its understanding of retroactive unfinalization: *Shrimpers & Fishermen of the RGV v. U.S. Army Corps of Engineers*, 849 F. App'x 459 (5th Cir. 2021) (per curiam). There, the "Army Corps of Engineers issued a permit for a natural gas pipeline." *Id.* at 461. Some petitioners sought review of that permit in our court. *Ibid.* But before we could consider it, the Corps suspended the permit to reconsider it and then vitiate it. *Ibid.* We held the original permit no longer constituted "final agency action." *Id.* at 462. *Shrimpers* was an unpublished and non-precedential decision. *See, e.g., Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006) ("An unpublished opinion issued after January 1, 1996 is not controlling precedent, but may be persuasive authority."). And we hold it was wrong because it conflicts with the authorities discussed above. In any event, *Shrimpers* is easily distinguishable. The thing that rendered the permit nonfinal was the Corps's reconsideration and vitiation of it. *See Shrimpers*, 849 F. App'x at 462. As we've already explained above, DHS did not reconsider the Termination Decision and certainly did not vitiate it.

No. 21-10806

Memorandum must now be moot, and the appeals court has no choice but to vacate the district court's judgment.

The Government's stance, in more colloquial terms, is this: DHS can write a memo, litigate a case to final judgment, lose, and then immediately moot the dispute by writing a new memo overnight. Never mind that *Lewis* and *Microsoft* involved statutes instead of memos: In the Government's view, posting a new PDF document on the internet can moot a case as easily as a statute that's undergone bicameralism and presentment. Even better, that mootness *requires* this court to vacate the district court's judgment, thus giving DHS the same relief it would have received if it had won on the merits—without the inconvenience of having to actually do so. To describe the Government's position is to demonstrate its absurdity.

We nonetheless address each of the Government's mootness arguments in turn. We first explain that the October 29 Memoranda, on their own terms, have no present legal effect. It necessarily follows that they cannot have the legal effect of mooting this case. Second, even if the October 29 Memoranda had legal effect, the Government has not shown they cure the unlawfulness of the Termination Decision. Third, even if the October 29 Memoranda did have legal effect and did cure that unlawfulness, the new memos would constitute (at very most) voluntary cessation that does not moot the dispute. Fourth and finally, our review of the October 29 Memoranda is barred by several independent appellate principles.

1.

The October 29 Memoranda cannot have the legal effect of mooting this case because those memos presently have *zero* legal effect. Perhaps more precisely, the memos' legal effect is one part nullity and one part impending. The Memoranda purported to do two things: (1) "immediately supersede[] and rescind[] the June 1 Memorandum," and (2) terminate MPP, with that

No. 21-10806

termination "to be implemented as soon as practicable after a final judicial decision to vacate the . . . injunction that currently requires good faith implementation and enforcement of MPP." October 29 Cover Memorandum 4; *see also* October 29 Explanation Memorandum 4–5.

The October 29 Memoranda's supposed rescission of the June 1 Termination Decision was a nullity. The district court had *already* vacated the Termination Decision under 5 U.S.C. § 706, which empowers and commands courts to "set aside" unlawful agency actions. *See Biden I*, 2021 WL 3603341, at *23–24 & n.12. That statutory empowerment means that, unlike a court's decision to hold a statute unconstitutional, the district court's vacatur rendered the June 1 Termination Decision void. *See* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1014–16 (2018) (explaining this point); *see also Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021) ("Vacatur [of an agency action] retroactively undoes or expunges a past [agency] action."). So the October 29 Memoranda may have attempted to rescind DHS's rationale for the Termination Decision, but that attempt had no effect because there was nothing to rescind. A nullity can't moot a case.

That leaves the Memoranda's second purported effect: the re-termination of MPP. The October 29 Memoranda expressly state that the re-termination will have no effect until after the district court's injunction has been lifted. *See* October 29 Explanation Memorandum 4–5. The Government offers no explanation for how a legal effect *that has yet to occur* could moot this case *now*. True, the new memos use equivocal phrasing to describe their legal effect, and sometimes this involves present-tense language. *See, e.g.*, October 29 Cover Memorandum 4 ("I am hereby terminating MPP."). But the fact remains that the Memoranda don't purport to actually do anything until the

No. 21-10806

injunction ends. Just as a nullity can't spring forth from the void to moot a case, a prophesied legal effect can't leap backward from the future to do so.[6]

The Government objects that it would be strange to fault DHS for postponing its re-termination until the future. How else, the Government asks, could it have framed the October 29 Memoranda without risking contempt of the district court's injunction?

The answer, of course, is that the Government made the bed it's attempting to not sleep in. The Government chose to (a) appeal this case, (b) act as though it's returning to the district court under Federal Rule of Civil Procedure 60(b) (even though the appeal means the case is *not* before the district court), and (c) moot the very case it appeals, not by doing what the district court ordered it to do, but by refusing to confess error—all at the same time. The Government cannot use this have-its-cake-and-eat-it-too strategy to moot the case. *See* Part V.A, *infra* pages 106–09 (discussing that strategy in more detail).

### 2.

Let's nonetheless assume that the October 29 Memoranda have present legal effects. Even if such effects existed (they don't), the Government has not shown the effects would cure the unlawfulness of the Termination Decision. Nor that they would eliminate the States' ongoing injuries from that decision. Nor that they would remove our judicial power to

---

[6] Our approach is consistent with the venerable principle that, "if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied." *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110 (1801); *accord Thorpe v. Housing Auth. of Durham*, 393 U.S. 268, 281 (1969) ("The general rule . . . is that an appellate court must apply the law in effect at the time it renders its decision."). This principle applies only to changes in "the rule which *governs*." *Schooner Peggy*, 5 U.S. at 110 (emphasis added). The October 29 Memoranda do nothing to change the rule which governs.

No. 21-10806

grant relief against DHS. That's an independent basis for concluding the case is not moot.

A case is moot if "it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (quotation omitted). For challenges to governmental actions, that means "a case challenging a statute, executive order, or local ordinance usually becomes moot if the challenged law has expired or been repealed." *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020). In *Spell*, we accordingly held moot a challenge to gubernatorial COVID-19 stay-at-home orders after those orders "expired by their own terms." *Ibid.* With the orders expired, there was simply "nothing for us to enjoin." *Id.* at 177. Likewise, the Supreme Court held moot a challenge to New York City gun rules after the City amended those rules in a way that gave the petitioners "the precise relief [they had] requested in the prayer for relief in their complaint." *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1526 (2020) (per curiam). But when a government repeals the challenged action and replaces it with something substantially similar, the injury remains. In such a case, the court can still "grant . . . effectual relief . . . to the prevailing party," *Knox*, 567 U.S. at 307 (quotation omitted), and the case is not mooted.

Consider *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993). There, Jacksonville adopted a "Minority Business Enterprise Participation" ordinance that required 10% of the city's contracting budget to be "set aside" for deals with minority-owned contractors. *Id.* at 658–59. Non-minority contractors brought a Fourteenth Amendment challenge. *See id.* at 658–60 (describing the case's procedural history). After the Court granted certiorari, the city "repealed its . . . ordinance and replaced it with an ordinance entitled 'African–American and Women's Business Enterprise Participation.'" *Id.* at

33

No. 21-10806

660. That program was slightly narrower and more flexible than the original, and it allowed for set-asides above or below 10%. *Id.* at 660–61. The city argued it had mooted the case by repealing and replacing the original ordinance. *Id.* at 661.

The Court saw right through the city's gamesmanship. The Court first explained that a defendant generally may not moot a case by voluntarily ceasing the challenged conduct. *Id.* at 661–62. But then it explained that the case at hand was even more obvious than that—because the defendant city *hadn't really ceased anything*:

> This is an *a fortiori* case. There is no mere risk that Jacksonville will repeat its allegedly wrongful conduct; it has already done so. Nor does it matter that the new ordinance differs in certain respects from the old one. [The relevant voluntary-cessation precedent] does not stand for the proposition that it is only the possibility that the *selfsame* statute will be enacted that prevents a case from being moot; if that were the rule, a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect. The gravamen of petitioner's complaint is that its members are disadvantaged in their efforts to obtain city contracts. The new ordinance may disadvantage them to a lesser degree than the old one, but insofar as it accords preferential treatment to black- and female-owned contractors—and, in particular, insofar as its "Sheltered Market Plan" is a "set aside" by another name—it disadvantages them in the same fundamental way.

*Id.* at 662.[7]

---

[7] *City of Jacksonville* is probably best read as a corollary to the voluntary-cessation rule. *See* Part II.B.3, *infra* pages 39–45. A defendant who merely modifies her injurious behavior obviously can't show "the allegedly wrongful behavior could not reasonably be expected to

No. 21-10806

Our court first applied *City of Jacksonville* in *Cooper v. McBeath*, 11 F.3d 547 (5th Cir. 1994). Faced with a challenge to its three-year residency requirement for liquor licenses, Texas repealed the relevant statute and replaced it with a one-year requirement. *Id.* at 549–50. *City of Jacksonville*, we held, was a perfect fit. Texas could not moot the case simply by tweaking its challenged law. *See id.* at 550–51. ("[T]he new one-year residency/citizenship requirement may lessen the burden placed on the Plaintiffs, but . . . the amendments' practical effect remains the same: Plaintiffs, as non-Texans, are treated differently.").

Likewise in *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279 (5th Cir. 2012). There, the city's zoning ordinance allegedly "singled out churches for unfavorable treatment." *Id.* at 281–82 (quotation omitted). The day before oral argument, the city repealed the challenged provision and replaced it with one that banned churches from certain properties outright. *Id.* at 284–85. We applied *City of Jacksonville* and held the case was not moot. *Id.* at 285–86; *see also Big Tyme Invs., LLC v. Edwards*, 985 F.3d 456, 464–65 (5th Cir. 2021) (holding an Equal Protection challenge to a COVID-19 bar closure not mooted even by the adoption of more lenient restrictions because the new rules "continue[d] to differentiate between bars and restaurants" (quotation omitted)).

The same principle governs here. The Government says DHS's October 29 Memoranda mooted this whole case by rescinding the June 1 Memorandum and replacing it with a *new* explanation for terminating MPP. As we've explained, the Termination Decision is at issue here, not the June 1 Memorandum. And even aside from that, the Government's purported line

---

recur." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quotation omitted). The rationale is intuitive: If the injury perdures, the court can still grant relief. So the case cannot be moot. *See Knox*, 567 U.S. at 307–08.

No. 21-10806

between harms-caused-by-the-June-1-Memorandum and harms-caused-by-the-October-29-Memoranda is a distinction without a difference. This kind of faux-metaphysical quibbling ignores the "gravamen" of the States' challenge to the Termination Decision. *See City of Jacksonville*, 508 U.S. at 662. DHS cannot moot this case by reaffirming and perpetuating the very same injury that brought the States into court.

The Government offers two lines of response. First, it relies heavily on the Supreme Court's order in *Mayorkas v. Innovation Law Lab*, 141 S. Ct. 2842 (2021) (mem.). That order concerned the mirror image of this case—a challenge to the creation of MPP rather than its termination. The district court enjoined MPP, and the Ninth Circuit affirmed. *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1095 (9th Cir. 2020). But on June 1, of course, DHS terminated MPP. So the Court vacated the Ninth Circuit's judgment and remanded the case "with instructions to direct the District Court to vacate as moot the . . . order granting a preliminary injunction." *Innovation Law Lab*, 141 S. Ct. at 2842.

That reliance is very much misplaced. DHS's policy change in *Innovation Law Lab* obviously gave the plaintiffs "the precise relief [they had] requested," leaving the injunction with no work to do. *See N.Y. State Rifle & Pistol*, 140 S. Ct. at 1526. So it made sense for the Supreme Court to hold the case moot. *See Innovation Law Lab*, 141 S. Ct. at 2842. In this case, DHS's October 29 Memoranda did nothing less than vow faithful adherence to the June 1 Termination Decision. Unlike the plaintiffs in *Innovation Law Lab*, the States are left with none of the relief they requested. That leaves the injunction with just as much work to do as ever.

Next, the Government focuses on each of the States' two merits challenges to the Termination Decision (based on 8 U.S.C. § 1225 and the APA). *See Biden I*, 2021 WL 3603341, at *22–23 (district court's discussion

No. 21-10806

of § 1225); Part IV.B, *infra* pages 98–106 (our analysis of § 1225); *see also Biden I*, 2021 WL 3603341, at *17–22 (district court's discussion of the APA); Part IV.A, *infra* pages 88–97 (our discussion of the APA). It argues the October 29 Memoranda change the situation enough to moot the case.

As for § 1225, the Government points out that DHS's new Memoranda invoke deference under *Chevron, USA, Inc. v. NRDC*, 467 U.S. 837 (1984), to justify paroling any and every alien DHS lacks the capacity to detain. *See* October 29 Explanation Memorandum 28 (citing *Chevron*). So *Chevron* deference, which wasn't at play before, is relevant now. And because the district court's § 1225 reasoning relied in part on the idea that paroling all above-capacity aliens would be impermissible under § 1182(d)(5)(A), *see Biden I*, 2021 WL 3603341, at *22 n.11, the Government argues, the § 1225 issue is now moot.

A creative move, but *Chevron* was as available before October 29 as it is today. The Government's own brief points out that "*DHS has long interpreted* Section 1182(d)(5) to authorize parole of noncitizens who present neither a security risk [n]or a risk of absconding and whose continued detention is not in the public interest." (Emphasis added and quotation omitted.) In fact, the American Civil Liberties Union (the "ACLU") raised *Chevron* deference in an August 17 *amicus curiae* brief filed in our court. The brief pointed to the longstanding DHS regulation in 8 C.F.R. § 212.5(b), arguing that the regulation is a broad, deference-worthy interpretation of 8 U.S.C. § 1182(d)(5)'s parole power. And if the district court had properly deferred to that interpretation, said the ACLU, it would have realized that releasing all over-capacity aliens fits within the statutory "case-by-case basis" limitation on parole.

The Government thus forfeited the *Chevron* issue by failing to mention it in its brief. *See HollyFrontier Cheyenne Refin., LLC v. Renewable*

No. 21-10806

*Fuels Ass'n*, 141 S. Ct. 2172, 2180 (2021) ("[T]he government is not invoking *Chevron*. We therefore decline to consider whether any deference might be due its regulation." (quotation omitted)); *Tiger Lily, LLC v. HUD*, 5 F.4th 666, 669 (6th Cir. 2021) ("Notably, the government does not ask us to grant *Chevron* deference to its interpretation of the relevant statute. 'We therefore decline to consider whether any deference might be due.'" (quoting *HollyFrontier*, 141 S. Ct. at 2180)); *cf. Ortiz v. McDonough*, 6 F.4th 1267, 1275–76 (Fed. Cir. 2021) (applying the same rule to deference under *Auer v. Robbins*, 519 U.S. 452 (1997)). In fact, it did not even raise the issue before the district court. *See generally Biden I*, 2021 WL 3603341. It now seeks to use the Suggestion of Mootness as a back door to undo those omissions. It may not do so. *See Bancorp*, 513 U.S. at 27 (concluding that a motion for *Munsingwear* vacatur is not a means to "collateral[ly] attack" the judgment); *accord Hous. Chron. Publ'g Co. v. City of League City*, 488 F.3d 613, 619 (5th Cir. 2007); *see also* Part IV.B, *infra* pages 98–106 (analyzing the statutory issue without regard to *Chevron*). And because *Chevron* was relevant to this case, if at all, before the October 29 Memoranda, the doctrine has no bearing at all on mootness.

As for the APA, the Government argues the October 29 Memoranda alleviate the States' injuries. The idea is that, even if the June 1 Termination Decision was arbitrary and capricious, the October 29 Memoranda are not. Thus, says the Government, DHS has fixed the problem the States complain of.

Again, no. The Government has not shown the October 29 Memoranda actually cure the States' APA-based injuries. For example, the Suggestion of Mootness's glowing description of the October 29 Memoranda offers no analysis whatsoever on whether they are *post hoc* rationalizations under the demanding standard announced by the Supreme Court. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1904–05, 1907–09 (2020)

No. 21-10806

(describing a multiple-memorandum agency process strikingly similar to the process here and concluding the later memorandum could "be viewed only as impermissible *post hoc* rationalization[]"). Nor does the Government explain how the October 29 Memoranda, which are not final agency action of their own under the reopening doctrine, can be anything more than *post hoc* rationalizations of the Termination Decision.

If the October 29 Memoranda are *post hoc* rationalizations, they are powerless to cure the June 1 Termination Decision's problems. *See* Part IV.A, *infra* pages 88–97 (explaining the Termination Decision was arbitrary and capricious under *Regents*); *Regents*, 140 S. Ct. at 1907–09 (explaining "*post hoc* rationalizations . . . are not properly before us"). We need not decide that issue here. We hold only that the Government has not carried its "formidable burden" of showing that the October 29 Memoranda remove the States' injuries by curing the Termination Decision's APA defects. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (quotation omitted) (laying out the burden for a party attempting to show its injurious conduct will not recur); *City of Jacksonville*, 508 U.S. at 662 (explaining that a showing that the injury is no longer occurring is a prerequisite to showing injurious conduct will not recur).

3.

Even if the October 29 Memoranda had legal effects, and even if those legal effects cured the unlawfulness of the Termination Decision, the new memos would constitute at most a voluntary cessation of unlawfulness. Again, that's an independent basis for holding the case is not moot.

