## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS and<br><br>THE STATE OF MISSOURI,<br><br>    *Plaintiffs*,<br><br>v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.*,<br><br>    *Defendants*. | § § § § § § § § § § § § § § § | Case No. 2:21-cv-00067-Z |

## SECOND AMENDED COMPLAINT

1.     On December 20, 2018, the Department of Homeland Security (DHS) announced a new program: the Migrant Protection Protocols (MPP). MPP was created in response to an immigration surge at the southern border, and a resulting "humanitarian and border security crisis" in which federal immigration officials were encountering approximately 2,000 inadmissible aliens each day. ECF 94 at 7. MPP provided that certain non-Mexican nationals arriving by land from Mexico would be returned to Mexico to await the results of their removal proceedings under 8 U.S.C. § 1229a. On the same day that DHS announced the program, the Government of Mexico agreed that it would cooperate in administering it, on a temporary basis. ECF 94 at 8.

2.     MPP was implemented pursuant to express congressional authorization in the Immigration and Nationality Act (INA), which provides that "[i]n the case of an alien ... who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(C).

3. A separate provision of the same section of the INA states that if "an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A). DHS lacks the resources to detain every alien seeking admission to the United States. ECF 94 at 43. Ameliorating that problem was one reason the Trump administration chose to implement MPP; the program ensured that "[c]ertain aliens attempting to enter the U.S. illegally or without documentation, including those who claim asylum, will no longer be released into the country, where they often fail to file an asylum application and/or disappear before an immigration judge can determine the merits of any claim." ECF 94 at 8.

4. In January 2019, DHS began implementing MPP, initially in San Diego, California, then in El Paso, Texas, and Calexico, California, and then nationwide. ECF 94 at 8. By December 31, 2020, DHS had enrolled 68,039 aliens in the program. ECF 94 at 12.

5. Following the 2020 election, however, the newly inaugurated Biden Administration sought to terminate the program. On January 20, 2021, the Acting Secretary of DHS wrote that "[e]ffective January 21, 2021, the Department will suspend new enrollments in [MPP] pending further review of the program. Aliens who are not already enrolled in MPP should be processed under other existing legal authorities." ECF 94 at 15 (the "January Suspension"). President Biden also issued Executive Order No. 14010, which directed the new Secretary of Homeland Security, Alejandro N. Mayorkas, to "promptly review and determine whether to terminate or modify the [MPP] program." 86 Fed. Reg. 8269 (2021). The effects on the border were immediate—according to the Government's own data, border "encounters jump[ed] from 75,000 in January 2021," when MPP was first suspended, to about "173,000 in April 2021." ECF 94 at 17.

6. On June 1, 2021, Secretary Mayorkas issued a memorandum officially terminating MPP (the "June 1 Memorandum"). In that memorandum, the Secretary noted his determination "that

MPP [d]oes not adequately or sustainably enhance border management in such a way as to justify the program's extensive operational burdens and other shortfalls." ECF 94 at 16. For this and other reasons, the Secretary announced that he was "by this memorandum terminating the MPP program," and "direct[ed] DHS personnel to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives or policy guidance issued to implement the program." ECF 54-2, App.467.

7.      On April 13, 2021, Plaintiffs the States of Texas and Missouri initiated this lawsuit challenging this Administration's shutdown of MPP. ECF 1. Plaintiffs' initial complaint challenged the January Suspension that paused new enrollments in MPP, but following the June 1 Memorandum, they amended their complaint to challenge the termination of the entire program. The First Amended Complaint asserted that the June 1 Memorandum violated the INA and the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, and sought preliminary and permanent injunctive relief, declaratory relief, and vacatur of the termination pursuant to the APA. ECF 48.

8.      After a consolidated preliminary injunction hearing and a trial on the merits under Federal Rule of Civil Procedure 65(a)(2), this Court vacated Defendants' decision to terminate MPP as arbitrary and capricious, ECF 94 at 34–42, and as contrary to law for causing Defendants to exacerbate their violation of the mandatory detention requirements of section 1225(b)(1)(B)(iii)(IV), ECF 94 at 42–44. The Court then enjoined Defendants to continue to implement MPP "in good faith until such a time as it has been lawfully rescinded in compliance with the APA *and* until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section 1255 without releasing any aliens *because of* a lack of detention resources." ECF 94 at 52 (*Biden I*).

