## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | § | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United | § | |
| States of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## Plaintiffs' Second Amended Complaint

# EXHIBIT A



**U.S. Department of Homeland Security**
Washington, DC 20528

October 29, 2021

MEMORANDUM TO:     Tae D. Johnson
                   Acting Director
                   U.S. Immigration and Customs Enforcement

                   Troy A. Miller
                   Acting Commissioner
                   U.S. Customs and Border Protection

                   Ur M. Jaddou
                   Director
                   U.S. Citizenship and Immigration Services

                   Robert Silvers
                   Under Secretary
                   Office of Strategy, Policy, and Plans

FROM:              Alejandro N. Mayorkas
                   Secretary

SUBJECT:           **Termination of the Migrant Protection Protocols**

_____

On January 25, 2019, then-Secretary of Homeland Security Kirstjen Nielsen issued a
memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols."
On February 2, 2021, President Biden issued Executive Order (EO) 14010, *Creating a
Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration
Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum
Seekers at the United States Border*.  In this Executive Order, President Biden directed the
Secretary of Homeland Security "to promptly review and determine whether to terminate or
modify the program known as the Migrant Protection Protocols."  After completing a
comprehensive review as directed by EO 14010, I concluded that the Migrant Protection
Protocols (MPP) should be terminated and, on June 1, 2021, issued a memorandum to that effect
(the "June 1 memo").

1

On August 13, 2021, the U.S. District Court for the Northern District of Texas determined that the June 1 memo was not issued in compliance with the Administrative Procedure Act (APA) because it failed to address all the relevant considerations. *See Texas v. Biden*, No. 2:21-cv-067, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021). As a result, the District Court vacated the June 1 memo in its entirety and remanded the matter to the Department for further consideration. *Id.* at *27. The District Court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA." *Id.* (emphasis in original). The Department is fully complying with the District Court's order. At the same time, the Department has filed a notice of appeal and continues to vigorously contest several of the District Court's conclusions.

Pursuant to the District Court's remand and in continuing compliance with the President's direction in EO 14010, I have once more assessed whether MPP should be maintained, terminated, or modified in a variety of different ways. In conducting my review, I have studied multiple court decisions, filings, and declarations related to MPP; considered relevant data regarding enrollments in MPP, encounters at the border, and outcomes in removal proceedings; reviewed previous Departmental assessments of MPP, as well as news reports and publicly available sources of information pertaining to conditions in Mexico; met with a broad and diverse array of internal and external stakeholders, including officials from across the federal government working on border management, state and local elected officials from across the border region, border sheriffs and other local law enforcement officials, and representatives from nonprofit organizations providing legal access and humanitarian aid across the southwest border; and considered the impact of other Administration initiatives related to immigration and the southern border. I also examined considerations that the District Court determined were insufficiently addressed in the June 1 memo, including claims that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, cause the Department to fail to comply with alleged detention obligations under the Immigration and Nationality Act, impose undue costs on states, and put a strain on U.S.-Mexico relations.

After carefully considering the arguments, evidence, and perspectives presented by those who support re-implementation of MPP, those who support terminating the program, and those who have argued for continuing MPP in a modified form, I have determined that MPP should be terminated. In reaching this conclusion, I recognize that MPP likely contributed to reduced migratory flows. But it did so by imposing substantial and unjustifiable human costs on the individuals who were exposed to harm while waiting in Mexico. The Biden-Harris Administration, by contrast, is pursuing a series of policies that disincentivize irregular migration while incentivizing safe, orderly, and humane pathways. These policies—including the ongoing efforts to reform our asylum system and address the root causes of migration in the region—seek to tackle longstanding problems that have plagued our immigration system for decades and achieve systemic change. Once fully implemented, I believe these policies will address migratory flows as effectively, in fact more effectively, while holding true to our nation's values.

To reiterate what the President has stated previously, the United States is a nation with borders and laws that must be enforced. It is also a nation of immigrants. This Administration is, as a result, committed to the twin goals of securing our borders and offering protection to those fleeing persecution and torture. MPP is neither the best, nor the preferred, strategy for achieving

either of these goals.  Significant evidence indicates that individuals awaiting their court hearings in Mexico under MPP were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited by exploiting migrants' vulnerabilities.  It is possible that such humanitarian challenges could be lessened through the expenditure of significant government resources currently allocated to other purposes.  Ultimately, however, the United States has limited ability to ensure the safety and security of those returned to Mexico.  Other significant issues with MPP, including the difficulties in accessing counsel and traveling to courts separated by an international border, are endemic to the program's design.

In reaching my determination, I have carefully considered what I deem to be the strongest argument in favor of retaining MPP: namely, the significant decrease in border encounters following the determination to implement MPP across the southern border.  Of course, correlation does not equal causation and, even here, the evidence is not conclusive.  I have nonetheless presumed, for the sake of this review, that MPP resulted in a significant decrease in irregular border crossings and persons approaching the U.S. border to pursue non-meritorious asylum claims.  I still conclude that the benefits do not justify the costs, particularly given the way in which MPP detracts from other regional and domestic goals, foreign-policy objectives, and domestic policy initiatives that better align with this Administration's values.

Importantly, the effective management of migratory flows requires that we work with our regional partners to address the root causes that drive migrants to leave their countries and to tackle this challenge before it arrives at our border.  This is a shared responsibility of all countries across the region.  MPP distracts from these regional efforts, focusing resources and attention on this singular program rather than on the work that is needed to implement broader and more enduring solutions.

Efforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration.  This was true under the previous implementation of MPP, and it is even more true today given the shared belief that the program should not be implemented without, at the very least, significant improvements.  Notably, Mexico has made clear that it will not agree to accept those the United States seeks to return to Mexico under MPP unless substantial improvements are made to the program.  But these much-needed efforts to enhance humanitarian protections for those placed in MPP are resource-intensive, exacerbating one of the flaws of the program: the concentration of resources, personnel, and aid efforts on the northern border of Mexico rather than on broader regional assistance efforts that would more effectively and systematically address the problem of irregular migration and better protect our border.

Moreover, the personnel required to adequately screen MPP enrollees to ensure they are not returned to persecution or torture in Mexico, process them for court hearings, and manage their cases pulls resources from other priority efforts, including the ongoing efforts to implement effective, fair, and durable asylum reforms that reduce adjudication delays and tackle the immigration court backlog.  Both the Dedicated Docket, designed so that immigration judges can adjudicate cases within 300 days, and the proposed Asylum Officer Rule, which would transfer the initial responsibility for adjudicating asylum claims from immigration judges to USCIS asylum officers to produce timely and fair decision-making, are expected to yield transformative

and lasting changes to the asylum system.  MPP, which can require unproductive, redundant screenings per case given the many different times individuals are returned to Mexico during the pendency of a single removal proceeding, diverts asylum officers and immigration judges away from these priority efforts.  MPP not only undercuts the Administration's ability to implement critically needed and foundational changes to the immigration system, but it also fails to provide the fair process and humanitarian protections that all persons deserve.

Having assessed the benefits and costs of the previous implementation of MPP, including how the program could potentially be improved, I have concluded that there are inherent problems with the program that no amount of resources can sufficiently fix.  Others cannot be addressed without detracting from key Administration priorities and more enduring solutions.

It is, as a result, my judgment that the benefits of MPP are far outweighed by the costs of continuing to use the program on a programmatic basis, in whatever form.  For the reasons detailed more fully in the attached memorandum, the contents of which are adopted and incorporated into the decision contained here, I am hereby terminating MPP.  Effective immediately, I hereby supersede and rescind the June 1 memorandum, Secretary Nielsen's January 25, 2019 memorandum, and any other guidance or other documents prepared by the Department to implement MPP.  The Department will continue complying with the *Texas* injunction requiring good-faith implementation and enforcement of MPP.  But the termination of MPP will be implemented as soon as practicable after a final judicial decision to vacate the *Texas* injunction.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United | § | |
| States of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## Plaintiffs' Second Amended Complaint

# EXHIBIT B



**Explanation of the Decision to Terminate the Migrant Protection Protocols**

October 29, 2021

I.      Executive Summary .......................................................................................... 2

II.     Background ...................................................................................................... 3

   A.      MPP's Statutory Basis and Implementation .................................................. 5

   B.      Prior Evaluations of MPP .............................................................................. 7

   C.      Litigation Regarding the Prior Implementation of MPP................................. 9

   D.      Suspension of New Enrollments and Phased Strategy for the Safe and Orderly Entry of Individuals Subjected to MPP.............................................................................. 10

   E.      Challenge to the Suspension and Termination............................................... 10

III.    Evaluation of MPP ......................................................................................... 11

   A.      Conditions for Migrants in Mexico .............................................................. 12

   B.      *Non-Refoulement* Concerns ......................................................................... 14

   C.      Access to Counsel, Notice of Hearings, and Other Process Concerns .......................... 16

   D.      Impacts of MPP on Immigration Court Appearance Rates and Outcomes ................. 18

   E.      MPP and Recidivist Irregular Re-Entries ................................................... 21

   F.      Investments and Resources Required to Operate MPP................................... 22

   G.      Impact of MPP and its Termination on SWB Migration Flows .................... 23

   H.      Addressing the Concerns of States and Border Communities ...................... 24

   I.      Relationship between Implementation of MPP and Statutory Mandates .................... 26

   J.      Impact on U.S.-Mexico Relationship............................................................ 29

IV.     The Biden-Harris Administration's Affirmative Efforts to Enhance Migration Management.............................................................................................. 30

   A.      Managing Flows ............................................................................................ 31

   B.      Managing Asylum Claims ............................................................................ 34

      1.      Dedicated Docket ................................................................................ 34

      2.      Asylum Officer Rule ........................................................................... 35

V.      Consideration of Alternatives to Terminating MPP....................................... 36

VI.     Conclusion...................................................................................................... 38

## I.  <u>Executive Summary</u>

On February 2, 2021, President Biden issued an Executive Order directing the Secretary of Homeland Security to "promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols."[1]  After extensive review, the Secretary of Homeland Security concluded that the Migrant Protection Protocols (MPP) should be terminated, and on June 1, 2021, issued a memorandum to that effect.[2]  On August 13, 2021, however, the U.S. District Court for the Northern District of Texas determined that the June 1, 2021, memorandum was not issued in compliance with the Administrative Procedure Act (APA) and caused DHS to violate 8 U.S.C. § 1225, vacated the memorandum, and remanded it to the Department for further consideration.  The court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA"—a ruling that the government is vigorously appealing.

Pursuant to the Texas court's remand, and in continuing compliance with the President's direction in the Executive Order, the Secretary has considered anew whether MPP should be maintained, terminated, or modified in a variety of different ways.  After carefully considering the arguments, evidence, and perspectives of those who support continuing to use MPP, those who support terminating the program, and those who have argued for the use of MPP with modifications, the Secretary has determined that MPP should be terminated.  In reaching this conclusion, the Secretary recognizes that MPP likely contributed to reduced migratory flows.  But it did so by imposing substantial and unjustifiable human costs on migrants who were exposed to harm while waiting in Mexico.  The Biden-Harris Administration, by contrast, is pursuing a series of policies that will disincentivize irregular migration while incentivizing safe, orderly, and humane pathways.  These policies—including the ongoing efforts to reform our asylum system and address the root causes of migration in the region—seek to tackle longstanding problems that have plagued our immigration system for decades and achieve systemic change.

To reiterate what the President has stated previously, the United States is a nation with borders and laws that must be enforced.  It is also a nation of immigrants.  This Administration is, as a result, committed to the twin goals of securing our borders and offering protection to those fleeing persecution and torture.  MPP is neither the best, nor the preferred, strategy for achieving either of these goals.  Significant evidence indicates that individuals were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited from putting migrants in harms' way while awaiting their court hearings in Mexico.  It is possible that some of these humanitarian challenges could be lessened through the expenditure of significant government resources currently allocated to other purposes.  Ultimately, however, the United States has limited ability to ensure the safety and security of those returned to Mexico.

---

[1] Exec. Order No. 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, 86 Fed. Reg. 8267 (Feb. 2, 2021).

[2] Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Security, *Termination of the Migrant Protection Protocols Program* (June 1, 2021) [hereinafter June 1 Memo].

Other significant issues with MPP, including the difficulties in accessing counsel and traveling to courts separated by an international border, are endemic to the program's design.

Importantly, as the Secretary has emphasized, the management of migratory flows is a shared responsibility among all countries in the hemisphere. MPP distracts from these regional efforts, focusing resources and attention on this singular program rather than on the work that is needed to implement broader, and more enduring, solutions. Efforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration.

Notably, Mexico has made clear that it will not agree to accept those the United States seeks to return to Mexico under MPP unless substantial improvements are made to the program. But these much-needed efforts to enhance humanitarian protections for those placed in MPP are resource-intensive, exacerbating one of the flaws of the program—the concentration of resources, personnel, and aid efforts on the northern border of Mexico rather than on broader regional assistance efforts that would more effectively and systemically tackle the problem of irregular migration and protect our border. Moreover, the personnel required to adequately screen MPP enrollees, potentially multiple times—to ensure they are not returned to persecution or torture in Mexico, process them for court hearings, and manage their cases—pulls resources from other priority efforts, including the ongoing efforts to implement effective, fair, and durable asylum reforms that reduce adjudication delays and tackle the immigration court backlog.

Having assessed the benefits and costs of the previous implementation of MPP as well as how the program could potentially be improved, the Secretary has concluded that there are inherent problems with the program—including the vulnerability of migrants to criminal networks, and the challenges associated with accessing counsel and courts across an international border—that resources cannot sufficiently fix. Others cannot be addressed without detracting from other key Administration priorities. It is thus the Secretary's judgment that the benefits of MPP are far outweighed by the costs of the program, in whatever form.

As a result, for the many reasons described in what follows, the Secretary in a memorandum issued today entitled, "Termination of the Migrant Protection Protocols," has decided to terminate MPP.[3] This determination will be implemented as soon as practicable after a final judicial decision to vacate the Texas injunction that currently requires good-faith enforcement of MPP.

## II.   Background

On January 25, 2019, Secretary of Homeland Security Kirstjen Nielsen issued a memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols." On January 20, 2021, Acting Secretary David Pekoske issued a memorandum temporarily suspending new enrollments into the Migrant Protection Protocols (MPP) pending

---

[3] Memorandum from Alejandro Mayorkas, Sec'y of Homeland Sec., *Termination of the Migrant Protection Protocols* (Oct. 29, 2021).

further review.[4]  Two weeks later, on February 2, 2021, President Biden issued Executive Order (EO) 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*.[5]  In this Executive Order, President Biden directed the Secretary of Homeland Security to "promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols" and "promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subject to MPP."[6]  In response, Secretary Mayorkas initiated a comprehensive review of MPP.  The Secretary, in conjunction with other agencies, also implemented a phased process for the safe and orderly entry into the United States of thousands of individuals who had been placed in MPP and certain of their immediate family members for proceedings.[7]

At the conclusion of his review, on June 1, 2021, Secretary Mayorkas issued a memorandum announcing and explaining his determination that MPP should be terminated (the "June 1 Memorandum").[8]  On August 13, 2021, the U.S. District Court for the Northern District of Texas determined that the June 1 Memorandum did not reflect reasoned decision-making and thus was not issued in compliance with the Administrative Procedure Act (APA), and that the memorandum caused the Department to violate detention provisions found in 8 U.S.C. § 1225.[9]  The court vacated the June 1 Memorandum in its entirety and remanded it to the Department of Homeland Security (DHS) for further consideration.[10]  The court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA."[11]  The government is complying with that injunction while appealing the decision.

