**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official capacity | § | |
| as President of the United States of | § | |
| America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### PLAINTIFFS' MOTION
### TO POSTPONE THE EFFECTIVE DATE OF AGENCY ACTION

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................. iii

Introduction .......................................................................................................................... 1

Statement of Facts ................................................................................................................ 5

Summary of the Argument .................................................................................................. 6

Argument .............................................................................................................................. 6

    I.       Plaintiffs are likely to succeed on the merits. ....................................................... 7

           A.    The October 29 Memoranda constitute arbitrary and capricious agency action under the APA. ............................................................................................. 7

                  1.    Defendants failed to adequately consider how using its contiguous-territory return authority would allow them to avoid violations of the INA's clear detention mandate. ....................................................... 8

                  2.    Defendants failed to adequately account for MPP's deterrent effect in reducing dangerous attempted illegal border crossings, as well as MPP's reduction of unmeritorious asylum claims. .................................................... 10

                  3.    Defendants failed to adequately justify their changed factual determinations regarding *in absentia* removal orders. ................................. 12

                  4.    Defendants failed to adequately examine whether DHS's rescission of MPP is causing it to violate the limits on its parole authority. ................. 12

                  5.    Defendants failed to adequately consider costs to States and their reliance interests. ................................................................................................ 19

           B.    No procedural issue precludes this Court's review. ............................................. 21

                  1.    Plaintiffs have standing to bring this claim. .................................................. 21

                  2.    Plaintiffs have a cause of action. .................................................................... 22

                  3.    The October 29 Memoranda are subject to judicial review. ......................... 22

                  4.    The October 29 Memoranda are final agency action ................................... 24

    II.      Texas and Missouri will suffer irreparable harm if a stay is not granted ........................ 24

    III.    The equities overwhelmingly favor a stay ........................................................... 25

Conclusion ........................................................................................................................... 25

Certificate of Conference .................................................................................................... 27

Certificate of Service ........................................................................................................... 27

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Affinity Healthcare Servs., Inc. v. Sebelius,*
 720 F. Supp. 2d 12 (D.D.C. 2010) ................................................................................7, 23

*Amanullah v. Nelson,*
 811 F.2d 1 (1st Cir. 1987) ........................................................................................................17

*Arizona v. United States,*
 567 U.S. 387 (2012) ..................................................................................................................21

*Bechtel v. FCC,*
 957 F.2d 873 (D.C. Cir. 1992) ..............................................................................................18

*Bennett v. Spear,*
 520 U.S. 154 (1997) ..................................................................................................................24

*Biden v. Texas,*
 142 S. Ct. 2528 (2022) *(Biden III)* ................................................................................*passim*

*Catawba Cnty. v. EPA,*
 571 F.3d 20 (D.C. Cir. 2009) ................................................................................................18

*Chevron U.S.A. Inc. v. NRDC,*
 467 U.S. 837 (1984) ..................................................................................................................16

*Cruz-Miguel v. Holder,*
 650 F.3d 189 (2d Cir. 2011) ..................................................................................................13

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
 140 S. Ct. 1891 (2020) ..................................................................................................8, 19, 20

*FBI v. Abramson,*
 456 U.S. 615 (1982) ..................................................................................................................14

*FCC v. Fox Television Stations, Inc.,*
 556 U.S. 502 (2009) ..................................................................................................................12

*FCC v. Prometheus Radio Project,*
 141 S. Ct. 1150 (2021) ...............................................................................................................7

*Gen. Chem. Corp. v. United States,*
 817 F.2d 844 (D.C. Cir. 1987) ..............................................................................................11

*Harper & Row Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985) .......................................................................................................... 14

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
    804 F.2d 1390 (5th Cir. 1986) ....................................................................................... 24

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018) ................................................................................................... 9, 18

*Judulang v. Holder*,
    565 U.S. 42 (2011) .............................................................................................................. 8

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) .................................................................................................... 14

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ........................................................................................... 25

*Lopez v. Davis*,
    531 U.S. 230 (2001) ........................................................................................................ 16

*Medellin v. Texas*,
    552 U.S. 491 (2008) ........................................................................................................ 15

*Michigan v. EPA*,
    576 U.S. 743 (2015) ........................................................................................................ 16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................................. 4, 7, 8, 11

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................................. 23, 25

*Office of Commc'n of the United Church of Christ v. FCC*,
    707 F.2d 1413 (D.C. Cir. 1983) ........................................................................... 9, 13, 18

*Portland Cement Ass'n v. EPA*,
    665 F.3d 177 (D.C. Cir. 2011) ............................................................................. 9, 13, 18

*Richardson v. Joslin*,
    501 F.3d 415 (5th Cir. 2007) ......................................................................................... 14

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) ........................................................................................... 7

*Texas v. Biden*,
    10 F.4th 538 (2021) (*per curiam*) ............................................................................... 3, 22

*Texas v. Biden*,
 20 F.4th 928 (5th Cir. 2021) (*Biden II*) ........................................................................*passim*

*Texas v. U.S. EPA*,
 829 F.3d 405 (5th Cir. 2016) ...................................................................................................7

*Texas v. United States*,
 40 F.4th 205 (5th Cir. 2022) (per curiam) ...................................................................... 19, 21

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
 985 F.3d 472 (5th Cir. 2021) ...................................................................................................7

*Valley v. Rapides Parish School Bd.*,
 118 F.3d 1047 (5th Cir. 1997) .................................................................................................7

**Statutes**

5 U.S.C. § 701(a)(2) ...................................................................................................................24

5 U.S.C. §705 .................................................................................................................. 6, 7, 23

5 U.S.C.§ 706 .............................................................................................................4, 5, 7, 22, 23

8 U.S.C. § 1182(d)(5) .......................................................................................................13, 15, 16

8 U.S.C. § 1225 ....................................................................................................................*passim*

8 U.S.C. § 1229a ...........................................................................................................................1

8 U.S.C. § 1252(a)(2)(B)(ii) .......................................................................................................24

8 U.S.C. § 1252(f)(1) ......................................................................................................... 4, 22, 23

8 U.S.C. §§ 1252(g), 1252(b)(9), 1252(a)(2)(B)(ii) ...................................................................24

8 U.S.C. § 1226(a) .......................................................................................................................18

**Other Authorities**

8 C.F.R. § 212.5(a) .....................................................................................................................13

86 Fed. Reg. 8269 (2021) .............................................................................................................2

Executive Order No. 14010 ..........................................................................................................2

Federal Rule of Civil Procedure 65(a)(2) .....................................................................................3

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 950–51, 1016
 (2018) .....................................................................................................................................23

## INTRODUCTION

On December 20, 2018, the Department of Homeland Security (DHS) announced a new program: the Migrant Protection Protocols (MPP). MPP was created in response to an immigration surge at the southern border, and a resulting "humanitarian and border security crisis" in which federal immigration officials were encountering approximately 2,000 inadmissible aliens each day. ECF 94 at 7. MPP provided that certain non-Mexican nationals arriving by land from Mexico would be returned to Mexico to await the results of their removal proceedings under 8 U.S.C. § 1229a. On the same day that DHS announced the program, the Government of Mexico agreed that it would cooperate in administering it, on a temporary basis. ECF 94 at 8.

