# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, | ) | |
| STATE OF MISSOURI, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:21-cv-00067-Z |
| | ) | |
| JOSEPH R. BIDEN, JR., | ) | |
| in his official capacity as | ) | |
| President of the United States, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |

## ADMINISTRATIVE RECORD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| STATE OF TEXAS,<br>STATE OF MISSOURI,<br><br>    *Plaintiffs,*<br><br>    v.<br><br>JOSEPH R. BIDEN, JR.,<br>in his official capacity as<br>President of the United States, *et al.*,<br><br>    *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 2:21-cv-00067-Z |

**CERTIFICATION**

My name is Blas Nuñez-Neto. I am employed with the U.S. Department of Homeland Security, I am the Acting Assistant Secretary for Border and Immigration Policy as of October 1, 2021. My permanent role is as Chief Operating Officer at U.S. Customs and Border Protection (CBP), within the Department of Homeland Security (DHS), which I began on March 5, 2021. Since August 24, 2021, I have also been serving as the Vice Chair for the Secretary of Homeland Security's Southwest Border Taskforce.  I also previously served at DHS as an Advisor to CBP Commissioner Gil Kerlikowske from January 12, 2015 to January 16, 2017.

I am the custodian of the October 29, 2021 Memoranda Terminating the Migrant Protection Protocols (MPP) and the administrative record for that decision for DHS. I certify that, to the best of my knowledge, information, and belief, the attached index contains the non-privileged documents considered by DHS, and that these documents constitute the administrative record the agency considered.

Executed this 27th day of August, 2022

_____
Blas Nuñez-Neto
Acting Assistant Secretary
Border and Immigration Policy
Department of Homeland Security
Chief Operating Officer
U.S. Customs and Border Protection

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| ) | |
| STATE OF TEXAS, ) | |
| STATE OF MISSOURI, ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| v. ) | Civil Action No. 2:21-cv-00067-Z |
| ) | |
| JOSEPH R. BIDEN, JR., ) | |
| in his official capacity as ) | |
| President of the United States, *et al.*, ) | |
| ) | |
| *Defendants.* ) | |
| ) | |

## CERTIFIED INDEX[1]

**DOCUMENT**                                                                                                       **PAGE**

1.    *Termination of the Migrant Protection Protocols,* Memorandum signed by Secretary
      Mayorkas, October 29, 2021.............................................................................AR00001

2.    *Explanation of the Decision to Terminate the Migrant Protection Protocols,*
      October 29, 2021..............................................................................................AR00005

3.    Memorandum for the Secretary, *Review and Recommendation on Migrant Protection*
      *Protocols (MPP)*, David Shahoulian, May 29, 2021 ........................................AR00044

4.    *Termination of the Migrant Protection Protocols Program, Signed by Secretary*
      *Mayorkas,* June 1, 2021...................................................................................AR00063

5.    *Fact Sheet: President Biden to Sign Presidential Memorandum to Expand Access to*
      *Legal Representation and the Courts*, Briefing Room, Statements and Releases, May 18,
      2021 ..................................................................................................................AR00070

6.    *Fact Sheet: The Biden Administration Blueprint for a Fair, Orderly and Humane*
      *Immigration System,* Briefing Room, Statements and Releases, July 27, 2021 ...AR00072

---

[1] Some of the documents below are spreadsheets that have been converted to PDFs to be included in this filing. Defendants are happy to provide the Court these spreadsheets in their original form if it would assist the Court.

7.      *Fact Sheet: U.S.-Mexico High-Level Economic Dialogue,* Briefing Room, Statements and Releases, September 9, 2021................................................................AR00078

8.      *Asylum-Seekers Protesting Squalid Conditions Shut Down A US Border Crossing for 15 Hours,* Adolfo Flores, Buzzfeed News, October 11, 2019...............................AR00081

9.      *"Leave me in a cell": The Desperate Please of Asylum Seekers Inside El Paso's Immigration Court,* Camilo Montoya-Galvez, CBS News, August 11, 2019......AR00091

10.     *"I Fear For Our Lives": Asylum Seekers Forced to Wait in Mexico Face Danger and Desperation*, Camilo Montoya-Galvez, CBS News, August 13, 2019................AR00096

11.     *Advocates Say "Remain in Mexico" Policy Turns Migrants Into a "Marketable Commodity",* Camilo Montoya-Galvez, CBS News, August 15, 2019...............AR00106

12.     *Trump's Asylum Policies Sent Him Back to Mexico.  He was Kidnapped 5 Hours Later*, Emily Green, Vice News, September 16, 2019. .................................................AR00116

13.     *Migrants Stuck in Lawless Limbo Within Sight of America*, Maria Verza, November 15, 2019 .................................................................................................................AR00137

14.     Office of Field Operations, Customs and Border Protection (CBP) Directive No. 3340-043, *The Exercise of Discretionary Authority*, September 2011.........................AR00144

15.     Office of Field Operations, CBP Memorandum, *Parole of Inadmissible Nonimmigrant Aliens*, May 12, 2015........................................................................................AR00158

16.     Office of Field Operations, CBP Memorandum, *Paroling Arriving Fugitives*, August 8, 2012. .............................................................................................................AR00160

17.     CBP Office of Field Operations Memorandum, *Parole of Inadmissible Nonimmigrant Aliens*, December 16, 2014..............................................................................AR00161

18.     CBP Admissibility and Passenger Programs Muster, *Parole of Inadmissible Nonimmigrant Aliens*....................................................................................AR00163

19.     Enforcement and Removal Operations (ERO), Updated Guidance: Implementation of the Modified Nationwide Preliminary Injunction in *Padilla v. ICE*, July 22, 2019...AR00164

20.     U.S. Immigration and Customs Enforcement (ICE), Directive No. 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture*, January 4, 2010...............................................................................................AR00170

21.     *I'm Kidnapped: A Father's Nightmare on the Border,* Miriam Jordan, The New York Times, December 21, 2019...............................................................................AR00171

22.     Email subject "quick q: re: Dedicated Docket" Monday October 25, 2021......... AR00176

23.     ISAP IV EOIR Court Appearance Rates through 8/31/2021 – FAMU Participants
        Apprehended Since May 1, 2014 (spreadsheet) ................................................. AR00179

24.     U.S. Commission on Civil Rights, *Trauma at the Border The Human Cost of Inhumane
        Immigration Policies*, October 2019................................................................... AR00182

25.     *Policy Guidance for Implementation of the Migrant Protection Protocols*, Memorandum
        signed by Secretary Nielsen, January 25, 2019 ................................................. AR00389

26.     *Wolf v. Innovation Law Lab*, No. 19-1212, Amicus Brief, The Laredo Project and the
        National Immigrant Justice Center in Support of Respondents .......................... AR00393

27.     Memorandum for the Acting Secretary, *Response to the Migration Protection Protocols
        Red Team Report*, January 14, 2020................................................................. AR00429

28.     The Migrant Protection Protocols Red Team Report, October 25, 2019............. AR00433

29.     *Review of Migrant Protection Protocols Policy and Implementation – Final
        Recommendations,* signed by Acting Secretary McAleenan, November 8, 2019 AR00443

30.     Memorandum for the Acting Secretary, *Closing out the Migrant Protection Protocols
        Red Team Report Evaluation Process,* signed by Acting Secretary Chad Wolf, December
        7, 2020.............................................................................................................. AR00445

31.     Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct
        of Removal Proceedings; Asylum Procedures, Federal Register Vol. 62, No. 2,
        444-517 ............................................................................................................. AR00448

32.     Declaration of Blas Nuñez-Neto, *Texas v. Biden,* No. 2:21-cv-00067, September 15,
        2021.................................................................................................................. AR00522

33.     Declaration of Blas Nuñez-Neto, Texas v. Biden, No. 2:21-cv-00067, October 14,
        2021 .................................................................................................................. AR00528

34.     *The Out Crowd*, This American Life, Episode 688, November 15, 2019............ AR00537

35.     Federal Register, *Asylum Eligibility and Procedural Modifications*, Vol. 84, No. 136,
        July 16, 2019..................................................................................................... AR00569

36.     Fiscal Year 2020 Enforcement Lifecycle Report, Office of Immigration Statistics,
        Department of Homeland Security, December 2020 ......................................... AR00586

37.   Federal Register, Control of Communicable Disease; Foreign Quarantine: Suspension of Introduction of Persons into United States from Desiganted Foreign Countries of Places for Public Health Purposes, Vol. 85, No. 57, March 24, 2020 16559 ................. AR00607

38.   Federal Register, Vol 86 No 99, May 25, 2021, p. 28198, *Exercise of Time Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H-2B Temporary Nonagricultural Worker Program and Portability Flexibility for H-2B Workers Seeking to Change Employers* .................................................................................. AR00616

39.   Federal Register, *Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, Vol. 86, No. 148, August 5, 2021, p. 42828............................. AR00653

40.   *Interim Guidance: Civil Immigration Enforcement and Removal Priorities,* Memorandum signed by Acting Director Tae D. Johnson, February 18, 2021. ......................... AR00667

41.   Spreadsheet entitled "Administrative Record for MPP Recission Memo" explaining the data in the October 29, 2021 memoranda.......................................................... AR00674

42.   *Treatment of Cuban Asylum Seekers at Land Border Ports of Entry,* Memorandum from Assistant Commissioner, Office of Field Operations, June 10, 2005.................. AR00690

43.   Chart of U.S. Customs and Border Protection, Drug Seizures FY 2019, 2020, 2021, and 2022 (FYTD)............................................................................................... AR00696

44.   *Review of Migrant Protection Protocols Policy and Implementation,* Memorandum signed by Acting Secretary McAleenan. June 12, 2019.................................... AR00697

45.   *Review of Migrant Protection Protocols Policy and Implementation – Final Recommendations,* Memorandum signed by Acting Secretary McAleenan, November 8, 2019 ......................................................................................................... AR00698

46.   *Assessment of the Migrant Protection Protocols (MPP),* October 28, 2019........ AR00700

47.   *Asylum Seekers Cling to Hope, Safety in Camp at U.S.-Mexico Border,* Delphine Schrank, Reuters, October 16, 2019. .............................................................. AR00710

48.   *They Missed Their U.S. Court Dates Because They Were Kidnapped.  Now They're Blocked from Applying for Asylum,* Kevin Sieff, The Washington Post, April 24, 2021. ....................................................................................................... AR00716

49.   *They Missed Their US Asylum Hearings Fearing The Cartel Would Kill Them.  Now They're Stuck in Mexico,* Hamed Aleaziz, Adolfo Flores, May 18, 2021, Buzzfeed News.......................................................................................... AR00721

50.   *Matter of Jonathan Said Herrera-Vasquez,* 27 I&N Dec. 825 (BIA 2020)......... AR00730

51.   *Migrant Protection Protocols FY 2021,* CBP Data.............................................AR00742

52.   *Chairman Nadler Announces House Judiciary Investigation into Trump Administration's "Remain in Mexico" Policy,* January 14, 2020 .................................................AR00745

53.   *"Like I'm Drowning" Children and Families Sent to Harm by the US 'Remain in Mexico' Program*, Human Rights Watch, January 6, 2021................................AR00753

54.   *Number of Persons Entering the U.S. Under the End of MPP Operation as of May 25, 2021*, International Organization for Migration..................................................AR00829

55.   Sr. John Creamer, Embajada de Estados Unidos en Mexico, Subsecretaria para America del Norte, December 20, 2018 .........................................................................AR00830

56.   *Delivered to Danger Trump Administration Sending Asylum Seekers and Migrants to Danger*, Human Rights First, February 19, 2021 .................................................AR00834

57.   *DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings*, U.S. Department of Homeland Security, May 28, 2021.....................AR00859

58.   Customs and Border Protection Migrant Protection Protocols FY 2020 Data.....AR00861

59.   Customs and Border Protection Migrant Protection Protocols FY 2021 Data.....AR00865

60.   *DHS Announces Process to Address Individuals in Mexico with Active MPP Cases, U.S.* Department of Homeland Security, February 11, 2021......................................AR00868

61.   *Migrant Protection Protocols (Trump Administration Archive),* U.S. Department of Homeland Security...........................................................................................AR00870

62.   *Migrant Protection Protocols (Biden Administration Archive),* U.S. Department of Homeland Security...........................................................................................AR00886

63.   *DHS OIG Formal Complaint Regarding 'Remain in Mexico'*, Human Rights Watch, June 2, 2020...................................................................................................AR00892

64.   *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, Executive Order 14010, February 2, 2021...................................................................................AR00914

65.   *USBP Total Enforcement Encounter FY 21 Planning Profile*, Data through May 8, 2021. ................................................................................................................AR00919

66.     U.S. Customs and Border Protection, *Guidance on Migrant Protection Protocols*, Memorandum signed by Chief Carla L. Provost, March 1, 2019 ...................... AR00923

67.     *Guidelines for the Enforcement of Civil Immigration Law*, Memorandum signed by Secretary Mayorkas, September 30, 2021 ........................................................... AR0092

68.     Congressional Research Service, *Mexico's Immigration Control Efforts*, May 28, 2021 ....................................................................................................... AR00932

69.     U.S. Immigration and Customs Enforcement, *Implementation of the Migrant Protection Protocols*, Memorandum signed by Senior Official Performing the Duties of the Director, Ronald D. Vitiello, February 12, 2019 .............................................................. AR00935

70.     U.S. Immigration and Customs Enforcement, *Migrant Protection Protocols Guidance*, Memorandum signed by Nathalie R. Asher, February 12, 2019 ......................... AR00937

71.     U.S. Citizenship and Immigration Services, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration Nationality Act and the Migrant Protection Protocols*, January 28, 2019 ........................................................................................ AR00941

72.     *Immigration Court Backlog Exceeds 1 Million Cases, Data Group Says*, Priscilla Alvarez, CNN, September 18, 2019 ................................................................. AR00946

73.     *Measuring In Absentia Removal in Immigration Court*, Ingrid Eagly, Esq. and Steven Shafer, Esq., January 2021 ........................................................................... AR00951

74.     Immigration and Naturalization Service, Office of the Deputy Commissioner, *Implementation of Expedited Removal*, March 31, 1997 .................................... AR00975

75.     Inside the Refugee Camp on America's Doorstep, Caitlin Dickerson, The New York Times, October 23, 2020 Updated October 29, 2021 ......................................... AR00983

76.     *Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; conduct of Removal Proceedings; Asylum Procedures*, 62 FR 10312-01, March 6, 1997 AR00990

77.     *Joint DHS/EOIR Statement on MPP Rescheduling*, U.S. Department of Homeland Security, March 23, 2020 ................................................................................. AR01155

78.     *Joint Statement by the U.S. Department of Homeland Security and U.S. Department of State on the Expansion of Access to the Central American Minors Program*, U.S. Department of Homeland Security, June 15, 2021 ........................................... AR01156

79.     *Matter of J.J. Rodriquez Rodriquez*, 27 I&N Dec. 762 (BIA 2020) .................... AR01158

80.     *Migrant Protection Protocols Metrics and Measures*, U.S. Department of Homeland Security, July 15, 2020. .................................................................................. AR01163

81.   *Migrant Protection Protocols Metrics and Measures,* December 2020.............. AR01164

82.   Email, Subject MPP Data, March 29, 2021....................................................... AR01167

83.   *Number of Persons Entering the U.S. Under the end of MPP Operations As of May 21, 2021,* International Organization for Migration................................................. AR01168

84.   U.S. Customs and Border Protection, *MPP Guiding Principles,* January 28, 2019 ................................................................................................... AR01169

85.   *Policy Guidance for Implementation of the Migrant Protection Protocols,* Memorandum signed by Secretary Nielsen, January 25, 2019 ................................................. AR01171

86.   *Suspension of Enrollment in the Migrant Protection Protocols Program,* Memorandum signed by Acting Secretary Pekoske, January 20, 2021 ..................................... AR01175

87.   U.S. Customs and Border Protection, *Guidance on Migrant Protection Protocols,* January 28, 2019................................................................................................... AR01176

88.   Series of emails with Number of Persons Entering the U.S. Under the End of MPP Operation, International Organization of Migration, Subject MPP Processing Numbers.................................................................................................. AR01177

89.   Dismantling Asylum: A Year into the Migrant Protection Protocols, American Friends Service Committee, Vanessa Cecena, January 2020......................................... AR01184

90.   *Complaints Related to the Implementation of the Migrant Protection Protocols (MPP),* Office for Civil Rights and Civil Liberties, January 29, 2021........................... AR01210

91.   Immigration and Naturalization Service, *Detention Guidelines Effective October 9, 1998,* Memorandum signed by Michael A. Pearson, October 7, 1998 ........................ AR01240

92.   Office of Inspector General, *U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract (Redacted),* November 30, 2017 . AR01261

93.   Office of Inspector General, *CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry,* October 27, 2020 ...................................................... AR01262

94.   Office of Immigration Statistics (OIS) Lifecycle Data, *Total SW Border Encounters by MPP cases*...................................................................................................... AR01299

95.   *The Devastating Toll of 'Remain in Mexico' Asylum Policy One Year Later,* Central American Migration, January 29, 2020............................................................ AR01303

96.     *Pentagon Announces Nearly 4,000 Additional Troops Hearing to U.S.-Mexico Border*, The Hill, February 3, 2019 ................................................................... AR01305

97.     *Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States*, February 15, 2019 ................................................ AR01307

98.     *Protection Postponed: Asylum Office Backlogs Cause Suffering, Separate Families, and Undermine Integration*, Human Rights First, April 2021 .................................... AR01311

99.     Human Rights First, Publicly Reported Cases of Violent Attacks on Individuals Returned to Mexico under the "Migrant Protection Protocols" ......................................... AR01332

100.    *Regulations Concerning the Convention Against Torture*, Federal Register vol. 64 No. 33, February 19, 1999 ........................................................................ AR01380

101.    *Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants*, Memorandum signed by Secretary Johnson, November 20, 2014 ...................... AR01399

102.    *Prosecutorial Discretion*, Memorandum signed by William J. Howard, Principal Legal Advisor, Immigration and Customs Enforcement, October 24, 2005 ................. AR01405

103.    Implementing the President's Border Security and Interior Immigration Enforcement Policies, Memorandum signed by Matthew T. Albence, Executive Associate Director, February 21, 2017 ............................................................................. AR01414

104.    Exercising Prosecutorial Discretion, Memorandum to Regional Directors signed by Doris Meissner, Commissioner, Immigration and Naturalization Service, November 17, 2000. .............................................................................................. AR01418

105.    *Report: Crimes Against Migrants Waiting in Mexico to Seek U.S. Aslyum continue to Climb*, Julian Aguilar, The Texas Tribune, December 5, 2019 .......................... AR01431

106.    *Detention and Release of Aliens with Final Orders of Removal*, Memorandum for Regional Counsel, signed by Bo Cooper, General Counsel, Immigration and Naturalization Service, March 16, 2000 ............................................................ AR01435

107.    *Clarification of March 16, 2000 Memorandum Entitled 'Detention and Release of Aliens with Final Orders of Removal'*, Memorandum for Regional Counsel signed by Bo Cooper, General Counsel, Immigration and Naturalization Service, July 24, 2000. .............................................................................................. AR01442

108.    *Implementing Department of Homeland Security Immigration Enforcement Priorities*, DHS Instruction Number 044-01-001, June 10, 2015 ...................... AR01444

109. *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens*, Memorandum signed by John Morton, Director of Immigration and Customs Enforcement, June 17, 2011................................................................AR01471

110. *Implementing the President's Border Security and Immigration Enforcement Improvement Policies*, Memoranda signed by Secretary John Kelly, February 20, 2017 ......................................................................................AR01471

111. *Detention Policy Where an Immigration Judge has Granted Asylum and ICE as Appealed (Feb. 9, 2004),* Memorandum from Michael J. Garcia, Assistant Secretary........AR01490

112. *Implementing the President's Border Security and Interior Immigration Enforcement Policies*, Memorandum signed by Matthew T. Albence, Executive Associate Director, February 21, 2017. ...........................................................................AR01492

113. *Immigration Policies Affect INS Detention Efforts*, U.S. General Accounting Office, GAO/GGD-92-85, June 1992 ..........................................................AR01496

114. *Inspector's Field Manual*, U.S. Department of Justice, Immigration and Naturalization Services, March 2001 ....................................................................AR01562

115. *Expedited Removal: Additional Policy Guidance*, Office of Field Operations, December 30, 1997...................................................................................AR01576

116. *Parole Project for Asylum Seekers at Ports of Entry and INS Detention and in INS Detention*, Memorandum from Office of the Commissioner, April 20, 1992.  ...AR01580

117. *ICE Transportation, Detention and Processing Requirements*, Memorandum signed by Marcy M. Forman, Director of Office of Investigations and Victor X. Cerda, Acting Director, Detention and Removal Operations, January 11, 2005.......................AR01584

118. *Expedited Removal Guidance*, Memorandum from Victor X. Ceda, Acting Director, Immigration and Customs Enforcement, September 14, 2004. ..........................AR01590

119. *Parole of Arriving Aliens Found to Have a "Credible Fear" of Persecution or Torture*, ICE Directive 7-1.0, November 6, 2007. ........................................................AR01590

120. *The Exercise of Discretionary Authority*, CBP Directive No. 3340-043, September 3, 2008. ...................................................................................AR01614

121. *Supplemental Policy Guidance for Additional Improvements of the Migrant Protection Protocols*, December 7, 2020.........................................................AR01628

122. *Supplemental Migrant Protection Protocols Guidance*, Initial Document Service, Enforcement Programs Division, December 7, 2020........................................AR01633

123. *Supplemental Migrant Protection Protocols Guidance*, MPP Amenability, Enforcement Programs Division, December 7, 2020..............................................................AR01633

124. *Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020), vacated as moot, 5 F.4th 1099 (9th Cir. 2021);..........................................................................................AR01636

125. *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 511 (9th Cir. 2019) (Watford, J. concurring). ....................................................................................................................AR01658

126. *Bollat Vasquez v. Wolf*, 520 F. Supp. 3d 94 (D. Mass. 2021);.............................AR01671

127. *Doe v. Wolf*, 432 F. Supp. 3d 1200 (S.D. Cal. 2020............................................AR01688

128. *E.A.R.R. v. Dep't of Homeland Sec.*, No. 3:20-cv-2146 (S.D. Cal. filed Nov. 2, 2020);................................................................................................................................AR01701

129. *Adrianza v. Trump*, 505 F. Supp. 3d 164 (E.D.N.Y. 2020), dismissed, No. 1:20-cv-03919 (E.D.N.Y. Sept. 2, 2021);...........................................................................................AR01761

130. *Nora v. Wolf*, No. 20-993, 2020 WL 3469670 (D.D.C. June 25, 2020); ............AR01780

131. *Turcios v. Wolf*, No. 1:20-cv-1982, 2020 WL 10788713 (S.D. Tex. Oct. 16, 2020)...................................................................................................................................AR01794

132. *"Mexican Camp That Was Symbol of Migrant Misery Empties Out Under Biden*, Laura Gottesdiener, Reuters, March 7, 2021..............................................................AR01799

133. "*Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border*, March 16, 2021".........................................AR01806

134. "*The Facts on the Increase in Illegal Immigration*, FactCheck.org, March 23, 2021"...................................................................................................................................AR01813

135. *Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, Immigration and Naturalization Service and Executive Office for Immigration Review, Federal Register Vol. 62, No. 2, January 3, 1997................................................................................................................AR01819

136. *USBP FY21 Planning Profile*, CBP Data Warehouse as of May 8, 2021............AR01893

137. *Rapid Protection Assessment, MPP Returnees at the Northern Border of Mexico*, UNHCR, December 2019.......................................................................................AR01897

138. *Final or Most Current Outcomes, Total SW Border Encounters by MPP Cases*, OIS Lifecycle Data.......................................................................................................AR01917

139. *Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, Federal Register Vol. 86, No. 159, August 20, 2021 ....................................................................... AR01921

140. *Restoring the Department of Justice's Access-to-Justice Function and Reinvigorating the White House Legal Aid Interagency Roundtable*, Federal Register Vol. 86, No. 97, Memorandum of May 18, 2021....................................................................... AR01966

141. *Information About Credible Fear Interview*, Form M-444 (Rev. 5-17-19) ......... AR01970

142. *U.S. Customs and Border Protection Encounters by Fiscal Year*, 2018-2021..... AR01972

143. *Southwest Land Border Encounters,* June 7, 2021............................................. AR01973

144. *Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border*, March 18, 2021............................................ AR01978

145. *Total MPP in abenstia Removal Orders as of March 29, 2021* ......................... AR01985

146. *Total MPP in person Removal Orders as of March 29, 2021*............................. AR01986

147. *Total MPP Removal Orders as of March 29, 2021* ............................................ AR01987

148. *Total MPP Termination Order as of March 29, 2021* ....................................... AR01988

149. *Trump Attorney General's Ruling Expands Indefinite Detention for Asylum Seekers*, Reuters, Mica Rosenberg and Kristina Cooke, April 16, 2019........................... AR01989

150. Trump Declares National Emergency at Border, The Hill, Jordan Fabian, Feb. 15, 2019 ................................................................................................................. AR01994

151. Supreme Court says Trump Administration May Continue 'Remain in Mexico' Policy for Asylum Seekers, The Washington Post, Robert Barnes, March 11, 2020........... AR01998

152. Declaration of Ricardo Zuniga, *Texas v. Biden*, No. 2:21-cv-00067, ECF 98-3 .. AR02001

153. Declaration of Blas Nunez-Neto, *Texas v. Biden*, No. 2:21-cv-00067, ECF 105-1 ...................................................................................................... AR02014

154. Declaration of Blas Nunez-Neto, *Texas v. Biden*, No. 2:21-cv-00067, ECF 110-1 ...................................................................................................... AR02020

155. *Texas v. Biden*, 10 F.4th 537 (5th Cir. 2021)................................................... AR02029

156. *West Virginia v. DHS*, No. 2:21-cv-22 (N.D. W. VA)...................................... AR02049

157.  Appendix to Defendants' Response in Opposition to Plaintiffs' Motion for a Preliminary Injunction, *Texas v. Biden*, No. 2:21-cv-00067 ECF 64 (N.D. TX).....................AR02083

158.  Declaration of Principal Deputy Chief Immigration Judge Daniel H. Weiss, *Texas v. Biden*, No:21-cv-00067 ECF 98-2 (N.D. TX)...................................................AR02105

159.  *Texas v Biden*, No 2:21-cv-00067, Appendix in Support of Plaintiffs' Motion for Preliminary Injunction Volume I of II, ECF 54-1...........................................AR012114

160.  *Texas v. Biden*, No 2:21-cv-00067, Appendix in Support of Plaintiffs' Motion for Preliminary Injunction Volume II of II, EFC 54-2 (N.D. TX)...........................AR02211

161.  *Texas v. Biden*, No. 2:21-cv-067, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021)AR02388

162.  *Position of Mexico on the Decision of the U.S. Government to Invoke Sections 235(b)(2)(C) of its Immigration and Nationality Act*, Gobierno de Mexico, December 20, 2018. ....................................................................................................AR02424

163.  Press Release, DHS, "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration," Dec. 20, 2018...................................AR02431

164.  Nomaan Merchant, *Tents, stench, smoke: Health risks are gripping migrant camp*, A.P. News, Nov. 14, 2019 .....................................................................AR02433

165.  Defendants' First Supplemental Notice of Compliance with Injunction, *Texas v. Biden*, No. 2:21-cv-00067, October 14, 2021, ECF 111 ..............................AR02442

166.  First Amended Complaint, *Arizona v. Mayorkas*, No. 2:21-cv-617 (D. Ariz. filed July 12, 2021)....................................................................................AR02448

167.  First Amended Complaint in *Texas v. Biden* 21-cv-67 ......................AR02491

168.  Convention Relating to the Status of Refugees, done July 28, 1951, 19 U.S.T. 6259, 6276, 189 U.N.T.S. 150..................................................................AR02539

169.  *Auguste v. Ridge*, 395 F.3d 123, 149 (3d Cir. 2005)........................AR02555

170.  *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009)..........................AR02582

171.  *Al-Fara v. Gonzales*, 404 F.3d 733, 743 (3d Cir. 2005).....................AR02595

172.  Hernandez Ortiz v. Garland, No. 20-71506 (9th Cir. filed Mar. 15, 2021)[2] ........AR02605

---

[2]  Because the briefs are filed under a restricted docket and concerns regarding the government's potential requirements under 8 C.F.R. § 208.6 and 8 U.S.C. § 1367, the government is providing the docket and coversheet for the briefs. The full briefs are available upon request. This applies for the documents 172, 173, 174, 187, 188,

173.  *Del Toro v. Garland*, No. 20¬60900 (5th Cir. filed Dec. 14, 2020)....................AR02606

174.  *Del Carmen Valle v. Garland*, No. 20-72071 (9th Cir. filed July 16, 2020)........AR02607

175.  *DHS Announces Expanded Criteria for MPP-Enrolled Individuals Who are Eligible for Processing into the United States*, June 23, 2021.............................................AR02608

176.  Examining the Human Rights and Legal Implications of DHS's "Remain in Mexico" Policy: Hearing Before the H. Comm. on Homeland Sec., 116th Cong. passim (2019), video available at Examining the Human Rights and Legal Implications of DHS' 'Remain in Mexico' Policy (house.gov)...........................................................AR02609

177.  *Hearing Statement of Border Security, Facilitation, and Operations Subcommittee*, Chairwoman Kathleen Rice (D-NY), November 19, 2019................................AR02611

178.  Hearing Statement of Chairman Bennie G. Thompson (D-MS), November 19, 2019 .........................................................................................................AR02613

179.  8 U.S.C. § 1225(b)(2)(C).....................................................................AR02614

180.  8 C.F.R. § 235.3(b)(2) ........................................................................AR02621

181.  8 C.F.R. §§ 208.16(a), (c)(4);...............................................................AR02626

182.  8 C.F.R. § 208.17(b)(1); ......................................................................AR02633

183.  8 C.F.R. § 208.31(c);..........................................................................AR02636

184.  8 C.F.R. §1208.16(b);.........................................................................AR02639

185.  8 C.F.R. §1208.17(b)..........................................................................AR02646

186.  *Human Rights Watch, We Can't Help You Here"; U.S. Returns of Asylum Seekers to Mexico*, July 2, 2019............................................................................AR02649

187.  *Tabera-Columbi v. Garland*, No. 20-60978 (5th Cir. filed Oct. 26, 2020)..........AR02684

188.  *Quinones Rodriguez v. Garland*, No. 20-61204 (5th Cir. filed Dec. 17, 2020)....AR02685

189.  *Miranda-Cruz v. Garland*, No. 21-60065 (5th Cir. filed Feb. 1, 2021)...............AR02686

190.  Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019)................................................................................................AR02687

---

and 189

191.  Matter of L-E-A-, 27 I&N Dec. 581 (A.G. 2019), vacated, 28 I&N Dec. 304 (A.G. 2021); ..................................................................................................................AR02704

192.  Matter of A-B-, 27 I&N Dec. 316 (A.G. 2018), vacated, 28 I&N Dec. 307 (A.G. 2021)....................................................................................................................AR02714

193.  *Southwest Border Migration* FY2020, Customs and Border Protection..............AR02734

194.  *Southwest Border Migration* FY2019, Customs and Border Protection..............AR02736

195.  *Southwest Border Migration* FY2018, Customs and Border Protection..............AR02739

196.  CBP Enforcement Statistics Fiscal Year 2020 ...................................................AR02742

197.  CBP Enforcement Statistics Fiscal Year 2019 ...................................................AR02750

198.  CBP Enforcement Statistics Fiscal Year 2018 ...................................................AR02757

199.  *Matter of M-S-,* 27 I&N Dec. 509, 516-517 (A.G. 2019);..................................AR02760

200.  *Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018)............................................AR02767

201.  8 U.S.C. § 1182(d)(5)(A)......................................................................................AR02809

202.  8 C.F.R. §§ 212.5(b), 235.3(c) ............................................................................AR02878

203.  8 U.S.C. § 1226(a)(2)(A)-(B)...............................................................................AR02882

204.  *Nishimura Ekiu v. United States*, 142 U.S. 651 (1892)......................................AR02885

205.  *Kaplan v. Tod*, 267 U.S. 228 (1925)...................................................................AR02892

206.  Leng May Ma v. Barber, 357 U.S. 185 (1958).....................................................AR02894

207.  Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, §§ 302, 602, 110 Stat 3009 ....................................................AR02899

208.  8 U.S.C § 1103(a)(1) ............................................................................................AR03455

209.  *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984)..........................................AR03477

210.  *Ibragimov v. Gonzales*, 476 F.3d 125 (2d Cir. 2007).........................................AR03494

211.  *Jeanty v. Bulger,* 204 F. Supp. 2d 1366, 1377-78 (S.D. Fla. 2002), aff'd, 321 F.3d 1336 (11th Cir. 2003)..................................................................................................AR03508

212.   *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)....................................................AR03524

213.   Exercise of Time-Limited Authority To Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 86 Fed. Reg. 28,198 (May 25, 2021)...........................................................................................AR03531

214.   ICE Enforcement and Removal Operations (ERO), "Alternatives to Detention Program,"......................................................................................AR03568

215.   U.S. Immigration and Customs Enforcement, ICE Detention Data FY2020 available at FY20-detentionstats.xlsx (live.com).................................................AR03576

216.   U.S. Immigration and Customs Enforcement, ICE Detention Data FY2019 available at FY19-detentionstats.xlsx (live.com).................................................AR03617

217.   CBP and ICE State and Local Support and Partnerships, Oct. 28, 2021............AR03672

218.   U.S. Customs and Border Protection, Migration Crisis Action Team, October 27, 2021...............................................................................................AR03674

219.   FY 2019 MPP Funding, DHS Chief Financial Officer Analysis........................AR03680



**U.S. Department of Homeland Security**
Washington, DC 20528

October 29, 2021

MEMORANDUM TO:          Tae D. Johnson
                        Acting Director
                        U.S. Immigration and Customs Enforcement

                        Troy A. Miller
                        Acting Commissioner
                        U.S. Customs and Border Protection

                        Ur M. Jaddou
                        Director
                        U.S. Citizenship and Immigration Services

                        Robert Silvers
                        Under Secretary
                        Office of Strategy, Policy, and Plans

FROM:                   Alejandro N. Mayorkas
                        Secretary

SUBJECT:                **Termination of the Migrant Protection Protocols**

---

On January 25, 2019, then-Secretary of Homeland Security Kirstjen Nielsen issued a
memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols."
On February 2, 2021, President Biden issued Executive Order (EO) 14010, *Creating a
Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration
Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum
Seekers at the United States Border*.  In this Executive Order, President Biden directed the
Secretary of Homeland Security "to promptly review and determine whether to terminate or
modify the program known as the Migrant Protection Protocols."  After completing a
comprehensive review as directed by EO 14010, I concluded that the Migrant Protection
Protocols (MPP) should be terminated and, on June 1, 2021, issued a memorandum to that effect
(the "June 1 memo").

1

**AR00001**

On August 13, 2021, the U.S. District Court for the Northern District of Texas determined that the June 1 memo was not issued in compliance with the Administrative Procedure Act (APA) because it failed to address all the relevant considerations. *See Texas v. Biden*, No. 2:21-cv-067, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021). As a result, the District Court vacated the June 1 memo in its entirety and remanded the matter to the Department for further consideration. *Id.* at *27. The District Court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA." *Id.* (emphasis in original). The Department is fully complying with the District Court's order. At the same time, the Department has filed a notice of appeal and continues to vigorously contest several of the District Court's conclusions.

Pursuant to the District Court's remand and in continuing compliance with the President's direction in EO 14010, I have once more assessed whether MPP should be maintained, terminated, or modified in a variety of different ways. In conducting my review, I have studied multiple court decisions, filings, and declarations related to MPP; considered relevant data regarding enrollments in MPP, encounters at the border, and outcomes in removal proceedings; reviewed previous Departmental assessments of MPP, as well as news reports and publicly available sources of information pertaining to conditions in Mexico; met with a broad and diverse array of internal and external stakeholders, including officials from across the federal government working on border management, state and local elected officials from across the border region, border sheriffs and other local law enforcement officials, and representatives from nonprofit organizations providing legal access and humanitarian aid across the southwest border; and considered the impact of other Administration initiatives related to immigration and the southern border. I also examined considerations that the District Court determined were insufficiently addressed in the June 1 memo, including claims that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, cause the Department to fail to comply with alleged detention obligations under the Immigration and Nationality Act, impose undue costs on states, and put a strain on U.S.-Mexico relations.

After carefully considering the arguments, evidence, and perspectives presented by those who support re-implementation of MPP, those who support terminating the program, and those who have argued for continuing MPP in a modified form, I have determined that MPP should be terminated. In reaching this conclusion, I recognize that MPP likely contributed to reduced migratory flows. But it did so by imposing substantial and unjustifiable human costs on the individuals who were exposed to harm while waiting in Mexico. The Biden-Harris Administration, by contrast, is pursuing a series of policies that disincentivize irregular migration while incentivizing safe, orderly, and humane pathways. These policies—including the ongoing efforts to reform our asylum system and address the root causes of migration in the region—seek to tackle longstanding problems that have plagued our immigration system for decades and achieve systemic change. Once fully implemented, I believe these policies will address migratory flows as effectively, in fact more effectively, while holding true to our nation's values.

To reiterate what the President has stated previously, the United States is a nation with borders and laws that must be enforced. It is also a nation of immigrants. This Administration is, as a result, committed to the twin goals of securing our borders and offering protection to those fleeing persecution and torture. MPP is neither the best, nor the preferred, strategy for achieving

2

either of these goals.  Significant evidence indicates that individuals awaiting their court hearings in Mexico under MPP were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited by exploiting migrants' vulnerabilities.  It is possible that such humanitarian challenges could be lessened through the expenditure of significant government resources currently allocated to other purposes.  Ultimately, however, the United States has limited ability to ensure the safety and security of those returned to Mexico.  Other significant issues with MPP, including the difficulties in accessing counsel and traveling to courts separated by an international border, are endemic to the program's design.

In reaching my determination, I have carefully considered what I deem to be the strongest argument in favor of retaining MPP: namely, the significant decrease in border encounters following the determination to implement MPP across the southern border.  Of course, correlation does not equal causation and, even here, the evidence is not conclusive.  I have nonetheless presumed, for the sake of this review, that MPP resulted in a significant decrease in irregular border crossings and persons approaching the U.S. border to pursue non-meritorious asylum claims.  I still conclude that the benefits do not justify the costs, particularly given the way in which MPP detracts from other regional and domestic goals, foreign-policy objectives, and domestic policy initiatives that better align with this Administration's values.

Importantly, the effective management of migratory flows requires that we work with our regional partners to address the root causes that drive migrants to leave their countries and to tackle this challenge before it arrives at our border.  This is a shared responsibility of all countries across the region.  MPP distracts from these regional efforts, focusing resources and attention on this singular program rather than on the work that is needed to implement broader and more enduring solutions.

Efforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration.  This was true under the previous implementation of MPP, and it is even more true today given the shared belief that the program should not be implemented without, at the very least, significant improvements.  Notably, Mexico has made clear that it will not agree to accept those the United States seeks to return to Mexico under MPP unless substantial improvements are made to the program.  But these much-needed efforts to enhance humanitarian protections for those placed in MPP are resource-intensive, exacerbating one of the flaws of the program: the concentration of resources, personnel, and aid efforts on the northern border of Mexico rather than on broader regional assistance efforts that would more effectively and systematically address the problem of irregular migration and better protect our border.

Moreover, the personnel required to adequately screen MPP enrollees to ensure they are not returned to persecution or torture in Mexico, process them for court hearings, and manage their cases pulls resources from other priority efforts, including the ongoing efforts to implement effective, fair, and durable asylum reforms that reduce adjudication delays and tackle the immigration court backlog.  Both the Dedicated Docket, designed so that immigration judges can adjudicate cases within 300 days, and the proposed Asylum Officer Rule, which would transfer the initial responsibility for adjudicating asylum claims from immigration judges to USCIS asylum officers to produce timely and fair decision-making, are expected to yield transformative

3

and lasting changes to the asylum system.  MPP, which can require unproductive, redundant screenings per case given the many different times individuals are returned to Mexico during the pendency of a single removal proceeding, diverts asylum officers and immigration judges away from these priority efforts.  MPP not only undercuts the Administration's ability to implement critically needed and foundational changes to the immigration system, but it also fails to provide the fair process and humanitarian protections that all persons deserve.

Having assessed the benefits and costs of the previous implementation of MPP, including how the program could potentially be improved, I have concluded that there are inherent problems with the program that no amount of resources can sufficiently fix.  Others cannot be addressed without detracting from key Administration priorities and more enduring solutions.

It is, as a result, my judgment that the benefits of MPP are far outweighed by the costs of continuing to use the program on a programmatic basis, in whatever form.  For the reasons detailed more fully in the attached memorandum, the contents of which are adopted and incorporated into the decision contained here, I am hereby terminating MPP.  Effective immediately, I hereby supersede and rescind the June 1 memorandum, Secretary Nielsen's January 25, 2019 memorandum, and any other guidance or other documents prepared by the Department to implement MPP.  The Department will continue complying with the *Texas* injunction requiring good-faith implementation and enforcement of MPP.  But the termination of MPP will be implemented as soon as practicable after a final judicial decision to vacate the *Texas* injunction.



**Explanation of the Decision to Terminate the Migrant Protection Protocols**

October 29, 2021

I.      Executive Summary ........................................................................................ 2

II.     Background ...................................................................................................... 3

    A.   MPP's Statutory Basis and Implementation ............................................. 5

    B.   Prior Evaluations of MPP ......................................................................... 7

    C.   Litigation Regarding the Prior Implementation of MPP............................ 9

    D.   Suspension of New Enrollments and Phased Strategy for the Safe and Orderly Entry of Individuals Subjected to MPP ..................................................................... 10

    E.   Challenge to the Suspension and Termination.......................................... 10

III.    Evaluation of MPP ....................................................................................... 11

    A.   Conditions for Migrants in Mexico ........................................................ 12

    B.   *Non-Refoulement* Concerns ................................................................... 14

    C.   Access to Counsel, Notice of Hearings, and Other Process Concerns ......................... 16

    D.   Impacts of MPP on Immigration Court Appearance Rates and Outcomes ................. 18

    E.   MPP and Recidivist Irregular Re-Entries ............................................... 21

    F.   Investments and Resources Required to Operate MPP.............................. 22

    G.   Impact of MPP and its Termination on SWB Migration Flows ................... 23

    H.   Addressing the Concerns of States and Border Communities ...................... 24

    I.   Relationship between Implementation of MPP and Statutory Mandates ..................... 26

    J.   Impact on U.S.-Mexico Relationship........................................................ 29

IV.    The Biden-Harris Administration's Affirmative Efforts to Enhance Migration Management........................................................................................................ 30

    A.   Managing Flows ...................................................................................... 31

    B.   Managing Asylum Claims ....................................................................... 34

        1.   Dedicated Docket ............................................................................ 34

        2.   Asylum Officer Rule ........................................................................ 35

V.     Consideration of Alternatives to Terminating MPP........................................ 36

VI.    Conclusion.................................................................................................... 38

## I.   <u>Executive Summary</u>

On February 2, 2021, President Biden issued an Executive Order directing the Secretary of Homeland Security to "promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols."[1]  After extensive review, the Secretary of Homeland Security concluded that the Migrant Protection Protocols (MPP) should be terminated, and on June 1, 2021, issued a memorandum to that effect.[2]  On August 13, 2021, however, the U.S. District Court for the Northern District of Texas determined that the June 1, 2021, memorandum was not issued in compliance with the Administrative Procedure Act (APA) and caused DHS to violate 8 U.S.C. § 1225, vacated the memorandum, and remanded it to the Department for further consideration.  The court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA"—a ruling that the government is vigorously appealing.

Pursuant to the Texas court's remand, and in continuing compliance with the President's direction in the Executive Order, the Secretary has considered anew whether MPP should be maintained, terminated, or modified in a variety of different ways.  After carefully considering the arguments, evidence, and perspectives of those who support continuing to use MPP, those who support terminating the program, and those who have argued for the use of MPP with modifications, the Secretary has determined that MPP should be terminated.  In reaching this conclusion, the Secretary recognizes that MPP likely contributed to reduced migratory flows.  But it did so by imposing substantial and unjustifiable human costs on migrants who were exposed to harm while waiting in Mexico.  The Biden-Harris Administration, by contrast, is pursuing a series of policies that will disincentivize irregular migration while incentivizing safe, orderly, and humane pathways.  These policies—including the ongoing efforts to reform our asylum system and address the root causes of migration in the region—seek to tackle longstanding problems that have plagued our immigration system for decades and achieve systemic change.

To reiterate what the President has stated previously, the United States is a nation with borders and laws that must be enforced.  It is also a nation of immigrants.  This Administration is, as a result, committed to the twin goals of securing our borders and offering protection to those fleeing persecution and torture.  MPP is neither the best, nor the preferred, strategy for achieving either of these goals.  Significant evidence indicates that individuals were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited from putting migrants in harms' way while awaiting their court hearings in Mexico.  It is possible that some of these humanitarian challenges could be lessened through the expenditure of significant government resources currently allocated to other purposes.  Ultimately, however, the United States has limited ability to ensure the safety and security of those returned to Mexico.

---

[1] Exec. Order No. 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, 86 Fed. Reg. 8267 (Feb. 2, 2021).

[2] Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Security, *Termination of the Migrant Protection Protocols Program* (June 1, 2021) [hereinafter June 1 Memo].

AR00006

Other significant issues with MPP, including the difficulties in accessing counsel and traveling to courts separated by an international border, are endemic to the program's design.

Importantly, as the Secretary has emphasized, the management of migratory flows is a shared responsibility among all countries in the hemisphere.  MPP distracts from these regional efforts, focusing resources and attention on this singular program rather than on the work that is needed to implement broader, and more enduring, solutions.  Efforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration.

Notably, Mexico has made clear that it will not agree to accept those the United States seeks to return to Mexico under MPP unless substantial improvements are made to the program. But these much-needed efforts to enhance humanitarian protections for those placed in MPP are resource-intensive, exacerbating one of the flaws of the program—the concentration of resources, personnel, and aid efforts on the northern border of Mexico rather than on broader regional assistance efforts that would more effectively and systemically tackle the problem of irregular migration and protect our border.  Moreover, the personnel required to adequately screen MPP enrollees, potentially multiple times—to ensure they are not returned to persecution or torture in Mexico, process them for court hearings, and manage their cases—pulls resources from other priority efforts, including the ongoing efforts to implement effective, fair, and durable asylum reforms that reduce adjudication delays and tackle the immigration court backlog.

Having assessed the benefits and costs of the previous implementation of MPP as well as how the program could potentially be improved, the Secretary has concluded that there are inherent problems with the program—including the vulnerability of migrants to criminal networks, and the challenges associated with accessing counsel and courts across an international border—that resources cannot sufficiently fix.  Others cannot be addressed without detracting from other key Administration priorities.  It is thus the Secretary's judgment that the benefits of MPP are far outweighed by the costs of the program, in whatever form.

As a result, for the many reasons described in what follows, the Secretary in a memorandum issued today entitled, "Termination of the Migrant Protection Protocols," has decided to terminate MPP.[3]  This determination will be implemented as soon as practicable after a final judicial decision to vacate the Texas injunction that currently requires good-faith enforcement of MPP.

## II.   Background

On January 25, 2019, Secretary of Homeland Security Kirstjen Nielsen issued a memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols."  On January 20, 2021, Acting Secretary David Pekoske issued a memorandum temporarily suspending new enrollments into the Migrant Protection Protocols (MPP) pending

---

[3] Memorandum from Alejandro Mayorkas, Sec'y of Homeland Sec., *Termination of the Migrant Protection Protocols* (Oct. 29, 2021).

AR00007

further review.[4]  Two weeks later, on February 2, 2021, President Biden issued Executive Order (EO) 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*.[5]  In this Executive Order, President Biden directed the Secretary of Homeland Security to "promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols" and "promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subject to MPP."[6]  In response, Secretary Mayorkas initiated a comprehensive review of MPP.  The Secretary, in conjunction with other agencies, also implemented a phased process for the safe and orderly entry into the United States of thousands of individuals who had been placed in MPP and certain of their immediate family members for proceedings.[7]

At the conclusion of his review, on June 1, 2021, Secretary Mayorkas issued a memorandum announcing and explaining his determination that MPP should be terminated (the "June 1 Memorandum").[8]  On August 13, 2021, the U.S. District Court for the Northern District of Texas determined that the June 1 Memorandum did not reflect reasoned decision-making and thus was not issued in compliance with the Administrative Procedure Act (APA), and that the memorandum caused the Department to violate detention provisions found in 8 U.S.C. § 1225.[9]  The court vacated the June 1 Memorandum in its entirety and remanded it to the Department of Homeland Security (DHS) for further consideration.[10]  The court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA."[11]  The government is complying with that injunction while appealing the decision.

Pursuant to the district court's remand, and consistent with the President's direction in EO 14010, the Secretary has considered anew whether MPP should be maintained, terminated, or modified.  This memorandum sets forth the results of that analysis and the basis for the Secretary's decision to terminate MPP by way of a separate memorandum being issued today.  The Secretary's memorandum immediately supersedes and rescinds the June 1 Memorandum, as well as Secretary Nielsen's January 25, 2019 memorandum and any other guidance or other documents prepared by the Department to implement it.  The Secretary's decision to terminate

---

[4] Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Suspension of Enrollment in the Migrant Protection Protocol Program* (Jan. 20, 2021) [hereinafter MPP Suspension Memorandum].

[5] Exec. Order No. 14010, 86 Fed. Reg. 8267 (Feb. 2, 2021).

[6] *Id.* at 8270.

[7] *See* Press Release, DHS, "DHS Announces Process to Address Individuals in Mexico with Active MPP Cases," Feb. 11, 2021, https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

[8] *See supra* note 2.

[9] *See Texas v. Biden*, No. 2:21-cv-067, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021), *appeal pending*, No. 21-10806 (5th Cir. filed Aug. 16, 2021).

[10] *Id.* at *27.

[11] *Id.* (emphasis in original).

AR00008

MPP is to be implemented as soon as practicable after a final judicial decision to vacate the *Texas* injunction that currently requires good faith implementation and enforcement of MPP.

A. MPP's Statutory Basis and Implementation

Enacted in 1996, Section 235(b)(2)(C) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1225(b)(2)(C), grants DHS discretionary authority to return to Mexico or Canada certain noncitizens who are arriving on land from those contiguous countries pending their removal proceedings before an immigration judge under Section 240 of the INA, 8 U.S.C. § 1229a. Historically, DHS and the legacy Immigration and Naturalization Service (INS) used this discretionary authority on a case-by-case basis to return certain Mexican and Canadian nationals who were arriving at land border ports of entry; occasionally, the provision also was used for third-country nationals under certain circumstances provided they did not have a fear of persecution or torture related to return to Canada or Mexico.[12] On December 20, 2018, the Department announced a decision to initiate MPP—a novel programmatic implementation of Section 235(b)(2)(C)—along the Southwest Border (SWB). That same day, Mexico announced its independent decision to accept those returned to Mexico through the program—a key precondition to implementation.[13]

At the time of its initial announcement, DHS stated that the program was intended to: (1) reduce unlawful migration and false claims of asylum; (2) ensure that migrants are not able to "disappear" into the United States prior to a court decision; (3) focus attention on more quickly assisting legitimate asylum seekers; (4) free up personnel and resources to better protect U.S. territory and clear the backlog of unadjudicated asylum applications; and (5) offer protection to vulnerable populations while they wait in Mexico for their removal proceedings.[14]

---

[12] Prior to MPP, DHS and the former INS primarily used Section 235(b)(2)(C) on an ad-hoc basis to return certain Mexican and Canadian nationals who were arriving at land border ports of entry. CBP, for instance, invoked Section 235(b)(2)(C) to return certain Mexican nationals who were U.S. lawful permanent residents (LPRs) and whose criminal histories potentially subjected them to removal, as well as LPRs who appeared to have abandoned their permanent residence in the United States but were not willing to execute a Form I-407, Record of Abandonment of Lawful Permanent Residence. At the Northern Border, CBP used Section 235(b)(2)(C) to return certain Canadian nationals or those with status in Canada who, for instance, appear to be subject to a criminal ground of inadmissibility. Although guidance is scant, DHS and the former INS also used Section 235(b)(2)(C), on a case-by-case basis, for certain third country nationals even prior to MPP. For example, CBP issued field guidance in 2005 advising that a Cuban national arriving at a land border port of entry may "be returned to contiguous territory pending section 240 proceedings . . . if: (1) the alien cannot demonstrate eligibility for the exercise of parole discretion; (2) the alien has valid immigration status in Canada or Mexico; (3) Canadian or Mexican border officials express a willingness to accept the returning alien; and (4) the alien's claim of fear of persecution or torture does not relate to Canada or Mexico." Mem. from Jayson P. Ahern, Asst. Comm'r, Office of Field Ops., CBP, *Treatment of Cuban Asylum Seekers at Land Border Ports of Entry* 2-3 (June 10, 2005). The INS also issued guidance in 1997 and 1998 contemplating the use of Section 235(b)(2)(C) only as a "last resort" and only when the individual does not claim a fear of persecution related to Canada or Mexico. Mem. from Michael A. Pearson, Executive Assoc. Comm'r, Office of Field Ops., INS, *Detention Guidelines Effective October 9, 1998* 3 (Oct. 7, 1998); Mem. from Chris Sale, Deputy Comm'r, INS, *Implementation of Expedited Removal* 4 (Mar. 31, 1997) (same).

[13] Secretaría de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018).

[14] Press Release, DHS, "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration," Dec. 20, 2018, https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration [hereinafter Nielsen Release].

On January 25, 2019, DHS issued policy guidance for implementing MPP,[15] which was augmented a few days later by operational guidance from U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS).[16]  Under MPP, certain non-Mexican applicants for admission who arrived on land at the SWB were placed in removal proceedings and returned to Mexico to await their immigration court proceedings under Section 240 of the INA.[17]  For those enrolled in MPP, DHS attempted to facilitate entry to and exit from the United States to attend their immigration proceedings, which were prioritized on the non-detained docket by the Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR).

MPP was initially piloted at the San Ysidro port of entry and San Diego Immigration Court.  In July 2019, the program was expanded into Texas and as of January 2020, individuals could be enrolled in MPP at locations across the SWB.  Individuals returned to Mexico were processed back into the United States to attend their removal proceedings at one of four immigration court locations in California and Texas.[18]  It was initially anticipated that enrollees' first hearings would be scheduled within 30-45 days, consistent with the goal of timely adjudication of cases.  But enrollment quickly outpaced EOIR's capacity to hear cases.  Over time, capacity constraints meant that even initial hearings were scheduled many months after enrollment.  Large numbers of migrants ended up living in camps in Northern Mexico that were, as well-documented in numerous reports and as described below, crowded, unsanitary, and beset by violence.[19]

Due to public health concerns brought on by the COVID-19 pandemic, EOIR paused immigration court hearings for all non-detained individuals, including those enrolled in MPP, in March 2020.[20]  MPP hearings never resumed prior to the program's January 2021 suspension,

---

[15] Memorandum from Kirstjen M. Nielsen, Sec'y of Homeland Sec., *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019).

[16] Guidance documents are available at the archived MPP landing page under the *MPP Guidance Documentation heading:* https://www.dhs.gov/archive/migrant-protection-protocols.

[17] Individuals who could be enrolled into MPP were, generally, individuals from Spanish-speaking countries and Brazil.

[18] Individuals enrolled in MPP in the San Diego or El Paso jurisdictions attended hearings at the immigration courts in San Diego or El Paso; individuals enrolled in MPP in San Antonio or Harlingen jurisdictions attended hearings at the Immigration Hearing Facilities (IHFs) in Laredo or Brownsville, respectively.

[19] *See infra* Section III.A; *see also* Caitlin Dickerson, *Inside the Refugee Camp on America's Doorstep*, N.Y. Times, Oct. 23, 2020; Miriam Jordan, *'I'm Kidnapped': A Father's Nightmare on the Border*, N.Y. Times, Dec. 21, 2019; Nomaan Merchant, *Tents, stench, smoke: Health risks are gripping migrant camp*, A.P. News, Nov. 14, 2019; Human Rights Watch, *Like I'm Drowning: Children and Families Sent to Harm by the US 'Remain in Mexico' Program*, Jan. 6, 2021 ("As a result [of MPP], thousands of people are concentrated in dangerous Mexican border towns indefinitely, living in limbo . . . . Migrant shelters in Ciudad Juárez and Tijuana quickly filled, and a large shelter run by Mexican federal authorities in Ciudad Juárez also quickly hit capacity soon after it opened in late 2019. In Matamoros, dangers in the city have led as many as 2,600 people to live in an informal camp on the banks of the river marking the border between Mexico and the United States, a location prone to flooding.").

[20] *See* Press Release, DHS, "Joint DHS/EOIR Statement of MPP Rescheduling," Mar. 23, 2020, https://www.dhs.gov/news/2020/03/23/joint-statement-mpp-rescheduling.

but new enrollments into MPP continued during this period, albeit at significantly reduced rates.[21]

In total, between the initial implementation of MPP on January 25, 2019, and the suspension of new enrollments that became effective on January 21, 2021,[22] DHS returned to Mexico approximately 68,000 individuals, according to DHS and EOIR data.[23]  During that same period, CBP processed a total of 1.5 million SWB encounters, including approximately 1 million encounters processed under Title 8 authorities (including the 68,000 processed through MPP) and approximately 500,000 Title 42 expulsions.[24]

    B.  Prior Evaluations of MPP

Prior to the Secretary's June 1, 2021, termination memorandum, the Department produced two notable assessments of the program that reached divergent conclusions.

In June 2019, as the Department prepared to expand MPP across the entire SWB, it formed a committee of senior leaders from multiple components (known as the "Red Team") to conduct a "top-down review of MPP's policies and implementation strategy and provide overall recommendations to increase the effectiveness of the program."[25]  The Red Team members were chosen, in part, because they had "little to no involvement developing policy or with implementing MPP," thus helping to ensure an independent assessment.[26]  The report and recommendations (the "Red Team Report") was issued October 25, 2019, but not publicly released.[27]  In preparing its report, the Red Team reviewed key MPP background documents, conducted dozens of interviews, made site visits, and performed additional research.[28]  The Red Team identified significant deficiencies in MPP and made multiple recommendations for improving MPP, organized around five different areas: the need for standardization and clarity

---

[21] *See* U.S. Customs and Border Protection, "Migrant Protection Protocols FY2021," https://www.cbp.gov/newsroom/stats/migrant-protection-protocols; U.S. Customs and Border Protection, "Migrant Protection Protocols FY2020," https://www.cbp.gov/newsroom/stats/migrant-protection-protocols-fy-2020; *see also* MPP Suspension Memorandum, *supra* note 4.

[22] MPP Suspension Memorandum, *supra* note 4.

[23] *See* "Migrant Protection Protocols Metrics and Measures," Jan. 21, 2021, https://www.dhs.gov/publication/metrics-and-measures.

[24] DHS Office of Immigration Statistics analysis of U.S. CBP administrative records. In March 2020, the U.S. Centers for Disease Control and Prevention (CDC) issued a public health order under 42 U.S.C. §§ 265 and 268 to prevent the spread of COVID-19 in CBP holding facilities and in the United States.  85 Fed. Reg. 16,559 (Mar. 24, 2020).  The Order temporarily suspending the introduction of certain persons into the United States from countries where a communicable disease exists. *Id*. In August 2021, CDC issued a new Order, which replaced, reaffirmed, and superseded the previous Orders. *See* 86 Fed. Reg. 42,828 (Aug. 5, 2021).

[25] Memorandum from Kevin McAleenan, Acting Sec'y of Homeland Sec., *Review of Migrant Protection Protocols Policy and Implementation* (June 12, 2019).

[26] *Id.* Working under the oversight of the Acting Deputy Secretary of Homeland Security, the Red Team was composed of individuals from the Offices of Privacy, Management, Civil Rights and Civil Liberties, and the Coast Guard.

[27] DHS Office of Operations Coordination, *The Migrant Protection Protocols Red Team Report* (Oct. 25, 2019) [hereinafter Red Team Report].

[28] *Id.* at 4.

AR00011

with respect to information provided to migrants upon initial screening and processing; the need for better access to counsel and better mechanisms for communication with counsel; the need to ensure better *non-refoulement* protections;[29] the need for safe housing and protections for those returned to Mexico; and the need for administrative and logistical improvements, including the establishment of measures of effectiveness and better mechanisms for the sharing of key information between migrants and relevant government agencies.  In December 2020—at a point when new enrollments into MPP had already dropped significantly and only a month before the program's suspension—the Department issued supplementary policy and operational guidance designed to address several of the Red Team's recommendations.[30]

Three days after the issuance of the Red Team Report, the Department released publicly a separate review of MPP (the "October 2019 Assessment"), which offered a very different assessment of the program.[31]  The October 2019 Assessment declared that MPP had demonstrated operational effectiveness, including by helping to address "the ongoing crisis at the southern border and restoring integrity to the immigration system."[32]  The assessment noted that apprehensions of noncitizens at and between ports of entry decreased from May through September 2019; reported that rapid and substantial declines in apprehensions occurred in areas where the greatest number of MPP-amenable noncitizens had been processed and returned to Mexico through MPP; asserted that MPP was restoring integrity to the immigration system; claimed that both the U.S. Government and the Government of Mexico (GOM) were endeavoring to provide safety and security for migrants returned to Mexico; and stated that the

---

[29] Article 33 of the 1951 Convention Relating to the Status of Refugees provides that "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Convention Relating to the Status of Refugees, done July 28, 1951, 19 U.S.T. 6259, 6276, 189 U.N.T.S. 150, 176. The United States is not a party to the 1951 Convention, but the United States is a party to the 1967 Protocol Relating to the Status of Refugees, done Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. 6577, which incorporates Article 33 of the 1951 Convention. The phrase "life or freedom would be threatened" is interpreted in U.S. law as meaning that it is more likely than not that the individual would be persecuted. *See, e.g.*, *INS v. Stevic*, 467 U.S. 407, 428 & n.22 (1984). Separately, Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) provides, "No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-2822 (8 U.S.C. § 1231 note). Article 3 of the CAT likewise is understood in U.S. law as requiring a "more likely than not" standard.  *See, e.g.*, *Auguste v. Ridge*, 395 F.3d 123, 149 (3d Cir. 2005) (citing Senate Resolution, 136 Cong. Rec. S17,486, S17491-92 (daily ed. 1990)). These *non-refoulement* obligations are non-self-executing, *see, e.g.*, *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009) (1967 Refugee Protocol); *Al-Fara v. Gonzales*, 404 F.3d 733, 743 (3d Cir. 2005) (CAT), and are not specifically required by statute with respect to MPP returns.

[30] The policy and operational guidance was published on an MPP website and took the form of a series of memoranda that provided clarity on matters like access to counsel during the *non-refoulement* interview, the importance of maintaining family unity, and more consistent application of the "known mental and physical health" exclusion for enrollment in MPP. DHS, *Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols* (Dec. 7, 2020); CBP, *Supplemental Migrant Protection Protocols Guidance, Initial Document Service* (Dec. 7, 2020); CBP, *Supplemental Migrant Protection Protocol Guidance, MPP Amenability* (Dec. 7, 2020).

[31] DHS, "Assessment of the Migrant Protection Protocols (MPP)," Oct. 28, 2019, https://www.dhs.gov/publication/assessment-migrant-protection-protocols-mpp [hereinafter Oct. 2019 Assessment].
[32] *Id.*

AR00012

screening protocols in place were appropriately assessing noncitizens' fear of persecution or torture in Mexico.

The public October 2019 Assessment presented MPP as a resounding success, whereas the internal Red Team Report raised serious concerns with the program. Notably, the October 2019 Assessment did not acknowledge or address any of the shortcomings identified by the Red Team Report, despite the fact that the Assessment was released *after* the Red Team Report was completed.

C.  Litigation Regarding the Prior Implementation of MPP

MPP was challenged many times on multiple grounds in federal court and remains the subject of ongoing litigation in several jurisdictions. Among other claims, litigants challenged the program as an impermissible exercise of the underlying statutory authority; argued that MPP caused DHS to return noncitizens to Mexico to face persecution, abuse, and other harms and that its procedures inadequately implemented *non-refoulement* protections; argued that their right to access counsel before and during *non-refoulement* interviews had been violated; contested the return to Mexico pursuant to MPP of noncitizens with mental and physical disabilities; asserted that the program had been implemented in violation of the APA; and contended that MPP's expansion across the SWB was unlawful because it led to the return of migrants to places that were particularly dangerous.[33] Both in the course of litigation and otherwise, litigants described, and some courts credited, extreme violence and substantial hardships faced by those returned to Mexico to await their immigration court proceedings, as well as substantial danger traveling to and from ports of entry to those hearings. Litigants described being exposed to violent crime, such as rape and kidnapping, as well as difficulty obtaining needed support and services in Mexico, including adequate food and shelter.[34] In addition, more than one hundred MPP enrollees who received final orders of removal have petitioned the federal courts of appeal for review of such orders on the grounds that various features of MPP, including limited access to

---

[33] *See, e.g.*, *Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020), *vacated as moot*, 5 F.4th 1099 (9th Cir. 2021); *Bollat Vasquez v. Wolf*, 520 F. Supp. 3d 94 (D. Mass. 2021); *Doe v. Wolf*, 432 F. Supp. 3d 1200 (S.D. Cal. 2020); *E.A.R.R. v. Dep't of Homeland Sec.*, No. 3:20-cv-2146 (S.D. Cal. filed Nov. 2, 2020); *Adrianza v. Trump*, 505 F. Supp. 3d 164 (E.D.N.Y. 2020), *dismissed*, No. 1:20-cv-03919 (E.D.N.Y. Sept. 2, 2021); *Nora v. Wolf*, No. 20-993, 2020 WL 3469670 (D.D.C. June 25, 2020); *Turcios v. Wolf*, No. 1:20-cv-1982, 2020 WL 10788713 (S.D. Tex. Oct. 16, 2020).

[34] For example, in *Innovation Law Lab v. Wolf*, the Ninth Circuit observed:

> The MPP has had serious adverse consequences for the individual plaintiffs. Plaintiffs presented evidence in the district court that they, as well as others returned to Mexico under the MPP, face targeted discrimination, physical violence, sexual assault, overwhelmed and corrupt law enforcement, lack of food and shelter, and practical obstacles to participation in court proceedings in the United States. The hardship and danger to individuals returned to Mexico under the MPP have been repeatedly confirmed by reliable news reports.

951 F.3d at 1078; *see also Bollat Vasquez*, 520 F. Supp. 3d at 111–12 (describing plaintiffs' unrebutted descriptions of rape, death threats, kidnapping risks, and insufficient food and shelter as supported by the U.S. State Department's assignment to Tamaulipas of a "Level 4: Do Not Travel" warning "due to crime and kidnapping").

AR00013

counsel and inability to access court hearings, prejudiced their ability to pursue relief in removal proceedings.[35]

    D.   <u>Suspension of New Enrollments and Phased Strategy for the Safe and Orderly Entry of Individuals Subjected to MPP</u>

On January 20, 2021, Acting Secretary David Pekoske issued a memorandum suspending new enrollments into MPP, effective January 21, 2021, pending further review of the program.[36] The MPP Suspension Memorandum was followed by the President's issuance of EO 14010 on February 2, 2021, which, in addition to requiring the Secretary to review the program, directed the Secretary to "promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subject to MPP."[37]

From February 19, 2021, until the effective date of the district court's order on August 25, 2021, DHS implemented a phased process for the safe and orderly entry into the United States of thousands of individuals who had been placed in MPP and remained outside the United States.[38]  Certain individuals whose removal proceedings were pending before EOIR or whose proceedings resulted in an *in absentia* order of removal or termination, and certain of their immediate family members, were processed into the United States to continue their Section 240 removal proceedings.[39]  About 13,000 individuals were processed into the United States to participate in Section 240 removal proceedings as a result of this process.[40]

    E.   <u>Challenge to the Suspension and Termination</u>

On April 13, 2021, the States of Missouri and Texas filed suit in the U.S. District Court for the Northern District of Texas, challenging the suspension of new enrollments into MPP on the grounds that the January 20, 2021, suspension memorandum violated the APA, 8 U.S.C. § 1225, the Constitution, and a purported agreement between Texas and the federal government.

---

[35] *See, e.g., Hernandez Ortiz v. Garland*, No. 20-71506 (9th Cir. filed Mar. 15, 2021) (describing repeated failed attempts to contact legal service providers from within Mexico and ultimately agreeing to proceed pro se because the alternative was to wait longer in Mexico at continued risk to the family's safety); *Del Toro v. Garland*, No. 20-60900 (5th Cir. filed Dec. 14, 2020) (explaining that MPP restricted access to counsel, which prevented the individual from filing an update State Department country report on Cuba for his individual hearing); *Del Carmen Valle v. Garland*, No. 20-72071 (9th Cir. filed July 16, 2020) (arguing that the individual's "extreme distress and vulnerability in Mexico, lack of access to counsel, and difficulty in preparing and presenting her asylum application" as grounds for appeal).

[36] MPP Suspension Memorandum, *supra* note 4.

[37] Exec. Order No. 14010, 86 Fed. Reg. at 8270.

[38] *See* Press Release, DHS, "DHS Announces Process to Address Individuals in Mexico with Active MPP Cases," Feb. 11, 2021, https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

[39] *Id.*; Press Release, DHS, "DHS Announces Expanded Criteria for MPP-Enrolled Individuals Who Are Eligible for Processing into the United States," June 23, 2021, https://www.dhs.gov/news/2021/06/23/dhs-announces-expanded-criteria-mpp-enrolled-individuals-who-are-eligible-processing.

[40] Data on the number of people permitted to enter the United States under this phased process, February 19-August 25, 2021, provided by the Department of State on October 24, 2021.

AR00014

Subsequent to the Secretary's June 1, 2021, termination memorandum, Missouri and Texas amended their complaint to challenge the June 1 Memorandum and filed a motion to enjoin the memorandum.

On August 13, 2021, the district court issued a nationwide permanent injunction requiring DHS "to enforce and implement MPP *in good faith*" until certain conditions were satisfied.[41] The district court determined that the June 1 Memorandum was arbitrary and capricious because, according to the court, the Department ignored critical factors and reached unjustified conclusions. In particular, the district court found that the June 1 Memorandum failed to sufficiently account for several considerations, including the prior administration's assessment of the benefits of MPP; warnings allegedly made by career DHS personnel during the presidential transition process that suspending MPP would lead to a surge of border crossers; the costs of terminating MPP to the States as well as their reliance on MPP; the impact that terminating MPP would have on the Department's ability to comply with detention provisions in the INA, which the court construed to require detention and to foreclose release based on detention capacity concerns; and modifications to MPP short of termination that could similarly achieve the Department's goals.[42] As a result, the district court enjoined the June 1 Memorandum in its entirety and "remanded" it to the Department for further consideration.[43] The district court denied a request for a stay of the injunction pending appeal, and the U.S. Court of Appeals for the Fifth Circuit and the Supreme Court of the United States also denied stays.[44] As a result, the district court's order, as construed by the Fifth Circuit, went into effect at 12:01 a.m. on August 25, 2021.

Since August, the Department has worked actively to reimplement MPP in good faith, as required by the district court's order.[45] At the same time, pursuant to the district court's order and in continuing compliance with the President's direction in EO 14010, the Secretary has considered anew whether to maintain, terminate, or modify MPP in various ways.

## III.  Evaluation of MPP

In considering whether to maintain, terminate, or modify MPP anew, the Department considered, among other things, the decisions of the *Texas* district court, Fifth Circuit, and Supreme Court; the decisions of multiple other courts in litigation challenging MPP or its termination; the briefs and declarations filed in all such lawsuits pertaining to MPP; various Departmental assessments of MPP, including both the Red Team Report and agency responses and the October 2019 Assessment; a confidential December 2019 Rapid Protection Assessment from the U.N. High Commissioner for Refugees (UNHCR) and publicly available sources of information, including news reports and publicly available sources of information, pertaining to conditions in Mexico; records and testimony from Congressional hearings on MPP and reports

---

[41] *Texas*, 2021 WL at 3603341, at *27 (emphasis in original).

[42] *Id*. at *17-22.

[43] *Id*. at * 27.

[44] *See Biden v. Texas*, No. 21A21, 2021 WL 3732667 (U.S. Aug. 24, 2021); *Texas v. Biden*, 10 F.4th 538 (5th Cir. 2021).

[45] *See* Declaration of Blas Nuñez-Neto, *Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex. Oct. 14, 2021); Defendants' First Supplemental Notice of Compliance with Injunction, *Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex. Oct. 14, 2021).

11

by nongovernmental entities; and data regarding enrollments in MPP, encounters at the border, and outcomes in removal proceedings conducted for MPP enrollees; and the impact of other government programs and policies concerning migration and the southern border.  In addition, over the course of several months, the Secretary and his staff met with a broad array of internal and external stakeholders with divergent views about MPP, including members of the DHS workforce engaged in border management, state and local elected officials across the border region, including from Texas, California, Arizona, and New Mexico, border sheriffs and other law enforcement officials, representatives from multiple nonprofit organizations providing legal access and humanitarian aid to noncitizens across the SWB, and dozens of Members of Congress focused on border and immigration policy.  The Secretary also assessed other migration-related initiatives the Administration is undertaking or considering undertaking.  And he examined the considerations that the district court determined were insufficiently addressed in the June 1 Memorandum, including the view that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, impose undue costs on states, put a strain on U.S.-Mexico relations, and cause DHS to fail to comply with its obligations under 8 U.S.C. § 1225.

After carefully considering the arguments, evidence, and perspectives of those who support resuming MPP, with or without modification, as well as those who support termination, the Secretary has determined that MPP should be terminated.  The following outlines the considerations that informed the Secretary's decision.

A.  Conditions for Migrants in Mexico

In January 2019, the Department implemented MPP with the stated expectation that vulnerable populations would get the protection they needed while they waited in Mexico during the pendency of their removal proceedings.[46]  In practice, however, there were pervasive and widespread reports of MPP enrollees being exposed to extreme violence and insecurity at the hands of transnational criminal organizations that prey on vulnerable migrants as they waited in Mexico for their immigration court hearings in the United States.  These security concerns, together with barriers many individuals faced in accessing stable and safe housing, health care and other services, and sufficient food, made it challenging for some to remain in Mexico for the duration of their proceedings.  Notably, the United States has limited ability to fix these issues, given that they relate to migrant living conditions and access to benefits in Mexico—an independent sovereign nation.

Concerns about migrants' safety and security in Mexico, and the effect this had on their ability to attend and effectively participate in court proceedings in the United States, have been highlighted in internal Department documents, court filings, and a range of external studies and press reports.  In its internal evaluation of the program, the Department's Red Team Report emphasized the need for safe housing for vulnerable populations.[47]  The Ninth Circuit, in affirming a district court ruling that enjoined implementation of MPP, determined that

---

[46] *See* Nielsen Release, *supra* note 14; *see also* Memorandum from Kirstjen M. Nielsen, Sec'y of Homeland Sec., *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019).

[47] Red Team Report, *supra* note 27, at 7.

AR00016

"[u]ncontested evidence in the record establishes that non-Mexicans returned to Mexico under the MPP risk substantial harm, even death, while they await adjudication of their applications for asylum."[48]  A Massachusetts district court similarly described the plaintiffs' claims of extreme violence and insecurity in Mexico and observed that "[t]heir personal accounts are unrebutted and are supported by affidavits from employees of two nongovernmental organizations and the U.S. State Department's assignment to Tamaulipas of a 'Level 4: Do Not Travel' warning 'due to crime and kidnapping.'"[49]  The court further cited a Human Rights First report that included a list of 1,544 allegations of serious harm (including homicide, rape, and kidnapping) faced by individuals placed in MPP from January 2019 to February 2021.[50]

Multiple other reports have similarly highlighted security and treatment concerns. A December 2019 UNHCR Rapid Protection Assessment found that 81% of individuals and families returned to Mexico under MPP did not feel safe in Mexico, and that 48% had been a victim or witness of violence in Mexico.[51]  According to this assessment, children represented about half (48%) of targets for physical violence, and about half (48%) of kidnapping victims.[52] The organization Médecins Sans Frontières (Doctors Without Borders) noted that 75% of its patients who were in Nuevo Laredo in October 2019 due to MPP reported having been kidnapped.[53]  In 2019, a U.S. Commission on Civil Rights report similarly credited several news and NGO reports in noting that "asylum seekers [awaiting proceedings in Mexico] have been killed, women have been raped, and children have been kidnapped."[54]  Similar accounts of insecurity and violence were the subject of numerous press reports describing squalor and violence in the "camps" where many MPP enrollees lived as they waited their court hearings.[55] But as bad as conditions often were in the makeshift border camps, migrants gathered there because the threat of violence and kidnapping in surrounding areas outside of the camps could be

---

[48] *Innovation Law Lab*, 951 F.3d at 1093.

[49] *Bollat Vasquez*, 520 F. Supp. 3d at 111-12 (issuing a preliminary injunction ordering the Department to return to the United States seven plaintiffs who had been enrolled in MPP).

[50] Human Rights First, *Delivered to Danger; Trump Administration sending asylum seekers and migrants to danger*, Feb. 19, 2021, https://www.humanrightsfirst.org/campaign/remain-mexico; *see Bollat Vasquez*, 520 F. Supp. 3d at 99 n.10 (citing a declaration by Kennji Kizuka, Senior Researcher and Policy Analyst at Human Rights First, regarding an earlier version of this list explaining that "'[a]s of December 15, 2020, Human Rights First has identified 1,314 public reports of murder, torture, rape, kidnapping, and other violent assaults against asylum seekers returned to Mexico under MPP' and that 'the security situation in Mexico, including in the state of Tamaulipas has worsened' with one of Mexico's 'most powerful and violent cartels' reportedly increasing its activities in Tamaulipas and migrants in Matamoros and Nuevo Laredo have been repeatedly targeted'").

[51] UNHCR, *Rapid Protection Assessment: MPP Returnees at the Northern Border of Mexico* 15, Dec. 2019. The UNHCR assessment, shared confidentially with the United States government, is cited here with the express permission of UNHCR.

[52] According to the UNHCR survey, it did not take long for MPP enrollees to experience danger in Mexico. Just over half of the individuals surveyed (51%) had been in Mexico for less than one month and more than nine-in-ten had been in Mexico for less than three months. *Id.* at 7, 17.

[53] Médecins Sans Frontières, *The devastating toll of 'Remain in Mexico' asylum policy one year later*, Jan. 29, 2020, https://www.msf.org/one-year-inhumane-remain-mexico-asylum-seeker-policy; *cf.* Emily Green, *Trump's Asylum Policies Sent Him Back to Mexico. He was Kidnapped 5 Hours Later By a Cartel.*, Vice, Sept. 16, 2019.

[54] U.S. Commission on Civil Rights, *Trauma at the Border; The Human Cost of Inhumane Immigration Policies*, Oct. 2019, https://www.usccr.gov/files/pubs/2019/10-24-Trauma-at-the-Border.pdf.

[55] *See, e.g.*, Dickerson, *supra* note 19; Jordan, *supra* note 19; Merchant, *supra* note 19; This American Life, *The Out Crowd*, Nov. 15, 2019, https://www.thisamericanlife.org/688/transcript.

13

greater.[56]  Poor conditions and violence in the Matamoros camp also created an operational challenge when migrants at the camp blocked traffic in both directions on the Gateway International Bridge for hours as a sign of protest.[57]  The security and treatment of MPP enrollees also been the subject of congressional oversight and investigation.[58]

The adverse living conditions and violence experienced by migrants returned to Mexico pursuant to MPP are of grave concern to the Secretary.  The return of noncitizens to Mexico under MPP is predicated, by statute, upon individuals' ability to remain in Mexico during the pendency of their removal proceedings.[59]  In practice, however, myriad problems faced by noncitizens returned to Mexico impeded their ability to access those removal proceedings.  As a result, the Secretary has determined that the key predicate on which the statutory authority underlying the program is built—that noncitizens stay in Mexico and continue to participate in their removal proceedings—was upended by reality in too many cases.  This is an intolerable result that is inconsistent with this Administration's values, which include ensuring the rights of migrants to seek lawful protection from removal in a safe environment.

Moreover, these are problems that cannot easily be fixed.  Once migrants are returned to Mexico—an independent sovereign nation—the United States' ability to respond and provide adequate conditions and safety is diminished.

B.  *Non-Refoulement* Concerns

Concerns about the *non-refoulement* process under MPP as it was previously implemented and the additional costs and resources that would be required to address those concerns also weigh against continued reliance on MPP.  As previously designed and implemented, MPP's *non-refoulement* screening process—used to assess whether individuals would likely face persecution on account of a protected ground or torture in Mexico—was limited in at least four respects.

First, as originally implemented, individuals processed for MPP were not questioned by CBP about their fear of persecution or torture in Mexico, but were instead required to affirmatively articulate such a fear regarding return to Mexico—a sharp contrast to the approach

---

[56] *See, e.g.*, María Verza and Fernanda Llano, *Lawless Limbo Within Sight of America*, Associated Press, Nov. 18, 2019; Delphine Schrank, *Asylum seekers cling to hope, safety in camp at U.S.-Mexico Border*, Reuters, Oct. 16, 2019, https://www.reuters.com/article/us-usa-immigration-mexico-matamoros-feat-idUSKBN1WV1DY.

[57] Adolfo Flores, "Asylum-Seekers Protesting Squalid Conditions Shut Down A US Border Crossing For 15 Hours," Buzzfeed, Oct. 11, 2019, https://www.buzzfeednews.com/article/adolfoflores/asylum-seekers-protesting-bridge-close-matamoros-texas.

[58] *See, e.g.*, Press Release, H. Comm. on the Judiciary, "Chairman Nadler Announces House Judiciary Investigation into Trump Administration's 'Remain in Mexico' Policy," Jan. 14, 2020, https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=2397; *Examining the Human Rights and Legal Implications of DHS's "Remain in Mexico" Policy*: Hearing Before the H. Comm. on Homeland Sec., 116th Cong. *passim* (2019).

[59] *See* 8 U.S.C. § 1225(b)(2)(C) (specifying that the Secretary may return a noncitizen to a contiguous territory "pending a proceeding under [8 U.S.C. §] 1229a").

14

used in the expedited removal context, in which individuals are affirmatively asked standard questions about fear of return to their home countries and the responses are recorded.[60]

Second, rather than using a screening standard familiar to asylum officers (such as the "significant possibility" standard used for credible fear interviews or the "reasonable possibility" standard used for reasonable fear interviews to screen for possible withholding or deferral of removal claims), *non-refoulement* screenings for MPP applied a more restrictive "more likely than not" standard.[61]  Under this standard, noncitizens had to demonstrate to an asylum officer that it was more likely than not that they would be persecuted or tortured if returned to Mexico in order to avoid a return to Mexico—a higher substantive standard than they would ultimately have had to establish to secure asylum and the same substantive standard they would have had to establish to an immigration judge if they were ineligible for asylum but were seeking withholding or deferral of removal under the INA or regulations implementing CAT.

Third, the Department did not initially allow counsel to participate in the *non-refoulement* interviews.[62]  This differs from how fear interviews are conducted during the expedited removal process; in that context, noncitizens receive at least at 48-hour period to find and consult with a legal representative.[63]  Eventually, and in part as response to a district court order, these restrictions were eased.[64]

---

[60] *See* 8 C.F.R. § 235.3(b)(2). Importantly, even if migrants processed for MPP expressed a fear of repatriation to their home country, they were never asked about any fear of being returned to Mexico. Assessing this feature of the program, Judge Watford of the U.S. Court of Appeals for the Ninth Circuit stated in *Innovation Law Lab* that it was "virtually guaranteed to result in some number of applicants being returned to Mexico in violation of the United States' *non-refoulement* obligations," as many individuals returned under MPP who feared persecution or torture in Mexico would "be unaware that their fear of persecution in Mexico is a relevant factor in determining whether they may lawfully be returned to Mexico, and hence is information they should volunteer to an immigration officer. *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 511 (9th Cir. 2019) (Watford, J. concurring).

[61] Prior to MPP implementation, this standard had been used almost exclusively by immigration judges to adjudicate statutory withholding of removal or withholding or deferral of removal under regulations implementing the Convention Against Torture (CAT). *See* 8 C.F.R. §§ 208.16(a), (c)(4); 208.17(b)(1); 208.31(c); 1208.16(b); 1208.17(b). It was, as a result, not a standard that had previously been used by asylum officers in the screening context, which resulted in additional, burdensome training and implementation requirements.

[62] U.S Citizenship and Immigration Services, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*, PM-602-0169 3 (Jan. 28, 2019) ("DHS is currently unable to provide access to counsel during the [*non-refoulement*] assessments given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals."). This differs from how fear interviews are conducted during the expedited removal process; in that context, noncitizens receive at least at 48-hour period to find and consult with a legal representative. *See* Form M-444, Information about Credible Fear Interview (May 17, 2019).

[63] *See* Form M-444, Information about Credible Fear Interview (May 17, 2019).

[64] *Doe v. Wolf*, 432 F. Supp. 3d 1200 (S.D. Cal. 2020). Previously retained counsel were permitted to participate in *non-refoulement* interviews conducted at Immigration Hearing Facilities (IHFs) in Laredo and Brownsville as of December 2019 and within the Ninth Circuit in January 2020. Supplemental guidance issued in December 2020 expanded this access to counsel to all MPP locations and required DHS to ensure the ability of retained counsel to participate telephonically in USCIS' MPP *non-refoulement* assessments, but only "where it does not delay the interview, or is required by court order." Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols, *supra* note 30, at 1-2.

15

Fourth, in practice, there were multiple challenges and inconsistencies in the implementation of *non-refoulement* screenings.  The Red Team Report emphasized the need for standard operating procedures to ensure consistency and address problems such as the use of a "pre-screening process" by CBP personnel at some locations that "preempt[ed] or prevent[ed]" USCIS from ever having cases referred for a determination.[65]  The report additionally noted that some CBP officials "pressure[d] USCIS to arrive at negative outcomes when interviewing migrants on their claim of fear of persecution or torture."[66]

Moreover, throughout the use of MPP, more than 2,500 individuals raised fear claims at multiple points in this process, leading to multiple screenings for those individuals during the pendency of their cases.[67]  These kinds of unproductive, redundant screenings are a drain on resources that may be more likely to occur in MPP as individuals are returned to Mexico multiple times over the pendency of a single removal proceeding, often to unsafe conditions.

For all these reasons, the Secretary has concluded that continuation of MPP in its prior form is not advisable.  These concerns likely could be addressed by policy changes that require the affirmative asking, the use of a more appropriate screening standard that protects those who face a reasonable or significant possibility of persecution or torture upon return to Mexico, the opportunity for individuals to consult with counsel prior to screenings, and better training and oversight.  But making these changes would likely lengthen the screenings and require DHS to devote additional asylum officers and detention space to these screenings, both of which are in short supply, especially as a result of challenges related to the COVID-19 pandemic.  New procedures could lengthen the screening process.  Such an approach would divert critical personnel and resources from other Administration priorities, including ongoing efforts to build a more durable, fair, and efficacious asylum system as discussed in greater detail in Section IV. The additional burdens that would be required to implement a *non-refoulement* process acceptable to the Department weigh against retention of MPP.  Moreover, even if making these changes better protected individuals from being returned to persecution or torture, it would not protect people from generalized violence or other extreme hardships that have no nexus to statutorily protected grounds, and that have been experienced by many returnees.

## C.  Access to Counsel, Notice of Hearings, and Other Process Concerns

Individuals in MPP faced multiple challenges accessing counsel and receiving sufficient information about court hearings.  First, there were several problems in communicating accurate and up-to-date information to migrants about rescheduled court hearings.  As noted in the Red Team Report, some migrants in MPP had to give up their shelter space in Mexico when they returned to the United States for their court hearings.  As a result, they were unable to provide the court an address for follow-up communications.[68]  To submit a change of address while in Mexico, migrants had to print and mail a Change of Address Form, which posed logistical challenges for individuals who lacked internet access and who could not readily print and mail

---

[65] Red Team Report, *supra* note 27, at 6.

[66] *Id*. at 4-5.

[67] Data on MPP Cases with Multiple Referrals, provided by USCIS on October 28, 2021.

[68] Red Team Report, *supra* note 27, at 7.

AR00020

documents internationally.  This made it difficult to communicate updates regarding enrollees' court cases and hearing dates.

Second, MPP enrollees faced several barriers in accessing counsel both in the United States and in Mexico.  Although MPP enrollees were permitted to meet with counsel at hearing locations prior to their hearings, these meetings were limited to a single hour before the court hearing took place.[69]  Opportunities for attorneys to meet with their clients outside of those organized at the hearing locations were limited due to, among other constraints, complications associated with cross-border communication.  Many migrants lacked access to a telephone with international coverage or other forms of technology that could be used to communicate with counsel.  Some legal services organizations also adopted policies against visiting clients in Mexico due to serious safety concerns.[70]  In addition, because hearings for the tens of thousands of people enrolled in MPP were concentrated in a handful of courts along the border, demand for legal assistance far outstripped supply.[71]

These problems are of significant concern to the Secretary.  Inadequate access to counsel casts doubt on the reliability of removal proceeding.  It also undermines the program's overall effectiveness at achieving final resolution of immigration proceedings; in several cases, noncitizens challenged adverse immigration-judge decisions on the ground that they did not have an adequate opportunity to identify and retain counsel, or to gather or present the evidence in support of their claims.[72]  More broadly, access to counsel is critical to ensuring migrants receive a full and fair hearing; this Administration recognizes the importance of access to counsel in civil contexts, including in immigration proceedings, and considers fostering legal representation and access to justice a priority.[73]

Meanwhile, some of these flaws are exceedingly challenging to fix.  While migrants could be provided additional means to communicate from Mexico with counsel by video or telephone, doing so requires a significant expenditure of resources to ensure that the appropriate technology is available in Mexico.  In-person consultations are significantly constrained by the

---

[69] *See* U.S. Immigration and Customs Enforcement, *Migrant Protection Protocols Guidance* 3 (Feb. 12, 2019).  As noted above, DHS also did not initially allow counsel to participate in *non-refoulement* interviews conducted by USCIS.

[70] *See* Brief for the Laredo Project, et al. as Amici Curiae Supporting Respondents at 20-21, *Wolf v. Innovation Law Lab*, No. 19-1212 (Jan. 22, 2021) ("The Laredo Project considered providing assistance across the border in Nuevo Laredo, but determined that it was far too dangerous. When Laredo Project attorneys took an exploratory trip across the border, the local pastor with whom they were scheduled to meet (who ran a shelter for migrants) was missing; he had been kidnapped by cartel members, reportedly because he attempted to stop them from kidnapping Cuban asylum seekers.").

[71] Human Rights Watch, *We Can't Help You Here"*; *U.S. Returns of Asylum Seekers to Mexico*, July 2, 2019, https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico ("[U]nder the MPP, thousands of asylum seekers have been forcibly concentrated in El Paso and San Diego, overwhelming the limited number of immigration attorneys who practice there.").

[72] *See supra* note 35.

[73] White House, "FACT SHEET: President Biden to Sign Presidential Memorandum to Expand Access to Legal Representation and the Courts," May 18, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/05/18/fact-sheet-president-biden-to-sign-presidential-memorandum-to-expand-access-to-legal-representation-and-the-courts/.

AR00021

reality that migrants are in Mexico and space for meetings with counsel to take place at ports of entry or upon their return to court is extremely limited.  Providing migrants with additional time to consult with attorneys would likely require them to spend a night in detention, which would also place additional strain on CBP facilities that have consistently been operating over their COVID restricted capacity.  In fact, the holding areas in six out of nine Border Patrol Sectors are over COVID-capacity as of October 27, 2021.[74]

### D. Impacts of MPP on Immigration Court Appearance Rates and Outcomes

The Department's October 2019 Assessment of MPP concluded that MPP was "restoring integrity to the immigration system" by (1) providing bona fide asylum seekers the opportunity to obtain relief in months, not years, and (2) eliminating the "perverse incentives" that reward and encourage people with non-meritorious asylum claims to enter the United States.[75]  But upon further consideration and examination, the facts tell a more complex story, thus undermining the claimed benefits.

MPP did result in some removal proceedings being completed more expeditiously than is typical for non-detained cases.  Overall, 41 percent of MPP cases resulted in a final enforcement disposition as of June 30, 2021, versus 35 percent of comparable non-MPP cases.[76]  But the fact that MPP may have resolved cases more quickly does not mean that the cases were resolved fairly or accurately.  The integrity of the nation's immigration system should be assessed by whether immigration proceedings achieve fair and just outcomes, both for individuals who merit relief and those who do not. In the Secretary's judgment, the data show that MPP generally failed to meet that bar.

Importantly, noncitizens in MPP were substantially more likely to receive *in absentia* removal orders than comparable noncitizens who were not placed in MPP during the relevant time period.  Overall, of the 67,694 cases of individuals enrolled in MPP,[77] 21,818 were subject to an *in absentia* order of removal at some point during their removal proceedings—32 percent of all individuals enrolled in MPP.[78]  For comparable noncitizens who were not processed

---

[74] Data on holding area capacity by U.S. Border Patrol Sector, provided by CBP on October 28, 2021.

[75] Oct. 2019 Assessment, *supra* note 31, at 3, 6.

[76] For the purposes of this memorandum, comparable noncitizens or comparable non-MPP cases are defined as non-Mexican single adults and family units who were apprehended along the SWB between January 25, 2019, and January 20, 2021, were not enrolled in MPP and were not detained throughout the pendency of their proceedings. Data derived from DHS Office of Immigration Statistics Enforcement Lifecycle, which is based on a comprehensive person-level analysis of DHS and EOIR enforcement and adjudication records. *See* Marc Rosenblum and Hongwei Zhang, *Fiscal Year 2020 Enforcement Lifecycle Report* (Dec. 2020) [hereinafter FY 2020 Enforcement Lifecycle Report].

[77] *Id.* This is based on DHS's Office of Immigration Statistics (OIS) analysis of MPP cases; this analysis excludes 345 cases originally identified as MPP enrollees in CBP data because the records are for unaccompanied children, accompanied minors, or Mexican nationals, all of whom are ineligible for the program, or because the records could not be matched to other administrative data.

[78] In his June 1 Memorandum, the Secretary referenced a 44% *in absentia* rate for this time period. The Department has since updated its methodology for measuring *in absentia* rates in two important ways. First, the Department did not count *in absentia* orders that were subject to subsequent motions to reopen or any other further action by DHS or

AR00022

through MPP during that same time period and who were also not detained for the duration of their proceedings, the *in absentia* rate was 13 percent—about two-fifths the rate of the MPP group.[79]

Moreover, an additional 6,151 MPP cases were terminated by the immigration court.[80] Courts generally issued such orders in MPP cases when a noncitizen failed to appear but the immigration judge declined to issue an *in absentia* removal given concerns that the noncitizen did not have proper notice of how to attend his or her hearing.[81]  Including these cases brings the total number of cases of individuals in MPP that involved the issuance of an *in absentia* order of removal or termination to 27,969 (41 percent of all MPP cases and nearly three-and-a-half times higher than the *in absentia* rate for comparable noncitizens not enrolled in MPP).[82]

The fact that *in absentia* removal order rates (and *in absentia* removal order rates plus termination rates) were considerably higher for MPP cases than for comparable non-MPP cases might not, by itself, indicate a problem with MPP.  For instance, the October 2019 Assessment concluded that MPP was incentivizing people without meritorious claims to voluntarily leave Mexico and return home.[83]  That assessment pointed to the fact that out of more than 55,000 MPP enrollees (at that time), only 20,000 were sheltered in northern Mexico and an additional 900 had returned home through International Organization for Migration's Assisted Voluntary Return program.

---

DOJ, thus undercounting the total number of *in absentia* orders that had been issued. Second, the *in absentia* rate of 44 percent only included cases in which there was a final disposition, rather than the full universe of MPP cases including those that were still pending, thus overstating the percentage. The updated numbers in this memorandum, by contrast, take into account the total number of *in absentia* orders issued in MPP cases, irrespective of whether there was a subsequent motion to reopen or other further action in the case, as well as the total number of MPP cases, including both active cases and those with a final disposition. This analysis captures all *in absentia* orders and compares them to the full set of MPP cases.

[79] *Id.*

[80] For individuals in removal proceedings under Section 240 of the INA who are not in MPP, termination of proceedings is frequently reported by DHS OIS as a form of relief because it generally marks the end of efforts to remove the noncitizen from the country. That situation is very different for noncitizens enrolled in MPP, who are outside of the country during the pendency of removal proceedings and have no basis upon which to seek admission to the United States once proceedings are terminated.

[81] *Matter of Herrera-Vasquez*, 27 I&N Dec. 825 (BIA 2020); *Matter of Rodriguez-Rodriguez*, 27 I&N Dec. 762 (BIA 2020).

[82] The district court in *Texas v. Biden* cited EOIR data indicating that *in absentia* rates in removal proceedings were also quite high in 2015 and 2017—42% and 47% percent, respectively. 2021 WL 3603341, at *21. But there are critical methodological differences between the ways in which these numbers are calculated and the *in absentia* rates presented in this memorandum. As explained in note 77, *supra*, the data presented in this memorandum measure *in absentia* rates as a share of the *total* number of cases. The EOIR data measures *in absentia* orders as a share of *completed* cases only, which excludes cases that remain ongoing that are disproportionately likely to not result in such cases. *See* Ingrid Eagley and Steven Shafer, *Measuring* In Absentia *Removal in Immigration Court*, American Immigration Council, Jan. 2021, https://www.americanimmigrationcouncil.org/research/measuring-absentia-removal-immigration-court. A recalculation of the 2015 and 2017 *in absentia* rates as a share of *total* cases referred to EOIR in those years yields rates of 21 percent and 20 percent, respectively. This is one-half the *in absentia* and termination rate found in MPP cases.

[83] Oct. 2019 Assessment, *supra* note 31, at 3.

19

AR00023

Other reports suggest, however, that individuals abandoned claims or otherwise failed to appear for proceedings because of insecurity in Mexico and inadequate notice about court hearings.[84]  The difficulties that MPP enrollees faced in Mexico, including the threat of violence and kidnapping, coupled with inadequate and unreliable access to food and shelter, likely contributed to people placed in MPP choosing to forego further immigration court proceedings regardless of whether their cases had merit.  Indeed, a number of petitions for review filed in federal courts of appeals by individuals in MPP who received *in absentia* removal orders explain their failure to appear based on serious threats to their personal safety.[85]

While individuals in MPP were more likely to receive *in absentia* removal orders than comparable noncitizens not enrolled in MPP, they were also less likely to receive relief or protection from removal.  This was true even though the decision to place someone in MPP was not linked to any assessment of the likely merits of the individual's claim.  DHS data reflect that only 732 individuals enrolled in MPP out of 67,694 cases were granted relief or protection from removal—a grant rate of just 1.1.[86]  For the comparable set of non-MPP cases from the same time period, the relief-granted rate was nearly two-and-a-half times as high (2.7 percent).[87]

The remarkably low 1.1 percent grant rate for MPP cases—the majority of which involved individuals from the Northern Triangle countries of Central America—is notable also because when MPP was first announced the Department observed that "approximately 9 out of

---

[84] *See, e.g.*, Kevin Sieff, "They missed their U.S. court dates because they were kidnapped. Now they're blocked from applying for asylum.," Washington Post, Apr. 24, 2021; Camilo Montoya-Galvez, "'Leave me in a cell': The desperate pleas of asylum seekers inside El Paso's immigration court," CBS News, Aug. 11, 2019, https://www.cbsnews.com/news/remain-in-mexico-the-desperate-pleas-of-asylum-seekers-in-el-paso-who-are-subject-to-trumps-policy/.

[85] *See, e.g.*, *Tabera-Columbi v. Garland*, No. 20-60978 (5th Cir. filed Oct. 26, 2020) (noting that MPP enrollee had been sexually assaulted by the police and was in a hospital as a result on the morning of the hearing); *Quinones Rodriguez v. Garland*, No. 20-61204 (5th Cir. filed Dec. 17, 2020) (describing an individual who did not attend the MPP hearing because he was hiding from gangs who threatened to kidnap him on his way to the hearing); *Miranda-Cruz v. Garland*, No. 21-60065 (5th Cir. filed Feb. 1, 2021) (describing a family that was kidnapped en route to an MPP hearing and held for ransom); *see also* Hamed Aleaziz and Adolfo Flores, "They Missed Their US Asylum Hearings Fearing the Cartel Would Kill Them. Now They're Stuck in Mexico," Buzzfeed, May 18, 2021.

[86] Relief or protection from removal is defined to include EOIR grants of asylum, grants of relief in non-asylum removal proceedings, withholding of removal, or conditional grants; DHS grants of Special Immigrant Juvenile (SIJ) status, lawful permanent residence, S, T, or U nonimmigrant status, and Temporary Protected Status (TPS); the exercise of DHS prosecutorial discretion; and decisions made by DHS that the subject is a U.S. citizen or lawfully present noncitizen not subject to removal. *See* FY 2020 Enforcement Lifecycle Report, *supra*, note 75.

[87] As discussed in note 79, this figure includes cases that were terminated. For those located in the United States, termination ends removal proceedings and effectively allows the subject to remain in the United States until further action is taken. The low relief-granted rates for both the MPP and comparable non-MPP cases are likely the result of a number of different factors. During this period, a policy was implemented that barred asylum for individuals who transited through third countries and decisions were issued that limited humanitarian protection claims based on family membership and gender; these likely depressed grant rates. *See* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019); *Matter of L-E-A-*, 27 I&N Dec. 581 (A.G. 2019), *vacated*, 28 I&N Dec. 304 (A.G. 2021); *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018), *vacated*, 28 I&N Dec. 307 (A.G. 2021). Additionally, the period of time being analyzed is both brief and recent. OIS analysis indicates that relief-granted rates tend to increase over the first three to four years after a case resulting from a credible or reasonable fear claim is initiated in immigration court. None of this, however, explains the substantial discrepancy in outcomes between MPP case and comparable non-MPP cases over the same time period. And none of this diminishes the statutory obligation to fairly assess asylum applications with the goal of producing reliable adjudications.

AR00024

10 asylum claims from Northern Triangle countries are ultimately found non-meritorious by federal immigration judges."[88]  DHS does not have a record of the methodology used to generate this "9 out of 10" statistic.  To the contrary, an analysis of EOIR case outcomes for Northern Triangle asylum-related claims originating in border encounters (i.e., all EOIR removal proceedings originating with border encounters followed by credible fear or reasonable fear claims) in the years leading up to MPP yields a relief-granted rate of about 29 percent—significantly higher than the 10 percent reflected in Department's January 2019 statement.  That relief-granted rate is more than 26 times the 1.1 percent grant rate observed for all forms of relief or protection among MPP enrollees.  These discrepancies strongly suggest that at least some MPP enrollees with meritorious claims either abandoned or were unable to adequately present their claims given the conditions faced by migrants in Mexico and barriers to legal access.[89]

Based on the Department's experience with MPP and informed by the data above, the Secretary has determined that the program did not succeed in a sufficient number of cases at achieving timely and reliable adjudication of migrants' removal proceedings.  Multiple features of MPP, especially combined with the difficulties in accessing counsel and migrants' living experience in Mexico as described above, have led the Secretary to conclude that the program deterred too many meritorious asylum claims at the expense of deterring non-meritorious claims.  Given the Administration's values, commitments, and policy preferences, the Secretary has concluded that this is an unacceptable result.  Individuals who may have abandoned meritorious protection claims should have been offered a meaningful opportunity to seek protection in the United States.  As stated above, the return-to-contiguous-territory authority at INA § 235(b)(2)(C) is predicated on the notion that individuals will be able to pursue their removal proceedings from within Mexico; the fact that so many individuals enrolled in MPP were unable to complete their proceedings due to their tenuous situation in Mexico undercuts a key requirement of the statute.  As a global leader in offering protection and resettlement to refugees, the United States also has a moral obligation to fairly consider such claims.  The Secretary is committed to ensuring meritorious claims are heard, even if that means non-meritorious claims end up being adjudicated as well.

### E.  MPP and Recidivist Irregular Re-Entries

As discussed below, CBP encounters along the SWB decreased dramatically over a number of months in which MPP was fully operational across the SWB.  But the data also show that a significant share of individuals enrolled in MPP—33 percent as of June 30, 2021—were subsequently encountered attempting to reenter the country without inspection, rather than continuing to wait in Mexico for the resolution of their removal proceedings.[90]  This rate is more

---

[88] Nielsen Release, *supra* note 14.

[89] Indeed, that conclusion is not dissimilar to the one reached in the October 2019 Assessment, when the Department found that "MPP is one among several tools DHS has employed effectively to reduce the incentive for aliens to assert claims for relief or protection, *many of which may be meritless*, as a means to enter the United States to live and work during the pendency of multi-year immigration proceedings." Oct. 2019 Assessment, *supra* note 31, at 6 (emphasis added). Implicit in this statement is an acknowledgment that some such claims do have merit.

[90] FY 2020 Enforcement Lifecycle Report, *supra* note 75. When the Department previously considered this issue in June, 27 percent of MPP enrollees had been re-encountered by CBP subsequent to their enrollment in MPP (not

21

than two-and-a-half times higher than the historical average for recidivism (defined as re-encounters within 12 months of initial apprehension) of 14 percent for individuals processed under Title 8 authorities.[91]  The high rate of repeat encounters undercuts one of MPP's key claimed advantages—namely its deterrent effect on would-be border crossers.  Contrary to such claims, the data show that MPP enrollees were much more likely try to cross the border after being returned to Mexico than individuals who were removed from the country under other Title 8 authorities.  Such re-encounters also impose significant additional work on frontline Border Patrol agents, who had to encounter, track, and process MPP enrollees multiple times—resources that could and should have been deployed to other objectives.

F.   Investments and Resources Required to Operate MPP

MPP was, according to the December 2018 announcement, intended to reduce burdens on border security personnel and resources to free them up to better protect the U.S. territory.  It was also intended to help clear the backlog of unadjudicated asylum claims.  In reality, however, backlogs in the Nation's immigration courts and asylum offices grew significantly during the period that MPP was in effect.[92]  In addition, MPP created substantial additional responsibilities on Department personnel that detracted from other critically important mission sets. This played out in numerous ways.

First, each time an MPP enrollee returns to the United States to attend a court proceeding, which could happen multiple times over the life of a case, DHS personnel are required to conduct additional rounds of processing, including biographic and biometric collection, property collection and return, and medical screenings.  None of this is required for those in removal proceedings in the United States.  The labor-intensive process of bringing migrants back into the United States for their court proceedings directly impacts staffing at the four U.S. ports of entry where migrants re-entered, taking frontline personnel away from other key missions—such as facilitating legal cross-border trade and travel.

Second, in order to implement and operate MPP, the Department devoted significant resources and personnel to building, managing, staffing, and securing specialized immigration hearing facilities (IHFs) to support EOIR.  During the period when MPP was operational during the prior Administration, IHFs cost approximately $168 million to build and operate.[93]  As part of its current efforts to comply the *Texas* court order and reimplement MPP in good faith, the Department has procured new contracts for IHFs, at a cost of approximately $14.1 million to build and $10.5 million per month to operate.[94]

---

counting encounters at POEs in connection with MPP). The increase since then reflects that individuals enrolled in MPP continued to seek entry without inspection to the United States.

[91] DHS Office of Immigration Statistics data provided on 10/29/2021.

[92] Between January 2019 and January 2021—the period when MPP was operational—the number of pending immigration court cases increased from 829,200 to 1,283,090 (a 55 percent increase). Data on pending caseload, provided by EOIR on October 28, 2021. The backlog of pending affirmative asylum claims increased over the same time period from 331,100 to 399,100. Data on the affirmative asylum backlog, USCIS Refugee, Asylum, and International Operations Directorate on October 27, 2021.

[93] DHS Office of the Chief Financial Officer analysis.

[94] Nuñez-Neto Decl., *supra* note 45, at ¶ 15.

AR00026

Third, adjudication of claims by individuals in MPP diverts asylum officers and immigration judges from other key efforts designed, as described in Section IV.B, to more effectively process cases and reduce backlogs.  As initially implemented, MPP required the training of asylum officers to learn the newly applied *non-refoulement* screening standards and support an additional adjudicative caseload.  Moreover, each time migrants came in and out of the United States for court hearings, there was another opportunity to claim fear—and another possible fear screening.  Department data shows that in the short time that MPP was operational, more than 2,500 individuals had repeat fear screenings.[95]

Fourth, the program drew on the same limited resources that non-profits and humanitarian organizations used to help other individuals in Mexico—thus focusing efforts on northern Mexico and diverting resources and services away from other parts of Mexico and the broader region.

Each of these, and other investments or resources, divest resources from other critically important Departmental missions and undercut the Department's ability to pursue longer-term, durable reform.

G.  Impact of MPP and its Termination on SWB Migration Flows

In making his determination decision, the Secretary has presumed—as is likely—that MPP contributed to a decrease in migration flows.  From January through May 2019, when MPP was used in a limited number of locations, encounters rose.[96]  But from June 2019, when DHS announced that MPP would be fully implemented along the entire SWB, through September 2019, border encounters decreased rapidly, falling 64 percent in just three months.  Border encounters continued to decrease until April 2020.  Beginning in May 2020, encounters once again started rising.[97]  At that point, individuals continued to be enrolled into MPP, however, at lower rates than previously; immigration court hearings for MPP enrollees were also suspended.

The sharp decrease in SWB encounters during the months in which MPP was fully operational is notable.  Of course, correlation does not equal causation.  And even at the height of MPP's implementation in August 2019, it was not the Department's primary enforcement tool; approximately 12,000 migrants were enrolled in MPP but more than 50,000 were processed under other Title 8 authorities.[98]  In addition, beginning in April 2019, Mexico surged its own enforcement, thus increasing their level of apprehensions and returns.  This, coupled with a range of other push and pull factors, both known and unknown, likely contributed to the decline in encounters.[99]  The relevant data is simply insufficiently precise to make an exact estimate of the extent to which MPP may have contributed to decreased flows at the southwest border.

---

[95] *See supra* note 66.

[96] U.S. Customs and Border Protection, "Southwest Land Border Encounters," https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

[97] *Id.*

[98] DHS OIS analysis of U.S. CBP administrative records.

[99] *See* Congressional Research Service, *Mexico's Immigration Control Efforts* (May 28, 2021).

AR00027

That said, the Secretary has, nonetheless, evaluated MPP on the premise that it contributed to decreased flows.[100] Even so, the Secretary has concluded that this benefit cannot be justified, particularly given the substantial and unjustifiable human costs on the migrants who were exposed to harm while in Mexico, and the way in which MPP detracts from other regional and domestic goals and policy initiatives that better align with this Administration's values while also serving to manage migratory flows, as described in Section IV.

H.  Addressing the Concerns of States and Border Communities

In the course of litigation, plaintiffs have alleged that the Secretary's June 1 Memorandum failed to consider the additional costs that States would allegedly incur as a result of the decision to terminate MPP.  Texas and Missouri, for example, argued—and the district court found—that the termination of MPP could lead to an increased number of noncitizens without proper documentation in their States, which might cause the States to incur additional costs related to the costs of driver's licenses, public education, state-funded healthcare, and law enforcement and correctional costs.[101]  State-plaintiffs also alleged that terminating MPP led to an increase in organized crime, human trafficking, and drug cartel activity, specifically with respect to the illegal trafficking of fentanyl.[102]  And State-plaintiffs further claimed that they had developed "reliance interests" dependent on the continued operation of MPP.

The Secretary takes these concerns seriously.  He has sought to understand and address the impacts that Departmental policies and practices may have on communities and has consulted with numerous state and local officials from across the SWB about the Department's border management strategy, including the decision to terminate MPP.  The Secretary has, as a result taken and will continue to take, steps designed to minimize adverse consequences of any policy shifts on border states.

Prior to the district court's injunction, for example, the Department facilitated the safe and orderly entry into the United States of about 13,000 individuals previously enrolled in MPP for purposes of participating in their removal proceedings.  Prior to doing so, however, the Department ensured that these individuals received COVID-19 tests before crossing the border and entering the United States.  The Department also worked in close partnership with nongovernmental organizations and local officials in border communities to connect migrants with short-term supports that facilitated their onward movement to final destinations away from the border.

---

[100] The district court faulted the Secretary for not taking into account alleged warnings to members of the Biden-Harris transition team by career DHS officials that terminating MPP would cause a spike in border encounters. *Texas*, 2021 WL 3603341, at *7. The Department is unaware of any such specific conversations, yet is aware of, and has taken into account, similar concerns raised by others.

[101] *See Texas*, 2021 WL 3603341, at *9-10.

[102] First Amended Complaint at 2, 38-39, *Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex. filed June 3, 2021); *see also* Complaint, *West Virginia v. Biden*, No. 2:21-cv-22 (N.D. W.Va. filed Aug. 19, 2021); First Amended Complaint, *Arizona v. Mayorkas*, No. 2:21-cv-617 (D. Ariz. filed July 12, 2021).

AR00028

In addition, the Secretary has devoted extensive resources on efforts designed to stop trafficking networks and protect border states from risks associated with criminal activity. Shortly after assuming office, the Secretary directed FEMA to increase funding for SWB law enforcement through FEMA's Operation Stonegarden, a $90 million grant that supports law enforcement partners, with more than 80% of such funds being been directed to SWB areas. Multiple and significant narcotics seizures have resulted from this initiative.[103]  The Secretary also directed DHS to work with GOM partners on joint law enforcement operations designed to attack the smuggling and trafficking organizations.  Operation Sentinel, which was launched in April, is a key example of these efforts—a multifaceted counter-network operation focused on identifying and taking law enforcement actions against transnational criminal organizations involved in the facilitation of mass migration to the SWB of the United States.  Working with the GOM, DHS law enforcement has identified over 2,200 targets associated with transnational criminal organizations and revoked multiple visas and Trusted Traveler memberships, blocked bank accounts, and blocked certain entities from conducting business with the U.S. government.[104]

These efforts build on the Department's longstanding partnership with state, local, territorial, and tribal (SLTT) governments and law enforcement agencies, including many on the SWB, to address transnational crime, including human smuggling and trafficking.  ICE's Homeland Security Investigations, for example, operates 79 Border Enforcement Security Task Forces nationwide, staffed by more than 700 State and Local law enforcement officers, that work cooperatively to combat emerging and existing transnational criminal organizations.  Operational successes resulted in the seizure of 2,503 weapons, 215,301 pounds of narcotics, and $104,742,957 in FY20.[105]  The ICE Criminal Apprehension Program also helps SLTT law enforcement partners better identify, arrest, and remove priority noncitizens who have been convicted of crimes in the United States and are incarcerated within federal, state, and local prisons and jails.  In FY21, ICE issued 65,940 immigration detainers to noncitizens booked in jails or prisons.[106] All such activities are ongoing.

The Department also has carefully reviewed the available information and has not seen any evidence that MPP had any effect on human trafficking and crime, including drug trafficking.  Seizures of narcotics, while not necessarily indicative of trafficking activity, are nonetheless the best available data, and do not show any impact related to MPP's implementation.  Seizure of narcotics between ports of entry have declined steadily from FY18 to FY21, including a decline of almost 40 percent since the point in time when MPP was fully implemented, through FY21, a time MPP was largely not being implemented.[107]  These declines have been driven by a substantial decrease in marijuana smuggling.  Meanwhile, hard narcotics, including cocaine, methamphetamine, heroin, and fentanyl, are historically smuggled through ports of entry and thus have very little connection to MPP's implementation.  Seizure trends for

---

[103] FEMA data on Operation Stonegarden provided on Oct. 28, 2021.

[104] CBP data on Operational Sentinel, provided on Oct. 28, 2021.

[105] ICE data on Border Enforcement Security Task Forces, provided on Oct. 28, 2021.

[106] ICE data on the Criminal Apprehension Program, provided on Oct. 28, 2021.

[107] Analysis of CBP data on drug seizures by U.S. Border Patrol agents, https://www.cbp.gov/newsroom/stats/drug-seizure-statistics.

hard drugs at ports of entry have been mixed, with fentanyl and methamphetamine seizures increasing substantially year on year since FY18, cocaine seizures remaining largely flat, and heroin seizures substantially higher in FY19 and FY21 than in FY18 and FY20.[108]

Meanwhile, the fact that some noncitizens might reside in the United States rather than being returned to Mexico and thus access certain services or impose law enforcement costs is not, in the Secretary's view, a sufficiently sound reason to continue MPP. Federal immigration policy virtually always affects the number of people living within the States. Notably, not all of those burdens are borne by border States—many noncitizens proceed to interior States; others are detained by the federal government. In this case, the Secretary has made the judgment that any marginal costs that might have been inflicted on the States as a result of the termination of MPP are outweighed by the other considerations and policy concerns; it is also the Secretary's view that the other policies and initiatives being pursued by this Administration will ultimately yield better outcomes than MPP.

Moreover, even after his many consultations, the Secretary is unaware of any State that has materially taken any action in reliance on the continued implementation (or in response to the prior termination) of MPP. State-plaintiffs in the litigation also have not identified any specific actions they took in reliance on MPP.[109] Moreover, any claimed reliance interest is undermined by the fact that the program itself is discretionary, as are decisions to detain or parole individuals into the country. *No* administration has ever done what State-plaintiffs in the litigation argue is required here—detain or return to Mexico everyone that the Department encounters along the border. States cannot have a reliance interest based on something that has never previously been implemented. Notably, only 6.5 percent of noncitizens encountered along the SWB and processed through Title 8 were enrolled in MPP during the period it was in place. In no month when MPP was operating—including in August 2019, the month with the highest number of MPP enrollments—were more than one-in-five noncitizens encountered at the SWB and processed through Title 8 placed in MPP.[110] The short time in which MPP was in place, as well as the small percentage of noncitizens encountered along the SWB who were enrolled in MPP while it was in operation, undercut any claimed reliance interest, as well as any claim regarding significant burdens to the States.

I.   Relationship between Implementation of MPP and Statutory Mandates

In enjoining the June 1 Memorandum, the district court faulted the Department for not considering the impact terminating MPP would have on the Department's ability to comply with the detention requirements in 8 U.S.C. § 1225.[111] In so doing, the district court accepted plaintiffs' argument that, pursuant to 8 U.S.C. § 1225, DHS has two options with regard to

---

[108] *Id.*

[109] The district court in *Texas* also discussed a purported "agreement" that the Department entered into with the State of Texas and several other states in early January 2021. *Texas*, 2021 WL 3603341, at *6-7. As the Department has explained in litigation, those documents were void *ab initio* and unenforceable. Any reliance on those documents is therefore unreasonable. To the extent those documents were ever valid, the Department has since terminated them and, in any event, Texas conceded in litigation that the "agreement" was no longer binding as of August 1, 2021.

[110] DHS OIS analysis of CBP administrative records.

[111] *Texas*, 2021 WL 3603341, at *21-23.

AR00030

noncitizens seeking asylum at the border: (1) mandatory detention or (2) return to a contiguous territory.[112]  This is a clear misreading of the statute for all of the reasons explained at length by the U.S. Government in the litigation—including a misreading of Section 1225 to effectively mandate detention of all those who are not subject to the contiguous-territory-return provision of 8 U.S.C. § 1225(b)(2)(C) if the agency lacks detention capacity to detain all noncitizens not otherwise subject to contiguous territory return.  It is also completely at odds with the history of immigration detention in this country, and the agency's consistent and longstanding interpretation of its statutory authorities.  Section 1225(b)(2)(C) is discretionary, and nothing in section 1225's text or history suggests any relationship between Congress's grant of return authority and section 1225's detention provisions.

Section 1225 does not impose a near-universal detention mandate for all inadmissible applicants for admission either as a general matter or conditionally where noncitizens are not returned to a contiguous territory.  Section 1225 "does not mean" that every noncitizen "must be detained from the moment of apprehension until the completion of removal proceedings."[113]  The INA provides DHS with latitude for processing noncitizens beyond returns or detention.  DHS "may ... in [its] discretion" release a noncitizen placed in Section 1229a proceedings through "parole," pursuant to 8 U.S.C. § 1182(d)(5) "for urgent humanitarian reasons or significant public benefit."[114]

Pursuant to Section 1182(d)(5)'s parole authority, Congress has expressly granted DHS the broad authority to release applicants for admission from detention as an exercise of the Department's parole power.  That power has been exercised for as long as the federal government has been regulating immigration.[115]  Indeed, Congress enacted 8 U.S.C. § 1182(d)(5) as a "codification of the [prior] administrative practice."[116]  And in the decades since, immigration agencies have continued to broadly exercise their parole power to release certain noncitizens from detention.  Notably, the statute does not set any limit on the number of individuals DHS can decide to release on parole.  Nor does it provide that the agency cannot rely on its limited resources and detention capacity to release noncitizens otherwise subject to detention under section 1225.  Rather, Congress simply required that parole decisions be made on a case-by-case basis and that they be based on "urgent humanitarian reasons" or "significant public benefit."[117]  As the statute does not define those ambiguous terms, Congress left it to the

---

[112] *Id*. at *22.

[113] *Matter of M-S-*, 27 I&N Dec. 509, 516-517 (A.G. 2019); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018).

[114] 8 U.S.C. § 1182(d)(5)(A); *see* 8 C.F.R. §§ 212.5(b), 235.3(c). Additionally, "pending a decision on whether the alien is to be removed" and "[e]xcept as provided in [§ 1226(c)]," noncitizens present in the United States "may" be released on "bond" or "conditional parole." 8 U.S.C. § 1226(a)(2)(A)-(B).

[115] *See, e.g.*, *Nishimura Ekiu v. United States*, 142 U.S. 651, 651, 661 (1892) (discussing release of noncitizen to care of private organization); *Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (same).

[116] *Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958).

[117] In a section entitled "Limitation on the Use of Parole," Congress amended the parole statute in 1996 to recharacterize the permissible purposes of parole from "emergent reasons or for reasons deemed strictly in the public interest" to "*only on a case-by-case basis* for urgent humanitarian reasons or significant public benefit." Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, §§ 302, 602, 110 Stat 3009 (emphasis added). But it did not otherwise alter DHS's parole authority and did not define these manifestly ambiguous statutory terms. Accordingly, after the 1996 amendment to the parole statute, the agency

agency to define them.[118]   In implementing section 1182(d)(5), the agency has long interpreted the phrase "significant public benefit" to permit it to parole noncitizens "whose continued detention is not in the public interest as determined by" specific agency officials.[119]   And in turn, the agency has for decades viewed detention as not being in the "public interest" where, in light of available detention resources, detention of a specific noncitizen would limit the agency's ability to detain another noncitizen whose release may pose a greater risk of flight or danger to the community.[120]

Moreover, no administration has *ever* interpreted or implemented 8 U.S.C § 1225, as the district court in *Texas* has read it, to require the detention of virtually all inadmissible applicants for admission, except for those returned to Mexico.  The Department does not have—and has never had under any prior administration—sufficient detention capacity to maintain in custody every single person described in section 1225.  In September 2021, for example, CBP encountered approximately 192,000 individuals along the SWB.[121]   And as discussed above, even in August 2019, when MPP enrollments were at their zenith, CBP encountered nearly 63,000 individuals along the SWB.  Meanwhile, ICE Enforcement and Removal Operations (ERO) is generally appropriated for approximately 34,000 detention beds nationwide with some modest fluctuation from year to year.

This variance between border crossings and detention capacity is not new and was in fact the reality even when MPP was in place (see Appendix 1).  From Fiscal Years 2013 to 2019, nearly three-quarters of single adult and family unit members who were encountered at the SWB were either never placed in or released from detention during the pendency of their proceedings—more than 1.1 million (41 percent) were never booked into ICE detention and nearly 900,000 (33 percent) were booked in for a period of time but released prior to the conclusion of their removal proceedings.[122]   Even during the period that MPP was in effect from late January 2019 to January 20, 2021, more than two-thirds of single adults and individuals in family units encountered along the SWB and processed through non-MPP Title 8 authorities— more than 650,000 individuals—were never detained or released from ICE custody during the

---

incorporated the new "case-by-case" requirement into its regulation, while also maintaining its longstanding regulatory authority to release when "continued detention is not in the public interest," 8 C.F.R. § 212.5(b)(5), which remained consistent with the statute after the 1996 amendment. Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312, 10,313 (Mar. 6, 1997).

[118] 8 U.S.C § 1103(a)(1); *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984); *cf., e.g., Ibragimov v. Gonzales*, 476 F.3d 125, 137 n.17 (2d Cir. 2007) (deferring to another aspect of same parole regulation).

[119] 8 C.F.R. § 212.5(b)(5).

[120] *See, e.g., Interim Guidance for Implementation of Matter of M-S*, 27 I&N Dec. 509 (A.G. 2019): Parole of Aliens Who Entered Without Inspection, Were Subject to Expedited Removal, and Were Found to Have a Credible Fear of Persecution or Torture; ICE Policy No. 11002.1, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009); *see also Jeanty v. Bulger*, 204 F. Supp. 2d 1366, 1377-78 (S.D. Fla. 2002) (referring to INS detention use policies, including parole policies, based on having to establish "priorities for the use of limited detention space"), *aff'd*, 321 F.3d 1336 (11th Cir. 2003).

[121] Southwest Land Border Encounters, *supra* note 95.

[122] FY 2020 Enforcement Lifecycle Report, *supra*, note 75.

AR00032

duration of their proceedings; a full 42 percent (more than 415,000 individuals) were never booked into ICE detention at all.[123]

By interpreting Section 1225 to mandate either detention or return to Mexico, the court essentially concluded that every single administration since 1997 has repeatedly and consistently violated Section 1225, by exercising the parole authority to release noncitizens detained under that authority, on a case-by-case basis, where detention of a specific noncitizen would limit the agency's ability to detain another noncitizen who release may pose a greater risk of flight or danger to the community.  There is no indication that Congress, in enacting Section 1225, intended to *require* the Secretary to use the explicitly *discretionary* return authority found in 8 U.S.C. § 1225(b)(2)(C) for virtually any noncitizen the Department fails to detain because of resource limitations.[124]  Rather, the decision to use the authority found in 8 U.S.C. § 1225(b)(2)(C) is entrusted to the Secretary's discretion and to his discretion alone.  Given these clear statutory authorities, and DHS's longstanding interpretation of the ambiguous parole statute, the Secretary's decision to terminate MPP creates no conflict with the detention authorities in Section 1225.

## J.   Impact on U.S.-Mexico Relationship

Mexico is a sovereign nation.  This means that the U.S. Government cannot return individuals to Mexico without an independent decision by the GOM to accept their entry.  It was for good reason that MPP was put into effect only *after* the U.S. government had conducted diplomatic engagement with GOM and *after* the GOM announced its independent decision to accept returnees.  The initiation of MPP required substantial diplomatic engagement in 2019; it does in 2021 as well.[125]

In deciding to accept returns of non-Mexican nationals under MPP, the GOM agrees to shoulder the burden of receiving these individuals, facilitating legal status and shelter, and accounting for their safety and security.  Not only does this place a great deal of strain on the GOM's ability to provide services for its own citizens and lawful residents, it diverts Mexican law enforcement resources from other missions that are important to the United States—

---

[123] *Id*. Indeed, when the last Administration created MPP, it expressly excluded from its coverage as a matter of discretion certain noncitizens, including citizens or nationals of Mexico, returning lawful permanent residents seeking admission, noncitizens with known physical or mental health issues, and other noncitizens. DHS, "Migrant Protection Protocols (Trump Administration Archive)," https://www.dhs.gov/archive/migrant-protection-protocols-trump-administration.

[124] Congress is aware that it would need to appropriate substantial additional funds to detain everyone potentially subject to detention under Section 1225; yet, it has never done so. *See* 8 U.S.C. § 1368(b) (providing for bi-annual reports to Congress on detention space, including estimates on "the amount of detention space that will be required" during "the succeeding fiscal year"). Although Congress has amended Section 1225 since 1996, *see* Pub. L. 110-229, 122 Stat. 754, 867 (2008), it has never amended Section 1225 to mandate the use of return authority when the agency lacks resources to detain all applicants for admission or to override the agency's longstanding interpretation permitting the use of parole to address capacity limitations as a significant public benefit. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative … interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

[125] *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act*, *supra* note 13.

AR00033

including addressing transnational organized crime networks and root causes of migration.  Over the past nearly three years, MPP has played an outsized role in its policy and operational engagement with GOM, thus distracting from other diplomatic initiatives and programs concerning migration flows.  These engagements, which have increased substantially in tempo and intensity since the court's order, require enormous amounts of time to prepare for and execute, and involve the same individuals at DHS and DOS who would otherwise be working on advancing other key bilateral priorities.

The Department is eager to expand the focus of the relationship with GOM to address broader issues related to migration to and through Mexico.  This includes implementing the bilateral economic and security frameworks adopted in September and October 2021, respectively;[126] addressing the root causes of migration from Central America; improving regional migration management; enhancing protection and asylum systems throughout North and Central America; and expanding cooperative efforts to combat smuggling and trafficking networks, and more.  Terminating MPP will, over time, help to broaden the United States' engagement with the GOM to address these critical efforts, which we expect will produce more effective and sustainable results than what we achieved through MPP.  It will also provide more space and resources to address the many other bilateral issues that fall within DHS's diverse mission, such as countering transnational organized crime, cybersecurity, trade and travel facilitation, cargo and port security, emergency management, biosurveillance, and much more.

## IV.     The Biden-Harris Administration's Affirmative Efforts to Enhance Migration Management

In December 2018, when DHS announced the start of MPP, the Department stated that MPP was expected to provide numerous benefits for the immigration system, including reducing false asylum claims, more quickly adjudicating meritorious asylum claims, clearing the backlog of unadjudicated asylum applications, and, perhaps most importantly, stemming migration flows across the SWB.  All of these goals remain top priorities for the Department and Administration.  But the Secretary assesses that there are ways to advance these goals through means other than MPP—through policies and practices that will more effectively and more humanely achieve the stated goals than continuing to implement MPP as designed or in modified form.

Not only has MPP failed to deliver many of its promised benefits, but the burden and attention required to reimplement and maintain MPP will undermine the Department's efforts to address irregular migration and achieve lasting reform of the asylum system through other means.  As noted earlier, the Secretary is undertaking this review on the premise that MPP was responsible for a share of the significant decrease in SWB encounters that occurred during many months of MPP's operations.  However, MPP is not the only, and certainly not the preferred, means of tackling irregular migration.  To the contrary, the Department is currently pursuing a range of other measures that it anticipates will disincentivize irregular migration in ways that are

---

[126] White House, "Joint Statement: U.S.-Mexico High-Level Security Dialogue," Oct. 8, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/08/joint-statement-u-s-mexico-high-level-security-dialogue/; White House, "Fact Sheet: U.S.-Mexico High-Level Economic Dialogue," Sept. 9, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/09/09/fact-sheet-u-s-mexico-high-level-economic-dialogue/.

AR00034

more consistent with this Administration's values and enduring, including by addressing root causes and building regional solutions.  In addition, the Department is committed to channeling migration through safe and orderly pathways and reforming our asylum adjudication system to achieve more timely, fair, and efficient results,

In July 2021, the Administration released a Blueprint describing its overarching strategy—as well as the concrete steps that will be taken—to ensure a secure, humane, and well-managed border, implement orderly and fair asylum processing, strengthen collaborative migration management with regional partners, and invest in the root causes of migration in Central America.[127]  The Administration, with DHS playing a critical role, has made significant investments and taken substantial actions to move forward with its strategy.

   A.  <u>Managing Flows</u>

The current Administration is pursuing a comprehensive vision for managing migration and facilitating safe, orderly, and legal pathways for individuals seeking protection or intending to migrate.[128]  A key part of this vision involves disincentivizing unlawful entries by robustly enforcing our laws at the land border while also ensuring the humane and lawful treatment of those who do arrive in the United States.  Doing so requires a concerted effort to address root causes of migration, provide alternative protection solutions in the region, enhance lawful pathways for migration to the United States, and streamline the fair adjudication of asylum claims at the border—efforts that the Department has determined will be more effective at reducing irregular migration than continuing to implement MPP.

To disincentivize irregular migration, the Administration is pursuing a multi-pronged approach.  At our border, we are employing expedited removal to rapidly, but humanely, return certain individuals and families that are encountered unlawfully crossing between POEs.  Those who do not express fear of persecution or torture, and who are nationals of countries that allow electronic nationality verification (ENV), are returned to their countries within a few days of being encountered.  DHS is working closely with the Department of State to expand the use of these ENV agreements throughout the hemisphere to more expeditiously facilitate removals of individuals who do not claim a fear of persecution or torture.  The Department additionally treats any noncitizen who unlawfully entered the United States on or after November 1, 2020, as a presumed border security enforcement and removal priority under current guidance,[129] as well as in guidance that will become effective on November 29, 2021.[130]

---

[127] White House, "Fact Sheet: The Biden Administration Blueprint for a Fair, Orderly and Humane Immigration System," July 27, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/27/fact-sheet-the-biden-administration-blueprint-for-a-fair-orderly-and-humane-immigration-system/.

[128] EO 14010 directed the creation of a Root Causes Strategy and Collaborative Migration Management Strategy. Published in July 2021, the strategies articulate a bold and comprehensive vision for managing migration throughout the Western Hemisphere. *Id.*

[129] Memorandum from Tae D. Johnson, Acting Director, ICE, *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* (Feb. 18, 2021).

[130] Memorandum from Alejandro Mayorkas, Sec'y of Homeland Security, *Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021).

AR00035

Recognizing that the management of migration is a shared responsibility among sending, transiting, and receiving countries, the Administration is also working with our partner countries across the region to manage migratory flows.  As part of these efforts, the United States is working bilaterally and multilaterally with countries across the Western Hemisphere, seeking to encourage humane border enforcement and enhance legal pathways throughout the region.  DHS is also working closely with the Department of State to provide additional technical assistance, mentoring, and resources to border and immigration authorities in the region, with the goal of enhancing the capability and effectiveness of our partners' efforts to identify and interdict unlawful activity.  As part of these efforts, the United States and Colombia co-hosted a regional conference on migration in Colombia on October 20, 2021 that brought together foreign ministries and immigration authorities from 17 partner nations across the hemisphere to directly address recent trends in irregular migration in the region. During this conference, countries committed to enhancing protection, combating human smuggling and trafficking, and expanding humane enforcement efforts.

The Department is also working bilaterally with countries across the region to build law enforcement capacity, tackle transborder crime, and slow migratory flows.  Beginning in April 2021, for example, DHS deployed dozens of CBP personnel to Guatemala to train and support local law enforcement units and help enhance the security of Guatemalan border crossings, checkpoints, and ports.[131]  And in October 2021, for example, the United States and Mexico agreed on joint actions to prevent transborder crime, with a particular focus on reducing arms trafficking, targeting illicit supply chains, and reducing human trafficking and smuggling.[132]  Such efforts build on the successes of Operation Sentinel, in which DHS is working with other U.S. government agencies and the GOM to identify and impose meaningful sanctions on those involved in human smuggling, including by freezing their assets, revoking their visas, and curtailing their trade activities.  DHS seeks to expand these efforts across the hemisphere, with the GOM as a key partner.  However, the senior U.S. and Mexican officials who would lead these efforts are the same officials that have spent much of the past three months negotiating the reimplementation of MPP—detracting from efforts to advance other key parts of the bilateral relationship.

The Administration is also expanding efforts to address root causes of migration and enhance legal pathways for individuals who intend to migrate, as well as building and improving asylum systems in other countries and scaling up protection efforts for at-risk groups.  These efforts reduce incentives to come to the United States to seek protection and, for those who still choose to do so, reduce incentives to cross the border unlawfully.  As part of these efforts, DHS is working with Department of State to expand efforts to build and improve asylum systems in other countries and scale up protection efforts for at-risk groups, thereby providing alternative opportunities for individuals to seek protection without making the often-dangerous journey to the SWB.

The Department of State and DHS, for example, are working to stand up Migrant Resource Centers (MRC) in key sending countries, including Guatemala, where individuals who

---

[131] CBP data on Guatemalan deployments provided on 10/29/2021.

[132] Joint Statement: U.S.-Mexico High-Level Security Dialogue, *supra* note 125.

AR00036

intend to migrate can apply for a visa or seek other available protection.[133]  The Department of State established the first MRC in Guatemala this year, and is working with international organizations to expand the MRCs to multiple locations and countries over the coming year.  The Administration is also working to continue to expand the legal pathways that are available for individuals who apply at these facilities.  We are also expanding refugee processing in Central America—including through in-country processing in Northern Triangle countries—and are helping international organizations and local non-governmental organizations identify and refer individuals with urgent protection needs to the U.S. Refugee Admissions Program and resettlement agencies in other countries.

Additionally, on March 10, 2021, DHS, in close coordination with the Department of State, restarted the Central American Minors (CAM) program to reunite eligible children from El Salvador, Guatemala, and Honduras with parents who are lawfully present in the United States. On June 15, 2021, the Departments expanded CAM eligibility to include certain U.S.-based parents or legal guardians who have a pending asylum application or U visa petition filed before May 15, 2021, thereby allowing them to file petitions on behalf of children who are nationals of El Salvador, Guatemala, or Honduras for potential resettlement in the United States.  This important program provides an avenue for children to come to the United States that would not otherwise be available, which in turn supports family unity and reduces the incentives for unlawful entry.  By restarting and expanding this safe, orderly, and lawful pathway through which children may reunite with their parent or legal guardians in the United States, CAM reduces the incentive for such vulnerable and often unaccompanied children to make the dangerous journey to the United States border.[134]

The Department also has expanded access to temporary work visas in the region, thereby providing a lawful pathway to work temporarily in the United States for individuals who might otherwise take the irregular and dangerous journey to the United States in search of economic opportunities and cross the border unlawfully.  To that end, on May 21, 2021, DHS published a temporary final rule making available 6,000 H-2B supplemental visas for temporary non-agricultural workers from Honduras, Guatemala, and El Salvador in FY21.[135]  The Administration is also working to enhance access to H-2A visas for temporary agricultural workers, for when there are insufficient qualified U.S. workers to fill these jobs.  Departments and agencies are engaged with the Northern Triangle governments, international organizations, the private sector, civil society, labor unions, and worker rights organizations to promote this program.

---

[133] *Id.*

[134] *See* "Joint Statement by the U.S. Department of Homeland Security and U.S. Department of State on the Expansion of Access to the Central American Minors Program," June 15, 2021, https://www.dhs.gov/news/2021/06/15/joint-statement-us-department-homeland-security-and-us-department-state-expansion.  Under the expanded guidance, eligible minors may apply for refugee status if they are sponsored by a parent or legal guardian in the United States who is in one of the categories: lawful permanent residence; temporary protected status; parole; deferred action; deferred enforced departure; withholding of removal; or certain parents or legal guardians who have a pending asylum application or a pending U visa petition filed before May 15, 2021.

[135] Exercise of Time-Limited Authority To Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 86 Fed. Reg. 28,198 (May 25, 2021).

AR00037

These efforts, all of which have only recently been initiated, require diplomatic engagement and investment of resources.  They will take some time to achieve substantial results.  Once fully operational, they will provide legal and regular pathways for individuals seeking protection and opportunity to work in the United States, thus reducing the need for unlawful crossings and reducing the appeal of exploitative smugglers.  By incentivizing migration through lawful channels, and disincentivizing the use of unlawful channels, these initiatives achieve several key goals of MPP, but in a more humane way that matches the Administration's values.

   B.   <u>Managing Asylum Claims</u>

The Department also is taking a number of different steps to better manage asylum claims that will allow the United States to more humanely, and fairly, achieve some of MPP's stated benefits: reducing false asylum claims, more quickly adjudicating meritorious asylum claims, and clearing the backlog of unadjudicated asylum applications.

   1.   *Dedicated Docket*

In May 2021, DHS and DOJ jointly announced a new Dedicated Docket, designed to expeditiously and fairly conduct removal proceedings for families who enter the United States between ports of entry at the SWB.[136]  With a goal that immigration judges will generally complete cases on the Dedicated Docket within 300 days, the process is intended to significantly decrease the length of time for adjudication of such noncitizens' cases, while also providing fair hearings for families seeking asylum and other forms of relief or protection from removal. Dedicated Dockets have been established in 11 cities (Boston, Denver, Detroit, El Paso, Los Angeles, Miami, Newark, New York City, San Diego, San Francisco, and Seattle) chosen because they are common destination cities for migrants and have robust communities of legal service providers.  Once fully up and running, it is expected to adjudicate approximately 80,000 cases each year.

The Dedicated Docket serves multiple goals: It provides a mechanism for the more efficient adjudication of claims.  It ensures compliance with court proceedings through use of case management services provided through ICE's Alternatives to Detention (ATD) program.[137] It promotes efficiency and fairness in those proceedings through robust access to legal orientation for families on the docket (including group and individual legal orientations and friend-of-the-court services for unrepresented individuals).  And, as MPP was designed to do, it discourages non-meritorious claims by dramatically reducing the amount of time that a noncitizen may remain in the United States while his or her claims for relief or protection are adjudicated.

---

[136] Press Release, DHS, "DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings," May 28, 2021, https://www.dhs.gov/news/2021/05/28/dhs-and-doj-announce-dedicated-docket-process-more-efficient-immigration-hearings.

[137] ICE Enforcement and Removal Operations (ERO), "Alternatives to Detention Program," https://www.ice.gov/detain/detention-management.

AR00038

Moreover, it is expected to achieve these goals in ways that avoid the pitfalls associated with MPP.  Unlike MPP, which was plagued with high *in absentia* rates, the Dedicated Docket is designed, via the use of ATD and case management services, to ensure high appearance rates and contribute to the proper functioning of our immigration system.  As of October 25, 2021, EOIR had conducted nearly 12,000 initial hearings for individuals in Dedicated Docket cases, just 4.5 percent of which had ended in issuance of an *in absentia* order of removal.[138]  ICE data reflect a 98.9% attendance rate at all hearings for individuals enrolled into ATD from the SWB from FY14 to FY21.[139]

Two immigration court locations currently hearing Dedicated Docket cases—El Paso and San Diego—are slated for use as part of the court-ordered reimplementation of MPP because of their proximity to ports of entry along the border.  To staff MPP cases, EOIR will have to either divert judges from existing initiatives such as the Dedicated Docket—which will prolong those cases and undermine the effort—or reassign other immigration judges handling other non-detained cases, which will exacerbate the 1.4 million case backlog that already exists.  It is the Department's reasoned decision—working in close partnership with EOIR—that the limited pool of asylum officers and immigration judges are best spent supporting the Dedicated Docket and other initiatives that achieve the goals of timely and fair adjudications.

### 2. *Asylum Officer Rule*

On August 20, 2021, DHS and DOJ promulgated a Notice of Proposed Rulemaking (NPRM) for the so-called "Asylum Officer Rule," which seeks to address systemic problems with the asylum system in an enduring way consistent with the Administration's values.  Specifically, it amends the procedures for credible fear screenings and consideration of asylum, withholding of removal, and CAT, so as to streamline the asylum process and address the current backlogs in the system.[140]  The comment period of this NPRM recently closed, and DHS and DOJ are currently reviewing the comments received and working on a final rule.

The proposed rule addresses the fact that the number of asylum and related protection claims at the SWB has increased dramatically over the years, that the system has not been able to keep pace, and that large immigration court backlogs and lengthy adjudicated delays are the result.[141]  As stated in the NPRM, the proposed rule also evidences this Administration's recognition that "[a] system that takes years to reach a result is simply not a functional one.  It delays justice and certainty for those who need protection, and it encourages abuse by those who will not qualify for protection and smugglers who exploit the delay for profit."[142]  The Asylum Officer Rule thus responds to the very same concerns identified by the last Administration when

---

[138] Data on the number of initial hearings for individuals on Dedicate Docket, provided by EOIR on Oct. 25, 2021.

[139] Data from ICE ERO Custody Management Division FY14, 15, 16, 17, 18, 19, 20, and 21 through Aug. 31, 2021 FAMU BP Apprehensions-Subsequently Enrolled into ATD, ISAP IV EOIR Court Appearance Rates FY14 & FY15 & FY16 & FY17 & FY18 & FY19 & FY20 & FY21 through Aug. 31, 2021.

[140] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46,906 (Aug. 20, 2021).

[141] *Id.* at 46,907.

[142] *Id.*

AR00039

it adopted MPP—and to a number of the concerns relied upon by the *Texas* court—but tackles them in a transformative and systemic way, while holding true to our laws and values.

To support the more expeditious and fair adjudication of claims, the proposed rule would transfer from immigration judges to USCIS asylum officers the initial responsibility for adjudicating asylum and related protection claims made by noncitizens who are encountered at or near the border and who are placed into expedited removal proceedings. Individuals who establish a credible fear of persecution or torture following an initial screening interview would have their applications referred to USCIS, rather than the immigration court, for further consideration of their claim. The initial credible fear interview would serve as the basis for the individual's asylum application, thereby introducing a key efficiency into the process.

Allowing cases with positive credible-fear findings to remain within USCIS for the full asylum merits adjudication, rather than being shifted to immigration judge-review, will capitalize on the investment of time and expertise developed during the screening interview and allow cases to be resolved more quickly. This will, in turn, employ limited asylum officer and immigration court resources more efficiently, reduce asylum backlogs, and protect against further expansions of the already large immigration court backlog. As currently drafted, the NPRM is also designed to include key procedural safeguards—including the ability to appeal, be represented by counsel, and present additional evidence as necessary to ensure due process, respect for human dignity, and equity. Once implemented, the Asylum Officer Rule is expected to represent a transformative and lasting shift in asylum claim processing that will ensure rapid and fair processing in a way that delivers appropriate outcomes and realistically keeps pace with the workflow.

Achieving the rule's objectives will require substantial investment in resources, training, and personnel; to fully implement this new process, USCIS will need to quadruple the current asylum officer corps.[143] Importantly, these are the same asylum officers needed to conduct *non-refoulement* interviews for MPP. Restarting MPP will likely undercut the ability to implement this new rule as designed.

It is the Department's reasoned view that these limited resources are better expended on implementing both the Dedicated Docket and the Asylum Officer Rule. Like MPP, both the Dedicated Docket and the Asylum Officer Rule are designed to render timely decisions and discourage non-meritorious claims. Unlike MPP, however, they do so without subjecting vulnerable individuals to increased risk in Mexico and without creating the inevitable barriers to accessing counsel that exist for those returned to Mexico.

## V.  Consideration of Alternatives to Terminating MPP

The Department has considered the following as alternatives to terminating MPP: First, implementing MPP in the same manner as the prior Administration. Second, implementing with modifications designed to address some of the access-to-counsel, safety, and other humanitarian considerations, consistent with demands from the GOM. (These modifications are currently

---

[143] *Id.* at 46,933.

being planned pursuant to the court's order to implement MPP in good faith.)  Third, implementing a significantly modified programmatic use of the Section 235(b)(2)(C) authority, as described below.

Reimplementation of MPP in the same manner as the prior Administration is not currently an available option.  As has been described in court filings, the United States cannot unilaterally implement MPP without the independent agreement of the GOM to accept those who the United States seeks to return.  In ongoing discussions with the GOM, the GOM has made clear it would agree to accept such returns only if certain changes were implemented, including (i) measures to ensure that cases are generally adjudicated within six months, thus limiting the amount of time individuals are waiting in Mexico; (ii) clear means of communicating to MPP enrollees accurate information about the time and date of their hearings; (iii) improved access to counsel; and (iv) better screenings to protect particularly vulnerable individuals from being returned to Mexico.  Each of these changes would, as a result, need to be made in any reimplementation.  Unless the GOM significantly changes its position, resuming the program as it existed previously is simply not possible in the foreseeable future as a matter of international diplomacy.

Moreover, the Secretary has his own independent and significant concerns about the prior implementation of MPP, including concerns about the safety and security of those returned to Mexico, deficiencies in the *non-refoulement* interview process, barriers to access to counsel, and the ways in which reimplementation of MPP would divert from other Administration goals and result in significant burdens for the Department that would limit DHS's opportunities to make other needed reforms consistent with this Administration's policy priorities.  In light of these concerns, the Secretary has decided not to resume MPP in precisely the same form as it previously existed, even if were a viable option.

As an alternative, the Secretary considered a modified implementation and enforcement plan, in the manner that the Administration is planning to start doing in the coming weeks— pending an independent decision by the GOM to facilitate returns—in order to comply with the district court's order.  As the Department moves to reimplement, it is making changes to account for GOM's concerns—changes which are designed to better protect individuals returned to Mexico and ensure, among other things, timely and accurate notice about court hearings.  In addition, the Department is evaluating what changes could be made to address the issues raised in the Red Team Report, to include changes announced by the December 2020 supplementary guidance to better ensure family unity, access to counsel during *non-refoulement* interviews, and assessment of vulnerability.  In addition, in the near term, the Department will need to put in place robust COVID-19 mitigation measures to safeguard DHS personnel, the public, and the migrants themselves from the spread of the pandemic.

The Secretary has carefully considered whether these changes would sufficiently address his concerns regarding MPP to such an extent that he would support reimplementation of a modified MPP in lieu of termination.  But ultimately he has concluded that, while helpful, they fail to address the fundamental problems with MPP—which is that it puts an international barrier between migrants and their counsel and relevant immigration court where their proceedings are pending and it places their security and safety in the hands of a sovereign nation, over which the

37

United States does not exercise control.  Further, the reimplementation of MPP diverts resources from key priorities that designed to address the same policy goals more effectively and in a more humane way, including this Administration's landmark efforts to transform our asylum system and address the root causes of migration.

A third alternative still would be to attempt to do even more to address the humanitarian and other concerns associated with MPP, thus designing a programmatic use of the Section 235(b)(2)(C) authority that aggressively tackles the humanitarian concern and is more fully aligned with the Administration's broader vision for migration management.  It is doubtful that DHS *could* adequately address these problems, given Mexican territorial sovereignty.  At best, any such effort would require the provision of significant U.S. foreign assistance to counterparts operating in Mexico to assist with housing, transportation to and from court hearings, and other protections to address safety and security concerns.  Attempting to do so would divert enormous Department of State resources away from the Administration's signature policy goals—to address the root causes and develop regional solutions for enforcing against irregular migration while providing regional approaches to lawful pathways.  Meanwhile, the fundamental flaws with MPP remain.

After careful consideration, and for all the reasons laid out in his termination memo and this explanatory document, the Secretary has concluded that there are inherent problems with the program that no amount of resources can sufficiently fix, and others that cannot be sufficiently addressed without detracting from key Administration priorities and more enduring solutions.

## VI.   <u>Conclusion</u>

In sum, continuation of MPP—even in a significantly modified format—is inconsistent with the current policy approach of this Administration.  Rather than forcing individuals to return to Mexico to await court hearings, this Administration is pursuing a range of other policies and rulemaking efforts—including regional approaches to addressing the root causes of migration and a reform of the asylum system—to better achieve the key goals of securing the border, reducing migratory flows, timely and fairly adjudicating asylum claims, and reducing the asylum backlog.  Many of these efforts are currently underway and will bear fruit over time; the resources needed to implement MPP will detract from these efforts.

It is squarely within the authority of the Secretary of Homeland Security to decide to pursue the immigration policies and practices that he believes are most effective, and to decide not to exercise the discretion granted him by Congress in Section 235(b)(2)(C) of the INA to continue MPP.  The Secretary reserves the prerogative to exercise this discretionary authority if circumstances—and the factors that led to this conclusion—change.  Until such time, the Secretary has determined that MPP is incompatible with his goals for managing migratory flows at the border, and doing so in a humane way, consistent with the Administration's values.

AR00042

**Appendix 1: Encounters by Detention, Fiscal Years 2013-2021**

| Fiscal Year | Total Encounters | Continuous detention | | Booked out prior to final outcome | | Never detained | |
|---|---|---|---|---|---|---|---|
| 2013 | 287,535 | 114,673 | 40% | 76,776 | 27% | 96,086 | 33% |
| 2014 | 338,650 | 113,005 | 33% | 102,371 | 30% | 123,274 | 36% |
| 2015 | 296,856 | 105,425 | 36% | 82,221 | 28% | 109,210 | 37% |
| 2016 | 373,506 | 105,295 | 28% | 131,147 | 35% | 137,064 | 37% |
| 2017 | 292,102 | 73,809 | 25% | 106,405 | 36% | 111,888 | 38% |
| 2018 | 360,574 | 93,449 | 26% | 149,183 | 41% | 117,942 | 33% |
| 2019 | 762,912 | 100,700 | 13% | 246,099 | 32% | 416,113 | 55% |
| 2020 | 312,794 | 61,751 | 20% | 37,981 | 12% | 213,062 | 68% |
| 2021 | 665,158 | 27,402 | 4% | 62,744 | 9% | 575,012 | 86% |
| 2013-2019 | 2,712,135 | 706,356 | 26% | 894,202 | 33% | 1,111,577 | 41% |
| 2013-2021 | 3,690,087 | 795,509 | 22% | 994,927 | 27% | 1,899,651 | 51% |
| Non-MPP Cases | 991,012 | 323,425 | 33% | 251023 | 25% | 416,564 | 42% |

*Note: Non-MPP cases are defined as single adults and family units encountered between Jan. 25, 2019, and Jan. 20, 2021, and not enrolled in MPP and not expelled under Title 42.*

Source: Data derived from DHS Office of Immigration Statistics Enforcement Lifecycle, which is based on a comprehensive person-level analysis of DHS and EOIR enforcement and adjudication records. *See* Marc Rosenblum and Hongwei Zhang, *Fiscal Year 2020 Enforcement Lifecycle Report* (Dec. 2020).

PREDECISIONAL / DELIBERATIVE

U.S. Department of Homeland Security
Washington, DC 20528



May 29, 2021

**DECISION**

MEMORANDUM FOR THE SECRETARY


THROUGH:              Kelli Ann Burriesci
                     Acting Under Secretary
                     Office of Strategy, Policy, and Plans

FROM:                David Shahoulian
                     Assistant Secretary for Border Security and Immigration

SUBJECT:             **Review and Recommendation on Migrant Protection Protocols
                     (MPP)**

## Purpose

On January 20, 2021, then-Acting Secretary David Pekoske issued a memorandum suspending enrollment in the Migrant Protection Protocols (MPP) program effective January 21, 2021, pending further review of the program.[1]  On February 2, 2021, President Biden issued Executive Order 14010, 86 Fed. Reg. 8267, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*.  In this Executive Order, President Biden directed the Secretary of Homeland Security "to promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols" and to "promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subjected to the Migrant Protection Protocols (MPP) for further processing of their asylum claims."[2]

---

[1] Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Suspension of Enrollment in the Migrant Protection Protocols Program* (Jan. 20, 2021).

[2] Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border,* 86 Fed. Reg. 8267 (Feb. 2, 2021), available at https://www.federalregister.gov/documents/2021/02/05/2021-02561/creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration.

PREDECISIONAL / DELIBERATIVE

PREDECISIONAL / DELIBERATIVE

**Subject: Review and Recommendation on Migrant Protection Protocols (MPP)**
**Page 2**

The purpose of this memorandum is to request a decision, consistent with Executive Order 14010, regarding whether the Department should terminate or modify MPP.  It is the recommendation of the Office of Strategy, Policy, and Plans (PLCY) that MPP should be terminated for the reasons discussed below.

**Background**

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1225(b)(2)(C), authorizes the Department of Homeland Security (DHS) to return to Mexico or Canada certain noncitizens who are arriving on land from those contiguous countries pending their removal proceedings before an immigration judge under Section 240 of the INA, 8 U.S.C. § 1229a.  On December 20, 2018, the Department announced its decision to initiate a novel program, under Section 235(b)(2)(C), along the Southwest Border (SWB).[3]  This particular multi-agency effort

---

[3] Section 235(b)(2)(C) was enacted in the Illegal Immigration Reform & Immigrant Responsibility Act of 1996 (IIRIRA).  The provision codified the longstanding practice of the legacy Immigration and Naturalization Service (INS) of "requiring aliens to remain in Mexico or Canada pending their exclusion proceedings."  *Matter of Sanchez-Avila*, 21 I&N Dec. 444, 450 (BIA 1996) (citation and internal quotation marks omitted).  Prior to codification in IIRIRA, there was "no explicit statutory or regulatory authority for [the] practice of returning applicants for admission at land border ports to Mexico or Canada to await their hearings." *Id.* at 464.  In IIRIRA, Congress both provided express authority for such temporary returns to Mexico or Canada and clarified that a noncitizen who is returned under that authority may be ordered removed *in absentia* if he or she fails to appear for the removal hearing after receiving sufficient notice.  *See* INA § 240(b)(5)(E), 8 U.S.C. § 1229a(b)(5)(E); *see also* 62 Fed. Reg. 444, 445 (Jan. 3, 1997) (INS) (proposing the implementing regulation at 8 C.F.R. § 235.3(d) and explaining that Section 235(b)(2)(C) "simply add[ed] to statute and regulation a long-standing practice of the Service" and that if the noncitizen returned under Section 235(b)(2)(C) "fails to appear for the hearing, the immigration judge may order the alien removed in absentia."); 8 C.F.R. § 1235.3(d) (cognate EOIR regulation).

MPP represented a significant expansion of the use of Section 235(b)(2)(C).  Prior to MPP, DHS and the former INS primarily used that authority on an ad-hoc basis to return certain Mexican and Canadian nationals who were arriving at land border ports of entry.  CBP, for instance, has invoked Section 235(b)(2)(C) to return certain Mexican nationals who are U.S. lawful permanent residents (LPRs) with criminal history that potentially subjects them to removal and LPRs who appear to have abandoned their permanent residence in the United States but are not willing to execute a Form I-407, Record of Abandonment of Lawful Permanent Residence.  At the Northern Border, CBP has used Section 235(b)(2)(C) to return certain Canadian nationals or those with status in Canada who, for instance, appear to be subject to a criminal ground of inadmissibility.

Although guidance is scant, DHS and the former INS also used Section 235(b)(2)(C) for third country nationals even prior to MPP.  For example, CBP issued field guidance in 2005 advising that a Cuban national arriving at a land border port of entry may "be returned to contiguous territory pending section 240 proceedings . . . if: (1) the alien cannot demonstrate eligibility for the exercise of parole discretion; (2) the alien has valid immigration status in Canada or Mexico; (3) Canadian or Mexican border officials express a willingness to accept the returning alien; and (4) the alien's claim of fear of persecution or torture does not relate to Canada or Mexico."  Mem. from Jayson P. Ahern, Asst. Comm'r, Office of Field Ops., CBP, *Treatment of Cuban Asylum Seekers at Land Border Ports of Entry* 2-3 (June 10, 2005).  The INS also issued guidance in 1997 and 1998 contemplating the use of Section 235(b)(2)(C) only as a "last resort" and only when the individual does not claim a fear of persecution related to Canada or Mexico.  Mem. from Michael A. Pearson, Executive Assoc. Comm'r, Office of Field Ops., INS, *Detention Guidelines Effective October 9, 1998* 3 (Oct. 7, 1998); Mem. from Chris Sale, Deputy Comm'r, INS, *Implementation of Expedited Removal* 4 (Mar. 31, 1997) (same).

CBP appears to have invoked Section 235(b)(2)(C) for certain third country nationals at land border ports of entry in other circumstances on an ad-hoc basis as well, but the practice seemed to have waned (especially along the

PREDECISIONAL / DELIBERATIVE

PREDECISIONAL / DELIBERATIVE

**Subject: Review and Recommendation on Migrant Protection Protocols (MPP)**
**Page 3**

under Section 235(b)(2)(C) was named the Migrant Protection Protocols.[4]  On January 25, 2019, DHS issued policy guidance for implementing MPP, which was subsequently augmented a few days later by guidance from U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS).[5]

Under MPP, certain non-Mexican applicants for admission who arrived on land at the SWB (primarily, but not exclusively, between ports of entry) were returned to Mexico to await their removal proceedings under Section 240 of the INA.  For those enrolled in MPP, DHS facilitated the individuals' entry into and exit from the United States to attend these proceedings, which were prioritized on the non-detained docket by the Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR).  MPP was initially piloted at the San Ysidro port of entry and San Diego Immigration Court, but subsequently expanded to apply to additional individuals encountered at or between ports of entry across the entire SWB.  DHS and EOIR operationalized the program through six ports, and individuals were processed in and out of the United States to attend their removal hearings at one of four immigration court locations in California or Texas.[6]  Due to public health measures necessitated by the COVID-19 pandemic, EOIR has been unable to conduct immigration court hearings for individuals enrolled in MPP since March 2020.[7]

According to data from DHS and EOIR, in the period between initial implementation on January 25, 2019, and when new enrollments were suspended on January 20, 2021,[8] DHS enrolled into

---

Southern Border).  Our understanding is that prior to MPP, CBP had significantly reduced its use of Section 235(b)(2)(C) for third country nationals arriving at Southern Border ports, largely due to Mexico's refusal to permit non-Mexican nationals to physically re-enter Mexican territory.  CBP also grew increasingly reluctant to use Section 235(b)(2)(C) because of the associated operational burden of having to ensure that the individuals did not abscond upon returning for their removal proceedings and therefore to make certain that OFO personnel were available to escort individuals to their hearings.

[4] *See* "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration," Dec. 20, 2018, available at https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration.  Critical to DHS's ability to implement MPP was Mexico's willingness to accept the return of such noncitizens temporarily and to provide them with documentation, known as a Forma Migratoria Multiple (FMM), that allowed them to remain in Mexico pending their U.S. removal proceedings and created an avenue for these noncitizens to request educational, medical, and other services from the Government of Mexico.  *See* Memorandum from Kirstjen M. Nielsen, Sec'y of Homeland Sec., *Policy Guidance for Implementation of the Migrant Protection Protocols* 2-3 (Jan. 25, 2019); Secretaria de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018).

[5] Guidance documents are available at the archived MPP landing page under the *MPP Guidance Documentation heading:* https://www.dhs.gov/archive/migrant-protection-protocols.

[6] MPP enrollees in the San Diego or El Paso jurisdictions attended hearings at the immigration courts in San Diego or El Paso; MPP enrollees in the San Antonio or Harlingen jurisdictions attended hearings at the Immigration Hearing Facilities (IHFs) in Laredo or Brownsville.

[7] *See* "Joint DHS/EOIR Statement on MPP Rescheduling," Mar. 23, 2020, available at https://www.dhs.gov/news/2020/03/23/joint-statement-mpp-rescheduling.

[8] Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Suspension of Enrollment in the Migrant Protection Protocols Program* (Jan. 20, 2021).

PREDECISIONAL / DELIBERATIVE

PREDECISIONAL / DELIBERATIVE

**Subject: Review and Recommendation on Migrant Protection Protocols (MPP)**
**Page 4**

MPP and returned to Mexico approximately 68,000 individuals.[9]  Currently, about 26,000 individuals enrolled into MPP continue to have removal proceedings pending before EOIR.[10]  As of late March, the remaining 42,000 individuals had closed cases; approximately 28,000 had been ordered removed *in absentia,* about 10,000 had their proceedings terminated without prejudice, and about 4,000 were ordered removed following an in-person hearing on the merits.[11]

MPP has been resource intensive, both when it was in full operation throughout 2019 and the early part of 2020 and, to a lesser extent, since March 2020 when immigration court hearings for individuals in MPP were suspended and DHS began assisting the Centers for Disease Control and Prevention (CDC) in implementing its Order under Title 42 to prevent the introduction of COVID-19 into the United States.  Additionally, it has been the subject of substantial public attention and scrutiny, including a significant amount of Congressional oversight and litigation that continues to this day.[12]  This attention and the significant amount of litigation generated by the program—including both challenges to the program and to the current Administration's suspension of the program, as well as individual appeals of removal orders secured through the program—have strained the Department's limited resources.

Consistent with Executive Order (EO) 14010, PLCY has carefully reviewed the implementation guidance and programmatic elements of MPP, as well as prior DHS assessments of the program.  PLCY has also considered whether MPP remains consistent with the policy priorities of the new Administration, which has committed to "restor[ing] and strengthen[ing] our own asylum system."[13]  Further in accord with EO 14010, DHS has worked with interagency partners and facilitating organizations to implement a new phased process for the safe and orderly entry into the United States of individuals who had been placed in MPP and are outside the United States.

Currently, individuals whose immigration proceedings remain pending before EOIR, and their immediate relatives who traveled with them, may seek entry to the United States through this phased process.  According to Department of State data, about 11,193 individuals were

---

[9] *See* "Migrant Protection Protocols Metrics and Measures," Jan. 21, 2021, available at https://www.dhs.gov/publication/metrics-and-measures.

[10] Approximately 65 percent of the 68,000 individuals initially enrolled have open cases.  In the time since the Metrics and Measures were published (Jan. 2021), approximately 2,000 more cases have been closed.

[11] MPP case resolution data, January 24, 2019-March 18, 2021, provided by the Department of Justice/Executive Office of Immigration Review on Mar. 29, 2021.

[12] *See, e.g.*, U.S. House of Representatives, Committee on Homeland Security, Subcommittee on Border Security, Facilitation, and Operation, "Examining the Human Rights and Legal Implications of DHS' 'Remain in Mexico' Policy" (Nov. 19, 2019) (detailing concerns relating to implementation of MPP during a hearing held by the House Homeland Security Committee, including insufficient access by asylum seekers to the asylum process and lawyers, sometimes resulting in missed court dates); Barnes, Robert, The Washington Post, "Supreme Court says Trump administration may continue 'Remain in Mexico' policy for asylum seekers" (Mar. 11, 2020), available at https://www.washingtonpost.com/politics/courts_law/supreme-court-trump-remain-in-mexico/2020/03/11/7abd4b9c-62d7-11ea-acca-80c22bbee96f_story.html (discussing a Supreme Court decision relating to MPP while lower court challenges continued).

[13] Exec. Order No. 14010, 86 Fed. Reg. 8267, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, 86 Fed. Reg. 8267 (Feb. 2, 2021).

PREDECISIONAL / DELIBERATIVE

PREDECISIONAL / DELIBERATIVE

**Subject: Review and Recommendation on Migrant Protection Protocols (MPP)**
**Page 5**

processed into the United States to continue their Section 240 removal proceedings between February 19 and May 25, 2021.[14]  This phased process is currently being implemented at six ports of entry along the SWB with full interagency support to uphold COVID-19 mitigation measures, update individuals' contact information, provide continuity of contact, and facilitate partnerships that assist individuals' onward movement to their final destinations.  The interagency continues to consider the possibility of expanding eligibility for other individuals who were enrolled in MPP.

<u>Discussion</u>

As outlined in President Biden's executive orders, the United States Government is committed to reforming our immigration system, addressing the root causes of migration, and ensuring safe, orderly, and humane processing at our border.  In Executive Order 14010, President Biden called for the Department to begin working with interagency partners—as well as international and non-governmental organizations—to develop policies and procedures capable of delivering a safe and orderly process through which people can request asylum at our land borders.[15]  President Biden also directed DHS to promptly consider a phased strategy for the safe and orderly entry into the United States of individuals who were enrolled in MPP, and to review MPP and determine whether to terminate or modify the program.

DHS has successfully begun the phased strategy for facilitating the safe and orderly entry of individuals enrolled in MPP into the United States.  PLCY has also reviewed the policies and procedures that constitute MPP as a program, as well as prior DHS assessments of the program, and we have considered whether it is possible to modify MPP such that it could be implemented consistent with the Biden Administration's policy objectives.

Based on PLCY's review, MPP is not the best strategy to implement the goals and objectives of the Biden Administration.  Further, PLCY's review identified a number of policy and operational challenges, discussed below, that cannot be remedied by simple programmatic adjustments.  PLCY is already at work with interagency partners on new policies and rulemakings to align more closely with the current Administration's vision for enforcing the nation's immigration laws in a safe, orderly, and humane manner.  For the reasons articulated in this memorandum, PLCY recommends that DHS terminate MPP through rescission of the applicable policy memorandum and guidance documents.

<u>Assessment of MPP</u>

In coming to this recommendation, PLCY evaluated MPP's performance against the anticipated benefits and goals articulated at the outset of MPP and over the course of the program, as well as

---

[14] Data on the number of people enrolled in MPP permitted to enter the United States, February 19-May 25, provided by the Department of State on May 26, 2021.

[15] Exec. Order No. 14010, 86 Fed. Reg. 8267, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, 86 Fed. Reg. 8267 (Feb. 2, 2021).

PREDECISIONAL / DELIBERATIVE

PREDECISIONAL / DELIBERATIVE

**Subject: Review and Recommendation on Migrant Protection Protocols (MPP)**
**Page 6**

the Department's prior efforts to identify and address challenges for the program.  Taken together, it is clear that even considering the significant personnel and resource investments made to implement the program, MPP's results were mixed and the program experienced challenges that could not be easily addressed without dramatically modifying the program's operations.  Importantly, although the previous Administration conducted its own evaluation of MPP and modified the program in some respects to ameliorate concerns, those efforts did not identify or resolve areas of concern to the Department under the current Administration.  For instance, the program's design appeared to prioritize the limitation of access to the United States and speed in completing removal proceedings over access to counsel and the provision of other procedural safeguards for adjudicating migrants' claims.

I.   Anticipated Benefits of MPP (December 2018)

Evaluating MPP against the anticipated benefits originally outlined by the Department provides a useful starting point for our review of the program.  In December 2018, when DHS announced the start of MPP, the Department stated that the program was intended to: (1) reduce illegal immigration and false claims of asylum, (2) ensure that migrants are not able to disappear into the United States prior to a court decision, (3) focus attention on more quickly assisting legitimate asylum seekers, (4) free up personnel and resources to better protect U.S. territory and clear the backlog of unadjudicated asylum applications, and (5) offer protection to vulnerable populations while they wait in Mexico for their immigration proceedings.[16]  After reviewing DHS documents, data, and internal and external reports, PLCY concluded that, even assuming the 2018 MPP goals were appropriate, MPP is not the best strategy for achieving those objectives and additionally is not the best strategy for achieving the broader policy objectives of the current Administration.

- First, based on PLCY's review of available metrics, there is insufficient evidence to conclude that MPP adequately contributed to reduced illegal immigration so as to justify the program's extensive operational burdens.  As an initial matter, during the first four months of the program from January to May 2019, border encounters actually rose dramatically.[17]  Although border encounters eventually decreased between May 2019 and May 2020,[18] these decreases coincided with multiple other policy and operational efforts aimed at decreasing border encounters.[19]  Moreover, as a policy matter, the current

---

[16] *See* "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration," Dec. 20, 2018, available at https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration.

[17] U.S. Customs and Border Protection, "Southwest Land Border Encounters," Dep't of Homeland Security, available at https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

[18] *Id*.

[19] *See, e.g.*, Brett Samuels, "Pentagon announces nearly 4,000 additional troops heading to US-Mexico border," The Hill, Feb. 3, 2019, available at https://thehill.com/policy/defense/428276-pentagon-announces-nearly-4000-additional-troops-heading-to-us-mexico-border; "Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States," Feb. 15, 2019, available at https://trumpwhitehouse.archives.gov/presidential-actions/presidential-proclamation-declaring-national-emergency-concerning-southern-border-united-states/; *Matter of M-S-*, 27 I&N Dec. 509 (A.G. 2019) (overruling *Matter of X-*

PREDECISIONAL / DELIBERATIVE

PREDECISIONAL / DELIBERATIVE

**Subject: Review and Recommendation on Migrant Protection Protocols (MPP)**
**Page 7**

Administration has articulated a vision of addressing migration throughout North and Central America, and facilitating the safe and orderly processing of asylum seekers at the SWB, in a comprehensive fashion.[20] At the core of the current Administration's policy approach is a belief that addressing the root causes of migration, providing alternative protection solutions in the region, enhancing lawful pathways for migration to the United States, and streamlining the fair adjudication of asylum claims at the border will be more effective at reducing illegal immigration than resuming MPP enrollment

- Second, according to data from the DHS Office of Immigration Statistics, based on all border encounters in Fiscal Year (FY) 2019 and FY 2020, about 27 percent of individuals enrolled in MPP were re-encountered attempting to enter without inspection.[21] When viewed together with the comparatively high rate of removal orders entered *in absentia* under MPP (44 percent of completed cases),[22] the large percentage of individuals encountered by CBP attempting to reenter the United States without inspection after enrollment in MPP raises questions about the extent to which the program actually succeeded in deterring people from attempting to enter the country illegally. Given that 27 percent of individuals in MPP were encountered while attempting a subsequent illegal entry, it seems likely that an additional share successfully entered without inspection and disappeared into the country while MPP was ongoing—the very outcome MPP was intended to avoid.

- Third, DHS originally stated that MPP was intended to focus resources on more quickly adjudicating the claims of legitimate asylum seekers and clearing the asylum backlog. Although MPP appears to have resulted in decreased adjudication times for some asylum applications, particularly when compared to average adjudication times for non-detained cases, these initial efficiency gains came with significant drawbacks. The program's focus on speed does not appear to have been matched with sufficient efforts to ensure fairness, which in addition to raising policy concerns has enhanced the risk to the finality of MPP decisions. This risk is highlighted by the many direct and collateral challenges to the final orders of removal obtained through the program that the Department is now defending against. There is also no question that MPP failed to clear the asylum backlog. Over the course of the program (and even looking only at 2019 before asylum offices and immigration courts closed as a result of COVID-19), affirmative and defensive asylum

---

*K-*, 23 I&N Dec. 731 (BIA 2005). A federal court blocked the Attorney General's decision in *Matter of M-S-* from taking effect approximately two-and-a-half months after it was issued but before it was set to go into effect, *see Padilla v. U.S. Immigration & Customs Enf't*, 953 F.3d 1134, 1143 (9th Cir. 2020). The Attorney General's decision remains subject to challenge in ongoing litigation.

[20] Exec. Order No. 14010, 86 Fed. Reg. 8267, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, 86 Fed. Reg. 8267 (Feb. 2, 2021).

[21] Source: DHS Office of Immigration Statistics Enforcement Lifecycle. Results based on source data as of December 31, 2020 and OIS Enforcement Lifecycle methodology as of February 1, 2021.

[22] *Id.*

PREDECISIONAL / DELIBERATIVE

PREDECISIONAL / DELIBERATIVE

**Subject: Review and Recommendation on Migrant Protection Protocols (MPP)**
**Page 8**

backlogs both grew.[23]  Immigration court backlogs (encompassing all individuals in proceedings) surpassed 1 million for the first time in FY 2019 and continued to grow thereafter.[24]

- Fourth, the Department originally believed that MPP would free up border security personnel and resources.  Over time, however, MPP imposed significant new responsibilities that detracted from the Department's overall mission and thus increased resource requirements.  While the program was operational, DHS needed to expend resources and take on non-traditional roles, such as building, managing, staffing, and securing specialized immigration hearing facilities (IHFs) to support EOIR; processing and temporarily paroling individuals into and out of the United States multiple times to attend immigration court hearings; and providing regular transportation to and from ports of entry in certain locations.  Each of these functions took time and effort away from other mandated DHS mission sets.  In addition, as noted earlier, the fact that individuals enrolled in MPP nevertheless sought to reenter the country without inspection at high rates also meant that CBP continued to expend resources processing these additional encounters.

- Fifth, the Department originally anticipated that MPP enrollees would receive temporary immigration status in Mexico and the ability to request certain Mexican social services while awaiting the resolution of their U.S. immigration proceedings.  Though the Government of Mexico (GOM) did make good on these commitments, the lack of durable housing arrangements, unstable income, and security concerns made it challenging for many migrants to remain in Mexico for the duration of their proceedings—particularly once immigration court proceedings were halted indefinitely due to COVID-19 (more than 14 months ago).  Further, the GOM offer of support was not sufficiently augmented by the U.S. Government's provision of foreign assistance, which was limited in scope and did not address security-related matters along the Northern Border of Mexico.  The result, contrary to the anticipated benefit of MPP, was that many people enrolled in the program were not well-situated to remain in Mexico for the time required to conclude their proceedings.

II.  Goals for MPP (July 2020)

In July 2020, some 18 months after the program started, the Department first published goals for the program on a dedicated webpage, which were supported by measures and metrics that were updated at regular intervals.[25]  The latest published data are through December 31, 2020.  The

---

[23] The affirmative asylum backlog grew during this period due to the number of asylum officers assigned to conduct credible and reasonable fear, MPP, and Asylum Cooperative Agreement interviews.

[24] Priscilla Alvarez, "Immigration court backlog exceeds 1 million cases, data group says," CNN, Sept. 18, 2019, available at https://www.cnn.com/2019/09/18/politics/immigration-court-backlog/index.html.

[25] *See* "Migrant Protection Protocols Metrics and Measures," Jan. 21.2021, available at https://www.dhs.gov/publications/metrics-and-measures.

PREDECISIONAL / DELIBERATIVE

**Subject: Review and Recommendation on Migrant Protection Protocols (MPP)**
**Page 9**

July 2020 goals were similar to, but not exactly the same as, several of the anticipated benefits articulated by the Department at the outset in December 2018.  The July 2020 goals were to: (1) streamline avenues for individuals who qualify for humanitarian protection to receive it, (2) support orderly and timely completion of immigration processes, (3) prevent releases into the United States, and (4) deter illegal entry.

Just as MPP failed to adequately achieve the original anticipated benefits of MPP in comparison to the resources required to sustain the program, MPP also did not adequately deliver on the July 2020 set of goals.  Moreover, based upon the evidence that PLCY reviewed, including the Department's own reviews of the program and data produced by the DHS Office of Immigration Statistics, serious concerns were raised early and continuously, but only limited corrective actions were taken.

- First, a key goal of the program was to prevent releases into the United States.  It is likely MPP was initially successful in achieving this goal with respect to some portion of the tens of thousands of individuals who were enrolled in the program, but that is because the program was specifically designed to deny their entry into the United States by returning them to Mexico for the duration of their removal proceedings.  As approximately 27 percent of MPP enrollees were subsequently re-encountered attempting to enter without inspection—and it is fair to assume some additional share successfully evaded detection and completed their entries—it is ultimately unclear to what extent this objective was met. More importantly perhaps, the policy determinations undergirding this goal are that (1) allowing people to pursue removal proceedings from within the United States and releasing them from DHS custody while they do so, where appropriate, should be minimized; and (2) the only options typically available are releasing individuals into the United States or returning them to Mexico.  To the first point, it has long been ICE's policy—including throughout the last Administration—that the detention of certain noncitizens is not always in the public interest and that release into the United States, including for asylum seekers who have established a credible fear of persecution or torture, can be the most appropriate decision in some situations.[26]  To the second point, other enforcement and supervision options like detention, alternatives to detention, and case management have long been, and remain, available to DHS, and allow for a far more nuanced approach to migration management than the MPP goal presumes.[27] ICE provides case management programs through its extended case management services (ECMS) and wraparound stabilization services (WSS), programs designed to increase compliance, and the evidence indicates that case management is successful.  ECMS incorporates a number of the principles developed in the Family Case Management Program that was terminated in 2017 despite producing a nearly perfect compliance rate of 99% with both ICE check-ins and immigration court appearances.[28] A recent analysis of EOIR data found that from 2008 to 2018, 83

---

[26] See, e.g., ICE Directive No. 11002.1, "Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture" (Dec. 8, 2009); see 8 C.F.R. § 212.5(b)(5).

[27] See, e.g., INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A) (allowing for the imposition of reasonable conditions on parole from custody); 8 C.F.R. § 212.5(d) (same – providing examples of such conditions).

[28] "As of March 30, 2017, ICE reported that it expended $17.5 million in program costs to enroll 781 active participants in FCMP across all five locations.  According to ICE, overall program compliance for all five regions is

PREDECISIONAL / DELIBERATIVE

**Subject: Review and Recommendation on Migrant Protection Protocols (MPP)**
**Page 10**

percent of non-detained individuals with completed or pending removal cases attended all of their hearings; that figure jumped to 96 percent when looking at those noncitizens who were represented by counsel.[29]

- Second, the July 2020 goals reiterated that MPP would reduce illegal immigration. However, as noted above, there is inadequate evidence to conclude that the program adequately deterred people from traveling to the SWB to seek entry to justify the resource commitments required for the program, and strong evidence that a substantial percentage of individuals (at least 27 percent) sought to reenter the country without inspection even after being enrolled into MPP.  The high rate of *in absentia* removal orders raises additional questions about how many of these individuals might have successfully entered the country without inspection.

- Third, the July 2020 goals stated that MPP would promote the orderly and timely completion of immigration processes and streamline the process by which eligible individuals could access humanitarian protections.  It appears that a large percentage of MPP cases were brought to conclusion, thus suggesting that immigration processes under MPP may have been more timely than those unrelated to MPP.  However, based on our review, the program's implementation did not satisfactorily account for: (1) the quality of the processes available to ensure that all individuals enrolled in MPP were able to appear at their hearings; (2) difficulties faced by some MPP enrollees with respect to access to counsel; (3) the high level of resources required to achieve streamlined outcomes and the source of those resources; and (4) whether the finality of case completions attained through MPP was vulnerable to being disrupted by appeals, petitions for review, and collateral challenges in federal court.

DHS data show that 626 individuals in MPP were granted relief—a grant rate of just 1.4 percent.[30]  Comparing the high rate of *in absentia* removal orders in MPP cases (44 percent) to that of non-MPP cases (11 percent) also raises concerns.[31]  While *in absentia* removal orders are legitimate outcomes in removal proceedings (they provide the government recourse for when migrants fail to abide by their summons to appear), the fact that they were four times more likely to occur in MPP proceedings than in other non-detained proceedings raises serious questions about the program's design and operation. In particular, a disproportionately high rate of *in absentia* removal orders raises key questions about whether the process provided individuals an adequate opportunity to

---

an average of 99 percent for ICE check-ins and appointments, as well as 100 percent attendance at court hearings." *U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract (Redacted)*," Nov. 30, 2017, OIG-18-22.

[29] Ingrid Eagly and Steven Shafer, "Measuring *In Absentia* Removal in Immigration Court," American Immigration Council (Jan. 2021), available at https://www.americanimmigrationcouncil.org/research/measuring-absentia-removal-immigration-court.

[30] Source: DHS Office of Immigration Statistics Enforcement Lifecycle.  Results based on source data as of December 31, 2020 and OIS Enforcement Lifecycle methodology as of February 1, 2021.

[31] *Id.*

PREDECISIONAL / DELIBERATIVE

PREDECISIONAL / DELIBERATIVE

**Subject: Review and Recommendation on Migrant Protection Protocols (MPP)**
**Page 11**

appear in court and present their cases, and whether conditions in Mexico alone may have caused migrants with potentially legitimate claims to abandon those claims.  In a number of cases—including several involving petitions for review currently being litigated by DHS—individuals reportedly failed to appear for their removal proceedings due to extenuating circumstances outside of their control, including the need for hospitalization after a violent assault or being a victim of kidnapping.[32]  Court challenges like these not only command government resources, but they threaten to undermine the finality of case completions obtained through MPP, further calling into question whether the anticipated efficiency gains were achieved.  Beyond the issue of whether individuals in MPP had adequate access to appear in court, the high *in absentia* rate has fueled a perception among many that the program is inconsistent with our country's values.

III. DHS' Prior Assessment of MPP (July 2019 - December 2020)

In 2019, the Department formed a committee of senior leaders across multiple components (known as a "Red Team") to conduct a "top-down review of MPP's policies and implementation strategy and provide overall recommendations to increase the effectiveness of the program."[33]  This Red Team review was intentionally composed of individuals who had "little to no involvement developing policy or with implementing MPP."[34]  The Red Team was a laudable effort that implicitly acknowledged MPP's programmatic challenges and identified 16 recommendations organized around Initial Screening and Processing; Access to Counsel and Due Process; Protection Claims; Treatment in Mexico; and Administration and Logistics.[35]  In December 2020, the Department issued supplementary policy[36] and operational guidance[37] as a result of the Red Team's recommendations.

As a threshold matter, although the Red Team process offered recommendations for improvement, there were significant delays in addressing what appear to have been fundamental concerns relating to program integrity, and the delays in addressing those recommendations further undermined their value.  For example, DHS launched a dedicated webpage to improve

---

[32] *See, e.g.*, *Tabera-Columbi v. Garland*, No. 20-60978 (5th Cir. filed Oct. 26, 2020) (noting that MPP enrollee had been sexually assaulted by the police and was in a hospital as a result on the morning of the hearing); *Quinones Rodriguez v. Garland*, No. 20-61204 (5th Cir. filed Dec. 17, 2020) (describing an individual who did not attend the MPP hearing because he was hiding from gangs who threatened to kidnap him on his way to the hearing); *Miranda-Cruz, et al., v. Garland*, No. 21-60065 (5th Cir. filed Feb. 1, 2021) (describing a family that was kidnapped en route to an MPP hearing and held for ransom).

[33] Memorandum from Kevin McAleenan, Acting Sec'y of Homeland Sec., Review of Migrant Protection Protocols Policy and Implementation (June 12, 2019).

[34] *Id.*

[35] DHS Office of Operations Coordination, *The Migrant Protection Protocols Red Team Report* (Oct. 25, 2019).

[36] U.S. Department of Homeland Security, "Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols," (Dec. 7, 2020), available at https://www.dhs.gov/publication/supplemental-policy-guidance-implementation-migrant-protection-protocols.

[37] *See* Supplemental Migrant Protection Protocols Guidance on Initial Document Service and MPP Amenability (Dec. 7, 2020) https://www.dhs.gov/publication/supplemental-policy-guidance-implementation-migrant-protection-protocols.

PREDECISIONAL / DELIBERATIVE

PREDECISIONAL / DELIBERATIVE

**Subject: Review and Recommendation on Migrant Protection Protocols (MPP)**
**Page 12**

information awareness about the program approximately 18 months after beginning the program,[38] and issued supplementary guidance to promote standardization in procedures across sectors and ports of entry approximately 22 months after the program's initiation.[39]  These delays meant that the program operated for nearly two years without the benefit of those improvements.

Beyond the recommendations themselves, the Red Team review also revealed certain operational and structural challenges that were either under-addressed or remained unaddressed, including the following:

- Use of a novel mechanism for ensuring *non-refoulement*.  For MPP, DHS developed a new and unique method for assessing whether individuals could be subject to persecution or torture if they were returned to Mexico.  Unlike with expedited removal, which similarly can result in rapid return from the United States, individuals in MPP were not questioned about their fear of persecution or torture but were instead required to affirmatively articulate such a fear with respect to return to Mexico.[40]  Additionally, rather than using a legal screening standard familiar to asylum officers (such as the "significant possibility" standard used in credible fear interviews or the "reasonable possibility" standard used in reasonable fear interviews), *non-refoulement* screenings for MPP applied the "more likely than not" standard previously used almost exclusively by immigration judges to fully adjudicate statutory withholding of removal or withholding or deferral of removal under regulations implementing the Convention Against Torture (CAT).[41]  That policy decision resulted in additional, burdensome training requirements.

- Meaningful access to counsel.  Regardless of whether access to counsel under MPP was sufficient to comply with due process, the challenges faced by program participants due to the unique design of MPP run counter to the Biden Administration's dedicated commitment to promoting access to justice.[42]  Before issuing the December 7, 2020, supplementary policy guidance,[43] DHS did not allow counsel to participate in *non-*

---

[38] U.S. Department of Homeland Security, *Migrant Protection Protocols (Archive)*, available at https://www.dhs.gov/archive/migrant-protection-protocols.

[39] *See* U.S. Department of Homeland Security, *Supplemental Migrant Protection Protocols Guidance on Initial Document Service and MPP Amenability* (Dec. 7, 2020), available at https://www.dhs.gov/publication/supplemental-policy-guidance-implementation-migrant-protection-protocols.

[40] U.S. Citizenship and Immigration Services, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*, (Jan. 28, 2019).

[41] *See* 8 C.F.R. § 208.16(b)(2), (c)(2); Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8480 (1999).

[42] Presidential Memorandum, *Restoring the Department of Justice's Access-to-Justice Function and Reinvigorating the White House Legal Aid Interagency Roundtable,* 86 Fed. Reg. 27,793 (May 21, 2021), available at https://www.federalregister.gov/documents/2021/05/21/2021-10973/restoring-the-department-of-justices-access-to-justice-function-and-reinvigorating-the-white-house.

[43] U.S. Department of Homeland Security, "Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols," (Dec. 7, 2020), available at https://www.dhs.gov/publication/supplemental-policy-guidance-implementation-migrant-protection-protocols.

PREDECISIONAL / DELIBERATIVE

PREDECISIONAL / DELIBERATIVE

**Subject: Review and Recommendation on Migrant Protection Protocols (MPP)**
**Page 13**

*refoulement* interviews conducted by USCIS when those interviews occurred in areas outside the Ninth Circuit. Additionally, while individuals in MPP were given time to meet with counsel at hearing locations prior to their hearings, these meetings were limited to a single hour.  Any attorney-client meetings that occurred outside of those organized at the hearing locations required the navigation of complications associated with cross-border communication and access to a telephone with international coverage or other forms of technology that were not always available for migrants in Mexico.  Moreover, because U.S. lawyers were generally prohibited from practicing law in Mexico without the appropriate immigration status or accreditation, it was challenging for MPP enrollees to receive in-person legal advice while in Mexico.

- <u>Burdens placed on migrants in Mexico.</u>  Migrants returned to Mexico from the United States were drawing on the same finite level of support that other newly arriving migrants were seeking to use in border communities in Mexico, including limited shelter capacity, cash-based assistance, and transportation challenges to access ports of entry for hearings. As a practical matter, the result was crowding along the U.S.-Mexico border and the creation of the informal migrant camp in Matamoros.[44]  Since January 2021, the U.S. Government has endeavored to improve those conditions, including by facilitating the entry into the United States of MPP enrollees.  By partnering with Mexico and international organizations, the Government was able to build a system allowing such individuals to be tested, processed, and transported to a port of entry safely and out of the hands of traffickers, and the Government succeeded in processing the individuals who were in the Matamoros camp in Mexico.  As a policy matter, the Government remains committed to building on this progress rather than taking steps that could exacerbate the challenges in Mexican border communities.

Viewed cumulatively, PLCY's review has determined that the operational and policy scaffolding that DHS created to support MPP was insufficient when the program began.  Moreover, while some problems were identified in prior departmental reviews, remedial measures were delayed and incomplete.  Finally, the program as constituted when suspended in January 2021 remains inconsistent with the Administration's current approach and anticipated future activities.

IV. <u>Impact of COVID-19</u>

Based on our review, the COVID-19 pandemic has exacerbated the previously identified challenges and made the operational challenges and burdens placed on migrants far worse.  Any benefit the program may have offered is now far outweighed by the challenges, risks, and costs it presents in a COVID-19 environment.  Further, between March 2020 (when the immigration courts hearing MPP cases were closed) until April 2021, DHS continued to spend millions of dollars each month to maintain the IHFs even though they were not being used for the intended purpose of holding court proceedings.  Without court hearings taking place since March 2020,

---

[44] Laura Gottesdiener, "Mexican camp that was symbol of migrant misery empties out under Biden," Reuters, Mar. 7, 2021, available at https://www.reuters.com/article/us-usa-immigration-mexico-feature-idUSKBN2AZ0GB.

PREDECISIONAL / DELIBERATIVE

PREDECISIONAL / DELIBERATIVE

**Subject: Review and Recommendation on Migrant Protection Protocols (MPP)**
**Page 14**

MPP has been completely incapable of delivering on the goal of efficiently processing legitimate claims by asylum seekers and has instead left large numbers of people in challenging circumstances in Mexico for a prolonged and indefinite length of time.

## Assessment of Alternative Options versus Termination

For the reasons articulated in this memorandum, it is PLCY's recommendation that DHS terminate MPP. Based on our review, PLCY believes termination is the best policy decision that is consistent with the Administration's objectives and considering the operational challenges presented by the program. Alternative options, including maintaining current MPP operations or modifying the program in certain respects, would not sufficiently address either consideration. Moreover, given the policy approach of the current Administration and its direction to pursue a comprehensive strategy to managing migration throughout North and Central America, including by restoring and strengthening the U.S. asylum system in a way that achieves outcomes that are both efficient and accurate, PLCY believes the strategy that the Administration is currently developing through policy and rulemaking is preferable to resuming MPP with or without modification.[45]

I.   Alternative Option of Maintaining MPP Without Change or Resuming New Enrollments

At present, if DHS maintains the program but retains the current suspension on new enrollments, individuals will continue to be subjected to prolonged uncertainty in Mexico as all but one of the immigration courts that would hear MPP cases remain closed. Retaining the program and lifting the suspension—even if it were to make sense to do this when the CDC's Title 42 Order remains in effect—would simply increase the number of people returned to Mexico to wait for an indefinite and extended period of time for their future immigration court hearings. Either option could increase instability and insecurity along Mexico's northern border and continue straining community resources, such as shelters and cash-based support.

Further, such a decision would show that the Department, upon its review of MPP and fully aware of persistent challenges, chose to proceed without making any changes to the program. Such an approach would undoubtedly exacerbate frequent concerns raised by elected officials, non-governmental organizations, and members of the public; increase the pressures caused by litigation challenging the program and its manner of operation; and result in significant burdens for the Department that would limit DHS's opportunities to make other needed reforms consistent with this Administration's policy priorities. Moreover, continuing to divert significant DHS personnel and resources to handle the necessary tasks of managing immigration court proceedings as part of MPP is unsustainable in light of current Administration priorities. Accordingly, PLCY does not recommend preserving the current version of MPP as a mechanism for operationalizing the authority at Section 235(b)(2)(C).

---

[45] Nothing in this memorandum is intended to foreclose the Department, at a future date, from considering the possibility of utilizing its Section 235(b)(2)(C) authority as appropriate. The recommendation contained herein is based on the unique features of MPP and the policy approach of the Biden Administration to the situation that the country is presently facing.

PREDECISIONAL / DELIBERATIVE

PREDECISIONAL / DELIBERATIVE

**Subject: Review and Recommendation on Migrant Protection Protocols (MPP)**
**Page 15**

II.  Alternative Option of Modifying MPP

Were DHS to consider programmatically utilizing the Section 235(b)(2)(C) authority in a way that is consistent with this Administration's vision of migration management, it would need to make significant modifications to the current operational and policy structure of MPP.  In fact, many of these changes would be substantial enough that it would effectively be a new program. Such an effort would likely require significant financial and personnel resources to ensure migrants can meaningfully access the U.S. immigration system; doing this would come at a significant opportunity cost and would inhibit other efforts that are currently underway and, in our judgment, are expected to sustainably address migration flows in a manner fully consistent with President Biden's direction in Executive Order 14010.

Further, any effort to create an alternative largescale program under Section 235(b)(2)(C) would require the provision of significant U.S. foreign assistance to counterparts operating in Mexico. Such funds would be needed to enhance conditions for migrants returned to northern Mexico to help alleviate the challenges inherent with displacement and ensure that proceedings conducted pursuant to the program are as fair and accessible as they are timely and orderly.  Doing this would, however, limit the ability of the Department of State to support the broader Administration strategy that includes addressing the root causes of migration in Central America and managing resulting outflows comprehensively.  Finally, the related diplomatic work it would take with GOM to augment U.S. engagement on Mexico's border region for MPP would detract from work with GOM on other critical border and immigration priorities.

**Assessment of the Impact of Termination**

PLCY has included in our review an assessment of the potential impacts of termination and concluded that DHS should nevertheless terminate MPP.

I.  Border Impact

In FY 2021, DHS has encountered through April 2021 more than 749,000 individuals at the SWB.[46] While this has been a challenge for the Department, DHS has expended significant effort to provide assistance in implementing important health authorities like Title 42 and to ensure that enforcement resources are focused on those who present national security or public safety risks or who are recent border crossers.  Further, current trend data suggest that encounters are leveling off and that today's surge is being driven largely by single adults.[47]  As more countries in the region begin to accept removal flights, DHS will have the ability to increase the removal of single adults (for instance), who currently have high rates of recidivism, to their home countries.

---

[46] U.S. Customs and Border Protection, "Southwest Land Border Encounters," Dep't of Homeland Security, available at https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.
[47] Id.

PREDECISIONAL / DELIBERATIVE

PREDECISIONAL / DELIBERATIVE

**Subject: Review and Recommendation on Migrant Protection Protocols (MPP)**
**Page 16**

PLCY believes the termination of MPP will eliminate the challenges discussed in this memorandum and allow the current Administration to execute a more effective approach to managing irregular migration comprehensively.  As outlined in EO 14010, this strategy includes addressing root causes of migration in the region, strengthening protection pathways and other legal immigration opportunities to the United States and to third countries, and rebuilding the U.S. asylum system.  To accomplish this rebuilding, the Department is working on new regulations and taking other measures to implement the long-needed systemic reforms to our asylum system.  One goal of the new regulations will be to shorten the time it takes to adjudicate a defensive asylum application from years to months while ensuring procedural safeguards and enhancing access to counsel.

The Department has additionally worked together with EOIR to establish a Dedicated Docket to process cases involving certain families arriving between ports of entry at the SWB in a fair and timely manner.[48]  This Dedicated Docket policy is being established in 10 common destination cities (Denver, Detroit, El Paso, Los Angeles, Miami, Newark, New York City, San Diego, San Francisco, and Seattle) that have robust communities of legal service providers, and is designed to combine the wraparound stabilization and case management services provided through the Alternatives to Detention program with Legal Orientation Program supports.  The combination of efficient court processing with robust access to legal information and other support is expected to result in high appearance rates and restored confidence in the immigration court process. PLCY believes these efforts will have a more sustainable impact on border flows and result in a more sustainable approach to managing migration.

II.  <u>Operational Impact</u>

The COVID-19 pandemic undisputedly presents challenges for DHS operations at our nation's borders.  DHS currently assists the CDC in enforcing its Order under Title 42 to prevent the introduction of COVID-19 into the United States.  Through the processing of individuals returned to Mexico under MPP, as well as a more recent effort, in consultation with the CDC, to except certain individuals from Title 42 for humanitarian reasons, DHS is rebuilding processing at ports of entry consistent with the Department's capacity to do so safely and working to reduce flows between the ports.  This effort involves partnering with international organizations, domestic non-governmental organizations, and local officials to ensure that processing can be coordinated to reduce any burden on border communities and connect migrants to efforts that assist with travel to final destinations away from border communities.

Consistent with DHS' implementation of public health protocols, and based in part on our experience with the phased processing of those in MPP, the Department has demonstrated that individuals enrolled in MPP can be processed at ports of entry in a safe and orderly manner.

---

[48] U.S. Department of Homeland Security, "DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings," May 28, 2021, available at https://www.dhs.gov/news/2021/05/28/dhs-and-doj-announce-dedicated-docket-process-more-efficient-immigration-hearings.

PREDECISIONAL / DELIBERATIVE

PREDECISIONAL / DELIBERATIVE

**Subject: Review and Recommendation on Migrant Protection Protocols (MPP)**
**Page 17**

Recognizing the toll the pandemic has taken on individuals and the prolonged uncertainty they face in Mexico, approximately 11,193 have been successfully processed into the United States to continue their immigration proceedings.[49]  Several thousand registrants are currently pending processing, with the potential for more if interagency partners expand eligibility.

This phased approach—which began at the San Ysidro port of entry on February 19, 2021 and has since expanded to six ports of entry—has demonstrated how DHS can safely and orderly process individuals through ports of entry. DHS created this process in coordination with interagency partners, international organizations and domestic non-governmental organizations, and in coordination with GOM.  Individuals are registered and staged in Mexico, where they receive additional information and are screened and tested for COVID-19 before being scheduled and facilitated to present at a port of entry.  DHS has worked collaboratively with domestic non-governmental organizations and local officials to ensure individuals in MPP are received and assisted with onward travel to a final destination.  To promote the use of the safe and orderly process described above, DHS has occasionally used the Section 235(b)(2)(C) authority to return to Mexico individuals currently enrolled in MPP who attempt to enter the United States between ports of entry.

The process established through the phased approach, combined with an effective communication strategy to migrants regarding the need to use the established processes as well as the continued use of Section 235(b)(2)(C), where appropriate, will ensure that the termination of MPP does not cause further influx at the border.  This approach reduces the burden on border communities and allows migrants to more quickly arrive at their final destinations.  In this way, the termination of MPP should not disrupt any reliance interests that may have been formed by states or other interested parties in the continuation of the program because it will be accomplished in connection with a broader policy strategy to managing border processing and adjudication of claims for immigration relief.  This is not to say that the Department has any particular obligation to consider reliance interests formed by states or others on this program, nor does it mean any such reliance interests would be reasonable given that the new enrollments in the program have been suspended for more than four months and the actual operation of the program—including court hearings and the adjudication of claims—has been suspended for more than 14 months.

   III. Foreign Affairs Impact

A significant amount of DHS and U.S. diplomatic engagement with GOM over the past two-and-a-half years has been focused on various port processing programs and plans, including MPP. Certainly, this will continue for a period of time, particularly as the Department considers whether and how to expand the process of allowing certain individuals who were enrolled in MPP to enter the United States in a safe and orderly manner.  DHS is, however, eager to focus collaboration with GOM on other mechanisms to address migration flows to and through

---

[49] Data on the number of people enrolled in MPP permitted to enter the United States, February 19-May 25, provided by the Department of State on May 26, 2021.

PREDECISIONAL / DELIBERATIVE

**Subject: Review and Recommendation on Migrant Protection Protocols (MPP)**
**Page 18**

Mexico.  These efforts include collaboratively addressing the root causes of migration from Central America; strengthening regional migration management in Central America; strengthening protection and asylum systems in the region, in Mexico, and in the United States; increasing the flow of lawful trade, travel, and immigration; and expanding cooperative efforts to address smuggling and trafficking networks.  MPP has been a major focus of the bilateral relationship since 2018 and does not deliver adequate return for the significant attention that it draws away from other elements necessary to the bilateral relationship.

PLCY has reviewed MPP, has gained insight from the successful phased and orderly approach to processing individuals in MPP into the United States through ports of entry, and is executing on the Administration's broader migration management strategy, as outlined in EO 14010.  PLCY assesses that MPP is no longer a viable or necessary tool for the Department since DHS is pursuing a new strategy.

.

**Subject: Review and Recommendation on Migrant Protection Protocols (MPP)**
**Page 19**

**Recommendation:** In accordance with the strategy and direction in Executive Order 14010, 86 Fed. Reg. 8267, following a review of the Migrant Protection Protocols (MPP), and informed by the current phased strategy for the safe and orderly entry into the United States of individuals enrolled in MPP, PLCY has identified significant concerns with the program's performance, operational burden, and outcomes. Moreover, PLCY is working with interagency partners to advance the Administration's policy objectives in creating a comprehensive regional framework to address the causes of migration, to manage migration throughout North and Central America, and to provide safe and orderly processing of asylum seekers at the United States border that is expected to effectively achieve the Administration's goals.  As such, PLCY recommends that you terminate MPP, through the rescission of the applicable policy memorandum and guidance documents.

Approve/date _5/29/21_       Disapprove/date_____

Modify/date _____       Needs discussion/date_____

AR00062

**U.S. Department of Homeland Security**
Washington, DC 20528



June 1, 2021

| | |
|---|---|
| MEMORANDUM FOR: | Troy A. Miller |
| | Acting Commissioner |
| | U.S. Customs and Border Protection |
| | |
| | Tae D. Johnson |
| | Acting Director |
| | U.S. Immigration and Customs Enforcement |
| | |
| | Tracy L. Renaud |
| | Acting Director |
| | U.S. Citizenship and Immigration Services |
| FROM: | Alejandro N. Mayorkas |
| | Secretary |
| SUBJECT: | **Termination of the Migrant Protection Protocols Program** |

On January 25, 2019, Secretary of Homeland Security Kirstjen Nielsen issued a memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols." Over the course of the Migrant Protection Protocols (MPP) program, the Department of Homeland Security and its components issued further policy guidance relating to its implementation. In total, approximately 68,000 individuals were returned to Mexico following their enrollment in MPP.[1]

On January 20, 2021, then-Acting Secretary David Pekoske issued a memorandum suspending new enrollments in MPP, effective the following day.[2] On February 2, 2021, President Biden issued Executive Order 14010, 86 Fed. Reg. 8267, *Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border.* In this Executive Order, President Biden directed me, in coordination with the Secretary of State, the Attorney General, and the Director of the Centers for Disease Control and Prevention, to "promptly

---

[1] *See* "Migrant Protection Protocols Metrics and Measures," Jan. 21, 2021, available at https://www.dhs.gov/publication/metrics-and-measures.

[2] Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Suspension of Enrollment in the Migrant Protection Protocols Program* (Jan. 20, 2021).

Case 2:21-cv-00067-Z Document 162 Filed 09/02/22 Page 82 of 400 PageID 4275
Subject: Termination of the Migrant Protection Protocols Program
Page 2

consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subjected to MPP for further processing of their asylum claims," and "to promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols."[3]

On February 11, the Department announced that it would begin the first phase of a program to restore safe and orderly processing at the Southwest Border of certain individuals enrolled in MPP whose immigration proceedings remained pending before the Department of Justice's Executive Office for Immigration Review (EOIR).[4] According to Department of State data, between February 19 and May 25, 2021, through this program's first phase approximately 11,200 individuals were processed into the United States. The Department is continuing to work with interagency partners to carry out this phased effort and to consider expansion to additional populations enrolled in MPP.

Having now completed the further review undertaken pursuant to Executive Order 14010 to determine whether to terminate or modify MPP, and for the reasons outlined below, I am by this memorandum terminating the MPP program. I direct DHS personnel to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives or policy guidance issued to implement the program.

## Background

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1225(b)(2)(C), authorizes DHS to return to Mexico or Canada certain noncitizens who are arriving on land from those contiguous countries pending their removal proceedings before an immigration judge under Section 240 of the INA, 8 U.S.C. § 1229a. Historically, DHS and the legacy Immigration and Naturalization Service primarily used this authority on an ad-hoc basis to return certain Mexican and Canadian nationals who were arriving at land border ports of entry, though the provision was occasionally used for third country nationals under certain circumstances provided they did not have a fear of persecution or torture related to return to Canada or Mexico.

On December 20, 2018, the Department announced the initiation of a novel program, the Migrant Protection Protocols, to implement the contiguous-territory-return authority under Section 235(b)(2)(C) on a wide-scale basis along the Southwest Border. On January 25, 2019, DHS issued policy guidance for implementing MPP, which was subsequently augmented a few days later by guidance from U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, and U.S. Citizenship and Immigration Services. During the course of MPP, DHS and its components continued to update and supplement the policy, including through the "Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols" issued on December 7,

---

[3] Executive Order 14010, *Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, 86 Fed. Reg. 8267 (Feb. 2, 2021), available at https://www.federalregister.gov/documents/2021/02/05/2021-02561/creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration.

[4] U.S. Department of Homeland Security, *DHS Announces Process to Address Individuals in Mexico with Active MPP Cases*, Feb. 11, 2021, available at https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

Case 2:21-cv-00067-Z Document 162 Filed 09/02/22 Page 83 of 400 PageID 4276
Subject: Termination of the Migrant Protection Protocols Program
Page 3

2020 by the Senior Official Performing the Duties of the Under Secretary for Strategy, Policy, and Plans.

Under MPP, it was DHS policy that certain non-Mexican applicants for admission who arrived on land at the Southwest Border could be returned to Mexico to await their removal proceedings under INA Section 240. To attend removal proceedings, which were prioritized by EOIR on the non-detained docket, DHS facilitated program participants' entry into and exit from the United States. Due to public health measures necessitated by the ongoing COVID-19 pandemic, however, DHS and EOIR stopped being able to facilitate and conduct immigration court hearings for individuals enrolled in MPP beginning in March 2020.[5]

Following the Department's suspension of new enrollments in MPP, and in accordance with the President's direction in Executive Order 14010, DHS has worked with interagency partners and facilitating organizations to implement a phased process for the safe and orderly entry into the United States of certain individuals who had been enrolled in MPP.

## Determination

In conducting my review of MPP, I have carefully evaluated the program's implementation guidance and programmatic elements; prior DHS assessments of the program, including a top-down review conducted in 2019 by senior leaders across the Department, and the effectiveness of related efforts by DHS to address identified challenges; the personnel and resource investments required of DHS to implement the program; and MPP's performance against the anticipated benefits and goals articulated at the outset of the program and over the course of the program. I have additionally considered the Department's experience to date carrying out its phased strategy for the safe and orderly entry into the United States of certain individuals enrolled in MPP. In weighing whether to terminate or modify the program, I considered whether and to what extent MPP is consistent with the Administration's broader strategy and policy objectives for creating a comprehensive regional framework to address the root causes of migration, managing migration throughout North and Central America, providing alternative protection solutions in the region, enhancing lawful pathways for migration to the United States, and—importantly—processing asylum seekers at the United States border in a safe and orderly manner consistent with the Nation's highest values.

As an initial matter, my review confirmed that MPP had mixed effectiveness in achieving several of its central goals and that the program experienced significant challenges.

- I have determined that MPP does not adequately or sustainably enhance border management in such a way as to justify the program's extensive operational burdens and other shortfalls. Over the course of the program, border encounters increased during certain periods and decreased during others. Moreover, in making my assessment, I share the belief that we can only manage migration in an effective, responsible, and durable manner if we approach the issue comprehensively, looking well beyond our own borders.

---

[5] See "Joint DHS/EOIR Statement on MPP Rescheduling," Mar. 23, 2020, available at https://www.dhs.gov/news/2020/03/23/joint-statement-mpp-rescheduling.

Case 2:21-cv-00067-Z Document 162 Filed 09/02/22 Page 84 of 400 PageID 4277
Subject: Termination of the Migrant Protection Protocols Program
Page 4

- Based on Department policy documents, DHS originally intended the program to more quickly adjudicate legitimate asylum claims and clear asylum backlogs. It is certainly true that some removal proceedings conducted pursuant to MPP were completed more expeditiously than is typical for non-detained cases, but this came with certain significant drawbacks that are cause for concern. The focus on speed was not always matched with sufficient efforts to ensure that conditions in Mexico enabled migrants to attend their immigration proceedings. In particular, the high percentage of cases completed through the entry of *in absentia* removal orders (approximately 44 percent, based on DHS data) raises questions for me about the design and operation of the program, whether the process provided enrollees an adequate opportunity to appear for proceedings to present their claims for relief, and whether conditions faced by some MPP enrollees in Mexico, including the lack of stable access to housing, income, and safety, resulted in the abandonment of potentially meritorious protection claims. I am also mindful of the fact that, rather than helping to clear asylum backlogs, over the course of the program backlogs increased before both the USCIS Asylum Offices and EOIR.

- MPP was also intended to reduce burdens on border security personnel and resources, but over time the program imposed additional responsibilities that detracted from the Department's critically important mission sets. The Department devoted resources and personnel to building, managing, staffing, and securing specialized immigration hearing facilities to support EOIR; facilitating the parole of individuals into and out of the United States multiple times in order to attend immigration court hearings; and providing transportation to and from ports of entry in certain locations related to such hearings. Additionally, as more than one-quarter of individuals enrolled in MPP were subsequently re-encountered attempting to enter the United States between ports of entry, substantial border security resources were still devoted to these encounters.

A number of the challenges faced by MPP have been compounded by the COVID-19 pandemic. As immigration courts designated to hear MPP cases were closed for public health reasons between March 2020 and April 2021, DHS spent millions of dollars each month to maintain facilities incapable of serving their intended purpose. Throughout this time, of course, tens of thousands of MPP enrollees were living with uncertainty in Mexico as court hearings were postponed indefinitely. As a result, any benefits the program may have offered are now far outweighed by the challenges, risks, and costs that it presents.

In deciding whether to maintain, modify, or terminate MPP, I have reflected on my own deeply held belief, which is shared throughout this Administration, that the United States is both a nation of laws and a nation of immigrants, committed to increasing access to justice and offering protection to people fleeing persecution and torture through an asylum system that reaches decisions in a fair and timely manner. To that end, the Department is currently considering ways to implement long-needed reforms to our asylum system that are designed to shorten the amount of time it takes for migrants, including those seeking asylum, to have their cases adjudicated, while still ensuring adequate procedural safeguards and increasing access to counsel. One such initiative that DHS recently announced together with the Department of Justice is the creation of a Dedicated Docket to

process the cases of certain families arriving between ports of entry at the Southwest Border.[6]  This process, which will take place in ten cities that have well-established communities of legal service providers, will aim to complete removal proceedings within 300 days—a marked improvement over the current case completion rate for non-detained cases.  To ensure that fairness is not compromised, noncitizens placed on the Dedicated Docket will receive access to legal orientation and other supports, including potential referrals for pro bono legal services. By enrolling individuals placed on the Dedicated Docket in Alternatives to Detention programs, this initiative is designed to promote compliance and increase appearances throughout proceedings.  I believe these reforms will improve border management and reduce migration surges more effectively and more sustainably than MPP, while better ensuring procedural safeguards and enhancing migrants' access to counsel.  We will closely monitor the outcomes of these reforms, and make adjustments, as needed, to ensure they deliver justice as intended: fairly and expeditiously.

In arriving at my decision to now terminate MPP, I also considered various alternatives, including maintaining the status quo or resuming new enrollments in the program.  For the reasons articulated in this memorandum, however, preserving MPP in this manner would not be consistent with this Administration's vision and values and would be a poor use of the Department's resources.  I also considered whether the program could be modified in some fashion, but I believe that addressing the deficiencies identified in my review would require a total redesign that would involve significant additional investments in personnel and resources.  Perhaps more importantly, that approach would come at tremendous opportunity cost, detracting from the work taking place to advance the vision for migration management and humanitarian protection articulated in Executive Order 14010.

Moreover, I carefully considered and weighed the possible impacts of my decision to terminate MPP as well as steps that are underway to mitigate any potential negative consequences.

- In considering the impact such a decision could have on border management and border communities, among other potential stakeholders, I considered the Department's experience designing and operating a phased process, together with interagency and nongovernmental partners, to facilitate the safe and orderly entry into the United States of certain individuals who had been placed in MPP.  Throughout this effort, the Department has innovated and achieved greater efficiencies that will enhance port processing operations in other contexts. The Department has also worked in close partnership with nongovernmental organizations and local officials in border communities to connect migrants with short-term supports that have facilitated their onward movement to final destinations away from the border.  The Department's partnership with the Government of Mexico has been an integral part of the phased process's success.  To maintain the integrity of this safe and orderly entry process for individuals enrolled in MPP and to encourage its use, the Department has communicated the terms of the process clearly to all stakeholders and has continued to use, on occasion and where appropriate, the return-to-contiguous-territory authority in INA Section 235(b)(2)(C) for MPP enrollees who nevertheless attempt to enter between ports of entry instead of through the government's process.

---

[6] See U.S. Department of Homeland Security, "DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings," May 28, 2011, available at https://www.dhs.gov/news/2021/05/28/dhs-and-doj-announce-dedicated-docket-process-more-efficient-immigration-hearings.

Subject: Termination of the Migrant Protection Protocols Program
Page 6

- In the absence of MPP, I have additionally considered other tools the Department may utilize to address future migration flows in a manner that is consistent with the Administration's values and goals. I have further considered the potential impact to DHS operations in the event that current entry restrictions imposed pursuant to the Centers for Disease Control and Prevention's Title 42 Order are no longer required as a public health measure. At the outset, the Administration has been—and will continue to be—unambiguous that the immigration laws of the United States will be enforced. The Department has at its disposal various options that can be tailored to the needs of individuals and circumstances, including detention, alternatives to detention, and case management programs that provide sophisticated wraparound stabilization services. Many of these detention alternatives have been shown to be successful in promoting compliance with immigration requirements. This Administration's broader strategy for managing border processing and adjudicating claims for immigration relief—which includes the Dedicated Docket and additional anticipated regulatory and policy changes—will further address multifaceted border dynamics by facilitating both timely and fair final determinations.

- I additionally considered the Administration's important bilateral relationship with the Government of Mexico, our neighbor to the south and a key foreign policy partner. Over the past two-and-a-half years, MPP played an outsized role in the Department's engagement with the Government of Mexico. Given the mixed results produced by the program, it is my belief that MPP cannot deliver adequate return for the significant attention that it draws away from other elements that necessarily must be more central to the bilateral relationship. During my tenure, for instance, a significant amount of DHS and U.S. diplomatic engagement with the Government of Mexico has focused on port processing programs and plans, including MPP. The Government of Mexico was a critically important partner in the first phase of our efforts to permit certain MPP participants to enter the United States in a safe and orderly fashion and will be an important partner in any future conversations regarding such efforts. But the Department is eager to expand the focus of the relationship with the Government of Mexico to address broader issues related to migration to and through Mexico. This would include collaboratively addressing the root causes of migration from Central America; improving regional migration management; enhancing protection and asylum systems throughout North and Central America; and expanding cooperative efforts to combat smuggling and trafficking networks, and more. Terminating MPP will, over time, help to broaden our engagement with the Government of Mexico, which we expect will improve collaborative efforts that produce more effective and sustainable results than what we achieved through MPP.

Given the analysis set forth in this memorandum, and having reviewed all relevant evidence and weighed the costs and benefits of either continuing MPP, modifying it in certain respects, or terminating it altogether, I have determined that, on balance, any benefits of maintaining or now modifying MPP are far outweighed by the benefits of terminating the program. Furthermore, termination is most consistent with the Administration's broader policy objectives and the Department's operational needs. Alternative options would not sufficiently address either consideration.

Therefore, in accordance with the strategy and direction in Executive Order 14010, following my review, and informed by the current phased strategy for the safe and orderly entry into the United States of certain individuals enrolled in MPP, I have concluded that, on balance, MPP is no longer a

Case 2:21-cv-00067-Z Document 162 Filed 09/02/22 Page 87 of 400 PageID 4280
Subject: Termination of the Migrant Protection Protocols Program
Page 7

necessary or viable tool for the Department.  Because my decision is informed by my assessment that MPP is not the best strategy for implementing the goals and objectives of the Biden-Harris Administration, I have no intention to resume MPP in any manner similar to the program as outlined in the January 25, 2019 Memorandum and supplemental guidance.

Accordingly, for the reasons outlined above, I hereby rescind, effective immediately, the Memorandum issued by Secretary Nielsen dated January 25, 2019 entitled "Policy Guidance for Implementation of the Migrant Protection Protocols," and the Memorandum issued by Acting Secretary Pekoske dated January 20, 2021 entitled "Suspension of Enrollment in the Migrant Protection Protocols Program."  I further direct DHS personnel, effective immediately, to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives issued to carry out MPP.  Furthermore, DHS personnel should continue to participate in the ongoing phased strategy for the safe and orderly entry into the United States of individuals enrolled in MPP.

The termination of MPP does not impact the status of individuals who were enrolled in MPP at any stage of their proceedings before EOIR or the phased entry process describe above.

<div align="center">*     *     *     *     *</div>

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

CC:     Kelli Ann Burriesci
         Acting Under Secretary
         Office of Strategy, Policy, and Plans

BRIEFING ROOM

# FACT SHEET: President Biden to Sign Presidential Memorandum to Expand Access to Legal Representation and the Courts

MAY 18, 2021 • STATEMENTS AND RELEASES

Today, President Biden will sign a Presidential Memorandum to expand access to legal representation and the courts.  As President Biden knows from his experience as a public defender, timely and affordable access to the legal system can make all the difference in a person's life—including by keeping an individual out of poverty, keeping an individual in his or her home, helping an unaccompanied child seek asylum, helping someone fight a consumer scam, or ensuring that an individual charged with a crime can mount a strong defense and receive a fair trial.  But low-income people have long struggled to secure quality access to the legal system.  Those challenges have only increased during the public health and economic crises caused by the COVID-19 pandemic.  At the same time, civil legal aid providers and public defenders have been under-resourced, understaffed, and unable to reach some of the people in greatest need of their services.

The federal government has a critical role to play in expanding access to the nation's legal system and supporting the work of civil legal aid providers and public defenders.  President Biden's executive action today will reinvigorate the federal government's role in advancing access to justice, and help ensure that the Administration's policies and recovery efforts can reach as many individuals as possible.

The Presidential Memorandum is the Biden-Harris Administration's latest action to protect vulnerable Americans, reform the justice system, and advance racial equity. On his first day in office, the President issued an executive order establishing a government-wide initiative to put equity at the heart of each agency's priorities and management agenda. His discretionary budget request called for $1.5 billion in funding for grants to strengthen state and local criminal justice systems, including by investing in public defenders. Improving access to counsel in civil and criminal proceedings builds on each of these efforts.

Specifically, President Biden is directing the following actions:

**AR00070**

**The Attorney General will, within 120 days, submit a plan to expand the Department of Justice's access to justice work**.  During the prior administration, the Department of Justice's access to justice work, formally launched as an initiative in 2010, was effectively shuttered.  To restore the Department of Justice's leadership in this area, President Biden is directing Attorney General Garland to submit a report to the President within 120 days that outlines the Department's plan to expand its access to justice work.  As Attorney General Garland will make clear in a memorandum that he will issue today, the Justice Department will start this work immediately.

**The Biden-Harris Administration will re-establish the White House Legal Aid Interagency Roundtable to prioritize civil legal aid and expand access to federal programs**.  The Biden-Harris Administration is re-committing to the mission of the White House Legal Aid Interagency Roundtable, which was initially established in 2015 to raise federal agencies' awareness of how civil legal aid could increase employment, family stability, housing security, consumer protection, and public safety.  The White House Legal Aid Interagency Roundtable will be co-chaired by the Attorney General and the Counsel to the President, or their designees, and will convene federal agencies to identify ways to address some of the most pressing legal services challenges that we face today—including those posed by the COVID-19 pandemic.

### 

**AR00071**

1/21/22, 9:57 AM                FACT SHEET: The Biden Administration Blueprint for a Fair, Orderly and Humane Immigration System | The White House

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 90 of 400   PageID 4283

BRIEFING ROOM

# FACT SHEET: The Biden Administration Blueprint for a Fair, Orderly and Humane Immigration System

JULY 27, 2021  •  STATEMENTS AND RELEASES

The United States can have an orderly, secure, and well-managed border while treating people fairly and humanely.

In January, the Biden-Harris Administration launched a broad, whole of government effort to reform our immigration system, including sending to Congress legislation that creates a new system to responsibly manage and secure our border, provide a pathway to citizenship, and better manage migration across the Hemisphere.

In the six months since, the Administration has made considerable progress to build a fair, orderly, and humane immigration system while continuing to call on Congress to make long overdue reforms to U.S. immigration laws. We successfully processed over 12,500 people who had been returned to Mexico under the Migrant Protection Protocols. We expanded lawful pathways for protection and opportunity, including the Central American Minors (CAM) program to reunite children with their parents in the United States. We strengthened collaborative migration management with regional partners, including through a new Human Smuggling and Trafficking Task Force to disrupt and prevent migrant smuggling and human trafficking operations. And we continue to deter irregular migration at our Southern border.

The Biden-Harris Administration has accomplished this and more while reckoning with the prior Administration's cruel and reckless immigration policies, which exacerbated long-standing challenges and failed to securely manage our border. Case in point: the total number of unique encounters at the Southern border to date this fiscal year remains below the total number of unique encounters to date during fiscal year 2019 under the Trump Administration.

Today the Administration is releasing a blueprint that outlines the next steps Federal agencies will be taking to continue implementing the President's transformative vision for a 21st century immigration system that secures the border, fairly and efficiently considers asylum claims, strengthens regional migration management efforts in North and Central America, and addresses the root causes of migration from Central America. Success in building this fair,

**AR00072**

orderly, and humane immigration system won't be achieved overnight, especially after the prior Administration's irrational and inhumane policies, but this Administration has a blueprint to get there and is making real progress.

We will always be a nation of borders, and we will enforce our immigration laws in a way that is fair and just. We will continue to work to fortify an orderly immigration system.

## ENSURING A SECURE, HUMANE AND WELL-MANAGED BORDER

The United States can allow people to exercise their legal right to apply for asylum while also reducing irregular migration and maintaining an orderly, secure, and well-managed border.

- **Making better use of existing enforcement resources.** Since fiscal year 2011, U.S. Customs and Border Protection's (CBP) discretionary budget has grown from $9.9 billion to $15 billion in FY 2021. The President's Budget redirects resources from a needless border wall to make robust investments in smarter border security measures, like border technology and modernization of land ports of entry, that are proven to be more effective at improving safety and security at the border. These investments will serve as a force multiplier to the over 19,500 Border Patrol Agents currently helping secure our Nation's borders and the over 25,500 CBP Officers working at our land, air, and sea ports. The investments will also facilitate more robust and effective security screening to combat human smuggling and trafficking and the entry of undocumented migrants.

- **Improving the expedited removal process for those who arrive at the border.** The Administration is working to improve the expedited removal process at the border to fairly and efficiently determine which individuals have legitimate claims for asylum and other forms of protection. Asylum and other legal migration pathways should remain available to those seeking protection. Those not seeking protection or who don't qualify will be promptly removed to their countries of origin.

- **Facilitating secure management of borders in the region** by providing training and technical assistance, supporting the improvement of border infrastructure and technology, and promoting collaborative migration and border management approaches.

- **Strengthening anti-smuggling and anti-trafficking operations** by working with regional governments to investigate and prosecute individuals involved in migrant smuggling, human trafficking, and other crimes against migrants. In April 2021, DHS announced Operation Sentinel, a new operation targeting organizations involved in criminal smuggling.

AR00073

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 92 of 400   PageID 4285

- **Bolstering public messaging on migration** by ensuring consistent messages to discourage irregular migration and promote safe, legal, and orderly migration.

## IMPLEMENTING ORDERLY AND FAIR PROCESSING OF ASYLUM APPLICATIONS

The Administration is committed to fairly and efficiently considering asylum claims. Asylum and other legal migration pathways should remain available to those seeking protection. But those not seeking protection or who don't qualify will be returned to their country of origin.

- **Establishing a dedicated docket to consider asylum claims.** The Administration has set up a special immigration court docket to promptly and fairly consider the protection claims of certain recent arrivals.

- **Further improving the efficiency and fairness of the U.S. asylum system** by authorizing asylum officers to adjudicate asylum claims for those arriving at the border and establishing clear and just eligibility standards that harmonize the U.S. approach with international standards. The Administration has already begun to rescind Trump administration policies and decisions that unjustly prevent individuals from obtaining asylum. On June 16, the Department of Justice reversed two of the former administration's rulings severely restricting asylum protections for victims of domestic and gang violence.

- **Maximizing legal representation** and legal orientation programs by working closelywith pro bono legal service providers. The President's FY 2022 Budget requests $15 million to provide representation to families and vulnerable individuals, as well as $23 million to support DOJ legal orientation programs.

- **Reducing immigration court backlogs** by ensuring priority cases are considered in a timely manner and hiring more immigration judges. The FY 2022 Budget requests an additional 100 immigration judges and provides support for additional court staff to ensure the efficient and fair processing of cases.  The Department of Justice also restored the discretion of immigration judges to administratively close cases in another step to ensure priority cases are considered in a timely manner.

## STRENGTHENING COLLABORATIVE MIGRATION MANAGEMENT WITH REGIONAL PARTNERS

The United States seeks to expand U.S. and multilateral efforts to address the dire humanitarian situation in Central America and strengthen regional collaborative migration management.  The United States believes that all individuals should be able to have a safe,

stable and dignified life within their own countries, while ensuring that asylum and other legal migration pathways remain available to those who need them.

- **Providing humanitarian support to address the acute needs that pressure individuals to abandon their homes**.  U.S. efforts will address food insecurity and malnutrition, mitigate the impacts of successive droughts and food shortages, promote protection for vulnerable individuals, and provide materials to support rebuilding of homes and schools damaged by the hurricanes.  The United States will also work with the United Nations to mobilize international support for the deteriorating situation in the Northern Triangle. As part of these efforts, the United States in April provided  $255 million in assistance to meet immediate and urgent humanitarian needs for people in El Salvador, Guatemala, and Honduras, refugees, other displaced people, and vulnerable migrants in the region.

- **Expanding access to international protection** to provide safety to individuals closer to their homes by building and improving national asylum systems, enhancing efforts to resettle refugees, and scaling up protection efforts for at-risk groups.

- **Establishing Migration Resource Centers** in the Northern Triangle countries with the support of international organizations and in coordination with governments in Central America to provide referrals to services for people seeking lawful pathways for migration and protection.  The centers also provide referrals to reintegration support for migrants returned from the United States and other countries.

- **Restarting and expanding the Central American Minors (CAM) program** to provide children the opportunity to receive protection and reunite with parents in the United States. In March 2021, the United States reopened the CAM program and, in June 2021, expanded it to additional categories of eligible U.S.-based relatives who can petition for their children.

- **Expanding refugee processing in the region**, including in-country processing in Northern Triangle countries, and helping international organizations and local non-governmental organizations to identify and refer individuals with urgent protection needs to the U.S. Refugee Admissions Program and other resettlement countries. The U.S. Department of State and Department of Homeland Security have resumed interviewing individuals via the Protection Transfer Arrangement (PTA) to expand protection for vulnerable nationals of El Salvador, Guatemala, and Honduras.

- **Expanding access to temporary work visas in the region.**  DHS announced a supplemental increase of 6,000 H-2B visas for temporary non-agricultural workers from Honduras, Guatemala and El Salvador in FY 2021. The Administration is also exploring

**AR00075**

ways to enhance access to H-2A visas for temporary agricultural workers when there are insufficient qualified U.S. workers to fill these jobs, while ensuring strong labor protections for all workers.  The Administration will also encourage other governments to develop and expand regional labor migration programs that protect workers' rights and allow access for individuals to find meaningful, temporary work.

- **Reducing immigrant visa backlogs.**  The United States aims to reduce the backlog of immigrant visa applications for Northern Triangle nationals as quickly as possible.

## INVESTING IN CENTRAL AMERICA TO ADDRESS THE ROOT CAUSES OF MIGRATION

We cannot solve the challenge at our border without addressing the lack of economic opportunity, weak governance and corruption, and violence and insecurity that compel people to flee their homes in the first place.  The impact of two major hurricanes in late 2020, a prolonged drought, and COVID-19 have aggravated these long-standing challenges.  The FY 2022 Budget requests $861 million to address the root causes of migration.

- **Addressing economic insecurity and inequality** by investing in programs that foster a business-enabling environment for inclusive economic growth; enhancing workforce development, health, and education; and building resilience to climate change and food insecurity so individuals can find economic opportunity at home. The U.S. will also work with stakeholders to increase trade and diversify industry, as well as with the private sector to build on the *Call to Action* to catalyze investments in the region and support economic development.

- **Combatting corruption and strengthening democratic governance** by working with governments, civil society, and independent media to improve government services, increase transparency, promote accountability and respect for human rights, sanction corrupt actors, and provide protection to at-risk youth, victims of violence, and other marginalized populations.

- **Promoting respect for human rights, labor rights and a free press** by working with governments and civil society to strengthen legal frameworks and build institutional capacity, hold perpetrators accountable, promote labor rights compliance, and ensure citizens have access to information from independent sources to inform their choices.

- **Countering and preventing violence, extortion, and other crimes** by strengthening accountable law enforcement, focusing on crime prevention, and encouraging regional cooperation to address shared criminal threats.

AR00076

- **Combatting sexual, gender-based and domestic violence** by working with governments and civil society to prevent and prosecute violence and support victims.

While President Biden can implement significant parts of this strategy within his executive authority, **Congress must also act.** Millions of noncitizens call our country home. Immigrants are key a key part of our communities and make significant contributions to our economy. Over the past year, millions of immigrants have risked their health to work side by side with other Americans to perform jobs that are essential to the functioning of the country. They are Americans in every way but on paper. The American public supports a path to citizenship and a fair and efficient legal immigration system that welcomes talent from around the globe and allows families to reunite and make a life in our country.

**Congress should pass** through reconciliation or other means:

- The U.S. Citizenship Act (H.R. 1177/S. 348) that reunites families, gives businesses access to a workforce with full labor rights, and creates a path to citizenship for those already living and working in the United States. These critical reforms, coupled with measures to address the root causes of migration from Central America, will relieve pressure at the border by dissuading irregular migration.

- The Dream and Promise Act (H.R. 6) and Farm Workforce Modernization Act (H.R. 1603) to create a path to citizenship for Dreamers, TPS recipients, and farmworkers. Both bills passed the House with bipartisan support. They will protect millions of families, children, and essential workers who live, work, study, and worship in our communities.

FACT SHEET: Strategy to Address the Root Causes of Migration in Central America

FACT SHEET: The Collaborative Migration Management Strategy

AR00077

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 96 of 400   PageID 4289

BRIEFING ROOM

# FACT SHEET: U.S. – Mexico High-Level Economic Dialogue

SEPTEMBER 09, 2021 • STATEMENTS AND RELEASES

**The HLED Vision**

United States President Joseph R. Biden and Mexican President Andrés Manuel López Obrador agreed to relaunch the U.S.-Mexico High-Level Economic Dialogue (HLED) in recognition of our broad strategic economic relationship.  Established in 2013, the HLED advances strategic economic and commercial priorities for both countries, with the shared goal of fostering economic development and growth, job creation, global competitiveness, and reduction of poverty and inequality.  The Biden-Harris Administration recognizes the importance of the dynamic, deep, and integrated commercial relationship with Mexico, currently our largest trading partner in goods, including as a top market for U.S. agricultural exports. As our countries face new challenges, the HLED will allow us to rebuild and grow as dynamic partners.

The relaunched HLED features four central pillars:

1. Building Back Together

2. Promoting Sustainable Economic and Social Development in Southern Mexico and Central America

3. Securing the Tools for Future Prosperity

4. Investing in Our People

Together, we will build back from the impact of the global pandemic, promote inclusive trade and investment, prepare our workforces for the future, and strengthen regional supply chains. As an ongoing forum to address priority issues, the HLED's agenda will be enhanced by regular input and engagement with key stakeholders from civil society and business.

**The HLED Work Plan**

AR00078

**Pillar I: Building Back Together**

The United States and Mexico will build back together in an environment informed by the pandemic by improving the regional business environment and strengthening the resilience of U.S.-Mexico supply chains. Work under this pillar will include how to best facilitate economic recovery and strengthen infrastructure, trade facilitation, and innovation.

- **Strengthening Existing and New Supply Chains**

  - Coordinate on critical industries to mitigate supply chain disruptions.

  - Explore opportunities to complement supply chain needs in both countries, assessing prospects to increase competitiveness, attract investment, and reduce vulnerabilities in critical sectors.

  - Promote environmental technologies through exchanges of information and trade missions.

- **Trade Facilitation and Infrastructure**

  - Build on the principles of co-responsibility and co-management of our shared border via the 21st Century Border Management Initiative.

  - Promote U.S.-Mexico economic competitiveness through innovation and by improving land border-crossing and marine port infrastructure, and better understanding and expediting cross-border trade flows.

  - Improve access to medical devices and supplies for public health emergencies.

**Pillar II: Promoting Sustainable Economic and Social Development in Southern Mexico and Central America**

The United States and Mexico will identify complementary and cooperative opportunities to improve livelihoods through the creation of jobs and opportunities in the short, medium, and long term in El Salvador, Honduras, Guatemala, and southern Mexico, increasing its trade potential and spurring investment.

- Increased technical cooperation between U.S. and Mexican international development agencies, promotion of value chains, clean energy, and rural development.

- Promote increased trade potential and spur investment in the region by mutually identifying projects of interest drawing on relevant research and analysis, including any present or future research or missions conducted by the two governments.

**AR00079**

## Pillar III: Securing the Tools for Future Prosperity

The United States and Mexico will support regulatory compatibility and risk mitigation on issues related to information and communication technologies, networks, cybersecurity, telecom and infrastructure, among others.

- **Mitigating Threats and Enhancing Data Flows**

  - Develop opportunities to strengthen cybersecurity protections in global supply chains. Facilitate collaboration and cooperation in tackling cybersecurity challenges through international industry practices and standards.

  - Enhance cross-border data flows and interoperability between the United States and Mexico.

## Pillar IV: Investing in Our People

The United States and Mexico will foster cooperation towards a more inclusive workforce that is better educated, more competitive, and better trained with the necessary skills to meet the needs of the 21st Century economy.

- Inclusiveness and Training

- Coordinate joint efforts to promote an innovation ethos.

- Promote initiatives to invest in entrepreneurs and small-and medium-sized enterprises (SMEs).

- Collaborate to enhance access to economic opportunity for women, youth, Indigenous, and LGBTQ+ community.

- Consider options for joint technical training and educational programs across priority sectors.

The HLED will strengthen our partnership to better ensure that the United States and Mexico meet the challenges of our time and ensure that our peoples can thrive.  Mexico and the United States will regularly consult with civil society, private sector, academia, and other non-governmental organizations to contribute to the HLED, fostering an open dialogue that values inclusion and diverse viewpoints while ensuring transparency in decision-making.

###

**AR00080**

# Asylum-Seekers Protesting Squalid Conditions Shut Down A US Border Crossing For 15 Hours

"This is an injustice," said one asylum-seeker.

**by Adolfo Flores**



Reporting From
**Matamoros, Mexico**

Updated on October 11, 2019, 11:58 am

Posted on October 10, 2019, 10:04 pm

**Be one of the first to comment**

Tweet          Share          Copy

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 100 of 400   PageID 4293



Asylum-seekers block the Puerta Mexico international border crossing bridge in Matamoros, Mexico.

*Veronica Cardenas / Reuters*

MATAMOROS, Mexico — Asylum-seekers frustrated over increasingly squalid conditions at the southern border — where they have been forced to wait until their US immigration court dates — shut down a normally busy international border crossing Thursday.

At about 1:30 a.m., a group of up to 300 immigrants marched to the middle of the Gateway International Bridge, which connects Brownsville, Texas, and Matamoros, Mexico, and sat down in the roadway, blocking traffic in both directions for nearly 15 hours. The group remained there through the afternoon until shortly after 4 p.m. when US Customs and Border Protection (CPB) officials reopened the bridge.

ADVERTISEMENT

AR00082

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 101 of 400   PageID 4294

On the southern side of the bridge is an ever-growing encampment of asylum-seekers sent back to Mexico until their immigration cases are adjudicated under the Trump administration's "remain in Mexico" policy. More than 51,000 asylum-seekers have been returned to Mexico under the Migrant Protection Protocols (MPP) across the southern border.

In Matamoros, where about 1,000 asylum-seekers sent back under the program are living on the streets under tents and blankets, many rely on donated food.

AR00083

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 102 of 400   PageID 4295



Guatemalan asylum seeker Biviana, 20, blows the neck of her one-year old daughter Maylin, which has a rash.

*Veronica Cardenas / Reuters*

Celia, a 42-year-old asylum-seeker from Honduras, said living in the encampment is difficult, in part, because there is no clean water to bathe in or to wash clothes. Immigrants often use the Rio Grande, the dangerous and polluted waterway that has claimed the lives of immigrants attempting to cross. Adults and children have developed rashes after bathing in the river.

"This is an injustice," Celia said.

All of the immigrants who spoke to BuzzFeed News for this story declined to use their full names due to concerns for their safety.

Other immigrants said they were frustrated by the lengthy duration they must wait for their asylum cases to be decided by an immigration judge. Some who believed they would receive a determination at their first court date, despite

**AR00084**

proceedings requiring multiple hearings, have grown desperate after being sent back to Matamoros with court dates weeks or months in the future.

Sara, a 35-year-old Honduran asylum-seeker who was among the protesters on the bridge, said she's been living on the streets of Matamoros for two months with her three children.

"If [the US] is going to give us an opportunity we want them to tell us because I have three kids I have to fight for," Sara said. "They keep telling us we have to wait longer and longer. When will it end?"

US Customs and Border Protection police agents keep watch as asylum-seekers block the Puerta Mexico international border crossing bridge.

*Alejandro Hernandez / Reuters*

ADVERTISEMENT

AR00085

Case 2:21-cv-00067-Z    Document 162    Filed 09/02/22    Page 104 of 400    PageID 4297

Critics of MPP have said forcing asylum-seekers to wait with few resources and access to legal information in dangerous Mexican cities like Matamoros is part of the Trump administration's plan to wear down immigrants.

In addition to squalid conditions and long wait times, asylum-seekers returned to Mexico also face the threat of violence and kidnappings. A State Department advisory for the Mexican state of Tamaulipas, which includes cities like Matamoros and Nuevo Laredo, warns US citizens about threats to safety when traveling to the area, noting that murder, kidnapping, and sexual assault are common.

Asylum-seekers returned to Mexico under MPP have reported more than 340 incidents of rape, kidnapping, torture, and other violent attacks, according to a report from Human Rights First.

At a White House press briefing on Tuesday, Mark Morgan, acting commissioner of CBP said Mexico was providing humanitarian protection to asylum-seekers.

AR00086

Asylum-seekers block the Puerta Mexico international border crossing bridge in Matamoros, Mexico.

*Veronica Cardenas / Reuters*

"With MPP, migrants are receiving due process and protection while the United States is restoring integrity to our immigration system," Morgan told reporters.

Also on the bridge was Jilma, a 26-year-old Honduran asylum-seeker who was sent to Nuevo Laredo after presenting herself at the US border. Along with a group of other immigrants, she was transported to a shelter at the direction of Mexican immigration agents.

Along the way, the bus was stopped by federal police, Jilma said, who ordered all of the immigrants off the vehicle. Moments later the group was boarded onto trucks at gunpoint by men who took them to a large house with about 300 kidnapped immigrants. When Jilma and two other women couldn't provide phone numbers for family members who could pay a ransom, some of the men took them to another room and took turns raping them, she said.

"While they raped us they told us they would do the same things to our children," Jilma told BuzzFeed News. "They let us go, but before they left they took photos of us and told us to never return to Nuevo Laredo."

**AR00087**

Jilma has since made her way to Matamoros where she hopes she will be safe, but is fearful of returning to Nuevo Laredo in January for her court hearing on the other side of the border.

Asylum-seekers block the Puerta Mexico international border crossing bridge in Matamoros, Mexico.

*Alejandro Hernandez / Reuters*

ADVERTISEMENT

AR00088

Because the protest shutdown the bridge, asylum-seekers who had hearings inside newly erected tent courts on the other side of the Rio Grande were unable to see the immigration judge and CBP said their hearings would be rescheduled to a later date, potentially months down the line.

"It is so hard to get ahead," said Claire Noone, an immigration attorney who has worked with asylum-seekers in Matamoros. "Protesting abhorrent conditions leads to individuals being forced to exist in those conditions longer."

Henri Vinet-Martin, another immigration attorney who was worked with immigrants in Matamoros, said the other "travesty" is asylum-seekers in MPP find it nearly impossible to find US attorneys who can take their cases.

"How can you even think about your case when you're trying to figure out how to feed your baby?" Vinet-Martin told BuzzFeed News. "They're being denied access to their right to have an attorney not paid for by the US government."

One estimate from July found that only 1.2% of MPP cases that had already been decided had legal representation. The odds of an asylum-seeker winning their case increase exponentially if they have an attorney.

At one point the mayor of Matamoros, Mario López Villarreal, went to speak with the protesters about their concerns of living on the streets and, in an attempt to talk them off the bridge, offered them space at a shelter. Some of the immigrants balked at the offer while others accepted an invitation to speak to city officials about their concerns.

"He's never come to speak to us and only came after we shut down the bridge," said Alex, a 25-year-old from El Salvador. "I don't trust him."

**AR00089**

**MORE ON THIS**

## Julián Castro Escorted 12 Asylum-Seekers To The US Border. They Were All Sent Back To Mexico.

Adolfo Flores · Oct. 8, 2019

## Mexican Immigrants Are Accusing Border Patrol Agents Of Denying Asylum And Illegally Deporting Them

Adolfo Flores · Oct. 4, 2019

## Asylum-Seekers Are Trying To Flee Violence In Mexico. The US Is Sending Them Right Back.

Adolfo Flores · Oct. 1, 2019



Adolfo Flores is a reporter for BuzzFeed News and is based in McAllen, Texas..

Contact Adolfo Flores at adolfo.flores@buzzfeed.com.

Got a confidential tip? Submit it here

## 0 comments

- **Sign in to comment**

FINCEN FILES

THE INVESTIGATION THAT CHANGED THE BANKING INDUSTRY

A BuzzFeed News investigation, in partnership with the International Consortium of Investigative Journalists, based on thousands of documents the government didn't want you to see.

READ NOW

**AR00090**

# "Leave me in a cell": The desperate pleas of asylum seekers inside El Paso's immigration court

*This story is the first installment in a three-part series on the Trump administration's controversial "Remain in Mexico" program and its impact on thousands of asylum-seeking families. Read parts* two *and* three *here.*

*El Paso, Texas* — Like most of the other migrants seeking asylum in court that day, Ana, a young indigenous woman from Guatemala's western highlands, sat alone at the defendant's desk, without a lawyer at her side.

Soon after she took her seat in one of the small, cold courtrooms in the seventh floor immigration court in downtown El Paso, the visibly distressed asylum seeker from Guatemala begged the presiding judge in her fast-moving, fragmented Spanish not to return her to Mexico.

"Leave me in a cell, please. Leave me in a cell," she told Judge Nathan Herbert, who listened to her plea through a court translator.

Ana was referring to a detention cell in a Border Patrol station in the U.S., where migrants like her — who cross the southern border illegally to seek asylum but otherwise don't have criminal records — are typically detained for a few days or weeks, and then released with a notice to appear in court.

But under a controversial policy known as "Remain in Mexico," the Trump administration has been requiring tens of thousands of migrants who seek asylum near El Paso and other highly transited parts of the southwestern border to wait in Mexico while their cases are processed in the U.S.

The program, which the administration is expanding across the entire border, is officially called the Migrant Protection Protocols (MPP).

But interviews CBS News conducted in El Paso in late July with migrants, advocates and attorneys — along with courtroom testimony from more than a dozen asylum seekers — depict a different policy.

Their accounts paint a picture of a program that places often vulnerable migrants, including families with small children and single women, in precarious situations in Mexico, where the chances of securing legal counsel are slim.

Herbert, one of four immigration judges in El Paso, has been hearing the testimony of these asylum seekers on a weekly basis since "Remain in Mexico" was first implemented in the El Paso sector in March.


dsc-0356.jpg

*In the seventh floor of this federal building in downtown El Paso, asylum seekers — most of them without lawyers — plead with a judge to allow them to stay in the U.S.  Camilo Montoya-Galvez/CBS News*

During her second hearing in late July, Ana reiterated to Herbert that she feared going back to the city across the border, Ciudad Juárez, one of the most dangerous communities in Mexico and the Western Hemisphere.

AR00091

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 110 of 400   PageID 4303

"In Mexico, nobody wants to help me," Ana said, adding later, "What hurts me the most is that no one wants to help me."

Herbert told Ana there was little he could do to remove her from the MPP program. But he asked the Department of Homeland Security lawyer in the room to refer the Guatemalan migrant to a so-called non-refoulement interview, offered when asylum seekers express fear about returning to the country that the government seeks to send them to.

The judge does this every time asylum seekers in his courtroom express fear of returning to Mexico. The interviews they go through after court are purportedly designed to ensure migrants are not returned by the government to places where they may face persecution — a longstanding standard in U.S. and international refugee law.

But advocates, attorneys and even some of the asylum officers conducting these non-refoulement interviews say it is almost impossible to satisfy the stringent requirements for the government to allow fearful migrants to stay in the U.S.

When Herbert informed Ana of the interview referral, she noted it would be her second one. "When I came to my first appointment, I said I was afraid of going back to Mexico and they still sent me back to Mexico," she told Herbert.

Midway through her hearing, Herbert realized that Spanish was not Ana's best language, as she initially indicated. She told him her native tongue was Q'anjob'al, a language of Mayan origins spoken primarily in western Guatemala.

After the judge told her he would get an interpreter through the phone, and struggled for a several minutes to find one, Ana, discernibly anxious, said she could continue in Spanish, seemingly worried a delay could jeopardize her case. She told Herbert she learned more Spanish while in Mexico.

But the Q'anjob'al interpreter was eventually found and through him, Herbert told Ana he could give her more time to find an attorney. She again told him she's been trying for weeks to find one to no avail.

"Is there any attorney who can help me?" she asked Herbert, this time in Q'anjob'al.

"The government cannot provide you with an attorney," the judge replied, offering her instead a paper list of legal organizations in the El Paso area.

Immigrants and migrants in the U.S. immigration court system — which is a branch of the Justice Department — do not have the right to a government-appointed lawyer if they can't afford counsel, unlike the independent judicial system.

Towards the end of the hearing with Ana, Herbert said it was of paramount importance for her to show up to her next court date because she could be ordered deported — even if she was technically living in Mexico — "in absentia." Along with nullifying her asylum claim, a deportation order also usually entails a multi-year ban from entering the U.S.

The sole mention of "deportation" rattled Ana.

"I'm pleading with you to help me," she said minutes before the next asylum seeker on the docket was escorted inside the courtroom. "Help me."

## "I'm afraid to go back to Mexico. Will I be sent back?"

AR00092

On the sweltering hot July day of Ana's hearing, about 18 other asylum seekers in the "Remain in Mexico" program — the majority families with small children — were brought to the El Paso immigration court.

The group of migrants, like thousands of others subject to the policy, are temporarily allowed to enter the U.S. to attend their court hearings. They enter through one of the ports of entry that connect El Paso and Ciudad Juárez, where most of them stay in shelters run by community organizers and the local Catholic church.

From there, they are escorted by DHS-contracted security guards, who keep the migrants under tight scrutiny, even when they use the restroom. Before noon, after most of the cases for migrant children are heard by another judge, the guards effectively take control of the 7th floor, placing the MPP program asylum seekers in the small waiting room and restricting access to them by blocking entry into the court until their hearings start.


dsc-0383.jpg

*El Paso shares a bustling international border with Ciudad Juárez, where the U.S. government has returned thousands of asylum seekers since March through the controversial "Remain in Mexico" program.  Camilo Montoya-Galvez/CBS News*

In the waiting room, filled with several maroon-colored chairs, the adult migrants and their children eagerly and quickly eat their lunch — a selection of snacks from the building's vending machines — as about a dozen guards stand watch.

Unlike the migrant children in the morning hearings, who are represented by attorneys from the Diocesan Migrant and Refugee Services, most families and single adults in the MPP docket do not have counsel.

According to Syracuse University's Transactional Records Access Clearinghouse center, only 1.3% of the nearly 13,000 migrants in the "Remain in Mexico" program had legal representation as of June.

During Ana's day in court, only three families and individuals were represented by attorneys.

One was a family that was absent from the courtroom. After months of waiting in Mexico, the family had given up on its asylum case and returned to Honduras. The family's lawyer was in court to prove they had voluntarily returned to Honduras.

The family's time in Ciudad Juárez, the lawyer said, was "untenable," and she wanted to ensure they did not receive a 10-year ban on entering the U.S.

For the migrants who were not represented, their hearings were strikingly similar.

One mother, who came to court in crutches, told the judge she, her husband and young son were frightened about returning to Ciudad Juárez, where she said she was assaulted.

Herbert's responses to the pleas of migrants in his courtroom — who were convinced he wielded the categorical power to take them out of the "Remain in Mexico" program and allow them to stay in the U.S. — were nearly identical.

"I don't have the authority to let you stay here," the judge told one young father who came to court with his 3-year-old son.

"I don't have the authority to take you out of this program," he told one family after the father said they feared being returned to Mexico and wanted to stay in El Paso.

**AR00093**

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 112 of 400   PageID 4305

"I have no control over that process," Herbert said when another father, who sat alongside his wife and 4-year-old son, asked, "I'm afraid to go back to Mexico. Will I be sent back?"



*Once of the first things asylum seekers in the "Remain in Mexico" program see when they are briefly escorted into the U.S. and to El Paso's immigration court is this replica of the "The Great Seal of the United States." It contains one of the nation's mottos in Latin, E pluribus unum — out of many, one. Camilo Montoya-Galvez/CBS News*

For most cases on that July day, Herbert gave the migrants more time to find counsel, even after nearly all told him their efforts to do so in Mexico had been futile. A few, citing growing desperation, opted to represent themselves — a move immigration attorneys say usually dooms asylum claims in a byzantine immigration system.

Those who claimed they feared returning to Mexico — nearly all — were referred to complete the non-refoulement interview. But most were likely returned to Mexico.

## "Magnets for kidnappers"

Taylor Levy, an independent lawyer in the El Paso area who does not represent those returned under MPP but actively works to help and guide them, said there's "roughly a 1%" chance of "winning" the non-refoulement interview.

Because of this, she said most migrants are stranded in Mexican border cities like Ciudad Juárez for months, where they struggle to find shelter and employment, with some facing persecution and extortion.

Some, Levy noted, choose to go home. "You have people get so desperate that they have decided to go home instead of remaining in Mexico, where they're just in so much danger."

"I keep thinking if it was my kids. I wouldn't want them in the shelters. And I work in the shelters a lot. I go there all the time. And the shelters are run by wonderful, loving, caring people," she added, referring to the shelters in Juárez. "But if it was my kids, I'd want them as far as humanly possible away from the shelters, because the shelters are targets — they're magnets for kidnappers."

MEXICO-CUBA-US-MIGRATION

*Cuban and Central American migrants leave the Casa del Migrante shelter in Ciudad Juarez, Chihuahua State, Mexico, to head to the border to request political asylum in the United States, on Jan. 9, 2019. Getty*

Others attempt to cross illegally for a second time or for the first time if they first claimed asylum at a port of entry. Late last month, a 20-year-old Guatemalan woman drowned trying to re-enter the U.S. after she had been sent to Mexico under the MPP program.

Because of the dangers faced by these migrants in Mexico, Levy said the deterrence effect she believes underpins the policy has been working.

"In that sense, yes, I think it's been effective in violating people's rights and forcing them into such a dire situation that they give up their lawful claims," she said.

The Trump administration seems to agree, with acting U.S. Citizenship and Immigration Services director Ken Cuccinelli recently bragging about the "spectacular success" of the policy. When announcing the second consecutive drop in apprehensions at the southern border during July, Customs

AR00094

and Border Protection (CBP) denied it was mainly a result of the summer heat, instead pointing to Mexico's amped up enforcement and the MPP program.

What concerns Levy the most is that she believes many Americans consider the "Remain in Mexico" policy "innocuous."

"It feels like such not a big deal to people, you know, it's like, 'Uh, that seems fair, they wait their turn,'" she said. "But that's just quite simply not how it plays out on the ground."

---

*Editor's note: The names of migrants featured in this series have been omitted because they currently have ongoing cases in immigration court.*



CBS News App  |  Ukraine Crisis  |  COVID Pandemic  |  CBS News Live  |  Full Episodes  |  Essentials Shopping  |  Newslett

CBS NEWS

Login

POLITICS ›

# "I fear for our lives": Asylum seekers forced to wait in Mexico face danger and desperation

BY CAMILO MONTOYA-GALVEZ

AUGUST 13, 2019 / 5:55 AM / CBS NEWS



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

Not Now                    Turn On

*he Trump administration's*

*ct on thousands of asylum-seeking*

**AR00096**

8/10/22, 11:12 AM
Remain in Mexico: Asylum seekers forced to wait in Mexico face danger and desperation - CBS News
Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 115 of 400   PageID 4308

Watch CBS News

*El Paso, Texas – O*ne afternoon in late March, as Ricci walked through the markets in Ciudad Juárez looking for somewhere to buy lunch for her 4-year-old son, a man approached the boy and tried to snatch him away.

"Because there were a lot people, I pleaded for help," Ricci said of the brazen kidnapping attempt. She spoke in Spanish with CBS News in the federal building in El Paso, minutes before her hearing in immigration court. "People helped me, and the man was not able to take my son."

---

Living in Ciudad Juárez, one of the most dangerous cities in the world, was harrowing for Ricci, a 25-year-old single mother from an indigenous community in Honduras. It wasn't her choice to be in Mexico.

Like tens of thousands of other migrants, mostly from Central America, she was placed in the "Remain in Mexico" program when she arrived at the border earlier this year. The controversial program, which the Trump administration is expanding despite a court challenge, requires asylum seekers to wait in Mexico for months while their claims are reviewed in the U.S.

Ciudad Juárez is the destination for migrants like Ricci who seek asylum at a port of entry or another part of the border in the El Paso sector. Beyond the obvious hazards of living in the crime-ridden city, migrants struggle to find shelter, employment and, perhaps most

importantly, lawyers who are key to helping them navigate the byzantine U.S. immigration system.

Ricci was more fortunate than others. Unlike most of the migrants subject to this policy, ... was able to find legal



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

Not Now                    Turn On

**AR00097**

Watch CBS News

A general view of Ciudad Juárez on a windy, dusty afternoon on May 20, 2019.

PAUL RATJE / AFP/GETTY IMAGES

In late July, Ricci was temporarily allowed back into the U.S. to attend a hearing, where she and her lawyer, Danielle Escontrias of the Catholic Charities of Southern New Mexico, formally filed her asylum petition. Ricci was also there to tell the judge she feared being sent back to Mexico – a sentiment echoed by most families and individuals in the program over the course of hours of court hearings.

"I feel a lot of fear. I can't go out," Ricci said inside a small room where the security guards allow the small number of represented migrants to talk to their lawyers for a few minutes before the judge hears their cases.

"I fear losing my life or my son losing his, or something that can happen to both of us. I fear for our lives," she added, turning to 4-year-old Binsel, who wore a plaid shirt and jeans and wobbled on a chair almost twice his size.

icci. She is shy and mild-mannered, gruesome murder late last year.



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

Not Now          Turn On

Pisijire, a remote village in
rage and La Mosquitia rainforest,
any members of the large
faced ethnic persecution.

Ricci's home village is plagued by poverty and violent crime carried out with impunity.

Watch CBS News

Horrific homicides headline local newspapers, including the story of a young mother murdered while she was breastfeeding her 11-month-old child and the apparent murder of an 8-year-old boy.

Ricci's 25-year-old husband, Arlynton, was shot and killed last December in a crime deemed a homicide, according to a local police report. Forensic photos seen by CBS News showed his body with gunshot wounds in his torso.

Soon after his murder, Ricci said she began to receive death threats. A letter left on her doorstep read, "I want blood to continue running. After your husband, you are next, Ricci, and your son. And then your family."

That prompted the young widow to take her son on the perilous, weeks-long journey to the U.S.-Mexico border, where she sought asylum at a port of entry in El Paso in March – the same month that the "Remain in Mexico" program was implemented in that sector.

Ricci claimed asylum based on her husband's assassination and the threats she faced in Honduras. But the U.S. government does not take those circumstances into consideration when determining whether to return her to Mexico.

After her first two hearings in El Paso, Ricci was referred to asylum officers for so-called "non-refoulement" interviews, offered when asylum seekers express fear about returning to the country to which the government seeks to send them.

On both occasions, she said she told the officers about her husband's murder in Honduras and the attempted kidnapping of her son in Mexico. And yet, after both interviews, she was still sent back to Mexico.



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

Not Now          Turn On

a hard time in Mexico but she's also as said, noting her client's growing very difficult choices."

time, Binsel was growing

aiting in Mexico, Ricci paused and began rubbing her legs with her hands in agitation. "I don't know," she said, breaking

AR00099

down into tears.

Watch CBS News

Escontrias, her lawyer, said Ricci was referred to a third non-refoulement interview during her hearing, which CBS News was barred from observing. But she did not hear from her client for a week.

## "The people themselves are being burned out"

Escontrias is only one of a handful of attorneys in the El Paso area representing a few of the thousands of migrants sent to Ciudad Juárez under the "Remain in Mexico" policy.

Along with Ricci, she had also been representing another asylum seeker, a 21-year-old woman from El Salvador named Cindis, whom she began representing in April, the same month Cindis was placed in the Migrant Protection Protocols (MPP) program, the Trump administration's official name for Remain in Mexico.

In early August – a week after Ricci's third hearing – Escontrias went to the El Paso immigration court on behalf of Cindis, who was to have her second asylum hearing. She knew that it was unlikely Cindis would show up.

Cindis had already told one of Escontrias' colleagues at Catholic Charities that she had received death threats in El Salvador from a gang, which she said tried to coerce her into prostitution. While she waited in Ciudad Juárez, Cindis said she was robbed, assaulted and targeted with anti-immigrant slurs.

Cindis had only met Escontrias once, during her first court hearing in El Paso. Because Cindis didn't have a cell phone, their communication was very limited. She was also staying in a shelter and had no access to a phone. Over the past weeks, Escontrias had



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

reason why people don't want to represent someone. You're putting communicate with them. You don't

Not Now                    Turn On

absentia," effectively nullifying her asylum claim and barring her from entering the U.S. for 10 years.

**AR00100**

Watch CBS News

Yolanda, a migrant from El Salvador, shows her documents from Migrant Protection Protocols inside a shelter in Ciudad Juárez on June 16, 2019.

PAUL RATJE/AFP/GETTY IMAGES

Escontrias was livid about the judge's ruling, telling him that the U.S. government's implementation of the program hinders her ability to represent migrants like Cindis. "I

had a lot to say on the record about how unfairly we're sending people to third countries that are unsafe and then giving them in absentia orders. It just seems really cruel."

"That's not justice," she added.



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

Not Now            Turn On

...indis had – out of desperation – ...come of Cindis' case is a clear ...leter asylum seekers and those

...doubt that they are succeeding, ...g out the attorneys. They're making representation so hard. And then the people themselves are being burned out."

AR00101

Watch CBS News

## "Work, fight"

After seven days, Escontrias finally received a WhatsApp message from Ricci. The U.S. government had removed her from the MPP program and granted her release into the U.S.

Escontrias was happy for Ricci but confused. After her two previous interviews, she had still been sent back to Mexico. Even some of the asylum officers conducting the non-refoulement interviews have acknowledged it is almost impossible for migrants to satisfy the burden of proof.

"It was her third shot at it and facts had not changed. So, it could've been luck of the draw. It could've been that she just got an asylum officer who felt bad for her," Escontrias said. "Or they could've gotten wind that she talked to a reporter. It's very unusual."

Ricci, too, was surprised she was allowed to say in the U.S. But she also said there was something different about her third plea.

"I say it was because the one who interviewed me was a woman. Previously, it had been men," Ricci told CBS News in a phone call from Austin. "She also interviewed my son and he started crying. He told her he did not want to go back to Juárez, that he was really scared and wanted to be with his grandfather."

After her third interview, the young Honduran mother said she was detained for three days in the U.S. before being fitted with an ankle bracelet and released. She spent a few days in an El Paso shelter, where volunteers helped her board a bus to Dallas and then to



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

Not Now                    Turn On

[...]aso courthouse, Ricci sounded [...]dmitted she had been growing [...]y, mostly because of him,"

**AR00102**

8/10/22, 11:12 AM · · · · · · Remain in Mexico: Asylum seekers forced to wait in Mexico face danger and desperation - CBS News

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 121 of 400   PageID 4314

Watch CBS News

Ricci and her son Binsel.

COURTESY

"He feels very good. He's very happy to be here," Ricci added, referring to her father's home in Texas. "He says it is very pretty here. He really likes going to the park. And he says he's not scared here."

Ricci is scheduled to have a fourth and definitive hearing on her asylum case in early October. It's scheduled in El Paso but Escontrias is working to move it to the immigration court in San Antonio, closer to Ricci's new home.

Asked about her plans now that she's finally in America, Ricci said, "work, fight to provide for him," referring to her son, who, imitating her, could be heard yelling "work!" in the background.

*Editor's note: The names or surnames of migrants featured in this series have been* ......................................................... *nmigration court.*



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

Not Now                              Turn On

**AR00103**

**Biden suspends Remain-in-Mexico border policy following court order**

**U.S. admits 100,000 Ukrainians, fulfilling Biden pledge**

| More  › |
|---|

---

In:    **Immigration**    **Mexico**    **Remain in Mexico**    **United States Department of Homeland Security**

**Camilo Montoya-Galvez**

Camilo Montoya-Galvez is the immigration reporter at CBS News. Based in Washington, he covers immigration policy and politics.

|  Twitter |
|---|

*First published on August 13, 2019 / 5:55 AM*

*© 2019 CBS Interactive Inc. All Rights Reserved.*



Copyright ©2022 CBS Interactive Inc. All rights reserved.

**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

**Not Now**                    **Turn On**

AR00104

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 123 of 400   PageID 4316

Watch CBS News

AR00105

8/10/22, 11:13 AM — "Remain in Mexico": Advocates say controversial policy turns migrants into a "marketable commodity" - CBS News

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 124 of 400   PageID 4317



CBS News App   |   Ukraine Crisis   |   COVID Pandemic   |   CBS News Live   |   Full Episodes   |   Essentials Shopping   |   Newslett

☰   Ⓒ CBS NEWS

🔍   Login

POLITICS ›

# Advocates say "Remain in Mexico" policy turns migrants into a "marketable commodity"

BY CAMILO MONTOYA-GALVEZ

AUGUST 15, 2019 / 6:42 AM / CBS NEWS



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

Not Now          Turn On

*Trump administration's*

*ct on thousands of asylum-seeking*

*here*

AR00106



late winter and spring of this year, the migrant shelters in this overwhelmed. Local immigration authorities were releasing king families, most of them from Central America.

"We were dealing with 800, 900, 1,000 people that were being released to us per day," Ruben Garcia, the executive director of the Annunciation House network of shelters, told CBS News.

---

For years, Garcia and his organization have been communicating with the Immigration and Customs Enforcement (ICE) and Border Patrol units in this sector to ensure the families released by the agencies get temporary housing and assistance while they arrange for travel to reunify with family members living across the U.S.

Although he acknowledged that helping such large groups of migrants was a monumental task, Garcia stressed that his organization and local partners were able to do so, including by paying more than $1 million in hotel room fees when there was no space at the shelters. Over the past 10 months, he said Annunciation House has housed more than 150,000 migrants, most of whom left El Paso within two days of their release from detention.

**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

Not Now                    Turn On

AR00107

8/10/22, 11:13 AM      "Remain in Mexico": Advocates say controversial policy turns migrants into a "marketable commodity" - CBS News

Case 3:21-cv-00067-Z    Document 162    Filed 09/02/22    Page 126 of 400    PageID 4319



A group of migrants board a bus at the Greyhound station in El Paso. After being detained, most migrant families are released by immigration authorities and transported to local shelters, where volunteers help them arrange travel to reunify with family across the U.S.

CAMILO MONTOYA-GALVEZ

In recent months, however, the U.S government has been keeping most asylum seekers on the other side of the border, in Ciudad Juárez, Mexico – where advocates like Garcia say they can't help them. Under a controversial program known as "Remain in Mexico," the Trump administration has been requiring tens of thousands of migrants who seek asylum at certain sectors of the border, including El Paso, to wait in Mexico while their cases are processed in the U.S.

Along with amped up immigration enforcement by the Mexican government, the administration has directly pointed to this policy as one the main reasons apprehension numbers along the southern border have dwindled in the past two months from the height of the recent surge in May. The Annunciation House is now receiving between 50 and 150 migrants per day – a sharp drop from the 1,000 peak – and has closed all but two shelters.

But Garcia said he "utterly" disagrees with the notion that the "Remain in Mexico" policy, formally called the Migrant Protection Protocols (MPP), should continue because it has contributed to lower numbers of families staying at his shelters.



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

Not Now            Turn On

... to lighten the load, be it on us or ... del Refugiado, a former warehouse ... nilies released by immigration ... when you have human need, you ...

**AR00108**

8/10/22, 11:13 AM        "Remain in Mexico": Advocates say controversial policy turns migrants into a "marketable commodity" - CBS News

Case 2:21-cv-00067-Z    Document 162    Filed 09/02/22    Page 127 of 400    PageID 4320



There are 550 cots at the Casa del Refugiado shelter in El Paso for migrant families. But in recent months, many of them are not being used as the U.S. has been keeping most asylum seekers on the Mexican side of the border.

CAMILO MONTOYA-GALVEZ

Garcia's main concerns about the policy are shared by attorneys, other advocates in the El Paso area and even some of the asylum officers interviewing migrants in the MPP program who express fear of returning to Mexico. They've all denounced the policy as one that forces desperate migrants – many of them vulnerable families with small children and single women – to wait months in Mexico, where they struggle to find housing and lawyers and sometimes face persecution.

"It's especially dangerous for refugees," Garcia said, referring to Ciudad Juárez, as locals refer to the city, one of the most dangerous in Mexico. "There are gangs that would kidnap a refugee and hold the refugee for ransom: 'I've got this woman and her child from _____ for relatives. Send me $2,000,



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

Not Now          Turn On

_____ ang activity are "widespread" in _____ e U.S. has also recently begun to _____ rive near Brownsville and _____ can states the State Department _____ d the risk of being kidnapped.

"They are a marketable commodity and our State Department knows that," Garcia added,

AR00109

8/10/22, 11:13 AM                    "Remain in Mexico": Advocates say controversial policy turns migrants into a "marketable commodity" - CBS News

Case 2:21-cv-00067-Z    Document 162    Filed 09/02/22    Page 128 of 400    PageID 4321



kers.

### ...danger"

Byron, 32, a native of Guatemala, was walking alongside his daughter Alexandra, 10, in the streets of Ciudad Juárez when he said two men began following them.

"We ran, but I told her we were exercising so she wouldn't get scared," he told CBS News. "When we got home, I still didn't tell her."

Byron is sure the two strangers were kidnappers, whom he said are known to target the thousands of Central American, Cuban and Venezuelan migrants stranded in Ciudad Juárez. Last week, the advocacy group Human Rights First released a report that documented 110 "cases of rape, kidnapping, sexual exploitation, assault, and other violent crimes" against asylum seekers sent to Mexico by the U.S. government.

"This places us in danger, us Central Americans and people from other countries," Byron said of the "Remain in Mexico" policy. "Here in Juárez, it is dangerous. You can't walk outside and feel safe."

The Guatemalan father and his daughter have their first hearing in El Paso's immigration court in mid-September, but he's contemplating returning to Guatemala. He said he can't work in Mexico because he has no one he trusts to take care of Alexandra. Like the vast

majority of migrants in the program, he also has not been able to find a lawyer to take up his case.

Despite these dangers, Byron said he will remain in Juárez for as long as he can for one ...shua, 13, and Angelina, 8, are in



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

Not Now                    Turn On

...ent, the family arrived together in ...elina were detained by Mexican ... and Alexandra waited for them to ... a few hours. But they became separated once again.

**AR00110**



...gelina crossed the border in the El Paso sector without Byron and ...ed by the people they paid for the journey – and were briefly ...sed by U.S. authorities.

Byron and Alexandra did the same a few hours afterwards, but after being detained, they were placed in the MPP program and returned to Mexico, where they have been waiting ever since. Sandra, Yoshua and Angelina, meanwhile, boarded a series of buses to get from El Paso to Florence, a city in northwestern Alabama where Byron's mother has been living for a few years.

Although the program has guidelines as to who can and can't be returned to Mexico, advocates and attorneys say the decision by U.S. border officials to place someone in MPP is completely discretionary, ensuring that some fortunate migrants, like Sandra and her two children, are allowed to stay in the U.S. as their cases are adjudicated, while others, like Byron and Alexandra, aren't.

"It appears to be completely random, like roughly a duck-duck-goose type of a thing," said Taylor Levy, an immigration attorney in El Paso. "There's no explanation or rhyme or reason for why they were not put into the program. It appears to be just luck."

**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

Not Now                        Turn On

AR00111

8/10/22, 11:13 AM      "Remain in Mexico": Advocates say controversial policy turns migrants into a "marketable commodity" - CBS News

Case 2:21-cv-00067-Z    Document 162    Filed 09/02/22    Page 130 of 400    PageID 4323



At the Greyhound station in El Paso, Sandra, 32, middle, and her children Yoshua, 13, and Angelina, 8, prepare to board the first of a series of buses to Florence, Alabama.

CAMILO MONTOYA-GALVEZ

Despite being sad about the family's separation and his current predicament in Ciudad Juárez, Byron said he's happy that his wife and two of his children are now in the U.S.

Sandra, however, said the family did not make a weeks-long, perilous trek to the U.S.-Mexico border to be separated. "Right now, we are all desperate," she told CBS News. "We've never been separated for such a long time. My little girl misses her dad."

This week, Sandra has been taking Yoshua and Angelina to a local clinic to get their vaccines. The two children will be starting school in Alabama next week. They do not want leave the U.S., but Sandra knows returning to Guatemala is a possibility if her husband's stay in Ciudad Juárez is prolonged or if he and Alexandra are denied asylum.

"I don't know what we will do," she said, referring to the potential scenario in which Byron and Alexandra are not allowed to the enter the U.S. "We might return to Guatemala."

## "Playing politics with the lives of human beings"

Unlike most of the administration's unilateral efforts to deter migration – including two sweeping regulations to restrict asylum at the border – the courts have allowed the "Remain in Mexico" policy to continue. It was briefly blocked by a federal judge but the

_____ proceed with the policy as it
_____ several advocacy groups.



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

Not Now        Turn On

n early October, meaning the MPP
months.

border sectors near San Diego,
rande Valley, the most heavily
patrolled section of the frontier. Since it reached an agreement in June with the Mexican government to avert President Trump's threats to impose tariffs on Mexican goods, the

8/10/22, 11:13 AM          "Remain in Mexico": Advocates say controversial policy turns migrants into a "marketable commodity" - CBS News

Case 2:21-cv-00067-Z    Document 162    Filed 09/02/22    Page 131 of 400    PageID 4324



has pledged to expand the MPP program along the entire border.

its debut in San Diego in December of last year, the Department of S) cited a "migration crisis" at U.S.-Mexico border stemming primarily from the months-long, unprecedented influx of Central American families and unaccompanied children. The agency said the program was designed, in part, to deter "false" asylum claims and devote "more attention on those who are actually fleeing persecution."

CBS News reached out DHS with a series of questions regarding where the policy would be implemented next and whether the program would continue indefinitely, even with significant declines in apprehension numbers. CBS News has not received a response.

**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

**Not Now**                    Turn On

AR00113

Ruben Garcia, left, the director of the Annunciation House network of shelters in El Paso, shows Sens. Mazie Hirono of Hawaii and Tim Kaine of Virginia the food pantry at the "Casa del Refugiado" facility.

CAMILO MONTOYA-GALVEZ

Unless blocked by the courts, Garcia, Annunciation House's director, said the "Remain in Mexico" policy will continue to place asylum seekers in harm's way and prompt many of them to give up on their claims and return home. The Mexican government has already been operating a program to transport asylum seekers turned back by U.S. border officials back to their home countries in Central America.

"MPP has absolutely nothing to do with immigration policy, it has nothing to do with asylum, it has nothing do with justice. It has everything to do with politics," Garcia said. "We are playing politics with the lives of human beings."

---

*Editor's note: The names or surnames of migrants featured in this series have been omitted because they currently have ongoing cases in immigration court.*

## Immigration

**Dozens of people missing after packed migrant boat sinks**

**6,500 Afghan evacuees stuck in limbo awaiting U.S. resettlement**

**ler**

Be the first to know

Get browser notifications for breaking news, live events, and exclusive reporting.

Not Now Turn On

AR00114

8/10/22, 11:13 AM          "Remain in Mexico": Advocates say controversial policy turns migrants into a "marketable commodity" - CBS News

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 133 of 400   PageID 4326



**Remain in Mexico**          **United States Border Patrol**

**Homeland Security**

### Camilo Montoya-Galvez

Camilo Montoya-Galvez is the immigration reporter at CBS News. Based in Washington, he covers immigration policy and politics.

🐦 Twitter

*First published on August 15, 2019 / 6:42 AM*

*© 2019 CBS Interactive Inc. All Rights Reserved.*

CBS NEWS

Copyright ©2022 CBS Interactive Inc. All rights reserved.

Privacy Policy                              Closed Captioning

Do Not Sell My Personal Information          CBS News Live on Paramount+

Cookies Policy                              CBS News Store

Terms of Use                                Site Map

About                                       Contact Us

Advertise                                   Help

**AR00115**

1/21/22, 9:40 AM
Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.
Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 134 of 400   PageID 4327



# VICE News

# Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by

AR00116

1/21/22, 9:40 AM                    Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 135 of 400   PageID 4328

David's story is not unique.

  By Emily Green

September 16, 2019, 7:23am

NUEVO LAREDO, Mexico — David wept as U.S. immigration agents marched him and his child across the bridge into Mexico. "They say here in this country, where we are, they kidnap a lot of people," he said.

They didn't even last the night. Hours later and just three miles away, cartel members surrounded David and a dozen other migrants at a bus station. They were forced into trucks and abducted.

David is among the estimated 42,000 asylum-seekers who've been returned to Mexico in recent months under President Trump's new asylum policies. The Trump administration calls the policy "Migrant Protection Protocols," but far from offering protection, the policy has led to a brutal wave of kidnappings in some of Mexico's most dangerous border cities.

ADVERTISEMENT

1/21/22, 9:40 AM                    Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 136 of 400   PageID 4329

sister, told VICE News. "Why are they doing this? Why, if Mexico is a place that is so dangerous?"

Powerful criminal organizations have seized on Trump's changes, targeting asylum-seekers with family in the U.S. by holding them hostage until their relatives come up with thousands of dollars to pay for their release.

VICE News spoke with multiple asylum-seekers who have been kidnapped or narrowly escaped being kidnapped upon being returned to Mexico. All of them said they suspected Mexican immigration officials were working in coordination with the cartels. Often, they were grabbed at the bus station or along the three-mile stretch from the Mexican immigration office to their shelter. The stretch between the border and the shelters may be a few miles, but it is among the most dangerous part of a migrant's journey.

"[The U.S. agents] told us they were going to bring us to a shelter," David told VICE News, a few hours before he and his child were kidnapped. "They lied." VICE News has changed names and withheld certain details of David's story to protect the identity of him and his family.

## The Phone Call

AR00118

1/21/22, 9:40 AM Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z Document 162 Filed 09/02/22 Page 137 of 400 PageID 4330



CLOTHES AND SHOES ARE SET OUT TO DRY INSIDE A PHONE BOOTH AT A MIGRANT SHELTER IN IN NUEVO LAREDO, MEXICO. SERGIO FLORES/VICE NEWS

Instead, once across the border, Mexican immigration officials gave David and the other 120 migrants sent back that day two options: The government would provide them a bus ride for free to Tapachula, a city 30 hours away, on the border with Guatemala, or they could go it alone in Nuevo Laredo.

ADVERTISEMENT

AR00119

1/21/22, 9:40 AM                    Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 138 of 400   PageID 4331

been scheduled for three or four months down the road.

Those who stayed did so at their own risk.

David, without a cellphone or any money, was among them.

Nuevo Laredo is one of the most dangerous cities in one of the most dangerous regions of Mexico. It's marked not only by the near-constant crime that fuels the city but also by the impunity with which criminals here operate. The corruption and crime is so prevalent that local news barely covered the recent kidnapping in broad daylight of a minister who ran a shelter for migrants, deeming it too dangerous to report on.

## "Why are they doing this? Why, if Mexico is a place that is so dangerous?"

At the Mexican immigration offices, David was frazzled and desperate to reach Laura, who lives in the U.S., and was prepared to wire him money so he could get a bus ticket to a safer city nearby. He borrowed the cellphone of a man he said identified himself as an immigration agent and wore the agency's typical white-shirt uniform. Outside the office, men in a white four-door truck kept an eye on who came and left the building's parking lot.

The man who lent David his phone spoke with Laura, also identifying himself to her as an immigration agent. He told her he would help David and instructed her to send the money directly to his account. David didn't have a Mexican ID or passport to receive a wire transfer on his own, but the man assured them their money was in safe hands.

AR00120

1/21/22, 9:40 AM                 Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 139 of 400   PageID 4332

But after Laura sent the money, the man stopped picking up. At 8 p.m. that night, Laura received a call from a different number. "A man got on the line and said my brother had been turned over to him."

David believes the immigration agents never intended to help them.



AR00121

1/21/22, 9:40 AM                    Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 140 of 400   PageID 4333

He said when he and another dozen or so asylum seekers who had been returned that day to Mexico arrived at the bus station in Nuevo Laredo, a group of 20 men were already waiting for them. Immediately, the men forced David, his child, and the other migrants into trucks, as an immigration official looked their way but did nothing.

"The people in migration turned us over to the cartels," he said. "They know what they are doing. They don't care if you're killed or not."

Mexico's Institute of Migration, which is in charge of carrying out Mexico's immigration policies, said it is "committed to combating any behavior that violates the rights and integrity of migrants," and that it has not received any recent complaints regarding Mexican immigration officials turning migrants over to cartels or turning a blind eye to their kidnapping.

Foreign Minister Marcelo Ebrard downplayed the issue on Thursday, saying he didn't see the kidnapping of migrants "as a massive phenomenon." But minutes later, Mexican President Andrés Manuel López Obrador said the government was attentive to the issue. "The more migrants that arrive at the [border], the more criminal groups there are, and the higher the risks." Ebrard's office later contacted VICE News to say it was looking into the problem.

---

ADVERTISEMENT

AR00122

1/21/22, 9:40 AM                    Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 141 of 400   PageID 4334

David said the kidnappers took his few belongings, including the paperwork U.S. Customs and Border Protection had given him. Without it, he and his child can't enter the U.S. to attend their hearing in December.

The kidnappers took a dozen pictures of each of the migrants who were being held, and they took notes on everyone — their full names, where they were from, their family members. The cartel was also holding at least 20 other men, plus dozens of children and women, who "were treated like pieces of meat," David said.

They separated the women from the men, and beat any of the men who turned to look. David said one man tried to escape and they shot him dead.

Back in the U.S., Laura was desperately trying to negotiate the release of her brother and his child. But she works in a factory, earning $10.50 an hour. She didn't have a dollar to spare, much less the thousands the kidnappers were demanding.

## "It's absolutely pointless to go to the police"

Over the course of several days, Laura received up to three calls a day from them, recordings of which VICE News has reviewed. She was passed between an underling and his boss, as they alternately comforted and threatened her while demanding money.

"I need you to send me the money as fast as possible, Grandma," one of the men told her. When she told them there was no way she could pay the

**AR00123**

1/21/22, 9:40 AM                    Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z    Document 162    Filed 09/02/22    Page 142 of 400    PageID 4335

depositing it in pieces." "You'll get all the money, mother, don't worry."

ADVERTISEMENT



MIGRANTS PLAY TABLE TENNIS AT A SHELTER IN NUEVO LAREDO, MEXICO. SERGIO FLORES/VICE NEWS

Kidnapping and extortion stories like these have become the norm in Nuevo Laredo since the U.S. started returning migrants there in mid-July.

AR00124

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 143 of 400   PageID 4336

because most victims and family members are too terrified to file a report to the police, who are also believed to have ties with the cartels. It's estimated that hundreds, if not thousands, of migrants have been kidnapped, raped, and targeted for extortion after being returned to Mexico under Migrant Protection Protocols.

"It's pretty clear that the Department of Homeland Security is essentially delivering asylum-seekers and migrants into the hands of kidnappers, and people who are attacking the refugees and migrants when they return," said Eleanor Acer, senior director for refugee protection at Human Rights First. She added that in these regions of Mexico, "it's absolutely pointless to go to the police."

The U.S. Department of Homeland Security didn't respond to queries about whether it was aware of the widespread kidnapping of migrants returned under Migrant Protection Protocols. Acting U.S. Customs and Border Protection Commissioner Mark Morgan said earlier this month that he has heard "anecdotal allegations" of migrants being kidnapped, but that "Mexico has provided nothing to the United States corroborating or verifying those allegations."

## The Business of Kidnapping

AR00125

1/21/22, 9:40 AM                    Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z    Document 162    Filed 09/02/22    Page 144 of 400    PageID 4337



A SHELTER IN NUEVO LAREDO. SERGIO FLORES/VICE NEWS

The business of kidnapping migrants is so entrenched in Nuevo Laredo that it's referred to as "passing through the office," according to victims and one person with knowledge of the process.

ADVERTISEMENT

One woman, whom VICE News is calling Ana to protect her identity, was kidnapped with her husband and two children the day after the U.S. sent them back. She said they were at the bus terminal buying a ticket for a

AR00126

1/21/22, 9:40 AM                    Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z    Document 162    Filed 09/02/22    Page 145 of 400    PageID 4338

needed to go with the men.

The first night, they stayed at an abandoned house. Then they were taken to a hotel, where they spent the next six nights. Ana, her husband, and the children slept in one bed. Many others were forced to sleep on the floor, she said. Every day captives were taken out and more were brought in. The hotel door was guarded by a single man. Meals were provided daily.

Unlike David, Ana said the kidnappers never showed force. But they didn't need to. She said the man guarding the door made clear the consequences if they tried to escape. "I promise you won't make it two blocks before we will catch you again and the situation will be much worse for you," he told them.

The kidnappers searched Ana, looking for slips of paper with U.S. telephone numbers. They didn't find any and demanded she give them numbers of family members. She gave them Honduran phone numbers. "We don't want those. We want numbers from the U.S.," they chastised.

Ana gave her the number of a brother in the U.S. In a separate room, hidden from her, the kidnappers negotiated over the phone. Over the next week, the brother scraped together more than $15,000 for their release and wired the money.

---

ADVERTISEMENT

AR00127

1/21/22, 9:40 AM     Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 146 of 400   PageID 4339



A WOMAN WASHES DISHES AT A MIGRANT SHELTER IN NUEVO LAREDO, MEXICO. SERGIO FLORES/VICE NEWS

Ana said when they were released, they were given a keyword as a form of security: If they were kidnapped again, the keyword would indicate what cartel they pertained to and that they had already paid the ransom fee.

The cartels keep records of the people they kidnap, according to the person with knowledge of their operations. That includes how many people they have kidnapped, where they are from, who could pay, who couldn't pay, where they crossed into the U.S., and how many opportunities the coyotes gave them to cross.

Throughout Mexico, migrants who travel with smugglers are given keywords that indicate what smugglers they have traveled with — and by extension, what cartels have been paid off. If the migrants don't have a

AR00128

1/21/22, 9:40 AM                    Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 147 of 400   PageID 4340

vulnerable.

"Here, organized crime is actually organized," said the person with knowledge of the cartel's operations. "It's a company that functions like a clock. Exactly like it should."

## The Threat

In the U.S., Laura was getting desperate. The kidnappers had promised to call back at 3 p.m. but hadn't.

She managed to pull together a few thousand dollars from family members to pay the kidnappers. When they called the following afternoon, the man on the other end of the line berated her for not having more.

Still, he told Laura that she should deposit what she had into Mexican bank accounts, and that he would talk to the boss. VICE News has reviewed records of the money deposits.

ADVERTISEMENT

AR00129

1/21/22, 9:40 AM                    Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 148 of 400   PageID 4341

# night, I dream about everything that has happened to us"

After Laura deposited the money, members of the cartel drove David and his child back to the bus station. They told him the cartel would be watching him from there, that they had people everywhere. Dozens of migrants remained behind, including at least 10 children, he said.

"They told me they would kill me if I talked," he said.

He has no idea how he will pursue his asylum claim in the U.S. since the cartel took away his paperwork that allows him to enter the U.S. for a hearing before a judge. But even then, the idea of staying in Mexico until December is untenable.

David can't stop crying, and his young child has stopped talking altogether.

"One of the kidnappers told me that the kidneys of my [child] were good for removal," David said, sobbing so hard he could barely get the words out. "I can't sleep thinking about it. Every night, I dream about everything that has happened to us."

**Cover**: *Migrants who were returned to Mexico under Migrant Protection Protocols prepare to be taken to a processing center in Nuevo Laredo, Mexico. Sergio Flores/VICE News*

*Design and illustrations by Hunter French.*

---

TAGGED: ASYLUM SEEKERS, INTERVIEWS WITH ASYLUM SEEKERS, MEXICO–US BORDER, DONALD TRUMP MEXICO, DONALD TRUMP BORDER, TRUMP IMMIGRATION, ASYLUM CRISIS, MEXICO MIGRANT CRISIS

**AR00130**

1/21/22, 9:40 AM                    Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z    Document 162    Filed 09/02/22    Page 149 of 400    PageID 4342

| Your email address | Subscribe |
|---|---|

By signing up, you agree to the **Terms of Use** and **Privacy Policy** & to receive electronic communications from Vice Media Group, which may include marketing promotions, advertisements and sponsored content.

# MORE FROM VICE

World News

## Wild Video Shows Brazen Prison Break In Mexico

NATHANIEL JANOWITZ

12.03.21

---

World News

## The US Just Put $5 Million Bounties on 4 of El Chapo's Sons

NATHANIEL JANOWITZ

12.16.21

---

World News

## El Chapo's Wife Emma Coronel Was Sentenced to 3 Years in Prison

KEEGAN HAMILTON

11.30.21

---

World News

## Colombia's Most Famous Kidnapping Victim is Running for President

EMILY GREEN

**AR00131**

1/21/22, 9:40 AM                    Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 150 of 400   PageID 4343

World News

## Feminist Activist Shot Dead While Protesting Violence Against Women

EMILY GREEN

11.30.21

World News

## French Fashion Crew Shows How to Be Horrible Foreigners in Mexico

EMILY GREEN

01.14.22

ADVERTISEMENT

1/21/22, 9:40 AM                    Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 151 of 400   PageID 4344

AR00133

1/21/22, 9:40 AM                    Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 152 of 400   PageID 4345

AR00134

1/21/22, 9:40 AM                    Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 153 of 400   PageID 4346

ABOUT

JOBS

PARTNER

VICE VOICES

CONTENT FUNDING ON VICE

SECURITY POLICY

PRIVACY & TERMS

ACCESSIBILITY STATEMENT



© 2022 VICE MEDIA GROUP

**AR00135**

1/21/22, 9:40 AM

Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel.

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 154 of 400   PageID 4347

AR00136

# Migrants stuck in lawless limbo within sight of America



In this Oct. 12, 2019 photo, a Cuban exits a migrant shelter in Reynosa, Mexico. In years past, migrants seeking asylum in the United States moved quickly through this violent territory on their way to the U.S., but now due to Trump administration policies, they remain here for weeks and sometimes months as they await their U.S. court dates, often in the hands of gangsters who hold Tamaulipas state in a vice-like grip. (AP Photo/Fernando Llano)

NUEVO LAREDO, Mexico (AP) — The gangsters trawling Nuevo Laredo know just what they're looking for: men and women missing their shoelaces.

Those are migrants who made it to the United States to ask for asylum, only to be taken into custody and stripped of their laces — to keep them from hurting themselves. And then they were thrust into danger, sent back to the lawless border state of Tamaulipas.

In years past, migrants moved quickly through this violent territory on their way to the United States. Now, due to Trump administration policies, they remain there for weeks and sometimes months as they await their U.S. court dates, often in the hands of the gangsters who hold the area in a vise-like grip.

Here, migrants in limbo are prey, and a boon to smugglers.

——

This story is part of an occasional series, "Outsourcing Migrants," produced with the support of the Pulitzer Center on Crisis Reporting.

——

They recount harrowing stories of robbery, extortion by criminals and crooked officials, and kidnappings by competing cartels. They tell of being captured by armed bandits who demand a ransom: They can pay for illegal passage to the border, or merely for their freedom, but either way they must pay.

And then they might be nabbed again by another gang. Or, desperate not to return to the homes they fled in the first place, they might willingly pay smugglers again.



In this Oct. 10, 2019 photo, a Mexican migrant points to a map of U.S.-Mexico border cities, hanging on display at a migrant shelter in Reynosa, Mexico. The Mexican state of Tamaulipas used to be a crossroads. Its dangers are well known; the U.S. has warned its citizens to stay away, assigning it the same alert level as war-torn countries such as Afghanistan and Syria. (AP Photo/Fernando Llano)
a Mexican migrant points to a map of U.S.-Mexico border cities, hanging on display at a migrant shelter in Reynosa, Mexico. (AP Photo/Fernando Llano)

That's what a 32-year-old Honduran accountant was contemplating. She had twice paid coyotes to help her cross into the U.S. only to be returned. Most recently, in September, she was sent back across the bridge from Brownsville to Matamoros.

Now, biding her time with her daughter in the city of Monterrey, she said one thing is for sure: "We are a little gold mine for the criminals."

**AR00137**

Tamaulipas used to be a crossroads. Its dangers are well known; the U.S. has warned its citizens to stay away, assigning it the same alert level as war-torn countries such as Afghanistan and Syria.

Whenever possible, migrants heading north immediately crossed the river to Texas or presented themselves at a U.S. port of entry to file an asylum claim, which would allow them to stay in the U.S. while their cases played out.

But the U.S. has set limits on applicants for asylum, slowing the number to a mere trickle, while the policy known colloquially as "Remain in Mexico," has meant the return of more than 55,000 asylum-seekers to the country while their requests meander through backlogged courts.

The Mexican government is ill-prepared to handle the influx along the border, especially in Tamaulipas, where it has been arranging bus rides south to the relative safety of the northern city of Monterrey or all the way to the Guatemala border, citing security concerns — tacit acknowledgement, some analysts say, of the state of anarchy.

The gangs have adapted quickly to the new reality of masses of vulnerable people parking in the heart of their fiefdom, experts say, treating the travelers, often families with young children, like ATMs, ramping up kidnapping, extortion, and illegal crossings to extract money and fuel their empires.

"There's probably nothing worse you could do in terms of overall security along the border," said Jeremy Slack, a geographer at the University of Texas at El Paso who studies the border region, crime and migration in Mexico. "I mean, it really is like the nightmare scenario."

Full Coverage: Outsourcing Migrants

Yohan, a 31-year-old Nicaraguan security guard, trudged back across the border bridge from Laredo, Texas, in July with his wife and two children in tow, clutching a plastic case full of documents including one with a court date to return and make their asylum claim to a U.S. immigration judge two months later.

Penniless, with little more than a cellphone, the family was entering Nuevo Laredo, dominated by the Northeast cartel, a splinter of the brutal and once-powerful Zetas gang.

This is the way he tells the story now, in an interview at a nonprofit in Monterrey that provides the family with shelter and food:

The plan was to call and ask help from the only people they knew in the area — the "coyotes," or people smugglers, who earlier helped them cross the Rio Grande on an inflatable raft and had treated them well. Only that was in Ciudad Miguel Aleman, about a two-hour drive south parallel to the river.

On their way to the bus station, two strange men stopped Yohan while another group grabbed his loved ones. At least one of them had a gun. They were hustled into a van, relieved of their belongings and told they had a choice: Pay thousands of dollars for their freedom, or for another illegal crossing.

All along the border, there have abuses and crimes against migrants by Mexican organized crime, which has long profited off them. But Tamaulipas is especially troubling. It is both the location of most illegal crossings, and the state where the United States has returned the most asylum seekers — 20,700 through Nuevo Laredo and Matamoros as of early October.

AR00138

read://https_apnews.com/?url=https%3A%2F%2Fapnews.com%2Farticle%2Fimmigration-el-paso-texas-mass-shooting-caribbean-ap-top-news-intern…    2/7

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 157 of 400   PageID 4350

The Mexico City-based Institute for Women in Migration, which tracks kidnappings of migrants and asylum-seekers, has documented 212 abductions in the state from mid-July through Oct. 15. And that's surely an undercount.

Of the documented kidnappings in Tamaulipas, 197 occurred in Nuevo Laredo, a city of about 500,000 whose international bridges fuel the trade economy.

Yohan's family was among them.

They had left Esteli in northwestern Nicaragua over three months earlier after armed, government-aligned civilian militias learned that Yohan had witnessed the killing of a government opponent, he said. They followed him and painted death threats on the walls of their home.

He is identified only by his middle name, because he and others quoted in this story fear for their lives and spoke to The Associated Press on condition of anonymity.

Yohan borrowed against his mother's house to pay smugglers $18,000 for the family's trip. But he had not bargained on the closed door at the border, or the ordeal in Nuevo Laredo, and his bankroll was depleted.

The men who grabbed the family "told us they were from the cartel, that they were not kidnappers, that their job was to get people across and that they would take us to the smuggler to explain," Yohan said. Then they connected a cable to his cellphone to download its contents.

Yohan's first instinct was to give the passphrase that his previous smugglers used to identify "their" migrants. "'That doesn't mean anything to us,' one of them told me," Yohan said — this lot belonged to a different group.

Gangs in Tamaulipas have fragmented in the last decade and now cartel cells there operate on a franchise model, with contacts across Mexico and Central America, said Guadalupe Correa-Cabrera, a political scientist specializing in organized crime, immigration, border security and human trafficking at George Mason University.

"They are contractors. They provide a service, control the territory, operate safe houses and charge for all that," she said.

Yohan's family was held in a series of what appeared to be private homes or offices, along with a family from El Salvador, two Cubans and two Mexicans. Everyone slept on the floor.

One captor, a 16-year-old, told him, "We have 15 smugglers, the cartel brings the people to us here and we take them across paying the cartel for the river crossing."

The gang had been hiring lately: "Since the United States is deporting so many through here, we are capturing them and that has meant more work," the teen told him. "We're saturated."

Initially the captors demanded $16,000. They gave Yohan and his wife a list of names and accounts; relatives were supposed to deposit $450 into each one without using companies seen as traceable by authorities.

But they were able to scrape together just $3,000, and that angered the gangsters.

"I'm going to give you to the cartel," one shouted.

AR00139

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 158 of 400   PageID 4351

Then Yohan's son came down with the mumps. The family got the captors to provide a bit of extra milk for him in exchange for his daughter's little gold ring, but the boy wasn't getting better and they abruptly released the family.

"They told us that the cartel doesn't allow them to hold sick children," Yohan said.

This is a matter of business, not humanity: A dead child could bring attention from the media, and then authorities, says George Mason's Correa-Cabrera.

After 14 days captive and before leaving the safe house, Yohan was given a code phrase: "We already passed through the office, checking." Only hours later they would need to use it. Arriving at the bus station, a group of strange men tried to grab them. Yohan spoke the six words in Spanish, and they were let go, and they went on to Monterrey.

On Sept. 22, Yohan's family returned to Nuevo Laredo for their court date, bringing with them a report on the family's kidnapping. Though U.S. law allows at-risk people to stay, they were sent back to the parking lot of a Mexican immigration facility, surrounded by seedy cantinas and watching eyes.

Mexican authorities organized bus transportation for those who wanted to return to their home countries. The family did not intend to go back to Nicaragua, so they asked the driver to leave them in Monterrey where they would await the next hearing.

After they were under way, the driver demanded $200. They couldn't pay, so he dumped them about 60 miles (100 kilometers) from the city at 1 a.m., along with four others.

———

Unlike other border cities such as Tijuana or Ciudad Juarez, migrants and asylum seekers are rarely seen on the streets in Nuevo Laredo. Fear keeps them in hiding, and safety isn't a sure thing even inside shelters. This summer pastor Aarón Méndez was abducted from the shelter he ran. He has not been heard from since.

Nor is it safe on the streets going to and from the station. A couple of months after Méndez disappeared, gunmen intercepted some people who were helping migrants make those trips; those being transported were taken away, and the helpers were told they would be killed if they persisted.

Kennji Kizuka, a researcher for New York-based Human Rights First, told of one woman who crossed into the U.S. for a hearing date, where she had to surrender her phone. While she was incommunicado for hours, calls were placed to relatives in the United States claiming she had been kidnapped and aggressively demanding a ransom.

"It's clear that they have a very sophisticated system to target people," Kizuka said.

In another instance, Kizuka said, cartel members were in the Nuevo Laredo office of Mexican migration, openly abducting asylum seekers who had just been sent back from the United States.

One woman hid in the bathroom with her daughter and called a local pastor for help; he tried to drive them away, but they were blocked by cartel members blocks way. The two were taken from the car and held by the gangsters, though they eventually were released unharmed.

A spokesperson for the Mexican foreign affairs secretary declined comment on allegations that Mexico cannot guarantee safety for immigrants returned from U.S.

**AR00140**

U.S. Border Patrol officials said recently they are continuing to send asylum seekers back over the border, and that includes Nuevo Laredo. The number of people returned there has been reduced recently, but that was related to a decrease in migrants arriving at the border — and not violence in Tamaulipas.

In an interview, Brian Hastings, Border Patrol chief of law enforcement operations, told AP that officials didn't see a "threat to that population" in Tamaulipas and "there was basically a small war between the cartel and the state police" there.

But the numbers indicate the danger is real.

As of August, Human Rights First had tabulated 100 violent crimes against returnees. By October, after it rolled out to Tamaulipas, that had more than tripled to 340. Most involved kidnapping and extortion. Kizuka said the danger is even greater than the numbers reflect because they are based solely on accounts his organization or reporters have been able to document.

Of dozens of people interviewed by AP who said they had been victimized in Nuevo Laredo, Reynosa, Matamoros and Monterrey, just one had filed a police report.

Kidnappings of migrants are not a new phenomenon. According to Mexico's National Human Rights Commission, in just six months in 2009 nearly 10,000 migrants were abducted while passing through the country.

Back then the cartels were splintering amid a government policy targeting their top bosses, leading them to fight among themselves in the people-smuggling business to fill two needs: money and labor. Kidnapped migrants generally were told they could avoid being killed by either paying ransom or working for the cartel.

Tamaulipas became a bloody emblem of the problem in 2010 when 72 migrants were found slain at a ranch in San Fernando, and a year later when the bodies of 193 migrants were found in the same area in clandestine mass graves — apparently murdered by a cartel to damage a rival's people-smuggling business.

Raymundo Ramos of the Nuevo Laredo Human Rights Committee said gangs today are more interested in squeezing cash from migrants: "They have to recover a lot of the money lost in those wars."

President Andrés Manuel López Obrador has acknowledged that another massacre or escalation of violence is a major fear and has deployed more than 25,000 troops and National Guard agents to police people-trafficking in border regions and along smuggling routes. But all the accounts of violence in this account took place after that deployment.

———

Reynosa, a factory city of about 650,000, is the largest in Tamaulipas and home to some of the worst drug war violence. It's also a key part of the migratory route and one of the busiest crossing points along with Ciudad Miguel Aleman.

Disputed by rival gangs, Reynosa has the feel of a place with invisible fences demarcating their territories, and numerous migrants said they had to pay to get past checkpoints at the main entrances to the city.

Lawyer and human rights worker Fortino López Balcázar said the gangs first took control of the river, attacking and beating migrants. Then they started grabbing them from bus stations, and then from the

AR00141

streets.

The airport is also tightly controlled.

A 46-year-old teacher from Havana recalled arriving with her 16-year-old son Aug. 13 by plane from Mexico City with the phone number for a taxi driver, provided by a lawyer who arranged their trip. As they drove into Reynosa, two other taxis cut the vehicle off. Two men got in, took away her cellphone and money and whisked them to a home that was under construction.

The lawyer "sold us out," the woman said.

That night they were moved to a thicket near the Rio Grande where they were held captive in an outdoor camp for a week with dozens of others. They met another group of Cubans, who were also abducted shortly after flying into Reynosa: Several taxi and vans brazenly intercepted them in broad daylight, bringing traffic to a halt.

"It was as if we were terrorists and the FBI had swooped down on us," one of the men said. He speculated they may have been betrayed by an airport immigration agent with whom they had argued over their travel documents.

López Obrador's government has said the National Immigration Institute is one of Mexico's most corrupt agencies. In early 2019 the institute announced the firing of more than 500 workers nationwide. According to a person with knowledge of the purge, Tamaulipas was one of four states where the most firings took place. Some worked in airports, others in the city of Reynosa.

In February the institute's deputy delegate to the city was fired and accused of charging detained migrants over $3,000 to avoid deportation. Later new complaints surfaced of people being shaken down for $1,500 to be put at the top of wait lists to present claims in the United States.

At the riverside camp, the Cuban teacher was introduced to its "commander" who demanded "rent" and a fine for not traveling with a guide. The ransom was set at $1,000.

Previously the Cuban woman's only exposure to the world of organized crime came from movies she watched on the illegal satellite TV hookup that caused her to run afoul of authorities back home. Now, they were witnessing things both terrifying and hard to understand.

There was the time a man tried to suffocate another with a plastic bag, or when the kidnappers, some barely in their teens, beat a "coyote" for working for a rival outfit. From what she was able to understand from the shouting, he had been kidnapped along with clients he was guiding and they wanted him to switch loyalties.

The captors at the thicket referred to themselves as "the corporation," the teacher said. People came and went, some delivered by men in uniforms who may or may not have been police.

Edith Garrido, a nun who works at the Casa del Migrante shelter in Reynosa, said both crooked officers and criminals dressed as police — known as "black cops" or "the clones" — are mixed up in the racket, making the rounds of safe houses to buy and sell kidnap victims.

"They say 'give me 10, 15, 25.' They tell you they are going to take them to a safer place, and they give them to the highest bidder," Garrido explained. "A migrant is money for them, not a person."

The captors let the Cubans use their cellphones for a few hours to coordinate ransom payments with relatives, always small amounts to different bank accounts. Weeping, the teacher recalled how her 25-year-old daughter in Cuba had to pawn all her belongings.

**AR00142**

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 161 of 400   PageID 4354

After the ransom came through, the captors took her picture and she, her son and another woman were put in a taxi and driven off. The cabbie stopped the car along a highway, took her cellphone and said they could go.

She and her son now await their immigration court date in Reynosa, where she has found temporary construction work to pay for rent and food.

There's not enough space for everyone at the shelters, so many rent rooms, and that demand has pushed prices up. It can range from $35 per person per month for a spot in a cramped five-person bedroom in a seedy area, to $300-$500 for a more secure home.

But nowhere is truly safe. Last month a family from El Salvador missed their turn to present themselves for U.S. asylum after a shootout erupted in the streets and they were afraid to leave their home.

Garrido said some pay protection fees so they are not bothered in their homes, while others rent directly from the gangs.

"So one way or another," she said, "they make money."

———

Associated Press writers Peter Orsi in Mexico City and Colleen Long in Washington contributed to this report.

AR00143

**U.S. Customs and Border Protection**

| | |
|---|---|
| **CBP Directive No.** 3340-043 | **Date:** September 3, 2008 |

**ORIGINATING OFFICE**: OFO: APP
**SUPERSEDES:**
**REVIEW DATE:** September 2011

**SUBJECT:    THE EXERCISE OF DISCRETIONARY AUTHORITY**

**1.  Purpose.**  To provide guidance and direction to promote the fair, objective and consistent application of U.S. Customs and Border Protection (CBP) discretionary authority in the enforcement of immigration laws nationwide.

**2.  Policy.**

2.1     It is the policy of CBP to protect the United States of America from threats posed by terrorist organizations and to prevent terrorists as well as suspected terrorists, terrorist funding, weapons, and instruments, including Weapons of Mass Effects (WME), and their precursors from entering the United States.

2.2     It is the policy of CBP, consistent with the Immigration and Nationality Act (INA) to verify the identity, citizenship and admissibility of persons seeking entry into the United States. Where there is a belief, based on an evaluation of available information, that an alien may have ties to or presents a threat related to terrorism, has criminality rendering him or her inadmissible, or is likely to add to the illegal population of the United States, the alien will be denied admission where there is a legal basis to do so.

2.3     It is the policy of CBP that, through the use of all authorities and sanctions provided by law and procedure, enforcement actions will be vigorously pursued against any individual where there exists any reasonable suspicion of association with terrorism, criminality, illegal migration, smuggling or any other activity contrary to national interests or in violation of U.S. statutes.

2.4     It is the policy of CBP to consider the exercise of discretionary measures in favor of aliens who are inadmissible due to a minor or technical violation of the INA.  This includes the use of the waiver and parole processes to allow such aliens into the United States, where appropriate and permissible by law.  In keeping with the CBP strategy of risk management, CBP will focus resources on those cases that pose the greatest risk.

2.5     It is the policy of CBP that in individual cases involving technical inadmissibility, minor violations, and apparent bona fide travel, where refusal of admission or withdrawal of application for admission would involve detention or undue hardship, it is appropriate to expansively consider the exercise of discretionary authority.  This principle must be applied on a case-by-case basis and may not be interpreted to provide relief from the visa requirement in any systemic manner to any particular class of aliens.

2.6     It is the policy of CBP that supervisors and managers will responsibly assess every case involving a prospective adverse action.  This will ensure that CBP's legal and discretionary authority is being exercised judiciously and in a manner consistent with the facts of the case.

Law Enforcement Sensitive / For Official Use Only

**3.  Authority/References.**  Immigration and Nationality Act (INA); Title 8 United States Code (USC); Title 19 USC; Title 8 Code of Federal Regulations (CFR); Inspector's Field Manual (IFM) Chapters 16.1 (Parole); 17.1 (Deferred Inspection); 17.2 (Withdrawal of Application for Admission); and 17.5 (Waivers).

**4.  Definitions.**

4.1     "Admission," means, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by a CBP officer.

4.2     "Brief overstay," generally means an overstay of approved nonimmigrant status, unintentional in nature or beyond the control of the alien, covering a period of ██████████ or less.

4.3     "Hardship," must be determined based on the factors presented.  Applicants must be encouraged to describe and document all applicable factors, since there is no guarantee that any particular reason will result in a finding that an adverse action would cause extreme or undue hardship.

4.4     "Minor or technical violation," means a single infraction of a CBP statute that does not rise to a level of such a serious nature that would preclude the offering of a form of discretion.

4.5     "Significant public benefit," means that the inadmissibility of an alien is outweighed by the public interest in allowing the alien to enter the United States.

4.6     "Unforeseen emergency," as used in 8 CFR § 212.1(g) generally means:

4.6.1    An alien arriving for a medical emergency (an injury or illness that requires immediate medical attention to prevent life-threatening or disabling conditions);

4.6.2    An emergency or rescue worker arriving in response to a community disaster or catastrophe in the United States;

4.6.3    An alien accompanying or following to join a person arriving for a medical emergency;

4.6.4    An alien arriving to visit a spouse, child, parent, or sibling who within the past 5 days has unexpectedly become critically ill or who within the past 5 days has died; or,

4.6.5    An alien whose passport or visa was lost or stolen within 48 hours of departing the last port of embarkation for the United States.

**5.  Responsibilities.**

5.1     The Assistant Commissioner, Office of Field Operations, is responsible for policy oversight, which includes the formulation and implementation of guidelines and procedures.

Law Enforcement Sensitive / For Official Use Only

**AR00145**

5.2     The Executive Director, Admissibility and Passenger Programs (APP), is responsible for the formulation and implementation of the guidelines set forth by the Assistant Commissioner. In addition, the Executive Director, APP, will be responsible for conducting national reviews to ensure compliance with implemented guidelines outlined in this directive.

5.3     Directors, Field Operations (DFOs) are responsible for the overall management and implementation of this program. DFOs will also be responsible for the overall monitoring of the exercise of discretionary authority within their areas of responsibility.

5.4     Port Directors (PDs) are responsible for performing periodic reviews of cases to ensure that the exercise of discretionary authority is being applied in accordance with this directive. PDs are also responsible to ensure that any exercise of discretionary authority is fully warranted.

5.5     Field managers and supervisors are responsible for ensuring that the Discretionary Checklist is utilized in every case involving a prospective adverse action. They are further responsible for assessing every case involving a prospective adverse action to ensure that any exercise of discretionary authority is done judiciously and in a manner consistent with the facts of the case.

5.6     Supervisors are responsible for ensuring that the Discretionary Checklist is completed during case processing. Supervisors are further responsible for ensuring that CBP officers under their supervision are familiar with the policies and procedures established by this directive.

5.7     CBP officers are responsible for knowing, understanding and adhering to the contents of this directive. CBP officers are further responsible for accurately presenting all facts and circumstances resulting from an inspection that may involve a prospective adverse action to the appropriate level of management, through the chain of command.

5.8     CBP officers are responsible for immediately forwarding information to the appropriate level of management, through the chain of command, regarding time-critical situations, including medical emergencies.

**6.   Port of Entry Environments.**

6.1     Land Border and Preclearance Ports of Entry

6.1.1   In these environments, an inadmissible alien can normally be returned to a contiguous country immediately or without the need to arrange for additional transportation or to be taken into federal custody. Ports may need to consider additional factors where refused aliens must be transported to a designated return location.

6.1.2   In these environments, it is generally reasonable to refuse admission, or accept a withdrawal of application, as it would not create an undue hardship on an alien. If necessary, an alien can access a United States Embassy or Consulate in an attempt to correct any documentary deficiencies, or can secure additional evidence to support a subsequent application for admission.

6.1.3   Despite the ease with which aliens may be refused admission in these environments, CBP supervisors and officers must continue to evaluate each case to adequately determine if the exercise of discretionary authority is warranted.

6.2     Air and Sea Ports of Entry

6.2.1   In these environments, there is less flexibility due to external circumstances that must be considered, such as transportation schedules and carrier liabilities.

6.2.2   When a violation is technical or minor in nature, and the purpose for travel is determined to be bona fide, discretionary guidelines shall be applied expansively to minimize hardship on an alien ███████████████████████████████████████. This does not preclude the use of restraints or detention where there is an articulable concern for officer safety.

**7.  Discretionary Checklist**

7.1     The attached Discretionary Checklist serves as an aid to frontline personnel and managers in exercising discretionary authority.  It also ensures that the INA is consistently applied and that each applicant's admissibility is viewed as a unique, individual case.

7.2     The Discretionary Checklist should be completed by the inspecting CBP officer and reviewed by a first and/or second line supervisor.

7.3     The Discretionary Checklist should be maintained as a part of the alien's port file or A-file (if one exists), regardless of whether discretionary authority is exercised or denied.  The checklist should explain why discretion was approved or denied.

7.4     Discretionary authority should generally not be exercised if the alien is unable to establish his or her identity or citizenship.

7.5     Discretionary authority should generally not be exercised if the alien has terrorist ties or affiliations, significant criminal history, or is likely to contribute to the illegal population of the United States. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

7.6     The factors outlined below should be considered when deciding whether to exercise discretion.  Not every factor will apply in every case.

7.6.1   The nature of the inadmissibility should be reviewed to determine if it is a minor or technical concern as opposed to more serious fraud, criminal or security grounds.

7.6.2   All potential grounds of inadmissibility should be reviewed.  Generally, if there are multiple grounds of inadmissibility, it is not merely a minor or technical concern.

~~Law Enforcement Sensitive / For Official Use Only~~

7.6.3    Previous violations or determinations of inadmissibility should be reviewed ████████

7.6.4    Previous grants of parole or waiver should be reviewed ██████████████

7.6.5    An alien's stated purpose of entry should be reviewed ████████████████

7.6.6    An alien's stated family or business ties in the United States should be reviewed and verified to the extent possible.  Such ties must be carefully considered as they may support a legitimate reason for entry, or provide evidence indicating intentions to contribute to the illegal population of the United States.

7.6.7    An alien's current and previous immigration status and length of residence in the United States (if applicable) should be reviewed to assess compliance with previous admissions.

7.6.8    An alien's good faith efforts to obtain correct information or documents prior to arrival should be reviewed and verified to the extent possible.

7.6.9    An alien's knowledge or ignorance of correct procedures or admissibility requirements should be reviewed to determine if a violation is inadvertent, or caused by unfamiliarity with the laws and/or language of the United States.

7.6.10   Advance opportunity to obtain travel documents should be reviewed to determine if the situation provided sufficient time for an alien to comply.  In some cases, an alien may have been aware of the documentary requirements, but may have a plausible reason for not complying.

7.6.11   Any suspected intentions to circumvent admissibility requirements should be reviewed to determine the underlying reason for inadmissibility, and the extent to which the alien was aware of any inability or unlikelihood of being granted a visa or admission to the United States.

7.6.12   Misrepresentations[1] made during the inspection process should be reviewed and treated with the seriousness they deserve.  While certain misrepresentations may subject an alien to Expedited Removal provisions, other misrepresentations may be less severe, and may be made due to fear or distrust of authority, or for cultural reasons.  Where inconsistencies in critical information exist due to misrepresentation, the exercise of discretionary authority is less likely to be appropriate.

---

[1] 

7.6.13  An alien may not be aware that a previous brief overstay has resulted in either the voidance of a visa, or future ineligibility to enter the United States under the Visa Waiver Program (VWP).  In such cases, the alien should be informed of the consequences of his or her previous overstay but discretion may still be considered.

7.6.14  An alien's claim of official misinformation, especially from government officials, should be reviewed to determine the credibility, and verified to the extent possible.

7.6.15  An alien's willingness to cooperate with CBP processing should be reviewed ███
███████████████████

7.6.16  An alien's age and health should be reviewed to determine if he or she requires assistance, as an infant, child, or elderly person, or if he or she is experiencing a life-threatening or long-term illness.  Such conditions may impact an alien's ability to travel, be detained or be restrained, and may also affect his or her ability to understand or comply with entry requirements.

7.6.17  Any political or media sensitivities should be reviewed to determine if the alien presents high-profile or sensitive issues.  Discretionary authority should not be exercised solely to avoid adverse publicity.

7.6.18  An alien's potential to pose a threat of future terrorist, criminal or violent acts in the United States should be considered.

7.6.19  Any other humanitarian or public interest considerations should be reviewed by the appropriate supervisor to determine if an officer should allow withdrawal of application for admission, or pursue Expedited Removal or removal proceedings before an Immigration Judge.
███████████████████████████████

## 8.  Forms of Discretion.

### 8.1  Waivers.

8.1.1    Generally, waivers approved at ports of entry will be for documentary deficiencies and will be documented using Form I-193, *Application for Waiver of Passport and/or Visa*.  If an alien is inadmissible for reasons other than documentary deficiencies, such a waiver is not appropriate and cannot be approved at the port of entry.  In such cases, parole may be considered as a discretionary means to allow the alien into to the United States.

8.1.2    The authority to approve such waivers under INA § 211(b) and INA § 212(d)(4)(A) is currently delegated to port management at the GS-13 level and above, and port directors at the GS-12 level.

8.1.3    The Form I-193 application fee may be waived for aliens granted a waiver for the first time under INA § 211(b) or INA § 212(d)(4).  Such determination shall be made by port management at the GS-13 level and above, or a port director at the GS-12 level.  Previous beneficiaries of a fee-exempt waiver may be considered for subsequent fee-exempt waivers on a case-by-case basis.

8.1.4    Ports of entry encountering returning lawful permanent residents lacking evidence of alien registration, and thus inadmissible under INA § 212(a)(7)(A)(i), may offer a visa waiver pursuant to INA § 211(b), if otherwise admissible.

8.1.4.1 If a lawful permanent resident claims his or her evidence of registration has been lost or stolen, the port may accept Form I-90, with fee.

8.1.5    Ports of entry encountering nonimmigrant aliens seeking admission to the United States determined to be inadmissible under INA § 212(a)(7)(B), may offer a waiver pursuant to INA § 212(d)(4).

8.1.5.1 Waivers approved pursuant to INA § 212(d)(4) should generally be for unforeseen emergency situations.  Such waivers may also be approved for aliens who fall outside the scope of an unforeseen emergency on a case-by-case basis where it is determined that humanitarian factors support the decision.  The following scenarios are a few examples of situations in which a waiver may be appropriate.

8.1.5.2 An alien is not in possession of a proper visa due to governmental error (e.g., the consulate issued an L-2 instead of an L-1 nonimmigrant visa).

8.1.5.3 An alien is not in possession of a proper visa, but has the requisite documentation for an employment based nonimmigrant visa (e.g., presents an I-797 confirming that a petition has been approved; however, the nonimmigrant visa presented has expired).  Note: CBP cannot waive the underlying documentary requirement for another agency (such as a Department of Labor (DOL) labor certification or petition).

8.1.5.4 An alien with a brief overstay that rendered his or her visa invalid pursuant to INA § 222(g).

8.1.5.5 An alien issued a valid and appropriate visa, but who is unable to present the visa at the time of his or her application for admission.  This often occurs when the visa is contained in a previously issued passport that is not in the alien's possession.

8.1.5.6 Representatives of foreign information media without appropriate visas.


8.2    **Parole.**

8.2.1    Generally, cases requiring parole authorization will present more complex circumstances than those in which a waiver would be considered.  Parole authority is normally exercised when

an alien is inadmissible for reasons other than simple documentary deficiencies.  Parole is not regarded as an "admission;" therefore, paroled aliens remain subject to proceedings as inadmissible (under INA § 212), rather than removable (under INA § 237), aliens.

8.2.2   The authority to approve a parole under INA § 212(d)(5) is currently delegated to port management at the GS-13 level and above, and port directors at the GS-12 level.

8.2.3   If a parole is provided as a benefit to an alien, the prescribed fee should generally be collected.  However, if a parole is provided in the interest of the government, the fee should be waived.

8.2.4   Since there is no application form for a parole, CBP officers must document all approved port of entry paroles in ██████████████████

8.2.4.1 Aliens presenting a valid, approved Form I-512, *Authorization for Parole of an Alien into the United States*, need not be documented ████████████

8.2.4.2 Port of entry paroles involving emergency or other time-critical situations should be documented ███████████████████████████████████████

8.2.4.3 In time-critical situations, an alien may be allowed to enter the United States ████████
████████████████████████████████████████████

8.2.5   Ports of entry may grant paroles for deferred inspection, referral for removal proceedings, to facilitate an alien's departure, and in other situations deemed to be in the public interest.

8.2.6   The following situations are a few examples in which parole may be appropriate.

8.2.6.1 An inadmissible alien in need of emergency medical treatment.

8.2.6.2 Emergency workers responding to a natural disaster or other emergency situation.

8.2.6.3 **Medical evacuation** — often termed **MEDEVAC** or **medivac** (land and air ambulance) crew and/or patients.

8.2.6.4 A minor accompanying a detained parent.

8.2.6.5 A missing or abducted minor located and paroled to another agency.

8.2.6.6 Sick or injured crewmembers, including shipwreck or plane crash survivors.

8.2.6.7 An unaccompanied minor who is being released pursuant to an order of preference found in 8 CFR § 212.5(b)(3) or 8 CFR § 236.3(b)(1).

8.2.6.8 Significant Public Benefit Parole, including silent parole, requested by other law enforcement agencies. ███████████████████████████████████

8.2.6.9   In situations involving minor or inadvertent violations and apparent bona fide travel with no other violations, such as a brief overstay of a VWP admission that rendered an alien statutorily ineligible to apply for admission under the VWP, ██████████████████
████████████████████████████████████████████████████████████████

8.2.6.10  Foreign students on field trips, aliens attending cultural events, and aliens coming for non-emergency medical treatment determined to be inadmissible for reasons other than documentary deficiencies may also be issued a port of entry parole.  When a documentary deficiency is the only apparent ground of inadmissibility, a waiver should be pursued prior to parole consideration.

8.2.7   Aliens placed into expedited removal proceedings must normally be detained until removed from the United States.  However, parole may be permitted if there is a medical emergency, or if it is necessary for legitimate law enforcement purposes, such as for criminal prosecution, or to testify in court.

## 8.3   Deferred Inspection.

8.3.1   A deferred inspection may be used when an immediate decision concerning admissibility cannot be made at a port of entry and when it appears likely that the issues surrounding admissibility can be resolved favorably at the onward port of entry.  Deferred inspections may be necessary to review an existing file, or some other documentary evidence essential to clarifying admissibility.

8.3.2   As a form of parole, the authority to approve a deferred inspection is currently delegated to port management at the GS-13 level and above, and port directors at the GS-12 level. ██
█████████████████████████████████████████████████████████

8.3.3 ████████████████████████████████████████████████

8.3.4 ████████████████████████████████████████████████

8.3.5   CBP processing shall be deferred for a specific purpose, and not as a way to transfer a difficult case to another office.

8.3.6    CBP processing shall be deferred to the office having jurisdiction over the area where the alien will be staying while in the United States.

8.3.7    CBP processing shall not be deferred where the alien is not expected to establish his or her admissibility. ████████████████████████████████████████
████████████████████████████████

8.3.8    An inspection shall not be deferred if, based on the totality of circumstances and the presence of articulable facts, there are concerns that the alien may abscond or fail to report for CBP processing as directed.

8.3.9    An inspection may be deferred on behalf of an alien who is the beneficiary of an immediate relative petition, and who has an adjustment of status application pending with U.S. Citizenship and Immigration Services (USCIS), if the only reason for inadmissibility is the alien's failure to have a valid advance parole, and there is a likelihood that USCIS will exercise discretion and allow the alien's adjustment of status application to continue to a final decision.

8.3.10   The deferred inspection provision contained in 8 CFR § 235.2(a) shall not apply to an applicant for admission under INA § 217, except that the removal of a VWP applicant may only be deferred if the alien is paroled for criminal prosecution or punishment.  This is the only provision for deferred removal under the Visa Waiver Program.

8.4     **Withdrawal of Application for Admission**.

8.4.1    A nonimmigrant applicant for admission who does not appear to be admissible may be offered the opportunity to withdraw his or her application for admission pursuant to INA § 235(a)(4), rather than being placed in proceedings pursuant to INA § 240 or removed under INA § 235(b)(1).

8.4.2    An alien cannot, as a matter of right, withdraw his or her application for admission, but may be permitted to withdraw if it is determined to be in the best interest of justice that a removal order not be issued.  All withdrawals of application for admission ████████████████
████████████████████████████████ should be approved by a first-line supervisor.

8.4.2.1 At land border ports of entry, aliens who refuse to pay the fee required for issuance of an entry document (I-94 or I-94W), and aliens who seek immediate return to the country of departure with documented intentions of obtaining or extending status in that country, but who are otherwise admissible, ███████████████████████████████████████
████████████████████████████████████████████████

8.4.3    Prior to permitting an alien to withdraw his or her application for admission, the alien must demonstrate both the intent and the means to depart immediately from the United States.

8.4.4    Withdrawal is strictly voluntary and may not be coerced in any way.  If withdrawal is offered, but not voluntarily accepted, appropriate removal proceedings should be initiated.

~~Law Enforcement Sensitive / For Official Use Only~~

8.4.5    In exercising discretion to permit a withdrawal of application for admission, carefully consider all the facts and circumstances related to the case to determine whether permitting withdrawal would be in the best interest of justice, or conversely, if justice would be ill-served if an order of removal were issued.

8.4.6    In light of the serious consequences of an expedited removal order, including a minimum 5-year bar on re-entry to the United States, the decision to permit withdrawal should be based on a careful consideration of relevant mitigating and aggravating factors in order to reach a reasonable decision.

8.4.7    Withdrawal of application for admission should not be permitted in situations involving obvious, deliberate fraud on the part of the applicant, or when especially egregious CBP violations are uncovered (e.g., long-term or repeated overstays, unauthorized employment).

8.5    **Voluntary Return.**

8.5.1    Voluntary Return (VR) is an act of discretion that can be applied to non-arriving aliens in circumstances analogous to those where withdrawal of application for admission is allowed, and should be approved by a first-line supervisor.

8.5.2    Usually, when an alien has demonstrated his or her intent to depart the United States, it serves no purpose to issue a Notice to Appear, because the alien is already executing the ultimate objective, which is removal from the United States.  There is generally no reason to burden the immigration court with these cases.

8.5.3    When feasible, Voluntary Return cases should be documented ███████████ ███████████████████████████, facts should be articulated documenting the unlawful presence, and an A-file ████████████████████████.  Without these actions, it may be difficult to sustain a future ground of inadmissibility regarding the alien's unlawful stay.

8.5.4    In circumstances where CBP officers encounter outbound illegal aliens and there is insufficient time before the departure flight to collect biometrics, CBP officers may use available biographic data alone to create ██████████████████████.

8.6    **Detention.**

8.6.1    When an alien does not pose a potential risk to the United States and transfer to a detention facility may cause undue hardship, parole and/or continued detention at the port of entry should be considered, when feasible.  When an alien is permitted to withdraw an application for admission, or is being refused admission under INA § 217, it is particularly important to carefully consider the consequences of transfer to a detention facility in each case.

8.7    **Fee Collection**.

Law Enforcement Sensitive / For Official Use Only

8.7.1   When a form of discretion under consideration requires the payment of an associated fee (such as waiver applications and certain paroles), CBP should determine if the action taken is solely for the benefit of the alien.  If the discretionary action is taken for reasons of significant public benefit, CBP should not charge a fee.

8.7.2   Situations resulting from an action at the port of entry in which it would not be appropriate to charge a fee include the following:

8.7.2.1 Parole for criminal prosecution;

8.7.2.2 Parole for incarceration after conviction for a crime;

8.7.2.3 Parole into the custody of another agency;

8.7.2.4 Parole for INA § 240 proceedings, if detention is not appropriate or feasible;

8.7.2.5 Parole of a stowaway for a medical emergency or legitimate law enforcement objective;

8.7.2.6 Parole of a witness in a judicial, administrative or legislative proceeding being conducted, or to be conducted in the United States;

8.7.2.7 Parole for deferred inspection; and,

8.7.2.8 Parole for deportation from another country through the United States.

8.7.3   Nothing in this directive is intended to diminish the authority of port management to waive fees under other circumstances, where appropriate, in accordance with 8 CFR § 103.7(c).

**9.  No Private Right Created.**  The procedures set forth in this Directive are for CBP internal use only and create no private rights, benefits, or privileges for any private person or party.

/s/
Assistant Commissioner
Office of Field Operations

Law Enforcement Sensitive / For Official Use Only

**Discretionary Authority Checklist for Alien Applicants**

| | | |
|---|---|---|
| Applicant's Name: | _____ | Port #: _____ |
| Date of Birth: | _____ | Date of Action: _____ |
| Citizenship: | _____ | Passport / A-#: _____ |

**1) Identity / Citizenship:**

Identity sufficiently determined:    Yes ☐ No ☐
Citizenship sufficiently determined: Yes ☐ No ☐

**2) Age, Health and Notoriety of Applicant:**

Are age or health relevant factors? Yes ☐ No ☐
Is the applicant a public figure?    Yes ☐ No ☐
Congressional or media interest?    Yes ☐ No ☐

*\*\*NOTE: Discretionary authority should generally not be exercised if identity or citizenship can not be established.*
**REMARKS (to include origin, destination and intended length of stay):**

_____

**3) Intended Purpose of Entry:**

Emergency:           Yes ☐ No ☐
Medical:             Yes ☐ No ☐
Pleasure:            Yes ☐ No ☐
Business/Official:   Yes ☐ No ☐
Other:               Yes ☐ No ☐

**4) Database queries:**

[redacted]

[redacted]

_____

**5) Previous Immigration Violations or Inadmissibility:**

Previous Immigration Violation(s): Yes ☐ No ☐
Previous Inadmissibility:          Yes ☐ No ☐
Previous Beneficiary of Discretion: Yes ☐ No ☐

**6) Nature of Inadmissibility:**

[redacted]

**REMARKS:**

_____

**7) Threat posed to the United States:**

[redacted]

*\*\*NOTE: Discretionary authority should generally not be exercised if a threat is posed to the United States.*
**REMARKS:**

_____

**8) Other Factors to Consider:**

| | |
|---|---|
| Legitimate reason for entering the United States: | Yes ☐ No ☐ |
| Documentary (Passport / Visa) deficiency only: | Yes ☐ No ☐ |
| Credible claim of official misinformation: | Yes ☐ No ☐ |
| Relationship to a U.S. employer or resident: | Yes ☐ No ☐ |
| Intent to circumvent admissibility requirements: | Yes ☐ No ☐ |
| Misrepresentations made during processing: | Yes ☐ No ☐ |
| Minor children accompanying or already in the United States: | Yes ☐ No ☐ |
| Unaware of visa voidance or consequences of VWP overstay: | Yes ☐ No ☐ |
| Relief available through the parole or waiver process: | Yes ☐ No ☐ |

**REMARKS:**

**Examining CBP Officer:**

**Applicable Ground(s) of Inadmissibility:**

**Applicable Discretionary Action(s):**

| | | |
|---|---|---|
| Withdrawal of Application for Admission: | Yes ☐ No ☐ | |
| Parole to Depart Foreign / Voluntary Return: | Yes ☐ No ☐ | Length of parole sought: _____ |
| Humanitarian Parole: | Yes ☐ No ☐ | Length of parole sought: _____ |
| Waiver of Passport Requirement: | Yes ☐ No ☐ | Period of admission sought: _____ |
| Waiver of Non-Immigrant Visa Requirement: | Yes ☐ No ☐ | |
|     Classification: _____ | | Period of admission sought: _____ |
| Waiver of Immigrant Visa Requirement: | Yes ☐ No ☐ | |
| Waiver of processing fee (if applicable): | Yes ☐ No ☐ | |
| Deferred Inspection: | Yes ☐ No ☐ | Deferral Period and Location: _____ |

**Supervisory CBP Officer:**

**Recommendation:**

Approve:        Yes ☐ No ☐
Disapprove:    Yes ☐ No ☐

**Justification for recommendation (to include alternatives, if disapproval is recommended):**

**Reviewing 2ⁿᵈ Line Manager:**
(GS13 or Above)

**Decision:**

Approved: ☐        Disapproved: ☐

**Justification for decision (to include final disposition, if disapproved):**

Law Enforcement Sensitive / For Official Use Only

AR00157

Washington, DC 20229



**U.S. Customs and
Border Protection**

**MAY 1 2 2015**

MEMORANDUM FOR:  Directors, Field Operations
Director, Preclearance Operations
Office of Field Operations

FROM:  Acting Executive Director
Admissibility and Passenger Programs

SUBJECT:  Parole of Inadmissible Nonimmigrant Aliens

This memorandum is to further clarify guidance previously issued on November 19th, 2014 titled: *Parole of Inadmissible Nonimmigrant Aliens* and on December 16, 2014 Titled: *Parole of Inadmissible Nonimmigrant Aliens*.

Effective immediately, any parole under Section 212(d)(5) of the Immigration and Nationality Act (INA) for nonimmigrant alien(s) that meet the following criteria:

1. The person is a non-immigrant alien;
2. Is inadmissible and would otherwise be removed under §235(b), refused under §217 to include 212.1q or Withdrawal in lieu of;
3. An emergent need exists, i.e. a legitimate law enforcement purpose or meet a medical emergency, and;
4. The person is not a flight risk or at risk to adding to the illegal population.

Authorization of such parole may only be delegated from Directors, Field Operations to Port Directors, Assistant Port Directors and Watch Commanders no lower than the GS-14 level. Any authorization of parole must be documented, along with a description of the emergent circumstances requiring such action on form I-160 and made part of the alien's file. In addition, the exercise of a parole of an alien who would otherwise would be removed should only be exercised as a last resort and when all other options are unavailable.

Both Title 8, Code of Federal Regulations (CFR) Section 235.3(b)(iii) and 8 CFR 217.4(c) requires the detention of inadmissible nonimmigrant aliens placed in removal proceedings or order removed, except where parole "... is required to meet a medical emergency or is necessary for a legitimate law enforcement purpose."

Law Enforcement Sensitive
For Official Use Only

Lack of detention space, requests from other law enforcement agencies (unless accompanied by a valid, unexpired I-512 issued by HSI), or other purposes not considered essential for law enforcement are not appropriate reasons to parole an inadmissible alien.  Deferral of Inspection should not be considered for an inadmissible alien unless that alien may be able to prove themselves admissible by evidence not immediately available at the time of the application.

This memorandum does not supersede CBP Directive #3340-043, *The Exercise of Discretion*, but is intended to address and clarify issues regarding travelers who are considered as potentially "contributing to the illegal population" or "may be a flight risk".

Please ensure that this memorandum and attached muster is disseminated to all ports of entry within your jurisdiction.  Should you have any questions or require additional information, please contact ███████████████████████████████████████████████████
███████████████████████████████████

Law Enforcement Sensitive
For Official Use Only

Washington, DC 20229



**U.S. Customs and Border Protection**

AUG − 8 2012

MEMORANDUM FOR:     Directors, Field Operations
                    Office of Field Operations

FROM:               Executive Director
                    Admissibility and Passenger Programs

SUBJECT:            Paroling Arriving Fugitives

U.S. Customs and Border Protection (CBP) routinely processes arriving aliens who are the
subject of criminal arrest warrants, many of whom were apprehended abroad and are being
returned to the U.S. by officers from another law enforcement agency. The CBP ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Some alien fugitives
are potentially inadmissible upon arrival and must be paroled into the U.S. for the purpose of
criminal prosecution.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ These actions are only taken ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮ are integral to the
furtherance of justice.

In many cases, the agency holding the active warrant is able to request advance parole from the
Immigration and Customs Enforcement Law Enforcement Parole Branch. However, in certain
instances, when fugitive aliens are identified on short notice and it is not possible to obtain an
advance parole, the arriving port of entry (POE) should consider issuing a detainer and paroling
the subject. The Authority to parole an alien under Sec 212(d)(5) of the Immigration and
Nationality Act is currently delegated to port management (second line supervisory level and
above) and must be in accordance with established policy and procedures, including the issuance
of Form I-247 to the arresting agency.

In the event that an inadmissible alien fugitive, lacking an advance parole, will be arriving, the
▮▮▮▮▮ will notify the POE as soon as possible. All approved port of entry paroles must be
documented using Secured Integrated Government Mainframe Access (SIGMA) for tracking
purposes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

If you have any further questions regarding this memorandum, please contact ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Law Enforcement Sensitive / For Official Use Only



**U.S. Department of Homeland Security**
Washington, DC 20229

**U.S. Customs and
Border Protection**

DEC 1 6 2014

MEMORANDUM FOR:    Directors, Field Operations
                          Director, Preclearance Operations
                          Office of Field Operations

FROM:                 Acting Executive Director
                 Admissibility and Passenger Programs

SUBJECT:          Parole of Inadmissible Nonimmigrant Aliens

This memo is to further clarify guidance previously issued on November 19th, 2014 titled: *Parole of Inadmissible Nonimmigrant Aliens.*

Effective immediately, any parole under Section 212(d)(5) of the Immigration and Nationality Act (INA) for nonimmigrant alien(s) that meet the following criteria:
1. The person is a non-immigrant alien;
2. Is inadmissible and would otherwise be removed under §235(b), refused under §217 to include 212.1q or Withdrawal in lieu of;
3. An emergent need exists, i.e. a legitimate law enforcement purpose or meet a medical emergency, and;
4. The person is not a flight risk or at risk to adding to the illegal population.

Then such parole must be authorized at the GS-15 level. This level of authority may be delegated *only* to GS-14 Port Directors. Any authorization of parole must be documented, along with a description of the emergent circumstances requiring such action on form I-160 and made part of the alien's file. In addition, the exercise of a parole of an alien who would otherwise would be removed should only be exercised as a last resort and when all other options are unavailable.

Both Title 8, Code of Federal Regulations (CFR) Section 235.3(b)(iii) and 8 CFR 217.4(c) requires the detention of inadmissible nonimmigrant aliens placed in removal proceedings or order removed, except where parole "… is required to meet a medical emergency or is necessary for a legitimate law enforcement purpose."

Lack of detention space, requests from other law enforcement agencies (unless accompanied by a valid, unexpired I-512 issued by HSI), or other purposes not considered essential for law enforcement are not appropriate reasons to parole an inadmissible alien.
Deferral of Inspection should not be considered for an inadmissible alien unless that alien may be able to prove themselves admissible by evidence not immediately available at the time of the application.

For Official Use Only
Law Enforcement Sensitive

Parole of Inadmissibile Nonimmigrant Aliens
Page 2

This does not supersede CBP Directive #3340-043, *The Exercise of Discretion*, but is intended to address and clarify issues regarding travelers who are considered as potentially "contributing to the illegal population" or "may be a flight risk".

Please ensure that this memorandum and attached muster is disseminated to all ports of entry within your jurisdiction.  Should you have any questions or require additional information, please contact ███████████████████████████████████████████
███

For Official Use Only
Law Enforcement Sensitive

AR00162

## Muster

| | |
|---|---|
| **Week of**: | Immediate |
| **Topic**: | Parole of Inadmissible Nonimmigrant Aliens |
| **References**: | Sections 212 and 235 of the Immigration and Nationality Act (INA); and 8 CFR 212 and 235 |
| **Headquarters POC**: | ███████████ |
| **Office**: | Admissibility and Passenger Programs |

Effective immediately, any parole under Section 212(d)(5) of the Immigration and Nationality Act (INA) for nonimmigrant alien(s) that meet the following criteria:

- o The person is a non-immigrant alien;
- o Is inadmissible and would otherwise be removed under §235(b), refused under §217 to include 212.1q or Withdrawal in lieu of;
- o An emergent need exists, i.e. a legitimate law enforcement purpose or meet a medical emergency, and;
- o The person is not a flight risk or at risk to adding to the illegal population.

must be authorized at the GS-15 level. This level of authority may be delegated *only* to GS-14 Port Directors.

- Any authorization of parole must be documented, along with a description of the emergent circumstances requiring such action on form I-160 and made part of the alien's file. In addition, the exercise of a parole of an alien who would otherwise would be removed should only be exercised as a last resort and when all other options are unavailable.

- 8 CFR 235.3(b)(iii) and 8 CFR 217.4(c) requires the detention of inadmissible nonimmigrant aliens placed into removal proceedings or ordered removed, except where parole "… is required to meet a medical emergency or is necessary for a legitimate law enforcement purpose."

- This muster does not supersede CBP Directive #3340-043, *The Exercise of Discretion*, but is intended to address and clarify issues regarding travelers who are considered as potentially "contributing to the illegal population" as an alien who has demonstratively shown that they would otherwise not comply with the terms of their admission or "may be a flight risk" considered as an alien who is likely to flee the jurisdiction or otherwise not comply with a lawful order to avoid the execution of the laws of the United States.
  - o The lack of available detention space, including cases where the traveler is not departing until the next day(s), or the case does not meet the prosecutorial guidelines for another agency are not a "legitimate law enforcement purpose"; and the traveler must remain in CBP custody.

For Official Use Only
Law Enforcement Sensitive

| From: | ERO Taskings |
|---|---|
| Subject: | UPDATED GUIDANCE: Implementation of the Modified Nationwide Preliminary Injunction in Padilla v. ICE, No. 18-928, 2019 WL 2766720 (W.D. Wash. July 2, 2019). |
| Date: | Monday, July 22, 2019 10:26:08 PM |
| Attachments: | Interim Notice Authorizing Parole (Final 7.15.19).docx |
| | Interim Notice Declining Parole (Final 7.15.19).docx |
| | Draft Padilla bond notice 07.22.19 OPLA DRAFT.docx |
| Importance: | High |

*The following message is sent on behalf of Nathalie R. Asher, Executive Associate Director for Enforcement and Removal Operations:*

**To: ERO Assistant Directors, Deputy Assistant Directors, Field Office Directors, and Deputy Field Office Directors**

**Subject:  UPDATED GUIDANCE:  Implementation of the Modified Nationwide Preliminary Injunction in *Padilla v. ICE*, No. 18-928, 2019 WL 2766720 (W.D. Wash. July 2, 2019).**

Please immediately distribute this guidance to your employees.  This guidance supplements and replaces the guidance included in the July 15, 2019 broadcast message below.

Today, the U.S. Court of Appeals for the Ninth Circuit lifted the temporary stay of the nationwide preliminary injunction in *Padilla v. ICE*, No. 18-928, 2019 WL 2766720 (W.D. Wash. July 2, 2019), and issued a permanent stay pending appeal with regard to only part of the preliminary injunction.

The Ninth Circuit declined to stay the district court's ruling that class members must continue to receive bond hearings before the Executive Office for Immigration Review (EOIR), even though the Attorney General held in *Matter of M-S-*, 27 I&N Dec. 509 (A.G. 2019) that the expedited removal statute gives no jurisdiction to EOIR to conduct such hearings.  The Ninth Circuit did, however, stay the requirements imposed by the district court to conduct bond hearings within seven (7) days of a bond hearing request by a class member, and to release such aliens if a bond hearing is not conducted within seven (7) days.  So, despite the decision of the Attorney General in *Matter of M-S-*, class members are entitled to a bond hearing before an immigration judge if requested.

The class of aliens to whom the preliminary injunction applies includes:  "All detained asylum seekers who entered the United States without inspection, were initially subject to expedited removal proceedings under [INA § 235(b)], were determined to have a credible fear of persecution, but are not provided a bond hearing with a verbatim transcript or recording of the hearing within seven days of requesting a bond hearing." Aliens pending a credible fear determination or who have received a negative credible fear determination are not part of the class.  Arriving aliens are not part of the class, even if they have been found to have a credible fear.  To reiterate, the preliminary injunction just applies to non-arriving aliens processed through expedited removal who are determined to have a credible fear of persecution or torture.

**Unless and until the preliminary injunction is vacated, ERO Field Personnel and ERO Supervisors will apply the following guidance with regard to aliens subject to expedited removal who are transferred to full removal proceedings under Section 240 of the Immigration and Nationality Act (INA).**

1. **Update EARM:** All expedited removal cases with a positive credible fear determination must continue to be accurately recorded in EARM. The new *8K Case Category*: *Expedited Removal Terminated due to Credible Fear Finding/NTA Issued* will be used to track these cases. Additionally, the five (5) new Actions and Decisions codes (A/Ds) created to track parole requests and determinations should continue to be utilized.

2. **Arriving Aliens:** Arriving aliens subject to expedited removal who are found to have a credible fear are not a part of the *Padilla* litigation and must continue to be considered for parole according to ICE Directive No. 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution of Torture* (Dec. 8, 2009), unless and until further guidance regarding such aliens is issued.

3. **Certain Other Aliens Subject to Expedited Removal:** For all aliens subject to expedited removal who are not arriving aliens and are referred for Section 240 removal proceedings after being determined to have a credible fear, ERO Field Personnel and ERO Supervisors:

   - Must facilitate the alien's appearance at any bond hearing scheduled by EOIR.

   - Must, absent a stay issued by the Board of Immigration Appeals (Board), comply with an immigration judge or Board order under *Padilla* to release the alien from custody. However, because neither the district court nor Ninth Circuit altered the Attorney General's legal conclusion that the detention authority for aliens determined to have a credible fear is found in Section 235(b)(1) of the INA, rather than Section 236, aliens released pursuant to the order of an immigration judge pursuant to *Padilla* **should not be released on parole or on an order of release on recognizance (OREC)**. Instead, ERO Field Personnel and ERO Supervisors should utilize the attached template *Padilla* Release Letter.

   - May exercise their discretion to release such aliens on parole pursuant to the guidance contained in the July 15, 2019 broadcast message below.

   - **If ERO wishes to exercise its own discretion to release** a *Padilla* class member from custody while Section 240 removal proceedings are pending (rather than because EOIR has ordered such a release as part of a *Padilla* bond hearing), ERO must **not release these aliens**: (i) on an order of release on recognizance (OREC), including on a bond issued by ERO based upon section 236(a) of the INA, or (ii) under an order of supervision (OSUP). Instead, such aliens may only be released from custody **on discretionary parole** pursuant to section 212(d)(5)(A) of the INA and 8 C.F.R. § 212.5, and subject to reasonable conditions. When granting parole to such aliens, ERO Field Personnel and ERO Supervisors should use the *Interim Notice Authorizing Parole* as set forth in the July 15, 2019 guidance below. The letter is issued in lieu of Form I-94, Arrival-Departure Record. *See* 8 C.F.R. § 235.1(h)(2).

4. **EARM Release Code**: Use the following release codes so that these cases can be adequately tracked.
   - If an alien is paroled by ERO in the agency's discretion, the correct release code is: **Paroled**. This code should be used for all cases where ICE grants a parole release, including where ICE sets a bond or any other condition, pursuant to a release on parole.

○ If the immigration judge or Board orders release under *Padilla*, the correct release code is: **Bonded Out**.

Until further notice, please follow the guidance issued above. If you have any questions concerning this guidance, please contact your ERO Field Operations Headquarters point of contact.

**Limitation on the Applicability of this Guidance.** This guidance is not intended to limit the appropriate exercise of prosecutorial discretion in other contexts. Moreover, this message provides only internal guidance to ICE and does not, is not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any person in any matter, civil or criminal.

---

**From:** ERO Taskings ███████████████████
**Sent:** Monday, July 15, 2019 7:55 PM
**Subject:** CORRECTED: Interim Guidance for Implementation of Matter of M-S, 27 I&N Dec. 509 (A.G. 2019) During the Stay of the Modified Nationwide Preliminary Injunction in Padilla v. ICE, No. 18-928, 2019 WL 2766720 (W.D. Wash. July 2, 2019): Parole of Aliens

***The following message is sent on behalf of Nathalie R. Asher, Executive Associate Director for Enforcement and Removal Operations:***

**To:** **Assistant Directors, Deputy Assistant Directors, Field Office Directors, and Deputy Field Office Directors**

**Subject:** **Interim Guidance for Implementation of *Matter of M-S*, 27 I&N Dec. 509 (A.G. 2019) During the Stay of the Modified Nationwide Preliminary Injunction in *Padilla v. ICE*, No. 18-928, 2019 WL 2766720 (W.D. Wash. July 2, 2019): Parole of Aliens Who Entered Without Inspection, Were Subject to Expedited Removal, and Were Found to Have a Credible Fear of Persecution or Torture**

THIS IS A CORRECTED COPY – REFERENCE TO 8 C.F.R. § 235.1(h)(2) IN THE BODY OF THE MESSAGE AND ATTACHMENT: *INTERIM NOTICE AUTHORIZING PAROLE*

Please immediately distribute this interim guidance, which is effective immediately, to your employees.

Background

On April 16, 2019, the Attorney General issued a decision in *Matter of M-S-*, 27 I&N Dec. 509 (A.G. 2019), in which he overruled the Board of Immigration Appeals decision in *Matter of X-K-*, 23 I&N Dec. 731 (BIA 2005), and concluded that <u>all</u> aliens subject to expedited removal (including those encountered between the ports-of-entry and in the interior of the United States), who are referred for full removal proceedings under section 240 of the Immigration and Nationality Act (INA) after being found to have a credible fear <u>are ineligible for release on bond</u>. The Attorney General recognized that although these aliens must be detained and have no right to bond or a bond hearing, they may be released on parole by the

Department of Homeland Security under section 212(d)(5) on a case-by-case basis "for urgent humanitarian reasons or significant public benefit."  The decision of the Attorney General is effective today.

On July 2, 2019, the U.S. District Court for the Western District of Washington issued a nationwide preliminary injunction in *Padilla v. ICE*, No. 18-928, 2019 WL 2766720 (W.D. Wash. July 2, 2019), ordering the Department of Justice's Executive Office of Immigration Review (EOIR) to conduct bond hearings within seven (7) days of a bond hearing request by a class member, and to release such aliens if a bond hearing is not conducted within seven (7) days.  The class of aliens to whom the preliminary injunction applies includes:  "All detained asylum seekers who entered the United States without inspection, were initially subject to expedited removal proceedings under [INA § 235(b)], were determined to have a credible fear of persecution, but are not provided a bond hearing with a verbatim transcript or recording of the hearing within seven days of requesting a bond hearing."  However, on Friday, July 12, 2019, the U.S. Court of Appeals for the Ninth Circuit granted a temporary stay of the district court's preliminary injunction.

*Interim Parole Guidance*

**Certain Other Aliens Subject to Expedited Removal**:  For all aliens subject to expedited removal who: (i) are not arriving aliens; (ii) have established a credible fear of persecution or torture; and (iii) have been referred for full removal proceedings under section 240 of the INA, the following interim guidance is applicable until further notice.  Such aliens may request consideration for parole at any time.  ERO personnel are not required to consider such aliens for parole absent an affirmative written request but ERO is not precluded from exercising its discretionary authority to do so at any time absent a request by the alien.

Because the Attorney General has held that these aliens are not detained pursuant to section 236 of the INA, effective today (July 15, 2019), ERO must **not release these aliens**: (i) on an order of release on recognizance (OREC), including on a bond issued by ERO based upon section 236(a) of the INA, or (ii) under an order of supervision (OSUP).  Any alien subject to expedited removal may only be released from custody **on discretionary parole authorized by ERO**, pursuant to section 212(d)(5)(A) of the INA and 8 C.F.R. § 212.5, and subject to reasonable conditions.

The applicable regulations describe five categories of aliens for whom parole would generally be justified only on a case-by-case basis.  Before considering whether an alien falls within one of these five categories, however, the alien must first satisfy the ERO officer that he or she does not present a security risk nor a flight risk.  Of course, in assessing flight risk, ERO officers have discretion to consider the degree to which the risk may be mitigated by appropriate conditions of parole (such as a monetary bond, GPS monitoring).  The five parole categories identified in the regulations are:  (1) aliens who have serious medical conditions in which continued detention would not be appropriate; (2) women who have been medically certified as pregnant; (3) certain alien juveniles; (4) aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; and (5) aliens whose continued detention is not in the public interest.  Although

the first four categories are relatively self-explanatory, the term "public interest" is not amenable to a single, standard definition, and the discretionary decision must be based on a case-specific justification.

Parole on public interest grounds requires careful consideration of whether, consistent with ICE's mission, a specific alien's case is appropriate for parole. Based upon an individualized review of the facts of a particular case, detention may not be in the public interest in the following non-exhaustive list of circumstances, including where: (1) the alien is the sole caretaker of a minor child, elderly family member, or family member with a serious illness; (2) the alien has established that he or she will serve as an organ donor in the near future; (3) the alien has a disability rendering detention inappropriate or has been the victim of sexual abuse or assault; or (4) where, in light of available detention resources, detention of the subject alien would limit the ability of ICE to detain another alien whose release may pose a greater risk of flight or danger to the community.

In exercising the Secretary's delegated parole authority, Field Office Directors should remain mindful of the need to properly manage the agency's limited detention resources and appropriately prioritize the utilization of detention beds. Without question, ICE has insufficient detention resources to detain throughout removal proceedings all aliens amenable to detention under the immigration laws. As of July 6, 2019, in Fiscal Year 2019, ERO has released more than 233,000 aliens pursuant to its discretionary authority. Maintaining custody of an alien subject to this interim guidance would likely not be in the public interest where doing so would render a detention bed unavailable for another alien who poses a greater potential danger to public safety or a greater risk of flight that would need to be mitigated with burdensome release conditions (e.g., GPS monitoring or recurring reporting). In light of finite detention resources, it is expected that a significant number of these individuals will ultimately need to be paroled from custody.

If ERO releases such an alien on parole, ERO Field Personnel and ERO Supervisors must <u>not</u> utilize Form I-220A, Order of Release on Recognizance, which applies only to releases pursuant to section 236 of the INA, but instead must utilize the attached *Interim Notice Authorizing Parole*. The letter is issued in lieu of Form I-94, Arrival-Departure Record. *See* 8 C.F.R. § 235.1(h)(2). If ERO declines to parole such an alien when requested, ERO Field Personnel and ERO Supervisors must utilize the attached *Interim Notice Declining Parole*.

**<u>Special Rule for Family Units</u>:** Members of family units detained together who are subject to expedited removal and who have been found to have a credible fear of persecution or torture shall be considered for parole regardless of whether any member of the family unit requests such consideration. As soon as practicable, but not more than two business days after learning that the alien has been found to have a credible fear of persecution or torture, ERO Field Personnel shall begin parole consideration for all associated family unit members who are detained together and promptly elevate to an ERO Supervisor their recommendation whether the family unit should be authorized for parole. If a member of the family unit is subject to reinstatement of a final removal order (rather than expedited removal) and it is necessary to release them, that family member should instead be considered for release under an OSUP.

**<u>Re-detention of Aliens Previously Released on OREC</u>:** Given representations made to the district court in *Padilla*, ERO should not re-detain aliens who were released from immigration detention prior to July 15, 2019, solely on account of the Attorney General's decision in

*Matter of M-S-*.  However, if an alien previously released on bond or other conditions violates the terms of his or her release (e.g., by engaging in criminal activity), the original custody determination is revoked and cancelled based on an intervening event and ICE may re-detain the alien pursuant to detention authorities and legal precedents which are in effect on the date of the encounter.

**Arriving Aliens:**  Arriving aliens subject to expedited removal who are found to have a credible fear must continue to be considered for parole according to the processes and standards set forth in ICE Directive No. 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution of Torture* (Dec. 8, 2009).  As explained above, efforts to issue consistent, unified ICE parole policy and procedures are on hold pending developments in the *Padilla* litigation.

**EARM Update:**  Effective July 15, 2019, all expedited removal cases with a positive credible fear determination must be accurately recorded in EARM using the new *8K Case Category: Expedited Removal Terminated due to Credible Fear Finding/NTA Issued*.  It is imperative that cases be accurately recorded in EARM to enable appropriate tracking and statistical reporting, including to ensure the availability of reliable information to defend against the *Padilla* litigation.  Five (5) new Actions and Decisions codes (A/Ds) were created to track parole requests and determinations.  Training on these changes will be forthcoming.

**EARM Release Code**:  If an alien is paroled by ICE, the correct release code is:  **Paroled**. This code should be used for all cases where ICE grants a parole release, including where ERO sets a bond or any other condition of release on parole.

If you have any questions concerning this guidance, please contact your ERO Field Operations Headquarters point of contact.

**Limitation on the Applicability of this Guidance.** This guidance is not intended to limit the appropriate exercise of discretion in other contexts.  Moreover, this message provides only internal guidance to ICE and does not, is not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any person in any matter, civil or criminal.

NOTICE: This communication may contain privileged or otherwise confidential information. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information. Please inform the sender that you received this message in error and delete the message from your system.

Washington, DC 20229



U.S. Customs and
Border Protection

AUG – 8 2012

MEMORANDUM FOR:    Directors, Field Operations
                   Office of Field Operations

FROM:              Executive Director
                   Admissibility and Passenger Programs

SUBJECT:           Paroling Arriving Fugitives

U.S. Customs and Border Protection (CBP) routinely processes arriving aliens who are the
subject of criminal arrest warrants, many of whom were apprehended abroad and are being
returned to the U.S. by officers from another law enforcement agency. The CBP ▮

▮ Some alien fugitives
are potentially inadmissible upon arrival and must be paroled into the U.S. for the purpose of
criminal prosecution.

These actions are only taken ▮ are integral to the
furtherance of justice.

In many cases, the agency holding the active warrant is able to request advance parole from the
Immigration and Customs Enforcement Law Enforcement Parole Branch. However, in certain
instances, when fugitive aliens are identified on short notice and it is not possible to obtain an
advance parole, the arriving port of entry (POE) should consider issuing a detainer and paroling
the subject. The Authority to parole an alien under Sec 212(d)(5) of the Immigration and
Nationality Act is currently delegated to port management (second line supervisory level and
above) and must be in accordance with established policy and procedures, including the issuance
of Form I-247 to the arresting agency.

In the event that an inadmissible alien fugitive, lacking an advance parole, will be arriving, the
▮ will notify the POE as soon as possible. All approved port of entry paroles must be
documented using Secured Integrated Government Mainframe Access (SIGMA) for tracking
purposes ▮.

If you have any further questions regarding this memorandum, please contact ▮
▮

~~Law Enforcement Sensitive / For Official Use Only~~

**AR00170**

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 189 of 400   PageID 4382

The New York Times | https://www.nytimes.com/2019/12/21/us/border-migrants-kidnapping-mexico.html

# I'm Kidnapped': A Father's Nightmare on the Border

A father was tortured in front of his 3-year-old son until his wife in New Jersey paid $2,000 to his captors. Chilling audio of the negotiations for his release shows how migrants, turned back by the U.S., are facing new dangers in Mexico.

 **By Miriam Jordan**

Dec. 21, 2019

REYNOSA, Mexico — He remembers being on his knees, gagged and blinded with duct tape, his hands tied behind his back. One of his captors struck his left thigh with a bat and scraped his neck with an ax, threatening to cut him.

His 3-year-old son watched and wailed.

"Tell the boy to shut up. Make him shut up," one of the men barked, ripping the duct tape from his mouth.

A few hours earlier, the 28-year-old migrant from Honduras, whose name is José, had been walking with his son down a street in Reynosa, Mexico, having been turned back at the border by the United States. Suddenly three men grabbed him, shoved a hood over his head and thrust him and his son into a vehicle.

The abduction on Nov. 25 set off hours of intense negotiations as José's wife in the United States, forced to listen to the sounds of her husband being tortured, tearfully negotiated a ransom over the phone.

In a series of phone conversations, and in several voice messages reviewed by The New York Times, the wife, a woman named Cindy who works at a bakery in Elizabeth, N.J., promised to get the $3,000 the kidnappers were demanding. "I will do everything to get it," she said, sobbing into the phone. "But don't let them hurt him. Take care of the child."

Hundreds of thousands of people fled Central America over the past year, many of them seeking asylum in the United States from threats of extortion, murder and forced recruitment into gangs. But instead of allowing them to enter, the Trump administration has forced more than 55,000 asylum seekers to wait for months in lawless Mexican border towns like Reynosa while it considers their requests for protection, according to Mexican officials and those who study the border.

Drug-related violence has long plagued these areas but this bottleneck of migrants is new — and because many asylum seekers have relatives in the United States, criminal cartels have begun kidnapping them and demanding ransoms, sometimes subjecting them to violence as bad or worse than what they fled.

In the past, migrants from places like Central America, Africa and Asia seeking asylum were allowed to enter the United States while their claims were adjudicated. Those who could not demonstrate a fear of persecution usually were ordered deported to their home countries. That changed earlier this year with the adoption of the "Remain in Mexico" policy, under which most asylum applicants are prevented from entering the United States except for their court hearings.

With the Mexican government struggling to contain crime and violence, and ramshackle camps full of vulnerable migrants cropping up on the border, kidnappings have spiked. "Families on this side of the border, regardless of social status, will manage to pay ransom," said Octavio Rodriguez, a scholar at the University of San Diego who studies violence in Mexico and the border region.

The authorities have doubled the number of police officers in the past three years in the state of Tamaulipas, which includes Reynosa, but it is not enough, said Aldo Hernandez, the state's communications director. "Neither the municipal nor state governments have the resources to fight this situation," he said.

Some are blaming Mexico's president, Andrés Manuel López Obrador, and his government's decision to step back from confrontations with drug cartels.

"The López Obrador administration has sent the message to organized crime that police and national guard will not confront you. That emboldens them to target this population," said Tony Payan, a scholar at the Baker Institute of Rice University who studies the United States-Mexico border.

Mark A. Morgan, acting commissioner for Customs and Border Protection, said that those awaiting asylum hearings who fear for their safety should "work with the government of Mexico" to keep themselves safe.

**AR00171**

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 190 of 400   PageID 4383

"I have heard reports the same as you of violence," he told reporters last week, noting that it is well known that dangerous drug cartels target migrants south of the border. "We encourage these people first of all not to even put themselves in the hands of the cartels to begin with."

In the border towns of the Rio Grande Valley, the busiest migrant crossing point into the United States, kidnappers have struck in recent months near shelters, at bus stops and outside grocery stores.

A 35-year-old Salvadoran man who was waiting with his family in Tijuana after claiming asylum near San Diego was kidnapped, fatally stabbed and dismembered on Nov. 20, Mexican authorities reported. His lawyer said he had been pursued by "criminal organizations" in his home country.

A 28-year-old woman from El Salvador and her 3-year-old son were abducted — not once but twice — after arriving at the border. The woman, who gave her name as Nora, said that in August they were held hostage until a family member in Houston transferred $2,200 to their captors.

Then in October, Nora said, she took her son to use the bathroom outside the encampment where they were staying and encountered three men. She was blindfolded, she said, and the men took turns raping her over several hours, in front of her son, before dumping the two of them on the side of a road.

"I surrendered to American immigration and thought we would be safe," she said in a recent interview at a shelter in Reynosa.



Nora was kidnapped and raped in front of her 3-year-old son in Mexico.  Ilana Panich-Linsman for The New York Times

There have been 636 documented cases of violent attacks, including abduction and rape, against migrants who were returned to Mexico by United States authorities since the Remain in Mexico policy began in January, with 293 attacks in the last month alone, according to Human Rights First. The advocacy group based its tally on credible reports from researchers, lawyers and media outlets, but said the actual numbers were likely higher because most incidents go unreported.

AR00172

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 191 of 400   PageID 4384

The story of José and his family began in Honduras earlier this year, when they decided to seek safe haven in the United States. Gang members had demanded a "war tax" to allow him to keep operating his carwash and dropped notes at the family's doorstep, threatening to kill them.

Cindy, who had a valid tourist visa, flew to the United States with their older son in June. José and their younger child, who lacked visas, made their trek over land. They arrived at the Texas border in July and applied for asylum, but were told to wait in Mexico and return for a series of court hearings in the ensuing months.

The kidnappers struck in November, after José and his son had already attended two court hearings in the United States.

His captors ordered him to contact any family he had in the United States, he said, and when he denied knowing anyone there, the beatings began.

"You're lying. This bat is thirsty for blood," he recalled one of them saying.

José dictated his wife's number to the men, and they called her from his cellphone. When she did not pick up, they clubbed him, causing him to keel over in pain.

When they called again, Cindy answered.

"I'm kidnapped," Cindy, who, like her husband, did not want her last name published because of fear of reprisals, recalled José uttering in agony over the phone.

Cindy with her 5 year-old son in New Jersey.   Desiree Rios for The New York Times

AR00173

Case 2:21-cv-00067-Z Document 162 Filed 09/02/22 Page 192 of 400 PageID 4385

Then the captors hung up, apparently hoping to ratchet up the pressure. When they called again, they told Cindy to come up with $3,000 within an hour if she wanted to spare the lives of her son and husband.

"I was completely desperate. I could hear my son crying in the background," Cindy recalled. "I told them I didn't have the money; I'd have to borrow it. Give me more time."

Cindy sprinted to the home of the babysitter who cares for her 5-year-old son and collapsed there, pleading for help.

A fusillade of calls and texts with threats from the kidnappers soon followed.

"If you don't deposit the money fast, we'll disappear with your son," the men told her.

Cindy called her husband's cellphone again and left a voice message.

"José, send me — send me an audio. I want to know how the child is doing," she said, her voice rising in anguish. "Respond! Respond!"

While she was driving to the bank with the babysitter to withdraw cash, one of the men in Reynosa taunted her husband and scraped his neck with the blunt side of an ax, he said, while another put a gun to his head.

On the next call, Cindy told the men she could manage no more than $2,000, and they relented. She rushed to a money-transfer kiosk to send the cash, and as the one-hour deadline approached, the captors urged her to hurry. "Si, I am here. Right now," she typed back.

There was a problem, though. She could not complete the transaction without their names, so they texted them to her — unfamiliar names belonging to a man and a woman. In the text, they urged her to use Moneygram or Western Union and send "one thousand to each."

"This is the first one," she texted, sending the kidnappers a photograph of the invoice for $1,009.99, including a $9.99 transfer fee.

Because the money-transfer outlet would not allow her to send more than $1,000, she rushed to another shop to send the rest of the money.

"As soon as all the money is here, we'll free them," one of the captors typed.

"O.K., gracias," Cindy replied.

Back at home, though, she received a call from the kidnappers: They had been unable to access the money. "We give you 20 minutes to fix this," a kidnapper typed.

Eight minutes later, another text message popped up: "Hurry up. It's getting late."

Back in Reynosa, one of the men struck José's right arm with the bat and kicked him in the stomach, and he began to vomit. The man brought a bucket and shoved his head inside.

AR00174

Jose's thigh was covered in bruises days after being beaten while held captive. Ilana Panich-Linsman for The New York Times

After visits to three money senders, Cindy managed to transfer the rest of the money. José's abductors stripped the tape from his eyes and put the hood back over his head. They dropped him and his son at the Reynosa bus station, warning that if he notified the police, "You're both dead. We have pictures of you."

With no phone and no money, José said, he staggered across the bridge that leads to the United States to seek out Border Patrol agents. He pleaded to stay in the United States. "Our lives depend on it. I swear I am telling the truth," he told them.

He said the agents took him to an office, where he remembers that they photographed his wounds and gave him a tranquilizer before sending them to spend the night at a holding facility.

The next day, José was escorted to a room where, over the phone, he expressed fear of returning to Mexico to an asylum officer.

About 40 minutes later, an immigration official told José that they would have to go back to Mexico. He handed him a document that said that José "did not establish a clear probability of persecution or torture in Mexico."

Recently, José described his ordeal from a migrant shelter in Reynosa. He still had bruises and scrapes on his neck, arms and legs, and said his right arm, the one that received most of the blows from the bat, was still numb.

His son, who just turned 4, was playing with another child near the picnic table where he sat. That day, José said, he had been able to borrow a phone to call Cindy, who was crying when she heard his voice. He was crying, too. They did not know when they would meet again.

Zolan Kanno-Youngs contributed reporting from Washington.

AR00175

| | |
|---|---|
| **From:** | ▮▮▮▮▮▮▮▮▮▮▮ |
| **To:** | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| **Subject:** | RE: quick q: re Dedicated Docket |
| **Date:** | Monday, October 25, 2021 3:24:41 PM |
| **Attachments:** | image001.png |

▮▮▮▮▮▮

Does this work?

Masters Held – 11,647
       Leads – 4,274
       Riders – 7,335
       Not Flagged as Lead or Rider – 38

In Absentia Orders - 528
       Lead – 204
       Rider – 320
       Not Flagged as Lead or Rider -  4

FYI...to date, there have been no individual hearings.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



This communication, along with any attachments, is covered by Federal and State law governing electronic communications, and may contain sensitive or legally privileged information.  If the reader is not the intended recipient, you are hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited.  If you have received this in error, please notify the sender immediately and delete or destroy this message.

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Monday, October 25, 2021 1:17 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
**Subject:** [EXTERNAL] RE: quick q: re Dedicated Docket



Best,

███████

---

**From:** ████████████████████████████
**Sent:** Monday, October 25, 2021 1:01 PM
**To:** ████████████████████████████████
████████████████████████
**Subject:** RE: quick q: re Dedicated Docket

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

Good afternoon.

This data is current as of 10/25.

Leads: 10,501
Riders: 18,730
Masters held: 11,647

In absentia orders: 528

I hope this was helpful. Have a nice afternoon.

████████  █████████████████████████████



██  communication, along with any attachments, is covered by Federal and State law governing electronic communications, and may contain sensitive or legally privileged information.  If the reader is not the intended recipient, you are hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited.  If you have received this in error, please notify the sender immediately and delete or destroy this message.

---

**From:** ████████████████████████████
**Sent:** Monday, October 25, 2021 10:41 AM
**To:** ████████████████████████████████
████████████
**Subject:** [EXTERNAL] RE: quick q: re Dedicated Docket

████████████████████████████████████████

**From:** ███████████████████
**Sent:** Monday, October 25, 2021 10:37 AM
**To:** █████████████████████████████████
███████████████
**Subject:** quick q: re Dedicated Docket
**Importance:** High

**ISAP IV EOIR Court Appearance Rates through 8/31/**

The following document was created based on Court Appearance data from BI In

Court Appearance data from BI, Inc. FY14 & FY15 & FY16 & FY17 & FY18 &

FAMU Participants Defined as OBP FAMU Apprehensions, between 5/1/2014-7/

FAMU Participant Data received from OBP

Some participants may have had multiple hearings

| Total Hearings |
|---|
| Total Hearings |
| Attended |
| Not Attended |
| **Attendance Rate** |

## /2021--FAMU Participants Apprehended Since May 1, 2014

c. and BI Inc. Population Report, 7/31/2021

 FY19 & FY20 & FY21 through 7/31/2021

'31/2021 that had been subsequently enrolled into ATD as of 7/31/2021

| |
|---|
| 192,439 |
| 190,324 |
| 2,115 |
| **98.9%** |

AR00180

U.S. COMMISSION ON CIVIL RIGHTS

Washington, DC 20425
Official Business
Penalty for Private Use $300

Visit us on the Web: www.usccr.gov



# TRAUMA AT THE BORDER

## THE HUMAN COST OF INHUMANE IMMIGRATION POLICIES

U.S. COMMISSION ON CIVIL RIGHTS

OCTOBER 2019

BRIEFING REPORT

AR00181

## U.S. COMMISSION ON CIVIL RIGHTS

The U.S. Commission on Civil Rights is an independent, bipartisan agency established by Congress in 1957. It is directed to:

- Investigate complaints alleging that citizens are being deprived of their right to vote by reason of their race, color, religion, sex, age, disability, or national origin, or by reason of fraudulent practices.

- Study and collect information relating to discrimination or a denial of equal protection of the laws under the Constitution because of race, color, religion, sex, age, disability, or national origin, or in the administration of justice.

- Appraise federal laws and policies with respect to discrimination or denial of equal protection of the laws because of race, color, religion, sex, age, disability, or national origin, or in the administration of justice.

- Serve as a national clearinghouse for information in respect to discrimination or denial of equal protection of the laws because of race, color, religion, sex, age, disability, or national origin.

- Submit reports, findings, and recommendations to the President and Congress.

- Issue public service announcements to discourage discrimination or denial of equal protection of the laws.

*rescued

*42 U.S.C. §1975a.

## MEMBERS OF THE COMMISSION

Catherine E. Lhamon, *Chairperson**
Patricia Timmons-Goodson, *Vice Chairperson*
Debo P. Adegbile
Gail L. Heriot
Peter N. Kirsanow
David Kladney
Karen Narasaki
Michael Yaki

Mauro Morales, Staff Director

**U.S. Commission on Civil Rights**
1331 Pennsylvania Avenue, NW
Washington, DC 20425
(202) 376-8128 voice
TTY Relay: 711

www.usccr.gov

# Trauma at the Border: The Human Cost of Inhumane Immigration Policies

The United States Commission on Civil Rights

Washington, D.C.

Report

AR00183

*[This page left intentionally blank]*

AR00184



## UNITED STATES COMMISSION ON CIVIL RIGHTS

1331 Pennsylvania Ave., NW • Suite 1150 • Washington, DC 20425  www.usccr.gov

### Letter of Transmittal

October 24, 2019

President Donald J. Trump
Vice President Mike Pence
Speaker of the House Nancy Pelosi

On behalf of the United States Commission on Civil Rights ("the Commission"), I am pleased to transmit our report, *Trauma at the Border: The Human Cost of Inhumane Immigration Policies*. The report is also available in full on the Commission's website at www.usccr.gov.

For this report, the Commission reopened our 2015 report on the condition of immigration detention centers, amid renewed concerns about worsening conditions. Based on media reports, government investigations, eyewitness accounts, and public testimony received by the Commission, the report details how the current Administration's changes to asylum, the detention of children, and certain other immigration policies, practices, and procedures have created an unnecessary human and civil rights crisis at the southern border.  The report does not rely on information provided directly by the relevant federal agencies as, regretfully, they did not respond to our discovery requests.

The institution of the Zero Tolerance policy and decision to forcibly and deliberately separate children, including infants and toddlers, from parents or adult family members on a mass scale, which proceeded with no plans or coordination to reunite families, is a gross human and civil rights violation.  The impact of separating immigrant families and indefinite detention is widespread, long-term, and perhaps irreversible physical, mental and emotional childhood trauma. Disturbingly, there remain credible allegations that family separations continue, despite an Executive Order halting them.  Immigrant children, as well as adults, experienced trauma as a result of the Administration's policies. The Commission heard directly from immigrant detainees who confirmed traumatic experiences as a result of not only being separated from their families, but also the trauma they suffered as a result of enduring inhumane conditions at detention facilities and sometimes on account of the cruel treatment by Department of Homeland Security personnel.

In addition, the new testimony and data indicate that federal agencies have not heeded the Commission's recommendations from its 2015 report.  Agencies continue not to provide appropriate and critical legal and medical services to detainees, or transparency about the government's policies in detaining individuals.  Further, agencies continue inequitable treatment of Lesbian, Gay, Bisexual, and Transgender (LGBT) individuals, individuals with disabilities, and non-English speakers. The Commission found that detention conditions have significantly deteriorated under the current Administration's policies. Some child detention facilities lack basic hygiene and sleeping arrangements; they sometimes lack soap, blankets, dental hygiene, potable

AR00185

204 of 400

water, clean clothing, and nutritious food. The Commission received evidence and testimony that child detention facilities lack appropriately trained medical personnel and medicine, medical staff are not routinely present at detention facilities, and wait times to see a doctor can be weeks long, regardless of how dire the situation. Language barriers pose an immense hurdle to staff's ability to offer adequate and appropriate medical and mental health treatment to children while detained.

The Commission majority voted for key recommendations, including the following: the Administration must immediately reunify any remaining children with their parents, including parents who were deported before, during, and after Zero Tolerance, unless there is a proven serious risk to the best interests of the child. The Administration should immediately remedy conditions in detention centers regarding overcrowding, food, and sanitation so as not to further traumatize children forced to flee their homes.

The Department of Homeland Security should conduct greater oversight and inspection of detention centers, specifically those relating to child detention centers, and should enforce detention center standards up to and including the closure of a detention facility for violating detention center standards and other applicable laws. Congress should expand the authority of Department of Homeland Security Office for Civil Rights and Civil Liberties to respond directly to complainants and enforce civil rights protections. New immigration policies should be precleared by Office for Civil Rights and Civil Liberties or another independent body to ensure they do not violate civil rights, prior to causing harm.

Due to the inconsistent and inhumane treatment of children, Congress should pass legislation that sets minimum safe, sanitary and humane detention conditions, and provide sufficient funding to address the crisis in detention facilities for both children and adults. Because the purpose of immigration detention is not punitive, the standard of care should be based on providing reasonable care and safety, and not on incarceration standards. Congress should require that no funds should be used for the detention of any asylum seeker who has been found to establish a credible fear of persecution, apart from narrow exceptions.

Congress must provide sufficient funding to address the need for hiring, full training, and retention of experienced and qualified administrative law judges and related staff to process asylum and other immigration claims, to ensure asylum seekers and other immigrants are accorded full due process. Congress should pass legislation allowing members of Congress and members of this Commission to conduct independent inspections of detention facilities with minimal notice (no more than 24 hours) and be given full access to detainees to interview them.

We at the Commission are pleased to share our views, informed by careful research and investigation as well as civil rights expertise, to help ensure that all Americans enjoy civil rights protections to which we are entitled.

For the Commission,

Patricia Timmons Goodson
Vice Chair

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

ACKNOWLEDGEMENTS ........................................................................................... v

EXECUTIVE SUMMARY ........................................................................................... 1

   Current Immigration Policies.................................................................................. 2

   Detention Conditions ............................................................................................. 4

   Bearing Witness: Voices from the Southern Border............................................... 6

CHAPTER 1:  Commission's National Origin Jurisdiction, Prior Report, and Current Fact-Finding Investigation .................................................................................................. 8

CHAPTER 2:  Historic and Current Treatment of Migrants at the Southern Border.................. 12

Historic Treatment of Migrants from Central and South America ................................ 12

Other Changes in Demographics of Migrants and Factors for Migration .................... 20

Policy Changes and Their Impact on Enforcement at the Southern Border ................... 22

   Zero Tolerance: Prosecute All Who Cross ............................................................ 22

   No Plan for Reunification of Migrant Children ..................................................... 26

   Metering: Not Allowing Asylum-Seeking Families to Enter ................................. 28

   Migration Protection Protocols............................................................................. 29

   Third Country Rule (Designation of Mexico and Guatemala) ............................... 31

   Removing Domestic Violence as a Basis for Political Asylum............................... 34

   Seeking Asylum and Credible Fear Determinations.............................................. 36

   Increased Detention of Children ........................................................................... 38

CHAPTER 3: U.S. Commission on Civil Rights Public Record................................. 41

Overview of Comments.............................................................................................. 41

   Overview Testimony............................................................................................. 42

Family Separation ...................................................................................................... 43

   Family Separation - Right to Family Integrity Testimony...................................... 49

   Barriers to Reunification Testimony...................................................................... 50

Standards of Care ....................................................................................................... 50

   The Flores Agreement and Other Applicable Standards ........................................ 50

Detention of Children ................................................................................................. 57

   Current Conditions................................................................................................ 57

   Child Deaths.......................................................................................................... 59

   Impact of Metering on Children ............................................................................ 62

   Medical Treatment of Children.............................................................................. 62

Lack of Pediatric Care Testimony ................................................................... 64

Mental Health and Children ............................................................................ 65

Lack of Mental Health Screening Testimony .................................................. 67

Trauma in Children Testimony ....................................................................... 67

Use of Physical Restraints and Juveniles Testimony...................................... 67

Use of Solitary Confinement, Juveniles and Mental Health Testimony.......... 68

Sexual and Physical Violence Against Detained Children ................................... 68

Testimony ..................................................................................................... 69

Length of Stay in Detention Facilities ................................................................ 70

Indefinite Detention for Children Testimony .................................................. 73

Migrant Children Sent to Foster Care ................................................................ 74

Legal Representation of Unaccompanied Minors ............................................... 75

Detention of Adults: Oversight and Transparency of Conditions ........................... 76

Transparency and Oversight Testimony ........................................................ 78

Legal Standard for Medical Care ...................................................................... 79

Medical Resources and Improper Care ............................................................. 81

Lack of Medical Care Testimony ................................................................... 82

Withholding Medication Testimony ............................................................... 83

Competency of Staff in Providing Medical Care Testimony............................. 84

Mental Health and Adults .............................................................................. 85

Pregnancy..................................................................................................... 87

Lack of Transparency in Providing Medical Care ............................................... 87

Deaths while Detained Testimony ................................................................. 88

Basic Needs: Nutrition, Hygiene and Clothing..................................................... 90

Food in Detention Testimony ........................................................................ 91

Hygiene and Clothing Testimony .................................................................. 92

Prison-like Conditions in Facilities ................................................................... 93

Working Conditions Testimony...................................................................... 94

Solitary Confinement as Punishment ................................................................ 95

Solitary Confinement Testimony ................................................................... 96

Sexual Violence and Application of Prison Rape Elimination Act to Detention Facilities.......... 97

Allegations of Sexual Abuse............................................................................ 99

Sexual Violence Testimony ........................................................................ 100

Abuse of Authority ......................................................................................... 100

Misuse of Authority Testimony ................................................................ 101

Treatment of LGBT Individuals ................................................................ 102

Treatment of Transgender Detainees Testimony ................................................ 104

Physical and Sexual Assaults of LGBT Testimony ............................................. 105

Due Process .................................................................................. 106

Due Process Testimony ........................................................................ 107

Length of Stay in Detention Facilities & Withholding Release ................................ 107

Indefinite Detention of Adults Testimony .................................................... 108

Legal Representation in Immigration Proceedings .............................................. 109

Limited English Proficiency and Legal Representation Testimony .............................. 111

Access to Legal Representation Testimony .................................................... 112

Detention Centers in Remote Locations Testimony ............................................. 113

Understanding the Legal Process ............................................................. 113

Navigating Immigration Proceedings Without Representation Testimony ......................... 114

Lack of Independence for Immigration Courts ................................................. 114

Location of Detention Facilities ............................................................ 115

Opening Detention Centers on Potentially Hazardous Sites Testimony .......................... 116

Allocation of Federal Monetary Resources Testimony .......................................... 117

CHAPTER 4: FINDINGS AND RECOMMENDATIONS ..................................................... 119

Findings .................................................................................... 119

I.      Creating a Humanitarian Crisis ...................................................... 119

II.     Discriminatory Immigration Policies ................................................. 120

III.    Trauma as a Result of Family Separations ............................................ 121

IV.     Inhumane Detention Conditions for Children and Adults ............................... 122

V.      Barriers to Access to Justice ....................................................... 124

VI.     Lack of Transparency and Accountability ............................................. 125

Recommendations ............................................................................. 125

I.      Addressing Family Separations ....................................................... 125

II.     Addressing Detention Conditions for Children and Adults ............................. 126

III.    Ensuring Due Process ................................................................ 127

IV.     Increasing Accountability ........................................................... 128

COMMISSIONERS' STATEMENTS AND DISSENTS ...................................................... 130

Statement of Commission Michael Yaki ........................................................ 131

Dissenting Statement of Commissioner Gail Heriot ............................................ 137

Dissenting Statement of Commissioner Peter N. Kirsanow ................................................. 143

Appendices...................................................................................................................... 157

Appendix A:    Federal Agency Roles in Immigration.......................................... 158

Department of Homeland Security ....................................................................... 158

Customs and Border Protection ..................................................................... 158

Immigration and Customs Enforcement ......................................................... 158

Citizenship and Immigration Services............................................................ 159

Department of Justice—Executive Office for Immigration Review ................... 160

Department of Health and Human Services...................................................... 160

Appendix B: Copy of Department of Homeland Security Discovery Request ..................... 162

Appendix C: Copy of Department of Health and Human Services Discovery Request......... 179

AR00190

# ACKNOWLEDGEMENTS

This report was produced under the direction of Commissioners and Commissioner Special Assistants. Special Assistant Jason T. Lagria coordinated the drafting of this report, as well as the review of public comments with the help of Special Assistants Amy Royce and Carissa Mulder and law clerks Erin Drolet (J.D Candidate 2021, George Washington University), Kori Pruett (J.D. Candidate 2021, Georgetown University), and Mark Saunders (J.D. Candidate 2021, Duke University). Special Assistants Alec Deull, Alison Somin, Amy Royce, Irena Vidulovic, Jason T. Lagria, and Rukku Singla and Law Clerks Erin Drolet, Kori Pruett, and Patrick Williamson (J.D. Candidate 2021, Georgetown University) also reviewed, edited, and offered editorial comments for the report, or findings and recommendations, or both.

Katherine Culliton-González, Esq., the Commission's Office of Civil Rights Evaluation (OCRE) Director, conducted substantial principal research and drafting on the background of this report and also reviewed, edited, and offered editorial comments for the report.

With the assistance of Attorney-Advisor Pilar Velasquez McLaughlin, and Law Clerks Christine Kumar (J.D. Candidate 2020, George Washington University), Lilian Ofili (J.D. Candidate 2021, George Washington University), Benjamin Falstein (J.D. Candidate 2021, George Washington University), and Brooke Schwartz (J.D. Candidate 2021, George Washington University), the Commission's General Counsel Maureen E. Rudolph reviewed and approved the report for legal sufficiency. Attorney-Advisor Pilar Velasquez McLaughlin, Law Clerks Christine Kumar, Lilian Ofili, Benjamin Falstein, and Brooke Schwartz, and the Commission's General Counsel Maureen E. Rudolph also provided valuable legal research assistance and writing for the report.

AR00191

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

As confirmed by media reports, government investigations, eyewitness accounts, and public testimony received by the Commission, the Trump Administration has implemented immigration policies that appear to violate constitutional due process rights and basic standards of medical and mental health care, and seemingly target migrants based on demographics including national origin, language status, and gender. These new policies have resulted in the separation of family units, lasting trauma and heartache, and shocking detention conditions for both children and adults.

In addition, the new testimony and data indicate that federal agencies have not heeded the Commission's recommendations from its 2015 report.  Agencies continue not to provide appropriate and critical legal and medical services to detainees, or transparency about the government's policies in detaining individuals.  Further, agencies continue inequitable treatment of LGBT individuals, individuals with disabilities, and non-English speakers.

<u>Current Immigration Policies</u>

Multiple executive branch policies under the Trump Administration are directly impacting the treatment of migrants at the southern border, most of whom are asylum seekers, including families with children: zero tolerance (or criminally prosecuting all who cross the southern border without authorization); metering (or only allowing a certain number of asylum claims per day to be filed); migration protection protocols (requiring asylum seekers to return to Mexico while their claim is processed); and the decision that domestic violence is not a basis upon which asylum will be granted in the U.S.

Functionally, what has resulted from the Administration's policies is the separation of more than 2,700 migrant families and children (including the separation of infants and toddlers from their parents), massive overcrowding of poorly run detention facilities that lack resources and fail to uphold basic standards of medical and mental health care, the forced return to Mexico of over 11,000 migrants waiting to be heard on asylum claims, and other conditions that give rise to concerns of civil and human rights violations.[5]  These policies put the lives of migrants and their families in danger and at times resulted in their needless deaths.[6]

---

[5] Order Granting Plf.'s Mot. for Classwide Prelim. Inj. 7, *Ms. L v. ICE*, No. 18cv0428 DMS (MDD) (S.D. Cal. June 26, 2018); Deanna Paul, "U.N. human rights chief 'deeply shocked' by migrant detention center conditions in Texas," *Washington Post*, July 8, 2019, https://www.washingtonpost.com/immigration/2019/07/08/un-human-rights-chief-deeply-shocked-by-migrant-detention-center-conditions-texas/?utm_term=.939980bb7bf1; Dep't of Homeland Security, Office of Immigration Statistics, *Annual Flow Report, Refugees and Asylees: 2017*, March 2019, Table 6a, p. 7, https://www.dhs.gov/sites/default/files/publications/Refugees_Asylees_2017.pdf.

[6] Hannah Rappleye and Lisa Riordan Seville, "24 Immigrants Have Died in ICE Custody During the Trump Administration," *NBC News*, June 9, 2019, https://www.nbcnews.com/politics/immigration/24-immigrants-have-died-ice-custody-during-trump-administration-n1015291.

AR00193

Perhaps the most egregious ramification is the long-lasting and possibly irreparable emotional and psychological harm these policies have had and will continue to have on migrant families and their children.[7] When families are separated at the border, children do not have contact with their parents or other family members, even if those family members live in the U.S.[8]  According to public reports, the federal government is not providing mental health or emotional support, which in turn causes extreme stress, which can lead to depression, anxiety, and other abnormal psychological functioning.[9] The trauma that migrants and their children face as a result of detention and separation was confirmed through testimony received by the Commission:

> Many families crossing the United State border are fleeing war and violence in their home countries and are already coping with the effects of stress and trauma. . . . A substantial body of research links the trauma of childhood detention with lasting adverse outcomes, including an increased risk of mental illness, such as depression, anxiety, and post-traumatic stress disorder. . . . These migration-related and postmigration stressors can produce demoralization, grief, loneliness, loss of dignity, and feelings of helplessness as normal syndromes of distress that impede refugees from living healthy and productive lives.[10]

> We know without a doubt that these practices cause physical and emotional harm and that this trauma may be long term. It is appalling that, in a country that purports to protect children, that we would, at the same time, victimize children seeking our care and protection.[11]

Implementation of these policies has taken place primarily at the southern border between the United States and Mexico.[12]  The overwhelming majority of persons crossing the southern border

---

[7] Hurley Riley, "The Impact of Parent-Child Separation at the Border," *Pursuit*, Sept. 7, 2018, https://sph.umich.edu/pursuit/2018posts/family-separation-US-border.html.

[8] *See Ms. L v. ICE*, 310 F.Supp.3d 1133 (S.D. Cal. 2018).

[9] Riley, "The Impact of Parent-Child Separation."

[10] *See* American Psychiatric Association, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 13, 2019, at 2, (hereinafter American Psychiatric Association Statement); *see also* Pepper Black, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, Apr. 25, 2019, at 1 (hereinafter Black Statement) (detailing the shock responses and extreme distress of children who have been detained).

[11] Mariela Olivares, Professor, Howard University School of Law, Testimony, *Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights,* Washington, D.C., Apr. 12, 2019, transcript, pp. 152 (hereinafter *Public Comment Session*).

[12] Dep't of Justice, Office of Public Affairs, "Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry," press release no. 18-417, Apr. 6, 2018, https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

are persons of color from Latin America.[13] The United States has a long and ongoing history of discrimination against immigrants of color from non-European countries, which the Commission has documented with regard to Latin American immigrants in particular.[14] Currently, in conjunction with xenophobic rhetoric about who crosses the southern border, the implementation of zero tolerance, family separation, Migration Protection Protocols, and metering at the southern border raise civil rights issues as to whether these policies target certain groups based on national origin and language status.

<u>Detention Conditions</u>

The conditions in which the United States houses migrant children remains of high concern, and the landscape of protections may be changing. In 1993, the Supreme Court stated "'legal custody' rather than 'detention' more accurately describes the arrangement" for migrant children then being housed by the federal government.[15] Given that conditions for migrant children held in federal custody in the 1990s included state child custody law protections as well as the clear ability for

---

[13] From 2010-2014, 71% of unauthorized immigrants in the U.S. were from Mexico and Central America, and 4% were from South America, such that 75% were from Latin American countries. *See* Jie Zong, Jeanne Batalova, and Jeffrey Hallock, "Frequently Requested Statistics on Immigrants and Immigration in the United States, Unauthorized Immigrants," *Migration Policy Institute*, Feb. 8, 2018, https://www.migrationpolicy.org/article/frequently-requested-statistics-immigrants-and-immigration-united-states#Unauthorized.

[14] *See infra* notes 54-102.

[15] *Reno v. Flores*, 507 U.S. 292, 298 (1993). The Court held that because migrant children were not in correctional institutions and were subject to the provisions of state child welfare laws, and because they could be released to a parent or legal guardian, they did not enjoy the full range of due process rights that pertain to persons who are detained by the government. *Id.* at 302:

> "Substantive due process" analysis must begin with a careful description of the asserted right, for "[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Collins, supra,* at 125; see *Bowers* v. *Hardwick, supra,* at 194-195. The "freedom from physical restraint" invoked by respondents is not at issue in this case. Surely not in the sense of shackles, chains, or barred cells, given the Juvenile Care Agreement. Nor even in the sense of a right to come and go at will, since, as we have said elsewhere, "juveniles, unlike adults, are always in some form of custody," *Schall,* 467 U. S., at 265, and where the custody of the parent or legal guardian fails, the government may (indeed, we have said *must*) either exercise custody itself or appoint someone else to do so. *Ibid.* Nor is the right asserted the right of a child to be released from all other custody into the custody of its parents, legal guardian, or even close relatives:
>
> The challenged regulation requires such release when it is sought. Rather, the right at issue is the alleged right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government selected child-care institution.

children to be released to their parents or guardians, the Supreme Court considered that those children had fewer due process rights.[16] As discussed herein, those conditions are changing as children cannot be released to their parents and some detention facilities may be housed on federal lands, including military bases.[17] Under these conditions, migrant children would arguably have more due process rights than those whose rights were defined by the law in the 1990s.[18]

In 1997, the federal government agreed in the *Flores* settlement agreement to provide "safe and sanitary" conditions for detained children,[19] and that agreement has recently been enforced by federal courts.[20] Contrary to this minimal requirement, court filings and media accounts report basic needs at certain southern border facilities are not being met. Examples include lack of shower facilities, soap, diapers, and nutritious food.[21] Additionally, there are multiple reports of sexual violence by staff at facilities, lack of addressing trauma, use of solitary confinement to address mental health, and deaths of children while detained. As this report discusses, these conditions raise concerns under the *Flores* agreement, U.S. Constitution, and federal detention standards.[22]

According to current news and U.S. Government Accountability Office reports, Department of Health and Human Services shelters, which house migrant children after their initial detainment by Customs and Border Protection, are still facing challenges of overcrowding; many are at maximum capacity and there is now additional construction of emergency shelters for thousands

---

[16] *Reno v. Flores*, 507 U.S. at 302.

[17] *See infra* notes 300-309, 670-671.

[18] *See also infra* notes 610-613 (discussing *Zadvydas v. Davis*, 533 U.S. 678 (2001) (except in narrow circumstances unreasonable to detain undocumented immigrants for over six months)).

[19] Stipulated Settlement Agreement, *Flores v. Reno*, No.CV 85-4544-RJK (Px) (C.D. Cal. Jan. 17, 1997) (hereinafter *Flores* Agreement).

[20] *See infra* notes 277; 282; 288-290.

[21] Lizzie O'Leary, "Children Were Dirty, They Were Scared, and They Were Hungry," *The Atlantic*, June 25, 2019, https://www.theatlantic.com/family/archive/2019/06/child-detention-centersimmigration-attorney-interview/592540/; Isaac Chotiner, "Inside a Texas Building Where the Government is Holding Immigrant Children," *New Yorker*, June 22, 2019, https://www.newyorker.com/news/q-and-a/inside-a-texas-building-where-the-government-is-holding-immigrant-children; Cedar Attanasio, Garance Burke and Martha Mendoza, "Attorneys: Texas Border Facility is Neglecting Migrant Kids," *AP News*, June 21, 2019 https://www.apnews.com/46da2dbe04f54adbb875cfbc06bbc615.

[22] *See infra* notes 312-322 (discussing U.S. Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011*, Revised December 2016, V. Expected Practices (hereinafter Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011*) https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf)); *See also infra* notes 452-463 discussing constitutional concerns (deliberate indifference discussion).

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

of children.[23] There are also serious problems of overcrowding and lack of access to proper care, along with prolonged detention, of both adults and children at Border Patrol facilities, documented by the Department of Homeland Security, Office of Inspector General and corroborated by testimony received by the Commission.[24]

Bearing Witness: Voices from the Southern Border

The most compelling voices heard by the Commission were those of formerly detained individuals who spoke out about the treatment they endured at border detention facilities and offered first-hand accounts of humiliation, trauma, fear, and courage.

A migrant from El Salvador described his experience at a detention center in Texas and another detention center in New Jersey to which he was later transferred.

> After crossing the border, Immigration put me in the *hielera*, a small cold room with 40 other people. We had to sit on the floor because they did not have beds or chairs. They only gave us aluminum blankets. The border patrol agents shouted at us. They accused us of being smugglers. The Immigration officers sent me to a detention center in Pearsall, Texas. The guards humiliated us. We had to strip in front of one another and put prison clothes on. The officers laughed and made fun of us.[25]

> The conditions [in New Jersey] were terrible. They gave us used underwear. The meals were very small portions and sometimes we were hungry. Many people got sick from the food they gave us. I remember well the meat was like cardboard. In the detention center, a detainee hurt and threatened me. I tried to speak to a supervisor but she shouted speak English and she didn't even try to call an interpreter. I had to wait two days for an official who spoke Spanish to accept my complaint. They took me to a hospital in handcuffs and put me in solitary confinement in the detention center, as if I had done something wrong. I felt very bad. I could not eat and I was shaking with fear.[26]

---

[23] *See* Maria Sacchetti, "HHS to House Thousands of Unaccompanied Minor Migrants on Military Bases and at Texas Facility," *Washington Post*, June 7, 2019, https://www.washingtonpost.com/immigration/hhs-to-house-thousands-of-unaccompanied-minor-migrants-on-military-bases-at-texas-facility/2019/06/07/a6c2c95c-8938-11e9-a491-25df61c78dc4_story.html?utm_term=.7c65250890c2; *See also, e.g.,* U.S. Gov't Accountability Office, *Unaccompanied Children DHS and HHS Have Taken Steps to Improve Transfers and Monitoring of Care, but Actions Still Needed*, GAO-18-506T, Apr. 26, 2018, https://www.gao.gov/products/GAO-18-506T.

[24] *See infra* notes 149; 325-329; 440-441; 424-425; 473-486; 538.

[25] Robin A. Testimony, *Public Comment Session,* pp. 106-108.

[26] Ibid.

Another formerly detained migrant originally from Mexico explained that:

> My experience in jail was that I was detained in Orange County. My experience, what I saw there, it was horrible, terrible. What I experienced was the worst experience in my life. I was not allowed to eat for weeks. And I was not allowed to bathe. I lost my dignity as a human being there. I was sexually abused and psychologically abused as well. I tried to ask, to talk the immigration officers asking for help. I needed that someone listen to me, to listen to what was happening to me at that moment. I talked to the officers. They didn't listen to me.
>
> They ma[d]e fun of me. They did whatever they wanted with my dignity. They threw the food, my food, to the floor. I had to pick it up.[27]

These stories, like many others the Commission heard, demonstrate the concerns of the Commission regarding a lack of due process and inhumane treatment at the hands of the U.S. government.

---

[27] Eduardo Jiménez Testimony, *Public Comment Session,* p. 116.

# CHAPTER 1:  Commission's National Origin Jurisdiction, Prior Report, and Current Fact-Finding Investigation

Congress has tasked the Commission with jurisdiction to investigate potential discrimination and violations of equal protection, including those based on national origin.[28]  "National origin" means "the country where a person was born, or, more broadly, the country from which plaintiff's ancestors came."[29] The U.S. Citizenship and Immigration Services defines national origin as "the individual's place of birth, country of origin, ethnicity, ancestry, native language, accent, or the perception that they look or sound 'foreign.'"[30] Many other agencies similarly define national origin, including in guidance for federal law enforcement.[31]

Discrimination based on national origin happens when people are singled out and denied equal opportunity because "they or their family are from another country, because they have a name or accent associated with a national origin group, because they are limited English proficient, or because they participate in certain customs associated with a national origin group."[32] Likewise, the Equal Employment Opportunity Commission defines discrimination on a basis of national origin as "including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group."[33]  Additionally, while the Supreme

---

[28] *See* 42 U.S.C. § 1975a(a)(2)(A)-(D). Congress has tasked the Commission with "study[ing] and collect[ing] information relating to . . . discrimination or denials of equal protection . . . because of color, race, religion, sex, age, disability, *or national origin*, or in the administration of justice."

[29] *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88-89 (1973).

[30] U.S. Citizenship and Immigration Services, *Handbook for Employers M-274: 11.2.3 National Origin Discrimination*, July 2017, https://www.uscis.gov/i-9-central/1123-national-origin-discrimination.

[31] The U.S. Customs and Border Protection follows guidance provided by the Department of Justice regarding the "Use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation, or Gender Identity." *See* Dep't. of Justice, *Guidance for Federal Law Enforcement Agencies Regarding the Use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation, or Gender Identity*, December 2014, https://www.justice.gov/sites/default/files/ag/pages/attachments/2014/12/08/use-of-race-policy.pdf?utm_source=google&utm_medium=google&utm_term=(not%20provided)&utm_content=undefined&utm_campaign=(not%20set)&gclid=undefined&dclid=undefined&GAID=248423598.1569429947.  In guidance for federal law enforcement, the Department. of Justice defines national origin as "an individual's, or his or her ancestor's, country of birth or origin, or an individual's possession of the physical, cultural or linguistic characteristics commonly associated with a particular country." Ibid., 2. The Department of Justice, Civil Rights Division defines national origin as someone's "birthplace, ancestry, culture, or language." Dep't. of Justice, Civil Rights Division, *Federal Protections Against National Origin Discrimination*, August 2010, p. 1, http://www.justice.gov/sites/default/files/crt/legacy/2011/04/07/natorign2.pdf.

[32] Dep't. of Justice, *Federal Protections Against National Origin Discrimination*, p. 1.

[33] 29 C.F.R. § 1606.1. The Equal Employment Opportunity Commission issued updated guidance in 2016, generally defining national origin discrimination as mentioned above, and provided further guidance on examples of national

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 218 of 400   PageID 4411
Commission's National Origin Jurisdiction, Prior Report, and Current Fact-Finding Investigation

9

Court has distinguished between citizenship and national origin discrimination, the Court clarified that the Civil Rights Act prohibits "discrimination on the basis of citizenship whenever it has the purpose or effect of discriminating on the basis of national origin."[34]

In 2015, the Commission examined "civil rights and constitutional concerns" at immigration detention centers,[35] and published "With Liberty and Justice for All: The State of Civil Rights at Immigration Detention Facilities."[36]   The Commission's 2015 report focused on the federal government's response to an increase in migration of children, and the "growing concerns over federal apprehension of immigrants and inhumane detention conditions detained immigrants suffer that are inconsistent with American values."[37]   The Commission's investigation included background research and analysis, a briefing held in Washington, D.C., and fact-finding site visits to the Karnes Immigration Family Detention Center in Karnes City, Texas and the Port Isabel Immigration Detention Center in Los Fresnos, Texas.[38] Through this process:

> [T]he Commission gathered facts and data to analyze whether [the Department of Homeland Security], its component agencies, and private detention corporations with whom the federal government contracts to detain immigrants were complying with the Performance Based National Detention Standards, Prison Rape Elimination Act Standards, the *Flores* Settlement Agreement and other related immigrant child detention policies, and the United States Constitution.[39]

In 2015, the Commission found that the federal government was not respecting the civil rights and due process rights of immigrant detainees.[40] The Commission made several recommendations, regarding families in detention, including that 1) Department of Homeland Security should act

---

origin discrimination. *See* U.S. Equal Emp. Opportunity Comm'n, *EEOC Enforcement Guidance on National Origin Discrimination*, Nov. 18, 2016, https://www.eeoc.gov/laws/guidance/national-origin-guidance.cfm.

[34] *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 92 (1973).

[35] 2015 Report, *supra* note 1.

[36] Ibid.

[37] Ibid., 2.

[38] Ibid., Letter of Transmittal, 1.

[39] Ibid.

[40] Ibid., 125.

10

immediately to release families from detention,[41]   2) Congress should no longer fund family detention and should reduce its funding for immigration detention generally, in favor of alternatives to detention,[42] and 3) Department of Homeland Security must ensure the provision of appropriate education and mental and medical health care for all detained adults, children, and youth.[43]  In response to the 2015 Report, a Department of Homeland Security spokesperson stated "[Department of Homeland Security] takes very seriously the health, safety and welfare of those in our care. The Department is committed to ensuring that individuals housed in our all of our centers have the proper care and appropriate resources, that they are held and treated in a safe, secure and humane manner, and that their civil and due process rights are respected.  We have consistently improved and updated our standards and policies to reflect this commitment."[44]

Now, Department of Homeland Security's 2018 zero tolerance policy and resulting separation of migrant children from their parents at the southern border (hereinafter "border") have raised even more serious civil rights issues. On June 15, 2018, the Commission majority sent a letter to the Departments of Justice and Homeland Security, urging the ending of separating families at the border and the zero tolerance policy.[45] The zero tolerance policy, the Commission noted, coerced parents into withdrawing valid asylum applications and impaired their legal immigration proceedings for fear of what would happen to their children if they did not comply.[46] The Commission emphasized its concern that these policies, directed at Mexican and Central American immigrants coming to the U.S. through the border, raised questions of unwarranted discrimination of the basis of national origin.[47] In addition, the Commission noted that the policy disregarded that many of those individuals coming to the U.S. are fleeing dangerous situations in their home countries and are seeking asylum within the parameters of our nation's immigration laws.[48]  On

---

[41] Ibid., Letter of Transmittal, 2.

[42] Ibid., 129.

[43] Ibid., 162.

[44] Franco Ordóñez, "Civil Rights Commission: Release Migrant Children, Parents," *McClatchy DC*, Sept. 17, 2015, https://www.mcclatchydc.com/news/nation-world/national/article35612661.html (citing: Dep't. of Homeland Security spokesperson Marsha Catron).

[45] U.S. Comm'n on Civil Rights Commissioners, letter to former Attorney General Jeff Sessions and former Dep't. of Homeland Security Secretary, June 15, 2018, https://www.usccr.gov/press/2018/06-15-18-letter.pdf (hereinafter June 15 letter).

[46] Ibid., 1.

[47] Ibid., 1-2.

[48] Ibid., 2.

June 26, 2018, the Commission voted to reopen the 2015 investigation, and formed a bipartisan subcommittee to facilitate discovery to update the 2015 report.[49]

To gather information for this investigation, the subcommittee held a public forum on April 12, 2019, and solicited public comments in order to solicit information on the "condition of immigration detention centers and status of treatment of immigrants, including children."[50] The responses from the public forum and public comment period are documented in the third chapter of this report. The Commission also sought formal discovery of information and documents from the Departments of Homeland Security and Health and Human Services, but as of the publication of this report the Commission has not received any responses or documents in connection with these discovery requests.[51]

Since the 1960s the Commission and its state advisory committees have chronicled the civil rights implications of our nation's immigration laws and policies.[52] Herein, the Commission adds to this record by examining the due process rights of detainees (including children) regarding the right to family integrity/unity, rights related to conditions of confinement, and the right to counsel during immigration proceedings. In addition, the Commission seeks to determine if national origin discrimination underlie any of the federal government's actions in separating families. The Commission also considers language access and whether the federal government is apprising migrants of their rights or inquiring about their status at crossing, while detained, and throughout any legal proceedings.

---

[49] U.S. Comm'n on Civil Rights, *Telephonic Business Meeting, U.S. Commission on Civil Rights*, Washington, D.C., June 26, 2018, transcript, p. 17.

[50] U.S. Comm'n on Civil Rights, Sunshine Act Meeting Notice, 84 Fed. Reg. 13003 (Apr. 3, 2019).

[51] Under the Commission's authorizing statute, "[a]ll Federal agencies shall cooperate fully with the Commission to the end that it may effectively carry out its functions and duties." 42 U.S.C. § 1975b(e). On August 16, 2018, the Commission served discovery requests to Dep't. of Homeland Security seeking information regarding the conditions of detention of undocumented immigrant children and families. *See* Maureen Rudolph, General Counsel, U.S. Comm'n on Civil Rights to Kirstjen Nielsen, Secretary, Dep't. of Homeland Security, Aug. 16, 2018, https://www.usccr.gov/press/2018/12-12-DHS-letter.pdf (a copy of this discovery request can be found in Appendix B). On September 17, 2018, Dep't. of Homeland Security wrote a letter objecting to the Commission's jurisdiction to collect such information. On October 18, 2018, the Commission replied to Dep't. of Homeland Security's letter explaining how the Commission had jurisdiction. The Commission also served similar discovery requests to Department of Health and Human Services on December 11, 2018, and followed up with a letter on February 15, 2019, after not receiving a response. *See* Interrogatories sent from Maureen Rudolph, General Counsel, U.S. Comm'n on Civil Rights to Alex M. Azar, Secretary, U.S. Dep't of Health and Human Services, Dec. 11, 2018, https://www.usccr.gov/press/2018/12-12-HHS-letter.pdf (a copy of this discovery request can be found in Appendix C).

[52] *See* U.S. Comm'n on Civil Rights, *The Mexican American; A Paper Prepared for the U.S. Commission on Civil Rights,* 1968, https://www2.law.umaryland.edu/marshall/usccr/documents/cr12m57.pdf; U.S. Comm'n on Civil Rights, *U.S. Commission on Civil Rights Commends President Obama on Issuance of Immigration Accountability Executive Action*, Nov. 21, 2014, http://www.usccr.gov/press/2014/Immigration_letter.pdf (summarizing history of U.S. Comm'n on Civil Rights immigration investigations).

Case 2:21-cv-00067-Z   Document 162   Filed 09/02/22   Page 221 of 400   PageID 4414

## CHAPTER 2:  Historic and Current Treatment of Migrants at the Southern Border

This chapter provides context and background for the current situation of immigrant arrivals at the southern border, conditions at detention facilities, treatment of immigrant detainees, and recent policy changes that triggered the Commission's investigation. The federal response to migrants at the border involves multiple federal departments and agencies, whose actions are governed by various federal statutes, the U.S. Constitution, case law, consent decrees, policies, and standards.[53] This chapter provides a brief summary of the various roles of federal departments and agencies federal policies that affect federal immigration detention practices.

## Historic Treatment of Migrants from Central and South America

The current immigration policies are the latest in a long history of the U.S. government's pattern of inviting and then reversing course to deport migrants. When the U.S. agricultural economy needed laborers to fill work shortages in the early 1900s, there was a large push to establish the first guest-worker program to fill those needs.[54] As migration from Europe declined, the U.S. increasingly turned to Mexico to fill the void by bringing more than 70,000 Mexican workers into the U.S., providing Mexican migrants with temporary legal status that lasted for decades.[55] But in the late 1920s to the mid-1930s, as the U.S. attempted to rebuild after the Great Depression, more than 50,000 Mexican American immigrants, including those who had become U.S. citizens as well as U.S. citizen children, were rounded up and sent back to Mexico - known as the Mexican Repatriations - under the belief that deporting them would provide job opportunities for native-born citizens.[56]  What ensued was a "racially motivated program to create jobs by getting rid of people."[57] This targeted effort consisted of raids in cities that were heavily populated by Latino

---

[53] A summary of federal agency roles in immigration is provided in Appendix A.

[54] "Timeline of Agricultural Labor," *National Farm Worker Ministry*, http://nfwm.org/farm-workers/farm-worker-issues/timeline-of-agricultural-labor/ (accessed July 9, 2019).

[55] Ibid.

[56] Steven Mintz, "Historical Context: Mexican Americans and the Great Depression," *Gilder Lehrman Institute of American History*, https://www.gilderlehrman.org/content/historical-context-mexican-americans-and-great-depression (accessed July 10, 2019).

[57] Alex Wagner, "America's Forgotten History of Illegal Deportations," *The Atlantic*, Mar. 6, 2017, https://www.theatlantic.com/politics/archive/2017/03/americas-brutal-forgotten-history-of-illegal-deportations/517971/.

people and resulted in the deportation by train and busloads of thousands of Mexican Americans, who were sent to regions of Mexico without regard to where their family originated.[58]

In 1929, Congress passed the law which made entering the U.S. without authorization a criminal misdemeanor.[59]  The law, originally constructed by Senator Coleman Livingston Blease, a white supremacist who also defended lynching and segregation, and then Secretary of Labor, James Davis, who oversaw immigration under the Department, was done so with two goals in mind – deterrence and punishment.[60]  Between 1920 and 1930 close to 7,000 illegal entry and re-entry entrants were prosecuted under the new law.[61]  Along with the Quota Acts of 1921 and 1924 severely limiting immigration from Asia, "[I]mmigration policy [during this period] rearticulated the U.S.-Mexico border as a cultural and racial boundary, as a creator of illegal immigration. Federal officials self-consciously understood their task as creating a barrier where, in a practical sense, none had existed before."[62]

In the 1940s and continuing through the 1960s, the U.S. government reopened its doors and invited close to 400,000 temporary workers from Mexico through a series of bi-lateral agreements with Mexico that became known as the Bracero Program.[63]  Notwithstanding the Bracero Program, many Mexicans chose to enter the U.S. without authorization (versus through the Bracero Program), and by late 1948 the Department of Justice convicted nearly 8,000 individuals for illegal

---

[58] Ibid.; *see also* Francisco E. Balderrama and Raymond Rodríguez, *Decade of Betrayal: Mexican Repatriation in the 1930s* (New Mexico: University of New Mexico Press, 2006) (describing the injustice and discrimination that the Mexican American community experienced in 1930s).

[59] *See* 8 U.S.C. § 1325; Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2, 45 Stat. 1551 (final version of the law), http://legisworks.org/congress/70/publaw-1018.pdf; *see also* Ian MacDougall, "Behind the Criminal Immigration Law: Eugenics and White Supremacy," *ProPublica*, June 19, 2018, https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy; Jasmine Aguilera, "Section 1325 of U.S. Immigration Law was a Hot Topic in Wednesday's Debate. Here's Why it's a Big Deal," *Time*, June 27, 2019, https://time.com/5615757/section-1325-immigration-law-2020-debate/.

[60] MacDougall, "Behind the Criminal Immigration Law."

[61] *See* U.S. Dep't of Labor, *Annual Report of the Commissioner General of Immigration*, (Washington, DC. Government Printing Office, 1930), p. 21, https://archive.org/stream/annualreportofco1930unit/annualreportofco1930unit_djvu.txt; *see also* Doug Keller, *Re-thinking Illegal Entry and Re-entry*, 44 LOY. U. CHI. L. J. 65, 76 (2012), https://lawcommons.luc.edu/luclj/vol44/iss1/2/?utm_source=lawcommons.luc.edu%2Fluclj%2Fvol44%2Fiss1%2F2&utm_medium=PDF&utm_campaign=PDFCoverPages.

[62] Keller, *supra* note 61, at 72 (quoting Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* 67 (2004)).

[63] "The Bracero Program: Bracero History Archive," *UCLA Labor Center*, https://www.labor.ucla.edu/what-we-do/research-tools/the-bracero-program/ (accessed July 9, 2019).

AR00204

entry and re-entry and by 1951, that number grew close to 15,000.[64] Most of the individuals entering without authorization, however, were not actually criminally prosecuted and were offered voluntary departure.[65] And despite their contributions to U.S. agriculture and labor market, Mexican laborers were continually treated as a "temporary fix for the domestic economy's current labor needs."[66]

> [B]y treating the immigrant as a temporary fix for the domestic economy's current labor needs, guest worker programs encourage the receiving society to treat immigrants as mere means to an end rather than as potentially permanent members of its communities. By labeling the immigrant a temporary guest, such programs contribute to a climate of inflexibility and intolerance vis-a-vis the cultural pluralism immigrants inevitably generate—a belief that immigrants should be temporary and should not change the "character" of our communities.[67]

In 1952, Congress passed a number of immigration reforms in the McCarran-Walter Act, which re-codified all of the immigration law, repealing some laws and creating new ones including revised illegal entry and re-entry provisions.[68]   The revised illegal entry offense was categorized as misdemeanor punishable by up to six months in prison,[69] and the second offense deemed a felony punishable by up to two years in prison.[70]   Two years later, in 1954, the U.S. government undertook "Operation Wetback" -- a plan instituted by President Eisenhower who ordered Border Patrol to round up millions of undocumented immigrants (and U.S. citizens of Mexican descent),

---

[64] *See* U.S. Dep't of Labor, *Annual Report of the Commissioner General of Immigration*, 81 tbl.49A, (noting that there were nearly 3500 convictions for illegal entry and over 4100 convictions for illegal re-entry); *see also* Keller, *supra* note 61, at 80.

[65] Keller, *supra* note 61, at 80-81.

[66] Cristina M. Rodríguez, *Guest Workers and Integration: Toward a Theory of What Immigrants and Americans Owe One Another*, 2007 U. CHI. LEGAL F. 219 (2007).

[67] *Id*. at 224.

[68] *See generally* Act of June 27, 1952, Pub. L. No. 82-414, ch. 477, § 275, 66 Stat. 163; *see also* Keller *supra* note 61, at 83. Under the revised illegal entry provision, an "alien" (i.e., a noncitizen) who "(1) enters the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact." Thus, consistent with the initial enactment of the law, illegal entry was a criminal offense, but illegal presence in the U.S. was merely a civil offense.

[69] Act of March 4, 1929, Pub. L. No. 70-1018, ch. 690, § 2, 45 Stat. 1551 (The 1929 version of the law made the first offense punishable by up to a year.).

[70] Act of June 27, 1952, Pub. L. No. 82-414, ch. 477, § 275, 66 Stat. 163, 229 (The illegal entry provision was codified at 8 U.S.C. § 1325, where it remains.).

and begin deportation efforts.[71]   By 1964, the Bracero program ended.  Despite the program's termination, less expensive Mexican labor remained in high demand, but many Mexican workers no longer had legal status to work in the U.S.[72]

The 1965 Immigration and Nationality Act was the first immigration-related statute to be revised after the 1964 Civil Rights Act.[73]  The Immigration and Nationality Act previously included discriminatory national origin quotas that permitted large numbers of immigrants from Europe, while limiting immigration from other regions of the world.[74]  The current Immigration and Nationality Act prohibits such national origin discrimination and permits that each country receive seven percent of available visas.[75]  This has resulted in a disparate impact on individuals who would seek to migrate legally from India, China, the Philippines, and Mexico, as their wait list for the major categories of legal visas stretches for decades, while wait lists from most European countries are non-existent.[76]  However, the Immigration and Nationality Act also remedied the more extreme prior disparities caused by the former discriminatory quotas, resulting in changing demographics of immigration to the U.S. In 1960, 75% of immigrants came from Europe, whereas by 2012, that

---

[71] Juan Ramón García, *Operation Wetback: The Mass Deportation of Mexican Undocumented Workers in 1954*, (United States: Praeger 1980); Ian F. Haney-López, *Racism on Trial: The Chicano Fight for Justice*, (Massachusetts: Belknap Press, 2003); *see also* "Depression War, and Civil Rights, Hispanics in the Southwest," *U.S. House of Representatives: History, Art, and Archives*, https://history.house.gov/Exhibitions-and-Publications/HAIC/Historical-Essays/Separate-Interests/Depression-War-Civil-Rights/ (accessed July 9, 2019).

[72] Keller, *supra* note 61, at 88-89.

[73] Immigration and Nationality Act of 1952, Pub. L. 82-414, 66 Stat. 163 (codified at 8 U.S.C. ch.12).

[74] *See* Quota Act of 1921, Pub. L. No. 67-5, ch. 8, § 2, 42 Stat. 5; Immigration Act of 1924, Pub. L. No. 68-139, ch. 190, § 11, 43 Stat. 153.

[75] 8 U.S.C. §§ 1152(a)(1)(nondiscrimination) and 1152(a)(2)(with limited exceptions, family-sponsored and employment-based visas given to natives of each foreign state not exceed 7 percent of worldwide total).

[76] *See, e.g.,* David J. Bier, "Immigration Wait Times from Quotas Have Doubled: Green Card Backlogs are Long, Growing and Inequitable," Cato Institute, June 18, 2019, pp. 2-3 https://object.cato.org/sites/cato.org/files/pubs/pdf/pa-873-updated.pdf (reviewing United States Citizenship and Immigration Services  processing times and finding that:

> The country limits result in each nationality waiting in lines that move at different speeds within each category. The wait time for Mexican siblings of U.S. citizens is different from that of Filipino siblings of U.S. citizens, and both wait times differ from those of Mexican or Filipino spouses of legal permanent residents. For the most part, just four nationalities— Indians, Chinese, Filipinos, and Mexicans—reach the country limits. When a nationality reaches the country limit, nationals of other countries pass them in the line. Each month, the State Department publishes the Visa Bulletin, which informs immigrants who entered the line before a certain date that they may now apply for a green card. For example, in October 2018, the date for Mexican-born siblings of U.S. citizens was January 22, 1998, meaning that Mexican-born siblings had waited about two decades for the chance to apply for a green card.

number dropped to less than 12%.[77] As the following Census data analyzed by Migration Policy Institute illustrates, from 1965 to 2017, immigration has changed from largely European to largely non-European:

***Table 1:*** *Regions of Birth for Immigrants in the United States, 1960-Present*[78]



**Source:** Migration Policy Institute tabulation of data from U.S. Census Bureau, 2010 and 2017 American Community Surveys, and 2000 Decennial Census; data for 1960 to 1990 were from Campbell J. Gibson and Emily Lennon, "Historical Census Statistics on the Foreign-Born Population of the United States: 1850-1990" (Working Paper No. 29, U.S. Census Bureau, Washington, D.C., February 1999).

---

[77] "The Facts on Immigration Today," Center for American Progress, Oct. 23, 2014, https://www.americanprogress.org/issues/immigration/reports/2014/10/23/59040/the-facts-on-immigration-today-3/.

[78] Migration Policy Institute, *Regions of Birth for Immigrants in the United States, 1960-Present*, https://www.migrationpolicy.org/programs/data-hub/us-immigration-trends (accessed July 9, 2019) (noting "[t]his bar chart displays the immigrant population in the United States, between 1960 and 2017, by region of birth. The chart demonstrates the significant shift in origins—from mostly European to predominantly Latin American and Asian, and more recently African—that resulted after enactment of the 1965 amendments to the Immigration and Nationality Act.").

AR00207

During the same period of time, and particularly since the 1990s, U.S. immigration policy became stricter.[79] An example of such stringent legislation came in 1996 when Congress passed the Illegal Immigration Reform and Immigration Responsibility Act.[80] This legislation amended 8 U.S.C. § 1325 to make it possible for a noncitizen "apprehended while entering or attempting to enter the United States at a time or place other than as designated by immigration officers" to be charged with a civil penalty.[81] The Illegal Immigration Reform and Immigration Responsibility Act also introduced bars to reentry to the U.S. for individuals who had previously accrued unlawful presence in the U.S., such that persons who would otherwise have access to legal status under other provisions under the Immigration and Nationality Act could no longer enter the U.S. legally.[82] Scholars have also documented that stricter immigration controls have been pushed by xenophobic reactions to non-white immigrants.[83] In particular, scholars have pointed to policies like "Secure Communities" and state laws like Arizona's S.B. 1070 as targeting Latino immigrants.[84]

---

[79] *See, e.g.*, Yolanda Vázquez, *Constructing Crimmigration: Latino Subordination in A "Post-Racial" World*, 76 OHIO ST. L.J. 599, 636-37 (2015) (tracing the history of immigration policy developments from the 1980s to today); David Alan Sklansky, *Crime, Immigration, and Ad Hoc Instrumentalism*, 15 NEW CRIM. L. REV. 157, 157 (2012) (describing the "rise of an intertwined regime of "crimmigration" law. . . attributed to some combination of nativism, overcriminalization"); César Cuauhtémoc García Hernández, *Creating Crimmigration*, 2013 B.Y.U. L. REV. 1457, 1461-67 (2013) (assessing the disparate racial impacts of the criminal justice system on contemporary immigration enforcement); *see also* Yolanda Vázquez, *Perpetuating the Marginalization of Latinos: A Collateral Consequence of the Incorporation of Immigration Law into the Criminal Justice System*, 54 HOW. L.J. 639, 666 (2011) (examining the disparate deportation of Latinos; in 2009 comprising ninety-four percent of deportations).

[80] Immigration Reform and Immigration Responsibility Act, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 (1996).

[81] *Id.* § 105, 110 Stat. 3009-556 (codified at 8 U.S.C. § 1325).

[82] *Id.* § 301, 110 Stat. 3009-576 (codified at 8 U.S.C. § 1182(a)) (introducing 3- and 10-year bars to reenter the U.S. for certain individuals who have accrued various lengths of unlawful presence in the U.S.).

[83] *See, e.g.,* Kevin Johnson, *Doubling Down on Racial Discrimination: The Racially Disparate Impacts of Crime-Based Removals*, 66 CASE W. RES. L. REV. 993, 1000-01, 1002, 1017 (2016) (the people most directly affected by the failure of comprehensive immigration reform and increased removals are noncitizens of color); Doris Marie Provine and Roxanne Lynn Doty, *"The Criminalization of Immigrants as a Racial Project,"* JOURNAL OF CONTEMPORARY CRIMINAL JUSTICE 27(3), 261-77 (2011) (examining how contemporary immigration policies "reinforce racialized anxieties"); s*ee generally* Karla Mari McKanders, *The Constitutionality of State and Local Laws Targeting Immigrants*, 31 U. ARK. LITTLE ROCK L. REV. 579 (2009).

[84] *See* Mariela Olivares, *Intersectionality at the Intersection of Profiteering and Immigration Detention*, 94 NEB. L. REV. 963, 1010-12 (2015) (reviewing state and federal immigration policies passed between 1965-2015, including "Secure Communities" and Arizona's S.B. 1070 and observing that more recent "historical and contemporary efforts highlight the fact that, although neither federal nor local laws explicitly and formally include racially or ethnocentrically prohibitive provisions, the practical effect of law and policy is to continue to disparately oppress immigrants of color and, particularly, Latina/os.").

18    *Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

As discussed above, the criminalization of illegal entry under 8 U.S.C. § 1325 has been around for exactly 90 years.[85] Yet, because enforcement is at the discretion of the president, each administration has applied it with varying degrees of intensity. For the first decade after Congress passed 8 U.S.C. § 1325, the U.S. prosecuted more than 44,000 illegal entry cases.[86] Due to the implementation of various economic and social programs in addition to the fact that the southern border was largely unguarded, the years between 1987 and 1992 saw a slump in the rate of apprehension and subsequent prosecutions for illegal entry.[87] From 1996 to 2000, the Clinton Administration remained under 20,000 immigration prosecutions a year.[88] From 2001-2002, the Bush Administration prosecuted a similar amount of immigration cases, holding fairly steady at around 20,000 prosecutions a year.[89] In November of 2002, Congress passed the Homeland Security Act, officially creating the Department of Homeland Security giving it the power to refer the prosecution of immigrants.[90] The year 2003 was subsequently marked by a slight increase of immigration prosecutions, and by 2008 this slight increase in prosecutions peaked to 80,000 cases a year.[91] In 2009, the Obama Administration continued with increasing immigration prosecutions and in 2013 at its peak, prosecuted over 95,000 immigration violation cases in a single year.[92] In 2016, the criminal prosecutions for immigration violations accounted for 52 percent of all federal criminal prosecutions.[93] Of the prosecutions involving immigration violations, 35,367 out of the 69,298 cases involved charges under 8 U.S.C. § 1325.[94]

---

[85] *See supra* note 59; 8 U.S.C. § 1325; Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2, 45 Stat. 1551 (final version of the law), http://legisworks.org/congress/70/publaw-1018.pdf.

[86] Gaby Del Valle, "The Dark, Racist History of Section 1325 of U.S. Immigration Law," *VICE News,* June 27, 2019, https://news.vice.com/en_us/article/a3x8x8/the-dark-racist-history-of-section-1325-of-us-immigration-law.

[87] Keller, *supra* note 61, at 76.

[88] Transactional Records Access Clearinghouse Reports, *Immigration Now 52 Percent of All Federal Crime Prosecutions*, https://trac.syr.edu/tracreports/crim/446/ (accessed July 28, 2019).

[89] Ibid.

[90] Homeland Security Act of 2002, Pub. L. 107-296 (codified at 6 U.S.C. § 101).

[91] Transactional Records Access Clearinghouse Reports, *Immigration Now 52 Percent of All Federal Crime Prosecutions*.

[92] Ibid.

[93] Ibid.

[94] Ibid. Other immigration violation charges in the 69,298 figure include those under: 8 U.S.C. § 1326 (Reentry of a deported noncitizen), 8 U.S.C. § 1324 (Bringing in and harboring certain noncitizens), 8 U.S.C. § 1546 (Fraud and misuse of visas, permits, and other documents), 18 U.S.C. § 1544 (Misuse of passport), 18 U.S.C. § 1028 (Fraud and related activity – Id documents), 18 U.S.C. § 1542 (False statements in application and use of passport), 18 U.S.C. § 922 (Firearms; Unlawful acts), 21 U.S.C. § 841 (Drug abuse Prevention & Control-Prohibited acts A), & 18 U.S.C. § 371 (Conspiracy to commit offense or to defraud the U.S.).

At present, the overwhelming majority of persons crossing the southern border are people of color, primarily from Latin America.[95] Border Patrol data about arrests at the southern border with Mexico and northern border with Canada from FY 2015-2018, show that a total of 837,518 individuals were arrested, the great majority of whom were arrested at the southern border.[96] Of the people arrested by the Border Patrol, 537,650 (64.2%) were from Mexico, 110,802 (13.2%) were from Guatemala, 72,402 (8.6%) were from El Salvador, 68,088 (8.1%) were from Honduras, and 11,600 (0.01%) were from India.[97]

In addition, the Trump Administration's characterization of certain countries exacerbates harmful and untrue stereotypes about immigrants of color, including Latino immigrants. Recent comments from political leaders single out immigrants of color as somehow being less desirable than those from countries where the population is primarily white.[98] Then candidate Trump's characterization of Mexicans as "rapists and murderers"[99] further inflames negative and untrue connotations about Mexicans and immigrants from Mexico and these statements have been considered by federal courts as indicia of discriminatory intent.[100]   Likewise, the Administration's

---

[95] From 2010-2014, 71% of unauthorized immigrants in the U.S. were from Mexico and Central America, and 4% were from South America, such that 75% were from Latin American countries. Zong et al., "Frequently Requested Statistics"; *see also* Dara Sharif, "Haitians and Africans Are Increasingly Among Those Stranded Along US – Mexico Border by Trump Immigration Policies," *The Root*, July 9, 2019, https://www.theroot.com/haitians-and-africans-are-increasingly-among-those-stra-1836201429.

[96]  Transactional Records Access Clearinghouse Reports, *Border Patrol Arrests*, https://trac.syr.edu/phptools/immigration/cbparrest/ (accessed July 11, 2019) ("The data currently begin in October 2014 and track Border Patrol apprehensions through April 2018. (Data for two months - August and September 2017 - has not as yet been received.) Additional FOIA requests are currently outstanding for more recent time periods. As more data become available, the App will continue to be updated.").

[97] Ibid.

[98] For example, President Trump reportedly expressed frustration with lawmakers who wished to protect immigrants from "shithole" countries such as Haiti, El Salvador, and African countries, and suggested the United States bring more people from countries like Norway. Josh Dawsey, "Trump Derides Protections for Immigrants from 'Shithole' Countries," *Washington Post*, Jan. 12, 2018, https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html; s*ee also* Ibram X. Kendi, "The Day 'Shithole' Entered the Presidential Lexicon," *The Atlantic*, Jan. 13, 2019, https://www.theatlantic.com/politics/archive/2019/01/shithole-countries/580054/; Terje Solsvik and Camilla Knudsen, "'Thanks, but no thanks' – Norwegians Reject Trump's Immigration Offer," *Reuters*, Jan. 12, 2018, https://www.reuters.com/article/us-usa-trump-immigration-norway/thanks-but-no-thanks-norwegians-reject-trumps-immigration-offer-idUSKBN1F11QK.

[99] *See Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F.Supp.3d 393, 400-01 (D. Mass. 2018) (allegations quoting then-candidate Trump regarding Mexican immigrants and alleging they are sending criminals and rapists); Katie Reilly, "Here Are All the Times Donald Trump Insulted Mexicans," *Time Magazine*, Aug. 31, 2016, https://time.com/4473972/donald-trump-mexico-meeting-insult/.

[100] *See Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F.Supp.3d 393, 412 (finding that Temporary Protective Status (TPS) recipients adequately alleged that the change in TPS policy raised a serious question of equal protection and due process); *Ramos v. Nielsen*, 336 F.Supp.3d 1075, 1098 (N.D. Cal. 2018) ("Plaintiffs have provided sufficient evidence to raise serious questions as to whether a discriminatory purpose was a motivating factor in the decisions to terminate the [Temporary Protective Status] designations. In particular, Plaintiffs have

rhetoric about building a wall between the U.S. and Mexico in order to keep Mexican immigrants out of the U.S. has been considered as additional evidence of the bias against Latino individuals and Latino immigrants.[101]   These statements add to historic and unfortunately ongoing discriminatory treatment of immigrants of color (including immigrants from Latin America) in the United States.[102]

**Other Changes in Demographics of Migrants and Factors for Migration**

The typical migrant crossing the southern boarder used to be a single man from Mexico looking for work in the United States, but today, there are actually more Mexicans leaving the United States than entering.[103] In recent years, typical migrants are families or children escaping violent crime, unrestrained gangs, and failing economies in their home countries in Central America.[104] These families seeking asylum turn themselves into Border Patrol at a higher rate, attempting to

---

provided evidence indicating that (1) the [Dep't. Of Homeland Security] Acting Secretary or Secretary was influenced by President Trump and/or the White House in her [Temporary Protective Status] decision-making and (2) President Trump has expressed animus against non-white, non-European immigrants. As this Court noted, even if the [Dep't. Of Homeland Security] Secretary or Acting Secretary did not "personally harbor animus . . ., their actions may violate the equal protection clause if President Trump's alleged animus influenced or manipulated their decision making process."); *Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 514-15  (9th Cir. 2018) (holding that because U.S. Citizenship and Immigration Services retained ultimate discretionary authority over protections granted by Deferred Action for Childhood Arrivals, illegal immigrants did not possess a liberty or property interest protected by due process; but upholding plaintiff's equal protection claim given that the recession of Deferred Action for Childhood Arrivals was motivated by discriminatory animus).

In fact, studies have shown that immigrants (who are majority Mexican nationals) commit fewer crimes than U.S. citizens. *See, e.g.*, Anna Flagg, "Is There a Connection Between Undocumented Immigrants and Crime?," *The Marshall Project*, May 13, 2019, https://www.themarshallproject.org/2019/05/13/is-there-a-connection-between-undocumented-immigrants-and-crime (citing various studies and adding her own study comparing FBI crime data to immigration data).

[101] Kristen Martnez-Gugerli, "Xenophobia and the American Immigration Debate: The Way We View Latino Immigrants," *Panorama*, Oct. 11, 2018, https://www.panoramas.pitt.edu/health-and-society/xenophobia-and-american-immigration-debate-way-we-view-latino-immigrants.

[102] Lee J. Terán, "Civil Rights and Immigration: Fifty Years of Failed U.S. Immigration Laws," Holding up the Mirror 50 Years Later, Mexican American in Texas: 1968-2019, Reports and Recommendations to the U.S. Commission Civil Rights," Nov. 18, 2018, ch. 3: "Civil Rights and Immigration: Fifty Years of Failed U.S. Immigration Laws" (includes list of relevant past Commission and advisory committee reports including "The Tarnished Golden Door: Civil Rights Issues in Immigration" (1980), "Federal Immigration Law Enforcement in the Southwest: Civil Rights Impacts on Border Communities" (1997) (joint report of Arizona, California, New Mexico, and Texas Advisory Committees), and "Migrant Civil Rights Issues Along the Southwest Border" (2003)).

[103] Miriam Jordan, "More Migrants Are Crossing the Border This Year. What's Changed?," *New York Times*, Mar. 5, 2019, https://www.nytimes.com/2019/03/05/us/crossing-the-border-statistics.html (hereinafter Jordan, "More Migrants Are Crossing the Border.").

[104] Adam Isacson, "The U.S. Government's 2018 Border Data Clearly Shows Why the Trump Administration is on the Wrong Track," *Washington Office on Latin America*, Nov. 9, 2018, https://www.wola.org/analysis/us-government-2018-border-data-trump-immigration-asylum-policy/ (hereinafter, Isacson, "2018 Border Data.").

enter with a legal claim of asylum.[105] In 2018, although the total number of migrants apprehended by Border Patrol was the fifth lowest total it had been since 1973, the proportion of migrants who were children and families reached a record high.[106] In 2012, only 10% of apprehended migrants were children and families whereas in 2018, it had grown to 40%.[107] From the beginning of the fiscal year in October 2018 to March 2019, Border Patrol detained 136,150 people traveling in families with children, compared with 107,212 detained during all of fiscal year 2018.[108]

The changing demographics of migrants reflects the changing living conditions in Central America, particularly El Salvador, Guatemala and Honduras, three countries with some of the world's highest levels of violent crime and homicide.[109] Although the number of unaccompanied children peaked in FY 2014 and has declined slightly since, the number of female migrants has been increasing.[110] From FY 1995 to FY 2017, female Mexican migrants averaged about 13% of all Mexican migrants.[111] Today, migrants from Central America are more likely to be female than in previous years, with women accounting for 48% of all Salvadoran migrants and 43% of all Honduran migrants in FY 2017.[112]

The Obama Administration directed aid and funding to the Northern Triangle countries of El Salvador, Guatemala, and Honduras.[113] This money was primarily distributed to U.S. agencies, international organizations, and non-profits and aimed at fostering economic growth, improving governance, and improving security in these three countries.[114] In order to receive the aid, each country's government was required to meet multiple benchmarks established by the State Department that proved they were working to combat corruption, expand their economies, and

---

[105] Ibid.

[106] Ibid.

[107] Ibid.

[108] Jordan, "More Migrants Are Crossing the Border."

[109] Ibid; Isacson, "2018 Border Data."

[110] Stephanie Leutert, "Who's Really Crossing the U.S. Border, and Why They're Coming," *Lawfare*, June 23, 2018, https://www.lawfareblog.com/whos-really-crossing-us-border-and-why-theyre-coming.

[111] Ibid.

[112] Ibid.

[113] Ted Hesson, "White House Slow-walking Aid to Central America," *Politico*, Mar. 27, 2019, https://www.politico.com/story/2019/03/27/central-america-aid-1292760.

[114] Ibid.

focus on judicial reform.[115] According to a July 2019 report by the Congressional Research Office, the U.S. had allocated $2.6 billion to Central America since fiscal year 2016.[116]

In March 2019, President Trump declared that the U.S. would no longer be giving aid to Central American countries, in part because he believed the countries were encouraging migrants to come to the United States.[117] Following President Trump's declaration, the State Department determined that about $432 million in aid from prior projects (from the Fiscal Year 2017 budget) would stay in place but further funding (approximately $370 million from the Fiscal Year 2018 budget) would be held back, pending further review.[118] Immigration policy experts state that the lack of aid would likely increase the number of migrants fleeing Central America for the U.S.[119]

## Policy Changes and Their Impact on Enforcement at the Southern Border

Several executive branch immigration policies directly impact the treatment of asylum seekers, families, and children: zero tolerance; metering; Migration Protection Protocols (remain in Mexico); Third Country Asylum Rule; and the decision that domestic violence is not a basis upon which asylum will be granted in the U.S.

### *Zero Tolerance: Prosecute All Who Cross*

Zero tolerance has resulted in the separation of thousands of migrant children, including infants and toddlers, from their parents, converted them into unaccompanied minors, and forced them into shelters for 6-8 months, or more. On April 6, 2018, then-Attorney General Jeff Sessions issued the zero tolerance policy memorandum for attempted entry or reentry into the United States along the Southwest border (defined as the border between Mexico and California, Arizona, New Mexico,

---

[115] Ibid.

[116] Congressional Research Service, *U.S. Strategy for Engagement in Central America: An Overview*, by Peter J. Meyer, July 2019, p. 1, https://crsreports.congress.gov/product/pdf/IF/IF10371; Samantha Raphelson, "U.S. Decision to Cut Central America Aid Could Worsen Migrant Crisis, Experts Say," *NPR*, Apr. 2, 2019, https://www.npr.org/2019/04/02/709089322/u-s-decision-to-cut-central-american-aid-could-worsen-migrant-crisis-experts-say.

[117] Hesson, "White House Slow-walking Aid."; Julian Borger, "Trump Plans to Cut Central America Aid, Blaming Countries for Migrant Caravans," *The Guardian*, Apr. 2, 2019, https://www.theguardian.com/world/2019/apr/03/trump-to-sanction-central-american-nations-with-aid-cuts.

[118] Matthew Lee, "US Restores Some Aid to El Salvador, Honduras, Guatemala," *Associated Press*, Jun. 18, 2019, https://www.apnews.com/0eaa42865d974e46ba04a51e21e1a81b.

[119] Raphelson, "U.S. Decision to Cut Central America."

and Texas).[120]  Under the revised policy, federal prosecutors were directed to criminally prosecute all border crossers apprehended between U.S. ports of entry as criminal misdemeanors and charge them for "improper entry" under 8 U.S.C. § 1325(a).[121]  A recent decision by the Ninth Circuit has called into question many of the criminal prosecutions that occurred of asylum seekers under 8 U.S.C. § 1325(a).[122]  But under the zero tolerance policy, federal prosecutors began criminally prosecuting *all* adult noncitizens apprehended crossing the border regardless of whether they were seeking asylum or accompanied by minor children.[123]  Adults were detained in adult criminal detention facilities, and their children "consequently" were transferred separately to shelters in a marked shift in policy.[124]

The policy was implemented when Border Patrol and Immigration and Customs Enforcement asked for guidance from the Secretary of Homeland Security "regarding various approaches for

---

[120] Dep't of Justice, Office of Public Affairs, "Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry," press release No. 18-417, Apr. 6, 2018, https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

[121] Dep't of Justice, Office of the Attorney General, *Memorandum from the Office of the Attorney General to Federal Prosecutors Along the Southwest Border; Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)*, Apr. 6, 2018,  https://www.justice.gov/opa/press-release/file/1049751/download (hereinafter Dep't of Justice, *Zero-Tolerance Memorandum*).  The Attorney General's memorandum "direct[ed] each United States Attorney's Office along the Southwest Border— to the extent practicable, and in consultation with [Dep't. of Homeland Security]— adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section 8 U.S.C. § 1325(a). This zero-tolerance policy shall supersede any existing policies."  Ibid. Congress made improper entry, i.e., not at a port of entry, a misdemeanor offense in 8 U.S.C. § 1325.

[122] *United States v. Corrales-Vázquez*, No. 18-50206, 2019 WL 3311349 (9th Cir. July 25, 2019), http://cdn.ca9.uscourts.gov/datastore/opinions/2019/07/24/18-50206.pdf.

[123] Congressional Research Service, *The Trump Administration's "Zero Tolerance" Immigration Enforcement Policy*, by William A. Kandel, Feb. 26, 2019, pp. 7-8,  https://crsreports.congress.gov/product/pdf/R/R45266 (hereinafter CRS, *Zero Tolerance*); *see also Oversight of Family Separation and U.S. Customs and Border Protection Short-Term Custody under the Trump Administration: Hearing Before the H. Comm. on the Judiciary*, 116th Cong. 1 (2019) (testimony of Brian S. Hastings, Chief, Law Enforcement Operations Directorate, U.S. Border Patrol, U.S. Customs and Border Protection), https://docs.house.gov/meetings/JU/JU00/20190725/109852/HHRG-116-JU00-Wstate-HastingsB-20190725.pdf. ("Consequently, when a parent or legal guardian traveling with his or her child was accepted for prosecution by [Department of Justice] under Zero Tolerance and was transferred to U.S. Marshals Service custody for the duration of their criminal proceedings, the child could not remain with the parent or legal guardian during criminal proceedings or subsequent incarceration. This is standard for criminal prosecutions when the defendant is incarcerated. Because the detained parent was not able to provide care and physical custody to the child, the child became an Unaccompanied Alien Child, as defined by 6 U.S.C. § 279(g). Section 235(b)(3) of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 which generally requires an [Unaccompanied Alien Child] in the custody of [Dep't of Homeland Security] be referred to the custody and care of the [Department of Health and Human Services Office of Refugee Resettlement].")

[124] Ibid., 8; *see* "Where Are the Migrant Children Facilities? Scattered Across America," *Washington Post*, June 25, 2018, https://www.washingtonpost.com/graphics/2018/national/migrant-child-shelters/.

implementing Department of Justice's April 2018 memo."[125] In response, then Secretary of Homeland Security Kirstjen Nielsen approved Department of Justice's recommended policy on May 4, and subsequently issued internal guidance on May 11, 2018, implementing the family separation policy.[126]

Shortly thereafter, at the news conference in San Diego, California near the Southern border with Tijuana, Mexico, then-Attorney General Sessions acknowledged that the zero tolerance policy does not have exceptions for those seeking asylum or accompanying minors:

> I have put in place a "zero tolerance" policy for illegal entry on our Southwest border.  If you cross this border unlawfully, then we will prosecute you.  It's that simple. . . .  I have no doubt that many of those crossing our border illegally are leaving difficult situations.  But we cannot take everyone on Earth who is in a difficult situation.[127]

Prior to zero tolerance, only a small number of migrant children were separated from their parents if the relationship could not be confirmed, or if they were a threat to the safety of the child.[128] The exact number of family separations prior to zero tolerance is unknown given the fact that Department of Health and Human Services, Office of Refugee and Resettlement staff had only begun informally tracking family separations in 2016.[129] Then-Department of Homeland Security Secretary Nielsen admitted, however, that the rate of family separation under the Obama

---

[125] U.S. Dep't of Justice, Justice News, "Attorney General Sessions Delivers Remarks Discussing the Immigration Actions of the Trump Administration," May 7, 2018, https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions (hereinafter Justice News, "Sessions Delivers Remarks.").

[126] U.S. Gov't Accountability Office, *Unaccompanied Children: Agency Efforts to Reunify Children With Parents Separated at the Border*, GAO 19-163, Oct. 2018, p. 7, https://www.gao.gov/assets/700/694963.pdf (hereinafter GAO 19-163, *Unaccompanied Children*) ("Prior to the Attorney General's April 2018 memo, according to [Department of Homeland Security] officials, accompanied children at the border were generally held with their parents in [U.S. Customs and Border Protection] custody for a limited time before being transferred to ICE and released pending removal proceedings in immigration court. However, according to [Department of Homeland Security] and [Department of Health and Human Services] officials, [Department of Homeland Security] has historically separated a small number of children from accompanying adults at the border and transferred them to [Office of Refugee Resettlement] custody for reasons such as if the parental relationship could not be confirmed, there was reason to believe the adult was participating in human trafficking or otherwise a threat to the safety of the child, or if the child crossed the border with other family members such as grandparents without proof of legal guardianship. [The Office of Refugee and Resettlement] has traditionally treated these children the same as other UAC [Unaccompanied Minor].")

[127] Justice News, "Sessions Delivers Remarks."

[128] GAO 19-163, *Unaccompanied Children*, p. 7.

[129] Dep't of Health and Human Services, Office of Inspector General, *Separated Children Placed in Office of Refugee Resettlement Care*, OEI-BL-18-00511, January 2019, p. 6, https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf. (hereinafter Dep't. of Health and Human Services, OEI-BL-18-00511, *Separated Children*).

Administration was less than it is under the Trump Administration.[130] According to an investigation by the Department of Health and Human Services, Office of Inspector General separated children accounted for 0.3% of all unaccompanied minors taken into Department of Health and Human Services custody near the end of the Obama Administration in late 2016, and by August 2017 that number had increased to 3.6%.[131] Under zero tolerance, relevant agencies began the wholesale separation of children from families as the norm, rather than the exception. Some parents were not provided with clear notice that their children were being taken from them, and some parents have been deported without their children, making reunification extremely difficult.[132] The removal of children from their families without a determination of the parent's fitness raises civil rights concerns, including constitutional due process rights to family integrity.[133]

Immediately after implementation, the separation of children from their parents at the border led to "international condemnation," and widespread protest in the U.S.[134]  In response, on June 20, 2018, President Trump signed an Executive Order amending the policy to include "preservation of the 'family unit' by keeping migrant families together during criminal and immigration proceedings to the extent permitted by law."[135]  The Executive Order does not require family reunification of the thousands of children that had already been separated from their parents and does not prohibit family separation.  Despite the Executive Order ending the policy and ongoing litigation resulting in federal court orders to reunify migrant children with their families,[136] family separation, as well as accounts that the government is using the threat of family separation to force

---

[130] Lori Robertson, "Did the Obama Administration Separate Families," *Factcheck*, June 20, 2018, https://www.factcheck.org/2018/06/did-the-obama-administration-separate-families/. Members of the Obama Administration recall considering all possible options for dealing with the surge of unaccompanied minors in 2014, but could not bring themselves to implement family separation because they believed it to be morally wrong.

[131] Dep't of Health and Human Services, OEI-BL-18-00511, *Separated Children*, p. 6.; Amy Goldstein, "IG: Trump Administration Took Thousands More Migrant Children From Parents," *Washington Post*, Jan. 17, 2019, https://www.washingtonpost.com/local/immigration/ig-trump-administration-took-thousands-more-migrant-children-from-parents/2019/01/17/c05f51e6-19c6-11e9-8813-cb9dec761e73_story.html?utm_term=.f2f021e51995.

[132] Dep't of Homeland Security, Office of the Inspector General, *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy*, Sept. 27, 2018, pp. 12-15, https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf (hereinafter Dep't. of Homeland Security, Office of the Inspector General, *Special Review*).

[133] *See infra* note 263.

[134] Prelim. Inj., *Ms. L. v. ICE*, 310 F.Supp.3d 1133 (S.D. Cal. 2018), at 2.

[135] Affording Congress an Opportunity to Address Family Separation, 2018 DAILY COMP. PRES. DOC. 1 (June 20, 2018), https://www.whitehouse.gov/presidential-actions/affording-congress-opportunity-address-family-separation/.

[136] Ibid.

parents to abandon asylum claims, have continued.[137]  Miriam Abaya from the Young Center for Immigrant Children's Rights told the Commission that:

> Department of Homeland Security officials with no child welfare expertise are making split-second decisions and these decisions have traumatic lifelong consequences that take months to undo. We are deeply concerned that family separation continues to be used solely to deter families from exercising their legal right to seek protection.[138]

The practice of family separation actually started a year before then-Attorney Sessions' public announcement on zero tolerance in April 2018 when Department of Homeland Security operated a "pilot program" for zero tolerance in El Paso.[139] According to a Government Accountability Office report, the El Paso program "processed approximately 1,800 individuals in families and 281 individuals in families were separated under this initiative."[140] The program ended in November 2017 and Border Patrol officials informed Government Accountability Office that there were no other similar local initiatives that occurred prior to the Attorney General's April 2018 zero tolerance memo.[141]

*No Plan for Reunification of Migrant Children*

The Departments of Homeland Security and Health and Human Services did not coordinate plans or communicate prior to the Administration's zero tolerance announcement and were not prepared

---

[137] Laura Peña, "The Real National Emergency: Zero Tolerance & the Continuing Horrors of Family Separation at the Border," *Texas Civil Rights Project*, Feb. 2019, https://texascivilrightsproject.org/wp-content/uploads/2019/02/FamilySeparations-Report-Final.pdf.

[138] Miriam Abaya Testimony, *Public Comment Session,* pp. 104-105.

[139] Lomi Kriel, "Trump Moves to End 'Catch and Release', Prosecuting Parents and Removing Children Who Cross Border," *Houston Chronicle*, Nov. 25, 2017, https://www.houstonchronicle.com/news/houston-texas/houston/article/Trump-moves-to-end-catch-and-release-12383666.php; Alan Gómez, "Democrats Grill Trump Administration Officials Over Family Separation Policy on the Border," *USA Today*, Feb. 7, 2019, https://www.usatoday.com/story/news/politics/2019/02/07/democrats-trump-administration-family-separation-policy-border-immigration/2794324002/; Lisa Riordan Seville and Hannah Rappleye, "Trump Admin Ran 'Pilot Program' for Separating Migrant Families in 2017," *NBC News*, June 29, 2018, https://www.nbcnews.com/storyline/immigration-border-crisis/trump-admin-ran-pilot-program-separating-migrant-families-2017-n887616 ("More than 1,000 children were separated between October 2016 and September 2017, and 703 were separated between October 2017 and February 2018, according to [the Department of Homeland Security]. It's unclear how many of those 1,768 children were separated after President Donald Trump's inauguration in January 2017. NBC repeatedly asked [the Department of Homeland Security] for comprehensive data, but the agency declined to provide month-by-month figures, did not provide data prior to October 2016 and did not supply any numbers for March and April 2018.").

[140] GAO 19-163, *Unaccompanied Children*, p. 8.

[141] Ibid.

for the increased number of children who would be in the care of Health and Human Services.[142] Brian Hastings, Chief of Law Enforcement Operations for Customs and Border Protection, recently testified at a Judiciary Committee hearing that Customs and Border Protection did not have a plan to reunify children with their parents once it had been determined that the parent was to be deported.[143] While Border Patrol was responsible for the deportation of parents, Hastings reported that whether or not the parent would be reunited with their child was not a consideration before deportation.[144]

Due to the lack of coordination, for its part, Health and Human Services was not fully prepared to reunite the separated families.[145] A Government Accountability Office report found that Health and Human Services has no "specific procedure" for reuniting separated children with their families.[146] Kevin McAleenan, Acting Secretary of the Department of Homeland Security, recently testified before the House Oversight Committee that while Border Patrol does track the relationship of the child and adult when entering the border, it requires coordination of other immigration agencies, such as Department of Health and Human Services and Immigration and Customs Enforcement, in order to actually reunify a child with their parent.[147] McAleenan went on to testify that additional funding would be used to create an "immigration portal" to consolidate all the data from the different immigration agencies to more efficiently reunite the separated families.[148]

Media accounts have also reported that the Department of Homeland Security has continuously failed to comply with the *Flores* agreement which requires Border Patrol to transfer

---

[142] Ibid., 13.

[143] *Oversight of Family Separation and U.S. Customs and Border Protection Short-Term Custody under the Trump Administration*, *Hearing Before the H. Comm. On the Judiciary*, 116th Cong. (July 25, 2019), 1:15:50-1:16:25, https://judiciary.house.gov/legislation/hearings/oversight-family-separation-and-us-customs-and-border-protection-short-term.

[144] Ibid., 1:16:18 (video testimony of Chief Brian Hastings to House Judiciary Committee. Question: "You would do the deportation before reunification without any knowledge of whether the parents are being reunified? Answer: Yes.").

[145] GAO 19-163, *Unaccompanied Children*, p. 22.

[146] Nomaan Merchant and Colleen Long, "No Clear Plan Yet on How to Reunite Parents with Children," *AP News*, June 20, 2018, https://apnews.com/8c3d79185d904b2abcc6f3debb9eb870.

[147] *Hearing with Acting Secretary of Homeland Security Kevin K. McAleenan: Hearing Before the H. Comm. on Oversight and Reform*, 116th Cong. (2019) (statement of Kevin K.McAleenan, Acting Director, Department of Homeland Security), https://oversight.house.gov/legislation/hearings/with-the-acting-secretary-of-homeland-security-kevin-k-mcaleenan.

[148] Ibid.

unaccompanied minors to Health and Human Services within 72 hours of making the determination that a child is in fact an unaccompanied child.[149]

*Metering: Not Allowing Asylum-Seeking Families to Enter*

Concurrent with the zero tolerance policy, the federal government also regulated the flow of entry of asylum seekers through the policy of "metering," or not allowing asylum-seeking families to enter at ports of entry if space is unavailable at the port of entry processing site,[150] resulting in many asylum seekers being turned away.[151]   Under U.S. law, once an individual is physically present in the U.S., he or she can apply for asylum regardless of whether or not that individual entered at a port of entry.[152] The Border Patrol metering policy may have led to an increase in illegal border crossing by asylum seekers who could not have otherwise entered at a port of entry processing site where they would then be susceptible to prosecution under zero tolerance.[153] An increase in illegal border crossings could include asylum seekers taking more dangerous paths to

---

[149]  Ibid.; Caitlin Dickerson, "'There Is a Stench': Soiled Clothes and No Baths for Migrant Children at a Texas Center," *New York Times*, June 21, 2019, https://www.nytimes.com/2019/06/21/us/migrant-children-border-soap.html; Abigail Hauslohner, "U.S. Returns 100 Migrant Children to Overcrowded Border Facility as HHS Says it is Out of Space," *Washington Post*, June 25, 2019, https://www.washingtonpost.com/immigration/us-returns-100-migrant-children-to-overcrowded-border-facility-as-hhs-says-it-is-out-of-space/2019/06/25/397b0cb6-96b6-11e9-830a-21b9b36b64ad_story.html?utm_term=.ffe72d5a16f9; Isaac Chotiner, "Children Remain in Dangerous Conditions on the Texas Border," *New Yorker*, June 25, 2019, https://www.newyorker.com/news/q-and-a/children-remain-in-dangerous-conditions-on-the-texas-border; *see also* Paul LeBlanc & Pricilla Álvarez, "U.S. Moves 249 Migrant Children from Texas Facility After Reports of Poor Conditions," *CNN*, June 25, 2019, https://www.cnn.com/2019/06/24/politics/hhs-children-border-facility-clint-texas/index.html; *see also* Dep't. of Homeland Security, Office of the Inspector General, OIG-19-51, *Management Alert – DHS Needs to Address Dangerous Overcrowding and Prolonged Detention of Children and Adults in the Rio Grande Valley*, July, 2, 2019, https://www.oig.dhs.gov/sites/default/files/assets/2019-07/OIG-19-51-Jul19_.pdf

[150] Dep't. of Homeland Security, Office of the Inspector General, *Special Review*, pp. 5-7; "When metering, [Border Patrol] officers stand at the international line out in the middle of the footbridges.  Before an alien without proper travel documents (most of whom are asylum-seekers) can cross the international line onto U.S. soil, those [Border Patrol] officers radio the ports of entry to check for available space to hold the individual while being processed. According to [Border Patrol], the officers only allow the asylum-seeker to cross the line if space is available," Ibid., 6.

[151] Adam Isacson, "New Border Apprehension Numbers Show Brutal Effect of 'Metering' at Ports of Entry," *WOLA*, May 9, 2019, https://www.wola.org/analysis/new-border-apprehensions-numbers-metering-effect-ports-of-entry/.

[152] Immigration and Nationality Act, 8 U.S.C. § 1158(a)(1)(2012); American Immigration Council, *Asylum in the United States*, May 14, 2018, https://www.americanimmigrationcouncil.org/research/asylum-united-states ("Asylum seekers who arrive at a U.S. port of entry or enter the United States without inspection generally must apply through the defensive asylum process.").

[153] Dep't. of Homeland Security, Office of the Inspector General, *Special Review*, p. 7 ("[T]he practice [of metering] may have unintended consequences.  For instance, [the Office of Inspector General] saw evidence that limiting the volume of asylum-seekers entering at ports of entry leads some aliens who would otherwise seek legal entry into the United States to cross the border illegally").

reach the U.S. This was the case for Óscar Alberto Martínez Ramírez and his one-year old daughter, Valeria, who attempted to enter the U.S. at the official port of entry at Matamoros, Texas were told it was closed, and subsequently drowned while attempting to cross the Río Grande River.[154]

*Migration Protection Protocols*

One of the most drastic policy shifts undertaken in regard to asylum is the practice of sending legal asylum seekers back to Mexico while their asylum cases are pending – this is also known as "Remain in Mexico"[155] or more formally, the "Migration Protection Protocols" (MPP).[156] According to the Department of Homeland Security's website, this policy is a "U.S. Government action whereby certain foreign individuals entering or seeking admission to the U.S. from Mexico – illegally or without proper documentation – may be returned to Mexico and wait outside of the U.S. for the duration of their immigration proceedings, where Mexico will provide them with all appropriate humanitarian protections for the duration of their stay."[157]

According the Department of Homeland Security this policy, with certain exceptions, applies to noncitizens "arriving in the U.S. on land from Mexico (including those apprehended along the border) who are not clearly admissible and who are placed in removal proceedings under Immigration and Nationality Act § 240." [158] The policy includes noncitizens "who claim a fear of return to Mexico at any point during apprehension, processing, or such proceedings, but who have been assessed not to be more likely than not to face persecution or torture in Mexico."[159] Some have criticized this new policy because when asylum seekers come to the border, instead of pleading their case in front of an asylum officer they are instead first put in front of a Border Patrol

---

[154] Reis Thebault, Luis Velarde, and Abigail Hauslohner, "The Father and Daughter Who Drowned at the Border Were Desperate for a Better Life, Family Says," *Washington Post*, June 26, 2019, https://www.washingtonpost.com/world/2019/06/26/father-daughter-who-drowned-border-dove-into-river-desperation/?utm_term=.75c49688ac75.

[155] Azam Ahmed and Michael Tackett, "U.S. Will Send Migrants Back to Mexico as They Wait on Asylum Claims," *New York Times*, Dec. 20, 2018, https://www.nytimes.com/2018/12/20/world/americas/us-mexico-asylum-migrants.html?module=inline.

[156] Dep't. of Homeland Security, "Migrant Protection Protocols," press release, Jan. 24, 2019, https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols (The Dep't. Of Homeland Security website states that the policy makes some exceptions for unaccompanied migrant children and migrants in expedited removal proceedings.).

[157] Ibid.

[158] Ibid.

[159] Ibid.

officer who determines if they have a sufficient fear of returning to Mexico, despite the officer not likely being trained to elicit or assess relevant statements about whether the person has a credible fear of returning to their country of origin.[160] Recent data also indicate fewer asylum applicants have an attorney compared to regular court cases.[161] As of the end of June 2019, a total of 1,155 MPP cases had already been decided but asylum seekers were represented in only 14 of those cases—only 1.2 percent had legal representation.[162]

The Migrant Protection Protocols policy was resisted for many years due to lack of proof that Mexico was a safe place for migrants,[163] and it was only recently announced in December of 2018.[164] On May 7, 2019, the Ninth Circuit allowed the policy to go forward stating that the Immigration and Nationality Act granted immigration officials discretion whether to allow foreign nations to remain in the U.S. or force them to stay in Mexico while they wait for their hearing.[165] According to news reports, as well as an amicus brief filed by the labor union for federal asylum

---

[160] Charles Tjersland Jr., "I became an Asylum Officer to Help People. Now I Put Them Back in Harm's Way," *Washington Post*, July 19, 2019, https://www.washingtonpost.com/outlook/i-became-an-asylum-officer-to-help-people-now-i-put-them-back-in-harms-way/2019/07/19/1c9f98f0-a962-11e9-9214-246e594de5d5_story.html?utm_term=.f771f00c22b4. (The author argues many asylum seekers have not prepared to answer questions about their time in Mexico and are unaware that the standard of proof is higher in an MPP interview with Border Patrol than it is in a regular asylum hearing, thus making it nearly impossible for them to prove a fear of returning to Mexico.); Ibid.

[161] Transactional Records Access Clearinghouse Reports, *Access to Attorneys Difficult for Those Required to Remain in Mexico*, July 29, 2019, https://trac.syr.edu/immigration/reports/568/.

[162] Ibid.

[163] According to the U.S. Dep't. of State, Mexico is not safe for migrants as they face violence, abuse and extortion, from police, immigration officers, other criminal groups, and even the gangs they sought to escape in their home countries. U.S. Dep't of State, *2018 Country Reports on Human Rights Practices: Mexico*, Mar. 13, 2019, pp. 20-21, https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/mexico/.  The U.S. Dep't of State also reports that the asylum system in Guatemala is inadequate stating that migration authorities and the police did not have sufficient training regarding the rules for establishing refugee status and that the process for referring asylum seekers was deficient.  U.S. Dep't of State, *2018 Country Reports on Human Rights Practices: Guatemala*, Mar. 13, 2019, pp. 20-21, https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/guatemala/.

[164] Tanvi Misra, "An Expanded 'Remain in Mexico' Policy May Cause More Suffering, Not Curb Migration," *Roll Call*, June 10, 2019, https://reimagine.rollcall.com/news/expanded-remain-mexico-policy-may-cause-suffering-not-curb-migration.

[165] *Innovation Law Lab v. McAleenan*, 924 F.3d 503 (9th Cir. 2019) (order denying stay of migrant protection protocols, allowing for them to take effect).

workers,[166] more than 11,000 migrants[167] have been returned to Mexico to wait out their asylum cases pending in the U.S., burdening migrant shelters in Mexico and putting asylum seekers at increased risk of violence. Several asylum seekers who were turned away from U.S. ports-of-entry have been killed, women have been raped, and children have been kidnapped, calling into question the relative safety of Central Americans in Mexico.[168]

### Third Country Rule (Designation of Mexico and Guatemala)

On July 15, 2019, the Department of Justice's Executive Office for Immigration Review and the Department of Homeland Security's U.S. Citizenship and Immigration Services announced plans to adopt a joint interim final rule regarding asylum claims.[169] The new rule ("Third-Country Asylum Rule") revises 8 C.F.R. § 208.13(c) and 8 C.F.R. § 1208.13(c), requiring immigrants seeking asylum from the U.S.-Mexico border to first "apply for protection in a third country outside of the [immigrant's] country of citizenship, nationality, or last lawful habitual residence through which the [immigrant] transited en route to the United States."[170] The Department of Justice and Department of Homeland Security state that the interim rule is in response to the "dramatic increase in the number of aliens encountered along or near the southern land border with

---

[166] Bobby Allyn, "Asylum Officers: Trump's 'Remain in Mexico' Policy is Against 'Moral Fabric' of U.S.," *NPR* June 27, 2019, https://www.npr.org/2019/06/27/736461700/asylum-officers-trumps-remain-in-mexico-policy-is-against-moral-fabric-of-u-s; Br. for The National Federation of Government Employees Local 1924 as Amici Curiae Supporting Pls.-Appellees, *Innovation Law Lab v. McAleenan*, 924 F.3d 503 (9th Cir. 2019), https://www.documentcloud.org/documents/6172520-Local-1924-Amicus-Brief.html.

[167] As of June 14, 2019, the U.S. government has sent more than 11,000 Central American asylum seekers back to Mexico. *See* Camilo Montoya-Gálvez, "Trump's Plan to Deter Migrants with 'Remain in Mexico' Faces Logistical and Legal Hurdles," *CBS News*, June 14, 2019, https://www.cbsnews.com/news/remain-in-mexico-trumps-plan-to-deter-migrants-faces-logistical-and-legal-hurdles/.

[168] "Safe Third Countries for Asylum-Seekers; Why Mexico Does Not Qualify as a Safe Third Country," *Women's Refugee Commission*, p. 2, https://www.womensrefugeecommission.org/images/zdocs/SafeThirdCountries.pdf; Kevin Sieff, "When Death Awaits Deported Asylum Seekers," *Washington Post*, Dec. 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/?utm_term=.8c8b2c1f5b80; Debbie Nathan, "Trump's 'Remain in Mexico' Policy Exposes Migrants to Rape, Kidnapping and Murder in Dangerous Border Cities," *The Intercept*, July 14, 2019, https://theintercept.com/2019/07/14/trump-remain-in-mexico-policy/; Amnesty International also reports that Mexico's asylum procuress does not provide adequate protection to refugees, finding that "the Mexican government is routinely failing in its obligations under international law to protect those who are in need of international protection, as well as repeatedly violating the *non-refoulement* principle, a binding pillar of international law that prohibits the return of people to a real risk of persecution or other serious human rights violations. These failures by the Mexican government in many cases can cost the lives of those returned to the country from which they fled." Amnesty International, *Overlooked, Under-Protected; Mexico's Deadly Refoulement of Central Americans Seeking Asylum*, 2018, p. 4, https://www.amnestyusa.org/wp-content/uploads/2018/01/AMR4176022018-ENGLISH-05.pdf.

[169] Dep't. of Homeland Security, "DHS and DOJ Issue Third-Country Asylum Rule," July 15, 2019, https://www.dhs.gov/news/2019/07/15/dhs-and-doj-issue-third-country-asylum-rule.

[170] Ibid.; Establishing Asylum Eligibility, 8 C.F.R. § 208.13; Establishing Asylum Eligibility, 8 C.F.R. § 1208.13.

Mexico," and specifically in the rise of immigrants seeking asylum when confronted with Department of Homeland Security officials.[171]

The Third Country Asylum Rule is a departure from past asylum policy, which previously allowed immigrants to apply for asylum at the U.S. border without first applying for protections in other countries before coming to the U.S. border.[172] Under this new rule, immigrants seeking protections at the U.S.-Mexico border only have viable claims under statutory withholding or Convention Against Torture protections, pursuant to 8 C.F.R. § 208.30, and thus must meet the higher reasonable-fear standard as opposed to the credible-fear standard used for determining asylum eligibility.[173] The Third Country Asylum Rule includes three exceptions to the bar to asylum eligibility: (1) if the immigrant demonstrates application for protection in at least one of the countries traveled through to get to the United States; (2) if the immigrant demonstrates they are a "victim of a severe form of trafficking in persons,"[174]; or (3) the immigrant has traveled only through a country or countries that are not parties to the 1951 Refugee Convention[175] or the 1967 Convention Against Torture[176] to get to the United States.[177]

On July 24, 2019, Jon S. Tigar, United States District Court Judge for the Northern District of California, issued a preliminary injunction temporarily barring the Administration's 'Third-

---

[171] Dep't. of Homeland Security and Dep't. of Justice, *Asylum Eligibility and Procedural Modifications: Interim Final Rule; Request for Comment*, July 15, 2019, p. 5, https://s3.amazonaws.com/public-inspection.federalregister.gov/2019-15246.pdf (hereinafter Third Country Asylum Interim Final Rule).

[172] Third Country Asylum Interim Final Rule, p. 30.

[173] Ibid.; Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act of whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act, 8 C.F.R. § 208.30(e)(2) ("An alien will be found to have a credible fear of persecution if there is a *significant possibility*, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, the alien can establish eligibility for asylum….or for withholding of removal.") (emphasis added). Cf. Reasonable fear of persecution or torture determinations involving aliens ordered removed under section 238(b) of the Act and aliens whose removal is reinstated under section 241(a)(5) of the Act, 8 C.F.R. § 203.31(c) ("The alien shall be determined to have a reasonable fear of persecution or torture if the alien establishes a *reasonable possibility* that he or she would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal.") (emphasis added); "Vindicating the Rights of Asylum Seekers at the Border and Beyond," *Asylum Advocacy*, June 2018, p. 14, https://asylumadvocacy.org/wp-content/uploads/2018/06/ASAP-Expedited-Removal-Guide.pdf.

[174] 8 C.F.R. § 214.11.

[175] Convention relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 1954.

[176] Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85.

[177] Third Country Asylum Interim Final Rule, p. 22.

Country Asylum Rule' from taking effect and ordered the previous asylum system, in which only safe third countries could be considered in the process of reviewing claims to asylum in the U.S., restored.[178]  Judge Tigar granted the injunction on the grounds that: the new third country rule is inconsistent with current U.S. asylum laws and provides none of the statutory protections ensuring the country is safe,[179] the administration had not complied with the Administrative Procedures Act's notice-and-comment rules thus calling into question its validity, and that the rule does not take into account the special requirements of unaccompanied minors.  The Judge also found that the government's decision to promulgate the rule was arbitrary and capricious in that it reasoned to offer asylum seekers a safe alternative – Mexico – which is neither safe nor offers a complete and equitable asylum process, and finally, the public has a strong interest in ensuring that the U.S. does not subject asylum seekers to greater harm.[180]

On July 26, 2019, after threatening increased tariffs and a ban on entry of Guatemalan migrants, among other negative consequences, the Trump Administration announced an agreement with Guatemala that would require other migrants who had passed through its border to first seek asylum there.[181] According to *Voice of America*, under the new agreement, in exchange for $40 million, El Salvadoran and Honduran asylum seekers would be flown from the U.S. border to Guatemala.[182] U.S. Department of Homeland Security Director McAleenan described the document signed on July 26, 2019 as a "safe third country agreement,"[183] apparently referring to the Immigration and Nationality Act's statutory rule that to be designated so, a country must be safe for asylum seekers and moreover, persons sent there would "have access to a full and fair

---

[178] *East Bay Sanctuary Covenant v. Barr*, No. 19-cv-04073-JST (N.D. Cal. July 24, 2019) (order granting preliminary injunction), at 1 ("First, Congress has already created a bar to asylum for an applicant who may be removed to a "safe third country." The safe third country bar requires a third country's formal agreement to accept refugees and process their claims pursuant to safeguards negotiated with the United States. As part of that process, the United States must determine that (1) the alien's life or freedom would not be threatened on account of a protected characteristic if removed to that third country and (2) the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection there. Thus, Congress has ensured that the United States will remove an asylum applicant to a third country only if that country would be safe for the applicant and the country provides equivalent asylum protections to those offered here. The Rule provides none of these protections.").

[179] *Id*. at § I.A.1, citing 8 U.S.C. § 1158(a)(Safe Third Country Rule).

[180] *Id*. at 1-2.

[181] *See* Michael D. Shear, Zolan Kanno-Youngs, and Elisabeth Malkin, "After Tariff Threat, Trump Says Guatemala Has Agreed to New Asylum Rules," *New York Times*, July 26, 2019, https://www.nytimes.com/2019/07/26/world/americas/trump-guatemala-asylum.html.

[182] *See* Aline Barros, "Acting DHS Secretary in Guatemala to Promote Safe Third Country Agreement," *Voice of America*, Aug. 1, 2019, https://www.voanews.com/usa/immigration/acting-dhs-secretary-guatemala-promote-safe-third-country-agreement.

[183] Shear et al., "After Tariff Threat."

34     *Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

procedure for determining a claim to asylum or equivalent temporary protection there."[184] U.S. State Department Human Rights Reports indicate that Guatemala is objectively unsafe for asylum seekers and the government, which has "widespread corruption," is unable to protect many Guatemalans who are fleeing and seeking asylum from human rights violations.[185] The *New York Times* reported that safe third country agreements are rare and that experts say that "it appears that no such agreement has been signed with a nation that is as ill-equipped as Guatemala to deal with asylum seekers and keep them safe."[186]

Before the agreement can be enforced, the U.S. must certify that Guatemala is able to provide safety and a full and fair asylum process.[187] The agreement was made by the outgoing Guatemalan president, and is still subject to possible litigation, as well as amendment by the new president elected in August 2019.[188]

<u>Removing Domestic Violence as a Basis for Political Asylum</u>

Under previous administrations, women fleeing gang violence and domestic violence in their home countries, from which the government did not protect them, were permitted to file asylum claims citing a credible fear of physical violence and/or sexual abuse.[189] On June 11, 2018, then-Attorney General Sessions issued a ruling reversing a 2016 Board of Immigration Appeals (BIA) decision granting an El Salvadorian woman asylum based on her claim of domestic abuse, including

---

[184] 8 U.S.C. § 1158(a).

[185] *See generally* U.S. Dep't of State, *2018 Country Reports on Human Rights Practices: Mexico* (Human rights issues included reports of harsh and life-threatening prison conditions; widespread corruption; trafficking in persons; crimes involving violence against lesbian, gay, bisexual, transgender, and intersex (LGBTI) persons, persons with disabilities, and members of other minority groups; and use of forced or compulsory or child labor. Corruption and inadequate investigations made prosecution difficult, and impunity continued to be widespread.), https://www.state.gov/wp-content/uploads/2019/03/MEXICO-2018.pdf .

[186] *See* Kirk Semple, "The U.S. and Guatemala Reached an Asylum Deal: Here's What it Means," *New York Times*, July 28, 2019, https://www.nytimes.com/2019/07/28/world/americas/guatemala-safe-third-asylum.html.

[187] *See* Michael D. Shear and Zolan Kanno-Youngs, "Trump Officials Argued Over Asylum Deal with Guatemala. Now Both Countries Must Make It Work.," *New York Times*, Aug. 2, 2019, https://www.nytimes.com/2019/08/02/us/politics/safe-third-guatemala.html.

[188] *See* Elisabeth Malkin, "Alejandro Giammattei, a Conservative, Wins Guatemala's Presidency," *New York Times*, Aug. 11, 2019, https://www.nytimes.com/2019/08/11/world/americas/guatemala-election.html (discussing the agreement and predicting continued pressure to enforce it); Reuters News Service, "Guatemala Election Winner Alejandro Giammattei Says He Wants To Rewrite Controversial Trump Migration Deal," *Telegraph*, Aug. 12, 2019, https://www.telegraph.co.uk/news/2019/08/12/guatemala-election-winner-alejandro-giammattei-says-wants-rewrite/.

[189] *Matter of A-R-C-G-*, 26 I. & N. Dec. 388 (BIA 2014).

physical and sexual violence, she endured at the hands of her husband in her country.[190]   The *Matter of A-B-* decision held that being a victim of domestic abuse or gang violence will not be accepted as a basis to claim asylum.[191]

After the decision in *Matter of A-B-*, the Department of Homeland Security issued guidance for asylum officers stating that "few gang-based or domestic violence claims involving particular social groups defined by the members' vulnerability to harm may . . . pass the 'significant probability' test in credible fear screenings." [192] In practice, this guidance meant that individuals seeking asylum in the United States based on domestic violence or gang-violence were unlikely to make it past the first step in seeking asylum – the initial credible fear determination – and would be deported without any review of their asylum claim.[193]   In December of 2018, a federal district court found that this policy violated the Refugee Act and the Immigration and Nationality Act.[194] The district court's decision barred the federal government from enforcing this policy.[195] In January 2019, the government requested a stay, pending appeal of the court's order, which was subsequently denied by the District Court, reinforcing  that the government's "unlawful policies" would be "permanently enjoined from being applied in future cases."[196]

---

[190] *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018) (The *Matter of A-B-* decision also overrules a prior decision, *Matter of A-R-C-G-*, 26 I&N Dec. 338 (BIA 2014), which held that in some circumstances, domestic violence survivors could receive asylum protection.).

[191] *Id.*

[192] Dep't. of Homeland Security, U.S. Citizenship and Immigration Services, *Policy Memorandum, Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with Matter of A-B-*, July 11, 2018, https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2018/2018-06-18-PM-602-0162-USCIS-Memorandum-Matter-of-A-B.pdf.

[193] *See Grace v. Whitaker*, No. 18-cv-01853, 2019 WL 329572 (D.C. Cir. Dec. 17, 2018). The court held "that Congress has not 'spoken directly' on the question of whether victims of domestic or gang-related persecution fall into the particular social group category." *Id.* at 52. The court held that Matter of A-B- "create[d] a general rule against [domestic and/or gang violence] claims at the credible fear stage" and that the rule was "not a permissible interpretation of the statute." *Id.* at 56. Additionally, the general rule "impermissibly heighten[ed] the standard at the credible fear stage[,]" rendering the rule arbitrary and capricious.  *Id.*

[194] *Id.* In January 2019, the government requested a stay, pending appeal of the Court's Order, which was subsequently denied by the District Court, cementing that the governments "unlawful policies" would be "permanently enjoined from being applied in future cases." *Grace v. Whitaker*, No. 18-cv-01853, 2019 WL 329572.

[195] *Id.*

[196] *Id.*

Seeking Asylum and Credible Fear Determinations

The 1996 immigration law reforms allowed for expedited removal of immigrants who have entered the United States with invalid entry documents in which they are ordered removed without further hearings, appeals, or reviews; however, expedited removal is subject to additional procedures should the migrant express an intention to apply for asylum.[197] Migrants who express an intention to apply for asylum[198] or a credible fear of persecution in their home country, must be interviewed by an asylum officer to determine whether they are eligible for asylum, and detained until a credible fear determination has been made.[199] Under the law, the Department of Homeland Security has discretion to parole noncitizens, or release them from detention, when urgent humanitarian reasons are present or there is a significant public interest in doing so.[200] This includes when immigrants have critical medical conditions, including pregnancy.[201]

Under current Border Patrol procedures, immigrants on the southern border who are "apprehended between Ports of Entry and claim credible fear are processed for expedited removal by U.S. Border Patrol."[202] Undocumented immigrants at the southern border who arrive at ports of entry who are found to be otherwise inadmissible into the U.S. (meaning they have not arrived with a visa), and claim credible fear of persecution are also processed for expedited removal.[203] The credible fear claims of undocumented immigrants are referred to asylum officers, where the immigrants are then interviewed to determine whether they are likely to be eligible for asylum.[204] In making credible fear determinations of an asylum applicant, interviewers look to the totality of circumstances; if

---

[197] 8 U.S.C. § 1225(b)(1)(A)(i).

[198] 8 U.S.C. § 1158.

[199] 8 U.S.C. § 1225(b)(1)(B)(ii).

[200] *Aracely v. Nielsen*, 319 F.Supp.3d 110, 121-22 (D.C. Cir. 2018); Immigration and Customs Enforcement, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture*, Dec. 8, 2009, https://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf.

[201]  8 C.F.R. § 212.5(b).

[202] "Claims of Fear: Customs and Border Patrol Southwest Border and Claims of Credible Fear Total Apprehensions/Inadmissibles (FY2017-FY2018)," *U.S. Customs and Border Protection*, https://www.cbp.gov/newsroom/stats/sw-border-migration/claims-fear (modified Dec. 10, 2018).

[203]  Ibid. Publicly available information does not confirm the extent to which these policies have been applied at airports around the United States or the northern border (as distinct from the southern border).

[204] Dep't.of Homeland Security, Office of Immigration Statistics, *Annual Flow Report Refugees and Asylees: 2017*, Mar. 2019, p. 7, https://www.dhs.gov/sites/default/files/publications/Refugees_Asylees_2017.pdf.

the asylum application is deemed not credible based on the totality of the evidence presented, then it is sufficient for an adverse credibility determination.[205]

When seeking asylum, an immigrant subject to expedited removal seeking asylum must inform Border Patrol of the individual's (1) wish to apply for asylum, (2) fear of persecution or torture, and (3) fear of returning to the individual's home country.[206] In seeking asylum, the asylum seeker does not need to show it is more likely than not that he or she will be persecuted in his or her home country.[207] Instead, the asylum seeker need only demonstrate "good reason" to fear persecution if returning to his or her home country.[208] If an asylum seeker succeeds in demonstrating a "well-founded fear of persecution" they still may not be eligible for asylum, as that feared persecution must be "on account of his [or her] race, religion, nationality, membership in a particular social group, or political opinion."[209]

If the asylum officer finds the individual has a credible fear of persecution or torture, the asylum officer will refer the individual's case to an Immigration Judge for a full hearing on the asylum claim.[210] If the asylum officer finds the individual does not have a credible fear of persecution or torture, the individual can request review by an Immigration Judge.[211] If the individual does not request a review of the determination, Immigration and Customs Enforcement will remove the individual from the United States.[212] While asylum seekers' applications are processing, they are afforded the right to be in the United States, however, there is ongoing debate as to whether they should remain detained[213] and whether asylum seekers detained for several months during their application process are entitled to a custody hearing.[214] On July 2, a federal court preliminarily

---

[205] *Xiu Xia Lin v. Mukasey*, 534 F.3d 162, 167 (2d Cir. 2008).

[206] "Questions and Answers: Credible Fear Screening," U.S. Citizenship and Immigration Services, https://www.uscis.gov/humanitarian/refugees-asylum/asylum/questions-answers-credible-fear-screening (accessed July 8, 2019).

[207] *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 442, 449 (1987).

[208] *Id.*

[209] *Eduard v. Ashcroft*, 379 F.3d 182, 190 (5th Cir. 2004) (quoting *Matter of Mogharrabi*, 19 I & N Dec. 439, 477 (BIA 1987)).

[210] "Questions and Answers," United States Citizenship and Immigration Services.

[211] Ibid.

[212] Ibid.

[213] *Damus v. Nielsen*, 313 F.Supp.3d 317 (D.C. Cir. 2018).

[214] *See Jennings v. Rodríguez*, 138 S.Ct. 830 (2018).

enjoined the Attorney General's decision that asylum seekers should be indefinitely detained, and at the time of this writing, if an asylum seeker is found to have a credible fear of persecution, they must be provided with a bond hearing and if not a risk, released on bond.[215]

The number of asylum claims filed from FY 2017 to FY 2018 increased by 12.5 percent, from 144,053 to 162,060.[216] The process of seeking asylum is very difficult and the passage rates are low. In 2017, only 13.67 percent of total asylum applicants were granted asylum, followed by 12.30 percent of applicants in 2018.[217] In 2018, 14.89 percent of El Salvadoran applicants were granted asylum and 51.28 percent were denied, 13.81 percent of Honduran applicants were granted asylum and 55.48 percent were denied, and 11.18 percent of Guatemalan applicants were granted asylum and 52.23 percent were denied.[218] Despite the dangerous conditions in all three countries, these are lower rates of approval than persons from other countries.[219]

Increased Detention of Children

During the current Administration, a high number of migrant children, including unaccompanied minors, have been held in custody. In November 2018, Department of Health and Human Services told reporters that 14,000 undocumented immigrant children have been held in custody, which is an all-time high.[220] This record number is reportedly due in part to a new Department of Homeland Security policy requiring background checks, including immigration status information, of

---

[215] On July 2, 2019, a federal court issued a nationwide preliminary injunction that immigrants who have entered the U.S. without inspection, requested asylum, and who the Government has determined to have a credible fear of persecution if they are returned home, have rights to a bond hearing with substantive due process. The bond hearing must occur within 7 days after being requested, and asylum seekers who have passed a credible fear interview must also be released if the bond hearing so indicates. The court found that "it is unconstitutional to deny these class members a bond hearing while they await a final determination of their asylum request." Order on Motions RE Preliminary Injunction, *Padilla v. ICE*, No. 2:18-cv-00928 (W.D. Wash. July 2, 2019), https://americanimmigrationcouncil.org/sites/default/files/litigation_documents/challenging_credible_fear_interview_and_bond_hearing_delays_preliminary_injunction_order.pdf.

[216] Dep't. of Justice, Exec. Office for Immigration Review, *Adjudication Statistics: Total Asylum Applications*, Apr. 23, 2019, https://www.justice.gov/eoir/page/file/1163606/download.

[217] Ibid.

[218] Dep't. of Justice, Exec. Office for Immigration Review, *Adjudication Statistics: Asylum Decision Rates by Nationality*, Oct. 24, 2018, https://www.justice.gov/eoir/page/file/1107366/download (additional percentages are accounted for by abandonment, withholding of removal, withdrawal, failure to adjudicate, or other).

[219] Ibid.

[220] Tal Kopen, "More Than 14,000 Immigrant Children are in U.S. Custody, an All-time High," *San Francisco Chronicle*, Nov. 26, 2018, https://www.sfchronicle.com/nation/article/More-than-14-000-immigrant-children-are-in-U-S-13399510.php.

persons, including family members, to whom the children would be released.[221] "Previous administrations didn't look into people's immigration status when deciding whether to release children into their care, but that changed under President Trump."[222] The Administration's aggressive immigration enforcement policies, leading to deportation of persons who were not previously prioritized (such as those without a criminal record or those with family ties, Deferred Action for Childhood Arrivals, or humanitarian parole),[223] have reportedly made parents afraid to attempt to reunite with their children.[224] In the month of September 2018, Department of Homeland Security reportedly arrested 41 family members seeking to have their children released to them.[225] In December 2018, an Immigration and Customs Enforcement spokesman said that Immigration and Customs Enforcement arrested 170 immigrants when they applied to take a child from government custody, from July to November, and of those, 109 (64.1%) had no criminal record.[226] On December 18, 2018, Department of Health and Human Services changed its policy to no longer require that potential sponsors for unaccompanied children submit to fingerprint background checks when they apply to sponsor a child.[227]

---

[221] Ibid. ("The reason is that children who arrive unaccompanied in the U.S. are spending more time in holding facilities before they can be released to suitable adults, often family members. One change that has especially slowed that down is an agreement Health and Human Services signed earlier this year for Immigration and Customs Enforcement to do background checks on potential sponsors. ICE confirmed in September that it had used that information to arrest undocumented adults who came forward to take custody of children.").

[222] Ibid.

[223] *See* Immigration and Customs Enforcement, *Memorandum: Implementing the President's Border Security and Interior Enforcement Priorities*, Feb. 21, 2017, p. 1, https://www.documentcloud.org/documents/3889695-doc00801320170630123624.html ("Effective immediately, all [Enforcement and Removal] Officers will take enforcement action against all removable aliens encountered in the course of their duties… Under the terms of the E.O. [several 2017 executive orders from President Trump cited], [Dep't. of Homeland Security] will no longer exempt classes or categories of removable aliens from potential enforcement."); *Cf.* Dep't. of Homeland Security, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*, Nov. 20, 2014, https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf (Obama Administration policies prioritizing removal of persons who are threats to national security or public safety).

[224] *See* Chris Baines, "Record High of 14,000 Immigrant Children in US Custody as Potential Careers 'Deterred by Fears of Retribution*," Independent*, Nov. 17, 2018, https://www.independent.co.uk/news/world/americas/us-politics/record-high-immigrant-children-us-government-custody-ice-background-checks-a8638771.html. (Immigration and Customs Enforcement arrests of parents seeking to have their children released to them "confirming suspicions the agency was using the [new] vetting process to track down illegal immigrants.").
[225] Ibid. ("Last month [Immigration and Customs Enforcement] confirmed it had arrested 41 people who came forward to take care of unaccompanied minors.").

[226] Tal Kopan, "ICE Arrested Undocumented Adults Who Sought to Take in Immigrant Children," *San Francisco Chronicle*, Dec. 10, 2018, https://www.sfchronicle.com/politics/article/ICE-arrested-undocumented-adults-who-sought-to-13455142.php.

[227] Dep't of Health and Human Services, *Fact Sheet – Unaccompanied Alien Children Program*, Dec. 20, 2018, https://www.hhs.gov/sites/default/files/Unaccompanied-Alien-Children-Program-Fact-Sheet.pdf; *See also* Dianne Gallagher, Devon M. Sayers, and Geneva Sands, "Feds Reverse Fingerprint Policy in Move Expected to

*[This page left intentionally blank]*

Speed Release of Unaccompanied Children in HHS Custody," *CNN*, Dec. 18, 2018, https://www.cnn.com/2018/12/18/politics/hhs-fingerprint-policy/index.html.

## CHAPTER 3: U.S. Commission on Civil Rights Public Record

To collect information on the condition of immigration detention centers and the status of treatment of immigrants, including children, on April 12, 2019, the Commission held a public forum where 37 individuals shared their testimony. In addition, the Commission offered an opportunity for the public to submit written public comments.  The Commission received 280 email and 34 additional written submissions. The comments the Commission received came from individuals who had experienced being detained in one of the southern border detention centers, individuals and groups who had visited and volunteered at immigrant detention centers, and individuals who had concerns about the treatment of immigrants in detention facilities. The testimonies regarding detention facilities are not all about a single facility, but rather, are about multiple detention centers throughout the country.

In this chapter, the Commission has compiled the comments received by subject matter. The Commission has provided brief summaries for each category/sub-category along with contextual information including applicable legal standards and background.  In addition, we quote testimony to highlight the comments received.

## Overview of Comments

Those who submitted public comments and gave testimony at the public briefing expressed general opposition to the use of immigration detention facilities for asylum seekers in particular, and concern about inhumane conditions of immigration detention facilities.[228] Public commenters expressed concern about many aspects of detention, particularly:

- Treatment of asylum seekers;[229]
- Separation of children from their parents, resulting trauma, and lack of reunification;[230]
- Detention of children;[231]

---

[228] All of the 280 emails except for 1 expressed opposition to immigration detention centers.

[229] *See* Charanya Krishnaswami, America's Advocacy Director, Amnesty International USA, *Public Comment Session,* p. 130; *see also* Olivares Testimony, *Public Comment Session,* p. 152; *see also* Yael Schacher, Senior U.S. Domestic Advocate, Refugees International, Testimony, *Public Comment Session,* p. 96.

[230] Génesis Regalado, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, Mar. 25, 2019, at 1 (hereinafter Regalado Statement); Detained Migrant Solidarity Committee,  Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 12, 2019, at 1 (hereinafter Detained Migrant Solidarity Committee Statement).

[231] Mel Hinebauch, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May. 12, 2019, at 1 (hereinafter Hinebauch Statement); Maranda J. Anderson, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 13, 2019, at 1 ("This will lead to lifelong damage for the children. I cannot imagine my own children being taken away at the young age of many of these refugee children.") (hereinafter Anderson Statement).

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

- Language barriers and lack of legal representation for detainees; and
- Lack of effective oversight and substandard living conditions[232]

In addition, many public commenters also believe that such conditions and separation policies are not an adequate deterrent to stop individuals from trying to enter the United States, because many are fleeing dangerous conditions in their home countries and are seeking asylum in the United States.[233] Many commenters were also concerned about the government outsourcing its responsibilities to private detention centers.[234]

*Overview Testimony*

> *"Considering the peril that they are leaving and the ordeal of the transit, what level of cruelty would the U.S. have to attain in its policies to have changed their decision to seek asylum here, to have deterred them from coming? In the name of deterrence, how much punishment are we prepared to mete out to these men in order for them to give up their asylum claims? In doing this, are we meeting our legal and humanitarian obligations not to turn away, to push back to danger those who seek refuge in his country?"[235]*

> *"[W]e routinely require survivors of trauma to navigate a bureaucratic maze of proceedings, daunting for most licensed attorneys, all while behind bars, proceedings that could culminate in their return to countries where they fear grave harm, even death, is a travesty.[236]*

> *"Please allow families to remain intact as they seek a better life in the USA. It is not illegal nor a crime to ask for asylum. In fact, many have arrived in America precisely because they had struggles in their homeland and they*

---

[232] Christine Kohnert, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 13, 2019, at 1 (hereinafter Kohnert Statement); Eve Krief, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, Apr. 12, 2019, at 1 (hereinafter Krief Statement).

[233] Misty Kirby, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 13, 2019, at 1 (hereinafter Kirby Statement); Donna Lannan, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 8, 2019, at 1 (hereinafter Lannan Statement); Sheryl Liberman, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 13, 2019, at 1 (hereinafter Liberman Statement); Gretchen McClain, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, Apr. 12, 2019, at 1 (hereinafter McClain Statement); Amy McIntyre, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 13, 2019, at 1 (hereinafter McIntyre Statement).

[234] Judi Hincks, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, Apr. 12, 2019, at 1 (hereinafter Hincks Statement); Hinebauch Statement, at 1.

[235] Schacher Testimony, *Public Comment Session*, p. 96.

[236] Krishnaswami Testimony, *Public Comment Session*, p. 130.

*knew their children could receive a better future in America. It is woven into our American Dream and welcomes travelers on the Statute of Liberty.*"[237]

"*I was shocked to see that we are currently treating law-abiding asylum seekers like criminals. They are unable to communicate with the outside world – except at great expense; they are forced to wear color coded jumpsuits and live in prison-like conditions.*"[238]

"*A sensible immigration policy requires smart, thoughtful people to construct practical, compassionate solutions and to develop the needed resources to implement them. We don't have to give up the principles we stand for to protect what we have. We don't have to betray America to protect America.*"[239]

"*There should be no for-profit detention centers – nobody should make money off the suffering and incarceration of children.*"[240]

## Family Separation

Recent reports have indicated that at least 2,737 children have been taken from their parents or guardians, beginning even before zero tolerance was officially implemented.[241] The real total is likely much higher.  A July 2019 Staff Report of the U.S. House of Representatives Committee on Oversight and Reform discussed partial data received from the Department of Justice, the Department of Homeland Security, and the Department of Health and Human Services which disclosed separation of 2,648 children, who do not include "children who were reunited with their

---

[237] Nathalie W. Chandra, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May. 12, 2019, at 1 (hereinafter Chandra Statement).

[238] Elyse Wechterman, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 10, 2019, at 1 (hereinafter Wechterman Statement).

[239] Jody Frank, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, Mar. 24, 2019, at 2 (hereinafter Frank Statement).

[240] Hincks Statement, at 1.

[241] *Ms. L. v. ICE*, 310 F.Supp.3d 1133, 1139 (S.D. Cal. 2018); Olivares Testimony, *Public Comment Session*, pp. 148-49. Based on data provided by the relevant agencies, approximately 900 children were separated from their parents between June 2018 and June 2019; these separations were largely based on allegations of prior criminal conduct. Memorandum in Support of Motion to Enforce Preliminary Injunction, *Ms. L. v. ICE et al.*, Case No. 18-cv-00428-DMS-MDD, Dkt. 439-1 (S.D. Cal. Jul. 30, 2019) at 10. Litigation is ongoing about the sufficiency of these concerns and whether the government had adequate basis to continue separating these families; Hincks Statement.

parents [before June 26, 2018] or more than 700 additional children separated since June 2018."[242]
Additionally, as of July 2019, another 149 children were known to have been separated from their
parents.[243]  Therefore, a bare minimum of 3,497 children appear to have been separated.  Though
an executive order has purported to end family separation, family separations have continued, and
the federal government is reviewing thousands of further past cases in which migrant children may
have been separated from their parents or guardians.[244]

The true number of children forcibly separated from their parents at the border appears unknowable
absent full disclosure of the involved federal agencies, even assuming that the agencies kept and
continue to keep accurate records. The government has admitted in court that there was no plan
for reunification and a federal court has found there was no effective system for tracking the
separated children.[245] Moreover, the former head of at least one involved federal agency denied
the very existence of the Administration's child separation policy after it was already in effect.
The U.S. House of Representatives Committee on Oversight and Reform reported that:

> Then Secretary [of Homeland Security Kirstjen] Nielsen stated on multiple
> occasions that there was no policy to separate children from their parents.
> On May 15, 2018, she stated in testimony before the Senate Homeland
> Security and Governmental Affairs Committee: "We do not have a policy
> to separate children from their parents. On June 17, 2018, Secretary Nielsen

---

[242] U.S. House of Representatives, Committee on Oversight and Reform, *Staff Report: Child Separations by the Trump Administration,* July 2019, pp. 5-6, (hereinafter *Staff Report on Child Separations*), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-07-2019.%20Immigrant%20Child%20Separations-%20Staff%20Report.pdf.

[243] Ibid.

[244] Katharina Obser, Senior Policy Advisor, Women's Refugee Commission, Testimony, *Public Comment Session,* p. 136.

[245] *See Ms. L. v. ICE*, 310 F. Supp. 3d at 1137 (family separation with no reunification plan in place), 1140-41 ("Government counsel explained the communication procedures that were in place, and represented, consistent with her earlier representation to the Court, that there was no procedure in place for the reunification of these families."), *Id* at 1144 ("the practice of separating these families was implemented without any effective system or procedure for (1) tracking the children after they were separated from their parents, (2) enabling communication between the parents and their children after separation, and (3) reuniting the parents and children after the parents are returned to immigration custody following completion of their criminal sentence. This is a startling reality. The government readily keeps track of personal property of detainees in criminal and immigration proceedings. Money, important documents, and automobiles, to name a few, are routinely catalogued, stored, tracked and produced upon a detainees' release, at all levels — state and federal, citizen and alien. Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children. The unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as *property*. Certainly, that cannot satisfy the requirements of due process." [internal citations omitted]).

tweeted: "We do not have a policy of separating families at the border. Period."[246]

According to testimony submitted to the Commission, these separations occur without the involvement of child welfare specialists or with clear justifications and processes that would ensure the best interests of the children and the due process rights of parents and legal guardians.[247] As discussed below, the government cannot legally remove children from a parent without finding that the parent or guardian is a danger to the child.

Regardless of the exact number of children who have been, are being, and likely will yet be separated from their parents at the border, it is critical to note that the U.S. House of Representatives Committee on Oversight and Reform determined that the Trump "Administration [h]as [n]ot [b]een [c]andid [a]bout [i]ts [p]urpose in [s]eparating [c]hildren" from their parents.[248] Specifically:

> [t]he records obtained by the Committee indicate that the Trump Administration separated children unnecessarily—even under the Administration's own rationale—and then failed to track separated families. These actions caused lengthy delays to reunification and, in some cases, separations that are still ongoing today.

> The Trump Administration claimed that child separations under the zero tolerance policy were necessary in order to criminally prosecute the parents and that such separations were no different than what occurs in the context of any criminal prosecution.

> . . .

> However, the data shows that many child separations were unnecessary even under this claimed rationale. Some parents who were separated from their children were never sent to U.S. Marshals or other federal criminal custody, but instead went straight from [Customs and Border Protection] custody to [Immigration and Customs Enforcement] detention. Other parents were briefly taken into U.S. Marshals' custody and then returned to [Customs and Border Protection] custody within a day or two. These parents were readmitted to the same facilities where they had been separated from

---

[246] *Staff Report on Child Separations*, pp. 11-12 (citing Senate Homeland Security and Governmental Affairs Committee, *Hearing on Authorities and Resources Needed to Protect and Secure the United States*, 115th Cong. (May 15, 2018) (online at www.hsgac.senate.gov/hearings/authorities-and-resources-needed-to-protect-and-secure-the-united-states) and then-Secretary Kirstjen Nielsen, Department of Homeland Security, @SecNielsen, Twitter (June 17, 2018) (online at www.twitter.com/SecNielsen/status/1008467414235992069).

[247] Obser Testimony, *Public Comment Session*, p. 136.

[248] *Staff Report on Child Separations*, p. 21.

their children days before, but the children had already been sent to [Office of Refugee Resettlement] custody. These parents were then sent to Immigration and Customs Enforcement detention and in some cases were deported without their children.

These parents may have been in federal criminal custody for only a brief period—or not at all—because prosecutors declined to prosecute the cases, or because the parents' only criminal offense was the misdemeanor of illegal entry and they were sentenced to time served when they immediately pleaded guilty. Yet their children were nevertheless taken from them and kept apart for weeks or months.[249]

This is layered on top of the apparent lack of candor about the underlying existence of family separation policies for which former Secretary Nielson is cited above.

The Supreme Court has repeatedly found that as persons within the United States' jurisdiction, noncitizens are entitled to substantive due process protections under the Fifth Amendment.[250] The language of the Fifth Amendment applies to all persons, regardless of citizenship.[251] The Court has also recognized a fundamental right to family integrity,[252] which specifically includes the right of parents to have control over the upbringing, custody, and care of their children.[253] Courts have even found that the separation of a child from their parent, "even for a short time, represents a serious impingement" on those fundamental parental rights.[254] Despite the Court articulating parental rights as fundamental, it has yet to establish a level of scrutiny for courts to use when reviewing familial integrity cases.[255] As such, lower courts have used varying levels in evaluating

---

[249] Ibid., 21 (citing "Sessions: Parents, Children Entering U.S. Illegally Will be Separated," *NBC News*, May 7, 2018, https://www.nbcnews.com/politics/justice-department/sessions-parents-children-entering-us-illegally-will-be-separated-%20n872081)).

[250] *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (finding Fifth Amendment protects all 'persons' within American borders); *see also Mathews v. Díaz*, 426 U.S. 67, 77 (1976); *see generally Reno v. Flores*, 507 U.S. 292, 306 (1993); *Plyler v. Doe*, 457 U.S. 202, 210 (1982).

[251] U.S. CONST. AMEND V ("No person shall be… deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.").

[252] *Troxel v. Granville*, 530 U.S. 57 (2000).

[253] *See Troxel*, 530 U.S. at 65-66; *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Quillion v. Walcott*, 434 U.S. 246 (1978) (finding relationship between parent and child constitutionally protected); *D.B. v. Cardall*, 826 F.3d 721, 740 (4th Cir. 2016); *Croft v. Westmoreland County Children & Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997) (finding interference in family relationship unconstitutional unless there is some showing that children in danger of staying with parent).

[254] *Jordan v. Jackson*, 15 F.3d 333, 346 (4th Cir. 1994).

[255] *Meyer v. Nebraska*, 262 U.S. 390 (1923).

different parental rights cases, such as rational basis or intermediate scrutiny.[256] For family separation in immigration cases specifically, some courts, such as the federal District Court for the District of Columbia and the D.C. Federal Court of Appeals, which have jurisdiction over federal questions, have used strict scrutiny review. Under strict scrutiny, they require that the government action in question is narrowly tailored to achieve a compelling government interest in order to meet constitutional standards.[257] In 2018, the D.C. federal district found that noncitizens do not lose their fundamental right to family integrity when lawfully detained, and thus separating children from parents "directly and substantially" burdens the right to family integrity.[258]

Courts have also understood substantive due process to protect against government action that "shocks the conscience."[259] This doctrine has been used particularly in due process challenges to President Trump's zero tolerance policy.[260] In its application, courts must determine whether the executive action in question is "so extreme and egregious as to shock the contemporary conscience,"[261] which requires an examination into the totality of the circumstances as opposed to requiring specific elements.[262] Executive actions can be challenged where impacted parties are located, and the federal District Court of the Southern District of California has found that the separation of children from families without a showing of parental unfitness plus the lack of procedure to reunite or even facilitate communication between separated family members is likely to meet the "shock the conscience" standard.[263]

---

[256] *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 457 (2d Cir. 1996) (finding rational basis review, evaluating whether the government action in question is rationally related to a legitimate state interest, appropriate when state interest is education); *New York Youth Club v. Smithtown*, 867 F.Supp.2d 328, 332 (E.D.N.Y. 2012) (finding intermediate scrutiny, evaluating whether the government action in question is substantially related to an important government interest, is appropriate in evaluating an ordinance about curfews).

[257] *Franz v. United States*, 707 F.2d 582, 602 (D.C. Cir. 1983); *M.G.U. v. Nielsen*, 325 F.Supp.3d 111, 120 (D.C. Cir. 2018) (holding that the Department of Health and Human Services "directly and substantially burdened [defendant's] right to family integrity."); *Nolasco v. ICE*, 319 F.Supp.3d 491, 502 (D.C. Cir. 2018) (holding policy of family separation not narrowly tailored to achieve compelling government interest in deterring unlawful immigration.) not narrowly tailored to achieve compelling government interest in deterring unlawful immigration.).

[258] *Nolasco*, 319 F.Supp.3d at 500.

[259] *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 728 (6th Cir. 2011); *Seegmiller v. LaVerkin City*, 528 F.3d 762, 769 (10th Cir. 2008) (finding two strands of substantive due process doctrine not mutually exclusive).

[260] Dep't. of Justice, *Zero-Tolerance Memorandum*.

[261] *DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005) (citing County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)).

[262] *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998); *Armstrong v. Squadrito*, 152 F.3d 564, 570 (7th Cir. 1998); *Ms. L v. ICE*, 310 F.Supp.3d 1133, 1143 (S.D. Cal. 2018).

[263] *Ms. L*, 310 F.Supp.3d at 1145; *Lewis*, 523 U.S. at 847.

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

In addition, despite courts ordering the federal government to stop family separation, migrants continue to allege that family separation is still used as a threat. For example, they say that Department of Homeland Security officials have been falsely informing them that their options are be separated from their children or face deportation.[264]

Finally, for families that already have been separated, public testimony to the Commission revealed that there are no standard procedures in place to ensure reunification, which implicates continuing substantive due process concerns.[265] Though Department of Homeland Security implemented this separation, the lack of coordination between Department of Homeland Security and Department of Health and Human Services regarding the identities of the children and the identities and locations of their parents has resulted in an ongoing, substantial information deficiency. In January 2019, the Office of the Inspector General of the Department of Health and Human Services released a report showing that "thousands of children may have been separated during an influx that began in 2017, before the accounting required by the Court, and Department of Health and Human Services has faced challenges in identifying separated children."[266] Even since the separation of these thousands of children came to light, no official numbers have been released by Department of Homeland Security due to the "lack of a coordinated formal tracking system between the Office of Refugee Resettlement . . . and the Department of Homeland Security."[267]

As of January 19, 2019, the Department of Homeland Security reportedly continued to "struggle[] to provide accurate, complete, reliable data on family separations . . . ."[268] On September 27, 2018, after site visits, the Department of Homeland Security Office of the Inspector General issued a report finding that lack of preparation and lack of reliable information systems had led to parents being unable to contact or locate their children.[269] Among numerous findings regarding these information gaps making it challenging for parents to locate their children who had been taken from them, the Office of the Inspector General found that:

---

[264] Abaya Testimony, *Public Comment Session*, p. 105

[265] Obser Testimony, *Public Comment Session*, p. 137.

[266] Dep't. of Health and Human Services, Office of Inspector General, *Separated Children Placed in Office of Refugee Resettlement Care*, OEI-BL-18-00511, January 2019.

[267] Miriam Jordan, "Family Separation May Have Hit Thousands More Migrant Children Than Reported," *New York Times*, Jan. 17, 2019, https://www.nytimes.com/2019/01/17/us/family-separation-trump-administration-migrants.html.

[268] Ibid.

[269] Dep't. of Homeland Security, Office of the Inspector General, *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy*, Sept. 27, 2018, pp. 9-12.

Border Patrol agents do not appear to take measures to ensure that pre-verbal children separated from their parents can be correctly identified. For instance, based on Office of the Inspector General's observations, *Border Patrol does not provide pre-verbal children with wrist bracelets or other means of identification, nor does Border Patrol fingerprint or photograph most children during processing to ensure that they can be easily linked with the proper file.*[270]

---

*Family Separation - Right to Family Integrity Testimony*

*"Any discussion of renewing family separation or giving families the false choice between being separated or indefinitely detained together should be recognized for what it is, a clear policy to inflict harm on families and deter them from seeking protection in the United States."*[271]

*"Though we had received referrals in the past for separated children where the adult's relationship with the child was unclear, what happened in 2017 was different. Some of the children referred to us were toddlers and babies. In all of these cases, there were no doubts about the relationship between these children and their parents but [Department of Homeland Security] still separated them."*[272]

*"[Immigration and Customs Enforcement] and [Department of Homeland Security] still have no standard procedures or policies in place to prevent family separation in the first place, to identify separated parents or close relatives, to facilitate regular and free communication. Similarly, the Departments still have no meaningful mechanisms to track and document separations or allow a decision with life-long consequences to be appealed."*[273]

*"We are deeply concerned that family separation continues to be used solely to deter families from exercising their legal right to seek protection."*[274]

---

[270] Ibid., 15 (emphasis added).

[271] Abaya Testimony, *Public Comment Session*, p. 105.

[272] Ibid., 102.

[273] Obser Testimony, *Public Comment Session*, p. 137.

[274] Abaya Testimony, *Public Comment Session*, pp. 104-05.

*Barriers to Reunification Testimony*

> "Worse yet, many parents were deported without knowing where their children were before we were appointed to them. Parents told us they abandoned valid asylum claims because" they were told it would either help their children or allow them to be reunified. In some cases, children believed their parents willingly abandoned them."[275]

> "The United States must stop immigrant family separation in all its forms, and all separated families must be immediately reunited. Thanks to recent US policies and practices, innocent children will forever bear the scars inflicted upon them by the pain and anxiety of forced separation. I pray this nation can change course before more children are forced to endure this literal torture."[276]

## Standards of Care

*The Flores Agreement and Other Applicable Standards*

The following is a summary of various detention standards that are referenced throughout this chapter. Different legal standards exist for the detention of migrant children, families, and single adults. An overview of the standards are provided here and discussed in more detail under the applicable sections below.

The *Flores* agreement is a 1997 court-ordered consent decree that established standards detailing how children should be treated in the immigration detention system, and it has been upheld by federal courts as enforceable.[277] The *Flores* agreement mandates all detention facilities that house immigrant children must be safe and sanitary, complete with suitable toilets, sinks, drinking water, food, medical assistance for emergencies, adequate temperature control and ventilation, adequate supervision to protect minors, and contact with all family members with whom the child was detained.[278] Additionally, Department of Homeland Security must segregate each minor from

---

[275] Ibid.

[276] Kari Hildreth, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 13, 2019, at 1 (hereinafter Hildreth Statement).

[277] Stipulated Settlement Agreement, *Flores v. Reno*, No. CV 85-4544-RJK (C.D. Cal. Jan. 17, 1997) (hereinafter *Flores* agreement). Parties in the case reached a settlement after the Supreme Court held that the circumstances of immigrant children's confinement were better described as "legal custody rather than detention" because they are not in correctional institutions but "facilities that meet state licensing requirements for the provision of shelter care, foster care, group care, and related services to dependent children." *Reno v. Flores*, 507 U.S. 292, 298 (1993).

[278] *See Flores* agreement.

unrelated adults, place him/her in the least restrictive setting possible that is appropriate for the child's age and special needs, and provide notice of his/her rights.[279] The *Flores* agreement also requires that Department of Homeland Security treat each child with dignity, respect, and with special concern for their particular vulnerabilities as children.[280]

Under the *Flores* agreement, Department of Homeland Security may detain migrant children only to secure their timely appearance before a Department of Homeland Security, Department of Health and Human Services, or Immigration Court, or to ensure their safety or the safety of others.[281] A 2015 court ruling set the presumptive reasonable transition time to release detained children from family immigration detention centers in compliance with the *Flores* agreement to 20 days.[282] If parents cannot be released with the children, the children are treated as unaccompanied children and transferred to the custody of the Department of Health and Human Services, Office of Refugee and Resettlement.  The Homeland Security Act of 2002 charged the Office of Refugee and Resettlement with providing temporary care and placement of unaccompanied minors[283] and the Trafficking Victims Protection Reauthorization Act of 2008 demands that children be "promptly placed in the least restrictive setting that is in the best interest of the child.[284] Moreover, when children are initially detained by Border Patrol, they may not be held for longer than seventy-two hours, except under exceptional circumstances.[285]

If detaining an unaccompanied migrant child is not required, then that child must be released to a parent, legal guardian, adult relative (brother, sister, aunt, uncle, or grandparent), an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being through a declaration or other documentation, a licensed program willing to accept legal custody, or an individual or entity willing to accept legal custody after a suitability statement has been conducted and an affidavit of support has been created.[286] Previously, *Flores*

---

[279] *Id.*

[280] *Id.*

[281] *Id.*

[282] *Flores v. Lynch*, 212 F.Supp.3d 907, 914 (2015).

[283] 6 U.S.C § 279(g)(2).

[284]  Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. 110-457, 122 Stat. 5044 (codified as 22 U.S.C. § 7101).

[285] Dep't. of Homeland Security, Office of the Inspector General, *Special Review*, p. 8 (citing 8 U.S.C. § 1232(b)(3) (2008)).

[286] *Flores* agreement (Some portions have been codified at 8 C.F.R. § 263.3).

was mainly applicable to unaccompanied minors but since zero tolerance, it has also applied to children who arrived with their parents or other guardians.[287]

In 2017, a federal court found the Obama Administration was in breach of the *Flores* agreement due to "egregious conditions" in border patrol facilities and for detaining children longer than necessary, and required their release.[288]   In June 2019, the Department of Justice attempted to argue that the 2017 findings went too far and added additional requirements, such as soap and toothbrushes, that were not required under the original guidelines of what qualifies as "safe and sanitary."[289]   These arguments were met incredulity by Ninth Circuit judges, including Senior Judge A. Wallace Tashima, who was held in a Japanese Internment Camp as a child during WWII, who stated, "It's within everybody's common understanding that if you don't have a toothbrush, if you don't have soap, if you don't have a blanket, it's not safe and sanitary. Wouldn't everybody agree to that? Do you agree to that?"[290]

The current Administration's defense of what it believes falls within the "safe and sanitary" guidelines continues to raise questions about the conditions of detainment at the southern border. Further, Immigration and Customs Enforcement's own standards require that: "Each detainee shall receive, at a minimum, the following items: 1. One bar of bath soap, or equivalent; 2. One comb; 3. One tube of toothpaste; 4. One toothbrush; 5. One bottle of shampoo, or equivalent; and 6. One container of skin lotion."[291]

The newest set of immigration policies undermines *Flores* by separating children from their parents in order to hold the adults indefinitely, and seeks to deter immigrants, namely those coming from Mexico and Central American countries, from pursuing entry into the U.S.[292] The

---

[287] *Flores v. Lynch,* 828 F.3d 898 (9th Cir. 2016).

[288] Order Re Plaintiffs' Motion to Enforce and Appoint a Special Monitor, *Flores v. Sessions*, No. 85-cv-04544, 2017 WL 6060252 (C.D. Cal. June 27, 2017).

[289] Helen Christophi, "Feds Tell 9th Circuit: Detained Kids 'Safe and Sanitary' Without Soap," *Courthouse News*, June 18, 2019, https://www.courthousenews.com/feds-tell-9th-circuit-detained-kids-safe-and-sanitary-without-soap/.

[290] Ibid.

[291] Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011*, Revised December 2016, pp. 328-330.

[292] Nicholas Wu, "What is the *Flores* Agreement, and What Happens if the Trump Administration Withdraws from It?," *Just Security*, Oct. 18, 2018, https://www.justsecurity.org/61144/flores-agreement-trump-administration-withdraws-it/; *see also* "Update on Separated Children & the *Flores* Agreement," *NPR*, Sept. 9, 2018, https://www.npr.org/2018/09/09/646018019/update-on-separated-children-and-the-flores-agreement; *see also*, Congressional Research Service, *The "Flores Settlement" and Alien Families Apprehended at the U.S. Border: Frequently Asked Questions,* by Sarah Herman Peck and Ben Harrington, Sept. 17, 2018, p. 11, https://fas.org/sgp/crs/homesec/R45297.pdf.

Administration issued a notice of draft regulation to withdraw the *Flores* agreement in September 9, 2018.[293] A total of 98,208 public comments were received.[294] Reviewing the first 100 shows that the overwhelming majority oppose the federal government ending or withdrawing from the *Flores* agreement.[295] Groups opposed withdrawal of the *Flores* agreement, include the American Immigration Lawyers' Association, which commented that the proposed new regulations would not guarantee safe conditions for children, would result in their indefinite detention and therefore be patently inhumane, and would require continued family separation.[296] The President of the American Bar Association and 18 State Attorney Generals expressed similar concerns.[297]

On August 21, 2019, two federal agencies, the Department of Homeland Security and the Department of Health and Human Services, released regulations "implementing the relevant and substantive terms of the *Flores* Settlement Agreement (*Flores*)."[298] At the time of the release, the agencies provided a description of the regulations, summarized generally as:[299]

- Implementing the provisions of *Flores* and thereby terminating the *Flores* Settlement Agreement

- Implementing the standards for how federal agencies care for accompanied and unaccompanied minors

- Allowing federal agencies to hold families in third-party licensed family facilities

---

[293] Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 83 Fed. Reg. 45486 (proposed Sept. 7, 2018) (to be codified at 8 C.F.R. 212 and 236 & 45 C.F.R. 410), https://www.federalregister.gov/documents/2018/09/07/2018-19052/apprehension-processing-care-and-custody-of-alien-minors-and-unaccompanied-alien-children.

[294] *See* "Apprehension, Processing, Care, and Custody of Alien Minors," *Regulations.gov*, https://www.regulations.gov/docketBrowser?rpp=25&so=DESC&sb=commentDueDate&po=0&dct=PS&D=ICEB-2018-0002 (accessed Aug. 12, 2019).

[295] Ibid.

[296] *See* American Immigration Lawyers Association and American Immigration Council, letter to Debbie Seguin, Assistant Director, Office of Policy, Immigration and Customs Enforcement, Nov. 6, 2018, https://www.aila.org/infonet/aila-council-submit-comments-opposing-flores.

[297] *See* Lorelei Laird, "ABA President Opposes Proposed Rule that Would Reduce Rights of Immigrant Minors," *ABA Journal*, Nov. 7, 2018, http://www.abajournal.com/news/article/aba_president_opposes_proposed_rule_that_would_reduce_rights_of_immigrant_m.

[298] Dep't. of Homeland Security, "DHS and HHS Announce New Rule to Implement the Flores Settlement Agreement; Final Rule Published to Fulfill Obligations under Flores Settlement Agreement," press release, Aug. 21, 2019, https://www.dhs.gov/news/2019/08/21/dhs-and-hhs-announce-new-rule-implement-flores-settlement-agreement.

[299] Ibid.

- Implementing provisions of the Trafficking Victims Protection Reauthorization Act of 2008, including the transfer of unaccompanied children to Department of Health and Human Services within 72 hours, absent exceptional circumstances.

Section VI of *Flores* provides conditions for a "general policy favoring release,"[300] and provides that the agency "shall release a minor from its custody without unnecessary delay" if detention is not required to ensure safety or make a legal appearance.[301] The agreement also provides that within five days of initial detention, the agencies must transfer a child to a licensed program, except in the event of an emergency of influx of children into the US, in which case the placement shall be made "as expeditiously as possible."[302]   A licensed program refers to a program, agency or organization "that is licensed by an appropriate State agency" to provide care for minor children.[303] A later court decision from the 9th Circuit clarified that *Flores* applied to children accompanied by an adult and, based on the arguments made by the parties, established a 20 day standard for the release of accompanied children.[304]

The new regulation [305] differs from *Flores* in several notable ways.  First, the regulation has several new barriers to the release of children that are not present in *Flores*.  The regulation eliminates the opportunity for release on humanitarian or public interest parole for children in expedited removal proceedings.[306]  The regulation limits access to bond hearings allowing Department of Health and Human Services to determine whether certain children will be released.[307]   The regulation will also permit the ongoing detention of accompanied children with their parents, with no set limits for release.[308]

---

[300] *Flores* agreement.

[301] *Id.*

[302] *Id.*

[303] *Id.*

[304] *Flores v. Lynch*, 212 F.Supp.3d 907, 914 (2015).

[305] Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 84 Fed. Reg. 44392 (proposed Sept. 7, 2019) (to be codified at 8 C.F.R. § 212 and 236 & 45 C.F.R. § 410), https://www.federalregister.gov/documents/2018/09/07/2018-19052/apprehension-processing-care-and-custody-of-alien-minors-and-unaccompanied-alien-children.

[306] *Id.*

[307] *Id.*

[308] *Id.*

Second, the regulation allows for children to be released into facilities that are not licensed by a state, and instead creates the option for the federal agencies to develop a separate licensing system. Third, in its statement announcing the publication of the regulation, the Administration stated that the regulation was "closing the key loophole in *Flores*—the new rule will restore integrity to our immigration system and eliminate the major pull factor fueling the current crisis." [309]   However, using family detention as a deterrent for legal migration has been found by the courts to be an illegitimate basis for civil detention.[310] Finally, under *Flores*, attorneys representing the best interests of the children were able to ask a court to determine whether delays were "necessary" and whether the placements were being made "as expeditiously as possible."[311]

Immigration and Customs Enforcement at the Department of Homeland Security may detain families at family detention centers. Immigration and Customs Enforcement also established guidelines that govern detention as family detention centers.[312] These standards cover many aspects of being detained including safety, security, care (medical, food, and hygiene), visitations, recreation, and access to legal counsel.[313]

Standards for detaining adult migrants are established by Immigration and Customs Enforcement, and are primarily based on correction incarceration standards.[314] Since 2000, Immigration and Customs Enforcement has implemented three sets of detention standards throughout all Immigration and Customs Enforcement detention facilities,[315] the National Detention Standards

---

[309] Dep't. of Homeland Security, "Acting Secretary of Homeland Security Kevin K. McAleenan on the DHS-HHS Federal Rule on Flores Agreement," press release, Aug. 21, 2019, https://www.dhs.gov/news/2019/08/21/acting-secretary-mcaleenan-dhs-hhs-federal-rule-flores-agreement.

[310] *R.I.L-R, et al., v. Johnson*, 80 F.Supp.3d 164, 181-82 (D.C. Cir.  Feb. 20, 2015),  https://www.aclu.org/legal-document/rilr-v-johnson-memorandum-opinion.

[311] *See Flores* agreement.

[312] "Family Residential Standards," Dep't. Of Homeland Security, Immigration and Customs Enforcement , http://www.ice.gov/detention-standards/family-residential (accessed June 1, 2019); Lazaro Zamora, "What You Need to Know: Immigrant Family Detention," *Bipartisan Policy Center*, Aug. 27, 2015, https://bipartisanpolicy.org/blog/what-you-need-to-know-immigrant-family-detention/.

[313] Dep't. Of Homeland Security, "Family Residential Standards."

[314] National Immigrant Justice Center, *Immigration Detention Oversight and Accountability Tool Kit*: *A Guide for Members of Congress Visiting Ice Jails*, May 2019, p. 5, https://www.immigrantjustice.org/research-items/toolkit-immigration-detention-oversight-and-accountability, (hereinafter *A Guide for Members of Congress*).

[315] "Ice Detention Standards," Dep't of Homeland Security, https://www.ice.gov/factsheets/facilities-pbnds (accessed July 26, 2019).

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

2000,[316] the Performance-Based National Detention Standards 2008,[317] and the Performance-Based National Detention Standards 2011.[318] Respectively, they contain 38, 41, and 43 standards pertaining to detainee care, services, and facility operations.[319] These standards also govern private contracted detention facilities and intergovernmental service agreement detention facilities.[320] Although the standards generally dictate uniformity, contract and intergovernmental facilities follow the detention standards stated in their contract,[321] which can sometimes create variation among Immigration and Customs Enforcement facilities.[322]

Finally, detainees retain basic civil rights as well as substantive due process rights granted to them by the U.S. Constitution.[323] Supreme Court case law also sets standards for the provision of medical care for adults in immigration detention facilities.[324]

---

[316] Immigration and Customs Enforcement, *Performance-Based National Detention Standards, 2000 Detention Operations Manual,* https://www.ice.gov/detention-standards/2000.

[317] Immigration and Customs Enforcement, *Performance-Based National Detention Standards, 2008 Detention Operations Manual,* https://www.ice.gov/detention-standards/2008.

**[318]** Immigration and Customs Enforcement, *Performance-Based National Detention Standards, 2011 Detention Operations Manual,* https://www.ice.gov/detention-standards/2011.

[319] *See supra* notes 315-318.

[320] Contract detention facilities are "owned by private companies and contracted directly with ICE." See 79 Fed. Reg. 13100, 13104 (March 7, 2014); Intergovernmental service agreement (IGSA) detention facilities are detention "facilities [that] are provided to ICE by States or local governments through agreements and may be owned by the State or local government, or a private entity. *See* 79 Fed. Reg. 13100, 13104 (Mar. 7, 2014).

[321] *See, e.g.*, Dep't. of Homeland Security, Immigration and Customs Enforcement, *Inter-governmental Service Agreement between DHS ICE, Office of Detention and Removal, and Collier County, Naples, Florida,* http://www.ice.gov/doclib/foia/isa/r_droigsa070024colliercountyfl.pdf.

[322] U.S. Gov't Accountability Office, *Immigration Detention: Additional Actions Needed to Strengthen Management and Oversight of Facility Costs and Standards*, GAO-15-153, Oct. 2014, pp. 1-2, 5, https://www.gao.gov/assets/670/666467.pdf. For example, if Immigration and Customs Enforcement contracted with a Contract Detention Facility prior to 2008, that Contract Detention Facility would only be required to implement the National Detention Standards 2000. According to the 2014 Government Accountability Office report, Immigration and Customs Enforcement officials have stated that "they were in the process of requesting that additional facilities authorized to hold detainees for 72 hours or longer implement the most recent 2011 [Performance-Based National Detention Standards], and documenting that change in facility contracts." Ibid., 32; In 2015 Kevin Landy, in his official capacity as Immigration and Customs Enforcement Assistant Director for the Office of Detention Policy and Planning (ODPP), sent the Commission additional comments in response to Commission staff inquiry. This information is available at the U.S. Commission on Civil Rights Headquarters located at 1331 Pennsylvania N.W., Washington D.C., 20425.

[323] *See infra* notes 609-614; 618-620 (due process discussion).

[324] *See infra* notes 452-453 (legal standard for medical care discussion).

# Detention of Children

<u>Current Conditions</u>

There have been civil rights issues with the initial detention of children by Border Patrol (before they are transferred to larger facilities like the South Texas Family Residential Center in located in Dilley, Texas, or to Department of Health and Human Services shelters). The Department of Homeland Security, Office of the Inspector General found that Border Patrol held children many days past the statutory limit of seventy-two hours, which may only be exceeded under "exceptional circumstances."[325] From May 5—June 20, 2018, among hundreds of children held by the Border Patrol, 32.9 percent were held for more than seventy-two hours, and some were held from twelve to twenty-five days.[326]

While the number of minors detained has reached a record high, the conditions in which they are housed has hit a disturbingly low standard. Thousands of children have been held by Department of Homeland Security in cages in former warehouses, in buildings with little if any natural light, forced to sleep on cement floors in cold temperatures, with only aluminum blankets issued to cover them.[327] The conditions of the shelters to which these children are transferred after being detained by Department of Homeland Security are similarly concerning. The shelters are run by Department of Health and Human Services' Office of Refugee Resettlement.[328] At the shelters, many children are not able to speak to their parents, hug their siblings who are also in custody, or know when they will be released, and there are a troubling number of allegations of abuse.[329]

Furthermore, undocumented children in the United States are entitled to equal access to public education. In 1982, in the case of *Plyler v. Doe*, the Supreme Court held that Equal Protection is a right enjoyed by all *persons* within the territory of the United States,[330] and that a state could not

---

[325] Dep't. of Homeland Security, Office of the Inspector General, *Special Review*, p. 8 (citing 8 U.S.C. § 1232(b)(3) (2008)).

[326] Ibid.

[327] Manny Fernández, "Inside the Former Walmart That Is Now a Shelter for Almost 1,500 Migrant Children," *New York Times*, June 14, 2018, https://www.nytimes.com/2018/06/14/us/family-separation-migrant-children-detention.html.

[328] For more information on agency coordination (or lack thereof), *see supra* notes 142-147; 265-267.

[329] *See* American Civil Liberties Union of Texas, letter to John V. Kelly, Acting Inspector General, Dep't. of Homeland Security, Cameron Quinn, CRCL Officer, and Matthew Klein, Assistant Commissioner for Office of Professional Responsibility, Mar. 30, 2019, (hereinafter American Civil Liberties Union of Texas letter) https://www.aclutx.org/sites/default/files/pdn_border_patrol_abuse_oig_complaint.pdf.

[330] *Plyler v. Doe*, 457 U.S. 202, 211-12 (1982).

58 *Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

deny undocumented children the right to public education, because that "imposes a lifetime hardship on a discrete class of children not accountable for their disabling status. The stigma of illiteracy will mark them for the rest of their lives."[331] The Court added: "We are reluctant to impute to Congress the intention to withhold from these children, for so long as they are present in this country through no fault of their own, access to a basic education."[332] However, access to education as required by the *Flores* agreement for six hours a day has been at issue for migrant children at some detention camps,[333] and their indefinite detention only contributes to the negative impact of lesser access to public education during detention.

On February 28, 2019, the American Immigration Council reported that there were at least nine infants under one year of age detained by Department of Homeland Security in Dilley, Texas where there was an alleged lack of access to medical care.[334] American Immigration Council and other immigrant rights groups wrote to the Department of Homeland Security's Office for Civil Rights and Civil Liberties and the Inspector General of the Department of Homeland Security, voicing "grave concerns about the lack of specialized medical care available in Dilley for this vulnerable population,"[335] and "long documented the limited access to adequate medical care in family detention centers."[336] A few days later, Immigration and Customs Enforcement confirmed there were sixteen babies in Department of Homeland Security custody at Dilley, and that twelve had been released.[337] Immigration and Customs Enforcement also reported that another baby detained at the Texas Karnes detention center, which is about an hour from the nearest hospital, and that

---

[331] *Id.* at 223.

[332] *Id.* at 227.

[333] *See, e.g.*, Dana Goldstein and Manny Fernández, "In a Migrant Shelter Classroom, It's Always Like the First Day of School," *New York Times*, July 6, 2018, https://www.nytimes.com/2018/07/06/us/immigrants-shelters-schools-border.html ("[A]ccording to lawyers and educators with firsthand knowledge of the child detention system, the education offered inside the facilities is uneven and, for some children, starkly inadequate. Teachers at the schools are sometimes not state-certified as teachers, according to these accounts. Some shelter instructors cannot communicate effectively in Spanish, and in other cases the curriculum is so limited and classes are so wide-ranging in age groups that students seem bored and disengaged.").

[334] American Immigration Council, letter to Ms. Cameron Quinn, Office for Civil Rights and Civil Liberties, Dep't. Of Homeland Security and Mr. John V. Kelly, Acting Inspector General, Dep't. Of Homeland Security, Feb. 28, 2019,https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/complaint_urges_immediate_release_of_infants_from_immigration_detention.pdf.

[335] Ibid., 1.

[336] Ibid.

[337] Kate Smith, "12 Detained Babies Have Been Released From ICE Custody in Dilley, Texas," *CBS News*, Mar. 4, 2019, https://www.cbsnews.com/news/immigrant-children-detained-12-babies-released-from-ice-custody-detention-center-dilley-texas-2019-03-04/.

AR00249

the status of four babies remaining in custody at Dilley was still unclear.[338] Compounding this and other civil rights issues arising in immigration detention, Office for Civil Rights and Civil Liberties does not have authority to remedy individual complaints but instead focuses on systemic issues."[339]

*Child Deaths*

After over a decade with no child deaths in federal immigration custody,[340] at least six migrant children have died while in custody since September 2018 based on public reports.[341] During the month of December 2018, two young Guatemalan children who were held in Border Patrol custody passed away.[342] Both seven-year-old Jakelín Caal Maquín and eight-year-old Felipe Gómez Alonso left impoverished indigenous villages with their respective fathers.[343] Then Secretary of Department of Homeland Security Kirstjen Neilsen reportedly stated that they were the first migrant children who had died in Department of Homeland Security custody in over a decade, and called for Central American families to stop migrating.[344] Customs and Border Protection Commissioner Kevin K. McAleenan stated that the border facilities where these children were intercepted and detained for days were "not built for that group that's crossing today. They were built 30, 40 years ago for single adult males and we had a different approach."[345] Since the death of Felipe on Christmas Eve of 2019, border patrol has begun hiring emergency medical technicians

---

[338] Ibid.

[339] *See* Susan Ferriss, Alison Kodjak, and Joshua Phillips, "Homeland Security's Civil Rights Unit Lacks Power to Protect Migrant Kids," *NPR*, Aug. 2, 2019, https://www.npr.org/sections/health-shots/2019/08/02/746982152/homeland-securitys-civil-rights-unit-lacks-power-to-protect-migrant-kids.

[340] Contrary to the documented deaths of children in Dep't. Of Homeland Security custody, Border Patrol Commissioner McAleenan recently stated in an interview that it had been "more than a decade" since a "child pass[ed] away anywhere in a [Customs and Border Protection] process." "'We Need a Different Approach,' Says Border Protection Chief After 2nd Migrant Child Dies in U.S. Custody," *CBS News*, Dec. 26, 2018, https://www.cbsnews.com/news/customs-and-border-protection-chief-kevin-mcaleenan-on-migrant-child-death/.

[341] Dianne Gallagher and Kate Sullivan, "Feds Say a Sixth Migrant Child Died While in the Care of Authorities in September," *CNN*, May 23, 2019 5:32 PM, https://www.cnn.com/2019/05/22/politics/sixth-migrant-child-dies/index.html.

[342] Miriam Jordan, "'A Breaking Point': Second Child's Death Prompts New Procedures for Border Agency," *New York Times*, Dec. 26, 2018, https://www.nytimes.com/2018/12/26/us/felipe-alonzo-gomez-customs-border-patrol.html.

[343] Ibid.

[344] Ibid.

[345] Ibid.

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

and paramedics to screen children and adults who are detained at the border.[346] Both Jakelín and Felipe's parents speak Mayan languages, but the fathers were reportedly questioned about their children's health in Spanish, which they do not fully understand, and signed forms asking about their children's health in English.[347] Both fathers stated that their children seemed healthy before they were picked up by Border Patrol.[348] In both cases, when their children became violently ill, Border Patrol brought them to hospitals that were over 30 miles away, but it was too late to save them.[349]

In 2019, three more Guatemalan minors died while in Department of Homeland Security custody.[350] In April, a sixteen-year-old, Juan de León Gutiérrez, fell ill with a rare condition and died several days later after being transferred roughly 160 miles from the migrant shelter in which he was detained to a hospital.[351] In May, a two-year-old (unnamed), detained with his mother, died after about a month of hospitalization, and another sixteen-year-old, Carlos Gregorio Hernández Vásquez, similarly passed away after becoming sick while in U.S. custody.[352] Carlos was confined for twice as long as federal law ordinarily allows, and was moved to a different holding facility after a diagnosis of the flu.[353] Though prescribed with the medicine Tamiflu, Carlos was never hospitalized.[354] In May 2019, the death of an unnamed Salvadoran child in Department of Health and Human Services custody came to light.[355] Though she died in September of 2018, her passing

---

[346] Ibid.

[347] Simon Romero, "Father of Migrant Girl Who Died in U.S. Custody Disputes Border Patrol Account," *New York Times*, Dec. 15, 2018, https://www.nytimes.com/2018/12/15/us/migrant-girl-border-patrol-jakelin.html (father speaks Q'eqchi' and did not fully understand Spanish or English); Maria Sacchetti, "Official: Guatemalan Boy Who Died in U.S. Custody Tested Positive for Influenza B, Final Cause of Death Remains Under Investigation," *Washington Post*, Dec. 28, 2018, https://www.washingtonpost.com/local/immigration/father-whose-son-died-in-custody-knew-bringing-him-would-ease-entry-into-us/2018/12/27/4c210bfc-0a1d-11e9-85b6-41c0fe0c5b8f_story.html?utm_term=.21b9eacc3dac (father speaks only the Mayan language Chuj).

[348] Romero, "Father of Migrant Girl Who Died."; Sacchetti, "Official: Guatemalan Boy Who Died."

[349] Ibid.

[350] Nomaan Merchant, "Fifth Migrant Child Dies After Detention by US Border Agents," *AP News*, May 20, 2019, https://www.apnews.com/5a49d65213b54043825acc282830b139 (hereinafter Merchant, "Fifth Migrant Child Dies.").

[351] Nomaan Merchant and Sonia Pérez D., "US Won't Answer New Questions About Migrant Teen's Death," *AP News*, May. 9, 2019, https://www.apnews.com/1d7d00f710ab4eb8979143717c94fab0.

[352] Merchant, "Fifth Migrant Child Dies."

[353] Ibid.

[354] Ibid.

[355] Graham Kates and Angel Canales, "A 10-Year-Old Migrant Girl Died Last Year in Government Care, Officials Acknowledge," *CBS News*, May 22, 2019, https://www.cbsnews.com/news/migrant-children-death-a-10-year-old-

was not reported until eight months later.[356] She entered the United States at an Office of Refugee Resettlement facility in Texas in a "medically fragile" state and was transferred by Department of Homeland Security between multiple medical facilities across multiple states for a number of months before she finally passed away.[357]

In addition to the five children who have died while in custody, Mariee Juárez, a one and a half year old migrant child from Guatemala, died just a few weeks after being released from Immigration and Customs Enforcement custody in 2018.[358] Her mother, Yazmín Juárez, is now suing the U.S. government in connection to her daughter's death.[359] Juárez testified before Congress that while she and her daughter were in the custody of Immigration and Customs Enforcement, they were kept in a cage with 30 other people, including sick and coughing children.[360] After a week, Mariee also became sick and was given only Tylenol and honey even though she was vomiting, had diarrhea, a fever, and stopped eating.[361] Mariee lost 8 percent of her body fat in 10 days and upon release, spent six weeks in hospitals with a respiratory infection, on a ventilator, before passing away just a few months before her second birthday.[362]

The deaths of these innocent minors demonstrate the devastating consequences of the dangerous conditions of border custody and child detention policies. According to relevant civil rights standards, any child, whether they arrived with an adult family member or as an unaccompanied minor, should not be held in detention for long periods, or subject to abusive conditions, or without proper care, including medical treatment.[363]

---

migrant-girl-died-last-year-in-government-care-officials-acknowledge-exclusive/?ftag=CNM-00-10aab7e&linkId=67929241.

[356] Ibid.

[357] Ibid.

[358] Sasha Ingber, "Migrant Woman Testifies: My Child Died on What is Mother's Day In My Country," *NPR*, Jul. 10, 2019, https://www.npr.org/2019/07/10/740512246/migrant-woman-testifies-my-child-died-on-what-is-mothers-day-in-my-country.

[359] Ibid.

[360] Ibid.

[361] Ibid.

[362] Ibid.

[363] *See, e.g., Flores* agreement.

Impact of Metering on Children

During the last week of March 2019, reports emerged that the Border Patrol was holding asylum seekers who sought to cross legally in a pen under a highway bridge near the legal border crossing.[364] Over 1,000 migrants, including babies and children, had been held under the bridge surrounded by a chain-link fence and forced to sleep outside in the cold, on gravel with bird droppings and dust falling on them at night.[365] On March 31, federal officials reportedly cleared out the enclosure, and the hundreds of families of asylum seekers were moved to other places, but the *New York Times* reported that they were still using a tent under another site under the bridge.[366]

The American Civil Liberties Union of Texas filed a complaint with Department of Homeland Security's Office for Civil Rights and Civil Liberties and its Office of Inspector General, stating that in addition to keeping families and children outside in the cold sleeping on gravel, there were reports of verbal and physical abuse, lack of clean water, lack of clean toilets and lack of soap, lack of access to medical care, and sleep deprivation as officials woke the families every few hours and many were unable to sleep in the cold on the gravel.[367] The American Civil Liberties Union of Texas alleged that:

> The detention of migrants for multiple nights in outdoor detention pens is an unprecedented and extreme violation. Although [Customs and Border Protection] has long violated the rights of migrants in its custody, the agency's decision to detain migrants, including children, in caged dirt filled outdoor areas is an escalation of this administration's cruelty. [Customs and Border Protection] has an obligation, under its own standards, to ensure that migrants are treated humanely, with dignity, and consistent with U.S. and international law.[368]

Medical Treatment of Children

In *Reno v. Flores*, the Supreme Court held that the circumstances of immigrant children's confinement were better described as "legal custody rather than detention" because they are not in

---

[364] *See* Alfredo Corchado, "Border Patrol Closes Ramshackle Migrant Holding Pen Near Where Trump Official Declared Crisis," *Dallas News*, Mar. 31, 2019, https://www.dallasnews.com/news/immigration/2019/03/31/border-patrol-closes-ramshackle-migrant-holding-pen-near-top-trump-official-declared-crisis.

[365] Ibid.

[366] Simon Romero, "Migrants Moved Out of Holding Pen Under El Paso Bridge," *New York Times*, Mar. 31, 2019, https://www.nytimes.com/2019/03/31/us/el-paso-bridge-migrants.html.

[367] American Civil Liberties Union Texas letter.

[368] Ibid., 1.

correctional institutions but "facilities that meet state licensing requirements for the provision of shelter care, foster care, group care, and related services to dependent children."[369] In a settlement reached by the class of plaintiffs in *Flores v. Reno* based on the needs of vulnerable children, both parties laid out the stipulated medical requirements for migrant children being detained in the legal custody of the former Immigration and Naturalization Services, which has now been reorganized into Department of Homeland Security. After acknowledging the particular vulnerabilities of the population being detained, the agreement set out that:

> [Immigration and Naturalization Service] will hold minors in a facility that is *safe and sanitary* and that is consistent with the [Immigration and Naturalization Services]'s concern for the particular vulnerability of minors. Such facilities will have access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation.[370]

The parties also included specific services and programs that should be made available to migrant children:

> Appropriate routine medical and dental care, family planning services, and emergency health care services, including a complete medical examination (including screening for infectious disease) within 48 hours of admission, excluding weekends and holidays, unless the minor was recently examined at another facility; appropriate immunizations in accordance with the U.S. Public Health Service (PHS), Center for Disease Control; administration of prescribed medication and special diets; appropriate mental health interventions when necessary.[371]

Detention centers must also comply with all applicable state child welfare laws and regulations and must provide for each minor in its care proper physical care and maintenance.[372]

Effective application of these standards have proven to be elusive for thousands of migrant children. As detailed in public testimony heard by the Commission in April of 2019, medical staff are not routinely present at detention facilities and wait times to see a doctor can be weeks long,

---

[369] *Reno v. Flores*, 507 U.S. at 298.

[370] *Id.*; Stipulated Settlement Agreement, Exhibit 2, Instructions to Service Officers re: Processing, Treatment, and Placement of Minors, *Flores v. Reno* (emphasis added).

[371] Ibid.

[372] Stipulated Settlement Agreement, Exhibit 1, Minimum Standards for Licensed Programs, *Flores v. Reno*.

regardless of how dire the situation.[373] Facilities lack appropriate medicine and detention staff have been known to deny migrants medication they need for pre-existing illnesses.[374] Due to the negligence of detention staff, multiple children have passed away in detention from illnesses such as the flu, which with proper treatment would not be deadly.[375] The Trump Administration is not complying with the medical requirements of the *Flores* agreement, and is seeking to withdraw from the agreement.[376]

The Director of Litigation at Refugee and Immigrant Center for Education and Legal Services (an organization that provides assistance to migrants at the border) told the Commission that there is a lack of adequate pediatric care in detention facilities, including inadequate or inappropriate immunizations, delayed medical treatment, inadequate educational services and limited mental health services.[377] Moreover, although privately run detention facilities such as Karnes and Dilley are contractually obligated to have a pediatrician on staff, Refugee and Immigrant Center for Education and Legal Services states that these detention facilities do not employ pediatricians.[378]

*Lack of Pediatric Care Testimony*

> *"[I]fants and children who may be housed in these detention centers are not in optimal health when they arrive and they face immense challenges and trauma from being separated from parents and guardians to being malnourished and dehydrated."[379]*

---

[373] Project South, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 13, 2019, at 6-7 (hereinafter Project South Statement).

[374] Margaret Seiler, Volunteer, Don't Separate Families, Testimony, *Public Comment Session,* p. 60; Project South Statement, at 6-7.

[375] Merchant, "Fifth Migrant Child Dies."

[376] Nick Miroff and Maria Sacchetti, "Trump administration to circumvent court limits on detention of child migrants," *Washington Post*, Sept. 6, 2018, https://www.washingtonpost.com/world/national-security/trump-administration-to-circumvent-court-limits-on-detention-of-child-migrants/2018/09/06/181d376c-b1bd-11e8-a810-4d6b627c3d5d_story.html?utm_term=.5fd3169183cf; *see also* Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 83 Fed. Reg. 45486 (proposed Sept. 7, 2018) (to be codified at 8 C.F.R. 212 and 236 & 45 C.F.R. 410).

[377] Manoj Govindaia, Litigation Director, Refugee and Immigrant Center for Education and Legal Services, Testimony, *Public Comment Session,* p. 120.

[378] Ibid, 120-21. See also Jeremy Raff, "What a Pediatrician Saw Inside a Border Patrol Warehouse," *The Atlantic*, Jul. 3, 2019, https://www.theatlantic.com/politics/archive/2019/07/border-patrols-oversight-sick-migrant-children/593224/.

[379] Michelle Mabson, Staff Scientist, Earthjustice, Testimony, *Public Comment Session,* pp. 114-15.

*"[Department of Homeland Security] has likely not been able and/or will be unable in the future to staff these facilities in a timely manner with qualified pediatricians, psychiatrists, child and adolescent physiatrists, mental health clinicians including those with expertise in treating children and toddlers, and pediatric nurses."*[380]

*"We were told about children who actually suffered respiratory issues due to the cold temperatures and the lack of any type of warmth or blankets provided to those migrants."*[381]

*"Another young boy, age 6, was screaming, thrashing, and attempting to bite due to what appeared to be a very high fever. The boy's father stated that his son had never had medicine before but needed it now. After several failed attempts of administering fever reducer, I resorted to applying a cold washcloth to his forehead over the course of two hours, utilizing an office Tupperware bin which was the only container that I could find that could hold water in the facility."*[382]

_____

Mental Health and Children

The federal government is not providing adequate mental health resources for migrant children. There is no initial screening at intake and no counseling provided for trauma. Yet there is substantial research available—some of which was provided to the government in advance of implementation of family separation and detention of the children[383]—linking traumas associated with childhood detention with long lasting negative outcomes such as depression, anxiety, and post-traumatic stress disorder.[384] Trauma may have also manifested due to the events that led children to leave their home countries, from the journey, or from being separated from parents and other care givers. Additionally, advocates argue that for children in detention centers, behavioral problems are often the result of trauma-caused mental illness and are exacerbated by the use of

[380] Government Accountability Project, Written Statement for Public Comment Session before the U.S. Commission on Civil Rights, May 13, 2019, at 6 (hereinafter Government Accountability Project Statement).

[381] Chelsea James, College Student, Howard University, Testimony, *Public Comment Session,* p. 62.

[382] Briones Bedell, High School Student, California, Testimony, *Public Comment Session,* p. 67.

[383] Government Accountability Project Statement, at 29.

[384] American Psychiatric Association Statement, at 2.

discipline as opposed to treatment.[385] Detention centers have also reportedly placed children with mental health issues in solitary confinement.[386]

Further, the American Academy of Pediatrics released a study finding that the physical and mental health needs of migrant children were not being met, finding that "Department of Homeland Security facilities do not meet the basic standards for the care of children in residential settings[;]" and emphasizing that: "From the moment children are in the custody of the United States, they deserve health care that meets guideline-based standards, treatment that mitigates harm or traumatization, and services that support their health and well-being."[387] Child detention and family separation are part of and exacerbate mental health issues arising from trauma the children fled and/or experienced in their journey to the border. The Department of Homeland Security Advisory Committee on Family Residential Centers conducted a year-long investigation of current immigrant detention conditions for children and recommended that:

> [Department of Homeland Security]'s immigration enforcement practices should operationalize the presumption that detention is generally neither appropriate nor necessary for families—and that detention or the separation of families for purposes of immigration enforcement or management are never in the best interest of children.[388]

Not only children, but also their parents or guardians, may be severely traumatized in detention because of family separation and concern for the well-being of their children.[389]

---

[385] Washington Lawyers' Committee for Civil Rights and Urban Affairs, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, Apr. 12, 2019, at 11 (hereinafter Washington Lawyers' Committee Statement).

[386] Washington Lawyers' Committee Statement, at 6-7.

[387] American Academy of Pediatrics, *Detention of Immigrant Children*, April 2017, p. 1 https://pediatrics.aappublications.org/content/pediatrics/139/5/e20170483.full.pdf.

[388] Dep't. of Homeland Security, Immigration and Customs Enforcement, *Report of the ICE Advisory Committee on Family Residential Centers*, Oct. 7, 2016, p. 2 https://www.ice.gov/sites/default/files/documents/Report/2016/acfrc-report-final-102016.pdf.

[389] *See, e.g.*, Associated Press, "'Suicide' of Migrant Separated From his Wife and Child Casts Harsh Light on Donald Trump's Immigration Policy," *South China Morning Post*, Jun. 11, 2018, https://www.scmp.com/news/world/united-states-canada/article/2150137/suicide-migrant-who-separated-his-wife-and-child; *see also* Prelim. Inj., *Ms. L. v. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018).

*Lack of Mental Health Screening Testimony*

> "[P]roblems exist with mental health treatment at the family detention centers. The [Department of Homeland Security] Federal Advisory Committee reported a lack of mental health screening for children and adults at the family detention centers. And Human Rights First reported that any period of incarceration can cause significant psychological harm and can exacerbate mental health trauma in children."[390]

*Trauma in Children Testimony*

> "Th[e] two-year-old was named Margarita. . . [and she] was part of . . . the family of 14. I soon came to the understanding that the family of 14 actually used to be a family of 16 but Margarita's parents were brutally shot in front of her on the trek from Honduras to the border, yet there was no sense of counseling or emotional support whatsoever provided to anyone in the family."[391]

> "These migration-related and postmigration stressors can produce demoralization, grief, loneliness, loss of dignity, and feelings of helplessness as normal syndromes of distress that impede refugees from living health and productive lives."[392]

> "Having studied trauma and the effects of trauma on the young brain, not like adults who can recover, children's brains flooded by cortisol and inflammatory agents typical of the traumatic responses we were seeing, cannot recover and are permanently damaged. This form of trauma has been likened to great incidences of mental health and physical health problems as well as exacerbated bouts of abnormal and antisocial behaviors as a result of the trauma."[393]

*Use of Physical Restraints and Juveniles Testimony*

> "Between June 2015 and May 2018, [Shenandoah Valley Juvenile Center] documents reveal that physical restraints were used on immigrant children on well over 100 occasions; senior Shenandoah Valley Juvenile Center staff

---

[390] Govindaia Testimony, *Public Comment Session*, p. 125.

[391] Amidha Washwa, High School Student, California, Testimony, *Public Comment Session,* pp. 75.

[392] American Psychiatric Association Statement, at 2.

[393] Black Statement, at 1.

AR00258

*acknowledged that physical restraints are used on these children even when a child's behavior is not "immediate[ly] threaten[ing]" Between November 2015 and November 2017, the restraint chair was used over 40 times on immigrant children, often in excess of Shenandoah Valley Juvenile Center's two-hour limit policy; on one occasion, one youth suffering from serious mental health problems was placed in the restraint chair for over 6 hours in a day and for nearly 9 hours the very next day, while John Doe 1 was put in the chair 11 times over a 16 month period for between 25 minutes and 2 hours at a time."[394]*

*Use of Solitary Confinement, Juveniles and Mental Health Testimony*

*"[Name omitted], for example – a 17-year-old youth with severe mental health needs – was placed in isolation for approximately 2,400 hours (a cumulative 100 days) during the less than two years he was detained at Shenandoah Valley Juvenile Center."[395]*

*"There is also the particular psychological harm being perpetrated against the youngest detained people. The fact that 17 year-olds are picked up at midnight on their 18th birthdays to be transferred to adult facilities seems like yet another deliberate cruelty.."[396]*

<u>Sexual and Physical Violence Against Detained Children</u>

Department of Homeland Security's policies resulting in the forced stay of immigrant children in shelters has further resulted in widespread allegations of sexual abuse, particularly among contractors. The largest contractor, Southwest Key, provided housing in Arizona, California, and Texas for over 5,000 children, who were not free to leave.[397] It received more than $1.3 billion in government contracts for housing immigrant children, from 2013-2018. Of the many allegations, the following is elucidating:

A ProPublica report in August [2018] detailed the charges against Levian Pacheco, a former Southwest Key employee who is accused of molesting eight boys at a Mesa shelter over an 11-month period. Pacheco, who is HIV-positive, [was hired]

---

[394] Washington Lawyers' Committee Statement, at 6-7.

[395] Ibid., 6.

[396] Julie Schwietert Collazo, Co-Founder of Immigrant Families Together, Written Statement for Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, Apr. 27, 2019.

[397] Topher Sanders and Michael Grabbel, ""Humanitarian Crisis" Looms as Arizona Threatens to Revoke Immigrant Children Shelter Licenses," *ProPublica*, Sept. 21, 2018, https://www.propublica.org/article/southwest-key-arizona-threatens-to-revoke-immigrant-children-shelter-licenses.

without a background check [and allowed to work] for nearly four months. He was convicted earlier this month of 10 sex offenses connected to the molestation.

In response to media attention and complaints, Arizona health officials reviewed records on background checks at every Southwest Key facility across the state. Of the 13 shelters, the state found two additional facilities also had problems with background checks. . . .

Arizona health officials also found that Southwest Key hadn't vetted all employees by interviewing their previous employers and hadn't ensured all employee files contained proof of tuberculosis testing. At some facilities, officials discovered bedroom and bathroom doors missing and problems with the size of residents' rooms.[398]

These issues are highly problematic under the Prison Rape Elimination Act, which is applicable to privately-run federal facilities.[399] In other Southwest Key shelters run under federal government contracts in Arizona, videos show physical abuse, including staff at the shelters dragging and slapping Latino migrant children.[400] As far as the Commission knows based on the limited information available from Department of Homeland Security, the federal government did not undertake any related enforcement actions. However, the state of Arizona did take action under state child welfare laws and revoked Southwest Key's permits, after which the company was forced to close two shelters.[401]

*Testimony*

*"Because Homestead (detention center) is a federal facility on an old Air Force base, they are not accountable to Florida State Regulations. The employees who work with the children are not vetted properly to screen out past prior sexual offenses. . . . And state agencies, like child and protective services, are not allowed to inspect the premises because it is on federal property."*[402]

---

[398] Ibid.

[399] 28 C.F.R. § 115.

[400] Janice Williams, "Video Shows Migrant Children Physically Abused by Staffers at Arizona Shelter," *Newsweek*, Dec. 30, 2018, https://www.newsweek.com/southwest-key-migrant-child-abuse-1274796.

[401] Agnel Philip, "Southwest Key to Close 2 Phoenix-area Migrant Shelters, Pay Fine to State," *Arizona Republic*, Oct. 24, 2018, https://www.azcentral.com/story/news/politics/immigration/2018/10/24/southwest-key-close-2-phoenix-area-child-immigrant-shelters-pay-fine-arizona-settlement/1754460002/.

[402] Hinebauch Statement, at 2.

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

> *"Although the children are conditioned to report sexual abuse and told that these reports maintain their anonymity, I learned that they all knew the hotline was not confidential and that none of their complaints were anonymous. This, I was told, was enough for some children to not report if other children bullied them."*[403]

## Length of Stay in Detention Facilities

Under the *Flores* Agreement, the federal government cannot detain migrant children for more than 20 days,[404] and in 2015, a federal court held that this limit applies to both unaccompanied minors as well as to minors being detained as part of a family unit.[405] A subsequent request by the Department of Justice to modify the Agreement to allow detention of minors beyond the 20 day limit was rejected in 2018 by the same Court.[406] The Trump Administration has since sought to make similar modifications to the Agreement through federal regulation.[407] As of publication of this report, the *Flores* Agreement remains in effect, however, given the conditions of migrant detention facilities, the federal government is likely not in compliance with the Agreement as alleged in a lawsuit filed in California on June 26, 2019.[408] According to public testimony to the Commission, most detainees in immigration detention facilities are held in prison like conditions with no idea when they will be released.[409] Although the *Flores* Agreement limits the confinement of children to 20 days, public testimony stated that at the Homestead detention facility on a military base in Florida the average length of stay for a child is 67 days.[410] Public testimony pointed out that at privately owned, for-profit detention facilities, there may be a monetary incentive to detain

---

[403] Nancy Hernández, Written Statement for Public Comment Session before the U.S. Commission on Civil Rights, May 12, 2019, at 2 (hereinafter Hernandez Statement).

[404] *Flores* Agreement.

[405] *Flores v. Johnson,* 212 F.Supp.3d 864 (C.D. Cal. 2015).

[406] *Flores v. Lynch*, No. 85-4544, 2017 WL 6049373 (C.D. Cal. Jan. 20, 2017); Laura Jarrett, "Federal Judge Rejects Trump Administration's Bid to Alter Rules on Detaining Minors," *CNN*, July 10, 2018, https://www.cnn.com/2018/07/09/politics/federal-judge-trump-administration-detaining-children/index.html.

[407] *See supra* notes 298-299; 305-308.

[408] *Flores v. Barr*, No. 85-04544 (C.D. Cal. 2019); Alejandro Lazo and Jacob Gershman, "Lawsuit Alleges Government Mistreatment of Migrant Children," *Wall Street Journal*, June 27, 2019, https://www.wsj.com/articles/lawsuit-alleges-government-mistreatment-of-migrant-children-11561608969.

[409] Seiler Testimony, *Public Comment Session*, p. 58.

[410] Hinebauch Statement, at 1.

immigrants for as long as possible.[411] Corporations are paid $775 per day for each migrant child in detention.[412]

On March 13, 2019, Refugee and Immigrant Center for Education and Legal Services of Texas sent a complaint to Office for Civil Rights and Civil Liberties alleging that despite its announcement to the contrary, Department of Homeland Security was still holding children separated from their parents for more than 20 days and taking other actions contrary to the rules of the *Flores* agreement upheld by federal courts to govern conditions of migrant child detention.[413] Refugee and Immigrant Center for Education and Legal Services documented that at Karnes Detention Center in Texas, children, the youngest of whom was 5, were being held "between 41-58 days with no word from [Immigration and Customs Enforcement] about their release [to their parents]."[414] In discussing the *Flores* settlement and subsequent court rulings about it, Refugee and Immigrant Center for Education and Legal Services clarifies that 20 days is the maximum time that children may be held under extenuating circumstances, and that it does not believe that ongoing border crossings by Central American families seeking asylum qualify as "extenuating circumstances."[415] Citing the American Academy of Pediatrics, Refugee and

---

[411] Sula Howell, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 13, 2019, at 2 (hereinafter Howell Statement).

[412] Julia Ainsley, "Trump Admin's 'Tent Cities' Cost More than Keeping Migrant Kids with Parents," *NBC News*, June 20, 2018, https://www.nbcnews.com/storyline/immigration-border-crisis/trump-admin-s-tent-cities-cost-more-keeping-migrant-kids-n884871?utm_source=newsletter&utm_medium=email&utm_campaign=newsletter_axiosam&stream=top.

[413] *See generally Flores* Agreement (Settling as enforceable law, in 1997 and updated in 2001 by the federal government, that migrant children may not be held more than 20 days, and the conditions of their detention must be safe and appropriate, including proper medical care and an education plan. Furthermore, settles that the Dep't. of Homeland Security should make every attempt to locate the parents, and children should be released to their parents (or other guardians if parents cannot be located); *See generally* Dep't. of Homeland Security and Dep't of Health and Human Services, *Proposed Rule: Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied* (Dep't. of Homeland Security proposing to modify the agreement; the proposed rules have been subject to public comment but a final rule has not been issued); Abbie Gruwell, "Unaccompanied Minors and the *Flores* Settlement Agreement: What to Know, National Conference of State Legislatures" *National Conference of State Legislatures*, Oct. 30, 2018, http://www.ncsl.org/blog/2018/10/30/unaccompanied-minors-and-the-flores-settlement-agreement-what-to-know.aspx (Reporting that the new rules would permit migrant children to be held indefinitely, and exempt federal facilities from state licensing agreements.); Caitlin Dickerson, "Trump Administration Moves to Sidestep Restrictions on Detaining Migrant Children," *New York Times*, Sept. 6, 2018, https://www.nytimes.com/2018/09/06/us/trump-flores-settlement-regulations.html?login=email&auth=login-email (Reporting the Trump Administration's proposed withdrawal from the agreement).

[414] Refugee and Immigrant Center for Education and Legal Services of Texas, letter to Cameron Quinn, Officer for Civil Rights and Civil Liberties, Dep't. of Homeland Security, and John V. Kelly, Acting Inspector General, Dep't. of Homeland Security, Mar. 13, 2019, (hereinafter Refugee and Immigrant Center for Education and Legal Services of Texas letter) https://www.raicestexas.org/2019/03/13/raices-urges-ice-to-release-families-currently-detained-in-violation-of-flores-agreement/?ms=raices_tw_hungerstrike.

[415] Ibid., n. 1 stating:

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

Immigrant Center for Education and Legal Services' current Complaint to Office for Civil Rights and Civil Liberties emphasizes that:

> Expert consensus has concluded that even brief detention can cause psychological trauma and induce long-term mental health risks for children. . . . there is no evidence indicating that any time in detention is safe for children." Clinical evidence from the study of detention of unaccompanied, asylum-seeking minors shows "forced detention is associated with a high risk of posttraumatic stress disorder, anxiety disorder, depression, aggression, psychosomatic complaints, and suicidal ideation.[416]

Refugee and Immigrant Center for Education and Legal Services therefore asks the Office for Civil Rights and Civil Liberties "to compel [Immigration and Customs Enforcement] to follow its obligations under *Flores* and release these children to their fathers expeditiously;" and "to investigate other past and present violations of the *Flores* norm of releasing children and parents within 20 days at the Karnes Detention Center," and to "review any written decisions by the Department of Homeland Security to continue detention despite the existing *Flores* requirements and any records documenting changes in Department of Homeland Security policy in adhering to *Flores*."[417]

Immigration and Customs Enforcement is not the only federal actor holding children in its custody for legally impermissible periods of time. Customs and Border Patrol appears, by its own limited,

---

[Refugee and Immigrant Center for Education and Legal Services] does not concede that *Flores* allows [Department of Homeland Security] to detain children at the Karnes Detention Center for 20 days. Rather, [Refugee and Immigrant Center for Education and Legal Services] uses 20 days as a benchmark because this is a timeframe Judge Gee found may be acceptable under *Flores*, specifically when [Department of Homeland Security] acts under extenuating circumstances, in good faith, and with due diligence. *See* Order re Response to Show Cause, *Flores v. Lynch*, Case No. CV 85-04544 DMG (Ex), 10-11 (C.D. Cal. Aug. 21, 2015) ("At a given time and under extenuating circumstances, if 20 days is as fast as Defendants, in good faith and in the exercise of due diligence, can possibly go in screening family members for reasonable or credible fear, then the recently-implemented [Department of Homeland Security] polic[i]es may fall within the parameters of Paragraph 12A of the Agreement.") (emphasis added)

https://www.aila.org/File/Related/14111359p.pdf ; *see also Flores* agreement; Stipulation Extending Settlement Agreement and for Other Purposes; and Order Thereon, *Flores v. Reno*, No. CV 85-4544-RJK (Px), (C.D. Cal. Dec. 7, 2001) (providing guidance on the care and custody of minor non-citizens in government custody); *see also* Order Re Plaintiffs' Motion to Enforce and Appoint a Special Monitor, *Flores v. Sessions*, No. 85-cv-04544-DMG-AGR, 2017 WL 6060252 (C.D. Cal. June 27, 2017), Collectively, Refugee and Immigrant Center for Education and Legal Services refers to these sources of law as the "FSA." It is not Refugee and Immigrant Center for Education and Legal Services' position that the arrival of asylum-seeking families at the southern border is an "extenuating circumstance" that requires the detention of families.").

[416] Refugee and Immigrant Center for Education and Legal Services of Texas letter, p. 3.

[417] Ibid., 7.

disclosed numbers, to have held more than a quarter of the children in its custody longer than the generally-legally permissible 72 hours allowed prior to transferring them to the Office of Refugee Resettlement.[418] Customs and Border Protection has moved children among its facilities before turning them over to Office of Refugee Resettlement.[419] Further, Office of Refugee Resettlement has reportedly held some separated-at-the-border children in its custody for over eighteen months.[420] Office of Refugee Resettlement has also moved children among facilities while having them in its custody,[421] including to its now-closed, "notorious emergency influx facility" of Tornillo, Texas, also known as a "tent city."[422]  Worse yet, as of July 2019, many children who had been court-ordered to be reunified with a parent or allowed to be in the care of a sponsor continue to languish in federal custody.[423]

---

*Indefinite Detention for Children Testimony*

> *"The Flores Settlement would limit the confinement of these children to 20 days in what the settlement calls the least restrictive environment. Children would stay only long enough for contact to be established with their families and friends and they would be placed appropriately. But here, at such places like in Homestead, Florida, and what was at Tornillo, Texas, the stays of these children are as long as ten months, and the children, aged 13 to 17, have the IDs hanging from their necks scanned as they move from place to place, tent to building, in single file."[424]*

> *According to a Complaint filed with [Office for Civil Rights and Civil Liberties] by [**Refugee and Immigrant Center for Education and Legal Services**], migrant parents and children who have been detained beyond the legal limits "provide stark examples as to the absolute necessity of Flores protections which guarantee a child's right to leave detention 'without unnecessary delay':*

---

[418] *Staff Report on Child Separations*, *supra,* note 242, p. 16.

[419] Ibid., p. 19.

[420] Ibid., pp. 17 – 18.

[421] Ibid., p. 19.

[422] Ibid., p. 20.

[423] Ibid., p. 23.

[424] Seiler Testimony, *Public Comment Session*, p. 58.

● _____ *says his 15-year-old son is not accustomed to having his freedom limited. _____explains his son becomes 'sad and desperate' when seeing other families leave the detention center. His son is also sad because he has not been able to speak to his mother or little sister. His son is not eating much and has developed indigestion. _____ is concerned that his son will only become sicker if their detention continues.*

● _____ *'s 5-year-old son has had indigestion, chicken pox, the cold, and a continuous cough since he and his father arrived at the Karnes Detention Center. His son is taking medicine for the cough, but it simply will not go away. His son a coughing fit any time he tries to run and play. When _____'s son had the chickenpox, he and his father were taken to medical isolation for four days. Since they have been detained, _____'s son always tells his dad, 'let's go dad, let's get out of here.'*

● _____ *'s 6-year-old son acts differently than he did before being detained. explained his son 'used to be a very active and friendly boy,' but since their detention his son 'seems very depressed . . . [he] sees and feels the heaviness of this place.' He always wants to cry. _____ believes his son will be traumatized and will have psychological problems. Now that they have been separated between two detention centers, worries even more about his son. _____ is suffering: 'sometimes I feel like my head might explode and I'll suffer an aneurysm,' he says. _____'s son has had stomach aches, a fever, and an allergic rash on his neck, and the medicine he has been given is only temporarily effective.*

● _____ *'s 16-year old son is anxious and distracted from school because of his long detention. His dream is to be a mechanic. He says that in the detention center, 'I cannot concentrate at school and can't stop worrying about what will happen to my father and I.'*[425]

---

Migrant Children Sent to Foster Care

An Associated Press investigation found that migrant children who had arrived with their parents and were separated and sent to private shelters subject to state law have been placed in foster care, and that some deported parents may lose their children to adoption.[426] Although foster care is apt to be much better for migrant children than being detained in a shelter, it can have damaging

---

[425] Refugee and Immigrant Center for Education and Legal Services of Texas letter, p 17.

[426] The Associated Press, "Deported Parents May Lose Kids to Adoption," *NBC News*, Oct. 9, 2018, https://www.nbcnews.com/news/latino/deported-parents-may-lose-kids-adoption-investigation-finds-n918261.

impacts. A 60 Minutes investigation documented some cases of children placed in foster care, including the case of a 5-year old boy from Honduras as follows:

> Immers and his father crossed the border illegally but presented themselves to the Border Patrol and requested asylum. Ever, the father, says he was shot in the back in Honduras, a country at war with gangs and drug cartels. As asylum applicants, they're permitted by law to stay until their hearing, usually in two or three months. Before, most asylum seekers were released at that point, but under the Trump administration they were arrested and charged with a crime. Because children can't be incarcerated, Immers was sent to a foster family in Michigan.[427]

After being in foster care for 73 days, when he was reunited with his mother, Immers was withdrawn and moody, and his mother said, "It felt like he wasn't my son anymore. It felt like a nightmare. Like I was dead."[428] As discussed above, the government may not take custody from a parent without adjudication that the parent is unfit.[429]

Legal Representation of Unaccompanied Minors

According to its website, Office of Refugee Resettlement has the responsibility under law to ensure, "to the greatest extent practicable, that all unaccompanied children in custody have access to legal representation or counsel[.]"[430] However, the government is not specifically required to pay for this representation[431] and the law is not clear on what legal services the government must provide.[432] Under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Department of Health and Human Services was assigned the duty to help unaccompanied

---

[427] Scott Pelley, "The Chaos Behind Donald Trump's Policy of Family Separation at the Border," *60 Minutes*, Nov. 26, 2019, https://www.cbsnews.com/news/trump-family-separation-policy-mexican-border-60-minutes-investigation-greater-in-number-than-trump-administration-admits/.

[428] Ibid. (interview with Gladys).

[429] *County of Sacramento v. Lewis,* 523 U.S. 833, 850 (1998)*; Ms. L v. ICE,* 310 F.Supp.3d 1133, 1143 (S.D. Cal. 2018).

[430] "About the Program," U.S. Dep't of Health and Human Services, Office of Refugee Resettlement, https://www.acf.hhs.gov/orr/programs/ucs/about (accessed May 18, 2019).

[431] Jacob Soboroff and Julia Ainsley, "Federal Funds for Legal Help to Child Migrants at Border Are Running Out," *NBC News*, June 26, 2019, https://www.nbcnews.com/politics/immigration/federal-funds-legal-help-child-migrants-border-are-running-out-n1021976.

[432] Patrick Michels, "The Government Pays for Migrant Children's Lawyers. Challenge the Government, and They Can Lose Their Funding," *Reveal*, Nov. 14, 2018, https://www.revealnews.org/article/th-government-pays-for-migrant-childrens-lawyers-challenge-the-government-and-they-can-lose-their-funding/.

minors receive legal representation.[433] To perform this obligation, Office of Refugee Resettlement funds a grant program for legal service providers, which is administered by the nonprofit Vera Institute of Justice.[434] Though the Vera Institute of Justice runs the majority of Office of Refugee Resettlement's legal aid program and serves 50,000 children a year, the federal grants they receive are not guaranteed and are in increasing danger of getting cut.[435] If their federal funding is cut, unless an unaccompanied minor can independently afford legal representation, children as young as infants will be forced to represent themselves in asylum proceedings.[436]

## Detention of Adults: Oversight and Transparency of Conditions

<u>Lack of Transparency and Incomplete Oversight</u>

In 2015, the Commission reported that:

> Both a lack of binding regulations and standards create confusion and a lack of clarity in the application of detention standards in the immigration detention system. The National Detention Standards 2000 and Performance-Based National Detention Standards 2008 and 2011 are intended to be "contractually binding upon detention facilities used by [Department of Homeland Security] through their incorporation into individual facility contract agreements." Different standards also apply to different facilities depending on when they created their respective contracts with [Immigration and Customs Enforcement]. Additionally, because these standards do not have enforcement mechanisms, facilities are not held accountable when they fail to maintain or meet these standards - at times with tragic results.[437]

At the Commission's public comment session, many also raised concerns about the detention of adults in immigration detention facilities. One category of concern includes internal oversight of detention facilities. The Department of Homeland Security has issued guidance on detention

---

[433] 8 U.S.C. § 1232.

[434] Michels, "The Government Pays for Migrant Children's Lawyers."; "Legal Services for Accompanied Children Overview," *Vera Institute of Justice,* https://www.vera.org/projects/legal-services-for-unaccompanied-children/overview.

[435] Soboroff and Ainsley, "Federal Funds for Legal Help."

[436] Ibid.

[437] 2015 Report, 15.

standards. These standards apply to all detention facilities—including privately contracted detention facilities—and govern detainee care, services provided, and facility operations. The most recent detention standards were issued in 2011 and include standards for medical and mental health services, access to legal services and religious opportunities, communication with detainees with limited English proficiency, the process for reporting and responding to complaints, and recreation and visitation.[438] The Department of Homeland Security provides oversight and accountability through inspections as to whether the facilities are following these detention standards, and at times this is through unannounced inspections.[439] The Office of Inspector General has recently issued a series of extremely troubling reports about detention conditions, sharing photos of serious overcrowding and also reporting prolonged detention in apparent violation of federal detention standards.[440] Congressional visits have confirmed the same.[441]

But according to testimony to the Commission, the majority of these internal inspections are announced beforehand and do not have proper checklists, often overlooking major problems in these facilities.[442] When an inspection does identify a defect in a detention center, the facility is able use a waiver on the issue that gives them the freedom to ignore the problem and not fix it.[443] Furthermore, the Department of Homeland Security Office for Civil Rights and Civil Liberties reported to the Commission that the Office for Civil Rights and Civil Liberties received thousands of complaints about family separation and the conditions of children in detention that they were unable to process except through samples of a small fraction of such complaints, and that the office does not have authority to remedy individual complaints.[444]

---

[438] Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011.*

[439] *See, e.g.*, Dep't. of Homeland Security, Office of Inspector General, *Concerns About ICE Detainee Treatment at Four Detention Facilities*, OIG-19-47, June 3, 2019, https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf (summarizing findings of unannounced inspections of detention facilities).

[440] Dep't. of Homeland Security, OIG-19-51, *Management Alert*.

[441] *See e.g.*, Congressional Hispanic Caucus, "Congressional Hispanic Caucus Leads Investigation at Immigrant Detention Facilities in Texas," press release, July 2, 2019, https://congressionalhispaniccaucus-castro.house.gov/media-center/press-releases/congressional-hispanic-caucus-leads-investigation-at-immigrant-detention; Leigh Ann Caldwell, "Senators Who Visited Border Asked DHS for Improved Care of Migrants," *NBC News*, July 26, 2019, https://www.nbcnews.com/politics/congress/senators-who-visited-border-asked-dhs-improved-care-migrants-n1034806; Molly Hennessee-Fiske, "Q&A: California Congresswoman Describes Tour of Border Patrol Detention Center," *Los Angeles Times*, July 20, 2019, https://www.latimes.com/world-nation/story/2019-07-19/california-congresswoman-describes-tour-of-border-patrol-detention-center.

[442] Mary Small, Policy Director, Detention Watch Network, Testimony, *Public Comment Session,* p. 140.

[443] Ibid., 141.

[444] Deputy Officer, Office for Civil Rights and Civil Liberties, Veronica Venture testified at the Commission's November 2018 briefing on federal civil rights enforcement that Office for Civil Rights and Civil Liberties received thousands of complaints about immigrant family separation and detention, but due to resource constraints, Office of Civil Rights and Civil Liberties is investigating only a small portion (23 out of over 3,000). Veronica Venture,

As reported to the Commission, the problem of transparency in detention facilities stem from many different causes. First, some detention facilities are on federal land, making them not subject to state regulations.[445] Because of this, many employees at detention facilities are not properly vetted.[446]  In addition to little reports getting produced from detention facilities, detention facilities have also sometimes been hostile towards federal and local officials who have attempted to enter these facilities.[447]

*Transparency and Oversight Testimony*

> *"Homestead detention center "has no jurisdiction. While it's called Homestead, it's in a no man's land. It's not actually in Homestead. So even the workers are not being held accountable. They're not screened properly."*[448]

> *"There must be greater transparency and oversight. The current system of announced inspections and toothless [Office of International Health] investigations are not improving the system."*[449]

> *"Immigration and Customs Enforcement "inspections are not independent, they're announced ahead of time. They're based on an inadequate checklist, they're often based on conversations with staff but not people who are*

---

Deputy Officer, Office for Civil Rights and Civil Liberties, Dep't. of Homeland Security, November 27, 2018 Briefing Transcript, unedited, at 125-26; *see also* Ferriss et al., "Homeland Security's Civil Rights Unit."

[445] Hinebauch Statement at 2; *see also* Graham Kates, "Some Detention Centers for Migrant Children Not Subject to State Inspections," *CBS News*, July 5, 2018, https://www.cbsnews.com/news/some-detention-centers-for-immigrant-children-wont-be-subject-to-traditional-inspections/.

[446] *See* Kates, "Some Detention Centers for Migrant Children."

[447] Kathy Hersh, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 7, 2019, at 1 ("Congresswoman Debbie Mucursal-Powell was denied entry for the second time in spite of a federal law which grants automatic access to members of Congress with no notice required… No press, Congressional representation or local officials have been allowed to talk to the children.") (hereinafter Hersh Statement); Vanessa McDougal, Written Statement before the U.S. Commission on Civil Rights, at 1 ("I was not permitted inside the facility, nor was anyone else. Speaking to the Texas Tribune, Tornillo schools Superintendent Rosy Vega-Barrio stated 'we have the same access that the whole world has, which is none.' The facility was surrounded by chain-link fences covered with thick black tarp to make it hard to see in. However, there were holes in the tarp through which I was able to peek.") (hereinafter McDougal Statement).

[448] Francine Tatu Slaton Testimony, *Public Comment Session*, p. 157.

[449]  Detained Migrant Solidarity Committee Statement, at 10 (citing: National Immigrant Justice Center, "ICE's Failed Monitoring of Immigration Detention Contracts"; National Immigrant Justice Center, "Lives in Peril: How Ineffective Inspections Make ICE Complicit in Immigration Detention Abuse.").

*detained. And they consistently fail to identify even well documented deficiencies.*"[450]

*"Over a three-year period, even [Immigration and Customs Enforcement]'s own sub-par inspections found 14,003 deficiencies. [Immigration and Customs Enforcement] imposed financial penalties on its contractor in two instances. But even worse, [Immigration and Customs Enforcement] consistently abuses a waiver process to waive the failed standard rather than address the underlying problem. According to the [Office of the Inspector General], there is almost no protocol for these waivers, 96 percent of which are granted, many of them indefinitely.*"[451]

---

Legal Standard for Medical Care

There is currently an open legal question as to what the standard is for the provision of medical care for adults in immigration detention facilities. The answer to this question turns primarily on the purpose of the detention.[452] In *Youngberg v. Romeo*, the Supreme Court held that where a person's confinement is for the purpose of providing "reasonable care and safety" they are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."[453] Inversely, when a person is detained for criminal acts, the detainment is punitive in nature and the standard of care is held at a lower bar. The majority of courts have held that immigration detention centers are similar in purpose to prisons, and therefore apply the deliberate indifference standard.[454] Courts that liken immigration detention centers to facilities meant for care and safety apply the professional judgment standard.[455] The professional judgement standard is typically used in cases involving defendants who are involuntarily committed to state institutions for intellectual impairment.[456] Those courts that apply the professional judgement standard liken the involuntary nature of those committed to state

---

[450] Small Testimony, *Public Comment Session*, p. 140.

[451] Ibid, 141.

[452] *See Newbrough v. Piedmont Regional Jail Authority*, 822 F. Supp. 2d 558, 575 (E.D. Va. 2011) (stating that the Supreme Court's decision "indicated that differently situated detainees are entitled to different standards of care from their custodians").

[453] *Youngberg v. Romeo,* 457 U.S. 307, 320 n. 27 (1982).

[454] *Charles v. Orange County*, 925 F.3d 73, 85 (2d Cir. 2019).

[455] *Youngberg*, 457 U.S. at 321-22; *see also Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004) (civil detainee awaiting adjudication need not prove "deliberate indifference").

[456] *Youngberg*, 457 U.S. at 321.

institutions for their intellectual impairments to those who are involuntarily confined in state institutions.

The deliberate indifference standard is used in criminal cases involving pre-trial detainees and determines how much medical care personnel must provide while the detainee is in their custody. Under the "deliberate indifference" standard, in order for a detainee to show that personnel have failed to provide adequate treatment, they must (1) show that they had a serious medical need, and (2) show that personnel acted with deliberate indifference to such needs.[457] Personnel's behavior must be so egregious that the court would find that it "shocked the conscience."[458] Need for care must be urgent, meaning the lack of care must result in death, degeneration, or extreme pain.[459] Even under this low standard, the Supreme Court has held that an inmate must also prove that prison officials have violated "contemporary standards of decency."[460] Standards of decency as determined by the courts have changed over time.[461]

To determine the differences between pre-trial detainees and those in question, courts have often examined (1) the purpose of the confinement; (2) the nature of the facility where the individual is confined; and (3) the length of the confinement.[462] Various courts around the country have applied such factors and have sided with both interpretations.

The U.S. Court of Appeals for the 2nd Circuit is among the group of courts that categorizes immigration detention facilities as those similar to prisons, applying the deliberate indifference standard.[463]   Those critical of this interpretation argue that deliberate indifference is a fairly high standard of proof to meet, making it fairly easy for those who may have failed to give care to evade accountability.

---

[457] *Charles*, 925 F.3d at 86-87.

[458] *Id*.

[459] *Id.* at 86.

[460] *Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992).

[461] *See, e.g.*, Michael B. Mushlin, The Rights of Prisoners § 3:13 (5th ed. 2018). For example, in 1994 the Supreme Court extended standards of decency to include protection of a transgender inmate from abuse from other inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners.").

[462] *Patten v. Nichols*, 274 F.3d 829, 840 (4th Cir. 2001).

[463] *See Charles*, 925 F.3d at 85-86.

Performance-Based National Detention Standards 2011 sets forth medical standards for providing care to detainees in Immigration and Customs Enforcement-owned facilities.[464] It provides the following, in relevant part:

- Detainees shall be able to request health services on a daily basis and shall receive timely follow up.

- A detainee who is determined to require health care beyond facility resources shall be transferred in a timely manner to an appropriate facility.

- 24-hour emergency medical and mental health services shall be available to all detainees.

- Detainees with chronic conditions shall receive care and treatment as needed, that includes monitoring of medications, diagnostic testing, and chronic care clinics.

- Prescriptions and medications shall be ordered, dispensed, and administered in a timely manner and as prescribed by a licensed healthcare professional.[465]

Medical Resources and Improper Care

Based on public testimony to the Commission, the state of medical care in federal immigrant detention facilities is highlighted by a lack of medical resources, primarily trained doctors and appropriate medicine.[466] Clinics in detention facilities are often not open when detainees need treatment, and detainees frequently have to wait weeks before they are able to visit the clinic, no matter how urgent the matter.[467] The Commission also received testimony that detention facilities also lack proper medication, and instead resort to providing over-the-counter medications to treat all illnesses.[468] According to public testimony from Human Rights Watch, since March 2010,

---

[464] While Performance-Based National Detention Standards may be acceptable if faithfully and fully implemented, they do not create a basis for a legal claim but may be used by a court to as a guide to minimum detention standards; moreover, any standard must meet Constitutional standards. Jack Rockers and Elizabeth Troutman, "Dangerous Detention: Human Rights Standards and Enforcement in Immigration Detention," *Univ. of North Carolina School of Law, Immigration and Human Rights Policy Clinic*, May 2009, https://www.law.unc.edu/documents/clinicalprograms/dangerousdetention.pdf (discussing 2008 Performance-Based National Detention Standards).

[465] Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011*, 4.3 Medical Care, pp. 257-59.

[466] Project South Statement, at 6-7.

[467] Ibid.

[468] Seiler Testimony, *Public Comment Session*, p. 60; Bedell Testimony, *Public Comment Session*, p. 65.

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

Immigration and Customs Enforcement has reported 80 deaths in adult detention centers.[469] Of those, Immigration and Customs Enforcement completed and released 52 death reviews and determined that inadequate care contributed to 23 of the deaths.[470] Along with having inadequate medication, there are reports that detainees who need daily medication, even if they enter detention facilities with their own medications, have their medications withheld from them without reason.[471] The Commission also received testimony questioning the medical competency of staff in detention centers and whether or not they either have the knowledge on how to care for sick detainees, or if they have the desire to help those in need.[472]

---

*Lack of Medical Care Testimony*

*"They moved me to Essex, another detention center in New Jersey. There, I got very sick one night. My body was swollen. I told the guards that I needed to go to the clinic but they did not take me. They told me that the clinic was closed. When the guards took me to the clinic the next day, I stayed there for a week but the staff only gave me tranquilizers to sleep. They did not diagnose me or treat me."[473]*

*"Irwin employs only two or three on-duty medical staff. . . As a result, outbreaks of illnesses like rashes, flues, and stomach illnesses remain rampant throughout the facility. One detained immigrant at Irwin told us that 'there is a lag time around weeks between the request to visit the medical ward and when you are allowed to visit the medical ward, even if it is an emergency.'"[474]*

---

[469] Jasmine Tyler, Advocacy Director, Human Rights Watch, *Public Comment Session,* p. 153; According to a 2018 Human Rights Watch 2018 report, since March 2010, Immigration and Customs Enforcement has reported a total of 74 adult deaths in immigration detention. "Code Red: the Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention," *Human Rights Watch*, June 20, 2018, https://www.hrw.org/report/2018/06/20/code-red/fatal-consequences-dangerously-substandard-medical-care-immigration.

[470] "Code Red: the Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention," *Human Rights Watch*.

[471] Project South Statement, at 6-7.

[472] Ibid., 7; Human Rights Watch, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, Apr. 12, 2019, at 2 (hereinafter Human Rights Watch Statement).

[473] Robin A. Testimony, *Public Comment Session*, p. 108.

[474] Project South Statement, at 6-7.

*"Doctor was on-site for only a minimal amount of time each week."*[475]

*"Awful health care: one doctor for 1,000 immigrants working 24 hours a week!"*[476]

*"Even when they are able to access healthcare, many detained immigrants at Stewart and Irwin reported that they were only given painkillers in response to serious injuries and illnesses."*[477]

*"[T]he stock [Immigration and Customs Enforcement] sickbay prescription seems to be a Tylenol and water."*[478]

*"Many [detainees] were showing signs of dehydration and, in place of ChapStick, I was forced to prepare Q-Tips with Aquaphor for the cracked and bleeding lips of almost everyone that I talked to."*[479]

### Withholding Medication Testimony

*"Nowhere near enough of the money goes to providing for the care of the people the Government has put in its custody. Medical facilities are severely under-resourced. A client with Type 1 diabetes [name omitted] was hospitalized with diabetic shock after jailers failed to provide the insulin he needed each day."*[480]

*"In addition, immigrants with severe health problems including breast cancer, diabetes, and hypertension have reported not receiving their medication consistently. One detained immigrant at Irwin reported that she did not get her breast cancer medication for 6 weeks when she initially arrived at Irwin even though she had it with her. In addition, her breast*

---

[475] Rabbi Doug Alpert, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 10, 2019, at 1 (hereinafter Alpert Statement).

[476] Suzanne Singer, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 12, 2019, at 1 (hereinafter Singer Statement).

[477] Project South Statement, at 7.

[478] Seiler Testimony, *Public Comment Session*, p. 60.

[479] Bedell Testimony, *Public Comment Session*, p. 65.

[480] Laura Rivera, staff attorney, Southern Poverty Law Center, Testimony, *Public Comment Session,* pp. 92-93.

*cancer medication was randomly stopped for a month afterwards and has not been consistently administered to her."*[481]

*"A man pleaded with me to give him blood pressure medicine, saying that they took his medication in detention."*[482]

### *Competency of Staff in Providing Medical Care Testimony*

*"On the morning that Jose Azurdia died in 2015, an officer at the Adelanto Detention Facility told a nurse Mr. Azurdia was ill and vomiting. The nurse told him 'she did not want to see Azurdia because she did not want to get sick.' This began a series of unconscionable delays for what turned out to be a fatal heart attack."*[483]

*"Violations included . . . delayed and grossly inadequate medical care, including doctors signing off on medical assessments that never happened; and a dentist refusing to fill cavities while suggesting detainees floss with strings pulled from their socks."*[484]

*"Common stories of detention told to us: extreme distress of not feeling they could trust [Immigration and Customs Enforcement] to have their wellbeing in mind through taking blankets from them or not providing blankets in extremely cold holding cells . . . ."*[485]

*"Others report that officers and medical staff at Stewart do not listen to detained immigrants when they complain about their pain and illnesses. One detained immigrant at Stewart noted 'the officers are the ones who can get you to the medical unit, but the problem is that the officers don't listen to you . . . they just don't listen to you or believe that you are in pain.'"*[486]

---

[481] Project South Statement, at 6-7.

[482] Bedell Testimony, *Public Comment Session*, p. 66.

[483] Human Rights Watch Statement, at 2.

[484] Asian Americans Advancing Justice, Written Statement for the Public Comment Session before the U.S. Commission on Civil Rights, May 13, 2019, (quoting Dep't. of Homeland Security, Office of Inspector General, OIG-18-86, *Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California*, Sept. 27, 2018, p. 3 https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-86-Sep18.pdf.

[485] Black Statement, at 1.

[486] Project South Statement, at 7.

Mental Health and Adults

Mental health services are severely lacking in detention facilities, despite the fact that the inherent traumatic nature of detention causes many detainees to suffer in their mental health.[487] The Commission received testimony indicating a lack of mental health professionals for children and adults in detention centers, and that solitary confinement is frequently used to segregate those afflicted with mental illness.[488] Human Rights Watch and Project South submitted testimony and documentation showing that even individuals who have a history of mental illness and suicide attempts have been put in solitary confinement while in detention facilities and tragically, this has led to the deaths of multiple detainees.[489]

---

*Mental Health and Adults Testimony*

> *"Food, hygiene, infrastructure, and healthcare are all substandard, and there is virtually no access to mental healthcare in a setting in which mental illness is a statistical inevitability. Any attempts to protest these conditions are often met with mistreatment, discipline, and punishment through solitary confinement."[490]*

> *"Those suffering serious mental afflictions are placed in handcuffs and helmets and put in solitary confinement . . . Similar fear of segregation bars detained immigrants' access to mental health care at Irwin: instead of receiving any emotional support, detained immigrants suffering from serious mental illnesses are drugged and segregated. Individuals placed on suicide watch are strapped into a straightjacket and placed in solitary confinement."[491]*

---

[487] Government Accountability Project Statement, at 6.

[488] Project South Statement, at 8.

[489] Human Rights Watch Statement, at 2-3; Project South Statement, at 8.

[490] Project South Statement, at 5.

[491] Ibid., 8.

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

*Segregation of Individuals with Mental Illness Testimony*

*"Many of the cases we examined indicate a particularly troubling failure to provide adequate mental health care, as well as the over use of solitary confinement, for people with serious mental health conditions."*[492]

*"JeanCarlo Alfonso Jimenez Joseph, 27, died by suicide at Stewart Detention Center in May 2017. [Immigration and Customs Enforcement] still has not released a death report for him, but the Georgia Bureau of Investigations found he had been in solitary confinement for 19 days as punishment for an act he described as an attempt to harm himself. He was identified as a suicide risk early on, but he was never put on suicide watch nor provided the upward adjustment on his anti-psychotic medication he begged for days before his death."*[493]

*"Efrain Romero de la Rosa, a 40-year-old immigrant detained at Stewart with bipolar disorder died of suicide [i]n July, 2018, after 21 days in solitary confinement. This comes about a year after Jeancarlo Jiménez-Joseph, a 27-year-old immigrant detained at Stewart, died of suicide on May 15, 2017 by hanging himself while in solitary confinement. He had been held in solitary for 19 days. [Immigration and Customs Enforcement] standards require all detained immigrants in solitary confinement to be observed every thirty minutes, and every fifteen minutes (or more often) if they are suicidal. In the hours before his death, officers went over the thirty-minute requirement twice (with forty-six and thirty-two minutes between checks). Further, a private officer logged three visits to Jiménez' cell that never happened. An advocate volunteer attempted to visit Jiménez, at his mother's request, on May 14th but was denied access. Jiménez was a clear suicide risk: he had told nurses that voices were telling him to kill himself, he had been seen banging on the mirror in his cell, and he had jumped off a second-floor walkway in the detention center weeks before. He should have been receiving treatment, not been isolated and forgotten in solitary."*[494]

---

[492] Tyler Testimony, *Public Comment Session*, p. 154.

[493] Human Rights Watch Statement, at 2-3.

[494] Project South Statement, at 8.

Pregnancy

According to testimony, pregnant women in detention are not given appropriate medical care or nutritious diets to support their pregnancies.[495] In December 2017, the Trump Administration pulled back a previous policy that instituted a presumption against detaining pregnant women.[496] In addition, according to testimony, the number of women who have miscarried in Immigration and Customs Enforcement custody nearly doubled from FY 2017 to FY 2018.[497]

---

*Pregnancy Testimony*

*"[T]en women who were detained by [Immigration and Customs Enforcement] while pregnant, suffered inadequate medical care, poor nutrition, in some cases miscarriages, and yet remained detained for no reason other than that [Immigration and Customs Enforcement] chose not to release them."*[498]

*"We had the opportunity to see a woman who was seven months pregnant and almost in her eighth month. She told us she was always very hungry and she'd lost weight in detention. [Immigration and Customs Enforcement] told us that she received a high-protein diet. We learned that the high-protein diet was just an extra piece of bread and cheese in addition to the three daily substandard meals she could barely eat."*[499]

---

Lack of Transparency in Providing Medical Care

The Commission also received testimony that there is little transparency about what goes on in immigration detention centers and those that are privately run are even harder to access and gain

---

[495] Losmin Jiménez, Esq. Project Director, Advancement Project, Testimony, *Public Comment Session,* p. 51.

[496] Maria Sacchetti, "Trump administration Ends Automatic Release From Immigration Detention for Pregnant Women," *Washington Post*, Mar. 29, 2018, https://www.washingtonpost.com/local/immigration/trump-administration-ends-automatic-release-from-detention-for-pregnant-women/2018/03/29/8b6b1bc0-3365-11e8-8abc-22a366b72f2d_story.html?utm_term=.94dc1a6acd18.

[497] Obser Testimony, *Public Comment Session,* p. 135.

[498] Ibid.

[499] Losmin Jiménez Testimony, *Public Comment Session,* p. 51.

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

information from.[500] Commenters were concerned that there is very little official reporting on the state of medical care in these facilities, and detainees have become ill while in these centers with no documentation on what happened to them.[501] In some tragic incidents, detainees have died and their families are not informed what happened to the detainees.[502]

According to Immigration and Customs Enforcement, it operates under requirements to review any instance where an individual dies in Immigration and Customs Enforcement custody to determine if the individual received appropriate health services.[503] Immigration and Customs Enforcement is supposed to make "official notifications to Congress, non-governmental organization (NGO) stakeholders and the media and post[] a news release with relevant details on the public website . . . within two business days, per agency policy."[504] Beginning in Fiscal Year 2018, Congress required Immigration and Customs Enforcement "to make public all reports regarding an in-custody death within 90 days."[505] Per this new public reporting requirement, based on the reports listed on Immigration and Customs Enforcement's website, since March 2018 there have been 12 deaths in Immigration and Customs Enforcement custody.[506]

---

*Deaths while Detained Testimony*

"*José was detained by [Immigration and Customs Enforcement] earlier in January this year . . . [L]ater, his wife found out that he had been placed in a medical facility, and she didn't understand why. No explanation was provided by the officials at [Immigration and Customs Enforcement] . . . It then turns out that he suffered a hemorrhage and entered a coma. Days after, he actually had to be pulled out of life support and he passed away. Within those days, [Immigration and Customs Enforcement] agents then delivered a letter and walked away without an explanation. The letter then*

---

[500] Isabel Sánchez, National Policy Advocate, Coalition for Humane Immigrant Rights, Testimony, *Public Comment Session,* pp. 121-122; Tyler Testimony, *Public Comment Session*, p. 155.

[501] Sánchez Testimony, *Public Comment Session*, pp. 121-122.

[502] Ibid.; Tyler Testimony, *Public Comment Session*, p. 154.

[503] "Death Detainee Report." Dep't. of Homeland Security, Immigration and Customs Enforcement, https://www.ice.gov/death-detainee-report (accessed July 29, 2019).

[504] Ibid.

[505] Ibid.; 164 Cong. Rec. H2551 (March 22, 2018), https://www.congress.gov/crec/2018/03/22/CREC-2018-03-22-bk2.pdf (directing Immigration and Customs Enforcement to comply with H.R. Rep. No. 115-239, at 33 (2017) regarding death-in-custody reporting).

[506] Ibid.

AR00279

*stated that he was now released from custody. Because he was released from custody, no report has been found on what really caused his death.*"[507]

"*[Jeancarlo Alfonso, who died by suicide at Steward Detention Center] had been in solitary confinement for 19 days as punishment for an act he described as an attempt to harm himself. He was identified as a suicide risk early on, but he was never put on suicide watch nor was he provided with the upwards adjustment of his anti-psychotic medication that he begged for four days before his death. No death report has been released.*"[508]

"*Early in 2018, Congress required that [Immigration and Customs Enforcement] publicly release all reporting on each in custody death within 90 days. But [Immigration and Customs Enforcement] has failed to meet this reporting requirement for 2018. Once they finally began to release detainee death reports, these reports were nothing like they had been. They were merely notifications rather than summaries of investigations.*"[509]

"*[Department of Homeland Security]'s own medical and mental health experts whose own investigative reports are referenced . . . are rightly, and deeply, concerned that scientific advice and evidence is being dismissed and ignored with the effect of knowingly endanger children to serve political ends.*"[510]

"*Trauma informed care was implemented only briefly then abandoned. Adequate screening for trauma was never implemented. HQ and facility staff at Dilley failed to develop an adequate plan for typical parenting challenges like two-year-old's biting or hitting peers and instead placed toddlers (with parent) in medical isolation for days. This practice is abusive and demonstrates how medical authority can be subverted in the confusion created by the numerous "authorities" controlling bits of facility operations while answering to Headquarters hundreds of miles away.*"[511]

---

[507] Sánchez Testimony, *Public Comment Session*, pp. 121-122.

[508] Tyler Testimony, *Public Comment Session*, p. 154.

[509] Ibid., 155.

[510] Government Accountability Project Statement, at 2.

[511] Ibid., 7.

Basic Needs: Nutrition, Hygiene and Clothing

Performance-Based National Detention Standards 2011 sets forth food-related standards for detainees in Immigration and Customs Enforcement-owned facilities. It provides the following, in relevant part:

- All detainees shall be provided nutritionally balanced diets that are reviewed at least quarterly by food service personnel and at least annually by a qualified nutritionist or dietitian.

- Detainees, staff, and others shall be protected from harm, and facility order shall be maintained, by the application of sound security practices in all aspects of food service and dining room operations.

- Detainees, staff, and others shall be protected from injury and illness by adequate food service training and the application of sound safety and sanitation practices in all aspects of food service and dining room operations.[512]

The Commission received testimony from advocates and whistleblowers that the quality of food in detention centers is substandard in quality, provides little to no nutritional value, and often has already gone to waste when it is served to detainees.[513] Portions are small and facility staff withhold food as punishment.[514]

The 2011 Performance Based Detention Standard 4.5 Personal Hygiene, "ensures that each detainee is able to maintain acceptable personal hygiene practices through the provision of adequate bathing facilities and the issuance and exchange of clean clothing, bedding, linens, towels and personal hygiene items."[515] It specifically requires that: "Each detainee shall have suitable, clean bedding, linens, blankets and towels;" and "Each detainee shall have sufficient clean clothing that is properly fitted; climatically suitable, durable and presentable;" and that: "Each detainee shall receive, at a minimum, the following items: 1. one bar of bath soap, or equivalent; 2. one comb; 3. one tube of toothpaste; 4. one toothbrush; 5. one bottle of shampoo, or equivalent; and 6. one container of skin lotion."[516]

---

[512] Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011*, II Expected Outcomes, p. 228.

[513] Project South Statement, at 6; Losmin Jiménez Testimony, *Public Comment Session*, p. 53.

[514] Robin A. Testimony, *Public Comment Session*, p. 107; Black Statement, at 1.

[515] Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011*, p. 327

[516] Ibid., 328; *see also supra* note 289 (discussing Trump Administration argument soap not included under "safe and sanity" provisions of the *Flores* agreement).

In contrast to these requirements, public commenters discussed an extreme lack of privacy in detention center, particularly surrounding hygiene and clothing.[517] Shower and toilet areas are often open spaces and used clothes are distributed to detainees still stained from their previous user.[518] In addition, privacy is often violated as detainees are crammed together in small spaces and these spaces are under constant surveillance by facility staff.[519]

---

### *Food in Detention Testimony*

> *"The meals were very small portions and sometimes we were hungry. Many people got sick from the food they gave us."*[520]

> *"What I experienced was the worst experience in my life. I was not allowed to eat for weeks."*[521]

> *"Detained immigrants at Stewart consistently report that food and water conditions at the facility posed serious health risks: meat is rarely served, food is often undercooked or rancid, the quantity of food is insufficient to a point that most detained immigrants experience weight loss, and the water is often green, and has reportedly caused headaches and rashes. At Irwin, all detained immigrants we interviewed unanimously reported finding objects in the food, being forced to eat rancid food, and needing to supplement their diet by purchasing additional food at the commissary. Many detained immigrants at Irwin also reported that they found rocks and nails in their food, and further stated that they experienced significant weight loss since their detention at Irwin."*[522]

---

[517] Singer Statement, at 1; Losmin Jiménez Testimony, *Public Comment Session*, p. 54; Christie Stewart Stein, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 12, 2019, at 1 (hereinafter Stein Statement).

[518] Losmin Jiménez Testimony, *Public Comment Session*, pp. 53 – 54.

[519] Olivia Huerta, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, Apr. 21, 2019, at 6 (hereinafter Huerta Statement); Hernández Statement, at 4.

[520] Robin A. Testimony, *Public Comment Session*, p. 107.

[521] Eduardo Jiménez Testimony, *Public Comment Session*, p. 116.

[522] Project South Statement, at 6.

*"We heard stories of rancid bread, expired food, putrid water, and medicine that seemed like it came from a dollar store."*[523]

*"[L]ack of food, food that had worms or mold; stale and inedible ham and cheese sandwiches; lack of water given and refused upon request; dehydration signs were common especially among the children."*[524]

## Hygiene and Clothing Testimony

*"[W]e heard about people having to wear, because that's what's provided, yellow, dingy, sometimes bloodstained underwear as part of their daily existence at this prison."*[525]

*". . . I was not allowed to bathe. I lost my dignity as a human being there."*[526]

*"I was appalled at the condition of those incarcerated for the crime of seeking asylum. 50 men to a dorm room, sleeping in what can hardly be called beds: flimsy slabs of plywood nailed together as bunk beds, with what could hardly be called mattresses, they were so thin. Open toilets and showers."*[527]

*"Not only are all of the beds in the open, but so are the toilets and showers. There are no curtains, there is no privacy, meaning everyone who's detained has to urinate, defecate and bathe in full view of everyone else."*[528]

*"Simple human dignity is disregarded for instance in the face that there are no doors, and therefore no privacy in the women's bathrooms."*[529]

---

[523] Losmin Jiménez Testimony, *Public Comment Session*, p. 53.

[524] Black Statement, at 1.

[525] Losmin Jiménez Testimony, *Public Comment Session*, p. 53.

[526] Eduardo Jiménez Testimony, *Public Comment Session*, p. 116.

[527] Singer Statement, at 1.

[528] Losmin Jiménez Testimony, *Public Comment Session*, p. 54.

[529] Stein Statement, at 1.

*"[T]here was merely a giant room with sixty bunk beds out in the open in which everyone slept. . . The people imprisoned at this facility had to sleep, eat, bathe, and relieve themselves all in the same giant open room."*[530]

*"The dorm areas consist of pods. In the center of each pod sits a tower of sorts, that is about 9-10 feet in height and contains an area for a staff member to watch over the dorms located on either side of the pod. This offers whoever is sitting in the watch tower an opportunity to view who is showering as the showers are only a little over 6-7 feet in height and are located behind a desk that a staff member sits and watches the common area. Women have complained of 'cameras' watching them in the showers. I wasn't sure how this was ethical or possible but I believe this is the 'cameras' they speak of."*[531]

*"In the compound, there was no library - no place to sit by yourself.  No corners with beanbags or couches.  There is no way to escape constantly being surrounded by your peers and the ever-present teachers and guards. There is no place to pray and no access to spiritual or religious services. The children ask for more phone calls to family and for a chance to go to church to practice their faith or to have religious and spiritual comfort."*[532]

*"I saw children held at the Franklin Institute who were under constant (24-hour) direct surveillance and were being cared for in a facility with bards [sic] on the doors and windows. And I saw adult men, fleeing from desperate situations, treated like animals."*[533]

---

Prison-like Conditions in Facilities

The Commission also received testimony that the overall conditions detention facilities are like prisons,[534] where individuals in detention are stripped of their humanity and often treated like prisoners, even those who are legally trying to claim asylum.[535] In addition, individuals who are

---

[530] Losmin Jiménez Testimony, *Public Comment Session*, p. 54.

[531] Huerta Statement, at 9.

[532] Hernández Statement, at 3.

[533] Wechterman Statement, at 1.

[534] Carmen Werder, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 13, 2019, at 1 (hereinafter Werder Statement).

[535] Wechterman Statement, at 1.

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

detained are only able to work for $1 a day while, advocates argue, the private corporations who own the private facilities make thousands of dollars from the U.S. government for detaining these individuals.[536] Individuals in detention are also forced to spend money on basic goods and food at commissary for inflated prices, and it is almost impossible for them to see visitors.[537] In addition, the Department of Homeland Security Inspector General has published reports of extreme overcrowding in Border Patrol migrant holding facilities,[538] which may also be cause for constitutional concerns.[539]

*Working Conditions Testimony*

> "[D]etainees are forced to work for $1 a day to maintain the facility while GEO Group pockets the profits. Detainees are forced to purchase their every need at inflated prices. The system for allowing visitors is unnecessarily complicated and utterly inflexible which leaves detainees isolated and in despair. Some detainees have become so desperate they have gone on hunger strike, and one detainee has died."[540]

> "A local immigration attorney, who has a detailed understanding of the conditions there [at Northwest Detention Center], simply refers to it now as the Northwest Detention 'prison.' The people being held are having to eat disgusting food and are working for a despicable $1 a day while having to buy any necessities from the on-site store at unreasonably high prices. They are unable to sustain even a minimal level of cleanliness, not to mention what it is doing to their basic sense of humanity."[541]

> "We saw people in detention . . . working to clean, to paint, to cook, to landscape in the hot desert sun. These voluntary jobs are paid $1 a day while the corporation gets over $73 a day from [Immigration and Customs Enforcement]."[542]

---

[536] Werder Statement, at 1; Human Rights Watch Statement, at 3.

[537] Werder Statement, at 1.

[538] Dep't. of Homeland Security, OIG-19-51, *Management Alert*.

[539] *See Gates v. Collier*, 501 F.2d 1291, 1300 (5th Cir. 1974) (describing facilities that were in such disrepair they created a fire hazard); and *Pugh v. Locke*, 406 F. Supp. 318, 322, 325 (M.D. Ala. 1976) (finding that overcrowding may exacerbate other prison conditions).

[540] Stein Statement, at 1.

[541] Werder Statement, at 1.

[542] Losmin Jiménez Testimony, *Public Comment Session*, p. 53.

<u>Solitary Confinement as Punishment</u>

According to the Performance-Based National Detention Standards 2011 standards, as revised in 2016, individuals in detention may be placed in what it terms the Special Management Unit, colloquially known as solitary confinement, for administrative, protective, or disciplinary reasons.[543] Among other parameters, disciplinary segregation is only allowed "when alternative dispositions may inadequately regulate the detainee's behavior;" health care personnel are to conduct, at minimum, a daily assessment of detainees; and detainees can only be held in disciplinary segregation for 30 days "except in extraordinary circumstances."[544]

The Commission received testimony that solitary confinement is frequently used as punishment in immigration detention facilities.[545] Solitary confinement causes harm to individuals in detention and is likely to be disproportional to legitimate security needs.[546] According to testimony, solitary confinement was used as punishment for infractions as small as hugging and comforting one another.[547]   Also, individuals in detention have been sexually and physically abused while in solitary confinement.[548]

---

[543] Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011*, 2.12 Special Management Units, p. 171 (incorporating revisions on the basis of ICE Directive 11065.1: Review of the Use of Segregation for Immigration and Customs Enforcement Detainees, Sept. 4, 2013, https://www.ice.gov/doclib/detention-reform/pdf/segregation_directive.pdf). The revisions to the Performance-Based National Detention Standards for solitary confinement were described in a Dep't. of Homeland Security report to Congress on the progress of implementing the Performance-Based National Detention Standards at detention facilities. *See* Dep't. of Homeland Security, *Progress in Implementing 2011 PBNDS and DHS PREA Requirements at Detention Facilities, Fiscal Year 2017 Report to Congress*, Mar. 19, 2018, p. 7, https://www.dhs.gov/sites/default/files/publications/ICE%20-%20Progress%20in%20Implementing%202011%20PBNDS%20Standards%20and%20DHS%20PREA%20Requirements_0.pdf (hereinafter Dep't. of Homeland Security, *Progress in Implementing 2011 Performance-Based National Detention Standards, Report to Congress*).

[544] Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011*, 2.12 Special Management Units, p. 172.

[545] Huerta Testimony, *Public Comment Session*, p. 129; Detained Migrant Solidarity Committee Statement, at 5.

[546] Spencer Woodman, Maryam Saleh, Hannah Rappleye, Karrie Kehoe, "Solitary Voices: Thousands of Immigrants Suffer in Solitary Confinement in ICE Detention," *The Intercept*, May 21, 2019, https://theintercept.com/2019/05/21/ice-solitary-confinement-immigration-detention/.

[547] Ibid.

[548] Huerta Testimony, *Public Comment Session*, p. 129; Detained Migrant Solidarity Committee Statement, at 4; Eduardo Jiménez Testimony, *Public Comment Session*, p. 117.

*Solitary Confinement Testimony*

"Just like [Department of Homeland Security][Office of the Inspector General], [Detained Migrant Solidarity Committee] found that [Otero County Processing Center] staff:  make inappropriate retaliatory use of solitary confinement; often do not explain to detained individuals the reason they are being disciplined; and verbally assault, harass, and abuse individuals detained at the facility."[549]

"They [detained women] have told me that there is a very strict policy for no touching, and if they do touch each other, even if it's just a hug, they're put in solitary confinement where, in solitary confinement, some of these women have claimed that they have been raped which is very disturbing."[550]

"When individuals complained about the chronic sexual harassment, facility staff placed the victims in solitary confinement and threatened others with similar isolation if they spoke up. [Advocate Visitors with Immigrants in Detention] volunteers are currently visiting two of the transgender women detained at [Otero County Processing Center], and both are held in solitary to this day. Neither individual is receiving the hormone therapy they have repeatedly request."[551]

"When I appeared in front of an immigration judge, I was handcuffed, I had chains on my waist and on my feet. I was treated as a criminal. When I testified, when I said what happened to me, [Immigration and Customs Enforcement] punished me. They put me in solitary confinement with people who don't even have good mental health. They tortured people in front of my. They broke their arms, and they threatened me, telling me that if I said something there were going to do the same thing to me."[552]

---

[549]  Detained Migrant Solidarity Committee Statement, at 4.

[550]  Huerta Testimony, *Public Comment Session*, p. 129.

[551]  Detained Migrant Solidarity Committee Statement, at 5.

[552]  Eduardo Jiménez Testimony, *Public Comment Session*, p. 117.

AR00287

<u>Sexual Violence and Application of Prison Rape Elimination Act to Detention Facilities</u>

The Prison Rape Elimination Act of 2003[553] protects prisoners/detainees against sexual abuse and assault while in prison or detention.[554] The Prison Rape Elimination Act also protects those detained at immigration detention centers.[555] On March 7, 2014, Department of Homeland Security implemented the Prison Rape Elimination Act[556] by issuing a Final Rule entitled "Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities."[557] The Final Rule provided "provisions spann[ing] eleven categories . . . to discuss and evaluate prison rape elimination standards; prevention planning, responsive planning, training and education, assessment for risk of sexual victimization and abusiveness, reporting, official response following a detainee report, investigations discipline, medical and mental care . . . [etc.]."[558]

Department of Homeland Security, Prison Rape Elimination Act regulations for Immigration and Customs Enforcement (codified at 6 CFR Pt. 115, Subpart A) (which applies to Immigration and Customs Enforcement as well as Contracted Detention Facilities), Section 115.11 mandates that:

(a)  The agency shall have a written policy mandating zero tolerance toward all forms of sexual abuse and outlining the agency's approach to preventing, detecting, and responding to such conduct.

(b)  The agency shall employ or designate an upper-level, agency-wide Prevention of Sexual Assault Coordinator (PSA Coordinator) with sufficient time and authority to develop, implement, and oversee agency efforts to comply with these standards in all of its immigration detention facilities.

(c)  Each facility shall have a written policy mandating zero tolerance toward all forms of sexual abuse and outlining the facility's approach to preventing, detecting,

---

[553] Prison Rape Elimination Act of 2013, Pub. L. No 108-79, 117 Stat 972 (codified at 42 U.S.C. § 15601).

[554] *Id.*; *see also* "National Prison Rape Elimination Commission Report," *National Prison Rape Elimination Commission*, June 2009, https://www.ncjrs.gov/pdffiles1/226680.pdf (hereinafter National Prison Rape Elimination Commission June 2009 Report).

[555] "National Prison Rape Elimination Commission June 2009 Report," p. 176.

[556] *See* 2015 Statutory Report, pp. 68-71 (discussing the complete regulatory history regarding the implementation of the Prison Rape Elimination Act).

[557] Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities, Final Rule, 79 Fed. Reg. 13,100 (March 7, 2014) (codified at 6 C.F.R. § 115.)

[558] *Id.*

and responding to such conduct. The agency shall review and approve each facility's written policy.[559]

In May 2014, Immigration and Customs Enforcement issued a revised Directive on Sexual Abuse and Assault Prevention and Intervention that was built from the requirements of the 2011 Performance Based National Detention Standards on Sexual Abuse and Assault Prevention.[560] The combination of these regulations along with other Immigration and Customs Enforcement policies regarding staff responsibilities is supposed to "ensure an integrated and comprehensive system of preventing and responding to sexual abuse or assault of individuals in Immigration and Customs Enforcement."[561] Consistent with Prison Rape Elimination Act requirements, Immigration and Customs Enforcement's policies, specifically Performance-Based National Detention Standards 2011 and the 2014 Directive, mandate zero tolerance for all forms of sexual abuse and assault.

As the Commission noted in its 2015 Report, "[a]lthough in some cases [Immigration and Customs Enforcement] finds that some contract detention facilities already incorporate many of [the Prison Rape Elimination Act]'s standards, [Department of Homeland Security] does not have the legal power to coerce facilities into complying with [Prison Rape Elimination Act] standards without altering existing contractual obligations."[562] As an Immigration and Customs Enforcement representative stated at the time, "With respect to the private contractor facilities . . . all of them are not yet governed contractually by [Prison Rape Elimination Act] in that [Prison Rape Elimination Act] is rolled out gradually. It has to be applied through contract modifications. It is not immediately applicable to our private contract facilities[.]"[563] In March 2018, Immigration and Customs Enforcement reported that it implemented Prison Rape Elimination Act standards through contract modifications at all detention facilities that exclusively hold Immigration and Customs Enforcement-detainees and at 11 facilities that do not exclusively hold Immigration and Customs Enforcement-detainees.[564]

---

[559] 6 C.F.R § 115.11 (2014).

[560] *See* Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011*; ICE, *Directive No. 11062.2*: *Sexual Abuse and Assault Prevention and Intervention*, May 22, 2014, http://www.ice.gov/doclib/detention-reform/pdf/saapi2.pdf (hereinafter Immigration and Customs Enforcement, *Directive No. 11062.2*: *Sexual Abuse and Assault*).

[561] Immigration and Customs Enforcement, *Directive No. 11062.2*: *Sexual Abuse and Assault*.

[562] 2015 Report, p.75.

[563] 2015 Report, pp. 85–86.

[564] *Progress in Implementing 2011Performance-Based National Detention Standards, Report to Congress*, p. 11.

Allegations of Sexual Abuse

According to a Freedom of Information Act request as part of a 2018 investigation by *The Intercept*, the Department of Homeland Security Office of Inspector General provided 1,224 complaints (out of approximately 33,000) of abuse that took placed in Immigration and Customs Enforcement custody from January 2010 to September 2017.[565] According to *The Intercept*:

> But the sheer number of complaints as well as the patterns they reveal about mistreatment in facilities nationwide — suggest that sexual assault and harassment in immigration detention are not only widespread but systemic and enabled by an agency that regularly fails to hold itself accountable. While the reports obtained by The Intercept are only a fraction of those filed, they shed light on a system that operates largely in secrecy, and they help hint at the magnitude of the abuse, and the incompetence and complicity of the agency tasked with the safety of the 40,000 women, men, and children it detains each day in more than 200 jails, prisons, and detention centers across the country.[566]

In response to the article, Immigration and Customs Enforcement told *The Intercept* it had received 1,448 allegations of sexual abuse between fiscal years 2012 and March 2018, including 103 recorded so far for fiscal year 2018 (starting in October 2017).[567]

According to testimony, sexual violence is a problem in detention facilities and it is perpetrated by facility staff and detainees alike.[568] Many individuals in detention do not report incidents of sexual violence for fear of retaliation and punishment.[569] In 2017, according to written testimony, there were 237 allegations of sexual abuse in detention facilities.[570]

---

[565] Alice Speri, "Detained, Then Violated," *The Intercept*, Apr. 11, 2018, https://theintercept.com/2018/04/11/immigration-detention-sexual-abuse-ice-dhs/.

[566] Ibid.

[567] Ibid.

[568] Huerta Statement, at 2; Project South Statement, at 10 (quoting a male immigrant from El Salvador).

[569] Nancy Hernández Statement, at 2.

[570] Helen McDonald, Domestic and Sexual Violence Advocate, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 13, 2019, at 1 (citing data on sexual and physical assault obtained from a Dep't of Homeland Security, Office of the Inspector General, Freedom of Information Request).

*Sexual Violence Testimony*

> *"Sexual violence is about power and control. That the U.S. government is allowing – and by the virtue of allowance, encouraging – paid staff to sexually violate women and children demonstrates the lack of scruples this administration and this nation has employed towards the most vulnerable peoples."*[571]

> *"From a person I pardoned out of detention, she stated that several women had been sent to isolation where they were raped by staff. It is unknown to me whether this was by male or female staff specifically."*[572]

> *"'They said they were going to pursue charges against the men who raped me, but I never received notice that charges had been filed. I heard wails in the middle of the night in the male dorms, and I believe other men were being raped. Everyone knew what was going on, but they just made louder sounds to cover the noise up. What's really sad is that no matter what you do, you push the button in the room, those officers will take their sweet time. Something awful could be happening in those rooms, and those officers will take their time. I have never seen anything like that. It's horrible.'"*[573]

<u>Abuse of Authority</u>

The Commission also received public comments relaying that employees in detention facilities reportedly used their position of power to humiliate individuals in detention and treat them like prisoners even though many of them are legally in the United States to claim asylum.[574] According to testimony, detention facility staff abuse their power to punish detainees and use psychological tactics that bring distress to detainees.[575]

---

[571] Ibid.

[572] Huerta Statement, at 9.

[573] Project South Statement, at 10 (quoting a male immigrant from El Salvador).

[574] Robin A. Testimony, *Public Comment Session*, p. 106; Asian Americans Advancing Justice Statement, at 2 (citing Garance Burke and Martha Mendoza, "ICE Force-feeding Detainees on Hunger Strike," *AP News*, Jan. 31, 2019, https://apnews.com/c4b201dac8bf48eba17485a5c357b810; Sunita Sohrabji, "Hundreds of Sikh Asylum Seekers Housed in Victorville Federal Prison Illegally Banned From Wearing Turbans," *India West*, July 30, 2018, https://www.indiawest.com/news/global_indian/hundreds-of-sikh-asylum-seekers-housed-in-victorville-federal-prion/article_cfb6f080-9425-11e8-811b-5b3bfd2ed928.html).

[575] Seiler Testimony, *Public Comment Session*, p. 61.

AR00291

Furthermore, emerging news reports about thousands of Border Patrol officers being members of a Facebook page that included posts with anti-immigrant rhetoric (with reportedly "racist, sexist and violent images"), disparaging Latino families being separated and migrants who have died in the agency's custody, give rise to concerns about a culture of xenophobia, racism, and sexism among Border Patrol personnel.[576] High-level Border Patrol officials reportedly knew about this Facebook page and its contents for "as many as three years," but did not initially investigate based on the belief that the statements may be protected based on the employees free speech rights.[577] Anti-discrimination laws and policy protect migrants from discrimination based on race or national origin, and if the members of the Facebook group discriminated against Latin American migrants, they should be held accountable.[578] Border Patrol has opened investigations into members of the Facebook group.[579]

---

*Misuse of Authority Testimony*

> *"The people who are detained there for immigration purposes are treated exactly the same way as people who are there serving their criminal sentence. There is no distinction."[580]*

> *"The guards humiliated us. We had to strip in front of one another and put prison clothes on. The officers laughed and made fun of us."[581]*

> *"[There are] ice boxes, where detainees are sent to windowless rooms in freezing temperatures to try to get them to waive their claim to asylum."[582]*

---

[576] *See, e.g.*, A.C. Thompson, "Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes," *ProPublica*, July 1, 2019, https://www.propublica.org/article/secret-border-patrol-facebook-group-agents-joke-about-migrant-deaths-post-sexist-memes#; Reis Thebault and Nick Miroff, "CBP Officials Knew About Derogatory Facebook Group Years Ago and Have Investigated Posts From It Before," *Washington Post*, July 5, 2019, https://www.washingtonpost.com/nation/2019/07/06/cbp-officials-knew-about-derogatory-facebook-group-years-ago-have-investigated-posts-it-before/?utm_term=.704be7a3727d.

[577] Thebault and Miroff, "CBP Officials Knew About Derogatory Facebook."

[578] *See* Dep't. of Justice, *Guidance for Federal Law Enforcement Agencies*.

[579] Ginger Thompson, "Revelations About a Secret Facebook Group Spawn Investigation of 70 Current and Former Border Patrol Employees," *ProPublica*, July 15, 2019, https://www.propublica.org/article/revelations-about-a-secret-facebook-group-spawn-investigation-of-70-current-and-former-border-patrol-employees.

[580] Jimiénez Testimony, *Public Comment Session*, p. 54.

[581] Robin A. Testimony, *Public Comment Session*, p. 106.

[582] Wadhwa Testimony, *Public Comment Session*, p. 78.

*"There is also the issue of psychological mistreatment; of guards who speak Spanish but refuse to speak in detainees' language; of the isolation of detained women who speak only indigenous languages; the prohibitions against detained women touching one another, even to hug or braid each other's hair . . ."*[583]

*"Violations included improper and overly restrictive use of solitary confinement, including placing detainees in disciplinary segregation without a hearing. . ."*[584]

*"South Asian asylum seekers protesting their prolonged detention by going on hunger strike have been retaliated against with solitary confinement and abusive forced-feeding practices. South Asian and Sikh detainees have also been denied religious accommodation, including being banned from wearing their turbans, being forced to cut their hair, and not being provided with vegetarian or vegan meals."*[585]

---

Treatment of LGBT Individuals

The 2011 Performance-Based National Detention Standards also enhanced medical standards related to preservation of LBGT detainees' rights and, in particular, the dignity of LGBT immigrant detainees. Below are some of the standards relating to custody classification, body cavity search, medical and mental health screening of new arrivals, and medical care:

•   When making classification and housing decisions for a transgender detainee, staff shall consider the detainee's gender self-identification and an assessment of the effects of placement on the detainee's mental health and well-being. A medical or mental health professional shall be consulted as soon as practicable on this assessment. Placement decisions should not be based solely on the identity documents or physical anatomy of the detainee and a detainee's self-identification of his/her gender shall always be taken into consideration as well. Placement shall be consistent with the safety and security considerations of the facility.[586]

---

[583] Seiler Testimony, *Public Comment Session*, p. 61.

[584] Asian Americans Advancing Justice Statement, at 3; Dep't. of Homeland Security, OIG-18-86, *Management Alert*, p. 3 https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-86-Sep18.pdf.

[585] Asian Americans Advancing Justice Statement, at 2.

[586] Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011*, p. 73.

AR00293

- Whenever possible, transgender detainees shall be permitted to choose the gender of the staff member conducting a body-cavity search.[587]

- Inquire into a transgender detainee's gender self-identification and history of transition-related care when a detainee self-identifies as transgender.[588]

- Transgender detainees who were already receiving hormone therapy when taken into Immigration and Customs Enforcement custody shall have continued access to treatment. All transgender detainees shall have access to mental health care, and other transgender related health care and medication based on medical need. Treatment shall follow accepted guidelines regarding medically necessary transition-related care.[589]

According to testimony, LGBT individuals, particular transgender individuals in detention, have been discriminated against by facility employees and other detainees.[590] Human Rights Campaign told the Commission that LGBT individuals have been victims of sexual, physical and verbal abuse.[591] They are denied necessary hormone treatment, and face humiliating circumstances in front of other detainees.[592]

The Commission heard testimony about how assaults against LGBT individuals often go unreported for fear of punishment or retaliation.[593] Guidelines were provided to detention facilities on how to care for transgender individuals while they are detained, but according to testimony they are frequently ignored.[594] In addition, transgender individuals are detained for twice as long as the average detainee and one in eight transgender individuals has been placed in solitary confinement.[595] Immigration and Customs Enforcement has reported that transgender individuals account for as little as 0.1% of all detainees, but account for 12% of all sexual assaults reported in

---

[587] Ibid., 72.

[588] Ibid., 289.

[589] Ibid., 296.

[590] Ishalaa Ortega, Activist, Immigration Equality, Testimony, *Public Comment Session,* p. 85.

[591] Ibid., 88.

[592] Human Rights Campaign, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 13, 2019, at 4 (hereinafter Human Rights Campaign Statement).

[593] Ibid., 3.

[594] Sara Hallock, College Student, University of California, Los Angeles, *Public Comment Session,* pp. 144-145.

[595] Ibid., 145-146.

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

detention centers.[596] The Prison Rape Elimination Act has special provisions for the protection of LBTQ individuals, including transgender individuals.[597]

---

*Treatment of Transgender Detainees Testimony*

*"Transgender people are exposed to the verbal and physical abuse of other inmates and officers."[598]*

*"First, I was taken into a little room, where a female officer touched me everywhere. Then she went to bring in male officers, who touched my genitalia area over and over again, trying to find out if I underwent sex reassignment surgery without believing the information I provided them."[599]*

*"They asked me about my health and gender identity. I told him I was a transgender woman. Then he asked, are you afraid of being in the male bunk? I said, yes. Then, he told me don't say that or I will have to put you in solitary confinement."[600]*

*"Inside the prison, they call everybody by their last name but transgender people are called by their first name so just to make sure to let everybody know our first name, which usually legally is a male name."[601]*

*"[Roxsana] Hernández (a transgender woman) traveled to the United States in 2018, seeking asylum. She would die just weeks later in [Immigration and Customs Enforcement] custody. [Immigration and Customs Enforcement] officials denied responsibility for the woman's death, but autopsy reports would confirm that before she died, Hernández was subject to "blows, and/or kicks, and possible strikes with a blunt object." Her wrists showed injury from use of handcuffs and there were contusions on her back and ribcage. In addition to the physical abuse she was subject to, fellow migrants from her caravan stated that Hernández had*

---

[596] Ibid., 145.

[597] Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities, Final Rule, 79 Fed. Reg. 13,100 (March 7, 2014) (codified at 6 C.F.R. § 115).

[598] Ortega Testimony, *Public Comment Session*, p. 88.

[599] Ibid., 85.

[600] Ibid., 87.

[601] Ibid.

*been placed in an 'icebox,' a holding cell which received its name because of the low temperatures detainees were forced to endure once inside."*[602]

*"In detention [transgender detainee] suffered significant physical illness, yet despite requesting medical attention six times, was unable to see a doctor until her lawyer intervened."*[603]

*"Transgender immigrants are also routinely denied hormone-treatment in [Immigration and Customs Enforcement] custody, leading them to experience withdrawal and other severe physical symptoms, such as suicidal ideation and gender dysphoria."*[604]

### Physical and Sexual Assaults of LGBT Testimony

*"Noelia (identifies as a gay man) was detained in a private detention center for six months in Georgia, where he experienced sexual harassment and assault that he said was 'happening every day.' On one frightening occasion, he was sexually assaulted in a bathroom by several other men. Afraid of being placed in solitary confinement or disbelieved by staff, Noelia did not report the assault right away. When Noelia worked up the courage to share his story with a psychologist, his claim was marked 'unsubstantiated' and he received no assistance."*[605]

*"Despite identifying as a woman, she was housed in an all-male unit in the detention center. While there, Guzmán-Martínez was continuously harassed and then sexually abused by a guard under threat of deportation. Although she reported the officer, she remained in the same unit and was sexually assaulted by a male detainee less than a year later. This time, Guzmán-Martínez was afraid of retaliation and like other detainees in her position, waited to report the incident."*[606]

*"In 2015, [Immigration and Customs Enforcement] released the Transgender Care Memorandum which provided a guideline for [Immigration and Customs Enforcement] officials to adhere to when*

---

[602] Human Rights Campaign Statement, at 4.

[603] Amnesty International, Written Statement for Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, Apr. 12, 2019, at 1 (hereinafter Amnesty International Statement).

[604] Human Rights Campaign Statement, at 4.

[605] Ibid., 2.

[606] Ibid., 3.

> *detaining and processing transgender immigrants. . . The memo states in the beginning that detainees should not be housed in solitary confinement for more than 72 hours but contradicts itself later on to say that transgender detainees may be housed . . . in general housing with their biological sex, in general housing consistent with their gender identity, in protective custody, solitary confinement, or medical or administrative segregation, also forms of solitary confinement.*"[607]

> *"Executive Order Enhancing the Public Safety in the Interior of the US, signed in January 2017, outlines that [Immigration and Customs Enforcement] is no longer supposed to be giving any special protections to vulnerable populations that are being detained in their facilities. It is fair to assume that even the most limited protections outlined in the Transgender Care Memorandum are no longer being practiced by [Immigration and Customs Enforcement] officials in an effort to discontinue the wasting of resources.*"[608]

---

Due Process

The Commission heard many concerns over the violation of detainees' basic due process and civil rights. Like undocumented immigrants in the U.S., these detainees retain basic civil rights as well as substantive due process rights granted to them by the U.S. Constitution.[609] In *Zadvydas v. Davis*,[610] the Supreme Court acknowledged that "indefinite detention" posed a "serious constitutional problem" given a non-citizen's due process rights.[611] In that case, the Court determined that "unless it is imposed as punishment in a criminal proceeding" or "in certain special and narrow non-punitive circumstances" it was wrong to impose indefinite detention.[612] Except in such narrow circumstances, the Court determined that it was unreasonable to detain undocumented

---

[607] Hallock Testimony, *Public Comment Session*, pp. 143-44.

[608] Ibid., 145.

[609] Leslie Brown, Co-Organizer, Teachers Against Child Detention, Written Statement for Public Comment Session before the U.S. Commission on Civil Rights, May 12, 2019, 1 (hereinafter Brown Statement).

[610] *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

[611] *Id.*; *see also* Project South Statement, at 2.

[612] *Zadvydas*, 533 U.S. at 690.

immigrants for over six months.[613] In addition, detainees' Eighth Amendment rights are violated by imposing onto them unreasonably high bonds.[614]

---

*Due Process Testimony*

> *"I strongly emphasize to you that the mass incarceration of asylum seekers, families, unaccompanied minors, and their children, which is occurring without due process and without basic child protection and welfare standards being enforced, is a violation not only of their civil rights, but their basic human rights."*[615]

> *"One of the things I teach my law students and future lawyers is that the Undocumented have human rights because they are human beings. These rights are all set out here in the Universal Declaration of Human Rights."*[616]

> *"Many immigrants at Stewart and Irwin (detention centers in Georgia) have been detained without a reasonable prospect of securing release or even deportation for years on end. The immigration courts at Stewart and Irwin are also notorious for setting prohibitively high bonds for detained immigrants, effectively precluding any possibility for release, and curtailing their Eighth Amendment right to a reasonable bond. At least one detained immigrant we interviewed reported that his bond was set at $10,000, an unaffordable rate for that individual, as well as for most persons who are likely to be held at Stewart and Irwin."*[617]

---

Length of Stay in Detention Facilities & Withholding Release

As discussed above, in *Zadvydas v. Davis*, the Supreme Court held that "unless it is imposed as punishment in a criminal proceeding" or "in certain special and narrow non-punitive

---

[613] Project South Statement, at 2.

[614] Ibid., 3.

[615] Brown Statement, at 1.

[616] Francis Boyle, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 10, 2019, at 1 (hereinafter Boyle Statement).

[617] Project South Statement, at 3.

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

circumstances" it was wrong to impose indefinite detention.[618] Except in such narrow circumstances, the Court determined that it was unreasonable to detain undocumented immigrants for over six months.[619] Most detainees in immigration detention facilities are held in prison like conditions with no idea when they will be released.[620] The Commission received testimony that at privately owned, for-profit detention facilities, there is monetary incentive to detain immigrants for as long as possible.[621]

---

*Indefinite Detention of Adults Testimony*

> "At the time of their detentions, [Immigration and Customs Enforcement] was detaining nearly 100 percent of all parole requests for asylum seekers with credible claims across five of its busiest field offices. Just five years ago though, these same offices were granting upwards of 90 percent of these parole requests in accordance with a 2009 policy. The report concluded in June 2018 that these blanket parole denials violated [Immigration and Customs Enforcement]'s own policies."[622]

> "Whereas the 2016 [Immigration and Customs Enforcement] policy presumed release for most pregnant women, the Agency superseded that policy with a March 2018 directive ending all presumption of their release and eliminating stricter oversight of their care and regular review of their custody."[623]

> "They are prisoners. Although they have committed no crime, they live under conditions considerably worse than any other prisoners. There are no regular visits. They cannot send or receive mail. They have no idea about the length of their sentence. And we have learned from interviews with released children, they are threatened with more time, longer prison terms if they misbehave."[624]

---

[618] *Zadvydas*, 533 U.S. at 690 (citing *United States v. Salerno*, 481 U.S. 739, 746 (1987) and *Foucha v. Louisiana*, 504 U.S. 74, 80 (1992)).

[619] *Id.*

[620] Seiler Testimony, *Public Comment Session*, p. 58.

[621] Howell Statement, at 2.

[622] Krishnaswami Testimony, *Public Comment Session*, p. 126.

[623] Obser Testimony, *Public Comment Session*, p. 135.

[624] Seiler Testimony, *Public Comment Session*, p. 58.

*"This vague guidance about how long families can be detained is concerning and has the potential to impose long-lasting trauma on detained children and their parents."*[625]

---

## Legal Representation in Immigration Proceedings

The Fifth Amendment to the U.S. Constitution mandates that "no person . . . shall be deprived of life, liberty, or property. . ." without due process of law.[626] According to *Reno v. Flores*, "[i]t is well established that the Fifth Amendment entitles" noncitizens "to due process of law in deportation proceedings."[627] Additionally, federal courts have held that the removal process implicates an undocumented immigrant's liberty interest.[628] Therefore, federal courts have considered access to counsel – at one's own expense – a requirement that assures fundamental fairness during removal proceedings.[629] For example, in *United States v. Charleswell*, the Third Circuit characterized a detained immigrant's right to counsel during removal proceedings as "so fundamental to the proceeding's fairness" that denying this right "rise[s] to the level of fundamental unfairness."[630] Furthermore, the Fifth Amendment is not the only law that grants undocumented immigrants the right to counsel at their own expense. The Immigration and Nationality Act guarantees undocumented immigrants with access to counsel at their own expense.[631] Additionally, the Immigration and Nationality Act provides detained immigrants other rights in removal proceedings, such as:

---

[625] American Psychiatric Association Statement, at 1.

[626] U.S. Const., amend. V.

[627] *Reno v. Flores*, 507 U.S. 292, 306 (1993).

[628] *See e.g.*, *Zadvydas*, 533 U.S. at 690 (establishing that a detained immigrant's liberty interest is implicated when a federal statute mandates that captured undocumented immigrants be detained).

[629] *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005) ("The right to counsel in immigration proceedings is rooted in the Due Process Clause."); *Dakane v. U.S. Attorney Gen.*, 399 F.3d 1269, 1273 (11th Cir. 2005) ("It is well established in this Circuit that an alien in civil deportation proceedings . . . has the constitutional right under the Fifth Amendment Due Process Clause . . . to a fundamentally fair hearing."); *Borges v. Gonzáles*, 402 F.3d 398, 408 (3d Cir. 2005) ("The Fifth Amendment entitles aliens to due process of law in deportation proceedings."); *Rosales v. ICE*, 426 F.3d 733, 736 (5th Cir. 2005) ("[D]ue process requires that deportation hearings be fundamentally fair."); *Brown v. Ashcroft*, 360 F.3d 346, 350 (2d Cir. 2004) ("The right . . . under the Fifth Amendment to due process of law in deportation proceedings is well established.").

[630] *United States v. Charleswell*, 456 F.3d 347, 360 (3d Cir. 2006).

[631] The Immigration and Nationality Act, as amended, Pub. L. 104-208, 66 Stat. 235 (Sept. 30, 1996) (codified as 8 U.S.C. § 1362).

- promulgates rules that grant detained immigrants ample opportunity to obtain counsel by placing restrictions on the removal proceeding's timing;[632]

- mandates that undocumented immigrants are furnished with a list of pro bono attorneys when removal proceedings have begun;[633] and

- establishes additional protections for unaccompanied minors, mentally incompetent individuals, and others.[634]

Although the Immigration and Nationality Act describes these provisions as a "privilege," several federal courts have construed the Immigration and Nationality Act as establishing a statutory right to counsel at a detained immigrant's own expense.[635]

Furthermore, in 2015 the Commission heard that the success rate of detained immigrants with counsel is strongly linked to an immigrant's ability to comprehend complex immigration law, making legal representation crucial for detained immigrants seeking asylum or entry into the United States.[636] According to testimony submitted to the Commission in 2015, statistics show that detained immigrants who obtain counsel are more successful in their asylum claims, and therefore released from detention more often, than those without counsel.[637] According to the National Immigration Justice Center, detained immigrants who had obtained counsel were six times more likely to succeed in removal proceedings.[638]

While the Immigration and Nationality Act mandates that the federal government furnish detained immigrants with legal materials and attorney contact information, the actual procedures Immigration and Customs Enforcement uses to process detained immigrants is not conducive to affording them adequate opportunity to obtain counsel. For example, Immigration and Customs Enforcement initially detains undocumented immigrants in a facility where they were apprehended. Immigration and Customs Enforcement transfers these detainees to remote detention

---

[632] *See* Immigration and Nationality Act § 239(b)(1) (codified at 8 U.S.C. § 1229(b)(1)).

[633] *See* Immigration and Nationality Act § 239(b)(2); 8 U.S.C. § 1229(b)(2); 8 C.F.R. § 238.1(b)(2)(iv).

[634] *See* 6 U.S.C. § 279(b)(1)(A).

[635] See *Castro-O'Ryan v. INS*, 847 F.2d 1307, at 1312 (9th Cir. 1987) (indicating Section 292 of the Immigration and Nationality Act, as well as its legislative history, "confirms that Congress intended to confer a *right*").

[636] 2015 Report at 108 (citing Karen Grisez, American Bar Association, Statement, at 4).

[637] Ibid.

[638] Charles Roth and Raia Stoicheva, "Order in the Court: Commonsense Solutions to Improve Efficiency and Fairness in the Immigration Court," *National Immigrant Justice Center*, Oct. 2014, http://immigrantjustice.org/sites/immigrantjustice.org/files/Order%20in%20the%20Courts%20-%20Immigration%20Court%20Reform%20White%20Paper%20October%202014%20FINAL2.pdf.

centers within hours of their apprehension. This immediate transfer affects a detained immigrant's ability to secure legal representation because his/her transfer location is generally unknown.[639] Additionally, a detained immigrant may be transferred to a facility located over 100 miles away from where he/she was initially apprehended.

Under Executive Order 13,166, federal agencies are required to examine the services they provide, identify any need for services to those with limited English proficiency (LEP), and develop and implement a system to provide those services so LEP persons can have meaningful access to them.[640] Language barriers make it extremely difficult for detainees to learn about the legal process and communicate with employees at facilities.[641] The Commission heard testimony that often times, documents and legal resources are only in English and detainees will sign documents without understanding what they are signing.[642] For detainees who only speak indigenous languages, there are very few interpreters available to translate and assist them while in detention.[643] Moreover, in July 2019, the Trump Administration announced plans to no longer provide in-person interpreters at immigrants' first immigration hearings, and will instead only provide in-language videos to provide information to asylum seekers and other immigrants facing deportation of their rights.[644]

---

*Limited English Proficiency and Legal Representation Testimony*

*"The limited language proficiency means that detained immigrants who do not speak English are unable to communicate with their deportation officers, while some detained immigrants were explicitly denied the opportunity to speak with the officers for months on end."*[645]

---

[639] The Commission learned that immigrants detained at Port Isabel Detention Facility and Karnes Family Detention Facility were apprehended from various places near the Rio Grande Valley and throughout Texas.

[640] "Frequently Asked Questions," LEP.gov, https://www.lep.gov/faqs/faqs.html (accessed July 13, 2019).

[641] Project South Statement, at 3.

[642] Project South Statement, at 4; Detained Migrant Solidarity Committee Statement, at 8.

[643] Slaton Testimony, *Public Comment Session*, p. 158.

[644] *See* Tal Kopan, "Trump Administration Ending In-Person Interpreters at Immigrants' First Hearings," *San Francisco Chronicle*, July 3, 2019, https://www.sfchronicle.com/politics/article/Trump-administration-ending-in-person-14070403.php; *see also* Stephen Franklin, Miriam Annenberg, and Ankur Singh, "Video hearings in immigration court are harming immigrants' cases," *Pacific Standard*, July 2, 2019, https://psmag.com/social-justice/video-hearings-in-immigration-court-are-harming-immigrants-cases.

[645] Project South Statement, at 3.

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

*"In addition, detained immigrants at both facilities also encounter constant problems accessing the law libraries for legal information. Many detained immigrants at Stewart reported that they were unable to access any legal resources in their native languages, effectively precluding their ability to fill out complex legal documents such as asylum applications. At Irwin, detained immigrants are required to submit a written form, only available in English and Spanish, to request library use."*[646]

*"Often times, people are asked to sign documents. They have no idea what they're signing."*[647]

*"In reviewing notifications sent to dozens of Spanish speaking detained migrants, most of the documents (if provided at all) were English only."*[648]

*"Children are also made to go before a judge without representation. In a language they don't speak. Civil Rights are being breached and broken left, right, and center by the US government."*[649]

*"Many of the refugees that I met spoke no Spanish when I tried to speak Spanish with them. They were indigenous."*[650]

*Access to Legal Representation Testimony*

*"I had to represent myself in court almost the entire time I was detained because I could not afford a private lawyer. . . I tried to call the numbers of pro bono lawyers but no one answered my calls. I don't know if the numbers worked but very few detainees could get pro bono lawyers."*[651]

*"While both Stewart and Irwin allow detained immigrants to meet with attorneys, in many ways the facilities physically bar the detained immigrants' right to substantive consultation and representation. Detained immigrants and attorneys have reported that they had to meet through*

---

[646] Ibid., 4.

[647] Slaton Testimony, *Public Comment Session*, pp. 158-59.

[648] Detained Migrant Solidarity Committee Statement, at 8.

[649] Eli Beller, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 13, 2019, at 1 (hereinafter Beller Statement).

[650] Slaton Testimony, *Public Comment Session*, p. 158.

[651] Robin A. Testimony, *Public Comment Session*, pp. 108-09.

*Plexiglas with malfunctioning phones or videoconferencing equipment. The conversations are not private, as the rooms are not sound-insulated, and the attorneys and clients often need to shout at each other over the television or other white noise in order to understand each other.*[652]

### Detention Centers in Remote Locations Testimony

*"Detained immigrants have a harder time accessing legal help since many detention facilities are located in remote, rural areas. About 30 percent of detained immigrants are held in [Immigration and Customs Enforcement] facilities more than 100 miles from the nearest government-listed legal aid provider, and for immigrants in detention the representation rate plummeted to an abysmal 14 percent."*[653]

*"Many of our clients are in facilities that are housed in rural areas far away from any type of support, legal advocacy organizations, or removal defense immigration attorneys."*[654]

---

Understanding the Legal Process

The Commission received testimony that the legal process is very complex and difficult to navigate without legal assistance, especially considering that migrants have entered a legal system that is foreign to them, but many detainees must represent themselves.[655] The limited resources available in detention center legal libraries are not readily available to detainees, making the process of learning their rights even more difficult.[656]

---

[652] Project South Statement, at 3.

[653] Asian Americans Advancing Justice Statement, at 2 (citing Kyle Kim, "Immigrants Held in Remote ICE Facilities Struggle to Find Legal Aid Before They're Deported," *Los Angeles Times*, Sept. 28, 2017, https://www.latimes.com/projects/la-na-access-to-counsel-deportation/; Ingrid Eagly and Steven Shafer, "Access to Counsel in Immigration Court," Sept. 28, 2016, https://www.americanimmigrationcouncil.org/research/access-counsel-immigration-court).

[654] Sánchez Testimony, *Public Comment Session*, p. 120.

[655] Krishnaswami Testimony, *Public Comment Session*, p. 127.

[656] Ishalaa Ortega, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, Apr. 12, 2019, at 2 (hereinafter Ortega Statement).

> *"[T]he vast majority of detained asylum seekers proceed without legal assistance."*[657]

> *"That we routinely require survivors of trauma to navigate a bureaucratic maze of proceedings daunting for licensed attorneys, all while behind bars- proceedings that could culminate in their return to countries where they fear grave harm, even death- is a travesty."*[658]

> *"There are only 30 minutes outside for recreational time, which inmates constantly lose in order to go to the legal library to prepare their cases. Most of the inmates endure the process by themselves without legal representation."*[659]

Lack of Independence for Immigration Courts

Immigration courts are housed under the Department of Justice, Executive Office for Immigration Review, and thus part of the executive branch and not the judicial branch.[660] Many organizations, including the American Bar Association, American Immigration Lawyers Association, Federal Bar Association, and the National Association of Immigration Judges have all urged Congress to create an immigration court system that is independent of the Department of Justice.[661] They point out that there is a conflict of interest when immigration courts are housed in the same department that is responsible for prosecuting immigrants in federal court, and this concern is exacerbated because immigration judges are Department of Justice employees, which leaves them vulnerable to political pressures and politicized interference into their duties.[662] Immigration courts also face massive backlogs, which result in delays, and commenters argue Executive Office for Immigration Review policies meant to address the backlog have actually worsened the backlog and threatened

---

[657] Krishnaswami Testimony, *Public Comment Session*, p. 127.

[658] Amnesty International Statement, at 2.

[659] Ortega Statement, at 2.

[660] "About the Office," *Dep't of Justice*, Aug. 14, 2018, https://www.justice.gov/eoir/about-office.

[661] American Bar Association, American Immigration Lawyers Association, Federal Bar Association, and the National Association of Immigration Judges, letter to Congress, July 11, 2019, https://www.naij-usa.org/images/uploads/publications/ABA_-_Congress_Should_Establish_an_Independent_Innigration_Court.pdf.

[662] Ibid.

the independence of immigration judges.[663] These policies include implementing case quotas to measure performance for immigration judges and reducing immigration judges' discretion to grant hearing continuances to ensure the fair administration of justice.[664] In 2018, the Commission majority issued a statement denouncing this practice.[665]

Location of Detention Facilities

The Commission also received testimony that immigration detention facilities are often located in rural areas, making it difficult for families to visit their detained loved ones, for lawyers to get in contact with their clients, and keeping issues that occur within their walls far away from the public eye.[666] Many people who submitted public comments also raised concern about how federal money has been allocated away from oversight of detention facilities.[667]

Commenters also raised issues with locating detention facilities at military bases.[668] EarthJustice staff told the Commission that the proposed sites of some new detention facilities at military bases pose serious health risks due to high levels of toxic chemicals in the soil.[669] In addition there are concerns regarding issues of access for family members who may be undocumented and attorneys

---

[663] Ibid.; American Immigration Lawyers Association, "American Immigration Lawyers Association's Policy Brief: FOIA Reveals EOIR's Failed Plan for Fixing the Immigration Court Backlog American Immigration Lawyers Association," Feb. 21, 2019, p. 3, https://www.aila.org/PolicyBriefEOIRPlan (discussing EOIR plan obtained through FOIA request which undermines due process in immigration courts and contributed to backlog in some instances).

[664] "American Immigration Lawyers Association's Policy Brief," p. 3.

[665] U.S. Comm'n on Civil Rights, "U.S. Commission on Civil Rights Denounces Imposition of Immigration Judge Quotas," Apr. 20, 2018, https://www.usccr.gov/press/2018/04-20-Immigration-Quota-Statement.pdf.

[666] Seiler Testimony, *Public Comment Session*, p. 58; Sánchez Testimony, *Public Comment Session*, p. 120.

[667] Lannan Statement, at 1; Human Rights Watch Statement, at 3; Small Testimony, *Public Comment Session*, p. 142.

[668] *See* Amy Toran Perry, Military Families for Families, Written Statement for Public Comment Session on Immigration Detention (discussing environmental concerns and citing Open Letter from Retired U.S. Military General and Flag Officers on the Use of Military Bases to Detain Immigrant Families, Aug. 1, 2018, https://americasvoice.org/press_releases/retired-general-and-flag-officers-sign-letter-in-opposition-to-housing-immigrants-and-asylum-seekers-on-military-bases/).

[669] Mabson Testimony, *Public Comment Session*, pp. 111-12.

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

at military bases.[670] This may also implicate heightened due process concerns for migrant children, if they are no longer protected by state child custody laws.[671]

---

*Opening Detention Centers on Potentially Hazardous Sites Testimony*

> *"Harmful contaminants like lead have been detected in both soil and groundwater and at levels that are shockingly well above the EPA's threshold that would trigger and require immediate remediation. . . There is a special concern for the infants and young children who may be housed on the site, as they may be harmed by both acute and chronic contact with lead. Lead exposure is known to cause brain damage, learning disabilities, stunted growth, and behavior problems, among other serious debilitating health effects."[672]*

> *"[M]oreover, a number of other chemicals have been identified on-site, including benzene, arsenic, and methylene chloride, all of which increase a child's likelihood to develop cancer and can cause long-lasting severe neurological, immunological, and developmental impacts."[673]*

> *"Due to a number of physiological differences children-especially infants-are more susceptible to the harms caused by toxic chemicals, particularly lead and per- and poly- fluoroalkyl substances, (PFAS), which have been*

---

[670] For example, an undocumented immigrant working to deliver pizza to the Fort Hamilton Army base was detained and held for 53 days. Felipe De La Hoz, "Military bases enforcing U.S. immigration laws may be exceeding their authority," *Documented*, Sept. 4, 2018, https://documentedny.com/2018/09/04/military-bases-enforcing-u-s-immigration-laws-may-be-exceeding-their-authority/; *See* Spencer Ackerman, "Ready, Fire, Aim: Military Rushes Into Detention Camp Plan," *Daily Beast*, July 10, 2018, https://www.thedailybeast.com/ready-fire-aim-military-rushes-into-detention-camp-plan ("Military bases are by necessity restricted areas, yet the thousands of undocumented people envisioned for detention on them need access to their lawyers for deportation proceedings. They also need secure areas to discuss their cases with attorneys, advocates or relatives, another factor complicated by the camps' operation on military bases."); Jana Lipman, "Detaining Refugee Children At Military Bases May Sound Un-American, But It's Been Done Before," *Government Executive*, June 19, 2019, https://www.govexec.com/management/2019/06/detaining-refugee-children-military-bases-may-sound-un-american-its-been-done/157799/ ("It is unclear whether the young migrants sent to Fort Sill will have access to lawyers, education or social services.").

[671] *See supra* notes 15-16 (discussing *Reno v. Flores*, 507 U.S. at 302) (Justice Scalia reasoned that full substantive due process rights did not apply because migrant children were housed in conditions in which state child custody rules contractually applied).

[672] Mabson Testimony, *Public Comment Session*, p. 111-112.

[673] Ibid., 112.

identified in intolerable high amounts in both soil and groundwater on GAFB (Goodfellow Air Force Base) and FBAB (Fort Bliss Army Base)."[674]

*Allocation of Federal Monetary Resources Testimony*

"Not only is this policy inhumane, it is costing taxpayers more than $775 dollars per day per child. With almost 3000 children being held in Homestead alone, that cost is close to $3 million per day."[675]

"In February of this year, [Immigration and Customs Enforcement] held a record 49,000 people in detention on average per day. The administration has asked Congress to allocate US$2.7 billion for Fiscal Year 2020 to lock up a daily average of 54,000 people per day, with the stated goal of detaining 60,000 people per day, including 10,000 family detention beds through an additional 'Border Security and Immigration Enforcement Fund.' At the same time, the Trump administration has requested less money for Department of Homeland Security oversight of detention – oversight which is intended to ensure that conditions of confinement are safe."[676]

"In the last two administration budget requests, the Agency has been clear about a desire to lower detention standards even further in order to facilitate entering into contracts with facilities that even they acknowledge can't meet current standards."[677]

"As a tax-paying citizen I am outraged that my tax dollars are funding a private prison in Homestead, FL for children of families seeking asylum."[678]

"As the granddaughter of a WWII veteran, I absolutely abhor the use of my tax dollars to detain innocent immigrants and asylum-seeking refugees."[679]

---

[674] Earthjustice, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 13, 2019, at 3.

[675] Lannan Statement, at 1.

[676] Human Rights Watch Statement, at 3.

[677] Small Testimony, *Public Comment Session*, p. 142.

[678] Priscilla Cobb, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, May 12, 2019, at 1.

[679] Lisa Dameron, Written Statement for the Public Comment Session on Immigration Detention before the U.S. Commission on Civil Rights, Mar. 23, 2019, at 1.

*[This page left intentionally blank]*

AR00309

## CHAPTER 4: FINDINGS AND RECOMMENDATIONS

## Findings

I.   **Creating a Humanitarian Crisis**

A.   The Trump Administration's changes to asylum, the detention of children, and certain other immigration policies, practices, and procedures have created an unnecessary human and civil rights crisis at the southern border. The institution of the Zero Tolerance policy and decision to forcibly and deliberately separate children, including infants and toddlers, from parents or adult family members on a mass scale is a gross human and civil rights violation.

B.   The Departments of Homeland Security and Health and Human Services did not have a plan or coordinate procedures to reunite children with their families. The Zero Tolerance policy, despite having been piloted for a year prior to its announcement, resulted in forcible and needless separation of children, including infants and toddlers, from parents or adult family members.

C.   The sharp rise in 2018-2019 in immigrant families traveling with children attempting to enter the United States and to claim asylum has created extreme and challenging conditions at the border. The serious humanitarian needs of arriving families have not been addressed, and these concerns have instead been exacerbated by Administration policies.

D.   The absence of planning and resulting confusion and chaos led to many children being sent up to thousands of miles from their parents who were typically given no information about the whereabouts of their children; nor were the children given any information about their parents.

E.   The Trump Administration's metering policy and Migration Policy Protocols forced asylum seekers at the southern border to risk crossing the border illegally, including via more dangerous and remote crossings. Wait periods for migrants can extend past a week outside ports of entry with no shelter, food, or water and expose them to further risk of harm. In one case, the Commission heard of a migrant husband and wife who waited 30 days in Calexico, a city near the Mexican border, before they were permitted to make their claim of asylum.  The Administration has obligations under the Immigration and Nationality Act to ensure that any third countries to which migrants seeking asylum in the United States are removed or returned are countries where they would not be subject to threat on account of race, religion, or nationality, and where they "would have access to a full and fair procedure" for determining a claim to asylum. 8 U.S.C.§ 1158(a)(2)(A).

F.   The Commission investigated immigration detention center conditions in 2015 and found noncompliance with various detention laws and standards, and detention conditions have significantly deteriorated under the Trump Administration's policies.

G. On April 12, 2019, the Commission heard testimony from the public, from numerous stakeholder organizations including nonprofit and immigrant rights groups who testified to the appalling conditions of immigrant detention centers, including lack of medical care, and basic human needs including food, water, and sanitary conditions. Commissioners heard from experts on the mental and physical consequences of detention and irreversible trauma associated with separating families and the effects of long-term confinement especially for children. Migrants offered testimony about being detained, inhumane treatment from Department of Homeland Security officials, their journeys migrating from their home countries where they escaped persecution, violence, and gangs, and their heroic stories of survival and triumph in the face of despair.

H. Despite the Trump Administration's claims to the contrary, Zero Tolerance and the resulting mass family separation is a policy that was initiated by that Administration. It was never a policy during the Obama, Bush, Clinton, Reagan, Carter, Ford, Nixon or Johnson Administrations, for example, and accordingly was not found to be a policy or practice in the Commission's 2015 report, *With Liberty and Justice for All: The State of Civil Rights at Immigration Detention Facilities*. Moreover, children were not routinely separated from family during prior Administrations and that policy or practice was not found to exist in the Commission's 2015 report.

I. Despite the Administration's issuance of an Executive Order halting family separations, there still remain credible allegations that children continue to be separated from their families and held in substandard facilities and conditions. The Young Center testified that the policy continues to be used as a tool to deter migrants from crossing the border and seeking asylum. Many parents abandoned their legitimate asylum claims because they were told that doing so would accelerate the family reunification process or benefit their children. Parents were deported and children believed their parents willingly left the behind and abandoned them.

## II.   Discriminatory Immigration Policies

A. The history of U.S. immigration policy includes discriminatory national origin quotas that permitted large numbers of immigrants from Europe, while limiting immigration from other regions of the world including Asia, Africa, and Latin America.  Following the Immigration and Nationality Act of 1965, which abolished discriminatory national origin quotas, immigration has changed from largely European to non-European.  Despite that change in the law, discriminatory treatment of non-European migrants persists today in other forms.

B. The Trump Administration's current immigration detention policies focus mainly on immigrants who are Latinx.

C. The Trump Administration's rhetoric and characterizations of certain countries and immigrants coming from those countries reflects animus against Latinos, Latino immigrants, and other immigrants of color. Because the Trump Administration's immigration and indefinite policies have appear to be aimed at claimants for asylum from Latin America , taken together with the nature and tone of comments characterizing the

people from these countries, the policies and practices raise concerns under the 14th Amendment.

D. Separated children were, in fact, housed in substandard facilities and conditions, were not apprised of their rights with regard to their parents, and stranded after their parents were deported, the practices raise concerns about due process under the Equal Protection and Due Process Clauses of the 14th Amendment, and whether any of the actions were on the basis of national origin.

## III.   Trauma as a Result of Family Separations

A. The impact of separating immigrant families and indefinite detention is widespread, long-term, and perhaps irreversible physical, mental and emotional childhood trauma. Immigrant children, as well as adults, experienced trauma as a result of the Administration's policies. At the Commission's Public Comment Session on April 12, 2019, Commissioners heard from a number of trauma experts and interested organizations on the effects of trauma. The Commission also heard directly from immigrant detainees who confirmed traumatic experiences as a result of not only being separated from their families, and also the trauma they suffered as a result of enduring inhumane conditions at detention facilities and sometimes on account of the cruel treatment by Department of Homeland Security personnel.

B. Miriam Abaya from The Young Center Policy Team testified that the Administration was fully aware of the trauma that would ensue if the Zero Tolerance Policy was implemented prior to implementation. They chose to ignore the advice and warnings from trauma experts, stakeholder organizations, and even experts within the Administration. Nearly a year before the policy was implemented, in a letter to the Administration, the Young Center, along with 500 other child health and welfare organizations, laid out the specific harms that family separations would inflict on children and families.

C. The American Psychiatric Association (APA), the national medical specialty society representing more than 38,500 psychiatric physicians nationwide, wrote to the Commission in response to its *Request for Public Comment on Immigration Detention Centers and Treatment of Immigrants.* The APA, also previously expressed concern regarding the long-lasting trauma on detained migrant children and their families that a result from the Administration's proposed modifications to the *Flores* agreement. The link between the trauma of childhood detention, stated the APA, and lasting unfavorable outcomes is backed by scientific evidence. Trauma from childhood detention has a proven association with "an increased risk of mental illness, such as depression, anxiety, and post-traumatic stress disorder." Migrants can "experience disabling post-traumatic stress disorder or other consequences that adversely impact their medical, psychological, social, and spiritual well-being. These consequences can range from demoralization to various sequelae, involving simple and complex trauma complicated by the migratory journey and resettlement process. These migration-related and post-migration stressors can produce demoralization, grief, loneliness, loss of dignity, and feelings of helplessness as normal syndromes of distress that impede refugees from living healthy and productive

lives." By prolonging the detention period for this at-risk population only serves to exacerbate the already significant mental health challenges that they face.

## IV.   Inhumane Detention Conditions for Children and Adults

A.  Some child detention facilities lack basic hygiene and sleeping arrangements; they sometimes lack soap, blankets, dental hygiene, potable water, sufficient showering days, clean clothing, and nutritious food.

B.  Under the Trump Administration's policies, U.S. Customs and Border Patrol staff and migrant holding facilities used to house separated children were and continue to be woefully unprepared, untrained, and understaffed to handle the detention of migrants, including separated and unaccompanied minors. This has resulted in overcrowding and dangerous, substandard conditions. These conditions violate not only Department of Homeland Security detention standards but challenge and degrade legal norms regarding the respect for human life and humane treatment of immigration detainees.

C.  Separated and unaccompanied migrant children have been detained in border patrol holding facilities in these unacceptable conditions for extended periods of time, and Department of Homeland Security has continuously failed to comply with the *Flores* agreement that requires Border Patrol to transfer unaccompanied minors to the Department of Health and Human Services within 72 hours of making the determination that a child either arrived, or due to family separation became, an unaccompanied child.

D.  The regulations released by Department of Homeland Security and Department of Health and Human Services on August 21, 2019 appear to be an attempt to subvert rules meant to protect migrant children under the *Flores* Settlement Agreement. While it states there is a general policy favoring release, it appears to be an attempt to gain agency discretion to allow some children to be detained indefinitely. The regulation runs the risk of subjecting children and their families, including those who have already been referred for immigration proceedings due to a credible fear of persecution, to prolonged—and indefinite—detention.  The regulation strips parents of their ability to entrust their child with a friend or relative, rather than remain in detention.  The regulations also remove the requirement that children be housed at state-licensed facilities, and instead create an alternative option for private third-party licensing.  In so doing, the regulations do not maintain sufficient accountability mechanisms for ensuring housing of adequate quality for children.

E.  The Refugee and Immigrant Center for Education and Legal Services, Refugee and Immigrant Center for Education and Legal Services, based in San Antonio, Texas, testified to the vulnerability of families housed at the family detention facilities. Most of the detainees are asylum seekers and have experienced traumatic events in their home counties; they arrive at the border having completed a taxing and dangerous journey escaping violence. Because of their onerous journey, and due to the fact that many of the migrants are children, they require specialized services. The detention facilities do not address these needs as they are not equipped with the proper resources, including professional personnel.

AR00313

F.  Refugee and Immigrant Center for Education and Legal Services also testified about visiting the Karnes Detention Center on a daily basis and observing their client's health deteriorate due to untreated and undiagnosed illnesses and mental trauma. Medical care is delayed, immunizations are inadequate, sometimes given inappropriately, and often delayed leading to communicable diseases in the child population.  There are very limited mental health services. Despite many of the obvious signs of mental health trauma observed in children at these facilities, such as bedwetting, isolation, regressive behavior and self-injurious behavior, basic medical history and physical examinations are not completed and mental health screenings are overlooked.

G.  The Office of Inspector General for Department of Homeland Security has issued two management alerts warning of dangerous overcrowding at Border Patrol facilities. Many media and eyewitness reports also corroborate the inhumane treatment of both children and adults, including overcrowding, lack of access to showers, basic health care, and nutritious meals in many detention facilities across the country.

H.  The Commission received evidence and testimony that child detention facilities lack appropriately trained medical personnel and medicine, medical staff are not routinely present at detention facilities, and wait times to see a doctor can be weeks long, regardless of how dire the situation. The Commission also received testimony that child detainees who need daily medication, even if they enter detention facilities with their own medications, have their medications withheld from them without reason.

I.  Language barriers pose an immense hurdle to staff's ability to offer adequate and appropriate medical and mental health treatment to children while detained.

J.  The Commission is aware of investigations into the deaths of six migrant children from Guatemala and El Salvador who have died either in federal immigration custody or shortly after their release. These children's names and ages are:

    • Jakelín Caal Maquín (7), died December 2018
    • Felipe Gómez Alonso (8), died December 2018
    • Juan de León Gutiérrez (16), died April 2019
    • Unnamed (2), died May 2019
    • Carlos Gregorio Hernández Vásquez (16), died May 2019
    • Mariee Juárez (1), died May 2019, weeks after being released from Immigration and Customs Enforcement custody.

    Media reports indicate at least some of these children showed signs of medical distress while in custody and may have been delayed proper medical care. Language barriers may have also played a role in these tragedies, as two of the children only spoke indigenous languages and their parents were unable to properly communicate their children's needs to detention staff.

K.  At some detention facilities guards and other employees are not properly vetted and do not receive background checks.

L. The Commission received evidence and testimony regarding abuse of authority including excessive use of force in detention centers, sharp increases in allegations of sexual assault, and improper use of solitary confinement as punishment.

M. Children have reported they are not allowed to hug and comfort each other while detained.

N. There are serious concerns with siting detention facilities on military bases, including exposure to toxic chemicals, heightened limitations on attorney access to detainees, and concerns such facilities may not be subject to state legal protections such as child welfare and licensing rules.

**V. Barriers to Access to Justice**

A. The Supreme Court has repeatedly found noncitizens within the United States' jurisdiction are entitled to substantive due process protections under the Fifth Amendment. Under U.S. law, once a child is physically present in the U.S., the individual may apply for asylum whether or not the individual entered at a designated port of entry.

B. The resulting enforcement of criminal sanctions against asylum seeking border crossing families between points between points of entry as a result of the Zero Tolerance policy transforms the civil immigration enforcement system into one that permanently physically and mentally damages children. These criminal prosecutions served as the legal mechanism for children to be separated from their parents.

C. The use of untrained Border Patrol agents rather than asylum officers to conduct interviews and initial credible fear determinations as part of the Migration Protection Protocols policy also raises due process concerns. Recent data show that asylum applicants who have been forced to remain in Mexico have less access to counsel than those who have not.

D. Child asylum seekers are not guaranteed a bond hearing with an immigration judge, and those who have shown a credible fear continue to be detained even if there is no proof that they are dangerous and even if they have relatives of others in the country who will care for them.

E. In 2015, the Commission documented practices at immigration detention centers that inhibited detainees' due process rights. These concerns remain and have been exacerbated under the Trump Administration. Detained migrants do not have proper access to legal representation because they are not provided with the contact information for immigration lawyers and because detention facilities are in remote locations.

F. There are very few interpreters to translate legal and detention information for detainees who speak indigenous languages, hindering many child migrants who don't speak English or Spanish from gaining access to information about the legal process and access to legal representation. The lack of language assistance for these individuals also limits their ability to communicate with detention facility staff.

G. Detainees face massive backlogs in understaffed immigration court and sometimes delays resolution of their cases. The housing of immigration courts under the Department of Justice creates a conflict of interest because the Department is also responsible for prosecuting immigrants in federal court and also subjects immigration courts to political interference. Department of Justice policies have exacerbated the backlog and threatened the judicial independence of immigration judges.

## VI.  Lack of Transparency and Accountability

A. It is difficult to have a truly independent inspection of detention facilities in part because inspections of facilities by Department of Homeland Security and other entities are announced beforehand. Members of Congress have been denied access to inspect facilities on short notice.

B. The Commission received testimony that some children's deaths in detention centers are not investigated in compliance with Congressional reporting requirements. Moreover, the Administration in some cases, has not provided explanations to immigrant families regarding the deaths of spouses and/or children.  The Coalition for Humane Immigrant Rights (CHIRLA), an immigrant rights organization in California, testified to the Commission about a man named Jose who was detained separately from his pregnant wife in an Immigration and Customs Enforcement facility while awaiting deportation. Upon the birth of his first child, he was forbidden to see the child. When Jose was subsequently placed in a medical facility, officials could not explain to his wife the reason for the move and when he died shortly after as a result of a hemorrhage and subsequent coma, officials offered the wife a letter stating that the husband was now released from custody. Agency officials did not conduct an investigation into the cause of Jose's death.

C. As the Commission found in its 2015 report, the lack of binding regulations and standards create confusion and a lack of clarity in the application of detention standards in the immigration detention system. Additionally, because these standards do not have enforcement mechanisms, facilities are not held accountable when they fail to maintain or meet these standards.

D. The Department of Homeland Security Office for Civil Rights and Civil Liberties reported to the Commission that Office for Civil Rights and Civil Liberties received thousands of complaints about family separation and the conditions of children in detention that they were unable to process except through samples of a small fraction of such complaints, and that the office does not have authority to remedy individual complaints.

# Recommendations

## I.  Addressing Family Separations

A. The Trump Administration must immediately reunify any remaining children with their parents, including parents who were deported before, during, and after Zero Tolerance,

unless there is a proven serious risk to the best interests of the child. In doing so, if the deported parents wish to file a petition for asylum, they should be allowed to return to the United States and make that claim on behalf of themselves and their children. Unless there is a clear and exigent danger based on assessment of an individual, all families should remain together and be allowed into the communities while awaiting their asylum determinations, and their asylum determinations should be immediately reviewed.

B.   Congress should pass legislation which would end family separation at the border except when authorized by a state court or child welfare agency, or when Customs and Border Protection and an independent child welfare specialist agree that a child is a trafficking victim, is not the child of an accompanying adult, or is in danger of abuse or neglect.

## II.   Addressing Detention Conditions for Children and Adults

A.   The Administration should immediately remedy the conditions detailed in the Department of Homeland Security Inspector General report regarding overcrowding, food, and sanitation so as not to further traumatize children forced to flee their homes whether unaccompanied, separated from their parents or adult guardians, or together with their families.

B.   The safe and humane treatment of detainees is already required under the Constitution, as well as various laws, regulations, and federal court settlements, and Department of Homeland Security should already be working to uphold these standards at all government- and privately-run facilities. Due to the inconsistent and inhumane treatment of children, Congress should pass legislation that sets minimum safe, sanitary and humane detention conditions, and provide sufficient funding to address the crisis in detention facilities for both children and adults. Because the purpose of immigration detention is not punitive, the standard of care should be based on providing reasonable care and safety, and not on incarceration standards. Instead, requirements should include the following:

1.   Adequate and appropriate medical care in detention facilities, including increased doctors, nurses, pediatricians, and mental health care professionals who work at the facilities fulltime, an appropriate stock of medicine, access to hospitals and more advanced medical care. The standard of medical care should be professional judgment and not deliberative indifference.

2.   Ensure medical staff are given appropriate language training or provide reliable translation services so patients can communicate their needs.

3.   Mental health screening and medical history and physical exam for every detainee upon admittance to a detention facility. In addition, the medical and mental health policies and record keeping at family detention centers must comply with Immigration and Customs Enforcement's family residential standards and relevant state child welfare standards.

4. Hygiene products including toothbrushes and toothpaste, diapers, and soap, beds, blankets, daily access to showers, access to laundry, feminine hygiene products, and nutritious and appetizing food.

5. Thorough background checks for security and other detention staff.

6. Ensure children have access to schooling while they are detained.

7. Allow children to interact with one another on a humane level, including actions such as hugging and comforting one another where no safety rationale, such as the prevention of abuse, requires otherwise.

8. Adequate medical standards related to preservation of LBGT detainees' rights and, in particular, the dignity of LGBT immigrant detainees.

C. Prohibiting the detention of pregnant persons.

D. Prohibit housing immigration detainees at prisons and jails.

E. Department of Homeland Security should ensure that personal medicines are not be taken and withheld from migrants.

F. Because they do not comply with the terms and spirit of the *Flores* settlement agreement, Department of Homeland Security and Department of Health and Human Services should immediately withdraw their *Flores* regulations.

G. Department of Homeland Security should ensure there is adequate staffing at border patrol stations and places of detention so that detainees are not being asked to take care of other detainees and that there are a sufficient number of adults to monitor the health and care for young children.

H. As the Commission recommended in its 2015 report, Congress should promote increased reliance on alternatives to detention and less reliance on immigration detention. There should be no for-profit child detention centers.

I. Immigration detention facilities should not be located on military bases. Any existing detention facility on military bases should be closed.


**III.     Ensuring Due Process**

A. Congress must provide sufficient funding to address the need for hiring, full training, and retention of experienced and qualified administrative law judges to process asylum and other immigration claims, as well as, sufficient funding for law clerks, interpreters and other administrative support staff to ensure asylum seekers and other immigrants are accorded full due process.

B. Congress should pass legislation to ensure asylum seekers who present themselves at border crossings are entitled to a bond hearing before an immigration judge.

C. The Commission agrees with the recommendation of the American Bar Association, American Immigration Lawyers Association, Federal Bar Association, and the National Association of Immigration Judges that Congress should create an immigration court system that is independent of the Department of Justice. Congress should also eliminate the requirement of case quotas for immigration law judges.

D. The Administration should adhere to the requirement of federal law providing that third countries designated as safe for returning those seeking asylum in the United State are limited to those where asylum seekers would not face threats on account of race, religion, or nationality and where they would have access to a full and fair procedure for their asylum claims.  The Administration should not return asylum seekers from the United States to countries that do not meet these criteria. Congress should take all measures needed to ensure that the Administration does not designate a third country that is not safe for persons seeking asylum in the United States.  Congress should require Department of Homeland Security to use trained asylum officers to conduct interviews under any iteration of the MPP policy, rather than using individuals who are not trained in making credible fear determinations.

E. Congress should require that no funds should be used for the detention of any asylum seeker who has been found to establish a credible fear of persecution, except in reliance of specific evidence supporting a finding that the asylum seeker poses a risk to the community or a flight risk.

F. Department of Homeland Security should provide translation services in detention facilities for indigenous languages so that migrants who do not speak English or Spanish have the ability to communicate with detention staff and have equal access to legal information and representation.

G. Department of Homeland Security should provide detainees with the contact information of immigration lawyers and create better access to detention facilities by either moving detention facilities to higher populated areas, implementing transportation systems, or expanding video conferencing.

**IV.    Increasing Accountability**

A. Congress should pass legislation allowing members of Congress and members of this Commission to conduct independent inspections of detention facilities with minimal notice (no more than 24 hours) and be given full access to detainees to interview them.

B. The Department of Homeland Security should conduct greater oversight and inspection of detention centers, specifically those relating to child detention centers, and should enforce detention center standards up to and including the closure of a detention facility for violating detention center standards and other applicable laws.

C.  Congress and federal agencies, including the Office of Inspector General for Department of Homeland Security, should conduct full investigations into the deaths of detainees, and Congress should require all federal agencies and contractor facilities to cooperate fully in any investigation. Furthermore, next of kin must be appropriately and promptly notified of a death, offered grief counseling, and access to the record of the investigation and any medical files.

D.  Congress should expand the authority of Department of Homeland Security Office for Civil Rights and Civil Liberties to respond directly to complainants and enforce civil rights protections. New immigration policies should be precleared by Office for Civil Rights and Civil Liberties or another independent body to ensure they do not violate civil rights, prior to causing harm.

*[This page left intentionally blank]*

**COMMISSIONERS' STATEMENTS AND DISSENTS**


## Statement of Commission Michael Yaki

In the spring of 2018, the revelation that the Administration's Zero Tolerance policy[1] at the southern border was separating young children – some as young as infants – from their parents, shocked the conscience of this nation and this Commission.   According to information this Commission has obtained, over 14,000 children may have been separated from their parents.[2] Worse, the conditions of this separation exacerbated the trauma felt by children already fleeing violence or dangerous crossing conditions.  In a report issued by the Office of the Inspector General for HHS – issued after the main body of this Report was finalized – the OIG found:

> "[S]eparated children exhibited more fear, feelings of abandonment, and post-traumatic stress than did children who were not separated. Separated children experienced heightened feelings of anxiety and loss as a result of their unexpected separation from their parents after their arrival in the United States."[3]

> "Facilities reported that children with longer stays experienced more stress, anxiety, and behavioral issues, which staff had to manage. Some children who did not initially exhibit mental health or behavioral issues began reacting negatively as their stays grew longer. . . . longer stays resulted in higher levels of defiance, hopelessness, and frustration among children, along with more instances of self-harm and suicidal ideation."[4]

To this day, there is still tremendous uncertainty over the number of children who are still separated from their parents and who are yet to be reunified.[5]


In hindsight, the subject matter of this Report, particularly its findings, should come as no surprise to anyone who has followed the Administration's rhetoric.   Beginning in 2013, the current

---

[1] U.S. Comm'n on Civil Rights, *Trauma at the Border: The Human Cost of Inhumane Immigration Policies,* 2019, p. 29 (hereinafter "Report").

[2] Ibid., 43.

[3] U.S. Department of Health and Human Services Office of Inspector General, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody* (2019), p. 10, https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf  (hereinafter U.S. HHS IG 2019).

[4] Ibid.

[5] Report, p. 48.

132   *Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

President made no secret of his animus toward immigrants from Central America[6].   During 2018, when the Administration began taking the actions that impelled the action of the Commission and the production of this latest report, the language took an even darker tone.

In May of 2018, the President referred to the border surge of immigrant applicants as "animals" during a White House meeting attended by the press:

> "You wouldn't believe how bad these people are. These aren't people, these are animals, and we're taking them out of the country at a level and at a rate that's never happened before."[7]

In June 2018, Trump tweeted:

> "They don't care about crime and want illegal immigrants, no matter how bad they may be, to pour into and infest our Country."[8]   "We cannot allow all of these people to invade our Country."[9]

Later that year, Trump ramped up his rhetoric by equating responding to the "invasion" with wartime language.

> "But, you know, it's like liberating, like a war, like there's a foreign invasion."[10]

---

[6] *See, e.g.,* February 24, 2015, Twitter.  "The Mexican legal system is corrupt, as is much of Mexico.  Pay me the money that is owed me now - and stop sending criminals over our border[.]" https://twitter.com/realDonaldTrump/status/570384640281870337?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E570384640281870337&ref_url=https%3A%2F%2Ftime.com%2F4473972%2Fdonald-trump-mexico-meeting-insult%2F; March 30, 2015, Twitter.  "The border is wide open for cartels & terrorists." https://twitter.com/realDonaldTrump/status/582645393227419648?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E582645393227419648&ref_url=https%3A%2F%2Ftime.com%2F4473972%2Fdonald-trump-mexico-meeting-insult%2F; and "When Mexico sends its people, they're not sending their best.  They're not sending you.  They're not sending you.  They're sending people that have lots of problems, and they're bringing those problems with us [sic].  They're bringing drugs.  They're bringing crime.  They're rapists."  "Full Text: Donald Trump Announces a Presidential Bid," *The Washington Post*, June 12, 2015, https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?noredirect=o.

[7] Julie Hirschfeld Davis, "Trump Calls Some Unauthorized Immigrants 'Animals' in Rant," *The New York Times*, May 16, 2018, https://www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html.

[8] June 19, 2019, Twitter, https://twitter.com/realDonaldTrump/status/1009071403918864385.

[9] June 24, 2019, Twitter, https://twitter.com/realdonaldtrump/status/1010900865602019329.

[10] Tim Marcin, "Donald Trump Claims American Towns are Celebrating Liberation from Violent Immigrants Like They're in 'World War II Movies.'" *Newsweek*, Oct. 26, 2018, https://www.newsweek.com/donald-trump-claims-american-towns-celebrating-liberation-violent-immigrants-1188953.

"This is an invasion of our Country and our Military is waiting for you!"[11]

"It's like an invasion.  They have violently overrun the Mexican border... This is an invasion, and nobody is even questioning that . . . . All we know is they're pretty tough people when they can blast through the Mexican military and Mexican police."[12]

"No nation can allow its borders to be overrun. And that's an invasion.  I don't care what they say.  I don't care what the fake media says.  That's an invasion of our country."[13]

The language of the President sets the tone for his Administration.  Rather than understanding that those coming here are seeking, for many reasons, a better life, the President equates them as invaders, as sub-human, unworthy of any response other than as a direct military threat to our country.  Is it any wonder that his Administration's treatment of children and families, detailed in our Report, shows deliberate indifference and reckless neglect towards their well-being?

In many ways, this is worse than the casual racism that has permeated the President's actions since he took office.  By usage of imagery invoking invasion, of infestation, of a people who are animals or sub-human, the President has recycled and repeated tropes of racism that were used in some of the darkest days of our country's history and our world's experience.

The world just observed the 75th anniversary of D-Day, the event that was the beginning of the end of Hitler's grip on Europe.  But for the 5 years of war that preceded, Hitler had been able to move apace to construct the machinery of genocide, a machine greased and fueled by mass hatred led by the Nazi propaganda state that labeled Jews, Gypsies, LGBT people, and disabled people as "Untermenschen" – literally, subhuman.[14]

---

[11] Oct. 29, 2019, Twitter, https://twitter.com/realdonaldtrump/status/1056919064906469376?lang=en.

[12] The White House, "Remarks by President Trump on the Illegal Immigration Crisis and Border Security," Nov. 1, 2018, https://www.whitehouse.gov/briefings-statements/remarks-president-trump-illegal-immigration-crisis-border-security/.

[13] October 29, 2018, Twitter, https://twitter.com/realDonaldTrump/status/1056919064906469376?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1056919064906469376&ref_url=https%3A%2F%2Fthehill.com%2Fhomenews%2Fadministration%2F413624-trump-calls-migrant-caravan-an-invasion.

[14] Talk of the Nation, "'Less Than Human': The Psychology of Cruelty," March 29, 2011, *National Public Radio,* https://www.npr.org/2011/03/29/134956180/criminals-see-their-victims-as-less-than-human.

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

In our nation's history, the racism felt by immigrant communities has been well documented. Fervor against Asian Americans began in the 1800s, where anti-Chinese agitation resulted in the passage of the Page Act, the Chinese Exclusion Act of 1882, and the California Alien Land Law of 1913[15], culminating in the inevitable and war-like animus, Executive Order 9066, the order that interned Japanese Americans during World War 2.[16] In all these instances, the language clamoring for and justifying these actions were couched in terms of "invasion" and, in all instances, characterizations of the Asians as having characteristics and traits inferior to whites.[17]

On a personal note, the legacy of the Chinese Exclusion Act was felt personally by my mother's family. My mother's father was a diplomat for the Chinese government, one of the first generation of their home-grown intelligentsia that went overseas and represented the fledgling country that had struggled to throw off the decades of colonial rule that had suppressed Chinese sovereignty. As part of China's mission to the League of Nation, he had warned about the dangers of Japanese expansion in Asia. In 1942 he found himself and his family stranded in the United States while traveling back from his post in Europe. As a diplomat, he found himself exempted from the Exclusion Act – until the war ended, and despite the repeal of the Exclusion Act during the War, the number of Chinese immigrants allowed was set so low that it took a private bill of Congress to allow them to stay.

Ironically, just some miles away, a second-generation Japanese American family found itself being forcibly removed from the business and the land that they owned, targeted by the nation of their citizenry because of their national origin. The exploitation of anti-Japanese fervor was directed inward, at our own citizens, families, children, and resulted in the incarceration of my father and his family in the Arizona desert. It is precisely this kind of anti-"other" rhetoric and actions that the present day Administration reiterates, on a daily basis, against Central Americans, against immigrants from Africa and the Middle East, against persons whose culture and skin color are not, as the President has said, from Norway.[18]

---

[15] The Act barred Asians, primarily directed at Japanese Americans, from owning or having long-term leases of agricultural land in California.

[16] *See, e.g.,* Ben Zimmer, "Where Does Trump's 'Invasion' Rhetoric Come From?," *The Atlantic,* Aug. 6, 2019, https://www.theatlantic.com/entertainment/archive/2019/08/trump-immigrant-invasion-language-origins/595579/.

[17] *See, e.g.,* Steven Heller, "The Artistic History of American Anti-Asian Racism," *The Atlantic,* Feb. 20, 2014, https://www.theatlantic.com/entertainment/archive/2014/02/the-artistic-history-of-american-anti-asian-racism/283962/.

[18] *See, e.g.,* Dawsey, Josh, "Trump Derides Protections for Immigrants from "Shithole" Countries," *The Washington Post,* https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html.

There are legitimate debates to be had over the issue of border security. There can be legitimate debates on the issues regarding allocation of resources and processes at the border. Our 2015 report raised these same issues. These are issues that should and must be debated and decided by our Executive and Legislative Branches. This report contains recommendations designed to alleviate the conditions to both prevent and reduce the need for and time for detention.

But once an individual or family who has either surrendered to, or been detained by, our border personnel, they come under the jurisdiction of the United States, and because of that, the jurisdiction of the U.S. Commission of Civil Rights is undisputed. Contrary to the beliefs of this Administration's Department of Homeland Security and the Department of Health and Human Services[19], these families and individuals are covered by our law and our Constitution. At the instant of detention, an individual within the custody of border enforcement personnel not only deserves to be but is expected to be treated humanely, with respect, and the compassion that any person seeking the comfort and climes of our shores should be provided. Ripping families apart as a means of intimidation, as a means of coercion, is contrary to everything our country stands for in the world. Characterizing these families and individuals from Central America as invaders, as people who are less than human, harkens back to day of discrimination past that we choose to bury – rightfully – in our past. Demonizing immigrants who have endured hardship is contrary to our founding mythology of the Pilgrims, contrary to the origin stories of millions of Americans whose ancestors sailed from distant points of the compass to our welcoming shores.

Perhaps Trump, who seems to be fond of a past that does not and cannot exist anymore, should go back in time just over two decades ago, when another President made these remarks that stand in stark contrast to the hateful rhetoric of the last two years:

> A man wrote me and said: ``You can go to live in France, but you cannot become a Frenchman. You can go to live in Germany or Turkey or Japan, but you cannot become a German, a Turk, or a Japanese. But anyone, from any corner of the Earth, can come to live in America and become an American.''

> Yes, the torch of Lady Liberty symbolizes our freedom and represents our heritage, the compact with our parents, our grandparents, and our ancestors. It is that lady who gives us our great and special place in the world. For it's the great life force of each generation of new Americans that guarantees that America's triumph shall continue unsurpassed into the next century and beyond. Other countries may seek to compete with us; but in one vital area, as a beacon of freedom and opportunity that draws the people of the world, no country on Earth comes close.

---

[19] Report, p. 15.

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

This, I believe, is one of the most important sources of America's greatness. We lead the world because, unique among nations, we draw our people -- our strength -- from every country and every corner of the world. And by doing so we continuously renew and enrich our nation. While other countries cling to the stale past, here in America we breathe life into dreams. We create the future, and the world follows us into tomorrow. Thanks to each wave of new arrivals to this land of opportunity, we're a nation forever young, forever bursting with energy and new ideas, and always on the cutting edge, always leading the world to the next frontier. This quality is vital to our future as a nation. If we ever closed the door to new Americans, our leadership in the world would soon be lost.[20]

This is the America I believe in.  This is the America that most Americans believe in.  This is the future of a country that will soon be majority-minority, but one where we are all, at our core, Americans who believe in the ideals that have made the country the beacon of liberty throughout the world.  The faces may change, part of our culture may change, but the essence of our Republic, our democracy, will always remain a constant.  And that is our ultimate strength as one nation, indivisible.

In the face of an American ethos and history that have rejected and apologized for our past misdeeds with regard to our immigrant communities, the Trump Administration stands in dark, cold contrast for its choice of deliberate cruelty.  The purposeful policies of this Administration in its characterization and treatment of Central American refugee families, in its deliberate cruelty and intentional infliction of trauma on the most vulnerable amongst us – children -- stands as a moral low for an Administration seeking to outdo itself in moral lows.

---

[20] President Ronald Reagan, "Remarks at the Presentation Ceremony for the Presidential Medal of Freedom," January 19, 1989, https://www.reaganlibrary.gov/research/speeches/011989b.

## Dissenting Statement of Commissioner Gail Heriot

***Remarkably little actual research went into this report.***   While a significant portion of it deals with the allegedly poor conditions at immigration detention centers, the Commission did not even attempt to visit an actual immigration detention center.

Instead, I did so on my own time.[1]  What I found at the Otay Mesa detention center was a clean and orderly facility with a law library, basketball courts, and chapel.[2]  Life skill classes are offered. Kosher, halal and vegetarian meals are available.   The medical and dental clinics there are overwhelmingly likely to be better equipped than what the detainees were used to in their home countries.[3]  Indeed, particularly in terms of their accessibility, the medical and dental clinics are no doubt better than what large numbers of Americans get.

This was consistent with what I observed in 2015 during two previous tours of immigration detention centers—Karnes and Port Isabel—which I took, along with many of my Commission colleagues, in connection with our 2015 report on immigration detention.  On those occasions, we also had the opportunity to speak with dozens of detainees.  They had few complaints about the detention facilities themselves and no serious ones.  One detainee at Port Isabel even said (in Spanish) that if they let him out on Sundays, he wouldn't mind staying indefinitely.

---

[1] I took the tour on September 11, 2019.  Note that immigration detention centers, which come under the jurisdiction of Immigration and Customs Enforcement ("ICE") and the short-term facilities where individuals are taken immediately after being picked up by Border Patrol agents, are not the same. I have not yet visited such a facility. Nor, apparently, has anyone else on the Commission.

[2] Efforts were made to ensure that detainees were treated appropriately.  For example, I saw posters in English and Spanish that stated, "I have a right to be treated fairly regardless of my sexual orientation or gender identity." Complaint boxes and boxes that allowed detainees to inquire about the status of their case were located through the facility.  Internal rules require prompt answers to those inquiries.

This is somewhat in tension with the lurid picture of detention painted by Ishalaa Ortega, a witness at the open-comment period who is affiliated with an advocacy group called Immigration Equality. Ortega testified that she was subject to "verbal and physical abuse." U.S. Commission on Civil Rights, Transcript of Open Comment Period, 83-88. The final report echoes Ortega's claims.  As far as I know, the Commission did not seek input on her allegations from ICE or from Core Civic, the private corrections company that owns and operates the detention center.

[3] The present Otay Mesa facility was built by Core Civic, completed in 2015 and contains about 350,000 square feet. It took about two years to build and is designed to hold 1572 residents (1000 ICE detainees and 572 separately-maintained individuals in the custody of the U.S. Marshals Service).   On the day that I visited, there were about 968 ICE detainees, living in "pods" that contain up to 128 detainees each.  About two-thirds of the detainees are male.  Males and females are completely separated.  Like the Port Isabel facility that I visited in 2015, the Otay Mesa detainees are dressed in blue, orange or red jump suits, depending on their known criminal record or lack thereof.  By far, most detainees are in blue (signifying no known record or only minor violations).  Known gang members and other high-risk prisoners are placed in separate pods from others.  The ICE officers who conducted the tour told me that procedures are designed to be the least restrictive possible given the circumstances.  They also told me that the detainees on the whole tend to be well-behaved and that few fights break out.

**AR00328**

138     *Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

That doesn't mean that all detainees should be content to remain in a detention center a long time (though I suspect that those who are escaping violence in their own countries are often quite happy to be where they are).  It is perfectly understandable why detainees would prefer freedom here in America to the Spartan communalism of a detention center.[4] But under our laws those who are asking for asylum must demonstrate that they are eligible for it.  That takes time.[5]  I was told the average length of stay at Otay Mesa was about 68 days.[6] It can be much longer for those who appeal a finding of ineligibility.

The purpose of this report is said to be to "update" our 2015 report, which was entitled *With Liberty and Justice for All:  The State of Civil Rights at Immigration Detention Facilities*. Given how disastrous the 2015 report was for the Commission's credibility, I am not surprised that its members would wish for a second chance.  I believe my 47-page dissenting statement to that report was quite devastating.[7]

There are several unusual aspects to this "update."  For reasons that were not made completely clear, the Commission decided to do it through a subcommittee.  That makes it unique among Commission reports during my 12-year tenure on the Commission.  Note that I was not assigned to be on the subcommittee.  I am therefore coming to this report somewhat late in the process.

At the Commission's telephone meeting on August 29, 2019, it adopted the subcommittee's report by a 5 to 1 vote, with one Commissioner recused and one absent. At that meeting, at least one commissioner took the position that our usual rules, which give each Commissioner 30 days to write a statement and an additional 30 days to respond to the statements of other Commissioners,[8] do not apply to reports produced by a subcommittee.  (While it was stated that this was the opinion

---

[4] If a detainee prefers freedom in his or her home country, that option is always available.  In that sense, detainees hold the key to the detention center in their hands.

[5]  In addition to time, it takes lawyers and judges.  The Otay Mesa detention center has an area given over to the U.S. Department of Justice, which employs the administrative law judges who preside over immigration matters.  The facilities there include a courtroom and an area for detainees to consult with their lawyers.  I was told that the length of time detainees stay at Otay Mesa is generally a function of how long their cases take to get through the legal system.  The longest stays are often the result of appeals to the U.S. Court of Appeals for the Ninth Circuit.  Speeding up this process would shorten the average length of stay.  I cannot comment further on this, because neither the Commission nor I have studied the process. When I visited Port Isabel and Karnes in 2015, the primary complaint I heard was that the process takes too long.

[6] Would it be possible to allow all individuals who apply for asylum to be released on their own recognizance?  Surely this is possible for some asylum seekers, and indeed it is done with some. But even now, many persons so released fail to attend their hearings. If implemented as a general policy, the numbers of migrants disappearing into the interior would likely rise significantly. See Statement of Commissioner Gail Heriot in U.S. Commission Civil Rights, *With Liberty and Justice For All:  The State of Civil Rights at Immigration Detention Facilities* 186-198 (2015).

[7] See Statement of Commissioner Gail Heriot in U.S. Commission Civil Rights, *With Liberty and Justice For All: The State of Civil Rights at Immigration Detention Facilities* (2015).

[8] The rules also provide for surrebuttal in appropriate circumstances, but surrebuttals are rare.

of our General Counsel, the General Counsel later stated in writing that this was *not* her opinion.) In any event, the Commission voted to allow Commissioners, including me, 30 days to write a statement, but not to allow us the usual 30 days to respond to one another.[9] This is yet another way in which this report constricted the usual procedures, which were designed to ensure that readers would be fully informed.

Another way in which input has been constricted is that no formal "briefing" was held in which experts and other witnesses were invited to testify. One of the reasons for this—possibly the main reason—is likely that the Commission's internal rules require that briefings be balanced with regard to the range of responsible viewpoints on the issue at hand. In this case, at a minimum, that would have meant that officials from the federal and state agencies whose work is being examined would have been afforded an opportunity to explain why they do things the way they do. I was told the reason for the lack of a formal briefing was cost. But it is not clear to me why we should undertake to write a report if the Commission's budget did not permit it to do so in a fair and balanced manner.

Instead, the subcommittee held only a three-hour, open-comment period where anyone from the public could come and talk to us about the topic.[10] Approximately 37 commenters showed up and were given up to five minutes each to make a statement (individuals using interpreters were allowed up to 10 minutes.) Many of the commenters who appeared were affiliated with activist groups and said the same things that they have said in many other places.[11]

I tend to like the idea of holding an open-comment period in conjunction with our more formal briefings. Even though open comment tends to attract a strong element of "astroturfing," it also gives individuals who might not otherwise be heard an opportunity to make their grievances known (or to explain why someone else's grievances are misplaced). Part of the Commission's role

---

[9] U.S. Commission on Civil Rights, Transcript of Commission Business Meeting, August 29, 2019, at 45-51. The Commissioner must have misheard the General Counsel. In a later email, dated September 16, 2019, she informed the Commissioners that she had said no such thing. On the other hand, it is true that the Commission has the *power* to suspend its rules by majority vote. And it did just that. The fact that the Commission has the power to do something is not the same thing as saying that it is appropriate for it to exercise that power. I note that Commissioner Kirsanow and I voted in favor of President Obama's nominations of our present Chair and Vice Chair on the condition that they would honor our current procedures for Commissioner Statements. In the present case, the Chair had previously recused herself from this report. She abstained from voting on whether to curtail our ordinary rights to respond to our fellow commissioners' statements. Although not recused, the Vice Chair also abstained rather than vote to honor those procedures.

[10] The Commission also collected written submissions for the record.

[11] See, e.g., the testimony of Losmin Jimenez (Advancement Project), Ishalaa Ortega (Immigration Equality); Yael Schacher (Refugees International); Miriam Abaya (Young Center for Immigrant Children's Rights); Manoj Govindaia (RAICES); Charanya Krishnaswami (Amnesty International); Jasmine Tyler (Human Rights Watch); and Laura Rivera of the Southern Poverty Law Center. I have criticized the Southern Poverty Law Center's methods in another forthcoming Commission report, *In the Name of Hate: Examining the Federal Government's Role in Responding to Hate Crimes.*

should be to ensure that everyone is heard.  But comments from open-comment periods (or from any source) cannot simply be accepted at face value.[12] The subcommittee should have followed up on the allegations made there and tried to see how many and which ones could be substantiated. As far as I can tell, it didn't. Instead, this report repeats largely verbatim portions of the transcript from that open-comment period.

For example, Eduardo Jimenez, originally from Mexico, testified during the open-comment period about his experiences at the Theo Lacy facility in Orange County, which has since ceased holding immigration detainees. *He said that he was not allowed to eat for weeks, not allowed to bathe, was sexually abused, and that fellow detainees' arms were broken in front of him.*[13]  If those allegations are true, we have a very serious problem on our hands.  You would think that if the subcommittee members viewed his allegation as at all credible, they would have followed up rather than simply report the allegation.  But they apparently did not do so.

Of course, there are reasons to doubt the allegation.  Some of those reasons I learned through an internet search (which apparently the subcommittee did not undertake).  While Jimenez did not testify to the dates that he was detained there, the State of California recently published an audit of its state-run facilities that hold federal immigration detainees, including the Theo Lacy facility in Orange County. It found that there were "no health and safety concerns at the facilities."[14] Apparently "multiple federal entities" also inspected Orange County's facilities. They found some concerns – including the failure to separate detainees of different risk levels, improper food handling, and mold and mildew in shower stalls – but not violations of the type or gravity that Mr. Jimenez described to us.[15]  That makes Jimenez's jaw-dropping allegations seem less credible than they would otherwise have been.  But more specific efforts by the subcommittee to get to the bottom of his story would certainly have been helpful.

Alas, the Commission has made similar mistakes before.  In the 2015 report, for example, it uncritically recounted a 2007 rumor that food served by a since-closed Willacy immigration detention center in Texas had contained maggots.  As I discuss in my Dissenting Statement in that report, if the Commission had done a simple internet search, it would have learned that shortly after the allegation first surfaced, both an American Bar Association delegation and a team from the Commission on Accreditation for Corrections that included food specialists had been sent in

---

[12] On occasion, open-comment period witnesses have presented what appear to be fantastic conspiracy theories. See, e.g., U.S. Commission on Civil Rights, Transcript of Briefing, November 2, 2018, at 347-350 (conspiracy theory involving Melania Trump being a spy for the Slovenian government.)

[13] U.S. Commission on Civil Rights, Transcript of Open Comment Period, April 12, 2019, at 116.

[14] California State Auditor, "City and County Contracts with U.S. Immigration and Customs Enforcement," February 2019, available at https://www.auditor.ca.gov/pdfs/reports/2018-117.pdf. The Commission's Chair, Catherine Lhamon, was recused from this report "due to [her] work outside the Commission." She serves as Legal Affairs Secretary for the Governor of California.

[15] Id. at 33.

to investigate Willacy.[16]  While no one can prove conclusively that the allegation was a fabrication, the findings of those delegations made it extremely unlikely to be true.  While neither delegation was composed of pushovers—both noted several issues—they found nothing remotely supportive of the maggot allegation.[17]  In that same report, the Commission uncritically recounted a story about a transgender woman with AIDS who died of what was alleged to be negligence on the part of a detention center.  When Commissioner Kirsanow and I followed up on that story, we learned that the patient had claimed to be allergic to the appropriate drugs and had initially refused treatment.  That puts the matter in a very different light.[18]  And again in the same report, the Commission uncritically reported accusations of massive sexual misconduct on the part of detention center guards with female detainees.  It failed to mention (presumably because it failed to follow up) that these allegations had been thoroughly investigated by Inspector General for the Department of Homeland Security.  After interviewing 33 witnesses and spending 380 hours investigating the situation (including reviewing 360 hours of time lapsed surveillance video footage of the places where the misconduct was alleged to have occurred), the Inspector General found no evidence whatever to substantiate the wild allegations.

All of this is part of a pattern of sloppy fact-finding.[19]  It is worth pointing out here that the Commission decided only near the end of its 2015 investigation (after the draft report was already

---

[16] The visit by the Commission on Accreditation for Corrections had been requested by ICE for the specific purpose of following up on the allegations of maggots in the food.

[17] The food service issues were minor.  For example, the Commission on Accreditation for Corrections found that "food in the dry storage area as well as the freezer are stacked too high," causing boxes on the bottom to be crushed."

Detainees were asked about their satisfaction with the food.  While there were some criticisms (as well as some praise), none of the criticism was remotely in the category of maggots.  A typical example was "too many sandwiches."

The ABA delegation had quite a few criticisms for Willacy (though none nearly so lurid as the accusations that were leveled at our briefing).  But it had nothing bad to say about the food.  While it acknowledged the Willacy "maggot allegation," it stated that Willacy appeared to meet the appropriate standards in the area of food service.  It was clear the members of the ABA delegation had serious doubts about the allegation.  See Memorandum of American Bar Association Delegation to Willacy Detention Facility to James T. Hayes, Jr., Acting Director of Detention and Removal, Immigration and Customs Enforcement (March7, 2008).

None of this made it into our 2015 report, except through my dissenting statement.  See Statement of Commissioner Gail Heriot in U.S. Commission Civil Rights, *With Liberty and Justice For All:  The State of Civil Rights at Immigration Detention Facilities* (2015).

[18] Letter to Gail Heriot & Peter Kirsanow for ICE Deputy Director Daniel H. Ragdale.  See Dissenting Statement of Commission Heriot in U.S. Commission on Civil Rights, *With Liberty And Justice for All:  The State of Civil Rights at Immigration Detention Facilities* 43 (September 2015).

[19] See, e.g., Statement of Commissioner Gail Heriot in U.S. Commission on Civil Rights, *Beyond Suspensions: Examining School Discipline Policies and Connection to School to Prison Pipeline for Students of Color with Disabilities* (2019)(criticizing Commission's misunderstanding of empirical research); Dissenting Statement of Commissioner Gail Heriot in U.S. Commission on Civil Rights, *Environmental Justice:  Examining the*

largely written) that it should actually visit a detention center.  That is when—in part at my insistence—we finally went to see Karnes and Port Isabel. I was not the only Commissioner to be surprised at how nice the Karnes Center, which was used for mothers and their minor children, was.  As I wrote then:

> Some of our Commission members and staff appeared to be quite surprised at the quality of treatment they saw.  When we were led to a room at the Karnes facility that contained rows and rows of brand new brand-name clothing and told that new arrivals were permitted to select six outfits for themselves and each of their children, the looks on the faces of my colleagues were of astonishment.  Questions were asked:  "These aren't new, are they?"  Yes, they are new, the tour guide explained.  "I guess they are donated, right?"  No, the tour guide replied, they are purchased by GEO (the private company that owns and manages the Karnes facility in cooperation with ICE).[20]

I described these visits at length in my Commissioner's Statement.[21]  The staff-written part of the 2015 report, however, barely mentioned the visits.  It was almost as if they had never happened. That was really inexcusable.

Although I cannot do them justice in this statement, two more issues deserve mention.  First, the current report renews the claim in the 2015 report that private detention centers are inherently worse than publicly run ones. I think I did a reasonable job explaining why I believe such claims are untrue.  I will not repeat that explanation here.[22]  I add only that the Otay Mesa facility is run by Core Civic, a private company.   Approximately 74 ICE officers work there along with approximately 400 Core Civic employees.

Second, I have not attempted to deal with the family separation issue in this statement.  Serious questions are being raised by both sides of the issue about how best to handle the problem.  I do not feel qualified at this time to sort them out.[23]  I understand that Commissioner Kirsanow intends to address them in his statement and that he has a somewhat different perspective than that offered by the staff-written portion of the report.

---

*Environmental Protection Agency's Compliance and Enforcement of Title VI and Executive Order 12,898* (2016)(criticizing the Commission for its fact finding).

[20] See Statement of Commissioner Gail Heriot in U.S. Commission Civil Rights, *With Liberty and Justice For All: The State of Civil Rights at Immigration Detention Facilities* at 174 (2015).

[21] Id. at 198-206 (Karnes); Id. at 206-210 (Port Isabel.)

[22] Id. at 181-186.

[23] In the past when the Commission has approved multiple reports during the same time frame, it has staggered the due dates for Commission Statements, so that Commissioners (who are only part-time officials) can comment thoughtfully.  This time with three reports going at the same time (and a fourth carried over for revisions from an earlier date), it did not.

## Dissenting Statement of Commissioner Peter N. Kirsanow

## Introduction

The short version of this report is that there is nothing the government can do, short of immediately admitting every person who presents himself at the southern border, with no regard to whether this person will ever resurface for an immigration hearing or report for removal if ordered removed, that will satisfy the Commission majority (or, for that matter, the judicial #Resistance). Metering to allow only a certain number of people in at a time, so as not to overwhelm Border Patrol facilities? No! It encourages people to cross illegally (which of course is the fault of the U.S., not the people crossing illegally.) Remain in Mexico until your asylum claim is adjudicated? Absolutely not! Safe third country agreement with Guatemala? How dare you even suggest such a thing!

## Evidence Adduced by the Commission

Question: "What evidence was adduced by the Commission?" Answer: "Very little."

No one should take this report seriously. We issued a report in 2015 on immigration detention facilities during the Obama Administration. That report contained serious errors[1], and as Commissioner Heriot noted in her statement, the report credulously reported eight-year-old rumors rather than conducting an investigation into the truth of those rumors.[2] At least in that instance, the Commission felt it had to go through the motions of actually visiting immigration detention facilities. That didn't happen for this report. Before we had done any work on this report, the Commission majority had issued a letter denouncing the family separation policy.[3] Somewhere a Red Queen is smiling.

Rather than visiting any detention centers, the Commission solicited public comments through a public hearing and email. The Commission states that it "heard directly from immigrant detainees".[4] To be precise, it heard from three former detainees. One former detainee who testified, a transgender woman, complained about the treatment she received in July 2012 – during the

---

[1] Dissenting Statement of Commissioner Peter Kirsanow, *With Liberty and Justice for All: The State of Civil Rights at Immigration Detention Facilities*, U.S. Commission on Civil Rights, 245-246, 2015, https://www.usccr.gov/pubs/docs/Statutory_Enforcement_Report2015.pdf.

[2] Statement of Commissioner Gail Heriot, *With Liberty and Justice for All: The State of Civil Rights at Immigration Detention Facilities*, U.S. Commission on Civil Rights, 172-181, 2015, https://www.usccr.gov/pubs/docs/Statutory_Enforcement_Report2015.pdf.

[3] "The U.S. Commission on Civil Rights Issues Letter to the Departments of Justice and Homeland Security Denouncing Separation of Immigrant Families," June 15, 2018, https://www.usccr.gov/press/2018/06-15-18-PR.pdf.

[4] Finding III A.

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

Obama Administration. This person asserted that immigration officers repeatedly touched her genital area to try to determine whether she had had sex reassignment surgery, rather than believing what this person told them on that front. Other complaints included being handcuffed too tightly, not having separate spaces for transgender people (although ICE staff did remove the other inmates from the cell so she could sleep in there alone), gaining 40 pounds in detention due to the unhealthy commissary snacks, and that, due to being unable to shower for the first day after being apprehended, "my facial hair was mixed with my makeup and people looked at me as if I was a circus sensation."[5] Likewise, another former detainee complained of treatment he received in 2015 . . . again, under the Obama Administration.[6] Another former detainee said that when he was detained in Orange County, "I was not allowed to eat for weeks." Admittedly, this was being stated through a translator, so perhaps something was lost in translation. Whatever terrible things this man may have suffered in detention, however, it seems very unlikely that he was not allowed to eat for *weeks*.[7]

## Willful Misunderstanding of Asylum

One of the primary flaws with this report is that it fundamentally misunderstands asylum. "In recent years, typical migrants are families or children escaping violent crime, unrestrained gangs, and failing economies in their home countries in Central America."[8] Later, it says:

> The process of seeking asylum is very difficult and passage rates are low. In 2017, only 13.67 percent of total asylum applicants were granted asylum, followed by 12.30 of applicants in 2018. In 2018, 14.89 percent of El Salvadoran applicants were granted asylum and 51.28 percent were denied, 13.81 percent of Honduran applicants were granted asylum and 55.48 percent were denied, and 11.18 percent of Guatemalan applicants were granted asylum and 52.23 percent were denied. Despite the dangerous conditions in all three countries, these are lower rates of approval than persons from other countries.[9]

The report itself inadvertently admits that these families are not eligible for asylum. None of these factors are grounds for asylum.[10] "Violent crime" and "dangerous conditions" are not grounds for

---

[5] Ishalaa Ortega, Briefing Transcript at 83-88.

[6] Robin A., Briefing Transcript at 105-109.

[7] Edouardo Jimenez, Briefing Transcript at 114-117.

[8] Report at n. 219.

[9] Report at n. 270-272.

[10] Pub. L. 96-212.
   The term "refugee" means (A) any such person who is outside any country of such peron's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable to unwilling to return to, and is unable or unwilling

AR00335

asylum. I agree that, for many, El Salvador, Guatemala, and Honduras are not great places to live. But that isn't grounds for asylum. The south side of Chicago isn't a great place to live either, but no one thinks gang violence there entitles Chicago residents to asylum in Canada. The report does not allege, nor does anyone have the gall to claim that there is an identifiable group in these countries facing targeted violence akin to that suffered by Yazidis and Christians in Syria during the rule of ISIS. Those are the types of situations intended to be addressed by asylum, not generic bad places to live. Were it otherwise, the majority of the world's population would have arguable claims for asylum.

Since at least the Obama Administration, many people from Central American countries seem to have been laboring under the misapprehension that the United States simply allows minors into the country. During the Obama Administration, news of the Administration's limited amnesty, DACA, filtered into the consciousness of Central Americans as "the U.S. is handing out permits to illegal alien minors." This was somewhat true, but inaccurate in that the U.S. government was not handing out permits at the border. Then-Department of Homeland Security Secretary Jeh Johnson issued an open letter to be published in Central American countries, warning parents who were thinking of sending their children illegally to the U.S. that "there are no 'permisos,' 'permits,' or free passes at the end."[11]

There is also evidence that illegal aliens are coached on what to say in order to pass a credible fear interview, regardless of whether what they are saying is true. *The Atlantic* and ProPublica, describing their recent co-investigation of human smuggling, wrote:

> In recent years, **a favored tactic has been to coach migrants to surrender to U.S. border authorities and request political asylum, which often gained them temporary residence** while cases languish in the overwhelmed immigration court

---

to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution *on account of race, religion, nationality, membership in a particular social group, or opinion*, or (B) in such special circumstances as the President after appropriate consultation (as defined in section 207(e) of this Act) may specify, any person who is within the country such person's nationality or, in the case of a person having no nationality, within the country in which such person is habitually residing and who is persecuted or has a well-founded fear of persecution *on account of race, religion, nationality, membership in a particular social group, or political opinion*.

[11] "An open letter to the parents of children crossing our Southwest border," in *Written testimony of DHS Secretary Jeh Johnson for a House Committee on Homeland Security hearing entitled, "Dangerous Passage: The Growing Problem of Unaccompanied Children Crossing the Border,"* June 24, 2014, https://www.dhs.gov/news/2014/06/24/written-testimony-dhs-secretary-jeh-johnson-house-committee-homeland-security.

system. Officials said some smuggling organizations track the evolution of U.S. policies, adapting their routes to the enforcement strategies. [emphasis added][12]

In 2014, a document believed to be a "cheat sheet" was found near McAllen, Texas border crossing that advised illegal immigrants on what to say when questioned by Border Patrol. One sample question was "Why did you abandon your country?" Suggested answers were "Because of poverty and misery," "You're in fear of your government and afraid to live in your country" and "You're afraid of extortion from Maras (the street gang MS-13)."[13] All of these are straightforward answers that would not require a cheat sheet to answer, *if they were actually true*. And the staff of Congresswoman Veronica Escobar allegedly crossed into Mexico to interview aliens who had been returned to wait in Mexico while their asylum claims were adjudicated and coached some to claim that they did not speak Spanish, which would permit them to immediately enter the U.S.[14]

All of this is to say that none of the claims for asylum can be taken simply at face value. There are too many individuals and organizations dedicated to insuring that illegal immigrants say the right things to pass a credible fear interview to take any of these claims seriously without thorough investigation.

An examination of how many people eventually receive asylum also suggests that the vast majority of those claiming asylum are not entitled to it. As I note in my statement in the Commission's forthcoming statutory enforcement report:

---

[12] Sebastian Rotella, Tim Golden, and ProPublica, *Human Smugglers Are Thriving Under Trump*, Feb. 21, 2019, https://www.theatlantic.com/politics/archive/2019/02/human-smugglers-thrive-under-trumps-zero-tolerance/583051/.

[13] Michael Zennie, *The 'cheat sheet' found near Mexico border [] that shows illegal immigrants how to stay in the United States if detained by authorities*, The Daily Mail, June 26, 2014, https://www.dailymail.co.uk/news/article-2671292/The-cheat-sheet-near-Mexico-border-shows-illegal-immigrants-guarantee-asylum-hearing-usually-release-detained-U-S-authorities.html.

[14] Anna Giaritelli, *Democratic congresswoman secretly sending staff into Mexico to coach asylum-seekers*, Wash. Examiner, July 5, 2019, https://www.washingtonexaminer.com/news/democratic-congresswoman-secretly-sending-staff-into-mexico-to-coach-asylum-seekers.

> Under the bilateral Migration Protection Protocols, or "Remain in Mexico" policy, anyone returned must be fluent in Spanish because they may have to reside in Mexico up to five years until a U.S. federal judge decides their asylum claim. A Democratic politician's aides re-escorting people back to the port are telling officers the Central American individual with them cannot speak Spanish despite their having communicated in it days earlier, [Customs and Border Protection] officials said.

> "What we're hearing from management is that they're attempting to return people, and the story was changed in Mexico, where a person who understood Spanish before now doesn't understand – where a person who didn't have any health issues before now has health issues," the union representative said.

The Commission majority would likely dispute my assertion that many of those claiming asylum at the southern border do not have a valid claim. Only 44.5 percent of asylum applicants who pass a credible fear interview show up in court to apply for asylum.[15] If you are truly worried that you will be subjected to physical persecution if you are returned to a country, you would be a little more on top of ensuring that you *actually applied* for asylum. After all, as we are told many times, these people undertake a treacherous journey from Central America to arrive at our southern border. If you can make it from Honduras to the United States, you can definitely show up in court to make your asylum claim – *if* you believe your claim is likely to be granted. If you know it is unlikely to be granted, you will probably vanish into the interior of the United States and hope to avoid removal. And this is exactly what the majority of those who have passed a credible fear interview do.

Of those who do show up for their hearing after passing a credible fear interview, DHS notes that "many more fail to comply with the lawfully issued removal orders from the immigration courts and some families engage in dilatory legal tactics when ICE works to enforce those orders."[16] Furthermore, the number of those who do not show up for hearings or removal has ballooned. According to EOIR (Executive Office for Immigration Review), in 2006 there were 573 final orders issued in absentia for cases originating as credible fear claims. In FY 2017, this had exploded to 4,038 – which actually was a marked decline from FY 2016, in which 8,999 such orders were issued.[17] Only 16 percent of adults who initially receive credible fear determinations are ultimately granted asylum.[18]

---

[15] Andrew R. Arthur, *Trump Baits the Press on Asylum No-Shows*, Center for Immigration Studies, Nov. 2, 2016, https://cis.org/Arthur/Trump-Baits-Press-Asylum-NoShows.

[16] 83 FR 45520.

[17] Credible Fear in the U.S. Immigration System, U.S. Dep't of Justice, Executive Office for Immigration Review (EOIR), May 24, 2018, at 5, https://cis.org/sites/default/files/2018-09/EOIR_Credible%20Fear_USCIS%20Proceedings%20Table.pdf; *see also* Andrew R. Arthur, *Trump Baits the Press on Asylum No-Shows*, Center for Immigration Studies, Nov. 2, 2016, https://cis.org/Arthur/Trump-Baits-Press-Asylum-NoShows; Jessica M. Vaughan, Andrew R. Arthur, and Dan Cadman, *A One-Sided Study on Detention of Illegal-Immigrant Families*, Center for Immigration Studies, Sept. 14, 2018, https://cis.org/Vaughan/OneSided-Study-Detention-IllegalImmigrant-Families.

[18] Credible Fear in the U.S. Immigration System, U.S. Dep't of Justice, Executive Office for Immigration Review (EOIR), May 24, 2018, at 9, https://cis.org/sites/default/files/2018-09/EOIR_Credible%20Fear_USCIS%20Proceedings%20Table.pdf; *see also* Andrew R. Arthur, *Trump Baits the Press on Asylum No-Shows*, Center for Immigration Studies, Nov. 2, 2016, https://cis.org/Arthur/Trump-Baits-Press-Asylum-NoShows; Jessica M. Vaughan, Andrew R. Arthur, and Dan Cadman, *A One-Sided Study on Detention of Illegal-Immigrant Families*, Center for Immigration Studies, Sept. 14, 2018, https://cis.org/Vaughan/OneSided-Study-Detention-IllegalImmigrant-Families.

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

## Family Separation

Family separation only occurred when parents decided to cross ***illegally*** with their children. If a person presented herself at a port of entry and requested asylum, she would not be separated from her children. If these families were primarily interested in seeking asylum, they would have presented themselves at a port of entry to be processed in an orderly manner, rather than entering the U.S. illegally and ***then*** requesting asylum after they are caught.

The report also does not address the near-certainty that many illegal immigrants bring their children with them in order to game the system. According to NPR:

> Garcia [an advocate for illegal immigrants] says so many immigrants are traveling with their children these days – because the smugglers tell them to.
> "Bring one of your kids, because you stand a better chance of not getting locked up right off the bat," he says, "And so that's part of the way the smuggler presents it."[19]

The *Wall Street Journal*, a strong supporter of expansive immigration policies, wrote in 2018:

> On this city's violent outskirts, where families live in tin-roofed shacks on streets menaced by gangs, the word is out about one of the biggest factors that can determine their fate in the U.S. immigration system: children.

> The number of Central American families with children arriving at the U.S. border seeking asylum has surged in recent years – and they keep coming, as more migrant caravans make their way through Mexico.

> Families from crime-ridden Honduras, Guatemala and El Salvador are able to gain entry by demonstrating a credible fear of returning home, and having children in tow can shorten the length of time they are detained in the U.S. because of a 20-day limit on detaining minors; an adult traveling alone could be detained much longer.

> Doris Paz, a 29-year-old mother of three, said that is how her sister-in-law reached San Antonio. It is how a neighbor recently crossed into the U.S. with two children. It is why a cousin grabbed her children and joined a caravan of migrants that left Honduras last month. And it is why Ms. Paz joined the same caravan with her 6-year-old son.

---

[19] John Burnett, *As Border Crossings Tick Up, Migrants Bring Children, Take More Dangerous Routes*, NPR, April 6, 2018, https://www.npr.org/2018/04/06/600288184/as-border-crossings-tick-up-migrants-bring-children-take-more-dangerous-routes.

"They say that bringing your child is your ticket in," said Ms. Paz. After a few days walking with her son under tropical heat, however, she turned around and went home.[20]

If people know that this is how to game the system, what would the Commission majority have us do? Nothing? It appears the best approach is what the Administration is, in fact, doing – issuing a regulation to replace the Flores Agreement so parents and children can be detained together while their claims are adjudicated.

It is worth noting that after DHS was ordered to reunite separated children with their parents, the press criticized DHS for having reunited only 364 out of 2,500 children. One reason more parents were not reunited with their children, which is conspicuously absent from the report, is that a large number of parents were found to have criminal records. According to a Congressional Research Services report, "Another 908 parents were not expected to be eligible for reunification because they possessed criminal backgrounds or required 'further evaluation.'"[21] In other words, approximately a third of parents separated from their children had criminal records in addition to illegal entry. The Commission report cites the CRS report, but curiously enough, this fact did not make it into the Commission report.[22]

## Metering

The report states:

> The Border Patrol metering policy may have led to an increase in illegal border crossing by asylum seekers who could not have otherwise entered at a port of entry processing site where they would then be susceptible to prosecution under zero tolerance. An increase in illegal border crossings could include asylum seekers taking more dangerous paths to reach the U.S. This was the case for Óscar Alberto Martínez Ramírez and his one-year old daughter, Valeria, who attempted to enter the U.S. at the official port of entry at Matamoros, Texas and told it was closed, and subsequently drowned while attempting to cross the Río Grande River.[23]

It is tragic whenever someone dies crossing the border, especially when it is a child who had no choice in the matter. Yet even this sad story illustrates that this is not an asylum issue, except

---

[20] Ryan Dube and Robbie Whelan, *A Way for Migrants to Ease U.S. Entry: Come as a Family*, Wall St. J., Nov. 16, 2018, https://www.wsj.com/articles/migrants-adopt-strategy-for-u-s-entry-come-as-a-family-1542376796.

[21] William A. Kandel, *The Trump Administration's "Zero Tolerance" Immigration Enforcement Policy*, Congressional Research Service, Feb. 26, 2019, at 12, https://crsreports.congress.gov/product/pdf/R/R45266.

[22] Report at n. 123.

[23] Report at n. 153-154.

insofar as asylum claims are being abused to obtain entry into the U.S. and then vanish. Interviewed in El Salvador, Ramirez's mother said that she had warned him not to travel north, and that he had done so to work and earn money.[24] We can all have sympathy for people who want to live where they can have a better life, but still realize that this is not a basis for asylum. Furthermore, someone who crosses the border illegally because they have to wait in line to make a formal asylum claim is probably not going to show up for removal years later when their asylum claim is denied.

## Domestic Violence

The report states, "Under previous administrations, women fleeing gang violence and domestic violence in their home countries, from which the government did not protect them, were permitted to file asylum claims citing a credible fear of physical violence and/or sexual abuse."[25] Let's clarify that. Under **one** administration, the Obama Administration, domestic violence was considered grounds for asylum. The **statute** does not provide grounds for considering usual cases of domestic violence as grounds for asylum. The Obama Administration created a "social group" called "married women in Guatemala who are unable to leave their relationship" and deemed it a "particular social group" within the meaning of the statute.[26] The Obama Administration issued this decision in 2014, so when the Trump Administration attempted to restore the status quo in 2018, this expanded definition of asylum had only been in place for four years, not since time immemorial.

## Unaccompanied Alien Children

The report also faults HHS for (briefly) checking the immigration status of potential sponsors for unaccompanied children. Checking the fingerprints of potential sponsors revealed that many of these individuals were themselves in the country illegally. Referring to unaccompanied alien children as "children," while technically correct, is also somewhat misleading. According to ORR, which is responsible for caring for UACs, 73 percent of unaccompanied minors who came through ORR in FY 2018 were over age 14, and 71% were boys.[27] The vast majority of these teenagers are almost certainly considered adults by their cultures and expected to contribute to their families, despite their minimal skills. According to USAID, only 43% of girls and 45% of boys in Guatemala

---

[24] Nelson Renteria, *'I told him not to go,' mother of drowned Salvadoran migrant laments*, Reuters, June 26, 2019, https://www.reuters.com/article/us-usa-immigration-mexico-mother/i-told-him-not-to-go-mother-of-drowned-salvadoran-migrant-laments-idUSKCN1TR2PJ.

[25] Report at n. 189.

[26] Matter of A-R-C-G-, 26 I. & N. Dec. 388 (BIA 2014).

[27] U.S. Dept. of Health and Human Servs., *Fact Sheet – Unaccompanied Alien Children (UAC) Program*, August 6, 2019, https://www.hhs.gov/sites/default/files/Unaccompanied-Alien-Children-Program-Fact-Sheet.pdf.

enroll in middle school, and those in rural areas are even less likely to enroll in middle school.[28] USAID further notes, "more than 1.6 million youth between 15 and 24 years, including 600,000 youth in the Western Highlands, are out of school and do not have basic life or vocational skills to enter the workforce."[29] Educational attainment in El Salvador is similarly low. USAID reports that 66 percent of youth in El Salvador attend 7th-9th grade, and "There are over 300,000 youth aged 15 to 24 that neither study nor work."[30]

These are not, as sold to the American public, helpless toddlers. These are teenagers who are coming to join their illegal alien parents in the U.S., likely in order to start working illegally in the U.S. themselves. There is a very good reason for not turning UACs over to their illegal alien parents, namely, that the U.S. government is assisting lawbreakers in completing their course of lawbreaking. As U.S. District Court Judge Andrew Hanen wrote in 2013:

> Mirtha Veronica Nava–Martinez pleaded guilty to attempting to smuggle a ten-year-old El Salvadorean female, Y.P.S., into the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).This Court sentenced Nava–Martinez in accordance with the established federal procedure, the law, and the United States Sentencing Guidelines, and has purposefully waited until after signing that judgment before addressing the issue that is the subject of this Order.

> On May 18, 2013, Nava–Martinez, an admitted human trafficker, was caught at the Brownsville & Matamoros Bridge checkpoint. She was trying to smuggle Y.P.S. into the United States using a birth certificate that belonged to one of her daughters. Nava–Martinez had no prior relationship with Y.P.S. and was hired by persons unknown solely to smuggle her into the United States. Nava–Martinez is a resident alien and this was her second felony offense in three years, having committed a food stamp fraud offense in 2011. She was to be paid for smuggling Y.P.S. from Matamoros to Brownsville, although the identity of her immediate payor and the amount are unknown. The details as to how Y.P.S. got to Matamoros, Mexico from El Salvador, and how she was to get from Brownsville to Virginia were also not disclosed to the Court. **This conspiracy was started when Patricia Elizabeth Salmeron Santos solicited human traffickers to smuggle Y.P.S. from El Salvador to Virginia. Salmeron Santos currently lives illegally in the United States. She applied for a tourist visa in 2000, but was turned down. Despite being denied legal entry into the United States, she entered the United States illegally and is living in Virginia.**

> Salmeron Santos admitted that she started this conspiracy by hiring alien smugglers to transfer her child from El Salvador to Virginia. She agreed to pay $8,500 (and

---

[28] USAID, *Guatemala: Sector Brief, Education*, June 2018, at 1, https://www.usaid.gov/sites/default/files/documents/1862/sector_brief_-_education_june_2018.pdf.

[29] *Id.*

[30] USAID, *El Salvador: Education*, July 29, 2019, https://www.usaid.gov/el-salvador/education.

actually paid $6,000 in advance) for these human traffickers to smuggle her daughter. The criminal conspiracy instigated by Salmeron Santos was temporarily interrupted when Nava–Martinez was arrested. Despite this setback, the goal of the conspiracy was successfully completed thanks to the actions of the United States Government. This Court is quite concerned with the apparent policy of the Department of Homeland Security (hereinafter "DHS") of completing the criminal mission of individuals who are violating the border security of the United States. Customs and Border Protection agents stopped the Defendant at the border inspection point. She was arrested, and the child was taken into custody. The DHS officials were notified that Salmeron Santos instigated this illegal conduct. **Yet, instead of arresting Salmeron Santos for instigating the conspiracy to violate our border security laws, the DHS delivered the child to her—thus successfully completing the mission of the criminal conspiracy. It did not arrest her. It did not prosecute her. It did not even initiate deportation proceedings for her.** This DHS policy is a dangerous course of action.

**The DHS, instead of enforcing our border security laws, actually assisted the criminal conspiracy in achieving its illegal goals.** The Government's actions were not done in connection with a sting operation or a controlled delivery situation. Rather, the actions it took were directly in furtherance of Y.P.S.'s illegal presence in the United States. It completed the mission of the conspiracy initiated by Salmeron Santos. In summary, instead of enforcing the laws of the United States, the Government took direct steps to help the individuals who violated it. A private citizen would, and should, be prosecuted for this conduct.

This is the fourth case with the same factual situation this Court has had in as many weeks. In all of the cases, human traffickers who smuggled minor children were apprehended short of delivering the children to their ultimate destination. **In all cases, a parent, if not both parents, of the children was in this country illegally. That parent initiated the conspiracy to smuggle the minors into the country illegally.** He or she also funded the conspiracy. **In each case, the DHS completed the criminal conspiracy, instead of enforcing the laws of the United States, by delivering the minors to the custody of the parent illegally living in the United States.** [emphasis added][31]

There is no reason to think this has changed dramatically in the intervening six years. Even 15 year olds are unlikely to be able to fund a trip to the United States on their own, and 6 year olds definitely will be unable to do so. Just because they show up at the border without their parents does not mean their parents did not assist in planning and funding their trip. The parents themselves are engaging in human trafficking, funding human trafficking, and exposing their children to the dangers inherent in human trafficking. As former Secretary of the Department of Homeland

---

[31] U.S. v. Nava-Martinez, 2013 WL 8844097 (S.D. Tex. 2013).

Security Jeh Johnson testified, "These organizations not only facilitate illegal migration across our border, they traumatize and exploit the children who are objects of their smuggling operation."[32]

When we turn UACs over to illegal alien parents who are living in the U.S., we are ensuring that the parents achieve exactly what they wanted. This only encourages other people to fund and make similar journeys.

## Child Deaths

The report blames DHS for the deaths of several minors who were in DHS custody.[33] Certainly, Americans expect DHS and all government departments and agencies to do everything they can to protect the lives of individuals in custody. But to generally assign blame for these deaths is irresponsible and detached from reality. First, as everyone agrees, there has been a huge increase in the number of children showing up at the border, both on their own and accompanied by adults. According to ORR, which is responsible for finding placements for UAC:

> For the first nine years of the UAC Program at ORR, fewer than 8,000 children were served annually in this program. Since Fiscal Year 2012 (October 1, 2011-September 30, 2012), this number has jumped dramatically, with a total of 13,625 children referred to ORR by the end of FY 2012. The program received 24,668 UAC referrals from DHS in FY 2013, 57,496 referrals in FY 2014, 33,726 referrals in FY 2015, 59,170 in FY 2016, and 40,810 in FY 2017. In FY 2019 49,100 UAC were referred.[34]

In other words, there was a 500% increase in the number of UACs ORR is responsible for in 2019 as compared to 2011. Probability alone would suggest deaths might occur.

Second, apparently no blame attaches to the parents for transporting their young children on an arduous journey of hundreds of miles. In the tragic case of Jakelin Caal Maquin, for example, even her family did not say there was a burning reason for her to accompany her father. Her mother and three other siblings remained in their village with their extended family. According to her grandfather, "Jakelin's father decided to leave because he was frustrated of living in extreme poverty. 'He wanted to work, because he said he could make a better living there,' Caal said. Speaking on behalf of Jakelin's mother, who only speaks a Mayan dialect, Caal said she hopes her

---

[32] Written testimony of DHS Secretary Jeh Johnson for a House Committee on Homeland Security hearing entitled, "Dangerous Passage: The Growing Problem of Unaccompanied Children Crossing the Border," June 24, 2014, https://www.dhs.gov/news/2014/06/24/written-testimony-dhs-secretary-jeh-johnson-house-committee-homeland-security.

[33] Report at n. 340-363.

[34] U.S. Dept. of Health and Human Servs., *Fact Sheet – Unaccompanied Alien Children (UAC) Program*, August 6, 2019, https://www.hhs.gov/sites/default/files/Unaccompanied-Alien-Children-Program-Fact-Sheet.pdf.

husband stays in the U.S. to work. The family is worried they would not be able to pay the debt they acquired to send Jakelin and her father north, he says."[35]

It is strange that the death of another, unnamed Salvadoran child is included in this report. The report states:

> In May 2019, the death of an unnamed Salvadoran child in HHS custody came to light. Though she died in September of 2018, her passing was not reported until eight months later. She entered the United States at an ORR facility in Texas in a "medically fragile" state and was transferred by DHS between multiple medical facilities across multiple states for a number of months before she finally passed away.[36]

It does not appear DHS was in any way at fault. Rather, this poor child entered the U.S. in a medically fragile state (doubtless exacerbated by the journey from El Salvador), and DHS kept seeking medical treatment for her. Just because the medical treatment was ultimately unavailing does not mean DHS contributed in any way to her death. And in fact, this is what happened. According to local news in Nebraska:

> Darlyn was encountered by Border Patrol on March 1, 2018, a few miles west of Hidalgo, Texas. She complained of chest pain and three days later, was transferred to HHS custody where she remained for about seven months. Darlyn was treated for a congenital heart defect at various hospitals – including in San Antonio, Texas and Phoenix, Arizona.
>
> HHS spokesperson Mark Weber told CNN Darlyn had surgery complications that left her in a comatose state. She was transported to a nursing facility in Phoenix and later to Children's Hospital in Omaha, Nebraska, where she died on September 29, due to fever and respiratory distress.[37]

To say that this poor child died "in custody" is willfully misleading. She journeyed to the U.S. to join her mother, who is living in the U.S. illegally after leaving her daughter in El Salvador when she was one year old. When the girl reached the U.S., she complained of chest pain and was found to have a congenital heart defect, which by its nature is a preexisting condition. She then received medical treatment and surgery in two different hospitals on the U.S. taxpayers' dime. Sadly, there

---

[35] Nicole Chavez and Ray Sanchez, *Thousands of miles away, grieving family wants to know how 7-year-old girl died in US custody*, CNN, Dec. 15, 2018, https://www.cnn.com/2018/12/15/us/guatemalan-girl-border-patrol-death/index.html.

[36] Report at n. 355-356.

[37] CNN Wire, *Father of 10-year-old Salvadoran Girl Who Died in U.S. Custody Recalls His Last Words With Her*, KTLA, May 27, 2019, https://ktla.com/2019/05/27/father-of-10-year-old-salvadoran-girl-who-died-in-u-s-custody-recalls-his-last-words-with-her/.

were complications. She was transferred to a specialty hospital, undoubtedly to be closer to her mother, who now lives in Omaha, Nebraska. And then, tragically, she died.

If this condition had manifested in El Salvador, the girl likely would have died. HHS treated her just like a U.S. citizen would be treated – specialist hospitals, a skilled nursing facility, months of in-patient care. Yet for some reason this poor girl's death is blamed on HHS and DHS.

## Third Country Rule

The report criticizes the new "Third-Country Asylum Rule," which requires asylum seekers to have applied for asylum in a third country that they passed through on their way to the U.S. In other words, if you come from Central America and claim to need asylum, you must apply for asylum in Mexico before you apply for asylum in the United States. If your concern is to escape an abusive husband or a gang, you can do that as well in Mexico as in the United States. If, on the other hand, your real concern is that you want to enjoy better job prospects and a higher standard of living, Mexico may be less appealing than the United States. As the rule says, "the additional bar created by this rule also seeks . . . to deny asylum protection to those persons effectively choosing among several countries where avenues to protection from return to persecution are available by waiting until they reach the United States to apply for protection."[38] I am not sure why my colleagues object to this if their true concern is protection from persecution, rather than an intellectual or emotional commitment to open borders.

At any rate, the report states that this rule has been enjoined.[39] This is no longer accurate. The Supreme Court stayed the injunction on September 11, 2019. The rule is now in force essentially until the Court either denies the inevitable petition for a writ of certiorari or issues a judgment following the grant of the petition.[40]

## Sexual and Physical Violence Against Detained Children

The report states, "DHS's policies resulting in the forced stay of immigrant children in shelters has further resulted in widespread allegations of sexual abuse, *particularly among contractors*." [emphasis added] This is false. The Commission's forthcoming 2019 statutory enforcement report also strongly implies that alleged sexual abuse of detained minors is primarily committed by adult

---

[38] 84 FR 33834.

[39] Report at n. 179-180.  The report also expresses concern that the Administration did not comply with the notice-and-comment provisions of the Administrative Procedure Act. It is amusing that the Commission is suddenly so concerned with the requirements of administrative law, having just issued a report bewailing the withdrawal of the Obama Administration's school discipline and transgender guidances. I suppose there's a first time for everything, even for the Commission being concerned about administrative law.

[40] Barr v. East Bay Sanctuary Covenant, 2019 WL 4292781 (2019).

staff members. That report cites the same case involving Levian Pachedo, so I simply reproduce what I wrote in that report:

> [I]n the vast majority of complaints, the alleged perpetrator is a fellow minor detainee, not an adult staff member. According to the data published by Axios, of the cases reported to DOJ from October 2014 to July 2018, 851 complaints alleged that another minor was the perpetrator, and 178 alleged that an adult staff member was the perpetrator.[41] Obviously sexual abuse is terrible regardless of the identity of the perpetrator, but by only discussing a case where an adult staff member at a contract facility was convicted of sexual offenses, the report misleads the reader to believe this is a typical case.[42]

---

[41] Caitlin Owens, Stef W. Kight, and Harry Stevens, *Thousands of migrant youth allegedly suffered sexual abuse in U.S. custody*, AXIOS, Feb. 26, 2019, https://www.axios.com/immigration-unaccompanied-minors-sexual-assault-3222e230-29e1-430f-a361-d959c88c5d8c.html.

[42] Dissenting Statement of Commissioner Peter Kirsanow, "Are Rights Reality?," U.S. Commission on Civil Rights, forthcoming November 2019.

**Appendices**

AR00348

## Appendix A:   Federal Agency Roles in Immigration

The Department of Homeland Security, Department of Health and Human Services and the Department of Justice carry out the Administration's immigration policies.

### Department of Homeland Security

The Department of Homeland Security includes Customs and Border Protection, Immigration and Customs Enforcement, and Citizenship and Immigration Services.[765]

*Customs and Border Protection*

Border Patrol Agents police the 6,000 miles of American borders shared with Mexico and Canada as well as coastal waters around Florida and Puerto Rico.[766] Border Patrol agents are the first individuals representing the U.S. government that migrants encounter when they approach the Southern border and seek admittance to the U.S. at a port of entry.  Agents also patrol the areas between the ports of entry – either a physical, man-made barricade or natural barrier separating the U.S. and Mexico - and take into custody migrants who attempt to cross in these areas. Children, who are found unaccompanied or removed from an adult are transferred to the custody of Department of Health and Human Services, Office of Refugee Resettlement for placement in a shelter.[767]

*Immigration and Customs Enforcement*

Immigration and Customs Enforcement is the principal investigative arm of Department of Homeland Security[768] whose primary mission is to promote homeland security and public safety

---

[765] *See* "Secure U.S. Borders and Approaches," Dep't. Of Homeland Security, https://www.dhs.gov/administer-immigration-laws.

[766] *See* "About CBP," Customs and Border Protection, http://www.cbp.gov/about (accessed Sept. 26, 2019); "Border Patrol Overview," Customs and Border Protection, https://www.cbp.gov/border-security/along-us-borders/overview (accessed Sept. 26, 2019); *see also* Congressional Research Service, *Border Security: The Role of the U.S. Border Patrol*, by Chad Haddal, Aug. 11, 2010, p. 3, https://fas.org/sgp/crs/homesec/RL32562.pdf.

[767] U.S. Gov't Accountability Office, *Unaccompanied Children: Agency Efforts to Reunify Children With Parents Separated at the Border*, Government Accountability Office 19-163, Oct. 2018, pp. 2-3. The President's June 20, 2018, Executive Order altered this process and directed the Secretary of Department of Homeland Security to maintain custody of alien families during any criminal improper entry or immigration proceedings involving their members, to the extent possible. Exec. Order No. 13,841, 83 Fed. Reg. 29,435 (June 25, 2018). Although the executive order was announced on June 20, 2018, it was not published in the Federal Register until June 25, 2018.

[768] "Who We Are," Immigration and Customs Enforcement, https://www.ice.gov/about (accessed May 11, 2019).

through the criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration.[769]

Immigration and Customs Enforcement's Enforcement and Removal Office is the principal component for enforcing U.S. immigration laws.[770] Enforcement and Removal enforces these laws by "identifying and apprehending removable aliens, detaining these individuals when necessary, and removing them from the United States."[771] In other words, Enforcement and Removal carries out the detention and deportation functions of the agency.[772]

Enforcement and Removal is prohibited from detaining a child unless the child is detained with his/her family and is housed at a family detention center.[773] If an immigrant child is unaccompanied, Enforcement and Removal must transfer him/her to the Department of Health and Human Service office within 72 hours.[774]

*Citizenship and Immigration Services*

U.S. Citizenship and Immigration Services is responsible for overseeing the federal government's immigration service functions[775], namely for the initial adjudication of asylum applications for migrants.[776] U.S. Citizenship and Immigration Services has jurisdiction over asylum applications after Customs and Border Protection or Immigration and Customs Enforcement determines if a child is an unaccompanied minor and transfers the minor to the Department of Health and Human Services Office of Refugee Resettlement. Additionally, U.S. Citizenship and Immigration Services

---

[769] "What We Do," Immigration and Customs Enforcement, https://www.ice.gov/overview (accessed May 11, 2019).

[770] 2015 Report, footnote 65, *supra* note 1.

[771] Ibid.

[772] Doris Meissner, former commissioner of the U.S. Immigration and Naturalization Service, interview, *NPR*, July 2, 2018, https://www.npr.org/2018/07/02/625406673/the-many-functions-of-ice-and-how-that-came-to-be.

[773] *See* 8 U.S.C. § 1232(b)(3). Family detention centers are detention centers that detain mothers and their children within the same facility.

[774] *Id*.

[775] "Online Filing with USCIS," USCIS, https://www.uscis.gov/ (accessed Sept. 26, 2019).

[776] Congressional Research Service, *Unaccompanied Alien Children: An Overview*, by Lisa Seghetti, Alison Siskin, and Ruth Ellen Wasem, Sept. 8, 2014, p. 4, https://trac.syr.edu/immigration/library/P8978.pdf; Under the William Wilberforce Trafficking Victim Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5074 (USCIS has initial jurisdiction over an asylum application filed by an individual determined to be unaccompanied alien children.).

has jurisdiction over unaccompanied minor asylum applications pending in immigration court, the Board of Immigration Appeals, or in federal court if applicable.[777]

### Department of Justice—Executive Office for Immigration Review

Executive Office for Immigration Review is a Department of Justice component agency created on January 9, 1983, by combining the Board of Immigration Appeals and Immigration and Naturalization Service.[778] Executive Office for Immigration Review's primary mission is to adjudicate immigration cases in a fair, expedient, and uniform manner.[779] Executive Office for Immigration Review conducts immigration court proceedings, appellate reviews, and administrative hearings under the authority of the Attorney General.[780]

### Department of Health and Human Services

In 2003, Congress transferred responsibilities for the care and placement of unaccompanied children from the Department of Homeland Security to the Director of the Department of Health and Human Services Office of Refugee Resettlement.[781] Since then, Office of Refugee Resettlement has cared for more than 150,000 children, incorporating child welfare values as well as the principles and provisions established by the *Flores* Agreement[782] in 1997, the Trafficking Victims Protection Act of 2000[783] and its reauthorization acts, Trafficking Victims Protection Reauthorization Act of 2005 and 2008.[784]

According to Office of Refugee Resettlement's website, unaccompanied alien children apprehended by the Department of Homeland Security immigration officials are transferred to the

---

[777] Congressional Research Service, *Unaccompanied Alien Children*, p. 10.

[778] "Executive Office for Immigration Review, About the Office," Dep't. of Justice, https://www.justice.gov/eoir/about-office (updated Aug. 14, 2018).

[779] "Executive Office for Immigration Review," Department of Justice, https://www.justice.gov/eoir (accessed Sept. 36, 2019).

[780] Ibid.

[781] Pub. L. No. 107–296, § 462, 116 Stat. 2135.

[782] *Flores* Agreement, *supra* note 19.

[783] Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106–386, 114 Stat. 1464 (codified at 22 U.S.C. § 7101).

[784] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110–457, 122 Stat. 5044 (2008) (as amended by the Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, § 1201, 127 Stat. 54 (2013)).

care and custody of Office of Refugee Resettlement.[785] Office of Refugee Resettlement states it promptly places an unaccompanied child in the least restrictive setting that is in the best interests of the child, taking into consideration danger to self, danger to the community, and risk of flight.[786] According to Office of Refugee Resettlement it takes into consideration the unique nature of each child's situation and incorporates child welfare principles when making placement, clinical, case management, and release decisions that are in the best interest of the child.[787]

---

[785] "Unaccompanied Alien Children," Dep't Health and Human Services, Office of Refugee Resettlement, https://www.acf.hhs.gov/orr/programs/ucs (accessed Sept. 26, 2019).

[786] Ibid.

[787] Ibid.

AR00352

Appendix B: Copy of Department of Homeland Security Discovery Request

 UNITED STATES COMMISSION ON CIVIL RIGHTS

1331 PENNSYLVANIA AVENUE NW, WASHINGTON, DC 20425
www.usccr.gov

August 16, 2018

Secretary Kirstjen Nielsen
U.S. Department of Homeland Security
Washington, DC 20528

Dear Secretary Nielsen:

Congress has tasked the United States Commission on Civil Rights with investigating allegations of discrimination because of color, race, religion, sex, age, disability, or national origin. *See* 42 U.S.C. § 1975a(a)(2). In 2015, the Commission published a report on immigration detention facilities. The Commission recently reopened this investigation to examine the detention conditions of children and families, and the policies, practices, and procedures governing the detention and separation of families.

Per 42 U.S.C. § 1975a(e)(4), please find enclosed a set of Interrogatories and Document Requests being issued to your office by the U.S. Commission on Civil Rights (the "Commission"). Please respond to these Interrogatories and Document Requests within 30 days of service; *i.e.*, by Monday, September 17, 2018.

Please note that Congress has also given the Commission subpoena authority, *see* 42 U.S.C. § 1975a(e)(2), and directed that "[a]ll federal agencies shall cooperate fully with the Commission to the end that it may effectively carry out its functions and duties." *See* 42 U.S.C. § 1975b(e).

Please also designate a member of your staff to coordinate and facilitate our research, meetings, and your responses to our interrogatories and document requests. Commissioner Michael Yaki, chair of the Commission's discovery subcommittee on this matter, will be the Commission's contact person on this project. Please have your representative contact Commissioner Yaki at (415) 601-4008 or myaki@usccr.gov.

Thank you for your attention to this matter.

Sincerely,

Maureen E. Rudolph
General Counsel

Copy (with enclosures):
Cameron Quinn, Officer for Civil Rights and Civil Liberties

| DATE: | **August 16, 2018** |
|---|---|

**DATE:**         **August 16, 2018**
**TO:**           **Kirstjen Nielsen, Secretary**
                  **U.S. Department of Homeland Security**

**FROM:**         **Mauro A. Morales, Staff Director**
                  **Maureen E. Rudolph, General Counsel**
                  **U.S. Commission on Civil Rights**

**SUBJECT:**      **Interrogatories and Document Requests in Support of the U.S.**
                  **Commission on Civil Rights' Examination of Separation of Families**

---

Congress has tasked the United States Commission on Civil Rights with investigating allegations of discrimination. because of color, race, religion, sex, age, disability, or national origin. *See* 42 U.S.C. § 1975a(a)(2). Under this mandate, the Commission is conducting a study to update earlier Commission reporting, from 2015, evaluating the conditions of detention of undocumented immigrant children and their families.[788]  This study encompasses, but is not limited to, civil rights issues including whether relevant federal policies and/or practices operate on the basis of race and national origin.

Pursuant to 42 U.S.C. § 1975e(4) and § 1975b(e), the United States Commission on Civil Rights (the "Commission"), through its General Counsel, Maureen E. Rudolph, requests that Kirstjen Nielsen, Secretary of the U.S. Department of Homeland Security, answer fully, in writing and under oath, each of the following Interrogatories and respond to each of the following Document Requests.

We request that the Secretary serve a copy of the answers and objections, if any, along with the requested documents on the counsel for the Commission within thirty days after service, at the offices of the U.S. Commission on Civil Rights, 1331 Pennsylvania Avenue, N.W., Suite 1150, Washington, D.C., 20425.

---

[788] The Commission's 2015 report is available here:
https://www.usccr.gov/pubs/docs/Statutory_Enforcement_Report2015.pdf.

## INSTRUCTIONS AND DEFINITIONS

1. These interrogatories request information available to the Secretary and her employees, agents, and representatives, including with respect to any information or persons within the Department of Homeland Security.

2. The United States Commission on Civil Rights is referred to as the "U.S. Commission on Civil Rights," or the "Commission."

3. The Department of Homeland Security is referred to as "DHS." DHS includes not just the department proper, but all agencies under its supervision and management including, but not limited to, the U.S. Customs and Border Protection ("Border Patrol"), U.S. Immigration and Customs Enforcement ("ICE"), and any and all companies, corporations, Limited Liability Companies, or any other type of business entity DHS has under contract and does any work on its behalf, including, but not limited to housing adults and children, providing psychological services, medical services, language services, or any other services touching or concerning immigrants, migrants or other border crossers.

4. The Secretary should state the basis for any objection to answering any interrogatory. In the event that the Secretary objects to a part of an interrogatory, please provide information requested by the interrogatory that is not included within that partial objection. Please state with your objection any and all grounds you are relying on to lodge the objection including, but not limited to the specific statute, case law or constitutional section you are relying on for the objection.

5. These interrogatories are continuing in nature, and to the extent that the Secretary acquires new information on or before October 1, 2018, that is responsive to these interrogatories, please supplement the response.

6. The word "document" or "documents" or words of like or similar import mean, and include correspondence; memoranda; data; letters; books; charts; diagrams; empirical studies; graphs; handwritten notes; telegrams; studies; working papers; tabulations; data sheets; reports; typewritten notes; printed notes; contracts; memoranda of understanding; computer printouts; and electronic mail; photographs: video recordings and audio recordings of any thing and made by any method; and, any other method that creates a record kept by the government or business entity under contract to DHS.

7. The word "parent" or "parents" means parents (by blood or legal relationship), guardians, relatives (by blood or legal relationship), or next friend (as defined by law).

AR00355

8. If any document responsive to this request was, but is no longer, in your possession, custody, or control, please furnish a description of each such document and indicate the manner and circumstances under which it left your possession, custody, and control and state its present or last known location and custodian, if known.

9. If for any request there are no responsive document(s) in your possession, custody, or control, state whether documents that would have been responsive were destroyed or mislaid, and if so, the circumstances under which they were destroyed or mislaid, and who was responsible for the destruction or loss of the document(s).

10. For any document response for production but withheld pursuant to a claim of privilege, identify:

    a. The author's name and title or position

    b. The recipient's name and title or position

    c. All persons receiving copies of the document

    d. The number of pages of the document

    e. The state of the document

    f. The subject matter of the document; and the basis for the claimed privilege.

11. In lieu of providing a written response to an interrogatory, you may produce a document that fully responds to the interrogatory. Should the document not fully respond to the interrogatory, please state so in your written response and also provide the additional information needed to fully respond or the grounds for withholding such information, as specified in these instructions.

12. When responding to these interrogatories please type the interrogatory as stated hereinbelow and then your responses hereto. At the end of each answer to the interrogatories below state the exhibit number or numbers that the documents produced per the request in the interrogatory and/or mentioned in response to that particular interrogatory as is applicable and upon which you rely as a basis for your answer.

## **INTERROGATORIES**

1. What was DHS's role in the policy decision to separate children at the border from their parents who were being prosecuted under the "zero-tolerance" policy put in place by Attorney General Sessions?

   (a) Please list the names, positions held at the time and presently, business addresses, telephone numbers, email addresses of each and every person who took part in the discussions, either orally or in writing.

   (b) Please list all dates of meetings (in person, telephonically and by video) where the policy was discussed and decisions were made.

   (c) Please produce all notes, documents, memoranda and emails generated from the responses herein pursuant to Request for Documents number 2 hereinbelow.

   (d) How much time elapsed between the date you were notified of the need to develop a policy for the "zero-tolerance policy" and the time the policy was finalized.  Please provide the date of notification of the need for a policy and the date the policy was finalized.

   (e) Please provide a true and correct copy of the finalized policy that was completed on the finalization date provided in 1(d) pursuant to this request and the Request For Production of Documents made below.

   (f) Please identify the person most knowledgeable in regard to the information requested in this interrogatory

2. What interest of the United States was promoted by family separation?

3. What pre-implementation evidence supported a conclusion by DHS that family separation was justified under any policy interest of the United States?

   (a) Did you review any evidence, documents, email, scholarly articles, or any other items concerning the best interests of the children during the formation of the policy of family separation, and, if so, please identify each and every such source.

   (b) Please identify the person most knowledgeable in regard to the information requested in this interrogatory

4. Please describe the process or procedure by which the DHS implemented family separations in response to the "zero-tolerance" policy.

   (a) Please list all the persons, including but not limited to government employees and private contractors, both for-profit and not-for-profit (collectively, "private entities") hired by the government to effectuate the process and the positions these

AR00357

persons held at the time and hold now and all contact information for all people who were involved in developing the process that was used in separating children from their parents, adult guardians and/or next friend(s) and relatives.

(b)  Please state the policy used to determine the location the children were sent to after the decision to separate them from their parents, adult guardians and/or next friend(s) and relatives.

(c)  Please describe, in detail, how the process was implemented when separating the children from their parents, adult guardians and/or next friend(s) and relatives.

(d)  If no regular process was used in the separations, please answer why not?

(e)  How much time did it take to develop the written process used in separating children from their families.

(f)  How much time elapsed between the date you were notified of the need to develop a written process for the "zero-tolerance policy" and the time the written policy was finalized.

(g)  Please provide the date of notification of the need for a process or procedure and the date they were finalized. Please identify any aspect of the process policy or procedure established to provide for reunification of separated children.

(h)  Please provide a true and correct copy of the finalized process or procedure that was completed on the finalization date provided in (g) pursuant to this request and the Request For Production of Documents made below.

(i)  Please identify the person most knowledgeable in regard to the information requested in this interrogatory

5.  Please detail the locations of every office or facility, whether governmental or private, where DHS initially detained families determined to be within the ambit of the "zero tolerance" policy, prior to separating the children from their parents.

(a)  Were any DHS offices on the Eastern Seaboard (defined as extending from Maine to Florida) detaining and separating any families under the "zero tolerance" policy?

i.  If so, please provide the number, broken down by age, race, ethnicity, national origin, and religion, of families either detained under the "zero tolerance" policy or detained and released between April 1, 2018 and July 31, 2018.

(b)  Were any DHS offices on the border with Canada detained and separating any families under the "zero tolerance" policy?

      i. If so, please provide the number, broken down by age, race, ethnicity, national origin, and religion of families either detained under the "zero tolerance" policy or detained and released between April 1, 2018 and July 31, 2018.

6. If the response to question 6 shows that the "zero tolerance" policy was not enforced on the Eastern Seaboard or the border with Canada, please provide justification, including any written policies, directives, and including but not limited to supporting documents such as underlying data and information, as to why it was not enforced there and where it was enforced.

    (a) Please identify the person most knowledgeable in regard to the information requested in this interrogatory

7. What were the DHS's written criteria for separating a child from his/her parents, guardian(s), next friend(s) or relative(s)?

    (a) Please describe in detail the process by which individual determinations to separate children from their parents were made.

    (b) Please provide a true and correct copy of the written criteria used by you, your agents, or any private entities to effectuate the separating of the children contemplated by this interrogatory pursuant to Request for Production of Document made below.

    (c) If there were no written criteria for this action or conduct, please state so.

    (d) Absent any written criteria, please state to the best of your knowledge what the criteria that was used to choose which children were to be taken from their parents, guardians, next friend(s) or relatives and which children were allowed to remain unseparated.

    (e) Please identify the person most knowledgeable regarding the information requested in this interrogatory

8. How were children and parents notified that they were to be separated?

    (a) Was the notification, if any, in English, Spanish, or another language spoken by the parents and children?

    (b) Was it provided orally or in written form?

    (c) Were the parents, guardians, next friend(s), or relatives required to sign any paperwork acknowledging the separation and/or any aspect of the separation, including but not limited to where the children were being sent, whose legal custody they would be in, and whose physical custody they would be in.

(d) Were the parents, guardians, next friend(s), or relatives given any information, in writing, informing them as to where the children were being sent, and were they given any information, in writing, as to whose legal custody they would be in and whose physical custody that would be in.

(e) What if any efforts were made to ascertain whether people to whom any notice was provided could read and understand said notice.

(f) Please provide any supporting evidence documenting your response.

(g) Please provide a true and correct copy of any writings used to inform parents, guardians, next friend(s), or relatives as part of the Request for Production of Documents.

(h) At the time of separation, had any government, DHS, and/or private entities have any Court order authorizing a change in custody from the parents, guardians, next friend(s), or relative(s) to the government, DHS, or private entities.

(i) If there was no Court order, under what legal authority did DHS proceed?

(j) Please identify the person most knowledgeable in regard to the information requested in this interrogatory

9. Prior to April 2018, what policies and procedures did DHS have in place to track children and parents after separation?

(a) Which agency was given responsibility, if any, to ensure that children and parents could be reunited, and what means were used to ensure that would happen?

(b) Did any government, DHS or any private entities petition and seek a Court order transferring custody?

(c) If so, did any petition contain any clauses about the rights of the parents to have visitation, be informed of their children's whereabouts, informed of who had custody, and were the custodians of the children required to communicate to the parents the well-being and life progress of the children.

(d) If your answer is no to any part of interrogatory 8 (b) and (c) above please state why DHS did not require a Petition for change of custody to be filed and/or why it did not inform parents of their rights to visitation, their children's whereabouts, or any communication regarding the well-being and life progress of the children.

(e) Please identify the person most knowledgeable in regard to the information requested in this interrogatory.

10. During the period from April 2018 to July 31, 2018, what policies and procedures did DHS have in place governing the physical transfer and transport of children from one location to another?

   (a) Please provide copies of any policies and procedures.

   (b) Did DHS require that any private entity involved in the physical transfer and transport of children from one location to another be in compliance with these policies and procedures?  If not why not?

   (c) Please identify the person most knowledgeable in regard to the information requested in this interrogatory.

11. Subsequent to July 2018, what policies and procedures did DHS institute to track children and parents after separation?

   (a) Please identify the person most knowledgeable in regard to the information requested in this interrogatory

12. Prior to April 2018, what was DHS's role in tracking whether parents who were deported had children being detained separately?

   (a) Did DHS notify the government or private entity with physical custody of children that parents of children within their custody were being deported?

   (b) Did DHS provide the parents who were deported with any information, in writing, regarding the status, custody, and location of their children?

   (c) What policies and procedures, if any, were in place to ensure that parents who were deported could be reunited with children being detained separately?

13. Subsequent to July 2018, what has DHS done to track whether parents who were deported had children being detained separately?

   (a) What policies and procedures were instituted to reunite children being detained separately with their detained parent.

14. Prior to April 2018, how did DHS track children and their parents after separation? Please describe the procedures, if any, used to track children and their parents after separation, including but not limited to:

15. who each child's parents are,

16. where each child was placed,

AR00361

17. where each child's parents were placed, and

18. whether the child had sponsors in the United States with whom the child could be placed.

    (a) If procedures were in writing, please provide a true and correct copy of such as part of the Request for Production of Documents.

19. What was DHS's role in determining where to place children separated from their parents, and in determining where to place the parents after separation?  Please list every entity or institution where children separated from their parents were placed.

20. Prior to April 2018, had DHS let, obligated, or executed any contract or executed a supplement, addendum, or modification to an existing contract with any private entity for the detention of children separated or to be separated from their parents?

    (a) If the answer to this question is "yes" please provide true and correct copies of such contracts as part of the Request for Production of Documents.

21. How did DHS determine where to place children separated from their parents, and where to place the parents? Please describe the procedures and criteria used to determine in which facility the children would be placed after separation, and in which facility the parents would be placed.

22. How did DHS coordinate with the Department of Health and Human Services and the Department of Justice on policies, decisions, actions, etc., relevant to separation, placement, and tracking of children and parents?

    (a) Please detail all the tools used to coordinate DHS action with other government agencies or government contractors, including but not limited to, memorandums of understanding, transmittal forms from custody of one entity to another, other relevant policy documents, letters, agreements, etc.

23. What were DHS's case management statistics as of the dates April 30, 2018, May 30, 2018, June 30, 2018, and July 30, 2018 on issues including, but not limited to:

24. the number of families who were separated,

25. the number of children who were separated

26. the age, gender, race, ethnicity, and national origin of these separated children,

27. the facilities, including name, address, and operator at which children were placed

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

28. the age, gender, race, ethnicity, and national origin of these children at each of these facilities

29. Prior to April 2018, what was DHS's policy for reunifying separated children and parents?

   (a) Please describe all policy details, including but not limited to, who was "eligible" for reunification with their children or parents, who was ineligible for reunification, and what determined eligibility.

30. Are there any instances of DHS personnel coercing or attempting to coerce parents to give up their right to apply for asylum/refugee status in order to be unified with their children?

   (a) Please provide any policies or procedures regarding prohibitions on coercion that existed prior to April 2018, and after July 2018.

31. Were there any instances of parents being told that as a condition of unification with their children, or as a means of reunifying with their children faster, they could give up their right to apply for asylum/refugee status?

32. How many parents were told that as a condition of unification with their children they had to give up their right to apply for asylum/refugee status?

33. Was the conditioning of unification with children applicable to all asylum/refugee applicants or was this applied on a case by case basis?

34. How many cases or instances of coercion or attempted coercion of parents to give up their right of asylum in order to be unified with their children currently exist?

35. What are DHS's current procedures for reunifying children and parents?

   (a) Please detail all procedures regarding reunifying children and parents, including but not limited to, when the process would begin, where reunification would take place, and how long children have been separated before being reunified.

36. What is the DHS's criteria for making eligibility determinations on which children would be reunited with their parents?

   (a) What is the DHS's criteria for continuing the detention of children and parents who have been determined to be eligible for release?

   (b) Please detail all considerations that determined which children and/or parents would be eligible for reunification, and all considerations that determined which children and/or parents would not be eligible for reunification.

37. What policy governed DHS's decision to make eligibility determinations that limited the number of families who qualified for reunification?

38. If eligibility was determined, in whole or in part, on allegations or proof of crimes committed by the parents, how did DHS obtain information related to such crimes?

39. What allegations or proof of crimes were deemed sufficient to deny eligibility? Which specific crimes (whether alleged or proven) were deemed sufficient to deny eligibility?

   (a) If allegations or proof of crimes were based on crimes committed in another country, please describe the procedure for verifying the allegations or proof of crimes.

40. Who made the determination and on what basis was a determination made that there existed sufficient evidence to deny eligibility based on allegations or proof of crimes?

41. Were the parents deemed ineligible given an opportunity to address or respond to the determination?

42. What happens to children whose parents are deemed ineligible for reunification?

43. Does DHS plan to reunify all children and parents who were separated and if so what is DHS's timeline for the reunification of all children and parents who were separated?

44. What are DHS' policies for informing counsel, legal services providers, or other representatives of families regarding information regarding reunification, including final release destinations?

45. What is DHS's plan for finding deported parents and reunifying them with their children who still remain in the United States?

   (a) Please detail the procedure that will be followed to facilitate the reunification of children with parents who have already been deported.

46. How many families, between April 2018 and July 31, 2018, after separation and reunification, have been deported?

47. What are DHS's statistics for the reunification of all children and parents, including but not limited to data on:

   (a) How many families were separated;

(b) How many children were separated from their parents and the age, race, ethnicity, and national origin of each child;

(c) How many children were reunited with their parents and the age, race, ethnicity, and national origin of each child;

(d) How many children remain separated from their parents and the age, race, ethnicity, religion and national origin of each such child;

(e) Where children still separated from their parents are located,

(f) Of these children still separated, their age, race, ethnicity, religion, and national origin.

48. Please detail, for children separated between April and July 30, 2018, the conditions of:

(a) Confinement,

(b) Habitability standards,

(c) Access to education, and availability of physical activity at each stage of detention and/or placement for children,

(d) The availability of interpreters and other materials for language accessibility,

(e) The availability of medical and mental health care personnel

(f) The qualification of medical and mental health care personnel to treat children

(g) How are treatment decisions made regarding the accessibility of available medical and mental health care personnel

(h) Access to communication with separated parents;

(i) Any other information regarding the medical and mental health care of children.

49. What are DHS's policies for preventing the sexual abuse of children in detention?

(a) What protections are in place to prevent sexual abuse of children in holding facilities and what were the procedures to report assault and protect victims of sexual abuse occurred in detention?

(b) What policies govern how DHS responds to notice that sexual abuse of children may have occurred for children DHS detains?

(c) Please provide statistics regarding:

50. number of children alleged to have been subject to sexual abuse in DHS detention,

51. where the abuse took place,

52. how many instances DHS has taken disciplinary action of any type regarding allegations that children have been subject to sexual abuse in DHS detention, disaggregated by the age, race, ethnicity, religion, and national origin of each such child.

      1. (d) Please describe measures DHS takes to ensure the safety and rehabilitation of any child subject to sexual abuse while in DHS detention.

53. What are DHS's policies for preventing the physical and/or mental abuse of children in detention?

    (a) What protections are in place to prevent physical and/or mental abuse of children in holding facilities and

    (b) What were the procedures to report assault and protect victims if physical abuse occurred in detention?

    (c) What policies govern how DHS responds to notice that physical and/or mental abuse of children may have occurred for children DHS detains?

    (d) Please provide statistics regarding:

54. number of children alleged to have been subject to physical and/or mental abuse in DHS detention,

55. where the abuse took place,

56. in how many instances DHS has taken disciplinary action of any type regarding allegations that children have been subject to physical and/or mental abuse in DHS detention, disaggregated by the age, race, ethnicity, religion, and national origin of each such child.

      i. (e) Please describe measures DHS takes to ensure the safety and rehabilitation of any child subject to physical and/or mental abuse while in DHS detention.

57. What are DHS' policies regarding the use of psychotropic drugs on children in detention, including policies regarding securing parental or other guardian approval for administration of psychotropic medication on children in detention?

    (a) Who was authorized to make a decision to administer psychotropic drugs to a child in detention?

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

      (b) Who was authorized to administer psychotropic drugs to a child in detention?

      (c) When was DHS informed that psychotropic drugs were being administered to children?

      (d) Please provide statistics regarding the number of children in DHS detention to whom psychotropic medications have been administered, disaggregated by the age, race, ethnicity, religion, and national origin of each such child and including whether a parent or guardian authorized the administration of psychotropic medications.

58. Please detail all information regarding the national origin, ethnicity, race, and religion of all families affected by the aforementioned policies and procedures of separation of children and parents.

59. How does the DHS respond to reports that it has destroyed records related to family separations?

60. Since the 2018 decision by the Administration not to separate children from families, where are families currently being detained?

      (a) Please detail the conditions of confinement at each stage of detention and/or placement for families, including but not limited to:

           1. habitability standards,

           2. access to education,

           3. availability of physical activity,

           4. the availability of interpreters and other materials for language accessibility, as well as medical and mental health care personnel;

           5. the qualification of medical and mental health care personnel to treat children; treatment decisions regarding the accessibility of available medical and mental health care personnel;

           6. any other information regarding the medical and mental health care of families.

61. Since the 2018 decision by the Administration not to separate children from families:

      (a) How many families are being detained;

(b)  Where are they being detained;

(c)  The ages, race, ethnicity, religion, and national origin of each family in detention.

(d)  What criteria determines whether a family is detained?  Please provide any studies, data, and other supporting evidence documenting policies that underlie a decision to detain a family.

62. How many families at the southern border who were detained, together or separately since April 2018, have been deported because they gave up their right to apply for asylum/refugee status?

(a)  Please provide the ages, race, ethnicity, religion and national origin of each family.

63. Under what circumstances can families be released from detention?

(a)  Please provide any studies, data, and other supporting evidence documenting policies that underlie a decision to release a family into the United States.

    i.  How many families have been released from detention since July 2018?

    ii.  The ages, race, ethnicity, religion and national origin of each family released.

## DOCUMENT REQUESTS

1. Please provide any and all historical and current policy guidance, written instructions, or directives, which have been developed or disseminated to local, state, and federal detention centers, advocacy partners, and internally within the U.S. Department of Homeland Security regarding the separation of families and the "zero-tolerance" policy.

2. Please provide any memoranda, documents, or analyses discussing the implementation of the policy of separating children from their parents as part of the Administration's "zero-tolerance" policy.

3. To the extent not covered by the document requests above, please provide any and all documents relied on to prepare responses to the above interrogatories.

_____
Maureen E. Rudolph
General Counsel
U.S. Commission on Civil Rights
1331 Pennsylvania Avenue, N.W.
Suite 1150
Washington, D.C. 20425
Tel: (202) 376-7622

## CERTIFICATE OF SERVICE

I certify that on August 16, 2018, I caused the foregoing United States Commission on Civil Rights' Interrogatories and Document Requests to be served by courier and email upon the following:

Secretary Kirstjen Nielsen
U.S. Department of Homeland Security
Washington, DC 20528

_____
Maureen E. Rudolph
General Counsel

## Appendix C: Copy of Department of Health and Human Services Discovery Request



UNITED STATES COMMISSION ON CIVIL RIGHTS

1331 PENNSYLVANIA AVENUE NW, WASHINGTON, DC 20425
www.usccr.gov

December 11, 2018

Secretary Alex M. Azar
U.S. Department of Health and Human Services
200 Independence Ave., S.W.
Washington, DC 20201

Dear Secretary Azar:

Congress has tasked the United States Commission on Civil Rights with investigating allegations of discrimination because of color, race, religion, sex, age, disability, or national origin. *See* 42 U.S.C. § 1975a(a)(2). In 2015, the Commission published a report on immigration detention facilities. The Commission recently reopened this investigation to examine the detention conditions of children and families, and the policies, practices, and procedures governing the detention and separation of families.

Per 42 U.S.C. § 1975a(e)(4), please find enclosed a set of Interrogatories and Document Requests being issued to your office by the U.S. Commission on Civil Rights (the "Commission"). Please respond to these Interrogatories and Document Requests within 30 days of service; *i.e.*, by Monday, September 17, 2018.

Please note that Congress has also given the Commission subpoena authority, *see* 42 U.S.C. § 1975a(e)(2), and directed that "[a]ll federal agencies shall cooperate fully with the Commission to the end that it may effectively carry out its functions and duties." *See* 42 U.S.C. § 1975b(e).

Please also designate a member of your staff to coordinate and facilitate our research, meetings, and your responses to our interrogatories and document requests. Commissioner Michael Yaki, chair of the Commission's discovery subcommittee on this matter, will be the Commission's contact person on this project. Please have your representative contact Commissioner Yaki at (415) 601-4008 or myaki@usccr.gov.

Thank you for your attention to this matter.

Sincerely,

Maureen E. Rudolph
General Counsel

AR00371

Copy (with enclosures):
Roger Severino, Director of the Office of Civil Rights

| | |
|---|---|
| **DATE:** | **December 10, 2018** |
| **TO:** | **Alex M. Ajar, II, Secretary** |
| | **U.S. Department of Health & Human Services** |
| | |
| **FROM:** | **Mauro A. Morales, Staff Director** |
| | **Maureen E. Rudolph, General Counsel** |
| | **U.S. Commission on Civil Rights** |
| | |
| **SUBJECT:** | **Interrogatories and Document Requests in Support of the U.S.** |
| | **Commission on Civil Rights' Examination of Separation of Families** |

---

Congress has tasked the United States Commission on Civil Rights with investigating allegations of discrimination. The Commission is authorized to "study and collect information relating to," and "make appraisals of the law and policies of the Federal Government with respect to," . . . "discrimination or denials of equal protections of the laws under the Constitution of the United States because of color, race, religion, sex, age, disability, or national origin[.]" *See* 42 U.S.C. § 1975a(a)(2)(A)-(B). Under this mandate, the Commission is conducting a study to update earlier Commission reporting, from 2015, evaluating the conditions of detention of undocumented immigrant children and their families.[789] This study encompasses, but is not limited to, civil rights issues including whether relevant federal policies and/or practices operate on the basis of race and national origin.

Pursuant to 42 U.S.C. § 1975a(e)(4) and § 1975b(e), the United States Commission on Civil Rights (the "Commission"), through its General Counsel, Maureen E. Rudolph, requests that Alex M. Ajar, II, Secretary of the U.S. Department of Health and Human Services, answer fully, in writing and under oath, each of the following Interrogatories and respond to each of the following Document Requests.

We request that the Secretary serve a copy of the answers and objections, if any, along with the requested documents on the counsel for the Commission within thirty days after service, at the offices of the U.S. Commission on Civil Rights, 1331 Pennsylvania Avenue, N.W., Suite 1150, Washington, D.C., 20425.

---

[789] The Commission's 2015 report is available here:
https://www.usccr.gov/pubs/docs/Statutory_Enforcement_Report2015.pdf.

182   *Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

## <u>INSTRUCTIONS AND DEFINITIONS</u>

**1.**     These interrogatories request information available to the Secretary and his employees, agents, and representatives, including with respect to any information or persons within the Department of Health and Human Services.

**2.**     The United States Commission on Civil Rights is referred to as the "U.S. Commission on Civil Rights," or the "Commission."

**3.**     The Department of Health and Human Services is referred to as "HHS."  HHS includes not just the department proper, but all agencies under its supervision and management including, but not limited to, the Office of Refugee Resettlement ("ORR"), and any and all companies, corporations, Limited Liability Companies, or any other type of business entity HHS has under contract and does any work on its behalf, including, but not limited to housing adults and children, providing psychological services, medical services, language services, or any other services touching or concerning immigrants, migrants or other border crossers.

**4.**     The Secretary should state the basis for any objection to answering any interrogatory. In the event that the Secretary objects to a part of an interrogatory, please provide information requested by the interrogatory that is not included within that partial objection. Please state with your objection any and all grounds you are relying on to lodge the objection including, but not limited to the specific statute, case law or constitutional section you are relying on for the objection.

**5.**     These interrogatories are continuing in nature, and to the extent that the Secretary acquires new information on or before January 5, 2019, that is responsive to these interrogatories, please supplement the response.

**6.**     The word "document" or "documents" or words of like or similar import mean, and include correspondence; memoranda; data; letters; books; charts; diagrams; empirical studies; graphs; handwritten notes; telegrams; studies; working papers; tabulations; data sheets; reports; typewritten notes; printed notes; contracts; memoranda of understanding; computer printouts; and electronic mail; photographs: video recordings and audio recordings of anything and made by any method; and, any other method that creates a record kept by the government or business entity under contract to HHS.

**7.**     The word "detain" or "detaining" means receiving children from DHS and placing them in an environment with a parent, guardian, relative, or next friend.

**8.**     The word "parent" or "parents" means parents (by blood or legal relationship), guardians, relatives (by blood or legal relationship), or next friend (as defined by law).

AR00373

**9.** If any document responsive to this request was, but is no longer, in your possession, custody, or control, please furnish a description of each such document and indicate the manner and circumstances under which it left your possession, custody, and control and state its present or last known location and custodian, if known.

**10.** If for any request there are no responsive document(s) in your possession, custody, or control, state whether documents that would have been responsive were destroyed or mislaid, and if so, the circumstances under which they were destroyed or mislaid, and who was responsible for the destruction or loss of the document(s).

**11.** For any document response for production but withheld pursuant to a claim of privilege, identify:

    A.    The author's name and title or position

    B.    The recipient's name and title or position

    C.    All persons receiving copies of the document

    D.    The number of pages of the document

    E.    The state of the document

    F.    The subject matter of the document; and the basis for the claimed privilege.

**12.** In lieu of providing a written response to an interrogatory, you may produce a document that fully responds to the interrogatory. Should the document not fully respond to the interrogatory, please state so in your written response and also provide the additional information needed to fully respond or the grounds for withholding such information, as specified in these instructions.

**13.** When responding to these interrogatories please type the interrogatory as stated and then your responses hereto. At the end of each answer to the interrogatories below state the exhibit number or numbers that the documents produced per the request in the interrogatory and/or mentioned in response to that particular interrogatory as is applicable and upon which you rely as a basis for your answer.

AR00374

## INTERROGATORIES

1. Please state what HHS' role was in the policy decision to detain children at the border separated from their parents who were being prosecuted under the "zero-tolerance" policy put in place by Attorney General Sessions.

   (a)     Please list the names, positions held at the time and presently, business addresses, telephone numbers, email addresses of each and every person who took part in the discussions, either orally or in writing.

   (b)     Please list all dates of meetings (in person, telephonically and by video) where the policy was discussed and decisions were made.

   (c)     Please produce all notes, documents, memoranda and emails generated from the responses herein pursuant to Request for Documents number 2 hereinbelow.

   (d)     Please state how much time elapsed between the date you were notified of the need to develop a policy for the "zero-tolerance policy" and the time the policy was finalized.  Please provide the date of notification of the need for a policy and the date the policy was finalized.

   (e)     Please provide a true and correct copy of the finalized policy that was completed on the finalization date provided in 1(d) pursuant to this request and the Request for Production of Documents made below.

   (f)     Please identify the person most knowledgeable in regard to the information requested in this interrogatory

2. Please describe what pre-implementation evidence supported a conclusion by HHS that family separation was justified under any policy interest of the United States?

   (a)     Please state if HHS reviewed any evidence, documents, email, scholarly articles, or any other items concerning the best interests of the children during the formation of the policy of family separation in coming to this conclusion, and, if so, please identify each and every such source.

   (b)     Please identify the person most knowledgeable in regard to the information requested in this interrogatory

AR00375

3.  Please describe the process or procedure by which HHS implemented or facilitated family separations in response to the "zero-tolerance" policy.

> (a)    Please list all the persons, including but not limited to government employees and private contractors, both for-profit and not-for-profit (collectively, "private entities") hired by the government to effectuate the process and the positions these persons held at the time and hold now and all contact information for all people who were involved in developing the process that was used in separating children from their parents, adult guardians and/or next friend(s) and relatives.

> (b)    Please state the policy used to determine the location the children were sent to after the decision to separate them from their parents, adult guardians and/or next friend(s) and relatives.

> (c)    Please describe, in detail, how the process was implemented when separating the children from their parents, adult guardians and/or next friend(s) and relatives.

> (d)    Please state if no regular process was used in the separations, and if not, state why not.

> (e)    Please state how much time it took to develop the written process used in separating children from their families.

> (f)    Please state how much time elapsed between the date you were notified of the need to develop a written process for detaining children under the "zero-tolerance policy" and the time the written policy was finalized.

> (g)    Please provide the date of notification of the need for a process or procedure and the date they were finalized. Please identify any aspect of the process policy or procedure established to provide for reunification of separated children.

> (h)    Please provide a true and correct copy of the finalized process or procedure that was completed on the finalization date provided in (g) pursuant to this request and the Request For Production of Documents made below.

(i)      Please identify the person most knowledgeable in regard to the information requested in this interrogatory.

4.  Please detail the operator, name, and locations of every office or facility, whether governmental or private, where HHS detained children determined to be within the ambit of the "zero tolerance" policy.

(a)      Please state if any HHS offices on the Eastern Seaboard (defined as extending from Maine to Florida) were working with DHS on detaining children under the "zero tolerance" policy.

i.  If so, please provide the number, broken down by age, race, ethnicity, national origin, and religion, of children either detained under the "zero tolerance" policy or detained and released between April 1, 2018 and July 31, 2018.

b)      Please state if any HHS offices on the border with Canada were working with DHS on detaining and separating any children under the "zero tolerance" policy.

ii.  If so, please provide the number, broken down by age, race, ethnicity, national origin, and religion of children either detained under the "zero tolerance" policy or detained and released between April 1, 2018 and July 31, 2018.

5.  Please state what HHS's written criteria were for detaining a child separate from his parents, guardian(s), next friend(s) or relative(s).

(a)      Please describe in detail the process by which individual determinations to separate children from their parents were made.

(b)      Please provide a true and correct copy of the written criteria used by you, your agents, or any private entities to effectuate the separating of the children contemplated by this interrogatory pursuant to Request for Production of Document made below.

(c)      If there were no written criteria for this action or conduct, please state so.

(d)      Absent any written criteria, please state to the best of your knowledge what the criteria that was used to choose which children were to be taken from their parents,

guardians, next friend(s) or relatives and which children were allowed to remain unseparated.

(e)     Please identify the person most knowledgeable regarding the information requested in this interrogatory.

6.   Please describe how children and parents were notified that they were to be separated.

(a)     Please state if the notification, if any, was provided in English, Spanish, or another language spoken by the parents and children.

(b)     Please state if the notification was provided orally or in written form?

(c)     Please state if the parents, guardians, next friend(s), or relatives were required to sign any paperwork acknowledging the separation and/or any aspect of the separation, including but not limited to where the children were being sent, whose legal custody they would be in, and whose physical custody they would be in.

(d)     Please state if the parents, guardians, next friend(s), or relatives were given any information, in writing, informing them as to where the children were being sent, and were they given any information, in writing, as to whose legal custody they would be in and whose physical custody that would be in.

(f)     Please describe what, if any, efforts were made to ascertain whether people to whom any notice was provided could read and understand said notice.

(g)     Please provide any supporting evidence documenting your response.

(h)     Please provide a true and correct copy of any writings used to inform parents, guardians, next friend(s), or relatives as part of the Request for Production of Documents.

*Trauma at the Border: The Human Cost of Inhumane Immigration Policies*

        (i)      Please state if, at the time of separation, had any government, HHS, and/or private entities have any Court order authorizing a change in custody from the parents, guardians, next friend(s), or relative(s) to the government, HHS, or private entities.

        (j)      Please state, if there was no Court order, under what legal authority HHS proceeded.

        (k)      Please identify the person most knowledgeable in regard to the information requested in this interrogatory

7. Please describe what policies and procedures, prior to April 2018, did HHS have in place to track children after separation from their parents.

    a.    Please state if any government, HHS or any private entities petition and seek a Court order transferring custody of children to HHS or any private entities/

    b.    If so, please state if any petition contained any clauses about the rights of the parents to have visitation, be informed of their children's whereabouts, and be informed of who had custody.

    c.    Please state if the custodians of the children were required to communicate to the parents about the well-being and life progress of the children.

    d.    If your answer is no to any part of interrogatory 7 (a-c) above please state why HHS did not require a petition for change of custody to be filed and/or why it did not inform parents of their rights to visitation, their children's whereabouts, or the well-being and life progress of the children.

    e.    Please identify the person most knowledgeable in regard to the information requested in this interrogatory.

8. During the period from April 1, 2018 to July 31, 2018, please describe what policies and procedures HHS had in place governing the physical transfer and transport of children from one location to another.

    i.    Please provide copies of any policies and procedures.

    ii.    Please state if HHS required that any private entity involved in the physical transfer and transport of children from one location to another be in compliance with these policies and procedures. If not, please describe why not.

    iii.    Please identify the person most knowledgeable in regard to the information requested in this interrogatory.

9. Subsequent to July 31, 2018, please describe what policies and procedures HHS instituted to track children and parents after separation.

   a.    Please identify the person most knowledgeable in regard to the information requested in this interrogatory

10. Prior to April 1, 2018, please describe HHS's role in tracking whether parents who were deported had children being detained separately.

   (a) Please state if HHS notified the government or any private entity with physical custody of children that parents of children within their custody were being deported.

   (b) Please state if HHS provided the parents who were deported with any information, in writing, regarding the status, custody, and location of their children.

   (c) Please describe what policies and procedures, if any, were in place to ensure that parents who were deported could be reunited with children being detained separately.

11. Subsequent to July 31, 2018, please describe what HHS has done to track whether parents who were deported had children being detained separately.

   (a) Please describe what policies and procedures did HHS institute to reunite children being detained separately with their detained parent.

12. Prior to April 1, 2018, please describe how HHS tracked children and their parents after separation. Please describe what information was collected and which procedures, if any, did HHS use to track children and their parents after separation, including but not limited to:

13. who each child's parents are;

14. where each child was placed;

15. where each child's parents were placed; and

16. whether the child had sponsors in the United States with whom the child could be placed.

   (a) If procedures were in writing, please provide a true and correct copy of such as part of the Request for Production of Documents.

AR00380

17. Please describe HHS's role in determining where to place children separated from their parents, and in determining where to place the parents after separation. Please list every entity or institution where children separated from their parents were placed.

18. Prior to April 1, 2018, please state if HHS let, obligated, or executed any contract or executed a supplement, addendum, or modification to an existing contract with any private entity for the detention of children separated or to be separated from their parents.

   (a) If the answer to this question is "yes" please provide true and correct copies of such contracts as part of the Request for Production of Documents.

19. Please describe how HHS determined where to place children separated from their parents? Please describe the procedures and criteria used to determine in which facility the children would be placed after separation.

20. Please describe how HHS coordinated with the Department of Homeland Security and the Department of Justice, and any agencies reporting to or under the supervision of those Departments, on policies, decisions, actions, etc., relevant to separation, placement, and tracking of children and parents.

   (a) Please detail all the tools used to coordinate HHS action with other government agencies or government contractors, including but not limited to, memorandums of understanding, transmittal forms from custody of one entity to another, other relevant policy documents, letters, agreements, etc.

21. Please describe HHS's case management statistics as of the dates April 30, 2018, May 30, 2018, June 30, 2018, and November 30, 2018 on issues including, but not limited to:

22. the number of families who were separated;

23. the number of children who were separated;

24. the age, gender, race, ethnicity, and national origin of these separated children;

25. the facilities, including name, address, and operator at which children were placed; and

26. the age, gender, race, ethnicity, and national origin of these children at each of these facilities.

27. Prior to April 1, 2018, please state what HHS's policy was for reunifying separated children and parents.

(a) Please describe all policy details, including but not limited to, who was eligible for reunification with their children or parents, who was ineligible for reunification, and what determined eligibility.

28. Please state if there are any instances of HHS personnel coercing or attempting to coerce parents to give up their right to apply for asylum/refugee status in order to be unified with their children

29. If the answer is yes, please describe each of those instances.

    Please provide any policies or procedures regarding prohibitions on coercion that existed prior to April 1, 2018, and after July 31, 2018.

30. Please state if there are any instances of parents being told that as a condition of reunification with their children, or as a means of reunifying with their children faster, they could give up their right to apply for asylum/refugee status.

    (a) If the answer is yes, please describe each of those instances.

31. Please state how many parents were told that as a condition of reunification with their children they had to give up their right to apply for asylum/refugee status.

32. Please state if the conditioning of reunification with children applicable to all asylum/refugee applicants or was any such condition applied on a case by case basis.

33. Please state how many cases or instances of coercion or attempted coercion of parents to give up their right of asylum in order to be reunified with their children currently exist.

34. Please describe what HHS's current procedures are for reunifying children and parents.

    (a) Please detail all procedures regarding reunifying children and parents, including but not limited to, when the process would begin, where reunification would take place, and how long children have been separated before being reunified.

35. Please state HHS criteria for making eligibility determinations on which children would be reunited with their parents.

    (a) Please state HHS criteria for continuing the detention of children who have been determined to be eligible for release.

    (b) Please detail all considerations that determined which children would be eligible for reunification, and all considerations that determined which children would not be eligible for reunification.

**AR00382**