36. Please describe HHS policies and procedures for placement of children once their parents are deemed ineligible for reunification.

    (a)  Please describe the steps HHS takes to monitor these procedures are being carried out fairly and effectively?

37. Please state if HHS plans to reunify all children and parents who were separated and if so, please state what HHS' timeline for the reunification of all children and parents who were separated.

    (a)  Please describe the steps HHS takes to monitor whether children were reunified with their parents.

38. Please describe HHS' policies for informing counsel, legal services providers, or other representatives of families regarding information regarding reunification, including final release destinations.

39. Please describe HHS' plan for finding deported parents and reunifying them with their children who still remain in the United States.

    (a)  Please detail the procedure that will be followed to facilitate the reunification of children with parents who have already been deported.

40. Please state how many families, between April 1, 2018 and July 31, 2018, after separation and reunification, were deported.

41. Please provide HHS' statistics for the reunification of all children and parents, including but not limited to data on:

42. how many families were separated;

43. how many children were separated from their parents and the age, race, ethnicity, and national origin of each child;

44. how many children were reunited with their parents and the age, race, ethnicity, and national origin of each child;

45. how many children remain separated from their parents and the age, race, ethnicity, religion and national origin of each such child;

46. where children still separated from their parents are located; and

47. of these children still separated, their age, race, ethnicity, religion, and national origin.

48. Please detail, for children separated between April 1, 2018 and July 30, 2018 the conditions of:

49. Confinement;

50. habitability standards;

51. access to education, and availability of physical activity at each stage of detention and/or placement for children;

52. the availability of interpreters and other materials for language accessibility;

53. the availability of medical and mental health care personnel;

54. the qualification of medical and mental health care personnel to treat children;

55. how are treatment decisions made regarding the accessibility of available medical and mental health care personnel;

56. access to communication with separated parents; and

57. any other information regarding the medical and mental health care of children.

58. Please state the background check requirements for any personnel employed, hired, or contracted by HHS that has contact with or custodial care and treatment of children detained by HHS pursuant to action by the Department of Homeland Security.

59. Please state what role, if any, HHS has in monitoring the
    (a) welfare of children who are being detained by the Department of Homeland Security?

60. Please state what role, if any, HHS has in ensuring that persons hired by HHS or any other federal agency or contractor or subcontractor have background checks for personnel who have contact with or custodial care and treatment of children detained by the Department of Homeland Security?

61. Please state what, if any, are HHS' policies for preventing the sexual abuse of children in detention.

    (a) Please detail what protections are in place to prevent sexual abuse of children in holding facilities and what were the procedures to report assault and protect victims of sexual abuse occurred in detention.

(b) Please detail what policies govern how HHS responds to notice that sexual abuse of children may have occurred for children HHS detains.

(c) Please provide statistics regarding:

62. number of children alleged to have been subject to sexual abuse in HHS detention;

63. where the abuse took place; and

64. in how many instances HHS has taken disciplinary action of any type regarding allegations that children have been subject to sexual abuse in HHS detention, disaggregated by the age, race, ethnicity, religion, and national origin of each such child.

iv.    Please describe measures HHS takes to ensure the safety and rehabilitation of any child subject to sexual abuse while in HHS detention.

65. Please detail what HHS' policies are for preventing the physical and/or mental abuse of children in detention?
    (a) Please detail what protections are in place to prevent physical and/or mental abuse of children in holding facilities and

    (b) Please detail what the procedures to report assault and protect victims are if physical abuse occurred in detention.

    (c) Please detail what policies govern how HHS responds to notice that physical and/or mental abuse of children may have occurred for children HHS detains.

    (d) Please provide statistics regarding:

66. number of children alleged to have been subject to physical and/or mental abuse in HHS detention;

67. where the abuse took place; and

68. in how many instances HHS has taken disciplinary action of any type regarding allegations that children have been subject to physical and/or mental abuse in HHS detention, disaggregated by the age, race, ethnicity, religion, and national origin of each such child.

v.    Please describe measures HHS takes to ensure the safety and rehabilitation of any child subject to physical and/or mental abuse while in HHS detention.

69. Please detail what HHS' policies are regarding the use of psychotropic drugs on children in detention, including policies regarding securing parental or other guardian approval for administration of psychotropic medication on children in detention.

(a) Please state who was authorized to make a decision to administer psychotropic drugs to a child in detention.

(b) Please state who was authorized to administer psychotropic drugs to a child in detention.

(c) Please state when HHS was informed that psychotropic drugs were being administered to children?

(d) Please provide statistics regarding the number of children in HHS detention to whom psychotropic medications have been administered, disaggregated by the age, race, ethnicity, religion, and national origin of each such child and including whether a parent or guardian authorized the administration of psychotropic medications.

70. Please detail all information regarding the national origin, ethnicity, race, and religion of all families affected by the aforementioned policies and procedures of separation of children and parents.

71. Please describe how HHS responds to reports that the federal government has destroyed records related to family separations.

72. Since the June 20, 2018 decision by the Administration not to separate children from families, please state where families are currently being detained.

(a) Please detail the conditions of confinement at each stage of detention and/or placement for families, including but not limited to:

   1. habitability standards;

   2. access to education;

   3. availability of physical activity;

   4. the availability of interpreters and other materials for language accessibility, as well as medical and mental health care personnel;

   5. the qualification of medical and mental health care personnel to treat children; treatment decisions regarding the accessibility of available medical and mental health care personnel; and

   6. any other information regarding the medical and mental health care of families.

73. Since the June 20, 2018 decision by the Administration not to separate children from families, please state:

    (a) how many families are being detained;

    (b) where are they being detained;

    (c) the ages, race, ethnicity, religion, and national origin of each family in detention; and

    (d) what criteria determines whether a family is detained.  Please provide any studies, data, and other supporting evidence documenting policies that underlie a decision to detain a family.

74. Please list the locations, agency or entity of jurisdiction, and number of beds for any facility that HHS is considering using to detain families after the June 20, 2018 decision by the Administration not to separate children from families.

    (a) Please list the criteria by which families will be detained.

    (b) Please list the criteria by which families will be assigned to facilities.

    (c) Please list the cost of each facilities, and the additional cost to HHS' budget to establish or expand these facilities.

    (d) For these facilities, please list how families may access legal counsel, while being detained.

75. Please state how many families at the southern border who were detained, together or separately since April 1, 2018, have been deported because they gave up their right to apply for asylum/refugee status.

    (a) Please provide the ages, race, ethnicity, religion and national origin of each family.

76. Please describe under what circumstances families can be released from detention.

77. Please provide any studies, data, and other supporting evidence documenting policies that underlie a decision to release a family into the United States.

    (a) Please state how many families have been released from detention since July 31, 2018.

    (b) Please state the ages, race, ethnicity, religion and national origin of each family released.

## DOCUMENT REQUESTS

4.  Please provide any and all historical and current policy guidance, written instructions, or directives, which have been developed or disseminated to local, state, and federal detention centers, advocacy partners, and internally within the U.S. Department of Health and Human Services regarding the separation of families and the "zero-tolerance" policy.

5.  Please provide any memoranda, documents, or analyses discussing the implementation of the policy of separating children from their parents as part of the Administration's "zero-tolerance" policy.

6.  To the extent not covered by the document requests above, please provide any and all documents relied on to prepare responses to the above interrogatories.

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



January 25, 2019

**ACTION**

MEMORANDUM FOR:       L. Francis Cissna
                      Director
                      U.S. Citizenship and Immigration Services

                      Kevin K. McAleenan
                      Commissioner
                      U.S. Customs and Border Protection

                      Ronald D. Vitiello
                      Deputy Director and Senior Official Performing the Duties of
                      Director
                      U.S. Immigration and Customs Enforcement

FROM:                 Kirstjen M. Nielsen
                      Secretary

SUBJECT:              Policy Guidance for Implementation of the Migrant Protection
                      Protocols

On December 20, 2018, I announced that the Department of Homeland Security (DHS), consistent with the Migrant Protection Protocols (MPP), will begin implementation of Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) on a large-scale basis to address the migration crisis along our southern border. In 1996, Congress added Section 235(b)(2)(C) to the INA. This statutory authority allows the Secretary of Homeland Security to return certain applicants for admission to the contiguous country from which they are arriving on land (whether or not at a designated port of entry) pending removal proceedings under Section 240 of the INA. Consistent with the MPP, citizens and nationals of countries other than Mexico ("third-country nationals") arriving in the United States by land from Mexico—illegally or without proper documentation—may be returned to Mexico pursuant to Section 235(b)(2)(C) for the duration of their Section 240 removal proceedings.

AR00389

## Section 235(b)(2)(C) and the MPP

The United States issued the following statement on December 20, 2018, regarding implementation of the Migrant Protection Protocols:

> [T]he United States will begin the process of implementing Section 235(b)(2)(C) . . . with respect to non-Mexican nationals who may be arriving on land (whether or not at a designated port of entry) seeking to enter the United States from Mexico illegally or without proper documentation.  Such implementation will be done consistent with applicable domestic and international legal obligations.  Individuals subject to this action may return to the United States as necessary and appropriate to attend their immigration court proceedings.
>
> The United States understands that, according to the Mexican law of migration, the Government of Mexico will afford such individuals all legal and procedural protection[s] provided for under applicable domestic and international law.  That includes applicable international human rights law and obligations as a party to the 1951 Convention relating to the Status of Refugees (and its 1967 Protocol) and the Convention Against Torture.
>
> The United States further recognizes that Mexico is implementing its own, sovereign, migrant protection protocols providing humanitarian support for and humanitarian visas to migrants.
>
> The United States proposes a joint effort with the Government of Mexico to develop a comprehensive regional plan in consultation with foreign partners to address irregular migration, smuggling, and trafficking with the goal of promoting human rights, economic development, and security.[1]

The Government of Mexico, in response, issued a statement on December 20, 2018.  That statement provides, in part, as follows:

> 1. For humanitarian reasons, [the Government of Mexico] will authorize the temporary entrance of certain foreign individuals coming from the United States who entered that country at a port of entry or who were detained between ports of entry, have been interviewed by U.S. immigration authorities, and have received a notice to appear before an immigration judge.  This is based on current Mexican legislation and the international commitments Mexico has signed, such as the Convention Relating to the Status of Refugees, its Protocol, and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, among others.

---

[1] Letter from Chargé d'Affaires John S. Creamer to Sr. Jesús Seade, Subsecretaría para América del Norte, Secretaría de Relaciones Exteriores (Dec. 20, 2018).

2

2. It will allow foreigners who have received a notice to appear to request admission into Mexican territory for humanitarian reasons at locations designated for the international transit of individuals and to remain in national territory. This would be a "stay for humanitarian reasons" and they would be able to enter and leave national territory multiple times.

3. It will ensure that foreigners who have received their notice to appear have all the rights and freedoms recognized in the Constitution, the international treaties to which Mexico is a party, and its Migration Law. They will be entitled to equal treatment with no discrimination whatsoever and due respect will be paid to their human rights. They will also have the opportunity to apply for a work permit for paid employment, which will allow them to meet their basic needs.

4. It will ensure that the measures taken by each government are coordinated at a technical and operational level in order to put mechanisms in place that allow migrants who have receive[d] a notice to appear before a U.S. immigration judge have access without interference to information and legal services, and to prevent fraud and abuse.[2]

### Prosecutorial Discretion and *Non-Refoulement* in the Context of the MPP

In exercising their prosecutorial discretion regarding whether to place an alien arriving by land from Mexico in Section 240 removal proceedings (rather than another applicable proceeding pursuant to the INA), and, if doing so, whether to return the alien to the contiguous country from which he or she is arriving pursuant to Section 235(b)(2)(C), DHS officials should act consistent with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees[3] (1951 Convention) and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).[4] Specifically, a third-country national should not be involuntarily returned to Mexico pursuant to Section 235(b)(2)(C) of the INA if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the

---

[2] Secretaría de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018).

[3] The United States is not a party to the 1951 Convention but is a party to the 1967 Protocol Relating to the Status of Refugees, which incorporates Articles 2 to 34 of the 1951 Convention. Article 33 of the 1951 Convention provides that: "[n]o Contracting State shall expel or return ('*refouler'*) a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

[4] Article 3 of the CAT states, "No State Party shall expel, return ('*refouler'*) or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *See also* Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, Title XXII, § 2242(a) (8 U.S.C. § 1231 note) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.").

3

INA), or would more likely than not be tortured, if so returned pending removal proceedings. The United States expects that the Government of Mexico will comply with the commitments articulated in its statement of December 20, 2018.

U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and U.S. Immigration and Customs Enforcement will issue appropriate internal procedural guidance to carry out the policy set forth in this memorandum.[5]

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

---

[5] A DHS immigration officer, when processing an alien for Section 235(b)(2)(C), should refer to USCIS any alien who has expressed a fear of return to Mexico for a *non-refoulement* assessment by an asylum officer.

4

No. 19-1212

IN THE

# Supreme Court of the United States

CHAD F. WOLF, ACTING SECRETARY OF HOMELAND
SECURITY, ET AL.,

*Petitioners,*

v.

INNOVATION LAW LAB, ET AL.,

*Respondents.*

**On Writ of Certiorari
to the United States Court of Appeals
for the Ninth Circuit**

**BRIEF FOR *AMICI CURIAE*
THE LAREDO PROJECT AND THE
NATIONAL IMMIGRANT JUSTICE CENTER
IN SUPPORT OF RESPONDENTS**

STEPHEN J. BROGAN
LAURA K. TUELL
ARIEL VOLPE
DANIEL J. S. BLEIBERG
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001

DAVID J. DIMEGLIO
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071

ILANA B. GELFMAN
*Counsel of Record*
JONES DAY
100 High Street
Boston, MA 02110
(617) 960-3939
igelfman@jonesday.com

MICAH M. DOAK
JONES DAY
717 Texas
Suite 3300
Houston, TX 77002

*Counsel for Amici Curiae*

AR00393

i

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.....................................ii

INTEREST OF *AMICI CURIAE* ..............................1

SUMMARY OF ARGUMENT...................................4

ARGUMENT ...............................................6

I.   Asylum Seekers Must Risk Kidnapping
     in Order to Appear for Proceedings at
     the Laredo Immigration Hearing Facility.........6

II.  Half of Migrants Forced to Return to
     Mexico Under MPP Miss at Least One
     Immigration Hearing ......................12

III. MPP Significantly Restricts Access
     to Counsel ...........................................15

IV.  MPP Impedes Counsel's Presentation
     of Asylum Claims ...........................23

CONCLUSION .......................................27

AR00394

ii

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Baltazar-Alcazar v. INS,*
    386 F.3d 940 (9th Cir. 2004) .................................. 4

*Batanic v. INS,*
    12 F.3d 662 (7th Cir. 1993) .................................... 4

*Chambers v. Baltimore & Ohio R.R. Co.,*
    207 U.S. 142 (1907) .............................................. 4

*Frech v. U.S. Att'y Gen.,*
    491 F.3d 1277 (11th Cir. 2007) ............................. 4

*Goldberg v. Kelly,*
    397 U.S. 254 (1970) ............................................ 23

*Hardy v. United States,*
    375 U.S. 277 (1964) ............................................ 27

*Iavorski v. INS,*
    232 F.3d 124 (2d Cir. 2000) .................................. 4

*Leslie v. Att'y Gen.,*
    611 F.3d 171 (3d Cir. 2010) .................................. 4

*Powell v. Alabama,*
    287 U.S. 45 (1932) .............................................. 23

*Saakian v. INS,*
    252 F.3d 21 (1st Cir. 2001) ................................... 4

*Tennessee v. Lane,*
    541 U.S. 509 (2004) ............................................. 4

STATUTES

8 U.S.C. § 1229a ................................................. 15, 22

AR00395

iii

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

OTHER AUTHORITIES

Am. Bar Ass'n Comm'n on Immigration,
*Reforming the Immigration System:
Proposals to Promote Independence,
Fairness, Efficiency and
Professionalism in the Adjudication
of Removal Cases* (2010) .....................................15

Sabrineh Ardalan, *Access to Justice for
Asylum Seekers: Developing an
Effective Model of Holistic Asylum
Representation*, 48 U. Mich. J.L.
Reform 1001 (2015)..................................15, 17, 18

Samantha Balaban et al., *Without A
Lawyer, Asylum-Seekers Struggle
With Confusing Legal Processes*,
NPR (Feb. 25, 2018)............................................18

Jeffrey S. Chase, *EOIR's New Math*
(Dec. 12, 2020)......................................................19

Greg Chen et al., *After AILA Attends Tour
of the Laredo Tent Court, Questions Still
Abound*, THINK IMMIGRATION
(Jan. 30, 2020)......................................................26

Doctors Without Borders, *No Way Out:
The Humanitarian Crisis for Migrants
and Asylum Seekers Trapped Between
the United States, Mexico and the
Northern Triangle of Central America*
(Feb. 2020)................................................11, 12, 17

iv

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Ingrid V. Eagly & Steven Shafer, *A
    National Study of Access to Counsel
    in Immigration Court*,
    164 U. Penn. L. Rev. 1 (2015) ..............................22

Emily Green, *Trump's Asylum Policies
    Sent Him Back to Mexico. He Was
    Kidnapped 5 Hours Later by a Cartel*,
    VICE NEWS (Sept. 16, 2019) ...................................7

Human Rights First, *Fact Check:
    Asylum Seekers Regularly Attend
    Immigration Court Hearings*
    (Jan. 25, 2019).......................................................14

Human Rights First, *Orders from Above:
    Massive Human Rights Abuses Under
    Trump Administration Return to
    Mexico Policy* (Oct. 2019) ......................................7

Human Rights Watch, *US: Investigate
    'Remain in Mexico' Program*
    (June 2, 2020)..........................................................7

Human Rights Watch, *"We Can't Help
    You Here": US Returns of Asylum
    Seekers to Mexico* (2019) ...............................13, 20

Miriam Jordan, *'I'm Kidnapped': A
    Father's Nightmare on the Border*,
    N.Y. TIMES (Dec. 21, 2019)...................................24

*Lawyer Defending Trump Policy Makes
    Stunning Admission*, CNN POLITICS
    (Mar. 11, 2020) ......................................................11

AR00397

v

## TABLE OF AUTHORITIES
(continued)

Page(s)

Stephen Paskey, *Telling Refugee Stories:*
*Trauma, Credibility, and the Adversarial*
*Adjudication of Claims for Asylum*, 56
Santa Clara L. Rev. 457 (2016) .................... 16, 17

Premier Christian News, *Mexico:*
*Commission calls for update three*
*months after Pastor kidnapping*
(Nov. 4, 2019) ....................................................... 21

Premier Christian News, *Still no sign of*
*pastor one year after kidnapping*
(Aug. 3, 2020) ....................................................... 21

Pub. Interest Pro Bono Ass'n, *Working*
*with Survivors of Abuse: A Trauma*
*Informed Approach* (Oct. 7, 2020) ...................... 17

Joel Rose, *Few Asylum-Seekers Winning*
*Cases Under 'Remain in Mexico'*
*Program*, NPR (Dec. 19, 2019) ........................... 26

Strauss Center, *Migrant Protection*
*Protocols: Implementation and*
*Consequences for Asylum Seekers in*
*Mexico* (May 2020) ............................................ 6, 7

Carol M. Suzuki, *Unpacking Pandora's Box:*
*Innovative Techniques for Effectively*
*Counseling Asylum Applicants Suffering*
*from Post-Traumatic Stress Disorder*,
4 Hastings Race & Poverty L.J. 235 (2007) ........ 17

This American Life, *The Out Crowd*
(Nov. 15, 2019) ..................................................... 24

AR00398

vi

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

TRAC Immigration, *After EOIR Fixes Most Egregious Data Errors, TRAC Releases New Asylum Data—But with a Warning* (Sept. 16, 2020) .......................... 19

TRAC Immigration, *Asylum Decisions* .............. 18, 19

TRAC Immigration, *Asylum Decisions and Denials Jump in 2018* (Nov. 29, 2018) ............... 22

TRAC Immigration, *Asylum Representation Rates Have Fallen Amid Rising Denial Rates* (Nov. 28, 2017) .......................................... 18

TRAC Immigration, *Details on MPP (Remain in Mexico) Deportation Proceedings* .................................................... *passim*

U.S. Dep't of Justice, EOIR, List of Downloadable EOIR Forms (updated Oct. 14, 2020) ....................................... 13

U.S. Dep't of Justice, EOIR, *Statistics Yearbook: Fiscal Year 2018* (updated Aug. 30, 2019) ....................................... 16

U.S. Dep't of Justice, EOIR-33, Alien's Change of Address/Phone Number Form (Immigration Court) (rev. Dec. 2019) .................. 13

U.S. Dep't of Justice, Office of Pub. Affairs, *Department of Justice and Department of Homeland Security Announce Plan to Restart MPP Hearings* (updated Nov. 9, 2020) ........................ 14

AR00399

vii

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

U.S. Institute of Peace, *Necessary
    Condition: Access to Justice* § 7.8 .........................4

U.S. State Dep't, Bureau of Consumer
    Affairs, Mexico Travel Advisory
    (Sept. 8, 2020) .................................................6, 21

Maria Verza, *In Nuevo Laredo and elsewhere,
    many migrants are stuck in Tamaulipas'
    lawless limbo*, PITTSBURGH POST-GAZETTE
    (Nov. 18, 2019).......................................................6

Ed Vulliamy, *Kidnappers prey with 'total
    impunity' on migrants waiting for
    hearings in Mexico*, THE GUARDIAN
    (Feb. 18, 2020).......................................................7

**AR00400**

1

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* the Laredo Project (a pro bono initiative of Jones Day) and the National Immigrant Justice Center ("NIJC") are committed to expanding access to justice for asylum seekers in removal proceedings. *Amici* have represented or assisted thousands of migrants who have entered the United States through, or have been detained in, Laredo, Texas. *Amici* have witnessed the degradation of access to justice for asylum seekers subject to the so-called Migrant Protection Protocols ("MPP") at Laredo.

Jones Day, a global law firm, launched the Laredo Project in 2017. Over 1,250 Jones Day attorneys and staff have devoted over 280,000 pro bono hours to this initiative. Initially, the Laredo Project focused on providing pro se counseling and pro bono representation to the women in Immigration and Customs Enforcement custody at the Laredo Detention Center. Partners, associates, and support staff from Jones Day offices across the nation operated a full-time office in Laredo. They visited the detention center on a near-daily basis; provided Know Your Rights presentations to more than 5,000 migrants at the facility; prepared detainees for "credible fear" interviews with asylum officers; and represented clients in bond and removal proceedings.

---

[1] Pursuant to Rule 37.2(a), both counsel of record received timely notice of intent to file this brief, and consented in writing. No counsel for any party authored this brief in any part, and no person or entity other than *amici*, its members, or its counsel made a monetary contribution to fund its preparation or submission.

2

Jones Day's partner in this work was (and is) NIJC, a program of the Heartland Alliance for Human Needs and Human Rights.  NIJC is a Chicago-based not-for-profit organization that provides legal representation and consultation to low-income immigrants, refugees, and asylum seekers.  Each year, NIJC represents hundreds of individuals before the immigration courts, the Board of Immigration Appeals, and the federal appellate courts.  NIJC consults on or co-counsels a number of Laredo Project cases, and NIJC also accepts client referrals from the Laredo Project.

In 2019, the government expanded MPP to the Laredo and Rio Grande Valley sectors of the southwest border.  Newly-arrived migrants seeking asylum at or around the Laredo port of entry were barred from entering the United States and were instead sent to Nuevo Laredo, the Mexican city directly across the border.  The Laredo Project and NIJC pivoted in response to these legal and logistical changes.  *Amici*'s practices in Laredo now focus on providing pro bono representation and pro se counseling to asylum seekers subject to MPP who have claims pending in the Laredo Immigration Hearing Facility ("LIHF").  The LIHF is a "tent court"—a facility constructed of tents and shipping containers, where migrants present their claims over video-conference to the immigration judges of the San Antonio Immigration Court (and, occasionally, the Fort Worth Immigration Adjudication Center).  The Laredo Project and NIJC represent more migrants appearing at the LIHF than any other legal services provider.

As some of the very few lawyers practicing at the LIHF, the attorneys of the Laredo Project and NIJC have had front-row seats to the deterioration of access

3

to justice under MPP at Laredo. Kidnapping is so prevalent in Nuevo Laredo that migrants waiting (or passing through) there face a significant risk of missing immigration hearings—because they may be held hostage by a cartel. Asylum seekers located in Mexico often struggle to locate attorneys who will represent them across the border in United States immigration court. And even when asylum seekers manage to find representation for proceedings at LIHF, their lawyers—such as those at the Laredo Project and NIJC—face serious obstacles providing representation because the migrants generally cannot meet their attorneys in person, have limited (or no) ability to receive or review documents, and have insufficient access to privacy and working phones.

*Amici* have dedicated themselves to bolstering access to justice for migrants who are detained or are in immigration proceedings in Laredo. *Amici* are committed to ensuring that asylum seekers with meritorious claims are able to obtain relief. Consequently, *amici* have a strong interest in this matter—and a strong interest in safeguarding access to justice from the deleterious effects of MPP.

AR00403

4

## SUMMARY OF ARGUMENT

Access to justice "is the right conservative of all other rights, and lies at the foundation of orderly government." *Chambers v. Baltimore & Ohio R.R. Co.*, 207 U.S. 142, 148 (1907). Access to justice includes the ability to (1) appear at the courthouse and (2) obtain the assistance of counsel. U.S. Institute of Peace, *Necessary Condition: Access to Justice* § 7.8, https://tinyurl.com/y6gsq2ac; *see also Tennessee v. Lane*, 541 U.S. 509, 523 (2004) ("[T]he right of [physical] access to the courts . . . [is] protected by the Due Process Clause."); *Batanic v. INS*, 12 F.3d 662, 667 (7th Cir. 1993) (an alien's right to representation by counsel of the alien's choice is "an integral part of the procedural due process to which the alien is entitled") (quotation marks omitted); *Leslie v. Att'y Gen.*, 611 F.3d 171, 181 (3d Cir. 2010) (same); *Frech v. U.S. Att'y Gen.*, 491 F.3d 1277, 1281 (11th Cir. 2007) (same); *Baltazar-Alcazar v. INS*, 386 F.3d 940, 944 (9th Cir. 2004) (same); *Saakian v. INS*, 252 F.3d 21, 24 (1st Cir. 2001) (same); *Iavorski v. INS*, 232 F.3d 124, 128 (2d Cir. 2000) (same). MPP corrodes these twin pillars of access to justice.

Under MPP in Laredo, Texas, migrants must risk life and limb to attend immigration hearings. In Nuevo Laredo, across the river, kidnapping is a booming business. Twenty-six percent of *amici*'s clients under MPP at Laredo have been kidnapped at least once since being forced to return to Mexico. Yet, for a migrant to attend a hearing at the LIHF, it is impossible to avoid the risk. There is no way to reach the LIHF without passing through Nuevo Laredo.

Numerous other obstacles—from gang shootouts to lack of notice—make it extremely difficult to attend

AR00404

5

hearings at LIHF. Those obstacles are frequently insurmountable. Indeed, 53% of migrants under MPP have missed at least one hearing. Most of those migrants were removed *in absentia*, without an opportunity to present their claims.

Migrants under MPP also struggle to retain counsel. Legal representation is the single most important factor affecting the outcome of an asylum claim, but counsel is largely unavailable to migrants in Mexico pursuing asylum claims across the border. Only 7% of migrants under MPP are represented. And fewer than 1% of pro se migrants under MPP have obtained relief. MPP's obstruction of access to counsel makes asylum relief impossible for the vast majority of asylum seekers subject to MPP.

Further, even when a migrant under MPP retains counsel, the attorney faces numerous challenges presenting the migrant's claims. *Amici*, for instance, cannot travel to Nuevo Laredo due to the extreme danger, so Laredo Project and NIJC attorneys typically cannot meet their clients in person before appearing in court. Mailing documents is usually impossible, and phone communication is often limited. Yet attorneys are tasked with establishing trust and building a case. MPP hinders this work—and generally impedes asylum seekers' access to justice.

6

## ARGUMENT

### I.  Asylum Seekers Must Risk Kidnapping in Order to Appear for Proceedings at the Laredo Immigration Hearing Facility.

Violence is endemic in Nuevo Laredo, the Mexican city directly across the border from Laredo.  The U.S. State Department assesses the state of Tamaulipas, where Nuevo Laredo is located, as posing the highest possible safety risk (Level 4)—the same level as conflict-ridden countries such as Syria and Afghanistan. U.S. State Dep't, Bureau of Consumer Affairs, Mexico Travel Advisory (Sept. 8, 2020), https://tinyurl.com/ybfbd2em; Maria Verza, *In Nuevo Laredo and elsewhere, many migrants are stuck in Tamaulipas' lawless limbo*, PITTSBURGH POST-GAZETTE (Nov. 18, 2019), https://tinyurl.com/y4c9gd95.  "Organized crime activity—including gun battles, murder, armed robbery, carjacking, kidnapping, forced disappearances, extortion, and sexual assault—is common along the northern border" of Tamaulipas, where "[h]eavily armed members of criminal groups . . . operate with impunity."  U.S. State Dep't, *supra*.  The State Department advises United States citizens not to travel to Tamaulipas at all, *id*., but the government remits asylum seekers—who are often traumatized, poor, and defenseless—to Nuevo Laredo under MPP.

In Tamaulipas, cartels and common criminals prey on asylum seekers.  "In Nuevo Laredo, the Cartel del Noreste kidnaps asylum seekers outside shelters, [immigration] offices, at bus stations, and in transit between those locations."  Strauss Center, *Migrant Protection Protocols: Implementation and Consequences*

7

*for Asylum Seekers in Mexico* 34 (May 2020), https://ti-nyurl.com/y9c968qz.  The cartel targets migrants "on the assumption that most asylum seekers in the MPP program have US relatives who can be extorted."  Human Rights Watch, *US: Investigate 'Remain in Mexico' Program* (June 2, 2020), https://tinyurl.com/y38bl9jt.  "After being physically apprehended, asylum seekers are typically taken to warehouses or other locations where they are held until people pay their ransom, which is usually thousands of dollars."  Strauss Center, *supra*, at 34.

Pastor Diego Robles, of Nuevo Laredo, observed last year that kidnapping had "become big business."  Ed Vulliamy, *Kidnappers prey with 'total impunity' on migrants waiting for hearings in Mexico*, THE GUARD-IAN (Feb. 18, 2020), https://tinyurl.com/tuqbzm6.  He explained:  "It is worse in Tamaulipas than other bor-der states, and worse in Nuevo Laredo than anywhere else in Tamaulipas.  There's no formula to the abduc-tions and disappearances—*they are kidnapped, beaten, women violated; most return, but not all*."  *Id.* (empha-sis added).

Migrants are especially vulnerable to "abduction as they travel to and from U.S. ports of entry for im-migration hearings."  Human Rights First, *Orders from Above: Massive Human Rights Abuses Under Trump Administration Return to Mexico Policy* 4 (Oct. 2019), https://tinyurl.com/upomvqw.  The streets near the border are particularly dangerous.  Emily Green, *Trump's Asylum Policies Sent Him Back to Mexico. He Was Kidnapped 5 Hours Later by a Cartel*, VICE NEWS (Sept. 16, 2019), https://tinyurl.com/y86d8dua.  Mi-grants must traverse those streets every time they travel to and from an immigration hearing at LIHF.

AR00407

8

A family represented by NIJC was abducted from those streets. The family—a husband and wife, their children (ages four and six), and the children's grandmothers—entered the United States to seek asylum in October 2019. United States immigration officials returned the family to Mexico under MPP, with instructions to report at the international bridge for their initial hearings months later. The family found temporary housing several hours away. The day before their hearing, the mother, father, and children traveled by bus to Nuevo Laredo. Several men at the Nuevo Laredo bus station questioned the family about the purpose of their trip and their destination. Shortly after the family departed the bus station in a taxi, they were kidnapped by a group of armed men who forced them into a vehicle and took them to a house. The kidnappers held the family in squalid conditions with a number of other victims. The kidnappers took all of the family's belongings, including their cell phones; forced the wife to cook and clean; and compelled the family to take a proof-of-life video that the kidnappers used to demand ransom payments. The children urinated in a bottle in front of everyone in the room because they were not given access to a bathroom. Neither the children nor the parents were given enough to eat or drink. The kidnappers held the family hostage for 16 days, including the date of their hearing. The immigration court issued a removal order in the family's absence. Only with the help of counsel was the family able to reopen their immigration proceedings.

The two grandmothers were not traveling with the rest of the family because the grandmothers were

9

given a separate hearing date by the immigration au-
thorities. The grandmothers traveled together to
Nuevo Laredo in anticipation of that hearing date.
When they arrived, they too were kidnapped by a car-
tel. The kidnappers were armed and took the victims'
phones. They held the grandmothers in a room with
a number of other hostages. The captors told one of
the elderly victims that if she wanted to eat, she
needed to cook, and they forced her to cook for every-
one in the house. The kidnappers did not release the
grandmothers until after their scheduled hearing date
had passed. NIJC subsequently determined that the
date the immigration authorities had given the grand-
mothers was a "dummy date" that was never actually
scheduled with the immigration court. The women
are now seeking to have their proceedings recom-
menced so that they may pursue asylum alongside the
rest of their family. The entire family remains in Mex-
ico, terrified of the next trip to Nuevo Laredo.

A different NIJC client was abducted *three times*
while in Mexico under MPP. In the summer of 2019,
she and her eight-year-old daughter presented them-
selves to United States immigration officials. Alt-
hough she requested asylum, the officials sent her
back to Mexico. They left her and her child on the in-
ternational bridge with no information about where to
stay or what to do while awaiting her first hearing, set
for months later. The mother and daughter sought
shelter at a hotel near the bridge. Soon, a cartel kid-
napped them from the hotel and brought them to a
crowded house. Heavily armed cartel members
guarded the house, preventing the migrants' escape,
and dozens of new hostages arrived each day. The cap-
tors confiscated the mother's cell phone and routinely

AR00409

10

threatened to kill her eight-year-old child. The mother and daughter could not bathe or change clothes. They were held for about a month, during which time the threats against them escalated. Cartel members threated to cut the mother's head off and to sell the child to another cartel. The mother and daughter spent every day crying, believing they would not make it out alive.

When the cartel finally released the mother and daughter, a second group of men came to the house and kidnapped them. These captors did not allow the mother and child to eat or sleep, and the child became very ill. After a few days, the captors took the two to an abandoned house, where a group of men sexually assaulted the mother in the presence of her daughter. They threatened to kill both mother and daughter. Soon after, the kidnappers forced mother and daughter across the Rio Grande (while threatening to drown the mother). The mother could not control her sobbing until she encountered a United States immigration official, who she thought would help them. Instead, the immigration authorities sent the woman and her daughter back to Mexico.

In search of relative safety, the mother and child relocated a few hours away from Nuevo Laredo. Yet they had no choice but to return to the city en route to another immigration hearing. And while in Nuevo Laredo, they were kidnapped a third time. This time, they were held for several hours and released late in the night before their hearing. The woman was terrified. And as long as she and her daughter remained in Mexico (until an immigration judge granted them relief from deportation), she was panicked that she and her child might be abducted again.

AR00410

11

The United States government appears indifferent to this risk. In 2019, a Laredo Project client subject to MPP was forced into a vehicle and kidnapped by cartel members. He missed his hearing date because he was being held hostage, but his cousin—who witnessed the kidnapping—informed the court of what had happened. The government nonetheless asked the judge to remove the man *in absentia*. The government's counsel told the court that kidnapping "is potentially a reality for every respondent." *Lawyer Defending Trump Policy Makes Stunning Admission*, CNN POLITICS (Mar. 11, 2020), https://tinyurl.com/vdxxajl. The immigration judge clarified: "[W]hat I'm hearing from the government is . . . everybody has to take that risk and that chance, and you get kidnapped, you get kidnapped, that's the risk you take for being in Mexico and wanting to apply for asylum here in the United States." *Id.* The judge stated: "I don't think it's humane . . . . [W]e're talking human beings and lives." *Id.*

These clients are not outliers. *Twenty-six percent* of *amici*'s clients subject to MPP at Laredo report being kidnapped at least once after being sent back to Mexico. And Doctors Without Borders, which operates in Nuevo Laredo, reports even higher numbers. In the Nuevo Laredo clinic in September 2019, 43.9% of patients who were subject to MPP (18 out of 41) had been recently kidnapped. Doctors Without Borders, *No Way Out: The Humanitarian Crisis for Migrants and Asylum Seekers Trapped Between the United States, Mexico and the Northern Triangle of Central America* 6 (Feb. 2020), https://tinyurl.com/y5h8p6y6. "In October, the percentage of kidnapping among

12

those sent to Mexico under the MPP program increased to 75% (33 of the 44 new patients)." *Id.*

This is a far cry from meaningful access to justice.

## II. Half of Migrants Forced to Return to Mexico Under MPP Miss at Least One Immigration Hearing.

Given the frequent kidnappings in Nuevo Laredo, some migrants are physically incapable of attending their immigration hearings because they are in the clutches of a cartel at the appointed time. Other migrants, facing the dangers of kidnapping, sexual assault, and other violent crime, decide not to stay to pursue their asylum claims—*even if those claims are meritorious*. For instance, one Laredo Project client abandoned his asylum claim after he and his daughter narrowly dodged a kidnapping attempt while returning from their first immigration hearing. He decided that nothing could be worse than the danger of Nuevo Laredo. His analysis of the risk—to himself and to his young child—was realistic. They departed from Nuevo Laredo and never got a chance to present their claims under the United States immigration laws.

Other migrants miss immigration hearings because they cannot get back to the port of entry due to other impediments, apart from kidnapping. For instance, one family that the Laredo Project assisted was unable to reach the port of entry because they were obstructed by a shootout between a Mexican cartel and the police. The family members received *in absentia* removal orders due to their absence. Another family, represented by the Laredo Project, was twice blocked from attending immigration hearings by U.S. Customs and Border Protection ("CBP"). The

13

mother—who had been kidnapped from Nuevo Laredo and raped in front of her children—was suffering from a stress-induced skin condition, and the CBP officer thought the peeling skin on her scalp looked like lice. The officer twice refused to let the family through the border checkpoint, causing the family to miss two different asylum hearings that each had to be reset.

Still other migrants miss their court dates because they do not receive notice of scheduled hearings. Many migrants subject to MPP have no mailing address because homeless shelters in Mexico typically do not accept mail for migrants. Even shelters that accept mail do not generally provide a stable address, since a migrant usually loses her spot (and her address) when she leaves the shelter to appear at a port of entry for a court date. Human Rights Watch, *"We Can't Help You Here": US Returns of Asylum Seekers to Mexico* 37 (2019), https://tinyurl.com/yc3o2942. And other migrants do not receive hearing notices because they cannot report address changes to the immigration authorities. The EOIR-33 form that applicants use to update their addresses with the Executive Office for Immigration Review ("EOIR") cannot be filed online, and the mailing instructions and pre-printed outer envelope assume mailing within the United States. U.S. Dep't of Justice, EOIR-33, Alien's Change of Address/Phone Number Form (Immigration Court) (rev. Dec. 2019), https://tinyurl.com/yabze6ys; U.S. Dep't of Justice, EOIR, List of Downloadable EOIR Forms (updated Oct. 14, 2020), https://tinyurl.com/yanpptog.

The government has instituted a stopgap measure to attempt to provide migrants with notice of their hearings. EOIR directs asylum applicants under MPP

14

"to check on case status in English and Spanish by calling the Automated Case Information Hotline [('EOIR Hotline')] . . . or visiting EOIR Automated Case Information portal [('EOIR Portal')]." U.S. Dep't of Justice, Office of Pub. Affairs, *Department of Justice and Department of Homeland Security Announce Plan to Restart MPP Hearings* (updated Nov. 9, 2020), https://tinyurl.com/y7wackjk. But the EOIR Hotline is sometimes out of service, and it is missing hearing information for a meaningful number of applicants. The Portal is similarly missing information, and in any event, it is useless for many applicants subject to MPP, who have no internet access while awaiting their hearings in Mexican border towns.

The notice issues, the frequent kidnappings, the safety concerns, and other deterrents have a significant impact on access to justice. Migrants subject to MPP must brave gang shootouts, attempted kidnappings, and potential sexual assault to appear at the port of entry at the designated time. Half do not make it.

In particular, through December 2020, 53% of migrants under MPP had missed at least one hearing.[2] TRAC Immigration, *Details on MPP (Remain in Mexico) Deportation Proceedings*, https://tinyurl.com/rzef29p (last visited Jan. 19, 2021) (considering only migrants who have had at least one hearing). The absences were generally fatal to the applicants' claims. In response to absences by migrants

---

[2] By contrast, in FY 2018, more than 89% of migrants who were allowed to remain in the United States appeared for all scheduled immigration hearings. Human Rights First, *Fact Check: Asylum Seekers Regularly Attend Immigration Court Hearings* (Jan. 25, 2019), https://tinyurl.com/y5j3mocs.

AR00414

15

subject to MPP at all border courts, including Laredo, the immigration courts have issued 27,916 *in absentia* removal orders and 2,905 *in absentia* terminations or other closures.  *Id.*  The removal orders rendered the migrants subject to them inadmissible to the United States for a period of 10 years.  *See* 8 U.S.C. § 1229a(b)(5), (7).  Thus, tens of thousands of asylum applicants have been unable or unwilling to present their claims under the inhumane conditions of MPP— and are barred from most types of immigration relief for years to come.

### III. MPP Significantly Restricts Access to Counsel.

Asylum seekers who manage to attend their hearings at LIHF face another serious impediment to presenting their claims:  It is almost impossible to find an attorney to represent asylum seekers subject to MPP at Laredo.  Having counsel is the "single most important factor affecting the outcome of an asylum case." Sabrineh Ardalan, *Access to Justice for Asylum Seekers: Developing an Effective Model of Holistic Asylum Representation*, 48 U. Mich. J.L. Reform 1001, 1015 n.51 (2015) (quoting Am. Bar Ass'n Comm'n on Immigration, *Reforming the Immigration System: Proposals to Promote Independence, Fairness, Efficiency and Professionalism in the Adjudication of Removal Cases: Executive Summary ES-7* (2010)).  That factor cuts against the vast majority of asylum seekers under MPP.

Legal representation is extraordinarily important in asylum cases.  Presenting any asylum claim is daunting.  Asylum seekers must prepare the Application for Asylum and for Withholding of Removal (Form

16

I-589), which comprises over one hundred questions and fourteen pages of instructions.  This form must be completed and submitted in English, yet most asylum seekers have little or no English proficiency.  *See* U.S. Dep't of Justice, EOIR, *Statistics Yearbook: Fiscal Year 2018*, at 18 (updated Aug. 30, 2019), https://ti-nyurl.com/t3v39le (reporting that 89% of immigration court cases required translation services).  Further-more, successful asylum applicants generally support their claims with evidence such as police reports, med-ical records, identification documents, and photo-graphs—but asylum seekers frequently flee with little more than the clothes on their backs.  And even those who bring documentation may have it stolen.  If kid-napped, as many are, asylum seekers often are stripped of their possessions, including documents and photos (in hard copy or stored electronically on their cell phones).  And asylum seekers frequently have reason to fear that friends and family back home will face persecution if they help the asylum seekers to gather documentation.  Additionally, migrants of-ten find it difficult or impossible to locate translators and to pay for the required certified translation of doc-uments and affidavits.

All of these challenges are compounded by asylum applicants' reactions to trauma.  Having fled extreme violence in search of safety, many asylum seekers ex-perience post-traumatic stress disorder ("PTSD") and other mental health challenges. Stephen Paskey, *Tell-ing Refugee Stories: Trauma, Credibility, and the Ad-versarial Adjudication of Claims for Asylum*, 56 Santa Clara L. Rev. 457, 461 (2016). "Avoiding painful topics is common among trauma survivors, and when asy-

17

lum seekers do open up, their memories can flood together." Ardalan, *supra*, at 1020.  Asylum applicants who experience trauma are less likely to recall the details of their persecution consistently over time, and are more likely to recall memories in overgeneralized terms or to minimize the importance and intensity of their trauma.  Carol M. Suzuki, *Unpacking Pandora's Box: Innovative Techniques for Effectively Counseling Asylum Applicants Suffering from Post-Traumatic Stress Disorder*, 4 Hastings Race & Poverty L.J. 235, 257 (2007); Pub. Interest Pro Bono Ass'n, *Working with Survivors of Abuse: A Trauma Informed Approach* 2 (Oct. 7, 2020), https://tinyurl.com/y8also7m. "None of these things [is] a reliable measure of whether a survivor is truthful, and yet they are the very things an immigration judge will typically point to as evidence that an asylum seeker is not credible." Paskey, *supra*, at 461-62.

Asylum seekers subject to MPP—especially in Laredo—are also likely to have experienced recent trauma while being forced to wait in Mexico.  According to Doctors Without Borders, 79.6% of patients treated in Nuevo Laredo during the first nine months of 2019 reported being the victims of violence.  Doctors Without Borders, *supra*, at 26.  This fresh trauma—experienced by an applicant who is still in Mexico and not yet out of danger—can make it particularly difficult to complete a lengthy and complex asylum application.

Lawyers are seldom therapists, but they can help a traumatized asylum applicant to assemble a coherent narrative history.  Lawyers are the best way (and often the only feasible way) for an asylum seeker to

18

collect official documentation without the involve-
ment of the applicant's vulnerable friends or family;
coordinate fact affidavits from witnesses in the appli-
cant's home country; retain an expert to prepare a
country-conditions report regarding the state of hu-
man rights in the applicant's country of origin; coordi-
nate certified English translations of materials in
Spanish, indigenous languages, and other languages;
and complete the asylum application—a filing that in
most of the Laredo Project's cases spans 300-350
pages. In addition, for asylum seekers forced to re-
main in Mexico subject to MPP, an attorney is often
the only way to ensure that the applicant knows of all
hearings and scheduling changes. *See supra* Part II.
The Laredo Project, for instance, employs a dedicated
support staff member who checks the hearing status
of every client every day. An attorney can also com-
municate with counsel for the government or with the
immigration court should scheduling issues arise.

For asylum seekers, these types of legal assistance
are critical. In general, an asylum applicant with rep-
resentation is multiple times more likely than a pro se
applicant to obtain relief. *See* TRAC Immigration,
*Asylum Representation Rates Have Fallen Amid Ris-
ing Denial Rates* (Nov. 28, 2017), https://ti-
nyurl.com/y8fn2pzt; Ardalan, *supra*, at 1003 & n.6;
Samantha Balaban et al., *Without A Lawyer, Asylum-
Seekers Struggle With Confusing Legal Processes*,
NPR (Feb. 25, 2018), https://tinyurl.com/yayysqgp. In
a survey of asylum decisions issued in FY 2018, 39.9%
of represented asylum applicants obtained some form
of immigration relief, compared to only 11.3% of appli-
cants who were unrepresented. *See* TRAC Immigra-
tion, *Asylum Decisions*, https://tinyurl.com/yamrfjo3

19

(last visited Jan. 19, 2021) (filtered for FY 2018).  In FY 2017, those numbers were 47.9% for asylum seekers with counsel and only 11.4% for asylum seekers without counsel.  *See id.* (filtered for FY 2017).  And in FY 2016, those numbers were 55.5% for asylum seekers with counsel and only 11.2% for asylum seekers without counsel.  *See id.* (filtered for FY 2016).[3]

The differences are even more stark for migrants who are forced to remain in Mexico subject to MPP. Among migrants under MPP whose cases have been decided, only 0.65% of unrepresented individuals were granted some form of relief, compared to 25.3% of individuals who were represented by an attorney. TRAC Immigration, *Details on MPP*, *supra*.  Consid-

---

[3] The data for FY 2019 and FY 2020 are not entirely reliable because thousands of asylum cases have been omitted.  *See* TRAC Immigration, *Asylum Decisions*, https://tinyurl.com/yamrfjo3 ("8,649 Asylum Applications Disappeared From EOIR Data during FY 2019-21") (last visited Jan. 19, 2021); TRAC Immigration, *After EOIR Fixes Most Egregious Data Errors, TRAC Releases New Asylum Data—But with a Warning* (Sept. 16, 2020), https://tinyurl.com/y3q4rzou (discussing missing data).  Nonetheless, the data that are available indicate that in FY 2019 and FY 2020, an asylum seeker with representation was approximately twice as likely to obtain relief as an asylum seeker without representation.  *See* TRAC Immigration, *Asylum Decisions*, *supra* (filtered for FY 2019, showing that 33.7% of represented migrants obtained some form of relief, compared with 16% of unrepresented migrants; and filtered for FY 2020, showing that 31.3% of represented migrants obtained some form of relief, compared with 18% of unrepresented migrants).  These statistics were generated by the Transactional Records Access Clearinghouse using EOIR data; EOIR-generated statistics do not straightforwardly address the issue.  *See* Jeffrey S. Chase, *EOIR's New Math* (Dec. 12, 2020), https://tinyurl.com/ycbjxll4.

20

ering Laredo alone, only 1.2% of unrepresented migrants under MPP were granted some form of relief, compared to 56.8% of individuals who were represented by an attorney. *Id.* (Over half of those successful migrants were represented by *amici*.) Representation by counsel is crucial.

Yet MPP makes it extraordinarily difficult for a migrant to find or retain counsel. Asylum seekers who remain in the United States generally relocate to cities and towns across the country, and their cases are assigned to the courts near where they reside. Human Rights Watch, *We Can't Help You Here*, *supra*, at 34. By contrast, under MPP, asylum cases are concentrated at particular ports of entry, "overwhelming the limited number of immigration attorneys who practice there." *Id.* The number of available attorneys is further reduced because many immigration practitioners in the United States are unable—logistically or otherwise—to provide services to migrants across the border in Mexico. *Id.* Further, some attorneys may be hesitant to place themselves at the potential receiving end of a cartel's demand for ransom. (The Laredo Project uses non-traceable "burner" phones for client communications, so that cartels cannot identify Laredo Project attorneys and target them for extortion.) And Mexican attorneys cannot substitute for counsel in the United States because attorneys in Mexico are typically neither licensed nor otherwise able to provide representation in United States courts.

*Amici* have seen this structural problem in Laredo. The Laredo Project considered providing assistance across the border in Nuevo Laredo, but determined that it was far too dangerous. When Laredo Project attorneys took an exploratory trip across the border,

21

the local pastor with whom they were scheduled to meet (who ran a shelter for migrants) was missing; he had been kidnapped by cartel members, reportedly because he attempted to stop them from kidnapping Cuban asylum seekers. *See* Premier Christian News, *Still no sign of pastor one year after kidnapping* (Aug. 3, 2020), https://tinyurl.com/yaefrzaq; Premier Christian News, *Mexico: Commission calls for update three months after Pastor kidnapping* (Nov. 4, 2019), https://tinyurl.com/yxl45swa. Given the danger—which the State Department assesses as the same level as Syria and Afghanistan, *see* U.S. State Dep't, *supra*—Jones Day could not send its attorneys to Nuevo Laredo. To *amici*'s knowledge, not a single organization operates an office in Nuevo Laredo offering pro bono legal representation in the United States immigration courts.

Without a physical presence, pro bono and other legal services providers can be hard to find. EOIR gives migrants the San Antonio Immigration Court List of Pro Bono Legal Services Providers, but for migrants at Laredo it is of little use. The list provides migrants with names of non-profit organizations that operate in the San Antonio Immigration Court—few (if any) of which offer services for proceedings at LIHF. The Laredo Project is not on the list because it is not a non-profit organization (but rather a pro bono initiative of Jones Day) and because it does not operate in the San Antonio Immigration Court. The non-profits on the list will sometimes provide migrants with the phone number for the Laredo Project, but many migrants fall between the cracks. Of the 13,425 migrants subject to MPP in Laredo, fewer than 1,500 have contacted the Laredo Project.

AR00421

22

Further, the Laredo Project and other legal services providers are unable to represent all who do manage to locate them.  The Laredo Project, for instance, has generally conducted about 25 assessments weekly (until the border closed in March 2020), but has the capacity to accept only 2-3 individuals or families as clients each week.  If the migrants' cases were dispersed across the United States (as immigration cases are outside of MPP), then the migrants would have access to many more attorneys all over the country.  But under MPP, migrants' cases are concentrated in just a small handful of courts near the border.  The need is overwhelming and the available attorneys are few.

The statistics regarding access to counsel under MPP are jarring.  Migrants outside of MPP (i.e., those residing in the United States while their hearings are pending) are often able to retain counsel.  Studies have calculated representation rates among asylum seekers ranging from 37% to over 80%.  *See, e.g.*, Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Penn. L. Rev. 1, 6-8, 15-16 (2015); TRAC Immigration, *Asylum Decisions and Denials Jump in 2018* (Nov. 29, 2018), https://tinyurl.com/yd2ool7t.  But migrants subject to MPP (i.e., those forced to remain in Mexico while their hearings are pending) are almost always unrepresented.  *Among migrants subject to MPP thus far, only 7% have been represented by counsel.  See* TRAC Immigration, *Details on MPP*, *supra*.  This makes the statutory right to retain counsel for immigration proceedings, *see* 8 U.S.C. § 1229a(b)(4)(A), largely theoretical.

AR00422

23

This Court has recognized that the "right to be heard [is], in many cases, of little avail if it d[oes] not comprehend the right to be heard by counsel." *Goldberg v. Kelly*, 397 U.S. 254, 270 (1970) (quoting *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932)). But for the vast majority of asylum applicants subject to MPP, retaining counsel is, as a practical matter, impossible. The very operation of MPP prevents it.

## IV. MPP Impedes Counsel's Presentation of Asylum Claims.

Even when a migrant subject to MPP at Laredo is able to retain counsel, providing that legal representation is a challenge. For safety reasons, *amici* cannot travel to Nuevo Laredo. At the same time, because of MPP, *amici*'s clients are not allowed to visit *amici*'s law offices in the United States. Attorneys are forced to put together a case without meeting their clients in person. This is extraordinarily difficult. When clients suffer from PTSD, in-person meetings are particularly important for attorneys seeking to establish trust, to understand their clients' experiences, and to prepare clients for cross-examination by the government's lawyer and questioning from the immigration judge.

Almost all communication occurs over the phone. But migrants huddling in border towns in Mexico are often unable to use their phones. Frequent power outages disrupt cell service and prevent phone-charging. For many clients, internet service on their phones is sporadic or nonexistent, which limits communication over WhatsApp (an instant messaging app). Migrants often have insufficient funds to purchase cellular data or minutes. Phone theft is common. And, to limit potential communication with cartels, many shelters

24

have policies preventing migrants from accessing their phones except during specific two-hour time periods, into which migrants must squeeze all communication (legal and otherwise), and during which they have no privacy. What is more, sometimes lawyers cannot communicate with clients over the phone at all, because the clients have been kidnapped by a cartel, which seizes their phones and does not give them back. *See* This American Life, *The Out Crowd* (Nov. 15, 2019), https://tinyurl.com/rvzjttt; Miriam Jordan, *'I'm Kidnapped': A Father's Nightmare on the Border*, N.Y. TIMES (Dec. 21, 2019), https://tinyurl.com/y4fbz44c; *supra* Part I.

It is particularly challenging to establish trust over the phone. When first calling the Laredo Project, migrants are often worried that the phone number really belongs to a government official, who can deny relief, or to a cartel member, who can inflict harm. Even after that initial fear subsides, it is extraordinarily difficult for many migrants to relate their most painful memories to an attorney whom they have never met face-to-face. One Laredo Project client, who likely suffers from PTSD, was kidnapped and raped in front of her children after being returned to Mexico under MPP. Her attorneys did not learn about the sexual assault until their fourth or fifth phone conversation, during which she repeatedly had to stop talking because the events were so painful to recall. Laredo Project attorneys were not able to get the full story until they flew to meet her in Monterrey—a safer location several hours away from Nuevo Laredo. If the client had remained in Nuevo Laredo, her attorneys may not have learned the full story of the abuse she had suffered.

25

Eliciting client histories can also be difficult (or impossible) because migrants frequently struggle to find private locations to talk on the phone. One client called the Laredo Project from a broom closet in a shelter because she was concerned that the pastor who ran the shelter was working with a cartel and might use against her the information she shared over the phone. Another Laredo Project client disclosed a family-based persecution claim during an initial interview (based on the murder of his uncle by gang members and the gang's subsequent threats and extortion of his entire family). He did not disclose until three days before his final hearing that he had also been the victim of a brutal sexual assault by five men who made clear that they attacked him because he was gay. The client, who is HIV positive, believed that he contracted HIV during the assault. He was reluctant to disclose this information over the phone because he had no privacy; he feared what his roommates would do if they found out about his sexuality or his HIV status.

The challenges persist at the hearing stage at LIHF. There is virtually no way to mail documents to clients in Nuevo Laredo, so in the very brief time before a hearing starts, attorneys must review with their clients (and obtain signatures on) the I-589 Application for Asylum, a detailed document with over one hundred questions. Attorneys are allotted a total of one hour to meet with their clients before a hearing—but, because some of this time is taken up with security and movement within the LIHF, as a practical matter *amici* frequently can speak with their clients for only half an hour. After the meeting, lawyers and clients are separated and are not allowed to sit

26

next to each other.  This prevents lawyers from receiving last-minute preparatory information about their clients' cases.  LIHF also prevents attorneys from performing last-minute research or preparation—government attorneys have full access to the internet and to electronic devices, but migrants' attorneys at LIHF are prohibited from bringing laptops or cellphones into the hearing and private-meeting spaces.  Greg Chen et al., *After AILA Attends Tour of the Laredo Tent Court, Questions Still Abound*, THINK IMMIGRATION (Jan. 30, 2020), https://tinyurl.com/y6dl6knb. Further, when a client's case is called, there is no opportunity to confer with the client quietly and privately during the hearing.  The proceedings at LIHF are held in shipping containers, where the microphones pick up every sound and convey any conversations or whispers to the immigration judge and government attorney in the immigration court.

Even eliciting coherent and clear testimony can be a challenge because migrants in the LIHF are exhausted.  The United States government generally directs migrants to report to immigration authorities on the international bridge by 4:30 a.m. on the day of a hearing.  *See, e.g.*, Joel Rose, *Few Asylum-Seekers Winning Cases Under 'Remain in Mexico' Program*, NPR (Dec. 19, 2019), https://tinyurl.com/y5ebw7cj. "[S]helters in [Nuevo Laredo] refuse to unlock their doors until the light of day because it's notoriously dangerous outside," *id.*, so many asylum seekers spend the entire night on the bridge.  Due to cartel activity, the migrants cannot get up to get food or go to the bathroom.  When it is cold, or when it rains, they cannot seek shelter.  One Laredo Project client spent a cold February night on the bridge with her

AR00426

27

three-year-old child.  An NIJC client spent a thirty-degree night on a sidewalk by the bridge, watching over her small daughter, waiting to appear in court. She arrived for her hearing having slept for only ten minutes while standing up.  She had a severe headache and was worried because she could not focus on her case.  Yet she had no choice but to proceed:  This was her only opportunity to present her claim for asylum, and her only opportunity to access justice.

\*     \*     \*

"If we are to keep our democracy, there must be one commandment: Thou shalt not ration justice." *Hardy v. United States*, 375 U.S. 277, 293-94 (1964) (Goldberg, J., concurring) (quoting Learned Hand, J.).  But MPP at Laredo limits migrants to only the stingiest ration.  Migrants must risk kidnapping and sexual assault to attend their hearings at LIHF.  They may miss a hearing (and be issued an order of removal) through no fault of their own.  They are unlikely to find an attorney, making relief almost impossible to obtain.  And they must present their testimonies to the court while overwhelmed and exhausted from the journey to the hearing.  This is MPP at Laredo—and this is not meaningful access to justice.

## CONCLUSION

For the foregoing reasons, the Court should affirm the decision below.

28

January 22, 2021          Respectfully submitted,

STEPHEN J. BROGAN          ILANA B. GELFMAN
LAURA K. TUELL               *Counsel of Record*
ARIEL VOLPE                JONES DAY
DANIEL J. S. BLEIBERG      100 High Street
JONES DAY                  Boston, MA 02110
51 Louisiana Ave., NW      (617) 960-3939
Washington, DC 20001       igelfman@jonesday.com


DAVID J. DIMEGLIO          MICAH M. DOAK
JONES DAY                  JONES DAY
555 South Flower Street    717 Texas
Fiftieth Floor             Suite 3300
Los Angeles, CA 90071      Houston, TX 77002


*Counsel for Amici Curiae*

AR00428

U.S. Department of Homeland Security
Washington, DC 20528



Homeland
Security

January 14, 2020

MEMORANDUM FOR THE ACTING SECRETARY

FROM:               Mark A. Morgan
                    Acting Commissioner
                    U.S. Customs and Border Protection

                    Matthew T. Albence
                    Deputy Director and
                    Senior Official Performing the Duties of the Director
                    U.S. Immigration and Customs Enforcement

                    Mark Koumans
                    Acting Director
                    U.S. Citizenship and Immigration Services

SUBJECT:            Response to the Migration Protection Protocols
                    Red Team Report

_____

We appreciate the DHS Senior Leadership-led effort to conduct a top-down review of the Migrant Protection Protocols (MPP) policies and implementation strategies. As was the case with then-Acting Secretary Kevin McAleenan, we welcome the thoughtful recommendations. In the former Acting Secretary's November 8, 2019 memorandum that accompanied the recommendations, we were directed to deliver a plan outlining how "the Department will enhance the implementation of the MPP in accordance with these recommendations" within thirty days, and then, within ninety days, to complete the actions identified in this plan. This memorandum is intended to meet that direction.

Upon careful review of the Migrant Protection Protocols Red Team Report, we note that many of the identified recommendations have already been or are being addressed by one or more Components. That said, the spirit of the Report is to find ways for increasing the effective and efficient implementation of MPP—that is something to which we are collectively committed.

With the intent to make MPP more effective and efficient, the following are items identified by the Report that we are already taking steps to address. For each item, we have identified ongoing activities:

**Subject: Thirty-Day Response to the MPP Red Team Report**
**Page 2**

*Recommendation*: Make every effort to ensure that migrants can access information and speak with Department of Homeland Security (DHS) officials in their preferred language.

*Ongoing Activities:*
- U.S. Customs and Border Protection (CBP) currently utilizes CBP employees, the U.S. Citizenship and Immigration Services (USCIS) Language Line Services, and contract language interpreters and translators to communicate with individuals who have limited English proficiency. Additionally, CBP uses numerous job aids to ensure language access is provided to individuals who have limited or no English proficiency.
- DHS Components have access to a 24/7/365 language contract with Lionbridge Technologies, Inc. to ensure that employees can communicate effectively with all individuals in custody.
- CBP will continue to review what languages other than Spanish, if any, are the primary means of communication for individuals amenable to MPP, and make available translations of the MPP tear sheet in those languages.

*Recommendation:* Reinforce the avenues by which family members, attorneys, witnesses, non-governmental and international organizations, the press, and relevant stakeholders can view MPP proceedings, meet with migrants (if appropriate), or visit temporary hearing locations.

*Ongoing Activities:*
- Currently, consistent with Executive Office for Immigration Review (EOIR) policy and practice, individuals interested in observing immigration court proceedings for individuals processed under the MPP can do so at either the physical court location in the case of San Diego and El Paso, or at the location from which the immigration judge video teleconferences into the immigration hearing facilities (IHFs) in Laredo and Brownsville.
- On December 20, our Components approved joint guidance to emphasize that it will continue to be the case that anyone has access to the IHFs, consistent with operational constraints and EOIR rules, with preference given to those involved in legal proceedings (lawyers, witnesses, etc.), and lawyers will continue to have time and space to meet with clients prior to hearings.
  - ➢ The guidance states that credentialed media, and other members of the public may be admitted, after those that are critical for the individual to receive a full and fair hearing are admitted. Moreover, individuals admitted to the IHFs must abide by EOIR rules pertaining to courtroom decorum, as well as DHS facility rules.
- CBP, ICE, the Federal Protective Service (FPS), and EOIR will continue to coordinate to allow appropriate access to immigration proceedings on a manageable scale that allows for safe and orderly court operations.
- USCIS will generally accommodate a request by an alien to have an attorney or accredited representative present (in-person or via telephone) during MPP non-refoulement assessment interviews that occur at the IHFs in Laredo and Brownsville, if the attorney or representative filed or intends to file a Form G-28.

*Recommendation:* Standardize and ensure the consistency of the information individuals are provided regarding "migrant rights" building on recent efforts to show "Know Your Rights" videos at temporary hearing locations.

**Subject:  Thirty-Day Response to the MPP Red Team Report**
**Page 3**

*Ongoing Activities:*
- CBP is updating the tear sheet provided to migrants enrolled in MPP with additional information about the operation of MPP during appeals to the Board of Immigration Appeals.
- "Know Your Rights" videos are being played in the waiting areas at the IHFs (in Laredo and Brownsville), and a script of the "Know Your Rights" video is also available.

*Recommendation:*  Advocate with the Government of Mexico (GOM), the Department of State (DOS), and trusted international organizations to improve the safety and security of MPP migrants while they wait in Mexico.

*Ongoing Activities:*
- DHS regularly advocates with GOM and DOS colleagues for increased security at shelters and MPP return locations.  DHS is also regularly engaged both directly and indirectly with the International Organization for Migration (IOM) and the United Nations High Commissioner for Refugees (UNHCR) on similar topics.  DHS will continue the efforts to engage with our partners on this issue.

*Recommendation:*  Reinforce training and standards for those involved in non-adversarial interviewing.

*Ongoing Activities:*
- All credible and reasonable fear screenings, and non-refoulement interviews as a part of the MPP, are to be conducted in a non-adversarial manner.  DHS continues to provide extensive training to its officers on how to conduct non-adversarial interviews.  In addition, USCIS also provides specific trainings on interviewing techniques and best practices.
- As noted above, USCIS will generally accommodate a request by an alien to have an attorney or an accredited representative present during MPP non-refoulement assessment interviews that occur at IHFs in Laredo and Brownsville, if the attorney or representative filed or intends to file a Form G-28.

In addition to the ongoing activities identified above, we intend to work together over the next ninety days to further enhance implementation of MPP through the following activities.  These are organized under broadly the same categories identified in the November 8, 2019 memorandum:

*Assessing and Processing the Amenability of Aliens for MPP*
- Reinforcing the MPP "Guiding Principles" to agents and officers regarding the categories of individuals not amenable to MPP, specifically "Aliens in special circumstances" such as those with "known physical/mental health issues."
- Examining current guidance to determine whether additional documents, including Standard Operating Procedures, would be appropriate for items such as application of amenability guidance, the roles of various actors in the MPP intake/screening process, when restraints are appropriate, and information-sharing standards and expectations.

AR00431

**Subject: Thirty-Day Response to the MPP Red Team Report**
**Page 4**

- Exploring whether additional, standardized information should accompany the service of MPP-related documentation.
- Developing plans with the Department of Justice (DOJ) to conduct all MPP proceedings at or near POEs to speed up case processing.

*Facilitating Access to Counsel and Safeguards through the MPP process*
- In addition to a list of free or low cost legal services provided to aliens subject to MPP upon enrollment, coordinating with GOM, DOS, and DOJ to make all reasonable efforts so that MPP migrants have access to information about the U.S. immigration system and are provided the opportunity to seek legal representation.
- Exploring issues related to, and identifying common practices for, family units of mixed nationalities.
- Creating an integrated mechanism to share MPP information among DHS and DOJ.

*Non-refoulement Assessment Interviews, Information Sharing, and Measuring the Success of the Programs*
- Reviewing and updating relevant arrangements between DHS and EOIR tied to information sharing about immigration cases.
- Developing with DOJ a "dashboard" to track, at the macro level, the outcomes of MPP cases, in connection with efforts tied to the Unified Immigration Portal.
- Working with DOJ to establish and implement MPP effectiveness measures in areas such as no-show rates, the timeline for case adjudication, the number of parents or legal guardians returned to Mexico pursuant to MPP who subsequently send minor children across the border to qualify as unaccompanied alien children (UACs), and tracking relevant trends in the number of unlawful entries of non-Mexicans along the Southern Border.
- Consistent with international agreements and arrangements and the U.S. Government's existing foreign assistance programs and processes, supporting GOM activities to address crime and insecurity in locations in Mexico where those in MPP are returned.
- Continuing regular contact with Mexican counterparts—daily at the local level and weekly between capitals—discussing whether GOM continues to fulfill the assurances it provided during the initiation of MPP, including GOM's commitment to fulfilling its international non-refoulement obligations.

Recognizing ongoing litigation with respect to MPP, USCIS, CBP, and ICE will closely consult with our respective legal teams going forward.

cc:   James W. McCament
      Senior Official Performing the Duties of the Under Secretary
      Office of Strategy, Policy, and Plans

*DHS Office of Operations Coordination*
**Deliberative Document**
November 16, 2019



# The Migrant Protection Protocols Red Team Report

*October 25, 2019*

**FOR OFFICIAL USE ONLY**
*Pre-decisional internal working document*

AR00433

*DHS Office of Operations Coordination*
**Deliberative Document**
November 16, 2019

**Executive Summary**

The U.S. implemented the *Migrant Protection Protocols* (MPP) in January 2019 to address the security and humanitarian crisis on the Southern border resulting from an unprecedented number of migrants seeking asylum.  MPP was implemented under Section 235(b)(2)(C) of the Immigration and Nationality Act (INA), which gives the Secretary of Homeland Security the authority to return certain applicants for admission to the contiguous country from which they are arriving on land (whether or not at a designated port of entry) pending removal proceedings under Section 240 of the INA.  The MPP is designed to support a safe and orderly immigration process, decrease the number of migrants who take advantage of the immigration system, decrease smugglers and traffickers' ability to prey on vulnerable populations, and reduce threats to life, national security, and public safety, while ensuring that migrants (particularly vulnerable population members) receive appropriate protections.

The Department established a multi-Component Red Team, composed of members from the Offices of Privacy, Management, Civil Rights and Civil Liberties, and United States Coast Guard, under the oversight of the DHS Acting Deputy Secretary to review and provide a report on the Department's implementation of the MPP.  This team examined the execution of the MPP across the Department to identify recommendations to increase the effectiveness of the program.

The DHS MPP Red Team identified 16 recommendations organized under the following areas:

- Initial Screening and Processing.
- Access to Counsel and Due Process.
- Protection Claims.
- Treatment in Mexico.
- Administration and Logistics.

Each recommendation is designed to correct a shortfall or improve the overall program efficiency.  The two attachments provide an overview of the MPP process (Attachment 1) and a consolidated summary of the MPP Recommendations (Attachment 2).

**FOR OFFICIAL USE ONLY**
*Pre-decisional internal working document*

AR00434

*DHS Office of Operations Coordination*
**Deliberative Document**
November 16, 2019

**Table of Contents**

1. Introduction

2. DHS MPP Red Team Approach

3. DHS MPP Red Team Recommendations

    a.  Initial Screening and Processing
    b.  Access to Counsel and Due Process
    c.  Protection Claims
    d.  Treatment in Mexico
    e.  Administration and Logistics

4. DHS MPP Red Team Summary

    a.  Summary
    b.  Points of Contact

ATTACHMENTS:
Attachment 1: MPP Flow Chart
Attachment 2: MPP Recommendations Matrix Summary (T)

**FOR OFFICIAL USE ONLY**
*Pre-decisional internal working document*

AR00435

*DHS Office of Operations Coordination*
**Deliberative Document**
November 16, 2019

**1. Introduction**

The U.S. implemented the MPP in January 2019 to address the security and humanitarian crisis on the Southern border.  These protocols pertain to certain foreign individuals, entering or seeking admission to the U.S. from Mexico, illegally or without proper documentation, and evaluates them for return to Mexico to wait outside of the U.S for the duration of their U.S. immigration proceedings.  The Government of Mexico (GOM) provides all appropriate humanitarian protections for the duration of their waiting period.  The MPP are designed to support a safe and orderly immigration process, decrease the number of migrants taking advantage of the immigration system, decrease smugglers and traffickers' ability to prey on vulnerable populations, and reduce threats to life, national security, and public safety, while ensuring that vulnerable populations receive the protections they need.

The Deputy Secretary of Homeland Security was directed to establish a Red Team to conduct a top-down review of the MPP policies and implementation strategy.  The team examined the way the Department executes the MPP to produce findings and recommendations to increase program effectiveness.  This report contains the results of this analysis with specific recommendations for the Department's senior leadership to consider.  DHS should consider these recommendations to enhance the effectiveness and implementation of the MPP program.

**2. DHS MPP Red Team Approach**

Acting Deputy Secretary Pekoske organized the *DHS MPP Red Team* in July 2019.  The members began by reviewing key MPP background documents (Secretary Nielsen's *Policy Guidance Memorandum*, CBP's *Implementation of Migrant Protection Protocols*, USCIS Policy Memorandum *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols, etc.)* and engaging with DHS Components implementing the MPP along the U.S. Southwest Border.  The Red Team did not formally engage with migrants, Non-government Organizations (NGOs), academics, attorneys, GOM officials or other experts outside the Department.  The Red Team then developed specific recommendations to improve the Department's implementation of MPP in the following areas:

    a.  Initial Screening and Processing
    b.  Access to Counsel and Due Process
    c.  Protection Claims
    d.  Treatment in Mexico
    e.  Administration and Logistics

DHS Components provided feedback on the initial draft, and the Red Team consolidated the input into a single draft report.  The draft report was then redistributed and discussed by all Red Team members, the Office of General Counsel, and the Office of Strategy, Policy, and Plans before additional revisions were incorporated into the final report.  The recommendations are presented below.

DHS Office of Operations Coordination
Deliberative Document
November 16, 2019

109 **3. DHS MPP Red Team Recommendations**
110 Based on information obtained through dozens of interviews, site visits, and extensive research, the *DHS*
111 *MPP Red Team* identified the 16 recommendations below:

112 **a. *Initial Screening and Processing.***
113 • *Enhance initial screening and processing of migrants where MPP is operational.*
114 o Standardize the information posted/provided at each facility regarding individual
115 migrant rights (signage should also notify indigenous language speakers of the
116 availability of interpretation services).
117 o Provide forms, including informational notices such as the "Notice to Appear"
118 (NTA), in multiple languages (English and Spanish at a minimum) to increase
119 migrants' ability to comprehend their individual rights.
120 o Improve identification of each migrant's primary language, particularly those
121 indigenous language speakers for whom English and Spanish are not the primary
122 language, prior to issuance of the NTA, and ensure interpreter availability.
123 o Standardize DHS MPP forms and ensure they are consistently used at all MPP
124 locations, Border Patrol stations, and ports of entry.
125 o Standardize procedures for vulnerable populations, including pregnant women,
126 LGBTQ, disabled, minors, and the elderly.
127 • *Clarify the interview process.*
128 o Publish a unified standard operating procedure to ensure consistent application of
129 operational MPP procedures across the Department.[1]
130 o Modify *DHS I-213 Form* to record whether migrants are traveling with relatives or
131 partners and any relevant phone numbers for the migrant and their family.
132 o Address situations where families are placed in MPP and returned to Mexico
133 despite having at least one immediate family member who is Mexican (e.g. the
134 child was born in Mexico to a non-Mexican mother).   Some families are placed in
135 the MPP program where the parents are not citizens of Mexico but their child has
136 Mexican citizenship. While one or both parents may have claimed fear, some are
137 returned to Mexico along with their child because they did not pass the asylum
138 officer's screening process. At some locations, DHS sends pregnant women back
139 to Mexico under MPP. It is unclear how DHS will treat families who claim fear of
140 persecution or torture in Mexico when they return to the U.S. with a child who was
141 born in Mexico (and may have Mexican citizenship).
142 • *Ensure migrants who have asserted "fear" understand the details and scope of the fear*
143 *screening process.*
144 o Add specific protocols during the "fear screening process" to determine the best-
145 spoken language to communicate with indigenous-language speakers, to ensure the
146 migrant understands the questions asked and can make informed decisions.

---

[1] This would include, but is not limited to: specific authorities, references, best practices, and procedures to ensure a standardized approach to the MPP processes across the Department.

AR00437

*DHS Office of Operations Coordination*
**Deliberative Document**
November 16, 2019

147     •   *Set standards on non-adversarial interviews.*
148       o   Develop and provide guidance to train components on what constitutes "non-
149         adversarial" interviews.  These guidelines would include: who can be present at the
150         interview, who may assist with substantiating a claim of fear, the appropriate use
151         of restraints during interviews, guidelines for participation of counsel or a
152         representative, and how to conduct the interview "separate and apart" from persons
153         not related to the claim.
154     •   *Ensure the consistent application of the fear screening process.*
155       o   Modify fear screening process protocols to clarify the role of CBP officers and
156         agents versus USCIS officers in making determinations on MPP amenability based
157         on the migrant's claimed fear of persecution or torture in Mexico.  At some
158         locations, CBP uses a pre-screening process that preempts or prevents a role for
159         USCIS to make its determination.  Interviewees also indicated that some CBP
160         officials pressure USCIS to arrive at negative outcomes when interviewing
161         migrants on their claim of fear of persecution or torture.
162     •   *Collect new information during screenings (e.g. affirmative statement regarding fear of*
163       *returning to Mexico).*
164       o   Modify current processes to include fear of "persecution or torture in Mexico" as
165         an additional piece of personal information that will be noted in ICE, CBP, or
166         USCIS data systems.
167       o   Review current processes for migrants not amenable to MPP to ensure that
168         personal information is not inappropriately shared with Mexico.  When an
169         individual asserts a fear of returning to Mexico, and USCIS determines that the
170         individual has met the threshold of "more likely than not that the individual will be
171         persecuted or tortured" if returned to Mexico, a filter in the Office of Biometric
172         Identification Management System's Automated Biometric Identification System
173         should prevent the individual's biometrics from being shared with Mexico.  This
174         would ensure DHS is consistently applying confidentiality protections to asylum
175         seekers.
176
177    **b.   *Access to Counsel and Due Process.* [2]**
178     •   *Facilitate migrant access to counsel.*
179       o   Engage with external stakeholders to provide options for multiple communication
180         forums to facilitate early interaction between MPP attorneys and their clients, as
181         much as practical.
182       o   Engage with external stakeholders to provide migrants who are not in the U.S.
183         access to "Know Your Rights" training, and pre-trial hearing advice, as much as
184         practical.  This would include, leveraging the internet, video teleconference, and
185         other communication forums to bridge geographic and security concerns.  This

---

[2] Due process does not necessarily mean 5th Amendment due process but refers to the administration of due process generally, as noted in the Secretary's June 2019 Memorandum directing a review of MPP policy and implementation.

**FOR OFFICIAL USE ONLY**
*Pre-decisional internal working document*

AR00438

*DHS Office of Operations Coordination*
**Deliberative Document**
November 16, 2019

186    support would be formalized through a Memorandum of Agreement or similar
187    document.

-    *Facilitate meeting locations/logistics surrounding pre-hearing meeting locations.*
  - In collaboration with the Government of Mexico (GOM), ensure a comprehensive standardized documentation package is used and recognized by all authorities to facilitate migrant travel, hearing scheduling, processing, and to protect personal information. Ensure this package can be replaced in Mexico if it is lost or stolen.
  - During site visits, the team noted some migrants must give up shelter space in Mexico when they come to the US for a hearing (particularly when in the US for 24-48 hours or more), leaving them without an address to allow for follow up. CBP should create a reliable method of communication (such as an email contact for each migrant) to allow for communication from USG to migrants during their wait in Mexico. The usage of a more reliable communication method, will allow outreach to migrants in Mexico, but will also ensure access to counsel, and communication between migrant families (such as those cases when family members were not all processed at the same time/location, or when juveniles were sent to ORR).

**c.**    *Protection Claims.*

-    *Enhance understanding of credible fear.*
  - Continue engaging with external stakeholders to foster a shared understanding of the elevated MPP standard of fear of return to Mexico from "a significant possibility" to "more likely than not," to help address current confusions about credible fear determinations.
  - Continue to document and analyze migrant "credible fear" claims to address potential *non-refoulement*[3] concerns.

**d.**    *Treatment in Mexico.*

-    *Support GOM, NGOs, and community service groups to ensure sufficient, safe, and secure living conditions for returnees in Mexico.*
  - Recommend Department of State (DOS) coordinate with Mexico to obtain the GOM's written assurance they will comply with *non-refoulement* obligations.
  - Continue to support safe/confidential housing for vulnerable populations remaining in Mexico through MPP.

---

[3] Non-refoulement is a fundamental principle of international law that forbids a country receiving asylum seekers from returning them to a country in which they would be in likely danger of persecution based on "race, religion, nationality, membership of a particular social group or political opinion".

220      •   *Periodically monitor and evaluate whether Mexico is meeting its basic obligations under*
221        *international law for migrants returning to Mexico under MPP.*[4]

222

223     **e. Administration and Logistics.**
224      •   *Establish protocols to ensure regular communication with migrants during their stay in*
225        *Mexico.*
226          o   Create an integrated mechanism to share information between migrants and
227            DHS/Department of Justice (DOJ)/Health and Human Services (HHS) throughout
228            removal proceedings.
229      •   *The Chief Privacy Officer will determine if DHS needs to conduct a Privacy Impact*
230        *Assessment (PIA) on the MPP.*
231          o   Take appropriate action to mitigate privacy risks identified in any potential DHS
232            MPP PIA.
233      •   *Examine internal and external information sharing considerations.*
234          o   Standardize intradepartmental information sharing between MPP Component
235            stakeholders (CBP, ICE, USCIS, and OBIM) to memorialize agreed upon
236            processes and procedures.
237          o   Standardize information sharing between external MPP stakeholders (DOJ/EOIR,
238            GOM, HHS) through a memorandum of agreement or other formal documentation.
239          o   Engage with the GOM to negotiate a formal information sharing agreement to
240            govern the collection, use, retention, and dissemination of any MPP related
241            information shared between DHS and GOM.
242          o   In collaboration with EOIR, review/update the *MOU between DHS and EOIR*
243            *Regarding the Sharing of Information on Immigration Cases*, approved in October
244            2012.
245      •   *Develop MPP regulations.*
246          o   Develop regulations for the MPP program.
247      •   *Establish MPP Measures of Effectiveness.*
248          o   Establish, implement, and assess specific measures of effectiveness (MOE) to
249            evaluate the MPP's effectiveness and scope.  These MOE would include:  the
250            incoming flow of migrants per day (both for initial screening and for subsequent
251            MPP proceedings); number and percentage of incoming migrants amenable to
252            MPP; flow-rate and backlog associated with removal adjudication proceedings by
253            outcome; number of MPP proceedings scheduled compared to number not held
254            due to no-shows; number of applicants asserting fear per day; number and
255            percentage of MPP applicants having to remain overnight in the U.S.; and the
256            number of Entry Without Inspection migrants apprehended who were previously
257            issued an order of removal from an immigration judge.

---

[4] The evaluation may include adoption of relevant data sets for trends, surveys, use of a NGO, or engagement with an entity or agency
independent of DHS (e.g. State Department or USAID) or some combination thereof.

**DHS Office of Operations Coordination**
**Deliberative Document**
November 16, 2019

258          o   Develop joint plans with DOJ to sustain the capability to conduct MPP
259                proceedings near Southwest Border ports of entry, as needed.

260 **4. DHS MPP Red Team Summary**

261

262      ***a.***   ***Summary***
263         Implementation of the DHS MPP Red Team recommendations will continue to improve
264         the Department's ability to secure the Southwest Border, improve the USG immigration
265         process, and ensure that the MPP are implemented in accordance with the January 25,
266         2019 Secretarial memorandum, applicable law, and policy guidance and procedures.
267         This will be an iterative process that the Department will reevaluate and refine over
268         time.  Attachment 1 provides an overview of the MPP process and Attachment 2
269         provides a summary of DHS MPP Red Team Recommendations.

270

271      ***b.***   ***Points of Contact***
272         Questions or subsequent coordination for this report should be directed to
273         Sam Kaplan, DHS Deputy Chief of Staff, 202-447-4583; sam.kaplan@hq.dhs.gov.

274

275 **ATTACHMENTS:**
276 **Attachment 1: MPP Flow Chart**
277 **Attachment 2: MPP Recommendations Matrix Summary (Published Separately)**
278

**DHS Office of Operations Coordination**
**Deliberative Document**
November 16, 2019

279 **Attachment 1: MPP Flow Chart**
280
281 **MIGRANT PROTECTION PROTOCOLS**
282 **FLOW CHART OVERVIEW**
283



284



285

**FOR OFFICIAL USE ONLY**
*Pre-decisional internal working document*

**AR00442**



Secretary

**U.S. Department of Homeland Security**
Washington, DC 20528

November 8, 2019

MEMORANDUM FOR:      Acting Commissioner
                     U.S. Customs and Border Protection

                     Acting Director
                     U.S. Immigration and Customs Enforcement

                     Acting Director
                     U.S. Citizenship and Immigration Services

FROM:                Kevin K. McAleenan
                     Acting Secretary

SUBJECT:             Review of Migrant Protection Protocols Policy and
                     Implementation - Final Recommendations

---

As Acting Secretary, it is my priority that our enforcement of the law is done with integrity, transparency, and respect for all people we encounter. With this in mind, earlier this year I directed the Acting Deputy Secretary to form a committee of senior leaders in the Department to conduct a top-down review of MPP's policies and implementation strategy, and provide overall recommendations to increase the effectiveness of the program. It is critical to the success of this program that we periodically review our policies and procedures.

The Acting Deputy Secretary convened a group of dedicated officials who did not have involvement in the implementation of MPP. These officials reviewed relevant policy and implementation documentation, conducted multiple interviews, and participated in site visits at various locations where MPP is implemented. The committee produced a number of thoughtful recommendations that highlighted areas where the program may become more effective and efficient, while maintaining the integrity of the program and safeguarding the rights of aliens who are in removal proceedings. I am grateful to the committee for their efforts.

I find that these detailed recommendations fall into three categories:

1. Screening, Processing, and Assessing the Amenability of Aliens for MPP;
2. Facilitating Access to Counsel and Safeguards Throughout the MPP Process; and

AR00443

Subject:  Review of Migrant Protection Protocols Policy and Implementation - Final Recommendations
Page 2

3. Fear Screenings, Information Sharing, and Measuring Success of the Program.[1]

Within 30 days of the date of this memorandum, I direct your Components to deliver one unified action plan outlining how the Department will enhance the implementation of MPP in accordance with these recommendations.  Within 90 days, I direct the completion of action items contained within that plan.

Attachment

---

[1] For those recommendations that fall outside the purview of the Department and are within the jurisdiction of our inter-agency partners, I direct the Acting Deputy Secretary to forward those recommendations to our partners for consideration and action.

AR00444

UNCLASSIFIED//FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE

U.S. Department of Homeland Security
Washington, DC 20528



**Homeland Security**

# ACTION

MEMORANDUM FOR THE ACTING SECRETARY

FROM:                U.S. Customs and Border Protection

                             U.S. Immigration and Customs Enforcement

                             U.S. Citizenship and Immigration Services

                             Office of Operations Coordination

                             Office of Strategy, Policy, and Plans

SUBJECT:       **Closing out the Migrant Protection Protocols Red Team Report Evaluation Process**

**Purpose:** To seek concurrence on a series of actions that will close out the Migrant Protection Protocols (MPP) Red Team Report evaluation process.

**Background:** Since its inception in January 2019, MPP has been a critical tool in managing irregular migrant flows at the U.S.-Mexico border. We have carefully considered the recommendations in the "The Migrant Protection Protocols Red Team Report" (October 25, 2019). Building on the items highlighted in the January 14, 2020 memorandum "Response to the Migrant Protection Protocols Red Team Report," in which we identified areas where we had already begun making improvements to MPP, we have identified additional action items to improve the program:

- Develop a DHS.gov MPP Landing Page—DHS recently created and published MPP landing pages on DHS.gov—available in both English and Spanish—on which DHS makes information about MPP, including measures and metrics, as available and updated as practicable.

- Issue a Departmental-level Guidance Memo—This memorandum, which would be issued by the Office of Strategy, Policy, and Plans, would articulate a broad policy vision on several topics identified as part of our review process on which further clarity is warranted. It would

**AR00445**

**Subject: Closing out the MPP Red Team Report Evaluation Process**
Page 2

seek to bring greater consistency to MPP operations to ensure the long-term viability of the program.

- Issue U.S. Customs and Border Protection (CBP) Guidance on Document Service—This memorandum, which would be issued by CBP, would provide additional guidance on the completion and service of documents related to MPP enrollment.

- Issue CBP Guidance on MPP Amenability—This memorandum, which would be issued by CBP, would intend to clarify how CBP Office of Field Operations (OFO) officers and U.S. Border Patrol (USBP) agents may exercise their discretion in determining whether individuals are amenable to be returned to Mexico under Section 235(b)(2)(C) of the Immigration and Nationality Act (INA), as implemented through MPP, and to standardize CBP's application of MPP to amenable aliens.

These items taken together, alongside previous improvements, would broadly implement the Red Team Report recommendations by way of increased transparency, updated guidance, and clearly articulated policy perspectives. We recommend that, as with previous practice, these memoranda be made publicly available on the new DHS.gov MPP landing page and that these programmatic improvements be accompanied by thoughtful and organized engagement with Congress, the media, and other relevant stakeholders. With your concurrence on these items, and with our commitment to continual reassessment and programmatic development of MPP, we would consider the Red Team Report evaluation process concluded.

**Signature Level Justification:** Because the MPP is founded on Secretary-level policy guidance, your approval of these steps is required.

**Timeliness:** We recommend implementing these actions as soon as practicable.

**Subject:  Closing out the MPP Red Team Report Evaluation Process**
Page 3

**Recommendation:**  Proceed with the issuance of the three memoranda and their publication on the DHS.gov MPP landing page, as described above:

Approve/date _____          Disapprove/date _____

DEC 0 7 2020

Modify/date _____          Needs discussion/date _____

Attachments:
A.  "Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols"
B.  "Supplemental Migrant Protection Protocols Guidance, Initial Document Service"
C.  "Supplemental Migrant Protection Protocols Guidance, MPP Amenability"

AR00447

# DEPARTMENT OF JUSTICE

## Immigration and Naturalization Service and Executive Office for Immigration Review

**8 CFR Parts 1, 3, 103, 204, 207, 208, 209, 211, 212, 213, 214, 216, 217, 221, 223, 232, 233, 234, 235, 236, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 248, 249, 251, 252, 253, 274a, 286, 287, 299, 316, 318, and 329**

**[INS No. 1788–96; AG Order No. 2065–96]**

**RIN 1115–AE47**

## Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures

**AGENCY:** Immigration and Naturalization Service, Justice, and Executive Office for Immigration Review, Justice.

**ACTION:** Proposed rule.

**SUMMARY:** This rule proposes to amend the regulations of the Immigration and Naturalization Service (Service) and the Executive Office for Immigration Review (EOIR) governing the conduct of both expedited and regular removal proceedings, and handling of asylum claims. The regulation addresses other activities involving the apprehension, detention, hearing of claims and ultimately the removal of inadmissible and deportable aliens. In addition, this rule incorporates a number of changes which are a part of the Administration's reinvention initiative, mandated in a directive signed by the President on March 4, 1995, requiring all heads of departments and agencies to conduct a page-by-page review of all regulations and to eliminate or revise those that are outdated or otherwise in need of reform. This rule is necessary to implement the provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) and the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

**DATES:** Written comments must be submitted on or before February 3, 1997.

**ADDRESSES:** Please submit written comments, in triplicate, to the Director, Policy Directives and Instructions Branch, Immigration and Naturalization Service, 425 I Street, NW., Room 5307, Washington, DC 20536. To ensure proper handling, please refer INS number 1788–96 on your correspondence. Comments are available for public inspection at the above address by calling (202) 514–3048 to arrange for an appointment.

**FOR FURTHER INFORMATION CONTACT:**

For matters relating to the Executive Office for Immigration Review—Peggy Philbin, General Counsel, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2400, Falls Church, VA 22041, telephone number (703) 305–0470; for asylum issues—Michael Shaul, Field Manual Project Office, Immigration and Naturalization Service, 425 I Street NW., ULLB–4th Floor, Washington, DC 20536, telephone number (202) 616–7439; for inspections issues—Linda Loveless, Office of Inspections, Immigration and Naturalization Service, 425 I Street NW., Room 4064, Washington, DC 20536, telephone number (202) 616–7489; for detention and removal issues—Len Loveless, Office of Detention and Deportation, Immigration and Naturalization Service, 425 I Street NW., Room 3008, Washington, DC 20536, telephone number (202) 616–7799.

**SUPPLEMENTARY INFORMATION:** The Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104–208, enacted on September 30, 1996, amends the Immigration and Nationality Act (Act) in several ways. This rule proposes to implement the IIRIRA by creating a new, expedited removal process for aliens attempting to enter the United States through fraud or misrepresentation or without proper documents while providing a mechanism for the determination and review of applicants who demonstrate a credible fear of persecution if returned to their own country. It consolidates exclusion and deportation proceedings into one unified removal proceeding. It revises the asylum process.

It provides that persons who are present in the United States without inspection are considered applicants for admission and indicates that such persons will not be subject to expedited removal unless and until the INS Commissioner invokes the provisions in the statute and this rule allowing her to expand the use of the expedited removal process to include such individuals. Also, various sections of IIRIRA have revised and expanded the grounds of inadmissibility (formerly exclusion grounds).

The effective date of the changes implementing the expedited removal process is April 1, 1997. The Antiterrorism and Effective Death Penalty Act of 1996, Public Law 104–132, was enacted April 24, 1996. Many of its major provisions were superseded by IIRIRA before they became effective. Several of the remaining provisions will be implemented with this rulemaking.

Taken together, the provisions of IIRIRA have made pervasive changes in

the laws governing admission, inspection, removal, and detention of aliens—eliminating or revising old standards, creating new ones, and reorganizing and revising numerous provisions of existing law. In some respects, even after the effective date of the new provisions, existing legal standards will still be applied with respect to legal matters initiated prior to that date. The length of this rulemaking document alone—only one of the regulatory actions necessary to implement IIRIRA— demonstrates the breadth and complexity of these changes.

Congress directed that the provisions of Title III–A of IIRIRA take effect on April 1, 1997, and also directed that the Attorney General publish implementing regulations by March 1, 1997. A five-month period is an extremely short time frame for completing the regulatory process for a rule of this magnitude, given the time needed to draft the rule, coordinate with interested agencies, complete the regulatory review process by OMB pursuant to Executive Order 12866, and allow time for public comment. In particular, it means that there is not adequate time for the usual rulemaking model of 60 days public notice.

Because of these exigencies, the Department has limited the public comment period on this proposed rule to 30 days. However, in order to provide a fuller opportunity for public input on the numerous issues addressed in this rulemaking, the Department will allow a 120-day comment period on the Interim Rule when that is published by the beginning of March, prior to the development of a Final Rule.

As of the date this document was submitted for publication, Public Law 104–208 had not been printed. The conference report accompanying the House version of the bill, however, contains the provisions of IIRIRA. *See* H.R. Conf. Rep. No. 863, 104th Cong. 2d Sess., at 561. The Act should be printed in its entirety in the next few weeks.

## Applicants for Admission and Arriving Aliens

Section 302 of IIRIRA amends section 235(a) of the Act to describe as applicants for admission both aliens who are arriving in the United States (whether or not they arrive at a designated port-of-entry) and aliens present in the United States who have not been admitted. This section also includes aliens brought to the United States after having been interdicted in international or United States waters. Prior to the enactment of the IIRIRA, aliens apprehended after entering the

United States without inspection were subject to deportation proceedings under section 242 of the Act. By considering such aliens to be applicants for admission, this amendment significantly changes the manner in which aliens who have entered the United States without inspection are considered under the Act.

In some instances, IIRIRA distinguishes between the broader term "applicants for admission" and a narrower group, "arriving aliens." For clarity, "arriving alien" has now been specifically defined in 8 CFR part 1. The proposed definition of "arriving alien" in section 1.1(q) includes aliens arriving at a port-of-entry, aliens interdicted at sea, and aliens previously paroled upon arrival. The term "arriving alien" could also include other classes of aliens, e.g., those apprehended crossing a land border between ports-of-entry. The Department would value commentary on the proper scope of the regulatory definition.

**Parole of Aliens**

The proposed rule amends § 212.5 to permit chief patrol agents to authorize parole from Service custody of aliens who have not been admitted to the United States. The regulations previously allowed the district director to exercise this authority for emergent reasons or when strictly in the public interest. Because many of the aliens apprehended and processed under the jurisdiction of a chief patrol agent will now be considered applicants for admission, this change is necessary to allow discretionary release of those aliens in the particular circumstances enumerated in § 212.5.

**Custody of Aliens Applying at Land Border Ports-of-entry**

The proposed regulation implements a new provision added to section 235(b)(2) of the Act to state that an applicant for admission arriving at a land border port-of-entry and subject to a removal hearing under section 240 of the Act may be required to await the hearing in Canada or Mexico. This simply adds to statute and regulation a longstanding practice of the Service. If the alien fails to appear for the hearing, the immigration judge may order the alien removed *in absentia*.

**Withdrawal of Application for Admission**

Section 302(a) of IIRIRA incorporates into section 235(a)(4) of the Act the longstanding practice used by the Service to permit applicants for admission to voluntarily withdraw their applications for admission to the United States, in lieu of removal proceedings, and to depart immediately. Permitting an alien to withdraw his or her application for admission allows the Service to better manage its resources by removing inadmissible aliens quickly at little or no expense to the Government, and may be considered instead of expedited or regular removal when the circumstances of the inadmissibility may not warrant a formal removal. The option to permit withdrawal is solely at the discretion of the Government, and is not a right of the alien. An immigration judge may allow only arriving aliens to withdraw an application for admission. Such a grant should ordinarily require the Service's concurrence once the issue of inadmissibility or deportability has been resolved. During the pendency of an appeal from an order of removal, permission to withdraw must be obtained from the immigration judge or the Board of Immigration Appeals (Board).

**Expedited Removal of Certain Applicants for Admission**

Pursuant to section 302(a) of IIRIRA, aliens who attempt to enter the United States by fraud or misrepresentation or who arrive without valid entry documents may be removed under an expedited process without further hearing or review. An exception is provided for Cuban nationals arriving by aircraft at a port-of-entry. Aliens who are inadmissible on other grounds will be referred for proceedings before an immigration judge under the new removal provisions of section 240 of the Act. Although not required by statute, the proposed regulation provides for review and approval of the expedited removal order by a supervisory immigration officer prior to removal of the alien. The expedited removal order bars reentry for 5 years following the removal, or 20 years in the case of a second or subsequent removal, unless the alien obtains advance permission to reenter the Untied States.

The Department requests public comment regarding the appropriate use of the authority conferred by the statute upon the Attorney General to expand the class of aliens subject to expedited removal. Section 235(b)(1)(A)(iii) of the Act permits the Attorney General, in her sole and unreviewable discretion, to apply expedited removal to aliens not admitted or paroled (and not described in section 235(b)(1)(H)) who cannot establish continuous physical presence in the United States for the previous two years.

Under the proposed rule, expedited removal will generally apply only to "arriving aliens," as defined in section 1.1(q), i.e., aliens arriving at a port-of-entry, aliens interdicted at sea, and aliens previously paroled upon arrival. The Commissioner may, however, elect to apply the expedited removal procedures to additional classes of aliens within the limits set by the statute, if, in the Commissioner's discretion, such action is operationally warranted. The Commissioner's designation may be localized, in response to specific needs within a particular region, or nationwide, as appropriate. The designation would become effective upon publication in the **Federal Register**, except where circumstances require immediate implementation. The Department would value commentary on two alternative approaches as well: (1) application of expedited removal only to "arriving aliens"; and (2) application of expedited removal to all aliens not admitted or paroled (and not described in section 235(b)(1)(F)) who cannot demonstrate continuous physical presence for the previous two years.

Finally, commentary on the proper scope of the term "arriving alien" would be helpful to the Department in implementing section 235(b)(1). The proposed regulatory definition in section 1.1(q) includes aliens arriving at a port-of-entry, aliens interdicted at sea, and aliens previously paroled upon arrival. The term "arriving alien" could also include other classes of aliens, e.g., those apprehended crossing a land border between ports-of-entry.

**Review of Claim to Lawful Permanent Resident, Refugee, or Asylee Status in Expedited Removal**

An expedited removal order entered against an alien by an immigration officer at the time of arrival or by an asylum officer following a determination that the alien does not have a credible fear of persecution is not subject to administrative appeal, but may be reviewed by an immigration judge upon request of the alien. An exception is provided in section 235(b)(1)(C) of the act for an alien who claims under oath or under penalty of perjury to be a lawful permanent resident, to have been admitted as a refugee under section 207 of the Act, or to have been granted asylum under section 208 of the Act.

Before entering an expedited removal order against these aliens, the Service will attempt to verify the alien's claim to lawful permanent resident, refugee, or asylee status. If a claim to lawful permanent resident status is verified, the examining officer will determine whether the alien is considered an applicant for admission within the

AR00449

meaning of section 101(a)(13) of the Act. Section 301(a) of IIRIRA amended section 101(a)(13) of the Act to provide that an alien lawfully admitted for permanent residence is not seeking admission unless the alien has abandoned or relinquished that status, has been absent for a continuous period in excess of 180 days, has engaged in illegal activity after having departed the United States, has departed while under legal process seeking removal, has committed certain criminal offenses, or is attempting to enter at a time or place other than as designated or has not been inspected and admitted to the United States. If the verified lawful permanent resident is determined to be an applicant for admission, the officer may consider appropriate discretionary waivers, if applicable, such as a waiver of documents under section 211(b) or other administrative options.

Current regulations do not provide for a waiver of documents or similar options for refugees and asylees who seek to reenter the United States without a refugee travel document. The regulations at § 223.2(b)(2) require that an application for a refugee travel document be filed before a refugee or asylee departs from the United States. The regulations also require at § 223.1(b) that a refugee or asylee must have a refugee travel document to return to the United States after temporary travel abroad unless he or she is in possession of a valid advance parole document. The combination of these two provisions has resulted in a few refugees and asylees (who had no intention of abandoning their status in the United States at the time of their departure) not being able to be readmitted in such status. With the advent of the expedited removal provisions, including the procedure for a review by an immigration judge of a claim to refugee or asylee status, the need for a formal process for dealing with such individuals has become more critical. The Service proposes to address the problem by giving district directors the discretionary authority to accept an application for a refugee travel document from an alien who is outside the United States, provided that alien: (1) held bonafide refugee or asylee status in the United States at the time of his or her departure from the United States, (2) did not intend to abandon such refugee or asylee status, (3) did nothing while outside the United States which would be inconsistent with refugee or asylum status, (4) has been outside the United States for less than one year (the maximum period of time for which the refugee travel document

can be issued), and (5) files the requisite Form I–131, Application for a Travel Document, with the appropriate fee. Upon the filing and approval of such application, the alien may be readmitted to the United States as if he or she were in possession of a valid refugee travel document, provided the alien is otherwise admissible.

If the immigration officer determines that an alien verified to have once held the status of a lawful permanent resident, refugee, or asylee does not merit a waiver, the officer will not issue an expedited removal order; rather, the officer may place the alien in removal proceedings under section 240 of the Act, Section 235(b)(1)(C) of the Act does not specify what should occur if an alien actually establishes to the satisfaction of an inspecting officer or an immigration judge that he or she is a lawful permanent resident, refugee, or asylee. However, section 242(e)(4) of the amended Act provides that if an alien appealing an expedited removal order to Federal district court establishes by a preponderance of the evidence that he or she is a lawful permanent resident, has been admitted as a refugee, or has been granted asylum, then the district court may order that the alien be provided a hearing under section 240 of the Act. In light of these judicial review provisions that would result in such aliens receiving a regular removal proceeding under section 240 of the Act, the Department considers a referral into section 240 removal proceedings upon verification of such status by an immigration officer or demonstration of such status to an immigration judge to be the most practical and efficient implementation of these provisions.

In cases where the alien's claim to lawful permanent resident, refugee, or asylee status cannot be verified, the immigration officer or the asylum officer will order the alien removal under section 235(b)(1)(A)(i) of the Act or for a credible fear determination under section 235(b)(1)(B)(iii), and then refer the alien to an immigration judge for review of the order. If the judge determines that the alien is not a lawful permanent resident, has not been admitted as a refugee, or has not been granted asylum under section 208 of the Act, the order issued by the examining immigration officer or asylum officer will be effected and the alien will be removed from the United States under that order. No further review is available. If the judge determines that the alien was once admitted and/or currently is a lawful permanent resident, refugee, or asylee, the order will be canceled and proceedings under section 235(b)(1) of the Act will be

terminated. The Service may then admit the alien or pursue any other grounds of inadmissibility or deportability under section 212 or 237 of the Act in a removal proceeding pursuant to section 240 of the Act, if appropriate.

**Revision of Asylum Procedures**

The regulation proposes to amend 8 CFR part 208 to create new procedures for the consideration of asylum applications as mandated by section 604 of IIRIRA, to make certain other changes which are not mandated by IIRIRA, but that will significantly improve the asylum process, and to streamline the existing regulations in accordance with the principles discussed elsewhere in the supplementary information.

Of special significance are the provisions in the regulation providing the immigration judges with exclusive jurisdiction over certain categories of asylum applications, including those filed by alien crewmen, stowaways who establish a credible fear of persecution, aliens covered by the Visa Waiver Pilot Program, aliens subject to removal under section 235(c) of the Act, and aliens who have applied for or received an "S" visa. Under the current regulations, some of these classes of aliens (stowaways, crewmen, and aliens removable under section 235(c) of the Act) receive only an interview with an asylum officer which is reviewed directly by the Board. However, some problems have arisen with these procedures, most significantly, the difficulty of generating a reliable and complete record and the absence of a government-provided interpreter in asylum officer interviews. The Department believes that giving the immigration judges exclusive jurisdiction over such determinations will certify these problems while still maintaining the high quality and consistency of the interview and decision-making process which the public has come to expect.

The proposed rule's treatment of section 208(a)(2) of the Act, which establishes a number of new grounds barring an alien from applying for asylum, is equally important. Regarding section 208(a)(2)(C) of the Act, which bars an alien from applying for asylum if the alien had a previous asylum application denied, the rule makes clear that this provision applies only to asylum applications that have been denied by an immigration judge or the Board. This ensures that aliens who received a denial of their application from an asylum officer because they applied for asylum while in valid status or under procedures in place prior to January 1995 receive consideration of

AR00450

their application by an immigration judge. The rule also interprets the terms "changed circumstances" and "extraordinary circumstances" in section 208(a)(2)(D) of the Act as those terms apply to the 1-year bar in section 208(a)(2)(B) of the Act. The regulation provides minimal guidance on the meaning of the term "changed circumstances." Nevertheless, because of the novelty of the "extraordinary circumstances" exception to the 1-year bar, the rule offers a regulatory interpretation of this term. While the Department considered having the regulation identify specific examples of extraordinary circumstances that would justify a waiver of the one-year filing requirement, the proposed rule opts in favor of a provision that generally defines the term as events or factors beyond the alien's control that caused the failure to meet the one-year deadline. The regulation also provides that the alien file the application as soon as practicable under those circumstances. Thus, an event or factor of relatively brief duration would be insufficient to excuse the filing of an application long after the deadline. In our view, such a general definition provides guidance to decision makers while offering more flexibility than a definition by example would. Nevertheless, we can imagine several examples that would likely satisfy this definition: the applicant suffered a physical or mental disability that prevented a timely filing; the applicant was under a legal disability (e.g., an unaccompanied minor) during the one-year period; or the applicant received ineffective assistance of counsel, as that concept has been interpreted by the Board of Immigration Appeals, resulting in a failure to file a timely application. Nevertheless, because of both the novelty and importance of these new provisions, the Department welcomes suggestions from the public on how best to implement them.

The proposed rulemaking also offers guidance on how to apply section 208(d)(6) of the Act, which provides that an alien who knowingly makes a frivolous asylum application shall be permanently ineligible for any benefits under the Act. At § 208.18, the rule first provides that such determinations may only be made in a final order by an immigration judge or the Board of Immigration Appeals. The rule also defines an application as "frivolous" if it is fabricated or brought for an improper purpose. In doing so, the Department is carrying out one of the central principles of the asylum reform process begun in 1993; to discourage

applicants from making patently false claims.

It should be noted that the proposed rule does not discuss § 208.19 dealing with the admission of the spouse and children of an alien granted asylum status. This topic was the subject of a separate proposed rule published July 9, 1996. *See* 61 FR 35,984 (1996). That separate rulemaking will be incorporated into the overall asylum regulations once it is finalized.

## Credible Fear Determination and Claims of Asylum or Fear of Persecution by Alien Subject to Expedited Removal

Under the new section 235(b)(1)(A)(ii) of the Act, an alien subject to expedited removal who indicates an intention to apply for asylum or who expresses a fear of persecution will be referred to an asylum officer to determine if the alien has a credible fear of persecution. Credible fear of persecution is defined in section 302(a) of IIRIRA to mean that "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 208." Interviews to determine whether an alien has a credible fear of persecution will be conducted by an asylum officer, either at the port-of-entry or at designated locations such as detention centers. For purposes of this credible fear interview, an asylum officer is defined in the Act as an immigration officer who has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 208, and is supervised by an officer who meets the same criteria and who has had substantial experience adjudicating asylum applications. This definition may include officers other than full-time asylum officers, provided they have undergone the necessary training and have the requisite supervision. The Service will generally attempt to assign full-time asylum officers to the task of determining credible fear. Prior to the interview, the alien may consult with a person or persons of his or her own choosing at no cost to the Government, provided it does not unreasonably delay the process.

The asylum officer will make a determination whether the alien has a credible fear of persecution. Service procedures will require that the determination be reviewed by a supervisory asylum officer. The

supervisory asylum officer may direct the asylum officer to interview the applicant further, or to research country conditions or other matters relevant to the decision. If the supervisory asylum officer agrees that the alien has not demonstrated a credible fear of persecution, the alien will be ordered removed under the provisions of section 235(b)(1)(B)(iii)(I) of the Act. If the alien requests review of the determination that he or she has not demonstrated a credible fear of persecution, the credible fear determination will be promptly reviewed by an immigration judge. The alien will have the opportunity to be heard and questioned by the immigration judge. This review will be limited solely to the issue of credible fear, and may be conducted either in person or by telephonic or video connection. By statute, the review should be conducted as soon as possible following the credible fear determination, preferably within 24 hours, and no later than seven days after the date of determination. The alien will be detained during this review period, and if found by the immigration judge not to have a credible fear, will be promptly removed.

Section 235(b)(1)(B)(ii) of the Act provides that aliens who are determined by an asylum officer to have a credible fear of persecution will be detained for further consideration of the asylum claim. While the statute does not specify how or by whom this further consideration should be conducted, the proposed rule provides for such consideration by an immigration judge in removal proceedings conducted pursuant to section 240 of the Act. In the removal hearing, the immigration judge will make a determination whether alien is eligible for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act. The removal order will be subject to administrative review by the Board in accordance with section 240 of the Act and § 3.1(b)(3).

Credible fear determinations are also made in the case of stowaways. Although not entitled to removal proceedings under section 240 of the Act, a stowaway who has been determined by an asylum officer (or by an immigration judge upon review of a negative determination by an asylum officer) to have a credible fear of persecution may file an asylum application to be adjudicated by an immigration judge in asylum-only proceedings. There is no appeal from the decision of an immigration judge as to whether the stowaway has a credible fear of persecution. A stowaway who is found not to have a credible fear will be

expeditiously removed. However, a stowaway who meets the credible fear threshold and is allowed to present an asylum or withholding of removal application in a proceeding before an immigration judge may appeal the resulting decision to the BIA.

**Proposed Changes Not Mandated by IIRIRA**

The rulemaking also proposes to remove §§ 208.13(b)(2)(ii) and 208.16(b)(4) which require that adjudicators give "due consideration to evidence that the government of the applicant's country of nationality or last habitual residence persecutes its nationals or residents if they leave the country without authorization or seek asylum in another country." The regulations accomplish little and are potentially misleading in their current form. The term "due consideration" provides little guidance. Moreover, the question of whether punishment for a migration-related offense is "persecution" hinges on an evaluation of the circumstances of each case. Under current law, prosecution for migration-related offenses does not ordinarily amount to persecution. Since the provision does not offer any assistance in adjudicating claims involving prosecution for unauthorized departure, we propose removing it from the regulations.

The rule provides a special regulation to govern the application of section 243(h)(3) of the Act, a provision added by section 413(f) of AEDPA that was eliminated by section 307 of IIRIRA. That section provided that, notwithstanding any other provision of law, the Attorney General could grant an alien withholding of deportation if she determined that it was necessary to do so to ensure compliance with the 1967 Protocol Relating to the Status of Refugees. In new section 241(b)(3)(B) of the Act, the only change Congress made to the existing bars to withholding of deportation was to require, in the case of an alien convicted of an aggravated felony (or felonies), that the alien receive an aggregate term of imprisonment of at least 5 years before such crime or crimes are automatically considered to be particularly serious. We understand this change to reflect Congress' conclusion that the bars to withholding of deportation or removal are consistent with the United States' obligations under the 1967 Protocol Relating to the Status of Refugees, except potentially in the case of an aggravated felon who receives less than a 5-year aggregate sentence. The Department proposes a regulatory interpretation of section 243(h)(3) that is

consistent with this most recently expressed view of the Congress. Thus, the rule provides that an alien may attempt to obtain relief under section 243(h)(3) of the Act only if he or she is an aggravated felon who received an aggregate sentence of less than 5 years and can establish that the crime or crimes of which he or she has been convicted are not particularly serious. This will require a case-by-case determination whether the crime or crimes committed by the alien are particularly serious. Only if the crime is determined not to be particularly serious will the alien be entitled to have his or her withholding of deportation claim considered. Because section 243(h)(3) of the Act was eliminated by IIRIRA, this rule applies only to applications for withholding made in proceedings commenced prior to April 1, 1997, so long as a final action on any such withholding request was not taken prior to April 24, 1996, the date of AEDPA's passage.

**Establishment of a Fee for Filing an Application for Asylum**

This rulemaking does not propose to establish a fee for filing an application for asylum or to expand the situations under which fees may be charged for asylum-based applications for work authorization, despite the statutory permission to do so contained in section 208(d)(3) of the Act. Should the Department decide to do so at a later date, that action would be part of a separate rulemaking.

**Employment Authorization for Asylum Applicants**

The proposed regulations will continue to allow asylum applicants to apply for an employment authorization document (EAD) once the asylum application has been pending for 150 days, which is 30 days before the new statutorily-mandated time for granting such authorization contained in section 208(d)(2) of the Act.

**Rules of Procedure for Executive Office for Immigration Review**

Implementation of IIRIRA will impact the rules of procedure for proceedings before the Executive Office for Immigration Review. These proposed rules amend the regulations to expand the scope of the rules of procedure to include new removal proceedings in provisions regarding motions to reopen and reconsider, jurisdiction and commencement of proceedings, stipulated requests for orders, in absentia hearings, public access to hearings, and additional charges. The proposed rules also add provisions

regarding the scheduling of removal cases, custody and bond in removal proceedings, and contents of the Notice of Appear form.

**Subpoenas by Immigration Judges**

Section 304 of IIRIRA bestows upon immigration judges the statutory authority to issue subpoenas for the attendance of witnesses and presentation of evidence in removal proceedings. This subpoena power had previously been granted to immigration judges by regulation only and the immigration judges had to enlist the district director to invoke the aid of the district court for failure to comply with the subpoena. The proposed rule amends the subpoena provisions to provide that an immigration judge directly invokes the aid of the district court for an order requiring the compliance with a subpoena instead of requiring the district director to take such action.

**New Removal Proceedings**

Section 240 of the Act as amended by section 304(a) of IIRIRA merges the separate proceedings of exclusion and deportation into one removal proceeding. In this single proceeding, the immigration judge will determine whether an alien is inadmissible under section 212 of the Act or deportable under section 237 (formerly section 241) of the Act. In light of these statutory changes, individuals in removal proceedings are referred to in the proposed rule as determined to be removable or ordered removed after being found to be either inadmissible or deportable (but no longer be referred to as excludable or excluded). Removal proceedings will in nearly all respects resemble present day deportation or exclusion proceedings, with some minor differences outlined below and implemented by this proposed rule.

Although not as a result of any provision of IIRIRA, the Department is soliciting public comments on whether these regulations should include a provision for appointment of a guardian ad litem in a case where a minor or incompetent respondent in removal proceedings is otherwise unrepresented.

**Applicability of New Removal Provisions**

The IIRIRA provides that the newly created removal procedures and the new amended forms of relief available in removal proceedings which appear in title III–A of IIRIRA will apply to all individuals placed into removal proceedings on or after April 1, 1997, and will not affect individuals who

were in deportation or exclusion proceedings prior to April 1, 1997. *See* Section 309(a) of IIRIRA. For this reason, the proposed rule preserves the former regulations relating to deportation and exclusion proceedings for those individuals who will continue on in such proceedings after April 1, 1997. The proposed rule preserves such provisions by retaining current regulatory provisions previously contained in 8 CFR parts 236, 242, and 244 within separate new subparts of part 240. In addition, sections formerly contained in parts 237 and 243 have been retained in new subparts of part 241. A more detailed description of the entire reorganization of effected parts of title 8 is contained later in this supplementary information.

### The Notice to Appear (Form I–862)

The charging document which commences removal proceedings under section 240 of the Act will be referred to as the Notice to Appear, Form I–862, replacing the Order to Show Cause, Form I–221, that was used to commence deportation proceedings and the Notice to Detained Applicant of Hearing Before an Immigration Judge, Form I–110. The Notice to Appear must contain nearly all of the information that was required to be in the Form I–221. The regulations reflect the fact that section 304 of IIRIRA did not retain the requirement that the Notice to Appear be provided in Spanish; that the mandatory period between service of a Notice to Appear and the date of an individual's first hearing is 10 days rather than the 14 days required for the Order to Show Cause; that service of the Notice to Appear by ordinary mail, rather than certified mail, is sufficient if there is proof of attempted delivery to the last address provided by the alien and noted in the Central Address File; and that no written notice need be provided if the alien has failed to provide his or her address as required under the amended Act.

In addition, the proposed rule implements the language of the amended Act indicating that the time and place of the hearing must be on the Notice to Appear. The Department will attempt to implement this requirement as fully as possible by April 1, 1997. Language has been used in this part of the proposed rule recognizing that such automated scheduling will not be possible in every situation (e.g., power outages, computer crashes/downtime.)

### Burdens of Proof in Removal Proceedings

The proposed regulation restates the burden of proof language in section

240(c) of the Act as revised by section 304(a) of IIRIRA. In removal proceedings in which an alien is charged with deportability, the Service must establish deportability by clear and convincing evidence. This replaces the clear, convincing, and unequivocal standard set forth in *Woodby* v. *INS*, 385 U.S. 276 (1966). An applicant for admission to the United States must establish that he or she is clearly and beyond a doubt entitled to be admitted and is not inadmissible. In the case of an alien present in the United States without being admitted or paroled, once the Service establishes alienage, the alien must prove that he or she is clearly and beyond a doubt entitled to be admitted and is not inadmissible, unless the alien proves by clear and convincing evidence that he or she is lawfully present pursuant to a prior admission.

### Cancellation of Removal

The proposed rule provides for the application by qualified individuals in removal proceedings for the new form of relief created by section 304(a) of IIRIRA: cancellation of removal. Cancellation of removal comes in two forms. The first form, available to lawful permanent residents, is similar to relief under section 212(c) of the pre-IIRIRA Act, except that only 5 years of the required 7 years of residence to statutorily qualify for this form of cancellation of removal need be fulfilled as a lawful permanent resident. This means that up to 2 years of the 7 years can be satisfied with temporary residence. This provision codifies the interpretation by a number of Federal circuit courts that a period of temporary residence counts toward the 7-year residency requirement for relief under section 212(c) of the pre-IIRIRA Act.

The second form of cancellation of removal resembles suspension of deportation under section 244 of the pre-IIRIRA Act, except that an applicant for the second form of cancellation of removal must demonstrate continuous physical presence for 10 years instead of 7 years, and must show "exceptional and extremely unusual hardship" instead of "extreme hardship." Further, unlike suspension of deportation, this form of cancellation of removal is not available for aliens who can only show hardship to themselves. The proposed rule also implements the availability of this second form of cancellation of removal to a battered spouse or child who can demonstrate 3 years of continuous physical presence in the United States and who shows that removal would result in "extreme hardship" to the battered spouse, his or her child, or the battered child's parent.

### Administrative Motions To Reopen and Reconsider Removal Proceedings

Section 304(a) of IIRIRA added a number of motions procedures to the Act regarding the reopening or reconsideration of a final order of removal. For the most part, these new statutory provisions encompass the new procedures implemented by EOIR's new motions and appeals regulation, which took effect on July 1, 1996. However, the statute does place the time and number restrictions for motions specifically on the alien. The proposed rule implements this change by adding a provision to indicate that in removal proceedings, the restrictions only apply to the alien and not to the Service. In addition, unlike the pre-IIRIRA regulations excepting motions to reopen exclusion or deportation orders rendered in absentia from both the 90-day and 1-motion restrictions, the statute only excepts motions to reopen removal orders rendered in absentia from the 90-day time period and not the numerical restriction. The proposed rule implements this change as well.

### Proceedings To Review Asylum Claims by Certain Aliens Not Eligible for Section 240 Proceedings

This rule established a new Notice of Referral to Immigration Judge, Form I–863, to be used to institute limited proceedings before an immigration judge. This referral form will be used by immigration officers to initiate review by an immigration judge for asylum or withholding of removal claims by Visa Waiver Pilot Program (VWPP) refusal cases and VWPP status violators, crew members, aliens ordered removed pursuant to section 235(c) of the Act, aliens present pursuant to section 101(a)(15)(S) of the Act, and alien stowaways found to have a credible fear of persecution. This proceeding is limited solely to the asylum or withholding claim and no other forms of relief may be presented by the alien or considered by the immigration judge.

Asylum officers will also use the Notice of Referral for expedited removal cases where the alien seeks review of a "no credible fear" finding by the asylum officer in section 235(b)(1) proceedings or for stowaways, prior to the execution of the expedited removal order or removal of the stowaway.

In addition, the Notice of Referral will be used to institute an immigration judge review of expedited removal orders issued against aliens claiming to be lawful permanent residents, refugees or asylees. In such cases, the immigration judge will review the

expedited removal order, which may either be affirmed or canceled.

Existing regulations regarding deportable VWPP aliens who claim asylum state that the alien will be referred for a determination of deportability. The current regulations for VWPP applicants arriving at ports-of-entry are vague, stating only that the alien will be referred to an immigration judge for further inquiry. The proposed change will clarify that VWPP applicants and status violators are to be provided a hearing and appeal on the asylum and withholding claim only.

Existing regulations provide that a crewman, stowaway, or alien temporarily excluded under section 235(c) of the Act file an application for asylum with the district director and that the district director forward it to an asylum officer for adjudication. The Attorney General has determined that these claims should be adjudicated by an immigration judge. This determination to adjudicate the asylum claims for these classes of aliens in a proceeding before an immigration judge is in response to recent case law holding that stowaway asylum applicants must be afforded the same asylum procedures deemed necessary for other aliens. In *Marincas* v. *Lewis,* 92 F.3d 195, 200–201 (3rd Cir. 1996), the court held that the plain language of the Refugee Act left no room to construe the statue to permit differing asylum procedures for stowaways. Although the Department with that holding, the Attorney General has found that providing a proceeding before an immigration judge to hear the asylum claim will address the concerns raised in *Mirancas,* while remaining consistent with the statutory directives to limit due process for these classes of aliens. As required by IIRIRA, a stowaway will receive a credible fear determination by an asylum officer prior to the referral to an immigration judge.

### Reorganization of Certain Regulatory Sections

The IIRIRA substantially revised sections of the Act relating to the arrest of aliens suspected of inadmissibility to or unlawful presence in the United States, detention of such aliens prior to and during removal proceedings, the conduct of removal proceedings, and ancillary issues such as voluntary departure and available forms of relief. The Service and EOIR have jointly undertaken a complete revision of the affected parts of title 8, to bring the relevant regulatory parts into alignment with the new sections of the Act. The newly revised sections are organized in the following manner: 8 CFR part 236, Subpart A—Detention of aliens prior to

order of removal, Subpart B—Family Unity Program; 8 CFR part 238—Expeditious removal of aggravated felons; 8 CFR part 239—Initiation of removal proceedings; 8 CFR part 240, Subpart A—Removal proceedings, Subpart B—Cancellation of removal, Subpart C—Voluntary departure, Subpart D—Exclusion of aliens (for proceedings commenced prior to April 1, 1997); Subpart E—Proceedings to determine deportability of aliens in the United States: Hearing and Appeal (commenced prior to April 1, 1997); Subpart F—Suspension of deportation and voluntary departure (for proceedings commenced prior to April 1, 1997); Subpart G—Civil penalties for failure to depart; 8 CFR part 241, Subpart A—Post-hearing detention and removal, Subpart B—Deportation of Excluded Aliens (for hearings commenced prior to April 1, 1997), Subpart C—Deportation of Aliens in the United States (for hearings commenced prior to April 1, 1997); 8 CFR parts 237, 242, and 243 have been removed and reserved; 8 CFR part 244 will now contain regulations pertaining to the Temporary Protected Status program.

Sections of the old regulations which are still applicable to proceedings commenced prior to April 1, 1997, have been retained, but moved to new parts of the regulations as separate subparts according to topic. For example, the regulations relating to the conduct of proceedings, formerly contained in 8 CFR part 242, have been moved to 8 CFR part 240, which contains regulations for the conduct of removal proceedings.

Most sections of the regulations have not been retained in this manner. They have been totally revised, in conformity with the new statute. In some instances, these regulations distinguish between situations involving aliens "grandfathered" under former statutory authority and those encompassed by the provisions of IIRIRA. For example, new § 252.2(b) contains separate provisions for alien crewmen who arrived prior to April 1, 1997, and those who arrive after that date.

Because the Service and EOIR have concerns about the serious restructuring of these regulations, the public is invited to comment on the approach taken by this rulemaking. In particular, the Service wishes to solicit comments concerning any possible unintended consequences of the restructuring, such as the inclusion of new sections which encompass aliens entitled to consideration under "old" provisions.

### Apprehension, Custody, and Detention of Aliens

This rule incorporates the changes made to section 242 of the Act by section 440(c) of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Public Law 104–132 as well as section 303(a) of the IIRIRA. By enactment of AEDPA, Congress altered the provisions created by section 504 of the Immigration Act of 1990 (IMMACT), Public Law 101–649, enacted November 29, 1990, relating to release of lawfully admitted aliens who had been convicted of aggravated felonies. The AEDPA directed the Attorney General to detain aliens convicted of aggravated felonies without bond and extended the mandatory detention provisions to aliens deportable for conviction of certain other felonies. The IIRIRA extended the mandatory detention provisions to additional classes of inadmissible and deportable aliens but provided an exception for certain witnesses. It also allowed the Attorney General the option of a transition period for implementation of mandatory detention. The INS exercised this discretion and implemented the transition period custody rules on October 9, 1996, effective for 1 year. The Act is very clear as to which aliens may be released. This rule proposes to amend the Service's regulations to comply with the amended Act by removing the release from custody provisions for aliens who may no longer be released. These amendments to the regulations will take effect upon the termination of the transition period. As for non-criminal aliens, the rule reflects the new $1,500 minimum bond amount specified by IIRIRA. Otherwise, the proposed rule essentially preserves the status quo for bond determination by the Service and bond redetermination proceedings before immigration judges. Despite being applicants for admission, aliens who are present without having been admitted (formerly referred to as aliens entering without inspection) will be eligible for bond and bond redetermination.

### Expedited Deportation Procedures for Aliens Convicted of Aggravated Felonies Who Are Not Lawful Permanent Residents

This rule incorporates the changes made to section 242A(b) of the Act by section 442 of the AEDPA and section 304(c) of the IIRIRA. By enactment of the AEDPA, Congress made several changes to the expedited administrative deportation procedure authorized under section 130004 of the Violent Crime Control and Law Enforcement Act of

1994, Public Law 103–322. Some of these changes were modified by the IIRIRA and one was eliminated. This rule proposes to amend the Service's regulations to comply with the amended Act as follows: aliens who have lawful permanent residence on a conditional basis under section 216 of the Act are subject to expedited administrative deportation procedures and have been included in the regulation. Since section 238(b)(5) of the Act states that an alien subject to these proceedings is ineligible for any relief from removal, all references to prima facie eligibility for relief and to relief from deportation have been removed. This revision also eliminates references to release from custody, since aliens subject to these proceedings are now statutorily ineligible for release as a result of changes to other sections of the Act.

**Voluntary Departure**

The proposed rule outlines how voluntary departure will be handled at various stages of proceedings. Prior to the initiation of proceedings, the Service has sole jurisdiction to grant voluntary departure for a period not to exceed 120 days. The Service may impose any conditions it deems necessary to ensure the alien's timely departure from the Untied States, including the posting of a bond, continued detention pending departure and removal under safeguards. After proceedings have been commenced and at any time up to 30 days subsequent to the master calendar, the immigration judge may grant voluntary departure for a period not to exceed 120 days. In each instance, the alien will be required to present to the Service travel documents sufficient to assure lawful entry into the country to which the alien is departing, unless such document is not necessary for the alien's return.

An alien may be granted voluntary departure at the conclusion of proceedings if the immigration judge finds that the alien meets the conditions of section 240B(b) of the Act. The judge may impose such conditions as he or she deems necessary to ensure the alien's timely departure from the United States, but in all cases, the alien shall be required, within 5 days of the order, to post a voluntary departure bond of no less than $500. In order for the bond to be canceled, the alien must provide proof of departure to the district director. If the alien fails to depart, or to meet any of the conditions attached to the grant of voluntary departure, such order will vacate and the alternate order of deportation will stand.

Section 304(a) of IIRIRA makes significant changes to both the nature

and duration of voluntary departure. Under the new law, voluntary departure is clearly meant to be granted to aliens illegally in the United States who are able and willing to depart in a relatively short period of time. It will no longer be available to those who are seeking to significantly extend their time in the United States for other reasons. If fact, the time periods which will be allowed for voluntary departure are such that they meet or exceed the normal processing time for applications for employment authorization. In light of these changes, the Department is eliminating the provisions currently contained in 8 CFR parts 242 and 274a which permit the granting of work authorization to aliens who have been given voluntary departure.

New section 240B of the Act and the corresponding regulations represent a significant departure from the predecessor provisions for voluntary departure. Public comments regarding the Department's approach to implementation of this provision will be particularly welcome.

**Reinstatement of Removal Orders Against Aliens Illegally Reentering**

Section 241(b)(5) of the Act requires the Attorney General to reinstate the removal order for an alien who illegally reenters the United States after having been removed or after having departed voluntarily under a removal order. Removal would be accomplished under the proposed rule without referral to an Immigration Court. Although the Act previously contained a provision for reinstatement of a final order of deportation, the accompanying regulation required the issuance of an order to show cause and a hearing before an immigration judge. This resulted in limited use of the provision. The proposed rule provides a procedure for a district director to reinstate a final order upon establishing identity and unlawful reentry of a previously deported or removed alien found in the United States. Once identity is affirmed, the original order will be executed.

**Detention and Removal of Aliens Ordered Removed**

This rule incorporates the changes made to section 241 of the Act by section 305(a) of IIRIRA. Section 241 of the Act now relates to the period for removal of aliens, post-order detention and removal of aliens, reinstatement of final orders, and detention and removal of stowaways.

This rule provides for the assumption of custody during the removal period, allows detention beyond the period, and provides condition for discretionary

release and supervision of aliens who cannot be removed during the period. A district director may issue a warrant of removal based on a final administrative order of removal. The warrant of removal will authorize the Service to take an alien in the United States into custody during the removal period. The Service is required to assume custody of any alien within the United States once the 90-day removal period begins, as defined in section 241 of the Act, and detain the alien until removal or expiration of the removal period. At the expiration of the removal period, the Service has the discretion to release an alien. If the alien shows to the satisfaction of the district director that the alien is not a threat to the community and is likely to report for removal, the district director may release the alien on an order of supervision. As a condition or release, an authorized officer may require the posting of a bond, impose restrictions on conduct, and require periodic reporting to a designated officer. The district director may grant employment authorization as specified in the Act. The district director retains the authority to grant humanitarian stays of removal.

This rule restates the principle, previously found at § 243.5, that an alien who departs the United States while a final order is outstanding has executed the order.

**Detention and Removal of Stowaways**

The arrival of stowaways in the United States, particularly aboard cargo vessels, has long been a problem for both the transportation companies and the Service. Section 308(e) of IIRIRA has stricken former section 273(d) of the Act, which governed stowaways and section 305 of IIRIRA has clearly defined the responsibilities for stowaways and costs of detention in the new section 241 of the Act. All stowaways are deemed to be inadmissible under the Act and are not entitled to a hearing on admissibility. Those with a credible fear of persecution may seek asylum in accordance with 8 CFR part 208 in proceedings before an immigration judge.

Under the provisions of section 241 of the Act, the carrier (which includes the owner, agent, master, commanding officer, person in charge, purser, or consignee) is responsible for detaining the stowaways on board the vessel or aircraft (or at another approved location) until completion of the inspection, and may not permit the alien to leave the vessel or aircraft, unless authorized by the Service for either medical treatment,

detention by the Service, or removal of the stowaways. The Service may order that the stowaway be removed on the vessel or aircraft of arrival when that is the most practical manner of removal. With the mutual goal of removing stowaways by the most expeditious and secure means, the Service will generally favor any reasonable request to remove the stowaway on other than the vessel or aircraft of arrival. The carrier must make all travel arrangements, including obtaining any necessary travel documents.

Since asylum-seeking stowaways may not be removed pending a final decision on their asylum claim, which may sometimes extend for a lengthy period, the statute limits the detention liability of the owner of the vessel or aircraft. The owner is now responsible for a period of time needed to determine whether the stowaway has a credible fear of persecution, and a reasonable period, beginning when a credible fear is found to exist, during which the asylum application may be considered. The statute and regulations allow for up to 72 hours to arrange and conduct the credible fear interview, although the Service anticipates that this will occur as expeditiously as possible, depending on the location and circumstances of the stowaway's arrival. If the stowaway is allowed to pursue his or her asylum application, the statute provides 15 working days, excluding Saturdays, Sundays, and holidays, for the asylum claim to be heard, at the expense of the owner of the vessel or aircraft. Any detention required beyond that time period will be at the expense of the Service. The carrier remains liable for removal, including removal expenses, if the alien is denied asylum.

## Adjustment of Status

Adjustment of status is granted in the discretion of the Attorney General. Consistent with Congress' intent that arriving aliens, as that term is defined in § 1.1(g), be removed in an expedited manner through the procedures provided in section 235(b)(1) of the Act, the Attorney General has determined that she will not favorably exercise her discretion to adjust the status of arriving aliens who are ordered removed pursuant to section 235(b)(1) of the Act or who are placed in removal proceedings under section 240 of the Act. Of course, any such alien who has been persecuted or has a reasonable fear of persecution may request asylum in expedited removal. Arriving aliens who are granted asylum may then adjust their status outside of the removal proceeding context. In all other instances, those apprehended after

arriving illegally in the United States should have no other benefit available to them, and should not be permitted to delay their removal through an application for adjustment of status. Any other arriving alien who is eligible to receive an immigrant visa will be required to return to his or her country of residence and request it through the consular process available to all aliens outside of the United States. If the Service decides as a matter of prosecutorial discretion, not to initiate removal proceedings but to parole the arriving alien, the alien will be able to apply for adjustment of status before the district director.

## Disposition of Cases of Aliens Arrested in the United States

The regulation proposes to amend § 287.3 to differentiate the actions that must be taken when an alien is apprehended entering or attempting to enter the United States in violation of the immigration laws, or is otherwise found in the United States in violation of those laws. Disposition of the case will vary depending on the circumstances of entry or attempted entry, or the specific violation with which the alien is charged. This section is amended to include those cases that may now be processed under the expedited removal provisions of section 235(b)(1) of the Act, if such provisions are invoked by the Commissioner.

## Elimination of Mexican Border Visitor's Permit

The Mexican Border Visitor's Permit, Form I–444, is a record of entry issued by the Service at land border ports-of-entry along the United States/Mexico border to holders of Nonresident Alien Border Crossing Cards, Forms I–186 and I–586. The Nonresident Alien Border Crossing Card is issued in place of a nonimmigrant visa. Currently, Form I–444 is issued when the requested visit to the United States will be for more than 72 hours but less than 30 days in duration or when requested travel is more than 25 miles from the United States/Mexico border but within the five states of Arizona, California, Nevada, New Mexico, or Texas. The Service also issues Form I–444 to Mexican nationals who are in possession of valid Mexican passports and multiple-entry nonimmigrant visas requesting admission to the United States under the limitations described above.

The current Form I–444 has been in use since 1983 and the Service now issues over 200,000 of these forms per month. Due largely to its lack of security features and the absence of standardization between ports, Form I–

444 is widely counterfeited. The Service has been unable to demonstrate that there is a connection between the limits on travel by persons issued Forms I–444 and immigration violations. These restrictions should be lifted and applicants for admission should be admitted as any other person in possession of a B–1 or B–2 visa is admitted.

This regulation proposes to remove references to the issuance of the form and the section requiring a fee for issuance of Form I–444. A provision is added requiring the issuance of Form I–94, and collection of the fee, for Mexican nationals seeking to enter for more than 72 hours and/or to travel further than 25 miles from the United States/Mexico border. The Form I–94 issued to a B–2 visitor for pleasure is normally valid for 6 months. The proposed rule provides in § 235.1(f) that a Form I–94 issued at a land border port-of-entry is valid for multiple entries unless otherwise indicated.

## Streamlining and Updating of Regulations

The President has directed each agency to undertake a review of its regulations for the purpose of reducing the regulations or, when possible, rendering them more readable and comprehensible. See E.O. 12866, 58 FR 51,735 (1993). The Service is engaging in a thorough line-by-line review of all regulations in Title 8 of the Code of Federal Regulations.

## Updated Sections

References to the former section 212(a)(17) of the Act dealing with the Attorney General's consent to apply for readmission have been removed from § 217.2(b) and replaced with the current citation. References throughout 8 CFR part 235 to special inquiry officers have been replaced with the title "immigration judge." References to regional commissioners have been replaced with references to regional directors. The regulatory language contained in §§ 238.1, 238.2, 238.3, and 238.5 has been moved to 8 CFR part 233, to conform with redesignation of those statutory sections by the IIRIRA. Lists of carriers signatory to agreements with the Service for carriage to transit passengers and preinspection have been removed form the regulations and will be maintained by the Headquarters Office of Inspections.

## Terminated Programs

References to initial (not replacement) application procedures in § 235.12 for Form I–777, Northern Mariana Card, have been removed as the application

period for that form expired in July 1990. Section 235.9, dealing with refugee admissions, has been removed as that procedure is no longer followed and its subject is now governed by section 207 of the Act. Provisions in § 211.2 dealing with waivers of passport requirements for third-preference immigrants have been removed as that category of immigrant no longer exists. Terms which were appropriate in referring to exclusion and deportation procedures have been changed to reflect the single removal process.

## Removal of Purely Procedural Matters Involving Only Internal Service Processes

The discussion of internal Service procedures regarding the admission of immigrant children formerly found in § 211.4 has been removed. Language in § 211.5 relating to admission procedures for alien commuters has been removed in favor of placing such information into Service Field Manuals. Examples dealing with alien crewmen, as well as Canadian nationals, have been removed from § 235.1. Part 232 of 8 CFR dealing with the procedures for notification of the master or agent of an arriving vessel when arriving aliens were placed in detention for mental or physical examination has been removed since it is addressed in Service manuals. Language dealing with procedures for completion of entry documents for nonimmigrant aliens, Mexican border crossers, bearers of Mexican diplomatic passports, and paroled aliens in 8 CFR part 235 has been removed. Language in § 235.2 relating to deferred inspection procedures for incapacitated or incompetent aliens has also been removed. Section 235.4 dealing solely with Service procedures for endorsing documents evidencing admission has been revised to address the withdrawal of an application for admission. The former § 251.1(d), dealing with the notations to be made on Service forms when inspecting crewmen, has been incorporated into Service manuals.

## Elimination of Duplication

Duplicative references have been removed. Language in § 217.2, relating to eligibility for the Visa Waiver Pilot Program, has been removed as it merely restates the eligibility requirements contained in the Act. Language in § 217.3 and throughout relating to Visa Waiver Pilot Program participants' eligibility for other immigration benefits and readmission after departure to contiguous territory has been removed as it merely restates the Act and is covered by other regulations in this part.

## Streamlining

Section 211.1. has been restructured in its entirety to make it easier to comprehend. The provisions relating to admission of children of lawful permanent residents formerly contained in § 211.2 have been consolidated into the general waiver provisions of section § 211.1. Language formerly in § 211.2(b) which referred to other code sections by description has been replaced by a simple citation. Sections 211.3, 211.4, and 235.9 have been removed and reserved as their contents are addressed in other sections of this part. The 8 CFR part 251, relating to alien crewmen, longshore work, and vessels has been restructured and clarified.

Unnecessary recitals of the law have been removed in the following: § 211.5(b), relating to forfeiture of an I–551 upon loss of resident status by a commuter alien; and § 217.1, which merely restates statutory language regarding eligibility for admission under the Visa Waiver Pilot Program. The 8 CFR part 217 has been streamlined by consolidating various definitions throughout that part into one section. Confusing language in § 217.3 has been streamlined with regard to readmission under the Visa Waiver Pilot Program of an alien who has departed to contiguous territory or an adjacent island has been streamlined.

## Other Changes

In addition, conforming and purely editorial or grammatical revisions have been made, as appropriate.

## Regulatory Flexibility Act

The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and, by approving it, certifies that the rule will not have a significant adverse economic impact on a substantial number of small entities because of the following factors. This rule affects only Federal government operations by codifying statutory amendments to the Immigration and Nationality Act primarily regarding the examination, detention, and removal of aliens from the United States. It affects only individuals and does not impose any reporting or compliance requirements on small entities.

## Executive Order 12866

This rule is considered by the Department of Justice to be a "significant regulatory action" under Executive Order 12866, section 3(f), because it will have a significant economic impact on the Federal government in excess of $100,000,000. No economic impact is anticipated for

state and local governments. The Service projects significant increases in detention-related costs due to the provisions of IIRIRA which mandate the custody of criminal aliens who have committed two or more crimes involving moral turpitude, aliens convicted of firearms offenses, and aliens who have been convicted of an aggravated felony. The type of crime that will qualify as an "aggravated felony" has been greatly expanded under IIRIRA. In addition, all aliens, even non-criminal aliens, who are subject to a final administrative order of removal must be held in custody until the alien can be removed from the United States. If the person is not removed within 90 days he or she may be released from custody.

The Commissioner has notified Congress pursuant to section 303(b) of IIRIRA that the Service lacks sufficient space to immediately implement the mandatory custody provisions. This notification will delay for 1 year full implementation of the new mandatory custody provisions. Section 303(b) also provides for an additional 1-year delay in implementation of the mandatory custody provisions upon a second certification that space and personnel are inadequate to comply with the requirement. The Service estimates that the cost to enforce the requirement to detain all criminal aliens will be at least $205,000,000. Of that total, personnel costs account for $65,284,000 which include detention and deportation officers ($32,873,000), investigators ($25,501,000), legal proceedings personnel ($4,968,000), and administrative support ($1,942,000). Non-personnel requirements are projected to be at least $139,732,000 which includes increases in bedspace and related alien custody requirements ($82,782,000—funds 3,600 beds @ $63.00 per day), increases in alien travel expenses ($36,000,000–3,600 removals @ $1,000 each), and detention vehicle expenses ($20,950,000). The Service is currently in the process of projecting the cost of the IIRIRA requirements that we detain all aliens with administratively final orders of deportation pending their removal.

In addition to these detention related costs, the Service estimates that the expenses for training employees on the provisions of the new law and the regulations will be $2,977,500. The cost to the Service related to additional forms or changes needed to current forms is estimated to be $2,000,000 (until the final list of form requirements is completed it is not possible to more accurately assess this cost). Finally, the Department believes there may be some

**454**    **Federal Register** / Vol. 62, No. 2 / Friday, January 3, 1997 / Proposed Rules

increases needed for immigration judges to review credible fear determinations made under section 235(b) of the INA.

The EOIR estimates increases in its costs related to IIRIRA-mandated immigration judge review of credible fear determinations (which must be made under stringent time frames) and the prompt immigration judge review which IIRIRA requires of certain expedited removal orders entered against aliens claiming to be lawful permanent residents, asylees or refugees. Further, EOIR projects costs associated with the need for an Immigration Court presence in nearly ever port-of-entry, which will result from the above-mentioned credible fear review and expedited removal review process. Also, there will be costs related to the overall need for an increased Immigration Court presence at existing Service detention centers to support the processing of the additional detainees that will result from the implementation of this rule. Similarly, EOIR anticipates a need for construction of new Immigration Courts at new detention facilities the Service may open as a result of this rule's implementation.

Although there are still a number of unknown variables which could affect the total costs to EOIR to implement its part of the new expedited removal process and to respond to the increased number of detained individuals in proceedings under this rule, EOIR estimates that the total annual cost for EOIR could be as high as $25,000,000. Of that total, the cost for hiring new immigration judges and legal support staff is projected to be $21,300,000. The cost for new video and audio teleconfering equipment is estimated at $3,000,000. Training costs are expected to be approximately $400,000. Finally, forms and other support requirements are estimated to cost $300,000.

**Small Business Regulatory Enforcement Act of 1996**

At this time the Department considers this rule a "major rule" as defined in 5 U.S.C. § 804(2).

**Executive Order 12612**

The regulations proposed herein will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 12612, it is determined that this rule does not have sufficient Federalism implications to warrant the preparation of a Federalism Assessment.

**Executive Order 12988**

This proposed rule meets the applicable standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988.

**Paperwork Reduction Act**

The information collection requirements contained in this rule have been forwarded to the Office of Management and Budget under the Paper Reduction Act. The OMB control numbers for these collections are contained in 8 CFR 299.5, Display of control numbers.

**List of Subjects**

*8 CFR Part 1*

Administrative practice and procedure, Immigration.

*8 CFR Part 3*

Administrative practice and procedure, Immigration, Organization and functions (Government agencies).

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Reporting and recordkeeping requirements.

*8 CFR Part 204*

Administrative practice and procedure, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 207*

Administrative practice and procedure, Refugees, Reporting and recordkeeping requirements.

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 209*

Aliens, Immigration, Refugees.

*8 CFR Part 211*

Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 213*

Immigration, Surety bonds.

*8 CFR Part 214*

Administrative practice and procedure, Aliens.

*8 CFR Part 216*

Administrative practice and procedure, Aliens.

*8 CFR Part 217*

Air carriers, Aliens, Maritime carriers, Passports and visas.

*8 CFR Part 221*

Aliens, Surety bonds.

*8 CFR Part 223*

Aliens, Reporting and recordkeeping requirements.

*8 CFR Part 232*

Aliens, Public health.

*8 CFR Part 233*

Administrative practice and procedure, Air carriers, Government contracts, Travel.

*8 CFR Part 234*

Air carriers, Aircraft, Airports, Aliens.

*8 CFR Part 235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 236*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 237*

Aliens.

*8 CFR Part 238*

Administrative practice and procedure, Aliens.

*8 CFR Part 239*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 240*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 241*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 242*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 243*

Administrative practice and procedure, Aliens.

*8 CFR Part 244*

Administrative practice and procedure, Aliens.

*8 CFR Part 245*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 246*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 248*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 249*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 251*

Air carriers, Aliens, Maritime carriers, Reporting and recordkeeping requirements, Crewmen.

*8 CFR Part 252*

Air carriers, Airmen, Aliens, Maritime carriers, Reporting and recordkeeping requirements, Crewmen.

*8 CFR Part 253*

Air carriers, Airmen, Aliens, Maritime carriers, Reporting and recordkeeping requirements, Seamen.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

*8 CFR Part 286*

Air carriers, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 287*

Immigration, Law enforcement officers.

*8 CFR Part 299*

Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 316*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 318*

Citizenship and naturalization.

*8 CFR Part 329*

Citizenship and naturalization, Military personnel, Veterans.

Accordingly, chapter I of title 8 of the Code of Federal Regulations is proposed to be amended as follows:

## PART 1—DEFINITIONS

1. The authority citation for part 1 is revised to read as follows:

**Authority:** 8 U.S.C. 1101.

2. Section 1.1 is amended by revising paragraph (l), and by adding new paragraphs (q) and (r) to read as follows:

### § 1.1   Definitions.

\* \* \* \* \*

(l) The term *immigration judge* means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under section 240 of the Act. An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe, but shall not be employed by the Immigration and Naturalization Service.

\* \* \* \* \*

(q) The term *arriving alien* means an alien who seeks admission to or transit through the United States, as provided in 8 CFR part 235, at a port-of-entry, or an alien who is interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act.

(r) the term *respondent* means a person named in a Notice to Appear issued in accordance with section 239(a) of the Act, or in an Order to Show Cause issued in accordance with § 242.1 of this chapter as it existed prior to April 1, 1997.

## PART 3—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

3. The authority citation for part 3 continues to read as follows:

**Authority:** 5 U.S.C. 301; 8 U.S.C. 1103, 1252 note, 1252b, 1324b, 1362; 28 U.S.C. 509, 510, 1746; sec. 2, Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002.

4. Section 3.1 is amended by revising paragraphs (b)(1), (b)(2), (b)(3), (b)(7), (b)(9), and (b)(10) to read as follows:

### § 3.1   General authorities.

\* \* \* \* \*

(b) \* \* \*

(1) Decisions of Immigration Judges in exclusion cases, as provided in 8 CFR part 236, Subpart D.

(2) Decisions of Immigration Judges in deportation cases, as provided in 8 CFR part 240, Subpart E, except that no appeal shall lie from an order of an Immigration Judge under 8 CFR part 240, Subpart F, granting voluntary departure within a period of at least 30 days, if the sole ground of appeal is that

a greater period of departure time should have been fixed.

(3) Decisions of Immigration Judges in removal proceedings, as provided in 8 CFR part 240.

\* \* \* \* \*

(7) Determinations relating to bond, parole, or detention of an alien as provided in 8 CFR part 236, Subpart A and 8 CFR part 240, Subpart E.

\* \* \* \* \*

(9) Decisions of Immigration Judges in asylum proceedings pursuant to § 208.2(b) of this chapter.

(10) Decisions of Immigration Judges relating to Temporary Protected Status as provided in 8 CFR part 244.

\* \* \* \* \*

5. Section 3.2 is amended by:

a. Revising the section heading;

b. Revising paragraph (b)(2);

c. Revising paragraph (c)(2) and (c)(3), and by

d. Revising paragraphs (d) through (f), to read as follows:

### § 3.2   Reopening or reconsideration before the Board of Immigration Appeals.

\* \* \* \* \*

(b) \* \* \*

(2) A motion to reconsider a decision must be filed with the Board within 30 days after the mailing of the Board decision or on or before July 31, 1996, whichever is later. A party may file only one motion to reconsider any given decision and may not seek reconsideration of a decision denying a previous motion to reconsider. In removal proceedings pursuant to section 240 of the Act, an alien may file only one motion to reconsider a decision that the alien is removable from the United States.

(c) \* \* \*

(2) Except as provided in paragraph (c)(3) of this section, a party may file only one motion to reopen deportation or exclusion proceedings (whether before the Board or the Immigration Judge) and that motion must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened. Except as provided in paragraph (c)(3) of this section, an alien may file only one motion to reopen removal proceedings (whether before the Board or the Immigration Judge) and that motion must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened.

(3) In removal proceedings pursuant to section 240 of the Act, the time limitation set forth in paragraph (c)(2) of this section shall not apply to a motion to reopen filed pursuant to the

provisions of § 3.23(b)(4)(ii). The time and numerical limitations set forth in paragraph (c)(2) of this section shall not apply to a motion to reopen proceedings:

(i) Filed pursuant to the provisions of § 3.23(b)(4)(iii)(A)(*1*) or § 3.23(b)(4)(iii)(A)(*2*);

(ii) To apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing;

(iii) Agreed upon by all parties and jointly filed. Notwithstanding such agreement, the parties may contest the issues in a reopened proceeding; or

(iv) Filed by the Service in exclusion or deportation proceedings when the basis of the motion is fraud in the original proceeding or a crime that would support termination of asylum in accordance with § 208.22(f) of this chapter.

\*       \*       \*       \*       \*

(d) *Departure, deportation, or removal.* A motion to reopen or a motion to reconsider shall not be made by or on behalf of a person who is the subject of exclusion, deportation, or removal proceedings subsequent to his or her departure from the United States.

(e) *Judicial proceedings.* Motions to reopen or reconsider shall state whether the validity of the exclusion, deportation, or removal order has been or is the subject of any judicial proceeding and, if so, the nature and date thereof, the court in which such proceeding took place or is pending, and its result or status. In any case in which an exclusion, deportation, or removal order is in effect, any motion to reopen or reconsider such order shall include a statement by or on behalf of the moving party declaring whether the subject of the order is also the subject of any pending criminal proceeding under the Act, and, if so, the current status of the proceeding. If a motion to reopen or reconsider seeks discretionary relief, the motion shall include a statement by or on behalf of the moving party declaring whether the alien for whose relief the motion is being filed is subject to any pending criminal prosecution and, if so, the nature and current status of that prosecution.

(f) *Stay of deportation.* Except where a motion is filed pursuant to the provisions of §§ 3.23(b)(4)(ii) and 3.23(b)(4)(iii)(A), the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision

made in the case. Execution of such decision shall proceed unless a stay of execution is specifically granted by the Board, the Immigration Judge, or an authorized officer of the Service.

\*       \*       \*       \*       \*

## Subpart B—Immigration Court

b. In Part 3, the heading of Subpart B is revised as set forth above.

7. Section 3.9 is revised to read as follows:

### § 3.9   Chief Immigration Judge.

The Chief Immigration Judge shall be responsible for the general supervision, direction, and scheduling of the Immigration Judges in the conduct of the various programs assigned to them. The Chief Immigration Judge shall be assisted by Deputy Chief Immigration Judges and Assistant Chief Immigration Judges in the performance of his or her duties. These shall include, but are not limited to:

(a) Establishment of operational policies; and

(b) Evaluation of the performance of Immigration Courts, making appropriate reports and inspections, and taking corrective action where indicated.

8. Section 3.10 is revised to read as follows:

### § 3.10   Immigration Judges.

Immigration Judges, as defined in 8 CFR part 1, shall exercise the powers and duties in this chapter regarding the conduct of exclusion, deportation, removal, and asylum proceedings and such other proceedings which the Attorney General may assign them to conduct.

9. Section 3.11 is revised to read as follows:

### § 3.11   Administrative control Immigration Courts.

An administrative control Immigration Court is one that creates and maintains Records of Proceedings for Immigration Courts within an assigned geographical area. All documents and correspondence pertaining to a Record of Proceeding shall be filed with the Immigration Court having administrative control over that Record of Proceeding and shall not be filed with any other Immigration Court. A list of the administrative control Immigration Courts with their assigned geographical areas will be made available to the public at any Immigration Court.

## Subpart C—Immigration Court—Rules of Procedure

10. In part 3, the heading of Subpart C is revised as set forth above.

11. Section 3.12 is amended by revising the last sentence, and adding a new sentence at the end of the section, to read as follows:

### § 3.12   Scope of rules.

\* \* \* Except where specifically stated, these rules apply to matters before Immigration Judges, including, but not limited to, deportation, exclusion, removal, bond, rescission, departure control, and asylum proceedings. The sole procedures for review of credible fear determinations by Immigration Judges are provided for in § 3.42.

12. Section 3.13 is revised to read as follows:

### § 3.13   Definitions.

As used in this subpart:

*Administrative control* means custodial responsibility for the Record of Proceeding as specified in § 3.11.

*Charging document* means the written instrument which initiates a proceeding before an Immigration Judge. For proceedings initiated prior to April 1, 1997, these documents include an Order to Show Cause, a Notice to Applicant for Admission Detained for Hearing before Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien. For proceedings initiated after April 1, 1997, these documents include a Notice to Appear, a Notice of Referral to Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien.

*Filing* means the actual receipt of a document by the appropriate Immigration Court.

*Service* means physically presenting or mailing a document to the appropriate party or parties; except that an Order to Show Cause or Notice of Deportation Hearing shall be served in person to the alien, or by certified mail to the alien or the alien's attorney and a Notice to Appear or Notice of Removal Hearing shall be served to the alien in person, or if personal service is not practicable, shall be served by regular mail to the alien or the alien's attorney of record.

13. Section 3.14 is amended by:

a. Revising paragraph (a), and by

b. Adding a new paragraph (c) to read as follows:

### § 3.14   Jurisdiction and commencement of proceedings.

(a) Jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service. The charging document must include a certificate showing service on the

opposing party pursuant to § 3.32 which indicates the Immigration Court in which the charging document is filed. However, no charging document is required to be filed with the Immigration Court to commence bond proceedings pursuant to §§ 3.19, 236.1(d) and 240.2(b) of this chapter or credible fear determinations pursuant to § 208.30 of this chapter.

\*     \*     \*     \*     \*

(c) Immigration Judges have jurisdiction to administer the oath of allegiance in administrative naturalization ceremonies conducted by the Service in accordance with § 337.2(b) of this chapter.

14. Section 3.15 is amended by:
a. Revising the section heading;
b. Amending paragraph (b) introductory text and paragraph (b)(6), by adding the phrase "and Notice to Appear" immediately after the phrase "Order to Show Cause";
c. Redesignating paragraph (c) as (d);
d. Adding a new paragraph (c); and by
e. Revising newly redesignated paragraph (d), to read as follows:

**§ 3.15   Contents of the order to show cause and notice to appear and notification of change of address.**

\*     \*     \*     \*     \*

(c) *Contents of the Notice to Appear for Removal Proceedings*. In the Notice to Appear for removal proceedings, the Service shall provide the following administrative information to the Immigration Court. Failure to provide any of these items shall not be construed as affording the alien any substantive or procedural rights.

(1) The alien's names and any known aliases;

(2) The alien's address;

(3) The alien's registration number, with any lead alien registration number with which the alien is associated;

(4) The alien's alleged nationality and citizenship; and

(5) The language that the alien understands.

(d) *Address and telephone number*. (1) If the alien's address is not provided on the Order to Show Cause or Notice to Appear, or if the address on the Order to Show Cause or Notice to Appear is incorrect, the alien must provide to the Immigration Court where the charging document has been filed, within five days of service of that document, a written notice of an address and telephone number at which the alien can be contacted. The alien may satisfy this requirement by completing and filing Form EOIR–33.

(2) Within five days of any change of address, the alien must provide written notice of the change of address on Form

EOIR–33 to the Immigration Court where the charging document has been filed, or if venue has been changed, to the Immigration Court to which venue has been changed.

**§ 3.16   [Amended]**

15. Section 3.16(b) is amended by revising the term "respondent/applicant" to read "alien".

**§ 3.17   [Amended]**

16. Section 3.17(a) is amended in the first sentence by revising the term "respondent/applicant" to read "alien", and by revising the phrase "the appropriate EOIR form" to read "Form EOIR–28".

17. Section 3.18 is revised to read as follows:

**§ 3.18   Scheduling of cases.**

(a) The Immigration Court shall be responsible for scheduling cases and providing notice to the government and the alien of the time, place, and date of hearings.

(b) In removal proceedings pursuant to section 240 of the Act, the Service shall provide in the Notice to Appear, the time, place and date of the initial removal hearing, where practicable. If that information is not contained in the Notice to Appear, the Immigration Court shall be responsible for scheduling the initial removal hearing and providing notice to the government and the alien of the time, place, and date of hearing. In the case of any change or postponement in the time and place of such proceeding, the Immigration Court shall provide written notice to the alien specifying the new time and place of the proceeding and the consequences under section 240(b)(5) of the Act of failing, except under exceptional circumstances as defined in section 240(e)(1) of the Act, to attend such proceeding. No such notice shall be required for an alien not in detention if the alien has failed to provide the address required in section 239(a)(1)(F) of the Act.

**§ 3.19   [Amended]**

18. Section 3.19(a) is amended by revising the reference to "part 242 of this chapter" to read "8 CFR part 236" wherever it appears in the paragraph.

19. Section 3.19(d) is amended in the first sentence by adding the term "or removal" immediately after the word "deportation".

20. Section 3.19 is amended by removing paragraph (h).

21. In § 3.20, paragraph (a) is revised to read as follows:

**§ 3.20   Change of venue.**

(a) Venue shall lie at the Immigration Court where jurisdiction vests pursuant to § 3.14.

\*     \*     \*     \*     \*

22. Section 3.23 is amended by revising the section heading and paragraph (b) to read as follows:

**§ 3.23   Reopening or Reconsideration before the Immigration Court.**

\*     \*     \*     \*     \*

(b) *Before the Immigration Court*. (1) *In general*. An Immigration Judge may upon his or her own motion at any time, or upon motion of the Service or the alien, reopen or reconsider any case in which he or she has made a decision, unless jurisdiction is vested with the Board of Immigration Appeals. Subject to the exceptions in this paragraph and paragraph (b)(4) of this section, a party may file only one motion to reconsider and one motion to reopen proceedings. A motion to reconsider must be filed within 30 days of the date of entry of a final administrative order of removal, deportation, or exclusion. A motion to reopen must be filed within 90 days of the date of entry of a final administrative order of removal, deportation, or exclusion. A motion to reopen or to reconsider shall not be made by or on behalf of a person who is the subject of removal, deportation, or exclusion proceedings subsequent to his or her departure from the United States. The time and numerical limitations set forth in this paragraph do not apply to motions by the Service in removal proceedings pursuant to section 240 of the Act, or to motions by the Service in exclusion or deportation proceedings, when the basis of the motion is fraud in the original proceeding or a crime that would support termination of asylum in accordance with § 208.22(f) of this chapter.

(i) *Form and contents of the motion*. The motion shall be in writing and signed by the affected party or the attorney or representative of record, if any. The motion and any submission made in conjunction with it must be in English or accompanied by a certified English translation. Motions to reopen or reconsider shall state whether the validity of the exclusion, deportation, or removal order has been or is the subject of any judicial proceeding and, if so, the nature and date thereof, the court in which such proceeding took place or is pending, and its result or status. In any case in which an exclusion, deportation, or removal order is in effect, any motion to reopen or reconsider such order shall include a statement by or on behalf of the moving party declaring whether the subject of the order is also the subject

of any pending criminal proceeding under the Act, and, if so, the current status of that proceeding.

(ii) *Filing*. Motions to reopen or reconsider a decision of an Immigration Judge must be filed with the Immigration Court having administrative control over the Record of Proceeding. A motion to reopen or a motion to reconsider shall include a certificate showing service on the opposing party of the motion and all attachments. If the moving party, other than the Service, is represented, a Form EOIR–28, Notice of Appearance as Attorney or Representative Before an Immigration Judge must be filed with the motion. The motion must be filed in duplicate with the Immigration Court, accompanied by a fee receipt.

(iii) *Assignment to an Immigration Judge*. If the Immigration Judge is unavailable or unable to adjudicate the motion to reopen or reconsider, the Chief Immigration Judge or his or her delegate shall reassign such motion to another Immigration Judge.

(iv) *Replies to motions; decision*. The Immigration Judge may set and extend time limits for replies to motions to reopen or reconsider. A motion shall be deemed unopposed unless timely response is made. The decision to grant or deny a motion to reopen or a motion to reconsider is within the discretion of the Immigration Judge.

(v) *Stays*. Except in cases involving in absentia orders, the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision made in the case. Execution of such decision shall proceed unless a stay of execution is specifically granted by the Immigration Judge, the Board, or an authorized officer of the Service.

(2) *Motion to reconsider*. A motion to reconsider shall state the reasons for the motion by specifying the errors of fact or law in the Immigration Judge's prior decision and shall be supported by pertinent authority. Such motion may not seek reconsideration of a decision denying previous motion to reconsider.

(3) *Motion to reopen*. A motion to reopen proceedings shall state the new facts that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits and other evidentiary material. Any motion to reopen for the purpose of acting on an application for relief must be accompanied by the appropriate application for relief and all supporting documents. A motion to reopen will not be granted unless the Immigration Judge is satisfied that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing. A

motion to reopen for the purpose of providing the alien an opportunity to apply for any form of discretionary relief will not be granted if it appears that the alien's right to apply for such relief was fully explained to him or her by the Immigration Judge and an opportunity to apply therefore was afforded at the hearing, unless the relief is sought on the basis of circumstances that have arisen subsequent to the hearing. Pursuant to section 240A(d)(1) of the Act, a motion to reopen proceedings for consideration or further consideration of an application for relief under section 240A(a) (cancellation of removal for certain permanent residents) or 240A(b) (cancellation of removal and adjustment of status for certain nonpermanent residents) may be granted only if the alien demonstrates that he or she was statutorily eligible for such relief prior to the service of a notice top appear, or prior to the commission of an offense referred to in section 212(a)(2) of the Act that renders the alien inadmissible or removable under sections 237(a)(2) of the Act or (a)(4), whichever is earliest. The Immigration Judge has discretion to deny a motion to reopen even if the moving party has established a prima facie case for relief.

(4) *Exceptions to filing deadlines*.

(i) *Asylum*. The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply if the basis of the motion is to apply for relief under section 208 or 241(b)(3) of the Act and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding. The filing of a motion to reopen under this section shall not automatically stay the removal of the alien. However, the alien many request a stay and, if granted by the Immigration Judge, the alien shall not be removed pending disposition of the motion by the Immigration Judge. If the original asylum application was denied based upon a finding that it was frivolous, then the alien is ineligible to file either a motion to reopen or reconsider, or for a stay of removal.

(ii) *Order entered in absentia in removal proceedings*. An order of removal entered in absentia pursuant to section 240(b)(5) of the Act may be rescinded only upon a motion to reopen filed within 180 days after the date of the order of removal, if the alien demonstrates that the failure to appear was because of "exceptional circumstances" as defined in section

240(e)(1) of the Act. An order entered in absentia pursuant to section 240(b)(5) may be rescinded upon a motion to reopen filed at any time if the alien demonstrates that he or she did not receive notice in accordance with sections 239(a)(1) or (2) of the Act, or the alien demonstrates that he or she was in Federal or state custody and the failure to appear was through no fault of the alien. However, in accordance with section 240(b)(5)(B) of the Act, no written notice of a change in time or place of proceeding small be required if the alien has failed to provide the address required under section 239(a)(1)(F) of the Act. The filing of a motion to reopen under this section shall stay the removal of the alien pending disposition of the motion by the Immigration Judge. An alien may file only one motion pursuant to this paragraph.

(iii) *Order entered in absentia in deportation or exclusion proceedings*. (A) An order entered in absentia in deportation proceedings may be rescinded only a motion to reopen filed:

(*1*) Within 180 days after the date of the order of deportation if the alien demonstrates that the failure to appear was because of "exceptional circumstances" beyond the control of the alien (e.g., serious illness of the alien or serious illness or death of an immediate relative of the alien, but not including less compelling circumstances); or

(*2*) At any time if the alien demonstrates that he or she did not receive notice or if the alien demonstrates that he or she was in federal or state custody and the failure to appear was through no fault of the alien.

(B) A motion to reopen exclusion hearings on the basis that the Immigration Judge improperly entered an order of exclusion in absentia must be supported by evidence that the alien had reasonable cause for his failure to appear.

(C) The filing of a motion to reopen under paragraph (b)(4)(iii)(A) of this section shall stay the deportation of the alien pending decision on the motion and the adjudication of any properly filed administrative appeal.

(D) The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply to a motion to reopen filed pursuant to the provisions of paragraphs (b)(4)(iii)(A)(*1*) of this section.

(iv) *Jointly filed motions*. The time and numerical limitations set forth in subsection (b)(1) of this section shall not apply to a motion to reopen agreed upon by all parties and jointly filed.

23. Section 3.25 is revised to read as follows:

§3.25   Form of the proceeding.

(a) *Waiver of presence of the parties.* The Immigration Judge may, for good cause, and consistent with section 240(b) of the Act, waive the presence of the alien at a hearing when the alien is represented or when the alien is a minor child at least one of whose parents or whose legal guardian is present. When it is impracticable by reason of an alien's mental incompetency for the alien to be present, the presence of the alien may be waived provided that the alien is represented at the hearing by an attorney or legal representative, a near relative, legal guardian, or friend.

(b) *Stipulated request for order, wavier of hearing.* An Immigration Judge may enter an order of deportation, exclusion or removal stipulated to by the alien (or the alien's representative) and the Service. The Immigration Judge may enter such an order without a hearing and in the absence of the parties based on a review of the charging document, the written stipulation, and supporting documents, if any. If the alien is unrepresented, the Immigration Judge must determine that the alien's waiver is voluntary, knowing, and intelligent. The stipulated request and required waivers shall be signed on behalf of the government and by the alien and his or her attorney or representative, if any. The attorney or representative shall file a Notice of Appearance in accordance with § 3.16(b). A stipulated order shall constitute a conclusive determination of the alien's deportability or removability from the United States. The stipulation shall include:

(1) An admission that all factual allegations contained in the charging document are true and correct as written;

(2) A concession of deportability or inadmissibility as charged;

(3) A statement that the alien makes no application for relief under the Act;

(4) A designation of a country for deportation or removal under section 241(b)(2)(A)(i) of the Act;

(5) A concession to the introduction of the written stipulation of the alien as an exhibit to the Record of Proceeding;

(6) A statement that the alien understands the consequences of the stipulated request and that the alien enters the request voluntarily, knowingly, and intelligently;

(7) A statement that the alien will accept a written order for his or her deportation, exclusion or removal as a final disposition of the proceedings; and

(8) A waiver of appeal of the written order of deportation or removal.

(c) *Telephonic or video hearings.* An Immigration Judge may conduct hearings through video conference to the same extent as he or she may conduct hearings in person. An Immigration Judge may also conduct a hearing through a telephone conference, but an evidentiary hearing on the merits may only be conducted through a telephone conference with the consent of the alien involved after the alien has been advised of the right to proceed in person or, where available, through a video conference, except that credible fear determinations may be reviewed by the Immigration Judge through a telephone conference without the consent of the alien.

24. Section 3.26 is amended by revising paragraph (c) and adding a new paragraph (d) to read as follows:

§3.26   In absentia hearings.

*      *      *      *      *

(c) In any removal proceeding before an Immigration Judge in which the alien fails to appear, the Immigration Judge shall order the alien removed *in absentia* if:

(1) The Service establishes by clear, unequivocal, and convincing evidence that the alien is removable; and

(2) The Service establishes by clear, unequivocal, and convincing evidence that written notice of the time and place of proceedings and written notice of the consequences of failure to appear were provided to the alien.

(d) Written notice to the alien shall be considered sufficient for purposes of this section if it was provided at the most recent address provided by the alien. If the respondent fails to provide his or her address as required under § 3.15(d), no written notice shall be required for an Immigration Judge to proceed with an *in absentia* hearing. This paragraph shall not apply in the event that the Immigration Judge waives the appearance of an alien under § 3.25.

25. Section 3.27 is amended by revising paragraph (c) to read as follows:

§3.27   Public access to hearings.

*      *      *      *      *

(c) In any proceeding before an Immigration Judge concerning an abused alien spouse, the hearing and the Record of Proceeding shall be closed to the public unless the abused spouse agrees that the hearing and the Record of Proceeding shall be open to the public. In any proceeding before an Immigration Judge concerning an abused alien child, the hearing and the Record of Proceeding shall be closed to the public.

26. Section 3.30 is revised to read as follows:

§3.30   Additional charges in deportation or removal hearings.

At any time during deportation or removal proceedings, additional or substituted charges of deportability and/ or factual allegations may be lodged by the Service in writing. The alien shall be served with a copy of these additional charges and/or allegations and the Immigration Judge shall read them to the alien. The Immigration Judge shall advise the alien, if he or she is not represented by counsel, that the alien may be so represented. The alien may be given a reasonable continuance to respond to the additional factual allegations and charges. Thereafter, the provision of § 240.10(b) of this chapter relating to pleading shall apply to the additional factual allegations and charges.

27. Section 3.35 is revised to read as follows:

§3.35   Depositions and Subpoenas.

(a) *Depositions.* If an Immigration Judge is satisfied that a witness is not reasonably available at the place of hearing and that said witness' testimony or other evidence is essential, the Immigration Judge may order the taking of deposition either at his or her own instance or upon application of a party. Such order shall designate the official by whom the deposition shall be taken, may prescribe and limit the content, scope, or manner of taking the deposition, and may direct the production of documentary evidence.

(b) *Subpoenas issued subsequent to commencement of proceedings.* (1) *General.* In any proceeding before an Immigration Judge, other than under 8 CFR part 335, the Immigration Judge shall have exclusive jurisdiction to issue subpoenas requiring the attendance of witnesses or for the production of books, papers and other documentary evidence, or both. An Immigration Judge may issue a subpoena upon his or her own volition or upon application of the Service or the alien.

(2) *Application for subpoena.* A party applying for a subpoena shall be required, as a condition precedent to its issuance, to state in writing or at the proceeding, what he or she expects to prove by such witnesses or documentary evidence, and to show affirmatively that he or she has made diligent effort, without success, to produce the same.

(3) *Issuance of subpoena.* Upon being satisfied that a witness will not appear and testify or produce documentary evidence and that the witness' evidence

is essential, the Immigration Judge shall issue a subpoena. The subpoena shall state the title of the proceeding and shall command the person to whom it is directed to attend and to give testimony at a time and place specified. The subpoena may also command the person to whom it is directed to produce the books, papers, or documents specified in the subpoena.

(4) *Appearance of witness.* If the witness is at a distance of more than 100 miles from the place of the proceeding, the subpoena shall provide for the witness' appearance at the Immigration Court nearest to the witness to respond to oral or written interrogatories, unless there is no objection by any party to the witness' appearance at the proceeding.

(5) *Service.* A subpoena issued under this section may be served by any person over 18 years of age not a party to the case.

(6) *Invoking aid of court.* If a witness neglects or refuses to appear and testify as directed by the subpoena served upon him or her in accordance with the provisions of this section, the Immigration Judge issuing the subpoena shall request the United States Attorney for the district in which the subpoena was issued to report such neglect or refusal to the United States District Court and to request such court to issue an order requiring the witness to appear and testify and to produce the books, papers or documents designated in the subpoena.

28. In Subpart C, a new § 3.42 is added to read as follows:

**§ 3.42   Review of credible fear determination.**

(a) *Referral.* Jurisdiction for an Immigration Judge to review an adverse credible fear finding by an asylum officer pursuant to section 235(b)(1)(B) of the Act shall commence with the filing by the Service to Form I–863, Notice of Referral to Immigration Judge. The Service shall also file with the notice of referral a copy of the written record of determination as defined in section 235(b)(1)(B)(iii)(II) of the Act, including a copy of the alien's written request for review, if any.

(b) *Record of proceeding.* The Immigration Court shall create a Record of Proceeding for a review of an adverse credible fear determination. This record shall be merged with any later proceeding pursuant to section 240 of the Act involving the same alien.

(c) *Procedures and evidence.* The Immigration Judge may receive into evidence any oral or written statement which is material and relevant to any issue in the review. The testimony of the alien shall be under oath or

affirmation administered by the Immigration Judge. If an interpreter is necessary, one will be provided by the Immigration Court. The Immigration Judge shall determine whether the review shall be in person, or through telephonic or video connection (where available). The alien may consult with a person or persons of the alien's choosing prior to the review.

(d) *Standard of review.* The Immigration Judge shall make a de novo determination as to whether there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the Immigration Judge, that the alien could establish eligibility for asylum under section 208 of the Act.

(e) *Timing.* The Immigration Judge shall conclude the review to the maximum extent practicable within 24 hours, but in no case later than 7 days after the determination of the asylum officer.

(f) *Decision.* If an Immigration Judge determines that an alien has a credible fear of persecution, the Immigration Judge shall vacate the order entered pursuant to section 235(b)(1)(B)(iii)(I) of the Act. Subsequent to the order being vacated, the Service shall issue and file Form I–862, Notice to Appear, with the Immigration Court to commence removal proceedings. The alien shall have the opportunity to apply for asylum in the course of removal proceedings pursuant to section 240 of the Act. If an Immigration Judge determines that an alien does not have a credible fear of persecution, the Immigration Judge shall affirm the asylum officer's determination and remand the case to the Service for execution of the removal order entered pursuant to section 235(b)(1)(B)(iii)(I) of the Act. No appeal shall lie from a review of an adverse credible fear determination made by an Immigration Judge.

(g) *Custody.* An Immigration Judge shall have no authority to review an alien's custody status in the course of a review of an adverse credible fear determination made by the Service.

**PART 103—POWERS AND DUTIES OF SERVICE OFFICERS; AVAILABILITY OF SERVICE RECORDS**

29. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 552, 552(a); 8 U.S.C. 1101, 1103, 1201, 1252 note, 1252b, 1304, 1356; 31 U.S.C. 9701; E.O. 12356; 47 FR. 14874, 15557; 3 CFR, 1982 Comp. p. 166; 8 CFR part 2.

30. In § 1301, paragraph (g)(3)(ii) is revised to read as follows:

**§ 103.1   Delegations of authority.**

\*   \*   \*   \*   \*

(g) \* \* \*

(3) \* \* \*

(ii) *Asylum Officers.* Asylum officers constitute a professional corps of officers who serve under the supervision and direction of the Director of International Affairs and shall be specially trained as required in § 208.1(b) of this chapter. Asylum officers are delegated the authority to hear and adjudicate credible fear of persecution determinations under section 235(b)(1)(B) of the Act and applications for asylum and for withholding of removal, as provided under 8 CFR part 208.

\*   \*   \*   \*   \*

**§ 103.5   [Amended]**

31. Section 103.5 is amended by:

a. Removing paragraphs (a)(1)(iii)(B);

b. Redesignating paragraphs (a)(1)(iii)(C) through (F) as paragraphs (a)(1)(iii)(B) through (E), respectively; and

c. Removing paragraph (a)(5)(iii).

32. In § 103.5a, paragraph (c)(1) is revised to read as follows:

**§ 103.5a   Service of notification, decisions, and other papers by the Service.**

\*   \*   \*   \*   \*

(c) \* \* \*

(1) *Generally.* In any proceeding which is initiated by the Service, with proposed adverse effect, service of the initiating notice and of notice of any decision by a Service officer shall be accomplished by personal service, except as provided in section 239 of the Act.

\*   \*   \*   \*   \*

33. In § 103.6, paragraph (a) is revised to read as follows:

**§ 103.6   Surety bonds.**

(a) *Posting of surety bonds.*—(1) *Extension agreements; consent of surety; collateral security.* All surety bonds posted in immigration cases shall be executed on Form I–352, Immigration Bond, a copy of which, and any rider attached thereto, shall be furnished the obligor. A district director is authorized to approve a bond, a formal agreement to extension of liability of surety, a request for delivery of collateral security to a duly appointed and undischarged administrator or executor of the estate of a deceased depositor, and a power of attorney executed on Form I–312, Designation of Attorney in Fact. All other matters relating to bonds, including a power of attorney not

executed on Form I–312 and a request for delivery of collateral security to other than the depositor or his or her approved attorney in fact, shall be forwarded to the regional director for approval.

(2) *Bond riders.*—(i) *General.* Bond riders shall be prepared on Form I–351, Bond Riders, and attached to Form I–352. If a condition to be included in a bond is not on Form I–351, a rider containing the condition shall be executed.

\* \* \* \* \*

### § 103.7 [Amended]

34. Section 103.7(b)(1) is amended by removing the entry to "Form I–444".

## PART 204—IMMIGRANT PETITIONS

35. The authority citation for part 204 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1186a, 1255; 8 CFR part 2.

36. Section 204.2 is amended by:
a. Revising paragraph (a)(1)(iii) introductory text;
b. Removing paragraphs (a)(1)(iii) (A) through (C); and
c. Redesignating paragraphs (a)(1)(iii) (D) through (I) as paragraphs (a)(1)(iii) (A) through (F) respectively, to read as follows:

### § 204.2 Petitions for relatives, widows, and widowers, and abused spouses and children.

\* \* \* \* \*

(a) \* \* \*

(1) \* \* \*

(iii) *Marriage during proceedings—general prohibition against approval of visa petition.* A visa petition filed on behalf of an alien by a United States citizen or a lawful permanent resident spouse shall not be approved if the marriage creating the relationship occurred on or after November 10, 1986, and while the alien was in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto. Determination of commencement and termination of proceedings and exemptions shall be in accordance with § 245.1(c)(8) of this chapter.

\* \* \* \* \*

## PART 207—ADMISSION OF REFUGEES

37. The authority citation for part 207 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1157, 1159, 1182; 8 CFR part 2.

38. Section 207.1 is amended by removing paragraph (e), and by revising paragraph (a) to read as follows:

### § 207.1 Eligibility.

(a) *Filing jurisdiction.* Any alien who believes he or she is a refugee as defined in section 101(a)(42) of the Act, and is included in a refugee group identified in section 207(a) of the Act, may apply for admission to the United States by filing an application in accordance with § 207.2 with the Service office having jurisdiction over the area where the applicant is located. In those areas too distant from a Service office, the application may be filed at a designated United States consular office.

\* \* \* \* \*

39. Section 207.3 is revised to read as follows:

### § 207.3 Waivers of inadmissibility.

(a) *Authority.* Section 207(c)(3) of the Act sets forth grounds of inadmissibility under section 212(a) of the Act which are not applicable and those which may be waived in the case of an otherwise qualified refugee and the conditions under which such waivers may be approved. Officers in charge of overseas offices are delegated authority to initiate the necessary investigations to establish the facts in each waiver application pending before them and to approve or deny such waivers.

(b) *Filing requirements.* The applicant for a waiver must submit Form I–602, Application by Refugee for Waiver of Grounds of Inadmissibility, with the Service office processing his or her case. The burden is on the applicant to show that the waiver should be granted based upon humanitarian grounds, family unity, or the public interest. The applicant shall be notified in writing of the decision, including the reasons for denial, if the application is denied. There is no appeal from such decision.

### § 207.8 [Amended]

40. Section 207.8 is amended in the last sentence by revising the reference to "sections 235, 236, and 237" to read "sections 235, 240, and 241".

41. Part 208 is revised to read as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

### Subpart A—Asylum and Withholding of Removal

Sec.

208.1 General.
208.2 Jurisdiction.
208.3 Form of application.
208.4 Filing the application.
208.5 Special duties toward aliens in custody of the Service.
208.6 Disclosure to third parties.
208.7 Employment authorization.
208.8 Limitations on travel outside the United States.
208.9 Procedure for interview before an asylum officer.
208.10 Failure to appear at an interview before an asylum officer.
208.11 Comments from the Department of State.
208.12 Reliance on information compiled by other sources.
208.13 Establishing asylum eligibility.
208.14 Approval, denial, or referral of application.
208.15 Definition of "firm resettlement."
208.16 Withholding of removal.
208.17 Decisions.
208.18 Determining if an asylum application is frivolous.
208.19 [Reserved]
208.20 Effect on exclusion, deportation, and removal proceedings.
208.21 Restoration of status.
208.22 Termination of asylum or withholding or removal or deportation.
208.23–29 [Reserved]

### Subpart B—Credible Fear of Persecution

208.30 Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

**Authority:** 8 U.S.C. 1103, 1158, 1226, 1252, 1282; 8 CFR part 2.

## Subpart A—Asylum and Withholding of Removal

### § 208.1 General.

(a) *Applicability.* Unless otherwise provided herein, this subpart shall apply to all applications for asylum under section 208 of the Act or for withholding of deportation or withholding of removal under section 241(b)(3) of the Act, whether before an asylum officer or an immigration judge, regardless of the date of filing. For purposes of this chapter, withholding of removal shall also mean withholding of deportation under section 243(h) of the Act, as it appeared prior to April 1, 1997, except as provided in § 208.16(c) of this chapter. Such applications are hereinafter referred to generically as asylum applications. The provisions of this part shall not affect the finality or validity of any decision made by a district director, an immigration judge, or the Board of Immigration Appeals in any such case prior to April 1, 1997. No asylum application that was filed with a district director, asylum officer or immigration judge prior to April 1, 1997, may be reopened or otherwise reconsidered under the provisions of this part except by motion granted in the exercise of discretion by the Board of Immigration Appeals, an immigration judge, or an asylum officer for proper cause shown. Motions to reopen or reconsider must meet the requirements of sections 240(c)(5) and (c)(6) of the Act, and 8 CFR parts 3 and 103, where

applicable. The provisions of this part relating to a person convicted of an aggravated felony, as defined in section 101(a)(43) of the Act, shall apply to asylum applications that are filed on or after November 29, 1990.

(b) *Training of asylum officers.* The Director of International Affairs shall ensure that asylum officers receive special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles. The Director of International Affairs shall also, in cooperation with the Department of State and other appropriate sources, compile and disseminate to asylum officers information concerning the persecution of persons in other countries on account of race, religion, nationality, membership in a particular social group, or political opinion, as well as other information relevant to asylum determinations, and shall maintain a documentation center with information on human rights conditions.

### § 208.2   Jurisdiction.

(a) *Office of International Affairs.* Except as provided in paragraph (b) of this section, the Office of International Affairs shall have initial jurisdiction over an asylum application filed by, or a credible fear determination pertaining to, an alien physically present in the United States or seeking admission at a port-of-entry. An application that is complete within the meaning of § 208.3(c)(3) shall be either adjudicated or referred by asylum officers under this part in accordance with § 208.14. An application that is incomplete within the meaning of § 208.3(c)(3) shall be returned to the applicant. Except as provided in § 208.16(a), an asylum officer shall not decide whether an alien is entitled to withholding of removal under section 241(b)(3) of the Act.

(b) *Immigration Court.* (1) *Certain aliens not entitled to proceedings under section 240 of the Act.* After Form I–863, Notice of Referral to Immigration Judge, has been filed with the Immigration Court, an immigration judge shall have exclusive jurisdiction over any asylum application filed on or after April 1, 1997, by:

(i) An alien crewman who:

(A) Is an applicant for a landing permit;

(B) Has been refused permission to land under section 252 of the Act; or

(C) Has been granted permission to land under section 252 of the Act, regardless of whether the alien has remained in the United States longer than authorized;

(ii) An alien stowaway who has been found to have a credible fear of persecution pursuant to the procedure set forth in Subpart B of this part;

(iii) An alien who is an applicant for admission pursuant to the Visa Waiver Pilot Program under section 217 of the Act;

(iv) An alien who was admitted to the United States pursuant to the Visa Waiver Pilot Program under section 217 of the Act and has remained longer than authorized or has otherwise violated his or her immigration status;

(v) An alien who has been ordered removed under section 235(c) of the Act; or

(vi) An alien who is an applicant for admission, or has been admitted, as an alien classified under section 101(a)(15)(S) of the Act.

(2) *Rules of procedure.* Proceeding falling under the jurisdiction of the immigration judge pursuant to paragraph (b)(1) of this section shall be conducted in accordance with the same rules of procedure as proceedings conducted under 8 CFR part 240, except the scope of review shall be limited to a determination of whether the alien is eligible for asylum or withholding of removal and whether asylum shall be granted in the exercise of discretion. During such proceeding all parties are prohibited from raising or considering any other issues, including but not limited to issues of admissibility, removability, eligibility for waivers, and eligibility for any form of relief other than asylum or withholding of removal.

(3) *other aliens.* Immigration judges shall have exclusive jurisdiction over asylum applications filed by an alien who has been served Form I–221, Order to Show Cause; Form I–122, Notice to Applicant for Admission Detained for a Hearing before an Immigration Judge; or Form I–862, Notice to Appear, after a copy of the charging document has been filed with the Immigration Court. Immigration judges shall also have jurisdiction over any asylum applications filed prior to April 1, 1997, by alien crew members who have remained in the United States longer than authorized, by applicants for admission under the Visa Waiver Pilot Program, and by aliens who have been admitted to the United States under the Visa Waiver Pilot Program.

### § 208.3   Form of application.

(a) An asylum applicant must file, in triplicate, Form I–589 together with any additional supporting material. The applicant's spouse and children shall be listed on the application and may be included in the request for asylum if they are in the United States. One

additional copy of the principal applicant's Form I–589 must be submitted for each dependent included in the principal's application. An application shall be accompanied by one completed fingerprint card, Form FD–258, for every individual included in the application who is 14 years of age or older. The application also shall be accompanied by two photographs of the applicant and of each dependent included in the application.

(b) An asylum application shall be deemed to constitute at the same time an application for withholding of removal, unless adjudicated in deportation or exclusion proceedings commenced prior to April 1, 1997. In such instances, the asylum application shall be deemed to constitute an application for withholding of deportation under section 243(h) of the Act, as that section existed prior to its amendment by Pub. L. 104–208.

(c) Form I–589 shall be filed under the following conditions and shall have the following consequences:

(1) Information provided on the application may be used as a basis for the institution of or as evidence in removal proceedings, and in deportation and exclusion proceedings where the application has been filed on or after January 4, 1995, as well as to satisfy the Service's burden of proof in such proceedings;

(2) The applicant and anyone other than a spouse, parent, son, or daughter of the applicant who assists the applicant in preparing the application must sign the application under penalty of perjury. The applicant's signature is evidence that the applicant is a aware of the contents of the application. A person other than a relative specified in this paragraph who assists the applicant in preparing the application also must provide his or her full mailing address;

(3) An asylum application that does not include a response to each of the questions contained in the Form I–589, is unsigned, or is unaccompanied by the required materials specified in paragraph (a) of this section is incomplete. The filling of an incomplete application shall not commence the 150-day period after which the applicant may file an application for employment authorization in accordance with § 208.7. An application that is incomplete shall be retuned by mail to the applicant within 30 days of the receipt of the application by the Service. If the Service has not mailed the incomplete application back to the applicant within 30 days, it shall be deemed complete;

(4) Knowing placement of false information on the application may

subject the person placing that information on the application to criminal penalties under title 18 of the United States Code and to civil penalties under section 274C of the Act; and

(5) Knowing filing of a frivolous application on or after April 1, 1997, so long as the applicant has received the notice required by section 208(d)(4) of the Act, shall render the applicant permanently ineligible for any benefits under the Act pursuant to § 208.18.

### § 208.4   Filing the application.

Except as prohibited in paragraph (a) of this section, asylum applications shall be filed in accordance with paragraph (b) of this section.

(a) *Prohibitions on filing.* Section 208(a)(2) of the Act prohibits certain aliens from filing for asylum on or after April 1, 1997, unless the alien can demonstrate that the exceptions in section 208(a)(2)(D) of the Act apply. For the purpose of making determinations under section 208(a)(2) of the Act, the following rules shall apply:

(1) For the purpose of section 208(a)(2)(C) of the Act, an asylum application has not been denied unless denied by an immigration judge or the Board of Immigration Appeals;

(2) The term "changed circumstances" in section 208(a)(2)(D) of the Act shall refer to circumstances materially affecting the applicant's eligibility for asylum that have arisen:

(i) For the purpose of section 208(a)(2)(C) of the Act, since the denial of the last asylum application by the alien. Changed circumstances arising after the denial of the application but before the alien's departure or removal from the United States shall only be considered as part of a motion to reopen under section 240(c)(6) of the Act and §§ 3.2, 3.23 and 103.5 of this chapter; or

(ii) For the purpose of section 208(a)(2)(B) of the Act, since the 1-year period has expired; and

(3) The term "extraordinary circumstances" in section 208(a)(2)(D) of the Act shall refer to events or factors beyond the alien's control that caused the failure to meet the 1-year deadline. Such circumstances shall excuse the failure to file within the 1-year period so long as the alien filed the application as soon after the deadline as practicable given those circumstances.

(b) *Filing location.* (1) *With the service center by mail.* Except as provided in paragraphs (b)(2), (b)(3), (b)(4) and (b)(5) of this section, asylum applications shall be filed directly by mail with the service center servicing the asylum office with jurisdiction over the place of the applicant's residence or, in the case of an alien without a United States residence, the applicant's current lodging or the land border port-of-entry through which the alien seeks admission to the United States.

(2) *With the asylum office.* Asylum applications shall be filed directly with the asylum office having jurisdiction over the matter in the case of an alien who has received the express consent of the Director of Asylum to do so.

(3) *With the immigration judge.* Aslyum applications shall be filed directly with the Immigration Court having jurisdiction over the case in the following circumstances:

(i) During exclusion, deportation, or removal proceedings, with the Immigration Court having jurisdiction over the port, district office, or sector after service and filing of the appropriate charging document.

(ii) After completion of exclusion, deportation, or removal proceedings, and in conjunction with a motion to reopen pursuant to 8 CFR part 3 where applicable, with the Immigration Court having jurisdiction over the prior proceeding. Any such motion must reasonably explain the failure to request asylum prior to the completion of the proceedings

(iii) In asylum proceedings pursuant to § 208.2(b)(1) and after the Notice of Referral to Immigration Judge has been served on the alien and filed with the Immigration Court having jurisdiction over the case.

(4) *With the Board of Immigration Appeals.* In conjunction with a motion to remand or reopen pursuant to §§ 3.2 and 3.8 of this chapter where applicable, an initial asylum application shall be filed with the Board of Immigration Appeals if jurisdiction over the proceedings is vested in the Board of Immigration Appeals under 8 CFR part 3. Any such motion must reasonably explain the failure to request asylum prior to the completion of the proceedings.

(5) *With the district director.* In the case of any alien described in § 208.2(b)(1) and prior to the service on the alien of Form I–863, any asylum application shall be submitted to the district director having jurisdiction pursuant to 8 CFR part 103. The district director shall forward such asylum application to the appropriate Immigration Court with the Form I–863 being filed with that Immigration Court.

(c) *Amending an application after filing.* Upon request of the alien and as a matter of discretion, the asylum officer or immigration judge having jurisdiction may permit an asylum applicant to amend or supplement the application, but any delay caused by such request shall extend the period within which the application may not apply for employment authorization in accordance with § 208.7(a).

### § 208.5   Special duties toward aliens in custody of the Service.

(a) *General.* When an alien in the custody of the Service requests asylum or withholding of removal or expresses a fear of persecution or harm upon return to his or her country of origin or to agents thereof, the Service shall make available the appropriate application forms and shall provide the applicant with the information required by section 208(d)(4) of the Act, except in the case of an alien who is in custody pending a credible fear of persecution determination under section 235(b)(1)(B) of the Act. Where possible, expedited consideration shall be given to applications of detained aliens. Except as provided in paragraph (c) of this section, such alien shall not be excluded, deported, or removed before a decision is rendered on his or her asylum application.

(b) *Certain aliens aboard vessels.* (1) If an alien crewman or alien stowaway on board a vessel or other conveyance alleges, claims, or otherwise makes known to an immigration inspector or other official making an examination on the conveyance that he or she is unable or unwilling to return to his or her country of nationality or last habitual residence (if not a national of any country) because of persecution or a fear of persecution in that country on account of race, religion, nationality, membership in a particular social group, or political opinion, the alien shall be promptly removed from the conveyance. If the alien makes such fear known to an official while off such conveyance, the alien shall not be returned to the conveyance but shall be retained in or transferred to the custody of the Service.

(i) An alien stowaway will be referred to an asylum officer for a credible fear determination under § 208.30.

(ii) An alien crewman shall be provided the appropriate applications forms and information required by section 208(d)(4) of the Act and may then have 10 days within which to submit an asylum application to the district director having jurisdiction over the port of entry. The district director, pursuant to § 208.4(b), shall serve Form I–863 on the alien and immediately forward any such application to the appropriate Immigration Court with a copy of the Form I–863 being filed with that court.

(2) Pending adjudication of the application, and, in the case of a

stowaway the credible fear determination and any review thereof, the alien may be detained by the Service or otherwise paroled in accordance with § 212.5 of this chapter. However, pending the credible fear determination, parole of an alien stowaway may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

(c) *Exception to prohibition on removal.* A motion to reopen or an order to remand accompanied by an asylum application pursuant to § 208.4(b)(3)(iii) shall not stay execution of a final exclusion, deportation, or removal order unless such stay is specifically granted by the Board of Immigration Appeals or the immigration judge having jurisdiction over the motion.

### § 208.6   Disclosure to third parties.

(a) Information contained in or pertaining to any asylum application shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Attorney General.

(b) The confidentiality of other records kept by the Service that indicate that a specific alien has applied for asylum shall also be protected from disclosure. The Service will coordinate with the Department of State to ensure that the confidentiality of these records is maintained if they are transmitted to Department of State offices in other countries.

(c) This section shall not apply to any disclosure to:

(1) Any United States Government official or contractor having a need to examine information in connection with:

(i) The adjudication of asylum applications;

(ii) The defense of any legal action arising from the adjudication of or failure to adjudicate the asylum application;

(iii) The defense of any legal action of which the asylum application is a part; or

(iv) Any United States Government investigation concerning any criminal or civil matter; or

(2) Any Federal, state, or local court in the United States considering any legal action:

(i) Arising from the adjudication of or failure to adjudicate the asylum application; or

(ii) Arising from the proceedings of which the asylum application is a part.

### § 208.7   Employment authorization.

(a) *Application and approval.* (1) Subject to the restrictions contained in sections 236(a) and 208(d) of the Act, an applicant for asylum who is not an aggravated felon shall be eligible pursuant to §§ 274a.12(c)(8) and 274a.13(a) of this chapter to submit a Form I–765, Application for Employment Authorization. The application shall be submitted no earlier than 150 days after the date on which a complete asylum application submitted in accordance with §§ 208.3 and 208.4 has been received. If an asylum application has been returned as incomplete in accordance with § 208.3(c)(3), the 150-day period will commence upon receipt by the Service of a complete asylum application. An applicant whose asylum application has been denied by an asylum officer or by an immigration judge within the 150-day period shall not be eligible to apply for employment authorization. If an asylum application is denied prior to a decision on the application for employment authorization, the application for employment authorization shall be denied. If the asylum application is not so denied, the Service shall have 30 days from the date of filing of the Form I–765 to grant or deny that application, except that no employment authorization shall be issued to an asylum applicant prior to the expiration of the 180-day period following the filing of the asylum application filed on or after April 1, 1997.

(2) Employment authorization pursuant to § 274a.12(c)(8) of this chapter may not be granted to an alien who fails to appear for a scheduled interview before an asylum officer or a hearing before an immigration judge, unless the applicant demonstrates that the failure to appear was the result of exceptional circumstances.

(3) The time periods within which the alien may not apply for employment authorization and within which the Service must respond to any such application and within which the asylum application must be adjudicated pursuant to section 208(d)(5)(A)(iii) of the Act shall begin when the alien has filed a complete asylum application in accordance with §§ 208.3 and 208.4. Any delay requested or caused by the applicant shall not be counted as part of these time periods. Such time periods also shall be extended by the equivalent of the time between issuance of a request for evidence under § 103.2(b)(8) of this chapter and the receipt of the applicant's response to such request.

(4) The provisions of paragraphs (a)(1) through (3) of this section apply to applications for asylum filed on or after January 4, 1995.

(b) *Renewal and termination.* Employment authorization shall be renewable, in increments to be determined by the Commissioner, for the continuous period of time necessary for the asylum officer or immigration judge to decide the asylum application and, if necessary, for completion of any administrative or judicial review.

(1) If the asylum application is denied by the asylum officer, the employment authorization shall terminate at the expiration of the employment authorization document or 60 days after the denial of asylum, whichever is longer.

(2) If the application is denied by the immigration judge, the Board of Immigration Appeals, or a Federal court, the employment authorization terminates upon the expiration of the employment authorization document, unless the applicant has filed an appropriate request for administrative or judicial review.

(c) *Supporting evidence for renewal of employment authorization.* In order for employment authorization to be renewed under this section, the alien must provide the Service (in accordance with the instructions on or attached to the employment authorization application) with a Form I–765, the required fee (unless waived in accordance with § 103.7(c) of this chapter), and (if applicable) proof that he or she has continued to pursue his or her asylum application before an immigration judge or sought administrative or judicial review. For purposes of employment authorization, pursuit of an asylum application is established by presenting to the Service one of the following, depending on the stage of the alien's immigration proceedings:

(1) If the alien's case is pending in proceedings before the immigration judge, and the alien wishes to continue to pursue his or her asylum application, a copy of any asylum denial, referral notice, or charging document placing the alien in such proceedings;

(2) If the immigration judge has denied asylum, a copy of the document issued by the Board of Immigration Appeals to show that a timely appeal has been filed from a denial of the asylum application by the immigration judge; or

(3) If the Board of Immigration Appeals has dismissed the alien's appeal of a denial of asylum, or sustained an appeal by the Service of a grant of asylum, a copy of the petition for judicial review or for habeas corpus

pursuant to section 242 of the Act, date stamped by the appropriate court.

(d) In order for employment authorization to be renewed before its expiration, the application for renewal must be received by the Service 90 days prior to expiration of the employment authorization.

## §208.8   Limitations on travel outside the United States.

(a) An applicant who leaves the United States without first obtaining advance parole under §212.5(e) of this chapter shall be presumed to have abandoned his or her application under this section.

(b) An applicant who leaves the United States pursuant to advance parole under §212.5(e) of this chapter and returns to the country of claimed persecution shall be presumed to have abandoned his or her application, unless the applicant is able to establish compelling reasons for such return.

## §208.9   Procedure for interview before an asylum officer.

(a) The Service shall adjudicate the claim of each asylum applicant whose application is complete within the meaning of §208.3(c)(3) and is within the jurisdiction of the Service.

(b) The asylum officer shall conduct the interview in a nonadversarial manner and, except at the request of the applicant, separate and apart from the general public. The purpose of the interview shall be to elicit all relevant and useful information bearing on the applicant's eligibility for asylum. At the time of the interview, the applicant must provide complete information regarding his or her identity, including name, date and place of birth, and nationality, and may be required to register this identity electronically or through any other means designated by the Attorney General. The applicant may have counsel or a representative present, may present witnesses, and may submit affidavits of witnesses and other evidence.

(c) The asylum officer shall have authority to administer oaths, verify the identity of the applicant (including through the use of electronic means), verify the identity of any interpreter, present and receive evidence, and question the applicant and any witnesses.

(d) Upon completion of the interview, the applicant or the applicant's representative shall have an opportunity to make a statement or comment on the evidence presented. The asylum officer may, in his or her discretion, limit the length of such statement or comment and may require their submission in writing. Upon completion of the interview, the applicant shall be informed that he or she must appear in person to receive and to acknowledge receipt of the decision of the asylum officer and any other accompanying material at a time and place designated by the asylum officer, except as otherwise provided by the asylum officer. An applicant's failure to appear to receive and acknowledge receipt of the decision shall be treated as delay caused by the applicant for purposes of §208.7(a)(3) and shall extend the period within which the applicant may not apply for employment authorization by the number of days until the applicant does appear to receive and acknowledge receipt of the decision or until the applicant appears before an immigration judge in response to the issuance of a charging document under §208.14(b).

(e) The asylum officer shall consider evidence submitted by the applicant together with his or her asylum application, as well as any evidence submitted by the applicant before or at the interview. As a matter of discretion, the asylum officer may grant the applicant a brief extension of time following an interview during which the applicant may submit additional evidence. Any such extension shall extend by an equivalent time the periods specified by §208.7 for the filing and adjudication of any employment authorization application.

(f) The asylum application, all supporting information provided by the applicant, any comments submitted by the Department of State or by the Service, and any other information specific to the applicant's case and considered by the asylum officer shall comprise the record.

(g) An applicant unable to proceed with the interview in English must provide, at no expense to the Service, a competent interpreter fluent in both English and the applicant's native language. The interpreter must be at least 18 years of age. Neither the applicant's attorney or representative of record, a witness testifying on the applicant's behalf, nor a representative or employee of the applicant's country of nationality, or if stateless, country of last habitual residence, may serve as the applicant's interpreter. Failure without good cause to comply with this paragraph may be considered a failure without good cause to appear for the interview for purposes of §208.10.

## §208.10   Failure to appear at an interview before an asylum officer.

Failure to appear for a scheduled interview without prior authorization may result in dismissal of the application, waiver of the right to an interview, or denial of any application for an employment authorization document. Failure to appear shall be excused if the notice of the interview was not mailed to the applicant's current address and such address had been provided to the Office of International Affairs by the applicant prior to the date of mailing in accordance with section 265 of the Act and regulations promulgated thereunder, unless the asylum officer determines that the applicant received reasonable notice of the interview. Failure to appear will be excused if the applicant demonstrates that such failure was the result of exceptional circumstances.

## §208.11   Comments from the Department of State.

(a) The Service shall forward to the Department of State a copy of each completed application it receives. At its option, the Department of State may provide detailed country conditions information relevant to eligibility for asylum or withholding of removal.

(b) At its option, the Department of State may also provide:

(1) An assessment of the accuracy of the applicant's assertions about conditions in his or her country of nationality or habitual residence and his or her particular situation;

(2) Information about whether persons who are similarly situated to the applicant are persecuted in his or her country of nationality or habitual residence and the frequency of such persecution; or

(3) Such other information as it deems relevant.

(c) Asylum officers and immigration judges may request specific comments from the Department of State regarding individual cases or types of claims under consideration, or such other information as they deem appropriate.

(d) Any such comments received pursuant to paragraphs (b) and (c) of this section shall be made part of the record. Unless the comments are classified under the applicable Executive Order, the applicant shall be provided an opportunity to review and respond to such comments prior to the issuance of any decision to deny the application.

## §208.12   Reliance on information compiled by other sources.

(a) In deciding an asylum application, or whether the alien has a credible fear of persecution pursuant to section 235(b)(1)(B) of the Act, the asylum officer may rely on material provided by the Department of State, the Office of

AR00469

International Affairs, other Service offices, or other credible sources, such as international organizations, private voluntary agencies, news organizations, or academic institutions.

(b) Nothing in this part shall be construed to entitle the applicant to conduct discovery directed toward the records, officers, agents, or employees of the Service, the Department of Justice, or the Department of State.

### § 208.13   Establishing asylum eligibility.

(a) *Burden of proof.* The burden of proof is on the applicant for asylum to establish that he or she is a refugee as defined in section 101(a)(42) of the Act. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. The fact that the applicant previously established a credible fear of persecution for purposes of section 235(b)(1)(B) of the Act does not relieve the alien of the additional burden of establishing eligibility for asylum.

(b) *Persecution.* The applicant may qualify as a refugee either because he or she has suffered actual past persecution or because he or she has a well-founded fear of future persecution.

(1) *Past persecution.* An applicant shall be found to be a refugee on the basis of past persecution if he or she can establish that he or she has suffered persecution in the past in his or her country of nationality or last habitual residence on account of race, religion, nationality, membership in a particular social group, or political opinion, and that he or she is unable or unwilling to return to or avail himself or herself of the protection of that country owing to such persecution.

(i) If it is determined that the applicant has established past persecution, he or she shall be presumed also to have a well-founded fear of persecution unless a preponderance of the evidence establishes that since the time the persecution occurred conditions in the applicant's country of nationality or last habitual residence have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return.

(ii) An application for asylum shall be denied if the applicant establishes past persecution under this paragraph but it is also determined that he or she does not have a well-founded fear of future persecution under paragraph (b)(2) of this section, unless it is determined that the applicant has demonstrated compelling reasons for being unwilling to return to his or her country of nationality or last habitual residence arising out of the severity of the past persecution. If the applicant demonstrates such compelling reasons, he or she may be granted asylum unless such a grant is barred by paragraph (c) of this section.

(2) *Well-founded fear of persecution.* An applicant shall be found to have a well-founded fear of persecution if he or she can establish first, that he or she has a fear of persecution in his or her country of nationality or last habitual residence on account of race, religion, nationality, membership in a particular social group, or political opinion; second, that there is a reasonable possibility of actually suffering such persecution if he or she were to return to that country; and third, that he or she is unable or unwilling to return to or avail himself or herself of the protection of that country because of such fear. In evaluating whether the applicant has sustained his or her burden of proving that he or she has a well-founded fear of persecution, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for persecution if:

(i) The applicant establishes that there is a pattern or practice in his or her country of nationality or last habitual residence of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that his or her fear of persecution upon return is reasonable.

(c) *Mandatory denials.* (1) *Applications filed on or after April 1, 1997.* For applications filed on or after April 1, 1997, an applicant shall not qualify for asylum if section 208(a)(2) or 208(b)(2) of the Act applies to the applicant. If the evidence indicates that the applicant may be ineligible under section 208(a)(2) of the Act to apply for asylum, or under section 208(b)(2) of the Act to be granted asylum, the applicant shall have the burden of proving by a preponderance of the evidence, or in the case of an alien described in section 208(a)(2)(B) of the Act by clear and convincing evidence, that he or she is eligible.

(2) *Applications filed before April 1, 1997.* An immigration judge or asylum officer shall not grant asylum to any applicant who filed his or her application before April 1, 1997, if the alien:

(i) Having been convicted by a final judgment of a particularly serious crime in the United States, constitutes a danger to the community;

(ii) Has been firmly resettled within the meaning of § 208.15;

(iii) Can reasonably be regarded as a danger to the security of the United States;

(iv) Has been convicted of an aggravated felony, as defined in section 101(a)(43) of the Act; or

(v) Ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion. If the evidence indicates that one of the above grounds apply to the applicant, he or she shall have the burden of proving by a preponderance of the evidence that he or she did not so act.

(d) *Discretionary denial.* An asylum application may be denied in the discretion of the Attorney General if the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution.

### § 208.14   Approval, denial, or referral of application.

(a) *By an immigration judge.* Unless otherwise prohibited in § 208.13(c), an immigration judge may grant or deny asylum in the exercise of discretion to an applicant who qualifies as a refugee under section 101(a)(42) of the Act.

(b) *By an asylum officer.* Unless otherwise prohibited in § 208.13(c):

(1) An asylum officer may grant asylum in the exercise of discretion to an applicant who qualifies as a refugee under section 101(a)(42) of the Act.

(2) If the alien appears to be deportable, excludable or removable under section 240 of the Act, the asylum officer shall either grant asylum or refer the application to an immigration judge for adjudication in deportation, exclusion, or removal proceedings. An asylum officer may refer such an application after an interview conducted in accordance with § 208.9 or if, in accordance with § 208.10, the applicant is deemed to have waived his or her right to an interview.

(3) If the applicant is maintaining valid nonimmigrant status at the time the application is decided, the asylum officer may grant or deny asylum, except in the case of an applicant described in § 208.2(b)(1).

(c) *Applicability of § 103.2(b) of this chapter.* No application for asylum or withholding of deportation shall be subject to denial pursuant to § 103.2(b) of this chapter.

(d) *Duration.* If the alien's asylum application is granted, the grant will be effective for an indefinite period, subject to termination as provided in § 208.22.

## §208.15  Definition of "firm resettlement."

An alien is considered to be firmly resettled if, prior to arrival in the United States, he entered into another nation with, or while in that nation received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he establishes:

(a) That his entry into that nation was a necessary consequence of his flight from persecution, that he remained in that nation only as long as was necessary to arrange onward travel, and that he did not establish significant ties in that nation; or

(b) That the conditions of his residence in that nation were so substantially and consciously restricted by the authority of the country of refuge that he was not in fact resettled. In making his determination, the Asylum Officer or Immigration Judge shall consider the conditions under which other residents of the country live, the type of housing made available to the refugee, whether permanent or temporary, the types and extent of employment available to the refugee, and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation including a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

## §208.16  Withholding of removal.

(a) *Consideration of application for withholding of removal.* An asylum officer shall not decide whether the exclusion, deportation, or removal of an alien to a country where the alien's life or freedom would be threatened must be withheld, except in the case of an alien who is otherwise eligible for asylum but is precluded from being granted such status due solely to section 207(a)(5) of the Act. In exclusion, deportation, or removal proceedings, an immigration judge may adjudicate both an asylum claim and a request for withholding of removal whether or not asylum is granted.

(b) *Eligibility for withholding of removal; burden of proof.* The burden of proof is on the applicant for withholding of removal to establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. The evidence shall be evaluated as follows:

(1) The applicant's life or freedom shall be found to be threatened if it is more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion.

(2) If the applicant is determined to have suffered persecution in the past such that his or her life or freedom was threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that his or her life or freedom would be threatened on return to that country unless a preponderance of the evidence establishes that conditions in the country have changed to such an extent that it is no longer more likely than not that the applicant would be so persecuted there.

(3) In evaluating whether the applicant has sustained the burden of proving that his or her life or freedom would be threatened in a particular country on account of race, religion, nationality, membership in a particular social group, or political opinion, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for such persecution if:

(i) The applicant establishes that there is a pattern or practice in the country of proposed removal of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that it is more likely than not that his or her life or freedom would be threatened upon return.

(c) *Approval or denial of application.* (1) *General.* Subject to paragraphs (c)(2) and (c)(3) of this section, an application for withholding of deportation or removal to a country of proposed removal shall be granted if the applicant's eligibility for withholding is established pursuant to paragraph (b) of this section.

(2) *Mandatory denials.* Except as provided in paragraph (c)(3) of this section, an application for withholding of removal shall be denied if the applicant falls within section 241(b)(3)(B) of the Act or, for applications for withholding of deportation adjudicated in proceedings commenced prior to April 1, 1997, within section 243(h)(2) of the Act as it appeared prior to that date. For purposes of section 241(b)(3)(B)(ii) of

the Act, or section 243(h)(2)(B) of the Act as it appeared prior to April 1, 1997, an alien who has been convicted of a particularly serious crime shall be considered to constitute a danger to the community. If the evidence indicates the applicability of one or more of the grounds for denial enumerated in the Act, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

(3) *Exception to the prohibition on withholding of deportation in certain cases.* Section 243(h)(3) of the Act, as added by section 413 of Pub. L. 104–132, shall apply only to applications adjudicated in proceedings commenced before April 1, 1997, and in which final action had not been taken before April 24, 1996. The discretion permitted by that section to override section 243(h)(2) shall be exercised only in the case of an applicant convicted of an aggravated felony (or felonies) where he or she was sentenced to an aggregate term of imprisonment of less than 5 years and the immigration judge determines on an individual basis that the crime (or crimes) of which the applicant was convicted does not constitute a particularly serious crime. Except in the cases specified in this paragraph, the grounds for denial of withholding of deportation in section 243(h)(2) of the Act as it appeared prior to April 1, 1997, shall be deemed to comply with the 1967 Protocol Relating to the Status of Refugees.

(d) *Reconsideration of discretionary denial of asylum.* In the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal under this section, thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her, the denial of asylum shall be reconsidered. Factors to be considered will include the reasons for the denial and reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country.

## §208.17  Decisions.

The decision of an asylum officer to grant or to deny asylum or withholding of removal, or to refer an asylum application in accordance with §208.14(b), shall be communicated in writing to the applicant. Notices of decisions to grant or deny asylum by asylum officers shall generally be served in person unless, in the discretion of the asylum office director, routine service by mail is appropriate. A letter communicating denial of the

AR00471

application shall state the basis for denial of the asylum application. The letter also shall contain an assessment of the applicant's credibility, unless the denial is the result of the applicant's conviction of an aggravated felony. Pursuant to § 208.9(d), an applicant must appear in person to receive and to acknowledge receipt of the decision.

### § 208.18   Determining if an asylum application is frivolous.

For applications filed on or after April 1, 1997, an applicant is subject to the provisions of section 208(d)(6) of the Act only if a final order by an immigration judge or the Board of Immigration Appeals specifically finds that the alien knowingly filed a frivolous asylum application. An asylum application is frivolous if it is fabricated or is brought for an improper purpose. Such finding shall only be made if the immigration judge or the Board is satisfied that the applicant, during the course of the proceedings, has had sufficient opportunity to account for any discrepancies or implausible aspects of the claim.

### § 208.19   [Reserved]

### § 208.20   Effect on exclusion, deportation and removal proceedings.

(a) An alien who has been granted asylum may not be deported or removed unless his or her asylum status is terminated pursuant to § 208.22. An alien in exclusion, deportation, or removal proceedings who is granted withholding of removal or deportation may not be deported or removed to the country to which his or her deportation or removal is ordered withheld unless the withholding order is terminated pursuant to § 208.22.

(b) When an alien's asylum status or withholding of removal or deportation is terminated under this chapter, the Service shall initiate removal proceedings under section 235 or 240 of the Act, as appropriate, if the alien is not already in exclusion, deportation, or removal proceedings. Removal proceedings may also be in conjunction with a termination hearing scheduled under § 208.22(e).

### § 208.21   Restoration of status.

An alien who was maintaining his or her nonimmigrant status at the time of filing an asylum application and has such application denied may continue in or be restored to that status, if it has not expired.

### § 208.22   Termination of asylum or withholding of removal or deportation.

(a) *Termination of asylum by the Service*. Except as provided in

paragraph (e) of this section, an asylum officer may terminate a grant of asylum made under the jurisdiction of an asylum officer or a district director if following an interview, the asylum officer determines that:

(1) There is a showing of fraud in the alien's application such that he or she was not eligible for asylum at the time it was granted;

(2) As to the applications filed on or after April 1, 1997, one or more of the conditions described in section 208(c)(2) of the Act exist; or

(3) As to applications filed before April 1, 1997, the alien no longer has a well-founded fear of persecution upon return due to a change of country conditions in the alien's country of nationality or habitual residence or the alien has committed any act that would have been grounds for denial of asylum under § 208.14(e)(2).

(b) *Termination of withholding of deportation or removal by the Service*. Except as provided in paragraph (e) of this section, an asylum officer may terminate a grant of withholding of deportation or removal made under the jurisdiction of an asylum officer or a district director if the asylum officer determines, following an interview, that:

(1) The alien is no longer entitled to withholding of deportation or removal due to a change of conditions in the country to which removal was withheld;

(2) There is a showing of fraud in the alien's application such that the alien was not eligible for withholding of removal at the time it was granted;

(3) The alien has committed any other act that would have been grounds for denial of withholding of removal under section 241(b)(3)(B) of the Act had it occurred prior to the grant of withholding of removal; or

(4) For applications filed in proceedings commenced before April 1, 1997, the alien has committed any act that would have been grounds for denial of withholding of deportation under section 243(h)(2) of the Act.

(c) *Procedure*. Prior to the termination of a grant of asylum or withholding of deportation or removal, the alien shall be given notice of intent to terminate, with the reasons therefor, at least 30 days prior to the interview specified in paragraph (a) of this section before an asylum officer. The alien shall be provided the opportunity to present evidence showing that he or she is still eligible for asylum or withholding of deportation or removal. If the asylum officer determines that the alien is no longer eligible for asylum or withholding of deportation or removal, the alien shall be given written notice

that asylum status or withholding of deportation or removal and any employment authorization issued pursuant thereto, are terminated.

(d) *Termination of derivative status*. The termination of asylum status for a person who was the principal applicant shall result in termination of the asylum status of a spouse or child whose status was based on the asylum application of the principal. Such termination shall not preclude the spouse or child of such alien from separately asserting an asylum or withholding of deportation or removal claim.

(e) *Termination of asylum or withholding of deportation or removal by the Executive Office for Immigration Review*. An immigration judge or the Board of Immigration Appeals may reopen a case pursuant to § 3.2 or § 3.23 of this chapter for the purpose of terminating a grant of asylum or withholding of deportation or removal made under the jurisdiction of an immigration judge. In such a reopened proceeding, the Service must establish, by a preponderance of evidence, one or more of the grounds set forth in paragraphs (a) or (b) of this section. In addition, an immigration judge may terminate a grant of asylum or withholding of deportation or removal made under the jurisdiction of the Service at any time after the alien has been provided a notice of intent to terminate by the Service. Any termination under this paragraph may occur in conjunction with an exclusion, deportation or removal proceeding.

(f) *Termination of asylum for arriving aliens*. If the Service determines that an applicant for admission who had previously been granted asylum in the United States falls within conditions set forth in section 208(c)(2) of the Act and is inadmissible, the Service shall issue a notice of intent to terminate asylum and initiate removal proceedings under section 240 of the Act. The alien shall present his or her response to the intent to terminate during proceedings before the immigration judge.

### §§ 208.23–208.29   [Reserved]

## Subpart B—Credible Fear of Persecution

### § 208.30   Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

(a) *Jurisdiction*. The provisions of this subpart apply to aliens subject to sections 235(a)(2) and 235(b)(1) of the Act. Pursuant to section 235(b)(1)(B) of the Act, the Service has exclusive jurisdiction to make credible fear determinations, and the Executive

Office for Immigration Review has exclusive jurisdiction to review such determinations. Except as otherwise provided in this subpart, paragraphs (b) through (e) of this section are the exclusive procedures applicable to credible fear interviews, determinations, and review under section 235(b)(1)(B) of the Act.

(b) *Interview and procedure*. The asylum officer, as defined in section 235(b)(1)(E) of the Act, will conduct the interview in a nonadversarial manner and separate and apart from the general public. At the time of the interview, the alien may be required to register his or her identity electronically or through any other means designated by the Attorney General. The alien may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, and may present other evidence when available. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process. Any person or persons with whom the alien chooses to consult may be present at the interview and may be permitted, in the discretion of the asylum officer, to present a brief statement at the end of the interview. The asylum officer, in his or her discretion, may place reasonable limits on the number of such persons who may be present at the interview and on the length of statement or statements made. If the alien is unable to proceed in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. The interpreter may not be a representative or employee of the applicant's country of nationality or, if the applicant is stateless, the applicant's country of last habitual residence.

(c) *Authority*. Asylum officers conducting credible fear interviews shall have the authorities described in § 208.9(c).

(d) *Referral for an asylum hearing*. If an alien, other than an alien stowaway, is found to have a credible fear of persecution, the asylum officer will so inform the alien, arrange for his or her detention, and issue a Form I–862, Notice to Appear, for full consideration of the asylum claim in proceedings under section 240 of the Act. Parole of the alien may only be considered in accordance with section 212(d)(5) of the Act and § 212.5 of this chapter. If an alien stowaway is found to have a credible fear of persecution, the asylum officer will so inform the alien, arrange for his or her detention, and issue a Form I–863, Notice to Referral to

Immigration Judge, for full consideration of the asylum claim in proceedings under § 208.2(b)(1).

(e) *Removal of aliens with no credible fear of persecution*. If an alien, other than an alien stowaway, is found not to have a credible fear of persecution, the asylum officer shall order the alien removed and issue a Form I–860, Notice and Order of Expedited Removal. If an alien stowaway is found not to have a credible fear of persecution, the asylum officer shall order the alien removed from the United States in accordance with section 235(a)(2) of the Act. The asylum officer shall also advise the alien of his or her right to request that an immigration judge review the negative decision.

(f) *Review by immigration judge*. The asylum officer's negative decision regarding credible fear shall be subject to review by an immigration judge upon the applicant's verbal or written request, in accordance with section 235(b)(1)(B)(iii)(III) of the Act. If the alien requests such review, the asylum officer shall arrange for the detention of the alien and serve him or her with a Form I–863, Notice of Referral to Immigration Judge. Copies of the Form I–863, the asylum officer's notes, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination. Upon review of the asylum officer's negative credible fear determination:

(1) If the immigration judge concurs with the determination of the asylum officer that the alien does not have a credible fear of persecution, the case shall be returned to the Service for removal of the alien.

(2) If the immigration judge finds that the alien, other than an alien stowaway, possesses a credible fear of persecution, the immigration judge shall vacate the order of the asylum officer issued on Form I–860 and the Service may commence removal proceedings under section 240 of the Act, during which time the alien may file an asylum application in accordance with § 208.4(b)(3)(i).

(3) If the immigration judge finds that an alien stowaway possesses a credible fear of persecution, the alien shall be allowed to file an asylum application before the immigration judge in accordance with § 208.4(b)(3)(iii). The immigration judge shall decide the asylum application as provided in that section. Such decision may be appealed by either the stowaway or the Service to the Board of Immigration Appeals. If and when a denial of the asylum application becomes final, the alien shall be removed from the United States

in accordance with section 235(a)(2) of the Act. If and when an approval of the asylum application becomes final, the Service shall terminate removal proceedings under section 235(a)(2) of the Act.

## PART 209—ADJUSTMENT OF STATUS OF REFUGEES AND ALIENS GRANTED ASYLUM

42. The authority citation for part 209 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1157, 1158, 1159, 1228, 1252, 1282; 8 CFR part 2.

### § 209.1   [Amended]

43. In § 209.1, paragraph (a)(1) is amended in the first sentence by revising the reference to ''. 236, and 237'' to read ''and 240''.

44. In § 209.2, the last sentence of paragraph (c) is revised to read as follows:

### § 209.2   Adjustment of status of alien granted asylum.

\*     \*     \*     \*     \*

(c) *Application*. \* \* \* If an alien has been placed in deportation, exclusion, or removal proceedings under any section of this Act (as effective on the date such proceedings commenced), the application can be filed and considered only in those proceedings.

\*     \*     \*     \*     \*

## PART 211—DOCUMENTARY REQUIREMENTS; IMMIGRANTS; WAIVERS

45. The authority citation for part 211 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1181, 1182, 1203, 1225, 1257; 8 CFR part 2.

46. Part 211 is revised to read as follows:

Sec.
211.1  Visas.
211.2  Passports.
211.3  Expiration of immigrant visas, reentry permits, refugee travel documents, and Forms I–551.
211.4  Waiver of documents for returning residents.
211.5  Alien commuters.

### § 211.1   Visas.

(a) *General*. Except as provided in paragraph (b) of this section, each arriving alien applying for admission (or boarding the vessel or aircraft on which he or she arrives) into the United States for lawful permanent residence, or as a returning lawful permanent resident, shall present one of the following:

(1) A valid, unexpired immigrant visa;

(2) A valid, unexpired Form I–551, Alien Registration Receipt Card, if seeking readmission after a temporary

absence of less than one year, or in the case of a crewmember regularly serving on board a vessel or aircraft of United States registry seeking readmission after any job-connected absence;

(3) A valid, unexpired Form I–327, Permit to Reenter the United States;

(4) A valid, unexpired Form I–571, Refugee Travel Document, properly endorsed to reflect admission as a lawful permanent resident;

(5) An expired Form I–551, Alien Registration Receipt Card, accompanied by a filing receipt issued within the previous six months for either a Form I–751, Petition to Remove the Conditions on Residence, or Form I–829, Petition by Entrepreneur to Remove Conditions, if seeking admission or readmission after a temporary absence of less than one year;

(6) A Form I–551, whether or not expired, presented by a civilian or military employee of the United States Government, who was outside the United States pursuant to official orders, or the spouse or child of such employee who is preceding, accompanying or following to join within four months the employee, returning to the United States; or

(7) Form I–551, whether or not expired, or a transportation letter issued by an American consular officer, presented by an employee of the American University of Beirut, returning temporarily to the United States before resuming employment with the American University of Beirut, or resuming permanent residence in the United States.

(b) *Waivers.* (1) A waiver of the visa required in paragraph (a) of this section shall be granted without fee by the district director, upon presentation of the child's birth certificate, to a child born subsequent to the issuance of an immigrant visa to his or her accompanying parent who applies for admission during the validity of such a visa; or a child born during the temporary visit abroad of a mother who is a lawful permanent resident alien, or a national, of the United States, provided that the child's application for admission to the United States is made within two years of birth, the child is accompanied by the parent who is applying for readmission as a permanent resident upon the first return of the parent to the United States after the birth of the child, and the accompanying parent is found to be admissible to the United States.

(2) For an alien described in paragraph (b)(1) of this section, recordation of the child's entry shall be on Form I–181, Memorandum of Creation of Record of Admission for Lawful Permanent Residence. The carrier of such alien shall not be liable for a fine pursuant to section 273 of the Act.

(3) If an immigrant alien returning to an unrelinquished lawful permanent residence in the United States after a temporary absence abroad believes that good cause exists for his or her failure to present an immigrant visa, Form I–551, or reentry permit, the alien may file an application for a waiver of this requirement with the district director in charge of the port-of-entry. To apply for this waiver, the alien must file Form I–193, Application for Waiver of Passport and/or Visa, with the fee prescribed in § 103.7(b)(1) of this chapter, *except* that if the alien's Form I–551 was lost or stolen, the alien shall instead file Form I–90, Application to Replace Alien Registration Receipt Card, with the fee prescribed in § 103.7(b)(1) of this chapter. In the exercise of discretion, the district director in charge of the port-of-entry may waive the alien's lack of an immigrant visa, Form I–551, or reentry permit and admit the alien as a returning resident, if the district director is satisfied that the alien has established good cause for the alien's failure to present an immigrant visa, Form I–551, or reentry permit.

(c) *Immigrants having occupational status defined in section 101(a)(15)(A), (E), or (G) of the Act.* An immigrant visa, reentry permit, or Form I–551 shall be invalid when presented by an alien who has an occupational status under section 101(a)(15)(A), (E), or (G) of the Act, unless he or she has previously submitted, or submits at the time he or she applies for admission to the United States, the written waiver required by section 247(b) of the Act and 8 CFR part 247.

(d) *Returning temporary residents.* (1) Form I–688, Temporary Resident Card, may be presented in lieu of an immigrant visa by an alien whose status has been adjusted to that of a temporary resident under the provisions of § 210.1 of this chapter, such status not having changed, and who is returning to an unrelinquished residence within one year after a temporary absence abroad.

(2) Form I–688 may be presented in lieu of an immigrant visa by an alien whose status has been adjusted to that of a temporary resident under the provisions of § 245a.2 of this chapter, such status not having changed, and who is returning to an unrelinquished residence within 30 days after a temporary absence abroad, provided that the aggregate of all such absences abroad during the temporary residence period has not exceeded 90 days.

## § 211.2 Passports.

(a) A passport valid for the bearer's entry into a foreign country at least 60 days beyond the expiration date of his or her immigrant visa shall be presented by each immigrant except an immigrant who:

(1) Is the parent, spouse, or unmarried son or daughter of a United States citizen or of an alien lawful permanent resident of the United States,

(2) Is entering under the provisions of § 211.1(a)(2) through (a)(7), or § 211.1(b)(1),

(3) Is a stateless person or a person who because of his or her opposition to Communism is unwilling or unable to obtain a passport from the country of his or her nationality, or is the accompanying spouse or unmarried son or daughter of such immigrant,

(4) Is a member of the Armed Forces of the United States,

(b) If an alien seeking admission as an immigrant with an immigrant visa believes that good cause exists for his or her failure to present a passport, the alien may file an application for a waiver of this requirement with the district director in charge of the port-of-entry. To apply for this waiver, the alien must file Form I–193, Application for Waiver of Passport and/or Visa, with the fee prescribed in § 103.7(b)(1) of this chapter. In the exercise of discretion, the district director in charge of the port-of-entry may waive the alien's lack of passport and admit the alien as an immigrant, if the district director is satisfied that the alien has established good cause for the alien's failure to present a passport.

## § 211.3 Expiration of immigrant visas, reentry permits, refugee travel document, and Form I–551.

An immigrant visa, reentry permit, refugee travel document, or Form I–551 shall be regarded as unexpired if the rightful holder embarked or enplaned before the expiration of his immigrant visa, reentry permit, or refugee travel document, or, with respect to Form I–551, before the first anniversary of the date on which he departed from the United States: provided, that the vessel or aircraft on which he so embarked or enplaned arrives in the United States or foreign contiguous territory on a continuous voyage. The continuity of the voyage shall not be deemed to have been interrupted by scheduled or emergency stops of the vessel or aircraft en route to the United States or foreign contiguous territory, or by a layover in foreign contiguous territory necessitated solely for the purpose of effecting a transportation connection to the United States.

**AR00474**

### §211.4   Waiver of documents for returning residents.

(a) Pursuant to the authority contained in section 211(b) of the Act, an alien previously lawfully admitted to the United States for permanent residence who, upon return from a temporary absence was inadmissible because of failure to have or to present a valid passport, immigrant visa, reentry permit, border crossing card, or other document required at the time of entry, may be granted a waiver of such requirement in the discretion of the district director if the district director determines that such alien:

(1) Was not otherwise inadmissible at the time of entry, or

(2) Having been otherwise inadmissible at the time of entry is with respect thereto qualified for an exemption from deportability under section 237(a)(1)(H) of the Act, and

(3) Is not otherwise subject to removal.

(b) Denial of a waiver by the district director is not appealable but shall be without prejudice to renewal of an application and reconsideration in proceedings before the immigration judge.

### §211.5   Alien commuters.

(a) *General*. An alien lawfully admitted for permanent residence or a special agricultural worker lawfully admitted for temporary residence under section 210 of the Act may commence or continue to reside in foreign contiguous territory and commute as a special immigrant defined in section 101(a)(27)(A) of the Act to his or her place of employment in the United States. An alien commuter engaged in seasonal work will be presumed to have taken up residence in the United States if he or she is present in this country for more than six months, in the aggregate, during any continuous 12-month period. An alien commuter's address report under section 265 of the Act must show his or her actual residence address even though it is not in the United States.

(b) *Loss of residence status*. An alien commuter who has been out of regular employment in the United States for a continuous period of six months shall be deemed to have lost residence status, notwithstanding temporary entries in the interim for other than employment purposes. An exception applies when employment in the United States was interrupted for reasons beyond the individual's control other than lack of a job opportunity or the commuter can demonstrate that he or she has worked 90 days in the United States in the aggregate during the 12-month period preceding the application for admission into the United States.

(c) *Eligibility for benefits under the immigration and nationality laws*. Until he or she has taken up residence in the United States, an alien commuter cannot satisfy the residence requirements of the naturalization laws and cannot qualify for any benefits under the immigration laws on his or her own behalf or on behalf of his or her relatives other than as specified in paragraph (a) of this section. When an alien commuter takes up residence in the United States, he or she shall no longer be regarded as a commuter. He or she may facilitate proof of having taken up such residence by notifying the Service as soon as possible, preferably at the time of his or her first reentry for that purpose. Application for issuance of a new alien registration receipt card to show that he or she has taken up residence in the United States shall be made on Form I–90.

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

47. The authority citation for part 212 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1187, 1225, 1226, 1227, 1228, 1252; 8 CFR part 2.

48. Section 212.5 is amended by:

a. Revising paragraph (a) and (b);

b. Revising introductory text in paragraph (c);

c. Revising paragraph (c)(1); and by

d. Revising paragraph (d)(2)(i), to read as follows:

### §212.5   Parole of aliens into the United States.

(a) The parole of aliens within the following groups who have been or are detained in accordance with § 235.3 (b) or (c) of this chapter would generally be justified for "urgent humanitarian reasons" or "significant public benefit," provided the aliens present neither a security risk nor a risk of absconding:

(1) Aliens who have serious medical conditions in which continued detention would not be appropriate;

(2) Women who have been medically certified as pregnant;

(3) Aliens who are defined as juveniles in § 236.3(a) of this chapter. The district director or chief patrol agent shall follow the guidelines set forth in § 236.3(a) of this chapter in determining under what conditions a juvenile should be paroled from detention;

(i) Juveniles may be released to a relative (brother, sister, aunt, uncle) not in Service detention who is willing to sponsor a minor and the minor may be released to that relative notwithstanding that the juvenile has a relative who is in detention.

(ii) If a relative who is not in detention cannot be located to sponsor the minor, the minor may be released with an accompany relative who is in detention.

(iii) If the Service cannot locate a relative in or out of detention to sponsor the minor, but the minor has identified a nonrelative in detention who accompanied him on arrival, the question of releasing the minor and the accompanying nonrelative adult shall be addressed on a case-by-case basis.

(4) Aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; or

(5) Aliens whose continued detention is not in the public interest as determined by the district director or chief patrol agent.

(b) In the case of all other arriving aliens, except those detained under § 235.3 (b) or (c) of this chapter and paragraph (a) of this section, the district director or chief patrol agent may, after review of the individual case, parole into the United States temporarily in accordance with section 212(d)(5)(A) of the Act, any alien applicant for admission, under such terms and conditions, including those set forth in paragraph (c) of this section, as he or she may deem appropriate. An alien who arrives at a port-of-entry and applies for parole into the United States for the sole purpose of seeking adjustment of status under section 245A of the Act, without benefit of advance authorization as described in paragraph (e) of this section shall be denied parole and detained for removal in accordance with the provisions of § 235.3 (b) or (c) of this chapter. An alien seeking to enter the United States for the sole purpose of applying for adjustment of status under section 210 of the Act shall be denied parole and detained for removal under § 235.3 (b) or (c) of this chapter, unless the alien has been recommended for approval of such application for adjustment by a consular officer at an Overseas Processing Office.

(c) *Conditions*. In any case where an alien is paroled under paragraph (a) or (b) of this section, the district director or chief patrol agent may require reasonable assurances that the alien will appear at all hearings and/or depart the United States when required to do so. Not all factors listed need be present for parole to be exercised. The district director or chief patrol agent should apply reasonable discretion. The

**AR00475**

consideration of all relevant factors includes:

(1) The giving of an undertaking by the applicant, counsel, or a sponsor to ensure appearances or departure, and a bond may be required on Form I–352 in such amount as the district director or chief patrol agent may deem appropriate;

\* \* \* \* \*

(d) \* \* \*

(2)(i) *On notice.* In cases not covered by paragraph (d)(1) of this section, upon accomplishment of the purpose for which parole was authorized or when in the opinion of the district director or chief patrol agent in charge of the area in which the alien is located, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien and he or she shall be restored to the status that he or she had at the time of parole. When a charging document is served on the alien, the charging document will constitute written notice of termination of parole, unless otherwise specified. Any further inspection or hearing shall be conducted under section 235 or 250 of the Act and this chapter, or any order of exclusion, deportation, or removal previously entered shall be executed. If the exclusion, deportation, or removal order cannot be executed by removal within a reasonable time, the alien shall again be released on parole unless in the opinion of the district director or the chief patrol agent the public interest requires that the alien be continued in custody.

\* \* \* \* \*

49. In § 212.6 paragraph (a)(2) is revised to read as follows:

### § 212.6   Nonresident alien border crossing cards.

(a) \* \* \*

(2) *Mexican border crossing card, Form I–186 or I–586.* The rightful holder of a nonresident alien Mexican border crossing card, Form I–186 or I–586, may be admitted under § 235.1(f) of this chapter if found otherwise admissible. However, any alien seeking entry as a visitor for business or pleasure must also present a valid passport and shall be issued Form I–94 if the alien is applying for admission from:

(i) A country other than Mexico or Canada, or

(ii) Canada if the alien has been in a country other than the United States or Canada since leaving Mexico.

\* \* \* \* \*

## PART 213—ADMISSION OF ALIENS ON GIVING BOND OR CASH DEPOSIT

50. The authority citation for part 213 is revised to read as follows:

**Authority:** 8 U.S.C. 1103; 8 CFR part 2.

### § 213.1   [Amended]

51. Section 213.1 is amended in the last sentence by revising the term "part 103" to read "§ 103.6".

## PART 214—NONIMMIGRANT CLASSES

52. The authority citation for part 214 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282; 8 CFR part 2.

53. Section 214.1 is amended by revising paragraph (c)(4)(iv) to read as follows:

### § 214.1   Requirements for admission, extension, and maintenance of status.

\* \* \* \* \*

(c) \* \* \*

(4) \* \* \*

(iv) The alien is not the subject of deportation proceedings under section 242 of the Act (prior to April 1, 1997) or removal proceedings under section 240 of the Act.

\* \* \* \* \*

## PART 215—[REMOVED]

54. Part 215 is removed.

## PART 216—CONDITIONAL BASIS OF LAWFUL PERMANENT RESIDENCE STATUS

55. The authority citation for part 216 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1154, 1184, 1186a, 1186b, and 8 CFR part 2.

Section 216.3 is revised to read as follows:

### § 216.3   Termination of conditional resident status.

(a) *During the two-year conditional period.* The director shall send a formal written notice to the conditional permanent resident of the termination of the alien's conditional permanent resident status if the director determines that any of the conditions set forth in section 216(b)(1) or 216A(b)(1) of the Act, whichever is applicable, are true, or it becomes known to the government that an alien entrepreneur who was admitted pursuant to section 203(b)(5) of the Act obtained his or her investment capital through other than legal means (such as through the sale of illegal drugs). If the Service issues a notice of intent to terminate an alien's conditional resident status, the director shall not adjudicate Form I–751 or Form

I–829 until it has been determined that the alien's status will not be terminated. During this time, the alien shall continue to be a lawful conditional permanent resident with all the rights, privileges, and responsibilities provided to persons possessing such status. Prior to issuing the notice of termination, the director shall provide the alien with an opportunity to review and rebut the evidence upon which the decision is to be based, in accordance with § 103.2(b)(2) of this chapter. The termination of status, and all of the rights and privileges concomitant thereto (including authorization to accept or continue in employment in this country), shall take effect as of the date of such determination by the director, although the alien may request a review of such determination in removal proceedings. In addition to the notice of termination, the director shall issue a notice to appear in accordance with 8 CFR part 239. During the ensuing removal proceedings, the alien may submit evidence to rebut the determination of the director. The burden of proof shall be on the Service to establish, by a preponderance of the evidence, that one or more of the conditions in section 216(b)(1) or 216A(b)(1) of the Act, whichever is applicable, are true, or that an alien entrepreneur who was admitted pursuant to section 203(b)(5) of the Act obtained his or her investment capital through other than legal means (such as through the sale of illegal drugs).

(b) *Determination of fraud after two years.* If, subsequent to the removal of the conditional basis of an alien's permanent resident status, the director determines that an alien spouse obtained permanent resident status through a marriage which was entered into for the purpose of evading the immigration laws or an alien entrepreneur obtained permanent resident status through a commercial enterprise which was improper under section 216A(b)(1) of the Act, the director may institute rescission proceedings pursuant to section 246 of the Act (if otherwise appropriate) or removal proceedings under section 240 of the Act.

57. Section 216.4 is amended by:

a. Revising paragraphs (a)(6) and (b)(3);

b. Revising paragraph (c)(4);

c. Removing the unnumbered paragraph immediately after paragraph (c)(4); and by

d. Revising paragraph (d)(2) to read as follows:

**§ 216.4   Joint petition to remove conditional basis of lawful permanent resident status for alien spouse.**

(a) * * *

(6) *Termination of status for failure to file petition.* Failure to properly file Form I–751 within the 90-day period immediately preceding the second anniversary of the date on which the alien obtained lawful permanent residence on a conditional basis shall result in the automatic termination of the alien's permanent residence status and the initiation of proceedings to remove the alien from the United States. In such proceedings the burden shall be on the alien to establish that he or she complied with the requirement to file the joint petition within the designated period. Form I–751 may be filed after the expiration of the 90-day period only if the alien establishes to the satisfaction of the director, in writing, that there was good cause for the failure to file Form I–751 within the required time period. If the joint petition is filed prior to the jurisdiction vesting with the immigration judge in removal proceedings and the director excuses the late filing and approves the petition, he or she shall restore the alien's permanent residence status, remove the conditional basis of such status and cancel any outstanding notice to appear in accordance with § 239.2 of this chapter. If the joint petition is not filed until after jurisdiction vests with the immigration judge, the immigration judge may terminate the matter upon joint motion by the alien and the service.

(b) * * *

(3) *Termination of status for failure to appear for interview.* If the conditional resident alien and/or the petitioning spouse fail to appear for an interview in connection with the joint petition required by section 216(c) of the Act, the alien's permanent residence status will be automatically terminated as of the second anniversary of the date on which the alien obtained permanent residence. The alien shall be provided with written notification of the termination and the reasons therefor, and a notice to appear shall be issued placing the alien under removal proceedings. The alien may seek review of the decision to terminate his or her status in such proceedings, but the burden shall be on the alien to establish compliance with the interview requirements. If the alien submits a written request that the interview be rescheduled or that the interview be waived, and the director determines that there is good cause for granting the request, the interview may be rescheduled or waived, as appropriate.

If the interview is rescheduled at the request of the petitioners, the Service shall not be required to conduct the interview within the 90-day period following the filing of the petition.

(c) * * *

(4) A fee or other consideration was given (other than a fee or other consideration to an attorney for assistance in preparation of a lawful petition) in connection with the filing of the petition through which the alien obtained conditional permanent residence. If derogatory information is determined regarding any of these issues, the director shall offer the petitioners the opportunity to rebut such information. If the petitioners fail to overcome such derogatory information the director may deny the joint petition, terminate the alien's permanent residence, and issue a notice to appear to initiate removal proceedings. If derogatory information not relating to any of these issues is determined during the course of the interview, such information shall be forwarded to the investigations unit for appropriate action. If no unresolved derogatory information is determined relating to these issues, the petition shall be approved and the conditional basis of the alien's permanent residence status removed, regardless of any action taken or contemplated regarding other possible grounds for removal.

(d) * * *

(2) *Denial.* If the director denies the joint petition, he or she shall provide written notice to the alien of the decision and the reason(s) therefor and shall issue a notice to appear under section 239 of the Act and 8 CFR part 239. The alien's lawful permanent residence status shall be terminated as of the date of the director's written decision. The alien shall also be instructed to surrender any Alien Registration Receipt Card previously issued by the Service. No appeal shall lie from the decision of the director; however, the alien may seek review of the decision in removal proceedings. In such proceedings the burden of proof shall be on the Service to establish, by a preponderance of the evidence, that the facts and information set forth by the petitioners are not true or that the petition was properly denied.

58. Section 216.5 is amended by revising paragraphs (a)(1), (d), (e)(1), (e)(3)(ii), and (f) to read as follows:

**§ 216.5   Waiver of requirement to file joint petition to remove conditions by alien spouse.**

(a) * * *

(1) Removal from the United States would result in extreme hardship;

*   *   *   *   *

(d) *Interview.* The service center director may refer the application to the appropriate local office and require that the alien appear for an interview in connection with the application for a waiver. The director shall deny the application and initiate removal proceedings if the alien fails to appear for the interview as required, unless the alien establishes good cause for such failure and the interview is rescheduled.

(e) *Adjudication of waiver application.* (1) *Application based on claim of hardship.* In considering an application for a waiver based upon an alien's claim that extreme hardship would result from the alien's removal from the United States, the director shall take into account only those factors that arose subsequent to the alien's entry as a conditional permanent resident. The director shall bear in mind that any removal from the United States is likely to result in a certain degree of hardship, and that only in those cases where the hardship is extreme should the application for a waiver be granted. The burden of establishing that extreme hardship exists rests solely with the applicant.

*   *   *   *   *

(3) * * *

(ii) A conditional resident or former conditional resident who has not departed the United States after termination of resident status may apply for the waiver. A conditional resident who is in exclusion, deportation, or removal proceedings may apply for the waiver only until such time as there is a final order of deportation or removal. The conditional resident may apply for the waiver regardless of his or her present marital status. The conditional resident may still be residing with the citizen or permanent resident spouse, or may be divorced or separated.

*   *   *   *   *

(f) *Decision.* The director shall provide the alien with written notice of the decision on the application for waiver. If the decision is adverse, the director shall advise the alien of the reasons therefore, notify the alien of the termination of his or her permanent residence status, instruct the alien to surrender any Alien Registration Receipt Card issued by the Service and issue a notice to appear placing the alien in removal proceedings. No appeal shall lie from the decision of the director, however, the alien may seek review of such decision in removal proceedings.

AR00477

## PART 217—VISA WAIVER PILOT PROGRAM

59. The authority citation for part 217 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1187; 8 CFR part 2.

60. Section 217.1 is revised to read as follows:

### §217.1  Scope.

The Visa Waiver Pilot Program (VWPP) described in this section is established pursuant to the provisions of section 217 of the Act.

61. Section 217.2 is revised to read as follows:

### §217.2  Eligibility.

(a) *Definitions*. As used in this part, the term:

*Carrier* refers to the owner, charterer, lessee, or authorized agent of any commercial vessel or commercial aircraft engaged in transporting passengers to the United States from a foreign place.

*Designated country* refers to Andorra, Argentina, Australia, Belgium, Brunei, Denmark, Finland, France, Germany, Iceland, Italy, Japan, Liechtenstein, Luxembourg, Monaco, the Netherlands, New Zealand, Norway, San Marino, Spain, Sweden, Switzerland, and the United Kingdom. The United Kingdom refers only to British citizens who have the unrestricted right of permanent abode in the United Kingdom (England, Scotland, Wales, Northern Ireland, the Channel Islands and the Isle of Man); it does not refer to British overseas citizens, British dependent territories' citizens, or citizens of British Commonwealth countries. Effective April 1, 1995, until September 30, 1998, or the expiration of the Visa Waiver Pilot Program, whichever comes first, Ireland has been designated as a Visa Waiver Pilot Program country with Probationary Status in accordance with section 217(g) of the Act.

*Return trip ticket* means any return trip transportation ticket presented by an arriving Visa Waiver Pilot Program applicant on a participating carrier valid for at least 1 year, airline employee passes indicating return passage, individual vouchers for return passage, group vouchers for return passage for charter flights, and military travel orders which include military dependents for return to duty stations outside the United States on U.S. military flights. A period of validity of 1 year need not be reflected on the ticket itself, provided that the carrier agrees that it will honor the return portion of the ticket at any time, as provided in §217.6(b)(2)(v).

(b) *Special program requirements*. (1) *General*. In addition to meeting all of the requirements for the Visa Waiver Pilot Program specified in section 217 of the Act, each applicant must posses a valid, unexpired passport issued by a designated country and present a completed, signed Form I–94W, Nonimmigrant Visa Waiver Arrival/Departure Form.

(2) *Persons previously removed*. Aliens who have been deported or removed from the United States, after having been determined deportable, require the consent of the Attorney General to apply for admission to the United States pursuant to section 212(a)(9)(A)(ii) of the Act. Such persons may not be admitted to the United States under the provisions of this part notwithstanding the fact that the required consent of the Attorney General may have been secured. Such aliens must secure a visa in order to be admitted to the United States as nonimmigrants, unless otherwise exempt.

(c) *Restrictions on manner of arrival*. (1) *Applicants arriving by air and sea*. Applicants must arrive on a carrier signatory to an agreement specified in §217.6 and at the time of arrival must be in possession of a return trip ticket that will transport the traveler out of the United States to any other foreign port or place as long as the trip does not terminate in contiguous territory or an adjacent island; except that the return trip ticket may transport the traveler to contiguous territory or an adjacent island, if the traveler is a resident of the country of destination.

(2) *Applicants arriving at land border ports-of-entry*. Any Visa Waiver Pilot Program applicant arriving at a land border port-of-entry must provide evidence to the immigration officer of financial solvency and a domicile abroad to which the applicant intends to return. An applicant arriving at a land-border port-of-entry will be charged a fee as prescribed in §103.7(b)(1) of this chapter for issuance of Form I–94W, Nonimmigrant Visa Waiver Arrival/Departure Form. A round-trip transportation ticket is not required of applicants at land border ports-of-entry.

(d) *Aliens in transit*. An alien who is in transit through the United States is eligible to apply for admission under the Visa Waiver Pilot Program, provided the applicant meets all other program requirements.

62. Section 217.3 is revised to read as follows:

### §217.3  Maintenance of status.

(a) *Satisfactory departure*. If an emergency prevents an alien admitted

under this part from departing from the United States within his or her period of authorized stay, the district director having jurisdiction over the place of the alien's temporary stay may, in his or her discretion, grant a period of satisfactory departure not to exceed 30 days. If departure is accomplished during that period, the alien is to be regarded as having satisfactorily accomplished the visit without overstaying the allotted time.

(b) *Readmission after departure to contiguous territory or adjacent island*. An alien admitted to the United States under this part may be readmitted to the United States for the balance of his or her Visa Waiver Pilot Program admission period if he or she is otherwise admissible.

63. Section 217.4 is amended by:

a. Revising the section heading;

b. Removing paragraph (a);

c. Redesignating paragraphs (b), (c), and (d) as paragraphs (a), (b), and (c) respectively;

d. Revising newly redesignated paragraph (a)(1);

e. Adding a new paragraph (a)(3);

f. Revising newly redesignated paragraph (b); and by

g. Revising newly redesignated paragraph (c) to read as follows:

### §217.4  Inadmissibility and deportability.

(a) *Determinations of inadmissibility*. (1) An alien who applies for admission under the provisions of section 217 of the Act, who is determined by an immigration officer not to be eligible for admission under that section or to be inadmissible to the United States under one or more of the grounds of inadmissibility listed in section 212 of the Act (other than for lack of a visa), or who is in possession of and presents fraudulent or counterfeit travel documents, will be refused admission into the United States and removed. Such refusal and removal shall be made at the level of the port director or officer-in-charge, or an officer acting in that capacity, and shall be effected without referral of the alien to an immigration judge for further inquiry, examination, or hearing, except that an alien who presents himself or herself as an applicant for admission under section 217 of the Act, who applies for asylum in the United States must be issued a Notice of Referral to Immigration Judge for a proceeding in accordance with §208.2(b)(1) of this chapter.

\*      \*      \*      \*      \*

(3) Refusal under paragraph (a)(1) of this section shall not constitute removal for purposes of section 212(a)(9)(A) of the Act.

(b) *Determination of deportability.* (1) An alien who has been admitted to the United States under the provisions of section 217 of the Act and of this part who is determined by an immigration officer to be deportable from the United States under one or more of the grounds of deportability listed in section 237 of the Act shall be removed from the United States to his or her country of nationality or last residence. Such removal shall be determined by the district director who has jurisdiction over the place where the alien is found, and shall be effected without referral of the alien to an immigration judge for a determination of deportability, except that an alien admitted as a Visa Waiver Pilot Program visitor who applies for asylum in the United States must be issued a Notice of Referral to Immigration Judge for a proceeding in accordance with § 208.2(b)(1) of this chapter.

(2) Removal under paragraph (b)(1) is equivalent in all respects and has the same consequences as removal after proceedings conducted under section 240 of the Act.

(c)(1) *Removal of inadmissible aliens who arrived by air or sea.* Removal of an alien from the United States under this section may be effected using the return portion of the round trip passage presented by the alien at the time of entry to the United States as required by section 217(a)(7) of the Act. Such removal shall be on the first available means of transportation to the alien's point of embarkation to the United States. Nothing in this part absolves the carrier of the responsibility to remove any inadmissible or deportable alien at carrier expense, as provided in § 217.6(b).

(2) *Removal of inadmissible and deportable aliens who arrived at land border ports-of-entry.* Removal under this section will be by the first available means of transportation deemed appropriate by the district director.

**§ 217.5   [Removed and reserved]**

64. Section 217.5 is removed and reserved.

65. Section 217.6 is revised to read as follows:

**§ 217.6   Carrier agreements.**

(a) *General.* The carrier agreements referred to in section 217(e) of the Act shall be made by the Commissioner on behalf of the Attorney General and shall be on Form I–775, Visa Waiver Pilot Program Agreement.

(b) *Agreement provisions.* (1) To be authorized to transport an alien to the United States pursuant to section 217 of the Act and this part, a carrier must enter into an agreement on Form I–775 to transport as an applicant for admission under section 217 of the Act and this chapter, only an alien who:

(i) Is a national of and in possession of a valid passport issued by a country listed in § 217.2;

(ii) Is in possession of a completed and signed Form I–94W, Nonimmigrant Visa Waiver Arrival/Departure Form, prior to inspection;

(iii) Seeks admission into the United States for 90 days or less;

(iv) Is in possession of a round trip ticket; and

(v) Appears otherwise admissible.

(2) The carrier further agrees to:

(i) Submit to the Immigration and Naturalization Service the Form I–94 was required by 8 CFR part 231 and section 217(e)(1)(B) of the Act;

(ii) Remove from the United States any alien transported by the carrier to the United States for admission under the Visa Waiver Pilot Program, in the event that the alien is determined by an immigration officer at the port-of-entry to be inadmissible or is determined to have remained unlawfully beyond the 90-day period of admission under the program;

(iii) Reimburse within 30 days of notice (not pay as a penalty) the Service for any and all expenses incurred in the transportation (from the point of arrival in the United States to the place of removal) of any alien found inadmissible or deportable under this program;

(iv) Retain the responsibilities and obligations enumerated in this part should the alien under the Visa Waiver Pilot Program depart temporarily for a visit to foreign contiguous territory during the period of authorized stay in the United States and be readmitted pursuant to § 217.3(b);

(v) Transport an alien found inadmissible to the United States or deportable from the United States after admission under the Visa Waiver Pilot Program, by accepting as full payment for return passage the return portion of the transportation ticket as required in paragraph (b)(1)(iv) of this section from the original port of arrival in the United States to point of embarkation or to the country of nationality or last residence.

(c) *Termination of agreements.* The Commissioner, on behalf of the Attorney General, may terminate any carrier agreement under this part, with 5 days notice to a carrier, for the carrier's failure to meet the terms of such agreement. As a matter of discretion, the Commissioner may notify a carrier of the existence of a basis for termination of a carrier agreement under this part and allow the carrier a period not to exceed 15 days within which the carrier may bring itself into compliance with the terms of the carrier agreement. The agreement shall be subject to cancellation by either party for any reason upon 15 days' written notice to the other party.

**PART 221—ADMISSION OF VISITORS OR STUDENTS**

66. The authority citation for part 221 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1201; 8 CFR part 2.

**§ 221.1   [Amended]**

67. Section 221.1 is amended in the last sentence by revising the term "part 103" to read "§ 103.6".

**PART 223—REENTRY PERMITS, REFUGEE TRAVEL DOCUMENTS, AND ADVANCE PAROLE DOCUMENTS**

68. The authority citation for part 223 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1181, 1182, 1186a, 1203, 1225, 1226, 1227, 1251; Protocol Relating to the Status of Refugees, November 1, 1968, 19 U.S.T. 6223 (TIAS) 6577; 8 CFR part 2.

69. In § 223.1, paragraph (b) is revised to read as follows:

**§ 223.1   Purpose of documents.**

\*       \*       \*       \*       \*

(b) *Refugee travel document.* A refugee travel document is issued pursuant to this part and article 28 of the United Nations Convention of July 29, 1951, for the purpose of travel. Except as provided in § 223.3(d)(2)(i), a person who holds refugee status pursuant to section 207 of the Act, or asylum status pursuant to section 208 of the Act, must have a refugee travel document to return to the United States after temporary travel abroad unless he or she is in possession of a valid advance parole document.

70. In § 223.2, paragraph (b)(2) is revised to read as follows:

**§ 223.2   Processing.**

\*       \*       \*       \*       \*

(b) \* \* \*

(2) *Refugee travel document.* (i) *General.* Except as otherwise provided in this section, an application may be approved if filed by a person who is in the United States at the time of application, and either holds valid refugee status under section 207 of the Act, valid asylum status under section 208 of the Act, or is a permanent resident and received such status as a direct result of his or her asylum or refugee status.

(ii) *Discretionary authority to accept an application from an alien not within the United States*. As a matter of discretion, a district having jurisdiction over a port-of-entry or a preinspection station where an alien is an applicant for admission, or an overseas district director having jurisdiction over the place where an alien is physically present, may accept and adjudicate an application for a refugee travel document from an alien who previously had been admitted to the United States as a refugee, or who previously had been granted asylum status in the United States, and who had departed from the United States without having applied for such refugee travel document, provided:

(A) The alien submits a Form I–131, Application for Travel Document, with the fee required under § 103.7(b)(1) of this chapter.

(B) The district director is satisfied that the alien did not intend to abandon his or her refugee status at the time of departure from the United States;

(C) The alien did not engage in any activities while outside the United States that would be inconsistent with continued refugee or asylum status; and

(D) The alien has been outside the United States for less than 1 year since his or her last departure.

*       *       *       *       *

71. In § 223.3, paragraph (d)(2) is revised to read as follows:

§ 223.3   Validity and effect on admissibility.

*       *       *       *       *

(d)  *       *       *

(2) *Refugee travel document*. (i) *Inspection and immigration status*. Upon arrival in the United States, an alien who presents a valid unexpired refugee travel document, or who has been allowed to file an application for a refugee travel document and this application has been approved under the procedure set forth in § 223.2(b)(2)(ii), shall be examined as to his or her admissibility under the Act. An alien shall be accorded the immigration status endorsed in his or her refugee travel document, or (in the case of an alien discussed in § 223.2(b)(2)(iii)) which will be endorsed in such document, unless he or she is no longer eligible therefor, or he or she applies for and is found eligible for some other immigration status.

(ii) *Inadmissibility*. If an alien who presents a valid unexpired refugee travel document appears to be inadmissible, he or she shall be referred for proceedings under section 240 of the Act. Section 235(c) of the Act shall not be applicable.

## PART 232—DETENTION OF ALIENS FOR PHYSICAL AND MENTAL EXAMINATION

72. The heading for part 232 is revised to read as set forth above.

73. The authority citation for part 232 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1222, 1224, 1252; 8 CFR part 2.

§ 232.1   Redesignated as 232.3 and revised]

74. Section 232.1 is redesignated as § 232.3, and is revised to read as follows:

§ 232.3   Arriving aliens.

When a district director has reasonable grounds for believing that persons arriving in the United States should be detained for reasons specified in section 232 of the Act, he or she shall, after consultation with the United States Public Health Service at the port-of-entry, notify the master or agent of the arriving vessel or aircraft of his or her intention to effect such detention by serving on the master or agent Form I–259 in accordance with § 235.3(a) of this chapter.

§ 234.1 and § 234.2   [Redesignated as §§ 232.1 and 232.2 respectively]

75. Sections 234.1 and 234.2 are redesignated as §§ 232.1 and 232.2 respectively.

## PART 234—[REMOVED]

76. Part 234 is removed.

77. The following parts are redesignated as set forth in the table below:

| Old part | New part |
|---|---|
| Part 238 .................... | Part 233. |
| Part 239 .................... | Part 234. |

## PART 233—CONTRACTS WITH TRANSPORTATION LINES

78. The authority citation for newly redesignated part 233 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1228; 8 CFR part 2.

79. Newly redesignated § 233.1 is revised to read as follows:

§ 233.1   Contracts.

The contracts with transportation lines referred to in section 233(c) of the Act may be entered into by the Executive Associate Commissioner for Programs, or by an immigration officer designated by the Executive Associate Commissioner for Programs on behalf of the government and shall be documented on Form I–420. The

contracts with transportation lines referred to in section 233(a) of the Act shall be made by the Commissioner on behalf of the government and shall be documented on Form I–426. The contracts with transportation lines desiring their passengers to be preinspected at places outside the United States shall be made by the Commissioner on behalf of the government and shall be documented on Form I–425; except that contracts for irregularly operated charter flights may be entered into by the Associate Commissioner for Examinations or an immigration officer designated by the Executive Associate Commissioner for Programs and having jurisdiction over the location where the inspection will take place.

80. In newly redesignated § 233.3, paragraph (b) is revised to read as follows:

§ 233.3   Aliens in immediate and continuous transit.

*       *       *       *       *

(b) *Signatory lines*. A list of currently effective Form I–426 agreements is maintained by the Service's Headquarters Office of Inspections and is available upon written request.

81. Newly redesignated § 233.4 is revised to read as follows:

§ 233.4   Preinspection outside the United States.

(a) *Form I–425 agreements*. A transportation line bringing applicants for admission to the United States through preinspection sites outside the United States shall enter into an agreement on Form I–425. Such an agreement shall be negotiated directly by the Service's Headquarters Office of Inspections and the head office of the transportation line.

(b) *Signatory lines*. A list of transportation lines with currently valid transportation agreements on Form I–425 is maintained by the Service's Headquarters Office of Inspections and is available upon written request.

82. Newly redesignated § 233.5 is revised to read as follows:

§ 233.5   Aliens entering Guam pursuant to section 14 of Public Law 99–396, "Omnibus Territories Act."

A transportation line bringing aliens to Guam under the visa waiver provisions of § 212.1(e) of this chapter shall enter into an agreement on Form I–760. Such agreements shall be negotiated directly by the Service's Headquarters and head offices of the transportation lines.

AR00480

## PART 234—DESIGNATION OF PORTS OF ENTRY FOR ALIENS ARRIVING BY CIVIL AIRCRAFT

83. The heading for newly redesignated part 234 is revised as set forth above.

84. The authority citation for newly redesignated part 234 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1221, 1229; 8 CFR part 2.

### § 234.3 [Amended]

85. Newly redesignated § 234.3 is amended by removing the last sentence.

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

86. The authority citation for part 235 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1183, 1201, 1224, 1225, 1226, 1227, 1228, 1252; 8 CFR part 2.

87. Section 235.1 is revised to read as follows:

### § 235.1  Scope of examination.

(a) *General.* Application to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection, or as otherwise designated in this section.

(b) *U.S. citizens.* A person claiming U.S. citizenship must establish that fact to the examining officer's satisfaction and must present a U.S. passport if such passport is required under the provisions of 22 CFR part 53. If such applicant for admission fails to satisfy the examining immigration officer that he or she is a U.S. citizen, he or she shall thereafter be inspected as an alien.

(c) *Alien members of United States Armed Forces and members of a force of a NATO country.* Any alien member of the United States Armed Forces who is in the uniform of, or bears documents identifying him or her as a member of, such Armed Forces, and who is coming to or departing from the United States under official orders or permit of such Armed Forces is not subject to the removal provisions of the Act. A member of the force of a NATO country signatory to Article III of the Status of Forces Agreement seeking to enter the United States under official orders is exempt from the control provision of the Act. Any alien who is a member of either of the foregoing classes may, upon request, be inspected and his or her entry as an alien may be recorded. If the alien does not appear to the examining immigration officer to be clearly and beyond a doubt entitled to enter the United States under the provisions of the Act, the alien shall be so informed and his or her entry shall not be recorded.

(d) *Alien applicants for admission.* (1) Each alien seeking admission at a United States port-of-entry shall present whatever documents are required and shall establish to the satisfaction of the immigration officer that he or she is not subject to removal under the immigration laws, Executive Orders, or Presidential Proclamations and is entitled under all of the applicable provisions of the immigration laws and this chapter to enter the United States. A person claiming to have been lawfully admitted for permanent residence must establish that fact to the satisfaction of the inspecting immigration officer and must present proper documents in accordance with § 211.1 of this chapter.

(2) An alien present in the United States who has not been admitted or paroled or an alien who seeks entry at other than an open, designated port-of-entry, except as otherwise permitted in this section, is subject to the provisions of section 212(a) of the Act and to removal under section 235(b) or 240 of the Act.

(3) An alien who is brought to the United States, whether or not to a designated port-of-entry and regardless of the means of transportation, after having been interdicted in international or United States waters, is considered an applicant for admission and shall be examined under section 235(b) of the Act.

(4) An alien stowaway is not an applicant for admission and may not be admitted to the United States. A stowaway shall be removed from the United States under section 235(a)(2) of the Act. The provisions of section 240 of the Act are not applicable to stowaways, nor is the stowaway entitled to further hearing or review of the removal, except that an alien stowaway who indicates an intention to apply for asylum shall be referred to an asylum officer for a determination of credible fear of persecution in accordance with section 235(b)(1)(B) of the Act and § 208.30 of this chapter. An alien stowaway who is determined to have a credible fear of persecution shall have his or her asylum application adjudicated in accordance with § 208.2(b)(2) of this chapter. Nothing in this section shall be construed to require expedited removal proceedings in accordance with section 235(b)(1) of the Act. A stowaway who absconds either prior to inspection by an immigration officer or after being ordered removed as a stowaway pursuant to section 235(a)(2) of the Act is not entitled to removal proceedings under section 240 of the Act and shall be removed under section 235(a)(2) of the Act as if encountered upon arrival. A stowaway who has been removed pursuant to section 235(a)(2) of the Act and this section shall be considered to have been formally removed from the United States for all purposes under the Act.

(e) *U.S. citizens, lawful permanent residents of the United States, Canadian nationals, and other residents of Canada having a common nationality with Canadians, entering the United States by small craft.* Upon being inspected by an immigration officer and found eligible for admission as a citizen of the United States, or found eligible for admission as a lawful permanent resident of the United States, or in the case of a Canadian national or other resident of Canada having a common nationality with Canadians being found eligible for admission as a temporary visitor for pleasure, a person who desires to enter the United States from Canada in a small pleasure craft of less than 5 net tons without merchandise may be issued, upon application and payment of a fee prescribed under § 103.7(b)(1) of this chapter, Form I–68, Canadian Border Boat Landing Card, and may thereafter enter the United States along with the immediate shore area of the United States on the body of water designated on the Form I–68 from time to time for the duration of that navigation season without further inspection. In the case of a Canadian national or other resident of Canada having a common nationality with Canadians, the Form I–68 shall be valid only for the purpose of visits not to exceed 72 hours and only if the alien will remain in nearby shopping areas, nearby residential neighborhoods, or other similar areas adjacent to the immediate shore area of the United States. If the bearer of Form I–68 seeks to enter the United States by means other than small craft of less than 5 net tons without merchandise, or if he or she seeks to enter the United States for other purposes, or if he or she is an alien, other than a lawful permanent resident alien of the United States, and intends to proceed beyond an area adjacent to the immediate shore area of the United States, or remains in the United States longer than 72 hours, he or she must apply for admission at a United States port of entry.

(f) *Form I–94, Arrival Departure Record.* (1) Unless otherwise exempted, each arriving nonimmigrant who is admitted to the United States shall be issued, upon payment of a fee prescribed in § 103.7(b)(1) of this chapter for land border admissions, a Form I–94 as evidence of the terms of

admission. A Form I–94 issued at a land border port-of-entry shall be considered issued for multiple entries unless specifically annotated for a limited number of entries. A Form I–94 issued at other than a land border port-of-entry, unless issued for multiple entries, must be surrendered upon departure from the United States in accordance with the instructions on the form. Form I–94 is not required by:

(i) Any nonimmigrant alien described in § 212.1(a) of this chapter and 22 CFR 41.33 who is admitted as a visitor for business or pleasure or admitted to proceed in direct transit through the United States;

(ii) Any nonimmigrant alien residing in the British Virgin Islands who was admitted only to the U.S. Virgin Islands as a visitor for business or pleasure under § 212.1(b) of this chapter;

(iii) Any Mexican national in possession of a valid nonresident alien Mexican border crossing card, or a valid Mexican passport and a multiple-entry nonimmigrant visa issued under section 101(a)(15)(B) of the Act, who is admitted as a nonimmigrant visitor at a Mexican border port of entry for a period not to exceed 72 hours to visit within 25 miles of the border;

(iv) Bearers of Mexican diplomatic or official passports described in § 212.1(c–1) of this chapter.

(2) *Paroled aliens.* Any alien paroled into the United States under section 212(d)(5) of the Act, including any alien crewmember, shall be issued a completely executed Form I–94, endorsed with the parole stamp.

88. Section 235.2 is revised to read as follows:

### § 235.2   Deferred inspection.

(a) A district director may, in his or her discretion, defer the inspection of any vessel or aircraft, or of any alien, to another Service office or port-of-entry. Any alien coming to a United States port from a foreign port, from an outlying possession of the United States, from Guam, Puerto Rico, or the Virgin Islands of the United States, or from another port of the United States at which examination under this part was deferred, shall be regarded as an applicant for admission at that onward port.

(b) An examining immigration officer may defer further examination and refer the alien's case to the district director having jurisdiction over the place where the alien is seeking admission, or over the place of the alien's residence or destination in the United States, if the examining immigration officer has reason to believe that the alien can

overcome a finding of inadmissibility by:

(1) Posting a bond under section 213 of the Act;

(2) Seeking and obtaining a waiver under section 211 or 212(d)(3) or (4) of the Act; or

(3) Presenting additional evidence of admissibility not available at the time and place of the initial examination.

(c) Such deferral shall be accomplished pursuant to the provisions of section 212(d)(5) of the Act for the period of time necessary to complete the deferred inspection.

(d) Refusal of a district director to authorize admission under section 213 of the Act, or to grant an application for the benefits of section 211 or section 212(d)(3) or (4) of the Act, shall be without prejudice to the renewal of such application or the authorizing of such admission by the immigration judge without additional fee.

(e) Whenever an alien on arrival is found or believed to be suffering from a disability that renders it impractical to proceed with the examination under the Act, the examination of such alien, members of his or her family concerning whose admissibility it is necessary to have such alien testify, and any accompanying aliens whose protection or guardianship will be required should such alien be found inadmissible shall be deferred for such time and under such conditions as the district director in whose district the port is located imposes.

89. Section 235.3 is revised to read as follows:

### § 235.3   Inadmissible aliens and expedited removal.

(a) *Detention prior to inspection.* All persons arriving at a port-of-entry in the United States by vessel or aircraft shall be detained aboard the vessel or at the airport of arrival by the owner, agent, master, commanding officer, person in charge, purser, or consignee of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service. Notice or order to detain shall not be required. The owner, agent, master, commanding officer, person in charge, purser, or consignee of such vessel or aircraft shall deliver every alien requiring examination to an immigration officer for inspection or to a medical officer for examination. The Service will not be liable for any expenses related to such detention or presentation or for any expenses of a passenger who has not been presented for inspection and for whom a determination has not been made concerning admissibility by a Service officer.

(b) *Expedited removal.* (1) *Determination of inadmissibility.* An alien who is arriving in the United States or other alien as designated pursuant to paragraph (b)(2)(ii) of this section who is determined to be inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act (except an alien for whom documentary requirements are waived under § 211.1(b)(3) or § 212.1 of this chapter), shall be ordered removed from the United States in accordance with section 235(b)(1) of the Act. The examining immigration officer shall serve the alien with Form I–860, Notice and Order of Expedited Removal. Except as otherwise provided in this section, such alien is not entitled to a hearing before an immigration judge in proceedings conducted pursuant to section 240 of the Act, or to an appeal of the expedited removal order by the Board of Immigration appeals. An alien whose inadmissibility is being considered under this section or who has been ordered removed pursuant to this section shall be detained pending determination and removal, except that parole of such alien, in accordance with section 212(d)(5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

(2) *Applicability.* The expedited removal provisions shall apply to the following classes of aliens who are determined to be inadmissible under section 212(a)(6)(C) or (7) of the Act:

(i) Arriving aliens, as defined in § 1.1(q) of this chapter, except for citizens of Cuba arriving at a United States port-of-entry by aircraft;

(ii) As specifically designated by the Commissioner, aliens who arrive in, attempt to enter, or have entered the United States without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and who have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the 2-year period immediately prior to the date of determination of inadmissibility. The Commissioner shall have the sole discretion to apply the provisions of section 235(b)(1) of the Act, at any time, to any class of aliens described in this section. The Commissioner's designation shall become effective upon publication of a notice in the **Federal Register.** However, if the Commissioner determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of

the United States or the effective enforcement of the immigration laws, the Commissioner's designation shall become effective immediately upon issuance, and shall be published in the **Federal Register** as soon as practicable thereafter. When these provisions are in effect for aliens who enter without inspection, the burden of proof rests with the alien to affirmatively show that he or she has the required continuous physical presence in the United States. Any absence from the United States shall serve to break the period of continuous physical presence. An alien who was not inspected and admitted or paroled into the United States but who establishes that he or she has been continuously physically present in the United States for the 2-year period immediately prior to the date of determination of inadmissibility shall be detained in accordance with section 235(b)(2) of the Act for a proceeding under section 240 of the Act.

(3) *Additional charges of inadmissibility*. In the expedited removal process, the Service may not charge an alien with any additional grounds of inadmissibility other than section 212(a)(6)(C) or 212(a)(7) of the Act. if an alien appears to be inadmissible under other grounds contained in section 212(a) of the Act, and if the Service wishes to pursue such additional grounds of inadmissibility, the alien shall be detained and referred for a removal hearing before an immigration judge pursuant to sections 235(b)(2) and 240 of the Act for inquiry into all charges. Once the alien is in removal proceedings under section 240 of the Act, the Service is not precluded from lodging additional charges against the alien. Nothing in this paragraph shall preclude the Service from pursuing such additional grounds of inadmissibility against the alien in any subsequent attempt to reenter the United States, provided the additional grounds of inadmissibility still exist.

(4) *Claim of asylum or fear of persecution*. If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, a fear of persecution, or a fear of return to his or her country, the inspecting officer shall, before proceeding further with the case, detain the alien and refer him or her for an interview by an asylum officer in accordance with § 208.30 of this chapter to determine if the alien has a credible fear of persecution. The referring officer shall provide information to the alien concerning the nature and purpose of the credible fear interview and shall advise the alien that he or she may, prior to the interview, consult with a person or person of his

or her choosing, at no expense to the Government and without unreasonably delaying the process. Pending the credible fear determination, the alien shall be detained. Parole of such alien in accordance with section 212(d)(5) of the Act may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

(5) *Claim to lawful permanent resident, refugee, or asylee status*. (i) *Verification of status*. If an applicant for admission who is subject to expedited removal pursuant to section 235(b)(1) of the Act claims to have been lawfully admitted for permanent residence, admitted as a refugee under section 207 of the Act, or granted asylum under section 208 of the Act, the immigration officer shall attempt to verify the alien's claim. Such verification shall include a check of all available Service data systems and any other means available to the officer. An alien whose claim to lawful permanent resident, refugee, or asylee status cannot be verified will be advised of the penalties for perjury, and will be placed under oath or allowed to make a declaration as permitted under 28 U.S.C. 1746, concerning his or her lawful admission for permanent residence, admission as a refugee under section 207 of the Act, or grant of asylum status under section 208 of the Act. Whenever practicable, a written statement shall be taken from the alien. The immigration officer shall issue an expedited order of removal under section 235(b)(1)(A)(i) of the Act and refer the alien to the immigration judge for review of the order in accordance with paragraph (b)(5)(iv) of this section and § 235.6(a)(2)(ii).

(ii) *Claimed lawful permanent residents*. If the claim to lawful permanent resident status is verified, and such status has not been terminated in exclusion, deportation, or removal proceedings, the examining immigration officer shall not order the alien removed pursuant to section 235(b)(1) of the Act. The examining immigration officer will determine in accordance with section 101(a)(13)(C) of the Act whether the alien is considered to be making an application for admission. If the alien is determined to be seeking admission and the alien is otherwise admissible, except that he or she is not in possession of the required documentation, a discretionary waiver of documentary requirements may be considered in accordance with section 211(b) of the Act and § 211.1(b)(3) of this chapter or the alien's inspection may be deferred to an onward office for presentation of the

required documents. If the alien appears to be inadmissible, the immigration officer may initiate removal proceedings against the alien under section 240 of the Act.

(iii) *Claimed refugees and asylees*. If a check of Service records or other means indicates that the alien has been granted refugee status or asylee status, and such status has not been terminated in deportation, exclusion, or removal proceedings, the immigration officer shall not order the alien removed pursuant to section 235(b)(1) of the Act. If the alien is not in possession of a valid, unexpired refugee travel document, the examining immigration officer may accept an application for a refugee travel document in accordance with § 223.2(b)(2)(ii) of this chapter. If accepted, the immigration officer shall readmit the refugee or asylee in accordance with § 223.3(d)(2)(i) of this chapter. If the alien is determined not to be eligible to file an application for a refugee travel document the immigration officer may initiate removal proceedings against the alien under section 240 of this Act.

(iv) *Review of order for claimed lawful permanent residents, refugees, or asylees*. When an alien whose status has not been verified but who is claiming under oath or under penalty or perjury to be a lawful permanent resident, refugee, or asylee is ordered removed pursuant to section 235(b)(1) of the Act, the case will be referred to an immigration judge for review of the expedited removal order under section 235(b)(1)(C) of the Act and § 235.6(a)(2)(ii). If the immigration judge determines that the alien has never been admitted as a lawful permanent resident or as a refugee, or granted asylum status, the order issued by the immigration officer will be affirmed and the Service will remove the alien. There is no appeal from the decision of the immigration judge. If the immigration judge determines that the alien was once so admitted as a lawful permanent resident or as a refugee, or was granted asylum status, and such status has not been terminated by final administrative action, the immigration judge will terminate proceedings and vacate the expedited removal order. The Service may initiate removal proceedings against such an alien in proceedings under section 240 of the Act. During removal proceedings, the immigration judge may consider any waivers, exceptions, or requests for relief for which the alien is eligible.

(6) *Opportunity for the alien to establish that he or she was admitted or paroled into the United States*. If the Commissioner determines that the

expedited removal provisions of section 235(b)(1) of the Act shall apply to any or all aliens described in paragraph (b)(2)(ii) of this section, such alien will be given a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she was admitted or paroled into the United States following inspection at a port-of-entry. The alien will be allowed to present evidence or provide sufficient information to support the claim. Such evidence may consist of documentation in the possession of the alien, the Service, or a third party. The examining immigration officer will consider all such evidence and information, make further inquiry if necessary, and will attempt to verify the alien's status through a check of all available Service data systems. The burden rests with the alien to satisfy the examining immigration officer of the claim of lawful admission or parole. If the alien establishes that he or she was lawfully admitted or paroled, the case will be examined to determine if grounds of deportability under section 237(a) of the Act are applicable, or if paroled, whether such parole has been, or should be, terminated, and whether the alien is inadmissible under section 212(a) of the Act. An alien who cannot satisfy the examining officer that he or she was lawfully admitted or paroled will be ordered removed pursuant to section 235(b)(1) of the Act.

(7) *Review of expedited removal orders.* Any removal order entered by an examining immigration officer pursuant to section 235(b)(1) of the Act must be reviewed and approved by the appropriate supervisor before the order is considered final. Such supervisory review shall not be delegated below the level of the second line supervisor, or a person acting in that capacity. The supervisory review and approval of an expedited removal order for an alien described in section 235(b)(1)(A)(iii) of the Act must include a review of any claim of lawful admission or parole and any evidence or information presented to support such a claim, prior to approval of the order. In such cases, the supervisor may request additional information from any source and may require further interview of the alien.

(8) *Removal procedures relating to expedited removal.* An alien ordered removed pursuant to section 235(b)(1) of the Act shall be removed in accordance with section 241(c) of the Act and 8 CFR part 241.

(9) *Waivers of documentary requirements.* Nothing in this section limits the discretionary authority of the Attorney General, including authority

under sections 211(b) or 212(d) of the Act, to waive the documentary requirements for arriving aliens.

(10) *Applicant for admission under section 217 of the Act.* The provisions of § 235.3(b) do not apply to an applicant for admission under section 217 of the Act.

(c) *Other inadmissible aliens.* Any alien applicant for admission, as included in sections 101(a)(13) and 235(a)(1) of the Act and § 235.1(d) of this chapter, who appears to the inspecting officer to be inadmissible, but who does not fall within paragraph (b) of this section, may be detained, paroled, or paroled for deferred inspection by the inspecting officer. In determining whether or not an alien shall be detained, paroled, or paroled for deferred inspection, the inspecting officer shall consider the likelihood that the alien will abscond or pose a security risk.

(d) *Service custody.* The Service will assume custody of any alien subject to detention under paragraph (b) or (c) of this section. In its discretion, the Service may require any alien who appears inadmissible and who arrives at a land border port-of-entry from Canada or Mexico, to remain in that country while awaiting a removal hearing. Such alien shall be considered detained for a proceeding within the meaning of section 235(b) of the Act and may be ordered removed in absentia by an immigration judge if the alien fails to appear for the hearing.

(e) *Detention in non-Service facility.* Whenever an alien is taken into Service custody and detained at a facility other than at a Service Processing Center, the public or private entities contracted to perform such service shall have been approved for such use by the Service's Jail Inspection Program or shall be performing such service under contract in compliance with the Standard Statement of Work for Contract Detention Facilities. Both programs are administered by the Detention and Deportation section having jurisdiction over the alien's place of detention. Under no circumstances shall an alien be detained in facilities not meeting the four mandatory criteria for usage. These are:

(1) 24-Hour supervision,

(2) Conformance with safety and emergency codes,

(3) Food Service, and

(4) Availability of emergency medical care.

(f) *Privilege of communication.* The mandatory notification requirements of consular and diplomatic officers pursuant to § 236.1(e) of this chapter

apply when an inadmissible alien is detained for removal proceedings.

90. Section 235.4 is revised to read as follows:

## § 235.4   Withdrawal of application for admission.

(a) The Attorney General may, in his or her discretion, permit any alien applicant for admission to withdraw his or her application for admission in lieu of removal proceedings under section 240 of the Act or expedited removal under section 235(b)(1) of the Act. The alien's decision to withdraw his or her application for admission must be made voluntarily, but nothing in this section shall be construed as to give an alien the right to withdraw his or her application for admission. Permission to withdraw an application for admission should not normally be granted unless the alien intends and is able to depart the United States immediately. An alien permitted to withdraw his or her application for admission shall normally remain in carrier or Service custody pending departure, unless the district director determines that parole of the alien is warranted in accordance with § 212.5(a) of this chapter.

(b) An immigration judge may allow only an arriving alien to withdraw an application for admission. Once the issue of inadmissibility or deportability has been resolved, permission to withdraw an application for admission should ordinarily be granted only with the concurrence of the Service. An immigration judge shall not allow an alien to withdraw an application for admission unless the alien, in addition to demonstrating that he or she possesses both the intent and the means to depart immediately from the United States, establishes that factors directly relating to the issue of inadmissibility indicate that the granting of the withdrawal would be in the interest of justice. In addition, during the pendency of an appeal from the order of removal, permission to withdraw an application for admission must be obtained from the immigration judge or the Board.

91. Section 235.5 is revised to read as follows:

## § 235.5   Preinspection.

(a) *In United States territories and possessions.* In the case of any aircraft proceeding from Guam, Puerto Rico, or the United States Virgin Islands destined directly and without touching at a foreign port or place, to any other of such places, or to one of the States of the United States or the District of Columbia, the examination of the passengers and crew required by the Act

may be made prior to the departure of the aircraft, and in such event, final determination of admissibility shall be made immediately prior to such departure. The examination shall be conducted in accordance with sections 232, 235, and 240 of the Act and 8 CFR parts 235 and 240. If it appears to the examining immigration officer that any person in the United States being examined under this section is prima facie removable from the United States, further action with respect to his or her examination shall be deferred and further proceedings regarding removability conducted as provided in section 240 of the Act and 8 CFR part 240. When the foregoing inspection procedure is applied to any aircraft, persons examined and found admissible shall be placed aboard the aircraft, or kept at the airport separate and apart from the general public until they are permitted to board the aircraft. No other person shall be permitted to depart on such aircraft until and unless he or she is found to be admissible as provided in this section.

(b) *In foreign territory.* In the case of any aircraft, vessel, or train proceeding directly, without stopping, from a port or place in foreign territory to a port-of-entry in the United States, the examination and inspection of passengers and crew required by the Act and final determination of admissibility may be made prior to such departure at the port or place in the foreign territory and shall have the same effect under the Act as though made at the destined port-of-entry in the United States.

92. Section 235.6 is revised to read as follows:

### § 235.6  Referral to immigration judge.

(a) *Notice.* (1) *Referral by Form I–862, Notice to Appear.* An immigration officer or asylum officer will sign and deliver a Form I–862 to an alien in the following cases:

(i) If, in accordance with the provisions of section 235(b)(2)(A) of the Act, the examining immigration officer detains an alien for a proceeding before an immigration judge under section 240 of the Act; or

(ii) If, in accordance with section 235(b)(1)(B)(ii) of the Act, an asylum officer determines that an alien is expedited removal proceedings has a credible fear of persecution and refers the case to the immigration judge for consideration of the application for asylum.

(iii) If, in accordance with section 235(b)(1)(B)(iii)(III) of the Act, the immigration judge determines that an alien in expedited removal proceedings has a credible fear of persecution and

vacates the expedited removal order issued by the asylum officer pursuant to section 235(b)(1)(B)(iii) of the Act.

(iv) If an immigration officer verifies that an alien subject to expedited removal under section 235(b)(1) of the Act has been admitted as a lawful permanent resident refugee, or asylee, or upon review pursuant to § 235.3(b)(5)(iv) an immigration judge determines that the alien was once so admitted, provided that such status has not been terminated by final administrative action, and the Service initiates removal proceedings against the alien under section 240 of the Act.

(2) *Referral by Form I–863, Notice of Referral to Immigration Judge.* An immigration officer will sign and deliver a Form I–863 to an alien in the following cases:

(i) If, in accordance with section 235(b)(1)(B)(iii)(III) of the Act, an asylum officer determines that an alien does not have a credible fear of persecution, and the alien requests a review of that determination by an immigration judge; or

(ii) If, in accordance with section 235(b)(1)(C) of the Act, an immigration officer refers an expedited removal order entered on an alien claiming to be a lawful permanent resident, refugee, or asylee for whom the officer could not verify such status to an immigration judge for review of the order.

(iii) If an immigration officer refers an applicant described in § 208.2(b)(1) of this chapter to an immigration judge for an asylum hearing under § 208.2(b)(2) of this chapter.

(b) *Certification for mental condition; medical appeal.* An alien certified under sections 212(a)(1) and 232(b) of the Act shall be advised by the examining immigration officer that he or she may appeal to a board of medical examiners of the United States Public Health Service pursuant to section 232 of the Act. If such appeal is taken, the district director shall arrange for the convening of the medical board.

### § 235.7  [Removed]

93. Section 235.7 is removed.

### § 235.13  [Redesignated as § 235.7]

94. Section 235.13 is redesignated as § 235.7.

95. Section 235.8 is revised to read as follows:

### § 235.8  Inadmissibility on security and related grounds.

(a) *Report.* When an immigration officer or an immigration judge suspects that an arriving alien appears to be inadmissible under section 212(a)(3)(A) (other than clause (ii), (B), or (C) of the

Act, the immigration officer or immigration judge shall order the alien removed and report the action promptly to the district director who has administrative jurisdiction over the place where the alien has arrived or where the hearing is being held. The immigration officer shall, if possible, take a brief sworn question-and-answer statement from the alien, and the alien shall be notified by personal service of Form I–147, Notice of Temporary Inadmissibility, of the action taken and the right to submit a written statement and additional information for consideration by the Attorney General. The district director shall forward the report to the regional director for further action as provided in paragraph (b) of this section.

(b) *Action by regional director.* (1) In accordance with section 235(c)(2)(B) of the Act, the regional director may deny any further inquiry or hearing by an immigration judge and order the alien removed by personal service of Form I–148, Notice of Permanent Inadmissibility, or issue any other order disposing of the case that the regional director considers appropriate.

(2) If the regional director concludes that the case does not meet the criteria contained in section 235(c)(2)(B) of the Act, the regional director may direct that:

(i) An immigration officer shall conduct a further examination of the alien, concerning the alien's admissibility; or,

(ii) The alien's case be referred to an immigration judge for a hearing, or for the continuation of any prior hearing.

(3) The regional director's decision shall be in writing and shall be signed by the regional director. Unless the written decision contains confidential information, the disclosure of which would be prejudicial to the public interest, safety, or security of the United States, the written decision shall be served on the alien. If the written decision contains such confidential information, the alien shall be served with a separate written order showing the disposition of the case, but with the confidential information deleted.

(c) *Finality of decision.* The regional director's decision under this section is final when it is served upon the alien in accordance with paragraph (b)(3) of this section. There is no administrative appeal from the regional director's decision.

(d) *Hearing by immigration judge.* If the regional director directs that an alien subject to removal under this section be given a hearing or further hearing before an immigration judge, the hearing and all further proceedings in

the matter shall be conducted in accordance with the provisions of section 240 of the Act and other applicable sections of the Act to the same extent as though the alien had been referred to an immigration judge by the examining immigration officer. In a case where the immigration judge ordered the alien removed pursuant to paragraph (a) of this section, the Service shall refer the case back to the immigration judge and proceedings shall be automatically reopened upon receipt of the notice of referral. If confidential information, not previously considered in the matter, is presented supporting the inadmissibility of the alien under section 212(a)(3)(A) (other than clause (ii)), (B), or (C) of the Act, the disclosure of which, in the discretion of the immigration judge, may be prejudicial to the public interest, safety, or security, the immigration judge may again order the alien removed under the authority of section 235(c) of the Act and further action shall be taken as provided in this section.

(e) *Nonapplicability.* The provisions of this section shall apply only to arriving aliens, as defined in § 1.1(q) of this chapter. Aliens present in the United States who have not been admitted or paroled may be subject to proceedings under Title V of the Act.

### § 235.9   [Removed]

96. Section 235.9 is removed.

### § 235.12   [Redesignated as § 235.9 and revised]

97. Section 235.12 is redesignated as § 235.9 and is revised to read as follows:

### § 235.9   Northern Marianas identification card.

During the two-year period that ended July 1, 1990, the Service issued Northern Marianas Identification Cards to aliens who acquired United States citizenship when the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States entered into force on November 3, 1986. These cards remain valid as evidence of United States citizenship. Although the Service no longer issues these cards, a United States citizen to whom a card was issued may file Form I–777, Application for Issuance or Replacement of Northern Marianas Card, to obtain replacement of a lost, stolen, or mutilated Northern Marianas Identification Card.

98. Section 235.10 is revised to read as follows:

### § 235.10   U.S. Citizen Identification Card.

(a) *General.* Form I–197, U.S. Citizen Identification Card, is no longer issued by the Service but valid existing cards will continue to be acceptable documentation of U.S. citizenship. Possession of the identification card is not mandatory for any purpose. A U.S. Citizen Identification Card remains the property of the United States. Because the identification card is no longer issued, there are no provisions for replacements cards.

(b) *Surrender and voidance.* (1) *Institution of proceeding under section 240 or 342 of the Act.* A U.S. Citizen Identification Card must be surrendered provisionally to a Service office upon notification by the district director that a proceeding under section 240 or 342 of the Act is being instituted against the person to whom the card was issued. The card shall be returned to the person if the final order in the proceeding does not result in voiding the card under this paragraph. A U.S. Citizen Identification Card is automatically void if the person to whom it was issued is determined to be an alien in a proceeding conducted under section 240 of the Act, or if a certificate, document, or record relating to that person is canceled under section 342 of the Act.

(2) *Investigation of validity of identification card.* A U.S. Citizen Identification Card must be surrendered provisionally upon notification by a district director that the validity of the card is being investigated. The card shall be returned to the person who surrendered it if the investigation does not result in a determination adverse to his or her claim to be a United States citizen. When an investigation results in a tentative determination adverse to the applicant's claim to be a United States citizen, the applicant shall be notified by certified mail directed to his or her last known address. The notification shall inform the applicant of the basis for the determination and of the intention of the district director to declare the card void unless within 30 days the applicant objects and demands an opportunity to see and rebut the adverse evidence. Any rebuttal, explanation, or evidence presented by the applicant must be included in the record of proceeding. The determination whether the applicant is a United States citizen must be based on the entire record and the applicant shall be notified of the determination. If it is determined that the applicant is not a United States citizen, the applicant shall be notified of the reasons, and the card deemed void. There is no appeal from the district director's decision.

(3) *Admission of alienage.* A U.S. Citizen Identification Card is void if the person to whom it was issued admits in a statement signed before an immigration officer that he or she is an alien and consents to the voidance of the card. Upon signing the statement the card must be surrendered to the immigration officer.

(4) *Surrender of void card.* A void U.S. Citizen Identification Card which has not been returned to the Service must be surrendered without delay to an immigration officer or to the issuing office of the Service.

(c) *U.S. Citizen Identification Card previously issued on Form I–179.* A valid Form I–179, U.S. Citizen Identification Card, continues to be valid subject to the provisions of this section.

99. Section 235.11 is revised to read as follows:

### § 235.11   Admission of conditional permanent residents.

(a) *General.* (1) *Conditional residence based on family relationship.* An alien seeking admission to the United States with an immigrant visa as the spouse or son or daughter of a United States citizen or lawful permanent resident shall be examined to determine whether the conditions of section 216 of the Act apply. If so, the alien shall be admitted conditionally for a period of 2 years. At the time of admission, the alien shall be notified that the alien and his or her petitioning spouse must file a Form I–751, Petition to Remove the Conditions on Residence, within the 90-day period immediately preceding the second anniversary of the alien's admission for permanent residence.

(2) *Conditional residence based on entrepreneurship.* An alien seeking admission to the United States with an immigrant visa as an alien entrepreneur (as defined in section 216A(f)(1) of the Act) or the spouse or unmarried minor child of an alien entrepreneur shall be admitted conditionally for a period of 2 years. At the time of admission, the alien shall be notified that the principal alien (entrepreneur) must file a Form I–829, Petition by Entrepreneur to Remove Conditions, within the 90-day period immediately preceding the second anniversary of the alien's admission for permanent residence.

(b) *Correction of endorsement on immigrant visa.* If the alien is subject to the provisions of section 216 of the Act, but the classification endorsed on the immigrant visa does not so indicate, the endorsement shall be corrected and the alien shall be admitted as a lawful permanent resident on a conditional basis, if otherwise admissible. Conversely, if the alien is not subject to the provisions of section 216 of the Act, but the visa classification endorsed on the immigrant visa indicates that the

AR00486

alien is subject thereto (e.g., if the second anniversary of the marriage upon which the immigrant visa is based occurred after the issuance of the visa and prior to the alien's application for admission) the endorsement on the visa shall be corrected and the alien shall be admitted as a lawful permanent resident without conditions, if otherwise admissible.

(c) *Expired conditional permanent resident status.* The lawful permanent resident alien status of a conditional resident automatically terminates if the conditional basis of such status is not removed by the Service through approval of a Form I–751, Petition to Remove the Conditions on Residence or, in the case of an alien entrepreneur (as defined in section 216A(f)(1) of the Act), Form I–829, Petition by Entrepreneur to Remove Conditions. Therefore, an alien who is seeking admission as a returning resident subsequent to the second anniversary of the date on which conditional residence was obtained (except as provided in § 211.1(b)(1) of this chapter) and whose conditional basis of such residence has not been removed pursuant to section 216(c) or 216A(c) of the Act, whichever is applicable, shall be placed under removal proceedings. However, in a case where conditional residence was based on a marriage, removal proceedings may be terminated and the alien may be admitted as a returning resident if the required Form I–751 is filed jointly, or by the alien alone (if appropriate), and approved by the Service. In the case of an alien entrepreneur, removal proceedings may be terminated and the alien admitted as a returning resident if the required Form I–829 is filed by the alien entrepreneur and approved by the Service.

100–101. Part 236 is revised to read as follows:

# PART 236—APPREHENSION AND DETENTION OF INADMISSIBLE AND DEPORTABLE ALIENS; REMOVAL OF ALIENS ORDERED REMOVED

**Subpart A—Detention of Aliens Prior to Order of Removal**

Sec.
236.1   Apprehension, custody, and detention.
236.2   Confined aliens, incompetents, and minors.
236.3   Detention and release of juveniles.
236.4   Removal of S–5, S–6, and S–7 nonimmigrants.
236.5   Fingerprints and photographs.

**Subpart B—Family Unity Program**

236.10   Description of program.
236.11   Definitions.
236.12   Eligibility.
236.13   Ineligible aliens.
236.14   Filing.
236.15   Voluntary departure and eligibility for employment.
236.16   Travel outside the United States.
236.17   Eligibility for Federal financial assistance programs.
236.18   Termination of Family Unity Program benefits.

**Authority:** 8 U.S.C. 1103, 1182, 1224, 1225, 1226, 1227, 1362; 8 CFR part 2.

## Subpart A—Detention of Aliens Prior to Order of Removal

### § 236.1   Apprehension, custody, and detention.

(a) *Detainers.* The issuance of a detainer under this section shall be governed by the provisions of § 287.7 of this chapter.

(b) *Warrant of arrest.* (1) *In general.* At the time of issuance of the notice to appear, or at any time thereafter and up to the time removal proceedings are completed, the respondent may be arrested and taken into custody under the authority of Form I–200, Warrant of Arrest. A warrant of arrest may be issued only by those immigration officers listed in § 287.5(e)(2) of this chapter and may be served only by those immigration officers listed in § 287.5(e)(3) of this chapter.

(2) If, after the issuance of a warrant of arrest, a determination is made not to serve it, any officer authorized to issue such warrant may authorize its cancellation.

(c) *Custody issues and release procedures.* (1) After expiration of the Transition Period Custody Rules under Pub. L. 104–208, no alien described in section 236(c)(1) of the Act shall be released from custody during removal proceedings except pursuant to section 236(c)(2) of the Act.

(2) Any officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236 (a)(2) and (3) of the Act; *provided* that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.

(3) When an alien who, having been arrested and taken into custody, has been released, such release may be revoked at any time in the discretion of the district director, acting district director, deputy district director, assistant district director for investigations, assistant district director for detention and deportation, or officer in charge (except foreign), in which event the alien may be taken into physical custody and detained. If

detained, unless a breach has occurred, any outstanding bond shall be revoked and canceled.

(4) The provisions of § 103.6 of this chapter shall apply to any bonds authorized. Subject to the provisions of this section, the provisions of § 3.19 of this chapter shall govern availability for respondent of recourse to other administrative authority for release from custody.

(5) An immigration judge may not exercise custody authority provided in this section and the review process described in paragraph (d) of this section shall not apply with respect to:

(i) Inadmissible aliens in removal proceedings,

(ii) Arriving aliens, as described in § 1.1(q) of this chapter, including aliens paroled pursuant to section 212(d)(5) of the Act, in removal proceedings,

(iii) Aliens described in section 237(a)(4) of the Act, or

(iv) After the expiration of section 303(b)(3) of Pub. L. 104–208, aliens described in section 236(c)(1) of the Act.

(d) *Appeals from custody decisions.* (1) *Application to immigration judge.* After an initial custody determination by the district director, including the setting of a bond, the respondent may at any time before an order under 8 CFR part 240 becomes final, request amelioration of the conditions under which he or she may be released. Prior to such final order, and except as otherwise provided in this chapter, the immigration judge is authorized to exercise the authority in section 236 of the Act to detain the alien in custody, release the alien, and determine the amount of bond, if any, under which the respondent may be released, as provided in § 3.19 of this chapter. If the alien has been released from custody, an application for amelioration of the terms of release must be filed within 7 days of release. Once a removal order becomes administratively final, determinations regarding custody and bond are made by the district director.

(2) *Application to the district director.* (i) After expiration of the 7-day period in paragraph (d)(1) of this section, the respondent may request review by the district director of the conditions of his or her release.

(ii) After an order becomes administratively final, the respondent may request review by the district director of the conditions of his or her release.

(3) *Appeal to the Board of Immigration Appeals.* An appeal relating to bond and custody determinations may be filed within 10 days of the decision, to the Board of

Immigration Appeals in the following circumstances:

(i) In accordance with § 3.38 of this chapter, the alien or the Service may appeal the decision of an immigration judge pursuant to paragraph (d)(1) of this section.

(ii) The alien may appeal from the district director's decision under paragraph (d)(2)(i) of this section.

(iii) The alien may appeal from the district director's decision under paragraph (d)(2)(ii) of this section, except that no appeal shall be allowed when the Service notifies the alien that it is ready to execute an order of deportation and takes the alien into custody for that purpose.

(4) *Effect of filing an appeal.* The filing of an appeal from a determination of an immigration judge or district director under this paragraph shall not operate to delay compliance with the order, nor stay the administrative proceedings or removal.

(e) *Privilege of communication.* Every detained alien shall be notified that he or she may communicate with the consular or diplomatic officers of the country of his or her nationality in the United States. Existing treaties with the countries listed below require immediate communication with appropriate consular or diplomatic officers whenever nationals of the following countries are detained in removal proceedings, whether or not requested by the alien and even if the alien requests that no communication be undertaken in his or her behalf. When notifying consular or diplomatic officials, Service officers shall not reveal the fact that any detained alien has applied for asylum or withholding of removal.

Albania [1]
Antigua
Armenia
Azerbaijan
Bahamas
Barbados
Belarus
Belize
Brunei
Bulgaria
China (People's Republic of) [2]
Costa Rica
Cyprus
Czech Republic

Dominica
Fiji
Gambia, The
Georgia
Ghana
Grenada
Guyana
Hungary
Jamaica
Kazakhstan
Kiribati
Kuwait
Kyrgyzstan
Malaysia
Malta
Mauritius
Moldova
Mongolia
Nigeria
Philippines
Poland
Romania
Russian Federation
St. Kitts/Nevis
St. Lucia
St. Vincent/Grenadines
Seychelles
Sierra Leone
Singapore
Slovak Republic
South Korea
Tajikistan
Tanzania
Tonga
Trinidad/Tobago
Turkmenistan
Tuvalu
Ukraine
United Kingdom [3]
U.S.S.R. [4]
Uzbekistan
Zambia

(f) *Notification to Executive Office for Immigration Review of change in custody status.* The Service shall notify the Immigration Court having administrative control over the Record of Proceeding of any change in custody location or of release from, or subsequent taking into, Service custody of a respondent/applicant pursuant to § 3.19(g) of this chapter.

### § 236.2   Confined aliens, incompetents, and minors.

(a) *Service.* If the respondent is confined, or if he or she is an incompetent, or a minor under the age of 14, the notice to appear, and the warrant of arrest, if issued, shall be

served in the manner prescribed in § 239.1 of this chapter upon the person or persons specified by § 103.5a(c) of this chapter.

(b) *Service custody and cost of maintenance.* An alien confined because of physical or mental disability in an institution or hospital shall not be accepted into physical custody by the Service until an order of removal has been entered and the Service is ready to remove the alien. When such an alien is an inmate of a public or private institution at the time of the commencement of the removal proceedings, expenses for the maintenance of the alien shall not be incurred by the Government until he or she is taken into physical custody by the Service.

### § 236.3   Detention and release of juveniles.

(a) *Juveniles.* A juvenile is defined as an alien under the age of 18 years.

(b) *Release.* Juveniles for whom bond has been posted, for whom parole has been authorized, or who have been ordered released on recognizance, shall be released pursuant to the following guidelines:

(1) Juveniles shall be released, in order of preference, to:

(i) A parent;

(ii) Legal guardian; or

(iii) An adult relative (brother, sister, aunt, uncle, grandparent) who is not presently in Service detention, unless a determination is made that the detention of such juvenile is required to secure his or her timely appearance before the Service or the Immigration Court or to ensure the juvenile's safety or that of others. In cases where the parent, legal guardian, or adult relative resides at a location distant from where the juvenile is detained, he or she may secure release at a Service office located near the parent, legal guardian, or adult relative.

(2) If an individual specified in paragraphs (b)(1) (i) through (iii) of this section cannot be located to accept custody of a juvenile, and the juvenile has identified a parent, legal guardian, or adult relative in Service detention, simultaneous release of the juvenile and the parent, legal guardian, or adult relative shall be evaluated on a discretionary case-by-case basis.

(3) In cases where the parent or legal guardian is in Service detention or outside the United States, the juvenile may be released to such person as is designated by the parent or legal guardian in a sworn affidavit, executed before an immigration officer or consular officer, as capable and willing to care for the juvenile's well-being. Such person must execute an agreement

---

[1] Arrangements with these countries provide that U.S. authorities shall notify responsible representatives within 72 hours of the arrest or detention of one of their nationals.

[2] When Taiwan nationals (who carry "Republic of China" passports) are detained, notification should be made to the nearest office of the Taiwan Economic and Cultural Representative's Office, the unofficial entity representing Taiwan's interests in the United States.

[3] British dependencies are also covered by this agreement. They are: Anguilla, British Virgin Islands, Hong Kong, Bermuda, Montserrat, and the Turks and Caicos Islands. Their residents carry British passports.

[4] All U.S.S.R. successor states are covered by this agreement. They are: Armenia, Azerbaijan, Belarus, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Russian Federation, Tajikistan, Turkmenistan, Ukraine, and Uzbekistan.

to care for the juvenile and to ensure the juvenile's presence at all future proceedings before the Service or an immigration judge.

(4) In unusual and compelling circumstances and in the discretion of the district director or chief patrol agent, a juvenile may be released to an adult, other than those identified in paragraphs (b)(1) (i) through (iii) of this section, who executes an agreement to care for the juvenile's well-being and to ensure the juvenile's presence at all future proceedings before the Service or an immigration judge.

(c) *Juvenile coordinator.* The case of a juvenile for whom detention is determined to be necessary should be referred to the ''Juvenile Coordinator,'' whose responsibilities should include, but not be limited to, finding suitable placement of the juvenile in a facility designated for the occupancy of juveniles. These may include juvenile facilities contracted by the Service, state or local juvenile facilities, or other appropriate agencies authorized to accommodate juveniles by the laws of the state or locality.

(d) *Detention.* In the case of a juvenile for whom detention is determined to be necessary, for such interim period of time as is required to locate suitable placement for the juvenile, whether such placement is under paragraph (b) or (c) of this section, the juvenile may be temporarily held by Service authorities or placed in any Service detention facility having separate accommodations for juveniles.

(e) *Refusal of release.* If a parent of a juvenile detained by the Service can be located, and is otherwise suitable to receive custody of the juvenile, and the juvenile indicates a refusal to be released to his or her parent, the parent(s) shall be notified of the juvenile's refusal to be released to the parent(s), and shall be afforded an opportunity to present their views to the district director, chief patrol agent, or immigration judge before a custody determination is made.

(f) *Notice to parent of application for relief.* If a juvenile seeks release from detention, voluntary departure, parole, or any form of relief from removal, where it appears that the grant of such relief may effectively terminate some interest inherent in the parent-child relationship and/or the juvenile's rights and interests are adverse with those of the parent, and the parent is presently residing in the United States, the parent shall be given notice of the juvenile's application for relief, and shall be afforded an opportunity to present his or her views and assert his or her interest to the district director or

immigration judge before a determination is made as to the merits of the request for relief.

(g) *Voluntary departure.* Each juvenile, apprehended in the immediate vicinity of the border, who resides permanently in Mexico or Canada, shall be informed, prior to presentation of the voluntary departure form or being allowed to withdraw his or her application for admission, that he or she may make a telephone call to a parent, close relative, a friend, or to an organization found on the free legal services list. A juvenile who does not reside in Mexico or Canada who is apprehended shall be provided access to a telephone and must in fact communicate either with a parent, adult relative, friend, or with an organization found on the free legal services list prior to presentation of the voluntary departure form. If such juvenile, of his or her own volition, asks to contact a consular officer, and does in fact make such contact, the requirements of this section are satisfied.

(h) *Notice and request for disposition.* When a juvenile alien is apprehended, he or she must be given a Form I–770, Notice of Rights and Disposition. If the juvenile is less than 14 years of age or unable to understand the notice, the notice shall be read and explained to the juvenile in a language he or she understands. In the event a juvenile who has requested a hearing pursuant to the notice subsequently decides to accept voluntary departure or is allowed to withdraw his or her application for admission, a new Form I–770 shall be given to, and signed by the juvenile.

**§ 236.4   Removal of S–5, S–6, and S–7 nonimmigrants.**

(a) *Condition of classification.* As a condition of classification and continued stay in classification pursuant to section 101(a)(15)(S) of the Act, nonimmigrants in S classification must have executed Form I–854, Part B, Inter-agency Alien Witness and Informant Record, certifying that they have knowingly waived their right to a removal hearing and right to contest, other than on the basis of an application for withholding of deportation or removal, any removal action, including detention pending deportation or removal, instituted before lawful permanent resident status is obtained.

(b) *Determination of deportability.* (1) A determination to remove a deportable alien classified pursuant to section 101(a)(15)(S) of the Act shall be made by the district director having jurisdiction over the place where the alien is located.

(2) A determination to remove such a deportable alien shall be based on one or more of the grounds of deportability listed in section 237 of the Act based on conduct committed after, or conduct or a condition not disclosed to the Service prior to, the alien's classification as an S nonimmigrant under section 101(a)(15)(S) of the Act, or for a violation of, or failure to adhere to, the particular terms and conditions of status in S nonimmigrant classification.

(c) *Removal procedures.* (1) A district director who determines to remove an alien witness or informant in S nonimmigrant classification shall notify the Commissioner, the Assistant Attorney General, Criminal Division, and the relevant law enforcement agency in writing to that effect. The Assistant Attorney General, Criminal Division, shall concur in or object to that decision. Unless the Assistant Attorney General, Criminal Division, objects within 7 days, he or she shall be deemed to have concurred in the decision. In the event of an objection by the Assistant Attorney General, Criminal Division, the matter will be expeditiously referred to the Deputy Attorney General for a final resolution. In no circumstances shall the alien or the relevant law enforcement agency have a right of appeal from any decision to remove.

(2) A district director who has provided notice as set forth in paragraph (c)(1) of this section and who has been advised by the Commissioner that the Assistant Attorney General, Criminal Division, has not objected shall issue a Warrant of Removal. The alien shall immediately be arrested and taken into custody by the district director initiating the removal. An alien classified under the provisions of section 101(a)(15)(S) of the Act who is determined, pursuant to a warrant issued by a district director, to be deportable from the United States shall be removed from the United States to his or her country of nationality or last residence. The agency that requested the alien's presence in the United States shall ensure departure from the United States and so inform the district director in whose jurisdiction the alien has last resided. The district director, if necessary, shall oversee the alien's departure from the United States and, in any event, shall notify the Commissioner of the alien's departure.

(d) *Withholding of removal.* An alien classified pursuant to section 101(a)(15)(S) of the Act who applies for withholding of removal shall have 10 days from the date the Warrant of Removal is served upon the alien to file an application for such relief with the

district director initiating the removal order. The procedures contained in §§ 208.2 and 208.16 of this chapter shall apply to such an alien who applies for withholding of removal.

(e) *Inadmissibility*. An alien who applies for admission under the provisions of section 101(a)(15)(S) of the Act who is determined by an immigration officer not to be eligible for admission under that section or to be inadmissible to the United States under one or more of the grounds of inadmissibility listed in section 212 of the Act and which have not been previously waived by the Commissioner will be taken into custody. The district director having jurisdiction over the port-of-entry shall follow the notification procedures specified in paragraph (c)(1) of this section. A district director who has provided such notice and who has been advised by the Commissioner that the Assistant Attorney General, Criminal Division, has not objected shall remove the alien without further hearing. An alien may not contest such removal, other than by applying for withholding of removal.

### § 236.5  Fingerprints and photographs.

Every alien 14 years of age or older against whom proceedings based on deportability under section 237 of the Act are commenced under this part by service of a notice to appear shall be fingerprinted and photographed. Such fingerprints and photographs shall be made available to Federal, State, and local law enforcement agencies upon request to the district director or chief patrol agent having jurisdiction over the alien's record. Any such alien, regardless of his or her age, shall be photographed and/or fingerprinted if required by any immigration officer authorized to issue a notice to appear. Every alien 14 years of age or older who is found to be inadmissible to the United States and ordered removed by an immigration judge shall be fingerprinted, unless during the preceding year he or she has been fingerprinted at an American consular office.

### §§ 236.6—236.9  [Reserved]

## Subpart B—Family Unity Program

### § 236.10  Description of program.

The family unity program implements the provisions of section 301 of the Immigration Act of 1990, Pub. L. 101–649. This Act is referred to in this section as "IMMACT 90''.

### § 236.11  Definitions.

In this subpart, the term:

*Eligible immigrant* means a qualified immigrant who is the spouse or unmarried child of a legalized alien.

*Legalized alien* means an alien who:

(1) Is a temporary or permanent resident under section 210 or 245A of the Act; or

(2) Is a permanent resident under section 202 of the Immigration Reform and Control Act of 1986 (Cuban/Haitian Adjustment).

### § 236.12  Eligibility.

(a) *General*. An alien who is not a lawful permanent resident is eligible to apply for benefits under the Family Unity Program if he or she establishes:

(1) That he or she entered the United States before May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), and has been continuously residing in the United States since that date; and

(2) That on May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), he or she was the spouse or unmarried child of a legalized alien, and that he or she has been eligible continuously since that time for family-sponsored second preference immigrant status under section 203(a)(2) of the Act based on the same relationship.

(b) *Legalization application pending as of May 5, 1988 or December 1, 1988.* An alien whose legalization application was filed on or before May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), but not approved until after that date will be treated as having been a legalized alien as of May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), for purposes of the Family Unity Program.

### § 236.13  Ineligible aliens.

The following categories of aliens are ineligible for benefits under the Family Unity Program:

(a) An alien who is deportable under any paragraph in section 237(a) of the Act, except paragraphs (1)(A), (1)(B), (1)(C), and (3)(A); provided that an alien who is deportable under section 237(a)(1)(A) of such Act is also ineligible for benefits under the Family Unity Program if deportability is based upon a ground of inadmissibility described in section 212(a) (2) or (3) of the Act;

(b) An alien who has been convicted of a felony or three or more misdemeanors in the United States; or

(c) An alien described in section 241(b)(3)(B) of the Act.

### § 236.14  Filing.

(a) *General*. An application for voluntary departure under the Family Unity Program must be filed at the service center having jurisdiction over the alien's place of residence. A Form I–817, Application for Voluntary Departure under the Family Unity Program, must be filed with the correct fee required in § 103.7(b)(1) of this chapter and the required supporting documentation. A separate application with appropriate fee and documentation must be filed for each person claiming eligibility.

(b) *Decision*. The service center director has sole jurisdiction to adjudicate an application for benefits under the Family Unity Program. The director will provide the applicant with specific reasons for any decision to deny an application. Denial of an application may not be appealed. An applicant who believes that the grounds for denial have been overcome may submit another application with the appropriate fee and documentation.

(c) *Referral of denied cases for consideration of issuance of notice to appear*. If an application is denied, the case will be referred to the district director with jurisdiction over the alien's place of residence for consideration of whether to issue a notice to appear. After an initial denial, an applicant's case will not be referred for issuance of a notice to appear until 90 days from the date of the initial denial, to allow the alien the opportunity to file a new Form I–817 application in order to attempt to overcome the basis of the denial. However, if the applicant is found not to be eligible for benefits under § 236.13(b), the Service reserves the right to issue a notice to appear at any time after the initial denial.

AR00490

### §236.15   Voluntary departure and eligibility for employment.

(a) *Authority*. Voluntary departure under this section implements the provisions of section 301 of IMMACT 90, and authority to grant voluntary departure under the family unity program derives solely from that section. Voluntary departure under the family unity program shall be governed solely by this section, notwithstanding the provisions of section 240B of the Act and 8 CFR part 240.

(b) *Children of legalized aliens*. Children of legalized aliens residing in the United States, who were born during an authorized absence from the United States of mothers who are currently residing in the United States under voluntary departure pursuant to the Family Unity Program, may be granted voluntary departure under section 301 of IMMACT 90 for a period of 2 years.

(c) *Duration of voluntary departure*. An alien whose application for benefits under the Family Unity Program is approved will receive voluntary departure for 2 years, commencing with the date of approval of the application. Voluntary departure under this section shall be considered effective from the date on which the application was properly filed.

(d) *Employment authorization*. An alien granted benefits under the Family Unity Program is authorized to be employed in the United States and may apply for an employment authorization document on Form I–765, Application for Employment Authorization. The application may be filed concurrently with Form I–817. The application must be accompanied by the correct fee required by § 103.7(b)(1) of this chapter. The validity period of the employment authorization will coincide with the period of voluntary departure.

(e) *Extension of voluntary departure*. An application for an extension of voluntary departure under the Family Unity Program must be filed by the alien on Form I–817 along with the correct fee required in § 103.7(b)(1) of this chapter and the required supporting documentation. The submission of a copy of the previous approval notice will assist in shortening the processing time. An extension may be granted if the alien continues to be eligible for benefits under the Family Unity Program. However, an extension may not be approved if the legalized alien is a lawful permanent resident, and a petition for family-sponsored immigrant status has not been filed in behalf of the applicant. In such case the Service will notify the alien of the reason for the denial and afford him or her the opportunity to file another Form I–817

once the petition, Form I–130, has been filed in behalf of him or her. No charging document will be issued for a period of 90 days.

(f) *Supporting documentation for extension application*. Supporting documentation need not include documentation provided with the previous application(s). The extension application need only include changes to previous applications and evidence of continuing eligibility since the date of the prior approval.

### §236.16   Travel outside the United States.

An alien granted Family Unity Program benefits who intends to travel outside the United States temporarily must apply for advance authorization using Form I–131, Application for Travel Document. The authority to grant an application for advance authorization for an alien granted Family Unity Program benefits rests soley with the district director. An alien who is granted advance authorization and returns to the United States in accordance with such authorization, and who is found not to be inadmissible under section 212(a) (2) or (3) of the Act, shall be inspected and admitted in the same immigration status as the alien had at the time of departure, and shall be provided the remainder of the voluntary departure period previously granted under the Family Unity Program.

### §236.17   Eligibility for Federal financial assistance programs.

An alien granted Family Unity Program benefits based on a relationship to a legalized alien as defined in §236.11 is ineligible for public welfare assistance in the same manner and for the same period as the legalized alien who is ineligible for such assistance under section 245A(h) or 210(f) of the Act, respectively.

### §236.18   Termination of Family Unity Program benefits.

(a) *Grounds of termination*. The Service may terminate benefits under the Family Unity Program whenever the necessity for the termination comes to the attention of the Service. Such grounds will exist in situations including, but not limited to, those in which:

(1) A determination is made that Family Unity Program benefits were acquired as the result of fraud or willful misrepresentation of a material fact;

(2) The beneficiary commits an act or acts which render him or her inadmissible as an immigrant or who are ineligible for benefits under the Family Unity Program;

(3) The legalized alien upon whose status benefits under the Family Unity Program were based loses his or her legalized status;

(4) The beneficiary is the subject of a final order of exclusion, deportation, or removal issued subsequent to the grant of Family Unity benefits unless such final order is based on entry without inspection; violation of status; or failure to comply with section 265 of the Act; or inadmissibility at the time of entry other than inadmissibility pursuant to section 212(a)(2) or 212(a)(3) of the Act, regardless of whether the facts giving rise to such ground occurred before or after the benefits were granted; or

(5) A qualifying relationship to a legalized alien no longer exists.

(b) *Notice procedure*. Notice of intent to terminate and of the grounds thereof shall be served pursuant to the provisions of § 103.5a of this chapter. The alien shall be given 30 days to respond to the notice and may submit to the Service additional evidence in rebuttal. Any final decision of termination shall also be served pursuant to the provisions of § 103.5a of this chapter. Nothing in this section shall preclude the Service from commencing exclusion or deportation proceedings prior to termination of Family Unity Program benefits.

(c) *Effect of termination*. Termination of benefits under the Family Unity Program, other than as a result of a final order of removal, shall render the alien amenable to removal proceedings under section 240 of the Act. If benefits are terminated, the period of voluntary departure under this section is also terminated.

## PART 237—[REMOVED AND RESERVED]

102. Part 237 is removed and reserved.

103. Part 238 is added to read as follows:

## PART 238—EXPEDITED REMOVAL OF AGGRAVATED FELONS

### §238.1   Proceedings under section 238(b) of the Act.

(a) *Definitions*. As used in this part:

*Deciding Service officer* means a district director, chief patrol agent, or another immigration officer designated by a district director or chief patrol agent, who is not the same person as the issuing Service officer.

*Issuing Service officer* means any Service officer listed in § 239.1 of this chapter as authorized to issue notices to appear.

(b) *Preliminary consideration and Notice of Intent to Issue a Final*

**AR00491**

*Administrative Deportation Order; commencement of proceedings.* (1) *Basis of Service charge.* An issuing Service officer shall cause to be served upon an alien a Form I–851, Notice of Intent to Issue a Final Administrative Deportation Order (Notice of Intent), if the officer is satisfied that there is sufficient evidence, based upon questioning of the alien by an immigration officer and upon any other evidence obtained, to support a finding that the individual:

(i) Is an alien;

(ii) Has not been lawfully admitted for permanent residence, or has conditional permanent resident status under section 216 of the Act;

(iii) Has been convicted (as defined in section 101(a)(48) of the Act and as demonstrated by any of the documents or records listed in § 3.41 of this chapter) of an aggravated felony and such conviction has become final; and

(iv) Is deportable under section 237(a)(2)(A)(iii) of the Act, including an alien who has neither been admitted nor paroled, but who is conclusively presumed deportable under section 237(a)(2)(A)(iii) by operation of section 238(c) of the Act ("Presumption of Deportability").

(2) *Notice.* (i) Removal proceedings under section 238(b) of the Act shall commence upon personal service of the Notice of Intent upon the alien, as prescribed by §§ 103.5a(a)(2) and 103.5a(c)(2) of this chapter. The Notice of Intent shall set forth the preliminary determinations and inform the alien of the Service's intention to issue a Form I–851A, Final Administrative Removal Order, without a hearing before an immigration judge. This Notice shall constitute the charging document. The Notice of Intent shall include allegations of fact and conclusions of law. It shall advise that the alien: has the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing, as long as counsel is authorized to practice in deportation proceedings; may inspect the evidence supporting the Notice of Intent; and may rebut the charges within 10 calendar days after service of such Notice (or 13 calendar days if service of the Notice was by mail).

(ii) The Notice of Intent also shall advise the alien that he or she may designate in writing, within the rebuttal period, the country to which he or she chooses to be deported in accordance with section 241 of the Act, in the event that a Final Administrative Removal Order is issued, and that the Service will honor such designation only to the extent permitted under the terms,

limitations, and conditions of section 241 of the Act.

(iii) The Service must determine that the person served with the Notice of Intent is the person named on the Notice.

(iv) The Service shall provide the alien with a list of available free legal services programs qualified under 8 CFR part 3 and organizations recognized pursuant to 8 CFR part 292, located within the district or sector where the Notice of Intent is issued.

(v) The Service must either provide the alien with a written translation of the Notice of Intent or explain the contents of the Notice of Intent to the alien in the alien's native language or in a language that the alien understands.

(c) *Alien's response.* (1) *Time for response.* The alien will have 10 calendar days from service of the Notice of Intent, or 13 calendar days if service is by mail, to file a response to the Notice of Intent. In the response, the alien may: designate his or her choice of country for removal; submit a written response rebutting the allegations supporting the charge and/or requesting the opportunity to review the Government's evidence; and/or request in writing an extension of time for response, stating the specific reasons why such an extension is necessary. Alternatively, the alien may, in writing, choose to accept immediate issuance of a Final Administrative Removal Order. The deciding Service officer may extend the time for response for good cause shown. A request for extension of time for response will not automatically extend the period for the response. The alien will be permitted to file a response outside the prescribed period only if the deciding Service officer permits it. The alien must send the response to the deciding Service officer at the address provided in the Notice of Intent.

(2) *Nature of rebuttal or request to review evidence.* (i) If an alien chooses to rebut the allegations contained in the Notice of Intent, the alien's written response must indicate which finding(s) are being challenged and should be accompanied by affidavit(s), documentary information, or other specific evidence supporting the challenge.

(ii) If an alien's written response requests the opportunity to review the Government's evidence, the Service shall serve the alien with a copy of the evidence in the record of proceeding upon which the Service is relying to support the charge. The alien may, within 10 calendar days following service of the Government's evidence (13 calendar days if service is by mail), furnish a final response in accordance

with paragraph (c)(1) of this section. If the alien's final response is a rebuttal of the allegations, such a final response should be accompanied by affidavit(s), documentary information, or other specific evidence supporting the challenge.

(d) *Determination by deciding Service officer.* (1) *No response submitted or concession of deportability.* If the deciding Service officer does not receive a timely response and the evidence in the record of processing establishes deportability by clear, convincing, and unequivocal evidence, or if the alien concedes deportability, then the deciding Service officer shall issue and cause to be served upon the alien a Final Administrative Removal Order that states the reasons for the deportation decision. The alien may, in writing, knowingly and voluntarily waive the 14-day waiting period before execution of the final order of removal provided in a paragraph (f) of this section.

(2) *Response submitted.* (i) *Insufficient rebuttal; no genuine issue of material fact.* If the alien timely submits a rebuttal to the allegations, but the deciding Service officer finds that deportability is established by clear, convincing, and unequivocal evidence in the record of proceeding, the deciding Service officer shall issue and cause to be served upon the alien a Final Administrative Removal Order that states the reasons for the decision of deportability.

(ii) *Additional evidence required.* (A) If the deciding Service officer finds that the record of proceeding, including the alien's timely rebuttal, raises a genuine issue of material fact regarding the preliminary findings, the deciding Service officer may either obtain additional evidence from any source, including the alien, or cause to be issued a notice to appear to initiate removal proceedings under section 240 of the Act. The deciding Service officer may also obtain additional evidence from any source, including the alien, if the deciding Service officer deems that such additional evidence may aid the officer in the rendering of a decision.

(B) If the deciding Service officer considers additional evidence from a source other than the alien, that evidence shall be made a part of the record of proceeding, and shall be provided to the alien. If the alien elects to submit a response to such additional evidence, such response must be filed with the Service within 10 calendar days of service of the additional evidence (or 13 calendar days if service is by mail). If the deciding Service officer finds, after considering all

**AR00492**

additional evidence, that deportability is established by clear, convincing, and unequivocal evidence in the record of proceeding, the deciding Service officer shall issue and cause to be served upon the alien a Final Administrative Deportation Order that states the reasons for the decision of deportability.

(iii) *Conversion to proceedings under section 240 of the Act.* If the deciding Service officer finds that the alien is not amenable to removal under section 238 of the Act, the deciding Service officer shall terminate the expedited proceedings under section 238 of the Act and shall, where appropriate, cause to be issued a notice to appear for the purpose of initiating removal proceedings before an immigration judge under section 240 of the Act.

(3) *Termination of proceedings by deciding Service officer.* Only the deciding Service officer may terminate proceedings under section 238 of the Act, in accordance with this section.

(e) *Proceedings commenced under section 240 of the Act.* In any proceeding commenced under section 240 of the Act which is based on deportability under section 237 of the Act, if it appears that the respondent alien is subject to removal pursuant to section 238 of the Act, the immigration judge may, upon the Service's request, terminate the case and, upon such termination, the Service may commence administrative proceedings under section 238 of the Act. However, in the absence of any such request, the immigration judge shall complete the proceeding commenced under section 240 of the Act.

(f) *Executing final removal order of deciding Service officer.* (1) *Time of execution.* Upon the issuance of a Final Administrative Removal Order, the Service shall issue a Warrant of Removal in accordance with § 241.2 of this chapter; such warrant shall be executed no sooner than 14 calendar days after the date the Final Administrative Removal Order is issued, unless the alien knowingly, voluntarily, and in writing waives the 14-day period.

(2) *Country to which alien is to be removed.* The deciding Service officer shall designate the country of removal in the manner prescribed by section 241 of the Act.

(g) *Arrest and detention.* At the time of issuance of a Notice of Intent or at any time thereafter and up to the time the alien becomes the subject of a Warrant of Removal, the alien may be arrested and taken into custody under the authority of a Warrant of Arrest issued by an officer listed in § 287.5(e)(2) of this chapter. The

decision of the Service concerning custody or bond shall not be administratively appealable during proceedings initiated under section 238 of the Act and this part.

(h) *Record of proceeding.* The Service shall maintain a record of proceeding for judicial review of the Final Administrative Removal Order sought by any petition for review. The record of proceeding shall include, but not necessarily be limited to: the charging document (Notice of Intent); the Final Administrative Removal Order (including any supplemental memorandum of decision); the alien's response, if any; all evidence in support of the charge; and any admissible evidence, briefs, or documents submitted by either party respecting deportability. The executed duplicate of the Notice of Intent in the record of proceedings shall be retained as evidence that the individual upon whom the notice for the proceeding was served was, in fact, the alien named in the notice.

**Authority:** 8 U.S.C. 1228; 8 CFR part 2.

104. Part 239 is added to read as follows:

## PART 239—INITIATION OF REMOVAL PROCEEDINGS

Sec.
239.1   Notice to appear.
239.2   Cancellation of notice to appear.
239.3   Effect of filing notice to appear.

**Authority:** 8 U.S.C. 1103, 1221, 1229; 8 CFR part 2.

### § 239.1  Notice to appear.

(a) *Commencement.* Every removal proceeding conducted under section 240 of the Act to determine the deportability or inadmissibility of an alien is commenced by the filing of a notice to appear with the Immigration Court. Any immigration officer performing an inspection of an arriving alien at a port-of-entry may issue a notice to appear to such an alien. In addition, the following officers, or officers acting in such capacity, may issue a notice to appear:

(1) District directors (except foreign);
(2) Deputy district directors (except foreign);
(3) Assistant district directors for investigations;
(4) Deputy assistant district directors for investigations;
(5) Assistant district directors for deportation;
(6) Deputy assistant district directors for deportation;
(7) Assistant district directors for examinations;

(8) Deputy assistant district directors for examinations;
(9) Officers in charge (except foreign);
(10) Assistant officers in charge (except foreign);
(11) Chief patrol agents;
(12) Deputy chief patrol agents;
(13) Associate chief patrol agents;
(14) Assistant chief patrol agents;
(15) Patrol agents in charge;
(16) The Assistant Commissioner, Investigations;
(17) Service center directors;
(18) Deputy center directors;
(19) Assistant center directors for examinations;
(20) Supervisory asylum officers; or
(21) Institutional Hearing Program directors.

(b) *Service of notice to appear.* Service of the notice to appear shall be in accordance with section 239 of the Act.

### § 239.2  Cancellation of notice to appear.

(a) Any officer authorized by § 239.1(a) to issue a notice to appear may cancel such notice prior to jurisdiction vesting with the immigration judge pursuant to § 3.14 of this chapter provided the officer is satisfied that:

(1) The respondent is a national of the United States;
(2) The respondent is not deportable or inadmissable under immigration laws;
(3) The respondent is deceased;
(4) The respondent is not in the United States;
(5) The notice was issued for the respondent's failure to file a timely petition as required by section 216(c) of the Act, but his or her failure to file a timely petition was excused in accordance with section 216(d)(2)(B) of the Act; or
(6) The notice to appear was improvidently issued.

(b) A notice to appear issued pursuant to section 235(b)(3) of the Act may be canceled under provisions in paragraphs (a)(2) and (a)(6) of this section only by the issuing officer, unless it is impracticable for the issuing officer to cancel the notice.

(c) *Motion to dismiss.* After commencement of proceedings pursuant to § 3.14 of this chapter, any officer enumerated in paragraph (a) of this section may move for dismissal of the matter on the grounds set out under paragraph (a) of this section. Dismissal of the matter shall be without prejudice to the alien or the Service.

(d) *Motion for remand.* After commencement of the hearing, any officer enumerated in paragraph (a) of this section may move for remand of the

matter to district jurisdiction on the ground that the foreign relations of the United States are involved and require further consideration. Remand of the matter shall be without prejudice to the alien or the Service.

(e) *Warrant of arrest.* When a notice to appear is canceled or proceedings are terminated under this section any outstanding warrant of arrest is canceled.

(f) *Termination of removal proceedings by immigration judge.* An immigration judge may terminate removal proceedings to permit the alien to proceed to a final hearing on a pending application or petition for naturalization when the alien has established prima facie eligibility for naturalization and the matter involves exceptionally appealing or humanitarian factors; in every other case, the removal hearing shall be completely as promptly as possible notwithstanding the pendency of an application for naturalization during any state of the proceedings.

### §239.3   Effect of filing notice to appear.

The filing of a notice to appear shall have no effect in determining periods of unlawful presence as defined in section 212(a)(9)(B) of the Act.

### §§ 240.1–240.20   Redesignated as §§ 244.3–244.22]

105. Sections 240.1 through 240.20 are redesignated as §§ 244.3 through 244.22.

106. Part 240 is revised to read as follows:

## PART 240—PROCEEDINGS TO DETERMINE REMOVABILITY OF ALIENS IN THE UNITED STATES

### Subpart A—Removal Proceedings

Sec.
240.1   Immigration judges.
240.2   Attorney for the Service.
240.3   Representation by counsel.
240.4   Incompetent respondents.
240.5   Interpreter.
240.6   Postponement and adjournment of hearing.
240.7   Evidence in removal proceedings under section 240 of the Act.
240.8   Burdens of proof in removal proceedings.
240.9   Contents of record.
240.10   Hearing.
240.11   Ancillary matters, applications.
240.12   Decision of the immigration judge.
240.13   Notice of decision.
240.14   Finality of order.
240.15   Appeals.
240.16   Application of new procedures or termination of proceedings in old proceedings pursuant to section 309(c) of Pub. L. 104–208.

### Subpart B—Cancellation of Removal

240.20   Cancellation of removal and adjustment of status under section 240A(a) and 240A(b) of the Act

### Subpart C—Voluntary Depature

240.25   Voluntary departure—authority of the Service.
240.26   Voluntary departure—authority of the Executive Office for Immigration Review.

### Subpart D—Exclusion of aliens (for proceedings commenced prior to April 1, 1997)

240.30   Proceedings prior to April 1, 1997.
240.31   Authority of immigration judges.
240.32   Hearing.
240.33   Applications for asylum or withholding of deportation.
240.34   Renewal of application for adjustment of status under section 245 of the Act.
240.35   Decision of the immigration judge; notice of the applicant.
240.36   Finality of order.
240.37   Appeals.
240.38   Fingerprinting of excluded aliens.
240.39   Reopening or reconsideration.

### Subpart E—Proceedings to determine deportability of aliens in the United States: Hearing and Appeal (for proceedings commenced prior to April 1, 1997)

240.40   Proceedings commenced prior to April 1, 1997.
240.41   Immigration judges.
240.42   Representation by counsel.
240.43   Incompetent respondents.
240.44   Interpreter.
240.45   Postponement and adjournment of hearing.
240.46   Evidence.
240.47   Contents of record.
240.48   Hearing.
240.49   Ancillary matters, applications.
240.50   Decision of the immigration judge.
240.51   Notice of decision.
240.52   Finality of order.
240.53   Appeals.
240.54   Proceedings under section 242(f) of the Act.

### Subpart F—Suspension of deportation and voluntary departure (for proceedings commenced prior to April 1, 1997)

240.55   Proceedings commenced prior to April 1, 1997.
240.56   Application.
240.57   Extension of time to depart.

### Subpart G—Civil penalties for failure to depart [Reserved]

**Authority:** 8 U.S.C. 1103; 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note, 1252a, 1252b, 1362; 8 CFR part 2.

## Subpart A—Removal Proceedings

### §240.1   Immigration judges.

(a) *Authority:* In any removal proceeding pursuant to section 240 of the Act, the immigration judge shall have the authority to: determine removability pursuant to section 240(a)(1) of the Act; to make decisions, including orders of removal as provided by section 240(c)(1)(A) of the Act; to determine applications under sections 208, 212(a)(2)(F), 212(a)(6)(F)(ii), 212(a)(9)(B)(v), 212(d)(11), 212(d)(12), 212(g), 212(h), 212(i), 212(k), 237(a)(1)(E)(iii), 237(a)(1)(H), 237(a)(3)(C)(ii), 240A(a) and (b), 240B, 245, and 249 of the Act; to order withholding of removal pursuant to section 241(b)(3) of the Act; and to take any other action consistent with applicable law and regulations as may be appropriate. In determining cases referred for further inquiry, immigration judges shall have the powers and authority conferred upon them by the Act and this chapter. Subject to any specific limitation prescribed by the Act and this chapter, immigration judges shall also exercise the discretion and authority conferred upon the Attorney General by the Act as is appropriate and necessary for the disposition of such cases. An immigration judge may certify his or her decision in any case under section 240 of the Act to the Board of Immigration Appeals when it involves an unusually complex or novel question of law or fact. Nothing contained in this part shall be construed to diminish the authority conferred on immigration judges under sections 101(b)(4) and 103 of the Act.

(b) *Withdrawal and substitution of immigration judges.* The immigration judge assigned to conduct the hearing shall at any time withdraw if he or she deems himself or herself disqualified. If an immigration judge becomes unavailable to complete his or her duties, another immigration judge may be assigned to complete the case. The new immigration judge shall familiarize himself or herself with the record in the case and shall state for the record that he or she has done so.

(c) *Conduct of hearing.* The immigration judge shall receive and consider material and relevant evidence, rule upon objections, and otherwise regulate the course of the hearing.

### §240.2   Attorney for the Service.

(a) *Authority.* The attorney for the Service shall present on behalf of the government evidence material to the issues of deportability or inadmissibility and any other issues that may require disposition by the immigration judge. The duties of the Service attorney include, but are not limited to, the presentation of evidence and the interrogation, examination, and cross-examination of the respondent or other witnesses. Nothing contained herein diminishes the authority of an immigration judge to conduct proceedings under this part. The Service

attorney is authorized to appeal from a decision of the immigration judge pursuant to § 3.38 of this chapter and to move for reopening or reconsideration pursuant to § 3.23 of this chapter.

(b) *Assignment*. In a removal proceeding, the Service shall assign an attorney to each case within the provisions of § 240.10(d), and to each case in which an unrepresented respondent is incompetent or is under 18 years of age, and is not accompanied by a guardian, relative, or friend. In a case in which the removal proceeding would result in an order of removal, the Service shall assign an attorney to each case in which a respondent's nationality is in issue. A Service attorney shall be assigned in every case in which the Commissioner approves the submission of non-record information under § 240.11(a)(3). In his or her discretion, whenever he or she deems such assignment necessary or advantageous, the General Counsel may assign a Service attorney to any other case at any stage of the proceeding.

### § 240.3   Representation by counsel.

The respondent may be represented at the hearing by an attorney or other representative qualified under 8 CFR part 292.

### § 240.4   Incompetent respondents.

When it is impracticable for the respondent to be present at the hearing because of mental incompetency, the attorney, legal representative, legal guardian, near relative, or friend who was served with a copy of the notice to appear shall be permitted to appear on behalf of the respondent. If such a person cannot reasonably be found or fails or refuses to appear, the custodian of the respondent shall be requested to appear on behalf of the respondent.

### § 240.5   Interpreter.

Any person acting as an interpreter in a hearing before an immigration judge under this part shall be sworn to interpret and translate accurately, unless the interpreter is an employee of the United States Government, in which event no such oath shall be required.

### § 240.6   Postponement and adjournment of hearing.

After the commencement of the hearing, the immigration judge may grant a reasonable adjournment either at his or her own instance or, for good cause shown, upon application by the respondent or the Service.

### § 240.7   Evidence in removal proceedings under section 240 of the Act.

(a) *Use of prior statements*.

The immigration judge may receive in evidence any oral or written statement that is material and relevant to any issue in the case previously made by the respondent or any other person during any investigation, examination, hearing, or trial.

(b) *Testimony*. Testimony of witnesses appearing at the hearing shall be under oath or affirmation administered by the immigration judge.

(c) *Depositions*. The immigration judge may order the taking of depositions pursuant to § 3.35 of this chapter.

### § 240.8   Burdens of proof in removal proceedings.

(a) *Deportable aliens*. A respondent charged with deportability shall be found to be removable if the Service proves by clear and convincing evidence that the respondent is deportable.

(b) *Arriving aliens*. In proceedings commenced upon a respondent's arrival in the United States or after the revocation or expiration of parole, the respondent must prove that he or she is clearly and beyond a doubt entitled to be admitted to the United States and is not inadmissible as charged.

(c) *Aliens present in the United States without being admitted or paroled*. In the case of a respondent in the United States without being admitted or paroled, the Service must first establish the alienage of the respondent. Once alienage has been established, unless the respondent demonstrates by clear and convincing evidence that he or she is lawfully in the United States pursuant to a prior admission, the respondent must prove that he or she is clearly and beyond a doubt entitled to be admitted to the United States and is not inadmissible as charged.

(d) *Relief from removal*. The respondent shall have the burden of establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion. If the evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

### § 240.9   Contents of record.

The hearing before the immigration judge, including the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, and all written orders, motions, appeals, briefs, and other papers filed in the proceedings shall constitute the record in the case. The hearing shall be

recorded verbatim except for statements made off the record with the permission of the immigration judge. In his or her decision, the immigration judge may exclude from the record any arguments made in connection with motions, applications, requests, or objections, but in such event the person affected may submit a brief.

### § 240.10   Hearing.

(a) *Opening*. In a removal proceeding, the immigration judge shall:

(1) Advise the respondent of his or her right to representation, at no expense to the government, by counsel of his or her own choice authorized to practice in the proceedings and require the respondent to state then and there whether he or she desires representation;

(2) Advise the respondent of the availability of free legal services provided by organizations and attorneys qualified under 8 CFR part 3 and organizations recognized pursuant to § 292.2 of this chapter, located in the district where the removal hearing is being held;

(3) Ascertain that the respondent has received a list of such programs, and a copy of appeal rights;

(4) Advise the respondent that he or she will have a reasonable opportunity to examine and object to the evidence against him or her, to present evidence in his or her own behalf and to cross-examine witnesses presented by the government (but respondent shall not be entitled to examine such national security information as the government may proffer in opposition to the respondent's admission to the United States or to an application by the respondent for discretionary relief);

(5) Place the respondent under oath;

(6) Read the factual allegations and the charges in the notice to appear to the respondent and explain them in non-technical language; and

(7) Enter the notice to appear as an exhibit in the Record of Proceeding.

(b) *Public access to hearings*. Removal hearings shall be open to the public, except that the immigration judge may, in his or her discretion, close proceedings as provided in § 3.27 of this chapter.

(c) *Pleading by respondent*. The immigration judge shall require the respondent to plead to the notice to appear by stating whether he or she admits or denies the factual allegations and his or her removability under the charges contained therein. If the respondent admits the factual allegations and admits his or her removability under the charges and the immigration judge is satisfied that no

issues of law or fact remain, the immigration judge may determine that removability as charged has been established by the admissions of the respondent. The immigration judge shall not accept an admission of removability from an unrepresented respondent who is incompetent or under the age of 18 and is not accompanied by an attorney or legal representative, a near relative, legal guardian, or friend; nor from an officer of an institution in which a respondent is an inmate or patient. When, pursuant to this paragraph, the immigration judge does not accept an admission of removability, he or she shall direct a hearing on the issues.

(d) *Issues of removability.* When removability is not determined under the provisions of paragraph (b) of this section, the immigration judge shall request the assignment of an assistant district counsel, and shall receive evidence as to any unresolved issues, except that no further evidence need be received as to any facts admitted during the pleading. The alien shall provide a court certified copy of a Judicial Recommendation Against Deportation (JRAD) to the immigration judge when such recommendation will be the basis of denying any charge(s) brought by the Service in the proceedings against the alien. No JRAD is effective against a charge of deportability under former section 241(a)(11) of the Act or if the JRAD was granted on or after November 29, 1990.

(e) *Additional charges in removal hearings.* At any time during the proceeding, additional or substituted charges of inadmissibility and/or deportability and/or factual allegations may be lodged by the Service in writing. The alien in removal proceedings shall be served with a copy of these additional charges and allegations. The immigration judge shall read the additional factual allegations and charges to the and explain them to him or her. The immigration judge shall advise the alien, if he or she is not represented by counsel, that the alien may be so represented, and that he or she may be given a reasonable continuance to respond to the additional factual allegations and charges. Thereafter, the provision of § 240.6(b) relating to pleading shall apply to the additional factual allegations and charges.

(f) *Country of removal.* The immigration judge shall notify the alien that if he or she is finally ordered removed, the country of removal will in the first instance be directed pursuant to section 241(b) of the Act to the country designated by the alien, unless section 241(b)(2)(C) of the Act applies, and shall afford him or her an opportunity then and there to make such designation. The immigration judge shall then specify and state for the record the country, or countries in the alternative, to which the alien's removal will be directed pursuant to section 241(b) of the Act if the country of his or her designation will not accept him or her into its territory, or fails to furnish timely notice of acceptance, or if the alien declines to designate a country.

(g) In the event that the Service is unable to remove the alien to the specified or alternative country or countries, the Service may remove the alien to any other country as permitted by section 241(b) of the Act.

### § 240.11  Ancillary matters, applications.

(a) *Creation of the status of an alien lawfully admitted for permanent residence.* (1) In a removal proceeding, an alien may apply to the immigration judge for cancellation of removal under section 240A of the Act, adjustment of status under section 245 of the Act, adjustment of status under section 1 of the Act of November 2, 1996 (as modified by section 606 of Pub. L. 104–132) or under section 101 or 104 of the Act of October 28, 1977, or for the creation of a record of lawful admission for permanent residence under section 249 of the Act. The application shall be subject to the requirements of § 240.20, and 8 CFR parts 245 and 249. The approval of any application made to the immigration judge under section 245 of the Act by an alien spouse (as defined in section 216(g)(1) of the Act) or by an alien entrepreneur (as defined in section 216A(f)(1) of the Act) shall result in the alien's obtaining the status of lawful permanent resident on a conditional basis in accordance with the provisions of section 216 or 216A of the Act, whichever is applicable. However, the Petition to Remove the Conditions on Residence required by section 216(c) of the Act, or the Petition by Entrepreneur to Remove Conditions required by section 216A(c) of the Act shall be made to the director in accordance with 8 CFR part 216.

(2) In conjunction with any application for creation of status of an alien lawfully admitted for permanent residence made to an immigration judge, if the alien is inadmissible under any provision of section 212(a) of the Act, and believes that he or she meets the eligibility requirements for a waiver of the ground of inadmissibility, he or she may apply to the immigration judge for such waiver. The immigration judge shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make application during the hearing.

(3) In exercising discretionary power when considering an application for status as a permanent resident under this chapter, the immigration judge may consider and base the decision on information not contained in the record and not made available for inspection by the alien, provided the Commissioner has determined that such information is relevant and is classified under the applicable Executive Order as requiring protection from unauthorized disclosure in the interest of national security. Whenever the immigration judge believes that he or she can do so while safeguarding both the information and its source, the immigration judge should inform the alien of the general nature of the information in order that the alien may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state that the information is material to the decision.

(b) *Voluntary departure.* The alien may apply to the immigration judge for voluntary departure in lieu of removal pursuant to section 240B of the Act and subpart C of this part.

(c) *Applications for asylum and withholding of removal.* (1) If the alien expresses fear of persecution or harm upon return to any of the countries to which the alien might be removed pursuant to § 240.10(f), and the alien has not previously filed an application for asylum or withholding of removal that has been referred to the immigration judge by an asylum officer in accordance with § 208.14 of this chapter, the immigration judge shall:

(i) Advise the alien that he or she may apply for asylum in the United States or withholding of removal of those countries;

(ii) Make available the appropriate application forms; and

(iii) Advise the alien of the privilege of being represented by counsel at no expense to the government and of the consequences, pursuant to section 208(d)(6) of the Act, of knowingly, filing a frivolous application for asylum. The immigration judge shall provide to the alien a list of persons who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis.

(2) An application for asylum or withholding of removal must be filed with the Immigration Court, pursuant to § 208.4(c) of this chapter. Upon receipt of an application that has not been referred by an asylum officer, the Immigration Court shall forward a copy

to the Department of State pursuant to § 208.11 of this chapter and shall calendar the case for a hearing. The reply, if any, from the Department of State, unless classified under the applicable Executive Order, shall be given to both the alien and to the assistant district counsel representing the government.

(3) Applications for asylum and withholding of removal so filed will be decided by the immigration judge pursuant to the requirements and standards established in 8 CFR part 208 of this chapter after an evidentiary hearing to resolve factual issues in dispute. An evidentiary hearing extending beyond issues related to the basis for a mandatory denial of the application pursuant to § 208.14 or § 208.16 of this chapter is not necessary once the immigration judge has determined that such a denial is required.

(i) Evidentiary hearings on applications for asylum or withholding of removal will be open to the public unless the alien expressly requests that the hearings be closed pursuant to § 3.27 of this chapter. The immigration judge shall inquire whether the alien requests such closure.

(ii) Nothing in this section is intended to limit the authority of the immigration judge to properly control the scope of any evidentiary hearing.

(iii) During the removal hearing, the alien shall be examined under oath on his or her application and may present evidence and witnesses in his or her own behalf. The alien has the burden of establishing that he or she is a refugee as defined in section 101(a)(42) of the Act pursuant to the standards set forth in § 208.13 of this chapter.

(iv) The assistant district counsel may call witnesses and present evidence for the record, including information classified under the applicable Executive Order, provided the immigration judge or the Board has determined that such information is relevant to the hearing. When the immigration judge receives such classified information, he or she shall inform the alien. The agency that provides the classified information to the immigration judge may provide an unclassified summary of the information for release to the alien, whenever it determines it can do so consistently with safeguarding both the classified nature of the information and its sources. The summary should be as detailed as possible, in order that the alien may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state whether such information is material to the decision.

(4) The decision of an immigration judge to grant or deny asylum or withholding of removal shall be communicated to the alien and to the assistant district counsel. An adverse decision shall state why asylum or withholding of removal was denied.

(d) *Application for relief under sections 237(a)(1)(H) and 237(a)(1)(E)(iii) of the Act.* The respondent may apply to the immigration judge for relief from removal under sections 237(a)(1)(H) and 237(a)(1)(E)(iii) of the Act.

(e) *General.* An application under this section shall be made only during the hearing and shall not be held to constitute a concession of alienage or deportability in any case in which the respondent does not admit his or her alienage or deportability. However, nothing in this section shall prohibit the Service from using information supplied in an application for asylum or withholding of deportation or removal submitted to the Service on or after January 4, 1995, as the basis for issuance of a charging document or to establish alienage or deportability in a case referred to an immigration judge under § 208.14(b) of this chapter. The alien shall have the burden of establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion. Nothing contained herein is intended to foreclose the respondent from applying for any benefit or privilege that he or she believes himself or herself eligible to receive in proceedings under this part. Nothing in this section is intended to limit the Attorney General's authority to remove an alien to any country permitted by section 241(b) of the Act.

(f) *Fees.* The alien shall not be required to pay a fee on more than one application within paragraphs (a) and (c) of this section, provided that the minimum fee imposed when more than one application is made shall be determined by the cost of the application with the highest fee.

## § 240.12   Decision of the immigration judge.

(a) *Contents.* The decision of the immigration judge may be oral or written. The decision of the immigration judge shall include a finding as to inadmissibility or deportability. The formal enumeration of findings is not required. The decision shall also contain reasons for granting or denying the request. The decision shall be concluded with the order of the immigration judge.

(b) *Summary decision.* Notwithstanding the provisions of paragraph (a) of this section, in any case where inadmissibility or deportability is determined on the pleadings pursuant to § 240.10(b) and the respondent does not make an application under § 240.11, the alien is statutorily ineligible for relief, or the respondent applies for voluntary departure only and the immigration judge grants the application, the immigration judge may enter a summary decision or, if voluntary departure is granted, a summary decision with an alternate order of removal.

(c) *Order of the immigration judge.* The order of the immigration judge shall direct the respondent's removal, or the termination of the proceedings, or such other disposition of the case as may be appropriate. When removal is ordered, the immigration judge shall specify the country, or countries in the alternate, to which respondent's removal shall be directed. The immigration judge is authorized to issue orders in the alternative or in combination as he or she may deem necessary.

## § 240.13   Notice of decision.

(a) *Written decision.* A written decision shall be served upon the respondent and the service counsel, together with the notice referred to in § 3.3 of this chapter. Service by mail is complete upon mailing.

(b) *Oral decision.* An oral decision shall be stated by the immigration judge in the presence of the respondent and the service counsel, if any, at the conclusion of the hearing. A copy of the summary written order shall be furnished at the request of the respondent or the service counsel.

(c) *Summary decision.* When the immigration judge renders a summary decision as provided in § 240.12(b), he or she shall serve a copy thereof upon the respondent at the conclusion of the hearing.

(d) *Decision to remove.* If the immigration judge decides that the respondent is removable and orders the respondent to be removed, the immigration judge shall advise the respondent of such decision, and of the consequences for failure to depart under the order of removal, including civil and criminal penalties described at sections 274D and 243 of the Act. Unless appeal from the decision is waived, the respondent shall be furnished with Form EOIR–26, Notice of Appeal, and advised of the provisions of § 240.15.

### § 240.14  Finality of order.

The order of the immigration judge shall become final in accordance with § 3.39 of this chapter.

### § 240.15  Appeals.

Pursuant to 8 CFR part 3, an appeal shall lie from a decision of an immigration judge to the Board of Immigration Appeals, except that no appeal shall lie from an order of removal entered in absentia. The procedures regarding the filing of a Form EOIR 26, Notice of Appeal, fees, and briefs are set forth in §§ 3.3, 3.31, and 3.38 of this chapter. An appeal shall be filed within 30 calendar days after the mailing of a written decision, the stating of an oral decision, or the service of a summary decision. The filing date is defined as the date of receipt of the Notice of Appeal by the Board of Immigration Appeals. The reasons for the appeal shall be stated in the Notice of Appeal in accordance with the provisions of § 3.3(b) of this chapter. Failure to do so may constitute a ground for dismissal of the appeal by the Board pursuant to § 3.1(d)(1–a) of this chapter.

### § 240.16  Application of new procedures or termination of proceedings in old proceedings pursuant to section 309(c) of Pub. L. 104–208.

The Attorney General shall have the sole discretion to apply the provisions of section 309(c) of Pub. L. 104–208, which provides for the application of new removal procedures to certain cases in exclusion or deportation proceedings and for the termination of certain cases in exclusion or deportation proceedings and initiation of new removal proceedings. The Attorney General's application of the provisions of section 309(c) shall become effective upon publication of a notice in the **Federal Register.** However, if the Attorney General determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws, the Attorney General's application shall become effective immediately upon issuance, and shall be published in the **Federal Register** as soon as practicable thereafter.

### §§ 240.17–240.19   [Reserved]

## Subpart B—Cancellation of Removal

### § 240.20  Cancellation of removal and adjustment of status under section 240A of the Act.

(a) *Jurisdiction.* An application for the exercise of discretion under section 240A of the Act shall be submitted on Form EOIR–42, Application for Cancellation of Removal, to the Immigration Court having administrative control over the Record of Proceeding of the underlying removal proceeding under section 240 of the Act.

(b) *Filing the application.* The application may be filed only with the immigration Court after jurisdiction has vested pursuant to § 3.14 of this chapter.

### §§ 240.21–240.24   [Reserved]

## Subpart C—Voluntary Departure

### § 240.25  Voluntary departure—authority of the Service.

(a) *Authorized officers.* The authority contained in section 240B(a) of the Act to permit aliens to depart voluntarily from the United States may be exercised in lieu of being subject to proceedings under section 240 of the Act or prior to the completion of such proceedings by district directors, assistant district directors for investigations, assistant district directors for examinations, officers in charge, chief patrol agents, service center directors, and assistant center directors for examinations.

(b) *Conditions.* The Service may attach to the granting of voluntary departure any conditions it deems necessary to ensure the alien's timely departure from the United States, including the posting of a bond, continued detention pending departure, and removal under safeguards. The alien shall be required to present to the Service, for inspection and photocopying, his or her passport or other travel documentation sufficient to assure lawful entry into the country to which the alien is departing. The Service may hold the passport or documentation for sufficient time to investigate its authenticity.

(c) *Periods of time.* The authorized officer, in his or her discretion, shall specify the period of time permitted for voluntary departure, and may grant extensions thereof, except that the total period allowed, including any extensions, shall not exceed 120 days.

(d) *Application.* Any alien who believes himself or herself to be eligible for voluntary departure under this section may apply therefor at any office of the Service. After the commencement of removal proceedings, the application may be communicated through the Service attorney. If the Service agrees to voluntary departure after proceedings have commenced, it may either:

(1) Join in a motion to terminate the proceedings, and if the proceedings are terminated, grant voluntary departure; or

(2) Join in a motion asking the immigration judge to permit voluntary departure in accordance with § 240.26.

(e) *Appeals.* An appeal shall not lie from a denial of an application for voluntary departure under this section, but the denial shall be without prejudice to the alien's right to apply to the immigration judge for voluntary departure in accordance with § 240.26 or for relief from removal under any provision of law.

(f) *Revocation.* If, subsequent to the granting of an application for voluntary departure under this section, it is ascertained that the application should not have been granted, that grant may be revoked without notice by any officer authorized to grant voluntary departure under § 240.25(a).

### § 240.26  Voluntary departure—authority of the Executive Office for Immigration Review.

(a) *Eligibility; general.* An alien previously granted voluntary departure under section 240B of the Act, including by the Service under § 240.25, and who fails to depart voluntarily within the time specified, shall thereafter be ineligible, for a period of ten years, for voluntary departure or for relief under sections 240A, 245, 248, and 249 of the Act.

(b) *Prior to completion of removal proceedings.* (1) *Grant by the immigration judge.* (i) An alien may be granted voluntary departure by an immigration judge pursuant to section 240B(a) of the Act only if the alien:

(A) Makes such request prior to or at a master calendar hearing;

(B) Makes no additional request for relief (or if such requests have been made, such requests are withdrawn prior to any grant of voluntary departure pursuant to this section);

(C) Concedes removability; and

(D) Waives appeal of all issues.

(ii) The judge may not grant voluntary departure under section 240B(a) of the Act beyond 30 days after the case has been calendared for a merits hearing, except pursuant to a stipulation under paragraph (b)(2) of this section.

(2) *Stipulation.* At any time prior to the completion of removal proceedings, the Service attorney may stipulate to a grant of voluntary departure under section 240B(a) of the Act.

(3) *Conditions.* (i) The judge may impose such conditions as he or she deems necessary to ensure the alien's timely departure from the United States, including the posting of a voluntary departure bond to be canceled upon proof that the alien has departed the United States within the time specified. The alien shall be required to present to

the Service, for inspection and photocopying, his or her passport or other travel documentation sufficient to assure lawful entry into the country to which the alien is departing, unless:

(A) A travel document is not necessary to return to his or her native country or to which country the alien is departing; or

(B) The document is already in the possession of the Service.

(ii) The Service may hold the passport or documentation for sufficient time to investigate its authenticity. If such documentation is not immediately available to the alien, but the immigration judge is satisfied that the alien is making diligent efforts to secure it, voluntary departure may be granted for a period not to exceed 120 days, subject to the condition that the alien within 60 days must secure such documentation and present it to the Service. The Service in its discretion may extend the period within which the alien must provide such documentation. If the documentation is not presented within the 60-day period or any extension thereof, the voluntary departure order shall vacate automatically and the alternate order of deportation will take effect, as if in effect on the date of issuance of the immigration judge order.

(c) *At the conclusion of the removal proceedings.* (1) *Required findings.* An immigration judge may grant voluntary departure at the conclusion of the removal proceedings under section 240B(b) of the Act, if he or she finds that:

(i) The alien has been physically present in the United States for period of at least one year preceding the date the Notice to Appear was served under section 239(a) of the Act;

(ii) the alien is, and has been, a person of good moral character for at least five years immediately preceding the application;

(iii) the alien is not deportable under section 237(a)(2)(A)(iii) or 237(a)(4) of the Act; and

(iv) the alien has established by clear and convincing evidence that the alien has the means to depart the United States and has the intention to do so.

(2) *Travel documentation.* Except as otherwise provided in paragraph (b)(3) of this section, the clear and convincing evidence of the means to depart shall include in all cases presentation by the alien of a passport or other travel documentation sufficient to assure lawful entry into the country to which the alien is departing. The Service shall have full opportunity to inspect and photocopy the documentation, and to

challenge its authenticity or sufficiency before voluntary departure is granted.

(3) *Conditions.* The judge may impose such conditions as he or she deems necessary to ensure the alien's timely departure from the United States. In all cases under section 240B(b) of the Act, the alien shall be required to post a voluntary departure bond, in an amount necessary to ensure that the alien departs within the time specified, but in no case less than $500. The voluntary departure bond shall be posted with the district director within 5 business days of the immigration judge's order granting voluntary departure, and the district director may, at his or her discretion, hold the alien in custody until the bond is posted. If the bond is not posted within 5 business days, the voluntary departure order shall vacate automatically and the alternate order of removal will take effect on the following day. In order for the bond to be canceled, the alien must provide proof of departure to the district director.

(d) *Alternate order of removal.* Upon granting a request made for voluntary departure either prior to the completion of proceedings or at the conclusion of proceedings, the immigration judge shall also enter an alternate order or removal.

(e) *Periods of time.* If voluntary departure is granted prior to the completion of removal proceedings, the immigration judge may grant a period not to exceed 120 days. If voluntary departure is granted at the conclusion of proceedings, the immigration judge may grant a period not to exceed 60 days.

(f) *Extension of time to depart.* Authority to extend the time within which to depart voluntarily specified initially by an immigration judge or the Board is within the sole jurisdiction of the district director. An immigration judge or the Board may reinstate voluntary departure in a removal proceeding that has been reopened for a purpose other than solely making an application for voluntary departure if reopening was granted prior to the expiration of the original period of voluntary departure. In no event can the total period of time, including any extension, exceed 120 days or 60 days as set forth in section 240B of the Act.

(g) *Administrative Appeals.* (1) *Grants of requests made prior to the completion of the section 240 removal proceeding.* A Service appeal of a grant of voluntary departure prior to the completion of section 240 removal proceedings shall be limited to the issue of whether the alien merits the grant of voluntary departure as a matter of discretion. Such an appeal shall not challenge the

number of days of voluntary departure granted.

(2) *At the conclusion of the section 240 removal proceeding.* An appeal of a grant or denial of voluntary departure at the conclusion of the section 240 removal proceeding shall be limited to the issues of whether the alien is eligible for a grant of voluntary departure under the Act and this chapter and whether the alien merits a grant of voluntary departure as a matter of discretion. Such an appeal shall not challenge the number of days of voluntary departure granted.

(h) *Reinstatement of voluntary departure.* An immigration judge or the Board may reinstate voluntary departure in a removal proceeding that has been reopened for a purpose other than solely making application for voluntary departure, if reopening was granted prior to the expiration of the original period of voluntary departure. In no event can the total period of time, including any extension, exceed 120 days or 60 days as set forth in section 240B of the Act and paragraph (a) of this section.

### §§ 240.27–240.29   [Reserved]

### Subpart D—Exclusion of Aliens (for Hearings Commenced Prior to April 1, 1997)

### § 240.30   Proceedings prior to April 1, 1997.

Subpart D of 8 CFR part 240 applies to exclusion proceedings commenced prior to April 1, 1997, pursuant to the former section 236 of the Act. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

### § 240.31   Authority of immigration judges.

In determining cases referred for further inquiry as provided in section 235 of the Act, immigration judges shall have the powers and authority conferred upon them by the Act and this chapter. Subject to any specific limitation prescribed by the Act and this chapter, immigration judges shall also exercise the discretion and authority conferred upon the Attorney General by the Act as is appropriate and necessary for the disposition of such cases.

### § 240.32   Hearing.

(a) *Opening.* Exclusion hearings shall be closed to the public, unless the alien at his or her own instance requests that the public, including the press, be permitted to attend; in that event, the hearing shall be open, provided that the alien states for the record that he or she is waiving the requirement in section 236 of the Act that the inquiry shall be kept separate and apart from the public.

**AR00499**

When the hearing is to be open, depending upon physical facilities, reasonable limitation may be placed upon the number in attendance at any one time, with priority being given to the press over the general public. The immigration judge shall ascertain whether the applicant for admission is the person to whom Form I–122 was previously delivered by the examining immigration officer as provided in 8 CFR part 235; enter a copy of such form in evidence as an exhibit in the case; inform the applicant of the nature and purpose of the hearing; advise him or her of the privilege of being represented by an attorney of his or her own choice at no expense to the Government, and of the availability of free legal services programs qualified under 8 CFR part 3 and organizations recognized pursuant to § 292.2 of this chapter located in the district where his or her exclusion hearing is to be held; and shall ascertain that the applicant has received a list of such programs; and request him or her to ascertain then and there whether he or she desires representation; advise him or her that he or she will have a reasonable opportunity to present evidence in his or her own behalf, to examine and object to evidence against him or her, and to cross-examine witnesses presented by the Government; and place the applicant under oath.

(b) *Procedure.* The immigration judge shall receive and adduce material and relevant evidence, rule upon objections, and otherwise regulate the course of the hearing.

(c) *Attorney for the Service.* The Service shall assign an attorney to each case in which an applicant's nationality is in issue and may assign an attorney to any case in which such assignment is deemed necessary or advantageous. The duties of the Service attorney include, but are not limited to, the presentation of evidence and the interrogation, examination, and cross-examination of the applicant and other witnesses. Nothing contained herein diminishes the authority of an immigration judge to conduct proceedings under this part.

(d) *Depositions.* The procedures specified in § 240.48(e) shall apply.

(e) *Record.* The hearing before the immigration judge, including the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, and all written orders, motions, appeals, and other papers filed in the proceeding shall constitute the record in the case. The hearing shall be recorded verbatim except for statements made off the record with the permission of the immigration judge.

## § 240.33   Applications for asylum or withholding of deportation.

(a) If the alien expresses fear of persecution or harm upon return to his or her country of origin or to a country to which the alien may be deported after a determination of excludability from the United States pursuant to this subpart, and the alien has not been referred to the immigration judge by an asylum officer in accordance with § 208.14(b) of this chapter, the immigration judge shall:

(1) Advise the alien that he may apply for asylum in the United States or withholding of deportation to that other country; and

(2) Make available the appropriate application forms.

(b) An application for asylum or withholding of deportation must be filed with the Immigration Court, pursuant to § 208.4(c) of this chapter. Upon receipt of an application that has not been referred by an asylum officer, the Immigration Court shall forward a copy to the Department of State pursuant to § 208.11 of this chapter and shall calendar the case for a hearing. The reply, if any, from the Department of State, unless classified under the applicable Executive Order, shall be given to both the applicant and to the trial attorney representing the government.

(c) Applications for asylum or withholding of deportation so filed will be decided by the immigration judge pursuant to the requirements and standards established in 8 CFR part 208 after an evidentiary hearing that is necessary to resolve material factual issues in dispute. An evidentiary hearing extending beyond issues related to the basis for a mandatory denial of the application pursuant to § 208.13(c) of this chapter is not necessary once the immigration judge has determined that such denial is required.

(1) Evidentiary hearings on applications for asylum or withholding of deportation will be closed to the public unless the applicant expressly requests that it be open pursuant to § 236.3 of this chapter.

(2) Nothing in this section is intended to limit the authority of the immigration judge properly to control the scope of any evidentiary hearing.

(3) During the exclusion hearing, the applicant shall be examined under oath on his or her application and may present evidence and witnesses on his or her own behalf. The applicant has the burden of establishing that he or she is a refugee as defined in section 101(a)(42) of the Act pursuant to the standard set forth in § 208.13 of this chapter.

(4) The trial attorney for the government may call witnesses and present evidence for the record, including information classified under the applicable Executive Order, provided the immigration judge or the Board has determined that such information is relevant to the hearing. The applicant shall be informed when the immigration judge receives such classified information. The agency that provides the classified information to the immigration judge may provide an unclassified summary of the information for release to the applicant whenever it determines it can do so consistently with safeguarding both the classified nature of the information and its source. The summary should be as detailed as possible, in order that the applicant may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state that such information is material to the decision.

(d) The decision of an immigration judge to grant or deny asylum or withholding of deportation shall be communicated to the applicant and to the trial attorney for the government. An adverse decision will state why asylum or withholding of deportation was denied.

## § 240.34   Renewal of application for adjustment of status under section 245 of the Act.

An adjustment application by an alien paroled under section 212(d)(5) of the Act, which has been denied by the district director, may be renewed in exclusion proceedings under section 236 of the Act (as in effect prior to April 1, 1997) before an immigration judge under the following two conditions: first, the denied application must have been properly filed subsequent to the applicant's earlier inspection and admission to the United States; and second, the applicant's later absence from and return to the United States must have been under the terms of an advance parole authorization on Form I–512 granted to permit the applicant's absence and return to pursue the previously filed adjustment application.

## § 240.35   Decision of the immigration judge; notice to the applicant.

(a) *Decision.* The immigration judge shall inform the applicant of his or her decision in accordance with § 3.37 of this chapter.

(b) *Advice to alien ordered excluded.* An alien ordered excluded shall be furnished with Form I–296, Notice to Alien Ordered Excluded by Immigration Judge, at the time of an oral decision by

the immigration judge or upon service of a written decision.

(c) *Holders of refugee travel documents.* Aliens who are holders of valid unexpired refugee travel documents may be ordered excluded only if they are found to be inadmissible under section 212(a)(2), 212(a)(3), or 212(a)(6)(E) of the Act, and it is determined that on the basis of the acts for which they are inadmissible there are compelling reasons of national security or public order for their exclusion. If the immigration judge finds that the alien is inadmissible but determines that there are no compelling reasons of national security or public order for exclusion, the immigration judge shall remand the case to the district director for parole.

### §240.36   Finality of order.

The decision of the immigration judge shall become final in accordance with §3.37 of this chapter.

### §240.37   Appeals.

Except for temporary exclusions under section 235(c) of the Act, an appeal from a decision of an Immigration Judge under this part may be taken by either party pursuant to §3.38 of this chapter.

### §240.38   Fingerprinting of excluded aliens.

Every alien 14 years of age or older who is excluded from admission to the United States by an immigration judge shall be fingerprinted, unless during the preceding year he or she has been fingerprinted at an American consular office.

### §240.39   Reopening or reconsideration.

Except as otherwise provided in this section, a motion to reopen or reconsider shall be subject to the requirements of §103.5 of this chapter. The immigration judge may upon his or her own motion, or upon motion of the trial attorney or the respondent, reopen or reconsider any case in which he or she had made a decision, unless jurisdiction in the case is vested in the Board of Immigration Appeals under 8 CFR part 3. An order by the immigration judge granting a motion to reopen may be made on Form I–328. A motion to reopen will not be granted unless the immigration judge is satisfied that evidence sought to be offered is material and was not available and could not have been discovered or presented at the hearing; nor will any motion to reopen for the purpose of providing the respondent with an opportunity to make an application under §242.17 of this chapter be granted if respondent's right to make such application were fully

explained to him or her by the immigration judge and he or she was afforded an opportunity to do so at the hearing, unless circumstances have arisen thereafter on the basis of which the request is being made. The filing of a motion under this section with an immigration judge shall not serve to stay the execution of an outstanding decision; execution shall proceed unless the immigration judge who has jurisdiction over the motion specifically grants a stay of deportation. The immigration judge may stay deportation pending his or her determination of the motion and also pending the taking and disposition of an appeal from such determination.

## Subpart E—Proceedings To Determine Deportability of Aliens in the United States: Hearing and Appeal (for Proceedings Commenced Prior to April 1, 1997)

### §240.40   Proceedings commenced prior to April 1, 1997.

Subpart E of 8 CFR part 240 applies only to deportation proceedings commenced prior to April 1, 1997. All references to the Act contained in this subpart pertain to the Act as in effect prior to April 1, 1997.

### §240.41   Immigration Judges.

(a) *Authority.* In any proceeding conducted under this part the immigration judge shall have the authority to determine deportability and to make decisions, including orders of deportation, as provided by section 242(b) and 242B of the Act; to reinstate orders of deportation as provided by section 242(f) of the Act; to determine applications under sections 208, 212(k), 241(a)(1)(E)(iii), 241(a)(1)(H), 244, 245, and 249 of the Act; to determine the country to which an alien's deportation will be directed in accordance with section 243(a) of the Act; to order temporary withholding of deportation pursuant to section 243(h) of the Act; and to take any other action consistent with applicable law and regulations as may be appropriate. An immigration judge may certify his or her decision in any case to the Board of Immigration Appeals when it involves an unusually complex or novel question of law or fact. Nothing contained in this part shall be construed to diminish the authority conferred on immigration judges under section 103 of the Act.

(b) *Withdrawal and substitution of immigration judges.* The immigration judge assigned to conduct the hearing shall at any time withdraw if he deems himself disqualified. If an immigration judge becomes unavailable to complete

his or her duties within a reasonable time, or if at any time the respondent consents to a substitution, another immigration judge may be assigned to complete the case. The new immigration judge shall familiarize himself or herself with the record in the case and shall state for the record that he has done so.

### §240.42   Representation by counsel.

The respondent may be represented at the hearing by an attorney or other representative qualified under 8 CFR part 292.

### §240.43   Incompetent respondents.

When it is impracticable for the respondent to be present at the hearing because of mental incompetency, the guardian, near relative, or friend who was served with a copy of the order to show cause shall be permitted to appear on behalf of the respondent. If such a person cannot reasonably be found or fails or refuses to appear, the custodian of the respondent shall be requested to appear on behalf of the respondent.

### §240.44   Interpreter.

Any person acting as interpreter in a hearing before an immigration judge under this part shall be sworn to interpret and translate accurately, unless the interpreter is an employee of the United States Government, in which event no such oath shall be required.

### §240.45   Postponement and adjournment of hearing.

After the commencement of the hearing, the immigration judge may grant a reasonable adjournment either at his or her own instance or, for good cause shown, upon application by the respondent or the Service.

### §240.46   Evidence.

(a) *Sufficiency.* A determination of deportability shall not be valid unless it is found by clear, unequivocal, and convincing evidence that the facts alleged as grounds for deportation are true.

(b) *Use of prior statements.* The immigration judge may receive in evidence any oral or written statement that is material and relevant to any issue in the case previously made by the respondent or any other person during any investigation, examination, hearing, or trial.

(c) *Testimony.* Testimony of witnesses appearing at the hearing shall be under oath or affirmation administered by the immigration judge.

(d) *Depositions.* The immigration judge may order the taking of depositions pursuant to §3.35 of this chapter.

**AR00501**

### §240.47   Contents of record.

The hearing before the immigration judge, including the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, and all written orders, motions, appeals, briefs, and other papers filed in the proceedings shall constitute the record in the case. The hearing shall be recorded verbatim except for statements made off the record with the permission of the immigration judge. In his or her discretion, the immigration judge may exclude from the record any arguments made in connection with motions, applications, requests, or objections, but in such event the person affected may submit a brief.

### §240.48   Hearing.

(a) *Opening*. The immigration judge shall advise the respondent of his or her right to representation, at no expense to the Government, by counsel of his or her own choice authorized to practice in the proceedings and require him or her to state then and there whether he desires representations; advise the respondent of the availability of free legal services programs qualified under 8 CFR part 3 and organizations recognized pursuant to § 292.2 of this chapter, located in the district where the deportation hearing is being held; ascertain that the respondent has received a list of such programs, and a copy of Form I–618, Written Notice of Appeal Rights; advise the respondent that he or she will have a reasonable opportunity to examine and object to the evidence against him, to present evidence in his or her own behalf and to cross-examine witnesses presented by the Government; place the respondent under oath; read the factual allegations and the charges in the order to show cause to the respondent and explain them in nontechnical language, and enter the order to show cause as an exhibit in the record. Deportation hearings shall be open to the public, except that the immigration judge may, in his or her discretion and for the purpose of protecting witnesses, respondents, or the public interest, direct that the general public or particular individuals shall be excluded from the hearing in any specific case. Depending upon physical facilities, reasonable limitation may be placed upon the number in attendance at any one time, with priority being given to the press over the general public.

(b) *Pleading by respondent*. The immigration judge shall require the respondent to plead to the order to show cause by stating whether he or she admits or denies the factual allegations and his or her reportability under the charges contained therein. If the respondent admits the factual allegations and admits his or her deportability under the charges and the immigration judge is satisfied that no issues of law or fact remain, the immigration judge may determine that deportability as charged has been established by the admissions of the respondent. The immigration judge shall not accept an admission of deportability from an unrepresented respondent who is incompetent or under age 16 and is not accompanied by a guardian, relative, or friend; nor from an officer of an institution in which a respondent is an inmate or patient. When, pursuant to this paragraph, the immigration judge may not accept an admission of deportability, he or she shall direct a hearing on the issues.

(c) *Issues of deportability*. When deportability is not determined under the provisions of paragraph (b) of this section, the immigration judge shall request the assignment of a trial attorney, and shall receive evidence as to any unresolved issues, except that no further evidence need be received as to any facts admitted during the pleading. The respondent shall provide a court certified copy of a Judicial Recommendation Against Deportation (JRAD) to the special inquiry officer when such recommendation will be the basis of denying any charge(s) brought by the Service in the proceedings against the respondent. No JRAD is effective against a charge of deportability under section 241(a)(11) of the Act or if the JRAD was granted on or after November 29, 1990.

(d) *Additional charges*. The Service may at any time during a hearing lodge additional charges of deportability, including factual allegations, against the respondent. Copies of the additional factual allegations and charges shall be submitted in writing for service on the respondent and entry as an exhibit in the record. The immigration judge shall read the additional factual allegations and charges to the respondent and explain them to him or her. The immigration judge shall advise the respondent if he or she is not represented by counsel that he or she may be so represented and also that he or she may have a reasonable time within which to meet the additional factual allegations and charges. The respondent shall be required to state then and there whether he or she desires a continuance for either of these reasons. Thereafter, the provisions of paragraph (b) of this section shall apply to the additional factual allegations and lodged charges.

### §240.49   Ancillary matters, applications.

(a) *Creation of the status of an alien lawfully admitted for permanent residence*. The respondent may apply to the immigration judge for suspension of deportation under section 244(a) of the Act; for adjustment of status under section 245 of the Act, or under section 1 of the Act of November 2, 1966, or under section 101 or 104 of the Act of October 28, 1977; or for the creation of a record of lawful admission for permanent residence under section 249 of the Act. The application shall be subject to the requirements of 8 CFR parts 240, 245, and 249. The approval of any application made to the immigration judge under section 245 of the Act by an alien spouse (as defined in section 216(g)(1) of the Act) or by an alien entrepreneur (as defined in section 216A(f)(1) of the Act), shall result in the alien's obtaining the status of lawful permanent resident on a conditional basis in accordance with the provisions of section 216 or 216A of the Act, whichever is applicable. However, the Petition to Remove the Conditions on Residence required by section 216(c) of the Act of the Petition by Entrepreneur to Remove Conditions required by section 216A(c) of the Act shall be made to the director in accordance with 8 CFR part 216. In conjunction with any application for creation of status of an alien lawfully admitted for permanent residence made to an immigration judge, if the respondent is inadmissible under any provision of section 212(a) of the Act and believes that he or she meets the eligibility requirements for a waiver of the ground of inadmissibility, he or she may apply to the immigration judge for such waiver. The immigration judge shall inform the respondent of his or her apparent eligibility to apply for any of the benefits enumerated in this paragraph and shall afford the respondent an opportunity to make application therefor during the hearing. In exercising discretionary power when considering an application under this paragraph, the immigration judge may consider and base the decision on information not contained in the record and not made available for inspection by the respondent, provided the Commissioner has determined that such information is relevant and is classified under the applicable Executive Order as requiring protection from unauthorized disclosure in the interest of national security. Whenever the immigration judge believes that he or she can do so while safeguarding both the information and its source, the immigration judge should inform the respondent of the general nature of the information in

order that the respondent may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state that the information is material to the decision.

(b) *Voluntary departure.* The respondent may apply to the immigration judge for voluntary departure in lieu of deportation pursuant to section 244(e) of the Act and § 240.56.

(c) *Applications for asylum or withholding of deportation.* (1) The immigration judge shall notify the respondent that if he or she is finally ordered deported, his or her deportation will in the first instance be directed pursuant to section 243(a) of the Act to the country designated by the respondent and shall afford him an opportunity then and there to make such designation. The immigration judge shall then specify and state for the record the country, or countries in the alternative, to which respondent's deportation will be directed pursuant to section 243(a) of the Act if the country of his or her designation will not accept him or her into its territory, or fails to furnish timely notice of acceptance, or if the respondent declines to designate a country.

(2) If the alien expresses fear of persecution or harm upon return to any of the countries to which the alien might be deported pursuant to paragraph (c)(1) of this section, and the alien has not previously filed an application for asylum or withholding of deportation that has been referred to the immigration judge by an asylum officer in accordance with § 208.14(b) of this chapter, the immigration judge shall:

(i) Advise the alien that he may apply for asylum in the United States or withholding of deportation to those countries; and

(ii) Make available the appropriate application forms.

(3) An application for asylum or withholding of deportation must be filed with the Immigration Court, pursuant to § 208.4(b) of this chapter. Upon receipt of an application that has not been referred by an asylum officer, the Immigration Court shall forward a copy to the Department of State pursuant to § 208.11 of this chapter and shall calendar the case for a hearing. The reply, if any, of the Department of State, unless classified under the applicable Executive Order, shall be given to both the applicant and to the trial attorney representing the government.

(4) Applications for asylum or withholding of deportation so filed will be decided by the immigration judge pursuant to the requirements and standards established in 8 CFR part 208 after an evidentiary hearing that is necessary to resolve factual issues in dispute. An evidentiary hearing extending beyond issues related to the basis for a mandatory denial of the application pursuant to § 208.13 or § 208.16 of this chapter is not necessary once the immigration judge has determined that such a denial is required.

(i) Evidentiary hearings on applications for asylum or withholding of deportation will be open to the public unless the applicant expressly requests that it be closed.

(ii) Nothing in this section is intended to limit the authority of the immigration judge properly to control the scope of any evidentiary hearing.

(iii) During the deportation hearing, the applicant shall be examined under oath on his or her application and may present evidence and witnesses in his or her own behalf. The applicant has the burden of establishing that he or she is a refugee as defined in section 101(a)(42) of the Act pursuant to the standard set forth in § 208.13 of this chapter.

(iv) The trial attorney for the government may call witnesses and present evidence for the record, including information classified under the applicable Executive Order, provided the immigration judge or the Board has determined that such information is relevant to the hearing. When the immigration judge receives such classified information he or she shall inform the applicant. The agency that provides the classified information to the immigration judge may provide an unclassified summary of the information for release to the applicant, whenever it determines it can do so consistently with safeguarding both the classified nature of the information and its source. The summary should be as detailed as possible, in order that the applicant may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state whether such information is material to the decision.

(5) The decision of an immigration judge to grant or deny asylum or withholding of deportation shall be communicated to the applicant and to the trial attorney for the government. An adverse decision will state why asylum or withholding of deportation was denied.

(d) *Application for relief under sections 241(a)(1)(H) and 241(a)(1)(E)(iii) of the Act.* The respondent may apply to the immigration judge for relief from deportation under sections 241(a)(1)(H) and 241(a)(1)(E)(iii) of the Act.

(e) *General.* An application under this section shall be made only during the hearing and shall not be held to constitute a concession of alienage or deportability in any case in which the respondent does not admit his alienage or deportability. However, nothing in this section shall prohibit the Service from using information supplied in an application for asylum or withholding of deportation submitted to an asylum officer pursuant to § 208.2 of this chapter on or after January 4, 1995, as the basis for issuance of an order to show cause or a notice to appear to establish alienage or deportability in a case referred to an immigration judge under § 208.14(b) of this chapter. The respondent shall have the burden of establishing that he or she is eligible for any request benefit or privilege and that it should be granted in the exercise of discretion. The respondent shall not be required to pay a fee on more than one application within paragraphs (a) and (c) of this section, provided that the minimum fee imposed when more than one application is made shall be determined by the cost of the application with the highest fee. Nothing contained herein is intended to foreclose the respondent from applying for any benefit or privilege which he or she believes himself or herself eligible to receive in proceedings under this part.

## § 240.50   Decision of the immigration judge.

(a) *Contents.* The decision of the immigration judge may be oral or written. Except when deportability is determined on the pleadings pursuant to § 240.48(b), the decision of the immigration judge shall include a finding as to deportability. The formal enumeration of findings is not required. The decision shall also contain the reasons for granting or denying the request. The decision shall be concluded with the order of the immigration judge.

(b) *Summary decision.* Notwithstanding the provisions of paragraph (a) of this section, in any case where deportability is determined on the pleadings pursuant to § 240.48(b) and the respondent does not make an application under § 240.49, or the respondent applies for voluntary departure only and the immigration judge grants the application, the immigration judge may enter a summary decision on Form EOIR–7, Summary Order of Deportation, if deportation is

ordered, or on Form EOIR–6, Summary Order of Voluntary Departure, if voluntary departure is granted with an alternate order of deportation.

(c) *Order of the immigration judge.* The order of the immigration judge shall direct the respondent's deportation, or the termination of the proceedings, or such other disposition of the case as may be appropriate. When deportation is ordered, the immigration judge shall specify the country, or countries in the alternate, to which respondent's deportation shall be directed. The immigration judge is authorized to issue orders in the alternative or in combination as he or she may deem necessary.

### § 240.51   Notice of decision.

(a) *Written decision.* A written decision shall be served upon the respondent and the trial attorney, together with the notice referred to in § 3.3 of this chapter. Service by mail is complete upon mailing.

(b) *Oral decision.* An oral decision shall be stated by the immigration judge in the presence of the respondent and the trail attorney, if any, at the conclusion of the hearing. Unless appeal from the decision is waived, the respondent shall be furnished with Form EOIR–26, Notice of Appeal, and advised of the provisions of § 240.53. A typewritten copy of the oral decision shall be furnished at the request of the respondent or the trial attorney.

(c) *Summary decision.* When the immigration judge renders a summary decision as provided in § 240.51(b), he or she shall serve a copy thereof upon the respondent at the conclusion of the hearing. Unless appeal from the decision is waived, the respondent shall be furnished with Form EOIR–26, Notice of Appeal, and advised of the provisions of § 240.54.

### § 240.52   Finality of order.

The decision of the immigration judge shall become final in accordance with § 3.39 of this chapter.

### § 240.53   Appeals.

(a) Pursuant to 8 CFR part 3, an appeal shall lie from a decision of an immigration judge to the Board, except that no appeal shall lie from an order of deportation entered in absentia. The procedures regarding the filing of a Form EOIR–26, Notice of Appeal, fees, and briefs are set forth in §§ 3.3, 3.31, and 3.38 of this chapter. An appeal shall be filed within 30 calendar days after the mailing of a written decision, the stating of an oral decision, or the service of a summary decision. The filing date is defined as the date of receipt of the

Notice of Appeal by the Board. The reasons for the appeal shall be stated in the Form EOIR–26, Notice of Appeal, in accordance with the provisions of § 3.3(b) of this chapter. Failure to do so may constitute a ground for dismissal of the appeal by the Board pursuant to § 3.1(d)(1–a) of this chapter.

(b) *Prohibited appeals; legalization or applications.* An alien respondent defined in § 245a.2(c)(6) or (7) of this chapter who fails to file an application for adjustment of status to that of a temporary resident within the prescribed period(s), and who is thereafter found to be deportable by decision of an immigration judge, shall not be permitted to appeal the finding of deportability based solely on refusal by the immigration judge to entertain such an application in deportation proceedings.

### § 240.54   Proceedings under section 242(f) of the Act.

(a) *Order to show cause.* In the case of an alien within the provisions of section 242(f) of the Act, the order to show cause shall charge him or her with deportability under section 242(f) of the Act. The prior order of deportation and evidence of the execution thereof, properly identified, shall constitute prima facie cause for deportability under this section.

(b) *Applicable procedure.* Except as otherwise provided in this section, proceedings under section 242(f) of the Act shall be conducted in general accordance with the rules prescribed in this part.

(c) *Deportability.* In determining the deportability of an alien alleged to be within the purview of paragraph (a) of this section, the issues shall be limited to solely to a determination of the identity of the respondent, i.e., whether the respondent is in fact an alien who was previously deported, or who departed while an order of deportation was outstanding; whether the respondent was previously deported as a member of any of the classes described in section 241(a)(2),(3) or (4) of the Act; and whether respondent has unlawfully reentered the United States.

(d) *Order.* If deportability as charged in the order to show cause is established, the Immigration Judge shall order that the respondent be deported under the previous order of deportation in accordance with section 242(f) of the Act.

(e) *Service counsel; additional charges.* When Service counsel is assigned to a proceeding under this section and additional charges are lodged against the respondent, the

provisions of paragraphs (c) and (d) of this section shall cease to apply.

## Subpart F—Suspension of Deportation and Voluntary Departure (for Proceedings Commenced Prior to April 1, 1997)

### § 240.55   Proceedings commenced prior to April 1, 1997.

Subpart F of 8 CFR part 240 applies to deportation proceedings commenced prior to April 1, 1997. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

### § 240.56   Application.

Notwithstanding any other provision of this chapter, an alien who is deportable because of a conviction on or after November 18, 1988, for an aggravated felony as defined in section 101(a)(43) of the Act, shall not be eligible for voluntary departure as prescribed in 8 CFR part 240 and section 244 of the Act. Pursuant to subpart F of this part and section 244 of the Act, an immigration judge may authorized the suspension of an alien's deportation; or, if the alien established that he or she is willing and has the immediate means with which to depart promptly from the United States, an immigration judge may authorized the alien to depart voluntarily from the United States in lieu of deportation within such time as may be specified by the immigration judge when first authorizing voluntary departure, and under such conditions as the district director shall direct. An application for suspension of deportation shall be made on Form EOIR–40.

### § 240.57   Extension of time to depart.

Authority to reinstate or extend the time within which to depart voluntarily specified initially by an immigration judge or the Board is within the sole jurisdiction of the district director, except that an immigration judge or the Board may reinstate voluntary departure in a deportation proceeding that has been reopened for a purpose other than solely making an application for voluntary departure. A request by an alien for reinstatement or an extension of time within which to depart voluntarily shall be filed with the district director having jurisdiction over the alien's place of residence. Written notice of the district director's decision shall be served upon the alien and no appeal may be taken therefrom.

**Subpart G—Civil Penalties for Failure To Depart [Reserved]**

107. Part 241 is revised to read as follows:

## PART 241—APPREHENSION AND DETENTION OF ALIENS ORDERED REMOVED

**Subpart A—Post-Hearing Detention and Removal**

Sec.
241.1   Final order of removal.
241.2   Warrant of removal.
241.3   Detention of aliens during removal period.
241.4   Continued detention beyond the removal period.
241.5   Conditions of release after removal period.
241.6   Administrative stay of removal.
241.7   Self-removal.
241.8   Reinstatement of removal orders.
241.9   Notice to transportation line of inadmissible alien's removal.
241.10   Special care and attention of removable aliens.
241.11   Detention and removal of stowaways.
241.12   Nonapplication of costs of detention and maintenance.

**Subpart B—Deportation of Excluded Aliens (for Hearings Commenced Prior to April 1, 1997).**

241.20   Proceedings commenced prior to April 1, 1997.
241.21   Stay of deportation of excluded alien.
241.22   Notice to surrender for deportation.
241.23   Cost of maintenance not assessed.
241.24   Notice to transportation line of alien's exclusion.
241.25   Deportation.

**Subpart C—Deportation of Aliens in the United States (for Hearings Commenced Prior to April 1, 1997)**

241.30   Proceedings commenced prior to April 1, 1997.
241.31   Final order of deportation.
241.32   Warrant of deportation.
241.33   Expulsion.
   **Authority:** 8 U.S.C. 1103, 1223, 1227, 1251, 1253, 1255, and 1330; 8 CFR part 2.

**Subpart A—Post-hearing Detention and Removal**

### § 241.1   Final order of removal.

An order of removal made by the immigration judge at the conclusion of proceedings under section 240 of the Act shall become final:

(a) Upon dismissal of an appeal by the Board of Immigration Appeals;

(b) Upon waiver of appeal by the respondent;

(c) Upon expiration of the time allotted for an appeal if the respondent does not file an appeal within that time;

(d) If certified to the Board or Attorney General, upon the date of the subsequent decision ordering removal;

(e) If an immigration judge orders an alien removed in the alien's absence, immediately upon entry of such order; or

(f) If an immigration judge issues an alternate order of removal in connection with a grant of voluntary departure, upon overstay of the voluntary departure period except where the respondent has filed a timely appeal with the Board. In such a case, the order shall become final upon an order of removal by the Board or the Attorney General, or upon overstay of any voluntary departure period granted or reinstated by the Board or the Attorney General.

### § 241.2   Warrant of removal.

(a) *Issuance of a warrant of removal.* A Form I–205, Warrant of Removal, based upon the final administrative removal order in the alien's case shall be issued by a district director. The district director shall exercise the authority contained in section 241 of the Act to determine at whose expense the alien shall be removed and whether his or her mental or physical condition requires personal care and attention en route to his or her destination.

(b) *Execution of the warrant of removal.* Any officer authorized by § 287.5(e) of this chapter to execute administrative warrants of arrest may execute a warrant of removal.

### § 241.3   Detention of aliens during removal period.

(a) *Assumption of custody.* Once the removal period defined in section 241(a)(1) of the Act begins, an alien in the United States will be taken into custody pursuant to the warrant of removal.

(b) *Cancellation of bond.* Any bond previously posted will be canceled unless it has been breached or is subject to being breached.

(c) *Judicial stays.* The filing of (or intention of file) a petition or action in a Federal court seeking review of the issuance or execution of an order of removal shall not delay execution of the Warrant of Removal except upon an affirmative order of the court.

### § 241.4   Continued detention beyond the removal period.

(a) *Continuation of custody for inadmissible or criminal aliens.* The district director may continue in custody any alien inadmissible under section 212(a) of the Act or removable under section 237(a)(1)(C), 237(a)(2), or 237(a)(4) of the Act, or who presents a significant risk of noncompliance with the order of removal, beyond the removal period, as necessary, until removal from the United States. If such an alien demonstrates by clear and convincing evidence that the release would not pose a danger to the community or a significant flight risk, the district director may, in the exercise of discretion, order the alien released from custody on such conditions as the district director may prescribe, including bond in an amount sufficient to ensure the alien's appearance for removal. The district may consider, but is not limited to considering, the following factors:

(1) The nature and seriousness of the alien's criminal convictions;

(2) Other criminal history;

(3) Sentence(s) imposed and time actually served;

(4) History of failures to appear for court (defaults);

(5) Probation history;

(6) Disciplinary problems while incarcerated;

(7) Evidence of rehabilitative effort or recidivism;

(8) Equities in the United States; and

(9) Prior immigration violations and history.

(b) *Continuation of custody for other aliens.* Any alien removable under any section of the Act other than section 212(a), 237(a)(1)(C), 237(a)(2), or 237(a)(4) may be detained beyond the removal period, in the discretion of the district director, unless the alien demonstrates to the satisfaction of the district director that he or she is likely to comply with the removal order and is not a risk to the community.

### § 241.5   Conditions of release after removal period.

(a) *Order of supervision.* An alien released pursuant to § 241.4 shall be released pursuant to an order of supervision. A district director, acting district director, deputy district director, assistant district director for investigations, assistant district director for detention and deportation, or officer in charge may issue an order of supervision on Form I–220B. The order shall specify conditions of supervision including, but not limited to, the following:

(1) A requirement that the alien report to a specified officer periodically and provide relevant information under oath as directed;

(2) A requirement that the alien continue efforts to obtain a travel document and assist the Service in obtaining a travel document;

(3) A requirement that the alien report as directed for a mental or physical examinations as directed by the Service;

(4) A requirement that the alien obtain advance approval of travel beyond previously specified times and distances; and

(5) A requirement that the alien provide the Service with written notice of any change of address within five days of the change.

(b) *Posting of bond.* An officer authorized to issue an order of supervision may require the posting of a bond in an amount determined by the officer to be sufficient to ensure compliance with the conditions of the order, including surrender for removal.

(c) *Employment authorization.* An officer authorized to issue an order of supervision may, in his or her discretion, grant employment authorization to an alien released under an order of supervision if the officer specifically finds that:

(1) The alien cannot be removed because no country will accept the alien; or

(2) The removal of the alien is impracticable or contrary to public interest.

### § 241.6   Administrative stay of removal.

Any request of an alien under a final order of deportation or removal for a stay of deportation or removal shall be filed on Form I–246, Stay of Removal, with the district director having jurisdiction over the place where the alien is at the time of filing. The district director, in his or her discretion and in consideration of factors such as are listed in § 212.5 of this chapter and section 241(c) of the Act, may grant a stay of removal or deportation for such time and under such conditions as he or she may deem appropriate. Neither the request nor the failure to receive notice of disposition of the request shall delay removal or relieve the alien from strict compliance with any outstanding notice to surrender for deportation or removal. Denial by the district director of a request for a stay is not appealable, but such denial shall not preclude an immigration judge or the Board from granting a stay in connection with a motion to reopen or a motion to reconsider as provided in 8 CFR part 3. The Service shall take all reasonable steps to comply with a stay granted by an immigration judge or the Board. However, such a stay shall cease to have effect if granted (or communicated) after the alien has been placed aboard an aircraft or other conveyance for removal and the normal boarding has been completed.

### § 241.7   Self-removal.

A district director may permit an alien ordered removed (including an alien ordered excluded or deported in proceedings prior to April 1, 1997) to depart at his or her own expense to a destination of his or her own choice. Any alien who has departed from the United States while an order of deportation or removal is outstanding shall be considered to have been deported, excluded and deported, or removed, except that an alien who departed before the expiration of the voluntary departure period granted in connection with an alternate order of deportation or removal shall not be considered to have been so deported or removed.

### § 241.8   Reinstatement of removal orders.

(a) *Applicability.* An alien who illegally reenters the United States after having been removed, or having departed voluntarily, while under an order of exclusion, deportation, or removal shall be removed from the United States by reinstating the prior order. The alien has no right to a hearing before an immigration judge in such circumstances. In establishing whether an alien is subject to this section, the immigration officer shall determine the following:

(1) Whether the alien has been subject to a prior order of removal. The immigration officer must obtain the prior order of exclusion, deportation, or removal relating to the alien.

(2) The identity of the alien, i.e., whether the alien is in fact an alien who was previously removed, or who departed voluntarily while under an order of exclusion, deportation, or removal. In disputed cases, verification of identity shall be accomplished by a comparison of fingerprints between those of the previously excluded, deported, or removed alien contained in Service records and those of the subject alien. In the absence of fingerprints in a disputed case the alien shall not be removed pursuant to this paragraph.

(3) Whether the alien unlawfully reentered the United States. In making this determination, the officer shall consider all relevant evidence, including statements made by the alien and any evidence in the alien's possession. The immigration officer shall attempt to verify an alien's claim, if any, that he or she was lawfully admitted, which shall include a check of Service data systems available to the officer.

(b) *Notice.* If an officer determines that an alien is subject to removal under this section, he or shall provide the alien with written notice of his or her determination. The officer shall advise the alien that he or she may make a written or oral statement contesting the determination. If the alien wishes to make such a statement, the officer shall allow the alien to do so and shall consider whether the alien's statement warrants reconsideration of the determination.

(c) *Order.* If the requirements of paragraph (a) of this section are met, the alien shall be removed under the previous order of exclusion, deportation, or removal in accordance with section 241(a)(5) of the Act.

(d) *Exception for withholding of removal.* If an alien whose prior order of removal has been reinstated under this section expresses a fear of returning to the country designated in that order, the alien shall be immediately referred to an asylum officer to determine whether the alien's removal to that country must be withheld under section 241(b)(3) of the Act. The alien's claim will be granted or denied by an asylum officer in accordance with § 208.16 of this chapter. If the alien has previously had a claim to withholding of deportation or removal denied, then that decision shall prevail unless the alien can establish the existence of changed circumstances that materially affect the alien's eligibility for withholding. The alien's case shall not be referred to an immigration judge, and there is no appeal from the decision of the asylum officer. If the alien is found to merit withholding of removal, the Service shall not enforce the reinstated order.

(e) *Execution of reinstated order.* Execution of the reinstated order of removal and detention of the alien shall be administered in accordance with this part.

### § 241.9   Notice to transportation line of alien's removal.

(a) An alien who has been ordered removed shall, immediately or as promptly as the circumstances permit, be offered for removal to the owner, agent, master, commanding officer, person in charge, purser, or consignee of the vessel or aircraft on which the alien is to be removed, as determined by the district director, with a written notice specifying the cause of inadmissibility or deportability, the class of travel in which such alien arrived and is to be removed, and with the return of any documentation that will assist in effecting his or her removal. If special care and attention are required, the provisions of § 241.10 shall apply.

(b) Failure of the carrier to accept for removal an alien who has been ordered removed shall result in the carrier being assessed any costs incurred by the Service for detention after the carrier's failure to accept the alien for removal, including the cost of any transportation

as required under section 241(e) of the Act. The User Fee Account shall not be assessed for expenses incurred because of the carrier's violation of the provisions of section 241 of the Act and this paragraph. The Service will, at the carrier's option, retain custody of the alien for an additional 7 days beyond the date of the removal order. If, after the third day of this additional 7-day period, the carrier has not made all the necessary transportation arrangements for the alien to be returned to his or her point of embarkation by the end of the additional 7-day period, the Service will make the arrangements and bill the carrier for its costs.

**241.10  Special care and attention of removable aliens.**

When, in accordance with section 241(c)(3) of the Act, a transportation line is responsible for the expenses of an inadmissible or deportable alien's removal, and the alien requires special care and attention, the alien shall be delivered to the owner, agent, master, commanding officer, person in charge, purser, or consignee of the vessel or aircraft on which the alien will be removed, who shall be given Forms I–287, I–287A, and I–287B. The reverse of Form I–287A shall be signed by the officer of the vessel or aircraft to whom the alien has been delivered and immediately returned to the immigration officer effecting delivery. Form I–287B shall be retained by the receiving officer and subsequently filled out by the agents or persons therein designated and returned by mail to the district director named on the form. The transportation line shall at its own expense forward the alien from the foreign port of disembarkation to the final destination specified on Form I–287. The special care and attention shall be continued to such final destination, except when the foreign public officers decline to allow such attendant to proceed and they take charge of the alien, in which case this fact shall be recorded by the transportation line on the reverse of Form I–287B. If the transportation line fails, refuses, or neglects to provide the necessary special care and attention or comply with the directions of Form I–287, the district director shall thereafter and without notice employ suitable persons, at the expense of the transportation line, and effect such removal.

**§ 241.11  Detention and removal of stowaways.**

(a) *Presentation of stowaways.* The owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft (referred to in this section as the carrier) bringing any alien stowaway to the United States is required to detain the stowaway on board the vessel or aircraft, at the expense of the owner of the vessel or aircraft, until completion of the inspection of the alien by an immigration officer. If detention on board the vessel or aircraft pending inspection is not possible, the carrier shall advise the Service of this fact without delay, and the Service may authorize that the carrier detain the stowaway at another designated location, at the expense of the owner, until the immigration officer arrives. No notice to detain the alien shall be required. Failure to detain an alien stowaway pending inspection shall result in a civil penalty under section 243(c)(1)(A) of the Act. The owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft must present the stowaway for inspection, along with any documents or evidence of identity or nationality in the possession of the alien or obtained by the carrier relating to the alien stowaway, and must provide any available information concerning the alien's boarding or apprehension.

(b) *Removal of stowaways from vessel or aircraft for medical treatment.* The district director may parole an alien stowaway into the United States for medical treatment, but the costs of detention and treatment of the alien stowaway shall be at the expense of the owner of the vessel or aircraft, and such removal of the stowaway from the vessel or aircraft does not relieve the carrier of the requirement to remove the stowaway from the United States once such medical treatment has been completed.

(c) *Repatriation of stowaways.* (1) *Requirements of carrier.* Following inspection, an immigration officer may order the owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft bringing any alien stowaway to the United States to remove the stowaway on the vessel or aircraft of arrival. If the owner, agent, master, commanding officer, cahrterer, or consignee requests that he or she be allowed to remove the stowaway by other means, the Service shall consider any such request, provided the carrier has obtained, or will obtain in a timely manner, any necessary travel documents and has made or will make all transportation arrangements. The owner, agent, master, commanding officer, charterer, or consignee shall transport the stowaway or arrange for secure escort of the stowaway to the vessel or aircraft of departure to ensure that the stowaway departs the United States. All expenses relating to removal shall be borne by the owner. Other than requiring compliance with the detention and removal requirements contained in section 241(d)(2) of the Act, the Service shall not impose additional conditions on the carrier regarding security arrangements. Failure to comply with an order to remove an alien stowaway shall result in a civil penalty under section 243(c)(1)(A) of the Act.

(2) *Detention of stowaways ordered removed.* If detention of the stowaway is required pending removal on other than the vessel or aircraft of arrival, or if the stowaway is to be removed on the vessel or aircraft of arrival but departure of the vessel or aircraft is not imminent and circumstances preclude keeping the stowaway on board the vessel or aircraft, the Service shall take the stowaway into Service custody. The owner is responsible for all costs of maintaining and detaining the stowaway pending removal, including costs for stowaways seeking asylum as described in paragraph (d) of this section. Such costs will be limited to those normally incurred in the detention of an alien by the Service, including, but not limited to, housing, food, transportation, medical expenses, and other reasonable costs incident to the detention of the stowaway. The Service may require the posting of a bond or other surety to ensure payment of costs of detention.

(d) *Stowaways claiming asylum.* (1) *Referral for credible fear determination.* A stowaway who indicates an intention to apply for asylum or a fear of persecution shall be removed from the vessel or aircraft of arrival in accordance with § 208.5(b) of this chapter. The immigration officer shall refer the alien to an asylum officer for a determination of credible fear in accordance with section 235(b)(1)(B) of the Act and § 208.18 of this chapter. The stowaway shall be detained in the custody of the Service pending the credible fear determination and during any consideration of the asylum application.

(2) *Costs of detention of asylum-seeking stowaways.* The owner of the vessel or aircraft that brought the stowaway to the United States shall reimburse the Service for the costs of maintaining and detaining the stowaway pending a determination of credible fear under section 235(b)(1)(B) of the Act, up to a maximum period of 72 hours. The owner is also responsible for the costs of maintaining and detaining the stowaway during the period in which the stowaway is pursuing his or her asylum application, for a maximum period of 15 working days, excluding Saturdays, Sundays,

and holidays. The 15-day period shall begin on the day following the day in which the alien is determined to have a credible fear of persecution by the asylum officer, or by the immigration judge if such review was requested by the alien pursuant to section 235(b)(1)(B)(iii)(III), but not later than 72 hours after the stowaway was initially presented to the Service for inspection. Following the determination of credible fear, if the stowaway's application for asylum is not adjudicated within 15 working days, the Service shall pay the costs of detention beyond this time period. If the stowaway is determined not to have a credible fear of persecution, or if the stowaway's application for asylum is denied, including any appeals, the carrier shall be notified and shall arrange for repatriation of the stowaway at the expense of the owner of the vessel or aircraft on which the stowaway arrived.

### § 241.12   Nonapplication of costs of detention and maintenance.

The owner of a vessel or aircraft bringing an alien to the United States who claims to be exempt from payment of the costs of detention and maintenance of the alien pursuant to section 241(c)(3)(B) of the Act shall establish to the satisfaction of the district director in charge of the port of arrival that such costs should not be applied. The district director shall afford the line a reasonable time within which to submit affidavits and briefs to support its claim. There is no appeal from the decision of the district director.

### §§ 241.13–241.19   [Reserved]

## Subpart B—Deportation of Excluded Aliens (for hearings commenced prior to April 1, 1997)

### § 241.20   Proceedings commenced prior to April 1, 1997.

Subpart B of 8 CFR part 241 applies to exclusion proceedings commenced prior to April 1, 1997. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

### § 241.21   Stay of deportation of excluded alien.

The district director in charge of the port of arrival may stay the immediate deportation of an excluded alien pursuant to sections 237 (a) and (d) of the Act under such conditions as he or she may prescribe.

### § 241.22   Notice to surrender for deportation.

An alien who has been finally excluded pursuant to 8 CFR part 240,

subpart D may at any time surrender himself or herself to the custody of the Service and shall surrender to such custody upon notice in writing of the time and place for his or her surrender. The Service may take the alien into custody at any time. An alien taken into custody either upon notice to surrender or by arrest shall not be deported less than 72 hours thereafter without his or her consent thereto filed in writing with the district director in charge of the place of his or her detention. An alien in foreign contiguous territory shall be informed that he or she may remain there in lieu of surrendering to the Service, but that he or she will be deemed to have acknowledged the execution of the order of exclusion and deportation in his or her case upon his or her failure to surrender at the time and place prescribed.

### § 241.23   Cost of maintenance not assessed.

A claim pursuant to section 237(a)(1) of the Act shall be established to the satisfaction of the district director in charge of the port of arrival, from whose adverse decision no appeal shall lie. The district director shall afford the line a reasonable time within which to submit affidavits and briefs to support its claim.

### § 241.24   Notice to transportation line of alien's exclusion.

(a) An excluded alien shall, immediately or as promptly as the circumstances permit, be offered for deportation to the master, commanding officer, purser, person in charge, agent, owner, or consignee of the vessel or aircraft on which the alien is to be deported, as determined by the district director, with a written notice specifying the cause of exclusion, the class of travel in which such alien arrived and is to be deported, and with the return of any documentation that will assist in effecting his or her deportation. If special care and attention are required, the provisions of § 241.10 shall apply.

(b) Failure of the carrier to accept for removal an alien who has been ordered excluded and deported shall result in the carrier being assessed any costs incurred by the Service for detention after the carrier's failure to accept the alien for removal including the cost of any transportation. The User Fee Account shall not be assessed for expenses incurred because of the carrier's violation of the provisions of section 237 of the Act and this paragraph. The Service will, at the carrier's option, retain custody of the excluded alien for an additional 7 days

beyond the date of the deportation/ exclusion order. If, after the third day of this additional 7-day period, the carrier has not made all the necessary transportation arrangements for the excluded alien to be returned to his or her point of embarkation by the end of the additional 7-day period, the Service will make the arrangements and bill the carrier for its costs.

### § 241.25   Deportation.

(a) *Definitions of terms*. For the purposes of this section, the following terms mean:

(1) Adjacent island—as defined in section 101(b)(5) of the Act.

(2) Foreign contiguous territory—any country sharing a common boundary with the United States.

(3) Residence in foreign contiguous territory or adjacent island—any physical presence, regardless of intent, in a foreign contiguous territory or an adjacent island if the government of such territory or island agrees to accept the alien.

(4) Aircraft or vessel—any conveyance and other mode of travel by which arrival is affected.

(5) Next available flight—the carrier's next regularly scheduled departure to the excluded alien's point of embarkation regardless of seat availability. If the carrier's next regulatory scheduled departure of the excluded aliens point of embarkation is full, the carrier has the option of arranging for return transportation on other carrier which service the excluded aliens point of embarkation.

(b) *Place to which deported*. Any alien (other than an alien crew member or an alien who boarded an aircraft or vessel in foreign contiguous territory or an adjacent island) who is ordered excluded shall be deported to the country where the alien boarded the vessel or aircraft on which the alien arrived in the United States. If that country refuses to accept the alien, the alien shall be deported to:

(1) The country of which the alien is a subject, citizen, or national;

(2) The country where the alien was born;

(3) The country where the alien has a residence; or

(4) Any country willing to accept the alien.

(c) *Contiguous territory and adjacent islands*. Any alien ordered excluded who boarded an aircraft or vessel in foreign contiguous territory or in any adjacent island shall be deported to such foreign contiguous territory or adjacent island is the alien is a native, citizen, subject or national of such foreign contiguous territory or adjacent

island, or if the alien has a residence in such foreign contiguous territory or adjacent island. Otherwise, the alien shall be deported, in the first instance, to the country in which is located the port at which the alien embarked for such foreign contiguous territory or adjacent island.

(d) *Land border pedestrian arrivals.* Any alien ordered excluded who arrived at a land border on foot shall be deported in the same manner as if the alien had boarded a vessel or aircraft in foreign contiguous territory.

### §§ 241.26–241.29   [Reserved]

### Subpart C—Deportation of Aliens in the United States (For Hearings Commenced Prior to April 1, 1997)

### § 241.30   Proceedings commenced prior to April 1, 1997.

Subpart C of 8 CFR part 241 applies to deportation proceedings commenced prior to April 1, 1997. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

### § 241.31   Final order of deportation.

Except as otherwise required by section 242(c) of the Act for the specific purposes of that section, an order of deportation, including an alternate order of deportation coupled with an order of voluntary departure, made by the immigration judge in proceedings under 8 CFR part 240 shall become final upon dismissal of an appeal by the Board of Immigration Appeals, upon waiver of appeal, or upon expiration of the time allotted for an appeal when no appeal is taken; of, if such an order is issued by the Board or approved by the Board upon certification, it shall be final as of the date of the Board's decision.

### § 241.32   Warrant of deportation.

A Form I–205, Warrant of Deportation, based upon the final administrative order of deportation in the alien's case shall be issued by a district director. The director shall exercise the authority contained in such 243 of the Act to determine at whose expense the alien shall be deported and whether his or her mental or physical condition requires personal care and attention en route to his or her destination.

### § 241.33   Expulsion.

(a) *Execution of order.* Except in the exercise of discretion by the district director, and for such reasons as set forth in § 212.5(a) of this chapter, once an order of deportation becomes final, an alien shall be taken into custody and the order shall be executed. For the

purposes of this part, and order of deportation is final and subject to execution upon the date when any of the following occurs:

(1) A grant of voluntary departure expires;

(2) An immigration judge enters an order of deportation without granting voluntary departure or other relief, and the alien respondent waives his or order right to appeal;

(3) The Board of Immigration Appeals enters and order of deportation on appeals, without granting voluntary departure or other relief; or

(4) A Federal district or appellate court affirms an administrative order of deportation in a petition for review or habeas corpus action.

(b) *Service of decision.* In the case of an order entered by any of the authorities enumerated above, the order shall be executed no sooner than 72 hours after service of the decision, regardless of whether the alien is in Service custody, provided that such period may be waived on the knowing and voluntary request of the alien. Nothing in this paragraph shall be construed, however, to preclude assumption of custody by the Service at the time of issuance of the final order.

### PART 242—[REMOVED AND RESERVED]

108. Part 242 is removed and reserved.

### PART 243—[REMOVED AND RESERVED]

109. Part 243 is removed and reserved.

### PART 244—TEMPORARY PROTECTED STATUS FOR NATIONALS OF DESIGNATED STATES

110. The heading for part 244 is revised as set forth above.

111. The authority citation for part 244 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1254, 1254a note.

### §§ 244.1 and 244.2   [Removed]

112. Sections 244.1 and 244.2 are removed.

### §§ 244.3 through 244.22   [Redesignated as §§ 244.1 through 244.20]

113. Newly redesignated §§ 244.3 through 244.22 are further redesignated as §§ 244.1 through 244.20, respectively.

### PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE

114. The authority citation for part 245 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1255; 8 CFR part 2.

115. Section 245.1 is amended by:

a. Removing the word "and" at the end of the paragraph (c)(3);

b. Removing the "." at the end of paragraphs (c)(4) through (c)(7), and replacing it with a ";";

c. Redesignating paragraph (c)(8) as paragraph (c)(9);

d. Adding a new paragraph (c)(8);

e. Revising newly redesignated paragraph (c)(9) introductory text,

f. Revising newly redesignated paragraphs (c)(9)(i) through (c)(9)(iii); and by

g. Revising paragraph (f), to read as follows:

### § 245.1   Eligibility.

\*    \*    \*    \*    \*

(c) \* \* \*

(8) Any arriving alien who is in removal proceedings pursuant to section 235(b)(1) or section 240 of the Act; and

(9) Any alien who seeks to adjust status based upon a marriage which occurred on or after November 10, 1986, and while the alien was in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto.

(i) *Commencement of proceedings.* The period during which the alien is in deportation, exclusion, or removal proceedings or judicial proceedings relating thereto, commences:

(A) With the issuance of the Form I–221, Order to Show Cause and Notice of Hearing prior to June 20, 1991;

(B) With the filing of a Form I–221, Order to Show Cause and Notice of Hearing, issued on or after June 20, 1991, with the Immigration Court;

(C) With the issuance of Form I–122, Notice to Applicant for Admission Detained for Hearing Before Immigration Judge, prior to April 1, 1997,

(D) With the filing of a Form I–862, Notice to Appear, with the Immigration Court, or

(E) With the issuance and service of Form I–860, Notice and Order of Expedited Removal.

(ii) *Termination of proceedings.* The period during which the alien is in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto, terminates:

(A) When the alien departs from the United States while an order of exclusion, deportation, or removal is outstanding or before the expiration of the voluntary departure time granted in connection with an alternate order of deportation or removal;

(B) When the alien is found not to be inadmissible or deportable from the United States;

(C) When the Form I–122, I–221, I–860, or I–862 is canceled;

(D) When proceedings are terminated by the immigration judge or the Board of Immigration Appeals; or

(E) When a petition for review or an action for habeas corpus is granted by a Federal court on judicial review.

(iii) *Exemptions*. This prohibition shall no longer apply if:

(A) The alien is found not to be inadmissible or deportable from the United States;

(B) Form I–122, I–221, I–860, or I–862, is canceled;

(C) Proceedings are terminated by the immigration judge or the Board of Immigration Appeals;

(D) A petition for review or an action for habeas corpus is granted by a Federal court on judicial review;

(E) The alien has resided outside the United States for 2 or more years following the marriage; or

(F) The alien establishes the marriage is bona fide by providing clear and convincing evidence that the marriage was entered into in good faith and in accordance with the laws of the place where the marriage took place, was not entered into for the purpose of procuring the alien's entry as an immigrant, and no fee or other consideration was given (other than to an attorney for assistance in preparation of a lawful petition) for the filing of a petition.

\*    \*    \*    \*    \*

(f) *Concurrent applications to overcome grounds of inadmissibility*. Except as provided in 8 CFR parts 235 and 249, an application under this part shall be the sole method of requesting the exercise of discretion under sections 212 (g), (h), (i), and (k) of the Act, as they relate to the inadmissibility of an alien in the United States. No fee is required for filing an application to overcome the grounds of inadmissibility of the Act if filed concurrently with an application for adjustment of status under the provisions of the Act of October 28, 1977, and of this part.

\*    \*    \*    \*    \*

116. Section 245.2 is amended by:

a. Revising paragraph (a)(1);

b. Revising paragraph (a)(4)(ii);

c. Revising paragraph (a)(5) (ii) and (iii); and by

d. Revising paragraph (c), to read as follows:

**§ 245.2   Application.**

(a) *General*. (1) *Jurisdiction*. An alien who believes he or she meets the eligibility requirements of section 245 of the Act or section 1 of the Act of November 2, 1966, and § 245.1 shall

apply to the director having jurisdiction over his or her place of residence unless otherwise instructed in 8 CFR part 245, or by the instruction on the application form. After an alien, other than an arriving alien, is in deportation or removal proceedings, his or her application for adjustment of status under section 245 of the Act or section 1 of the Act of November 2, 1966 shall be made and considered only in those proceedings. An arriving alien, other than an alien in removal proceedings, who believes he or she meets the eligibility requirements of section 245 of the Act or section 1 of the Act of November 2, 1966, and § 245.1 shall apply to the director having jurisdiction over his or her place of arrival. An adjustment application by an alien paroled under section 212(d)(5) of the Act, which has been denied by the Director, may be renewed in removal proceedings under 8 CFR part 240 only if:

(i) The denied application must have been properly filed subsequent to the applicant's earlier inspection and admission to the United States; and

(ii) The applicant's later absence from and return to the United States was under the terms of an advance parole authorization on Form I–512 granted to permit the applicant's absence and return to pursue the previously filed adjustment application.

\*    \*    \*    \*    \*

(4) \*  \*  \*

(ii) *Under section 245 of the Act*. The departure from the United States of an applicant who is under exclusion, deportation, or removal proceedings shall be deemed an abandonment of the application constituting grounds for termination of the proceeding by reason of the departure. The departure of an applicant who is not under exclusion, deportation, or removal proceedings shall be deemed an abandonment of his or her application constituting grounds for termination, unless the applicant was previously granted advance parole by the Service for such absence, and was inspected upon returning to the United States. If the application of an individual granted advance parole is subsequently denied, the applicant will be treated as an applicant for admission, and subject to the provisions of sections 212 and 235 of the Act.

\*    \*    \*    \*    \*

(5) \*  \*  \*

(ii) *Under section 245 of the Act*. If the application is approved, the applicant's permanent residence shall be recorded as of the date of the order approving the adjustment of status. An application for adjustment of status, as a preference

alien, shall not be approved until an immigrant visa number has been allocated by the Department of State, except when the applicant has established eligibility for the benefits of Public Law 101–238. No appeal lies from the denial of an application by the director, but the applicant, if not an arriving alien, retains the right to renew his or her application in proceedings under 8 CFR part 240. Also, an applicant who is a parolee and meets the two conditions described in § 245.2(a)(1) may renew a denied application in proceedings under 8 CFR part 240 to determine admissibility. At the time of renewal of application, an applicant does not need to meet the statutory requirement of section 245(c) of the Act, or § 245.1(g), if, in fact, those requirements were met at the time the renewed application was initially filed with the director. Nothing in this section shall entitle an alien to proceedings under section 240 of the Act who is not otherwise so entitled.

(iii) *Under the Act of November 2, 1966*. If the application is approved, the applicant's permanent residence shall be recorded in accordance with the provisions of section 1. No appeal lies from the denial of an application by the director, but the applicant, if not an arriving alien, retains the right to renew his or her application in proceedings under 8 CFR part 240. Also, an applicant who is a parolee and meets the two conditions described in § 245.2(a)(1) may renew a denied application in proceedings under 8 CFR part 240 to determine admissibility.

\*    \*    \*    \*    \*

(c) *Application under section 214(d) of the Act*. An application for permanent resident status pursuant to section 214(d) of the Act shall be filed on Form I–485 with the director having jurisdiction over the applicant's place of residence. A separate application shall be filed by each applicant. If the application is approved, the director shall record the lawful admission of the applicant as of the date of approval. The applicant shall be notified of the decision and, if the application is denied, of the reasons therefor. No appeal shall lie from the denial of an application by the director but such denial shall be without prejudice to the alien's right to renew his or her application in proceedings under 8 CFR part 240.

117. Section 245.5 is amended by revising the first sentence to read as follows:

**§ 245.5   Medical examination.**

Pursuant to section 232(b) of the Act, an applicant for adjustment of status

shall be required to have a medical examination by a designated civil surgeon, whose report setting forth the findings of the mental and physical condition of the applicant, including compliance with section 212(a)(1)(A)(ii) of the Act, shall be incorporated into the record.* * *

118. Section 245.8 is amended by revising paragraph (e), to read as follows:

**§ 245.8  Adjustment of status as a special immigrant under section 101(a)(27)(K) of the Act.**

*       *       *       *       *

(e) *Removal provisions of section 237 of the Act.* If the Service is made aware by notification from the appropriate executive department or by any other means that a section 101(a)(27)(K) special immigrant who has already been granted permanent residence fails to complete his or her total active duty service obligation for reasons other than an honorable discharge, the alien may become subject to the removal provisions of section 237 of the Act, provided the alien is in one or more of the classes of deportable aliens specified in section 237 of the Act. The Service shall obtain current Form DD–214, Certificate of Release or Discharge from Active Duty, from the appropriate executive department for verification of the alien's failure to maintain eligibility.

*       *       *       *       *

119. Section 245.9 is amended by revising paragraphs (d) and (m), to read as follows:

**§ 245.9  Adjustment of Status of Certain Nationals of the People's Republic of China under Public Law 102–404.**

*       *       *       *       *

(d) *Waivers of inadmissibility under section 212(a) of the Act.* An applicant for the benefits of the adjustment of status provisions of Pub. L. 102–404 is automatically exempted from compliance with the requirements of sections 212(a)(5) and 212(a)(7)(A) of the Act. A Pub. L. 102–404 applicant may also apply for one or more waivers of inadmissibility under section 212(a) of the Act, except for inadmissibility under section 212(a)(2)(C), 212(a)(3)(A), 212(a)(3)(B), 212(a)(3)(C) or 212(a)(3)(E) of the Act.

*       *       *       *       *

(m) *Effect of enactment on family members other than qualified family members.* The adjustment of status benefits and waivers provided by Pub. L. 102–404 do not apply to a spouse or child who is not a qualified family member as defined in paragraph (c) of this section. However, a spouse or child whose relationship to the principal

alien was established prior to the approval of the principal's adjustment of status application may be accorded the derivative priority date and preference category of the principal alien, in accordance with the provisions of section 203(d) of the Act. The spouse or child may use the priority date and category when it becomes current, in accordance with the limitations set forth in sections 201 and 202 of the Act. Persons who are unable to maintain lawful nonimmigrant status in the United States and are not immediately eligible to apply for adjustment of status may request voluntary departure pursuant to 8 CFR part 240.

120. Section 245.10 is amended by:
a. Revising paragraphs (a)(3) and (6); and by
b. Revising introductory text in paragraph (b), to read as follows:

**§ 245.10  Adjustment of status upon payment of additional sum under Public Law 103–317.**

(a) * * *
(3) Is not inadmissible from the United States under any provision of section 212 of the Act, or all grounds for inadmissibility have been waived;

*       *       *       *       *

(6) Remits the sum specified in section 245(i) of the Act, unless payment of the sum is waived under section 245(i) of the Act; and

*       *       *       *       *

(b) *Payment of additional sum.* An applicant filing under the provisions of section 245(i) of the Act must pay the standard adjustment of status filing fee, as shown on Form I–485 and contained in § 103.7(b)(1) of this chapter. The applicant must also pay the additional sum specified in section 245(i) of the Act, unless at the time the application for adjustment of status is filed, the alien is:

*       *       *       *       *

121. Section 245.11 is amended by:
a. Revising paragraph (a)(4)(ii)(B);
b. Revising paragraph (b)(1)(iii);
c. Revising the introductory text in paragraph (c); and by
d. Revising paragraphs (h) and (i), to read as follows:

**§ 245.11  Adjustment of aliens in S nonimmigrant classification.**

(a) * * *
(4) * * *
(ii) * * *
(B) Be admissible to the United States as an immigrant, unless the ground of inadmissibility has been waived;

*       *       *       *       *

(b) * * *
(1) * * *
(iii) The family member is not inadmissible from the United States as

a participant in Nazi persecution or genocide as described in section 212(a)(3)(E) of the Act;

*       *       *       *       *

(c) *Waivers of inadmissibility.* An alien seeking to adjust status pursuant to the provisions of section 101(a)(15)(S) of the Act may not be denied adjustment of status for conduct or a condition that:

*       *       *       *       *

(h) *Removal under section 237 of the Act.* Nothing in this section shall prevent an alien adjusted pursuant to the terms of these provisions from being removed for conviction of a crime of moral turpitude committed within 10 years after being provided lawful permanent residence under this section or for any other ground under section 237 of the Act.

(i) *Denial of application.* In the event the district decides to deny an application on Form I–485 and an approved Form I–854 to allow an S nonimmigrant to adjust status, the Assistant Attorney General, Criminal Division, and the relevant LEA shall be notified in writing to that effect. The Assistant Attorney General, Criminal Division, shall concur in or object to that decision. Unless the Assistant Attorney General, Criminal Division, objects within 7 days, he or she shall be deemed to have concurred in the decision. In the event of an objection by the Assistant Attorney General, Criminal Division, the matter will be expeditiously referred to the Deputy Attorney General for a final resolution. In no circumstances shall the alien or the relevant LEA have a right of appeal from any decision to deny. A denial of an adjustment application under this paragraph may not be renewed in subsequent removal proceedings.

**PART 246—RESCISSION OF ADJUSTMENT OF STATUS**

122. The authority citation for part 246 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1254, 1255, 1256, 1259; 8 CFR part 2.

**§ 246.8   [Removed]**

123. Section 246.8 is removed.

**PART 248—CHANGE OF NONIMMIGRANT CLASSIFICATION**

124. The authority citation for part 248 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1184, 1187, 1258; 8 CFR part 2.

125. Section 248.1 is amended by revising paragraph (b)(4) to read as follows:

## §248.1  Eligibility.

*   *   *   *   *

(b) * * *

(4) The alien is not the subject of removal proceedings under 8 CFR part 240.

*   *   *   *   *

## PART 249—CREATION OF RECORDS OF LAWFUL ADMISSION FOR PERMANENT RESIDENCE

126. The authority citation for part 249 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1259; 8 CFR part 2.

127. Section 249.2 is amended by revising the first sentence in paragraph (a) and by revising paragraph (b), to read as follows:

## §249.2  Application.

(a) *Jurisdiction.* An application by an alien, other than an arriving alien, who has been served with a notice to appear or warrant of arrest shall be considered only in proceedings under 8 CFR part 240. * * *

(b) *Decision.* The applicant shall be notified of the decision and, if the application is denied, of the reasons therefor. If the application is granted, a Form I–551, showing that the applicant has acquired the status of an alien lawfully admitted for permanent residence, shall not be issued until the applicant surrenders any other document in his or her possession evidencing compliance with the alien registration requirements of former or existing law. No appeal shall lie from the denial of an application by the district director. However, an alien, other than an arriving alien, may renew the denied application in proceedings under 8 CFR part 240.

## PART 251—ARRIVAL MANIFESTS AND LISTS: SUPPORTING DOCUMENTS

128. The authority citation for part 251 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1221, 1281, 1282, 8 CFR part 2.

129. Section 251.1 is revised to read as follows:

## §251.1  Arrival manifests and lists.

(a) *Vessels.* (1) *General.* The master or agent of every vessel arriving in the United States from a foreign place or an outlying possession of the United States shall present to the immigration officer at the port where the immigration inspection is performed a manifest of all crewmen on board on Form I–418, Passenger List and Crew List, in accordance with the instructions contained thereon.

(2) *Longshore work notations.* The master or agent of the vessel shall indicate in writing immediately below the name of the alien listed on the Form I–418 whether or not crewmen aboard the vessel will be used to perform longshore work at any United States port before the vessel departs the United States.

(i) If no longshore work will be performed, no further notation regarding longshore work is required.

(ii) If longshore work will be performed, the master or agent shall note which exception listed in section 258 of the Act permits the work. The exceptions are:

(A) The hazardous cargo exception;

(B) The prevailing practice exception in accordance with a port's collective bargaining agreements;

(C) The prevailing practice exception in a port where there is no collective bargaining agreement, but for which the vessel files an attestation;

(D) The prevailing practice exception for automated vessels; and

(E) The reciprocity exception.

(iii) If longshore work will be performed under the hazardous cargo exception, the vessel must either be a tanker or be transporting dry bulk cargo that qualifies as hazardous. All tankers qualify for the hazardous cargo exception, except for a tanker that has been gas-freed to load non-hazardous dry bulk commodities.

(A) To invoke the exception for tankers, the master or agent shall note on the manifest that the vessel is a qualifying tanker.

(B) If the vessel is transporting dry bulk hazardous cargo, the master or agent shall note on the manifest that the vessel's dry bulk cargo is hazardous and shall show the immigration officer the dangerous cargo manifest that is signed by the master or an authorized representative of the owner, and that under 46 CFR 148.02 must be kept in a conspicuous place near the bridge house.

(iv) If longshore work will be performed under the prevailing practice exception, the master or agent shall note on the manifest each port at which longshore work will be performed under this exception. Additionally, for each port the master or agent shall note either that:

(A) The practice of nonimmigrant crewmen doing longshore work is in accordance with all collective bargaining agreements covering 30 percent or more of the longshore workers in the port;

(B) The port has no collective bargaining agreement covering 30 percent or more of the longshore

workers in the port and an attestation has been filed with the Secretary of Labor;

(C) An attestation that was previously filed is still valid and the continues to comply with the conditions stated in that attestation; or

(D) The longshore work consists of operating an automated, self-unloading conveyor belt or a vacuum-actuated system.

(v) If longshore work will be performed under the reciprocity exception, the master or agent shall note on the manifest that the work will be done under the reciprocity exception, and will note the nationality of the vessel's registry and the nationality or nationalities of the holders of a majority of the ownership interest in the vessel.

(3) *Exception for certain Great Lakes vessels.* (i) A manifest shall not be required for a vessel of United States, Canadian, or British registry engaged solely in traffic on the Great Lakes or the St. Lawrence River and connecting waterways, herein designated as a Great Lakes vessel, unless:

(A) The vessel employs nonimmigrant crewmen who will do longshore work at a port in the United States; or

(B) The vessel employs crewmen of other than United States, Canadian, or British citizenship.

(ii) In either situation, the master shall note the manifest in the manner prescribed in paragraph (a)(2) of this section.

(iii) After submission of a manifest on the first voyage of a calendar year, a manifest shall not be required on subsequent arrivals unless a nonimmigrant crewman of other than Canadian or British citizenship is employed on the vessel who was not aboard and listed on the last prior manifest, or a change has occurred regarding the performance of longshore work in the United States by nonimmigrant crewmen, or a change has occurred in the exception that the master or agent of the vessel wishes to invoke which was not noted on the last prior manifest.

(4) The master or agent of a vessel that only bunkers at a United States port en route to another United States port shall annotate Form I–418 presented at the onward port to indicate the time, date, and place of bunkering.

(5) If documentation is required to support an exception, as described in §258.2 of this chapter, it must accompany the manifest.

(b) *Aircraft.* The captain or agent of every aircraft arriving in the United States from a foreign place or from an outlying possession of the United States, except an aircraft arriving in the United

States directly from Canada on a flight originating in that country, shall present to the immigration officer at the port where the inspection is performed a manifest on United States Customs Service Form 7507 or on the International Civil Aviation Organization's General Declaration of all the alien crewmembers on board, including alien crewmembers who are returning to the United States after taking an aircraft of the same line from the United States to a foreign place or alien crewmembers who are entering the United States as passengers solely for the purpose of taking an aircraft of the same line from the United States to a foreign port. The captain or agent of an aircraft that only refuels at the United States en route to another United States port must annotate the manifest presented at the onward port to indicate the time, date, and place of refueling. The surname, given name, and middle initial of each alien crewman listed also shall be shown on the manifest. In addition, the captain or agent of the aircraft shall indicate the total number of United States citizen crewmembers and total number of alien crewmembers.

(c) *Additional documents*. The master, captain, or agent shall prepare as a part of the manifest, when one is required for presentation to an immigration officer, a completely executed set of Forms I–95, Conditional Landing Permit, for each nonimmigrant alien crewman on board, except:

(1) A Canadian or British citizen crewman serving on a vessel plying solely between Canada and the United States; or

(2) A nonimmigrant crewman who is in possession of an unmutilated Form I–184, Alien Crewman Landing Permit and Identification Card, or an unmutilated Form I–95 with space for additional endorsements previously issued to him or her as a member of the crew of the same vessel or an aircraft of the same line on his or her last prior arrival in the United States, following which he or she departed from the United States as a member of the crew of the same vessel or an aircraft of the same line.

130. Section 251.2 is revised to read as follows:

### § 251.2   Notification of illegal landings.

As soon as discovered, the master or agent of any vessel from which an alien crewman has illegally landed or deserted in the United States shall inform the immigration officer in charge of the port where the illegal landing or desertion occurred, in writing, or the name, nationality, passport number and, if known, the personal description,

circumstances and time of such illegal landing or desertion of such alien crewman, and furnish any other information and documents that might aid in his or her apprehension, including any passport surrendered pursuant to § 252.1(d) of this chapter. Failure to file notice of illegal landing or desertion and to furnish any surrendered passport within 24 hours of the time of such landing or desertion becomes known shall be regarded as lack of compliance with section 251(d) of the Act.

131. Section 251.3 is revised to read as follows:

### § 251.3   Departure manifests and lists for vessels.

(a) *Form I–418, Passenger List-Crew List*. The master or agent of every vessel departing from the United States shall submit to the immigration officer at the post from which such vessel is to depart directly to some foreign place or outlying possession of the United States, except when a manifest is not required pursuant to § 251.1(a), a single Form I–418 completed in accordance with the instructions on the form. Submission of a Form I–418 that lacks any required endorsement shall be regarded as lack of compliance with section 251(c) of the Act.

(b) *Exception for certain Great Lakes vessels*. The required list need not be submitted for Canadian or British crewmembers of Great Lakes vessels described in § 251.1(a)(3).

132. Section 251.4 is revised to read as follows:

### § 251.4   Departure manifests and lists for aircraft.

(a) *United States Customs Service Form 7507 or International Civil Aviation Organization's General Declaration*. The captain or agent of every aircraft departing from the United States for a foreign place or an outlying possession of the United States, except on a flight departing for and terminating in Canada, shall submit to the immigration officer at the port from which such aircraft is to depart a completed United States Customs Service Form 7507 or the International Civil Aviation Organization's General Declaration. The form shall contain a list of all alien crewmen on board, including alien crewmen who arrived in the United States as crewmen on an aircraft of the same line and who are departing as passengers. The surname, given name, and middle initial of each such alien crewman listed shall be shown. In addition, the captain or agent of the craft shall indicate the total number of alien crewmembers and the

total number of United States citizen crewmembers.

(b) *Notification of changes in employment for aircraft*. The agent of the air transportation line shall immediately notify in writing the nearest immigration office of the termination of employment in the United States of each alien employee of the line furnishing the name, birth date, birthplace, nationality, passport number, and other available information concerning such alien. The procedure to follow in obtaining permission to pay off or discharge an alien crewman in the United States after initial immigration inspection, other than an alien lawfully admitted for permanent residence, is set forth in § 252.1(f) of this chapter.

133. Section 251.5 is revised to read as follows:

### § 251.5   Exemptions for private vessels and aircraft.

The provisions of this part relating to submission of arrival and departure manifests and lists shall not apply to a private vessel or a private aircraft not engaged directly or indirectly in the carriage of persons or cargo for hire.

## PART 252—LANDING OF ALIEN CREWMEN

134. The authority citation for part 252 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1184, 1258, 1281, 1282; 8 CFR part 2.

135. Section 252.1 is amended by revising paragraphs (a) through (c) to read as follows:

### § 252.1   Examination of crewmen.

(a) *Detention prior to examination*. All persons employed in any capacity on board any vessel or aircraft arriving in the United States shall be detained on board the vessel or at the airport of arrival by the master or agent of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service.

(b) *Classes of aliens subject to examination under this part*. The examination of every nonimmigrant alien crewman arriving in the United States shall be in accordance with this part except that the following classes of persons employed on vessels or aircraft shall be examined in accordance with the provisions of 8 CFR parts 235 and 240:

(1) Canadian or British citizen crewmen serving on vessels plying solely between Canada and the United States; or

(2) Canadian or British citizen crewmen of aircraft arriving in a State of the United States directly from

Canada on flights originating in that country. The crew of a vessel arriving at a United States port that may not require inspection by or clearance from the United States Customs Service is, nevertheless, subject to examination under this part; however, the master of such a vessel is not required to present Form I–95 for any crewman who is not an applicant for a conditional landing permit.

(c) *Requirements for landing permits.* Every alien crewman applying for landing privileges in the United States must make his or her application in person before an immigration officer, present whatever documents are required, be photographed and fingerprinted as the district director may require, and establish to the satisfaction of the immigration officer that he or she is not inadmissible under any provision of the law and is entitled clearly and beyond doubt to landing privileges in the United States.

136. Section 252.2 is revised to read as follows:

### §252.2   Revocation of conditional landing permits; removal.

(a) *Revocation and removal while vessel is in the United States.* A crewman whose landing permit is subject to revocation pursuant to section 252(b) of the Act may be taken into custody by any immigration officer without a warrant of arrest and be transferred to the vessel of arrival, if the vessel is in any port in the United States and has not departed foreign since the crewman was issued his or her conditional landing permit. Detention and removal of the crewman shall be at the expense of the transportation line on which the crewman arrived. Removal may be effected on the vessel of arrival or, if the master of the vessel has requested in writing, by alternate means if removal on the vessel of arrival is impractical.

(b) *Revocation and removal after vessel has departed the United States.* A crewman who was granted landing privileges prior to April 1, 1997, and who has not departed foreign on the vessel of arrival, or on another vessel or aircraft if such permission was granted pursuant to §252.1(f), is subject to removal proceedings under section 240 of the Act as an alien deportable pursuant to section 237(a)(1)(C)(i) of the Act. A crewman who was granted landing privileges on or after April 1, 1997, and who has not departed foreign on the vessel of arrival, or on another vessel or aircraft if such permission was granted pursuant to §252.1(f), shall be removed from the United States without a hearing. In either case, if the alien is

removed within 5 years of the date of landing, removal of the crewman shall be at the expense of the owner of the vessel. In the case of a crewman ordered removed more than 5 years after the date of landing, removal shall be at the expense of the appropriation for the enforcement of the Act.

137. Section 252.3 is revised to read as follows:

### §252.3   Great Lakes vessels and tugboats arriving in the United States from Canada; special procedures.

(a) *United States vessels and tugboats.* An immigration examination shall not be required of any crewman aboard a Great Lakes vessel of United States registry or a tugboat of United States registry arriving from Canada at a port of the United States who has been examined and admitted by an immigration officer as a member of the crew of the same vessel or tugboat or of any other vessel or tugboat of the same company during the current calendar year.

(b) *Canadian or British vessels or tugboats.* An alien crewman need not be presented for inspection if the alien crewman:

(1) Serves aboard a Great Lakes vessel of Canadian or British registry or aboard a tugboat of Canadian or British registry arriving at a United States port-of-entry from Canada;

(2) Seeks admission for a period of less than 29 days;

(3) Has, during the current calendar year, been inspected and admitted by an immigration officer as a member of the crew of the same vessel or tugboat, or of any other vessel or tugboat of the same company;

(4) Is either a British or Canadian citizen or is in possession of a valid Form I–95 previously issued to him or her as a member of the crew of the same vessel or tugboat, or of any vessel or tugboat of the same company;

(5) Does not request or require landing privileges in the United States beyond the time the vessel or tugboat will be in port; and,

(6) Will depart to Canada with the vessel or tugboat.

138. Section 252.4 is revised to read as follows:

### §252.4   Permanent landing permit and identification card.

A Form I–184 is valid until revoked. It shall be revoked when an immigration officer finds that the crewman is in the United States in willful violation of the terms and conditions of his or her permission to land, or that he or she is inadmissible to the United States. On revocation, the Form I–184 shall be

surrendered to an immigration officer. No appeal shall lie from the revocation of Form I–184.

139. Section 252.5 is revised to read as follows:

### §252.5   Special procedures for deserters from Spanish or Greek ships of war.

(a) *General.* Under E.O. 11267 of January 19, 1966 (31 FR 807) and 28 CFR 0.109, and E.O. 11300 of August 17, 1966 (31 FR 11009), and 28 CFR 0.110, the Commissioner and immigration officers (as defined in § 103.1(j) of this chapter) are designated as "competent national authorities" on the part of the United States within the meaning of Article XXIV of the 1903 Treaty of Friendship and General Relations between the United States and Spain (33 Stat. 2105, 2117), and "local authorities" and "competent officers" on the part of the United States within the meaning of Article XIII of the Convention between the United States and Greece (33 Stat. 2122, 2131).

(b) *Application for restoration.* On application of a Consul General, Consul, Vice-Consul, or Consular-Agent of the Spanish or Greek Government, made in writing pursuant to Article XXIV of the treaty, or Article XIII of the Convention, respectively, stipulating for the restoration of crewmen deserting, stating that the person named therein has deserted from a ship of war of that government, while in any port of the United States, and on proof by the exhibition of the register, crew list, or official documents of the vessel, or a copy or extract therefrom, duly certified, that the person named belonged, at the time of desertion, to the crew of such vessel, such person shall be taken into custody by any immigration officer without a warrant of arrest. Written notification of charges shall be served on the alien when he or she is taken into custody or as soon as practical thereafter.

(c) *Examination.* Within a reasonable period of time after the arrest, the alien shall be accorded an examination by the district director, acting district director, or the deputy district director having jurisdiction over the place of arrest. The alien shall be informed that he or she may have the assistance of a counsel or representative of his or her choice qualified under 8 CFR part 292 without expense to the Government, and that he or she may present such evidence in his or her behalf as may be relevant to this proceeding. If, upon the completion of such examination, it is determined that:

(1) The individual sought by the Spanish or Greek authorities had

deserted from a Spanish or Greek ship of war in a United States port;

(2) The individual actually arrested and detained is the person sought;

(3) The individual is not a citizen of the United States; and

(4) The individual had not previously been arrested for the same cause and set at liberty because he or she had been detained for more than 3 months, or more than 2 months in the case of a deserter from a Greek ship of war, from the day of his or her arrest without the Spanish or Greek authorities having found an opportunity to send him or her home, the individual shall be served with a copy of the findings, from which no appeal shall lie, and be surrendered forthwith to the Spanish or Greek authorities if they are prepared to remove him or her from the United States. On written request of the Spanish or Greek authorities, the individual shall be detained, at their expense, for a period not exceeding 3 months or 2 months, respectively, from the day of arrest to afford opportunity to arrange for his or her departure from the United States.

(d) *Timely departure not effected*. If the Spanish authorities delay in sending the individual home for more than 3 months, or if the Greek authorities delay in sending the individual home for more than 2 months, from the day of his or her arrest, the individual shall be dealt with as any other alien unlawfully in the United States under the removal provisions of the Act, as amended.

(e) *Commission of crime*. If the individual has committed any crime or offense in the United States, he or she shall not be placed at the disposal of the consul until after the proper tribunal having jurisdiction in his or her case shall have pronounced sentence, and such sentence shall have been executed.

## PART 253—PAROLE OF ALIEN CREWMEN

140. The authority citation for part 253 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1282, 1283, 1285; 8 CFR part 2.

141. In § 253.1, paragraph (f) is revised to read as follows:

### § 253.1  Parole.

*      *      *      *      *

(f) *Crewman, stowaway, or alien removable under section 235(c) alleging persecution*. Any alien crewman, stowaway, or alien removable under section 235(c) of the Act who alleges that he or she cannot return to his or her country of nationality or last habitual residence (if not a national of any country) because of fear of persecution

in that country on account of race, religion, nationality, membership in a particular social group, or political opinion, is eligible to apply for asylum or withholding of removal under 8 CFR part 208. Service officers shall take particular care to ensure the provisions of § 208.5(b) of this chapter regarding special duties toward aliens aboard certain vessels are closely followed.

*      *      *      *      *

## PART 274A—CONTROL OF EMPLOYMENT OF ALIENS

142. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 8 CFR part 2.

143. Section 274a.12 is amended by:
a. Revising paragraphs (a)(10) and (12);

b. Revising paragraphs (c)(8) and (10);
c. Removing and reserving paragraph (c)(12); and by

d. Revising paragraph (c)(18), to read as follows:

### § 274a.12  Classes of aliens authorized to accept employment.

(a) *  *  *

(10) An alien granted withholding of deportation or removal for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

*      *      *      *      *

(12) An alien granted Temporary Protected Status under section 244 of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service; or

*      *      *      *      *

(c) *  *  *

(8) An alien who has filed a complete application for asylum or withholding of deportation or removal pursuant to 8 CFR part 208, whose application has not been decided, and who is eligible to apply for employment authorization under § 208.7 of this chapter because the 150-day period set forth in that section has expired. Employment authorization may be granted according to the provisions of § 208.7 of this chapter in increments to be determined by the Commissioner and shall expire on a specified date;

*      *      *      *      *

(10) An alien who has filed an application for suspension of deportation under section 243 of the Act or cancellation of removal pursuant to section 240A of the Act. Employment authorization shall be granted in increments not exceeding one year during the period the application is

pending (including any period when an administrative appeal or judicial review is pending) and shall expire on a specified date;

*      *      *      *      *

(12) [Reserved]

*      *      *      *      *

(18) An alien against whom a final order of deportation or removal exists and who is released on an order of supervision under the authority contained in section 241(a)(3) of the Act may be granted employment authorization in the discretion of the district director only if the alien cannot be removed due to the refusal of all countries designated by the alien or under section 241 of the Act to receive the alien, or because the removal of the alien is otherwise impracticable or contrary to the public interest. Additional factors which may be considered by the district director in adjudicating the application for employment authorization include, but are not limited to, the following:

(i) The existence of economic necessity to be employed;

(ii) The existence of a dependent spouse and/or children in the United States who rely on the alien for support; and

(iii) The anticipated length of time before the alien can be removed from the United States.

*      *      *      *      *

## PART 286—IMMIGRATION USER FEE

144. The authority citation for part 286 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1356; 8 CFR part 2.

145. In § 286.9, paragraph (b)(3) is revised to read as follows:

### § 286.9  Fee for processing applications and issuing documentation at land border Ports-of-Entry.

*      *      *      *      *

(b) *  *  *

(3) A Mexican national in possession of a valid nonresident alien border crossing card or nonimmigrant B–1/B–2 visa who is required to be issued Form I–94, Arrival/Departure Record, pursuant to § 235.1(f) of this chapter, must remit the required fee for issuance of Form I–94 upon determination of admissibility.

*      *      *      *      *

## PART 287—FIELD OFFICERS; POWERS AND DUTIES

146. The authority citation for part 287 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1225, 1226, 1251, 1252, 1357; 8 CFR part 2.

AR00515

147. Section 287.3 is revised to read as follows:

### §287.3   Disposition of cases of aliens arrested without warrant.

(a) *Examination.* An alien arrested without a warrant of arrest under the authority contained in section 287(a)(2) of the Act will be examined by an officer other than the arresting officer. If no other qualified officer is readily available and the taking of the alien before another officer would entail unnecessary delay, the arresting officer, if the conduct of such examination is a part of the duties assigned to him or her, may examine the alien.

(b) *Determination of proceedings.* If the examining officer is satisfied that there is prima facie evidence that the arrested alien was entering, attempting to enter, or is present in the United States in violation of the immigration laws, the examining officer will refer the case to an immigration judge for further inquiry in accordance with 8 CFR parts 235, 239, or 240, order the alien removed as provided for in section 235(b)(1) of the Act and § 235.3(b) of this chapter, or take whatever other action may be appropriate or required under the laws or regulations applicable to the particular case.

(c) *Notifications and information.* Except in the case of an alien subject to the expedited removal provisions of section 235(b)(1)(A) of the Act, all aliens arrested without warrant and placed in formal proceedings under section 238 or 240 of the Act will be advised of the reasons for his or her arrest and the right to be represented at no expense to the Government. The examining officer will provide the alien with a list of the available free legal services provided by organizations and attorneys qualified under 8 CFR part 3 and organizations recognized under § 292.2 of this chapter that are located in the district where the hearing will be held. The examining officer shall note on Form I–862 that such a list was provided to the alien. The officer will also advise the alien that any statement made may be used against him or her in a subsequent proceeding.

(d) *Custody procedures.* Unless voluntary departure has been granted pursuant to subpart C of 8 CFR part 240, a determination will be made within 24 hours of the arrest whether the alien will be continued in custody or released on bond or recognizance and whether a notice to appear and warrant of arrest as prescribed in 8 CFR parts 236 and 239 will be issued.

148. In § 287.4, paragraph (d) is revised to read as follows:

### §287.4   Subpoena.

\*       \*       \*       \*       \*

(d) *Invoking aid of court.* If a witness neglects to appear and testify as directed by the subpoena served upon him or her in accordance with the provisions of this section, the officer or immigration judge issuing the subpoena shall request the United States Attorney for the district in which the subpoena was issued to report such neglect or refusal to the United States District Court and to request such court to issue an order requiring the witness to appear and testify and to produce the books, papers, or documents designated in the subpoena.

149. In § 287.5, paragraphs (b) through (f) are revised to read as follows:

### §287.5   Exercise of power by immigration officers.

\*       \*       \*       \*       \*

(b) *Power and authority to patrol the border.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power to patrol the border conferred by section 287(a)(3) of the Act:

(1) border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Immigration inspectors (seaport operations only);

(4) Adjustments officers and deportation officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections (seaport operations only);

(5) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(6) Immigration officers who need the authority to patrol the border under section 287(a)(3) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commission.

(c) *Power and authority to arrest.* (1) *Arrests of aliens under section 287(a)(2) of the Act for immigration violations.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the arrest power conferred by section 287(a)(2) of the Act and in accordance with § 287.8(c):

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Immigration inspectors;

(v) Adjudications officers;

(vi) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(vii) Immigration officers who need the authority to arrest aliens under section 287(a)(2) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner.

(2) *Arrests of persons under section 287(a)(4) of the Act for felonies regulating the admission or removal of aliens.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the arrest power conferred by section 287(a)(4) of the Act and in accordance with § 287.8(c):

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Immigration inspectors;

(v) Adjudications officers;

(vi) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(vii) Immigration officers who need the authority to arrest persons under section 287(a)(4) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(3) *Arrests of persons under section 287(a)(5)(A) of the Act for any offense against the United States.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the arrest power conferred by section 287(a)(5)(A) of the Act in accordance with § 287.8(c):

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Immigration inspectors (permanent full-time immigration inspectors only);

(v) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(vi) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(vii) Immigration officers who need the authority to arrest persons under

section 287(a)(5)(A) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(4) *Arrests of persons under section 287(a)(5)(B) of the Act for any felony.* (i) Section 287(a)(5)(B) of the Act authorizes designated immigration officers, as listed in paragraph (c)(4)(iii) of this section, to arrest persons, without warrant, for any felony cognizable under the laws of the United States if:

(A) The immigration officer has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony;

(B) The immigration officer is performing duties relating to the enforcement of the immigration laws at the time of the arrest;

(C) There is a likelihood of the person escaping before a warrant can be obtained of his or her arrest; and

(D) The immigration officer has been certified as successfully completing a training program that covers such arrests and the standards with respect to the enforcement activities of the Service as defined in § 287.8.

(ii) The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the arrest power conferred by section 287(a)(5)(B) of the Act and in accordance with § 287.8(c):

(A) Border patrol agents, including aircraft pilots;

(B) Special agents;

(C) Deportation officers;

(D) Immigration inspectors (permanent full-time immigration inspectors only);

(E) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(F) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(G) Immigration officers who need the authority to arrest persons under section 287(a)(5)(B) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(iii) Notwithstanding the authorization and designation set forth in paragraph (c)(4)(ii) of this section, no immigration officer is authorized to make an arrest for any felony under the authority of section 287(a)(5)(B) of the

Act until such time as he or she has been certified by the Director of Training as successfully completing a training course encompassing such arrests and the standards for enforcement activities as defined in § 287.8. Such certification shall be valid for the duration of the immigration officer's continuous employment, unless it is suspended or revoked by the Commissioner or the Commissioner's designee for just cause.

(5) *Arrests of persons under section 274(a) of the Act who bring in, transport, or harbor certain aliens, or induce them to enter.*

(i) Section 274(a) of the Act authorizes designated immigration officers, as listed in paragraph (c)(5)(ii) of this section, to arrest persons who bring in, transport, or harbor aliens, or induce them to enter the United States in violation of law. When making an arrest, the designated immigration officer shall adhere to the provisions of the enforcement standard governing the conduct of arrests in § 287.8(c).

(ii) The following immigration officers who have successfully completed basic immigration law enforcement training are authorized and designated to exercise the arrest power conferred by section 274(a) of the Act:

(A) Border patrol agents, including aircraft pilots;

(B) Special agents;

(C) Deportation officers;

(D) Immigration inspectors;

(E) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(F) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(G) Immigration officers who need the authority to arrest persons under section 274(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(6) *Custody and transportation of previously arrested persons.* In addition to the authority to arrest pursuant to a warrant of arrest in paragraph (e)(2)(i) of this section, detention enforcement officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to take and maintain custody of and transport any person who has been arrested by an immigration officer pursuant to paragraphs (c)(1) through (c)(5) of this section.

(d) *Power and authority to conduct searches.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power to conduct searches conferred by section 287(c) of the Act:

(1) Border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Deportation officers;

(4) Immigration inspectors;

(5) Adjudications officers;

(6) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(7) Immigration officers who need the authority to conduct searches under section 287(c) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner.

(e) *Power and authority to execute warrants.* (1) *Search warrants.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power conferred by section 287(a) of the Act to execute a search warrant:

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(iv) Immigration officers who need the authority to execute search warrants under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(2) *Issuance of arrest warrants for immigration violations.* A warrant of arrest may be issued only by the following immigration officers:

(i) District directors (except foreign);

(ii) Deputy district directors (except foreign);

(iii) Assistant district directors for investigations;

(iv) Deputy assistant district directors for investigations;

(v) Assistant district directors for deportation;

(vi) Deputy assistant district directors for deportation;

(vii) Assistant district directors for examinations;

(viii) Deputy assistant district directors for examinations;

(ix) Officers in charge (except foreign);

(x) Assistant officers in charge (except foreign);

(xi) Chief patrol agents;

(xii) Deputy chief patrol agents;

(xiii) Associate chief patrol agents;

(xiv) Assistant chief patrol agents;

(xv) Patrol agents in charge;

(xvi) The Assistant Commissioner, Investigations;

(xvii) Institutional Hearing Program Directors;

(xviii) Area Port Directors;

(xix) Port Directors; or

(xx) Deputy Port Directors.

(3) *Service of warrant of arrests for immigration violations.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power pursuant to section 287(a) of the Act to execute warrants of arrest for administrative immigration violations issued under section 236 of the Act or to execute warrants of criminal arrest issued under the authority of the United States:

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Detention enforcement officers (warrants of arrest for administrative immigration violations only);

(v) Immigration inspectors;

(vi) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(vii) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(viii) Immigration officers who need the authority to execute arrest warrants for immigration violations under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner, for warrants of arrest for administrative immigration violations, and with the approval of the Deputy Attorney General, for warrants of criminal arrest.

(4) *Service of warrant of arrests for non-immigration violations.* The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power to execute warrants of criminal arrest for non-immigration violations issued under the authority of the United States:

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(v) Immigration officers who need the authority to execute warrants of arrest for non-immigration violations under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(f) *Power and authority to carry firearms.* The following immigration officers who have successfully completed basic immigration enforcement training are hereby authorized and designated to exercise the power conferred by section 287(a) of the Act to carry firearms provided that they are individually qualified by training and experience to handle and safely operate the firearms they are permitted to carry, maintain proficiency in the use of such firearms, and adhere to the provisions of the enforcement standard governing the use of force in § 287.8(a):

(1) Border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Deportation officers;

(4) Detention enforcement officers;

(5) Immigration inspectors;

(6) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(7) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(8) Immigration officers who need the authority to carry firearms under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

150. Section 287.7 is revised to read as follows:

### § 287.7   Detainer provisions under section 287(b)(3) of the Act.

(a) *Detainers in general.* Detainers are issued pursuant to sections 236 and 287 of the Act and this chapter. Any authorized Service official may at any time issue a Form I–247, Immigration Detainer-Notice of Action, to any other Federal, State, or local law enforcement agency. A detainer serves to advise another law enforcement agency that the Service seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. The detainer is a request that such agency advise the Service, prior to release of the alien, in order for the Service to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible.

(b) *Authority to issue detainers.* The following officers are authorized to issue detainers:

(1) Border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Deportation officers;

(4) Immigration inspectors;

(5) Adjudications officers;

(6) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed above; and

(7) Immigration officers who need the authority to issue detainers under section 287(d)(3) of the Act in order to effectively accomplish their individual missions and who are designated individually or as a class, by the Commissioner.

(c) *Availability of records.* In order for the Service to accurately determine the propriety of issuing a detainer, serving a notice to appear, or taking custody of an alien in accordance with this section, the criminal justice agency requesting such action or informing the Service of a conviction or act that renders an alien inadmissible or removable under any provision of law shall provide the Service with all documentary records and information available from the agency that reasonably relates to the alien's status in the United States, or that may have an impact on conditions of release.

(d) *Temporary detention at Service request.* Upon a determination by the Service to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Service.

(e) *Financial responsibility for detention.* No detainer issue as a result of a determination made under this chapter shall incur any fiscal obligation on the part of the Service, until actual assumption of custody by the Service, except as provided in paragraph (d) of this section.

## PART 299—IMMIGRATION FORMS

151. The authority citation for part 299 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103; 8 CFR part 2.

152. Section 299.1 is amended by:

**Federal Register** / Vol. 62, No. 2 / Friday, January 3, 1997 / Proposed Rules          **515**

a. Revising the entries for Forms "I–147", "I–205", "I–246", "I–247", "I–259", "I–284", "I–286", "I–291", "I–296", "I–310", "I–408", "I–426", "I–541", "I–589", "I–775", "I–851", and "I–851A";

b. Removing the entries for Forms "I–122", "I–221", "I–259C", "I–290A", and "I–444", and by

c. Adding the entries for Forms "I–94T", "I–99", "I–148", "I–160", "I–210", "I–213", "I–217", "I–220A", "I–220B", "I–241", "I–261", "I–270", "I–275", "I–294", "I–407", "I–546", "I–701", "I–770", "I–771", "I–826", "I–827A", "I–827B", "I–860", "I–862", and "I–863", in proper numerical sequence, to the listing of forms, to read as follows:

**§ 299.1   Prescribed forms.**

\* \* \* \* \*

| Form No. | | Edition date | Title |
|---|---|---|---|
| \* | \* | \* \* \* | \* \* |
| I–94T ................................ | | 09–22–87 | Arrival-Departure Record (Transit without visa). |
| \* | \* | \* \* \* | \* \* |
| I–99 ................................. | | 04–01–97 | Notice of Revocation and Penalty. |
| \* | \* | \* \* \* | \* \* |
| I–147 ................................ | | 04–01–97 | Notice of Temporary Inadmissibility to U.S. |
| I–148 ................................ | | 04–01–97 | Notice of Permanent Inadmissibility. |
| \* | \* | \* \* \* | \* \* |
| I–160 ................................ | | 04–01–97 | Notice of Parole/Lookout Intercept. |
| \* | \* | \* \* \* | \* \* |
| I–205 ................................ | | 04–01–97 | Warrant of Removal. |
| I–210 ................................ | | 04–01–97 | Voluntary Departure Notice. |
| \* | \* | \* \* \* | \* \* |
| I–213 ................................ | | 04–01–97 | Record of Deportable/Inadmissible Alien. |
| I–217 ................................ | | 04–01–97 | Information for Travel Document or Passport. |
| I–220A ............................... | | 04–01–97 | Order of Release on Recognizance. |
| I–220B ............................... | | 04–01–97 | Order of Supervision. |
| \* | \* | \* \* \* | \* \* |
| I–241 ................................ | | 04–01–97 | Request for Travel Document to Country Designated by Alien. |
| \* | \* | \* \* \* | \* \* |
| I–246 ................................ | | 04–01–97 | Application for Stay of Removal. |
| I–247 ................................ | | 04–01–97 | Immigration Detainer—Notice of Action. |
| I–259 ................................ | | 04–01–97 | Notice to Detain, Deport, Remove, or Present Aliens. |
| \* | \* | \* \* \* | \* \* |
| I–261 ................................ | | 04–01–97 | Additional Charges of Removability. |
| \* | \* | \* \* \* | \* \* |
| I–270 ................................ | | 04–01–97 | Request for Consent to Return Person to Canada. |
| I–275 ................................ | | 04–01–97 | Withdrawal of Application/Consular Notification. |
| I–284 ................................ | | 04–01–97 | Notice to Transportation Line Regarding Deportation and Detention Expenses of Detained Alien. |
| I–286 ................................ | | 04–01–97 | Notification to Alien of Conditions of Release or Detention. |
| \* | \* | \* \* \* | \* \* |
| I–291 ................................ | | 04–01–97 | Decision on Application for Status as Permanent Resident. |
| \* | \* | \* \* \* | \* \* |
| I–294 ................................ | | 04–01–97 | Notice of Country to Which Deportation has been Directed and Penalty for Reentry without Permission. |
| I–296 ................................ | | 04–01–97 | Notice to Alien Ordered Removed. |
| \* | \* | \* \* \* | \* \* |
| I–310 ................................ | | 04–01–97 | Bond for Payment of Sums and Fines Imposed under Immigration and Nationality Act (Term or Single Entry). |
| \* | \* | \* \* \* | \* \* |
| I–407 ................................ | | 04–01–97 | Abandonment by Alien of Status as Lawful Permanent Resident. |
| I–408 ................................ | | 04–01–97 | Application to Pay Off or Discharge Alien Crewman. |
| \* | \* | \* \* \* | \* \* |
| I–426 ................................ | | 04–01–97 | Immediate and Continuous Transit Agreement Between a Transportation Line and United States of America (special direct transit procedure). |
| \* | \* | \* \* \* | \* \* |
| I–541 ................................ | | 04–01–97 | Order of Denial of Application for Extension of Stay or Student Employment or Student Transfer. |

| Form No. | | Edition date | Title | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |
| I–546 .......................................... | | 04–01–97 | Order to Appear—Deferred Inspection. | | | |
| * | * | * | * | * | * | * |
| I–589 .......................................... | | 04–01–97 | Application for Asylum and Withholding of Removal. | | | |
| * | * | * | * | * | * | * |
| I–701 .......................................... | | 04–01–97 | Detainee Transfer Worksheet. | | | |
| * | * | * | * | * | * | * |
| I–770 .......................................... | | 04–01–97 | Notice of Rights and Request for Disposition. | | | |
| I–771 .......................................... | | 04–01–97 | Bond Computation Worksheet. | | | |
| I–775 .......................................... | | 04–01–97 | Visa Waiver Pilot Program Agreement. | | | |
| * | * | * | * | * | * | * |
| I–826 .......................................... | | 04–01–97 | Notice of Rights. | | | |
| I–827A .......................................... | | 04–01–97 | Request for Disposition. | | | |
| * | * | * | * | * | * | * |
| I–827B .......................................... | | 04–01–97 | Request for Disposition. | | | |
| I–851 .......................................... | | 04–01–97 | Notice of Intent to Issue Final Administrative Removal Order. | | | |
| I–851A .......................................... | | 04–01–97 | Final Administrative Removal Order. | | | |
| * | * | * | * | * | * | * |
| I–860 .......................................... | | 04–01–97 | Notice and Order of Expedited Removal. | | | |
| I–862 .......................................... | | 04–01–97 | Notice to Appear. | | | |
| I–863 .......................................... | | 04–01–97 | Notice of Referral to Immigration Judge. | | | |
| * | * | * | * | * | * | * |

153. Section 299.5 is amended by:

a. Removing the entry for Form "I–259C"; and by

b. Revising the entries for Forms "I–246" and "I–589", and to read as follows:

### § 299.5  Display of control numbers.

| | | | * | * | * | * | * |

| INS form No. | | INS form title | | | | Currently assigned OMB control no. |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |
| I–246 .......................................... | | Application for Stay of Removal ....................... | | | | 1115–0055 |
| * | * | * | * | * | * | * |
| I–589 .......................................... | | Application for Asylum and Withholding of Removal ............. | | | | 1115–0086 |
| * | * | * | * | * | * | * |

## PART 316—GENERAL REQUIREMENTS FOR NATURALIZATION

154. The authority citation for part 316 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1181, 1182, 1443, 1447; 8 CFR part 2.

155. Section 316.5 is amended by revising paragraph (c)(3) to read as follows:

### § 316.5  Residence in the United States.

* * * * *

(c) * * *

(3) *Removal and return.* Any departure from the United States while under an order of removal (including previously issued orders of exclusion or deportation) terminates the applicant's status as a lawful permanent resident and, therefore, disrupts the continuity of residence for purposes of this part.

* * * * *

## PART 318—PENDING REMOVAL PROCEEDINGS

156. The heading for part 318 is revised as set forth above.

157. The authority citation for part 318 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1252, 1429, 1443; 8 CFR part 2.

158. Section 318.1 is revised to read as follows:

### § 318.1  Warrant of arrest.

For the purposes of section 318 of the Act, a notice to appear issued under 8 CFR part 239 (including a charging document issued to commence proceedings under sections 236 or 242 of the Act prior to April 1, 1997) shall be regarded as a warrant of arrest.

## PART 329—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: NATURALIZATION BASED ON ACTIVE DUTY SERVICE IN THE UNITED STATES ARMED FORCES DURING SPECIFIED PERIODS OF HOSTILITIES.

159. The authority citation for part 329 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1440, 1443; 8 CFR part 2.

160. Section 329.2 is amended by revising paragraph (e)(3) to read as follows:

**§ 329.2   Eligibility.**

\*   \*   \*   \*   \*

(e) \* \* \*

(3) The applicant may be naturalized even if an outstanding notice to appear pursuant to 8 CFR part 239 (including a charging document issued to commence proceedings under sections 236 or 242 of the Act prior to April 1, 1997) exists.

Dated: December 24, 1996.

**Janet Reno,**

*Attorney General.*

[FR Doc. 96–33166 Filed 12–27–96; 12:10 pm]

**BILLING CODE 4410–10–M**

AR00521

# EXHIBIT A

AR00522

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| STATE OF TEXAS, )<br>STATE OF MISSOURI, )<br> )<br> *Plaintiffs,* )<br> )<br> v. )<br> )<br>JOSEPH R. BIDEN, JR., )<br>in his official capacity as )<br>President of the United States, *et al.,* )<br> )<br> *Defendants.* )<br> ) | Civil Action No. 2:21-cv-00067-Z |

**DECLARATION OF BLAS NUÑEZ-NETO**

I, Blas Nuñez-Neto, pursuant to 28 U.S.C. § 1746, and based upon my personal

knowledge, and documents and information made known or available to me from official records

and reasonably relied upon in the course of my employment, hereby declare as follows:

1. I am the Chief Operating Officer at U.S. Customs and Border Protection (CBP), within the

Department of Homeland Security (DHS), and have been in this role since March 5, 2021.  Since

August 24, 2021, I have been serving as the Vice Chair for the Secretary of Homeland Security's

Southwest Border Taskforce.  I also previously served at DHS as an Advisor to CBP

Commissioner Gil Kerlikowske from January 12, 2015 to January 16, 2017.

2. Pursuant to this Court's August 13, 2021, order, DHS has taken a number of steps to

reimplement the Migrant Protection Protocols (MPP).  These steps include (1) engaging with the

Government of Mexico (GOM); (2) creating an interagency task force; (3) initiating the

1

processes required to rebuild needed infrastructure and reorganize resources; and (4) reviewing and updating MPP related policies in light of Title 42 and COVID-19.

3. Most importantly, DHS and the Department of State (DOS) are holding diplomatic engagements with the Government of Mexico (GOM) and have already held several high-level meetings to advance negotiations related to restarting MPP. Because the U.S. Government cannot implement MPP without GOM's concurrence, these negotiations—which are ongoing—are critical.

4. Though the specific details of ongoing diplomatic engagements are sensitive, at this point GOM has not yet agreed to accept individuals returned to Mexico under the court-ordered restart of MPP. Prior to implementation, our two governments must reach agreement on a number of foundational matters, to include: the demographic make-up of individuals who can be returned to Mexico pursuant to MPP; in what circumstances and locations returns and reentry for court-related matters can occur; how many individuals can be enrolled in given locations; and what kind of support these individuals will receive while in Mexico. All of these topics, and others, are being actively discussed with the GOM.

5. DHS is not waiting for these negotiations to conclude, however, before taking steps to reimplement MPP. DHS has created an interagency task force comprised of the various DHS components involved in MPP as well as the Executive Office for Immigration Review (EOIR) at the Department of Justice (DOJ) and DOS. The task force is meeting regularly to quickly and efficiently rebuild the infrastructure and reapportion the staffing required to reimplement MPP.

6. The task force is, among other things, coordinating with EOIR regarding dockets and management of removal proceedings. Before individuals can be placed into MPP, they must be placed into removal proceedings, which is done by issuing the charging document (the notice to

AR00524

appear) that ideally sets a hearing date. EOIR is, as a result, working to make space available on immigration court dockets to schedule hearings for individuals in MPP. These ongoing efforts will allow the government to be able to rapidly implement MPP once an agreement is reached with GOM.

7. Restarting MPP requires operational adjustments. DHS is taking steps to rebuild the infrastructure needed for MPP and redeploy resources as needed. Importantly, MPP requires space near the border to hold immigration court proceedings. Although there are some immigration courts near the border, under the previous iteration of MPP these were not sufficient to meet the program's needs. To supplement the existing courts, DHS utilized soft-sided Immigration Hearing Facilities (IHFs) in Laredo and Brownsville, Texas. These IHFs, however, were largely dismantled and repurposed to facilitate processing at the ports of entry (POEs) when MPP was terminated. These IHFs now need to be restructured and rebuilt built to accommodate court proceedings, and these new facilities must be designed and constructed with robust mitigation measures for COVID-19. In addition, the POEs will need to find another space to process the migrants currently being processed in the repurposed facilities in order to not adversely impact POE operations.

8. DHS has identified funds to contract for the IHFs, which will cost approximately $14.1 million to construct and $10.5 million per month to operate. In line with the actions taken by the previous Administration, DHS plans to execute the contract for the IHFs as soon as an agreement is reached with GOM.[1] DHS estimates that once the contracting process has been completed the

---

[1] During the previous administration, the IHFs were not built until after the June 7, 2019 joint declaration between the U.S. Government and the Government Of Mexico. The June 7th agreement permitted further expansion of MPP.

AR00525

building of the IHFs and the installation of necessary information technology will take approximately 30 days.

9.  Among other efforts, the Task Force is reviewing MPP-related policies and procedures in light of two developments that were not at issue when MPP was initiated: first, the ongoing risk posed by COVID-19, and second, the continued role that DHS plays in enforcing the Center of Disease Control's (CDC's) Title 42 Order, which temporarily prohibits the entry of certain noncitizens traveling from Canada or Mexico into the United States.  Both of these developments require updates to past protocols and practices, as well as updated guidance to the workforce.

10. The current COVID-19 pandemic greatly affects how MPP is reimplemented.  In March 2020, immigration court proceedings were paused indefinitely because of COVID-19.  DHS is currently reviewing the necessary and critical measures to be taken at each step of MPP processing to protect our officers, communities, and the migrants from the spread of COVID-19 (e.g., face coverings, social distancing, disinfecting, testing, vaccines, etc.). Given these protocols, DHS is evaluating how many people can safely be processed for court hearings on a daily basis, which will in turn affect the setting of court dates and issuance of the requisite Notices to Appear.  These changed circumstances require updating of internal guidance and procedures, developing necessary health protocols, and putting plans in place to provide this updated information to third parties, including the noncitizens who will be placed into MPP. Lastly, as noted above, the IHF facilities must include COVID mitigation measures in their redesign.

11. In addition, when MPP was first implemented, DHS was not implementing the CDC's Title 42 public health order, which restricts the entry of non-citizens into the United States for public health reasons and takes precedence over the use of Title 8 authorities (such as expedited

4

removal or MPP returns) at the land border.  DHS is actively assessing the interplay of this authority with the reimplementation of MPP and developing appropriate guidance to the field to clarify this interplay.  Importantly, individuals who are subject to Title 42 will continue to be expelled when MPP is reimplemented. However, the Title 42 order has always included exceptions for humanitarian reasons, and DHS has been working with non-governmental partners to identify individuals who meet specified vulnerability criteria that merit such exceptions from Title 42.  In other cases, individuals who are covered by Title 42 cannot be expelled because of the GOM does not accept the return of certain nationalities or demographics at certain parts of the border.  There is no guarantee that the GOM will accept via MPP those whom it has refused to allow to be expelled pursuant to Title 42.

12. Those individuals who are not covered by, are exempted from, or cannot be expelled pursuant to Title 42 are put into Title 8 removal proceedings..  DHS also has the discretion to place certain inadmissible noncitizens into expedited removal.  DHS intends to continue the exercise of its pre-existing policies and practices as it continues to work in good faith to re-implement MPP.

13. These actions demonstrate that DHS has been working, and will continue to work, in good faith to reimplement the MPP, as required by the court's injunction.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.  Executed on this 15th day of September, 2021

Blas Nuñez-Neto
Vice Chair, Southwest Border Taskforce
Department of Homeland Security
Chief Operating Officer
U.S. Customs and Border Protection

5

AR00527

# EXHIBIT 1

AR00528

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, | ) | |
| STATE OF MISSOURI, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:21-cv-00067-Z |
| | ) | |
| JOSEPH R. BIDEN, JR., | ) | |
| in his official capacity as | ) | |
| President of the United States, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |

## DECLARATION OF BLAS NUÑEZ-NETO

I, Blas Nuñez-Neto, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge, and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1.      I am the Acting Assistant Secretary for Border and Immigration Policy as of October 1, 2021.  My permanent role is Chief Operating Officer at U.S. Customs and Border Protection (CBP), within the Department of Homeland Security (DHS), which I began on March 5, 2021.  Since August 24, 2021, I have been concurrently serving as the Vice Chair for the Secretary of Homeland Security's Southwest Border Taskforce.  I also previously served at DHS as an Advisor to CBP Commissioner Gil Kerlikowske from January 12, 2015 to January 16, 2017.

1

AR00529

2.      I have read and am familiar with the declaration of Mark Morgan, the former

Acting CBP Commissioner.  I also read and am familiar with the *Plaintiffs' Motion to Enforce*

*Permanent Injunction and for Expedited Discovery*, filed Sept. 23, 2021.

*I. Continued Compliance with Court Order*

3.      Over the past month, DHS has continued to make substantial progress as it works

in good faith to reimplement the Migrant Protection Protocols (MPP).  The Department has,

among other things: engaged in a number of high-level and ongoing virtual and in-person

discussions with the Government of Mexico (GOM); continued to finalize the operational plans

that will be required to quickly reimplement MPP; worked closely with the Department of

Justice and other interagency partners to ensure that the immigration courts are prepared to hear

the cases of those subject to MPP on a timely basis; and issued the contracts required to rebuild

soft-sided Immigration Hearing Facilities (IHFs) in Laredo and Brownsville, Texas.  As a result

of this progress, and dependent on the independent decisions made by the sovereign GOM, DHS

anticipates being in a position to reimplement MPP in mid-November.

*A. Discussions with Mexico*

4.      DHS, along with the Department of State (DOS), has, since August 2021, been

engaged in high-level discussions to coordinate a wide range of border management and

migration issues as part of a bilateral U.S.- Mexico working group.  In conjunction with those

efforts, DHS has had multiple virtual and in-person high-level discussions with the GOM about

DHS's planned reimplementation of MPP.

5.      Critically, and as described in my prior declaration on September 15, 2021, the

U.S. Government cannot unilaterally implement MPP without an independent decision by the

AR00530

GOM to accept individuals that the United States wishes to send to Mexico. As a sovereign nation, Mexico decides who it allows to cross its borders. In the prior implementation of MPP, for example, the GOM only accepted the return of individuals from Spanish-speaking countries and Brazil; it did not generally accept the return of Haitians, or other nationals from other non-Spanish-speaking countries, unless they were family members of an individual that the GOM accepted.

6.      Therefore, before DHS can begin sending individuals back to Mexico, the United States needs Mexico's concurrence, as well as a shared understanding about key details of how MPP will be reimplemented, including, for example: where and what time such entries into Mexico will be permitted; how many individuals and what demographics will be permitted per day at each location; and what nationalities will be accepted for return to Mexico.

7. Mexico's decision to accept individuals returned pursuant to MPP was needed before the program was initiated in 2019, and, because the previous program was terminated, it is needed again now. This is true whether the U.S. seeks to re-implement border-wide, as DHS prefers in order to avoid pushing migratory flows from one part of the border to another, or whether it seeks to adopt a phased approach to reimplementation. Both require a unilateral decision by Mexico to accept those individuals the United States seeks to return to return to Mexico—that decision by the GOM has yet to be made.

8.      In the context of the ongoing discussions, the GOM has made clear that it expects to see substantial improvements in how MPP is reimplemented before it can make its decision. The GOM has stated it would not decide to accept MPP enrollees unless and until its concerns about how MPP was previously implemented are addressed. The GOM has identified a number of improvements that it deems critical, including the following key areas of concern:

AR00531

(i) *Length of time for Case Adjudication / Clarity about Timing of Hearings*

9.      The  GOM expressed significant concerns about the lengthy delays in the adjudication of immigration proceedings under the previous implementation of MPP and has made clear that, in order to accept returns under the program, it needs assurances that proceedings will generally be concluded within six months of an individual's return to Mexico and the initiation of the individual's case.  The GOM similarly made clear that it is critical that any individuals awaiting court hearings in Mexico receive timely and accurate information about hearing dates and times and other information about their cases.

(ii) *Access to Counsel*

10.      The GOM made clear that enhancing opportunities for MPP enrollees to secure adequate access to counsel is a critical issue that needs to be addressed before it could decide to accept MPP enrollees into Mexico.

(iii) *Accounting for Vulnerability:*

11.      The GOM expressed concern that, under the previous MPP, DHS returned particularly vulnerable individuals to Mexico, and that this placed an undue burden on the services provided by local communities in Mexico.  In particular, the GOM raised concerns about certain populations being enrolled in MPP, including particularly elderly or sick individuals, as well as other populations, such as LGBTQI individuals.  GOM made clear that it expects the reimplementation of MPP to address these concerns.

(iv)  *Times and Locations of Returns.*

4

AR00532

12.     The GOM also expressed concern that under the previous implementation of MPP, individuals were returned to Mexico at locations and times of the day that made it difficult for the GOM officials to adequately receive them in a safe and orderly manner.  It expects that, if the GOM decides to accept such returns, DHS will better coordinate the locations and times of day that individuals are returned to Mexico.

13.     Based on these discussions, DHS is finalizing a plan for the reimplementation of MPP that takes into account these concerns, which it will be communicating to the GOM in the coming days.  The GOM — which has repeatedly emphasized that, as a sovereign nation, Mexico is not subject to the Court's jurisdiction — will need to independently assess the plan to ensure it adequately addresses their concerns.  The GOM will then make an independent decision as to whether it is prepared to accept for entry into Mexico the individuals that the USG seeks to return under MPP.

*B. The U.S. Government's Ongoing Efforts*

14.     However, consistent with its obligation to comply in good faith with the Court's Order, DHS is not waiting for the GOM's decision to put in place what is needed to restart MPP. To the contrary, DHS has made significant progress since we last reported to the Court, including taking the following key steps to begin reimplementing MPP around the middle of November, subject to GOM's response to the reimplementation plan and a decision to accept returns.

15.     First, DHS issued a task order on October 13, 2021, under an existing contract, to rebuild the soft-sided Immigration Hearing Facilities (IHFs) in Laredo and Brownsville, Texas. These facilities will take about 30 days to reconstruct at a cost of approximately $14.1 million to

5

rebuild and $10.5 million per month to operate. In my prior declaration, I indicated that DHS did not intend to initiate these contracts until the GOM decided to accept returns. However, after reviewing the substantial progress that has been made in the discussions with the GOM over the past month, DHS believes that it makes sense to proceed with contracting now despite the lack of a final decision by GOM. This will ensure that DHS is ready to begin implementing the program across the entire border in a timely fashion, even as we await the GOM's unilateral decision about if, when, and where it will accept returns.

16. Second, as noted in my previous declaration, the USG stood up an interagency task force, comprising DHS, the Department of Justice (DOJ), the Department of Health and Human Services (HHS), and DOS, to manage and oversee the reimplementation of MPP. This interagency taskforce draws on the expertise of a number of career officials who were previously involved in standing up and implementing MPP, includes a large number of working groups that are addressing specific components of the reimplementation, and is working daily to ensure that the policies and processes are in place to be ready to begin reimplementation in mid-November.

17. Among other things, the task force is working with DOJ's Executive Office for Immigration Review (EOIR) to ensure that there is sufficient space available on immigration court dockets so that hearings for individuals in MPP can be done in a timely manner subsequent to enrollment. This is to address a key concern identified by the GOM, which, as noted above, has expressed its expectation that cases would generally be adjudicated within six months after the case is initiated.

18. Third, as noted in my previous declaration, the current COVID-19 pandemic greatly affects how MPP can be reimplemented. In response to the unprecedented effects of the global pandemic, the government began postponing immigration court proceedings for MPP

AR00534

enrollees in March 2020, and ultimately paused them indefinitely in July 2020—significantly before the termination at issue in this case. Although the government developed guidelines for restarting court hearings during the pandemic, those plans were never implemented. Moreover, the unexpected emergence of the highly contagious Delta variant this past year is a significant complicating factor that requires updates to these guidelines. DHS, as a result, is continuing to review the measures needed to ensure that these hearings can take place in a manner that protects government personnel, our communities, and the migrants themselves from the spread of COVID-19. As part of this process, DHS is working with interagency partners, including EOIR and the Centers for Disease Control and Prevention (CDC) at HHS, to evaluate how many people can safely be processed for court hearings on a daily basis, which will in turn affect the setting of court dates and issuance of the requisite Notices to Appear. DHS is also working to update guidance, protocols, and communication plans to ensure that these protections are implemented effectively. All of this work is currently being finalized in order to ensure a timely reimplementation of the program.

7

AR00535

*II. Conclusion*

19.     In sum, we have made great progress and are, as a result, ready to begin reimplementing MPP in mid-November, subject to the GOM's independent decision to accept those that the USG seeks to return. Critically, DHS and DOS have sufficiently advanced discussions with the GOM to the point that we will shortly finalize and communicate to GOM a plan for reimplementation that addresses the concerns they have identified.  DHS has also taken all the necessary steps to reimplement MPP—including contracting for the IHFs, working to establish robust COVID-19 protocols, and updating policies and guidelines.  These actions demonstrate that DHS has been working diligently, and will continue to work as expeditiously as possible, to reimplement MPP in good faith, as required by the Court's injunction.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.  Executed on this 14th day of October 2021

_____
Blas Nuñez-Neto
Acting Assistant Secretary
Border and Immigration Policy
Department of Homeland Security
Chief Operating Officer
U.S. Customs and Border Protection

AR00536

Case 2:21-cv-00067-Z   Document 162-1   Filed 09/02/22   Page 155 of 350   PageID 4748

 This American Life Archive

Recommended

How to Listen

Transcript About

 688: The Out Crowd

*Note: This American Life is produced for the ear and designed to be heard. If you are able, we strongly encourage you to listen to the audio, which includes emotion and emphasis that's not on the page. Transcripts are generated using a combination of speech recognition software and human transcribers, and may contain errors. Please check the corresponding audio before quoting in print.*

Announcements

Fellowships

Jobs

Prologue: Prologue

Music

Make Radio

**Ira Glass** A quick warning-- there are curse words that are unbeeped in today's episode of the show. If you prefer a beeped version, you can find that at our website-- thisamericanlife.org. Darwin's fine. And he's a kid who-- I don't know-- people just give him stuff. When he met my co-worker, Aviva, he was playing with a soccer ball somebody gave him, eating a taco somebody else gave him. And Darwin's mom was explaining all this.

On The Road

FAQ

Submissions

Store

**Elizabeth** Comemos más porque nos traigan.

Contact Us

**Aviva DeKornfeld** Can you just describe what just happened?

Our Other Shows



‹ Full episode

Follow Us

**Aviva DeKornfeld** A man, as you were talking about people just giving him things, walked by and gave you-- how much did he give you? Diez?

**Darwin** Diez.

**Aviva DeKornfeld** Wow. Store

**Elizabeth** Diez. Diez pesos.

Subscribe to our newsletter

Email Address



Go

AR00537

**Aviva DeKornfeld** Y por que te dio eso?

**Ira Glass** Why'd he give you that? Aviva asks him. Darwin gives a little shrug like, eh, what can I say?

**Darwin** Porque pensaba que yo estaba pidiendo una moneda.

**Ira Glass** Because he thought I was asking for a coin. His mom says, he was just sitting there eating.

**Aviva DeKornfeld** You're like king of the camp.

**Darwin** Que si, soy el rey del campamento!

**Ira Glass** Yes, I am the king of the camp, he says. As Aviva sits there with Darwin's mom, Elizabeth, he runs off for 15, 20 minutes at a time. And then returns with cash.

**Elizabeth** Ay Dios mio, santo Dios. Cinco dolares.

**Darwin** Cinco! Dolar!

**Ira Glass** $5. She hugs him.

**Elizabeth** Ay, tan lindo. Muchachito.

**Ira Glass** Darwin runs to their tent to pull out all the money he's saved and show Aviva-- $279, a huge wad of cash, which for context, they're living in a makeshift tent camp in Matamoros, Mexico, right over the border from Brownsville, Texas. And, I mean, immediately on the other side-- nestled against the US, and the Rio Grande, and the customs office. You can see the big red arches of the border station it's so close.

Over 2,500 people living here, hoping to get asylum in the US. Darwin and his mom came here from Honduras. 279 bucks here is huge.

Most of the people here, even with a little money saved, have been here so long, they've spen[t] [o]ur family sends us money, his mom says. Lots of families do that. But he brings in so

**AR00538**

This American Life Archive

Recommended

How to Listen

About

Overview

○ Staff

○ Announcements

○ Fellowships

○ Jobs

○ Music

Make Radio

The Radio

○ FAQ

○ Submissions

Store

○ Contact Us

○ Our Other Shows

Q

Follow Us

○ f

○ ⌄

Store

Subscribe to our newsletter

**Elizabeth** Es inteligentísimo.

**Ira Glass** Aviva then follows Darwin as he walks from the tents to the long line of cars that's waiting at the border to cross into the United States. He's a happy-looking kid with neatly cut hair and a big smile. Really cute.

Darwin gives a fist bump to the fruit stand guy. Claps the man selling corn on the back to say hello. Nods to the half-dozen other vendors working the line. Remember, he's nine.

When we asked one woman in the camp about him, she was like, oh, El Terremoto-- The Earthquake. He holds a finger in the air, asking for one coin.

He says that's his move-- ask for a coin, and then hopefully they'll give you more than a coin. And, in fact, a car with three women waves him over. And the woman in the passenger seat rolls down her window and hands him a dollar.

**Darwin** Gracias. Que los bendiga!

**Ira Glass** Thanks. Bless you. Are you Cuban? He asks her.

**Darwin** Es Cubana?

**Ira Glass** He says, I knew it-- from your accent. And she's like, right. You thought I was from Cuba. And they laugh. The woman asks his name, and he tells her.

She says she likes his hair. I like your hair, he says. He reaches out to stroke her hair. It's straight and blond. I like your hair because it's pretty, he says. And she laughs and claps her hands. Look at what a flirt he ended up being.

**Woman** Mira coqueto salió este. Ay Dios mío, tu tienes novia?

**Ira Glass** Oh, my god. You have a girlfriend?

**Darwin** Usted es! Usted es!



Email Address

Go

**Ira G**____ ____u, you.

AR00539

Case 2:21-cv-00067-Z   Document 162-1   Filed 09/02/22   Page 158 of 350   PageID 4751

This American Life Archive

**Darwin** Bye. Bye.

**Ira Glass** Darwin runs to his mom, who's watching all this, and gives her the dollar. Both of them, and the thousands of other people camped here at the border-- to be clear, they're trying to follow the rules and enter the United States through a border station and formally apply for asylum. It used to be, you'd show up. If you passed a basic interview-- which most people did-- you'd wait in the US for your day in court.

But now it's all different. Under the Trump administration's Remain in Mexico policy, you get turned back to wait in Mexico. This policy is still pretty new. It really kicked in full force this summer, but it's a profound change with massive consequences.

One of them? The size of this camp, which didn't exist before President Trump, and which grows in size every day. And all across Mexico, in cities just on the other side of the border, there are now tens of thousands of people-- according to the Department of Homeland Security-- stranded under this policy, in shelters, on the streets, and in encampments like this one, sent by our government without much of a plan for where or how they'd live once they got to Mexico.

This camp, for instance, is totally improvised-- long rows of scruffy blue and white and gray tents, over 700 of them, donated by do-gooder groups and churches in America. These are Coleman tents meant for weekend camping, not designed for rain and direct sun and cold for months at a time.

There's no regular water supply here. Volunteer groups from over the border in Brownsville haul in over 3,000 bottles of water each day, and these are just the little 16-ounce bottles like you would buy with your lunch at a fast food place. There's no proper sanitation, just five toilets for 2,500 people-- yellow Porta Potties which get precisely as gross as you would imagine.

One of the fathers here, Elwin David Baquis told me that when his eight-year-old daughter needs the bathroom--

**Elwin** No, pues si cuando tengo dinero le busco otro baño.

**Interpreter** Well, you know, if I have some money, then I'll look and see if I can find her isn't any, then I'll take her out into the woods-- into the

AR00540

This American Life Archive

Recommended

How to Listen

About
    ○ Our Team
    ○ Staff
    ○ Announcements
    ○ Fellowships
    ○ Jobs
    ○ Music
    ○ Make Radio
    ○ For This American...
    ○ FAQ
    ○ Submissions
    ○ Store
    ○ Contact Us
    ○ Other Life Stories

Follow Us
    ○
    ○

Store

Subscribe to our newsletter

**Elwin** Para tantas personas. No tienen ni cinco horas cuando ya están repletos.

**Interpreter** And honestly, with the amount of people using them, in five hours, they'll be totally full. And people still keep on going to use them, especially women, because as you can imagine, you know, like, there's a bunch of men out there in the woods that are using the bathroom, and they don't want to be surrounded by that.

**Ira Glass** There's a nurse at the camp named Helen Perry who runs a very small relief group with a very grand-sounding name-- Global Response Management. With some volunteers, she started a medical tent in the camp, modeled after the battalion aid stations that she learned to set up back when she was in the army. Anyway, I mentioned all of this to Helen-- that this father and daughter were going up in the woods. And she was like, oh yeah, knew that.

**Helen Perry** Yeah. And then when it rains, all that rainwater washes down there, or it washes into the hard spaces in the camp and they get, you know, infectious diarrhea.

**Ira Glass** Are you seeing a lot of infectious diarrhea?

**Helen Perry** Yes. Most everyone here has some form of GI something or other-- you know, different types of tapeworms and ringworms. And the problem is is that you treat it, and then they come right back out and they get it again.

**Ira Glass** I actually met Elwin because he was Helen's first patient of the day. He and his daughter both had pinkeye from bathing in the Rio Grande, which is not clean. Helen's trying to organize a fix for that.

**Helen Perry** So this is actually one of areas that we're talking about bringing in a water purification system. So the Rio Grande is, like, right down there. Hola.

**Man** Hola.

**Helen Perry** And so what we want to do is put in a water purification system right over here, run a hose out into the water. It'll suck up the water, purify it, and they'll have their own

Email Address

Go

AR00541



This American Life Archive

Recommended

How to Listen

About

Overview

○ Staff

○ Announcements

Fellowships

○ Jobs

○ Music

○ Make Radio

○ On The Road

○ FAQ

○ Submissions

○ Store

○ Contact Us

Subscription status

Follow Us

○ f

○ 

Store

**Helen Perry** Yeah.

**Ira Glass** Not a government?

**Helen Perry** No, no.

**Ira Glass** Not the UN?

**Helen Perry** Nope.

**Ira Glass** Just you, a person.

**Helen Perry** I've never-- people are like, have you done water? And I'm like, no, but like, I'll Google it.

**Ira Glass** I have to say, this is the thing that hit me hardest in Matamoros. You have thousands of people stuck there, right on our border, two big governments-- the United States and Mexico-- one of them, of course, a lot richer than the other, and nobody's looking after these people with food and water and shelter, except a bunch volunteers who raised their hands and said, we cannot ignore this.

**Woman** Buenas tardes. Hoy día tenemos voluntarios que vienen de Indiana.

**Ira Glass** Good afternoon. Today we have volunteers from Indiana.

**Woman** Y de Indianapolis,

**Ira Glass** From Indianapolis.

**Woman** Muy lejos!

**Ira Glass** Really far.

**Woman** A cocinar para ustedes.

**Ira Glass** cook for you.

Subscribe to our newsletter

Email Address

Go

AR00542

This American Life Archive

**Ira Glass** Because we're all brothers, right?

**Woman** So les vamos a decir gracias. Un aplauso para nuestros voluntarios.

[APPLAUSE]

**Ira Glass** So let's say thanks with a round of applause. Eight very nice ladies from Indiana in fluorescent green t-shirts start serving food out of aluminum foil trays, food for 1,000 people. It cost $1,900, which they raised back home in 20 dollar donations. They also paid for their own flights and everything.

An impressively competent group that calls itself Team Brownsville, started by a bunch of teachers, all volunteer, has organized it so a different bunch of people shows up five nights a week with food. They also pay for a Matamoros restaurant to deliver hundreds of breakfasts each day. The food today is fresh, but very north of the border, and very plain-- slices of ham and cheese on white bread, tangerines, grapes, baby carrots. Everybody we ask about the food, though, is polite enough to say how great it is.

**Man** Pues rica.

**Aviva DeKornfeld** Si?

**Man** Todos los dias

**Ira Glass** It's tasty, this guy tells Aviva.

**Man** La comida es rica? Bien rica. Si.

**Ira Glass** It's tasty, right? He says to the woman next to him. Oh sure, very tasty, she says. As soon as Aviva walks away, the interpreter who was with us for the day, Gabby Muñoz, overhears what happens next.

**Gabriela Mu** Oh yeah, then afterwards, like, her friend, or like, the guy or the person's friend was like, what did she ask you? And he's like, well, she asked me how good the food [...] he fuck else was I supposed to say? [LAUGHS]

**AR00543**

This American Life Archive

Mexico, according to the US State Department. Its web page about Matamoros says, murder, carjacking, and sexual assault are common. Gang gun battles are widespread. Anybody here is at high risk.

Not far from where they serve the food, like, just 20 feet or so from the actual border station, a woman named Jenny and her husband and her daughter set up their tent. I asked her if she chose that spot because it seemed like the safest, closes into the border like that.

**Jenny** Sí, es más seguro…

**Ira Glass** She said yes, and explained that she and her husband and daughter had been kidnapped in the last city they were in.

**Jenny** Fue en Reynosa. Quince días estuvimos secuestrados.

**Interpreter** So it was in Reynosa, and we were kidnapped for 15 days.

**Ira Glass** She starts to tell the story of her family and the cartel, and the house they were held in, but as she does, a man quietly approaches and just kind of hovers nearby, listening. And she says, atras, atras, atras-- look behind you-- and covers her face.

**Jenny** Atrás atrás atrás. Están viendo. Atrás. No hay que hablar de eso. Están atrás.

**Ira Glass** You can't talk about this. He's behind.

**Jenny** Peligroso.

**Ira Glass** We switch the subject. He goes away. A journalist who's in this camp a lot confirmed that he was a cartel guy. How much violence there is against people in the camp is not clear.

The nurse, Helen Perry, has heard about people being kidnapped from the camp, but that's hard to confirm. And she told me this story.

**Helen Perry** When I first showed up in the camp, a woman came up to me and asked me if [...] cause when she got sexually assaulted again she [...] d to be able to ask her attacker to wear a condom so she wouldn't get pregnant.

**AR00544**

This American Life Archive

How to Listen
About
○ Overview
○ Staff
○ Announcements
○ Fellowships
○ Jobs
○ Music
○ Make Radio
○ On The Road
○ FAQ
○ Submissions
○ Store
○ Contact Us
○ Our Other Shows

Follow Us
○ f
○ 
○ Store

Subscribe to our newsletter

Email Address
[ Go ]

sanitation, five toilets where there should be 125, no proper tents for people--

**Helen Perry** When I first saw it, I was literally just dumbfounded, because I've seen refugee situations like this. I've been to Bangladesh. I've seen Cox's Bazar. I've been to Iraq. I've seen the IDP camps. I've seen the refugee camps from Syria.

I'd say this was the worst. Yeah, I would definitely say that this is the worst, if at a bare minimum for a lack of humanitarian accountability for what's happening to these people.

**Ira Glass** You mean that nobody's keeping account of who's here and who isn't, who goes in and who goes out?

**Helen Perry** Who goes in, who goes out, who goes missing.

**Ira Glass** At a proper refugee camp, she says, like a United Nations camp, they'd have that-- a big, tall fence, somebody keeping track of who comes in and out. When we asked Mexican officials about conditions in this camp, they said they aren't helping the 2,500 people here because they don't want a permanent tent city in the spot. They want people to move to government shelters.

And the United Nations said they won't step in unless the Mexican government invites them to step in. The United States, whose policies landed people here in the first place, has also donated $5 million to house them in Mexico. The money doesn't go to tent camps like this one, but to the official Mexican government shelters.

It's enough money to shelter 8,000 people, but we sent way more people than that back across the border-- over 57,000 under the Remain in Mexico policy, plus another 21,000 who immigration officials haven't even begun to process. We've told them, the system's backed up. You should sit on a waiting list, stay in Mexico, and we'll get to your cases in a few months.

And these are mostly people who, in the past, before President Trump, would have been allowed into the United States to wait for their asylum court dates here. It's so many people we're pushing back across the border, resulting in refugee camps that we don't call refugee camps right on our country's doorstep.

Today [...] policy means for the people we send across the border. And [...] hear from US officials who sent them there who are not feeling so great about it,

**AR00545**

This American Life Archive

Recommended

Act One: Goodbye, Stranger

How to Listen

About

○ Overview

**Ira Glass** Act one, "Goodbye, Stranger." So let's start today with the US officials on the front lines whose job under Remain in Mexico is to send people back. Lots of them have been resigning, saying no, that's actually not my job. Los Angeles Times reporter Molly O'Toole talked to a bunch of them.

○ Staff

○ Announcements

**Molly O'Toole** Before the Remain in Mexico policy began and upended the asylum system and completely changed what it is to be an asylum officer, here's how the job used to work. When a Central American showed up at the US-Mexico border and said, "let me in, I'm afraid of going back to my country," that's where the asylum officer came in.

○ Music

The officer did something called a credible fear screening to check if the person was likely to face harm or death if the US sent them back home. If there's even a chance that they would, the asylum officer would let them into the United States to wait for a court date, where an immigration judge would make the final call.

○ FAQ

○ Submissions

Doug Stephens says people don't understand how hard the job is. At the time all this started, he was an asylum officer in San Francisco.

○ Store

○ Contact Us

**Doug Stephens** And so I'd have people come into my office, and my job, essentially, is, tell me the worst things that have happened to you. You have an hour. Go. And then I'll decide if you're telling me the truth, and I'll decide if you get to stay.

You are expected to be-- or, really, to do the job well, need to be-- an expert in the political, cultural, social, and economic situations in innumerable countries around the world, and you're expected to be a human lie detector, all at once.

**Molly O'Toole** President Trump talks about asylum itself as if it's fraud. He says it's a hoax, a big fat con job, that people come in with fake asylum claims, that asylum officers just let everyone through, and then asylum seekers never show up for their day in court-- that it's a border-wide, 2,000-mile loophole. And it's true that most people do pass that first stop with an asylum officer and enter the United States, but there's a good reason for that.

It's built into US asylum law-- a commonsense humanitarian idea. We don't want to send people back to situations where they'd get tortured or killed. The legal term is non-refoulment. And so US

Email Address

Go

point.

Later, when they get before an immigration judge-- and by the way, the majority do show up-- there they need proof, and most of them get rejected. Even before President Trump took office, less than 15% per year got asylum, and that's because most people don't meet the specific criteria in the law, or don't have enough evidence, or it doesn't check out. All of the asylum officers I've ever spoken with see it as their job to weed out the fakers, the people who don't really need protection, the ones who are just trying to game the system.

**Ursula** Oh my god. Like, here's where I'm going to be real with you.

**Molly O'Toole** This is an asylum officer we're calling Ursula. This isn't her voice. She's afraid of getting fired, so we had an actor copy what she said as closely as possible.

**Ursula** The fraud is, like, happening on a scale that's huge. We're talking, like, hundreds of people a month.

**Molly O'Toole** I interviewed three asylum officers for this story, and all three said the groups that have been the primary target of President Trump's immigration policies, they actually aren't the main ones committing fraud.

**Ursula** It's not the Central Americans. It's not the Middle Eastern people. It is the Indian people and the Chinese people. They all have the same bullshit story about getting beaten with hockey sticks three times, because they're part of a Sikh party, and the police told them they're going to jail them if they ever bad-mouth the ruling party ever again. Bullshit.

They all just happened to do the same thing and suffer the same fate, even though there's absolutely no confirmation in any media that any of this persecution is happening, and studies done by our Department of State counterparts in the country are straight up like, this is not a real thing. The Chinese are running a similar scam with Christian claims.

**Molly O'Toole** In the fall of 2018, asylum officers started hearing about these big changes coming. The policy that was first called Remain in Mexico, and then later, Migrant Protection Protocols, MPP. But the asylum officers who were going to have to implement this thing, they didn't know any of how they were supposed to do it.

This American Life Archive

**Molly O'Toole** This is another asylum officer. We're calling her Anne. We used an actor here, too, to protect her identity. Over the next few weeks, Anne starts picking up around the office that some of her colleagues were being called in quietly and asked to go to the border in San Diego.

And instead of the credible fear screenings they'd always done, they seemed to be doing something entirely different under MPP-- a whole new kind of interview with different rules. She knew she was going to have to start doing them too, so she pulled aside a coworker who'd already been sent to the border.

**Anne** I was asking her, hey, like, what's the training? Like, what is this? And she was like, I am not allowed to talk to you about it.

**Molly O'Toole** Another asylum officer?

**Anne** Yeah. Yeah.

**Molly O'Toole** Is this someone who you'd, like, consider a friend, or just sort of, like, professional colleague?

**Anne** Good colleague-- a good colleague, someone that we had mutual trust, for sure, and then was told-- was brought in by a supervisor for, like, a special brief about it before I was going to start doing these interviews, and was told, here's the skinny on it and don't tell anyone.

**Molly O'Toole** Why?

**Anne** Because I think they knew that it was legally dubious and suspect, and they wanted to keep the leak to a minimum.

**Molly O'Toole** The leak being a major policy rollout that was going to change asylum?

**Anne** Yeah.

**Molly O'Toole** That's the leak?

That's the leak. Yeah.

**AR00548**

This American Life Archive

Recommended

How to Listen

About

**Ursula** Hands we're going up and being like, wait, how is this legal, or how are we going to be doing this, and how do we know how this works?

**Molly O'Toole** All three of the asylum officers I talked to said that the presentation left them with lots of questions, including the biggest one, how is this legal? These officers knew better than almost anyone how dangerous Mexico is, and this policy seemed designed to send tons of people back to Mexico.

It seemed to be in direct contradiction with US asylum law, which says that, at the very least, we can't send people back to a situation where they'd get harmed or killed. We can't violate the principle of non-refoulment.

**Ursula** And the the response was like, I'm just the messenger bringing this down from HQ, and this is the PowerPoint they gave us. I was like, well, if you don't even care about double checking that this is legal, and you're just the messenger as you say, you're a fucking asshole, you know?

**Molly O'Toole** All three officers say they raised concerns and got roughly the same response-- just get out there and do your job. What they found out soon enough was just how radical a change the new MPP interviews were from the old credible fear screenings.

For starters, not everyone would get an interview. Only the people who volunteered that they were scared to go back to Mexico would. If they got an interview, under MPP, asylum seekers would have to prove that they'd be harmed in Mexico, not their home country. And not just any harm-- they can't just be threatened by gangs or the police, they have to be threatened by gangs or police or whoever because of some very specific reasons laid out in the US law-- because of their nationality, race, religion, politics, or being part of a particular social group, like LGBTQ.

And they'd have to show that the Mexican government, like a cop or an official, was unable or unwilling to protect them. And the asylum seeker couldn't just say all this happened like they could under credible fear screenings. Now, they'd need to prove it.

It's like, as asylum seekers were traveling through Mexico fleeing for their lives, they should have been [...] keep things happening to them there, making a paper trail. [...] ey should have had all of this evidence on them right then, right after crossing the

**AR00549**

Staff

○ Announcements

○ Fellowships

○ Jobs

Music

○ Make Radio

○ On The Road

○ FAQ

Submissions

Store

○ Contact Us

○ Our Other Shows

Follow Us

○  f

○ 🐦

Store

Subscribe to our newsletter

Email Address

Go

This American Life Archive

Recommended

Doug saw all of this happening and wanted nothing to do with it, so he tried to keep his head down to try and avoid having to do these interviews, hoping the courts would kill MPP, but they didn't. By June, MPP returns had skyrocketed, and it was all hands on deck for the asylum corps. Doug couldn't dodge it anymore.

**Doug Stephens** And I got the email.

**Molly O'Toole** It said, you're doing MPP interviews today.

**Doug Stephens** So I had a father and son. The son, I think, was preteens, 11 or 12. They're fleeing from Honduras because of violence and other problems. We didn't talk about that much, because it doesn't matter for the purpose of MPP, right? I'm focused only on why they're afraid to go back to Mexico.

**Molly O'Toole** Of course, the guy and his son don't understand why they're even talking about Mexico. They don't understand any of this at all. The interview continued.

**Doug Stephens** So he had tried to find a place to live there, had tried to get a work permit in Mexico, and was essentially denied. And as they're transiting, he's talking about, you know, encountering cartels and witnessing other migrants being murdered and tortured in front of his son, and fleeing, and barely getting away, you know, while death threats are being shouted at him, and, you know, talking about his son having nightmares for weeks because of this.

And then, they get stopped by the police, and the police take all of their money, their cell phones, and because I can't get them to say these magic words of, like, yeah, they threatened me because I'm Honduran, but that's all they had to say. But they don't know that, right?

**Molly O'Toole** Because I'm Honduran. Those would be the magic words that would put them in a protected category. They were targeted because of their nationality. Though even if the father had said because I'm Honduran, they probably still would have been sent back to Mexico, because odds are he didn't have any evidence proving that any of this happened. Doug, he did what the policy told him to do. He sent them back to Mexico.

Email Address

Go

AR00550

This American Life Archive

them? For the migrants in front of them, Ursula gave the most vivid picture.

She told me about the very first MPP interview she did-- a family from El Salvador, two parents and two kids. She had a script she had to stick to. The family was exhausted and traumatized and totally unprepared.

**Ursula** You're put into a cell. You're separated from your kids and your wife. You have no idea what's going on, because you thought today you were going to be interviewed about El Salvador and you were going to get to enter the United States.

A couple hours later, they lead you into this freezing cold cell where they chain your hands to a table in handcuffs, and someone is sitting across from you who doesn't speak your language, and starts talking to someone in the phone who starts translating to you that you're going to talk about Mexico. You smell like shit, because you've been living in a shelter, you know, without any running water for a month and half, plus you've traveled all the way across Central America to get there, and you don't understand why someone is talking to you about Mexico.

This interview goes on for an hour and a half, and the person keeps pausing it so they can talk to someone on the computer, which they say is their supervisor, and another guard leads your wife in that you haven't seen in the last 12 hours into the interview room, and you can, you know, brush her hand as she passes by. You're so happy to see her because you've been separated, and you have no idea what's going on.

So, where are my children? I don't know, sir, I'm sure they'll be fine. Your wife goes through a similar interview, but she keeps being confronted about the answers she's giving because they're different from yours, and the officer can't understand why this story varies so differently between two people who experienced it.

Half an hour passes before her children are brought into the room, and then the officer has to talk to a 10-year-old boy about whatever his parents said, and then confront the 10-year-old boy on inconsistencies between his story and his parents' story. And then, the wife is like, when am I going to see my husband again? And the officer's like, I have no idea, let them know if you need to use the bathroom.

Recommended
How to Listen
About
  ○ Overview
  ○ Staff
  ○ Announcements
  ○ Fellowships
  ○ Jobs
  ○ Music
  ○ Make Radio
  ○ On The Road
  ○ FAQ
  ○ Submissions
  ○ Store
  ○ Contact Us
  ○ Our Other Shows

Follow Us
  ○ f
  ○
Store
Subscribe to our newsletter

Email Address

Go

**AR00551**

This American Life Archive

released. They've got their backpacks on. They're holding hands. She thought, maybe this won't be so bad. But that was the last time. The very next interview, a woman told her over and over she was afraid of being raped and killed in Mexico. Ursula believed she was going back to a place where that was very possible, but because the woman couldn't name a specific person who'd assault her, Ursula had to send her back. Since then, it's essentially been no after no after no.

Asylum officers told me that even when they find one of those unicorn cases where they check off all the boxes and recommend not returning to Mexico, their supervisors overrule them. Anne told me and my producer, Nadia Reiman, about one asylum seekers case where their attacker even spelled out their motive, and it still didn't fly.

**Anne** It was basically a situation where there was a really clear connection to the nationality. Like, the persecutor had, like, really said, like, I am harming you because of this nationality-- your nationality. And the harm was really, really severe. It was, like, definitely torture.

And it was really clear that the police, like, weren't going to do a thing about it-- didn't care at all. And the supervisor rejected it.

**Nadia Reiman** Why? Like, did they say why?

**Anne** They said, we can't show that if this individual went back to Mexico, the persecutor would be able to locate them.

**Molly O'Toole** So the standard today is upside down from what it used to be under credible fear. Instead of, let's err on the side of letting people in because we don't want anyone to be tortured or die, under MPP the standard is almost impossibly high, so almost nobody gets in. The Department of Homeland Security says only about 960 people interviewed have not been sent back to Mexico.

Ultimately, of a little more than 47,000 MPP cases registered as of October, with about 37,000 of those still pending, of those, only 11 people have been granted asylum or some other kind of relief, according to Syracuse University, which tracks all of this using government statistics. 11.

And that's what the policy was meant to do. The administration credits MPP for a sharp drop in the n... ...organ, the acting head of Customs and Border Prote... ...alls it a game changer, and absolutely successful.

hundreds of pages long that makes it the foundation of the US immigration system.

He grabbed that off his bedroom shelf, along with a few of his other books from law school. He printed out a bunch of court cases and Supreme Court decisions with more cases pulled up on his computer screen. In the middle of all of this was his pen and white legal pad.

As an attorney, he wanted to get his feelings about MPP-- how much worse it felt compared to everything else they did-- down in writing. He worked for hours, and he wrote down seven bullet points, the main ways he thought MPP was illegal. Once he saw the list laid out there on the lined white paper, Doug knew what to do. The next day, he went to tell his supervisor he wasn't going to do any more MPP interviews.

**Doug Stephens** His response was, I know these interviews are hard. We're all required to do them. That's why we're trying to spread it out, that it's, you know, on a rolling basis, et cetera, et cetera. And, you know, at that point, there was, like, this moment where I could have just said, you're right, I know, this sucks, and gone back.

And I paused, and I told him, you don't understand. I'm not doing these interviews. And he looked at me and he's like, what do you-- you're not doing these interviews? And I was like, no. I was like, I think they're illegal. They're definitely immoral, and I'm not doing them.

**Molly O'Toole** His boss was stunned. He didn't really seem to know what to say. Eventually, he told him he was probably going to have to write him up somehow to start disciplinary proceedings. Doug went home that night and decided to escalate. He went back to his legal pad.

**Doug Stephens** I essentially wrote a legal memo explaining all of the reasons that I thought it was illegal, and why I was refusing to do it. And then, on that Monday, I emailed that to all of the administration in San Francisco, and the two supervisors that were involved in the disciplinary proceedings.

**Molly O'Toole** And then, nothing. Nothing happened. Instead of sparking some kind of rebellion, or at least forcing a confrontation, it's crickets. So he took it a step further.

He sent his memo to a senator's office, then he drafted his goodbye email, attached his memo, and sent it to Asylum, about 80 people, and to a representative of

AR00553

This American Life Archive

Recommended

How to Listen

About

○ Our Team

○ Staff

○ Awards

○ Fellowships

○ Jobs

Music

○ Make Radio

○ Producers

○ FAQ

○ Submissions

○ Store

○ Contact Us

○ Our Leadership

Follow Us

○ f

○ y

Store

Subscribe to our newsletter

**Doug Stephens** They make one change, and everyone at the office is like, oh, this is terrible, but we'll figure it out. And then they make another change. And they're like, oh, this is terrible, but I need my job. I'm going to do it even if I don't want to, and I'll complain about it, and I'll complain about the work, and I'll complain about the hours.

At the end of the day, I'm going to do it, and the more I do it, the easier it is to do. And that is terrifying. I mean, that's how all of the awful things in the world have happened. That's how you get so many good people doing really bad things.

And that's what's happening, and it's terrifying. You're, like, literally sending people back to be raped and killed. That's what this is.

**Molly O'Toole** The three officers I spoke with are not alone. A union representing the asylum officers and USCIS employees filed a brief and a lawsuit against the administration arguing that MPP was illegal, and a ton of officers are quitting. I've heard this from a bunch of people in the asylum corps, and at Citizenship and Immigration Services, the parent agency.

Several used the word, exodus. And if officers can't quit, they're calling in sick-- anything they can do to avoid MPP interviews. We tried to get some numbers from the government.

They wouldn't tell us how many people had left. They did say that, by the end of the year, they hoped to have 771 asylum officers, but as of a month ago, they had something like 550, meaning they're roughly 200 people short. I tried to get an interview with the acting head of USCIS, Ken Cuccinelli, to talk about all this. He's since been named Deputy Homeland Security Secretary.

He didn't give us one, but I did get one question in. It was at a press breakfast, so this audio was recorded on my phone.

**Woman** All right, Molly O'Toole from the *Los Angeles Times.*

**Molly O'Toole** How do you answer the concerns from some of your asylum officers-- their concerns that many of these policies being handed down by the Trump administration, particularly targeting asylum, are in fact, illegal-- that they're being ordered to implement [something] with immigration laws that are passed by Congress?

Email Address

Go

AR00554

This American Life Archive

agree on all of this, but I do expect that the professional employees at USCIS will implement the policies in place. They're part of the--

**Molly O'Toole** They're part of the executive branch, he said, and so long as we're in the position of putting in place what we believe to be legal policies that haven't been found to be otherwise, we fully expect them to implement those faithfully and sincerely and vigorously.

Now, we're just shy of MPP's first birthday. After a chaotic start, it's thousands returned each week, it's expanded all the way east across the US border from California to Texas' Gulf Coast. And it's not just Central Americans being pushed back. Now, it's Cubans, Venezuelans, pregnant women, LGBTQ.

Asylum, at least at the southern border, has essentially ground to a halt. Here's Anne.

**Anne** I'll say this. Like, the administration's been successful.

**Molly O'Toole** What do you mean?

**Anne** They want negative decisions. They don't want asylum seekers in this country. They don't want people to get positive decisions or determinations for asylum. They have felt that the standards for screening interviews were too low, and they wanted those standards changed and those standards raised, and they've succeeded.

**Molly O'Toole** What do you think the administration's end goal is?

**Anne** No more people from shithole countries.

**Molly O'Toole** Anne throws up in the shower almost every day. She has recurring nightmares. She says she can't focus, can't sleep. She thinks about the people she's returned to Mexico all the time. It's nearly 10. But there's one family in particular that she can't stop thinking about, a father and son.

**Molly O'Toole** Why do you think their case sticks with you?

t happened to him? Did this kid get kidnapped? Did he rdered? It's happening. It's happening a lot.

AR00555

**Anne** And the-- what's my moral culpability in that? I interviewed that case, and my signature is on that paperwork, and that's something now that I live with. So yeah, I feel-- I feel in some ways that this administration's made me a human rights abuser.

**Molly O'Toole** The irony of this policy is that, under our asylum law, to qualify for asylum, you have to have been harmed because you're part of a particular group, a certain class of people. And the way that the asylum officers have implemented MPP, they've created exactly that-- a huge group of people in need of protection, about 60,000 migrants forced by the US back to Mexico to be preyed upon there as they wait on their request for safety in the US.

It's exactly the sort of situation that our law was supposed to prevent. One asylum officer told me, it's the first time that we've been asked to affirmatively do harm to people. You're not just saying, I don't think you're eligible. You're literally saying, I believe what you're saying. I think you're in danger. Go back to that danger.

**Ira Glass** Molly O'Toole covers immigration for the *Los Angeles Times.* She wrote a print version of this story, also. It's at their website.

Coming up, what's it sound like when the cartels get on the phone and bargain with your family for your life? We have recordings. That's in a minute from Chicago Public Radio when our program continues.

It's *This American Life.* I'm Ira Glass. Today on our program, "The Out Crowd," stories about the people-- the tens of thousands of them-- who have been pushed into Mexico by the President's Remain in Mexico policy and other policies. We're talking about what happens to those people as they wait in Mexico for months.

And before we get to the next act, there is another thing that the Trump administration has put in place that makes it a lot harder to get asylum here, something we haven't talked about yet, a new rule that went into effect this summer. It says, if you want asylum in the United States, you first have to apply for asylum in at least one of the countries that you passed through on your way here, and you have to get rejected by that country before we'll give you asylum here in the United States.

Many asylum seekers, of course, have no idea that they're required to do this. When I was in Matamoros, I was talking with that woman, Jenny from Honduras, the one who got wind about the cartel guy listening in on her interview, the one who'd been kidnapped. She

This American Life Archive

Recommended

How to Listen

About

  ○ Overview

  ○ Staff

  ○ Fellowships

  ○ Jobs

  ○ Music

  ○ Make Radio

  ○ FAQ

  ○ Submissions

  ○ Contact Us

Follow Us

Store

**Ira Glass** Have you applied for asylum in Mexico?

**Aviva DeKornfeld** [SPEAKING SPANISH]

**Jenny** No. No. [SPEAKING SPANISH]

**Aviva DeKornfeld** No, no, not here, because it's too dangerous here.

**Ira Glass** My co-worker Aviva and I looked at each other, like, does she know about the new rule? So we asked, and she did know that she was supposed to apply for asylum in Mexico or in Guatemala, which she'd passed through, but she wasn't going to do it, she said. She didn't want to live there.

**Ira Glass** Are you worried that that'll keep you from getting asylum in the United States?

**Jenny** [SPEAKING SPANISH]

**Aviva DeKornfeld** Yeah, I think so, because from what I've heard, we needed to have asked for asylum in the neighboring countries.

**Ira Glass** At that point, we all just kind of look down at the ground and avoid eye contact. Nobody knows what to say. It sounds so bad for her.

In fact, for everybody in the camp, all 2,500 of them who are waiting for months for the court dates hoping for asylum, it's easy to imagine that this one rule would kill all their applications. Jenny's attitude was, I'm just going to cross my fingers and hope for the best, because I don't want to go back home. Things seem too dangerous there, and too dangerous in Mexico, too. Lots of people feel that way.

Act Two: Take the Long Way Home

**Ira Glass** And the danger in Mexico is the subject of act two, which we have arrived at now. Act two, [?] to pick which border city in Mexico is the most dangerous, Nuevo Laredo, right across the border from Laredo, Texas, would be a good contender.

Email Address

[ Go ]

AR00557

This American Life Archive

Kidnapping is so prevalent there that one of our producers met men in a migrant shelter who were terrified to go outside. A young Cuban guy told her, just putting one foot outside the shelter makes him worried. A trip of just two minutes, he's looking all around, and he's scared.

We're interested in these kidnappings because they're so common. Reporter Emily Green went to Nuevo Laredo in August, and she has this story about one kidnapping and what happened to one family, including recordings and details you really never get to hear. This family ended up in Nuevo Laredo because of MPP. Here's Emily.

**Emily Green** This guy who got kidnapped, I met him by chance, actually, before he got kidnapped, and he told me how scared he was that he would get kidnapped. I was on a bridge in Nuevo Laredo that connects Mexico to the US. Every day around 1:00 PM that month, the US was sending back migrants from the US side to Mexico under MPP.

That day, there were a hundred of them. They were easy to spot. They all carried clear plastic bags with a couple of documents in them, and none of them had shoelaces. US Immigration takes shoelaces from anyone they detain.

Most of them were men, many of them with their heads down, and one pair stands out to me-- a father and son in matching polo shirts, both of them sweating in the heat. They're chubby, soft faces, dad has his arm around son. They seem like they'll talk to me. The man, I'll call him David, quickly tells me a story.

**David** No soy delincuente Soy una persona que ha ganado la vida pero ya no puedo vivir en mi país. Eso es lo que pasa.

**Emily Green** He says he's not a criminal. He's a person who's always made a living, but he can't live in his country anymore. They're from Honduras. David was a businessman. He ran a little clothing store.

The gangs there demand money. They call it a war tax. The tax kept hitting higher and higher until David's family couldn't pay it anymore. One night, the cartel broke into his house, threatened to rape his daughter, and so they fled.

[SOBBING]

**AR00558**

This American Life Archive

How to Listen

About

○ Overview

○ Staff

○ Announcements

○ Fellowships

○ Jobs

○ Music

Make Radio

○ On The Road

○ FAQ

○ Submissions

○ Store

○ Contact Us

Our Comic Book

Q

Follow Us

○ f

○

Store

Subscribe to our newsletter

Email Address

Go

old son.

**David** Nunca me escucharon. Solo me dieron los documentos para venir a una cita aquí pero yo no puedo regresar más a Honduras.

**Emily Green** David says he wanted to ask for asylum in the US, but the agents didn't listen to him. They just gave him documents to come back to a court date in December. He can't go back to Honduras, he says.

**David** No tengo donde ir. No tengo nada. No tengo dinero. A mi me dicen aqui en esta lado donde vamos a pasar dicen que secuestran mucha la gente y no se que hacer.

**Emily Green** I don't have anywhere to go. I don't have anything. I don't have money, he says. They say that here, where we're being sent, a lot of people get kidnapped, and I don't know what to do.

We only talked for 10 minutes. I ended up lending him my phone. He called his sister in New Jersey and explained what happened-- that he made it to the United States only to be sent back to Mexico.

It was getting dark out, and I'd been told not to stay in Nuevo Laredo past dusk. I crossed back into the US to go to dinner, probably not a mile away from where I'd last seen David, and my phone rang. It was David's sister. I'll call her Laura.

She had my number because it was my phone he called her from earlier today. She was crying so hard I struggled to understand what she was saying. She tells me David and his son had been kidnapped just hours after I'd left them. She'd gotten a call from a cartel demanding ransom.

**Laura** [SPEAKING SPANISH]

**Emily Green** Laura says of the cartel told her the ransom was $9,000 for David, and another $9,000 for his son, so $18,000 total. They put David on the phone briefly so she knew he was alive, and then the kidnappers got on.

**Laura** Yo le dije a él que nosotros de adonde íbamos a sacar el dinero...

**Green** OK.

This American Life Archive

**Emily Green** And I told them, where in the world are we going to get this money? The man on the other end told her she had to get the money. He said he'd call back tomorrow. I asked Laura to record the phone calls.

And she did. When they called the next day, she put them on speaker and used a relative's phone to shoot video of it.

   **Laura** Es que no tengo nada. Nosotros no tenemos dinero muchacho. Viera como estamos ahorita de los nervios. Estoy más bien enferma.

**Emily Green** They tell her, I need you to deposit the money as soon as possible, viejita. Viejita means, old lady. Laura is 38. She tells them again that she has no money, that she's sick from anxiety.

In her conversations with me, Laura is scared, crying, but when she talked to the kidnappers, she holds it together. She asks if David and his son are OK. The kidnappers tell her they have food, that they can bathe, for now. Each call only last a few minutes.

   **Man** [SPEAKING SPANISH]

**Emily Green** By the third day, the cartel has lowered the price to $5,000 each for David and his son. Laura works the night shift at a printing factory in New Jersey, hardly makes $20,000 in a year, plus she's a single mom.

   **Man** [SPEAKING SPANISH]

**Emily Green** In all of these calls, the kidnappers talk super fast, I'm guessing because they have other ransom calls to make. Kidnapping is a big business, a volume business, with a whole infrastructure. Kidnapping migrants has been common in Mexico for a long time.

What's different now is that the US is making it especially easy for the cartels to identify and snatch victims. They're sending asylum seekers back in big groups, all at once, at the same time each day, and they're easy to identify with their plastic bags and missing shoelaces. Homeland Security didn't respond to my request for comment on the kidnapping situation, but this week the acting secretary of [        ] on said the US is, quote, "sending a message to the crim[     ] nizations to stop exploiting these migrants."

This American Life Archive

the Mexican Immigration Office by van. Outside the office, men in four-door trucks monitor who's coming and going.

Locals call them, Los Malos, the bad guys. One migrant told me about getting chased as he walked to a shelter from there. But by far, the most dangerous place is a bus station.

It's a place they go to escape Nuevo Laredo, but it's a place they end up getting caught. Kidnapping is so routine the cartels refer to it as, passing through the office. On the extortion calls, you can tell it's a well-oiled machine. It's methodical. They sound like they're negotiating the price of a car. They do this all the time.

**Man** [SPEAKING SPANISH]

**Emily Green** Laura turns to everyone she can think of. She goes to her local police department and to her mayor's office to ask for help. They reach out to the Office of Senator Cory Booker, but by the time they get back to her about a week later, it's too late. Laura eventually scrapes together money from her mom and sister, but just a fraction of what the cartel is asking for.

**Laura** Muchacho, yo te tengo 1,200 dollares...diceme que vamos a hacer y dame tiempo para conseguir otra parte más.

**Emily Green** She tells them, look, I've already pulled together $1,200. Tell me what we're going to do and give me time to get the rest. The man says he'll confer with his boss.

In the meantime, he says, she should wire the money. Laura asks to talk to her brother and they put him on.

**David** [SPEAKING SPANISH]

**Laura** [SPEAKING SPANISH]

**David** [SPEAKING SPANISH]

**Laura** [SPEAKING SPANISH]

This American Life Archive

to David on the phone three days after his release. He's so distressed, it's hard for him to finish a sentence.

**David** [SOBBING]

**Emily Green** [SPEAKING SPANISH]

Breathe, I tell him. I wanted to help him. That's not something a reporter is supposed to say, but back when they were kidnapped, their lives were in immediate danger, and I helped in small ways.

I connected Laura with an NGO in Mexico City that advocates for migrants. Since David and his son were released, I've suggested safe bus options. The family, they always knew that I was a reporter doing a story on them, but they came to see me as one of the few people they could trust-- that they could rely on. Laura called me almost every day with updates. She still does.

A few weeks ago, I went to meet David and his family in Monterrey in northern Mexico, where they were holed up. They were staying with an acquaintance of Laura's in exchange for grocery money and help with construction. David didn't want us interviewing him in there. He feels his welcome has run out, so we do the interview at our hotel.

It's David, his 11-year-old son, and his 19-year-old daughter, who's also been sent back to Mexico under MPP. I'm here with my producer, Lina. We figure we'll talk to David in one room while the kids watch TV in the other, but the kids sit by their dad on the bed. They won't leave one another's side.

I wanted to know what happened when I left him that day on the bridge, and what he described were all these details of how the cartel's kidnapping business actually works once you're a victim on the inside-- details that were routine, and also terrifying. So here's what happened.

He said, he and the other 100 people who were sent back to Mexico that day were taken from the bridge to the local immigration office for processing. After that, he says a man wearing a Mexican immigration officer uniform agreed to take him and his son to the bus station so they could go to a safer city. But as soon as they got to the station, he got a bad feeling.

AR00562

This American Life Archive

Recommended

How to Listen

About
- Overview
- Staff
- Announcers
- Fellowships
- Jobs
- Music
- Make Radio
- The Radio Drama Club
- FAQ
- Submissions
- Store
- Contact Us
- Our Other Shows

Follow Us
- f
- twitter
- Store

Subscribe to our newsletter

talk to you about.

And he said, you're going to get into that car, and we're going to ask you some questions. And I said, no. And he said, you can get into the car the easy way or the hard way.

**David** [SPEAKING SPANISH]

**Emily Green** He says at least a dozen migrants also arrived at the bus station that night, and the cartel hustled them into different trucks. All the trucks were brand new, he says. He remembers that the one he got into was a gray Nissan, and there were four or five other migrants in there with him.

He says, the immigration officer who drove him to the bus station sat in his car and watched them all being carted off. We can't confirm this, but there is a long history of law enforcement and the cartels working hand-in-hand. For example, in 2011, seven top officials at Mexico's immigration agency were fired amid allegations that the agency was involved in the kidnapping of migrants.

And it squares with what his sister in New Jersey told me. She wired money to that immigration officer for David's bus ticket, and when she got the ransom call, the kidnappers told her to wire the money to that same account, the one the immigration officer used. She said something like, isn't that the immigration officer's account? And they hung up.

I asked the Mexican immigration agency to respond. They told me they have no knowledge of recent complaints of immigration officers turning migrants over to the cartels.

In the truck, David held onto his son. The kidnappers didn't speak.

**David** [SPEAKING SPANISH]

**Interpreter** The guy just told us to keep our heads down, to stop looking at the sights. And the guy who was driving us was keeping an eye on us, and he was making sure we were not chatting. They had the windows all rolled up.

**Emily Green** The truck drove around for a while, but David suspects they were just going in circles to disorient everyone. They pulled up to a normal-looking house with a big gate.

Email Address

[ Go ]

AR00563

importantly, what family members he has there. It was like patient intake at a health clinic, except for by a cartel.

We talk about the cartels as organized crime, but I never imagined the bookkeeping. They keep records and photos of the migrants they kidnap, and also who they release.

David says there were more than 20 migrants at the house. The men and women slept in separate rooms. During the day, the kidnappers hit any of the men who tried to look at the women.

The room David and his son slept in had one mattress. Everyone else slept on the floor. At night, David would lay on the ground, holding his son.

**David** [SPEAKING SPANISH]

**Interpreter** I would lay down with him in a corner, and I would hug my son. They couldn't see you crying, but my tears were almost, like, falling out.

What hurt me the most, Emily, was that when this guy arrived, the boss, he would always tell me that my son's organs were good for selling, that he was in a good age, that he was only 11 years old.

**David** [SPEAKING SPANISH] [CRYING]

**Interpreter** And my son once heard the guy saying that his kidneys-- that his organs-- were good for selling, and he was almost crying. And I told him, don't cry, but I was desperate.

**David** [SPEAKING SPANISH]

**Emily Green** As David tells me this story, his two kids are still sitting on the bed beside him. Neither of them is looking at anything in particular. They're just sitting there blankly.

David also seems devoid of emotion. He doesn't at all resemble the David from a few weeks ago, the one I talked to right after his release. Now, his affect is completely flat.

On the night they made a deal for David, the bosses woke David up and told him they'd reached a deal with his sister.

**AR00564**

**Interpreter** And he said to me, get up with your son, fat guy, because today I'm going to release you guys because your sister already paid, made a deposit.

**Emily Green** The man told David if he talked to anyone-- police, reporters-- the cartel would come for him, take his son, and kill David. The same man who kidnapped them in the first place drove them back to the bus station and bought them each a ticket.

David doesn't know what happened to the dozens of other people in the house. Most migrants who are kidnapped and released, the cartel gives them a key word. It's like a passcode that indicates the migrant has paid off the cartel so they aren't kidnapped again, but David isn't given one, maybe because he hasn't paid a high enough ransom.

When we met David in Monterrey, he didn't know what he was going to do. On day one of the kidnapping, the cartel had taken David and his son's immigration paperwork, and they didn't give it back. Without that paperwork, he doesn't even know which day he's supposed to show up in court.

But even if he could figure it out, he told us, he's too scared to return to Nuevo Laredo. Under MPP, he'd have to pass through the same port of entry to get to his hearing. What if we get kidnapped again? He asks.

Last week, I got a phone call from David. The family they've been staying with in Monterrey wants them gone, and he's lost hope in the asylum process. He thinks they won't be listened to, that the hearing process is a lie.

And in fact, he's right about how his case is likely to come out. Under this administration, it's virtually impossible to gain asylum based on gang violence. So David's decided to take his family back to Honduras, the country they tried escaping in the first place. According to Homeland Security's own statistics, thousands of other families are making the same choice.

**Ira Glass** Emily Green. She also reported on David for Vice.com. One last thing before we end today's program. When we were in the tent camp in Matamoros, I learned that the way the Remain in Mexico policy works.

It ap[...]hout an adult, the border agents have to let them into the U[...]tates. They don't send them back.

AR00565

This American Life Archive

Recommended

How to Listen

About
  ○ Overview
  ○ Staff
  ○ Announcements
  ○ Fellowships
  ○ Jobs
  ○ Music
  ○ Make Radio
  ○ On The Road
  ○ FAQ
  ○ Submissions
  ○ Store
  ○ Contact Us
  ○ Our Other Shows

probably be better.

The whole reason they were trying to get into the US was for his son's future, anyway. He has an aunt in Houston. He'd be put into a shelter on the other side, but hopefully he'd get to her.

It's was a gamble, but a calculated one. So at 5:30 in the afternoon a couple weeks ago, his father walked his teenager to the border station, gave him a hug, asked God to bless him, and sent him off.

**Dad** [SPEAKING SPANISH]

**Interpreter** He just, the only thing he said to me is, I'll see you later, dad.

**Ira Glass** In the two weeks since then, his son has called his mother three times. She's back in their home country with their other children. The dad asked me not to specify what country or say their names.

His son said he's in custody with other kids, and says it's way better than the tent camp. In other words, so far so good.

**Dad** [SPEAKING SPANISH]

**Interpreter** He's doing well there, that they treat him well, that he gets everything he needs there, that he gets a place to sleep, food, clothing, and he also is getting classes.

**Ira Glass** The only bad part of it, now, is that the dad's here alone. He misses his son. He thinks about him all the time, first thing in the morning, he said, and last thing at night.

Darwin, that 9-year-old who's the king of the camp-- remember him? He and his mom told Aviva that they've talked about whether she should send him over alone to fend for himself.

**Mom** [SPEAKING SPANISH]

**Ira Glass** She asked him, look, as a mom it's not that she doesn't love him, but if there's no way for them to cross together, would he want to go alone? But he doesn't want that.

Follow Us

Store

Subscribe to our newsletter

Email Address

Go

**AR00566**

This American Life Archive

**Ira Glass** No, because of the fear that I have.

**Mom** [SPEAKING SPANISH]

**Ira Glass** Honestly, you won't lose me, she says.

**Darwin** [SPEAKING SPANISH]

**Mom** [SPEAKING SPANISH]

**Darwin** [SPEAKING SPANISH]

**Ira Glass** My fear is that I'll lose my mom. The kids there don't see their moms.

**Darwin** [SPEAKING SPANISH]

**Mom** [SPEAKING SPANISH]

**Ira Glass** I've never been separated from her, he says. And she jumps in, our love is inseparable. He's sitting at her feet and hugs her legs. She puts her arm around him.

**Aviva DeKornfeld** So if your mom tells you you should cross into the US by yourself, what would you tell her?

**Mom** [SPEAKING SPANISH]

**Ira Glass** I tried it, she says, and he doesn't want to go. He refuses and starts to cry. And she doesn't want him to go, but given how things might play out, she's not sure what else to do.

Well, our program was produced today by Nadia Reiman with help from Aviva Dekornfeld. The people who put together today's show includes Elna Baker, Emanuele Berry, Susan Burton, Ben Calhoun, Zoe Chace, Dana Chivvis, Sean Cole, Whitney Dangerfield, Damien Graef, Michelle Harris, Jessica Lussenhop, Miki Meek, Lina Misitzis, Stowe Nelson, Katherine Rae Mondo, Ben Phelan, Alissa Shipp, Lilly Sullivan, Christopher Swetala, Matt Tierney, and Nancy Updike.

Recommended
How to Listen
About
⚬ Overview
⚬ Staff
⚬ Announcements
⚬ Fellowships
⚬ Jobs
⚬ Music
⚬ Make Radio
⚬ FAQ
⚬ Submissions
Store
⚬ Contact Us

🔍

Follow Us
⚬ f
g
Store
Subscribe to our newsletter
Email Address
Go

AR00567

Case 2:21-cv-00067-Z    Document 162-1    Filed 09/02/22    Page 186 of 350    PageID 4779

 This American Life Archive

Recommended

How to Listen

About

Overview

Staff

Announcements

Fellowships

Jobs

Music

Make Radio

On The Road

FAQ

Submissions

Store

Contact Us

Our Other Shows

Our fixer in Matamoros was journalist Vero Cardenas. The voices of the asylum officers in the first story of the show were performed by Maggie Siff and Betty Gilpin.

By the way, you can see Maggie Siff on *Billions* and Betty Gilpin on the Netflix show *Glow.* Special thanks today to Harrison Nesbit and Amy Kaufman, Kimbrell Kelly, Reynaldo Leanos Jr., Kennji Kizuka, Christopher Turpin, William Dobson, Didrik Schanche, Russell Dion. Lewis, Clay Boggs, Maureen Meyer, Nick Miriello, and Woodson Martin.

Our website, ThisAmericanLife.org. *This American Life* is delivered to public radio stations by PRX, the Public Radio Exchange. Thanks, as always, to our program's co-founder Mr. Torey Malatia. You know, he recently cooked dinner for some friends who hate onions and anything in the onion family.

**Woman** And they wanted to keep the leak to a minimum.

**Ira Glass** I'm Ira Glass. Back next week with more stories of *This American Life.*

 This American Life

Archive        Recommended        How to Listen        About        Store        Contact

Follow Us



        

© 1995 - 2022 This American Life    Privacy Policy | Terms of Use

Store

Subscribe to our newsletter

Email Address

Go

AR00568

to $44.00 per ton of assessable olives. The Committee unanimously recommended 2019 expenditures of $1,628,923 and an assessment rate of $44.00 per ton of assessable olives. The recommended assessment rate of $44.00 is $20.00 higher than the 2018 rate. The quantity of assessable olives for the 2019 Fiscal year is 17,953 tons. The $44.00 rate should provide $789,932 in assessment revenue. The higher assessment rate is needed because annual receipts for the 2018 crop year are 17,953 tons compared to 90,188 tons for the 2017 crop year. Olives are an alternate-bearing crop, with a small crop followed by a large crop. Income derived from the $44.00 per ton assessment rate, along with funds from the authorized reserve and interest income, should be adequate to meet this fiscal year's expenses.

The major expenditures recommended by the Committee for the 2019 fiscal year include $713,900 for program administration, $513,500 for marketing activities, $343,523 for research, and $58,000 for inspection equipment. Budgeted expenses for these items during the 2018 fiscal year were $401,200 for program administration, $973,500 for marketing activities, $297,777 for research, and $77,000 for inspection equipment. The Committee deliberated on many of the expenses, weighed the relative value of various programs or projects, and increased their expenses for marketing and research activities.

Prior to arriving at this budget and assessment rate, the Committee considered information from various sources including the Committee's executive, marketing, inspection, and research subcommittees. Alternate expenditure levels were discussed by these groups, based upon the relative value of various projects to the olive industry. The assessment rate of $44.00 per ton of assessable olives was derived by considering anticipated expenses, the low volume of assessable olives, and a late season freeze.

A review of NASS information indicates that the average producer price for the 2017 crop year was $974.00 per ton. Therefore, utilizing the assessment rate of $44.00 per ton, the assessment revenue for the 2019 fiscal year as a percentage of total producer revenue would be approximately 4.52 percent.

This action increases the assessment obligation imposed on handlers which are minimal and uniform on all handlers. Some of the additional costs may be passed on to producers. However, these costs would be offset by the benefits derived by the operation of

the marketing order. In addition, the Committee's December 11, 2018 meeting was widely publicized throughout the production area and all interested persons were invited to attend the meeting and participate in Committee deliberations on all issues.

In accordance with the Paperwork Reduction Act of 1995, (44 U.S.C. chapter 35), the marketing order's information collection requirements have been previously approved by OMB and assigned OMB No. 0581–0178 Vegetable and Specialty Crops. No changes in those requirements because of this action are necessary. Should any changes become necessary, they would be submitted to OMB for approval.

This final rule imposes no additional reporting or recordkeeping requirements on either small or large California olive handlers. As with all Federal marketing order programs, reports and forms are periodically reviewed to reduce information requirements and duplication by industry and public sector agencies. USDA has not identified any relevant Federal rules that duplicate, overlap, or conflict with this final rule.

AMS is committed to complying with the E-Government Act, to promote the use of the internet and other information technologies to provide increased opportunities for citizen access to Government information and services, and for other purposes.

A proposed rule concerning this action was published in the **Federal Register** on April 24, 2019 (84 FR 17089). Copies of the proposed rule were provided to all California olive handlers. The proposal was also made available through the internet by USDA and the Office of the Federal Register. A 30-day comment period ending May 24, 2019, was provided for interested persons to respond to the proposal. No comments were received. Accordingly, no changes will be made to the rule as proposed.

A small business guide on complying with fruit, vegetable, and specialty crop marketing agreements and orders may be viewed at: *http://www.ams.usda.gov/rules-regulations/moa/small-businesses.* Any questions about the compliance guide should be sent to Richard Lower at the previously-mentioned address in the **FOR FURTHER INFORMATION CONTACT** section.

After consideration of all relevant material presented, including the information and recommendation submitted by the Committee and other available information, it is hereby found that this rule will tend to effectuate the declared policy of the Act.

List of Subjects in 7 CFR Part 932

Olives, Marketing agreements, Reporting and recordkeeping requirements.

For the reasons set forth in the preamble, 7 CFR part 932 is amended as follows:

**PART 932—OLIVES GROWN IN CALIFORNIA**

■ 1. The authority citation for 7 CFR part 932 continues to read as follows:

**Authority:** 7 U.S.C. 601–674.

■ 2. Section 932.230 is revised to read as follows:

**§ 932.230   Assessment rate.**

On and after January 1, 2019, an assessment rate of $44.00 per ton is established for California olives.

Dated: July 11, 2019.

**Bruce Summers,**
*Administrator, Agricultural Marketing Service.*
[FR Doc. 2019–15061 Filed 7–15–19; 8:45 am]
**BILLING CODE 3410–02–P**

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Part 208**

**RIN 1615–AC44**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Parts 1003 and 1208**

[EOIR Docket No. 19–0504; A.G. Order No. 4488–2019]

**RIN 1125–AA91**

**Asylum Eligibility and Procedural Modifications**

**AGENCY:** Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Interim final rule; request for comment.

**SUMMARY:** The Department of Justice and the Department of Homeland Security ("DOJ," "DHS," or collectively, "the Departments") are adopting an interim final rule ("interim rule" or "rule") governing asylum claims in the context of aliens who enter or attempt to enter the United States across the southern land border after failing to apply for protection from persecution or torture while in a third country through which

they transited en route to the United States. Pursuant to statutory authority, the Departments are amending their respective regulations to provide that, with limited exceptions, an alien who enters or attempts to enter the United States across the southern border after failing to apply for protection in a third country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States is ineligible for asylum. This basis for asylum ineligibility applies only prospectively to aliens who enter or arrive in the United States on or after the effective date of this rule. In addition to establishing a new mandatory bar for asylum eligibility for aliens who enter or attempt to enter the United States across the southern border after failing to apply for protection from persecution or torture in at least one third country through which they transited en route to the United States, this rule would also require asylum officers and immigration judges to apply this new bar on asylum eligibility when administering the credible-fear screening process applicable to stowaways and aliens who are subject to expedited removal under section 235(b)(1) of the Immigration and Nationality Act. The new bar established by this regulation does not modify withholding or deferral of removal proceedings. Aliens who fail to apply for protection in a third country of transit may continue to apply for withholding of removal under the Immigration and Nationality Act ("INA") and deferral of removal under regulations issued pursuant to the legislation implementing U.S. obligations under Article 3 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

**DATES:**
*Effective date:* This rule is effective July 16, 2019.

*Submission of public comments:* Written or electronic comments must be submitted on or before August 15, 2019. Written comments postmarked on or before that date will be considered timely. The electronic Federal Docket Management System will accept comments prior to midnight eastern standard time at the end of that day.

**ADDRESSES:** You may submit comments, identified by EOIR Docket No. 19–0504, by one of the following methods:
• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.
• *Mail:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive

Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. To ensure proper handling, please reference EOIR Docket No. 19– 0504 on your correspondence. This mailing address may be used for paper, disk, or CD–ROM submissions.
• *Hand Delivery/Courier:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. Contact Telephone Number (703) 305–0289 (not a toll-free call).

**FOR FURTHER INFORMATION CONTACT:**
Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. Contact Telephone Number (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**I. Public Participation**

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule. The Departments also invite comments that relate to the potential economic or federalism effects that might result from this rule. To provide the most assistance to the Departments, comments should reference a specific portion of the rule; explain the reason for any recommended change; and include data, information, or authority that supports the recommended change. Comments received will be considered and addressed in the process of drafting the final rule.

All comments submitted for this rulemaking should include the agency name and EOIR Docket No. 19–0504. Please note that all comments received are considered part of the public record and made available for public inspection at *www.regulations.gov.* Such information includes personally identifiable information (such as a person's name, address, or any other data that might personally identify that individual) that the commenter voluntarily submits.

If you want to submit personally identifiable information as part of your comment, but do not want it to be posted online, you must include the phrase "PERSONALLY IDENTIFIABLE INFORMATION" in the first paragraph of your comment and precisely and prominently identify the information of which you seek redaction.

If you want to submit confidential business information as part of your comment, but do not want it to be posted online, you must include the phrase "CONFIDENTIAL BUSINESS

INFORMATION" in the first paragraph of your comment and precisely and prominently identify the confidential business information of which you seek redaction. If a comment has so much confidential business information that it cannot be effectively redacted, all or part of that comment may not be posted on *www.regulations.gov.* Personally identifiable information and confidential business information provided as set forth above will be placed in the public docket file of DOJ's Executive Office for Immigration Review ("EOIR"), but not posted online. To inspect the public docket file in person, you must make an appointment with EOIR. Please see the **FOR FURTHER INFORMATION CONTACT** paragraph above for the contact information specific to this rule.

**II. Purpose of This Interim Rule**

As discussed further below, asylum is a discretionary immigration benefit that generally can be sought by eligible aliens who are physically present or arriving in the United States, irrespective of their status, as provided in section 208 of the INA, 8 U.S.C. 1158. Congress, however, has provided that certain categories of aliens cannot receive asylum and has further delegated to the Attorney General and the Secretary of Homeland Security ("Secretary") the authority to promulgate regulations establishing additional bars on eligibility to the extent consistent with the asylum statute, as well as the authority to establish "any other conditions or limitations on the consideration of an application for asylum" that are consistent with the INA. *See* INA 208(b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(2)(C), (d)(5)(B). This interim rule will limit aliens' eligibility for this discretionary benefit if they enter or attempt to enter the United States across the southern land border after failing to apply for protection in at least one third country through which they transited en route to the United States, subject to limited exceptions.

The United States has experienced a dramatic increase in the number of aliens encountered along or near the southern land border with Mexico. This increase corresponds with a sharp increase in the number, and percentage, of aliens claiming fear of persecution or torture when apprehended or encountered by DHS. For example, over the past decade, the overall percentage of aliens subject to expedited removal and referred, as part of the initial screening process, for a credible-fear interview on claims of a fear of return has jumped from approximately 5

percent to above 40 percent. The number of cases referred to DOJ for proceedings before an immigration judge has also risen sharply, more than tripling between 2013 and 2018. These numbers are projected to continue to increase throughout the remainder of Fiscal Year ("FY") 2019 and beyond. Only a small minority of these individuals, however, are ultimately granted asylum.

The large number of meritless asylum claims places an extraordinary strain on the nation's immigration system, undermines many of the humanitarian purposes of asylum, has exacerbated the humanitarian crisis of human smuggling, and affects the United States' ongoing diplomatic negotiations with foreign countries. This rule mitigates the strain on the country's immigration system by more efficiently identifying aliens who are misusing the asylum system to enter and remain in the United States rather than legitimately seeking urgent protection from persecution or torture. Aliens who transited through another country where protection was available, and yet did not seek protection, may fall within that category.

Apprehending the great number of aliens crossing illegally into the United States and processing their credible-fear and asylum claims consumes an inordinate amount of resources of the Departments. DHS must surveil, apprehend, screen, and process the aliens who enter the country. DHS must also devote significant resources to detain many aliens pending further proceedings and to represent the United States in immigration court proceedings. The large influx of aliens also consumes substantial resources of DOJ, whose immigration judges adjudicate aliens' claims and whose officials are responsible for prosecuting and maintaining custody over those who violate Federal criminal law. Despite DOJ deploying close to double the number of immigration judges as in 2010 and completing historic numbers of cases, currently more than 900,000 cases are pending before the immigration courts. This represents an increase of more than 100,000 cases (or a greater than 13 percent increase in the number of pending cases) since the start of FY 2019. And this increase is on top of an already sizeable jump over the previous five years in the number of cases pending before immigration judges. From the end of FY 2013 to the close of FY 2018, the number of pending cases more than doubled, increasing nearly 125 percent.

That increase is owing, in part, to the continued influx of aliens and record numbers of asylum applications being filed: More than 436,000 of the currently pending immigration cases include an asylum application. But a large majority of the asylum claims raised by those apprehended at the southern border are ultimately determined to be without merit. The strain on the immigration system from those meritless cases has been extreme and extends to the judicial system. The INA provides many asylum-seekers with rights of appeal to the Article III courts of the United States. Final disposition of asylum claims, even those that lack merit, can take years and significant government resources to resolve, particularly where Federal courts of appeals grant stays of removal when appeals are filed. *See De Leon* v. *INS,* 115 F.3d 643 (9th Cir. 1997).

The rule's bar on asylum eligibility for aliens who fail to apply for protection in at least one third country through which they transit en route to the United States also aims to further the humanitarian purposes of asylum. It prioritizes individuals who are unable to obtain protection from persecution elsewhere and individuals who are victims of a "severe form of trafficking in persons" as defined by 8 CFR 214.11, many of whom do not volitionally transit through a third country to reach the United States. By deterring meritless asylum claims and de-prioritizing the applications of individuals who could have obtained protection in another country, the Departments seek to ensure that those refugees who have no alternative to U.S.-based asylum relief or have been subjected to an extreme form of human trafficking are able to obtain relief more quickly.

Additionally, the rule seeks to curtail the humanitarian crisis created by human smugglers bringing men, women, and children across the southern border. By reducing the incentive for aliens without an urgent or genuine need for asylum to cross the border—in the hope of a lengthy asylum process that will enable them to remain in the United States for years, typically free from detention and with work authorization, despite their statutory ineligibility for relief—the rule aims to reduce human smuggling and its tragic effects.

Finally, the rule aims to aid the United States in its negotiations with foreign nations on migration issues. Addressing the eligibility for asylum of aliens who enter or attempt to enter the United States after failing to seek protection in at least one third country through which they transited en route to the United States will better position the United States as it engages in ongoing diplomatic negotiations with Mexico and the Northern Triangle countries (Guatemala, El Salvador, and Honduras) regarding migration issues in general, related measures employed to control the flow of aliens into the United States (such as the recently implemented Migrant Protection Protocols [1]), and the urgent need to address the humanitarian and security crisis along the southern land border between the United States and Mexico.

In sum, this rule provides that, with limited exceptions, an alien who enters or arrives in the United States across the southern land border is ineligible for the discretionary benefit of asylum unless he or she applied for and received a final judgment denying protection in at least one third country through which he or she transited en route to the United States. The alien would, however, remain eligible to apply for statutory withholding of removal and for deferral of removal under the CAT.

In order to alleviate the strain on the U.S. immigration system and more effectively provide relief to those most in need of asylum—victims of a severe form of trafficking and refugees who have no other option—this rule incorporates the eligibility bar on asylum into the credible-fear screening process applicable to stowaways and aliens placed in expedited removal proceedings.

## III. Background

### A. Joint Interim Rule

The Attorney General and the Secretary publish this joint interim rule pursuant to their respective authorities concerning asylum determinations.

The Homeland Security Act of 2002 ("HSA"), Public Law 107–296, as amended, transferred many functions related to the execution of Federal immigration law to the newly created DHS. The HSA charged the Secretary "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. 1103(a)(1), and granted the Secretary the power to take all actions "necessary for carrying out" the provisions of the INA, *id.* at 1103(a)(3). The HSA also transferred to DHS some responsibility for affirmative asylum applications, *i.e.,* applications for asylum made outside the removal context. *See* 6 U.S.C. 271(b)(3). That authority has been delegated within DHS to U.S. Citizenship and Immigration Services ("USCIS"). USCIS asylum officers

---

[1] *See* Notice of Availability for Policy Guidance Related to Implementation of the Migrant Protection Protocols, 84 FR 6811 (Feb. 28, 2019).

determine in the first instance whether an alien's affirmative asylum application should be granted. *See* 8 CFR 208.4(b), 208.9.

But the HSA retained authority over certain individual immigration adjudications (including those related to defensive asylum applications) for DOJ, under EOIR and subject to the direction and regulation of the Attorney General. *See* 6 U.S.C. 521; 8 U.S.C. 1103(g). Thus, immigration judges within DOJ continue to adjudicate all asylum applications made by aliens during the removal process (defensive asylum applications), and they also review affirmative asylum applications referred by USCIS to the immigration court. *See* INA 101(b)(4), 8 U.S.C. 1101(b)(4); 8 CFR 1208.2; *Dhakal* v. *Sessions,* 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals (Board), also within DOJ, hears appeals from certain decisions by immigration judges. 8 CFR 1003.1(b)–(d). Asylum-seekers may appeal certain Board decisions to the Article III courts of the United States. *See* INA 242(a), 8 U.S.C. 1252(a).

The HSA also provided "[t]hat determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1). This broad division of functions and authorities informs the background of this interim rule.

### B. Legal Framework for Asylum

Asylum is a form of discretionary relief under section 208 of the INA, 8 U.S.C. 1158, that generally, if granted, keeps an alien from being subject to removal, creates a path to lawful permanent resident status and U.S. citizenship, and allows a variety of other benefits, such as allowing certain alien family members to obtain lawful immigration status derivatively. *See R–S–C* v. *Sessions,* 869 F.3d 1176, 1180 (10th Cir. 2017); *see also, e.g.,* INA 208(c)(1)(A), (C), 8 U.S.C. 1158(c)(1)(A), (C) (asylees cannot be removed subject to certain exceptions and can travel abroad with prior consent); INA 208(c)(1)(B), (d)(2), 8 U.S.C. 1158(c)(1)(B), (d)(2) (asylees shall be given work authorization; asylum applicants may be granted work authorization 180 days after the filing of their applications); INA 208(b)(3), 8 U.S.C. 1158(b)(3) (allowing derivative asylum for an asylee's spouse and unmarried children); INA 209(b), 8 U.S.C. 1159(b) (allowing the Attorney General or Secretary to adjust the status of an asylee to that of a lawful permanent resident); 8 CFR 209.2; 8 U.S.C. 1612(a)(2)(A) (asylees are eligible

for certain Federal means-tested benefits on a preferential basis compared to most legal permanent residents); INA 316(a), 8 U.S.C. 1427(a) (describing requirements for the naturalization of lawful permanent residents).

Aliens applying for asylum must establish that they meet the definition of a "refugee," that they are not subject to a bar to the granting of asylum, and that they merit a favorable exercise of discretion. INA 208(b)(1), 240(c)(4)(A), 8 U.S.C. 1158(b)(1), 8 U.S.C. 1229a(c)(4)(A); *see Moncrieffe* v. *Holder,* 569 U.S. 184, 187 (2013) (describing asylum as a form of "discretionary relief from removal"); *Delgado* v. *Mukasey,* 508 F.3d 702, 705 (2d Cir. 2007) ("Asylum is a discretionary form of relief . . . . Once an applicant has established eligibility . . . it remains within the Attorney General's discretion to deny asylum."). Because asylum is a discretionary form of relief from removal, the alien bears the burden of showing both eligibility for asylum and why the Attorney General or Secretary should exercise the discretion to grant relief. *See* INA 208(b)(1), 240(c)(4)(A), 8 U.S.C. 1158(b)(1), 1229a(c)(4)(A)(ii); 8 CFR 1240.8(d); *see Romilus* v. *Ashcroft,* 385 F.3d 1, 8 (1st Cir. 2004).

Section 208 of the INA provides that, in order to apply for asylum, an applicant must be "physically present" or "arriving" in the United States, INA 208(a)(1), 8 U.S.C. 1158(a)(1). Furthermore, to obtain asylum, the alien must demonstrate that he or she meets the statutory definition of a "refugee," INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A), and is not subject to an exception or bar, INA 208(b)(2), 8 U.S.C. 1158(b)(2); 8 CFR 1240.8(d). The alien bears the burden of proof to establish that he or she meets these criteria. INA 208(b)(1)(B)(i), 8 U.S.C. 1158(b)(1)(B)(i); 8 CFR 1240.8(d).

For an alien to establish that he or she is a "refugee," the alien generally must be someone who is outside of his or her country of nationality and "is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A). In addition, if evidence indicates that one or more of the grounds for mandatory denial may apply, *see* INA 208(b)(2)(A)(i)–(vi), 8 U.S.C. 1158(b)(2)(A)(i)–(vi), an alien must show not only that he or she does not fit within one of the statutory bars to granting asylum but also that he or she is not subject to any "additional limitations and conditions . . . under which an alien shall be ineligible for

asylum" established by a regulation that is "consistent with" section 208 of the INA, *see* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). The asylum applicant bears the burden of establishing that the bar at issue does not apply. 8 CFR 1240.8(d); *see also, e.g., Rendon* v. *Mukasey,* 520 F.3d 967, 973 (9th Cir. 2008) (applying 8 CFR 1240.8(d) in the context of the aggravated felony bar to asylum); *Chen* v. *U.S. Att'y Gen.,* 513 F.3d 1255, 1257 (11th Cir. 2008) (applying 8 CFR 1240.8(d) in the context of the persecutor bar); *Gao* v. *U.S. Att'y Gen.,* 500 F.3d 93, 98 (2d Cir. 2007) (same).

Because asylum is a discretionary benefit, those aliens who are statutorily eligible for asylum (*i.e.,* those who meet the definition of "refugee" and are not subject to a mandatory bar) are not entitled to it. After demonstrating eligibility, aliens must further meet their burden of showing that the Attorney General or Secretary should exercise his or her discretion to grant asylum. *See* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A) (the "Secretary of Homeland Security or the Attorney General may grant asylum to an alien" who applies in accordance with the required procedures and meets the definition of a "refugee"). The asylum statute's grant of discretion "[i]s a broad delegation of power, which restricts the Attorney General's discretion to grant asylum only by requiring the Attorney General to first determine that the asylum applicant is a 'refugee.'" *Komarenko* v. *INS,* 35 F.3d 432, 436 (9th Cir. 1994), *overruled on other grounds by Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009) (en banc) (per curiam). Immigration judges and asylum officers exercise that delegated discretion on a case-by-case basis.

### C. Establishing Bars to Asylum

The availability of asylum has long been qualified both by statutory bars and by administrative discretion to create additional bars. Those bars have developed over time in a back-and-forth process between Congress and the Attorney General. The original asylum statute, as set out in the Refugee Act of 1980, Public Law 96–212, simply directed the Attorney General to "establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee" within the meaning of the INA. *See* 8 U.S.C. 1158(a) (1982); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 427–

29 (1987) (describing the 1980 provisions).

In the 1980 implementing regulations, the Attorney General, in his discretion, established several mandatory bars to granting asylum that were modeled on the mandatory bars to eligibility for withholding of deportation under the then-existing section 243(h) of the INA. *See* Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980). Those regulations required denial of an asylum application if it was determined that (1) the alien was "not a refugee within the meaning of section 101(a)(42)" of the INA, 8 U.S.C. 1101(a)(42); (2) the alien had been "firmly resettled in a foreign country" before arriving in the United States; (3) the alien "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular group, or political opinion"; (4) the alien had "been convicted by a final judgment of a particularly serious crime" and therefore constituted "a danger to the community of the United States"; (5) there were "serious reasons for considering that the alien ha[d] committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States"; or (6) there were "reasonable grounds for regarding the alien as a danger to the security of the United States." *See* 45 FR at 37394–95.

In 1990, the Attorney General substantially amended the asylum regulations while retaining the mandatory bars for aliens who (1) persecuted others on account of a protected ground; (2) were convicted of a particularly serious crime in the United States; (3) firmly resettled in another country; or (4) presented reasonable grounds to be regarded as a danger to the security of the United States. *See* Asylum and Withholding of Deportation Procedures, 55 FR 30674, 30683 (July 27, 1990); *see also Yang* v. *INS,* 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding firm-resettlement bar); *Komarenko,* 35 F.3d at 436 (upholding particularly-serious-crime bar), *abrogated on other grounds, Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009) (en banc). In the Immigration Act of 1990, Congress added an additional mandatory bar to applying for or being granted asylum for "an[y] alien who has been convicted of an aggravated felony." Public Law 101–649, sec. 515 (1990).

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Public Law 104–208, div. C, and the Antiterrorism and Effective Death Penalty Act of 1996, Public Law 104–132, Congress amended section 208 of the INA, 8 U.S.C. 1158, to include the asylum provisions in effect today: Among other things, Congress designated three categories of aliens who, with limited exceptions, are ineligible to apply for asylum: (1) Aliens who can be removed to a safe third country pursuant to a bilateral or multilateral agreement; (2) aliens who failed to apply for asylum within one year of arriving in the United States; and (3) aliens who have previously applied for asylum and had the application denied. Public Law 104–208, div. C, sec. 604(a); *see* INA 208(a)(2)(A)–(C), 8 U.S.C. 1158(a)(2)(A)–(C). Congress also adopted six mandatory bars to granting asylum, which largely tracked the pre-existing asylum regulations. These bars prohibited asylum for (1) aliens who "ordered, incited, or otherwise participated" in the persecution of others on account of a protected ground; (2) aliens convicted of a "particularly serious crime" in the United States; (3) aliens who committed a "serious nonpolitical crime outside the United States" before arriving in the United States; (4) aliens who are a "danger to the security of the United States"; (5) aliens who are inadmissible or removable under a set of specified grounds relating to terrorist activity; and (6) aliens who have "firmly resettled in another country prior to arriving in the United States." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(A)(i)–(vi), 8 U.S.C. 1158(b)(2)(A)(i)–(vi). Congress further added that aggravated felonies, defined in 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]." Public Law 104–208, div. C, sec. 604(a); *see* INA 201(a)(43), 8 U.S.C. 1101(a)(43).

Although Congress enacted specific bars to asylum eligibility, that statutory list is not exhaustive. Congress, in IIRIRA, expressly authorized the Attorney General to expand upon two of those exceptions—the bars for "particularly serious crimes" and "serious nonpolitical offenses." While Congress prescribed that all aggravated felonies constitute particularly serious crimes, Congress further provided that the Attorney General may "designate by regulation offenses that will be considered" a "particularly serious crime," the perpetrator of which "constitutes a danger to the community of the United States." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(A)(ii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(ii), (B)(ii). Courts and the Board have long held that this grant of authority also authorizes the Board to identify additional particularly serious crimes (beyond aggravated felonies) through case-by-case adjudication. *See, e.g., Delgado* v. *Holder,* 648 F.3d 1095, 1106 (9th Cir. 2011) (en banc) (finding that Congress's decisions over time to amend the particularly serious crime bar by statute did not call into question the Board's additional authority to name serious crimes via case-by-case adjudication); *Ali* v. *Achim,* 468 F.3d 462, 468–69 (7th Cir. 2006) (relying on the absence of an explicit statutory mandate that the Attorney General designate "particular serious crimes" *only* via regulation). Congress likewise authorized the Attorney General to designate by regulation offenses that constitute "a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(A)(iii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(iii), (B)(ii).[2]

Congress further provided the Attorney General with the authority, by regulation, to "establish additional limitations and conditions, consistent with [section 208 of the INA], under which an alien shall be ineligible for asylum under paragraph (1)." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). As the Tenth Circuit has recognized, "the statute clearly empowers" the Attorney General and the Secretary to "adopt[] further limitations" on asylum eligibility. *R–S–C,* 869 F.3d at 1187 & n.9. By allowing the creation by regulation of "additional limitations and conditions," the statute gives the Attorney General and the Secretary broad authority in determining what the "limitations and conditions" should be. The additional limitations on eligibility must be established "by regulation," and must be "consistent with" the rest of section 208 of the INA. INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C).

Thus, the Attorney General has previously invoked section 208(b)(2)(C) of the INA to limit eligibility for asylum based on a "fundamental change in circumstances" and on the ability of an applicant to safely relocate internally within the alien's country of nationality or of last habitual residence. *See* Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000). More recently, the Attorney General and Secretary invoked section 208(b)(2)(C) to limit eligibility for asylum for aliens subject to a bar on entry under certain presidential proclamations. *See* Aliens Subject to a Bar on Entry Under Certain Presidential

---

[2] These provisions continue to refer only to the Attorney General, but the Departments interpret the provisions to also apply to the Secretary by operation of the HSA, Public Law 107–296. *See* 6 U.S.C. 552; 8 U.S.C. 1103(a)(1).

Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018).[3] The courts have also viewed section 208(b)(2)(C) as conferring broad discretion, including to render aliens ineligible for asylum based on fraud. *See R–S–C,* 869 F.3d at 1187; *Nijjar* v. *Holder,* 689 F.3d 1077, 1082 (9th Cir. 2012) (noting that fraud can be "one of the 'additional limitations . . . under which an alien shall be ineligible for asylum' that the Attorney General is authorized to establish by regulation").

Section 208(d)(5) of the INA, 8 U.S.C. 1158(d)(5), also establishes certain procedures for consideration of asylum applications. But Congress specified that the Attorney General "may provide by regulation for any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B).

In sum, the current statutory framework leaves the Attorney General (and, after the HSA, also the Secretary) significant discretion to adopt additional bars to asylum eligibility. As noted above, when creating mandatory bars to asylum eligibility in the IIRIRA, Congress simultaneously delegated the authority to create additional bars in section 1158(b)(2)(C). Public Law 104–208, sec. 604 (codified at 8 U.S.C. 1158(b)(2)). Pursuant to this broad delegation of authority, the Attorney General and the Secretary have in the past acted to protect the integrity of the asylum system by limiting eligibility for those who do not truly require this country's protection, and do so again here. *See, e.g.,* 83 FR at 55944; 65 FR at 76126.

In promulgating this rule, the Departments rely on the broad authority granted by 8 U.S.C. 1158(b)(2)(C) to protect the "core regulatory purpose" of asylum law by prioritizing applicants "with nowhere else to turn." *Matter of B–R–,* 26 I&N Dec. 119, 122 (BIA 2013) (internal quotation marks omitted) (explaining that, in light of asylum law's "core regulatory purpose," several provisions of the U.S. Code "limit an alien's ability to claim asylum in the United States when other safe options are available"). Such prioritization is consistent with the purpose of the statutory firm-resettlement bar (8 U.S.C. 1158(b)(2)(A)(vi)), which likewise was implemented to limit the availability of asylum for those who are seeking to choose among a number of safe countries. *See Sall* v. *Gonzales,* 437 F.3d 229, 233 (2d Cir. 2006); *Matter of A–G–G–,* 25 I&N Dec. 486, 503 (BIA 2011); *see also* 8 U.S.C. 1158(a)(2)(A) (providing that aliens who may be removed, pursuant to a bilateral or multilateral agreement, to a safe third country may not apply for asylum, and further demonstrating the intention of Congress to afford asylum protection only to those applicants who cannot seek effective protection in third countries). The concern with avoiding such forum-shopping has only been heightened by the dramatic increase in aliens entering or arriving in the United States along the southern border after transiting through one or more third countries where they could have sought protection, but did not. *See infra* at 33–41; *Kalubi* v. *Ashcroft,* 364 F.3d 1134, 1140 (9th Cir. 2004) (noting that forum-shopping might be "part of the totality of circumstances that sheds light on a request for asylum in this country"). While under the current regulatory regime the firm-resettlement bar applies only in circumstances in which offers of permanent status have been extended by third countries, *see* 8 CFR 208.15, 1208.15, the additional bar created by this rule also seeks—like the firm-resettlement bar—to deny asylum protection to those persons effectively choosing among several countries where avenues to protection from return to persecution are available by waiting until they reach the United States to apply for protection. *See Sall,* 437 F.3d at 233. Thus, the rule is well within the authority conferred by section 208(b)(2)(C).

## D. Other Forms of Protection

Aliens who are not eligible to apply for or receive a grant of asylum, or who are denied asylum on the basis of the Attorney General's or the Secretary's discretion, may nonetheless qualify for protection from removal under other provisions of the immigration laws. A defensive application for asylum that is submitted by an alien in removal proceedings is deemed an application for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* 8 CFR 208.30(e)(2)–(4); 8 CFR 1208.16(a). And an immigration judge may also consider an alien's eligibility for withholding and deferral of removal under regulations issued pursuant to the implementing legislation regarding U.S. obligations under Article 3 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). *See* Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, sec. 2242(b)

(1998); 8 CFR 1208.13(c); 8 CFR 1208.3(b), *see also* 8 CFR 1208.16(c) and 1208.17.

Those forms of protection bar an alien's removal to any country where the alien would "more likely than not" face persecution or torture, meaning that the alien would face a clear probability that his or her life or freedom would be threatened on account of a protected ground or a clear probability of torture. 8 CFR 1208.16(b)(2), (c)(2); *see Kouljinski* v. *Keisler,* 505 F.3d 534, 544 (6th Cir. 2007); *Sulaiman* v. *Gonzales,* 429 F.3d 347, 351 (1st Cir. 2005). Thus, if an alien proves that it is more likely than not that the alien's life or freedom would be threatened on account of a protected ground, but is denied asylum for some other reason—for instance, because of a statutory exception, an eligibility bar adopted by regulation, or a discretionary denial of asylum—the alien nonetheless may be entitled to statutory withholding of removal if not otherwise barred from that form of protection. INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); 8 CFR 208.16, 1208.16; *see also Garcia* v. *Sessions,* 856 F.3d 27, 40 (1st Cir. 2017) ("[W]ithholding of removal has long been understood to be a mandatory protection that must be given to certain qualifying aliens, while asylum has never been so understood."). Likewise, an alien who establishes that he or she will more likely than not face torture in the country of removal will qualify for CAT protection. *See* 8 CFR 208.16(c), 208.17(a), 1208.16(c), 1208.17(a). In contrast to the more generous benefits available through asylum, statutory withholding and CAT protection do not: (1) Prohibit the Government from removing the alien to a third country where the alien would not face the requisite probability of persecution or torture (even in the absence of an agreement with that third country); (2) create a path to lawful permanent resident status and citizenship; or (3) afford the same ancillary benefits (such as derivative protection for family members) and access to Federal means-tested public benefits. *See R–S–C,* 869 F.3d at 1180.

## E. Implementation of International Treaty Obligations

The framework described above is consistent with certain U.S. obligations under the 1967 Protocol relating to the Status of Refugees ("Refugee Protocol"), which incorporates Articles 2–34 of the 1951 Convention relating to the Status of Refugees ("Refugee Convention"), as well as U.S. obligations under Article 3 of the CAT. Neither the Refugee Protocol nor the CAT is self-executing in the United States. *See Khan* v.

---

[3] This rule is currently subject to a preliminary injunction against its enforcement. *See East Bay Sanctuary Covenant* v. *Trump,* 354 F. Supp. 3d 1094, 1115, 1121 (N.D. Cal. 2018), *on remand from* 909 F.3d 1219 (9th Cir. 2018).

*Holder,* 584 F.3d 773, 783 (9th Cir. 2009) ("[T]he [Refugee] Protocol is not self-executing."); *Auguste* v. *Ridge,* 395 F.3d 123, 132 (3d Cir. 2005) (the CAT "was not self-executing"). These treaties are not directly enforceable in U.S. law, but some of their obligations have been implemented by domestic legislation. For example, the United States has implemented the non-refoulement provisions of these treaties—*i.e.,* provisions prohibiting the return of an individual to a country where he or she would face persecution or torture—through the withholding of removal provisions at section 241(b)(3) of the INA and the CAT regulations, rather than through the asylum provisions at section 208 of the INA. *See Cardoza-Fonseca,* 480 U.S. at 440–41; Foreign Affairs Reform and Restructuring Act of 1998 at sec. 2242(b); 8 CFR 208.16(b)–(c), 208.17–208.18; 1208.16(b)–(c), 1208.17–1208.18. Limitations on the availability of asylum that do not affect the statutory withholding of removal or protection under the CAT regulations are consistent with these provisions. *See R–S–C,* 869 F.3d at 1188 & n. 11; *Cazun* v. *U.S. Att'y Gen.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016).

Courts have rejected arguments that the Refugee Convention, as implemented, requires that every qualified refugee receive asylum. For example, the Supreme Court has made clear that Article 34, which concerns the assimilation and naturalization of refugees, is precatory and not mandatory, and, accordingly, does not mandate that all refugees be granted asylum. *See Cardoza-Fonseca,* 480 U.S. at 441. Section 208 of the INA reflects that Article 34 is precatory and not mandatory, and accordingly does not provide that all refugees shall receive asylum. *See id.; see also R–S–C,* 869 F.3d at 1188; *Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *Cazun,* 856 F.3d at 257 & n. 16; *Garcia,* 856 F.3d at 42; *Ramirez-Mejia,* 813 F.3d at 241. As noted above, Congress has also recognized the precatory nature of Article 34 by imposing various statutory exceptions and by authorizing the creation of new bars to asylum eligibility through regulation.

Courts have likewise rejected arguments that other provisions of the Refugee Convention require every refugee to receive asylum. For example, courts have held, in the context of upholding the bar on eligibility for asylum in reinstatement proceedings under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5), that limiting the ability to apply for asylum does not constitute a prohibited "penalty" under

Article 31(1) of the Refugee Convention. *Mejia,* 866 F.3d at 588; *Cazun,* 856 F.3d at 257 & n.16. Courts have also rejected the argument that Article 28 of the Refugee Convention, governing the issuance of international travel documents for refugees "lawfully staying" in a country's territory, mandates that every person who might qualify for statutory withholding must also be granted asylum. *R–S–C,* 869 F.3d at 1188; *Garcia,* 856 F.3d at 42.

**IV. Regulatory Changes**

*A. Limitation on Eligibility for Asylum for Aliens Who Enter or Attempt To Enter the United States Across the Southern Land Border After Failing To Apply for Protection in at Least One Country Through Which They Transited En Route to the United States*

Pursuant to section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), the Departments are revising 8 CFR 208.13(c) and 8 CFR 1208.13(c) to add a new mandatory bar to eligibility for asylum for an alien who enters or attempts to enter the United States across the southern border, but who did not apply for protection from persecution or torture where it was available in at least one third country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which he or she transited en route to the United States, such as in Mexico via that country's robust protection regime. The bar would be subject to several limited exceptions, for (1) an alien who demonstrates that he or she applied for protection from persecution or torture in at least one of the countries through which the alien transited en route to the United States, and the alien received a final judgment denying the alien protection in such country; (2) an alien who demonstrates that he or she satisfies the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11; or (3) an alien who has transited en route to the United States through only a country or countries that were not parties to the 1951 Convention relating to the Status of Refugees, the 1967 Protocol, or the CAT.

In all cases the burden would remain with the alien to establish eligibility for asylum consistent with current law, including—if the evidence indicates that a ground for mandatory denial applies—the burden to prove that a ground for mandatory denial of the asylum application does not apply. 8 CFR 1240.8(d).

In addition to establishing a new mandatory bar for asylum eligibility for

an alien who enters or attempts to enter the United States across the southern border after failing to apply for protection from persecution or torture in at least one third country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which he or she transited en route to the United States, this rule would also modify certain aspects of the process for screening fear claims asserted by such aliens who are subject to expedited removal under section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1). Under current procedures, aliens subject to expedited removal may avoid being removed by making a threshold showing of a credible fear of persecution or torture at an initial screening interview. At present, those aliens are often released into the interior of the United States pending adjudication of such claims by an immigration court in removal proceedings under section 240 of the INA, especially if those aliens travel as family units. Once an alien is released, adjudications can take months or years to complete because of the increasing volume of claims and the need to expedite cases in which aliens have been detained. The Departments expect that a substantial proportion of aliens subject to a third-country-transit asylum eligibility bar would be subject to expedited removal, since approximately 234,534 aliens in FY 2018 who presented at a port of entry or were apprehended at the border were referred to expedited-removal proceedings. The procedural changes within expedited removal would be confined to aliens who are ineligible for asylum because they are subject to a regulatory bar for contravening the new mandatory third-country-transit asylum eligibility bar imposed by the present rule.

1. Under existing law, expedited-removal procedures—streamlined procedures for expeditiously reviewing claims and removing certain aliens— apply to those individuals who arrive at a port of entry or those who have entered illegally and are encountered by an immigration officer within 100 miles of the border and within 14 days of entering. *See* INA 235(b), 8 U.S.C. 1225(b); Designating Aliens For Expedited Removal, 69 FR 48877, 48880 (Aug. 11, 2004). To be subject to expedited removal, an alien must also be inadmissible under section 212(a)(6)(C) or (a)(7) of the INA, 8 U.S.C. 1182(a)(6)(C) or (a)(7), meaning that the alien has either tried to procure documentation through misrepresentation or lacks such documentation altogether. Thus, an

**AR00575**

alien encountered in the interior of the United States who entered the country after the publication of this rule imposing the third-country-transit bar and who is not otherwise amenable to expedited removal would be placed in proceedings under section 240 of the INA.

Section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1), prescribes procedures in the expedited-removal context for screening an alien's eligibility for asylum. When these provisions were being debated in 1996, the House Judiciary Committee expressed particular concern that "[e]xisting procedures to deny entry to and to remove illegal aliens from the United States are cumbersome and duplicative," and that "[t]he asylum system has been abused by those who seek to use it as a means of 'backdoor' immigration." H.R. Rep. No. 104–469, pt. 1, at 107 (1996). The Committee accordingly described the purpose of expedited removal and related procedures as "streamlin[ing] rules and procedures in the Immigration and Nationality Act to make it easier to deny admission to inadmissible aliens and easier to remove deportable aliens from the United States." *Id.* at 157; *see Am. Immigration Lawyers Ass'n* v. *Reno,* 18 F. Supp. 2d 38, 41 (D.D.C. 1998), *aff'd,* 199 F.3d 1352 (D.C. Cir. 2000) (rejecting several constitutional challenges to IIRIRA and describing the expedited-removal process as a "summary removal process for adjudicating the claims of aliens who arrive in the United States without proper documentation").

Congress thus provided that aliens "inadmissible under [8 U.S.C.] 1182(a)(6)(C) or 1182(a)(7)" shall be "removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. 1158] or a fear of persecution." INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i); *see* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii) (such aliens shall be referred "for an interview by an asylum officer"). On its face, the statute refers only to proceedings to establish eligibility for an affirmative grant of asylum, not to statutory withholding of removal or CAT protection against removal to a particular country.

An alien referred for a credible-fear interview must demonstrate a "credible fear," defined as a "significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [8 U.S.C. 1158]." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). According to the House

report, "[t]he credible-fear standard [wa]s designed to weed out non-meritorious cases so that only applicants with a likelihood of success will proceed to the regular asylum process." H. Rep. No. 104–69, at 158.

If the asylum officer determines that the alien lacks a credible fear, then the alien may request review by an immigration judge. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). If the immigration judge concurs with the asylum officer's negative credible-fear determination, then the alien shall be removed from the United States without further review by either the Board or the courts. INA 235(b)(1)(B)(iii)(I), (b)(1)(C), 8 U.S.C. 1225(b)(1)(B)(iii)(I), (b)(1)(C); INA 242(a)(2)(A)(iii), (e)(5), 8 U.S.C. 1252(a)(2)(A)(iii), (e)(5). By contrast, if the asylum officer or immigration judge determines that the alien has a credible fear—*i.e.,* "a significant possibility . . . that the alien could establish eligibility for asylum," INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v)—then the alien, under current regulations, is placed in section 240 proceedings for a full hearing before an immigration judge, with appeal available to the Board and review in the Federal courts of appeals, *see* INA 235(b)(1)(B)(ii), (b)(2)(A), 8 U.S.C. 1225(b)(1)(B)(ii), (b)(2)(A); INA 242(a), 8 U.S.C. 1252(a); 8 CFR 208.30(e)(5), 1003.1.

By contrast, section 235 of the INA is silent regarding procedures for the granting of statutory withholding of removal and CAT protection; indeed, section 235 predates the legislation directing implementation of U.S. obligations under Article 3 of the CAT. *See* Foreign Affairs Reform and Restructuring Act of 1998 at sec. 2242(b) (requiring implementation of the CAT); IIRIRA at sec. 302 (revising section 235 of the INA to include procedures for dealing with inadmissible aliens who intend to apply for asylum). The legal standards for ultimately meeting the statutory standards for asylum on the merits versus statutory withholding or CAT protection are also different. Asylum requires an applicant to ultimately establish a "well-founded fear" of persecution, which has been interpreted to mean a "reasonable possibility" of persecution—a "more generous" standard than the "clear probability" of persecution or torture standard that applies to statutory withholding or CAT protection. *See INS* v. *Stevic,* 467 U.S. 407, 425, 429–30 (1984); *Santosa* v. *Mukasey,* 528 F.3d 88, 92 & n.1 (1st Cir. 2008); *compare* 8 CFR 1208.13(b)(2)(i)(B), *with* 8 CFR 1208.16(b)(2), (c)(2). As a result, applicants who establish eligibility for

asylum are not necessarily eligible for statutory withholding or CAT protection.

Current regulations instruct USCIS adjudicators and immigration judges to treat an alien's request for asylum in expedited-removal proceedings under section 1225(b) as a request for statutory withholding and CAT protection as well. *See* 8 CFR 208.13(c)(1), 208.30(e)(2)–(4), 1208.13(c)(1), 1208.16(a). In the context of expedited-removal proceedings, "credible fear of persecution" is defined to mean a "significant possibility" that the alien "could establish eligibility for asylum," not the CAT or statutory withholding. INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Regulations nevertheless have generally provided that aliens in expedited removal should be subject to the same process and screening standard for considering statutory withholding of removal claims under INA 241(b)(3), 8 U.S.C. 1231(b)(3), and claims for protection under the CAT regulations, as they are for asylum claims. *See* 8 CFR 208.30(e)(2)–(4).

Thus, when the former Immigration and Naturalization Service provided for claims for statutory withholding of removal and CAT protection to be considered in the same expedited-removal proceedings as asylum, the result was that if an alien showed that there was a significant possibility of establishing eligibility for asylum and was therefore referred for removal proceedings under section 240 of the INA, any potential statutory withholding and CAT claims the alien might have had were referred as well. This was done on the assumption that it would not "disrupt[] the streamlined process established by Congress to circumvent meritless claims." Regulations Concerning the Convention Against Torture, 64 FR 8478, 8485 (Feb. 19, 1999). But while the INA authorizes the Attorney General and Secretary to provide for consideration of statutory withholding and CAT claims together with asylum claims or other matters that may be considered in removal proceedings, the INA does not mandate that approach, *see Foti* v. *INS,* 375 U.S. 217, 229–30 & n.16 (1963), or that they be considered in the same manner.

Since 1999, regulations also have provided for a distinct "reasonable fear" screening process for certain aliens who are categorically ineligible for asylum and can thus make claims only for statutory withholding or CAT protection. *See* 8 CFR 208.31. Specifically, if an alien is subject to having a previous order of removal reinstated or is a non-permanent

AR00576

resident alien subject to an administrative order of removal resulting from an aggravated felony conviction, then he or she is categorically ineligible for asylum. *See id.* § 208.31(a), (e). Such an alien can be placed in withholding-only proceedings to adjudicate his statutory withholding or CAT claims, but only if he first establishes a "reasonable fear" of persecution or torture through a screening process that tracks the credible-fear process. *See id.* § 208.31(c), (e).

To establish a reasonable fear of persecution or torture, an alien must establish a "reasonable possibility that [the alien] would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal." *Id.* § 208.31(c). "This . . . screening process is modeled on the credible-fear screening process, but requires the alien to meet a higher screening standard." Regulations Concerning the Convention Against Torture, 64 FR at 8485; *see also Garcia* v. *Johnson,* No. 14–CV–01775, 2014 WL 6657591, at *2 (N.D. Cal. Nov. 21, 2014) (describing the aim of the regulations as providing "fair and efficient procedures" in reasonable-fear screening that would comport with U.S. international obligations).

Significantly, when establishing the reasonable-fear screening process, DOJ explained that the two affected categories of aliens should be screened based on the higher reasonable-fear standard because, "[u]nlike the broad class of arriving aliens who are subject to expedited removal, these two classes of aliens are ineligible for asylum," and may be entitled only to statutory withholding of removal or CAT protection. Regulations Concerning the Convention Against Torture, 64 FR at 8485. "Because the standard for showing entitlement to these forms of protection (a clear probability of persecution or torture) is significantly higher than the standard for asylum (a well-founded fear of persecution), the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher." *Id.*

2. Drawing on the established framework for considering whether to grant withholding of removal or CAT protection in the reasonable-fear context, this interim rule establishes a bifurcated screening process for aliens subject to expedited removal who are ineligible for asylum by virtue of falling subject to this rule's third-country-transit eligibility bar, but who express a fear of return or seek statutory withholding or CAT protection. The Attorney General and Secretary have broad authority to implement the immigration laws, *see* INA 103, 8 U.S.C. 1103, including by establishing regulations, *see* INA 103(a)(3), 8 U.S.C. 1103(a)(3), and to regulate "conditions or limitations on the consideration of an application for asylum," *id.* 1158(d)(5)(B). Furthermore, the Secretary has the authority—in his "sole and unreviewable discretion," the exercise of which may be "modified at any time"—to designate additional categories of aliens that will be subject to expedited-removal procedures, so long as the designated aliens have not been admitted or paroled nor continuously present in the United States for two years. INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii). The Departments have frequently invoked these authorities to establish or modify procedures affecting aliens in expedited-removal proceedings, as well as to adjust the categories of aliens subject to particular procedures within the expedited-removal framework.

This rule does not change the credible-fear standard for asylum claims, although the regulation would expand the scope of the inquiry in the process. An alien who is subject to the third-country-transit bar and nonetheless has entered the United States along the southern land border after the effective date of this rule creating the bar would be ineligible for asylum and would thus not be able to establish a "significant possibility . . . [of] eligibility for asylum under section 1158." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Consistent with section 235(b)(1)(B)(iii)(III) of the INA, the alien could still obtain review from an immigration judge regarding whether the asylum officer correctly determined that the alien was subject to a limitation or suspension on entry imposed by the third-country-transit bar. Further, consistent with section 235(b)(1)(B) of the INA, if the immigration judge reversed the asylum officer's determination, the alien could assert the asylum claim in section 240 proceedings.

Aliens determined to be ineligible for asylum by virtue of falling subject to the third-country-transit bar, however, would still be screened, but in a manner that reflects that their only viable claims could be for statutory withholding or CAT protection pursuant to 8 CFR 208.30(e)(2)–(4) and 1208.16. After determining the alien's ineligibility for asylum under the credible-fear standard, the asylum officer would apply the long-established reasonable-fear standard to assess whether further proceedings on a possible statutory withholding or CAT protection claim are warranted. If the asylum officer determined that the alien had not established the requisite reasonable fear, the alien then could seek review of that decision from an immigration judge (just as the alien may under existing 8 CFR 208.30 and 208.31), and would be subject to removal only if the immigration judge agreed with the negative reasonable-fear finding. Conversely, if either the asylum officer or the immigration judge determined that the alien cleared the reasonable-fear threshold, the alien would be put in section 240 proceedings, just like aliens who receive a positive credible-fear determination for asylum. Employing a reasonable-fear standard in this context, for this category of ineligible aliens, would be consistent with DOJ's longstanding rationale that "aliens ineligible for asylum," who could only be granted statutory withholding of removal or CAT protection, should be subject to a different screening standard that would correspond to the higher bar for actually obtaining these forms of protection. *See* Regulations Concerning the Convention Against Torture, 64 FR at 8485 ("Because the standard for showing entitlement to these forms of protection . . . is significantly higher than the standard for asylum[,] . . . the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher.").

3. The screening process established by the interim rule accordingly will proceed as follows. For an alien subject to expedited removal, DHS will ascertain whether the alien seeks protection, consistent with INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). All such aliens will continue to go before an asylum officer for screening, consistent with INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B). The asylum officer will ask threshold questions to elicit whether an alien is ineligible for a grant of asylum pursuant to the third-country-transit bar. If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates that there is a significant possibility that he or she can establish eligibility for asylum), then the alien will have established a credible fear.

If, however, an alien lacks a significant possibility of eligibility for asylum because of the third-country-transit bar, then the asylum officer will make a negative credible-fear finding.

The asylum officer will then apply the reasonable-fear standard to assess the alien's claims for statutory withholding of removal or CAT protection.

An alien subject to the third-country-transit asylum eligibility bar who clears the reasonable-fear screening standard will be placed in section 240 proceedings, just as an alien who clears the credible-fear standard will be. In those proceedings, the alien will also have an opportunity to raise whether the alien was correctly identified as subject to the third-country-transit ineligibility bar to asylum, as well as other claims. If an immigration judge determines that the alien was incorrectly identified as subject to the third-country-transit bar, the alien will be able to apply for asylum. Such aliens can appeal the immigration judge's decision in these proceedings to the Board and then seek review from a Federal court of appeals.

Conversely, an alien who is found to be subject to the third-country-transit asylum eligibility bar and who does not clear the reasonable-fear screening standard can obtain review of both of those determinations before an immigration judge, just as immigration judges currently review negative credible-fear and reasonable-fear determinations. If the immigration judge finds that either determination was incorrect, then the alien will be placed into section 240 proceedings. In reviewing the determinations, the immigration judge will decide de novo whether the alien is subject to the third-country-transit asylum eligibility bar. If, however, the immigration judge affirms both determinations, then the alien will be subject to removal without further appeal, consistent with the existing process under section 235 of the INA. In short, aliens subject to the third-country-transit asylum eligibility bar will be processed through existing procedures by DHS and EOIR in accordance with 8 CFR 208.30 and 1208.30, but will be subject to the reasonable-fear standard as part of those procedures with respect to their statutory withholding and CAT protection claims.

4. The above process will not affect the process in 8 CFR 208.30(e)(5) (to be redesignated as 8 CFR 208.30(e)(5)(i) under this rule) for certain existing statutory bars to asylum eligibility. Under that regulatory provision, many aliens who appear to fall within an existing statutory bar, and thus appear to be ineligible for asylum, can nonetheless be placed in section 240 proceedings and have their asylum claim adjudicated by an immigration judge, if they establish a credible fear of persecution, followed by further review of any denial of their asylum application before the Board and the courts of appeals.

### B. Anticipated Effects of the Rule

When the expedited procedures were first implemented approximately two decades ago, very few aliens within those proceedings claimed a fear of persecution. Since then, the numbers have dramatically increased. In FY 2018, USCIS received 99,035 credible-fear claims, a 175 percent increase from five years earlier and a 1,883 percent increase from ten years earlier. FY 2019 is on track to see an even greater increase in claims, with more than 35,000 credible-fear claims received in the first four months of the fiscal year. This unsustainable, increased burden on the U.S. immigration system also extends to DOJ: Immigration courts received over 162,000 asylum applications in FY 2018, a 270 percent increase from five years earlier.

This dramatic increase in credible-fear claims has been complicated by a demographic shift in the alien population crossing the southern border from Mexican single adult males to predominantly Central American family units and unaccompanied alien minors. Historically, aliens coming unlawfully to the United States along the southern land border were predominantly Mexican single adult males who generally were removed or who voluntarily departed within 48 hours if they had no legal right to stay in the United States. As of January 2019, more than 60 percent are family units and unaccompanied alien children; 60 percent are non-Mexican. In FY 2017, CBP apprehended 94,285 family units from the Northern Triangle countries at the southern land border. Of those family units, 99 percent remained in the country (as of January 2019). And, while Mexican single adults who are not legally eligible to remain in the United States may be immediately repatriated to Mexico, it is more difficult to expeditiously repatriate family units and unaccompanied alien children not from Mexico or Canada. And the long and arduous journey of children to the United States brings with it a great risk of harm that could be relieved if individuals were to more readily avail themselves of legal protection from persecution in a third country closer to the child's country of origin.

Even though the overall number of apprehensions of illegal aliens was relatively higher two decades ago than it is today (around 1.6 million in 2000), given the demographic of aliens arriving to the United States at that time, they could be processed and removed more quickly, often without requiring detention or lengthy court proceedings. Moreover, apprehension numbers in past years often reflected individuals being apprehended multiple times over the course of a given year.

In recent years, the United States has seen a large increase in the number and proportion of inadmissible aliens subject to expedited removal who claim a fear of persecution or torture and are subsequently placed into removal proceedings before an immigration judge. This is particularly true for non-Mexican aliens, who now constitute the overwhelming majority of aliens encountered along the southern border with Mexico, and the overwhelming majority of aliens who assert claims of fear. But while the number of non-Mexican aliens encountered at the southern border has dramatically increased, a substantial number of such aliens failed to apply for asylum or refugee status in Mexico—despite the availability of a functioning asylum system.

In May of FY 2017, DHS recorded 7,108 enforcement actions with non-Mexican aliens along the southern border—which accounted for roughly 36 percent of all enforcement actions along the southern border that month. In May of FY 2018, DHS recorded 32,477 enforcement actions with non-Mexican aliens along the southern border— which accounted for roughly 63 percent of that month's enforcement actions along the southern border. And in May of FY 2019, DHS recorded 121,151 enforcement actions with non-Mexican aliens along the southern border— which accounted for approximately 84 percent of enforcement actions along the southern border that month. Accordingly, the number of enforcement actions involving non-Mexican aliens increased by more than 1,600 percent from May FY 2017 to May FY 2019, and the percentage of enforcement actions at the southern land border involving non-Mexican aliens increased from 36 percent to 84 percent. Overall, southern border non-Mexican enforcement actions in FY 2017 totaled 233,411; they increased to 298,503 in FY 2018; and, in the first eight months of FY 2019 (through May) they already total 524,446.

This increase corresponds to a growing trend over the past decade, in which the overall percentage of all aliens subject to expedited removal who are referred for a credible-fear interview by DHS jumped from approximately 5 percent to above 40 percent. The total number of aliens referred by DHS for credible-fear screening increased from

fewer than 5,000 in FY 2008 to more than 99,000 in FY 2018. The percentage of aliens who receive asylum remains small. In FY 2018, DHS asylum officers found over 75 percent of interviewed aliens to have a credible fear of persecution or torture and referred them for proceedings before an immigration judge within EOIR under section 240 of the INA. In addition, EOIR immigration judges overturn about 20 percent of the negative credible-fear determinations made by asylum officers, finding those aliens also to have a credible fear. Such aliens are referred to immigration judges for full hearings on their asylum claims.

But many aliens who receive a positive credible-fear determination never file an application for asylum. From FY 2016 through FY 2018, approximately 40 percent of aliens who received a positive credible-fear determination failed to file an asylum application. And of those who did proceed to file asylum applications, relatively few established that they should be granted such relief. From FY 2016 through FY 2018, among aliens who received a positive credible-fear determination, only 12,062 aliens [4]—an average of 4,021 per year—were granted asylum (14 percent of all completed asylum cases, and about 36 percent of asylum cases decided on the merits).[5] The many cases that lack merit occupy a large portion of limited docket time and absorb scarce government resources, exacerbating the backlog and diverting attention from other meritorious cases. Indeed, despite DOJ deploying the largest number of immigration judges in history and completing historic numbers of cases, a significant backlog remains. There are more than 900,000 pending cases in immigration courts, at least 436,000 of which include an asylum application.

Apprehending and processing this growing number of aliens who cross illegally into the United States and invoke asylum procedures consumes an ever-increasing amount of resources of DHS, which must surveil, apprehend, screen, and process the aliens who enter the country and must represent the U.S. Government in cases before immigration judges, the Board, and the U.S. Courts of Appeals. The interim rule seeks to ameliorate these strains on the immigration system.

The rule also aims to further the humanitarian purposes of asylum by prioritizing individuals who are unable to obtain protection from persecution elsewhere and individuals who have been victims of a "severe form of trafficking in persons" as defined by 8 CFR 214.11,[6] many of whom do not volitionally transit through a third country to reach the United States.[7] By deterring meritless asylum claims and de-prioritizing the applications of individuals who could have sought protection in another country before reaching the United States, the Departments seek to ensure that those asylees who need relief most urgently are better able to obtain it.

The interim rule would further this objective by restricting the claims of aliens who, while ostensibly fleeing persecution, chose not to seek protection at the earliest possible opportunity. An alien's decision not to apply for protection at the first available opportunity, and instead wait for the more preferred destination of the United States, raises questions about the validity and urgency of the alien's claim and may mean that the claim is less likely to be successful.[8] By barring such

claims, the interim final rule would encourage those fleeing genuine persecution to seek protection as soon as possible and dissuade those with non-viable claims, including aliens merely seeking employment, from further overburdening the Nation's immigration system.

Many of the aliens who wait to seek asylum until they arrive in the United States transit through not just one country, but multiple countries in which they may seek humanitarian protection. Yet they do not avail themselves of that option despite their claims of fear of persecution or torture in their home country. Under these circumstances, it is reasonable to question whether the aliens genuinely fear persecution or torture, or are simply economic migrants seeking to exploit our overburdened immigration system by filing a meritless asylum claim as a way of entering, remaining, and legally obtaining employment in the United States.[9]

All seven countries in Central America plus Mexico are parties to both the Refugee Convention and the Refugee Protocol. Moreover, Mexico has expanded its capacity to adjudicate asylum claims in recent years, and the number of claims submitted in Mexico has increased. In 2016, the Mexican government received 8,789 asylum applications. In 2017, it received 14,596. In 2018, it received 29,623 applications. And in just the first three months of 2019, Mexico received 12,716 asylum

---

[4] These numbers are based on data generated by EOIR on April 12, 2019.

[5] Completed cases include both those in which an asylum application was filed and those in which an application was not filed. Cases decided on the merits include only those completed cases in which an asylum application was filed and the immigration judge granted or denied that application.

[6] "Severe form of trafficking in persons means sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act is under the age of 18 years; or the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery." 8 CFR 214.11. Determinations made with respect to this exception will not be binding on Federal departments or agencies in subsequent determinations of eligibility for T or U nonimmigrant status under section 101(a)(15)(T) or (U) of the Act or for benefits or services under 22 U.S.C. 7105 or 8 U.S.C. 1641(c)(4).

[7] This rule does not provide for a categorical exception for unaccompanied alien children ("UAC"), as defined in 6 U.S.C. 279(g)(2). The Departments recognize that UAC are exempt from two of three statutory bars to applying for asylum: The "safe third country" bar and the one-year filing deadline, *see* INA 208(a)(2)(E), 8 U.S.C. 1158(a)(2)(E). Congress, however, did not exempt UAC from the bar on filing successive applications for asylum, *see* INA 208(a)(2)(C), 8 U.S.C. 1158(a)(2)(C), the various bars to asylum eligibility in INA 208(b)(2)(A), 8 U.S.C. 1158(b)(2)(A), or the bars, like this one, established pursuant to the Departments' authorities under INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). But UAC, like others subject to this rule, will be able to apply for withholding of removal under INA section 241(b)(3), 8 U.S.C. 1231(b)(3), or the CAT regulations. UAC will not be returned to the transit country for consideration of these protection claims.

[8] Indeed, the Board has previously held that this is a relevant consideration in asylum applications. In *Matter of Pula*, 19 I&N Dec. 467, 473–74 (BIA 1987), the Board stated that "in determining whether a favorable exercise of discretion is warranted" for an applicant under the asylum statute, INA 208(a), 8 U.S.C. 1158(2)(a), "[a]mong those factors which should be considered are whether the alien passed through any other

countries or arrived in the United States directly from his country, whether orderly refugee procedures were in fact available to help him in any country he passed through, and whether he made any attempts to seek asylum before coming to the United States." Consistent with the reasoning in *Pula*, this rule establishes that an alien who failed to request asylum in a country where it was available is not eligible for asylum in the United States. Even though the Board in *Pula* indicated that a range of factors is relevant to evaluating discretionary asylum relief under the general *statutory* asylum provision, the INA also authorizes the establishment of additional limitations to asylum eligibility by *regulation*—beyond those embedded in the statute. *See* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). This rule uses that authority to establish one of the factors specified as relevant in *Pula* as the foundation of a new categorical asylum bar. This rule's prioritization of the third-country-transit factor, considered as just one of many factors in *Pula*, is justified, as explained above, by the increased numbers and changed nature of asylum claims in recent years.

[9] Economic migrants are not eligible for asylum. *See, e.g., In re: Brenda Leticia Sonday-Chavez*, No. A–7–969, 2017 WL 4946947, at *1 (BIA Sept. 7, 2017) ("[E]conomic reasons for coming to the United States . . . would generally not render an alien eligible for relief from removal."); *see also Sale* v. *Haitian Centers Council Inc.,* 509 U.S. 155, 161–62 & n.11 (1993); *Hui Zhuang* v. *Gonzales*, 471 F.3d 884, 890 (8th Cir. 2006) ("Fears of economic hardship or lack of opportunity do not establish a well-founded fear of persecution.").

applications, putting Mexico on track to receive more than 50,000 asylum applications by the end of 2019 if that quarterly pace continues. Instead of availing themselves of these available protections, many aliens transiting through Central America and Mexico decide not to seek protection, likely based upon a preference for residing in the United States. The United States has experienced an overwhelming surge in the number of non-Mexican aliens crossing the southern border and seeking asylum. This overwhelming surge and its accompanying burden on the United States has eroded the integrity of our borders, and it is inconsistent with the national interest to provide a discretionary benefit to those who choose not to seek protection at the first available opportunity.

The interim final rule also is in keeping with the efforts of other liberal democracies to prevent forum-shopping by directing asylum-seekers to present their claims in the first safe country in which they arrive. In 1990, European states adopted the Dublin Regulation in response to an asylum crisis as refugees and economic migrants fled communism at the end of the Cold War; it came into force in 1997. *See* Convention Determining the State Responsible for Examining Applications for Asylum Lodged in One of the Member States of the European Communities, 1997 O.J. (C 254). The United Nations High Commission for Refugees praised the Dublin Regulation's "commendable efforts to share and allocate the burden of review of refugee and asylum claims." *See* UN High Comm'r for Refugees, *UNHCR Position on Conventions Recently Concluded in Europe (Dublin and Schengen Conventions),* 3 Eur. Series 2, 385 (1991). Now in its third iteration, the Dublin III Regulation sets asylum criteria and protocol for the European Union ("EU"). It instructs that asylum claims "shall be examined by a single Member State." Regulation (EU) No 604/ 2013 of the European Parliament and of the Council of 26 June 2013, Establishing the Criteria and Mechanisms for Determining the Member State Responsible for Examining an Application for International Protection Lodged in One of the Member States by a Third-Country National or a Stateless Person (Recast), 2013 O.J. (L 180) 31, 37. Typically, for irregular migrants seeking asylum, the member state by which the asylum applicant first entered the EU "shall be responsible for examining the application for international protection." *Id.* at 40. Generally, when

a third-country national seeks asylum in a member state other than the state of first entry into the EU, that state may transfer the asylum-seeker back to the state of first safe entry. *Id.* at 2.

This rule also seeks to curtail the humanitarian crisis created by human smugglers bringing men, women, and children across the southern border. By reducing a central incentive for aliens without a genuine need for asylum to cross the border—the hope of a lengthy asylum process that will enable them to remain in the United States for years despite their statutory ineligibility for relief—the rule aims to reduce human smuggling and its tragic effects.

Finally, as discussed further below, this rule will facilitate ongoing diplomatic negotiations with Mexico and the Northern Triangle countries regarding general migration issues, related measures employed to control the flow of aliens (such as the Migrant Protection Protocols), and the humanitarian and security crisis along the southern land border between the United States and Mexico.

In sum, the rule would bar asylum for any alien who has entered or attempted to enter the United States across the southern border and who has failed to apply for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States, unless the alien demonstrates that the alien only transited through countries that were not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the CAT, or the alien was a victim of "a severe form of trafficking in persons" as defined by 8 CFR 214.11.

Such a rule would ensure that the ever-growing influx of meritless asylum claims do not further overwhelm the country's immigration system, would promote the humanitarian purposes of asylum by speeding relief to those who need it most (*i.e.,* individuals who have no alternative country where they can escape persecution or torture or who are victims of a severe form of trafficking and thus did not volitionally travel through a third country to reach the United States), would help curtail the humanitarian crisis created by human smugglers, and would aid U.S. negotiations on migration issues with foreign countries.

## V. Regulatory Requirements

### A. Administrative Procedure Act

#### 1. Good Cause Exception

While the Administrative Procedure Act ("APA") generally requires agencies to publish notice of a proposed rulemaking in the **Federal Register** for a period of public comment, it provides an exception "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. 553(b)(B). That exception relieves agencies of the notice-and-comment requirement in emergency situations, or in circumstances where "the delay created by the notice and comment requirements would result in serious damage to important interests." *Woods Psychiatric Inst.* v. *United States,* 20 Cl. Ct. 324, 333 (1990), *aff'd,* 925 F.2d 1454 (Fed. Cir. 1991); *see also United States* v. *Dean,* 604 F.3d 1275, 1279 (11th Cir. 2010); *Nat'l Fed'n of Federal Emps.* v. *Nat'l Treasury Emps. Union,* 671 F.2d 607, 611 (D.C. Cir. 1982). Agencies have previously relied on that exception in promulgating immigration-related interim rules.[10] Furthermore, DHS has relied on that exception as additional legal justification when issuing orders related to expedited removal—a context in which Congress explicitly recognized the need for dispatch in addressing large volumes of aliens by giving the Secretary significant discretion to "modify at any time" the classes of aliens who would be subject to such procedures. *See* INA 235(b)(1)(A)(iii)(I), 8 U.S.C. 1225(b)(1)(A)(iii)(I).[11]

---

[10] *See, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (interim rule citing good cause to immediately require additional documentation from certain Caribbean agricultural workers to avoid "an increase in applications for admission in bad faith by persons who would otherwise have been denied visas and are seeking to avoid the visa requirement and consular screening process during the period between the publication of a proposed and a final rule"); Suspending the 30-Day and Annual Interview Requirements From the Special Registration Process for Certain Nonimmigrants, 68 FR 67578, 67581 (Dec. 2, 2003) (interim rule claiming the good cause exception for suspending certain automatic registration requirements for nonimmigrants because "without [the] regulation approximately 82,532 aliens would be subject to 30-day or annual re-registration interviews" over a six-month period).

[11] *See, e.g.,* Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017) (identifying the APA good cause factors as additional justification for issuing an immediately effective expedited removal order because the ability to detain certain Cuban nationals "while admissibility and identity are determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status,

The Departments have concluded that the good cause exceptions in 5 U.S.C. 553(b)(B) and (d)(3) apply to this rule. Notice and comment on this rule, along with a 30-day delay in its effective date, would be impracticable and contrary to the public interest. The Departments have determined that immediate implementation of this rule is essential to avoid a surge of aliens who would have strong incentives to seek to cross the border during pre-promulgation notice and comment or during the 30-day delay in the effective date under 5 U.S.C. 553(d). As courts have recognized, smugglers encourage migrants to enter the United States based on changes in U.S. immigration policy, and in fact "the number of asylum seekers entering as families has risen" in a way that "suggests a link to knowledge of those policies." *East Bay Sanctuary Covenant* v. *Trump,* 354 F. Supp. 3d 1094, 1115 (N.D. Cal. 2018). If this rule were published for notice and comment before becoming effective, "smugglers might similarly communicate the Rule's potentially relevant change in U.S. immigration policy, albeit in non-technical terms," and the risk of a surge in migrants hoping to enter the country before the rule becomes effective supports a finding of good cause under 5 U.S.C. 553. *See id.*

This determination is consistent with the historical view of the agencies regulating in this area. DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . . endanger[] human life and hav[e] a potential destabilizing effect in the region." Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017). DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to

travel to and enter the United States during the period between the publication of a proposed and a final rule." *Id.* DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations." *Id.* DHS concluded that "a surge could result in significant loss of human life." *Id.; accord, e.g.,* Designating Aliens for Expedited Removal, 69 FR 48877 (Aug. 11, 2004) (noting similar destabilizing incentives for a surge during a delay in the effective date); Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

DOJ and DHS raised similar concerns and drew similar conclusions in the November 2018 joint interim final rule that limited eligibility for asylum for aliens, subject to a bar on entry under certain presidential proclamations. *See* 83 FR at 55950. These same concerns would apply to an even greater extent to this rule. Pre-promulgation notice and comment, or a delay in the effective date, would be destabilizing and would jeopardize the lives and welfare of aliens who could surge to the border to enter the United States before the rule took effect. The Departments' experience has been that when public announcements are made regarding changes in our immigration laws and procedures, there are dramatic increases in the numbers of aliens who enter or attempt to enter the United States along the southern border. *See East Bay Sanctuary Covenant,* 354 F. Supp. 3d at 1115 (citing a newspaper article suggesting that such a rush to the border occurred due to knowledge of a pending regulatory change in immigration law). Thus, there continues to be an "urgent need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations." 69 FR at 48878.

Furthermore, an additional surge of aliens who sought to enter via the southern border prior to the effective date of this rule would be destabilizing to the region, as well as to the U.S. immigration system. The massive increase in aliens arriving at the southern border who assert a fear of persecution is overwhelming our

immigration system as a result of a variety of factors, including the significant proportion of aliens who are initially found to have a credible fear and therefore are referred to full hearings on their asylum claims; the huge volume of claims; a lack of detention space; and the resulting high rate of release into the interior of the United States of aliens with a positive credible-fear determination, many of whom then abscond without pursuing their asylum claims. Recent initiatives to track family unit cases revealed that close to 82 percent of completed cases have resulted in an *in absentia* order of removal. A large additional influx of aliens who intend to enter unlawfully or who lack proper documentation to enter this country, all at once, would exacerbate the existing border crisis. This concern is particularly acute in the current climate in which illegal immigration flows fluctuate significantly in response to news events. This interim final rule is thus a practical means to address the time-sensitive influx of aliens and avoid creating an even larger short-term influx. An extended notice-and-comment rulemaking process would be impracticable and self-defeating for the public.

*2. Foreign Affairs Exemption*

Alternatively, the Departments may forgo notice-and-comment procedures and a delay in the effective date because this rule involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1), and proceeding through notice and comment may "provoke definitely undesirable international consequences," *City of New York* v. *Permanent Mission of India to United Nations,* 618 F.3d 172, 201 (2d Cir. 2010) (quoting the description of the purpose of the foreign affairs exception in H.R. Rep. No. 79–1980, 69th Cong., 2d Sess. 257 (1946)). The flow of aliens across the southern border, unlawfully or without appropriate travel documents, directly implicates the foreign policy and national security interests of the United States. *See, e.g.,* Exec. Order 13767 (Jan. 25, 2017) (discussing the important national security and foreign affairs-related interests associated with securing the border); Presidential Memorandum on Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System (Apr. 29, 2019) ("This strategic exploitation of our Nation's humanitarian programs undermines our Nation's security and sovereignty."); *see also, e.g., Malek-Marzban* v. *INS,* 653 F.2d 113, 115–16 (4th Cir. 1981) (finding that a regulation

---

is a necessity for national security and public safety"); Designating Aliens For Expedited Removal, 69 FR 48877, 48880 (Aug. 11, 2004) (identifying the APA good cause factors as additional justification for issuing an immediately effective order to expand expedited removal due to "[t]he large volume of illegal entries, and attempted illegal entries, and the attendant risks to national security presented by these illegal entries," as well as "the need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations").

AR00581

requiring the expedited departure of Iranians from the United States in light of the international hostage crisis clearly related to foreign affairs and fell within the notice-and-comment exception).

This rule will facilitate ongoing diplomatic negotiations with foreign countries regarding migration issues, including measures to control the flow of aliens into the United States (such as the Migrant Protection Protocols), and the urgent need to address the current humanitarian and security crisis along the southern land border between the United States and Mexico. *See City of New York,* 618 F.3d at 201 (finding that rules related to diplomacy with a potential impact on U.S. relations with other countries fall within the scope of the foreign affairs exemption). Those ongoing discussions relate to proposals for how these other countries could increase efforts to help reduce the flow of illegal aliens north to the United States and encourage aliens to seek protection at the safest and earliest point of transit possible.

Those negotiations would be disrupted if notice-and-comment procedures preceded the effective date of this rule—provoking a disturbance in domestic politics in Mexico and the Northern Triangle countries, and eroding the sovereign authority of the United States to pursue the negotiating strategy it deems to be most appropriate as it engages its foreign partners. *See, e.g., Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (the foreign affairs exemption facilitates "more cautious and sensitive consideration of those matters which so affect relations with other Governments that . . . public rulemaking provisions would provoke definitely undesirable international consequences" (internal quotation marks omitted)). During a notice-and-comment process, public participation and comments may impact and potentially harm the goodwill between the United States and Mexico and the Northern Triangle countries—actors with whom the United States must partner to ensure that refugees can more effectively find refuge and safety in third countries. *Cf. Rajah* v. *Mukasey,* 544 F.3d 427, 437–38 (2d Cir. 2008) ("[R]elations with other countries might be impaired if the government were to conduct and resolve a public debate over why some citizens of particular countries were a potential danger to our security.").

In addition, the longer that the effective date of the interim rule is delayed, the greater the number of people who will pass through third countries where they may have otherwise received refuge and reach the U.S. border, which has little present capacity to provide assistance. *Cf. East Bay Sanctuary Covenant* v. *Trump,* 909 F.3d 1219, 1252 (9th Cir. 2018) ("Hindering the President's ability to implement a new policy in response to a current foreign affairs crisis is the type of 'definitely undesirable international consequence' that warrants invocation of the foreign affairs exception."). Addressing this crisis will be more effective and less disruptive to long-term U.S. relations with Mexico and the Northern Triangle countries the sooner that this interim final rule is in place to help address the enormous flow of aliens through these countries to the southern U.S. border. *Cf. Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.,* 751 F.2d at 1249 ("The timing of an announcement of new consultations or quotas may be linked intimately with the Government's overall political agenda concerning relations with another country."); *Rajah,* 544 F.3d at 438 (finding that the notice-and-comment process can be "slow and cumbersome," which can negatively impact efforts to secure U.S. national interests, thereby justifying application of the foreign affairs exemption); *East Bay Sanctuary Covenant,* 909 F.3d at 1252–53 (9th Cir. 2018) (suggesting that reliance on the exemption is justified where the Government "explain[s] how immediate *publication* of the Rule, instead of *announcement* of a proposed rule followed by a thirty-day period of notice and comment" is necessary in light of the Government's foreign affairs efforts).

The United States and Mexico have been engaged in ongoing discussions regarding both regional and bilateral approaches to asylum. This interim final rule will strengthen the ability of the United States to address the crisis at the southern border and therefore facilitate the likelihood of success in future negotiations. This rule thus supports the President's foreign policy with respect to Mexico and the Northern Triangle countries in this area and is exempt from the notice-and-comment and delayed-effective-date requirements in 5 U.S.C. 553. *See Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.,* 751 F.2d at 1249 (noting that the foreign affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country"); *Yassini* v. *Crosland,* 618 F.2d 1356, 1361 (9th Cir. 1980) (because an immigration directive "was implementing the President's foreign policy," the action "fell within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA").

Invoking the APA's foreign affairs exception is also consistent with past rulemakings. In 2016, for example, in response to diplomatic developments between the United States and Cuba, DHS changed its regulations concerning flights to and from the island via an immediately effective interim final rule. Flights to and From Cuba, 81 FR 14948, 14952 (Mar. 21, 2016). In a similar vein, DHS and the State Department recently provided notice that they were eliminating an exception to expedited removal for certain Cuban nationals. The notice explained that the change in policy was consistent with the foreign affairs exception for rules subject to notice-and-comment requirements because the change was central to ongoing negotiations between the two countries. Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902, 4904–05 (Jan. 17, 2017).

*B. Regulatory Flexibility Act*

The Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.,* as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires an agency to prepare and make available to the public a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.,* small businesses, small organizations, and small governmental jurisdictions). A regulatory flexibility analysis is not required when a rule is exempt from notice-and-comment rulemaking.

*C. Unfunded Mandates Reform Act of 1995*

This interim final rule will not result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*D. Congressional Review Act*

This interim final rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-

based companies in domestic and export markets.

*E. Executive Order 12866, Executive Order 13563, and Executive Order 13771 (Regulatory Planning and Review)*

This rule is not subject to Executive Order 12866 as it implicates a foreign affairs function of the United States related to ongoing discussions with potential impact on a set of specified international relationships. As this is not a regulatory action under Executive Order 12866, it is not subject to Executive Order 13771.

*F. Executive Order 13132 (Federalism)*

This rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*G. Executive Order 12988 (Civil Justice Reform)*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*H. Paperwork Reduction Act*

This rule does not propose new, or revisions to existing, ''collection[s] of information'' as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

**List of Subjects**

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1003*

Administrative practice and procedure, Aliens, Immigration, Legal services, Organization and functions (Government agencies).

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

**Regulatory Amendments**

**DEPARTMENT OF HOMELAND SECURITY**

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR part 208 as follows:

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229; 8 CFR part 2.

■ 2. Section 208.13 is amended by adding paragraphs (c)(4) and (5) to read as follows:

**§ 208.13   Establishing asylum eligibility.**

\*   \*   \*   \*   \*

(c) \* \* \*

(4) *Additional limitation on eligibility for asylum.* Notwithstanding the provisions of § 208.15, any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum unless:

(i) The alien demonstrates that he or she applied for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States, and the alien received a final judgment denying the alien protection in such country;

(ii) The alien demonstrates that he or she satisfies the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11; or

(iii) The only countries through which the alien transited en route to the United States were, at the time of the transit, not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

(5) *Non-binding determinations.* Determinations made with respect to paragraph (c)(4)(ii) of this section are not binding on Federal departments or agencies in subsequent determinations of eligibility for T or U nonimmigrant status under section 101(a)(15)(T) or (U) of the INA or for benefits or services

under 22 U.S.C. 7105 or 8 U.S.C. 1641(c)(4).

■ 3. In § 208.30, revise the section heading, the first sentence of paragraph (e)(2), and paragraphs (e)(3) and (5) to read as follows:

**§ 208.13   Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act, whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act, or who failed to apply for protection from persecution in a third country where potential relief is available while en route to the United States.**

\*   \*   \*   \*   \*

(e) \* \* \*

(2) Subject to paragraph (e)(5) of this section, an alien will be found to have a credible fear of persecution if there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act. \* \* \*

(3) Subject to paragraph (e)(5) of this section, an alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to § 208.16 or § 208.17.

\*   \*   \*   \*   \*

(5)(i) Except as provided in this paragraph (e)(5)(i) or paragraph (e)(6) of this section, if an alien is able to establish a credible fear of persecution but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and 208(b)(2) of the Act, or to withholding of removal contained in section 241(b)(3)(B) of the Act, the Department of Homeland Security shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's claim, if the alien is not a stowaway. If the alien is a stowaway, the Department shall place the alien in proceedings for consideration of the alien's claim pursuant to § 208.2(c)(3).

(ii) If the alien is found to be an alien described in § 208.13(c)(3), then the asylum officer shall enter a negative credible fear determination with respect to the alien's intention to apply for asylum. The Department shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's

claim for withholding of removal under section 241(b)(3) of the Act, or for withholding or deferral of removal under the Convention Against Torture, if the alien establishes, respectively, a reasonable fear of persecution or torture. However, if an alien fails to establish, during the interview with the asylum officer, a reasonable fear of either persecution or torture, the asylum officer will provide the alien with a written notice of decision, which will be subject to immigration judge review consistent with paragraph (g) of this section, except that the immigration judge will review the reasonable fear findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g) and in 8 CFR 1208.30(g).

(iii) If the alien is found to be an alien described as ineligible for asylum in § 208.13(c)(4), then the asylum officer shall enter a negative credible fear determination with respect to the alien's application for asylum. The Department shall nonetheless place the alien in proceedings under section 240 of the Act for consideration of the alien's claim for withholding of removal under section 241(b)(3) of the Act, or for withholding or deferral of removal under the Convention Against Torture, if the alien establishes, respectively, a reasonable fear of persecution or torture. The scope of review shall be limited to a determination of whether the alien is eligible for withholding or deferral of removal, accordingly. However, if an alien fails to establish, during the interview with the asylum officer, a reasonable fear of either persecution or torture, the asylum officer will provide the alien with a written notice of decision, which will be subject to immigration judge review consistent with paragraph (g) of this section, except that the immigration judge will review the reasonable fear findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g) and in 8 CFR 1208.30(g).

*   *   *   *   *

## DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR parts 1003 and 1208 as follows:

## PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 4. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 6 U.S.C 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231,

1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

■ 5. In § 1003.42, revise paragraph (d) to read as follows:

### § 1003.42   Review of credible fear determination.

*   *   *   *   *

(d) *Standard of review.* (1) The immigration judge shall make a de novo determination as to whether there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the immigration judge, that the alien could establish eligibility for asylum under section 208 of the Act or withholding under section 241(b)(3) of the Act or withholding or deferral of removal under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

(2) If the alien is determined to be an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5)(ii), the immigration judge shall first review de novo the determination that the alien is described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) prior to any further review of the asylum officer's negative determination.

(3) If the alien is determined to be an alien described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5)(iii), the immigration judge shall first review de novo the determination that the alien is described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4) prior to any further review of the asylum officer's negative determination.

*   *   *   *   *

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 6. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229.

■ 7. In § 1208.13, add paragraphs (c)(4) and (5) to read as follows:

### § 1208.13   Establishing asylum eligibility.

*   *   *   *   *

(c) *   *   *

(4) *Additional limitation on eligibility for asylum.* Notwithstanding the

provisions of 8 CFR 208.15, any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum unless:

(i) The alien demonstrates that he or she applied for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States and the alien received a final judgment denying the alien protection in such country;

(ii) The alien demonstrates that he or she satisfies the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11; or

(iii) The only country or countries through which the alien transited en route to the United States were, at the time of the transit, not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol, or the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

(5) *Non-binding determinations.* Determinations made with respect to paragraph (c)(4)(ii) of this section are not binding on Federal departments or agencies in subsequent determinations of eligibility for T or U nonimmigrant status under section 101(a)(15)(T) or (U) of the Act or for benefits or services under 22 U.S.C. 7105 or 8 U.S.C. 1641(c)(4).

■ 8. In § 1208.30, revise the section heading and paragraph (g)(1) to read as follows:

### § 1208.30   Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act, whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act, or who failed to apply for protection from persecution in a third country where potential relief is available while en route to the United States.

*   *   *   *   *

(g) *   *   *

(1) *Review by immigration judge of a mandatory bar finding.* (i) If the alien is determined to be an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5), the immigration judge shall first review de novo the determination that the alien is described in 8 CFR 208.13(c)(3) or 1208.13(c)(3). If the immigration judge

finds that the alien is not described in 8 CFR 208.13(c)(3) or 1208.13(c)(3), then the immigration judge shall vacate the order of the asylum officer, and DHS may commence removal proceedings under section 240 of the Act. If the immigration judge concurs with the credible fear determination that the alien is an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3), the immigration judge will then review the asylum officer's negative decision regarding reasonable fear made under 8 CFR 208.30(e)(5) consistent with paragraph (g)(2) of this section, except that the immigration judge will review the findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g)(2).

(ii) If the alien is determined to be an alien described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5), the immigration judge shall first review de novo the determination that the alien is described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4). If the immigration judge finds that the alien is not described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4), then the immigration judge shall vacate the order of the asylum officer and DHS may commence removal proceedings under section 240 of the Act. If the immigration judge concurs with the credible fear determination that the alien is an alien described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4), the immigration judge will then review the asylum officer's negative decision regarding reasonable fear made under 8 CFR 208.30(e)(5) consistent with paragraph (g)(2) of this section, except that the immigration judge will review the findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g)(2).

\*    \*    \*    \*    \*

Approved:

Dated: July 12, 2019.

**Kevin K. McAleenan,**

*Acting Secretary of Homeland Security.*

Approved:

Dated: July 12, 2019.

**William P. Barr,**

*Attorney General.*

[FR Doc. 2019–15246 Filed 7–15–19; 8:45 am]

**BILLING CODE 4410–30–P; 9111–97–P**

# DEPARTMENT OF TRANSPORTATION

## Federal Aviation Administration

## 14 CFR Part 73

[Docket No. FAA–2018–0984; Airspace Docket No. 18–ASW–8]

**RIN 2120–AA66**

## Expansion of R–3803 Restricted Area Complex; Fort Polk, LA

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final rule.

**SUMMARY:** This action expands the R–3803 restricted area complex in central Louisiana by establishing four new restricted areas, R–3803C, R–3803D, R–3803E, and R–3803F, and makes minor technical amendments to the existing R–3803A and R–3803B legal descriptions for improved operational efficiency and administrative standardization. The restricted area establishments and amendments support U.S. Army Joint Readiness Training Center training requirements at Fort Polk for military units preparing for overseas deployment.

**DATES:** *Effective date:* 0901 UTC, September 13, 2019.

**FOR FURTHER INFORMATION CONTACT:** Colby Abbott, Airspace Policy Group, Office of Airspace Services, Federal Aviation Administration, 800 Independence Avenue SW, Washington, DC 20591; telephone: (202) 267–8783.

**SUPPLEMENTARY INFORMATION:**

### Authority for This Rulemaking

The FAA's authority to issue rules regarding aviation safety is found in Title 49 of the United States Code. Subtitle I, Section 106 describes the authority of the FAA Administrator. Subtitle VII, Aviation Programs, describes in more detail the scope of the agency's authority. This rulemaking is promulgated under the authority described in Subtitle VII, Part A, Subpart I, Section 40103. Under that section, the FAA is charged with prescribing regulations to assign the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace. This regulation is within the scope of that authority as it establishes restricted area airspace at Fort Polk, LA, to enhance aviation safety and accommodate essential U.S. Army hazardous force-on-force and force-on-target training activities.

### History

The FAA published a notice of proposed rulemaking for Docket No.

FAA–2018–0984 in the **Federal Register** (83 FR 60382; November 26, 2018) establishing four new restricted areas, R–3803C, R–3803D, R–3803E, and R–3803F, and making minor technical amendments to the R–3803A and R–3803B descriptions for improved operational efficiency and administrative standardization in support of hazardous U.S. Army force-on-force and force-on-target training activities. Interested parties were invited to participate in this rulemaking effort by submitting written comments on the proposal. Two comments were received.

### Discussion of Comments

While supportive of the U.S. Army's need to train as they fight, the first commenter noted that modern general aviation aircraft have longer flight endurance today, making timely NOTAM publication of restricted area activations necessary for effective flight planning. To overcome the possibility of the restricted areas being activated with no advance notification, the commenter recommended adding "at least 4 hours in advance" to the "By NOTAM" time of designation proposed for the R–3803A, R–3803C, and R–3803D restricted areas. Additionally, the commenter requested the effective date of the proposed restricted areas, if approved, coincide with the next update of the Houston Sectional Aeronautical Chart.

It is FAA policy that when NOTAMs are issued to activate special use airspace, the NOTAMs should be issued as far in advance as feasible to ensure the widest dissemination of the information to airspace users. The FAA acknowledges that the addition of the "at least 4 hours in advance" provision to the proposed "By NOTAM" time of designation, as recommended by the commenter, would contribute to ensuring the widest dissemination of the restricted areas being activated to effected airspace users. As such, the FAA adopts the commenter's recommendation to amend the time of designation for R–3803A, R–3803C, and R–3803D to reflect "By NOTAM issued at least 4 hours in advance."

Additionally, the establishment of R–3803C, R–3803D, R–3803E, and R–3803F, and the minor technical amendments to the existing R–3803A and R–3803B legal descriptions are being made effective to coincide with the upcoming Houston Sectional Aeronautical Chart date.

The second commenter raised aerial access concerns of the area in which the new restricted areas were proposed to be established. The commenter stated

**AR00585**

Fiscal Year 2020 Enforcement Lifecycle Report

DECEMBER 2020

OFFICE OF IMMIGRATION STATISTICS
MARC R. ROSENBLUM AND HONGWEI ZHANG



AR00586

## Summary

U.S. Customs and Border Protection (CBP), the Department of Homeland Security (DHS) Component responsible for securing U.S. borders, apprehended 2.8 million aliens between ports of entry along the Southwest Border between Fiscal Year 2014 and 2019 and found an additional 725,000 aliens inadmissible at Southwest Border ports of entry.[1] This report updates previous Office of Immigration Statistics (OIS) efforts to link administrative records across DHS and Department of Justice (DOJ) data systems and to describe the end-to-end enforcement lifecycle (OIS 2019). OIS' Enforcement Lifecycle methodology matches each unique border encounter to its associated final or most current enforcement outcome. This 2020 Enforcement Lifecycle Report describes the final or most current outcomes, as of March 31, 2020, associated with the 3.5 million Southwest Border encounters occurring between 2014 and 2019.

Overall, 59 percent of the 3.5 million Southwest Border encounters between 2014 and 2019 had been resolved through a final outcome of repatriation or relief/protection from removal as of the end of 2020 Q2. Repatriations accounted for 51 percent of encounters (or 1.8 million) versus 49 percent (or 1.7 million) of encounters that had no confirmed departure, including 8.1 percent that had been granted relief or other protection from removal (284,000 encounters).

The 2014 to 2019 period coincides with shifts in the demographic characteristics of aliens encountered at the Southwest Border. The bulk of encounters shifted from aliens from Mexico to aliens from the Northern Triangle countries of Central America (El Salvador, Guatemala, and Honduras); from aliens who do not seek humanitarian protection to aliens who seek asylum or otherwise claim a fear of being returned to their home countries ("asylum seekers"); and from adults traveling without children ("single adults") to parents or legal guardians and children traveling together ("family unit aliens," or FMUA) and children traveling alone ("unaccompanied alien children," or UAC).

These changes are noteworthy, in part, because of dramatic differences in enforcement outcomes across these sub-groups, as this report shows. Most encounters of aliens from Mexico, single adults, and non-asylum seekers were fully resolved (i.e., either repatriated or granted relief) relatively quickly; however, most encounters of aliens from countries other than Mexico, FMUA and UAC, and asylum seekers remained in an unresolved status (i.e., still being processed by DHS or DOJ or subject to an unexecuted order of removal) even years after their initial encounter. Among encounters that had been resolved as of March 31, 2020, aliens from Mexico, single adults, and non-asylum seekers were much more likely to have been repatriated than were aliens from countries other than Mexico or the Northern Triangle, UACs, and asylum seekers, all of whom who were somewhat more likely to have been granted relief. These differences overlap with similar disparities in enforcement outcomes as a function of whether and how consistently aliens were held in detention following their initial encounters.

Section 1 of this report summarizes OIS' Enforcement Lifecycle methodology. Sections 2 and 3 describe the 2014 to 2019 Southwest Border enforcement cohorts and summarize high-level enforcement outcomes as of March 31, 2020. Section 4 reports on outcomes by country of origin.

---

[1] Throughout this report, years refer to fiscal years. This report describes enforcement events, not individual aliens, so aliens apprehended or found inadmissible multiple times between 2014 and 2019 are counted multiple times in the report. Data in the body of the report are rounded to the nearest thousand (or to the nearest hundred thousand for figures over 1 million); for detailed data tables see Appendices A and B.

1

Section 5 reports on outcomes by family status. Section 6 reports on outcomes by whether the alien made a fear claim at some point in the enforcement process.

## Methodology

For historic reasons, DHS data systems are siloed, and the immigration enforcement system is highly complex, spanning multiple DHS Components as well as part of DOJ. An alien who is encountered at the Southwest Border may touch a dozen or more stand-alone data systems as they claim a fear of return to their home country, are booked into Immigration and Customs Enforcement (ICE) custody, appear before an immigration judge, and are eventually either repatriated or granted relief or some other form of protection from removal. Given the challenges of linking records across these different systems, traditional DHS reports are limited to separate subsets of the overall enforcement process: how many aliens were apprehended or found inadmissible; how many were booked into or booked out of ICE detention; and, how many were removed, returned, or granted relief?

The key innovation behind the OIS Enforcement Lifecycle is that OIS links records across the multiple data systems aliens may touch during the course of their enforcement process, providing a more complete view of the end-to-end immigration enforcement system. OIS calls the resulting integrated, person-level data the "Flow Dataset," because it captures how aliens flow through the immigration enforcement process. Currently, the Flow Dataset combines data from 19 different source systems central to the immigration enforcement process (see text box). OIS matches records by using individual and event identifiers from the different source systems and assigns a new person-level identifier to each unique

| Source Datasets included in the Flow Dataset | |
| --- | --- |
| • USCIS Affirmative Asylum | • ICE ERO Final Book-Outs |
| • USCIS Asylum Pre-Screening Officer (APSO) | • ICE Removals & Returns |
| • USCIS Employment Authorization Document (EAD) | • ICE HSI Administrative & Criminal Arrests |
| • USCIS Deferred Action for Child Arrivals (DACA) | • CBP OFO Inadmissibles |
| • USCIS Legal Permanent Residents (LPR) | • CBP USBP Apprehensions |
| | • DHS OIS Removals & Returns |
| • ICE ERO Charging Documents Issued | • DOJ EOIR Bonds |
| • ICE ERO Administrative Arrests | • DOJ EOIR Schedule |
| • ICE ERO Initial Book-Ins | • DOJ EOIR Appeals |
| | • DOJ EOIR Proceedings |
| | • DOJ EOIR Case Information |

individual appearing in one or more of the source datasets. OIS also converts non-standardized data into a common format based on data standards gathered and published by the DHS Immigration Data Integration Initiative. OIS sorts the matched records by unique individual and date, yielding a comprehensive, integrated person-centric dataset that includes one row for each in-scope event.

The unit of analysis for the Enforcement Lifecycle methodology is defined as an "event cycle." An *event cycle* consists of an initial enforcement action and all subsequent reportable events associated with the subject alien.  Many aliens are encountered at the border and repatriated on multiple occasions. In these cases, the aliens have more than one initial enforcement action and they pass through multiple event cycles. All of the data in this report are event- and event cycle-based, meaning an alien with multiple Southwest Border encounters is counted multiple times toward the total numbers of initial encounters and the numbers of final or most current enforcement outcomes.

2

AR00588

Working with DHS and DOJ subject matter experts, OIS uses the Flow Dataset to map Component administrative data into 129 distinct enforcement events. For purposes of the Enforcement Lifecycle Analysis, OIS groups events into three categories: "initial enforcement actions," "final enforcement outcomes," and "interim enforcement outcomes":

- *Initial enforcement actions* include U.S. Border Patrol (USBP) apprehensions and Office of Field Operations (OFO) inadmissibility determinations. These events are "initial" in the sense that they initiate a process that may lead to a repatriation or to relief/protection from removal.
- *Final enforcement outcomes* include confirmed repatriations (removals or returns), grants of relief or other forms of protection from removal, findings of non-removability, and CBP re-encounters of aliens believed to have departed the country of their own accord.[2] These events are "final" in that they represent a durable resolution to an initial enforcement action.
- *Interim enforcement outcomes* encompass all other reportable enforcement events, including book-ins to ICE detention facilities, U.S. Citizenship and Immigration Services (USCIS) credible fear screenings, applications for immigration benefits, and DOJ Executive Office for Immigration Review (EOIR) hearings, among others. These interim outcomes provide important information about aliens' paths through the immigration enforcement system, but they do not represent start- or end-points of an enforcement process.

For each event cycle, OIS' Enforcement Lifecycle algorithm matches the initial enforcement action to its associated final enforcement action if one exists, or to the *most current* interim enforcement action if the encounter remains in unresolved status. In most cases, interim actions are identified as most current if they are the latest event (by calendar date) in an enforcement encounter's event cycle. When multiple interim events occur on the same day and in certain other scenarios, OIS identifies the most current enforcement outcome based on which event takes logical precedence in the DHS and DOJ enforcement processes.[3]

OIS uses the Enforcement Lifecycle methodology to answer four main questions about groups of aliens encountered at the Southwest Border. First, fundamentally, for any such group of aliens, what is their final or most current enforcement outcome? OIS groups outcomes to align with different points in the enforcement process, including aliens being processed by DHS or DOJ for possible removal, aliens subject to a final order of removal, aliens who have been repatriated, and aliens who have been granted relief or some other protection from removal. OIS' standard Enforcement Lifecycle table sorts the outcomes of Southwest Border encounters into these four large categories and 19 sub-categories. Appendix A provides a detailed listing of the specific outcomes that comprise each of the four main Enforcement Lifecycle outcomes.

---

[2] OIS defines a CBP re-encounter as a case in which an alien is encountered more than once by CBP without an intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period. A re-encounter is both a final enforcement outcome and a second initial enforcement action.

[3] For example, a DOJ final order of removal, which is considered an interim outcome unless and until it is executed, would take precedence over an application for an immigration benefit or other status even if the application occurs later in time.

3

As noted above, while traditional DHS reporting focuses on enforcement (or benefits) events occurring in a given year, Enforcement Lifecycle reporting represents a snapshot of final or most current events as of the date of the analysis. Thus, while this report examines Southwest Border encounters for each year 2014 to 2019, all results are based on final or most current outcomes as of the end of 2020 Q2 (March 31, 2020).

A second, related question concerns what share of initial enforcement actions are "resolved" versus "unresolved." Resolved encounters include those with final enforcement outcomes. These encounters have resulted in an alien being repatriated or being granted some form of relief or other protection from removal, so their enforcement event cycle is complete.[4] (An alien who, for whatever reason, is subsequently re-apprehended is the subject of an additional event cycle, as noted above.)

Initial enforcement actions that lack a final outcome are unresolved. Most unresolved event cycles fall into two main sub-categories:[5]

- Aliens being processed for removal. These event cycles include aliens being processed by DHS who do not have records in EOIR's case management system, aliens with removal proceedings pending before EOIR, and aliens subject to an EOIR removal order that is pending additional DOJ action (i.e., because the case is subject to a motion to reopen or reconsider or because the case has been appealed to the Board of Immigration Appeals (BIA)).

- Aliens subject to an unexecuted final order or offer of voluntary departure. These event cycles include aliens who have been ordered removed (in person or *in absentia*) or accepted an offer of voluntary departure but who have not been repatriated or confirmed their exit from the country.

Third, what share of initial enforcement actions have resulted in an alien being repatriated or otherwise departing the United States and what share have resulted in no confirmed departure? For the purposes of this analysis, repatriations include removals, returns, voluntary departures,

---

[4] Repatriations include removals, returns, and re-encounters. Throughout this report relief from removal includes both formal relief and certain other forms of permanent or temporary protection from removal, including: granting of affirmative asylum; Special Immigrant Juvenile status; cancelation of removal; LPR status granted by DHS or EOIR; a T, S, or U visa; withholding of removal; Convention Against Torture protection; termination of EOIR proceedings; Temporary Protected Status; DHS prosecutorial discretion; EOIR conditional grants of relief; and people found to be U.S. citizens or lawfully present aliens not subject to removal. See Appendix A for further details. Aliens subject to temporary forms of relief such as withholding of removal may be reclassified if the temporary relief is revoked or the alien is subject to additional enforcement outcomes on the same event trip. Note that aliens who remain in Mexico while their removal proceedings are ongoing pursuant to the Migration Protection Protocols program are not counted among repatriations since they have not been removed or returned, and their enforcement cycles remain unresolved.

[5] About 2 percent of all enforcement encounters are unresolved but do not fall into these two categories. These other unresolved encounters include aliens paroled into the United States who have not been granted a lawful status (1 percent) and encounters for which no updated enforcement outcome data are available (1 percent). Encounters are coded as "no subsequent event" if OIS is unable to match the initial encounter to any additional enforcement action or form of relief. These cases may result from data errors or errors in OIS' record-matching.

4

and re-encounters. No confirmed departure includes encounters resulting in aliens being granted relief or other protection from removal as well as all encounters that remain unresolved.[6]

Resolved versus unresolved and repatriated versus no confirmed departure represent two distinct dimensions of how the immigration enforcement system operates (see Table 1). The first of these questions essentially gets at how well or how quickly the system produces durable results; and the second of these questions gets at the substantive impact of its results.

Table 1: Primary Enforcement Lifecycle Statuses and Events

| Status Following an Initial Encounter | Repatriated | No Confirmed Departure |
|---|---|---|
| **Resolved** | Repatriated<br>• Removed<br>• Returned<br>• Re-encountered | Granted relief or other protection from removal:<br>• Special Immigrant Juvenile status or asylum<br>• Cancellation of removal<br>• LPR status<br>• T, S, or U visa<br>• Withholding of removal or Convention Against Torture protection<br>• Other form or relief |
| **Unresolved** | N/A | Being Processed for Possible Removal:<br>• Being processed by DHS but no record of EOIR proceedings<br>• In EOIR proceedings<br>• Subject to an EOIR decision that has been reopened/reconsidered or appealed to the Board of Immigration Appeals<br><br>Subject to an EOIR final order or grant of voluntary departure that has not been executed |

---

[6] As a practical matter, "no confirmed departure" may be interpreted to mean that the alien likely remains in the United States. An unknown share of aliens with no confirmed departure may have departed the United States without notifying DHS.

5

AR00591

A fourth overarching question focuses exclusively on the subset of resolved encounters and asks: what share of resolved encounters have been repatriated versus granted relief or other protection from removal? Especially for certain groups of border encounters (i.e., those for which large shares of encounters remain unresolved), focusing exclusively on resolved encounters rather than the broader cohort may provide more insight into the substantive outcomes of immigration enforcement.

## The 2014 to 2019 Southwest Border Enforcement Cohorts

CBP completed 3.5 million initial enforcement actions along the Southwest Border between 2014 and 2019, including 2.8 million USBP apprehensions and 725,000 OFO inadmissibility determinations. Total encounters (apprehensions plus inadmissibility determinations) were relatively stable between 2014 and 2018, ranging between an annual low of 417,000 and a high of 571,000, before increasing sharply to 980,000 in 2019. The demographics of border encounters shifted notably from Mexicans to aliens from the Northern Triangle, from single adults to family units, and to more aliens seeking to claim asylum. The number of aliens younger than 18 years of age has risen as well, particularly among those younger than 13 years of age, most of whom arrived within family units.

Figure 1.
Southwest Border Encounters by Nationality: FY 2014 to 2019



Source: OIS Statistical Immigration Data.

Figure 1 depicts Southwest Border encounters by nationality. One noteworthy pair of trends since 2014 has been a slight decline in the number of Mexican nationals encountered at the border and a pronounced increase in the number of encounters from the Northern Triangle countries of Guatemala, Honduras, and El Salvador. Encounters of Mexican nationals fell 16 percent from 285,000 in 2014 to 239,000 in 2019. Conversely, encounters of Guatemalans more than tripled over the same period from 85,000 to 270,000; encounters of Hondurans more than

6

AR00592

doubled from 96,000 to 261,000; and encounters of El Salvadorans increased by just over a third from 68,000 to 92,000. Aliens from countries other than Mexico and the three Northern Triangle countries also more than tripled in this period, from 37,000 to 118,000, with most of the increase consisting of Haitians (through 2017) and Cubans (through 2019).

These contrasting trends are even more pronounced when analyzed proportionally. Viewed this way, Mexicans dropped from 97 percent of all encounters from 2000 to 2004 and 87 percent from 2005 to 2013 to 50 percent of all encounters in 2014 and just 24 percent of all encounters in 2019. Meanwhile, Guatemala's share of encounters rose from 15 percent in 2014 to 28 percent in 2019 and Honduras's share rose from 17 percent to 27 percent, while El Salvador's dropped from 12 percent to 9.4 percent. Together, encounters with aliens from the three Northern Triangle countries increased from 44 percent to 64 percent of total encounters between 2014 and 2019.

Figure 2.

Southwest Border Encounters by Family Type: FY 2014 to 2019



Source: OIS Statistical Immigration Data.
Note: FMUA data are limited to USBP apprehensions for 2013–2015; later years include both USBP and OFO.

Figure 2 depicts the breakdown of 2014 to 2019 Southwest Border encounters into single adults; FMUAs, which include each individual in a group of a parent or legal guardian traveling with one or more minor children; and UACs, defined as minor children traveling without a parent or legal guardian. A second set of noteworthy trends concerns changes among these demographic groups during this period, including a 14 percent decline in single adult encounters from 431,000 in 2014 to 372,000 in 2019; a 686 percent increase in FMUAs from 67,000 in 2014 to 527,000 in 2019; and an 11 percent increase in UACs from 73,000 in 2014 to 81,000 in 2019. As a result,

7

single adults fell from 76 percent of encounters in 2014 to 38 percent in 2019 while FMUAs increased from 12 percent to 54 percent during the same period.[7]

The shift from single adults to a larger number of FMUA and UAC was accompanied by a shift toward younger aliens. In particular, the number of encounters of aliens under 18 years old almost tripled from 125,000 in 2014 to 356,000 in 2019, increasing from 22 percent of all encounters in 2014 to 36 percent in 2019. All other age groups saw more modest growth in their numbers of encounters and accounted for smaller shares of encounters in 2019 than in 2014. Within the under-18 grouping, encounters of children under 6 years old more than quadrupled from 25,000 in 2014 to 102,000 in 2019, while encounters of children between 6 and 12 years old nearly did so as well, from 29,000 in 2014 to 115,000 in 2019. In contrast, the number of children ages 13 to 17 years old only nearly doubled from 70,000 in 2014 to 138,000 in 2019.[8] These shifts caused the median age of encountered minors to drop from 14 years old to 10 years old between 2014 and 2019.

Figure 3.
Southwest Border Encounters by Fear Claim: FY 2014 to 2019



Source: OIS Statistical Immigration Data.

Figure 3 depicts a third noteworthy recent trend in Southwest Border encounters: the rising share through 2018 of aliens who claimed a fear of return to their home countries following an apprehension or determination of inadmissibility. The number of encounters resulting in a fear claim increased from 60,000 in 2014 (10 percent of encounters in 2014) to 108,000 in 2018 (21 percent of encounters in 2018). The number of fear claims showed a further modest increase to

---

[7] OFO began collecting FMUA data in March 2016; as a result, reported FMUA counts are biased downward for 2013–2015. Southwest Border encounters appear to have fallen sharply back to 2017 and 2018 levels in FY 2020, a period beyond the scope of this report.

[8] Overall, 4 percent of encounters under age5 arrived as UACs versus 96 percent that arrived within family units; 19 percent of encounters between ages 6 and 12 arrived as UACs versus 81 percent that arrived within family units; and 72 percent of encounters between ages 13 and 17 arrive as UACs versus 28 percent that arrived within family units.

8

AR00594

115,000 in 2019 while falling to 12 percent of encounters.[9] Overall, 520,000 Southwest Border encounters resulted in fear claims between 2014 and 2019, 15 percent of all Southwest Border encounters during this period.

## High-Level Outcomes

Overall, 59 percent of 3.5 million apprehensions or findings of inadmissibility along the Southwest Border between 2014 and 2019 had been resolved through a final outcome of repatriation or relief/protection from removal as of the end of 2020 Q2 (See Appendix A). Repatriations accounted for 51 percent of encounters (or 1.8 million), versus 49 percent (or 1.7 million) of encounters that had no confirmed departure, including 8.1 percent that had been granted relief or other protection from removal (284,000 encounters). Restricting attention to border encounters that had been resolved, 86 percent resulted in repatriation and 14 percent led to relief or other protection from removal.

The majority (83 percent) of the 1.8 million repatriations were removals, which accounted for 76 percent of resolved encounters (and 43 percent of all encounters). The next largest share of repatriations (13 percent) were returns, which accounted for 12 percent of resolved encounters (and 6.9 percent of all encounters).[10]

The largest share (40 percent) of those granted relief were granted LPR status by DHS, accounting for 5.5 percent of resolved encounters (and 3.3 percent of all encounters). The next largest share (22 percent) of those granted relief had their EOIR proceedings terminated, accounting for 3.0 percent of resolved encounters (and 1.8 percent of all encounters).

The largest share (74 percent) of unresolved encounters were still being processed by DHS or EOIR (accounting for 30 percent of all encounters), and the next largest share (22 percent) were encounters with unexecuted final orders of removal or voluntary departure (accounting for 9.0 percent of all encounters).[11]

---

[9] This figure includes fear claims made at any point following a CBP encounter; 30 percent of fear claims between 2014 and 2019 occurred after aliens were released from CBP into ICE custody. About 92 percent of fear claims during this period were credible fear claims by aliens subject to expedited removal, and 7.8 percent were reasonable fear claims by aliens subject to reinstatement of a removal order or subject to administrative removal because they were aggravated felons.

[10] About 2 percent of all encounters were aliens encountered at the border twice without an intervening removal or return; OIS assumes that these "re-encounters" departed the United States following the first border encounter without notifying DHS and counts them as departures.

[11] The remaining 2 percent of encounters were paroled into the United States with no subsequent change in status or were unable to be matched to subsequent enforcement outcomes.

9

Figure 4.
Southwest Border Encounters by Enforcement Outcomes: FY 2014 to 2019



Source: OIS Statistical Immigration Data.
Note: Outcomes are current as of March 31, 2020.

Figure 4 depicts enforcement outcomes as of the end of 2020 Q2 for aliens encountered at the Southwest Border each year from 2014 to 2019 (see Appendix B for a more detailed breakdown). Because many enforcement encounters take months or years to be resolved, outcomes differ partly—but not exclusively—as a function of how much time has elapsed since a cohort of aliens was initially encountered.[12] Thus, a relatively large share (66 percent) of the 980,000 encounters in 2019 remained unresolved at the end of 2020 Q2. Most of the 1.4 million unresolved encounters in 2019 were still being processed for removal (83 percent), while an additional 15 percent had unexecuted final orders of removal or voluntary departure. Of the 34 percent of the 980,000 encounters in 2019 that had been resolved by 2020 Q2, 94 percent had been repatriated versus 5.6 percent that had been granted relief.

For each earlier cohort of encounters, the additional time elapsed between the initial encounter and the reporting date is associated with a smaller share of aliens still being processed and larger proportions having been repatriated, issued a final order, or granted relief. For the 2014 cohort of 571,000 encounters, for example, most encounters had been resolved (79 percent) by the end of 2020 Q2, and only 20 percent were still being processed or had unexecuted removal orders or unexecuted voluntary departures.

---

[12] Not all variation in enforcement outcomes between cohorts is a function of time elapsed, as the demographic characteristics and specific enforcement histories of each cohort also differ.

AR00596

## Enforcement Outcomes by Nationality

Figure 5: Enforcement Outcomes by Country or Region and Year of Initial Encounter: FY 2014 to 2019



Source: OIS Statistical Immigration Data.

Note: Outcomes are current as of March 31, 2020. "NTC" refers to Northern Triangle Countries.

Figure 5 depicts variation in final or most current enforcement outcomes by country or region and by year (see Appendix B for a more detailed breakdown).

As Figure 5 illustrates, the vast majority (90 percent) of 1.4 million encounters of Mexican nationals between 2014 and 2019 had been resolved by the end of 2020 Q2, ranging from 95 percent of the 285,000 encounters in 2014 to 83 percent of the 239,000 encounters in 2019. Overall, 88 percent of Mexican encounters between 2014 and 2019 had resulted in repatriations by 2020 Q2 versus 12 percent with no confirmed departure, including 1.8 percent of Mexican encounters resulting in some form or relief from removal. Very few Mexican encounters (6.0 percent) were still being processed, ranging from 2.6 percent of 2014 encounters to 13 percent of 2019 encounters. Mexicans had a relatively high proportion of encounters leading to parole (2.2 percent of Mexican encounters over this period). And Mexican encounters were notably unlikely to result in unexecuted final orders or offers of voluntary departure: just 1.5 percent over the entire period.

Just over a third (36 percent) of the 1.7 million encounters of aliens from the Northern Triangle were resolved by the end of 2020 Q2, ranging from 61 percent of the 248,000 encounters in 2014 to 18 percent of the 623,000 encounters in 2019. Among all Northern Triangle encounters during this period, 28 percent had been repatriated and 72 percent had no confirmed departure, including 7.6 percent granted some form of relief from removal. A total of 64 percent of all Northern Triangle encounters over this period remained unresolved, including 48 percent that

11

were still being processed by DHS or DOJ for removal and 16 percent with unexecuted final orders of removal or offers of voluntary departure.

Almost half (49 percent) of the 370,000 encounters of aliens from countries other than Mexico or the Northern Triangle between 2014 and 2019 were resolved by the end of 2020 Q2, ranging from 73 percent of the 37,000 encounters in 2014 to 17 percent of the 118,000 encounters in 2019. Encounters of aliens from these other countries had been repatriated 14 percent of the time while 86 percent of these encounters had no confirmed departure, including 35 percent that had been granted relief. A total of 51 percent of all encounters for aliens from countries other than Mexico or the Northern Triangle encountered over this period remained unresolved, including 42 percent still being processed and 7.5 percent with unexecuted final orders or offers of voluntary departure.

Comparing across the three sets of countries between 2014 and 2019, encounters of aliens from Mexico had the highest rate of resolution (90 percent) as of the end of 2020 Q2, followed by encounters from countries other than Mexico or the Northern Triangle (49 percent), with encounters for those from the Northern Triangle having the lowest rate of resolution (36 percent). Setting aside unresolved encounters and focusing exclusively on encounters with final outcomes, Mexicans had the highest rate of repatriation/lowest rate of relief from removal (98 percent repatriated; 2 percent granted relief), followed by aliens from the Northern Triangle (79 repatriated; 21 percent granted relief) and aliens from all other countries (29 percent repatriated; 71 percent granted relief).

12

## Enforcement Outcomes by Family Status

Figure 6 depicts variation in final or most current enforcement outcomes by family status (FMUAs, UACs, or single adults) and by year (see Appendix B for a more detailed breakdown). Mexican and Canadian UACs are excluded from this portion of the analysis because U.S. law includes special provisions for unaccompanied children from non-contiguous countries.[13]

Figure 6.
Enforcement Outcomes by Family Status and Year of Initial Encounter: FY 2014 to 2019



Source: OIS Statistical Immigration Data.
Note: Outcomes are current as of March 31, 2020. UAC excludes contiguous countries.

The vast majority (85 percent) of the 2.1 million encounters of single adults between 2014 and 2019 had been resolved by the end of 2020 Q2, ranging from 89 percent of the 431,000 encounters in 2014 to 76 percent of the 372,000 encounters in 2019. Among all single adult encounters, 78 percent had been repatriated versus 22 percent with no confirmed departure, including 7.2 percent that had been granted relief. A total of 15 percent of encounters of single adults over this period remained unresolved, including 11 percent that were still being processed at the end of 2020 Q2, ranging from 6.7 percent of single adult encounters in 2014 to 19 percent of single adult encounters in 2019. Just 2.9 percent of single adult encounters over the entire period had resulted in an unexecuted final order of removal or voluntary departure.

Just over a tenth (11 percent) of the 1 million FMUA encounters between 2014 and 2019 were resolved by the end of 2020 Q2, ranging from 24 percent of the 67,000 encounters in 2014 to 5.9 percent of the 527,000 encounters in 2019. Among FMUA encounters, just 6.1 percent had been

---

[13] In general, the Trafficking Victims Protection Reauthorization Act of 2008 prevents the immediate return of UACs from non-contiguous countries and allows them to make an affirmative asylum claim before an asylum officer and to appear before an immigration judge to seek relief or other protection from removal. UACs from Mexico or Canada who are not found to be victims of severe trafficking and who are considered able to make an informed decision to return to their country of citizenship may be offered voluntary return by CBP. A total of 79,055 Mexican and five Canadian UAC encounters occurred between 2014 and 2019, and a high percentage (88 percent) resulted in such returns. Among the remainder, 3.6 percent were removed or re-encountered, 2.5 percent were granted relief or other protection from removal, 4.5 percent were being processed as of 2020 Q2, and 0.9 percent had received unexecuted orders of removal or offers of voluntary departure.

13

AR00599

repatriated versus 94 percent with no confirmed departure, including 4.7 percent granted relief. A total of 89 percent of FMUA encounters over this period remained unresolved, including 67 percent of all encounters between 2014 and 2019 that were still being processed by DHS or DOJ as of 2020 Q2. Twenty percent of all FMUA encounters had received an unexecuted final order of removal or offer of voluntary departure.

Almost a third (32 percent) of the 290,000 encounters of UACs from non-contiguous countries between 2014 and 2019 were resolved by the end of 2020 Q2, ranging from 58 percent of the 56,000 encounters in 2014 to 4.5 percent of the 67,000 encounters in 2019. Among all non-contiguous UAC encounters, 4.3 percent had been repatriated versus 96 percent with no confirmed departure, including 28 percent granted some form of relief or other protection from removal. A total of 68 percent of non-contiguous UAC encounters remained unresolved, including 52 percent that were still being processed by DHS or DOJ. Sixteen percent of all non-contiguous UAC encounters had received an unexecuted final order of removal or voluntary departure.

Comparing across the three sub-groups, encounters of single adults had the highest rate of resolution (85 percent) as of the end of 2020 Q2 followed by UACs from non-contiguous countries (32 percent), with encounters for FMUAs having the lowest rate of resolution (11 percent). Outcomes also differed substantially across these groups. For encounters that had been resolved, single adults had the highest rate of repatriation (92 percent; 8.5 percent relief), followed by FMUAs (56 percent repatriation; 44 percent relief) and UACs from non-contiguous countries (13 percent repatriations; 87 percent relief).

14

### Enforcement Outcomes by Fear Claims

Figure 7 breaks down final or most current enforcement outcomes by whether or not the alien made a fear claim (see Appendix B for a more detailed breakdown).[14]

Figure 7.
Enforcement Outcomes by Fear Claim and Year of Initial Encounter: FY 2014 to 2019



Source: OIS Statistical Immigration Data.
Note: Outcomes are current as of March 31, 2020.

The majority (64 percent) of the 3 million encounters of aliens between 2014 and 2019 that did not involve fear claims had been resolved by the end of 2020 Q2 (ranging from 82 percent of the 511,000 encounters in 2014 to 34 percent of the 864,000 encounters in 2019). Slightly more than half of non-fear encounters (55 percent) over this period had been repatriated by 2020 Q2 versus 45 percent with no confirmed departure, including 8.1 percent that had been granted some form of relief or protection from removal. A total of 36 percent of non-fear encounters remained unresolved, including 27 percent that were still being processed for removal and 8.2 percent with unexecuted final orders of removal or offers of voluntary departure.

The ratio of resolved versus unresolved encounters was exactly reversed for Southwest Border encounters resulting in fear claims (520,000), with just over a third (36 percent) of encounters resolved and 64 percent unresolved. Among encounters with fear claims, just 28 percent had been repatriated, with the rest having no confirmed departure, including 8.0 percent of

---

[14] This section of the report analyzes outcomes by whether aliens made a *fear claim*, not by whether they sought asylum or some other form of humanitarian relief. Some aliens who initially claim fear never make an asylum claim because their fear claim is not found credible/reasonable, because they abandon their effort, or because they seek some form of relief or protection from removal other than asylum, among other reasons. And some aliens seek asylum or other relief before EOIR without first making a fear claim because they are issued a Notice to Appear (NTA) after their border encounter rather without ever being placed in expedited removal. Many FMUAs encountered since 2014 have fallen into the latter category because large numbers of family arrivals have overwhelmed the Department's family detention capacity, and when detention facilities are unavailable CBP may release people with NTAs rather than holding them for ER processing.

15

encounters that had been granted relief or other protection from removal. Half (50 percent) of encounters over this period involving a fear claim were still being processed at the end of 2020 Q2, ranging from 34 percent of the 60,000 encounters in 2014 to 60 percent of the 115,000 encounters in 2019. Just 13 percent of aliens encountered over the entire period who claimed fear had an unexecuted final order of removal or voluntary departure.

While the absolute proportions of encounters resulting in relief or other protection from removal were similar across the non-fear claim and fear claim encounters (8.1 percent of 3 million non-fear claim encounters and 8.0 percent of 520,000 fear claim encounters), these groups differed somewhat when accounting for differences in the share of encounters that remained unresolved. Restricting attention to the 2.1 million encounters that had been resolved, the 185,000 encounters of aliens making fear claims were somewhat more likely to have been granted relief (23 percent relief; 77 percent repatriation) than the 1.9 million encounters of aliens not making fear claims (13 percent relief; 87 percent repatriation).

Table 2.
Most Current Outcomes for Fear Claimants by Year of Initial Encounter: FY 2014 to 2019

| MOST CURRENT OUTCOMES | TOTAL | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| **Total Encounters** | **570,832** | **446,060** | **560,432** | **416,645** | **522,626** | **979,729** | **3,496,324** |
| **Fear Claims**[1] | 59,871 | 54,797 | 104,692 | 77,319 | 107,826 | 115,371 | 519,876 |
| EOIR cases[2] | 48,647 | 45,605 | 89,277 | 64,790 | 87,107 | 82,310 | 417,756 |
| Being Processed[3] | 17,717 | 18,950 | 46,740 | 36,921 | 52,301 | 50,588 | 223,217 |
| *Being Processed as Share of EOIR cases* | 36.4% | 41.6% | 52.4% | 57.0% | 60.0% | 61.5% | 53.4% |
| Asylum Granted or other EOIR Relief from Removal[4] | 8,080 | 6,727 | 9,858 | 5,460 | 7,036 | 3,511 | 40,672 |
| *Asylum/Relief as Share of EOIR cases* | 16.6% | 14.8% | 11.0% | 8.4% | 8.1% | 4.3% | 9.7% |
| Removal Orders[5] | 22,870 | 19,928 | 32,679 | 22,409 | 27,770 | 28,211 | 153,867 |
| *Removal Orders as Share of EOIR cases* | 47.0% | 43.7% | 36.6% | 34.6% | 31.9% | 34.3% | 36.8% |

Source: OIS Statistical Immigration Data.
Note: Outcomes are current as of March 31, 2020.
[1] Fear claims include credible and reasonable fear at any time following an initial encounter, including individuals who claimed fear at the time of apprehension but who have no record of a fear determination, possibly because they withdrew their claim.
[2] EOIR cases include aliens with EOIR case-started dates.
[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.
[4] Asylum granted or other relief from removal includes withholding of removal, protection under the Convention Against Torture, Special Immigrant Juvenile status, cancelation of removal, EOIR termination, or other status.
[5] Removal orders include completed repatriations and unexecuted orders of removal or grants of voluntary departure.

Table 2 provides additional detail on enforcement outcomes for the population claiming fear. As noted above, the proportion of border encounters involving a fear claim more than doubled from 10 percent in 2014 to 21 percent in 2018. The total number of fear claims reached its highest number ever (115,000) in 2019, even while falling back to 12 percent of total encounters (also see Figure 3). The third row of the table reports the subset of fear claims resulting in EOIR cases—typically because of a positive USCIS credible or reasonable fear determination, but these cases also include negative fear determinations that are vacated by EOIR.

16

The remaining rows of Table 2 describe the final or most current status for this subset of cases with fear claims. Not surprisingly, the 2019 cohort has the largest share of cases (62 percent) still being processed, and the share being processed drops in each preceding cohort, falling to a still-high 36 percent for 2014 encounters. Comparing outcomes by year of encounter suggests that EOIR asylum cases that are completed quickly are much more likely to result in removal orders, but that cases completed over longer periods of time yield more grants of asylum. Thus, for the 82,000 fear claims resulting in EOIR cases out of the 2019 border encounters, 28,000 (34 percent) resulted in removal orders by 2020 Q2, versus just 3,500 (4.3 percent) cases resulting in grants of asylum or other relief from removal. In the case of the 2014 cohort, 49,000 EOIR cases yielded 23,000 (47 percent) removal orders versus 8,000 (17 percent) resulting in grants of asylum or other relief from removal. Not all of the variation between cohorts is a function of time elapsed since the demographic characteristics and enforcement histories of each cohort differ, as noted above.

## Conclusion

This 2019 Enforcement Lifecycle Analysis describes the final or most current outcomes of about 3.5 million Southwest Border encounters occurring between 2014 and 2019 as of March 31, 2020. It offers a very different lens into the enforcement process than our usual production tables. From 2014 to 2019, the demographic characteristics of aliens encountered at the Southwest Border have shifted away from single Mexican adult non-asylum seekers to Northern Triangle FMUA and UAC asylum seekers.

Encounters with these different groups tend to lead to different paths through the enforcement system, both in terms of whether and how quickly encounters are resolved and what resolution is reached: Encounters with Mexicans tend to lead to repatriations; encounters with Central Americans tend to remain unresolved; and encounters with nationals from countries other than Mexico or the Northern Triangle tend (on average) to lead to relief. Encounters with single adults tend to quickly lead to repatriations, while encounters with FMUAs and non-contiguous UACs tend to remain unresolved. Encounters with aliens who do not claim a fear of return to their home countries tend to be repatriated, while those who claim fear are more likely to remain in the United States and some eventually get relief.

Some of these disparities in enforcement outcomes reflect differences in detention practices. Overall, 42 percent of aliens encountered in 2014 – 2019 remained continuously in DHS custody between their initial encounter and a final enforcement outcome (or had no final outcome but still remained in custody as of March 31, 2020). For these encounters, aliens were repatriated 98 percent of the time, with 0.5 percent resulting in relief or other protection from removal and 1.5 percent remaining unresolved as of March 31, 2020. Just 1 percent of continuously detained encounters resulted in unexecuted removal orders. In contrast, aliens who were never detained following their initial encounters were repatriated 30 percent of the time, with 15 percent granted relief and 55 percent unresolved. The largest share of these encounters were still being processed (40 percent), while 11 percent were subject to unexecuted removal orders, including 10 percent subject to *in absentia* orders. The detention pattern yielding the greatest share of unresolved cases were encounters initially placed in detention but then released prior to a final enforcement

17

AR00603

outcome. These "partially detained" encounters resulted in repatriations just 3 percent of the time and relief just 12 percent of the time, with 85 percent still unresolved, including 18 percent with unexecuted removal orders (14 percent *in absentia* orders) (see Appendix B).

Differences in enforcement practices overlap with and contribute to the other factors analyzed in this report. For example, Mexican nationals (67 percent) were much more likely than Northern Triangle (27 percent) and other (14 percent) nationals to be continuously detained, a fact partly reflecting the large share of Mexicans repatriated by CBP within a day or two of their initial encounters. Similarly, a plurality (45 percent) of encounters of aliens not making fear claims resulted in continuous detentions (and a large number of repatriations), while the majority of encounters resulting in fear claims (68 percent) were initially detained but released prior to a final enforcement outcome (i.e., partially detained, and mainly unresolved). Differences were greatest in the breakdown by family status, partly driven by Department policies and legal frameworks and judicial decisions covering these populations. In particular, encounters of single adults resulted in continuous detentions 64 percent of the time, versus 4 percent for FMUAs and for non-contiguous UACs; most FMUAs (50.1 percent) were never detained, while most non-contiguous UACs (76 percent) were partially detained.

The findings in this report are important in light of the changing demographics of who has arrived at the border since 2014—though less so during the pandemic—and they make more concrete some of the policy conversations around enforcement and resource priorities at the border. OIS is working to extend the flow back in time, and this should offer additional insight into how outcomes differ for cases resolved quickly versus those that take more time to resolve.

18

## Appendix A.

| MOST RECENT OUTCOMES | TOTAL | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| **Total Encounters** | **570,832** | **446,060** | **560,432** | **416,643** | **522,626** | **979,729** | **3,496,324** |
| Repatriations | 380,870 | 294,306 | 306,225 | 227,098 | 273,332 | 310,111 | 1,791,942 |
| Removals | 309,498 | 250,189 | 263,003 | 184,850 | 228,030 | 250,465 | 1,486,035 |
| Expedited | 179,785 | 142,872 | 145,669 | 102,219 | 128,580 | 141,855 | 840,980 |
| Reinstatement | 119,455 | 98,805 | 108,929 | 76,467 | 92,613 | 98,323 | 594,592 |
| Administrative removals | 977 | 892 | 781 | 589 | 565 | 628 | 4,432 |
| Other removals[1] | 9,281 | 7,620 | 7,624 | 5,575 | 6,272 | 9,659 | 46,031 |
| Returns | 63,367 | 36,183 | 34,847 | 32,578 | 32,874 | 41,408 | 241,257 |
| Re-encounters[2] | 8,005 | 7,934 | 8,375 | 9,670 | 12,428 | 18,238 | 64,650 |
| No confirmed departure | 189,962 | 151,754 | 254,207 | 189,547 | 249,294 | 669,618 | 1,704,382 |
| Being processed | 64,244 | 51,767 | 113,013 | 109,445 | 170,705 | 543,562 | 1,052,736 |
| Being processed by DHS | 19,421 | 11,805 | 28,024 | 29,112 | 48,133 | 237,075 | 373,570 |
| In EOIR proceedings[3] | 11,630 | 10,270 | 34,082 | 43,303 | 72,751 | 232,434 | 404,470 |
| EOIR case completed - additional DOJ action[4] | 33,193 | 29,692 | 50,907 | 37,030 | 49,821 | 74,053 | 274,696 |
| Final order/voluntary departure | 49,176 | 31,055 | 50,498 | 36,990 | 49,329 | 96,428 | 313,466 |
| Unexecuted removal orders | 47,231 | 29,628 | 48,739 | 36,039 | 48,206 | 94,758 | 304,601 |
| In absentia | 36,646 | 21,471 | 35,248 | 29,409 | 39,665 | 75,633 | 238,072 |
| Not in absentia | 10,585 | 8,157 | 13,491 | 6,630 | 8,541 | 19,125 | 66,529 |
| Unexecuted voluntary departures | 1,945 | 1,427 | 1,759 | 941 | 1,123 | 1,670 | 8,865 |
| Relief | 67,482 | 61,910 | 81,814 | 34,966 | 19,138 | 18,235 | 283,545 |
| SIJ or affirmative asylum | 11,124 | 9,394 | 20,146 | 10,356 | 5,236 | 1,380 | 57,636 |
| LPR status granted by DHS | 18,941 | 31,801 | 42,114 | 15,534 | 3,950 | 1,458 | 113,798 |
| EOIR relief[5] | 9,560 | 8,350 | 9,124 | 4,175 | 5,472 | 5,596 | 42,277 |
| EOIR termination | 25,215 | 10,608 | 8,567 | 3,822 | 4,025 | 9,667 | 61,904 |
| Other[6] | 2,642 | 1,757 | 1,863 | 1,079 | 455 | 134 | 7,930 |
| Parole | 4,043 | 4,598 | 5,387 | 5,722 | 6,446 | 7,525 | 33,721 |
| No Subsequent Event[7] | 5,017 | 2,424 | 3,495 | 2,434 | 3,676 | 3,868 | 20,914 |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

Notes: Results based on source data as of March 31, 2020 and OIS Enforcement Lifecycle methodology as of August 31, 2020. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border. Columns present results by year of encounter, with all data reflecting final or most current enforcement outcomes as of March 31, 2020. Table is event-based, so aliens encountered on multiple occasions appear in the table multiple times.

[1] Other removals include those executed pursuant to an INA §240 proceeding.

[2] Includes aliens encountered more than once by CBP without a known intervening removal or return. OIS assumes the alien departed of their own accord during the intervening period.

[3] Includes aliens in proceedings whose cases have been closed and are not on an active docket.

[4] Includes aliens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.

[5] Includes aliens granted relief including, but not limited to, asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.

[6] Includes aliens granted cancelation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present aliens not subject to removal.

[7] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the alien awaits further processing.

19

Appendix B

OIS' standard Enforcement Lifecycle table sorts the outcomes of Southwest Border encounters into four large categories and a total of 19 sub-categories and provides breakouts by country of citizenship, family status, and fear claim, among other factors.  This appendix can be found at https://www.dhs.gov/immigration-statistics/special-reports.

20

they meet the criteria of the CAA. Accordingly, this action merely approves state law as meeting Federal requirements and does not impose additional requirements beyond those imposed by state law. For that reason, this action:

• Is not a significant regulatory action subject to review by the Office of Management and Budget under Executive Orders 12866 (58 FR 51735, October 4, 1993) and 13563 (76 FR 3821, January 21, 2011);

• Is not an Executive Order 13771 regulatory action because this action is not significant under Executive Order 12866;

• Does not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*);

• Is certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*);

• Does not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4);

• Does not have Federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);

• Is not an economically significant regulatory action based on health or safety risks subject to Executive Order 13045 (62 FR 19885, April 23, 1997);

• Is not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001);

• Is not subject to requirements of Section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the Clean Air Act; and

• Does not provide EPA with the discretionary authority to address, as appropriate, disproportionate human health or environmental effects, using practicable and legally permissible methods, under Executive Order 12898 (59 FR 7629, February 16, 1994).

In addition, this rule is not approved to apply on any Indian reservation land or in any other area where EPA or an Indian tribe has demonstrated that a tribe has jurisdiction. In those areas of Indian country, the rule does not have tribal implications and will not impose substantial direct costs on tribal governments or preempt tribal law as specified by Executive Order 13175 (65 FR 67249, November 9, 2000).

The Congressional Review Act, 5 U.S.C. 801 *et seq.*, as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA will submit a report containing this action and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the Clean Air Act, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by May 26, 2020. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements (See section 307(b)(2)).

Parties with objections to this direct final rule are encouraged to file a comment in response to the parallel notice of proposed rulemaking for this action published in the proposed rules section of this issue of the **Federal Register**, rather than file an immediate petition for judicial review of this direct final rule, so that the EPA can withdraw this direct final rule and address comment(s) in the final rulemaking.

### List of Subjects in 40 CFR Part 62

Environmental protection, Administrative practice and procedure, Air pollution control, Intergovernmental relations, Reporting and recordkeeping requirements.

Dated: March 18, 2020.

**Dennis Deziel,**

*Regional Administrator, EPA Region 1.*

Part 62 of chapter I, title 40 of the Code of Federal Regulations is amended as follows:

## PART 62—APPROVAL AND PROMULGATION OF STATE PLAN FOR DESIGNATED FACILITIES AND POLLUTANTS

■ 1. The authority citation for part 62 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

### Subpart UU—Vermont

■ 2. Revise § 62.11485 to read as follows:

### § 62.11485   Identification of Plan—negative declaration.

On September 10, 2019 the State of Vermont Department of Environmental Conservation submitted a letter certifying no Municipal Solid Waste Landfills subject to 40 CFR part 60 Subpart Cf operate within the State's jurisdiction.

[FR Doc. 2020–06171 Filed 3–23–20; 8:45 am]

**BILLING CODE 6560–50–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### 42 CFR Part 71

**[Docket No. CDC–2020–0033]**

**RIN 0920–AA76**

**Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes**

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Interim final rule with request for comments.

**SUMMARY:** The Centers for Disease Control and Prevention (CDC) within the U.S. Department of Health and Human Services (HHS) issues this interim final rule with request for comments to amend its Foreign Quarantine Regulations. This interim final rule provides a procedure for CDC to suspend the introduction of persons from designated countries or places, if required, in the interest of public health.

**DATES:**

*Effective date:* This interim final rule is effective on 11:59 p.m. EDT on March 20th, 2020.

*Comment date:* Written comments are invited and must be submitted on or before 30 days from the date of publication of this interim final rule in the **Federal Register**.

*Expiration date:* Unless extended after consideration of submitted comments, this interim final rule will cease to be in effect on the earlier of (1) one year from the publication of this interim final rule, or (2) when the HHS Secretary determines there is no longer a need for this interim final rule. The Secretary will publish a document in the **Federal Register** announcing the expiration date.

**ADDRESSES:** You may submit comments, identified by Docket No. CDC–2020–0033, by the following method:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

*Instructions:* All submissions received must include the agency name and docket number or Regulatory Information Number (RIN) for this rulemaking. All comments received will be posted without change to *http://regulations.gov,* including any personal information provided. For access to the docket to read background documents or comments received, go to *http://www.regulations.gov.*

Any comment that is submitted will be shared with the Department of Homeland Security and the Department of State, and will also be made available to the public. Comments must be identified by RIN 0920–AA76. Because of staff and resource limitations, all comments must be submitted electronically to *www.regulations.gov.* Follow the "Submit a comment" instructions.

*Warning:* Do not include any personally identifiable information (such as name, address, or other contact information) or confidential business information that you do not want publicly disclosed. All comments may be posted on the internet and can be retrieved by most internet search engines. No deletions, modifications, or redactions will be made to comments received.

*Inspection of Public Comments:* All comments received before the close of the comment period are available for viewing by the public, including personally identifiable or confidential business information that is included in a comment.

**FOR FURTHER INFORMATION CONTACT:** Kyle McGowan, Office of the Chief of Staff, Centers for Disease Control and Prevention, 1600 Clifton Road NE, MS H21–10, Atlanta, GA 30329. Telephone: 404–498–7000; email: *cdcregulations@cdc.gov.*

**SUPPLEMENTARY INFORMATION:** The IFR is organized as follows:

**Table of Contents**

I. Background
II. Statutory Authority
III. Provisions of New § 71.40
IV. Request for Comment
V. Rationale for Issuance of an Interim Final Rule With Immediate Effectiveness
VI. Regulatory Impact Analysis

## I. Background

The Centers for Disease Control and Prevention (CDC), a component of the U.S. Department of Health and Human Services (HHS), is amending the regulations that implement section 362 of the Public Health Service (PHS) Act, 42 U.S.C. 265, as part of its response to Coronavirus Disease 2019 (COVID–19). Section 362 provides that if the Secretary [1] "determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health," he has the authority, in accordance with regulations approved by the President,[2] "to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose." PHS Act, 42 U.S.C. 265. Pursuant to a delegation of the Secretary's authority, the CDC Director has promulgated regulations under section 362 to suspend the introduction of property into the United States. Current regulations, however, only address suspension of the introduction of property into the United States and the procedures to quarantine or isolate persons. That is, current regulations permit CDC to quarantine or isolate persons entering the United States, but they do not address the suspension of the introduction of persons into the United States under section 362.

CDC's experience with COVID–19 is that, under some circumstances, quarantine or isolation is not a viable solution for protecting the public health from the introduction of a communicable disease from another country. For example, the arrival in U.S. ports of cruise ships with numerous passengers requiring quarantine or isolation has presented complex logistical challenges, consumed disproportionate agency resources, and taken CDC personnel away from other critical parts of the domestic and international response to COVID–19. To continue to respond promptly and effectively to the public health emergency presented by COVID–19, CDC needs a more efficient regulatory mechanism to exercise its section 362 authority and suspend the introduction of persons who would otherwise pose a serious danger of introduction of COVID–19 into the United States.

Even though COVID–19 is present in certain locations within the United States, the suspension of the introduction of persons into the United States may be required in the interest of public health to avert the danger of further introduction of the disease into the same or other locations in the United States. For example, hypothetically, the introduction of COVID–19 into the United States would occur if two infected persons disembarked in a large metropolitan city in the Midwest from an international flight. Another vector for further introduction of COVID–19 into the United States would be a group of two infected persons who entered that Midwestern state by land after crossing the border from Canada. Suspension of the introduction of those two persons into the United States at the land border would mitigate the serious and increased danger of further introduction of COVID–19 in the United States. The same public health analysis would apply if two infected persons walked across the land border from Canada into a Northeastern State.

*Past Experience With Migration and Communicable Disease*

International travel and migration play a significant role in the global transmission of infectious biological agents or their toxic products that pose risks for vulnerable populations.[3] Travelers can serve as unwitting vectors of disease, and thereby increase the risk of communicable disease transmission and of the introduction of communicable disease into the United States. The risk increases when travelers are in congregate settings, such as

---

[1] The statute assigns this authority to the Surgeon General of the Public Health Service. However, Reorganization Plan No. 3 of 1966 abolished the Office of the Surgeon General and transferred all statutory powers and functions of the Surgeon General and other officers of the Public Health Service and of all agencies of or in the Public Health Service to the Secretary of Health, Education, and Welfare, now the Secretary of Health and Human Services, 31 FR 8855, 80 Stat. 1610 (June 25, 1966), *see also* Public Law 96–88, 509(b), 93 Stat. 695 (codified at 20 U.S.C. 3508(b)). References in the PHS Act to the Surgeon General are to be read in light of the transfer of statutory functions and re-designation. Although the Office of the Surgeon General was re-established in 1987, the Secretary of HHS has retained the authorities previously held by the Surgeon General.

[2] Executive Order 13295 assigned the functions of the President under section 362 to the Secretary of HHS.

[3] *See, e.g.,* Institute of Medicine (US) Forum on Microbial Threats, "Infectious Disease Movement in a Borderless World: Workshop Summary," National Academies Press (US); 2010, *available at https://www.ncbi.nlm.nih.gov/books/NBK45728/* (hereinafter "Infectious Disease Movement in a Borderless World"); Wilson, ME. Travel and the Emergence of Infectious Diseases. *Emerging Infectious Diseases.* 1995;1(2):39–46. doi:10.3201/eid0102.950201; Tatem, A.J., Rogers, D.J. & Hay, S. Global Transport Networks and Infectious Disease Spread. *Adv. Parasitology* 62, 293–343 (2006).

carriers (*i.e.*, ships, aircraft, trains, and road vehicles) or terminals with shared sitting, sleeping, eating, or recreational areas, all of which are conducive to disease transmission.[4]

The speed and far reach of global travel were factors in prior outbreaks that expanded to numerous continents. Examples include: The H1N1 influenza pandemic in 2009; severe acute respiratory syndrome (SARs) coronavirus in 2003; tuberculosis; measles; Middle East Respiratory Syndrome (MERS-CoV) in 2012; and Ebola Virus Disease in 2014 and 2018.[5] All of these high-consequence diseases posed significant public health risks, especially given the compressed timeframes in which the outbreaks occurred.

For example, the Federal response to the H1N1 influenza pandemic in 2009 would have benefitted from the availability of an efficient mechanism for suspending the introduction of persons into the United States. The initial cases of H1N1 occurred in Mexico, before the first confirmed cases in the United States. Retrospective research findings in Mexico indicated that transmission of the virus in Mexico involved person-to-person spread with multiple generations of transmission.[6]

Like 2009 H1N1, COVID–19 is a pandemic. But the new coronavirus is more infectious than 2009 H1N1.[7]

Indeed, it appears that the virus may at times be transmitted by persons who are asymptomatic. As discussed below, COVID–19 is also more likely to cause death in high-risk individuals.

In addition, global travel has increased dramatically since prior infectious disease outbreaks. By 2018, international visitations to the U.S. totaled over 20 million more per year than in 2009, when the 2009 H1N1 pandemic occurred, and 10 million more per year than in 2014, when the Ebola Virus Disease outbreak occurred.[8] These differences make the availability of an efficient mechanism for exercising the section 362 authority all the more important to the protection of the public health going forward.

*The Current Outbreak of COVID–19*

COVID–19 is a communicable disease caused by a novel (new) coronavirus, SARS–CoV–2, that was first identified as the cause of an outbreak of respiratory illness that began in Wuhan, Hubei Province, People's Republic of China ("PRC"). The virus is thought to be transmitted primarily by person-to-person contact through respiratory droplets produced when an infected person coughs or sneezes. It may also be transmitted through contact with surfaces or objects. While much is still unknown about the transmission of COVID–19, asymptomatic transmission may also occur.

Manifestations of severe disease have included severe pneumonia, acute respiratory distress syndrome (ARDS), septic shock, and multi-organ failure. According to the World Health Organization (WHO), as of March 17, 2020, approximately 4.1% of reported COVID–19 cases have resulted in death globally. This mortality rate is higher among seniors or those with compromised immune systems. Older adults and people who have severe chronic medical conditions like hypertension, heart, lung, or kidney disease are also at higher risk for more serious COVID–19 illness. Early data suggest older people are twice as likely to have serious COVID–19 illness.

As of March 17, 2020, there were over 179,100 cases of COVID–19 globally in over 150 locations (including countries), resulting in over 7,425 deaths; more than 4,225 cases have been identified in the United States, with new cases being reported daily and with at least 75 deaths due to the disease. Continued introduction into the United States of persons from foreign countries where COVID–19 exists presents a danger of

disease transmission in congregate settings such as carriers or terminals, which may, in turn, result in a danger of disease transmission in contiguous areas.[9]

Unfortunately, at this time, there is no vaccine that can prevent infection with COVID–19, nor are there therapeutics for those who become infected. Treatment is currently limited to supportive (or palliative) care to manage symptoms while the body fights off the disease. Hospitalization may be required in severe cases and mechanical respiratory support may be needed in the most severe cases. The ease of COVID–19 transmission presents a risk of a surge in hospitalizations for COVID–19, which would limit hospital capacity available to treat other serious conditions.

Testing is available to confirm suspected cases of COVID–19 infection. Testing generally requires specimens collected from the nose, throat, or lungs; such specimens can only be analyzed in a laboratory setting. However, commercial test results are typically available within three to four days. Currently, the time required to obtain test results—coupled with the incubation period of the disease—makes it impracticable to confirm whether each person moving into the United States is infected with COVID–19 at the time of the movement. Widespread, compulsory Federal quarantines or isolations of such persons pending test results are impracticable due to the numbers of persons involved, logistical challenges, and CDC resource and personnel constraints.

On January 30, 2020, the Director General of WHO declared that the outbreak of COVID–19 is a Public Health Emergency of International Concern under the International Health Regulations.[10] The following day, the Secretary of HHS declared COVID–19 a public health emergency under the PHS Act.[11] On March 11, 2020, the WHO declared COVID–19 a pandemic. On March 13, 2020, the President issued a

---

[4] *E.g., https://wwwnc.cdc.gov/travel/yellowbook/2020/travel-by-air-land-sea/cruise-ship-travel* (noting that the "often crowded, semi-enclosed environments onboard ships can facilitate the spread of person-to-person, foodborne, or waterborne diseases"); CDC, "Interim US Guidance for Risk Assessment and Public Health Management of Persons with Potential Coronavirus Disease 2019 (COVID–19) Exposures: Geographic Risk and Contacts of Laboratory-confirmed Cases," Updated March 7, 2020, *available at https://www.cdc.gov/coronavirus/2019-ncov/php/risk-assessment.html.*

[5] Infectious Disease Movement in a Borderless World (noting that "swine-origin H1N1 has spread globally, its movement hastened by global air travel" and [i]t is easy to see how travelers could play a key role in the global epidemiology of infections that are transmitted from person to person, such as HIV, SARS, tuberculosis, influenza, and measles") (citing Hufnagel L, Brockmann D, Geisel T. Forecast and Control of Epidemics in a Globalized World. *Proceedings of the National Academy of Sciences.* 2004;101(42):15124–15129).

[6] *https://www.cdc.gov/h1n1flu/cdcresponse.htm.*

[7] *See generally,* CDC, "2009 H1N1 Pandemic Timeline," *available at https://www.cdc.gov/flu/pandemic-resources/2009-pandemic-timeline.html;* Van Kerkhove, Maria D et al. Estimating age-specific cumulative incidence for the 2009 influenza pandemic: A meta-analysis of A(H1N1)pdm09 serological studies from 19 countries. *Influenza and Other Respiratory Viruses* vol. 7,5 (2013): 872–86, *available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5781221/;* CDC, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID–19), *available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.*

[8] *https://travel.trade.gov/outreachpages/download_data_table/Fast_Facts_2018.pdf.*

[9] *See supra* n.4; *see also* CDC, Travelers from Countries with Widespread Sustained (Ongoing) Transmission Arriving in the United States, *available at https://www.cdc.gov/coronavirus/2019-ncov/travelers/after-travel-precautions.html.*

[10] Statement on the second meeting of the International Health Regulations (2005) Emergency Committee regarding the outbreak of novel coronavirus (2019–nCoV) (January 30, 2020), *available at https://www.who.int/news-room/detail/30-01-2020-statement-on-the-second-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-outbreak-of-novel-coronavirus-(2019-ncov).*

[11] HHS, "Determination that a Public Health Emergency Exists," *available at https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx.*

Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19) Outbreak.[12] As of March 16, 2020, all 50 states and several local and territorial jurisdictions declared states of emergency.

Global efforts to slow disease transmission have included sweeping measures to limit travel and exposure to COVID–19. A number of countries, such as Russia, Australia, the Philippines, Japan, and Israel, have imposed stringent restrictions on travelers who have recently been to the PRC. On March 17, 2020, the European Union approved a plan to ban all nonessential travel into its bloc for a minimum of 30 days. Many countries are asking persons to self-quarantine for 14 days (a period estimated to encompass the incubation period for the disease) following return from foreign countries or places with sustained community transmission.

The President has exercised his authority in section 212(f) of the Immigration and Nationality Act ("INA"), 8 U.S.C. 1182(f), to suspend entry into the United States of certain foreign nationals who have recently visited PRC (excluding the Special Administrative Regions of Hong Kong and Macau), the Islamic Republic of Iran, the Schengen Area (comprised of 26 countries in Europe), the United Kingdom (excluding overseas territories outside of Europe), and the Republic of Ireland, within 14 days preceding their entry or attempted entry into the United States due to concerns of person-to-person transmission of COVID–19. CDC has issued Level 3 Travel Health Notices recommending that travelers avoid all nonessential travel to PRC (excluding the Special Administrative Regions of Hong Kong and Macau), the Islamic Republic of Iran, the Republic of Korea, and the Schengen Area. The U.S. Department of State has issued a Global Level 3 Health Advisory directing U.S. citizens to reconsider all travel abroad due to the global impact of COVID–19 and Level 4 Travel Advisories (Do Not Travel) for PRC (excluding the Special Administrative Regions of Hong Kong and Macau), Iran, and certain regions of Italy. In addition, CDC has recommended that travelers, particularly those with underlying health conditions, avoid all cruise ship travel worldwide. The U.S. Department of State has similarly issued guidance

that U.S. citizens should not travel by cruise ship at this time. On March 16, 2020, the Federal government announced guidelines recommending that the public should avoid discretionary travel; discretionary shopping trips; social visits; gatherings in groups of more than 10 people; and eating or drinking at bars, restaurants, and food courts. Numerous States and cities have gone further and shut down restaurants, bars, nightclubs, and theaters. On March 18, 2020, the United States and Canada announced plans to, by mutual consent, close the U.S.-Canadian border to nonessential travel.

The COVID–19 pandemic highlights why CDC needs an efficient regulatory mechanism to suspend the introduction of persons who would otherwise increase the serious danger of the introduction of a communicable disease into the United States. Section 212(f) of the Immigration and Nationality Act ("INA") applies to the "entry" of aliens, but section 362 instead provides the authority to prohibit the "introduction" of persons into the United States. Despite the unprecedented global efforts at mitigating or slowing the transmission of COVID–19, cases of COVID–19 have rapidly propagated and multiplied, crossing international borders with ease. As of March 17, 2020, CDC reported that 229 of the confirmed cases of COVID–19 in the United States with an established source of exposure were travel-related as opposed to community transmission, accounting for almost half of the 474 cases with an established source of exposure; another 3,752 cases remain under investigation. As of March 14, 2020, travelers from Japan have exported at least 20 COVID–19 cases to eight countries. As of March 14, 2020, travelers from the Islamic Republic of Iran have exported at least 145 COVID–19 cases to 17 other countries, as reported by the WHO, and travelers from the Schengen Area have exported 624 COVID–19 cases to 70 countries, including to the United States. In the near future, persons traveling from other foreign countries and jurisdictions may compound the serious danger of further introduction of COVID–19 into the United States.

To summarize, CDC knows that COVID–19 infection transmits easily, spreads quickly through global travel, and can have a high mortality rate for some of the most vulnerable members of society. At this time, there is no vaccine, therapeutic, or rapid testing for the disease. CDC needs a robust, efficient mechanism for exercising its authority under section 362 and other applicable authorities to suspend the introduction of persons into the United States,

should the public health require it. In issuing orders pursuant to this interim final rule, CDC would coordinate with the Secretary of State in order to ensure compliance with the international legal obligations of the United States and to take due account of U.S. national and security interests.

*Other Public Health Risks*

Beyond the current COVID–19 pandemic, the suspension authority is also critical to CDC because there is always a risk of another emerging, or re-emerging, communicable disease that may harm the American public. One such risk is pandemic influenza (as opposed to seasonal influenza), which occurs when a novel, or new, influenza virus strain spreads over a wide geographic area and affects an exceptionally high proportion of the population. In such circumstances, the strain of virus is new, there is usually no available vaccine, and humans do not typically have immunity to the virus, often resulting in a more severe illness. The severity and unpredictable nature of an influenza pandemic requires public health systems to prepare constantly for the next occurrence. Whenever a new strain of influenza virus appears, or a major change to a preexisting virus occurs, individuals may have little or no immunity, which can lead to a pandemic when the virus passes easily from human to human and causes serious illness or death. The most recent influenza pandemics include H1N1 in 2009–2010, the 1968–1969 Hong Kong Flu, the 1957–1958 Asian Flu, and the 1918–1919 Spanish Flu.

It is difficult to predict the impact that another emerging, or re-emerging, communicable disease would have on the U.S. public health system. The 2009 H1N1 pandemic caused between 100,000 and 600,000 deaths worldwide,[13] while the 1918–1919 Spanish Flu was estimated to have caused over 50 million deaths worldwide.[14] Although advances in health care quality have greatly improved since 1918, the dramatic increases in global mobility in the 21st century have increased the rate at which a communicable disease can spread. Modern pandemics, spread through international travel, can engulf the world in three months or less. Moreover, pandemics can last from 12

---

[12] "Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19) Outbreak," March 13, 2020, *available at https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.*

[13] *https://www.cdc.gov/flu/pandemic-resources/2009-h1n1-pandemic.html.*

[14] *https://www.cdc.gov/flu/pandemic-resources/1918-pandemic-h1n1.html.*

to 18 months and are not considered one-time events.

The introduction of another emerging, or re-emerging, communicable disease into the United States is always a risk. The PHS Act section 362 suspension authority would be critical to any effort by CDC and its Federal, State, and local partners to contain or mitigate the risk. CDC expects to mitigate the risk in the future by issuing a Final Rule, after considering comments, to implement a permanent regulatory structure regarding the potential suspension of introduction of persons into the United States in the event a serious danger of the introduction of communicable disease arises in the future.

## II. Statutory Authority

The primary legal authority supporting this rulemaking is section 362 of the PHS Act, which is codified at 42 U.S.C. 265. Under section 362, the Secretary [15] has the authority—if he were to determine that the existence of a communicable disease in a foreign country creates a serious danger of the introduction of such disease into the United States, and that this danger is increased by the introduction of persons or property from such country such that suspension of introduction is necessary to protect the public health—to suspend, in accordance with regulations approved by the President,[16] such introduction for determined periods of time.

In addition to section 362, other sections of the PHS Act are relevant to this rulemaking, including section 311, 42 U.S.C. 243; section 361, 42 U.S.C. 264; section 365, 42 U.S.C. 268; and section 367, 42 U.S.C. 270. Section 311 authorizes the Secretary to accept State and local assistance in the enforcement of quarantine rules and regulations and to assist States and their political subdivisions in the control of communicable diseases. Section 361 authorizes the Secretary to make and enforce such regulations that in the Secretary's judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the United States. It also permits the "apprehension, detention, or conditional release of individuals" in order to prevent the "introduction, transmission, or spread" of such communicable diseases as may be specified from time to time in Executive Orders of the President upon the recommendation of the Secretary, in consultation with the Surgeon General.

[15] *See supra* at n.1.

[16] *See supra* at n.2.

Section 365 provides that it shall be the duty of designated customs officers and of Coast Guard officers to aid in the enforcement of quarantine rules and regulations.[17] Section 367 authorizes the application of certain sections of the PHS Act and promulgated regulations (including penalties and forfeitures for violations of such sections and regulations) to air navigation and aircraft to such extent and upon such conditions as deemed necessary for safeguarding public health.[18]

## III. Provisions of New § 71.40

This interim final rule will implement section 362 and other applicable provisions of the PHS Act to enable the CDC Director to suspend the introduction of persons into the United States consistent with the statute and applicable law.

Section 71.40(a) sets forth the statutory requirements for the CDC Director to suspend the introduction of persons into the United States. The provision establishes that the CDC Director may prohibit the introduction into the United States of persons from designated foreign countries (or one or more political subdivisions and regions thereof) or places, only for such period of time that the Director deems necessary for the public health, by issuing an order in which the Director determines that:

(1) By reason of the existence of any communicable disease in a foreign country (or one or more political subdivisions or regions thereof) or place, there is serious danger of the introduction of such communicable disease into the United States, and

(2) This danger is so increased by the introduction of persons from such

[17] The terms "officer of the customs" and "customs officer" are defined by statute to mean, "any officer of the United States Customs Service of the Treasury Department (also hereinafter referred to as the "Customs Service") or any commissioned, warrant, or petty officer of the Coast Guard, or any agent or other person, including foreign law enforcement officers, authorized by law or designated by the Secretary of the Treasury to perform any duties of an officer of the Customs Service." 19 U.S.C. 1401(i). Although this provision refers to the Secretary of the Treasury, the Homeland Security Act transferred to the Secretary of Homeland Security all "the functions, personnel, assets, and liabilities of . . . the United States Customs Service of the Department of the Treasury, including the functions of the Secretary of the Treasury relating thereto . . . [,]" 6 U.S.C. 203(1), such that reference to the Secretary of the Treasury should be read to reference the Secretary of Homeland Security.

[18] HHS quarantine authorities also apply to vessels. *See, e.g.*, PHS Act 364 (providing for quarantine stations at anchorages and vessel quarantine inspections), 366 (providing for bills of health for vessels, authorizing issuance of regulations applicable to vessels, and certificate of a quarantine officer before a vessel can enter any U.S. port to discharge cargo or land passengers).

country (or one or more political subdivisions or regions thereof) or place that a suspension of the introduction of such persons into the United States is required in the interest of the public health.

Section 71.40(b) sets forth definitions of several terms used in § 71.40. CDC defines the "introduction into the United States of persons" from a foreign country (or one or more political subdivisions or regions thereof) or place" as the movement of a person from a foreign country (or one or more political subdivisions or regions thereof) or a place, or series of foreign countries or places, into the United States so as to bring the person into contact with others in the United States, or so as to cause the contamination of property in the United States, in a manner that the Director determines to present a risk of transmission of the communicable disease to persons or property, even if the communicable disease has already been introduced, transmitted, or is spreading within the United States.

Section 362 refers to the "introduction of persons" from foreign countries. CDC defines "introduction into the United States of persons" from a foreign country (including one or more political subdivisions or regions thereof) or place to clarify that "introduction" can encompass those who have physically crossed a border of the United States and are in the process of moving into the interior in a manner the Director determines to present a risk of transmission of a communicable disease. This additional mechanism to halt the travel of such persons and rapidly moving them outside the United States constitutes preventing their "introduction" into the United States for purposes of § 71.40.

Similarly, Section 362 refers to the "introduction of [a communicable disease] into the United States." CDC defines "serious danger of the introduction of such communicable disease into the United States" to mean the potential for introduction of vectors of the communicable disease into the United States, even if persons or property in the United States are already infected or contaminated with the communicable disease. CDC establishes this definition to clarify that, even if persons or property (*e.g.* animals) in the United States are already infected or contaminated with a communicable disease in some localities, the potential for introduction of additional vectors that would introduce, transmit, or spread the disease in the same or different localities can present a serious danger of the introduction of the disease into the United States. Suspension of

AR00611

the introduction of persons into the United States may be required, in the interest of public health, to avert the increased danger that results from further introduction, transmission, or spread of the disease within the United States.

Finally, for purposes of this section, CDC defines the term "place" to include any location specified by the Director, including any carrier, whatever the carrier's nationality. CDC does this in order to remove all doubt that when this interim final rule refers to "place," it refers not just to territory within or outside of a country, but also to carriers, as that term is defined in 42 CFR 71.1, whatever the carrier's nationality.

CDC will establish the requirement to suspend the introduction of persons into the United States from certain designated places for certain periods of time by means of an order executed by the CDC Director. In § 71.40(c), CDC describes the required contents of such order. In any § 71.40 order, the CDC Director must designate:

• The foreign countries (or one or more designated political subdivisions or regions thereof) or places from which the introduction of persons is being suspended.

• The period of time or circumstances under which the introduction of any persons or class of persons into the United States is being suspended.

• The conditions under which that prohibition on introduction should be effective in whole or in part, including any relevant exceptions that the CDC Director determines are appropriate.

CDC might at times rely on (1) State and local authorities who agree to help implement orders issued pursuant to § 71.40, or (2) other Federal agencies to implement and execute the orders issued under this section. Accordingly, in § 71.40(d), CDC establishes that, before issuing any § 71.40 order, CDC may coordinate with the appropriate State and local authorities or other Federal agency (or agencies). If the order will be implemented in whole or in part by State and local authorities under 42 U.S.C. 243(a), the Director's order may explain the procedures and standards by which those State or local authorities are expected to aid in the order's enforcement. Similarly, if the order will be implemented in whole or in part by designated customs officers (including officers of the Department of Homeland Security with U.S. Customs and Border Protection who exercise the authorities of customs officers) or the United States Coast Guard under 42 U.S.C. 268(b), or another Federal department or agency, the CDC Director, in coordination with the Secretary of Homeland Security or

the head of the other applicable department or agency, shall explain in the order the procedures and standards by which any authorities or officers or agents are expected to aid in the enforcement of the order, to the extent that they are permitted to do so under their existing legal authorities.

Section 71.40(e) provides that this section does not apply to members of the armed forces of the United States and associated personnel for whom the Secretary of Defense provides assurance to the Director that the Secretary of Defense, through measures such as quarantine, isolation, or other measures maintaining control over such individuals, is preventing the risk of transmission of a communicable disease to persons or property in the United States. CDC includes this exception because the Secretary of Defense has authority and means to prevent the introduction of a communicable disease into the United States from his personnel returning from foreign countries. Therefore, this interim final rule need not apply to Department of Defense personnel.

Although section 362 applies to "persons," this interim final rule will not apply to U.S. citizens or lawful permanent residents. Congress provided CDC with the authority to prohibit the introduction of persons who would increase a serious danger of introducing into the United States a communicable disease, when required in the interest of the public health. CDC believes that, at present, quarantine, isolation, and conditional release, in combination with other authorities, while not perfect solutions, can mitigate any transmission or spread of COVID–19 caused by the introduction of U.S. citizens or lawful permanent residents into the United States. Section 71.40(f) therefore explains that this interim final rule shall not apply to U.S. citizens and lawful permanent residents. Determining the appropriate protections for U.S. citizens and lawful permanent aliens requires a complex balancing of numerous interests and would benefit from additional consideration and public comment. HHS does not want such concerns to delay the issuance of this interim final rule, which would enable the CDC Director to issue orders that would have the effect of slowing the introduction, transmission, and spread of COVID–19 in the United States.

## V. Rationale for Issuance of an Interim Final Rule With Immediate Effectiveness

Agency rulemaking is governed by section 553 of the Administrative Procedure Act (APA) (5 U.S.C. 553).

Section 553(b) requires that, unless the rule falls within one of the enumerated exemptions, HHS must publish a notice of proposed rulemaking in the **Federal Register** that provides interested persons an opportunity to submit written data, views, or arguments, prior to finalization of regulatory requirements. Section 553(b)(3)(B) of the APA authorizes a department or agency to dispense with the prior notice and opportunity for public comment requirement when the agency, for "good cause," finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest. In addition, because this interim final rule represents a critical part of the dialogue between the United States and the Governments of Mexico and Canada in preventing the spread of COVID–19 along our shared borders, it involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1).

As noted above, the United States and numerous other countries have taken unprecedented measures to try to contain or slow the transmission or spread of COVID–19. Such public health actions, especially the actions by the President and the Secretary, have slowed the introduction and transmission of the disease into the United States, which has benefitted the public health, preserved limited public and private resources, and given the U.S. public health system additional time to implement further measures to protect and support the public.

Nevertheless, these measures have not completely stopped global travelers, and other persons crossing from one country into another country, from spreading COVID–19 across national boundaries and around the globe. The introduction of persons from foreign countries with COVID–19 outbreaks is continuing to cause the introduction of COVID–19 into disparate locations within the United States. The suspension authority is therefore critical to slowing the introduction of COVID–19 into such disparate locations within the United States. The United States is in a phase where suspending the introduction of persons from certain countries or places may be required in the interest of the public health, because it could still materially reduce the transmission and spread of COVID–19 in the United States. Because persons can have COVID–19 and be asymptomatic at the time of introduction into the United States, and because the completion of testing for COVID–19 may take three to four days, it is impracticable to confirm who is infected with COVID–19 and who is not infected with COVID–19 as persons move into the United States.

Similarly, Federal quarantines or isolations of all such persons pending test results would be impracticable due to the numbers of persons involved, logistical challenges, and CDC resource and personnel constraints.

In addition, whereas section 212(f) of the INA applies to the "entry" of aliens, section 362 applies to the "introduction" of persons into the United States. Therefore, although 212(f) has been effective in slowing the transmission or spread of COVID–19 in the United States, section 362 provides CDC with a mechanism tied specifically to persons who increase the danger of introducing COVID–19 into the United States.

Given the national emergency caused by COVID–19, it would be impracticable and contrary to the public health—and, by extension, the public interest—to delay these implementing regulations until a full public notice-and-comment process is completed.

Pursuant to 5 U.S.C. 553(b)(3)(B), and for the reasons stated above, HHS therefore concludes that there is good cause to dispense with prior public notice and the opportunity to comment on this rule before finalizing this rule. For the same reasons, HHS has determined, consistent with section 553(d) of the APA, that there is good cause to make this interim final rule effective immediately upon filing at the Office of the Federal Register.

## IV. Request for Comment

HHS requests comment on all aspects of this interim final rule, including its likely costs and benefits and the impacts that it is likely to have on the public health, as compared to the current requirements under 42 CFR part 71.

## VI. Regulatory Impact Analysis

### Executive Orders 12866 and 13563 and Regulatory Flexibility Act

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, and public health and safety effects; distributive impacts; and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a regulation (1) having an annual effect on the economy of $100 million or more in

any one year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities (also referred to as "economically significant"); (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order. This interim final rule is economically significant for the purposes of Executive Orders 12866 and 13563. CDC, however, is proceeding under the emergency provision at Executive Order 12866 Section 6(a)(3)(D) based on the need to move expeditiously during the current public health emergency to limit the number of new cases of COVID–19.

The Regulatory Flexibility Act (RFA) generally requires that when an agency issues a proposed rule, or a final rule pursuant to section 553(b) of the APA or another law, the agency must prepare a regulatory flexibility analysis that meets the requirements of the RFA and publish such analysis in the **Federal Register**. 5 U.S.C. 603, 604. Specifically, the RFA normally requires agencies to describe the impact of a rulemaking on small entities by providing a regulatory impact analysis. Such analysis must address the consideration of regulatory options that would lessen the economic effect of the rule on small entities. The RFA defines a "small entity" as (1) a proprietary firm meeting the size standards of the Small Business Administration (SBA); (2) a nonprofit organization that is not dominant in its field; or (3) a small government jurisdiction with a population of less than 50,000. 5 U.S.C. 601(3)–(6). Except for such small government jurisdictions, neither State nor local governments are "small entities." Similarly, for purposes of the RFA, individual persons are not small entities. The requirement to conduct a regulatory impact analysis does not apply if the head of the agency "certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. 605(b). The agency must, however, publish the certification in the **Federal Register** at the time of publication of the rule, "along with a statement providing the factual basis for such certification."

*Id.* If the agency head has not waived the requirements for a regulatory flexibility analysis in accordance with the RFA's waiver provision, and no other RFA exception applies, the agency must prepare the regulatory flexibility analysis and publish it in the **Federal Register** at the time of promulgation or, if the rule is promulgated in response to an emergency that makes timely compliance impracticable, within 180 days of publication of the final rule. 5 U.S.C. 604(a), 608(b).[19]

This interim final rule establishes a regulatory mechanism for the exercise of the PHS Act section 362 suspension authority, which directly applies against persons and not State, local, or tribal governments, or the private sector. Accordingly, HHS and CDC believe that this interim final rule would likely impact only persons, and that it would, therefore, not have a significant economic impact on a substantial number of small entities. In addition, for the reasons set forth in this document pertaining to the COVID–19 outbreak, the Secretary finds that this interim final rule is being promulgated in response to an emergency that makes timely compliance with the provisions of section 604 impracticable. CDC will assess the potential impacts—including economic effects—of this action on all small entities. Based on that assessment, the Secretary will either certify that the rule will not have a significant economic impact on a substantial number of small entities or publish a final regulatory flexibility analysis.

### Unfunded Mandates Reform Act

Section 202 of the Unfunded Mandates Reform Act of 1995 (Unfunded Mandates Act) (2 U.S.C. 1532) requires that covered agencies prepare a budgetary impact statement before promulgating a rule that includes any Federal mandate that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million in 1995 dollars, updated annually for inflation. Currently, that threshold is approximately $154 million. If a

---

[19] An agency head may delay the completion of the regulatory impact analysis requirements for a period of not more than 180 days after the date of publication in the **Federal Register** of a final rule by publishing in the **Federal Register**, not later than such date of publication, a written finding, with reasons therefor, that the final rule is being promulgated in response to an emergency that makes timely compliance with such requirements impracticable. If the agency has not prepared a final regulatory analysis within 180 days from the date of publication of the final rule, the RFA provides that the rule shall lapse and have no effect and shall not be re-promulgated until a final regulatory flexibility analysis has been completed by the agency. 5 U.S.C. 608(b).

budgetary impact statement is required, section 205 of the Unfunded Mandates Act also requires covered agencies to identify and consider a reasonable number of regulatory alternatives before promulgating a rule. HHS has determined that this interim final rule is not expected to result in expenditures by State, local, and tribal governments, or by the private sector, of $154 million or more in any one year because it only establishes a regulatory mechanism for the exercise of the PHS Act section 362 suspension authority, which applies against persons and not State, local, or tribal governments, or the private sector. Accordingly, HHS has not prepared a budgetary impact statement or specifically addressed the regulatory alternatives considered.

*National Environmental Policy Act (NEPA)*

HHS has determined that the amendments to 42 CFR part 71 will not have a significant impact on the human environment.

*Executive Order 12988: Civil Justice Reform*

HHS has reviewed this rule under Executive Order 12988 on Civil Justice Reform and has determined that this interim final rule meets the standard in the Executive Order.

*Executive Order 13132: Federalism*

This interim final rule has been reviewed under Executive Order 13132, Federalism. Under 42 U.S.C. 264(e), Federal public health regulations do not preempt State or local public health regulations, except in the event of a conflict with the exercise of Federal authority. Other than to restate this statutory provision, this rulemaking does not alter the relationship between the Federal government and State/local governments as set forth in 42 U.S.C. 264. The longstanding provision on preemption in the event of a conflict with Federal authority (42 CFR 70.2) is left unchanged by this rulemaking. Furthermore, there are no provisions in this regulation that impose direct compliance costs on State and local governments. Therefore, HHS believes that the interim final rule does not warrant additional analysis under Executive Order 13132.

*Plain Language Act of 2010*

Under the Plain Language Act of 2010 (Pub. L. 111–274, October 13, 2010), executive Departments and Agencies are required to use plain language in documents that explain to the public how to comply with a requirement the Federal Government administers or enforces. HHS/CDC has attempted to use plain language in promulgating this interim final rule, consistent with the Federal Plain Writing Act guidelines.

*Congressional Review Act*

The Congressional Review Act defines a ''major rule'' as ''any rule that the Administrator of the Office of Information and Regulatory Affairs (OIRA) of the Office of Management and Budget finds has resulted in or is likely to result in—(A) an annual effect on the economy of $100,000,000 or more; (B) a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; or (C) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.'' 5 U.S.C. 804(2). This Office of Information and Regulatory Affairs has determined that this interim final rule is a major rule for purposes of the Congressional Review Act. As this rule is promulgated under the ''good cause'' exemption of the Administrative Procedure Act, there is not a delay in its effective date under the Congressional Review Act.

*Assessment of Federal Regulation and Policies on Families*

Section 654 of the Treasury and General Government Appropriations Act of 1999 requires Federal departments and agencies to determine whether a proposed policy or regulation could affect family well-being. If the determination is affirmative, then the Department or agency must prepare an impact assessment to address criteria specified in the law. HHS has determined that this interim final rule will not have an impact on family well-being, as defined in the Act.

*Paperwork Reduction Act of 1995*

In accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. Ch. 3506; 5 CFR 1320 Appendix A.1), HHS has reviewed this interim final rule and has determined that there are no new collections of information contained therein.

**List of Subjects in 42 CFR Part 71**

Apprehension, Communicable diseases, Conditional release, CDC, Ill person, Isolation, Non-invasive, Public health emergency, Public health prevention measures, Qualifying stage, Quarantine, Quarantinable communicable disease.

For the reasons set forth in the preamble, the Department of Health and Human Services, on behalf of the Centers for Disease Control and Prevention, amends 42 CFR part 71 as follows:

**PART 71—FOREIGN QUARANTINE**

■ 1. The authority citation for part 71 continues to read as follows:

**Authority:** Secs. 215 and 311 of the Public Health Service (PHS) Act, as amended (42 U.S.C. 216, 243); secs. 361–369, PHS Act, as amended (42 U.S.C. 264–272).

■ 2. Add § 71.40 to Subpart D of part 71 to read as follows:

**§ 71.40  Prohibiting the introduction of persons from designated foreign countries and places into the United States.**

(a) The Director may prohibit the introduction into the United States of persons from designated foreign countries (or one or more political subdivisions and regions thereof) or places, only for such period of time that the Director deems necessary for the public health, by issuing an order in which the Director determines that:

(1) By reason of the existence of any communicable disease in a foreign country (or one or more political subdivisions or regions thereof) or place there is serious danger of the introduction of such communicable disease into the United States; and

(2) This danger is so increased by the introduction of persons from such country (or one or more political subdivisions or regions thereof) or place that a suspension of the introduction of such persons into the United States is required in the interest of the public health.

(b) For purposes of this section:

(1) *Introduction into the United States* of persons from a foreign country (or one or more political subdivisions or regions thereof) or place means the movement of a person from a foreign country (or one or more political subdivisions or regions thereof) or place, or series of foreign countries or places, into the United States so as to bring the person into contact with persons in the United States, or so as to cause the contamination of property in the United States, in a manner that the Director determines to present a risk of transmission of a communicable disease to persons or property, even if the communicable disease has already been introduced, transmitted, or is spreading within the United States;

(2) *Serious danger of the introduction of such communicable disease into the United States* means the potential for introduction of vectors of the

communicable disease into the United States, even if persons or property in the United States are already infected or contaminated with the communicable disease; and

(3) The term "*Place*" includes any location specified by the Director, including any carrier, as that term is defined in 42 CFR 71.1, whatever the carrier's nationality.

(c) In any order issued under this section, the Director shall designate the foreign countries (or one or more political subdivisions or regions thereof) or places; the period of time or circumstances under which the introduction of any persons or class of persons into the United States shall be suspended; and the conditions under which that prohibition on introduction, in whole or in part, shall be effective, including any relevant exceptions that the Director determines are appropriate.

(d) Before issuing any order under this section, the Director may coordinate with State and local authorities and other Federal departments or agencies as he deems appropriate in his discretion.

(1) If the order will be implemented in whole or in part by State and local authorities who have agreed to do so under 42 U.S.C. 243(a), then the Director may explain in the order the procedures and standards by which those authorities are expected to aid in the enforcement of the order.

(2) If the order will be implemented in whole or in part by designated customs officers (including officers of the Department of Homeland Security with U.S. Customs and Border Protection, who exercise the authorities of customs officers) or Coast Guard officers under 42 U.S.C. 268(b), or another Federal department or agency, then the Director shall, in coordination with the Secretary of Homeland Security or other applicable Federal department or agency head, explain in the order the procedures and standards by which any authorities or officers or agents are expected to aid in the enforcement of the order, to the extent that they are permitted to do so under their existing legal authorities.

(e) This section does not apply to members of the armed forces of the United States and associated personnel for whom the Secretary of Defense provides assurance to the Director that the Secretary of Defense, through measures such as quarantine, isolation, or other measures maintaining control over such individuals, is preventing the risk of transmission of a communicable disease into the United States.

(f) This section shall not apply to U.S. citizens and lawful permanent residents.

Alex M. Azar II,
*Secretary, Department of Health and Human Services.*

[FR Doc. 2020–06238 Filed 3–20–20; 4:15 pm]
**BILLING CODE 4163–18–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### 42 CFR Part 71

### Order Suspending Introduction of Persons From a Country Where a Communicable Disease Exists

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Notification of order.

---

**SUMMARY:** This document is to inform the public that the Director of the Centers for Disease Control and Prevention, an agency of the Department of Health and Human Services, has issued an Order suspending the introduction of persons into the United States.

**DATES:** *Effective date:* The Order referenced in this document is effective on 11:59 p.m. EDT on March 20th, 2020.

**FOR FURTHER INFORMATION CONTACT:** Kyle McGowan, Office of the Chief of Staff, Centers for Disease Control and Prevention, 1600 Clifton Road NE, MS H21–10, Atlanta, GA 30329. Telephone: 404–498–7000; email: *cdcregulations@cdc.gov.*

**SUPPLEMENTARY INFORMATION:** The CDC Director (Director) has issued an Order pursuant to section 362 of the Public Health Service Act, 42 U.S.C. 265. The Order suspends the introduction of certain persons into the United States because the Director has determined that the existence of Coronavirus Disease 2019 (COVID–19) in certain foreign countries creates a serious danger of the introduction of the disease into the United States, and the danger is so increased by the introduction of persons from the foreign countries that a temporary suspension of the introduction of such persons is necessary to protect the public health. The Order is posted on the website for the Centers for Disease Control and Prevention. It will be submitted to the **Federal Register** for publication.

The Order does not apply to U.S. citizens, lawful permanent residents, persons from foreign countries who hold valid travel documents, or persons from foreign countries in the visa waiver program who are not subject to travel restrictions.

The U.S. Department of Homeland Security (DHS) is implementing the Order. The Order also does not apply where a designated customs officer of DHS determines, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests, that the Order should not be applied to a specific person otherwise subject to the order.

Finally, the Order does not apply to members of the armed forces of the United States and associated personnel for whom the Secretary of Defense provides assurance to the Director that the Secretary of Defense, through measures such as quarantine, isolation, or other measures for maintaining control over such individuals, is preventing the risk of transmission of COVID–19 to others in the United States.

Dated: March 20, 2020.

Alex M. Azar II,
*Secretary, Department of Health and Human Services.*

[FR Doc. 2020–06241 Filed 3–20–20; 4:15 pm]
**BILLING CODE P**

---

## FEDERAL COMMUNICATIONS COMMISSION

### 47 CFR Parts 25, 73, and 76

[MB Docket Nos. 17–317, 17–105; FCC 19–69; FRS 16539]

### Carriage Election Notification Procedures

**AGENCY:** Federal Communications Commission.

**ACTION:** Final rule; announcement of compliance date.

---

**SUMMARY:** In this document, the Commission announces that the Office of Management and Budget (OMB) has approved the information collections associated with the carriage election procedures adopted in the Commission's *2019 CEN Order,* FCC 19–69, and that compliance with the modified rules is now required. This document is consistent with the *2019 CEN Order,* FCC 19–69, which states that the Commission will publish a document in the **Federal Register** announcing a compliance date for the modified rule sections and revise the rule accordingly.

**DATES:** *Compliance date:* Compliance with 47 CFR 25.701, 73.3526, 73.3527, 76.64, and 76.66(d), published at 84 FR

# DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 214 and 274a**

[CIS No. 2689–21]

**RIN 1615–AC72**

# DEPARTMENT OF LABOR

**Employment and Training Administration**

**20 CFR Part 655**

[DOL Docket No. ETA–2021–0005]

**RIN 1205–AC07**

## Exercise of Time-Limited Authority To Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS) and Employment and Training Administration and Wage and Hour Division, U.S. Department of Labor (DOL).

**ACTION:** Temporary rule.

---

**SUMMARY:** The Secretary of Homeland Security, in consultation with the Secretary of Labor, is exercising his time-limited Fiscal Year (FY) 2021 authority and increasing the numerical limitation on H–2B nonimmigrant visas to authorize the issuance of no more than 22,000 additional visas through the end of the second half of FY 2021 to those businesses likely to suffer irreparable harm, as attested by the employer on a new attestation form. In addition to making additional visas available under the FY 2021 time-limited authority, DHS is exercising its general H–2B regulatory authority to temporarily provide portability flexibility by allowing H–2B workers who are already in the United States to begin work immediately after an H–2B petition (supported by a valid temporary labor certification) is received by USCIS, and before it is approved.

**DATES:** The amendments to title 8 of the Code of Federal Regulations in this rule are effective from May 25, 2021 through May 28, 2024, although DHS will not approve any H–2B petition under the provisions related to the supplemental numerical allocation after September 30, 2021, and the provisions related to portability are only available to petitioners and H–2B nonimmigrant workers initiating employment through the end of November 22, 2021. The amendments to title 20 of the Code of Federal Regulations in this rule are effective from May 25, 2021 through September 30, 2021, except for 20 CFR 655.68 which is effective from May 25, 2021 through September 30, 2024.

The Office of Foreign Labor Certification within the U.S. Department of Labor will be accepting comments in connection with the new information collection Form ETA–9142B–CAA–4 associated with this rule until July 26, 2021.

**ADDRESSES:** You may submit written comments on the new information collection Form ETA–9142B–CAA–4, identified by Regulatory Information Number (RIN) 1205–AC07 electronically by the following method:

*Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions on the website for submitting comments.

*Instructions:* Include the agency's name and the RIN 1205–AC07 in your submission. All comments received will become a matter of public record and will be posted without change to *http://www.regulations.gov.* Please do not include any personally identifiable information or confidential business information you do not want publicly disclosed.

**FOR FURTHER INFORMATION CONTACT:** Regarding 8 CFR parts 214 and 274a: Charles L. Nimick, Chief, Business and Foreign Workers Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746; telephone 240–721–3000 (not a toll-free call).

Regarding 20 CFR part 655 and Form ETA–9142B–CAA–4: Brian D. Pasternak, Administrator, Office of Foreign Labor Certification, Employment and Training Administration, Department of Labor, 200 Constitution Ave NW, Room N–5311, Washington, DC 20210, telephone (202) 693–8200 (this is not a toll-free number).

Individuals with hearing or speech impairments may access the telephone numbers above via TTY by calling the toll-free Federal Information Relay Service at 1–877–889–5627 (TTY/TDD).

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
II. Background
  A. Legal Framework
  B. H–2B Numerical Limitations Under the INA
  C. FY 2021 Omnibus
  D. Joint Issuance of the Final Rule
III. Discussion
  A. Statutory Determination
  B. Numerical Increase and Allocation of up to 22,000 Visas
  C. Returning Workers
  D. Returning Worker Exemption for up to 6,000 Visas for Nationals of Guatemala, El Salvador, and Honduras (Northern Triangle Countries)
  E. Business Need Standard—Irreparable Harm and FY 2021 Attestation
  F. Portability
  G. COVID–19 Worker Protections
  H. DHS Petition Procedures
  I. DOL Procedures
IV. Statutory and Regulatory Requirements
  A. Administrative Procedure Act
  B. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)
  C. Regulatory Flexibility Act
  D. Unfunded Mandates Reform Act of 1995
  E. Small Business Regulatory Enforcement Fairness Act of 1996
  F. Executive Order 13132 (Federalism)
  G. Executive Order 12988 (Civil Justice Reform)
  H. Congressional Review Act
  I. National Environmental Policy Act
  J. Paperwork Reduction Act

## I. Executive Summary

*FY 2021 H–2B Supplemental Cap*

With this temporary final rule (TFR), the Secretary of Homeland Security, following consultation with the Secretary of Labor, is authorizing the immediate release of an additional 22,000 H–2B visas through the end of FY 2021, subject to certain conditions. The 22,000 visas are divided into two allocations, as follows:

• 16,000 visas limited to returning workers, regardless of country of nationality, in other words, those workers who were issued H–2B visas or held H–2B status in fiscal years 2018, 2019, or 2020; and

• 6,000 visas initially reserved for nationals of the Northern Triangle countries as attested by the petitioner (regardless of whether such nationals are returning workers). However, if all 6,000 visas reserved for nationals of the Northern Triangle countries are not allocated by July 8, 2021, USCIS will announce by July 23, 2021, on its website, that such unused Northern Triangle country visas will be made available to employers regardless of the beneficiary's country of nationality, subject to the returning worker limitation.

To qualify for the FY 2021 supplemental cap, eligible petitioners must:

• Meet all existing H–2B eligibility requirements, including obtaining an approved temporary labor certification

(TLC) from DOL before filing the Form I–129, Petition for Nonimmigrant Worker, with USCIS;

• Submit an attestation affirming, under penalty of perjury, that the employer will likely suffer irreparable harm if it cannot employ the requested H–2B workers, and that it is seeking to employ returning workers only, unless the H–2B worker is a Northern Triangle national and counted towards the 6,000 cap (during such time as when the Northern Triangle cap reservation allocation is applicable); and

• Agree to comply with all applicable labor and employment laws, including health and safety laws pertaining to COVID–19, as well as any rights to time off or paid time off to obtain COVID–19 vaccinations, and notify the workers in a language understood by the worker, as necessary or reasonable, of equal access of nonimmigrants to COVID–19 vaccines and vaccination distribution sites.

Employers filing an H–2B petition 45 or more days after the certified start date on the TLC, must attest to engaging in the following additional steps to recruit U.S. workers:

• No later than 1 business day after filing the petition, place a new job order with the relevant State Workforce Agency (SWA) for at least 15 calendar days;

• Contact the nearest American Job Center serving the geographic area where work will commence and request staff assistance in recruiting qualified U.S. workers;

• Contact the employer's former U.S. workers, including those the employer furloughed or laid off beginning on January 1, 2019, and until the date the H–2B petition is filed, disclose the terms of the job order and solicit their return to the job;

• Provide written notification of the job opportunity to the bargaining representative for the employer's employees in the occupation and area of employment, or post notice of the job opportunity at the anticipated worksite if there is no bargaining representative; and

• Hire any qualified U.S. worker who applies or is referred for the job opportunity until the later of either (1) the date on which the last H–2B worker departs for the place of employment, or (2) 30 days after the last date of the SWA job order posting.

Petitioners filing H–2B petitions under the FY 2021 supplemental cap must retain documentation of compliance with the attestation requirements for 3 years from the date the TLC was approved, and must provide the documents and records upon the request of DHS or DOL, as well as fully cooperate with any compliance reviews such as audits. Both DHS and DOL intend to conduct a significant number of post-adjudication audits to ascertain compliance with the attestation requirements of this TFR.

Falsifying information in attestation(s) can result not only in penalties relating to perjury, but can also result in, among other things, a finding of fraud or willful misrepresentation; denial or revocation of the H–2B petition requesting supplemental workers; debarment by DOL and DHS from the H–2 program; and may subject petitioner/employer to other criminal penalties.

The authority to approve H–2B petitions under the FY 2021 supplemental cap expires on September 30, 2021.

*H–2B Portability*

In addition to exercising time limited authority to make additional H–2B visas available in FY 2021, DHS is providing additional flexibilities to H–2B petitioners under its general programmatic authority by allowing nonimmigrant workers in the United States in valid H–2B status to begin work with a new employer after an H–2B petition (supported by a valid TLC) is filed and before the petition is approved generally for a period of up to 60 days. However, such employment authorization would end 15 days after USCIS denies the H–2B petition or such petition is withdrawn. This H–2B portability ends 180 days after the effective date of this rule, in other words, after the date this rule is published in the **Federal Register**.

## II. Background

### A. Legal Framework

The Immigration and Nationality Act (INA), as amended, establishes the H–2B nonimmigrant classification for a nonagricultural temporary worker "having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform . . . temporary [non-agricultural] service or labor if unemployed persons capable of performing such service or labor cannot be found in this country." INA section 101(a)(15)(H)(ii)(b), 8 U.S.C. 1101(a)(15)(H)(ii)(b). Employers must petition the Department of Homeland Security (DHS) for classification of prospective temporary workers as H–2B nonimmigrants. INA section 214(c)(1), 8 U.S.C. 1184(c)(1). Generally, DHS must approve this petition before the beneficiary can be considered eligible for an H–2B visa. In addition, the INA requires that "[t]he question of importing any alien as [an H–2B] nonimmigrant . . . in any specific case or specific cases shall be determined by [DHS],[1] after consultation with appropriate agencies of the Government." INA section 214(c)(1), 8 U.S.C. 1184(c)(1). The INA generally charges the Secretary of Homeland Security with the administration and enforcement of the immigration laws, and provides that the Secretary "shall establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority" under the INA. *See* INA section 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3); *see also* 6 U.S.C. 202(4) (charging the Secretary with "[e]stablishing and administering rules . . . governing the granting of visas or other forms of permission . . . to enter the United States to individuals who are not a citizen or an alien lawfully admitted for permanent residence in the United States"). With respect to nonimmigrants in particular, the INA provides that "[t]he admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the [Secretary] may by regulations prescribe." INA section 214(a)(1), 8 U.S.C. 1184(a)(1); *see also* INA section 274A(h)(1) and (3), 8 U.S.C. 1324a(h)(1) and (3) (prohibiting employment of noncitizen[2] not authorized for employment). The Secretary may designate officers or employees to take and consider evidence concerning any matter which is material or relevant to the enforcement of the INA. INA sections 287(a)(1), (b), 8 U.S.C. 1357(a)(1), (b) and INA section 235(d)(3), 8 U.S.C. 1225(d)(3).

Finally, under section 101 of HSA, 6 U.S.C. 111(b)(1)(F), a primary mission of DHS is to "ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland."

DHS regulations provide that an H–2B petition for temporary employment in the United States must be accompanied by an approved TLC from the U.S.

---

[1] As of March 1, 2003, in accordance with section 1517 of Title XV of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the Immigration and Nationality Act describing functions which were transferred from the Attorney General or other Department of Justice official to the Department of Homeland Security by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (2003) (codifying HSA, Title XV, sec. 1517); 6 U.S.C. 542 note; 8 U.S.C. 1551 note.

[2] For purposes of this discussion, the Departments use the term "noncitizen" colloquially to be synonymous with the term "alien" as it is used in the Immigration and Nationality Act.

Department of Labor (DOL), issued pursuant to regulations established at 20 CFR part 655, or from the Guam Department of Labor if the workers will be employed on Guam. 8 CFR 214.2(h)(6)(iii)(A) and (C) through (E), (h)(6)(iv)(A); *see also* INA section 103(a)(6), 8 U.S.C. 1103(a)(6). The TLC serves as DHS's consultation with DOL with respect to whether a qualified U.S. worker is available to fill the petitioning H–2B employer's job opportunity and whether a foreign worker's employment in the job opportunity will adversely affect the wages and working conditions of similarly-employed U.S. workers. *See* INA section 214(c)(1), 8 U.S.C. 1184(c)(1); 8 CFR 214.2(h)(6)(iii)(A) and (D).

In order to determine whether to issue a TLC, the Departments have established regulatory procedures under which DOL certifies whether a qualified U.S. worker is available to fill the job opportunity described in the employer's petition for a temporary nonagricultural worker, and whether a foreign worker's employment in the job opportunity will adversely affect the wages or working conditions of similarly employed U.S. workers. *See* 20 CFR part 655, subpart A. The regulations establish the process by which employers obtain a TLC and the rights and obligations of workers and employers.

Once the petition is approved, under the INA and current DHS regulations, H–2B workers do not have employment authorization outside of the validity period listed on the approved petition unless otherwise authorized, and the workers are limited to employment with the H–2B petitioner. *See* 8 U.S.C. 1184(c)(1), 8 CFR 274a.12(b)(9). An employer or U.S. agent generally may submit a new H–2B petition, with a new, approved TLC, to USCIS to request an extension of H–2B nonimmigrant status for the validity of the TLC or for a period of up to 1 year. 8 CFR 214.2(h)(15)(ii)(C). Except as provided for in this rule, and except for certain professional athletes being traded among organizations,[3] H–2B workers seeking to extend their status with a new employer may not begin employment with the new employer until the new H–2B petition is approved.

The INA also authorizes DHS to impose appropriate remedies against an employer for a substantial failure to meet the terms and conditions of employing an H–2B nonimmigrant worker, or for a willful misrepresentation of a material fact in a petition for an H–2B nonimmigrant worker. INA section 214(c)(14)(A), 8 U.S.C. 1184(c)(14)(A). The INA expressly authorizes DHS to delegate certain enforcement authority to DOL. INA section 214(c)(14)(B), 8 U.S.C. 1184(c)(14)(B); *see also* INA section 103(a)(6), 8 U.S.C. 1103(a)(6). DHS has delegated its authority under INA section 214(c)(14)(A)(i), 8 U.S.C. 1184(c)(14)(A)(i) to DOL. *See* DHS, Delegation of Authority to DOL under Section 214(c)(14)(A) of the INA (Jan. 16, 2009); *see also* 8 CFR 214.2(h)(6)(ix) (stating that DOL may investigate employers to enforce compliance with the conditions of, among other things, an H–2B petition and a DOL-approved TLC). This enforcement authority has been delegated within DOL to the Wage and Hour Division (WHD), and is governed by regulations at 29 CFR part 503.

*B. H–2B Numerical Limitations Under the INA*

The INA sets the annual number of noncitizens who may be issued H–2B visas or otherwise provided H–2B nonimmigrant status to perform temporary nonagricultural work at 66,000, to be distributed semi-annually beginning in October and April. *See* INA sections 214(g)(1)(B) and (g)(10), 8 U.S.C. 1184(g)(1)(B) and (g)(10). With certain exceptions, described below, up to 33,000 noncitizens may be issued H–2B visas or provided H–2B nonimmigrant status in the first half of a fiscal year, and the remaining annual allocation, including any unused nonimmigrant H–2B visas from the first half of a fiscal year, will be available for employers seeking to hire H–2B workers during the second half of the fiscal year.[4] If insufficient petitions are approved to use all H–2B numbers in a given fiscal year, the unused numbers cannot be carried over for petition approvals for employment start dates beginning on or after the start of the next fiscal year.

In FYs 2005, 2006, 2007, and 2016, Congress exempted H–2B workers identified as returning workers from the annual H–2B cap of 66,000.[5] A returning worker is defined by statute as an H–2B worker who was previously counted against the annual H–2B cap during a designated period of time. For example, Congress designated that returning workers for FY 2016 needed to have been counted against the cap during FY 2013, 2014, or 2015.[6] DHS and the Department of State (DOS) worked together to confirm that all workers requested under the returning worker provision in fact were eligible for exemption from the annual cap (in other words, were issued an H–2B visa or provided H–2B status during one of the prior 3 fiscal years) and were otherwise eligible for H–2B classification.

Because of the strong demand for H–2B visas in recent years, the statutorily-limited semi-annual visa allocation, the DOL regulatory requirement that employers apply for a TLC 75 to 90 days before the start date of work,[7] and the DHS regulatory requirement that all H–2B petitions be accompanied by an approved TLC,[8] employers that wish to obtain visas for their workers under the semi-annual allotment must act early to receive a TLC and file a petition with U.S. Citizenship and Immigration Services (USCIS). As a result, DOL typically sees a significant spike in TLC applications from employers seeking to hire H–2B temporary or seasonal workers prior to the United States' warm weather months. For example, in FY 2021, based on TLC applications filed during the 3-day filing window of January 1 through 3, 2021, DOL's Office of Foreign Labor Certification (OFLC) received requests to certify 96,641 worker positions for start dates of work on April 1, 2021.[9] USCIS, in turn, received sufficient H–2B petitions to reach the second half of the fiscal year

---

[3] *See* 8 CFR 214.2(h)(6)(vii) and 8 CFR 274a.12(b)(9).

[4] The Federal Government's fiscal year runs from October 1 of the prior year through September 30 of the year being described. For example, fiscal year 2021 is from October 1, 2020, through September 30, 2021.

[5] INA section 214(g)(9)(A), 8 U.S.C. 1184(g)(9)(A), *see also* Consolidated Appropriations Act, 2016, Public Law 114–113, div. F, tit. V, sec 565; John Warner National Defense Authorization Act for Fiscal Year 2007, Public Law 109–364, div. A, tit. X, sec. 1074, (2006); Save Our Small and Seasonal Businesses Act of 2005, Public Law 109–13, div. B, tit. IV, sec. 402.

[6] *See* Consolidated Appropriations Act, 2016, Public Law 114–113, div. F, tit. V, sec 565.

[7] 20 CFR 655.15(b).

[8] *See* 8 CFR 214.2(h)(5)(i)(A).

[9] DOL announcement on January 7, 2021. *See https://www.foreignlaborcert.doleta.gov/* (last accessed on April 9, 2021). For historical context, with the FY 2020 statutory cap, DOL announced on January 6, 2020 that it received requests to certify 99,362 worker positions for start dates of work on April 1, 2020. On February 26, 2020, USCIS announced that it had received a sufficient number of petitions to reach the congressionally mandated H–2B cap for FY 2020. On February 18, 2020, the number of beneficiaries listed on petitions received by USCIS surpassed the total number of remaining H–2B visas available against the H–2B cap for the second half of FY 2020. In accordance with regulations, USCIS determined it was necessary to use a computer generated process, commonly known as a lottery, to ensure the fair and orderly allocation of H–2B visa numbers to meet, but not exceed, the remainder of the FY 2020 cap. 8 CFR 214.2(h)(vii). On February 20, 2020, USCIS conducted a lottery to randomly select petitions from those received on February 18, 2020. As a result, USCIS assigned all petitions selected in the lottery the receipt date of February 20, 2020.

statutory cap by February 12, 2021.[10] This early date continues to reflect an ongoing trend of higher H–2B demand in the second half of the fiscal year compared to the statutorily authorized level. Congress, in recognition of this increased demand: (1) Allowed for additional H–2B workers through the FY 2016 reauthorization of the returning worker cap exemption;[11] and (2) for the last 5 fiscal years authorized supplemental caps under section 543 of Division F of the Consolidated Appropriations Act, 2017, Public Law 115–31 (FY 2017 Omnibus); section 205 of Division M of the Consolidated Appropriations Act, 2018, Public Law 115–141 (FY 2018 Omnibus); section 105 of Division H of the Consolidated Appropriations Act, 2019, Public Law 116–6 (FY 2019 Omnibus); section 105 of Division I of the Further Consolidated Appropriations Act, 2020, Public Law 116–94 (FY 2020 Omnibus);[12] and section 105 of Division O of the Consolidated Appropriations Act, 2021, Public Law 116–260 (FY 2021 Omnibus), which is discussed below.

### C. FY 2021 Omnibus

On December 27, 2020, then-President Donald Trump signed the FY 2021 Omnibus which contains a provision, section 105 of Division O (section 105), permitting the Secretary of Homeland Security, under certain circumstances and after consultation with the Secretary of Labor, to increase the number of H–2B visas available to U.S. employers, notwithstanding the otherwise-established statutory numerical limitation set forth in the INA. Specifically, section 105 provides

that "the Secretary of Homeland Security, after consultation with the Secretary of Labor, and upon the determination that the needs of American businesses cannot be satisfied in [FY] 2021 with U.S. workers who are willing, qualified, and able to perform temporary nonagricultural labor," may increase the total number of noncitizens who may receive an H–2B visa in FY 2021 by not more than the highest number of H–2B nonimmigrants who participated in the H–2B returning worker program in any fiscal year in which returning workers were exempt from the H–2B numerical limitation.[13] The Secretary of Homeland Security has consulted with the Secretary of Labor, and this rule implements the authority contained in section 105.

As noted above, since FY 2017, Congress has enacted a series of public laws providing the Secretary of Homeland Security with the discretionary authority to increase the H–2B cap beyond that set forth in section 214 of the INA. The previous four statutory provisions are materially identical to section 105 of the FY 2021 Omnibus. During each fiscal year from FY 2017 through FY 2019, the Secretary of Homeland Security, after consulting with the Secretary of Labor, determined that the needs of some American businesses could not be satisfied in such year with U.S. workers who were willing, qualified, and able to perform temporary nonagricultural labor. On the basis of these determinations, on July 19, 2017, and May 31, 2018, DHS and DOL jointly published temporary final rules for FY 2017 and FY 2018, respectively, each of which allowed an increase of up to 15,000 additional H–2B visas for those businesses that attested that if they did not receive all of the workers requested on the Petition for a Nonimmigrant Worker (Form I–129), they were likely to suffer irreparable harm, in other words, suffer a permanent and severe financial loss.[14] A total of 12,294 H–2B workers were approved for H–2B classification under petitions filed

pursuant to the FY 2017 supplemental cap increase.[15] In FY 2018, USCIS received petitions for more than 15,000 beneficiaries during the first 5 business days of filing for the supplemental cap, and held a lottery on June 7, 2018. The total number of H–2B workers approved toward the FY 2018 supplemental cap increase was 15,788.[16] The vast majority of the H–2B petitions received under the FY 2017 and FY 2018 supplemental caps requested premium processing[17] and were adjudicated within 15 calendar days.

On May 8, 2019, DHS and DOL jointly published a temporary final rule authorizing an increase of up to 30,000 additional H–2B visas for the remainder of FY 2019. The additional visas were limited to returning workers who had been counted against the H–2B cap or were otherwise granted H–2B status in the previous 3 fiscal years, and for those businesses that attested to a level of need such that, if they did not receive all of the workers requested on the Form I–129, they were likely to suffer irreparable harm, in other words, suffer a permanent and severe financial loss.[18] The Secretary determined that limiting returning workers to those who were issued an H–2B visa or granted H–2B status in the past 3 fiscal years was appropriate, as it mirrored the standard that Congress designated in previous returning worker provisions. On June 5, 2019, approximately 30 days after the supplemental visas became available, USCIS announced that it received sufficient petitions filed pursuant to the FY 2019 supplemental cap increase. USCIS did not conduct a lottery for the FY 2019 supplemental cap increase. The total number of H–2B workers approved towards the FY 2019 supplemental cap increase was 32,666.[19] The vast majority

---

[10] On February 24, 2021, USCIS announced that it had received a sufficient number of petitions to reach the congressionally mandated H–2B cap for the second half of FY 2021. *See https://www.uscis.gov/news/alerts/h-2b-cap-reached-for-second-half-of-fy-2021* (Feb. 24, 2021). On February 12, 2021, the number of beneficiaries listed on petitions received by USCIS surpassed the total number of remaining H–2B visas available against the H–2B statutory cap for the second half of FY 2021. In accordance with regulations, USCIS determined it was necessary to use a computer-generated process, commonly known as a lottery, to ensure the fair and orderly distribution of H–2B visa numbers to meet, but not exceed, the remainder of the FY 2021 cap. 8 CFR 214.2(h)(8)(vii). On February 17, 2021, USCIS conducted a lottery to randomly select petitions from those received on February 12, 2021. As a result, USCIS assigned all petitions selected in the lottery the receipt date of February 17, 2021.

[11] INA section 214(g)(9)(a), 8 U.S.C. 1184(g)(9)(a), as revised by the Consolidated Appropriations Act of 2016 (Pub. L. 114–113). This program expired on September 30, 2016.

[12] DHS, after consulting with DOL, did not publish a temporary final rule supplementing the H–2B cap for FY 2020 pursuant to the Further Consolidated Appropriations Act, 2020, Public Law 116–94.

[13] The highest number of returning workers in any such fiscal year was 64,716, which represents the number of beneficiaries covered by H–2B returning worker petitions that were approved for FY 2007. DHS also considered using an alternative approach, under which DHS measured the number of H–2B returning workers admitted at the ports of entry (66,792 for FY 2007).

[14] Temporary Rule, *Exercise of Time-Limited Authority To Increase the Fiscal Year 2017 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program*, 82 FR 32987, 32998 (July 19, 2017); Temporary Rule, *Exercise of Time-Limited Authority To Increase the Fiscal Year 2018 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program*, 83 FR 24905, 24917 (May 31, 2018).

[15] USCIS data pulled from the Computer Linked Application Information Management System (CLAIMS3) database, available at *https://www.dhs.gov/publication/dhsuscispia-016-computer-linked-application-information-management-system-claims-3-and*, on Mar. 15, 2021.

[16] The number of approved workers exceeded the number of additional visas authorized for FY 2018 to allow for the possibility that some approved workers would either not seek a visa or admission, would not be issued a visa, or would not be admitted to the United States. USCIS data pulled from CLAIMS3 on Mar. 15, 2021.

[17] Premium processing allows for expedited processing for an additional fee. *See* INA 286(u), 8 U.S.C. 1356(u).

[18] Temporary Rule, *Exercise of Time-Limited Authority To Increase the Fiscal Year 2019 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program*, 84 FR 20005, 20021 (May 8, 2019).

[19] The number of approved workers exceeded the number of additional visas authorized for FY 2019 to allow for the possibility that some approved

Continued

of these petitions requested premium processing and were adjudicated within 15 calendar days.

Although Congress provided the Secretary of Homeland Security with the discretionary authority to increase the H–2B cap in FY 2020, the Secretary did not exercise that authority. DHS initially intended to exercise its authority and, on March 4, 2020, announced that it would make available 35,000 supplemental H–2B visas for the second half of fiscal year.[20] On March 13, 2020, then-President Trump declared a National Emergency concerning COVID–19, a communicable disease caused by the coronavirus SARS–CoV–2.[21] On April 2, 2020, DHS announced that the rule to increase the H–2B cap was on hold due to economic circumstances, and no additional H–2B visas would be released until further notice.[22] DHS also noted that the Department of State had suspended routine visa services.[23] As explained in further detail below, although the COVID–19 public health emergency is still in effect, DHS believes that it is appropriate to increase the H–2B cap coupled with additional protections (for example, post-adjudication audits, investigations, and compliance checks), for FY 2021 based on the demand for H–2B workers in the second half of FY 2021, recent and continuing economic growth, the improving job market and increased visa processing by the Department of State.

*D. Joint Issuance of This Final Rule*

As they did in FY 2017, FY 2018, and FY 2019, the Departments have determined that it is appropriate to jointly issue this temporary rule.[24] The determination to issue the temporary rule jointly follows conflicting court decisions concerning DOL's authority to independently issue legislative rules to carry out its consultative and delegated functions pertaining to the H–2B program under the INA.[25] Although

DHS and DOL each have authority to independently issue rules implementing their respective duties under the H–2B program,[26] the Departments are implementing section 105 in this manner to ensure there can be no question about the authority underlying the administration and enforcement of the temporary cap increase. This approach is consistent with rules implementing DOL's general consultative role under INA section 214(c)(1), 8 U.S.C. 1184(c)(1), and delegated functions under INA sections 103(a)(6) and 214(c)(14)(B), 8 U.S.C. 1103(a)(6), 1184(c)(14)(B).[27]

**III. Discussion**

*A. Statutory Determination*

Following consultation with the Secretary of Labor, the Secretary of Homeland Security has determined that the needs of some U.S. employers cannot be satisfied in FY 2021 with U.S. workers who are willing, qualified, and able to perform temporary nonagricultural labor. In accordance with section 105 of the FY 2021 Omnibus, the Secretary of Homeland Security has determined that it is appropriate, for the reasons stated below, to raise the numerical limitation on H–2B nonimmigrant visas up to 22,000 additional visas for those American businesses that attest to a level of need such that, if they do not receive the workers under the cap increase, they are likely to suffer irreparable harm, in other words, suffer a permanent and severe financial loss. These businesses must retain documentation, as described below, supporting this attestation.

DHS and DOL intend to conduct a significant number of random audits during the period of temporary need to verify compliance with H–2B program requirements, including the irreparable harm standard as well as other key worker protection provisions implemented through this rule. If an employer's documentation does not establish the likelihood of irreparable harm, or if the employer fails to provide evidence demonstrating irreparable harm or comply with the audit process, this may be considered a substantial violation resulting in an adverse agency action on the employer, including revocation of the petition and/or TLC or program debarment.

The Secretary of Homeland Security has also determined that for certain employers, additional recruitment steps are necessary to confirm that there are no qualified U.S. workers available for the positions. In addition, the Secretary of Homeland Security has determined that the supplemental visas will be limited to returning workers, with the exception that up to 6,000 of the 22,000 visas will be exempt from the returning worker requirement and will be reserved for H–2B workers who are nationals of Guatemala, Honduras, or El Salvador (the Northern Triangle countries).[28] The 6,000 H–2B visas are reserved for nationals of the Northern Triangle countries to further the objectives of E.O. 14010, which among other initiatives, instructs the Secretary of Homeland Security and the Secretary of State to implement measures to enhance access to visa programs for individuals from the Northern Triangle.[29] This decision supports the President's vision of expanding lawful pathways for protection and opportunity for individuals from the Northern Triangle.[30]

Similar to the temporary final rule for the FY 2019 supplemental cap, the Secretary of Homeland Security has also determined to limit the supplemental visas to H–2B returning workers, in other words, workers who were issued H–2B visas or were otherwise granted H–2B status in FY 2018, 2019, or 2020,[31] unless the employer indicates on the new attestation form that it is requesting workers who are nationals of the Northern Triangle countries and who are therefore counted towards the 6,000 allotment regardless of whether they are new or returning workers. If the 6,000 returning worker exemption cap for Northern Triangle nationals has been

---

workers would either not seek a visa or admission, would not be issued a visa, or would not be admitted to the United States. USCIS data pulled from CLAIMS3 on Mar. 15, 2021.

[20] DHS to Improve Integrity of Visa Program for Foreign Workers, March 5, 2020, *https://www.dhs.gov/news/2020/03/05/dhs-improve-integrity-visa-program-foreign-workers.*

[21] Proclamation 9994 of Mar. 13, 2020, *Declaring a National Emergency Concerning the Coronavirus Disease (COVID–19) Outbreak,* 85 FR 15337 (Mar. 18, 2020).

[22] *https://twitter.com/DHSgov/status/1245745115458568192?s=20.*

[23] *Id.*

[24] 82 FR 32987 (Jul. 19, 2017); 83 FR 24905 (May 31, 2018); 84 FR 20005 (May 8, 2019).

[25] *See Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Sec.,* 983 F.3d 671 (4th Cir. 2020); *see also Temporary Non-Agricultural Employment of*

*H–2B Aliens in the United States,* 80 FR 24042, 24045 (Apr. 29, 2015).

[26] *See Outdoor Amusement Bus. Ass'n,* 983 F.3d at 684–89.

[27] *See* 8 CFR 214.2(h)(6)(iii)(A) and (C), (h)(6)(iv)(A).

[28] These conditions and limitations are not inconsistent with sections 214(g)(3) ("first in, first out" H–2B processing) and (g)(10) (fiscal year H–2B allocations) because noncitizens covered by the special allocation under section 105 of the FY 2021 Omnibus are not "subject to the numerical limitations of [section 214(g)(1),]" *See, e.g.,* INA section 214(g)(3); INA section 214(g)(10); FY 2021 Omnibus div. O, sec. 105 ("Notwithstanding the numerical limitation set forth in section 214(g)(1)(B) of the [INA]. . . .").

[29] *See* Section 3(c) of E.O. 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, signed February 2, 2021. *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf.*

[30] *Id.*

[31] For purposes of this rule, these returning workers could have been H–2B cap exempt or extended H–2B status in FY 2018, 2019, or 2020. Additionally they may have been previously counted against the annual H–2B cap of 66,000 visas during FY 2018, 2019, or 2020, or the supplemental caps in FY 2018 or FY 2019.

reached and visas remain available under the returning worker cap, the petition would be rejected and any fees submitted returned to the petitioner. In such a case, a petitioner may continue to request workers who are nationals of one of the Northern Triangle countries, but the petitioner must file a new Form I–129 petition, with fee, and attest that these noncitizens will be returning workers, in other words, workers who were issued H–2B visas or were otherwise granted H–2B status in FY 2018, 2019, or 2020. If the 6,000 returning worker exemption cap for nationals of the Northern Triangle countries remains unfilled by July 8, 2021, USCIS will announce on its website that the remaining visas will be made available to the general public, but the petitioner must file a new Form I–129 petition and attest that these noncitizens will be returning workers.

The Secretary of Homeland Security's determination to increase the numerical limitation is based, in part, on the conclusion that some businesses are likely to suffer irreparable harm in the absence of a cap increase. Congress has expressed concern with the unavailability of H–2B visas for employers that need workers to start late in the fiscal year.[32] In addition, members of Congress have sent numerous letters to the Secretaries of Homeland Security and Labor about the needs of some U.S. businesses for H–2B workers (after the statutory cap for the second half of the fiscal year has been reached) and about the potentially negative impact on state and local economies if the cap is not increased.[33] U.S. businesses, chambers of commerce, employer organizations, and state and local elected officials have also written to the DHS and Labor Secretaries to express their concerns with the unavailability of H–2B visas after the statutory cap has been reached.[34] DHS held a stakeholder listening session on April 8, 2021, during and after which numerous small and seasonal business owners described the challenges they face absent the ability to secure H–2B workers because the statutory cap has been reached.[35]

The Secretary of Homeland Security and the Secretary of Labor heard from many trade unions and worker advocates who opposed raising the cap. They argued that the unemployment rate remains high. In particular, they provided evidence that the unemployment rate for summer-related occupations, such as landscaping workers, restaurant workers, construction workers and others, for which businesses were pressing for an increase in visas, exceeds the national average in unemployment.[36] They also pointed to what they consider weaknesses in the labor market test, and stated that some H–2B employers have violated labor laws, including requirements in the H–2B program.

After considering the full range of evidence and diverse points of view, the Secretary of Homeland Security has deemed it appropriate to take action to avoid irreparable harm to businesses that were unable to obtain H–2B workers under the statutory cap, including potential wage and job losses by their U.S. workers, as well as other adverse downstream economic effects.[37] At the same time, the Secretary of Homeland Security believes it is appropriate to condition receipt of supplemental visas on adherence to additional worker protections, particularly because of current national unemployment rates, as discussed below.

The decision to afford the benefits of this temporary cap increase to U.S. businesses that need workers to avoid irreparable harm and that will comply with additional worker protections, rather than applying the cap increase to any and all businesses seeking temporary workers, is consistent with section 105 of the FY 2021 Omnibus, as explained below. The Secretary of Homeland Security, in implementing section 105 and determining the scope of any such increase, has broad discretion, following consultation with the Secretary of Labor, to identify the business needs that are most relevant, while bearing in mind the need to protect U.S. workers. Within that context, for the below reasons, the Secretary of Homeland Security has determined to allow an overall increase of 22,000 additional visas solely for the businesses facing permanent, severe potential losses.

First, DHS interprets section 105's reference to "the needs of American businesses" as describing a need different from the need ordinarily required of employers in petitioning for an H–2B worker. Under the generally applicable H–2B program, each individual H–2B employer must demonstrate that it has a temporary need for the services or labor for which it seeks to hire H–2B workers. *See* 8 CFR 214.2(h)(6)(ii), 20 CFR 655.6. The use the phrase "needs of American businesses," which is not found in INA section 101(a)(15)(H)(ii)(b), 8 U.S.C. 1101(a)(15)(H)(ii)(b), or the regulations governing the standard H–2B program, authorizes the Secretary of Homeland Security in allocating additional H–2B visas under section 105 to require that employers establish a need above and beyond the normal standard under the H–2B program, that is, an inability to find sufficient qualified U.S. workers willing and available to perform services or labor and that the employment of the H–2B worker will not adversely affect the wages and working conditions of U.S. workers, *see* 8 CFR 214.2(h)(6)(i)(A). DOL concurs with this interpretation.

Second, the approach set forth in this rule limits the increase in a way that is similar to the implementation of the supplemental caps in fiscal years 2017, 2018, and 2019, and provides protections against adverse effects on U.S. workers that may result from a cap increase. Although there is not enough time to conduct a more full and formal quantitative analysis of such adverse effects, the Secretary has determined that in the particular circumstances presented here, it is appropriate, within the limits discussed below, to tailor the availability of this temporary cap increase to those businesses likely to suffer irreparable harm, in other words, those facing permanent and severe financial loss.

As noted above, to address the increased, and, in some cases, imminent need for H–2B workers, for FY 2021, the Secretary of Homeland Security has determined that employers may petition for supplemental visas on behalf of up to 16,000 workers who were issued an

---

[32] In the Joint Explanatory Statement for the FY 2018 DHS Consolidated Appropriations Act (Public Law 115–141), for example, Congress directed DHS, in consultation with DOL, to report on options to improve the accessibility of H–2B visas for employers that need workers to start late in the season. DHS submitted the report to Congress on June 7, 2019. Congress made a similar request in the Joint Explanatory Statement for the FY 2020 DHS Further Consolidated Appropriations Act (Public Law 116–94).

[33] See the docket for this rulemaking for access to these letters.

[34] *Id.*

[35] USCIS expects to post a recording of the stakeholder listening engagement on its Electronic Reading Room, at *https://www.uscis.gov/records/electronic-reading-room.*

[36] See: Department of Labor, Bureau of Labor Statistics, Labor Force Statistics from the Current Population Survey, Table A–30, available at *https://www.bls.gov/web/empsit/cpseea30.htm.* According to the March 2021 Current Population Survey, the unemployment rate for construction and landscaping workers was 9.5 percent and 9.9 percent, respectively, whereas the national unemployment rate was 6.2 percent.

[37] *See, e.g.,* Impacts of the H–2B Visa Program for Seasonal Workers on Maryland's Seafood Industry and Economy, Maryland Department of Agriculture Seafood Marketing Program and Chesapeake Bay Seafood Industry Association (March 2, 2020), available at *https://mda.maryland.gov/documents/2020-H2B-Impact-Study.pdf* (last visited May 7, 2021).

AR00621

H–2B visa or were otherwise granted H–2B status in FY 2018, 2019, or 2020.[38] The last three fiscal years' temporal limitation in the returning worker definition in this temporary rule mirrors the temporal limitation Congress imposed in previous returning worker statutes.[39] Such workers (in other words, those who recently participated in the H–2B program) have previously obtained H–2B visas and therefore have been vetted by DOS, would have departed the United States after their authorized period of stay as generally required by the terms of their nonimmigrant admission, and therefore may obtain their new visas through DOS and begin work more expeditiously.[40] DOS has informed DHS that, in general, H–2B visa applicants who are able to demonstrate clearly that they have previously abided by the terms of their status granted by DHS have a higher success rate when applying to renew their H–2B visas, as compared with the overall visa applicant pool from a given country. For that reason, some consular sections waive the in-person interview requirement for H–2B applicants whose visa expired within a specific timeframe and who otherwise meet the strict limitations set out under INA section 222(h), 8 U.S.C. 1202(h). We note that DOS has, in response to the COVID–19 pandemic, expanded interview waivers to some first-time H–2 applicants[41] potentially allowing some such applicants to be processed with increased efficiency. However, there is no indication that this temporary, short-term measure will necessarily affect the overall success rates of applicants, which DOS has indicated is higher for returning workers who can demonstrate prior compliance with the program.

Limiting the supplemental cap to returning workers is beneficial because

these workers have generally followed immigration law in good faith and demonstrated their willingness to return home after they have completed their temporary labor or services or their period of authorized stay, which is a condition of H–2B status. The returning worker condition therefore provides a basis to believe that H–2B workers under this cap increase will again abide by the terms and conditions of their visa. The returning worker condition also benefits employers that seek to re-hire known and trusted workers who have a proven positive employment track record while previously employed as workers in this country. While the Departments recognize that the returning worker requirement may limit to an extent the flexibility of employers that might wish to hire non-returning workers, the requirement provides an important safeguard against H–2B abuse, which DHS considers to be a significant consideration.

In allocating up to 6,000 H–2B visas to nationals of the Northern Triangle countries while making the remaining up to 16,000 H–2B initially available visas available to qualified returning workers, irrespective of their country of nationality, this rule strikes a balance between furthering the U.S. foreign policy interests of creating a comprehensive framework—of which this allocation is one piece—to address and manage migration from the Northern Triangle and addressing the needs of certain H–2B employers at risk of suffering from irreparable harm. The United States has strong foreign policy interests in initially allocating up to 6,000 supplemental visas only to nationals of the Northern Triangle countries and exempting such persons from the returning worker requirement. The Secretary of Homeland Security has determined that both the 6,000 limitation and the exemption from the returning worker requirement for nationals of the Northern Triangle countries is beneficial in light of President Biden's February 2, 2021 E.O. 14010, which instructed the Secretary of Homeland Security and the Secretary of State to implement measures to enhance access for individuals of the Northern Triangle countries to visa programs, as appropriate and consistent with applicable law. In response to this executive order, DHS seeks to promote and improve safety, security, and economic stability throughout the region, and work with these countries to stem the flow of irregular migration in the region and enhance access to visa programs.

The exemption from the returning worker requirement recognizes the

relatively small numbers of individuals from the three Northern Triangle countries who were previously granted H–2B visas in recent years.[42] Absent this exemption, there may be insufficient workers from these countries, which means that the rule might thereby fail to achieve its intended policy objective, in other words, to provide additional temporary foreign workers for U.S. employers that may suffer irreparable harm absent these workers, while also enhancing access to the H–2B visa classification for individuals from the Northern Triangle countries.

Finally, this rule provides that employers seeking H–2B visas for nationals of the Northern Triangle countries exempt from the returning worker requirement must file their petitions with USCIS no later than July 8, 2021. If fewer petitions are received than needed to reach the 6,000 allocation by July 8, 2021, the remaining visas will be made available to returning workers, irrespective of their country of origin. USCIS will announce the availability and filing period for such remaining visas on its website, uscis.gov, no later than July 23, 2021. DHS believes that making any remaining visas available to returning workers after July 8, 2021 will provide sufficient opportunity for their use by nationals of Northern Triangle countries and also help ensure that supplemental H–2B visas do not go unused if there is insufficient demand from employers seeking or able to employ nationals of Northern Triangle countries.

For all petitions filed under this rule and the H–2B program, generally, employers must establish, among other requirements, that insufficient qualified U.S. workers are available to fill the petitioning H–2B employer's job opportunity and that the foreign worker's employment in the job opportunity will not adversely affect the wages or working conditions of similarly-employed U.S. workers. INA section 214(c)(1), 8 U.S.C. 1184(c)(1); 8 CFR 214.2(h)(6)(iii)(A) and (D); 20 CFR 655.1. To meet this standard of protection for U.S. workers and, in order to be eligible for additional visas under this rule, employers must have applied for and received a valid TLC in accordance with 8 CFR 214.2(h)(6)(iv)(A) and (D) and 20 CFR

---

[38] DHS believes that this temporal limitation is appropriate even though H–2B visa issuances and admissions were lower in FY 2020 than in previous years, likely due to the impacts of COVID–19 as DHS believes that there will still be a sufficient number of returning workers available to U.S. employers to use the 16,000 additional visas authorized by this rule.

[39] Consolidated Appropriations Act, 2016, Public Law 114–113, div. F, tit. V, sec 565; John Warner National Defense Authorization Act for Fiscal Year 2007, Public Law 109–364, div. A, tit. X, sec. 1074, (2006); Save Our Small and Seasonal Businesses Act of 2005, Public Law. 109–13, div. B, tit. IV, sec. 402.

[40] Non-returning workers cannot meet the statutory criteria under INA section 222(h)(1)(B) for an interview waiver. The previous review of an applicant's qualifications and current evidence of lawful travel to the United States will generally lead to a shorter processing time of a renewal application.

[41] DOS, *Important Announcement on H2 Visas, https://travel.state.gov/content/travel/en/News/visas-news/important-announcement-on-h2-visas.html* (last updated Mar. 26, 2020).

[42] DOS issued a combined total of approximately 26,600 H–2B visas to nationals of the Northern Triangle countries from FY 2015 through FY 2020, combined, approximately 4,400 per year. DOS Monthly NIV Issuances by Nationality and Visa Class; *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics.html* (last visited April 11, 2021).

part 655, subpart A. Under DOL's H–2B regulations, TLCs are valid only for the period of employment certified by DOL and expire on the last day of authorized employment. 20 CFR 655.55(a).

In order to have a valid TLC, therefore, the employment start date on the employer's H–2B petition must not be different from the employment start date certified by DOL on the TLC. *See* 8 CFR 214.2(h)(6)(iv)(D). Under generally applicable DHS regulations, the only exception to this requirement applies when an employer files an amended visa petition, accompanied by a copy of the previously approved TLC and a copy of the initial visa petition approval notice, at a later date to substitute workers as set forth under 8 CFR 214.2(h)(6)(viii)(B). This rule also requires additional recruitment for certain petitioners, as discussed below.

In sum, this rule increases the FY 2021 numerical limitation by up to 22,000 visas, but also restricts the availability of those additional visas by prioritizing only the most significant business needs, and limiting eligibility to H–2B returning workers, unless the worker is a national of one of the Northern Triangle countries counted towards the 6,000 allocation that are exempt from the returning worker limitation. These provisions are each described in turn below.

*B. Numerical Increase and Allocation of up to 22,000 Visas*

The increase of up to 22,000 visas will help address the urgent needs of eligible employers for additional H–2B workers for the remainder of FY 2021.[43] The determination to allow up to 22,000 additional H–2B visas reflects a balancing of a number of factors including the demand for H–2B visas for the second half of FY 2021; current economic conditions; the increased demand for supplemental visas from FY 2017 to FY 2019; H–2B returning worker data; the amount of time remaining for employers to hire and obtain H–2B workers in the fiscal year; congressional concerns such as the one demonstrated by the FY 2018 and FY 2020 Joint Explanatory Statements where Congress directed DHS, in consultation with DOL, to consider options that would help address the unavailability of H–2B visas for late-season employers; and the objectives of E.O. 14010. DHS believes the numerical increase both addresses the needs of U.S. businesses and, as explained in more detail below, furthers the foreign policy interests of the United States. Additional provisions address the need to protect workers, such as informing them of access to COVID–19 vaccines and requiring additional recruitment efforts.

Section 105 of the FY 2021 Omnibus sets the highest number of H–2B returning workers who were exempt from the cap in certain previous years as the maximum limit for any increase in the H–2B numerical limitation for FY 2021.[44] Consistent with the statute's reference to H–2B returning workers, in determining the appropriate number by which to increase the H–2B numerical limitation, the Secretary of Homeland Security focused on the number of visas allocated to such workers in years in which Congress enacted returning worker exemptions from the H–2B numerical limitation. During each of the years the returning worker provision was in force, U.S. employers' standard business needs for H–2B workers exceeded the statutory 66,000 cap. The highest number of H–2B returning workers approved was 64,716 in FY 2007. In setting the number of additional H–2B visas to be made available during FY 2021, DHS considered this number, overall indications of increased need, the availability of U.S. workers during this period of high unemployment, as discussed below, Congress's prior direction that DHS review options for addressing the problem of unavailability of H–2B visas for businesses that need workers to start work late in a semiannual period of availability, and the time remaining in FY 2021. On the basis of these considerations, DHS determined that it would be appropriate to make additional visas available and to limit the supplemental cap to up to 22,000. The Secretary further considered the objectives of E.O. 14010, which among other initiatives, instructs the Secretary of Homeland Security and the Secretary of State to implement measures to enhance access to visa programs for individuals from the Northern Triangle, and determined that reserving up to 6,000 of the up to 22,000 additional visas and exempting this number from the returning worker requirement would be appropriate.

In past years, the number of beneficiaries covered by H–2B petitions filed exceeded the number of additional visas allocated under the two most recent supplemental caps. In FY 2018, USCIS received petitions for approximately 29,000 beneficiaries during the first 5 business days of filing for the 15,000 supplemental cap. USCIS therefore conducted a lottery on June 7, 2018, to randomly select petitions that would be accepted under the supplemental cap. Of the petitions that were selected, USCIS issued approvals for 15,672 beneficiaries.[45] In FY 2019, USCIS received sufficient petitions for the 30,000 supplemental cap on June 5, 2019, but did not conduct a lottery to randomly select petitions that would be accepted under the supplemental cap. Of the petitions received, USCIS issued approvals for 32,717 beneficiaries.[46]

Available data clearly indicate a need for supplemental H–2B visas in FY 2021. As noted above, in FY 2021, based on TLC applications filed during the 3-day filing window of January 1 through 3, 2021, DOL's Office of Foreign Labor Certification (OFLC) received requests to certify 96,641 worker positions, from 5,377 H–2B applications, for start dates

---

[43] In contrast with section 214(g)(1) of the INA, 8 U.S.C. 1184(g)(1), which establishes a cap on the number of individuals who may be issued visas *or otherwise provided [H–2B] status,* and section 214(g)(10) of the INA, 8 U.S.C. 1184(g)(10) (emphasis added), which imposes a first half of the fiscal year cap on H–2B issuance with respect to the number of individuals who may be issued visas *or are accorded [H–2B] status*" (emphasis added), section 105 only authorizes DHS to increase the number of available H–2B *visas.* Accordingly, DHS will not permit individuals authorized for H–2B status pursuant to an H–2B petition approved under section 105 to change to H–2B status from another nonimmigrant status. *See* INA section 248, 8 U.S.C. 1258; *see also* 8 CFR part 248. If a petitioner files a petition seeking H–2B workers in accordance with this rule and requests a change of status on behalf of someone in the United States, the change of status request will be denied, but the petition will be adjudicated in accordance with applicable DHS regulations. Any noncitizen authorized for H–2B status under the approved petition would need to obtain the necessary H–2B visa at a consular post abroad and then seek admission to the United States in H–2B status at a port of entry.

[44] During fiscal years 2005 to 2007, and 2016, Congress enacted "returning worker" exemptions to the H–2B visa cap, allowing workers who were counted against the H–2B cap in one of the three preceding fiscal years not to be counted against the upcoming fiscal year cap. Save Our Small and Seasonal Businesses Act of 2005, Public Law 109–13, Sec. 402 (May 11, 2005); John Warner National Defense Authorization Act, Public Law 109–364, Sec. 1074 (Oct. 17, 2006); Consolidated Appropriations Act of 2016, Public Law 114–113, Sec. 565 (Dec. 18, 2015).

[45] USCIS recognizes it may have received petitions for more than 29,000 supplemental H–2B workers if the cap had not been exceeded within the first 5 days of opening. However, DHS estimates that not all of the 29,000 workers requested under the FY 2018 supplemental cap would have been approved and/or issued visas. For instance, although DHS approved petitions for 15,672 beneficiaries under the FY 2018 cap increase, the Department of State data shows that as of January 15, 2019, it issued only 12,243 visas under that cap increase. Similarly, DHS approved petitions for 12,294 beneficiaries under the FY 2017 cap increase, but the Department of State data shows that it issued only 9,160 visas.

[46] The number of approved workers exceeded the number of additional visas authorized for FY 2018 and FY 2019 to allow for the possibility that some approved workers would either not seek a visa or admission, would not be issued a visa, or would not be admitted to the United States.

AR00623

of work on April 1, 2021.[47] USCIS, in turn, received sufficient H–2B petitions to reach the second half of the fiscal year statutory cap by February 12, 2021.[48] This is similar to the level of demand in FY 2020, when OFLC received requests to certify 99,362 worker positions for start dates of work on April 1, 2020,[49] and USCIS received sufficient H–2B petitions to reach the second half of the fiscal year statutory cap by February 18, 2020.[50] On March 4, 2020, DHS announced that it would make available 35,000 supplemental H–2B visas for the second half of fiscal year.[51] However, on March 13, 2020, then-President Trump declared a National Emergency concerning the COVID–19 outbreak to control the spread of the virus in the United States.[52] On April 2, 2020, DHS announced that the rule to increase the H–2B cap was on hold due to economic circumstances, and no additional H–2B visas would be released until further notice.[53] DHS also noted that DOS had suspended routine visa services.[54]

Although the public health emergency due to COVID–19 still exists,[55] DHS believes that it is appropriate to issue additional H–2B visas for the remainder of FY 2021. While the economic impacts of COVID–19 continue to be felt, real gross domestic product (GDP) grew significantly in the third and fourth quarters of 2020.[56] Economists project that this economic growth will continue throughout FY 2021 and beyond.[57] Similarly, the unemployment rate, while still not at pre-pandemic levels, improved from 14.7 percent in April 2020[58] to 6.0 percent in March 2021. (Note, however, that higher unemployment in the top H–2B occupations remains.[59])

In March 2020, the U.S. labor market was severely affected by the onset of the COVID–19 pandemic, pushing the national unemployment rate to near record levels and resulting in millions of U.S. workers being displaced from work. At the beginning of March 2020, the national unemployment rate was 3.5 percent with an estimated 5.8 million people categorized as unemployed.[60] This continued a 6-month trend of the unemployment rate sitting at or below 3.5 percent. However, by the end of April 2020, the unemployment rate increased from 4.4 percent to a peak of 14.7 percent. The 10.3 percent increase in the unemployment rate is the largest recorded month-to-month increase in the rate and coincided with total employment declining 20.5 million in April 2020.[61] As of April 2021, the U.S. unemployment rate sat at 6.0 percent. While this is a considerable decline from the prior year's rate, it remains 2.5 percent above the pre-pandemic unemployment rate, and the number of unemployed persons is currently 9.7 million people which is 4 million people higher than it was at the beginning of March 2020. A February 2021 Congressional Budget Office outlook of the labor market projects that a full recovery to pre-pandemic levels of employment could take in excess of 3 years.[62]

Typically H–2B occupations are cyclical jobs, and U.S. workers in these occupations are more susceptible to job instability and labor market variability. Amongst the occupations most commonly associated with the H–2B program, the unemployment rate has displayed a wide degree of variance. Whereas the pre-pandemic unemployment rate for the U.S. was 3.5 percent, the unemployment rate across the top 25 occupations most commonly associated with the H–2B program sat at 6.82 percent.[63] Currently the average unemployment rate across these occupations is 8.93 percent. The current unemployment rate for Landscaping and Groundskeeping Workers (the single largest occupation that uses the H–2B program) is 7.8 percent, followed by Amusement and Recreation Attendants at 9.3 percent, and 7.1 percent for Meat, Poultry, and Fish Cutters.[64]

From March 2020 through March 2021, approximately 1 million U.S. workers have been displaced across occupations that are predominantly used in the H–2B program.[65] Because of the higher unemployment rate of these occupations for U.S. workers, there is an increased likelihood that more U.S. workers could be available to work in H–2B jobs. The Departments acknowledge that it is challenging to extrapolate, from national unemployment rates in occupations, precise estimates regarding the availability of U.S. workers for any particular job opportunity and in any particular geographic area. The additional procedures contained in this rule, including the attestation requirements and DOL procedures, provide appropriate protections for U.S. workers within the context of that uncertainty.

Finally, while DOS temporarily suspended routine immigrant and nonimmigrant visa services at all U.S. Embassies and Consulates on March 20, 2020, it subsequently announced a phased resumption of visa services[66] and indicated it would continue

[47] DOL announcement on January 7, 2021. *See https://www.foreignlaborcert.doleta.gov/* (last accessed on February 24, 2021).

[48] On February 24, 2021, USCIS announced that it had received a sufficient number of petitions to reach the congressionally mandated H–2B cap for the second half of FY 2021. *See https://www.uscis.gov/news/alerts/h-2b-cap-reached-for-second-half-of-fy-2021* (Feb. 24, 2021). On February 12, 2021, the number of beneficiaries listed on petitions received by USCIS surpassed the total number of remaining H–2B visas available against the H–2B statutory cap for the second half of FY 2021. In accordance with regulations, USCIS determined it was necessary to use a computer-generated process, commonly known as a lottery, to ensure the fair and orderly allocation of H–2B visa numbers to meet, but not exceed, the remainder of the FY 2021 cap. 8 CFR 214.2(h)(8)(vii). On February 17, 2021, USCIS conducted a lottery to randomly select petitions from those received on February 12, 2021. As a result, USCIS assigned all petitions selected in the lottery the receipt date of February 17, 2021.

[49] DOL announcement on January 6, 2020. *OFLC Conducts Randomization Process on H–2B Applications Requesting an April 1, 2020, Work Start Date, https://flag.dol.gov/announcements/01-06-2020.*

[50] *H–2B Cap Reached for Second Half of FY2020,* Feb. 26, 2020, *https://www.uscis.gov/news/alerts/h-2b-cap-reached-for-second-half-of-fy2020.*

[51] DHS to Improve Integrity of Visa Program for Foreign Workers, March 5, 2020, *https://www.dhs.gov/news/2020/03/05/dhs-improve-integrity-visa-program-foreign-workers.*

[52] Proclamation 9994 of Mar. 13, 2020, *Declaring a National Emergency Concerning the Coronavirus Disease (COVID–19) Outbreak,* 85 FR 15337 (Mar. 18, 2020).

[53] *https://twitter.com/DHSgov/status/1245745115458568192?s=20.*

[54] *Id.*

[55] *See* HHS Renewal of Determination That A Public Health Emergency Exists, *https://www.phe.gov/emergency/news/healthactions/phe/Pages/COVID-15April2021.aspx* (Apr. 15, 2021).

[56] *https://www.bea.gov/news/glance.*

[57] *https://www.bloomberg.com/news/articles/2021-02-12/charting-the-global-economy-u-s-growth-forecasts-upgraded.*

[58] *https://www.bls.gov/opub/ted/2020/unemployment-rate-rises-to-record-high-14-point-7-percent-in-april-2020.htm*

[59] Department of Labor, Bureau of Labor Statistics, The Employment Situation, March 2021. Available at *https://www.bls.gov/news.release/archives/empsit_04022021.htm.*

[60] *https://www.bls.gov/news.release/archives/empsit_03062020.pdf.*

[61] *https://www.bls.gov/news.release/archives/empsit_05082020.pdf.*

[62] *https://www.cbo.gov/system/files/2021-02/56965-Economic-Outlook.pdf.*

[63] *See https://www.bls.gov/web/empsit/cpseea30.htm. The unemployment rates for the top 25 H–2B occupations were obtained by identifying the top occupations based on OFLC performance data.*

[64] *See* 2021 Q2 OFLC Performance data: *https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/H-2B_Disclosure_Data_FY2021_Q2.xlsx* and OFLC 2021 Q2 Selected statistics *https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/H-2B_Selected_Statistics_FY2021_Q2.pdf*

[65] *See https://www.bls.gov/web/empsit/cpseea30.htm. The number of displaced workers within the most commonly held H–2B occupations were obtained by identifying the top occupations based on OFLC performance data and comparing those occupations to unemployment data from BLS.*

[66] DOS, *Suspension of Routine Visa Services, https://travel.state.gov/content/travel/en/News/visas-news/suspension-of-routine-visa-services.html* (last updated July 22, 2020).

processing H–2 cases as much as possible, as permitted by post resources and local government restrictions, and expanded the categories of H–2 visa applicants whose applications can be adjudicated without an in-person interview.[67] In addition, Presidential Proclamation 10052, which temporarily suspended the entry of certain nonimmigrants, including certain H–2B nonimmigrants, expired on March 31, 2021.[68] Given the level of demand for H–2B workers, the continued and projected economic recovery, the continued and projected job growth, and the resumption of visa processing services and the expiration of the suspension of entry of H–2B nonimmigrants, DHS believes it is appropriate to release additional visas at this time. Further, DHS believes that 22,000 is an appropriate number of visas for the reasons discussed above.

Finally, recognizing the high demand for H–2B visas, it is plausible that the additional H–2B allocations provided in this rule will be reached prior to the end of the fiscal year. Specifically, the following scenarios may still occur:

• The 16,000 supplemental cap visas limited to returning workers that will be immediately available for employers will be reached before September 15, 2021.

• The 6,000 supplemental cap visas limited to nationals of the Northern Triangle countries will be reached before July 8, 2021.

• The cap for any remaining visas from the Northern Triangle allotment made available to returning workers after July 8, 2021,regardless of the country of nationality, will be reached before September 15, 2021.

DHS regulation, 8 CFR 214.2(h)(6)(x)(E), reaffirms the use of the processes that are in place when H–2B numerical limitations under INA section 214(g)(1)(B) or (g)(10), 8 U.S.C. 1184(g)(1)(B) or (g)(10), are reached, as applicable to each of the scenarios described above that involve numerical limitations of the supplemental cap. Specifically, for each of the scenarios mentioned above, DHS will monitor petitions received, and make projections of the number of petitions necessary to achieve the projected numerical limit of approvals. USCIS will also notify the public of the dates that USCIS has received the necessary number of petitions (the ''final receipt dates'') for each of these scenarios. The day the public is notified will not control the final receipt dates. Moreover, USCIS may randomly select, via computer-generated selection, from among the petitions received on the final receipt date the remaining number of petitions deemed necessary to generate the numerical limit of approvals for each of the scenarios involving numerical limitations to the supplemental cap. USCIS may, but will not necessarily, conduct a lottery if: The 16,000 supplemental cap visas for returning workers is reached before September 15, 2021; the 6,000 visas limited to nationals of the Northern Triangle countries is reached before July 8, 2021; or the cap for any remaining visas from the Northern Triangle allotment made available to returning workers regardless of the country of nationality, is reached before September 15, 2021. Finally, similar to the processes applicable to the H–2B statutory cap, if the final receipt date is any of the first 5 business days on which petitions subject to the applicable numerical limit may be received (in other words, if the numerical limit is reached on any one of the first 5 business days that filings can be made), USCIS will randomly apply all of the numbers among the petitions received on any of those 5 business days.

## C. Returning Workers

Similar to the temporary increase in FY 2019, the Secretary of Homeland Security has determined that the supplemental visas should be granted to returning workers from the past 3 fiscal years, in order to meet the immediate need for H–2B workers, unless the H–2B worker is a national of one of the Northern Triangle countries and is counted towards the separate 6,000 cap for such workers. The Secretary has determined that, for purposes of this program, H–2B returning workers include those individuals who were issued an H–2B visa or were otherwise granted H–2B status in FY 2018, 2019, or 2020. As discussed above, the Secretary determined that limiting returning workers to those who were issued an H–2B visa or granted H–2B status in the past three fiscal years is appropriate as it mirrors the standard that Congress designated in previous returning worker provisions. DHS acknowledges that H–2B visa issuances and admissions were lower in the second half of FY 2021 than in recent fiscal years, likely as a result of COVID–19. However, DHS believes that there will be sufficient numbers of returning workers to meet the needs of employers and fully utilize the additional 16,000 visas, and thus the temporal limitation remains appropriate. Returning workers have previously obtained H–2B visas and therefore been vetted by DOS, would have departed the United States after their authorized period of stay as generally required by the terms of their nonimmigrant admission, and therefore may have a higher likelihood of success in obtaining their new visas through DOS, possibly without a required interview, and begin work more expeditiously.

To ensure compliance with the requirement that additional visas only be made available to returning workers, petitioners seeking H–2B workers under the supplemental cap will be required to attest that each employee requested or instructed to apply for a visa under the FY 2021 supplemental cap was issued an H–2B visa or otherwise granted H–2B status in FY 2018, 2019, or 2020, unless the H–2B worker is a national of one of the Northern Triangle countries and is counted towards the 6,000 cap. This attestation will serve as prima facie initial evidence to DHS that each worker, unless a national of one of the Northern Triangle countries who is counted against the 6,000 cap, meets the returning worker requirement. DHS and DOS retain the right to review and verify that each beneficiary is in fact a returning worker any time before and after approval of the petition or visa. DHS has authority to review and verify this attestation during the course of an audit or investigation.

## D. Returning Worker Exemption for up to 6,000 Visas for Nationals of Guatemala, El Salvador, and Honduras (Northern Triangle Countries)

As described above, the Secretary of Homeland Security has determined that up to 6,000 additional H–2B visas will be limited to workers who are nationals of one of the Northern Triangle countries. These 6,000 visas will be exempt from the returning worker requirement. If the 6,000 visa limit has been reached and the 16,000 cap has not, petitioners may continue to request workers who are nationals of one of the Northern Triangle countries, but these noncitizens must be specifically requested as returning workers who were issued H–2B visas or were otherwise granted H–2B status in FY 2018, 2019, or 2020. Alternatively, if the returning worker exemption cap initially reserved for nationals from the Northern Triangle remains unfilled on July 8, 2021, the remaining H–2B visas will be made available to workers

---

[67] DOS, *Expansion of Interview Waiver Eligibility,* https://travel.state.gov/content/travel/en/News/ visas-news/expansion-of-interview-waiver- eligibility.html (last updated Mar. 11, 2021); DOS, *Important Announcement on H2 Visas,* https:// travel.state.gov/content/travel/en/News/visas-news/ important-announcement-on-h2-visas.html (last updated Mar. 26, 2020).

[68] https://travel.state.gov/content/travel/en/News/ visas-news/update-on-presidential-proclamation- 10052.html

irrespective of their home country, but these noncitizens must be returning workers. USCIS will announce the availability of the remainder of the allocation on the USCIS website at uscis.gov no later than July 23, 2021.

DHS has determined that reserving 6,000 supplemental H–2B visas for nationals of the Northern Triangle countries—a number significantly higher than the average annual number of visas issued to such persons in the past 6 fiscal years—will encourage U.S. employers who face a likelihood of irreparable harm to seek out workers from such countries, while, at the same time, increase interest among nationals of the Northern Triangle countries seeking temporary employment in the United States. DOS issued a combined total of approximately 26,600 H–2B visas to nationals of the Northern Triangle countries from FY 2015 through FY 2020, an average of approximately 4,400 per year.[69] As previously stated, DHS has determined that the additional increase will not only provide U.S. businesses who have been unable to find qualified and available U.S. workers with potential workers, but also promote lawful immigration and lawful employment authorization for Northern Triangle nationals.

While DHS reiterates the importance of limiting the general supplemental cap exclusively to returning workers, for the reasons stated previously, the Secretary has determined that the exemption from the returning worker requirement for nationals of the Northern Triangle countries is beneficial for the following reasons. It strikes a balance between furthering the U.S. foreign policy interests of expanding access to lawful pathways in the United States for Northern Triangle nationals and addressing the needs of certain H–2B employers at risk of suffering from irreparable harm. This policy initiative would also support the strategies for the region described in E.O. 14010, which directs DHS to implement efforts to expand access to lawful immigration to the United States, including visa programs, as appropriate and consistent with the law through both protection-related and non-protection related programs. The availability of workers from the Northern Triangle countries may help provide U.S. employers with additional labor from neighboring countries who are committed to working with the United States and also promote

safe and lawful immigration to the United States.

Similar to the discussion above regarding returning workers, DOS will work with the relevant countries to facilitate consular interviews, as required,[70] and channels for reporting incidents of fraud and abuse within the H–2 programs. Further, each country's own consular networks will maintain contact with the workers while in the United States and ensure the workers know their rights and responsibilities under the U.S. immigration laws, which are all valuable protections to the immigration system, U.S. employers, U.S. workers, and workers entering the country on H–2 visas.

Nothing in this rule will limit the authority of DHS or DOS to deny, revoke, or take any other lawful action with respect to an H–2B petition or visa application at any time before or after approval of the H–2B petition or visa application.

*E. Business Need Standard—Irreparable Harm and FY 2021 Attestation*

To file any H–2B petition under this rule during the remainder of FY 2021, petitioners must meet all existing H–2B eligibility requirements, including having an approved, valid, and unexpired TLC. *See* 8 CFR 214.2(h)(6) and 20 CFR part 655, subpart A. In addition, the petitioner must submit an attestation to USCIS in which the petitioner affirms, under penalty of perjury, that it meets the business need standard. Under that standard, the petitioner must be able to establish that, if it does not receive all of the workers requested under the cap increase,[71] it is likely to suffer irreparable harm, that is, permanent and severe financial loss. The TLC process focuses on establishing whether a petitioner has a temporary need for workers and whether there are U.S. workers who are able, willing, qualified, and available to perform the

temporary service or labor, and does not address the harm a petitioner may face in the absence of such workers; the attestation addresses this question. The attestation must be submitted directly to USCIS, together with Form I–129, the approved and valid TLC, and any other necessary documentation. As in the rules implementing the FY 2017, FY 2018, and FY 2019 temporary cap increases, employers will be required to complete the new attestation form which can be found at: *https:// www.foreignlaborcert.doleta.gov/ form.cfm.*[72]

The attestation form will serve as prima facie initial evidence to DHS that the petitioner's business is likely to suffer irreparable harm. Any petition requesting H–2B workers under the FY 2021 supplemental cap that is received lacking the requisite attestation form may be, as applicable, rejected in accordance with 8 CFR 103.2(a)(7)(ii) or denied in accordance with 8 CFR 103.2(b)(8)(ii). Although this regulation does not require submission of evidence at the time of filing of the petition, other than an attestation, the employer must have such evidence on hand and ready to present to DHS or DOL at any time starting with the date of filing the I–129 petition, through the prescribed document retention period discussed below. In fact, the Departments intend to select a significant number of petitions approved for audit examination to verify compliance with program requirements, including the irreparable harm standard and recruitment provisions implemented through this rule. Failure to provide evidence demonstrating irreparable harm or to comply with the audit process may be considered a substantial violation resulting in an adverse agency action on the employer, including revocation of the petition and/or TLC or program debarment. Similarly, failure to cooperate with any compliance review, evaluation, verification, or inspection conducted by DHS or DOL as required by 8 CFR 214.2(h)(6)(x)(B)(2)(*vi*) and (*vii*), respectively, may constitute a violation of the terms and conditions of an approved petition and lead to petition revocation under 8 CFR 214.2(h)(11)(iii)(A)(*3*).

In addition to the statement regarding the irreparable harm standard, the

---

[69] DOS Monthly NIV Issuances by Nationality and Visa Class; *https://travel.state.gov/content/travel/ en/legal/visa-law0/visa-statistics/nonimmigrant- visa-statistics.html* (last visited April 11, 2021).

[70] As noted previously, some consular sections waive the in-person interview requirement for H–2B applicants whose prior visa expired within a specific timeframe and who otherwise meet the strict limitations set out under INA section 222(h), 8 U.S.C. 1202(h) and, as an effort to reduce the risk of COVID–19 transmission, DOS recently expanded the ability of consular officers to waive the in-person interview requirement for individuals applying for a nonimmigrant visa in the same classification. DOS, *Expansion of Interview Waiver Eligibility, https://travel.state.gov/content/travel/en/ News/visas-news/expansion-of-interview-waiver- eligibility.html* (last updated Mar. 11, 2021).

[71] An employer may request fewer workers on the H–2B petition than the number of workers listed on the TLC. *See* Instructions for Petition for Nonimmigrant Worker, providing that "the total number of workers you request on the petition must not exceed the number of workers approved by the Department of Labor or Guam Department of Labor, if required, on the temporary labor certification."

[72] This portion of the temporary rule does not apply to workers who have already been counted under the fiscal year 2021 H–2B statutory cap (66,000). Further, this portion of the rule does not apply to noncitizens who are exempt from the fiscal year 2021 H–2B statutory cap, including those who are extending their stay in H–2B status. Accordingly, petitioners who are filing on behalf of such workers are not subject to the attestation requirement.

attestation submitted to USCIS will also state that the employer meets all other eligibility criteria for the available visas, including the returning worker requirement, unless exempt because the H–2B worker is a national of one of the Northern Triangle countries who is counted against the 6,000 visas reserved for such workers; will comply with all assurances, obligations, and conditions of employment set forth in the *Application for Temporary Employment Certification* (Form ETA 9142B and appendices) certified by DOL for the job opportunity (which serves as the TLC); will conduct additional recruitment of U.S. workers in accordance with the requirements of this rule and discussed further below; and will document and retain evidence of such compliance. Because the attestation will be submitted to USCIS as initial evidence with Form I–129, DHS considers the attestation to be evidence that is incorporated into and a part of the petition consistent with 8 CFR 103.2(b)(1). Accordingly, a petition may be denied or revoked, as applicable, based on or related to statements made in the attestation, including but not limited to the following grounds: (1) Because the employer failed to demonstrate employment of all of the requested workers as required under the irreparable harm standard; and (2) the employer failed to demonstrate that it requested and/or instructed that each worker petitioned for was a returning worker, or a national of one of the Northern Triangle countries, as required by this rule. Any denial or revocation on such basis, however, would be appealable under 8 CFR part 103, consistent with DHS regulations and existing USCIS procedures.

It is the view of the Secretaries of Homeland Security and Labor that requiring a post-TLC attestation to USCIS is the most practical approach, given the time remaining in FY 2021 and the need to assemble the necessary documentation. In addition, the employer is required to retain documentation, which must be provided upon request by DHS or DOL, supporting the new attestations regarding (1) the irreparable harm standard, (2) the returning worker requirement, or, alternatively, documentation supporting that the H–2B worker(s) requested is a national of one of the Northern Triangle countries who is counted against the 6,000 cap (which may be satisfied by the separate Form I–129 that employers are required to file for such workers in accordance with this rule) and (3) a recruitment report for any additional recruitment required under this rule for a period of 3 years. *See* new 20 CFR 655.68. Although the employer must have such documentation on hand at the time it files the petition, the Departments have determined that, if employers were required to submit the attestation form to DOL before filing a petition with DHS, the attendant delays would render any visas unlikely to satisfy the needs of American businesses given processing timeframes and the time remaining in this fiscal year. However, as noted above, the Departments will be conducting audits, investigations and/or post-adjudication compliance reviews on a significant number of H–2B petitions. As part of that process, USCIS may issue a request for additional evidence, a notice of intent to revoke, or a revocation notice, based on the review of such documentation, and DOL's OFLC and WHD will be able to review this documentation and enforce the attestations during the course of an audit examination or investigation. *See* 8 CFR 103.2(b) or 8 CFR 214.2(h)(11).

In accordance with the attestation requirements, under which petitioners attest that they meet the irreparable harm standard, that they are seeking to employ only returning workers (unless exempt as described above), and they meet the document retention requirements at new 20 CFR 655.68, the petitioner must retain documents and records fulfilling their responsibility to demonstrate compliance with this rule for 3 years from the date of the attestation, and must provide the documents and records upon the request of DHS or DOL. Supporting evidence may include, but is not limited to, the following types of documentation:

(1) Evidence that the business has suffered or will suffer permanent and severe financial loss due to the inability to meet financial or existing contractual obligations without all of the H–2B workers, including evidence of contracts, reservations, orders, or other business arrangements that have been or would be cancelled absent the requested H–2B workers, and evidence demonstrating an inability to pay debts/bills;

(2) Evidence that the business has suffered or will suffer permanent and severe financial loss during the period of need, as compared to the period of need in prior years, such as financial statements (including profit/loss statements) comparing the present period of need to prior years; bank statements, tax returns, or other documents showing evidence of current and past financial condition; and relevant tax records, employment records, or other similar documents showing hours worked and payroll comparisons from prior years to current year;

(3) Evidence showing the number of workers needed in the previous three seasons (FY 2018, 2019 and 2020) to meet the employer's need as compared to those currently employed. Such evidence must indicate the dates of their employment, and their hours worked (for example, payroll records) and evidence showing the number of H–2B workers requested under this rule, the number of workers it claims are needed, the workers' actual dates of employment and hours worked;

(4) Evidence that the petitioner is reliant on obtaining a certain number of workers to operate, based on the nature and size of the business, such as documentation showing the number of workers it has needed to maintain its operations in the past, or will need prospectively, including but not limited to; a detailed business plan, copies of purchase orders or other requests for good and services, or other reliable forecast of its need for workers; and/or

(5) With respect to satisfying the returning worker requirement, evidence that the employer requested and/or instructed that each of the workers petitioned by the employer in connection with this temporary rule were issued H–2B visas or otherwise granted H–2B status in FY 2018, 2019, or 2020, unless the H–2B worker is a national of one of the Northern Triangle countries counted towards the 6,000 cap. Such evidence would include, but is not limited to, a date-stamped written communication from the employer to its agent(s) and/or recruiter(s) that instructs the agent(s) and/or recruiter(s) to only recruit and provide instruction regarding an application for an H–2B visa to those foreign workers who were previously issued an H–2B visa or granted H–2B status in FY 2018, 2019, or 2020.

These examples are not exhaustive, nor will they necessarily establish that the business meets the irreparable harm or returning worker standards; petitioners may retain other types of evidence they believe will satisfy these standards. When an approved petition is selected for audit examination or investigation, DHS or DOL will review all evidence available to it to confirm that the petitioner properly attested to DHS that their business would likely suffer irreparable harm and that they petitioned for and employed only returning workers, unless the H–2B worker is a national of one of the Northern Triangle countries counted

towards the 6,000 cap. If DHS subsequently finds that the evidence does not support the employer's attestations, DHS may deny or, if the petition has already been approved, revoke the petition at any time consistent with existing regulatory authorities. DHS may also, or alternatively, notify DOL. In addition, DOL may independently take enforcement action, including by, among other things, debarring the petitioner from the H–2B program for not less than 1 year or more than 5 years from the date of the final agency decision, which also disqualifies the debarred party from filing any labor certification applications or labor condition applications with DOL for the same period set forth in the final debarment decision. *See, e.g.,* 20 CFR 655.73; 29 CFR 503.20, 503.24.[73]

To the extent that evidence reflects a preference for hiring H–2B workers over U.S. workers, an investigation by other agencies enforcing employment and labor laws, such as the Immigrant and Employee Rights Section (IER) of the Department of Justice's Civil Rights Division, may be warranted. *See* INA section 274B, 8 U.S.C. 1324b (prohibiting certain types of employment discrimination based on citizenship status or national origin). Moreover, DHS and DOL may refer potential discrimination to IER pursuant to applicable interagency agreements. *See* IER, Partnerships, *https:// www.justice.gov/crt/partnerships* (last visited Apr. 9, 2021). In addition, if members of the public have information that a participating employer may be abusing this program, DHS invites them to notify USCIS by completing the online fraud tip form, *https:// www.uscis.gov/report-fraud/uscis-tip-form* (last visited Apr. 9, 2021).[74]

DHS, in exercising its statutory authority under INA section 101(a)(15)(H)(ii)(b), 8 U.S.C. 1101(a)(15)(H)(ii)(b), and section 105 of the FY 2021 Omnibus, is responsible for adjudicating eligibility for H–2B

classification. As in all cases, the burden rests with the petitioner to establish eligibility by a preponderance of the evidence. INA section 291, 8 U.S.C. 1361. *Matter of Chawathe,* 25 I&N Dec. 369, 375–76 (AAO 2010). Accordingly, as noted above, where the petition lacks initial evidence, such as a properly completed attestation, DHS may, as applicable, reject the petition in accordance with 8 CFR 103.2(a)(7)(ii) or deny the petition in accordance with 8 CFR 103.2(b)(8)(ii). Further, where the initial evidence submitted with the petition contains inconsistencies or is inconsistent with other evidence in the petition and the underlying TLC, DHS may issue a Request for Evidence, Notice of Intent to Deny, or Denial in accordance with 8 CFR 103.2(b)(8). In addition, where it is determined that an H–2B petition filed pursuant to the FY 2021 Omnibus was granted erroneously, the H–2B petition approval may be revoked. *See* 8 CFR 214.2(h)(11).

Because of the particular circumstances of this regulation, and because the attestation and other requirements of this rule play a vital role in achieving the purposes of this rule, DHS and DOL intend that the attestation requirement, DOL procedures, and other aspects of this rule be non-severable from the remainder of the rule, including the increase in the numerical allocations.[75] Thus, in the event the attestation requirement or any other part of this rule is enjoined or held invalid, the remainder of the rule, with the exception of the retention requirements being codified in 20 CFR 655.68, is also intended to cease operation in the relevant jurisdiction, without prejudice to workers already present in the United States under this regulation, as consistent with law.

## G. Portability

As an additional option for employers that cannot find U.S. workers this rule allows petitioners to hire immediately certain H–2B workers that are already present in the United States in H–2B status without waiting for approval of a new H–2B petition. Specifically, the rule allows H–2B nonimmigrant workers to begin new employment with a new H–2B employer or agent upon USCIS' receipt of a timely, non-frivolous H–2B petition. The H–2B nonimmigrant worker must have been lawfully admitted to the United States, must not have worked without authorization

subsequent to such lawful admission, and must currently hold valid H–2B status. Since every H–2B petition must be accompanied by an approved TLC, all H–2B petitioners must have completed a test of the U.S. labor market, as a result of which DOL determined that there were no qualified U.S. workers available to fill these temporary positions.

This provision mirrors temporary flexibilities that DHS has used previously to improve employer access to noncitizen workers during the COVID–19 pandemic.[76] In the context of this rule, DHS believes this flexibility will help some U.S. employers address the challenges related to the limitations imposed by the cap, as well as due to the ongoing disruptions caused by the COVID–19 pandemic. The pandemic has resulted in a variety of travel restrictions and visa processing limitations to mitigate the spread of COVID–19.

In addition to resulting in a devastating loss of life, the worldwide pandemic of COVID–19 has impacted the United States in myriad ways, disrupting daily life, travel, and the operation of individual businesses and the economy at large. On January 31, 2020, the Secretary of the U.S. Department of Health and Human Services (HHS) declared a public health emergency dating back to January 27, 2020, under section 319 of the Public Health Service Act (42 U.S.C. 247d).[77] This determination that a public health emergency exists due to COVID–19 has subsequently been renewed five times: On April 21, 2020, on July 23, 2020, on October 2, 2020, on January 7, 2021, and most recently on April 15, 2021, effective April 21, 2021.[78] On March 13, 2020, then-President Trump declared a National Emergency concerning the

---

[73] Pursuant to the statutory provisions governing enforcement of the H–2B program, INA section 214(c)(14), 8 U.S.C. 1184(c)(14), a violation exists under the H–2B program where there has been a willful misrepresentation of a material fact in the petition or a substantial failure to meet any of the terms and conditions of the petition. A substantial failure is a willful failure to comply that constitutes a significant deviation from the terms and conditions. *See, e.g.,* 29 CFR 503.19.

[74] DHS may publicly disclose information regarding the H–2B program consistent with applicable law and regulations. For information about DHS disclosure of information contained in a system of records, *see https://www.dhs.gov/ system-records-notices-sorns.* Additional general information about DHS privacy policy generally can be accessed at *https://www.dhs.gov/policy.*

[75] The Departments' intentions with respect to non-severability extend to all features of this rule other than the portability provision, which is described in the section below.

[76] On May 14, 2020, DHS published a temporary final rule in the **Federal Register** to amend certain H–2B requirements to help H–2B petitioners seeking workers to perform temporary nonagricultural services or labor essential to the U.S. food supply chain. 85 FR 28843 (May 14, 2020). In addition, on April 20, 2020, DHS issued a temporary final rule which, among other flexibilities, allowed H–2A workers to change employers and begin work before USCIS approved the new H–2A petition for the new employer. 85 FR 21739. DHS has subsequently extended that portability provision for H–2A workers through two additional temporary final rules, on August 20, 2020, and December 18, 2020, which have been effective for H–2A petitions that were received on or after August 19, 2020 through December 17, 2020, and on or after December 18, 2020 through June 16, 2021, respectively. 85 FR 51304 and 85 FR 82291.

[77] HHS, *Determination of Public Health Emergency,* 85 FR 7316 (Feb. 7, 2020).

[78] *See* HHS Renewal of Determination That A Public Health Emergency Exists, *https:// www.phe.gov/emergency/news/healthactions/phe/ Pages/COVID-15April2021.aspx* (Apr. 15, 2021).

AR00628

COVID–19 outbreak to control the spread of the virus in the United States.[79] The proclamation declared that the emergency began on March 1, 2020. DOS temporarily suspended routine immigrant and nonimmigrant visa services at all U.S. Embassies and Consulates on March 20, 2020, and subsequently announced a phased resumption of visa services in which it would continue to provide emergency and mission critical visa services and resume routine visa services as local conditions and resources allowed.[80] Based on the importance of the H–2A temporary agricultural worker and H–2B temporary nonagricultural worker programs, DOS indicated it would continue processing H–2A and H–2B cases to the extent possible, as permitted by post resources and local government restrictions, and expanded the categories of H–2 visa applicants whose applications can be adjudicated without an in-person interview.[81] As recently as April 6, 2021, however, DOS noted the COVID–19 pandemic continues to have a severe adverse impact on routine visa services for embassies and consulates around the world.[82]

Further, due to the possibility that some H–2B workers may be unavailable due to visa processing delays or may become unavailable due to COVID–19 related illness or a legitimate fear of contracting COVID–19 under current conditions, U.S. employers that have approved H–2B petitions or who will be filing H–2B petitions in accordance with this rule might not receive all of the workers requested to fill the temporary positions.

DHS is strongly committed not only to protecting U.S. workers and helping U.S. businesses receive the documented and work-authorized workers to perform temporary nonagricultural services or labor that they need, but also to protecting the rights and interests of H–2B workers (consistent with Executive Order 13563 and in particular its reference to ''equity,'' ''fairness,'' and ''human dignity''). In the FY 2020 DHS

Further Consolidated Appropriations Act (Public Law 116–94), Congress directed DHS to provide options to improve the H–2A and H–2B visa programs, to include options that would protect worker rights.[83] DHS has determined that providing H–2B nonimmigrant workers with the flexibility of being able to begin work with a new H–2B petitioner immediately and avoid a potential job loss or loss of income while the new H–2B petition is pending, provides some certainty to H–2B workers who have maintained their status but may have found themselves in situations that warrant a change in employers.[84] Providing that flexibility is also equitable and fair.

Portability for H–2B workers provides these noncitizens with the option of not having to worry about job loss or loss of income between the time they leave a current employer and while they await approved employment with a new U.S. employer or agent. DHS believes this flexibility and job portability not only protects H–2B workers but also provides an alternative to H–2B petitioners who have not been able to find U.S. workers and who have not been able to obtain H–2B workers subject to the statutory or supplemental caps who have the skills to perform the job duties. In that sense as well, it is equitable and fair.

DHS is making this flexibility available for a 180-day period in order to provide stability for H–2B employers amidst uncertainties surrounding the COVID–19 pandemic. This period is justified especially given the possible

future impacts of COVID–19 variants, continuing limited vaccine access for certain groups (including in H–2B workers' home countries), and uncertainty regarding the duration of vaccine-gained immunity and how effective currently approved vaccines are in responding to COVID–19 variants.[85] DHS will continue to monitor the evolving health crisis caused by COVID–19 and may address it in future rules.

*H. COVID–19 Worker Protections*

It is the policy of DHS and its Federal partners to support equal access to the COVID–19 vaccines and vaccine distribution sites, irrespective of an individuals' immigration status.[86] This policy promotes fairness and equity (see Executive Order 13563). Accordingly, DHS and DOL encourage all individuals, regardless of their immigration status, to receive the COVID–19 vaccine. U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection do not conduct enforcement operations at or near vaccine distribution sites or clinics. Consistent with ICE's long-standing sensitive locations policy, ICE does not and will not carry out enforcement operations at or near health care facilities, such as hospitals, doctors' offices, accredited health clinics, and emergent or urgent care facilities, except in the most extraordinary of circumstances.

This TFR reflects that policy by providing as follows:

*Supplemental H–2B Visas:* With respect to petitioners who wish to qualify to receive supplemental H–2B visas pursuant to the FY 2021 Omnibus, the Departments are using the DOL Form ETA–9142–B–CAA–4 to support equal access to vaccines in two ways. First, the Departments are requiring such petitioners to attest on the DOL Form ETA–9142–B–CAA–4 that, consistent with such petitioners' obligations under generally applicable H–2B regulations, they will comply with all Federal, State, and local employment-related laws and

---

[79] Proclamation 9994 of Mar. 13, 2020, *Declaring a National Emergency Concerning the Coronavirus Disease (COVID–19) Outbreak,* 85 FR 15337 (Mar. 18, 2020[0]).

[80] DOS, *Suspension of Routine Visa Services, https://travel.state.gov/content/travel/en/News/visas-news/suspension-of-routine-visa-services.html* (last updated July 22, 2020).

[81] DOS, *Important Announcement on H2 Visas, https://travel.state.gov/content/travel/en/News/visas-news/important-announcement-on-h2-visas.html* (last updated Mar. 26, 2020).

[82] DOS, *Visa Services Operating Status Update, https://travel.state.gov/content/travel/en/News/visas-news/visa-services-operating-status-update.html* (last updated, Apr. 6, 2021).

[83] The Joint Explanatory Statement accompanying the *Fiscal Year* (FY) *2020 Department of Homeland Security* (DHS) *Further Consolidated Appropriations Act* (Public Law 116–94) states, ''H–2A and H–2B Visa Program Processes.—Not later than 120 days after the date of enactment of this Act, DHS, the Department of Labor, the Department of State, and the United States Digital Service are directed to report on options to improve the execution of the H–2A and H–2B visa programs, including: processing efficiencies; combatting human trafficking; protecting worker rights; and reducing employer burden, to include the disadvantages imposed on such employers due to the current semiannual distribution of H–2B visas on October 1 and April 1 of each fiscal year. USCIS is encouraged to leverage prior year materials relating to the issuance of additional H–2B visas, to include previous temporary final rules, to improve processing efficiencies.''

[84] The National Action Plan to Combat Human Trafficking, Priority Action 1.6.3, at p. 20–21 (2020) (Stating that ''[w]orkers sometimes find themselves in abusive work situations, but because their immigration status is dependent on continued employment with the employer in whose name the visa has been issued, workers may be left with few options to leave that situation.'' By providing the option of changing employers without risking job loss or a loss of income through the publication of this rule, DHS believes that H–2B workers may be more likely to leave abusive work situations, and thereby are afforded greater worker protections.)

[85] *See,* About Variants of the Virus that Causes COVID–19, Centers for Disease Control and Prevention, last updated April 2, 2021. *https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html,* Key Things to Know About COVID–19 Vaccines, *https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html?s_cid=10499:what%20is%20the%20covid%20vaccine:sem.ga:p:RG:GM:gen:PTN:FY21* (Last visited April 14, 2021).

[86] *See* DHS Statement on Equal Access to COVID–19 Vaccines and Vaccine Distribution Sites, *https://www.dhs.gov/news/2021/02/01/dhs-statement-equal-access-covid-19-vaccines-and-vaccine-distribution-sites* (Feb. 1, 2021), (accessed Apr. 28, 2021).

regulations, including health and safety laws and laws related to COVID–19 worker protections and any right to time off or paid time off for COVID–19 vaccination. *See* new 8 CFR 214.2(h)(6)(x)(B)(*2*)(*iii*) and 20 CFR 655.64(a)(4). Second, the Departments are requiring such petitioners to also attest that they will notify any H–2B workers approved under the supplemental cap, in a language understood by the worker, as necessary or reasonable, that all persons in the United States, including nonimmigrants, have equal access to COVID–19 vaccines and vaccine distribution sites. Because the attestation will be submitted to USCIS as initial evidence with Form I–129, DHS considers the attestation to be evidence that is incorporated into and a part of the petition consistent with 8 CFR 103.2(b)(1). Accordingly, a petition may be denied or revoked, as applicable, based on or related to statements made in the attestation, including, but not limited to, because the employer violated an applicable employment-related law or regulation, or failed to notify workers regarding equal access to COVID–19 vaccines and vaccine distribution sites.

*Other H–2B Employers:* While there is no additional attestation with respect to H–2B petitioners that do not avail themselves of the supplemental H–2B visas made available under this rule, the Departments remind all H–2B employers that they must comply with all Federal, State, and local employment-related laws and regulations, including health and safety laws and laws related to COVID–19 worker protections and any right to time off or paid time off for COVID–19 vaccination. Failure to comply with such laws may be a basis for DHS to revoke the petition under 8 CFR 214.2(h)(11). This obligation is also reflected as a condition of H–2B portability under this rule. See new 8 CFR 214.2(h)(26)(iii)(C).

Ensuring that the Departments encourage employers to provide access to COVID–19 vaccines is consistent with the policies of the Biden Administration. President Biden, in his speech to Joint Session of Congress, made the following statement: ''[T]oday, I'm announcing a program to address [the issue of COVID vaccinations] . . . nationwide. I'm calling on every employer, large and small, in every state, to give employees the time off they need, with pay, to get vaccinated and any time they need, with pay, to recover if they are feeling under the weather after the shot.''[87] Consistent with the President's statement, the Departments strongly urge, but do not require, that all employers seeking H–2B workers under either the Supplemental Cap or portability sections of the TFR, make every effort to ensure that all their workers, including nonimmigrant workers, be afforded an opportunity to take the time off needed to get receive their COVID–19 vaccinations, as well as time off, with pay, to recover from any temporary side effect.

As noted, Executive Order 13563 refers to fairness, equity, and human dignity, and such efforts, on the part of employers, would be consistent with those commitments.

Petitioners otherwise are strongly encouraged to facilitate and provide flexibilities, to the greatest extent possible, to all workers who wish to receive COVID–19 vaccinations.

*I. DHS Petition Procedures*

To petition for H–2B workers under this rule, the petitioner must file a Form I–129 in accordance with applicable regulations and form instructions, an unexpired TLC, and the attestation form described above. All H–2B petitions must state the nationality of all the requested H–2B workers, whether named or unnamed, even if there are beneficiaries from more than one country. *See* 8 CFR 214.2(h)(2)(iii). If filing multiple Forms I–129 based on the same TLC (for instance, one requesting returning workers and another requesting workers who are nationals of one of the Northern Triangle countries), each H–2B petition must include a copy of the TLC and reference all previously-filed or concurrently filed petitions associated with the same TLC. The total number of requested workers may not exceed the total number of workers indicated on the approved TLC. Petitioners seeking H–2B classification for Northern Triangle country nationals under the 6,000 visas that are exempt from the returning worker provision must file a separate Form I–129 for those Northern Triangle country nationals only. *See* new 8 CFR 214.2(h)(6)(x). Requiring the filing of separate petitions to request returning workers and to request workers who are Northern Triangle country nationals is necessary to ensure the operational capability to properly calculate and manage the respective additional cap allocations and to ensure that all corresponding visa issuances are limited to qualifying applicants, particularly when such petitions request unnamed beneficiaries or are relied upon for subsequent requests to substitute beneficiaries in accordance with 8 CFR 214.2(h)(6)(viii). The attestations must be filed on Form ETA–9142–B–CAA–4, Attestation for Employers Seeking to Employ H–2B Nonimmigrants Workers Under Section 105 of Division O of the Further Consolidated Appropriations Act, 2021 Public Law 116–260. *See* 20 CFR 655.64. A petitioner is required to retain a copy of such attestations and all supporting evidence for 3 years from the date the associated TLC was approved, consistent with 20 CFR 655.56 and 29 CFR 503.17. *See* new 20 CFR 655.68. Petitions submitted to DHS pursuant to the FY 2021 Omnibus will be processed in the order in which they were received. Petitioners may also choose to request premium processing of their petitions under 8 CFR 103.7(e), which allows for expedited processing for an additional fee.

To encourage timely filing of any petition seeking a visa under the FY 2021 Omnibus, DHS is notifying the public that the petition may not be approved by USCIS on or after October 1, 2021. *See* new 8 CFR 214.2(h)(6)(x). Petitions pending with USCIS that are not approved before October 1, 2021 will be denied and any fees will not be refunded. *See* new 8 CFR 214.2(h)(6)(x).

USCIS's current processing goal for H–2B petitions filed via premium processing that can be adjudicated without the need for further evidence (in other words, without a Request for Evidence or Notice of Intent to Deny) is 15 days. USCIS intends to adjudicate petitions filed for standard processing within a reasonable period of time.[88] Given USCIS' processing goals for premium processing, DHS believes that 15 days from the end of the fiscal year is the minimum time needed for petitions to be adjudicated, although USCIS cannot guarantee the time period will be sufficient in all cases. Therefore, if the increase in the H–2B numerical limitation to 22,000 visas has not yet been reached, USCIS will stop accepting petitions received after September 15, 2021. *See* new 8 CFR 214.2(h)(6)(x)(C). Such petitions will be rejected and the filing fees will be returned.

As with other Form I–129 filings, DHS encourages petitioners to provide a duplicate copy of Form I–129 and all supporting documentation at the time of filing if the beneficiary is seeking a

---

[87] See https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/04/21/remarks-by-president-biden-on-the-covid-19-response-and-the-state-of-vaccinations-2/.

[88] These processing goals are not binding on USCIS; depending on the evidence presented, actual processing times may vary.

nonimmigrant visa abroad. Failure to submit a duplicate copy may cause a delay in the issuance of a visa to an otherwise eligible applicant.[89]

## J. DOL Procedures

As noted above, all employers are required to have an approved and valid TLC from DOL in order to file a Form I–129 petition with DHS. *See* 8 CFR 214.2(h)(6)(iv)(A) and (D). The standards and procedures governing the submission and processing of *Applications for Temporary Employment Certification* for employers seeking to hire H–2B workers are set forth in 20 CFR part 655, subpart A. Employers with an approved TLC have conducted recruitment, as set forth in 20 CFR 655.40 through 655.48, to determine whether U.S. workers are qualified and available to perform the work for which H–2B workers are sought.

In addition to the recruitment already conducted in connection with a valid TLC, in order to ensure the recruitment has not become stale, employers that wish to obtain visas for their workers under 8 CFR 214.2(h)(6)(x), and who file an I–129 petition 45 or more days after the certified start date of work on the TLC must conduct additional recruitment for U.S. workers. This is particularly important this year as U.S. workers have begun to, and will continue to, reenter the workforce as they become vaccinated and the COVID–19 emergency subsides.

As noted in the 2015 H–2B Interim Final Rule, U.S. workers seeking employment in temporary or seasonal nonagricultural jobs typically do not search for work months in advance, and cannot make commitments about their availability for employment far in advance of the work start date. *See* 80 FR 24041, 24061, 24071. Given that the temporary labor certification process generally begins 75 to 90 days in advance of the employer's start date of work, employer recruitment efforts typically occur between 40 and 60 days before that date with an obligation to provide employment to any qualified U.S. worker who applies until 21 days before the date of need. Therefore, employers with TLCs containing a start date of work on April 1, 2021, likely conducted their positive recruitment beginning around late-January and ending around mid-February 2021, and continued to consider U.S. worker

applicants and referrals only until March 11, 2021.

In order to provide U.S. workers a realistic opportunity to pursue jobs for which employers will be seeking foreign workers under this rule, the Departments have determined that if employers file an I–129 petition 45 or more days after their date of need, they have not conducted recruitment recently enough for the Departments to reasonably conclude that there are currently an insufficient number of U.S. workers who are qualified, willing, and available to perform the work absent taking additional, positive recruitment steps. The 45-day threshold for additional recruitment identified in this rule reflects a timeframe between the end of the employer's recruitment and filing of the petition similar to that provided under the FY 2018 and FY 2019 H–2B supplemental cap rules.

An employer who files an I–129 petition under 8 CFR 214.2(h)(6)(x) less than 45 after the certified start date of work on the TLC must submit the TLC and a completed Form ETA–9142B–CAA–4, but is not required to conduct recruitment for U.S. workers beyond the recruitment already conducted as a condition of certification. Only those employers with still-valid TLCs with a start date of work that is 45 or more days before the date they file a petition will be required to conduct recruitment in addition to that conducted prior to being granted labor certification and attest that the recruitment will be conducted, as follows.

The employer must place a new job order for the job opportunity with the State Workforce Agency (SWA) serving the area of intended employment no later than the next business day after submitting an I–129 petition for H–2B workers to USCIS. The job order must contain the job assurances and contents set forth in 20 CFR 655.18 for recruitment of U.S. workers at the place of employment, and remain posted for at least 15 calendar days. The employer must also follow all applicable SWA instructions for posting job orders and receive applications in all forms allowed by the SWA, including online applications. The Departments have concluded that keeping the job order posted for a period of 15 calendar days, during the period the employer is conducting the additional recruitment steps explained below, will effectively ensure U.S. workers are apprised of the job opportunity and are referred for employment, if they are willing, qualified, and available to perform the work. The 15 calendar day period also is consistent with the employer-

conducted recruitment activity period applicable under 20 CFR 655.40(b).

The employer also must conduct additional recruitment steps during the period of time the SWA is actively circulating the job order for intrastate clearance. First, the employer must contact, by email or other electronic means, the nearest American Job Center(s) (AJC) offering business services and serving the area of intended employment where work will commence to request staff assistance to advertise and recruit U.S. workers for the job opportunity. AJCs bring together a variety of programs providing a wide range of employment and training services for U.S. workers, including job search services and assistance for prospective workers and recruitment services for employers through the Wagner-Peyser Program. Therefore, AJCs can offer assistance to employers with recruitment of U.S. workers, and contact with local AJCs will facilitate contemporaneous and effective recruitment activities that can broaden dissemination of the employer's job opportunity through connections with other partner programs within the One-Stop System to locate qualified U.S. workers to fill the employer's labor need. For example, the local AJC may contact community-based organizations in the geographic area that serve potentially qualified workers or, when a job opportunity is in an occupation or industry that is traditionally or customarily unionized, the local AJC is well-positioned to identify and circulate the job order to appropriate union offices, consistent with 20 CFR 655.33(b)(5). In addition, as a partner program in the One-Stop System, AJCs are connected with the state's unemployment insurance program, thus an employer's connection with the AJC will help facilitate knowledge of the job opportunity to U.S. workers actively seeking employment. When contacting the AJC(s), the employer must provide staff with the job order number or, if the job order number is unavailable, a copy of the job order.

To increase navigability and to make the process as convenient as possible, DOL offers an online service for employers to locate the nearest local AJC at *https://www.careeronestop.org/* and by selecting the "Find Local Help" feature on the main homepage. This feature will navigate the employer to a search function called "Find an American Job Center" where the city, state or zip code covering the geographic area where work will commence can be entered. Once entered and the search function is executed, the online service will return a listing of the

---

[89] Petitioners should note that under section 105, the H–2B numerical increase relates to the total number of noncitizens who may receive a visa under INA section 101(a)(15)(H)(ii)(b) in this fiscal year.

name(s) of the AJC(s) serving that geographic area as well as contact option(s) and an indication as to whether the AJC is a "comprehensive" or "affiliate" center. Employers must contact an AJC that is labeled "comprehensive center" as those offer the full range of employment and business services. As explained on the locator website, many AJCs continue to offer virtual or remote services due to the pandemic with physical office locations temporarily closed for in-person and mail processing services. Therefore, this rule requires that employers utilize available electronic methods for the nearest AJC to meet the contact and disclosure requirements in this rule.

Second, during the period of time the SWA is actively circulating the job order described in paragraph (a)(5)(i) for intrastate clearance, the employer must make reasonable efforts to contact (by mail or other effective means) its former U.S. workers that it employed in the occupation at the place of employment (except those who were dismissed for cause or who abandoned the worksite) during the period beginning January 1, 2019, until the date the I–129 petition required under 8 CFR 214.2(h)(6)(x) is submitted. Among the employees the employer must contact are those who have been furloughed or laid off during this period. The employer must disclose to its former employees the terms of the job order, and solicit their return to the job. The contact and disclosures required by this paragraph must be provided in a language understood by the worker, as necessary or reasonable.

Furloughed employees are employees the employer laid off (as the term is defined in 20 CFR 655.5 and 29 CFR 503.4), but the layoff is intended to last for a temporary period of time. This recruitment step will help ensure notice of the job opportunity is disseminated broadly to U.S. workers who were laid off or furloughed during the COVID–19 outbreak and who may be seeking employment as the economy begins to recover in 2021. While this requirement goes beyond the requirement at 20 CFR 655.43, the Departments believes it is appropriate given the evolving conditions of the U.S. labor market, as described above, and the increased likelihood that qualified U.S. workers will make themselves available for these job opportunities.

Third, as the employer was required to do when initially applying for its labor certification, the employer must provide a copy of the job order to the bargaining representative for employees in the occupation and area of intended employment, consistent with 20 CFR

655.45(a), or if there is no bargaining representative, post the job order in the places and manner described in 20 CFR 655.45(b).

The requirements to contact former U.S. workers and provide notice to the bargaining representative or post the job order must be conducted in a language understood by the workers, as necessary or reasonable. This requirement would apply, for example, in situations where an employer has one or more employees who do not speak English as their primary language and who have a limited ability to read, write, speak, or understand English. This requirement would allow those workers to make informed decisions regarding the job opportunity, and is a reasonable interpretation of the recruitment requirements in 20 CFR part 655, subpart A, in light of the need to ensure that the test of the U.S. labor market is as comprehensive as possible. Consistent with existing language requirements in the H–2B program under 20 CFR 655.20(l), DOL intends to broadly interpret the necessary or reasonable qualification, and apply an exemption only in those situations where having the job order translated into a particular language would both place an undue burden on an employer and not significantly disadvantage the employee.

The employer must hire any qualified U.S. worker who applies or is referred for the job opportunity until either (1) the date on which the last H–2B worker departs for the place of employment, or (2) 30 days after the last date on which the SWA job order is posted, whichever is later. Additionally, consistent with 20 CFR 655.40(a), applicants may be rejected only for lawful job-related reasons. Given that the employer, SWA, and AJC(s) will be actively engaged in conducting recruitment and broader dissemination of the job opportunity during the period of time the job order is active, this requirement provides an adequate period of time for U.S. workers to contact the employer or SWA for referral to the employer and completion of the additional recruitment steps described above. As explained above, the Departments have determined that if employers file a petition 45 or more days after their dates of need, they have not conducted recruitment recently enough for the Departments to reasonably conclude that there are currently an insufficient number of U.S. workers qualified, willing, and available to perform the work absent additional recruitment.

Because of the abbreviated timeline for the additional recruitment required for employers whose initial recruitment

has gone stale, the Departments have determined that a longer hiring period is necessary to approximate the hiring period under normal recruitment procedures and ensure that domestic workers have access to these job opportunities, consistent with the Departments' mandate. Additionally, given the relatively brief period during which additional recruitment will occur, additional time may be necessary for U.S. workers to have a meaningful opportunity to learn about the job opportunities and submit applications.

Although the hiring period may require some employers to hire U.S. workers after the start of the contract period, this is not unprecedented. For example, in the H–2A program, employers have been required to hire U.S. workers through 50 percent of the contract period since at least 2010,[90] which "enhance[s] protections for U.S. workers, to the maximum extent possible, while balancing the potential costs to employers," and is consistent with the Departments' responsibility to ensure that these job opportunities are available to U.S. workers.[91] The Department acknowledges that hiring workers after the start of the contract period imposes an additional cost on employers, but that cost can be lessened, in part, by the ability to discharge the H–2B worker upon hiring a U.S. worker. Additionally, this rule permits employers to immediately hire H–2B workers who are already present in the United States without waiting for approval of an H–2B petition, which will reduce the potential for harm to H–2B workers as a result of displacement by U.S. workers. *See* new 8 CFR 214.2(h)(26). Most importantly, a longer hiring period will ensure that available U.S. workers have a viable opportunity to apply for H–2B job opportunities. Accordingly, the Departments have determined that in affording the benefits of this temporary cap increase to businesses that need workers to avoid irreparable harm, it is necessary to ensure U.S. workers who may be seeking employment as the economy begins to recover in 2021 have sufficient time to apply for these jobs.

Finally, as in the temporary rules implementing the supplemental cap increases in prior years, employers must retain documentation demonstrating compliance with the recruitment requirements described above, including placement of a new job order

---

[90] Final Rule, *Temporary Agricultural Employment of H–2A Aliens in the United States,* 75 FR 6884, 6921 (Feb. 12, 2010).

[91] NPRM, *Temporary Agricultural Employment of H–2A Aliens in the United States,* 74 FR 45906, 45917 (Sept. 4, 2009); 75 FR at 6922.

AR00632

with the SWA, contact with AJCs, contact with former U.S. workers, and compliance with § 655.45(a) or (b). Employers must prepare and retain a recruitment report that describes these efforts and meets the requirements set forth in 20 CFR 655.48, including the requirement to update the recruitment report throughout the recruitment and hiring period set forth in paragraph (a)(5)(v) of new 20 CFR 655.64. Employers must maintain copies of the recruitment report, attestation, and supporting documentation, as described above, for a period of 3 years from the date that the TLC was approved, consistent with the document retention requirements under 20 CFR 655.56. These requirements are similar to those that apply to certain seafood employers who stagger the entry of H–2B workers under 20 CFR 655.15(f).

DOL's WHD has the authority to investigate the employer's attestations, as the attestations are a required part of the H–2B petition process under this rule and the attestations rely on the employer's existing, approved TLC. Where a WHD investigation determines that there has been a willful misrepresentation of a material fact or a substantial failure to meet the required terms and conditions of the attestations, WHD may institute administrative proceedings to impose sanctions and remedies, including (but not limited to) assessment of civil money penalties; recovery of wages due; make-whole relief for any U.S. worker who has been improperly rejected for employment, laid off, or displaced; and/or debarment for 1 to 5 years. *See* 29 CFR 503.19, 503.20. This regulatory authority is consistent with WHD's existing enforcement authority and is not limited by the expiration date of this rule. Therefore, in accordance with the documentation retention requirements at new 20 CFR 655.68, the petitioner must retain documents and records evidencing compliance with this rule, and must provide the documents and records upon request by DHS or DOL.

DHS has the authority to verify any information submitted to establish H–2B eligibility at any time before or after the petition has been adjudicated by USCIS. *See, e.g.,* INA sections 103 and 214 (8 U.S.C. 1103, 1184); *see also* 8 CFR part 103 and 8 CFR 214.2(h). DHS' verification methods may include, but are not limited to, review of public records and information, contact via written correspondence or telephone, unannounced physical site inspections, and interviews. USCIS will use information obtained through verification to determine H–2B eligibility and assess compliance with

the requirements of the H–2B program. Subject to the exceptions described in 8 CFR 103.2(b)(16), USCIS will provide petitioners with an opportunity to address any adverse information that may result from a USCIS compliance review, verification, or site visit after a formal decision is made on a petition or after the agency has initiated an adverse action that may result in revocation or termination of an approval.

As previously noted, the Departments have agreed to select a significant number of approved petitions for audit examination to verify compliance with the irreparable harm standard and additional employer conducted recruitment implemented through this rule. DOL's OFLC already has the authority under 20 CFR 655.70 to conduct audit examinations on adjudicated *Applications for Temporary Employment Certification,* including all appropriate appendices, and verify any information supporting the employer's attestations. OFLC uses audits of adjudicated *Applications for Temporary Employment Certification,* as authorized by 20 CFR 655.70, to ensure employer compliance with attestations made in its *Application for Temporary Employment Certification* and to ensure the employer has met all statutory and regulatory criteria and satisfied all program requirements. The OFLC certifying officer (CO) has sole discretion to choose which *Applications for Temporary Employment Certification* will be audited. *See* 20 CFR 655.70(a). Post adjudication audits can be used to establish a record of employer compliance or non-compliance with program requirements and the information gathered during the audit assists DOL in determining whether it needs to further investigate or debar an employer or its agent or attorney from future labor certifications.

Under this rule, an employer may submit a petition to USCIS, including a valid TLC and Form ETA–9142B–CAA–4, in which the employer attests to compliance with requirements for access to the supplemental H–2B visas allocated through 8 CFR 214.2(h)(6)(x), including that its business is likely to suffer irreparable harm and that it will conduct additional recruitment, if necessary to refresh the TLC's labor market test. DHS and DOL consider Form ETA–9142B–CAA–4 to be an appendix to the *Application for Temporary Employment Certification* and the attestations contained on the Form ETA–9142B–CAA–4 and documentation supporting the attestations to be evidence that is incorporated into and a part of the approved TLC. Therefore, DOL's audit

authority includes the authority to audit the veracity of any attestations made on Form ETA–9142B–CAA–4 and documentation supporting the attestations. However, DOL's audit authority is independently authorized, and is not limited by the expiration date of this rule. In order to make certain that the supplemental visa allocation is not subject to fraud or abuse, DHS will share information regarding Forms ETA–9142B–CAA–4 with DOL, consistent with existing authorities. This information sharing will support DOL's identification of TLCs used to access the supplemental visa allocation for closer examination of TLCs through the audit process.

In accordance with the documentation retention requirements in this rule, the petitioner must retain documents and records proving compliance with this rule, and must provide the documents and records upon request by DHS or DOL. Under this rule, DOL will audit a significant number of TLCs used to access the supplemental visa allocation to ensure employer compliance with attestations, including those regarding the irreparable harm standard and additional employer conducted recruitment, required under this rule. In the event of an audit, the OFLC CO will send a letter to the employer and, if appropriate, a copy of the letter to the employer's attorney or agent, listing the documentation the employer must submit and the date by which the documentation must be sent to the CO. During audits under this rule, the CO will request documentation necessary to demonstrate the employer conducted all e recruitment steps required under this rule and truthfully attested to the irreparable harm the employer would suffer if it does not receive all requested workers under the cap increase, including documentation the employer is required to retain under this rule. If necessary to complete the audit, the CO may request supplemental information and/or documentation from the employer during the course of the audit process. 20 CFR 655.70(c).

Failure to comply in the audit process may result in the revocation of the employer's certification or in debarment, under 20 CFR 655.72 and 655.73, respectively, or require the employer to undergo assisted recruitment in future filings of an *Application for Temporary Employment Certification,* under 20 CFR 655.71. Where an audit examination or review of information from DHS or other appropriate agencies determines that there has been fraud or willful misrepresentation of a material fact or a

substantial failure to meet the required terms and conditions of the attestations or failure to comply with the audit examination process, OFLC may institute appropriate administrative proceedings to impose sanctions on the employer. Those sanctions may result in revocation of an approved TLC, the requirement that the employer undergo assisted recruitment in future filings of an *Application for Temporary Employment Certification* for a period of up to 2 years, and/or debarment from the H–2B program and any other foreign labor certification program administered by DOL for 1 to 5 years. *See* 29 CFR 655.71, 655.72, 655.73. Additionally, OFLC has the authority to provide any finding made or documents received during the course of conducting an audit examination to DHS, WHD, IER, or other enforcement agencies. OFLC's existing audit authority is independently authorized, and is not limited by the expiration date of this rule. Therefore, in accordance with the documentation retention requirements at new 20 CFR 655.68, the petitioner must retain documents and records proving compliance with this rule, and must provide the documents and records upon request by DHS or DOL.

Petitioners must also comply with any other applicable laws, such as avoiding unlawful discrimination against U.S. workers based on their citizenship status or national origin. Specifically, the failure to recruit and hire qualified and available U.S. workers on account of such individuals' national origin or citizenship status may violate INA section 274B, 8 U.S.C. 1324b.

## IV. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

This rule is issued without prior notice and opportunity to comment and with an immediate effective date pursuant to the Administrative Procedure Act (APA). 5 U.S.C. 553(b) and (d).

### 1. Good Cause To Forgo Notice and Comment Rulemaking

The APA, 5 U.S.C. 553(b)(B), authorizes an agency to issue a rule without prior notice and opportunity to comment when the agency, for good cause, finds that those procedures are "impracticable, unnecessary, or contrary to the public interest." Among other things, the good cause exception for forgoing notice and comment rulemaking "excuses notice and comment in emergency situations, or where delay could result in serious harm." *Jifry* v. *FAA,* 370 F.3d 1174,

1179 (D.C. Cir. 2004). Although the good-cause exception is "narrowly construed and only reluctantly countenanced," *Tenn. Gas Pipeline Co.* v. *FERC,* 969 F.2d 1141, 1144 (D.C. Cir. 1992), the Departments have appropriately invoked the exception in this case, for the reasons set forth below.

With respect to the supplemental allocations provisions in 8 CFR 214.2 and 20 CFR part 655, subpart A, the Departments are bypassing advance notice and comment because of the exigency created by section 105 of Div. O of the FY 2021 Omnibus, which went into effect on December 27, 2020, and expires on September 30, 2021, as well as rapidly evolving economic conditions and labor demand, as described above. USCIS received more than enough petitions to meet the H–2B visa statutory cap for the second half of FY 2021 on February 12, 2021, which is 6 days earlier than when the statutory cap for the second half of FY 2020 was reached. USCIS conducted a lottery on February 17, 2021, to randomly select a sufficient number of petitions to meet the remainder of the statutory cap. USCIS rejected and returned the petitions and associated filing fees to petitioners that were not selected, as well as all cap-subject petitions received after February 12, 2021. Given high demand by American businesses for H–2B workers, rapidly evolving economic conditions and labor demand, and the short time remaining in the fiscal year for U.S. employers to avoid the economic harm described above, a decision to undertake notice and comment rulemaking would likely delay final action on this matter by weeks or months, and would, therefore, greatly complicate and indeed likely preclude the Departments from successfully exercising the authority created by section 105.

The temporary portability and change of employer provisions in 8 CFR 214.2 and 274a.12 are further supported by conditions created by the COVID–19 pandemic. On January 31, 2020, the Secretary of Health and Human Services declared a public health emergency under section 319 of the Public Health Service Act in response to COVID–19 retroactive to January 27, 2020.[92] This determination that a public health emergency exists due to COVID–19 has subsequently been renewed five times: On April 21, 2020, on July 23, 2020, on October 2, 2020, January 7, 2021, and

most recently on April 15, 2021 effective on April 21, 2021.[93] On March 13, 2020, then-President Trump declared a National Emergency concerning the COVID–19 outbreak, retroactive to March 1, 2020, to control the spread of the virus in the United States.[94] In response to the Mexican government's call to increase social distancing in that country, DOS announced the temporary suspension of routine immigrant and nonimmigrant visa services processed at the U.S. Embassy in Mexico City and all U.S. consulates in Mexico beginning on March 18, 2020.[95] DOS expanded the temporary suspension of routine immigrant and nonimmigrant visa services at all U.S. Embassies and Consulates on March 20, 2020.[96] On July 22, 2020, DOS indicated that embassies and consulates should continue to provide emergency and mission critical visa services to the extent possible and could begin a phased resumption of routine visa services as local conditions and resources allow.[97] On March 26, 2020 DOS designated the H–2 programs as essential to the economy and food security of the United States and a national security priority; DOS indicated that U.S. Embassies and Consulates will continue to process H–2 cases to the extent possible and implemented a change in its procedures, to include interview waivers.[98] On January 25, 2021, President Biden issued a *Proclamation on the Suspension of Entry as Immigrants and Non-Immigrants of Certain Additional Persons Who Pose a Risk of Transmitting Coronavirus Disease.*[99] The proclamation restricted entry into the United States from European Schengen treaty countries, the United Kingdom (including territories outside of Europe), Ireland, Brazil, and South

---

[92] HHS, Determination that a Public Health Emergency Exists, *https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx* (last visited Apr. 20, 2021). See also HHS, Determination of Public Health Emergency, 85 FR 7316 (Feb. 7, 2020).

[93] *See* HHS Renewal of Determination That A Public Health Emergency Exists, *https://www.phe.gov/emergency/news/healthactions/phe/Pages/COVID-15April2021.aspx.* (Apr. 15, 2021).

[94] President of the United States, Proclamation 9994 of March 13, 2020, Declaring a National Emergency Concerning the Coronavirus Disease (COVID–19) Outbreak, 85 FR 15337 (Mar. 18, 2020).

[95] DOS, Suspension of Routine Visa Services, *https://travel.state.gov/content/travel/en/News/visas-news/suspension-of-routine-visa-services.html* (last updated Mar. 20, 2020).

[96] *https://travel.state.gov/content/travel/en/News/visas-news/suspension-of-routine-visa-services.html*

[97] *https://travel.state.gov/content/travel/en/News/visas-news/important-announcement-on-h2-visas.html* (Last visited on Apr. 21, 2021).

[99] Proclamation 10143 of January 25, 2021, 86 FR 7467 (Jan. 28, 2021). *https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/25/proclamation-on-the-suspension-of-entry-as-immigrants-and-non-immigrants-of-certain-additional-persons-who-pose-a-risk-of-transmitting-coronavirus-disease/.*

Africa—countries where COVID–19 variants originated or were identified as present.[100] On January 28, 2021, DOS reaffirmed the importance of the H–2 programs by making a national interest designation for certain H–2 travelers from South Africa.[101] On April 19, 2021, Customs and Border Protection announced an extension of certain land border restrictions between U.S. and Canada, and U.S. and Mexico to May 21, 2021.[102]

In addition to travel restrictions and impacts of the pandemic on visa services, as discussed elsewhere in this rule, current efforts to curb the pandemic in the United States and worldwide have been partially successful, however, with the emergence of COVID–19 variants; different rates of vaccination in some countries and regions; and other uncertainties associated with the evolving pandemic situation, DHS anticipates that H–2B employers may need additional flexibilities, beyond supplemental visa numbers, to meet all of their labor needs, particularly if some U.S. and H–2B workers become unavailable due to illness or other restrictions related to the spread of COVID–19. Therefore, DHS is acting expeditiously to put in place rules that will facilitate the continued employment of H–2B workers already present in the United States. This action will help employers fill these critically necessary nonagricultural job openings and protect U.S. businesses' economic investments in their operations.

Courts have found ''good cause'' under the APA when an agency is moving expeditiously to avoid significant economic harm to a program, program users, or an industry. Courts have held that an agency may use the good cause exception to address ''a serious threat to the financial stability of [a government] benefit program,'' *Nat'l Fed'n of Fed. Emps.* v. *Devine,* 671 F.2d 607, 611 (D.C. Cir. 1982), or to avoid ''economic harm and disruption'' to a given industry, which would likely result in higher consumer prices, *Am. Fed'n of Gov't Emps.* v. *Block,* 655 F.2d 1153, 1156 (D.C. Cir. 1981).

Consistent with the above authorities, the Departments are bypassing notice

and comment to prevent ''serious economic harm to the H–2B community,'' including U.S. employers, associated U.S. workers, and related professional associations, that could result from ongoing uncertainty over the status of the numerical limitation, in other words, the effective termination of the program through the remainder of FY 2021. *See Bayou Lawn & Landscape Servs.* v. *Johnson,* 173 F. Supp. 3d 1271, 1285 & n.12 (N.D. Fla. 2016). The Departments note that this action is temporary in nature, *see id.,*[103] and includes appropriate conditions to ensure that it affects only those businesses most in need, and also protects H–2B and U.S. workers.

### 2. Good Cause To Proceed With an Immediate Effective Date

The APA also authorizes agencies to make a rule effective immediately, upon a showing of good cause, instead of imposing a 30-day delay. 5 U.S.C. 553(d)(3). The good cause exception to the 30-day effective date requirement is easier to meet than the good cause exception for foregoing notice and comment rulemaking. *Riverbend Farms, Inc.* v. *Madigan,* 958 F.2d 1479, 1485 (9th Cir. 1992); *Am. Fed'n of Gov't Emps., AFL–CIO* v. *Block,* 655 F.2d 1153, 1156 (D.C. Cir. 1981); *U.S. Steel Corp.* v. *EPA,* 605 F.2d 283, 289–90 (7th Cir. 1979). An agency can show good cause for eliminating the 30-day delayed effective date when it demonstrates urgent conditions the rule seeks to correct or unavoidable time limitations. *U.S. Steel Corp.,* 605 F.2d at 290; *United States* v. *Gavrilovic,* 511 F.2d 1099, 1104 (8th Cir. 1977). For the same reasons set forth above expressing the need for immediate action, we also conclude that the Departments have good cause to dispense with the 30-day effective date requirement.

### B. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to proceed (to the extent permitted by law) only if the benefits justify the costs and to select (again to the extent permitted by law) the regulatory approach that maximizes net

benefits. Executive Order 13563 emphasizes the importance of quantifying both costs and benefits; reducing costs; simplifying and harmonizing rules; and promoting flexibility through approaches that preserve freedom of choice (including through ''provision of information in a form that is clear and intelligible''). It also allows consideration of equity, fairness, distributive impacts, and human dignity, even if some or all of these are difficult or impossible to quantify.

This rule is a ''significant regulatory action,'' although not an economically significant regulatory action since it does not meet the threshold of $100 million in annual economic effects, under section 3(f)(1) of Executive Order 12866. Accordingly, the Office of Management and Budget has reviewed this regulation.

### Summary

With this temporary final rule (TFR), DHS is authorizing the immediate release of an additional 22,000 H–2B visas. By the authority given under the Further Consolidated Appropriations Act, 2021, Public Law 116–260 (FY 2021 Omnibus), DHS is raising the H–2B cap by an additional 22,000 visas for the remainder of FY 2021 to businesses that: (1) Show that there are an insufficient number of U.S. workers to meet their needs in FY 2021; (2) attest that their businesses are likely to suffer irreparable harm without the ability to employ the H–2B workers that are the subject of their petition, among other commitments; and (3) petition for returning workers who were issued an H–2B visa or were otherwise granted H–2B status in FY 2018, 2019, or 2020, unless the H–2B worker is a national of Guatemala, Honduras, and El Salvador (the Northern Triangle countries). Additionally, up to 6,000 of the 22,000 visas may be granted to workers from the Northern Triangle countries who are exempt from the returning worker requirement. This TFR aims to prevent irreparable harm to certain U.S. businesses by allowing them to hire additional H–2B workers within FY 2021.

The estimated total costs to petitioners ranges from $10,192,963 to $26,063,006. The estimated total cost to the Federal Government is $467,820. DHS estimates that the total cost of this rule ranges from $10,660,783 to $26,530,826. The benefits of this rule are diverse, though some of them are difficult to quantify. They include:

(1) Employers benefit from this rule significantly through increased access to H–2B workers;

---

[100] *Id.*

[101] *See* https://travel.state.gov/content/travel/en/News/visas-news/national-interest-exception-for-certain-h-2-travelers-from-south-africa.html (Jan. 28, 2021).

[102] *See Temporary Restriction of Travelers Crossing US-Canada and Mexico Land Borders for Non-Essential Purposes,* https://www.cbp.gov/s/article/Article-1596?language=en_US#:~:text=On%20March%2021%2C%202020%2C%20the,EDT%20on%20April%2021%2C%202021 (last visited on April 20, 2021).

[103] Because the Departments have issued this rule as a temporary final rule, this rule—with the sole exception of the document retention requirements—will be of no effect after September 30, 2021, even if Congress includes an authority similar to section 105 in a subsequent act of Congress.

(2) Customers and others benefit directly or indirectly from that increased access;

(3) H–2B workers benefit from this rule significantly through obtaining jobs and earning wages, potential ability to port and earn additional wages, and increased information on COVID–19 and vaccination distribution. DHS recognizes that some of the effects of these provisions may occur beyond the borders of the United States;[104]

(4) Some American workers may benefit to the extent that they do not lose jobs through the reduced or closed business activity that might occur if fewer H–2B workers were available;

(5) The existence of a lawful pathway, for the 6,000 visas set aside for new workers from Guatemala, Honduras, and El Salvador, is likely to provide multiple benefits in terms of U.S. policy with respect to the Northern Triangle; and

(6) The Federal Government benefits from increased evidence regarding attestations. Table 1 provides a summary of the provisions in this rule and some of their impacts.

### Table 1—Summary of the TFR's Provisions and Economic Impact

| Current provision | Changes resulting from the provisions of the TFR | Expected costs of the provisions of the TFR | Expected benefits of the provisions of the TFR |
|---|---|---|---|
| —The current statutory cap limits H–2B visa allocations to 66,000 workers a year. | —The amended provisions will allow for an additional 22,000 H–2B temporary workers. Up to 6,000 of the 22,000 additional visas will be reserved for workers who are nationals of Guatemala, Honduras, and El Salvador and will be exempt from the returning worker requirement. | —The total estimated cost to file Form I–129 by human resource specialists is approximately $1,344,810. The total estimated cost to file Form I–129 and Form G–28 will range from approximately $1,545,882 if filed by in-house lawyers to approximately $2,148,647 if filed by outsourced lawyers. The total estimated cost associated with filing additional petitions ranges from $2,890,692 to $3,493,457 depending on the filer. | —Form I–129 petitioners would be able to hire temporary workers needed to prevent their businesses from suffering irreparable harm.<br>—Businesses that are dependent on the success of other businesses that are dependent on H–2B workers would be protected from the repercussions of local business failures.<br>—Some American workers may benefit to the extent that they do not lose jobs through the reduced or closed business activity that might occur if fewer H–2B workers were available. |
| | | —The total estimated costs associated with filing Form I–907 if it is filed with Form I–129 is $2,863,603 if filed by human resource specialists. The total estimated costs associated with filing Form I–907 would range from approximately $2,259,184 if filed by an in-house lawyer to approximately $2,322,317 if filed by an outsourced lawyer. The total estimated costs associated with requesting premium processing ranges from approximately $5,122,787 to approximately $5,185,920.<br>—DHS may incur additional adjudication costs as more applicants file Form I–129. However, these additional costs to USCIS are expected to be covered by the fees paid for filing the form, which have been accounted for in costs to petitioners. | |
| | —Petitioners will be required to fill out the newly created Form ETA–9142–B–CAA–4, Attestation for Employers Seeking to Employ H–2B Nonimmigrant Workers Under Section 105 of Div. O of the Consolidated Appropriations Act, 2021.<br>—Petitioners would be required to conduct an additional round of recruitment. | —The total estimated cost to petitioners to complete and file Form ETA–9142–B–CAA–4 is approximately $1,370,719. | —Form ETA–9142–B–CAA–4 will serve as initial evidence to DHS that the petitioner meets the irreparable harm standard and returning worker requirements. |
| | | —The total estimated cost to petitioners to conduct an additional round of recruitment is approximately $516,622. | —The additional round of recruitment will ensure that a U.S. worker that is willing and able to fill the position is not replaced by a nonimmigrant worker. |

[104] See, e.g., Arnold Brodbeck et al., Seasonal Migrant Labor in the Forest Industry of the Southeastern United States: The Impact of H–2B Employment on Guatemalan Livelihoods, 31 Society and Natural Resources 1012 (2018).

AR00636

TABLE 1—SUMMARY OF THE TFR'S PROVISIONS AND ECONOMIC IMPACT—Continued

| Current provision | Changes resulting from the provisions of the TFR | Expected costs of the provisions of the TFR | Expected benefits of the provisions of the TFR |
|---|---|---|---|
| | —Employers of H–2B workers would be required to provide information about equal access to COVID–19 vaccines and vaccination distribution sites.<br>—An H–2B nonimmigrant with a valid visa who is physically present in the United States may port to another employer. | —The total estimated cost to petitioners to provide COVID–19 vaccines and vaccination distribution site information is approximately $1,743.<br><br>—The total estimated cost to file Form I–129 if filed by human resource specialists will range from $0 to approximately $2,081,206. The total estimated costs to file Form I–129 and Form G–28 ranges from $0 to approximately $2,393,077 if filed by in-house lawyers and from $0 to approximately $5,095,792 if filed by outsourced lawyers. | —Workers would be given information about equal access to vaccines and vaccination distribution.<br><br>—H–2B workers with a valid visa present in the United States will be able to port to another employer and potentially extend their stay and, therefore, earn additional wages.<br>—An H–2B worker with an employer that is not complying with H–2B program requirements would have additional flexibility in porting to another employer's certified position.<br>—This provision would ensure employers will be able to hire the H–2B workers they need. |
| | | —The total estimated cost associated with filing Form I–907 if filed by human resource specialists ranges from $0 to approximately $4,431,409. The total estimated cost to file Form I–907 ranges from $0 to approximately $3,497,990 if filed by in-house lawyers and from $0 to approximately $3,595,738 if filed by outsourced lawyers. The total estimated costs associated with this provision ranges from $0 to approximately $15,204,145.<br>—DHS may incur some additional adjudication costs as more petitioners file Form I–129. However, these additional costs to USCIS are expected to be covered by the fees paid for filing the form, which have been accounted for in costs to petitioners. | |
| | —DHS and DOL intend to conduct a significant number of random audits during the period of temporary need to verify compliance with H–2B program requirements, including the irreparable harm standard as well as other key worker protection provisions implemented through this rule. | —Employers will have to comply with audits for an estimated total opportunity cost of time of $290,400.<br>—It is expected both DHS and DOL will be able to shift resources to be able to conduct these audits without incurring additional costs. However, the Departments will incur opportunity costs of time. The audits are expected to take a total of approximately 6,000 hours and cost approximately $467,820. | —DOL and DHS audits will yield evidence of the efficacy of attestations in enforcing compliance with H–2B supplemental cap requirements.<br>—Conducting a significant number of audits will discourage uncorroborated attestations. |

Source: USCIS and DOL analysis.

## Background and Purpose of the Proposed Rule

The H–2B visa classification program was designed to serve U.S. businesses that are unable to find a sufficient number of U.S. workers to perform nonagricultural work of a temporary or seasonal nature. For a nonimmigrant worker to be admitted into the United States under this visa classification, the hiring employer is required to: (1) Receive a temporary labor certification (TLC) from the Department of Labor (DOL); and (2) file Form I–129 with DHS. The temporary nature of the services or labor described on the approved TLC is subject to DHS review during adjudication of Form I–129.[105] The current INA statute sets the annual number of H–2B visas for workers performing temporary nonagricultural work at 66,000 to be distributed semi-annually beginning in October (33,000) and in April (33,000).[106] Any unused H–2B visas from the first half of the fiscal year will be available for employers seeking to hire H–2B workers during the second half of the fiscal year. However, any unused H–2B visas from one fiscal year do not carry over into the next and will therefore not be made

[105] Revised effective 1/18/2009; 73 FR 78104.

[106] See 8 U.S.C. 1184(g)(1)(B), INA 214(g)(1)(B) and 8 U.S.C. 1184(g)(4), INA 214(g)(4).

available.[107] Once the statutory H–2B visa cap limit has been reached, petitioners must wait until the next half of the fiscal year, or the beginning of the next fiscal year, for additional visas to become available.

On Dec 27, 2020, the President signed the FY 2021 Omnibus that contains a provision (Sec. 105 of Div. O) permitting the Secretary of Homeland Security, under certain circumstances, to increase the number of H–2B visas available to U.S. employers, notwithstanding the established statutory numerical limitation. After consulting with the Secretary of Labor, the Secretary of the Homeland Security has determined it is appropriate to exercise his discretion and raise the H–2B cap by up to an additional 22,000 visas for the remainder of FY 2021 for those businesses who would qualify under certain circumstances.

These businesses must attest that they will likely suffer irreparable harm if the requested H–2B visas are not granted. The Secretary has determined that initially up to 16,000 of the 22,000 these supplemental visas will be limited to specified H–2B returning workers for nationals of any country. Specifically, these individuals must be workers who were issued H–2B visas or were otherwise granted H–2B status in fiscal years 2018, 2019, or 2020. The Secretary has also determined that up to 6,000 of the 22,000 additional visas will be reserved for workers who are nationals of Guatemala, Honduras, and El Salvador, and that these 6,000 workers will be exempt from the returning worker requirement. Once the 6,000-visa limit has been reached, a petitioner may continue to request H–2B visas for workers who are nationals of Guatemala, Honduras, and El Salvador, but these workers must be returning workers. If the 6,000 exemption cap for nationals of the Northern Triangle countries remains unfilled by July 8, 2021, USCIS will announce that the remaining visas will be made available to employers with TLCs that comply with the provisions of this rule but the petitioner must file a new Form I–129 petition and attest that these noncitizens will be returning workers.

### Population

This rule would affect those employers that file Form I–129 on behalf of nonimmigrant workers they seek to hire under the H–2B visa

program. More specifically, this rule would affect those employers that can establish that their business is likely to suffer irreparable harm because they cannot employ the H–2B returning workers requested on their petition in this fiscal year, without the exercise of authority that is the subject of this rule. Due to the temporary nature of this rule and the limited time left for these additional visas to become available, DHS believes that it is reasonable to assume that eligible petitioners for these additional 22,000 visas will generally be those employers that have already completed the steps to receive an approved TLC prior to the issuance of this rule.

This rule would also have additional impacts on the population of H–2B employers and workers presently in the United States by permitting some H–2B workers to port to another certified employer. These H–2B workers would continue to earn wages and gaining employers would continue to obtain necessary workers.

### Population That Will File a Form I–129, Petition for a Nonimmigrant Worker

According to DOL OFLC's certification data for FY 2021, as of April 15, 2021, about 6,172 TLCs for 107,654 H–2B positions were received with expected work start dates between April 1 and September 30, 2021. DOL OFLC has approved 5,507 certifications for 97,627 H–2B positions and is still reviewing the remaining 155 TLC requests for 2,227 H–2B positions. DOL OFLC has denied, withdrawn, rejected, or returned 510 certifications for 7,800 H–2B positions.[108] However, many of these certified worker positions have already been filled under the semi-annual cap of 33,000 and, for approximately 10 percent of the worker positions certified and still under review by DOL, employers indicated on the Form ETA–9142B their intention to employ some or all of the H–2B workers under the application who will be exempt from the statutory visa cap. The number of approved and pending certifications is 5,662 for 99,854 H–2B positions.[109]

Of the 5,507 certified Applications for Temporary Employment Certification DOL issued, USCIS data shows that 2,104 H–2B petitions for 36,792 positions with approved certifications were already filed toward the second semi-annual cap of 33,000 visas.[110] Therefore, we estimate that approximately 3,558 *Applications for Temporary Employment Certification* may be filed towards the FY 2021 supplemental cap. This number is based on 5,507 (total certified) − 2,104 (certified and already submitted under the second semi-annual cap) and 155 (*Applications for Temporary Employment Certification* that are still being processed by DOL), and therefore represents a reasonable estimate of the pool of potential petitions that may request additional H–2B workers under this rule, in other words, under the FY 2021 supplemental cap. USCIS recognizes that some employers would have to submit two Forms I–129 if they choose to request H–2B workers under both the returning worker and Northern Triangle Countries cap. At this time, USCIS cannot predict how many employers will choose to take advantage of this set-aside, and therefore recognize that the number of petitions may be underestimated. Additionally, due to the timing of the availability of these additional 22,000 visas, USCIS assumes there will not be additional TLCs filed with the DOL.

### Population That Files Form G–28, Notice of Entry of Appearance as Attorney or Accredited Representative

If an attorney or accredited representative submits Form I–129 on behalf of the petitioner, Form G–28, Notice of Entry of Appearance as Attorney or Accredited Representative, must accompany the Form I–129 submission.[111] Using data from FY 2016 to FY 2020, we estimate that approximately 43.59 percent of Form I–129 petitions will be filed by a lawyer or accredited representative (Table 2). Table 2 shows the percentage of Form I–129 H–2B petitions that were accompanied by a Form G–28. We estimate that 1,551 Form I–129 and Form G–28 will be filed by in-house or outsourced lawyers, and that 2,007 Form I–129 will be filed by human resources (HR) specialists.[112]

---

[107] A Temporary Labor Certification (TLC) approved by the Department of Labor must accompany an H–2B petition. The employment start date stated on the petition must match the start date listed on the TLC. *See* 8 CFR 214.2(h)(6)(iv)(A) and (D).

[108] As of April 15, 2021, DOL OFLC had denied 163 applications for 2,161 positions and rejected 28 applications for 360 positions. Employers had withdrawn 312 applications for 5,161 positions and returned 7 applications for 118 positions. This totals 510 applications for 7,800 positions either denied, rejected, withdrawn, or returned.

[109] Calculation: 5,507 approved certifications + 155 pending certifications = 5,662 approved and pending certifications.

Calculation: 97,627 positions associated with approved certification + 2,227 positions associated with pending certifications = 99,854 positions associated with approved and pending certifications.

[110] USCIS, Office of Performance and Quality, Data pulled on April 21, 2021.

[111] USCIS, *Filing Your Form G–28, https:// www.uscis.gov/forms/filing-your-form-g-28.*

[112] Calculation: 3,558 estimated additional petitions * 43.59 percent of petitions filed by a lawyer = 1551 petitions (rounded) filed by a lawyer.

TABLE 2—FORM I–129 H–2B PETITION RECEIPTS THAT WERE ACCOMPANIED BY A FORM G–28, FY 2016–2020

| Fiscal year | Number of Form I–129 H–2B petitions accompanied by a Form G–28 | Total Number of Form I–129 H–2B petitions received | Percent of Form I–129 H–2B petitions accompanied by a Form G–28 |
|---|---|---|---|
| 2016 | 2,795 | 6,527 | 42.82 |
| 2017 | 2,615 | 6,112 | 42.78 |
| 2018 | 2,626 | 6,148 | 42.71 |
| 2019 | 3,335 | 7,461 | 44.70 |
| 2020 | 2,434 | 5,422 | 44.89 |
| 2016–2020 Total | 13,805 | 31,670 | 43.59 |

Source: USCIS Claims3 database, queried using the SMART utility by the USCIS Office of Policy and Strategy on April 8, 2021.

**Population That Files Form I–907, Request for Premium Processing Service**

Employers may use Form I–907, Request for Premium Processing Service, to request faster processing of their Form I–129 petitions for H–2B visas. Table 3 shows the percentage of Form I–129 H–2B petitions that were filed with a Form I–907. USCIS estimates that approximately 93.37 percent of Form I–129 H–2B petitioners will also file a Form I–907 requesting premium processing, though this could be higher because of the timing of this rule. Based on this historical data, USCIS estimates that 3,322 Forms I–907 will be filed with the Forms I–129 as a result of this rule.[113] We estimate that 1,448 Forms I–907 will be filed by in-house or outsourced lawyers and 1,874 will be filed by HR specialists.[114]

TABLE 3—FORM I–129 H–2B PETITION RECEIPTS THAT WERE ACCOMPANIED BY A FORM I–907, FY 2016–2020

| Fiscal year | Number of Form I–129 H–2B petitions accompanied by Form I–907 | Total Number of Form I–129 H–2B petitions received | Percent of Form I–129 H–2B petitions accompanied by Form I–907 |
|---|---|---|---|
| 2016 | 6,084 | 6,527 | 93.21 |
| 2017 | 5,932 | 6,112 | 97.05 |
| 2018 | 5,986 | 6,148 | 97.36 |
| 2019 | 7,227 | 7,461 | 96.86 |
| 2020 | 4,341 | 5,422 | 80.06 |
| 2016–2020 Total | 29,570 | 31,670 | 93.37 |

Source: USCIS Claims3 database, queried using the SMART utility by the USCIS Office of Policy and Strategy on April 8, 2021.

**Population That Files Form ETA–9142–B–CAA–4, Attestation for Employers Seeking To Employ H–2B Nonimmigrant Workers Under Section 105 of Division O of the Consolidated Appropriations Act, 2021 Public Law 116–260**

Petitioners seeking to take advantage of the FY 2021 H–2B supplemental visa cap will need to file a Form ETA–9142–B–CAA–4 attesting their business will suffer irreparable harm without the ability to hire temporary nonimmigrant workers, comply with third party notification, and maintain required records, among other requirements. DOL estimates that each of the 3,558 petitioners will need to file a Form ETA–9142–B–CAA–4 and comply with its provisions.

**Population Affected by the Portability Provision**

The population affected by this provision are nonimmigrants in H–2B status who are present in the United States and the employers with valid TLCs seeking to hire H–2B workers. We use the population of 66,000 H–2B workers authorized by statute and 22,000 additional H–2B workers authorized by this supplemental cap regulation as a proxy for the H–2B population that could be currently present in the United States.[115] We use the number of approved TLCs (5,507) to estimate the potential number of Form I–129 H–2B petitions that incur impacts associated with this porting provision. USCIS is not able to predict an estimate of what percentage of these approved

---

Calculation: 3,558 estimated additional petitions − 1,551 petitions filed by a lawyer = 2,007 petitions filed by an HR specialist.

[113] Calculation: 3,558 estimated additional petitions * 93.37 percent premium processing filing rate = 3,322 (rounded) additional Form I–907.

[114] Calculation: 3,322 additional Form I–907 * 43.59 percent of petitioners represented by a lawyer = 1,448 (rounded) additional Form I–907 filed by a lawyer.

Calculation: 3,322 additional Form I–907 − 1448 additional Form I–907 filed by a lawyer = 1,874 additional Form I–907 filed by an HR specialist.

[115] H–2B workers may have varying lengths in time approved on their H–2B visas. This number may overestimate H–2B workers who have already completed employment and departed and may underestimate H–2B workers not reflected in the current cap and long-term H–2B workers. In FY2020, 346 requests for change of status to H–2B were approved by USCIS and 3,505 crossings of visa-exempt H–2B workers were processed by Customs and Border Protection (CBP). *See Characteristics of H–2B Nonagricultural Temporary Workers FY2020 Report to Congress at https://www.uscis.gov/sites/default/files/document/reports/H-2B-FY-20-Characteristics-Report.pdf.* USCIS assumes some of these workers, along with current workers with a valid H–2B visa under the cap, could be eligible to port under this new provision. USCIS does not know the exact number of H–2B workers who would be eligible to port at this time but uses the cap and supplemental cap allocations as a possible proxy for this population.

TLCs will file petitions for H–2B workers who would port under this provision. Therefore, USCIS presents a sensitivity analysis in Table 4 based on the percentage of employers with approved TLCs that could file a Form I–129 H–2B petition in order to obtain an H–2B worker under the porting provision.

TABLE 4—SENSITIVITY ANALYSIS OF FORM I–129 H–2B PETITIONS FILED ON BEHALF OF H–2B WORKERS WHO MAY BE ELIGIBLE TO PORT

| Percent of Form I–129 H–2B petitions that may be filed on behalf of workers eligible to port | Estimated number of approved Form I–129 H–2B petitions that may be filed on behalf of workers eligible to port |
|---|---|
| 0 | 0 |
| 5 | 275 |
| 25 | 1,377 |
| 50 | 2,754 |
| 75 | 4,130 |
| 95 | 5,232 |
| 100 | 5,507 |

Source: USCIS Analysis.

Population Affected by the Audits

DHS and DOL each intend to conduct 250 audits of employers hiring H–2B workers under this FY2021 H–2B supplemental cap rule. The determination of which employers are audited will be mostly random, though the agencies will coordinate so that no employer is audited by both DOL and DHS. Therefore, a total of 500 audits on employers who petition for H–2B workers under this TFR will be conducted by the Federal Government.

Cost-Benefit Analysis

The provisions of this rule require the submission of a Form I–129 H–2B petition. The costs for this form include filing costs and the opportunity cost of time to complete and submit the form. The current filing fee for Form I–129 is $460 and the estimated time to complete and file Form I–129 for H–2B classification is 4.34 hours.[116] The application must be filed by a U.S. employer, a U.S. agent, or a foreign employer filing through the U.S. agent. DHS estimates that 43.59 percent of Form I–129 H–2B petitions will be filed by an in-house or outsourced lawyer,

and the remainder (56.41 percent) will be filed by an HR specialist or equivalent occupation. DHS presents estimated costs for HR specialists filing Form I–129 petitions and an estimated range of costs for in-house lawyers or outsourced lawyers filing Form I–129 petitions.

To estimate the total opportunity cost of time to HR specialists who complete and file Form I–129, DHS uses the mean hourly wage rate of HR specialists of $33.38 as the base wage rate.[117] If petitioners hire an in-house or outsourced lawyer to file Form I–129 on their behalf, DHS uses the mean hourly wage rate of $71.59 as the base wage rate.[118] Using the most recent Bureau of Labor Statistics (BLS) data, DHS calculated a benefits-to-wage multiplier of 1.45 to estimate the full wages to include benefits such as paid leave, insurance, and retirement.[119] DHS multiplied the average hourly U.S. wage rate for HR specialists and for in-house lawyers by the benefits-to-wage multiplier of 1.45 to estimate the full cost of employee wages. The total compensation for an HR specialist is $48.40 per hour, and the total compensation for an in-house lawyer is $103.81 per hour.[120] In addition, DHS recognizes that an entity may not have in-house lawyers and seek outside counsel to complete and file Form I–129 on behalf of the petitioner. Therefore, DHS presents a second wage rate for lawyers labeled as outsourced lawyers. DHS recognizes that the wages for outsourced attorneys may be much higher than in-house attorneys and therefore uses a higher compensation-to-wage multiplier of 2.5 for outsourced attorneys.[121] DHS estimates the total

compensation for an outsourced lawyer is $178.98 per hour.[122] If a lawyer submits Form I–129 on behalf of the petitioner, Form G–28 must accompany the Form I–129 petition.[123] DHS estimates the time burden to complete and submit Form G–28 for a lawyer is 50 minutes (0.83 hour, rounded).[124] For this analysis, DHS adds the time to complete Form G–28 to the opportunity cost of time to lawyers for filing Form I–129 on behalf of a petitioner. This results in a time burden of 5.17 hours for in-house lawyers and outsourced lawyers to complete Form G–28 and Form I–129.[125] Therefore, the total opportunity cost of time per petition for an HR specialist to complete and file Form I–129 is approximately $210.06, for an in-house lawyer to complete and file Forms I–129 and G–28 is about $536.70, and for an outsourced lawyer to complete and file is approximately $925.33.[126] The total cost, including filing fee and opportunity costs of time, per petitioner to file Form I–129 is approximately $670.06 if HR specialists file, $996.70 if an in-house lawyer files, and $1,385.33 if an outsourced lawyer files the form.[127]

Cost to Petitioners

As mentioned in *Section 3*, the estimated population impacted by this rule is 3,558 eligible petitioners who are projected to apply for the additional 22,000 H–2B visas for the remainder of FY 2021, with 6,000 of the additional visas reserved for employers that will petition for workers who are nationals

---

[116] The public reporting burden for this form is 2.34 hours for Form I–129 and an additional 2.00 hours for H Classification Supplement, totaling 4.34 hours. See Form I–129 instructions at *https://www.uscis.gov/i-129*.

[117] U.S. Department of Labor, Bureau of Labor Statistics, "May 2020 National Occupational Employment and Wage Statistics" Human Resources Specialist (13–1071), Mean Hourly Wage, available at *https://www.bls.gov/oes/2020/may/oes_nat.htm#13-0000* (accessed April 9, 2021).

[118] U.S. Department of Labor, Bureau of Labor Statistics, "May 2020 National Occupational Employment and Wage Estimates" Lawyers (23–1011), Mean Hourly Wage, available at *https://www.bls.gov/oes/2020/may/oes_nat.htm#23-0000* (accessed April 9, 2021).

[119] Calculation: $38.60 mean Total Employee Compensation per hour for civilian workers/$26.53 mean Wages and Salaries per hour for civilian workers = 1.45 benefits-to-wage multiplier. *See* Economic News Release, Bureau of Labor Statistics, U.S. Department of Labor, Table 1. Employer Costs for Employee Compensation by ownership, Civilian workers, available at *https://www.bls.gov/news.release/pdf/ecec.pdf* (accessed April 9, 2021).

[120] Calculation for the total wage of an HR specialist: $33.38 × 1.45 = $48.40 (rounded).

Calculation for the total wage of an in-house lawyer: $71.59 × 1.45 = $103.81 (rounded).

[121] The DHS ICE "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" used a multiplier of 2.5 to convert in-house attorney wages to the cost of outsourced attorney based on

information received in public comment to that rule. We believe the explanation and methodology used in the Final Small Entity Impact Analysis remains sound for using 2.5 as a multiplier for outsourced labor wages in this rule, see page G–4 [September 1, 2015] [*https://www.regulations.gov/document/ICEB-2006-0004-0921*].

[122] Calculation: Average hourly wage rate of lawyers × benefits-to-wage multiplier for outsourced lawyer = $71.59 × 2.5 = $178.98.

[123] USCIS, *Filing Your Form G–28, https://www.uscis.gov/forms/filing-your-form-g-28*.

[124] Id.

[125] Calculation: 0.83 hours to file Form G–28 + 4.34 hours to file Form I–129 = 5.17 hours to file both forms.

[126] Calculation if an HR specialist files Form I–129: $48.40 × 4.34 hours = $210.06 (rounded).

Calculation if an in-house lawyer files Forms I–129 and G–28: $103.81 × 5.17 hours = $536.70 (rounded).

Calculation if an outsourced lawyer files Forms I–129 and G–28: $178.98 × 5.17 hours = $925.33 (rounded).

[127] Calculation if an HR specialist files Form I–129 and filing fee: $210.06 opportunity cost of time + $460 filing fee = $670.06.

Calculation if an in-house lawyer files Forms I–129, G–28, and filing fee: $536.70 opportunity cost of time + $460 filing fee = $996.70.

Calculation if outsourced lawyer files Forms I–129, G–28 and filing fee: $925.33 opportunity cost of time + $460 filing fee = $1,385.33.

of the Northern Triangle countries who are exempt from the returning worker requirement.

Costs to Petitioners To File Form I–129 and Form G–28

As discussed above, DHS estimates that an additional 2,007 petitions will be filed with the form using Form I–129 and an additional 1,551 petitions will be filed by lawyers using Form I–129 and Form G–28. DHS estimates the total cost to file Form I–129 petitions if filed by HR specialists is $1,344,810 (rounded).[128] DHS estimates total cost to file Form I–129 petitions and Form G–28 if filed by lawyers will range from $1,545,882 (rounded) if only in-house lawyers file these forms to $2,148,647 (rounded) if only outsourced lawyers file them.[129] Therefore, the estimated total cost to file Form I–129 and Form G–28 range from $2,890,692 and $3,493,457.[130]

Costs To File Form I–907

Employers may use Form I–907 to request premium processing of Form I–129 petitions for H–2B visas. The filing fee for Form I–907 for H–2B petitions is $1,500 and the time burden for completing the form is 35 minutes (0.58 hour).[131] Using the wage rates established previously, the opportunity cost of time to file Form I–907 is approximately $28.07 for an HR specialist, $60.21 for an in-house lawyer, and $103.81 for an outsourced lawyer.[132] Therefore, the total filing cost

to complete and submit Form I–907 per petitioner is approximately $1,528.07 for HR specialists, $1,560.21 for in-house lawyers, and $1,603.81 for outsourced lawyers.[133]

As discussed above, DHS estimates that an additional 1,874 Form I–907 will be filed by HR specialists and an additional 1,448 Form I–907 will be filed lawyers. DHS estimates the total cost of Form I–907 filed by HR specialists is about $2,863,603 (rounded).[134] DHS estimates total cost to file Form I–907 filed by lawyers range from about $2,259,184 (rounded) for only in-house lawyers to $2,322,317 (rounded) for only outsourced lawyers.[135] The estimated total cost to file Form I–907 range from $5,122,787 and $5,185,920.[136]

Cost To File Form ETA–9142–B–CAA–4

Form ETA–9142–B–CAA–4 is an attestation form that includes recruiting requirements, the irreparable harm standard, and document retention obligations. DOL estimates the time burden for completing and signing the form is 0.25 hour, 0.25 hours for retaining records, and 0.5 hours to comply with the returning workers' requirement, for a total time burden of 1 hour. Using the total wage per hour for an HR specialist ($48.40), the opportunity cost of time for an HR specialist to complete the attestation form, and notify third parties, and retain records relating to the returning worker requirements, is approximately $48.40.[137]

Additionally, the form requires that petitioners assess and document supporting evidence for meeting the irreparable harm standard, and retain those documents and records, which we assume will require the resources of a financial analyst (or another equivalent occupation). Using the same methodology previously described for wages, the total wage per hour for a financial analyst is $67.37.[138] DOL estimates the time burden for these tasks is at least 4 hours, and 1 hour for gathering and retaining documents and records. Therefore, the total opportunity cost of time for a financial analyst to assess, document, and retain supporting evidence is approximately $336.85.[139]

As discussed previously, DHS believes that the estimated 3,558 remaining certifications for the latter half of FY 2021 would include potential employers that might request to employ H–2B workers under this rule. This number of certifications is a reasonable proxy for the number of employers that may need to review and sign the attestation. Using this estimate for the total number of certifications, we estimate the opportunity cost of time for completing the attestation for HR specialists is approximately $172,207 and for financial analysts is about $1,198,512.[140] The total cost is estimated to be approximately $1,370,719.[141]

Cost to Conduct Recruitment

An employer that files Form ETA–9142B–CAA–4 and the I–129 petition 45 or more days after the certified start date of work must conduct additional

---

[128] Calculation: $670.06 opportunity costs for HR specialist plus filing fees * 2,007 Form I–129 filed by HR specialists = $1,344,810(rounded) total cost of Form I–129 filed by HR specialists.

[129] Calculation: $996.70 opportunity costs for in-house lawyers plus filing fees * 1,551 Form I–129 and Form G–28 filed by in-house lawyers = $1,545,882(rounded) total cost of Form I–129 and Form G–28 filed by in-house lawyers.

Calculation: $1,385.33 opportunity costs for outsourced lawyers plus filing fees * 1,551 Form I–129 and Form G–28 filed by outsourced lawyers = $2,148,647(rounded) total cost of Form I–129 and Form G–28 filed by outsourced lawyers.

[130] Calculation: $1,344,810 total cost of Form I–129 filed by HR specialists + $1,545,882 total cost of Form I–129 and Form G–28 filed by in-house lawyers = $2,890,692 estimated total costs to file Form I–129 and Form G–28

Calculation: $1,344,810 total cost of Form I–129 filed by HR specialists + $2,148,647 total cost of Form I–129 and G–28 filed by outsourced lawyers = $3,493,457 estimated total costs to file Form I–129 and G–28

[131] See Form I–907 instructions at *https://www.uscis.gov/i-907*.

[132] Calculation for opportunity cost of time if an HR specialist files Form I–907: $48.40 × 0.58 hours = $28.07(rounded).

Calculation for opportunity cost of time if an in-house lawyer files Form I–907: $103.81 × 0.58 hours= $60.21(rounded).

Calculation for opportunity cost of time if an outsourced lawyer files Form I–907: $178.98 × 0.58 hours = $103.81(rounded).

[133] Calculation if an HR specialist files: $28.07 + $1,500 = $1,528.07.

Calculation if an in-house lawyer files: $60.21 + $1,500 = $1,560.21.

Calculation if outsourced lawyer files: $103.81 + $1,500 = $1,603.81.

[134] Calculation: $1,528.07 opportunity costs for HR specialist plus filing fees * 1,874 Form I–907 filed by HR specialists = $2,863,603 (rounded) total cost of Form I–907 filed by HR specialists.

[135] Calculation: $1,560.21 opportunity costs for in-house lawyers plus filing fees * 1,448 Form I–907 filed by in-house lawyers = $2,259,184 (rounded) total cost of Form I–907 filed by in-house lawyers.

Calculation: $1,603.81 opportunity costs for outsourced lawyers plus filing fees * 1,448 Form I–907 filed by outsourced lawyers = $2,322,317 (rounded) total cost of Form I–907 filed by outsourced lawyers.

[136] Calculation: $2,863,603 total cost of Form I–907 filed by HR specialists + $2,259,184 total cost of Form I–907 filed by in-house lawyers = $5,122,787 estimated total costs to file Form I–907.

Calculation: $2,863,603 total cost of Form I–129 filed by HR specialists + $2,322,317 total cost of Form I–907 filed by outsourced lawyers = $5,185,920 estimated total costs to file Form I–907.

[137] Calculation: $48.40 opportunity cost of time for HR specialist × 1-hour time burden for the new attestation form and notifying third parties and retaining records related to the returning worker requirements = $48.40.

[138] Calculation: $46.46 (average per hour wage for a financial analyst, based on BLS wages) × 1.45 (benefits-to-wage multiplier) = $67.37. U.S. Department of Labor, Bureau of Labor Statistics, "May 2020 National Occupational Employment and Wage Statistics" Financial and Investment Analysts, Financial Risk Specialists, and Financial Specialists, All Other (13–2098): *https://www.bls.gov/oes/2020/may/oes_nat.htm#13-0000* (accessed April 9, 2021).

[139] Calculation: $67.37 (fully loaded hourly wage for a financial analyst) × 5 hours (time burden for assessing, documenting and retention of supporting evidence demonstrating the employer is likely to suffer irreparable harm) = $336.85.

[140] Calculation: Cost for HR Specialists: $48.40 opportunity cost of time for an HR specialist to comply with attestation requirements * 3,558 estimated additional requirements = $172,207(rounded) total cost for HR specialists to comply with attestation requirements.

Calculation: $336.85 opportunity cost of time for a financial analyst to comply with attestation requirements * 3,558 estimated additional petitions = $1,198,512(rounded) for financial analysts to comply with attestation requirements.

[141] Calculation: $172,207 total cost for HR specialist to comply with attestation requirement + $1,198,512 total cost for financial analysts to comply with attestation requirements = $1,370,719 total cost to comply with attestation requirements.

recruitment of U.S. workers. This consists of placing a new job order with the State Workforce Agency, contacting the American Job Center, and contacting laid-off workers. Employers must place a new job order for the job opportunity with the State Workforce Agency (SWA). DOL estimates that it would take up to one hour to satisfy this requirement.

Employers are required to make reasonable efforts to contact, by mail or other effective means, their former U.S. workers, including those workers who were furloughed and laid off, beginning January 1, 2019. Employers must also disclose the terms of the job order to these workers as required by the rule. DOL estimates that it would take up to one hour to contact and provide the disclosure to displaced U.S. workers.

During the period of time the SWA is actively circulating the job order, employers must contact, by email or other available electronic means, the nearest local American Job Center (AJC) in order to request staff assistance advertising and recruiting qualified U.S. workers for the job opportunity, and to provide to the AJC the unique identification number associated with the job order placed with the SWA. DOL estimates that it would take up to one hour to satisfy this requirement.

DOL estimates the total time burden for activities related to conducting recruitment is 3 hours. Assuming this work will be done by an HR specialist or an equivalent occupation, the estimated cost to each petitioner is approximately $145.20.[142] Using the 3,558 as the estimated number of petitioners, the estimated total cost of this provision is approximately $516,622.[143] It is possible that if U.S. employees apply for these positions, H–2B employers may incur some costs associated with reviewing applications, interviewing, vetting, and hiring applicants who are referred to H–2B employers by the recruiting activities required by this rule. However, DOL is unable to quantify the impact.

Cost of the COVID Protection Provision

Employers must notify employees, in a language understood by the worker, as necessary or reasonable, that all persons in the United States, including nonimmigrants, have equal access to COVID–19 vaccines and vaccine

distribution sites. We assume that employers will provide a printed notification to inform their employees that printing and posting the notification can be done during the normal course of business. Given that the regulatory text associated with this provision is less than 150 words, we expect that an employer would only need to post a one-page notification, even if the notification is in multiple languages. The printing cost associated with posting the notification (assuming that the notification is written) is $0.49 per posting.[144] The estimated total cost to petitioners to print copies is approximately $1,743 (rounded).[145]

Cost of the Portability Provision

Petitioners seeking to hire H–2B nonimmigrants who are currently present in the United States with a valid H–2B visa would need to file a Form I–129 which includes paying the associated fee as discussed above. Also previously discussed, we assume that all employers with an approved TLC—5,507—would be able to file a petition under this provision. As discussed previously, if a petitioner is represented by a lawyer, the lawyer must file Form G–28; if premium processing is desired, a petitioner must file Form I–907 and pay the associated fee. We expect these actions to be performed by an HR specialist, in-house lawyer, or an outsourced lawyer. Moreover, as previously estimated, we expect that about 43.59 percent of these Form I–129 petitions will be filed by an in-house or outsourced lawyer. We do not have an estimate of the percentage of H–2B workers that may choose to port under this provision and therefore we do not know the numbers of petitions that may be filed with USCIS. Therefore, Table 5 presents a sensitivity analysis of the number of Forms I–129 H–2B petitions that may be filed under this provision by an HR specialist and the number of Forms I–129 H–2B petitions and accompanying Forms G–28 that may be filed by an in-house or outsourced lawyer.

TABLE 5—NUMBERS OF FORM I–129 H–2B PETITIONS THAT MAY BE FILED ON BEHALF OF H–2B WORKERS THAT CHOOSE TO PORT BY HR SPECIALISTS AND LAWYERS

| Percent of approved TLCs | Numbers of Form I–129 H–2B petitions filed by HR specialists | Numbers of Form I–129 H–2B petitions and Form G–28 filed by lawyers |
|---|---|---|
| 0 ................ | 0 | 0 |
| 5 ................ | 155 | 120 |
| 25 .............. | 777 | 600 |
| 50 .............. | 1,554 | 1,200 |
| 75 .............. | 2,330 | 1,800 |
| 95 .............. | 2,951 | 2,281 |
| 100 ............ | 3,106 | 2,401 |

Source: USCIS Analysis.

Previously, we estimated that about 93.37 percent of Form I–129 H–2B petitions are filed with Form I–907 for premium processing. For this provision, we estimate that 5,142 Form I–129 H–2B petitions will be filed with premium processing Forms I–907.[146] Table 6 presents a sensitivity analysis of the numbers of Forms I–907 that may be filed by HR specialists and lawyers under this portability provision.

TABLE 6—NUMBERS OF FORM I–907 FILED WITH FORM I–129 H–2B PETITIONS ON BEHALF OF H–2B WORKERS THAT CHOOSE TO PORT BY HR SPECIALISTS AND LAWYERS

| Percent of approved TLCs | Numbers of Form I–907 filed by HR specialists | Numbers of Form I–907 filed by lawyers |
|---|---|---|
| 0 ................ | 0 | 0 |
| 5 ................ | 145 | 112 |
| 25 .............. | 725 | 560 |
| 50 .............. | 1,451 | 1,120 |
| 75 .............. | 2,176 | 1,681 |
| 95 .............. | 2,755 | 2,130 |
| 100 ............ | 2,900 | 2,242 |

Source: USCIS Analysis.

As previously discussed, the estimated cost for an HR specialist to file a Form I–129 is approximately $670.06 and the estimated cost for an HR specialist to file a Form I–907 is about $1,528.07. Table 7 presents a sensitivity analysis of costs resulting from HR specialists filing Form I–129, Form I–907, and the estimated total cost. The "Cost for HR Specialist Filing Form I–129" column multiplies the values in the "Form I–129 Petitions Filed by HR Specialists" column from

[142] Calculation: $48.40 hourly opportunity cost of time for an HR specialist * 3-hour time burden = $145.20 per petitioner cost to conduct additional recruitment.

[143] Calculation: 3,558 estimated number of petitioners * $145.20 per petitioner cost to conduct additional recruitment = $516,622 (rounded) total cost to conduct additional recruitment.

[144] Cost to make copies $0.49. See https://www.fedex.com/en-us/office/copy-and-print-services.html (accessed April 21, 2021).

[145] Calculation: $0.49 per posting * 3,558 petitioners = $1,743 cost of notifications copies.

[146] Calculation: 5,507 estimated number of approved petitioners * 93.37 percent premium processing filing rate = 5,142 (rounded) additional Forms I–907.

Table 5 by $670.06, the estimated cost for an HR specialist to file a Form I–129. The "Costs for HR Specialist Filing Form I–907" column multiplies the values in the "Form I–907 Filed by HR Specialists" from Table 6 by $1,528.07, the estimated cost for an HR specialist for an HR specialist to file a Form I–907.

TABLE 7—TOTAL COSTS FOR FILING FORM I–129 H–2B PETITIONS IF FILED BY HR SPECIALISTS ON BEHALF OF WORKERS THAT CHOOSE TO PORT

| Percent of Approved TLCs | Total costs for HR specialists filing Form I–129 | Total costs for HR specialists filing Form I–907 | Total estimated costs for HR specialists |
|---|---|---|---|
| 0 | 0 | 0 | 0 |
| 5 | 103,859 | 221,570 | 325,429 |
| 25 | 520,637 | 1,107,852 | 1,628,489 |
| 50 | 1,041,273 | 2,217,232 | 3,258,505 |
| 75 | 1,561,240 | 3,325,085 | 4,886,325 |
| 95 | 1,977,347 | 4,209,838 | 6,187,185 |
| 100 | 2,081,206 | 4,431,409 | 6,512,615 |

Source: USCIS Analysis.

As previously discussed, the estimated cost for an in-house lawyer to file a Form I–129 petition and the accompanying Form G–28 is approximately 996.70 and the estimated cost for an in-house lawyer to file a Form I–907 is about 1,560.21. Table 8 presents a sensitivity analysis of costs resulting from in-house lawyers filing Form I–129, Form G–28, Form I–907, and the estimated total cost. The "Cost for In-house Lawyer Filing Form I–129 and Form G–28" column multiplies the values in the "Form I–129 Petitions and Form G–28 Filed by Lawyers" column from Table 5 by 996.70, the estimated cost for an in-house lawyer to file a Form I–129 and Form G–28. The "Costs for In-house Lawyer Filing Form I–907" column multiplies the values in the "Form I–907 by Lawyers" from Table 6 by 1,560.21, the estimated cost for an HR specialist for an HR specialist to file a Form I–907.

TABLE 8—TOTAL COSTS FOR FILING FORM I–129 H–2B PETITIONS IF FILED BY IN-HOUSE LAWYERS ON BEHALF OF WORKERS THAT CHOOSE TO PORT

| Percent of Approved TLCs | Costs for In-house lawyer filing Form I–129 and Form G–28 | Costs for In-house lawyer filing Form I–907 | Total estimated costs resulting from in-house lawyer |
|---|---|---|---|
| 0 | $0 | $0 | $0 |
| 5 | 119,604 | 174,743 | 294,347 |
| 25 | 598,020 | 873,717 | 1,471,737 |
| 50 | 1,196,040 | 1,747,435 | 2,943,475 |
| 75 | 1,794,060 | 2,622,713 | 4,416,773 |
| 95 | 2,273,473 | 3,323,247 | 5,596,720 |
| 100 | 2,393,077 | 3,497,990 | 5,891,067 |

Source: USCIS Analysis.

As previously discussed, the estimated cost for an outsourced lawyer to file a Form I–129 and the accompanying Form G–28 is approximately 1,385.33 and the estimated cost for an outsourced lawyer to file a Form I–907 is about 1,603.81. Table 9 presents a sensitivity analysis of costs resulting from outsourced lawyers filing Form I–129, Form G–28, Form I–907, and the estimated total cost. The "Costs for Outsourced Lawyer Filing Form I–129 and Form G–28" column multiplies the values in the "Form I–129 Petitions and Form G–28 Filed by Lawyers" column from Table 5 by 1,385.33, the estimated cost for an outsourced lawyer to file a Form I–129 and Form G–28. The "Costs for Outsourced Lawyer Filing Form I–907" column multiplies the values in the "Form I–907 by Lawyers" from Table 6 by 1,603.81, the estimated cost for an outsourced lawyer to file a Form I–907.

TABLE 9—TOTAL COSTS FOR FILING FORM I–129 H–2B PETITIONS IF FILED BY OUTSOURCED LAWYERS ON BEHALF OF WORKERS THAT CHOOSE TO PORT

| Percent of Approved TLCs | Costs for outsourced lawyer filing Form I–129 and Form G–28 | Costs for outsourced lawyer filing Form I–907 | Total estimated costs resulting from outsourced lawyer |
|---|---|---|---|
| 0 | 0 | 0 | 0 |
| 5 | 254,466 | 179,627 | 434,093 |
| 25 | 1,274,179 | 898,133 | 2,172,312 |
| 50 | 2,548,359 | 1,796,265 | 4,344,624 |
| 75 | 3,821,613 | 2,696,002 | 6,517,615 |
| 95 | 4,841,327 | 3,416,112 | 8,257,439 |
| 100 | 5,095,792 | 3,595,738 | 8,691,530 |

Source: USCIS Analysis.

The total quantified costs for this provision range from 0 to 15,204,145 and are presented in Table 10 below. Though we present the sensitivity analysis as if no one will choose to port to another employer, DHS expects that at least one worker will take advantage of this porting provision and therefore, does not expect a 0 cost from this provision. DHS recognizes that if an employer that loses workers as a result of this provision chooses to replace those lost workers, that employer may incur some additional search and replacement costs associated with this provision.

TABLE 10—SENSITIVITY ANALYSIS OF TOTAL COSTS OF FORM I–129 H–2B PETITIONS TO HIRE H–2B WORKERS WHO CHOOSE TO PORT

| Percent of Approved TLCs | Range in costs from HR specialists and in-house lawyers to hire H–2B workers who choose to port (addition of totals from Table 7 and Table 8) | Range in costs from HR specialists and outsourced lawyers to hire H–2B workers who choose to port (addition of totals from Table 7 and Table 9) |
|---|---|---|
| 0 | 0 | 0 |
| 5 | 619,776 | 759,522 |
| 25 | 3,100,226 | 3,800,801 |
| 50 | 6,201,980 | 7,603,129 |
| 75 | 9,303,098 | 11,403,940 |
| 95 | 11,783,905 | 14,444,624 |
| 100 | 12,403,682 | 15,204,145 |

Source: USCIS Analysis.

Cost of Audits to Petitioners

DHS and DOL will each conduct audits on 250 separate employers of H–2B workers hired under this supplemental cap, for a total of 500 employers. Employers will need to provide requested information to comply with the audit. The expected time burden to comply with audits is estimated to be 12 hours.[147] We expect that providing these documents will be accomplished by an HR specialist or equivalent occupation. Given an hourly opportunity cost of time of 48.40, the estimated cost of complying with audits is 580.80 per audited employer.[148] Therefore, the total estimated cost to employers to comply with audits is 290,400.[149]

Estimated Total Costs to Petitioners

The monetized costs of this rule come from filing and complying with Form I–129, Form G–28, Form I–907, and Form ETA–9142–B–CAA–4, as well as contacting refreshing recruitment efforts, posting notifications, filings to obtain a porting worker, and complying with audits. The estimated total cost to file Form I–129 and an accompanying Form G–28 ranges from $2,890,692 to $3,493,457, depending on the filer. The estimated total cost of filing Form I–907 ranges from $5,122,787 to $5,185,920, depending on the filer. The estimated total cost of filing and complying with Form ETA–9142–B–CAA–4 is about $1,370,719. The estimated total cost of conducting additional recruitment is about $516,662. The estimated total cost of the COVID–19 protection provision is approximately $1,743. The estimated cost of the portability provision ranges

[147] The number in hours for audits was provided by the USCIS, Service Center Operations.

[148] Calculation: 48.40 hourly opportunity cost of time for an HR specialist * 12 hours to comply with an audit = 580.80 per audited employer.

[149] Calculation: 500 audited employers * 580.80 opportunity cost of time to comply with an audit = 290,400.

from $0 to $15,204,145.[150] The estimated total cost for employers to comply with audits is $290,400. The total estimated cost to petitioners ranges from $10,192,963 to $26,063,006.[151]

## Cost to the Federal Government

The INA provides USCIS with the authority for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including administrative costs, and services provided without charge to certain applicants and petitioners.[152] DHS notes USCIS establishes its fees by assigning costs to an adjudication based on its relative adjudication burden and use of USCIS resources. Fees are established at an amount that is necessary to recover these assigned costs such as clerical, officers, and managerial salaries and benefits, plus an amount to recover unassigned overhead (for example, facility rent, IT equipment and systems among other expenses) and immigration benefits provided without a fee charge. Consequently, since USCIS immigration fees are based on resource expenditures related to the benefit in question, USCIS uses the fee associated with an information collection as a reasonable measure of the collection's costs to USCIS. DHS anticipates some additional costs in adjudicating the additional petitions submitted because of the increase in cap limitation for H–2B visas. However, DHS expects these costs to be fully recovered by the fees associated with the forms, which have been accounted for under costs to petitioners and serve as proxy of the costs to the agency to adjudicate these forms.

Both DOL and DHS intend to conduct a significant number of random audits during the period of temporary need to verify compliance with H–2B program requirements, including the irreparable harm standard as well as other key worker protection provisions implemented through this rule. While most USCIS activities are funded through fees and DOL is funded through

appropriations, it is expected that both agencies will be able to shift resources to be able to conduct these audits without incurring additional costs. As previously mentioned, the agencies will conduct a total of 500 audits and each audit is expected to take 12 hours. This results in a total time burden of 6,000 hours.[153] USCIS anticipates that a Federal employee at a GS–13 Step 5 salary will conduct these audits for each agency. The base pay for a GS–13 Step 5 in the Washington, DC locality area is $117,516.[154] The hourly wage for this salary is approximately $56.50.[155] To estimate the total hourly compensation for these positions, we multiply the hourly wage ($56.50) by the Federal benefits to wage multiplier of 1.38.[156] This results in an hourly opportunity cost of time of $77.97 for GS 13–5 Federal employees in the Washington, DC locality pay area.[157] The total opportunity costs of time for Federal workers to conduct audits is estimated to be $467,820.[158]

## Benefits to Petitioners

The inability to access H–2B workers for some entities may cause their businesses to suffer irreparable harm. Temporarily increasing the number of available H–2B visas for this fiscal year may result in a cost savings, because it will allow some businesses to hire the additional labor resources necessary to avoid such harm. Preventing such harm may ultimately preserve the jobs of other employees (including U.S. workers) at that establishment. Additionally, returning workers are likely to be very familiar with the H–2B process and requirements, and may be

positioned to begin work more expeditiously with these employers. Moreover, employers may already be familiar with returning workers as they have trained, vetted, and worked with some of these returning workers in past years. As such, limiting the supplemental visas to returning workers would assist employers that are facing irreparable harm.

## Benefits to Workers

The existence of this rule will benefit the workers who receive H–2B visas. See Arnold Brodbeck et al., Seasonal Migrant Labor in the Forest Industry of the United States: The Impact of H–2B Employment on Guatemalan Livelihoods, 31 Society & Natural Resources 1012 (2018), and in particular this finding: ''Participation in the H–2B guest worker program has become a vital part of the livelihood strategies of rural Guatemalan families and has had a positive impact on the quality of life in the communities where they live. Migrant workers who were landless, lived in isolated rural areas, had few economic opportunities, and who had limited access to education or adequate health care, now are investing in small trucks, building roads, schools, and homes, and providing employment for others in their home communities. . . . The impact has been transformative and positive.''

Some provisions of this rule will benefit such workers in particular ways. The portability provision of this rule will allow nonimmigrants with valid H–2B visas who are present in the United States to transfer to a new employer more quickly and potentially extend their stay in the United States and, therefore, earn additional wages. Importantly, the rule will also increase information employees have about equal access to COVID–19 vaccinations and vaccine distribution sites. DHS recognizes that some of the effects of these provisions may occur beyond the borders of the United States.

Note as well that U.S. workers will benefit in multiple ways. For example, the additional round of recruitment and U.S. worker referrals required by the provisions of this rule will ensure that a U.S. worker who is willing and able to fill the position is not displaced by a nonimmigrant worker. As noted, the avoidance of irreparable harm that would be suffered by employers unable to secure sufficient workers, made possible by this rule, could ensure that U.S. workers do not lose their jobs, which might otherwise be vulnerable if H–2B workers were not given visas.

---

[150] The lower bound cost of $0 is only if none of the eligible workers choose to port under this provision, while the upper bound cost of $15,204,145 is if every eligible worker chooses to port and every petitioner uses the more expensive filing option of an outsourced lawyer. As shown in Table 10, the range in costs if 50 percent of eligible workers choose to port with their petitioners using an HR specialist or an outsourced lawyer to file would be from $6,201,980 to $7,603,129.

[151] Calculation of lower range: $2,890,692 + $5,122,787 + $1,370,719 + $516,622 + $1,743 + $0 + $290,400 = $10,192,963.

Calculation of upper range: $3,493,457 + $5,185,920 + $1,370,719 + $516,622 + $1,743 + $15,204,145 + $290,400 = $26,063,006.

[152] See INA section 286(m), 8 U.S.C. 1356(m).

[153] Calculation: 12 hours to conduct an audit * 500 audits = 6,000 total hours to conduct audits.

[154] U.S. Office of Personnel Management, Pay and Leave, Salaries and Wages, For the Locality Pay area of Washington-Baltimore-Arlington, DC–MD–VA–WV–PA, 2021. *https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/21Tables/html/DCB.aspx* (last accessed May 6, 2021).

[155] Calculation: $117,516 GS 13–5 Washington, DC locality annual salary/2080 annual hours = $56.50 (rounded).

[156] Calculation: $1,717,321 Full-time Permanent Salaries + $656,748 Civilian Personnel Benefits = $2,374,069 Compensation.

$2,374,069 Compensation/$1,717,321 Full-time Permanent Salaries = 1.38 (rounded) Federal employee benefits to wage ratio.

*https://www.uscis.gov/sites/default/files/document/reports/USCIS_FY_2021_Budget_Overview.pdf* (last accessed May 6, 2021).

[157] Calculation: $56.50 hourly wage for a GS 13–5 in the Washington, DC locality area * 1.38 Federal employee benefits to wage rate = $77.97 hourly opportunity cost of time for a GS 13–5 federal employee in the Washington, DC locality area.

[158] Calculation: 6,000 hours to conduct audits * $77.97 hourly opportunity cost of time = $467,820 total opportunity costs of time for Federal employees to conduct audits.

## C. Regulatory Flexibility Act

The Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.* (RFA), imposes certain requirements on Federal agency rules that are subject to the notice and comment requirements of the APA. See 5 U.S.C. 603(a), 604(a). This temporary final rule is exempt from notice and comment requirements for the reasons stated above. Therefore, the requirements of the RFA applicable to final rules, 5 U.S.C. 604, do not apply to this temporary final rule. Accordingly, the Departments are not required to either certify that the temporary final rule would not have a significant economic impact on a substantial number of small entities nor conduct a regulatory flexibility analysis.

## D. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of the Act requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule that includes any Federal mandate that may result in $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector. This rule is exempt from the written statement requirement because DHS did not publish a notice of proposed rulemaking for this rule.

In addition, this rule does not exceed the $100 million expenditure in any 1 year when adjusted for inflation ($169.8 million in 2020 dollars),[159] and this rulemaking does not contain such a mandate. The requirements of Title II of the Act, therefore, do not apply, and the

---

[159] *See* U.S. Bureau of Labor Statistics, *Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. City Average, All Items, available at https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202103.pdf* (last visited May 5, 2021).

Calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the most recent current year available (2020); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2020 − Average monthly CPI–U for 1995)/(Average monthly CPI–U for 1995)] * 100 = [(258.811 − 152.383]/152.383] * 100 = (106.428/152.383) *100 = 0.6984 * 100 = 69.84 percent = 69.8 percent (rounded).

Calculation of inflation-adjusted value: $100 million in 1995 dollars * 1.698 = $169.8 million in 2020 dollars.

Departments have not prepared a statement under the Act.

## E. Executive Order 13132 (Federalism)

This rule does not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, 64 FR 43255 (Aug. 4, 1999), this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

## F. Executive Order 12988 (Civil Justice Reform)

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988, 61 FR 4729 (Feb. 5, 1996).

## G. National Environmental Policy Act

DHS and its components analyze proposed actions to determine whether the National Environmental Policy Act (NEPA) applies to them and, if so, what degree of analysis is required. DHS Directive (Dir) 023–01 Rev. 01 and Instruction Manual 023–01–001–01 Rev. 01 (Instruction Manual) establish the procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions ("categorical exclusions") which experience has shown do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require an Environmental Assessment (EA) or Environmental Impact Statement (EIS). 40 CFR 1507.3(b)(1)(iii), 1508.4. The Instruction Manual, Appendix A, Table 1 lists Categorical Exclusions that DHS has found to have no such effect. Under DHS NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect. Instruction Manual, section V.B.2(a–c).

This rule temporarily amends the regulations implementing the H–2B

nonimmigrant visa program to increase the numerical limitation on H–2B nonimmigrant visas for the remainder of FY 2021 based on the Secretary of Homeland Security's determination, in consultation with the Secretary of Labor, consistent with the FY 2021 Omnibus. It also allows H–2B beneficiaries who are in the United States to change employers upon the filing of a new H–2B petition and begin to work for the new employer for a period generally not to exceed 60 days before the H–2B petition is approved by USCIS.

DHS has determined that this rule clearly fits within categorical exclusion A3(d) because it interprets or amends a regulation without changing its environmental effect. The amendments to 8 CFR part 214 would authorize up to an additional 22,000 visas for aliens who may receive H–2B nonimmigrant visas, of which 16,000 are for returning workers (persons issued H–2B visas or were otherwise granted H–2B status in Fiscal Years 2018, 2019, or 2020). The proposed amendments would also facilitate H–2B nonimmigrants to move to new employment faster than they could if they had to wait for a petition to be approved. The amendment's operative provisions approving H–2B petitions under the supplemental allocation would effectively terminate after September 30, 2021 for the cap increase, and 180 days from the rule's effective date for the portability provision. DHS believes amending applicable regulations to authorize up to an additional 22,000 H–2B nonimmigrant visas will not result in any meaningful, calculable change in environmental effect with respect to the current H–2B limit or in the context of a current U.S. population exceeding 331,000,000 (maximum temporary increase of 0.0066%).

The amendment to applicable regulations is a stand-alone temporary authorization and not a part of any larger action, and presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this action is categorically excluded and no further NEPA analysis is required.

## H. Congressional Review Act

This temporary final rule is not a "major rule" as defined by the Congressional Review Act, 5 U.S.C. 804(2), and thus is not subject to a 60-day delay in the rule becoming effective. DHS will send this temporary final rule to Congress and to the Comptroller General under the Congressional Review Act, 5 U.S.C. 801 *et seq.*

## I. Paperwork Reduction Act

Attestation for Employers Seeking To Employ H–2B Nonimmigrants Workers Under Section 105 of Division O of the Consolidated Appropriations Act, 2021 Public Law 116–260, Form ETA–9142–B–CAA–4

The Paperwork Reduction Act (PRA), 44 U.S.C. 3501 *et seq.,* provides that a Federal agency generally cannot conduct or sponsor a collection of information, and the public is generally not required to respond to an information collection, unless it is approved by OMB under the PRA and displays a currently valid OMB Control Number. In addition, notwithstanding any other provisions of law, no person shall generally be subject to penalty for failing to comply with a collection of information that does not display a valid Control Number. *See* 5 CFR 1320.5(a) and 1320.6. DOL has submitted the Information Collection Request (ICR) contained in this rule to OMB and obtained approval of a new form, Form ETA–9142B–CAA–4, using emergency clearance procedures outlined at 5 CFR 1320.13. The Departments note that while DOL submitted the ICR, both DHS and DOL will use the information.

Petitioners will use the new Form ETA–9142B–CAA–4 to make attestations regarding, for example, irreparable harm and returning worker (unless exempt because the H–2B worker is a national of one of the Northern Triangle countries who is counted against the 6,000 returning worker exemption cap) described above. Petitioners will need to file the attestation with DHS until it announces that the supplemental H–2B cap has been reached. In addition, the petitioner will need to retain all documentation demonstrating compliance with this implementing rule, and must provide it to DHS or DOL in the event of an audit or investigation.

In addition to obtaining immediate emergency approval, DOL is seeking comments on this information collection pursuant to 5 CFR 1320.13. Comments on the information collection must be received by July 26, 2021. This process of engaging the public and other Federal agencies helps ensure that requested data can be provided in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the impact of collection requirements on respondents can be properly assessed. The PRA provides that a Federal agency generally cannot conduct or sponsor a collection of information, and the public is generally

not required to respond to an information collection, unless it is approved by OMB under the PRA and displays a currently valid OMB Control Number. *See* 44 U.S.C. 3501 *et seq.* In addition, notwithstanding any other provisions of law, no person must generally be subject to a penalty for failing to comply with a collection of information that does not display a valid OMB Control Number. *See* 5 CFR 1320.5(a) and 1320.6.

In accordance with the PRA, DOL is affording the public with notice and an opportunity to comment on the new information collection, which is necessary to implement the requirements of this rule. The information collection activities covered under a newly granted OMB Control Number 1205–NEW are required under Section 105 of Division O of the FY 2021 Omnibus, which provides that "the Secretary of Homeland Security, after consultation with the Secretary of Labor, and upon the determination that the needs of American businesses cannot be satisfied in [FY] 2021 with U.S. workers who are willing, qualified, and able to perform temporary nonagricultural labor," may increase the total number of noncitizens who may receive an H–2B visa in FY 2021 by not more than the highest number of H–2B nonimmigrants who participated in the H–2B returning worker program in any fiscal year in which returning workers were exempt from the H–2B numerical limitation. As previously discussed in the preamble of this rule, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has decided to increase the numerical limitation on H–2B nonimmigrant visas to authorize the issuance of up to, but not more than, an additional 22,000 visas through the end of FY 2021 for certain H–2B workers for U.S. businesses who attest that they will likely suffer irreparable harm. As with the previous supplemental rules, the Secretary has determined that the additional visas will only be available for returning workers, that is workers who were issued H–2B visas or otherwise granted H–2B status in FY 2018, 2019, or 2020, unless the worker is one of the 6,000 nationals of one of the Northern Triangle countries who are exempt from the returning worker requirement.

Commenters are encouraged to discuss the following:

• Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

• the accuracy of the agency's estimate of the burden of the proposed

collection of information, including the validity of the methodology and assumptions used;

• the quality, utility, and clarity of the information to be collected; and

• the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, permitting electronic submission of responses.

The aforementioned information collection requirements are summarized as follows:

*Agency:* DOL–ETA.

*Type of Information Collection:* Extension of an existing information collection.

*Title of the Collection:* Attestation for Employers Seeking to Employ H–2B Nonimmigrants Workers Under Section 105 of Division O of the Consolidated Appropriations Act, 2021 Public Law 116–260.

*Agency Form Number:* Form ETA–9142–B–CAA–4.

*Affected Public:* Private Sector—businesses or other for-profits.

*Total Estimated Number of Respondents:* 3,558.

*Average Responses per Year per Respondent:* 1.

*Total Estimated Number of Responses:* 3,558.

*Average Time per Response:* 9 hours per application.

*Total Estimated Annual Time Burden:* 32,023 hours.

*Total Estimated Other Costs Burden:* $0.

Application for Premium Processing Service, Form I–907

The Paperwork Reduction Act (PRA), 44 U.S.C. 3501 *et seq.,* provides that a Federal agency generally cannot conduct or sponsor a collection of information, and the public is generally not required to respond to an information collection, unless it is approved by OMB under the PRA and displays a currently valid OMB Control Number. In addition, notwithstanding any other provisions of law, no person shall generally be subject to penalty for failing to comply with a collection of information that does not display a valid Control Number. *See* 5 CFR 1320.5(a) and 1320.6. Form I–907, Application for Premium Processing Service, has been approved by OMB and assigned OMB control number 1615–0048. DHS is making no changes to the Form I–907 in connection with this temporary rule implementing the time-limited authority pursuant to section

105 of Division O, FY 2021 Omnibus (which expires on September 30, 2021). However, USCIS estimates that this temporary rule may result in approximately 3,332 additional filings of Form I–907 in fiscal year 2021. The current OMB-approved estimate of the number of annual respondents filing a Form I–907 is 319,301. USCIS has determined that the OMB-approved estimate is sufficient to fully encompass the additional respondents who will be filing Form I–907 in connection with this temporary rule, which represents a small fraction of the overall Form I–907 population. Therefore, DHS is not changing the collection instrument or increasing its burden estimates in connection with this temporary rule, and is not publishing a notice under the PRA or making revisions to the currently approved burden for OMB control number 1615–0048.

## List of Subjects

### 8 CFR Part 214

Administrative practice and procedure, Aliens, Cultural exchange programs, Employment, Foreign officials, Health professions, Reporting and recordkeeping requirements, Students.

### 8 CFR Part 274a

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

### 20 CFR Part 655

Administrative practice and procedure, Employment, Employment and training, Enforcement, Foreign workers, Forest and forest products, Fraud, Health professions, Immigration, Labor, Longshore and harbor work, Migrant workers, Nonimmigrant workers, Passports and visas, Penalties, Reporting and recordkeeping requirements, Unemployment, Wages, Working conditions.

## Department of Homeland Security

### 8 CFR Chapter I

For the reasons discussed in the joint preamble, chapter I of title 8 of the Code of Federal Regulations is amended as follows:

## PART 214—NONIMMIGRANT CLASSES

■ 1. Effective May 25, 2021 through May 28, 2024, the authority citation for part 214 is revised to read as follows:

**Authority:** 6 U.S.C. 202, 236; 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305, 1357, and 1372; sec. 643, Pub. L. 104–208, 110 Stat. 3009–708; Pub. L. 106–386, 114 Stat. 1477–

1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 115–218, 132 Stat. 1547 (48 U.S.C. 1806).

■ 2. Effective May 25, 2021 through May 28, 2024, amend § 214.2 by:
■ a. Adding paragraph (h)(6)(x);
■ b. Adding reserved paragraph (h)(25); and
■ c. Adding paragraph (h)(26).

The additions read as follows:

### § 214.2 Special requirements for admission, extension, and maintenance of status.

\*　\*　\*　\*　\*

(h) \* \* \*

(6) \* \* \*

(x) *Special requirements for additional cap allocations under the Consolidated Appropriations Act, 2021, Public Law 116–260—(A) Public Law 116–260—(1) Supplemental allocation for returning workers.* Notwithstanding the numerical limitations set forth in paragraph (h)(8)(i)(C) of this section, for fiscal year 2021 only, the Secretary has authorized up to an additional 16,000 visas for aliens who may receive H–2B nonimmigrant visas pursuant to section 105 of Division O of the Consolidated Appropriations Act, 2021, Public Law 116–260. An alien may be eligible to receive an H–2B nonimmigrant visa under this paragraph (h)(6)(x)(A)(*1*) if she or he is a returning worker. The term "returning worker" under this paragraph (h)(6)(x)(A)(*1*) means a person who was issued an H–2B visa or was otherwise granted H–2B status in fiscal year 2018, 2019, or 2020. Notwithstanding § 248.2 of this chapter, an alien may not change status to H–2B nonimmigrant under this paragraph (h)(6)(x)(A)(*1*).

(*2*) *Supplemental allocation for nationals of Guatemala, El Salvador, and Honduras (Northern Triangle countries).* Notwithstanding the numerical limitations set forth in paragraph (h)(8)(i)(C) of this section, for fiscal year 2021 only, and in addition to the allocation described in paragraph (h)(6)(x)(A)(*1*) of this section, the Secretary has authorized up to an additional 6,000 aliens who are nationals of Guatemala, El Salvador, or Honduras (Northern Triangle countries) who may receive H–2B nonimmigrant visas pursuant to section 105 of Division O of the Consolidated Appropriations Act, 2021, Public Law 116–260. Such workers are not subject to the returning worker requirement in paragraph (h)(6)(x)(A)(*1*). Petitioners must request

such workers in an H–2B petition that is separate from H–2B petitions that request returning workers under paragraph (h)(6)(x)(A)(*1*) and must declare that they are requesting these workers in the attestation required under 20 CFR 655.68(a)(1). Notwithstanding § 248.2 of this chapter, an alien may not change status to H–2B nonimmigrant under this paragraph (h)(6)(x)(A)(*2*).

(*i*) Petitions submitted under this paragraph (h)(6)(x)(A)(*2*) must be received by July 8, 2021. H–2B petitions under the supplemental allocation for nationals of Northern Triangle countries received after that date will be rejected.

(*ii*) If USCIS determines that it has received fewer petitions by July 8, 2021 than needed to reach the USCIS projections for the Northern Triangle countries supplemental allocation in this paragraph (h)(6)(x)(A)(*2*), it will make the remainder of the allocation available as a separate allocation described in paragraph (h)(6)(x)(A)(*3*) of this section.

(*3*) *Availability of remainder of supplemental allocation.* If USCIS determines that fewer petitions have been received by July 8, 2021 than needed to meet the additional allocation described in paragraph (h)(6)(x)(A)(*2*) of this section, USCIS will make the remainder of the allocation available as a separate allocation to returning workers as described in paragraph (h)(6)(x)(A)(*1*) of this section and will announce the availability of the remainder of the allocation on the USCIS website at *uscis.gov* no later than July 23, 2021. Such announcement, if made, will specify the date on which petitioners may begin to file H–2B petitions under this paragraph (h)(6)(x)(A)(*3*).

(B) *Eligibility.* In order to file a petition with USCIS under this paragraph (h)(6)(x), the petitioner must:

(*1*) Comply with all other statutory and regulatory requirements for H–2B classification, including, but not limited to, requirements in this section, under part 103 of this chapter, and under 20 CFR part 655 and 29 CFR part 503; and

(*2*) Submit to USCIS, at the time the employer files its petition, a U.S. Department of Labor attestation, in compliance with this section and 20 CFR 655.64, evidencing that:

(*i*) Without the ability to employ all of the H–2B workers requested on the petition filed pursuant to this paragraph (h)(6)(x), its business is likely to suffer irreparable harm (that is, permanent and severe financial loss);

(*ii*) All workers requested and/or instructed to apply for a visa have been issued an H–2B visa or otherwise

granted H–2B status in fiscal year 2018, 2019, or 2020, unless the H–2B worker is a national of Guatemala, El Salvador, or Honduras and is counted towards the 6,000 cap described in paragraph (h)(6)(x)(A)(*2*) of this section;

(*iii*) The employer will comply with all Federal, State, and local employment-related laws and regulations, including health and safety laws and laws related to COVID–19 worker protections, any right to time off or paid time off for COVID–19 vaccination, and that the employer will notify any H–2B workers approved under the supplemental cap in paragraph (h)(6)(x)(A)(*2*) of this section, in a language understood by the worker, as necessary or reasonable, that all persons in the United States, including nonimmigrants, have equal access to COVID–19 vaccines and vaccine distribution sites;

(*iv*) The employer will comply with obligations and additional recruitment requirements outlined in 20 CFR 655.64(a)(3) through (5);

(*v*) The employer will provide documentary evidence of the facts in paragraphs (h)(6)(x)(B)(*2*)(*i*) through (*iv*) of this section to DHS or DOL upon request; and

(*vi*) The employer will agree to fully cooperate with any compliance review, evaluation, verification, or inspection conducted by DHS, including an on-site inspection of the employer's facilities, interview of the employer's employees and any other individuals possessing pertinent information, and review of the employer's records related to the compliance with immigration laws and regulations, including but not limited to evidence pertaining to or supporting the eligibility criteria for the FY 2021 supplemental allocations outlined in paragraph (h)(6)(x)(B) of this section, as a condition for the approval of the petition.

(*vii*) The employer must attest on Form ETA–9142–B–CAA–4 that it will fully cooperate with any audit, investigation, compliance review, evaluation, verification or inspection conducted by DOL, including an on-site inspection of the employer's facilities, interview of the employer's employees and any other individuals possessing pertinent information, and review of the employer's records related to the compliance with applicable laws and regulations, including but not limited to evidence pertaining to or supporting the eligibility criteria for the FY 2021 supplemental allocations outlined in 20 CFR 655.64(a) and 655.68(a), as a condition for the approval of the H–2B petition. The employer must further attest on Form ETA–9142–B–CAA–4

that it will not impede, interfere, or refuse to cooperate with an employee of the Secretary of the U.S. Department of Labor who is exercising or attempting to exercise DOL's audit or investigative authority pursuant to 20 CFR part 655, subpart A, and 29 CFR 503.25.

(C) *Processing.* USCIS will reject petitions filed pursuant to paragraph (h)(6)(x)(A)(*1*) or (*3*) of this section that are received after the applicable numerical limitation has been reached or after September 15, 2021, whichever is sooner. USCIS will reject petitions filed pursuant to paragraph (h)(6)(x)(A)(*2*) of this section that are received after the applicable numerical limitation has been reached or after July 8, 2021, whichever is sooner. USCIS will not approve a petition filed pursuant to this paragraph (h)(6)(x) on or after October 1, 2021.

(D) *Numerical limitations under paragraphs (h)(6)(x)(A)(1), (2), and (3) of this section.* When calculating the numerical limitations under paragraphs (h)(6)(x)(A)(*1*), (*2*), and (*3*) of this section as authorized under Public Law 116–260, USCIS will make numbers for each allocation available to petitions in the order in which the petitions subject to the respective limitation are received. USCIS will make projections of the number of petitions necessary to achieve the numerical limit of approvals, taking into account historical data related to approvals, denials, revocations, and other relevant factors. USCIS will monitor the number of petitions (including the number of workers requested when necessary) received and will notify the public of the dates that USCIS has received the necessary number of petitions (the ''final receipt dates'') under paragraph (h)(6)(x)(A)(*1*) or paragraphs (h)(6)(x)(A)(*2*) and (*3*). The day the public is notified will not control the final receipt dates. When necessary to ensure the fair and orderly allocation of numbers subject to the numerical limitations in paragraphs (h)(6)(x)(A)(*1*), (*2*), and (*3*), USCIS may randomly select from among the petitions received on the final receipt dates the remaining number of petitions deemed necessary to generate the numerical limit of approvals. This random selection will be made via computer-generated selection. Petitions subject to a numerical limitation not randomly selected or that were received after the final receipt dates that may be applicable under paragraph (h)(6)(x)(A)(*1*), (*2*), or (*3*) will be rejected. If the final receipt date is any of the first 5 business days on which petitions subject to the applicable numerical limits described in paragraph

(h)(6)(x)(A)(*1*), (*2*), or (*3*) may be received (in other words, if any of the numerical limits described in paragraph (h)(6)(x)(A)(*1*), (*2*), or (*3*) is reached on any one of the first 5 business days that filings can be made), USCIS will randomly apply all of the numbers among the petitions received on any of those 5 business days.

(E) *Sunset.* This paragraph (h)(6)(x) expires on October 1, 2021.

(F) *Non-severability.* The requirement to file an attestation under paragraph (h)(6)(x)(B)(*2*) of this section is intended to be non-severable from the remainder of this paragraph (h)(6)(x), including, but not limited to, the numerical allocation provisions at paragraphs (h)(6)(x)(A)(*1*), (*2*), and (*3*) of this section in their entirety. In the event that any part of this paragraph (h)(6)(x) is enjoined or held to be invalid by any court of competent jurisdiction, the remainder of this paragraph (h)(6)(x) is also intended to be enjoined or held to be invalid in such jurisdiction, without prejudice to workers already present in the United States under this paragraph (h)(6)(x), as consistent with law.

\* \* \* \* \*

(26) *Change of employers and portability for H–2B workers.* (i) This paragraph (h)(26) relates to H–2B workers seeking to change employers during the time period specified in paragraph (h)(26)(iv) of this section. Notwithstanding paragraph (h)(2)(i)(D) of this section, an alien in valid H–2B nonimmigrant status:

(A) Whose new petitioner files a non-frivolous H–2B petition requesting an extension of the alien's stay on or after May 25, 2021, is authorized to begin employment with the new petitioner after the petition described in this paragraph (h)(26) is received by USCIS and before the new H–2B petition is approved, but no earlier than the start date indicated in the new H–2B petition; or

(B) Whose new petitioner filed a non-frivolous H–2B petition requesting an extension of the alien's stay before May 25, 2021 that remains pending on May 25, 2021, is authorized to begin employment with the new petitioner before the new H–2B petition is approved, but no earlier than the start date of employment indicated on the new H–2B petition.

(ii)(A) With respect to a new petition described in paragraph (h)(26)(i)(A) of this section, and subject to the requirements of 8 CFR 274a.12(b)(30), the new period of employment described in paragraph (h)(26)(i) of this section may last for up to 60 days beginning on the Received Date on Form

I–797 (Notice of Action) or, if the start date of employment occurs after the I–797 Received Date, for a period of up to 60 days beginning on the start date of employment indicated in the H–2B petition.

(B) With respect to a new petition described in paragraph (h)(26)(i)(B) of this section, the new period of employment described in paragraph (h)(26)(i) of this section may last for up to 60 days beginning on the later of either May 25, 2021 or the start date of employment indicated in the H–2B petition.

(C) With respect to either type of new petition, if USCIS adjudicates the new petition before the expiration of this 60-day period and denies the petition, or if the new petition is withdrawn by the petitioner before the expiration of the 60-day period, the employment authorization associated with the filing of that petition under 8 CFR 274a.12(b)(30) will automatically terminate 15 days after the date of the denial decision or 15 days after the date on which the new petition is withdrawn. Nothing in this paragraph (h)(26) is intended to alter the availability of employment authorization related to professional H–2B athletes who are traded between organizations pursuant to paragraph (h)(6)(vii) of this section and 8 CFR 274a.12(b)(9).

(iii) In addition to meeting all other requirements in paragraph (h)(6) of this section for the H–2B classification, to commence employment and be approved under this paragraph (h)(26):

(A) The alien must have been in valid H–2B nonimmigrant status on or after May 25, 2021;

(B) The new H–2B petition must have been—

(1) Pending as of May 25, 2021; or

(2) Received on or after May 25, 2021, but no later than November 22, 2021;

(C) The petitioner must comply with all Federal, State, and local employment-related laws and regulations, including health and safety laws, laws related to COVID–19 worker protections, and any right to time off or paid time off for COVID–19 vaccination; and

(D) The petitioner may not impede, interfere, or refuse to cooperate with an employee of the Secretary of the U.S. Department of Labor who is exercising or attempting to exercise DOL's audit or investigative authority under 20 CFR part 655, subpart A, and 29 CFR 503.25.

(iv) Authorization to initiate employment changes pursuant to this paragraph (h)(26) begins at 12 a.m. on

May 25, 2021, and ends at the end of November 22, 2021.

*    *    *    *    *

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 3. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1105a, 1324a; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 101–410, 104 Stat. 890, as amended by Pub. L. 114–74, 129 Stat. 599.

■ 4. Effective May 25, 2021 through May 28, 2024, amend § 274a.12 by adding paragraph (b)(30) to read as follows:

### § 274a.12   Classes of aliens authorized to accept employment.

*    *    *    *    *

(b) *   *   *

(30)(i) Pursuant to 8 CFR 214.2(h)(26) and notwithstanding 8 CFR 214.2(h)(2)(i)(D), an alien is authorized to be employed no earlier than the start date of employment indicated in the H–2B petition and no earlier than May 25, 2021, by a new employer that has filed an H–2B petition naming the alien as a beneficiary and requesting an extension of stay for the alien, for a period not to exceed 60 days beginning on:

(A) The later of the "Received Date" on Form I–797 (Notice of Action) acknowledging receipt of the petition, or the start date of employment indicated on the new H–2B petition, for petitions filed on or after May 25, 2021; or

(B) The later of May 25, 2021 or the start date of employment indicated on the new H–2B petition, for petitions that are pending as of May 25, 2021.

(ii) If USCIS adjudicates the new petition prior to the expiration of the 60-day period in paragraph (b)(30)(i) of this section and denies the new petition for extension of stay, or if the petitioner withdraws the new petition before the expiration of the 60-day period, the employment authorization under this paragraph (b)(30) will automatically terminate upon 15 days after the date of the denial decision or the date on which the new petition is withdrawn. Nothing in this section is intended to alter the availability of employment authorization related to professional H–2B athletes who are traded between organizations pursuant to paragraph (b)(9) of this section and 8 CFR 214.2(h)(6)(vii).

(iii) Authorization to initiate employment changes pursuant to 8 CFR 214.2(h)(26) and paragraph (b)(30)(i) of this section begins at 12 a.m. on May 25, 2021, and ends at the end of November 22, 2021.

*    *    *    *    *

## Department of Labor

## Employment and Training Administration

## 20 CFR Chapter V

Accordingly, for the reasons stated in the joint preamble, 20 CFR part 655 is amended as follows:

## PART 655—TEMPORARY EMPLOYMENT OF FOREIGN WORKERS IN THE UNITED STATES

■ 5. The authority citation for part 655 continues to read as follows:

**Authority:** Section 655.0 issued under 8 U.S.C. 1101(a)(15)(E)(iii), 1101(a)(15)(H)(i) and (ii), 8 U.S.C. 1103(a)(6), 1182(m), (n), (p), and (t), 1184(c), (g), and (j), 1188, and 1288(c) and (d); sec. 3(c)(1), Pub. L. 101–238, 103 Stat. 2099, 2102 (8 U.S.C. 1182 note); sec. 221(a), Pub. L. 101–649, 104 Stat. 4978, 5027 (8 U.S.C. 1184 note); sec. 303(a)(8), Pub. L. 102–232, 105 Stat. 1733, 1748 (8 U.S.C. 1101 note); sec. 323(c), Pub. L. 103–206, 107 Stat. 2428; sec. 412(e), Pub. L. 105–277, 112 Stat. 2681 (8 U.S.C. 1182 note); sec. 2(d), Pub. L. 106–95, 113 Stat. 1312, 1316 (8 U.S.C. 1182 note); 29 U.S.C. 49k; Pub. L. 107–296, 116 Stat. 2135, as amended; Pub. L. 109–423, 120 Stat. 2900; 8 CFR 214.2(h)(4)(i); 8 CFR 214.2(h)(6)(iii); and sec. 6, Pub. L. 115–218, 132 Stat. 1547 (48 U.S.C. 1806).

Subpart A issued under 8 CFR 214.2(h).

Subpart B issued under 8 U.S.C. 1101(a)(15)(H)(ii)(a), 1184(c), and 1188; and 8 CFR 214.2(h).

Subpart E issued under 48 U.S.C. 1806.

Subparts F and G issued under 8 U.S.C. 1288(c) and (d); sec. 323(c), Pub. L. 103–206, 107 Stat. 2428; and 28 U.S.C. 2461 note, Pub. L. 114–74 at section 701.

Subparts H and I issued under 8 U.S.C. 1101(a)(15)(H)(i)(b) and (b)(1), 1182(n), (p), and (t), and 1184(g) and (j); sec. 303(a)(8), Pub. L. 102–232, 105 Stat. 1733, 1748 (8 U.S.C. 1101 note); sec. 412(e), Pub. L. 105–277, 112 Stat. 2681; 8 CFR 214.2(h); and 28 U.S.C. 2461 note, Pub. L. 114–74 at section 701.

Subparts L and M issued under 8 U.S.C. 1101(a)(15)(H)(i)(c) and 1182(m); sec. 2(d), Pub. L. 106–95, 113 Stat. 1312, 1316 (8 U.S.C. 1182 note); Pub. L. 109–423, 120 Stat. 2900; and 8 CFR 214.2(h).

■ 6. Effective May 25, 2021 through September 30, 2021, add § 655.64 to read as follows:

### § 655.64   Special application filing and eligibility provisions for Fiscal Year 2021 under the Consolidated Appropriations Act, 2021.

(a) An employer filing a petition with USCIS under 8 CFR 214.2(h)(6)(x) to request H–2B workers who will begin employment on or after May 25, 2021, through September 30, 2021, must meet the following requirements:

(1) The employer must attest on Form ETA–9142–B–CAA–4 that without the ability to employ all of the H–2B

workers requested on the petition filed pursuant to 8 CFR 214.2(h)(6)(x), its business is likely to suffer irreparable harm (that is, permanent and severe financial loss), and that the employer will provide documentary evidence of this fact to DHS or DOL upon request.

(2) The employer must attest on Form ETA–9142–B–CAA–4 that each of the workers requested and/or instructed to apply for a visa, whether named or unnamed, on a petition filed pursuant to 8 CFR 214.2(h)(6)(x), have been issued an H–2B visa or otherwise granted H–2B status during one of the last three (3) fiscal years (fiscal year 2018, 2019, or 2020), unless the H–2B worker is a national of Guatemala, El Salvador, or Honduras and is counted towards the 6,000 cap described in 8 CFR 214.2(h)(6)(x)(A)(*2*).

(3) The employer must attest on Form ETA–9142–B–CAA–4 that the employer will comply with all the assurances, obligations, and conditions of employment set forth on its approved *Application for Temporary Employment Certification.*

(4) The employer must attest on Form ETA–9142–B–CAA–4 that it will comply with all Federal, State, and local employment-related laws and regulations, including health and safety laws and laws related to COVID–19 worker protections, any right to time off or paid time off for COVID–19 vaccination, and that the employer will notify any H–2B workers approved under the supplemental cap in 8 CFR 214.2(h)(6)(x)(A)(*1*) and (*2*), in a language understood by the worker, as necessary or reasonable, that all persons in the United States, including nonimmigrants, have equal access to COVID–19 vaccines and vaccine distribution sites.

(5) An employer that submits Form ETA–9142B–CAA–4 and the I–129 petition 45 or more days after the certified start date of work, as shown on its approved *Application for Temporary Employment,* must conduct additional recruitment of U.S. workers as follows:

(i) Not later than the next business day after submitting the I–129 petition for H–2B worker(s), the employer must place a new job order for the job opportunity with the State Workforce Agency (SWA), serving the area of intended employment. The employer must follow all applicable SWA instructions for posting job orders and receive applications in all forms allowed by the SWA, including online applications (sometimes known as ''self-referrals''). The job order must contain the job assurances and contents set forth in § 655.18 for recruitment of U.S. workers at the place of employment,

and remain posted for at least 15 calendar days;

(ii) During the period of time the SWA is actively circulating the job order described in paragraph (a)(5)(i) of this section for intrastate clearance, the employer must contact, by email or other available electronic means, the nearest comprehensive American Job Center offering business services and serving the area of intended employment where work will commence, request staff assistance advertising and recruiting qualified U.S. workers for the job opportunity, and provide the unique identification number associated with the job order placed with the SWA or, if unavailable, a copy of the job order;

(iii) During the period of time the SWA is actively circulating the job order described in paragraph (a)(5)(i) of this section for intrastate clearance, the employer must contact (by mail or other effective means) its former U.S. workers, including those who have been furloughed or laid off, during the period beginning January 1, 2019, until the date the I–129 petition required under 8 CFR 214.2(h)(6)(x) is submitted, who were employed by the employer in the occupation at the place of employment (except those who were dismissed for cause or who abandoned the worksite), disclose the terms of the job order, and solicit their return to the job. The contact and disclosures required by this paragraph (a)(5)(iii) must be provided in a language understood by the worker, as necessary or reasonable;

(iv) During the period of time the SWA is actively circulating the job order described in paragraph (a)(5)(i) of this section for intrastate clearance, the employer must engage in the recruitment of U.S. workers as provided in § 655.45(a) and (b). The contact and disclosures required by this paragraph (a)(5)(iv) must be provided in a language understood by the worker, as necessary or reasonable; and

(v) The employer must hire any qualified U.S. worker who applies or is referred for the job opportunity until the date on which the last H–2B worker departs for the place of employment, or 30 days after the last date on which the SWA job order is posted, whichever is later. Consistent with § 655.40(a), applicants can be rejected only for lawful job-related reasons.

(6) The employer must attest on Form ETA–9142–B–CAA–4 that it will fully cooperate with any audit, investigation, compliance review, evaluation, verification, or inspection conducted by DOL, including an on-site inspection of the employer's facilities, interview of the employer's employees and any other

individuals possessing pertinent information, and review of the employer's records related to the compliance with applicable laws and regulations, including but not limited to evidence pertaining to or supporting the eligibility criteria for the FY 2021 supplemental allocations outlined in this paragraph (a) and § 655.68(a), as a condition for the approval of the H–2B petition. Pursuant to this subpart and 29 CFR 503.25, the employer will not impede, interfere, or refuse to cooperate with an employee of the Secretary who is exercising or attempting to exercise DOL's audit or investigative authority.

(b) This section expires on October 1, 2021.

(c) The requirements under paragraph (a) of this section are intended to be non-severable from the remainder of this section; in the event that paragraph (a)(1), (2), (3), (4), or (5) of this section is enjoined or held to be invalid by any court of competent jurisdiction, the remainder of this section is also intended to be enjoined or held to be invalid in such jurisdiction, without prejudice to workers already present in the United States under this part, as consistent with law.

■ 7. Effective May 25, 2021 through September 30, 2024, add § 655.68 to read as follows:

### § 655.68   Special document retention provisions for Fiscal Years 2021 through 2024 under the Consolidated Appropriations Act, 2021.

(a) An employer who files a petition with USCIS to employ H–2B workers in fiscal year 2021 under authority of the temporary increase in the numerical limitation under section 105 of Division O, Public Law 116–260 must maintain for a period of three (3) years from the date of certification, consistent with 20 CFR 655.56 and 29 CFR 503.17, the following:

(1) A copy of the attestation filed pursuant to the regulations in 8 CFR 214.2 governing that temporary increase;

(2) Evidence establishing, at the time of filing the I–129 petition, that employer's business is likely to suffer irreparable harm (that is, permanent and severe financial loss), if it cannot employ H–2B nonimmigrant workers in fiscal year 2021;

(3) Documentary evidence establishing that each of the workers the employer requested and/or instructed to apply for a visa, whether named or unnamed on a petition filed pursuant to 8 CFR 214.2(h)(6)(x), have been issued an H–2B visa or otherwise granted H–2B status during one of the last three (3) fiscal years (fiscal year 2018, 2019,

or 2020), unless the H–2B worker(s) is a national of El Salvador, Guatemala, or Honduras and is counted towards the 6,000 cap described in 8 CFR 214.2(h)(6)(x)(A)(*2*). Alternatively, if applicable, employers must maintain documentary evidence that the workers the employer requested and/or instructed to apply for visas are eligible nationals of El Salvador, Guatemala, or

Honduras, as defined in 8 CFR 214.2(h)(6)(x)(A)(*2*); and

(4) If applicable, proof of recruitment efforts set forth in § 655.64(a)(5)(i) through (iv) and a recruitment report that meets the requirements set forth in § 655.48(a)(1) through (4) and (7), and maintained throughout the recruitment period set forth in § 655.64(a)(5)(v).

(b) DOL or DHS may inspect the documents in paragraphs (a)(1) through (4) of this section upon request.

(c) This section expires on October 1, 2024.

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

**Martin J. Walsh,**
*Secretary, U.S. Department of Labor.*

[FR Doc. 2021–11048 Filed 5–21–21; 11:15 am]

**BILLING CODE 9111–97–P; 4510–FP–P**

state, local and courtroom requirements and seek a commitment to adhere to those requirements. The requirements apply to all attorneys, assistants, parties, and witnesses. The discussion will also address who may enter the courtroom, when, and what safety measures, such as masks and social distancing, must be implemented. No person may enter the courtroom, or the witness room without the permission of the Judge. The Judge may consider allowing persons who are not fully vaccinated to enter the courtroom, but they must wear masks and practice social distancing.

All court reporters will be notified that they must be vaccinated.

The Judge may consider all factors, in totality, in determining if a remote hearing will be held and who may be present for the hearing. No single factor is dispositive. These procedures shall be in place until December 31, 2021, unless extended or modified by order. The order shall be posted on the Commission's website (*www.fmshrc.gov*) and the contents of the order will be published in a notice appearing in the **Federal Register**.

*Authority:* 30 U.S.C. 823; 29 CFR part 2700.

Dated: July 30, 2021.

**Sarah L. Stewart,**

*Deputy General Counsel, Federal Mine Safety and Health Review Commission.*

[FR Doc. 2021–16661 Filed 8–4–21; 8:45 am]

**BILLING CODE 6735–01–P**

---

## FEDERAL RESERVE SYSTEM

### Solicitation of Statements of Interest for Membership on the Insurance Policy Advisory Committee

**AGENCY:** Board of Governors of the Federal Reserve System (Board).

**ACTION:** Notice.

**SUMMARY:** The Economic Growth, Regulatory Relief, and Consumer Protection Act established at the Board an Insurance Policy Advisory Committee (IPAC). This notice advises individuals who wish to serve as IPAC members of the annual opportunity to be considered for the IPAC.

**DATES:** Individuals that submit a Statement of Interest that is received by the Board from the first Monday in August through the first Monday in October of each year will be considered for appointments to the IPAC announced in the fourth calendar quarter of the same year. Statements of Interest received outside the period from the first Monday in August through the first Monday in October generally will not be considered.

**ADDRESSES:** Individuals seeking an appointment to the IPAC may send a Statement of Interest by email to *IPAC@ frb.gov*. The Statement of Interest contains only contact information. Candidates also may choose to provide additional information. Candidates may send this information by email to *IPAC@ frb.gov*. The Privacy Act Statement for IPAC Member Selection, which describes the purposes, authority, effects of nondisclosure, and uses of this information, can be found at *https:// www.federalreserve.gov/aboutthefed/ ipac-privacy.htm*.

Individuals also may mail Statements of Interest and any additional information to the Board of Governors of the Federal Reserve System, Attn: Insurance Policy Advisory Committee, 20th Street and Constitution Ave. NW, Washington, DC 20551.

**FOR FURTHER INFORMATION CONTACT:** Jan Bauer, Senior Insurance Policy Analyst, (202) 475–7697 or Thomas Sullivan, Senior Associate Director, (202) 452–3000, Division of Supervision and Regulation; or *IPAC@frb.gov*.

**SUPPLEMENTARY INFORMATION:** The Economic Growth, Regulatory Relief, and Consumer Protection Act established at the Board an Insurance Policy Advisory Committee (IPAC) to advise the Board on international capital standards and other insurance matters. This notice advises individuals of the opportunity to be considered for appointment to the IPAC. To assist with the appointment of IPAC members, the Board considers information submitted by the candidate, public information, and any other relevant information the Board determines to consider.

### Council Size and Terms

The IPAC has at most 21 members. IPAC members serve staggered three-year terms. Members are appointed to three-year terms unless the Board appoints a member to fill a vacant unexpired term. A member that is appointed to serve a three-year term begins his or her service on the first January 1 occurring after his or her appointment. A member appointed to fill an vacant unexpired term serves for the remaining time of the term. The Board provides a nominal honorarium and reimburses members only for their actual travel expenses, subject to Board policy.

### Statement of Interest

A Statement of Interest must contain the following information:

- Full name;
- Address;
- Phone number; and

- Email address

At their option, candidates may provide additional information for consideration.

### Qualifications

IPAC candidates should be insurance experts. The Board provides equal appointment opportunity to all persons without regard to race, color, religion, sex (including sexual orientation, gender identity, and pregnancy), national origin, age, disability, genetic information, or military service. In addition, the Board is committed to a diverse committee and seeks a diverse set of expert perspectives from the various sectors of the U.S. insurance industry including life insurance, property and casualty insurance and reinsurance, agents and brokers, academics, consumer advocates, and experts on issues facing underserved insurance communities and consumers. The Board also seeks relevant actuarial, legal, regulatory, and accounting expertise, as well as expertise on lines of business underwritten by its currently supervised population of insurance institutions.

Members must be willing and able to participate in conference calls and prepare for and attend meetings in person. Membership and attendance is not delegable.

By order of the Board of Governors of the Federal Reserve System, acting through the Director of the Division of Supervision and Regulation under delegated authority.

**Ann Misback,**

*Secretary of the Board.*

[FR Doc. 2021–16669 Filed 8–4–21; 8:45 am]

**BILLING CODE P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Disease Control and Prevention

### Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Centers for Disease Control and Prevention (CDC), a component of the Department of Health and Human Services (HHS), announces an Order to replace and supersede the Order Suspending the Right to Introduce Certain Persons from

Countries Where a Quarantinable Communicable Disease Exists, issued on October 13, 2020 (''October Order''). Following an assessment of the current status of the COVID–19 public health emergency and the situation in congregate settings where noncitizens seeking to enter the United States are processed and held, CDC has determined that an Order remains appropriate at this time for all ''covered noncitizens'' as defined in the order. Unaccompanied noncitizen children, already excepted under a July 16, 2021 order, remain excepted from the order's coverage. In addition, CDC is continuing an exception for individuals on a case-by-case basis, based on the totality of the circumstances, and is incorporating an additional exception for programs approved by the U.S. Department of Homeland Security (DHS) that incorporate appropriate COVID–19 mitigation protocols as recommended by CDC.

**DATES:** This Order went into effect August 2, 2021.

**FOR FURTHER INFORMATION CONTACT:** Tiffany Brown, Deputy Chief of Staff, Centers for Disease Control and Prevention, 1600 Clifton Road NE, MS H21–10, Atlanta, GA 30329. Phone: 404–639–7000. Email: *cdcregulations@cdc.gov.*

**SUPPLEMENTARY INFORMATION:** CDC has determined that an Order under 42 U.S.C. 265 remains necessary to protect U.S. citizens, U.S. nationals, lawful permanent residents, personnel and noncitizens at the ports of entry (POE) and U.S. Border Patrol stations, and destination communities in the United States during the COVID–19 public health emergency. This Order reflects the current, highly dynamic conditions regarding COVID–19, including variants of concern and levels of vaccination, as well as evolving circumstances specific to the U.S. borders. As facts change, CDC may further modify the Order. This Order will remain in place until either the expiration of the Secretary of HHS' declaration that COVID–19 constitutes a public health emergency, or the CDC Director determines that the danger of further introduction of COVID–19 into the United States has declined such that continuation of the Order is no longer necessary to protect public health, whichever occurs first. The circumstances necessitating the Order will be reassessed at least every 60 days. This Order continues the suspension of the right to introduce ''covered noncitizens,''[1] into the United States

[1] The term ''covered noncitizens'' is defined as persons traveling from Canada or Mexico

along the U.S. land and adjacent coastal borders. In recognition of the specific COVID–19 mitigation measures available in facilities providing care for Unaccompanied Noncitizen Children (UC), CDC excepted UC from the October Order[2] on July 16, 2021 (July Exception) and continues that exception herein.[3] In addition, CDC is continuing an exception for individuals on a case-by-case basis, based on the totality of the circumstances, and is incorporating an additional exception for programs approved by the U.S. Department of Homeland Security (DHS) that incorporate appropriate COVID–19 mitigation protocols as recommended by CDC.

A copy of the Order is provided below, and a copy of the signed Order can be found at *https://www.cdc.gov/coronavirus/2019-ncov/downloads/CDC-Order-Suspending-Right-to-Introduce-_Final_8-2-21.pdf.*

_____

(regardless of their country of origin) who would otherwise be introduced into a congregate setting in a POE or U.S. Border Patrol station at or near the U.S. land and adjacent coastal borders subject to certain exceptions detailed below; this includes noncitizens who do not have proper travel documents, noncitizens whose entry is otherwise contrary to law, and noncitizens who are apprehended at or near the border seeking to unlawfully enter the United States between POE.

[2] Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 FR 65806 (Oct. 16, 2020). The October Order replaced the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020 (March Order) and subsequently extended and amended. Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 17060 (Mar. 26, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 FR 22424 (Apr. 22, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 31503 (May 26, 2020).

[3] Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children from Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/NoticeUnaccompaniedChildren.pdf* (July 16, 2021); *see* 86 FR 38717 (July 22, 2021). The July Exception relating to UC is hereby made a part of this Order and incorporated by reference as if fully set forth herein.

## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES CENTERS FOR DISEASE CONTROL AND PREVENTION (CDC)

### Order Under Sections 362 & 365 of the Public Health Service Act

### (42 U.S.C. 265, 268) and 42 CFR 71.40

### Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists

### Executive Summary

The Centers for Disease Control and Prevention (CDC), a component of the U.S. Department of Health and Human Services (HHS), is hereby replacing and superseding the Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, issued on October 13, 2020 (October Order). The instant Order continues the suspension of the right to introduce ''covered noncitizens,'' as defined herein,[4] into the United States along the U.S. land and adjacent coastal borders. In recognition of the specific COVID–19 mitigation measures available in facilities providing care for Unaccompanied Noncitizen Children (UC), CDC excepted UC from the October Order on July 16, 2021 (July Exception) and continues that exception herein.[5] Following an assessment of the current status of the COVID–19 public health emergency and the situation in congregate settings where noncitizens seeking to enter the United States are processed and held, CDC has determined that an Order remains appropriate at this time for all other covered noncitizens as described herein. As outlined below, CDC is continuing an exception for individuals on a case-by-case basis, based on the totality of the circumstances, and is incorporating an additional exception for programs approved by the U.S. Department of Homeland Security (DHS) that incorporate appropriate COVID–19 mitigation protocols as recommended by CDC.

CDC has determined that an Order under 42 U.S.C. 265 remains necessary

[4] *See infra* Section III.A.

[5] Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children from Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/NoticeUnaccompaniedChildren.pdf* (July 16, 2021); *see* 86 FR 38717 (July 22, 2021). The July Exception relating to UC is hereby made a part of this Order and incorporated by reference as if fully set forth herein.

AR00654

to protect U.S. citizens, U.S. nationals, lawful permanent residents, personnel and noncitizens at the ports of entry (POE) and U.S. Border Patrol stations, and destination communities in the United States during the COVID–19 public health emergency. This Order reflects the current, highly dynamic conditions regarding COVID–19, including variants of concern and levels of vaccination, as well as evolving circumstances specific to the U.S. borders. As facts change, CDC may further modify the Order. This Order will remain in place until either the expiration of the Secretary of HHS' declaration that COVID–19 constitutes a public health emergency, or the CDC Director determines that the danger of further introduction of COVID–19 into the United States has declined such that continuation of the Order is no longer necessary to protect public health, whichever occurs first. The circumstances necessitating the Order will be reassessed at least every 60 days.

## Outline of Reassessment and Order

I. Background
 A. Current Status of COVID–19 Public Health Emergency
 B. Public Health Factors Related to COVID–19
 1. Manner of COVID–19 Transmission
 2. Emerging Variants of the SARS–CoV–2 Virus
 3. Risks of COVID–19 Transmission Specific To Congregate Settings
 4. Availability of Testing, Vaccines, and Other Mitigation Measures
 5. Impact on U.S. Communities and Healthcare Resources
II. Public Health Reassessment
 A. Immigration Processing and Public Health Impacts
 B. Public Health Assessment of Single Adults and Family Units
 C. Comparison to Unaccompanied Noncitizen Children
 D. Summary of Findings
III. Legal Basis for the Order
IV. Issuance and Implementation of the Order
 A. Covered Noncitizens
 B. Exceptions
 C. APA, Review, and Termination

## I. Background

 Coronavirus disease 2019 (COVID–19) is a quarantinable communicable disease [6] caused by the SARS–CoV–2

virus. As part of U.S. government efforts to mitigate the introduction, transmission, and spread of COVID–19, CDC issued an Order on October 13, 2020 (October Order), replacing an Order initially issued on March 20, 2020 (March Order),[7] suspending the right to introduce [8] certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increase in risk of the introduction of COVID–19. The October Order applied specifically to covered noncitizens who would otherwise be introduced into a congregate setting in land or coastal POE or U.S. Border Patrol stations at or near the U.S. borders [9] with Canada and Mexico. On February 17, 2021, CDC published a notice announcing the temporary exception of unaccompanied noncitizen children (UC) [10] encountered in the United States from the October

causing, or have the potential to cause, a pandemic. *See* Exec. Order 13295, 68 FR 17255 (Apr. 4, 2003), as amended by Exec. Order 13375, 70 FR 17299 (Apr. 1, 2005) and Exec. Order 13674, 79 FR 45671 (July 31, 2014).

[7] Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 FR 65806 (Oct. 16, 2020). The October Order replaced the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020 (March Order), and subsequently extended and amended. Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 17060 (Mar. 26, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 FR 22424 (Apr. 22, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 31503 (May 26, 2020).

[8] *Suspension of the right to introduce* means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States. 42 CFR 71.40(b)(5).

[9] When U.S. Customs and Border Protection (CBP) or the U.S. Department of Homeland Security (DHS) partner agencies encounter noncitizens off the coast closely adjacent to the land borders, it transfers the noncitizens for processing in POE or U.S. Border Patrol stations closest to the encounter. Absent the October Order, such noncitizens would be held in the same congregate settings and holding facilities as any encounters along the land border, resulting in similar public health concerns related to the introduction, transmission, and spread of COVID–19.

[10] As stated in the July Exception, CDC's understanding is that UC are a class of individuals similar to or the same as those individuals who would be considered ''unaccompanied alien children'' (see 6 U.S.C. 279) for purposes of HHS Office of Refugee Resettlement custody, were DHS to make the necessary immigration determinations under Title 8 of the U.S. Code. 86 FR 38717, 38718 at note 4.

Order.[11] The exception of UC from the October Order was confirmed with the publication of the July Exception.[12]

 POE and U.S. Border Patrol stations are operated by U.S. Customs and Border Protection (CBP), an agency within DHS. The March and October Orders were intended to reduce the risk of COVID–19 introduction, transmission, and spread in POE and U.S. Border Patrol stations by significantly reducing the number and density of covered noncitizens held in these congregate settings, thereby reducing risks to U.S. citizens and residents, DHS/CBP personnel and noncitizens at the facilities, and the healthcare systems in local communities overall. Because of the congregate nature of these facilities and the sustained community transmission of COVID–19, including the highly transmissible B.1.617.2 (Delta) variant, in both the United States and migrants' countries of origin and transit, at this time, there continues to be a high risk of COVID–19 outbreaks in these facilities following the introduction of an infected person. Upon reassessment of the current situation with respect to the pandemic and the situation at the U.S. borders, CDC finds an Order under 42 U.S.C. 265 for Single Adults (SA) [13] and Family Units (FMU) [14] remains necessary at this time, as discussed in detail below. CDC also recognizes the availability of testing, vaccines, and other mitigation protocols can minimize risk in this area. As the ability of DHS facilities to employ mitigation measures to address the COVID–19 public health emergency increases, CDC anticipates additional lifting of restrictions.

## A. Current Status of COVID–19 Public Health Emergency

 Since late 2019, SARS–CoV–2, the virus that causes COVID–19, has spread throughout the world, resulting in a pandemic. As of July 28, 2021, there have been over 195 million confirmed cases of COVID–19 globally, resulting in over 4.1 million deaths.[15] The United

[11] Notice of Temporary Exception from Expulsion of Unaccompanied Noncitizen Children Pending Forthcoming Public Health Determination, 86 FR 9942 (Feb. 17, 2021).

[12] *Supra* note 2.

[13] A single adult (SA) is any noncitizen adult 18 years or older who is not an individual in a ''family unit,'' *see infra* note 11.

[14] An individual in a family unit (FMU) includes any individual in a group of two or more noncitizens consisting of a minor or minors accompanied by their adult parent(s) or legal guardian(s). Any statistics regarding FMU count the number of individuals in a family unit rather than counting the groups.

[15] *Coronavirus disease (COVID–19) pandemic,* World Health Organization, *https:// covid19.who.int/* (last visited July 28, 2021).

[6] Quarantinable communicable diseases are any of the communicable diseases listed in Executive Order, as provided under § 361 of the Public Health Service Act (42 U.S.C. 264). 42 CFR 71.1. The list of quarantinable communicable diseases currently includes cholera, diphtheria, infectious tuberculosis, plague, smallpox, yellow fever, viral hemorrhagic fevers (Lassa, Marburg, Ebola, Crimean-Congo, South American, and others not yet isolated or named), severe acute respiratory syndromes (including Middle East respiratory syndrome and COVID–19), and influenza caused by novel or reemergent influenza viruses that are

States has reported over 34 million cases resulting in over 609,000 deaths due to the disease [16] and is currently averaging around 61,976 new cases of COVID–19 a day as of July 27, 2021 with high community transmission.[17] Although several of the key indicators of transmission and spread of COVID–19 in the United States improved during the first half of 2021, variants of concern, particularly the more transmissible Delta variant, have driven a stark increase in COVID–19 cases, hospitalizations, and deaths. COVID–19 cases increased approximately 400% between June 19 and July 28, 2021.[18]

Many countries have begun widespread vaccine administration; however, 78 countries continue to experience high or substantial incidence rates (≥50 cases per 100,000 people in the last seven days) and 123 countries, including the United States, are experiencing an increasing incidence of reported new cases.[19] It is imperative that individuals and communities stay vigilant and that vaccination and other COVID–19 mitigation efforts are maintained. As the Delta variant continues to spread, both the United States and Mexico are experiencing high or substantial incidence rates with 137.9 and 68.6 daily cases per 100,000 persons over a seven-day average, respectively; in Canada, the incidence rate is 8.0. The United States saw a 91.0% increase in new cases over the past week, Mexico experienced a 30.2% increase in new cases. During the same time period, the incidence rate in Canada increased by 14.8%.[20]

COVID–19 was first declared a public health emergency in January 2020 [21] and

the U.S. government and CDC have implemented a number of COVID–19 mitigation and response measures since that time. Many of these mitigation measures have involved restrictions on international travel and migration.[22] Other measures have focused on recommending and enforcing COVID–19 mitigation efforts, including physical distancing and mask-wearing.[23] Recent concerns regarding the spread of the Delta variant prompted CDC to release updated guidance calling for vaccinated persons to wear a mask indoors in public when in an area of substantial or high transmission.[24] Furthermore, CDC

recommends that all individuals, including those fully vaccinated, continue to wear a well-fitted face mask in correctional and detention facilities.[25]

### B. Public Health Factors Related to COVID–19

As directed by Executive Order,[26] CDC conducted a comprehensive reassessment of the October Order to determine whether the suspension of the right to introduce certain persons into the United States remains necessary in light of the current circumstances, including the evolving understanding of the epidemiology of COVID–19 variants and available mitigation measures including testing and vaccination.[27] In conducting this reassessment, CDC examined a number of public health factors, and evaluated how these factors impact POE and U.S. Border Patrol stations and the personnel and noncitizens in those facilities. CDC also scrutinized whether the potential impacts varied by category of noncitizen: SA, FMU, and UC. In carrying out its reassessment, CDC evaluated the following public health factors: (1) The manner of COVID–19 transmission, including asymptomatic and pre-symptomatic transmission; (2) the emerging variants of the SARS–CoV–2 virus; (3) the risks specific to the type of facility or congregate setting; (4) the availability of testing and vaccines and the applicability of other mitigation efforts; and (5) the impact on U.S. communities and healthcare resources. CDC views this public health reassessment as setting forth a roadmap toward the safe resumption of normal processing of arriving noncitizens, taking into account COVID–19 concerns and immigration facilities' ability to implement mitigation measures.

---

[16] *COVID Data Tracker,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/ covid-data-tracker/#datatracker-home* (last visited July 28, 2021).

[17] *United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#cases_community* (last visited July 28, 2021).

[18] Christie A, Brooks JT, Hicks LA, et al. Guidance for Implementing COVID-19 Prevention Strategies in the Context of Varying Community Transmission Levels and Vaccination Coverage. MMWR Morb Mortal Wkly Rep. ePub: 27 July 2021. DOI: *http:// dx.doi.org/10.15585/mmwr.mm7030e2.*

[19] *See Global Trends, Epidemic Curve trajectory Classification,* WHO, as reported at *https:// covid.cdc.gov/covid-data-tracker/#global-trends* (last visited July 28, 2021).

[20] Low/Moderate incidence describes <50 cases per 100,000 people during the past 7 days. Increasing or Decreasing incidence is based on the percentage change in the number of cases reported in the past 7 days compared to the 7 days prior to that (Increasing: >0% change, Decreasing: <0% change).

[21] *Determination that a Public Health Emergency Exists,* U.S. Department of Health and Human Services (Jan. 31, 2020), *https://www.phe.gov/*

*emergency/news/healthactions/phe/Pages/2019-nCoV.aspx* (last visited July 21, 2021). The public health emergency determination has been subsequently renewed at 90-day intervals, most recently on July 28, 2021. *See https://www.phe.gov/ emergency/news/healthactions/phe/Pages/COVID-19July2021.aspx* (last visited July 28, 2021).

[22] The President issued proclamations suspending entry into the United States of immigrants or nonimmigrants who were physically present within a number of countries during the 14-day period preceding their entry or attempted entry into the U.S. *See* Proclamation 9984 (Jan. 31, 2020); Proclamation 9992 (Feb. 28, 2020); Proclamation 10143 (Jan. 25, 2021); and Proclamation 10199 (Apr. 30, 2021). Since March 2020, Canada and Mexico have joined with the U.S. to restrict non-essential travel along land borders to prevent the introduction and spread of the virus that causes COVID–19; these restrictions are in place until at least August 21, 2021. Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the U.S. and Canada, 86 FR 38556 (July 22, 2021); Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the U.S. and Mexico, 86 FR 38554 (July 22, 2021). CDC has also issued orders to mitigate risk of further introducing and spreading SARS CoV–2 and its variants into the United States. *See* Framework for Conditional Sailing and Initial Phase COVID–19 Testing Requirements for Protection of Crew, 85 FR 70153 (Nov. 4, 2020) (outlining the process for the phased resumption of cruise ship passenger operations); Requirement for Negative Pre-Departure COVID–19 Test Result or Documentation of Recovery from COVID–19 for all Airline or Other Aircraft Passengers Arriving into the U.S. from Any Foreign Country, 86 FR 7387 (Jan. 28, 2021); and *COVID-19 Travel Recommendations by Destination,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/travelers/map-and-travel-notices.html#travel-1* (last updated July 26, 2021) (COVID–19-related travel recommendations, including 62 Level 4 Travel Health Notices for countries with very high COVID–19 rates).

[23] CDC's Order requiring the wearing of face masks by travelers while on a conveyance entering, traveling within, or departing the United States and in U.S. transportation hubs remains in place for all travelers at indoor settings on public transportation conveyances and at transportation hubs, regardless of vaccination. Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs, 86 FR 8025 (Feb. 3, 2021). *See Requirement for Face Masks on Public Transportation Conveyances and at Transportation Hubs,* Centers for Disease Control and Prevention, *https:// www.cdc.gov/coronavirus/2019-ncov/travelers/face-masks-public-transportation.html* (last updated June 10, 2021).

[24] *Supra* note 15 (CDC also recommends fully vaccinated persons consider wearing a mask

regardless of transmission level if they or someone in their household is immunocompromised or at increased risk for severe disease, or if someone in their household is unvaccinated (including children currently ineligible for vaccination)); *see also infra* page 11, section 5 (discussion of "high" and "substantial transmission").

[25] *Interim Public Health Recommendations for Fully Vaccinated People,* Centers for Disease Control and Prevention, *https://www.cdc.gov/ coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html* (last updated May 28, 2021).

[26] Exec. Order 14010, "Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border," 86 FR 8267 (Feb. 2, 2021).

[27] CDC's reassessment of the public health situation with respect to covered noncitizens and border facilities relies upon information and data provided by DHS, CBP, and HHS' Office of Refugee Resettlement, including information regarding those entities' policies and practices.

### 1. Manner of COVID–19 Transmission

SARS–CoV–2, the virus that causes COVID–19, spreads mainly from person-to-person through respiratory fluids released during exhalation, such as when an infected person coughs, sneezes, or talks. Exposure to these respiratory fluids occurs in three principal ways: (1) Inhalation of very fine respiratory droplets and aerosol particles, (2) deposition of respiratory droplets and particles on exposed mucous membranes in the mouth, nose, or eye by direct splashes and sprays, and (3) touching mucous membranes with hands that have been soiled either directly by virus-containing respiratory fluids or indirectly by touching surfaces with virus on them.[28] Spread is more likely when people are in close contact with one another (within about 6 feet), especially in crowded or poorly ventilated indoor settings. Unvaccinated persons with asymptomatic and pre-symptomatic infection are significant contributors to community SARS–CoV–2 transmission and occurrence of COVID–19.[29] Asymptomatic cases are currently believed to represent roughly 30% of all COVID–19 infections and the infectiousness of asymptomatic individuals is believed to be about 75% of the infectiousness of symptomatic individuals. CDC's current best estimate is that 50% of infections are transmitted prior to symptom onset (pre-symptomatic transmission).[30] Although rare, as discussed below, breakthrough infections may occur in vaccinated individuals. Due to the variety of source of spread—transmission by asymptomatic, pre-symptomatic, symptomatic, and vaccinated individuals—testing is critical to identify those infected with COVID–19.

Among those who are not vaccinated, serious COVID–19 illness necessitating treatment occurs with greater frequency in older adults and those with certain pre-existing conditions.[31] Although children can be infected with SARS–CoV–2, get sick from COVID–19, and spread the virus to others, when compared with adults, children and adolescents who have COVID–19 are more commonly asymptomatic or have mild, non-specific symptoms. Children are less likely to develop severe illness or die from COVID–19.[32] They typically present with mild symptoms, if any, and have a good prognosis, recovering within one to two weeks after disease onset.[33]

### 2. Emerging Variants of the SARS–CoV–2 Virus

Like all viruses, SARS–CoV–2 constantly changes through mutation as it circulates, resulting in new virus variants over time.[34] Unchecked transmission of SARS–CoV–2 may result in increased viral mutations and the emergence of new variants. New variants of SARS–CoV–2 have emerged globally,[35] several of which have been identified as variants of concern,[36] including the Alpha, Beta, Gamma, and Delta variants. These variants of concern have evidence of an increase in transmissibility and more severe disease, which may lead to higher incidence, hospitalization, and death rates among exposed persons.[37] Furthermore, findings suggest variants may reduce levels of neutralization by antibodies generated during previous infection or vaccination, resulting in reduced effectiveness of treatments or vaccines, or increased diagnostic detection failures.[38] The ultimate concern is a variant that substantially decreases the effectiveness of available vaccines against severe or deadly disease.

Currently, the Delta variant is the predominant SARS–CoV–2 strain circulating in the United States, accounting for over 82% of cases as of July 17, 2021.[39] Of critical significance for this Order, the Delta variant has demonstrated increased levels of transmissibility among unvaccinated persons and might increase the risk of vaccine breakthrough infections in the absence of other mitigation strategies.[40] For the unvaccinated, Delta remains a formidable threat and rates of infection of the Delta variant are growing more rapidly in U.S. counties with lower vaccination rates.[41] Available evidence suggests all three vaccines currently authorized for emergency use in the United States provide significant protection against variants circulating in the United States.[42] However, a small

---

[28] *Scientific Brief: SARS–CoV–2 Transmission,* Centers for Disease Control and Prevention (May 7, 2021), *https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html*; *Science Brief: SARS–CoV–2 and Surface (Fomite) Transmission for Indoor Community Environments,* Centers for Disease Control and Prevention (Apr. 5, 2021), *https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html.*

[29] Moghadas SM, Fitzpatrick MC, Sah P, et al. The implications of silent transmission for the control of COVID–19 outbreaks. *Proc Natl Acad Sci U S A.* 2020;117(30):17513–17515.10.1073/pnas.2008373117, available at *https://www.ncbi.nlm.nih.gov/pubmed/32632012;* Johansson MA, Quandelacy TM, Kada S, et al. SARS–CoV–2 Transmission From People Without COVID–19 Symptoms. Johansson MA, et al. JAMA Netw Open. 2021 January4;4(1):e2035057. doi: 10.1001/jamanetworkopen.2020.35057.

[30] *COVID–19 Pandemic Planning Scenarios,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html* (last visited July 28, 2021).

[31] *People at Increased Risk and Other People Who Need to Take Extra Precautions,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html* (last updated Apr. 20, 2021).

[32] *Science Brief: Transmission of SARS–CoV–2 in K–12 Schools and Early Care and Education Programs—Updated,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/transmission_k_12_schools.html* (last updated July 9, 2021).

[33] *See* Leeb RT, Price S, Sliwa S, et al. COVID–19 Trends Among School-Aged Children—United States, March 1–September 19, 2020. MMWR Morb Mortal Wkly Rep 2020;69:1410–1415. DOI: *http://dx.doi.org/10.15585/mmwr.mm6939e2;* Leidman E, Duca LM, Omura JD, Proia K, Stephens JW, Sauber-Schatz EK. COVID–19 Trends Among Persons Aged 0–24 Years—United States, March 1–December 12, 2020. MMWR Morb Mortal Wkly Rep 2021;70:88–94. DOI: *http://dx.doi.org/10.15585/mmwr.mm7003e1;* Rankin DA, Talj R, Howard LM, Halasa NB. Epidemiologic trends and characteristics of SARS–CoV–2 infections among children in the United States. Curr Opin Pediatr. 2021 Feb 1;33(1):114–121. doi: 10.1097/MOP.0000000000000971. PMID: 33278112; PMCID: PMC8011299; and Castagnoli R, Votto M, Licari A, et al. Severe Acute Respiratory Syndrome Coronavirus 2 (SARS–CoV–2) Infection in Children and Adolescents: A Systematic Review. JAMA Pediatr. 2020;174(9):882–889. doi:10.1001/jamapediatrics.2020.1467.

[34] *About Variants of the Virus that Causes COVID–19,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html* (last updated Apr. 2, 2021).

[35] Abdool Karim SS, de Oliveira T. New SARS–CoV–2 Variants—Clinical, Public Health, and Vaccine Implications [published online ahead of print, 2021 Mar 24]. *N Engl J Med.* 2021. doi:10.1056/NEJMc2100362. doi:10.1056/NEJMc2100362.

[36] *Id.*

[37] Dougherty K, Mannell M, Naqvi O, Matson D, Stone J. SARS–CoV–2 B.1.617.2 (Delta) Variant COVID–19 Outbreak Associated with a Gymnastics Facility—Oklahoma, April–May 2021. MMWR Morb Mortal Wkly Rep 2021;70:1004–1007. DOI: *http://dx.doi.org/10.15585/mmwr.mm7028e2* (describing a B.1.617.2 (Delta) Variant COVID–19 outbreak associated with a gymnastics facility and finding that the Delta variant is highly transmissible in indoor sports settings and households, which might lead to increased incidence rates).

[38] *SARS–CoV–2 Variant Classifications and Definitions,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/variants/variant-info.html#Concern* (last updated June 29, 2021).

[39] *Variant Proportions,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#variant-proportions* (citing data for the two-week interval ending July 17, 2021).

[40] *About Variants of the Virus that Causes COVID–19,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/variants/variant.html* (last updated June 28, 2021).

[41] COVID Data Tracker Weekly Review, Interpretive Summary for July 23, 2021, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html* (attributing rising numbers of COVID–19 cases in nearly 90% of U.S. jurisdictions to the rapid spread of the Delta variant).

[42] *Science Brief: COVID–19 Vaccines and Vaccination,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html* (last updated May 27, 2021). Other vaccines, particularly the one manufactured by AstraZeneca, show reduced efficacy against

proportion of people who are fully vaccinated may become infected with the Delta variant (known as breakthrough infection); emerging evidence suggests that fully vaccinated persons who do become infected with the Delta variant are at risk for transmitting it to others.[43]

CDC continues to monitor the situation and may adapt recommendations based on the epidemiology of variants of concern. Given the transmissibility of variant strains and the continued emergence of new variants, ongoing monitoring of vaccine effectiveness is needed to identify mutations that could render vaccines most commonly used in the United States less effective against more transmissible variants.[44]

### 3. Risks of COVID–19 Transmission Specific to Congregate Settings

Given the manner of transmission, including asymptomatic or pre-symptomatic transmission, the risk of spreading COVID–19 is particularly pronounced among those who are unvaccinated, partially vaccinated, or vaccinated with less effective vaccines.[45] This risk is acutely present in congregate settings, where a number of people reside, meet, or gather in close proximity for either a limited or extended period of time.[46] Facilities must often carefully weigh the risks of increased transmission not only in the facilities, but also in the local community, due to secondary transmission. These congregate facilities must also consider individual facility

and community characteristics (*e.g.,* ability to maintain physical distancing, compliance with universal mask-use policies, ability to properly ventilate, proportion of staff and occupants vaccinated, numbers of those who are at increased risk for severe illness from COVID–19, the availability of resources for broad-based vaccination, testing, and outbreak response, and level of community transmission).[47]

Congregate settings, particularly detention facilities with limited ability to provide adequate physical distancing and cohorting, have a heightened risk of COVID–19 outbreaks.[48] CDC has long recognized the risks specific to such settings, including homeless shelters, detention centers, schools, and workplaces and has provided a number of guidance documents to address the concerns in such spaces. Specifically, CDC developed interim guidance for law enforcement agencies that have custodial authority for detained populations, including civil and pre-trial detention settings. Among the recommendations are physical distancing strategies, isolation of individuals with confirmed or suspected COVID–19, quarantine of close contacts, cohorting of individuals when space is limited, testing, healthcare evaluations for individuals with suspected COVID–19, clinical care as needed for individuals with confirmed or suspected COVID–19, and addressing specific considerations for people who are at increased risk for severe illness.[49]

Vaccine coverage in congregate settings varies and infection risk is greater where there is sustained community transmission.[50] In light of

this, CDC strongly recommends vaccination against COVID–19 for everyone who is eligible, including people who are incarcerated or detained and staff at correctional and detention facilities.[51] CDC is discussing additional guidance with DHS, highlighting the key metrics to consider before modifying COVID–19 prevention and mitigation measures in facilities that hold or detain migrants.[52]

### 4. Availability of Testing, Vaccines, and Other Mitigation Measures

The potential for asymptomatic and pre-symptomatic transmission makes testing an essential part of COVID–19 mitigation protocols. With the additional testing capacity available through antigen tests, rapid testing can be implemented to identify infected persons so they can be isolated until they no longer pose a risk of spreading infections and their close contacts can be identified and quarantined.[53] Testing is especially important in congregate settings where even a single asymptomatic case can trigger an outbreak that may quickly exceed a facility's capacity to isolate and quarantine residents. Furthermore, if personnel are infected or exposed, the number of available staff members may be reduced, further stressing facility operations. Testing facility residents and personnel can help facilitate prompt mitigation actions.

COVID–19 vaccines are now widely available in the United States, and vaccination is recommended for all people 12 years of age and up. Three COVID–19 vaccines are currently authorized by the U.S. Food and Drug Administration (FDA) for emergency use: Two mRNA vaccines (produced by Pfizer-BioNTech and Moderna) and one viral vector vaccine (produced by

---

infection with certain variants but may still protect against severe disease; at the time of the issuance of this Order, the FDA has not authorized the AstraZeneca COVID–19 vaccine for use in the United States.

[43] *Supra* note 15.

[44] *See About Variants of the Virus that Causes COVID–19, supra* note 37.

[45] Vaccines with effectiveness of less than 50% against wildtype strains of COVID–19 are considered less effective.

[46] Notably, COVID–19 has disproportionately affected persons in congregate settings and high-density workplaces. Studies conducted prior to the availability of vaccines showed that a single introduction of SARS–CoV–2 into a facility can result in a widespread outbreak. Lehnertz NB, Wang X, Garfin J, Taylor J, Zipprich J, VonBank B, et al. Transmission Dynamics of Severe Acute Respiratory Syndrome Coronavirus 2 in High-Density Settings, Minnesota, USA, March–June 2020. Emerg Infect Dis. 2021;27(8):2052–2063. *https://doi.org/10.3201/eid2708.204838.* Whole genome sequencing of samples taken following an outbreak at a correctional facility demonstrated that 92.2% of the samples taken from patients were genetically related, indicating that a single case had likely led to the infection of 48 individuals. Similarly, phylogenetic analysis established that 29.6% of cases from an outbreak at a second correctional facility were closely related and genetically identical, indicating that the index case had led to the infection of approximately 60 others.

[47] *See Recommendations for Quarantine Duration in Correctional Facilities,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/community/quarantine-duration-correctional-facilities.html* (last visited July 28, 2021).

[48] Since March 31, 2020, the U.S. Federal Bureau of Prisons and state departments of corrections have together recorded 416,854 COVID–19 cases among residents and 108,945 cases among staff in correctional and detention facilities, resulting in 2,911 deaths. *Confirmed COVID–19 Cases and Deaths in U.S. Correctional and Detention Facilities by State,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#correctional-facilities* (last visited July 28, 2021).

[49] *See* Guidance for Correctional & Detention Facilities, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html* (last updated July 9, 2021).

[50] Falk A, Benda A, Falk P, Steffen S, Wallace Z, Høeg TB. *COVID–19 Cases and Transmission in 17 K–12 Schools—Wood County, Wisconsin, August 31–November 29, 2020.* MMWR Morb Mortal Wkly Rep 2021;70:136–140. DOI: *http://doi.org/ 10.15585/mmwr.mm7004e3. See also* Link-Gelles R,

DellaGrotta AL, Molina C, et al. *Limited Secondary Transmission of SARS–CoV–2 in Child Care Programs—Rhode Island, June 1–July 31, 2020.* MMWR Morb Mortal Wkly Rep 2020;69:1170–1172. DOI: *http://dx.doi.org/10.15585/mmwr.mm6934e2.*

[51] *COVID–19 Vaccine FAQs in Correctional and Detention Centers,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/vaccine-faqs.html* (last updated June 1, 2021).

[52] *See* CDC memo to DHS ''Considerations for modifying COVID–19 prevention and mitigation measures in Department of Homeland Security migrant holding facilities in response to declining transmission,'' Centers for Disease Control and Prevention (last updated June 11, 2021).

[53] *See* COVID–19 Testing and Diagnostics Working Group (TDWG). U.S. Department of Health and Human Services, *https://www.hhs.gov/coronavirus/testing/testing-diagnostics-working-group/index.html* (last visited July 28, 2021) (defining the role of the COVID–19 TDWG, which develops testing-related guidance and provides targeted investments to expand the available testing supply and maximize testing capacity).

Johnson & Johnson/Janssen), each of which has been determined to be safe and effective against COVID–19. As of July 28, 2021, over 163 million people in the United States (57.6% of the population 12 years or older) have been fully vaccinated and over 189 million people in the United States (66.8% of the population 12 years or older) have received at least one dose.[54] After substantial vaccine uptake in the first months of 2021, however, vaccination uptake has plateaued, particularly in those under the age of 65 years.[55] The combination of reduced vaccine uptake and the extreme transmissibility of the Delta variant has resulted in rising numbers of COVID–19 cases, primarily and disproportionately affecting the unvaccinated population.

The availability of COVID–19 vaccines is rising globally but still dwarfed by the rates of vaccination in the United States and a handful of other countries.[56] Countries of origin for the majority of incoming covered noncitizens have markedly lower vaccination rates.[57] Given this, the increased movement of typically unvaccinated covered noncitizens into the United States presents a heightened risk of morbidity and mortality to this population due to the congregate holding facilities at the border and the practical constraints on implementation of mitigation measures in such facilities. Outbreaks in these settings increase the serious danger of further introduction, transmission, and spread of COVID–19 and variants into the country.

CDC is aware of a rising number of breakthrough SARS–CoV–2 infections[58] in vaccinated individuals; even without variants of concern, more vaccine breakthroughs are to be expected due to the rising number of vaccinated individuals. While the vaccines currently authorized by the FDA are successful in mitigating severe illness from the highly transmissible Delta variant, infection and even mild to moderate illness has been documented in a small percentage of vaccinated persons.[59] The emergence of these more transmissible variants increases the urgency to expand vaccination coverage for everyone and especially those in densely populated congregate settings.[60] Public health agencies and other organizations must collaboratively monitor the status of the pandemic in their communities. As widespread vaccination efforts continue, ongoing use of the full panoply of mitigation measures is nevertheless especially important in congregate settings and remains key to slowing introduction, transmission, and spread of COVID–19.

**5. Impact on U.S. Communities and Healthcare Resources**

COVID–19 cases are on the rise in nearly 90% of U.S. jurisdictions, and multiple outbreaks are occurring in parts of the country that have low vaccination coverage. A person's risk for SARS–CoV–2 infection is directly related to the risk for exposure to infectious persons, which is largely determined by the extent of SARS–CoV–2 circulation in the surrounding community. Emerging evidence regarding the Delta variant finds that it is more than two times as transmissible as the original strains of SARS–CoV–2 circulating at the start of the pandemic. In light of this, CDC recommends assessing the level of community transmission using, at a minimum, two metrics: New COVID–19 cases per 100,000 persons in the last 7 days and percentage of positive SARS–CoV–2 diagnostic nucleic acid amplification tests in the last 7 days. For each of these metrics, CDC classifies transmission values as low, moderate, substantial, or high. At the time of this Order's issuance, over 70% of the U.S. counties along the U.S.-Mexico border were classified as experiencing high or substantial levels of community transmission.[61] In areas of substantial or high transmission, CDC recommends community leaders encourage vaccination and universal masking in indoor public spaces in addition to other layered prevention strategies to prevent further spread.

Between March and June 2021, rates of hospitalization due to COVID–19 decreased dramatically, easing long endured pressures on the U.S. healthcare system. However, in July 2021, with the rise of the Delta variant, the seven-day average for new hospital admissions in the United States increased 35.8% over the prior seven-day period.[62] Rates of hospitalization are rising most sharply in areas with low vaccination coverage.[63] CDC recommends continuous monitoring of the availability of staffed inpatient and intensive care unit beds, as data on usage of clinical care resources to manage patients with COVID–19 reflect underlying community disease incidence. This information can signal when urgent implementation of layered prevention strategies might be necessary to prevent overloading local and regional health care systems. Strains on

---

[54] *COVID–19 Vaccinations in the United States,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#vaccinations* (last updated July 28, 2021).

[55] Diesel J, Sterrett N, Dasgupta S, et al. COVID–19 Vaccination Coverage Among Adults—United States, December 14, 2020–May 22, 2021. MMWR Morb Mortal Wkly Rep 2021;70: 922–927. DOI: *http://dx.doi.org/10.15585/mmwr.mm7025e1.* The study found that the lowest vaccination coverage and the intent to be vaccinated among adults aged 18–24 years, non-Hispanic Black adults, and individuals with less education, no insurance, and lower household incomes. Concerns about vaccine safety and effectiveness were commonly cited barriers to vaccination. *See also supra* note 15 (finding that vaccine uptake has slowed nationally with wide variation in coverage by state (range = 33.9%–67.2%) and by county (range = 8.8%–89.0%)).

[56] *See* "PAHO Director calls for fair and broad access to COVID–19 vaccines for Latin America and the Caribbean," Pan American Health Organization, *https://www.paho.org/en/news/7-7-2021-paho-director-calls-fair-and-broad-access-covid-19-vaccines-latin-america-and* (July 7, 2021) (noting the discrepancies in vaccine availability coverage among North, Central, and South American countries).

[57] Thus far in 2021, Ecuador, El Salvador, Guatemala, Honduras, and Mexico constitute the top five countries of origin for covered noncitizens. Rates of vaccination for each country are as follows: Ecuador: 11% fully vaccinated, 30% only partly vaccinated; El Salvador: 22% fully vaccinated, 17% only partly vaccinated; Guatemala: 1.6% fully vaccinated, 5.3% only partly vaccinated; Honduras: 1.8% fully vaccinated, 12% only partly vaccinated; Mexico: 18% fully vaccinated, 14% only partly vaccinated, *https://ourworldindata.org/covid-vaccinations* (last visited July 24, 2021).

[58] A vaccine breakthrough infection is defined as the detection of SARS–CoV–2 RNA or antigen in a respiratory specimen collected from a person ≥14 days after receipt of all recommended doses of an FDA-authorized COVID–19 vaccine. COVID–19 Vaccine Breakthrough Infections Reported to CDC—United States, January 1–April 30, 2021. MMWR Morb Mortal Wkly Rep 2021;70:792–793. DOI: *http://dx.doi.org/10.15585/mmwr.mm7021e3.*

[59] *COVID–19 Vaccine Breakthrough Case Investigation and Reporting,* Centers for Disease Control and Prevention, *https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html* (last updated July 15, 2021).

[60] *Supra* at note 55.

[61] Of the 22 U.S. counties along the U.S.-Mexico border, 13 counties are experiencing high levels of community transmission (San Diego County, CA; Hidalgo County, NM; Presidio County, TX; Brewster County, TX; Terrell County, TX; Val Verde County, TX; Kinney County, TX; Maverick County, TX; Webb County, TX; Zapata County, TX; Starr County, TX; Hidalgo County, TX; and Cameron County, TX) and four counties are experiencing substantial levels of community transmission (Imperial County, CA; Pima County, AZ; Santa Cruz County, AZ; and Luna County, NM;). Five counties are experiencing moderate levels of community transmission (Yuma County, AZ; Cochise County, AZ; Dona Ana County, NM; El Paso County, TX; and Hudspeth County, TX). No counties along the border are experiencing low levels of community transmission. *COVID–19 Integrated County View,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#county-view* (last updated July 28, 2021).

[62] COVID Data Tracker Weekly Review, Interpretive Summary for July 16, 2021, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-reports/07162021.html* (last visited July 28, 2021).

[63] COVID Data Tracker Weekly Review, Interpretive Summary for July 9, 2021, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-reports/07092021.html.*

**Federal Register** / Vol. 86, No. 148 / Thursday, August 5, 2021 / Notices **42835**

critical care capacity can increase COVID–19 mortality while decreasing the availability and use of health care resources for non-COVID–19 related medical care.[64] Increased hospital admissions are forecasted in the coming weeks as the Delta variant continues to predominate.[65]

The rapid spread of the highly transmissible Delta variant is leading to worrisome trends in healthcare and community resources. Signs of stress are already present in the southern regions of the United States.[66] Ultimately, the flow of migration directly impacts not only border communities and regions, but also destination communities and the healthcare resources of both. In light of this, the totality of the U.S. community transmission, health system capacity, and public health capacity, as well as local capacity to implement mitigation protocols, are important considerations when reassessing the need for this Order.[67]

## II. Public Health Reassessment

*A. Immigration Processing and Public Health Impacts*

Noncitizens arriving in the United States who lack proper travel documents, whose entry is otherwise contrary to law, or who are apprehended at or near the border seeking to unlawfully enter the United States between POE are normally subject to initial immigration processing by CBP in POE facilities and U.S. Border Patrol stations. Absent CDC's issuance of an order under 42 U.S.C. 265 directing otherwise, immigration processing takes place pursuant to Title 8 of the U.S. Code. Although some number of inadmissible noncitizens present at POE, the vast majority are encountered by CBP between POE.[68] Upon such encounters, Border Patrol agents conduct an initial field assessment and transport the

individuals to a CBP facility for intake processing.[69]

CBP facilities are designed to provide this short-term intake processing and are thus space-constrained.[70] While undergoing intake processing under Title 8 at CBP facilities, noncitizens are regularly held in close proximity to one another anywhere from several hours to several days. Depending on the outcome of intake processing, a noncitizen is generally referred to the DHS' Immigration and Customs Enforcement (ICE), where they are often subject to longer-term detention.[71] [72]

Compared to CBP facilities, ICE facilities have space allocations similar to traditional long-term correctional facilities. Still, during migratory surges, capacity constraints hinder CBP and ICE operations and facilities alike. If downstream ICE operations and facilities reach capacity limits, ICE may be unable to take custody of additional noncitizens in a timely manner. When this movement of noncitizens from CBP to ICE custody is impeded or delayed, noncitizens may remain in CBP's densely populated, short-term holding facilities for much longer periods. Of note, the United States is currently experiencing such a migratory surge of noncitizens attempting to enter the country at and between POE at the southern border.[73] DHS has already recorded more encounters this fiscal year to date than the approximate 977,000 encounters in the whole of FY 2019.[74]

CBP has implemented a variety of mitigation efforts to prevent the spread of COVID–19 in POE and U.S. Border Patrol facilities based on the infection prevention strategy referred to as the

hierarchy of controls.[75] CBP has invested in engineering upgrades, such as installing plexiglass dividers in facilities where physical distancing is not possible and enhancing ventilation systems. All CBP facilities adhere to CDC guidance for cleaning and disinfection. Surgical masks are provided to all persons in custody and are changed at least daily and if or when they become wet or soiled. Personal protective equipment (PPE) and guidance are regularly provided to CBP personnel. Recognizing the value of vaccination, CBP is encouraging vaccination among its workforce. All noncitizens brought into CBP custody are subject to health intake interviews, including COVID–19 screening questions and temperature checks. If a noncitizen in custody displays symptoms of COVID–19 or has a known exposure, CBP facilitates referral to the local healthcare system for testing. Finally, in the event CBP decides to release a noncitizen prior to removal proceedings, the agency has coordinated with local governments and non-governmental organizations to arrange COVID–19 testing at release.[76]

In addition to these mitigation measures, enhanced physical distancing and cohorting remain key to preventing transmission and spread of COVID–19, particularly in congregate settings. To address this, as the pandemic emerged, CBP greatly reduced capacity in their holding facilities. While U.S. Border Patrol facilities along the southern border currently have a non-pandemic total holding capacity of 14,553 individuals, implementation of mitigation measures led to a 50–75% reduction in holding capacity depending on the design of a given facility, resulting in COVID-constrained holding capacity of 4,706.[77] However, the current surge has caused CBP to exceed COVID-constrained capacity and routinely exceed its non-COVID capacity.[78] From July 3 to July 24, 2021,

---

[64] *Supra* note 15.

[65] COVID–19 Forecasts: Hospitalizations, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/science/forecasting/hospitalizations-forecasts.html* (last updated July 21, 2021).

[66] *See* COVID Data Tracker: New Hospital Admissions, *https://covid.cdc.gov/covid-data-tracker/#new-hospital-admissions* (last updated July 22, 2021) (showing HHS Regions 4, 6, and 9, encompassing all southern states, experiencing increased rates of new admissions of COVID–19-confirmed patients).

[67] *See Implementation of Mitigation Strategies for Communities with Local COVID–19 Transmission,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/community/community-mitigation.html* (last visited May 6, 2021).

[68] Fiscal year to date, 96% (1,076,242 of 1,119,204) of encounters of noncitizens occurred between POE.

[69] CBP facilities include POE, U.S. Border Patrol stations, and facilities managed by the Office of Field Operations.

[70] CBP facilities were designed for the immediate processing of persons and are statutorily designated as short-term (less than 72 hours) holding facilities. 6 U.S.C. 211(m).

[71] FMU transferred to ICE custody are generally held at a Family Staging Center (FSC). Following intake processing, UC are referred to the Office of Refugee Resettlement (ORR) within HHS' Administration for Children and Families (ACF) for care.

[72] While CBP policies regarding transfer and release decisions are the same across the Southern Border, implementation varies based on local CBP capacity, and ICE capacity.

[73] According to data from DHS, encounters at the southern border have been rising since April 2020 due to several factors, including ongoing violence, insecurity, and famine in the Northern Triangle countries of Central America (El Salvador, Honduras, Guatemala).

[74] *Southwest Land Border Encounters,* U.S. Customs and Border Protection, available at *https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last visited July 28, 2021).

[75] *Hierarchy of Controls,* Centers for Disease Control and Prevention, available at *https://www.cdc.gov/niosh/topics/hierarchy/default.html* (last visited July 6, 2021). The hierarchy of controls is used as a means of determining how to implement feasible and effective control solutions. The hierarchy is outlined as: (1) Elimination (physically remove the hazard); (2) Substitution (replace the hazard); (3) Engineering Controls (isolate people from the hazard); (4) Administrative Controls (change the way people work); and (5) PPE (protect people with Personal Protective Equipment).

[76] This is also true of ICE facilities.

[77] Similarly, the operational holding capacity for SA in ICE facilities was reduced by 30% from a regular total capacity of 56,888 beds to 39,821 beds.

[78] Non-COVID–19 holding capacity was exceeded as recently as July 25, 2021.

CBP encountered an average of 3,573 SA and 2,479 FMU daily, over a 21-day period, even with the CDC Order in place. This extreme population density and the resulting increased time spent in custody by noncitizens presents a serious risk of increased COVID–19 transmission in CBP facilities.

CBP faces unique challenges in implementing certain COVID–19 mitigation measures. All individuals encountered by U.S. Border Patrol must be processed in CBP facilities. Not only does this involve close and often continuing contact between CBP personnel and noncitizens, but CBP is further constrained by requirements separate noncitizens within its holding facilities according to specific permutations.[79] These cohorting requirements significantly complicate CBP's ability to address COVID–19-related risks, as CBP facility capacity to accommodate COVID–19 mitigation protocols may not always align with the makeup of the incoming population of noncitizens and the categorical separations required of DHS.

Immigration Processing Under Title 8 of the U.S. Code

The vast majority of noncitizens attempting to enter the United States without proper travel documents are SA; SA account for 68% of overall CBP encounters this fiscal year as of July 26, 2021. Under normal Title 8 immigration processes, SA are transferred to ICE custody pending removal proceedings. As noted above, absent expulsions directed by an order under 42 U.S.C. 265, SA presenting at POE or attempting entry between POE would be processed and held in CBP facilities while awaiting transfer to ICE. Generally, CBP only releases SA into U.S. communities as a last resort, due to severe overcrowding and when all possible detention options have been explored.

A smaller percentage, 23%, of noncitizens encountered by CBP are members of an FMU.[80] As with SA, CBP has limited capacity to hold FMU. Under Title 8, due to court-ordered restrictions that largely prohibit the long-term detention of families, FMU are generally released from DHS custody pending removal proceedings. Prior to release, some FMU are transferred from CBP custody to Family Staging Centers (FSC) operated by ICE. Only a limited number of FMU may be held in an FSC, and time in custody for an FMU is

generally about 2–3 days before being released. FSC capacity is further limited by COVID–19 mitigation protocols.[81]

Releasing FMU to communities necessitates robust testing, vaccination where possible, and careful attention to consequence management (*e.g.,* facilities for isolation and quarantine). DHS has partnered with state and local agencies and non-governmental organizations to facilitate COVID–19 testing of FMU upon release from CBP custody. Pursuant to these arrangements, CBP generally transports FMU to release locations where partner agencies and organizations are on-site to provide testing and facilitate consequence management. Although the implementing partners and their capacities (including for consequence management such as housing) vary, the objectives are constant. These resources, however, are limited. They are already stretched thin, and certainly not available for all FMU who would be processed under Title 8 in the absence of an order issued under 42 U.S.C. 265. DHS has committed to supporting and, where possible, expanding these efforts, including exploring the incorporation of vaccination into this model. CDC strongly supports DHS efforts that include broad-based testing and vaccination.

Immigration Processing With an Order Under 42 U.S.C. 265

Following the issuance of the March and October Orders, covered noncitizens apprehended at or near U.S. borders, regardless of their country of origin, generally were expelled to Mexico or Canada, whichever they entered from, via the nearest POE, or to their country of origin. Where possible, SA and FMU eligible for expulsion based on the March and October Orders have been processed pursuant to the Title 42 authority, unless a case-by-case exception was made by DHS.[82]

Even with the March and October Orders in place, a significant percentage of FMU were unable to be expelled pursuant to the order, given a range of factors, including, most notably, restrictions imposed by foreign governments.[83] For example, the Mexican government has placed certain nationality- and demographic-specific restrictions on the individuals it will accept for return via the Title 42 expulsion process. With limited exceptions, the Mexican government will only accept the return of Mexican and Northern Triangle nationals. Moreover, along sections of the border, Mexican officials refuse to accept the return of any non-Mexican family with children under the age of seven, greatly reducing DHS' ability to expel FMU. In addition, many countries impose travel requirements, including COVID–19 testing, consular interviews, and identity verification that can delay repatriation. These added requirements often make prompt expulsion a practical impossibility. Conversely, DHS continues to be able to process the majority of SA under Title 42.[84] In those cases where Title 42 processing is not possible, SA and FMU are instead processed pursuant to Title 8. Processing noncitizens and issuing a Notice to Appear under Title 8 processes takes approximately an hour and a half to two hours per person. Conversely, processing an individual for expulsion under the CDC order takes roughly 15 minutes and generally happens outdoors.

The March and October Orders permitted noncitizens to be promptly returned to their country of origin, rather than being transferred to ICE custody or released into the United States, resulting in noncitizens spending shorter amounts of time in custody at CBP facilities. However, as the number of noncitizens attempting to enter the United States has surged and as individuals cannot be expelled pursuant to Title 42 given the restrictions in place, the time in custody at CBP facilities has increased for SA and FMU, even with the October Order in place. As of July 29, 2021, the current average time in custody at CBP facilities for SA

---

[79] For example, criminal cases must be held separately from administrative cases, SA must be separated by gender identity, FMU and UC must be separated from SA, and all vulnerable individuals must be protected from harm.

[80] Thus far this fiscal year, as of July 26, 2021.

[81] The total capacity for these FSCs is 3,230. However, due to COVID–19 mitigation protocols and family composition limitations, current operational capacity for the FSCs is approximately 2,400. In July 2021, due to an influx of single adults at the SWB, ICE ceased intake of family units at one of the FSCs and began to transition the facility to hold single adults. With this transition, the remaining COVID-limited FSC capacity for family units is approximately 1,800. Additionally, ICE has procured 1,200 additional beds at Emergency Family Staging Centers (EFSCs); this bed space is not limited by family composition or COVID–19.

[82] Some countries have put in place limitations that make expulsion pursuant to Title 42 inapplicable. The October Order excepted covered noncitizens "who must test negative for COVID–19 before they are expelled to their home country" and several countries refuse to accept the return of SA and FMU and other individuals unless DHS first secures a negative test result for each individual to be returned. These noncitizens are thus not covered

by the prior Order and thus cannot be expelled pursuant to Title 42. See 85 FR at 65807.

[83] Only 33% of FMU encountered fiscal year to date have been expelled under Title 42 and this percentage has fallen over time. In June 2021, only 14% of FMU were expelled under Title 42, an average of approximately 300 per day.

[84] Fiscal year to date, 89% of SA have been expelled under Title 42. This percentage has fallen slightly as the constraints on expelling individuals have increased. In June 2021, 82% of SA were expelled under Title 42, an average of over 3,000 per day.

not subject to expulsion under the October Order is 50 hours. FMU currently spend an average of 62 hours in CBP custody prior to release or transfer to ICE. If the CDC Order were not in place, both SA and FMU time in custody would likely increase significantly.

*B. Public Health Assessment of Single Adults and Family Units*

Implementation of CDC's March and October Orders significantly reduced the length of time covered noncitizen SA and FMU are held in congregate settings at POE and U.S. Border Patrol stations, as well as in the ICE facilities that subsequently hold noncitizens.[85] By reducing congestion in these facilities, the Orders have helped lessen the introduction, transmission, and spread of COVID–19 among border facilities and into the United States while also decreasing the risk of exposure to COVID–19 for DHS personnel and others in the facilities. Implementation of the Orders has mitigated the potential erosion of DHS operational capacity due to COVID–19 outbreaks. The reduction in the number of SA and FMU held in these congregate settings continues to be a necessary mitigation measure as DHS moves towards the resumption of normal border operations.

The availability of testing, vaccination, and other mitigation measures [86] at migrant holding facilities must also be considered. While downstream ICE facilities may have greater ability to provide these measures, CBP cannot appropriately execute consequence management measures to minimize spread or transmission of COVID–19 within its facilities. Space constraints, for example, preclude implementation of cohorting and consequence management such as quarantine and isolation. Covered noncitizens housed in congregate settings who may be infected with COVID–19 may ultimately increase community transmission rates in the United States, especially among susceptible populations (*i.e.,* non-

immune, under-vaccinated, and non-vaccinated persons). Mitigation measures, especially testing and vaccination, must be considered for the noncitizens being held, as well as for facility personnel. On-site COVID–19 testing for noncitizens at CBP holding facilities is very limited and the majority of testing takes place off-site. For example, if a noncitizen is transported to a community healthcare facility for medical care, testing is provided based on local protocols. Once transferred to ICE custody, testing for SA and FMU is more widely available.

Although COVID–19-related healthcare resources have substantially improved since the October Order was issued, emerging variants and the potential for a future vaccine-resistant variant mean the possible impacts on U.S. communities and local healthcare resources in the event of a COVID–19 outbreak at CBP facilities cannot be ignored. The introduction, transmission, and spread of SARS–CoV–2—including its variants—among covered noncitizens during processing and holding at congregate CBP settings remain a significant concern to the noncitizens, CBP personnel, as well as the community at large in light of transmission to unvaccinated individuals and the potential for breakthrough cases. Of particular note, POE and U.S. Border Patrol stations are ill-equipped to manage an outbreak and these facilities are heavily reliant on local healthcare systems for the provision of more extensive medical services to noncitizens.[87] Transfers to local healthcare systems for care could strain local or regional healthcare resources. Reliance on healthcare resources in border and destination communities may increase the pressure on the U.S. healthcare system and supply chain during the current public health emergency.[88] Of note, hospitalization rates are once again soaring nationally as the Delta variant spreads and the vaccination rate of the

public lags. Ensuring the continued availability of healthcare resources is a critical component of the federal government's overall public health response to COVID–19.

Given the nature of COVID–19, there is no zero-risk scenario, particularly in congregate settings and with variants as transmissible as that of Delta in high circulation in the country. The ongoing pandemic presents complex and dynamic challenges relating to public health that limit DHS' ability to process noncitizens safely under normal Title 8 procedures. Processing a noncitizen under Title 8 can take up to eight times as long as processing a noncitizen under Title 42. Importantly, longer processing times result in longer exposure times to a heightened risk of COVID–19 transmission for both noncitizens and CBP personnel. Amid the ongoing migrant surge, both the COVID–19-reduced capacity and higher non-COVID holding capacity limits have been exceeded in CBP facilities. Complete termination of any order under 42 U.S.C. 265 would increase the number of noncitizens requiring processing under Title 8, resulting in severe overcrowding and a high risk of COVID–19 transmission among those held in the facilities and the CBP workforce, ultimately burdening the local healthcare system.[89]

All of this is of particular concern as the Delta variant continues to drive an increase in COVID–19 cases. While scientists learn more about Delta and other emerging variants, rigorous and increased compliance with public health mitigation strategies is essential to protect public health.[90] Reducing the further introduction, transmission, and spread of these variants and future variants of concern into the United States is key to defeating COVID–19. CDC has concluded that SA and FMU should continue to be subject to the Order at this time pending further improvements in the public health situation.

*C. Comparison to Unaccompanied Noncitizen Children*

As discussed in the July Exception, UC are differently situated than SA and

[85] For example, when processing noncitizens under Title 8, prior to referral to ICE or release into the community, CBP generally issues the noncitizen a "Notice to Appear" (also called an I–862), which is a charging document that initiates removal proceedings against the noncitizen and may include a court date or direct the noncitizen to report to an ICE office to receive a court date.

[86] *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID–19) in Correctional and Detention Facilities,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention.html#correctional-facilities* (last visited July 28, 2021).

[87] *See* CBP Directive No. 2210–004, U.S. Customs and Border Protection, *https://www.cbp.gov/sites/default/files/assets/documents/2019-Dec/CBP_Final_Medical_Directive_123019.pdf* (Dec. 30, 2019). Many of the U.S. Border Patrol stations and POE facilities are located in remote areas and do not have ready access to local healthcare systems (which typically serve small, rural populations and have limited resources). 85 FR 56424, 56433. *See also* Abubakar I, Aldridge RW, Devakumar D, et al. The UCL-Lancet Commission on Migration and Health: the health of a world on the move. *Lancet.* 2018;392(10164):2606–2654. doi:10.1016/S0140–6736(18)32114–7.

[88] *See COVID-19 State Profile Report—Combined Set, HealthData.gov, https://healthdata.gov/Community/COVID-19-State-Profile-Report-Combined-Set/5mth-2h7d* (last visited July 28, 2021).

[89] Throughout the course of the COVID–19 pandemic, CDC has observed numerous outbreaks in similar congregate settings. *See FAQs for Correctional and Detention Facilities,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html* (last visited Apr. 15, 2021).

[90] *About Variants of the Virus that Causes COVID–19,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html* (last updated Apr. 2, 2021).

FMU. The Government has greater ability to care for UC while implementing appropriate COVID–19 mitigation measures. ORR has established a robust network of care facilities that provide testing and medical care and institute COVID–19 mitigation protocols, including vaccination for personnel and eligible UC. In light of these considerations, there is very low likelihood that processing UC in accordance with existing Title 8 procedures will result in undue strain on the U.S. healthcare system or healthcare resources. Moreover, UC released to a vetted sponsor or placed in a temporary or licensed ORR shelter do not pose a significant level of risk for COVID–19 spread into the community. UC are released only after having undergone testing, quarantine and/or isolation, and vaccination when possible, and their sponsors are provided with appropriate medical and public health direction. CDC thus finds that, at this time,[91] there is appropriate infrastructure in place to protect the children, caregivers, and local and destination communities from elevated risk of COVID–19 transmission. CDC believes the COVID–19-related public health concerns associated with UC introduction can be adequately addressed without UC being subject to this Order. As outlined in the July Exception and incorporated herein, CDC is fully excepting UC from this Order. The number of UC entering the United States is smaller than both the number of SA[92] and of FMU. Whereas UC can be excepted from the Order without posing a significant public health risk, the same is not true of SA and FMU, as described above.

*D. Summary of Findings*

Upon review of the various public health factors outlined above and in consideration of the circumstances at DHS facilities, it is CDC's assessment that suspending the right to introduce covered noncitizen SA and FMU who would otherwise be held at POE and U.S. Border Patrol stations remains necessary as the United States continues to combat the COVID–19 public health emergency. In making this determination, CDC has considered various possible alternatives (including but not limited to terminating the application of an order under 42 U.S.C. 265 for some or all SA and FMU,

modifying the availability of exceptions for individual SA and FMU in an order under 42 U.S.C. 265, and reissuing an order under 42 U.S.C. 265 for some or all UC); but for the reasons discussed herein, CDC finds that the continued suspension of the right to introduce SA and FMU under the terms set forth herein, combined with the exception for UC, is appropriate at this time. This temporary suspension pending further improvements in the public health situation and greater ability to implement COVID–19 mitigation measures in migrant holding facilities will slow the influx of noncitizens into environments at higher risk for COVID–19 transmission and spread.

DHS has indicated a commitment to restoring border operations in a manner that complies with applicable COVID–19 mitigation protocols while also accounting for other public health and humanitarian concerns. In light of available mitigation measures, and with DHS' pledge to expand capacity in a COVID-safe manner similar to expansions undertaken by HHS and ORR to address UC influx, CDC believes that the gradual resumption of normal border operations under Title 8 is feasible. With careful planning, this may be initiated in a stepwise manner that complies with COVID–19 mitigation protocols. HHS and CDC intend to support DHS in this effort and continues to work with DHS to provide technical guidance on COVID–19 mitigation strategies for their unique facilities and populations.[93] CDC understands that DHS intends to continue exercising case-by-case exceptions for individual SA and FMU based on a totality of the circumstances as CDC transitions away from this Order. CDC is also providing an additional exception to permit DHS to except noncitizens participating in a DHS-approved program that incorporates pre-processing COVID–19 testing in Mexico of the noncitizens, prior to their safe and orderly entry to the U.S. via ports of entry. Based on the incorporation of relevant COVID–19 mitigation measures in such programs, in consultation with CDC, CDC believes

such an exception is consistent with its legal authorities and in the public health interest.

**II. Legal Basis for This Order Under Sections 362 and 365 of the Public Health Service Act and 42 CFR 71.40**

CDC is issuing this Order pursuant to sections 362 and 365 of the Public Health Service Act (42 U.S.C. 265, 268) and the implementing regulation at 42 CFR 71.40. In accordance with these authorities, the CDC Director is permitted to prohibit, in whole or in part, the introduction into the United States of persons from designated foreign countries (or one or more political subdivisions or regions thereof) or places, only for such period of time that the Director deems necessary to avert the serious danger of the introduction of a quarantinable communicable disease, by issuing an Order in which the Director determines that:

(1) By reason of the existence of any quarantinable communicable disease in a foreign country (or one or more political subdivisions or regions thereof) or place there is serious danger of the introduction of such quarantinable communicable disease into the United States; and

(2) This danger is so increased by the introduction of persons from such country (or one or more political subdivisions or regions thereof) or place that a suspension of the right to introduce such persons into the United States is required in the interest of public health.[94]

CDC has authority under Section 362 and the implementing regulation to issue this Order to mitigate the further spread of COVID–19 disease, especially as the need to prevent proliferation of COVID–19 disease related to SARS–CoV–2 virus variants is heightened while vaccination efforts continue. Section 362 and the implementing regulation provide the Director with a public health tool to suspend introduction of persons not only to prevent the introduction of a quarantinable communicable disease, but also to aid in continued efforts to mitigate spread of that disease.[95]

The term "introduction into the United States" is defined in 42 CFR 71.40 as "the movement of a person from a foreign country (or one or more political subdivisions or regions thereof) or place, or series of foreign countries or places, into the United States so as to bring the person into contact with persons or property in the United States,

---

[91] This situation could change based on an increased influx of UC, changes in COVID–19 infection dynamics among UC, or unforeseen reductions in housing capacity.

[92] Note, the total number of SA encounters may include repeat encounters with SA who attempt entry again following expulsion.

[93] CDC has advised DHS on best practices with regard to testing noncitizens at the point they are released to U.S. communities to await further immigration proceedings. In addition to enforcing physical distancing (as practicable), mask-wearing, and testing for both noncitizens and personnel alike in POE and U.S. Border Patrol stations, CDC advises vaccination of DHS/CBP personnel to further reduce the risk of COVID–19 introduction, transmission, and spread in facilities and communities and protect the federal workforce. Widespread vaccination of federal employees and other personnel in congregate settings at POE and U.S. Border Patrol stations is another layer of the strategy that will lead to the normalization of border operations.

[94] 42 U.S.C. 265; 42 CFR 71.40.
[95] 85 FR 56424 at 56425–26.

in a manner that the Director determines to present a risk of transmission of a quarantinable communicable disease to persons, or a risk of contamination of property with a quarantinable communicable disease, even if the quarantinable communicable disease has already been introduced, transmitted, or is spreading within the United States.'' 42 CFR 71.40(b)(1). Similarly, the term ''serious danger of the introduction of such quarantinable communicable disease into the United States'' is defined as, ''the probable introduction of one or more persons capable of transmitting the quarantinable communicable disease into the United States, even if persons or property in the United States are already infected or contaminated with the quarantinable communicable disease.'' 42 CFR 71.40(b)(3).

In promulgating § 71.40, CDC and HHS noted that '''introduction' does not necessarily conclude the instant that a person first steps onto U.S. soil. The introduction of a person into the United States can occur not only when a person first steps onto U.S. soil, but also when a person on U.S. soil moves further into the United States, and begins to come into contact with persons or property in ways that increase the risk of transmitting the quarantinable communicable disease.''[96] This language recognizes that many quarantinable communicable diseases, including COVID–19, may be spread by infected individuals who are asymptomatic and therefore unaware that they are capable of transmitting the disease. Even when a communicable disease is already circulating within the United States, prevention and mitigation of continued transmission of the virus is nevertheless a key public health measure. In this case, although COVID–19 has already been introduced and is spreading within the United States, this Order serves as an important disease-mitigation tool to protect public health. This is particularly true as new variants of the virus continue to emerge. By continuing to suspend the introduction of persons from foreign countries into the United States, this Order will help minimize the spread of variants and their ability to accelerate disease transmission.

Section 71.40(b)(2) defines ''[p]rohibit, in whole or in part, the introduction into the United States of persons'' in Section 362 as ''to prevent the introduction of persons into the United States by suspending any right to introduce into the United States, physically stopping or restricting

movement into the United States, or physically expelling from the United States some or all of the persons.'' *See also* 42 U.S.C. 265 (authorizing the prohibition when the danger posed by the communicable disease ''is so increased by the introduction of persons from such country . . . or place that a suspension of the right to introduce such persons into the United States is required in the interest of public health''). Pursuant to that provision, this Order permits expulsion of persons covered by it, as did the prior Orders issued under this authority.[97] CDC recognizes that expulsion is an extraordinary action but, as explained in the Final Rule, the power to expel is critical where neither HHS/CDC, nor other Federal agencies, nor state or local governments have the facilities and personnel necessary to quarantine, isolate, or conditionally release the number of persons who would otherwise increase the serious danger of the introduction of a quarantinable communicable disease into the United States.[98] In those situations, the rapid expulsion of persons from the United States may be the most effective public health measure that HHS/CDC can implement within the finite resources of HHS/CDC and its Federal, State, and local partners.[99]

As stated in the Final Rule for 42 CFR 71.40, CDC ''may, in its discretion, consider a wide array of facts and circumstances when determining what is required in the interest of public health in a particular situation . . . includ[ing]: the overall number of cases of disease; any large increase in the number of cases over a short period of time; the geographic distribution of cases; any sustained (generational) transmission; the method of disease transmission; morbidity and mortality associated with the disease; the effectiveness of contact tracing; the adequacy of state and local healthcare systems; and the effectiveness of state and local public health systems and control measures.''[100] Other factors noted in the Final Rule are the potential for disease spread among persons held in congregate settings, specifically during processing and holding at CBP facilities, and the potential for disease spread to the community at large.[101]

As stated in 42 CFR 71.40, this Order does not apply to U.S. citizens, U.S. nationals, lawful permanent residents, members of the armed forces of the United States and associated personnel if the Secretary of Defense provides assurance to the Director that the Secretary of Defense has taken or will take measures such as quarantine or isolation, or other measures maintaining control over such individuals, to prevent the risk of transmission of the quarantinable communicable disease into the United States, and U.S. government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household, if the Director receives assurances from the relevant head of agency and determines that the head of the agency or department has taken or will take measures such as quarantine or isolation, to prevent the risk of transmission of a quarantinable communicable disease into the United States.[102]

In addition, this Order does not apply to those classes of persons excepted by the CDC Director. Including exceptions in the Order is consistent with Section 362 and 42 CFR 71.40, which permit the prohibition of introduction into the United States to be ''in whole or in part.'' As explained in the Final Rule for section 71.40, this language is intended to allow the Director to narrowly tailor the use of the authority to what is required in the interest of public health.[103] Pursuant to this capability, CDC is therefore excepting specific categories of persons from the Order, as described herein.

As required by Section 362, this Order will be in effect only for as long as it is needed to avert the serious danger of the introduction, transmission, and spread of COVID–19 into the United States and will be terminated when the continuation of the Order is no longer necessary to protect the public health. Finally, as directed by 42 CFR 71.40(c), the Order sets out the following:

(1) The foreign countries (or one or more political subdivisions or regions thereof) or places from which the introduction of persons is being prohibited;

(2) The period of time or circumstances under which the introduction of any persons or class of persons into the United States is being prohibited;

---

[96] *Id.* at 56425.

[97] *See id.* at 56425, 56433.
[98] *Id.* at 56425, 56445–46.
[99] *Id.* at 56425.
[100] *Id.* at 56444.
[101] *Id.* at 56434. Strain on healthcare systems was also cited as a factor in the Final Rule, specifically the additional strain that noncitizen migrant healthcare needs may place on already overburdened systems; the Final Rule described the

reduction of this strain as a result of CDC's previously issued orders. *Id.* at 56431.
[102] 42 CFR 71.40(e) and (f).
[103] 85 FR 56424, 56444.

(3) The conditions under which that prohibition on introduction will be effective, in whole or in part, including any relevant exceptions that the Director determines are appropriate;

(4) The means by which the prohibition will be implemented; and

(5) The serious danger posed by the introduction of the quarantinable communicable disease in the foreign country or countries (or one or more political subdivisions or regions thereof) or places from which the introduction of persons is being prohibited.

## III. Issuance and Implementation of Order

Based on the foregoing public health reassessment, I hereby issue this Order pursuant to Sections 362 and 365 of the Public Health Service (PHS) Act, 42 U.S.C. 265, 268, and their implementing regulations under 42 CFR part 71,[104] which authorize the CDC Director to suspend the right to introduce persons into the United States when the Director determines that the existence of a quarantinable communicable disease in a foreign country or place creates a serious danger of the introduction of such disease into the United States and the danger is so increased by the introduction of persons from the foreign country or place that a temporary suspension of the right of such introduction is necessary to protect public health. This Order hereby replaces and supersedes the Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, issued on October 13, 2020 (October Order)[105] and affirms and incorporates the exception for UC published in the July Exception, such that UC are excepted from this Order.[106]

This Order addresses the current status of the COVID–19 public health emergency and ongoing public health concerns, including virus transmission dynamics, viral variants, mitigation efforts, the public health risks inherent to high migration volumes, low vaccination rates among migrants, and crowding of immigration facilities. In making this determination, I have considered myriad facts, including the congregate nature of border facilities and the high risk for COVID–19 outbreaks—especially now with the predominant, more transmissible Delta

variant—presented following the introduction of an infected person, as well as the benefits of reducing such risks. I have also considered epidemiological information, including the viral transmissibility and asymptomatic transmission of COVID–19, the epidemiology and spread of SARS–CoV–2 variants, the morbidity and mortality associated with the disease for individuals in certain risk categories, as well as public health concerns with crowding at border facilities and resultant risk of transmission of additional quarantinable communicable diseases. I am issuing this Order to preserve the health and safety of U.S. citizens, U.S. nationals, and lawful permanent residents, and personnel and noncitizens in POE and U.S. Border Patrol stations by reducing the introduction, transmission, and spread of the virus that causes COVID–19, including new and existing variants, in congregate settings where covered noncitizens would otherwise be held while undergoing immigration processing, including at POE and U.S. Border Patrol stations at or near the U.S. land and adjacent coastal borders.

Based on an assessment of the current COVID–19 epidemiologic landscape and the U.S. government's ongoing efforts to accommodate UC, CDC does not find public health justification for this Order to apply with respect to UC, as outlined in the July Exception. Although CDC finds that, at this time, this Order should be applicable to FMU, CDC notes that there are fewer FMU than SA unlawfully entering the United States and many FMU are already being processed pursuant to Title 8 versus Title 42 given a variety of practical and other limitations on immediately expelling FMU. DHS has indicated that it plans to continue to partner with state and local agencies and nongovernmental organizations to provide testing, consequence management, and eventually vaccination to FMU who are determined to be eligible for Title 8 processing. CDC considers these efforts to be a critical risk reduction measure and encourages DHS to evaluate the potential expansion of such COVID–19 mitigation programs for FMU such that they may be excepted from this Order in the future. Although vaccination programs are not available at this time, CDC encourages DHS to develop such programs as quickly as practicable. While the migration of SA and FMU into the United States during the COVID–19 public health emergency continues and given the inherent risks that accompany holding these groups in crowded congregate settings with

insufficient options for effective mitigation, CDC finds the public health justification for this Order is sustained at this time.

DHS has indicated that it is committed to restoring border operations and facilitating arrivals to the United States in a manner that comports with CDC's recommended COVID–19 mitigation protocols. Given the recent migrant surge, DHS believes that an incremental approach is the best way to recommence normal border operations while ensuring health and safety concerns are addressed. To this end, DHS will work to establish safe, efficient, and orderly processes that are consistent with appropriate health and safety protocols and the epidemiology of the COVID–19 pandemic, in consultation with CDC.

CDC's expectation is that although this Order will continue with respect to SA and FMU, DHS will use case-by-case exceptions based on the totality of the circumstances where appropriate to except individual SA and FMU in a manner that gradually recommences normal migration operations as COVID–19 health and safety protocols and capacity allows. DHS will consult with CDC to ensure that the standards for such exceptions are consistent with current CDC guidance and public health recommendations. Based on this incorporation of relevant COVID–19 mitigation measures, CDC believes it is consistent with the legal authorities and in the public health interest to continue the use of case-by-case exceptions as a step towards the resumption of normal border operations under Title 8. Additionally, DHS is working in coordination with nongovernmental organizations, state and local health departments, and other relevant facilitating organizations and entities as appropriate to develop DHS-approved processes that include pre-entry COVID–19 testing. Additional public health mitigation measures, such as maintaining physical distancing and use of masks, testing, and isolation and quarantine as appropriate, are included in such processes. DHS has documented these processes and shared them with CDC. CDC has consulted with DHS to ensure that the processes appropriately address public health concerns and align with relevant CDC COVID–19 mitigation protocols. Based on these plans and processes, CDC believes it is consistent with legal authorities and in the public health interest to permit an exception for noncitizens in such DHS-approved processes to allow for safe and orderly entry into the United States.

---

[104] Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes, 85 FR 56424 (Sept. 11, 2020); 42 CFR 71.40.

[105] *Supra* note 4.

[106] *Supra* note 3.

## A. Covered Noncitizens

This Order applies to persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a POE or U.S. Border Patrol station at or near the U.S. land and adjacent coastal borders subject to certain exceptions detailed below; this includes noncitizens who do not have proper travel documents, noncitizens whose entry is otherwise contrary to law, and noncitizens who are apprehended at or near the border seeking to unlawfully enter the United States between POE. For purposes of this Order, I refer to persons covered by the Order as ''covered noncitizens.''

## B. Exceptions

This Order does *not* apply to the following:

• U.S. citizens, U.S. nationals, and lawful permanent residents;[107]

• Members of the armed forces of the United States and associated personnel, U.S. government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household, subject to required assurances;[108]

• Noncitizens who hold valid travel documents and arrive at a POE;

• Noncitizens in the visa waiver program who are not otherwise subject to travel restrictions and arrive at a POE;

• Unaccompanied Noncitizen Children;[109]

• Noncitizens who would otherwise be subject to this Order, who are permitted to enter the U.S. as part of a DHS-approved process, where the process approved by DHS has been documented and shared with CDC, and includes appropriate COVID–19 mitigation protocols, per CDC guidance; and

• Persons whom customs officers determine, with approval from a supervisor, should be excepted from this Order based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests. DHS will consult with CDC regarding the standards for such exceptions to help ensure consistency with current CDC

guidance and public health recommendations.

## C. APA, Review, and Termination

This Order shall be immediately effective. I consulted with DHS and other federal departments as needed before I issued this Order and requested that DHS continue to aid in the enforcement of this Order because CDC does not have the capability, resources, or personnel needed to do so.[110] As part of the consultation, DHS developed operational plans for implementing this Order. CDC has reviewed these plans and finds them to be consistent with the language of this Order directing that covered noncitizens spend as little time in congregate settings as practicable under the circumstances. In my view, DHS's assistance with implementing the Order is necessary, as CDC's other public health tools are not viable mechanisms given CDC resource and personnel constraints, the large numbers of covered noncitizens involved, and the likelihood that covered noncitizens do not have homes in the United States.[111]

This Order is not a rule subject to notice and comment under the Administrative Procedure Act (APA). Even if it were, notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and the opportunity to comment on this Order and a delayed effective date. Given the public health emergency caused by COVID–19, it would be impracticable and contrary to public health practices and the public interest to delay the issuing and effective date of this Order with respect to all covered noncitizens. In addition, this Order concerns ongoing discussions with Canada and Mexico on how best to control COVID–19 transmission over our shared borders and therefore directly ''involve[s] . . . a . . . foreign affairs function of the United States;''[112] thus, notice and comment and a delay in effective date are not required.

This Order shall remain effective until either the expiration of the Secretary of HHS' declaration that COVID–19 constitutes a public health emergency, or I determine that the danger of further introduction, transmission, or spread of COVID–19 into the United States has ceased to be a serious danger to the

public health and continuation of this Order is no longer necessary to protect public health, whichever occurs first. At least every 60 days, the CDC shall review the latest information regarding the status of the COVID–19 public health emergency and associated public health risks, including migration patterns, sanitation concerns, and any improvement or deterioration of conditions at the U.S. border, to determine whether the Order remains necessary to protect public health. Upon determining that the further introduction of COVID–19 into the United States is no longer a serious danger to the public health necessitating the continuation of this Order, I will publish a notice in the **Federal Register** terminating this Order. I retain the authority to modify or terminate the Order, or its implementation, at any time as needed to protect public health.

## Authority

The authority for this Order is Sections 362 and 365 of the Public Health Service Act (42 U.S.C. 265, 268) and 42 CFR 71.40.

Dated: August 3, 2021.

**Sherri Berger,**
*Chief of Staff, Centers for Disease Control and Prevention.*

[FR Doc. 2021–16856 Filed 8–3–21; 4:15 pm]

**BILLING CODE 4163–18–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Centers for Medicare & Medicaid Services

**[Document Identifier: CMS–10148 and CMS–10784]**

## Agency Information Collection Activities: Proposed Collection; Comment Request

**AGENCY:** Centers for Medicare & Medicaid Services, Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Centers for Medicare & Medicaid Services (CMS) is announcing an opportunity for the public to comment on CMS' intention to collect information from the public. Under the Paperwork Reduction Act of 1995 (the PRA), federal agencies are required to publish notice in the **Federal Register** concerning each proposed collection of information (including each proposed extension or reinstatement of an existing collection of information) and to allow 60 days for public comment on the proposed action. Interested persons are invited to send comments regarding our

---

[107] 42 CFR 71.40(f).

[108] 42 CFR 71.40(e)(1) and (3).

[109] As excepted pursuant to the Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children from Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists. 86 FR 38717 (July 22, 2021).

[110] 42 U.S.C. 268; 42 CFR 71.40(d).

[111] CDC relies on the Department of Defense, other federal agencies, and state and local governments to provide both logistical support and facilities for federal quarantines. CDC lacks the resources, manpower, and facilities to quarantine covered noncitizens.

[112] 5 U.S.C. 553(a)(1).

Policy Number: 11090.1
FEA Number: 306-112-002b

Office of the Director

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

February 18, 2021

| | |
|---|---|
| MEMORANDUM FOR: | All ICE Employees |
| FROM: | Tae D. Johnson<br>Acting Director |
| SUBJECT: | Interim Guidance: Civil Immigration Enforcement and<br>Removal Priorities |

Purpose

This memorandum establishes interim guidance in support of the interim civil immigration enforcement and removal priorities that Acting Secretary Pekoske issued on January 20, 2021. Acting Secretary Pekoske issued the interim priorities in his memorandum titled, *Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* (Interim Memo).

This interim guidance is effective immediately. It applies to all U.S. Immigration and Customs Enforcement (ICE) Directorates and Program Offices, and it covers enforcement actions, custody decisions, the execution of final orders of removal, financial expenditures, and strategic planning.

This interim guidance will remain in effect until Secretary Mayorkas issues new enforcement guidelines. The Secretary has informed me that he will issue new guidelines only after consultation with the leadership and workforce of ICE, U.S. Customs and Border Protection, and other Department of Homeland Security (Department) agencies and offices. He anticipates issuing these guidelines in less than 90 days.

I have requested approval of certain revisions to the Interim Memo until the Secretary issues new enforcement guidelines. My requested revisions have been approved, and they are incorporated into this guidance. To the extent this guidance conflicts with the Interim Memo, this guidance controls. As you will read below, the revisions include, but are not limited to: (1) authorization to apprehend presumed priority noncitizens[1] in at-large enforcement actions without advance approval; (2) the inclusion of current qualifying members of criminal gangs and transnational criminal organizations as presumed enforcement priorities; (3) authorization to apprehend

---

[1] For purposes of this memorandum, "noncitizen" means any person as defined in section 101(a)(3) of the Immigration and Nationality Act (INA).

without prior approval other presumed priority noncitizens who are encountered during enforcement operations; (4) how to evaluate whether a noncitizen who is not a presumed priority nevertheless poses a public safety threat and should be apprehended; (5) the further delegation of approval authority; and (6) the importance of providing advance notice of at-large enforcement actions to state and local law enforcement.

Section C of the Interim Memo has been enjoined. This memorandum does not implement, nor take into account, Section C. This memorandum implements Section B (Interim Civil Enforcement Guidelines).

Background

On January 20, 2021, President Biden issued Executive Order (EO) 13993, Revision of Civil Immigration Enforcement Policies and Priorities, 86 Fed. Reg. 7051 (Jan. 25, 2021), which articulated the Administration's baseline values and priorities for the enforcement of the civil immigration laws.

On the same day, Acting Secretary Pekoske issued the Interim Memo. The Interim Memo did four things. First, it directed a comprehensive Department-wide review of civil immigration enforcement policies. Second, it established interim civil immigration enforcement priorities for the Department. Third, it instituted a 100-day pause on certain removals pending the review. Fourth, it rescinded several existing policy memoranda, including two ICE-related memoranda, as inconsistent with EO 13993.[2] The Interim Memo further directed that ICE issue interim guidance implementing the revised enforcement priorities and the removal pause.

On January 26, 2021, the U.S. District Court for the Southern District of Texas issued a temporary restraining order (TRO) enjoining the Department from enforcing and implementing the 100-day removal pause in Section C.

Like other national security and public safety agencies, ICE operates in an environment of limited resources. Due to these limited resources, ICE has always prioritized, and necessarily must prioritize, certain enforcement and removal actions over others.

In addition to resource constraints, several other factors render ICE's mission particularly complex. These factors include ongoing litigation in various fora; the health and safety of the ICE workforce and those in its custody, particularly during the current COVID-19 pandemic; the responsibility to ensure that eligible noncitizens are able to pursue relief from removal under the immigration laws; and the requirements of, and, relationships with, sovereign nations, whose laws and expectations can place additional constraints on ICE's ability to execute final orders of removal.

---

[2] Memorandum from Matthew T. Albence, Exec. Assoc. Dir., ICE, to All ERO Employees, *Implementing the President's Border Security and Interior Immigration Enforcement Policies* (Feb. 21, 2017); Memorandum from Tracy Short, Principal Legal Advisor, ICE, to All OPLA Attorneys, *Guidance to OPLA Attorneys Regarding Implementation of the President's Executive Orders and the Secretary's Directives on Immigration Enforcement* (Aug. 15, 2017).

Accordingly, in executing its critical national security, border security, and public safety mission, the Department must exercise its well-established prosecutorial discretion and prioritize its limited resources to most effectively achieve that mission.

<u>Civil Immigration Enforcement and Removal Priorities</u>

In support of the interim priorities, the guidance established in this memorandum shall be applied to all civil immigration enforcement and removal decisions made after the issuance of this memorandum. The civil immigration enforcement and removal decisions include, but are not limited to, the following:[3]

- Deciding whether to issue a detainer, or whether to assume custody of a noncitizen subject to a previously issued detainer;
- Deciding whether to issue, reissue, serve, file, or cancel a Notice to Appear;
- Deciding whether to focus resources only on administrative violations or conduct;
- Deciding whether to stop, question, or arrest a noncitizen for an administrative violation of the civil immigration laws;
- Deciding whether to detain or release from custody subject to conditions;
- Deciding whether to grant deferred action or parole; and
- Deciding when and under what circumstances to execute final orders of removal.

For ease of reference, the interim priorities identified in the Interim Memo, and as revised by this guidance, are set forth below along with further explanation.

As a preliminary matter, it is vitally important to note that the interim priorities do not require or prohibit the arrest, detention, or removal of any noncitizen. Rather, officers and agents are expected to exercise their discretion thoughtfully, consistent with ICE's important national security, border security, and public safety mission. Enforcement and removal actions that meet the criteria described below are presumed to be a justified allocation of ICE's limited resources. Actions not reflected in the criteria described below may also be justified, but they are subject to advance review as outlined further below.

In determining whether to pursue an action that falls outside the criteria described below, all relevant facts and circumstances regarding the noncitizen should be considered. For instance, officers and agents should consider: whether there are criminal convictions; the seriousness and recency of such convictions, and the sentences imposed; the law enforcement resources that have been spent; whether a threat can be addressed through other means, such as through recourse to criminal law enforcement authorities at the federal, state, or local level, or to public health and other civil authorities at the state or local level; and, other relevant factors (including, for example, the mitigating factors identified on page 5).

---

[3] As discussed above, the Department is enjoined from enforcing the Immediate 100-Day Pause on Removals in the Interim Memo. This following interim guidance should not be read to permit implementation of Section C of the Interim Memo.

AR00669

*Criteria Defining Cases That Are Presumed to be Priorities*

**Priority Category 1: National Security**. A noncitizen is *presumed* to be a national security enforcement and removal priority if:

1) he or she has engaged in or is suspected of engaging in terrorism or terrorism-related activities;

2) he or she has engaged in or is suspected of engaging in espionage or espionage-related activities;[4] or

3) his or her apprehension, arrest, or custody is otherwise necessary to protect the national security of the United States.

In evaluating whether a noncitizen's "apprehension, arrest, or custody is otherwise necessary to protect" national security, officers and agents should determine whether a noncitizen poses a threat to United States sovereignty, territorial integrity, national interests, or institutions. General criminal activity does not amount to a national security threat (as distinguished from a public safety threat) and is discussed below.

**Priority Category 2: Border Security**. A noncitizen is *presumed* to be a border security enforcement and removal priority if:

1) he or she was apprehended at the border or a port of entry while attempting to unlawfully enter the United States on or after November 1, 2020[5]; or

2) he or she was not physically present in the United States before November 1, 2020.

To be clear, the border security priority includes any noncitizen who unlawfully entered the United States on or after November 1, 2020.

**Priority Category 3: Public Safety**. A noncitizen is *presumed* to be a public safety enforcement and removal priority if he or she poses a threat to public safety and:

1) he or she has been convicted of an aggravated felony as defined in section 101(a)(43) of the INA[6]; or

---

[4] For purposes of the national security enforcement priority, the terms "terrorism or terrorism-related activities" and "espionage or espionage-related activities" should be applied consistent with (1) the definitions of "terrorist activity" and "engage in terrorist activity" in section 212(a)(3)(B)(iii)-(iv) of the INA, and (2) the manner in which the term "espionage" is generally applied in the immigration laws.

[5] The statutory mandates in Section 235 of the INA (regarding asylum seekers) continue to apply to noncitizens.

[6] This criterion tracks Congress's prioritization of aggravated felonies for immigration enforcement actions. Whether an individual has been convicted of an aggravated felony is a complex question that may involve securing and analyzing a host of conviction documents, many of which may not be immediately available to officers and agents. Even when all conviction documents are available, whether a conviction is for an aggravated felony may be a novel question under applicable law. Accordingly, in deciding whether a noncitizen has been convicted of an

2)   he or she has been convicted of an offense for which an element was active
     participation in a criminal street gang, as defined in 18 U.S.C. § 521(a), or is not
     younger than 16 years of age and intentionally participated in an organized criminal
     gang or transnational criminal organization to further the illegal activity of the gang or
     transnational criminal organization.

In evaluating whether a noncitizen currently "pose[s] a threat to public safety," officers and
agents are to consider the extensiveness, seriousness, and recency of the criminal activity.
Officers and agents are to also consider mitigating factors, including, but not limited to, personal
and family circumstances, health and medical factors, ties to the community, evidence of
rehabilitation, and whether the individual has potential immigration relief available.

Officers are to base their conclusions about intentional participation in an organized criminal
gang or transnational criminal organization on reliable evidence and consult with the Field
Office Director (FOD) or Special Agent in Charge (SAC) in reaching this conclusion.

Particular attention is to be exercised in cases involving noncitizens who are elderly or are
known to be suffering from serious physical or mental illness. Similarly, particular attention is to
be exercised with respect to noncitizens who have pending petitions for review on direct appeal
from an order of removal; have filed only one motion to reopen removal proceedings, and such a
motion either remains pending or is on direct appeal via a petition for review; or have pending
applications for immigration relief and are prima facie eligible for such relief. In such cases,
execution of removal orders should have a compelling reason and are to have approval from the
FOD.

A civil enforcement or removal action that does not meet the above criteria for presumed priority
cases will require preapproval as described below.

<u>Enforcement and Removal Actions: Approval, Coordination, and Data Collection</u>

To ensure compliance with this guidance and consistency across geographic areas of
responsibility, and to facilitate a dialogue between headquarters and field leadership about the
effectiveness of the interim guidance, ICE will require that field offices collect data on the nature
and type of enforcement and removal actions they perform. In addition, ICE will require field
offices to coordinate their operations and obtain preapproval for enforcement and removal
actions that do not meet the above criteria for presumed priority cases. The data and coordination
will inform the development of the Secretary's new enforcement guidance.

*No Preapproval Required for Presumed Priority Cases*

Officers and agents need not obtain preapproval for enforcement or removal actions that meet the
above criteria for presumed priority cases, beyond what existing policy requires and what a
supervisor instructs.

---

aggravated felony for purposes of this memorandum, officers and agents must have a good-faith belief based on
either a final administrative determination, available conviction records, or the advice of agency legal counsel.

*Preapproval for Other Priority Cases*

Any civil immigration enforcement or removal actions that do not meet the above criteria for presumed priority cases will require preapproval from the FOD or SAC. In deciding to undertake an enforcement action or removal, the agent or officer must consider, in consultation with his or her leadership, the nature and recency of the noncitizen's convictions, the type and length of sentences imposed, whether the enforcement action is otherwise an appropriate use of ICE's limited resources, and other relevant factors. In requesting this preapproval, the officer or agent must raise a written justification through the chain of command, explaining why the action otherwise constitutes a justified allocation of limited resources, and identify the date, time, and location the enforcement action or removal is expected to take place.

The approval to carry out an enforcement action against a particular noncitizen will not authorize enforcement actions against other noncitizens encountered during an operation if those noncitizens fall outside the presumption criteria identified above. An approval to take an enforcement action against any other noncitizen encountered who is not a presumed priority must be separately secured as described above.

In some cases, exigent circumstances and the demands of public safety will make it impracticable to obtain preapproval for an at-large enforcement action. While it is impossible to preconceive all such circumstances, they generally will be limited to situations where a noncitizen poses an imminent threat to life or an imminent substantial threat to property. If preapproval is impracticable, an officer or agent should conduct the enforcement action and then request approval as described above within 24 hours following the action.[7]

As always, it is important that ICE endeavor to remove noncitizens with final removal orders who have remained in post-order detention for more than 90 days. ICE will continue to review such noncitizens' cases on a regular basis, consistent with existing law and policy. ICE will endeavor to remove such noncitizens consistent with legal requirements and national, border security, and public safety priorities.

Periodically, ICE receives requests to exercise some form of individualized discretion in the interests of law and justice. ICE will create and maintain a system by which personnel can evaluate these individualized requests.

*Notice of At-Large Enforcement Actions*

The execution of an at-large enforcement action should be preceded by notification to the relevant state and local law enforcement agency or agencies. This notification will advance

---

[7] Where approval is sought following the enforcement action due to exigent circumstances, the request shall explain the exigency, where and when the enforcement activity took place, and whether the noncitizen is currently detained. Additionally, when the location of a proposed or completed enforcement action is a courthouse, as defined in ICE Directive 11072.1: Civil Immigration Enforcement Actions Inside Courthouses (Jan. 10, 2018, or as superseded), or a sensitive location, as defined in ICE Directive No. 10029.2, Enforcement Actions at or Focused on Sensitive Locations (Oct. 24, 2011, or as superseded), that should be explicitly highlighted in the request.

public safety and help ensure that planned immigration enforcement actions do not improperly interfere with state and local law enforcement investigations and actions.

*Weekly Reporting of All Enforcement and Removal Actions*

The Director will review all enforcement actions to ensure compliance with this guidance and consistency across geographic areas of responsibility and to facilitate a dialogue between headquarters and field leadership about the effectiveness of the interim priorities.

Each Friday, the Executive Associate Directors for Enforcement and Removal Operations and Homeland Security Investigations will compile and provide to the Office of the Director, the Office of the Deputy Director, and the Office of Policy and Planning (OPP), a written report: (1) identifying each enforcement action taken in the prior week, including the applicable priority criterion, if any; (2) providing a narrative justification of the action; and (3) identifying the date, time, and location of the action.

In addition, each Friday the Executive Associate Director for Enforcement and Removal Operations will provide to the Office of the Director, the Office of the Deputy Director, and OPP, a written report: (1) identifying each removal in the prior week, including the applicable priority criterion, if any; (2) providing a narrative justification of the removal; and (3) identifying the date, time, and location of the removal.

These reporting requirements will be assessed periodically during this interim period to ensure that they are both productive and manageable.

The weekly reports will be made available to the Office of the Secretary.

Questions

Questions regarding this interim guidance or the Interim Memo should be directed to OPP through the chain of command and Directorate or Program Office leadership. Answers to frequently asked policy questions will be published on OPP's inSight page on an ongoing basis. Please note, however, that case-specific questions should generally be addressed by Directorate or Program Office leadership.

No Private Right Statement

These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

Overall, 41 percent of MPP cases resulted in a final enforcement disposition as of June 30, 2021, versus 35 percent of comparable non-MPP cases.(76)

See rows 8, 31, and 32.

**Final or Most Current Outcomes, SW Border Encounters of MPP Enrollees and Comparable Cases**

| Most Current Enforcement Outcome | MPP | Non-MPP |
|---|---|---|
| **Total Encounters** | **67,694** | **596,801** |
| Title 42 Expulsion | 5 | 125,714 |
| Removals | 638 | 10,521 |
| Returns | 32 | 344 |
| Re-encounters[1] | 22,332 | 14,039 |
| Being processed | 17,030 | 572,254 |
| Being processed by DHS | 567 | 107,491 |
| In EOIR proceedings[2] | 5,798 | 211,064 |
| EOIR case completed – additional DOJ action[3] | 11,385 | 53,699 |
| Final order/voluntary departure | 20,233 | 46,871 |
| Unexecuted removal orders | 20,232 | 46,103 |
| In absentia | 18,414 | 39,664 |
| Not in absentia | 1,818 | 6,439 |
| Unexecuted voluntary departures | 1 | 768 |
| Relief | 732 | 10,174 |
| SIJ or affirmative asylum | 14 | 1,614 |
| LPR status granted by DHS | 36 | 3,313 |
| EOIR relief[4] | 677 | 5,080 |
| Other[5] | 5 | 167 |
| EOIR termination | 6,153 | 6,229 |
| Parole | | 203 |
| No Subsequent Event[6] | 1 | 6,586 |
| **Additional Calculations** | **MPP** | **Non-MPP** |
| Completed Cases | 27,812 | 206,308 |
| Completed cases as share of total | 41% | 35% |

Notes: "Non-MPP cases" are defined as non-Mexican single adults and family units who were apprehended along the SWB between January 25, 2019, and January 20, 2021, were not enrolled in MPP, and were not detained throughout the pendency of their proceedings. Data valid as of FY2021 Q3 (June 30, 2021).
1 Includes noncitizens encountered more than once by CBP without a known intervening removal or return. OIS assumes the noncitizen departed of their own accord during the intervening period.
2 Includes noncitizens in proceedings whose cases have been closed and are not on an active docket.
3 Includes noncitizens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.
4 Includes noncitizens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.
5 Includes noncitizens granted cancellation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present noncitizens not subject to removal.
6 Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the noncitizen awaits further processing.
Source: OIS analysis of Enforcement Lifecycle data.

**AR00674**

During that same period [1/25/2019 - 1/21/2021], CBP processed a total of 1.5 million SWB encounters, including approximately 1 million encounters processed under Title 8 authorities (including the 68,000 processed through MPP) and approximately 500,000 Title 42 expulsions.(24)

See row 34.

**Southwest Border Encounters 1/25/2019-1/21/2021 by Title Authority**

| FY | Month | CBP Encounters | | |
|---|---|---|---|---|
| | | All | T42 | T8 |
| **2019** | 1 | 16,753 | | 16,753 |
| | 2 | 76,543 | | 76,543 |
| | 3 | 103,730 | | 103,730 |
| | 4 | 109,413 | | 109,413 |
| | 5 | 144,113 | | 144,113 |
| | 6 | 104,310 | | 104,310 |
| | 7 | 81,748 | | 81,748 |
| | 8 | 62,608 | | 62,608 |
| | 9 | 52,424 | | 52,424 |
| **2020** | 10 | 45,139 | | 45,139 |
| | 11 | 42,642 | | 42,642 |
| | 12 | 40,563 | | 40,563 |
| | 1 | 36,583 | | 36,583 |
| | 2 | 36,686 | | 36,686 |
| | 3 | 34,457 | 7,150 | 27,307 |
| | 4 | 17,106 | 15,522 | 1,584 |
| | 5 | 23,237 | 20,895 | 2,342 |
| | 6 | 33,029 | 29,809 | 3,220 |
| | 7 | 40,949 | 36,891 | 4,058 |
| | 8 | 50,007 | 44,446 | 5,561 |
| | 9 | 57,668 | 50,061 | 7,607 |
| **2021** | 10 | 71,927 | 64,892 | 7,035 |
| | 11 | 72,113 | 63,230 | 8,883 |
| | 12 | 73,994 | 62,342 | 11,652 |
| | 1 | 46,244 | 38,717 | 7,527 |
| **Total** | | **1,473,986** | **433,955** | **1,040,031** |

Source: DHS Office of Immigration Statistics analysis of CBP data. Data re-pulled June 29, 2022.

Overall, of the 67,886 cases of individuals enrolled in MPP,275 (0.4)8 were subject to an in absentia order of removal at some point during their removal proceedings—32 percent of all individuals enrolled in MPP.[78] For comparable noncitizens who were not processed through MPP during that same time period and who were also not detained for the duration of their proceedings, the in absentia rate was 13 percent—about two-fifths the rate of the MPP group. [79]

See Rows 8, 32, 33, and 34.

### Final or Most Current Outcomes, SW Border Encounters of MPP Enrollees and Comparable Cases

| Most Current Enforcement Outcomes | MPP | Non-MPP |
|---|---|---|
| Total Encounters | | |
| Title 42 Expulsion | | |
| Removals | | |
| Returns | | |
| Re-encounters[2] | | |
| Being processed | | |
| Being processed by EOIR | | |
| In EOIR removal[last]* | | |
| EOIR case reinstated - additional DOS notice[?] | | |
| Final order/voluntary departure | | |
| Contested removal orders | | |
| In absentia | | |
| Not in absentia | | |
| Uncontested voluntary departure | | |
| Relief | | |
| SIJ or affirmative asylum | | |
| LPR status granted by DHS | | |
| EOIR relief[?] | | |
| Other[?] | | |
| EOIR termination | | |
| Parole | | |

| EOIR Case History | MPP | Non-MPP |
|---|---|---|
| DHS Referred to EOIR | | |
| EOIR Absentia Orders Ever Issued | | |

Notes: "Non-MPP cases" are defined as non-Mexican single adults and family units who were apprehended along the SWB between January 25, 2019, and January 30, 2021, were not enrolled in MPP, and were not detained throughout the pendency of their proceedings. Data valid as of FY2022 Q3 (June 30, 2021).
1 Excludes noncitizens encountered more than once by CBP without a known intervening removal or return. CBP assumes the noncitizen departed of their own accord during the intervening period.
2 Includes noncitizens in proceedings whose cases have been closed and are not on an active docket.
3 Includes noncitizens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.
4 Includes noncitizens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.
5 Includes noncitizens granted cancellation of removal, LPRS prosecutorial discretion, T visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present noncitizens not subject to removal.
6 Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the noncitizen enters further processing.
Source: CBP analysis of Enforcement Lifecycle data.

**Final or Most Current Outcomes, SW Border Encounter of MPP Enrollees and Comparable Cases**

AR00677

DHS data reflect that only 732 individuals enrolled in MPP out of 67,694 cases were granted relief or protection from removal—a grant rate of just 1.1.(86) For the comparable set of non-MPP cases from the same time period, the relief-granted rate was nearly two-and-a-half times as high (2.7 percent).(87)

See rows 22 and 31-32.

**Final or Most Current Outcomes, SW Border Encounters of MPP Enrollees and Comparable Cases**

| Most Current Enforcement Outcome | MPP | Non-MPP |
|---|---|---|
| **Total Encounters** | 67,694 | 396,881 |
| Title 42 Expulsion | 1 | 125,714 |
| Removals | 650 | 102,921 |
| Returns | 32 | 544 |
| Re-encounters[1] | 22,232 | 58,670 |
| Being processed | 17,690 | 372,234 |
| Being processed by DHS | 367 | 107,491 |
| In EOIR noncustody[2] | 5,798 | 211,064 |
| EOIR case convicted - additional DOJ action[3] | 11,505 | 53,699 |
| Final order/voluntary departure | 20,233 | 46,871 |
| Unexecuted removal order | 20,232 | 46,103 |
| In absentia | 18,414 | 39,444 |
| Not in absentia | 1,818 | 6,659 |
| Unexecuted voluntary departure | 1 | 768 |
| Relief[4] | 732 | 10,176 |
| SIJ or affirmative asylum | 14 | 1,614 |
| LPR status granted by DHS | 36 | 3,515 |
| EOIR relief[5] | 677 | 5,090 |
| Other[6] | 5 | 147 |
| EOIR termination | 6,131 | 6,229 |
| Parole | | 260 |
| No Subsequent Event[7] | 1 | 8,586 |
| **Additional Calculations** | **MPP** | **Non-MPP** |
| Relief + in the U.S. Terminations | N/A | 16,405 |
| Relief + in the U.S. Terminations to share of total | 1.1% | 2.7% |

Notes: "Non-MPP cases" are defined as non-Mexican single adults and family units who were apprehended along the SWB between January 20, 2019, and January 20, 2021, were not enrolled in MPP, and were not detained throughout the pendency of their proceedings. Terminations are excluded from the percentage calculation for MPP cases in row 31. Data valid as of FY2021 Q3 (June 30, 2021).
1 Includes noncitizens encountered more than once by CBP without a known intervening removal or return. OIS assumes the noncitizen departed of their own accord during the intervening period.
2 Includes noncitizens in proceedings whose cases have been closed and are not on an active docket.
3 Includes noncitizens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.
4 Includes noncitizens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.
5 Includes noncitizens granted cancellation of removal, DHS-prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present noncitizens not subject to removal.
6 Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the noncitizen awaits further processing.
Source: OIS analysis of Enforcement Lifecycle data.

AR00679

AR00680

But the data also show that a significant share of individuals enrolled in MPP—33 percent as of June 30, 2021—were subsequently encountered attempting to reenter the country without inspection, rather than continuing to wait in Mexico for the resolution of their removal proceedings.(90)

See rows 12 and 31.

### Final or Most Current Outcomes, SW Border Encounters of MPP Enrollees and Comparable Cases

| Most Current Enforcement Outcome | MPP | Non-MPP |
|---|---|---|
| **Total Encounters** | 67,694 | 596,801 |
| Title 42 Expulsion | 5 | 125,714 |
| Removals | 658 | 10,321 |
| Returns | 32 | 344 |
| Re-encounters[1] | 22,192 | 18,039 |
| Being processed | 17,690 | 372,254 |
| Being processed by DHS | 507 | 107,491 |
| In EOIR proceedings[2] | 5,798 | 211,064 |
| EOIR case completed - additional DOJ action[3] | 11,385 | 53,699 |
| Final order/voluntary departure | 20,233 | 46,871 |
| Unexecuted removal orders | 20,232 | 46,105 |
| In absentia | 18,414 | 39,664 |
| Not in absentia | 1,818 | 6,439 |
| Unexecuted voluntary departures | 1 | 768 |
| Relief | 732 | 10,174 |
| SIJ or affirmative asylum | 14 | 1,614 |
| LPR status granted by DHS | 36 | 3,313 |
| EOIR relief[4] | 677 | 5,080 |
| Other[5] | 5 | 167 |
| EOIR termination | 6,151 | 6,229 |
| Parole | | 265 |
| No Subsequent Event[6] | 1 | 6,586 |
| **Additional Calculations** | **MPP** | **Non-MPP** |
| Re-encounters as a share of enrollment | 33% | 3% |

Notes: "Non-MPP cases" are defined as non-Mexican single adults and family units who were apprehended along the SWB between January 25, 2019, and January 20, 2021, were not enrolled in MPP, and were not detained throughout the pendency of their proceedings. Data valid as of FY2021 Q3 (June 30, 2021).

1 Includes noncitizens encountered more than once by CBP without a known intervening removal or return. OIS assumes the noncitizen departed of their own accord during the intervening period.

2 Includes noncitizens in proceedings whose cases have been closed and are not on an active docket.

3 Includes noncitizens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.

4 Includes noncitizens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.

5 Includes noncitizens granted cancellation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present noncitizens not subject to removal.

6 Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the noncitizen awaits further processing.

Source: OIS analysis of Enforcement Lifecycle data.

This rate is more than two-and-a-half times higher than the historical average for recidivism (defined as re-encounters within 12 months of initial apprehension) of 14 percent for individuals processed under Title 8 authorities.(91)

The reported rate of 14 percent was based on an analysis of encounters for FY 2014 - February 2020, prior to the implementation of Title 42 expulsions beginning in March 2020. For the entire period FY 2014 - FY 2021 the 12-month repeat encounter rate was 16 percent.

Southwest Border Enforcement Encounters by 12-Month Repeat vs. Unique Encounters and Encounter Rate, FY 2014 - FY 2021

| Encounter Month | Repeat Encounters | Unique Encounters | Total | 12-Month Re-encounter Rate |
|---|---|---|---|---|
| Oct-13 | 9,818 | 30,021 | 39,839 | 25% |
| ######## | 8,643 | 27,940 | 36,583 | 24% |
| Dec-13 | 7,782 | 26,787 | 34,569 | 23% |
| Jan-14 | 7,716 | 25,622 | 33,338 | 23% |
| Feb-14 | 8,644 | 32,169 | 40,813 | 21% |
| ######## | 10,924 | 44,624 | 55,548 | 20% |
| Apr-14 | 11,582 | 45,877 | 57,459 | 20% |
| ######## | 11,131 | 55,639 | 66,770 | 17% |
| Jun-14 | 9,435 | 54,915 | 64,350 | 15% |
| Jul-14 | 8,706 | 37,914 | 46,620 | 19% |
| Aug-14 | 7,681 | 29,610 | 37,291 | 21% |
| Sep-14 | 6,923 | 24,564 | 31,487 | 22% |
| Oct-14 | 7,362 | 26,108 | 33,470 | 22% |
| ######## | 6,828 | 23,613 | 30,441 | 22% |
| Dec-14 | 6,784 | 24,099 | 30,883 | 22% |
| Jan-15 | 5,978 | 21,033 | 27,011 | 22% |
| Feb-15 | 6,367 | 23,616 | 29,983 | 21% |
| ######## | 7,536 | 28,303 | 35,839 | 21% |
| Apr-15 | 6,847 | 28,224 | 35,071 | 20% |
| ######## | 6,967 | 30,311 | 37,278 | 19% |
| Jun-15 | 6,433 | 28,778 | 35,211 | 18% |
| Jul-15 | 5,718 | 28,717 | 34,435 | 17% |
| Aug-15 | 5,882 | 31,116 | 36,998 | 16% |
| Sep-15 | 5,880 | 30,973 | 36,853 | 16% |
| Oct-15 | 6,243 | 32,731 | 38,974 | 16% |
| ######## | 5,978 | 33,771 | 39,749 | 15% |
| Dec-15 | 6,152 | 38,697 | 44,849 | 14% |
| Jan-16 | 5,187 | 24,453 | 29,640 | 18% |
| Feb-16 | 5,487 | 26,481 | 31,968 | 17% |
| ######## | 6,988 | 33,355 | 40,343 | 17% |
| Apr-16 | 7,633 | 37,595 | 45,228 | 17% |
| ######## | 7,962 | 40,798 | 48,760 | 16% |
| Jun-16 | 6,769 | 35,800 | 42,569 | 16% |
| Jul-16 | 5,984 | 37,261 | 43,245 | 14% |
| Aug-16 | 6,476 | 41,468 | 47,944 | 14% |
| Sep-16 | 7,137 | 44,680 | 51,817 | 14% |
| Oct-16 | 8,072 | 53,376 | 61,448 | 13% |
| ######## | 7,300 | 51,652 | 58,952 | 12% |
| Dec-16 | 6,026 | 46,178 | 52,204 | 12% |
| Jan-17 | 5,276 | 34,717 | 39,993 | 13% |
| Feb-17 | 4,239 | 18,378 | 22,617 | 19% |
| ######## | 2,814 | 12,692 | 15,506 | 18% |
| Apr-17 | 2,623 | 11,917 | 14,540 | 18% |
| ######## | 3,216 | 15,510 | 18,726 | 17% |
| Jun-17 | 3,271 | 17,158 | 20,429 | 16% |
| Jul-17 | 3,391 | 19,993 | 23,384 | 15% |
| Aug-17 | 3,976 | 24,452 | 28,428 | 14% |
| Sep-17 | 4,073 | 24,892 | 28,965 | 14% |
| Oct-17 | 4,625 | 28,375 | 33,000 | 14% |
| ######## | 4,645 | 32,571 | 37,216 | 12% |
| Dec-17 | 4,501 | 34,202 | 38,703 | 12% |
| Jan-18 | 4,598 | 29,237 | 33,835 | 14% |
| Feb-18 | 4,924 | 30,064 | 34,988 | 14% |
| ######## | 6,578 | 41,925 | 48,503 | 14% |
| Apr-18 | 6,910 | 42,474 | 49,384 | 14% |
| ######## | 6,232 | 43,990 | 50,222 | 12% |
| Jun-18 | 4,990 | 36,615 | 41,605 | 12% |
| Jul-18 | 4,886 | 33,031 | 37,917 | 13% |
| Aug-18 | 5,448 | 39,104 | 44,552 | 12% |
| Sep-18 | 5,540 | 42,919 | 48,459 | 11% |
| Oct-18 | 6,151 | 52,772 | 58,923 | 10% |
| ######## | 5,549 | 55,068 | 60,617 | 9% |
| Dec-18 | 4,439 | 54,637 | 59,076 | 8% |
| Jan-19 | 4,794 | 51,710 | 56,504 | 8% |
| Feb-19 | 5,946 | 68,964 | 74,910 | 8% |
| ######## | 7,366 | 94,621 | 101,987 | 7% |
| Apr-19 | 7,860 | 99,827 | 107,687 | 7% |
| ######## | 9,624 | 132,822 | 142,446 | 7% |
| Jun-19 | 8,261 | 94,731 | 102,992 | 8% |
| Jul-19 | 6,956 | 73,425 | 80,381 | 9% |
| Aug-19 | 7,539 | 53,529 | 61,068 | 12% |
| Sep-19 | 8,774 | 42,044 | 50,818 | 17% |
| Oct-19 | 8,542 | 35,073 | 43,615 | 20% |
| ######## | 8,114 | 33,095 | 41,209 | 20% |
| Dec-19 | 7,795 | 31,497 | 39,292 | 20% |
| Jan-20 | 7,886 | 27,642 | 35,528 | 22% |
| Feb-20 | 7,834 | 27,744 | 35,578 | 22% |
| ######## | 5,891 | 20,677 | 26,568 | 22% |
| Apr-20 | 300 | 1,172 | 1,472 | 20% |
| ######## | 435 | 1,668 | 2,103 | 21% |
| Jun-20 | 765 | 2,147 | 2,912 | 26% |
| Jul-20 | 1,052 | 2,702 | 3,754 | 28% |
| Aug-20 | 1,611 | 3,580 | 5,191 | 31% |
| Sep-20 | 2,058 | 5,163 | 7,221 | 29% |
| Oct-20 | 1,902 | 4,739 | 6,641 | 29% |
| ######## | 2,138 | 6,366 | 8,504 | 25% |
| Dec-20 | 3,042 | 8,218 | 11,260 | 27% |
| Jan-21 | 2,889 | 10,652 | 13,541 | 21% |
| Feb-21 | 4,385 | 21,757 | 26,142 | 17% |
| ######## | 7,087 | 56,302 | 63,389 | 11% |
| Apr-21 | 7,287 | 58,234 | 65,521 | 11% |
| ######## | 8516 | 57996 | 66,512 | 13% |
| Jun-21 | 8907 | 74451 | 83,358 | 11% |
| Jul-21 | 9067 | 107404 | 116,471 | 8% |
| Aug-21 | 8926 | 104650 | 113,576 | 8% |
| Sep-21 | 4936 | 83572 | 88,508 | 6% |
| Total | 588,341 | 3,613,736 | 4,202,077 | 14% |

Notes: Total excludes administrative encounters (OFO parolees and certain OFO withdrawals of applications for admission and crew members); repeat encounters are defined as distinct individuals who had been previously encountered in the prior 12 months.
Source: OIS analysis of CBP data.

**AR00682**

But from June 2019, when DHS announced that MPP would be fully implemented along the entire SWB, through September 2019, border encounters decreased rapidly, falling 50 percent in just three months.

Change from June 2019 - September 2019:    -50%

| | MPP Enrollments | All encounters |
|---|---|---|
| Jan-19 | 14 | 16,753 |
| Feb-19 | 157 | 76,543 |
| Mar-19 | 590 | 103,730 |
| Apr-19 | 2,650 | 109,413 |
| May-19 | 5,309 | 144,113 |
| Jun-19 | 4,698 | 104,310 |
| Jul-19 | 11,266 | 81,748 |
| Aug-19 | 12,024 | 62,608 |
| Sep-19 | 7,571 | 52,424 |
| Oct-19 | 4,858 | 45,139 |
| Nov-19 | 3,632 | 42,642 |
| Dec-19 | 3,090 | 40,563 |
| Jan-20 | 1,969 | 36,583 |
| Feb-20 | 1,756 | 36,686 |
| Mar-20 | 2,108 | 34,457 |
| Apr-20 | 172 | 17,106 |
| May-20 | 131 | 23,237 |
| Jun-20 | 207 | 33,029 |
| Jul-20 | 383 | 40,949 |
| Aug-20 | 852 | 50,007 |
| Sep-20 | 1,090 | 57,668 |
| Oct-20 | 641 | 71,927 |
| Nov-20 | 940 | 72,113 |
| Dec-20 | 1,127 | 73,994 |
| Jan-21 | 543 | 43,387 |

Source: OIS analysis of CBP administrative records.

And even at the height of MPP's implementation in August 2019, it was not the Department's primary enforcement tool; approximately 12,000 migrants were enrolled in MPP but more than 50,000 were processed under other Title 8 authorities.(98)

See row 12.

| | MPP | All T8 | Non-MPP T8 | All encounters | MPP as % of T8 | MPP as % of all encounters |
|---|---|---|---|---|---|---|
| Jan-19 | 14 | 16,753 | 16,739 | 16,753 | 0% | 0% |
| Feb-19 | 157 | 76,543 | 76,386 | 76,543 | 0% | 0% |
| Mar-19 | 590 | 103,730 | 103,140 | 103,730 | 1% | 1% |
| Apr-19 | 2,650 | 109,413 | 106,763 | 109,413 | 2% | 2% |
| May-19 | 5,309 | 144,113 | 138,804 | 144,113 | 4% | 4% |
| Jun-19 | 4,698 | 104,310 | 99,612 | 104,310 | 5% | 5% |
| Jul-19 | 11,266 | 81,748 | 70,482 | 81,748 | 14% | 14% |
| Aug-19 | 12,024 | 62,608 | 50,584 | 62,608 | 19% | 19% |
| Sep-19 | 7,571 | 52,424 | 44,853 | 52,424 | 14% | 14% |
| Oct-19 | 4,858 | 45,139 | 40,281 | 45,139 | 11% | 11% |
| Nov-19 | 3,632 | 42,642 | 39,010 | 42,642 | 9% | 9% |
| Dec-19 | 3,090 | 40,563 | 37,473 | 40,563 | 8% | 8% |
| Jan-20 | 1,969 | 36,583 | 34,614 | 36,583 | 5% | 5% |
| Feb-20 | 1,756 | 36,686 | 34,930 | 36,686 | 5% | 5% |
| Mar-20 | 2,108 | 27,307 | 25,199 | 34,457 | 8% | 6% |
| Apr-20 | 172 | 1,584 | 1,412 | 17,106 | 11% | 1% |
| May-20 | 131 | 2,342 | 2,211 | 23,237 | 6% | 1% |
| Jun-20 | 207 | 3,220 | 3,013 | 33,029 | 6% | 1% |
| Jul-20 | 383 | 4,058 | 3,675 | 40,949 | 9% | 1% |
| Aug-20 | 852 | 5,561 | 4,709 | 50,007 | 15% | 2% |
| Sep-20 | 1,090 | 7,607 | 6,517 | 57,668 | 14% | 2% |
| Oct-20 | 641 | 7,044 | 6,403 | 71,927 | 9% | 1% |
| Nov-20 | 940 | 8,889 | 7,949 | 72,113 | 11% | 1% |
| Dec-20 | 1,127 | 11,676 | 10,549 | 73,994 | 10% | 2% |
| Jan-21 | 543 | 7,061 | 6,518 | 43,387 | 8% | 1% |

Source: OIS analysis of CBP administrative records.

AR00684

Notably, only 6.5 percent of noncitizens encountered along the SWB and processed through Title 8 were enrolled in MPP during the period it was in place. In no month when MPP was operating—including in August 2019, the month with the highest number of MPP enrollments—were more than one-in-five noncitizens encountered at the SWB and processed through Title 8 placed in MPP

| | MPP Enrollments | All encounters | CBP Encounters | | | | | % of Title 8 SWB encounters that are MPP enrollments |
|---|---|---|---|---|---|---|---|---|
| | | | FY | Month | All | T42 | T8 | |
| Jan-19 | 14 | 16,753 | 2019 | 1 | 16,753 | | 16,753 | 0.1% |
| Feb-19 | 157 | 76,543 | | 2 | 76,543 | | 76,543 | 0.2% |
| Mar-19 | 590 | 103,730 | | 3 | 103,730 | | 103,730 | 0.6% |
| Apr-19 | 2,650 | 109,413 | | 4 | 109,413 | | 109,413 | 2.4% |
| May-19 | 5,309 | 144,113 | | 5 | 144,113 | | 144,113 | 3.7% |
| Jun-19 | 4,698 | 104,310 | | 6 | 104,310 | | 104,310 | 4.5% |
| Jul-19 | 11,266 | 81,748 | | 7 | 81,748 | | 81,748 | 13.8% |
| Aug-19 | 12,024 | 62,608 | | 8 | 62,608 | | 62,608 | 19.2% |
| Sep-19 | 7,571 | 52,424 | | 9 | 52,424 | | 52,424 | 14.4% |
| Oct-19 | 4,858 | 45,139 | 2020 | 10 | 45,139 | | 45,139 | 10.8% |
| Nov-19 | 3,632 | 42,642 | | 11 | 42,642 | | 42,642 | 8.5% |
| Dec-19 | 3,290 | 40,563 | | 12 | 40,563 | | 40,563 | 7.5% |
| Jan-20 | 1,969 | 36,583 | | 1 | 36,583 | | 36,583 | 5.4% |
| Feb-20 | 1,756 | 36,686 | | 2 | 36,686 | | 36,686 | 4.8% |
| Mar-20 | 2,508 | 34,457 | | 3 | 34,457 | 7,150 | 27,307 | 7.7% |
| Apr-20 | 172 | 17,106 | | 4 | 17,106 | 15,522 | 1,584 | 10.9% |
| May-20 | 131 | 23,237 | | 5 | 23,237 | 20,895 | 2,342 | 5.6% |
| Jun-20 | 207 | 33,029 | | 6 | 33,029 | 29,809 | 3,220 | 6.4% |
| Jul-20 | 383 | 40,949 | | 7 | 40,949 | 36,891 | 4,058 | 9.4% |
| Aug-20 | 852 | 50,007 | | 8 | 50,007 | 44,446 | 5,561 | 15.3% |
| Sep-20 | 1,090 | 57,668 | | 9 | 57,668 | 50,061 | 7,607 | 14.3% |
| Oct-20 | 641 | 71,927 | 2021 | 10 | 71,927 | 64,892 | 7,035 | 9.1% |
| Nov-20 | 960 | 72,113 | | 11 | 72,113 | 63,230 | 8,883 | 10.6% |
| Dec-20 | 1,127 | 73,994 | | 12 | 73,994 | 62,342 | 11,652 | 9.7% |
| Jan-21 | 543 | 43,387 | | 1 | 43,387 | 38,717 | 7,527 | 7.2% |
| | 67,776 | 1,471,139 | Total | | 1,473,966 | 433,955 | 1,040,031 | 6.5% |

Source: CIS analysis of CBP admin Source: DHS Office of Immigration Statistics analysis of CBP data. Data re-pulled June 29, 2022.

Both tables copied from other tabs.

110

AR00686

From Fiscal Years 2013 to 2019, 43 percent of single adult and family unit members who were encountered at the SWB were either never placed in or released from detention during the pendency of their proceedings— almost 750,000 (25 percent) were never booked into ICE detention, and more than 770,000 (22 percent) were booked in for a period of time but released prior to the conclusion of their removal proceedings. (122)

See row 16.

Encounters by Detention History, Fiscal Years 2013-2021

| Fiscal Year | Total Encounters | Continuous Detention | | Booked out prior to final outcome | | Never Detained | |
|---|---|---|---|---|---|---|---|
| 2013 | 448,433 | 263,717 | 82% | 42,806 | 9% | 42,217 | 9% |
| 2014 | 487,292 | 346,916 | 70% | 63,739 | 17% | 56,637 | 13% |
| 2015 | 400,731 | 264,451 | 66% | 77,868 | 19% | 58,412 | 14% |
| 2016 | 402,624 | 281,108 | 57% | 125,225 | 25% | 89,289 | 18% |
| 2017 | 368,585 | 203,624 | 56% | 86,143 | 23% | 78,818 | 20% |
| 2018 | 460,388 | 247,216 | 58% | 122,317 | 23% | 90,852 | 18% |
| 2019 | 851,568 | 282,514 | 32% | 225,062 | 26% | 343,792 | 40% |
| 2020 | 210,623 | 159,542 | 66% | 27,363 | 13% | 44,718 | 21% |
| 2021 | 521,192 | 52,040 | 10% | 138,358 | 26% | 334,645 | 64% |
| 2013-2019 | 3,117,419 | | 37% | 772,857 | 22% | 749,913 | 25% |
| 2013-2021 | 4,212,130 | | 37% | 939,428 | 22% | 1,999,884 | 27% |
| Non-MPP Cases | 1,271,611 | 311,294 | 34% | 183,084 | 21% | 538,851 | 38% |

Notes: Table includes single adults and individuals in family units encountered at the southwest border, excluding noncitizens enrolled in MPP and those expelled under Title 42 authority. Non-MPP cases cover the period between Jan. 20, 2019, and Jan. 20, 2021. Data is pulled and valid as of April 21, 2022.

Source: OIS analysis of Enforcement Lifecycle data.

Even during the period that MPP was in effect from late January 2019 to January 20, 2021, 59 percent of single adults and individuals in family units encountered along the SWB and processed through non-MPP Title 8 authorities—more than 520,000 encounters—were never detained or were released from ICE custody during the duration of their proceedings; a full 38 percent (more than 330,000 individuals) were never booked into ICE detention at all. (123)

See row 18.

Encounters by Detention History, Fiscal Years 2013–2021

| Fiscal Year | Total Encounters | Continuous Detention | | Booked out prior to final outcome | | Never Detained | |
|---|---|---|---|---|---|---|---|
| 2013 | 448,433 | 369,717 | 82% | 42,499 | 9% | 66,017 | 9% |
| 2014 | 487,292 | 344,932 | 70% | 83,739 | 17% | 68,637 | 13% |
| 2015 | 400,731 | 268,951 | 66% | 77,968 | 19% | 56,412 | 14% |
| 2016 | 492,634 | 281,328 | 57% | 125,229 | 25% | 86,289 | 18% |
| 2017 | 368,581 | 205,624 | 56% | 96,165 | 25% | 74,816 | 20% |
| 2018 | 492,988 | 247,239 | 54% | 122,317 | 27% | 80,812 | 18% |
| 2019 | 851,508 | 480,514 | 56% | 225,062 | 26% | 165,703 | 40% |
| 2020 | 216,623 | 138,342 | 66% | 27,282 | 13% | 46,736 | 21% |
| 2021 | 525,191 | 112,940 | 22% | 138,208 | 26% | 334,649 | 64% |
| 2013–2019 | 3,517,419 | 1,895,548 | 57% | 713,867 | 22% | 748,055 | 21% |
| 2013–2021 | 4,259,235 | 2,186,455 | 51% | 938,658 | 22% | 1,109,376 | 27% |
| Non-MPP Cases | 875,233 | 353,584 | 41% | 185,486 | 21% | 336,663 | 38% |

Notes: Table includes single adults and individuals in family units encountered at the southwest border, excluding noncitizens enrolled in MPP and those expelled under Title 42 authority. Non-MPP cases cover the period between Jan. 25, 2019, and Jan. 20, 2021. Data is pulled and valid as of April 21, 2022.
Source: OIS analysis of Enforcement Lifecycle data.

Encounters by Detention History, Fiscal Years 2013-2021

| Fiscal Year | Total Encounters | Continuous Detention | | Booked out prior to final outcome | | Never Detained | |
|---|---|---|---|---|---|---|---|
| 2013 | 448,433 | 365,717 | 82% | 42,499 | 9% | 40,217 | 9% |
| 2014 | 497,292 | 346,916 | 70% | 83,739 | 17% | 66,637 | 13% |
| 2015 | 400,731 | 266,451 | 66% | 77,868 | 19% | 56,412 | 14% |
| 2016 | 492,626 | 281,108 | 57% | 125,229 | 25% | 86,289 | 18% |
| 2017 | 366,581 | 205,624 | 56% | 86,143 | 23% | 74,814 | 20% |
| 2018 | 460,388 | 247,219 | 54% | 132,317 | 29% | 80,852 | 18% |
| 2019 | 851,368 | 282,514 | 33% | 225,062 | 26% | 343,792 | 40% |
| 2020 | 210,623 | 138,542 | 66% | 27,363 | 13% | 44,718 | 21% |
| 2021 | 525,193 | 52,340 | 10% | 138,208 | 26% | 334,645 | 64% |
| 2013-2019 | 3,517,419 | 1,995,549 | 57% | 772,857 | 22% | 749,013 | 21% |
| 2013-2021 | 4,253,235 | 2,186,431 | 51% | 938,428 | 22% | 1,128,376 | 27% |
| Non-MPP Cases | 875,331 | 355,294 | 41% | 183,186 | 21% | 336,851 | 38% |

Notes: Table includes single adults and individuals in family units encountered at the southwest border, excluding noncitizens enrolled in MPP and those expelled under Title 42 authority. Non-MPP cases cover the period between Jan. 25, 2019, and Jan. 20, 2021. Data re-pulled and valid as of April 23, 2022.
Source: OIS analysis of Enforcement Lifecycle data.

June 10, 2005                                    IPP 05 1562

MEMORANDUM FOR:      DIRECTORS, FIELD OPERATIONS
                     DIRECTOR, PRECLEARANCE OPERATIONS

FROM:                Assistant Commissioner
                     Office of Field Operations

SUBJECT:             Treatment of Cuban Asylum Seekers at Land Border
                     Ports of Entry


This memorandum amends current policy with respect to Cubans who arrive at
land border ports of entry and seek asylum, and provides that such aliens should
be placed in proceedings pursuant to section 240 of the Immigration and
Nationality Act (INA) rather than in expedited removal proceedings. To that
extent, it revises the procedures set forth in a January 29, 2002 memorandum
issued by the former Immigration and Naturalization Service (INS) and entitled
"Aliens Seeking Asylum at Land Border Ports-of-Entry". The revision brings the
treatment of Cubans arriving at land border ports of entry in line with that of
Cubans arriving at airports, by sea, or between ports of entry at specified
locations.

The differential treatment of Cubans dates back to the passage of the Cuban
Adjustment Act of 1966, Pub. L. No. 89-732, 80 Stat. 1161 (1966). Under the
Cuban Adjustment Act of 1966, natives or citizens of Cuba are eligible for
adjustment of status to lawful permanent resident provided they meet the
following criteria. First, a native or citizen of Cuba must be inspected and
admitted or paroled into the United States. Second, he or she must apply for
adjustment of status and be eligible for admission as an immigrant. Finally, a
native or citizen of Cuba must be physically present in the United States for one
year prior to submitting an application for adjustment of status.

Natives or citizens of Cuba do not have to be refugees in order to qualify for legal
permanent resident status under the Cuban Adjustment Act of 1966. See Matter
of Mason, 12 I & N Dec. 699 (BIA 1968). In other words, the refugee status of
natives or citizens of Cuba has been determined to be irrelevant to their eligibility
for adjustment. See General Counsel Opinion 91-85 (July 24, 1991). However,
as a practical matter, natives or citizens of Cuba often seek asylum at land

AR00690

-2-

border ports of entry in order to obtain parole and to document their physical presence in the United States.

The January 29, 2002 memorandum established procedures for the processing of third-country nationals who present themselves at land border ports of entry and seek asylum in the United States. It instructed immigration inspectors to treat all such aliens as applicants for admission. Furthermore, the memorandum instructed them to place asylum-seekers at land border ports of entry into expedited removal proceedings and to detain them pending a final determination of credible fear in accordance with section 235(b) of the INA.

Accordingly, immigration inspectors placed all Cubans found to be inadmissible under section 212(a)(6)(C) or (7) of the INA at land border ports of entry into expedited removal proceedings, referred them for a credible fear interview, and detained them pending a final determination. Most Cubans interviewed by asylum officers were determined to have a credible fear of persecution or torture, placed in section 240 proceedings, and paroled until the date of their removal hearing before an immigration judge. With regard to natives and citizens of Cuba, this policy has resulted in an inefficient use of detention space at land border ports of entry.

This memorandum amends the policy of the former INS in that it addresses circumstances in which expedited removal may not be appropriate for aliens eligible for relief under the Cuban Adjustment Act. Natives or citizens of Cuba who arrive at land border ports of entry should now be processed for section 240 proceedings without lodging additional charges as required by 8 CFR § 235.3 for aliens of other nationalities. They may apply for adjustment of status under the Cuban Adjustment Act in section 240 proceedings or pursue their claim of asylum before the immigration judge. See Matter of Artigas, 23 I & N Dec. 99 (BIA 2001) (holding that an Immigration Judge has jurisdiction to adjudicate an application for adjustment of status under the Cuban Adjustment Act).

A native or citizen of Cuba may be paroled from the land border port of entry while awaiting section 240 proceedings provided three conditions have been met: (1) CBP has firmly established the identity of the alien; (2) CBP has conducted all available background checks; and (3) CBP determines that the alien does not pose a terrorist or criminal threat to the United States. Except in exceptional circumstances, a CBP Officer should not parole a native or citizen of Cuba into the United States for the sole purpose of applying for adjustment under the Cuban Adjustment Act without initiating section 240 proceedings.

Pursuant to section 235(b)(2)(C) of the INA, a native or citizen of Cuba may also be returned to contiguous territory pending section 240 proceedings. A CBP Officer should consider this option only if: (1) the alien can not demonstrate eligibility for the exercise of parole discretion; (2) the alien has valid immigration status in Canada or Mexico; (3) Canadian or Mexican border officials express a

AR00691

willingness to accept the returning alien; and (4) the alien's claim of fear of persecution or torture does not relate to Canada or Mexico.

The attached field guidance contains detailed instructions regarding the processing of natives or citizens of Cuba at land border ports of entry.   In addition, it lays out procedures developed in the January 2002 memorandum for handling the withdrawal of an application for admission in lieu of initiating expedited removal proceedings.

If you have any questions, please contact Linda Loveless, Director, Immigration Policy, at (202) 344-1438.

/S/ William S. Heffelfinger III for

Jayson P. Ahern

AR00692

ATTACHMENT

**Chapter 17.15(a) of the Inspector's Field Manual is revised to read as follows:**

(5)  <u>Aliens seeking asylum at land border ports of entry</u>.

Section 235(b) of the INA does not provide for an affirmative asylum application process at a port of entry.  Therefore, an officer should consider an alien who arrives at a land border port-of-entry and seeks asylum to be an applicant for admission by operation of law.  The alien will most likely be inadmissible under section 212(a)(7)(A)(i) of the INA as an intending immigrant without proper documentation or under section 212(a)(6)(C) of the INA as an immigration violator with fraudulent documents.  As a result, he or she will be subject to expedited removal proceedings.

Except as noted below, the alien, if otherwise subject, should be placed in expedited removal proceedings, referred for a credible fear interview, and detained pending a final determination of a credible fear of persecution or torture.  See INA § 235(b)(1)(B)(iii)(IV); 8 CFR § 235.3(b)(4)(ii).  Once it has been determined that an alien has a credible fear of persecution or torture, DHS may continue to detain the alien or parole the alien from custody, as appropriate.

(6)  <u>Cuban asylum seekers at land border ports-of-entry</u>.

Natives or citizens of Cuba arriving at land border ports of entry, whose immediate removal from the United States is highly unlikely, should be placed directly into section 240 proceedings in lieu of expedited removal, without lodging additional charges.  These aliens may be paroled directly from the port of entry while awaiting removal proceedings if identity is firmly established, all available background checks are conducted, and the alien does not pose any terrorist or criminal threat.  Pursuant to section 235(b)(2)(C) of the INA, they may also be returned to contiguous territory pending removal proceedings under section 240 of the INA.  This option should only be considered if the alien is not eligible for the exercise of parole discretion, the alien has valid status in Canada or Mexico, Canadian or Mexican border officials are willing to accept the alien back, and the claim of fear of persecution is unrelated to Canada or Mexico.

An officer should not parole a native or citizen of Cuba from a land border port of entry for the sole purpose of allowing the alien to apply for adjustment under the Cuban Adjustment Act of 1966, Pub. L. 89-732, 80 Stat. 1161 (1966), without initiating section 240 proceedings.  The Cuban Adjustment Act (CAA) provides that any native or citizen of Cuba who has been admitted or paroled into the United States, *and who is otherwise admissible as an immigrant,* may adjust status to that of a lawful permanent resident after being physically present in the United States for at least one year.  It does not, however, require an officer to

AR00693

parole a native or citizen of Cuba at a port of entry without regard to public safety. Therefore, an officer should grant parole to a native or citizen of Cuba only if the alien does not pose a criminal or terrorist threat to the United States.

**Chapter 17.15(c) of the Inspector's Field Manual is revised to read as follows:**

(c) <u>Withdrawal of application for admission in lieu of an expedited removal order.</u>

DHS has the discretion to allow an inadmissible alien to voluntarily withdraw his or her application for admission and to depart the United States in accordance with section 235(a)(4) of the INA. This discretion applies to aliens subject to expedited removal, and should be applied carefully and consistently, since an officer's decision to allow withdrawal or issue a removal order is final. Officers should keep in mind that an order of expedited removal carries with it all the penalties of an order of removal issued by an immigration judge (including a bar to reentry of at least 5 years following removal pursuant to section 212(a)(9)(A)(i)).

Follow the guidelines contained in Chapter 17.2 to determine whether an alien's withdrawal of an application for admission or asylum claim best serves the interest of justice. An officer's decision to permit withdrawal of an application for admission must be properly documented by means of a Form I-275, Withdrawal of Application for Admission/Consular Notification, to include the facts surrounding the voluntary withdrawal and the withdrawal of the asylum claim. In addition, an officer should prepare a new sworn statement, or an addendum to the original sworn statement on Form I-867A&B, covering the facts pertaining to the alien's withdrawal of the asylum claim.

An alien may not be pressured into withdrawing his or her application for admission or asylum claim under any circumstances. An officer must provide adequate interpretation to ensure that the alien understands the expedited removal process and the effects of withdrawing an application for admission or an asylum claim. Furthermore, an asylum officer must be consulted before an alien who has expressed a fear of return to his or her home country may be permitted to withdraw an asylum claim.

If an officer permits an alien to withdraw his or her application for admission and elects to return the alien to Canada or Mexico, the Form I-275 should indicate the alien's status in Canada or Mexico and the basis for determination of that status. This determination may be based on contacts with Canadian or Mexican authorities, stamps in the alien's passport, or other available documentation. The narrative on Form I-275 should also indicate

AR00694

that the alien has not expressed concern about returning to Canada or Mexico.

If the alien expresses any concern or reluctance about returning to Canada or Mexico and wishes to pursue the asylum claim in the United States, the officer should advise the alien that he or she will be placed in the expedited removal process, unless subject to section 240 proceedings by statute, regulation, or policy, and will be detained pending the credible fear determination. The alien should not be given the Form I-589, Application for Asylum and for Withholding of Removal, nor should an affirmative asylum interview be scheduled at the port of entry.



**U.S. Customs and Border Protection (CBP) Drug Seizures**
US Border Patrol (USBP) and Office of Field Operations (OFO)
Weight (lbs) and Count of Drug Seizure Events by Fiscal Year (FY)

View Seizures by:
○ Drug Seizure Weight (lb..
○ Drug Seizure Events

| Component | Fiscal Year | Drug Type |
| All | All | All |

| Region Filter | Land Filter | Area of Responsibility | Reset Filters |
| All | All | All | |

FY   | 2019 | 2020 | 2021 | 2022 (FYTD)

### FY Drug Seizure Weight (lbs) by Month

| FY | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022 (FYTD) | 81,370 | 71,095 | | | | | | | | | | | 152,464 |
| 2021 | 98,209 | 66,801 | 68,851 | 59,793 | 89,272 | 87,784 | 63,998 | 88,615 | 93,331 | 77,217 | 74,796 | 44,660 | 913,326 |
| 2020 | 65,721 | 87,751 | 93,490 | 61,884 | 61,400 | 146,029 | 54,615 | 77,602 | 118,989 | 78,449 | 120,824 | 92,495 | 1,059,249 |
| 2019 | 54,573 | 67,967 | 78,471 | 64,044 | 80,933 | 73,158 | 62,181 | 65,754 | 127,634 | 62,930 | 97,658 | 66,012 | 901,315 |

### FY Comparison by Drug Type and Drug Seizure Weight (lbs)

Select drug type below or FY to filter:                          Multiple values

| Drug Type | FY | Value |
|---|---|---|
| Marijuana | 2021 | 319,447 |
| | 2022 (FYTD) | 26,602 |
| Methamphetamine | 2021 | 190,861 |
| | 2022 (FYTD) | 58,316 |
| Cocaine | 2021 | 97,638 |
| | 2022 (FYTD) | 9,690 |
| Fentanyl | 2021 | 11,201 |
| | 2022 (FYTD) | 2,158 |
| Heroin | 2021 | 5,400 |
| | 2022 (FYTD) | 277 |
| Khat (Catha Edulis) | 2021 | 202,820 |
| | 2022 (FYTD) | 38,214 |
| Ketamine | 2021 | 10,848 |
| | 2022 (FYTD) | 6,556 |
| Ecstasy | 2021 | 1,201 |
| | 2022 (FYTD) | 204 |
| LSD | 2021 | 38 |
| | 2022 (FYTD) | 3 |
| Other Drugs* | 2021 | 73,872 |
| | 2022 (FYTD) | 10,446 |

**Source:** USBP and OFO Official year end reporting for FY19-FY21. USBP and OFO month end reporting for FY22 to date. Data is current as of 12/3/2021.
**Note:** The Methamphetamine drug type includes both Methamphetamine and Crystal Methamphetamine.
*Other Drugs category for OFO includes but is not limited to: Amphetamine, Ephedrine, Hashish, Marijuana Plants, Opium, Oxycodone (Oxycontin), Precursor Chemicals, Prescription, Chemical, & Other Uncategotized Drugs. For a full list please contact CBP Media Relations.
*Other Drugs category for USBP incules: All drugs seized by USBP except Cocaine, Fentanyl, Heroin, Marijuana, Methamphetamine, and Ecstasy

**AR00696**



**U.S. Department of Homeland Security**
Washington, DC 20528

June 12, 2019

MEMORANDUM FOR:    David P. Pekoske
                               Senior Official Performing the Duties of the Deputy Secretary

FROM:                   Kevin K. McAleenan
                               Acting Secretary

SUBJECT:            Review of Migrant Protection Protocols Policy and Implementation

---

As Acting Secretary, it is my priority that our enforcement of the law is done with integrity, transparency, and respect for all people we encounter.  In light of the ongoing humanitarian and border security crisis along the Southwest Border, we are employing all of the legal tools provided by Congress, including the provision of the Immigration and Nationality Act that provides that migrants who are inadmissible to the United States may remain in Mexico during the pendency of their removal proceedings.  The Department has carefully crafted a policy regime to lawfully implement what we have called the Migrant Protection Protocols, and has done so to protect those involved from harm as well as provide for due process under the law.  As we move forward with the expansion of MPP, I request that you form a committee of senior leaders in the Department to do a top-down review of MPP's policies and implementation strategy, and provide overall recommendations to increase the effectiveness of the program.

I ask you to chair the committee and include senior leaders from the Office of Management, the Office of Civil Rights and Civil Liberties, the Office of General Counsel, the Privacy Office, the Judge Advocate General and Chief Counsel Office, U.S. Coast Guard, and any other senior leader that you deem appropriate.  While some of these entities were involved with the planning and implementation of MPP, committee members should have had little to no involvement developing policy or with implementing MPP to date.

In order to ensure a thorough review, the committee is advised to conduct interviews with subject matter experts from the Office of Strategy, Policy, and Plans, and employees from DHS operational components with first-hand knowledge and experience of the program's implementation.  Headquarters and operational components are directed to fully comply with the committee's requests for interviews and supporting documents.  John Gountanis will act as Headquarters' liaison and will provide support to the committee as needed.

Given the urgency of this matter, I look forward to reviewing the committee's summary of findings and recommendations for improvement within 30 days of the committee's formation and initial meeting.  Thank you in advance for your work on this review and associated recommendations for improvement.



**U.S. Department of Homeland Security**
Washington, DC 20528

November 8, 2019

MEMORANDUM FOR:    Acting Commissioner
    U.S. Customs and Border Protection

    Acting Director
    U.S. Immigration and Customs Enforcement

    Acting Director
    U.S. Citizenship and Immigration Services

FROM:    Kevin K. McAleenan
    Acting Secretary

SUBJECT:    Review of Migrant Protection Protocols Policy and
    Implementation - Final Recommendations

As Acting Secretary, it is my priority that our enforcement of the law is done with integrity, transparency, and respect for all people we encounter.  With this in mind, earlier this year I directed the Acting Deputy Secretary to form a committee of senior leaders in the Department to conduct a top-down review of MPP's policies and implementation strategy, and provide overall recommendations to increase the effectiveness of the program.  It is critical to the success of this program that we periodically review our policies and procedures.

The Acting Deputy Secretary convened a group of dedicated officials who did not have involvement in the implementation of MPP.  These officials reviewed relevant policy and implementation documentation, conducted multiple interviews, and participated in site visits at various locations where MPP is implemented. The committee produced a number of thoughtful recommendations that highlighted areas where the program may become more effective and efficient, while maintaining the integrity of the program and safeguarding the rights of aliens who are in removal proceedings. I am grateful to the committee for their efforts.

I find that these detailed recommendations fall into three categories:

1. Screening, Processing, and Assessing the Amenability of Aliens for MPP;
2. Facilitating Access to Counsel and Safeguards Throughout the MPP Process; and
3. Fear Screenings, Information Sharing, and Measuring Success of the Program.[1]

---

[1] For those recommendations that fall outside the purview of the Department and are within the jurisdiction of our inter-agency partners, I direct the Acting Deputy Secretary to forward those recommendations to our partners for consideration and action.

Within 30 days of the date of this memorandum, I direct your Components to deliver one unified action plan outlining how the Department will enhance the implementation of MPP in accordance with these recommendations.  Within 90 days, I direct the completion of action items contained within that plan.

Attachment

AR00699

## Assessment of the Migrant Protection Protocols (MPP)
## October 28, 2019

### I.   Overview and Legal Basis

The Department of Homeland Security (DHS) remains committed to using all available tools to address the unprecedented security and humanitarian crisis at the southern border of the United States.

- At peak of the crisis in May 2019, there were more than 4,800 aliens crossing the border daily—representing an average of more than *three apprehensions per minute*.

- The law provides for mandatory detention of aliens who unlawfully enter the United States between ports of entry if they are placed in expedited removal proceedings. However, resource constraints during the crisis, as well as other court-ordered limitations on the ability to detain individuals, made many releases inevitable, particularly for aliens who were processed as members of family units.

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) authorizes the Department of Homeland Security to return certain applicants for admission to the contiguous country from which they are arriving on land (whether or not at a designated port of entry), pending removal proceedings under INA § 240.

- Consistent with this express statutory authority, DHS began implementing the Migrant Protection Protocols (MPP) and returning aliens subject to INA § 235(b)(2)(C) to Mexico, in January 2019.

- Under MPP, certain aliens who are nationals and citizens of countries other than Mexico (third-country nationals) arriving in the United States by land from Mexico who are not admissible may be returned to Mexico for the duration of their immigration proceedings.

The U.S. government initiated MPP pursuant to U.S. law, but has implemented and expanded the program through ongoing discussions, and in close coordination, with the Government of Mexico (GOM).

- MPP is a core component of U.S. foreign relations and bilateral cooperation with GOM to address the migration crisis across the shared U.S.-Mexico border.

- MPP expansion was among the key "meaningful and unprecedented steps" undertaken by GOM "to help curb the flow of illegal immigration to the U.S. border since the launch of the U.S.-Mexico Declaration in Washington on June 7, 2019."[1]

---

[1] https://www.whitehouse.gov/briefings-statements/readout-vice-president-mike-pences-meeting-mexican-foreign-secretary-marcelo-ebrard/

AR00700

- On September 10, 2019, Vice President Pence and Foreign Minister Ebrard "agree[d] to implement the Migrant Protection Protocols to the fullest extent possible."[2]

- Therefore, disruption of MPP would adversely impact U.S. foreign relations—along with the U.S. government's ability to effectively address the border security and humanitarian crisis that constitutes an ongoing national emergency.[3]

## II.    MPP Has Demonstrated Operational Effectiveness

In the past nine months—following a phased implementation, and in close coordination with GOM—DHS has returned more than 55,000 aliens to Mexico under MPP. MPP has been an indispensable tool in addressing the ongoing crisis at the southern border and restoring integrity to the immigration system.

### *Apprehensions of Illegal Aliens are Decreasing*

- Since a recent peak of more than 144,000 in May 2019, total enforcement actions—representing the number of aliens apprehended between points of entry or found inadmissible at ports of entry—have decreased by 64%, through September 2019.

- Border encounters with Central American families—who were the main driver of the crisis and comprise a majority of MPP-amenable aliens—have decreased by approximately 80%.

- Although MPP is one among many tools that DHS has employed in response to the border crisis, DHS has observed a connection between MPP implementation and decreasing enforcement actions at the border—including a rapid and substantial decline in apprehensions in those areas where the most amenable aliens have been processed and returned to Mexico pursuant to MPP.

### *MPP is Restoring Integrity to the System*

- Individuals returned to Mexico pursuant to MPP are now at various stages of their immigration proceedings: some are awaiting their first hearing; some have completed their first hearing and are awaiting their individual hearing; some have received an order of removal from an immigration judge and are now pursuing an appeal; some have established a fear of return to Mexico and are awaiting their proceedings in the United States; some have been removed to their home countries; and some have withdrawn claims and elected to voluntarily return to their home countries.

---

[2] https://www.whitehouse.gov/briefings-statements/readout-vice-president-mike-pences-meeting-mexican-foreign-secretary-marcelo-ebrard/
[3] https://www.whitehouse.gov/presidential-actions/presidential-proclamation-declaring-national-emergency-concerning-southern-border-united-states/

AR00701

- MPP returnees with meritorious claims can be granted relief or protection within months, rather than remaining in limbo for years while awaiting immigration court proceedings in the United States.

  o The United States committed to GOM to minimize the time that migrants wait in Mexico for their immigration proceedings.  Specifically, the Department of Justice (DOJ) agreed to treat MPP cases such as detained cases such that they are prioritized according to longstanding guidance for such cases.

  o The first three locations for MPP implementation—San Diego, Calexico, and El Paso—were chosen because of their close proximity to existing immigration courts.

  o After the June 7, 2019, Joint Declaration between GOM and the United States providing for expansion of MPP through bilateral cooperation, DHS erected temporary, dedicated MPP hearing locations at ports of entry in Laredo and Brownsville, in coordination with DOJ, at a total six-month construction and operation cost of approximately $70 million.

  o Individuals processed in MPP receive initial court hearings within two to four months, and—as of October 21, 2019—almost 13,000 cases had been completed at the immigration court level.

  o A small subset of completed cases have resulted in grants of relief or protection, demonstrating that MPP returnees with meritorious claims can receive asylum, or any relief or protection for which they are eligible, more quickly via MPP than under available alternatives.

  o Individuals not processed under MPP generally must wait years for adjudication of their claims.  There are approximately one million pending cases in DOJ immigration courts.  Assuming the immigration courts received no new cases and completed existing cases at a pace of 30,000 per month—it would take several years, until approximately the end of 2022, to clear the existing backlog.

- MPP returnees who do not qualify for relief or protection are being quickly removed from the United States.  Moreover, aliens without meritorious claims—which no longer constitute a free ticket into the United States—are beginning to voluntarily return home.

  o According to CBP estimates, approximately 20,000 people are sheltered in northern Mexico, near the U.S. border, awaiting entry to the United States.  This number— along with the growing participation in an Assisted Voluntary Return (AVR) program operated by the International Organization for Migration (IOM), as described in more detail below—suggests that a significant proportion of the 55,000+ MPP returnees have chosen to abandon their claims.

3

AR00702

### III.   Both Governments Endeavor to Provide Safety and Security for Migrants

- The Government of Mexico (GOM) has publicly committed to protecting migrants.

  o A December 20, 2018, GOM statement indicated that "Mexico will guarantee that foreigners who have received their notice fully enjoy the rights and freedoms recognized in the Constitution, in the international treaties to which the Mexican State is a party, as well as in the current Migration Law.  They will be entitled to equal treatment without any discrimination and due respect to their human rights, as well as the opportunity to apply for a work permit in exchange for remuneration, which will allow them to meet their basic needs."

    ▪ Consistent with its commitments, GOM has accepted the return of aliens amenable to MPP.  DHS understands that MPP returnees in Mexico are provided access to humanitarian care and assistance, food and housing, work permits, and education.

    ▪ GOM has launched an unprecedented enforcement effort bringing to justice transnational criminal organizations (TCOs) who prey on migrants transiting through Mexico—enhancing the safety of all individuals, including MPP-amenable aliens.

  o As a G-20 country with many of its 32 states enjoying low unemployment and crime, Mexico's commitment should be taken in good faith by the United States and other stakeholders.  Should GOM identify any requests for additional assistance, the United States is prepared to assist.

- Furthermore, the U.S. government is partnering with international organizations offering services to migrants in cities near Mexico's northern border.

  o In September 2019, the U.S. Department of State Bureau of Population, Refugees, and Migration (PRM) funded a $5.5 million project by IOM to provide shelter in cities along Mexico's northern border to approximately 8,000 vulnerable third-country asylum seekers, victims of trafficking, and victims of violent crime in cities along Mexico's northern border.

  o In late September 2019, PRM provided $11.9 million to IOM to provide cash-based assistance for migrants seeking to move out of shelters and into more sustainable living.

- The U.S. Government is also supporting options for those individuals who wish to voluntarily withdraw their claims and receive free transportation home.  Since November 2018, IOM has operated its AVR program from hubs within Mexico and Guatemala, including Tijuana and Ciudad Juarez.  PRM has provided $5 million to IOM to expand that program to Matamoros and Nuevo Laredo and expand operations in other Mexican

AR00703

northern border cities.  As of mid-October, almost 900 aliens in MPP have participated in the AVR program.

- The United States' ongoing engagement with Mexico is part of a larger framework of regional collaboration.  Just as United Nations High Commissioner for Refugees has called for international cooperation to face the serious challenges in responding to large-scale movement of migrants and asylum-seekers travelling by dangerous and irregular means, the U.S. Government has worked with Guatemala, El Salvador, and Honduras to form partnerships on asylum cooperation (which includes capacity-building assistance), training and capacity building for border security operations, biometrics data sharing and increasing access to H-2A and H-2B visas for lawful access to the United States.


**IV.  Screening Protocols Appropriately Assess Fear of Persecution or Torture**

- When a third-country alien states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, the alien is referred to U.S. Citizenship & Immigration Services (USCIS).  Upon referral, USCIS conducts an MPP fear-assessment interview to determine whether it is more likely than not that the alien will be subject to torture or persecution on account of a protected ground if returned to Mexico.

  - MPP fear assessments are conducted consistent with U.S. law implementing the *non-refoulement* obligations imposed on the United States by certain international agreements and inform whether an alien is processed under—or remains—in MPP.

  - As used here, "persecution" and "torture" have specific international and domestic legal meanings distinct from fear for personal safety.

- Fear screenings are a well-established part of MPP.  As of October 15, 2019, USCIS completed over 7,400 screenings to assess a fear of return to Mexico.

  - That number included individuals who express a fear upon initial encounter, as well as those who express a fear of return to Mexico at any subsequent point in their immigration proceedings, including some individuals who have made multiple claims.

  - Of those, approximately 13% have received positive determinations and 86% have received negative determinations.

  - Thus, the vast majority of those third-country aliens who express fear of return to Mexico are not found to be more likely than not to be tortured or persecuted on account of a protected ground there.  This result is unsurprising, not least because aliens amenable to MPP voluntarily entered Mexico en route to the United States.

AR00704

### V.    Summary and Conclusion

In recent years, only about 15% of Central American nationals making asylum claims have been granted relief or protection by an immigration judge.  Similarly, affirmative asylum grant rates for nationals of Guatemala, El Salvador, and Honduras were approximately 21% in Fiscal Year 2019.  At the same time, there are—as noted above—over one million pending cases in DOJ immigration courts, in addition to several hundred thousand asylum cases pending with USCIS.

These unprecedented backlogs have strained DHS resources and challenged its ability to effectively execute the laws passed by Congress and deliver appropriate immigration consequences: those with meritorious claims can wait years for protection or relief, and those with non-meritorious claims often remain in the country for lengthy periods of time.

This broken system has created perverse incentives, with damaging and far-reaching consequences for both the United States and its regional partners.  In Fiscal Year 2019, certain regions in Guatemala and Honduras saw 2.5% of their population migrate to the United States, which is an unsustainable loss for these countries.

MPP is one among several tools DHS has employed effectively to reduce the incentive for aliens to assert claims for relief or protection, many of which may be meritless, as a means to enter the United States to live and work during the pendency of multi-year immigration proceedings. Even more importantly, MPP also provides an opportunity for those entitled to relief to obtain it within a matter of months.  MPP, therefore, is a cornerstone of DHS's ongoing efforts to restore integrity to the immigration system—and of the United States' agreement with Mexico to address the crisis at our shared border.

AR00705

**Appendix A: Additional Analysis of MPP Fear-Assessment Protocol**

U.S. Citizenship and Immigration Services (USCIS) strongly believes that if DHS were to change its fear-assessment protocol to affirmatively ask an alien amenable to MPP whether he or she fears return to Mexico, the number of fraudulent or meritless fear claims will significantly increase.  This prediction is, in large part, informed by USCIS's experience conducting credible fear screenings for aliens subject to expedited removal.  Credible fear screenings occur when an alien is placed into expedited removal under section 235(b)(1) of the Immigration and Nationality Act – a streamlined removal mechanism enacted by Congress to allow for prompt removal of aliens who lack valid entry documents or who attempt to enter the United States by fraud – and the alien expresses a fear of return to his or her home country or requests asylum.  Under current expedited removal protocol, the examining immigration officer – generally U.S. Customs and Border Protection officers at a port of entry or Border Patrol agents – read four questions, included on Form I-867B, to affirmatively ask each alien subject to expedited removal whether the alien has a fear of return to his or her country of origin.[4]

The percentage of aliens subject to expedited removal who claimed a fear of return or requested asylum was once quite modest. However, over time, seeking asylum has become nearly a default tactic used by undocumented aliens to secure their release into the United States.  For example, in 2006, of the 104,440 aliens subjected to expedited removal, only 5% (5,338 aliens) were referred for a credible fear interview with USCIS.  In contrast, 234,591 aliens were subjected to expedited removal in 2018, but 42% (or 99,035) were referred to USCIS for a credible fear interview, significantly straining USCIS resources.

Table A1: Aliens Subject to Expedited Removal and Share Making Fear Claims, FY 2006 - 2018

| Fiscal Year | Subjected to Expedited Removal | Referred for a Credible Fear Interview | Percentage Referred for Credible Fear |
|---|---|---|---|
| 2006 | 104,440 | 5,338 | 5% |
| 2007 | 100,992 | 5,252 | 5% |
| 2008 | 117,624 | 4,995 | 4% |
| 2009 | 111,589 | 5,369 | 5% |
| 2010 | 119,876 | 8,959 | 7% |
| 2011 | 137,134 | 11,217 | 8% |
| 2012 | 188,187 | 13,880 | 7% |
| 2013 | 241,442 | 36,035 | 15% |
| 2014 | 240,908 | 51,001 | 21% |
| 2015 | 192,120 | 48,052 | 25% |
| 2016 | 243,494 | 94,048 | 39% |
| 2017 | 178,129 | 78,564 | 44% |
| 2018 | 234,591 | 99,035 | 42% |

---

[4] *See* 8 C.F.R. § 235.3(b)(2).

AR00706

Transitioning to an affirmative fear questioning model for MPP-amenable aliens would likely result in a similar increase.  Once it becomes known that answering "yes" to a question can prevent prompt return to Mexico under MPP, DHS would experience a rise in fear claims similar to the expedited removal/credible fear process.  And, affirmatively drawing out this information from aliens rather than reasonably expecting them to come forward on their own initiative could well increase the meritless fear claims made by MPP-amenable aliens.

It also bears emphasis that relatively small proportions of aliens who make fear claims ultimately are granted asylum or another form of relief from removal. Table A2 describes asylum outcomes for aliens apprehended or found inadmissible on the Southwest Border in fiscal years 2013 – 2018.  Of the 416 thousand aliens making fear claims during that six-year period, 311 thousand (75 percent) had positive fear determinations, but only 21 thousand (7 percent of positive fear determinations) had been granted asylum or another form of relief from removal as of March 31, 2019, versus 72 thousand (23 percent) who had been ordered removed or agreed to voluntary departure. (Notably, about 70 percent of aliens with positive fear determinations in FY 2013 – 2018 remained in EOIR proceedings as of March 31, 2019.)

Table A2: Asylum Outcomes, Southwest Border Encounters, FY 2013 – 2018

| Year of Encounter | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|
| Total Encounters | 490,093 | 570,832 | 446,060 | 560,432 | 416,645 | 522,626 | 3,006,688 |
| Subjected to ER | 225,426 | 222,782 | 180,328 | 227,382 | 160,577 | 214,610 | 1,231,105 |
| Fear Claims[1] | 39,648 | 54,850 | 50,588 | 98,265 | 72,026 | 100,756 | 416,133 |
| Positive Fear Determinations[2] | 31,462 | 36,615 | 35,403 | 76,005 | 55,251 | 75,856 | 310,592 |
| Asylum Granted or Other Relief[3] | 3,687 | 4,192 | 3,956 | 4,775 | 2,377 | 2,168 | 21,155 |
| | *11.7%* | *11.4%* | *11.2%* | *6.3%* | *4.3%* | *2.9%* | *6.8%* |
| Removal Orders[4] | 9,980 | 11,064 | 9,466 | 17,700 | 12,130 | 11,673 | 72,013 |
| | *31.7%* | *30.2%* | *26.7%* | *23.3%* | *22.0%* | *15.4%* | *23.2%* |
| Asylum Cases Pending | 17,554 | 21,104 | 21,737 | 53,023 | 40,586 | 61,918 | 215,922 |
| | *55.8%* | *57.6%* | *61.4%* | *69.8%* | *73.5%* | *81.6%* | *69.5%* |
| Other | 241 | 255 | 244 | 507 | 158 | 97 | 1,502 |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.
Notes for Table A2: Asylum outcomes are current as of March 31, 2019.
[1] Fear claims include credible fear cases completed by USCIS as well as individuals who claimed fear at the time of apprehension but who have no record of a USCIS fear determination, possibly because they withdrew their claim.
[2] Positive fear determinations include positive determinations by USCIS as well as negative USCIS determinations vacated by EOIR.
[3] Asylum granted or other relief includes withholding of removal, protection under the Convention Against Torture, Special Immigrant Juvenile status, cancelation of removal, and other permanent status conferred by EOIR.
[4] Removal orders include completed repatriations and unexecuted orders of removal and grants of voluntary departure.

AR00707

Implementing MPP assessments currently imposes a significant resource burden to DHS. As of October 15, 2019, approximately 10% of individuals placed in MPP have asserted a fear of return to Mexico and have been referred to an asylum officer for a MPP fear assessment. The USCIS Asylum Division assigns on average approximately 27 asylum officers per day to handle this caseload nationwide. In addition, the Asylum Division must regularly expend overtime resources after work hours and on weekends to keep pace with the same-day/next-day processing requirements under MPP. This workload diverts resources from USCIS's affirmative asylum caseload, which currently is experiencing mounting backlogs.

Most importantly, DHS does not believe amending the process to affirmatively ask whether an alien has a fear of return to Mexico is necessary in order to properly identify aliens with legitimate fear claims in Mexico because under DHS's current procedures, aliens subject to MPP **may raise a fear claim to DHS at any point in the MPP process**. Aliens are not precluded from receiving a MPP fear assessment from an asylum officer if they do not do so initially upon apprehension or inspection, and many do. As of October 15, 2019[5], approximately 4,680 aliens subject to MPP asserted a fear claim and received an MPP fear-assessment **after** their initial encounter or apprehension by DHS, with 14% found to have a positive fear of return to Mexico. Additionally, Asylum Division records indicate as of October 15, 2019[6], approximately 618 aliens placed into MPP have asserted **multiple** fear claims during the MPP process (from the point of placement into MPP at the initial encounter or apprehension) and have therefore received multiple fear assessments to confirm whether circumstances have changed such that the alien should not be returned to Mexico. Of these aliens, 14% were found to have a positive fear of return to Mexico.

Additionally, asylum officers conduct MPP fear assessments with many of the same safeguards provided to aliens in the expedited removal/credible fear context. For example, DHS officers conduct MPP assessment interviews in a non-adversarial manner, separate and apart from the general public, with the assistance of language interpreters when needed.[7]

In conducting MPP assessments, asylum officers apply a "more likely than not" standard, which is a familiar standard. "More likely than not" is equivalent to the "clear probability" standard for statutory withholding and not unique to MPP. Asylum officers utilize the same standard in the reasonable fear screening process when claims for statutory withholding of removal and protection under the Convention Against Torture (CAT).[8] The risk of harm standard for withholding (or deferral) of removal under the Convention Against Torture (CAT) implementing regulations is the same, i.e., "more likely than not."[9] In addition to being utilized by asylum

---

[5] USCIS began tracking this information on July 3, 2019.

[6] USCIS began tracking this information on July 3, 2019.

[7] USCIS Policy Memorandum PM-602-0169, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*, 2019 WL 365514 (Jan. 28, 2019).

[8] See INA § 241(b)(3); 8 C.F.R. § 1208.16(b)(2) (same); See 8 C.F.R. § 1208.16(c)(2).

[9] *See* 8 C.F.R. § 1208.16(c)(2); Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8480 (Feb. 19, 1999) (detailing incorporation of the "more likely than not" standard into U.S. CAT ratification history); *see also Matter of J-F-F-*, 23 I&N Dec. 912 (BIA 2006).

AR00708

officers in other protection contexts, the "more likely than not" standard satisfies the U.S. government's *non-refoulement* obligations.

AR00709

 REUTERS   **World**   **Business**   **Markets**   **Breakingviews**   **Video**   **More** 

EMERGING MARKETS

OCTOBER 16, 2019 / 7:06 AM / UPDATED 2 YEARS AGO

# Asylum seekers cling to hope, safety in camp at U.S.-Mexico border

By Delphine Schrank



MATAMOROS, Mexico (Reuters) - Even after he was kidnapped and robbed outside the makeshift migrant camp where he had slept for two weeks, Luis Osorto decided his only chance for eventual asylum in the United States was to stay put along the border just inside Mexico.

Case 2:21-cv-00067-Z   Document 162-1   Filed 09/02/22   Page 329 of 350   PageID 4922

Central American migrants are seen in an encampment in Matamoros, Mexico, at the end of the Gateway
International Bridge, where migrants sent back under the "Remain in Mexico" program, officially called the
Migrant Protection Protocols (MPP), await their U.S. asylum hearings, September 14, 2019. Picture taken
September 14, 2019. REUTERS/Henry Romero

But the 37-year-old Honduran made a pact with himself: not to leave the enclave of tents at the
end of a bridge between Matamoros and Brownsville, Texas - not even to buy a bottle of water
or to collect money transfers from his family back home.

The cramped camp, in a partly fenced-in plaza abutting administrative buildings just feet from
the Rio Grande, is home to approximately 1,000 migrants, many of them sent back to Mexico
to await U.S. immigration hearings under a policy called the Migrant Protection Protocols
(MPP) begun this year.

After what is commonly known as an "express kidnapping" last month by men waiting in a van
for him outside a convenience store where he was collecting a $100 transfer from relatives,
Osorto promised himself he would only leave the camp to cross the bridge to Texas for his
December court date with U.S. immigration authorities.

"I just wait here and trust someone else ... to get me 70 pesos ($3.50) or so when I need it," he
said.

MPP, sometimes called Remain in Mexico, is among various overlapping U.S. policies aimed at
severely reducing asylum claims.

President Donald Trump, whose hardline stance on immigration was a mainstay of his 2016
campaign, has said lax U.S. asylum laws encourage people to show up at the border with their
children.

Before MPP, it was common practice to release arriving families into the United States to wait
out their U.S. court hearings – something Trump and others said allowed many migrants to
disappear into the country to live illegally. Studies by legal aid groups, such as the Urban
Justice Center, have shown that most asylum seekers show up for their hearings, however.

**AR00711**

Case 2:21-cv-00067-Z   Document 162-1   Filed 09/02/22   Page 330 of 350   PageID 4923

More than 51,000 people, mainly from Central America, have been sent to Mexico since the MPP program started in January, according to U.S. Customs and Border Protection.

But reports of kidnapping and extortion have increased since the program was expanded to Matamoros and nearby Nuevo Laredo in crime-wracked Tamaulipas state.

Human Rights First, a U.S.-based rights group, in August documented 110 publicly reported cases of rape, kidnapping, sexual exploitation and other violence against MPP returnees.

In Matamoros, violence and abuse targeting migrants means many in the MPP program refuse to move to a shelter in the city during their long waits for a U.S. court hearing.

Since July, Matamoros has received more than 12,000 asylum seekers under MPP, said Enrique Maciel, of the Tamaulipas Institute for Migrants, a state agency.

Matamoros Mayor Mario Lopez described the city as calmer than neighboring towns, because of a truce between two rival drug cartels. Elsewhere in the state, gangs regularly fight pitched battles for turf.

Reuters spoke to six asylum seekers at Osorto's camp who said they had been kidnapped or extorted, and several more who had brushes with suspected criminals near the border or elsewhere within Mexico.

Oscar Ramirez, a 30-year-old Honduran waiting for a U.S. court date on Dec. 2, said three Mexican men surrounded him around midnight last month, and began interrogating him on his plans and his paperwork, he said.

"I was terrified," said Ramirez, who said he ran away from the men when a crowd of people arrived. "The rumors circulating are that at any moment unknown people will kidnap you."

Reuters was unable to independently corroborate the migrants' stories. Osorto said he did not report the attack on him to police.

**AR00712**

Slideshow（7 images）

Kristin Clarens, a U.S. attorney who advises asylum-seekers at the border, said she had come across five cases of migrants in Matamoros awaiting MPP hearings who were kidnapped briefly. They were taken to an ATM to clear out their accounts or forced to phone relatives to send cash transfers to a nearby convenience store.

A spokesman for Mexico's National Institute for Migration said it had no data on such complaints. Mexico's national rights ombudsman said it was checking for data.

The Tamaulipas state Attorney General's Office and the federal Attorney General's Office declined to comment. The U.S. Department of Homeland Security did not respond to requests for comment about the dangers in Tamaulipas.

**AR00713**

Case 2:21-cv-00067-Z   Document 162-1   Filed 09/02/22   Page 332 of 350   PageID 4925

## TOO AFRAID TO GO TO SHELTER

In Osorto's camp, asylum seekers use water from the Rio Grande to wash, despite outbreaks of rashes. Women pay a small fee to use a nearby toilet. For food, tents, and the occasional yoga mat to lie on they depend on volunteers from across the border.

At night, couples take turns keeping watch over their children, fearful criminals will snatch them if they both sleep.

Early last month, a Honduran mother and daughter seeking asylum drowned in the river near the camp, in what the Honduran foreign ministry said was an act of desperation after three month's wait in Mexico.

Glady Canas, director of Matamoros-based migrant-aid nonprofit Helping Them to Triumph, said she has tried in vain to convince families to move into the city's lone migrant shelter and its neat dormitories.

"ATTACKING OUR MINDS"

A U.S. Supreme Court decision last month allowed the Trump administration to reject asylum for anyone who passed through a third country, such as Mexico, and did not apply for asylum there.

Trump had earlier threatened to impose tariffs on Mexico unless it stopped more migrants, and the U.S. neighbor has since used its military police to contain migration northward.

Clarens, the U.S. attorney, said Trump's policies were effectively blocking most routes to asylum.

"It's like a complicated chess game and this is like checkmate," she said.

**AR00714**

Case 2:21-cv-00067-Z   Document 162-1   Filed 09/02/22   Page 333 of 350   PageID 4926

In the Matamoros camp, asylum-seekers fret on a shared What's App group, or aloud, while trying to discern U.S. policy means for them.

"They are attacking our minds," 27-year-old Oscar Borjas, said of shifting U.S. policy, shuffling a deck of cards late one night in an alleyway between tents.

Osorto, who fled violence in San Pedro Sula, Honduras, said fear and a feeling of being powerless were inescapable.

"We don't go downtown because they say it's more dangerous," he said. But wincing as he glanced out over the tents, he added: "There's nothing to do here."

Reporting by Delphine Schrank; Editing by Daniel Flynn and Tom Brown

*Our Standards: <u>The Thomson Reuters Trust Principles.</u>*

---

Apps        Newsletters        Advertise with Us        Advertising Guidelines        Cookies        Terms of Use        Privacy

Do Not Sell My Personal Information



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2022 Reuters. All Rights Reserved.

AR00715

**The Washington Post** *Democracy Dies in Darkness*

# They missed their U.S. court dates because they were kidnapped. Now they're blocked from applying for asylum.

By  Kevin Sieff

April 24, 2021 at 12:16 p.m. EDT

MATAMOROS, Mexico — Carolina had memorized the date, but she triple-checked her documents just to make sure. For months, her life had revolved around the court hearing at which she could finally make her asylum claim.

Like tens of thousands of asylum seekers who reached the U.S. border during the Trump administration, the 36-year-old from Honduras had been sent to wait in Mexico for her immigration hearing. She was told to return to the border on her court date.

So on Feb. 26, 2020, she woke up early and put on her best blouse. She said a short prayer. But not long after her bus left for Laredo, Tex., gunmen stopped the vehicle. They kidnapped Carolina and her 15-year-old daughter, took them to a stash house packed with other kidnapped migrants and demanded thousands of dollars in ransom.

By the time they were released a few days later, Carolina had missed her day in court.

Her asylum case, it turned out, had been closed in absentia because she hadn't shown up. Of the 68,000 asylum cases processed under the Trump-era Migrant Protection Protocols, the policy also know as "Remain in Mexico," 28,000 were closed for the same reason: Because asylum seekers didn't present themselves.

Many missed their court dates because they were kidnapped and held hostage, or detained by Mexican officials, or because they couldn't find a safe way to get to the border in the middle of the night, when most were told to arrive for their hearings, according to lawyers, advocates and the migrants themselves. Some had medical emergencies related to the conditions in which they waited. An untold number, their asylum cases now closed, remain in hiding in northern Mexico.

The Biden administration ended MPP in February and is now bringing those whose cases remain active into the United States. But unwinding the policy has proved complicated.

Attorneys and advocates are asking the administration to reopen MPP cases that were closed in absentia and give asylum seekers a chance to continue their applications.

"This program returned tens of thousands of asylum seekers into harm's way and as a result many never got their day in court," said Cindy Woods, the managing attorney of PASA Project. "The Biden administration announced it would end MPP, but efforts to remedy the damages it caused have only just scratched the surface."

But while officials contend with the growing number of children and families arriving at the border, it's unclear how likely the White House is to revisit individual cases derailed under a Trump-era policy.

"The system to process individuals with active MPP cases is the first phase of a program to restore safe and orderly processing at the Southwest border," said Sarah Peck, a spokeswoman for the Department of Homeland Security. "The U.S. is currently prioritizing individuals with active MPP cases, generally based on their MPP enrollment date, while also considering prioritized access for certain highly vulnerable individuals. At this time, we do not have any new announcements regarding populations who do not have active MPP cases, and the border remains closed."

Carolina, who like others in this article spoke on the condition that her last name be withheld out of security concerns, arrived at the border in September 2019. She and her daughter have been waiting in northern Mexico for more than a year and a half; they seldom leave their rented apartment.

They've watched as friends and acquaintances who were also processed under MPP are brought into the United States, but their own fate is unclear. When a U.S. court closes an asylum case in absentia, it issues a removal order that bans the migrant from seeking U.S. immigration relief for 10 years.

"It's hard to think because I was kidnapped on my way to my court hearing, I missed my only chance to make an asylum case," Carolina said.

MPP was started by the Trump administration on Jan. 25, 2019, and ended by the Biden administration on Feb. 11 of this year. During that period, the New York-based advocacy group Human Rights First says, it documented "at least 1,314 public reports of violent attacks against people subjected to MPP."

Biden himself called the policy "inhumane." Since February, his administration has brought 7,853 migrants whose MPP cases remain open into the United States and enlisted the help of the United Nations to process them. About 25,000 MPP cases remain open.

But there are more migrants whose MPP cases were closed in absentia — 28,000 — than those with active MPP cases. Some migrant families include members with open asylum cases who are permitted to enter to the United States and members whose cases were closed in absentia.

Beatriz, a 37-year-old mother of three who fled threats of violence in El Salvador, brought her children to the border in the hope of gaining asylum in the United States. Her son, Luis, 17, was kidnapped in northern Mexico in early 2020. Beatriz attended her court date with her other children. She told the judge that her son had gone missing and that she had filed a missing person's report. But Luis's case was closed, even as Beatriz's remained open.

Luis has since been released. Now the family wonders if they'll be able to cross the border together.

"I don't want us to be separated," Beatriz said. "It would be terrible."

Some of the asylum seekers processed under MPP decided to return to their countries of origin rather than waiting in northern Mexico. Others crossed the border illegally and are now living in the United States as undocumented immigrants. Because their asylum cases were closed, they have no clear path to legal status.

Many asylum seekers remain unaware that because they missed their court dates, their cases have been closed. Because many have no fixed address in Mexico, U.S. authorities did not mail their removal orders. Immigration decisions are available online, but many asylum seekers do not know how to access them.

Some migrants have returned to the border to ask immigration officials about their cases, but have been given little clarity.

Viviana, a Cuban asylum seeker waiting for her hearing in Matamoros, missed her court date because she was in the hospital, where she suffered a second-trimester miscarriage. She was bedridden for two weeks.

When she was released, she said, she went to the border to speak to U.S. Customs and Border Protection agents.

"I told them, 'Listen, this is what happened to me. This is why I missed my court date,' " she said. "And they just said, 'Sorry, there's nothing we can do. We don't have any information.' "

Through an advocacy group, she was able to connect with Haiyun Damon-Feng, the director of the Adelante Pro Bono Project and assistant director of the William H. Gates Public Service Law Program at the University of Washington School of Law.

Damon-Feng informed Viviana that her case had been closed in absentia.

Viviana was allowed into the United States earlier this month. But her case has not been reopened, meaning she is unable to apply for asylum and is subject to deportation.

"It's a huge relief that some people who were issued removal orders under extreme circumstances in MPP have been allowed into the United States, but they still don't have access to asylum," Damon-Feng said.

"MPP deprived people of due process and fundamental fairness," she said. "In order to restore access to asylum in a meaningful way, the Biden administration needs to reopen cases for people ordered removed under MPP and allow them to pursue their claims safely from within the United States."

**Read more:**

In squalid Mexico tent city, asylum seekers are growing so desperate they're sending their children over the border alone

When they filed their asylum claim, they were told to wait in Mexico. There, they say, they were kidnapped.

She told the U.S. immigration agent she was HIV-positive and requested asylum. She was sent back to Mexico, without medication.



AR00720

*BuzzFeed* News

# They Missed Their US Asylum Hearings Fearing The Cartel Would Kill Them. Now They're Stuck In Mexico.

"It's like seeking refuge in Canada and being sent to wait in Afghanistan where you might be killed."

**by Hamed Aleaziz, Adolfo Flores**

Posted on May 18, 2021, 8:17 pm

**View 7 comments**

Tweet          Share          Copy

AR00721



A Salvadoran woman seeking asylum in the United States poses for a portrait in a relative's home behind a page from her court documents in Tijuana, Mexico, on Nov. 5, 2019.

*Gregory Bull / AP*

On the day of her first immigration court hearing, Veronica had two choices: miss her family's chance at getting asylum in the US, or return to the border city where the cartel had threatened to kill them.

Veronica, an asylum-seeker from El Salvador who asked to be identified only by her first name out of fear for her safety, chose to miss her court hearing and stay put in Mexico City. The 24-year-old said she tried calling the court to explain why she and her family couldn't make it, but no one ever picked up. In February 2020, a judge ordered them deported for not showing up.

ADVERTISEMENT

AR00722

"It was a horrifying feeling," Veronica told BuzzFeed News. "I cried a lot because we came here with such high hopes that someone would help us."

Nearly 28,000 immigrants like Veronica and her family were ordered deported without them being present at their last hearing. In addition to conditions being too dangerous to travel to the border, some immigrants missed their hearings because they were kidnapped by cartels, some were denied entry because they were pregnant, and others were too sick. Whatever the reason, it didn't matter and the judges overseeing their cases ordered them deported in absentia.

The Biden administration has started to undo the Migrant Protection Protocols (MPP) policy that sent more than 71,000 immigrants and asylum-seekers to wait in Mexico while a US judge ruled in their case. So far, the administration has mostly only allowed those with open cases to enter the US, leaving those with removal orders like Veronica waiting in Mexico with the hopes that one day it will be her turn.

In recent weeks, Homeland Security officials have agreed that those ordered deported in absentia should have their cases reopened, according to government documents obtained by BuzzFeed News. The move would clear the way for them to be allowed back into the US and pursue their asylum cases, but it's unclear when this next phase of the rollback would be implemented.

ADVERTISEMENT

**AR00723**

Case 2:21-cv-00067-Z   Document 162-1   Filed 09/02/22   Page 342 of 350   PageID 4935

"It's like seeking refuge in Canada and being sent to wait in Afghanistan where you might be killed," Dante, a 26-year-old asylum-seeker from Cuba, told BuzzFeed News. "But if you don't show up to your hearing, you get ordered deported. One way or another, you get screwed."

Dante, who asked to be identified only by his first name fearing retaliation in Mexico and Cuba, and his girlfriend missed their asylum hearing in October 2019, a month after nearly being kidnapped in a Mexican border town. A judge also ordered them deported in absentia.

The process to reopen the cases can be particularly time intensive, and DHS officials have been concerned that forcing government attorneys to file thousands of reopening motions could overwhelm staff.

A DHS spokesperson said the system to process people with active cases is the "first phase" of a program to "restore safe and orderly processing at the Southwest border."

"The US is currently prioritizing individuals with active MPP cases, generally based on their MPP enrollment date, while also considering prioritized access for certain highly vulnerable individuals," the spokesperson said, adding that, at this time, "we do not have any new announcements regarding populations who do not have active MPP cases."

AR00724

"The Biden administration has made it clear that our borders are not open, people should not make the dangerous journey, and individuals and families are subject to border restrictions, including expulsion," the spokesperson said.



Asylum-seekers in the Remain in Mexico policy living inside a makeshift camp in the Mexican city of Matamoros.

*Daniel Becerril / Reuters*

So far, nearly 8,400 immigrants who had been forced to remain in Mexico under MPP have been able to enter the US under a process started by the Biden administration, underline according to an analysis from the Transactional Records Access Clearinghouse (TRAC) at Syracuse University. For the most part, only those with active cases have been able to apply to be allowed into the US, and according to the analysis, as of the end of April, 18,087 people still remained in Mexico with open cases who in theory could register to be allowed into the United States.

AR00725

ADVERTISEMENT

Attorneys and advocates who worked with immigrants in MPP said the Trump administration's policy effectively weaponized geography to make it nearly impossible for people to win their asylum cases. In addition to having little access to attorneys or legal guidance, asylum-seekers were expected to wait months, if not years, in Mexican cities known for the kidnapping, rape, and killing of immigrants.

On Monday night, an asylum-seeker who was forced to wait in Mexico under MPP was fatally shot in Ciudad Juárez just a few days before he was to be allowed into the US by the Biden administration.

Human Rights First has counted at least 1,544 public reports of murder, rape, and other attacks committed against people in MPP. But in only about 2% of cases decided by a judge were immigrants able to get some type of relief like asylum.

The uncertainty of if or when Veronica and her family will be able to pursue their asylum case within the US weighs on her, particularly because of the dangers immigrants face in Mexico. She didn't want to miss her court hearing, Veronica said, but the family also didn't want to risk their lives. Moments after Veronica, her husband, and her then–2-year-old daughter were sent back to the Mexican border city of Nuevo Laredo in November 2019, they were

kidnapped by the local cartel. After days of threats and abuse, they were
released, but warned that if they ever returned to any part of the border, they
would be killed. Their kidnappers had taken photos of them and their personal
information.

Veronica and her family eventually moved from Mexico City to Mexicali,
another border city, with the hopes of getting help from a legal advocacy
organization, but their case is still closed. Now, they're waiting to see if the
Biden administration will reopen cases and allow them into the US.

ADVERTISEMENT

"It's very difficult to live with the fear that the cartel, which has our
information, will grab us again," Veronica said. "My hope is the US will give us a
chance, just like they did with the people who had open cases, because we are
not safe here in Mexico."

**MORE ON THIS**

## A 19-Year-Old Asylum-Seeker Forced To Wait In Mexico Was Killed Days Before He Was Scheduled To Enter The US

Adolfo Flores · May 18, 2021

## He Sent His Two Young Daughters Across The US Border Without Him. Now He And His Wife Are Stuck In Mexico While They Await

AR00727

## Biden's Next Move.

Adolfo Flores · March 19, 2021

## "When The Bus Took Off, We All Cheered": Asylum-Seekers Trump Forced To Wait In Mexico Are Now Arriving In The US

Adolfo Flores · March 6, 2021



Hamed Aleaziz is a reporter for BuzzFeed News and is based in San Francisco.

Contact Hamed Aleaziz at hamed.aleaziz@buzzfeed.com.

Got a confidential tip? Submit it here



Adolfo Flores is a reporter for BuzzFeed News and is based in McAllen, Texas..

Contact Adolfo Flores at adolfo.flores@buzzfeed.com.

## 7 comments

## · Sign in to comment

**Order by:** ⦿ Most Hearts        ◯ Most Recent



**[deleted]**
8 months ago

Show replies (1)



**armandocdll81**
8 months ago

Always be punctual.

♡ 5    Show replies (2)



**moxi8614**
8 months ago

This is so sad to hear. I can't imagine what it feels like to fear for your life for every waking moment. I hope that they get the support and help they need. People's lives are all equally important and it's important to remember that.

AR00728

♡ 1

Load more comments

### FINCEN FILES
## THE INVESTIGATION THAT CHANGED THE BANKING INDUSTRY

**A BuzzFeed News investigation, in partnership with the International Consortium of Investigative Journalists, based on thousands of documents the government didn't want you to see.**

**READ NOW**

AR00729

# Matter of Jonathan Said HERRERA-VASQUEZ, Respondent

*Decided May 8, 2020*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

   The absence of a checked alien classification box on a Notice to Appear (Form I-862) does not, by itself, render the notice to appear fatally deficient or otherwise preclude an Immigration Judge from exercising jurisdiction over removal proceedings, and it is therefore not a basis to terminate the proceedings of an alien who has been returned to Mexico under the Migrant Protection Protocols.  *Matter of J.J. Rodriguez*, 27 I&N Dec. 762 (BIA 2020), followed.

FOR RESPONDENT:  Pro se

FOR THE DEPARTMENT OF HOMELAND SECURITY:  Meggan G. Johnson, Associate Legal Advisor

BEFORE: Board Panel: MANN, Board Member; MORRIS, Temporary Board Member; Concurring Opinion: KELLY, Board Member.

MANN, Board Member:

   In a decision dated May 30, 2019, an Immigration Judge terminated these removal proceedings on the basis that the Notice to Appear (Form I-862) served on the respondent was defective.  The Department of Homeland Security ("DHS") has appealed from that decision.  We requested and received supplemental briefs from the DHS and amici curiae.[1]  There has been no response to our request or the DHS's appeal from the respondent. The appeal will be sustained, the proceedings will be reinstated, and the record will be remanded to the Immigration Judge.

## I.  FACTUAL AND PROCEDURAL HISTORY

   According to the respondent's Record of Deportable/Inadmissible Alien (Form I-213), a United States Customs and Border Patrol agent encountered and arrested him at 2:40 a.m. on April 1, 2019, in San Ysidro, California, at a location approximately a quarter mile north of the United States border with Mexico.  The respondent was transported to the Imperial Beach Border Patrol Station where he "admitted to be a citizen and national of Honduras without

---

[1]   We acknowledge with appreciation the briefs submitted by the DHS and amici.

AR00730

the necessary legal documents to enter, pass through, or remain in the United States." He "also admitted to illegally crossing the United States/Mexico international boundary on or about April 1, 2019, without being inspected by an Immigration Officer at a designated Port of Entry." The respondent conceded that he was a member of a migrant "caravan."

On April 3, 2019, the DHS personally served the respondent with a notice to appear that bears the heading, "In removal proceedings under section 240 of the Immigration and Nationality Act." On the first page of the notice to appear, the DHS alleges that the respondent is not a citizen or national of the United States; that he is a native and citizen of Honduras; that he arrived in the United States at or near San Ysidro, California, on or about April 1, 2019; that he was not then admitted or paroled after inspection by an immigration officer; and that he is an immigrant not in possession of a valid unexpired visa, reentry permit, border crossing card, or other valid entry document required by the Immigration and Nationality Act.

The next section of the notice to appear states, "On the basis of the foregoing, it is charged that you are subject to removal from the United States" under section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(7)(A)(i)(I) (2018), as an alien who, at the time of application for admission, did not possess a valid entry document. The notice to appear contains the respondent's signature, acknowledging that the DHS personally served it on him. It informed him that his removal hearing would be held on May 30, 2019, at 12:30 p.m. in the San Diego Immigration Court and listed his address as a "Domicilio Conocido" ("Known Domicile") in Tijuana, Baja California, Mexico. However, the DHS did not check any of the three alien classification boxes on the notice to appear to indicate whether he was alleged to be (1) an arriving alien, (2) an alien present in the United States who has not been admitted or paroled, or (3) an alien who has been admitted to the United States but is removable for reasons stated elsewhere on the notice to appear.

The DHS also provided the respondent with a document entitled "Migrant Protection Protocols Initial Processing Information" ("MPP Sheet"). The MPP Sheet, which is written in the English language and translated into Spanish, instructed him to arrive at a specific location at the San Ysidro port of entry at 9:00 a.m. on May 30, 2019, so that he could be transported to the San Diego Immigration Court for his hearing. Following the service of the notice to appear and MPP Sheet, the respondent was returned to Mexico to await removal proceedings pursuant to section 235(b)(2)(C) of the Act, 8 U.S.C. § 1225(b)(2)(C) (2018).

The respondent did not appear at the Immigration Court on May 30, 2019. During the hearing, the DHS requested that the Immigration Judge order the respondent removed from the United States in absentia pursuant to section

Cite as 27 I&N Dec. 825 (BIA 2020)                    Interim Decision #3983

240(b)(5)(A) of the Act, 8 U.S.C. § 1229a(b)(5)(A) (2018).  Instead, the
Immigration Judge terminated the proceedings.

## II.  ANALYSIS

### A.  Notice of the Hearing

In his decision, the Immigration Judge expressed a concern that the
respondent was not given proper notice of how to attend his hearing.
Subsequently, we issued *Matter of J.J. Rodriguez*, 27 I&N Dec. 762 (BIA
2020), holding that where, as here, the DHS returns an alien to Mexico to
await a removal hearing pursuant to the Migrant Protection Protocols and
provides the alien with sufficient notice of that hearing, an Immigration
Judge should enter an in absentia order of removal if the respondent fails to
appear and is removable.  The record indicates that the respondent received
sufficient notice of the hearing pursuant to *Matter of J.J. Rodriguez*.  There
is no indication in the record that he did not understand the instructions for
appearing at the hearing or that he made any attempt to appear.

Moreover, according to the Form I-213, the respondent understood that
he would be returned to Mexico and should not attempt to enter the United
States "until he returns to the appropriate port of entry on the date of his
hearing before an immigration judge." *See Matter of Gomez-Gomez*, 23 I&N
Dec. 522, 524 (BIA 2002) (stating that a Form I-213 is presumptively
trustworthy).  The Immigration Judge also acknowledged that many other
aliens who were returned to Mexico under the Migrant Protection Protocols
attended their hearings that day.  We conclude that termination of the
respondent's removal proceedings on the basis that he did not receive
adequate notice of his removal hearing is foreclosed by our decision in
*Matter of J.J. Rodriguez*.

### B.  Sufficiency of the Notice To Appear

However, this case differs from *Matter of J.J. Rodriguez* in several
respects.  First, unlike the respondent, who was alleged to have arrived in the
United States without presenting himself at a port of entry, the alien in that
case applied for admission at a designated port of arrival.  *Matter of J.J.
Rodriguez*, 27 I&N Dec. at 762.  Second, the respondent's notice to appear
did not indicate, by a checked alien classification box, whether he was
alleged to be an arriving alien, an alien present in the United States but not
admitted or paroled, or one who has been admitted but is removable.  Third,
in *Matter of J.J. Rodriguez*, we did not address whether the notice to appear
provided sufficient information to establish notice of the type of proceedings

AR00732