The voluntary-cessation rule is well settled: "[A] defendant cannot automatically moot a case simply by ending its allegedly unlawful conduct once sued." *Spell*, 962 F.3d at 179 (quotation omitted). Were it otherwise, the Supreme Court has explained, "a defendant could engage in unlawful

No. 21-10806

conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Nike*, 568 U.S. at 91. And "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Ibid.* (quotation omitted). The inquiry centers on "whether the defendant's actions are 'litigation posturing' or whether the controversy is actually extinguished." *Yarls v. Bunton*, 905 F.3d 905, 910 (5th Cir. 2018).

Our court applies this same test in a slightly modified way when the defendant is a governmental entity. In such cases, "[w]ithout evidence to the contrary, we assume that formally announced changes to official governmental policy are not mere litigation posturing." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009), *aff'd on other grounds sub nom. Sossamon v. Texas*, 563 U.S. 277 (2011). In *Speech First, Inc. v. Fenves*, we explained three factors that can overcome the presumption. 979 F.3d 319 (5th Cir. 2020); *see also id.* at 328–29 (assuming "*arguendo*" that the presumption applies to public universities and analyzing accordingly). They are: "(1) the absence of a controlling statement of future intention [not to repeat the challenged policy]; (2) the suspicious timing of the change; and (3) the [governmental entity's] continued defense of the challenged polic[y]" after the supposedly mooting event. *Id.* at 328. If all three factors obtain, the case isn't moot. *See id.* at 328–29 (declining to decide whether fewer than three will suffice).

This case fits *Fenves* like a glove. DHS has repeatedly exhibited gamesmanship in its decisionmaking. DHS first announced it was suspending MPP on Inauguration Day 2021. *See Biden I*, 2021 WL 3603341, at *7 (noting the suspension went into effect the next day, on January 21). As the district court pointed out:

No. 21-10806

> Since that day, DHS has not offered a single justification for
> suspending new enrollments in the program during the period
> of [its review of MPP]. Indeed, when the original
> administrative record was filed [in district court] prior to the
> June 1 Memorandum's issuance, *it contained only a single
> document — the January 20 Memorandum*. There was no cost-
> benefit analysis or any sort of reasoned decisionmaking for a
> court to review.

*Id.* at *8 (citation omitted) (emphasis added). The States challenged that
Suspension Decision on April 13. They "alleged that DHS's two-sentence,
three-line memorandum" violated the APA and § 1225, among other things.
*Id.* at *1 (quotation omitted). On May 14, the States moved for a preliminary
injunction against the Suspension Decision. *Ibid.*

In the midst of briefing, DHS tried—successfully—to moot that
challenge. This by way of its June 1 Termination Decision, which
permanently ended MPP. *See ibid.* The district court held this mooted the
States' challenge to the Suspension Decision, thus allowing the Government
to avoid any responsibility for its completely unreasoned, two-sentence
decision that started this whole case. *Ibid.*

After the district court allowed the States to replead a challenge to the
Termination Decision, DHS threw another last-minute wrench into the
bench trial. *See id.* at *2. At least three weeks before the trial was scheduled
to begin, DHS became aware the administrative record was missing a key
document: DHS's own 2019 assessment of MPP, which judged the policy to
be a success. *Ibid.*; *id.* at *5 (describing the assessment). Despite the advance
notice, DHS waited until *two days* before the one-day bench trial to add it to
the record. *Id.* at *2.

The States claimed unfair surprise and moved to have the addition
excluded, *see* ECF No. 80, but the district court denied that motion, *see* ECF

41

No. 21-10806

No. 85. It pointed out: "Defendants even waited until 3:27pm two days before the [trial] to file the corrected Administrative Record, despite the declaration of the custodian [explaining that DHS had noticed the omission] being electronically signed at 5:14 p.m. Eastern time *the day before*." *Id.* at 2. This behavior, said the district court, came "perilously close to undermining the presumption of administrative regularity" courts normally accord to agency procedures. *Biden I*, 2021 WL 3603341, at *2 (quoting ECF No. 85 at 3). In the end, despite the States' limited opportunity to tailor their case to the inclusion of the 2019 assessment, the assessment played a significant role in the district court's analysis. *See id.* at *19 ("By ignoring its own previous assessment on the importance of deterring meritless asylum applications without a reasoned analysis for the change, [DHS] acted arbitrarily and capriciously." (quotation omitted)).

DHS continued its tactics on appeal. After we denied its motion for a stay, DHS announced its intention to issue a new memorandum. *See Biden II*, 10 F.4th 538 (decided August 19); DHS ANNOUNCES INTENTION TO ISSUE NEW MEMO TERMINATING MPP (posted September 29), screenshotted at *supra* page 25. On the Friday before oral argument—October 29—DHS issued its new Memoranda. Around 4:30 p.m. that Friday, the Government filed its 26-page Suggestion of Mootness.

Those facts easily satisfy all three *Fenves* factors. First, DHS "has not issued a controlling statement of future intention" to refrain from repeating MPP's termination. *Fenves*, 979 F.3d at 328–29. In *Fenves*, the University president, "in his official capacity, represent[ed] in his brief that the University has no plans to, and will not, reenact the [challenged] policies." *Id.* at 328 (quotation omitted). The court held that wasn't enough: Only "sworn testimony" from someone with "control" over the relevant policy choice would suffice. *Id.* at 328–29 (quotation omitted). This case is even more clear-cut. The Government's Suggestion of Mootness doesn't even

No. 21-10806

*claim* that DHS has forsworn further memos on this topic. And there's certainly nothing close to "sworn testimony" establishing such a commitment.

Second, "the timing of [DHS's] policy amendments is at least as suspicious as was the timing of the changes in" *Fenves. Id.* at 329. In *Fenves*, the timing was "suspicious" because the University only began reviewing its policies after it lost in district court. *Ibid.* And the "changes were first announced only in the University's appellate brief." *Ibid.* Here, as in *Fenves*, DHS started reviewing its policy only after losing in district court. And unlike *Fenves*, DHS made the change the Friday before oral argument—long after briefing had concluded. That timing, combined with DHS's pattern of belated shifts and its eleventh-hour mooting of the States' original challenge, is more than a little "suspicious." *Ibid.*

Third, DHS "continues to defend the original policies . . . as it did in the district court." *Ibid.* DHS's original stance, expressed in its briefing, was that the June 1 Termination Decision was entirely defensible and legal. In no way does the Suggestion of Mootness alter that stance. Nor do the October 29 Memoranda themselves. And if any doubt remained on this score, oral argument would remove it. When asked whether "the Government believe[s] that the June 1 Memo was a lawful exercise of government power," the Government's counsel responded: "Yes, your honor." Oral Argument at 55:46–55:54.

Even after giving DHS "some solicitude" in the voluntary-cessation analysis, *Sossamon*, <u>560 F.3d at 325</u>, we hold this case is not moot. Each of the three *Fenves* factors is at least as obvious here as in *Fenves* itself. DHS has therefore not borne its "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Nike*, <u>568 U.S. at 91</u> (quotation omitted).

No. 21-10806

Instead of trying to shoulder that burden, the Government asserts the Memoranda can't possibly fit into the voluntary-cessation doctrine because DHS issued them in response to the district court's remand order. That's incorrect because it ignores the fundamental one-court-at-a-time rule. "The general rule is that a case can exist only in one court at a time, and a notice of appeal permanently transfers the case to us until we send it back." *United States v. Lucero*, 755 F. App'x 384, 386 (5th Cir. 2018) (per curiam); *see also Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam) ("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.").

That same principle applies when an agency notices an appeal instead of accepting a remand order. Thus, if the Government wanted the October 29 Memoranda to be assessed as a response to *the district court's* remand, it should have voluntarily dismissed this appeal and asked *the district court* for relief from the judgment. *See* Fed. R. App. P. 42(b) (allowing for voluntary dismissal); Fed. R. Civ. P. 60(b) (providing a mechanism for a party to seek relief from a judgment); Part V.A, *infra* pages 106–09 (discussing DHS's attempt to have it both ways at once in this case). That court's disposition of such a motion, of course, would have been an appealable final decision. *See, e.g.*, *Brumfield v. La. State Bd. of Educ.*, 806 F.3d 289, 296 (5th Cir. 2015) ("[T]he district court's denial of the 60(b)(4) motion amounts to a refusal to dissolve an injunction, making the denial appealable under this court's precedent."). Such an approach would have run parallel to DHS's path in *Regents* itself, where a post-remand DHS returned to the district court with its second memorandum, waited for the district court's ruling, and appealed that ruling. 140 S. Ct. at 1904–05 (explaining that, before appealing, "[t]he Government asked the D. C. District Court to revise its prior order in light of [the new memorandum], but the court declined"). That's what

No. 21-10806

allowed the appeals courts in the *Regents* litigation to proceed with the benefit of full, first-instance review from the district court on the merits of both sets of agency documents.

The Government was entirely free, of course, to appeal when it did. But it may not invoke the timing of its own appeal to avoid the voluntary-cessation doctrine. Just as a litigant cannot notice an appeal and then continue litigating the case in the district court, an agency cannot notice an appeal and then act as if it had accepted the remand order.

4.

Finally, and in any event, independent principles of appellate law prohibit the Government's efforts to inject the October 29 Memoranda into this case at the eleventh hour. Three bear emphasis.

First and foremost is the record rule. Immediately after empowering courts to review agency action, the APA commands: "In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706; *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). That rule applies not only to arbitrary-and-capricious review, *see* § 706(2)(A), but also to review for compliance with statutes, *see* § 706(2)(C). Thus, we will apply the law to the facts based on the agency record as it stood on the date of the Termination Decision—June 1.

Second, the States challenged the June 1 Termination Decision in district court. They did not challenge the October 29 Memoranda, which obviously did not exist at the time of the district court proceedings. This is an appeal from the district court's disposition of the States' challenge, and the merits of DHS's actions on October 29 are not before us. Indeed, because the reopening doctrine establishes that the October 29 Memoranda

No. 21-10806

embodied no final agency action, *see* Part II.A.2.b, *supra* pages 20–27, we do not have *jurisdiction* to decide those merits.

Third, the general rule is that "we are a court of review, not of first view." *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005); *see also Landry's, Inc. v. Ins. Co. of the State of Pa.*, 4 F.4th 366, 372 n.4 (5th Cir. 2021). That rule counsels against considering the merits of the October 29 Memoranda before a district court has done so. *Cf. Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, 946 F.3d 1100, 1110–15 (9th Cir. 2020) (holding a 2019 agency funding allocation didn't moot a challenge to the 2018 version of the same allocation, deciding the merits without regard to the 2019 allocation, and declining to address most issues not considered by the district court).[8]

## C.

Now, standing. Several factual findings were central to the district court's standing analysis, and they will be central to ours as well. So we begin by reviewing those findings for clear error, and we find none. Then we conclude the States have standing to bring this suit.

### 1.

Under clear-error review, "[i]f the district court's view of the evidence is plausible in light of the entire record, an appellate court may not reverse even if it is convinced that it would have weighed the evidence differently in the first instance." *Brnovich v. Democratic Nat'l Comm.*, 141 S.

---

[8] While we cannot and will not consider the *merits* of the October 29 Memoranda, we obviously can, must, and already have addressed the memos' effect on our *jurisdiction* (which is none, as it turns out). "This court necessarily has the inherent jurisdiction to determine its own jurisdiction." *Camsoft Data Sys., Inc. v. S. Elecs. Supply, Inc.*, 756 F.3d 327, 333 (5th Cir. 2014) (quotation omitted). As explained above in Part II.A.2, *supra* pages 17–29, and in Part II.B.1–3, *supra* pages 30–45, the October 29 Memoranda do nothing to destroy our jurisdiction.

No. 21-10806

Ct. 2321, 2349 (2021). That same standard applies to facts that underlie jurisdictional issues like standing. *See Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 367 (5th Cir. 2020) ("Because this case was tried, Plaintiffs needed to prove standing by a preponderance of the evidence. A factual finding that a plaintiff met that burden is reviewed for clear error." (citation omitted)); *DeJoria v. Maghreb Petroleum Expl., S.A.*, 935 F.3d 381, 390 (5th Cir. 2019) ("[J]urisdiction is a legal question. But the facts that underlie a jurisdictional determination are still reviewed only for clear error.").

a.

The district court's most important finding was that MPP's termination has increased the number of aliens released on parole into the United States, including Texas and Missouri. *See Biden I*, 2021 WL 3603341, at *8 ("Without MPP, Defendants are forced to release and parole aliens into the United States because Defendants simply do not have the resources to detain aliens as mandated by statute."); *see also* 8 U.S.C. § 1182(d)(5) (laying out parole procedures).

The court rooted that finding firmly in the evidence before it. The court noted DHS's inadequate detention capacity, citing both a record declaration and some of DHS's own publications on the matter. *Biden I*, 2021 WL 3603341, at *8–9. So it's unsurprising that on appeal, even the Government admits DHS is "detaining at or near its capacity limits." Next, the court pointed to evidence that "the termination of MPP has contributed to the current border surge." *Biden I*, 2021 WL 3603341, at *9 (citing DHS's own previous determinations that MPP had curbed the rate of illegal entries). And it pointed out that the number of "enforcement encounters"—that is, instances where immigration officials encounter immigrants attempting to cross the southern border without documentation—had "skyrocketed"

No. 21-10806

since MPP's termination. *Ibid.*; *see also id.* at *9 n.7 (noting a sworn statement of David Shahoulian, then the Assistant Secretary for Border and Immigration Policy at DHS, who predicted that "total [border] encounters this fiscal year [2021] are likely to be the highest ever recorded" (emphasis omitted)). Those pieces of record evidence make it eminently "plausible" that DHS's termination of MPP has increased the total number of aliens paroled into the United States. *Brnovich*, 141 S. Ct. at 2349.

The Government contests this fact in several ways—none of which persuades us the district court committed clear error. Broadly, the Government insists that "[t]he court cited no record evidence demonstrating that terminating MPP in fact led to an increase in the number of noncitizens released." The district court's record citations belie this claim. *See Biden I*, 2021 WL 3603341, at *8–9. So does the Government's own brief. As discussed below, that brief faults the district court for giving DHS only two options: either detain aliens (8 U.S.C. § 1225(b)(2)(A)) or return them to Mexico (8 U.S.C. § 1225(b)(2)(C)). *See* Part IV.B, *infra* pages 98–106. Instead, says the Government, DHS has the third option of paroling aliens under 8 U.S.C. § 1182(d)(5)(A). Thus, for any given alien whose nondetention would otherwise violate § 1225, DHS can comply with the law (and was complying, before the district court's injunction) simply by paroling that alien under § 1182.

Put differently, the Government first denies DHS's policy will increase the number of paroled aliens. Then it argues DHS is complying with the law precisely by paroling the aliens it lacks the capacity to detain rather than returning them to Mexico. That litigating position confirms the district court's extensive record citations: MPP's termination, combined with the lack of detention capacity, has increased and (without an injunction) will increase the total number of parolees. *See Biden I*, 2021 WL 3603341, at *9 ("Even if the termination of MPP played *no* role in the increasing number of

No. 21-10806

migrants, the lack of MPP as a tool to manage the influx means that more aliens will be released and paroled into the United States as the surge continues to overwhelm DHS's detainment capacity.").

The Government nonetheless contests the district court's statistics as to capacity limits and offers its own statistics in their place. This is effectively a request that we re-weigh the evidence that was before the district court, and we will not do that. *See Brnovich*, 141 S. Ct. at 2349. The task of evaluating competing statistics is precisely the kind of task a district court is best situated to undertake. *Cf. Woodfox v. Cain*, 772 F.3d 358, 380 (5th Cir. 2014) ("Again, given the fact-intensive nature of the statistical inquiry, we can find no clear error in the district court's opting to use the one-tailed and two-tailed tests.").

Third, the Government faults the district court for considering the number of encounters between immigration officials and would-be entrants at the border (called "border encounters"). The Government points out that officials might be arresting the same would-be entrants multiple times. And that could artificially inflate the number of *encounters*, even while the rate of *illegal entries* itself remains constant. So, the argument goes, the district court clearly erred by citing border encounters to conclude MPP's termination has contributed to the border surge. This misses the mark entirely. The district court's point was just that MPP's termination has caused an increase in attempted illegal crossings. And the court quite reasonably used the rate of border encounters as a proxy for that rate. If illegal entry attempts increase, it's irrelevant how many times a given entrant has tried *in the past*. As in any other context, a repeat offender is an offender just the same. And in all events, the Government's false-positive theory makes sense only if the incidence of repeat entrants has increased since MPP's termination. But it offers no such evidence, and the June 1 Memorandum itself suggests DHS made the

No. 21-10806

Termination Decision with the hope that doing so would *decrease* the rate of repeat entry.

Fourth, the Government denies that DHS ever acknowledged MPP's effectiveness. The district court supported this proposition by reference to a DHS document that said, "MPP implementation contributes to decreasing the volume of inadmissible aliens arriving in the United States on land from Mexico." *Biden I*, 2021 WL 3603341, at *5, *9 (quotation omitted). The Government points out that this quote came under the header "Metric," and says the document was therefore doing nothing more than proposing a metric for measuring MPP's effectiveness—not touting that effectiveness.

Yes, the quote comes from a sub-header labeled "Metric." But the prior page explains that "[t]he following are the intended goals of MPP and measurements of how those goals *are currently being met*." (Emphasis added.) And just after the metric is a "Data measurement" sub-header, measuring the "Number of Aliens Enrolled in MPP." That suggests the document was doing more than just proposing future measurements—and that instead, it was actually carrying out measurements itself. So one "plausible" "view of the evidence" is that DHS was not just proposing a metric but in fact concluding MPP had already successfully reduced illegal entries. *See Brnovich*, 141 S. Ct. at 2349. The district court did not clearly err by interpreting the DHS document the way it did.