9.      Defendants sought a stay of that order, which the Fifth Circuit denied. *Texas v. Biden*, 10 F.4th 538, 543–561 (2021) (*per curiam*).

10.     Defendants then sought a stay in the Supreme Court, but their application there was also denied as they "had failed to show a likelihood of success on the claim that the [June 1 Memorandum] was not arbitrary and capricious." 594 U. S. ——, 142 S.Ct. 926 (2021).

11.     Two business days before oral argument on the merits in the Fifth Circuit, DHS issued two memoranda (the "October 29 Memoranda") declaring that it had made a new decision terminating MPP. *See* Ex. A, Termination of the Migrant Protection Protocols (the "Termination Memorandum"); Ex. B, Explanation of the Decision to Terminate the Migrant Protection Protocols (the "Explanation Memorandum"). At the same time, Defendants asked the Fifth Circuit to hold that the case was moot, to vacate this Court's judgment and permanent injunction, and to remand the case for further proceedings. *Texas v. Biden*, 20 F.4th 928, 946 (5th Cir. 2021) (*Biden II*). The Fifth Circuit declined, holding that the October 29 Memoranda did not moot—or have any legal effect on—the appeal. *Id.* at 956–966, 998–1000. The Fifth Circuit then affirmed this Court on the merits.

12.     The Supreme Court granted certiorari, 595 U. S. ——, 142 S.Ct. 1098, 212 (2022), and expedited consideration of the appeal at Defendants' request.

13.     On June 30, the Supreme Court reversed the Fifth Circuit. *Biden v. Texas*, 142 S. Ct. 2528 (2022) (*Biden III*). First, it found that this Court's permanent injunction was barred by 8 U.S.C. § 1252(f)(1),[1] *id.* at 2538, though that provision "does not deprive the lower courts of all subject matter jurisdiction over claims brought under sections 1221 through 1232 of the INA." *Id.* at 2539.

14.     The Court also held that the termination of MPP did not itself violate the mandatory detention requirements of section 1225(b)(2)(A), *id.* at 2541–43, although the majority

---

[1] "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221–1232], other than with respect to the application of such provisions to an individual alien against whom proceedings under [those provisions] have been initiated."

4

"assume[d] *arguendo* … that the dissent's interpretation [advanced by Justice Alito] of section 1225(b)(2)(A) is correct, and that the Government is currently violating its obligations under that provision." *Id.* at 2542.

15.     *Biden III* did not disturb any of the holdings of this Court or the Fifth Circuit on issues of standing or reviewability to challenge a termination of MPP, the limits on parole authority, or the mandatory nature of the detention requirements of section 1225.

16.     The Supreme Court expressly left open a challenge in this Court to the October 29 Memoranda as arbitrary and capricious under the APA. *Biden III*, 142 S. Ct. at 2548 ("On remand, the District Court should consider in the first instance whether the October 29 Memoranda comply with section 706 of the APA.") (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46–57 (1983)); *id.* at 2549 (Kavanaugh, J., concurring) ("The question of whether DHS's October 29 decision satisfies the *State Farm* standard is not before this Court at this time. The Court today therefore properly leaves the *State Farm* issue for consideration on remand."); *id.* at 2559 (Alito, J., dissenting) ("I agree with the majority that the District Court on remand should consider in the first instance whether the October 29 Memoranda complied with § 706 of the APA.").

17.     Indeed, the Court determined that the October 29 Memoranda constituted final agency action that superseded the June 1 Memorandum. *Id.* at 2544. Plaintiffs now challenge the October 29 Memoranda, which—like its predecessor—suffers from arbitrary and capricious decisionmaking.

18.     On October 29, the Secretary released the Termination Memorandum, consisting of four pages that again announced the termination of MPP, along with the 39-page Explanation Memorandum explaining his reasons for doing so. As the Secretary explained it, these October 29 Memoranda "examined considerations that the District Court determined were insufficiently addressed in the June 1 Memorandum, including claims that MPP discouraged unlawful border

crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, impose undue costs on states, put a strain on U.S.-Mexico relations, and cause DHS to fail to comply with its [detention] obligations under 8 U.S.C. § 1225." Ex. B, Explanation Memorandum at 12.