Pursuant to the district court's remand, and consistent with the President's direction in EO 14010, the Secretary has considered anew whether MPP should be maintained, terminated, or modified.  This memorandum sets forth the results of that analysis and the basis for the Secretary's decision to terminate MPP by way of a separate memorandum being issued today.  The Secretary's memorandum immediately supersedes and rescinds the June 1 Memorandum, as well as Secretary Nielsen's January 25, 2019 memorandum and any other guidance or other documents prepared by the Department to implement it.  The Secretary's decision to terminate

---

[4] Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Suspension of Enrollment in the Migrant Protection Protocol Program* (Jan. 20, 2021) [hereinafter MPP Suspension Memorandum].

[5] Exec. Order No. 14010, 86 Fed. Reg. 8267 (Feb. 2, 2021).

[6] *Id.* at 8270.

[7] *See* Press Release, DHS, "DHS Announces Process to Address Individuals in Mexico with Active MPP Cases," Feb. 11, 2021, https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

[8] *See supra* note 2.

[9] *See Texas v. Biden*, No. 2:21-cv-067, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021), *appeal pending*, No. 21-10806 (5th Cir. filed Aug. 16, 2021).

[10] *Id*. at *27.

[11] *Id*. (emphasis in original).

MPP is to be implemented as soon as practicable after a final judicial decision to vacate the *Texas* injunction that currently requires good faith implementation and enforcement of MPP.

    A.  <u>MPP's Statutory Basis and Implementation</u>

      Enacted in 1996, Section 235(b)(2)(C) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1225(b)(2)(C), grants DHS discretionary authority to return to Mexico or Canada certain noncitizens who are arriving on land from those contiguous countries pending their removal proceedings before an immigration judge under Section 240 of the INA, 8 U.S.C. § 1229a.  Historically, DHS and the legacy Immigration and Naturalization Service (INS) used this discretionary authority on a case-by-case basis to return certain Mexican and Canadian nationals who were arriving at land border ports of entry; occasionally, the provision also was used for third-country nationals under certain circumstances provided they did not have a fear of persecution or torture related to return to Canada or Mexico.[12]  On December 20, 2018, the Department announced a decision to initiate MPP—a novel programmatic implementation of Section 235(b)(2)(C)—along the Southwest Border (SWB).  That same day, Mexico announced its independent decision to accept those returned to Mexico through the program—a key precondition to implementation.[13]

      At the time of its initial announcement, DHS stated that the program was intended to: (1) reduce unlawful migration and false claims of asylum; (2) ensure that migrants are not able to "disappear" into the United States prior to a court decision; (3) focus attention on more quickly assisting legitimate asylum seekers; (4) free up personnel and resources to better protect U.S. territory and clear the backlog of unadjudicated asylum applications; and (5) offer protection to vulnerable populations while they wait in Mexico for their removal proceedings.[14]

---

[12] Prior to MPP, DHS and the former INS primarily used Section 235(b)(2)(C) on an ad-hoc basis to return certain Mexican and Canadian nationals who were arriving at land border ports of entry. CBP, for instance, invoked Section 235(b)(2)(C) to return certain Mexican nationals who were U.S. lawful permanent residents (LPRs) and whose criminal histories potentially subjected them to removal, as well as LPRs who appeared to have abandoned their permanent residence in the United States but were not willing to execute a Form I-407, Record of Abandonment of Lawful Permanent Residence. At the Northern Border, CBP used Section 235(b)(2)(C) to return certain Canadian nationals or those with status in Canada who, for instance, appear to be subject to a criminal ground of inadmissibility. Although guidance is scant, DHS and the former INS also used Section 235(b)(2)(C), on a case-by-case basis, for certain third country nationals even prior to MPP. For example, CBP issued field guidance in 2005 advising that a Cuban national arriving at a land border port of entry may "be returned to contiguous territory pending section 240 proceedings . . . if: (1) the alien cannot demonstrate eligibility for the exercise of parole discretion; (2) the alien has valid immigration status in Canada or Mexico; (3) Canadian or Mexican border officials express a willingness to accept the returning alien; and (4) the alien's claim of fear of persecution or torture does not relate to Canada or Mexico." Mem. from Jayson P. Ahern, Asst. Comm'r, Office of Field Ops., CBP, *Treatment of Cuban Asylum Seekers at Land Border Ports of Entry* 2-3 (June 10, 2005). The INS also issued guidance in 1997 and 1998 contemplating the use of Section 235(b)(2)(C) only as a "last resort" and only when the individual does not claim a fear of persecution related to Canada or Mexico. Mem. from Michael A. Pearson, Executive Assoc. Comm'r, Office of Field Ops., INS, *Detention Guidelines Effective October 9, 1998* 3 (Oct. 7, 1998); Mem. from Chris Sale, Deputy Comm'r, INS, *Implementation of Expedited Removal* 4 (Mar. 31, 1997) (same).

[13] Secretaría de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018).

[14] Press Release, DHS, "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration," Dec. 20, 2018, https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration [hereinafter Nielsen Release].

On January 25, 2019, DHS issued policy guidance for implementing MPP,[15] which was augmented a few days later by operational guidance from U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS).[16]  Under MPP, certain non-Mexican applicants for admission who arrived on land at the SWB were placed in removal proceedings and returned to Mexico to await their immigration court proceedings under Section 240 of the INA.[17]  For those enrolled in MPP, DHS attempted to facilitate entry to and exit from the United States to attend their immigration proceedings, which were prioritized on the non-detained docket by the Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR).

MPP was initially piloted at the San Ysidro port of entry and San Diego Immigration Court.  In July 2019, the program was expanded into Texas and as of January 2020, individuals could be enrolled in MPP at locations across the SWB.  Individuals returned to Mexico were processed back into the United States to attend their removal proceedings at one of four immigration court locations in California and Texas.[18]  It was initially anticipated that enrollees' first hearings would be scheduled within 30-45 days, consistent with the goal of timely adjudication of cases.  But enrollment quickly outpaced EOIR's capacity to hear cases.  Over time, capacity constraints meant that even initial hearings were scheduled many months after enrollment.  Large numbers of migrants ended up living in camps in Northern Mexico that were, as well-documented in numerous reports and as described below, crowded, unsanitary, and beset by violence.[19]

Due to public health concerns brought on by the COVID-19 pandemic, EOIR paused immigration court hearings for all non-detained individuals, including those enrolled in MPP, in March 2020.[20]  MPP hearings never resumed prior to the program's January 2021 suspension,

---

[15] Memorandum from Kirstjen M. Nielsen, Sec'y of Homeland Sec., *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019).

[16] Guidance documents are available at the archived MPP landing page under the *MPP Guidance Documentation heading:* https://www.dhs.gov/archive/migrant-protection-protocols.

[17] Individuals who could be enrolled into MPP were, generally, individuals from Spanish-speaking countries and Brazil.

[18] Individuals enrolled in MPP in the San Diego or El Paso jurisdictions attended hearings at the immigration courts in San Diego or El Paso; individuals enrolled in MPP in San Antonio or Harlingen jurisdictions attended hearings at the Immigration Hearing Facilities (IHFs) in Laredo or Brownsville, respectively.

[19] *See infra* Section III.A; *see also* Caitlin Dickerson, *Inside the Refugee Camp on America's Doorstep*, N.Y. Times, Oct. 23, 2020; Miriam Jordan, *'I'm Kidnapped': A Father's Nightmare on the Border*, N.Y. Times, Dec. 21, 2019; Nomaan Merchant, *Tents, stench, smoke: Health risks are gripping migrant camp*, A.P. News, Nov. 14, 2019; Human Rights Watch, *Like I'm Drowning: Children and Families Sent to Harm by the US 'Remain in Mexico' Program*, Jan. 6, 2021 ("As a result [of MPP], thousands of people are concentrated in dangerous Mexican border towns indefinitely, living in limbo . . . . Migrant shelters in Ciudad Juárez and Tijuana quickly filled, and a large shelter run by Mexican federal authorities in Ciudad Juárez also quickly hit capacity soon after it opened in late 2019. In Matamoros, dangers in the city have led as many as 2,600 people to live in an informal camp on the banks of the river marking the border between Mexico and the United States, a location prone to flooding.").

[20] *See* Press Release, DHS, "Joint DHS/EOIR Statement of MPP Rescheduling," Mar. 23, 2020, https://www.dhs.gov/news/2020/03/23/joint-statement-mpp-rescheduling.

but new enrollments into MPP continued during this period, albeit at significantly reduced rates.[21]

In total, between the initial implementation of MPP on January 25, 2019, and the suspension of new enrollments that became effective on January 21, 2021,[22] DHS returned to Mexico approximately 68,000 individuals, according to DHS and EOIR data.[23]  During that same period, CBP processed a total of 1.5 million SWB encounters, including approximately 1 million encounters processed under Title 8 authorities (including the 68,000 processed through MPP) and approximately 500,000 Title 42 expulsions.[24]

   B.  Prior Evaluations of MPP

Prior to the Secretary's June 1, 2021, termination memorandum, the Department produced two notable assessments of the program that reached divergent conclusions.

In June 2019, as the Department prepared to expand MPP across the entire SWB, it formed a committee of senior leaders from multiple components (known as the "Red Team") to conduct a "top-down review of MPP's policies and implementation strategy and provide overall recommendations to increase the effectiveness of the program."[25]  The Red Team members were chosen, in part, because they had "little to no involvement developing policy or with implementing MPP," thus helping to ensure an independent assessment.[26]  The report and recommendations (the "Red Team Report") was issued October 25, 2019, but not publicly released.[27]  In preparing its report, the Red Team reviewed key MPP background documents, conducted dozens of interviews, made site visits, and performed additional research.[28]  The Red Team identified significant deficiencies in MPP and made multiple recommendations for improving MPP, organized around five different areas: the need for standardization and clarity

---

[21] *See* U.S. Customs and Border Protection, "Migrant Protection Protocols FY2021," https://www.cbp.gov/newsroom/stats/migrant-protection-protocols; U.S. Customs and Border Protection, "Migrant Protection Protocols FY2020," https://www.cbp.gov/newsroom/stats/migrant-protection-protocols-fy-2020; *see also* MPP Suspension Memorandum, *supra* note 4.

[22] MPP Suspension Memorandum, *supra* note 4.

[23] *See* "Migrant Protection Protocols Metrics and Measures," Jan. 21, 2021, https://www.dhs.gov/publication/metrics-and-measures.

[24] DHS Office of Immigration Statistics analysis of U.S. CBP administrative records. In March 2020, the U.S. Centers for Disease Control and Prevention (CDC) issued a public health order under 42 U.S.C. §§ 265 and 268 to prevent the spread of COVID-19 in CBP holding facilities and in the United States.  85 Fed. Reg. 16,559 (Mar. 24, 2020).  The Order temporarily suspending the introduction of certain persons into the United States from countries where a communicable disease exists. *Id*. In August 2021, CDC issued a new Order, which replaced, reaffirmed, and superseded the previous Orders. *See* 86 Fed. Reg. 42,828 (Aug. 5, 2021).

[25] Memorandum from Kevin McAleenan, Acting Sec'y of Homeland Sec., *Review of Migrant Protection Protocols Policy and Implementation* (June 12, 2019).

[26] *Id.* Working under the oversight of the Acting Deputy Secretary of Homeland Security, the Red Team was composed of individuals from the Offices of Privacy, Management, Civil Rights and Civil Liberties, and the Coast Guard.

[27] DHS Office of Operations Coordination, *The Migrant Protection Protocols Red Team Report* (Oct. 25, 2019) [hereinafter Red Team Report].

[28] *Id.* at 4.

with respect to information provided to migrants upon initial screening and processing; the need for better access to counsel and better mechanisms for communication with counsel; the need to ensure better *non-refoulement* protections;[29] the need for safe housing and protections for those returned to Mexico; and the need for administrative and logistical improvements, including the establishment of measures of effectiveness and better mechanisms for the sharing of key information between migrants and relevant government agencies.  In December 2020—at a point when new enrollments into MPP had already dropped significantly and only a month before the program's suspension—the Department issued supplementary policy and operational guidance designed to address several of the Red Team's recommendations.[30]

Three days after the issuance of the Red Team Report, the Department released publicly a separate review of MPP (the "October 2019 Assessment"), which offered a very different assessment of the program.[31]  The October 2019 Assessment declared that MPP had demonstrated operational effectiveness, including by helping to address "the ongoing crisis at the southern border and restoring integrity to the immigration system."[32]  The assessment noted that apprehensions of noncitizens at and between ports of entry decreased from May through September 2019; reported that rapid and substantial declines in apprehensions occurred in areas where the greatest number of MPP-amenable noncitizens had been processed and returned to Mexico through MPP; asserted that MPP was restoring integrity to the immigration system; claimed that both the U.S. Government and the Government of Mexico (GOM) were endeavoring to provide safety and security for migrants returned to Mexico; and stated that the

---

[29] Article 33 of the 1951 Convention Relating to the Status of Refugees provides that "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Convention Relating to the Status of Refugees, done July 28, 1951, 19 U.S.T. 6259, 6276, 189 U.N.T.S. 150, 176. The United States is not a party to the 1951 Convention, but the United States is a party to the 1967 Protocol Relating to the Status of Refugees, done Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. 6577, which incorporates Article 33 of the 1951 Convention. The phrase "life or freedom would be threatened" is interpreted in U.S. law as meaning that it is more likely than not that the individual would be persecuted.  *See, e.g.*, *INS v. Stevic*, 467 U.S. 407, 428 & n.22 (1984). Separately, Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) provides, "No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-2822 (8 U.S.C. § 1231 note). Article 3 of the CAT likewise is understood in U.S. law as requiring a "more likely than not" standard.  *See, e.g.*, *Auguste v. Ridge*, 395 F.3d 123, 149 (3d Cir. 2005) (citing Senate Resolution, 136 Cong. Rec. S17,486, S17491-92 (daily ed. 1990)). These *non-refoulement* obligations are non-self-executing, *see, e.g.*, *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009) (1967 Refugee Protocol); *Al-Fara v. Gonzales*, 404 F.3d 733, 743 (3d Cir. 2005) (CAT), and are not specifically required by statute with respect to MPP returns.

[30] The policy and operational guidance was published on an MPP website and took the form of a series of memoranda that provided clarity on matters like access to counsel during the *non-refoulement* interview, the importance of maintaining family unity, and more consistent application of the "known mental and physical health" exclusion for enrollment in MPP. DHS, *Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols* (Dec. 7, 2020); CBP, *Supplemental Migrant Protection Protocols Guidance, Initial Document Service* (Dec. 7, 2020); CBP, *Supplemental Migrant Protection Protocol Guidance, MPP Amenability* (Dec. 7, 2020).

[31] DHS, "Assessment of the Migrant Protection Protocols (MPP)," Oct. 28, 2019, https://www.dhs.gov/publication/assessment-migrant-protection-protocols-mpp [hereinafter Oct. 2019 Assessment].