MPP was implemented pursuant to express congressional authorization in the Immigration and Nationality Act (INA), which provides that "[i]n the case of an alien ... who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(C).

A separate provision of the same section of the INA states that if "an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A). DHS lacks the resources to detain every alien seeking admission to the United States. ECF 94 at 43. Ameliorating that problem was one reason the Trump administration chose to implement MPP; the program ensured that "[c]ertain aliens attempting to enter the U.S. illegally or without documentation, including those who claim asylum, will no longer be released into the country, where they often fail to file an asylum application and/or disappear before an immigration judge can determine the merits of any claim." ECF 94 at 8.

In January 2019, DHS began implementing MPP, initially in San Diego, California, then in El Paso, Texas, and Calexico, California, and then nationwide. ECF 94 at 8. By December 31, 2020, DHS

had enrolled 68,039 aliens in the program. ECF 94 at 12.

Following the 2020 election, however, the newly inaugurated Biden Administration sought to terminate the program. On January 20, 2021, the Acting Secretary of DHS wrote that "[e]ffective January 21, 2021, the Department will suspend new enrollments in [MPP] pending further review of the program. Aliens who are not already enrolled in MPP should be processed under other existing legal authorities." ECF 94 at 15 (the "January Suspension"). President Biden also issued Executive Order No. 14010, which directed the new Secretary of Homeland Security, Alejandro N. Mayorkas, to "promptly review and determine whether to terminate or modify the [MPP] program." 86 Fed. Reg. 8269 (2021). The effects on the border were immediate—according to Defendants' own data, border "encounters jump[ed] from 75,000 in January 2021," when MPP was first suspended, to about "173,000 in April 2021." ECF 94 at 17.

On June 1, 2021, Secretary Mayorkas issued a memorandum officially terminating MPP (the "June 1 Memorandum"). In that memorandum, the Secretary noted his determination "that MPP [d]oes not adequately or sustainably enhance border management in such a way as to justify the program's extensive operational burdens and other shortfalls." ECF 94 at 16. For this and other reasons, the Secretary announced that he was "by this memorandum terminating the MPP program," and "direct[ed] DHS personnel to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives or policy guidance issued to implement the program." ECF 54-2, App.467.

On April 13, 2021, Plaintiffs, the States of Texas and Missouri, initiated this lawsuit challenging this Administration's shutdown of MPP. ECF 1. Plaintiffs' initial complaint challenged the January Suspension that paused new enrollments in MPP, but following the June 1 Memorandum, they amended their complaint to challenge the termination of the entire program. The First Amended Complaint asserted that the June 1 Memorandum violated the INA and the Administrative Procedure

Act (APA), 5 U.S.C. § 701 *et seq.*, and sought preliminary and permanent injunctive relief, declaratory relief, and vacatur of the termination pursuant to the APA. ECF 48.

After a consolidated preliminary injunction hearing and a trial on the merits under Federal Rule of Civil Procedure 65(a)(2), this Court vacated Defendants' decision to terminate MPP as arbitrary and capricious, ECF 94 at 34–42, and as contrary to law for causing Defendants to exacerbate their violation of the mandatory detention requirements of section 1225(b)(1)(B)(iii)(IV), ECF 94 at 42–44. The Court then enjoined Defendants to continue to implement MPP "in good faith until such a time as it has been lawfully rescinded in compliance with the APA *and* until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section 1255 without releasing any aliens *because of* a lack of detention resources." ECF 94 at 52 (*Biden I*). Defendants sought a stay of that order, which the Fifth Circuit denied. *Texas v. Biden*, 10 F.4th 538, 543–561 (2021) (*per curiam*). Defendants then sought a stay in the Supreme Court, but their application there was also denied as they "had failed to show a likelihood of success on the claim that the [June 1 Memorandum] was not arbitrary and capricious." 594 U. S. ——, 142 S.Ct. 926 (2021).

Two business days before oral argument on the merits in the Fifth Circuit, DHS issued two memoranda (the "October 29 Memoranda") declaring that it had made a new decision terminating MPP. *See* Termination of the Migrant Protection Protocols (the "Termination Memorandum"), Supp.App.001–004; Explanation of the Decision to Terminate the Migrant Protection Protocols (the "Explanation Memorandum"), Supp.App.005–043. At the same time, Defendants asked the Fifth Circuit to hold that the case was moot, to vacate this Court's judgment and permanent injunction, and to remand the case for further proceedings. *Texas v. Biden*, 20 F.4th 928, 946 (5th Cir. 2021) (*Biden II*). The Fifth Circuit declined, holding that the October 29 Memoranda did not moot—or have any legal effect on—the appeal. *Id.* at 956–966, 998–1000. The Fifth Circuit then affirmed this Court on the merits.

The Supreme Court granted certiorari, 595 U. S. ——, 142 S.Ct. 1098, 212 (2022), and expedited consideration of the appeal at Defendants' request. On June 30, the Supreme Court reversed the Fifth Circuit. *Biden v. Texas*, 142 S. Ct. 2528 (2022) (*Biden III*). First, it found that this Court's permanent injunction was barred by 8 U.S.C. § 1252(f)(1),[1] *id.* at 2538, though that provision "does not deprive the lower courts of all subject matter jurisdiction over claims brought under sections 1221 through 1232 of the INA." *Id.* at 2539. The Court also held that the termination of MPP did not itself violate the mandatory detention requirements of section 1225(b)(2)(A), *id.* at 2541–43, although the majority "assume[d] *arguendo* … that the dissent's interpretation [advanced by Justice Alito] of section 1225(b)(2)(A) is correct, and that the Government is currently violating its obligations under that provision." *Id.* at 2542. *Biden III* did not disturb any of the holdings of this Court or the Fifth Circuit on issues of standing or reviewability to challenge a termination of MPP, the limits on parole authority, or the mandatory nature of the detention requirements of section 1225.