Last and related, the Government argues MPP was an ineffective deterrent, and that its termination therefore could not have caused an increase in illegal entries. But the district court made the contrary finding after its own consideration of the record and weighing of the evidence. *See Biden I*, 2021 WL 3603341, at *8–9. That finding is "plausible in light of the entire record," *Brnovich*, 141 S. Ct. at 2349, and we will not disturb it on appeal. And even if the Government were correct that MPP was an

No. 21-10806

ineffective deterrent, the fact remains that, according to both the record and the Government's own brief, MPP's termination drastically increases the proportion of incoming aliens who are paroled rather than returned to Mexico. And it is precisely that increase in paroles that causes the States' harms.

b.

The district court found that the increase in parolees causes the States financial harm by way of driver's license applications. *Biden I*, 2021 WL 3603341, at *9–10. More specifically, the court found both that "[a]s a result of the termination of MPP, some aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States and will obtain Texas driver's licenses" at a cost to Texas, and that "[e]ach additional customer seeking a Texas driver's license imposes a cost on Texas." *Id.* at *9.

Neither finding was clearly erroneous. In *DAPA*, we observed that "driving is a practical necessity in most of" Texas. 809 F.3d at 156. For that reason, we explained, it was "hardly speculative" that individuals would apply for driver's licenses upon becoming eligible to do so. *Id.* at 160. This case is indistinguishable. Among other things, eligibility for a Texas driver's license requires both residence in Texas and lawful status. And under Texas law, immigration parole under § 1182(d)(5) suffices. *See* Part II.C.2.b, *infra* pages 54–57 (explaining this). Thus, just as in *DAPA*, it is here "hardly speculative" that many newly paroled individuals will apply for Texas licenses. 809 F.3d at 160. Further, the district court found—with support from the record—that Texas incurs a cost for each driver's license application it reviews. *Biden I*, 2021 WL 3603341, at *10 (citing a declaration of the Chief of the Texas Department of Public Safety Driver License Division, which explains, "DPS estimates that for an additional 10,000

No. 21-10806

driver['s] license customers seeking a limited term license, DPS would incur a biennial cost of approximately $2,014,870.80"). And of course, the record shows the State incurs a cost for actually granting licenses.

c.

Finally, the district court found that the increase in releases and paroles will increase the States' healthcare costs. *See Ibid.* (citing a record deposition for the proposition that "[t]he total costs to the State will increase as the number of aliens within the state increases").[9] That's because both Texas and Missouri subsidize healthcare for immigrants, regardless of immigration status. *See ibid.* Federal law affirmatively *requires* the States to make some of those expenditures. *See* 42 C.F.R. § 440.255(c) (Emergency Medicaid).

The Government appears to concede the obvious—that *if* the total number of in-State aliens increases, the States will spend more on healthcare. The Government's objection, instead, boils down to repeating its claim that MPP's termination can't have caused either an increase in entries or an increase in parolees. Because *those* district court findings were not clearly erroneous, this objection goes nowhere.

2.

To establish standing, the States "must show an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *DAPA*, 809 F.3d at 150 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). And

---

[9] The district court also made findings about educational and criminal-justice costs. *Ibid.* We do not address those findings here because nothing turns on them.

No. 21-10806

because there was a trial, the States "needed to prove standing by a preponderance of the evidence." *Env't Tex. Citizen Lobby*, 968 F.3d at 367.

Texas and Missouri each contend they have standing. But because only one of the States must have standing, we focus on Texas. *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *accord NRA v. McCraw*, 719 F.3d 338, 344 n.3 (5th Cir. 2013). We begin with (a) the special solicitude that Texas is owed in the standing analysis. Then we hold Texas (b) incurred an injury in fact that (c) was traceable to the Termination Decision, and that (d) can be redressed by a favorable judicial decision. Finally, we hold (e) the Government's counterarguments are foreclosed by precedent.

a.

At the outset, we note that Texas is entitled to "special solicitude" in the standing analysis. *Massachusetts*, 549 U.S. at 520; *see also DAPA*, 809 F.3d at 151 (beginning with the special-solicitude question). Special solicitude has two requirements: (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests. *Id.* at 151–52 (citing *Massachusetts*, 549 U.S. at 516–20). In both *Massachusetts* and *DAPA*, the first prong was satisfied because a State challenged an agency action as invalid under a statute. 549 U.S. at 516–17 (Clean Air Act); 809 F.3d at 152–53 (APA). And in both cases, the second prong was satisfied because a State's challenge involved an agency's alleged failure to protect certain formerly "sovereign prerogatives [that] are now lodged in the Federal Government." *Massachusetts*, 549 U.S. at 519–20; *see also DAPA*, 809 F.3d at 152–54. Particularly relevant here is *DAPA*, where we held that DAPA, by authorizing the presence of many previously unlawful aliens in the United States, affected "quasi-sovereign interests by imposing substantial pressure on them to change their laws, which provide for issuing

No. 21-10806

driver's licenses to some aliens and subsidizing those licenses." 809 F.3d at 153 (quotation omitted).

This case is no different. First, just as in the *DAPA* suit, Texas is asserting a procedural right under the APA to challenge an agency action. *See id.* at 152 ("In enacting the APA, Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, and the states fall well within that definition." (quoting 5 U.S.C. § 702)). And second, Texas asserts precisely the same driver's-license-based injury here that it did there. *See id.* at 153–54 (explaining that DAPA, by greatly increasing the class of people to whom existing Texas law would entitle a subsidized driver's license, pressured Texas to change its own law—thus affecting a quasi-sovereign interest). Thus, Texas is entitled to special solicitude in the standing inquiry. If nothing else, that means imminence and redressability are easier to establish here than usual. *See Massachusetts*, 549 U.S. at 517–18 (holding a State "can assert [its] right[s] without meeting all the normal standards for redressability and immediacy" (quotation omitted)).[10]

b.

Texas has suffered actual injury already, and it faces additional costs if the district court's injunction ends. MPP's termination has increased the number of immigrants paroled into Texas under 8 U.S.C. § 1182(d)(5). And as *DAPA* discussed at length, Texas law requires the issuance of a license to any qualified person—including aliens who "present . . . documentation

---

[10] The Government's sole response is to assert that *only* a notice-and-comment claim under 5 U.S.C. § 553—like the claim Texas asserted in *DAPA*—suffices for special solicitude. And because the States are making an arbitrary-and-capricious claim under 5 U.S.C. § 706, they don't qualify. Supreme Court precedent forecloses this argument: *Massachusetts* itself recognized a procedural right to bring arbitrary-and-capricious challenges. *See* 549 U.S. at 520 (recognizing "a . . . procedural right to challenge the rejection of [a State's] rulemaking petition as arbitrary and capricious").

No. 21-10806

issued by the appropriate United States agency that authorizes the applicant to be in the United States." 809 F.3d at 155 (alteration in original) (quoting Tex. Transp. Code § 521.142(a)); *see also* Tex. Transp. Code § 521.181. Parole under 8 U.S.C. § 1182 satisfies that requirement. *See* Tex. Dep't of Pub. Safety, Verifying Lawful Presence 4 (2013), https://perma.cc/Z55H-GHBH (listing an acceptable document for "parolees" as "[i]mmigration documentation with an alien number or I-94 number," and going on to explain that "[t]his can include but is not limited to an I-94 with annotation 'parole' or 'paroled pursuant to [8 U.S.C. § 1182(d)(5)]'"); *see also* Tex. Dep't of Pub. Safety, U.S. Citizenship or Lawful Presence Requirement (2021), https://perma.cc/5AWR-HVPF (including a hyperlink to the Verifying Lawful Presence document). Likewise, parole (or any other form of release into the state, as opposed to return to Mexico) satisfies Texas's residency requirement for driver's licenses. *See* Tex. Transp. Code § 521.1426(a) ("The department may not issue a driver's license or a personal identification certificate to a person who has not established a domicile in this state.").

Because driving is a "practical necessity in most of the state," there's "little doubt" many newly paroled aliens have applied—and without the district court's injunction, will apply in the future—for Texas driver's licenses. *See DAPA*, 809 F.3d at 156. And the district court found, without a hint of clear error, that each granted license (and each *reviewed application* for a license, even if not granted) costs Texas money. It follows that Texas has been actually injured—or at the least, that it faces imminent injury without the district court's injunction. Likewise with healthcare costs.

The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. Tellingly, however, it offers no hint as to how Texas

55

No. 21-10806

could make that showing—nor why we should require it to do so. Imagine Texas had produced copies of driver's license applications from paroled aliens. Would that have counted as evidence that Texas had, in the Government's words, "issued a single additional driver's license as a result" of MPP's termination? Of course not: There would always remain some possibility that *any given parolee* would have been paroled even under MPP. MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing "conjectural" or "hypothetical" about that. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (quotation omitted); *cf. DAPA*, 809 F.3d at 161–62 ("The state must allege an injury that has already occurred or is certainly impending; it is easier to demonstrate that some DAPA beneficiaries would apply for licenses than it is to establish that a particular alien would." (quotation omitted)). To the contrary, given both MPP's effect of increasing the number of parolees and the fact that many of those parolees will apply for Texas licenses, it's impossible to imagine how the Government could terminate MPP *without* costing Texas any money. *See Clapper*, 568 U.S. at 409 ("[T]hreatened injury must be certainly impending to constitute injury in fact." (emphasis omitted)). And in all events, *Massachusetts* countenanced a far less obvious injury than this one. 549 U.S. at 522–23.

Second, the Government resorts to *Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015), where this court held Mississippi lacked standing to challenge the Deferred Action for Childhood Arrivals ("DACA") program. *Id.* at 252. Mississippi produced neither "evidence that any DACA eligible immigrants resided in the state," nor "evidence of costs it would incur if some DACA-approved immigrants came to the state." *Ibid.* Instead, Mississippi cited nothing more than a nine-year-old study regarding the costs

No. 21-10806

of illegal immigration as a whole (not the costs imposed by DACA in particular). *Id.* at 249, 252. We concluded that "Mississippi's claim of injury [was] not supported by any facts." *Id.* at 252. This case is worlds apart. Texas *has*, of course, supported its claim of injury with facts. And that includes precisely the kind of facts Mississippi was missing: "evidence of costs it would incur" if MPP increased the number of parolees in the state. *See ibid.*; *Biden I*, 2021 WL 3603341, at *9–10 (citing record evidence of projected costs to issue additional driver's licenses, projected costs to evaluate additional driver's license applications, and projected healthcare costs).

Third, the Government points out that there's been a full bench trial here, unlike the preliminary-injunction posture of *DAPA*. That is a distinction, and it means Texas must show standing by a preponderance of the evidence rather than that it's merely "likely" to establish standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (concluding the standing burden of proof varies with the stages of litigation); *Fenves*, 979 F.3d at 329 (explaining the standard at the preliminary-injunction stage). Yet the distinction changes nothing. The district court's factual findings are not clearly erroneous. And as just explained, those findings do indeed suffice to show Texas's actual or imminent injury by a preponderance of the evidence.

Finally, the Government says Texas's injuries are self-inflicted and therefore entirely irrelevant to the standing inquiry. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam). Our court addressed and rejected precisely this argument in *DAPA*. *See* 809 F.3d at 157–60 (citing *Wyoming v. Oklahoma*, 502 U.S. 437 (1992)). The Government does not acknowledge that exhaustive, precedent-based treatment of the issue, and it offers no reason at all for holding that Texas's injury is self-inflicted in this case when it was not in *DAPA*. Here, as there, Texas is injured by the "Hobson's choice of spending millions of dollars to subsidize driver's licenses or changing its statutes." *Id.* at 163.

No. 21-10806

c.

Texas's injury is also traceable to DHS's termination of MPP. The district court found that MPP's termination has caused, and will continue to cause, an increase in immigrants paroled into Texas. Many new parolees are certain to apply for driver's licenses—and evaluating each application will impose costs on Texas. *Cf. DAPA*, 809 F.3d at 160 (noting that new immigrants—in that case, DAPA recipients—"have strong incentives to obtain driver's licenses, and it is hardly speculative that many would do so if they became eligible"). Not to mention actually granting licenses. Likewise, at least some MPP-termination-caused immigrants will certainly seek healthcare services from the State. The causal chain is easy to see. *See Massachusetts*, 549 U.S. at 523 (finding traceability where the EPA's challenged action may have caused people to drive less fuel-efficient cars, which may in turn contribute to a prospective rise in sea levels, which may in turn cause the erosion of Massachusetts's shoreline).

The Government nonetheless argues that, when "a causal relation between injury and challenged action depends upon the decision of an independent third party . . . standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (quotation omitted). And the district court's causal reasoning relies on mere speculation about "complex decisions made by non-citizens . . . before they risk[] life and limb to come here." *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015). Thus, says the Government, Texas's injury (if any) can be traced back to immigrants' choices, not to MPP's termination.

But the court was not speculating. It did not merely prognosticate that, sometime in the future, MPP's termination would influence aliens' decisions whether to immigrate illegally. Instead, the court surveyed the record and found the relevant cause-and-effect had already been taking place (even if

58

No. 21-10806

some of its impacts on Texas were still imminent rather than actual). *See Biden I*, 2021 WL 3603341, at *9–10. In other words, MPP's termination has already increased the rate of illegal entries and the number of parolees. That means the States have met their burden "to adduce facts showing that [the choices of the relevant third parties] have been or will be made in such manner as to produce causation." *Lujan*, 504 U.S. at 562. Those same findings of *past and present* facts differentiate this case from others where the Supreme Court has refused to base standing on speculation about the *future* choices of third parties. *See, e.g.*, *California*, 141 S. Ct. at 2118–19 ("The state plaintiffs have failed to show that the challenged minimum essential coverage provision, without any prospect of penalty, *will* harm them by leading more individuals to enroll in these programs." (emphasis added)); *Allen v. Wright*, 468 U.S. 737, 758 (1984) ("[I]t is entirely speculative . . . whether withdrawal of a tax exemption from any particular school would lead the school to change its [racially discriminatory] policies. It is just as speculative whether any given parent of a child attending such a private school would decide to transfer the child to public school as a result of any changes in educational or financial policy made by the private school once it was threatened with loss of tax-exempt status." (citation omitted)); *Clapper*, 568 U.S. at 413 ("[E]ven if respondents could show that the Government will seek the Foreign Intelligence Surveillance Court's authorization to acquire the communications of respondents' foreign contacts . . . respondents can only speculate as to whether that court *will* authorize such surveillance." (emphasis added)). Here, unlike in those cases, MPP's termination has already increased the rate of illegal entries into Texas. The only relevant third-party choice that remains, then, is the alien's choice to apply for a license once in Texas.

And in that regard, this case fits comfortably within the reasoning of *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019). There, the Court

No. 21-10806

concluded traceability was satisfied, even when it hinged on foreseeing "that third parties will likely react in predictable ways to the citizenship question, even if they do so unlawfully." *Id.* at 2566. That's because (a) the district court found that noncitizens' lower response rates to the census were "likely attributable at least in part to noncitizens' reluctance to answer a citizenship question," and (b) common sense showed that inference to be a reasonable prediction rather than "mere speculation." *Ibid.* In short, the Court held it's entirely permissible to rest traceability "on the predictable effect of Government action on the decisions of third parties." *Ibid.*

Here, likewise, the district court found that many newly arrived aliens will apply for licenses upon becoming eligible. *See Biden I*, 2021 WL 3603341, at *9–10; *DAPA*, 809 F.3d at 160. That is a simple causal inference based on a simple change in incentives. The district court was not speculating but instead describing "the predictable effect of Government action on the decisions of third parties." *Dep't of Com.*, 139 S. Ct. at 2566; *see also Massachusetts*, 549 U.S. at 523 (finding traceability where the EPA's challenged action may have caused people to drive less fuel-efficient cars, which may in turn contribute to a prospective rise in sea levels, which may in turn cause the erosion of Massachusetts's shoreline).

d.

An injunction would redress Texas's injury by requiring reinstatement of MPP. And with MPP back in place, immigration officers would once again have discretion to return certain aliens to Mexico. That would help to alleviate Texas's driver's license- and healthcare-based injuries. *Cf. Massachusetts*, 549 U.S. at 525 ("While it may be true that regulating motor-vehicle emissions will not by itself *reverse* global warming, it by no means follows that we lack jurisdiction to decide whether EPA has a duty to take steps to *slow* or *reduce* it.").

No. 21-10806

The Government makes two arguments that it says undercut redressability. First, it says an injunction would provide no redress because immigration officers under MPP would have discretion not to return any given immigrant to Mexico. This argument ignores the fact that DHS "returned more than 55,000 aliens to Mexico under MPP." *Biden I*, 2021 WL 3603341, at *5 (quotation omitted). True, those were exercises of discretion—discretion the June 1 Termination Decision withdrew by explicitly requiring "DHS personnel, effective immediately, to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives issued to carry out MPP." The Government offers no basis to conclude that a renewed MPP, by restoring that discretion, would do *anything but* increase the number of aliens returned to Mexico. And that would decrease the number of aliens released into Texas, thereby redressing Texas's injuries.

Second, the Government argues there is no redressability because aliens cannot be returned to Mexico without Mexico's consent. This argument fails because for at least some aliens, DHS can refuse admission at ports of entry in the first place. *See* 8 U.S.C. § 1225(b)(2)(C) (allowing the Attorney General to "return [an] alien" "who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States . . . to that territory pending a" removal proceeding). Part of MPP's function was to exercise that authority on a programmatic, widespread basis. And DHS can do *that* unilaterally.

e.