19.     The Secretary acknowledged what he called "the strongest argument in favor of retaining MPP: namely, the significant decrease in border encounters following the determination to implement MPP across the southern border." Ex. A, Termination Memorandum at 3. But he nonetheless concluded that the program's "benefits do not justify the costs, particularly given the way in which MPP detracts from other regional and domestic goals, foreign-policy objectives, and domestic policy initiatives that better align with this Administration's values." *Id.* Finally, the Secretary noted that "[e]fforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration." *Id.*

20.     In light of those conclusions, the Secretary announced that he was once again "hereby terminating MPP." *Id.* at 4. He explained that DHS would "continue complying with the [this Court's] injunction requiring good-faith implementation and enforcement of MPP," but that "the termination of MPP" would be "implemented as soon as practicable after a final judicial decision to vacate" that injunction. *I*

## PARTIES

21.     Plaintiffs incorporate by reference all other paragraphs.

22.     Plaintiff State of Texas is a sovereign State of the United States of America.

23.     Defendants' unlawful termination of MPP injures Texas. MPP reduced both the number of illegal aliens attempting to come to Texas and the percentage of illegal aliens released into Texas and the rest of the United States. Discontinuing MPP has increased and will increase the number

of illegal aliens attempting to come to Texas and the percentage of illegal aliens released into Texas and the rest of the United States. That harms Texas in multiple ways.

24.     Discontinuing MPP will cause Texas to "incur significant costs in issuing driver's licenses." *Texas*, 809 F.3d at 155. Texas law subsidizes driver's licenses, including for noncitizens who have "documentation issued by the appropriate United States agency that authorizes [them] to be in the United States." *Id.* (quoting Tex. Transp. Code § 521.142(a)). Aliens paroled into the United States, rather than enrolled in MPP, will be eligible for subsidized driver's licenses.[2] By enabling more aliens to secure subsidized licenses, discontinuing MPP will impose significant financial harm on the State of Texas. *See Texas*, 809 F.3d at 155.

25.     Texas spends significant amounts of money providing services to illegal aliens. Those services include education services and healthcare, as well as many other social services broadly available in Texas. Federal law requires Texas to include illegal aliens in some of these programs. Discontinuing MPP will injure Texas by increasing the number of illegal aliens receiving such services at Texas's expense.

26.     The State funds multiple healthcare programs that cover illegal aliens. The provision of these services—utilized by illegal aliens—results in millions of dollars of expenditures per year. These services include the Emergency Medicaid program, the Texas Family Violence Program, and the Texas Children's Health Insurance Program.

27.     The Emergency Medicaid program provides health coverage for low-income children, families, seniors and the disabled. Federal law requires Texas to include illegal aliens in its Emergency Medicaid program. The program costs the State tens of millions of dollars annually.

---

[2] Tex. Dep't of Public Safety, *Verifying Lawful Presence* 4 (Rev. 7-13), https://www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifying lawfulpresence.pdf (listing "Parolees" as eligible for driver's licenses).

28.     The Texas Family Violence Program provides emergency shelter and supportive services to victims and their children in the State of Texas. Texas spends over a million dollars per year on the Texas Family Violence Program for services to illegal aliens.

29.     The Texas's Children's Health Insurance Program offers low-cost health coverage for children from birth through age 18. Texas spends tens of millions of dollars each year on CHIP expenditures for illegal aliens.

30.     Further, Texas faces the costs of uncompensated care provided by state public hospital districts to illegal aliens which results in expenditures of hundreds of millions of dollars per year.

31.     Aliens and the children of those aliens receive education benefits from the State at significant taxpayer expense. Defendants' failure to detain criminal aliens increases education expenditures by the State of Texas each year for children of those aliens.

32.     Plaintiff State of Missouri is a sovereign State of the United States of America.

33.     There is a well-documented and tragic connection between human trafficking in the Midwest and unlawful immigration from the southern border.  Indeed, data makes it readily apparent that trafficking on the southern border is a contributing factor to overall rates of human trafficking in the United States—and such cross-border human trafficking activity directly affects the overall prevalence of human trafficking within Missouri.[3] The prevalence of human trafficking in Missouri