[32] *Id.*

screening protocols in place were appropriately assessing noncitizens' fear of persecution or torture in Mexico.

The public October 2019 Assessment presented MPP as a resounding success, whereas the internal Red Team Report raised serious concerns with the program. Notably, the October 2019 Assessment did not acknowledge or address any of the shortcomings identified by the Red Team Report, despite the fact that the Assessment was released *after* the Red Team Report was completed.

### C.  Litigation Regarding the Prior Implementation of MPP

MPP was challenged many times on multiple grounds in federal court and remains the subject of ongoing litigation in several jurisdictions. Among other claims, litigants challenged the program as an impermissible exercise of the underlying statutory authority; argued that MPP caused DHS to return noncitizens to Mexico to face persecution, abuse, and other harms and that its procedures inadequately implemented *non-refoulement* protections; argued that their right to access counsel before and during *non-refoulement* interviews had been violated; contested the return to Mexico pursuant to MPP of noncitizens with mental and physical disabilities; asserted that the program had been implemented in violation of the APA; and contended that MPP's expansion across the SWB was unlawful because it led to the return of migrants to places that were particularly dangerous.[33] Both in the course of litigation and otherwise, litigants described, and some courts credited, extreme violence and substantial hardships faced by those returned to Mexico to await their immigration court proceedings, as well as substantial danger traveling to and from ports of entry to those hearings. Litigants described being exposed to violent crime, such as rape and kidnapping, as well as difficulty obtaining needed support and services in Mexico, including adequate food and shelter.[34] In addition, more than one hundred MPP enrollees who received final orders of removal have petitioned the federal courts of appeal for review of such orders on the grounds that various features of MPP, including limited access to

---

[33] *See, e.g.*, *Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020), *vacated as moot*, 5 F.4th 1099 (9th Cir. 2021); *Bollat Vasquez v. Wolf*, 520 F. Supp. 3d 94 (D. Mass. 2021); *Doe v. Wolf*, 432 F. Supp. 3d 1200 (S.D. Cal. 2020); *E.A.R.R. v. Dep't of Homeland Sec.*, No. 3:20-cv-2146 (S.D. Cal. filed Nov. 2, 2020); *Adrianza v. Trump*, 505 F. Supp. 3d 164 (E.D.N.Y. 2020), *dismissed*, No. 1:20-cv-03919 (E.D.N.Y. Sept. 2, 2021); *Nora v. Wolf*, No. 20-993, 2020 WL 3469670 (D.D.C. June 25, 2020); *Turcios v. Wolf*, No. 1:20-cv-1982, 2020 WL 10788713 (S.D. Tex. Oct. 16, 2020).

[34] For example, in *Innovation Law Lab v. Wolf*, the Ninth Circuit observed:

> The MPP has had serious adverse consequences for the individual plaintiffs. Plaintiffs presented evidence in the district court that they, as well as others returned to Mexico under the MPP, face targeted discrimination, physical violence, sexual assault, overwhelmed and corrupt law enforcement, lack of food and shelter, and practical obstacles to participation in court proceedings in the United States. The hardship and danger to individuals returned to Mexico under the MPP have been repeatedly confirmed by reliable news reports.

951 F.3d at 1078; *see also Bollat Vasquez*, 520 F. Supp. 3d at 111–12 (describing plaintiffs' unrebutted descriptions of rape, death threats, kidnapping risks, and insufficient food and shelter as supported by the U.S. State Department's assignment to Tamaulipas of a "Level 4: Do Not Travel" warning "due to crime and kidnapping").

counsel and inability to access court hearings, prejudiced their ability to pursue relief in removal proceedings.[35]

    D.  <u>Suspension of New Enrollments and Phased Strategy for the Safe and Orderly Entry of Individuals Subjected to MPP</u>

On January 20, 2021, Acting Secretary David Pekoske issued a memorandum suspending new enrollments into MPP, effective January 21, 2021, pending further review of the program.[36] The MPP Suspension Memorandum was followed by the President's issuance of EO 14010 on February 2, 2021, which, in addition to requiring the Secretary to review the program, directed the Secretary to "promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subject to MPP."[37]

From February 19, 2021, until the effective date of the district court's order on August 25, 2021, DHS implemented a phased process for the safe and orderly entry into the United States of thousands of individuals who had been placed in MPP and remained outside the United States.[38] Certain individuals whose removal proceedings were pending before EOIR or whose proceedings resulted in an *in absentia* order of removal or termination, and certain of their immediate family members, were processed into the United States to continue their Section 240 removal proceedings.[39] About 13,000 individuals were processed into the United States to participate in Section 240 removal proceedings as a result of this process.[40]

    E.  <u>Challenge to the Suspension and Termination</u>

On April 13, 2021, the States of Missouri and Texas filed suit in the U.S. District Court for the Northern District of Texas, challenging the suspension of new enrollments into MPP on the grounds that the January 20, 2021, suspension memorandum violated the APA, 8 U.S.C. § 1225, the Constitution, and a purported agreement between Texas and the federal government.

---

[35] *See, e.g.*, *Hernandez Ortiz v. Garland*, No. 20-71506 (9th Cir. filed Mar. 15, 2021) (describing repeated failed attempts to contact legal service providers from within Mexico and ultimately agreeing to proceed pro se because the alternative was to wait longer in Mexico at continued risk to the family's safety); *Del Toro v. Garland*, No. 20-60900 (5th Cir. filed Dec. 14, 2020) (explaining that MPP restricted access to counsel, which prevented the individual from filing an update State Department country report on Cuba for his individual hearing); *Del Carmen Valle v. Garland*, No. 20-72071 (9th Cir. filed July 16, 2020) (arguing that the individual's "extreme distress and vulnerability in Mexico, lack of access to counsel, and difficulty in preparing and presenting her asylum application" as grounds for appeal).

[36] MPP Suspension Memorandum, *supra* note 4.

[37] Exec. Order No. 14010, 86 Fed. Reg. at 8270.

[38] *See* Press Release, DHS, "DHS Announces Process to Address Individuals in Mexico with Active MPP Cases," Feb. 11, 2021, https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

[39] *Id.*; Press Release, DHS, "DHS Announces Expanded Criteria for MPP-Enrolled Individuals Who Are Eligible for Processing into the United States," June 23, 2021, https://www.dhs.gov/news/2021/06/23/dhs-announces-expanded-criteria-mpp-enrolled-individuals-who-are-eligible-processing.

[40] Data on the number of people permitted to enter the United States under this phased process, February 19-August 25, 2021, provided by the Department of State on October 24, 2021.

Subsequent to the Secretary's June 1, 2021, termination memorandum, Missouri and Texas amended their complaint to challenge the June 1 Memorandum and filed a motion to enjoin the memorandum.

On August 13, 2021, the district court issued a nationwide permanent injunction requiring DHS "to enforce and implement MPP *in good faith*" until certain conditions were satisfied.[41] The district court determined that the June 1 Memorandum was arbitrary and capricious because, according to the court, the Department ignored critical factors and reached unjustified conclusions.  In particular, the district court found that the June 1 Memorandum failed to sufficiently account for several considerations, including the prior administration's assessment of the benefits of MPP; warnings allegedly made by career DHS personnel during the presidential transition process that suspending MPP would lead to a surge of border crossers; the costs of terminating MPP to the States as well as their reliance on MPP; the impact that terminating MPP would have on the Department's ability to comply with detention provisions in the INA, which the court construed to require detention and to foreclose release based on detention capacity concerns; and modifications to MPP short of termination that could similarly achieve the Department's goals.[42]  As a result, the district court enjoined the June 1 Memorandum in its entirety and "remanded" it to the Department for further consideration.[43]  The district court denied a request for a stay of the injunction pending appeal, and the U.S. Court of Appeals for the Fifth Circuit and the Supreme Court of the United States also denied stays.[44]  As a result, the district court's order, as construed by the Fifth Circuit, went into effect at 12:01 a.m. on August 25, 2021.

Since August, the Department has worked actively to reimplement MPP in good faith, as required by the district court's order.[45] At the same time, pursuant to the district court's order and in continuing compliance with the President's direction in EO 14010, the Secretary has considered anew whether to maintain, terminate, or modify MPP in various ways.

### III.   Evaluation of MPP

In considering whether to maintain, terminate, or modify MPP anew, the Department considered, among other things, the decisions of the *Texas* district court, Fifth Circuit, and Supreme Court; the decisions of multiple other courts in litigation challenging MPP or its termination; the briefs and declarations filed in all such lawsuits pertaining to MPP; various Departmental assessments of MPP, including both the Red Team Report and agency responses and the October 2019 Assessment; a confidential December 2019 Rapid Protection Assessment from the U.N. High Commissioner for Refugees (UNHCR) and publicly available sources of information, including news reports and publicly available sources of information, pertaining to conditions in Mexico; records and testimony from Congressional hearings on MPP and reports

---

[41] *Texas*, 2021 WL at 3603341, at *27 (emphasis in original).

[42] *Id.* at *17-22.

[43] *Id.* at * 27.

[44] *See Biden v. Texas*, No. 21A21, 2021 WL 3732667 (U.S. Aug. 24, 2021); *Texas v. Biden*, 10 F.4th 538 (5th Cir. 2021).

[45] *See* Declaration of Blas Nuñez-Neto, *Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex. Oct. 14, 2021); Defendants' First Supplemental Notice of Compliance with Injunction, *Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex. Oct. 14, 2021).

by nongovernmental entities; and data regarding enrollments in MPP, encounters at the border, and outcomes in removal proceedings conducted for MPP enrollees; and the impact of other government programs and policies concerning migration and the southern border.  In addition, over the course of several months, the Secretary and his staff met with a broad array of internal and external stakeholders with divergent views about MPP, including members of the DHS workforce engaged in border management, state and local elected officials across the border region, including from Texas, California, Arizona, and New Mexico, border sheriffs and other law enforcement officials, representatives from multiple nonprofit organizations providing legal access and humanitarian aid to noncitizens across the SWB, and dozens of Members of Congress focused on border and immigration policy.  The Secretary also assessed other migration-related initiatives the Administration is undertaking or considering undertaking.  And he examined the considerations that the district court determined were insufficiently addressed in the June 1 Memorandum, including the view that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, impose undue costs on states, put a strain on U.S.-Mexico relations, and cause DHS to fail to comply with its obligations under 8 U.S.C. § 1225.

After carefully considering the arguments, evidence, and perspectives of those who support resuming MPP, with or without modification, as well as those who support termination, the Secretary has determined that MPP should be terminated.  The following outlines the considerations that informed the Secretary's decision.

A. <u>Conditions for Migrants in Mexico</u>

In January 2019, the Department implemented MPP with the stated expectation that vulnerable populations would get the protection they needed while they waited in Mexico during the pendency of their removal proceedings.[46]  In practice, however, there were pervasive and widespread reports of MPP enrollees being exposed to extreme violence and insecurity at the hands of transnational criminal organizations that prey on vulnerable migrants as they waited in Mexico for their immigration court hearings in the United States.  These security concerns, together with barriers many individuals faced in accessing stable and safe housing, health care and other services, and sufficient food, made it challenging for some to remain in Mexico for the duration of their proceedings.  Notably, the United States has limited ability to fix these issues, given that they relate to migrant living conditions and access to benefits in Mexico—an independent sovereign nation.

Concerns about migrants' safety and security in Mexico, and the effect this had on their ability to attend and effectively participate in court proceedings in the United States, have been highlighted in internal Department documents, court filings, and a range of external studies and press reports.  In its internal evaluation of the program, the Department's Red Team Report emphasized the need for safe housing for vulnerable populations.[47]  The Ninth Circuit, in affirming a district court ruling that enjoined implementation of MPP, determined that

---

[46] *See* Nielsen Release, *supra* note 14; *see also* Memorandum from Kirstjen M. Nielsen, Sec'y of Homeland Sec., *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019).

[47] Red Team Report, *supra* note 27, at 7.

"[u]ncontested evidence in the record establishes that non-Mexicans returned to Mexico under the MPP risk substantial harm, even death, while they await adjudication of their applications for asylum."[48]  A Massachusetts district court similarly described the plaintiffs' claims of extreme violence and insecurity in Mexico and observed that "[t]heir personal accounts are unrebutted and are supported by affidavits from employees of two nongovernmental organizations and the U.S. State Department's assignment to Tamaulipas of a 'Level 4: Do Not Travel' warning 'due to crime and kidnapping.'"[49]  The court further cited a Human Rights First report that included a list of 1,544 allegations of serious harm (including homicide, rape, and kidnapping) faced by individuals placed in MPP from January 2019 to February 2021.[50]

        Multiple other reports have similarly highlighted security and treatment concerns. A December 2019 UNHCR Rapid Protection Assessment found that 81% of individuals and families returned to Mexico under MPP did not feel safe in Mexico, and that 48% had been a victim or witness of violence in Mexico.[51]  According to this assessment, children represented about half (48%) of targets for physical violence, and about half (48%) of kidnapping victims.[52] The organization Médecins Sans Frontières (Doctors Without Borders) noted that 75% of its patients who were in Nuevo Laredo in October 2019 due to MPP reported having been kidnapped.[53]  In 2019, a U.S. Commission on Civil Rights report similarly credited several news and NGO reports in noting that "asylum seekers [awaiting proceedings in Mexico] have been killed, women have been raped, and children have been kidnapped."[54]  Similar accounts of insecurity and violence were the subject of numerous press reports describing squalor and violence in the "camps" where many MPP enrollees lived as they waited their court hearings.[55] But as bad as conditions often were in the makeshift border camps, migrants gathered there because the threat of violence and kidnapping in surrounding areas outside of the camps could be

---

[48] *Innovation Law Lab*, 951 F.3d at 1093.

[49] *Bollat Vasquez*, 520 F. Supp. 3d at 111-12 (issuing a preliminary injunction ordering the Department to return to the United States seven plaintiffs who had been enrolled in MPP).

[50] Human Rights First, *Delivered to Danger; Trump Administration sending asylum seekers and migrants to danger*, Feb. 19, 2021, https://www.humanrightsfirst.org/campaign/remain-mexico; *see Bollat Vasquez*, 520 F. Supp. 3d at 99 n.10 (citing a declaration by Kennji Kizuka, Senior Researcher and Policy Analyst at Human Rights First, regarding an earlier version of this list explaining that "'[a]s of December 15, 2020, Human Rights First has identified 1,314 public reports of murder, torture, rape, kidnapping, and other violent assaults against asylum seekers returned to Mexico under MPP' and that 'the security situation in Mexico, including in the state of Tamaulipas has worsened' with one of Mexico's 'most powerful and violent cartels' reportedly increasing its activities in Tamaulipas and migrants in Matamoros and Nuevo Laredo have been repeatedly targeted'").

[51] UNHCR, *Rapid Protection Assessment: MPP Returnees at the Northern Border of Mexico* 15, Dec. 2019. The UNHCR assessment, shared confidentially with the United States government, is cited here with the express permission of UNHCR.

[52] According to the UNHCR survey, it did not take long for MPP enrollees to experience danger in Mexico. Just over half of the individuals surveyed (51%) had been in Mexico for less than one month and more than nine-in-ten had been in Mexico for less than three months. *Id.* at 7, 17.