The Supreme Court expressly left open a challenge in this Court to the October 29 Memoranda as arbitrary and capricious under the APA. *Biden III*, 142 S. Ct. at 2548 ("On remand, the District Court should consider in the first instance whether the October 29 Memoranda comply with section 706 of the APA.") (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46–57 (1983)); *id.* at 2549 (Kavanaugh, J., concurring) ("The question of whether DHS's October 29 decision satisfies the *State Farm* standard is not before this Court at this time. The Court today therefore properly leaves the *State Farm* issue for consideration on remand."); *id.* at 2559 (Alito, J., dissenting) ("I agree with the majority that the District Court on remand should consider in the first instance whether the October 29 Memoranda complied with § 706 of the APA.").

---

[1] "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221–1232], other than with respect to the application of such provisions to an individual alien against whom proceedings under [those provisions] have been initiated."

Indeed, the Court determined that the October 29 Memoranda constituted final agency action that superseded the June 1 Memorandum. *Id.* at 2544. Plaintiffs now challenge the October 29 Memoranda, which—like its predecessor—suffers from arbitrary and capricious decisionmaking.

STATEMENT OF FACTS

On October 29, the Secretary released the Termination Memorandum, consisting of four pages that again announced the termination of MPP, along with the 39-page Explanation Memorandum explaining his reasons for doing so. As the Secretary explained it, these October 29 Memoranda "examined considerations that the District Court determined were insufficiently addressed in the June 1 Memorandum, including claims that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, impose undue costs on states, put a strain on U.S.-Mexico relations, and cause DHS to fail to comply with its [detention] obligations under 8 U.S.C. § 1225." Supp.App.016.

The Secretary acknowledged what he called "the strongest argument in favor of retaining MPP: namely, the significant decrease in border encounters following the determination to implement MPP across the southern border." Supp.App.003. But he nonetheless concluded that the program's "benefits do not justify the costs, particularly given the way in which MPP detracts from other regional and domestic goals, foreign-policy objectives, and domestic policy initiatives that better align with this Administration's values." *Id.* Finally, the Secretary noted that "[e]fforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration." *Id.*

In light of those conclusions, the Secretary announced that he was once again "hereby terminating MPP." *Id.* at 4. He explained that DHS would "continue complying with the [this Court's]

5

injunction requiring good-faith implementation and enforcement of MPP," but that "the termination of MPP" would be "implemented as soon as practicable after a final judicial decision to vacate" that injunction. *Id.*

This Court vacated the permanent injunction on August 8, 2022. ECF 147.

## SUMMARY OF THE ARGUMENT

Plaintiffs are entitled to a stay of the October 29 Memoranda pending a final merits determination as to whether they satisfy the requirements of reasoned decisionmaking under the APA. The termination of MPP failed to adequately consider (1) how using contiguous-territory return authority would allow Defendants to avoid violations of the INA's clear detention mandate; (2) MPP's deterrent effect in reducing dangerous attempted illegal border crossings, as well as MPP's reduction of unmeritorious asylum claims; (3) the justification of changed factual determinations regarding *in absentia* removal orders; (4) whether DHS's rescission of MPP is causing it to violate the limits on its parole authority; and (5) costs to States and their reliance interests.

## ARGUMENT

The stay provision of the APA provides that:

> On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process *to postpone the effective date of an agency action* or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. §705 (emphasis added).[2]

This provision "authorizes reviewing courts to stay agency action pending judicial

---

[2] This Court should consider this motion for interim relief without waiting for Defendants to produce an administrative record for the October 29 Memoranda. *See, e.g., Franciscan All., Inc. v. Burwell*, 7:16-cv-108-O, 2016 WL 9281524, at *3 (N.D. Tex. Nov. 1, 2016) (O'Connor, J.) (setting a briefing schedule "to consider the pending motion for preliminary injunction" despite "no administrative record" and deferring consideration of summary judgment so that the court could consider the "administrative record in the normal course of this litigation"); *Doe v. Trump*, 3:19-cv-1743, 2020 WL 1853657, at *3 (D. Or. Apr. 13, 2020) (noting that the court relied on a "partial record produced before the preliminary injunction" and then set a later deadline "to supplement the administrative record" after the preliminary injunction decision).

review." *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) (citing 5 U.S.C. § 705). "Motions to stay agency action pursuant to these provisions are reviewed under the same standards used to evaluate requests for interim injunctive relief." *Id.* (citing *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)); *see also Texas v. U.S. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (granting stay of agency action under 5 U.S.C. § 705 and applying preliminary injunction factors).

The issuance of a preliminary injunction is appropriate when the movant shows (1) a likelihood of success on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and that (4) an injunction is in the public interest. *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997) (citing *Roho Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)). Plaintiffs easily satisfy these standards.

## I.  Plaintiffs are likely to succeed on the merits.

### A.  The October 29 Memoranda constitute arbitrary and capricious agency action under the APA.

Courts have the duty to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). While a reviewing court must not "substitute" its "own policy for that of the agency" and must apply this standard deferentially, the agency action must still "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Courts "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quotation omitted). Arbitrary and capricious review "is not toothless." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself," not reasons developed *post hoc. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).

The agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43. The agency must consider the reliance interests of those affected by a contemplated decision, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913–15 (2020), and must consider less-disruptive policies in light of those interests. *Id.*

 "[B]ecause agency action must be based on non-arbitrary, relevant factors, the agency's approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system," *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (cleaned up), and an agency rule is "arbitrary and capricious if it the agency has relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43.

### 1. Defendants failed to adequately consider how using its contiguous-territory return authority would allow them to avoid violations of the INA's clear detention mandate.

Though the October 29 Memoranda purport to address compliance with section 1225's detention mandate, Supp.App.030–033, they rely on incorrect legal conclusions, including that "[s]ection 1225 does not impose a near-universal detention mandate," and that section 1182(d)(5)(A)'s parole authority permits DHS to parole nearly all aliens subject to section 1225's mandatory-detention obligation. Supp.App.031–033.

This Court has already determined that the detention requirements of section 1225 are mandatory. ECF 94 at 42–44. The Fifth Circuit reinforced this determination. *Biden II*, 20 F.4th at 992–96; *see also id.* at 978 ("Section 1225(b)(2)(A) provides that, under certain circumstances, 'the alien shall be detained' during her removal proceeding. That's obviously a mandatory statutory command— not a commitment to agency discretion.").

Nothing by the Supreme Court in *Biden III* upsets those prior determinations. The majority rejected the insinuation that its "opinion authorizes the Government to release aliens subject to

detention under section 1225(b)(2)(A)," clarifying that it "need[s] not and d[id] not decide whether the detention requirement in section 1225(b)(2)(A) is subject to principles of law enforcement discretion, as the Government argues, or whether the Government's current practices simply violate that provision." *Biden III*, 142 S. Ct. at 2542 n.4. Instead, the majority "assume[d] *arguendo* for purposes of this opinion that the dissent's interpretation of section 1225(b)(2)(A) [as mandating detention] is correct, and that the Government is currently violating its obligations under that provision." *Id.* at 2540.