The Government argues that this theory of standing lacks a limiting principle. It says our reasoning would allow states to object whenever DHS exercises its discretion not to remove even one noncitizen. *See DAPA*, 809 F.3d at 161 (explaining that its rationale would not allow standing in such a

No. 21-10806

case). It also says our reasoning would let states challenge *any* federal policy with an effect on state populations, since such a policy might have some effect on a state's fisc.

As we explained in *DAPA*, the Supreme Court considered precisely these risks in *Massachusetts* and found them unpersuasive. *DAPA*, 809 F.3d at 161; *Massachusetts*, 549 U.S. at 546 (Roberts, C.J., dissenting) (raising similar concerns, evidently without persuading the majority). "After *Massachusetts v. EPA*, the answer to those criticisms is that there are other ways to cabin policy disagreements masquerading as legal claims." *DAPA*, 809 F.3d at 161. And our reasoning leaves precisely the same safeguards in effect as did *DAPA*. A litigant must have a cause of action to sue. *Id.* at 161 (citing *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 396 (1987)). The litigant must avoid the dual nonreviewability provisions in 5 U.S.C. § 701(a). *Id.* at 161–62. The litigant must show it has standing—a feasible task when a broad, class-based policy makes it a practical certainty that some aliens will apply for licenses (as in *DAPA* and here), but not so feasible if the litigant seeks to challenge an *individual* immigration decision. *See ibid.* And most litigants will not be entitled to special solicitude in the standing inquiry—not even states, unless a "quasi-sovereign" interest is at stake. *Id.* at 162 (quoting *Massachusetts*, 549 U.S. at 520). The Government's "parade of horribles" is, for that reason, purely speculative. *Ibid.* True, the States have managed to clear every standing and reviewability hurdle in this case. But it does not follow that those hurdles have suddenly ceased to exist.

The Government also seeks to differentiate this case from *DAPA* on grounds of magnitude—it seems to suggest there's no standing here because the damages may not total to millions of dollars. Our court noted that Texas's injuries in that case largely depended on its "need to hire employees, purchase equipment, and obtain office space"—"steps that would be unnecessary" with smaller numbers of new applicants. *DAPA*, 809 F.3d at

No. 21-10806

162. Regardless of what *DAPA* had to say on the magnitude of injury required for standing, the Supreme Court has since clarified that "[f]or standing purposes, a loss of even a small amount of money is ordinarily an injury." *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) (quotation omitted); *see also Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801–02 (2021) (nominal damages sufficient for standing's redressability prong).

III.

We've arrived at page 63 of this opinion, but we're still not ready for the merits. Two more non-jurisdictional threshold questions remain. First, do the States have a cause of action to bring this suit? Yes. Second, does the APA nonetheless shield DHS's Termination Decision from judicial review? No.

A.

The States must have a cause of action to sue. And because this is an APA case, the States' claims must fall within the zone of interests of the INA. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224–25 (2012). The Supreme Court has repeatedly explained that the zone-of-interests inquiry is "not especially demanding." *See, e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (quotation omitted). To satisfy the test, the States must show only that their asserted interest is "arguably within the zone of interests to be protected or regulated by" the statutes they claim have been violated. *Patchak*, 567 U.S. at 224–25 (quotation omitted) (going on to emphasize the word "arguably" and the lenience it confers). And though the test is rooted in legislative intent, the States need not point to "any indication of congressional purpose to benefit" them. *Id.* at 225 (quotation omitted). Instead, "[t]he test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably

No. 21-10806

be assumed that Congress intended to permit the suit." *Ibid.* (quotation omitted).

The States easily clear this low bar. As discussed above, MPP's termination poses imminent and actual harm to Texas's fisc. *See* Part II.C.2.b, *supra* pages 54–57. It's clear that the INA aimed, at least in part, to protect States from just those kinds of harms. *Cf. Demore v. Kim*, 538 U.S. 510, 517–22 (2003) (discussing the policy concerns animating Congress's 1996 amendments to the INA). And that's exactly what our court concluded in *DAPA*, where we explained Texas was within the INA's zone of interests because "Texas seeks to participate in notice and comment before the Secretary changes the immigration classification of millions of illegal aliens in a way that forces the state to the Hobson's choice of spending millions of dollars to subsidize driver's licenses or changing its statutes." 809 F.3d at 163. Under the Supreme Court's lenient test for APA cases, that is more than enough. *See Patchak*, 567 U.S. at 224–25.

The Government nonetheless argues the States lack a cause of action because their claims fall outside the zone of interest of § 1225(b)(2)(A) and (C). Note the shift—the Government focuses on the zone of interests of *two subparagraphs* in § 1225(b)(2) rather than that of the INA (or even § 1225(b)(2)) as a whole. That particular form of jiu-jitsu is at odds with both Fifth Circuit and Supreme Court precedent. *See DAPA*, 809 F.3d at 163 (analyzing the INA's zone of interests, not the zone of one particular provision); *Clarke*, 479 U.S. at 401 ("In considering whether the 'zone of interest' test provides or denies standing in these cases, we first observe that the Comptroller's argument focuses too narrowly on 12 U.S.C. § 36, and does not adequately place § 36 in the overall context of the National Bank Act.").

No. 21-10806

The Government also argues "Congress said nothing in Section 1225 about benefiting States or saving them from attenuated financial burdens." That argument likewise focuses too narrowly on § 1225, *see Clarke*, 479 U.S. at 401, and in any event it's nothing more than a rehash of the Government's failed standing arguments, rejected above. *See* Part II.C.2, *supra* pages 52–63. And the Government's cases to the contrary are entirely inapposite. *See Fed'n for Am. Immigr. Reform, Inc. v. Reno*, 93 F.3d 897, 900–01 (D.C. Cir. 1996) (holding the test unsatisfied, but decided before *Patchak* and *Lexmark* clarified the test's leniency); *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in chambers) (discussing a different immigration statute in a suit that did not involve States).

We therefore hold the APA affords the States a cause of action.

## B.

The next reviewability question is whether Congress gave with one hand and took away with the other. The Government argues that, even if the APA gives the plaintiff States a cause of action to review some agency actions, it doesn't extend to this particular one. Why? Because, in the Government's view, Congress's enactment of 5 U.S.C. § 701(a) gave DHS the power to make the Termination Decision without *any* review by *any* court, at *any* time, in *any* way. This is perhaps the Government's most ambitious claim in a case that does not want for ambitious assertions of governmental power. And if the Government were correct, it would have far-reaching implications for the separation of powers and would herald a new era of lawmaking-by-PDF-document. We hold the Government is wrong.

The APA creates a "basic presumption of judicial review": Any proper plaintiff aggrieved by final agency action may presumptively challenge that action in federal court. *Regents*, 140 S. Ct. at 1905; *see* 5 U.S.C. § 702. This presumption is "strong" and "well-settled." *DAPA*, 809 F.3d at 163

No. 21-10806

(going on to note that rebutting the presumption requires "clear and convincing evidence"). The presumption can be rebutted "by a showing that [1] the relevant statute precludes review, § 701(a)(1), or [2] that the agency action is committed to agency discretion by law, § 701(a)(2)." *Regents*, 140 S. Ct. at 1905 (quotation omitted). We address each in turn.

1.

The Government halfheartedly suggests that the INA is a statute that "preclude[s] judicial review." 5 U.S.C. § 701(a)(1). In particular, the Government points to this text in the INA:

> [A]ny other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B)(ii). This restriction, says the Government, combines with § 1225(b)(2)(C) (which provides the Secretary "may return" certain aliens to contiguous territories) to deny judicial review of the Termination Decision.

We disagree for three reasons. For starters, this reviewability argument succeeds only if the Government prevails on the statutory interpretation argument itself, discussed below. Because we conclude § 1225 does indeed restrain DHS's discretion, *see* Part IV.B, *infra* pages 98–106, this reviewability argument must fail.

Second and more fundamentally, the Government misconstrues the two relevant statutory provisions. Under § 1225(b)(2)(C), the Attorney General "may return" "*an alien*"—that is, a certain specified person—to Mexico pending her removal proceeding. *Id.* (emphasis added). So perhaps the Government's discretionary decision to return one specific person to

No. 21-10806

Mexico is affected by the discretion-insulating, jurisdiction-stripping provision in § 1252(a)(2)(B)(ii). But that's not what this case is about. The question here is whether DHS's decision to terminate an *entire program*— operating across an international border and affecting thousands or millions of people and dollars—is rendered unreviewable by § 1252(a)(2)(B)(ii). And there's nothing in that clause to suggest Congress embraced the latter proposition. To the contrary, the entirety of the text and structure of § 1252 indicates that it operates only on denials of relief for individual aliens.[11] The Government's reading of it would bury an awfully large elephant in a really small mousehole. *Cf. Am. Bar Ass'n v. FTC*, 430 F.3d 457, 469 (D.C. Cir.

_____

[11] At the risk of belaboring an obvious point, we note three features of § 1252 in support. First, § 1252 is titled "[j]udicial review of orders of removal," which indicates the section applies to individual aliens (who are subject to orders of removal) rather than programmatic decisions. Second, the provisions surrounding § 1252(a)(2)(B) apply to individual removal decisions and not broad programmatic decisions. Section 1252(a)(2)(A) repeatedly refers to an "individual determination," § 1252(a)(2)(A)(i), "individual aliens," § 1252(a)(2)(A)(iii), and to the provisions of § 1225(b)(1) that apply to inspection and asylum for individual aliens. Obviously none of that contemplates DHS decisions to create or terminate entire governmental programs outside of individualized removal proceedings. Subparagraph (C) refers to "any final order of removal against an alien," yet again describing an individual removal order and not broad programmatic decisions like the Termination Decision. Subparagraph (D) refers to a "petition for review" filed by, yet again, an individual alien. Thus all of the subparagraphs surrounding § 1252(a)(2)(B)—and hence the structure of the statute—suggest it applies to removal decisions affecting individual aliens and not broad programmatic decisions made by the Secretary of DHS. Third, there's the text of § 1252(a)(2)(B) itself. It begins by stripping jurisdiction to review "any judgment regarding the granting of relief" under five INA provisions—all of which affect only individual aliens. § 1252(a)(2)(B)(i). And it preserves judicial review over certain asylum decisions—again, affecting individual aliens. The text invoked by the Government ("any other decision . . . the authority for which is specified under this subchapter to be in the discretion of [DHS]") is nestled into this litany of individualized decisions affecting only single aliens. § 1252(a)(2)(B)(ii). The best reading of the "any other decision" language, then, is that it "appl[ies] only to persons or things of the same general kind or class specifically mentioned (*ejusdem generis*)." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 199 (2012).

No. 21-10806

2005) (Sentelle, J.) ("To find [the agency's view] deference-worthy, we would have to conclude that Congress not only had hidden a rather large elephant in a rather obscure mousehole, but had buried the ambiguity in which the pachyderm lurks beneath an incredibly deep mound of specificity, none of which bears the footprints of the beast or any indication that Congress even suspected its presence.").

Third, the Government wrongly focuses on § 1225(b)(2)(C) in isolation. When read in context, § 1225(b)(2) comes nowhere close to giving the Government unreviewable discretion to terminate MPP and release undocumented immigrants into the United States *en masse*. Section 1225(b)(2)(A) provides that, under certain circumstances, "the alien shall be detained" during her removal proceeding. That's obviously a mandatory statutory command—not a commitment to agency discretion. Then § 1225(b)(2)(C) gives the Government the discretion to return certain otherwise-detainable aliens to Mexico. Those provisions cannot be read together to give the Government unreviewable discretion to release anyone. *Cf. Hawkins v. HUD*, 16 F.4th 147, 155 (5th Cir. 2021) ("Whereas the first sentence in the regulation employs discretionary language when the two conditions are present (HUD 'may' undertake certain actions), the second sentence uses quintessential mandatory language (HUD 'shall' provide assistance) when a third condition is established in addition to the first two.").

### 2.

Next is 5 U.S.C. § 701(a)(2), which disallows judicial review of "agency action . . . committed to agency discretion by law." The Supreme Court has held that "an agency's decision not to institute enforcement proceedings [is] presumptively unreviewable under § 701(a)(2)." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (citing *Heckler*, 470 U.S. at 831). We conclude

No. 21-10806

*Heckler* does not bar judicial review in this case. The first reason is that *Heckler* does not apply to agency rules. Second, even if it did, it would not apply to *this* agency rule. And third, even if the presumption applied to rules, the clear statutory text would override it here.

Before we explain, take careful note of the APA's presumption structure. By default in APA cases, we presume reviewability. *See, e.g.*, *Regents*, 140 S. Ct. at 1905. That presumption flips if *Heckler* applies, *see, e.g.*, *Lincoln*, 508 U.S. at 191, but not before then. Thus, it's perfectly correct to presume nonreviewability once we know we're in *Heckler*'s domain. But it's perfectly incorrect to presume we're in *Heckler*'s domain at the outset. That would be question-begging of the worst sort, and it would fly in the face of Supreme Court precedent. *See, e.g.*, *Regents*, 140 S. Ct. at 1905.

a.

*Heckler* does not apply to agency rules. To understand why, we must start with the English constitutional tradition against which the Founders framed our Constitution's executive power and against which the Supreme Court decided *Heckler*. We (i) explain the background principles of English law. Then we (ii) explain our Constitution's executive power. Next we (iii) turn to *Heckler* and (iv) its progeny. Then (v) we apply these principles to this case and hold that, far from barring our review, *Heckler* powerfully supports it. And finally, (vi) we reject the Government's counterarguments.

i.

We begin with English law's struggle against royal prerogative. The word "prerogative" refers to powers that are vested in the executive and not governed by law. *See* JOHN LOCKE, TWO TREATISES OF GOVERNMENT 375 (Peter Laslett ed. 1988) ("This power to act according to discretion, for the public good, without the prescription of the law, and sometimes even against it, is that which is called prerogative."). It also

No. 21-10806

connotes powers that inhere in the king by virtue of his kingship. *See* Michael W. McConnell, *Tradition and Constitutionalism Before the Constitution*, 1998 U. Ill. L. Rev. 173, 178 (1998).

Most relevant here are the *suspending* and *dispensing* prerogatives wielded by the Stuart Kings Charles II and James II. *See* Michael W. McConnell, The President Who Would Not Be King: Executive Power Under the Constitution 115–19 (2020) (discussing the life and death of these powers). These prerogatives were closely related to one another, but they were not identical. As one historian put it, "[t]he power to suspend a law was the power to set aside the operation of a statute for a time. It did not mean, technically, the power to repeal it. The power to dispense with a law meant the power to grant permission to an individual or a corporation to disobey a statute." Lois G. Schwoerer, The Declaration of Rights, 1689, at 59–60 (1981); *see also* Carolyn A. Edie, *Tactics and Strategies: Parliament's Attack upon the Royal Dispensing Power 1597–1689*, 29 Am. J. Legal Hist. 197, 198–99 (1985) (similar explanation, including distinguishing the dispensing power from the pardoning power on the ground that the former "made the act or thing prohibited lawful to be done by him who hath" the dispensation (quotation omitted)).

As Catholic kings governing a Protestant nation, the Stuarts focused their prerogatives most fiercely on laws that excluded Catholics from certain offices and positions. *See* McConnell, *supra*, at 116 (discussing). For instance, in 1661, Parliament required certain officials to swear an "Oath of Allegiance and Supremacy" to profess faith in the Church of England and renounce Catholicism. Corporation Act of 1661, 13 Car. II, st. 2 c. 1. Charles II eventually responded by suspending all such laws. He said: "We do . . . declare our will and pleasure to be, that the execution of all, and all manner of penal laws in matters ecclesiastical, against whatsoever sort of

No. 21-10806

nonconformists, or recusants, be immediately suspended, and they are hereby suspended." King Charles II, Declaration of Indulgence (Mar. 15, 1672). Thus, Charles purported to set aside the laws entirely—literally, to suspend their operation. Parliament ended up forcing Charles II to rescind that declaration. Parliament also enacted the Test Act of 1672, 25 Car. II c. 2, and the Test Act of 1678, 30 Car. II, st. 2. These Acts (together the "Test Act") excluded Catholics from public office. *See* 2 Henry Hallam, Constitutional History of England from the Accession of Henry VII to the Death of George II 149–50 (1827).

Charles II died in 1685, and his brother James II assumed the throne that same year. "Not trusting Protestant militias and gentry to protect him from rebellion, James II tried to create an enlarged standing army under the control of Catholic officers, and to put Catholic peers in key positions in the Privy Council and the government." McConnell, *supra*, at 116. The Test Act stood in his way, so he granted dispensations from it—thereby allowing certain Catholics to hold high-ranking civil and military offices in defiance of Parliament. After various political intrigues (all interesting but none relevant here), a court sided with James II and held "that the King had a power to dispense with any of the laws of Government as he saw necessity for it." *Godden v. Hales*, 2 Show. 475, 478 (K.B. 1686). Score one for prerogative.

Flush with victory, James II decided to go further, suspending the Test Act *in toto*. He declared "that from henceforth the execution of all and all manner of penal laws in matters ecclesiastical … be immediately suspended; and the further execution of the said penal laws and every of them is hereby suspended." King James II, Declaration of Indulgence (Apr. 4, 1687). The following year, James II reissued that same Declaration, requiring Anglican clergy to read it aloud from their pulpits. Seven bishops petitioned the King to withdraw the order. So the King charged them with seditious libel

No. 21-10806

on the theory that they had falsely denied his suspension and dispensation powers.

This gave rise to the celebrated *Case of the Seven Bishops*, 12 How. St. Tr. 183 (K.B. 1688). The King's Bench split 2-2 and sent the case to a jury to break the tie.[12] The jury acquitted the bishops, and all of London exploded into celebration. Edie, 29 Am. J. Legal Hist. at 229. "The charge had been one of libel, but the verdict was against the prerogative." *Ibid.*; *see also* McConnell, *supra*, at 116 (explaining the case's impact).