---

[3] *See generally* U.S. Department of State, *Trafficking in Persons Report* (20th ed., June 2020), https://www.state.gov/wp-content/uploads/2020/06/2020-TIP-Report-Complete-062420-FINAL.pdf; *U.S.-Mexico Bilateral Human Trafficking Enforcement Initiative*, U.S. DEPARTMENT OF JUSTICE, https://www.justice.gov/humantrafficking/special-initiatives#bilateral (last visited Mar. 30, 2021) ("Mexico is the country of origin of the largest number of foreign-born human trafficking victims identified in the United States."); Polaris Project, *Fighting Human Trafficking Across the U.S. – Mexico Border* (2018), https://polarisproject.org/wp-content/uploads/2016/10/Consejo-NHTH-Statistics-2018.pdf ("Every day, powerful criminal networks and individual traffickers on both sides of the border recruit people for labor or sexual exploitation."); U.S. Customs and Border Protection, *CBP Releases Fiscal Year 2020 Southwest Border Migration and Enforcement Statistics* (Oct. 14, 2020), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-fiscal-year-2020-southwest-

directly affects Missouri financially.

34.     Because "[h]uman trafficking is a form of modern slavery that occurs in every state, including Missouri[,]"[4] the Attorney General of Missouri has created a Human Trafficking Task Force that is designed and structured to identify, respond to, investigate, and ultimately eradicate human trafficking in Missouri.[5]

35.     While one case of human trafficking in Missouri is tragic enough, Missouri has seen higher numbers just in the last few years. For example, of the 233 human trafficking cases reported in Missouri to the Human Trafficking Hotline in 2019, 21 were foreign nationals.[6] Of the 179 human trafficking cases reported in Missouri to the Human Trafficking Hotline in 2018, 18 were foreign nationals.[7] And of the 146 human trafficking cases reported in Missouri to the Human Trafficking Hotline in 2017, 17 were foreign nationals.[8]

36.     Missouri annually expends funds on the Human Trafficking Task Force and Human Trafficking Hotline to combat human trafficking. Those amounts will increase should DHS be allowed to discontinue implementation of MPP.

37.     When DHS fails to implement MPP and comply with federal law, Missouri faces other significant costs. Aside from the higher costs associated with fighting human trafficking, the Administration's decision to end MPP—and therefore allow more unlawfully present aliens to enter and remain in Missouri—requires Missouri to increase taxpayer expenditures for social and

---

border-migration-and; United Nations Office on Drugs and Crime, *Global Report on Trafficking in Persons* (2018), https://www.unodc.org/documents/data-and-analysis/glotip/2018/GLOTiP_2018_BOOK_web_small.pdf.
    [4]     *Missouri*, NATIONAL HUMAN TRAFFICKING HOTLINE, https://humantraffickinghotline.org/state/missouri (last visited Apr. 11, 2021).
    [5]     *Human Trafficking Task Force*, OFFICE OF THE MISSOURI ATTORNEY GENERAL, https://ago.mo.gov/home/human-trafficking/task-force (last visited Mar. 29, 2021).
    [6] *Missouri*, *supra*, at n.10.
    [7] *Id.*
    [8] *Id.*

educational services for such aliens, resulting in irreparable injury.

38.     The Biden Administration's unlawful termination of MPP will require Missouri to increase funding for its Human Trafficking Task Force, which will have to expend substantially more resources in order to combat a substantial increase in human trafficking efforts that arise out of the mass-migration surge.

39.     While the costs of combating human trafficking will vary from state to state, Texas and Missouri will inevitably face these costs. For example, a report from 2016 concluded that Texas spends approximately $6.6 billion in lifetime expenditures on minor and youth sex trafficking victims, and that traffickers exploit approximately $600 million annually from victims of labor trafficking in Texas (*i.e.*, lost wages), which necessarily results in corresponding lost tax revenue to the State.[9] Missouri faces comparable costs. Other States likewise suffer these costs proportional to their sizes and populations of trafficking victims.

40.     Defendants are officials of the United States government and United States governmental agencies responsible for the issuance and implementation of the challenged termination of MPP.

41.     Defendant Joseph R. Biden, Jr., is the President of the United States of America. He is sued in his official capacity.

42.     Defendant United States Department of Homeland Security is a federal cabinet agency responsible for implementing and enforcing certain immigration-related statutes, policies, and directives, including the termination of MPP. DHS is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 551(1). DHS oversees

---

[9] The University of Texas at Austin, School of Social Work: Institute on Domestic Violence and Sexual Assault, *Human Trafficking by the Numbers* (2016), https://globalinitiative.net/wp-content/uploads/2018/01/Human-trafficking-by-the-numbers.pdf.