[53] Médecins Sans Frontières, *The devastating toll of 'Remain in Mexico' asylum policy one year later*, Jan. 29, 2020, https://www.msf.org/one-year-inhumane-remain-mexico-asylum-seeker-policy; *cf.* Emily Green, *Trump's Asylum Policies Sent Him Back to Mexico. He was Kidnapped 5 Hours Later By a Cartel.*, Vice, Sept. 16, 2019.

[54] U.S. Commission on Civil Rights, *Trauma at the Border; The Human Cost of Inhumane Immigration Policies*, Oct. 2019, https://www.usccr.gov/files/pubs/2019/10-24-Trauma-at-the-Border.pdf.

[55] *See*, *e.g.*, Dickerson, *supra* note 19; Jordan, *supra* note 19; Merchant, *supra* note 19; This American Life, *The Out Crowd*, Nov. 15, 2019, https://www.thisamericanlife.org/688/transcript.

greater.[56]  Poor conditions and violence in the Matamoros camp also created an operational challenge when migrants at the camp blocked traffic in both directions on the Gateway International Bridge for hours as a sign of protest.[57]  The security and treatment of MPP enrollees also been the subject of congressional oversight and investigation.[58]

The adverse living conditions and violence experienced by migrants returned to Mexico pursuant to MPP are of grave concern to the Secretary.  The return of noncitizens to Mexico under MPP is predicated, by statute, upon individuals' ability to remain in Mexico during the pendency of their removal proceedings.[59]  In practice, however, myriad problems faced by noncitizens returned to Mexico impeded their ability to access those removal proceedings.  As a result, the Secretary has determined that the key predicate on which the statutory authority underlying the program is built—that noncitizens stay in Mexico and continue to participate in their removal proceedings—was upended by reality in too many cases.  This is an intolerable result that is inconsistent with this Administration's values, which include ensuring the rights of migrants to seek lawful protection from removal in a safe environment.

Moreover, these are problems that cannot easily be fixed.  Once migrants are returned to Mexico—an independent sovereign nation—the United States' ability to respond and provide adequate conditions and safety is diminished.

B.  *Non-Refoulement* Concerns

Concerns about the *non-refoulement* process under MPP as it was previously implemented and the additional costs and resources that would be required to address those concerns also weigh against continued reliance on MPP.  As previously designed and implemented, MPP's *non-refoulement* screening process—used to assess whether individuals would likely face persecution on account of a protected ground or torture in Mexico—was limited in at least four respects.

First, as originally implemented, individuals processed for MPP were not questioned by CBP about their fear of persecution or torture in Mexico, but were instead required to affirmatively articulate such a fear regarding return to Mexico—a sharp contrast to the approach

---

[56] *See*, *e.g.*, María Verza and Fernanda Llano, *Lawless Limbo Within Sight of America*, Associated Press, Nov. 18, 2019; Delphine Schrank, *Asylum seekers cling to hope, safety in camp at U.S.-Mexico Border*, Reuters, Oct. 16, 2019, https://www.reuters.com/article/us-usa-immigration-mexico-matamoros-feat-idUSKBN1WV1DY.

[57] Adolfo Flores, "Asylum-Seekers Protesting Squalid Conditions Shut Down A US Border Crossing For 15 Hours," Buzzfeed, Oct. 11, 2019, https://www.buzzfeednews.com/article/adolfoflores/asylum-seekers-protesting-bridge-close-matamoros-texas.

[58] *See*, *e.g.*, Press Release, H. Comm. on the Judiciary, "Chairman Nadler Announces House Judiciary Investigation into Trump Administration's 'Remain in Mexico' Policy," Jan. 14, 2020, https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=2397; *Examining the Human Rights and Legal Implications of DHS's "Remain in Mexico" Policy*: Hearing Before the H. Comm. on Homeland Sec., 116th Cong. *passim* (2019).

[59] *See* 8 U.S.C. § 1225(b)(2)(C) (specifying that the Secretary may return a noncitizen to a contiguous territory "pending a proceeding under [8 U.S.C. §] 1229a").

14

used in the expedited removal context, in which individuals are affirmatively asked standard questions about fear of return to their home countries and the responses are recorded.[60]

Second, rather than using a screening standard familiar to asylum officers (such as the "significant possibility" standard used for credible fear interviews or the "reasonable possibility" standard used for reasonable fear interviews to screen for possible withholding or deferral of removal claims), *non-refoulement* screenings for MPP applied a more restrictive "more likely than not" standard.[61]  Under this standard, noncitizens had to demonstrate to an asylum officer that it was more likely than not that they would be persecuted or tortured if returned to Mexico in order to avoid a return to Mexico—a higher substantive standard than they would ultimately have had to establish to secure asylum and the same substantive standard they would have had to establish to an immigration judge if they were ineligible for asylum but were seeking withholding or deferral of removal under the INA or regulations implementing CAT.

Third, the Department did not initially allow counsel to participate in the *non-refoulement* interviews.[62]  This differs from how fear interviews are conducted during the expedited removal process; in that context, noncitizens receive at least at 48-hour period to find and consult with a legal representative.[63]  Eventually, and in part as response to a district court order, these restrictions were eased.[64]

---

[60] *See* 8 C.F.R. § 235.3(b)(2). Importantly, even if migrants processed for MPP expressed a fear of repatriation to their home country, they were never asked about any fear of being returned to Mexico. Assessing this feature of the program, Judge Watford of the U.S. Court of Appeals for the Ninth Circuit stated in *Innovation Law Lab* that it was "virtually guaranteed to result in some number of applicants being returned to Mexico in violation of the United States' *non-refoulement* obligations," as many individuals returned under MPP who feared persecution or torture in Mexico would "be unaware that their fear of persecution in Mexico is a relevant factor in determining whether they may lawfully be returned to Mexico, and hence is information they should volunteer to an immigration officer. *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 511 (9th Cir. 2019) (Watford, J. concurring).

[61] Prior to MPP implementation, this standard had been used almost exclusively by immigration judges to adjudicate statutory withholding of removal or withholding or deferral of removal under regulations implementing the Convention Against Torture (CAT). *See* 8 C.F.R. §§ 208.16(a), (c)(4); 208.17(b)(1); 208.31(c); 1208.16(b); 1208.17(b). It was, as a result, not a standard that had previously been used by asylum officers in the screening context, which resulted in additional, burdensome training and implementation requirements.

[62] U.S Citizenship and Immigration Services, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*, PM-602-0169 3 (Jan. 28, 2019) ("DHS is currently unable to provide access to counsel during the [*non-refoulement*] assessments given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals."). This differs from how fear interviews are conducted during the expedited removal process; in that context, noncitizens receive at least at 48-hour period to find and consult with a legal representative. *See* Form M-444, Information about Credible Fear Interview (May 17, 2019).

[63] *See* Form M-444, Information about Credible Fear Interview (May 17, 2019).

[64] *Doe v. Wolf*, 432 F. Supp. 3d 1200 (S.D. Cal. 2020). Previously retained counsel were permitted to participate in *non-refoulement* interviews conducted at Immigration Hearing Facilities (IHFs) in Laredo and Brownsville as of December 2019 and within the Ninth Circuit in January 2020. Supplemental guidance issued in December 2020 expanded this access to counsel to all MPP locations and required DHS to ensure the ability of retained counsel to participate telephonically in USCIS' MPP *non-refoulement* assessments, but only "where it does not delay the interview, or is required by court order." Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols, *supra* note 30, at 1-2.

Fourth, in practice, there were multiple challenges and inconsistencies in the implementation of *non-refoulement* screenings. The Red Team Report emphasized the need for standard operating procedures to ensure consistency and address problems such as the use of a "pre-screening process" by CBP personnel at some locations that "preempt[ed] or prevent[ed]" USCIS from ever having cases referred for a determination.[65] The report additionally noted that some CBP officials "pressure[d] USCIS to arrive at negative outcomes when interviewing migrants on their claim of fear of persecution or torture."[66]

Moreover, throughout the use of MPP, more than 2,500 individuals raised fear claims at multiple points in this process, leading to multiple screenings for those individuals during the pendency of their cases.[67] These kinds of unproductive, redundant screenings are a drain on resources that may be more likely to occur in MPP as individuals are returned to Mexico multiple times over the pendency of a single removal proceeding, often to unsafe conditions.

For all these reasons, the Secretary has concluded that continuation of MPP in its prior form is not advisable. These concerns likely could be addressed by policy changes that require the affirmative asking, the use of a more appropriate screening standard that protects those who face a reasonable or significant possibility of persecution or torture upon return to Mexico, the opportunity for individuals to consult with counsel prior to screenings, and better training and oversight. But making these changes would likely lengthen the screenings and require DHS to devote additional asylum officers and detention space to these screenings, both of which are in short supply, especially as a result of challenges related to the COVID-19 pandemic. New procedures could lengthen the screening process. Such an approach would divert critical personnel and resources from other Administration priorities, including ongoing efforts to build a more durable, fair, and efficacious asylum system as discussed in greater detail in Section IV. The additional burdens that would be required to implement a *non-refoulement* process acceptable to the Department weigh against retention of MPP. Moreover, even if making these changes better protected individuals from being returned to persecution or torture, it would not protect people from generalized violence or other extreme hardships that have no nexus to statutorily protected grounds, and that have been experienced by many returnees.

### C.   Access to Counsel, Notice of Hearings, and Other Process Concerns

Individuals in MPP faced multiple challenges accessing counsel and receiving sufficient information about court hearings. First, there were several problems in communicating accurate and up-to-date information to migrants about rescheduled court hearings. As noted in the Red Team Report, some migrants in MPP had to give up their shelter space in Mexico when they returned to the United States for their court hearings. As a result, they were unable to provide the court an address for follow-up communications.[68] To submit a change of address while in Mexico, migrants had to print and mail a Change of Address Form, which posed logistical challenges for individuals who lacked internet access and who could not readily print and mail

---

[65] Red Team Report, *supra* note 27, at 6.

[66] *Id*. at 4-5.

[67] Data on MPP Cases with Multiple Referrals, provided by USCIS on October 28, 2021.

[68] Red Team Report, *supra* note 27, at 7.

documents internationally.  This made it difficult to communicate updates regarding enrollees' court cases and hearing dates.

Second, MPP enrollees faced several barriers in accessing counsel both in the United States and in Mexico.  Although MPP enrollees were permitted to meet with counsel at hearing locations prior to their hearings, these meetings were limited to a single hour before the court hearing took place.[69]  Opportunities for attorneys to meet with their clients outside of those organized at the hearing locations were limited due to, among other constraints, complications associated with cross-border communication.  Many migrants lacked access to a telephone with international coverage or other forms of technology that could be used to communicate with counsel.  Some legal services organizations also adopted policies against visiting clients in Mexico due to serious safety concerns.[70]  In addition, because hearings for the tens of thousands of people enrolled in MPP were concentrated in a handful of courts along the border, demand for legal assistance far outstripped supply.[71]

These problems are of significant concern to the Secretary.  Inadequate access to counsel casts doubt on the reliability of removal proceeding.  It also undermines the program's overall effectiveness at achieving final resolution of immigration proceedings; in several cases, noncitizens challenged adverse immigration-judge decisions on the ground that they did not have an adequate opportunity to identify and retain counsel, or to gather or present the evidence in support of their claims.[72]  More broadly, access to counsel is critical to ensuring migrants receive a full and fair hearing; this Administration recognizes the importance of access to counsel in civil contexts, including in immigration proceedings, and considers fostering legal representation and access to justice a priority.[73]

Meanwhile, some of these flaws are exceedingly challenging to fix.  While migrants could be provided additional means to communicate from Mexico with counsel by video or telephone, doing so requires a significant expenditure of resources to ensure that the appropriate technology is available in Mexico.  In-person consultations are significantly constrained by the

---

[69] See U.S. Immigration and Customs Enforcement, *Migrant Protection Protocols Guidance* 3 (Feb. 12, 2019).  As noted above, DHS also did not initially allow counsel to participate in *non-refoulement* interviews conducted by USCIS.

[70] See Brief for the Laredo Project, et al. as Amici Curiae Supporting Respondents at 20-21, *Wolf v. Innovation Law Lab*, No. 19-1212 (Jan. 22, 2021) ("The Laredo Project considered providing assistance across the border in Nuevo Laredo, but determined that it was far too dangerous. When Laredo Project attorneys took an exploratory trip across the border, the local pastor with whom they were scheduled to meet (who ran a shelter for migrants) was missing; he had been kidnapped by cartel members, reportedly because he attempted to stop them from kidnapping Cuban asylum seekers.").

[71] Human Rights Watch, *We Can't Help You Here"*; *U.S. Returns of Asylum Seekers to Mexico*, July 2, 2019, https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico ("[U]nder the MPP, thousands of asylum seekers have been forcibly concentrated in El Paso and San Diego, overwhelming the limited number of immigration attorneys who practice there.").

[72] *See supra* note 35.

[73] White House, "FACT SHEET: President Biden to Sign Presidential Memorandum to Expand Access to Legal Representation and the Courts," May 18, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/05/18/fact-sheet-president-biden-to-sign-presidential-memorandum-to-expand-access-to-legal-representation-and-the-courts/.

reality that migrants are in Mexico and space for meetings with counsel to take place at ports of entry or upon their return to court is extremely limited. Providing migrants with additional time to consult with attorneys would likely require them to spend a night in detention, which would also place additional strain on CBP facilities that have consistently been operating over their COVID restricted capacity. In fact, the holding areas in six out of nine Border Patrol Sectors are over COVID-capacity as of October 27, 2021.[74]

### D. Impacts of MPP on Immigration Court Appearance Rates and Outcomes

The Department's October 2019 Assessment of MPP concluded that MPP was "restoring integrity to the immigration system" by (1) providing bona fide asylum seekers the opportunity to obtain relief in months, not years, and (2) eliminating the "perverse incentives" that reward and encourage people with non-meritorious asylum claims to enter the United States.[75] But upon further consideration and examination, the facts tell a more complex story, thus undermining the claimed benefits.

MPP did result in some removal proceedings being completed more expeditiously than is typical for non-detained cases. Overall, 41 percent of MPP cases resulted in a final enforcement disposition as of June 30, 2021, versus 35 percent of comparable non-MPP cases.[76] But the fact that MPP may have resolved cases more quickly does not mean that the cases were resolved fairly or accurately. The integrity of the nation's immigration system should be assessed by whether immigration proceedings achieve fair and just outcomes, both for individuals who merit relief and those who do not. In the Secretary's judgment, the data show that MPP generally failed to meet that bar.

Importantly, noncitizens in MPP were substantially more likely to receive *in absentia* removal orders than comparable noncitizens who were not placed in MPP during the relevant time period. Overall, of the 67,694 cases of individuals enrolled in MPP,[77] 21,818 were subject to an *in absentia* order of removal at some point during their removal proceedings—32 percent of all individuals enrolled in MPP.[78] For comparable noncitizens who were not processed

---

[74] Data on holding area capacity by U.S. Border Patrol Sector, provided by CBP on October 28, 2021.

[75] Oct. 2019 Assessment, *supra* note 31, at 3, 6.