"[T]he dissent's interpretation" that the majority assumed was correct is in harmony with this Court's previous determination of the mandatory nature of the detention requirements in 8 U.S.C. § 1225(b)(2)(A). The dissent pointed to the Court's conclusion in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), that "[r]ead most naturally, §§ 1225(b)(1) and (b)(2) ... mandate detention of applicants for admission until certain proceedings have concluded." *Biden III*, 142 S. Ct. at 2553–54 (Alito, J. dissenting) (quoting *Jennings*, 138 S. Ct. at 842).

The termination of MPP reduces Defendants' ability to detain all of the arriving aliens that Congress has mandated them to do, and DHS failed to adequately consider this effect on that related statutory requirement. *Cf. Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) ("an agency must have a similar obligation to acknowledge and account for a changed regulatory posture the agency creates—especially when the change impacts a contemporaneous and closely related rulemaking"); *Office of Comm'n of the United Church of Christ v. FCC*, 707 F.2d 1413, 1441–42 (D.C. Cir. 1983) (finding it "seriously disturbing" and "almost beyond belief" that an agency would take rulemaking action undercutting another "concurrent" rulemaking process).

By denying that section 1225 creates a detention mandate in the October 29 Memoranda— despite this Court's earlier determination to the contrary, ECF 94 at 42–44—Defendants have based the renewed termination of MPP on arbitrary and capricious grounds. Their erroneous legal root

prevented Defendants from properly analyzing the strength of using MPP to reduce their noncompliance with their detention mandates.

### 2. Defendants failed to adequately account for MPP's deterrent effect in reducing dangerous attempted illegal border crossings, as well as MPP's reduction of unmeritorious asylum claims.

The October 29 Memoranda failed to consider key benefits of MPP. For example, they extensively discussed conditions for migrants in Mexico, Supp.App.016–022, but omitted the hardships befalling aliens who make the dangerous journey to the southern border—even though the Secretary similarly acknowledged that MPP "is likely … to contribute[] to a decrease in migrant flows." Supp.App.027. The October 29 Memoranda also had no analysis of the harms avoided by deterring migrants without meritorious asylum claims from traveling to the United States. Explanation Supp.App.022–025.

This Court previously faulted the June 1 Memorandum for failing to "address the problems created by false claims of asylum or how MPP addressed those problems." ECF 94 at 36. The October 29 Memoranda suffer from the same defect.

"[W]hen MPP was first announced the Department observed that 'approximately 9 out of 10 asylum claims from Northern Triangle countries are ultimately found non-meritorious." Supp.App.024–025. Though the October 29 Memoranda acknowledge that Defendants "do[] not have a record of the methodology used to generate this … statistic," they nonetheless disagree with it and change policy because, in their view, MPP resulted in too few asylum grants. Supp.App.025. Defendants cite the lower rates for granting asylum claims for those enrolled in MPP, Supp.App.024–025, but they articulate no reason to think that the higher rates outside MPP they cite are more accurate determinations than the lower rates for aliens enrolled in the program. They concluded that "[t]hese discrepancies strongly suggest that at least some MPP enrollees with meritorious claims either abandoned or were unable to adequately present their claims," Supp.App.025, but "[s]uch intuitional

forms of decisionmaking, completely opaque to judicial review, fall somewhere on the distant side of arbitrary." *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 855 (D.C. Cir. 1987) (quoting *Central Florida Enterprises, Inc. v. FCC*, 598 F.2d 37, 50 (D.C. Cir. 1978)). The October 29 Memoranda do not evidence "a rational connection between the facts found and the choice made" to terminate MPP. *State Farm*, 463 U.S. at 43.

A substantial harm resulting from migrant flows includes human trafficking. ECF 94 at 20. Defendants dismiss the concern that terminating MPP contributed to an increase in these crimes by looking at the data for seizures of narcotics, which indicates a decline, including while MPP was moribund. Supp.App.029–030.

But Defendants themselves note that "[t]hese declines have been driven by a substantial decrease in marijuana smuggling," and the numbers for "hard narcotics … are historically smuggled through ports of entry and this have very little connection to MPP's implementation." Supp.App.029. Indeed, Defendants concede up front that "[s]eizures of narcotics [are not] necessarily indicative of trafficking activity," but use this data to determine that there is no evidence of effects on human trafficking due to implementation of MPP. Supp.App.029. This use of admittedly irrelevant data is a hallmark of a lack of rational decisionmaking, as agencies "must examine the relevant data" and are required to articulate a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43; *see also Biden II*, 20 F.4th at 992 ("We do not fault DHS for failing to provide a study. We fault DHS for cherry-picking a *single* statistic from the administrative record and relying on it in an entirely nonsensical fashion."). By failing to adequately consider the effects of the implementation of MPP on deterring illegal border crossings and unmeritorious asylum claims, and in reducing the opportunities for human trafficking, Defendants did not consider the relevant costs and benefits to make a rational decision when it terminated MPP.

**3. Defendants failed to adequately justify their changed factual determinations regarding *in absentia* removal orders.**

The October 29 Memoranda also purport to "rest[] upon factual findings that contradict those which underlay [DHS's] prior policy," but fail to provide the "more detailed justification" required under those circumstances. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516–17 (2009). For example, the October 29 Memoranda contain completely different numbers regarding *in absentia* removal orders than those contained in the June 1 Memorandum's administrative record to show MPP resulted in a high rate of *in absentia* removals. Supp.App.022–025. But Defendants did not explain the discrepancy or contest the Fifth Circuit's conclusion "that *in absentia* removal rates were similar prior to MPP." *Biden II*, 20 F. 4th at 991–92; *see also* ECF 94 at 40.

Defendants also never provided a rational explanation why the increased *in absentia* removal rates for aliens enrolled in MPP is not an indicator of MPP working; this Court has noted that "[a] higher rate of *in absentia* removal is consistent with DHS's [previous] findings that MPP reduced the 'perverse incentives' to pursue meritless asylum applications." ECF 94 at 40–41. This failure to appreciate the relevant costs and benefits of MPP precluded DHS from making a reasoned determination that considered all relevant factors.