After William of Orange deposed James II—in part because of James's abuse of the suspending and dispensing powers—Parliament drafted the English Bill of Rights. Its very first declaration reads: "That the pretended Power of Suspending of Laws, or the Execution of Laws, by regal Authority, without Consent of Parliament, is illegal." An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown (1689). Its second declaration reads: "That the pretended power of dispensing with laws or the execution of laws by regal authority, as it hath been assumed and

---

[12] Justice John Powell, who voted against the King, explained his reasoning:

Gentlemen, I do not remember, in any case in all our law (and I have taken some pains upon this occasion to look into it), that there is any such power in the king, and the case must turn upon that. In short, if there be no such dispensing power in the king, then that can be no libel which they presented to the king, which says, that the declaration, being founded upon such a pretended power, is illegal.

Now, gentlemen, this is a dispensation with a witness: it amounts to an abrogation and utter repeal of all the laws; for I can see no difference, nor know of none in law, between the king's power to dispense with laws ecclesiastical, and his power to dispense with any other laws whatever. If this be once allowed of, there will need no parliament; all the legislature will be in the king, which is a thing worth considering, and I leave the issue to God and your consciences.

12 How. St. Tr. at 183.

No. 21-10806

exercised of late, is illegal." Thus, the English Bill of Rights codified the celebrated verdict from the *Case of the Seven Bishops*.

This became a fundamental tenet of English law. McConnell, *supra*, at 117. As Blackstone explained, "it was formerly held, that the king might, in many cases, dispense with penal statutes." 1 William Blackstone, Commentaries on the Laws of England *186 (1753) [*hereinafter* Blackstone's Commentaries]. But by Blackstone's time, he noted, the English Bill of Rights had "declared, that the suspending or dispensing with laws by regal authority, without consent of parliament, is illegal." *Ibid.* Or as Lord Mansfield put it in 1766, "I can never conceive the prerogative to include a power of any sort to suspend or dispense with laws." 16 The Parliamentary History of England 267 (T.C. Hansard ed. 1813) (going on to explain that "the duty of [the executive] is to see the execution of the laws, which can never be done by dispensing with or suspending them").

ii.

The Framers agreed that the executive should have neither suspending nor dispensing powers. And they framed our Constitution against the backdrop of that belief. The delegates to the Constitutional Convention voted "[o]n question 'for giving this suspending power'" to the President. 1 The Records of the Federal Convention of 1787 104 (Max Farrand ed. 1911). Madison recorded that the vote was a unanimous no. *Ibid.* Further, the amended Virginia Plan originally gave a "single person" the "power to carry into execution the national laws." *Id.* at 67. That text passed through the Committee on Detail, which was chaired by John Rutledge—a major critic of royal prerogatives. *Id.* at 65. The Committee changed the text to read more or less as the Take Care Clause does now: "he shall take care that the laws of the United States be duly and faithfully executed." *Id.* at 185;

No. 21-10806

*see also* McConnell, *supra*, at 118 ("[T]he significance [of the wording change] is that the President has the duty, not just the authority, to carry the laws of the nation into execution."). Hence, George Nicholas could conclude during Virginia's ratification debate that "[t]he English Bill of Rights provides that no laws shall be suspended. The Constitution provides that no laws shall be suspended, except one, and that in time of rebellion or invasion, which is the writ of *habeas corpus*." 3 Jonathan Elliot, Debates in the Several State Conventions on the Adoption of the Federal Constitution 246 (2d ed. 1881).

And since then, both courts and the executive branch itself have recognized the president's inability to suspend or dispense with the law. Consider *United States v. Smith*, 27 F. Cas. 1192 (C.C.D.N.Y. 1806). There, the defendants claimed President Thomas Jefferson had authorized them to violate the Neutrality Act. President Jefferson's lawyers responded that such an authorization would be either suspension or dispensation—and therefore unconstitutional under the Take Care Clause. *Id.* at 1203 (explaining the president "cannot suspend [a statute's] operation, dispense with its application, or prevent its effect . . . . If he could do so, he could repeal the law, and would thus invade the province assigned to the legislature"). Supreme Court Justice William Paterson, riding circuit, agreed and concluded the Take Care Clause "explicitly" denies the president's power to dispense with laws. *Id.* at 1229.

Consider also President Andrew Jackson's attempt to convince the Supreme Court that he, and only he, got to decide whether the laws were being faithfully executed. *See Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 612–13 (1838). The Court forcefully responded that presidents have no power to suspend the law: "To contend that the obligation imposed on the President to see the laws faithfully executed, implies *a power to forbid*

No. 21-10806

*their execution*, is a novel construction of the constitution, and entirely inadmissible." *Id.* at 613 (emphasis added).

Scholars also broadly agree that the Constitution ruled out the suspending and dispensing powers. As one professor explained it:

> The duty to execute laws "faithfully" means that American presidents may not—whether by revocation, suspension, dispensation, inaction, or otherwise—refuse to honor and enforce statutes that were enacted with their consent or over their veto. Many scholars have agreed that the Take Care Clause was meant to deny the president a suspending or dispensing power.

CHRISTOPHER N. MAY, PRESIDENTIAL DEFIANCE OF "UNCONSTITUTIONAL" LAWS 16 (1998); *id.* at 160 n.58 (collecting sources); *see also* MCCONNELL, *supra*, at 118 ("[I]t would be hard to imagine language that would preclude those prerogatives more effectively" than does the language in the Take Care Clause.); David Gray Adler, *George Bush and the Abuse of History: The Constitution and Presidential Power in Foreign Affairs*, 12 UCLA J. INT'L L. & FOREIGN AFFS. 75, 99–100 (2007); Saikrishna Bangalore Prakash, *The Great Suspender's Unconstitutional Suspension of the Great Writ*, 3 ALB. GOV'T L. REV. 575 (2010) (arguing Lincoln's suspension of habeas corpus was unconstitutional).

iii.

*Heckler* is best understood as a recognition of these principles. There, death-row inmates had asked the Food and Drug Administration (the "FDA") to "take various enforcement actions" against states and drug companies regarding lethal-injection drugs. 470 U.S. at 823. The FDA refused, and the inmates sued under the APA. *Ibid.* The Court held the FDA's decision unreviewable under § 701(a)(2). It explained that "an

No. 21-10806

agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Id.* at 831–32 ("[A]n agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)."). In other words, a litigant may not waltz into court, point his finger, and demand an agency investigate (or sue, or otherwise enforce against) "that person over there." Thus, *Heckler* recognized and carried forward the executive's longstanding, common-law-based discretion to do nothing in a particular case. *See id.* at 831 (citing *Confiscation Cases*, 74 U.S. (7 Wall.) 454 (1869)).

But the Court also carried forward the executive's duty to faithfully execute the laws. Thus, the Court recognized that Congress *can* rebut the common-law presumption that nonenforcement discretion is unreviewable. Specifically, "the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 832–33. In other words, the executive *cannot* look at a statute, recognize that the statute is telling it to enforce the law in a particular way or against a particular entity, and tell Congress to pound sand. So *Heckler* expressly embraces the common law's condemnation of the dispensing power. *Compare ibid.* (explaining Congress's ability to rebut the nonreviewability presumption), *with Smith*, 27 F. Cas. at 1203 (explaining that the Constitution does not let the president "suspend [a statute's] operation, dispense with its application, or prevent its effect"). Moreover, the Court emphasized that nothing in the *Heckler* opinion should be construed to let an agency "consciously and expressly adopt[] a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." *Heckler*, 470 U.S. at 833 n.4 (quotation omitted). This, of course, is a condemnation of the suspending power. *Compare ibid.*, *with Kendall*, 37 U.S. at 613 ("To contend that the obligation imposed on the

No. 21-10806

President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible.").

*Heckler*'s two "exceptions," then, were not random.[13] They were instead recognitions of the hoary principle that the executive branch may neither suspend nor dispense with the laws. By recognizing those principles, the Court harmonized the common law's rule *in favor of* enforcement discretion with the common law's (and the Constitution's) rule *against* suspensions and dispensations.

None of that would make any sense if *Heckler* nonenforcement discretion applied to rules. Start with the definition of "rule." Under the APA, that word simply means "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). Courts typically emphasize "general . . . applicability" at the expense of "particular applicability." *E.g.*, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 892 (1990) (concluding, in the § 551 context, that "the individual actions . . . identified in the six affidavits can be regarded as rules *of general applicability*" (emphasis added)). Contrast that with an "order." *See* § 551(6) (defining "order" as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing").

---

[13] This does not include the unrelated exception for the case where an agency refuses to enforce "based solely on the belief that it lacks jurisdiction." *Heckler*, 470 U.S. at 833 n.4.

No. 21-10806

The Government's contention that *Heckler* should apply to rules is reminiscent of the Stuarts. The heart of Charles II's 1672 suspension was that "the execution of all, and all manner of penal laws in matters ecclesiastical . . . be immediately suspended." Charles II, Declaration of Indulgence (Mar. 15, 1672). And James II's suspension similarly proclaimed "that from henceforth the execution of all and all manner of penal laws in matters ecclesiastical . . . be immediately suspended." King James II, Declaration of Indulgence (Apr. 4, 1687). Thus, suspending a law is nothing more than (a) announcing a refusal to enforce that law (as per *Heckler*) and (b) applying that refusal on a generalized, prospective basis (*à la* "rule" under § 551(4)). To apply *Heckler* to rules, then, would be to contort the Supreme Court's precedent into a rejection of the English Bill of Rights of 1689. That simply can't be right.

Once we recognize that *Heckler* nonreviewability applies only to *orders* and not *rules*, the problem disappears entirely. The Stuart suspensions are ineligible for the nonreviewability presumption precisely because those suspensions would be, in today's parlance, "rules of general applicability" under the APA. *See Lujan*, 497 U.S. at 892. The common law left the executive free to leave the law unenforced in *particular* instances and at *particular moments* in time. *See, e.g.*, *Confiscation Cases*, 74 U.S. at 457–59, 462 (recognizing the executive's nonreviewable discretion to simultaneously dismiss several civil forfeiture proceedings it had instituted). But the English Bill of Rights, followed by the Constitution, explicitly forbade the executive from nullifying whole statutes by refusing to enforce them on a *generalized* and *prospective* basis.

iv.

That is why the Supreme Court and the Fifth Circuit have consistently read *Heckler* as sheltering one-off nonenforcement decisions

No. 21-10806

rather than decisions to suspend entire statutes. *Heckler*'s progeny never has allowed the executive to affirmatively enact prospective, class-wide rules without judicial review.

*Heckler* itself, as discussed above, contains no hint of an intent to allow such suspension. Likewise with *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983). The *State Farm* Court held that an agency rule is reviewable—even when the rule does nothing but remove preexisting legal constraints. *Id.* at 39–41. The National Highway Traffic Safety Administration had previously required (by rule) passive safety restraints in cars. *Id.* at 37. Then it issued a new rule that rescinded that requirement. *Id.* at 38. The Court had no trouble reviewing the new rule. *Id.* at 40–41.[14]

*Massachusetts* confirms that *Heckler* doesn't apply to rulemaking. The Court there asked whether the *denial* of a petition for rulemaking—the mere decision not to make a rule—was reviewable. 549 U.S. at 527. The answer was a qualified yes: Such decisions are subject to limited review. *Id.* at 527–28 (going on to explain the relevant differences between nonenforcement decisions and refusals to initiate rulemaking). But if the decision *not* to make a rule is subject to limited review under *Massachusetts*, how could the decision *to* make a rule be entirely exempt from review under *Heckler*?

_____

[14] It's true that the Supreme Court decided *State Farm* before *Heckler*. But the *State Farm* Court acknowledged—and held inapplicable—the longstanding doctrine that "an agency's refusal to take action in the first instance" is nonreviewable. 463 U.S. at 39–41. Indeed, the Court acknowledged that "rescission is not unrelated to an agency's refusal to take action in the first instance," but went on to find the rescission reviewable precisely because the organic statute in question applied the APA's ordinary reviewability rules to the issue at hand. *Ibid.* Thus, applying *Heckler* to rules would seem to entail that *Heckler* overturned *State Farm sub silentio. But see Heckler*, 470 U.S. at 839 (Brennan, J., concurring) (explaining that *Heckler* did not overturn *State Farm sub silentio*).

79

No. 21-10806

And *United States v. Armstrong*, <u>517 U.S. 456</u> (1996), further underscores the point. There the Court considered a claim of race-based selective prosecution. *Id.* at 458. Before conducting its due process analysis, the Court noted that "[i]n the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.'" *Id.* at 464 (quoting *Bordenkircher v. Hayes*, <u>434 U.S. 357, 364</u> (1978)). That canonical formulation has everything to do with the decision whether to enforce a law against a given individual. It has nothing to do with flouting a statutory command as to an entire class of people, as DHS has done here. *See* Part IV.B, *infra* pages 98–106 (explaining the statutory command). And it has less-than-nothing to do with engaging in APA rulemaking.

Our cases likewise apply *Heckler*, if at all, to one-off agency enforcement decisions rather than to agency rulemakings. *See, e.g.*, *Chao v. Occupational Safety & Health Rev. Comm'n*, <u>480 F.3d 320, 324</u> n.3 (5th Cir. 2007) (*Heckler* protected the Secretary of Labor's "prosecutorial discretion to cite only a single willful violation where the facts alleged would support numerous willful violations."); *Ellison v. Connor*, <u>153 F.3d 247</u> (5th Cir. 1998) (applying *Heckler* to an agency's decision not to issue an individual permit, where the governing statute provided no standard by which to judge such a decision); *Pub. Citizen, Inc. v. EPA*, <u>343 F.3d 449, 455</u> (5th Cir. 2003) (applying *Heckler* to the EPA's "decision not to issue [notices of deficiency] related to four aspects of" a Texas state program).

Apparently, the lone exception in this centuries-old line of cases was the now-vacated *Texas v. United States (Interim Enforcement)*, <u>14 F.4th 332</u> (5th Cir. 2021), *vacated by* ___ F.4th ___, <u>2021 WL 5578015</u> (5th Cir. Nov. 30, 2021) (en banc) (mem.). There, a combination of memos from DHS and its subagency Immigration and Customs Enforcement ("ICE") had established

new "interim enforcement priorities." *Id.* at 334. Those memos effectively created a class-based priority scheme governing agency decisions to arrest, detain, and remove aliens. *See id.* at 334–35. After the district court enjoined those memos' operation, a panel of our court granted the Government a partial stay pending appeal. *Ibid.* The panel, among other holdings, characterized the relevant part of the memos as mere nonenforcement and therefore held that part nonreviewable under *Heckler*. *See id.* at 336–40. It did so even though the memos in question were undisputedly rules. *See Texas v. United States*, 2021 WL 3683913, at *51 (S.D. Tex. Aug. 19, 2021) ("[N]o Party disputes that the Memoranda are rules of some kind and, therefore, that the rulemaking provisions of the APA apply."). And it did so without any discussion of that fact or any recognition of its significance.

Because our en banc court vacated *Interim Enforcement*, we are left with no cases either in the Supreme Court or in our circuit applying *Heckler* to agency rules. Like Justice John Powell, *see supra* note 12, we conclude: "[We] do not remember, in any case in all our law (and [we] have taken some pains upon this occasion to look into it), that there is any such power in the [agency], and the case must turn upon that." *Seven Bishops*, 12 How. St. Tr. at 183. For all those reasons, we hold that *Heckler* cannot apply to agency actions that qualify as rules under 5 U.S.C. § 551(4).

v.

Now, we apply that principle to this case. The June 1 Termination Decision is a rule under 5 U.S.C. § 551(4). To see why, start with MPP itself. That was obviously a rule; it applied to DHS operations nationwide and on a prospective basis. *See Biden I*, 2021 WL 3603341, at *5 (describing DHS's nationwide rollout of the program and noting it aimed "to ensure that certain aliens attempting to enter the U.S. illegally or without documentation, including those who claim asylum, *will* no longer be released into the

No. 21-10806

country" (quotation omitted) (emphasis added)). So MPP was "an agency statement of general . . . applicability and future effect." § 551(4). And by directing agents to return certain aliens to Mexico, it either "prescribe[d] law or policy" or at the very least "describe[d] the organization, procedure, or practice requirements" of the agency. *Ibid.*; *see also Biden I*, 2021 WL 3603341, at \*5 (describing how MPP worked); *cf. DAPA*, 809 F.3d at 170–77 (holding DAPA required notice and comment on the ground it was a *substantive* rule, which entails *a fortiori* it was a rule).

DHS's June 1 decision to terminate MPP was, therefore, also a rule. As just explained, MPP was "an agency statement of general . . . applicability and future effect" that either "prescribe[d] law or policy" or "describe[d] [agency] organization, procedure, or practice requirements. § 551(4). And that means terminating the policy necessarily was too. Because it entirely negated MPP's future effect, the Termination Decision was just as general and just as prospective as MPP itself. *See Regents*, 140 S. Ct. at 1933–34 (Kavanaugh, J., dissenting) (using similar reasoning to conclude rescinding DACA was a rule); *id.* at 1909 n.3 (majority opinion) (responding to Justice Kavanaugh's broader point without contesting the rescission's status as a rule). Because the Termination Decision was a rule, *Heckler* does nothing to affect our power to review it.[15]

---

[15] We hasten to underscore the limits of this holding. The parties have not asked us to decide whether this rule requires notice and comment, and we express no view on that issue. Indeed, not all rules *do* require notice and comment. That is why the *DAPA* court, for example, had to dedicate multiple pages to the question whether DAPA (which was undisputedly a rule) was a *substantive* rule that required notice and comment. 809 F.3d at 170–77.