Defendants' Office of Strategy, Policy, and Plans, United States Citizenship and Immigration Services, United States Customs and Border Protection, and United States Immigration and Customs Enforcement.

43. Defendant Alejandro N. Mayorkas is the Secretary of Homeland Security and the head of DHS. He authored the October 29 Memoranda. He is sued in his official capacity.

44. Defendant Robert Silvers is the Under Secretary for the Office of Strategy, Policy, and Plans.[10] He received the October 29 Memoranda. He is sued in his official capacity.

45. Defendant Troy A. Miller is the Acting Commissioner of the United States Customs and Border Protection. He received the October 29 Memoranda. He is sued in an official capacity.

46. Defendant Tae D. Johnson is the Acting Director of the United States Immigration and Customs Enforcement. He received the October 29 Memoranda. He is sued in his official capacity.

47. Defendant Ur M. Jaddou is the Director of the United States Citizenship and Immigration Services.[11] She received the October 29 Memoranda. She is sued in her official capacity.

## JURISDICTION AND VENUE

48. Plaintiffs incorporate by reference all other paragraphs.

49. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2201(a). This action arises under 5 U.S.C. §§ 702-703, and other federal statutes.

50. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e). Defendants are United States agencies or officers sued in their official capacities. The State of Texas is a resident of this judicial district and a substantial part of the events or omissions giving rise to this

---

10 Pursuant to Fed. R. Civ. P. 25(d), Defendant Robert Silvers is automatically substituted for Defendant Kelli Ann Burriesci, his predecessor in this position.

11 Pursuant to Fed. R. Civ. P. 25(d), Defendant Ur M. Jaddou is automatically substituted for Defendant Tracy L. Renaud, her predecessor in this position.

complaint occurred and continue to occur within the Northern District of Texas.

51.    Texas and Missouri bring this action to redress harms to their sovereign interests, quasi-sovereign interests, proprietary interests, and interests as *parens patriae*; and to vindicate their interests under 5 U.S.C. § 702. Plaintiffs' ongoing fight against human trafficking—including the exploitation and trafficking of vulnerable migrants—provides them with justiciable interests that fall within the zone of interests of federal statutes on immigration-related policy. The injury to Texas's and Missouri's fiscal interests from the increase in unlawful migrants entering and remaining in Texas and Missouri provides them with redressable injuries in this case as well.

52.    This Court is authorized to award the requested relief under 5 U.S.C. § 703, 5 U.S.C. § 705, 5 U.S.C. § 706, 28 U.S.C. §§ 1361, 2201, and 2202, and its inherent equitable powers.

## CLAIMS

### COUNT I
### (Arbitrary and Capricious Agency Action)

53.    Plaintiffs incorporate by reference all other paragraphs.

54.    The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

55.    The termination of MPP constitutes final agency action reviewable under the APA. *See* 5 U.S.C. § 701. Defendants cannot identify any "clear and convincing evidence of legislative intention to preclude review" of Defendants' termination of MPP. *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986).

56.    Federal administrative agencies are required to engage in "reasoned decision-making." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (quotation marks omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* Put differently, "agency action is lawful

only if it rests 'on a consideration of the relevant factors.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

57.     DHS has previously recognized the importance of MPP. The current Administration failed to consider the benefits of the MPP program (and the costs of not having it), as detailed by the prior Administration. Failing to consider important costs of a new policy renders that policy arbitrary and capricious. *See Michigan*, 135 S. Ct. at 2706 ("[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'").

### Plaintiffs have standing to bring this claim.

58.     Plaintiffs have standing to challenge Defendants' termination of MPP for the same reasons that they had standing to challenge the previous termination of the program. This Court's previous determinations on standing constitute the law of the case because the challenged agency action here is identical to the previous one: whereas under MPP large numbers of aliens who would have otherwise been imposing costs on the States were instead required to wait in Mexico pending the determination of their asylum proceedings, the termination of the program led to the imposition of those costs. ECF 94 at 17–26; *see also Biden II*, 20 F.4th at 966–76 (finding States had standing to challenge agency action terminating MPP, including for claim of arbitrary-and-capricious decisionmaking under the APA).