[76] For the purposes of this memorandum, comparable noncitizens or comparable non-MPP cases are defined as non-Mexican single adults and family units who were apprehended along the SWB between January 25, 2019, and January 20, 2021, were not enrolled in MPP and were not detained throughout the pendency of their proceedings. Data derived from DHS Office of Immigration Statistics Enforcement Lifecycle, which is based on a comprehensive person-level analysis of DHS and EOIR enforcement and adjudication records. *See* Marc Rosenblum and Hongwei Zhang, *Fiscal Year 2020 Enforcement Lifecycle Report* (Dec. 2020) [hereinafter FY 2020 Enforcement Lifecycle Report].

[77] *Id.* This is based on DHS's Office of Immigration Statistics (OIS) analysis of MPP cases; this analysis excludes 345 cases originally identified as MPP enrollees in CBP data because the records are for unaccompanied children, accompanied minors, or Mexican nationals, all of whom are ineligible for the program, or because the records could not be matched to other administrative data.

[78] In his June 1 Memorandum, the Secretary referenced a 44% *in absentia* rate for this time period. The Department has since updated its methodology for measuring *in absentia* rates in two important ways. First, the Department did not count *in absentia* orders that were subject to subsequent motions to reopen or any other further action by DHS or

through MPP during that same time period and who were also not detained for the duration of their proceedings, the *in absentia* rate was 13 percent—about two-fifths the rate of the MPP group.[79]

Moreover, an additional 6,151 MPP cases were terminated by the immigration court.[80] Courts generally issued such orders in MPP cases when a noncitizen failed to appear but the immigration judge declined to issue an *in absentia* removal given concerns that the noncitizen did not have proper notice of how to attend his or her hearing.[81]  Including these cases brings the total number of cases of individuals in MPP that involved the issuance of an *in absentia* order of removal or termination to 27,969 (41 percent of all MPP cases and nearly three-and-a-half times higher than the *in absentia* rate for comparable noncitizens not enrolled in MPP).[82]

The fact that *in absentia* removal order rates (and *in absentia* removal order rates plus termination rates) were considerably higher for MPP cases than for comparable non-MPP cases might not, by itself, indicate a problem with MPP.  For instance, the October 2019 Assessment concluded that MPP was incentivizing people without meritorious claims to voluntarily leave Mexico and return home.[83]  That assessment pointed to the fact that out of more than 55,000 MPP enrollees (at that time), only 20,000 were sheltered in northern Mexico and an additional 900 had returned home through International Organization for Migration's Assisted Voluntary Return program.

---

DOJ, thus undercounting the total number of *in absentia* orders that had been issued. Second, the *in absentia* rate of 44 percent only included cases in which there was a final disposition, rather than the full universe of MPP cases including those that were still pending, thus overstating the percentage. The updated numbers in this memorandum, by contrast, take into account the total number of *in absentia* orders issued in MPP cases, irrespective of whether there was a subsequent motion to reopen or other further action in the case, as well as the total number of MPP cases, including both active cases and those with a final disposition. This analysis captures all *in absentia* orders and compares them to the full set of MPP cases.

[79] *Id.*

[80] For individuals in removal proceedings under Section 240 of the INA who are not in MPP, termination of proceedings is frequently reported by DHS OIS as a form of relief because it generally marks the end of efforts to remove the noncitizen from the country. That situation is very different for noncitizens enrolled in MPP, who are outside of the country during the pendency of removal proceedings and have no basis upon which to seek admission to the United States once proceedings are terminated.

[81] *Matter of Herrera-Vasquez*, 27 I&N Dec. 825 (BIA 2020); *Matter of Rodriguez-Rodriguez*, 27 I&N Dec. 762 (BIA 2020).

[82] The district court in *Texas v. Biden* cited EOIR data indicating that *in absentia* rates in removal proceedings were also quite high in 2015 and 2017—42% and 47% percent, respectively. 2021 WL 3603341, at *21. But there are critical methodological differences between the ways in which these numbers are calculated and the *in absentia* rates presented in this memorandum. As explained in note 77, *supra*, the data presented in this memorandum measure *in absentia* rates as a share of the *total* number of cases. The EOIR data measures *in absentia* orders as a share of *completed* cases only, which excludes cases that remain ongoing that are disproportionately likely to not result in such cases. *See* Ingrid Eagley and Steven Shafer, *Measuring* In Absentia *Removal in Immigration Court*, American Immigration Council, Jan. 2021, https://www.americanimmigrationcouncil.org/research/measuring-absentia-removal-immigration-court. A recalculation of the 2015 and 2017 *in absentia* rates as a share of *total* cases referred to EOIR in those years yields rates of 21 percent and 20 percent, respectively. This is one-half the *in absentia* and termination rate found in MPP cases.

[83] Oct. 2019 Assessment, *supra* note 31, at 3.

Other reports suggest, however, that individuals abandoned claims or otherwise failed to appear for proceedings because of insecurity in Mexico and inadequate notice about court hearings.[84]  The difficulties that MPP enrollees faced in Mexico, including the threat of violence and kidnapping, coupled with inadequate and unreliable access to food and shelter, likely contributed to people placed in MPP choosing to forego further immigration court proceedings regardless of whether their cases had merit.  Indeed, a number of petitions for review filed in federal courts of appeals by individuals in MPP who received *in absentia* removal orders explain their failure to appear based on serious threats to their personal safety.[85]

While individuals in MPP were more likely to receive *in absentia* removal orders than comparable noncitizens not enrolled in MPP, they were also less likely to receive relief or protection from removal.  This was true even though the decision to place someone in MPP was not linked to any assessment of the likely merits of the individual's claim.  DHS data reflect that only 732 individuals enrolled in MPP out of 67,694 cases were granted relief or protection from removal—a grant rate of just 1.1.[86]  For the comparable set of non-MPP cases from the same time period, the relief-granted rate was nearly two-and-a-half times as high (2.7 percent).[87]

The remarkably low 1.1 percent grant rate for MPP cases—the majority of which involved individuals from the Northern Triangle countries of Central America—is notable also because when MPP was first announced the Department observed that "approximately 9 out of

---

[84] *See, e.g.*, Kevin Sieff, "They missed their U.S. court dates because they were kidnapped. Now they're blocked from applying for asylum.," Washington Post, Apr. 24, 2021; Camilo Montoya-Galvez, "'Leave me in a cell': The desperate pleas of asylum seekers inside El Paso's immigration court," CBS News, Aug. 11, 2019, https://www.cbsnews.com/news/remain-in-mexico-the-desperate-pleas-of-asylum-seekers-in-el-paso-who-are-subject-to-trumps-policy/.

[85] *See, e.g.*, *Tabera-Columbi v. Garland*, No. 20-60978 (5th Cir. filed Oct. 26, 2020) (noting that MPP enrollee had been sexually assaulted by the police and was in a hospital as a result on the morning of the hearing); *Quinones Rodriguez v. Garland*, No. 20-61204 (5th Cir. filed Dec. 17, 2020) (describing an individual who did not attend the MPP hearing because he was hiding from gangs who threatened to kidnap him on his way to the hearing); *Miranda-Cruz v. Garland*, No. 21-60065 (5th Cir. filed Feb. 1, 2021) (describing a family that was kidnapped en route to an MPP hearing and held for ransom); *see also* Hamed Aleaziz and Adolfo Flores, "They Missed Their US Asylum Hearings Fearing the Cartel Would Kill Them. Now They're Stuck in Mexico," Buzzfeed, May 18, 2021.

[86] Relief or protection from removal is defined to include EOIR grants of asylum, grants of relief in non-asylum removal proceedings, withholding of removal, or conditional grants; DHS grants of Special Immigrant Juvenile (SIJ) status, lawful permanent residence, S, T, or U nonimmigrant status, and Temporary Protected Status (TPS); the exercise of DHS prosecutorial discretion; and findings by DHS that the subject is a U.S. citizen or lawfully present noncitizen not subject to removal. *See* FY 2020 Enforcement Lifecycle Report, *supra*, note 75.

[87] As discussed in note 79, this figure includes cases that were terminated. For those located in the United States, termination ends removal proceedings and effectively allows the subject to remain in the United States until further action is taken. The low relief-granted rates for both the MPP and comparable non-MPP cases are likely the result of a number of different factors. During this period, a policy was implemented that barred asylum for individuals who transited through third countries and decisions were issued that limited humanitarian protection claims based on family membership and gender; these likely depressed grant rates. *See* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019); *Matter of L-E-A-*, 27 I&N Dec. 581 (A.G. 2019), *vacated*, 28 I&N Dec. 304 (A.G. 2021); *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018), *vacated*, 28 I&N Dec. 307 (A.G. 2021). Additionally, the period of time being analyzed is both brief and recent. OIS analysis indicates that relief-granted rates tend to increase over the first three to four years after a case resulting from a credible or reasonable fear claim is initiated in immigration court. None of this, however, explains the substantial discrepancy in outcomes between MPP case and comparable non-MPP cases over the same time period. And none of this diminishes the statutory obligation to fairly assess asylum applications with the goal of producing reliable adjudications.

10 asylum claims from Northern Triangle countries are ultimately found non-meritorious by federal immigration judges."[88]  DHS does not have a record of the methodology used to generate this "9 out of 10" statistic.  To the contrary, an analysis of EOIR case outcomes for Northern Triangle asylum-related claims originating in border encounters (i.e., all EOIR removal proceedings originating with border encounters followed by credible fear or reasonable fear claims) in the years leading up to MPP yields a relief-granted rate of about 29 percent—significantly higher than the 10 percent reflected in Department's January 2019 statement.  That relief-granted rate is more than 26 times the 1.1 percent grant rate observed for all forms of relief or protection among MPP enrollees.  These discrepancies strongly suggest that at least some MPP enrollees with meritorious claims either abandoned or were unable to adequately present their claims given the conditions faced by migrants in Mexico and barriers to legal access.[89]

Based on the Department's experience with MPP and informed by the data above, the Secretary has determined that the program did not succeed in a sufficient number of cases at achieving timely and reliable adjudication of migrants' removal proceedings.  Multiple features of MPP, especially combined with the difficulties in accessing counsel and migrants' living experience in Mexico as described above, have led the Secretary to conclude that the program deterred too many meritorious asylum claims at the expense of deterring non-meritorious claims. Given the Administration's values, commitments, and policy preferences, the Secretary has concluded that this is an unacceptable result.  Individuals who may have abandoned meritorious protection claims should have been offered a meaningful opportunity to seek protection in the United States.  As stated above, the return-to-contiguous-territory authority at INA § 235(b)(2)(C) is predicated on the notion that individuals will be able to pursue their removal proceedings from within Mexico; the fact that so many individuals enrolled in MPP were unable to complete their proceedings due to their tenuous situation in Mexico undercuts a key requirement of the statute.  As a global leader in offering protection and resettlement to refugees, the United States also has a moral obligation to fairly consider such claims.  The Secretary is committed to ensuring meritorious claims are heard, even if that means non-meritorious claims end up being adjudicated as well.

E.   MPP and Recidivist Irregular Re-Entries

As discussed below, CBP encounters along the SWB decreased dramatically over a number of months in which MPP was fully operational across the SWB.  But the data also show that a significant share of individuals enrolled in MPP—33 percent as of June 30, 2021—were subsequently encountered attempting to reenter the country without inspection, rather than continuing to wait in Mexico for the resolution of their removal proceedings.[90]  This rate is more

---

[88] Nielsen Release, *supra* note 14.

[89] Indeed, that conclusion is not dissimilar to the one reached in the October 2019 Assessment, when the Department found that "MPP is one among several tools DHS has employed effectively to reduce the incentive for aliens to assert claims for relief or protection, *many of which may be meritless*, as a means to enter the United States to live and work during the pendency of multi-year immigration proceedings." Oct. 2019 Assessment, *supra* note 31, at 6 (emphasis added). Implicit in this statement is an acknowledgment that some such claims do have merit.

[90] FY 2020 Enforcement Lifecycle Report, *supra* note 75. When the Department previously considered this issue in June, 27 percent of MPP enrollees had been re-encountered by CBP subsequent to their enrollment in MPP (not

21

than two-and-a-half times higher than the historical average for recidivism (defined as re-encounters within 12 months of initial apprehension) of 14 percent for individuals processed under Title 8 authorities.[91]   The high rate of repeat encounters undercuts one of MPP's key claimed advantages—namely its deterrent effect on would-be border crossers.  Contrary to such claims, the data show that MPP enrollees were much more likely try to cross the border after being returned to Mexico than individuals who were removed from the country under other Title 8 authorities.  Such re-encounters also impose significant additional work on frontline Border Patrol agents, who had to encounter, track, and process MPP enrollees multiple times—resources that could and should have been deployed to other objectives.

F.   Investments and Resources Required to Operate MPP

MPP was, according to the December 2018 announcement, intended to reduce burdens on border security personnel and resources to free them up to better protect the U.S. territory.  It was also intended to help clear the backlog of unadjudicated asylum claims.  In reality, however, backlogs in the Nation's immigration courts and asylum offices grew significantly during the period that MPP was in effect.[92]  In addition, MPP created substantial additional responsibilities on Department personnel that detracted from other critically important mission sets. This played out in numerous ways.

First, each time an MPP enrollee returns to the United States to attend a court proceeding, which could happen multiple times over the life of a case, DHS personnel are required to conduct additional rounds of processing, including biographic and biometric collection, property collection and return, and medical screenings.  None of this is required for those in removal proceedings in the United States.  The labor-intensive process of bringing migrants back into the United States for their court proceedings directly impacts staffing at the four U.S. ports of entry where migrants re-entered, taking frontline personnel away from other key missions—such as facilitating legal cross-border trade and travel.

Second, in order to implement and operate MPP, the Department devoted significant resources and personnel to building, managing, staffing, and securing specialized immigration hearing facilities (IHFs) to support EOIR.  During the period when MPP was operational during the prior Administration, IHFs cost approximately $168 million to build and operate.[93]  As part of its current efforts to comply the *Texas* court order and reimplement MPP in good faith, the Department has procured new contracts for IHFs, at a cost of approximately $14.1 million to build and $10.5 million per month to operate.[94]

---

counting encounters at POEs in connection with MPP). The increase since then reflects that individuals enrolled in MPP continued to seek entry without inspection to the United States.

[91] DHS Office of Immigration Statistics data provided on 10/29/2021.

[92] Between January 2019 and January 2021—the period when MPP was operational—the number of pending immigration court cases increased from 829,200 to 1,283,090 (a 55 percent increase). Data on pending caseload, provided by EOIR on October 28, 2021. The backlog of pending affirmative asylum claims increased over the same time period from 331,100 to 399,100. Data on the affirmative asylum backlog, USCIS Refugee, Asylum, and International Operations Directorate on October 27, 2021.

[93] DHS Office of the Chief Financial Officer analysis.

[94] Nuñez-Neto Decl., *supra* note 45, at ¶ 15.

Third, adjudication of claims by individuals in MPP diverts asylum officers and immigration judges from other key efforts designed, as described in Section IV.B, to more effectively process cases and reduce backlogs.  As initially implemented, MPP required the training of asylum officers to learn the newly applied *non-refoulement* screening standards and support an additional adjudicative caseload.  Moreover, each time migrants came in and out of the United States for court hearings, there was another opportunity to claim fear—and another possible fear screening.  Department data shows that in the short time that MPP was operational, more than 2,500 individuals had repeat fear screenings.[95]

Fourth, the program drew on the same limited resources that non-profits and humanitarian organizations used to help other individuals in Mexico—thus focusing efforts on northern Mexico and diverting resources and services away from other parts of Mexico and the broader region.