**4. Defendants failed to adequately examine whether DHS's rescission of MPP is causing it to violate the limits on its parole authority.**

The Supreme Court majority in *Biden III* noted that "the INA expressly authorizes DHS to process applicants for admission under a third option: parole." *Biden III*, 142 S. Ct. at 2543 (citing 8 U.S.C. § 1182(d)(5)(A)). But it also emphasized that this "the authority is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'" *Id.* (quoting 8 U.S.C. § 1182(d)(5)(A)). "And under the APA, DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Id.* (citing *State Farm*, 463 U.S. 29). The October 29 Memoranda failed to consider how

terminating MPP—combined with Defendants' inability to detain all arriving aliens—leads to increased violations of the limits on their parole authority as they release aliens into the United States. *Cf. Portland Cement Ass'n*, 665 F.3d at 187 ("an agency must have a similar obligation to acknowledge and account for a changed regulatory posture the agency creates—especially when the change impacts a contemporaneous and closely related rulemaking"); *Office of Commc'n of the United Church of Christ,* 707 F.2d at 1441–42 (finding it "seriously disturbing" and "almost beyond belief" that an agency would take rulemaking action undercutting another "concurrent" rulemaking process).

By passing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Congress cabined the Executive's parole authority precisely because it believed the Executive used that authority to evade congressionally mandated detention. *See Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011). Defendants point to a history of broad discretion in exercising parole, Supp.App.031–032., but Congress's decision to restrict that discretion renders that irrelevant.

Unable to detain and unwilling to return aliens eligible for MPP, Defendants propose that two sources of parole authority, subparagraph 1182(d)(5)(A) and subsection 1226(a), permit DHS to release tens of thousands of detention-mandated aliens into the United States. Subparagraph 1182(d)(5)(A) authorizes individual parole on a case-by-case basis for narrow reasons; subsection 1226(a) does not apply to individuals eligible for MPP. Neither justifies Defendants' dogged refusal to employ its contiguous-return authority to avoid violating its mandatory-detention obligation.

Defendants challenge the Fifth Circuit's conclusion that they cannot parole aliens *en masse* under subparagraph 1182(d)(5)(A). Subparagraph 1182(d)(5)(A) provides only limited humanitarian-parole authority, authorizing "parole … only on a case-by-case basis for urgent humanitarian reasons or a significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Subparagraph 1182(d)(5)(A)'s implementing regulations reiterate that parole may only be granted on a case-by-case basis. 8 C.F.R. § 212.5(a). No deference is due Defendants' interpretation of the regulation implementing their parole authority

because, after "exhaust[ing] all the traditional tools of construction[,]" the regulation is not "genuinely ambiguous," *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (quoting *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843 n.9 (1984))—the requirement that a power must be exercised on a case-by-case basis generally precludes the exercise of that power on a categorical basis, *see, e.g., Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561 (1985); *FBI v. Abramson*, 456 U.S. 615, 631 (1982). Justice Alito noted that "the Solicitor General argued that the case-by-case determination requirement can be met simply by going through a brief checklist for each alien," that "[e]ven the rudimentary step of verifying that an alien does not have a criminal record is not performed in every case," and concluded that "[s]uch procedures are inconsistent with the ordinary meaning of 'case-by-case' review." *Biden III*, 142 S. Ct. at 2555 (Alito, J., dissenting).

"The *Accardi* doctrine stands for the unremarkable proposition that an agency must abide by its own regulations." *Richardson v. Joslin*, 501 F.3d 415, 418 (5th Cir. 2007) (referring to *United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)) (internal quotation marks and citation omitted). The October 29 Memoranda make no attempt to evaluate the limitations on parole in the statute and in DHS's own regulations—as properly understood—and how they are undermined by the refusal to use MPP to relieve the pressure to categorically releaser aliens *en masse* into the United States.

This Court found that MPP's termination forced Defendants "to release and parole aliens into the United States because [they] simply do not have the resources to detain aliens as mandated by statute." ECF 94 at 17. And Defendants have long been on notice that Plaintiffs believed their decision to rescind MPP would necessarily cause the Executive to fail to meet its statutory obligations to detain or otherwise return aliens pending removal proceedings. Plaintiffs argued as much when they first sought a preliminary injunction on May 14, 2020, claiming that "[i]nstead of detaining … aliens or returning them to Mexico, Defendants are paroling them into the United States. But parole is available 'only on a case-by-case basis for urgent humanitarian reasons or a significant public benefit,' not on a

class-wide basis." ECF 30 at 20.

Defendants continue paroling aliens *en masse* into the United States. Defendants' most recent status report filed pursuant to this Court's injunction indicates that in June alone, DHS paroled 11,424 applicants for admission under section 1225 into the United States and—"whether paroled or otherwise"—released 72,611 applicants for admission under section 1225. ECF 143-1 at 4-5. Although Defendants reason that "the [parole] statute does not set any limit on the number of individuals DHS can decide to release on parole," Supp.App.031, it is impossible to believe that DHS has paroled or released these aliens based on case-by-case determinations of urgent humanitarian reasons or significant public benefit. *See Biden III*, 142 S. Ct. at 2554 (Alito, J. Dissenting) ("the number of aliens paroled each month under [under § 1182(d)(5)(A)]—more than 27,000 in April of this year—gives rise to a strong inference that the Government is not really making these decisions on a case-by-case basis.").

Defendants reason that the parole statute "does [not] provide that the agency cannot rely on limited resources and detention capacity to release noncitizens otherwise subject to detention under section 1225." Supp.App.031. But the Fifth Circuit has rejected "the Government's proposal to parole every alien it cannot detain [as] the opposite of the 'case-by-case basis' determinations required by law." *Biden II*, 20 F.4th at 997. Defendants require such a power to resolve their conundrum: if they may systemically grant parole instead of either detaining or returning MPP-eligible aliens, then they need not detain or return those aliens as the law requires. Defendants implicitly recognize that subparagraph 1182(d)(5)(A)'s "case-by-case basis" requirement forecloses the sweeping, thousands-by-thousands parole authority they want. They therefore instead rely on past DHS practice, asserting that DHS has "long interpreted" its parole authority to enable it to simply parole aliens when it lacks sufficient capacity to detain them. Supp.App.032. But such a practice "does not, by itself, create power," *Medellin v. Texas*, 552 U.S. 491, 532 (2008), and DHS's claim to such a power is contradicted

by subparagraph 1182(d)(5)(A)'s text, IIRIRA's historical context, and Congress's history of circumscribing DHS's parole authority.

Subparagraph 1182(d)(5)(A)'s text is unusually clear: it permits DHS to parole aliens only based on individualized determinations, and only for urgent humanitarian reasons or significant public benefit. As the Fifth Circuit observed, "[d]eciding to parole aliens *en masse* is the opposite of case-by-case decisionmaking." *Biden II*, 20 F. 4th at 942.