No. 21-10806

vi.

The Government offers two responses, but they are unpersuasive. First, it says *Lincoln* held *Heckler* can apply to rulemakings. But that's wrong. The *Lincoln* Court applied *Heckler* nonreviewability to an agency's "allocation of funds from a lump-sum [congressional] appropriation." *Lincoln*, <u>508 U.S. at 192</u>. For one thing, the discretionary allocation of funds is not the same as refusing to follow a statute. The Court also explicitly refused to hold that the allocation in question was a rule. *Id.* at 196–97. And the Government's (over)reading of *Lincoln* would set it at odds with the more recent *Massachusetts*—a case whose holding, we reiterate, would make no sense if *Heckler* applied to rules.

The Government next invokes *Heckler* as sound public policy. The idea seems to be that because the policy concerns underlying *Heckler* are in play here, nonreviewability must apply—even though the agency action in question is a rule rather than an order. But this argument is inconsistent with the very opinion it cites.

The *Heckler* Court did indeed list some of the "many" reasons for its rule. <u>470 U.S. at 831</u>–32. First, "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Id.* at 831. Second, "when an agency refuses to act it generally does not exercise its coercive power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect." *Id.* at 832 (emphasis omitted). And third, "an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Ibid.*

But immediately after its policy discussion, the Court said this:

No. 21-10806

> We of course *only* list the above concerns to facilitate understanding of our conclusion that an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2). For good reasons, such a decision has traditionally been 'committed to agency discretion,' and we believe that the Congress enacting the APA did not intend to alter that tradition.

*Ibid.* (emphasis added); *see also Armstrong*, 517 U.S. at 458–64 (laying out the rule in similar terms, without any suggestion that policy concerns justify its expansion). So the rule, which comes from the common law, is simply that one-off decisions not to act get a presumption of nonreviewability. The policy rationales behind that rule are just that: policy rationales.

And that is how our court has treated them. We consistently lay out and apply the *Heckler* rule in pure nonenforcement terms—and we discuss the underlying policy separately, if at all. *See, e.g.*, *Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty. Tex.*, 6 F.4th 633, 644–45 (5th Cir. 2021) (laying out the rule and only then discussing its justifications); *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 233–34 (5th Cir. 2015) (similar); *Pub. Citizen*, 343 F.3d at 464–65 (similar). *But see Texas Interim*, 14 F.4th at 336–40.

Nor does our holding create a slippery slope. One might worry that, if *Heckler* can't apply to rules, every agency document (for example, a nonbinding priority memo) would be *ipso facto* reviewable. But that's mistaken: Most agency memos are not final agency action under 5 U.S.C. § 704. And they are nonreviewable for that reason (or for others)—not because of *Heckler*. The Termination Decision, in contrast, is *both* ineligible for *Heckler and* qualifies as final agency action under § 704. *See* Part II.A.1, *supra* pages 14–17; *accord EEOC*, 933 F.3d at 441–44 (concluding a supposed "Guidance" document was in fact final agency action because it bound

No. 21-10806

EEOC staff). And it's reviewable only because both are true—and because no other reviewability hurdle stands in the way in this case.

b.

In the previous section, we discussed English law, American law, *Heckler*, and *Heckler*'s progeny to show that *Heckler*'s unreviewability holding does not apply to agency rules. But even if every word of that preceding section were wrong—that is, even if *Heckler*'s unreviewability holding *could* apply to agency rules—it still would not apply here. That's for two reasons.

The first reason is simple. As the district court pointed out:

> [T]he MPP program is not about enforcement proceedings *at all*. Any alien eligible for MPP has already been placed into enforcement proceedings under Section 1229a. The only question MPP answers is *where* the alien will *be* while the federal government pursues removal — in the United States or in Mexico.

*Biden I*, 2021 WL 3603341, at *16. That is precisely correct. *See Heckler*, 470 U.S. at 832 (describing "our conclusion that an agency's decision *not to take enforcement action* should be presumed immune from judicial review under § 701(a)(2)" (emphasis added)). Up until this point, we have assumed for the sake of argument that deciding to terminate MPP is nothing more than deciding to leave the INA entirely unenforced against a class of individuals. But that isn't true. Terminating MPP does not leave the INA *un*enforced; it just leaves the INA *mis*enforced—that is, enforced in a way that's inconsistent with the statute itself. The decision is whether to detain aliens while § 1229a proceedings are pending, return aliens to Mexico while § 1229a proceedings are pending, or do something else (like parole) while § 1229a proceedings are pending. No matter which way *that* decision goes, the § 1229a proceeding goes on. The Government is still engaged in

enforcement—even if it chooses to do so in a way that ignores the statute. That's obviously not nonenforcement.

Second and independent, we explained in *DAPA* that an agency action "need not directly confer public benefits" to be "more than nonenforcement." 809 F.3d at 166-67. Instead, "removing a categorical bar on receipt of [governmental] benefits and thereby making a class of persons newly eligible for them 'provides a focus for judicial review.'" *Ibid.* (quoting *Heckler*, 470 U.S. at 832). That's so even if the agency retains the ability to undo its decision in any particular case in the future. *Ibid.* (explaining "[r]evocability . . . is not the touchstone for whether agency action is reviewable").

As discussed above, the district court found that MPP's termination will result in the parole of many aliens (under 8 U.S.C. § 1182(d)(5)) whom DHS otherwise would have returned to Mexico. The Government's brief, of course, confirms that the plan is indeed to give widespread parole to the class of aliens whom it can't or won't detain. And under Texas law, § 1182(d)(5) parole satisfies the state's "lawful presence" requirement—which is a prerequisite to obtaining a Texas driver's license. *See* Part II.C.2.b, *supra* pages 54–57. To be sure, status as a § 1182(d)(5) parolee is not *sufficient* for obtaining a license in Texas. But it is one way of satisfying the *necessary* condition of lawful status. Thus, MPP's termination functions to "remov[e] a categorical bar on receipt of [public] benefits and thereby mak[e] a class of persons newly eligible for them." *DAPA*, 809 F.3d at 167. The removal of that bar "provides a focus for judicial review." *Heckler*, 470 U.S. at 832; *accord DAPA*, 809 F.3d at 167.

Indeed, the executive branch has historically used parole *precisely* as a means of removing bars that would otherwise stand between an alien and governmental benefits. As one treatise explains:

No. 21-10806

> Parole under [§ 1182(d)(5)(A)] has many different uses. The government has granted parole as an alternative to admission, for example for noncitizens who do not qualify for an admission category but have an urgent need for medical care in the United States; or who qualify for a visa but are waiting for it to become available.

ALEINIKOFF ET AL., *supra*, at 299 (also explaining that "[e]*ven after* a noncitizen's parole ends, the fact that she has been paroled may help make her eligible for adjustment of status to lawful permanent resident" (emphasis added)). So it's easy to see how the termination of MPP—and the Government's substitution of parole—"remov[es] a categorical bar on receipt of [public] benefits." *DAPA*, 809 F.3d at 167.

The Government responds that DHS didn't specifically tell immigration officers how to use the parole power. It adds that not all parolees are eligible for employment authorization. But neither point is responsive. That's because MPP's termination (*i.e.*, DHS's refusal to return above-capacity aliens to Mexico), coupled with DHS's limited detention capacity and its limited options for handling above-capacity aliens, *necessarily entails* that DHS will parole those aliens. What else could it do? So the Government offers no reason to doubt the Termination Decision, by offering class-wide parole to above-capacity aliens, removes a categorical bar on those aliens' ability to obtain Texas driver's licenses.

c.

Even if *Heckler* could apply in theory, the statute's text would rebut it in actuality. As the *Heckler* Court explained, "the presumption [that nonenforcement decisions are unreviewable] may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." 470 U.S. at 832–33. That is precisely what Congress did when it phrased § 1225(b)(2)(A) in mandatory terms. We

No. 21-10806

discuss the statutory interpretation point below. *See* Part IV.B, *infra* pages 98–106. That discussion will explain exactly the statutory guidelines that would suffice to overcome *Heckler* even if it could in theory apply to something like the Termination Decision. *Cf. Hawkins*, 16 F.4th at 156 (holding over a dissent that regulatory text, which featured a mandatory/permissive distinction less clear than the distinction at issue here, provided the relevant guidelines and thereby overrode *Heckler*).

IV.

At long last, we've reached the merits. We confront two issues. First, was the Termination Decision arbitrary and capricious under the APA? Yes. Second, was the Termination Decision contrary to the text of 8 U.S.C. § 1225? Again, yes.

A.

The APA directs courts to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). While applying this "deferential" standard, we must not "substitute" our "own policy judgment for that of the agency." *Ibid.* But we must ensure that "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Ibid.* "Put simply, we must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quotation omitted). This review "is not toothless." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). "In fact, after *Regents*, it has serious bite." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th

No. 21-10806

1130, 1136 (5th Cir. 2021). And in all events, we can consider only the reasoning "articulated by the agency itself"; we cannot consider *post hoc* rationalizations. *State Farm*, 463 U.S. at 50; *see also Regents*, 140 S. Ct. at 1909 ("An agency must defend its actions based on the reasons it gave when it acted.").

DHS failed to consider several "relevant factors" and "important aspect[s] of the problem" when it made the Termination Decision. *Michigan v. EPA*, 576 U.S. 743, 750, 752 (2015) (quotations omitted). These include (1) the States' legitimate reliance interests, (2) MPP's benefits, (3) potential alternatives to MPP, and (4) the legal implications of terminating MPP. We address each in turn. Then we (5) address an overarching counterargument from the Government.

1.

DHS "failed to address whether there was legitimate reliance on" MPP. *Regents*, 140 S. Ct. at 1913 (quotation omitted). That alone is fatal. *See ibid.* ("It would be arbitrary and capricious to ignore such matters." (quotation omitted)).

The seven-page memo that accompanied the June 1 Termination Decision didn't directly mention any reliance interests, and certainly not those of the States. The closest it got was a reference to "the impact [terminating MPP] could have on border management and border communities." But it then made clear that "border communities" include *only* "nongovernmental organizations and local officials"—with no mention whatsoever of border states. And the vague reference to "border management" is insufficient to show specific, meaningful consideration of the States' reliance interests. Given the Supreme Court's explanation that border states "bear[] many of the consequences of unlawful immigration," *Arizona v. United States*, 567 U.S. 387, 397 (2012), one would expect a

No. 21-10806

"reasonable and reasonably explained" memo to mention the issue at least once, *Prometheus*, 141 S. Ct. at 1158.

The Agreement between DHS and Texas underscores the reliance interests at play—and DHS's awareness of them. The Agreement stipulated, *inter alia*:

- "Texas, like other States, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement."

- "The harm to Texas is particularly acute where its budget has been set months or years in advance and it has no time to adjust its budget to respond to DHS policy changes."

- "[A]n aggrieved party will be irreparably damaged."

And the Agreement went on to describe itself as "a binding and enforceable commitment between DHS and Texas." Thus, the Agreement *both* demonstrates DHS's prior knowledge of the States' reliance interests *and* affirmatively created reliance interests all its own. DHS's failure to consider those interests when it terminated MPP was arbitrary and capricious. *See Regents*, 140 S. Ct. at 1913.

Astonishingly, the Government responds that DHS had *no* obligation to consider the States' reliance interests at all. Yet again, that "contention is squarely foreclosed by *Regents*." *Biden II*, 10 F.4th at 553. There, the Supreme Court acknowledged that DACA was a discretionary program. *Regents*, 140 S. Ct. at 1910. Still, the Court faulted DHS for not considering reliance interests. As the Court explained, "[w]hen an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* at 1913

90

No. 21-10806

(quotation omitted). That included the States' reliance interests. *See id.* at 1914 (highlighting assertions that "States and local governments could lose $1.25 billion in tax revenue each year"). So if DHS must consider states' reliance interests before terminating DACA—a discretionary immigration program—then it must do so before terminating MPP.

The Government interprets *Regents* differently. On its view, *Regents* "said that legitimate reliance interests were 'one factor to consider' . . . it did not categorically hold that costs to States must be considered in undertaking any and all agency actions." (quoting 140 S. Ct. at 1914). But that's not what *Regents* said. The Court was clear that agencies must consider reliance interests, and that failure to do so is arbitrary and capricious. *See* 140 S. Ct. at 1913 (explaining that "[i]t would be arbitrary and capricious to ignore" reliance interests and that "consideration [of any reliance interests] must be undertaken by the agency in the first instance" (quotation omitted)). And *Regents* contains not one hint that States' reliance interests somehow fall outside the general rule.

The Government next responds that the States lack "any cognizable reliance interests in MPP." And it faults the States for failing to provide a better accounting of the specific actions they took in reliance on MPP. There are three problems with that.

First, the Government's argument reads as if taken straight from the *Regents* dissent. The majority explicitly rejected the dissent's argument that "DACA recipients have no legally cognizable reliance interests." 140 S. Ct. at 1913 (quotation omitted). Instead, explained the majority, agencies "must" assess the strength of reliance interests (even *weak* interests, it seems) "in the first instance." *See ibid.* That's at least as true here as it was there.

No. 21-10806

Second, the Government premises its cognizability argument on its related contention that the Termination Decision does nothing to injure the States. But of course, we've already held the opposite in the standing discussion above. *See* Part II.C.2, *supra* pages 52–63.

And third, this reasoning depends entirely on ignoring the Agreement—in which DHS explicitly acknowledged, in a manner akin to a liquidated-damages clause, that Texas would be "irreparably damaged" by DHS policy changes that relaxed strictures on illegal border crossings. Obviously, nothing like the Agreement existed in the *Regents* case; in fact, the DACA program expressly told its beneficiaries that their deferred-action status could be revoked for any reason or no reason, at any time, without any notice. *See* 140 S. Ct. at 1930–31 (Thomas, J., concurring in the judgment in part and dissenting in part). If that nonetheless created cognizable reliance interests, the Agreement *a fortiori* does the same.

2.

DHS failed to reasonably consider its own factual findings regarding the benefits of MPP. When a "new policy rests upon factual findings that contradict those which underlay [an agency's] prior policy," the agency must provide "a more detailed justification" than usual to avoid arbitrariness and capriciousness. *Fox*, 556 U.S. at 515. Yet DHS didn't address its own prior factual findings at all when it terminated MPP.

As the district court explained, DHS's October 2019 Assessment of MPP found that "aliens without meritorious claims—which no longer constitute[d] a free ticket into the United States—[were] beginning to voluntarily return home." *Biden I*, 2021 WL 3603341, at *5 (quotation omitted). DHS also found that MPP addressed the "perverse incentives" created by allowing "those with non-meritorious claims [to] remain in the country for lengthy periods of time." *Id.* at *6. (quotation omitted). These

No. 21-10806

benefits, DHS emphasized, were a "cornerstone" of the agency's immigration policy. *Id.* at \*5–6 (quotation omitted).

The Termination Decision "rest[ed] upon factual findings that contradict those which underlay" MPP. *Fox*, 556 U.S. at 515. "As an initial matter," the June 1 Memorandum explained DHS's determinations "that MPP had mixed effectiveness in achieving several of its central goals" and that "MPP does not adequately or sustainably enhance border management" in a cost-effective manner. In other words, DHS began its Termination-Decision analysis by disclaiming its earlier conclusion that MPP had been a resounding success.

Given that setup, one might expect DHS to address its prior factual findings—explaining why they were mistaken, misguided, or the like. And indeed, a "more detailed justification" of that sort is not just a good idea; it's legally required for a decision predicated on contradicting prior agency findings. *See ibid.* DHS nonetheless failed to discuss *any* of its prior factual findings—much less explain why they were wrong. That failure provides another basis for our conclusion that the Termination Decision was arbitrary and capricious. *Ibid.*

The Government, of course, does not contest that DHS made those findings in 2019. It instead spills much ink explaining that it predicated the Termination Decision partly on *other* issues with MPP. That misses the point. The Termination Decision explicitly rested upon 2021 factual findings that contradicted DHS's own 2019 findings. That triggers the arbitrary-and-capricious rule set forth in *Fox*. *See* 556 U.S. at 515. Yet DHS failed to give a "detailed" (or *any*) discussion of the prior findings. *Ibid.* That's that.

Further, some of DHS's discussion of MPP's supposed shortcomings was itself irrational. For example, the June 1 Memorandum partly relied on the notion that MPP resulted in too many *in absentia* removal proceedings:

No. 21-10806

> The focus on speed was not always matched with sufficient efforts to ensure that conditions in Mexico enabled migrants to attend their immigration proceedings. In particular, the high percentage of cases completed through the entry of *in absentia* removal orders (approximately 44 percent, based on DHS data) raises questions for me about the design and operation of the program, whether the process provided enrollees an adequate opportunity to appear for proceedings to present their claims for relief, and whether conditions faced by some MPP enrollees in Mexico, including the lack of stable access to housing, income, and safety, resulted in the abandonment of potentially meritorious protection claims.

But the district court found, and the Government does not now contest, that *in absentia* removal rates were similar prior to MPP. *Biden I*, 2021 WL 3603341, at *20–21. It makes no sense to reject MPP because of its high *in absentia* rate without even mentioning that its predecessor had a similar rate. We therefore cannot conclude DHS "examine[d] the relevant data and articulate[d] a satisfactory explanation" with "a rational connection between the facts found and the choice" to terminate MPP. *State Farm*, 463 U.S. at 43 (quotation omitted).