### Plaintiffs have a cause of action.

59.     This Court has already determined that the States' claims challenging the termination of MPP fall within the zone of interests of the INA. ECF 94 at 33–34; *see also Biden II*, 20 F.4th at 975–76. Nothing could justify a different result here as the subsequent October 29 Memoranda purports to do the same thing: terminate MPP.

**The October 29 Memoranda are subject to judicial review.**

60.     8 U.S.C. § 1252(f)(1) does not bar a stay of the effective date, vacatur, or declaratory relief regarding the October 29 Memoranda. The Supreme Court noted "the narrowness of [Section 1252(f)(1)'s] scope" as indicated by its tile: "Limit on injunctive relief." *Biden III*, 142 S. Ct. at 2539. Section 1252(f)(1) only "deprives courts of the power to issue a specific category of remedies: those that 'enjoin or restrain the operation of' the relevant sections of the statute." *Id.*

61.     There is no bar to judicial review of agency action terminating MPP in 8 U.S.C. §§ 1252(g), 1252(b)(9), 1252(a)(2)(B)(ii)).

62.     The termination of MPP is not "agency action … committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and is therefore subject to judicial review. ECF 94 at 31–32; *see also Biden II*, 20 F.4th at 978–88 (same).

**The October 29 Memoranda are final agency action.**

63.     Agency action is "final" for the purposes of judicial review if two conditions are met: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks omitted). The Supreme Court has already determined that the October 29 Memoranda satisfy these conditions and "were therefore final agency action for the same reasons that the June 1 Memorandum was final agency action." *Biden III*, 142 S. Ct. at 2544–45.

> **Defendants failed to adequately consider how using its contiguous-territory return authority would allow them to avoid violations of the INA's clear detention mandate.**

64.     Though the October 29 Memoranda purport to address compliance with § 1225's detention mandate, Ex. B, Explanation Memorandum at 26–29, they rely on incorrect legal

conclusions, including that "[s]ection 1225 does not impose a near-universal detention mandate," and that section 1182(d)(5)(A)'s parole authority permits DHS to parole nearly all aliens subject to section 1225's mandatory-detention obligation. Ex. B, Explanation Memorandum at 27–29.

65.     The termination of MPP reduces Defendants' ability to detain all of the arriving aliens that Congress has mandated them to do, and DHS failed to adequately consider this effect on that related statutory requirement.

66.     By denying that § 1225 creates a detention mandate in the October 29 Memoranda—despite this Court's earlier determination to the contrary, ECF 94 at 42–44—Defendants have based the renewed termination of MPP on arbitrary and capricious grounds. Their erroneous legal root prevented Defendants from properly analyzing the strength of using MPP to reduce their noncompliance with their detention mandates.

> **Defendants failed to adequately account for MPP's deterrent effect in reducing dangerous attempted illegal border crossings, as well as MPP's reduction of unmeritorious asylum claims.**

67.     The October 29 Memoranda failed to consider key benefits of MPP. For example, they extensively discussed conditions for migrants in Mexico, Ex. B. Explanation Memorandum at 12–18, but omitted the hardships befalling aliens who make the dangerous journey to the southern border—even though the Secretary similarly acknowledged that MPP "is likely … to contribute[] to a decrease in migrant flows." Ex. B, Explanation Memorandum at 23. The October 29 Memoranda also had no analysis of the harms avoided by deterring migrants without meritorious asylum claims from traveling to the United States. Ex. B, Explanation Memorandum at 18–21.

68.     A substantial harm resulting from migrant flows includes human trafficking. ECF 94 at 20. Defendants dismiss the concern that terminating MPP contributed to an increase in these crimes by looking at the data for seizures of narcotics, which indicates a decline, including while MPP was moribund. Ex. B, Explanation Memorandum at 25–26.

69.     But Defendants themselves note that "[t]hese declines have been driven by a substantial decrease in marijuana smuggling," and the numbers for "hard narcotics … are historically smuggled through ports of entry and this have very little connection to MPP's implementation." Ex. B, Explanation Memorandum at 25. Indeed, Defendants concede up front that "[s]eizures of narcotics [are not] necessarily indicative of trafficking activity," but use this data to determine that there is no evidence of effects on human trafficking due to implementation of MPP. Ex. B, Explanation Memorandum at 25.