Each of these, and other investments or resources, divest resources from other critically important Departmental missions and undercut the Department's ability to pursue longer-term, durable reform.

G.   Impact of MPP and its Termination on SWB Migration Flows

In making his determination decision, the Secretary has presumed—as is likely—that MPP contributed to a decrease in migration flows.  From January through May 2019, when MPP was used in a limited number of locations, encounters rose.[96]  But from June 2019, when DHS announced that MPP would be fully implemented along the entire SWB, through September 2019, border encounters decreased rapidly, falling 64 percent in just three months.  Border encounters continued to decrease until April 2020.  Beginning in May 2020, encounters once again started rising.[97]  At that point, individuals continued to be enrolled into MPP, however, at lower rates than previously; immigration court hearings for MPP enrollees were also suspended.

The sharp decrease in SWB encounters during the months in which MPP was fully operational is notable.  Of course, correlation does not equal causation.  And even at the height of MPP's implementation in August 2019, it was not the Department's primary enforcement tool; approximately 12,000 migrants were enrolled in MPP but more than 50,000 were processed under other Title 8 authorities.[98]  In addition, beginning in April 2019, Mexico surged its own enforcement, thus increasing their level of apprehensions and returns.  This, coupled with a range of other push and pull factors, both known and unknown, likely contributed to the decline in encounters.[99]  The relevant data is simply insufficiently precise to make an exact estimate of the extent to which MPP may have contributed to decreased flows at the southwest border.

---

[95] *See supra* note 66.

[96] U.S. Customs and Border Protection, "Southwest Land Border Encounters," https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

[97] *Id*.

[98] DHS OIS analysis of U.S. CBP administrative records.

[99] *See* Congressional Research Service, *Mexico's Immigration Control Efforts* (May 28, 2021).

That said, the Secretary has, nonetheless, evaluated MPP on the premise that it contributed to decreased flows.[100]  Even so, the Secretary has concluded that this benefit cannot be justified, particularly given the substantial and unjustifiable human costs on the migrants who were exposed to harm while in Mexico, and the way in which MPP detracts from other regional and domestic goals and policy initiatives that better align with this Administration's values while also serving to manage migratory flows, as described in Section IV.

H.  Addressing the Concerns of States and Border Communities

In the course of litigation, plaintiffs have alleged that the Secretary's June 1 Memorandum failed to consider the additional costs that States would allegedly incur as a result of the decision to terminate MPP.  Texas and Missouri, for example, argued—and the district court found—that the termination of MPP could lead to an increased number of noncitizens without proper documentation in their States, which might cause the States to incur additional costs related to the costs of driver's licenses, public education, state-funded healthcare, and law enforcement and correctional costs.[101]  State-plaintiffs also alleged that terminating MPP led to an increase in organized crime, human trafficking, and drug cartel activity, specifically with respect to the illegal trafficking of fentanyl.[102]  And State-plaintiffs further claimed that they had developed "reliance interests" dependent on the continued operation of MPP.

The Secretary takes these concerns seriously.  He has sought to understand and address the impacts that Departmental policies and practices may have on communities and has consulted with numerous state and local officials from across the SWB about the Department's border management strategy, including the decision to terminate MPP.  The Secretary has, as a result taken and will continue to take, steps designed to minimize adverse consequences of any policy shifts on border states.

Prior to the district court's injunction, for example, the Department facilitated the safe and orderly entry into the United States of about 13,000 individuals previously enrolled in MPP for purposes of participating in their removal proceedings.  Prior to doing so, however, the Department ensured that these individuals received COVID-19 tests before crossing the border and entering the United States.  The Department also worked in close partnership with nongovernmental organizations and local officials in border communities to connect migrants with short-term supports that facilitated their onward movement to final destinations away from the border.

---

[100] The district court faulted the Secretary for not taking into account alleged warnings to members of the Biden-Harris transition team by career DHS officials that terminating MPP would cause a spike in border encounters. *Texas*, 2021 WL 3603341, at *7. The Department is unaware of any such specific conversations, yet is aware of, and has taken into account, similar concerns raised by others.

[101] *See Texas*, 2021 WL 3603341, at *9-10.

[102] First Amended Complaint at 2, 38-39, *Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex. filed June 3, 2021); *see also* Complaint, *West Virginia v. Biden*, No. 2:21-cv-22 (N.D. W.Va. filed Aug. 19, 2021); First Amended Complaint, *Arizona v. Mayorkas*, No. 2:21-cv-617 (D. Ariz. filed July 12, 2021).

In addition, the Secretary has devoted extensive resources on efforts designed to stop trafficking networks and protect border states from risks associated with criminal activity. Shortly after assuming office, the Secretary directed FEMA to increase funding for SWB law enforcement through FEMA's Operation Stonegarden, a $90 million grant that supports law enforcement partners, with more than 80% of such funds being been directed to SWB areas. Multiple and significant narcotics seizures have resulted from this initiative.[103] The Secretary also directed DHS to work with GOM partners on joint law enforcement operations designed to attack the smuggling and trafficking organizations. Operation Sentinel, which was launched in April, is a key example of these efforts—a multifaceted counter-network operation focused on identifying and taking law enforcement actions against transnational criminal organizations involved in the facilitation of mass migration to the SWB of the United States. Working with the GOM, DHS law enforcement has identified over 2,200 targets associated with transnational criminal organizations and revoked multiple visas and Trusted Traveler memberships, blocked bank accounts, and blocked certain entities from conducting business with the U.S. government.[104]

These efforts build on the Department's longstanding partnership with state, local, territorial, and tribal (SLTT) governments and law enforcement agencies, including many on the SWB, to address transnational crime, including human smuggling and trafficking. ICE's Homeland Security Investigations, for example, operates 79 Border Enforcement Security Task Forces nationwide, staffed by more than 700 State and Local law enforcement officers, that work cooperatively to combat emerging and existing transnational criminal organizations. Operational successes resulted in the seizure of 2,503 weapons, 215,301 pounds of narcotics, and $104,742,957 in FY20.[105] The ICE Criminal Apprehension Program also helps SLTT law enforcement partners better identify, arrest, and remove priority noncitizens who have been convicted of crimes in the United States and are incarcerated within federal, state, and local prisons and jails. In FY21, ICE issued 65,940 immigration detainers to noncitizens booked in jails or prisons.[106] All such activities are ongoing.

The Department also has carefully reviewed the available information and has not seen any evidence that MPP had any effect on human trafficking and crime, including drug trafficking. Seizures of narcotics, while not necessarily indicative of trafficking activity, are nonetheless the best available data, and do not show any impact related to MPP's implementation. Seizure of narcotics between ports of entry have declined steadily from FY18 to FY21, including a decline of almost 40 percent since the point in time when MPP was fully implemented, through FY21, a time MPP was largely not being implemented.[107] These declines have been driven by a substantial decrease in marijuana smuggling. Meanwhile, hard narcotics, including cocaine, methamphetamine, heroin, and fentanyl, are historically smuggled through ports of entry and thus have very little connection to MPP's implementation. Seizure trends for

---

[103] FEMA data on Operation Stonegarden provided on Oct. 28, 2021.

[104] CBP data on Operational Sentinel, provided on Oct. 28, 2021.

[105] ICE data on Border Enforcement Security Task Forces, provided on Oct. 28, 2021.

[106] ICE data on the Criminal Apprehension Program, provided on Oct. 28, 2021.

[107] Analysis of CBP data on drug seizures by U.S. Border Patrol agents, https://www.cbp.gov/newsroom/stats/drug-seizure-statistics.

hard drugs at ports of entry have been mixed, with fentanyl and methamphetamine seizures increasing substantially year on year since FY18, cocaine seizures remaining largely flat, and heroin seizures substantially higher in FY19 and FY21 than in FY18 and FY20.[108]

Meanwhile, the fact that some noncitizens might reside in the United States rather than being returned to Mexico and thus access certain services or impose law enforcement costs is not, in the Secretary's view, a sufficiently sound reason to continue MPP. Federal immigration policy virtually always affects the number of people living within the States. Notably, not all of those burdens are borne by border States—many noncitizens proceed to interior States; others are detained by the federal government. In this case, the Secretary has made the judgment that any marginal costs that might have been inflicted on the States as a result of the termination of MPP are outweighed by the other considerations and policy concerns; it is also the Secretary's view that the other policies and initiatives being pursued by this Administration will ultimately yield better outcomes than MPP.

Moreover, even after his many consultations, the Secretary is unaware of any State that has materially taken any action in reliance on the continued implementation (or in response to the prior termination) of MPP. State-plaintiffs in the litigation also have not identified any specific actions they took in reliance on MPP.[109] Moreover, any claimed reliance interest is undermined by the fact that the program itself is discretionary, as are decisions to detain or parole individuals into the country. *No* administration has ever done what State-plaintiffs in the litigation argue is required here—detain or return to Mexico everyone that the Department encounters along the border. States cannot have a reliance interest based on something that has never previously been implemented. Notably, only 6.5 percent of noncitizens encountered along the SWB and processed through Title 8 were enrolled in MPP during the period it was in place. In no month when MPP was operating—including in August 2019, the month with the highest number of MPP enrollments—were more than one-in-five noncitizens encountered at the SWB and processed through Title 8 placed in MPP.[110] The short time in which MPP was in place, as well as the small percentage of noncitizens encountered along the SWB who were enrolled in MPP while it was in operation, undercut any claimed reliance interest, as well as any claim regarding significant burdens to the States.

I.   Relationship between Implementation of MPP and Statutory Mandates

In enjoining the June 1 Memorandum, the district court faulted the Department for not considering the impact terminating MPP would have on the Department's ability to comply with the detention requirements in 8 U.S.C. § 1225.[111] In so doing, the district court accepted plaintiffs' argument that, pursuant to 8 U.S.C. § 1225, DHS has two options with regard to

---

[108] *Id.*

[109] The district court in *Texas* also discussed a purported "agreement" that the Department entered into with the State of Texas and several other states in early January 2021. *Texas*, 2021 WL 3603341, at *6-7. As the Department has explained in litigation, those documents were void *ab initio* and unenforceable. Any reliance on those documents is therefore unreasonable. To the extent those documents were ever valid, the Department has since terminated them and, in any event, Texas conceded in litigation that the "agreement" was no longer binding as of August 1, 2021.

[110] DHS OIS analysis of CBP administrative records.

[111] *Texas*, 2021 WL 3603341, at *21-23.

noncitizens seeking asylum at the border: (1) mandatory detention or (2) return to a contiguous territory.[112]  This is a clear misreading of the statute for all of the reasons explained at length by the U.S. Government in the litigation—including a misreading of Section 1225 to effectively mandate detention of all those who are not subject to the contiguous-territory-return provision of 8 U.S.C. § 1225(b)(2)(C) if the agency lacks detention capacity to detain all noncitizens not otherwise subject to contiguous territory return.  It is also completely at odds with the history of immigration detention in this country, and the agency's consistent and longstanding interpretation of its statutory authorities.  Section 1225(b)(2)(C) is discretionary, and nothing in section 1225's text or history suggests any relationship between Congress's grant of return authority and section 1225's detention provisions.

Section 1225 does not impose a near-universal detention mandate for all inadmissible applicants for admission either as a general matter or conditionally where noncitizens are not returned to a contiguous territory.  Section 1225 "does not mean" that every noncitizen "must be detained from the moment of apprehension until the completion of removal proceedings."[113]  The INA provides DHS with latitude for processing noncitizens beyond returns or detention.  DHS "may ... in [its] discretion" release a noncitizen placed in Section 1229a proceedings through "parole," pursuant to 8 U.S.C. § 1182(d)(5) "for urgent humanitarian reasons or significant public benefit."[114]

Pursuant to Section 1182(d)(5)'s parole authority, Congress has expressly granted DHS the broad authority to release applicants for admission from detention as an exercise of the Department's parole power.  That power has been exercised for as long as the federal government has been regulating immigration.[115]  Indeed, Congress enacted 8 U.S.C. § 1182(d)(5) as a "codification of the [prior] administrative practice."[116]  And in the decades since, immigration agencies have continued to broadly exercise their parole power to release certain noncitizens from detention.  Notably, the statute does not set any limit on the number of individuals DHS can decide to release on parole.  Nor does it provide that the agency cannot rely on its limited resources and detention capacity to release noncitizens otherwise subject to detention under section 1225.  Rather, Congress simply required that parole decisions be made on a case-by-case basis and that they be based on "urgent humanitarian reasons" or "significant public benefit."[117]  As the statute does not define those ambiguous terms, Congress left it to the

---

[112] *Id*. at *22.

[113] *Matter of M-S-*, 27 I&N Dec. 509, 516-517 (A.G. 2019); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018).

[114] 8 U.S.C. § 1182(d)(5)(A); *see* 8 C.F.R. §§ 212.5(b), 235.3(c). Additionally, "pending a decision on whether the alien is to be removed" and "[e]xcept as provided in [§ 1226(c)]," noncitizens present in the United States "may" be released on "bond" or "conditional parole." 8 U.S.C. § 1226(a)(2)(A)-(B).

[115] *See, e.g.*, *Nishimura Ekiu v. United States*, 142 U.S. 651, 651, 661 (1892) (discussing release of noncitizen to care of private organization); *Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (same).

[116] *Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958).

[117] In a section entitled "Limitation on the Use of Parole," Congress amended the parole statute in 1996 to recharacterize the permissible purposes of parole from "emergent reasons or for reasons deemed strictly in the public interest" to "*only on a case-by-case basis* for urgent humanitarian reasons or significant public benefit." Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, §§ 302, 602, 110 Stat 3009 (emphasis added). But it did not otherwise alter DHS's parole authority and did not define these manifestly ambiguous statutory terms. Accordingly, after the 1996 amendment to the parole statute, the agency

agency to define them.[118]  In implementing section 1182(d)(5), the agency has long interpreted the phrase "significant public benefit" to permit it to parole noncitizens "whose continued detention is not in the public interest as determined by" specific agency officials.[119]  And in turn, the agency has for decades viewed detention as not being in the "public interest" where, in light of available detention resources, detention of a specific noncitizen would limit the agency's ability to detain another noncitizen whose release may pose a greater risk of flight or danger to the community.[120]

Moreover, no administration has *ever* interpreted or implemented 8 U.S.C § 1225, as the district court in *Texas* read it, to require the detention of virtually all inadmissible applicants for admission, except for those returned to Mexico.  The Department does not have—and has never had under any prior administration—sufficient detention capacity to maintain in custody every single person described in section 1225.  In September 2021, for example, CBP encountered approximately 192,000 individuals along the SWB.[121]  And as discussed above, even in August 2019, when MPP enrollments were at their zenith, CBP encountered nearly 63,000 individuals along the SWB.  Meanwhile, ICE Enforcement and Removal Operations (ERO) is generally appropriated for approximately 34,000 detention beds nationwide with some modest fluctuation from year to year.