The Explanation Memorandum claims its interpretation of its parole authority is entitled to deference under *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). Supp.App.031–032. "Even under this deferential [*Chevron*] standard, however, agencies must operate within the bounds of reasonable interpretation." *Michigan v. EPA*, 576 U.S. 743, 751 (2015) (cleaned up). And while an agency ordinarily "has the authority to rely on rulemaking" to categorically resolve "certain issues of general applicability," Congress can withhold that authority. *Lopez v. Davis*, 531 U.S. 230, 243-44 (2001).

Congress did so here, passing IIRIRA specifically to curtail the Executive's improper exercise of parole authority to release classes of aliens rather than individual aliens. After "the executive branch on multiple occasions purported to use the parole power to bring in large groups of immigrants, … Congress twice amended 8 U.S.C. § 1182(d)(5) to limit the scope of the parole power and prevent the executive branch from using it as a programmatic policy tool." *Biden II*, 20 F.4th at 947 (citing Pub. L. No. 96-212, 94 Stat. 102, 108 (adding 8 U.S.C. § 1182(d)(5)(B)); Pub. L. No. 104-208, 110 Stat. 3009, 3009-689 (adding subparagraph 1182(d)(5)(A)). "By enacting [IIRIRA], Congress 'specifically narrowed the executive's discretion' to grant parole due to 'concern that parole … was being used by the executive to circumvent congressionally established immigration policy.'" ECF 94 at 43 n.11 (quoting *Cruz-Miguel*, 650 F.3d at 199 & n.15).

Additional historical context confirms that DHS cannot exercise its parole authority under subparagraph 1182(d)(5)(A) to grant relief to categories of aliens instead of individuals. Before

16

IIRIRA, federal immigration authorities enjoyed a parole power "under such conditions as [the Attorney General] may prescribe for emergent reasons or for reasons deemed strictly in the public interest." Pub. L. No. 414 c. 477, Title II, c. 2, § 212, 66 Stat. 182. As the First Circuit summarized, that pre-IIRIRA parole authority was understood to be "close to plenary," even though "[t]he legislative history of the parole statute demonstrate[d] clearly that Congress intended such largesse to be extended infrequently, where exigent circumstances obtained." *Amanullah v. Nelson*, 811 F.2d 1, 6 (1st Cir. 1987) (citing H.R. Rep. No. 1365, 82d Cong., 2d Sess., 1952, reprinted in 1952 U.S.C.C.A.N. 1653, 1706). Congress made clear as early as 1965 that the parole authority should be used narrowly. *See* H.R. 2580, 89th Cong., 1st sess., H. Rept. 945, Aug. 6, 1965, p. 15-16; H.R. 2580, 89th Cong., 1st sess., S. Rept. 748, Sept. 15, 1965, p. 17. These "parole provisions" were "designed to authorize the Attorney General to act only in emergent, individual, and isolated situations, such as the case of an alien who requires immediate medical attention, and not for the immigration of classes or groups outside of the limit of the law." *Id.*

The Executive nonetheless continued to abuse its parole authority to release classes of aliens into the United States, and Congress remained concerned that "parole ha[d] been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law." H.R. Rep. No. 469, 104th Cong., 2d Sess. Pt. 1, Mar. 4, 1996, at 140. Congress therefore determined that "further, specific limitations on [the Executive's] discretion . . . [were] necessary," *id.*, and it amended subparagraph 1182(d)(5)(A) to make clear that parole "should not be used to circumvent Congressionally-established immigration policy or to admit aliens who do not qualify for admission under established legal immigration categories." *Id.* at 141.

In other words, after long experience with Executive Branch intransigence, Congress expressly foreclosed DHS from exercising its parole authority under subparagraph 1182(d)(5)(A) on a categorical basis. To describe Defendants' reasoning in the Explanation Memorandum—that DHS's

17

historical disregard of legislative restrictions on its historical parole power justifies a present disregard of legislative restrictions on its present parole power—is to refute it.

In a footnote, the Explanation Memorandum claims an alternative source to parole aliens into the United States: 8 U.S.C. § 1226(a)'s bond-and-condition parole provisions. Supp.App.031. But as the Supreme Court has explained, subsection 1226(a) governs the arrest, detention, and release of aliens who are already "present in the country." *Jennings v. Rodriguez,* 138 S. Ct. 830, 838 (2018). "Section 1226 generally governs the process of arresting and detaining that group of aliens," *i.e.,* those already "inside the United States." *Id.* For arriving aliens, section 1225 applies instead. Neither side disputes that only aliens apprehended at the border are eligible for MPP—so whatever the scope of DHS's subsection 1226(a) authorities, they cannot be used to parole MPP-eligible aliens in lieu of either detention or contiguous return.

Since agencies "have an obligation to deal with newly acquired evidence in some reasonable fashion," *Catawba Cnty. v. EPA,* 571 F.3d 20, 45 (D.C. Cir. 2009), or to "reexamine" their approaches "if a significant factual predicate" changes, *Bechtel v. FCC,* 957 F.2d 873, 881 (D.C. Cir. 1992), "an agency must have a similar obligation to acknowledge and account for a changed regulatory posture the agency creates." *Portland Cement Ass'n,* 665 F.3d at 187; *see also Office of Commc'n of the United Church of Christ,* 707 F.2d at 1441–42. Despite their purported implementation of MPP in good faith, DHS is presently releasing into the country tens of thousands of individuals per month through parole and otherwise. The continued violation of the limits on Defendants' parole authority—even after the re-institution of MPP—should have led Defendants to consider how terminating MPP would only exacerbate that problem.

The loss of MPP as a tool to reduce the numbers paroled without the required individualized assessment was not adequately considered in the October 29 Memoranda. The consideration of the relevant costs and benefits of MPP thus did not adequately consider the relevant factors.

**5. Defendants failed to adequately consider costs to States and their reliance interests.**

The Fifth Circuit recently evaluated a DHS memorandum under the APA, finding that federal agencies, many of whom are Defendants here, failed to consider both States' costs and their reliance interests in federal immigration policies. *Texas v. United States*, 40 F.4th 205 (5th Cir. 2022) (per curiam). There, DHS had "a multi-page section … analyzing the 'Impact on States'" but the court found its analysis "dismissive," merely "dot[ting] 'i's' and cross[ing] 't's' without actually saying anything." *Id.* at 228. The failure to actually "quantify or at least reasonably describe the costs of this policy to the States …[and] the agency['s] audacious[] conclu[sion] that 'any effects from implementation of priorities guidance are unlikely to be significant'" did not satisfy the requirement that agencies consider the costs to the States. *Id.*

So too here. DHS devoted just a single paragraph purporting to consider this factor. Supp.App.030. It was dismissive towards to costs of the States on the ground that "[f]ederal immigration policy virtually always affects the number of people living within the States," and describes these as "marginal costs" that are "outweighed by the other considerations and policy concerns." Supp.App.030.  But no such calculation can be rationally made without attempting to quantify these costs—such as the sorts of expenses the States set forth earlier in this case—in order to perform such a cost-benefit analysis.