The Government says this conclusion would require DHS to provide "empirical or statistical studies." *See Prometheus*, 141 S. Ct. at 1160 (explaining studies are not required to avoid arbitrariness). That's incorrect. We do not fault DHS for failing to provide a study. We fault DHS for cherry-picking a *single* statistic from the administrative record and relying on it in an entirely nonsensical fashion. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (holding "an unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice" (quotation omitted)); *State Farm*, 463 U.S. at 43 ("[T]he agency must examine the relevant data.").

No. 21-10806

3.

DHS also insufficiently addressed alternatives to terminating MPP. The rule is that, "when an agency rescinds a prior policy[,] its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *Regents*, 140 S. Ct. at 1913 (quotation omitted). In *Regents*, for example, the DACA program had two main components—deferred action ("forbearance") and governmental benefits. *Ibid.* Yet when DHS rescinded DACA, it considered only the yes-no choice whether to retain or terminate the entire program: Its "memorandum contain[ed] no discussion of forbearance *or the option of retaining forbearance without benefits.*" *Ibid.* (emphasis added). And "[t]hat omission alone render[ed] [DHS's] decision arbitrary and capricious." *Ibid.* In short, agency action is arbitrary and capricious when it considers *only* the binary choice whether to retain or terminate a program, without also "considering less disruptive alternatives." *Wages & White Lion*, 16 F.4th at 1139.

That is just the situation here. As the Government points out, DHS considered the possibility of retaining MPP as a whole. It also considered the opportunity cost of doing so. But that is not enough under *Regents*: DHS was required to consider, not just the binary decision whether to keep or reject MPP, but also "the alternatives that [were] within the ambit of" MPP. 140 S. Ct. at 1913 (quotation omitted). In *Regents*, that required considering possible *changes* to DACA (such as keeping forbearance while eliminating government benefits). And here, it requires considering possible *changes* to MPP. DHS failed to consider any alternative within the ambit of the policy. "That omission alone renders [DHS's] decision arbitrary and capricious." *Regents*, 140 S. Ct. at 1913.

No. 21-10806

4.

DHS also failed to consider the legal implications of terminating MPP. As the district court explained, the States' complaint, filed on April 13, put DHS on notice of these issues (including the § 1225 issue) one and a half months before the Termination Decision. *Biden I*, 2021 WL 3603341, at *24. One would think the "natural response" to this "newly identified problem" would be to consider the problem—perhaps explaining why DHS thought terminating MPP comported with § 1225. *See Regents*, 140 S. Ct. at 1916. But DHS did not do so. That's one more reason for our conclusion that DHS's action was not the product of "reasoned decisionmaking." *Michigan*, 576 U.S. at 750 (quotation omitted).

The Government's only response on this score is to assert that terminating MPP did not violate § 1225. "But it is a fundamental precept of administrative law that an administrative agency cannot make its decision first and explain it later." *Wages & White Lion*, 16 F.4th at 1140 (quotation omitted). DHS cannot omit any discussion of § 1225 in the Termination Decision and then "cure those deficiencies by offering *post hoc* rationalizations before our court. The very fact that [DHS] perceived the need to rehabilitate its [Termination Decision] with new and different arguments before our court underscores that the [Memorandum] itself omitted a reasoned justification for the agency's action." *Ibid*. (And in any event, as we explain in Part IV.B, *infra* pages 98–106, the Termination Decision did violate § 1225.)

5.

As an overarching matter, the June 1 Memorandum sometimes baldly asserted that DHS considered this or that factor—in lieu of showing its work and actually considering the factor on paper. For example, the June 1 Memorandum said DHS had "carefully evaluated [MPP's] implementation

No. 21-10806

guidance and programmatic elements; prior DHS assessments of the program"; and other considerations. The Government's brief several times treats this and similar statements as materially equivalent to *actual evaluation* of the factors in question.

The law says otherwise. "Stating that a factor was considered . . . is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986); *see also Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1226 (5th Cir. 1991) ("The EPA's failure to consider the regulatory alternatives, however, cannot be substantiated by conclusory statements.").

This well-established principle makes sense. As another circuit has put it:

> [A]n agency's "experience and expertise" presumably enable the agency to provide the required explanation, but they do not substitute for the explanation, any more than an expert witness's credentials substitute for the substantive requirements applicable to the expert's testimony under [Federal Rule of Evidence] 702. The requirement of explanation presumes the expertise and experience of the agency and still demands an adequate explanation in the particular matter.

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016) (citations omitted). As we've already explained, the Government's arguments fail even without taking this principle into account. But to the extent they rely on substituting DHS's *assertions about explanations* with *explanations* themselves, we reject those arguments with redoubled vigor.

No. 21-10806

## B.

The Termination Decision also violated the INA. We begin by explaining the four statutory provisions that are most relevant here. Then we hold that DHS violated them.

### 1.

Four provisions are relevant here. We provide them here for reference, in order of descending importance. First, 8 U.S.C. § 1225(b)(2)(A) provides:

> Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

Section 1225(b)(2)(C) provides:

> In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

Section 1182(d)(5) provides:

> (A) The Attorney General may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same

No. 21-10806

manner as that of any other applicant for admission to the United States.

(B) The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 1157 of this title.

And finally, § 1226(a) provides in relevant part:

On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—

    (1) may continue to detain the arrested alien; and

    (2) may release the alien on—

        (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

        (B) conditional parole . . . .

Here's how those provisions fit together. First and most important is § 1225(b)(2)(A), which applies to "the case of an alien who is an applicant for admission." MPP concerns only that same group of aliens. *See Biden I*, 2021 WL 3603341, at *5 (explaining MPP concerns "aliens attempting to enter" the United States (quotation omitted)); *compare ibid.*, *with* 8 C.F.R. § 1.2 (defining "[a]rriving alien" as "*an applicant for admission* coming or attempting to come into the United States" (emphasis added)). As DHS itself put it in the administrative record, MPP applies "to non-Mexican nationals who may be arriving on land . . . seeking to enter the United States from Mexico illegally or without documentation."

No. 21-10806

And § 1225(b)(2)(A) uses mandatory language ("the alien shall be detained") to require DHS to detain aliens pending removal proceedings. *See also* 8 U.S.C. § 1229a (describing "proceedings for deciding the inadmissibility or deportability of an alien"). The Supreme Court has given this provision the same gloss. *See Jennings*, 138 S. Ct. at 837 ("Read most naturally, §§ 1225(b)(1) and (b)(2) . . . mandate detention of applicants for admission until certain proceedings have concluded.").

Section 1225(b)(2)(C) then explains a permissible alternative to otherwise-mandatory detention. As for most aliens who fit within (A)'s scope, (C) provides that DHS "may" return them to a contiguous foreign territory instead of detaining them. This allowance is, of course, discretionary. But it does not undo the obvious fact that (A) is otherwise mandatory. So (A) sets a default (mandatory detention), and (C) explicitly sets out an allowed alternative (contiguous-territory return pending removal proceedings).[16]

Section 1182(d)(5), meanwhile, provides another alternative. Rather than detaining or returning any given alien, DHS may instead "parole" that alien. § 1182(d)(5)(A). Unlike § 1225(b)(2)(C), § 1182(d)(5) doesn't *explicitly* apply to aliens covered by § 1225(b)(2)(A). But it does so implicitly by referring to "any alien *applying for admission* to the United States,"

---

[16] In *Hawkins*, our court considered a regulation that gave HUD broad, general discretion. 16 F.4th at 154–55 (quoting the regulation, which said in some circumstances, "HUD may exercise any of its rights or remedies under the contract, or Regulatory Agreement, if any" (quotation omitted)). The regulation then said "HUD shall" take certain actions under certain circumstances. *Ibid.* (emphasis omitted). Our court read those provisions to confer some discretion—limited by the "shall." *Id.* at 155 (The "language marks a contrast between the mandatory 'shall' in this sentence and the permissive 'may'" before it.). Judge Duncan dissented, arguing the majority overlooked a key "textual link." *Id.* at 161 (Duncan, J., dissenting). No matter which reading was better in *Hawkins*, this case is much easier because § 1225 has none of the nuance that divided that panel.

No. 21-10806

§ 1182(d)(5)(A) (emphasis added), which is an obvious parallelism to § 1225(b)(2)(A)'s "alien who is an *applicant for admission*." (Emphasis added.)

But § 1182(d)(5)'s parole alternative has its limits. Thanks to a 1996 amendment, § 1182(d)(5)(A) requires that parole be granted "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Ibid.*; Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, 3009–689. And because of a 1980 amendment, § 1182(d)(5)(B) forbids parole of any given alien refugee "unless the Attorney General determines that compelling reasons in the public interest *with respect to that particular alien* require that the alien be paroled into the United States rather than be admitted as a refugee under section 1157 of this title." *Ibid.* (emphasis added); Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, 108.

Section 1226(a), meanwhile, provides a parallel detention-and-parole scheme that applies to aliens who have *already* entered the United States. As the Supreme Court has explained, § 1226(a) "generally governs the process of arresting and detaining" inadmissible aliens who are already "inside the United States." *Jennings*, 138 S. Ct. at 837; *see also Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1115–20 (9th Cir. 2007) (explaining and holding the two forms of parole are distinct, but allowing for the possibility that § 1182(d)(5) parole could apply even to already-arrived aliens). DHS may arrest such aliens pursuant to an administrative arrest warrant. § 1226(a); *cf.* § 1357(a)(2) (warrantless arrests sometimes permissible).

DHS may release aliens detained under § 1226(a) on either bond or conditional parole. Bond and conditional parole apply only to "the arrested alien"—meaning aliens arrested and detained under § 1226(a), rather than any and every alien. Bond is more or less self-explanatory. *See*

No. 21-10806

§ 1226(a)(2)(A). Conditional parole, however, differs from § 1182(d)(5)'s humanitarian parole in important ways. Most obviously, conditional parole involves conditions. *See Ortega-Cervantes*, <u>501 F.3d at 1112</u>–13 ("Among the conditions imposed on Ortega-Cervantes was a requirement that he report to the INS at the conclusion of the criminal proceedings in which he was to be a witness for further review of his case." (quotation omitted)). And unlike humanitarian parole, being conditionally paroled does not count as being "paroled into the United States" under § 1255(a). *See id.* at 1116–20 (announcing that holding and explaining that conflating narrow humanitarian parole and broadly available conditional parole would cause statutory incoherence); *Matter of Castillo-Padilla*, <u>25 I. & N. Dec. 257, 260</u>–63 (BIA 2010) (drawing the same distinction), *aff'd sub nom.*, *Castillo-Padilla v. U.S. Atty. Gen.*, <u>417 F. App'x 888</u> (11th Cir. 2011) (per curiam).[17]

So in short, § 1225(b)(2)(A) sets forth a general, plainly obligatory rule: detention for aliens seeking admission. Section 1225(b)(2)(C) authorizes contiguous-territory return as an alternative. Section 1182(d)(5) allows humanitarian parole as another alternative, but that parole can be exercised only within narrow parameters (case-by-case and with a public-interest justification). And § 1226(a)'s bond-and-conditional-parole provisions, by their very terms, apply only to aliens detained under § 1226(a) itself—not to aliens detained under § 1225(b). And even if they did apply elsewhere, bond and conditional parole have restrictions of their own.

---

[17] That matters a great deal: Having been "paroled into the United States" often triggers eligibility for adjustment of status under § 1255. *See* § 1255(a) (allowing "[a]djustment of status of nonimmigrant to that of person admitted for permanent residence" for, *inter alia*, "an alien who was inspected and admitted or paroled into the United States").

No. 21-10806

2.

The Government recognizes that the four statutory alternatives described in the preceding section are exhaustive. Congress gave DHS no fifth choice. The Termination Decision nonetheless purported to arrogate to DHS a fifth alternative that Congress did not provide. By so deciding, DHS contradicted § 1225's statutory scheme.

As the district court found, DHS lacks the resources to detain every alien seeking admission to the United States. *Biden I*, 2021 WL 3603341, at *8. That means DHS can't detain everyone § 1225(b)(2)(A) says it "shall" detain. So it's left with a class of people: aliens it apprehended at the border but whom it lacks the capacity to detain. By terminating MPP, DHS has refused to return that class to contiguous territories, as permitted by § 1225(b)(2)(C). The Government's position thus boils down to this: We can't do one thing Congress commanded (detain under § 1225(b)(2)(A)), and we don't want to do one thing Congress allowed (return under § 1225(b)(2)(C)).[18]

Parole does not provide a way out of the box created by DHS's can'ts-and-don't-wants. As noted in the previous section, the Government can parole aliens under § 1182(d)(5) or § 1226(a). Let's consider both parole options.

---

[18] The Government also says that any detention mandate in § 1225(b)(2)(A) is entirely undone by § 1225(b)(2)(C)'s discretionary return authority. Put differently, the idea is that we are improperly reading a "shall" into § 1225(b)(2)(C)'s "may"—effectively requiring the Government to return people to Mexico when Congress merely authorized (and did not require) that result. This is a strawman. It's obviously true that § 1225(b)(2)(C) is discretionary. But § 1225(b)(2)(A) is mandatory, and (C) offers a permissible alternative to the otherwise-mandatory obligation in (A). DHS is violating (A)'s mandate, refusing to avail itself of (C)'s authorized alternative, and then complaining that it doesn't like its options.

No. 21-10806

Start with § 1182(d)(5). That provision gives DHS the power to parole certain aliens "*only* on a case-by-case basis for urgent humanitarian reasons or significant public benefit." § 1182(d)(5)(A) (emphasis added). DHS cannot use that power to parole aliens *en masse*; that was the whole point of the "case-by-case" requirement that Congress added in IIRIRA. *See ibid.* So the Government's proposal to parole every alien it cannot detain is the opposite of the "case-by-case basis" determinations required by law. *See ibid.*

The Government also suggests that DHS retains the discretion to return aliens to Mexico on a case-by-case basis—and that means its § 1182(d)(5) parole decisions really *are* case-by-case after all. But that is backward. It's the § 1225(b)(2)(C) return power DHS is allowed to exercise as a class-wide alternative to detention. It can make case-by-case exceptions for § 1182(d)(5) parole. The Government conjures the mirror image of that scheme by proposing that DHS exercise the parole power on a class-wide basis, with narrow, case-by-case exceptions for returns. That is the exact opposite of what Congress said.

Equally unhelpful is § 1226(a) parole. Though the Government does not say it outright, it hints that DHS could use this power to release on bond or parole aliens whom it lacks the capacity to detain—all within its statutory authority. And § 1226(a)(2)'s bond-and-parole power, unlike the distinct parole power in § 1182(d)(5), isn't limited to case-by-case determinations.

But § 1226(a) parole has other problems. DHS's § 1226(a) power applies *only* to aliens arrested and detained under § 1226(a). The Government has not even suggested that any aliens within MPP's scope were arrested under § 1226(a). And indeed, given that both MPP and § 1225(b)(2) concern aliens *apprehended at the border*—in contrast to § 1226(a)'s concern with aliens *already in the United States*—it's hard to see how the latter provision is relevant to MPP at all. Even if it were, that would not allow DHS

No. 21-10806

to simply release anyone into the United States. Instead, DHS would be able to release only on "bond" or "conditional parole." § 1226(a)(2). There is no indication that this is DHS's practice or its plan.

Finally, the Government says DHS can ignore Congress's limits on immigration parole and that Supreme Court precedent makes everyone (including the plaintiff States and the federal courts) powerless to say anything about it. The Government's sole precedent for this proposition is *Town of Castle Rock v. Gonzales*, <u>545 U.S. 748</u> (2005). There, the Court held that "[t]he deep-rooted nature of law-enforcement discretion" can survive "even in the presence of seemingly mandatory legislative commands." *Id.* at 761. The Government reads this to mean that it can take the powers given to it by Congress (such as the power to grant immigration parole) while ignoring the limits Congress placed on those powers (such as the case-by-case requirement in § 1182 and the arrest limitation in § 1226).

This argument is as dangerous as it is limitless. By the Government's logic, *Castle Rock* would allow DHS to use the power to make, say, asylum decisions while ignoring every single limitation on those decisions imposed by the INA. And perhaps worse, the Government would have us hold that DHS's pick-and-choose power is completely insulated from judicial review. That would make DHS a genuine law unto itself. And *Castle Rock* says no such thing.

To the contrary, *Castle Rock* is relevant only where an official makes a nonenforcement decision. *See id.* at 760–61 (noting the widespread existence of statutes that "by their terms, seem to preclude *nonenforcement* by the police" and explaining the statutes do not in fact do so (emphasis added) (quotation omitted)). As we've already explained, DHS's Termination Decision was not nonenforcement. *See* Part III.B.2.b, *supra* pages 85–87. And the same is true of DHS's pretended power to parole aliens while ignoring

No. 21-10806

the limitations Congress imposed on the parole power. That's not *non*enforcement; it's *mis*enforcement, suspension of the INA, or both. *See* Part III.B.2.a.i, *supra* pages 69–73 (describing the English prerogative power of suspension).

We therefore hold that DHS has violated not only the APA but also Congress's statutory commands in § 1225.

## V.

Having resolved jurisdiction (Part II), reviewability (Part III), and the merits (Part IV), we turn at last to remedies. Here the Government presents three issues. First, whether DHS is entitled to vacatur of the district court's judgment and injunction under *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950). No. Second, whether the district court abused its discretion in vacating the Termination Decision rather than remanding to DHS without vacatur. No. Third, whether the district court erred in granting permanent injunctive relief against the Government. Again, no.

## A.

The Government requests that we vacate the district court's judgment and remand the case under *Munsingwear*. Because the case is not moot, we will not do so. But even if the case were moot, which it's not, we'd still refuse to order the equitable *Munsingwear* remedy.