70.     This use of admittedly irrelevant data is a hallmark of a lack of rational decisionmaking, as agencies "must examine the relevant data" and are required to articulate a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43; *see also Biden II*, 20 F.4th at 992 ("We do not fault DHS for failing to provide a study. We fault DHS for cherry-picking a *single* statistic from the administrative record and relying on it in an entirely nonsensical fashion.").

71.     By failing to adequately consider the effects of the implementation of MPP on deterring illegal border crossings and unmeritorious asylum claims, and in reducing the opportunities for human trafficking, Defendants did not consider the relevant costs and benefits to make a rational decision when it terminated MPP.

### Defendants failed to adequately justify their changed factual determinations regarding *in absentia* removal orders.

72.     The October 29 Memoranda also purport to "rest[] upon factual findings that contradict those which underlay [DHS's] prior policy," but fail to provide the "more detailed justification" required under those circumstances. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516–17 (2009).

73.     For example, the October 29 Memoranda contain completely different numbers regarding *in absentia* removal orders than those contained in the June 1 Memorandum's administrative record to show MPP resulted in a high rate of *in absentia* removals. Ex. B, Explanation Memorandum

at 18 n.78; *id.* at 19 n.82; *id.* at 18–21.

74.    But Defendants did not explain the discrepancy or contest the Fifth Circuit's conclusion "that *in absentia* removal rates were similar prior to MPP." *Biden II*, 20 F. 4th at 991–92; *see also* ECF 94 at 40.

75.    Defendants also never provided a rational explanation why the increased *in absentia* removal rates for aliens enrolled in MPP is not an indicator of MPP working; this Court has noted that "[a] higher rate of *in absentia* removal is consistent with DHS's [previous] findings that MPP reduced the 'perverse incentives' to pursue meritless asylum applications." ECF 94 at 40–41. This failure to appreciate the relevant costs and benefits of MPP precluded DHS from making a reasoned determination that considered all relevant factors.

### Defendants failed to adequately examine whether DHS's rescission of MPP is causing it to violate the limits on its parole authority.

76.    The Supreme Court majority in *Biden III* noted that "the INA expressly authorizes DHS to process applicants for admission under a third option: parole." *Biden III*, 142 S. Ct. at 2543 (citing 8 U.S.C. § 1182(d)(5)(A)). But it also emphasized that this "the authority is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'" *Id.* (quoting 8 U.S.C. § 1182(d)(5)(A)). "And under the APA, DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Id.* (citing *State Farm*, 463 U.S. 29).

77.    The October 29 Memoranda failed to consider how terminating MPP—combined with Defendants' inability to detain all arriving aliens—leads to increased violations of the limits on their parole authority as they release aliens into the United States. *Cf. Portland Cement Ass'n*, 665 F.3d at 187 ("an agency must have a similar obligation to acknowledge and account for a changed regulatory posture the agency creates—especially when the change impacts a contemporaneous and closely related rulemaking"); *Office of Commc'n of the United Church of Christ*, 707 F.2d at 1441–42 (finding it

"seriously disturbing" and "almost beyond belief" that an agency would take rulemaking action undercutting another "concurrent" rulemaking process).

78.     Since agencies "have an obligation to deal with newly acquired evidence in some reasonable fashion," *Catawba Cnty. v. EPA,* 571 F.3d 20, 45 (D.C. Cir. 2009), or to "reexamine" their approaches "if a significant factual predicate" changes, *Bechtel v. FCC,* 957 F.2d 873, 881 (D.C. Cir. 1992), "an agency must have a similar obligation to acknowledge and account for a changed regulatory posture the agency creates." *Portland Cement Ass'n*, 665 F.3d at 187; *see also Office of Commc'n of the United Church of Christ,* 707 F.2d at 1441–42.

79.     Despite their purported implementation of MPP in good faith, DHS is presently releasing into the country tens of thousands of individuals per month through parole and otherwise. The continued violation of the limits on Defendants' parole authority—even after the re-institution of MPP—should have led Defendants to consider how terminating MPP would only exacerbate that problem.

80.     The loss of MPP as a tool to reduce the numbers paroled without the required individualized assessment was not adequately considered in the October 29 Memoranda. The consideration of the relevant costs and benefits of MPP thus did not adequately consider the relevant factors.