This variance between border crossings and detention capacity is not new and was in fact the reality even when MPP was in place (see Appendix 1).  From Fiscal Years 2013 to 2019, nearly three-quarters of single adult and family unit members who were encountered at the SWB were either never placed in or released from detention during the pendency of their proceedings—more than 1.1 million (41 percent) were never booked into ICE detention and nearly 900,000 (33 percent) were booked in for a period of time but released prior to the conclusion of their removal proceedings.[122]  Even during the period that MPP was in effect from late January 2019 to January 20, 2021, more than two-thirds of single adults and individuals in family units encountered along the SWB and processed through non-MPP Title 8 authorities—more than 650,000 individuals—were never detained or released from ICE custody during the

---

incorporated the new "case-by-case" requirement into its regulation, while also maintaining its longstanding regulatory authority to release when "continued detention is not in the public interest," 8 C.F.R. § 212.5(b)(5), which remained consistent with the statute after the 1996 amendment. Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312, 10,313 (Mar. 6, 1997).

[118] 8 U.S.C § 1103(a)(1); *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984); *cf., e.g., Ibragimov v. Gonzales*, 476 F.3d 125, 137 n.17 (2d Cir. 2007) (deferring to another aspect of same parole regulation).

[119] 8 C.F.R. § 212.5(b)(5).

[120] *See, e.g., Interim Guidance for Implementation of Matter of M-S*, 27 I&N Dec. 509 (A.G. 2019): Parole of Aliens Who Entered Without Inspection, Were Subject to Expedited Removal, and Were Found to Have a Credible Fear of Persecution or Torture; ICE Policy No. 11002.1, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009); *see also Jeanty v. Bulger*, 204 F. Supp. 2d 1366, 1377-78 (S.D. Fla. 2002) (referring to INS detention use policies, including parole policies, based on having to establish "priorities for the use of limited detention space"), *aff'd*, 321 F.3d 1336 (11th Cir. 2003).

[121] Southwest Land Border Encounters, *supra* note 95.

[122] FY 2020 Enforcement Lifecycle Report, *supra*, note 75.

duration of their proceedings; a full 42 percent (more than 415,000 individuals) were never booked into ICE detention at all.[123]

By interpreting Section 1225 to mandate either detention or return to Mexico, the court essentially concluded that every single administration since 1997 has repeatedly and consistently violated Section 1225, by exercising the parole authority to release noncitizens detained under that authority, on a case-by-case basis, where detention of a specific noncitizen would limit the agency's ability to detain another noncitizen who release may pose a greater risk of flight or danger to the community.  There is no indication that Congress, in enacting Section 1225, intended to *require* the Secretary to use the explicitly *discretionary* return authority found in 8 U.S.C. § 1225(b)(2)(C) for virtually any noncitizen the Department fails to detain because of resource limitations.[124]  Rather, the decision to use the authority found in 8 U.S.C. § 1225(b)(2)(C) is entrusted to the Secretary's discretion and to his discretion alone.  Given these clear statutory authorities, and DHS's longstanding interpretation of the ambiguous parole statute, the Secretary's decision to terminate MPP creates no conflict with the detention authorities in Section 1225.

J.   Impact on U.S.-Mexico Relationship

Mexico is a sovereign nation.  This means that the U.S. Government cannot return individuals to Mexico without an independent decision by the GOM to accept their entry.  It was for good reason that MPP was put into effect only *after* the U.S. government had conducted diplomatic engagement with GOM and *after* the GOM announced its independent decision to accept returnees.  The initiation of MPP required substantial diplomatic engagement in 2019; it does in 2021 as well.[125]

In deciding to accept returns of non-Mexican nationals under MPP, the GOM agrees to shoulder the burden of receiving these individuals, facilitating legal status and shelter, and accounting for their safety and security.  Not only does this place a great deal of strain on the GOM's ability to provide services for its own citizens and lawful residents, it diverts Mexican law enforcement resources from other missions that are important to the United States—

---

[123] *Id*. Indeed, when the last Administration created MPP, it expressly excluded from its coverage as a matter of discretion certain noncitizens, including citizens or nationals of Mexico, returning lawful permanent residents seeking admission, noncitizens with known physical or mental health issues, and other noncitizens. DHS, "Migrant Protection Protocols (Trump Administration Archive)," https://www.dhs.gov/archive/migrant-protection-protocols-trump-administration.

[124] Congress is aware that it would need to appropriate substantial additional funds to detain everyone potentially subject to detention under Section 1225; yet, it has never done so. *See* 8 U.S.C. § 1368(b) (providing for bi-annual reports to Congress on detention space, including estimates on "the amount of detention space that will be required" during "the succeeding fiscal year"). Although Congress has amended Section 1225 since 1996, *see* Pub. L. 110-229, 122 Stat. 754, 867 (2008), it has never amended Section 1225 to mandate the use of return authority when the agency lacks resources to detain all applicants for admission or to override the agency's longstanding interpretation permitting the use of parole to address capacity limitations as a significant public benefit. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative … interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

[125] *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act*, *supra* note 13.

including addressing transnational organized crime networks and root causes of migration.  Over the past nearly three years, MPP has played an outsized role in its policy and operational engagement with GOM, thus distracting from other diplomatic initiatives and programs concerning migration flows.  These engagements, which have increased substantially in tempo and intensity since the court's order, require enormous amounts of time to prepare for and execute, and involve the same individuals at DHS and DOS who would otherwise be working on advancing other key bilateral priorities.

The Department is eager to expand the focus of the relationship with GOM to address broader issues related to migration to and through Mexico.  This includes implementing the bilateral economic and security frameworks adopted in September and October 2021, respectively;[126] addressing the root causes of migration from Central America; improving regional migration management; enhancing protection and asylum systems throughout North and Central America; and expanding cooperative efforts to combat smuggling and trafficking networks, and more.  Terminating MPP will, over time, help to broaden the United States' engagement with the GOM to address these critical efforts, which we expect will produce more effective and sustainable results than what we achieved through MPP.  It will also provide more space and resources to address the many other bilateral issues that fall within DHS's diverse mission, such as countering transnational organized crime, cybersecurity, trade and travel facilitation, cargo and port security, emergency management, biosurveillance, and much more.

## IV.    The Biden-Harris Administration's Affirmative Efforts to Enhance Migration Management

In December 2018, when DHS announced the start of MPP, the Department stated that MPP was expected to provide numerous benefits for the immigration system, including reducing false asylum claims, more quickly adjudicating meritorious asylum claims, clearing the backlog of unadjudicated asylum applications, and, perhaps most importantly, stemming migration flows across the SWB.  All of these goals remain top priorities for the Department and Administration.  But the Secretary assesses that there are ways to advance these goals through means other than MPP—through policies and practices that will more effectively and more humanely achieve the stated goals than continuing to implement MPP as designed or in modified form.

Not only has MPP failed to deliver many of its promised benefits, but the burden and attention required to reimplement and maintain MPP will undermine the Department's efforts to address irregular migration and achieve lasting reform of the asylum system through other means.  As noted earlier, the Secretary is undertaking this review on the premise that MPP was responsible for a share of the significant decrease in SWB encounters that occurred during many months of MPP's operations.  However, MPP is not the only, and certainly not the preferred, means of tackling irregular migration.  To the contrary, the Department is currently pursuing a range of other measures that it anticipates will disincentivize irregular migration in ways that are

---

[126] White House, "Joint Statement: U.S.-Mexico High-Level Security Dialogue," Oct. 8, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/08/joint-statement-u-s-mexico-high-level-security-dialogue/; White House, "Fact Sheet: U.S.-Mexico High-Level Economic Dialogue," Sept. 9, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/09/09/fact-sheet-u-s-mexico-high-level-economic-dialogue/.

more consistent with this Administration's values and enduring, including by addressing root causes and building regional solutions.  In addition, the Department is committed to channeling migration through safe and orderly pathways and reforming our asylum adjudication system to achieve more timely, fair, and efficient results,

In July 2021, the Administration released a Blueprint describing its overarching strategy—as well as the concrete steps that will be taken—to ensure a secure, humane, and well-managed border, implement orderly and fair asylum processing, strengthen collaborative migration management with regional partners, and invest in the root causes of migration in Central America.[127]  The Administration, with DHS playing a critical role, has made significant investments and taken substantial actions to move forward with its strategy.

A.  <u>Managing Flows</u>

The current Administration is pursuing a comprehensive vision for managing migration and facilitating safe, orderly, and legal pathways for individuals seeking protection or intending to migrate.[128]  A key part of this vision involves disincentivizing unlawful entries by robustly enforcing our laws at the land border while also ensuring the humane and lawful treatment of those who do arrive in the United States.  Doing so requires a concerted effort to address root causes of migration, provide alternative protection solutions in the region, enhance lawful pathways for migration to the United States, and streamline the fair adjudication of asylum claims at the border—efforts that the Department has determined will be more effective at reducing irregular migration than continuing to implement MPP.

To disincentivize irregular migration, the Administration is pursuing a multi-pronged approach.  At our border, we are employing expedited removal to rapidly, but humanely, return certain individuals and families that are encountered unlawfully crossing between POEs.  Those who do not express fear of persecution or torture, and who are nationals of countries that allow electronic nationality verification (ENV), are returned to their countries within a few days of being encountered.  DHS is working closely with the Department of State to expand the use of these ENV agreements throughout the hemisphere to more expeditiously facilitate removals of individuals who do not claim a fear of persecution or torture.  The Department additionally treats any noncitizen who unlawfully entered the United States on or after November 1, 2020, as a presumed border security enforcement and removal priority under current guidance,[129] as well as in guidance that will become effective on November 29, 2021.[130]

---

[127] White House, "Fact Sheet: The Biden Administration Blueprint for a Fair, Orderly and Humane Immigration System," July 27, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/27/fact-sheet-the-biden-administration-blueprint-for-a-fair-orderly-and-humane-immigration-system/.

[128] EO 14010 directed the creation of a Root Causes Strategy and Collaborative Migration Management Strategy. Published in July 2021, the strategies articulate a bold and comprehensive vision for managing migration throughout the Western Hemisphere. *Id.*

[129] Memorandum from Tae D. Johnson, Acting Director, ICE, *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* (Feb. 18, 2021).

[130] Memorandum from Alejandro Mayorkas, Sec'y of Homeland Security, *Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021).

Recognizing that the management of migration is a shared responsibility among sending, transiting, and receiving countries, the Administration is also working with our partner countries across the region to manage migratory flows.  As part of these efforts, the United States is working bilaterally and multilaterally with countries across the Western Hemisphere, seeking to encourage humane border enforcement and enhance legal pathways throughout the region.  DHS is also working closely with the Department of State to provide additional technical assistance, mentoring, and resources to border and immigration authorities in the region, with the goal of enhancing the capability and effectiveness of our partners' efforts to identify and interdict unlawful activity.  As part of these efforts, the United States and Colombia co-hosted a regional conference on migration in Colombia on October 20, 2021 that brought together foreign ministries and immigration authorities from 17 partner nations across the hemisphere to directly address recent trends in irregular migration in the region. During this conference, countries committed to enhancing protection, combating human smuggling and trafficking, and expanding humane enforcement efforts.

The Department is also working bilaterally with countries across the region to build law enforcement capacity, tackle transborder crime, and slow migratory flows.  Beginning in April 2021, for example, DHS deployed dozens of CBP personnel to Guatemala to train and support local law enforcement units and help enhance the security of Guatemalan border crossings, checkpoints, and ports.[131]  And in October 2021, for example, the United States and Mexico agreed on joint actions to prevent transborder crime, with a particular focus on reducing arms trafficking, targeting illicit supply chains, and reducing human trafficking and smuggling.[132] Such efforts build on the successes of Operation Sentinel, in which DHS is working with other U.S. government agencies and the GOM to identify and impose meaningful sanctions on those involved in human smuggling, including by freezing their assets, revoking their visas, and curtailing their trade activities.  DHS seeks to expand these efforts across the hemisphere, with the GOM as a key partner.  However, the senior U.S. and Mexican officials who would lead these efforts are the same officials that have spent much of the past three months negotiating the reimplementation of MPP—detracting from efforts to advance other key parts of the bilateral relationship.

The Administration is also expanding efforts to address root causes of migration and enhance legal pathways for individuals who intend to migrate, as well as building and improving asylum systems in other countries and scaling up protection efforts for at-risk groups.  These efforts reduce incentives to come to the United States to seek protection and, for those who still choose to do so, reduce incentives to cross the border unlawfully.  As part of these efforts, DHS is working with Department of State to expand efforts to build and improve asylum systems in other countries and scale up protection efforts for at-risk groups, thereby providing alternative opportunities for individuals to seek protection without making the often-dangerous journey to the SWB.

The Department of State and DHS, for example, are working to stand up Migrant Resource Centers (MRC) in key sending countries, including Guatemala, where individuals who

---

[131] CBP data on Guatemalan deployments provided on 10/29/2021.

[132] Joint Statement: U.S.-Mexico High-Level Security Dialogue, *supra* note 125.

intend to migrate can apply for a visa or seek other available protection.[133]  The Department of State established the first MRC in Guatemala this year, and is working with international organizations to expand the MRCs to multiple locations and countries over the coming year.  The Administration is also working to continue to expand the legal pathways that are available for individuals who apply at these facilities.  We are also expanding refugee processing in Central America—including through in-country processing in Northern Triangle countries—and are helping international organizations and local non-governmental organizations identify and refer individuals with urgent protection needs to the U.S. Refugee Admissions Program and resettlement agencies in other countries.

Additionally, on March 10, 2021, DHS, in close coordination with the Department of State, restarted the Central American Minors (CAM) program to reunite eligible children from El Salvador, Guatemala, and Honduras with parents who are lawfully present in the United States. On June 15, 2021, the Departments expanded CAM eligibility to include certain U.S.-based parents or legal guardians who have a pending asylum application or U visa petition filed before May 15, 2021, thereby allowing them to file petitions on behalf of children who are nationals of El Salvador, Guatemala, or Honduras for potential resettlement in the United States.  This important program provides an avenue for children to come to the United States that would not otherwise be available, which in turn supports family unity and reduces the incentives for unlawful entry.  By restarting and expanding this safe, orderly, and lawful pathway through which children may reunite with their parent or legal guardians in the United States, CAM reduces the incentive for such vulnerable and often unaccompanied children to make the dangerous journey to the United States border.[134]

The Department also has expanded access to temporary work visas in the region, thereby providing a lawful pathway to work temporarily in the United States for individuals who might otherwise take the irregular and dangerous journey to the United States in search of economic opportunities and cross the border unlawfully.  To that end, on May 21, 2021, DHS published a temporary final rule making available 6,000 H-2B supplemental visas for temporary non-agricultural workers from Honduras, Guatemala, and El Salvador in FY21.[135]  The Administration is also working to enhance access to H-2A visas for temporary agricultural workers, for when there are insufficient qualified U.S. workers to fill these jobs.  Departments and agencies are engaged with the Northern Triangle governments, international organizations, the private sector, civil society, labor unions, and worker rights organizations to promote this program.

---

[133] *Id.*

[134] *See* "Joint Statement by the U.S. Department of Homeland Security and U.S. Department of State on the Expansion of Access to the Central American Minors Program," June 15, 2021, https://www.dhs.gov/news/2021/06/15/joint-statement-us-department-homeland-security-and-us-department-state-expansion.  Under the expanded guidance, eligible minors may apply for refugee status if they are sponsored by a parent or legal guardian in the United States who is in one of the categories: lawful permanent residence; temporary protected status; parole; deferred action; deferred enforced departure; withholding of removal; or certain parents or legal guardians who have a pending asylum application or a pending U visa petition filed before May 15, 2021.