Plaintiffs also faulted the June 1 Memorandum for the Secretary's failure to consider their legitimate reliance interests in MPP's continued operation or to provide for alternative means of meeting the Executive's § 1225 detention obligations. Yet the October 29 Memoranda airily dismiss the notion that Plaintiffs retain any legitimate reliance interests in MPP's operation and presume the Executive may broadly release aliens notwithstanding § 1225's mandate. Supp.App.030.

While *Regents* requires DHS to actually consider Plaintiffs' financial injuries and other reliance interests, 140 S. Ct. at 1913, the October 29 Memoranda did the opposite. Without explaining what

19

inquiry they made, Defendants breezily assert that "the Secretary is unaware of any State that has materially taken any action in reliance on the continued implementation … of MPP." Supp.App.030. The Explanation Memorandum also asserts that "any claimed reliance interest is undermined by the fact that [MPP] is itself discretionary." Supp.App.030. But in *Regents*, "the Supreme Court acknowledged that DACA was a discretionary program [but still] faulted DHS for not considering reliance interests … [t]hat included the States' reliance interests" including financial injuries from termination of the program. *Biden II*, 20 F.4th at 990 (5th Cir. 2021). "So if DHS must consider states' reliance interests before terminating DACA—a discretionary immigration program—then it must do so before terminating MPP." *Id.*

The October 29 Memoranda also maintain that "[t]he short time in which MPP was in place, as well as the small percentage of noncitizens encountered along the [southwest border] who were enrolled in MPP while it was in operation, undercut any claimed reliance interest, as well as any claim regarding significant burdens to the States." Supp.App.030. But DACA was a program that had only existed for five years before the challenged termination, *Regents*, 140 S. Ct. at 1901, and this statement is contradicted by Secretary Mayorkas's repeated concessions that the benefits of MPP included deterring aliens from arriving— that is, the reduction of the number of aliens present in the States included the aliens *deterred from arriving* by MPP, not just those actually enrolled in MPP.

The Fifth Circuit's recent decision as to evaluating costs to the States also addressed the issue of adequately considering reliance:

> As to the States' reliance interests, the Considerations Memo flatly concludes that "no such reasonable reliance interests exist." In a single paragraph citing no evidence, DHS concluded that the States, including Texas as a 900-mile border state, has *no reliance interests* in the enforcement of federal criminal immigration law according to the governing statutes. This omission is more inexcusable since the States have consistently asserted their reliance interests in the context of this litigation, which has been ongoing simultaneously with DHS's promulgation of the Final Memo and the Considerations Memo. "Stating that a factor was considered ... is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). Rather, courts "must make a searching and careful inquiry to determine if [the

> agency] actually *did* consider it." *Id.* (internal quotation marks omitted). At this point,
> DHS has not shown a likelihood that it adequately considered the relevant costs to the
> States or their reliance interests in the pre-existing enforcement policy.

*Texas*, 40 F.4th at 228. The October 29 Memoranda demonstrate this same failure to evaluate reliance

interests here: by terminating MPP without adequately considering the reliance interests of States in

the control of the flow of aliens—as assisted by MPP—Defendants failed to shape their "approach

[to be] tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of

the immigration system." *Judulang*, 565 U.S. at 55. The States "bear[] many of the consequences of

unlawful immigration," which "must not be underestimated." *Arizona v. United States*, 567 U.S. 387,

397 (2012). The failure of the October 29 Memoranda to seriously evaluate these consequences was

arbitrary and capricious.

### B.   No procedural issue precludes this Court's review.

Defendants cannot avoid judicial review by raising non-merits arguments that this Court has

already rejected.

#### 1.   Plaintiffs have standing to bring this claim.

Plaintiffs have standing to challenge Defendants' termination of MPP for the same reasons

that they had standing to challenge the previous termination of the program. This Court's previous

determinations on standing constitute the law of the case because the challenged agency action here

is identical to the previous one: whereas under MPP large numbers of aliens who would have otherwise

been imposing costs on the States were instead required to wait in Mexico pending the determination

of their asylum proceedings, the termination of the program led to the imposition of those costs. ECF

94 at 17–26; *see also Biden II*, 20 F.4th at 966–76 (finding States had standing to challenge agency action

terminating MPP, including for claim of arbitrary-and-capricious decisionmaking under the APA).

And regardless of whether it is law of the case, the evidence already in the record in this case amply

supports Plaintiffs' standing. *See* ECF 54.

## 2.   Plaintiffs have a cause of action.

This Court has already determined that the States' claims challenging the termination of MPP fall within the zone of interests of the INA. ECF 94 at 33–34; *see also Biden II*, 20 F.4th at 975–76. Nothing could justify a different result here as the subsequent October 29 Memoranda purports to do the same thing: terminate MPP.

## 3.   The October 29 Memoranda are subject to judicial review.

Section 1252(f)(1) does not bar a stay of the effective date of the October 29 Memoranda. The Supreme Court noted "the narrowness of [Section 1252(f)(1)'s] scope" as indicated by its tile: "Limit on injunctive relief.*" Biden III*, 142 S. Ct. at 2539. Section 1252(f)(1) only "deprives courts of the power to issue a specific category of remedies: those that 'enjoin or restrain the operation of' the relevant sections of the statute." *Id.* The opinion of the Court distinguished its own previous cases that considered challenges under §§ 1221–1232, reasoning that they included claims for declaratory relief that would not be barred by § 1252(f)(1). *Id.* at 2540. The majority also emphasized that it "express[ed] no view" on "whether that limitation [in § 1252(f)(1)] extends to other specific remedies, such as declaratory relief and relief under section 706 of the APA [*i.e.*, vacatur of agency action]." *Id.* at 2540 n.4; *see also id.* at 2552 (Alito, J., dissenting) (noting Defendants' "far-reaching position that § 1252(f)(1)" bars vacatur under the APA); *id.* at 2562 (Barrett, J., dissenting) (noting that the Court "reserves the question whether § 1252(f)(1) bars declaratory relief" and "avoids a position on whether § 1252(f)(1) prevents a lower court from vacating or setting aside an agency action under the Administrative Procedure Act") (internal citations omitted).