Broadly, the vacatur inquiry "is an equitable one." *Bancorp*, 513 U.S. at 29. When a case becomes moot on appeal, the reviewing court must dispose of the case "in the manner most consonant to justice" and must account for "the nature and character of the conditions which have caused the case to become moot." *Id.* at 24 (quotation omitted); *see also Staley v. Harris Cnty.*, 485 F.3d 305, 310 (5th Cir. 2007) ("[V]acatur is to be determined on a case-by-case basis, governed by facts and not inflexible

No. 21-10806

rules."). The default disposition is to "vacate the judgment below and remand with a direction to dismiss." *Munsingwear*, <u>340 U.S. at 39</u>. That default, however, flips when the case is mooted by "the voluntary conduct of the party that lost in the District Court." *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, <u>528 U.S. 167, 194</u> n.6 (2000) (citing *Bancorp* for the proposition that "mootness attributable to a voluntary act of a nonprevailing party ordinarily does not justify vacatur of a judgment under review").

The decision to issue the October 29 Memoranda was "voluntary conduct of the party that lost in the District Court." *Ibid.* To show its entitlement to vacatur, then, the Government must show that the equities of this particular case warrant a departure from *Laidlaw*'s default rule.

As discussed above in greater detail, *see* Part II.B.1–3, *supra* pages 30–45, DHS's litigation tactics tilt the equities decidedly against vacatur. After losing in district court, DHS had two procedural options. Each had its upsides and downsides. Discontent with its choices, DHS tried to choose both at the same time.

Option 1: DHS could've reopened the Termination Decision, taken new action, and returned to the district court to seek relief from the judgment under <u>Federal Rule of Civil Procedure 60(b)</u>. *See Horne v. Flores*, <u>557 U.S. 433</u> (2009). DHS's ultimate goal under Option 1 would have been a district court holding that its new action was lawful, accompanied by a lifting of the injunction. *Cf. Regents*, <u>140 S. Ct. at 1904</u>–05 (describing DHS's unsuccessful attempt to secure such a ruling). That would leave the ball in the States' court. The injunction would be gone, and the States would have to appeal the 60(b) determination if they wanted it reinstated. Option 1, however, would've had two downsides: (a) DHS would have no chance to ask our court or the Supreme Court for a stay pending appeal from the *Biden*

No. 21-10806

*I* judgment. And (b) the district court might have ruled against DHS on the merits at the 60(b) stage, holding DHS's action still violated the law in one way or another.

Option 2: DHS could've appealed the district court's *Biden I* decision. Unlike Option 1, this would give DHS the chance to try for a stay pending appeal. *See Biden II*, 10 F.4th 538; *Biden III*, 2021 WL 3732667. But Option 2 had a downside of its own: (c) A merits loss on appeal would put DHS right back in district court with nothing to show for its efforts. Nothing, that is, except lost time and a new Fifth Circuit precedent on the books, holding the Termination Decision to be unlawful. Such a precedent would be the law of the case, potentially hampering any subsequent attempt to seek Rule 60(b) relief in the district court on the basis of new agency action.

Instead of choosing Option 1 or Option 2, DHS tried to split the difference by taking Option 1.5: appeal the district court's *Biden I* decision, try to get a stay pending appeal, read the tea leaves, and then try to moot the case with a new memo (but not a full-on new agency action) if things seem to be going poorly. What's more, the Government now argues that its Option 1.5 strategy should give it the exact same remedy—vacatur of the injunction—as if it had never appealed at all (Option 1) or had appealed and won (Option 2). This is a game of heads I win, tails I win, *and* I win without even bothering to flip the coin. Suffice it to say, it does nothing to entitle the Government to an equitable remedy. And the Government comes nowhere near overcoming *Laidlaw*'s strong presumption against vacatur in a situation of voluntarily caused mootness. 528 U.S. at 194 n.6.[19]

---

[19] All of this is made worse by the fact that DHS could've switched from Option 2 to Option 1 at any time. For example, if at any point in the appellate process DHS thought things were going badly and wanted to confess error, it could voluntarily dismiss its appeal.

No. 21-10806

The Government points to several Supreme Court cases in response. None of them change our conclusion. The Government's main authority is the Supreme Court's grant of *Munsingwear* vacatur in *Innovation Law Lab*. As we've already explained, that vacatur happened after the losing party backed down from, rather than doubling down on, its injurious action. 141 S. Ct. at 2842; *accord N.Y. State Rifle & Pistol*, 140 S. Ct. at 1526–27. And as we've already explained, the Government cannot invoke cases like *Lewis* and *Microsoft* that ordered vacatur where a *legislature* changed a statute while an appeal was pending. *See Lewis*, 494 U.S. at 475–77; *Microsoft*, 138 S. Ct. at 1187–88. Neither case concerned a situation where, as here, the agency appealing the judgment is the sole entity responsible for changing the challenged action. *See also* Part II.B, *supra* pages 29–30 (discussing *Lewis* and *Microsoft*); Part II.B.3, *supra* pages 39–45 (discussing voluntary cessation).

## B.

Next, we consider the district court's decision to remand and vacate the June 1 Termination Decision rather than remanding without vacatur.[20] This issue should not be confused with *Munsingwear* vacatur. In discussing

---

*See* FED. R. APP. P. 42. That would put it right back at Option 1. It could then restart its rulemaking process and then attempt to get Rule 60(b) relief from the district court. But the fact that DHS can switch from one option to the other does not mean that it gets to choose both options at once.

[20] The district court phrased its order as vacating the "June 1 Memorandum" rather than the Termination Decision. *Biden I*, 2021 WL 3603341, at *27. But the obvious upshot was vacatur of the Decision underlying the Memorandum, as evidenced by the district court's order "to enforce and implement MPP in good faith." *Ibid.* (emphasis omitted). That order would make no sense if the court hadn't vacated the Termination Decision. Moreover, it's the Government's obligation—as the appellant—to identify errors or ambiguities in the decision it's appealing. The Government has forfeited any complaint about the district court's phraseology by failing to raise it in its original brief. *See, e.g.*, *Satterfield & Pontikes Constr., Inc. v. U.S. Fire Ins. Co.*, 898 F.3d 574, 584 (5th Cir. 2018) ("An argument that is not pressed in the original brief is [forfeited] on appeal.").

No. 21-10806

*Munsingwear* vacatur above, we considered whether to vacate the district court's order on mootness grounds. Here, in contrast, we consider whether the district court committed reversible error by itself vacating the underlying agency action—that is, the June 1 Termination Decision. "We review the district court's decision to vacate for abuse of discretion." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (quotation omitted).

Remand without vacatur of the agency action is "generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389–90 (5th Cir. 2021). But by default, remand *with* vacatur is the appropriate remedy. *See, e.g.*, *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action.").

The D.C. Circuit's test for whether vacatur is appropriate considers two factors: "(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Ibid.* (quotation omitted). Our court applies the same test, though perhaps phrased differently. *See Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) ("EPA may well be able to justify its decision to refuse to promulgate a national variance for the electric utilities and it would be disruptive to vacate a rule that applies to other members of the regulated community.").

The district court didn't abuse its discretion when it vacated the Termination Decision. As described above, the Termination Decision was seriously deficient in several ways. And the district court explained that "DHS *knew* of these failings when it issued the June 1 Memorandum because Plaintiffs first brought suit on April 13, 2021—nearly two months earlier."

No. 21-10806

*Biden I*, 2021 WL 3603341, at \*24. That original complaint raised the same arbitrary-and-capricious challenge we now adjudicate. So DHS was on notice about the problems with its decision well before it terminated MPP. And it still failed to correct them. It therefore makes sense that the district court didn't take seriously DHS's claim that it could easily fix those errors on remand without vacatur. *See United Steel*, 925 F.3d at 1287. Doubly so because any post-remand DHS memorandum would run the risk of being an impermissible *post hoc* rationalization under *Regents*. *See* 140 S. Ct. at 1907– 10.

    And for two reasons, the district court acted well within its discretion when it concluded vacatur is not disruptive in this case. *See Standing Rock Sioux Tribe*, 985 F.3d at 1053 (district court did not abuse its discretion by vacating, *even* when vacatur "would cause" "severe economic disruption," because the court reasonably considered all relevant factors (quotation omitted)). First, the district court required DHS to re-implement MPP "in good faith," not overnight. *Biden I*, 2021 WL 3603341, at \*27. Second, the Government's disruption arguments rise or fall with its balance-of-equities arguments, many of which ignore the good-faith aspect of the injunction. Because we reject those arguments below, we reject their analogues here. *See United Steel*, 925 F.3d at 1287 (The agency "explains neither how the [agency action] can be saved nor how vacatur will cause disruption. We therefore take the normal course and vacate."); *cf. Biden II*, 10 F.4th at 560 ("The Government makes no [vacatur] argument materially different from its irreparable-injury argument.").

C.

    Finally, we ask whether the district court abused its discretion by granting permanent injunctive relief. It did not. The district court's injunction restrained DHS "from implementing or enforcing" the June 1

No. 21-10806

Termination Decision. *See Biden I*, 2021 WL 3603341, at *27. It also ordered DHS "to enforce and implement MPP *in good faith* until such a time as it has been lawfully rescinded in compliance with the APA **and** until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section 1255 without releasing any aliens *because of* a lack of detention resources." *Ibid.* And it imposed various reporting requirements. *Ibid.* The court clarified, however, that it was not requiring "DHS to take any immigration or removal action nor withhold its statutory discretion towards any individual that it would not otherwise take." *Id.* at *28.

1.

To be entitled to permanent injunctive relief, plaintiffs must show "(1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s] and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). The district court applied that test and concluded the States were entitled to a permanent injunction. *Biden I*, 2021 WL 3603341, at *26–27. We review that decision for abuse of discretion. *E.g.*, *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021); *Whole Woman's Health v. Paxton*, 10 F.4th 430, 438 (5th Cir. 2021) (en banc). Our circuit's settled rule is that "[a] district court abuses its discretion if it (1) relies on clearly erroneous factual findings or erroneous conclusions of law when deciding to grant the injunction, or (2) misapplies the factual or legal conclusions when fashioning its injunctive relief." *Valentine*, 993 F.3d at 280 (quotation omitted).

No. 21-10806

On the first and second prongs, the district court incorporated by reference its discussion of injuries in the standing context. *Biden I*, 2021 WL 3603341, at *26. The court found that MPP's termination has contributed, and will continue to contribute, to the number of parolee aliens in the States. *Id.* at *8. It likewise found this would impose costs on the States. *Id.* at *9–10. And because they will be unable to recover those additional costs from the federal government, the court concluded the costs constituted an irreparable injury not adequately remedied by damages. *Id.* at *26; *see also DAPA*, 809 F.3d at 186 (noting the difficulty of retracting governmental benefits once granted). Add to that pocketbook injury the pressure imposed by DHS's termination of MPP, which gives the States "the Hobson's choice of spending," potentially, "millions of dollars" to evaluate and grant additional licenses—or instead changing their statutes. *See id.* at 163. The Government contests these points only by challenging the district court's factual findings, as it did in the injury-in-fact context. We rejected those arguments there, *see* Part II.C.1, *supra* pages 46–52, and we reject them here. The district court did not abuse its discretion by determining that the first two *eBay* prongs have been satisfied.

The Government has entirely failed to contest the public-interest prong on appeal, so we will not hold the district court abused its discretion by concluding that an injunction was in the public interest. *See Biden I*, 2021 WL 3603341, at *26 (explaining that "there is a public interest in having governmental agencies abide by the federal laws that govern their existence and operations" (quotation omitted)); *see also Wages & White Lion*, 16 F.4th at 1143 ("And there is generally no public interest in the perpetuation of unlawful agency action." (quotation omitted)); *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021) (per curiam) ("[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends.").

No. 21-10806

That leaves the balance of the equities—*eBay*'s third prong. On this score, the Government gives a litany of harms it says the district court's injunction is causing. It says these harms outweigh the harms to the States. Again, our review is tightly circumscribed. *See Texas v. Ysleta Del Sur Pueblo*, 955 F.3d 408, 415–16 (5th Cir. 2020) (applying the deferential abuse-of-discretion standard to the district court's balancing of the equities in the permanent injunction context), *as revised* (Apr. 3, 2020), *cert. granted on other grounds*, 142 S. Ct. 395 (2021).

Much of the Government's argument amounts to repeating its claim that DHS cannot restart MPP unilaterally. The district court explained why that's at least partially false: DHS has the unilateral power to turn back individuals who have not yet entered the United States. *Biden I*, 2021 WL 3603341, at *25 n.15. And to the extent restarting MPP requires cooperation with Mexico, the Government studiously downplays the fact that the district court ordered reinstatement "*in good faith*." *Id.* at *27. Further, the mere fact that *some* foreign-relations issues are in play cannot suffice to defeat the injunction. The Government's contrary position would allow DHS to implement any immigration program it liked—no matter how far afield from the law—with impunity.

The Government also invokes foreign-policy concerns and logistical disruptions. For example, the Government cites a DHS official's declaration that "requiring DHS to reinstitute the program, would wreak havoc on the Administration's approach to managing migration in the region, including by undermining . . . delicate bilateral (and multilateral) discussions." And the Government says restarting MPP is complicated by the fact that the relevant facilities have been shuttered for months "due to COVID-19."

Those harms are entirely self-inflicted. *Pennsylvania*, 426 U.S. at 664 (explaining the principle); *Biden I*, 2021 WL 3603341, at *24 (reaching that

114

No. 21-10806

conclusion). As for foreign relations, DHS could have simply informed Mexico throughout the negotiation process that its ability to terminate MPP was contingent on judicial review. Doubly so because the States filed this very lawsuit one and a half months *before* the Termination Decision—so there's no question DHS was on notice about these legal issues. As the district court aptly put it, "Mexico is capable of understanding that DHS is required to follow the laws of the United States." *Ibid.* As for shuttered infrastructure, the district court specifically considered, and rejected, the bizarre factual claim that DHS's infrastructure has somehow remained closed this whole time solely due to COVID-19. *See id.* at \*21 (explaining that "[*p*]*ast* problems with *past* closures are irrelevant to the decision to *prospectively* terminate MPP in June 2021"). The Government gives no reason to think that finding was clearly erroneous.[21]

The Government also complains the injunction impinges on "Executive autonomy." But of course, that whole line of reasoning is based on the notion that MPP's termination was a *lawful* exercise of autonomy. Under both the APA and 8 U.S.C. § 1225, it was not.

We conclude the district court made factual findings that were not clearly erroneous and gave correct statements of the law, and it soundly

---

[21] The Government also cites two additional declarations from government officials in support of its balance-of-equities argument. These declarations, however, were not before the district court when it decided to grant the injunction. The district court issued its judgment on August 13, 2021, and the Government did not submit these declarations until it requested a *stay* from the district court's judgment—on August 16. Because the declarations were not before the district court when it decided the injunction issue, and because the Government gives no argument why we should consider them despite that, we will not do so. And even if we did, they would not change our analysis. The declarations are largely repetitive of the arguments we've already addressed. That includes the generous use of strawmen, based on the false assumption that the district court ordered DHS to reinstate MPP overnight.

No. 21-10806

applied those conclusions in fashioning its injunctive relief. *See Valentine*, 993 F.3d at 280. The district court did not abuse its discretion by granting a permanent injunction.

2.

The Government objects that 8 U.S.C. § 1252(f)(1) bars injunctive relief in this case. That provision reads as follows:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

The Government says the district court's injunction restrained the operation of § 1225(b)(2)(C).

That is backward. In its Termination Decision, DHS all but forbade its own officers from invoking the "operation" of § 1225(b)(2)(C). The district court's injunction undid that restraint. Far from "restrain[ing]" the "operation" of the statute, the injunction restored it.

Justice Thomas's concurrence in *Nielsen v. Preap*, 139 S. Ct. 954 (2019), is not to the contrary. The Court in that case did not reach the § 1252(f) issue. *See id.* at 962. But Justice Thomas rejected the idea that an injunction complied with § 1252(f) simply by framing itself as "enjoin[ing] conduct not authorized by the statutes" rather than enjoining their "operation." *Id.* at 975 (Thomas, J., concurring in part and concurring in the judgment) (quotation omitted). He called this reasoning "circular and unpersuasive." *Ibid.* (going on to note that "[m]any claims seeking to enjoin or restrain the operation of the relevant statutes will allege that the Executive's action does not comply with the statutory grant of authority, but

No. 21-10806

the text clearly bars jurisdiction to enter an injunction '[r]egardless of the nature of the action or claim'" (quoting § 1252(f)(1)).

But again, *Preap* was the opposite of our case. The plaintiffs in *Preap* were seeking to prevent DHS from enforcing § 1226(c), which requires the agency to take certain categories of aliens into custody. *See id.* at 959–60. In other words, DHS was applying the provision in question, and the injunction interfered with the way it did so. Here, in contrast, DHS flatly refuses to apply either § 1225(b)(2)(A) or § 1225(b)(2)(C), and the injunction requires otherwise. Thus, the injunction did anything but "enjoin or restrain the operation of" the INA. § 1252(f)(1).

\*       \*       \*

The Government's position in this case has far-reaching implications for the separation of powers and the rule of law. The Government says it has unreviewable and unilateral discretion to create and to eliminate entire components of the federal bureaucracy that affect countless people, tax dollars, and sovereign States. The Government also says it has unreviewable and unilateral discretion to ignore statutory limits imposed by Congress and to remake entire titles of the United States Code to suit the preferences of the executive branch. And the Government says it can do all of this by typing up a new "memo" and posting it on the internet. If the Government were correct, it would supplant the rule of law with the rule of say-so. We hold the Government is wrong.

The Government's motion to vacate the judgment and remand for further proceedings is DENIED. The judgment of the district court is AFFIRMED.