### Defendants failed to adequately consider costs to States and their reliance interests.

81.     DHS devoted just a single paragraph purporting to consider costs to the States and their reliance interests. Ex. B, Explanation Memorandum at 26. It was dismissive towards to costs of the States on the ground that "[f]ederal immigration policy virtually always affects the number of people living within the States," and describes these as "marginal costs" that are "outweighed by the other considerations and policy concerns." Ex. B, Explanation Memorandum at 26. But no such calculation can be rationally made without attempting to quantify these costs—such as the sorts of

expenses the States set forth earlier in this case—in order to perform such a cost-benefit analysis.

82.     Plaintiffs also faulted the June 1 Memorandum for the Secretary's failure to consider their legitimate reliance interests in MPP's continued operation or to provide for alternative means of meeting the Executive's § 1225 detention obligations. Yet the October 29 Memoranda airily dismiss the notion that Plaintiffs retain any legitimate reliance interests in MPP's operation and presume the Executive may broadly release aliens notwithstanding § 1225's mandate. Ex. B, Explanation Memorandum at 26.

83.     While DHS was required to actually consider Plaintiffs' financial injuries and other reliance interests, the October 29 Memoranda did the opposite. Without explaining what inquiry they made, Defendants breezily assert that "the Secretary is unaware of any State that has materially taken any action in reliance on the continued implementation … of MPP." Ex. B, Explanation Memorandum at 26. The Explanation Memorandum also asserts that "any claimed reliance interest is undermined by the fact that [MPP] is itself discretionary." Ex. B, Explanation Memorandum at 26.

84.     The October 29 Memoranda also maintain that "[t]he short time in which MPP was in place, as well as the small percentage of noncitizens encountered along the [southwest border] who were enrolled in MPP while it was in operation, undercut any claimed reliance interest, as well as any claim regarding significant burdens to the States." Ex. B, Explanation Memorandum at 26. But this statement is contradicted by Secretary Mayorkas's repeated concessions that the benefits of MPP included deterring aliens from arriving— that is, the reduction of the number of aliens present in the States included the aliens *deterred from arriving* by MPP, not just those actually enrolled in MPP.

85.     The October 29 Memoranda demonstrate failure to evaluate reliance interests by terminating MPP without adequately considering the reliance interests of States in the control of the flow of aliens—as assisted by MPP—Defendants failed to shape their "approach [to be] tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration

system." *Judulang v. Holder*, 565 U.S. 42, 55 (2011)

86.     The States "bear[] many of the consequences of unlawful immigration," which "must not be underestimated." *Arizona v. United States*, 567 U.S. 387, 397 (2012). The failure of the October 29 Memoranda to seriously evaluate these consequences was arbitrary and capricious.

### DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a.     Postpone the effective date of Defendants' termination of MPP effected by the October 29 Memoranda;

b.     Hold unlawful and set aside Defendants' termination of MPP effected by the October 29 Memoranda;

c.     Declare that Defendants' termination of MPP effected by the October 29 Memoranda is unlawful;

d.     Award Texas and Missouri the costs of this action and reasonable attorney's fees; and

e.     Award such other and further relief as the Court deems equitable and just.

Dated: August 8, 2022

Respectfully submitted,

ERIC S. SCHMITT
Attorney General of Missouri

KEN PAXTON
Attorney General of Texas

/S/ *D. JOHN SAUER*
D. JOHN SAUER, #58720MO*
Solicitor General

BRENT WEBSTER
First Assistant Attorney General

MICHAEL E. TALENT, #73339MO *
Deputy Solicitor General

JUDD E. STONE II
Solicitor General
Texas Bar No. 24076720

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-8870
Fax (573) 751-0774
John.Sauer@ago.mo.gov

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Texas Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
*Attorney-in-Charge*
Texas Bar No. 24088531

*Counsel for Plaintiff*
*State of Missouri*

/S/ *Ryan D. Walters*
RYAN D. WALTERS
Special Counsel
Texas Bar No. 24105085

*Admitted pro hac vice

OFFICE OF THE ATTORNEY GENERAL
SPECIAL LITIGATION UNIT
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov

*Counsel for Plaintiff*
*State of Texas*

**CERTIFICATE OF SERVICE**

I certify that on August 8, 2022, a true and accurate copy of the foregoing document was filed

electronically (via CM/ECF) and served on all counsel of record.

*/s/ Ryan D. Walters*
RYAN D. WALTERS