[135] Exercise of Time-Limited Authority To Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 86 Fed. Reg. 28,198 (May 25, 2021).

These efforts, all of which have only recently been initiated, require diplomatic engagement and investment of resources.  They will take some time to achieve substantial results.  Once fully operational, they will provide legal and regular pathways for individuals seeking protection and opportunity to work in the United States, thus reducing the need for unlawful crossings and reducing the appeal of exploitative smugglers.  By incentivizing migration through lawful channels, and disincentivizing the use of unlawful channels, these initiatives achieve several key goals of MPP, but in a more humane way that matches the Administration's values.

    B.  <u>Managing Asylum Claims</u>

The Department also is taking a number of different steps to better manage asylum claims that will allow the United States to more humanely, and fairly, achieve some of MPP's stated benefits: reducing false asylum claims, more quickly adjudicating meritorious asylum claims, and clearing the backlog of unadjudicated asylum applications.

    1.  *Dedicated Docket*

In May 2021, DHS and DOJ jointly announced a new Dedicated Docket, designed to expeditiously and fairly conduct removal proceedings for families who enter the United States between ports of entry at the SWB.[136]  With a goal that immigration judges will generally complete cases on the Dedicated Docket within 300 days, the process is intended to significantly decrease the length of time for adjudication of such noncitizens' cases, while also providing fair hearings for families seeking asylum and other forms of relief or protection from removal.  Dedicated Dockets have been established in 11 cities (Boston, Denver, Detroit, El Paso, Los Angeles, Miami, Newark, New York City, San Diego, San Francisco, and Seattle) chosen because they are common destination cities for migrants and have robust communities of legal service providers.  Once fully up and running, it is expected to adjudicate approximately 80,000 cases each year.

The Dedicated Docket serves multiple goals: It provides a mechanism for the more efficient adjudication of claims.  It ensures compliance with court proceedings through use of case management services provided through ICE's Alternatives to Detention (ATD) program.[137]  It promotes efficiency and fairness in those proceedings through robust access to legal orientation for families on the docket (including group and individual legal orientations and friend-of-the-court services for unrepresented individuals).  And, as MPP was designed to do, it discourages non-meritorious claims by dramatically reducing the amount of time that a noncitizen may remain in the United States while his or her claims for relief or protection are adjudicated.

---

[136] Press Release, DHS, "DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings," May 28, 2021, https://www.dhs.gov/news/2021/05/28/dhs-and-doj-announce-dedicated-docket-process-more-efficient-immigration-hearings.

[137] ICE Enforcement and Removal Operations (ERO), "Alternatives to Detention Program," https://www.ice.gov/detain/detention-management.

Moreover, it is expected to achieve these goals in ways that avoid the pitfalls associated with MPP.  Unlike MPP, which was plagued with high *in absentia* rates, the Dedicated Docket is designed, via the use of ATD and case management services, to ensure high appearance rates and contribute to the proper functioning of our immigration system.  As of October 25, 2021, EOIR had conducted nearly 12,000 initial hearings for individuals in Dedicated Docket cases, just 4.5 percent of which had ended in issuance of an *in absentia* order of removal.[138]  ICE data reflect a 98.9% attendance rate at all hearings for individuals enrolled into ATD from the SWB from FY14 to FY21.[139]

Two immigration court locations currently hearing Dedicated Docket cases—El Paso and San Diego—are slated for use as part of the court-ordered reimplementation of MPP because of their proximity to ports of entry along the border.  To staff MPP cases, EOIR will have to either divert judges from existing initiatives such as the Dedicated Docket—which will prolong those cases and undermine the effort—or reassign other immigration judges handling other non-detained cases, which will exacerbate the 1.4 million case backlog that already exists.  It is the Department's reasoned decision—working in close partnership with EOIR—that the limited pool of asylum officers and immigration judges are best spent supporting the Dedicated Docket and other initiatives that achieve the goals of timely and fair adjudications.

## 2. *Asylum Officer Rule*

On August 20, 2021, DHS and DOJ promulgated a Notice of Proposed Rulemaking (NPRM) for the so-called "Asylum Officer Rule," which seeks to address systemic problems with the asylum system in an enduring way consistent with the Administration's values.  Specifically, it amends the procedures for credible fear screenings and consideration of asylum, withholding of removal, and CAT, so as to streamline the asylum process and address the current backlogs in the system.[140]  The comment period of this NPRM recently closed, and DHS and DOJ are currently reviewing the comments received and working on a final rule.

The proposed rule addresses the fact that the number of asylum and related protection claims at the SWB has increased dramatically over the years, that the system has not been able to keep pace, and that large immigration court backlogs and lengthy adjudicated delays are the result.[141]  As stated in the NPRM, the proposed rule also evidences this Administration's recognition that "[a] system that takes years to reach a result is simply not a functional one.  It delays justice and certainty for those who need protection, and it encourages abuse by those who will not qualify for protection and smugglers who exploit the delay for profit."[142]  The Asylum Officer Rule thus responds to the very same concerns identified by the last Administration when

---

[138] Data on the number of initial hearings for individuals on Dedicate Docket, provided by EOIR on Oct. 25, 2021.

[139] Data from ICE ERO Custody Management Division FY14, 15, 16, 17, 18, 19, 20, and 21 through Aug. 31, 2021 FAMU BP Apprehensions-Subsequently Enrolled into ATD, ISAP IV EOIR Court Appearance Rates FY14 & FY15 & FY16 & FY17 & FY18 & FY19 & FY20 & FY21 through Aug. 31, 2021.

[140] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46,906 (Aug. 20, 2021).

[141] *Id*. at 46,907.

[142] *Id*.

it adopted MPP—and to a number of the concerns relied upon by the *Texas* court—but tackles them in a transformative and systemic way, while holding true to our laws and values.

To support the more expeditious and fair adjudication of claims, the proposed rule would transfer from immigration judges to USCIS asylum officers the initial responsibility for adjudicating asylum and related protection claims made by noncitizens who are encountered at or near the border and who are placed into expedited removal proceedings.  Individuals who establish a credible fear of persecution or torture following an initial screening interview would have their applications referred to USCIS, rather than the immigration court, for further consideration of their claim.  The initial credible fear interview would serve as the basis for the individual's asylum application, thereby introducing a key efficiency into the process.

Allowing cases with positive credible-fear findings to remain within USCIS for the full asylum merits adjudication, rather than being shifted to immigration judge-review, will capitalize on the investment of time and expertise developed during the screening interview and allow cases to be resolved more quickly.  This will, in turn, employ limited asylum officer and immigration court resources more efficiently, reduce asylum backlogs, and protect against further expansions of the already large immigration court backlog.  As currently drafted, the NPRM is also designed to include key procedural safeguards—including the ability to appeal, be represented by counsel, and present additional evidence as necessary to ensure due process, respect for human dignity, and equity.  Once implemented, the Asylum Officer Rule is expected to represent a transformative and lasting shift in asylum claim processing that will ensure rapid and fair processing in a way that delivers appropriate outcomes and realistically keeps pace with the workflow.

Achieving the rule's objectives will require substantial investment in resources, training, and personnel; to fully implement this new process, USCIS will need to quadruple the current asylum officer corps.[143]  Importantly, these are the same asylum officers needed to conduct *non-refoulement* interviews for MPP.  Restarting MPP will likely undercut the ability to implement this new rule as designed.

It is the Department's reasoned view that these limited resources are better expended on implementing both the Dedicated Docket and the Asylum Officer Rule.  Like MPP, both the Dedicated Docket and the Asylum Officer Rule are designed to render timely decisions and discourage non-meritorious claims.  Unlike MPP, however, they do so without subjecting vulnerable individuals to increased risk in Mexico and without creating the inevitable barriers to accessing counsel that exist for those returned to Mexico.

## V.   Consideration of Alternatives to Terminating MPP

The Department has considered the following as alternatives to terminating MPP: First, implementing MPP in the same manner as the prior Administration.  Second, implementing with modifications designed to address some of the access-to-counsel, safety, and other humanitarian considerations, consistent with demands from the GOM.  (These modifications are currently

---

[143] *Id*. at 46,933.

being planned pursuant to the court's order to implement MPP in good faith.)  Third, implementing a significantly modified programmatic use of the Section 235(b)(2)(C) authority, as described below.

Reimplementation of MPP in the same manner as the prior Administration is not currently an available option.  As has been described in court filings, the United States cannot unilaterally implement MPP without the independent agreement of the GOM to accept those who the United States seeks to return.  In ongoing discussions with the GOM, the GOM has made clear it would agree to accept such returns only if certain changes were implemented, including (i) measures to ensure that cases are generally adjudicated within six months, thus limiting the amount of time individuals are waiting in Mexico; (ii) clear means of communicating to MPP enrollees accurate information about the time and date of their hearings; (iii) improved access to counsel; and (iv) better screenings to protect particularly vulnerable individuals from being returned to Mexico.  Each of these changes would, as a result, need to be made in any reimplementation.  Unless the GOM significantly changes its position, resuming the program as it existed previously is simply not possible in the foreseeable future as a matter of international diplomacy.

Moreover, the Secretary has his own independent and significant concerns about the prior implementation of MPP, including concerns about the safety and security of those returned to Mexico, deficiencies in the *non-refoulement* interview process, barriers to access to counsel, and the ways in which reimplementation of MPP would divert from other Administration goals and result in significant burdens for the Department that would limit DHS's opportunities to make other needed reforms consistent with this Administration's policy priorities.  In light of these concerns, the Secretary has decided not to resume MPP in precisely the same form as it previously existed, even if were a viable option.

As an alternative, the Secretary considered a modified implementation and enforcement plan, in the manner that the Administration is planning to start doing in the coming weeks— pending an independent decision by the GOM to facilitate returns—in order to comply with the district court's order.  As the Department moves to reimplement, it is making changes to account for GOM's concerns—changes which are designed to better protect individuals returned to Mexico and ensure, among other things, timely and accurate notice about court hearings.  In addition, the Department is evaluating what changes could be made to address the issues raised in the Red Team Report, to include changes announced by the December 2020 supplementary guidance to better ensure family unity, access to counsel during *non-refoulement* interviews, and assessment of vulnerability.  In addition, in the near term, the Department will need to put in place robust COVID-19 mitigation measures to safeguard DHS personnel, the public, and the migrants themselves from the spread of the pandemic.

The Secretary has carefully considered whether these changes would sufficiently address his concerns regarding MPP to such an extent that he would support reimplementation of a modified MPP in lieu of termination.  But ultimately he has concluded that, while helpful, they fail to address the fundamental problems with MPP—which is that it puts an international barrier between migrants and their counsel and relevant immigration court where their proceedings are pending and it places their security and safety in the hands of a sovereign nation, over which the

United States does not exercise control.  Further, the reimplementation of MPP diverts resources from key priorities that designed to address the same policy goals more effectively and in a more humane way, including this Administration's landmark efforts to transform our asylum system and address the root causes of migration.

A third alternative still would be to attempt to do even more to address the humanitarian and other concerns associated with MPP, thus designing a programmatic use of the Section 235(b)(2)(C) authority that aggressively tackles the humanitarian concern and is more fully aligned with the Administration's broader vision for migration management.  It is doubtful that DHS *could* adequately address these problems, given Mexican territorial sovereignty.  At best, any such effort would require the provision of significant U.S. foreign assistance to counterparts operating in Mexico to assist with housing, transportation to and from court hearings, and other protections to address safety and security concerns.  Attempting to do so would divert enormous Department of State resources away from the Administration's signature policy goals—to address the root causes and develop regional solutions for enforcing against irregular migration while providing regional approaches to lawful pathways.  Meanwhile, the fundamental flaws with MPP remain.

After careful consideration, and for all the reasons laid out in his termination memo and this explanatory document, the Secretary has concluded that there are inherent problems with the program that no amount of resources can sufficiently fix, and others that cannot be sufficiently addressed without detracting from key Administration priorities and more enduring solutions.

## VI.   Conclusion

In sum, continuation of MPP—even in a significantly modified format—is inconsistent with the current policy approach of this Administration.  Rather than forcing individuals to return to Mexico to await court hearings, this Administration is pursuing a range of other policies and rulemaking efforts—including regional approaches to addressing the root causes of migration and a reform of the asylum system—to better achieve the key goals of securing the border, reducing migratory flows, timely and fairly adjudicating asylum claims, and reducing the asylum backlog.  Many of these efforts are currently underway and will bear fruit over time; the resources needed to implement MPP will detract from these efforts.

It is squarely within the authority of the Secretary of Homeland Security to decide to pursue the immigration policies and practices that he believes are most effective, and to decide not to exercise the discretion granted him by Congress in Section 235(b)(2)(C) of the INA to continue MPP.  The Secretary reserves the prerogative to exercise this discretionary authority if circumstances—and the factors that led to this conclusion—change.  Until such time, the Secretary has determined that MPP is incompatible with his goals for managing migratory flows at the border, and doing so in a humane way, consistent with the Administration's values.

**Appendix 1: Encounters by Detention, Fiscal Years 2013-2021**

| Fiscal Year | Total Encounters | Continuous detention | | Booked out prior to final outcome | | Never detained | |
|---|---|---|---|---|---|---|---|
| 2013 | 287,535 | 114,673 | 40% | 76,776 | 27% | 96,086 | 33% |
| 2014 | 338,650 | 113,005 | 33% | 102,371 | 30% | 123,274 | 36% |
| 2015 | 296,856 | 105,425 | 36% | 82,221 | 28% | 109,210 | 37% |
| 2016 | 373,506 | 105,295 | 28% | 131,147 | 35% | 137,064 | 37% |
| 2017 | 292,102 | 73,809 | 25% | 106,405 | 36% | 111,888 | 38% |
| 2018 | 360,574 | 93,449 | 26% | 149,183 | 41% | 117,942 | 33% |
| 2019 | 762,912 | 100,700 | 13% | 246,099 | 32% | 416,113 | 55% |
| 2020 | 312,794 | 61,751 | 20% | 37,981 | 12% | 213,062 | 68% |
| 2021 | 665,158 | 27,402 | 4% | 62,744 | 9% | 575,012 | 86% |
| 2013-2019 | 2,712,135 | 706,356 | 26% | 894,202 | 33% | 1,111,577 | 41% |
| 2013-2021 | 3,690,087 | 795,509 | 22% | 994,927 | 27% | 1,899,651 | 51% |
| Non-MPP Cases | 991,012 | 323,425 | 33% | 251023 | 25% | 416,564 | 42% |

*Note: Non-MPP cases are defined as single adults and family units encountered between Jan. 25, 2019, and Jan. 20, 2021, and not enrolled in MPP and not expelled under Title 42.*

Source: Data derived from DHS Office of Immigration Statistics Enforcement Lifecycle, which is based on a comprehensive person-level analysis of DHS and EOIR enforcement and adjudication records. *See* Marc Rosenblum and Hongwei Zhang, *Fiscal Year 2020 Enforcement Lifecycle Report* (Dec. 2020).