In a post-*Biden III* opinion, the Fifth Circuit construed § 1252(f)(1) as not precluding vacatur of agency actions under section 706 of the APA for claims relating to INA §§ 1221–1232. *Texas,* 40 F.4th at 219–20. There, the court noted the "meaningful differences between an injunction, which is a 'drastic and extraordinary remedy,' and vacatur, which is 'a less drastic remedy.'" *Id.* at 219 (quoting

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)). These fundamental distinctions make "[e]xtending [the Supreme Court's construction of section 1252(f)(1)] to vacatur … particularly dubious in light of the Court's caveats." *Id.* at 219–220. As "[A] vacatur does nothing but re-establish the status quo absent the unlawful agency action," and "[a]part from the constitutional or statutory basis on which the court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making." *Id.* at 220. Thus, section 1252(f)(1) does not "strip[] federal court jurisdiction to vacate unlawful agency action." *Id.* Delaying the effective date of MPP's termination is no different; if anything, it is less drastic than vacatur. If vacatur—*a.k.a.*, "set[ting] aside" unlawful agency action after a merits determination, 5 U.S.C.§ 706—is not precluded by § 1252(f)(1), then neither is postponing the effective date.

Underscoring that fact is that is that § 705 authorizes is a stay of agency action. *See, e.g., Affinity Healthcare Servs., Inc.*, 720 F. Supp. 2d at 15 n.4. Stays are not injunctions. "An injunction and a stay have typically been understood to serve different purposes." *Nken v. Holder*, 556 U.S. 418, 428 (2009). An injunction "is a means by which a court tells someone what to do or not to do," *id.*, but stays are a limit upon the actions of the agency itself, not its officers as would be in the case of an injunction, *cf. id.* (noting stays "operate[] upon the judicial proceeding itself … either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability."); Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 950–51, 1016 (2018) (noting that both sections 705 and 706 nullify the agency action itself, rather than (as in an injunction) acting on officials who enforce an unlawful provision). Stays of agency action under § 705 are therefore not within the ambit of the injunctive relief precluded by section 1252(f)(1). *See Nken*, 556 U.S. at 430 (noting that "the language of [1252](f) says nothing about stays, but is instead titled 'Limit on injunctive relief'").

As to Defendants' earlier arguments involving other statutory bars of judicial review of the termination of MPP, the analyses of those provisions can be no different for the termination ordered

by the October 29 Memoranda, as it was for that ordered by the June 1 Memorandum. This Court's rulings are therefore the law of the case; there are no statutory bars of judicial review of this action. *See* ECF 94 at 28–30 (finding no bar to judicial review of agency action terminating MPP in 8 U.S.C. §§ 1252(g), 1252(b)(9), 1252(a)(2)(B)(ii)); *see also Biden II*, 20 F.4th at 977 (finding that 8 U.S.C. § 1252(a)(2)(B)(ii) did not bar review of agency action terminating MPP).

This Court has also rejected the argument that agency action terminating MPP is "agency action … committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and therefore not subject to judicial review. ECF 94 at 31–32; *see also Biden II*, 20 F.4th at 978–88 (same). This determination remains the law of the case.

### 4. The October 29 Memoranda are final agency action.

Agency action is "final" for the purposes of judicial review if two conditions are met: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks omitted). The Supreme Court has already determined that the October 29 Memoranda satisfy these conditions and "were therefore final agency action for the same reasons that the June 1 Memorandum was final agency action." *Biden III*, 142 S. Ct. at 2544–45.

## II. Texas and Missouri will suffer irreparable harm if a stay is not granted.

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Instead, "[t]he plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id.* (footnote omitted).

The Court's analysis of this factor in granting a permanent injunction is equally applicable to

challenges this new attempt to terminate MPP. ECF 94 at 50. It is sufficient, for this factor, that MPP will impose unrecoverable costs on Plaintiffs. *See id.*; *see also Biden II*, 20 F.4th at 1002 (factual findings regarding injury made in standing context show increased costs to States from termination of MPP, and inability to recover from federal government supports determination that States have suffered an irreparable injury for which remedies available at law are precluded due to sovereign immunity).

## III. The equities overwhelmingly favor a stay.

The two final prongs of the inquiry for a stay of agency action "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Defendants have no legitimate interest in the implementation of an unlawful agency action. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). The analysis of the public interest and the balance of the equities is the same regarding the new attempt to terminate MPP as it was the last time the Court addressed the issue. ECF 94 at 50. Indeed, because MPP is currently operational, Defendants lack their primary arguments they made regarding this prong in the previous challenge to the termination of MPP.

When Defendants terminated MPP in the June 1 Memorandum, the program had been effectively shuttered, and injunctive relief required them to restart the program from scratch—requiring them to negotiate with Mexico, to rebuild facilities and to find resources. *Biden II*, 20 F.4th at 1002–03. None of those arguments are now available to Defendants—they have been complying with the Court's permanent injunction and MPP has been operational since December. *See* ECF 117 (Defendants' notice that MPP was restarted on December 2, 2021, after agreement with Mexico); ECF 143-1 at 2 (most recent status report showing 1,382 returns to Mexico via MPP for month of June 2022).

## CONCLUSION

Plaintiffs respectfully request that the Court postpone the effective date of the October 29 Memoranda that terminate MPP.

Dated: August 8, 2022

Eric S. Schmitt
Attorney General of Missouri

/s/ D. John Sauer
D. John Sauer, #58720MO*
Solicitor General

Michael E. Talent, #73339MO *
Deputy Solicitor General

Office of the Attorney General
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-8870
Fax (573) 751-0774
John.Sauer@ago.mo.gov

*Counsel for Plaintiff*
*State of Missouri*

*Admitted pro hac vice

Respectfully submitted,

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Judd E. Stone II
Solicitor General
Texas Bar No. 24076720

Patrick K. Sweeten
Deputy Attorney General for Special Litigation
Texas Bar No. 00798537

William T. Thompson
Deputy Chief, Special Litigation Unit
*Attorney-in-Charge*
Texas Bar No. 24088531

/s/ Ryan D. Walters
Ryan D. Walters
Special Counsel
Texas Bar No. 24105085

Office of the Attorney General
Special Litigation Unit
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov

*Counsel for Plaintiff*
*State of Texas*

**CERTIFICATE OF CONFERENCE**

I certify that on August 8, 2022, I conferred with Defendants' counsel, who represented that Defendants oppose this motion.

*/s/ Ryan D. Walters*
RYAN D. WALTERS

**CERTIFICATE OF SERVICE**

I certify that on August 8, 2022, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

*/s/ Ryan D. Walters*
RYAN D. WALTERS