being initiated and the proper grounds for removability.  In light of these distinctions, we requested and received supplemental briefing from the DHS and amici curiae regarding (1) whether, under the Migrant Protection Protocols program, the DHS may return an alien to a contiguous territory pending removal proceedings if the notice to appear does not allege that the person is an arriving alien or entered the United States via a port of entry or by interdiction and (2) whether the DHS has statutory authority to apply the Migrant Protection Protocols program to aliens who did not present themselves for inspection at a port of entry.

The notice to appear is the charging document that commences removal proceedings under section 240 of the Act.  *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 444, 449 (Jan. 3, 1997) (Supplementary Information).  Historically, the DHS has used a version of the notice to appear that contains three possible allegations referring to the circumstances of an alien's arrival or presence in the United States.[2]

The statute and the regulations set forth the requirements for a notice to appear, which include:

> (A) The nature of the proceedings against the alien.
> (B) The legal authority under which the proceedings are conducted.
> (C) The acts or conduct alleged to be in violation of law.
> (D) The charges against the alien and the statutory provisions alleged to have been violated.

Section 239(a)(1)(A)–(D) of the Act, 8 U.S.C. § 1229(a)(1)(A)–(D) (2018); *see also* 8 C.F.R. § 1003.15(b)(1)–(4) (2020).

Amici argue that absent a checked box designation, a notice to appear fails to meet the statutory and regulatory requirement to advise the respondent of the nature of the proceedings.  However, neither section 239(a)(1)(A) of the Act nor the regulation at 8 C.F.R. § 1003.15(b)(1) explicitly requires that the DHS check one of the three alien classification boxes on the notice to appear, so long as the required information is provided. Had Congress wanted the DHS to place an alien on notice of the applicable designation, it could have included such a requirement in section 239(a)(1)

---

[2]   The version of the notice to appear in this case, which was revised on August 1, 2007, includes the following alien classification checkboxes:

> ☐ 1.  You are an arriving alien.
> ☐ 2.  You are an alien present in the United States who has not been admitted or paroled.
> ☐ 3.  You have been admitted to the United States, but are removable for the reasons stated below.

AR00733

of the Act. *Cf. Kucana v. Holder*, 558 U.S. 233, 248 (2010) (stating that if Congress wanted to preclude judicial review over decisions not specified as discretionary by statute, it could have done so).

In this regard, we have previously held that an Order to Show Cause (Form I-221) issued pursuant to the former regulations at 8 C.F.R. § 242.1 (1975) provided adequate information because it was "sufficiently explicit to inform the alien . . . what actions were in violation of the law, and what law he violated, so as to enable him to mount a defense." *Matter of Chery and Hasan*, 15 I&N Dec. 380, 381 (BIA 1975);[3] *see also Matter of Raqueno*, 17 I&N Dec. 10, 12–13 (BIA 1979) ("An Order to Show Cause is designed to inform an alien of the charges against [him] with sufficient precision to allow [him] to properly defend [himself]." (citing *Matter of Chery and Hasan*, 15 I&N Dec. 380)); *Matter of Ho*, 12 I&N Dec. 516, 517–18 (BIA 1967), *aff'd sub nom.*, *Ho Yeh Sze v. INS*, 389 F.2d 978, 981 (2d Cir. 1968). This standard is instructive in interpreting our current regulations at 8 C.F.R. § 1003.15(b)(1)–(4), whose provisions are substantively similar to the former regulations.

Overall, our review of the respondent's notice to appear satisfies us that it sufficiently enabled him to mount a defense to the inadmissibility charge against him. The notice to appear placed the respondent on notice of the nature of the proceedings, advising him that he was being placed "[i]n removal proceedings under section 240 of the Immigration and Nationality Act," as opposed to some other immigration proceeding, such as expedited removal, or any other form of criminal, civil, or administrative proceedings. *See Nature*, *Black's Law Dictionary* (11th ed. 2019) (defining "nature" as "[a] fundamental quality that distinguishes one thing from another; the essence of something").

Among other things, the respondent's notice to appear described his right to be represented, the conduct of the hearing, and the consequences of failing to appear.[4] Specifically, the notice to appear directed the respondent, "[Y]ou

---

[3]   At the time of our decision in *Matter of Chery and Hasan*, 15 I&N Dec. at 380–81, the regulations at 8 C.F.R. § 242.1(b) required a statement of the nature of the proceedings, the legal authority under which they were conducted, the factual allegations, the charges against the alien, and the statutory provisions alleged to have been violated. *See* Immigration and Naturalization Service, Department of Justice, 22 Fed. Reg. 9765, 9796 (Dec. 6, 1957).

[4]   The notice to appear placed the respondent on notice that he could be represented at the hearing, and he was given a current list of attorneys and organizations that provide free legal services and allowed a period of time to secure counsel. *See* section 239(a)(1)(E) of the Act; 8 C.F.R. § 1003.15(b)(5). It also warned the respondent of the requirements that he must "immediately provide (or have provided)" the DHS and the Immigration Court "with a written record of an address and telephone number (if any) at which [he] may be

AR00734

are ordered to appear before an immigration judge . . . to show why you should not be removed from the United States." It set forth the factual allegations against him, namely, that he recently arrived in the United States, was not inspected or admitted by an immigration officer, and lacked valid documentation to enter the country. It also stated the charge against the respondent, specifying that he was inadmissible under section 212(a)(7)(A)(i)(I) of the Act because he did not possess valid entry documents. We conclude that this notice to appear placed the respondent on notice of all the information required by sections 239(a)(1)(A)–(D) of the Act and 8 C.F.R. § 1003.15(b)(1)–(4).

We have also considered amici's concerns regarding the potential consequences of a notice to appear that has no checked box. For example, amici suggest that if no box is checked, an Immigration Judge may not have jurisdiction to adjudicate a potential application for adjustment of status, because 8 C.F.R. § 1245.2(a)(1)(ii) (2020) generally divests Immigration Judges from considering such an application filed by an arriving alien. However, such a concern is speculative at this point. There is no indication that the respondent is the beneficiary of an approved (or even pending) immigrant visa petition.

Moreover, in requiring that a notice to appear advise the respondent of the "nature of the proceedings against" him, neither section 239(a)(1)(A) of the Act nor 8 C.F.R. § 1003.15(b)(1) mandates that a notice to appear set forth an alien's eligibility for every form of relief from removal for which he might be eligible. *See Matter of Raqueno*, 17 I&N Dec. at 13 ("There is no need, under the law or the regulations, for allegations in an Order to Show Cause of elements [that are] unnecessary to the charge as that charge is defined in the statute."). Once an alien appears, it is the duty of the Immigration Judge, not the DHS, to advise the alien of any apparent eligibility to apply for relief from removal. 8 C.F.R. § 1240.11(a)(2) (2020).

For the reasons stated above, we conclude that the respondent's notice to appear was proper and met the requirements of section 239(a)(1) of the Act and 8 C.F.R. § 1003.15(b). It contained the nature of the proceedings against the respondent, the legal authority under which the proceedings would be conducted, his acts or conduct alleged to be in violation of law, and the statutory provisions that he is charged with violating. Moreover, it advised him that he may be represented by counsel and warned him that he was

___

contacted" and "with a written record of any change of [his] address or telephone number," as well as the consequences under section 240(b)(5) of the Act of "failure to provide address and telephone information." Sections 239(a)(1)(F)(i)–(iii) of the Act. Finally, the notice to appear contained the time and place at which the removal hearing would be held and the consequences under section 240(b)(5) of "the failure, except under exceptional circumstances, to appear." Sections 239(a)(1)(G)(i)–(ii) of the Act.

AR00735

Cite as 27 I&N Dec. 825 (BIA 2020)                    Interim Decision #3983

required to provide the DHS and the Immigration Court of his address. The notice to appear contained the time and place at which the removal hearing would be held and the consequences of his failure to appear. Finally, it complied with the statutory and regulatory requirements identified in *Karingithi v. Whitaker*, 913 F.3d 1158, 1160 (9th Cir. 2019), and *Matter of Bermudez-Cota*, 27 I&N Dec. 441, 447 (BIA 2018).

"It is well settled that an Immigration Judge may only 'terminate removal proceedings under [specific] circumstances identified in the regulations' and where 'the charges of removability against a respondent have not been sustained.'" *Matter of J.J. Rodriguez*, 27 I&N Dec. at 763 (quoting *Matter of S-O-G- & F-D-B-*, 27 I&N Dec. 462, 468 (A.G. 2018) (alteration in original)). An Immigration Judge is not authorized to terminate proceedings because a notice to appear has no alien classification box checked when the Act and its implementing regulations do not require one. *See United States v. Garza-Sanchez*, 217 F.3d 806, 810 (9th Cir. 2000) ("We may not read into [a] regulation a requirement that it does not impose by its precise terms."). Accordingly, we conclude that the record does not support the Immigration Judge's sua sponte termination of the proceedings on the basis that the notice to appear did not sufficiently put the respondent on notice of the nature of the proceedings against him.[5]

### C.  Burden of Proof

The Immigration Judge also terminated proceedings upon his finding that the charge of removability did not sufficiently place the respondent on notice of the burden of proof.[6] We disagree. Sections 240(c)(2) and (3) of the Act

---

[5]   As we have recently held, the rules regarding the initiation of proceedings in 8 C.F.R. § 1003.14 (2020) and related regulations are "claims-processing rules," which do not implicate the subject matter jurisdiction of the Immigration Court, but which may be challenged in a timely manner. *Matter of Rosales Vargas and Rosales Rosales*, 27 I&N Dec. 745, 751–53 (BIA 2020). Since the respondent did not appear at his hearing, he did not challenge any deficiencies in the notice to appear. Accordingly, there is no claim of prejudice to the respondent, so termination is inappropriate for this reason as well. *See id.* at 753–54. Even if the respondent had challenged any deficiencies in the notice to appear, jurisdiction over the case was established because the notice to appear satisfies the regulatory requirements of 8 C.F.R. § 1003.15. *See Karingithi v. Whitaker*, 913 F.3d at 1160 (holding that a notice to appear that met the regulatory requirements vested jurisdiction in the Immigration Judge).

[6]   The Immigration Judge questioned the fact that the notice to appear alleged both that the respondent was not admitted or paroled after inspection by an immigration officer and that he was an immigrant not in possession of valid documentation. However, the DHS charged the respondent with having no valid entry documents under section 212(a)(7) of the Act, but not under section 212(a)(6). No argument has been made that the DHS could

831

set forth the applicable burdens of proof on each party depending on whether the respondent is an applicant for admission or was previously admitted but is subject to removal.

In the case of an applicant for admission, the alien is charged as inadmissible under section 212(a) of the Act. The alien bears the burden of establishing either under section 240(c)(2)(A) that he is "clearly and beyond doubt entitled to be admitted" or under section 240(c)(2)(B) "by clear and convincing evidence, that [he] is lawfully present in the United States pursuant to a prior admission." In the case of an alien who has been admitted to the United States, the charge will fall under section 237(a) of the Act, and the DHS will bear the burden of establishing "by clear and convincing evidence that . . . the alien is deportable." Section 240(c)(3)(A) of the Act.

The required contents of the respondent's notice to appear, namely, the allegations and the charge, make clear that he is charged with being inadmissible under section 212(a) of the Act. As an applicant for admission, therefore, he bears the burden of proof as a matter of law.[7] Section 240(c)(2) of the Act.

---

not, in its discretion, charge an alien with either or both of these violations of the Act, which are not inconsistent or mutually exclusive. *Cf. Matter of E-R-M & L-R-M-*, 25 I&N Dec. 520, 523 (BIA 2011) (holding that "the DHS has discretion to put aliens in section 240 removal proceedings even though they may also be subject to expedited removal under section 235(b)(1)(A)(i) of the Act" because "the broad discretion given to the Executive Branch regarding charging decisions in the criminal context . . . also appl[ies] to charging decisions by the Executive Branch, that is, the DHS, in the immigration context").

[7]   Regarding the checkboxes on the notice to appear, both the first box (arriving alien) and the second box (alien present in the United States who has not been admitted or paroled) apply to applicants for admission. In either case, the charge of removability would fall under section 212(a) of the Act and the alien would bear the burden of proof under section 240(c)(2).

Amici argue that there is a significant difference under the regulations regarding the burden of proof between an arriving alien and an alien present without being admitted. As applied to the facts of this case, we disagree. Both categories are indisputably applicants for admission. As the DHS argues, the checkboxes, at most, subdivide applicants for admission into two categories—arriving aliens and other applicants for admission. That information does not alter the facts that the notice to appear plainly placed the respondent in removal proceedings and that he is an applicant for admission.

Under 8 C.F.R. § 1240.8(c) (2020), where the DHS alleges that an alien is present without being admitted or paroled, it bears the initial burden of establishing alienage. If the DHS proves alienage, the burden shifts to the alien to show by clear and convincing evidence that he is lawfully in the United States pursuant to a prior admission. *Id.* However, we need not now resolve whether an indication of this difference in the initial burden of proof must be included in the notice to appear under the statute or the regulations. Since the respondent did not appear for the hearing, the applicable burden of proof on the DHS in presenting its motion for an in absentia removal order is "clear, unequivocal, and convincing evidence" under section 240(b)(5)(A) of the Act.

832

AR00737

Section 235(a)(1) of the Act provides that an "alien present in the United States who has not been admitted or who arrives in the United States," whether or not at a designated port of arrival, is deemed to be an applicant for admission. In turn, an alien who has not demonstrated that he is within any of the nonimmigrant classes specified in section 101(a)(15) of the Act, 8 U.S.C. § 1101(a)(15) (2018), is deemed to be an "immigrant." *Cf. Matter of Healy and Goodchild*, 17 I&N Dec. 22, 26 (BIA 1979) (holding that where an alien has not established his entitlement to status as a nonimmigrant under any of the classifications in section 101(a)(15) of the Act, he is properly excludable as an immigrant without the requisite travel or entry documents). While the exact reasons for the respondent's application for admission into this country are not identified in the Form I-213, there is no indication that he is seeking admission as a nonimmigrant, such as a tourist, student, or temporary worker. Moreover, applicants for admission bear the burden to establish that they are clearly and beyond doubt entitled to be admitted to the United States and are not inadmissible. Section 240(c)(2)(A) of the Act; 8 C.F.R. § 1240.8(c) (2020).

The fact that no box is checked on the notice to appear does not prevent the Immigration Judge from evaluating the allegations of fact against the respondent and any evidence presented by the DHS. The Form I-213 alone may be sufficient to support a conclusion that the respondent is inadmissible under section 212(a)(7)(A)(i)(I) of the Act, and is therefore subject to removal, because he is an immigrant who, at the time of his application for admission, was not in possession of a valid entry document. *See Matter of Gomez-Gomez*, 23 I&N Dec. at 524 (stating that absent evidence that information on a Form I-213 is inaccurate or obtained by coercion, the document is inherently trustworthy and admissible to prove alienage or deportability). Accordingly, since the respondent has not appeared, the DHS has potentially proffered clear, unequivocal, and convincing evidence that he is subject to removal from the United States as charged in the notice to appear. Section 240(b)(5)(A) of the Act; 8 C.F.R. § 1240.8(c).

We disagree with amici's contention that "[i]f [the] DHS does not give notice of which admission status [the] DHS believes a respondent to hold, even the most experienced immigration attorney will be at a loss to fully advise a client as to the nature of the removal proceeding and their rights in that proceeding based on the [notice to appear]." Amici assert that the aliens who have been returned to Mexico under the Migrant Protection Protocols are "asylum seekers." Regardless of whether the notice to appear contains a checked box, an alien seeking asylum is required to appear at his scheduled removal hearings and file an Application for Asylum and for Withholding of Removal (Form I-589). *See* 8 C.F.R. § 1208.3(a) (2020). An attorney will be able to advise an alien that, in order to apply for asylum, he will need to

appear at his removal hearings and file a Form I-589.  In every proceeding, the burden of establishing eligibility for asylum rests on the applicant. Section 240(c)(4)(A) of the Act; 8 C.F.R. §§ 1208.13(a), 1240.8(d) (2020). As explained in the MPP Sheet, the respondent was informed to attend his removal hearing at the Immigration Court in San Diego, California, by presenting himself at the port of entry in San Ysidro, California, on the morning of May 30, 2019.  Had he appeared at the hearing, he could have submitted a Form I-589.[8]

The DHS may opt to provide more information in a notice to appear than the law requires, or it may duplicate required information.[9]  Ultimately, however, we know of no statutory or regulatory requirement that the DHS do either, and the respondent and amici have identified none.

### D.  Return to a Contiguous Foreign Territory Under
### Section 235(b)(2)(C) of the Act

Congress has authorized that an alien "who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States" may be returned to that territory pending a proceeding under section 240 of the Act.  Section 235(b)(2)(C) of the Act.  Once the DHS places an alien into removal proceedings under section 240 of the Act, the alien is entitled to the due process rights afforded in a removal proceeding, even if the DHS elects to return the alien to Mexico under the Migrant Protection Protocols program.  In this case, we resolve the issue before us narrowly on the question whether the Immigration Judge properly terminated these proceedings for failure of the DHS to indicate the nature of the proceedings.

Given that the respondent did not appear for his hearing, we do not address the constitutional or statutory challenges to his return to Mexico under the Migrant Protection Protocols, because the notice to appear alleged he arrived in the United States and he has not been designated as an arriving alien.  Sections 235(a), (b)(2)(C) of the Act; 8 C.F.R. § 1001.1(q) (2020); *cf. Matter of J-A-B- & I-J-V-A-*, 27 I&N Dec. 168, 170 (BIA 2017) ("The DHS's decision to commence removal proceedings involves the exercise of

---

[8]   To the extent that amici are concerned that it is unclear whether the respondent is eligible for a redetermination of his custody status, we note that bond proceedings are separate and apart from removal proceedings.  8 C.F.R. § 1003.19(d) (2020).  The requirements for a notice to appear that are set forth in section 239(a)(1) of the Act and 8 C.F.R. § 1003.15(b) are applicable to these removal proceedings.  We do not address the requirements for the notice to appear in the context of other proceedings, such as those relating to bond.

[9]   As the DHS argues, it may amend the notice to appear or file a Form I-261 (Additional Charges of Inadmissibility/Deportability).  8 C.F.R. § 1240.10(e) (2020).

AR00739

prosecutorial discretion, and neither the Immigration Judges nor the Board may independently review a decision by the DHS to forgo expedited removal proceedings or initiate removal proceedings in a particular case.").

The provisions governing the entry of in absentia orders of removal apply equally to all aliens placed in removal proceedings, including any alien who remains in a contiguous foreign territory pursuant to section 235(b)(2)(C) of the Act.  Section 240(b)(5)(E) of the Act.  "An alien does not need to be physically in the United States for the Immigration Judge to retain jurisdiction over pending [removal] proceedings and to conduct an in absentia hearing."  *Matter of Sanchez-Herbert*, 26 I&N Dec. 43, 44 (BIA 2012).  Since the DHS has elected to commence removal proceedings against the respondent and to prosecute them to a conclusion, the Immigration Judge is obligated to order his removal if the evidence supports a finding of removability on the ground charged and the respondent has not established eligibility for relief.  *Matter of Roussis*, 18 I&N Dec. 256, 258 (BIA 1982).

## III.  CONCLUSION

For the reasons set forth above, we conclude that the absence of a checked alien classification box on a notice to appear does not, by itself, render the notice to appear fatally deficient or otherwise preclude an Immigration Judge from exercising jurisdiction over removal proceedings, and it is therefore not a basis to terminate the proceedings of an alien who has been returned to Mexico under the Migrant Protection Protocols.  Accordingly, we will sustain the DHS's appeal, reinstate the respondent's removal proceedings, and remand the record to the Immigration Judge for further proceedings. On remand, if the DHS establishes the respondent's removability based on the facts and the evidence, the Immigration Judge should enter an order of removal.  *Matter of Sanchez-Herbert*, 26 I&N Dec. at 45.

**ORDER:**   The appeal of the Department of Homeland Security is sustained, the decision of the Immigration Judge is vacated, and the removal proceedings are reinstated.

**FURTHER ORDER:**   The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion and for the entry of a new decision.

*CONCURRING OPINION*:  Edward F. Kelly, Board Member

I join my colleagues in concluding that current law precludes termination of these removal proceedings.

However, I write separately to emphasize that our decision today expresses no opinion as to the unresolved issue of the statutory or constitutional authority for the Migrant Protection Protocols program, as applied, because any challenge to that program in these removal proceedings is collateral in nature.  *See, e.g.*, section 235(b)(2)(C) of the Immigration and Nationality Act, 8 U.S.C. § 1225(b)(2)(C) (2018) (limiting the authority to return aliens to contiguous territory pending removal proceedings to those applicants for admission "who are arriving"); *see also Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020) (upholding a preliminary injunction upon finding that the Migrant Protection Protocols program likely violates the statute when applied to aliens who lack valid entry documents), *stay granted*, No. 19A960, 2020 WL 1161432 (U.S. Mar. 11, 2020) (staying execution of the preliminary injunction pending the timely filing and disposition of a petition for writ of certiorari).

AR00741

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 10 of 548   PageID 4953

Published on *U.S. Customs and Border Protection* (https://www.cbp.gov (https://www.cbp.gov))

# Migrant Protection Protocols FY2021

Fiscal Year 2021 runs from October 1, 2020 to September 30, 2021

> **Expand All**

> ❯ Southwest Border Total Encounters

## USBP Apprehensions by Southwest Border Sector

| Sector | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Big Bend | 1,521 | 1,621 | 1,980 | 2,669 | 3,096 | 4,500 | 4,588 | 5,050 | 4,554 | 3,433 | 1,680 | 2,574 |
| Del Rio | 8,446 | 8,714 | 9,196 | 11,142 | 11,094 | 20,052 | 21,779 | 27,932 | 30,707 | 33,600 | 33,062 | 43,570 |
| El Centro | 4,089 | 3,636 | 3,118 | 2,946 | 3,777 | 6,211 | 7,039 | 7,525 | 6,132 | 5,172 | 4,643 | 4,943 |
| El Paso | 8,777 | 8,748 | 11,028 | 10,617 | 13,184 | 19,456 | 19,797 | 22,219 | 21,507 | 20,550 | 20,220 | 17,815 |
| Laredo | 9,373 | 8,244 | 7,746 | 8,633 | 8,486 | 11,180 | 10,925 | 12,092 | 10,272 | 8,518 | 8,167 | 8,605 |
| Rio Grande | 17,617 | 17,305 | 17,214 | 17,056 | 28,403 | 62,685 | 60,874 | 51,146 | 59,521 | 81,006 | 81,178 | 55,072 |
| San Diego | 6,953 | 7,722 | 8,510 | 9,880 | 9,725 | 13,380 | 14,680 | 14,602 | 15,119 | 15,550 | 13,599 | 12,739 |
| Tucson | 11,469 | 12,189 | 11,146 | 10,749 | 14,750 | 19,870 | 20,283 | 19,908 | 18,405 | 17,983 | 16,721 | 17,759 |
| Yuma | 787 | 990 | 1,203 | 1,624 | 5,128 | 11,882 | 13,734 | 12,180 | 12,432 | 14,846 | 17,244 | 22,438 |
| Total | 69,032 | 69,169 | 71,141 | 75,316 | 97,643 | 169,216 | 173,699 | 172,654 | 178,649 | 200,658 | 195,514 | 185,515 |

## OFO Southwest Border Inadmissibles by Field Office

| Field Office | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| El Paso | 371 | 380 | 391 | 414 | 388 | 427 | 721 | 1,226 | 1,579 | 1,532 | 1,728 | 508 |
| Laredo | 669 | 648 | 637 | 617 | 686 | 950 | 981 | 2,174 | 3,150 | 4,836 | 4,631 | 1,685 |
| San Diego | 1,559 | 1,658 | 1,563 | 1,843 | 2,089 | 2,326 | 2,928 | 3,809 | 4,584 | 5,326 | 5,918 | 3,889 |
| Tucson | 298 | 258 | 262 | 224 | 293 | 358 | 466 | 734 | 1,072 | 1,241 | 1,049 | 404 |
| Total | 2,897 | 2,944 | 2,853 | 3,098 | 3,456 | 4,061 | 5,096 | 7,943 | 10,385 | 12,935 | 13,326 | 6,486 |

> ❯ Southwest Border Enrollments in MPP

| Component | Location | Oct-20 | Nov-20 | Dec-20 | Jan-21 |
|---|---|---|---|---|---|
| USBP | Big Bend | 83 | 126 | 149 | 20 |
| | Del Rio | 75 | 128 | 123 | 87 |
| | El Centro | 4 | 0 | 0 | 0 |
| | El Paso | 277 | 332 | 450 | 313 |
| | Laredo | 2 | 0 | 0 | 0 |

**AR00742**

| Component | Location | Oct-20 | Nov-20 | Dec-20 | Jan-21 |
|---|---|---|---|---|---|
| | Rio Grande | 140 | 233 | 254 | 149 |
| | San Diego | 8 | 11 | 22 | 9 |
| | Tucson | 39 | 25 | 62 | 44 |
| | Yuma | 17 | 26 | 25 | 31 |
| | USBP Monthly Enrollment Total | 645 | 881 | 1,085 | 653 |
| | El Paso | 0 | 2 | 0 | 0 |
| | Laredo | 0 | 0 | 0 | 0 |
| OFO | San Diego | 3 | 4 | 7 | 9 |
| | Tucson | 0 | 0 | 0 | 0 |
| | OFO Monthly Enrollment Total | 3 | 6 | 7 | 9 |
| CBP | CBP Total | 648 | 887 | 1,092 | 662 |

❯ Cases referred to USCIS

**Cases referred to USCIS for MPP Fear Assessment**

| | | |
|---|---|---|
| | October | 133 |
| | November | 259 |
| | December | 618 |
| FY 2021 | January | 411 |
| | February | 38 |
| | March | 0 |
| Grand Total | | 1,459 |

*Data provided by U.S. Citizenship and Immigration Services*

❯ Individuals Apprehended Entering the US Without Inspection Subsequent to Being Returned to Mexico through MPP

| Category | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FMUA | 41 | 49 | 60 | 29 | 166 | 259 | 136 | 102 | 143 | 209 | 157 | 79 |
| Single Adult [1] | 168 | 142 | 221 | 174 | 121 | 119 | 64 | 55 | 46 | 41 | 38 | 49 |
| UAC [2] | 36 | 15 | 16 | 14 | 17 | 62 | 44 | 18 | 39 | 38 | 27 | 21 |
| Total | 245 | 206 | 297 | 217 | 304 | 440 | 244 | 175 | 228 | 288 | 222 | 149 |

[1] *May include those adults who were previously enrolled in MPP as a single adult or as part of a family unit (FMUA).*

[2] *UACs are not amenable to MPP. UACs shown in this table were previously part of a family unit (FMUA) that was enrolled in MPP.*

❯ Note: MPP Partner Metrics

In addition to the MPP goals and metrics set out by the Department, CBP will work with its DHS and DoJ partners to take into account daily data for migrants entering the United States by location, including both the number of migrants assigned to MPP appearing at a port of entry to attend immigration adjudication proceedings along with the outcomes of such proceedings and the number of migrants assigned to MPP who remain overnight in the United States when evaluating the effectiveness of MPP.

**Tags:**

Statistics (https://www.cbp.gov/tags/statistics) [1]

**Source URL:** https://www.cbp.gov/newsroom/stats/migrant-protection-protocols-fy2021

**Links**

[1] https://www.cbp.gov/tags/statistics

AR00744

Case 2:21-cv-00067-Z    Document 162-2    Filed 09/02/22    Page 13 of 548    PageID 4956





**CHAIRMAN JERROLD NADLER**

# Press Releases

## Chairman Nadler Announces House Judiciary Investigation into Trump Administration's "Remain in Mexico" Policy

**On the one-year anniversary of the introduction of the Keep Families Together Act, the House Judiciary Committee Subcommittee on Immigration and Citizenship announced that it will be investigating the Administration's implementation of the "Remain in Mexico" immigration policy**

**Washington, January 14, 2020**

Tags: *Immigration*

Washington, D.C. – Today, House Judiciary Chairman Jerrold Nadler (D-NY), along with Subcommittee on Immigration and Citizenship Chair Zoe Lofgren (D-CA) and Subcommittee Members Pramila Jayapal (D-WA), Veronica Escobar (D-TX), Sylvia Garcia (D-TX), Joe Neguse (D-CO), Debbie Mucarsel-Powell (D-FL), and Lou Correa (D-CA), announced the start of an investigation into how the Administration's "zero tolerance" immigration policy has morphed into a policy whereby refugees and asylum seekers are being kept in Mexico indefinitely and without due process or access to counsel. The announcement comes on the one-year anniversary of the introduction of the *Keep Families Together Act*, which came in response to the Trump

**AR00745**

Case 2:21-cv-00067-Z    Document 162-2    Filed 09/02/22    Page 14 of 548    PageID 4957



Chad Wolf, demands the Department turn over any information regarding the development and execution of the Migrant Protection Protocols (MPP), also known as the "Remain in Mexico" policy, which threatens the health and safety of legitimate asylum seekers—including women, children, and families.

**In their letter, the Members wrote**, "The policy has nearly eliminated the already scarce due process protections available to asylum-seekers—such as access to counsel—further reducing the likelihood that legitimate asylum-seekers can obtain asylum. Moreover, MPP forces women, children, and families to remain in areas that the federal government recognizes as especially unsafe. As of today, there are 31 active travel advisories for Mexico, including 5 warnings in which the State Department explicitly advises Americans against travel.It is difficult to understand why this administration is sending children and families to areas where they will face certain harm."

Full text of the letter can be found below and <u>here</u>:

<div align="center">January 14, 2020</div>

The Honorable Chad Wolf

Acting Secretary

Department of Homeland Security

301 7th Street, SW

Washington, D.C.20528

Dear Acting Secretary Wolf:

We write to renew our objections to the "Migrant Protection Protocols" (MPP), as we continue to question the policy's legality and remain deeply concerned

AR00746

Case 2:21-cv-00067-Z    Document 162-2    Filed 09/02/22    Page 15 of 548    PageID 4958



abandoned.

As we have previously written to you, MPP is inconsistent with the Department of Homeland Security's (DHS) statutory authority, while exposing thousands of people to threats of murder, sexual violence, and kidnapping as they are forced to wait in extremely dangerous conditions before their asylum claims may be heard.The policy has nearly eliminated the already scarce due process protections available to asylum-seekers—such as access to counsel—further reducing the likelihood that legitimate asylum-seekers can obtain asylum. Moreover, MPP forces women, children, and families to remain in areas that the federal government recognizes as especially unsafe.As of today, there are 31 active travel advisories for Mexico, including 5 warnings in which the State Department explicitly advises Americans against travel.[1] It is difficult to understand why this administration is sending children and families to areas where they will face certain harm.

The House Judiciary Committee has held hearings, sent oversight letters, and participated in a variety of staff-level briefings in which administration officials have been unable or unwilling to answer basic questions relating to MPP. A comprehensive review of the policy, its implementation, and its impact on vulnerable populations is necessary.Therefore, we respectfully ask that you produce the relevant documents, data, and communications listed below by January 30, 2020.

1. Documents and communications dated from December 20, 2018 to January 2, 2020 relating to the implementation of MPP along the southern border.
2. The total number of individuals subjected to MPP and breakdown of this number by nationality, gender, and age.

**AR00747**



from the program, including the reason an individual (or family unit) was removed from MPP.

5. The total number of nonrefoulement interviews, including the number of people given nonrefoulement interviews, that have been conducted for individuals in MPP, including the results of those interviews.

6. An unredacted copy of "The Migrant Protection Protocols Red Team Report," including the "MPP Flow Chart" and "MPP Recommendations Matrix Summary" attached to the report.

7. Documents and communications, dated from December 19, 2018 to January 4, 2020, referring or relating to policies, processes, or resources needed to implement or expand MPP.

8. Documents and communications referring or relating to "tent courts"[2] being erected along the southern border for MPP, including policies related to access to tent courts or other nonpermanent facilities by attorneys, the public, and media.

9. Documents and communications referring or relating to individuals in MPP who were granted relief by an immigration judge and then were subsequently transported or sent back to Mexico.

Thank you for your prompt attention to this matter.

Sincerely,

_____

Jerrold Nadler

Chairman

House Committee on the Judiciary

AR00748

1/20/22, 10:01 AM          Chairman Nadler Announces House Judiciary Investigation into Trump Administration's "Remain in Mexico" Policy | U.S. House …

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 17 of 548   PageID 4960



~~Chair~~

Subcommittee on Immigration and Citizenship

House Committee on the Judiciary

_____

Pramila Jayapal

Vice Chair

Subcommittee on Immigration and Citizenship

House Committee on the Judiciary

_____

J. Luis Correa

Member of Congress

_____

Sylvia R. Garcia

Member of Congress

_____

Joe Neguse

Member of Congress

_____

AR00749



_____

Veronica Escobar

Member of Congress

cc: Honorable Doug Collins, Ranking Member, House Committee on the Judiciary

Honorable Ken Buck, Ranking Member, Immigration and Citizenship Subcommittee

_____

[1] *US Slaps Highest-Level "Do Not Travel "Warning on Five Mexican States*, Fox News (Jan. 10, 2018), https://www.foxnews.com/world/us-slaps-highest-level-do-not-travel-warning-on-five-mexican-states

[2] Nick Miroff, *Along Texas Border, Trump Administration Sets up Tent Courts for Virtual Asylum Hearings*, Wash. Post (Sept. 18, 2019).

### ###

LATEST PHOTOS

LATEST VIDEOS

AR00750

1/20/22, 10:01 AM      Chairman Nadler Announces House Judiciary Investigation into Trump Administration's "Remain in Mexico" Policy | U.S. House …

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 19 of 548   PageID 4962





Reviving Competition Pt 5: Addressing th…

January 19, 2022

## LATEST TWEETS

Tweets by @HouseJudiciary



Embed                          View on Twitter

## LATEST POSTS

### With four companies producing over 80% o…

January 19, 2022

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 20 of 548   PageID 4963



# U.S. House Committee On The Judiciary

**Committee Hearing Room**

2141 Rayburn House Office Building

Washington, D.C. 20515

202-225-3951

**Rayburn Staff Office**

2138 Rayburn House Office Building

Washington, D.C. 20515

202-225-3951

Please sign up for updates from our committee

SUBSCRIBE

ACCESSIBILITY

COPYRIGHT

PRIVACY

TOOLS

MINORITY WEBSITE

     

AR00752

  "Like I'm Drowning"           DONATE NOW

# "Like I'm Drowning"

**Children and Families Sent to Harm by the US 'Remain in Mexico' Program**



A Honduran migrant mother and child wait in line for a dinner provided by volunteers at a makeshift encampment occupied by asylum seekers sent back to Mexico from the U.S. under the "Remain in Mexico" program, officially named Migrant Protection Protocols (MPP), in Matamoros, Tamaulipas, Mexico, October 27, 2019. © 2019 REUTERS/Loren Elliott

 **Map**

## Summary

AR00753

HUMAN
RIGHTS
WATCH

"Like I'm Drowning"

  

DONATE NOW

crossing to the United States and tried to apply for asylum. She learned she would have to wait. As at most border crossings between Mexico and the United States, US officials were only accepting a few people seeking asylum each day and on some days none at all. She put her name on a list maintained by Mexican federal officials, wrote down the number they gave her, and checked back every day.

Mexican and US officials allowed her and her children to enter the United States in December 2019. Cecilia was relieved: she assumed she would soon be able to explain her case to officials. If she received asylum, she planned to stay with her sister, already in the United States, while she and her children found their footing.

Instead, US Customs and Border Protection (CBP) agents told her they were returning her and her family to Mexico. She and her family would get an asylum hearing in the United States, officials said, but until an immigration judge decided their case, they would have to wait in Mexico. In addition, they would not be sent back to Nogales, where they had just spent several weeks, but instead to Ciudad Juárez, a border town about 550 km (340 miles) away, a city with one of the highest murder rates in the world and infamous for the unusually high numbers of women killed there over the last three decades. Cecilia tried to explain that she had no family or friends in Mexico and was afraid of what might happen to her and her children there, especially in Ciudad Juárez. Their response, she said, was to tell her to get her children on the CBP bus that would take her and her family to El Paso, directly across the border from Ciudad Juárez.

AR00754

Case 2:21-cv-00067-Z    Document 162-2    Filed 09/02/22    Page 23 of 548    PageID 4966

**HUMAN RIGHTS WATCH**    "Like I'm Drowning"    f   t   🔵   ✉   ⌿   DONATE NOW



© 2020 John Emerson for Human Rights Watch

US agents took them to the Paso del Norte international bridge, connecting El Paso with Ciudad Juárez, early in the morning. "The officials leave you there to do what you want with your life," she said. "We were completely lost." She called her sister to try to get some idea of where they could go. Another Venezuelan woman, Berenice Q., a 24-year-old sent to Mexico with her 4-year-old son, was in the same predicament.

While the two women and their children waited together for Cecilia's sister to call them back, four men attacked them. "It was clear from what they were saying they wanted to rape us," Cecilia said. "One grabbed me. Another one grabbed my friend. We started to scream. Some people came up and helped drive the men off. The children were completely traumatized."

Shaken, they found a room in a nearby hotel. Cecilia had a little money with her, but Berenice had nothing, so Cecilia paid for both of them. Their court dates were three months away, and they decided they couldn't remain in Ciudad Juárez while they waited. Instead, they bought bus tickets back to Nogales. "It's a long way from Juárez, 10 hours of travel, but at least we know people there, we thought to ourselves," Cecilia said, referring to the time they spent there before US authorities allowed them to enter the United States.

A few hours into the journey, the bus stopped, and two uniformed officers boarded the bus. They identified themselves as agents of the National Migration Institute (Instituto Nacional de Migración, INM) and ordered everybody to show identification. When Cecilia and Berenice

HUMAN
RIGHTS
WATCH        "Like I'm Drowning"                  DONATE NOW

order to attempt another crossing into the United States. "We're going to tear up your permits and deport you if you don't give us a hundred dollars each," one said. The women begged the agents to let them go, saying they did not have that much money. "Solve it, I don't know how you'll solve it, but crying isn't going to fix anything. If you don't have the money, I'll rip up the permits and with one call, you'll be deported," the agent replied. When Cecilia opened her purse to show them what she had, they took everything she had, about 2,500 pesos (US$120) and let them return to the bus. More than 20 months later, they and their children are still waiting in Mexico; they have only had preliminary hearings on their requests for asylum in the United States.

The US Department of Homeland Security (DHS) has placed more than 69,000 people in its "Remain in Mexico" program since January 2019. This number includes families with children of all ages, some of them with disabilities, including newborns, infants, and toddlers.

Experiences like those of Cecilia and Berenice are common among those subjected to the program. Before the program began, people seeking asylum, including those who applied at border stations, would remain in the United States while their asylum case was considered. Court dates were often months away because US immigration courts are chronically understaffed, and the large number of cases that go forward without legal representation slows down proceedings. In the meantime, people seeking asylum could often live with family members or friends and seek help to prepare their cases.

Under the "Remain in Mexico" program, people seeking asylum have to wait in Mexico and return periodically to the United States for immigration court hearings. Formally known as the "Migration Protection Protocols" (MPP), the program is anything but protective: it has sent people to some of Mexico's most dangerous cities and needlessly and foreseeably exposed them to considerable risk of serious harm. People interviewed for this report, including children, described rape or attempted rape and other sexual assault, abduction for ransom, extortion, armed robbery, and other crimes committed against them. In many cases, their attackers targeted them as they arrived in Mexico after their initial placement in the MPP or on their way back from court hearings, or as they left the migrant shelters where they stayed. In some cases, Mexican immigration officers or police committed these crimes.

These accounts are consistent with previous Human Rights Watch research and the findings of other investigations. In Matamoros and Nuevo Laredo, two of the Mexican cities to which US authorities have sent people after placing them in the MPP, Human Rights Watch identified 32

"Like I'm Drowning"            DONATE NOW

included at least 38 children. Human Rights First, a nongovernmental human rights organization, has tracked more than 1,100 reported cases of murder, rape, kidnapping, torture, and assault of people sent to Mexico under the MPP.

In theory, the Remain in Mexico program has two safeguards against return to harm, but neither is effective in practice. First, US officials are not supposed to send people to Mexico under the program if an asylum officer finds that they are likely to face threats to their lives or freedom or if they would be tortured there. Former asylum officers have said authorities interpret this rule to require near certainty of harm. And even threats of serious harm do not qualify unless they are linked to one of the protected grounds for refugee status (race, religion, national origin, political opinion, or membership in a particular social group). In the case of torture, authorities require proof that ill-treatment would be by a state agent.

The second safeguard is that DHS has said that it will not place "vulnerable" people in the MPP, including unaccompanied children and people with "[k]nown physical/mental health issues." DHS has refused to specify what conditions qualify for these humanitarian exemptions. In practice, exceptions are rarely granted.

Cecilia and Berenice twice sought unsuccessfully for their families to be removed from the MPP because of the extortion they faced by Mexican immigration agents. We repeatedly heard of other cases in which people told asylum officers that they had suffered kidnapping attempts by members of cartels, rape or other violent attacks by other private actors, or acts of extortion by Mexican officials. But in nearly every case asylum officers denied their requests to remain in the United States. Others tried to tell agents that they or their children had serious health conditions that required specialized care or were living with disabilities that meant they could not live safely and in conditions of dignity in shelters in Mexico, also to no avail. In some cases, people said immigration agents simply ignored their requests to explain why they were afraid to go to Mexico.

Commenting on DHS's approach to such requests, Alexandra Miller, an attorney based in Tucson for the Florence Immigrant and Refugee Rights Project, said in July 2020, "We've been put into a corner where we can only escalate the [most] extreme cases. But the fact is that everybody in the MPP is at extreme risk."

As a result, thousands of people are concentrated in dangerous Mexican border towns indefinitely, living lives in limbo, many dependent on the generosity of humanitarian groups

AR00757

"Like I'm Drowning"          DONATE NOW

Juárez also quickly hit capacity soon after it opened in late 2019. In Matamoros, dangers in the
city have led as many as 2,600 people to live in an informal camp on the banks of the river
marking the border between Mexico and the United States, a location prone to flooding. In
Nuevo Laredo, asylum seekers as well as those who try to help them also face particularly
serious risks. The Rev. Aarón Méndez, a pastor who ran a migrant shelter, was kidnapped in
August 2019, likely by members of the cartel that had repeatedly targeted the shelter and those
staying there.

Asylum hearings under the MPP raise serious due process concerns. Most people processed
under the MPP are unrepresented. Even for those who are in the United States, it is difficult to
secure legal assistance for asylum cases—the United States does not provide publicly funded
lawyers to people facing deportation who cannot afford an attorney, and the number of pro
bono and low-cost lawyers cannot meet the need. Those who are sent to Mexico face
particularly formidable barriers to legal representation. Few attorneys are able to take on pro
bono clients who are physically located across an international border, and those who do
consistently describe serious obstacles to interviewing their clients safely, obtaining necessary
documents, and preparing clients adequately for court hearings. Adding to these difficulties,
DHS has only undertaken to allow attorneys one hour to meet with clients prior to hearings,
and in fact US immigration agents have often given attorneys even less preparation time and
sometimes barred them from meeting with clients at all.

When immigration judges dismissed charges because of inaccurate or incomplete DHS filings,
DHS sent people to Mexico even though they were no longer in deportation proceedings. DHS
issued notices with fictitious court dates, in some instances explicitly—and falsely—stating that
the immigration judge had ordered the person to return for another hearing. DHS did the same
with some people who had in fact received asylum.

DHS appeared to end this practice in December 2019, after members of Congress wrote to the
DHS Office of Inspector General.

Prior to the end of March 2020, when MPP hearings were suspended in response to the Covid-
19 pandemic, families were often required to report to designated border crossing points at 4:00
a.m., requiring them to travel through and to unsafe locations well before dawn. Those sent to
Mexicali, Nogales, or Piedras Negras were assigned to immigration courts in San Diego or El
Paso, meaning that they had to make journeys of 160 to 600 km (100 to 375 miles) to reach their
designated border crossing points.

AR00758

HUMAN
RIGHTS
WATCH          "Like I'm Drowning"                     DONATE NOW

brief hearing, and agents have told parents they risked being sent back to Mexico without seeing a judge if their children made noise or could not sit still.

Families said that after each hearing, they were locked up in cold, often overcrowded immigration holding cells, with men and teenage boys held separately, sometimes overnight or longer, before US officials returned them to Mexico. Some said they were considering abandoning their asylum cases because their children were so afraid of being detained again.

The program has faced several legal challenges, all pending at this writing. In one of these cases, a federal appeals court found in February 2020 that the program violated federal law and international treaties and caused "extreme and irreversible harm." The Supreme Court will review the appellate court's ruling in 2021.

"Remain in Mexico" is one element of a larger, sustained attack on asylum and other protections for people fleeing harm and seeking safety in the United States.

US immigration authorities placed substantially fewer people in the Remain in Mexico program in the four months following March 21, 2020, when an order issued by the US Centers for Disease Control and Prevention (CDC) effectively closed the border to asylum seekers purportedly in response to the Covid-19 pandemic. The order, based upon an unprecedented interpretation of an obscure provision of the 1944 Public Health Services Act, authorizes US border agents to summarily expel people who cross land borders without valid entry documents. Summary expulsions do not place people in the MPP. Instead, they are simply turned away with no opportunity to seek asylum, see an immigration judge, or, in the case of unaccompanied children, receive the specific protections provided for in federal law. The order allows the expulsion of noncitizens without any assessment, or finding, of infection with the SARS-CoV-2 virus or the opportunity to isolate or quarantine to avoid the possibility of transmission. The order does not apply to all who arrive in the United States, allowing for example people who may be infected or who are arriving from countries with explosive transmission to enter without screening or testing if they have valid entry documents.

In another response to the Covid-19 pandemic, MPP hearings have been postponed since the end of March, leaving people seeking asylum stranded indefinitely in Mexico. Some people have had their hearings rescheduled for May or June 2021, lawyers told Human Rights Watch. "People are telling me, 'MPP kills us from the inside out,'" said Tania Guerrero, an El Paso-

AR00759

HUMAN
RIGHTS
WATCH

"Like I'm Drowning"

    DONATE NOW

Living conditions for people waiting in Mexico were bad before the pandemic and have gotten worse, Human Rights Watch repeatedly heard. "The only thing that gets me through each day is that I am doing this for my children. I tell myself I have to be strong for my children. But I feel like I am drowning," said Delfina L., a 34-year-old woman from Honduras, in June.

Assessing the Remain in Mexico program, Michael Knowles, a longtime asylum officer who spoke as president of the union that represents asylum officers, told a congressional subcommittee in November 2019, "These policies are illegal, they're immoral, and they're the basis for human rights abuses on behalf of our nation." He added, "I don't know a single asylum officer in the country who believes this is a good policy."[1]

The new US administration is an opportunity for a badly needed reset of US asylum policies. Among other urgent steps, the Biden administration should revert to the global norm of allowing asylum seekers to remain in the country where their claims are heard. In line with the president-elect's campaign promises, the Biden administration should immediately terminate the MPP program and cease all returns of asylum seekers to Mexico.

The Departments of Homeland Security, Justice, and State should develop a plan for the tens of thousands of people placed in the program to report to a US border crossing and be allowed to reenter the United States until their asylum claims are resolved. Reentries should follow a fair and orderly process and be as expeditious as possible. At a minimum, people who should never have been in the MPP under a reasonable interpretation of the "vulnerable population" standard set forth in 2019 by the administration of President Donald J. Trump—including anybody who is pregnant, has medical conditions requiring specialized treatment or care, is living with a disability, or who is lesbian, gay, bisexual, or transgender—should be allowed to return to the United States as soon as possible. Permission to return for families, particularly those with newborns and young children, should also be expedited.

The US government should safeguard asylum seekers' right to a fair and timely hearing, including by establishing an adequately resourced, independent immigration court system and by providing, at a minimum, for court-appointed legal representation for asylum seekers who are members of vulnerable groups.

The incoming administration should acknowledge that the MPP is an abject failure by the United States to uphold the right to seek asylum and to afford protection to people seeking

1/19/22, 6:34 PM
Children and Families Sent to Harm by the US 'Remain in Mexico' Program | HRW
Case 2:21-cv-00067-Z  Document 162-2  Filed 09/02/22  Page 29 of 548  PageID 4972

   

"Like I'm Drowning"  DONATE NOW

possible to the situation they would have been in if they had not been sent to Mexico, should include specific assistance to help them recover from the hardships and anguish the program has imposed on them, should publicly acknowledge these harms, and should commit never to repeat them.

## Related Content



January 6, 2021 | News Release

### US: 'Remain in Mexico' Harms Children, Families

Two Years into Program, Thousands Face Violence, Trauma, Uncertainty

## Glossary

**ACA**          Asylum Cooperative Agreement

**BIA**          Board of Immigration Appeals, the branch of the Executive Office for Immigration Review (EOIR) that hears administrative appeals of the decisions of immigration judges. The EOIR is an agency of the US Department of Justice, and BIA decisions may be overturned by the Attorney General.

**Border Patrol**  The US Customs and Border Protection (CBP) agency responsible for immigration enforcement at land borders other than at official border stations ("ports of entry").

AR00761

1/19/22, 6:34 PM
Children and Families Sent to Harm by the US 'Remain in Mexico' Program | HRW
Case 2:21-cv-00067-Z    Document 162-2    Filed 09/02/22    Page 30 of 548    PageID 4973

HUMAN
RIGHTS
WATCH        "Like I'm Drowning"            f    t    🌐    ✉    ⌘        DONATE NOW

arriving in Ciudad Juárez from the United States.

**CBP**             US Customs and Border Protection, the branch of the US Department of Homeland Security that includes the Border Patrol and the Office of Field Operations.

**CDC**             US Centers for Disease Control and Prevention

**CFI**             Credible fear interview, a procedure for people who have entered the United States without valid travel documents, are apprehended at or near a border crossing, and state that they are afraid to return to their home countries. In such cases, if an asylum officer finds a significant possibility of persecution, the person is allowed to apply for asylum before an immigration judge. (If the person has returned to the United States after being deported, they receive a "reasonable fear interview.")

**COESPO**          Consejo Estatal de Población (State Population Council), an agency of state governments in Mexico that is responsible for the development and oversight of public policy in areas such as health, education, and social development, including among groups such as women, Indigenous peoples, people living with disabilities, migrants, children and adolescents, and older persons.

**COMAR**           Mexican Commission for Refugee Assistance (Comisión Mexicana de Ayuda a Refugiados), the government agency that adjudicates applications for refugee recognition and complementary protection.

*coyote*            A slang term for a person who engages in the smuggling of migrants.

**DACA**            Deferred Action for Childhood Arrivals

**DHS**             US Department of Homeland Security

**DOJ**             US Department of Justice

**EOIR**            Executive Office for Immigration Review, the agency of the US Department of Justice that includes the immigration courts and the Board of Immigration Appeals.

AR00762

  

"Like I'm Drowning"                                          DONATE NOW

December 2019 sought to halt the use of HARP and a similar fast-track pilot program known as PACR.

*Hielera*          Literally "freezer," the name commonly given to CBP holding cells because immigration agents set the temperature of many of these cells at a level that is uncomfortably cold.

**ICE**          US Immigration and Customs Enforcement, the agency of the US Department of Homeland Security that enforces immigration laws in the interior of the United States.

**INM**          The National Institute of Migration (Instituto Nacional de Migración), the Mexican government agency charged with enforcement of the immigration laws.

**MPP**          Migrant Protection Protocols, also known as the "Remain in Mexico" program.

**NRI**          Nonrefoulement interview, an assessment for people subject to the MPP to determine whether it is more likely than not that they will be subject to torture or persecution on account of a protected ground if sent to Mexico.

**PACR**          Prompt Asylum Claim Review Process, a fast-track asylum screening pilot program that, like HARP, operated in El Paso in 2019. PACR applied to single adults and families from Central America and elsewhere who were subject to a ban on US asylum because they transited through a country where they could have sought asylum.

**OFO**          Office of Field Operations, the branch of CBP responsible for immigration and customs enforcement at regular border crossings, or "ports of entry."

**ORR**          Office of Refugee Resettlement, the agency of the US Department of Health and Human Services responsible for the care and custody of unaccompanied children.

**Port of entry**     An official border crossing point

**Removal**          The term used in US immigration law for "deportation."

**UNHCR**          The United Nations High Commissioner for Refugees, also known as the UN Refugee Agency and by its Spanish acronym, ACNUR (Agencia de la ONU para los Refugiados).

applications (other than those made in the course of a removal, or deportation, hearing).

# Recommendations

## To the US Department of Homeland Security (DHS)

- Immediately stop sending people to Mexico under the Migrant Protection Protocols (MPP) and instead, in line with international norms, allow people to seek asylum from within the United States.

- Expeditiously allow people it has already sent to Mexico under the MPP to return to the United States, striking an appropriate balance between the need to allow people who have spent many months in Mexico to enter the United States promptly with the necessity of ensuring that entries are orderly. To do so:
  - DHS should accept and grant, on a rolling basis, parole requests from at least the following groups of vulnerable people who should be deemed "not amenable to MPP" under a reasonable interpretation of MPP policy guidance, along with their families: people who are pregnant, have medical conditions requiring specialized treatment or care, are living with a disability, or who are lesbian, gay, bisexual, or transgender.

  - DHS should develop and implement a plan to allow all others placed in the MPP to report to a US border crossing and be allowed to reenter the United States pending resolution of their asylum claims. This plan should not require people to wait until their next scheduled immigration court hearing.

  - This plan should include provision for all people placed in the MPP, including those whose hearings were terminated or otherwise closed by an immigration judge, regardless of whether any appeal was made; those who received in absentia removal

AR00764

"Like I'm Drowning"           DONATE NOW

- The plan should also make provision, in coordination with the US Department of State, for pre-processing at a US consulate in Mexico or in other countries where people placed in the MPP have relocated.

- The plan to progressively close down the Remain in Mexico program should include provision for adequate notice of these arrangements by a variety of means, including regular radio announcements in Mexico in Spanish, Portuguese, and the most common Indigenous languages spoken in Guatemala, including K'iche', Q'eqchi', Kaqchikel, and Mam. DHS should coordinate with the Department of State to implement these outreach efforts.

- People removed from the MPP should receive specific assistance to help them recover from the hardships and damage the program has imposed on them. Such support should include medical care and mental health services.

- Until the Remain in Mexico program is fully rescinded, take at least the following steps:
  - Direct Border Patrol agents and other CBP officers to allow people placed in the MPP to receive nonrefoulement interviews, screenings that give them the opportunity to be removed from the MPP if they are likely to face harm in Mexico.

  - Require CBP to accept requests at ports of entry for humanitarian parole, the mechanism that allows people to enter the United States temporarily on humanitarian grounds.

  - Direct asylum officers conducting nonrefoulement interviews to apply a standard of review equivalent to that used in the "credible fear" screenings employed for asylum seekers who are placed in expedited removal proceedings. Border Patrol agents and other CBP officers should not conduct nonrefoulement interviews.

  - Following the recommendations of DHS's Red Team Report, add specific protocols to determine the best language for communication with Indigenous-language speakers during nonrefoulement interviews and ensure that the person being interviewed understands the questions asked and is able to make informed decisions.

- Direct US Customs and Border Protection (CBP) agents to stop requiring people seeking asylum at ports of entry to wait at the border before making their claim, the practice

"Like I'm Drowning"

   

should be paroled into the United States pending resolution of their asylum claims. In line with international standards, the detention of asylum seekers should be a measure of last resort; DHS should apply a presumption of release for all people seeking asylum.

- End fast-tracked asylum screening under the pilot programs known as the Prompt Asylum Claim Review (PACR) and the "Humanitarian Asylum Review Process" (HARP).

- End the cooperative agreements on asylum with El Salvador, Guatemala, and Honduras, which lack the capacity to provide a full and fair procedure for determining asylum claims and to provide effective protection for people found to be refugees.

- For those asylum seekers not qualifying for presumption of release, restore the 48-hour waiting period before conducting credible fear interviews in US Immigration and Customs Enforcement (ICE) detention facilities and permit in-person orientation sessions in all ICE detention facilities, including family immigration detention centers.

## To the US Department of Justice

- Restore the ability of immigration judges to grant continuances and terminate or administratively close cases.

- Withdraw decisions by the Attorney General not in line with international standards, including *Matter of A- B-* and *Matter of L- E- A-*, which announced interpretations of the term "particular social group" that unduly restrict claims made by people who face persecution because of their family ties or who are targeted by nonstate actors, including gangs, in circumstances where the state is unable or unwilling to protect them from harm.

- Review and rescind regulatory changes and proposed changes that restrict access to asylum. These include the bar to asylum imposed on July 16, 2019 (and vacated by a federal court in June 2020), for anybody who passed through a country where they could have claimed asylum; proposed changes to standards for asylum claims announced on June 15, 2020; a proposed asylum bar announced on July 9, 2020, for those coming from or transiting through countries affected by Covid-19 or another pandemic; proposed fees for asylum applications; the proposed rule announced on September 23, 2020, that would set a 15-day filing deadline for some asylum applications and restrict the use of evidence from sources other than the US government; and the asylum eligibility bars for certain

AR00766

HUMAN RIGHTS WATCH   |   "Like I'm Drowning"            DONATE NOW

## To the US Department of State

- Develop and implement a variety of means to provide adequate notice of arrangements to permit people placed in the MPP to return to the United States pending resolution of their asylum claims. Notice should be provided by a variety of means, including regular radio announcements in Spanish, Portuguese, and the most common Indigenous languages spoken in Guatemala, including K'iche', Q'eqchi', Kaqchikel, and Mam.

- Carry out pre-processing at US consulates in Mexico or in other countries where people placed in the MPP have relocated, in order to facilitate their reentry to the United States pending resolution of their asylum claims.

## To the Centers for Disease Control and Prevention

- Rescind the summary expulsion order issued on March 20, 2020, and renewed on October 13, 2020, which authorizes the summary expulsion of noncitizens arriving at the border, bypassing normal immigration removal processes regardless of any finding of disease or contagion.

## To the US Congress

- Establish an independent immigration court system, removing the adjudication of immigration matters and the review of determinations made in immigration matters from the control of the US Department of Justice.

- Provide, at a minimum, for court-appointed legal representation for unaccompanied children and for adult asylum seekers who are members of vulnerable groups.

- Provide sufficient resources for additional immigration judges as well as to US Citizenship and Immigration Services for additional asylum officers.

- Consider creating an individualized "complementary protection" standard for arriving asylum seekers who are not able to meet the 1951 Refugee Convention standard but who would face a serious threat to life or physical integrity if returned because of a real risk of

AR00767

"Like I'm Drowning"              DONATE NOW 

- Do not provide additional funding to DHS for immigration enforcement without specific measures to ensure appropriate and effective oversight and accountability for abuses and to stop and prevent abusive policies.

- Prohibit any appropriated funds from being used to implement the Migrant Protection Protocols or any subsequent revisions to those protocols, except to the extent funding is necessary to rescind the protocols, allow people placed in them to reenter the United States, and repair the harm done by the protocols.

- Mandate the provision of rehabilitative services, including psychosocial support, for people placed in the Migrant Protection Protocols.

## To the Mexican Government

While the MPP remains in place:

- Do not accept asylum seekers sent by the United States to Mexico under the MPP unless the US and Mexican governments can ensure they are able to safely stay in Mexico, and so long as the US government can ensure they receive due process in their immigration proceedings.

- Improve screening for people from vulnerable groups and refuse to accept such persons. Do not accept asylum seekers sent by the United States who under a reasonable interpretation of MPP guidance should not be placed in the program, including people with disabilities, who are pregnant, who have medical conditions requiring specialized treatment or care, or who are lesbian, gay, bisexual, or transgender.

- Help those placed in the MPP to find adequate housing.

- Clearly communicate to DHS the current shelter capacity in each sector and refuse to accept anyone DHS attempts to transfer outside of those parameters.

- Issue humanitarian visas to people placed in the MPP, including those now in Mexico under the MPP.

- Ensure that everyone placed in the MPP receives the necessary documentation and information on how to work legally and how to access public health care and education in

"Like I'm Drowning"             DONATE NOW

- Which types of public health services those placed under the MPP can use and how to access those services.

- How to enroll children in public schools.

- Instruct public health and education authorities to ensure that those placed in the MPP program have equal access to these services.

- Ensure access to justice and to appropriate services for survivors of crimes in Mexico.

---

# Methodology

This report is based on 52 interviews with people placed in the Migrant Protection Protocols (MPP) and sent to Mexico. We also spoke with some people who had been "metered" and were waiting to be allowed to enter the United States to claim asylum, and others who had been summarily expelled under an order issued by the US Centers for Disease Control and Prevention (CDC) in March 2020, purportedly in response to the Covid-19 pandemic.

The research team conducted private face-to-face interviews with 47 people in Ciudad Juárez and Tijuana who were placed in the MPP. After the onset of the Covid-19 pandemic prevented further in-person interviewing, the team spoke to an additional five people by telephone or video calls.

These interviews were conducted in Spanish or Portuguese by researchers fluent in those languages. Interviews were conducted according to the principles and practices of trauma-informed interviewing, including child-sensitive approaches where relevant.[2] In-person interviews took place in November 2019 in Tijuana and in January and March 2020 in Ciudad Juárez. Remote interviews took place between April and October 2020. The research team was

AR00769

H U M A N
R I G H T S
W A T C H

"Like I'm Drowning"

       DONATE NOW

The researchers informed all interviewees of the nature and purpose of our research, and our intention to publish a report with the information gathered. They informed each potential interviewee that they were under no obligation to speak with us, that Human Rights Watch does not provide humanitarian services, legal assistance, health treatment services, or clinical care, and that they could stop speaking with us or decline to answer any question with no adverse consequences. They obtained oral consent for each interview. Interviewees did not receive material compensation for speaking with Human Rights Watch.

The team also reviewed case files for most of the 52 people interviewed for this report. These materials included documents issued by US Customs and Border Protection (CBP) agents and immigration courts as well as, where available, medical records and police reports relating to harms suffered in Mexico.

In addition to interviewing people who were in the MPP, the team conducted more than 40 interviews with lawyers, health professionals, shelter staff and volunteers, and others working with migrant families on both sides of the US-Mexico border.

This report also draws on previous Human Rights Watch research on the MPP, including a July 2019 investigation in which the Hope Border Institute and Human Rights Watch interviewed 19 asylum seekers and observed 69 MPP immigration court hearings,[3] a follow-up investigation analyzing the MPP's expansion,[4] an investigation of the challenges asylum seekers with disabilities and chronic health conditions face in Ciudad Juárez published in October 2019,[5] a detailed complaint Human Rights Watch submitted to the US Department of Homeland Security (DHS) Inspector General and to DHS' Office of Civil Rights and Civil Liberties,[6] an October 2020 report that included information on the obstacles lesbian, gay, bisexual, and transgender people face to asylum in the United States,[7] and other reporting.[8]

Human Rights Watch sought comment from CBP and the Executive Office for Immigration Review (EOIR), the agency of the US Department of Justice that oversees the immigration courts, but had not received responses by the time of publication.

This report uses pseudonyms for all children and adults placed in the MPP, those required to wait at the border before beginning the asylum process (the practice known as "metering"), or those summarily expelled under the March 2020 CDC order. Human Rights Watch has also

AR00770

 

In line with international standards, the term "child" refers to a person under the age of 18.[9] As the United Nations Committee on the Rights of the Child and other international authorities do, we use the term "unaccompanied children" in this report to refer to children "who have been separated from both parents and other relatives and are not being cared for by an adult who, by law or custom, is responsible for doing so."[10] "Separated children" are those who are "separated from both parents, or from their previous legal or customary primary care-giver, but not necessarily from other relatives,"[11] meaning that they may be accompanied by other adult relatives.

---

# I. "Remain in Mexico"

Over the last two years, US immigration authorities have sent more than 69,000 people to Mexico while they wait for their asylum hearings in US immigration courts,[12] including families with children of any age. By one estimate, children under the age of 18 were one-third of all those sent to Mexico; more than 4,000 were under the age of five, and nearly 500 were less than one year old.[13] In January 2019, the US Department of Homeland Security (DHS) began to send people to Tijuana under the program, formally known as the Migration Protection Protocols (MPP) but more commonly called "Remain in Mexico." By the beginning of 2020, DHS was also sending people to Mexicali, Nogales, Ciudad Juárez, Nuevo Laredo, and Matamoros. In some cases, DHS sent people to places far from where they entered—in some instances, to the opposite coast.

About one-third of those placed in the MPP have been given immigration court hearings in El Paso. Most were sent to Ciudad Juárez, the city directly across the border, but that total also includes people sent to Nogales and told to make their own way to the Ciudad Juárez-El Paso border crossing, some 550 kilometers (340 miles) away, for each of their immigration court hearings.

Before the MPP, when asylum seekers were often allowed to stay with family members in the United States, many of these cases would have been heard in immigration courts across the

HUMAN RIGHTS WATCH

"Like I'm Drowning"            DONATE NOW

January 2020. "Now the court is a mess. It's completely overwhelmed. Sometimes there are hundreds of people waiting in court for master calendar hearings," the preliminary hearings in which people tell the court how they intend to proceed with their cases.[15] Lawyers described similar conditions in Brownsville and Laredo, both in Texas and assigned 16,950 and 13,500 cases respectively,[16] where DHS and the US Department of Justice set up temporary "tent courts" to handle the large number of cases.

As of July 17, 2020, just 523 people had received grants of asylum or withholding of removal out of nearly 44,000 MPP cases DHS considered completed, a grant rate of slightly more than 1 percent for the MPP cases concluded in the first year-and-a-half of the program.[17] By comparison, in fiscal year 2018 (the period from October 2017 to September 2018), the asylum grant rate was about 35 percent.[18]

At least four lawsuits challenging the validity of the MPP were pending at this writing. One, filed in federal district court in California, resulted in a February 2020 ruling by a federal appeals court that the program is "invalid in its entirety" because it is inconsistent with federal immigration laws.[19] The Supreme Court stayed that order to allow the government to seek review; in October, it announced that it would consider the case in 2021.[20] A separate, narrower lawsuit filed by the ACLU has challenged the government's decision to extend the MPP to the Mexican border state of Tamaulipas.[21] A third case, filed in October 2020, challenged the use of the MPP in California.[22] And a case filed in November 2020 challenged the placement of people with disabilities in the MPP.[23]

Although US immigration authorities summarily expelled most people who crossed the US-Mexico border after March 20, 2020,[24] CBP has continued to place some in the MPP—some 4,400 in the first eight months after the summary expulsion order took effect, including at least 1,100 in September 2020 alone.[25]

## Rollout of the Program

Then-DHS Secretary Kirstjen Nielsen announced the MPP in December 2018, justifying the program in part by saying that it would "allow us to focus more attention on those who are actually fleeing persecution."[26] DHS expanded the program to apply to people who entered the United States at or near Calexico, California, and El Paso, Texas, in March 2019; Laredo and

     DONATE NOW

In its first year, the program only applied to nationals of Spanish-speaking countries, including Cubans, Ecuadorians, and Venezuelans as well as those from Central America's Northern Triangle, but DHS began subjecting Brazilians to the program at the end of January 2020.[28] Brazilians placed in the MPP told Human Rights Watch the experience was very difficult for them. "It's complicated. It's another reality. There's a lot of prejudice and discrimination. Here in the shelter [in Ciudad Juárez], everybody speaks Spanish. The culture, the customs, the food —for them, it's familiar. Even after seven months, we haven't adjusted," said Renata A., a 38-year-old woman from Brazil. Other boys in the shelter called her 12-year-old son a "Brazilian weakling" and began hitting him while they were playing soccer, she told Human Rights Watch, texting us a photo showing her son with a black eye. Language barriers made it difficult to access even the minimal services other families received in the shelter, she said.[29]

## Unaccompanied Children Sent to Mexico

DHS policy guidance states that unaccompanied children should not be placed in the MPP,[30] and groups in Ciudad Juárez, El Paso, and Tijuana agreed that border agents were generally allowing unaccompanied children to enter the United States if they were accompanied by a lawyer or a Mexican official.[31]

But Human Rights Watch heard of several instances in which CBP placed unaccompanied children into the MPP. In one case, Luis M. Gonzalez, supervising immigration attorney at the Jewish Family Service of San Diego, told us that a 16-year-old Honduran girl contacted his office after CBP agents sent her and her 1-year-old daughter to Mexico in mid-2019 after placing them in the MPP. After DHS rebuffed their request to remove the girl and her daughter from the MPP, Gonzalez and his colleagues presented her birth certificate to the immigration judge and pointed out that CBP had correctly listed her date of birth on the documents they prepared before sending her and her daughter to Mexico. "DHS counsel kept refusing to agree she was an unaccompanied child. They wanted to send her and the baby back to Mexico while they investigated," Gonzalez said. "Then they wanted the judge to set a bond to release the girl and her daughter, at least $1,500 for each of them." The immigration judge rejected the government's request for bond and ordered the girl and her daughter released on their own recognizance to allow them to join the girl's mother, who lives in the United States.[32]

"Like I'm Drowning"           DONATE NOW

his birth certificate was false. They didn't believe he was a minor and returned him to Mexico under the MPP," Linda Rivas, executive director of Las Americas, Immigrant Advocacy Center told Human Rights Watch.[33]

## Family Separation Under the MPP

Immigration agents routinely separate children from adult relatives who are not parents, including grandparents, aunts and uncles, and older siblings.[34] In addition, Human Rights Watch heard accounts indicating that US border agents are still separating families in some cases, for instance by allowing one parent to remain in the United States and placing the other in the MPP even when the family is travelling together and ask to be kept together,[35] and the Women's Refugee Commission has documented cases of parents and legal guardians whom US immigration agents separated from their children, placing the parents in the MPP and transferring their children to the custody of the US Department of Health and Human Services.[36]

Additional accounts of forced family separation have appeared in news reports. In one of these cases, in October 2020, after a Honduran woman gave birth on her own in a field in Eagle Pass, Texas, Border Patrol agents transported the woman and her baby to a local hospital.[37] When the hospital arranged to have the child transferred to a neonatal intensive care unit in San Antonio, agents prevented the woman from remaining with her child and instead prepared to deport her, lawyers told the *Los Angeles Times*.[38] The chief patrol agent for the Border Patrol's Del Rio sector stated in a tweet, "Due to strict COVID-19 restrictions in the neonatal intensive care unit, the mother could not join the child in the aircraft or at the hospital."[39] The hospital disputed that statement.[40] After publication of the *Los Angeles Times* story, border agents released the woman and allowed her to reunite with her child.[41]

## Arbitrary, Distant Transfers

US immigration agents sent some people to distant border towns—in some cases, on the opposite coast—without explanation. Other people were sent to border towns relatively close to where they crossed into the United States but given court hearings elsewhere along the border. In either case, these decisions exposed people to additional danger by making them undertake lengthy journeys to unfamiliar towns.

AR00774

  
west. For instance, Kuymi P. said that after she, her husband, and their daughter entered the United States, "Immigration caught us. They took us to a place where they held us for two days. They said they would send us to Tijuana."[42] But most people were returned to Mexicali, across the border from Calexico, with orders to report to a border station in Tijuana, Nicole Ramos of Al Otro Lado told Human Rights Watch.[43] In one such case, CBP transferred María Q., a 41-year-old Honduran woman, and her family from Yuma, Arizona, to Calexico, California, about 100 kilometers (60 miles) west, and sent them across the border into Mexicali with a court hearing scheduled in San Diego, California, across the border from Tijuana. "From Mexicali, we had to make our way here," she told us when we spoke with her in Tijuana. "The immigration agents didn't give us any directions. They didn't tell us where there were shelters," she said.[44]

People sent to Nogales must make their way to Ciudad Juárez, a 550-kilometer (340-mile), seven-and-a-half-hour journey by the most direct route through Mexico, to attend hearings in El Paso; no MPP cases are heard in Tucson, Arizona, where the nearest immigration court is located. Those sent to Piedras Negras, across the border from Eagle Pass, Texas, must travel to Laredo, the nearest immigration court, 180 kilometers (110 miles) away by the most direct route.

DHS also flew some people across the country before sending them to Mexico. Some people told us they were sent from the Rio Grande Valley in Texas to San Diego, and from there to Tijuana. Henrique C., from Honduras, said that he and his two children entered the United States near Reynosa in August 2019 and were detained in McAllen, Texas. "An agent announced, 'We're going to process you. We're going to send you to wait for your court in Tijuana.' When we heard that, everybody started to cry."[45]

In another such case, Alejandra Q., a 53-year-old woman from Honduras, told us that after she, her husband, and their 15-year-old son entered the United States near Reynosa in June 2019, immigration officials held them for three or four days in Texas before flying them to San Diego. They spent another three days in immigration holding cells in San Diego before US immigration authorities sent them to Tijuana with an initial hearing date in January 2020.[46] Similarly, Karina E., a 26-year-old Guatemalan woman, said that she, her husband, and their 5-year-old son also entered the United States near Reynosa in June 2019, spent four days in a holding cell in Texas, and then another five days in detention in San Diego before US immigration authorities sent her to Tijuana.[47]

AR00775

HUMAN
RIGHTS
WATCH    "Like I'm Drowning"

       DONATE NOW

Getting to court can be difficult and dangerous even for those sent directly across the border from the US city where their court hearings are scheduled. Many people showed us CBP documents directing them to report at 4:00 a.m., requiring them to travel well before dawn through neighborhoods that were often unsafe. Some families spent the night on the sidewalk near the border crossing because they had no reliable way of getting to the border after nightfall. Once in the United States, people described long hours waiting in hallways with guards ordering young children to sit silently and still. Many of those we interviewed said they spent a night in a cold immigration holding cell each time they attended a court hearing.

Blanca M., 31, attended her first immigration court hearing in August 2019 with her husband and their three daughters, all under age 5. "We had nothing to eat from 9 a.m. to 3 p.m.," she said. "The officials wanted us to keep the kids quiet. Really I was at the point of giving up."[48] They had the same experience at later court hearings. Julián, her husband, said that when they went to court in November 2019, "One guard kept saying, 'Those of you with children, control them. If your children are fucking around, I can take away your court hearing.' It's almost impossible to get a 1-year-old to stay seated in a chair."[49] Reflecting on the long waits to see the judge, Blanca said, "They make people wait a long time. We think it's meant as a punishment."[50]

Others gave similar accounts, matching the reports of other groups.[51] Micaela H., a 27-year-old Guatemalan woman, told us that on the day of her immigration court hearing in November, she arrived at 3:00 a.m., an hour ahead of the time CBP agents had instructed her to arrive. A bus took her and others to court in San Diego, about 25 km (16 miles) from the border station, and she saw the judge at 8:00 a.m. Asked what she did in the four hours between 4:00 a.m. and seeing the judge other than taking the bus, she replied, "We just waited. They didn't say why."[52]

"We wait in a hallway, seated in chairs," said Nuria J. "The kids are right there with us. There's nowhere else for them. They can't play. The guards don't permit them to move around. They reprimand you if the kids get out of the chairs. You sit all day. It's a long time."[53] Another woman said: "If you have a baby and you need to change your baby's diapers, they'll give you a diaper. But there's no place to go. You have to change your baby on the floor, right there in the hallway."[54]

The early arrival times are in part to allow time for CBP-required health screenings, including lice checks, before people are transported to the immigration court, but as the accounts of Micaela and others suggested, these procedures take a fraction of the time available between

"Like I'm Drowning"             DONATE NOW 

people in the MPP told Human Rights Watch.[55]

As was the case with Blanca, some families said they were thinking of abandoning their asylum claims because the process was so traumatic for their children.

## Due Process Failures

The Remain in Mexico program has significant due process shortcomings. These include barriers in access to counsel, disruptions and alienation when hearings are conducted by video, deficient notice resulting in the loss of rights and creating the risk that people may not appear at hearings through no fault of their own, and questionable procedural tactics by DHS and dubious interpretations of newly issued asylum regulations by some immigration judges. In perhaps the most shocking of these abusive practices, DHS agents returned people to Mexico after immigration judges terminated their deportation hearings (meaning that the judge dismissed the deportation charges and closed the case) and in some instances even after they received grants of asylum. As a consequence, people in the MPP are denied their right to a full and fair hearing and deprived of the right to seek asylum.

## Lack of Access to Counsel

Deportation proceedings are a high-stakes process that affords minimal protection at the best of times. US immigration law is complicated, particularly with respect to asylum, and immigration court filing requirements afford little latitude to people who represent themselves. Unlike defendants in criminal cases, people facing deportation, including children, are not entitled to have lawyers appointed for them if they cannot afford one.[56]

The network of nonprofit legal services organizations and pro bono or low-cost private attorneys who provide representation in deportation cases cannot meet the need. Particularly in asylum cases, having legal representation can significantly increase people's chances of success.[57] People who do not win asylum under this difficult process have been returned to death or other serious harm.[58]

People sent to Mexico under the MPP face additional formidable obstacles. Few of the pro bono or low-cost legal service providers represent people in the MPP. For those that do, the time and

AR00777



"Like I'm Drowning"



DONATE NOW

to prepare cases. Even mundane tasks such as copying documents or getting signatures on forms become onerous when lawyers and clients are separated by an international border.[59]

"Access to clients in Mexico is always difficult," Luis Gonzalez, a senior staff attorney with Jewish Family Service of San Diego, told Human Rights Watch, describing problems with getting permission to visit certain shelters and, for those living in private accommodation, the risks of meeting where they live. "It's difficult to walk into people's homes. These areas are not the safest, and people coming from the US are readily identified. If we go into some neighborhoods, we put everyone in the house at risk," Gonzalez said, explaining that any perceived US connection carries a risk of extortion and kidnapping.[60]

Some of these barriers could be mitigated in part by orientation sessions and the opportunity to meet with lawyers individually in court prior to initial hearings, initiatives that have long been in use in immigration courts across the country and in family immigration detention centers. In fact, until June 2019 in the El Paso immigration court, pro bono attorneys and other trained volunteers could meet with people on the day of their hearings to go over their case, assist them with completing asylum applications, and provide translations of documents. But the court suspended these activities that month.[61] Similarly, when Kennji Kizuka of Human Rights First observed MPP hearings in the San Diego immigration court, lawyers told him that the court did not permit legal service organizations or pro bono attorneys to meet with people seeking asylum or to provide orientation sessions.[62] The Laredo and Brownsville tent courts also did not permit orientation sessions or the opportunity for people to meet lawyers who did not already represent them, observers found.[63]

DHS policy documents state that people who attend MPP hearings will be available to speak with their lawyers for one hour before their case is called.[64] In practice, lawyers who represent clients in MPP hearings often have far less time to meet with them on the day of the hearing. The American Immigration Lawyers Association heard from its members that contractors at the Laredo tent courts "frequently limit the attorney-client preparation time to 30 or 45 minutes."[65] In some cases, lawyers cannot meet their clients at all: when Denise Gilman, a law professor at the University of Texas at Austin, tried to observe MPP hearings in El Paso in November 2019, she spoke to a lawyer who told her that the court personnel required attorneys to wait in the building lobby instead of in the courtroom or on the floor where the court is located, making it logistically impossible to see clients at all.[66]

AR00778

  

DONATE NOW

disconcerting because they expect to be able to tell the judge why they left their home countries. Instead, they receive a 12-page asylum application in English, a directive to complete the application in English and provide English translations of all supporting documents, and another court date, the sole purpose of which is to receive their completed application and set an individual hearing to consider it. Many of those Human Rights Watch interviewed had attended four or five such initial, or "master calendar," hearings—repeated preliminary appearances, each requiring a full-day trip across the border, that could have been avoided by legal representation or orientation sessions.

## Impediments Caused by Video Hearings

Video hearings create further barriers for people's ability to understand the proceedings and effectively convey the elements of their claims. For hearings in Brownsville and Laredo, Texas, where DHS set up temporary "tent courts," the judge and the DHS lawyer are physically located in Harlingen, El Paso, Port Isabel, or San Antonio.[67] Some of the judges who hear MPP cases assigned to El Paso are based in Fort Worth and also appear by video.

In a submission to the Inter-American Commission on Human Rights, the University of Pennsylvania Law School's Transnational Legal Clinic and the University of Texas School of Law's Immigration Clinic described video proceedings in the tent courts as "distancing and dehumanizing," observing:

> [T]he Laredo and Brownsville facilities are not really courts at all. In the facilities themselves, there are no Immigration Court personnel available. The Department of Homeland Security attorneys, the immigration judges, and even the interpreters, are all in San Antonio or Harlingen. The government employees located at the facility are responsible only for immigration enforcement. In effect, the facility is a temporary detention center, run by immigration enforcement officers, to which asylum seekers must present themselves in order to access court proceedings conducted by video.

> [A]sylum seekers take turns at a small table in the front of the room with two chairs that face a giant television screen with video showing the

AR00779

"Like I'm Drowning"    

approximately once every forty minutes, and all communication between the facility in Laredo and the court in San Antonio is lost at such moments.[68]

## Inaccurate Notices

Most of the notices viewed by Human Rights Watch listed incorrect addresses for the person facing deportation, meaning that the immigration court had no reliable way to alert people of changes to the date and time of their hearing. Alternatively, some notices listed the person's address as "Facebook," according to news reports.[69] Commenting on such practices, the immigration judge noted in one case reviewed by Human Rights Watch:

> DHS does not provide an actual address for the respondents. The address provided by DHS in this case, and in virtually all MPP cases, merely lists the respondents' address as *domicilio conocido,* Tijuana, Baja California, Mexico or *domicilio conocido,* Mexicali, Baja California, Mexico. This is the only "address" obtained by DHS in the vastly overwhelming majority of MPP cases. The address is completely inadequate. The term *domicilio conocido* literally translates as "known domicile." It generally is used as a mailing address where the recipient lives in a small village where the postal worker also knows where everyone lives. However, in cities the size of Tijuana and Mexicali there is no reasonable possibility that correspondence sent to respondents at *domicilio conocido* will actually be received by respondents, particularly since respondents are not Mexican and have no prior residence in Mexico.[70]

New guidance issued by CBP in December 2020 advises agents to "affirmatively inquire" if a person has an address in Mexico and notes that "DHS is obligated to record the [person's] answer" on the notice.[71]

In some cases, people received notices listing the wrong date for their immigration court hearing.[72] Because the likely consequence of not appearing at the exact date and time of an immigration court hearing is a deportation order issued in absentia, this defect is particularly serious.

AR00780

"Like I'm Drowning"                  DONATE NOW

the papers CBP gave her before placing her in the MPP, she stopped us when we told her that according to the record of her interview, she had told agents she entered the United States in San Luis, Arizona. She told us she could not have provided that answer because she did not know where she crossed the border. The documents also stated that her 4-year-old daughter left Ecuador "to look for work."[73]

## Procedural Short-Circuits

In many cases, DHS employed a procedural sleight of hand to deprive people of the opportunity for release. To accomplish this, immigration agents did not completely fill out Notices to Appear, the document they prepare upon apprehension to initiate deportation proceedings. The agent who prepares a Notice to Appear should select one of three options to indicate whether the person being charged is "an arriving alien" (for example, someone who requests asylum at an official border crossing), is "present in the United States without admission" (after an irregular entry), or was "admitted but . . . removable for specified reasons" (such as overstaying a visa or committing a crime). The distinction is important because people who are apprehended within the United States, including people who entered irregularly, are generally eligible for bond hearings to determine if they can be released upon the deposit of a sum sufficient to guarantee their appearance at their immigration court hearings.[74] In addition, only "arriving aliens" are subject to return to Mexico pending resolution of their deportation proceedings.[75] Instead, DHS left these fields blank on the initial notices and then amended the notices at people's first MPP hearing to state that they were "arriving aliens," on the theory that they had "arrived" in the United States at the time they crossed the border to attend their hearing.

This practice is both disingenuous and illogical. The government created the very circumstances it then used to deny rights: if it did not send people to Mexico under the MPP, they would not have to cross the border to attend their hearings. In addition, for those whose initial entry was irregular, that fact is the basis for the initiation of deportation proceedings against them, and the amended notices Human Rights Watch viewed did not alter the descriptions in the original notices detailing dates and places of alleged irregular entry. In fact, the documents Human Rights Watch reviewed in cases where DHS issued amended notices contained detailed information about individuals' apprehension within the United States, often noting the exact longitude and latitude where Border Patrol agents made the apprehension.[76]

AR00781

"Like I'm Drowning"

      DONATE NOW

In other cases, immigration agents issued inaccurate Notices to Appear, with the same result that people were ineligible for release on bond. María Q. and her family entered without inspection near Yuma, Arizona, and were in the United States when CBP agents apprehended them. Nonetheless, their charging documents issued in Yuma alleged, "You are an arriving alien."[78]

Similarly, some immigration judges treated each court appearance as an "arrival" in the United States as the basis for finding that people were ineligible for asylum. These rulings relied on the third-country asylum transit bar, which provided that a person was ineligible for asylum in the United States if they had travelled through another country without seeking protection there. [79] Until the end of March, when MPP hearings were postponed in response to the pandemic, two of the four judges hearing MPP cases in El Paso were interpreting the transit bar to apply to people who entered the United States before July 16, 2019, the date the bar took effect, because they crossed the border after that date to attend immigration court hearings.[80] (A federal district court vacated the bar at the end of June 2020.[81]

In some instances, immigration judges treated humanitarian visas issued in Mexico as evidence of "firm resettlement," another legal bar to asylum, lawyers told Human Rights Watch.[82] In fact, Mexican humanitarian visas are temporary; they do not afford permanent status in Mexico. [83]

We heard some accounts of people not allowed to cross the border to attend their hearing even though they arrived well before the actual time of their hearing. "They won't be processed by DHS if they show up a few minutes after the time they were told to appear at the port of entry; 4:00 a.m. if they have a morning hearing or 9:00 a.m. if their hearing is in the afternoon," Luis Gonzalez, of the Jewish Family Service of San Diego, said of the practice at the San Ysidro border crossing. He added, "The court notice only lists the time of the hearing itself, so that confuses people."[84] The border crossing time appears on a separate form that is sometimes issued only in English, Human Rights Watch saw when we reviewed the notices and other papers people received when they were placed in the MPP.

The attorney general has limited the authority of immigration judges to order continuances, which postpone hearings to a later date.[85] More recently, the Board of Immigration Appeals has ruled that immigration judges may not terminate proceedings even if immigration officials list incorrect addresses and leave other sections of the charging document blank.[86] The

"Like I'm Drowning"           DONATE NOW

incomplete.

Other immigration courts that handle MPP cases did not follow the practice of the San Diego immigration judges. Cindy Woods, a managing attorney with Texas RioGrande Legal Aid, commented, "In Laredo, judges have always issued in absentia orders" when a person failed to appear, regardless of the information on the Notice to Appear. She knew of only one case in which a judge ordered a continuance in a case where the individual facing deportation was not in court; in that case, a lawyer explained the reasons for the person's failure to appear.[87]

Any deportation order, including one issued in absentia, can be "reinstated," meaning that it can be carried out immediately as if it had just been issued, if the person subsequently returns to the United States irregularly.[88] This summary procedure precludes access to asylum (although a person subject to reinstatement can seek withholding of removal under the stricter standard for that form of protection) and is not subject to administrative review.[89] A deportation order can only be reinstated if the person reenters "after having been removed or having departed voluntarily, under an order of removal . . . ."[90] A person who is outside the country when a deportation order is issued, as in the case of most people issued in absentia orders while in the MPP, has not left the United States "under an order of removal" and should not be subject to reinstatement of removal.[91] Nonetheless, the government has reinstated the removal orders of at least some people who made irregular entries after they were ordered deported in absentia while in the MPP, lawyers told Human Rights Watch.[92]

## Fake Court Dates

Well before the board restricted immigration judges' authority to terminate proceedings, DHS responded to orders of termination by sending people to Mexico even though the immigration judge had dismissed the charges against them and closed their cases, meaning that they were no longer in deportation proceedings. Because Mexican immigration authorities do not accept people transferred by US immigration authorities unless they have an immigration court date, DHS issued notices with court dates that were fictitious. Some of these notices explicitly—and falsely—stated, "At your last court appearance, an immigration judge ordered you to return to court for another hearing."[93] Other notices misleadingly stated that "an immigration judge will determine whether you are removable from the United States," referred to "the date of your hearing before an immigration judge," and gave a date and time to arrive at a port of entry "to

HUMAN
RIGHTS
WATCH         "Like I'm Drowning"                   DONATE NOW

In one such case, Clara P., a 25-year-old Honduran woman, told us that after her immigration hearing in September 2019, DHS held her for seven days and then returned her to Mexico. [95] The papers she showed us included an order from the immigration judge terminating proceedings and a CBP-issued notice instructing her to return to the port of entry in December 2019 to be "transported to your hearing."[96] During our interview, Human Rights Watch called EOIR's immigration case status information number and confirmed that she had no court hearing scheduled on that day or any other.

Others we spoke with in Tijuana, including Santiago F., a 30-year-old man from Guatemala, were also given fictitious court dates and returned to Mexico after their deportation proceedings were terminated.[97]

After immigration advocates met with Mexican immigration officials to explain that a termination of the case meant that the person was no longer facing deportation and would not have another immigration court hearing, INM began refusing to accept people with termination orders, said Luis Gonzalez, the attorney with Jewish Family Service of San Diego. "But the people who were sent back before that were stuck, with no recourse unless DHS counsel appealed the termination order," he told us.[98]

In some instances, DHS returned or attempted to return people after they received asylum, apparently on the theory that the government had thirty days to appeal the asylum decision.[99] In November 2019, Kennji Kizuka, a senior staff attorney with Human Rights First, met a Venezuelan man in Nuevo Laredo whom DHS had returned to Mexico the previous month after an immigration judge granted the man asylum.[100] Kizuka identified 16 other cases in which DHS sent people to Mexico with fake hearing notices after immigration judges granted them asylum or withholding of removal.[101]

After media reports and a December 2019 letter from more than 50 members of Congress to the DHS Office of Inspector General,[102] DHS appeared to end returns to Mexico of people who won asylum or withholding, lawyers told Human Rights Watch. New DHS guidance issued in December 2020 states that ICE "will determine whether to detain or release the alien into the United States"—but no longer claims the authority to keep the person in the MPP and return them to Mexico—in cases where a person has received a grant of asylum or withholding of removal and the government has reserved the right to appeal the immigration judge's decision. [103]

AR00784

"Like I'm Drowning"                   DONATE NOW

After their initial entry, whether irregularly or at a border station, people often spend a night or more—in some cases several weeks—in CBP holding cells. These cells are often uncomfortably cold, and in fact migrants and CBP agents commonly refer to these cells as *hieleras,* meaning "freezers."[104] When CBP agents apprehended María Q., her husband, and their three sons, ages 4, 11, and 16, near Yuma, Arizona, "we spent two days in the famous *hielera.* For me this was really bad, especially when they separated my oldest son from me. We had never been separated before. He was 16, so he went with his father. The younger boys stayed with me."[105] Rosalyn G., from Cuba, spent five days in a holding cell in San Ysidro after she sought asylum at the border station.[106]

CBP usually separates men from their children in these holding cells, and teenage boys are also held apart from their parents and younger siblings. When Salvador E. and his wife, Marla, and their five children were held in the Chula Vista Border Patrol Station for two days, Salvador asked if some of their sons could stay with him so that his wife did not have to care for all of their children. Border agents refused his request, he told us.[107]

In addition to the time they spend in these holding cells before they are processed in the MPP and sent to Mexico, families must often spend a night or more in detention each time they appear in court. For example, Julián M. said that after he and his family had a court hearing in October, they were held in an overcrowded El Paso immigration holding cell. He told us:

> The cell I was in had a capacity of 38. There was a sign. It was in English, but I understood the word "capacity," and right next to it was the number 38. We all counted ourselves. There were 112 of us in that cell. At first there were 99. Then the guards brought 13 more. The 13 didn't fit. We were all sleeping on the floor. An official told us to get up so everyone could fit in the cell. He had a stun gun. He threatened us with it, saying, "If you don't get up, I'll shoot you with the stun gun." Of course everyone immediately got up. Nobody slept that night.[108]

In a similar account, Santiago F., a 30-year-old from Guatemala, told us that after each of the court hearings he and his 5-year-old son attended in late 2019 in San Diego, they spent three nights in immigration holding cells. After one hearing, immigration officials inexplicably transported him and his son to Calexico and held them there overnight before sending them

      DONATE NOW

People also described unusually lengthy periods of detention after immigration judges terminated their deportation proceedings, meaning that they were no longer facing deportation. For instance, after an immigration judge terminated proceedings in Karina E.'s case, she spent five nights in detention.[110] Similarly, when the judge terminated proceedings against Clara P., a 25-year-old woman from Honduras, she and her two-year-old son spent seven days in detention. Her son did not eat the food they were given while they were locked up and lost weight during the time they were held, she told us.[111]

We heard many other accounts of children showing significant anxiety, intense fear, and changes in behavior as immigration court appointments approach, changes that parents linked to the distress their children suffered during their time in holding cells. These parents told us they felt they were forced to choose between subjecting their children to trauma and missing their immigration court hearings.

## Abusive Immigration Agents

We heard numerous accounts of abusive treatment by immigration agents. "A man, an agent, took us to the cells, banging on the doors. 'Sit down there on the floor,' he said. He used really racist words, really strong words. 'You're not in your country,' he said. The way he spoke was really rude. I felt bad when I heard him say those things," Henrique C., from Honduras, said of his first day in a McAllen holding cell in August 2019. He said the guards were worse in the San Diego holding cell where he spent another four days before being sent to Tijuana. "I saw an official—there was a boy who wanted another cookie. The official almost smacked the boy in the face with the door when he slammed it shut."[112]

In another example, while Blanca M. and her family were in immigration holding cells after their second court appearance, in October 2019, her baby fell seriously ill. At first, she said, the immigration agents refused to listen to her when she asked for medical attention. "They slammed the door in my face. The way they reacted was cruel," she said. She eventually persuaded agents to arrange for the baby to be taken to the hospital.[113]

Others told us that guards threatened to detain them longer if they complained about their treatment or were otherwise seen to be noncompliant. Wendy G., 32, from Honduras, was held in a *hielera* with her 12-year-old daughter and 10 and 8-year-old sons in August and again in

1/19/22, 6:34 PM
Children and Families Sent to Harm by the US 'Remain in Mexico' Program | HRW
Case 2:21-cv-00067-Z    Document 162-2    Filed 09/02/22    Page 55 of 548    PageID 4998

HUMAN
RIGHTS
WATCH
"Like I'm Drowning"

   

DONATE NOW

risked being locked up more days if we misbehaved."[114]

We heard one account of immigration agents destroying documents that a family had brought with them to support their asylum claim. In that case, Nicola A., a 37-year-old Cuban woman, told us that she and her family crossed into the United States near Nogales "with the idea and intention of turning ourselves in to US immigration authorities" to seek asylum. Border Patrol agents took them to a detention center in Tucson to be processed. There, she tried to explain to an immigration agent why she and her family were seeking asylum. "We had extensive evidence and documentation of our political persecution in Cuba, including citations, fines, and arrest records from Cuban authorities. The immigration official took all of our records, and, in front of us, tore them up and threw them in the garbage," she said.[115]

## The Uneven Response to the Pandemic

Immigration courts suspended MPP cases at the end of March 2020; at this writing, MPP hearings had not resumed. In itself, the extended postponement of these cases was not unreasonable in light of the public health emergency in Texas and California. But the piecemeal nature of postponements, the erratic and often last-minute communications that announced them, and the reporting requirements DHS imposed until mid-July 2020 placed significant burdens on and were an unnecessary source of additional stress for people in the MPP.

Across the country, initial decisions to postpone hearings were made with no notice during the second week of March,[116] seven days or more after the immigration judges' union, the union representing immigration trial attorneys, and the immigration bar called for the temporary closure of all immigration courts.[117]

The Executive Office for Immigration Review (EOIR) extended the closure five times before the end of 2020. Its most recent order, announced at the end of the day on July 17, the last business day before hearings would have recommenced, stating that hearings would resume only when all of the US border state reopening stages, health advisories from the State Department and the CDC, and Mexican government designations for each of its states bordering the United States reached specific levels.[118] Assessing the challenges in fulfilling all of these criteria, the *Arizona Republic* observed, "The changes likely mean that migrants already waiting in Mexico will have to continue doing so for an even longer, undetermined amount of time in often precarious conditions."[119]

AR00787

  

DONATE NOW

a pregnant 22-year-old Cuban woman and her husband travelled for 10 hours on crowded buses from Nogales to Ciudad Juárez in mid-May, learning only after they arrived that hearings had again been postponed.[120]

In addition, for the first several months, the procedures the agencies adopted for people to receive their rescheduled hearing dates were unnecessarily burdensome. Until May 10, DHS and EOIR instructed people to go to the border on the original date of their hearing to receive a new notice, or "tear sheet,"[121] an approach that did not take into account the difficulties migrant families face to get to border stations before dawn. One man whose attorney had already given him a copy of his rescheduled hearing notice told Human Rights Watch that when he went alone to the border crossing early in the morning, without his wife and young children, to confirm the rescheduled date, CBP agents said he should have come with his entire family and told him not bringing them risked their deportation in absentia.[122]

The agencies then instructed people to appear one month after the date of their hearings without clarifying what they should do if the day the following month fell on a weekend.[123] Speaking to us in June, when that instruction was in effect, Nicolas Palazzo, a lawyer with Las Americas Immigrant Advocacy Center, commented, "The vast majority of people still do not know that they are not required to go to the bridge to get a tear sheet. Logistically speaking, the lack of clear information has been a nightmare for both CBP and our clients."[124] And Alexandra Miller, Border Action Team managing attorney for the Florence Immigrant and Refugee Rights Project in Tucson, told Human Rights Watch in early July, "Now that people theoretically don't have to get the tear sheets, many are going anyway because they have been misled so many times. They don't trust CBP. They have no faith in the system."[125]

Once immigration courts reopen for MPP hearings, US authorities should allow people to cross the border on their new court dates if they bring valid photo identification and their original paperwork, attorneys told Human Rights Watch.[126]

An additional concern is that asylum applications must be filed within one year of the date of arrival in the United States. People who are not represented by lawyers typically submit their asylum applications at one of their initial hearings and are unlikely to be aware that EOIR set up an electronic filing process in response to the pandemic. "There's no information in Spanish about this. How would a pro se respondent know they could send in an application electronically, and where they should send it?" Cindy Woods asked.[127]

AR00788

Case 2:21-cv-00067-Z    Document 162-2    Filed 09/02/22    Page 57 of 548    PageID 5000

delays in immigration court hearings, Constance Wannamaker, an immigration lawyer in El Paso, said, "There's overwhelming desperation."[128]

---

## II. Illusory Safeguards Against Return to Harm

Mexican towns along the border with the United States can be very dangerous, especially for people whose demeanor and speech mark them as newcomers and who lack the resources to stay in hotels or in rented accommodation in safer neighborhoods. Human Rights Watch heard repeated accounts of migrant families beaten, robbed, or subjected to other serious harm in circumstances that suggest their assailants targeted them because of their national origin or ethnicity. Women and girls described actual or attempted rape or other sexual assault, also in circumstances suggesting they were targeted because they were not Mexican or because they were Indigenous or transgender. Some of those responsible for extortion and other serious abuses appear to have been Mexican government officials—police or immigration agents who identified themselves as such, wore uniforms and drove vehicles bearing official insignia, in some cases took people to police stations, and often threatened people with arrest or deportation if they did not hand over money and other valuables.[129]

The "Remain in Mexico" program theoretically incorporates two safeguards against sending people to harm while they wait for their US asylum hearings. First, in purported compliance with the principle of nonrefoulement, US asylum officers are supposed to interview people who express fear of being sent to Mexico and determine if their lives or freedom would be likely threatened in Mexico. CBP is not supposed to place in the MPP those found more likely than not to face torture or persecution in Mexico. Second, CBP is supposed to consider humanitarian exceptions on a case-by-case basis—for example, high-risk pregnancies, other serious medical issues, disabilities, and transgender status.

In practice, people rarely receive the benefits of these safeguards; the standard applied is nearly impossible to meet. "The general idea US officials seem to have is that being kidnapped, raped, or extorted is to be expected," one attorney commented.[130]

AR00789




abducted on their way to immigration court, attorneys told Human Rights Watch. Most then received in absentia deportation orders when they did not appear at their hearings.[131] Immigration judges frequently deny motions to reopen in absentia deportation orders even when abduction was the reason for a person's failure to appear.[132]

CBP has suspended most nonrefoulement interviews since the US government effectively closed the border to asylum seekers at the end of March 2020.

## Near Impossibility of Success in Nonrefoulement Interviews

Immigration agents do not always give people nonrefoulement interviews when requested. Those who do get interviews often report that they did not have the opportunity to fully explain why they feared return to Mexico. Even if they do, the excessively high standard applied in these interviews means that very few are removed from the MPP.

According to policy guidance issued by then-DHS Secretary Kirstjen Nielsen, US immigration agents are supposed to refer anybody "who has expressed a fear of return to Mexico" for a nonrefoulement interview.[133] (Many people placed in the MPP told us that CBP agents often referred to these interviews as "credible fear interviews," the term for a different screening process,[134] and some of the paperwork we reviewed used this term.) Immigration agents are not required to ask people if they fear being sent back to Mexico,[135] and every family we interviewed said agents did not proactively ask that question. CBP did not refer some people who asked for interviews, Human Rights Watch heard.

Moreover, many people told Human Rights Watch that the prospect of additional time in an immigration holding cell dissuaded them from asking for nonrefoulement interviews even if they experienced threats or actual harm. Julián M., a 28-year-old from Honduras, said that the second time he, his wife, and their three young daughters went to El Paso for an immigration court hearing, "we didn't ask for a [nonrefoulement] call. If we did, we would have to spend another night in the cells."[136]

Those who have received nonrefoulement interviews described summary hearings that take place by telephone, sometimes in the middle of the night or very early in the morning. It is not clear that the official conducting the interview has access to any documents people try to show

"Like I'm Drowning"         

Human Rights Watch heard of very few cases in which people succeeded in persuading US authorities that they should not be sent to Mexico. Cindy Woods, a managing attorney with Texas RioGrande Legal Aid, said she and other attorneys helped prepare 50 asylum seekers for nonrefoulement interviews in Brownsville, El Paso, and Laredo before March 2020, when CBP stopped offering such interviews. "Out of these fifty, none received a positive response. Twelve didn't even get an interview when they requested one," she said.[137]

Government data establishes that nonrefoulement interviews are rarely successful. A DHS assessment found that of the approximately 7,400 "fear screenings" completed by October 15, 2019, 13 percent received positive determinations.[138] An analysis of immigration court data by the news agency *Reuters* found that less than 1 percent of MPP cases had been removed from the MPP docket, meaning that they were allowed to remain in the United States while their asylum cases were pending.[139] These cases include people who were removed from the MPP for humanitarian reasons as well as those who passed nonrefoulement interviews.

In one of the few successful cases we heard of, family members and their lawyers had to go to extreme lengths to prevail and were only successful on their third attempt. In that case, a 41-year-old Guatemalan woman was kidnapped, held against her will for 12 days, sexually assaulted in front of her 10-year-old daughter, and had her legs burned with acid in Ciudad Juárez in July 2019 before she and her daughter escaped and sought asylum in the United States. Even after hearing her account, CBP agents denied her request not to return her to Mexico under the MPP. In January 2020, lawyers with Las Americas Immigrant Advocacy Center walked her to the border and helped her ask for a nonrefoulement interview with an asylum officer. That request to be allowed to remain in the United States while her asylum case was being heard was also denied. In March 2020, after a third interview, US immigration authorities released her with an ankle monitor to reunite with family members in Kansas.[140]

## Requests for Interviews Ignored

Human Rights Watch heard repeated accounts of people denied a nonrefoulement interview even though they requested one or expressed fear of being sent to Mexico. For example:

·    Nicola A., from Cuba, said that she and her family did not receive a nonrefoulement interview even though they told immigration agents that they had been kidnapped while in

AR00791

**HUMAN RIGHTS WATCH**

"Like I'm Drowning"              DONATE NOW

·   Marisela F., a 21-year-old from Honduras, told us that she did not have an interview before she was sent to Ciudad Juárez in December 2019 with her husband and their 5-year-old son even though she and her husband said they were afraid they would face harm in Mexico. While one of the papers they received before they were sent to Ciudad Juárez stated, "Attached is a credible fear worksheet," they had no memory of ever receiving such a worksheet and had no copy of one among the papers from their legal proceedings.[142]

·   Maria Q., a 41-year-old from Honduras, said that when she tried to tell immigration agents she was afraid of being returned to Mexico, "They said they couldn't do anything. They just handed us some papers. They didn't pay attention to what we needed or what we said."[143]

Lawyers we spoke with also described cases of people who said CBP denied them an interview. For instance, Tania Guerrero, an attorney with the Estamos Unidos Asylum Project of CLINIC, told us in mid-January 2020, "People are now being denied interviews, with no reason given and no documentation of denial." She said she had heard of more than 10 such cases in El Paso in a single week that month.[144] Similarly, among the plaintiffs in a lawsuit challenging the expansion of the MPP to Tamaulipas, one "was not allowed to speak at all when she was processed by CBP,"[145] and CBP turned away two others who crossed the bridge from Matamoros to Brownsville without an interview.[146]

## Due Process Shortcomings

Many of those we spoke with told us that nonrefoulement interviews were cursory and that the officials conducting the interviews did not give them an opportunity to explain their fears fully. For instance, during Salvador E.'s nonrefoulement interview in San Diego, he started to explain why he was afraid for his family if they had to return to Mexico. The asylum officer asked him if the family had been attacked, tortured, or assaulted in Mexico. When he said they had not, the officer told him they did not qualify for an exemption from the MPP and ended the interview before Salvador had a chance to explain that the family had been the victims of an aborted kidnapping attempt, armed robbery, burglary, and threats on separate occasions. Salvador believed the family was targeted in each instance because they are migrants.[147]

In another case, Héctor C. said he only spoke briefly with officials before he was sent to Mexico. "They did not ask me any real questions except whether I wanted to be returned to Honduras or Mexico. How is that even a choice?"[148]

"Like I'm Drowning"          DONATE NOW

English stating that he had received a nonrefoulement interview. "I never knew that until now," he replied. He continued:

> You say that it says here, on page 3, that the US Border Patrol advised me of my rights? They did not. The form says I have no fear of returning to Honduras? That is a lie. I explained clearly that I am afraid of returning to Honduras and why. . . . It also says that I am not afraid to be in Mexico? That is not true. I am afraid to be in Mexico and I told them so. . . . I am afraid of being in both countries and clearly told them so, but that is not what they wrote down.[149]

Similarly, when the American Immigration Lawyers Association (AILA) observed the Laredo tent courts in January 2020, it "heard reports that some asylum seekers were rushed through the interview process in about 10 minutes and did not feel they had the opportunity to explain their situation."[150]

Douglas Stephens, a former asylum officer who conducted five MPP nonrefoulement interviews in August 2019 and then refused to do any more, described the interviews in these terms:

> If, and only if, an asylum-seeker expresses a fear of returning to Mexico to Customs and Border Patrol (CBP) [a]gents, CBP notifies the [Asylum] Office. Interviews are conducted telephonically that same day. Officers remain in their home office and conduct a three-way call with migrants being held in a CBP detention facility on the border and a third-party interpreter. The telephone connections are bad; the line is often fuzzy or has static, and calls are frequently dropped. The asylum seeker is denied access to legal representation during the interview and the interview will not be postponed to give the applicant an opportunity to find and confer with counsel.[151]

Consistent with Stephens' description, the official conducted the nonrefoulement interview by telephone in every case Human Rights Watch reviewed. Nelly O., a 27-year-old Honduran woman in Ciudad Juárez, explained the procedure: "If you say you're afraid of going back to Mexico, they put you in a cell in the *hielera* [the "freezer," referring to an immigration holding

AR00793

Case 2:21-cv-00067-Z    Document 162-2    Filed 09/02/22    Page 62 of 548    PageID 5005

"Like I'm Drowning"              DONATE NOW

As Stephens noted, at least through November 2019, DHS did not permit lawyers to attend nonrefoulement interviews. Under the terms of a January 2019 policy memorandum, "provided the MPP assessments are part of either primary or secondary inspection, DHS is currently unable to provide access to counsel during the assessments given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals."[153]

By the beginning of 2020, DHS was allowing attorneys to attend interviews by telephone, but this practice was not consistent. Nearly every attorney interviewed by Human Rights Watch described cases in which DHS did not call them even though they had submitted written requests in advance and even after their clients asked CBP and the interviewing officer to contact them. For example, Alexandra Miller, a managing attorney with the Florence Project, said that CBP often failed to call her for these hearings; when they have called, it has been without notice.[154]

New DHS guidance issued in December 2020 states that immigration officers "should continue to ensure the ability to have retained counsel participate telephonically in USCIS's MPP *non-refoulement* assessments—where it does not delay the interview, or as required by court order."[155]

The publicly available DHS policy guidance states that nonrefoulement interviews are conducted by asylum officers, officials who work with US Citizenship and Immigration Services (USCIS), rather than by CBP agents.[156] Nevertheless, in September 2019, *The Intercept* reported that CBP agents had begun conducting these interviews instead of asylum officers.[157]

The standard, "more likely than not,"[158] is high, requiring a person to show at least a 51 percent probability of harm. In addition, asylum officers deny many cases for failure to establish that the harm a person fears is because of their race, religion, nationality, political opinion, or membership in a particular social group.

Even if the standard were lower, it is not clear how most people would corroborate their accounts. While they are detained, "their documents are locked up. They don't have their phones with them, so if they had photos or screen shots of messages, they won't be able to access them," observed Constance Wannamaker, an immigration attorney in El Paso.[159]

AR00794

Watch.[160] The case files Human Rights Watch reviewed either had such check boxes or were similarly terse. For instance, Kuymi P., a 28-year-old Ecuadorian woman, showed us documents that included the notation "credible fear claim," noting that she told Border Patrol agents that she had a fear of returning to Mexico and then stating, "CIS Asylum officer found subject's fear of Mexico to be unreasonable."[161] The asylum officer's decision cannot be appealed.

Although asylum officers are supposed to reach their decisions independently, some asylum officers have described pressure by supervisors to issue negative decisions.[162]

In addition, an internal DHS draft report found that "some CBP officials pressure USCIS to arrive at negative outcomes when interviewing migrants on their claim of fear of persecution or torture."[163] The draft report also noted, "At some locations, CBP uses a pre-screening process that preempts or prevents a role for USCIS to make its determination."[164]

Stephens, the former asylum officer, wrote to his supervisors before resigning to say:

> MPP complies with our obligations of non-refoulement in name only. . . .
> The current process places on the applicants the highest burden of proof
> available in civil proceedings in the lowest quality hearing available. This is
> a legal standard heretofore reserved for an immigration judge in a full
> hearing. However, here we are conducting the interviews telephonically,
> often with poor telephone connections, while at the same time denying
> applicants any time to rest, gather evidence, witnesses, or other relevant
> information and, most egregious of all denying them access to legal
> representation.[165]

## Absurd Outcomes

US authorities have denied requests for release from the MPP even when people offer detailed, substantiated accounts of being targeted by Mexican police because of their national origin.

In one such case, Mexican federal police stopped a Salvadoran family as they approached the bridge to seek asylum from US immigration authorities. The officers confirmed that the family was not Mexican and then escorted the family to a police station, took their phones and money,

AR00795

"Like I'm Drowning"            DONATE NOW

The family had no doubt that the men who abducted them were federal police. "They were wearing federal police uniforms, with a Mexican flag seal on their arms," Florencia M. said in a declaration submitted to CBP in November 2019 when the family requested a second nonrefoulement interview. She continued:

> They took us to an office where there were other police. The ones that had brought us in from the street were two guys, one tall and skinny that the others called "Chief." The other one was short, chubby, and bald. We knew they were Federal Police because they all had the uniform, they had the Mexican flag on their arm . . . they had police badges. The office had lots of computers, other police working on the computers, with a lot of signs on the walls with police things.[166]

Her husband, Vicente O., stated, "The men who took us looked like Mexican Federal Police. They were dressed like them with black boots, black pants. They had pistols in their belts and hats that said *Federal*."[167] Their 13-year-old son, Ian, gave a similar description: "They had black boots and black pants. On their sleeves was the Mexican flag and the words *Mexican Federal Police*. They wore badges on their chests and on their belts. They had pistols on their belts and small telephones on their chests."[168]

The family unsuccessfully tried to explain these events as the basis for their fear of return to Mexico in an initial nonrefoulement interview before they were placed in the MPP. In November 2019, when they attended their first immigration court hearing, they requested another nonrefoulement interview. The family provided detailed declarations recounting their abduction and extortion together with corroborating evidence that included an account from Florencia's mother, whom the officers contacted to demand a ransom, along with transcripts of voice messages, photographs of text messages sent to her with details for the wire transfers, and copies of the wire transfer receipts that show ransom payments made. Human Rights Watch reviewed these documents. Their request to be removed from the MPP was again denied.[169]

Luis Gonzalez of the Jewish Family Service of San Diego added that asylum officers appeared to base denials in part on the assumption that people could be safe in Mexico if they travelled to another part of the country.[170] "That fails to take into consideration that they can't easily leave border cities because they have to be back for their hearings. If they go elsewhere in the

HUMAN
RIGHTS
WATCH     "Like I'm Drowning"          f    t    ⓦ    ✉    ⤴    DONATE NOW

addition, migrants face risks throughout Mexico.[172]

## Humanitarian Exemptions Rarely Granted

CBP policy guidance states that "vulnerable" persons "will not be placed into MPP."[173] The guidance does not precisely define vulnerability but notes that people with "[k]nown physical/mental health issues" are among those who are "not amenable to MPP."[174]

The humanitarian exemption, which would result in parole into the United States, has been erratically implemented throughout the period that the MPP has been in effect. Human Rights Watch identified numerous cases in which CBP placed people with disabilities, high-risk pregnancies, or other needs that require specialized, ongoing treatment and care in the MPP or declined to remove them from the MPP once it became aware of these needs.

In one such case, Kamila A., 37, left Honduras in 2019 with her 6-year-old son, Christopher, because he had faced bullying and, she strongly suspected, sexual assault in their community. She explained, "My son is developmentally delayed. Last year an evaluation said he functions as a 3-year-old. . . . One day, I found blood in his underwear. I knew the other children mocked and harassed him because he was different, but when I saw the blood, I feared someone was sexually abusing him," she said.

Christopher and Kamila were placed in the MPP in August 2019 and sent to Ciudad Juárez. The following month, she told us, "One of the boys at the shelter told my son to open his mouth. The boy stuck his penis in my son's mouth. He threatened my son not to tell me or anybody else."

After their first immigration court hearing in October 2019, "I told [CBP] about my son's sexual assault and that he was mentally disabled, but they returned us to Mexico anyway," she said. In December, another boy sexually assaulted Christopher. Other children also regularly mocked him. The week before we spoke to Kamila and Christopher, she said, "A group of boys were making fun of him, calling him 'stupid' and 'crazy.' They hit him on the head with a screwdriver. You can see the wound where it cut his head."[175]

In another case, a Brazilian family apprehended by CBP near Calexico in February 2020 showed immigration agents medical records for their 1-year-old daughter, who was born with congenital

AR00797

HUMAN RIGHTS WATCH    "Like I'm Drowning"          DONATE NOW

medical reports and the parents' request to remain in the United States because of their daughter's health. Instead, immigration officials placed the family in the MPP and sent them to Ciudad Juárez.[176]

With the help of the Las Americas Immigrant Advocacy Center, the family twice sought a humanitarian exemption from the MPP. In response to their first request, made in April 2020, "the first official we saw said things like, 'You're not a good mother. You don't know how to take care of your children.' That really made me afraid," Renata A. told Human Rights Watch, explaining that the comments made her worry that US officials would take her children from her.

The following cases are among others Human Rights Watch heard:

· A 10-year-old boy who suffers from convulsions was placed in the MPP along with his family even though "he needs specific medication on an ongoing basis," Luis Gonzalez said, adding that the family had been unable to get adequate medical care in Mexico. When the boy and his mother attended an immigration court hearing, "we sent in a parole request and asked for a doctor to see him. We didn't find out their parole was denied until they were back in Mexico," Gonzalez told Human Rights Watch.[177]

· After 7-year-old Sofía T. was sexually assaulted in the shelter where she and her mother, Juliana L., a 23-year-old from Honduras, were staying, the two made an urgent request to be paroled into the United States on humanitarian grounds. They gave a copy of a psychologist's evaluation to CBP when they made the request at the end of December 2019.[178] CBP denied their request.

In September 2019, Human Rights Watch documented six cases in which persons with disabilities, four of them children, were placed in the MPP.[179]

Lawyers and aid workers Human Rights Watch spoke with told us that these accounts were not unusual. Indeed, reports from other groups and news accounts have described people placed in the MPP even though they had epilepsy, heart conditions, other serious medical conditions, or significant psychosocial disabilities.[180] CBP guidance issued in December 2020 explicitly limits MPP exemptions for disabilities to people with a "significant" disability, defined as one that "substantially limits the alien from meaningfully participating in removal proceedings."[181]

AR00798

HUMAN
RIGHTS
WATCH     "Like I'm Drowning"               DONATE NOW

Human Rights Watch also heard accounts of people denied a humanitarian exemption even though they faced high-risk pregnancies or were near their due date and risked having no safe place to deliver their babies in Mexico. For instance, at a time when El Paso immigration authorities were typically exempting pregnant women from the MPP, they turned away a pregnant woman from Cuba. "She was seven months pregnant, but CBP told her they thought she was only four months pregnant. I had sent her medical records in advance to CBP. The records clearly showed" how far along with the pregnancy the woman was, said Constance Wannamaker, an immigration lawyer in El Paso who was representing her. CBP ultimately reversed its decision and allowed the family to enter the United States after Wannamaker persuaded government lawyers to review the file.[183] New CBP guidance issued in December 2020 states that "[p]regnancy in and of itself does not preclude" placement in or continued processing under the MPP.[184]

In other cases, CBP denied humanitarian exemptions to people with health conditions that could not be accommodated with dignity in the circumstances in which they were living after US officials sent them to Mexico. "I had a case of a pregnant woman who had to be carried across the bridge because she had a broken foot. She couldn't walk. She couldn't move around by herself in the shelter. She couldn't go to the bathroom by herself. She was relying on her 14-year-old son to take her to the bathroom. CBP wouldn't let her in," Wannamaker said.[185]

People whose first language is not Spanish—for example, Guatemalans who speak K'iche' or other Indigenous languages—frequently face discrimination and experience additional hardship in Mexico,[186] meaning that they should also be considered for exemption from the MPP. In fact, DHS policy guidance suggests that people whose first language is not Spanish should not be placed in the MPP at all. Nevertheless, Human Rights Watch interviewed Indigenous families placed in the MPP who spoke only limited Spanish, and lawyers we spoke with described similar cases.[187]

In one such case, CBP placed an Indigenous Guatemalan woman and her 2-year-old daughter in the MPP in August 2019 even though she did not speak Spanish. With the help of pro bono lawyers in Texas, she asked several times to be released from the MPP and allowed to reunite with her partner and their 4-year-old son, who are in the United States. Her requests for humanitarian parole have all been rejected.[188]

AR00799

"Like I'm Drowning"          

those who entered the United States at a regular border crossing, that means seeking parole from the Office of Field Operations (OFO). "People who were processed by OFO can walk up to the port of entry to request parole. But if they entered without inspection and were picked up by the Border Patrol, OFO will tell us we have to submit the request to the Border Patrol. They'll also tell us the people seeking parole have to present themselves in person. How is someone supposed to ask the Border Patrol for parole in person?" Gonzalez said, noting that as a practical matter the only way for somebody in Mexico to see a Border Patrol agent in person would be to make an irregular entry and then be apprehended.[189]

We did not hear of such a requirement elsewhere. But when the Women's Refugee Commission observed MPP hearings in El Paso in April 2019, it reported: "When asked by the immigration judge, DHS attorneys in court could not identify a process for requesting parole, refusing to even specify which component of DHS (CBP, ICE, US Citizenship and Immigration Services (USCIS)) might be the appropriate one to submit a request to."[190]

## Sent to Danger

Human Rights Watch and other groups have consistently documented sexual assaults and other violent attacks, armed robbery, extortion, and other crimes committed against migrants sent to Mexico since the start of the "Remain in Mexico" program. Commenting on the ways migrants are targeted, Linda Rivas, executive director of Las Americas Immigrant Advocacy Center, a nonprofit legal services organization based in El Paso, said that the perpetrators of such crimes "target people who look lost. They target the places where migrants are dropped off, like the bus station or the CAIM [the Centro de Atención a Migrantes, or Migrant Assistance Center]," a facility established by the Chihuahua state government to assist Mexican nationals and others arriving in Ciudad Juárez from the United States.[191]

Two of the cities to which CBP sends people, Matamoros and Laredo, are among the most dangerous in Mexico. Both are in the state of Tamaulipas, which the US Department of State designates as a "Level 4: Do Not Travel" zone, citing "crime and kidnapping" as one of the reasons for this designation.[192] In these two cities, Human Rights Watch identified 32 separate instances of kidnapping or attempted kidnapping of asylum seekers subject to the MPP—mostly by criminal organizations but in at least one case by a Mexican federal official—between November 2019 and January 2020. At least 38 children were kidnapped or subject to kidnapping

AR00800

**HUMAN RIGHTS WATCH**

"Like I'm Drowning"

      DONATE NOW

Other groups have also documented high numbers of kidnappings and attempted kidnappings in both cities. For example, Médecins Sans Frontières (MSF) reports:

> In September 2019, 43.9 percent of our patients sent to Mexico under the MPP program in Nuevo Laredo (18 of 41) had recently been kidnapped and an additional 12.2 percent (5 of 41) had been the victim of an attempted kidnapping. In October, the percentage of kidnappings among those received under the MPP program increased to 75 percent (33 of the 44 new patients).[194]

A lawsuit filed by the ACLU named seven adults who, together with their families, were kidnapped in the state of Tamaulipas after they were placed in the MPP.[195] News reports relate similar accounts.[196] The dangers for people staying in the Matamoros camp were so high that some parents reportedly sent their children to the United States on their own.[197]

To avoid these dangers, people placed in the MPP and sent to Nuevo Laredo often relocate to Monterrey, 220 km south, or Piedras Negras, about 175 km northwest along the border and across the river from Eagle Pass, Texas. "Very few stay in Nuevo Laredo," Cindy Woods, a managing attorney with Texas RioGrande Legal Aid, told Human Rights Watch.[198]

Ciudad Juárez, located northwest of Nuevo Laredo and immediately across the border from El Paso, Texas, saw a 31 percent increase in homicides in June 2020 compared to the same month in 2019.[199] As a whole, the state of Chihuahua has the second-highest rate of femicides, gender-motivated killings of women, in Mexico.[200] Human Rights Watch documented 29 reports of harm to asylum seekers in a July 2019 report,[201] and in 2020, advocates and humanitarian workers were seeing an increase in assaults on people seeking asylum in the United States. "Cuban shelters are being targeted. Central Americans are also being targeted," Linda Rivas, executive director of Las Americas Immigrant Advocacy Center, told us.[202]

In one case reviewed by Human Rights Watch, Esteban G., a 36-year-old from Cuba, reported to the Chihuahua state prosecutor's office that he saw three hooded men enter the shelter where he, his wife, and their 6-year-old daughter were staying. He told prosecutors:

**AR00801**

HUMAN
RIGHTS
WATCH          "Like I'm Drowning"                      

individuals say to the others, "Kill one of them so they can see we're not playing." The individuals stayed about 10 minutes. After people started saying the individuals had left, I saw young men with bruises, and they said the backpacks, documents, cell phones [and] money of many Cuban brothers had been stolen.[203]

Describing the same attack, another man told a reporter that one of the armed assailants hit him in the face so hard he fell to the floor.[204]

Women described ongoing harassment on the streets and in places where they work in circumstances that suggest they were targeted because of the countries they came from. For instance, Juana G., a 34-year-old woman from Honduras, said that she was sexually harassed in the restaurant where she works in Ciudad Juárez. "The customers can tell I'm not Mexican. My accent isn't a Mexican accent, and they ask where I'm from. Then the harassment starts. Some of the customers will say indecent things, unwelcome things. I try not to speak while I'm working."[205] Her 16-year-old son, Thiago B., told us in a separate interview, "There is a customer from the restaurant where my mom works who bothers my mother and threatens me. We tried to report it, but the police say they don't care about reports from migrants."[206]

Other cities to which people have been sent under the MPP are also unsafe for them. In Mexicali and Tijuana, one-quarter of more than 600 asylum seekers who participated in an October 2019 study by the US Immigration Policy Center of the University of California San Diego said they were threatened with physical violence while they waited in Mexico for their immigration court hearings.[207]

Overall, one year after the Remain in Mexico program went into effect, Human Rights First had collected more than 800 accounts of violent attacks on asylum seekers in Mexican border towns.[208] By mid-May 2020, the group had tracked more than 1,100 reported cases of murder, rape, kidnapping, torture, and assault of asylum seekers sent to Mexico under the MPP. Of those, 265 were kidnappings or attempted kidnappings of children.[209]

In some instances, people described abuses by Mexican officials. Edwin F., a 28-year-old from Honduras staying in a shelter in Ciudad Juárez with his wife and 5-year-old son, said in January 2020:

AR00802

"Like I'm Drowning"

  

DONATE NOW

to do harm to the country. They held us close to half an hour while they searched us, even our son. They asked for money. I didn't have any.[210]

His wife, Marisela, 21, said that when the police officers searched her: "I had some sanitary pads in a shopping bag. They dumped them out on the ground. Everything I had, they dumped out on the ground."[211] The encounter traumatized their 5-year-old. "He became really anxious," his father said. "He started to cry uncontrollably."[212]

We also heard accounts of Mexican police harassing migrants on buses as they travelled from one part of the border to another. Delfina L., a 34-year-old from Honduras, said that a police officer stopped and boarded her bus when she was returning to Ciudad Juárez from an immigration court hearing in Laredo in January. "He wanted me and my children to get off the bus. The other passengers objected, they said it wasn't right. He backed down, but it really intimidated me."[213]

## Abducted and Ordered Deported in Absentia

People who miss immigration court dates typically receive in absentia deportation orders, which can be enforced immediately if they are found in the United States and can be "reinstated" without the possibility of applying for asylum if they return irregularly. It is possible to reopen a deportation case after an in absentia order if, among other grounds, the immigration judge is persuaded that the person's failure to appear was due to exceptional circumstances. A kidnapping is by any measure an exceptional circumstance. Nonetheless, attorneys told Human Rights Watch that reopening such cases was very difficult.

In one case, a Guatemalan woman told an immigration judge in September 2019 that she had nearly been kidnapped with her 10-year-old son and 6-year-old daughter the night before, as they travelled to Nuevo Laredo for their court hearing. She went on to tell the judge that a man and his 16-year-old daughter with whom they were travelling and whose case had been called earlier that morning, had been abducted by the same cartel members. Denise Gilman, a law professor who was observing in court, confirmed that the man and his daughter had been ordered deported in absentia earlier that day when they did not appear at their hearing. Despite the woman's testimony, the immigration judge did not revoke the deportation order against the man and his daughter.[214]

AR00803

HUMAN
RIGHTS
WATCH

"Like I'm Drowning"

       DONATE NOW

because he had been kidnapped by members of a cartel. When the immigration judge verified that the boy was not in court, he told the woman he would order CBP to request a nonrefoulement interview for her and the rest of her children. He did not tell her what he would do with her son's case. Alysha Welsh, an attorney with Human Rights First who was observing court hearings that day, later confirmed that the judge ordered the boy deported in absentia. "This boy had been taken by a cartel because the US government sent him back to Nuevo Laredo. It was clear from her evident distress, from the desperation in her voice, that she wasn't making the kidnapping up. She was so worried for his safety and the safety of her other two children," Welsh told us.[215]

And in a third case, an Indigenous Ecuadorian woman and her child who were placed in the MPP missed their court date in Laredo because they were kidnapped, their attorney told Human Rights Watch. Her first effort to reopen her case was unsuccessful because the private attorney whom she hired failed to submit a declaration from her or any other evidence to support the motion to reopen. Her next attorney, Cindy Woods, told us, "We documented the ineffective assistance she received, got a declaration from her brother and proof of payment of the ransom amount. There were questions about whether she'd had notice of her hearing because she had not been spoken to in her native language by anyone. The judge denied all motions even though it was very clear she had been failed multiple times."[216]

Government attorneys generally vigorously oppose motions to reopen by people who testify that their failure to appear was because they were kidnapped, we heard. "The basic response from DHS is to oppose these motions, characterizing respondents' detailed declarations as 'self-serving.' On occasion, DHS will take the position that people 'collaborated with terrorists' by making arrangements to pay a ransom. Sometimes DHS will blame them for what happened, saying, 'Your *coyote* situation went wrong,'" Woods told Human Rights Watch.[217]

Immigration judges often find that a person's account of being kidnapped does not amount to exceptional circumstances warranting reopening of the case. "Often the judge will say that there isn't sufficient proof. But the country conditions are well-documented. It's unconscionable to me," said Woods.[218]

In a rare success, a woman and one of her teenage sons were able to get their case reopened. "It was only because the other son's hearing was set for a different date, which turned out to be after their kidnappers released them, that the mother managed to get in front of a judge," said Denise Gilman, a law professor at the University of Texas at Austin, who was observing hearings

"Like I'm Drowning"         DONATE NOW

an in absentia order set aside and a case reopened when a person didn't appear because of a kidnapping."[219]

## Nonrefoulement Interviews and Humanitarian Exemptions Suspended

In response to the Covid-19 pandemic, the general practice has been not to hold nonrefoulement interviews or consider humanitarian requests for families in the MPP to return to the United States.

When an attorney with Texas RioGrande Legal Aid contacted an asylum officer in May 2020 to confirm that her client would receive a nonrefoulement interview, noting that he had previously been kidnapped by a cartel and continued to be at risk, she received the following reply: "I checked with the Laredo Port of Entry and they have indicated that non-refoulement interviews are not being conducted at this time at the POE due to the COVID-19 pandemic."[220]

Similarly, attorneys in El Paso told us CBP had not scheduled nonrefoulement interviews or considered any requests for humanitarian exceptions since March 20, 2020, when the CDC order went into effect. In one case, Nicolas Palazzo, a lawyer with Las Americas, submitted a request for a humanitarian exemption from the MPP for a family with two very sick children. "We submitted a request for medical evaluation, but they were turned away. They received no nonrefoulement interviews and no medical evaluations," he told Human Rights Watch.[221]

Since March 20, one family represented by Jewish Family Service of San Diego has received parole, a case that is one of the few instances Human Rights Watch identified of DHS granting parole during the pandemic. "It's the only time we've been successful" after that date, Luis Gonzalez told us.[222]

## III. Lives in Limbo

AR00805

   
family to live and must depend on the network of migrant shelters, mostly run by religious or other nonprofit groups, many of which are at or near capacity. Health care is, in practice, limited to basic services; frequently, the only health services those in the MPP receive are services provided by nongovernmental organizations and volunteers. Most children in the MPP have not attended formal education since they left their home countries. Moreover, by sending thousands of people to Mexican border towns who would otherwise have dispersed throughout the United States, the MPP has placed considerable strain on the limited housing, health services, and support that are available.

Nearly everybody interviewed for this report described the sense that their lives were in limbo. Summarizing this sentiment, when we spoke to her in January 2020, Tania Guerrero, the CLINIC project attorney, told us, "The women I speak to tell me, 'Nobody understands what we're going through here [in Ciudad Juárez].' They have been here eight months. They're exhausted, alone, miserable. They want to get on with their lives. The level of disillusionment and despair they feel is profound."[223] Speaking to us again in June, she said that fear of the pandemic and delays with court hearings have increased people's sense of desperation. "They're reaching the point where they feel they have no more to give. They're confronting a continuous struggle that seems never-ending," she said.[224]

## Overcrowded Shelters and Informal Camps

Migrant shelters in Mexican border towns quickly reached capacity as the United States rolled out its "Remain in Mexico" program. Some shelters began to use whatever space they had available, making garages, auditoriums, and courtyards available for families to set up individual tents. In the Buen Pastor shelter in Ciudad Juárez, families slept in between pews in the chapel, rolling out bedding every night and carefully packing it back up with the rest of their possessions during the day. Those who could afford to do so rented rooms in private homes or shared apartments, but many could not continue to do so as their asylum cases dragged on and their resources ran low, we heard. Conditions were particularly dire in Matamoros, where anywhere between 1,000 and 2,600 people or more, including children of all ages, have been living in tents, with inadequate access to clean water or proper sanitation, along the river that marks the international border.

Illnesses spread quickly in cramped quarters, and the people we spoke with described daily struggles to maintain hygienic conditions for themselves and their children. Skin diseases,

AR00806

"Like I'm Drowning"           DONATE NOW

The pandemic has exacerbated the difficulties people faced. Some shelters imposed extended lockdowns, while others seemed to disregard basic protocols. Staff in many shelters were particularly critical of the lack of government guidance and support, including the provision of masks, to help them respond appropriately to the pandemic.

Health care services in Tijuana, the first city to which US authorities sent people, were quickly strained. Between April and August 2019, DHS assigned more than 6,200 MPP cases to the San Ysidro port of entry, immediately across the border from Tijuana.[225] As a result, by July 2019, many migrant shelters were operating close to capacity.[226] When Human Rights Watch visited the city in November 2019, every shelter provider we interviewed told us they were using all available space in their facilities. And in response to the Covid-19 pandemic, many shelters in Tijuana reduced their capacity.[227]

After US authorities began to send people to Ciudad Juárez, the number of asylum seekers and migrants in that city quickly surpassed those in Tijuana. Ciudad Juárez hosted some 16,000 asylum seekers and migrants at the end of May 2019, an estimated 17,000 in June 2019,[228] and more than 19,000 migrants in November 2019.[229]

Until early January 2020, some people stayed in two makeshift camps near the international bridges. Many of those in the camps were Mexican nationals, mostly from Guerrero, Michoacán, and Zacatecas, who intended to seek asylum in the US and were forced to wait under the US "metering" policy, under which US border agents restricted the number of applicants accepted each day.[230] State authorities evicted people from the camps in January 2020 and bussed them to shelters.

In February 2020, the Mexican immigration agency, the National Migration Institute (Instituto Nacional de Migración, INM) estimated that there were between 13,000 and 15,000 migrants in Ciudad Juárez, a number that included people who were metered and those who had not yet attempted to enter as well as people placed in the MPP. Eighteen migrant shelters in the city, including the Leona Vicario federal shelter, housed about 1,200 people that month, the coordinator of COESPO's migrant assistance program told *El Heraldo de Juárez*.[231]

In Nuevo Laredo, Tamaulipas, where asylum seekers, migrants, and shelter workers face significant risks of kidnapping and other serious harm at the hands of organized crime, the

HUMAN RIGHTS WATCH    "Like I'm Drowning"

      DONATE NOW

In Matamoros, in the Mexican state of Tamaulipas across the border from Brownsville, Texas, some 2,600 asylum seekers were staying in tents near the international bridge at the end of March 2020; in September, the camp's estimated population had fallen to about 1,000.[234] Overcrowding and inadequate sanitation in the camp has resulted in a high incidence of intestinal and respiratory infections and skin diseases, MSF has reported.[235] Global Response Management, which has offered medical services in the camp since September 2019, has observed that "living conditions in the camp remain poor," with limited space, little protection from the elements, and an insufficient number of latrines and showers. Water shortages leave camp residents to bathe in the Rio Grande, which can contaminate the water and increase the spread of waterborne illnesses such as E. coli, infectious conjunctivitis, cellulitis, and other diseases.[236]

The camp's location, along a dirt levee as close as possible to the river that marks the international border, makes it vulnerable to flooding. A downpour accompanied by heavy winds on a single morning in May 2020 destroyed about 40 tents and sent water coursing through the camp.[237] In late July, the river's level rose by three-and-a-half meters (12 feet) when the first Atlantic hurricane of the year hit Texas, forcing camp residents to crowd their tents together on higher ground.[238] In addition to the destruction flooding caused, rising waters brought more rats, snakes, and mosquitos to the camp. And in response to flood warnings, the camp's portable toilets were temporarily removed at the directive of the company that owns them.[239]

In Nogales, Sonora, "there is no formal data from the local government" on the number of people US authorities have sent after placing them in the MPP, said Alma Cota de Yanes, the director of a community group in Sonora.[240] One shelter in Nogales housed about 40 people per night in July 2020, a number that included people who had been deported or expelled from the United States as well as people who were placed in the MPP and were awaiting asylum hearings.[241]

In response to the pandemic, many shelters, including those in Tijuana and Nogales, adopted lockdown policies that in principle put strict controls on entry and exit. In Ciudad Juárez, however, many people in the MPP program work in *maquilas*, factories on the outskirts of the city, which have generally continued to operate and have become sites of Covid-19 outbreaks that have infected hundreds of workers.[242] "The protocols for exiting and entering shelters aren't followed. People aren't tested," Guerrero said.[243]

AR00808

HUMAN
RIGHTS
WATCH         "Like I'm Drowning"            DONATE NOW

shelter. They were told they'd exceeded the amount of time they could stay in the shelter, and now they were on the street with nowhere to go," Luis Gonzalez, a lawyer in San Diego, told Human Rights Watch.[244]

Migrant shelters along the border criticized the lack of official directives on what procedures they should take during the pandemic[245] and expressed concerns about their inability to isolate those who develop symptoms.[246] In many cases, shelter workers said, they depended on nongovernmental organizations for the personal protective equipment and other supplies they needed to prevent the spread of Covid-19.[247]

A hotel quarantine program in Ciudad Juárez, an IOM initiative known as the "Hotel Filtro," provides 14 days of quarantined shelter, food, and access to primary health care for people who have just arrived in the city, after which they can go to a regular shelter if there is space available.[248] Two women we spoke with who stayed in the Hotel Filtro spoke positively about the initiative and their experiences while at the hotel.[249]

## Overstretched Health Care Services

As a general rule, people placed in the MPP as well as health professionals and other service providers said that access to specialized treatment and medications was difficult; basic services were in principle available. For instance, "in Mexico there is no charge for vaccinations. That applies to everybody," a Chihuahua state official told us.[250]

Mexican law establishes the right to receive emergency medical care necessary for the preservation of life regardless of migration status.[251] Beginning in December 2014, the Ministry of Health allowed migrants to have access to health services for 90 days under the country's national health insurance program, known as Seguro Popular,[252] although compliance by health care providers with this directive was uneven.[253] In addition, public health researchers have found that a high level of mistrust in approaching health services meant that many people did not attempt to access services to which they were entitled.[254]

A change in Mexico's national health coverage announced in November 2019 took effect in January 2020, eliminating Seguro Popular and establishing a new entity, the Institute of Health for Well-Being (Instituto de Salud para el Bienestar, INSABI), to provide free health care, including medication, for those who do not have access to social security.[255] The change

AR00809

"Like I'm Drowning"           

published in May 2020, five months after the change, observed that "while Seguro Popular provided migrants in transit with health coverage for 90 days, specific guidelines for migrant access to INSABI health care services are not yet publicly available."[257]

Chihuahua state officials said they had made specific efforts to include migrants sent to Ciudad Juárez in their health programs, including mental health programming, and told us the state has a team of health providers that regularly visit migrant shelters throughout the city.[258] In fact, the families we spoke with in Juárez appeared to have greater access to health services than those we interviewed elsewhere along the border. "That's not to say there aren't valid complaints," a state health official told us. "It may be that not all medicines are available. We can't always cover 100 percent of the need. This is primary care," he said.[259]

In Baja California, we heard of some instances in which people in the MPP were able to access state health services. For instance, in urgent cases, Jewish Family Services of San Diego has been able to connect people to health services in Tijuana by contacting the local UNHCR office, said Luis Gonzalez, the organization's supervising immigration attorney.[260]

More commonly, we heard that people depend on private initiatives, whether from organized efforts such as those of the Refugee Health Alliance in Tijuana and Global Response Management in the Matamoros migrant camp, or sporadic individual offers of medical care and donations of medication to shelters across the border.[261]

People have received care for specialized or urgent health needs inconsistently, if at all. For example:

·     A woman living with HIV told us that she had struggled to get medication during her time in the MPP, sometimes going a week or more before she could find another supply. In December 2019, a health clinic gave her two months' worth. They were three months past their expiration date, but she was happy to get them, she said.[262]

·     The parents of a 1-year-old girl born with congenital hydrocephalus said that they had been unable to get medical care for her in Ciudad Juárez since their arrival in February 2020. "We've been here seven months and she hasn't seen a pediatrician," Renata A., her mother, told Human Rights Watch in September.[263]

AR00810



"Like I'm Drowning"         DONATE NOW

the week. It's a serious situation," a state health official told us.[264] To isolate those with the illness, the shelter relocated everybody else—families with children of all ages, along with single unrelated adults—into a single large space that resembled an airplane hangar or cleared-out factory floor.

The Covid-19 pandemic placed considerable strain on health services along the border. In Ciudad Juárez, Tania Guerrero said, "People placed in MPP are living in a city where medical resources are already very limited for its own population. Now it's even worse. The hospitals are saturated with Covid cases. They say they can't take people for other needs because they say those aren't emergencies. The hospitals aren't taking non-Covid cases."[265]

A Covid-19 assessment published in May 2020 observed that Mexico had established "no surveillance strategy for migrant populations"[266] and added:

> While the Mexican government's efforts to include refugees in the national COVID-19 response have been acknowledged by the United Nations High Commissioner for Refugees (UNHCR), such efforts have not included or reached all distress migrants equally. Those living in overcrowded and unsanitary conditions, as so many are, struggle to abide by physical distancing or sanitary self-protection strategies. Popular fear and suspicion exacerbate already latent xenophobic tendencies, which further distance this population from equitable and high-quality access to healthcare and social support. Local actors have noted the absence of necessary staff, "stuff" (personal protection equipment), space (for shelter, quarantine and isolation), systems (coordination and rapid response by the local health governance) and social support—the so-called "five Ss" described by the prominent public health expert Paul Farmer.[267]

## A Year or More Without School

None of the children in the families Human Rights Watch spoke with for this report was enrolled in school, and most had been out of the formal education system for more than a year at this writing.

AR00811

   
many parents replied that they were fearful of sending their children to school, a reflection both of the dangers they had experienced in Mexico and the risks they had faced in their own countries.

These accounts were typical, we heard. Sister Salomé Limas, a social worker at the Madre Assunta shelter in Tijuana, told us that most of the women who stay in the shelter are afraid that their children will face harm if they attend local schools.[269] "Some families are reluctant to let children go because their children are survivors of kidnapping, and it's traumatic for the children and their parents for the children to be somewhere else for much of the day," Tania Guerrero said of families in Ciudad Juárez.[270] Chihuahua state officials said they had heard the same from parents. "Many prefer not to send their children out of fear. But in reality it is a right to go to school," one official told us.[271]

In addition, some people told us they worried their children would face harassment from other students because they were not from Mexico. "I wanted to put my son in school, but I worry about bullying," Marisela F., a 21-year-old Honduran woman, told us, explaining that she and her family had experienced a lot of discrimination in Ciudad Juárez and elsewhere in Mexico because they were from Central America.[272] Tania Guerrero said that after city and state officials developed an initiative to enroll migrant children, "Some children decided not to attend because they were mocked for the way they spoke or dressed."[273]

Some people did not seem aware that they could enroll their children in local schools. When we asked Nuria J., a 37-year-old Honduran woman in Ciudad Juárez, whether her 13-year-old son was in school, she replied, "No, he doesn't have papers from Mexico." She added, "I have no idea if there's a school here."[274]

In a few cases, people told us their children had been turned away by schools elsewhere in Mexico. Marisela F., the 21-year-old Honduran woman, said that she and her family spent five months in Tenosique, in the state of Tabasco, before travelling to Ciudad Juárez and seeking asylum in the United States. "In Tabasco we tried to put our son in kindergarten, but the school didn't accept him. They didn't let him register. They said we needed a CURP and other identification."[275] A CURP (Clave Única de Registro de Población, roughly translating to "individual registration number") is an identity number for people resident in Mexico and Mexicans residing abroad.[276] The website of Mexico's Ministry of Public Education includes "CURP certificate" as among the recommended requirements for enrollment in preschool, primary education, and secondary education.[277]

AR00812

"Like I'm Drowning"          DONATE NOW

children to private schools. "In Juárez, there are kids who have not been going to school for at least a year. There are a few reasons: families don't know if their children have the right to go to school, they don't know how to enroll their children, and they're scared," she said, adding, "There's a real fear of kids being harassed or discriminated against in school or kidnapped on their way to or from school."[278]

Groups and individuals volunteered their time to offer classes and other activities in some shelters. In Tijuana, for example, Santiago F.'s 5-year-old son, Mateo, was attending classes two days a week taught by volunteer teachers who came to their shelter.[279] The Tijuana initiative, a mobile classroom program affiliated with the School Box Project, had to suspend its in-person activities in March due to the Covid-19 pandemic; in response, the volunteer who had brought the mobile learning program to three Tijuana shelters organized virtual classes for the shelter. [280] In Matamoros, a "sidewalk school" organized by the volunteer group Team Brownsville gathered children together on a concrete plaza near the international bridge, where teachers gave them lessons in subjects such as math, reading, social studies, geography, music, and English.[281]

Some shelters have organized their own classes. For example, a woman who had been a teacher in Honduras offered informal classes in the Ciudad Juárez shelter where she and her daughter stayed until early 2020.[282] In Tijuana, a mother in the Embajadores de Jesús shelter began to offer informal activities after the suspension of the mobile classroom program, the *New York Times* reported.[283]

## Challenges in Finding Work

When they are sent to Mexico, people in the MPP receive a stamped paper form—usually used for tourists and other short-term visitors—giving them a stay of up to 180 days in the country. Even before immigration courts suspended MPP hearings in response to the pandemic, most cases were not resolved within this time. We heard that Mexican authorities have generally renewed temporary stays as long as a person's asylum case remains pending.

Mexican authorities on the border tell people they have the right to work in Mexico during the time they are in the MPP, but the paper record of admission, the only Mexican document the people we interviewed had received, is not work authorization. "The reality is that this document does not in itself permit work, and many employers will not accept it," Alejandra

University of Texas at Austin, commented.[285]

For migrants, jobs are scarce, particularly in Matamoros and Nuevo Laredo. In addition, people may be fearful of leaving their children unsupervised, and in the case of parents of all but the oldest children, unable to do so. "We see a lot of single parents with children. It's very complicated for them to work in Mexico, because they don't have anyone to care for their children while they're on the job," said Luis Gonzalez, supervising immigration attorney at the Jewish Family Service of San Diego.[286]

## Mexico's Underfunded Refugee Protection System

None of the families we spoke with had sought asylum in Mexico. Most were unaware that was an option. For instance, Ana J., a 31-year-old from Honduras staying at a shelter in Ciudad Juárez with her husband and their three daughters, said, "We didn't know we could ask for asylum here."[287] Delfina L., 34, also from Honduras, told us, "Nobody ever spoke of this possibility."[288]

A few had humanitarian visas, temporary status issued at one-year intervals to people who meet specific conditions, including those who are victims of serious crime. But others who appeared to qualify for them had not heard of that option or had only recently become aware of the possibility. A woman who was raped in Monterrey said that she did not know about the humanitarian visa until months later, when she made a police report on behalf of another woman in Ciudad Juárez. "The officer said this was an option, but that was the first time I had heard of it," she told us.[289] In fact, Mexico's immigration agency does not have uniform criteria for issuing humanitarian visas, Mexican lawyers observed. "Each delegation has its own approach," Alejandra Macías of Asylum Access said, referring to the state-level offices of the National Migration Institute. For example, some delegations require victims of crime to supply both a complaint and a certification from prosecutors that the Attorney General's office has recognized the person as the victim of a crime. Other delegations simply do not issue humanitarian visas, she said.[290]

The Mexican refugee protection system does not offer an effective alternative to asylum in the United States. The Mexican refugee agency, known as the Mexican Commission for Refugee Assistance (Comisión Mexicana de Ayuda a Refugiados, COMAR), has received an increasing number of applications for refugee recognition in recent years. Its staffing and budget have not

HUMAN RIGHTS WATCH

"Like I'm Drowning"



DONATE NOW

the year, as compared with $575 per application received in 2013, an analysis by the University of Texas at Austin's Strauss Center for International Security and Law found.[291] Nearly half of those who sought refugee recognition in 2018 were still waiting for a decision in October 2019, Asylum Access found when it analyzed government data.[292]

A 30-day time limit to apply for refugee recognition is enforced even for those who only become aware of the possibility of seeking safety in Mexico once they are at its northern border. Asylum Access has had success in some cases in getting individual exemptions from this limit, but only after seeking and obtaining an *amparo*, a remedy for violations of constitutional rights.[293]

A requirement that those seeking refugee recognition in Mexico present themselves for weekly signatures at the COMAR office has been suspended during the pandemic. But a source of stress for applicants is that COMAR does not provide people with a document giving them some security that they will not be deported while their asylum case is pending, Macías told Human Rights Watch.[294]

---

# IV. Damage to Mental Health

Salvador E. and his wife, Marla, fled death threats from gang members in El Salvador, leaving their homes in January 2019. They travelled north with their five children, ages 1 to 12, hoping to join Marla's mother and sisters, all US citizens, in Utah. In Guatemala, they were robbed of all of their money, so they stayed with a relative in Belize for a time while they worked to earn money to continue their journey.

As they moved on from Veracruz, Mexican immigration agents apprehended the family and detained them for 40 days. After they were released, they travelled to Monterrey, where Marla was robbed at knifepoint.

**AR00815**

   

Patrol station, which they approached to request asylum. After two days in immigration holding cells, CBP sent them to Tijuana. They felt unsafe in the first shelter they found, so they rented a room. A few days after they moved to the room, they returned to it one afternoon to find they had been robbed. Suspecting that they had been set up by their landlord, they confronted her but quickly left the premises when she threatened to call the police to have them arrested.

When we spoke to Marla and Salvador in November 2019, they had found another shelter. Nevertheless, they said in combination, the moves and the dangers they had faced weighed on them. They each described constantly feeling stressed. Marla had begun to have regular headaches. In addition, she said, "I feel lost."[295]

Like Marla, Salvador, and their family, many people face violent attacks, extortion, and other serious abuse on their journey through Mexico. Some spend time in immigration detention; others are preyed upon by Mexican authorities. In some instances, they are subjected to violence from the same groups that caused them to flee their homes. In many of the events described to Human Rights Watch, people appeared to be targeted because they were migrants —they were singled out for violent attacks or other serious abuse because they looked or sounded like they were from somewhere else.

These traumatic events hurt their mental well-being, people told us. For instance, a Cuban woman told Human Rights Watch:

> After we arrived in Puebla [Mexico], we were abducted by members of an armed group and held along with 80 others in a building resembling a warehouse. We were held captive for five days in the warehouse and were extorted for ransom . . . . They subjected us to many abuses while we were there. It is really difficult to talk about what we faced there. Even thinking about it now makes me very upset, and I think it will be a long time before I can talk about it without feeling great distress.[296]

Being placed in the MPP added to their stress, they said. "I have headaches and am worried all the time. I cannot sleep. I want to be able to take care of our family and protect them . . . . I am very distressed about our situation," Héctor C., from Honduras, told us.[297]

HUMAN
RIGHTS
WATCH            "Like I'm Drowning"                  

described the changes in his 5-year-old son during the three months they had been in Mexico. He continued:

> He isn't prepared mentally for these things. We've seen a change in him. . . . Before he was more easygoing. Now he's easily bothered, more irritable, gets angry easily. He's anxious and impulsive now, he doesn't control himself. He was more well-behaved in Honduras. Now he misbehaves. We've seen a complete change in the boy. We didn't want this life for our son.[298]

In another case, an 8-year-old girl who was sexually assaulted by a man staying at her shelter in Ciudad Juárez was having nightmares several times a week. When we spoke to her and her father one week after the assault, she said that she often feared that scary people would hurt her.[299] Her father said that after the assaults, which took place over several days in December before she reported them, she often shook with anxiety when she was distressed. He noticed other changes in her behavior: for example, she sought more attention from him and was more disruptive than before, including by being defiant toward requests from him and others. He said she also had begun to come to him and cry after interactions with other children; before the assaults, she was usually able to resolve conflicts with other children without his help, he told us.[300]

Such behavioral changes are common reactions among children to exposure to traumatic stress, especially when there has been a rupture in trust and security in parent-child attachment. Increased difficulty with emotional regulation is another common outcome of children's exposure to trauma.[301]

The girl's father told us that he had noticed changes in his own behavior as well. He was always on the lookout for danger and felt sad, increasingly negative, and hopeless, he said.[302] His hypervigilance and reduced sense of trust and confidence in others are consistent with anxiety and posttraumatic stress.[303] Research by Médecins Sans Frontières and Physicians for Human Rights, among other groups, has also found that the experience of being sent to Mexico under the MPP had adverse impacts on mental health.[304]

Another 23-year-old Honduran woman, Juliana T., described significant changes in her 7-year-old daughter's behavior and functioning after the girl was sexually assaulted while in a shelter in

AR00817

   

hypervigilance. Her daughter is no longer interested in school, socializing, or play, is afraid to go out in public, and demonstrates increased aggression toward her family, Juliana told us.[305]

The experience of immigration detention in the United States was also traumatic, we heard. Santiago F., a 30-year-old Guatemalan man, said that his 5-year-old son, Mateo, became so frightened when they were locked up after their court hearings that he had to hold his son to comfort him the entire time they were in the *hielera*. "Mateo used to be a very active and happy boy, but now he is quiet and sad. He gets very nervous whenever we have appointments with the US immigration officials because he knows that immediately after court, we'll be locked up for several days," Santiago told us.[306]

We heard many such accounts. Héctor C., a 42-year-old Honduran man, said that being locked up for two days in a Yuma holding cell badly affected his 3-year-old daughter. "The girl was traumatized. After that, she would not let anybody get close to her for a long time," he told us.[307]

Renata A. gave a similar account, telling us that her 5-year-old daughter's behavior changed markedly after their detention in CBP holding cells in California, Arizona, and Texas. "The whole time we were interviewed by the CBP agents, she hung on to our legs and wouldn't look at the immigration agent. She started wetting the bed. She has nightmares and wakes up screaming. She'll scream, 'Police, police! The police are going to take us away! The police are coming to get us!' This isn't how she was before the immigration agents detained us. This is new; it started after we were in immigration detention," Renata said.[308]

Even before immigration courts suspended MPP hearings in response to the pandemic, lengthy waits for court dates added to people's distress. When Julián M. heard in November that he and his family would wait four months for their merits hearing, he said, "I felt desperate." He was most concerned for the well-being of his daughters, ages 5, 3, and 1, he said. "The shelter isn't a good place for them, and we've been here for months already."[309]

Staff at migrant shelters said such reactions were common. "People have a sense of despair and hopelessness. Confronting this reality, many go into a state of depression," Melissa Soto Osuna, a staff member at Tijuana's Casa del Migrante, told Human Rights Watch in November 2019.[310]

Exposure to stress, adversity, and trauma is known to have a cumulative impact: increased frequency and duration of exposure to stress and adversity correspond with increased risk for

HUMAN
RIGHTS
WATCH

"Like I'm Drowning"

   

prior trauma exposure in countries of origin and in transit to significantly increase the likelihood, intensity, and complexity of psychological disturbance and impairment in functioning for affected individuals and families. Such adverse impacts are particularly pronounced for children, including adolescents, because of increased vulnerability associated with the impact of trauma and adversity exposure on child development.[311]

The general conditions and experiences of individuals and families in the MPP correspond to factors associated with trauma exposure and posttraumatic stress reactions.[312] Individuals and families in the MPP consistently described a sense of disempowerment and helplessness, coupled with a chronic sense of threat and danger of assault, persecution, and general instability and insecurity. The long-term and ambiguous nature of their life on the border, with no clear timeline for court hearings or protection, intensifies the stress, anxiety, and trauma they experience, we heard.

The prolonged sense of helplessness imposed by the MPP may have long-term repercussions. Prolonged and inescapable insecurity can cause distress that can become a "way of being" for many people.[313]

The psychological impact of the MPP on children and families is particularly marked. The prevention of childhood distress in the face of trauma and adversity is largely dependent upon the presence of a stable and supportive caregiving relationship and environment.[314] A stable and supportive caregiving environment promotes child and family resilience by providing security, validation, and emotional support.[315] The MPP does not facilitate such an environment for children and their families; instead, children and their families frequently face food and shelter insecurity, assault, harassment, and discrimination, significantly disrupting the stability of the caregiving environment and the security of family relationships. As a result, placement in the MPP can be expected to correspond with long-term difficulties in parenting, family functioning, child behavior, child development, and overall health and well-being.

Particularly after the onset of the pandemic, many of those we interviewed described daily struggles to cope. Some said that the only thing that kept them going was their recognition that their children depended on them. Describing her mental state, Delfina L., a 34-year-old Honduran woman, told us, "I spend every day feeling like I am drowning."[316]

AR00819

HUMAN
RIGHTS
WATCH          "Like I'm Drowning"          [f] [t] [w] [✉] [⤴]          DONATE NOW

# V. The Trump Administration's Attack on Asylum

The MPP was part of a more general, sustained attack the Trump administration levelled on asylum and other protections for people fleeing harm and seeking safety in the United States. Under Trump, the US government abandoned a decades-long commitment to refugee resettlement. It introduced technical changes to rules and administrative caselaw to sharply restrict asylum standards, foreclosing most claims by women seeking protection from abusive partners and people fleeing gang violence. It routinely flouted court orders, including directives to release children to relatives in the United States. It forcibly separated parents from their children. It held children travelling on their own for weeks in squalid, packed holding cells. And it has used the Covid-19 pandemic as a pretext to summarily expel more than 316,000 people, including at least 8,800 unaccompanied children,[317] without the pretense of due process, and moving to bar asylum for anybody coming from a country affected by Covid-19.

The administration began processing some asylum seekers under a streamlined process that afforded inadequate due process protections. It initiated an agreement with Guatemala under which it transferred asylum seekers from El Salvador and Honduras to that country to pursue asylum there rather than in the United States,[318] despite Guatemala's incapacity to provide asylum seekers with a full and fair procedure to examine their claims.[319]

It also took steps to direct asylum seekers to official border crossings, including an agency rule and presidential proclamations that purported to render ineligible for asylum anybody who entered the United States irregularly.[320] But many people who went to border stations, or "ports of entry," to apply for asylum found that CBP agents prevented them from crossing the international boundary with variations on the message "there is no processing capacity,"[321] the border post is "too full,"[322] or "Trump says we don't have to let you in."[323] Under a practice known as "metering," CBP accepted a limited number of people each day for asylum processing —sometimes, nobody at all.[324]

The Trump administration rolled out many other restrictions on asylum, in furtherance of a policy to end what it described as "the abuse of parole and asylum provisions currently used to prevent the lawful removal of removable aliens."[325] If left in place, these restrictions would "dismantle[] . . . America's position as a global leader in refugee assistance," the union

AR00820



"Like I'm Drowning"                                                                    DONATE NOW

screening interviews and a ban on know-your-rights orientation sessions in US Immigration and Customs Enforcement (ICE) detention,[328] a bar on asylum for people who transited through countries without seeking protection there,[329] a new asylum bar for those who come from or transit through countries affected by Covid-19 or another pandemic,[330] fees for making asylum applications,[331] a 15-day filing deadline for some asylum and withholding of removal applications,[332] and other restrictions on asylum eligibility.[333]

The flurry of new policies rendered unpredictable and arbitrary what had been relatively clear, reliable criteria for determining who received which type of deportation proceeding. "All of a sudden there's MPP, meaning people are sent to Mexico, and the potential for applying the ACA [the Asylum Cooperative Agreement], meaning they might go to Guatemala," said Alexandra Miller, an attorney in Tucson. "Now add Covid Title 42 [summary expulsions] to the list. The effect is to astronomically increase the uncertainty people face."[334]

In addition, administration officials appear to have acted in ways that hurt the integrity of the asylum adjudication process. A whistleblower complaint made in September 2020 by a senior DHS official, Brian Murphy, stated that Ken Cuccinelli, acting as DHS deputy secretary, asked for changes to information in intelligence reports in order to minimize references to "high levels of corruption, violence, and poor economic conditions" in El Salvador, Guatemala, and Honduras. "The intelligence reports were designed to help asylum officers render better determinations regarding their legal standards," Murphy's complaint said, adding that Cuccinelli asked for the changes because the reports' description of country conditions "undermine[d]" President Trump's "policy objectives with respect to asylum."[335]

Not all of these measures were creations of the Trump administration, and in other instances the administration implemented practices for which the groundwork was laid decades ago. Expedited removal proceedings and the option of requiring people seeking asylum to wait in Mexico for US immigration court hearings were authorized by legislation signed by President Bill Clinton in 1996.[336] Under President George W. Bush, immigration authorities expanded the use of expedited removal.[337] The Obama administration made extensive use of prolonged family detention,[338] regularly violated the 1997 settlement agreement that set minimum standards for immigration detention of children,[339] and employed border turnbacks, particularly of Haitians seeking asylum,[340] among other abusive practices. But no previous US administration has made such systematic use of these provisions or deployed them so

**AR00821**

"Like I'm Drowning"

DONATE NOW

# VI. US Violations of Domestic and International Law

The US Department of Homeland Security (DHS) and the US Department of Justice (DOJ) initiated and expanded the "Remain in Mexico" program even though senior administration officials knew or should have known that most people sent to Mexico under the program would have to rely on the limited, overstretched humanitarian services available in Mexican towns bordering the United States and that they would face significant—in many cases insurmountable—barriers to legal representation for their asylum claims. Other serious due process shortcomings of the Remain in Mexico program include deficient notice, resulting in the loss of rights and creating the risk that people may not appear at hearings through no fault of their own; questionable procedural tactics by DHS; and dubious interpretations of newly issued asylum regulations by some immigration judges. As a consequence, people placed in the MPP are denied their right to a full and fair hearing[341] and deprived of the right to seek asylum. [342]

Expulsions or returns to ill-treatment are prohibited under international law.[343] From the start of the program, DHS and DOJ had ample warning of overcrowded shelters, serious threats to peoples' lives and safety, food insecurity, concerns about the ability to maintain good hygiene, and the heightened risk these conditions posed for the spread of contagious diseases. DHS has refused most requests for exemption or release from the MPP on humanitarian grounds, as Human Rights Watch and other groups have found. And at the beginning of the pandemic, when Mexican states on the US border had few or no known cases of Covid-19, DHS rejected calls to release people from the MPP to allow them to join family members or friends in the United States while their asylum claims proceed.

In these and other ways, the Remain in Mexico program violates the United States' obligations under the Refugee Protocol, the Convention against Torture, the International Covenant on Civil and Political Rights (ICCPR), and customary international law. It is inconsistent with the

"Like I'm Drowning"

  

DONATE NOW

nonrefoulement and the other refugee rights enumerated in the Refugee Convention.

## The Prohibition on Returns to Torture or Other Ill-Treatment

People placed in the MPP are at risk of serious harm in Mexico, including sexual assault and other violent attacks, armed robbery, and extortion, often at the hands of organized crime and in some instances by Mexican immigration agents or police.[344] The MPP's woefully inadequate safeguards against return to such harm violate the Convention against Torture and the International Covenant on Civil and Political Rights (ICCPR), which prohibit expulsions or returns in circumstances where people would face a substantial risk of torture or, in the case of the ICCPR, exposure to other ill-treatment.[345]

They also violate the customary international law prohibition on refoulement,[346] which in the case of returns to risk of torture, is a peremptory norm of international law.[347] These obligations are in addition to the nonrefoulement provision of the Refugee Convention.[348]

There are no exceptions to the prohibition of refoulement under the Convention against Torture.[349] The UN Committee against Torture, the treaty body that provides authoritative guidance on states' obligations under the Convention against Torture, has observed:

> Each state party must apply the principle of non-refoulement in any territory under its jurisdiction or any area under its control or authority, or on board a ship or aircraft registered in the State party, to any person, *including persons requesting or in need of international protection, without any form of discrimination* and *regardless of the nationality or statelessness or the legal, administrative or judicial status* of the person concerned under ordinary or emergency law.[350]

Compliance with the nonrefoulement obligation under the Convention against Torture requires individual, impartial, and independent examination of "[e]ach case" in a way that provides "essential procedural safeguards."[351] In particular, "[c]ollective deportation, without an objective examination of the individual cases with regard to personal risk, should be considered as a violation of the principle of nonrefoulement."[352]

AR00823

  

"Like I'm Drowning"

DONATE NOW

risk of irreparable harm.[353] As with the nonrefoulement obligation of the Convention against Torture, the obligation under the ICCPR does not allow for exceptions.[354]

## US Asylum Law

The current US asylum framework is the product of the Refugee Act of 1980,[355] "a clear statement of intention of the United States Congress to move away from a refugee and asylum policy which, for over forty years, discriminated on the basis of ideology, geography and even national origin, to one that was rooted in principles of humanitarianism and objectivity."[356]

In enacting the Refugee Act of 1980, Congress intended to implement the United States' obligations under the Protocol relating to the Status of Refugees (the Refugee Protocol), which incorporated the substantive protections of the Convention relating to the Status of Refugees (the Refugee Convention).[357] Congress enacted the Refugee Act "with the understanding that it is based directly upon the language of the Protocol and it is intended that the provision be construed consistent with the Protocol."[358] As the US Supreme Court observed, "The principal motivation for the enactment of the Refugee Act of 1980 was a desire to revise and regularize the procedures governing the admission of refugees into the United States,"[359] and to make "U.S. statutory law clearly reflect . . . [US] legal obligations under international agreements."[360]

In particular, the "withholding of removal" provision[361] tracks the prohibition of refoulement in article 33 of the Refugee Convention. As the US Supreme Court observed in 1993, the "history of the 1980 Act does disclose a general intent to conform our law to Article 33 of the Convention."[362] Similarly, the US Court of Appeals for the Third Circuit has stated, "The adoption of essentially identical language to that contained in Article 33 . . . is important because it is one of the strongest indicators that Congress intended to incorporate the understanding of the Protocol developed under international law into the U.S. statutory scheme."[363]

AR00824

"Like I'm Drowning"

      DONATE NOW

# Acknowledgments

This report is based on research undertaken in Ciudad Juárez and El Paso from November 2019 to March 2020 and remote interviews carried out between March and October 2020. The research team consisted of Warren Binford, professor of law and director of the Clinical Law Program, Willamette University; Michael Garcia Bochenek, senior counsel on children's rights at Human Rights Watch; Ryan Matlow, a child clinical psychologist and Director of Community Programs for Stanford University's Early Life Stress and Resilience Program and member of Stanford's Human Rights in Trauma Mental Health Program; Hannah Rule, law student, Willamette University; Patricia Stoneroad, law student, Willamette University; and Ewen Wang, a pediatrician and professor of emergency medicine, Stanford University Medical Center.

Michael Garcia Bochenek wrote the report, with contributions from Warren Binford, Ryan Matlow, and Ewen Wang. Hannah Rule provided research assistance.

Zama Neff, executive director of the Children's Rights Division; Maria McFarland Sánchez-Moreno, senior legal advisor; and Tom Porteous, deputy program director, edited the report. Joe Amon, director of global health and clinical professor of Community Health and Prevention at the Dornsife School of Public Health, Drexel University, reviewed the sections on health services and the impact of the Remain in Mexico program on mental health. Ximena Casas, researcher, Women's Rights Division; Bill Frelick, director, Refugee and Migrant Rights Division; Neela Ghoshal, associate director, Lesbian, Gay, Bisexual, and Transgender Rights Division; Amanda Klasing, interim co-director, Women's Rights Division; Tyler Mattiace, Mexico researcher; Grace Meng, associate director, US Program; Carlos Ríos Espinosa, senior researcher, Disability Rights Division; and Ariana Sawyer, researcher, US program, also reviewed the report. Delphine Starr, coordinator, Children's Rights Division; Travis Carr, Digital coordinator, Fitzroy Hepkins, senior administrative manager; and José Martínez, administrative officer, produced the report.

We appreciate the willingness of the Leona Vicario Migrant Integration Center in Ciudad Juárez to allow us to visit and make staff available to answer our questions, and to the Chihuahua State Population Council (COESPO) for meeting with us.

AR00825

   

"Like I'm Drowning"

Borderland Connections, El Paso, Texas; Border Community Alliance, Nogales, Arizona;

Casa del Migrante, Ciudad Juárez, Chihuahua; Casa del Migrante, Tijuana, Baja California; Casa YMCA para Menores Migrantes, Tijuana; Alma Cota de Yanez, director, Fundación del Empresariado Sonorense, A.C. (FESAC), Ciudad Obregón, Sonora; Luis M. Gonzalez, supervising immigration attorney, Jewish Family Service of San Diego, San Diego, California; Jodi Goodwin, attorney, Harlingen, Texas; Tania Guerrero, attorney, Estamos Unidos Asylum Project of CLINIC, El Paso; Denise Gilman, clinical professor of law and director, Immigration Clinic, University of Texas at Austin, Austin, Texas; Iglesia Alabanzas al Rey, Ciudad Juárez; Instituto Madre Assunta, Tijuana; Juventud 2000, Tijuana; Kennji Kizuka, senior researcher and policy analyst, Refugee Protection, Human Rights First, New York; Las Americas Immigrant Advocacy Center, El Paso; Alejandra Macías, Asylum Access, Mexico City; Alexandra Miller, managing attorney, Border Action Team, Florence Immigrant and Refugee Rights Project, Tucson, Arizona; Casey Miller, San Antonio, Texas; Alejandro Olayo-Méndez, S.J., assistant professor, School of Social Work, Boston College, Boston, Massachusetts; Refugee Health Alliance; Templo Embajadores de Jesús, Tijuana; Erika Pinheiro, litigation and policy director, Al Otro Lado, Tijuana; Nicole Ramos, Border Rights Project director, Al Otro Lado, Tijuana; Texas Civil Rights Project; Amy Thompson, postdoctoral researcher, El Colegio de Sonora, Hermosillo, Sonora; Constance Wannamaker, attorney, El Paso; Alysha Welsh, managing attorney, Washington office, Human Rights First, Washington, D.C.; Joanna Williams, director of education and advocacy, KINO Border Initiative, Nogales, Arizona; and Cindy Woods, managing attorney, Proyecto de Ayuda para Solicitantes de Asilo, Texas RioGrande Legal Aid.

Finally, we would like to thank the children and adults who were willing to share their firsthand experiences in the hope of improving the lives of others who follow them in seeking safety in the United States.

**Region / Country** Americas, Mexico, United States, Immigration

AR00826

       "Like I'm Drowning"    DONATE NOW

and bringing perpetrators to justice

## DONATE NOW



## Get Updates On Rights Issues From Around The Globe

Enter an email address        Sign Up

## Connect With Us

Contact Us

Corrections

Privacy Policy

Permissions

Blackbaud Security Incident

Site Map

Child Safeguarding

© 2022 Human Rights Watch

**Human Rights Watch** | 350 Fifth Avenue, 34th Floor | New York, NY 10118-3299 USA | t 1.212.290.4700

**Human Rights Watch** is a 501(C)(3) nonprofit registered in the US under EIN: 13-2875808

AR00827

   

DONATE NOW

AR00828



NUMBER OF PERSONS ENTERING THE U.S. UNDER
THE END OF MPP OPERATION AS OF MAY 25, 2021

| PoE | New entries (May 25, 2021) | Cumulative total (Feb 19 – May 25, 2021) |
|---|---|---|
| Tijuana | - | 2,413 |
| Matamoros | 8 | 2,303 |
| Ciudad Juarez | - | 4,523 |
| Reynosa | - | 845 |
| Nuevo Laredo | - | 483 |
| Piedras Negras | - | 626 |
| TOTAL | 8 | 11,193 |

Source: IOM End of MPP Daily Monitoring, May 25, 2021.

AR00829



**SRE**

**Subsecretaría para América del Norte**

Ciudad de México, 20 de diciembre de 2018.

**Sr. John Creamer**
**Encargado de Negocios**
**Embajada de Estados Unidos en México**

A continuación se transcribe el posicionamiento del Gobierno de México ante la decisión del Gobierno de Estados Unidos de implementar la sección 235(b)(2)(c) de su Ley de Inmigración y Nacionalidad:

"A las ocho de la mañana, el Gobierno de Estados Unidos comunicó al Gobierno de México que el Departamento de Seguridad Interna de los Estados Unidos de América (DHS por sus siglas en inglés) tiene la intención de implementar una sección de su ley migratoria que le permitiría devolver a extranjeros, no mexicanos, a nuestro país para que aguarden aquí el desarrollo de su proceso migratorio en Estados Unidos.

México reafirma su derecho soberano de admitir o rechazar el ingreso de extranjeros a su territorio, en ejercicio de su política migratoria. Por ello, el Gobierno de México ha decidido tomar las siguientes acciones en beneficio de las personas migrantes, en particular a los menores de edad, estén acompañados o no, así como para proteger el derecho de aquellos que desean iniciar y seguir un procedimiento de asilo en territorio de los Estados Unidos de América:

1.      Autorizará, por razones humanitarias y de manera temporal, el ingreso de ciertas personas extranjeras provenientes de Estados Unidos que hayan ingresado a ese país por un puerto de entrada o que hayan sido aprehendidas entre puertos de entrada, hayan sido entrevistadas por las autoridades de control migratorio de ese país, y hayan recibido un citatorio para presentarse ante un Juez Migratorio. Lo anterior con base en la legislación mexicana vigente y los compromisos internacionales suscritos, como la Convención sobre el Estatuto de los Refugiados, su Protocolo, así como la Convención Contra la Tortura y otros Tratos o Penas Crueles, Inhumanos o Degradantes, entre otros.

2.      Permitirá que las personas extranjeras que hayan recibido un citatorio soliciten su internación a territorio nacional por razones humanitarias en los lugares destinados al tránsito internacional de personas, permanezcan en territorio nacional bajo la condición de "estancia



**SRE**

SECRETARIA DE RELACIONES
EXTERIORES

**Subsecretaría para América del Norte**



Ciudad de México, 20 de diciembre de 2018.

por razones humanitarias", y puedan realizar entradas y salidas múltiples del territorio nacional.

3.    Garantizará que las personas extranjeras que hayan recibido su citatorio gocen plenamente de los derechos y libertades reconocidos en la Constitución, en los tratados internacionales de los cuales es parte el Estado mexicano, así como en la Ley de Migración. Tendrán derecho a un trato igualitario sin discriminación alguna y con el debido respeto a sus derechos humanos, así como la oportunidad de solicitar un permiso para trabajar a cambio de una remuneración, lo que les permitirá solventar sus necesidades básicas.

4.    Procurará que la implementación de las medidas que tome cada gobierno se coordine a nivel técnico-operativo con la finalidad de desarrollar mecanismos que permitan la participación de las personas migrantes con citatorio en su audiencia ante un Juez Migratorio estadounidense, el acceso sin interferencias a información y servicios legales, así como para prevenir fraudes y abusos.

Las acciones que tomen los gobiernos de México y de Estados Unidos no constituyen un esquema de Tercer País Seguro, en el que se obligaría a las personas migrantes en tránsito a solicitar asilo en México. Están dirigidas a facilitar el seguimiento de las solicitudes de asilo en los Estados Unidos, sin que eso implique obstáculo alguno para que cualquier persona extranjera pueda solicitar refugio en México.

El Gobierno de México reitera que toda persona extranjera deberá observar la Ley mientras se encuentre en territorio nacional."

Atentamente,

Julián Escutia Rodríguez
Coordinador de Asesores del Subsecretario para América del Norte

AR00831

Courtesy translation

**Press Release No. 14**
Mexico City, December 20, 2018

### Statement of the Government of Mexico regarding the decision of the United States Government to implement section 235 (b) (2) (c) of its Immigration and Nationality Law

At eight in the morning, the Government of the United States informed the Government of Mexico that the Department of Homeland Security of the United States of America (DHS) intends to implement a section of its immigration law that allows returning non-Mexican foreigners to our country so that they can wait for the development of their United States' immigration process.

Mexico reaffirms its sovereign right to admit or reject the entry of foreigners into its territory, in the exercise of its migration policy. Therefore, the Government of Mexico has decided to take the following actions for the benefit of the migrants, in particular of minors whether accompanied or not and to protect the right of those who wish to initiate an asylum procedure in the territory of the United States of America:

Mexico will authorize, for humanitarian reasons and in a temporarily fashion, the entry of certain foreign persons from within the United States who have entered that country through a port of entry or who have been apprehended between ports of entry and interviewed by the authorities of migration authorities of that country, and have received a notice to attend a hearing before a judge. This is based on the current Mexican legislation and the international commitments thereby signed, such as the Convention on the Status of Refugees, its Protocol, as well as the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment, among others.

Mexico will allow foreigners with a notice to attend a hearing to request their admission to the national territory for humanitarian reasons in the posts designated to the international transit of persons, with the right to stay in national territory under the humanitarian reasons stay condition and make multiple entries from the national territory.

Mexico will guarantee that foreigners who have received their notice fully enjoy the rights and freedoms recognized in the Constitution, in the international treaties to which the Mexican State is a party, as well as in the current Migration Law. They will be entitled to equal treatment without any discrimination and with due respect to their human rights, as well as the opportunity to apply for a work permit in exchange for remuneration, which will allow them to meet their basic needs.

Mexico will ensure that the implementation of the measures taken by each government is coordinated at the technical-operational level in order to develop mechanisms that allow the participation of migrants with notice to attend a hearing before an immigration judge, the right to access information and legal services without interference, as well as to prevent fraud and abuse.

The actions taken by the governments of Mexico and the United States do not represent the

Courtesy translation

scheme of a Third Secure Country, in which migrants in transit are forced to seek asylum in Mexico. They are aimed at facilitating the follow-up of asylum applications in the United States without any impediment to such matter.

The Government of Mexico stresses the need that every foreigner must respect domestic law while it is located in the national territory.

Follow us on Twitter: @SRE_mx

Plaza Juárez 20, P.B. Col. Centro
Del. Cuauhtémoc, Ciudad de México, 06010
Tel. 36865214
www.gob.mx/sre

AR00833

# #SaveAsylum

REPORT ABUSES

TAKE ACTION

MORE RESOURCES

# Delivered to Danger

Trump Administration sending asylum seekers and migrants to danger

AR00835

# FORCED RETURNS TO MEXICO: AT LEAST 1,544 PUBLICLY REPORTED CASES OF MURDER, RAPE, TORTURE, KIDNAPPING & OTHER VIOLENT ASSAULTS

Current as of February 19, 2021

SHARE     

# TRUMP ADMINISTRATION SENDING ASYLUM SEEKERS AND MIGRANTS TO DANGER

AR00836



Mario Tama/Getty Images

AR00837



Joe Raedle/Getty Images



John Moore/Getty Images

The U.S. government is forcing asylum seekers and migrants, including at least 16,000 children and nearly 500 infants (https://www.reuters.com/article/us-usa-immigration-babies-exclusive/exclusive-u-s-migrant-policy-sends-thousands-of-children-including-babies-back-to-mexico-idUSKBN1WQ1H1) under the age of one, to return to Mexico under the "Migrant Protection Protocols"—better known as the "Remain in Mexico" policy.

In Mexico, waiting months for immigration court hearings in the United States, these families and other returned asylum seekers and migrants face grave dangers.

AR00839

**As of February 19, 2021, there are at least 1,544 publicly reported cases of murder, rape, torture, kidnapping, and other violent assaults against asylum seekers and migrants forced to return to Mexico by the Trump Administration under this illegal scheme. Among these reported attacks are 341 cases of children returned to Mexico who were kidnapped or nearly kidnapped.**

DOWNLOAD THE LIST
(HTTPS://WWW.HUMANRIGHTSFIRST.ORG/SITES/DEFAULT/FILES/PUBLICLYREPORTEDM

These figures are likely only the tip of the iceberg, as the vast majority of the more than 68,000 (https://trac.syr.edu/phptools/immigration/mpp/) individuals already returned to Mexico have not been interviewed by reporters or human rights researchers, let alone spoken to an attorney. Nintety-four percent (https://trac.syr.edu/phptools/immigration/mpp/) of the individuals stranded by the Trump Administration in Mexico lack a U.S. lawyer to help them apply for asylum.

#StopMPP | MPP Explained



AR00840

**MPP Explained** RAICES

U.S. government officials know that these regions of the border are extremely dangerous. The U.S. State Department's travel advisories warn U.S. citizens not to travel to some of the same Mexican border towns where U.S. authorities send asylum seekers to wait for immigration court hearings. These areas are designated as level 4 threats—the same danger assessment as for Afghanistan, Iraq, and Syria.

Senior Trump Administration officials claim that they don't believe (https://www.texastribune.org/2019/09/18/texas-border-tent-courts-erected-virtual-asylum-hearings/) that the refugees and migrants the U.S. has returned to Mexico are being kidnapped and attacked there. But this willful blindness is no defense for a policy that clearly jeopardizes the safety and very lives of the children, women, and men sent back to Mexico.

## HOLD THE TRUMP ADMINISTRATION ACCOUNTABLE

Report human rights abuses against people forced by the Trump Administration to remain in danger.

SUBJECT=REPORT%20OF%20HUMAN%20RIGHTS%20ABUSE%20AGAINST%20RETURNE

**AR00841**

#DeliveredToDanger: Eduardo's Kidnapping



**Eduardo\*, a Nicaraguan political activist seeking asylum in the U.S. was kidnapped in Mexico, the Trump Administration sent him back there anyway.** Human Rights First

# MOMMY, I DON'T WANT TO DIE.

*— A 7-year-old girl to her mother after the Trump Administration returned them to Nuevo Laredo, where they were kidnapped*

The Trump Administration falsely claims this dangerous policy is an alternative to separating families at the border and holding them in detention centers. In reality, the program is yet another move by President Trump and his administration's leadership to block, ban, and frighten asylum seekers from asking for protection in the United States—even if those policies cost refugees their lives.

AR00842

**The following are just a few of their stories —**

# MURDERED

**A Salvadoran father returned to Mexico by the Trump Administration was brutally stabbed to death and possibily tortured in Tijuana** in November 2019. The man and his wife and two children had reportedly repeatedly (https://www.latimes.com/california/story/2019-12-12/attorney-central-american-in-mpp-program-murdered-in-tijuana) told immigration officers, an immigration judge and asylum officers that they feared being returned to Mexico but they were not removed from the program. The man's widow said (https://www.telemundo20.com/noticias/local/migrante-muere-en-espera-de-asilo/1971748/): "I told the judge that I was afraid for my children because we were in a horrible, horrible place, and we didn't feel safe here."

# KIDNAPPED AND RAPED

**Two Cuban women were repeatedly raped in Mexico, then returned there by the Trump Administration to more danger.** In April 2019, armed men (https://www.humanrightsfirst.org/sites/default/files/Delivered-to-Danger-August-2019 .pdf) abducted three Cuban asylum seekers–Lilia*, Yasmin* and Yasmin's partner–while waiting for a taxi near Ciudad Juárez. **Imprisoned for a week, Lilia and Yasmin were repeatedly raped by multiple men.** Eventually ransomed, the three spent weeks in hiding until they were finally able to request asylum at the El Paso port of entry, where they had placed their names on the asylum wait "list" three weeks prior to the kidnapping. However, U.S. border officers returned Lilia and Yasmin to Ciudad Juárez without giving them a chance to explain their fear of being returned there. Back in Mexico, Yasmin said, "we feel totally destroyed." She added, **"I'm afraid of the men who kidnapped and raped us… we almost never go out….  We're still in hiding. Everyone here can tell that we're Cuban**

**AR00843**

**because of the way that we dress, the way that our faces and bodies look, and the way that we talk. I'm afraid that what happened to me before will happen to me again."**

# YOU'RE LITERALLY SENDING PEOPLE BACK TO BE RAPED AND KILLED.

-Former U.S. asylum officer

**An Afro-Honduran woman returned to Mexico by the Trump Administration was kidnapped and raped.** After the U.S. government sent a Honduran woman back to Mexico, she was reportedly (https://diario.mx/juarez/secuestraron-federales-a-migrante-20190618-1528960.html) kidnapped by a group of men in Mexican federal police uniforms and repeatedly raped. According to her attorney, Linda Rivas of Las Americas Immigrant Advocacy Center in El Paso, she is a member of the Afro-Caribbean Garifuna minority. Customs and Border Protection officers returned her to Ciudad Juárez even though she told them she "had a target on her back" because of her race. They expelled her without giving her an opportunity to explain her fear to an asylum officer.

**Another Honduran asylum seeker returned to Mexico was kidnapped, raped, and forced into sexual slavery**: After U.S. border officials returned Gisela* (https://www.humanrightsfirst.org/sites/default/files/Delivered-to-Danger-August-2019 .pdf) to Mexico, a trafficker kidnapped her as she left a migration office. She was raped and forced into sexual slavery for three months. She escaped only when one of her captors assisted her in exchange for sex. Forced into hiding at a Juárez church shelter, she was not safe even there. The parish priest told her that an unknown man had come looking for her.

AR00844

# I'M AFRAID OF THE MEN WHO KIDNAPPED AND RAPED US... WE ALMOST NEVER GO OUT. WE'RE STILL IN HIDING.

— Yasmin*, Cuban asylum seeker returned by Trump Administration to Ciudad Juárez

## TORTURED

**A Honduran boy and his parents were kidnapped, and the father was tortured and disappeared**: According to El Diario (https://diario.mx/usa/actualidad/nos-mandaron-a-la-boca-del-lobo-a-sufrir-secuestros-y-extorsiones-inmigrantes-20190921-1565325.html), a three-year-old boy from Honduras and his parents were kidnapped after U.S. border officials returned them to Nuevo Laredo. The boy's parents were separated, and the woman reported hearing the kidnappers beat and electrocute her husband. When she last saw him lying on the ground, beaten and bleeding, he told her, "Love, they're going to kill us." The woman and her three-year-old son were released but she does not know if her husband is alive.

## LOVE, THEY'RE GOING TO KILL US.

— A Honduran asylum seeker returned by the Trump Administration to Mexico tells his wife after being tortured by their kidnappers

## TAKE ACTION

**AR00845**

Tell the incoming Biden Administration to end the illegal forced return of asylum seekers
and migrants to danger.

## TAKE ACTION
### (HTTPS://HUMANRIGHTSFIRST.QUORUM.US/CAMPAIGN/29629/)



(https://www.humanrightsfirst.org)



(https://www.wola.org)



(https://www.imumi.org)



(https://womensrefugeecommission.org)



(https://www.lawg.org)



(https://www.aila.org)

AR00846



(https://www.phr.org/)



(https://www.refugeesinternational.org/)



(https://www.immigrationequality.org/)



(https://www.hrw.org/)



(http://www.hias.org)



(http://www.immdef.org)

**ACCOUNTABILITY**

AR00847

**FILE A COMPLAINT WITH THE DEPARTMENT OF HOMELAND SECURITY**

OFFICE OF INSPECTOR GENERAL
(HTTPS://HOTLINE.OIG.DHS.GOV/#STEP-1)


OFFICE FOR CIVIL RIGHTS AND CIVIL LIBERTIES
(HTTPS://WWW.DHS.GOV/PUBLICATION/FILE-CIVIL-RIGHTS-
COMPLAINT)


**REPORT ABUSES AGAINST RETURNED ASYLUM SEEKERS AND MIGRANTS TO HUMAN
RIGHTS INVESTIGATORS**

- Send an email with information on human rights abuses under the Remain in
  Mexico policy to report@humanrightsfirst.org. Investigators will contact you to
  follow up on your report.

**REPORTS OF HUMAN RIGHTS ABUSES UNDER THE REMAIN IN MEXICO POLICY**

- Physicians for Human Rights, "Forced into Danger (https://phr.org/wp-
  content/uploads/2021/01/PHR-Report-Forced-into-Danger_Human-Rights-
  Violations-and-MPP-January-2021.pdf): Human Rights Violations Resulting from
  the U.S. Migrant Protection Protocols" (January 2021)

- Human Rights Watch, " 'Like I'm Drowning
  (https://www.hrw.org/report/2021/01/06/im-drowning/children-and-families-
  sent-harm-us-remain-mexico-program)': Children and Families Sent to Harm by
  the US 'Remain in Mexico' Program" (January 2021)

- Human Rights First, "Humanitarian Disgrace
  (https://www.humanrightsfirst.org/resource/humanitarian-disgrace-us-
  continues-illegally-block-expel-refugees-danger): U.S. Continues to Illegally Block,
  Expel Refugees to Danger" (December 2020)  (en español
  (https://www.humanrightsfirst.org/sites/default/files/UnaDesgraciaHumanitaria.pdf))

- IMUMI, "En la boca del lobo (https://imumi.org/attachments/2020/Informe-En-la-
  boca-del-lobo-Protocolo-Quedate-en-Mexico.pdf)" (December 2020)

**AR00848**

- American Friends Service Committee, Center for Reproductive Rights, Human Rights First, Women's Refugee Commission, "Pregnant Immigrants and Asylum Seekers During COVID-19 (https://www.womensrefugeecommission.org/wp-content/uploads/2020/09/Pregnant-Immigrants-Asylum-Seekers-during-COVID-19.pdf)" (September 2020)

- Strauss Center, "Migrant Protection Protocols: Implementation and Consequences (https://www.strausscenter.org/wp-content/uploads/PRP-218_-Migrant-Protection-Protocols.pdf) for Asylum Seekers in Mexico" (May 2020) (en español (https://www.strausscenter.org/wp-content/uploads/PRP-218_-Protocolos-de-Proteccio%CC%81n-a-Migrantes.pdf))

- Human Rights First, "Pandemic as Pretext (https://www.humanrightsfirst.org/resource/pandemic-pretext-trump-administration-exploits-covid-19-expels-asylum-seekers-and-children): Trump Administration Exploits COVID-19, Expels Asylum Seekers and Children to Escalating Danger" (May 2020) (en español (https://www.humanrightsfirst.org/sites/default/files/PandemiaComoPretexto.pdf))

- Doctors Without Borders, "No Way Out (https://www.doctorswithoutborders.org/sites/default/files/documents/Doctors%20Withou The Humanitarian Crisis for Migrants and Asylum Seekers Trapped Between the United States, Mexico and the Northern Triangle of Central America" (February 2020)

- Human Rights Watch, "'Remain in Mexico' Program Harming Children (https://www.hrw.org/news/2020/02/12/us-remain-mexico-program-harming-children)" (February 2020)

- Refugees International "Remain in Mexico: A Year of Deliberate Endangerment and Evasion (https://www.refugeesinternational.org/reports/2020/1/29/remain-in-mexico-a-year-of-deliberate-endangerment-and-evasion)" (January 2020)

- American Friends Service Committee, "Dismantling Asylum (https://www.afsc.org/sites/default/files/documents/MPP_Final_Jan2020-300hi.pdf): A Year into the Migrant Protection Protocols" (January 2020)

- Mills Legal Clinic, Stanford Law School, "Violations of Human Rights (https://7dac4932-ebde-4b1a-96f5-fac5c6bec362.filesusr.com/ugd/e07ba9_b0e2d1ff662c41308737555d7d245572.pdf) Occurring in Mexico as a Result of the Remain in Mexico Program" (January 2020)

- HOPE Border Institute, "2020 Situation Report: Remain in Mexico (https://7dac4932-ebde-4b1a-96f5-fac5c6bec362.filesusr.com/ugd/e07ba9_42dc2e4ae15b49e5a833d297491fae6d.pdf)" (January 2020)

- Human Rights First, "A Year of Horrors (https://www.humanrightsfirst.org/sites/default/files/MPP-aYearofHorrors-UPDATED.pdf): The Trump Administration's Illegal Returns of Asylum Seekers to Danger in Mexico" (January 2020)

- Global Response Management "Medical Summary (https://www.humanrightsfirst.org/sites/default/files/GRM%20Report%20on%20Conditions for Refugee Camp: Matamoros" (January 2020)

- Human Rights First, "Human Rights Fiasco (https://www.humanrightsfirst.org/sites/default/files/HumanRightsFiascoDec19.pdf): The Trump Administration's Dangerous Asylum Returns Continue" (December 2019) (en español (https://www.humanrightsfirst.org/sites/default/files/Fiasco%20de%20derechos%20human

- American Immigration Council, Statement (http://americanimmigrationcouncil.org/sites/default/files/general_litigation/statement_for the Migrant Protection Protocols to the House Homeland Security Subcommittee on Border Security (November 2019) (en

- Catholic Legal Immigration Network, Inc., "Seven Migrant Protection Protocols Stories (https://cliniclegal.org/news/seven-migrant-protection-protocols-stories-estamos-unidos-asylum-project) from Estamos Unidos: Asylum Project" (November 2019)

- IMUMI, Kidnappings (http://bit.ly/2XvkSCB) of Asylum Seekers along the Northern Mexican Border (November 2019)

- U.S. Immigration Policy Center, "Seeking Asylum (https://usipc.ucsd.edu/publications/usipc-seeking-asylum-part-2-final.pdf)" study on fear of return and harm to returned asylum seekers in Mexico (October 2019)

- Human Rights Watch, "Risks at Border for Those with Disabilities (https://www.hrw.org/news/2019/10/29/mexico-risks-border-those-disabilities)" (October 2019)

**AR00850**

- Physicians for Human Rights, "If I went back, I would not survive (https://phr.org/our-work/resources/asylum-seekers-fleeing-violence-in-mexico-and-central-america/#close-modal).' Asylum Seekers Fleeing Violence in Mexico and Central America" (October 2019)

- Human Rights First, "Orders from Above (https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf): Massive Human Rights Abuses under Trump Administration Return to Mexico Policy" (October 2019) (en español (https://www.humanrightsfirst.org/sites/default/files/resources/Ordenes%20de%20Arriba_

- Human Rights Watch, "US Move Puts More Asylum Seekers at Risk (https://www.hrw.org/news/2019/09/25/us-move-puts-more-asylum-seekers-risk): Expanded 'Remain in Mexico' Program Undermines Due Process" (September 2019)

- Doctors Without Borders, "US 'Remain in Mexico' Policy Endangers Lives of Asylum Seekers (https://www.doctorswithoutborders.org/what-we-do/news-stories/news/us-remain-mexico-policy-endangers-lives-asylum-seekers-tamaulipas) in Tamaulipas State" (September 2019)

- WOLA, Six Points (https://www.wola.org/analysis/migration-agreement-mexico-border-migrant-arrests/) About the U.S.-Mexico Migration Agreement and the Latest Border Apprehension Numbers (September 2019)

- Human Rights First, "Delivered to Danger (https://www.humanrightsfirst.org/resource/delivered-danger-illegal-remain-mexico-policy-imperils-asylum-seekers-lives-and-denies-due): Illegal Remain in Mexico Policy Imperils Asylum Seekers' Lives and Denies Due Process" (August 2019)

- Human Rights Watch, "'We Can't Help You Here' (https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico): US Returns of Asylum Seekers to Mexico" (July 2019)

- Human Rights First, "The Trump Administration's Migrant Persecution Protocols (https://www.humanrightsfirst.org/blog/trump-administration-s-migrant-persecution-protocols)" (June 2019)

- HOPE Border Institute, Remain in Mexico Updates (https://www.hopeborder.org/remain-in-mexico-052219) (June 2019)

**AR00851**

- Refugees International, "Remain in Mexico" Policy Pushes Asylum Seekers into Grave Dangers (https://www.refugeesinternational.org/reports/2019/5/30/remain-in-mexico-policy-pushes-asylum-seekers-into-grave-danger)" (May 2019)

- Women's Refugee Commission, "Chaos, Confusion, and Danger (https://www.womensrefugeecommission.org/rights/resources/1763-chaos-confusion-and-danger): The Remain in Mexico Program in El Paso" (May 2019)

- Human Rights First, "Congress and Courts Mislead (https://www.humanrightsfirst.org/resource/courts-and-congress-misled-about-trump-administration-policy-forcing-asylum-seekers-remain) About Trump Administration Policy Forcing Asylum Seekers to "Remain in Mexico" (May 2019)

- ACLU, "Trump's New Policy is Stranding Asylum Seekers (https://www.aclu.org/issues/immigrants-rights/trumps-new-policy-stranding-asylum-seekers-mexico) in Mexico" (March 2019)

- Human Rights First, "A Sordid Scheme (https://www.humanrightsfirst.org/resource/sordid-scheme-trump-administration-s-illegal-return-asylum-seekers-mexico): The Trump Administration's Illegal Return of Asylum Seekers to Mexico" (February/March 2019)

- American Immigration Council, American Immigration Lawyers Association, CLINIC, "Substantial Evidence Demonstrating Catastrophic Harms That Will Befall Migrants in Mexico (https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/letter_u with Continued Implementation and Further Expansion of Migrant Protection Protocols" (February 2019)

**INVESTIGATIONS, LAWSUITS AND OTHER LITIGATION**

- *E.A.R.R. v. DHS*
  - Complaint (https://creeclaw.org/wp-content/uploads/2020/11/E.A.R.R.-v.-US-Department-of-Homeland-Security-Class-Action-Complaint.pdf) (November 2020)

- *Diocesan Migrant & Refugee Services v. ICE*
  - FOIA document production (http://www.dmrs-ep.org/wp-content/uploads/2020/11/2019-ICLI-00062.pdf) (October 2020)

- *Immigrant Defenders Law Center v. Wolf*

**AR00852**

- Complaint (https://www.splcenter.org/sites/default/files/complaint_dkt_1-_immigrant_defenders_law_center_et_al_v._wolf_et_al.pdf) (October 2020)

- BIA case on MPP notice and advisals
  - Amicus Brief (https://www.humanrightsfirst.org/sites/default/files/BorderLegalServiceProvidersBIAA of Border Legal and Humanitarian Service Providers (October 2020)
  - Amicus Brief (https://www.tahirih.org/quotes/page/2/?cpt=pubs) of Tahirih Justice Center, the American Immigration Council, the American Immigration Lawyers Association, HIAS, the Fred T. Korematsu Center for Law and Equality, and Human Rights First (October 2020)
  - Amicus Invitation (https://www.justice.gov/eoir/page/file/1313321/download) (September 2020)

- *Salim-Adrianza v. Trump*
  - Complaint (https://www.nyclu.org/sites/default/files/field_documents/complaint_0.pdf) (August 2020)

- *Matter of M-D-C-V-*
  - Amicus Brief (https://1ttls613brjl37btxk4eg60v-wpengine.netdna-ssl.com/wp-content/uploads/2020/10/M-D-C-V-Amicus-Brief_Redacted.pdf) of CLINIC, HIAS, Human Rights First, Immigrant Defenders Law Center, Jewish Family Service of San Diego, Public Counsel, and Tahirih Justice Center (October 2020)
  - BIA Decision (https://www.justice.gov/eoir/page/file/1293971/download) (July 2020)

- *Turcios v. Wolf*
  - Order (https://www.humanrightsfirst.org/sites/default/files/TurciosvWolfOrder.10.16.20.pdf) (October 2020)
  - Complaint (https://www.humanrightsfirst.org/sites/default/files/TurciosvWolfComplaint.06.04.20.p (June 2020)

- *American Immigration Council v. USCIS*

- Complaint
  (https://www.americanimmigrationcouncil.org/sites/default/files/litigation_documents/

- *Nora v. Wolf*
  - Complaint
    (https://www.acludc.org/sites/default/files/field_documents/nora_v_wolf_complaint.pdf
    (April 2020)

- *Bollat Vasquez v. Wolf*
  - Amicus Brief
    (https://www.aclum.org/sites/default/files/field_documents/2020_08_03_council_119_a
    of Asylum Officers' Union (August 2020)

  - Amicus Brief
    (https://www.aclum.org/sites/default/files/field_documents/2020_08_03_former_officia
    Former Government Officials (August 2020)

  - Amicus Brief (https://cliniclegal.org/resources/litigation/amicus-brief/clinic-
    joins-amicus-brief-case-challenging-mpp) of Immigration and Refugee Legal
    Services Providers, LawSchool Clinics, and Community Organizations (August
    2020)

  - Order
    (https://www.aclum.org/sites/default/files/field_documents/45._memorandum_and_ord
    (May 2020)

  - Complaint
    (https://www.aclum.org/sites/default/files/field_documents/1_complaint_0.pdf)
    (March 2020)

- *Constanza Lemus v. Wolf*
  - Complaint
    (https://www.aclum.org/sites/default/files/field_documents/1_complaint.pdf) (January
    2020)

- *Doe v. McAleenan*
  - Preliminary Injunction and Class Certification
    (https://www.courtlistener.com/recap/gov.uscourts.casd.654553/gov.uscourts.casd.654
    (January 2020)

  - Temporary Restraining Order (https://www.aclusandiego.org/wp-
    content/uploads/2019/11/434704150-Sabraw-Order.pdf) (November 2019) -

requiring government to allow access to counsel before and during fear screening interviews

- ○ [Complaint (https://www.aclusandiego.org/wp-content/uploads/2019/11/2019-11-05-MPP-Non-R-Complaint-FILED.pdf)](https://www.aclusandiego.org/wp-content/uploads/2019/11/2019-11-05-MPP-Non-R-Complaint-FILED.pdf) (November 2019)

- *Innovation Law Lab v. McAleenan*
  - ○ [Complaint (https://www.aclu.org/legal-document/innovation-law-lab-v-nielsen-complaint)](https://www.aclu.org/legal-document/innovation-law-lab-v-nielsen-complaint) (February 2019)

  - ○ [Amicus Brief (https://www.aclu.org/legal-document/innovation-law-lab-v-mcaleenan-amicus-brief-labor-union-local-1924)](https://www.aclu.org/legal-document/innovation-law-lab-v-mcaleenan-amicus-brief-labor-union-local-1924) of Asylum Officers' Union (June 2019)

  - ○ [Amicus Brief (https://www.aclu.org/legal-document/innovation-law-lab-v-mcaleenan-amicus-brief-amnesty-international)](https://www.aclu.org/legal-document/innovation-law-lab-v-mcaleenan-amicus-brief-amnesty-international) of Amnesty International (June 2019)

  - ○ [Amicus Brief (https://www.aclu.org/legal-document/innovation-law-lab-v-mcaleenan-amicus-brief-human-rights-first)](https://www.aclu.org/legal-document/innovation-law-lab-v-mcaleenan-amicus-brief-human-rights-first) of Human Rights First (June 2019)

  - ○ [Amicus Brief (https://www.aclu.org/legal-document/innovation-law-lab-v-mcaleenan-amicus-brief-un-high-commissioner-refugees)](https://www.aclu.org/legal-document/innovation-law-lab-v-mcaleenan-amicus-brief-un-high-commissioner-refugees) of UNHCR (June 2019)

  - ○ [Amicus Brief (https://www.aclu.org/legal-document/innovation-law-lab-v-mcaleenan-amicus-brief-former-government-officials)](https://www.aclu.org/legal-document/innovation-law-lab-v-mcaleenan-amicus-brief-former-government-officials) of Former Government Officials (June 2019)

- [Letter (https://www.humanrightsfirst.org/sites/default/files/CBPBlockingMPPFearScreeningLetter](https://www.humanrightsfirst.org/sites/default/files/CBPBlockingMPPFearScreeningLetter) to DHS regarding CBP blocking MPP fear screenings (June 2020)

- [Letter (https://www.humanrightsfirst.org/sites/default/files/LetterfromMPPServiceProvidersonCO](https://www.humanrightsfirst.org/sites/default/files/LetterfromMPPServiceProvidersonCO) to DHS from 27 service providers regarding MPP and COVID-19, and urging DHS to end MPP and parole asylum seekers into the United States (April 2020)

- [Letter (https://www.humanrightsfirst.org/sites/default/files/Letter%20from%20Service%20Provide %20UPDATED.pdf)](https://www.humanrightsfirst.org/sites/default/files/Letter%20from%20Service%20Provide%20UPDATED.pdf) to DHS from 23 legal, faith-based, humanitarian, and community organizations providing legal and other assistance to asylum seekers

and migrants subjected to MPP urging the policy's immediate termination (January 2020)

- ACLU and the Center for Gender & Refugee Studies, Letter to DHS Demanding Immediate Halt (https://www.aclu.org/other/re-implementation-migrant-protection-protocols-mpp-tamaulipas-state) of MPP Returns to Tamaulipas, Mexico (December 2019)

- AILA, Letter to Congress Demanding Public Access (https://www.aila.org/advo-media/aila-correspondence/2019/aila-sends-letter-to-congress-demanding-public) to Tent Courts (November 2019)

- Refugees International, Statement (https://www.refugeesinternational.org/reports/2019/11/19/examining-the-human-rights-and-legal-implications-of-dhs-remain-in-mexico-policy) to House Committee on Homeland Security (November 2019)

- NGOs Urge Congress to Conduct Significant Oversight (https://www.aila.org/advo-media/aila-correspondence/2019/organizations-urge-congress-to-conduct-significant) of Remain in Mexico and Use of Tent Courts by DHS and DOJ (October 2019)

- ACLU, Complaint to DHS OIG/CRCL regarding "Pregnant women (https://www.aclutx.org/sites/default/files/aclu_oig_complaint_preg_mpp.pdf) returned to Mexico under the 'Migration Protection Protocols' (MPP)" (September 2019)

- Human Rights First, Complaint to DHS OIG/CRCL regarding "Rape, Kidnapping, Assault (https://www.humanrightsfirst.org/resource/complaint-office-inspector-general-concerning-rape-kidnapping-assault-and-other-attacks) and Other Attacks on Asylum Seekers and Migrants Returned to Mexico Under the 'Migrant Protection Protocols'; Returns of Other Vulnerable Individuals" (August 2019)

- Women's Refugee Commission, Complaint to DHS OIG/CRCL regarding "Separation of Families (https://www.womensrefugeecommission.org/rights/resources/1824-separation-of-families-via-the-migrant-protection-protocols) via the 'Migrant Protection Protocols'" (August 2019)

- Testimony of Yael Schacher, Refugees International (https://www.refugeesinternational.org/reports/2019/8/28/remain-in-mexico-policy-is-undermining-asylum-and-endangering-asylum-seekers), to the Inter-

AR00856

American Commission on Human Rights (IACHR) regarding "Remain in Mexico" (August 2019)

- AILA, Letter to DHS Acting Secretary Detailing MPP's Barriers to Counsel (https://www.aila.org/infonet/aila-sends-letter-to-dhs-acting-secretary-mpp? utm_source=Recent%20Postings%20Alert&utm_medium=Email&utm_campaign=RP%20Da 2019)

## U.S. GOVERNMENT WARNINGS AND REPORTS OF DANGER IN MEXICO

- U.S. State Department, Mexico 2018 Human Rights Report (https://www.state.gov/wp-content/uploads/2019/03/MEXICO-2018.pdf)

- U.S. State Department, Travel Advisory (https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html) on Mexico

- U.S. State Department, OSAC, Mexico 2019 Crime & Safety Report: Ciudad Juarez (https://www.osac.gov/Content/Report/767346f9-d5f4-40e0-bc0e-15f4aeb82c35)

- U.S. State Department, OSAC, Mexico 2019 Crime & Safety Report: Matamoros (https://www.osac.gov/Content/Report/03b73ba8-0cd3-4772-bc97-15f4aebfc985)

- U.S. State Department, OSAC, Mexico 2019 Crime & Safety Report: Nuevo Laredo (https://www.osac.gov/Content/Report/4811d231-eea0-4a49-b25c-15f4aec0eb64)

- U.S. State Department, OSAC, Mexico 2019 Crime & Safety Report: Tijuana (https://www.osac.gov/Country/Mexico/Content/Detail/Report/72d11598-3cfa-4ff4-a9bc-15f4aec22ce4)

## U.S. LAW AND TREATIES VIOLATED BY TRUMP ADMINISTRATION RETURN POLICIES

- Immigration and Nationality Act Section 208 (https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1158&num=0&edition=prelim)

- Immigration and Nationality Act Section 235 (https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim)

**AR00857**

- Convention and Protocol Relating to the Status of Refugees (https://www.unhcr.org/en-us/3b66c2aa10)

- Convention Against Torture (https://www.ohchr.org/EN/ProfessionalInterest/Pages/CAT.aspx)

## STATEMENTS BY INTERNATIONAL BODIES

- IACHR (http://www.oas.org/en/iachr/media_center/PReleases/2020/179.asp), "IACHR Concerned About Restrictions of the Rights of Migrants and Refugees in the United States During COVID-19 Pandemic"

- IACHR (https://www.oas.org/en/iachr/media_center/PReleases/2019/228.asp), "IACHR conducted visit to the United States' Southern Border" (September 2019)

- IACHR (https://www.oas.org/en/iachr/media_center/PReleases/2019/180.asp), "IACHR Expresses Deep Concern about the Situation of Migrants and Refugees in the United States, Mexico, and Central America" (July 2019)

- Special rapporteur on the human rights of migrants (file:///C:/â€¢%09https/::www.ohchr.org:Documents:Issues:SRMigrants:Comments:OL_USA_4-2019.pdf), Letter of concern regarding the "Remain in Mexico" policy (March 2019)

Official website of the Department of Homeland Security



**U.S. Department of Homeland Security**

# DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings

**Release Date:** May 28, 2021

WASHINGTON – Today, Secretary of Homeland Security Alejandro N. Mayorkas and Attorney General Merrick B. Garland announced a new Dedicated Docket process to more expeditiously and fairly make decisions in immigration cases of families who arrive between ports of entry at the Southwest Border. This new process should significantly decrease the amount of time it takes for migrants to have their cases adjudicated while still providing fair hearings for families seeking asylum at the border.

"Families arriving at the border who are placed in immigration proceedings should have their cases decided in an orderly, efficient, and fair manner," **said Secretary of Homeland Security Alejandro N. Mayorkas.** "Families who have recently arrived should not languish in a multi-year backlog; today's announcement is an important step for both justice and border security."

"The mission of the Department of Justice's immigration courts is to decide the cases that come before them promptly and fairly," said **Attorney General Merrick B. Garland**. "This new program for certain newly arriving families will help achieve that critically important goal."

Under this new process, certain recently arrived families may be placed on the Dedicated Docket. Families may qualify if they are apprehended between ports of entry on or after Friday, May 28, 2021, placed in removal proceedings, and enrolled in Alternatives to Detention (ATD). DHS, in partnership with the Department of Justice (DOJ) Executive Office for Immigration Review (EOIR), will make available information services to help families understand the immigration system and refer families to pro bono legal service providers for possible representation.

**AR00859**

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 128 of 548   PageID 5071

EOIR has identified immigration courts in 10 cities with established communities of legal services providers and available judges to handle the cases.  The designated cities are Denver, Detroit, El Paso, Los Angeles, Miami, Newark, New York City, San Diego, San Francisco, and Seattle.

Under the Dedicated Docket, EOIR's immigration judges will work generally to issue a decision within 300 days of the initial master calendar hearing, subject to the unique circumstances of each case including allowing time for families to seek representation where needed.  While the goal of this process is to decide cases expeditiously, fairness will not be compromised.

Topics: Immigration and Customs Enforcement (/topics/immigration-enforcement)

Keywords: Immigration and Customs Enforcement (ICE) (/keywords/ice), Secretary Alejandro Mayorkas (/keywords/secretary-alejandro-mayorkas)

Last Published Date: May 28, 2021

**AR00860**


**U.S. Customs and Border Protection**

# Migrant Protection Protocols FY 2020

Fiscal Year 2020 runs from October 1, 2019 through September 30, 2020

Southwest Border Total Encounters

## USBP Apprehensions by Southwest Border Sector

| Sector | Jan-20 | Feb-20 | Mar-20 | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 |
|---|---|---|---|---|---|---|---|---|---|
| Big Bend | 604 | 562 | 675 | 507 | 628 | 660 | 746 | 1,120 | 1,404 |
| Del Rio | 2,348 | 2,622 | 2,619 | 2,027 | 2,289 | 3,471 | 4,163 | 5,129 | 6,354 |
| El Centro | 1,699 | 2,020 | 2,063 | 1,258 | 1,880 | 2,773 | 3,569 | 3,507 | 3,059 |
| El Paso | 4,394 | 3,366 | 3,414 | 1,759 | 2,617 | 3,876 | 5,091 | 6,560 | 7,900 |
| Laredo | 3,618 | 3,946 | 4,024 | 1,991 | 3,355 | 4,040 | 5,445 | 7,242 | 7,474 |
| Rio Grande | 6,479 | 6,703 | 7,208 | 3,459 | 3,698 | 5,414 | 7,571 | 10,243 | 13,309 |
| San Diego | 4,209 | 4,672 | 4,704 | 2,268 | 3,311 | 4,951 | 5,556 | 6,032 | 6,163 |
| Tucson | 5,158 | 5,184 | 5,106 | 2,615 | 3,070 | 4,703 | 5,605 | 6,766 | 8,373 |
| Yuma | 696 | 1,002 | 576 | 298 | 745 | 948 | 790 | 684 | 735 |
| Total | 29,205 | 30,077 | 30,389 | 16,182 | 21,593 | 30,836 | 38,536 | 47,283 | 54,771 |

## OFO Southwest Border Inadmissibles by Field Office

| Field Office | Jan-20 | Feb-20 | Mar-20 | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 |
|---|---|---|---|---|---|---|---|---|---|
| El Paso | 1,272 | 959 | 642 | 148 | 253 | 394 | 428 | 358 | 311 |
| Laredo | 2,716 | 2,414 | 1,455 | 267 | 528 | 539 | 685 | 871 | 889 |
| San Diego | 2,442 | 2,191 | 1,391 | 430 | 730 | 1,064 | 1,120 | 1,266 | 1,464 |
| Tucson | 950 | 1,046 | 583 | 79 | 133 | 216 | 160 | 236 | 239 |
| Total | 7,380 | 6,610 | 4,071 | 924 | 1,644 | 2,213 | 2,393 | 2,731 | 2,903 |

Southwest Border Enrollments in MPP

| Component | Location | Jan-20 | Feb-20 | Mar-20 | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 |
|-----------|----------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| **USBP** | **Big Bend** | 20 | 12 | 41 | 18 | 5 | 30 | 33 | 44 | 45 |
| | **Del Rio** | 351 | 209 | 301 | 28 | 31 | 47 | 52 | 74 | 136 |
| | **El Centro** | 11 | 94 | 3 | 0 | 0 | 0 | 0 | 46 | 7 |
| | **El Paso** | 499 | 525 | 460 | 74 | 43 | 39 | 236 | 499 | 664 |
| | **Laredo** | 69 | 62 | 51 | 15 | 0 | 0 | 2 | 0 | 3 |
| | **Rio Grande** | 285 | 227 | 917 | 39 | 23 | 37 | 30 | 65 | 192 |
| | **San Diego** | 80 | 46 | 69 | 1 | 1 | 5 | 0 | 8 | 18 |
| | **Tucson** | 237 | 340 | 133 | 37 | 19 | 29 | 12 | 8 | 61 |
| | **Yuma** | 25 | 53 | 35 | 0 | 2 | 21 | 17 | 23 | 41 |
| | **USBP Monthly Enrollment Total** | 1,577 | 1,568 | 2,010 | 212 | 124 | 208 | 382 | 767 | 1,167 |
| **OFO** | **El Paso** | 92 | 43 | 71 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Laredo** | 129 | 111 | 121 | 0 | 0 | 0 | 0 | 1 | 0 |
| | **San Diego** | 82 | 60 | 17 | 3 | 0 | 0 | 0 | 0 | 0 |
| | **Tucson** | 94 | 47 | 36 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **OFO Monthly Enrollment Total** | 397 | 261 | 245 | 3 | 0 | 0 | 0 | 1 | 0 |
| **CBP** | **CBP Total** | 1,974 | 1,829 | 2,255 | 215 | 124 | 208 | 382 | 768 | 1,167 |

Cases referred to USCIS

| | | Cases referred to USCIS for MPP Fear Assessment |
|--|--|--|
| **FY 2019** | **January** | 2 |
| | **February** | 34 |
| | **March** | 74 |
| | **April** | 188 |
| | **May** | 277 |
| | **June** | 282 |
| | **July** | 1,100 |
| | **August** | 2,406 |

**AR00862**

| | | Cases referred to USCIS for MPP Fear Assessment |
|---|---|---|
| | September | 1,982 |
| | October | 2,527 |
| | November | 1,942 |
| | December | 2,523 |
| | January | 1,705 |
| | February | 1,634 |
| FY 2020 | March | 1,254 |
| | April | 17 |
| | May | 32 |
| | June | 70 |
| | July | 90 |
| | August | 250 |
| | September | 308 |
| Grand Total | | 18,697 |

*Data provided by U.S. Citizenship and Immigration Services

Outcomes of MPP Cases**

| Removal | In Absentia Removal | Relief | Termination | Voluntary Departure | Withdraw of Application for Admission | Other |
|---|---|---|---|---|---|---|
| 32,574 | 28,040 | 523 | 10,629 | 1 | 48 | 45 |

**Data provided by the Department of Justice since program inception through July 17, 2020

Individuals Apprehended Entering the US Without Inspection Subsequent to Being Returned to Mexico through MPP

| Category | Jan-20 | Feb-20 | Mar-20 | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 |
|---|---|---|---|---|---|---|---|---|---|
| Single Adult[1] | 1,086 | 880 | 545 | 50 | 67 | 54 | 75 | 100 | 201 |
| UAC[2] | 38 | 14 | 22 | 1 | 1 | 8 | 28 | 25 | 37 |
| FMUA | 316 | 222 | 178 | 8 | 5 | 14 | 7 | 70 | 58 |
| Total | 1,440 | 1,116 | 745 | 59 | 73 | 76 | 110 | 195 | 296 |

[1]May include those adults who were previously enrolled in MPP as a single adult or as part of a family unit (FMUA).

**AR00863**

| Category | Jan-20 | Feb-20 | Mar-20 | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 |

[2]*UACs are not amenable to MPP. UACs shown in this table were previously part of a family unit (FMUA) that was enrolled in MPP.*

Note: MPP Partner Metrics

In addition to the MPP goals and metrics set out by the Department,  CBP will work with its DHS and DoJ partners to take into account daily data for migrants entering the United States by location, including both the number of migrants assigned to MPP appearing at a port of entry to attend immigration adjudication proceedings along with the outcomes of such proceedings and the number of migrants assigned to MPP who remain overnight in the United States when evaluating the effectiveness of MPP.

Tags:
Statistics

**Source URL:** *https://www.cbp.gov/newsroom/stats/migrant-protection-protocols-fy-2020*

AR00864



# Migrant Protection Protocols FY2021

Fiscal Year 2021 runs from October 1, 2020 to September 30, 2021

Southwest Border Total Encounters

## USBP Apprehensions by Southwest Border Sector

| Sector | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Big Bend | 1,521 | 1,621 | 1,980 | 2,669 | 3,096 | 4,500 | 4,588 | 5,050 | 4,554 | 3,433 | 1,680 | 2,574 |
| Del Rio | 8,446 | 8,714 | 9,196 | 11,142 | 11,094 | 20,052 | 21,779 | 27,932 | 30,707 | 33,600 | 33,062 | 43,570 |
| El Centro | 4,089 | 3,636 | 3,118 | 2,946 | 3,777 | 6,211 | 7,039 | 7,525 | 6,132 | 5,172 | 4,643 | 4,943 |
| El Paso | 8,777 | 8,748 | 11,028 | 10,617 | 13,184 | 19,456 | 19,797 | 22,219 | 21,507 | 20,550 | 20,220 | 17,815 |
| Laredo | 9,373 | 8,244 | 7,746 | 8,633 | 8,486 | 11,180 | 10,925 | 12,092 | 10,272 | 8,518 | 8,167 | 8,605 |
| Rio Grande | 17,617 | 17,305 | 17,214 | 17,056 | 28,403 | 62,685 | 60,874 | 51,146 | 59,521 | 81,006 | 81,178 | 55,072 |
| San Diego | 6,953 | 7,722 | 8,510 | 9,880 | 9,725 | 13,380 | 14,680 | 14,602 | 15,119 | 15,550 | 13,599 | 12,739 |
| Tucson | 11,469 | 12,189 | 11,146 | 10,749 | 14,750 | 19,870 | 20,283 | 19,908 | 18,405 | 17,983 | 16,721 | 17,759 |
| Yuma | 787 | 990 | 1,203 | 1,624 | 5,128 | 11,882 | 13,734 | 12,180 | 12,432 | 14,846 | 17,244 | 22,438 |
| Total | 69,032 | 69,169 | 71,141 | 75,316 | 97,643 | 169,216 | 173,699 | 172,654 | 178,649 | 200,658 | 195,514 | 185,515 |

## OFO Southwest Border Inadmissibles by Field Office

| Field Office | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| El Paso | 371 | 380 | 391 | 414 | 388 | 427 | 721 | 1,226 | 1,579 | 1,532 | 1,728 | 508 |
| Laredo | 669 | 648 | 637 | 617 | 686 | 950 | 981 | 2,174 | 3,150 | 4,836 | 4,631 | 1,685 |
| San Diego | 1,559 | 1,658 | 1,563 | 1,843 | 2,089 | 2,326 | 2,928 | 3,809 | 4,584 | 5,326 | 5,918 | 3,889 |
| Tucson | 298 | 258 | 262 | 224 | 293 | 358 | 466 | 734 | 1,072 | 1,241 | 1,049 | 404 |
| Total | 2,897 | 2,944 | 2,853 | 3,098 | 3,456 | 4,061 | 5,096 | 7,943 | 10,385 | 12,935 | 13,326 | 6,486 |

Southwest Border Enrollments in MPP

| Component | Location | Oct-20 | Nov-20 | Dec-20 | Jan-21 |
|---|---|---|---|---|---|
| USBP | Big Bend | 83 | 126 | 149 | 20 |
| | Del Rio | 75 | 128 | 123 | 87 |
| | El Centro | 4 | 0 | 0 | 0 |

**AR00865**

| Component | Location | Oct-20 | Nov-20 | Dec-20 | Jan-21 |
|---|---|---|---|---|---|
| | El Paso | 277 | 332 | 450 | 313 |
| | Laredo | 2 | 0 | 0 | 0 |
| | Rio Grande | 140 | 233 | 254 | 149 |
| | San Diego | 8 | 11 | 22 | 9 |
| | Tucson | 39 | 25 | 62 | 44 |
| | Yuma | 17 | 26 | 25 | 31 |
| | USBP Monthly Enrollment Total | 645 | 881 | 1,085 | 653 |
| OFO | El Paso | 0 | 2 | 0 | 0 |
| | Laredo | 0 | 0 | 0 | 0 |
| | San Diego | 3 | 4 | 7 | 9 |
| | Tucson | 0 | 0 | 0 | 0 |
| | OFO Monthly Enrollment Total | 3 | 6 | 7 | 9 |
| CBP | CBP Total | 648 | 887 | 1,092 | 662 |

Cases referred to USCIS

**Cases referred to USCIS for MPP Fear Assessment**

| | | |
|---|---|---|
| | October | 133 |
| | November | 259 |
| | December | 618 |
| FY 2021 | January | 411 |
| | February | 38 |
| | March | 0 |
| Grand Total | | 1,459 |

*Data provided by U.S. Citizenship and Immigration Services*

Individuals Apprehended Entering the US Without Inspection Subsequent to Being Returned to Mexico through MPP

| Category | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FMUA | 41 | 49 | 60 | 29 | 166 | 259 | 136 | 102 | 143 | 209 | 157 | 79 |
| Single Adult[1] | 168 | 142 | 221 | 174 | 121 | 119 | 64 | 55 | 46 | 41 | 38 | 49 |
| UAC[2] | 36 | 15 | 16 | 14 | 17 | 62 | 44 | 18 | 39 | 38 | 27 | 21 |
| Total | 245 | 206 | 297 | 217 | 304 | 440 | 244 | 175 | 228 | 288 | 222 | 149 |

[1]*May include those adults who were previously enrolled in MPP as a single adult or as part of a family unit (FMUA).*

[2]*UACs are not amenable to MPP. UACs shown in this table were previously part of a family unit (FMUA) that was enrolled in MPP.*

**AR00866**

Note: MPP Partner Metrics

In addition to the MPP goals and metrics set out by the Department,  CBP will work with its DHS and DoJ partners to take into account daily data for migrants entering the United States by location, including both the number of migrants assigned to MPP appearing at a port of entry to attend immigration adjudication proceedings along with the outcomes of such proceedings and the number of migrants assigned to MPP who remain overnight in the United States when evaluating the effectiveness of MPP.

Tags:
Statistics

---

**Source URL:** *https://www.cbp.gov/newsroom/stats/migrant-protection-protocols-fy2021*

**AR00867**

≡ 🇺🇸 Official website of the Department of Homeland Security

 **U.S. Department of Homeland Security**

# DHS Announces Process to Address Individuals in Mexico with Active MPP Cases

**Release Date:** February 11, 2021

En español (/news/2021/02/11/departamento-de-seguridad-nacional-dhs-anuncia-proceso-para-atender-individuos-en-m)

WASHINGTON – Building on a series of Executive Orders last week, the Biden Administration is announcing another step in our phased strategy to reform the nation's immigration system. Beginning on February 19, the Department of Homeland Security (DHS) will begin phase one of a program to restore safe and orderly processing at the southwest border. DHS will begin processing people who had been forced to "remain in Mexico" under the Migrant Protection Protocols (MPP). Approximately 25,000 individuals in MPP continue to have active cases.

Individuals should not take any action at this time and should remain where they are to await further instructions. We will soon announce a virtual registration process that will be accessible from any location. Once registered, eligible individuals will be provided additional information about where and when to present themselves. Individuals should not approach the border until instructed to do so.

"As President Biden has made clear, the U.S. government is committed to rebuilding a safe, orderly, and humane immigration system," said Secretary of Homeland Security Alejandro Mayorkas. "This latest action is another step in our commitment to reform immigration policies that do not align with our nation's values. Especially at the border, however, where capacity constraints remain serious, changes will take time. Individuals who are not eligible under this initial phase should wait for further instructions and not travel to the border. Due to the current pandemic, restrictions at the border remain in place and will be enforced."

Through a whole-of-government approach, DHS, the Department of State, and the Department of Justice will collaborate with international partners—including the Government

**AR00868**

of Mexico and international and non-governmental organizations—to safely process eligible individuals to pursue their cases in the United States.

This new process applies to individuals who were returned to Mexico under the MPP program and have cases pending before the Executive Office for Immigration Review (EOIR). Individuals outside of the United States who were not returned to Mexico under MPP or who do not have active immigration court cases will not be considered for participation in this program and should await further instructions. Similarly, those individuals in the United States with active MPP cases will receive separate guidance at a later date.

This announcement should not be interpreted as an opening for people to migrate irregularly to the United States.  Eligible individuals will only be allowed to enter through designated ports of entry at designated times. We will provide instructions in the coming days for how individuals with active MPP cases may remotely register for in-processing. We will continue to enforce U.S. immigration law and border security measures throughout this process.

The United States and our partners will employ all necessary safety precautions in accordance with the Centers for Disease Control and Prevention (CDC) guidance, including mandatory face coverings and social distancing. Individuals processed through this program will be tested for COVID-19 before entering the United States. DHS will only process individuals consistent with its capacity to safely do so while fully executing its important national security and trade and travel facilitation missions.

A <u>Fact Sheet announcing the process to address individuals outside the United States with active MPP cases</u> (/news/2021/02/18/fact-sheet-dhs-announces-process-address-individuals-outside-united-states-active) is also  available.

Topics: Border Security (/topics/border-security) , Citizenship and Immigration Services (/topics/immigration-and-citizenship-services) , Homeland Security Enterprise (/topics/homeland-security-enterprise) , Immigration and Customs Enforcement (/topics/immigration-enforcement) , Secretary of Homeland Security (/topics/secretary-homeland-security)

Keywords: Asylum (/keywords/asylum-applications) , Immigration (/keywords/immigration) , Immigration Enforcement (/keywords/immigration-enforcement) , Immigration Reform (/keywords/immigration-reform) , Migrant Protection Protocols (MPP) (/keywords/migrant-protection-protocols-mpp) , President Biden (/keywords/president-biden) , Secretary Alejandro Mayorkas (/keywords/secretary-alejandro-mayorkas)

Last Published Date: February 19, 2021

**AR00869**

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 138 of 548   PageID 5081



**U.S. Department of
Homeland Security**

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may
not reflect current policy or programs.

# Migrant Protection Protocols (Trump Administration Archive)

En español (/archive/los-protocolos-de-protecci-n-migrantes-administraci%C3%B3n-trump)

The Migrant Protection Protocols (MPP) are a U.S. Government (USG) action whereby citizens
and nationals of countries other than Mexico arriving in the United States by land from Mexico
-- whether or not at a port of entry -- may be returned to Mexico pursuant to Section 235(b)(2)
(C) of the Immigration and Nationality Act (INA) while their U.S. removal proceedings are
pending under Section 240 of the INA. The Government of Mexico (GOM) has committed to
provide aliens placed into MPP with appropriate humanitarian protections, including
immigration documentation and access to education, healthcare and employment. (DHS
Press Release - January 24, 2019 (/news/2019/01/24/migrant-protection-protocols) ). (U.S.-Mexico Joint
Declaration - June 7, 2019 (https://2017-2021.state.gov/u-s-mexico-joint-declaration/index.html) )

*The U.S. Department of Homeland Security (DHS) and the U.S. Department of Justice (DOJ)
remain committed to resuming removal hearings for aliens subject to MPP as expeditiously as
possible. To lend greater certainty in a fluid COVID-19 environment, DHS has maintained close
contact with the Department of State (DOS) and GOM and worked with DOJ to identify public
health criteria to determine when hearings may resume swiftly and safely. For additional
information see the DHS Press Release - July 17, 2020 (/news/2020/07/17/department-homeland-
security-and-department-justice-announce-plan-restart-mpp) .*

# What gives DHS the authority to implement MPP? (#)

Section 235 of the INA addresses the inspection of aliens seeking admission into the United States and provides specific procedures regarding the treatment of those not clearly entitled to admission. Section 235(b)(2)(C) provides that "[i]n the case of an alien...who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the [U.S.}," the Secretary of Homeland Security "may return the alien to that territory pending a [removal] proceeding under [Section 240 of the INA]." Individuals in such removal proceedings have the ability to seek relief or protection from removal, including asylum.

# How does the MPP process work? (#)

Aliens subject to MPP are placed into removal proceedings under Section 240 of the INA before an immigration judge, just like any other alien in removal proceedings pursuant to Section 240 of the INA. Aliens generally remain in Mexico throughout the duration of their removal proceedings.

When aliens are placed into MPP, they are served with a notice to appear (NTA) with the time and location of their initial court hearing, in addition to an informational "tear sheet" -- provided in English, Spanish, or Portuguese, as appropriate -- instructing them of the *date* and *time* to appear at the designated port of entry (POE) where they will be transported or escorted to their immigration court hearing. Aliens placed in Section 240 proceedings, including those in MPP, are provided with a list of pro bono legal service providers specific to the court where their hearings will take place, and aliens in MPP can, at no expense to the government, contact the counsel of their choice.

Since DHS has already served aliens in MPP with NTAs that clearly state which day they are scheduled for court, it is unnecessary for them to wait at or near POEs. Aliens are informed on the tear sheets that they may not attempt to enter the identified POE for their hearings before the designated time on the tear sheets. Aliens are responsible for their own transportation to reach the POE to attend their removal hearings.

At the conclusion of their removal proceedings, aliens who receive final orders of removal are turned over to U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal

**AR00871**

Operations (ERO). Aliens who are granted relief or protection from removal, including asylum, will be allowed to remain in the United States consistent with existing laws and policies.

DHS and the DOJ Executive Office for Immigration Review (EOIR) seek to conclude removal proceedings as expeditiously as possible.

## Why did DHS institute MPP? (#)

During Fiscal Year (FY) 2019, the United States faced a security and humanitarian crisis across the U.S. Southwest Border when nearly a million aliens who entered the United States illegally or without proper documentation were apprehended or encountered by U.S. Customs and Border Protection (CBP). To address this crisis, DHS used all appropriate resources and authorities to secure the borders; enforce immigration and customs laws; facilitate legal trade and travel; counter traffickers, smugglers, and transnational criminal organizations; and interdict drugs and contraband. (DHS Press Release - August 27, 2019 (/news/2019/08/27/dhs-reprogram-and-transfer-271-million-support-humanitarian-and-security-emergency) )

MPP is a program that helps restore a safe and orderly immigration process by reducing the incentive for aliens to attempt illegal entry and/or make meritless claims for relief or protection from removal in order to be released into the interior of the United States for the pendency of removal proceedings, for which many fail to appear. MPP also ensures that aliens who merit protection receive the relief or protection they need in a timely manner.

## Who is subject to MPP? (#)

With certain exceptions, MPP applies to citizens and nationals of countries other than Mexico arriving in the United States on land from Mexico, who are not clearly admissible and who are placed in removal proceedings under Section 240 of the INA.

## Are there any exclusions to who is subject to MPP? (#)

Aliens in the following categories are not amenable to MPP:

- Unaccompanied alien children (UACs),
- Citizens or nationals of Mexico,

AR00872

- Aliens processed for expedited removal,
- Aliens in special circumstances:
  - Returning lawful permanent residents (LPRs) seeking admission (subject to INA Section 212)
  - Aliens with an advance parole document or in parole status
  - Known physical/mental health issues
  - Criminals/history of violence
  - GOM or USG interest,

- Any alien who is more likely than not to face persecution or torture in Mexico, or
- Other aliens at the discretion of the Port Director or Chief Patrol Agent.

(Guiding Principles for Migrant Protection Protocols – January 28, 2019
(https://www.cbp.gov/document/guidance/migrant-protection-protocols) )

# Are mixed-nationality family units amenable to MPP? (#)

Non-Mexican national or citizen members of mixed-nationality family units may be considered for processing through MPP if doing so maintains family unity. This applies even if one or more member(s) of the family unit might be a nationality that is otherwise not generally amenable to MPP. Every effort is made to maintain the integrity of family units pending completion of removal proceedings, consistent with applicable law and policy. (Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols – December 7, 2020 (/publication/supplemental-policy-guidance-implementation-migrant-protection-protocols) )

# Are Mexican citizens or nationals amenable to MPP? (#)

Mexican citizens or nationals are not amenable to MPP. (Guiding Principles for Migrant Protection Protocols – January 28, 2019 (https://www.cbp.gov/document/guidance/migrant-protection-protocols) )

In the case of a family member who is a Mexican citizen or national, in order to maintain family unity, the Mexican citizen or national would be allowed to voluntarily withdraw his/her application for admission through a Form I-275 or be voluntarily returned to Mexico with the rest of the non-Mexican citizen/national family unit.

If a Mexican citizen or national (or a parent or legal guardian on behalf of a Mexican citizen or national child) expresses fear of return to Mexico, that individual must no longer be voluntarily returned to Mexico with the rest of the family unit. In that instance, and because the family unit cannot be separated pursuant to MPP, the entire family unit must not be processed for MPP or, if previously processed for MPP, the family unit must be removed from MPP and reprocessed as appropriate. (Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols – December 7, 2020 (/publication/supplemental-policy-guidance-implementation-migrant-protection-protocols) )

# Who is not amenable to MPP based on known physical or mental health issues? (#)

Generally, aliens who are determined not to be fit to travel by medical personnel should be excluded from MPP.

# How is non-amenability for known physical or mental health issues determined? (#)

Exemptions from MPP for aliens with known physical or mental health issues are decided on a case-by-case basis.

Following CBP's medical evaluation process -- which should consider potential physical and/or mental health issues related to an alien's disclosure of personal history -- determinations as to whether an alien is exempt from MPP due to known physical or mental health issues are generally to be made on a case-by-case basis at the local level with supervisory review. The Port Director or Chief Patrol Agent of each location should use his/her discretion to determine amenability on a case-by-case basis considering the totality of the circumstances. Aliens who receive medical clearance and are fit for travel, as determined by medical personnel, are amenable under MPP guidelines unless the Chief Patrol Agent or Port Director determines otherwise. (Supplemental Policy Guidance for Implementation of the

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 143 of 548   PageID 5086

Migrant Protection Protocols – December 7, 2020 (/publication/supplemental-policy-guidance-implementation-migrant-protection-protocols) )

Though a particular situation may not in and of itself be considered a physical or mental health issue, conditions related to an alien's disclosed personal history (e.g., pregnancy, prior illness, or any other disclosed medical condition) should be taken into account during the medical assessment process, and may, on a case-by-case basis, constitute grounds for an alien to be excluded from MPP. (Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols – December 7, 2020 (/publication/supplemental-policy-guidance-implementation-migrant-protection-protocols) ) (Guiding Principles for Migrant Protection Protocols– MPP Amenability – December 7, 2020 (https://www.cbp.gov/document/guidance/migrant-protection-protocols)

## What if an alien processed for MPP needs medical attention while in CBP custody? (#)

If at any time an alien expresses a need for medical attention, or if a U.S. Customs and Border Protection (CBP) agent or officer observes that medical attention is warranted, that alien will be referred to on-site medical staff. The on-site medical staff will both screen the alien and make the determination about his/her immediate medical needs and whether emergent care is required. In this situation, CBP is to follow the guidance issued in its "Enhanced Medical Support Directive." (CBP Enhanced Medical Support Directive – December 30, 2019) (https://www.cbp.gov/sites/default/files/assets/documents/2019-Dec/CBP_Final_Medical_Directive_123019.pdf)

## What if an alien expresses a fear of return to Mexico? (#)

If an alien who is potentially subject to MPP, or has already been returned to Mexico pursuant to MPP, affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, at any time while he/she is in the United States, U.S. Customs and Border Protection (CBP) refers the alien to U.S. Citizenship and Immigration Services (USCIS) for an MPP assessment interview conducted by an asylum officer.

Aliens continue to have the ability to have retained counsel participate telephonically in USCIS's MPP non-refoulement assessments – where it does not delay the interview, or as

**AR00875**

required by court order.

Following the interview, the asylum officer assesses whether it is more likely than not that the alien will face persecution on account of a protected ground (i.e., race, religion, nationality, membership in a particular social group or political opinion), or torture, if returned to Mexico. The asylum officer's assessment is subject to review by a supervisory asylum officer.

If USCIS makes a positive assessment that the individual is more likely than not to face persecution on account of a protected ground or torture in Mexico, the alien is not processed for MPP and may be processed/re-processed for any other available disposition. An alien who has already been placed into MPP with pending Section 240 proceedings will not be returned to Mexico, but will remain in Section 240 proceedings and will await their immigration court hearings in the United States. Pursuant to the INA and applicable regulations, U.S. Immigration and Customs Enforcement (ICE) determines whether aliens who are not eligible for return to Mexico under MPP are to be maintained in custody or paroled, or if another disposition is appropriate. ICE makes custody determinations for such aliens on a case-by-case basis, considering the facts and circumstances unique to each particular case. An alien who does not establish that it is more likely than not that he or she will face persecution on account of a protected ground or torture in Mexico may be returned to Mexico pending his/her removal proceedings.

# What if a member of a family unit in MPP expresses a fear of returning to Mexico? (#)

If any member of a family unit in MPP expresses a fear of returning to Mexico, then the entire family unit will await the adjudication of that claim before any return to Mexico can proceed, so long as there is not an independent basis to separate members of a family unit. If any member of a family unit establishes that he/she is more likely than not to suffer persecution on account of a protected ground or torture in Mexico, the entire family unit must not be processed for MPP or, if currently in MPP and in the United States together, must be removed from MPP and reprocessed as appropriate.

# What if a member of a family unit in MPP is granted relief or protection from removal? (#)

**AR00876**

If any member(s) of a family unit processed under MPP is/are granted relief or protection from removal, the family member(s) (regardless of nationality) not granted relief or protection should be taken into ICE custody. A determination will be made regarding whether to detain or release the alien(s) into the United States pending completion of removal proceedings (including an administrative appeal) of all members of the family unit. (Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols – December 7, 2020 (/publication/supplemental-policy-guidance-implementation-migrant-protection-protocols) )

# Do aliens in MPP have access to counsel for their Section 240 removal proceedings? (#)

Yes, aliens may choose to retain their own legal counsel for their Section 240 removal proceedings. Section 240(b)(4)(A) of the INA provides that an alien in removal proceedings before an Immigration Judge "shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings." Similarly, Section INA 292 provides that "[i]n any removal proceedings . . . the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel . . . as he shall choose."

All aliens in MPP are given a list of pro bono legal service providers (whom aliens may contact if they choose) when initially processed. To facilitate access to counsel, aliens in MPP are instructed to arrive at the designated port of entry (POE) at the time and date indicated on the tear sheet, which is a time early enough to be processed at the POE and arrive at court before their scheduled hearings to provide time to meet with their retained attorneys or accredited representatives. Aliens can also communicate with their counsel of choice on their own accord at any other time.

# How do aliens in MPP access legal information if they do not have a lawyer? (#)

In addition to the resources on this website, the necessary forms from the DOJ Executive Office for Immigration Review (EOIR) are available in immigration court and on the EOIR website (https://www.justice.gov/eoir/self-help-materials) . Additionally, DHS understands that several

migrant shelters in Northern Mexican cities make the EOIR forms and other Know Your Rights information available.

# How long will MPP court hearings take? (#)

The length of time needed for a removal hearing is subject to each Immigration Judge's discretion considering the circumstances of each case. However, aliens should plan to spend the entire day being processed for and attending court. If processes are not concluded that same day, some aliens may have to spend the night in U.S. Customs and Border Protection (CBP) custody and will be returned to Mexico as soon as all processes are concluded.

Immigration courts hear cases involving different aliens. There are other aliens who have court hearings on the same day, so it is not uncommon for aliens to wait for others to be processed at the port of entry (POE) and for other cases to be heard. Aliens will have access to food and water during the time they attend court and are in CBP or U.S. Immigration and Customs Enforcement (ICE) custody.

Aliens should generally expect to have a minimum of two court hearings on different days. However, it is common to have even more court hearings depending on the specific circumstances of each case.

# What services are provided in Mexico for aliens in MPP? (#)

GOM committed to providing documentation for aliens waiting in Mexico under MPP that provides access to education, healthcare and employment. GOM, as well as international and non-governmental organizations, have previously highlighted their efforts to establish new, or further equip existing, migrant shelters to which aliens in MPP also have access. (U.S.-Mexico Joint Declaration - June 7, 2019 (https://2017-2021.state.gov/u-s-mexico-joint-declaration/index.html) ).

# How does the public gain access to the Immigration and Hearing Facilities (IHFs) in Laredo and Brownsville? (#)

**AR00878**

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 147 of 548   PageID 5090

Consistent with DOJ Executive Office for Immigration Review (EOIR) policy and practice, individuals interested in observing immigration court proceedings can do so at either the physical court locations where the immigration judge is located, or at the IHFs in Laredo and Brownsville. Anyone can request access to the IHFs in Laredo and Brownsville by appearing in person at those facilities. Access will be granted on a case-by-case basis and, if at an IHF, in accordance with DHS rules and guidelines, as well as EOIR rules, orders and regulations.

Removal proceedings are generally open to the public in all immigration courts, with limited exceptions, as specified by law. Notably, an alien may be presenting issues in his/her case that relate to sensitive matters that the alien may not want to be made public and are subject to privacy protections. As in any federal building, there are access control measures to ensure the safety of those who appear for official business. Attorneys and accredited representatives are provided the time and private space to meet with clients prior to hearings. (General Services Administration Rules and Regulations Governing Conduct on Federal Property – November 2005 (http://www.gsa.gov/cdnstatic/GSA_Rules_Reg_1105.pdf) ) (DOJ Immigration Court Practice Manual (https://www.justice.gov/eoir/file/1205666/download) ) (DOJ EOIR Fact Sheet – February 2017 (http://www.justice.gov/eoir/observing-immigration-court-hearings) )

# How does media gain access to the IHFs in Laredo and Brownsville? (#)

DHS may accommodate press requests to visit IHFs that are coordinated through DHS's Office of Public Affairs and consistent with existing procedures for access to U.S. Customs and Border Protection (CBP) ports of entry (POEs). Access will be granted on a case-by-case basis and, if at an IHF, in accordance with DHS rules and guidelines, as well as DOJ Executive Office for Immigration Review (EOIR) rules, orders and regulations. As in any federal building, there are access control measures to ensure the safety of those who appear for official business. (General Services Administration Rules and Regulations Governing Conduct on Federal Property – November 2005 (http://www.gsa.gov/cdnstatic/GSA_Rules_Reg_1105.pdf) ) (DOJ Immigration Court Practice Manual (https://www.justice.gov/eoir/file/1205666/download) ) (DOJ Executive Office for Immigration Review Fact Sheet – February 2017 (http://www.justice.gov/eoir/observing-immigration-court-hearings) )

# Are there resources for aliens who do not speak English? (#)

AR00879

Yes. This is a long-standing DHS practice regardless of whether the alien has been processed pursuant to MPP.

For MPP, if the officer/agent is not fluent in the alien's preferred language, he/she should utilize in-person or telephonic interpretation to complete and serve documentation to the alien, including any explanation of the documents. (Migrant Protection Protocols Guiding Principles – Initial Document Service – December 7, 2020) (https://www.cbp.gov/document/guidance/migrant-protection-protocols) (Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols – December 7, 2020 (/publication/supplemental-policy-guidance-implementation-migrant-protection-protocols) )

If an MPP-enrolled alien affirmatively states a fear of returning to Mexico while he/she is in the United States, the alien is referred to a U.S. Citizenship and Immigration Services (USCIS) asylum officer for an MPP assessment interview. When the asylum officer conducts the MPP assessment interview, the same protocols apply for language accommodation as in other USCIS fear screenings or *non-refoulement* interviews. If the alien is unable to proceed effectively in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview.

# Important Reminders for Aliens in MPP (#)

- The "alien number" is a nine-digit number that begins with the letter "A" and is found in the upper right-hand corner of the notice to appear (NTA). This is how the USG tracks each case. Aliens should have this number available when interacting with U.S. officials.

- Aliens should retain all documents received from U.S. officials. These documents contain important case information.

- Aliens will be allowed to enter the United States to attend immigration court on the date and at the location listed on the NTA or notice of hearing and on the tear sheet. There is no need to wait at or near the port of entry (POE). Aliens will not be allowed to enter for their hearing before this time, and those with an NTA or notice of hearing will not need to wait in line if they report at the designated time and location.

- Aliens may have to return to court for several hearings or may have their hearings rescheduled as part of normal court processes.

- Aliens may inquire with a GOM official about how to access education, employment and healthcare while in Mexico.

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 149 of 548   PageID 5092

- In the event aliens in MPP have an address change while in Mexico, aliens should mail a completed Form EOIR-33, Alien's Change of Address, to the court where the case is assigned or bring a physical copy to their hearings. (DOJ Form EOIR-33 Immigration Court Listing (https://www.justice.gov/eoir/form-eoir-33-eoir-immigration-court-listing) )

- If an alien believes that DHS policies and activities have violated their civil rights or civil liberties, the alien may file a complaint with the DHS Office for Civil Rights and Civil Liberties (CRCL). More information can be found on the CRCL Compliance Branch website (/compliance-branch) .

# MPP Guidance Documentation (#)

- Policy Guidance for Implementation of the Migrant Protection Protocols – January 25, 2019 (/publication/policy-guidance-implementation-migrant-protection-protocols)

- Guiding Principles for Migrant Protection Protocols – January 28, 2019 (https://www.cbp.gov/document/guidance/migrant-protection-protocols)

- Implementation of the Migrant Protection Protocols (CBP Implementation Memorandum) – January 28, 2019 (https://www.cbp.gov/document/guidance/migrant-protection-protocols)

- Guidance on Migrant Protection Protocols (CBP OFO Implementation Memorandum) – January 28, 2019 (https://www.cbp.gov/document/guidance/migrant-protection-protocols)

- Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols (USCIS Implementation Memorandum) – January 28, 2019 (https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2019/2019-01-28-Guidance-for-Implementing-Section-35-b-2-C-INA.pdf)

- Implementation of the Migrant Protection Protocols (ICE Implementation Memorandum) – February 12, 2019 (https://www.ice.gov/factsheets/migrant-protection-protocols-mpp)

- Migrant Protection Protocols Guidance (ICE ERO Implementation Memorandum) – February 12, 2019 (https://www.ice.gov/factsheets/migrant-protection-protocols-mpp)

- Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols - December 7, 2020 (/publication/supplemental-policy-guidance-implementation-migrant-protection-protocols)

- Guiding Principles for Migrant Protection Protocols - Initial Document Service - December 7, 2020 (https://www.cbp.gov/document/guidance/migrant-protection-protocols)

AR00881

- Guiding Principles for Migrant Protection Protocols - MPP Amenability - December 7, 2020 (https://www.cbp.gov/document/guidance/migrant-protection-protocols)

# Resources for Aliens in MPP (#)

*Self-Help Guides to Removal Proceedings and Common Forms of Relief*

Guides on the topics below related to removal proceedings can be found on EOIR's Self-Help Materials site in both English and Spanish (http://www.justice.gov/eoir/self-help-materials) .

- Notice to Appear

- Accessing an Attorney

- Fraud

- Change of Address and Change of Venue

- Bond

- Missed Hearing

- Asylum

- Voluntary Departure

- Appeal

# Additional "Know Your Rights" Information (In English, en Español and em Português) (#)

- Know Your Rights Pamphlet (in English) (/redirect?
url=https%3A%2F%2Fwww.americanbar.org%2Fcontent%2Fdam%2Faba%2Fadministrative%2Fimmigration%2F
your-rights%2Fknow_your_rights_english.pdf)

- Know Your Rights Video (in English) (/redirect?
url=https%3A%2F%2Fwww.americanbar.org%2Fgroups%2Fpublic_interest%2Fimmigration%2Fprojects_initiativ
your-rights%2F)

- Conozca sus derechos- folleto (en Español) (/redirect?
url=https%3A%2F%2Fwww.americanbar.org%2Fcontent%2Fdam%2Faba%2Fadministrative%2Fimmigration%2F

AR00882

your-rights%2Fknow_your_rights_spanish.pdf)

- Conozca sus derechos- video (en Español) (/redirect?
  url=https%3A%2F%2Fwww.americanbar.org%2Fgroups%2Fpublic_interest%2Fimmigration%2Fprojects_initiativ
  your-rights%2F)

- Conheça seus direitos- panfleto (em Português) (/redirect?
  url=https%3A%2F%2Fwww.americanbar.org%2Fcontent%2Fdam%2Faba%2Fadministrative%2Fimmigration%2F
  your-rights%2Fknow_your_rights_portuguese.pdf)

# Press Release Archive (#)

- DHS Statement on the Suspension of New Enrollments in the Migrant Protection
  Protocols Program (/news/2021/01/20/dhs-statement-suspension-new-enrollments-migrant-protection-
  protocols-program) - January 20, 2021

- Department of Homeland Security Announces Supplemental Guidance for MPP
  Implementation (/news/2020/12/07/dhs-announce-supplemental-guidance-mpp-implementation) -
  December 7, 2020

- Migrant Protection Protocols (CBP Statistics) (https://www.cbp.gov/newsroom/stats/migrant-
  protection-protocols) - August 7, 2020

- Department of Homeland Security and Department of Justice Announce Plan to Restart
  MPP Hearings (/news/2020/07/17/department-homeland-security-and-department-justice-announce-
  plan-restart-mpp) – July 17, 2020

- Joint DHS/EOIR Statement on MPP Rescheduling (/news/2020/06/16/joint-dhseoir-statement-
  mpp-rescheduling) – June 16, 2020

- Joint DHS/EOIR Statement on the Rescheduling of MPP Hearings (/news/2020/05/10/joint-
  dhseoir-statement-rescheduling-mpp-hearings) – May 10, 2020

- Weekly Update: DHS Response to COVID-19 (/news/2020/05/04/weekly-update-dhs-response-
  covid-19) – May 4, 2020

- Joint DHS/EOIR Statement on MPP Rescheduling (/news/2020/04/30/joint-dhseoir-statement-
  mpp-rescheduling) – April 30, 2020

- Joint DHS/EOIR Statement on MPP Rescheduling (/news/2020/04/01/joint-dhseoir-statement-
  mpp-rescheduling) – April 1, 2020

- Joint Statement on MPP Rescheduling (/news/2020/03/23/joint-statement-mpp-rescheduling) –
  March 23, 2020

AR00883

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 152 of 548   PageID 5095

- DHS Expands MPP To Brazilian Nationals (/news/2020/01/29/dhs-expands-mpp-brazilian-nationals) – January 29, 2020

- DHS Begins MPP Returns at Nogales Port of Entry in Arizona (/news/2020/01/02/dhs-begins-mpp-returns-nogales-port-entry-arizona) – January 2, 2020

- DHS Expands MPP Operations to Eagle Pass (/news/2019/10/28/dhs-expands-mpp-operations-eagle-pass) – October 28, 2019

- Assessment of the Migrant Protection Protocols (/publication/assessment-migrant-protection-protocols-mpp) – October 28, 2019

- Statement from the Department of Homeland Security following the Acting Secretary's appearance at Georgetown University this morning (/news/2019/10/07/statement-department-homeland-security-following-acting-secretary-s-appearance) – October 7, 2019

- Acting Secretary McAleenan Announces End to Widespread Catch and Release (/news/2019/09/23/acting-secretary-mcaleenan-announces-end-widespread-catch-and-release) – September 23, 2019

- DHS to Reprogram and Transfer $271 Million to Support Humanitarian and Security Emergency Response (/news/2019/08/27/dhs-reprogram-and-transfer-271-million-support-humanitarian-and-security-emergency) – August 27, 2019

- Transcript: Press Conference in Yuma, AZ on August 8, 2019 (/news/2019/08/09/transcript-press-conference-yuma-az-august-8-2019) – August 9, 2019

- Secretary Nielsen, President Trump Assess Humanitarian and Security Emergency Response in Calexico, CA (/news/2019/04/07/secretary-nielsen-president-trump-assess-humanitarian-and-security-emergency) – April 7, 2019

- Secretary Nielsen Orders CBP to Surge More Personnel to Southern Border, Increase Number of Aliens Returned to Mexico (/news/2019/04/01/secretary-nielsen-orders-cbp-surge-more-personnel-southern-border-increase-number) – April 1, 2019

- Secretary Nielsen Meets with Mexican Officials on Border Emergency, Travels to Honduras to Meet with Northern Triangle Governments to Address Crisis at Source (/news/2019/03/26/secretary-nielsen-meets-mexican-officials-border-emergency-travels-honduras-meet) – March 26, 2019

- Readout from Secretary Nielsen's Trip to San Diego (/news/2019/01/29/readout-secretary-nielsen-s-trip-san-diego) – January 29, 2019

- Migrant Protection Protocols (/news/2019/01/24/migrant-protection-protocols) – January 24, 2019

AR00884

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 153 of 548   PageID 5096

- Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration (/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration) – December 20, 2018

# Metrics and Measures (#)

DHS remains committed to using all available tools to address the unprecedented security and humanitarian crisis at the southern border of the United States. At the peak of the crisis in May 2019, there were more than 4,800 undocumented aliens attempting to cross the border into the United States daily.

MPP is a core component of the U.S. Government's efforts to address the migration crisis along the U.S.-Mexico border. MPP streamlines existing avenues for aliens in removal proceedings who qualify for humanitarian protection in the United States to receive it in order to support an orderly and timely completion of U.S. immigration processes. At the same time, MPP provides a deterrent to illegal entry into the United States, and it prevents "catch and release" from DHS custody, including for those whose claims of fear to return to their home countries prove not to be merit relief or protection from an immigration judge.

Further information about how DHS is meeting the intended goals of MPP can be found on the MPP Metrics and Measures Publication Page (/publication/metrics-and-measures) .

Last Published Date: April 14, 2020

**AR00885**

U.S. Department of Homeland Security

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Migrant Protection Protocols (Biden Administration Archive)

**En español**

### DHS Terminates MPP and Continues to Process Individuals Who Were Enrolled in MPP Into the United States to Complete Their Immigration Proceedings

On June 01, 2021, following careful review of the program as directed by President Biden in Executive Order 14010, the Secretary of Homeland Security terminated the Migrant Protection Protocols (MPP) program. This announcement does not impact the processing of MPP-enrolled individuals into the United States as described below.

On February 19, 2021, the Department of Homeland Security (DHS) began processing into the United States certain individuals who had been returned to Mexico under the MPP program and had pending cases before the Executive Office for Immigration Review (EOIR). In its continued efforts to restore safe and orderly processing at the Southwest Border, DHS is now expanding the eligible pool of MPP-enrolled individuals for such processing. Beginning June 23, 2021, DHS is expanding eligibility for U.S. processing to also include MPP enrollees who had their cases terminated or who were ordered removed in absentia (i.e., individuals ordered removed while not present at their hearings).

Individuals who believe they may be eligible for processing should stay where they are currently located. Registration is available online through https://conecta.acnur.org (https://www.dhs.gov/now-leaving?external_url=https%3A%2F%2Fconecta.acnur.org&back_url=https%3A%2F%2Fwww.dhs.gov%2Farchive%2Fmigrant-protection-protocols-biden-administration), and there is no need to approach or cross any borders to access this process.

We strongly discourage anyone from approaching the U.S. border without proper documentation or instructions to present themselves at a specific port of entry. Individuals who attempt to cross illegally are putting themselves and their families at risk, especially during a global pandemic.

## What is MPP and what changed?

The MPP program was initiated in 2019. Under this program, certain individuals who arrived at the Southwest Border were returned to Mexico pursuant to Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) to await immigration proceedings under Section 240 of the INA. On January 21, 2021, DHS suspended the program and since then, no new individuals have been enrolled. DHS terminated the program on June 1, 2021. DHS terminated the program on June 1, 2021.

As outlined in the President's executive actions, the United States is committed to reforming our immigration system, addressing the root causes of irregular migration in the region, and ensuring safe, orderly, and humane processing at our border. Addressing MPP enrollees with ongoing removal proceedings, proceedings that were terminated, or proceedings that resulted in in absentia removal orders are steps toward achieving these goals.

DHS is collaborating with the Departments of State and Justice, as well as international and non-governmental organizations, and regional partners, in this effort.

## What are the general steps in this process?

First, individuals who believe they may be eligible for processing may register via the online support hub at https://conecta.acnur.org (https://www.dhs.gov/now-leaving?external_url=https%3A%2F%2Fconecta.acnur.org&back_url=https%3A%2F%2Fwww.dhs.gov%2Farchive%2Fmigrant-protection-protocols-biden-administration), where they will be asked to provide basic information to confirm eligibility. Through the support hub, they can ask questions about

their case. There is also a telephone hotline to answer questions and offer support. The support hub is operated by facilitating organizations with the support of the U.S. Government.

Next, facilitating organizations will transmit registration information to DHS to verify that the individual is eligible for processing into the United States. Based on DHS-provided criteria, facilitating organizations will prioritize eligible individuals based on their date of enrollment in MPP and other factors.

Individuals who are determined to be eligible for processing will be contacted by facilitating organizations and provided instructions for accessing a designated staging location, where they will complete a health questionnaire and undergo testing for COVID-19. Those who test negative will receive further assistance in preparation for U.S. processing. Those who test positive will receive support from facilitating organizations to isolate and/or seek treatment in line with the policy of the relevant local health authority in Mexico. Following isolation and screening, such individuals will again be eligible for processing. At staging sites, facilitating organizations will provide EOIR-33 Change of Address forms and offer additional legal orientation and support.

Individuals who complete the testing and screening requirements above will be transported from staging sites to designated ports of entry for processing into the United States. If the Change of Address form is complete, DHS will use this form to administratively move cases to the immigration court closest to the identified address. Unless an individual presents a national security or public safety concern, the individual will generally be assessed for enrollment in an alternative-to-detention program, released by DHS, and provided instructions for contacting U.S. Immigration and Customs Enforcement (ICE) at their destination.

## Am I eligible for this process?

This process is available to a limited set of individuals who were returned to Mexico under MPP. MPP enrollees are eligible for this process only if their cases fall into one of three categories:
1) their immigration proceedings remain pending;
2) their immigration proceedings were terminated before reaching a decision; or
3) they received an *in absentia* removal order.

Individuals who were ordered removed after attending their removal hearings are not eligible for this process. Case status information is available on the EOIR website in English and Spanish (https://portal.eoir.justice.gov/) (under "Automated Case Information" on the right side).

Those who believe they may be eligible for this process can register through the virtual hub at https://conecta.acnur.org (https://www.dhs.gov/now-leaving?external_url=https%3A%2F%2Fconecta.acnur.org&back_url=https%3A%2F%2Fwww.dhs.gov%2Farchive%2Fmigrant-protection-protocols-biden-administration). Individuals can access this link, available online from any location, to register and obtain information. Once registered, individuals should remain where they are to await further instructions. Facilitating organizations will confirm eligibility and, once confirmed, will send instructions on next steps, depending on their unique case circumstances and location.

## How will previously closed immigration proceedings be addressed?

MPP enrollees whose immigration cases were terminated or who received removal orders in absentia should register for this process online at https://conecta.acnur.org (https://www.dhs.gov/now-leaving?external_url=https%3A%2F%2Fconecta.acnur.org&back_url=https%3A%2F%2Fwww.dhs.gov%2Farchive%2Fmigrant-protection-protocols-biden-administration). Once eligibility is confirmed, individuals will be contacted by facilitating organizations and provided additional instructions.

Facilitating organizations will work with individuals to prepare necessary documents in advance, including documents to reopen cases for individuals with in absentia removal orders. Upon the successful completion of these pre-processing steps, individuals will be given instructions for accessing a designated staging location, where they will complete a health questionnaire and undergo testing for COVID-19 prior to arriving at the port of entry.

## How is DHS protecting individuals and communities against COVID-19?

The Administration's policy is to protect our national and border security, address the humanitarian challenges at the U.S.-Mexico border, and ensure public health and safety. Resolving the situation of vulnerable migrants at our borders is consistent with both our national interests and our values as a nation. The United States will prioritize the public health and safety of our communities, U.S. government personnel, and migrants throughout the process.

DHS will employ all necessary safety precautions in accordance with Centers for Disease Control and Prevention (CDC) guidance for unvaccinated individuals, including mandatory face coverings and social distancing. Individuals processed through this program will be tested for COVID-19 before

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 156 of 548   PageID 5099

entering the United States. At staging sites in Mexico, facilitating organizations will use antigen testing for COVID-19, temperature checks, and health questionnaires to determine whether individuals intending to present at ports of entry have COVID-19 or other communicable diseases.

After being cleared, facilitating organizations will transport individuals to designated ports of entry in accordance with applicable physical distancing guidelines. Surgical masks will be provided for any individual who lacks an appropriate face covering. Facilitating organizations will also provide individuals the same CDC instructions given to international air travelers. DHS will only process individuals consistent with its capacity to safely do so while fully executing its important national security and trade and travel facilitation missions.

## How can I register?

A virtual registration process, accessible online from any location, is available via https://conecta.acnur.org (https://www.dhs.gov/now-leaving?external_url=https%3A%2F%2Fconecta.acnur.org&back_url=https%3A%2F%2Fwww.dhs.gov%2Farchive%2Fmigrant-protection-protocols-biden-administration). Once registered, individuals confirmed as eligible for this process will be provided additional information about their case-specific steps, including where and when to present themselves at staging sites. Facilitating organizations will support individuals in the program and ready them for processing into the United States.

Approaching or crossing borders without proper documentation or waiting near ports of entry is dangerous and discouraged. Registration for this process does not happen at the border, but through https://conecta.acnur.org (https://www.dhs.gov/now-leaving?external_url=https%3A%2F%2Fconecta.acnur.org&back_url=https%3A%2F%2Fwww.dhs.gov%2Farchive%2Fmigrant-protection-protocols-biden-administration) and intake interviews with facilitating organization staff.

## Where is this happening?

Once registered, individuals determined to be eligible for processing are provided information to access one of several staging locations along the border. At these locations, individuals are provided information and tested for COVID-19 before being transported to designated ports of entry. DHS is currently processing scheduled cases in San Ysidro, CA; El Paso, TX; Eagle Pass, TX; Laredo, TX; Hidalgo, TX; and Brownsville, TX. As a reminder, intake for this process does not occur at ports of entry, but through this website: https://conecta.acnur.org (https://www.dhs.gov/now-leaving?external_url=https%3A%2F%2Fconecta.acnur.org&back_url=https%3A%2F%2Fwww.dhs.gov%2Farchive%2Fmigrant-protection-protocols-biden-administration).

We strongly discourage individuals from approaching the border without proper documentation or instructions to present themselves at a specific port of entry. Those who attempt to cross illegally are putting themselves and their families at risk, especially during a global pandemic.

## If I am eligible for this process but am not currently in Mexico, should I return to Mexico for processing?

No. Individuals who are eligible for this process but are located in a country other than Mexico should remain where they are and follow the directions to identify themselves through https://conecta.acnur.org (https://www.dhs.gov/now-leaving?external_url=https%3A%2F%2Fconecta.acnur.org&back_url=https%3A%2F%2Fwww.dhs.gov%2Farchive%2Fmigrant-protection-protocols-biden-administration). Those who register and are determined to be eligible for processing will receive specific instructions with next steps.

## Once I am processed through the port of entry, how will I get to my next destination?

To the extent possible, individuals will need to arrange their own transportation. If needed, there are networks of non-governmental organizations that may be able to help arrange transportation and shelter in route to your final destination.

## Are individuals vetted before entry?

The United States continues to strictly enforce existing immigration laws and border security measures. DHS will follow existing protocols—including biometric checks—to identify individuals who pose a threat to the American public. Anyone determined to pose a national security or public safety threat will be referred to U.S. Immigration and Customs Enforcement (ICE) for a custody determination.

## How long will this new process for individuals in MPP last?

DHS and the Departments of State and Justice are working as expeditiously as possible but have not set a deadline by which the process will end.

## What are the vulnerability criteria that facilitating organizations will use?

Facilitating organizations will generally prioritize individuals based on their enrollment date into MPP, while also considering other criteria provided by DHS. Those who have been waiting the longest will generally be prioritized first, along with those who find themselves in particularly vulnerable situations.

## What happens if a facilitating organization cannot verify my case status?

Facilitating organizations will request more information and contact U.S. Customs and Border Protection (CBP) to seek resolution.

## What happens when my immigration case is completed?

This new process is meant to provide an opportunity to individuals who were returned to Mexico under MPP to proceed with their immigration proceedings from within the United States. Entry into the United States through this process does not guarantee the right to stay in the United States, nor does it impact eligibility for relief or protection from removal. The process, however, will facilitate individuals' ability to appear before an immigration judge and have their claims heard. If a claim is denied, and any appeal process runs its course, the individual will be subject to removal from the United States.

## How is DHS tracking individuals once they are processed into the United States?

The safety of the American public and all those we encounter remains a top priority. Depending on the circumstances of a particular case, DHS may take an individual into custody or enroll the individual into an alternative-to-detention (ATD) program at the port of entry. Otherwise, U.S. Immigration and Customs Enforcement (ICE) will consider enrolling individuals into ATD or other case management programs after arrival at their final destination.

## What happens if I attempt to cross the border in between ports of entry instead of being scheduled through the established process?

This process is meant to provide an opportunity for all eligible individuals to be processed into the United States in a fair and efficient manner consistent with public health measures. DHS strongly discourages individuals from attempting to circumvent the established process facilitated by international organizations. Individuals should not approach the border without proper documentation or otherwise attempt to cross illegally between ports of entry.

Any individuals who are encountered between the ports of entry, or who otherwise attempt to enter the United States without inspection or parole, will be apprehended and processed according to all applicable immigration laws and border security priorities, which could include detention and removal. Any individual who illegally enters the United States and is placed into removal proceedings, or any individual who has previously been ordered removed from the United States, may be considered inadmissible to the United States in the future.

## Additional Resources for Individuals

**Case Status:** Individuals are able to access case status information as long as they know their A-number (the nine-digit number that begins with the letter "A" and is found in the upper right-hand corner of the Notice to Appear and other immigration-related documentation). Case information can be accessed 24 hours a day, 7 days a week via EOIR's Automated Case Information Portal (https://portal.eoir.justice.gov/InfoSystem/Form?Language=EN) or at 1-800-898-7180 (toll-free).

**Address Update:** Individuals in removal proceedings need to ensure that their address is up to date with the immigration court. Every time individuals move residences, they should update their addresses by submitting an EOIR-33, Change of Address Form (https://www.justice.gov/eoir/form-eoir-33-eoir-immigration-court-listing) (by mail or in person) to the court location where their cases are currently docketed.

**Legal Assistance:** For individuals searching for legal assistance, EOIR publishes a List of Pro Bono Legal Service Providers (https://www.justice.gov/eoir/list-pro-bono-legal-service-providers) corresponding to each court location.

**Self Help Materials:** Individuals who are not represented by counsel or who need additional resources can access resources on EOIR's Self-Help Materials website (https://www.justice.gov/eoir/self-help-materials), including information on the topics listed below:

- Accessing an Attorney

**AR00889**

- Appeal
- Asylum
- Bond
- Change of Address and Change of Venue
- EOIR Self- Help Legal Centers
- Fraud
- Missed Hearing

- Notice to Appear
- Self-Help Guides to Immigration Removal, Proceedings and Common Forms of Relief
- T-Visa
- U-Visa
- Voluntary Departure

**Civil Rights Complaint:** If an individual believes that DHS policies or activities have violated their civil rights or civil liberties, they may file a complaint with the DHS Office for Civil Rights and Civil Liberties (CRCL). More information can be found on the [CRCL Compliance Branch website](/compliance-branch).

# "Know Your Rights" Information

- [Know Your Rights Pamphlet (in English)](https://www.dhs.gov/now-leaving?external_url=https%3A%2F%2Fwww.americanbar.org%2Fcontent%2Fdam%2Faba%2Fadministrative%2Fimmigration%2Fknow-your-rights%2Fknow_your_rights_english.pdf&back_url=https%3A%2F%2Fwww.dhs.gov%2Farchive%2Fmigrant-protection-protocols-biden-administration)
- [Know Your Rights Video (in English)](https://www.dhs.gov/now-leaving?external_url=https%3A%2F%2Fwww.americanbar.org%2Fgroups%2Fpublic_interest%2Fimmigration%2Fprojects_initiatives%2Fknow-your-rights%2F&back_url=https%3A%2F%2Fwww.dhs.gov%2Farchive%2Fmigrant-protection-protocols-biden-administration)
- [Conozca sus derechos- folleto (en Español)](https://www.dhs.gov/now-leaving?external_url=https%3A%2F%2Fwww.americanbar.org%2Fcontent%2Fdam%2Faba%2Fadministrative%2Fimmigration%2Fknow-your-rights%2Fknow_your_rights_spanish.pdf&back_url=https%3A%2F%2Fwww.dhs.gov%2Farchive%2Fmigrant-protection-protocols-biden-administration)
- [Conozca sus derechos- video (en Español)](https://www.dhs.gov/now-leaving?external_url=https%3A%2F%2Fwww.americanbar.org%2Fgroups%2Fpublic_interest%2Fimmigration%2Fprojects_initiatives%2Fknow-your-rights%2F&back_url=https%3A%2F%2Fwww.dhs.gov%2Farchive%2Fmigrant-protection-protocols-biden-administration)
- [Conheça seus direitos- panfleto (em Português)](https://www.dhs.gov/now-leaving?external_url=https%3A%2F%2Fwww.americanbar.org%2Fcontent%2Fdam%2Faba%2Fadministrative%2Fimmigration%2Fknow-your-rights%2Fknow_your_rights_portuguese.pdf&back_url=https%3A%2F%2Fwww.dhs.gov%2Farchive%2Fmigrant-protection-protocols-biden-administration)

# Policy Guidance

- [ICE Office of the Principal Legal Advisor: Prosecutorial Discretion Guidance](https://www.ice.gov/about-ice/opla/prosecutorial-discretion)
- June 01, 2021: [DHS Memo on the Termination of the Migrant Protection Protocols Program](/publication/dhs-terminates-mpp-and-continues-process-individuals-mpp-united-states-complete-their)

# Media Archive

- June 23, 2021: [DHS Announces Expanded Criteria for MPP-Enrolled Individuals Who Are Eligible for Processing into the United States](/news/2021/06/23/dhs-announces-expanded-criteria-mpp-enrolled-individuals-who-are-eligible-processing)
- March 10, 2021: [Press Briefing by Press Secretary Jen Psaki and Special Assistant to the President and Coordinator for the Southern Border Ambassador Roberta Jacobson](https://www.whitehouse.gov/briefing-room/press-briefings/2021/03/10/press-briefing-by-press-secretary-jen-psaki-and-special-assistant-to-the-president-and-coordinator-for-the-southern-border-ambassador-roberta-jacobson-march-10-2021/) | Whitehouse.gov
- March 01, 2021: [Press Briefing by Press Secretary Jen Psaki and Secretary of Homeland Security Alejandro Mayorkas](https://www.whitehouse.gov/briefing-room/press-briefings/2021/03/01/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-homeland-security-alejandro-mayorkas/) | Whitehouse.gov
- February 23, 2021: [DHS Statement on Processing Current Residents of the Matamoros Camp Into the U.S.](/news/2021/02/23/dhs-statement-processing-current-residents-matamoros-camp-us)
- February 19, 2021: [DHS Statement on First Step in Process to Address Individuals in Mexico with Active MPP Cases](/news/2021/02/19/dhs-statement-first-step-process-address-individuals-mexico-active-mpp-cases)

- February 18, 2021: Public Health and the Draw Down of the Migrant Protection Protocols Program (https://www.state.gov/public-health-and-the-draw-down-of-the-migrant-protection-protocols-program/) | State.gov
- February 18, 2021: FACT SHEET: DHS Announces Process to Address Individuals Outside the United States with Active MPP Cases (/news/2021/02/18/fact-sheet-dhs-announces-process-address-individuals-outside-united-states-active)
- February 16, 2021: The MPP Program and Border Security Joint Statement by Assistant to the President and National Security Advisor Jake Sullivan and Assistant to the President and Homeland Security Advisor Elizabeth Sherwood-Randall (https://www.whitehouse.gov/briefing-room/statements-releases/2021/02/16/the-mpp-program-and-border-security-joint-statement-by-assistant-to-the-president-and-national-security-advisor-jake-sullivan-and-assistant-to-the-president-and-homeland-security-advisor-and-deputy-na/) | Whitehouse.gov
- February 11, 2021: DHS Announces Process to Address Individuals in Mexico with Active MPP Cases (/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases)
- February 2, 2021: Executive Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border (https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration-throughout-north-and-central-america-and-to-provide-safe-and-orderly-processing/) | Whitehouse.gov
- January 20, 2021: DHS Statement on the Suspension of New Enrollments in the Migrant Protection Protocols Program (/news/2021/01/20/dhs-statement-suspension-new-enrollments-migrant-protection-protocols-program)

# Previous Administrations

- Archive: Migrant Protection Protocols (/archive/migrant-protection-protocols)

## Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)

## Keywords

BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)     MIGRANT PROTECTION PROTOCOLS (MPP) (/KEYWORDS/MIGRANT-PROTECTION-PROTOCOLS-MPP)

Last Updated: 12/20/2021

AR00891



☰ |

**DONATE NOW**

June 2, 2020 10:00AM EDT

## DHS OIG Formal Complaint Regarding 'Remain in Mexico'



*Via Email*

Joseph Cuffari

Inspector General

U.S. Department of Homeland Security

254 Murray Lane SW

Washington, D.C. 20528

Cameron Quinn

Officer for Civil Rights and Civil Liberties

U.S. Department of Homeland Security

Building 410, Mail Stop #0190

Washington, D.C. 20528

**Re: Asylum seekers sent to Tamaulipas, Mexico under DHS Migrant Protection Protocols are systematically targeted by criminal organizations, yet DHS continues to endanger people in violation of its own policies and legal obligations**

Dear Mr. Cuffari and Ms. Quinn:

Human Rights Watch submits this complaint and requests that the Department of Homeland Security (DHS) Office of Inspector General (OIG) and Office for Civil Rights and Civil Liberties (CRCL) investigate and report on the Migrant Protection Protocols (MPP) program and hold DHS accountable for knowingly subjecting asylum seekers to situations of persecution and other serious harm in the Mexican state of Tamaulipas in violation of its own policies and its obligations under US and international law. The dangers asylum seekers in the MPP program face are now even more acute during the Covid-19 pandemic, as asylum seekers are forced to wait for delayed hearings in crowded camps and shelters with limited and rudimentary sanitation facilities.

Human Rights Watch is an international, nonprofit, non-governmental organization that investigates and reports on abuses around the world, based on accurate factfinding and impartial reporting. This complaint is based on research Human Rights Watch conducted in the

Mexican cities of Matamoros and Reynosa, Tamaulipas, in November 2019; Monterrey, Nuevo León, in December 2019; and San Luis Potosí, San Luis Potosí, in January 2020. Human Rights Watch researchers spoke to 43 adult asylum seekers (23 women and 20 men) who had been placed in the MPP program, many of whom had traveled with families, including 42 children. Over half of those children were under the age of 10. Human Rights Watch researchers also reviewed documents provided by asylum seekers and immigration attorneys including court documents, police reports, sworn declarations, and detailed notes taken by immigration attorneys present during nonrefoulement interviews.

These interviews and our review of documents illustrate the risk of serious harm US asylum seekers face in Tamaulipas:

- Human Rights Watch identified 32 separate instances of kidnapping or attempted kidnapping of asylum seekers subject to the MPP program – mostly by criminal organizations but at least once by a Mexican federal official – in Tamaulipas between November 2019 and January 2020.

- At least 80 asylum seekers were kidnapped in the incidents we identified.

- A further 19 asylum seekers described kidnapping attempts.

- At least 38 children were kidnapped or subjected to kidnapping attempts in these incidents.

- Eight people said they were robbed outside of these kidnappings or kidnapping attempts.

- Four people said they were sexually assaulted during a kidnapping incident.

- In five additional cases, Mexican police abducted asylum seekers for a short period of time and extorted them, a practice known as "express kidnapping."

In addition to reports from people who had themselves been kidnapped or subjected to a kidnapping attempt, these numbers include accounts from asylum seekers Human Rights Watch interviewed of other asylum seekers they witnessed being held in captivity while they themselves were kidnapped, as well as secondhand accounts of friends or family members they knew to have been kidnapped. While some of these cases could be verified by reviewing text or audio message communications between persons known to the kidnapped asylum seeker, at times the kidnapped person remained disappeared and the asylum seeker Human Rights Watch spoke to was a friend unsure of how to contact that person's family members. In such cases, verification was not possible.

Human Rights Watch has previously notified DHS of the serious rights consequences for asylum seekers subjected to the MPP across the US-Mexico border and urged the United States to immediately end the MPP program across the entire border, cease returning asylum seekers to Mexico, and instead ensure them access to humanitarian support, safety, and access to counsel from within the United States, where many have family members or others who can support them while their asylum cases are heard.[1] Despite attempts by Human Rights Watch to share findings and recommendations in the past, DHS has failed to respond to or address these harms.

Asylum seekers sent to the Mexican state of Tamaulipas under the MPP are at increased risk of life-threatening violence, including kidnapping, extortion, and sexual assault. During the pandemic, they are now also at heightened risk of infection in crowded shelters and camps where social distancing is impossible, sometimes without sufficient clean running water[2] to follow the basic hygiene recommendations put forward by the Centers for Disease Control and Prevention (CDC), the World Health Organization (WHO), other public health entities, and human rights experts.[3]

**The MPP Program**

Under the MPP program – known as "Remain in Mexico" – non-Mexican asylum seekers in the United States are sent to border towns in Mexico while awaiting asylum hearings in US immigration court.[4]

On February 28, 2020, the US Court of Appeals for the Ninth Circuit upheld a preliminary injunction of the MPP, noting that "uncontested evidence in the record establishes that non-Mexicans returned to Mexico under the MPP risk substantial harm, even death." [5]

AR00893

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 162 of 548   PageID 5105

The court later stayed its injunction pending the government's appeal to the Supreme Court, which then issued its own stay of the injunction.[6] At time of writing, the program remains intact, but the appellate court's finding that people sent to Mexico under the MPP "risk substantial harm, even death, so long as the directives of the MPP are followed"[7] is consistent with Human Rights Watch's findings.

When launching the MPP program, then-Secretary of Homeland Security Kirstjen Nielsen said the US government would implement the program in a manner consistent with domestic and international law, including US humanitarian commitments.[8] The 1951 Convention relating to the Status of Refugees and its 1967 Protocol prohibit the expulsion or return of refugees to "territories where [their] life or freedom would be threatened on account of [their] race, religion, nationality, membership of a particular social group or political opinion."[9] In addition, under the UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Convention against Torture), the United States is obligated not to return anyone to a country "where there are substantial grounds for believing that [they] would be in danger of being subjected to torture."[10] The screening process set up under the MPP fails in several material ways to ensure compliance with the international obligation of nonrefoulement.

**Nonrefoulement Screenings Under MPP Lack Necessary Protections**

A nonrefoulement screening procedure should be designed to ensure asylum seekers are not returned to countries where they would likely face the threat of persecution or torture or cruel, inhuman or degrading treatment.[11]

Existing statutory and regulatory procedures aim to implement the United States' nonrefoulement obligations in other contexts. Asylum is a discretionary form of relief that may be granted to individuals with a well-founded fear of persecution on account of a protected ground—i.e., their race, religion, nationality, membership in a particular social group, or political opinion.[12] Withholding of removal under 8 U.S.C § 1231(b)(3) must be granted to noncitizens who demonstrate that their "life or freedom would be threatened" on account of a protected ground in the country to which they face removal. Relief under the Convention against Torture must be granted to noncitizens who demonstrate that are more likely than not to be tortured in the country to which they face removal.[13] Before claims for these forms of protections are fully assessed, credible fear and reasonable fear interview protocols established by regulation aim to screen for eligibility for these protections.[14]

However, under the MPP, DHS agents send migrants to Mexico without the benefit of established procedures for evaluating whether they have a credible fear or reasonable fear of persecution in Mexico. DHS instead purports to comply with the United States' international and humanitarian obligations by providing "nonrefoulement" interviews. But these MPP nonrefoulement interviews employ procedures and standards that drastically differ from credible fear or reasonable fear interviews and in effect make it all but impossible for migrants to avoid placement in the MPP program.

First, DHS sets an almost impossibly high standard for these interviews, requiring migrants to remain in the MPP unless they establish they are "more likely than not" to face persecution on account of a protected ground or torture — a standard much higher than "reasonable fear," arbitrarily implemented by DHS, and not provided for in law or even in regulation. In fact, "more likely than not" is the same as the standard required to win withholding of removal in front of an immigration judge after a full hearing.

Second, DHS's decision to return a noncitizen to Mexico is unilateral. Unlike in the reasonable fear or other summary removal contexts, a noncitizen who fears persecution in Mexico receives no review by an immigration judge.

Third, most asylum seekers in the MPP program are not guaranteed access to attorneys in nonrefoulement interviews.[15] In an exception to this rule, on January 14, 2020, a US District Court judge issued a preliminary injunction requiring DHS to give asylum seekers placed in the MPP program along the California-Mexico border access to an attorney before and during nonrefoulement hearings. [16] The court found that some families who had been denied access to their retained legal counsel by US Customs and Border Protection (CBP) before and during their nonrefoulement interviews and who received a negative finding by the interviewing asylum officer, subsequently received a positive finding once CBP gave those same families access to their attorneys during a second nonrefoulement interview.[17] "Given the stakes of a nonrefoulement interview—the return to a country in which one may face persecution and torture—and the interview's fact-intensive nature, it is undeniable that access to counsel is important," Judge Sabraw said in the order.[18] That injunction does not apply to nonrefoulement interviews conducted with asylum seekers placed into the MPP program along other parts of the border, including Tamaulipas.

**AR00894**

Fourth, DHS now allows CBP agents to conduct nonrefoulement interviews with the expectation that they will be "tougher" on asylum seekers[19] – a motivation at odds with Congress' original purpose in implementing screenings to guard against nonrefoulement in other contexts.[20] CBP agents are immigration enforcement officers and not neutral asylum officers, and they have far less training in asylum law. Asylum officers have alleged that CBP agents have committed serious errors in the process.[21]

Fifth, under the MPP program, CBP agents are not required to ask asylum seekers placed in the program if they are afraid to be sent to Mexico.[22] Instead, asylum seekers subject to the program must "affirmatively" – or without being questioned or prompted – express fear of harm in Mexico in order to be referred for a nonrefoulement interview. Asylum seekers who are not from Mexico may lack knowledge of the harms they are likely to face in Mexico, may not be aware that voluntarily expressing fear of return to Mexico is required to trigger an interview that would assess whether they can be sent there, and may not even expect they could be sent to Mexico under the MPP program in the first place.[23]

Indeed, many of the asylum seekers Human Rights Watch spoke to had no prior understanding of the existence or purpose of nonrefoulement interviews, let alone knowledge about how they could trigger such interviews.[24]

As of mid-October, the US Citizenship and Immigration Services had completed screenings to assess a fear of return to Mexico for only about 13.5 percent of asylum seekers placed in the MPP program at that time, or about 7,400 out of 55,000 asylum seekers.[25] As of October, only 13 percent of the small fraction of those referred for nonrefoulement interviews prevailed and were subsequently removed from the program, according to DHS.[26] Even when asylum seekers do pass the nonrefoulement interview, affirmative decisions are often reviewed — and blocked or overturned — by asylum headquarters, an asylum officer told *Vox*, an online news source, while negative decisions did not appear to be subjected to the same review.[27]

Some asylum seekers told Human Rights Watch that they were aware of how difficult it is to prevail in the nonrefoulement interviews and said they did not want to spend time in frigid CBP border detention facilities only to be sent again to Mexico.[28] Nearly all of the asylum seekers Human Rights Watch spoke to expressed a fear of being forced to remain in Mexico.[29]


**Nonrefoulement Interviews Are Not Given Even When Requested Affirmatively**

Human Rights Watch found that CBP agents failed to refer asylum seekers to nonrefoulement interviews even when they affirmatively expressed a fear of return to Mexico in violation of DHS policy.

Acting CBP Commissioner Mark Morgan in a November 14, 2019 press briefing said that reports of violence against asylum seekers along the Mexico border were merely anecdotal and that anybody in the MPP program who feared for their safety could approach a port of entry, tell CBP agents of their fear, and be given a nonrefoulement interview.[30]

But asylum seekers who had been placed in the MPP program in Tamaulipas told Human Rights Watch that when they affirmatively expressed fear, CBP agents ignored them, even when Mexican government officials had been implicated in the harm:

- Nina V., who fled domestic violence in Guatemala with her 12- and 8-year-old sons, said CBP agents told the family they had two options: "go to Mexico or go home." She said she told agents that they had been kidnapped from a Mexico City bus terminal for ransom, but she said the agents "did not care." She was placed into the MPP program and sent to Matamoros without being given a nonrefoulement interview.[31]

- Daniel G., who fled Cuba, was kidnapped and extorted by Mexican federal police in southern Mexico and pursued through Reynosa by armed men, according to a sworn declaration. When he turned himself into Border Patrol agents, he was held for four days in a series of CBP border jails before finally being brought to speak to an official, he said. "It was difficult to understand her because she spoke very little Spanish, and I do not speak English," Daniel said. "She explained that I was going to be returned to Mexico to wait for my day in court on Sept. 20, 2019. I explained to her what had happened in Mexico, but she insisted that I had to return to Mexico. . . She never explained my rights, nor did I get a [nonrefoulement] interview."[32]

- An asylum-seeking family consisting of a mother, father and their two children who fled Guatemala were kidnapped for ransom in Nuevo Laredo by cartel operatives while they were on their way to the US-Mexico border to ask for asylum, according to attorney

AR00895

notes from the interview made available to Human Rights Watch. While in captivity, the father was beaten with a wooden plank, and cartel operatives threatened the family with death. The family told the DHS official conducting their nonrefoulement interview that when they first arrived "at the bridge, we tried to tell all of this to the CBP officer. And they told us that this was not important."[33]

- Yago R., who fled Cuba, was assaulted 3 times in the 5 days he spent in Reynosa, according to a sworn declaration. "One day, I went to buy food when two men accosted me and robbed me of all my money," Yago said. "US officials were not permitting anyone to cross the bridge to ask for asylum." Faced with the prospect of waiting months in the dangerous city as the result of illegal turnbacks by CBP agents at the port of entry,[34] Yago decided to cross the Rio Grande away from the port of entry and seek asylum. There, a group of around 15 men surrounded him and stole his watch, cellphone, and backpack, which contained important evidence of his asylum claim. Only then did they allow him to swim across. He immediately sought out Border Patrol agents to turn himself in and ask for asylum. Yago said he told agents of all the harm he had suffered in Tamaulipas, but that they paid no attention to him, and he was not given a nonrefoulement interview.[35]

- According to a federal lawsuit filed by the American Civil Liberties Union (ACLU) of Massachusetts, DHS returned a Guatemalan father, Hanz Minoldo Morales Barrera, and his 9-year-old son to Nuevo Laredo under the MPP without a nonrefoulement interview in July 2019 despite his affirmative expression of fear. According to the complaint, Mr. Morales "was so afraid [to enter Nuevo Laredo] that he refused to cross. He sat down on the bridge in the hot sun and told H.E.M.C. (name withheld for fear of retribution) to sit next to him. He begged officials to do anything with him—including taking him to jail—as long as they did not send him and [his son] to Mexico. Mr. Morales and [his son] were crying. An official told Mr. Morales and [his son] that because they did not cooperate, they would be separated—Mr. Morales would be sent to jail for a long time, and [his son] would be sent to a facility for minors—and they would never see each other again. [Mr. Morales' son] heard this and was inconsolable."[36] In early February 2020, DHS reportedly agreed to a settlement of the lawsuit that included removing Mr. Morales and his son from the MPP program and allowing them to pursue their asylum claims while living in the United States.[37]

More recently under the Covid-19 pandemic, a CBP official said that nonrefoulement interviews are now only being given to asylum seekers in the MPP on a case-by-case basis after the agency began using an order from the Centers for Disease Control and Prevention to turn away asylum seekers.[38]

Human Rights Watch also found that asylum seekers subject to the MPP program may lack access to nonrefoulement interviews because they are too afraid to travel to the border after receiving threats from or being harmed by criminal organizations:

- Fabiola B., who fled El Salvador with her 4-year-old son, told Human Rights Watch she was sexually assaulted in front of her child after being kidnapped in Nuevo Laredo for the second time. Fabiola was on her way to the port of entry with her friend Beatriz A. and Beatriz' 10-year-old son, who also fled El Salvador, so that the two families could attend their US immigration court hearings. When they stepped off of the bus they had taken from a Reynosa shelter to Nuevo Laredo, a group of men encircled the women and children and began asking them where they were from and why they were in Nuevo Laredo. The men then kidnapped the asylum seekers, separating the two families and taking Fabiola and her son to an empty store where they sexually assaulted her. When the criminal organization released them, telling them never to return, Fabiola and Beatriz fled Nuevo Laredo, missing both their court date and the opportunity for a nonrefoulement interview.[39]

- Walter P. and his 11-year-old daughter, who together fled El Salvador, spent their first night in Nuevo Laredo after being placed in the MPP program sleeping on the floor at the Mexican immigration office. Mexican immigration officials warned him and other asylum seekers of the frequent kidnappings of asylum seekers that have been taking place there. The next day, they sought to leave Nuevo Laredo to find somewhere safer to live but were kidnapped from the bus terminal after two men walked up and asked where they are from. Walter said one of the members of the criminal operation identified as the leader told him, "There is no asylum in the United States. But we can get you across safely." After Walter and his daughter were released several hours later, they fled Nuevo Laredo, and the 11-year-old begged her father never to return. They subsequently missed both their immigration court hearing and the opportunity for a nonrefoulement interview. They are now hiding out in Mexico, waiting to see if there is a policy change that would allow them to safely pursue asylum in the future. Walter's wife and 18-year-old son left El Salvador separately, and planned on traveling to the US-Mexico border to ask for asylum. After they learned of their family's kidnapping, they decided against approaching the border and are also hiding in Mexico.[40]

AR00896

**Nonrefoulement Interviews Under the MPP Program Apply an Excessively Stringent Standard for Assessing Likelihood of Harm in Mexico and Fail to Comport with Guidelines Under International Law**

When asylum seekers are given nonrefoulement interviews under the MPP program, the evidentiary standard they must meet to pass those interviews is extremely high. DHS officials must find it is "more likely than not" an applicant will be tortured or persecuted in Mexico.[41] An asylum officer who had been administering interviews for asylum seekers in the MPP program told *Vox* that in practice the standard for prevailing on claims of fear of return to Mexico was "all but impossible for applicants to meet."[42] Asylum rights groups challenging the MPP have argued the nonrefoulement interview "imposes a significantly higher evidentiary standard"[43] than the traditional "well-founded fear" standard applied otherwise.[44]

US asylum officers acting through their union condemned the MPP program in an amicus ("friend of the court") brief filed June 26, 2019, in a lawsuit against the program, saying the interview process under the MPP "virtually guarantees a violation of the nonrefoulement obligation" because it lacks the safeguards and protections that asylum seekers need to meet the high burden of proof required.[45] The "more likely than not" standard is typically reserved for full-scale removal proceedings in front of an immigration judge, officers explained, whereas asylum officers typically apply lower standards to determine if someone has a "well-founded fear" in the reasonable fear interview context since outside of the MPP context an asylum seeker who has passed the officer's interview would then go before a judge where the higher "more likely than not" standard would be applied.[46] In that process, asylum seekers are given time to find an attorney and gather evidence. In the context of the MPP program, asylum seekers' nonrefoulement claims will never go before a judge, and they are not given sufficient time to seek out counsel or gather evidence.

The UN Committee against Torture, which provides authoritative guidance on the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, has stressed the need for a high level of due process protection to comply with the principle of nonrefoulement.[47] We have found that:

- The nonrefoulement interview practice fails to meet the need for an examination of each case "individually, impartially and independently"[48] insofar as CBP agents are now conducting some interviews.

- While access to a lawyer, free of charge if necessary, for the nonrefoulement hearing is required under the convention,[49] asylum seekers are not given consistent access to an attorney.

- Though the nonrefoulement interview should be a procedure conducted in a language the person understands,[50] asylum seekers were given interviews in a language other than their first language.

- The MPP program violates the convention in that there should be no "dissuasive measures" such as prolonged asylum processes or poor detention conditions.[51]

- The nonrefoulement process should take into account prior cruel, inhuman, and degrading treatment in the state to which the person would be returned, considering such treatment "an indication that the person is in danger of being subjected to torture" in that state,[52] but asylum seekers in the MPP program who have suffered prior harm have been sent to Mexico again and again (see following section). This presumption should apply in cases where the person "has been or would be a victim of violence, including gender-based or sexual violence, in public or in private, gender-based persecution or genital mutilation, amounting to torture, without the intervention of the competent authorities of the State concerned for the protection of the victim."[53]

- Finally, the principle of nonrefoulement also applies to returns to torture or other ill-treatment at the hands of nonstate actors "over which the receiving State has no or only partial de facto control, or whose acts it is unable to prevent or whose impunity it is unable to counter."[54] Criminal organizations in Mexico routinely operate with impunity.[55]

**Asylum Seekers in the MPP Program Who Have Already Suffered Harm Are Nevertheless Returned Again to Mexico**

Even when asylum seekers Human Rights Watch spoke to described persecution or torture in Tamaulipas to DHS officials in the nonrefoulement interview, they were still unable to prevail and were returned to Mexico.

**AR00897**

asylum seekers who described being kidnapped, physically harmed, or sexually assaulted – some on multiple occasions – based on one or more of the protected grounds and even with the involvement of Mexican government officials failed their nonrefoulement interviews and were sent again to the same cities in which they had been harmed.

- Julio L., who said he fled Honduras with his 11-year-old daughter when members of a militia working for local politicians beat, raped and murdered his sister and then brutally beat him almost to death, told Human Rights Watch he was kidnapped for 12 days with his daughter for ransom in Veracruz along with a group of migrants, including a cousin and a friend, both of whom were also traveling with their young daughters. He said they were targeted because they were migrants. "The girls were very upset," Julio said. "[The men who kidnapped them] would grab the girls, get really close to them. They would watch the girls while they showered." After Julio, his cousin, his friend, and their children were placed into the MPP program and sent to Matamoros, criminal operatives attempted to kidnap the group yet again, succeeding in kidnapping at least one parent-child pair. At his first immigration court hearing, he expressed a fear of return to Mexico and was given a nonrefoulement interview. Though interviews are required to be non-adversarial, Julio said the DHS official who performed the interview over the telephone was very aggressive in both his tone of voice and in the language he used, at one point ordering Julio to "stop being emotional." The nonrefoulement decision notice said he "did not establish a clear probability of persecution or torture in Mexico," and he and his daughter were sent back to Mexico."[56] "Everyone fails these interviews the same way," Julio said, remarking on what he has seen among other asylum seekers at the sprawling makeshift encampment where he and his daughter were living. "The same box is always checked." Julio and his daughter eventually won protection under the Convention Against Torture and now reside in the United States, meaning he successfully showed that it is more likely than not he will be tortured with government acquiescence if returned to Honduras.[57]

- Yohan P., who fled political persecution in Nicaragua with his wife, 2-year-old son, and 10-year-old daughter, told Human Rights Watch he and his family were kidnapped at gunpoint from the Nuevo Laredo bus terminal shortly after being sent there under the MPP program. They were held for 11 days along with several other asylum seekers. Throughout that time, criminal operatives continuously called Yohan "Nica" in reference to his nationality, a protected ground in US asylum law. When the family showed up for their first immigration court hearing, they expressed a fear of return to Mexico and were given a nonrefoulement interview. Even though the family presented a Mexican police report detailing the incident, evidence most asylum seekers lack because they are often too fearful of corruption among police in Mexico and retaliation to file reports, they were sent back to Nuevo Laredo because they "did not establish a clear probability of persecution or torture in Mexico," according to the explanation contained in the nonrefoulement decision notice.[58] The family is now in hiding, too afraid to approach the US border again and have since missed their US immigration court hearings.[59]

- An asylum seeker from Cuba who was placed in the MPP program and sent to Matamoros told the DHS official conducting her nonrefoulement interview that when she first arrived in Reynosa, she was kidnapped by a Mexican immigration official based on her status as a migrant, held in a room for 42 days and told she would be deported if she did not pay $3,500, according to notes taken by her attorney during the interview and turned over to Human Rights Watch. She told the official that in another incident in Reynosa, she was kidnapped and sexually assaulted by three men who pulled up in a van after she'd collected money from a wire transfer and pulled her inside in broad daylight. Afterward, they told her "not to report them to the police because they knew where I lived and they would find me," according to the attorney notes. The men threatened to kill her. When asked whether she thought the police could have helped her, the asylum seeker explained that the Mexican police are corrupt and that federal police officers had robbed her on a bus while she was traveling through Mexico on her way to the US-Mexico border. She affirmed that she had been harmed in Mexico after being identified as a Cuban migrant on account of both her race and nationality, both protected grounds under US asylum law. She was failed on her nonrefoulement interview and sent back to Mexico.[60]

- An asylum seeker traveling, who was traveling with her daughter after fleeing Honduras, told a DHS official during a nonrefoulement interview that in Tamaulipas she had suffered attempted rape by cartel members who verbally identified the woman as a migrant while they ripped off her clothes, and on another occasion was extortion by Mexican police officers who also identified her as a migrant, according to notes taken by her attorney during the interview and turned over to Human Rights Watch. They were failed on their nonrefoulement interview and sent back to Tamaulipas.[61]

- Eric M., who fled El Salvador with his 3-year-old son and pregnant partner, told a DHS official during a nonrefoulement interview that the family was kidnapped and that his partner suffered a miscarriage as the result of a physical assault targeted at her abdomen in Tamaulipas, according to notes taken by the family's attorney during the interview and given to Human Rights Watch. Members of a cartel kidnapped the family for ransom in Reynosa, beating Eric and threatening to kill their toddler and harvest his organs for sale if they did not come up with the money the cartel operatives were demanding. After they were placed in the MPP program and

returned to Matamoros, those cartel operatives threatened to kidnap the family again because they wanted more money, according to attorney notes from the interview. On two other occasions, Eric was assaulted and robbed, he told the DHS official. He explained they had been targeted for being asylum seekers because they "talk differently and do not wear shoelaces." CBP agents routinely take asylum seekers' shoelaces while they are in detention to prevent them from harming themselves. When CBP agents send asylum seekers in the MPP program to Mexico, they do not give them their shoelaces back. Five days before the nonrefoulement interview, some men assaulted the asylum seekers during a robbery, hitting Eric in the head with a pistol and punching his wife in her stomach even though Eric pleaded with the men to leave his pregnant partner alone, according to the notes. The men verbally identified the family as migrants. The family said that even though they reported two of the incidents to Mexican police officers, the officers failed to assist or protect them, and that, in another incident, police officers extorted them, threatening to turn them over to the cartel if they did not pay. Though they brought evidence to their nonrefoulement interview, including hospital documents they obtained after Eric's wife sought medical treatment for the miscarriage. The DHS official nonetheless failed Eric and his family on their nonrefoulement interview and sent them back to Tamaulipas.[62]

**DHS Knows or Should Know that Asylum Seekers Are at Risk of Serious Harm in Tamaulipas**

Human Rights Watch, other civil society organizations and the media have documented risks of violence to asylum seekers sent to Mexico under the MPP since the program began in Tijuana early 2019.[63] In July 2019, despite warnings from Human Rights Watch, other human rights defenders, and federal asylum officers, DHS expanded the MPP in the Texas Rio Grande Valley, returning vulnerable asylum seekers to cities in the Mexican state of Tamaulipas, which is on the US State Department's "do not travel" list.[64]

That State Department notice warns:

Criminal groups target public and private passenger buses as well as private automobiles traveling through Tamaulipas, often taking passengers hostage and demanding ransom payments. Heavily armed members of criminal groups often patrol areas of the state in marked and unmarked vehicles and operate with impunity particularly along the border region from Reynosa northwest to Nuevo Laredo.

Tamaulipas has long been known as a particularly dangerous place for migrants. It is one of two Mexican Gulf states where officials and human rights defenders have discovered more than 1,300 mass graves since 2007, including those of murdered migrants. There have also been multiple reports of bus kidnappings of migrants attempting to reach the US border.[65] For many years, kidnapping for ransom and human trafficking have been a main source of income for transnational criminal organizations operating in Tamaulipas.[66] A study released in June 2018 by the Robert Strauss Center for International Security and Law estimated that such groups can earn over $134 million annually from crimes against migrants and identified the state of Tamaulipas as having "the highest incidence of crime against migrants."[67]

In both November and January, the US Consulate issued security alerts warning US government employees in Nuevo Laredo to shelter in place and observe a curfew after a series of open gunfights and blockades of burning vehicles.[68]

In late December 2019, the ACLU and the Center for Gender and Refugee Studies wrote a letter to the Department of Homeland Security calling on DHS to immediately stop returning asylum seekers in MPP to Tamaulipas.[69] A May 2020 report by Human Rights First tracked more than 1,100 publicly reported abuses, including murder, rape, and kidnapping, a figure that includes many of the cases presented in this complaint.[70]

Instead, DHS has continued sending asylum seekers to Tamaulipas, even though the government was alerted to the life-threatening conditions there. Those sent to Tamaulipas have included people who ask for asylum anywhere in the Rio Grande Valley sector, including Reynosa, Mexico, and McAllen, Texas, and other cities.[71] In practice, this means CBP agents at times have gone out of their way to drive asylum seekers placed in the MPP program more than 150 miles to Laredo, Texas, where they are then expelled to Nuevo Laredo, one of the most dangerous cities in Mexico, despite the significant risk that asylum seekers in the MPP program will suffer abuse, persecution, or torture there.[72]

As of December 31, 2019, more than 28,000 asylum seekers had been expelled to Tamaulipas under the MPP program, according to the Mexican National Institute of Migration.[73]

Given the well-documented history of abuse of migrants in that region by both criminal organizations and Mexican law enforcement,[74] as well as longstanding US State Department warnings against travel to the state due to "crime and kidnapping," [75] the threats to asylum seekers sent to Tamaulipas are entirely foreseeable.

**Asylum Seekers' Consistent Accounts Suggest Routine Targeting on the Basis of Protected Grounds**

The UN Human Rights Committee, in its general comment on the prohibition against torture and other ill-treatment, stated that governments "must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to another country by way of their extradition, expulsion or refoulement."[76]

Yet, DHS continues to implement the MPP program even though it knows or should know that Central Americans and other migrants subjected to MPP face likely abuse in Mexico or persecution on account of their race, national origin, and particular social group. Asylum seekers in MPP are easily identifiable in Mexico and often appear foreign, speak with noticeable accents, or do not speak Spanish at all. [77] Additionally, CBP agents routinely expel asylum seekers in the MPP program to Mexico without shoelaces and with plastic folders containing their notice to appear in court and other important documents, making these asylum seekers even easier for criminal actors to immediately identify. Criminal organizations that routinely kidnap migrants operate on the assumption that the majority of asylum seekers placed in the MPP program have US family members who can be extorted for thousands of dollars. One asylum seeker reported that while he was kidnapped, one of his captors told him the cartel had been hiring new members to respond to the increased number of migrants sent to Mexico under MPP. "Since the United States is deporting so many through here, we are capturing them and that has meant more work," the captor told him. "We're saturated."[78]

Instead of safely pursuing their US asylum cases from within the United States, asylum seekers expelled by DHS to Tamaulipas have become commodities in a growing market exploiting vulnerable migrants and their US-based families and fueling the profits of transnational criminal organizations.[79]

A report by Doctors Without Borders (MSF) in early February 2020 corroborates Human Rights Watch's concern that migrants are frequently victimized in Tamaulipas. MSF found that nearly 80 percent of the 670 patients they treated in Nuevo Laredo, Tamaulipas from January to October 2019 had suffered from violence, including assault, sexual violence, torture, extortions, or threats, and in October 2019 the percentage of their new patients in Nuevo Laredo who had been kidnapped reached 75 percent (33 of 44 new patients). [80] According to monitoring of publicly reported cases of kidnapping and other abuse of asylum seekers in the MPP program by Human Rights First, there were 265 cases of children returned to Mexico who were kidnapped or nearly kidnapped as of May 13, 2020. It is ultimately impossible to know how many people are kidnapped at a given time or how many asylum seekers have been killed after their families failed to pay the ransom because asylum seekers are often afraid to report crimes to Mexican authorities, citing corruption and impunity.[81]

The accounts of kidnapping that Human Rights Watch documented repeatedly described having been kidnapped from bus terminals, while riding in taxis, or from in front of or within Mexican immigration offices near US ports of entry.[82] Their descriptions of events during their abductions were highly consistent:

Asylum seeker accounts related that kidnappers routinely made reference to the fact that asylum seekers were "migrants," "refugees," or "foreigners"; referred to asylum seekers by their country of origin; or asked asylum seekers where they were from prior to attack.[83] Armed cartel or other criminal operatives quickly confiscated cellphones, sometimes placing them in airplane mode, and transported asylum seekers to a stash house where they frequently saw other asylum seekers who had also been kidnapped. Asylum seekers reported being put through a standardized intake process – photos of each person were taken, identity and court documents inspected, and identifying information logged into a notebook.

Criminal organizations set an extortion amount and began looking through asylum seekers' phone contacts in search of a US-based number to call.[84] According to data collected by the Mexican National Institute of Migration through mid-June 2019, nearly 84 percent

of asylum seekers in the MPP program reported having family members in the United States.[85] Criminal organizations are aware of the familial ties asylum seekers have with US residents and seek to exploit them for profit by threatening to harm or kill their asylum-seeking relatives.[86]

According to attorney notes from a nonrefoulement interview, when a DHS official asked one asylum seeker from El Salvador traveling with his wife and young son how many times he was punched after having been kidnapped for ransom, he said, "Several times. Two times whenever I was on the phone [with] my mother-in-law asking about the money. They would hit me to make me scream and convince her to send the money."

The ransom amounts ranged from $2,000 to more than $20,000 per person.

**Mexican Government is Unable or Unwilling to Provide Protection as Required by DHS Policy**

The MPP program policy guidance claims that "the Government of Mexico will afford such individuals all legal and procedural protection[s] provided for under applicable domestic and international law. That includes applicable international human rights law and obligations as a party to the 1951 Convention relating to the Status of Refugees (and its 1967 Protocol) and the Convention Against Torture."[87]

Mexican government officials, including police and immigration officers, have been implicated in some reports of persecution or torture against asylum seekers in the MPP program, while in others, officials did nothing to prevent harm to asylum seekers.[88]

DHS has not made any meaningful efforts to monitor the conditions for asylum seekers in Tamaulipas.

Contrary to Acting CBP Commissioner Mark Morgan's October 2019 statements in a press briefing defending the MPP program,[89] most shelters that Human Rights Watch researchers visited do not have security guards and are not capable of ensuring asylum seekers expelled to Mexico under the MPP program remain safe. Shelters where asylum seekers are known to stay have been targeted by criminal organizations, which had been reported in the media prior to Morgan's misleading statement.[90]

For example, on August 3, 2019, kidnappers showed up at a migrant shelter in Nuevo Laredo, but when Pastor Aaron Méndez refused to let them take any asylum seekers, they took Méndez instead, along with Alfredo Castillo, who also worked at the shelter.[91] Both men remain missing, and the United Nations High Commissioner for Human Rights and the Inter-American Commission on Human Rights have since called on the Mexican government to intensify efforts to find and protect both men.[92]

Asylum seekers have also reported being targeted directly outside of shelters.[93] Expecting asylum seekers to never leave shelters, as Morgan suggested, is unreasonable considering the fact that they are ordered by DHS to show up to US ports of entry as early as 3 a.m. multiple times to appear for their immigration court hearings.[94] They must also leave to purchase personal hygiene products, to work, or for other necessary reasons.

Morgan continued to defend the MPP program in a February 2020 press briefing, where he claimed that when visiting migrant shelters in Mexico, he had not heard the kinds of reports of violence to asylum seekers in the program that so many journalists and nongovernmental organizations have reported on.[95]

"When Morgan visited El Paso, I ran into his staffers at one of the shelters by accident," immigration attorney Taylor Levy responded on Twitter. "I took them aside and told them I had represented a woman the day before who was kidnapped *outside of that very shelter.* They told me (per my memory), 'That's what everyone has been telling us.'" She said Morgan's staff looked "truly impacted."[96] She said she warned them that asylum seekers had been kidnapped from within the shelter and that "masked men had entered the unsecured compound on multiple occasions screaming while riding in the backs of pick-up trucks with semi-automatic rifles, as a scare tactic. They heard all of this."[97]

Almost none of the asylum seekers interviewed for this complaint reported crimes against them to the police in Mexico. Not only have some asylum seekers been persecuted by Mexican police or immigration authorities, but the high level of impunity in Mexico often deters asylum seekers from risking their safety knowing they are not likely to receive protection.[98]

Asylum seekers continue to face a severe shortage of shelter space in cities in Tamaulipas. Many asylum seekers have extremely limited financial means and often have no ability to pay for shelter, food, water, or other necessities. This further increases their vulnerability to criminal organizations aiming to exploit them.

In Matamoros, thousands of asylum seekers in the MPP have been forced to live in a makeshift refugee camp with little to no support from the Mexican government. What little access asylum seekers have there to potable water, medical care, showers or bathrooms has mainly been provided by volunteers and is insufficient. Asylum seekers have had to bathe and wash clothes in the nearby Rio Grande, causing irritated skin rashes, and have had to defecate on the open ground in close proximity to where they sleep. Medical professionals volunteering in the camp told Human Rights Watch they have documented outbreaks of chickenpox, parasites such as lice and intestinal worms, as well as respiratory and gastrointestinal problems. Asylum seekers forced to wait in Tamaulipas also often suffer from anxiety, post-traumatic stress disorder, and depression.[99]

Encampments are also unsafe. Asylum seekers told Human Rights Watch that cartel members are constantly surveilling them. Many parents live in constant fear that their children will be raped, kidnapped, or otherwise harmed.

- Hugo O., an asylum seeker living in the makeshift camp in Matamoros who fled Honduras with his 15-year-old daughter after members of a gang tried to forcibly recruit her, said he is constantly afraid his daughter will be kidnapped or raped in the camp. When we talked to him, he was thinking about sending his daughter across alone and had written a letter to US immigration officials. It read:

My daughter is desperate. I am trying to be strong so that she does not see that I'm afraid. But inside I am destroyed by what is happening. We live in a little tent here near the repatriation place in Matamoros, but that does not matter. The sad thing is the fear that we experience because of the threats. My daughter is traumatized. We cannot leave here. They say they [the cartel] control everything. Please help us.[100]

- A young woman returned to a crowded refugee area in Tamaulipas under the MPP fled the threat of death in Central America with her toddler. Her child needed to go to the bathroom in the middle of the night, but there were no facilities available, so she took the toddler to some nearby shrubs. Three men subsequently accosted them, forced them into a vehicle, and violently raped the young woman in front of her child. The following day, when Human Rights Watch researchers met the young asylum seeker, she was still suffering from injuries caused by the abuse and had to return to the hospital.[101]

The Matamoros camp is situated directly next to the port of entry and along the Rio Grande partly because asylum seekers are afraid to seek shelter in the interior of the city and partly because if it were located elsewhere, asylum seekers would no longer have access to the few US attorneys and volunteers serving asylum seekers in the camp.

**During Pandemic, Asylum Seekers in the MPP Face a Prolonged Wait in Danger**

All of the dangers described above, as well as the heightened risk of infection in crowded, unsanitary settings, have increased asylum seekers' vulnerability in the MPP program. Currently, MPP hearings have been delayed until June 19, 2020,[102] due to the pandemic and could be further delayed. Asylum seekers are now therefore forced to wait even longer than previously for their day in court.

Many of those waiting for their US immigration court hearings are homeless in Mexico and have little access to health care. For example, Human Rights Watch found that in Matamoros, Mexico, just across from a US port of entry, about 2,500 asylum seekers live back-to-back in tents holding up to five people each with only a handful of outdoor showers and portable restrooms that have at times overflowed with human waste.

Health workers have said that an outbreak of COVID-19 in camps and shelters is inevitable, meaning asylum seekers face a real risk of life-threatening disease.[103]

**Conclusion**

In its implementation of the MPP in the Mexican state of Tamaulipas, DHS is knowingly and willingly returning asylum seekers to harm, as well as violating US asylum law, international human rights law, and its own policies associated with the program.

**AR00902**

Despite the significant risk that asylum seekers will face persecution or torture in Tamaulipas, the nonrefoulement screening process implemented by DHS has proven ineffective at protecting against these harms, and, even when applied, is implemented incorrectly or not at all.

DHS should end the MPP program, or at a minimum, DHS should immediately cease sending asylum seekers to Tamaulipas State.

Asylum seekers in the MPP program should be paroled into the United States and allowed to continue their immigration court proceedings in communities where they have existing networks of support. To achieve this, the US government should ensure those who have been subjected to the MPP program are given a change of venue to the immigration court nearest to their destination.

Asylum seekers who have been sent to Mexico under the MPP program and who have been issued orders *in absentia* should be given the opportunity to reopen their cases, and DHS should be required to properly notify such persons, as well as facilitate transportation and entry into the United States.

So long as MPP is in place, DHS should not apply the onerous "more likely than not" standard during nonrefoulement interviews, and asylum seekers should have access to an attorney before and during such interviews across the border. Those interviews should be conducted for all asylum seekers DHS intends to place in the MPP program, rather than requiring asylum seekers to affirmatively express fear of Mexico.

CBP agents should not perform any nonrefoulement interviews. Fear of return assessments should only be conducted by properly trained asylum officers.

We look forward to learning what action you have taken in regard to this matter. Thank you for your time and attention.

Sincerely,

Nicole Austin-Hillery

[1] Human Rights Watch, *"We Can't Help You Here": US Returns of Asylum Seekers to Mexico*, July 2, 2019, https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico; Human Rights Watch, *US Move Puts More Asylum Seekers at Risk*, September 25, 2019, https://www.hrw.org/news/2019/09/25/us-move-puts-more-asylum-seekers-risk#; Human Rights Watch, *Mexico: Risks at Border for Those With Disabilities*, October 29, 2019, https://www.hrw.org/news/2019/10/29/mexico-risks-border-those-disabilities; Human Rights Watch, *US: 'Remain in Mexico' Program Harming Children*, February 12, 2020, https://www.hrw.org/news/2020/02/12/us-remain-mexico-program-harming-children.

[2] Mikael Wolfe, "Mexico has some of the best water laws around. So why are its rivers so contaminated?" April 26, 2018, https://www.washingtonpost.com/news/made-by-history/wp/2018/04/26/mexico-has-some-of-the-best-water-laws-around-so-why-are-its-rivers-so-contaminated/ (accessed May 28, 2020).

[3] Centers for Disease Control and Prevention, "How to Protect Yourself and Others," April 24, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (accessed May 28, 2020.; World Health Organization, "Water, sanitation, hygiene, and waste management for the COVID-19 virus: interim guidance," April 23, 2020, https://www.who.int/publications-detail/water-sanitation-hygiene-and-waste-management-for-covid-19 (accessed May 28, 2020).; United Nations Human Rights Office of the High Commissioner, "COVID-19 will not be stopped without providing safe water to people living in vulnerability – UN experts," News Release, March 23, 2020, https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=25738&LangID=E (accessed May 28, 2020).

Case 2:21-cv-00067-Z    Document 162-2    Filed 09/02/22    Page 172 of 548    PageID 5115

[4] Human Rights Watch, Q&A: *Trump's Remain in Mexico Program*, January 29, 2020, https://www.hrw.org/news/2020/01/29/qa-trump-administrations-remain-mexico-program

[5] *Innovation Law Lab v. Wolf*, No. 19-15716 (9th Cir. February 28, 2020), op. at 7, available at https://cdn.ca9.uscourts.gov/datastore/opinions/2020/02/28/19-15716.pdf (viewed March 16, 2020).

[6] *Wolf v. Innovation Law Lab*, Order in Pending Case, No. 19A960 (U.S. March 11, 2020), available at https://www.supremecourt.gov/orders/courtorders/031120zr_19m2.pdf (viewed March 16, 2020).

[7] *Innovation Law Lab v. Wolf*, No. 19-15716, op. at 49.

[8] US Department of Homeland Security, "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration," press release, December 20, 2018, https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration (viewed March 16, 2020).

[9] Convention Relating to the Status of Refugees, 189 U.N.T.S. 150, *entered into force* April 22, 1954, article 33.

[10] Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), *entered into force* June 26, 1987, article 3(1). The US ratified the convention in 1994. The convention defines

torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." Ibid., art. 1. The UN Committee against Torture, which provides authoritative guidance on states' obligations under the Convention against Torture, has determined that "'substantial grounds' exist whenever the risk of torture is 'foreseeable, personal, present and real.'" Committee against Torture, General Comment No. 4, U.N. Doc. CAT/C/GC/4 (September 4, 2018), para. 11.

[12] 8 U.S.C. §§ 1101(a)(42)(A), 1158.

[13] 8 C.F.R. §§ 208.16-208.18.

[14] 8 C.F.R §§ 208.30; 8 C.F.R 1208.31

[15] Memorandum from US Department of Homeland Security to US Citizenship and Immigration Services, "MPP Guiding Principles," January 28, 2019, https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/MPP%20Guiding%20Principles%201-28-19.pdf (accessed February 17, 2019); Letter from Human Rights First to https://www.humanrightsfirst.org/sites/default/files/OIG-CRCL-Complaint-MPP.pdf (accessed February 20, 2020).

[16] *Doe v. Wolf*, Order Granting Motion for Classwide Preliminary Injunction, No. 19-cv-2119-DMS (S.D. Cal. January 14, 2020), https://www.aclusandiego.org/wp-content/uploads/2020/01/ORDER-GRANTING-MOTION-FOR-CLASSWIDE-PRELIMINARY-INJUNCTION.pdf (viewed March 16, 2020).

[17] Ibid., op. at 16.

[18] Ibid.

[19] Dara Lind, "Exclusive: Civil Servants Say They're Being Used as Pawns in a Dangerous Asylum Program," Vox, May 2, 2019, https://www.vox.com/2019/5/2/18522386/asylum-trump-mpp-remain-mexico-lawsuit (accessed February 20, 2020); Debbie Nathan, "An Asylum Officer Speaks Out Against the Trump Administration's 'Supervillian' Attacks On Immigrants," *Intercept*, September 13, 2019, https://theintercept.com/2019/09/13/asylum-interview-immigration-trump/ (accessed February 20, 2020).

**AR00904**

[20] Congressional Record – Senate, September 27, 1996, Asylum and Summary Exclusion Provisions, https://www.govinfo.gov/content/pkg/CREC-1996-09-27/pdf/CREC-1996-09-27-pt1-PgS11491-2.pdf (accessed February 20, 2020).

[21] Debbie Nathan, "An Asylum Officer Speaks Out Against the Trump Administration's 'Supervillian' Attacks On Immigrants," *Intercept*, September 13, 2019, https://theintercept.com/2019/09/13/asylum-interview-immigration-trump/ (accessed February 20, 2020).

[22] Memorandum from US Department of Homeland Security to US Citizenship and Immigration Services, "MPP Guiding Principles," January 28, 2019, https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/MPP%20Guiding%20Principles%201-28-19.pdf (accessed February 17, 2019); Dara Lind, "Exclusive: Civil Servants Say They're Being Used as Pawns in a Dangerous Asylum Program," Vox, May 2, 2019, https://www.vox.com/2019/5/2/18522386/asylum-trump-mpp-remain-mexico-lawsuit (accessed February 20, 2020).

[23] Dara Lind, "Exclusive: Civil Servants Say They're Being Used as Pawns in a Dangerous Asylum Program," *Vox*, May 2, 2019, https://www.vox.com/2019/5/2/18522386/asylum-trump-mpp-remain-m (accessed June 24, 2019).

[24] Human Rights Watch interviews with asylum seekers (names withheld), Monterrey, Mexico, December 9-13, 2019. When Human Rights Watch asked asylum seekers in Monterrey whether they'd requested or been given an interview to discuss potential fear of return to or harms in Mexico, they consistently responded with confusion, and many followed up with questions about the purpose of such interviews and how they could be accessed.

[25] US Department of Homeland Security, "Assessment of the Migrant Protection Protocols (MPP)," October 28, 2019, https://www.dhs.gov/sites/default/files/publications/assessment_of_the_migrant_protection_protocols_mpp.pdf (accessed February 21, 2020).

[26] Ibid.

[27] Dara Lind, "Exclusive: Civil Servants Say They're Being Used as Pawns in a Dangerous Asylum Program," *Vox*, May 2, 2019, https://www.vox.com/2019/5/2/18522386/asylum-trump-mpp-remain-mexico-lawsuit(accessed June 5, 2019).

[28] Human Rights Watch, *In the Freezer: Abusive Conditions for Women and Children in US Immigration Holding Cells*, February 28, 2018, https://www.hrw.org/report/2018/02/28/freezer/abusive-conditions-women-and-children-us-immigration-holding-cells

[29] US Department of Homeland Security, "Assessment of the Migrant Protection Protocols (MPP)," October 28, 2019, available at https://www.dhs.gov/sites/default/files/publications/assessment_of_the_migrant_protection_protocols_mpp.pdf

[30] Transcript of press briefing, Acting Customs and Border Protection Commissioner Mark Morgan, Washington D.C., November 14, 2019, https://www.whitehouse.gov/briefings-statements/press-briefing-acting-cbp-commissioner-mark-morgan-2/ (accessed February 21, 2020).

[31] Human Rights Watch interview with Nina V. (name withheld), Matamoros, Mexico, November 8, 2019.

[32] Sworn declaration by Daniel G., (name withheld), taken by Jennifer Harbury, Monterrey, Mexico, August 4, 2019 (on file with Human Rights Watch).

[33] Attorney notes from nonrefoulement interview (names and date withheld), Laredo, Texas, (on file with Human Rights Watch).

[34] Human Rights Watch, *US: Mexican Asylum Seekers Ordered to Wait*, December 23, 2019, https://www.hrw.org/news/2019/12/23/us-mexican-asylum-seekers-ordered-wait.

[35] Sworn declaration by Yago R., (name withheld), taken by Jennifer Harbury, Monterrey, Mexico, August 4, 2019, (on file with Human Rights Watch).

[36] *Constanza Lemus et al v. Wolf et al. US District Court*, No. 20-cv-10009 (D. Mass. filed January 3, 2020), available at https://www.aclum.org/sites/default/files/field_documents/1_complaint.pdf.

[37] Phillip Marcelo, "Guatemalan family seeking asylum reunited after suing feds," *Associated Press*, February 7, 2020, https://www.milforddailynews.com/news/20200207/guatemalan-family-seeking-asylum-reunited-after-suing-feds (accessed February 21, 2020).

[38] Mallory Falk, "Asylum Seekers In Mexico Worry About Waiting Longer In Dangerous Conditions Due To COVID-19," *KERA News*, April 28, 2020, https://www.keranews.org/post/asylum-seekers-mexico-worry-about-waiting-longer-dangerous-conditions-due-covid-19 (accessed May 27, 2020).

[39] Human Rights Watch interview with Fabiola B., (name withheld), Reynosa, Mexico, November 6, 2019.

[40] Human Rights Watch interview with Walter P., (name withheld), San Luis Potosi, Mexico, January 17, 2020.

[41] Memorandum from US Department of Homeland Security to US Citizenship and Immigration Services, "MPP Guiding Principles," January 28, 2019, https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/MPP%20Guiding%20Principles%201-28-19.pdf (accessed June 10, 2019).

[42] Dara Lind, "Exclusive: Civil Servants Say They're Being Used as Pawns in a Dangerous Asylum Program," *Vox*, May 2, 2019, https://www.vox.com/2019/5/2/18522386/asylum-trump-mpp-remain-mexico-lawsuit(accessed June 5, 2019).

[43] Brief of Amicus Curiae Local 1924, pp. 21-22, *Innovation Law Lab v. McAleenan*, No. 19-15716 (9th Cir. June 26, 2019).

[44] Ibid. p. 21.

[45] Ibid. pp. 18-20.

[46] Ibid.

[47] UN Committee against Torture, General Comment No. 4, U.N. Doc. CAT/C/GC/4 (September 4, 2018), para. 13.

[48] Ibid.

[49] Ibid. para. 18(b).

[50] Ibid. para. 18(c).

[51] Ibid. para. 14.

[52] Ibid. para. 28.

[53] Ibid. para. 29(c).

[54] Ibid. para. 30.

[55] "Level 4: Do Not Travel" advisory for the state of Tamaulipas warning that "Organized crime activity – including gun battles, murder, armed robbery, carjacking, kidnapping, forced disappearances, extortion, and sexual assault – is common along the northern border," that criminal groups "operate with impunity particularly along the border region from Reynosa northwest to Nuevo Laredo," and that "local law enforcement has limited capability to respond to crime incidents," US Department of State, Mexico Travel Advisory, December 17, 2019, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html (accessed February 17, 2020).

[56] Nonrefoulement interview decision notice reviewed by Human Rights Watch, Matamoros, Mexico, November 6, 2019.

[57] Human Rights Watch interview with Julio L., (name withheld), Matamoros, Mexico, November 6, 2019.

[58] Nonrefoulement interview decision notice reviewed by Human Rights Watch, Monterrey, Mexico, December 11, 2019.

AR00906

[59] Human Rights Watch interview with Yohan F., (name withheld), Monterrey, Mexico, December 11, 2019.

[60] Attorney notes from nonrefoulement interview, (name withheld), on file with Human Rights Watch, Brownsville, Texas, December 16, 2019.

[61] Attorney notes from nonrefoulement interview, (names withheld), on file with Human Rights Watch, Brownsville, Texas.

[62] Attorney notes from nonrefoulement interview, (names withheld), on file with Human Rights Watch, Brownsville, Texas, December 11, 2019.

[63] Human Rights Watch, *"We Can't Help You Here" US Returns of Asylum Seekers to Mexico*, July 2, 2019, https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico; Human Rights Watch, *US Move Puts More Asylum Seekers at Risk*, September 25, 2019, https://www.hrw.org/news/2019/09/25/us-move-puts-more-asylum-seekers-risk#; Human Rights Watch, *US: 'Remain in Mexico' Program Harming Children*, February 12, 2020, https://www.hrw.org/news/2020/02/12/us-remain-mexico-program-harming-children.

[64] Human Rights Watch, *"We Can't Help You Here" US Returns of Asylum Seekers to Mexico*, July 2, 2019, https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico. ; Letter from Center for Gender and Refugee Studies and the American Civil Liberties Union to Acting Secretary of Homeland Security Chad F. Wolf, et al., December 9, 2019, https://www.aclu.org/other/re-implementation-migrant-protection-protocols-mpp-tamaulipas-state (accessed February 20, 2020);

Letter from Human Rights First to https://www.humanrightsfirst.org/sites/default/files/OIG-CRCL-Complaint-MPP.pdf (accessed February 20, 2020); Innovation Law Lab v. Nielsen, US District Court, Northern District of California, Case No. 19-00807, order granting preliminary injunction, April 8, 2019; Innovation Law Lab v. Nielsen, US Court of Appeals for the Ninth Circuit, Case No. 19-15716, stay order, May 7, 2019.

[65] Nick Miroff, "Migrant Caravan: One Reason Central Americans Are Going All the Way to Tijuana to Reach the U.S. Border? El Chapo," *Washington Post*, November 15, 2018, https://www.washingtonpost.com/world/2018/10/24/migrant-caravan-updates/?utm_term=.dda236d09ed6 (accessed on June 24, 2019); "At Least 4,000 Migrant on Way to US Have Died of Gone Missing in Last Four Years," *Associated Press*, December 5, 2018, https://www.nbcnews.com/news/latino/least-4-000-migrants-way-u-s-have-died-or-n944046 (accessed June 17, 2019); Kate Linthicum, "Mexico Launching Search for Migrants Pulled Off Bus by Gunmen Near the US Border," *Los Angeles Times*, March 13, 2019, https://www.latimes.com/world/la-fg-mexico-missing-migrants-20190313-story.html (accessed June 17, 2019).

[66] Arthur Brice, "Human Trafficking Second Only to Drugs in Mexico," *CNN*, August 27, 2010, https://edition.cnn.com/2010/WORLD/americas/08/26/mexico.human.trafficking/index.html (accessed February 20, 2020); Ioan Grillo, "The Mexico Drug Cartels' Other Business: Sex Trafficking," *Time*, July 31, 2013, https://world.time.com/2013/07/31/the-mexican-drug-cartels-other-business-sex-trafficking/ (accessed February 20, 2020).

[67] Stephanie Leutert, "Organized Crime and Central American Migration in Mexico," Robert Strauss Center for International Security and Law, June 2018, http://strausscenter.org/images/pdf/MSI/MSI-2017-2018_PoliciaPRP.pdf (accessed February 20, 2020).

[68] Tweet posted by US Consulate General Nuevo Laredo, Twitter, November 16, 2019, https://twitter.com/USAConNVL/status/1195785512176386048?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1195785514822991872&ref_url=https%3A%2F%2Fwww.borderreport.com%2Fhtopics%2Fborder-crime%2Famericans-warned-against-traveling-to-nuevo-laredo-curfew-imposed-on-us-government-employees%2F (accessed February 20, 2020); US Consulate General Nuevo Laredo, Security Alert Update, January 2, 2020, https://mx.usembassy.gov/security-alert-update-u-s-consulate-general-nuevo-laredo-january-2-2020/ (accessed February 20, 2020); López Dóriga Digital, "En Nuevo Laredo, Tamaulipas, civiles armados incendiaron varios vehículos para crear bloqueos en distintos puntos de la localidad (In Nuevo Laredo, Tamaulipas, armed civilians light various vehicles on fire to create blockades at different points in the city)," November 15, 2019, https://lopezdoriga.com/nacional/disparos-y-quema-de-vehiculos-en-nuevo-laredo-tras-enfrentamientos/ (accessed February 20, 2020).

Case 2:21-cv-00067-Z    Document 162-2    Filed 09/02/22    Page 176 of 548    PageID 5119

[69] Center for Gender and Refugee Studies and the American Civil Liberties Union to Acting Secretary of Homeland Security Chad F. Wolf, et al., December 9, 2019, https://www.aclu.org/other/re-implementation-migrant-protection-protocols-mpp-tamaulipas-state (accessed February 20, 2020).

[70] Human Rights First, "Delivered to Danger," May 13, 2020, https://www.humanrightsfirst.org/campaign/remain-mexico (accessed May 27, 2020).

[71] Human Rights Watch interviews with asylum seekers, (names withheld), Matamoros and Reynosa, Mexico, November 4-8, 2019, and Monterrey, Mexico, December 9-13, 2019.

[72] Ibid.

[73] Estados Unidos Mexicanos Secretaría de Gobernación, Instituto Nacional de Migracion, MPP totals at all ports of entry, (Copy on file with Human Rights Watch), Dec 31, 2019.

[74] Asylum seekers sometimes choose to take a longer route more than twice as long to the US-Mexico border, crossing near Tijuana in part so that they can avoid cartels that prey upon migrants as a means to make money ever since El Chapo and the Sinaloa Cartel dominated the drug trafficking industry in the west, forcing other cartels to diversify into other illegal activities such as kidnapping and extortion, human trafficking and smuggling, Nick Miroff, "Migrant Caravan: One Reason Central Americans Are Going All The Way to Tijuana to Reach the U.S. Border? El Chapo," Washington Post, November 15, 2018, (accessed on February 17, 2020) https://www.washingtonpost.com/world/2018/10/24/migrant-caravan-updates/?arc404=true; "At Least 4,000 Migrant on Way to US Have Died of Gone Missing in Last Four Years," Associated Press, December 5, 2018, (accessed February 17, 2020) Drug trafficking and gang violence have led to migrant deaths in Mexico as they travel northward, especially in the state of Tamaulipas, https://www.nbcnews.com/news/latino/least-4-000- migrants-way-u-s-have-died-or-n944046; In February 2019, 25 migrants were pulled off a bus in Tamaulipas state, and their whereabouts remain unknown, Kate Linthicum, "Mexico Launching Search for Migrants Pulled Off Bus by Gunmen Near the US Border," Los Angeles Times, March 13, 2019, (accessed February 17, 2020) https://www.latimes.com/world/la-fg-mexico-missing-migrants-20190313-story.html?; declassified documents show Mexican police helped kidnap and massacre hundreds of migrants, most of whom were Central Americans en route to the United States, in a Tamaulipas city and further show how cartels control police in parts of Mexico, Michael Evans, "Mexico: Los Zetas Drug Cartel Linked San Fernando Police to Migrant Massacres," The National Security Archive, December 22, 2014, (accessed February 17, 2020) https://nsarchive2.gwu.edu/NSAEBB/NSAEBB499/; Mexican police helped the Zetas Cartel in the "intercepting of" migrants, after which the migrants were forced to work as drug mules or killed – in three massacres, at least 314 migrants were killed, Associated Press, "Mexican Police Helped Cartel Massacre 193 Migrants, Documents Show," NPR, December 22, 2014, (accessed February 17, 2020) https://www.npr.org/2014/12/22/372579429/mexican-police-helped-cartel-massacre-193-migrants-documents-show; on March 7, masked gunmen kidnapped 19 migrants from a bus along a northern highway in Tamaulipas, Catherine E. Shoichet, "Investigators are Scrambling to Solve a Mystery Just Miles from the US-Mexico Border" CNN, March 16, 2019, (accessed February 17, 2020) https://edition.cnn.com/2019/03/16/americas/mexico-bus-migrants-missing/index.html; Debbie Nathan, "Trump's 'Remain in Mexico' Policy Exposes Migrants to Rape, and Murder in Dangerous Border Cities," The Intercept, July 14, 2019, (accessed February 20, 2020) https://theintercept.com/2019/07/14/trump-remain-inmexico-policy/; report documenting harms to asylum seekers, including those in the state of Tamaulipas, Human Rights First, "Trump Administration Delivers Asylum Seekers to Grave Danger in Mexico: 200+ publicly reported cases of rape, kidnapping, and assault just the tip of the iceberg," September 17, 2019, https://www.humanrightsfirst.org/resource/trump-administration-delivers-asylum-seekers-grave-danger-mexico-200-publicly-reported (accessed February 20, 2020); Asylum seekers face rape, kidnap, and assault in Tamaulipas and other parts of Mexico, Human Rights First, Complaint letter to the Office of the Inspector General, August 26, 2019, https://www.humanrightsfirst.org/resource/complaint-office-inspector-general-concerning-rape-kidnapping-assault-and-other-attacks (accessed February 20, 2020); Mexican authorities rescued 34 Central Americans migrants being held captive in Tamaulipas while continuing to search for two other large groups who were kidnapped in a bus while traveling there, Kristy V. Siegfried, The Refugee Brief, UNHCR, March 14, 2019, https://www.unhcr.org/refugeebrief/the-refugee-brief-14-march-2019/ (accessed February 20, 2020).

[75] "Level 4: Do Not Travel" advisory for the state of Tamaulipas warning that "Organized crime activity – including gun battles, murder, armed robbery, carjacking, kidnapping, forced disappearances, extortion, and sexual assault – is common along the northern border," that criminal groups "operate with impunity particularly along the border region from Reynosa northwest to Nuevo Laredo," and that "local law enforcement has limited capability to respond to crime incidents," US Department of State, Mexico Travel Advisory, December 17, 2019, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html (accessed February 17, 2020);

AR00908

Tamaulipas has the most disappeared people at 5,657, U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, "Country Reports on Human Rights Practices – 2017, Mexico," https://www.state.gov/reports/2017-country-reports-on-human-rights-practices/mexico/ (accessed February 20, 2020); "Level 4: Do Not Travel" advisory for the state of Tamaulipas "due to crime and kidnapping," "[v]iolent crime, such as murder, armed robbery, carjacking, kidnapping, extortion, and sexual assault, is common," and warning that "[f]ederal and state security forces have limited capability to respond to violence in many parts of the state," Overseas Security Advisory Council, US Department of State Mexico Travel Advisory, April 10, 2019, https://www.osac.gov/Country/Mexico/Content/Detail/Report/bf2179c1-3f43-48c5-87fe-15f4aec6836d (accessed February 20, 2020); see also similar travel advisories from November 16, 2018, https://www.osac.gov/Country/Mexico/Content/Detail/Report/31f43935-a417-4854-b88f-15f4ad0fc3b6, and September 10, 2018, https://www.osac.gov/Country/Mexico/Content/Detail/Report/851120dd-8981-44de-a490-15f4ae86ad18 (accessed February 20, 2020).

[76] UN Human Rights Committee, General Comment No. 20, Article 7 (Forty-fourth session, 1992), Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI/GEN/1/Rev.1 at 30 (1994).

[77] Jennifer Medina, "Anyone Speak K'iche' or Mam? Immigration Courts Overwhelmed by Indigenous Languages," *New York Times*, March 19, 2019, https://www.nytimes.com/2019/03/19/us/translators-border-wall-immigration.html (accessed February 21, 2020); Camilo Montoya-Galvez, "U.S. to require Brazilian asylum-seekers to wait in Mexico for court hearings," *CBS News*, January 29, 2020, https://www.cbsnews.com/news/remain-in-mexico-expansion-us-to-require-brazilian-asylum-seekers-to-wait-in-mexico-for-hearings/

[78] Maria Verza, "In Nuevo Laredo and elsewhere, many migrants are stuck in Tamaulipas' lawless limbo," Associated Press, November 18, 2019, https://www.post-gazette.com/news/world/2019/11/17/Nuevo-Laredo-Mexico-migrants-border-US/stories/201911170222 (accessed February 20, 2020).

[79] Maria Verza, "Migrants Stuck in Lawless Limbo Within Sight of America," Associated Press, November 17, 2019, https://abcnews.go.com/International/wireStory/migrants-stuck-lawless-limbo-sight-america-67091445 (accessed February 21, 2020).

[80] Doctors Without Borders (MSF), "No Way Out: The Humanitarian Crisis for Migrants and Asylum Seekers Trapped Between the United States, Mexico and the Northern Triangle of Central America," February 2020, https://www.msf.org/report-no-way-out-central-american-migration (accessed February 20, 2020). MSF found that eight out of every 10 people (80%) they treated in Nuevo Laredo during the first nine months of 2019 reported being a victim of violence. About 44% of patients said they had experienced violence in the seven days prior to their consultation; 19% of the people seen by the MSF mental health program in Nuevo Laredo between January and September 2019 had been victims of kidnapping, and 63% of those said they had been abducted in the seven days prior to the consultation. In September 2019, out of 41 patients in Nuevo Laredo who were returned to Mexico by the US under the Migrant Protection Protocols (MPP), 18 had been kidnapped recently (44%) and an additional five patients (12%) had been the victim of an attempted kidnapping. In October, the percentage of kidnappings among those sent to Mexico under the MPP program increased to 75% (33 of the 44 new MSF patients). Doctors Without Borders email message to Human Rights Watch, March 11, 2020.

[81] UN Commission on Human Rights, Report of the Special Rapporteur on the Situation of Human Rights Defenders, Michel Forst, Mission to Mexico, February 12, 2018, https://www.ohchr.org/_layouts/15/WopiFrame.aspx?sourcedoc=/Documents/Issues/Defenders/A_HRC_37_51_Add%202.docx&action=default&DefaultItemOpen=1 (accessed February 21, 2020).

[82] Human Rights Watch interviews with asylum seekers, (names withheld), Matamoros and Reynosa, Mexico, November 4-8, 2019, and Monterrey, Mexico, December 9-13, 2019; Sworn declarations by Daniel G., Yago R., and Enrique H., (names withheld), taken by Jennifer Harbury, Monterrey, Mexico, August 4, 2019 (on file with Human Rights Watch); Attorney notes from nonrefoulement interview, (names withheld), on file with Human Rights Watch, Laredo and Brownsville, Texas.

[83] Human Rights Watch interviews with asylum seekers, (names withheld), Matamoros and Reynosa, Mexico, November 4-8, 2019, and Monterrey, Mexico, December 9-13, 2019; sworn declarations by Daniel G., Yago R., and Enrique H., (names withheld), taken by Jennifer Harbury, Monterrey, Mexico, August 4, 2019 (on file with Human Rights Watch); attorney notes from nonrefoulement interview, (names withheld), on file with Human Rights Watch, Laredo and Brownsville, Texas.

[84] Human Rights Watch interviews with asylum seekers, (names withheld), Matamoros and Reynosa, Mexico, November 4-8, 2019, and Monterrey, Mexico, December 9-13, 2019.

**AR00909**

[85] Estados Unidos Mexicanos Secretaría de Gobernación, Instituto Nacional de Migración, MPP Program–Chihuahua, June 18, 2019, and MPP Program–Tijuana and Mexicali, June 13, 2019, (copies on file with Human Rights Watch).

[86] Maria Verza, "In Nuevo Laredo and elsewhere, many migrants are stuck in Tamaulipas' lawless limbo," Associated Press, November 18, 2019, https://www.post-gazette.com/news/world/2019/11/17/Nuevo-Laredo-Mexico-migrants-border-US/stories/201911170222 (accessed February 20, 2020).

[87] Memorandum from Kirstjen Nielsen, secretary, Department of Homeland Security, to L. Francis Cissna, director, US Citizenship and Immigration Services, Kevin McAleenan, commissioner, US Customs and Border Protection, Ronald Vitiello, deputy director and senior official performing the duties of director, US Immigration and Customs Enforcement, January 25, 2019, https://www.dhs.gov/sites/default/files/publications/19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf (accessed February 21, 2020).

[88] Human Rights Watch interviews (names withheld), Monterrey and Matamoros, Mexico, November 5-8 and December 9-13, 2019; Sworn declarations, taken by Jennifer Harbury, on file with Human Rights Watch, Monterrey, Mexico, August 4, 2019; Attorney notes from nonrefoulement interview, (names withheld), on file with Human Rights Watch, Laredo and Brownsville, Texas.

[89] Transcript of press briefing, Acting Customs and Border Protection Commissioner Mark Morgan, Washington D.C., November 14, 2019, https://www.whitehouse.gov/briefings-statements/press-briefing-acting-cbp-commissioner-mark-morgan-2/ (accessed February 21, 2020).

[90] Erica Evans, "A pastor was kidnapped. White tents go up. In Nuevo Laredo, the border crisis is reaching a tipping point," *Deseret News*, August 22, 2019, https://www.deseret.com/2019/8/22/20828880/nuevo-loredo-mexico-border-crisis-immigration (accessed February 21, 2020); Julian Resendiz, "Gunmen beat and rob Cuban migrants inside Juarez shelter," KVEO, September 4, 2019, https://www.kveo.com/news/gunmen-beat-and-rob-cuban-migrants-inside-juarez-shelter/ (Accessed February 21, 2020); Silvia Forster-Frau, "Gangs profit from Trump's 'Remain in Mexico' policy," *San Antonio Express-News*, September 29, 2019, https://www.expressnews.com/news/local/article/Gangs-profit-from-Trump-s-Remain-in-14474477.php (accessed May 27, 2020).

[91] Patrick J. McDonnell, "Pastor's kidnapping underscores threat to migrants returned to Mexican border towns," *Los Angeles Times*, September 2, 2019, https://www.latimes.com/world-nation/story/2019-09-01/kidnapping-of-pastor-in-mexican-border-town-dramatizes-threats-to-migrants (accessed February 21, 2020); "La ONU-DH llama a intensificar la búsqueda de dos defensores de derechos de migrantes desaparecidos en Nuevo Laredo (The UN-DH calls to intensify the search for two missing migrant rights defenders in Nuevo Laredo)," United Nations High Commissioner for Human Rights press release, September 5, 2019, https://www.hchr.org.mx/index.php?option=com_k2&view=item&id=1319:la-onu-dh-llama-a-intensificar-la-busqueda-de-dos-defensores-de-derechos-de-migrantes-desaparecidos-en-nuevo-laredo&Itemid=265 (accessed February 21, 2020).

[92] "Aaron Casimiro Méndez Ruíz y Alfredo Castillo respecto de México," Inter-American Commission on Human Rights resolution 51/2019, October 4, 2019, https://www.oas.org/es/cidh/decisiones/pdf/2019/51-19MC870-19-MX.pdf (accessed February 21, 2020); "La ONU-DH llama a intensificar la búsqueda de dos defensores de derechos de migrantes desaparecidos en Nuevo Laredo (The UN-DH calls to intensify the search for two missing migrant rights defenders in Nuevo Laredo)," United Nations High Commissioner for Human Rights press release, September 5, 2019, https://www.hchr.org.mx/index.php?option=com_k2&view=item&id=1319:la-onu-dh-llama-a-intensificar-la-busqueda-de-dos-defensores-de-derechos-de-migrantes-desaparecidos-en-nuevo-laredo&Itemid=265 (accessed February 21, 2020).

[93] Tweet posted by Taylor Levy, Twitter, February 11, 2020, https://twitter.com/taylorklevy/status/1227300091838394368?s=20 (accessed February 21, 2020); Human Rights First, "Delivered to Danger," May 13, 2020, https://www.humanrightsfirst.org/campaign/remain-mexico (accessed May 27, 2020).

[94] Transcript of press briefing, Acting Customs and Border Protection Commissioner Mark Morgan, Washington D.C., November 14, 2019, https://www.whitehouse.gov/briefings-statements/press-briefing-acting-cbp-commissioner-mark-morgan-2/ (accessed February 21, 2020); Immigration court notices to appear on file with Human Rights Watch.

[95] Tweet posted by Michelle Hackman, Twitter, February 11, 2020, https://twitter.com/MHackman/status/1227254791220473858 (accessed February 21, 2020).

[96] Tweet posted by Taylor Levy, Twitter, February 11, 2020, https://twitter.com/taylorklevy/status/1227300093142818819 (accessed February 21, 2020).

[97] Tweet posted by Taylor Levy, Twitter, February 11, 2019, https://twitter.com/taylorklevy/status/1227300094006849537 (accessed February 21, 2020).

[98] UN Commission on Human Rights, Report of the Special Rapporteur on the Situation of Human Rights Defenders, Michel Forst, Mission to Mexico, February 12, 2018, https://www.ohchr.org/_layouts/15/WopiFrame.aspx?sourcedoc=/Documents/Issues/Defenders/A_HRC_37_51_Add%202.docx&action=default&DefaultItemOpen=1 (accessed February 21, 2020).

[99] Human Rights Watch interviews (names withheld) and observations at Matamoros encampment, November 5-8, 2019; Reynaldo Leaños Jr., "Mental Health Crisis Grows In Border Camps Filled With Hopeless, Depressed Migrants," *Texas Public Radio*, January 19, 2020, https://www.tpr.org/post/mental-health-crisis-grows-border-camps-filled-hopeless-depressed-migrants (accessed February 21, 2020); Doctors Without Borders, "Hopelessness and anxiety: the consequences of waiting for US asylum," December 18, 2019, https://www.msf.org/reality-asylum-seekers-mexico-us-border (accessed February 21, 2020).

[100] Human Rights Watch interview with Hugo O. in Matamoros, Mexico, November 6, 2019.

[101] Human Rights Watch interview with Jennifer Harbury, Reynosa, Mexico, November 6, 2019.

[102] US Department of Justice, EOIR Operational Status During Coronavirus Pandemic, https://www.justice.gov/eoir/eoir-operational-status-during-coronavirus-pandemic, (viewed May 27, 2020).

[103] "Widespread outbreak of coronavirus is 'inevitable,' health authorities say," *Mexico News Daily*, March 12, 2020, https://mexiconewsdaily.com/news/coronavirus/widespread-outbreak-of-coronavirus-inevitable/ (accessed May 27, 2020).

Your tax deductible gift can help stop human rights violations and save lives around the world.

**$50**       **$100**
$250
**$1000**      **$500**
         **Other**

DONATE NOW

Region / Country Immigration, US Poverty and Economic Inequality, Racial Discrimination

Tags Coronavirus

Topic Refugees and Migrants, Refugees and Migrants, Asylum Seekers

**MORE READING**

May 20, 2020 | Blog

**US Should Rescind Guatemala Agreement that Compels Asylum-Seekers to Abandon Claims**

## REPORTS

February 5, 2020 | Report

**Deported to Danger**

United States Deportation Policies Expose Salvadorans to Death and Abuse

July 2, 2019 | Report

**"We Can't Help You Here"**

US Returns of Asylum Seekers to Mexico

## MOST VIEWED

1    April 27, 2021 | Report

**A Threshold Crossed**



2    May 21, 2021 | Dispatches

**A Gold Medal for Homophobia in Japan**



3    May 20, 2021 | Dispatches

**Abandoned Corpses in Rural India Indicate Surge in Covid-19 Deaths**



4    April 27, 2021 | News Release

**Abusive Israeli Policies Constitute Crimes of Apartheid, Persecution**



5    May 12, 2020 | Report

**Covid-19 Fueling Anti-Asian Racism and Xenophobia Worldwide**

Protecting Rights, Saving Lives

Human Rights Watch defends the rights of people in 90 countries worldwide, spotlighting abuses and bringing perpetrators to justice

**DONATE NOW**

AR00912

Get Updates On Rights Issues From Around The Globe

Enter an email address        Sign Up

Connect With Us

Contact Us

Corrections

Privacy Policy

Permissions

Blackbaud Security Incident

© 2021 Human Rights Watch

**Human Rights Watch** | 350 Fifth Avenue, 34th Floor | New York, NY 10118-3299 USA | **t** 1.212.290.4700

**Human Rights Watch** is a 501(C)(3) nonprofit registered in the US under EIN: 13-2875808

**AR00913**

Federal Register

Vol. 86, No. 23

Friday, February 5, 2021

# Presidential Documents

Title 3—

The President

Executive Order 14010 of February 2, 2021

## Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* it is hereby ordered as follows:

**Section 1**. *Policy.* For generations, immigrants have come to the United States with little more than the clothes on their backs, hope in their hearts, and a desire to claim their own piece of the American Dream. These mothers, fathers, sons, and daughters have made our Nation better and stronger.

The United States is also a country with borders and with laws that must be enforced. Securing our borders does not require us to ignore the humanity of those who seek to cross them. The opposite is true. We cannot solve the humanitarian crisis at our border without addressing the violence, instability, and lack of opportunity that compel so many people to flee their homes. Nor is the United States safer when resources that should be invested in policies targeting actual threats, such as drug cartels and human traffickers, are squandered on efforts to stymie legitimate asylum seekers.

Consistent with these principles, my Administration will implement a multipronged approach toward managing migration throughout North and Central America that reflects the Nation's highest values. We will work closely with civil society, international organizations, and the governments in the region to: establish a comprehensive strategy for addressing the causes of migration in the region; build, strengthen, and expand Central and North American countries' asylum systems and resettlement capacity; and increase opportunities for vulnerable populations to apply for protection closer to home. At the same time, the United States will enhance lawful pathways for migration to this country and will restore and strengthen our own asylum system, which has been badly damaged by policies enacted over the last 4 years that contravened our values and caused needless human suffering.

**Sec. 2**. *United States Strategies for Addressing the Root Causes of Irregular Migration and for Collaboratively Managing Migration in the Region.* (a) The Assistant to the President for National Security Affairs (APNSA), in coordination with the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the heads of any other relevant executive departments and agencies, shall as soon as possible prepare:

(i) the United States Strategy for Addressing the Root Causes of Migration (the "Root Causes Strategy"); and

(ii) the United States Strategy for Collaboratively Managing Migration in the Region (the "Collaborative Management Strategy").

(b) The Root Causes Strategy shall identify and prioritize actions to address the underlying factors leading to migration in the region and ensure coherence of United States Government positions. The Root Causes Strategy shall take into account, as appropriate, the views of bilateral, multilateral, and private sector partners, as well as civil society, and it shall include proposals to:

(i) coordinate place-based efforts in El Salvador, Guatemala, and Honduras (the ''Northern Triangle'') to address the root causes of migration, including by:

   (A) combating corruption, strengthening democratic governance, and advancing the rule of law;

   (B) promoting respect for human rights, labor rights, and a free press;

   (C) countering and preventing violence, extortion, and other crimes perpetrated by criminal gangs, trafficking networks, and other organized criminal organizations;

   (D) combating sexual, gender-based, and domestic violence; and

   (E) addressing economic insecurity and inequality;

(ii) consult and collaborate with the Office of the United States Trade Representative, the Secretary of Commerce, and the Secretary of Labor to evaluate compliance with the Dominican Republic-Central America Free Trade Agreement to ensure that unfair labor practices do not disadvantage competition; and

(iii) encourage the deployment of Northern Triangle domestic resources and the development of Northern Triangle domestic capacity to replicate and scale efforts to foster sustainable societies across the region.

(c) The Collaborative Management Strategy shall identify and prioritize actions to strengthen cooperative efforts to address migration flows, including by expanding and improving upon previous efforts to resettle throughout the region those migrants who qualify for humanitarian protection. The Collaborative Management Strategy should focus on programs and infrastructure that facilitate access to protection and other lawful immigration avenues, in both the United States and partner countries, as close to migrants' homes as possible. Priorities should include support for expanding pathways through which individuals facing difficult or dangerous conditions in their home countries can find stability and safety in receiving countries throughout the region, not only through asylum and refugee resettlement, but also through labor and other non-protection-related programs. To support the development of the Collaborative Management Strategy, the United States Government shall promptly begin consultations with civil society, the private sector, international organizations, and governments in the region, including the Government of Mexico. These consultations should address:

(i) the continued development of asylum systems and resettlement capacities of receiving countries in the region, including through the provision of funding, training, and other support;

(ii) the development of internal relocation and integration programs for internally displaced persons, as well as return and reintegration programs for returnees in relevant countries of the region; and

(iii) humanitarian assistance, including through expansion of shelter networks, to address the immediate needs of individuals who have fled their homes to seek protection elsewhere in the region.

**Sec. 3**. *Expansion of Lawful Pathways for Protection and Opportunity in the United States*. (a) The Secretary of State and the Secretary of Homeland Security shall promptly review mechanisms for better identifying and processing individuals from the Northern Triangle who are eligible for refugee resettlement to the United States. Consideration shall be given to increasing access and processing efficiency. As part of this review, the Secretary of State and the Secretary of Homeland Security shall also identify and implement all legally available and appropriate forms of relief to complement the protection afforded through the United States Refugee Admissions Program. The Secretary of State and Secretary of Homeland Security shall submit a report to the President with the results of the review.

(b) As part of the review conducted pursuant to section 3(a) of this order, the Secretary of Homeland Security shall:

(i) consider taking all appropriate actions to reverse the 2017 decision rescinding the Central American Minors (CAM) parole policy and terminating the CAM Parole Program, *see* ''Termination of the Central American Minors Parole Program,'' 82 FR 38,926 (August 16, 2017), and consider initiating appropriate actions to reinstitute and improve upon the CAM Parole Program; and

(ii) consider promoting family unity by exercising the Secretary's discretionary parole authority to permit certain nationals of the Northern Triangle who are the beneficiaries of approved family-sponsored immigrant visa petitions to join their family members in the United States, on a case-by-case basis.

(c) The Secretary of State and the Secretary of Homeland Security shall promptly evaluate and implement measures to enhance access for individuals from the Northern Triangle to visa programs, as appropriate and consistent with applicable law.

**Sec. 4**. *Restoring and Enhancing Asylum Processing at the Border.* (a) *Resuming the Safe and Orderly Processing of Asylum Claims at United States Land Borders.*

(i) The Secretary of Homeland Security and the Director of the Centers for Disease Control and Prevention (CDC), in coordination with the Secretary of State, shall promptly begin consultation and planning with international and non-governmental organizations to develop policies and procedures for the safe and orderly processing of asylum claims at United States land borders, consistent with public health and safety and capacity constraints.

(ii) The Secretary of Homeland Security, in consultation with the Attorney General, the Secretary of Health and Human Services (HHS), and the Director of CDC, shall promptly begin taking steps to reinstate the safe and orderly reception and processing of arriving asylum seekers, consistent with public health and safety and capacity constraints. Additionally, in furtherance of this goal, as appropriate and consistent with applicable law:

(A) The Secretary of HHS and the Director of CDC, in consultation with the Secretary of Homeland Security, shall promptly review and determine whether termination, rescission, or modification of the following actions is necessary and appropriate: ''Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists,'' 85 FR 65,806 (October 13, 2020); and ''Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes,'' 85 FR 56,424 (September 11, 2020) (codified at 42 CFR 71.40).

(B) The Secretary of Homeland Security shall promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols (MPP), including by considering whether to rescind the Memorandum of the Secretary of Homeland Security titled ''Policy Guidance for Implementation of the Migrant Protection Protocols'' (January 25, 2019), and any implementing guidance. In coordination with the Secretary of State, the Attorney General, and the Director of CDC, the Secretary of Homeland Security shall promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subjected to MPP for further processing of their asylum claims.

(C) The Attorney General and the Secretary of Homeland Security shall promptly review and determine whether to rescind the interim final rule titled ''Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims,'' 83 FR 55,934 (November 9,

2018), and the final rule titled ''Asylum Eligibility and Procedural Modifications,'' 85 FR 82,260 (December 17, 2020), as well as any agency memoranda or guidance that were issued in reliance on those rules.

(D) The Attorney General and the Secretary of Homeland Security shall promptly review and determine whether to rescind the interim final rule titled ''Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act,'' 84 FR 63,994 (November 19, 2019), as well as any agency memoranda or guidance issued in reliance on that rule. In the interim, the Secretary of State shall promptly consider whether to notify the governments of the Northern Triangle that, as efforts to establish a cooperative, mutually respectful approach to managing migration across the region begin, the United States intends to suspend and terminate the following agreements:

(1) ''Agreement Between the Government of the United States of America and the Government of the Republic of Guatemala on Cooperation Regarding the Examination of Protection Claims,'' 84 FR 64,095 (July 26, 2019).

(2) ''Agreement Between the Government of the United States of America and the Government of the Republic of El Salvador for Cooperation in the Examination of Protection Claims,'' 85 FR 83,597 (September 20, 2019).

(3) ''Agreement Between the Government of the United States of America and the Government of the Republic of Honduras for Cooperation in the Examination of Protection Claims,'' 85 FR 25,462 (September 25, 2019).

(E) The Secretary of Homeland Security shall promptly cease implementing the ''Prompt Asylum Case Review'' program and the ''Humanitarian Asylum Review Program'' and consider rescinding any orders, rules, regulations, guidelines or policies implementing those programs.

(F) The following Presidential documents are revoked:

(1) Executive Order 13767 of January 25, 2017 (Border Security and Immigration Enforcement Improvements).

(2) Proclamation 9880 of May 8, 2019 (Addressing Mass Migration Through the Southern Border of the United States).

(3) Presidential Memorandum of April 29, 2019 (Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System).

(4) Presidential Memorandum of April 6, 2018 (Ending ''Catch and Release'' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement).

(5) Presidential Memorandum of April 4, 2018 (Securing the Southern Border of the United States).

(G) The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take steps to rescind any agency memoranda or guidance issued in reliance on or in furtherance of any directive revoked by section 4(a)(ii)(F) of this order.

(b) *Ensuring a Timely and Fair Expedited Removal Process.*

(i) The Secretary of Homeland Security, with support from the United States Digital Service within the Office of Management and Budget, shall promptly begin a review of procedures for individuals placed in expedited removal proceedings at the United States border. Within 120 days of the date of this order, the Secretary of Homeland Security shall submit a report to the President with the results of this review and recommendations for creating a more efficient and orderly process that facilitates timely adjudications and adherence to standards of fairness and due process.

(ii) The Secretary of Homeland Security shall promptly review and consider whether to modify, revoke, or rescind the designation titled ''Designating Aliens for Expedited Removal,'' 84 FR 35,409 (July 23, 2019), regarding the geographic scope of expedited removal pursuant to INA section

235(b)(1), 8 U.S.C. 1225(b)(1), consistent with applicable law. The review shall consider our legal and humanitarian obligations, constitutional principles of due process and other applicable law, enforcement resources, the public interest, and any other factors consistent with this order that the Secretary deems appropriate. If the Secretary determines that modifying, revoking, or rescinding the designation is appropriate, the Secretary shall do so through publication in the *Federal Register*.

(c) *Asylum Eligibility.* The Attorney General and the Secretary of Homeland Security shall:

(i) within 180 days of the date of this order, conduct a comprehensive examination of current rules, regulations, precedential decisions, and internal guidelines governing the adjudication of asylum claims and determinations of refugee status to evaluate whether the United States provides protection for those fleeing domestic or gang violence in a manner consistent with international standards; and

(ii) within 270 days of the date of this order, promulgate joint regulations, consistent with applicable law, addressing the circumstances in which a person should be considered a member of a ''particular social group,'' as that term is used in 8 U.S.C. 1101(a)(42)(A), as derived from the 1951 Convention relating to the Status of Refugees and its 1967 Protocol.

**Sec. 5.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 2, 2021.*

[FR Doc. 2021–02561
Filed 2–4–21; 8:45 am]
Billing code 3295–F1–P

**AR00918**

UNCLASSIFIED // FOR OFFICIAL USE ONLY

*USBP SBO Planning Profile for Remainder of FY*
*CBP Data Warehouse as of May 8, 2021*



### USBP Total Enforcement Encounter FY21 Planning Profile
*based on data through May 8, 2021*

Data through April is actual and reconciled for the FYTD.
<u>Projection 1</u>: May through September trends are a hybrid based on current trends from this FY influenced by previous surges.  Projected total: 1,575,324
<u>Projection 2</u>: May through September is based on the monthly rate of change observed FY16.  Projected total: 1,624,867



**U.S. Customs and Border Protection**

UNCLASSIFIED // FOR OFFICIAL USE ONLY



**CBP STAT Division**
Operations Support

AR00919

UNCLASSIFIED // FOR OFFICIAL USE ONLY

*USBP SBO Planning Profile for Remainder of FY*
*CBP Data Warehouse as of May 8, 2021*



### USBP Total Unaccompanied Children Enforcement Encounter FY21 Planning Profile
*based on data through May 8, 2021*

Legend: FY21 Actual — Based on Hybrid — Based on FY16

Data through April is actual and reconciled for the FYTD.
Projection 1: May through September trends are a hybrid based on current trends from this FY influenced by previous surges.  Projected total: 141,497
Projection 2: May through September is based on the monthly rate of change observed FY16.  Projected total: 152,673



U.S. Customs and
Border Protection

UNCLASSIFIED // FOR OFFICIAL USE ONLY



CBP STAT Division
Operations Support

AR00920

UNCLASSIFIED // FOR OFFICIAL USE ONLY

*USBP SBO Planning Profile for Remainder of FY*
*CBP Data Warehouse as of May 8, 2021*



### USBP Total Individuals in a Family Enforcement Encounter FY21 Planning Profile
*based on data through May 8, 2021*

Data through April is actual and reconciled for the FYTD.
Projection 1: May through September trends are a hybrid based on current trends from this FY influenced by previous surges.  Projected total: 405,961
Projection 2: May through September is based on the monthly rate of change observed FY16.  Projected total: 483,776



U.S. Customs and
Border Protection

UNCLASSIFIED // FOR OFFICIAL USE ONLY



CBP STAT Division
Operations Support

AR00921

UNCLASSIFIED // FOR OFFICIAL USE ONLY

*USBP SBO Planning Profile for Remainder of FY*
*CBP Data Warehouse as of May 8, 2021*



### USBP Total Single Adult Enforcement Encounter FY21 Planning Profile
*based on data through May 8, 2021*

Legend: FY21 Actual | Based on Hybrid | Based on FY16

Data through April is actual and reconciled for the FYTD.
Projection 1: May through September trends are a hybrid based on current trends from this FY influenced by previous surges.  Projected total: 1,027,865
Projection 2: May through September is based on the monthly rate of change observed FY16.  Projected total: 988,418



U.S. Customs and
Border Protection

UNCLASSIFIED // FOR OFFICIAL USE ONLY



CBP STAT Division
Operations Support

AR00922

1300 Pennsylvania Avenue NW
Washington, DC 20229

HQBOR 50/1-C



**U.S. Customs and Border Protection**

MAR 0 1 2019

| | |
|---|---|
| MEMORANDUM FOR: | All Chief Patrol Agents<br>All Directorate Chiefs |
| FROM: | Carla L. Provost<br>Chief<br>U.S. Border Patrol |
| SUBJECT: | Guidance on Migrant Protection Protocols |

Effective immediately, in accordance with the Commissioner's guidance dated January 28, 2019, the U.S. Border Patrol (USBP), San Diego Sector (SDC) will remain consistent with its existing discretion and authorities in implementing Section 235(b)(2)(C) of the Immigration and Nationality Act (INA). Under this implementation of Section 235(b)(2)(C), referenced as the Migrant Protection Protocols (MPP), the Department of Homeland Security is authorized to return certain applicants for admission, who arrive on land from Mexico to the SDC, and who are subject to removal proceedings under INA Section 240, to Mexico pending removal proceedings. Implementation will begin in SDC and is expected to expand to other southern border sectors.

Under section 235(b)(2)(C), aliens may be processed for the MPP if they are "arriving on land" between the ports of entry. In general, and on an individualized basis, USBP agents may consider an alien to be "arriving on land" for purposes of the MPP if the alien is encountered within 96 hours of the alien's crossing of the land border.[1] Agents should make these determinations based on the facts and circumstances presented by a particular case when determining whether an alien is amenable to the MPP.

Certain aliens; including unaccompanied alien children, aliens with criminal or violent history, aliens with known serious physical or mental health issues, and aliens of interest to Mexico or the United States, will not be amenable to the MPP. The attached Guiding Principles Muster for the MPP outlines in more detail which aliens may be amenable to the MPP. As part of the determination for MPP, USBP will refer aliens who are potentially amenable to the MPP; but who affirmatively state fear of return to Mexico, whether before or after they are processed for the MPP or other disposition, to U.S. Citizenship and Immigration Services for screening following such an affirmative statement.

---

[1] Section 235(b)(2)(C) applies to applicants for admission who are "arriving on land." This term thus clearly constitutes a reference to both an alien's location (in the act of "arriving") and manner of entry (on land, rather than by sea or air). "Arriving on land," in this context, refers both to those in the process of crossing the land border, as well as those encountered reasonably proximate to crossing the land border between the ports of entry. Over the past several fiscal years, approximately 90% of aliens apprehended by the U.S. Border Patrol along the southwest border have been apprehended within 96 hours of crossing the land border. USBP agents, however, also should consider unique circumstances in which an alien apprehended in that period has credibly demonstrated that he or she has reached his or her intended destination in the United States.

AR00923

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Please ensure that this memorandum is distributed to all stations within your jurisdiction.

Attachments

AR00924

Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528


Homeland
Security

September 30, 2021

MEMORANDUM TO:          Tae D. Johnson
                        Acting Director
                        U.S. Immigration and Customs Enforcement

CC:                     Troy Miller
                        Acting Commissioner
                        U.S. Customs and Border Protection

                        Ur Jaddou
                        Director
                        U.S. Citizenship and Immigration Services

                        Robert Silvers
                        Under Secretary
                        Office of Strategy, Policy, and Plans

                        Katherine Culliton-González
                        Officer for Civil Rights and Civil Liberties
                        Office for Civil Rights and Civil Liberties

                        Lynn Parker Dupree
                        Chief Privacy Officer
                        Privacy Office

FROM:                   Alejandro N. Mayorkas
                        Secretary

SUBJECT:                Guidelines for the Enforcement of Civil Immigration Law

This memorandum provides guidance for the apprehension and removal of noncitizens.

I am grateful to you, the other leaders of U.S. Immigration and Customs Enforcement, and our
frontline personnel for the candor and openness of the engagements we have had to help shape this
guidance.  Thank you especially for dedicating yourselves – all your talent and energy – to the
noble law enforcement profession.  In executing our solemn responsibility to enforce immigration

1

law with honor and integrity, we can help achieve justice and realize our ideals as a Nation.  Our colleagues on the front lines and throughout the organization make this possible at great personal sacrifice.

## I. Foundational Principle: The Exercise of Prosecutorial Discretion

It is well established in the law that federal government officials have broad discretion to decide who should be subject to arrest, detainers, removal proceedings, and the execution of removal orders.  The exercise of prosecutorial discretion in the immigration arena is a deep-rooted tradition.  The United States Supreme Court stated this clearly in 2012:

> "A principal feature of the removal system is the broad discretion exercised by immigration officials.  Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all."

In an opinion by Justice Scalia about twelve years earlier, the Supreme Court emphasized that enforcement discretion extends throughout the entire removal process, and at each stage of it the executive has the discretion to not pursue it.

It is estimated that there are more than 11 million undocumented or otherwise removable noncitizens in the United States.  We do not have the resources to apprehend and seek the removal of every one of these noncitizens.  Therefore, we need to exercise our discretion and determine whom to prioritize for immigration enforcement action.

In exercising our discretion, we are guided by the fact that the majority of undocumented noncitizens who could be subject to removal have been contributing members of our communities for years.  They include individuals who work on the frontlines in the battle against COVID, lead our congregations of faith, teach our children, do back-breaking farm work to help deliver food to our table, and contribute in many other meaningful ways.  Numerous times over the years, and presently, bipartisan groups of leaders have recognized these noncitizens' contributions to state and local communities and have tried to pass legislation that would provide a path to citizenship or other lawful status for the approximately 11 million undocumented noncitizens.

The fact an individual is a removable noncitizen therefore should not alone be the basis of an enforcement action against them.  We will use our discretion and focus our enforcement resources in a more targeted way.  Justice and our country's well-being require it.

By exercising our discretionary authority in a targeted way, we can focus our efforts on those who pose a threat to national security, public safety, and border security and thus threaten America's well-being.  We do not lessen our commitment to enforce immigration law to the best of our ability.  This is how we use the resources we have in a way that accomplishes our enforcement mission most effectively and justly.

2

## II. Civil Immigration Enforcement Priorities

We establish civil immigration enforcement priorities to most effectively achieve our goals with the resources we have. We will prioritize for apprehension and removal noncitizens who are a threat to our national security, public safety, and border security.

### A. Threat to National Security

A noncitizen who engaged in or is suspected of terrorism or espionage, or terrorism-related or espionage-related activities, or who otherwise poses a danger to national security, is a priority for apprehension and removal.

### B. Threat to Public Safety

A noncitizen who poses a current threat to public safety, typically because of serious criminal conduct, is a priority for apprehension and removal.

Whether a noncitizen poses a current threat to public safety is not to be determined according to bright lines or categories. It instead requires an assessment of the individual and the totality of the facts and circumstances.

There can be aggravating factors that militate in favor of enforcement action. Such factors can include, for example:

- the gravity of the offense of conviction and the sentence imposed;
- the nature and degree of harm caused by the criminal offense;
- the sophistication of the criminal offense;
- use or threatened use of a firearm or dangerous weapon;
- a serious prior criminal record.

Conversely, there can be mitigating factors that militate in favor of declining enforcement action. Such factors can include, for example:

- advanced or tender age;
- lengthy presence in the United States;
- a mental condition that may have contributed to the criminal conduct, or a physical or mental condition requiring care or treatment;
- status as a victim of crime or victim, witness, or party in legal proceedings;
- the impact of removal on family in the United States, such as loss of provider or caregiver;
- whether the noncitizen may be eligible for humanitarian protection or other immigration relief;
- military or other public service of the noncitizen or their immediate family;

3

**AR00927**

- time since an offense and evidence of rehabilitation;
- conviction was vacated or expunged.

The above examples of aggravating and mitigating factors are not exhaustive. The circumstances under which an offense was committed could, for example, be an aggravating or mitigating factor depending on the facts. The broader public interest is also material in determining whether to take enforcement action. For example, a categorical determination that a domestic violence offense compels apprehension and removal could make victims of domestic violence more reluctant to report the offense conduct. The specific facts of a case should be determinative.

Again, our personnel must evaluate the individual and the totality of the facts and circumstances and exercise their judgment accordingly. The overriding question is whether the noncitizen poses a current threat to public safety. Some of the factors relevant to making the determination are identified above.

The decision how to exercise prosecutorial discretion can be complicated and requires investigative work. Our personnel should not rely on the fact of conviction or the result of a database search alone. Rather, our personnel should, to the fullest extent possible, obtain and review the entire criminal and administrative record and other investigative information to learn of the totality of the facts and circumstances of the conduct at issue. The gravity of an apprehension and removal on a noncitizen's life, and potentially the life of family members and the community, warrants the dedication of investigative and evaluative effort.

C. Threat to Border Security

A noncitizen who poses a threat to border security is a priority for apprehension and removal.

A noncitizen is a threat to border security if:

(a) they are apprehended at the border or port of entry while attempting to unlawfully enter the United States; or

(b) they are apprehended in the United States after unlawfully entering after November 1, 2020.

There could be other border security cases that present compelling facts that warrant enforcement action. In each case, there could be mitigating or extenuating facts and circumstances that militate in favor of declining enforcement action. Our personnel should evaluate the totality of the facts and circumstances and exercise their judgment accordingly.

4

### III.  Protection of Civil Rights and Civil Liberties

We must exercise our discretionary authority in a way that protects civil rights and civil liberties. The integrity of our work and our Department depend on it.  A noncitizen's race, religion, gender, sexual orientation or gender identity, national origin, or political associations shall never be factors in deciding to take enforcement action.  A noncitizen's exercise of their First Amendment rights also should never be a factor in deciding to take enforcement action.  We must ensure that enforcement actions are not discriminatory and do not lead to inequitable outcomes.

This guidance does not prohibit consideration of one or more of the above-mentioned factors if they are directly relevant to status under immigration law or eligibility for an immigration benefit. For example, religion or political beliefs are often directly relevant in asylum cases and need to be assessed in determining a case's merit.

State and local law enforcement agencies with which we work must respect individuals' civil rights and civil liberties as well.

### IV.  Guarding Against the Use of Immigration Enforcement as a Tool of Retaliation for the Assertion of Legal Rights

Our society benefits when individuals – citizens and noncitizens alike – assert their rights by participating in court proceedings or investigations by agencies enforcing our labor, housing, and other laws.

It is an unfortunate reality that unscrupulous employers exploit their employees' immigration status and vulnerability to removal by, for example, suppressing wages, maintaining unsafe working conditions, and quashing workplace rights and activities.  Similarly, unscrupulous landlords exploit their tenants' immigration status and vulnerability to removal by, for example, charging inflated rental costs and failing to comply with housing ordinances and other relevant housing standards.

We must ensure our immigration enforcement authority is not used as an instrument of these and other unscrupulous practices.  A noncitizen's exercise of workplace or tenant rights, or service as a witness in a labor or housing dispute, should be considered a mitigating factor in the exercise of prosecutorial discretion.

### V.  The Quality and Integrity of our Civil Immigration Enforcement Actions

The civil immigration enforcement guidance does not compel an action to be taken or not taken. Instead, the guidance leaves the exercise of prosecutorial discretion to the judgment of our personnel.

5

To ensure the quality and integrity of our civil immigration enforcement actions, and to achieve consistency in the application of our judgments, the following measures are to be taken before the effective date of this guidance:

A. Training

Extensive training materials and a continuous training program should be put in place to ensure the successful application of this guidance.

B. Process for Reviewing Effective Implementation

A review process should be put in place to ensure the rigorous review of our personnel's enforcement decisions throughout the first ninety (90) days of implementation of this guidance. The review process should seek to achieve quality and consistency in decision-making across the entire agency and the Department. It should therefore involve the relevant chains of command.

Longer-term review processes should be put in place following the initial 90-day period, drawing on the lessons learned. Assessment of implementation of this guidance should be continuous.

C. Data Collection

We will need to collect detailed, precise, and comprehensive data as to every aspect of the enforcement actions we take pursuant to this guidance, both to ensure the quality and integrity of our work and to achieve accountability for it.

Please work with the offices of the Chief Information Officer; Strategy, Policy, and Plans; Science and Technology; Civil Rights and Civil Liberties; and Privacy to determine the data that should be collected, the mechanisms to collect it, and how and to what extent it can be made public.

D. Case Review Process

We will work to establish a fair and equitable case review process to afford noncitizens and their representatives the opportunity to obtain expeditious review of the enforcement actions taken. Discretion to determine the disposition of the case will remain exclusively with the Department.

**VI. Implementation of the Guidance**

This guidance will become effective in sixty (60) days, on November 29, 2021. Upon the effective date, this guidance will serve to rescind (1) the January 20, *2021 Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* issued by then-Acting Secretary David Pekoske, and (2) the *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* issued by Acting ICE Director Tae D. Johnson.

6

We will meet regularly to review the data, discuss the results to date, and assess whether we are achieving our goals effectively.  Our assessment will be informed by feedback we receive from our law enforcement, community, and other partners.

This guidance is Department-wide.  Agency leaders as to whom this guidance is relevant to their operations will implement this guidance accordingly.

## VII.  Statement of No Private Right Conferred

This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

7





Updated May 28, 2021

# Mexico's Immigration Control Efforts

## Background

Since 2014, Mexico has experienced periodic surges in unauthorized migration from the "Northern Triangle" of Central America (El Salvador, Guatemala, and Honduras). Mexico, like the United States, has struggled to deal with large numbers of families and unaccompanied minors, many of whom are seeking asylum. Under the threat of U.S. tariffs, Mexican President Andrés Manuel López Obrador accommodated Trump Administration policy changes that shifted some of the burden of interdicting migrants and hosting asylum seekers from the United States to Mexico. The Biden Administration has also sought Mexico's assistance in managing U.S.-bound migration flows.

**Figure 1. Mexico: Reported Apprehensions of Migrants from Northern Triangle Countries and Asylum Applications**



*Apprehensions data through March 2021 excludes cases under review; asylum applications data through April 2021. Asylum country of origin not available before 2013 and all data are based on preliminary figures.

**Source:** CRS, based on information from Mexico's Secretary of the Interior.

President Joe Biden has begun to revise certain restrictive policies implemented by the Trump Administration but is seeking to do so in a way that does not overwhelm the processing capacity of U.S. agencies. President Biden also proposed a comprehensive immigration reform bill, introduced as the U.S. Citizenship Act (S. 348/H.R. 1177), which would create a regional migration management system involving Mexico and Central America. Vice President Kamala Harris is leading diplomatic efforts to secure Mexico's help in addressing the root causes of migration, interdicting migrants, and combating alien smuggling and human trafficking. In mid-March 2021, Mexico closed its southern borders to nonessential travel.

## Immigration Control

Since 2014, with support from the United States, Mexico has established naval bases on its rivers, security cordons north of its borders with Guatemala and Belize, and drone surveillance. Unarmed agents from the National Migration Institute (INM) have increased operations along train routes and at bus stations. INM has improved infrastructure at border crossings and created mobile highway checkpoints. INM also has sought to professionalize its workforce and

improve coordination with customs and federal, state, and local security forces.

López Obrador took office in December 2018, endorsing a humanitarian approach to migration and pledging to promote development in Central America as a solution to unauthorized migration. Nevertheless, he did not increase funding for Mexico's backlogged Commission for the Aid of Refugees (COMAR). His government's austere budgets have not reflected his early pledges to invest $100 million in the Northern Triangle.

Since April 2019, López Obrador has taken a harder line toward migration, in part due to U.S. pressure. His government has increased migrant apprehensions (see **Figure 2**) and restricted access to humanitarian visas, particularly for those traveling in large groups (or caravans). As during prior enforcement surges, migrants have taken more dangerous routes and increased their reliance on smugglers. After Mexico deployed its new National Guard to help with immigration enforcement, reports of mistreatment of migrants rose. Corruption within INM and impunity for crimes against migrants have increased migrants' vulnerability to human rights abuses and crime. A dozen state police have been implicated in a January 2021 massacre of 19 people, including Guatemalan migrants, near the U.S. border.

**Figure 2. Mexico: Recent Trends in Reported Apprehensions of Central American Migrants**



*Data excludes cases under review.

**Source:** CRS, based on data from Mexico's Secretary of the Interior.

## Humanitarian Protection

Mexico has a broader definition of *refugee* than the United States and the 1951 U.N. Refugee Convention; Mexico recognizes a right to asylum based on "generalized violence; foreign aggression; internal conflicts; massive violations of human rights; and other circumstances leading

AR00932

to a serious disturbance of public order." As a result, many of the migrants arriving in Mexico from the Northern Triangle could qualify as refugees. Asylum requests doubled in Mexico each year from 2015 to 2019 (see **Figure 1**). Through April 2021, Mexico had received nearly 32,000 asylum requests, with most asylum seekers originating from Honduras, Haiti, Cuba, El Salvador, and Venezuela.

With support from the U.N. High Commissioner for Refugees (UNHCR), COMAR reduced the backlog of asylum requests in 2020. COMAR granted refugee status to 10,100 people from the Northern Triangle that year, up from 1,863 in 2019.

## U.S. Foreign Assistance and Policy

### Foreign Assistance
Since June 2015, the State Department has spent $58.5 million in Mérida Initiative funding to support Mexico's immigration control and border security efforts. U.S. funds have enabled the provision of nonintrusive inspection equipment, mobile kiosks, canine teams, and vehicles, as well as training for more than 1,000 officials. U.S. assistance helped Mexican agencies build a secure communications network in the southern border area. Current funding supports the collection of biometric information that interfaces with U.S. databases and efforts to counter alien smuggling and human trafficking.

Since FY2018, the State Department has provided more than $106 million through the Migration and Refugee Assistance (MRA) account to UNHCR to improve access to asylum in Mexico, provide legal assistance and alternatives to detention for asylum seekers, and increase COMAR's asylum processing capacity. MRA funds have supported other humanitarian organizations involved in improving shelters, providing medical aid to migrants, and transporting migrants who voluntarily agree to be sent back to their home countries.

### U.S. Migrant Protection Protocols
In December 2018, López Obrador allowed the United States to return Central American migrants to Mexico under the U.S. Migrant Protection Protocols (MPP). From January 2019 through its suspension in January 2021, the MPP allowed the Department of Homeland Security (DHS) to require more than 70,000 non-Mexican migrants who arrived at the border to wait in Mexico while U.S. immigration courts processed their cases. The MPP gradually expanded to include asylum seekers from Cuba, Venezuela, and Ecuador. In March 2020, all pending MPP hearings were suspended indefinitely in response to the Coronavirus Disease 2019 (COVID-19) pandemic.

On June 7, 2019, Mexico reached a migration agreement with the Trump Administration to avert U.S. tariffs. According to the U.S.-Mexico joint declaration, Mexico agreed to deploy its National Guard to its borders, counter human smuggling networks, and accept the expansion of the MPP across the entire northern border. The United States pledged to speed up adjudication of asylum claims and prioritize the court proceedings of migrants in the MPP

program. The countries reiterated a 2018 joint statement supporting economic development in Mexico and the Northern Triangle.

The June 2019 agreement coincided with a 65% reduction in U.S. border apprehensions by September 2019. Increasing incidents of violence against migrants in both southern and northern Mexico also occurred. Mexican border cities—some of which have high rates of violent crime—were sheltering tens of thousands of migrants with little support. Human Rights First, a nongovernmental organization, documented 1,300 publicly reported cases of those subject to the MPP who had been murdered, raped, kidnapped, tortured, or assaulted as of January 2021.

In February 2021, the Biden Administration suspended new enrollments in the MPP. DHS began a phased process for MPP enrollees with pending immigration court proceedings to enter the United States for processing.

### Title 42
In response to the pandemic, DHS largely suspended asylum processing at the U.S.-Mexico border in March 2020 under a Centers for Disease Control and Prevention public health order (referred to as *Title 42*). The Trump Administration then expelled most migrants without valid travel documents into Mexico or returned them to their home countries as quickly as possible. Mexico has struggled to absorb those migrants, particularly after a revision to its immigration law prohibiting the detention of minors in facilities with adults took effect in January 2021.

The Biden Administration has exempted unaccompanied children and certain vulnerable migrants from the Title 42 policy but otherwise left the policy mostly in place. U.S.-funded international organizations are helping identify vulnerable migrants in need of U.S. processing. Some 190,400 migrants still have been subject to expulsion, mostly to Mexico, from February to April 2021. As the pandemic has begun to subside, migrants' rights groups have urged an end to this policy. However, doing so could increase the migration surge.

### Operation Sentinel
In April 2021, DHS announced it had launched a new multiagency effort to target transnational criminal organizations (TCOs) involved in smuggling migrants. With support from Mexico, the effort will target assets and individuals associated with TCOs complicit in alien smuggling with visa revocations and frozen bank accounts.

## Congressional Action
Congress may consider legislation that would affect U.S.-Mexico migration issues discussed in this product (such as S. 348/H.R. 1177 and/or S. 1358, which would create more border processing centers). The 117th Congress is continuing to fund and oversee U.S. assistance to Mexico through the Mérida Initiative and MRA funds. See also CRS Report R41349, *U.S.-Mexican Security Cooperation: The Mérida Initiative and Beyond.*

**Clare Ribando Seelke**, Specialist in Latin American Affairs

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

AR00934

FEA Number: 306-112-002b

**U.S. Department of Homeland Security**
500 12th Street SW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

February 12, 2019

MEMORANDUM FOR:     Executive Associate Directors
                    Principal Legal Advisor

FROM:               Ronald D. Vitiello
                    Deputy Director and
                    Senior Official Performing the Duties of the Director

SUBJECT:            Implementation of the Migrant Protection Protocols

On January 25, 2019, Secretary Nielsen issued a memorandum entitled *Policy Guidance for Implementation of the Migrant Protection Protocols*, in which she provided guidance for the implementation of the Migrant Protection Protocols (MPP) announced on December 20, 2018, an arrangement between the United States and Mexico to address the migration crisis along our southern border.  Pursuant to the Secretary's direction, this memorandum provides guidance to U.S. Immigration and Customs Enforcement (ICE) about its role in the implementation of the MPP.

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) allows the Department of Homeland Security (DHS), in its discretion, with regard to certain aliens who are "arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, . . . [to] return the alien[s] to that territory pending a proceeding under [INA] section 240."  Consistent with the MPP, third-country nationals (i.e., aliens who are not citizens or nationals of Mexico) who are arriving in the United States by land from Mexico may be returned to Mexico pursuant to INA section 235(b)(2)(C) for the duration of their INA section 240 removal proceedings.  DHS will not use the INA section 235(b)(2)(C) process in the cases of unaccompanied alien children, aliens placed into the expedited removal (ER) process of INA section 235(b)(1), and other aliens determined, in the exercise of discretion, not to be appropriate for such processing (which may include certain aliens with criminal histories, individuals determined to be of interest to either Mexico or the United States, and lawful permanent residents of the United States).

The direct placement of an alien into INA section 240 removal proceedings (and, in DHS's discretion, returning the alien to Mexico pursuant to INA section 235(b)(2)(C) pending those proceedings) is a separate and distinct process from ER.  Processing determinations, including whether to place an alien into ER or INA section 240 proceedings (and, as applicable, to return an alien placed into INA section 240 proceedings to Mexico under INA section 235(b)(2)(C) as

**AR00935**

part of MPP), or to apply another processing disposition, will be made by U.S. Customs and
Border Protection (CBP), in CBP's enforcement discretion.

MPP implementation began at the San Ysidro port of entry on or about January 28, 2019, and it
is intended that MPP implementation will expand eventually across the southern border. In
support of MPP, ICE Enforcement and Removal Operations (ERO) will provide appropriate
transportation when necessary, for aliens returned to Mexico under the MPP, from the designated
port of entry to the court facility for the scheduled removal hearings before an immigration judge
and back to the port of entry for return to Mexico by CBP after such hearings. ERO also will be
responsible for effectuating removal orders entered against aliens previously processed under
INA section 235(b)(2)(C), including post-removal order detention. ICE attorneys will represent
DHS in the related removal proceedings pursuant to 6 U.S.C. § 252(c).

As instructed by the Secretary, in exercising prosecutorial discretion concerning the potential
return of third-country nationals to Mexico under INA section 235(b)(2)(C), DHS officials
should act consistently with the *non-refoulement* principles contained in Article 33 of the 1951
Convention Relating to the Status of Refugees and Article 3 of the Convention Against Torture
and Other Cruel, Inhuman or Degrading Treatment or Punishment. Specifically, a third-country
national who affirmatively states a fear of return to Mexico (including while in the United States
to attend a removal hearing) should not be involuntarily returned under INA section 235(b)(2)(C)
if the alien would more likely than not be persecuted on account of race, religion, nationality,
membership in a particular social group, or political opinion (unless described in INA section
241(b)(3)(B) as having engaged in certain criminal, persecutory, or terrorist activity), or would
more likely than not be tortured, if so returned pending removal proceedings. *Non-refoulement*
assessments will be made by U.S. Citizenship and Immigration Services (USCIS) asylum in
accordance with guidance issued by the Director of USCIS.

Within ten (10) days after this memorandum, relevant ICE program offices are directed to issue
further guidance to ensure that MPP is implemented in accordance with the Secretary's
memorandum, this memorandum, and policy guidance and procedures, in accordance with
applicable law.

This document provides internal ICE policy guidance, which may be modified, rescinded, or
superseded at any time without notice. This memorandum is not intended to, and does not,
create any right or benefit, substantive or procedural, enforceable at law or in equity by any party
against the United States, its departments, agencies, or entities, its officers, employees, or agents,
or any other person. Likewise, no limitations are placed by this guidance on the otherwise lawful
enforcement or litigative prerogatives of DHS.

Attachment:
DHS Secretary Memorandum, *Policy Guidance for Implementation of Migrant Protection
Protocols*, dated January 25, 2019.

AR00936

*Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration
and Customs
Enforcement**

February 12, 2019

MEMORANDUM FOR:   Field Office Directors
                  Enforcement and Removal Operations

FROM:             Nathalie R. Asher *Nathalie R. Asher*
                  Acting Executive Associate Director

SUBJECT:          Migrant Protection Protocols Guidance

Purpose

This memorandum provides operational guidance to impacted Enforcement and Removal
Operations (ERO) field offices to ensure that the Migrant Protection Protocols (MPP) are
implemented in accordance with applicable law, the Secretary's January 25, 2019, memorandum,
*Policy Guidance for Implementation of the Migrant Protection Protocols*, Acting Director
Vitiello's February 12, 2019, memorandum of the same title, and other applicable policies and
procedures.

Background

On January 25, 2019, Secretary Nielsen issued a memorandum entitled *Policy Guidance for
Implementation of the Migrant Protection Protocols*, in which she provided guidance for the
implementation of the MPP, an arrangement between the United States and Mexico to address
the migration crisis along our southern border announced on December 20, 2018.  Thereafter, on
February 12, 2019, Deputy Director and Senior Official Performing the Duties of the Director
Vitiello issued U.S. Immigration and Customs Enforcement (ICE) Policy Memorandum 11088.1,
*Implementation of the Migrant Protection Protocols*, announcing that operational
implementation of MPP began at the San Ysidro port of entry on or about January 28, 2019, and
directing that ICE program offices issue further guidance to ensure that the MPP is implemented
in accordance with the Secretary's memorandum, applicable law, and policy guidance and
procedures.

Discussion

Under section 235(b)(2)(C) of the Immigration and Nationality Act (INA), the U.S. Department
of Homeland Security (DHS) may, in its discretion, with regard to certain applicants for
admission who are "arriving on land (whether or not at a designated port of arrival) from a
foreign territory contiguous to the United States, . . . return the alien[s] to that territory pending a
proceeding under [INA section] 240."

**AR00937**

Migrant Protection Protocols Guidance
Page 2

return the alien to Mexico pending removal proceedings pursuant to section 235(b)(2)(C) of the INA, as detailed in ICE Policy Memorandum 11088.1.  Aliens processed under the MPP will be issued a Notice to Appear (NTA) by CBP and returned by CBP to Mexico to await their removal proceedings.

Aliens returned to Mexico under the MPP pursuant to section 235(b)(2)(C) of the INA will be required to report to a designated POE on their scheduled hearing dates and will be paroled into the United States by CBP for purposes of their hearings.  As further explained in the next section, CBP will then transfer the aliens to ERO custody for transportation to designated Executive Office for Immigration Review (EOIR) court locations for their hearings.

If the alien is granted relief or protection from removal by the immigration judge or is ordered removed from the United States, and appeal is not reserved by either party, the alien will be processed in accordance with standard procedures applicable to final order cases.  If the immigration judge continues proceedings or enters an order upon which either party reserves appeal, ERO will transport the alien back to the POE, whereupon CBP officers will take custody of the alien to return the alien to Mexico to await further proceedings.

MPP implementation began at the San Ysidro port of entry (POE) on or about January 28, 2019, and it is intended that MPP implementation will expand to additional locations along the southern border.  This memorandum provides general procedural guidance applicable to ERO personnel in the implementation of the MPP.  Field Office Directors should each assign a lead POC for MPP issues arising within their AORs and issue local operational guidance applicable to their individual areas of responsibility as the MPP is phased in.

*Hearing Transportation and Custody*

Before returning an alien to Mexico under the MPP to await his or her removal proceedings, CBP will provide the alien instructions explaining when and to which POE to report to attend his or her hearing.  On the day of the hearing, an alien returned to Mexico under the MPP will arrive at the POE at the time designated—generally, a time sufficient to allow for CBP processing, pre-hearing consultation with counsel (if applicable), and timely appearance at hearings.  Once CBP conducts POE processing (including verification of identity and a brief medical screening), for hearings set at immigration courts located in the interior of the United States, CBP will parole the alien into ICE's custody under INA section 212(d)(5)(A), and ERO will maintain physical custody of the alien during transportation of the alien from the POE to the designated immigration court location, making appropriate use of contract support and complying with applicable requirements concerning the transportation of aliens.

In cases in which ICE performs that transportation function between the POE and an inland immigration court, the alien is detained in ICE custody as an arriving alien.[1]  ERO should coordinate locally with CBP officials at POEs where the MPP has been implemented, so that the

---

[1] Aliens participating in the MPP who CBP initially encounters at a POE are "arriving aliens" within the meaning of 8 C.F.R. §§ 1.2 and 1001.1(q) (defining "arriving alien" to include "an applicant for admission coming … into the United States at a port-of-entry").  Moreover, on their hearing dates before an immigration judge, aliens who CBP initially encountered *between* the POEs will come *to* a POE to attend their hearings, placing them within the "arriving alien" definition, as well.

Migrant Protection Protocols Guidance
Page 3

daily volume of MPP cases can be monitored and any transportation needs may be properly met. ERO should also coordinate locally with EOIR concerning security arrangements at the immigration court location. While EOIR is responsible for security inside the courtroom, and ERO should generally defer to immigration judges' wishes concerning their presence in the courtroom, DHS is ultimately responsible for maintaining custody of the alien. If an alien is ordered released by an immigration judge, ERO should coordinate closely with the ICE Office of the Principal Legal Advisor (OPLA) regarding how to proceed with the case. After an alien's removal hearing is over, ERO will transport him or her back to the POE for return to Mexico or to retrieve property, as applicable. If the alien has received a final grant of relief or an administratively final order of removal, ERO will coordinate with CBP and make appropriate custody determinations.

*Access to Counsel*

Section 240(b)(4)(A) of the INA provides that an alien in removal proceedings before an immigration judge "shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings." Similarly, section 292 provides that "[i]n any removal proceedings . . . the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel . . . as he shall choose." Accordingly, in order to facilitate access to counsel for aliens subject to return to Mexico under the MPP who will be transported to their immigration court hearings by ERO, ERO will depart from the POE with the alien at a time sufficient to ensure arrival at the immigration court not later than one hour before his or her scheduled hearing time in order to afford the alien the opportunity to meet in-person with his or her legal representative.

*Non-Refoulement Considerations*

In accordance with Secretary Nielsen's January 25, 2019, memorandum, DHS should implement the MPP consistent with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees (1951 Convention) and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT). Specifically, an alien should not be involuntarily returned to Mexico under the MPP if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in section 241(b)(3)(B) of the INA), or would more likely than not be tortured, if so returned pending removal proceedings.

If an alien subject to the MPP affirmatively states to an ERO officer that he or she has a fear of persecution or torture *in Mexico*, or a fear of return *to Mexico*, at any point while in ERO custody, ERO will notify CBP of the alien's affirmative statement so that CBP officials at the POE may refer the alien to a U.S. Citizenship and Immigration Services (USCIS) asylum officer for screening before any return to Mexico to assess whether it is more likely than not that the alien will face persecution or torture if returned to Mexico in accordance with guidance issued by the Director of USCIS.

AR00939

Migrant Protection Protocols Guidance
Page 4

If USCIS assesses that such an alien is more likely than not to face persecution or torture in Mexico, ERO will determine whether the alien may be maintained in custody or paroled, or if another disposition is appropriate.  Such an alien may not be subject to expedited removal; however, and may not be returned to Mexico to await further proceedings.[2]

*Recordkeeping and Reporting*

MPP aliens booked in and out of ICE custody must be appropriately documented in the Enforce Alien Detention Module (EADM) and monitored per a final Form I-216, *Record of Person and Property Transfer*.  For MPP aliens booked into ICE custody, the comment "out to court pursuant to MPP," must be added to the comments section of EADM.

EADM records for MPP aliens booked out of ICE custody will need to reflect the appropriate court dispositions.  Comments in EADM should reflect "MPP, Returned to the POE for Future Hearing;" "MPP, Granted Relief, Released from Custody;" "MPP, Claimed Fear of Mexico, returned to the POE;" or "MPP, Ordered Removed," or similar comments indicating an MPP disposition as appropriate.

*Disclaimers*

Except as specifically provided in relation to the MPP, existing policies and procedures for processing and removing aliens remain unchanged.  That applies to record-keeping responsibilities as well as removal authority and responsibility.  The MPP does not change ERO's removal operations, and removable aliens will be processed in accordance with standard practices and procedures.

This document is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Likewise, this guidance places no limitations on the otherwise lawful enforcement or litigative prerogatives of DHS.

---

[2] In MPP cases where an immigration judge grants withholding or deferral of removal *to Mexico* and appeal is reserved, ERO should confer with OPLA about appropriate next steps prior to any return under INA section 235(b)(2)(C).

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Washington, DC 20529



**U.S. Citizenship and Immigration Services**

January 28, 2019                                                                     PM-602-0169

# Policy Memorandum

SUBJECT:     **Guidance for Implementing Section 235(b)(2)(C) of the Immigration and
                 Nationality Act and the Migrant Protection Protocols**

## Purpose

This memorandum provides guidance to immigration officers in U.S. Citizenship and
Immigration Services (USCIS) regarding the implementation of the Migrant Protection Protocols
(MPP), including supporting the exercise of prosecutorial discretion by U.S. Customs and Border
Protection (CBP).  This memorandum follows the Secretary of Homeland Security's January 25,
2019, memorandum, *Policy Guidance for Implementation of the Migrant Protection Protocols*.

## Background

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) provides that aliens arriving
by land from a foreign contiguous territory (i.e., Mexico or Canada)—whether or not at a
designated port of entry—generally may be returned, as a matter of enforcement discretion, to
the territory from which they are arriving pending a removal proceeding under Section 240 of the
INA.

On December 20, 2018, Secretary of Homeland Security Kirstjen M. Nielsen announced that the
Department of Homeland Security (DHS) will begin the process of implementing Section
235(b)(2)(C) of the INA on a large scale.  That statutory provision allows for the return of certain
aliens to a contiguous territory pending Section 240 removal proceedings before an immigration
judge.  Under the MPP, aliens who are nationals and citizens of countries other than Mexico
(third-country nationals) arriving in the United States by land from Mexico—illegally or without
proper documentation—may be returned to Mexico for the duration of their immigration
proceedings as a matter of prosecutorial discretion.  *Accord* 8 C.F.R. § 235.3(d).

In her January 25, 2019, memorandum, Secretary Nielsen issued general policy guidance
concerning DHS's implementation of Section 235(b)(2)(C) at the southern border consistent with
the MPP.  Memorandum from Kirstjen M. Nielsen, Secretary of Homeland Security, *Policy*

*PM-602-0169:  Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*
Page 2

*Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019) (Jan. 25, 2019, Memorandum).  The Secretary advised that such authority should be implemented consistent with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees (1951 Convention)—as incorporated in the 1967 Protocol Relating to the Status of Refugees[1]—and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).[2]

The Secretary specifically advised that, consistent with those principles, "a third-country national should not be involuntarily returned to Mexico pursuant to Section 235(b)(2)(C) of the INA if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA), or would more likely than not be tortured, if so returned pending removal proceedings."  Jan. 25, 2019, Memorandum at 3-4.  Article 33 of the 1951 Convention and Article 3 of the CAT require that the individual demonstrate that he or she is "more likely than not" to face persecution on account of a protected ground or torture, respectively.[3]  That is the same standard used for withholding of removal and CAT protection determinations.  *See* 8 C.F.R. § 208.16(b)(2), (c)(2); Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8480 (1999).

At the same time, under the MPP, the United States "understands that, according to the Mexican law of migration, the Government of Mexico will afford such individuals all legal and procedural protection[s] provided for under applicable domestic and international law," including the 1951 Convention and the CAT.  Letter from Chargé d'Affaires John S. Creamer to Sr. Jesús Seade, Subsecretaría para América del Norte, Secretaría de Relaciones Exteriores (Dec. 20, 2018).  Further, "[t]he United States expects that the Government of Mexico will comply with the commitments articulated in its statement of December 20, 2018."[4]

---

[1] The United States is not a party to the 1951 Convention Relating to the Status of Refugees but is a party to the 1967 Protocol Relating to the Status of Refugees, which incorporates Articles 2 to 34 of the 1951 Convention. Article 33 of the 1951 Convention provides that: "[n]o Contracting State shall expel or return ('*refouler*') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

[2] Article 3 of the CAT states, "No State Party shall expel, return ('*refouler*') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."  *See also* Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, Title XXII, § 2242(a) (8 U.S.C. § 1231 note) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.").

[3] *See INS v. Stevic*, 467 U.S. 407, 429-30 (1984); *Auguste v. Ridge*, 395 F.3d 123, 132-33 (3d Cir. 2005); *Pierre v. Gonzales*, 502 F.3d 109, 115 (2d Cir. 2007); *see also* Senate Resolution of Advice and Consent to Ratification of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Treaty Doc. No. 100-20, II(2), *available at* https://www.congress.gov/treaty-document/100th-congress/20/resolution-text; Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8480 (1999).

[4] Jan. 25, 2019, Memorandum at 4.

*PM-602-0169:  Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*
Page 3

The Secretary also advised that, where an alien affirmatively states a concern that he or she may face a risk of persecution on account of a protected ground or torture upon return to Mexico, CBP should refer the alien to USCIS, which will conduct an assessment to determine whether it is more likely than not that the alien will be subject to persecution or torture if returned to Mexico.  The Secretary directed USCIS to issue appropriate internal procedural guidance to carry out this policy.  That guidance is explained below.

**Guidance**

Upon a referral by a DHS immigration officer of an alien who could potentially be amenable to the MPP, the USCIS asylum officer should interview the alien to assess whether it is more likely than not that the alien would be persecuted in Mexico on account of his or her race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA),[5] or that the alien would be tortured in Mexico.  The process or procedures described in INA Sections 208, 235(b)(1), (3), and 241(b)(3) and their implementing regulations, as well as those in the CAT regulations, do not apply to the MPP assessments.

### A.  Interview

Upon receipt of such a referral, the USCIS officer should conduct the MPP assessment interview in a non-adversarial manner, separate and apart from the general public.  The purpose of the interview is to elicit all relevant and useful information bearing on whether the alien would more likely than not face persecution on account of a protected ground, or torture, if the alien is returned to Mexico pending the conclusion of the alien's Section 240 immigration proceedings.

The officer should conduct the assessment in person, via video teleconference, or telephonically.  At the time of the interview, the USCIS officer should verify that the alien understands that he or she may be subject to return to Mexico under Section 235(b)(2)(C) pending his or her immigration proceedings.  The officer should also confirm that the alien has an understanding of the interview process.  In addition, provided the MPP assessments are part of either primary or secondary inspection, DHS is currently unable to provide access to counsel during the assessments given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals.[6]

In conducting the interview, the USCIS officer should take into account the following and other such relevant factors as:

---

[5] The disqualifying grounds for *non-refoulement* vis-à-vis the 1951 Convention and 1967 Protocol are reflected in Section 241(b)(3)(B) of the INA.  However, the reference to Section 241(b)(3)(B) should not be construed to suggest that Section 241(b)(3)(B) applies to MPP.
[6] *See* 8 C.F.R. § 292.5(b).

*PM-602-0169:  Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*
Page 4

1. The credibility of any statements made by the alien in support of the alien's claim(s) and such other facts as are known to the officer.  That includes whether any alleged harm (i.e., the alleged persecution or torture) could occur in the region in which the alien would reside in Mexico, pending their removal proceedings, or whether residing in another region of Mexico to which the alien would have reasonable access could mitigate against the alleged harm;

2. Commitments from the Government of Mexico regarding the treatment and protection of aliens returned under Section 235(b)(2)(C) (including those set forth in the Government of Mexico's statement of December 20, 2018),[7] the expectation of the United States Government that the Government of Mexico will comply with such commitments,[8] and reliable assessments of current country conditions in Mexico (especially those provided by DHS and the U.S. Department of State); and

3. Whether the alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA.

### B.  Assessment

Once a USCIS officer assesses whether the alien, if returned to Mexico, would be more likely than not persecuted in Mexico on account of a protected ground (or has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA), or would be more likely than not tortured in Mexico, the assessment shall be reviewed by a supervisory asylum officer, who may change or concur with the assessment's conclusion.  DHS staff should inform the alien of the outcome of the final assessment.  USCIS should then provide its assessment to CBP for purposes of exercising prosecutorial discretion in connection with one or more of the decisions as to whether to place the alien in expedited removal or to issue a Notice to Appear for the purpose of placement directly into Section 240 removal proceedings, and if the latter, whether to return the alien to Mexico pending the conclusion of Section 240  proceedings under Section 235(b)(2)(C) pursuant to the MPP, and, when appropriate, to U.S. Immigration and Customs Enforcement for purposes of making discretionary custody determinations for aliens who are subject to detention and may be taken into custody pending removal proceedings.

If an officer makes a positive MPP assessment (i.e., that an alien is more likely than not either to be persecuted in Mexico on account of a protected ground and has not engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA, or to be tortured in Mexico), USCIS is *not* granting withholding of removal or protection from removal under the CAT regulations.  Nor shall there be further administrative review, reopening, or reconsideration of the assessment by USCIS.  The purpose of the assessment is simply to assess whether the alien meets one of the eligibility criteria under the MPP, pursuant to Section 235(b)(2)(C).

---

[7] Secretaría de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018); *see* Jan. 25, 2019, Memorandum at 2-3.

[8] *See* Jan. 25, 2019, Memorandum at 4.

*PM-602-0169:  Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*
Page 5

**Disclaimer**

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

**Contact Information**

Questions relating to this memorandum must be directed through the appropriate channels to the Asylum Division Headquarters point of contact.

6/7/2021
Immigration court backlog exceeds 1 million cases, data group says | CNN Politics
Case 2:21-cv-00067-Z    Document 162-2    Filed 09/02/22    Page 214 of 548    PageID 5157

CNN politics                                                    LIVE TV

# Immigration court backlog exceeds 1 million cases, data group says

By Priscilla Alvarez, CNN
Updated 5:42 PM EDT, Wed September 18, 2019



Sketches by Bill Hennessy

**(CNN)** — The immigration court backlog now exceeds 1 million cases, according to Syracuse University's Transactional Records Access Clearinghouse, which tracks immigration court data.

Immigration courts, which fall under the Justice Department and decide whether to deport immigrants, have been bogged down over the years as more cases are added to the docket that can be addressed at any given time.

"If nothing else, the continuing rise of the backlog shows that the immigration court is broken," said Judge Ashley Tabaddor, president of the National Association of

**AR00946**

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 215 of 548   PageID 5158

Immigration Judges. "Until we fix the design defect of having a court in a law enforcement agency, we will not be able to address the backlog in a fair and effective manner."

President Donald Trump has repeatedly criticized the nation's immigration system, specifically taking issue with the practice of releasing immigrants while they await their court dates. To remedy that, his administration has sought to hire more immigration judges in the hopes of unclogging the court. Even so, the number of cases has continued to tick upward.

During the last partial government shutdown, for example, the only cases that moved forward were those of immigrants in detention. All others were postponed.

In January, the Transactional Records Access Clearinghouse estimated that more than 42,000 immigration court hearings had been canceled as a result of the shutdown – exacerbating an issue Trump had pledged to resolve.

"The latest case-by-case court records through the end of August 2019 show the court's active case backlog was 1,007,155," according to the clearinghouse's report released Wednesday. "If the additional 322,535 cases which the court says are pending but have not been placed on the active caseload rolls are added, then the backlog now tops 1.3 million."

While a Justice Department spokesman said in a statement to CNN that the department "does not certify data from third parties," the spokesman added: "This report and DOJ's own data further confirms there is a crisis at the border. This Administration is taking aggressive steps to increase productivity, close loopholes, and hire a record number of judges to address the backlog with our existing authorities."

While the clearinghouse doesn't attribute the backlog to any one factor, the American Bar Association has previously proposed a major overhaul of the US immigration system, calling the courts "irredeemably dysfunctional."

"The state of the U.S. immigration court system has worsened considerably since our 2010 Report," that March report noted, mentioning an unprecedented backlog of cases, increased wait times, policy changes that aim to accelerate cases without allocating enough funding, overreliance on video teleconferencing during court proceedings and possible bias in the hiring of judges.

The Justice Department had previously addressed some of the issues the bar association report raised.

The administration has acknowledged the massive immigration court backlog and has, at times, placed blame on unfounded asylum claims, which have to work their way

AR00947

through their court system.

This month, the administration opened tent courts along the Texas border to hear the cases of migrants who have been returned to Mexico to await their immigration proceedings as part of the Migrant Protection Protocols program. Around 42,000 migrants have been sent back under the program.

In Wednesday's report, the Transactional Records Access Clearinghouse notes that the Migrant Protection Protocols cases still make up a small share of the court's active backlog.

CNN's Catherine E. Shoichet contributed to this report.

Search CNN...

US

World

Politics

Business

Opinion

Health

Entertainment

Tech

**AR00948**

Style

Travel

Sports

Videos

Audio

Coupons

Weather

More



**FOLLOW CNN POLITICS**

   

Terms of Use    Privacy Policy    Do Not Sell My Personal Information    Accessibility & CC    About    Newsletters

Transcripts

© 2021 Cable News Network. A Warner Media Company. All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

AR00950



# Measuring *In Absentia* Removal in Immigration Court

By Ingrid Eagly, Esq. and Steven Shafer, Esq.

SPECIAL REPORT | JANUARY 2021



American Immigration Council

AR00951

# ABOUT THE AUTHORS

**Ingrid Eagly** is a Professor of Law at the UCLA School of Law. An expert on immigration law, Eagly is an affiliated faculty member of the UCLA Center for the Study of International Migration. She earned an A.B. from Princeton University and a J.D. from Harvard Law School.

**Steven Shafer** is a managing attorney at the Esperanza Immigrant Rights Project in Los Angeles. Before pursuing law, Shafer spent a decade as a social scientist at Princeton University and the Harvard Business School. Shafer earned a B.A. from Yale University, a M.A. in sociology from Princeton University, and a J.D. from UCLA School of Law.

# ABOUT THE AMERICAN IMMIGRATION COUNCIL

The American Immigration Council works to strengthen America by shaping how America thinks about and acts towards immigrants and immigration and by working toward a more fair and just immigration system that opens its doors to those in need of protection and unleashes the energy and skills that immigrants bring. Through its research and analysis, the American Immigration Council provides policymakers, the media, and the general public with information about how the immigration system works, the impact of policy proposals, and the crucial role that immigration plays in our communities and workplaces.

Visit us at www.AmericanImmigrationCouncil.org and www.ImmigrationImpact.com.

AR00952

# CONTENTS

**Executive Summary** ................................................................................................... 4

**Introduction** ................................................................................................................. 6

**The Overwhelming Majority of Immigrants Appear
for Their Immigration Court Hearing** ......................................................................... 7

**The Majority of Immigrants Came to Court if Given a Second Chance** ............... 10

**Immigrants Were More Likely to Miss Court in the Early Stages of the
Removal Process** ........................................................................................................ 11

**A Significant Portion of Immigrants Ordered Removed for Missing Court
Later Overturned That Order** ................................................................................... 12

**Higher Rates of Appearance in Court Were Associated with Having a
Lawyer, Applying for Relief from Removal, and Court Location** .......................... 13

**Conclusion** ................................................................................................................. 19

**Endnotes** .................................................................................................................... 22

# Executive Summary

Do immigrants attend their immigration court hearings? This question is central to current debates about the immigration court system. Contrary to claims by the government that most immigrants fail to appear in immigration court, our analysis of data provided by the federal government reveals that 83% of all nondetained immigrants with completed or pending removal cases from Fiscal Years (FY) 2008 through 2018 attended all of their court hearings. Among those who were represented by counsel during the same time period, 96% attended all of their court hearings. Moreover, we reveal that 15% of those who were ordered deported because they didn't appear in court successfully reopened their cases and had their removal orders rescinded. This crucial finding suggests that many individuals who fail to appear in court wanted to attend their hearings but never received notice or faced hardship in getting to court.

## Key Findings

- 83% of nondetained immigrants with completed or pending removal cases attended all their hearings from 2008 to 2018.

- 96% of nondetained immigrants represented by a lawyer attended all of their hearings from 2008 to 2018.

- 15% of all removal orders for failure to appear issued from 2008 to 2018 were successfully overturned. In some years, as many as 20% of all orders of removal for missing court were later overturned.

- Individuals who appliedy for relief from removal hadve especially high rates of appearance.

- Appearance rates variedy strongly based on the immigration court's location.

- The Executive Office for Immigration Review's method for measuring the rate at which immigrants fail to appear in court presents a limited picture of the frequency of missed court appearances.

**AR00954**

This report presents these and other key findings from a recent study of the rate at which immigrants appear for hearings in U.S. immigration court. The findings stand in marked contrast to the bold and inconsistent claims made by former President Donald Trump and members of his administration about purportedly dismal court appearance rates. Indeed, former President Trump repeatedly shared misinformation that noncitizens never or rarely appear in court. Policymakers have relied on these assertions about purported failures to appear to drive key decisions, including to expand reliance on immigration detention and to reduce access to asylum. Appearance rates have also been pivotal to the debate about building a border wall, which the Trump administration sought to justify by claiming that those who cross the southern border simply "vanish" into the country and never come to court.

This report provides accurate information, based on independent analysis of government data, of the rate at which immigrants attend court. It sheds light on the concerted effort made by immigrants to comply with the law so as to increase transparency to policymakers and the public. The report provides a detailed analysis of the frequency of *in absentia* orders and discusses the important relationship between appearance rates and representation by counsel, applications for relief, and court location. Taken together, this data-driven report lays bare the lie that noncitizens never appear in court. It also serves as a necessary guide for the newly elected administration of President Joe Biden, which has the opportunity to take a fresh look at immigration policy and implement the data-driven policy recommendations discussed in the report's conclusion.

## About the Data

This report analyzes the government's own court records in immigration cases. Using the Freedom of Information Act (FOIA), these court records were obtained from the Executive Office for Immigration Review (EOIR), the division of the Department of Justice (DOJ) that conducts immigration court proceedings. EOIR periodically updates these data, and we analyzed data tables made available by EOIR as of November 2, 2018. These data included 8,253,223 immigration court proceedings, with completed and pending cases dating back to 1951.

To conduct the analysis, we limited our data to 2,797,437 nondetained removal proceedings from the period between fiscal years 2008 and 2018. These proceedings included both individuals who were never detained and those who were released from detention. Each of these immigration court proceedings contained one or more hearings.

For more information regarding the data and methodology used in this analysis, see Ingrid Eagly and Steven Shafer, "Measuring *In Absentia* Removal in Immigration Court," *University of Pennsylvania Law Review* 168, no. 4 (2020): 817-876.

**AR00955**

# Introduction

Throughout much of the 20th century, immigrants that the United States sought to deport were required to present themselves to "Special Inquiry Officers" for the former Immigration and Naturalization Service (INS), who in 1973 were authorized to wear judicial robes and use the title of "immigration judge." At those hearings, immigration judges would choose whether to issue a deportation order. In 1983, immigration judges became part of the Department of Justice (DOJ) and housed within a new agency, the Executive Office for Immigration Review (EOIR).

Prior to 1990, immigration judges had discretion over how to handle missed court appearances. For example, they could hold a hearing and dismiss, continue, or administratively close the case. In 1990 the law was amended to require immigration judges to order a noncitizen who missed even one court hearing deported. This type of deportation without the individual being present in court is called *in absentia* removal, based on the Latin phrase meaning "in the absence of."

Today, immigration judges must order removal *in absentia* if the noncitizen is not in court at the scheduled hearing, provided the government can first establish by "clear, unequivocal, and convincing evidence" that the noncitizen is subject to removal and that written notice of the hearing was provided. Those subject to *in absentia* removal are generally barred from seeking admission to the United States or relief from removal for a period of years.

Since the 1990 law took effect, U.S. government officials have routinely relied on a purported rise in the prevalence of *in absentia* removal orders to support major policy shifts to the immigration system and buttress legal arguments defending those changes. For example, in 1995 Congress relied on government-produced statistics showing a "high rate of no-shows for those criminal aliens released on bond" to change the immigration law to require noncitizens with certain convictions be mandatorily detained pending deportation without access to a bond hearing. In 2002, the solicitor general cited those same government *in absentia* statistics as persuasive authority in defending against a challenge to the constitutionality of mandatory detention. The U.S. Supreme Court later relied on the government's statistical claims to uphold the constitutionality of mandatory detention for immigrants with criminal convictions as reasonable to prevent "an unacceptable rate of flight."

More recently, DOJ officials have repeatedly told the public that many asylum seekers "simply disappear and never show up at their immigration hearings," thus justifying tighter restrictions on the asylum law and even criminal prosecution of asylum seekers to prevent the court system from being "gamed." Claims about failures to appear have also been relied upon by the Department of Homeland Security (DHS) to justify the so-called Migrant Protection Protocols (MPP) program that requires migrants to remain in Mexico to await their immigration court hearings. The Department of Health and Human Services and DHS have also prominently relied on purportedly high *in absentia* rates to argue in favor of radically restructuring the established system that protects children against long-term detention.

**AR00956**

Summary entry of a removal order when someone does not appear for a hearing—without the opportunity for the individual to respond and without regard to the merits of the individual's eligibility for relief—has been controversial and raises serious due process concerns. The practice also differs markedly from the criminal system, where failure to appear at trial is generally treated with issuance of an arrest warrant, not adjudication of the criminal charges without the defendant present in court. For example, pursuant to Federal Rule of Criminal Procedure 43, a defendant's presence in court is required to begin a trial and cannot be waived. This is very different from the immigration court system, where there is no requirement that a noncitizen be present before concluding the hearing with the entry of a removal order.

Although much is at stake, government officials offer no verifiable empirical support for their claims that migrants "never" or rarely come to court. Therefore, scholars, members of the press, and other experts have turned to the annual report published by the statistical division of EOIR. The EOIR's annual statistics yearbook has typically included a measurement of the *in absentia* removal rate but has offered only a sparse description of the method used to reach their measurement. This report offers an independent analysis of EOIR's method for calculating *in absentia* removal and discusses the policy implications of these findings.

## The Overwhelming Majority of Immigrants Appear for Their Immigration Court Hearings

This report relies on the government's own court data to provide reliable measurements of *in absentia* removal orders. Specifically, to calculate the rate at which immigrants have been ordered removed for failing to appear in court, we analyzed data released by EOIR, the agency within DOJ that contains the immigration courts. Because almost all *in absentia* orders take place in nondetained cases, we limited our analysis to those cases where the immigrant was never detained by ICE or had been detained and then released. In total, we analyzed 2,797,437 nondetained removal proceedings from the period between fiscal years 2008 and 2018.

We examined these data using three different analytical methods for calculating *in absentia* removal.

First, we replicated the method of calculating the *in absentia* rate generally used by EOIR in its annual statistics reports, which divides the number of *in absentia* removals issued at the initial case completion stage of a case by the total number of initial immigration judge decisions issued during the fiscal year. Initial immigration judge decisions are the first on-the-merits decisions by the immigration judge to order removal, grant relief, or terminate the case. This report refers to EOIR's approach to measuring the *in absentia* rate as the "IJ decisions" method.

Second, we analyzed the rate at which immigrants were ordered removed for failure to appear among all cases which reached an initial case completion of any kind, including both initial immigration judge decisions and other immigration judge completions, such as administrative closures. Administrative closure is a discretionary docket-management

tool that immigration judges have used for decades. Through this practice, a judge removes a case from the active docket, thereby putting the case on indefinite hold and allowing the noncitizen to remain in the United States. We call this the "all completions" method.

Third, we analyzed the rate at which immigrants were ordered removed for failure to appear as a percentage of both all initial case completions (including initial immigration judge decisions and other immigration judge completions) and pending cases. Pending cases are not yet resolved and have ongoing hearings to rule on motions and applications for relief. Pending cases ballooned from 156,714 in 2008 to 707,147 in 2018. This report calls this approach that includes pending cases the "all matters" method.

### Table 1: *In Absentia* Removal Rate (Initial Case Completions), by Method (Nondetained Only)

| Fiscal Year | IJ Decisions | | Other | | *In Absentia* Removal Rate (Among . . .) | | |
| | *In Absentia* | Not *In Absentia* | Other IJ Completions | Pending | IJ Decisions | All Completions | All Matters |
|---|---|---|---|---|---|---|---|
| 2008 | 24,882 | 60,337 | 8,020 | 144,996 | 29% | 27% | 8% |
| 2009 | 22,071 | 57,640 | 6,803 | 178,156 | 28% | 26% | 6% |
| 2010 | 23,852 | 64,357 | 7,883 | 212,053 | 27% | 25% | 6% |
| 2011 | 21,739 | 65,417 | 5,235 | 246,153 | 25% | 24% | 5% |
| 2012 | 18,990 | 60,344 | 14,994 | 275,132 | 24% | 20% | 4% |
| 2013 | 20,940 | 56,727 | 27,243 | 303,015 | 27% | 20% | 4% |
| 2014 | 25,587 | 46,655 | 29,845 | 372,884 | 35% | 25% | 5% |
| 2015 | 37,994 | 45,467 | 41,003 | 393,651 | 46% | 31% | 6% |
| 2016 | 33,896 | 47,579 | 47,071 | 443,658 | 42% | 26% | 5% |
| 2017 | 41,374 | 45,684 | 28,055 | 559,855 | 48% | 36% | 5% |
| 2018 | 44,764 | 63,975 | 9,046 | 673,580 | 41% | 38% | 5% |
| *Summary Statistics* | | | | | | | |
| Total | 316,089 | 614,182 | 225,198 | 673,580 | 34% | 27% | 17% |
| Average | 28,735 | 55,835 | 20,473 | 345,739 | 34% | 27% | 5% |
| (SD) | (9,092) | (7,990) | (14,877) | (163,990) | (8%) | (6%) | (1%) |

**Source: Authors' analysis of Executive Office for Immigration Review data, FY 2008–2018**

AR00958

Table 1 provides the findings from this analysis. Each of these three methods yielded a different *in absentia* rate for nondetained immigrants during the period from 2008 to 2018.

- First, using the government's IJ decisions method, the *in absentia* rate was 34%.

- Second, using the all completions method, the *in absentia* rate was 27%.

- Third, using the all matters method, the *in absentia* rate was 17%.

When the same data were analyzed using the government's IJ decisions method, nondetained immigrants appear to miss court much more often. The government measurement is twice as high as the all matters approach—34% of the time compared to just 17% of the time. That means that under the all matters approach, immigrants have appeared for all scheduled hearings in 83% of all pending and completed cases over an 11-year period.

Of the three methods, the all matters method is the most reliable measurement of the rate at which immigrants appear in court. First, unlike the government's IJ decisions method, the all matters method includes all judicial decisions, including decisions to administratively close a case, in its analysis. Because administrative closure reached a rate as high as one-fourth of all initial case completions from 2008–2018, the failure to include such closures makes the government method significantly less inclusive of what is happening in immigration court.

Second, unlike the government's IJ decisions method, the all matters method includes pending cases. If immigration cases were quickly decided on their merits, excluding pending cases when measuring the *in absentia* removal rate—as EOIR does—might make sense. But given the immense and growing backlog in the immigration courts, cases can drag on for many years before a decision is reached. During this time, immigrants who diligently are attending all of their court hearings should not be excluded from calculations of appearance rates.

Because the government's IJ decisions method excludes pending cases, it does not account for the hundreds of thousands of cases each year in which immigrants appear for a hearing while their case wends its way through the lengthy court process. Given the flaws with the government's IJ decisions method, and its tendency to overstate the rate at which immigrants fail to appear in court, we recommend against the method's use whenever possible.

**Figure 1: *In Absentia* Removal Rate, by Calculation Method (Nondetained Only)**



Source: Authors' analysis of Executive Office for Immigration Review data, FY 2008–2018

# The Majority of Immigrants Came to Court if Given a Second Chance

The immigration court compliance rates discussed above reveal that the vast majority of immigrants have attended their court hearings. For those who do miss their hearings, a crucial question is whether they were made aware of their court date and time in accordance with due process. Indeed, court appearance rates must be considered against the backdrop of a pervasive failure of DHS to include the time and date of hearings in the charging documents given to individuals in removal proceedings. In a 2018 oral argument before the U.S. Supreme Court, counsel for the government admitted that "almost 100%" of notices to appear issued over the previous three years had omitted the time and date of the court proceeding. These pervasive defects in notice are part of the reason why noncitizens do not appear in court. This reality has made it hard for individuals—particularly if they do not speak English, are unfamiliar with the court system, or do not have lawyers—to figure out when and where to go to court.

To address these notice deficits, we evaluated how often immigration judges identified failures to appear that occurred because of notice issues. Looking at the cases of individuals who were never detained, we found that immigration judges adjourned fewer than 1% of initial hearings due to potential notice issues. However, when judges did adjourn these missed hearings due to notice issues, we found that 54% of these individuals appeared in court at the next hearing.

This is an essential data point. First, it reveals that, although notice issues were prevalent during the time period of this study and the government has the burden to prove proper service of notice, notice issues were rarely identified or challenged by immigration judges. Second, it demonstrates that when immigration judges did pay attention to notice issues, the majority of noncitizens made it to court after the notice issue was addressed.

## Immigrants Were More Likely to Miss Court in the Early Stages of the Removal Process

Each immigration proceeding contains one or more hearings. The first hearings in a case are generally referred to as "initial master" hearings (also commonly known as "master calendar" hearings), which are scheduled to allow for general administration of the case, including the taking of pleadings, requests for time to find an attorney or time to prepare a case, and the filing of applications for relief. Some cases proceed on to an "individual" hearing (also commonly known as "merits" hearing) in which the immigration judge adjudicates the substance of the claim for relief, such as asylum or cancellation of removal.

As seen in Figure 2, 47% of *in absentia* removal orders occurred at the very first hearing in the case. The pattern was very different among initial case completions that did not result in an *in absentia* order. Less than 9% of non-*in absentia* decisions were completed at the first hearing. These patterns, along with the other data reported above, suggest that some immigrants who fail to appear at their first hearing may not have received notice about the court proceeding.

Figure 2 also reveals that once individuals have begun the court process, they were more likely to appear in court. In other words, the more an immigrant becomes invested in the court process through awareness of how the system works and familiarity with the procedural requirements, the less likely the person is to fail to appear.



**Figure 2: Number of Hearings Before Initial Case Completion, by Decision Type (Nondetained Only)**

Source: Authors' analysis of Executive Office for Immigration Review data, FY 2008–2018

**AR00961**

American Immigration Council   **11**

# A Significant Portion of Immigrants Ordered Removed for Missing Court Later Overturned That Order

Immigrants may overturn a removal order for failure to appear in court in two specific circumstances, both of which require the immigrant to prove they did not intentionally or negligently fail to appear:

- When a motion to reopen is filed within 180 days of the order of removal, demonstrating that "exceptional circumstances" prevented the immigrant from appearing in court and led to the failure to appear.

- When the immigrant can prove that they never received notice of the scheduled hearing.

We relied on the EOIR data to examine what happened after the initial *in absentia* order was entered. From 2008 to 2018, nearly 20% of all *in absentia* removal orders were challenged through a motion to reopen. These motions were overwhelmingly successful, and fully 15% of those who were ordered removed *in absentia* during that period successfully reopened their cases and had their deportation orders rescinded (see Figure 3 & Table 2). This crucial finding suggests that many individuals who failed to appear in court wanted to attend their hearings but never received notice or faced hardship in getting to court.

**Figure 3: Rate at Which *In Absentia* Orders Are Overturned, by Fiscal Year Order of Removal Order Entered (Nondetained Only)**



Source: Authors' analysis of Executive Office for Immigration Review data, 2008–2018

**AR00962**

## Table 2: Reopening of *In Absentia* Removal Orders, by Fiscal Year (Nondetained Only)

| Fiscal Year | *In Absentia* Removal at Initial Completion | Successful Motion to Reopen | Reopened (Percent) |
|---|---|---|---|
| 2008 | 24,882 | 4,716 | 19% |
| 2009 | 22,071 | 4,560 | 21% |
| 2010 | 23,852 | 4,651 | 19% |
| 2011 | 21,739 | 4,331 | 20% |
| 2012 | 18,990 | 3,464 | 18% |
| 2013 | 20,940 | 3,799 | 18% |
| 2014 | 25,587 | 4,188 | 16% |
| 2015 | 37,994 | 5,558 | 15% |
| 2016 | 33,896 | 4,589 | 14% |
| 2017 | 41,374 | 4,812 | 12% |
| 2018 | 44,764 | 3,284 | 7% |
| *Total* | 316,089 | 47,952 | 15% |

Source: Authors' analysis of Executive Office for Immigration Review data, FY 2008–2018

In reviewing Figure 3, note how older cases had a higher rate of reopening than newer cases. For cases that received an *in absentia* order in 2008, 19% were reopened by the end of our study period. In contrast, only 7% of *in absentia* orders entered in 2018 had been reopened at the end of 2018. This outcome makes sense given that many individuals with *in absentia* orders may not yet be aware that they were ordered removed and need time to make a motion to reopen in immigration court. Given the legal complexity of such a motion, individuals may also need time to find and retain counsel. Over time, therefore, we can expect the percentage of *in absentia* cases that are reopened to rise.

# Higher Rates of Appearance in Court Were Associated with Having a Lawyer, Applying for Relief from Removal, and Court Location

We also analyzed three factors associated with showing up in immigration court: having a lawyer, applying for relief from removal, and court location.

### Attorney Involvement

Noncitizens have a right to be represented by counsel in immigration proceedings, but generally not at the expense of the government. To evaluate the relationship between representation and *in absentia* removal rates, we examined the rate of *in absentia* removals among those who had counsel between 2008 and 2018.

**AR00963**

American Immigration Council  **13**

The data reveal that individuals with counsel rarely failed to show up in court. Even using the government's IJ decision method, persons with counsel were ordered removed *in absentia* just 8% of them time. When using the all matters method, those with counsel were ordered removed *in absentia* in just 4% of cases (see Figure 4).

**Figure 4: *In Absentia* Removal Rate for Individuals Represented by Counsel, by Calculation Method (Nondetained Only)**



Source: Authors' analysis of Executive Office for Immigration Review data, FY 2008–2018

We also find that most cases with failures to appear involved unrepresented litigants. Overall, only 15% of those who were ordered removed *in absentia* during our study period had an attorney. By contrast, 86% of those with an initial completion not ending *in absentia* had counsel (see Figure 4).

We also find that the ability to reopen an *in absentia* removal case is mainly reserved for those who find a lawyer. That is, among those who were able to successfully reopen their case after an *in absentia* removal order, 84% had a lawyer representing them.

As these striking statistics suggest, attorneys play a vital supporting role in ensuring that their clients make it to court. Attorneys can make sure their client knows when and where to appear and how to keep the court updated on any change of address. Without a lawyer, some immigrants attend their check-in appointments with ICE believing erroneously that it is their court date and then miss their actual court date. Others have reported missing their hearings after being given Notices to Appear (NTAs) with no court date or with a fake court date at an erroneous location. Unrepresented litigants may also encounter challenges in completing the necessary court documents to reschedule an immigration court hearing or to notify the court about a change of address. For example, despite policy to the contrary, immigration courts do not always accept notifications of changes of address before proceedings have formally begun, making it impossible to receive notice at a new address.

**AR00964**

## Applying for Relief

Immigration removal proceedings are best understood as occurring in two stages. In the first stage, the immigration judge decides whether to sustain the charge of removability alleged by DHS in the NTA against the individual, who is referred to in immigration court as the "respondent." If the charge is sustained and the respondent is found to be subject to removal, the respondent can seek relief from removal in the second stage. There are numerous forms of relief in immigration court. The most commonly sought are asylum, cancellation of removal, and adjustment of status. To qualify for relief, a respondent must satisfy the applicable statutory eligibility requirements and convince the judge that the case merits the favorable exercise of discretion. A respondent who wins relief will be able to remain lawfully in the United States.

Across the 11 years of our study period, 48% of individuals in removal proceedings who were not detained sought some form of relief prior to the initial completion in their cases. Among these individuals who sought relief, 72% submitted an asylum application; 28% applied for cancellation of removal for lawful permanent residents or non-lawful permanent residents; and 10% applied for adjustment of status.

Overall, 95% of all litigants with completed or pending applications for relief attended all of their court hearings between 2008 and 2018. This result makes sense: individuals pursuing claims for relief in court have a strong incentive to fight for permission to remain in the United States.

Figure 5 presents the *in absentia* rates for nondetained respondents who sought relief in immigration court, organized by the most common types of relief (asylum, cancellation of removal, and adjustment of status). We present these findings using all three possible measurements for *in absentia* removal: as percentages of all initial immigration judge decisions on the merits, all initial case completions, and all matters. Focusing on the all matters approach, only 6% of those seeking asylum failed to appear during the study period, while only 3% of those seeking cancellation of removal and 2% of those seeking adjustment of status did.

**Figure 5: *In Absentia* Removal Rate,
by Application Type and Calculation Method (Nondetained Only)**



Source: Authors' analysis of Executive Office for Immigration Review data, FY 2008–2018

**AR00965**

These findings are noteworthy because they reveal that immigrants seeking relief are highly likely to come to court. Such statistics have not traditionally been released by the federal government, which generally provides only overall rates—not rates among those seeking relief from removal.

**Court Location**

The *in absentia* rate also varied by court location. Currently, there are more than 60 different cities in the United States that host immigration courts, and approximately 460 immigration judges appointed by the attorney general of the United States. As seen in Table 3, the variation in *in absentia* removal rates by city was striking, ranging from a high of 54% in Harlingen, Texas, to a low of 15% in New York City. The three courts that handled the highest numbers of cases involving individuals who were not detained—San Francisco, Los Angeles, and New York—also had among the lowest *in absentia* removal rates.

Some of these differences across jurisdictions no doubt reflect different migrant populations at these court locations. In column 3 of Table 3 we calculate by jurisdiction the percentage of nondetained initial case completions that involved respondents who were never detained (as opposed to being released from detention). In Harlingen, Texas, for example, only 20% of initial case completions were for never-detained respondents; the remaining 80% were for individuals who were released from detention. Interestingly, however, there was still wide variation in the *in absentia* removal rates across cities with similar proportions of never-detained cases. For example, approximately two-thirds of the dockets in both San Francisco and Dallas were composed of cases of individuals who were never detained, but the *in absentia* removal rate in San Francisco was 19%, compared to 41% in Dallas.

This deviation in appearance rates may also reflect differences in local court practices. For example, some local courts may have better and more timely systems in place for scheduling court hearings and notifying respondents about their upcoming court hearings. A 2017 DOJ on-site review of the immigration court in Baltimore, Maryland, found that the court was so understaffed as caseloads grew that administrators were unable to enter change-of-address paperwork sent to the court into their computer system. This problem means that respondents would not receive their court notices, which the report warned "can result in respondents being ordered removed [for failure to appear in court] through no fault of their own." As our data reveal, 33% of respondents in the Baltimore court were ordered removed for failure to appear.

**Table 3:  *In Absentia* Removal as a Percentage of Initial Case Completions, by Court Location (Nondetained Only)**

| City | Initial Case Completions | Never-Detained (% of total) | Active IJs (2008—2018) | *In Absentia* Rate |
|---|---|---|---|---|
| Harlingen, TX | 16,535 | 20% | 8 | 54% |
| Houston, TX | 46,691 | 56% | 17 | 46% |
| New Orleans, LA | 17,633 | 53% | 12 | 45% |
| Charlotte, NC | 36,619 | 78% | 4 | 44% |
| San Antonio, TX | 26,444 | 19% | 16 | 42% |
| Dallas, TX | 34,193 | 69% | 9 | 41% |
| Chicago, IL | 41,253 | 60% | 13 | 38% |
| Memphis, TN | 26,225 | 75% | 7 | 36% |
| Atlanta, GA | 37,845 | 66% | 10 | 35% |
| Arlington, VA | 41,022 | 67% | 15 | 33% |
| Baltimore, MD | 33,407 | 76% | 9 | 33% |
| Orlando, FL | 39,334 | 79% | 9 | 29% |
| Philadelphia, PA | 20,015 | 73% | 8 | 28% |
| Kansas City, MO | 17,862 | 57% | 13 | 28% |
| Cleveland, OH | 14,423 | 60% | 11 | 28% |
| Newark, NJ | 30,641 | 65% | 18 | 27% |
| Miami, FL | 85,383 | 77% | 37 | 26% |
| Boston, MA | 33,517 | 73% | 12 | 24% |
| Denver, CO | 18,722 | 57% | 10 | 23% |
| Los Angeles, CA | 135,393 | 74% | 54 | 23% |
| Seattle, WA | 22,113 | 61% | 5 | 19% |
| San Francisco, CA | 59,257 | 68% | 31 | 19% |
| San Diego, CA | 18,583 | 50% | 10 | 17% |
| Phoenix, AZ | 25,140 | 42% | 5 | 16% |
| New York, NY | 149,444 | 76% | 48 | 15% |

Source: Authors' analysis of Executive Office for Immigration Review data, FY 2008–2018

Another court practice that is associated with whether respondents came to court is the length of delay between the issuance of the NTA and the initial court date. Looking only at all initial case completions among never detained, we found that the average time between the filing of the NTA and the initial hearing was 239 days for cases that ended with *in absentia* orders. By comparison, on average there were only 167 days between the filing of the NTA and the first hearing in never-detained cases that did not end with *in absentia* removals. The median number of days showed similar patterns: 153 days median for cases ending *in absentia*, compared to 101 days median for cases not ending *in absentia*. This finding suggests that, on average, long delays can make it harder for people to receive proper notice, remember their court hearings, and remain in contact with the court.

The availability of counsel in different jurisdictions may be an additional contributing factor to variation in failures to appear. In previous work, we found that some cities have very few practicing immigration attorneys. These problems were most acute in smaller cities where detained courts tend to be located. For example, we found that Lumpkin, Georgia, where the Stewart Detention Center is located did not have a single practicing immigration lawyer in 2015, and Oakdale, Louisiana, had only four. As a result, the rate of attorney representation also varies dramatically between immigration courts.

AR00967

Notably, those cities with the highest *in absentia* removal rates using the all case completions method also had the lowest representation rates (Table 3). For example, in Harlingen, Texas, where 54% of nondetained respondents were ordered removed for failing to appear, only 41% of nondetained respondents had counsel. In sharp contrast, 85% of nondetained respondents in New York City's immigration court had counsel, and only 15% were removed for not appearing in court.

In summary, attorney representation, seeking relief, and court assignment were all associated with variation in *in absentia* removal rates. Individuals who filed claims for relief (such as asylum or cancellation of removal) were very unlikely to miss court: 95% attended all of their court hearings over the 11 years of our study in pending and completed nondetained cases. Those who obtained lawyers also almost always came to court: 96% attended all court hearings in pending and completed nondetained cases. In addition, the prevalence of *in absentia* removals varied widely based on court location, ranging from a low of 15% of all initial case completions in New York City, to a high of 54% in Harlingen, Texas.

## Conclusion

A key insight of this report is that the method chosen for measuring failures to appear in court matters. As we have set forth, the method adopted by the government to measure annual rates of *in absentia* removals—as a percentage of initial immigration judge decisions on the merits—ignores a large number of court cases in which respondents have not missed any court hearings. In particular, the government's measurement ignores cases that are administratively closed, an essential tool that has been used by immigration judges over the past decade to remove cases indefinitely from the immigration court's docket. The government's measurement also ignores the historically high number of backlogged cases pending in immigration courts today. These backlogs matter because nondetained deportation cases now take many court hearings and several years to resolve, and during this time immigrants continue to appear for their court hearings. This report has argued that counting administrative completions and pending cases in the *in absentia* removal measurement is a necessary complement to the government's measurement that enhances public understanding of the rate at which noncitizens are complying with their court dates. We recommend that future statistical reporting by EOIR include these measurements.

The analysis of over a decade of government data presented here also has immediate relevance to the consideration of policy questions in which statistics on failures to appear in court play a central role. The findings presented in this report are particularly important as the new administration of President Joe Biden considers how to reform the immigration system, including the immigration courts. The "timely and fair" adjudication of asylum and other cases by immigration judges is a vital component of the Biden plan "for securing our values as a nation of immigrants."

In particular, this report supports four meaningful policy reforms:

**AR00968**

1. reducing reliance on detention and programs such as the Migrant Protection Protocols (MPP) that keep asylum seekers in Mexico while awaiting court hearings;

2. ensuring access to counsel for individuals in removal proceedings;

3. reforming the *in absentia* law and enhancing judicial training; and

4. establishing an independent Article I immigration court.

First, our finding that the vast majority of nondetained respondents attended their court hearings supports releasing far more people from custody rather than creating stricter detention rules and expanded detention capacity. Further improvement in court appearance rates could also be attained by learning from the proven success of other court systems in providing reminder calls, postcards, and text messages with the accurate time and date of the hearing. In addition, ICE could ensure that individuals who are scheduled for agency check-ins are educated on the court process and provided transportation assistance to court if necessary. Our analysis showing that asylum seekers are very likely to attend their court hearings similarly undermines arguments that asylum seekers should be prevented from entering the country out of a fear they will not come to court.

Second, further enhancements in appearance rates could be fostered by expanding funding for pro bono lawyers and know-your-rights programs. Our data show that individuals with attorneys have near-perfect attendance rates. Over the 11 years of our study, 96% of represented individuals in completed or pending courts attended all of their court hearings (Figure 4).

Third, this report's findings support giving immigration judges greater independence and training to give individuals a second chance to come to court. Our independent analysis of federal data reveals that in those cases where individuals were given another opportunity to come to court, more than half did show up at the next hearing. One significant reform along these lines would be to amend the immigration law to give judges greater discretion to provide immigrants more chances to come to court, as the law allowed prior to 1990. Even if the law is not changed, EOIR could work to train judges to more carefully scrutinize notice issues at the first hearing to ensure that proper notice was provided before issuing any removal orders, making sure that DHS has met its burden to prove by clear, unequivocal, and convincing evidence that a person has received proper notice.

Finally, this report supports the creation of an independent structure for the immigration courts. The federal tax and bankruptcy courts provide precedent for creating specialized federal courts under Article I of the United States Constitution. Such an independent court structure would help to reduce the prevalence of unwarranted *in absentia* removal orders by giving immigration judges more authority over their dockets and individual case decisions. As an independent court, judges would feel less pressure to meet case quotas and approve removal orders, allowing them to focus proper attention on notice deficiencies. Judges would also have more flexibility to use court continuances to give respondents further opportunity to come to court.

# Endnotes

1. The findings in this report were first published in Ingrid Eagly and Steven Shafer, "Measuring *In Absentia* Removal in Immigration Court," *University of Pennsylvania Law Review* 168, no. 4 (2020): 817-876.

2. In the final presidential campaign debate in 2020, President Trump claimed that "less than 1%" of immigrants "come back" to court. "Debate Transcript: Trump, Biden Final Presidential Debate Moderated by Kristen Welker," *USA Today*, October 23, 2020, https://www.usatoday.com/story/news/politics/elections/2020/10/23/debate-transcript-trump-biden-final-presidential-de-bate-nashville/3740152001/ [https://perma.cc/8VWA-G443]. President Trump made similar remarks throughout his term in office. See e.g., Remarks During a Roundtable Discussion on Tax Reform in Cleveland, Ohio, 2018 Daily Compilation of Presidential Documents, May 5, 2018, 2 ("Our immigration laws are a disgrace . . . . We give them, like, trials. That's the good news. The bad news is, they never show up for the trial. . . . Nobody ever shows up."); Remarks Prior to a Working Lunch with President Kersti Kaljulaid of Estonia, President Raimonds Vejonis of Latvia, and President Dalia Grybauskaite of Lithuania and an Exchange with Reporters, 2018 Daily Compilation of Presidential Documents, April 3, 2018, 3 ("We cannot have people flowing into our country illegally, disappearing, and, by the way, never showing up to court."); Remarks at the American Farm Bureau Federation's 100th Annual Convention in New Orleans, Louisiana, 2019 Daily Compilation of Presidential Documents, January 14, 2019, 6 ("Tell me, what percentage of people come back [for their trial]? Would you say 100 percent? No, you're a little off. Like, how about 2 percent? [Laughter] . . . Two percent come back. Those 2 percent are not going to make America great again, that I can tell you. [Laughter]"); Remarks at the National Federation of Independent Businesses 75th Anniversary Celebration, 2018 Daily Compilation of Presidential Documents, June 19, 2018, 5 ("Do you know, if a person comes in and puts one foot on our ground . . . they let the person go; they say show back up to court in 1 year from now. One year. . . . But here's the thing: That in itself is ridiculous. Like 3 percent come back.").

3. For example, amid claims that migrants will not come to court, President Trump called for $4.2 billion in additional funding to dramatically increase the federal government's capacity to detain immigrants. See "President Donald J. Trump Calls on Congress to Secure Our Borders and Protect the American People," White House, January 8, 2019, https://trumpwhitehouse.archives.gov/briefings-statements/president-donald-j-trump-calls-congress-secure-our-borders-protect-american-people/ [https://perma.cc/M7EG-RZ98].

4. On November 9, 2018, President Trump issued a proclamation drastically reducing access to asylum, supported in part by a claim that "many released aliens fail to appear for hearings." Proclamation No. 9822, 83 Fed. Reg. 57,661 (November 9, 2018).

5. See, e.g., "Remarks by President Trump in Cabinet Meeting," White House, January 2, 2019, https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-cabinet-meeting-12/ [https://perma.cc/6WJH-M6J7] (arguing that "[t]he United States needs a physical barrier, needs a wall, to stop illegal immigration" and claiming that without a wall asylum seekers will enter the country and instead of coming to court will "vanish[] and escape[] the law").

6. "Evolution of the U.S. Immigration Court System: Pre-1983," Executive Office for Immigration Review, U.S. Department of Justice, April 30, 2015, https://www.justice.gov/eoir/evolution-pre-1983 [https://perma.cc/QCT8-SHHV].

7. "Evolution of the U.S. Immigration Court System: Post-1983," Executive Office for Immigration Review, U.S. Department of Justice, April 30, 2015, https://www.justice.gov/eoir/evolution-post-1983 [https://perma.cc/ZJF2-VR4J].

8. Immigration and Nationality Act (I.N.A.) § 242(B)(c)(3), 8 U.S.C. § 1252(b) (1988); see also William R. Robie, Chief Immigration Judge, Executive Office for Immigration Review, to All Immigration Judges, Operating Policy and Procedure Memorandum 84-2: Cases in Which Respondents/Applicants Fail to Appear for Hearing, March 7, 1984, 1, http://libguides.law.ucla.edu/ld.php?content_id=38258649 [https://perma.cc/W2WH-WDP9] (describing operating policy and procedures for how immigration judges may proceed if a respondent fails to appear).

9. See Immigration Act of 1990, Pub. L. No. 101-649, § 545(a), 104 Stat. 4978, 5063 (codified as amended at 8 U.S.C. § 1229a(b)(5)(a) (2018)) (providing that any noncitizen "who . . . does not attend a proceeding under section 242, shall be ordered deported under section 242(b)(1) in absentia").

10. The term removal has been used since 1997 to refer to the decision of an immigration judge to order an individual removed from the United States. Prior to April 1997, removal proceedings were separated into distinct procedures for exclusion and deportation. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 308(d)(4)(B), 110 Stat. 3009-546, 3009-585 (amending a section of the immigration law by "striking 'exclusion or deportation' and inserting 'removal'").

11. Executive Office for Immigration Review, U.S. Department of Justice, *FY 2013 Statistics Yearbook*, 2014, Glossary of Terms, 7, https://www.justice.gov/sites/default/files/eoir/legacy/2014/04/16/fy13syb.pdf [https://perma.cc/U3WF-W7S3] [hereinafter *EOIR 2013 Yearbook*].

12. I.N.A. § 240(b)(5)(A), 8 U.S.C. § 1229a(b)(5)(A) (2018); see also 8 C.F.R. § 1003.26 (2019) (defining *in absentia* hearings and identifying factors sufficient to order a respondent deported *in absentia*). EOIR defines an *in absentia* order as "[a]n order issued when an immigration judge determines that a removable alien received the required notice about their removal hearing and failed to appear." *EOIR 2013 Yearbook*, 7.

13. See generally I.N.A. § 212(a)(6)(B), 8 U.S.C. § 1182(a)(6)(B) (providing that failure to appear without reasonable cause renders a noncitizen inadmissible for five years); I.N.A. § 240(b)(7), 8 U.S.C. § 1229a(b)(7) (stating that failure to appear for a removal hearing bars a noncitizen from relief for ten years).

14. S. Rep. No. 104-48, 32 (1995); see also ibid. ("Congress should consider requiring that all aggravated felons be detained pending deportation. Such a step may be necessary because of the high rate of no-shows for those criminal aliens released on bond."). The resulting mandatory detention rules for those with convictions are codified at I.N.A. § 236(c), 8 U.S.C. § 1226(c).

15. Brief for Petitioners at 19, Demore v. Kim, 538 U.S. 510 (2003) (No. 01-1491), 2002 WL 31016560 (arguing that "more than 20% of criminal aliens who were released on bond or otherwise not kept in custody throughout their deportation proceedings failed to appear for those proceedings").

AR00970

16. *Demore v. Kim*, 538 U.S. 510, 519-20 (2003); see also ibid. at 519 ("Once released, more than 20% of deportable criminal aliens failed to appear for their removal hearings.").

17. "Attorney General Jeff Sessions Delivers Remarks to the Executive Office for Immigration Review," U.S. Department of Justice, October 12, 2017, https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review [https://perma.cc/675Y-TW7U].

18. Ibid. See also "Attorney General Sessions Delivers Remarks on Immigration Enforcement," U.S. Department of Justice, April 11, 2018, https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-immigration-enforcement [https://perma.cc/ZBN7-55FZ] (claiming that "loopholes in our laws [are] being exploited by illegal aliens" who, after release from detention, "simply disappear[]—never show[] up for their hearings in immigration court").

19. In announcing the MPP on December 20, 2018, then-DHS Secretary Kirstjen Nielsen claimed that without the new program asylum seekers would simply "disappear into the United States, where many skip their court dates." U.S. Department of Homeland Security, "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration," press release, December 20, 2018, https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration [https://perma.cc/ZSS3-3SWB] (internal quotation marks omitted); see also U.S. Department of Homeland Security, "Migrant Protection Protocols," press release, January 24, 2019, https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols [https://perma.cc/KZH4-D3SR] (justifying the Trump administration's MPP program based in part on the claim that migrants released into the country "disappear before an immigration judge can determine the merits of any claim").

20. See, e.g., Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 83 Fed. Reg. 45,486, 45,494 (proposed September 7, 2018) (codified at 8 C.F.R. pts. 212, 236; 45 C.F.R. pt. 410) ("While statistics specific to family units have not been compiled, the reality is that a significant number of aliens who are not in detention either fail to appear at the required proceedings or never actually seek asylum relief, thus remaining illegally in the United States."); see also "Acting Secretary of Homeland Security Kevin K. McAleenan on the DHS-HHS Federal Rule on Flores Agreement," U.S. Department of Homeland Security, August 21, 2019, https://www.dhs.gov/news/2019/08/21/acting-secretary-mcaleenan-dhs-hhs-federal-rule-flores-agreement [https://perma.cc/82YS-V9E4] (quoting the Acting Secretary of Homeland Security Kevin K. McAleenan claiming that the majority of removal orders issued to families have been issued *in absentia*, thus benefitting those with "meritless claims" for asylum).

21. See, e.g., Matter of Lei, 22 I. & N. Dec. 113, 121 (B.I.A. 1998) (Rosenberg, Board Member, concurring in part and dissenting in part) ("It is difficult to imagine what could be more prejudicial to a respondent charged with being deportable from the United States than denial of an opportunity to be present at his deportation hearing where he might provide any defenses to the charges against him, or advance any claims he may have for relief from deportation."); Matter of Villalba-Sinaloa, 21 I. & N. Dec. 842, 847-48 n.2 (B.I.A. 1997) (Rosenberg, Board Member, dissenting) (urging the majority to consider constitutional concerns when interpreting the statutory provision for *in absentia* removal).

22. Failure to appear is often treated in state court systems as a misdemeanor crime to be adjudicated separately from the merits of the underlying case. See, e.g., Ariz. Rev. Stat. Ann. § 13-2506(A)(1), (B) (2019); Cal. Penal Code § 1320(a) (2019).

23. Fed. R. Crim. P. 43(a); see also *Crosby v. United States*, 506 U.S. 255, 262 (1993) ("The language, history, and logic of Rule 43 support a straightforward interpretation that prohibits the trial *in absentia* of a defendant who is not present at the beginning of trial."). If, however, the defendant fails to appear after already appearing at the beginning of the trial, the trial may continue under certain circumstances. Fed. R. Crim. P. 43(c).

24. See Jennifer Lee Koh, "Removal in the Shadows of Immigration Court," *Southern California Law Review* 90, no. 2 (2017): 181, 218 (explaining that unlike in criminal court, a respondent's failure to appear in immigration court constitutes an "automatic loss for the noncitizen").

25. See generally "Statistics Yearbook," Executive Office for Immigration Review, U.S. Department of Justice, updated August 30, 2019, https://www.justice.gov/eoir/statistical-year-book [https://perma.cc/X6GZ-BGQ4] (containing links to Statistics Yearbooks from fiscal year 2000 through fiscal year 2018).

26. We note that the EOIR's 2018 Yearbook included measurements of total *in absentia* removals, but for the first time eliminated a calculation of the *in absentia* removal rate. Compare Executive Office for Immigration Review, U.S. Department of Justice, *Statistics Yearbook: Fiscal Year 2018*, 2019, 33, https://www.justice.gov/eoir/file/1198896/download [https://perma.cc/EVP7-SN2D] (providing data on the number of *in absentia* orders issued in fiscal years 2014–2018), with Executive Office for Immigration Review, U.S. Department of Justice, *Statistics Yearbook: Fiscal Year 2017*, 2018, 33, https://www.justice.gov/eoir/page/file/1107056/download [https://perma.cc/DC4B-YUDQ] (reporting *in absentia* rates in addition to the numbers of *in absentia* orders).

27. The authors acknowledge the foundational work of other researchers that has also contributed to public understanding of appearance rates in immigration court, including the Transactional Records Access Clearinghouse (TRAC), the Catholic Legal Immigration Network, the Asylum Seeker Advocacy Project, and the Vera Institute of Justice. See, e.g., "Details on Deportation Proceedings in Immigration Court," TRAC Immigration, updated December 2020, https://trac.syr.edu/phptools/immigration/nta [https://perma.cc/D2KV-UVQ5] (select "Hearing Attendance," "Immigration Court State," and "Month and Year Case Began," and click link for "Not Present at Last Hearing (Absentia Decision)") (organizing *in absentia* totals by state and time period); "Priority Immigration Court Cases: Women with Children," TRAC Immigration, updated May 2018, https://trac.syr.edu/phptools/immigration/mwc [https://perma.cc/6THA-MWUX]; Asylum Seeker Advocacy Project and Catholic Legal Immigration Network, Inc., *Denied a Day in Court: The Government's Use of In Absentia Removal Orders Against Families Seeking Asylum*, 2019, 15, https://asylumadvocacy.org/wp-content/uploads/2018/04/Denied-a-Day-in-Court-2019-Update.pdf [https://perma.cc/96EB-CTR8] [hereinafter *Denied a Day in Court*] (discussing how families may miss court hearings in part due to lack of notice); Eileen Sullivan, et al., *Testing Community Supervision for the INS: An Evaluation of the Appearance Assistance Program* (Vera Institute of Justice, 2000), 33, 36, https://www.vera.org/publications/testing-community-supervision-for-the-ins-an-evaluation-of-the-appearance-assistance-program [https://perma.cc/2AWQ-66ML] (finding that roughly 90% of noncitizens who were supervised appeared in court, compared with 71% of nonparticipants); Vera Institute of Justice, "Evidence Shows That Most Immigrants Appear for Immigra-

tion Court Hearings," October 2020, https://www.vera.org/publications/immigrant-court-appearance-fact-sheet [https://perma.cc/LD7B-25TG] (summarizing research on appearance rates).

28. These data were made available for download to researchers by EOIR. See "Executive Office for Immigration Review," U.S. Department of Justice, accessed January 23, 2021, https://www.justice.gov/eoir [https://perma.cc/L2AV-VLYR] (providing a link to download court data under the heading "EOIR Case Data"). We analyzed data tables made available by EOIR as of November 2, 2018.

29. EOIR defines an "initial case completion" as the first dispositive decision issued by the immigration judge in a case. *EOIR 2013 Yearbook*, 7. Under this approach, EOIR does not count decisions to change venue or transfer a case as an initial case completion.

30. Ibid., P1 (calculating the "*in absentia* rate" as the percentage of initial immigration judge completions that end in *in absentia* removal); see also Executive Office for Immigration Review, U.S. Department of Justice, *FY 2014 Statistics Yearbook*, 2015, P1, https://www.justice.gov/sites/default/files/eoir/pages/attachments/2015/03/16/fy14syb.pdf [https://perma.cc/U8DF-4JVS]; Executive Office for Immigration Review, U.S. Department of Justice, *FY 2015 Statistics Yearbook*, 2016, P1, https://www.justice.gov/eoir/page/file/fysb15/download [https://perma.cc/WH27-CH6J]; Executive Office for Immigration Review, U.S. Department of Justice, *FY 2016 Statistics Yearbook*, 2017, B2 & tbl.4, https://www.justice.gov/eoir/page/file/fysb16/download [https://perma.cc/VT6Z-P5UM]. Note that while the EOIR 2017 Yearbook uses a similar approach, EOIR narrowed its definition of relevant case types and its calculation of relevant immigration judge completions.

31. Brian M. O'Leary, Chief Immigration Judge, Executive Office for Immigration Review, to All Immigration Judges, All Court Administrators, All Attorney Advisors and Judicial Law Clerks, and All Immigration Court Staff, Operating Policies and Procedures Memorandum 13-01: Continuances and Administrative Closure 2-3, March 7, 2013, https://libguides.law.ucla.edu/ld.php?content_id=38258569 [https://perma.cc/643J-CE6J].

32. Ibid., 2 (instructing immigration judges to grant requests for administrative closure "in appropriate circumstances"); see also Executive Office for Immigration Review, U.S. Department of Justice, *Immigration Court Practice Manual*, 2018, 86, https://www.justice.gov/eoir/page/file/1084851/download [https://perma.cc/57QL-C32K] ("Once a case has been administratively closed, the court will not take any action on the case until a request to recalendar is filed by one of the parties."). In 2018, the Attorney General issued a decision to greatly restrict the practice of administrative closure. Castro-Tum, 27 I. & N. Dec. 271 (A.G. 2018). However, on August 29, 2019, the Fourth Circuit Court of Appeals abrogated *Castro-Tum*, finding that the immigration law unambiguously permits immigration judges to control their own dockets. Romero v. Barr, 937 F.3d 282, 286, 292-94 (4th Cir. 2019).

33. See U.S. Government Accountability Office, *Immigration Courts: Actions Needed to Reduce Case Backlog and Address Long-Standing Management and Operational Challenges*, GAO-17-438, 2017, 22, https://www.gao.gov/assets/690/685022.pdf [https://perma.cc/54GQ-LE2C] (finding that EOIR's case backlog more than doubled between fiscal years 2006 and 2015).

34. Transcript of Oral Argument at 52, Pereira v. Sessions, 138 S. Ct. 2105 (2018) (No. 17-459) (Frederick Liu, Assistant to the Solicitor General, Department of Justice, responding to Justice Anthony M. Kennedy).

35. Each time a hearing ends, the immigration court enters an "adjournment code" that describes the reason why the hearing was adjourned. One of these codes indicates that notice was sent or served incorrectly. See MaryBeth Keller, Chief Immigration Judge, Executive Office for Immigration Review, to All Immigration Judges, All Court Administrators, All Attorney Advisors and Judicial Law Clerks, All Support Staff, Operating Policies and Procedures Memorandum 17-02: Definitions and Use of Adjournment, Call-Up, and Case Identification Codes, October 5, 2017, 3, https://libguides.law.ucla.edu/ld.php?content_id=38258359 [https://perma.cc/LTH2-DE7A] (including Adjournment Code 10, to be used when an "[a]ttorney and/or alien does not appear at the scheduled hearing due to the notice of hearing containing inaccurate information, or, alien/attorney appears but has not received adequate notice of hearing of the proceedings").

36. Analyzing never-detained cases, we found that 11,121 out of a total of 1,285,947 initial hearings, or .86%, were adjourned due to lack of notice. This calculation measures the number of hearings that were adjourned with code 10, "Notice Sent/Served Incorrectly." Use of adjournment code 10 in the EOIR data dates back to the 1980s.

37. Analyzing both completed and pending cases, we found that 5,981 out of the 11,121 hearings adjourned for lack of notice at the initial-hearing stage did not end *in absentia*, compared to 5,140 that did result in an *in absentia* order.

38. I.N.A. § 240(b)(5)(A), 8 U.S.C. § 1229a(b)(5)(A) (2018).

39. Of 1,155,469 initial completions in our All Custody Removal Sample, only 4,344 cases (0.37%) were excluded from the analysis due to lack of hearing-level data.

40. I.N.A. § 240(b)(5)(C), 8 U.S.C. § 1229a(b)(5)(C).

41. Of the 316,089 cases where initial completion occurred through an *in absentia* removal order, 18% (*n* = 56,877) of those respondents sought to reopen their cases by filing motions to reopen.

42. Judges granted 84% of these motions (*n* = 47,952). Overall, 15% of those ordered removed *in absentia* had a successful motion to reopen (*n* = 47,952 of 316,089).

43. A motion to reopen based on lack of notice of the hearing can be brought at any time. See I.N.A. § 240(b)(5)(C), 8 U.S.C. § 1229a(b)(5)(C); 8 C.F.R. § 1003.23(b)(4)(ii) (2019) (noting that an alien can file a motion to reopen at "any time"). Of course, individuals who do not obtain counsel or otherwise learn about the motion to reopen process may never bring such a motion in court. Additionally, although cases with *in absentia* orders may be reopened, *in absentia* orders cannot be appealed. Matter of Guzman-Arguera, 22 I. & N. Dec. 722 (B.I.A. 1999) (holding that the Board of Immigration Appeals has no jurisdiction over direct appeals of *in absentia* orders).

44. See I.N.A. § 240(b)(4)(A), 8 U.S.C. § 1229a(b)(4)(A) ("[T]he alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings."); Orantes-Hernandez v. Thornburgh, 919 F.2d 549, 554 (9th Cir. 1990) ("[A]liens have a due process right to obtain counsel of their choice at their own

AR00972

expense.").

45. Of the 316,089 *in absentia* orders issued in removal proceedings at the initial case completion over the 11-year period of our study, only 47,350 were represented by counsel.

46. Of the 839,380 immigration judge initial case completions not issued *in absentia* in removal proceedings over the 11-year period of our study, 719,226 were represented by counsel.

47. Of the 47,952 respondents who successfully reopened their cases after an initial *in absentia* order, 40,303 were represented by counsel at their most recent proceeding.

48. Individuals motivated to fight their case may also be more likely to seek out an attorney. Yet serious notice deficits and confusion about immigration court would suggest that even motivated individuals may not get the chance to engage the process.

49. Persons released awaiting their immigration court hearings are often told to report periodically to a deportation officer.

50. See, e.g., Tatiana Sanchez, "Confusion Erupts as Dozens Show Up for Fake Court Date at SF Immigration Court," *San Francisco Chronicle*, January 31, 2019, https://www.sfchronicle.com/bayarea/article/Confusion-erupts-as-dozens-show-up-for-fake-13579045. php [https://perma.cc/BHJ2-CQ3X] (reporting that some attorneys contend that ICE is sending notices to appear "with court dates it knows are not real").

51. See *Denied a Day in Court*, 15.

52. Mark Pasierb, Chief Clerk of Immigration Court, to All Immigration Judges, All Court Administrators, All Attorney Advisors and Judicial Law Clerks, and All Immigration Court Staff, memorandum, June 17, 2008, 6, https://libguides.law.ucla.edu/ld.php?_content_id=52153727 [https://perma.cc/3CUT-QHWZ] ("EOIR-33/ICs are accepted even if no Notice to Appear has been filed.").

53. See, e.g., "AILA-EOIR Liaison Meeting Agenda Questions and Answers" (October 21, 2008), 3, https://www.justice.gov/sites/default/files/eoir/legacy/2009/01/29/eoiraila102108.pdf [https://perma.cc/D8SK-8NEL] (reporting rejections of changes of address forms in cases where the notice to appear had not yet been filed with the court).

54. Asylum is a form of discretionary relief available to individuals who qualify as refugees by demonstrating past persecution or a "well-founded fear of persecution" based on the noncitizen's race, religion, nationality, political opinion, and/or membership in a particular social group. I.N.A. § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A) (2018); I.N.A. § 208(b)(1)(A), 8 U.S.C. § 1158(b)(1)(A). Applicants for asylum may also be considered for relief under withholding of removal and protection under the United Nations Convention Against Torture by satisfying more stringent standards. See I.N.A. § 241(b)(3), 8 U.S.C. § 1231(b)(3) (providing statutory requirements for demonstrating eligibility for withholding of removal); 8 C.F.R. §§ 1208.16, 1208.17, 1208.18 (discussing the standards for withholding of removal and deferral of removal under the Convention Against Torture).

55. Cancellation of removal is a form of relief available to both lawful permanent residents and undocumented individuals who have lived for a minimum number of years in the United States and who satisfy certain requirements. I.N.A. § 240A(a)-(b), 8 U.S.C. § 1229b(a)-(b).

56. Adjustment of status is a form of relief available to any noncitizen who is determined eligible for lawful permanent resident status based on a visa petition approved by the United States Citizenship and Immigration Services. I.N.A. § 245, 8 U.S.C. § 1255.

57. I.N.A. § 240(c)(4), 8 U.S.C. § 1229a(c)(4).

58. EOIR Form I-589 includes an application for asylum and withholding of removal, and also offers the opportunity for an application of withholding of removal under the Convention Against Torture. See U.S. Citizenship and Immigration Services, Department of Homeland Security, and Executive Office for Immigration Review, U.S. Department of Justice, "I-589, Application for Asylum and for Withholding of Removal," updated September 30, 2019, https://www.uscis.gov/i-589 [https://perma.cc/6M-JU-W5NY] (listing the information that an applicant is required to provide to apply for asylum and withholding of removal). We use the term "asylum application" to refer to all three forms of relief.

59. For purposes of our analysis, we did not consider voluntary departure to be a form of relief.

60. During the study period, there were 829,083 completed and pending cases with applications for relief on file (*n* = 549,053 initial completions with such applications, and *n* = 431,752 initial immigration judge decisions with filed applications). Of these individuals, only 43,250 had an *in absentia* removal order, leading to *in absentia* rates of 5% for all matters, 8% for initial case completions, and 10% for immigration judge decisions.

61. See Oren Root, National Director, Appearance Assistance Program, Vera Institute of Justice, "The Appearance Assistance Program: An Alternative to Detention for Noncitizens in U.S. Immigration Removal Proceedings," April 2000, 2, https://www.vera.org/publications/appearance-assistance-program-alternative-to-detention [https://perma.cc/T7FW-WXYA] (arguing that individuals with claims for relief are "good candidates for supervised release, as they have an incentive to appear at their hearings").

62. In 2018, EOIR began to occasionally report in press releases and other documents statistics on *in absentia* rate among those seeking asylum. See, e.g., U.S. Department of Justice, "Executive Office for Immigration Review Releases Court Statistics, Announces Transparency Initiative," press release, May 9, 2018, https://www.justice.gov/opa/pr/executive-office-immigration-review-releases-court-statistics-announces-transparency [https://perma.cc/T3EA-3JAK].

63. "EOIR Immigration Court Listing," Executive Office of Immigration Review, U.S. Department of Justice, updated January 22, 2001, https://www.justice.gov/eoir/eoir-immigration-court-listing [https://perma.cc/T69X-KN6C].

64. "Office of the Chief Immigration Judge," Executive Office of Immigration Review, U.S. Department of Justice, updated December 7, 2020, https://www.justice.gov/eoir/office-of-the-chief-immigration-judge [https://perma.cc/GWA9-P86E].

65. Ani Ucar, "Leaked Report Shows the Utter Dysfunction of Baltimore's Immigration Court," *Vice News*, October 3, 2018, https://news.vice.com/en_us/article/xw94ea/leaked-report-shows-the-utter-dysfunction-of-baltimores-immigration-court [https://

**AR00973**

American Immigration Council **23**

perma.cc/K6J6-DGWT].

66.   Ibid. (internal quotation marks omitted).

67.   To address the potential relationship between delays in court scheduling and *in absentia* removal, we narrowed our analysis from all initial case completions to only never-detained initial case completions with no prior change of venue or transfer (*n* = 745,031 of 1,155,469). Of the remaining 745,031 initial case completions, we excluded 4,678 cases (less than 1%) with missing or erroneous NTAs. Finally, to focus on more active cases, we narrowed the analysis further, excluding the 3% of remaining cases (*n* = 21,638) with NTAs dated prior to 2006. By taking these steps, we attempt to better isolate the potential impact of delays in receiving a hearing notice on court appearances.

68.   Ingrid V. Eagly and Steven Shafer, "A National Study of Access to Counsel in Immigration Court," *University of Pennsylvania Law Review* 164, no. 1 (2015): 42.

69.   Ibid., 40 ("In the busiest twenty nondetained court jurisdictions, representation rates reached as high as 87% in New York City and 78% in San Francisco. At the low end of these twenty high-volume nondetained jurisdictions, only 47% of immigrants in Atlanta and Kansas City secured representation.").

70.   Ingrid Eagly and Steven Shafer, "Measuring *In Absentia* Removal in Immigration Court," *University of Pennsylvania Law Review* 168, no. 4 (2020): 870–71 & fig.6.

71.   This high representation rate reflects the 2014 establishment of a project known as the New York Immigrant Family Unity Project, which provides free legal representation to any individual in New York's immigration court who is unable to afford counsel. "New York Immigrant Family Unity Project," Bronx Defenders, accessed January 23, 2021, https://www.bronxdefenders.org/programs/new-york-immigrant-family-unity-project [https://perma.cc/DZ26-62X3].

72.   Ingrid Eagly and Steven Shafer, "Measuring *In Absentia* Removal in Immigration Court," *University of Pennsylvania Law Review* 168, no. 4 (2020): 870–71 & fig.6.

73.   Ibid., 869.

74.   Ibid., 865.

75.   Ibid., 869.

76.   "The Biden Plan for Securing Our Values as a Nation of Immigrants," Biden-Harris, accessed January 23, 2021, https://joebiden.com/immigration/ [https://perma.cc/Y2Y9-HWVD].

77.   Alissa Fishbane, Aurelie Ouss, and Anuj K. Shah, "Behavioral Nudges Reduce Failure to Appear for Court," *Science* 370, no. 6517 (2020).

78.   See note 37, *supra*.

79.   See generally Iris Gomez, "The Consequences of Nonappearance: Interpreting New Section 242B of the Immigration and Nationality Act," *San Diego Law Review* 30, no. 1 (1993): 75, 78-80 (explaining how the immigration law gave judges greater discretion on how to treat missed court appearances prior to 1990).

80.   In 2018, Senators Mazie K. Hirono, Kirsten Gillibrand, and Kamala Harris introduced the Immigration Court Improvement Act, a bill that would insulate immigration judges from top-down political interference. "Sen. Mazie K. Hirono, Hirono, Gillibrand, Harris Introduce Bill to Insulate Immigration Judges from Political Interference," press release, April 18, 2018, 1, https://hirono.senate.gov/news/press-releases/hirono-gillibrand-harris-introduce-bill-to-insulate-immigration-judges-from-political-interference [https://perma.cc/CPR4-748M].

81.   The Federal Bar Association (FBA) recently completed a report proposing model legislation to establish an Article I immigration court. See Federal Bar Association, *Congress Should Establish an Article I Immigration Court*, accessed January 23, 2021, https://www.fedbar.org/government-relations/policy-priorities/article-i-immigration-court [https://perma.cc/CQ5D-C2AU]. The FBA proposal is supported by the union representing immigration judges, the National Association of Immigration Judges. See Hon. A. Ashley Tabaddor, President, National Association of Immigration Judges, to Elizabeth Stevens, President, Federal Bar Association, Immigration Law Section, letter, March 15, 2018, https://www.naij-usa.org/images/uploads/publications/NAIJ_endorses_FBA_Article_I_proposal_3-15-18.pdf [https://perma.cc/LC29-BVH3] (endorsing the Federal Bar Association's proposed legislation due to the "proven . . . conflicts of interest" that arise when immigration courts can be used as "political pawn[s] by various administrations on both sides of the aisle").

82.   Although the creation of an Article I immigration court would solve many problems within the court system, as Amit Jain has warned, such a change must be accompanied by other procedural and substantive forms. Amit Jain, "Bureaucrats in Robes: Immigration 'Judges' and the Trappings of 'Courts,'" *Georgetown Immigration Law Journal* 33, no. 2 (2019): 324.

AR00974

Appendix I

# Memorandum



| Subject: | | Date: |
|---|---|---|
| Implementation of Expedited Removal | | MAR 3 1 1997 |

**To:** Management Team
Regional Directors
Regional Administrators
District Directors (incl. foreign)
Officers-in-Charge (incl. foreign)
Chief Patrol Agents
Asylum Office Directors
Service Center Directors
Port Directors
ODTF Glynco
ODTF Artesia

**From:** Office of the Deputy Commissioner

The expedited removal provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) become effective April 1, 1997. These provisions provide immigration officers the exclusive authority to order removed from the United States, without further hearing or review, arriving aliens who attempt entry by fraud or who arrive without proper documents. A proposed rule was published on January 3, and interim implementing regulations were published in the Federal Register on March 6, to be effective April 1.

From February 27 - March 5, the Training Division conducted a train-the-trainer session at Jekyll Island, Georgia, to train almost 300 Immigration and Naturalization Service (INS) trainers in many of the provisions of IIRIRA, including expedited removal. All Service officers are to have received this training by April 1.

In addition to the interim regulations, the Service has completed a draft of the Inspector's Field Manual (IFM), the first in a series of officer field manuals that will eventually replace the Service Operations Instructions. Each of these field manuals will eventually be carried on INSERTS, the INS Easy Research and Transmittal System. Several advance chapters of the IFM particularly affected by IIRIRA are being distributed to field offices for use in implementing these new provisions. Chapter 17.15 of the IFM contains the expedited removal provisions.

The expedited removal provisions present a tremendous challenge and responsibility to INS officers, and will be the subject of close scrutiny by Congress, the Department of Justice, advocacy groups, and others. Every officer must adhere strictly to required procedures to ensure that the rights of aliens are protected, particularly those who express a fear of persecution, at the same time ensuring that aliens who clearly seek to violate the immigration laws are quickly removed from the United States in a professional, fair, and objective manner.

AR00975

Case 2:21-cv-00067-Z    Document 162-2    Filed 09/02/22    Page 244 of 548    PageID 5187

Appendix I. continued

Although the general expedited removal procedures are contained in Chapter 17.15 of the IFM and the IIRIRA training materials, following are additional instructions relating to implementation of these provisions.

1.  Arriving aliens who are inadmissible under section 212(a)(6)(C) or (7) are subject to expedited removal under section 235(b)(1) of the new Act. If 212(a)(6)(C) and 212(a)(7) are the only charges lodged, the alien must be processed under expedited removal and may not be referred for an immigration hearing under section 240. If additional charges are lodged, the alien may be referred for a section 240 hearing, but this should only occur in extraordinary circumstances. Generally speaking, if an alien is inadmissible under 212(a)(6)(C) or (7), additional charges should not be brought and the alien should be placed in expedited removal. Aliens charged with grounds other than 212(a)(6)(C) or (7) should be referred for a hearing under section 240.

2.  Any immigration officer issuing an expedited removal order and any designated supervisory officer concurring on an expedited removal order must have completed Phase I of the official 96 Act Training Program prepared by the Training Division.

3.  All expedited removal orders require supervisory approval before service upon the alien. By regulation, this approval authority is not to be delegated below the level of a second line supervisor. Each district may determine at what level this review authority should be delegated. All districts must report the names and titles of designated approving officials through channels to the Headquarters Office of Field Operations no later than April 1.

4.  When an unaccompanied minor or mentally incompetent alien appears to be subject to expedited removal, and the case cannot be resolved under existing guidelines by granting a waiver, deferring the inspection, or by other discretionary means, an expedited removal order may be issued, but the order must by reviewed by the district director or the deputy district director, or person officially acting in that capacity, before the alien is removed from the United States.

5.  The Service retains the discretion to permit withdrawal of application for admission in lieu of issuing an expedited removal order. Provisions for withdrawal are now contained in both statute and regulation, with specific guidance in the IFM and should be followed by all officers with authority to permit withdrawals. As an example, in cases where a lack of proper documents is the result of inadvertent error, misinformation, or where no fraud was intended (e.g. an expired nonimmigrant visa), Service officers may consider, on a case-by-case basis and at the discretion of the Service, any appropriate waivers, withdrawal of application for admission, or deferred inspection to resolve the ground of inadmissibility rather than issuing an expedited removal order.

6.  Numerous Service forms have been revised or newly created to conform with IIRIRA. The revised forms are listed in 8 CFR 299.1 and 299.5 of the interim regulations. A separate IIRIRA wire details the list of forms and how to obtain them. Districts may request these forms from the Service Forms Centers. In addition, the forms are being

AR00976

Appendix I. continued

incorporated in electronic format into numerous automated forms-generation systems.

7.  When recording answers to the closing questions on Form I-867B, Jurat for Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, if the alien indicates an intention to apply for asylum or a fear of harm or concern about returning home, the inspector should ask enough follow-up questions to ascertain the general nature of the fear or concern.  If the alien indicates an intention to apply for asylum or a fear of persecution, the alien should be referred to an asylum officer.  Inspectors should consider verbal as well as non-verbal cues given by the alien.  If an alien asserts a fear or concern which is clearly unrelated to an intention to seek asylum or a fear of persecution, then the case should not be referred to an asylum officer.  In determining whether to refer the alien, inspectors should not make eligibility determinations or weigh the strength of the claims, nor should they make credibility determinations concerning the alien's statements.  The inspector should err on the side of caution and apply the criteria generously, referring to the asylum officer any questionable cases, including cases which might raise a question about whether the alien faces persecution.  Immigration officers processing aliens for expedited removal may contact the asylum office point(s) of contact when necessary to obtain guidance on questionable cases involving an expression of fear or a potential asylum claim.

8.  It is the responsibility of the referring officer to provide the alien being referred for a credible fear interview with both a Form M-444, Information about Credible Fear Interview, and a list of free legal services, as provided in 8 CFR parts 3 and 292.

9.  Credible fear interviews will normally take place at Service or contract detention facilities. Each port-of-entry and detention facility will be provided with a point or points of contact at the asylum office having responsibility for that geographical area.  It is the responsibility of the detention or deportation officer to notify the appropriate Asylum office point of contact when an alien subject to the expedited removal process requires a credible fear interview, and is being detained in Service custody pending this interview.  That officer should also provide any additional information or requirements of the alien, such as whether the alien requires an interpreter or other special requests or considerations.  When aliens are detained in non-Service facilities or at remote locations, the referring officer must notify the appropriate Asylum Office.  If the alien is subsequently transferred to another detention site, the detention or deportation officer must ensure that the appropriate Asylum Office has been notified.

10.  Normally the credible fear interview will not take place sooner than 48 hours after the alien arrives at the detention facility.  If the alien requests that the interview be conducted sooner, the referring officer, or any other officer to whom the alien makes the request, should immediately convey that information to the appropriate Asylum office.

11.  Aliens placed into expedited removal proceedings must be detained until removed from the United States.  Parole may be authorized only for medical emergencies or for a legitimate law enforcement objective.  Once an alien has established a credible fear of persecution or is otherwise referred (as provided by regulation) for a full removal proceeding under section 240, release of the alien may be considered under normal parole

AR00977

Appendix I, continued

criteria.

12. If there is insufficient detention space to detain an alien in expedited removal who is arriving at a land port-of-entry and who claims a fear of persecution, that alien may be required to wait in Canada or Mexico pending a final determination of his or her claim. This option should be taken only as a last resort and should only be used for aliens who claim a fear of persecution that is unrelated to Canada or Mexico. Aliens who make false claims to U.S. citizenship, or false or unverified claims to lawful permanent resident, asylee, or refugee status, and aliens who claim a fear of persecution that is related to Canada or Mexico must be detained. Aliens arriving at a land border port-of-entry who do not claim lawful status in the United States or a fear of persecution should normally be processed immediately and either returned to Canada or Mexico or detained until removed. These aliens should not be required to wait in Canada or Mexico pending issuance of an expedited removal order.

13. Every case in which an expedited removal order is issued must be entered into the Deportable Alien Control System (DACS). Entry of data for those aliens detained by the Service will be handled by the Detention and Deportation section responsible for the detention facility. Entry of data for aliens not requiring detention who are removed directly from the port-of-entry is the responsibility of the Inspections section. A separate memorandum issued by the Office of Field Operations on March 18 details the procedures for entry of data into DACS for expedited removal cases. Cases initiated at the ports-of-entry and referred for removal proceedings under section 240 will continue to be entered into DACS by Detention and Deportation.

14. The expedited removal process will be the subject of extensive inquiry and will require appropriate tracking of specific case data. A separate memorandum regarding tracking of expedited removal cases at ports-of-entry explains how this data collection will be accomplished.

15. Unless an "A" number already exists for an alien placed into expedited removal, an "A" number must be assigned to every expedited removal case at the port-of-entry in order to ensure proper tracking of the case from the onset.

16. New codes are being considered for entry of expedited removal cases into the Central Index System (CIS). Field offices will be notified once these codes are finalized. Entry of cases into CIS should be accomplished as quickly as possible in accordance with district policy. To ensure prompt data entry, "A" files for expedited removal cases should be separated from other files and flagged as expedited removal cases.

17. New codes are also being created to designate expedited removal cases in the National Automated Immigration Lookout System (NAILS) and the Interagency Border Inspection System (IBIS). The new IBIS disposition codes have recently been posted in the IBIS Daily News. Field offices will be notified as new codes are finalized.

18. The Inspections Workload Report, Form G-22.1 is being revised to include data relating

Appendix I, continued

_____

to expedited removal cases, and is expected to be available October 1.

19.   The expedited removal provisions are not applicable in preclearance or preinspection operations. If the Service wishes to proceed with expedited removal of an alien inspected during an en route inspection of a vessel, action on the case will be deferred until the vessel has arrived in the United States. The alien may then be processed as an expedited removal case.

20.   Port directors are responsible for ensuring that all U.S. Customs officers who are cross-designated to perform immigration inspections are adequately trained in the expedited removal provisions. Customs officers shall not issue expedited orders of removal, even in ports where there is only a Customs officer on duty. Such cases must be referred to an INS officer if a decision is made to pursue expedited removal.

        Questions regarding this memorandum may be addressed to Linda Loveless, Office of Inspections, at (202) 616-7489; Patrice Ward, Office of Inspections, at (202) 514-0964; Charlie Fillinger, Office of Asylum, at (202) 305-2666; Kelly Ryan, Office of General Counsel, at (202) 514-3211, and Ken Elwood, Office of Field Operations, at (202) 307-1983.

                                        Chris Sale
                                        Deputy Commissioner

AR00979



HQINS 50/5.12 96 Act .066

| Subject: Withdrawal of Application for Admission (IN 98-05) | Date: DEC 22 1997 |
| --- | --- |

To:   Management Team
      Regional Directors
      District Directors
      Officers-in-Charge
      Chief Patrol Agents
      Asylum Office Directors
      Port Directors
      ODTF Glynco
      ODTF Artesia

From:   Office of Programs

This memorandum is being issued as a review and revision of Chapter 17.2 of Inspector's Field Manual (IFM), relating to withdrawal of application for admission.

Section 235(a)(4) of the Immigration and Nationality Act (INA), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), gives the Attorney General the express authority to permit an alien to withdraw his or her application for admission in lieu of being placed in formal removal proceedings. In the past, the alternative to withdrawal was a full exclusion hearing before an immigration judge. With the implementation of expedited removal in which some inadmissible aliens are not entitled to a full removal hearing, the judicious and uniform exercise of this discretionary authority has become increasingly important. Accordingly, Chapter 17.2 of the IFM is revised to read as follows:

**17.2 Withdrawal of Application for Admission.**

(a) General. A nonimmigrant applicant for admission who does not appear to the inspecting officer to be admissible may be offered the opportunity to withdraw his or her application for admission rather than be detained for a removal hearing before an immigration judge or placed in expedited removal. An alien cannot, as a matter of right, withdraw his or her application for admission, but may be permitted to withdraw if it is determined to be in the best interest of justice that a removal order not be issued. Before allowing an alien to withdraw, you must be sure that the alien has both the intent and the means to depart immediately from the United States. See section 235(a)(4) of the Act and 8 CFR 235.4.

Withdrawal is strictly voluntary and should not be coerced in any way. It may only be considered as an alternative to removal proceedings when the alien is not clearly admissible. Occasionally, POE workload, personnel resources, and availability of detention space may affect whether you will allow withdrawal or pursue removal proceedings before an immigration judge. However, in cases where the alternative to withdrawal is expedited removal, workload and detention space are less significant considerations.

AR00980

In exercising your discretion to permit withdrawal, you should carefully consider all facts and circumstances related to the case to determine whether permitting withdrawal would be in the best interest of justice, or conversely, that justice would be ill-served if an order of removal were issued. In light of the serious consequences of issuing an expedited removal order, which includes a 5-year bar to re-entry, the decision of whether to permit withdrawal should be based on a careful balancing of relevant favorable and unfavorable factors in order to reach an equitable decision. Such factors might include, but are not limited to:

      (1) The seriousness of the immigration violation;

      (2) Previous findings of inadmissibility against the alien;

      (3) Intent on the part of the alien to violate the law;

      (4) Ability to easily overcome the ground of inadmissibility (i.e., lack of documents);

      (5) Age or poor health of the alien; and

      (6) Other humanitarian or public interest considerations.

An expedited removal order should ordinarily be issued, rather than permitting withdrawal, in situations where there is obvious, deliberate fraud on the part of the applicant. For example, where counterfeit or fraudulent documents are involved, an expedited removal order is normally the appropriate response. On the other hand, in a situation where the alien may have innocently or through ignorance, misinformation, or bad advice obtained an inappropriate visa but has not concealed information during the course of the inspection, withdrawal should ordinarily be permitted. Where an immigration violation has not yet occurred, and the determination of inadmissibility is based on the alien's ignorance of permissible activities or on a judgment of the alien's future intent, the factors cited above should be carefully weighed in deciding whether to permit withdrawal or issue an expedited removal order. Where the travel documents presented are prima facie valid, you should consider whether the violation warrants the serious consequences of a formal removal. If the alien may readily overcome the inadmissibility by obtaining proper documents, the alien may be permitted to withdraw his or her application for admission and should also be appropriately advised of the necessary forms and requirements to overcome the grounds of inadmissibility.

Under section 222(g) of the INA, as amended by IIRIRA, when an alien has remained in the United States beyond the period of his or her authorized stay, the alien's visa is considered to be void, even though no action may have been taken to physically cancel the visa. In a case when an alien could not have been reasonably expected to know that his or her visa is void, but the alien is otherwise admissible except for the lack of valid nonimmigrant visa, withdrawal of application for admission may be considered. However, if the facts of the case indicate particularly egregious immigration violations, such as long-term or repeated previous overstays, unauthorized employment in the United States, or that the alien is again likely to remain beyond his or her authorized stay or otherwise violate his or her status, an expedited removal order may be appropriate.

An applicant who withdraws his or her application for admission is not considered formally removed and therefore does not require permission to reapply for admission to the United States. Once the reason for the inadmissibility is overcome, the alien may be eligible to apply for a new visa or admission to reenter the United States.

(b) Jurisdiction. Generally, a withdrawal will be taken at the port-of-entry or following a deferred inspection. However, there will be instances where a detained alien, prior to or during the expedited removal credible fear process, is permitted to withdraw his or her application for admission. Any INS officer involved in the continuing processing of an arriving alien may, after obtaining authorization in accordance with local procedures, offer withdrawal if the situation warrants. Withdrawal during the later stages of the expedited removal and credible fear process should be the exception rather than the normal course of action. All facts, circumstances, and factors relating to the case should be carefully considered. In expedited removal cases, several units within INS may have already invested considerable time and

resources in pursuing expedited removal of the alien. In order to preserve a unified expedited removal process and uniformity of decision, asylum officers may wish to consult with other units involved to obtain any additional information concerning the case which may affect the decision to permit withdrawal.

(c) Withdrawal procedures. If, after obtaining supervisory concurrence in accordance with local procedures, you decide to permit an applicant to withdraw, complete the necessary paperwork. Once an applicant is granted permission to withdraw, prepare Form I-275, Withdrawal of Application for Admission/Consular Notification. The I-275 must clearly state the reasons for inadmissibility in the remarks block. A sworn statement should be taken and attached to the I-275. If the alien is inadmissible under section 212(a)(6)(C) or (7) and would have been subject to expedited removal if not permitted to withdraw, the sworn statement should be taken using Form I-867A&B. Check any appropriate boxes on the I-275. The alien must sign the I-275, acknowledging that the action is entirely voluntary. The alien should be given a copy of the I-275 and any sworn statement taken, unless the Form I-275 contains classified or sensitive information. Prepare and serve an I-259 on the appropriate carrier to effect removal. Complete the I-94, endorsing both sections with: "WD - Application for Admission Withdrawn. (Stamp number), (Port), and (Date)." On the reverse of the I-94, indicate the file number, if appropriate, in Block 20. In Block 26, under Itinerary/Comments, write the grounds of inadmissibility, and "I-275 served". To be removed via (flight number) on (date)". Also include removal flight information on the front of the departure portion of the I-94. Cancel the nonimmigrant visa, and note the visa page "22 CFR 41.122(h)(3)." In a case where the alien may, through ignorance, bad advice, or misinformation, have inadvertently arrived with inadequate documents or an improper visa, and there was no fraud involved and you are satisfied that the alien will depart in order to comply with admissibility requirements, a visa may be left intact for future use.

Prepare a packet in a sealed envelope for immigration officials in the country to which the alien is being returned, containing the alien's travel document and a copy of the Form I-275 or other relevant information that may be needed by the immigration officials in the ongoing country. Where practical, advise INS offices overseas by phone or fax of aliens moving through their jurisdiction. Forward the original of the I-275 and sworn statement to the consulate where the visa was issued. Route the arrival I-94 for data entry and deliver the departure I-94 to the carrier to be submitted with other departure I-94s for the outbound flight. Maintain a copy of all relating documents, including the pertinent passport pages and other evidence at the port of arrival for 6 months. Refer to Chapter 21.2 for special Canadian border procedures and to Chapter 17.15(f) for specific instructions relating to withdrawal of application for admission by minors.

(d) Return transportation arrangements. An alien who is permitted to withdraw must depart immediately from the United States, or as soon as return transportation can be arranged. If the alien arrived at an airport or seaport, arrange for departure on the next available transportation either back to the country where the alien boarded the flight or vessel, or to another country if the alien is entitled to enter that country. In instances where the alien is being returned to a third country through a foreign transit point, every possible effort must be made to ensure that an immediate and continuous transit will be ensured. If the alien does not have either a return ticket or the carrier has not otherwise agreed to transport the alien, removal proceedings should be instituted. If the alien has an open ticket, make sure satisfactory confirmed return transportation arrangements are made. If the alien arrived at a land border port-of-entry, he or she is not permitted to enter the United States, and is simply returned to the contiguous territory from which he or she arrived.

The above revisions to the IFM will be incorporated into future releases of the INS Easy Research and Transmittal System (INSERTS).

Paul Virtue
Executive Associate
Commissioner, Programs

AR00982

The New York Times | https://www.nytimes.com/2020/10/23/us/mexico-migrant-camp-asylum.html

# Inside the Refugee Camp on America's Doorstep

A squalid tent camp on the border is the result of President Trump's unprecedented limits on asylum. Some people have waited in filthy conditions for more than a year to obtain refuge in the United States.

 **By Caitlin Dickerson**

Published Oct. 23, 2020   Updated Oct. 29, 2021

MATAMOROS, Mexico — A butter yellow sun rose over the crowded tent camp across the river from Texas and a thick heat baked the rotten debris below, a mixture of broken toys, human waste and uneaten food swarming with flies.

Clothing and sheets hung from trees and dried stiff after being drenched and muddied in a hurricane the week before.

As residents emerged from the zipper-holes of their canvas homes that morning in August, some trudged with buckets in hand toward tanks of water for bathing and washing dishes. Others assembled in front of wash basins with arms full of children's underwear and pajamas. They waited for the first warm meal of the day to arrive, though it often made them sick.

The members of this displaced community requested refuge in the United States but were sent back into Mexico, and told to wait. They came there after unique tragedies: violent assaults, oppressive extortions, murdered loved ones. They are bound together by the one thing they share in common — having nowhere else to go.

"Sometimes I feel like I can't hold on anymore," said Jaqueline Salgado, who fled to the camp from Southern Mexico, sitting outside her tent on a bucket as her children played in the dirt. "But when I remember everything I've been through, and how it was worse, I come back to the conclusion that I have to wait."

Ms. Salgado is one of about 600 people stranded in a place that many Americans might have thought would never exist. It is effectively a refugee camp on the doorstep of the United States, one of several that have sprung up along the border for the first time in the country's history.

**AR00983**

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 252 of 548   PageID 5195



A line for groceries at the camp.  Ilana Panich-Linsman for The New York Times

After first cropping up in 2018, the encampment across the border from Brownsville, Texas, exploded to nearly 3,000 people the following year under a policy that has required at least 60,000 asylum seekers to wait in Mexico for the entirety of their legal cases, which can take years.

Those who have not given up and returned home or had the means to move into shelters or apartments while they wait have been stuck outside ever since in this camp, or others like it that are now strung along the southwest border.

Many have been living in fraying tents for more than a year.

The Trump administration has said the "remain in Mexico" policy was essential to end exploitation of American immigration laws and alleviate overcrowding at Border Patrol facilities after nearly two million migrants crossed into the United States between 2017 and 2019.

The Mexican authorities have blamed the American government for the situation. But they have also declined to designate the outdoor areas as official refugee camps in collaboration with the United Nations, which could then have provided infrastructure for housing and sanitation.

"It has been the first time we have been in this situation," said Shant Dermegerditchian, director of the United Nations High Commissioner for Refugees' office in Monterrey, Mexico. "And we certainly don't support this."

AR00984

Case 2:21-cv-00067-Z    Document 162-2    Filed 09/02/22    Page 253 of 548    PageID 5196

About 600 people are stranded in a place that many Americans might have thought would never exist, what is effectively a refugee camp on the doorstep of the United States.  Ilana Panich-Linsman for The New York Times

The U.S. Supreme Court agreed this week to review the policy after it was successfully challenged in the federal Court of Appeals for the Ninth Circuit. The case will not be resolved until after the election, so those living in the camp have months of waiting ahead, if not longer.

The camp drew attention during Thursday night's presidential debate, when former Vice President Joseph R. Biden Jr. noted, "This is the first president in the history of the United States of America that anybody seeking asylum has to do it in another country," he said. "They're sitting in squalor on the other side of the river."

The arrival of the coronavirus has made things much worse. Though only a few cases broke out at the camp, most of the American aid workers who entered regularly to distribute supplies stopped coming, hoping to avoid transporting the virus.

The Gulf Cartel, which traffics drugs across the border and is as powerful a force as local law enforcement, moved in to fill the void.

The gang charges tolls to camp residents who decide to swim across the river on their own and sometimes kidnaps them for ransom. Beatings and disappearances have also become more common — sometimes to protect women or children who are being abused, but other times because camp residents have violated the gang's rules about when and where they are permitted to roam outside their tents.

Nine bodies have washed ashore on the banks of the Rio Grande near the camp in the last two months; the Mexican authorities said most of the deaths were a result of a rise in gang activity during the pandemic.

"I haven't done anything, I haven't stolen anything, and still I have to keep escaping. Why?" Ms. Salgado said that day in August.

AR00985

Children playing on a bank of the Rio Grande across from Brownsville, Texas.  Ilana Panich-Linsman for The New York Times

She said she and her children were on the run from her abusive husband, who drank excessively and would beat them when he was upset, and because her brother had been kidnapped and killed. Just then, her 11-year-old son, Alexander, who seemed to have only vaguely been paying attention, put down his toys and started to heave.

"He is constantly nervous," his mother said. "Every time we fought, his anxiety would make him sick and he would end up vomiting."

Most children in the camp have not attended formal schooling since they left home. Parents agonize over whether they will be able to make up for the lost time. Some have become worried enough to launch their children across the river on the backs of smugglers, sending them alone on the last leg of their dangerous journey to the United States.

Those who cannot bear to make such a decision are often tormented by second-guessing.

"I was scared I would never see him again because he's all I have," said Carmen Vargas, clinging to the arm of her 13-year-old son, Cristopher, who has a mop of curly brown hair and is tall for his age. "But my son needs to go to school. He's only 13 years old and practically he has lost two years already."

Cristopher teared up listening to his mother describe the life they had left behind. She pulled out identification cards showing that she had been a municipal police officer in Honduras, but said her success became a liability when she put a powerful drug cartel member in jail in 2018. Within hours, the cartel announced a hit on Ms. Vargas. She and Cristopher fled, leaving behind the ornate wooden furniture she had saved up to buy and a refrigerator full of food.

Women washing clothing inside the camp.  Ilana Panich-Linsman for The New York Times

With cupped palms, Ms. Vargas caught beads of sweat that dripped down her forehead as she spoke. She apologized for the stench; just outside her tent, insects crawled around a pile of feces that had washed up when the river flooded. "You have to withstand everything here: sun, water, cold, heat, we have it all."

**AR00986**

The camp residents are chronically sick with flulike viruses and stomach bugs that wend endlessly through the tents and with respiratory problems aggravated by the dusty air. Their skin is pockmarked from the throngs of mosquitoes that overwhelm the camp after it rains.

Most acknowledge that life on the other side of the border would hardly be charmed — especially if they lost their asylum cases and had to live in the shadows.

"Without papers is it still better to be in the U.S. rather than here? Yes, it's a thousand times better," said Lucia Gomez, from Guerrero, Mexico, as she picked up clothing and toys that had been scattered outside their tent by hurricane winds. "They might find you, detain you and deport you," she said. "But if you manage to avoid them, you will be able to put food on the table."

In her arms, she held her youngest child, an 8-month-old boy named Yahir, whose back was covered in a bumpy heat rash. Her son William, 16, plopped cherries into his mouth from a plate that was covered in flies.

Ms. Gomez said her family had made a run for the camp from Southern Mexico after their home was ransacked and her husband and father-in-law were shot to death. "A man came in and shouted, 'Put your hands up!'" her 8-year-old son Johan chimed in, holding his arms up as if he were holding an imaginary gun.

"That is why we wait," she said. "We try to get through this unworthy life. And we try to resist for our children's sake."

Lucia Gomez said her family had made a run for the camp from Southern Mexico after their home was ransacked and her husband and father-in-law were killed.  Ilana Panich-Linsman for The New York Times

Volunteer groups bought the laundry basins and water tanks, as well as hand-washing stations and a row of concrete showers that, after months of laying dry in the middle of the camp, were recently connected to a water source.

But their efforts have often felt futile. Since the camp appeared, the invisible wall of policies blocking its inhabitants from being allowed into the United States has only grown taller and more fortified.

Some have found ways to improvise a modicum of comfort. Antonia Maldonado, 41, from Honduras, stood in a kitchen she had cobbled together under tattered blue tarps suspended from trees. She placed raw chicken onto a grate over an open flame, using a scavenged piece of wood resting on two stacks of upside-down buckets as a countertop.

She said she had been looking toward the election for hope that a new administration might ease some of the restrictions put into place by President Trump.

**AR00987**

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 256 of 548   PageID 5199

"Not a leaf gets into that country without his permission," Ms. Maldonado said, adding, "I just want to live with dignity. I'm not asking for riches."

Some parents pinch pesos to buy decorations and treats from supermarket reject bins for their children's birthdays. But many walk around the camp with bloodshot eyes, constantly on the brink of tears, or in a zombielike state, as if they have shut down emotionally.

When Rodrigo Castro de la Parra arrived in Matamoros, he alternated between emotional extremes. In the span of a year, he had gone from being a shy high school student who liked to stay up late at night and draw flowers in his notebook to the head of his entire family. That was after the 18th Street Gang, the most brutal and powerful gang in Guatemala, murdered his mother and sister — signaling a grudge that meant he and the rest of his relatives could be next on its kill list.

Rodrigo Castro de la Parra behind his family's tent in Matamoros in August.  Ilana Panich-Linsman for The New York Times

"I can't sleep," he said one afternoon, sitting outside the tents where he lived with his wife, daughter, grandmother, orphaned niece and his 16-year-old-sister, who had given birth after arriving at the camp. "Sometimes I feel hysterical." He said he worried that someone else in his family could be killed.

But only two weeks later, it was Mr. Castro de la Parra's body that washed out of the river at one edge of the camp. His death was a mystery. The police investigated it as a possible homicide but ultimately determined that he had drowned.

His wife, Cinthia, was still in shock when she took a bus back to Guatemala City for the repatriation of her husband's body. She also hoped to replace her travel documents that had been soaked in his pants when he died.

She would need them when she went back with their 2-year-old to try again.

AR00988

Cinthia and other relatives mourning Rodrigo at his funeral in Guatemala City.  Daniele Volpe for The New York Times

AR00989

62 FR 10312-01, 1997 WL 93131(F.R.)

RULES and REGULATIONS

DEPARTMENT OF JUSTICE

Immigration and Naturalization Service

Executive Office for Immigration Review

8 CFR Parts 1, 3, 103, 204, 207, 208, 209, 211, 212, 213, 214, 216, 217, 221, 223, 232, 233, 234, 235, 236, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 248, 249, 251, 252, 253, 274a, 286, 287, 299, 316, 318, and 329

[INS No. 1788-96; AG ORDER No. 2071-97]

RIN 1115-AE47

Inspection and Expedited Removal of Aliens; Detention and Removal

of Aliens; Conduct of Removal Proceedings; Asylum Procedures

Thursday, March 6, 1997

**\*10312**  AGENCY: Immigration and Naturalization Service, Justice, and Executive Office for Immigration Review, Justice.

ACTION: Interim rule with request for comments.

SUMMARY: This interim rule amends the regulations of the Immigration and Naturalization Service (Service) and the Executive Office for Immigration Review (EOIR) to implement the provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) governing expedited and regular removal proceedings, handling of asylum claims, and other activities involving the apprehension, detention, hearing of claims and ultimately the removal of inadmissible and deportable aliens. This rule incorporates a number of changes which are a part of the Administration's reinvention and regulation streamlining initiative.

DATES: Effective date: This interim rule is effective April 1, 1997.

Comment date: Written comments must be submitted on or before July 7, 1997.

ADDRESSES: Please submit written comments, in triplicate, to the Director, Policy Directives and Instructions Branch, Immigration and Naturalization Service, 425 I Street, NW, Room 5307, Washington, DC 20536. To ensure proper handling, please reference INS number 1788-96 on your correspondence. Comments are available for public inspection at the above address by calling (202) 514-3048 to arrange for an appointment.

FOR FURTHER INFORMATION CONTACT: For matters relating to the Executive Office for Immigration Review—Peggy Philbin, General Counsel, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2400, Falls Church, VA 22041, telephone number (703) 305-0470; for asylum issues—Michael Shaul, Field Manual Project Office, Immigration and Naturalization Service, 425 I Street NW, ULLB—4th Floor, Washington, DC 20536, telephone number (202) 616-7439; for inspections issues—Linda Loveless, Office of Inspections, Immigration and Naturalization Service, 425 I Street NW, Room 4064, Washington, DC 20536, telephone number (202) 616-7489; for detention and removal issues—Len Loveless, Office of Detention and Deportation, Immigration and Naturalization Service, 425 I Street NW, Room 3008, Washington, DC 20536, telephone number (202) 616-7799.

SUPPLEMENTARY INFORMATION:

**Background**

The Immigration and Naturalization Service and the Executive Office for Immigration Review jointly published a proposed rule on January 3, 1997 (62 FR 443-517 (1997)), to implement sections of the Illegal Immigration Reform and Immigrant

Responsibility Act of 1996, Pub. L. 104-208, which was enacted on September 30, 1996. This legislation significantly amended the Immigration and Nationality Act (Act) by revising the asylum process and providing a mechanism for the determination and review of certain applicants who demonstrate a credible fear of persecution if returned to their own country; expanding the grounds of inadmissibility; redefining applicants for admission to include aliens who entered the United States without inspection; creating new expedited removal procedures for aliens attempting to enter the United States through fraud or misrepresentation or without proper documents; consolidating the former exclusion and deportation proceedings into one unified removal proceeding; and reorganizing and renumbering numerous provisions of existing law.

The effective date of most of the provisions affecting asylum, inspection, and removal processes is April 1, 1997, and implementing regulations must be in place by March 1, 1997. The proposed rule allowed only a 30-day comment period. The limited comment period was necessary, given the short statutory deadline and the time needed to draft the rule, coordinate with interested agencies, and complete the regulatory review process by the Office of Management and Budget. In order to meet the statutory deadline for an implementing regulation and yet provide adequate opportunity for public input on the issues addressed in this rulemaking, this rule is being published as an interim rule with an additional 120-day comment period.

The Department received 124 comments on the proposed rule. Most of the commenters represented either attorney organizations or voluntary organizations predominantly involved with refugees and asylum claimants. Commenters addressed a variety of topics, with much of the focus on asylum, expedited removal, and voluntary departure. The Department also received comments from individual members of Congress and Congressional subcommittees. Since many of the comments were duplicative or endorsed the submissions of other commenters, they will be addressed by topic, rather than referencing each specific comment and commenter. Also, because many of the comments were complex and dealt with issues that may be better addressed after the Department has had a period of time to gain operational experience under the new law, suggestions that were not adopted for the interim period will be further considered when a final rule is prepared. A number of comments were received concerning sections of the regulations that were not specifically changed by the proposed rule, but were simply moved to new sections. The Department has not addressed these comments at this time, but will consider them either as part of separate rulemaking initiatives or as part of the final rule rather than the interim rule, after the Service and EOIR more closely study the proposals. This supplementary information will identify significant changes made to the proposed rule and briefly discuss reasons why many other major suggestions were not adopted at this time.

Although the Department has addressed the major comments received, there will be further detailed analysis of these comments, as well as consideration of the additional comments received during the 120-day comment period following publication of the interim regulation. This will ensure every suggestion is more fully explored. Commenters responding to the interim rule may choose to amend or expand on prior comments or address other areas not raised by commenters during the first comment period.

**Definitions**

Several sections of the statute, such as sections 212(a)(9), 240B, and 241 of the Act, refer to arriving aliens, even though this term is not defined in statute. After carefully considering these references, the Department felt that the statute  **\*10313**  seemed to differentiate more clearly between aliens at ports-of-entry and those encountered elsewhere in the United States. For clarity, "arriving alien" was specifically defined in 8 CFR part 1, and the Department invited commentary on the proper scope of the regulatory definition.

One commenter suggested that aliens interdicted in United States waters should not be included in the definition because persons arriving in United States waters have already legally arrived in the United States. The Board of Immigration Appeals (BIA) has consistently held that the mere crossing into the territorial waters of the United States has never satisfied the test of having entered the United States. See Matter of G, 20 I&N Dec. 764 (BIA 1993). Aliens who have not yet established physical presence on land in the United States cannot be considered as anything other than arriving aliens. In addition, the Department has for years relied on interdiction efforts to stem the flow of inadmissible aliens and attempted illegal entries by sea. The inclusion of aliens interdicted at sea in the definition of arriving alien will support the Department's mandate to protect the nation's borders against illegal immigration. These provisions in no way alter the Department's current interdiction policy and should not be

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

construed as to require that all interdicted aliens be brought to the United States. Only when an express decision is made, in accordance with existing interdiction policies, to transport an interdicted alien to the United States, will that alien be considered an arriving alien for purposes of the Act.

Another commenter suggested that the definition be expanded to include aliens who have been present for less than 24 hours in the United States without inspection and admission. The Department extensively considered this and similar options, such as a distance-based distinction. For the reasons discussed below relating to the decision not to apply the expedited removal provisions at this time to certain aliens who entered without inspection, and considering the difficulty not only in establishing that the alien entered without inspection, but also in determining the exact time of the alien's arrival, the Department continues to believe the position taken in the proposed rule is correct and will not modify this definition in the interim rule. The definition of "arriving alien" will be given further consideration in the final rule, however, drawing upon the experience of the early implementation of the interim rule.

One commenter objected to the inclusion of parolee in the definition of arriving alien. The definition in the proposed rule states "An arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act." The inclusion of paroled aliens was based on the statutory language in section 212(d)(5) of the Act, which states "* * * but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he or she was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." Existing regulations at §212.5(d) relating to termination of parole echo this provision, stating "* * * he or she shall be restored to the status he or she had at the time of parole." The Department feels there is solid statutory basis for inclusion of certain paroled aliens in the definition of arriving alien, and so will retain this provision.

The Department has added two additional definitions for the sake of clarity. The term "Service counsel" has been added to clarify that although the term refers to any immigration officer designated to represent the Service before the Immigration Court or the BIA. Existing regulations interchangeably use this term and a variety of other terms, including trial attorney, district counsel and assistant district counsel. The term "aggravated felony" has also been defined by reference to section 101(a)(43) of the Act as amended by IIRIRA. The regulatory definition clarifies that the amended section 101(a)(43) applies to any proceeding, application, custody determination or adjudication.

**Parole of Aliens**
This interim rule modifies §212.5(a) to comport with the statutory change made by IIRIRA to section 212(d)(5)(A) of the Act.

**Withdrawal of Application for Admission**
The proposed rule contains provisions to implement the longstanding practice used by the Service to permit applicants for admission to voluntarily withdraw their application for admission to the United States in lieu of removal proceedings, now included in section 235(a)(4) of the Act. The withdrawal provisions in the proposed rule were written to conform with rulings of the BIA on withdrawal and with standard practice in many jurisdictions. Several commenters suggested that every alien subject to the expedited removal provisions should automatically be offered the opportunity to withdraw his or her application for admission prior to the secondary inspection interview. Permission to withdraw an application for admission is solely at the discretion of the Attorney General and is not a right of the alien, a premise that has been consistently upheld by the BIA. Only the Attorney General may decide whether to pursue removal charges against an alien who has violated the immigration laws. Withdrawal of application for admission is only one of several discretionary options that may be considered by the Service once the facts of the case are known, and so will not automatically be offered to all aliens subject to expedited removal.

The Department does, however, share the concern of several commenters that aliens who may be inadvertently or unintentionally in violation of the immigration laws or regulations should not be subject to the harsh consequences of a formal removal order. The Department also wishes to ensure that the expedited removal provisions and the discretionary option to permit withdrawal

are applied consistently and fairly throughout the nation. Although not included in the regulations at this time, the Department intends to formulate policy guidance and criteria for determining the types of cases in which such permission should or should not be considered.

**Classes Subject to Expedited Removal**

The Department requested public comment regarding the appropriate use of the authority conferred by the statute upon the Attorney General to expand the class of aliens subject to expedited removal. Most commenters commended the Department on its decision not to apply at this time the expedited removal provisions to aliens in the United States who have not been admitted or paroled and who cannot establish continuous physical presence in the United States for the previous two years. At this time, the Department will apply the provisions only to "arriving aliens," as defined in §1.1(q). The Department acknowledges that application of the expedited removal provisions to aliens already in the United States will involve more complex determinations of fact and will be more difficult to manage, and therefore wishes to gain insight and experience by initially applying these new provisions on a more limited and controlled basis.  **\*10314**

The Department does, however, reserve the right to apply the expedited removal procedures to additional classes of aliens within the limits set by the statute, if, in the Commissioner's discretion, such action is operationally warranted. It is emphasized that a proposed expansion of the expedited removal procedures may occur at any time and may be driven either by specific situations such as a sudden influx of illegal aliens motivated by political or economic unrest or other events or by a general need to increase the effectiveness of enforcement operations at one or more locations.

Although several commenters suggested that imposition of the provisions should only occur after publication of a proposed rule followed by a comment period, the statute does not impose any specific notice requirement in connection with the Attorney General's designation under section 235(b)(1)(A)(3), and certainly does not impose the requirement of a full administrative rulemaking. Indeed, such a requirement would defeat a major purpose of this provision: to allow the Attorney General to respond rapidly, effectively, and flexibly to situations of mass influx or other exigencies. The Attorney General has elected to exercise this authority in connection with publication of a notice in the Federal Register (in advance, where practicable) simply as a matter of sound administration and policy. The provisions contained in §235.3(b) of this interim rule will apply for now only to arriving aliens.

Several commenters suggested that certain classes of individuals, such as minors, certain nonimmigrant classifications, and aliens claiming to be lawful permanent residents or U.S. citizens, should not be subject to expedited removal, or that it should not be applied where resources or location do not permit optimal inspection conditions. Some stated that aliens in expedited removal should be entitled to a full hearing before an immigration judge. The statute is clear that the expedited removal provisions apply to all aliens inadmissible under sections 212(a)(6)(C) or (7) of the Act, and that such aliens are not entitled to further hearing or review with specific limited exceptions. Although the statute does not require it, the Department has provided for supervisory review and concurrence on all expedited removal orders. The statute itself provides for review of a claim to lawful permanent resident, refugee, or asylee status. In addition, the Department has a certain amount of prosecutorial discretion provided by statute. It may, in lieu of instituting removal proceedings, permit an alien to withdraw his or her application for admission in those cases where there is no fraudulent intent and the alien is inadmissible only through inadvertent error or misinformation. There are also discretionary waivers available in certain cases.

**Reorganization of §235.3(b)(1) and (2)**

In order to provide a more logical discussion of the applicability of the expedited removal provisions and the procedures for applying them, § 235.3(b)(1) (determination of inadmissibility) and §235.3(b)(2) (applicability) as they appeared in the proposed regulation have been interchanged and revised as discussed below.

**Expedited Removal Procedures**

Many commenters stated that the provisions in §235.3(b) were not sufficiently explicit to ensure that the expedited removal provisions are fairly and consistently applied. Because most of these commenters represented organizations primarily concerned with refugee and asylum issues, we have addressed this topic in detail below in the section relating to credible fear determinations and claims of asylum or fear of persecution by aliens subject to expedited removal.

**Review of Claim of Status as Lawful Permanent Resident, Asylee, or Refugee**

Several commenters suggested provisions of §235.3(b)(5) were not sufficiently clear to provide adequate review of claims by returning lawful permanent residents, asylees, or refugees who are subject to expedited removal. Specifically, the commenters asserted that §235.3(b)(5)(ii) could be interpreted to imply that an alien whose claim to lawful permanent residence is verified and is not granted a discretionary waiver or provided an opportunity through deferred inspection to present the required documents could be ordered removed under section 235(b) of the Act. These commenters requested that § 235.3(b)(5)(iv) of the proposed regulation be amended to allow that claimed lawful permanent residents, asylees, or refugees (who the Service has been unable to verify ever was admitted in such status) be referred directly to removal proceedings under section 240 of the Act.

For the following reasons, these sections of the proposed regulation will not be changed in the interim rule. Section 235.3(b)(5)(ii) of the proposed regulation relates to those arriving aliens whose prior admission as a lawful permanent resident has been verified by the immigration officer by referring to official Service records. The Department intends that when such a prior admission is verified, the individual will not be removed under the expedited removal provisions of section 235(b) of the Act, regardless of the officer's determination as to the individual's current admissibility and/or retention of such lawful permanent status. For that reason the first sentence of § 235.3(b)(5)(ii) sets forth this prohibition. Since the removal provisions under section 235(b) of the Act are not available, the only actions left for the examining officer are to: admit the individual (through the grant of a waiver if need be); defer inspection to allow the individual to retrieve the appropriate documents; or place the person in removal proceedings under section 240 of the Act. This process will allow those individuals verified as having once been admitted as a lawful permanent resident, asylee, or refugee a full evidentiary hearing in removal proceedings under section 240 of the Act before an immigration judge to address the heavily fact-based issues of abandonment of status or other issues concerning loss of status. The language "may initiate proceedings" was used here to indicate that the officer is not required to initiate any proceedings but may opt to admit the individual into the United States.

As for those individuals claiming to be returning lawful permanent residents, asylees, or refugees, but who are not verified by the Service as having ever been admitted in such status, the referral to the immigration judge in §235.3(b)(5)(iv) is for the purpose of allowing the individual to establish such a prior admission in such status, nothing more. If the individual establishes such a prior admission, the immigration judge will terminate the expedited removal order and at that point that person will be in the same position as the person whose prior admission was verified by the inspecting Service officer: the Service can admit the individual or contest his or her current retention of such status in the context of removal proceedings under section 240 of the Act.

Another commenter contended that it is not appropriate to refer aliens who are verified as having been admitted or establish that they were once admitted as lawful permanent residents, asylees, or refugees to proceedings under section 240 of the Act. Section 235(b)(1)(C) of the Act states that the Attorney General shall provide regulations for administrative review of an expedited removal order entered against "an alien who claims under oath . . ." to have **\*10315** been lawfully admitted as a lawful permanent resident, asylee, or refugee. The statute provides no further directive as to how aliens who actually have been admitted in such status are to be processed if, in fact, the Service believes that such status may no longer be valid. If that claim is never verified or established before the inspecting Service officer or an Immigration Judge, the expedited removal order entered against the alien will be effected and the alien will be removed from the United States. However, once an alien establishes admission in such status, it is not inconsistent with the statute for further proceedings against an alien known to have been lawfully admitted as a permanent resident, asylee, or refugee to occur in the context of proceedings under section 240 of the Act. Further, given the greater interests and ties to the United States normally at stake for such aliens compared to those arriving without any previous status, the Department considers it appropriate that verified arriving permanent residents, asylees, and refugees be accorded the protections inherent in proceedings under section 240 of the Act.

**Review of Claim to U.S. Citizenship**

Several commenters stated that while the statute and regulations provide for review of an expedited removal order of an alien claiming to be a lawful permanent resident, refugee, or asylee, there is no such provision for review of a claim to U.S. citizenship. While U.S. citizens are not subject to the inadmissibility and removal provisions of the Act and the Department makes every effort to prevent the inadvertent removal of U.S. citizens, there are approximately 35,000 false claims to U.S. citizenship made every year at ports-of-entry. Congress recognized this problem in IIRIRA by adding a new ground of inadmissibility to section 212(a)(6)(C)(ii) of the Act specifically designating such aliens as inadmissible and subject to the expedited removal provisions. Existing regulations at §235.1(b), which have been in place for many years, place the burden of establishing a claim to U.S. citizenship on the person seeking entry. Otherwise, that person is inspected as an alien. To provide an additional level of review and safeguard against a mistaken determination, the Department will institute the same procedures contained in §235.3(b)(5) for persons who have not been able to establish U.S. citizenship, but who maintain a claim under oath or under penalty of perjury to be U.S. citizens, which are used for persons claiming to be lawfully admitted as permanent residents, refugees, or asylees.

Several commenters stated that the regulations do not provide any criteria for the detention or release of these individuals. The provisions of §235.3(b)(2)(iii) requiring detention of all aliens subject to the expedited removal provisions and issued a removal order also apply to persons whose claim to lawful permanent resident, refugee, asylee, or U.S. citizen status has not been verified. To clarify that detention is required for these individuals, the interim rule reiterates this requirement in §235.3(b)(5)(i).

**Filing of an Application for a Refugee Travel Document While Outside the United States**

Several commenters remarked favorably on the proposal to revise 8 CFR part 223 to allow refugees and asylees to apply for refugee travel documents from outside the United States, after departure from the United States, under certain very limited circumstances. The Department proposed this revision with full awareness of the provision in section 208(c)(1) of the Act under which the Attorney General may allow the alien to travel abroad "with the prior consent of the Attorney General." Despite the implied language of the statute, the Department felt that an exception was warranted for those cases where the alien innocently departed in ignorance of the requirement or, although aware of the requirement, departed without applying for the document due to an urgent humanitarian need, such as the impending death of a close relative. It should be noted that the current regulations only require that an application be filed before departure, not that the applicant delay travel until after the application is approved and the document is received. The Service has always provided the option of allowing the alien to pick up the document overseas at an American consular post.

A few commenters suggested that the decision whether to accept such applications not be left to the discretion of the Service. This change has been made. However, the regulation does not remove the general requirement that the application be filed before departure, nor does it intend that the new procedure be viewed as a routine method of obtaining the document. Although not specifically stated in the regulation, the Department intends that if it is apparent that the alien knew of the general requirement and simply chose to ignore it (e.g., if the alien had previously been issued a refugee travel document through this "overseas procedure" and there was no emergency necessitating the more recent departure), the director may determine that favorable exercise of discretionary authority is not warranted. Accordingly, the regulation provides that the district director having jurisdiction over the overseas location, or over the inspection facility in the case of an alien at a port-of-entry, may deny the application as a matter of discretion.

A few commenters suggested that there be no limit on how long after departure the application may be filed. Others suggested that the time limit be shortened from 1 year to 6 months to coincide with the 6 month time frame in section 101(a)(13)(C) of the Act, which is the period during which a lawful permanent resident who meets certain other requirements is not considered to be an applicant for admission. Another commenter stated that the validity of a refugee travel document approved under this process should not be limited to 1 year from the date of the alien's departure from the United States, so long as the application was filed within 1 year of that departure. The 1-year limitation was chosen because it is the maximum validity period for which a document would have been approved had the alien complied with the requirement of filing prior to departure. Allowing an applicant to file from outside the United States more than 1 year after departure would effectively authorize a longer validity

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 264 of 548   PageID 5207

period for the person who failed to comply with the requirement than for one who did. This would not be appropriate. Likewise, the 6-month period during which a lawful permanent resident (who meets the other criteria in section 101(a)(13) of the Act) is not deemed to be seeking admission is not analogous to that of the stranded refugee, since the refugee is clearly deemed to be seeking admission. Additionally, 6 months might be too short a time for the alien who realizes his or her error to file the application and for the Service to verify eligibility and approve that application. The Department feels that in those cases where it is proper to allow an exception from the requirement to file before departure, it is appropriate that the document be valid for the same length of time as for the person who complied with that requirement.

**Revision of Asylum Procedures**

In general, many commenters requested that specific "step-by-step" procedural instructions be placed in the regulations regarding the interview process at both the secondary inspection stage and the credible fear **\*10316** determination stage. Although a number of these suggestions have been adopted, others have not. While the Department appreciates both the necessity for equal and proper treatment of all cases and the advantages of standardization, it must also recognize that not all situations are identical and the interviewing officer must be allowed a certain amount of flexibility in conducting interviews to account for differences in individual situations.

**Convention Against Torture**

Many commenters urged that there be express reference in several parts of the regulation to the non-refoulement obligation under Article 3 of the Convention Against Torture. This article requires a state not to "expel, return ('refouler') or extradite a person to another state where there are substantial grounds for believing that he or she would be in danger of being subjected to torture." This article has been in effect for the United States since November 1994. Although Article 3 of the Torture Convention itself is not self-executing, the Attorney General has sufficient administrative authority to ensure that the United States observes the limitations on removal required by this provision. In fact, the Service has received and considered individual requests for relief under the Torture Convention since November 1994 and has arranged for relief where appropriate. For the present, the Department intends to continue to carry out the non-refoulement provision of the Torture Convention through its existing administrative authority rather than by promulgating regulations. The Service is, however, developing thorough guidelines to address Article 3 issues and intends to issue those guidelines soon. These guidelines generally, and the expedited removal process in particular, will be implemented in accordance with Article 3.

**Prohibitions on Filing Asylum Applications**

There were numerous comments on the prohibitions on the filing of asylum applications in section 208(a)(2) of the Act. Because of the importance of a decision to deny an alien the right to apply for asylum, the Department has chosen to adopt the suggestion that only asylum officers, immigration judges, and the BIA be empowered to make such determinations. The Department has also made clear that, while the alien must establish by clear and convincing evidence that he or she applied within one year of his or her arrival in the United States, the alien's burden of establishing that one of the exceptions in section 208(a)(2)(D) applies must only be to the "satisfaction of the Attorney General." The rule also contemplates that the asylum officer or immigration judge hearing such a case will explore the reasons for the late filing. Finally, and importantly, the Department has decided to follow the recommendation that the date of arrival used to determine the one-year period in section 208(a)(2)(B), consistent with the effective date of that section, be no earlier than April 1, 1997. Thus, the first case to which this prohibition could apply would be one filed on April 2, 1998.

Regarding the changed circumstances exception in section 208(a)(2)(D), the Department has followed the recommendation of numerous commentators to drop the language limiting this exception, for purposes of section 208(a)(2)(B), to circumstances that arise after the one-year period. The Department has also decided to provide a better definition of this exception by indicating that the definition may include either changed conditions in the home country or changes in objective circumstances relating to the applicant in the United States, including changes in applicable U.S. law, that create a reasonable possibility that the applicant may qualify for asylum. Because of inconsistency between the formulation of changed circumstances in section 208(a)(2)(D)

and the formulation in section 240(c)(5)(ii) of the Act, which permits an alien to file a motion to reopen beyond the time limit normally applicable to such a motion, the Department has decided to drop the requirement that, for purposes of the prohibition in section 208(a)(2)C), such exception may only be raised through a motion to reopen.

A large number of commenters requested that the Department list examples of what is meant by extraordinary circumstances within the meaning of section 208(a)(2)(D) of the Act, and several commenters suggested examples that they believed were appropriate. Accordingly, the Department has included such a list in the interim rule. It is important to bear two points in mind when reviewing the list. First, the list is not all-inclusive, and it is recognized that there are many other circumstances that might apply if the applicant is able to show that but for such circumstances the application would have been filed within the first year of the alien's arrival in the United States. Second, the alien still has the burden of establishing the existence of the claimed circumstance and that but for that circumstance, the application would have been filed within the year.

Some commenters requested that the Department clarify that failure to establish changed circumstances or extraordinary circumstances might bar an applicant from applying for asylum, it does not bar him or her from applying for withholding of removal. The Department agrees and the interim rule contains this clarification.

Some commenters objected to the requirement that an alien who meets the extraordinary circumstances criteria, file the application "as soon after the deadline as practicable given those circumstances," preferring instead the phrase "within a reasonable time period given those circumstances." The Department has adopted this suggestion and a similar formulation for the "changed circumstances" exception.

### "Asylum-Only" Hearings

The Department noted a conflict in the proposed rule between the provisions of §208.2(b)(1)(i)(C) and §252.2(b) regarding crewmembers who are granted landing permits prior to April 1, 1997, and subsequently become deportable. The former provision would place such alien in "asylum-only" proceedings before the immigration judge, while the latter would place him or her in regular removal proceedings under section 240 of the Act. The interim rule corrects this conflict by specifying that the "asylum-only" process applies to those crewmembers granted landing privileges on or after April 1, 1997. Also, § 208.2(b) (2) has been expanded to explain the consequences of failure to appear for an asylum-only hearing and to set forth conditions and limitations on reopening such proceedings.

### Discovery and FOIA Issues

Some commenters expressed concern about the statement in 8 CFR 208.12 that "[n]othing in this part shall be construed to entitle the applicant to conduct discovery directed towards the records, officers, agents, or employees of the Service, the Department of Justice or the Department of States." Specifically, they feared that the provision would preclude someone from seeking, or excuse the Service from providing, information under the Freedom of Information Act (FOIA). This fear is totally groundless. FOIA provisions are covered under separate statutory and regulatory bases. The Service is guided by 5 U.S.C. 522 and 8 CFR 103 with regard to FOIA matters, neither of which are in any way affected by this rulemaking.  **\*10317**

### Persecution for Illegal Departure or Applying for Asylum

Several commenters objected to the proposed elimination of §208.13(b)(2)(ii) and §208.16(b)(4), which require asylum officers and immigration judges to give "due consideration" to evidence that the government of the applicant's country of nationality or last habitual residence persecutes its nationals or residents if they leave the country without authorization or seek asylum in another country. These commenters interpreted this change to mean that the Department does not wish to consider seriously such evidence or to grant asylum or withholding to persons who are at risk of punishment for illegal departure from their countries or for applying for asylum abroad. This is not the case. The Department and the United States Government continue to deplore and oppose certain countries' practice of severely punishing their citizens for illegal departure or for applying for asylum in another country. The Department also acknowledges that persons who face severe punishment for such acts may continue to

qualify for asylum or withholding of removal. However, the regulation at issue did not clearly implement this policy. First, it requires only that asylum officers and immigration judges give "due consideration" to evidence of such practices; this is a vague and indefinite standard. Second, it obliges adjudicators to consider evidence of whether a country "persecutes" its nationals for such actions. Such language begs the very question that an adjudicator must answer in deciding such a case: Does the alleged punishment amount to persecution? It is well-established that not all punishment for illegal departure constitutes persecution. See, e.g., Sovich v. Esperdy, 319 F. 2d 21 (2d Cir. 1963); Matter of Chumpitazi, 16 I&N Dec. 629 (BIA 1978). However, in some cases, it may. Such a question must be resolved on a case-by-case basis. Thus, rather than continue to have an ambiguous regulation on this issue, the Department believes its adjudicators should apply the same standards to these cases as they would to any other case in which the applicant claims a fear that derives from governmental prosecution. This is best accomplished by removing the provisions in question from the regulations.

**Exception to the Prohibition on Withholding of Deportation in Certain Cases**

Several commenters objected to the proposed rule's limitation in § 208.16(c)(3) on those aliens who may be eligible for relief under section 243(h)(3) of the Act, as amended by Pub. L. 104-132. In particular, these commenters object to the notion that the United States may summarily preclude from eligibility for withholding of deportation aliens convicted of a particularly serious crime, including an aggravated felony, without individually considering their cases. However, it is well established in U.S. law that aliens who have been convicted of an aggravated felony are mandatorily barred from obtaining withholding of deportation. See, e.g., Kofa v. INS, 60 F. 3d 1084, 1090 (4th Cir. 1995) (en banc). In the proposed regulation implementing section 243(h)(3) of the Act, the Department decided, consistent with the revisions made to the withholding of deportation statute by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, to make relief under this section available only to those persons convicted of an aggravated felony who receive an aggregate sentence of imprisonment of less than 5 years. This proposal is almost entirely consistent with a recent precedent decision issued by the BIA on this issue. See Matter of Q-T-M-T-, Int. Dec. 3300 (BIA 1996). Thus, the Department intends to retain the basic approach in the proposed regulation. We have only added a sentence providing that an alien convicted of an aggravated felony shall be presumed to have been convicted of a particularly serious crime. This minor change renders the regulation fully consistent with the Board's decision in Matter of Q-T-M-T-, supra.

**Admission of the Spouse and Children of an Asylee**

The proposed rule reserved §208.19 for regulations pertaining to the admission of the spouse and children of an asylee. This matter was the subject of a separate proposed rule published July 9, 1996, see 61 FR 35,984 (1996) and the Department had intended to incorporate the revised regulations into this interim rule. However, because analysis of the comments to that earlier proposed rule has not been completed, the Department will instead redesignate the existing regulations at §208.21 as §208.19. The revised regulations on the admission of the spouse and children of an asylee will be incorporated into the final regulations, which will be published after the expiration of the comment period for this interim rule.

**Credible Fear Standard**

Several commenters urged that we adopt regulatory language emphasizing that the credible fear standard is a low one and that cases of certain types should necessarily meet that standard. Since the statute expressly defines the term "credible fear of persecution," we have chosen not to provide in the rule a further refinement of this definition. However, both INS and EOIR will give extensive training to their officials on the purpose of the credible fear standard and how it is to be applied to particular cases. The Department believes that such training will ensure that the standard is implemented in a way which will encourage flexibility and a broad application of the statutory standard.

**Employment Authorization for Asylum Applicants**

Almost all who chose to comment on the Department's position regarding work authorization for asylum applicants were pleased with the decision to continue to allow the applicant to apply for an employment authorization document once the asylum application has been pending for 150 days. One commenter requested that the 150-day period be abolished, but that

suggestion was not deemed viable, especially in light of the new statutorily-mandated 6-month minimum time before granting such authorization contained in section 208(d)(2) of the Act.

The Department has also modified the regulations relating to employment authorization at §§208.7(a) and 274a.12(a)(8) to ensure that applicants who appear to an asylum officer to be eligible for asylum but have not yet received a grant of asylum are able to obtain employment authorization. Section 208(d)(5)(A)(i) of the Act obliges the Service, prior to granting asylum, to check the identity of the applicant "against all appropriate records or databases maintained by the Attorney General and by the Secretary of State * * *." Such databases include, among others, the Federal Bureau of Investigation's (FBI) fingerprint database. At present, the Service initiates such a fingerprint check at the time it grants asylum; if the check turns up information that undercuts that decision, asylum is later revoked. The Service's experience is that the FBI's fingerprint checks often take a significant period of time to complete. The new statutory requirement at section 208(d)(5)(A)(i) of the Act thus means that after April 1, 1997, an alien who would otherwise appear to be eligible for asylum may have to wait for a long period of time before he or she can be granted asylum or employment authorization. (A similar problem may **\*10318** arise in the case of an alien who is determined to be a refugee under the new language in section 101(a)(42) of the Act but is precluded from being granted asylum because of the cap in section 207(a)(5) of the Act.) Such a result is contrary to one of the chief purposes of the asylum reforms brought about by the regulatory changes of January 1995: to ensure that bona fide asylees are eligible to obtain employment authorization as quickly as possible. Thus, consistent with the authority in section 208(d)(2) of the Act, the Department has decided to make employment authorization available to asylum applicants who are recommended for a grant of asylum but have not yet received such grant of asylum or withholding. An alien may apply for employment authorization under these provisions as soon as he or she receives notice of the grant recommendation.

**Credible Fear Determinations and Claims of Asylum or Fear of Persecution by Alien Subject to Expedited Removal**

Under the new section 235(b)(1)(A)(ii) of the Act, an alien subject to expedited removal who indicates an intention to apply for asylum or who expresses a fear of persecution will be referred to an asylum officer to determine if the alien has a credible fear of persecution. Many commenters stated that the regulation in §235.3 was not sufficiently detailed in delineating the following procedures for recognizing and referring arriving aliens who may be genuine refugees fleeing persecution: disclosures to arriving aliens; conditions of secondary inspection; use of interpreters; representation during secondary inspection; written record of proceeding; time and place of credible fear interview; detention pending a determination of credible fear; and detention following a determination of credible fear. We will address these concerns individually.

**Disclosures to Arriving Aliens**

Many commenters expressed the opinion that all arriving aliens should be provided with information concerning the credible fear interview. This contention is based on the language of the statute in section 235(b)(1)(B)(iv) that states: "The Attorney General shall provide information concerning the asylum interview described in this subparagraph to aliens who may be eligible * * *." The commenters' position is that this requirement is not limited only to aliens who "are" eligible, but that all aliens who are suspected of qualifying for expedited removal "may" be eligible, and that the information should be given before the secondary inspection pre-screening process.

To understand the Service position on this issue, one must understand the general inspection process. All persons entering the United States at ports-of-entry undergo primary inspection. U.S. citizens are exempt from the inspection process, but must nevertheless undergo an examination to determine entitlement to exemption from inspection. In FY 96, the Service conducted more than 475 million primary inspections. During the primary inspection stage, the immigration officer literally has only a few seconds to examine documents, run basic lookout queries, and ask pertinent questions to determine admissibility and issue relevant entry documents. At most land border ports-of-entry, primary inspection duties are shared with U.S. Customs inspectors, who are cross-designated to perform primary immigration inspections. If there appear to be discrepancies in documents presented or answers given, or if there are any other problems, questions, or suspicions that cannot be resolved within the exceedingly brief period allowed for primary inspection, the person must be referred to a secondary inspection procedure, where a more thorough inquiry may be conducted. In addition, aliens are often referred to secondary inspection for routine matters,

such as processing immigration documents and responding to inquiries. While millions of aliens (almost 10 million in FY 96) are referred to secondary inspection each year for many reasons, approximately 90 percent of these aliens are ultimately admitted to the United States in a very short period of time once they have been interviewed and have established their admissibility.

The secondary officer often does not know if an alien is likely to be removed under the expedited removal process until he or she has questioned the alien. Congress, in drafting the expedited removal provisions, chose to include both section 212(a)(6)(C) and 212(a)(7) of the Act as the applicable grounds of inadmissibility. The common perception is that most expedited removal cases will involve obvious fraudulent documents, or aliens arriving with no documents at all. This is not necessarily the type of case that most frequently falls within the provisions of sections 212(a)(6)(C) and (7) of the Act. Section 212(a)(6)(C) of the Act includes "any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this Act * * *," as well as aliens who falsely represent themselves to be citizens of the United States. In addition to the presentation of fraudulent documents, the falsity of which may not be verified until a thorough examination has been conducted, the fraud and misrepresentation referenced in this section may include falsehoods told by the alien concerning his or her admission or other misrepresentations told to Government officials now or in the past.

Section 212(a)(7) of the Act, in addition to covering a lack of valid documents (including expired or incorrect visas or passports), also encompasses the alien "who is not in possession of a valid unexpired immigrant visa." Under immigration law, aliens who cannot establish entitlement to one of the nonimmigrant categories contained in the Act are presumed to be immigrants, and, if not in possession of a valid immigrant visa, are inadmissible under section 212(a)(7) of the Act. The majority of the aliens currently found inadmissible to the United States fall into this category and will now be subject to expedited removal. Again, inadmissibility under this ground often cannot be determined until the secondary inspector has thoroughly questioned the alien.

To fully advise, prior to any secondary questioning, nearly all aliens referred to secondary inspection of the expedited removal procedures and of the possibility of requesting asylum would needlessly delay the millions of aliens who are ultimately found admissible after secondary questioning. For almost all of these people, asylum, fear of persecution, or fear of return is not an issue.

The Service has very carefully considered how best to ensure that bona fide asylum claimants are given every opportunity to assert their claim, while at the same time not unnecessarily burdening the inspections process or encouraging spurious asylum claims. Service procedures require that all expedited removal cases will be documented by creation of an official Service file, to include a complete sworn statement taken from the alien recording all the facts of the case and the reasons for a finding of inadmissibility. This sworn statement will be taken on a new Form I-867AB, Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act. The form will be used in every case where it is determined that an alien  **\*10319**  is subject to the expedited removal process, and contains a statement of rights, purpose, and consequences of the process. Among other things, it clearly advises the alien that this may be the only opportunity to present information concerning any fears or concerns about being removed from the United States, and that any information concerning that fear will be heard confidentially by another officer. The final page of the form contains a standard question asking if the alien has any fear or concern of being removed or of being sent home. If, during the course of the sworn statement, or at any time in the process, the alien indicates a fear or concern of being removed, he or she will be given a more detailed written explanation of the credible fear interview process prior to being placed in detention pending the credible fear interview. The Inspector's Field Manual will contain detailed instructions and guidance to officers to assist them in recognizing potential asylum claims, and this topic will also be covered in officer training. Every expedited removal case also undergoes supervisory review before the alien is removed from the United States. The Service is confident that these safeguards will adequately protect potential asylum claimants. To ensure that these procedures are followed in every expedited removal case, language has been added to §235.3(b)(4) outlining the procedures.

**Conditions of Secondary Inspection**

Numerous commenters indicated that the secondary inspection should be conducted in private, comfortable rooms, and that no secondary inspection should take place before an alien has had time to rest (some commenters suggested 24 hours), eat, and

consult with family, friends, counsel, or other representatives. The commenters also suggest that aliens should have access to interpreters before and during the screening process.

At airports, the inspection facilities for the Federal Inspection Services (FIS), which includes the Service, U.S. Customs Service, the U.S. Department of Agriculture, and the U.S. Public Health Service, are provided by the airport authorities. While the Government has input when new facilities are constructed, the inspection areas, especially in older airports, simply do not allow for the amenities suggested by the commenters. The same is true for land border ports, where the facility is usually provided by the General Services Administration and overall space is often extremely limited. The Service has always made every effort to afford as much privacy during sensitive or complex interviews as conditions allow, and will continue to do so.

As for delaying the secondary interview to allow every alien time to rest prior to being questioned, the Service again points out that it conducts more than ten million secondary inspections each year. Most of those questioned are eager to have their inspection completed as quickly as possible. The Department has neither the resources nor the authority to detain all secondary referrals without first conducting a prompt interview to determine inadmissibility.

**Use of Interpreters**

The issue of language barriers and the use of interpreters is not new to the Service. The Service makes use of interpreters whenever necessary and will continue to do so to ensure that all aliens are fully apprised of the proceedings against them. The Service currently uses its own officers, many of whom are bilingual or multilingual, airport personnel, or telephonic interpretive services when in-person interpreters are not available. Occasionally, family members or persons waiting to meet the arriving alien may be allowed to assist in translation of the interview. The Service will use appropriate means to ensure that aliens being removed are advised of and understand the reasons for the removal and the consequences of such removal.

**Representation During Secondary Inspection**

Several commenters stated that an alien subject to expedited removal should be able to obtain representation or counsel prior to any secondary inspection interview. As discussed in the section on disclosures to aliens in expedited removal, the secondary inspection officer often does not know that an alien will be subject to expedited removal until such questioning has taken place, nor will all determinations of inadmissibility under section 212(a)(6)(C) or (7) of the Act result in an expedited removal order. Section 292 of the Act provides that in any removal proceeding before an immigration judge, the person concerned shall have the privilege of being represented by counsel, at no expense to the Government. Congress did not amend this section to include proceedings before an immigration officer. In addition, while Congress specifically provided for consultation prior to the credible fear interview, it did not provide for consultation prior to the immigration inspection and issuance of the order. Therefore, the Department will retain its interpretation that an alien in primary or secondary inspection is not entitled to representation, except where the person has become the focus of a criminal investigation and has been taken into custody for that purpose.

**Written Record of Proceeding**

Several commenters expressed concern that there be a complete record of proceeding to ensure that Service officers are making proper decisions. As previously explained, an official Service file will be created on every expedited removal case. The file will include photographs, fingerprints, copies of any documentary or other evidence presented or discovered, and a complete written sworn statement. The sworn statement will record all facts of the case and the alien's statements. As with all sworn statements taken by the Service, the alien is required to initial each page and any corrections, and sign the statement certifying that he or she has read (or had read to him or her), the statement and that it is true and correct. When necessary, interpreters will be used. The language added to the regulation at § 235.3(b)(2) requires that such sworn statement be taken in every case. Procedures developed for the Inspector's Field Manual also contain very specific instructions regarding the record of proceeding.

**Time and Place of Credible Fear Interview**

Several commenters requested that the regulations state where and when the credible fear interviews will take place. The statute provides that credible fear interviews may take place either at a port-of-entry or at other locations that the Attorney General may designate. The Service intends that most interviews will be conducted at Service detention facilities, but prefers the flexibility to make adjustments to this arrangement as the need arises. Therefore, this operational concern will not be addressed in the regulation. The Service maintains detention facilities near several major airports such as JFK, Miami, and Los Angeles, as well as many locations along the southern border and other sites like Denver, Seattle, and Houston. In circumstances where the port of arrival is not near a Service detention facility and it is impractical to transport the alien to a Service facility, the alien may be detained in other Service-approved detention sites, such as local or county jails. In these instances an asylum **\*10320** officer will travel to the detention site to conduct the interview.

Several commenters suggest that the Service should conduct credible fear interviews at its local asylum offices whenever possible. The Service declines to be bound by this suggestion because of the prohibitive costs involved in transporting aliens, under escort, to and from detention facilities. However, the Service retains the option to conduct interviews at places designated for asylum officers.

Similarly, the Service intends that aliens will normally be given 48 hours from the time of arrival at the detention facility, in which to contact family members, friends, attorneys, or representatives. During the referral process from the port-of-entry, they will be given a list of pro bono representatives. This list is provided for the purpose of consultation prior to the interview, and does not entitle the alien to formal counsel or representation during the credible fear interview. The aliens will be given access to a telephone to make such contacts. Commenters suggest that aliens be given petty cash or be permitted to make telephone calls at Government expense; however, the statute that provides for such consultation specifically states that the consultation shall be at no expense to the Government.

**Detention Pending a Determination of Credible Fear**

A few commenters stated that the provisions of §235.3(b)(4) for detention of aliens awaiting a credible fear determination are too harsh, and asked that the rule be amended to allow for parole of such aliens. However, because section 235(b)(1)(B)(iii)(IV) of the Act requires that an alien in expedited removal proceedings "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed," the Department feels that parole is appropriate only in the very limited circumstances specified in §235.3(b)(4). The interim rule has been amended, however, to clarify that aliens found to have a credible fear will be subject to the generally applicable detention and parole standards contained in the Act. Although parole authority is specifically limited while a credible fear determination is pending under §235.3(b)(4), those found to have a credible fear and referred for a hearing under section 240 of the Act will be subject to the rule generally applicable to arriving aliens in §235.3(c). In addition, §235.3(c) has been amended to retain detention authority for aliens whose admissibility will be determined in exclusion proceedings after April 1, 1997.

**Review of Credible Fear Determinations**

The proposed regulation provides that an alien may receive, upon request, review by an immigration judge of an asylum officer's finding of no credible fear. A number of commenters requested that language be inserted in the interim regulation which presumes that an asylum officer's finding of no credible fear will be reviewed by an immigration judge unless the alien desires to abandon the review and return to his or her home country. If such a suggestion is not adopted, these commenters request that, at a minimum, language be inserted requiring that the asylum officer advise the alien of his or her right to request review of the negative decision and requiring the officer to ask the alien whether he or she desires such review. The language of section 235(b)(1)(B)(iii)(III) of the Act clearly provides that the alien has the obligation to request review of a negative credible fear determination. The Department notes that §208.30(e) of the proposed regulation requires the asylum officer to inquire whether the alien wishes review of the negative credible fear determination. This provision is appropriated into Form I-589.

A number of commenters asked that the regulation provide that, whenever practicable, the credible fear review be conducted in person; that the alien may be assisted by an attorney or other representative; and that an interpreter be provided when necessary. Another commenter stated, however, that no counsel should be allowed in the review of credible fear determinations; rather, a representative should be allowed to submit a written statement. The Department recognizes the concerns raised by these commenters. However, because the proposed regulation sets forth a procedure for credible fear review that is consistent with the language of section 235(b)(1)(B)(iii)(III) of the Act and provides the Attorney General the flexibility to administer such a procedure, the rule was not changed.

One commenter asserted that the proposed regulation that provides for an alien who demonstrates a credible fear of persecution to be placed in removal proceedings under section 240 of the Act is incorrect. The commenter maintains that IIRIRA contemplates that such aliens will be limited to an "asylum only" hearing with an appeal to the Board. This portion of the regulation will not be changed in the interim rule. Section 235(b)(1)(B)(ii) of the Act provides that if an asylum officer determines that an alien has a credible fear of persecution, the alien "shall be detained for further consideration of the application for asylum. The remainder of section 235(b) of the Act is very specific as to what procedures should be followed if an alien does not establish a credible fear. However, the statute is silent as to the procedures for those who do demonstrate a credible fear of persecution. Once an alien establishes a credible fear of persecution, the purpose behind the expedited removal provisions of section 235 of the Act to screen out arriving aliens with fraudulent documents or no documents and with no significant possibility of establishing a claim to asylum has been satisfied. Therefore, the further consideration of the application for asylum by an alien who has established a credible fear of persecution will be provided for in the context of removal proceedings under section 240 of the Act.

**Detention Following a Determination of Credible Fear**

Numerous commenters stated that aliens who have established a credible fear of persecution are presumptively eligible for release and should not be detained unless the government can demonstrate that the alien poses a danger to the community or a risk of flight. Some stated that the burden should be on the government to prove that custody is necessary. Again, the clear language of the statute states that such aliens shall be detained. The parole provisions of section 212(d)(5) of the Act provide discretionary authority to the Attorney General to parole into the United States or from custody only on a case-by-case basis. The credible fear standard sets a low threshold of proof of potential entitlement to asylum; many aliens who have passed the credible fear standard will not ultimately be granted asylum. It should also be noted, as stated by one commenter, that these aliens are prima facie inadmissible to the United States. However, the Department intends, as part of the credible fear interview process, to assess the eligibility for parole of aliens who have been determined to have a credible fear. The discretion to release from custody will remain with the district director on a case-by-case basis.

**Effect of Initiation of Removal Proceedings**

Several commenters objected to the language in section 239.3 providing that the filing of a notice to appear has no  **\*10321** effect in determining periods of unlawful presence. These commenters noted that this section of the regulation could be interpreted to mean that the period of time a respondent is in removal proceedings is not a period "authorized by the Attorney General," which would mean that removal proceedings would not toll the running of time periods for purposes of the bars to admission in section 212(a)(9)(B) of the Act. The result, the commenters assert, would be that people would be compelled to abandon their legitimate claims for relief from removal because, by pursuing such relief before an immigration judge or on appeal to the Board, an individual would risk accruing over 180 days in "unlawful status" and thereby becoming inadmissible under section 212(a)(9)(B)(i)(I) of the Act. The commenters recommended that either this language in section 239.2 be deleted or that it be replaced by a statement that the filing of a notice to appear tolls the period of unlawful presence.

Upon review, the Department has concluded that the regulation will be retained without change in the interim rule. Section 212(a)(9)(B)(iv) of the statute is clear that any period of illegal presence may tolled only in very limited circumstances. This section of the statute does not include issuance of a charging document among those circumstances. The Department does not agree that application of this section will deter aliens from pursuing valid claims for relief in removal proceedings. The same forms of relief, including asylum and adjustment of status, remain available in such cases, even after passage of the 180 day

and one year time limits. Similarly, availability of voluntary departure is unchanged. Further clarification of the applicability of section 212(a)(9) will be included in a separate proposed rule which the Service is currently drafting.

**Motions to Reopen After Departure From United States**

A few commenters recommended that motions to reopen be permitted after departure and that the Department delete the language in §3.2(d) of the proposed rule providing that motions to reopen or reconsider cannot be made by or on behalf of a person after that person's departure from the United States. These commenters contend that this regulation is no longer valid because IIRIRA substituted former section 106(c) of the Act with new section 242. New section 242 of the Act does not contain the provision of former section 106(c) barring judicial review of a final order of deportation or exclusion if the alien departed the United States after issuance of that order. The commenters assert that if a petition for review of habeas corpus is successful, the petitioner should be lawfully entitled to reopen his or her removal case, even though he or she departed from the United States. They argue that such motions will promote judicial efficiency and economy.

The Department has decided not to adopt this suggestion and the interim regulations will not be changed. No provision of the new section 242 of the Act supports reversing the long established rule that a motion to reopen or reconsider cannot be made in immigration proceedings by or on behalf of a person after that person's departure from the United States.

**Departure Constituting Withdrawal of Motion**

In the proposed regulation, §3.2(d) did not provide that departure from the United States after the filing of a motion to reopen or a motion to reconsider constitutes a withdrawal of such motion. The Department has reconsidered the advisability of adjudicating motions to reopen and reconsider subsequent to an alien's departure from the United States. The interim regulation retains the long established principal that any departure subsequent to moving to reopen or reconsider constitutes a withdrawal of that motion. The Department believes that the burdens associated with the adjudication of motions to reopen and reconsider on behalf of deported or departed aliens would greatly outweigh any advantages this system might render. Further, the Department is confident that the immigration judge's discretionary authority to stay the deportation or removal of an alien who has filed a motion to reopen or a motion to reconsider will safeguard an alien from being inappropriately deported before he is heard on his motion to reopen or motion to reconsider.

**Time and Numerical Limitations on Filing Motions**

A number of commenters pointed out that §§3.2(d) and 3.23(b) subject all parties to time and numerical limits for motions to reopen in deportation and exclusion proceedings, but apply those limits only to aliens in removal proceedings. These commenters argue that the same limitations should apply to all parties in all proceedings.

IIRIRA specifically mandates that "[a]n alien may only file one motion to reopen" in removal proceedings. Congress has imposed limits on motions to reopen, where none existed by statute before, and specifically imposed those limits on the alien only. The interim regulations will not be changed.

One commenter suggested that the time and numerical limitations for motions to reopen should be broader than changed country conditions, as provided in § 3.23(b)(4). The commenter asserted that IIRIRA contains a much broader exception for individuals to apply for asylum beyond the one year deadline and that it is inconsistent for the statute to provide these broader exceptions if eligible applicants will be barred from applying for asylum because of the stricter motion to reopen standard. As noted earlier, the Department has decided to drop the requirement that the changed circumstances exception to the one year filing deadline in section 208(a)(2) of the Act be raised only through a motion to reopen. The Department also notes that the standard for reopening an asylum case provided in 8 CFR 3.23(b)(4) is entirely consistent with the asylum reopening standard provided in IIRIRA.

**Retention of September 30, 1996 Cut-Off Date on Filing Certain Motions**

Some commenters indicated that §3.2(c)(2) does not retain the September 30, 1996 cut-off date for earlier motions to reopen, while the proposed section 3.2(b)(2) retain the July 31, 1996 cut-off date for earlier motions to reconsider. The commenters point out that although these dates have passed, they should be retained to ensure the rights of respondents who submitted timely motions that have not yet been adjudicated. Since the commenters demonstrate that the cut-off date in §§3.2(c)(2) and 3.23(b)(1) are not necessarily obsolete references, those sections are revised in the interim regulation to retain the appropriate cut-off dates.

**Immigration Court Rules of Procedure**

One commenter noted that §3.12 omitted disciplinary proceedings under §292.3 from the scope of the rules of Immigration Court procedure. The commenter correctly noted that no explanation had been given as to why disciplinary proceedings were omitted from the scope of the rules. Section 292.3 is currently being revised by EOIR and will ultimately be moved into 8 CFR 3. It was thought that the disciplinary proceedings regulations would have been revised and moved into part 3 prior to publication of this interim regulation and that a reference to §292.3 would not be necessary. The disciplinary proceedings regulation, however, is still in progress. The interim **\*10322** rule will therefore place the reference to disciplinary proceedings pursuant to §292.3 back into §3.12.

One commenter claimed that §3.25(b), which allows the immigration judge to waive a hearing and enter a decision upon a stipulated request for that order, raises due process concerns because the provision requiring an immigration judge to determine that the alien's waiver is voluntary, knowing and intelligent is not an adequate safeguard. The interim rule does not change this provision. The requirement that the immigration judge determine if an unrepresented alien's waiver is voluntary, knowing and intelligent before granting a stipulated request for an order safeguards against an imprudent waiver of a formal adjudication on the part of an unrepresented alien. Further, the request for the order and waiver of the hearing must not only be stipulated to by both the alien and the Service, but must also be approved by the immigration judge. If an immigration judge is confronted with a stipulated request raising due process concerns, he or she may examine that request in the context of a hearing.

**Comments Relating to Removal Hearings Under Section 240 of the Act**

Several commenters were concerned with various aspects of the ordinary removal hearing process. One aspect of the removal process that received several comments was the method of service of Form I-862, Notice to Appear. Specifically, commenters were concerned that service of the notice to appear by regular mail would be inadequate. A few commenters have assumed that because service by certified mail is not required in all cases, it will not be used in any case. Both the statute and the regulations, however, allow for service by regular mail only when personal service is "not practicable." Moreover, because the regulatory provisions at issue follow exactly the requirements of the Act, these provisions have not been changed in the interim rule.

Commenters expressed concern over the provision at §240.8(d) that states that it is the alien's burden to establish that mandatory grounds for denial of any application for relief do not apply. It is well-settled that an alien bears the burden of establishing eligibility for relief or a benefit. This provision merely reflects this well-settled rule. Also, an alien is only required to establish eligibility by a preponderance of the evidence. This provision has not been changed in the interim rule.

One commenter expressed concern that §240.10 of the proposed regulation does not cross-reference §236.1(e). Section 236.1(e) requires that every detained alien be notified that he or she has the privilege of communication with consular authorities. The commenter proposed that §240.10 require the Service to determine whether the alien is covered by §236.1(e) and therefore must have an opportunity to contact the consular officer before a responsive pleading. The Service is required to comply with this requirement before commencement of removal proceedings. In the unlikely event that the Service failed to comply with this requirement, such a procedure could unduly delay an otherwise routine removal case. Contact with a consular officer is unlikely to have any bearing on a respondent's inadmissibility or deportability. The delay in the proceedings and its attendant cost would generate little substantive benefit for the alien as a result.

One commenter expressed concern over provisions in §240.10(g) implementing section 241(b) of the Act. Those provisions allow the Attorney General to remove an alien to a country other than as designated by the alien under certain circumstances.

The commenter suggests a 30-day waiting period for removal from the time the alien is given notice of the new country of removal. The Service has considered this suggestion and has decided not to change this provision in the interim rule. This procedure is not required by the Act, and would place a significant strain on detention resources.

Another commenter argued that provisions in §240.7(a) relating to the admissibility of prior statements in removal proceedings were unnecessary. Specifically, the commenter was concerned about criminal pleas resulting in less than a criminal conviction and their effect on removal proceedings. It is always within the authority of the immigration judge to assign the statement a proper weight. Moreover, this provision was carried over from the prior regulations where it formerly existed at §242.14(c). Thus, this section has not been changed in the interim rule.

Several commenters requested that §240.12(a) of the proposed regulation include language that was in former §242.18(a) requiring that the decision of an immigration judge "shall include a discussion of the evidence and findings as to deportability [inadmissibility]." The commenters assert that such findings and discussion of the evidence is necessary for the respondent to properly determine whether to file a motion for reconsideration of that decision or to prepare a notice of appeal with sufficient specificity to prevent a summary dismissal by the Board under §3.1(d)(1)(1-a) of the regulations. The Department disagrees. The proposed regulation allows for an adequate articulation of the immigration judge's basis for his or her decision as well as the underlying reasons for granting or denying the request. The rule provides sufficient information for the respondent to prepare a notice of appeal with sufficient specificity to prevent a summary dismissal of appeal. For these reasons this section has not been changed in the interim rule.

Other comments regarding procedures are not discussed individually and have not been adopted in this interim rule. Most recommended changes to existing procedures or commented on matters which directly resulted from changes to the law itself. These comments will be reviewed and considered in greater detail when the final rule is prepared.

**Guardian Ad Litem**

In the proposed rulemaking, the Department solicited comments on the advisability of procedures for appointment of guardians ad litem. Several thorough and detailed comments were received. Because the issue is a complex and sensitive one, the Department has decided to further examine the issue and prepare a separate rulemaking at a later date.

**Cancellation of Removal**

A number of commenters expressed concern with section 240.20(b) of the proposed regulation, which states that an application for cancellation of removal may be filed only with the Immigration Court after jurisdiction has vested pursuant to section 8 CFR 3.14. Section 3.14(a) provides that jurisdiction vests when a charging document is filed with the Immigration Court by the Service. The practical concern raised by the commenters arise if the Service serves Form I-862, Notice to Appear, on a respondent but does not file it with the Immigration Court. If the Service does not file a notice to appear which has been served, a respondent would not have access to the Immigration Court to obtain forms of relief such as cancellation of removal or adjustment of status. Moreover, the service of the notice to appear will cut off the accrual of time in continuous residence or continuous physical presence for that respondent under new section 240A(d)(1) of the Act. The commenters proposed that language be added to §3.14(a) of the regulation allowing for jurisdiction to vest and  **\*10323**  proceedings to commence when a charging document is filed by the Service or by a respondent. The commenters added that §3.14(a) already permits immigration judges to conduct bond proceedings and credible fear determinations without a charging document being filed with the court. Thus, they assert, there is no rational basis to permit the initiation of those two types of proceedings and not permit an immigration judge to consider an application for cancellation of removal after a respondent files a charging document that previously has been served on the respondent by the Service. The ability to file a charging document has rested exclusively with the Service for a number of years, without problem. This portion of the proposed regulation will not be changed in the interim rule. The issue of the initiation of removal proceedings lies within the prosecutorial discretion of the Service. The Service needs to have control over when charging documents are filed with the Immigration Courts in order to best manage its administrative resources.

**Apprehension, Custody, and Detention of Aliens**

The IIRIRA extended the mandatory detention provisions to additional classes of inadmissible and deportable aliens but provided an exception for certain witnesses. It also allowed the Attorney General the option of a transition period for implementation of mandatory detention. The Service exercised this discretion and implemented the transition period custody rules on October 9, 1996, effective for 1 year. This interim rule amends the regulations to comply with the amended Act by removing the release from custody provisions for aliens who may no longer be released. These amendments to the regulations will take effect upon the termination of the transition period. As for non-criminal aliens, the rule reflects the new $1,500 minimum bond amount specified by IIRIRA. Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination.

Several commenters complained that the Service has no national standards of detention. They stated that policies, practices, and decisions regarding outside communication are bewildering, arbitrary, and inconsistent. Consistent with its focus on providing safe, secure, and humane detention environments, the Service has implemented detention facility improvements and has set as a goal the accreditation of each of its facilities. The Krome Service Processing Center (SPC) has received accreditation with commendation from the Joint Commission of Healthcare Organizations (JCHO), the most prestigious medical accreditation that can be awarded. Currently, six SPCs are accredited by the National Commission on Correctional Health Care (NCCHC), and accreditation is pending at the remaining three SPCs. The Denver contract facility is also NCCHC accredited. Six contract facilities have American Correctional Association (ACA) accreditation and two others have begun the accreditation process.

Several commenters stated that the Service should require ACA standards in local detention facilities used. Approximately 46 percent of the detention space used by the Service is with state and local facilities. Formal ACA accreditation of a state or local facility is a matter for the state or local government. The Service could not meet its detention requirements by using only facilities that have been formally accredited. The Service has established its own rigorous inspection program that uses ACA standards for evaluation of a facility. The Service will not use a facility that fails to pass our inspection.

Several commenters stated that §236 of the proposed rule as written is a reversal of long established procedure that provides that a noncriminal alien is presumptively eligible for release. The Service has been strongly criticized for its failure to remove aliens who are not detained. A recent report by the Department of Justice Inspector General shows that when aliens are released from custody, nearly 90 percent abscond and are not removed from the United States. The mandate of Congress, as evidenced by budget enhancements and other legislation, is increased detention to ensure removal. Accordingly, because the Service believes that the regulation as written is consistent with the intent of Congress, the interim rule has not modified the proposed rule in this regard.

Several commenters noticed a discrepancy between the discussion in the supplementary information and the substance of §236.1(c)(5) of the proposed regulation. The supplementary information stated the Department's intended approach, and clause (i) of the proposed regulation was in error. Accordingly, the interim rule removes paragraph (c)(5)(i) of §236.1 and renumbers the remaining paragraphs (c)(5)(ii), (iii), and (iv). The effect of this change is that inadmissible aliens, except for arriving aliens, have available to them bond redetermination hearings before an immigration judge, while arriving aliens do not. This procedure maintains the status quo regarding release decisions for aliens in proceedings, as discussed in the supplementary information of the proposed regulation.

One commenter stated that no criminal alien may be released pursuant to the Transition Period Custody Rules in section 303(b)(3) of IIRIRA where there is sufficient space to detain the individual alien. The same commenter stated that it was not the intention of Congress that EOIR continue to exercise bond redetermination authority under the Transition Rules. Aside from the classes of aliens covered by the Transition Rules, however, the basic structure of the Rules is essentially that of section 242(a)(2) of the Act as it stood prior to AEDPA, providing for the release of "lawfully admitted" criminal aliens (as well as unremovable criminal aliens), in the exercise of the Attorney General's discretion, when such aliens can demonstrate the absence

of a danger to the community or a flight risk upon release. The Department intends to issue a separate proposed rule in the near future establishing both substantive limitations and procedural safeguards concerning the release of criminal aliens eligible to be considered for release under the Transition Rules. Accordingly, the interim rule has not been modified.

**Expedited Deportation Procedures for Aliens Convicted of Aggravated Felonies Who Are Not Lawful Permanent Residents**

The interim rule amends the Service's regulations to comply with the Act, as amended, by: including aliens who have lawful permanent residence on a conditional basis under section 216 of the Act as being subject to expedited administrative deportation procedures; removing references to prima facie eligibility for relief; and eliminating references to release from custody, since aliens subject to these proceedings are now statutorily ineligible for release as a result of changes to other sections of the Act.

Several commenters addressed the time period for response, the role of the deciding Service officer, the risk of deporting U.S. citizens or permanent residents, and other aspects of the procedure. These procedures were not changed from the regulation as it was written at §242.25. These comments were previously addressed when the regulation was published on August 24, 1995. **\*10324**

**Voluntary Departure and Employment Authorization**

The proposed rule outlined how voluntary departure would be handled at various stages of proceedings. Since new section 240B of the Act and the corresponding proposed regulations represented a significant departure from the predecessor provisions for voluntary departure, public comments regarding the Department's approach to implementation of this provision were particularly welcomed.

Several commenters wrote in opposition to the language in §240.25 providing that "[t]he Service may attach to the granting of voluntary departure any conditions it deems necessary to ensure the alien's timely departure from the United States." Many based their opposition on their contention that the language was "beyond the scope of the legislation." However, a similar provision already exists in regulation. The present §242.5(b) states that "officers * * * may deny or grant the application and determine the conditions under which the alien's departure shall be effected." Similarly, current §244.1 states that voluntary departure may be authorized "under such conditions as the district director shall direct." Basically, the language of the proposed rule merely stated what was already in regulation. In addition, it is noted that voluntary departure is a privilege granted by the Service and is not an entitlement to be claimed by the alien. An alien must establish both that he or she is statutorily eligible for voluntary departure and that he or she merits voluntary departure in the exercise of discretion. See Matter of Seda, 17 I&N Dec. 550 (BIA 1980). The ability to attach conditions to a grant of voluntary departure is necessary to the Service's ability to consider the request and is fully consistent with the intent of Congress in enacting section 240B of the Act, which tightens the previously applicable voluntary departure provisions in order better to assure actual departure. Therefore, the language will not be changed for the interim rule.

Several commenters objected to the maximum time limits for voluntary departure of 120 days prior to completion of removal proceedings, and 60 days at the completion of removal proceedings. Those commenters indicated that the statutory language limiting voluntary departure to 120 and 60 days did not preclude an interpretation authorizing additional extensions of voluntary departure in increments of 120 or 60 days. Several commenters, however, wrote in support of the voluntary departure provisions contained in the proposed rule. One commenter stated that "it would be unlawful to extend or renew voluntary departure beyond the single period of 60 or 120 days specified in that section." Another commenter stated that "These changes represent nothing more or less than what has been mandated by Congress, and there is no basis on which they can be substantively altered or amended in the promulgation of the interim rule."

In its proper form, voluntary departure serves several functions. First, it allows the Service to allocate its enforcement resources more efficiently through case management. Second, it saves resources by allowing aliens to depart at their own expense rather than at the expense of the government. Finally, it benefits the aliens involved by allowing them to avoid the harsh consequences

of a formal order of removal. Too often, however, voluntary departure has been sought and obtained by persons who have no real intention to depart. The IIRIRA was intended as a comprehensive reform of the immigration system and was specifically designed to curb abuses of voluntary departure. A reading of the voluntary departure provisions allowing for extensions of voluntary departure in multiple increments of 120 or 60 days inconsistent with the purpose of the statute and would be at best difficult to reconcile with the language of section 240B of the Act.

Prior to IIRIRA, the authority for voluntary departure was found in section 244(e) of the Act, which contained no time limitation. Now, for the first time, there are statutory restrictions limiting the time for which voluntary departure may be authorized. The Conference Report on H.R. 2202 stated that under section 240B(a) of the Act, "[p]ermission to depart voluntarily under this subsection shall not be valid for a period exceeding 120 days * * *." Similarly, the Conference Report stated that under section 240B(b) of the Act, "[t]he period for voluntary departure cannot exceed 60 days * * *. The Department concludes that the total period, including all extensions, may not exceed 120 days for voluntary departure granted prior to completion of proceedings or 60 days for voluntary departure granted at the conclusion of proceedings.

Several commenters objected to the elimination of employment authorization for aliens who have been granted voluntary departure. Several other commenters wrote in favor of the elimination. Prior to April 1, 1997, voluntary departure was often granted by EOIR and the Service for extended periods of time. With grants and extensions of voluntary departure for extended periods of time, it was reasonable to allow for employment authorization. Now, voluntary departure is limited to a maximum of 120 days. Moreover, it has long been recognized that employment provides a magnet that draws aliens to this country. Voluntary departure provides an opportunity for an alien to complete the process of departure from the United States and should not be seen as a new opportunity for employment authorization. Although the granting of voluntary departure will not, in and of itself, cause any previously approved employment authorization to be terminated, neither will the granting of voluntary departure provide a new opportunity to apply for employment authorization. Therefore, the interim rule will eliminate the general provision found at § 274a.12(c)(12) for employment authorization for aliens who have been granted voluntary departure. Employment authorization will be retained only for beneficiaries of the Family Unity Program (section 301 of the Immigration Act of 1990, Pub. L. 101-649).

Several commenters expressed concern about the consequences for certain abused immigrant spouses and children of lawful permanent residents with properly filed self-petitions who were granted voluntary departure and work authorization pending availability of an immigrant visa. The Department shares the concerns of the commenters and is looking at how best to address them outside the context of voluntary departure.

Several commenters objected to the provisions for appeals, generally stating that the Service could appeal approvals, yet aliens cannot appeal denials. In §240.25 (voluntary departure by the Service), the appeal procedure at paragraph (e) states that a denial of an application for voluntary departure may not be appealed, but such denial shall be without prejudice to the alien's right to apply to the immigration judge in accordance with §240.26. Section 240.26(g)(1) (voluntary departure by EOIR) places limitations for appeals only on the Service, and places none on the alien. Section 240.26(g)(2) discusses an appeal of a grant or denial of voluntary departure. Therefore, the appeal procedures in §§240.25(e) and 240.26(g)(1) and (2) do not allow the Service to appeal approvals while precluding aliens from appealing denials. In reviewing the comments, however, it became apparent that the language of 240.26(g) appeared to  **\*10325**  prohibit the Service from appealing a grant of voluntary departure on the ground that the alien was not eligible for the relief. Any such implication was unintended, and the language has been corrected to reflect that both the alien and the Government may appeal issues of both eligibility and discretion, but that neither may appeal the length of the voluntary departure period granted by the immigration judge.

One commenter expressed concern about the dangerous intersection between the voluntary departure time limits and new section 212(a)(9)(B) of the Act, which imposes a 3- to 10-year bar to admission upon any alien unlawfully present in the United States from 180 days to more than 1 year. The commenter pointed out that individuals now granted voluntary departure for extended periods of time for humanitarian reasons will become unlawfully present after 120 days of voluntary departure. The commenter stated that if deferred action is to be the sole avenue of relief, the Service needs to develop policy guidelines so

that district directors will not be afraid to use it to enable the sick and the dying to receive treatment and to enable their parents to work for health insurance. The Department acknowledges that there will be some compelling humanitarian cases for which voluntary departure cannot be extended. A district director will be able to give individual consideration for a recommendation for deferred action to the regional director. If approved by the regional director, employment authorization may be granted under the provisions of §274a.12(c)(14).

Several commenters objected to the provision for revocation found in § 240.25(f), and stated that revocation of voluntary departure should require notice and the opportunity to be heard. However, this provision already exists in the current §242.5(c), which provides for revocation of a grant of voluntary departure without notice. The revocation is an adverse action initiated by the Service; therefore, personal service of the decision is required in accordance with §103.5a(c). However, a notice of intent to revoke will not be issued. The interim rule will be amended to point out that the revocation shall be communicated in writing, and shall cite the statutory basis for revocation.

Several commenters objected to the limits in §240.26(b)(1) on grants of voluntary departure under section 240B(a) of the Act, particularly the requirement that a request for such relief be made at or before a master calendar hearing, and decided by the immigration judge within 30 days thereafter. Other commenters stated that these provisions were confusing.

The regulation has not been changed substantively based on these comments but has been revised to clarify the applicable time periods. The revisions make it clear that in order to obtain voluntary departure from an immigration judge under section 240B(a) of the Act, an alien must request it prior to or at the master calendar hearing at which the case is initially calendared for a merits hearing, which is not necessarily the first master calendar hearing. This ensures that the alien is not obligated to request voluntary departure at preliminary stages of the process, before the case is ready to be scheduled for a merits hearing. The Department believes that this allows sufficient time for the alien to consider voluntary departure and other options and to discuss them with counsel. If such requests cannot be resolved at the master calendar hearing the immigration judge may take an additional 30 day period in case he or she desires additional time to consider the voluntary departure request or to complete the processing. In the event that the alien decides only after the specified master calendar hearing that he or she wishes to request voluntary departure, such a request can still be made later, but requires the concurrence of the Service under §240.26(b)(2). Finally, even without Service concurrence, the immigration judge may grant voluntary departure under section 240B(b) of the Act upon conclusion of the proceeding.

Several commenters objected to the language at §240.26(b)(1)(iv) authorizing the grant of voluntary departure by immigration judges pursuant to section 240B(a) of the Act only if the alien waives appeal of all issues. The Department believes that voluntary departure authorized by immigration judges prior to completion of proceedings should be for the purpose of settling cases in the interests of economy and justice. If an alien wishes to contest any issues, the proper forum will be a merits hearing. Once a case proceeds to a merits hearing and contested issues are settled, voluntary departure remains a form of relief; however, it may be authorized only pursuant to the provisions of section 240B(b) of the Act for voluntary departure granted at the completion of removal proceedings.

Several commenters wrote that the regulation should provide an exemption for an alien who would otherwise have a removal order issued against him or her for failing to depart when the alien, through no fault of his own, has not obtained travel documents. The regulation already provides, at §240.26(b)(3)(ii), that the Service in its discretion may extend the period within which the alien must provide such documentation. However, the provision for extension is discretionary and not an entitlement. The alien in removal proceedings bears the responsibility to demonstrate eligibility for any relief requested. The alien is encouraged to work with the government of his or her home country to obtain a valid passport or other travel authorization if a travel document is necessary for return to that country. Failure to obtain necessary travel documentation will leave the Department no option but to enforce the alternate order of removal.

Several commenters pointed out that in a case involving an alien who was previously granted voluntary departure and failed to depart, the proposed regulation correctly reflects the statutory language that such an alien is not eligible for voluntary departure

or relief under sections 240A, 245, 248, and 249 of the Act. The commenters pointed out, however, that the proposed regulation fails to include the statutory requirement that the alien must receive notice of the penalty for failing to depart. The Department agrees with the commenters, and will change the language in the interim rule to reflect the requirement that a voluntary departure order permitting an alien to depart voluntarily shall inform the alien of the penalties under section 240B(d) of the Act.

Sections 240B(a)(1) and 240B(b)(1)(C) of the statute bar aliens deportable under section 237(a)(2)(A)(iii) of the Act from voluntary departure. Because aliens entering without inspection are no longer considered deportable, however, the statutory bar might be read as allowing such aliens to obtain voluntary departure despite an aggravated felony conviction. The statute would thus create the anomaly of more favorable treatment for aggravated felons who enter without inspection. The Department does not believe that Congress intended such an anomaly. In any event, having become aware of the problem, the Department now exercises its discretion to bar such aliens from receiving this form of relief.

Finally, several commenters requested clarification regarding the effect of a motion or appeal to the Immigration Court, BIA, or a federal court on any period of voluntary departure already granted. Since an alien granted voluntary departure prior to completion of proceedings must concede removeability and agree to waive **\*10326** pursuit of any alternative form of relief, no such appeal or motion would be possible in this situation. Regarding post-hearing voluntary departure, the Department considered several options, but has not adopted any position or modified the interim rule. The Department has identified three possible options: no tolling of any period of voluntary departure; tolling the voluntary departure period for any period that an appeal or motion is pending; or setting a brief, fixed period of voluntary departure (for example, 10 days) after any appeal or motion is resolved. The Department wishes to solicit additional public comments on these or other possible approaches to this issue so that it can be resolved when a final rule is promulgated.

**Detention and Removal of Aliens Ordered Removed**

This rule provides for the assumption of custody during the removal period, allows detention beyond the period, and provides conditions for discretionary release and supervision of aliens who cannot be removed during the period.

Several commenters stated that the wording of the statute provides for release of noncriminal aliens during the removal period and suggested that the Service adopt a policy of allowing the alien to remain at liberty during the 90-day removal period. One commenter stated that the proposed rule is consistent with the language and intent of IIRIRA and should be retained in the interim rule. The plain language of the statute requires that an alien be held in custody during the 90-day removal period and not be released. Accordingly, the proposed language is retained in the interim rule.

Several commenters stated that the statute requires release on an order of supervision after the expiration of the 90-day removal period. One commenter stated that the proposed rule is consistent with the language and intent of IIRIRA and should be retained in the interim rule. Taken together, sections 241(a)(3) and (a)(6) of the Act provide that any alien who is inadmissible or who is deportable on the grounds enumerated in paragraph (a)(6) may be detained beyond the removal period. Additionally, any alien who is a risk to the community or is unlikely to appear for removal may be detained regardless of the charge of inadmissibility or deportability. Accordingly, the proposed language is retained in the interim rule.

**Reinstatement of Removal Orders Against Aliens Illegally Reentering**

Several commenters suggested that aliens caught illegally reentering the United States after removal should be provided a hearing before an immigration judge. They expressed concern that issues such as identity and the propriety of the earlier removal order would not be addressed. One commenter argued that new section 241(a)(5) of the Act was not intended to be a substantive revision of former section 242(f) of the Act, which also dealt with reinstatement of deportation orders, but was merely taken from a bill proposing to recodify the Act without substantive change. One commenter wrote in support of these provisions, stating that they were consistent with the language and intent of IIRIRA.

A review of the relevant statutory provisions reveals that a substantive change was in fact effected in the transition from section 242(f) of the Act to section 241(a)(5) of the Act. Section 242(f) of the Act provided only that the deportation order was to be reinstated upon illegal entry. New section 241(a)(5) of the Act provides that the removal order is reinstated from its original date, but adds the provision "and is not subject to being reopened or reviewed."

The Service has taken steps to ensure the positive identification of an alien apprehended and removed under this section. In §241.8(a)(2), the regulation requires fingerprint identification before an alien can be removed under section 241(a)(5) of the Act. In cases where no fingerprints are available and the alien disputes that he or she was previously removed, the alien will not be removed under section 241(a)(5) of the Act. Because the process mandated by the proposed rule adequately addresses the concerns expressed by the commenters, this provision remains unchanged in the interim rule.

**Detention and Removal of Stowaways**

Section 241.11 implements section 305 of IIRIRA, defining the responsibilities for stowaways and costs of detention in the new section 241 of the Act. All stowaways are deemed to be inadmissible under the Act and are not entitled to a hearing on admissibility. Those with a credible fear of persecution may seek asylum in accordance with 8 CFR part 208 in special proceedings before an immigration judge. The statute is very specific regarding most detention and removal responsibilities of the carriers.

Several commenters stated that the regulations do not contain a definition of stowaway. Since IIRIRA added a clear definition of stowaway in section 101(a)(49) of the Act, the Department saw no need to repeat the definition in the regulations. One commenter objected to the 15-day detention period for asylum-seeking stowaways, for which the owner of the vessel or aircraft bringing the stowaway is obligated for the costs of detention. As this time frame is mandated by statute in section 241(c)(3)(A)(ii)(III) of the Act, the Department is bound by it.

One commenter suggested that the regulation clearly define the situations where the Service should allow the carrier to remove, by aircraft, a stowaway who arrived by vessel. The regulation at §241.11(c)(1) has been amended to include general circumstances where the Service might favorably consider such request. These circumstances will also be more thoroughly addressed in the Inspector's Field Manual.

One commenter stated that the regulations should define how the Service will make a determination that the necessary travel documents for the stowaway cannot be obtained, so as to shift the costs of the stowaway's detention from the carrier to the Service, as stated in section 241(c)(3)(A)(ii)(II) of the Act. The Department has not had sufficient time to consider this issue and so will address it in the final rule.

**Adjustment of Status**

Some commenters objected to the policy statement contained in the proposed rule that amended §245.1(c)(8) and indicated that, as an exercise of discretion, the Attorney General would not adjust the status of arriving aliens ordered removed under section 235(b)(1) of the Act or in proceedings under section 240 of the Act. Those commenters believed that such a statement exceeded the Attorney General's authority by eliminating an immigration benefit that has not been eliminated by an act of Congress. Other commenters suggested that the policy statement did not go far enough and that the policy should be expanded to include all inadmissible aliens in section 240 proceedings, not just arriving aliens. In this interim rule, the Department will maintain the position taken in the proposed rule. This position promotes the Department's objective of taking steps to preserve the integrity of the visa issuance process while preserving the current additional avenue for review of discretionary denials of adjustment applications filed by aliens present without inspection and admission. The Department continues to believe this position is **\*10327** consistent with the intent of Congress when it passed IIRIRA.

In response to the commenters who suggested this policy exceeded the Attorney General's statutory authority, it is noted that section 245 of the Act clearly and unambiguously states that adjustment of status is a discretionary decision, subject to such

regulatory limitations as the Attorney General may prescribe. The same commenters stated that aliens who depart using an advance parole authorization and whose applications are subsequently denied would no longer be able to renew their adjustment application before an immigration judge. However, the revisions to §245.2(a)(5)(ii) contained in the proposed rule preserved this procedure.

**Rescission of Adjustment of Status**

The interim rule includes several changes to 8 CFR part 246 that update obsolete references and bring the regulation into agreement with the statute. References to special inquiry officer were updated to refer to immigration judges. References to status of permanent residence acquired through outdated sections of law, and any related procedures for special report to Congress, were eliminated. In §246.2, the provision that limited the rescission authority of the district director to cases that had been adjusted under section 245 of 249 or the Act was expanded to include all types of adjustment, thereby bringing the regulation into accord with the statute. In §246.6, the requirements for immigration judges' decisions were changed to comport with the requirements of immigration judges' decisions found in §240.12. The reference to Form I-151 in §246.9 was removed because Form I-151 is no longer a valid document.

**Elimination of Mexican Border Visitor's Permit**

The proposed rule eliminated the Form I-444, Mexican Border Visitor's Permit, which is issued at land border ports-of-entry along the United States/Mexico border to Mexican nationals traveling for more than 72 hours but less than 30 days in duration or for more than 25 miles from the United States/Mexico border but within the five states of Arizona, California, Nevada, New Mexico, or Texas. The elimination was proposed because the Form I-444 does not have adequate security features to deter counterfeiting, and provides no tracking or enforcement benefits.

One commenter suggested that since the elimination of the Form I-444 was not mandated by IIRIRA and represented a significant departure from past procedure, it should be removed from this rule and proposed in a separate rulemaking. The commenter specifically objected to the elimination of the time and distance controls imposed on Mexican nationals inherent in the issuance of the Form I-444. As stated in the proposed rule, the Service has been unable to demonstrate that there is any connection between the limits on travel by persons issued Forms I-444 and immigration violations. Mexican nationals must undergo the same interview process to obtain a Border Crossing Card (BCC) or nonimmigrant visa as any other applicant from any other country. New validity periods have been imposed in recent years on the BCC, requiring periodic renewal. A Mexican national entering with a BCC undergoes the same inspection process as any other applicant for admission and must establish eligibility as a visitor for business or pleasure upon each entry to the United States. Presently, Mexican nationals who request entry at a Mexican land border port-of-entry to travel more than 30 days or beyond the five-state area, and who establish admissibility as a visitor, are issued Form I-94, Arrival/Departure Record, and allowed to proceed anywhere in the United States with no additional restrictions. Mexican BCC holders entering the United States by air or via the Canadian land border are also admitted with no restrictions. The elimination of the Form I-444 does not expand the possible use of the BCC in any way; it merely standardizes the entry documentation issued. The Department can see no reason to continue to impose specific controls on Mexican nationals seeking admission only at Mexican border ports-of-entry, and so accordingly will retain in the interim rule the elimination of Form I-444 in favor of more thoroughly documenting entry with Form I-94.

**Visa Waiver Pilot Program (VWPP)**

The provisions relating to the VWPP in 8 CFR part 217 were included in the proposed rule primarily as part of the review intended to streamline and eliminate duplication in Department regulations. In addition, several changes were made to conform to new statutory terminology and to include certain new procedures created as a result of IIRIRA. One commenter expressed concern that there could be confusion in §217.4 as to what constitutes fraudulent or counterfeit documents and that aliens could be removed without the opportunity for review by an immigration judge. The language in this section was not changed from what has existed in the regulations for years. Moreover, aliens applying under the VWPP are, by statute, not entitled to a hearing before an immigration judge, except on the basis of an asylum claim. The only change that the proposed rule made to this

provision was that the hearing provided for VWPP asylum claimants is now more clearly limited to asylum issues only. In addition, inadmissible VWPP applicants may be temporarily refused permission to enter the United States, but are not subject to the formal expedited removal provisions of section 235(b)(1) of the Act.

One commenter objected to several aspects of the amended language in § 217.6 relating to carrier agreements. Since most of the language in this section is already contained on the Form I-775, Visa Waiver Pilot Program Agreement, which is signed by all carriers participating in the VWPP, much of this section has been removed from the interim rule. The commenter objected to the elimination of due process safeguards in allowing termination of agreements by the Commissioner, with 5 days notice to the carrier, for failure to meet the terms of the agreement. This is not a new provision. The exact language has existed in the regulations since at least 1991 and has also been part of the existing Form I-775 for years, and will be retained. The definition of round (return) trip ticket has been revised to conform with terminology used elsewhere in the regulation and carrier agreement, and to provide for electronic ticketing technology.

**Miscellaneous Changes**

The proposed rule contemplated removing 8 CFR part 215, Controls of Aliens Departing from the United States, because it was also contained in the Department of State regulations. The Department has decided to retain 8 CFR part 215.

The proposed rule contained §240.39, which retained material previously found in §242.22, and §240.54, which preserved the former §242.23. These sections have been removed from the interim rule since the subjects are encompassed by §§3.23 and 241.8, respectively.

One commenter correctly noted that §216.5(e)(3)(ii) had been amended to allow an alien in exclusion, deportation, or removal proceedings to file a petition for waiver only until such time as there is a final order of deportation or removal. In § 216.5(e)(3), adjudication of a waiver is based upon the alien's claim of having been battered or subjected to extreme mental cruelty. The commenter stated that there is no reason to shorten **\*10328** the period allotted for a battered woman and child to file a battered spouse waiver. The proposed rule change was meant to apply generally to all aliens filing a petition for a waiver, and was intended to add a point of finality to the time when the petition could be filed. Therefore, the interim rule has been amended to clarify the general applicability to all petitions for waiver. The regulation will permit filing of a petition for waiver at any time prior to the second anniversary of obtaining permanent resident status and up to the point of receiving a final order in exclusion, deportation, or removal proceedings, which includes any possible Federal court review.

Several commenters were concerned about removing language at § 204.2(a)(1)(iii)(A) through (C), which dealt with commencement and termination of proceedings, and exemptions from the general prohibition against approval of visa petitions filed on the basis of marriages during proceedings. The language was removed as part of the Service's streamlining initiative because it was duplicative of language in §245.1(c)(8). The interim rule does clarify that in visa petition proceedings the burden of proof remains on the petitioner to establish eligibility for the exemption found at section 204(g) of the Act. In addition, §204.2(a)(1)(iii) introductory text has been amended reflecting that §245.1(c)(8) has been renumbered as §245.1(c)(9).

**Streamlining, Updating, and Reorganization**

Several commenters expressed concern about sections of the regulation that were identified in the Supplementary Information of the proposed regulation as being revised solely for the purpose of streamlining: elimination of unnecessary recitation of statutory provisions; discussion of procedural matters; elimination of duplication; or general updating. It is emphasized that these streamlining changes neither created new requirements nor abolished any existing ones. Similarly, several comments concerned regulatory provisions that were simply carried over from the existing regulation, but relocated to new sections in order to conform with the general regulatory outline for the affected sections. Although the Department reviewed these comments, none resulted in further amendments to the streamlined or reorganized paragraphs. Other commenters proposed changes to current regulations that are beyond the scope of this rulemaking. These suggestions will be considered for inclusion in separate regulations after implementation of IIRIRA.

The Department solicited comments on the general organization and restructuring contained in the proposed regulation. No comments were received on this topic. Accordingly, the organizational structure has not been revised in the interim rule.

**Regulatory Flexibility Act**

The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and, by approving it, certifies that the rule will not have a significant adverse economic impact on a substantial number of small entities because of the following factors. This rule affects only federal government operations by codifying statutory amendments to the Immigration and Nationality Act primarily regarding the examination, detention, and removal of aliens from the United States. It affects only individuals and does not impose any reporting or compliance requirements on small entities.

**Unfunded Mandates Reform Act of 1995**

This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

**Executive Order 12866**

This rule is considered by the Department of Justice to be a "significant regulatory action" under Executive Order 12866, section 3(f), because it will have a significant economic impact on the federal government in excess of $100 million. No economic impact is anticipated for state and local governments. The Service projects significant increases in detention-related costs due to the provisions of IIRIRA that mandate the custody of criminal aliens who have committed two or more crimes involving moral turpitude, aliens convicted of firearms offenses, and aliens who have been convicted of an aggravated felony. The type of crime that will qualify as an "aggravated felony" has been greatly expanded under IIRIRA. In addition, all aliens, even non-criminal aliens, who are subject to a final administrative order of removal must be held in custody until the alien can be removed from the United States. If the person is not removed within 90 days he or she may be released from custody.

The Commissioner has notified Congress pursuant to section 303(b) of IIRIRA that the Service lacks sufficient space to immediately implement the mandatory custody provisions. This notification will delay for 1-year full implementation of the new mandatory custody provisions. Section 303(b) also provides for an additional 1-year delay in implementation of the mandatory custody provisions upon a second certification that space and personnel are inadequate to comply with the requirement. The Service estimates that the cost to enforce the requirement to detain all criminal aliens will be at least $205,000,000. Of that total, personnel costs account for $65,284,000 and include detention and deportation officers ($32,873,000), investigators ($25,501,000), legal proceedings personnel ($4,968,000), and administrative support ($1,942,000). Non-personnel requirements are projected to be at least $139,732,000 and includes increases in bed space and related alien custody requirements ($82,782,000 —funds 3,600 beds @ $63.00 per day), increases in alien travel expenses ($36,000,000—3,600 removals @ $1,000 each), and detention vehicle expenses ($20,950,000). The Service is currently in the process of projecting the costs of the IIRIRA requirement that we detain all aliens with administratively final orders of deportation pending their removal.

In addition to these detention related costs, the Service estimates that the expenses for training employees on the provisions of the new law and the regulations will be $2,977,500. The cost to the Service related to additional forms or changes needed to current forms is estimated to be $2,000,000 (until the final list of form requirements is completed it is not possible to more accurately assess this cost). Finally, the Department believes there may be some increases needed for immigration judges to review credible fear determinations made under section 235(b) of the Act.

The EOIR estimates increases in its costs related to IIRIRA-mandated immigration judge review of credible fear determinations (which must be made under stringent time frames) and the prompt immigration judge review that IIRIRA requires of certain expedited removal orders entered against aliens claiming to be, lawful permanent residents, asylees, or refugees. Further, EOIR

projects costs associated with the possible need for an Immigration Court presence at certain ports-of-entry and additional detention centers, which will result from the above-mentioned **\*10329** credible fear review and expedited removal review process. Also, there will be costs related to the overall need for an increased Immigration Court presence at existing Service detention centers to support the processing of the additional detainees that will result from the implementation of this rule. Similarly, EOIR anticipates a need for construction of new Immigration Courts at new detention facilities the Service may open as a result of this rule's implementation.

Although there are still a number of unknown variables which could effect the total costs to EOIR to implement its part of the new expedited removal process and to respond to the increased number of detained individuals in proceedings under this rule, EOIR estimates that the total annual cost for EOIR could be as high as $25,000,000. Of that total, the cost for hiring new immigration judges and legal support staff is projected to be $21,300,000. The cost for new video and audio teleconferencing equipment is estimated at $3,000,000. Training costs are expected to be approximately $400,000. Finally, forms and other support requirements are estimated to cost $300,000.

**Small Business Regulatory Enforcement Fairness Act of 1996**
The Department of Justice considers this rule to be a "major" rule under the Small Business Regulatory Enforcement Fairness Act of 1996 in view of the projected expenditures for the federal government as discussed in the preceding section. The Department finds good cause to make this rule effective on April 1, 1997, in order to meet the statutory deadline. These rules are essential for the implementation of the provisions of Title III-A of IIRIRA, which become effective on that date pursuant to Section 309(a) of IIRIRA.

**Executive Order 12612**
The regulation adopted herein will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 12612, it is determined that this rule does not have sufficient Federalism implications to warrant the preparation of a Federalism Assessment.

**Executive Order 12988**
This interim rule meets the applicable standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988.

**Paperwork Reduction Act**
The information collection requirements contained in this rule have been approved by the Office of Management and Budget under the provisions of the Paperwork Reduction Act. The OMB control numbers for these collections are contained in 8 CFR 299.5, Display of control numbers.

**List of Subjects**

*8 CFR Part 1*
Administrative practice and procedure, Immigration.

*8 CFR Part 3*
Administrative practice and procedure, Immigration, Organization and functions (Government agencies).

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Reporting and recordkeeping requirements.

***8 CFR Part 204***

Administrative practice and procedure, Immigration, Reporting and recordkeeping requirements.

***8 CFR Part 207***

Administrative practice and procedure, Refugees, Reporting and recordkeeping requirements.

***8 CFR Part 208***

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

***8 CFR Part 209***

Aliens, Immigration, Refugees.

***8 CFR Part 211***

Immigration, Passports and visas, Reporting and recordkeeping requirements.

***8 CFR Part 212***

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

***8 CFR Part 213***

Immigration, Surety bonds.

***8 CFR Part 214***

Administrative practice and procedure, Aliens.

***8 CFR Part 216***

Administrative practice and procedure, Aliens.

***8 CFR Part 217***

Air carriers, Aliens, Maritime carriers, Passports and visas.

***8 CFR Part 221***

Aliens, Surety bonds.

***8 CFR Part 223***

Aliens, Reporting and recordkeeping requirements.

***8 CFR Part 232***

Aliens, Public health.


*8 CFR Part 233*

Administrative practice and procedure, Air carriers, Government contracts, Travel.


*8 CFR Part 234*

Air carriers, Aircraft, Airports, Aliens.


*8 CFR Part 235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.


*8 CFR Part 236*

Administrative practice and procedure, Aliens, Immigration.


*8 CFR Part 237*

Aliens.


*8 CFR Part 238*

Administrative practice and procedure, Aliens.


*8 CFR Part 239*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.


*8 CFR Part 240*

Administrative practice and procedure, Aliens, Immigration.


*8 CFR Part 241*

Administrative practice and procedure, Aliens, Immigration.


*8 CFR Part 242*

Administrative practice and procedure, Aliens, Immigration.


*8 CFR Part 243*

Administrative practice and procedure, Aliens.


*8 CFR Part 244*

Administrative practice and procedure, Aliens.


*8 CFR Part 245*

Aliens, Immigration, Reporting and recordkeeping requirements.

***8 CFR Part 246***

Administrative practice and procedure, Aliens, Immigration.  **\*10330**

***8 CFR Part 248***

Aliens, Immigration, Reporting and recordkeeping requirements.

***8 CFR Part 249***

Aliens, Immigration, Reporting and recordkeeping requirements.

***8 CFR Part 251***

Air carriers, Aliens, Crewmen, Maritime carriers, Reporting and recordkeeping requirements.

***8 CFR Part 252***

Air carriers, Airmen, Aliens, Crewmen, Maritime carriers, Reporting and recordkeeping requirements.

***8 CFR Part 253***

Air carriers, Airmen, Aliens, Maritime carriers, Reporting and recordkeeping requirements, Seamen.

***8 CFR Part 274a***

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

***8 CFR Part 286***

Air carriers, Immigration, Reporting and recordkeeping requirements.

***8 CFR Part 287***

Immigration, Law enforcement officers.

***8 CFR Part 299***

Immigration, Reporting and recordkeeping requirements.

***8 CFR Part 316***

Citizenship and naturalization, Reporting and recordkeeping requirements.

***8 CFR Part 318***

Citizenship and naturalization.

***8 CFR Part 329***

Citizenship and naturalization, Military Personnel, Veterans.

Accordingly, chapter I of title 8 of the Code of Federal Regulations is amended as follows:


**PART 1—DEFINITIONS**

1. The authority citation for part 1 is revised to read as follows:

Authority: 8 U.S.C. 1101; 8 CFR part 2.

 8 CFR § 1.1

2. Section 1.1 is amended by revising paragraph (l), and by adding new paragraphs (q) through (t) to read as follows:

 8 CFR § 1.1

**§1.1 Definitions.**

* * * * *

(l) The term immigration judge means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under section 240 of the Act. An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe, but shall not be employed by the Immigration and Naturalization Service.

 * * * * *

(q) The term arriving alien means an alien who seeks admission to or transit through the United States, as provided in 8 CFR part 235, at a port-of-entry, or an alien who is interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act.

(r) The term respondent means a person named in a Notice to Appear issued in accordance with section 239(a) of the Act, or in an Order to Show Cause issued in accordance with §242.1 of this chapter as it existed prior to April 1, 1997.

(s) The term Service counsel means any immigration officer assigned to represent the Service in any proceeding before an immigration judge or the Board of Immigration Appeals.

(t) The term aggravated felony means a crime (or a conspiracy or attempt to commit a crime) described in section 101(a)(43) of the Act. This definition is applicable to any proceeding, application, custody determination, or adjudication pending on or after September 30, 1996, but shall apply under section 276(b) of the Act only to violations of section 276(a) of the Act occurring on or after that date.


**PART 3—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**

3. The authority citation for part 3 continues to read as follows:

Authority: 5 U.S.C. 301; 8 U.S.C. 1103, 1252 note, 1252b, 1324b, 1362; 28 U.S.C. 509, 510, 1746; sec. 2, Reorg. Plan No. 2 of 1950; 3 CFR, 1949-1953 Comp., p. 1002.

 8 CFR § 3.1

4. Section 3.1 is amended by revising paragraphs (b)(1), (b)(2), (b)(3), (b)(7), (b)(9), and (b)(10) to read as follows:

 8 CFR § 3.1

**§3.1 General authorities.**

* * * * *

(b) * * *

(1) Decisions of Immigration Judges in exclusion cases, as provided in 8 CFR part 240, Subpart D.

(2) Decisions of Immigration Judges in deportation cases, as provided in 8 CFR part 240, Subpart E, except that no appeal shall lie seeking review of a length of a period of voluntary departure granted by an Immigration Judge under section 244E of the Act as it existed prior to April 1, 1997.

(3) Decisions of Immigration Judges in removal proceedings, as provided in 8 CFR part 240, except that no appeal shall lie seeking review of the length of a period of voluntary departure granted by an immigration judge under section 240B of the Act or part 240 of this chapter.

 * * * * *

(7) Determinations relating to bond, parole, or detention of an alien as provided in 8 CFR part 236, Subpart A and 8 CFR part 240, Subpart E.

 * * * * *

(9) Decisions of Immigration Judges in asylum proceedings pursuant to § 208.2(b) of this chapter.

(10) Decisions of Immigration Judges relating to Temporary Protected Status as provided in 8 CFR part 244.

 * * * * *8 CFR § 3.2

5. Section 3.2 is amended by:

a. Revising the section heading;

b. Revising paragraph (b)(2);

c. Revising paragraph (c)(2) and (c)(3), and by

d. Revising paragraphs (d) through (g)(1), to read as follows:

 8 CFR § 3.2

**§3.2 Reopening or reconsideration before the Board of Immigration Appeals.**

* * * * *

(b) * * *

(2) A motion to reconsider a decision must be filed with the Board within 30 days after the mailing of the Board decision or on or before July 31, 1996, whichever is later. A party may file only one motion to reconsider any given decision and may not seek reconsideration of a decision denying a previous motion to reconsider. In removal proceedings pursuant to section 240 of the Act, an alien may file only one motion to reconsider a decision that the alien is removable from the United States.

(c) * * *

(2) Except as provided in paragraph (c)(3) of this section, a party may file only one motion to reopen deportation or exclusion proceedings (whether before the Board or the Immigration Judge) and that motion must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened, or on or before September 30, 1996, whichever is later. Except as provided in paragraph (c)(3) **\*10331** of this section, an alien may file only one motion to reopen removal proceedings (whether before the Board or the Immigration Judge) and that motion must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened.

(3) In removal proceedings pursuant to section 240 of the Act, the time limitation set forth in paragraph (c)(2) of this section shall not apply to a motion to reopen filed pursuant to the provisions of §3.23(b)(4)(ii). The time and numerical limitations set forth in paragraph (c)(2) of this section shall not apply to a motion to reopen proceedings:

(i) Filed pursuant to the provisions of §3.23(b)(4)(iii)(A)(1) or § 3.23(b)(4)(iii)(A)(2);

(ii) To apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing;

(iii) Agreed upon by all parties and jointly filed. Notwithstanding such agreement, the parties may contest the issues in a reopened proceeding; or

(iv) Filed by the Service in exclusion or deportation proceedings when the basis of the motion is fraud in the original proceeding or a crime that would support termination of asylum in accordance with §208.22(f) of this chapter.
 * * * * *
(d) Departure, deportation, or removal. A motion to reopen or a motion to reconsider shall not be made by or on behalf of a person who is the subject of exclusion, deportation, or removal proceedings subsequent to his or her departure from the United States. Any departure from the United States, including the deportation or removal of a person who is the subject of exclusion, deportation, or removal proceedings, occurring after the filing of a motion to reopen or a motion to reconsider, shall constitute a withdrawal of such motion.

(e) Judicial proceedings. Motions to reopen or reconsider shall state whether the validity of the exclusion, deportation, or removal order has been or is the subject of any judicial proceeding and, if so, the nature and date thereof, the court in which such proceeding took place or is pending, and its result or status. In any case in which an exclusion, deportation, or removal order is in effect, any motion to reopen or reconsider such order shall include a statement by or on behalf of the moving party declaring whether the subject of the order is also the subject of any pending criminal proceeding under the Act, and, if so, the current status of that proceeding. If a motion to reopen or reconsider seeks discretionary relief, the motion shall include a statement by or on behalf of the moving party declaring whether the alien for whose relief the motion is being filed is subject to any pending criminal prosecution and, if so, the nature and current status of that prosecution.

(f) Stay of deportation. Except where a motion is filed pursuant to the provisions of §§3.23(b)(4)(ii) and 3.23(b)(4)(iii)(A), the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision made in the case. Execution of such decision shall proceed unless a stay of execution is specifically granted by the Board, the Immigration Judge, or an authorized officer of the Service.

(g) Filing procedures. (1) English language, entry of appearance, and proof of service requirements. A motion and any submission made in conjunction with a motion must be in English or accompanied by a certified English translation. If the moving party, other than the Service, is represented, Form EOIR-27, Notice of Entry of Appearance as Attorney or Representative Before the Board, must be filed with the motion. In all cases, the motion shall include proof of service on the opposing party of the motion and all attachments. If the moving party is not the Service, service of the motion shall be made upon the Office of the District Counsel for the district in which the case was completed before the Immigration Judge.
 * * * * *8 CFR § 3.4
6. The following sentence is added to the end of §3.4:
 8 CFR § 3.4

### §3.4 Withdrawal of appeal.
8 CFR § 1.1
 * * * Departure from the United States of a person who is the subject of deportation or removal proceedings, except for arriving aliens as defined in § 1.1(q) of this chapter, subsequent to the taking of an appeal, but prior to a decision thereon, shall constitute a withdrawal of the appeal, and the initial decision in the case shall be final to the same extent as though no appeal had been taken.

### Subpart B—Immigration Court
7. In Part 3, the heading of Subpart B is revised as set forth above.
 8 CFR § 3.9

8. Section 3.9 is revised to read as follows:
 8 CFR § 3.9

**§3.9 Chief Immigration Judge.**
The Chief Immigration Judge shall be responsible for the general supervision, direction, and scheduling of the Immigration Judges in the conduct of the various programs assigned to them. The Chief Immigration Judge shall be assisted by Deputy Chief Immigration Judges and Assistant Chief Immigration Judges in the performance of his or her duties. These shall include, but are not limited to:

(a) Establishment of operational policies; and

(b) Evaluation of the performance of Immigration Courts, making appropriate reports and inspections, and taking corrective action where indicated.
 8 CFR § 3.10
9. Section 3.10 is revised to read as follows:
 8 CFR § 3.10

**§3.10 Immigration Judges.**
Immigration Judges, as defined in 8 CFR part 1, shall exercise the powers and duties in this chapter regarding the conduct of exclusion, deportation, removal, and asylum proceedings and such other proceedings which the Attorney General may assign them to conduct.
 8 CFR § 3.11
10. Section 3.11 is revised to read as follows:
 8 CFR § 3.11

**§3.11 Administrative control Immigration Courts.**
An administrative control Immigration Court is one that creates and maintains Records of Proceedings for Immigration Courts within an assigned geographical area. All documents and correspondence pertaining to a Record of Proceeding shall be filed with the Immigration Court having administrative control over that Record of Proceeding and shall not be filed with any other Immigration Court. A list of the administrative control Immigration Courts with their assigned geographical areas will be made available to the public at any Immigration Court.


**Subpart C—Immigration Court—Rules of Procedure**
11. In part 3, the heading of Subpart C is revised as set forth above.
 8 CFR § 3.12
12. Section 3.12 is amended by revising the last sentence, and adding a new sentence at the end of the section, to read as follows:
 8 CFR § 3.12

**§3.12 Scope of rules.**
8 CFR § 3.42
* * * Except where specifically stated, the rules in this subpart apply to matters before Immigration Judges, including, but not limited to, deportation, exclusion, removal, bond, rescission, departure control, asylum proceedings, and disciplinary  **\*10332** proceedings under §292.3 of this chapter. The sole procedures for review of credible fear determinations by Immigration Judges are provided for in §3.42.
 8 CFR § 3.13
13. Section 3.13 is revised to read as follows:
 8 CFR § 3.13

**§3.13 Definitions.**
As used in this subpart:

Administrative control means custodial responsibility for the Record of Proceeding as specified in §3.11.

Charging document means the written instrument which initiates a proceeding before an Immigration Judge. For proceedings initiated prior to April 1, 1997, these documents include an Order to Show Cause, a Notice to Applicant for Admission Detained for Hearing before Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien. For proceedings initiated after April 1, 1997, these documents include a Notice to Appear, a Notice of Referral to Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien.

Filing means the actual receipt of a document by the appropriate Immigration Court.

Service means physically presenting or mailing a document to the appropriate party or parties; except that an Order to Show Cause or Notice of Deportation Hearing shall be served in person to the alien, or by certified mail to the alien or the alien's attorney and a Notice to Appear or Notice of Removal Hearing shall be served to the alien in person, or if personal service is not practicable, shall be served by regular mail to the alien or the alien's attorney of record.

8 CFR § 3.14

14. Section §3.14 is amended by:

a. Revising paragraph (a), and by

b. Adding a new paragraph (c) to read as follows:

8 CFR § 3.14

**§3.14 Jurisdiction and commencement of proceedings.**

(a) Jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service. The charging document must include a certificate showing service on the opposing party pursuant to §3.32 which indicates the Immigration Court in which the charging document is filed. However, no charging document is required to be filed with the Immigration Court to commence bond proceedings pursuant to §§ 3.19, 236.1(d) and 240.2(b) of this chapter.

* * * * *

(c) Immigration Judges have jurisdiction to administer the oath of allegiance in administrative naturalization ceremonies conducted by the Service in accordance with §337.2(b) of this chapter.

8 CFR § 3.15

15. Section 3.15 is amended by:

a. Revising the section heading;

b. Amending paragraph (b) introductory text and paragraph (b)(6), by adding the phrase "and Notice to Appear" immediately after the phrase "Order to Show Cause";

c. Redesignating paragraph (c) as (d);

d. Adding a new paragraph (c); and by

e. Revising newly redesignated paragraph (d), to read as follows:

8 CFR § 3.15

**§3.15 Contents of the order to show cause and notice to appear and notification of change of address.**

* * * * *

Case 2:21-cv-00067-Z Document 162-2 Filed 09/02/22 Page 293 of 548 PageID 5236

(c) Contents of the Notice to Appear for Removal Proceedings. In the Notice to Appear for removal proceedings, the Service shall provide the following administrative information to the Immigration Court. Failure to provide any of these items shall not be construed as affording the alien any substantive or procedural rights.

(1) The alien's names and any known aliases;

(2) The alien's address;

(3) The alien's registration number, with any lead alien registration number with which the alien is associated;

(4) The alien's alleged nationality and citizenship; and

(5) The language that the alien understands.

(d) Address and telephone number. (1) If the alien's address is not provided on the Order to Show Cause or Notice to Appear, or if the address on the Order to Show Cause or Notice to Appear is incorrect, the alien must provide to the Immigration Court where the charging document has been filed, within five days of service of that document, a written notice of an address and telephone number at which the alien can be contacted. The alien may satisfy this requirement by completing and filing Form EOIR-33.

(2) Within five days of any change of address, the alien must provide written notice of the change of address on Form EOIR-33 to the Immigration Court where the charging document has been filed, or if venue has been changed, to the Immigration Court to which venue has been changed.
  8 CFR § 3.16

**§3.16 [Amended]**
8 CFR § 3.16
16. Section 3.16(b) is amended by revising the term "respondent/applicant" to read "alien".
  8 CFR § 3.17

**§3.17 [Amended]**
8 CFR § 3.17
17. Section 3.17(a) is amended in the first sentence by revising the term "respondent/applicant" to read "alien", and by revising the phrase "the appropriate EOIR form" to read "Form EOIR-28".
  8 CFR § 3.18
18. Section 3.18 is revised to read as follows:
  8 CFR § 3.18

**§3.18 Scheduling of cases.**
(a) The Immigration Court shall be responsible for scheduling cases and providing notice to the government and the alien of the time, place, and date of hearings.

(b) In removal proceedings pursuant to section 240 of the Act, the Service shall provide in the Notice to Appear, the time, place and date of the initial removal hearing, where practicable. If that information is not contained in the Notice to Appear, the Immigration Court shall be responsible for scheduling the initial removal hearing and providing notice to the government and the alien of the time, place, and date of hearing. In the case of any change or postponement in the time and place of such proceeding, the Immigration Court shall provide written notice to the alien specifying the new time and place of the proceeding and the consequences under section 240(b)(5) of the Act of failing, except under exceptional circumstances as defined in section 240(e)(1) of the Act, to attend such proceeding. No such notice shall be required for an alien not in detention if the alien has failed to provide the address required in section 239(a)(1)(F) of the Act.
  8 CFR § 3.19

**§3.19 [Amended]**

8 CFR § 3.19

19. Section 3.19(a) is amended by revising the reference to "part 242 of this chapter" to read "8 CFR part 236" wherever it appears in the paragraph.

 8 CFR § 3.19

20. Section 3.19(d) is amended in the first sentence by adding the term "or removal" immediately after the word "deportation".

 8 CFR § 3.19

21. Section 3.19 is amended by removing paragraph (h).

 8 CFR § 3.20

22. In §3.20, paragraph (a) is revised to read as follows:

 8 CFR § 3.20

**§3.20 Change of venue.**

(a) Venue shall lie at the Immigration Court where jurisdiction vests pursuant to §3.14.

 * * * * *8 CFR § 3.23

23. Section 3.23 is amended by revising the section heading and paragraph (b) to read as follows:

 8 CFR § 3.23

**§3.23 Reopening or Reconsideration before the Immigration Court.**

(a) * * *

(b) Before the Immigration Court. (1) In general. An Immigration Judge may upon his or her own motion at any time, or upon motion of the Service or the  **\*10333**  alien, reopen or reconsider any case in which he or she has made a decision, unless jurisdiction is vested with the Board of Immigration Appeals. Subject to the exceptions in this paragraph and paragraph (b)(4), a party may file only one motion to reconsider and one motion to reopen proceedings. A motion to reconsider must be filed within 30 days of the date of entry of a final administrative order of removal, deportation, or exclusion, or on or before July 31, 1996, whichever is later. A motion to reopen must be filed within 90 days of the date of entry of a final administrative order of removal, deportation, or exclusion, or on or before September 30, 1996, whichever is later. A motion to reopen or to reconsider shall not be made by or on behalf of a person who is the subject of removal, deportation, or exclusion proceedings subsequent to his or her departure from the United States. Any departure from the United States, including the deportation or removal of a person who is the subject of exclusion, deportation, or removal proceedings, occurring after the filing of a motion to reopen or a motion to reconsider shall constitute a withdrawal of such motion. The time and numerical limitations set forth in this paragraph do not apply to motions by the Service in removal proceedings pursuant to section 240 of the Act. Nor shall such limitations apply to motions by the Service in exclusion or deportation proceedings, when the basis of the motion is fraud in the original proceeding or a crime that would support termination of asylum in accordance with § 208.22(f) of this chapter.

(i) Form and contents of the motion. The motion shall be in writing and signed by the affected party or the attorney or representative of record, if any. The motion and any submission made in conjunction with it must be in English or accompanied by a certified English translation. Motions to reopen or reconsider shall state whether the validity of the exclusion, deportation, or removal order has been or is the subject of any judicial proceeding and, if so, the nature and date thereof, the court in which such proceeding took place or is pending, and its result or status. In any case in which an exclusion, deportation, or removal order is in effect, any motion to reopen or reconsider such order shall include a statement by or on behalf of the moving party declaring whether the subject of the order is also the subject of any pending criminal proceeding under the Act, and, if so, the current status of that proceeding.

(ii) Filing. Motions to reopen or reconsider a decision of an Immigration Judge must be filed with the Immigration Court having administrative control over the Record of Proceeding. A motion to reopen or a motion to reconsider shall include a certificate showing service on the opposing party of the motion and all attachments. If the moving party is not the Service, service of the motion shall be made upon the Office of the District Counsel for the district in which the case was completed. If

the moving party, other than the Service, is represented, a Form EOIR-28, Notice of Appearance as Attorney or Representative Before an Immigration Judge must be filed with the motion. The motion must be filed in duplicate with the Immigration Court, accompanied by a fee receipt.

(iii) Assignment to an Immigration Judge. If the Immigration Judge is unavailable or unable to adjudicate the motion to reopen or reconsider, the Chief Immigration Judge or his or her delegate shall reassign such motion to another Immigration Judge.

(iv) Replies to motions; decision. The Immigration Judge may set and extend time limits for replies to motions to reopen or reconsider. A motion shall be deemed unopposed unless timely response is made. The decision to grant or deny a motion to reopen or a motion to reconsider is within the discretion of the Immigration Judge.

(v) Stays. Except in cases involving in absentia orders, the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision made in the case. Execution of such decision shall proceed unless a stay of execution is specifically granted by the Immigration Judge, the Board, or an authorized officer of the Service.

(2) Motion to reconsider. A motion to reconsider shall state the reasons for the motion by specifying the errors of fact or law in the Immigration Judge's prior decision and shall be supported by pertinent authority. Such motion may not seek reconsideration of a decision denying previous motion to reconsider.

(3) Motion to reopen. A motion to reopen proceedings shall state the new facts that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits and other evidentiary material. Any motion to reopen for the purpose of acting on an application for relief must be accompanied by the appropriate application for relief and all supporting documents. A motion to reopen will not be granted unless the Immigration Judge is satisfied that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing. A motion to reopen for the purpose of providing the alien an opportunity to apply for any form of discretionary relief will not be granted if it appears that the alien's right to apply for such relief was fully explained to him or her by the Immigration Judge and an opportunity to apply therefore was afforded at the hearing, unless the relief is sought on the basis of circumstances that have arisen subsequent to the hearing. Pursuant to section 240A(d)(1) of the Act, a motion to reopen proceedings for consideration or further consideration of an application for relief under section 240A(a) (cancellation of removal for certain permanent residents) or 240A(b) (cancellation of removal and adjustment of status for certain nonpermanent residents) may be granted only if the alien demonstrates that he or she was statutorily eligible for such relief prior to the service of a notice to appear, or prior to the commission of an offense referred to in section 212(a)(2) of the Act that renders the alien inadmissible or removable under sections 237(a)(2) of the Act or (a)(4), whichever is earliest. The Immigration Judge has discretion to deny a motion to reopen even if the moving party has established a prima facie case for relief.

(4) Exceptions to filing deadlines.—(i) Asylum. The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply if the basis of the motion is to apply for relief under section 208 or 241(b)(3) of the Act and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous proceeding. The filing of a motion to reopen under this section shall not automatically stay the removal of the alien. However, the alien may request a stay and, if granted by the Immigration Judge, the alien shall not be removed pending disposition of the motion by the Immigration Judge. If the original asylum application was denied based upon a finding that it was frivolous, then the alien is ineligible to file either a motion to reopen or reconsider, or for a stay of removal.

(ii) Order entered in absentia in asylum proceedings or removal proceedings. An order of removal entered in absentia in asylum proceedings pursuant to § 208.2(b) of this chapter or in removal proceedings pursuant to section 240(b)(5) of the Act may be rescinded only upon a motion to reopen filed within 180 days after the date of the order of removal, if the alien *10334 demonstrates that the failure to appear was because of exceptional circumstances as defined in section 240(e)(1) of the Act. An order entered in absentia pursuant to §208.2(b) of this chapter or pursuant to section 240(b)(5) may be rescinded upon a motion

to reopen filed at any time if the alien demonstrates that he or she did not receive notice in accordance with sections 239(a)(1) or (2) of the Act, or the alien demonstrates that he or she was in Federal or state custody and the failure to appear was through no fault of the alien. However, in accordance with section 240(b)(5)(B) of the Act, no written notice of a change in time or place of proceeding shall be required if the alien has failed to provide the address required under section 239(a)(1)(F) of the Act. The filing of a motion under this paragraph shall stay the removal of the alien pending disposition of the motion by the Immigration Judge. An alien may file only one motion pursuant to this paragraph.

(iii) Order entered in absentia in deportation or exclusion proceedings. (A) An order entered in absentia in deportation proceedings may be rescinded only upon a motion to reopen filed:

(1) Within 180 days after the date of the order of deportation if the alien demonstrates that the failure to appear was because of exceptional circumstances beyond the control of the alien (e.g., serious illness of the alien or serious illness or death of an immediate relative of the alien, but not including less compelling circumstances); or

(2) At any time if the alien demonstrates that he or she did not receive notice or if the alien demonstrates that he or she was in federal or state custody and the failure to appear was through no fault of the alien.

(B) A motion to reopen exclusion hearings on the basis that the Immigration Judge improperly entered an order of exclusion in absentia must be supported by evidence that the alien had reasonable cause for his failure to appear.

(C) The filing of a motion to reopen under paragraph (b)(4)(iii)(A) of this section shall stay the deportation of the alien pending decision on the motion and the adjudication of any properly filed administrative appeal.

(D) The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply to a motion to reopen filed pursuant to the provisions of paragraph (b)(4)(iii)(A) of this section.

(iv) Jointly filed motions. The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply to a motion to reopen agreed upon by all parties and jointly filed.
8 CFR § 3.25
24. Section 3.25 is revised to read as follows:
8 CFR § 3.25

**§3.25 Form of the proceeding.**
(a) Waiver of presence of the parties. The Immigration Judge may, for good cause, and consistent with section 240(b) of the Act, waive the presence of the alien at a hearing when the alien is represented or when the alien is a minor child at least one of whose parents or whose legal guardian is present. When it is impracticable by reason of an alien's mental incompetency for the alien to be present, the presence of the alien may be waived provided that the alien is represented at the hearing by an attorney or legal representative, a near relative, legal guardian, or friend.

(b) Stipulated request for order; waiver of hearing. An Immigration Judge may enter an order of deportation, exclusion or removal stipulated to by the alien (or the alien's representative) and the Service. The Immigration Judge may enter such an order without a hearing and in the absence of the parties based on a review of the charging document, the written stipulation, and supporting documents, if any. If the alien is unrepresented, the Immigration Judge must determine that the alien's waiver is voluntary, knowing, and intelligent. The stipulated request and required waivers shall be signed on behalf of the government and by the alien and his or her attorney or representative, if any. The attorney or representative shall file a Notice of Appearance in accordance with §3.16(b). A stipulated order shall constitute a conclusive determination of the alien's deportability or removability from the United States. The stipulation shall include:

(1) An admission that all factual allegations contained in the charging document are true and correct as written;

(2) A concession of deportability or inadmissibility as charged;

(3) A statement that the alien makes no application for relief under the Act;

(4) A designation of a country for deportation or removal under section 241(b)(2)(A)(i) of the Act;

(5) A concession to the introduction of the written stipulation of the alien as an exhibit to the Record of Proceeding;

(6) A statement that the alien understands the consequences of the stipulated request and that the alien enters the request voluntarily, knowingly, and intelligently;

(7) A statement that the alien will accept a written order for his or her deportation, exclusion or removal as a final disposition of the proceedings; and

(8) A waiver of appeal of the written order of deportation or removal.

(c) Telephonic or video hearings. An Immigration Judge may conduct hearings through video conference to the same extent as he or she may conduct hearings in person. An Immigration Judge may also conduct a hearing through a telephone conference, but an evidentiary hearing on the merits may only be conducted through a telephone conference with the consent of the alien involved after the alien has been advised of the right to proceed in person or, where available, through a video conference, except that credible fear determinations may be reviewed by the Immigration Judge through a telephone conference without the consent of the alien.

8 CFR § 3.26

25. Section 3.26 is amended by revising paragraph (c) and adding a new paragraph (d) to read as follows:

8 CFR § 3.26

### §3.26 In absentia hearings.

* * * * *

(c) In any removal proceeding before an Immigration Judge in which the alien fails to appear, the Immigration Judge shall order the alien removed in absentia if:

(1) The Service establishes by clear, unequivocal, and convincing evidence that the alien is removable; and

(2) The Service establishes by clear, unequivocal, and convincing evidence that written notice of the time and place of proceedings and written notice of the consequences of failure to appear were provided to the alien.

(d) Written notice to the alien shall be considered sufficient for purposes of this section if it was provided at the most recent address provided by the alien. If the respondent fails to provide his or her address as required under §3.15(d), no written notice shall be required for an Immigration Judge to proceed with an in absentia hearing. This paragraph shall not apply in the event that the Immigration Judge waives the appearance of an alien under §3.25.

8 CFR § 3.27

26. Section 3.27 is amended by revising paragraph (c) to read as follows:

8 CFR § 3.27

### §3.27 Public access to hearings.

* * * * *

(c) In any proceeding before an Immigration Judge concerning an abused alien spouse, the hearing and the Record of Proceeding shall be closed to the public unless the abused spouse agrees that the hearing and the Record of Proceeding shall be open to the public. In any proceeding before an  **10335**  Immigration Judge concerning an abused alien child, the hearing and the Record of Proceeding shall be closed to the public.

8 CFR § 3.30

27. Section 3.30 is revised to read as follows:

8 CFR § 3.30

**§3.30 Additional charges in deportation or removal hearings.**

8 CFR § 240.10

At any time during deportation or removal proceedings, additional or substituted charges of deportability and/or factual allegations may be lodged by the Service in writing. The alien shall be served with a copy of these additional charges and/or allegations and the Immigration Judge shall read them to the alien. The Immigration Judge shall advise the alien, if he or she is not represented by counsel, that the alien may be so represented. The alien may be given a reasonable continuance to respond to the additional factual allegations and charges. Thereafter, the provision of §240.10(b) of this chapter relating to pleading shall apply to the additional factual allegations and charges.

8 CFR § 3.35

28. Section 3.35 is revised to read as follows:

8 CFR § 3.35

**§3.35 Depositions and subpoenas.**

(a) Depositions. If an Immigration Judge is satisfied that a witness is not reasonably available at the place of hearing and that said witness' testimony or other evidence is essential, the Immigration Judge may order the taking of deposition either at his or her own instance or upon application of a party. Such order shall designate the official by whom the deposition shall be taken, may prescribe and limit the content, scope, or manner of taking the deposition, and may direct the production of documentary evidence.

(b) Subpoenas issued subsequent to commencement of proceedings. (1) General. In any proceeding before an Immigration Judge, other than under 8 CFR part 335, the Immigration Judge shall have exclusive jurisdiction to issue subpoenas requiring the attendance of witnesses or for the production of books, papers and other documentary evidence, or both. An Immigration Judge may issue a subpoena upon his or her own volition or upon application of the Service or the alien.

(2) Application for subpoena. A party applying for a subpoena shall be required, as a condition precedent to its issuance, to state in writing or at the proceeding, what he or she expects to prove by such witnesses or documentary evidence, and to show affirmatively that he or she has made diligent effort, without success, to produce the same.

(3) Issuance of subpoena. Upon being satisfied that a witness will not appear and testify or produce documentary evidence and that the witness' evidence is essential, the Immigration Judge shall issue a subpoena. The subpoena shall state the title of the proceeding and shall command the person to whom it is directed to attend and to give testimony at a time and place specified. The subpoena may also command the person to whom it is directed to produce the books, papers, or documents specified in the subpoena.

(4) Appearance of witness. If the witness is at a distance of more than 100 miles from the place of the proceeding, the subpoena shall provide for the witness' appearance at the Immigration Court nearest to the witness to respond to oral or written interrogatories, unless there is no objection by any party to the witness' appearance at the proceeding.

(5) Service. A subpoena issued under this section may be served by any person over 18 years of age not a party to the case.

(6) Invoking aid of court. If a witness neglects or refuses to appear and testify as directed by the subpoena served upon him or her in accordance with the provisions of this section, the Immigration Judge issuing the subpoena shall request the United States Attorney for the district in which the subpoena was issued to report such neglect or refusal to the United States District Court and to request such court to issue an order requiring the witness to appear and testify and to produce the books, papers or documents designated in the subpoena.

8 CFR § 3.42

29. In Subpart C, a new §3.42 is added to read as follows:
 8 CFR § 3.42

**§3.42 Review of credible fear determination.**

(a) Referral. Jurisdiction for an Immigration Judge to review an adverse credible fear finding by an asylum officer pursuant to section 235(b)(1)(B) of the Act shall commence with the filing by the Service of Form I-863, Notice of Referral to Immigration Judge. The Service shall also file with the notice of referral a copy of the written record of determination as defined in section 235(b)(1)(B)(iii)(II) of the Act, including a copy of the alien's written request for review, if any.

(b) Record of proceeding. The Immigration Court shall create a Record of Proceeding for a review of an adverse credible fear determination. This record shall not be merged with any later proceeding pursuant to section 240 of the Act involving the same alien.

(c) Procedures and evidence. The Immigration Judge may receive into evidence any oral or written statement which is material and relevant to any issue in the review. The testimony of the alien shall be under oath or affirmation administered by the Immigration Judge. If an interpreter is necessary, one will be provided by the Immigration Court. The Immigration Judge shall determine whether the review shall be in person, or through telephonic or video connection (where available). The alien may consult with a person or persons of the alien's choosing prior to the review.

(d) Standard of review. The Immigration Judge shall make a de novo determination as to whether there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the Immigration Judge, that the alien could establish eligibility for asylum under section 208 of the Act.

(e) Timing. The Immigration Judge shall conclude the review to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date the supervisory asylum officer has approved the asylum officer's negative credible fear determination issued on Form I-869, Record of Negative Credible Fear Finding and Request for Review.

(f) Decision. If an Immigration Judge determines that an alien has a credible fear of persecution, the Immigration Judge shall vacate the order entered pursuant to section 235(b)(1)(B)(iii)(I) of the Act. Subsequent to the order being vacated, the Service shall issue and file Form I-862, Notice to Appear, with the Immigration Court to commence removal proceedings. The alien shall have the opportunity to apply for asylum in the course of removal proceedings pursuant to section 240 of the Act. If an Immigration Judge determines that an alien does not have a credible fear of persecution, the Immigration Judge shall affirm the asylum officer's determination and remand the case to the Service for execution of the removal order entered pursuant to section 235(b)(1)(B)(iii)(I) of the Act. No appeal shall lie from a review of an adverse credible fear determination made by an Immigration Judge.

(g) Custody. An Immigration Judge shall have no authority to review an alien's custody status in the course of a review of an adverse credible fear determination made by the Service. **\*10336**

**PART 103—POWERS AND DUTIES OF SERVICE OFFICERS; AVAILABILITY OF SERVICE RECORDS**

30. The authority citation for part 103 continues to read as follows:

Authority: 5 U.S.C. 552, 552(a); 8 U.S.C. 1101, 1103, 1201, 1252 note, 1252b, 1304, 1356; 31 U.S.C. 9701; E.O. 12356; 47 FR 14874, 15557; 3 CFR, 1982 Comp., p. 166; 8 CFR part 2.
 8 CFR § 103.1
31. In §103.1, paragraph (g)(3)(ii) is revised to read as follows:
 8 CFR § 103.1

**§103.1 Delegations of authority.**

* * * * *

(g) * * *

(3) * * *

(ii) Asylum officers. Asylum officers constitute a professional corps of officers who serve under the supervision and direction of the Director of International Affairs and shall be specially trained as required in §208.1(b) of this chapter. Asylum officers are delegated the authority to hear and adjudicate credible fear of persecution determinations under section 235(b)(1)(B) of the Act and applications for asylum and for withholding of removal, as provided under 8 CFR part 208.

* * * * *8 CFR § 103.5

**§103.5 [Amended]**

8 CFR § 103.5

32. Section 103.5 is amended by:

a. Removing paragraph (a)(1)(iii)(B);

b. Redesignating paragraphs (a)(1)(iii)(C) through (F) as paragraphs (a)(1)(iii)(B) through (E), respectively; and

c. Removing paragraph (a)(5)(iii).

8 CFR § 103.5a

33. In §103.5a, paragraph (c)(1) is revised to read as follows:

8 CFR § 103.5a

**§103.5a Service of notification, decisions, and other papers by the Service.**

* * * * *

(c) * * *

(1) Generally. In any proceeding which is initiated by the Service, with proposed adverse effect, service of the initiating notice and of notice of any decision by a Service officer shall be accomplished by personal service, except as provided in section 239 of the Act.

* * * * *8 CFR § 103.6

34. In §103.6, paragraph (a) is revised to read as follows:

8 CFR § 103.6

**§103.6 Surety bonds.**

(a) Posting of surety bonds.—(1) Extension agreements; consent of surety; collateral security. All surety bonds posted in immigration cases shall be executed on Form I-352, Immigration Bond, a copy of which, and any rider attached thereto, shall be furnished the obligor. A district director is authorized to approve a bond, a formal agreement to extension of liability of surety, a request for delivery of collateral security to a duly appointed and undischarged administrator or executor of the estate of a deceased depositor, and a power of attorney executed on Form I-312, Designation of Attorney in Fact. All other matters relating to bonds, including a power of attorney not executed on Form I-312 and a request for delivery of collateral security to other than the depositor or his or her approved attorney in fact, shall be forwarded to the regional director for approval.

(2) Bond riders.—(i) General. Bond riders shall be prepared on Form I-351, Bond Riders, and attached to Form I-352. If a condition to be included in a bond is not on Form I-351, a rider containing the condition shall be executed.

* * * * *8 CFR § 103.7

35. Section 103.7(b)(1) is amended by:

a. Removing the entry to "Form I-444", and by

b. Adding the entry for "Form EOIR-42" to the listing of forms, in proper numerical sequence, to read as follows:

8 CFR § 103.7

**§103.7 Fees**

* * * * *

(b) * * *

(1) * * *

* * * * *

Form EOIR-42. For filing application for cancellation of removal under section 240A of the Act—$100.00. (A single fee of $100.00 will be charged whenever cancellation of removal applications are filed by two or more aliens in the same proceedings).

* * * * *

## PART 204—IMMIGRANT PETITIONS

36. The authority citation for part 204 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1186a, 1255; 8 CFR part 2.

8 CFR § 204.2

37. Section 204.2 is amended by:

a. Revising paragraph (a)(1)(iii) introductory text;

b. Removing paragraphs (a)(1)(iii)(A) through (C); and

c. Redesignating paragraphs (a)(1)(iii)(D) through (I) as paragraphs (a)(1)(iii)(A) through (F) respectively, to read as follows:

8 CFR § 204.2

**§204.2 Petitions for relatives, widows, and widowers, and abused spouses and children.**

(a) * * *

(1) * * *

(iii) Marriage during proceedings—general prohibition against approval of visa petition. A visa petition filed on behalf of an alien by a United States citizen or a lawful permanent resident spouse shall not be approved if the marriage creating the relationship occurred on or after November 10, 1986, and while the alien was in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto. Determination of commencement and termination of proceedings and exemptions shall be in accordance with § 245.1(c)(9) of this chapter, except that the burden in visa petition proceedings to establish eligibility for the exemption in §245.1(c)(9)(iii)(F) of this chapter shall rest with the petitioner.

* * * * *

## PART 207—ADMISSION OF REFUGEES

38. The authority citation for part 207 is revised to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1151, 1157, 1159, 1182; 8 CFR part 2.

8 CFR § 207.1

39. Section 207.1 is amended by removing paragraph (e), and by revising paragraph (a) to read as follows:

8 CFR § 207.1

**§207.1 Eligibility.**

(a) Filing jurisdiction. Any alien who believes he or she is a refugee as defined in section 101(a)(42) of the Act, and is included in a refugee group identified in section 207(a) of the Act, may apply for admission to the United States by filing an application in accordance with §207.2 with the Service office having jurisdiction over the area where the applicant is located. In those areas too distant from a Service office, the application may be filed at a designated United States consular office.

* * * * *8 CFR § 207.3

40. Section 207.3 is revised to read as follows:

8 CFR § 207.3

**§207.3 Waivers of inadmissibility.**

(a) Authority. Section 207(c)(3) of the Act sets forth grounds of inadmissibility under section 212(a) of the Act which are not applicable and those which may be waived in the case of an otherwise qualified refugee and the conditions under which such waivers may be approved. Officers in charge of overseas offices are delegated authority to initiate the necessary investigations to establish the facts in each waiver application pending before them and to approve or deny such waivers.

(b) Filing requirements. The applicant for a waiver must submit Form I-602, Application by Refugee for Waiver of Grounds of Inadmissibility, with the Service office processing his or her case. The burden is on the applicant to show that the waiver should be granted based upon humanitarian grounds, family **\*10337** unity, or the public interest. The applicant shall be notified in writing of the decision, including the reasons for denial, if the application is denied. There is no appeal from such decision.

8 CFR § 207.8

**§207.8 [Amended]**
8 CFR § 207.8
41. Section 207.8 is amended in the last sentence by revising the reference to "sections 235, 236, and 237" to read "sections 235, 240, and 241".

42. Part 208 is revised to read as follows:


**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

**Subpart A—Asylum and Withholding of Removal**

Sec.

208.1 General.

208.2 Jurisdiction.

208.3 Form of application.

208.4 Filing the application.

208.5 Special duties toward aliens in custody of the Service.

208.6 Disclosure to third parties.

208.7 Employment authorization.

208.8 Limitations on travel outside the United States.

208.9 Procedure for interview before an asylum officer.

208.10 Failure to appear at an interview before an asylum officer.

208.11 Comments from the Department of State.

208.12 Reliance on information compiled by other sources.

208.13 Establishing asylum eligibility.

208.14 Approval, denial, or referral of application.

208.15 Definition of "firm resettlement."

208.16 Withholding of removal.

208.17 Decisions.

208.18 Determining if an asylum application is frivolous.

208.19 Admission of the asylee's spouse and children.

208.20 Effect on exclusion, deportation, and removal proceedings.

208.21 Restoration of status.

208.22 Termination of asylum or withholding of removal or deportation.

208.23—29 [Reserved]

**Subpart B—Credible Fear of Persecution**

208.30 Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.
Authority: 8 U.S.C. 1103, 1158, 1226, 1252, 1282; 8 CFR part 2.


**Subpart A—Asylum and Withholding or Removal**
8 CFR § 208.1

**§208.1 General.**
(a) Applicability. Unless otherwise provided in this chapter, this subpart shall apply to all applications for asylum under section 208 of the Act or for withholding of deportation or withholding of removal under section 241(b)(3) of the Act, whether before an asylum officer or an immigration judge, regardless of the date of filing. For purposes of this chapter, withholding of removal shall also mean withholding of deportation under section 243(h) of the Act, as it appeared prior to April 1, 1997, except as provided in §208.16(c). Such applications are hereinafter referred to generically as asylum applications. The provisions of this part shall not affect the finality or validity of any decision made by a district director, an immigration judge, or the Board of Immigration Appeals in any such case prior to April 1, 1997. No asylum application that was filed with a district director, asylum officer or immigration judge prior to April 1, 1997, may be reopened or otherwise reconsidered under the provisions of this part except by motion granted in the exercise of discretion by the Board of Immigration Appeals, an immigration judge, or an asylum officer for proper cause shown. Motions to reopen or reconsider must meet the requirements of sections 240(c)(5) and (c)(6) of the Act, and 8 CFR parts 3 and 103, where applicable.

(b) Training of asylum officers. The Director of International Affairs shall ensure that asylum officers receive special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles. The Director of International Affairs shall also, in cooperation with the Department of State and other appropriate sources, compile and disseminate to asylum officers information concerning the persecution of persons in other countries on

AR01035

account of race, religion, nationality, membership in a particular social group, or political opinion, as well as other information relevant to asylum determinations, and shall maintain a documentation center with information on human rights conditions.

 8 CFR § 208.2

**§208.2 Jurisdiction.**

(a) Office of International Affairs. Except as provided in paragraph (b) of this section, the Office of International Affairs shall have initial jurisdiction over an asylum application filed by, or a credible fear determination pertaining to, an alien physically present in the United States or seeking admission at a port-of-entry. An application that is complete within the meaning of §208.3(c)(3) shall be either adjudicated or referred by asylum officers under this part in accordance with §208.14. An application that is incomplete within the meaning of §208.3(c)(3) shall be returned to the applicant. Except as provided in §208.16(a), an asylum officer shall not decide whether an alien is entitled to withholding of removal under section 241(b)(3) of the Act.

(b) Immigration Court—(1) Certain aliens not entitled to proceedings under section 240 of the Act. After Form I-863, Notice of Referral to Immigration Judge, has been filed with the Immigration Court, an immigration judge shall have exclusive jurisdiction over any asylum application filed on or after April 1, 1997, by:

(i) An alien crewmember who:

(A) Is an applicant for a landing permit;

(B) Has been refused permission to land under section 252 of the Act; or

(C) On or after April 1, 1997, was granted permission to land under section 252 of the Act, regardless of whether the alien has remained in the United States longer than authorized;

(ii) An alien stowaway who has been found to have a credible fear of persecution pursuant to the procedure set forth in subpart B of this part;

(iii) An alien who is an applicant for admission pursuant to the Visa Waiver Pilot Program under section 217 of the Act;

(iv) An alien who was admitted to the United States pursuant to the Visa Waiver Pilot Program under section 217 of the Act and has remained longer than authorized or has otherwise violated his or her immigration status;

(v) An alien who has been ordered removed under section 235(c) of the Act; or

(vi) An alien who is an applicant for admission, or has been admitted, as an alien classified under section 101(a)(15)(S) of the Act.

(2) Rules of procedure. (i) General. Proceedings falling under the jurisdiction of the immigration judge pursuant to paragraph (b)(1) of this section shall be conducted in accordance with the same rules of procedure as proceedings conducted under 8 CFR part 240, except the scope of review shall be limited to a determination of whether the alien is eligible for asylum or withholding of removal and whether asylum shall be granted in the exercise of discretion. During such proceedings all parties are prohibited from raising or considering any other issues, including but not limited to issues of admissibility, removability, eligibility for waivers, and eligibility for any form of relief other than asylum or withholding of removal.

(ii) Notice of hearing procedures and in-absentia decisions. The alien will be provided with notice of the time and place of the proceeding. The request for asylum and withholding of removal **\*10338** submitted by an alien who fails to appear for the hearing shall be denied. The denial of asylum and withholding of removal for failure to appear may be reopened only upon a motion filed with the immigration judge with jurisdiction over the case. Only one motion to reopen may be filed, and it must

be filed within 90 days, unless the alien establishes that he or she did not receive notice of the hearing date or was in Federal or State custody on the date directed to appear. The motion must include documentary evidence which demonstrates that:

(A) The alien did not receive the notice;

(B) The alien was in Federal or State custody and the failure to appear was through no fault of the alien; or

(C) "Exceptional circumstances," as defined in section 240(e)(1) of the Act, caused the failure to appear.

(iii) Relief. The filing of a motion to reopen shall not stay removal of the alien unless the immigration judge grants a written request for a stay pending disposition of the motion. An alien who fails to appear for a proceeding under this section shall not be eligible for relief under section 208, 212(h), 212(i), 240A, 240B, 245, 248, or 249 for a period of 10 years after the date of the denial.

(3) Other aliens. Immigration judges shall have exclusive jurisdiction over asylum applications filed by an alien who has been served Form I-221, Order to Show Cause; Form I-122, Notice to Applicant for Admission Detained for a Hearing before an Immigration Judge; or Form I-862, Notice to Appear, after a copy of the charging document has been filed with the Immigration Court. Immigration judges shall also have jurisdiction over any asylum applications filed prior to April 1, 1997, by alien crewmembers who have remained in the United States longer than authorized, by applicants for admission under the Visa Waiver Pilot Program, and by aliens who have been admitted to the United States under the Visa Waiver Pilot Program.

8 CFR § 208.3

## §208.3 Form of application.

(a) An asylum applicant must file Form I-589, Application for Asylum or Withholding of Removal, together with any additional supporting evidence in accordance with the instructions on the form. The applicant's spouse and children shall be listed on the application and may be included in the request for asylum if they are in the United States. One additional copy of the principal applicant's Form I-589 must be submitted for each dependent included in the principal's application.

(b) An asylum application shall be deemed to constitute at the same time an application for withholding of removal, unless adjudicated in deportation or exclusion proceedings commenced prior to April 1, 1997. In such instances, the asylum application shall be deemed to constitute an application for withholding of deportation under section 243(h) of the Act, as that section existed prior to April 1, 1997. Where a determination is made that an applicant is ineligible to apply for asylum under section 208(a)(2) of the Act, an asylum application shall be construed as an application for withholding of removal.

(c) Form I-589 shall be filed under the following conditions and shall have the following consequences:

(1) If the application was filed on or after January 4, 1995, information provided in the application may be used as a basis for the initiation of removal proceedings, or to satisfy any burden of proof in exclusion, deportation, or removal proceedings;

(2) The applicant and anyone other than a spouse, parent, son, or daughter of the applicant who assists the applicant in preparing the application must sign the application under penalty of perjury. The applicant's signature establishes a presumption that the applicant is aware of the contents of the application. A person other than a relative specified in this paragraph who assists the applicant in preparing the application also must provide his or her full mailing address;

(3) An asylum application that does not include a response to each of the questions contained in the Form I-589, is unsigned, or is unaccompanied by the required materials specified in paragraph (a) of this section is incomplete. The filing of an incomplete application shall not commence the 150-day period after which the applicant may file an application for employment authorization in accordance with §208.7. An application that is incomplete shall be returned by mail to the applicant within 30 days of the receipt of the application by the Service. If the Service has not mailed the incomplete application back to the applicant

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

within 30 days, it shall be deemed complete. An application returned to the applicant as incomplete shall be resubmitted by the applicant with the additional information if he or she wishes to have the application considered;

(4) Knowing placement of false information on the application may subject the person placing that information on the application to criminal penalties under title 18 of the United States Code and to civil penalties under section 274C of the Act; and

(5) Knowingly filing a frivolous application on or after April 1, 1997, so long as the applicant has received the notice required by section 208(d)(4) of the Act, shall render the applicant permanently ineligible for any benefits under the Act pursuant to §208.18.

8 CFR § 208.4

§208.4 **Filing the application.**

Except as prohibited in paragraph (a) of this section, asylum applications shall be filed in accordance with paragraph (b) of this section.

(a) Prohibitions on filing. Section 208(a)(2) of the Act prohibits certain aliens from filing for asylum on or after April 1, 1997, unless the alien can demonstrate to the satisfaction of the Attorney General that one of the exceptions in section 208(a)(2)(D) of the Act applies. Such prohibition applies only to asylum applications under section 208 of the Act and not to applications for withholding of removal under section 241 of the Act. If an applicant submits an asylum application and it appears that one or more of the prohibitions contained in section 208(a)(2) of the Act apply, an asylum officer or an immigration judge shall review the application to determine if the application should be rejected or denied. For the purpose of making determinations under section 208(a)(2) of the Act, the following rules shall apply:

(1) Authority. Only an asylum officer, an immigration judge, or the Board of Immigration Appeals is authorized to make determinations regarding the prohibitions contained in section 208(a)(2)(B) or (C) of the Act;

(2) One-year filing deadline. (i) For purposes of section 208(a)(2)(B) of the Act, an applicant has the burden of proving

(A) By clear and convincing evidence that he or she applied within one year of the alien's arrival in the United States or

(B) To the satisfaction of the asylum officer, immigration judge, or Board of Immigration Appeals that he or she qualifies for an exception to the one-year deadline.

(ii) The one-year period shall be calculated from the date of the alien's last arrival in the United States or April 1, 1997, whichever is later. In the case of an application that appears to have been filed more than a year after the applicant arrived in the United States, an asylum officer or immigration judge will determine whether the applicant qualifies under one of the exceptions to the deadline;  **\*10339**

(3) Prior denial of application. For purposes of section 208(a)(2)(C) of the Act, an asylum application has not been denied unless denied by an immigration judge or the Board of Immigration Appeals;

(4) Changed circumstances. (i) The term "changed circumstances" in section 208(a)(2)(D) of the Act shall refer to circumstances materially affecting the applicant's eligibility for asylum. They may include:

(A) Changes in conditions in the applicant's country of nationality or, if the person is stateless, country of last habitual residence or

(B) Changes in objective circumstances relating to the applicant in the United States, including changes in applicable U.S. law, that create a reasonable possibility that applicant may qualify for asylum.

(ii) The applicant shall apply for asylum within a reasonable period given those "changed circumstances."

(5) The term extraordinary circumstances in section 208(a)(2)(D) of the Act shall refer to events or factors beyond the alien's control that caused the failure to meet the 1-year deadline. Such circumstances shall excuse the failure to file within the 1-year period so long as the alien filed the application within a reasonable period given those circumstances. The burden of proof is on the applicant to establish to the satisfaction of the asylum officer or immigration judge that the circumstances were both beyond his or her control and that, but for those circumstances, he or she would have filed within the 1-year period. These circumstances may include:

(i) Serious illness or mental or physical disability of significant duration, including any effects of persecution or violent harm suffered in the past, during the 1-year period after arrival;

(ii) Legal disability (e.g., the applicant was an unaccompanied minor or suffered from a mental impairment) during the first year after arrival;

(iii) Ineffective assistance of counsel, provided that:

(A) The alien files an affidavit setting forth in detail the agreement that was entered into with counsel with respect to the actions to be taken and what representations counsel did or did not make to the respondent in this regard;

(B) The counsel whose integrity or competence is being impugned has been informed of the allegations leveled against him or her and given an opportunity to respond; and

(C) The alien indicates whether a complaint has been filed with appropriate disciplinary authorities with respect to any violation of counsel's ethical or legal responsibilities, and if not, why not;

(iv) The applicant maintained Temporary Protected Status until a reasonable period before the filing of the asylum application; and

(v) The applicant submitted an asylum application prior to the expiration of the 1-year deadline, but that application was rejected by the Service as not properly filed, was returned to the applicant for corrections, and was refiled within a reasonable period thereafter.

(b) Filing location—(1) With the service center by mail. Except as provided in paragraphs (b)(2), (b)(3), (b)(4) and (b)(5) of this section, asylum applications shall be filed directly by mail with the service center servicing the asylum office with jurisdiction over the place of the applicant's residence or, in the case of an alien without a United States residence, the applicant's current lodging or the land border port-of-entry through which the alien seeks admission to the United States.

(2) With the asylum office. Asylum applications shall be filed directly with the asylum office having jurisdiction over the matter in the case of an alien who has received the express consent of the Director of Asylum to do so.

(3) With the immigration judge. Asylum applications shall be filed directly with the Immigration Court having jurisdiction over the case in the following circumstances:

(i) During exclusion, deportation, or removal proceedings, with the Immigration Court having jurisdiction over the port, district office, or sector after service and filing of the appropriate charging document.

(ii) After completion of exclusion, deportation, or removal proceedings, and in conjunction with a motion to reopen pursuant to 8 CFR part 3 where applicable, with the Immigration Court having jurisdiction over the prior proceeding. Any such motion must reasonably explain the failure to request asylum prior to the completion of the proceedings.

(iii) In asylum proceedings pursuant to §208.2(b)(1) and after the Notice of Referral to Immigration Judge has been served on the alien and filed with the Immigration Court having jurisdiction over the case.

(4) With the Board of Immigration Appeals. In conjunction with a motion to remand or reopen pursuant to §§3.2 and 3.8 of this chapter where applicable, an initial asylum application shall be filed with the Board of Immigration Appeals if jurisdiction over the proceedings is vested in the Board of Immigration Appeals under 8 CFR part 3. Any such motion must reasonably explain the failure to request asylum prior to the completion of the proceedings.

(5) With the district director. In the case of any alien described in §208.2(b)(1) and prior to the service on the alien of Form I-863, any asylum application shall be submitted to the district director having jurisdiction pursuant to 8 CFR part 103. The district director shall forward such asylum application to the appropriate Immigration Court with the Form I-863 being filed with that Immigration Court.

(c) Amending an application after filing. Upon request of the alien and as a matter of discretion, the asylum officer or immigration judge having jurisdiction may permit an asylum applicant to amend or supplement the application, but any delay caused by such request shall extend the period within which the applicant may not apply for employment authorization in accordance with §208.7(a).

 8 CFR § 208.5

**§208.5 Special duties toward aliens in custody of the Service.**
(a) General. When an alien in the custody of the Service requests asylum or withholding of removal or expresses a fear of persecution or harm upon return to his or her country of origin or to agents thereof, the Service shall make available the appropriate application forms and shall provide the applicant with the information required by section 208(d)(4) of the Act, except in the case of an alien who is in custody pending a credible fear of persecution determination under section 235(b)(1)(B) of the Act. Where possible, expedited consideration shall be given to applications of detained aliens. Except as provided in paragraph (c) of this section, such alien shall not be excluded, deported, or removed before a decision is rendered on his or her asylum application.

(b) Certain aliens aboard vessels. (1) If an alien crewmember or alien stowaway on board a vessel or other conveyance alleges, claims, or otherwise makes known to an immigration inspector or other official making an examination on the conveyance that he or she is unable or unwilling to return to his or her country of nationality or last habitual residence (if not a national of any country) because of persecution or a fear of persecution in that country on account of race, religion, nationality, membership in a particular social group, or political opinion, the alien shall be promptly removed from the conveyance. If the alien makes such fear known to an official while off such conveyance, the  **\*10340**  alien shall not be returned to the conveyance but shall be retained in or transferred to the custody of the Service.

(i) An alien stowaway will be referred to an asylum officer for a credible fear determination under §208.30.

(ii) An alien crewmember shall be provided the appropriate application forms and information required by section 208(d)(4) of the Act and may then have 10 days within which to submit an asylum application to the district director having jurisdiction over the port of entry. The district director, pursuant to §208.4(b), shall serve Form I-863 on the alien and immediately forward any such application to the appropriate Immigration Court with a copy of the Form I-863 being filed with that court.

(2) Pending adjudication of the application, and, in the case of a stowaway the credible fear determination and any review thereof, the alien may be detained by the Service or otherwise paroled in accordance with §212.5 of this chapter. However, pending the credible fear determination, parole of an alien stowaway may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

(c) Exception to prohibition on removal. A motion to reopen or an order to remand accompanied by an asylum application pursuant to §208.4(b)(3)(iii) shall not stay execution of a final exclusion, deportation, or removal order unless such stay is specifically granted by the Board of Immigration Appeals or the immigration judge having jurisdiction over the motion.

 8 CFR § 208.6

### §208.6 Disclosure to third parties.

(a) Information contained in or pertaining to any asylum application shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Attorney General.

(b) The confidentiality of other records kept by the Service that indicate that a specific alien has applied for asylum shall also be protected from disclosure. The Service will coordinate with the Department of State to ensure that the confidentiality of these records is maintained if they are transmitted to Department of State offices in other countries.

(c) This section shall not apply to any disclosure to:

(1) Any United States Government official or contractor having a need to examine information in connection with:

(i) The adjudication of asylum applications;

(ii) The defense of any legal action arising from the adjudication of or failure to adjudicate the asylum application;

(iii) The defense of any legal action of which the asylum application is a part; or

(iv) Any United States Government investigation concerning any criminal or civil matter; or

(2) Any Federal, state, or local court in the United States considering any legal action:

(i) Arising from the adjudication of or failure to adjudicate the asylum application; or

(ii) Arising from the proceedings of which the asylum application is a part.

 8 CFR § 208.7

### §208.7 Employment authorization.

(a) Application and approval. (1) Subject to the restrictions contained in sections 208(d) and 236(a) of the Act, an applicant for asylum who is not an aggravated felon shall be eligible pursuant to §§274a.12(c)(8) and 274a.13(a) of this chapter to submit a Form I-765, Application for Employment Authorization. Except in the case of an alien whose asylum application has been recommended for approval, or in the case of an alien who filed an asylum application prior to January 4, 1995, the application shall be submitted no earlier than 150 days after the date on which a complete asylum application submitted in accordance with §§208.3 and 208.4 has been received. In the case of an applicant whose asylum application has been recommended for approval, the applicant may apply for employment authorization when he or she receives notice of the recommended approval. If an asylum application has been returned as incomplete in accordance with §208.3(c)(3), the 150-day period will commence upon receipt by the Service of a complete asylum application. An applicant whose asylum application has been denied by an asylum officer or by an immigration judge within the 150-day period shall not be eligible to apply for employment authorization. If an asylum application is denied prior to a decision on the application for employment authorization, the application for employment authorization shall be denied. If the asylum application is not so denied, the Service shall have 30 days from the date of filing of the Form I-765 to grant or deny that application, except that no employment authorization shall be issued to an asylum applicant prior to the expiration of the 180-day period following the filing of the asylum application filed on or after April 1, 1997.

(2) The time periods within which the alien may not apply for employment authorization and within which the Service must respond to any such application and within which the asylum application must be adjudicated pursuant to section 208(d)(5)(A)

(iii) of the Act shall begin when the alien has filed a complete asylum application in accordance with §§208.3 and 208.4. Any delay requested or caused by the applicant shall not be counted as part of these time periods. Such time periods also shall be extended by the equivalent of the time between issuance of a request for evidence under §103.2(b)(8) of this chapter and the receipt of the applicant's response to such request.

(3) The provisions of paragraphs (a)(1) and (a)(2) of this section apply to applications for asylum filed on or after January 4, 1995.

(4) Employment authorization pursuant to §274a.12(c)(8) of this chapter may not be granted to an alien who fails to appear for a scheduled interview before an asylum officer or a hearing before an immigration judge, unless the applicant demonstrates that the failure to appear was the result of exceptional circumstances.

(b) Renewal and termination. Employment authorization shall be renewable, in increments to be determined by the Commissioner, for the continuous period of time necessary for the asylum officer or immigration judge to decide the asylum application and, if necessary, for completion of any administrative or judicial review.

(1) If the asylum application is denied by the asylum officer, the employment authorization shall terminate at the expiration of the employment authorization document or 60 days after the denial of asylum, whichever is longer.

(2) If the application is denied by the immigration judge, the Board of Immigration Appeals, or a Federal court, the employment authorization terminates upon the expiration of the employment authorization document, unless the applicant has filed an appropriate request for administrative or judicial review.

(c) Supporting evidence for renewal of employment authorization. In order for employment authorization to be renewed under this section, the alien must provide the Service (in accordance with the instructions on or attached to the employment authorization application) with a Form I-765, the required fee (unless waived in accordance with §103.7(c) of this chapter), and (if applicable) proof that **\*10341** he or she has continued to pursue his or her asylum application before an immigration judge or sought administrative or judicial review. For purposes of employment authorization, pursuit of an asylum application is established by presenting to the Service one of the following, depending on the stage of the alien's immigration proceedings:

(1) If the alien's case is pending in proceedings before the immigration judge, and the alien wishes to continue to pursue his or her asylum application, a copy of any asylum denial, referral notice, or charging document placing the alien in such proceedings;

(2) If the immigration judge has denied asylum, a copy of the document issued by the Board of Immigration Appeals to show that a timely appeal has been filed from a denial of the asylum application by the immigration judge; or

(3) If the Board of Immigration Appeals has dismissed the alien's appeal of a denial of asylum, or sustained an appeal by the Service of a grant of asylum, a copy of the petition for judicial review or for habeas corpus pursuant to section 242 of the Act, date stamped by the appropriate court.

(d) In order for employment authorization to be renewed before its expiration, the application for renewal must be received by the Service 90 days prior to expiration of the employment authorization.

8 CFR § 208.8

## §208.8 Limitations on travel outside the United States.

(a) An applicant who leaves the United States without first obtaining advance parole under §212.5(e) of this chapter shall be presumed to have abandoned his or her application under this section.

(b) An applicant who leaves the United States pursuant to advance parole under §212.5(e) of this chapter and returns to the country of claimed persecution shall be presumed to have abandoned his or her application, unless the applicant is able to establish compelling reasons for such return.

 8 CFR § 208.9

**§208.9 Procedure for interview before an asylum officer.**

(a) The Service shall adjudicate the claim of each asylum applicant whose application is complete within the meaning of §208.3(c)(3) and is within the jurisdiction of the Service.

(b) The asylum officer shall conduct the interview in a nonadversarial manner and, except at the request of the applicant, separate and apart from the general public. The purpose of the interview shall be to elicit all relevant and useful information bearing on the applicant's eligibility for asylum. At the time of the interview, the applicant must provide complete information regarding his or her identity, including name, date and place of birth, and nationality, and may be required to register this identity electronically or through any other means designated by the Attorney General. The applicant may have counsel or a representative present, may present witnesses, and may submit affidavits of witnesses and other evidence.

(c) The asylum officer shall have authority to administer oaths, verify the identity of the applicant (including through the use of electronic means), verify identity of any interpreter, present and receive evidence, and question the applicant and any witnesses.

(d) Upon completion of the interview, the applicant or the applicant's representative shall have an opportunity to make a statement or comment on the evidence presented. The asylum officer may, in his or her discretion, limit the length of such statement or comment and may require its submission in writing. Upon completion of the interview, the applicant shall be informed that he or she must appear in person to receive and to acknowledge receipt of the decision of the asylum officer and any other accompanying material at a time and place designated by the asylum officer, except as otherwise provided by the asylum officer. An applicant's failure to appear to receive and acknowledge receipt of the decision shall be treated as delay caused by the applicant for purposes of §208.7(a)(3) and shall extend the period within which the applicant may not apply for employment authorization by the number of days until the applicant does appear to receive and acknowledge receipt of the decision or until the applicant appears before an immigration judge in response to the issuance of a charging document under §208.14(b).

(e) The asylum officer shall consider evidence submitted by the applicant together with his or her asylum application, as well as any evidence submitted by the applicant before or at the interview. As a matter of discretion, the asylum officer may grant the applicant a brief extension of time following an interview during which the applicant may submit additional evidence. Any such extension shall extend by an equivalent time the periods specified by §208.7 for the filing and adjudication of any employment authorization application.

(f) The asylum application, all supporting information provided by the applicant, any comments submitted by the Department of State or by the Service, and any other information specific to the applicant's case and considered by the asylum officer shall comprise the record.

(g) An applicant unable to proceed with the interview in English must provide, at no expense to the Service, a competent interpreter fluent in both English and the applicant's native language or any other language in which the applicant is fluent. The interpreter must be at least 18 years of age. Neither the applicant's attorney or representative of record, a witness testifying on the applicant's behalf, nor a representative or employee of the applicant's country of nationality, or if stateless, country of last habitual residence, may serve as the applicant's interpreter. Failure without good cause to comply with this paragraph may be considered a failure to appear for the interview for purposes of §208.10.

 8 CFR § 208.10

**§208.10 Failure to appear at an interview before an asylum officer.**

Failure to appear for a scheduled interview without prior authorization may result in dismissal of the application or waiver of the right to an interview. Failure to appear shall be excused if the notice of the interview was not mailed to the applicant's current address and such address had been provided to the Office of International Affairs by the applicant prior to the date of mailing in accordance with section 265 of the Act and regulations promulgated thereunder, unless the asylum officer determines that the applicant received reasonable notice of the interview. Failure to appear will be excused if the applicant demonstrates that such failure was the result of exceptional circumstances.

8 CFR § 208.11

**§208.11 Comments from the Department of State.**

(a) The Service shall forward to the Department of State a copy of each completed application it receives. At its option, the Department of State may provide detailed country conditions information relevant to eligibility for asylum or withholding of removal.

(b) At its option, the Department of State may also provide:

(1) An assessment of the accuracy of the applicant's assertions about conditions in his or her country of nationality or habitual residence and his or her particular situation;

(2) Information about whether persons who are similarly situated to the applicant are persecuted in his or her country of nationality or habitual  **\*10342**  residence and the frequency of such persecution; or

(3) Such other information as it deems relevant.

(c) Asylum officers and immigration judges may request specific comments from the Department of State regarding individual cases or types of claims under consideration, or such other information as they deem appropriate.

(d) Any such comments received pursuant to paragraphs (b) and (c) of this section shall be made part of the record. Unless the comments are classified under the applicable Executive Order, the applicant shall be provided an opportunity to review and respond to such comments prior to the issuance of any decision to deny the application.

8 CFR § 208.12

**§208.12 Reliance on information compiled by other sources.**

(a) In deciding an asylum application, or whether the alien has a credible fear of persecution pursuant to section 235(b)(1)(B) of the Act, the asylum officer may rely on material provided by the Department of State, the Office of International Affairs, other Service offices, or other credible sources, such as international organizations, private voluntary agencies, news organizations, or academic institutions.

(b) Nothing in this part shall be construed to entitle the applicant to conduct discovery directed toward the records, officers, agents, or employees of the Service, the Department of Justice, or the Department of State.

8 CFR § 208.13

**§208.13 Establishing asylum eligibility.**

(a) Burden of proof. The burden of proof is on the applicant for asylum to establish that he or she is a refugee as defined in section 101(a)(42) of the Act. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. The fact that the applicant previously established a credible fear of persecution for purposes of section 235(b)(1)(B) of the Act does not relieve the alien of the additional burden of establishing eligibility for asylum.

(b) Persecution. The applicant may qualify as a refugee either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution.

(1) Past persecution. An applicant shall be found to be a refugee on the basis of past persecution if he or she can establish that he or she has suffered persecution in the past in his or her country of nationality or last habitual residence on account of race, religion, nationality, membership in a particular social group, or political opinion, and that he or she is unable or unwilling to return to or avail himself or herself of the protection of that country owing to such persecution.

(i) If it is determined that the applicant has established past persecution, he or she shall be presumed also to have a well-founded fear of persecution unless a preponderance of the evidence establishes that since the time the persecution occurred conditions in the applicant's country of nationality or last habitual residence have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return.

(ii) An application for asylum shall be denied if the applicant establishes past persecution under this paragraph but it is also determined that he or she does not have a well-founded fear of future persecution under paragraph (b)(2) of this section, unless it is determined that the applicant has demonstrated compelling reasons for being unwilling to return to his or her country of nationality or last habitual residence arising out of the severity of the past persecution. If the applicant demonstrates such compelling reasons, he or she may be granted asylum unless such a grant is barred by paragraph (c) of this section .

(2) Well-founded fear of persecution. An applicant shall be found to have a well-founded fear of persecution if he or she can establish first, that he or she has a fear of persecution in his or her country of nationality or last habitual residence on account of race, religion, nationality, membership in a particular social group, or political opinion; second, that there is a reasonable possibility of suffering such persecution if he or she were to return to that country; and third, that he or she is unable or unwilling to return to or avail himself or herself of the protection of that country because of such fear. In evaluating whether the applicant has sustained his or her burden of proving that he or she has a well-founded fear of persecution, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for persecution if:

(i) The applicant establishes that there is a pattern or practice in his or her country of nationality or last habitual residence of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that his or her fear of persecution upon return is reasonable.

(c) Mandatory denials. (1) Applications filed on or after April 1, 1997. For applications filed on or after April 1, 1997, an applicant shall not qualify for asylum if section 208(a)(2) or 208(b)(2) of the Act applies to the applicant. If the applicant is found to be ineligible for asylum under either section 208(a)(2) or 208(b)(2) of the Act, the applicant shall be considered for eligibility for withholding of removal under section 241(b)(3) of the Act.

(2) Applications filed before April 1, 1997. (i) An immigration judge or asylum officer shall not grant asylum to any applicant who filed his or her application before April 1, 1997, if the alien:

(A) Having been convicted by a final judgment of a particularly serious crime in the United States, constitutes a danger to the community;

(B) Has been firmly resettled within the meaning of §208.15;

(C) Can reasonably be regarded as a danger to the security of the United States;

(D) Has been convicted of an aggravated felony, as defined in section 101(a)(43) of the Act; or

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(E) Ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion.

(ii) If the evidence indicates that one of the above grounds apply to the applicant, he or she shall have the burden of proving by a preponderance of the evidence that he or she did not so act.

(d) Discretionary denial. An asylum application may be denied in the discretion of the Attorney General if the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution.

8 CFR § 208.14

### §208.14 Approval, denial, or referral of application.

(a) By an immigration judge. Unless otherwise prohibited in §208.13(c), an immigration judge may grant or deny asylum in the exercise of discretion to an applicant who qualifies as a refugee under section 101(a)(42) of the Act.

(b) By an asylum officer. Unless otherwise prohibited in §208.13(c):

(1) An asylum officer may grant asylum in the exercise of discretion to an applicant who qualifies as a refugee under section 101(a)(42) of the Act.

(2) If the alien appears to be deportable, excludable or removable under section 240 of the Act, the asylum **\*10343** officer shall either grant asylum or refer the application to an immigration judge for adjudication in deportation, exclusion, or removal proceedings. An asylum officer may refer such an application after an interview conducted in accordance with §208.9 or if, in accordance with §208.10, the applicant is deemed to have waived his or her right to an interview.

(3) If the applicant is maintaining valid nonimmigrant status at the time the application is decided, the asylum officer may grant or deny asylum, except in the case of an applicant described in §208.2(b)(1).

(c) Applicability of §103.2(b) of this chapter. No application for asylum or withholding of deportation shall be subject to denial pursuant to §103.2(b) of this chapter.

(d) Duration. If the alien's asylum application is granted, the grant will be effective for an indefinite period, subject to termination as provided in § 208.22.

(e) Effect of denial of principal's application on separate applications by dependents. The denial of an asylum application filed by a principal applicant for asylum shall also result in the denial of asylum status to any dependents of that principal applicant who are included in that same application. Such denial shall not preclude a grant of asylum for an otherwise eligible dependent who has filed a separate asylum application, nor shall such denial result in an otherwise eligible dependent becoming ineligible to apply for asylum due to the provisions of section 208(a)(2)(C) of the Act.

8 CFR § 208.15

### §208.15 Definition of "firm resettlement."

An alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another nation with, or while in that nation received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he or she establishes:

(a) That his or her entry into that nation was a necessary consequence of his or her flight from persecution, that he or she remained in that nation only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that nation; or

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(b) That the conditions of his or her residence in that nation were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled. In making his or her determination, the Asylum Officer or Immigration Judge shall consider the conditions under which other residents of the country live, the type of housing made available to the refugee, whether permanent or temporary, the types and extent of employment available to the refugee, and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation including a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

8 CFR § 208.16

## §208.16 Withholding of removal.

(a) Consideration of application for withholding of removal. An asylum officer shall not decide whether the exclusion, deportation, or removal of an alien to a country where the alien's life or freedom would be threatened must be withheld, except in the case of an alien who is otherwise eligible for asylum but is precluded from being granted such status due solely to section 207(a)(5) of the Act. In exclusion, deportation, or removal proceedings, an immigration judge may adjudicate both an asylum claim and a request for withholding of removal whether or not asylum is granted.

(b) Eligibility for withholding of removal; burden of proof. The burden of proof is on the applicant for withholding of removal to establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. The evidence shall be evaluated as follows:

(1) The applicant's life or freedom shall be found to be threatened if it is more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion.

(2) If the applicant is determined to have suffered persecution in the past such that his or her life or freedom was threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that his or her life or freedom would be threatened on return to that country unless a preponderance of the evidence establishes that conditions in the country have changed to such an extent that it is no longer more likely than not that the applicant would be so persecuted there.

(3) In evaluating whether the applicant has sustained the burden of proving that his or her life or freedom would be threatened in a particular country on account of race, religion, nationality, membership in a particular social group, or political opinion, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for such persecution if:

(i) The applicant establishes that there is a pattern or practice in the country of proposed removal of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that it is more likely than not that his or her life or freedom would be threatened upon return.

(c) Approval or denial of application. (1) General. Subject to paragraphs (c)(2) and (c)(3) of this section, an application for withholding of deportation or removal to a country of proposed removal shall be granted if the applicant's eligibility for withholding is established pursuant to paragraph (b) of this section.

(2) Mandatory denials. Except as provided in paragraph (c)(3) of this section, an application for withholding of removal shall be denied if the applicant falls within section 241(b)(3)(B) of the Act or, for applications for withholding of deportation adjudicated in proceedings commenced prior to April 1, 1997, within section 243(h)(2) of the Act as it appeared prior to that date. For purposes of section 241(b)(3)(B)(ii) of the Act, or section 243(h)(2)(B) of the Act as it appeared prior to April 1, 1997, an

alien who has been convicted of a particularly serious crime shall be considered to constitute a danger to the community. If the evidence indicates the applicability of one or more of the grounds for denial enumerated in the Act, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

(3) Exception to the prohibition on withholding of deportation in certain cases. Section 243(h)(3) of the Act, as added by section 413 of Public Law 104-132, shall apply only to applications adjudicated in proceedings commenced before April 1, 1997, and in which final action had not been taken before April 24, 1996. The discretion permitted by that section to override section 243(h)(2) of the Act shall be exercised only in the case of an applicant convicted of an aggravated felony (or felonies) where he or she was **\*10344** sentenced to an aggregate term of imprisonment of less than 5 years and the immigration judge determines on an individual basis that the crime (or crimes) of which the applicant was convicted does not constitute a particularly serious crime. Nevertheless, it shall be presumed that an alien convicted of an aggravated felony has been convicted of a particularly serious crime. Except in the cases specified in this paragraph, the grounds for denial of withholding of deportation in section 243(h)(2) of the Act as it appeared prior to April 1, 1997, shall be deemed to comply with the 1967 Protocol Relating to the Status of Refugees.

(d) Reconsideration of discretionary denial of asylum. In the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal under this section, thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her, the denial of asylum shall be reconsidered. Factors to be considered will include the reasons for the denial and reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country.

 8 CFR § 208.17

## §208.17 Decisions.

8 CFR § 208.14 8 CFR § 208.9

The decision of an asylum officer to grant or to deny asylum or withholding of removal, or to refer an asylum application in accordance with §208.14(b), shall be communicated in writing to the applicant. Notices of decisions to grant or deny asylum, or to refer an application, by asylum officers shall generally be served in person unless, in the discretion of the asylum office director, routine service by mail is appropriate. A letter communicating denial of the application shall state the basis for denial of the asylum application. The letter also shall contain an assessment of the applicant's credibility, unless the denial is the result of the applicant's conviction of an aggravated felony. Pursuant to §208.9(d), an applicant must appear in person to receive and to acknowledge receipt of the decision.

 8 CFR § 208.18

## §208.18 Determining if an asylum application is frivolous.

For applications filed on or after April 1, 1997, an applicant is subject to the provisions of section 208(d)(6) of the Act only if a final order by an immigration judge or the Board of Immigration Appeals specifically finds that the alien knowingly filed a frivolous asylum application. For purposes of this section, an asylum application is frivolous if any of its material elements is deliberately fabricated. Such finding shall only be made if the immigration judge or the Board is satisfied that the applicant, during the course of the proceedings, has had sufficient opportunity to account for any discrepancies or implausible aspects of the claim.

 8 CFR § 208.19

## §208.19 Admission of the asylee's spouse and children.

(a) Eligibility. A spouse, as defined in section 101(a)(35) of the Act, 8 U.S.C. 1101(a)(35), or child, as defined in section 101(b)(1)(A), (B), (C), (D), (E), or (F) of the Act, also may be granted asylum if accompanying or following to join the principal alien who was granted asylum, unless it is determined that:

(1) The spouse or child ordered, incited, assisted, or otherwise participated in the persecution of any persons on account of race, religion, nationality, membership in a particular social group, or political opinion;

(2) The spouse or child, having been convicted by a final judgment of a particularly serious crime in the United States, constitutes a danger to the community of the United States;

(3) The spouse or child has been convicted of an aggravated felony, as defined in section 101(a)(43) of the Act; or

(4) There are reasonable grounds for regarding the spouse or child a danger to the security of the United States.

(b) Relationship. The relationship of spouse and child as defined in section 101(b)(1) of the Act must have existed at the time the principal alien's asylum application was approved, except for children born to or legally adopted by the principal alien and spouse after approval of the principal alien's asylum application.

(c) Spouse or child in the United States. When a spouse or child of an alien granted asylum is in the United States but was not included in the principal alien's application, the principal alien may request asylum for the spouse or child by filing Form I-730 with the District Director having jurisdiction over his only place of residence, regardless of the status of that spouse or child in the United States.

(d) Spouse or child outside the United States. When a spouse or child of an alien granted asylum is outside the United States, the principal alien may request asylum for the spouse or child by filing form I-730 with the District Director, setting forth the full name, relationship, date and place of birth, and current location of each such person. Upon approval of the request, the District Director shall notify the Department of State, which will send an authorization cable to the American Embassy or Consulate having jurisdiction over the area in which the asylee's spouse or child is located.

(e) Denial. If the spouse or child is found to be ineligible for the status accorded under section 208(c) of the Act, a written notice stating the basis for denial shall be forwarded to the principal alien. No appeal shall lie from this decision.

(f) Burden of proof. To establish the claim of relationship of spouse or child as defined in section 101(b)(1) of the Act, evidence must be submitted with the request as set forth in part 204 of this chapter. Where possible this will consist of the documents specified in 8 CFR 204.2(c) (2) and (3). The burden of proof is on the principal alien to establish by a preponderance of the evidence that any person on whose behalf he or she is making a request under this section is an eligible spouse or child.

(g) Duration. The spouse or child qualifying under section 208(c) of the Act shall be granted asylum for an indefinite period unless the principal's status is revoked.
  8 CFR § 208.20

## §208.20 Effect on exclusion, deportation, and removal proceedings.

(a) An alien who has been granted asylum may not be deported or removed unless his or her asylum status is terminated pursuant to §208.22. An alien in exclusion, deportation, or removal proceedings who is granted withholding of removal or deportation may not be deported or removed to the country to which his or her deportation or removal is ordered withheld unless the withholding order is terminated pursuant to §208.22.

(b) When an alien's asylum status or withholding of removal or deportation is terminated under this chapter, the Service shall initiate removal proceedings under section 235 or 240 of the Act, as appropriate, if the alien is not already in exclusion, deportation, or removal proceedings. Removal proceedings may also be in conjunction with a termination hearing scheduled under § 208.22(e).
  8 CFR § 208.21

## §208.21 Restoration of status.

An alien who was maintaining his or her nonimmigrant status at the time of filing an asylum application and has such application denied may continue in or be restored to that status, if it has not expired.
  8 CFR § 208.22

**§208.22 Termination of asylum or withholding of removal or deportation.**

(a) Termination of asylum by the Service. Except as provided in **\*10345** paragraph (e) of this section, an asylum officer may terminate a grant of asylum made under the jurisdiction of an asylum officer or a district director if following an interview, the asylum officer determines that:

(1) There is a showing of fraud in the alien's application such that he or she was not eligible for asylum at the time it was granted;

(2) As to applications filed on or after April 1, 1997, one or more of the conditions described in section 208(c)(2) of the Act exist; or

(3) As to applications filed before April 1, 1997, the alien no longer has a well-founded fear of persecution upon return due to a change of country conditions in the alien's country of nationality or habitual residence or the alien has committed any act that would have been grounds for denial of asylum under §208.13(c)(2).

(b) Termination of withholding of deportation or removal by the Service. Except as provided in paragraph (e) of this section, an asylum officer may terminate a grant of withholding of deportation or removal made under the jurisdiction of an asylum officer or a district director if the asylum officer determines, following an interview, that:

(1) The alien is no longer entitled to withholding of deportation or removal due to a change of conditions in the country to which removal was withheld;

(2) There is a showing of fraud in the alien's application such that the alien was not eligible for withholding of removal at the time it was granted;

(3) The alien has committed any other act that would have been grounds for denial of withholding of removal under section 241(b)(3)(B) of the Act had it occurred prior to the grant of withholding of removal; or

(4) For applications filed in proceedings commenced before April 1, 1997, the alien has committed any act that would have been grounds for denial of withholding of deportation under section 243(h)(2) of the Act.

(c) Procedure. Prior to the termination of a grant of asylum or withholding of deportation or removal, the alien shall be given notice of intent to terminate, with the reasons therefor, at least 30 days prior to the interview specified in paragraph (a) of this section before an asylum officer. The alien shall be provided the opportunity to present evidence showing that he or she is still eligible for asylum or withholding of deportation or removal. If the asylum officer determines that the alien is no longer eligible for asylum or withholding of deportation or removal, the alien shall be given written notice that asylum status or withholding of deportation or removal and any employment authorization issued pursuant thereto, are terminated.

(d) Termination of derivative status. The termination of asylum status for a person who was the principal applicant shall result in termination of the asylum status of a spouse or child whose status was based on the asylum application of the principal. Such termination shall not preclude the spouse or child of such alien from separately asserting an asylum or withholding of deportation or removal claim.

(e) Termination of asylum or withholding of deportation or removal by the Executive Office for Immigration Review. An immigration judge or the Board of Immigration Appeals may reopen a case pursuant to §3.2 or §3.23 of this chapter for the purpose of terminating a grant of asylum or withholding of deportation or removal made under the jurisdiction of an immigration judge. In such a reopened proceeding, the Service must establish, by a preponderance of evidence, one or more of the grounds set forth in paragraphs (a) or (b) of this section. In addition, an immigration judge may terminate a grant of asylum or withholding of deportation or removal made under the jurisdiction of the Service at any time after the alien has been provided a notice of intent

to terminate by the Service. Any termination under this paragraph may occur in conjunction with an exclusion, deportation or removal proceeding.

(f) Termination of asylum for arriving aliens. If the Service determines that an applicant for admission who had previously been granted asylum in the United States falls within conditions set forth in section 208(c)(2) of the Act and is inadmissible, the Service shall issue a notice of intent to terminate asylum and initiate removal proceedings under section 240 of the Act. The alien shall present his or her response to the intent to terminate during proceedings before the immigration judge.
 8 CFR § 208.23

§§208.23—208.29 [Reserved]

**Subpart B—Credible Fear of Persecution**
8 CFR § 208.30

**§208.30 Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.**
(a) Jurisdiction. The provisions of this subpart apply to aliens subject to sections 235(a)(2) and 235(b)(1) of the Act. Pursuant to section 235(b)(1)(B) of the Act, the Service has exclusive jurisdiction to make credible fear determinations, and the Executive Office for Immigration Review has exclusive jurisdiction to review such determinations. Except as otherwise provided in this subpart, paragraphs (b) through (e) of this section are the exclusive procedures applicable to credible fear interviews, determinations, and review under section 235(b)(1)(B) of the Act.

(b) Interview and procedure. The asylum officer, as defined in section 235(b)(1)(E) of the Act, will conduct the interview in a nonadversarial manner, separate and apart from the general public. At the time of the interview, the asylum officer shall verify that the alien has received Form M-444, Information about Credible Fear Interview in Expedited Removal Cases. The officer shall also determine that the alien has an understanding of the credible fear determination process. The alien may be required to register his or her identity electronically or through any other means designated by the Attorney General. The alien may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, and may present other evidence, if available. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process. Any person or persons with whom the alien chooses to consult may be present at the interview and may be permitted, in the discretion of the asylum officer, to present a statement at the end of the interview. The asylum officer, in his or her discretion, may place reasonable limits on the number of such persons who may be present at the interview and on the length of statement or statements made. If the alien is unable to proceed effectively in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. The interpreter may not be a representative or employee of the applicant's country of nationality or, if the applicant is stateless, the applicant's country of last habitual residence. The asylum officer shall create a summary of the material facts as stated by the applicant. At the conclusion of the interview, the officer shall review the summary with the alien and provide the alien with an opportunity to correct errors therein. The asylum officer shall create a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officer, and the officer's determination of whether, in light of such facts, the alien **\*10346** has established a credible fear of persecution. The decision shall not become final until reviewed by a supervisory asylum officer.

(c) Authority. Asylum officers conducting credible fear interviews shall have the authorities described in §208.9(c).

(d) Referral for an asylum hearing. If an alien, other than an alien stowaway, is found to have a credible fear of persecution, the asylum officer will so inform the alien and issue a Form I-862, Notice to Appear, for full consideration of the asylum claim in proceedings under section 240 of the Act. Parole of the alien may only be considered in accordance with section 212(d)(5) of the Act and §212.5 of this chapter. If an alien stowaway is found to have a credible fear of persecution, the asylum officer will so inform the alien and issue a Form I-863, Notice to Referral to Immigration Judge, for full consideration of the asylum claim in proceedings under §208.2(b)(1).

(e) Removal of aliens with no credible fear of persecution. If an alien is found not to have a credible fear of persecution, the asylum officer shall provide the alien with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative decision, using Form I-869, Record of Negative Credible Fear Finding and Request for Review by Immigration Judge, on which the alien shall indicate whether he or she desires such review. If the alien is not a stowaway, the officer shall also order the alien removed and issue a Form I-860, Notice and Order of Expedited Removal. If the alien is a stowaway and the alien does not request a review by an immigration judge, the asylum officer shall also refer the alien to the district director for completion of removal proceedings in accordance with section 235(a)(2) of the Act.

(f) Review by immigration judge. The asylum officer's negative decision regarding credible fear shall be subject to review by an immigration judge upon the applicant's request, in accordance with section 235(b)(1)(B)(iii)(III) of the Act. If the alien requests such review, the asylum officer shall arrange for the detention of the alien and serve him or her with a Form I-863, Notice of Referral to Immigration Judge. The record of determination, including copies of the Form I-863, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination. Upon review of the asylum officer's negative credible fear determination:

(1) If the immigration judge concurs with the determination of the asylum officer that the alien does not have a credible fear of persecution, the case shall be returned to the Service for removal of the alien.

(2) If the immigration judge finds that the alien, other than an alien stowaway, possesses a credible fear of persecution, the immigration judge shall vacate the order of the asylum officer issued on Form I-860 and the Service may commence removal proceedings under section 240 of the Act, during which time the alien may file an asylum application in accordance with §208.4(b)(3)(i).

(3) If the immigration judge finds that an alien stowaway possesses a credible fear of persecution, the alien shall be allowed to file an asylum application before the immigration judge in accordance with §208.4(b)(3)(iii). The immigration judge shall decide the asylum application as provided in that section. Such decision may be appealed by either the stowaway or the Service to the Board of Immigration Appeals. If and when a denial of the asylum application becomes final, the alien shall be removed from the United States in accordance with section 235(a)(2) of the Act. If and when an approval of the asylum application becomes final, the Service shall terminate removal proceedings under section 235(a)(2) of the Act.


## PART 209—ADJUSTMENT OF STATUS OF REFUGEES AND ALIENS GRANTED ASYLUM

43. The authority citation for part 209 is revised to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1157, 1158, 1159, 1228, 1252, 1282; 8 CFR part 2.

 8 CFR § 209.1

## §209.1 [Amended]

8 CFR § 209.1

44. In §209.1, paragraph (a)(1) is amended in the first sentence by revising the reference to ", 236, and 237" to read "and 240".

 8 CFR § 209.2

45. In §209.2, the last sentence of paragraph (c) is revised to read as follows:

 8 CFR § 209.2

## §209.2 Adjustment of status of alien granted asylum.

* * * * *

(c) Application. * * * If an alien has been placed in deportation, exclusion, or removal proceedings under any section of this Act (as effective on the date such proceedings commenced), the application can be filed and considered only in those proceedings.

 * * * * *

**PART 211—DOCUMENTARY REQUIREMENTS: IMMIGRANTS; WAIVERS**

46. Part 211 is revised to read as follows:

Sec.

211.1 Visas.

211.2 Passports.

211.3 Expiration of immigrant visas, reentry permits, refugee travel documents, and Forms I-551.

211.4 Waiver of documents for returning residents.

211.5 Alien commuters.

Authority: 8 U.S.C. 1101, 1103, 1181, 1182, 1203, 1225, 1257; 8 CFR part 2.

 8 CFR § 211.1

**§211.1 Visas.**

(a) General. Except as provided in paragraph (b) of this section, each arriving alien applying for admission (or boarding the vessel or aircraft on which he or she arrives) into the United States for lawful permanent residence, or as a lawful permanent resident returning to an unrelinquished lawful permanent residence in the United States, shall present one of the following:

(1) A valid, unexpired immigrant visa;

(2) A valid, unexpired Form I-551, Alien Registration Receipt Card, if seeking readmission after a temporary absence of less than 1 year, or in the case of a crewmember regularly serving on board a vessel or aircraft of United States registry seeking readmission after any temporary absence connected with his or her duties as a crewman;

(3) A valid, unexpired Form I-327, Permit to Reenter the United States;

(4) A valid, unexpired Form I-571, Refugee Travel Document, properly endorsed to reflect admission as a lawful permanent resident;

(5) An expired Form I-551, Alien Registration Receipt Card, accompanied by a filing receipt issued within the previous 6 months for either a Form I-751, Petition to Remove the Conditions on Residence, or Form I-829, Petition by Entrepreneur to Remove Conditions, if seeking admission or readmission after a temporary absence of less than 1 year;

(6) A Form I-551, whether or not expired, presented by a civilian or military employee of the United States Government who was outside the United States pursuant to official orders, or by the spouse or child of such employee who resided abroad while the employee or serviceperson was on overseas duty and who is preceding, accompanying or following to join within 4 months the employee, returning to the United States; or

(7) Form I-551, whether or not expired, or a transportation letter issued by an American consular officer, **\*10347** presented by an employee of the American University of Beirut, who was so employed immediately preceding travel to the United States, returning temporarily to the United States before resuming employment with the American University of Beirut, or resuming permanent residence in the United States.

(b) Waivers. (1) A waiver of the visa required in paragraph (a) of this section shall be granted without fee or application by the district director, upon presentation of the child's birth certificate, to a child born subsequent to the issuance of an immigrant

visa to his or her accompanying parent who applies for admission during the validity of such a visa; or a child born during the temporary visit abroad of a mother who is a lawful permanent resident alien, or a national, of the United States, provided that the child's application for admission to the United States is made within 2 years of birth, the child is accompanied by the parent who is applying for readmission as a permanent resident upon the first return of the parent to the United States after the birth of the child, and the accompanying parent is found to be admissible to the United States.

(2) For an alien described in paragraph (b)(1) of this section, recordation of the child's entry shall be on Form I-181, Memorandum of Creation of Record of Admission for Lawful Permanent Residence. The carrier of such alien shall not be liable for a fine pursuant to section 273 of the Act.

(3) If an immigrant alien returning to an unrelinquished lawful permanent residence in the United States after a temporary absence abroad believes that good cause exists for his or her failure to present an immigrant visa, Form I-551, or reentry permit, the alien may file an application for a waiver of this requirement with the district director in charge of the port-of-entry. To apply for this waiver, the alien must file Form I-193, Application for Waiver of Passport and/or Visa, with the fee prescribed in §103.7(b)(1) of this chapter, except that if the alien's Form I-551 was lost or stolen, the alien shall instead file Form I-90, Application to Replace Alien Registration Receipt Card, with the fee prescribed in §103.7(b)(1) of this chapter, provided the temporary absence did not exceed 1 year. In the exercise of discretion, the district director in charge of the port-of-entry may waive the alien's lack of an immigrant visa, Form I-551, or reentry permit and admit the alien as a returning resident, if the district director is satisfied that the alien has established good cause for the alien's failure to present an immigrant visa, Form I-551, or reentry permit. Filing the Form I-90 will serve as both application for replacement and as application for waiver of passport and visa, without the obligation to file a separate waiver application.

(c) Immigrants having occupational status defined in section 101(a)(15) (A), (E), or (G) of the Act. An immigrant visa, reentry permit, or Form I-551 shall be invalid when presented by an alien who has an occupational status under section 101(a)(15) (A), (E), or (G) of the Act, unless he or she has previously submitted, or submits at the time he or she applies for admission to the United States, the written waiver required by section 247(b) of the Act and 8 CFR part 247.

(d) Returning temporary residents. (1) Form I-688, Temporary Resident Card, may be presented in lieu of an immigrant visa by an alien whose status has been adjusted to that of a temporary resident under the provisions of §210.1 of this chapter, such status not having changed, and who is returning to an unrelinquished residence within one year after a temporary absence abroad.

(2) Form I-688 may be presented in lieu of an immigrant visa by an alien whose status has been adjusted to that of a temporary resident under the provisions of §245a.2 of this chapter, such status not having changed, and who is returning to an unrelinquished residence within 30 days after a temporary absence abroad, provided that the aggregate of all such absences abroad during the temporary residence period has not exceeded 90 days.

8 CFR § 211.2

## §211.2 **Passports.**

(a) A passport valid for the bearer's entry into a foreign country at least 60 days beyond the expiration date of his or her immigrant visa shall be presented by each immigrant except an immigrant who:

(1) Is the parent, spouse, or unmarried son or daughter of a United States citizen or of an alien lawful permanent resident of the United States;

(2) Is entering under the provisions of §211.1(a)(2) through (a)(7);

(3) Is a child born during the temporary visit abroad of a mother who is a lawful permanent resident alien, or a national, of the United States, provided that the child's application for admission to the United States is made within 2 years of birth, the child is accompanied by the parent who is applying for readmission as a permanent resident upon the first return of the parent to the United States after the birth of the child, and the accompanying parent is found to be admissible to the United States;

(4) Is a stateless person or a person who because of his or her opposition to Communism is unwilling or unable to obtain a passport from the country of his or her nationality, or is the accompanying spouse or unmarried son or daughter of such immigrant; or

(5) Is a member of the Armed Forces of the United States.

(b) Except as provided in paragraph (a) of this section, if an alien seeking admission as an immigrant with an immigrant visa believes that good cause exists for his or her failure to present a passport, the alien may file an application for a waiver of this requirement with the district director in charge of the port-of-entry. To apply for this waiver, the alien must file Form I-193, Application for Waiver of Passport and/or Visa, with the fee prescribed in §103.7(b)(1) of this chapter. In the exercise of discretion, the district director in charge of the port-of-entry may waive the alien's lack of passport and admit the alien as an immigrant, if the district director is satisfied that the alien has established good cause for the alien's failure to present a passport.

 8 CFR § 211.3

**§211.3 Expiration of immigrant visas, reentry permits, refugee travel documents, and Forms I-551.**
An immigrant visa, reentry permit, refugee travel document, or Form I—551 shall be regarded as unexpired if the rightful holder embarked or enplaned before the expiration of his or her immigrant visa, reentry permit, or refugee travel document, or with respect to Form I—551, before the first anniversary of the date on which he or she departed from the United States, provided that the vessel or aircraft on which he or she so embarked or enplaned arrives in the United States or foreign contiguous territory on a continuous voyage. The continuity of the voyage shall not be deemed to have been interrupted by scheduled or emergency stops of the vessel or aircraft en route to the United States or foreign contiguous territory, or by a layover in foreign contiguous territory necessitated solely for the purpose of effecting a transportation connection to the United States.

 8 CFR § 211.4

**§211.4 Waiver of documents for returning residents.**
(a) Pursuant to the authority contained in section 211(b) of the Act, an alien previously lawfully admitted to the United States for permanent residence who, upon return from a temporary absence was inadmissible because of failure to have or to present **\*10348** a valid passport, immigrant visa, reentry permit, border crossing card, or other document required at the time of entry, may be granted a waiver of such requirement in the discretion of the district director if the district director determines that such alien:

(1) Was not otherwise inadmissible at the time of entry, or having been otherwise inadmissible at the time of entry is with respect thereto qualified for an exemption from deportability under section 237(a)(1)(H) of the Act; and

(2) Is not otherwise subject to removal.

(b) Denial of a waiver by the district director is not appealable but shall be without prejudice to renewal of an application and reconsideration in proceedings before the immigration judge.

 8 CFR § 211.5

**§211.5 Alien commuters.**
(a) General. An alien lawfully admitted for permanent residence or a special agricultural worker lawfully admitted for temporary residence under section 210 of the Act may commence or continue to reside in foreign contiguous territory and commute as a special immigrant defined in section 101(a)(27)(A) of the Act to his or her place of employment in the United States. An alien commuter engaged in seasonal work will be presumed to have taken up residence in the United States if he or she is present in this country for more than 6 months, in the aggregate, during any continuous 12-month period. An alien commuter's address report under section 265 of the Act must show his or her actual residence address even though it is not in the United States.

(b) Loss of residence status. An alien commuter who has been out of regular employment in the United States for a continuous period of 6 months shall be deemed to have lost residence status, notwithstanding temporary entries in the interim for other than employment purposes. An exception applies when employment in the United States was interrupted for reasons beyond the individual's control other than lack of a job opportunity or the commuter can demonstrate that he or she has worked 90 days in the United States in the aggregate during the 12-month period preceding the application for admission into the United States. Upon loss of status, Form I-551 or I-688 shall become invalid and must be surrendered to an immigration officer.

(c) Eligibility for benefits under the immigration and nationality laws. Until he or she has taken up residence in the United States, an alien commuter cannot satisfy the residence requirements of the naturalization laws and cannot qualify for any benefits under the immigration laws on his or her own behalf or on behalf of his or her relatives other than as specified in paragraph (a) of this section. When an alien commuter takes up residence in the United States, he or she shall no longer be regarded as a commuter. He or she may facilitate proof of having taken up such residence by notifying the Service as soon as possible, preferably at the time of his or her first reentry for that purpose. Application for issuance of a new alien registration receipt card to show that he or she has taken up residence in the United States shall be made on Form I-90.

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

47. The authority citation for part 212 continues to read as follows:

Authority: 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1187, 1225, 1226, 1227, 1228, 1252; 8 CFR part 2.

8 CFR § 212.5

48. Section 212.5 is amended by:

a. Revising paragraph (a) and (b);

b. Revising introductory text in paragraph (c);

c. Revising paragraph (c)(1); and by

d. Revising paragraph (d)(2)(i), to read as follows:

8 CFR § 212.5

### §212.5 Parole of aliens into the United States.

(a) The parole of aliens within the following groups who have been or are detained in accordance with §235.3(b) or (c) of this chapter would generally be justified only on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit," provided the aliens present neither a security risk nor a risk of absconding:

(1) Aliens who have serious medical conditions in which continued detention would not be appropriate;

(2) Women who have been medically certified as pregnant;

(3) Aliens who are defined as juveniles in §236.3(a) of this chapter. The district director or chief patrol agent shall follow the guidelines set forth in §236.3(a) of this chapter and paragraphs (a)(3)(i) through (iii) of this section in determining under what conditions a juvenile should be paroled from detention:

(i) Juveniles may be released to a relative (brother, sister, aunt, uncle, or grandparent) not in Service detention who is willing to sponsor a minor and the minor may be released to that relative notwithstanding that the juvenile has a relative who is in detention.

(ii) If a relative who is not in detention cannot be located to sponsor the minor, the minor may be released with an accompanying relative who is in detention.

(iii) If the Service cannot locate a relative in or out of detention to sponsor the minor, but the minor has identified a non-relative in detention who accompanied him or her on arrival, the question of releasing the minor and the accompanying non-relative adult shall be addressed on a case-by-case basis;

(4) Aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; or

(5) Aliens whose continued detention is not in the public interest as determined by the district director or chief patrol agent.

(b) In the cases of all other arriving aliens, except those detained under § 235.3(b) or (c) of this chapter and paragraph (a) of this section, the district director or chief patrol agent may, after review of the individual case, parole into the United States temporarily in accordance with section 212(d)(5)(A) of the Act, any alien applicant for admission, under such terms and conditions, including those set forth in paragraph (c) of this section, as he or she may deem appropriate. An alien who arrives at a port-of-entry and applies for parole into the United States for the sole purpose of seeking adjustment of status under section 245A of the Act, without benefit of advance authorization as described in paragraph (e) of this section shall be denied parole and detained for removal in accordance with the provisions of §235.3(b) or (c) of this chapter. An alien seeking to enter the United States for the sole purpose of applying for adjustment of status under section 210 of the Act shall be denied parole and detained for removal under §235.3(b) or (c) of this chapter, unless the alien has been recommended for approval of such application for adjustment by a consular officer at an Overseas Processing Office.

(c) Conditions. In any case where an alien is paroled under paragraph (a) or (b) of this section, the district director or chief patrol agent may require reasonable assurances that the alien will appear at all hearings and/or depart the United States when required to do so. Not all factors listed need be present for parole to be exercised. The district director or chief patrol agent should apply reasonable discretion. The consideration of all relevant factors includes:  **10349

(1) The giving of an undertaking by the applicant, counsel, or a sponsor to ensure appearances or departure, and a bond may be required on Form I-352 in such amount as the district director or chief patrol agent may deem appropriate;
 * * * * *
(d) * * *

(2)(i) On notice. In cases not covered by paragraph (d)(1) of this section, upon accomplishment of the purpose for which parole was authorized or when in the opinion of the district director or chief patrol agent in charge of the area in which the alien is located, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien and he or she shall be restored to the status that he or she had at the time of parole. When a charging document is served on the alien, the charging document will constitute written notice of termination of parole, unless otherwise specified. Any further inspection or hearing shall be conducted under section 235 or 240 of the Act and this chapter, or any order of exclusion, deportation, or removal previously entered shall be executed. If the exclusion, deportation, or removal order cannot be executed by removal within a reasonable time, the alien shall again be released on parole unless in the opinion of the district director or the chief patrol agent the public interest requires that the alien be continued in custody.
 * * * * *8 CFR § 212.6

49. In §212.6, paragraph (a)(2) is revised to read as follows:
 8 CFR § 212.6

§212.6 Nonresident alien border crossing cards.
(a) * * *

(2) Mexican border crossing card, Form I-186 or I-586. The rightful holder of a nonresident alien Mexican border crossing card, Form I-186 or I-586, may be admitted under §235.1(f) of this chapter if found otherwise admissible. However, any alien seeking entry as a visitor for business or pleasure must also present a valid passport and shall be issued Form I-94 if the alien is applying for admission from:

(i) A country other than Mexico or Canada, or

(ii) Canada if the alien has been in a country other than the United States or Canada since leaving Mexico.
* * * * *

## PART 213—ADMISSION OF ALIENS ON GIVING BOND OR CASH DEPOSIT
50. The authority citation for part 213 is revised to read as follows:

Authority: 8 U.S.C. 1103; 8 CFR part 2.
 8 CFR § 213.1

### §213.1 [Amended]
8 CFR § 213.1
51. Section 213.1 is amended in the last sentence by revising the term "part 103" to read "§103.6".

## PART 214—NONIMMIGRANT CLASSES
52. The authority citation for part 214 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282; 8 CFR part 2.
 8 CFR § 214.1
53. Section 214.1 is amended by revising paragraph (c)(4)(iv) to read as follows:
 8 CFR § 214.1

### §214.1 Requirements for admission, extension, and maintenance of status.
* * * * *
(c) * * *

(4) * * *

(iv) The alien is not the subject of deportation proceedings under section 242 of the Act (prior to April 1, 1997) or removal proceedings under section 240 of the Act.
* * * * *

## PART 216—CONDITIONAL BASIS OF LAWFUL PERMANENT RESIDENCE STATUS
54. The authority citation for part 216 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1154, 1184, 1186a, 1186b, and 8 CFR part 2.
 8 CFR § 216.3
55. Section 216.3 is revised to read as follows:
 8 CFR § 216.3

### §216.3 Termination of conditional resident status.
(a) During the two-year conditional period. The director shall send a formal written notice to the conditional permanent resident of the termination of the alien's conditional permanent resident status if the director determines that any of the conditions set forth in section 216(b)(1) or 216A(b)(1) of the Act, whichever is applicable, are true, or it becomes known to the government

that an alien entrepreneur who was admitted pursuant to section 203(b)(5) of the Act obtained his or her investment capital through other than legal means (such as through the sale of illegal drugs). If the Service issues a notice of intent to terminate an alien's conditional resident status, the director shall not adjudicate Form I-751 or Form I-829 until it has been determined that the alien's status will not be terminated. During this time, the alien shall continue to be a lawful conditional permanent resident with all the rights, privileges, and responsibilities provided to persons possessing such status. Prior to issuing the notice of termination, the director shall provide the alien with an opportunity to review and rebut the evidence upon which the decision is to be based, in accordance with §103.2(b)(2) of this chapter. The termination of status, and all of the rights and privileges concomitant thereto (including authorization to accept or continue in employment in this country), shall take effect as of the date of such determination by the director, although the alien may request a review of such determination in removal proceedings. In addition to the notice of termination, the director shall issue a notice to appear in accordance with 8 CFR part 239. During the ensuing removal proceedings, the alien may submit evidence to rebut the determination of the director. The burden of proof shall be on the Service to establish, by a preponderance of the evidence, that one or more of the conditions in section 216(b)(1) or 216A(b)(1) of the Act, whichever is applicable, are true, or that an alien entrepreneur who was admitted pursuant to section 203(b)(5) of the Act obtained his or her investment capital through other than legal means (such as through the sale of illegal drugs).

(b) Determination of fraud after two years. If, subsequent to the removal of the conditional basis of an alien's permanent resident status, the director determines that an alien spouse obtained permanent resident status through a marriage which was entered into for the purpose of evading the immigration laws or an alien entrepreneur obtained permanent resident status through a commercial enterprise which was improper under section 216A(b)(1) of the Act, the director may institute rescission proceedings pursuant to section 246 of the Act (if otherwise appropriate) or removal proceedings under section 240 of the Act.

8 CFR § 216.4

56. Section 216.4 is amended by:

a. Revising paragraphs (a)(6), and (b)(3);

b. Revising paragraph, (c)(4);

c. Removing the unnumbered paragraph immediately after paragraph (c)(4); and by

d. Revising paragraph (d)(2) to read as follows:

8 CFR § 216.4

**§216.4 Joint petition to remove conditional basis of lawful permanent resident status for alien spouse.**
(a) * * * **\*10350**

(6) Termination of status for failure to file petition. Failure to properly file Form I-751 within the 90-day period immediately preceding the second anniversary of the date on which the alien obtained lawful permanent residence on a conditional basis shall result in the automatic termination of the alien's permanent residence status and the initiation of proceedings to remove the alien from the United States. In such proceedings the burden shall be on the alien to establish that he or she complied with the requirement to file the joint petition within the designated period. Form I-751 may be filed after the expiration of the 90-day period only if the alien establishes to the satisfaction of the director, in writing, that there was good cause for the failure to file Form I-751 within the required time period. If the joint petition is filed prior to the jurisdiction vesting with the immigration judge in removal proceedings and the director excuses the late filing and approves the petition, he or she shall restore the alien's permanent residence status, remove the conditional basis of such status and cancel any outstanding notice to appear in accordance with §239.2 of this chapter. If the joint petition is not filed until after jurisdiction vests with the immigration judge, the immigration judge may terminate the matter upon joint motion by the alien and the Service.

(b) * * *

(3) Termination of status for failure to appear for interview. If the conditional resident alien and/or the petitioning spouse fail to appear for an interview in connection with the joint petition required by section 216(c) of the Act, the alien's permanent residence status will be automatically terminated as of the second anniversary of the date on which the alien obtained permanent residence. The alien shall be provided with written notification of the termination and the reasons therefor, and a notice to appear shall be issued placing the alien under removal proceedings. The alien may seek review of the decision to terminate his or her status in such proceedings, but the burden shall be on the alien to establish compliance with the interview requirements. If the alien submits a written request that the interview be rescheduled or that the interview be waived, and the director determines that there is good cause for granting the request, the interview may be rescheduled or waived, as appropriate. If the interview is rescheduled at the request of the petitioners, the Service shall not be required to conduct the interview within the 90-day period following the filing of the petition.

(c) * * *

(4) A fee or other consideration was given (other than a fee or other consideration to an attorney for assistance in preparation of a lawful petition) in connection with the filing of the petition through which the alien obtained conditional permanent residence. If derogatory information is determined regarding any of these issues, the director shall offer the petitioners the opportunity to rebut such information. If the petitioners fail to overcome such derogatory information the director may deny the joint petition, terminate the alien's permanent residence, and issue a notice to appear to initiate removal proceedings. If derogatory information not relating to any of these issues is determined during the course of the interview, such information shall be forwarded to the investigations unit for appropriate action. If no unresolved derogatory information is determined relating to these issues, the petition shall be approved and the conditional basis of the alien's permanent residence status removed, regardless of any action taken or contemplated regarding other possible grounds for removal.

(d) * * *

(2) Denial. If the director denies the joint petition, he or she shall provide written notice to the alien of the decision and the reason(s) therefor and shall issue a notice to appear under section 239 of the Act and 8 CFR part 239. The alien's lawful permanent resident status shall be terminated as of the date of the director's written decision. The alien shall also be instructed to surrender any Alien Registration Receipt Card previously issued by the Service. No appeal shall lie from the decision of the director; however, the alien may seek review of the decision in removal proceedings. In such proceedings the burden of proof shall be on the Service to establish, by a preponderance of the evidence, that the facts and information set forth by the petitioners are not true or that the petition was properly denied.

8 CFR § 216.5

57. Section 216.5 is amended by revising paragraphs (a), (d), (e)(1), (e)(3)(ii), and (f) to read as follows:

8 CFR § 216.5

## §216.5 Waiver of requirement to file joint petition to remove conditions by alien spouse.

(a) General. (1) A conditional resident alien who is unable to meet the requirements under section 216 of the Act for a joint petition for removal of the conditional basis of his or her permanent resident status may file Form I-751, Petition to Remove the Conditions on Residence, if the alien requests a waiver, was not at fault in failing to meet the filing requirement, and the conditional resident alien is able to establish that:

(i) Deportation or removal from the United States would result in extreme hardship;

(ii) The marriage upon which his or her status was based was entered into in good faith by the conditional resident alien, but the marriage was terminated other than by death, and the conditional resident was not at fault in failing to file a timely petition; or

(iii) The qualifying marriage was entered into in good faith by the conditional resident but during the marriage the alien spouse or child was battered by or subjected to extreme cruelty committed by the citizen or permanent resident spouse or parent.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 329 of 548   PageID 5272

(2) A conditional resident who is in exclusion, deportation, or removal proceedings may apply for the waiver only until such time as there is a final order of exclusion, deportation or removal.

 * * * * *

(d) Interview. The service center director may refer the application to the appropriate local office and require that the alien appear for an interview in connection with the application for a waiver. The director shall deny the application and initiate removal proceedings if the alien fails to appear for the interview as required, unless the alien establishes good cause for such failure and the interview is rescheduled.

(e) Adjudication of waiver application. (1) Application based on claim of hardship. In considering an application for a waiver based upon an alien's claim that extreme hardship would result from the alien's removal from the United States, the director shall take into account only those factors that arose subsequent to the alien's entry as a conditional permanent resident. The director shall bear in mind that any removal from the United States is likely to result in a certain degree of hardship, and that only in those cases where the hardship is extreme should the application for a waiver be granted. The burden of establishing that extreme hardship exists rests solely with the applicant.

 * * * * *

(3) * * *

(ii) A conditional resident or former conditional resident who has not departed the United States after termination of resident status may apply for the waiver. The conditional resident may apply for the waiver regardless of  **\*10351**  his or her present marital status. The conditional resident may still be residing with the citizen or permanent resident spouse, or may be divorced or separated.

 * * * * *

(f) Decision. The director shall provide the alien with written notice of the decision on the application for waiver. If the decision is adverse, the director shall advise the alien of the reasons therefor, notify the alien of the termination of his or her permanent residence status, instruct the alien to surrender any Alien Registration Receipt Card issued by the Service and issue a notice to appear placing the alien in removal proceedings. No appeal shall lie from the decision of the director; however, the alien may seek review of such decision in removal proceedings.


### PART 217—VISA WAIVER PILOT PROGRAM

58. The authority citation for part 217 continues to read as follows:

Authority: 8 U.S.C. 1103, 1187; 8 CFR part 2.

 8 CFR § 217.1

59. Section 217.1 is revised to read as follows:

 8 CFR § 217.1

### §217.1 Scope.

The Visa Waiver Pilot Program (VWPP) described in this section is established pursuant to the provisions of section 217 of the Act.

 8 CFR § 217.2

60. Section 217.2 is revised to read as follows:

 8 CFR § 217.2

### §217.2 Eligibility.

(a) Definitions. As used in this part, the term:

Carrier refers to the owner, charterer, lessee, or authorized agent of any commercial vessel or commercial aircraft engaged in transporting passengers to the United States from a foreign place.

Designated country refers to Andorra, Argentina, Australia, Austria, Belgium, Brunei, Denmark, Finland, France, Germany, Iceland, Italy, Japan, Liechtenstein, Luxembourg, Monaco, the Netherlands, New Zealand, Norway, San Marino, Spain, Sweden, Switzerland, and the United Kingdom. The United Kingdom refers only to British citizens who have the unrestricted right of permanent abode in the United Kingdom (England, Scotland, Wales, Northern Ireland, the Channel Islands and the Isle of Man); it does not refer to British overseas citizens, British dependent territories' citizens, or citizens of British Commonwealth countries. Effective April 1, 1995, until September 30, 1998, or the expiration of the Visa Waiver Pilot Program, whichever comes first, Ireland has been designated as a Visa Waiver Pilot Program country with Probationary Status in accordance with section 217(g) of the Act.

Round trip ticket means any return trip transportation ticket in the name of an arriving Visa Waiver Pilot Program applicant on a participating carrier valid for at least 1 year, electronic ticket record, airline employee passes indicating return passage, individual vouchers for return passage, group vouchers for return passage for charter flights, and military travel orders which include military dependents for return to duty stations outside the United States on U.S. military flights. A period of validity of 1 year need not be reflected on the ticket itself, provided that the carrier agrees that it will honor the return portion of the ticket at any time, as provided in Form I-775, Visa Waiver Pilot Program Agreement.

(b) Special program requirements. (1) General. In addition to meeting all of the requirements for the Visa Waiver Pilot Program specified in section 217 of the Act, each applicant must possess a valid, unexpired passport issued by a designated country and present a completed, signed Form I-94W, Nonimmigrant Visa Waiver Arrival/Departure Form.

(2) Persons previously removed as deportable aliens. Aliens who have been deported or removed from the United States, after having been determined deportable, require the consent of the Attorney General to apply for admission to the United States pursuant to section 212(a)(9)(A)(iii) of the Act. Such persons may not be admitted to the United States under the provisions of this part notwithstanding the fact that the required consent of the Attorney General may have been secured. Such aliens must secure a visa in order to be admitted to the United States as nonimmigrants, unless otherwise exempt.

(c) Restrictions on manner of arrival. (1) Applicants arriving by air and sea. Applicants must arrive on a carrier that is signatory to a Visa Waiver Pilot Program Agreement and at the time of arrival must have a round trip ticket that will transport the traveler out of the United States to any other foreign port or place as long as the trip does not terminate in contiguous territory or an adjacent island; except that the round trip ticket may transport the traveler to contiguous territory or an adjacent island, if the traveler is a resident of the country of destination.

(2) Applicants arriving at land border ports-of-entry. Any Visa Waiver Pilot Program applicant arriving at a land border port-of-entry must provide evidence to the immigration officer of financial solvency and a domicile abroad to which the applicant intends to return. An applicant arriving at a land-border port-of-entry will be charged a fee as prescribed in §103.7(b)(1) of this chapter for issuance of Form I-94W, Nonimmigrant Visa Waiver Arrival/Departure Form. A round-trip transportation ticket is not required of applicants at land border ports-of-entry.

(d) Aliens in transit. An alien who is in transit through the United States is eligible to apply for admission under the Visa Waiver Pilot Program, provided the applicant meets all other program requirements.

8 CFR § 217.3

61. Section 217.3 is revised to read as follows:

8 CFR § 217.3

### §217.3 Maintenance of status.

(a) Satisfactory departure. If an emergency prevents an alien admitted under this part from departing from the United States within his or her period of authorized stay, the district director having jurisdiction over the place of the alien's temporary stay may, in his or her discretion, grant a period of satisfactory departure not to exceed 30 days. If departure is accomplished during that period, the alien is to be regarded as having satisfactorily accomplished the visit without overstaying the allotted time.

(b) Readmission after departure to contiguous territory or adjacent island. An alien admitted to the United States under this part may be readmitted to the United States after a departure to foreign contiguous territory or adjacent island for the balance of his or her original Visa Waiver Pilot Program admission period if he or she is otherwise admissible and meets all the conditions of this part with the exception of arrival on a signatory carrier.

8 CFR § 217.4

62. Section 217.4 is amended by:

a. Revising the section heading:

b. Removing paragraph (a);

c. Redesignating paragraphs (b), (c), and (d) as paragraphs (a), (b), and (c) respectively;

d. Revising newly redesignated paragraph (a)(1);

e. Adding a new paragraph (a)(3);

f. Revising newly redesignated paragraph (b); and by

g. Revising newly redesignated paragraph (c) to read as follows:

8 CFR § 217.4

## §217.4 Inadmissibility and deportability.

(a) Determinations of inadmissibility. (1) An alien who applies for admission under the provisions of section 217 of the Act, who is determined by an immigration officer not to be eligible for  **10352**  admission under that section or to be inadmissible to the United States under one or more of the grounds of inadmissibility listed in section 212 of the Act (other than for lack of a visa), or who is in possession of and presents fraudulent or counterfeit travel documents, will be refused admission into the United States and removed. Such refusal and removal shall be made at the level of the port director or officer-in-charge, or an officer acting in that capacity, and shall be effected without referral of the alien to an immigration judge for further inquiry, examination, or hearing, except that an alien who presents himself or herself as an applicant for admission under section 217 of the Act, who applies for asylum in the United States must be issued a Form I-863, Notice of Referral to Immigration Judge, for a proceeding in accordance with §208.2(b)(1) and (2) of this chapter.

* * * * *

(3) Refusal of admission under paragraph (a)(1) of this section shall not constitute removal for purposes of the Act.

(b) Determination of deportability. (1) An alien who has been admitted to the United States under the provisions of section 217 of the Act and of this part who is determined by an immigration officer to be deportable from the United States under one or more of the grounds of deportability listed in section 237 of the Act shall be removed from the United States to his or her country of nationality or last residence. Such removal shall be determined by the district director who has jurisdiction over the place where the alien is found, and shall be effected without referral of the alien to an immigration judge for a determination of deportability, except that an alien admitted as a Visa Waiver Pilot Program visitor who applies for asylum in the United States must be issued a Form I-863 for a proceeding in accordance with §208.2(b)(1) and (2) of this chapter.

(2) Removal by the district director under paragraph (b)(1) of this section is equivalent in all respects and has the same consequences as removal after proceedings conducted under section 240 of the Act.

(c)(1) Removal of inadmissible aliens who arrived by air or sea. Removal of an alien from the United States under this section may be effected using the return portion of the round trip passage presented by the alien at the time of entry to the United States as required by section 217(a)(7) of the Act. Such removal shall be on the first available means of transportation to the

alien's point of embarkation to the United States. Nothing in this part absolves the carrier of the responsibility to remove any inadmissible or deportable alien at carrier expense, as provided in the carrier agreement.

(2) Removal of inadmissible and deportable aliens who arrived at land border ports-of-entry. Removal under this section will be by the first available means of transportation deemed appropriate by the district director.

8 CFR § 217.5

**§217.5 [Removed and reserved]**

8 CFR § 217.5

63. Section 217.5 is removed and reserved.

8 CFR § 217.6

64. Section 217.6 is revised to read as follows:

8 CFR § 217.6

**§217.6 Carrier agreements.**

(a) General. The carrier agreements referred to in section 217(e) of the Act shall be made by the Commissioner on behalf of the Attorney General and shall be on Form I-775, Visa Waiver Pilot Program Agreement.

(b) Termination of agreements. The Commissioner, on behalf of the Attorney General, may terminate any carrier agreement under this part, with 5 days notice to a carrier, for the carrier's failure to meet the terms of such agreement. As a matter of discretion, the Commissioner may notify a carrier of the existence of a basis for termination of a carrier agreement under this part and allow the carrier a period not to exceed 15 days within which the carrier may bring itself into compliance with the terms of the carrier agreement. The agreement shall be subject to cancellation by either party for any reason upon 15 days' written notice to the other party.


**PART 221—ADMISSION OF VISITORS OR STUDENTS**

65. The authority citation for part 221 is revised to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1201; 8 CFR part 2.

8 CFR § 221.1

**§221.1 [Amended]**

8 CFR § 221.1

66. Section 221.1 is amended in the last sentence by revising the term "part 103" to read "§103.6".


**PART 223—REENTRY PERMITS, REFUGEE TRAVEL DOCUMENTS, AND ADVANCE PAROLE DOCUMENTS**

67. The authority citation for part 223 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1181, 1182, 1186a, 1203, 1225, 1226, 1227, 1251; Protocol Relating to the Status of Refugees, November 1, 1968, 19 U.S.T. 6223 (TIAS) 6577; 8 CFR part 2.

8 CFR § 223.1

68. In §223.1, paragraph (b) is revised to read as follows:

8 CFR § 223.1

**§223.1 Purpose of documents.**

* * * * *

(b) Refugee travel document. A refugee travel document is issued pursuant to this part and article 28 of the United Nations Convention of July 29, 1951, for the purpose of travel. Except as provided in §223.3(d)(2)(i), a person who holds refugee status

pursuant to section 207 of the Act, or asylum status pursuant to section 208 of the Act, must have a refugee travel document to return to the United States after temporary travel abroad unless he or she is in possession of a valid advance parole document.

8 CFR § 223.2

69. In §223.2, paragraph (b)(2) is revised to read as follows:

8 CFR § 223.2

**§223.2 Processing.**

* * * * *

(b) * * *

(2) Refugee travel document. (i) General. Except as otherwise provided in this section, an application may be approved if filed by a person who is in the United States at the time of application, and either holds valid refugee status under section 207 of the Act, valid asylum status under section 208 of the Act, or is a permanent resident and received such status as a direct result of his or her asylum or refugee status.

(ii) Discretionary authority to adjudicate an application from an alien not within the United States. As a matter of discretion, a district director having jurisdiction over a port-of-entry or a preinspection station where an alien is an applicant for admission, or an overseas district director having jurisdiction over the place where an alien is physically present, may accept and adjudicate an application for a refugee travel document from an alien who previously had been admitted to the United States as a refugee, or who previously had been granted asylum status in the United States, and who had departed from the United States without having applied for such refugee travel document, provided:

(A) The alien submits a Form I-131, Application for Travel Document, with the fee required under §103.7(b)(1) of this chapter;

(B) The district director is satisfied that the alien did not intend to abandon his or her refugee status at the time of departure from the United States;

(C) The alien did not engage in any activities while outside the United States that would be inconsistent with continued refugee or asylee status; and  **\*10353**

(D) The alien has been outside the United States for less than 1 year since his or her last departure.

* * * * *8 CFR § 223.3

70. In §223.3, paragraph (d)(2) is revised to read as follows:

8 CFR § 223.3

**§223.3 Validity and effect on admissibility.**

* * * * *

(d) * * *

(2) Refugee travel document. (i) Inspection and immigration status. Upon arrival in the United States, an alien who presents a valid unexpired refugee travel document, or who has been allowed to file an application for a refugee travel document and this application has been approved under the procedure set forth in §223.2(b)(2)(ii), shall be examined as to his or her admissibility under the Act. An alien shall be accorded the immigration status endorsed in his or her refugee travel document, or (in the case of an alien discussed in § 223.2(b)(2)(ii)) which will be endorsed in such document, unless he or she is no longer eligible for that status, or he or she applies for and is found eligible for some other immigration status.

(ii) Inadmissibility. If an alien who presents a valid unexpired refugee travel document appears to the examining immigration officer to be inadmissible, he or shall be referred for proceedings under section 240 of the Act. Section 235(c) of the Act shall not be applicable.

## PART 232—DETENTION OF ALIENS FOR PHYSICAL AND MENTAL EXAMINATION

71. The heading for part 232 is revised to read as set forth above.

72. The authority citation for part 232 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1222, 1224, 1252; 8 CFR part 2.

 8 CFR § 232.1

### §232.1 [Redesignated and revised]

8 CFR § 232.1 8 CFR § 232.3

73. Section 232.1 is redesignated as §232.3, and is revised to read as follows:

 8 CFR § 232.3

### §232.3 Arriving aliens.

When a district director has reasonable grounds for believing that persons arriving in the United States should be detained for reasons specified in section 232 of the Act, he or she shall, after consultation with the United States Public Health Service at the port-of-entry, notify the master or agent of the arriving vessel or aircraft of his or her intention to effect such detention by serving on the master or agent Form I-259 in accordance with § 235.3(a) of this chapter.

 8 CFR § 234.1 8 CFR § 234.2

### §§234.1 and 234.2 [Redesignated as §§232.1 and 232.2 respectively]

8 CFR § 232.1 8 CFR § 232.2 8 CFR § 234.1 8 CFR § 234.2

74. Sections 234.1 and 234.2 are redesignated as §§232.1 and 232.2 respectively.

## PART 234—[REMOVED]

75. Part 234 is removed.

76. The following parts are redesignated as set forth in the table below:

| Old part | New part |
| --- | --- |
| Part 238 | Part 233. |
| Part 239 | Part 234. |

## PART 233—CONTRACTS WITH TRANSPORTATION LINES

77. The authority citation for newly designated part 233 continues to read as follows:

Authority: 8 U.S.C. 1103, 1228; 8 CFR part 2.

 8 CFR § 233.1

78. Newly redesignated §233.1 is revised to read as follows:

 8 CFR § 233.1

### §233.1 Contracts.

The contracts with transportation lines referred to in section 233(c) of the Act may be entered into by the Executive Associate Commissioner for Programs, or by an immigration officer designated by the Executive Associate Commissioner for Programs on behalf of the government and shall be documented on Form I-420. The contracts with transportation lines referred to in section 233(a) of the Act shall be made by the Commissioner on behalf of the government and shall be documented on Form

I-426. The contracts with transportation lines desiring their passengers to be preinspected at places outside the United States shall be made by the Commissioner on behalf of the government and shall be documented on Form I-425; except that contracts for irregularly operated charter flights may be entered into by the Associate Commissioner for Examinations or an immigration officer designated by the Executive Associate Commissioner for Programs and having jurisdiction over the location where the inspection will take place.

 8 CFR § 233.3

79. In newly redesignated §233.3, paragraph (b) is revised to read as follows (the list of agreements is removed):

 8 CFR § 233.3

**§233.3 Aliens in immediate and continuous transit.**

* * * * *

(b) Signatory lines. A list of currently effective Form I-426 agreements is maintained by the Service's Headquarters Office of Inspections and is available upon written request.

 * * * * * 8 CFR § 233.4

80. Newly redesignated §233.4 is revised to read as follows:

 8 CFR § 233.4

**§233.4 Preinspection outside the United States.**

(a) Form I-425 agreements. A transportation line bringing applicants for admission to the United States through preinspection sites outside the United States shall enter into an agreement on Form I-425. Such an agreement shall be negotiated directly by the Service's Headquarters Office of Inspections and the head office of the transportation line.

(b) Signatory lines. A list of transportation lines with currently valid transportation agreements on Form I-425 is maintained by the Service's Headquarters Office of Inspections and is available upon written request.

 8 CFR § 233.5

81. Newly redesignated §233.5 is revised to read as follows:

 8 CFR § 233.5

**§233.5 Aliens entering Guam pursuant to section 14 of Public Law 99-396, "Omnibus Territories Act.'**

A transportation line bringing aliens to Guam under the visa waiver provisions of §212.1(e) of this chapter shall enter into an agreement on Form I-760. Such agreements shall be negotiated directly by the Service's Headquarters and head offices of the transportation lines.


**PART 234—DESIGNATION OF PORTS OF ENTRY FOR ALIENS ARRIVING BY CIVIL AIRCRAFT**

82. The heading for newly redesignated part 234 is revised as set forth above.

83. The authority citation for newly designated part 234 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1221, 1229; 8 CFR part 2.

 8 CFR § 234.3

**§234.3 [Amended]**

 8 CFR § 234.3

84. Newly redesignated §234.3 is amended by removing the last sentence.


**PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION**

85. The authority citation for part 235 is revised to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1182, 1183, 1201, 1224, 1225, 1226, 1227, 1228, 1252; 8 CFR part 2.

8 CFR § 235.1

86. Section 235.1 is revised to read as follows:

8 CFR § 235.1

**§235.1 Scope of examination.**

(a) General. Application to lawfully enter the United States shall be made in **\*10354** person to an immigration officer at a U.S. port-of-entry when the port is open for inspection, or as otherwise designated in this section.

(b) U.S. citizens. A person claiming U.S. citizenship must establish that fact to the examining officer's satisfaction and must present a U.S. passport if such passport is required under the provisions of 22 CFR part 53. If such applicant for admission fails to satisfy the examining immigration officer that he or she is a U.S. citizen, he or she shall thereafter be inspected as an alien.

(c) Alien members of United States Armed Forces and members of a force of a NATO country. Any alien member of the United States Armed Forces who is in the uniform of, or bears documents identifying him or her as a member of, such Armed Forces, and who is coming to or departing from the United States under official orders or permit of such Armed Forces is not subject to the removal provisions of the Act. A member of the force of a NATO country signatory to Article III of the Status of Forces Agreement seeking to enter the United States under official orders is exempt from the control provision of the Act. Any alien who is a member of either of the foregoing classes may, upon request, be inspected and his or her entry as an alien may be recorded. If the alien does not appear to the examining immigration officer to be clearly and beyond a doubt entitled to enter the United States under the provisions of the Act, the alien shall be so informed and his or her entry shall not be recorded.

(d) Alien applicants for admission. (1) Each alien seeking admission at a United States port-of-entry shall present whatever documents are required and shall establish to the satisfaction of the immigration officer that he or she is not subject to removal under the immigration laws, Executive Orders, or Presidential Proclamations and is entitled under all of the applicable provisions of the immigration laws and this chapter to enter the United States. A person claiming to have been lawfully admitted for permanent residence must establish that fact to the satisfaction of the inspecting immigration officer and must present proper documents in accordance with §211.1 of this chapter.

(2) An alien present in the United States who has not been admitted or paroled or an alien who seeks entry at other than an open, designated port-of-entry, except as otherwise permitted in this section, is subject to the provisions of section 212(a) of the Act and to removal under section 235(b) or 240 of the Act.

(3) An alien who is brought to the United States, whether or not to a designated port-of-entry and regardless of the means of transportation, after having been interdicted in international or United States waters, is considered an applicant for admission and shall be examined under section 235(b) of the Act.

(4) An alien stowaway is not an applicant for admission and may not be admitted to the United States. A stowaway shall be removed from the United States under section 235(a)(2) of the Act. The provisions of section 240 of the Act are not applicable to stowaways, nor is the stowaway entitled to further hearing or review of the removal, except that an alien stowaway who indicates an intention to apply for asylum shall be referred to an asylum officer for a determination of credible fear of persecution in accordance with section 235(b)(1)(B) of the Act and §208.30 of this chapter. An alien stowaway who is determined to have a credible fear of persecution shall have his or her asylum application adjudicated in accordance with §208.2(b)(2) of this chapter. Nothing in this section shall be construed to require expedited removal proceedings in accordance with section 235(b)(1) of the Act. A stowaway who absconds either prior to inspection by an immigration officer or after being ordered removed as a stowaway pursuant to section 235(a)(2) of the Act is not entitled to removal proceedings under section 240 of the Act and shall be removed under section 235(a)(2) of the Act as if encountered upon arrival. A stowaway who has been removed pursuant to section 235(a)(2) of the Act and this section shall be considered to have been formally removed from the United States for all purposes under the Act.

(e) U.S. citizens, lawful permanent residents of the United States, Canadian nationals, and other residents of Canada having a common nationality with Canadians, entering the United States by small craft. Upon being inspected by an immigration officer and found eligible for admission as a citizen of the United States, or found eligible for admission as a lawful permanent resident of the United States, or in the case of a Canadian national or other resident of Canada having a common nationality with Canadians being found eligible for admission as a temporary visitor for pleasure, a person who desires to enter the United States from Canada in a small pleasure craft of less than 5 net tons without merchandise may be issued, upon application and payment of a fee prescribed under §103.7(b)(1) of this chapter, Form I-68, Canadian Border Boat Landing Card, and may thereafter enter the United States along with the immediate shore area of the United States on the body of water designated on the Form I-68 from time to time for the duration of that navigation season without further inspection. In the case of a Canadian national or other resident of Canada having a common nationality with Canadians, the Form I-68 shall be valid only for the purpose of visits not to exceed 72 hours and only if the alien will remain in nearby shopping areas, nearby residential neighborhoods, or other similar areas adjacent to the immediate shore area of the United States. If the bearer of Form I-68 seeks to enter the United States by means other than small craft of less than 5 net tons without merchandise, or if he or she seeks to enter the United States for other purposes, or if he or she is an alien, other than a lawful permanent resident alien of the United States, and intends to proceed beyond an area adjacent to the immediate shore area of the United States, or remains in the United States longer than 72 hours, he or she must apply for admission at a United States port-of-entry.

(f) Form I-94, Arrival Departure Record. (1) Unless otherwise exempted, each arriving nonimmigrant who is admitted to the United States shall be issued, upon payment of a fee prescribed in §103.7(b)(1) of this chapter for land border admissions, a Form I-94 as evidence of the terms of admission. A Form I-94 issued at a land border port-of-entry shall be considered issued for multiple entries unless specifically annotated for a limited number of entries. A Form I-94 issued at other than a land border port-of-entry, unless issued for multiple entries, must be surrendered upon departure from the United States in accordance with the instructions on the form. Form I-94 is not required by:

(i) Any nonimmigrant alien described in §212.1(a) of this chapter and 22 CFR 41.33 who is admitted as a visitor for business or pleasure or admitted to proceed in direct transit through the United States;

(ii) Any nonimmigrant alien residing in the British Virgin Islands who was admitted only to the U.S. Virgin Islands as a visitor for business or pleasure under §212.1(b) of this chapter;

(iii) Any Mexican national in possession of a valid nonresident alien Mexican border crossing card, or a valid Mexican passport and a multiple-entry nonimmigrant visa issued under section 101(a)(15)(B) of the Act, who is admitted as a nonimmigrant visitor at a Mexican border port of entry for a **10355** period not to exceed 72 hours to visit within 25 miles of the border;

(iv) Bearers of Mexican diplomatic or official passports described in § 212.1(c-1) of this chapter.

(2) Paroled aliens. Any alien paroled into the United States under section 212(d)(5) of the Act, including any alien crewmember, shall be issued a completely executed Form I-94, endorsed with the parole stamp.

8 CFR § 235.2

87. Section 235.2 is revised to read as follows:

8 CFR § 235.2

§235.2 Parole for deferred inspection.

(a) A district director may, in his or her discretion, defer the inspection of any vessel or aircraft, or of any alien, to another Service office or port-of-entry. Any alien coming to a United States port from a foreign port, from an outlying possession of the United States, from Guam, Puerto Rico, or the Virgin Islands of the United States, or from another port of the United States at which examination under this part was deferred, shall be regarded as an applicant for admission at that onward port.

(b) An examining immigration officer may defer further examination and refer the alien's case to the district director having jurisdiction over the place where the alien is seeking admission, or over the place of the alien's residence or destination in the

United States, if the examining immigration officer has reason to believe that the alien can overcome a finding of inadmissibility by:

(1) Posting a bond under section 213 of the Act;

(2) Seeking and obtaining a waiver under section 211 or 212(d)(3) or (4) of the Act; or

(3) Presenting additional evidence of admissibility not available at the time and place of the initial examination.

(c) Such deferral shall be accomplished pursuant to the provisions of section 212(d)(5) of the Act for the period of time necessary to complete the deferred inspection.

(d) Refusal of a district director to authorize admission under section 213 of the Act, or to grant an application for the benefits of section 211 or section 212(d)(3) or (4) of the Act, shall be without prejudice to the renewal of such application or the authorizing of such admission by the immigration judge without additional fee.

(e) Whenever an alien on arrival is found or believed to be suffering from a disability that renders it impractical to proceed with the examination under the Act, the examination of such alien, members of his or her family concerning whose admissibility it is necessary to have such alien testify, and any accompanying aliens whose protection or guardianship will be required should such alien be found inadmissible shall be deferred for such time and under such conditions as the district director in whose district the port is located imposes.

8 CFR § 235.3

88. Section 235.3 is revised to read as follows:

8 CFR § 235.3

§235.3 **Inadmissible aliens and expedited removal.**

(a) Detention prior to inspection. All persons arriving at a port-of-entry in the United States by vessel or aircraft shall be detained aboard the vessel or at the airport of arrival by the owner, agent, master, commanding officer, person in charge, purser, or consignee of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service. Notice or order to detain shall not be required. The owner, agent, master, commanding officer, person in charge, purser, or consignee of such vessel or aircraft shall deliver every alien requiring examination to an immigration officer for inspection or to a medical officer for examination. The Service will not be liable for any expenses related to such detention or presentation or for any expenses of a passenger who has not been presented for inspection and for whom a determination has not been made concerning admissibility by a Service officer.

(b) Expedited removal. (1) Applicability. The expedited removal provisions shall apply to the following classes of aliens who are determined to be inadmissible under section 212(a)(6)(C) or (7) of the Act:

(i) Arriving aliens, as defined in §1.1(q) of this chapter, except for citizens of Cuba arriving at a United States port-of-entry by aircraft;

(ii) As specifically designated by the Commissioner, aliens who arrive in, attempt to enter, or have entered the United States without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and who have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the 2-year period immediately prior to the date of determination of inadmissibility. The Commissioner shall have the sole discretion to apply the provisions of section 235(b)(1) of the Act, at any time, to any class of aliens described in this section. The Commissioner's designation shall become effective upon publication of a notice in the Federal Register. However, if the Commissioner determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws, the Commissioner's designation shall become effective immediately upon issuance, and shall be published in the Federal Register as soon as practicable thereafter. When

these provisions are in effect for aliens who enter without inspection, the burden of proof rests with the alien to affirmatively show that he or she has the required continuous physical presence in the United States. Any absence from the United States shall serve to break the period of continuous physical presence. An alien who was not inspected and admitted or paroled into the United States but who establishes that he or she has been continuously physically present in the United States for the 2-year period immediately prior to the date of determination of inadmissibility shall be detained in accordance with section 235(b)(2) of the Act for a proceeding under section 240 of the Act.

(2) Determination of inadmissibility. (i) Record of proceeding. An alien who is arriving in the United States, or other alien as designated pursuant to paragraph (b)(1)(ii) of this section, who is determined to be inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act (except an alien for whom documentary requirements are waived under §211.1(b)(3) or §212.1 of this chapter), shall be ordered removed from the United States in accordance with section 235(b)(1) of the Act. In every case in which the expedited removal provisions will be applied and before removing an alien from the United States pursuant to this section, the examining immigration officer shall create a record of the facts of the case and statements made by the alien. This shall be accomplished by means of a sworn statement using Form I-867AB, Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act. The examining immigration officer shall read (or have read) to the alien all information contained on Form I-867A. Following questioning and recording of the alien's statement regarding identity, alienage, and inadmissibility, the examining immigration officer shall record the alien's response to the questions contained on Form I-867B, and have the alien read (or have read to him or her) the statement, and the alien shall sign and initial each page of the statement and each correction. The examining immigration officer shall advise the alien of the charges against him or her **\*10356** on Form I-860, Notice and Order of Expedited Removal, and the alien shall be given an opportunity to respond to those charges in the sworn statement. After obtaining supervisory concurrence in accordance with paragraph (b)(7) of this section, the examining immigration official shall serve the alien with Form I-860 and the alien shall sign the reverse of the form acknowledging receipt. Interpretative assistance shall be used if necessary to communicate with the alien.

(ii) No entitlement to hearings and appeals. Except as otherwise provided in this section, such alien is not entitled to a hearing before an immigration judge in proceedings conducted pursuant to section 240 of the Act, or to an appeal of the expedited removal order to the Board of Immigration Appeals.

(iii) Detention and parole of alien in expedited removal. An alien whose inadmissibility is being considered under this section or who has been ordered removed pursuant to this section shall be detained pending determination and removal, except that parole of such alien, in accordance with section 212(d)(5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

(3) Additional charges of inadmissibility. In the expedited removal process, the Service may not charge an alien with any additional grounds of inadmissibility other than section 212(a)(6)(C) or 212(a)(7) of the Act. If an alien appears to be inadmissible under other grounds contained in section 212(a) of the Act, and if the Service wishes to pursue such additional grounds of inadmissibility, the alien shall be detained and referred for a removal hearing before an immigration judge pursuant to sections 235(b)(2) and 240 of the Act for inquiry into all charges. Once the alien is in removal proceedings under section 240 of the Act, the Service is not precluded from lodging additional charges against the alien. Nothing in this paragraph shall preclude the Service from pursuing such additional grounds of inadmissibility against the alien in any subsequent attempt to reenter the United States, provided the additional grounds of inadmissibility still exist.

(4) Claim of asylum or fear of persecution. If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, a fear of persecution, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with §208.30 of this chapter to determine if the alien has a credible fear of persecution. The examining immigration officer shall record sufficient information in the sworn statement to establish and record that the alien has indicated such intention, fear, or concern, and to establish the alien's inadmissibility.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(i) Referral. The referring officer shall provide the alien with a written disclosure on Form M-444, Information About Credible Fear Interview, describing:

(A) The purpose of the referral and description of the credible fear interview process;

(B) The right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government;

(C) The right to request a review by an immigration judge of the asylum officer's credible fear determination; and

(D) The consequences of failure to establish a credible fear of persecution.

(ii) Detention pending credible fear interview. Pending the credible fear determination by an asylum officer and any review of that determination by an immigration judge, the alien shall be detained. Parole of such alien in accordance with section 212(d)(5) of the Act may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective. Prior to the interview, the alien shall be given time to contact and consult with any person or persons of his or her choosing. Such consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained, shall be at no expense to the government, and shall not unreasonably delay the process.

(5) Claim to lawful permanent resident, refugee, or asylee status or U.S. citizenship.—(i) Verification of status. If an applicant for admission who is subject to expedited removal pursuant to section 235(b)(1) of the Act claims to have been lawfully admitted for permanent residence, admitted as a refugee under section 207 of the Act, granted asylum under section 208 of the Act, or claims to be a U.S. citizen, the immigration officer shall attempt to verify the alien's claim. Such verification shall include a check of all available Service data systems and any other means available to the officer. An alien whose claim to lawful permanent resident, refugee, asylee status, or U.S. citizen status cannot be verified will be advised of the penalties for perjury, and will be placed under oath or allowed to make a declaration as permitted under 28 U.S.C. 1746, concerning his or her lawful admission for permanent residence, admission as a refugee under section 207 of the Act, grant of asylum status under section 208 of the Act, or claim to U.S. citizenship. A written statement shall be taken from the alien in the alien's own language and handwriting, stating that he or she declares, certifies, verifies, or states that the claim is true and correct. The immigration officer shall issue an expedited order of removal under section 235(b)(1)(A)(i) of the Act and refer the alien to the immigration judge for review of the order in accordance with paragraph (b)(5)(iv) of this section and §235.6(a)(2)(ii). The person shall be detained pending review of the expedited removal order under this section. Parole of such person, in accordance with section 212(d)(5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

(ii) Verified lawful permanent residents. If the claim to lawful permanent resident status is verified, and such status has not been terminated in exclusion, deportation, or removal proceedings, the examining immigration officer shall not order the alien removed pursuant to section 235(b)(1) of the Act. The examining immigration officer will determine in accordance with section 101(a)(13)(C) of the Act whether the alien is considered to be making an application for admission. If the alien is determined to be seeking admission and the alien is otherwise admissible, except that he or she is not in possession of the required documentation, a discretionary waiver of documentary requirements may be considered in accordance with section 211(b) of the Act and §211.1(b)(3) of this chapter or the alien's inspection may be deferred to an onward office for presentation of the required documents. If the alien appears to be inadmissible, the immigration officer may initiate removal proceedings against the alien under section 240 of the Act.

(iii) Verified refugees and asylees. If a check of Service records or other means indicates that the alien has been granted refugee status or asylee status, and such status has not been terminated in deportation, exclusion, or removal proceedings, the

immigration officer shall not order the alien removed pursuant to section 235(b)(1) of the Act.  **\*10357** If the alien is not in possession of a valid, unexpired refugee travel document, the examining immigration officer may accept an application for a refugee travel document in accordance with §223.2(b)(2)(ii) of this chapter. If accepted, the immigration officer shall readmit the refugee or asylee in accordance with §223.3(d)(2)(i) of this chapter. If the alien is determined not to be eligible to file an application for a refugee travel document the immigration officer may initiate removal proceedings against the alien under section 240 of the Act.

(iv) Review of order for claimed lawful permanent residents, refugees, asylees, or U.S. citizens. A person whose claim to U.S. citizenship has been verified may not be ordered removed. When an alien whose status has not been verified but who is claiming under oath or under penalty of perjury to be a lawful permanent resident, refugee, asylee, or U.S. citizen is ordered removed pursuant to section 235(b)(1) of the Act, the case will be referred to an immigration judge for review of the expedited removal order under section 235(b)(1)(C) of the Act and §235.6(a)(2)(ii). If the immigration judge determines that the alien has never been admitted as a lawful permanent resident or as a refugee, granted asylum status, or is not a U.S. citizen, the order issued by the immigration officer will be affirmed and the Service will remove the alien. There is no appeal from the decision of the immigration judge. If the immigration judge determines that the alien was once so admitted as a lawful permanent resident or as a refugee, or was granted asylum status, or is a U.S. citizen, and such status has not been terminated by final administrative action, the immigration judge will terminate proceedings and vacate the expedited removal order. The Service may initiate removal proceedings against such an alien, but not against a person determined to be a U.S. citizen, in proceedings under section 240 of the Act. During removal proceedings, the immigration judge may consider any waivers, exceptions, or requests for relief for which the alien is eligible.

(6) Opportunity for alien to establish that he or she was admitted or paroled into the United States. If the Commissioner determines that the expedited removal provisions of section 235(b)(1) of the Act shall apply to any or all aliens described in paragraph (b)(2)(ii) of this section, such alien will be given a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she was admitted or paroled into the United States following inspection at a port-of-entry. The alien will be allowed to present evidence or provide sufficient information to support the claim. Such evidence may consist of documentation in the possession of the alien, the Service, or a third party. The examining immigration officer will consider all such evidence and information, make further inquiry if necessary, and will attempt to verify the alien's status through a check of all available Service data systems. The burden rests with the alien to satisfy the examining immigration officer of the claim of lawful admission or parole. If the alien establishes that he or she was lawfully admitted or paroled, the case will be examined to determine if grounds of deportability under section 237(a) of the Act are applicable, or if paroled, whether such parole has been, or should be, terminated, and whether the alien is inadmissible under section 212(a) of the Act. An alien who cannot satisfy the examining officer that he or she was lawfully admitted or paroled will be ordered removed pursuant to section 235(b)(1) of the Act.

(7) Review of expedited removal orders. Any removal order entered by an examining immigration officer pursuant to section 235(b)(1) of the Act must be reviewed and approved by the appropriate supervisor before the order is considered final. Such supervisory review shall not be delegated below the level of the second line supervisor, or a person acting in that capacity. The supervisory review shall include a review of the sworn statement and any answers and statements made by the alien regarding a fear of removal or return. The supervisory review and approval of an expedited removal order for an alien described in section 235(b)(1)(A)(iii) of the Act must include a review of any claim of lawful admission or parole and any evidence or information presented to support such a claim, prior to approval of the order. In such cases, the supervisor may request additional information from any source and may require further interview of the alien.

(8) Removal procedures relating to expedited removal. An alien ordered removed pursuant to section 235(b)(1) of the Act shall be removed from the United States in accordance with section 241(c) of the Act and 8 CFR part 241.

(9) Waivers of documentary requirements. Nothing in this section limits the discretionary authority of the Attorney General, including authority under sections 211(b) or 212(d) of the Act, to waive the documentary requirements for arriving aliens.

(10) Applicant for admission under section 217 of the Act. The provisions of §235.3(b) do not apply to an applicant for admission under section 217 of the Act.

(c) Arriving aliens placed in proceedings under section 240 of the Act. Except as otherwise provided in this chapter, any arriving alien who appears to the inspecting officer to be inadmissible, and who is placed in removal proceedings pursuant to section 240 of the Act shall be detained in accordance with section 235(b) of the Act. Parole of such alien shall only be considered in accordance with §212.5(a) of this chapter. This paragraph shall also apply to any alien who arrived before April 1, 1997, and who was placed in exclusion proceedings.

(d) Service custody. The Service will assume custody of any alien subject to detention under paragraph (b) or (c) of this section. In its discretion, the Service may require any alien who appears inadmissible and who arrives at a land border port-of-entry from Canada or Mexico, to remain in that country while awaiting a removal hearing. Such alien shall be considered detained for a proceeding within the meaning of section 235(b) of the Act and may be ordered removed in absentia by an immigration judge if the alien fails to appear for the hearing.

(e) Detention in non-Service facility. Whenever an alien is taken into Service custody and detained at a facility other than at a Service Processing Center, the public or private entities contracted to perform such service shall have been approved for such use by the Service's Jail Inspection Program or shall be performing such service under contract in compliance with the Standard Statement of Work for Contract Detention Facilities. Both programs are administered by the Detention and Deportation section having jurisdiction over the alien's place of detention. Under no circumstances shall an alien be detained in facilities not meeting the four mandatory criteria for usage. These are:

(1) 24-Hour supervision,

(2) Conformance with safety and emergency codes,

(3) Food service, and

(4) Availability of emergency medical care.

(f) Privilege of communication. The mandatory notification requirements of consular and diplomatic officers pursuant to §236.1(e) of this chapter apply when an inadmissible alien is detained for removal proceedings, including for purpose of conducting the credible fear determination.  *10358

 8 CFR § 235.4

89. Section 235.4 is revised to read as follows:

 8 CFR § 235.4

## §235.4 Withdrawal of application for admission.

(a) The Attorney General may, in his or her discretion, permit any alien applicant for admission to withdraw his or her application for admission in lieu of removal proceedings under section 240 of the Act or expedited removal under section 235(b)(1) of the Act. The alien's decision to withdraw his or her application for admission must be made voluntarily, but nothing in this section shall be construed as to give an alien the right to withdraw his or her application for admission. Permission to withdraw an application for admission should not normally be granted unless the alien intends and is able to depart the United States immediately. An alien permitted to withdraw his or her application for admission shall normally remain in carrier or Service custody pending departure, unless the district director determines that parole of the alien is warranted in accordance with §212.5(a) of this chapter.

(b) An immigration judge may allow only an arriving alien to withdraw an application for admission. Once the issue of inadmissibility has been resolved, permission to withdraw an application for admission should ordinarily be granted only with

the concurrence of the Service. An immigration judge shall not allow an alien to withdraw an application for admission unless the alien, in addition to demonstrating that he or she possesses both the intent and the means to depart immediately from the United States, establishes that factors directly relating to the issue of inadmissibility indicate that the granting of the withdrawal would be in the interest of justice. During the pendency of an appeal from the order of removal, permission to withdraw an application for admission must be obtained from the immigration judge or the Board.

8 CFR § 235.5

90. Section 235.5 is revised to read as follows:

8 CFR § 235.5

### §235.5 Preinspection.

(a) In United States territories and possessions. In the case of any aircraft proceeding from Guam, Puerto Rico, or the United States Virgin Islands destined directly and without touching at a foreign port or place, to any other of such places, or to one of the States of the United States or the District of Columbia, the examination of the passengers and crew required by the Act may be made prior to the departure of the aircraft, and in such event, final determination of admissibility shall be made immediately prior to such departure. The examination shall be conducted in accordance with sections 232, 235, and 240 of the Act and 8 CFR parts 235 and 240. If it appears to the examining immigration officer that any person in the United States being examined under this section is prima facie removable from the United States, further action with respect to his or her examination shall be deferred and further proceedings regarding removability conducted as provided in section 240 of the Act and 8 CFR part 240. When the foregoing inspection procedure is applied to any aircraft, persons examined and found admissible shall be placed aboard the aircraft, or kept at the airport separate and apart from the general public until they are permitted to board the aircraft. No other person shall be permitted to depart on such aircraft until and unless he or she is found to be admissible as provided in this section.

(b) In foreign territory. In the case of any aircraft, vessel, or train proceeding directly, without stopping, from a port or place in foreign territory to a port-of-entry in the United States, the examination and inspection of passengers and crew required by the Act and final determination of admissibility may be made immediately prior to such departure at the port or place in the foreign territory and shall have the same effect under the Act as though made at the destined port-of-entry in the United States.

8 CFR § 235.6

91. Section 235.6 is revised to read as follows:

8 CFR § 235.6

### §235.6 Referral to immigration judge.

(a) Notice. (1) Referral by Form I-862, Notice to Appear. An immigration officer or asylum officer will sign and deliver a Form I-862 to an alien in the following cases:

(i) If, in accordance with the provisions of section 235(b)(2)(A) of the Act, the examining immigration officer detains an alien for a proceeding before an immigration judge under section 240 of the Act; or

(ii) If, in accordance with section 235(b)(1)(B)(ii) of the Act, an asylum officer determines that an alien in expedited removal proceedings has a credible fear of persecution and refers the case to the immigration judge for consideration of the application for asylum.

(iii) If, in accordance with section 235(b)(1)(B)(iii)(III) of the Act, the immigration judge determines that an alien in expedited removal proceedings has a credible fear of persecution and vacates the expedited removal order issued by the asylum officer pursuant to section 235(b)(1)(B)(iii) of the Act.

(iv) If an immigration officer verifies that an alien subject to expedited removal under section 235(b)(1) of the Act has been admitted as a lawful permanent resident refugee, or asylee, or upon review pursuant to § 235.3(b)(5)(iv) an immigration judge determines that the alien was once so admitted, provided that such status has not been terminated by final administrative action, and the Service initiates removal proceedings against the alien under section 240 of the Act.

(2) Referral by Form I-863, Notice of Referral to Immigration Judge. An immigration officer will sign and deliver a Form I-863 to an alien in the following cases:

(i) If, in accordance with section 235(b)(1)(B)(iii)(III) of the Act, an asylum officer determines that an alien does not have a credible fear of persecution, and the alien requests a review of that determination by an immigration judge; or

(ii) If, in accordance with section 235(b)(1)(C) of the Act, an immigration officer refers an expedited removal order entered on an alien claiming to be a lawful permanent resident, refugee, asylee, or U.S. citizen for whom the officer could not verify such status to an immigration judge for review of the order.

(iii) If an immigration officer refers an applicant described in §208.2(b)(1) of this chapter to an immigration judge for an asylum hearing under § 208.2(b)(2) of this chapter.

(b) Certification for mental condition; medical appeal. An alien certified under sections 212(a)(1) and 232(b) of the Act shall be advised by the examining immigration officer that he or she may appeal to a board of medical examiners of the United States Public Health Service pursuant to section 232 of the Act. If such appeal is taken, the district director shall arrange for the convening of the medical board.

 8 CFR § 235.7

## §235.7 [Removed]
8 CFR § 235.7
92. Section 235.7 is removed.

 8 CFR § 235.13

## §235.13 [Redesignated as §235.7]
8 CFR § 235.13 8 CFR § 235.7
93. Section 235.13 is redesignated as §235.7.

 8 CFR § 235.8
94. Section 235.8 is revised to read as follows:

 8 CFR § 235.8

## §235.8 Inadmissibility on security and related grounds.
(a) Report. When an immigration officer or an immigration judge suspects that an arriving alien appears to be inadmissible under section 212(a)(3)(A) (other than clause (ii)), (B), or (C) of the  **10359**  Act, the immigration officer or immigration judge shall order the alien removed and report the action promptly to the district director who has administrative jurisdiction over the place where the alien has arrived or where the hearing is being held. The immigration officer shall, if possible, take a brief sworn question-and-answer statement from the alien, and the alien shall be notified by personal service of Form I-147, Notice of Temporary Inadmissibility, of the action taken and the right to submit a written statement and additional information for consideration by the Attorney General. The district director shall forward the report to the regional director for further action as provided in paragraph (b) of this section.

(b) Action by regional director. (1) In accordance with section 235(c)(2)(B) of the Act, the regional director may deny any further inquiry or hearing by an immigration judge and order the alien removed by personal service of Form I-148, Notice of Permanent Inadmissibility, or issue any other order disposing of the case that the regional director considers appropriate.

(2) If the regional director concludes that the case does not meet the criteria contained in section 235(c)(2)(B) of the Act, the regional director may direct that:

(i) An immigration officer shall conduct a further examination of the alien, concerning the alien's admissibility; or,

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(ii) The alien's case be referred to an immigration judge for a hearing, or for the continuation of any prior hearing.

(3) The regional director's decision shall be in writing and shall be signed by the regional director. Unless the written decision contains confidential information, the disclosure of which would be prejudicial to the public interest, safety, or security of the United States, the written decision shall be served on the alien. If the written decision contains such confidential information, the alien shall be served with a separate written order showing the disposition of the case, but with the confidential information deleted.

(c) Finality of decision. The regional director's decision under this section is final when it is served upon the alien in accordance with paragraph (b)(3) of this section. There is no administrative appeal from the regional director's decision.

(d) Hearing by immigration judge. If the regional director directs that an alien subject to removal under this section be given a hearing or further hearing before an immigration judge, the hearing and all further proceedings in the matter shall be conducted in accordance with the provisions of section 240 of the Act and other applicable sections of the Act to the same extent as though the alien had been referred to an immigration judge by the examining immigration officer. In a case where the immigration judge ordered the alien removed pursuant to paragraph (a) of this section, the Service shall refer the case back to the immigration judge and proceedings shall be automatically reopened upon receipt of the notice of referral. If confidential information, not previously considered in the matter, is presented supporting the inadmissibility of the alien under section 212(a)(3)(A) (other than clause (ii)), (B) or (C) of the Act, the disclosure of which, in the discretion of the immigration judge, may be prejudicial to the public interest, safety, or security, the immigration judge may again order the alien removed under the authority of section 235(c) of the Act and further action shall be taken as provided in this section.

(e) Nonapplicability. The provisions of this section shall apply only to arriving aliens, as defined in §1.1(q) of this chapter. Aliens present in the United States who have not been admitted or paroled may be subject to proceedings under Title V of the Act.
 8 CFR § 235.9

**§235.9 [Removed]**
8 CFR § 235.9
95. Section 235.9 is removed.
 8 CFR § 235.12

**§235.12 [Redesignated as §235.9 and revised]**
8 CFR § 235.12  8 CFR § 235.9
96. Section 235.12 is redesignated as §235.9 and is revised to read as follows:
 8 CFR § 235.9

**§235.9 Northern Marianas identification card.**
During the two-year period that ended July 1, 1990, the Service issued Northern Marianas Identification Cards to aliens who acquired United States citizenship when the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States entered into force on November 3, 1986. These cards remain valid as evidence of United States citizenship. Although the Service no longer issues these cards, a United States citizen to whom a card was issued may file Form I-777, Application for Issuance or Replacement of Northern Marianas Card, to obtain replacement of a lost, stolen, or mutilated Northern Marianas Identification Card.
 8 CFR § 235.10
97. Section 235.10 is revised to read as follows:
 8 CFR § 235.10

**§235.10 U.S. Citizen Identification Card.**

(a) General. Form I-197, U.S. Citizen Identification Card, is no longer issued by the Service but valid existing cards will continue to be acceptable documentation of U.S. citizenship. Possession of the identification card is not mandatory for any purpose. A U.S. Citizen Identification Card remains the property of the United States. Because the identification card is no longer issued, there are no provisions for replacement cards.

(b) Surrender and voidance. (1) Institution of proceeding under section 240 or 342 of the Act. A U.S. Citizen Identification Card must be surrendered provisionally to a Service office upon notification by the district director that a proceeding under section 240 or 342 of the Act is being instituted against the person to whom the card was issued. The card shall be returned to the person if the final order in the proceeding does not result in voiding the card under this paragraph. A U.S. Citizen Identification Card is automatically void if the person to whom it was issued is determined to be an alien in a proceeding conducted under section 240 of the Act, or if a certificate, document, or record relating to that person is canceled under section 342 of the Act.

(2) Investigation of validity of identification card. A U.S. Citizen Identification Card must be surrendered provisionally upon notification by a district director that the validity of the card is being investigated. The card shall be returned to the person who surrendered it if the investigation does not result in a determination adverse to his or her claim to be a United States citizen. When an investigation results in a tentative determination adverse to the applicant's claim to be a United States citizen, the applicant shall be notified by certified mail directed to his or her last known address. The notification shall inform the applicant of the basis for the determination and of the intention of the district director to declare the card void unless within 30 days the applicant objects and demands an opportunity to see and rebut the adverse evidence. Any rebuttal, explanation, or evidence presented by the applicant must be included in the record of proceeding. The determination whether the applicant is a United States citizen must be based on the entire record and the applicant shall be notified of the determination. If it is determined that the applicant is not a United States citizen, the applicant shall be notified of the reasons, and the card deemed void. There is no appeal from the district director's decision.

(3) Admission of alienage. A U.S. Citizen Identification Card is void if the person to whom it was issued admits in a statement signed before an  *10360  immigration officer that he or she is an alien and consents to the voidance of the card. Upon signing the statement the card must be surrendered to the immigration officer.

(4) Surrender of void card. A void U.S. Citizen Identification Card which has not been returned to the Service must be surrendered without delay to an immigration officer or to the issuing office of the Service.

(c) U.S. Citizen Identification Card previously issued on Form I-179. A valid Form I-179, U.S. Citizen Identification Card, continues to be valid subject to the provisions of this section.
 8 CFR § 235.11
98. Section 235.11 is revised to read as follows:
 8 CFR § 235.11

§235.11 Admission of conditional permanent residents.
(a) General. (1) Conditional residence based on family relationship. An alien seeking admission to the United States with an immigrant visa as the spouse or son or daughter of a United States citizen or lawful permanent resident shall be examined to determine whether the conditions of section 216 of the Act apply. If so, the alien shall be admitted conditionally for a period of 2 years. At the time of admission, the alien shall be notified that the alien and his or her petitioning spouse must file a Form I-751, Petition to Remove the Conditions on Residence, within the 90-day period immediately preceding the second anniversary of the alien's admission for permanent residence.

(2) Conditional residence based on entrepreneurship. An alien seeking admission to the United States with an immigrant visa as an alien entrepreneur (as defined in section 216A(f)(1) of the Act) or the spouse or unmarried minor child of an alien entrepreneur shall be admitted conditionally for a period of 2 years. At the time of admission, the alien shall be notified that the principal alien (entrepreneur) must file a Form I-829, Petition by Entrepreneur to Remove Conditions, within the 90-day period immediately preceding the second anniversary of the alien's admission for permanent residence.

(b) Correction of endorsement on immigrant visa. If the alien is subject to the provisions of section 216 of the Act, but the classification endorsed on the immigrant visa does not so indicate, the endorsement shall be corrected and the alien shall be admitted as a lawful permanent resident on a conditional basis, if otherwise admissible. Conversely, if the alien is not subject to the provisions of section 216 of the Act, but the visa classification endorsed on the immigrant visa indicates that the alien is subject thereto (e.g., if the second anniversary of the marriage upon which the immigrant visa is based occurred after the issuance of the visa and prior to the alien's application for admission) the endorsement on the visa shall be corrected and the alien shall be admitted as a lawful permanent resident without conditions, if otherwise admissible.

(c) Expired conditional permanent resident status. The lawful permanent resident alien status of a conditional resident automatically terminates if the conditional basis of such status is not removed by the Service through approval of a Form I-751, Petition to Remove the Conditions on Residence or, in the case of an alien entrepreneur (as defined in section 216A(f)(1) of the Act), Form I-829, Petition by Entrepreneur to Remove Conditions. Therefore, an alien who is seeking admission as a returning resident subsequent to the second anniversary of the date on which conditional residence was obtained (except as provided in §211.1(b)(1) of this chapter) and whose conditional basis of such residence has not been removed pursuant to section 216(c) or 216A(c) of the Act, whichever is applicable, shall be placed under removal proceedings. However, in a case where conditional residence was based on a marriage, removal proceedings may be terminated and the alien may be admitted as a returning resident if the required Form I-751 is filed jointly, or by the alien alone (if appropriate), and approved by the Service. In the case of an alien entrepreneur, removal proceedings may be terminated and the alien admitted as a returning resident if the required Form I-829 is filed by the alien entrepreneur and approved by the Service.

99. Part 236 is revised to read as follows:

## PART 236—APPREHENSION AND DETENTION OF INADMISSIBLE AND DEPORTABLE ALIENS; REMOVAL OF ALIENS ORDERED REMOVED

### Subpart A—Detention of Aliens Prior to Order of Removal

Sec.

236.1 Apprehension, custody, and detention.

236.2 Confined aliens, incompetents, and minors.

236.3 Detention and release of juveniles.

236.4 Removal of S-5, S-6, and S-7 nonimmigrants.

236.5 Fingerprints and photographs.

236.6-236.9 Reserved.

### Subpart B—Family Unity Program

236.10 Description of program.

236.11 Definitions.

236.12 Eligibility.

236.13 Ineligible aliens.

236.14 Filing.

236.15 Voluntary departure and eligibility for employment.

236.16 Travel outside the United States.

236.17 Eligibility for Federal financial assistance programs.

236.18 Termination of Family Unity Program benefits.
Authority: 8 U.S.C. 1103, 1182, 1224, 1225, 1226, 1227, 1362; 8 CFR part 2.

**Subpart A—Detention of Aliens Prior to Order of Removal**
8 CFR § 236.1

**§236.1 Apprehension, custody, and detention.**
(a) Detainers. The issuance of a detainer under this section shall be governed by the provisions of §287.7 of this chapter.

(b) Warrant of arrest. (1) In general. At the time of issuance of the notice to appear, or at any time thereafter and up to the time removal proceedings are completed, the respondent may be arrested and taken into custody under the authority of Form I-200, Warrant of Arrest. A warrant of arrest may be issued only by those immigration officers listed in §287.5(e)(2) of this chapter and may be served only by those immigration officers listed in §287.5(e)(3) of this chapter.

(2) If, after the issuance of a warrant of arrest, a determination is made not to serve it, any officer authorized to issue such warrant may authorize its cancellation.

(c) Custody issues and release procedures. (1) After the expiration of the Transition Period Custody Rules under Public Law 104-208, no alien described in section 236(c)(1) of the Act shall be released from custody during removal proceedings except pursuant to section 236(c)(2) of the Act.

(2) Any officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.

(3) When an alien who, having been arrested and taken into custody, has been released, such release may be revoked at any time in the discretion of the district director, acting district director, deputy district director, assistant district director for investigations, assistant district director for detention and deportation, or officer in charge (except foreign), in which event the alien may be taken into physical custody and detained. If  **\*10361**  detained, unless a breach has occurred, any outstanding bond shall be revoked and canceled.

(4) The provisions of §103.6 of this chapter shall apply to any bonds authorized. Subject to the provisions of this section, the provisions of §3.19 of this chapter shall govern availability to the respondent of recourse to other administrative authority for release from custody.

(5) An immigration judge may not exercise authority provided in this section and the review process described in paragraph (d) of this section shall not apply with respect to:

(i) Arriving aliens, as described in §1.1(q) of this chapter, including aliens paroled pursuant to section 212(d)(5) of the Act, in removal proceedings,

(ii) Aliens described in section 237(a)(4) of the Act, or

(iii) After the expiration of section 303(b)(3) of Public Law 104-208, aliens described in section 236(c)(1) of the Act.

(d) Appeals from custody decisions. (1) Application to immigration judge. After an initial custody determination by the district director, including the setting of a bond, the respondent may, at any time before an order under 8 CFR part 240 becomes final, request amelioration of the conditions under which he or she may be released. Prior to such final order, and except as otherwise provided in this chapter, the immigration judge is authorized to exercise the authority in section 236 of the Act to detain the alien in custody, release the alien, and determine the amount of bond, if any, under which the respondent may be released, as provided in §3.19 of this chapter. If the alien has been released from custody, an application for amelioration of the terms of release must be filed within 7 days of release. Once a removal order becomes administratively final, determinations regarding custody and bond are made by the district director.

(2) Application to the district director. (i) After expiration of the 7-day period in paragraph (d)(1) of this section, the respondent may request review by the district director of the conditions of his or her release.

(ii) After an order becomes administratively final, the respondent may request review by the district director of the conditions of his or her release.

(3) Appeal to the Board of Immigration Appeals. An appeal relating to bond and custody determinations may be filed to the Board of Immigration Appeals in the following circumstances:

(i) In accordance with §3.38 of this chapter, the alien or the Service may appeal the decision of an immigration judge pursuant to paragraph (d)(1) of this section.

(ii) The alien, within 10 days, may appeal from the district director's decision under paragraph (d)(2)(i) of this section.

(iii) The alien, within 10 days, may appeal from the district director's decision under paragraph (d)(2)(ii) of this section, except that no appeal shall be allowed when the Service notifies the alien that it is ready to execute an order of removal and takes the alien into custody for that purpose.

(4) Effect of filing an appeal. The filing of an appeal from a determination of an immigration judge or district director under this paragraph shall not operate to delay compliance with the order, nor stay the administrative proceedings or removal.

(e) Privilege of communication. Every detained alien shall be notified that he or she may communicate with the consular or diplomatic officers of the country of his or her nationality in the United States. Existing treaties with the following countries require immediate communication with appropriate consular or diplomatic officers whenever nationals of the following countries are detained in removal proceedings, whether or not requested by the alien and even if the alien requests that no communication be undertaken in his or her behalf. When notifying consular or diplomatic officials, Service officers shall not reveal the fact that any detained alien has applied for asylum or withholding of removal.

Albania[FN1]

Antigua

Armenia

Azerbaijan

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Bahamas

Barbados

Belarus

Belize

Brunei

Bulgaria

China (People's Republic of)[FN2]

Costa Rica

Cyprus

Czech Republic

Dominica

Fiji

Gambia, The

Georgia

Ghana

Grenada

Guyana

Hungary

Jamaica

Kazakhstan

Kiribati

Kuwait

Kyrgyzstan

Malaysia

Malta

Mauritius

Moldova

Mongolia

Nigeria

Philippines

Poland

Romania

Russian Federation

St. Kitts/Nevis

St. Lucia

St. Vincent/Grenadines

Seychelles

Sierra Leone

Singapore

Slovak Republic

South Korea

Tajikistan

Tanzania

Tonga

Trinidad/Tobago

Turkmenistan

Tuvalu

Ukraine

United Kingdom[FN3]

U.S.S.R.[FN4]

Uzbekistan

Zambia

(f) Notification to Executive Office for Immigration Review of change in custody status. The Service shall notify the Immigration Court having administrative control over the Record of Proceeding of any change in custody location or of release from, or subsequent taking into, Service custody of a respondent/applicant pursuant to §3.19(g) of this chapter.

8 CFR § 236.2

§236.2 **Confined aliens, incompetents, and minors.**

(a) Service. If the respondent is confined, or if he or she is an incompetent, or a minor under the age of 14, the notice to appear, and the warrant of arrest, if issued, shall be served in the manner prescribed in §239.1 of this chapter upon the person or persons specified by §103.5a(c) of this chapter.

(b) Service custody and cost of maintenance. An alien confined because of physical or mental disability in an institution or hospital shall not be **\*10362** accepted into physical custody by the Service until an order of removal has been entered and the Service is ready to remove the alien. When such an alien is an inmate of a public or private institution at the time of the commencement of the removal proceedings, expenses for the maintenance of the alien shall not be incurred by the Government until he or she is taken into physical custody by the Service.

8 CFR § 236.3

## §236.3 Detention and release of juveniles.

(a) Juveniles. A juvenile is defined as an alien under the age of 18 years.

(b) Release. Juveniles for whom bond has been posted, for whom parole has been authorized, or who have been ordered released on recognizance, shall be released pursuant to the following guidelines:

(1) Juveniles shall be released, in order of preference, to:

(i) A parent;

(ii) Legal guardian; or

(iii) An adult relative (brother, sister, aunt, uncle, grandparent) who is not presently in Service detention, unless a determination is made that the detention of such juvenile is required to secure his or her timely appearance before the Service or the Immigration Court or to ensure the juvenile's safety or that of others. In cases where the parent, legal guardian, or adult relative resides at a location distant from where the juvenile is detained, he or she may secure release at a Service office located near the parent, legal guardian, or adult relative.

(2) If an individual specified in paragraphs (b)(1)(i) through (iii) of this section cannot be located to accept custody of a juvenile, and the juvenile has identified a parent, legal guardian, or adult relative in Service detention, simultaneous release of the juvenile and the parent, legal guardian, or adult relative shall be evaluated on a discretionary case-by-case basis.

(3) In cases where the parent or legal guardian is in Service detention or outside the United States, the juvenile may be released to such person as is designated by the parent or legal guardian in a sworn affidavit, executed before an immigration officer or consular officer, as capable and willing to care for the juvenile's well-being. Such person must execute an agreement to care for the juvenile and to ensure the juvenile's presence at all future proceedings before the Service or an immigration judge.

(4) In unusual and compelling circumstances and in the discretion of the district director or chief patrol agent, a juvenile may be released to an adult, other than those identified in paragraphs (b)(1)(i) through (iii) of this section, who executes an agreement to care for the juvenile's well-being and to ensure the juvenile's presence at all future proceedings before the Service or an immigration judge.

(c) Juvenile coordinator. The case of a juvenile for whom detention is determined to be necessary should be referred to the "Juvenile Coordinator," whose responsibilities should include, but not be limited to, finding suitable placement of the juvenile in a facility designated for the occupancy of juveniles. These may include juvenile facilities contracted by the Service, state or local juvenile facilities, or other appropriate agencies authorized to accommodate juveniles by the laws of the state or locality.

(d) Detention. In the case of a juvenile for whom detention is determined to be necessary, for such interim period of time as is required to locate suitable placement for the juvenile, whether such placement is under paragraph (b) or (c) of this

section, the juvenile may be temporarily held by Service authorities or placed in any Service detention facility having separate accommodations for juveniles.

(e) Refusal of release. If a parent of a juvenile detained by the Service can be located, and is otherwise suitable to receive custody of the juvenile, and the juvenile indicates a refusal to be released to his or her parent, the parent(s) shall be notified of the juvenile's refusal to be released to the parent(s), and shall be afforded an opportunity to present their views to the district director, chief patrol agent, or immigration judge before a custody determination is made.

(f) Notice to parent of application for relief. If a juvenile seeks release from detention, voluntary departure, parole, or any form of relief from removal, where it appears that the grant of such relief may effectively terminate some interest inherent in the parent-child relationship and/or the juvenile's rights and interests are adverse with those of the parent, and the parent is presently residing in the United States, the parent shall be given notice of the juvenile's application for relief, and shall be afforded an opportunity to present his or her views and assert his or her interest to the district director or immigration judge before a determination is made as to the merits of the request for relief.

(g) Voluntary departure. Each juvenile, apprehended in the immediate vicinity of the border, who resides permanently in Mexico or Canada, shall be informed, prior to presentation of the voluntary departure form or being allowed to withdraw his or her application for admission, that he or she may make a telephone call to a parent, close relative, a friend, or to an organization found on the free legal services list. A juvenile who does not reside in Mexico or Canada who is apprehended shall be provided access to a telephone and must in fact communicate either with a parent, adult relative, friend, or with an organization found on the free legal services list prior to presentation of the voluntary departure form. If such juvenile, of his or her own volition, asks to contact a consular officer, and does in fact make such contact, the requirements of this section are satisfied.

(h) Notice and request for disposition. When a juvenile alien is apprehended, he or she must be given a Form I-770, Notice of Rights and Disposition. If the juvenile is less than 14 years of age or unable to understand the notice, the notice shall be read and explained to the juvenile in a language he or she understands. In the event a juvenile who has requested a hearing pursuant to the notice subsequently decides to accept voluntary departure or is allowed to withdraw his or her application for admission, a new Form I-770 shall be given to, and signed by the juvenile.

8 CFR § 236.4

## §236.4 Removal of S-5, S-6, and S-7 nonimmigrants.

(a) Condition of classification. As a condition of classification and continued stay in classification pursuant to section 101(a)(15)(S) of the Act, nonimmigrants in S classification must have executed Form I-854, Part B, Inter-agency Alien Witness and Informant Record, certifying that they have knowingly waived their right to a removal hearing and right to contest, other than on the basis of an application for withholding of deportation or removal, any removal action, including detention pending deportation or removal, instituted before lawful permanent resident status is obtained.

(b) Determination of deportability. (1) A determination to remove a deportable alien classified pursuant to section 101(a)(15)(S) of the Act shall be made by the district director having jurisdiction over the place where the alien is located.

(2) A determination to remove such a deportable alien shall be based on one or more of the grounds of deportability listed in section 237 of the Act based on conduct committed after, or conduct or a condition not disclosed to the Service prior to, the alien's classification as an S nonimmigrant under section 101(a)(15)(S) of the Act, or for a **\*10363** violation of, or failure to adhere to, the particular terms and conditions of status in S nonimmigrant classification.

(c) Removal procedures. (1) A district director who determines to remove an alien witness or informant in S nonimmigrant classification shall notify the Commissioner, the Assistant Attorney General, Criminal Division, and the relevant law enforcement agency in writing to that effect. The Assistant Attorney General, Criminal Division, shall concur in or object to that decision. Unless the Assistant Attorney General, Criminal Division, objects within 7 days, he or she shall be deemed to have concurred in the decision. In the event of an objection by the Assistant Attorney General, Criminal Division, the matter

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

will be expeditiously referred to the Deputy Attorney General for a final resolution. In no circumstances shall the alien or the relevant law enforcement agency have a right of appeal from any decision to remove.

(2) A district director who has provided notice as set forth in paragraph (c)(1) of this section and who has been advised by the Commissioner that the Assistant Attorney General, Criminal Division, has not objected shall issue a Warrant of Removal. The alien shall immediately be arrested and taken into custody by the district director initiating the removal. An alien classified under the provisions of section 101(a)(15)(S) of the Act who is determined, pursuant to a warrant issued by a district director, to be deportable from the United States shall be removed from the United States to his or her country of nationality or last residence. The agency that requested the alien's presence in the United States shall ensure departure from the United States and so inform the district director in whose jurisdiction the alien has last resided. The district director, if necessary, shall oversee the alien's departure from the United States and, in any event, shall notify the Commissioner of the alien's departure.

(d) Withholding of removal. An alien classified pursuant to section 101(a)(15)(S) of the Act who applies for withholding of removal shall have 10 days from the date the Warrant of Removal is served upon the alien to file an application for such relief with the district director initiating the removal order. The procedures contained in §§208.2 and 208.16 of this chapter shall apply to such an alien who applies for withholding of removal.

(e) Inadmissibility. An alien who applies for admission under the provisions of section 101(a)(15)(S) of the Act who is determined by an immigration officer not to be eligible for admission under that section or to be inadmissible to the United States under one or more of the grounds of inadmissibility listed in section 212 of the Act and which have not been previously waived by the Commissioner will be taken into custody. The district director having jurisdiction over the port-of-entry shall follow the notification procedures specified in paragraph (c)(1) of this section. A district director who has provided such notice and who has been advised by the Commissioner that the Assistant Attorney General, Criminal Division, has not objected shall remove the alien without further hearing. An alien may not contest such removal, other than by applying for withholding of removal.

8 CFR § 236.5

## §236.5 Fingerprints and photographs.

Every alien 14 years of age or older against whom proceedings based on deportability under section 237 of the Act are commenced under this part by service of a notice to appear shall be fingerprinted and photographed. Such fingerprints and photographs shall be made available to Federal, State, and local law enforcement agencies upon request to the district director or chief patrol agent having jurisdiction over the alien's record. Any such alien, regardless of his or her age, shall be photographed and/or fingerprinted if required by any immigration officer authorized to issue a notice to appear. Every alien 14 years of age or older who is found to be inadmissible to the United States and ordered removed by an immigration judge shall be fingerprinted, unless during the preceding year he or she has been fingerprinted at an American consular office.

8 CFR § 236.6

## §§236.6—236.9 [Reserved]

## Subpart B—Family Unity Program

8 CFR § 236.10

## §236.10 Description of program.

The family unity program implements the provisions of section 301 of the Immigration Act of 1990, Public Law 101-649. This Act is referred to in this subpart as "IMMACT 90".

8 CFR § 236.11

## §236.11 Definitions.

In this subpart, the term:

Eligible immigrant means a qualified immigrant who is the spouse or unmarried child of a legalized alien.

Legalized alien means an alien who:

(1) Is a temporary or permanent resident under section 210 or 245A of the Act; or

(2) Is a permanent resident under section 202 of the Immigration Reform and Control Act of 1986 (Cuban/Haitian Adjustment).
 8 CFR § 236.12

§236.12 **Eligibility.**
(a) General. An alien who is not a lawful permanent resident is eligible to apply for benefits under the Family Unity Program if he or she establishes:

(1) That he or she entered the United States before May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), and has been continuously residing in the United States since that date; and

(2) That on May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), he or she was the spouse or unmarried child of a legalized alien, and that he or she has been eligible continuously since that time for family-sponsored second preference immigrant status under section 203(a)(2) of the Act based on the same relationship.

(b) Legalization application pending as of May 5, 1988 or December 1, 1988. An alien whose legalization application was filed on or before May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), but not approved until after that date will be treated as having been a legalized alien as of May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), for purposes of the Family Unity Program.
 8 CFR § 236.13

§236.13 **Ineligible aliens.**
The following categories of aliens are ineligible for benefits under the Family Unity Program:

(a) An alien who is deportable under any paragraph in section 237(a) of the Act, except paragraphs (1)(A), (1)(B), (1)(C), and (3)(A); provided that an alien who is deportable under section 237(a)(1)(A) of such Act is also ineligible for benefits under the Family Unity Program if deportability is based  **\*10364**  upon a ground of inadmissibility described in section 212(a)(2) or (3) of the Act;

(b) An alien who has been convicted of a felony or three or more misdemeanors in the United States; or

(c) An alien described in section 241(b)(3)(B) of the Act.
 8 CFR § 236.14

§236.14 **Filing.**
(a) General. An application for voluntary departure under the Family Unity Program must be filed at the service center having jurisdiction over the alien's place of residence. A Form I-817, Application for Voluntary Departure under the Family Unity Program, must be filed with the correct fee required in §103.7(b)(1) of this chapter and the required supporting documentation. A separate application with appropriate fee and documentation must be filed for each person claiming eligibility.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(b) Decision. The service center director has sole jurisdiction to adjudicate an application for benefits under the Family Unity Program. The director will provide the applicant with specific reasons for any decision to deny an application. Denial of an application may not be appealed. An applicant who believes that the grounds for denial have been overcome may submit another application with the appropriate fee and documentation.

(c) Referral of denied cases for consideration of issuance of notice to appear. If an application is denied, the case will be referred to the district director with jurisdiction over the alien's place of residence for consideration of whether to issue a notice to appear. After an initial denial, an applicant's case will not be referred for issuance of a notice to appear until 90 days from the date of the initial denial, to allow the alien the opportunity to file a new Form I-817 application in order to attempt to overcome the basis of the denial. However, if the applicant is found not to be eligible for benefits under §236.13(b), the Service reserves the right to issue a notice to appear at any time after the initial denial.

 8 CFR § 236.15

### §236.15 Voluntary departure and eligibility for employment.

(a) Authority. Voluntary departure under this section implements the provisions of section 301 of IMMACT 90, and authority to grant voluntary departure under the family unity program derives solely from that section. Voluntary departure under the family unity program shall be governed solely by this section, notwithstanding the provisions of section 240B of the Act and 8 CFR part 240.

(b) Children of legalized aliens. Children of legalized aliens residing in the United States, who were born during an authorized absence from the United States of mothers who are currently residing in the United States under voluntary departure pursuant to the Family Unity Program, may be granted voluntary departure under section 301 of IMMACT 90 for a period of 2 years.

(c) Duration of voluntary departure. An alien whose application for benefits under the Family Unity Program is approved will receive voluntary departure for 2 years, commencing with the date of approval of the application. Voluntary departure under this section shall be considered effective from the date on which the application was properly filed.

(d) Employment authorization. An alien granted benefits under the Family Unity Program is authorized to be employed in the United States and may apply for an employment authorization document on Form I-765, Application for Employment Authorization. The application may be filed concurrently with Form I-817. The application must be accompanied by the correct fee required by § 103.7(b)(1) of this chapter. The validity period of the employment authorization will coincide with the period of voluntary departure.

(e) Extension of voluntary departure. An application for an extension of voluntary departure under the Family Unity Program must be filed by the alien on Form I-817 along with the correct fee required in §103.7(b)(1) of this chapter and the required supporting documentation. The submission of a copy of the previous approval notice will assist in shortening the processing time. An extension may be granted if the alien continues to be eligible for benefits under the Family Unity Program. However, an extension may not be approved if the legalized alien is a lawful permanent resident, and a petition for family-sponsored immigrant status has not been filed in behalf of the applicant. In such case the Service will notify the alien of the reason for the denial and afford him or her the opportunity to file another Form I-817 once the petition, Form I-130, has been filed in behalf of him or her. No charging document will be issued for a period of 90 days.

(f) Supporting documentation for extension application. Supporting documentation need not include documentation provided with the previous application(s). The extension application need only include changes to previous applications and evidence of continuing eligibility since the date of the prior approval.

 8 CFR § 236.16

### §236.16 Travel outside the United States.

An alien granted Family Unity Program benefits who intends to travel outside the United States temporarily must apply for advance authorization using Form I-131, Application for Travel Document. The authority to grant an application for advance

authorization for an alien granted Family Unity Program benefits rests solely with the district director. An alien who is granted advance authorization and returns to the United States in accordance with such authorization, and who is found not to be inadmissible under section 212(a)(2) or (3) of the Act, shall be inspected and admitted in the same immigration status as the alien had at the time of departure, and shall be provided the remainder of the voluntary departure period previously granted under the Family Unity Program.

8 CFR § 236.17

§236.17 **Eligibility for Federal financial assistance programs.**

An alien granted Family Unity Program benefits based on a relationship to a legalized alien as defined in §236.11 is ineligible for public welfare assistance in the same manner and for the same period as the legalized alien who is ineligible for such assistance under section 245A(h) or 210(f) of the Act, respectively.

**§236. 18 Termination of Family Unity Program benefits.**

(a) Grounds for termination. The Service may terminate benefits under the Family Unity Program whenever the necessity for the termination comes to the attention of the Service. Such grounds will exist in situations including, but not limited to, those in which:

(1) A determination is made that Family Unity Program benefits were acquired as the result of fraud or willful misrepresentation of a material fact;

(2) The beneficiary commits an act or acts which render him or her inadmissible as an immigrant or who are ineligible for benefits under the Family Unity Program;

(3) The legalized alien upon whose status benefits under the Family Unity Program were based loses his or her legalized status;

(4) The beneficiary is the subject of a final order of exclusion, deportation, or removal issued subsequent to the grant of Family Unity benefits unless such final order is based on entry without inspection; violation of status; or failure to comply with section 265 of the Act; **\*10365** or inadmissibility at the time of entry other than inadmissibility pursuant to section 212(a)(2) or 212(a)(3) of the Act, regardless of whether the facts giving rise to such ground occurred before or after the benefits were granted; or

(5) A qualifying relationship to a legalized alien no longer exists.

(b) Notice procedure. Notice of intent to terminate and of the grounds thereof shall be served pursuant to the provisions of §103.5a of this chapter. The alien shall be given 30 days to respond to the notice and may submit to the Service additional evidence in rebuttal. Any final decision of termination shall also be served pursuant to the provisions of §103.5a of this chapter. Nothing in this section shall preclude the Service from commencing exclusion or deportation proceedings prior to termination of Family Unity Program benefits.

(c) Effect of termination. Termination of benefits under the Family Unity Program, other than as a result of a final order of removal, shall render the alien amenable to removal proceedings under section 240 of the Act. If benefits are terminated, the period of voluntary departure under this section is also terminated.

**PART 237—[REMOVED AND RESERVED]**

100. Part 237 is removed and reserved.

101. Part 238 is added to read as follows:

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**PART 238—EXPEDITED REMOVAL OF AGGRAVATED FELONS**

Sec.

238.1 Proceedings under section 238(b) of the Act.
Authority: 8 U.S.C. 1228; 8 CFR part 2.
 8 CFR § 238.1

**§238.1 Proceedings under section 238(b) of the Act.**
(a) Definitions. As used in this part:

Deciding Service officer means a district director, chief patrol agent, or another immigration officer designated by a district director or chief patrol agent, who is not the same person as the issuing Service officer.

Issuing Service officer means any Service officer listed in §239.1 of this chapter as authorized to issue notices to appear.

(b) Preliminary consideration and Notice of Intent to Issue a Final Administrative Deportation Order; commencement of proceedings.—(1) Basis of Service charge. An issuing Service officer shall cause to be served upon an alien a Form I-851, Notice of Intent to Issue a Final Administrative Deportation Order (Notice of Intent), if the officer is satisfied that there is sufficient evidence, based upon questioning of the alien by an immigration officer and upon any other evidence obtained, to support a finding that the individual:

(i) Is an alien;

(ii) Has not been lawfully admitted for permanent residence, or has conditional permanent resident status under section 216 of the Act;

(iii) Has been convicted (as defined in section 101(a)(48) of the Act and as demonstrated by any of the documents or records listed in §3.41 of this chapter) of an aggravated felony and such conviction has become final; and

(iv) Is deportable under section 237(a)(2)(A)(iii) of the Act, including an alien who has neither been admitted nor paroled, but who is conclusively presumed deportable under section 237(a)(2)(A)(iii) by operation of section 238(c) of the Act ("Presumption of Deportability").

(2) Notice. (i) Removal proceedings under section 238(b) of the Act shall commence upon personal service of the Notice of Intent upon the alien, as prescribed by §§103.5a(a)(2) and 103.5a(c)(2) of this chapter. The Notice of Intent shall set forth the preliminary determinations and inform the alien of the Service's intention to issue a Form I-851A, Final Administrative Removal Order, without a hearing before an immigration judge. This Notice shall constitute the charging document. The Notice of Intent shall include allegations of fact and conclusions of law. It shall advise that the alien: has the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing, as long as counsel is authorized to practice in deportation proceedings; may inspect the evidence supporting the Notice of Intent; and may rebut the charges within 10 calendar days after service of such Notice (or 13 calendar days if service of the Notice was by mail).

(ii) The Notice of Intent also shall advise the alien that he or she may designate in writing, within the rebuttal period, the country to which he or she chooses to be deported in accordance with section 241 of the Act, in the event that a Final Administrative Removal Order is issued, and that the Service will honor such designation only to the extent permitted under the terms, limitations, and conditions of section 241 of the Act.

(iii) The Service must determine that the person served with the Notice of Intent is the person named on the notice.

(iv) The Service shall provide the alien with a list of available free legal services programs qualified under 8 CFR part 3 and organizations recognized pursuant to 8 CFR part 292, located within the district or sector where the Notice of Intent is issued.

(v) The Service must either provide the alien with a written translation of the Notice of Intent or explain the contents of the Notice of Intent to the alien in the alien's native language or in a language that the alien understands.

(c) Alien's response. (1) Time for response. The alien will have 10 calendar days from service of the Notice of Intent, or 13 calendar days if service is by mail, to file a response to the Notice of Intent. In the response, the alien may: designate his or her choice of country for removal; submit a written response rebutting the allegations supporting the charge and/or requesting the opportunity to review the Government's evidence; and/or request in writing an extension of time for response, stating the specific reasons why such an extension is necessary. Alternatively, the alien may, in writing, choose to accept immediate issuance of a Final Administrative Removal Order. The deciding Service officer may extend the time for response for good cause shown. A request for extension of time for response will not automatically extend the period for the response. The alien will be permitted to file a response outside the prescribed period only if the deciding Service officer permits it. The alien must send the response to the deciding Service officer at the address provided in the Notice of Intent.

(2) Nature of rebuttal or request to review evidence. (i) If an alien chooses to rebut the allegations contained in the Notice of Intent, the alien's written response must indicate which finding(s) are being challenged and should be accompanied by affidavit(s), documentary information, or other specific evidence supporting the challenge.

(ii) If an alien's written response requests the opportunity to review the Government's evidence, the Service shall serve the alien with a copy of the evidence in the record of proceeding upon which the Service is relying to support the charge. The alien may, within 10 calendar days following service of the Government's evidence (13 calendar days if service is by mail), furnish a final response in accordance with paragraph (c)(1) of this section. If the alien's final response is a rebuttal of the allegations, such a final response should be accompanied by affidavit(s), documentary information, or other **\*10366** specific evidence supporting the challenge.

(d) Determination by deciding Service officer. (1) No response submitted or concession of deportability. If the deciding Service officer does not receive a timely response and the evidence in the record of proceeding establishes deportability by clear, convincing, and unequivocal evidence, or if the alien concedes deportability, then the deciding Service officer shall issue and cause to be served upon the alien a Final Administrative Removal Order that states the reasons for the deportation decision. The alien may, in writing, waive the 14-day waiting period before execution of the final order of removal provided in a paragraph (f) of this section.

(2) Response submitted. (i) Insufficient rebuttal; no genuine issue of material fact. If the alien timely submits a rebuttal to the allegations, but the deciding Service officer finds that deportability is established by clear, convincing, and unequivocal evidence in the record of proceeding, the deciding Service officer shall issue and cause to be served upon the alien a Final Administrative Removal Order that states the reasons for the decision of deportability.

(ii) Additional evidence required. (A) If the deciding Service officer finds that the record of proceeding, including the alien's timely rebuttal, raises a genuine issue of material fact regarding the preliminary findings, the deciding Service officer may either obtain additional evidence from any source, including the alien, or cause to be issued a notice to appear to initiate removal proceedings under section 240 of the Act. The deciding Service officer may also obtain additional evidence from any source, including the alien, if the deciding Service officer deems that such additional evidence may aid the officer in the rendering of a decision.

(B) If the deciding Service officer considers additional evidence from a source other than the alien, that evidence shall be made a part of the record of proceeding, and shall be provided to the alien. If the alien elects to submit a response to such

additional evidence, such response must be filed with the Service within 10 calendar days of service of the additional evidence (or 13 calendar days if service is by mail). If the deciding Service officer finds, after considering all additional evidence, that deportability is established by clear, convincing, and unequivocal evidence in the record of proceeding, the deciding Service officer shall issue and cause to be served upon the alien a Final Administrative Removal Order that states the reasons for the decision of deportability.

(iii) Conversion to proceedings under section 240 of the Act. If the deciding Service officer finds that the alien is not amenable to removal under section 238 of the Act, the deciding Service officer shall terminate the expedited proceedings under section 238 of the Act and shall, where appropriate, cause to be issued a notice to appear for the purpose of initiating removal proceedings before an immigration judge under section 240 of the Act.

(3) Termination of proceedings by deciding Service officer. Only the deciding Service officer may terminate proceedings under section 238 of the Act, in accordance with this section.

(e) Proceedings commenced under section 240 of the Act. In any proceeding commenced under section 240 of the Act which is based on deportability under section 237 of the Act, if it appears that the respondent alien is subject to removal pursuant to section 238 of the Act, the immigration judge may, upon the Service's request, terminate the case and, upon such termination, the Service may commence administrative proceedings under section 238 of the Act. However, in the absence of any such request, the immigration judge shall complete the proceeding commenced under section 240 of the Act.

(f) Executing final removal order of deciding Service officer. (1) Time of execution. Upon the issuance of a Final Administrative Removal Order, the Service shall issue a Warrant of Removal in accordance with §241.2 of this chapter; such warrant shall be executed no sooner than 14 calendar days after the date the Final Administrative Removal Order is issued, unless the alien knowingly, voluntarily, and in writing waives the 14-day period.

(2) Country to which alien is to be removed. The deciding Service officer shall designate the country of removal in the manner prescribed by section 241 of the Act.

(g) Arrest and detention. At the time of issuance of a Notice of Intent or at any time thereafter and up to the time the alien becomes the subject of a Warrant of Removal, the alien may be arrested and taken into custody under the authority of a Warrant of Arrest issued by an officer listed in §287.5(e)(2) of this chapter. The decision of the Service concerning custody or bond shall not be administratively appealable during proceedings initiated under section 238 of the Act and this part.

(h) Record of proceeding. The Service shall maintain a record of proceeding for judicial review of the Final Administrative Removal Order sought by any petition for review. The record of proceeding shall include, but not necessarily be limited to: the charging document (Notice of Intent); the Final Administrative Removal Order (including any supplemental memorandum of decision); the alien's response, if any; all evidence in support of the charge; and any admissible evidence, briefs, or documents submitted by either party respecting deportability. The executed duplicate of the Notice of Intent in the record of proceedings shall be retained as evidence that the individual upon whom the notice for the proceeding was served was, in fact, the alien named in the notice.

102. Part 239 is added to read as follows:

## PART 239—INITIATION OF REMOVAL PROCEEDINGS

Sec.

239.1 Notice to appear.

239.2 Cancellation of notice to appear.

239.3 Effect of filing notice to appear.
Authority: 8 U.S.C. 1103, 1221, 1229; 8 CFR part 2.
 8 CFR § 239.1

## §239.1 Notice to appear.

(a) Commencement. Every removal proceeding conducted under section 240 of the Act to determine the deportability or inadmissibility of an alien is commenced by the filing of a notice to appear with the Immigration Court. Any immigration officer performing an inspection of an arriving alien at a port-of-entry may issue a notice to appear to such an alien. In addition, the following officers, or officers acting in such capacity, may issue a notice to appear:

(1) District directors (except foreign);

(2) Deputy district directors (except foreign);

(3) Assistant district directors for investigations;

(4) Deputy assistant district directors for investigations;

(5) Assistant district directors for deportation;

(6) Deputy assistant district directors for deportation;

(7) Assistant district directors for examinations;

(8) Deputy assistant district directors for examinations;

(9) Officers in charge (except foreign);

(10) Assistant officers in charge (except foreign);

(11) Chief patrol agents;

(12) Deputy chief patrol agents;

(13) Associate chief patrol agents;  **\*10367**

(14) Assistant chief patrol agents;

(15) Patrol agents in charge;

(16) The Assistant Commissioner, Investigations;

(17) Service center directors;

(18) Deputy center directors;

(19) Assistant center directors for examinations;

(20) Supervisory asylum officers;

(21) Institutional Hearing Program directors; or

(22) Deputy Institutional Hearing Program directors.

(b) Service of notice to appear. Service of the notice to appear shall be in accordance with section 239 of the Act.

8 CFR § 239.2

**§239.2 Cancellation of notice to appear.**

(a) Any officer authorized by §239.1(a) to issue a notice to appear may cancel such notice prior to jurisdiction vesting with the immigration judge pursuant to §3.14 of this chapter provided the officer is satisfied that:

(1) The respondent is a national of the United States;

(2) The respondent is not deportable or inadmissible under immigration laws;

(3) The respondent is deceased;

(4) The respondent is not in the United States;

(5) The notice was issued for the respondent's failure to file a timely petition as required by section 216(c) of the Act, but his or her failure to file a timely petition was excused in accordance with section 216(d)(2)(B) of the Act;

(6) The notice to appear was improvidently issued, or

(7) Circumstances of the case have changed after the notice to appear was issued to such an extent that continuation is no longer in the best interest of the government.

(b) A notice to appear issued pursuant to section 235(b)(3) of the Act may be canceled under provisions in paragraphs (a)(2) and (a)(6) of this section only by the issuing officer, unless it is impracticable for the issuing officer to cancel the notice.

(c) Motion to dismiss. After commencement of proceedings pursuant to §3.14 of this chapter, Service counsel, or any officer enumerated in paragraph (a) of this section may move for dismissal of the matter on the grounds set out under paragraph (a) of this section. Dismissal of the matter shall be without prejudice to the alien or the Service.

(d) Motion for remand. After commencement of the hearing, Service counsel, or any officer enumerated in paragraph (a) of this section may move for remand of the matter to district jurisdiction on the ground that the foreign relations of the United States are involved and require further consideration. Remand of the matter shall be without prejudice to the alien or the Service.

(e) Warrant of arrest. When a notice to appear is canceled or proceedings are terminated under this section any outstanding warrant of arrest is canceled.

(f) Termination of removal proceedings by immigration judge. An immigration judge may terminate removal proceedings to permit the alien to proceed to a final hearing on a pending application or petition for naturalization when the alien has established prima facie eligibility for naturalization and the matter involves exceptionally appealing or humanitarian factors; in every other case, the removal hearing shall be completed as promptly as possible notwithstanding the pendency of an application for naturalization during any state of the proceedings.

8 CFR § 239.3

**§239.3 Effect of filing notice to appear.**

The filing of a notice to appear shall have no effect in determining periods of unlawful presence as defined in section 212(a)(9)(B) of the Act.

8 CFR § 240.1-240.20

**§§240.1-240.20 [Redesignated as §§244.3-244.22]**

103. Sections 240.1 through 240.20 are redesignated as §§244.3 through 244.22.

104. Part 240 is revised to read as follows:

**PART 240—PROCEEDINGS TO DETERMINE REMOVABILITY OF ALIENS IN THE UNITED STATES**

**Subpart A—Removal Proceedings**

Sec.

240.1 Immigration judges.

240.2 Service counsel.

240.3 Representation by counsel.

240.4 Incompetent respondents.

240.5 Interpreter.

240.6 Postponement and adjournment of hearing.

240.7 Evidence in removal proceedings under section 240 of the Act.

240.8 Burdens of proof in removal proceedings.

240.9 Contents of record.

240.10 Hearing.

240.11 Ancillary matters, applications.

240.12 Decision of the immigration judge.

240.13 Notice of decision.

240.14 Finality of order.

240.15 Appeals.

240.16 Application of new procedures or termination of proceedings in old proceedings pursuant to section 309(c) of Public Law 104-208.

240.17-240.19 [Reserved]

**Subpart B—Cancellation of Removal**

240.20 Cancellation of removal and adjustment of status under section 240A of the Act.

240.21-240.24 [Reserved]

**Subpart C—Voluntary Departure**

240.25 Voluntary departure—authority of the Service.

240.26 Voluntary departure—authority of the Executive Office for Immigration Review.

240.27-240.29 [Reserved]

**Subpart D—Exclusion of Aliens (for proceedings commenced prior to April 1, 1997)**

240.30 Proceedings prior to April 1, 1997.

240.31 Authority of immigration judges.

240.32 Hearing.

240.33 Applications for asylum or withholding of deportation.

240.34 Renewal of application for adjustment of status under section 245 of the Act.

240.35 Decision of the immigration judge; notice to the applicant.

240.36 Finality of order.

240.37 Appeals.

240.38 Fingerprinting of excluded aliens.

240.39 [Reserved]

**Subpart E—Proceedings to determine deportability of aliens in the United States: Hearing and Appeal (for proceedings commenced prior to April 1, 1997)**

240.40 Proceedings commenced prior to April 1, 1997.

240.41 Immigration judges.

240.42 Representation by counsel.

240.43 Incompetent respondents.

240.44 Interpreter.

240.45 Postponement and adjournment of hearing.

240.46 Evidence.

240.47 Contents of record.

240.48 Hearing.

240.49 Ancillary matters, applications.

240.50 Decision of the immigration judge.

240.51 Notice of decision.

240.52 Finality of order.

240.53 Appeals.

240.54 [Reserved]

**Subpart F—Suspension of Deportation and Voluntary Departure (for proceedings commenced prior to April 1, 1997)**

240.55 Proceedings commenced prior to April 1, 1997.

240.56 Application.

240.57 Extension of time to depart.

**Subpart G—Civil Penalties for Failure to Depart [Reserved]**
Authority: 8 U.S.C. 1103; 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note, 1252a, 1252b, 1362; 8 CFR part 2.


**Subpart A—Removal Proceedings**
8 CFR § 240.1

**§240.1 Immigration judges.**
(a) Authority. In any removal proceeding pursuant to section 240 of the Act, the immigration judge shall have the authority to: determine removability pursuant to section  **\*10368**  240(a)(1) of the Act; to make decisions, including orders of removal as provided by section 240(c)(1)(A) of the Act; to determine applications under sections 208, 212(a)(2)(F), 212(a)(6)(F)(ii), 212(a) (9)(B)(v), 212(d)(11), 212(d)(12), 212(g), 212(h), 212(i), 212(k), 237(a)(1)(E)(iii), 237(a)(1)(H), 237(a)(3)(C)(ii), 240A(a) and (b), 240B, 245, and 249 of the Act; to order withholding of removal pursuant to section 241(b)(3) of the Act; and to take any other action consistent with applicable law and regulations as may be appropriate. In determining cases referred for further inquiry, immigration judges shall have the powers and authority conferred upon them by the Act and this chapter. Subject to any specific limitation prescribed by the Act and this chapter, immigration judges shall also exercise the discretion and authority conferred upon the Attorney General by the Act as is appropriate and necessary for the disposition of such cases. An immigration judge may certify his or her decision in any case under section 240 of the Act to the Board of Immigration Appeals when it involves an unusually complex or novel question of law or fact. Nothing contained in this part shall be construed to diminish the authority conferred on immigration judges under sections 101(b)(4) and 103 of the Act.


(b) Withdrawal and substitution of immigration judges. The immigration judge assigned to conduct the hearing shall at any time withdraw if he or she deems himself or herself disqualified. If an immigration judge becomes unavailable to complete his or her duties, another immigration judge may be assigned to complete the case. The new immigration judge shall familiarize himself or herself with the record in the case and shall state for the record that he or she has done so.


(c) Conduct of hearing. The immigration judge shall receive and consider material and relevant evidence, rule upon objections, and otherwise regulate the course of the hearing.
 8 CFR § 240.2

**§240.2 Service counsel.**
(a) Authority. Service counsel shall present on behalf of the government evidence material to the issues of deportability or inadmissibility and any other issues that may require disposition by the immigration judge. The duties of the Service counsel include, but are not limited to, the presentation of evidence and the interrogation, examination, and cross-examination of the respondent or other witnesses. Nothing contained in this subpart diminishes the authority of an immigration judge to conduct

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 366 of 548   PageID 5309

proceedings under this part. The Service counsel is authorized to appeal from a decision of the immigration judge pursuant to §3.38 of this chapter and to move for reopening or reconsideration pursuant to §3.23 of this chapter.

(b) Assignment. In a removal proceeding, the Service shall assign an attorney to each case within the provisions of §240.10(d), and to each case in which an unrepresented respondent is incompetent or is under 18 years of age, and is not accompanied by a guardian, relative, or friend. In a case in which the removal proceeding would result in an order of removal, the Service shall assign an attorney to each case in which a respondent's nationality is in issue. A Service attorney shall be assigned in every case in which the Commissioner approves the submission of non-record information under §240.11(a)(3). In his or her discretion, whenever he or she deems such assignment necessary or advantageous, the General Counsel may assign a Service attorney to any other case at any stage of the proceeding.

 8 CFR § 240.3

## §240.3 Representation by counsel.

The respondent may be represented at the hearing by an attorney or other representative qualified under 8 CFR part 292.

 8 CFR § 240.4

## §240.4 Incompetent respondents.

When it is impracticable for the respondent to be present at the hearing because of mental incompetency, the attorney, legal representative, legal guardian, near relative, or friend who was served with a copy of the notice to appear shall be permitted to appear on behalf of the respondent. If such a person cannot reasonably be found or fails or refuses to appear, the custodian of the respondent shall be requested to appear on behalf of the respondent.

 8 CFR § 240.5

## §240.5 Interpreter.

Any person acting as an interpreter in a hearing before an immigration judge under this part shall be sworn to interpret and translate accurately, unless the interpreter is an employee of the United States Government, in which event no such oath shall be required.

 8 CFR § 240.6

## §240.6 Postponement and adjournment of hearing.

After the commencement of the hearing, the immigration judge may grant a reasonable adjournment either at his or her own instance or, for good cause shown, upon application by the respondent or the Service.

 8 CFR § 240.7

## §240.7 Evidence in removal proceedings under section 240 of the Act.

(a) Use of prior statements. The immigration judge may receive in evidence any oral or written statement that is material and relevant to any issue in the case previously made by the respondent or any other person during any investigation, examination, hearing, or trial.

(b) Testimony. Testimony of witnesses appearing at the hearing shall be under oath or affirmation administered by the immigration judge.

(c) Depositions. The immigration judge may order the taking of depositions pursuant to §3.35 of this chapter.

 8 CFR § 240.8

## §240.8 Burdens of proof in removal proceedings.

(a) Deportable aliens. A respondent charged with deportability shall be found to be removable if the Service proves by clear and convincing evidence that the respondent is deportable as charged.

(b) Arriving aliens. In proceedings commenced upon a respondent's arrival in the Untied States or after the revocation or expiration of parole, the respondent must prove that he or she is clearly and beyond a doubt entitled to be admitted to the United States and is not inadmissible as charged.

(c) Aliens present in the United States without being admitted or paroled. In the case of a respondent charged as being in the United States without being admitted or paroled, the Service must first establish the alienage of the respondent. Once alienage has been established, unless the respondent demonstrates by clear and convincing evidence that he or she is lawfully in the United States pursuant to a prior admission, the respondent must prove that he or she is clearly and beyond a doubt entitled to be admitted to the United States and is not inadmissible as charged.

(d) Relief from removal. The respondent shall have the burden of establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion. If the evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.
 8 CFR § 240.9

**§240.9 Contents of record.**

The hearing before the immigration judge, including the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, and all **\*10369** written orders, motions, appeals, briefs, and other papers filed in the proceedings shall constitute the record in the case. The hearing shall be recorded verbatim except for statements made off the record with the permission of the immigration judge. In his or her discretion, the immigration judge may exclude from the record any arguments made in connection with motions, applications, requests, or objections, but in such event the person affected may submit a brief.
 8 CFR § 240.10

**§240.10 Hearing.**

(a) Opening. In a removal proceeding, the immigration judge shall:

(1) Advise the respondent of his or her right to representation, at no expense to the government, by counsel of his or her own choice authorized to practice in the proceedings and require the respondent to state then and there whether he or she desires representation;

(2) Advise the respondent of the availability of free legal services provided by organizations and attorneys qualified under 8 CFR part 3 and organizations recognized pursuant to §292.2 of this chapter, located in the district where the removal hearing is being held;

(3) Ascertain that the respondent has received a list of such programs, and a copy of appeal rights;

(4) Advise the respondent that he or she will have a reasonable opportunity to examine and object to the evidence against him or her, to present evidence in his or her own behalf and to cross-examine witnesses presented by the government (but the respondent shall not be entitled to examine such national security information as the government may proffer in opposition to the respondent's admission to the United States or to an application by the respondent for discretionary relief);

(5) Place the respondent under oath;

(6) Read the factual allegations and the charges in the notice to appear to the respondent and explain them in non-technical language; and

(7) Enter the notice to appear as an exhibit in the Record of Proceeding.

(b) Public access to hearings. Removal hearings shall be open to the public, except that the immigration judge may, in his or her discretion, close proceedings as provided in §3.27 of this chapter.

(c) Pleading by respondent. The immigration judge shall require the respondent to plead to the notice to appear by stating whether he or she admits or denies the factual allegations and his or her removability under the charges contained therein. If the respondent admits the factual allegations and admits his or her removability under the charges and the immigration judge is satisfied that no issues of law or fact remain, the immigration judge may determine that removability as charged has been established by the admissions of the respondent. The immigration judge shall not accept an admission of removability from an unrepresented respondent who is incompetent or under the age of 18 and is not accompanied by an attorney or legal representative, a near relative, legal guardian, or friend; nor from an officer of an institution in which a respondent is an inmate or patient. When, pursuant to this paragraph, the immigration judge does not accept an admission of removability, he or she shall direct a hearing on the issues.

(d) Issues of removability. When removability is not determined under the provisions of paragraph (c) of this section, the immigration judge shall request the assignment of an Service counsel, and shall receive evidence as to any unresolved issues, except that no further evidence need be received as to any facts admitted during the pleading. The alien shall provide a court certified copy of a Judicial Recommendation Against Deportation (JRAD) to the immigration judge when such recommendation will be the basis of denying any charge(s) brought by the Service in the proceedings against the alien. No JRAD is effective against a charge of deportability under former section 241(a)(11) of the Act or if the JRAD was granted on or after November 29, 1990.

(e) Additional charges in removal hearings. At any time during the proceeding, additional or substituted charges of inadmissibility and/or deportability and/or factual allegations may be lodged by the Service in writing. The alien in removal proceedings shall be served with a copy of these additional charges and allegations. The immigration judge shall read the additional factual allegations and charges to the alien and explain them to him or her. The immigration judge shall advise the alien, if he or she is not represented by counsel, that the alien may be so represented, and that he or she may be given a reasonable continuance to respond to the additional factual allegations and charges. Thereafter, the provision of §240.6(b) relating to pleading shall apply to the additional factual allegations and charges.

(f) Country of removal. The immigration judge shall notify the alien that if he or she is finally ordered removed, the country of removal will in the first instance be directed pursuant to section 241(b) of the Act to the country designated by the alien, unless section 241(b)(2)(C) of the Act applies, and shall afford him or her an opportunity then and there to make such designation. The immigration judge shall then specify and state for the record the country, or countries in the alternative, to which the alien's removal will be directed pursuant to section 241(b) of the Act if the country of his or her designation will not accept him or her into its territory, or fails to furnish timely notice of acceptance, or if the alien declines to designate a country.

(g) In the event that the Service is unable to remove the alien to the specified or alternative country or countries, the Service may remove the alien to any other country as permitted by section 241(b) of the Act.

 8 CFR § 240.11

## §240.11 Ancillary matters, applications.

(a) Creation of the status of an alien lawfully admitted for permanent residence. (1) In a removal proceeding, an alien may apply to the immigration judge for cancellation of removal under section 240A of the Act, adjustment of status under section 245 of the Act, adjustment of status under section 1 of the Act of November 2, 1966 (as modified by section 606 of Public Law 104-132) or under section 101 or 104 of the Act of October 28, 1977, or for the creation of a record of lawful admission for permanent residence under section 249 of the Act. The application shall be subject to the requirements of §240.20, and 8 CFR parts 245 and 249. The approval of any application made to the immigration judge under section 245 of the Act by an alien spouse (as defined in section 216(g)(1) of the Act) or by an alien entrepreneur (as defined in section 216A(f)(1) of the Act) shall result in the alien's obtaining the status of lawful permanent resident on a conditional basis in accordance with the provisions of section 216 or 216A of the Act, whichever is applicable. However, the Petition to Remove the Conditions on Residence

AR01100

required by section 216(c) of the Act, or the Petition by Entrepreneur to Remove Conditions required by section 216A(c) of the Act shall be made to the director in accordance with 8 CFR part 216.

(2) In conjunction with any application for creation of status of an alien lawfully admitted for permanent residence made to an immigration judge, if the alien is inadmissible under any provision of section 212(a) of the Act, and believes that he or she meets the eligibility requirements for a waiver of the ground of inadmissibility, he or **\*10370** she may apply to the immigration judge for such waiver. The immigration judge shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make application during the hearing.

(3) In exercising discretionary power when considering an application for status as a permanent resident under this chapter, the immigration judge may consider and base the decision on information not contained in the record and not made available for inspection by the alien, provided the Commissioner has determined that such information is relevant and is classified under the applicable Executive Order as requiring protection from unauthorized disclosure in the interest of national security. Whenever the immigration judge believes that he or she can do so while safeguarding both the information and its source, the immigration judge should inform the alien of the general nature of the information in order that the alien may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state that the information is material to the decision.

(b) Voluntary departure. The alien may apply to the immigration judge for voluntary departure in lieu of removal pursuant to section 240B of the Act and subpart C of this part.

(c) Applications for asylum and withholding of removal. (1) If the alien expresses fear of persecution or harm upon return to any of the countries to which the alien might be removed pursuant to §240.10(f), and the alien has not previously filed an application for asylum or withholding of removal that has been referred to the immigration judge by an asylum officer in accordance with §208.14 of this chapter, the immigration judge shall:

(i) Advise the alien that he or she may apply for asylum in the United States or withholding of removal to those countries;

(ii) Make available the appropriate application forms; and

(iii) Advise the alien of the privilege of being represented by counsel at no expense to the government and of the consequences, pursuant to section 208(d)(6) of the Act, of knowingly filing a frivolous application for asylum. The immigration judge shall provide to the alien a list of persons who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis.

(2) An application for asylum or withholding of removal must be filed with the Immigration Court, pursuant to §208.4(c) of this chapter. Upon receipt of an application that has not been referred by an asylum officer, the Immigration Court shall forward a copy to the Department of State pursuant to §208.11 of this chapter and shall calendar the case for a hearing. The reply, if any, from the Department of State, unless classified under the applicable Executive Order, shall be given to both the alien and to the Service counsel representing the government.

(3) Applications for asylum and withholding of removal so filed will be decided by the immigration judge pursuant to the requirements and standards established in 8 CFR part 208 of this chapter after an evidentiary hearing to resolve factual issues in dispute. An evidentiary hearing extending beyond issues related to the basis for a mandatory denial of the application pursuant to §208.14 or §208.16 of this chapter is not necessary once the immigration judge has determined that such a denial is required.

(i) Evidentiary hearings on applications for asylum or withholding of removal will be open to the public unless the alien expressly requests that the hearing be closed pursuant to §3.27 of this chapter. The immigration judge shall inquire whether the alien requests such closure.

(ii) Nothing in this section is intended to limit the authority of the immigration judge to properly control the scope of any evidentiary hearing.

(iii) During the removal hearing, the alien shall be examined under oath on his or her application and may present evidence and witnesses in his or her own behalf. The alien has the burden of establishing that he or she is a refugee as defined in section 101(a)(42) of the Act pursuant to the standards set forth in §208.13 of this chapter.

(iv) Service counsel may call witnesses and present evidence for the record, including information classified under the applicable Executive Order, provided the immigration judge or the Board has determined that such information is relevant to the hearing. When the immigration judge receives such classified information, he or she shall inform the alien. The agency that provides the classified information to the immigration judge may provide an unclassified summary of the information for release to the alien, whenever it determines it can do so consistently with safeguarding both the classified nature of the information and its sources. The summary should be as detailed as possible, in order that the alien may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state whether such information is material to the decision.

(4) The decision of an immigration judge to grant or deny asylum or withholding of removal shall be communicated to the alien and to the Service counsel. An adverse decision shall state why asylum or withholding of removal was denied.

(d) Application for relief under sections 237(a)(1)(H) and 237(a)(1)(E)(iii) of the Act. The respondent may apply to the immigration judge for relief from removal under sections 237(a)(1)(H) and 237(a)(1)(E)(iii) of the Act.

(e) General. An application under this section shall be made only during the hearing and shall not be held to constitute a concession of alienage or deportability in any case in which the respondent does not admit his or her alienage or deportability. However, nothing in this section shall prohibit the Service from using information supplied in an application for asylum or withholding of deportation or removal submitted to the Service on or after January 4, 1995, as the basis for issuance of a charging document or to establish alienage or deportability in a case referred to an immigration judge under §208.14(b) of this chapter. The alien shall have the burden of establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion. Nothing contained in this section is intended to foreclose the respondent from applying for any benefit or privilege that he or she believes himself or herself eligible to receive in proceedings under this part. Nothing in this section is intended to limit the Attorney General's authority to remove an alien to any country permitted by section 241(b) of the Act.

(f) Fees. The alien shall not be required to pay a fee on more than one application within paragraphs (a) and (c) of this section, provided that the minimum fee imposed when more than one application is made shall be determined by the cost of the application with the highest fee.

 8 CFR § 240.12

## §240.12 Decision of the immigration judge.

(a) Contents. The decision of the immigration judge may be oral or written. The decision of the immigration judge shall include a finding as to inadmissibility or deportability. The formal enumeration of findings is not required. The decision shall also contain reasons for granting or denying the request. The decision shall be  **10371**  concluded with the order of the immigration judge.

(b) Summary decision. Notwithstanding the provisions of paragraph (a) of this section, in any case where inadmissibility or deportability is determined on the pleadings pursuant to §240.10(b) and the respondent does not make an application under §240.11, the alien is statutorily ineligible for relief, or the respondent applies for voluntary departure only and the immigration judge grants the application, the immigration judge may enter a summary decision or, if voluntary departure is granted, a summary decision with an alternate order of removal.

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 371 of 548   PageID 5314

(c) Order of the immigration judge. The order of the immigration judge shall direct the respondent's removal, or the termination of the proceedings, or such other disposition of the case as may be appropriate. When removal is ordered, the immigration judge shall specify the country, or countries in the alternate, to which respondent's removal shall be directed. The immigration judge is authorized to issue orders in the alternative or in combination as he or she may deem necessary.

 8 CFR § 240.13

### §240.13 Notice of decision.

(a) Written decision. A written decision shall be served upon the respondent and the Service counsel, together with the notice referred to in §3.3 of this chapter. Service by mail is complete upon mailing.

(b) Oral decision. An oral decision shall be stated by the immigration judge in the presence of the respondent and the Service counsel, if any, at the conclusion of the hearing. A copy of the summary written order shall be furnished at the request of the respondent or the Service counsel.

(c) Summary decision. When the immigration judge renders a summary decision as provided in §240.12(b), he or she shall serve a copy thereof upon the respondent and the Service counsel at the conclusion of the hearing.

(d) Decision to remove. If the immigration judge decides that the respondent is removable and orders the respondent to be removed, the immigration judge shall advise the respondent of such decision, and of the consequences for failure to depart under the order of removal, including civil and criminal penalties described at sections 274D and 243 of the Act. Unless appeal from the decision is waived, the respondent shall be furnished with Form EOIR-26, Notice of Appeal, and advised of the provisions of §240.15.

 8 CFR § 240.14

### §240.14 Finality of order.

The order of the immigration judge shall become final in accordance with §3.39 of this chapter.

 8 CFR § 240.15

### §240.15 Appeals.

8 CFR § 3.3 8 CFR § 3.31 8 CFR § 3.38 8 CFR § 3.1

Pursuant to 8 CFR part 3, an appeal shall lie from a decision of an immigration judge to the Board of Immigration Appeals, except that no appeal shall lie from an order of removal entered in absentia. The procedures regarding the filing of a Form EOIR 26, Notice of Appeal, fees, and briefs are set forth in §§3.3, 3.31, and 3.38 of this chapter. An appeal shall be filed within 30 calendar days after the mailing of a written decision, the stating of an oral decision, or the service of a summary decision. The filing date is defined as the date of receipt of the Notice of Appeal by the Board of Immigration Appeals. The reasons for the appeal shall be stated in the Notice of Appeal in accordance with the provisions of §3.3(b) of this chapter. Failure to do so may constitute a ground for dismissal of the appeal by the Board pursuant to §3.1(d)(1-a) of this chapter.

 8 CFR § 240.16

### §240.16 Application of new procedures or termination of proceedings in old proceedings pursuant to section 309(c) of Public Law 104-208.

The Attorney General shall have the sole discretion to apply the provisions of section 309(c) of Public Law 104-208, which provides for the application of new removal procedures to certain cases in exclusion or deportation proceedings and for the termination of certain cases in exclusion or deportation proceedings and initiation of new removal proceedings. The Attorney General's application of the provisions of section 309(c) shall become effective upon publication of a notice in the Federal Register. However, if the Attorney General determines, in the exercise of his or her discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws, the Attorney General's application shall become effective immediately upon issuance, and shall be published in the Federal Register as soon as practicable thereafter.

 8 CFR § 240.17

**§§240.17—240.19 [Reserved]**

**Subpart B—Cancellation of removal**
8 CFR § 240.20

**§240.20 Cancellation of removal and adjustment of status under section 240A of the Act.**
(a) Jurisdiction. An application for the exercise of discretion under section 240A of the Act shall be submitted on Form EOIR-42, Application for Cancellation of Removal, to the Immigration Court having administrative control over the Record of Proceeding of the underlying removal proceeding under section 240 of the Act. The application must be accompanied by payment of the filing fee as set forth in §103.7(b) of this chapter or a request for a fee waiver.

(b) Filing the application. The application may be filed only with the Immigration Court after jurisdiction has vested pursuant to §3.14 of this chapter.
 8 CFR § 240.21

**§§240.21—240.24 [Reserved]**

**Subpart C—Voluntary Departure**
8 CFR § 240.25

**§240.25 Voluntary departure—authority of the Service.**
(a) Authorized officers. The authority contained in section 240B(a) of the Act to permit aliens to depart voluntarily from the United States may be exercised in lieu of being subject to proceedings under section 240 of the Act by district directors, assistant district directors for investigations, assistant district directors for examinations, officers in charge, chief patrol agents, service center directors, and assistant center directors for examinations.

(b) Conditions. The Service may attach to the granting of voluntary departure any conditions it deems necessary to ensure the alien's timely departure from the United States, including the posting of a bond, continued detention pending departure, and removal under safeguards. The alien shall be required to present to the Service, for inspection and photocopying, his or her passport or other travel documentation sufficient to assure lawful entry into the country to which the alien is departing. The Service may hold the passport or documentation for sufficient time to investigate its authenticity. A voluntary departure order permitting an alien to depart voluntarily shall inform the alien of the penalties under section 240B(d) of the Act.

(c) Decision. The authorized officer, in his or her discretion, shall specify the period of time permitted for voluntary departure, and may grant extensions thereof, except that the total period allowed, including any extensions, shall not exceed 120 days. Every decision regarding voluntary departure shall be communicated in writing on Form I-210, Notice of Action—Voluntary Departure. Voluntary departure may not be granted unless the alien requests such voluntary departure and agrees to its terms and conditions.

(d) Application. Any alien who believes himself or herself to be eligible  *10372  for voluntary departure under this section may apply therefor at any office of the Service. After the commencement of removal proceedings, the application may be communicated through the Service counsel. If the Service agrees to voluntary departure after proceedings have commenced, it may either:

(1) Join in a motion to terminate the proceedings, and if the proceedings are terminated, grant voluntary departure; or

(2) Join in a motion asking the immigration judge to permit voluntary departure in accordance with §240.26.

(e) Appeals. An appeal shall not lie from a denial of an application for voluntary departure under this section, but the denial shall be without prejudice to the alien's right to apply to the immigration judge for voluntary departure in accordance with §240.26 or for relief from removal under any provision of law.

(f) Revocation. If, subsequent to the granting of an application for voluntary departure under this section, it is ascertained that the application should not have been granted, that grant may be revoked without advance notice by any officer authorized to grant voluntary departure under §240.25(a). Such revocation shall be communicated in writing, citing the statutory basis for revocation. No appeal shall lie from revocation.

 8 CFR § 240.26

**§240.26 Voluntary departure—authority of the Executive Office for Immigration Review.**

(a) Eligibility: general. An alien previously granted voluntary departure under section 240B of the Act, including by the Service under §240.25, and who fails to depart voluntarily within the time specified, shall thereafter be ineligible, for a period of ten years, for voluntary departure or for relief under sections 240A, 245, 248, and 249 of the Act.

(b) Prior to completion of removal proceedings.—(1) Grant by the immigration judge. (i) An alien may be granted voluntary departure by an immigration judge pursuant to section 240B(a) of the Act only if the alien:

(A) Makes such request prior to or at the master calendar hearing at which the case is initially calendared for a merits hearing;

(B) Makes no additional requests for relief (or if such requests have been made, such requests are withdrawn prior to any grant of voluntary departure pursuant to this section);

(C) Concedes removability;

(D) Waives appeal of all issues; and

(E) Has not been convicted of a crime described in section 101(a)(43) of the Act and is not deportable under section 237(a)(4).

(ii) The judge may not grant voluntary departure under section 240B(a) of the Act beyond 30 days after the master calendar hearing at which the case is initially calendared for a merits hearing, except pursuant to a stipulation under paragraph (b)(2) of this section.

(2) Stipulation. At any time prior to the completion of removal proceedings, the Service counsel may stipulate to a grant of voluntary departure under section 240B(a) of the Act.

(3) Conditions. (i) The judge may impose such conditions as he or she deems necessary to ensure the alien's timely departure from the United States, including the posting of a voluntary departure bond to be canceled upon proof that the alien has departed the United States within the time specified. The alien shall be required to present to the Service, for inspection and photocopying, his or her passport or other travel documentation sufficient to assure lawful entry into the country to which the alien is departing, unless:

(A) A travel document is not necessary to return to his or her native country or to which country the alien is departing; or

(B) The document is already in the possession of the Service.

(ii) The Service may hold the passport or documentation for sufficient time to investigate its authenticity. If such documentation is not immediately available to the alien, but the immigration judge is satisfied that the alien is making diligent efforts to secure it, voluntary departure may be granted for a period not to exceed 120 days, subject to the condition that the alien within 60 days must secure such documentation and present it to the Service. The Service in its discretion may extend the period within which

the alien must provide such documentation. If the documentation is not presented within the 60-day period or any extension thereof, the voluntary departure order shall vacate automatically and the alternate order of removal will take effect, as if in effect on the date of issuance of the immigration judge order.

(c) At the conclusion of the removal proceedings.—(1) Required findings. An immigration judge may grant voluntary departure at the conclusion of the removal proceedings under section 240B(b) of the Act, if he or she finds that:

(i) The alien has been physically present in the United States for period of at least one year preceding the date the Notice to Appear was served under section 239(a) of the Act;

(ii) The alien is, and has been, a person of good moral character for at least five years immediately preceding the application;

(iii) The alien has not been convicted of a crime described in section 101(a)(43) of the Act and is not deportable under section 237(a)(4); and

(iv) The alien has established by clear and convincing evidence that the alien has the means to depart the United States and has the intention to do so.

(2) Travel documentation. Except as otherwise provided in paragraph (b)(3) of this section, the clear and convincing evidence of the means to depart shall include in all cases presentation by the alien of a passport or other travel documentation sufficient to assure lawful entry into the country to which the alien is departing. The Service shall have full opportunity to inspect and photocopy the documentation, and to challenge its authenticity or sufficiency before voluntary departure is granted.

(3) Conditions. The judge may impose such conditions as he or she deems necessary to ensure the alien's timely departure from the United States. In all cases under section 240B(b) of the Act, the alien shall be required to post a voluntary departure bond, in an amount necessary to ensure that the alien departs within the time specified, but in no case less than $500. The voluntary departure bond shall be posted with the district director within 5 business days of the immigration judge's order granting voluntary departure, and the district director may, at his or her discretion, hold the alien in custody until the bond is posted. If the bond is not posted within 5 business days, the voluntary departure order shall vacate automatically and the alternate order of removal will take effect on the following day. In order for the bond to be canceled, the alien must provide proof of departure to the district director.

(d) Alternate order of removal. Upon granting a request made for voluntary departure either prior to the completion of proceedings or at the conclusion of proceedings, the immigration judge shall also enter an alternate order or removal.

(e) Periods of time. If voluntary departure is granted prior to the completion of removal proceedings, the immigration judge may grant a period not to exceed 120 days. If voluntary departure is granted at the conclusion of proceedings, the immigration judge may grant a period not to exceed 60 days.

(f) Extension of time to depart. Authority to extend the time within which to depart voluntarily specified initially by an immigration judge or the Board is within the sole jurisdiction of **10373** the district director. An immigration judge or the Board may reinstate voluntary departure in a removal proceeding that has been reopened for a purpose other than solely making an application for voluntary departure if reopening was granted prior to the expiration of the original period of voluntary departure. In no event can the total period of time, including any extension, exceed 120 days or 60 days as set forth in section 240B of the Act.

(g) Administrative Appeals. No appeal shall lie regarding the length of a period of voluntary departure (as distinguished from issues of whether to grant voluntary departure).

(h) Reinstatement of voluntary departure. An immigration judge or the Board may reinstate voluntary departure in a removal proceeding that has been reopened for a purpose other than solely making application for voluntary departure, if reopening was granted prior to the expiration of the original period of voluntary departure. In no event can the total period of time, including any extension, exceed 120 days or 60 days as set forth in section 240B of the Act and paragraph (a) of this section.

 8 CFR § 240.27-240.29

§§240.27-240.29 [Reserved]

**Subpart D—Exclusion of Aliens (for proceedings commenced prior to April 1, 1997)**
8 CFR § 240.30

**§240.30 Proceedings prior to April 1, 1997.**
Subpart D of 8 CFR part 240 applies to exclusion proceedings commenced prior to April 1, 1997, pursuant to the former section 236 of the Act. An exclusion proceeding is commenced by the filing of Form I-122 with the Immigration Court, and an alien is considered to be in exclusion proceedings only upon such filing. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

 8 CFR § 240.31

**§240.31 Authority of immigration judges.**
In determining cases referred for further inquiry as provided in section 235 of the Act, immigration judges shall have the powers and authority conferred upon them by the Act and this chapter. Subject to any specific limitation prescribed by the Act and this chapter, immigration judges shall also exercise the discretion and authority conferred upon the Attorney General by the Act as is appropriate and necessary for the disposition of such cases.

 8 CFR § 240.32

**§240.32 Hearing.**
(a) Opening. Exclusion hearings shall be closed to the public, unless the alien at his or her own instance requests that the public, including the press, be permitted to attend; in that event, the hearing shall be open, provided that the alien states for the record that he or she is waiving the requirement in section 236 of the Act that the inquiry shall be kept separate and apart from the public. When the hearing is to be open, depending upon physical facilities, reasonable limitation may be placed upon the number in attendance at any one time, with priority being given to the press over the general public. The immigration judge shall ascertain whether the applicant for admission is the person to whom Form I-122 was previously delivered by the examining immigration officer as provided in 8 CFR part 235; enter a copy of such form in evidence as an exhibit in the case; inform the applicant of the nature and purpose of the hearing; advise him or her of the privilege of being represented by an attorney of his or her own choice at no expense to the Government, and of the availability of free legal services programs qualified under 8 CFR part 3 and organizations recognized pursuant to §292.2 of this chapter located in the district where his or her exclusion hearing is to be held; and shall ascertain that the applicant has received a list of such programs; and request him or her to ascertain then and there whether he or she desires representation; advise him or her that he or she will have a reasonable opportunity to present evidence in his or her own behalf, to examine and object to evidence against him or her, and to cross-examine witnesses presented by the Government; and place the applicant under oath.

(b) Procedure. The immigration judge shall receive and adduce material and relevant evidence, rule upon objections, and otherwise regulate the course of the hearing.

(c) Attorney for the Service. The Service shall assign an attorney to each case in which an applicant's nationality is in issue and may assign an attorney to any case in which such assignment is deemed necessary or advantageous. The duties of the Service counsel include, but are not limited to, the presentation of evidence and the interrogation, examination, and cross-examination of the applicant and other witnesses. Nothing contained in this section diminishes the authority of an immigration judge to conduct proceedings under this part.

(d) Depositions. The procedures specified in §240.48(e) shall apply.

(e) Record. The hearing before the immigration judge, including the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, and all written orders, motions, appeals, and other papers filed in the proceeding shall constitute the record in the case. The hearing shall be recorded verbatim except for statements made off the record with the permission of the immigration judge.

8 CFR § 240.33

### §240.33 Applications for asylum or withholding of deportation.

(a) If the alien expresses fear of persecution or harm upon return to his or her country of origin or to a country to which the alien may be deported after a determination of excludability from the United States pursuant to this subpart, and the alien has not been referred to the immigration judge by an asylum officer in accordance with §208.14(b) of this chapter, the immigration judge shall:

(1) Advise the alien that he or she may apply for asylum in the United States or withholding of deportation to that other country; and

(2) Make available the appropriate application forms.

(b) An application for asylum or withholding of deportation must be filed with the Immigration Court, pursuant to §208.4(c) of this chapter. Upon receipt of an application that has not been referred by an asylum officer, the Immigration Court shall forward a copy to the Department of State pursuant to §208.11 of this chapter and shall calendar the case for a hearing. The reply, if any, from the Department of State, unless classified under the applicable Executive Order, shall be given to both the applicant and to the Service counsel representing the government.

(c) Applications for asylum or withholding of deportation so filed will be decided by the immigration judge pursuant to the requirements and standards established in 8 CFR part 208 after an evidentiary hearing that is necessary to resolve material factual issues in dispute. An evidentiary hearing extending beyond issues related to the basis for a mandatory denial of the application pursuant to §208.13(c) of this chapter is not necessary once the immigration judge has determined that such denial is required.

(1) Evidentiary hearings on applications for asylum or withholding of deportation will be closed to the public unless the applicant expressly requests that it be open pursuant to §236.3 of this chapter.

(2) Nothing in this section is intended to limit the authority of the immigration judge properly to control the scope of any evidentiary hearing.

(3) During the exclusion hearing, the applicant shall be examined under oath on his or her application and may **\*10374** present evidence and witnesses on his or her own behalf. The applicant has the burden of establishing that he or she is a refugee as defined in section 101(a)(42) of the Act pursuant to the standard set forth in §208.13 of this chapter.

(4) The Service counsel for the government may call witnesses and present evidence for the record, including information classified under the applicable Executive Order, provided the immigration judge or the Board has determined that such information is relevant to the hearing. The applicant shall be informed when the immigration judge receives such classified information. The agency that provides the classified information to the immigration judge may provide an unclassified summary of the information for release to the applicant whenever it determines it can do so consistently with safeguarding both the classified nature of the information and its source. The summary should be as detailed as possible, in order that the applicant may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state that such information is material to the decision.

(d) The decision of an immigration judge to grant or deny asylum or withholding of deportation shall be communicated to the applicant and to the Service counsel for the government. An adverse decision will state why asylum or withholding of deportation was denied.

8 CFR § 240.34

## §240.34 Renewal of application for adjustment of status under section 245 of the Act.

An adjustment application by an alien paroled under section 212(d)(5) of the Act, which has been denied by the district director, may be renewed in exclusion proceedings under section 236 of the Act (as in effect prior to April 1, 1997) before an immigration judge under the following two conditions: first, the denied application must have been properly filed subsequent to the applicant's earlier inspection and admission to the United States; and second, the applicant's later absence from and return to the United States must have been under the terms of an advance parole authorization on Form I-512 granted to permit the applicant's absence and return to pursue the previously filed adjustment application.

8 CFR § 240.35

## §240.35 Decision of the immigration judge; notice to the applicant.

(a) Decision. The immigration judge shall inform the applicant of his or her decision in accordance with §3.37 of this chapter.

(b) Advice to alien ordered excluded. An alien ordered excluded shall be furnished with Form I-296, Notice to Alien Ordered Excluded by Immigration Judge, at the time of an oral decision by the immigration judge or upon service of a written decision.

(c) Holders of refugee travel documents. Aliens who are the holders of valid unexpired refugee travel documents may be ordered excluded only if they are found to be inadmissible under section 212(a)(2), 212(a)(3), or 212(a)(6)(E) of the Act, and it is determined that on the basis of the acts for which they are inadmissible there are compelling reasons of national security or public order for their exclusion. If the immigration judge finds that the alien is inadmissible but determines that there are no compelling reasons of national security or public order for exclusion, the immigration judge shall remand the case to the district director for parole.

8 CFR § 240.36

## §240.36 Finality of order.

The decision of the immigration judge shall become final in accordance with § 3.37 of this chapter.

8 CFR § 240.37

## §240.37 Appeals.

Except for temporary exclusions under section 235(c) of the Act, an appeal from a decision of an Immigration Judge under this part may be taken by either party pursuant to §3.38 of this chapter.

8 CFR § 240.38

## §240.38 Fingerprinting of excluded aliens.

Every alien 14 years of age or older who is excluded from admission to the United States by an immigration judge shall be fingerprinted, unless during the preceding year he or she has been fingerprinted at an American consular office.

8 CFR § 240.39

## §240.39 [Reserved]

## Subpart E—Proceedings to Determine Deportability of Aliens in the United States: Hearing and Appeal (for proceedings commenced prior to April 1, 1997)

8 CFR § 240.40

## §240.40 Proceedings commenced prior to April 1, 1997.

Subpart E of 8 CFR part 240 applies only to deportation proceedings commenced prior to April 1, 1997. A deportation proceeding is commenced by the filing of Form I-221 (Order to Show Cause) with the Immigration Court, and an alien is

considered to be in deportation proceedings only upon such filing, except in the case of an alien admitted to the United States under the provisions of section 217 of the Act. All references to the Act contained in this subpart pertain to the Act as in effect prior to April 1, 1997.

 8 CFR § 240.41

### §240.41 Immigration judges.

(a) Authority. In any proceeding conducted under this part the immigration judge shall have the authority to determine deportability and to make decisions, including orders of deportation, as provided by section 242(b) and 242B of the Act; to reinstate orders of deportation as provided by section 242(f) of the Act; to determine applications under sections 208, 212(k), 241(a)(1)(E)(iii), 241(a)(1)(H), 244, 245 and 249 of the Act; to determine the country to which an alien's deportation will be directed in accordance with section 243(a) of the Act; to order temporary withholding of deportation pursuant to section 243(h) of the Act; and to take any other action consistent with applicable law and regulations as may be appropriate. An immigration judge may certify his or her decision in any case to the Board of Immigration Appeals when it involves an unusually complex or novel question of law or fact. Nothing contained in this part shall be construed to diminish the authority conferred on immigration judges under section 103 of the Act.


(b) Withdrawal and substitution of immigration judges. The immigration judge assigned to conduct the hearing shall at any time withdraw if he or she deems himself or herself disqualified. If an immigration judge becomes unavailable to complete his or her duties within a reasonable time, or if at any time the respondent consents to a substitution, another immigration judge may be assigned to complete the case. The new immigration judge shall familiarize himself or herself with the record in the case and shall state for the record that he or she has done so.

 8 CFR § 240.42

### §240.42 Representation by counsel.

The respondent may be represented at the hearing by an attorney or other representative qualified under 8 CFR part 292.

 8 CFR § 240.43

### §240.43 Incompetent respondents.

When it is impracticable for the respondent to be present at the hearing because of mental incompetency, the guardian, near relative, or friend who was served with a copy of the order to show cause shall be permitted to appear on behalf of the respondent. If such a person cannot reasonably be found or fails or refuses to appear, the custodian of the respondent shall be requested to appear on behalf of the respondent.  **10375**

 8 CFR § 240.44

### §240.44 Interpreter.

Any person acting as interpreter in a hearing before an immigration judge under this part shall be sworn to interpret and translate accurately, unless the interpreter is an employee of the United States Government, in which event no such oath shall be required.

 8 CFR § 240.45

### §240.45 Postponement and adjournment of hearing.

After the commencement of the hearing, the immigration judge may grant a reasonable adjournment either at his or her own instance or, for good cause shown, upon application by the respondent or the Service.

 8 CFR § 240.46

### §240.46 Evidence.

(a) Sufficiency. A determination of deportability shall not be valid unless it is found by clear, unequivocal, and convincing evidence that the facts alleged as grounds for deportation are true.


(b) Use of prior statements. The immigration judge may receive in evidence any oral or written statement that is material and relevant to any issue in the case previously made by the respondent or any other person during any investigation, examination, hearing, or trial.

(c) Testimony. Testimony of witnesses appearing at the hearing shall be under oath or affirmation administered by the immigration judge.

(d) Depositions. The immigration judge may order the taking of depositions pursuant to §3.35 of this chapter.
 8 CFR § 240.47

### §240.47 Contents of record.

The hearing before the immigration judge, including the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, and all written orders, motions, appeals, briefs, and other papers filed in the proceedings shall constitute the record in the case. The hearing shall be recorded verbatim except for statements made off the record with the permission of the immigration judge. In his or her discretion, the immigration judge may exclude from the record any arguments made in connection with motions, applications, requests, or objections, but in such event the person affected may submit a brief.
 8 CFR § 240.48

### §240.48 Hearing.

(a) Opening. The immigration judge shall advise the respondent of his or her right to representation, at no expense to the Government, by counsel of his or her own choice authorized to practice in the proceedings and require him or her to state then and there whether he or she desires representation; advise the respondent of the availability of free legal services programs qualified under 8 CFR part 3 and organizations recognized pursuant to §292.2 of this chapter, located in the district where the deportation hearing is being held; ascertain that the respondent has received a list of such programs, and a copy of Form I-618, Written Notice of Appeal Rights; advise the respondent that he or she will have a reasonable opportunity to examine and object to the evidence against him or her, to present evidence in his or her own behalf and to cross-examine witnesses presented by the Government; place the respondent under oath; read the factual allegations and the charges in the order to show cause to the respondent and explain them in nontechnical language, and enter the order to show cause as an exhibit in the record. Deportation hearings shall be open to the public, except that the immigration judge may, in his or her discretion and for the purpose of protecting witnesses, respondents, or the public interest, direct that the general public or particular individuals shall be excluded from the hearing in any specific case. Depending upon physical facilities, reasonable limitation may be placed upon the number in attendance at any one time, with priority being given to the press over the general public.

(b) Pleading by respondent. The immigration judge shall require the respondent to plead to the order to show cause by stating whether he or she admits or denies the factual allegations and his or her deportability under the charges contained therein. If the respondent admits the factual allegations and admits his or her deportability under the charges and the immigration judge is satisfied that no issues of law or fact remain, the immigration judge may determine that deportability as charged has been established by the admissions of the respondent. The immigration judge shall not accept an admission of deportability from an unrepresented respondent who is incompetent or under age 16 and is not accompanied by a guardian, relative, or friend; nor from an officer of an institution in which a respondent is an inmate or patient. When, pursuant to this paragraph, the immigration judge may not accept an admission of deportability, he or she shall direct a hearing on the issues.

(c) Issues of deportability. When deportability is not determined under the provisions of paragraph (b) of this section, the immigration judge shall request the assignment of a Service counsel, and shall receive evidence as to any unresolved issues, except that no further evidence need be received as to any facts admitted during the pleading. The respondent shall provide a court certified copy of a Judicial Recommendation Against Deportation (JRAD) to the immigration judge when such recommendation will be the basis of denying any charge(s) brought by the Service in the proceedings against the respondent. No JRAD is effective against a charge of deportability under section 241(a)(11) of the Act or if the JRAD was granted on or after November 29, 1990.

(d) Additional charges. The Service may at any time during a hearing lodge additional charges of deportability, including factual allegations, against the respondent. Copies of the additional factual allegations and charges shall be submitted in writing for service on the respondent and entry as an exhibit in the record. The immigration judge shall read the additional factual allegations

and charges to the respondent and explain them to him or her. The immigration judge shall advise the respondent if he or she is not represented by counsel that he or she may be so represented and also that he or she may have a reasonable time within which to meet the additional factual allegations and charges. The respondent shall be required to state then and there whether he or she desires a continuance for either of these reasons. Thereafter, the provisions of paragraph (b) of this section shall apply to the additional factual allegations and lodged charges.

8 CFR § 240.49

### §240.49 Ancillary matters, applications.

(a) Creation of the status of an alien lawfully admitted for permanent residence. The respondent may apply to the immigration judge for suspension of deportation under section 244(a) of the Act; for adjustment of status under section 245 of the Act, or under section 1 of the Act of November 2, 1966, or under section 101 or 104 of the Act of October 28, 1977; or for the creation of a record of lawful admission for permanent residence under section 249 of the Act. The application shall be subject to the requirements of 8 CFR parts 240, 245, and 249. The approval of any application made to the immigration judge under section 245 of the Act by an alien spouse (as defined in section 216(g)(1) of the Act) or by an alien entrepreneur (as defined in section 216A(f)(1) of the Act), shall result in the alien's obtaining the status of lawful permanent resident on a conditional basis in accordance with the provisions of section 216 or 216A of the Act, whichever is applicable. However, the Petition to Remove the Conditions on **\*10376** Residence required by section 216(c) of the Act or the Petition by Entrepreneur to Remove Conditions required by section 216A(c) of the Act shall be made to the director in accordance with 8 CFR part 216. In conjunction with any application for creation of status of an alien lawfully admitted for permanent residence made to an immigration judge, if the respondent is inadmissible under any provision of section 212(a) of the Act and believes that he or she meets the eligibility requirements for a waiver of the ground of inadmissibility, he or she may apply to the immigration judge for such waiver. The immigration judge shall inform the respondent of his or her apparent eligibility to apply for any of the benefits enumerated in this paragraph and shall afford the respondent an opportunity to make application therefor during the hearing. In exercising discretionary power when considering an application under this paragraph, the immigration judge may consider and base the decision on information not contained in the record and not made available for inspection by the respondent, provided the Commissioner has determined that such information is relevant and is classified under the applicable Executive Order as requiring protection from unauthorized disclosure in the interest of national security. Whenever the immigration judge believes that he or she can do so while safeguarding both the information and its source, the immigration judge should inform the respondent of the general nature of the information in order that the respondent may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state that the information is material to the decision.

(b) Voluntary departure. The respondent may apply to the immigration judge for voluntary departure in lieu of deportation pursuant to section 244(e) of the Act and §240.56.

(c) Applications for asylum or withholding of deportation. (1) The immigration judge shall notify the respondent that if he or she is finally ordered deported, his or her deportation will in the first instance be directed pursuant to section 243(a) of the Act to the country designated by the respondent and shall afford him or her an opportunity then and there to make such designation. The immigration judge shall then specify and state for the record the country, or countries in the alternative, to which respondent's deportation will be directed pursuant to section 243(a) of the Act if the country of his or her designation will not accept him or her into its territory, or fails to furnish timely notice of acceptance, or if the respondent declines to designate a country.

(2) If the alien expresses fear of persecution or harm upon return to any of the countries to which the alien might be deported pursuant to paragraph (c)(1) of this section, and the alien has not previously filed an application for asylum or withholding of deportation that has been referred to the immigration judge by an asylum officer in accordance with §208.14(b) of this chapter, the immigration judge shall:

(i) Advise the alien that he or she may apply for asylum in the United States or withholding of deportation to those countries; and

(ii) Make available the appropriate application forms.

(3) An application for asylum or withholding of deportation must be filed with the Immigration Court, pursuant to §208.4(b) of this chapter. Upon receipt of an application that has not been referred by an asylum officer, the Immigration Court shall forward a copy to the Department of State pursuant to §208.11 of this chapter and shall calendar the case for a hearing. The reply, if any, of the Department of State, unless classified under the applicable Executive Order, shall be given to both the applicant and to the Service counsel representing the government.

(4) Applications for asylum or withholding of deportation so filed will be decided by the immigration judge pursuant to the requirements and standards established in 8 CFR part 208 after an evidentiary hearing that is necessary to resolve factual issues in dispute. An evidentiary hearing extending beyond issues related to the basis for a mandatory denial of the application pursuant to §208.13 or §208.16 of this chapter is not necessary once the immigration judge has determined that such a denial is required.

(i) Evidentiary hearings on applications for asylum or withholding of deportation will be open to the public unless the applicant expressly requests that it be closed.

(ii) Nothing in this section is intended to limit the authority of the immigration judge properly to control the scope of any evidentiary hearing.

(iii) During the deportation hearing, the applicant shall be examined under oath on his or her application and may present evidence and witnesses in his or her own behalf. The applicant has the burden of establishing that he or she is a refugee as defined in section 101(a)(42) of the Act pursuant to the standard set forth in §208.13 of this chapter.

(iv) The Service counsel for the government may call witnesses and present evidence for the record, including information classified under the applicable Executive Order, provided the immigration judge or the Board has determined that such information is relevant to the hearing. When the immigration judge receives such classified information he or she shall inform the applicant. The agency that provides the classified information to the immigration judge may provide an unclassified summary of the information for release to the applicant, whenever it determines it can do so consistently with safeguarding both the classified nature of the information and its source. The summary should be as detailed as possible, in order that the applicant may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state whether such information is material to the decision.

(5) The decision of an immigration judge to grant or deny asylum or withholding of deportation shall be communicated to the applicant and to the Service counsel for the government. An adverse decision will state why asylum or withholding of deportation was denied.

(d) Application for relief under sections 241(a)(1)(H) and 241(a)(1)(E)(iii) of the Act. The respondent may apply to the immigration judge for relief from deportation under sections 241(a)(1)(H) and 241(a)(1)(E)(iii) of the Act.

(e) General. An application under this section shall be made only during the hearing and shall not be held to constitute a concession of alienage or deportability in any case in which the respondent does not admit his alienage or deportability. However, nothing in this section shall prohibit the Service from using information supplied in an application for asylum or withholding of deportation submitted to an asylum officer pursuant to §208.2 of this chapter on or after January 4, 1995, as the basis for issuance of an order to show cause or a notice to appear to establish alienage or deportability in a case referred to an immigration judge under §208.14(b) of this chapter. The respondent shall have the burden of establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion. The respondent shall not be required to pay a fee on more than one application within paragraphs (a)  **\*10377**  and (c) of this section, provided that the minimum fee imposed when more than one application is made shall be determined by the cost of the application with the highest fee. Nothing contained in this section is intended to foreclose the respondent from applying for any benefit or privilege which he or she believes himself or herself eligible to receive in proceedings under this part.

8 CFR § 240.50

**§240.50 Decision of the immigration judge.**

(a) Contents. The decision of the immigration judge may be oral or written. Except when deportability is determined on the pleadings pursuant to § 240.48(b), the decision of the immigration judge shall include a finding as to deportability. The formal enumeration of findings is not required. The decision shall also contain the reasons for granting or denying the request. The decision shall be concluded with the order of the immigration judge.

(b) Summary decision. Notwithstanding the provisions of paragraph (a) of this section, in any case where deportability is determined on the pleadings pursuant to §240.48(b) and the respondent does not make an application under § 240.49, or the respondent applies for voluntary departure only and the immigration judge grants the application, the immigration judge may enter a summary decision on Form EOIR-7, Summary Order of Deportation, if deportation is ordered, or on Form EOIR-6, Summary Order of Voluntary Departure, if voluntary departure is granted with an alternate order of deportation.

(c) Order of the immigration judge. The order of the immigration judge shall direct the respondent's deportation, or the termination of the proceedings, or such other disposition of the case as may be appropriate. When deportation is ordered, the immigration judge shall specify the country, or countries in the alternate, to which respondent's deportation shall be directed. The immigration judge is authorized to issue orders in the alternative or in combination as he or she may deem necessary.

8 CFR § 240.51

**§240.51 Notice of decision.**

(a) Written decision. A written decision shall be served upon the respondent and the Service counsel, together with the notice referred to in §3.3 of this chapter. Service by mail is complete upon mailing.

(b) Oral decision. An oral decision shall be stated by the immigration judge in the presence of the respondent and the trail attorney, if any, at the conclusion of the hearing. Unless appeal from the decision is waived, the respondent shall be furnished with Form EOIR-26, Notice of Appeal, and advised of the provisions of §240.53. A printed copy of the oral decision shall be furnished at the request of the respondent or the Service counsel.

(c) Summary decision. When the immigration judge renders a summary decision as provided in §240.51(b), he or she shall serve a copy thereof upon the respondent at the conclusion of the hearing. Unless appeal from the decision is waived, the respondent shall be furnished with Form EOIR-26, Notice of Appeal, and advised of the provisions of §240.54.

8 CFR § 240.52

**§240.52 Finality of order.**

The decision of the immigration judge shall become final in accordance with § 3.39 of this chapter.

8 CFR § 240.53

**§240.53 Appeals.**

(a) Pursuant to 8 CFR part 3, an appeal shall lie from a decision of an immigration judge to the Board, except that no appeal shall lie from an order of deportation entered in absentia. The procedures regarding the filing of a Form EOIR-26, Notice of Appeal, fees, and briefs are set forth in §§3.3, 3.31, and 3.38 of this chapter. An appeal shall be filed within 30 calendar days after the mailing of a written decision, the stating of an oral decision, or the service of a summary decision. The filing date is defined as the date of receipt of the Notice of Appeal by the Board. The reasons for the appeal shall be stated in the Form EOIR-26, Notice of Appeal, in accordance with the provisions of §3.3(b) of this chapter. Failure to do so may constitute a ground for dismissal of the appeal by the Board pursuant to §3.1(d)(1-a) of this chapter.

(b) Prohibited appeals; legalization or applications. An alien respondent defined in §245a.2(c)(6) or (7) of this chapter who fails to file an application for adjustment of status to that of a temporary resident within the prescribed period(s), and who is thereafter

found to be deportable by decision of an immigration judge, shall not be permitted to appeal the finding of deportability based solely on refusal by the immigration judge to entertain such an application in deportation proceedings.

8 CFR § 240.54

**§240.54 [Reserved]**

**Subpart F—Suspension of Deportation and Voluntary Departure (for proceedings commenced prior to April 1, 1997)**
8 CFR § 240.55

**§240.55 Proceedings commenced prior to April 1, 1997.**
Subpart F of 8 CFR part 240 applies to deportation proceedings commenced prior to April 1, 1997. A deportation proceeding is commenced by the filing of Form I-221 (Order to Show Cause) with the Immigration Court, and an alien is considered to be in deportation proceedings only upon such filing, except in the case of an alien admitted to the United States under the provisions of section 217 of the Act. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

8 CFR § 240.56

**§240.56 Application.**
Notwithstanding any other provision of this chapter, an alien who is deportable because of a conviction on or after November 18, 1988, for an aggravated felony as defined in section 101(a)(43) of the Act, shall not be eligible for voluntary departure as prescribed in 8 CFR part 240 and section 244 of the Act. Pursuant to subpart F of this part and section 244 of the Act, an immigration judge may authorize the suspension of an alien's deportation; or, if the alien establishes that he or she is willing and has the immediate means with which to depart promptly from the United States, an immigration judge may authorize the alien to depart voluntarily from the United States in lieu of deportation within such time as may be specified by the immigration judge when first authorizing voluntary departure, and under such conditions as the district director shall direct. An application for suspension of deportation shall be made on Form EOIR-40.

8 CFR § 240.57

**§240.57 Extension of time to depart.**
Authority to reinstate or extend the time within which to depart voluntarily specified initially by an immigration judge or the Board is within the sole jurisdiction of the district director, except that an immigration judge or the Board may reinstate voluntary departure in a deportation proceeding that has been reopened for a purpose other than solely making an application for voluntary departure. A request by an alien for reinstatement or an extension of time within which to depart voluntarily shall be filed with the district director having jurisdiction over the alien's place of residence. Written notice of the district director's decision **\*10378** shall be served upon the alien and no appeal may be taken therefrom.

**Subpart G—Civil Penalties for Failure to Depart [Reserved]**
105. Part 241 is revised to read as follows:

**PART 241—APPREHENSION AND DETENTION OF ALIENS ORDERED REMOVED**

**Subpart A—Post-hearing Detention and Removal**

Sec.

241.1 Final order of removal.

241.2 Warrant of removal.

241.3 Detention of aliens during removal period.

241.4 Continued detention beyond the removal period.

241.5 Conditions of release after removal period.

241.6 Administrative stay of removal.

241.7 Self-removal.

241.8 Reinstatement of removal orders.

241.9 Notice to transportation line of alien's removal.

241.10 Special care and attention of removable aliens.

241.11 Detention and removal of stowaways.

241.12 Nonapplication of costs of detention and maintenance.

241.13—241.19 [Reserved]

**Subpart B—Deportation of Excluded Aliens (for hearings commenced prior to April 1, 1997)**

241.20 Proceedings commenced prior to April 1, 1997.

241.21 Stay of deportation of excluded alien.

241.22 Notice to surrender for deportation.

241.23 Cost of maintenance not assessed.

241.24 Notice to transportation line of alien's exclusion.

241.25 Deportation.

241.26—241.29 [Reserved]

**Subpart C—Deportation of Aliens in the United States (for hearings commenced prior to April 1, 1997)**

241.30 Proceedings commenced prior to April 1, 1997.

241.31 Final order of deportation.

241.32 Warrant of deportation.

241.33 Expulsion.
Authority: 8 U.S.C. 1103, 1223, 1227, 1251, 1253, 1255, and 1330; 8 CFR part 2.


**Subpart A—Post-hearing Detention and Removal**
8 CFR § 241.1

**§241.1 Final order of removal.**
An order of removal made by the immigration judge at the conclusion of proceedings under section 240 of the Act shall become final:

(a) Upon dismissal of an appeal by the Board of Immigration Appeals;

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(b) Upon waiver of appeal by the respondent;

(c) Upon expiration of the time allotted for an appeal if the respondent does not file an appeal within that time;

(d) If certified to the Board or Attorney General, upon the date of the subsequent decision ordering removal;

(e) If an immigration judge orders an alien removed in the alien's absence, immediately upon entry of such order; or

(f) If an immigration judge issues an alternate order of removal in connection with a grant of voluntary departure, upon overstay of the voluntary departure period except where the respondent has filed a timely appeal with the Board. In such a case, the order shall become final upon an order of removal by the Board or the Attorney General, or upon overstay of any voluntary departure period granted or reinstated by the Board or the Attorney General.

 8 CFR § 241.2

§241.2 **Warrant of removal.**
(a) Issuance of a warrant of removal. A Form I-205, Warrant of Removal, based upon the final administrative removal order in the alien's case shall be issued by a district director. The district director shall exercise the authority contained in section 241 of the Act to determine at whose expense the alien shall be removed and whether his or her mental or physical condition requires personal care and attention en route to his or her destination.

(b) Execution of the warrant of removal. Any officer authorized by § 287.5(e) of this chapter to execute administrative warrants of arrest may execute a warrant of removal.

 8 CFR § 241.3

§241.3 **Detention of aliens during removal period.**
(a) Assumption of custody. Once the removal period defined in section 241(a)(1) of the Act begins, an alien in the United States will be taken into custody pursuant to the warrant of removal.

(b) Cancellation of bond. Any bond previously posted will be canceled unless it has been breached or is subject to being breached.

(c) Judicial stays. The filing of (or intention to file) a petition or action in a Federal court seeking review of the issuance or execution of an order of removal shall not delay execution of the Warrant of Removal except upon an affirmative order of the court.

 8 CFR § 241.4

§241.4 **Continued detention beyond the removal period.**
(a) Continuation of custody for inadmissible or criminal aliens. The district director may continue in custody any alien inadmissible under section 212(a) of the Act or removable under section 237(a)(1)(C), 237(a)(2), or 237(a)(4) of the Act, or who presents a significant risk of noncompliance with the order of removal, beyond the removal period, as necessary, until removal from the United States. If such an alien demonstrates by clear and convincing evidence that the release would not pose a danger to the community or a significant flight risk, the district director may, in the exercise of discretion, order the alien released from custody on such conditions as the district director may prescribe, including bond in an amount sufficient to ensure the alien's appearance for removal. The district may consider, but is not limited to considering, the following factors:

(1) The nature and seriousness of the alien's criminal convictions;

(2) Other criminal history;

(3) Sentence(s) imposed and time actually served;

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(4) History of failures to appear for court (defaults);

(5) Probation history;

(6) Disciplinary problems while incarcerated;

(7) Evidence of rehabilitative effort or recidivism;

(8) Equities in the United States; and

(9) Prior immigration violations and history.

(b) Continuation of custody for other aliens. Any alien removable under any section of the Act other than section 212(a), 237(a)(1)(C), 237(a)(2), or 237(a)(4) may be detained beyond the removal period, in the discretion of the district director, unless the alien demonstrates to the satisfaction of the district director that he or she is likely to comply with the removal order and is not a risk to the community.

 8 CFR § 241.5

### §241.5 Conditions of release after removal period.

(a) Order of supervision. An alien released pursuant to §241.4 shall be released pursuant to an order of supervision. A district director, acting district director, deputy district director, assistant district director for investigations, assistant district director for detention and deportation, or officer in charge may issue an order of supervision on Form I-220B. The order shall specify conditions of supervision including, but not limited to, the following:

(1) A requirement that the alien report to a specified officer periodically and provide relevant information under oath as directed;

(2) A requirement that the alien continue efforts to obtain a travel document and assist the Service in obtaining a travel document;
 **\*10379**

(3) A requirement that the alien report as directed for a mental or physical examination or examinations as directed by the Service;

(4) A requirement that the alien obtain advance approval of travel beyond previously specified times and distances; and

(5) A requirement that the alien provide the Service with written notice of any change of address on Form AR-11 within ten days of the change.

(b) Posting of bond. An officer authorized to issue an order of supervision may require the posting of a bond in an amount determined by the officer to be sufficient to ensure compliance with the conditions of the order, including surrender for removal.

(c) Employment authorization. An officer authorized to issue an order of supervision may, in his or her discretion, grant employment authorization to an alien released under an order of supervision if the officer specifically finds that:

(1) The alien cannot be removed because no country will accept the alien; or

(2) The removal of the alien is impracticable or contrary to public interest.

 8 CFR § 241.6

### §241.6 Administrative stay of removal.

8 CFR § 212.5

Any request of an alien under a final order of deportation or removal for a stay of deportation or removal shall be filed on Form I-246, Stay of Removal, with the district director having jurisdiction over the place where the alien is at the time of filing. The district director, in his or her discretion and in consideration of factors such as are listed in §212.5 of this chapter and section 241(c) of the Act, may grant a stay of removal or deportation for such time and under such conditions as he or she may deem appropriate. Neither the request nor the failure to receive notice of disposition of the request shall delay removal or relieve the alien from strict compliance with any outstanding notice to surrender for deportation or removal. Denial by the district director of a request for a stay is not appealable, but such denial shall not preclude an immigration judge or the Board from granting a stay in connection with a motion to reopen or a motion to reconsider as provided in 8 CFR part 3. The Service shall take all reasonable steps to comply with a stay granted by an immigration judge or the Board. However, such a stay shall cease to have effect if granted (or communicated) after the alien has been placed aboard an aircraft or other conveyance for removal and the normal boarding process has been completed.

8 CFR § 241.7

### §241.7 Self-removal.

A district director may permit an alien ordered removed (including an alien ordered excluded or deported in proceedings prior to April 1, 1997) to depart at his or her own expense to a destination of his or her own choice. Any alien who has departed from the United States while an order of deportation or removal is outstanding shall be considered to have been deported, excluded and deported, or removed, except that an alien who departed before the expiration of the voluntary departure period granted in connection with an alternate order of deportation or removal shall not be considered to have been so deported or removed.

8 CFR § 241.8

### §241.8 Reinstatement of removal orders.

(a) Applicability. An alien who illegally reenters the United States after having been removed, or having departed voluntarily, while under an order of exclusion, deportation, or removal shall be removed from the United States by reinstating the prior order. The alien has no right to a hearing before an immigration judge in such circumstances. In establishing whether an alien is subject to this section, the immigration officer shall determine the following:

(1) Whether the alien has been subject to a prior order of removal. The immigration officer must obtain the prior order of exclusion, deportation, or removal relating to the alien.

(2) The identity of the alien, i.e., whether the alien is in fact an alien who was previously removed, or who departed voluntarily while under an order of exclusion, deportation, or removal. In disputed cases, verification of identity shall be accomplished by a comparison of fingerprints between those of the previously excluded, deported, or removed alien contained in Service records and those of the subject alien. In the absence of fingerprints in a disputed case the alien shall not be removed pursuant to this paragraph.

(3) Whether the alien unlawfully reentered the United States. In making this determination, the officer shall consider all relevant evidence, including statements made by the alien and any evidence in the alien's possession. The immigration officer shall attempt to verify an alien's claim, if any, that he or she was lawfully admitted, which shall include a check of Service data systems available to the officer.

(b) Notice. If an officer determines that an alien is subject to removal under this section, he or she shall provide the alien with written notice of his or her determination. The officer shall advise the alien that he or she may make a written or oral statement contesting the determination. If the alien wishes to make such a statement, the officer shall allow the alien to do so and shall consider whether the alien's statement warrants reconsideration of the determination.

(c) Order. If the requirements of paragraph (a) of this section are met, the alien shall be removed under the previous order of exclusion, deportation, or removal in accordance with section 241(a)(5) of the Act.

(d) Exception for withholding of removal. If an alien whose prior order of removal has been reinstated under this section expresses a fear of returning to the country designated in that order, the alien shall be immediately referred to an asylum officer to determine whether the alien's removal to that country must be withheld under section 241(b)(3) of the Act. The alien's claim will be granted or denied by an asylum officer in accordance with §208.16 of this chapter. If the alien has previously had a claim to withholding of deportation or removal denied, then that decision shall prevail unless the alien can establish the existence of changed circumstances that materially affect the alien's eligibility for withholding. The alien's case shall not be referred to an immigration judge, and there is no appeal from the decision of the asylum officer. If the alien is found to merit withholding of removal, the Service shall not enforce the reinstated order.

(e) Execution of reinstated order. Execution of the reinstated order of removal and detention of the alien shall be administered in accordance with this part.

 8 CFR § 241.9

### §241.9 Notice to transportation line of alien's removal.

(a) An alien who has been ordered removed shall, immediately or as promptly as the circumstances permit, be offered for removal to the owner, agent, master, commanding officer, person in charge, purser, or consignee of the vessel or aircraft on which the alien is to be removed, as determined by the district director, with a written notice specifying the cause of inadmissibility or deportability, the class of travel in which such alien arrived and is to be removed, and with the return of any documentation that will assist in effecting his or her removal. If special care and attention are required, the provisions of §241.10 shall apply.

(b) Failure of the carrier to accept for removal an alien who has been ordered removed shall result in the carrier being assessed any costs incurred by the **\*10380** Service for detention after the carrier's failure to accept the alien for removal, including the cost of any transportation as required under section 241(e) of the Act. The User Fee Account shall not be assessed for expenses incurred because of the carrier's violation of the provisions of section 241 of the Act and this paragraph. The Service will, at the carrier's option, retain custody of the alien for an additional 7 days beyond the date of the removal order. If, after the third day of this additional 7-day period, the carrier has not made all the necessary transportation arrangements for the alien to be returned to his or her point of embarkation by the end of the additional 7-day period, the Service will make the arrangements and bill the carrier for its costs.

 8 CFR § 241.10

### §241.10 Special care and attention of removable aliens.

When, in accordance with section 241(c)(3) of the Act, a transportation line is responsible for the expenses of an inadmissible or deportable alien's removal, and the alien requires special care and attention, the alien shall be delivered to the owner, agent, master, commanding officer, person in charge, purser, or consignee of the vessel or aircraft on which the alien will be removed, who shall be given Forms I-287, I-287A, and I-287B. The reverse of Form I-287A shall be signed by the officer of the vessel or aircraft to whom the alien has been delivered and immediately returned to the immigration officer effecting delivery. Form I-287B shall be retained by the receiving officer and subsequently filled out by the agents or persons therein designated and returned by mail to the district director named on the form. The transportation line shall at its own expense forward the alien from the foreign port of disembarkation to the final destination specified on Form I-287. The special care and attention shall be continued to such final destination, except when the foreign public officers decline to allow such attendant to proceed and they take charge of the alien, in which case this fact shall be recorded by the transportation line on the reverse of Form I-287B. If the transportation line fails, refuses, or neglects to provide the necessary special care and attention or comply with the directions of Form I-287, the district director shall thereafter and without notice employ suitable persons, at the expense of the transportation line, and effect such removal.

 8 CFR § 241.11

### §241.11 Detention and removal of stowaways.

(a) Presentation of stowaways. The owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft (referred to in this section as the carrier) bringing any alien stowaway to the United States is required to detain the stowaway on board the vessel or aircraft, at the expense of the owner of the vessel or aircraft, until completion of the inspection of the alien

by an immigration officer. If detention on board the vessel or aircraft pending inspection is not possible, the carrier shall advise the Service of this fact without delay, and the Service may authorize that the carrier detain the stowaway at another designated location, at the expense of the owner, until the immigration officer arrives. No notice to detain the alien shall be required. Failure to detain an alien stowaway pending inspection shall result in a civil penalty under section 243(c)(1)(A) of the Act. The owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft must present the stowaway for inspection, along with any documents or evidence of identity or nationality in the possession of the alien or obtained by the carrier relating to the alien stowaway, and must provide any available information concerning the alien's boarding or apprehension.

(b) Removal of stowaways from vessel or aircraft for medical treatment. The district director may parole an alien stowaway into the United States for medical treatment, but the costs of detention and treatment of the alien stowaway shall be at the expense of the owner of the vessel or aircraft, and such removal of the stowaway from the vessel or aircraft does not relieve the carrier of the requirement to remove the stowaway from the United States once such medical treatment has been completed.

(c) Repatriation of stowaways—(1) Requirements of carrier. Following inspection, an immigration officer may order the owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft bringing any alien stowaway to the United States to remove the stowaway on the vessel or aircraft of arrival, unless it is impracticable to do so or other factors exist which would preclude removal on the same vessel or aircraft. Such factors may include, but are not limited to, sanitation, health, and safety concerns for the crew and/or stowaway, whether the stowaway is a female or a juvenile, loss of insurance coverage on account of the stowaway remaining aboard, need for repairs to the vessel, and other similar circumstances. If the owner, agent, master, commanding officer, charterer, or consignee requests that he or she be allowed to remove the stowaway by other means, the Service shall favorably consider any such request, provided the carrier has obtained, or will obtain in a timely manner, any necessary travel documents and has made or will make all transportation arrangements. The owner, agent, master, commanding officer, charterer, or consignee shall transport the stowaway or arrange for secure escort of the stowaway to the vessel or aircraft of departure to ensure that the stowaway departs the United States. All expenses relating to removal shall be borne by the owner. Other than requiring compliance with the detention and removal requirements contained in section 241(d)(2) of the Act, the Service shall not impose additional conditions on the carrier regarding security arrangements. Failure to comply with an order to remove an alien stowaway shall result in a civil penalty under section 243(c)(1)(A) of the Act.

(2) Detention of stowaways ordered removed. If detention of the stowaway is required pending removal on other than the vessel or aircraft of arrival, or if the stowaway is to be removed on the vessel or aircraft of arrival but departure of the vessel or aircraft is not imminent and circumstances preclude keeping the stowaway on board the vessel or aircraft, the Service shall take the stowaway into Service custody. The owner is responsible for all costs of maintaining and detaining the stowaway pending removal, including costs for stowaways seeking asylum as described in paragraph (d) of this section. Such costs will be limited to those normally incurred in the detention of an alien by the Service, including, but not limited to, housing, food, transportation, medical expenses, and other reasonable costs incident to the detention of the stowaway. The Service may require the posting of a bond or other surety to ensure payment of costs of detention.

(d) Stowaways claiming asylum—(1) Referral for credible fear determination. A stowaway who indicates an intention to apply for asylum or a fear of persecution shall be removed from the vessel or aircraft of arrival in accordance with §208.5(b) of this chapter. The immigration officer shall refer the alien to an asylum officer for a determination of credible fear in accordance with section 235(b)(1)(B) of the Act and §208.30 of this chapter. The stowaway shall be detained in the custody of the Service pending the credible fear  *10381  determination and any review thereof. Parole of such alien, in accordance with section 212(d) (5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective. A stowaway who has established a credible fear of persecution in accordance with §208.30 of this chapter may be detained or paroled pursuant to §212.5 of this chapter during any consideration of the asylum application. In determining whether to detain or parole the alien, the Service shall consider the likelihood that the alien will abscond or pose a security risk.

(2) Costs of detention of asylum-seeking stowaways. The owner of the vessel or aircraft that brought the stowaway to the United States shall reimburse the Service for the costs of maintaining and detaining the stowaway pending a determination of credible fear under section 235(b)(1)(B) of the Act, up to a maximum period of 72 hours. The owner is also responsible for the costs of maintaining and detaining the stowaway during the period in which the stowaway is pursuing his or her asylum application, for a maximum period of 15 working days, excluding Saturdays, Sundays, and holidays. The 15-day period shall begin on the day following the day in which the alien is determined to have a credible fear of persecution by the asylum officer, or by the immigration judge if such review was requested by the alien pursuant to section 235(b)(1)(B)(iii)(III) of the Act, but not later than 72 hours after the stowaway was initially presented to the Service for inspection. Following the determination of credible fear, if the stowaway's application for asylum is not adjudicated within 15 working days, the Service shall pay the costs of detention beyond this time period. If the stowaway is determined not to have a credible fear of persecution, or if the stowaway's application for asylum is denied, including any appeals, the carrier shall be notified and shall arrange for repatriation of the stowaway at the expense of the owner of the vessel or aircraft on which the stowaway arrived.

8 CFR § 241.12

### §241.12 Nonapplication of costs of detention and maintenance.

The owner of a vessel or aircraft bringing an alien to the United States who claims to be exempt from payment of the costs of detention and maintenance of the alien pursuant to section 241(c)(3)(B) of the Act shall establish to the satisfaction of the district director in charge of the port of arrival that such costs should not be applied. The district director shall afford the owner a reasonable time within which to submit affidavits and briefs to support the claim. There is no appeal from the decision of the district director.

8 CFR § 241.13

### §§241.13—241.19 [Reserved]

### Subpart B—Deportation of Excluded Aliens (for hearings commenced prior to April 1, 1997)
8 CFR § 241.20

### §241.20 Proceedings commenced prior to April 1, 1997.

Subpart B of 8 CFR part 241 applies to exclusion proceedings commenced prior to April 1, 1997. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

8 CFR § 241.21

### §241.21 Stay of deportation of excluded alien.

The district director in charge of the port of arrival may stay the immediate deportation of an excluded alien pursuant to sections 237 (a) and (d) of the Act under such conditions as he or she may prescribe.

8 CFR § 241.22

### §241.22 Notice to surrender for deportation.

An alien who has been finally excluded pursuant to 8 CFR part 240, subpart D may at any time surrender himself or herself to the custody of the Service and shall surrender to such custody upon notice in writing of the time and place for his or her surrender. The Service may take the alien into custody at any time. An alien taken into custody either upon notice to surrender or by arrest shall not be deported less than 72 hours thereafter without his or her consent thereto filed in writing with the district director in charge of the place of his or her detention. An alien in foreign contiguous territory shall be informed that he or she may remain there in lieu of surrendering to the Service, but that he or she will be deemed to have acknowledged the execution of the order of exclusion and deportation in his or her case upon his or her failure to surrender at the time and place prescribed.

8 CFR § 241.23

### §241.23 Cost of maintenance not assessed.

A claim pursuant to section 237(a)(1) of the Act shall be established to the satisfaction of the district director in charge of the port of arrival, from whose adverse decision no appeal shall lie. The district director shall afford the line a reasonable time within which to submit affidavits and briefs to support its claim.

8 CFR § 241.24

**§241.24 Notice to transportation line of alien's exclusion.**

(a) An excluded alien shall, immediately or as promptly as the circumstances permit, be offered for deportation to the master, commanding officer, purser, person in charge, agent, owner, or consignee of the vessel or aircraft on which the alien is to be deported, as determined by the district director, with a written notice specifying the cause of exclusion, the class of travel in which such alien arrived and is to be deported, and with the return of any documentation that will assist in effecting his or her deportation. If special care and attention are required, the provisions of §241.10 shall apply.

(b) Failure of the carrier to accept for removal an alien who has been ordered excluded and deported shall result in the carrier being assessed any costs incurred by the Service for detention after the carrier's failure to accept the alien for removal including the cost of any transportation. The User Fee Account shall not be assessed for expenses incurred because of the carrier's violation of the provisions of section 237 of the Act and this paragraph. The Service will, at the carrier's option, retain custody of the excluded alien for an additional 7 days beyond the date of the deportation/exclusion order. If, after the third day of this additional 7-day period, the carrier has not made all the necessary transportation arrangements for the excluded alien to be returned to his or her point of embarkation by the end of the additional 7-day period, the Service will make the arrangements and bill the carrier for its costs.

8 CFR § 241.25

**§241.25 Deportation.**

(a) Definitions of terms. For the purposes of this section, the following terms mean:

(1) Adjacent island—as defined in section 101(b)(5) of the Act.

(2) Foreign contiguous territory—any country sharing a common boundary with the United States.

(3) Residence in foreign contiguous territory or adjacent island—any physical presence, regardless of intent, in a foreign contiguous territory or an adjacent island if the government of such territory or island agrees to accept the alien.

(4) Aircraft or vessel—any conveyance and other mode of travel by which arrival is effected.

(5) Next available flight—the carrier's next regularly scheduled departure to **\*10382** the excluded alien's point of embarkation regardless of seat availability. If the carrier's next regularly scheduled departure to the excluded aliens point of embarkation is full, the carrier has the option of arranging for return transportation on other carriers which service the excluded aliens point of embarkation.

(b) Place to which deported. Any alien (other than an alien crewmember or an alien who boarded an aircraft or vessel in foreign contiguous territory or an adjacent island) who is ordered excluded shall be deported to the country where the alien boarded the vessel or aircraft on which the alien arrived in the United States. If that country refuses to accept the alien, the alien shall be deported to:

(1) The country of which the alien is a subject, citizen, or national;

(2) The country where the alien was born;

(3) The country where the alien has a residence; or

(4) Any country willing to accept the alien.

(c) Contiguous territory and adjacent islands. Any alien ordered excluded who boarded an aircraft or vessel in foreign contiguous territory or in any adjacent island shall be deported to such foreign contiguous territory or adjacent island if the alien is a native, citizen, subject, or national of such foreign contiguous territory or adjacent island, or if the alien has a residence in such foreign contiguous territory or adjacent island. Otherwise, the alien shall be deported, in the first instance, to the country in which is located the port at which the alien embarked for such foreign contiguous territory or adjacent island.

(d) Land border pedestrian arrivals. Any alien ordered excluded who arrived at a land border on foot shall be deported in the same manner as if the alien had boarded a vessel or aircraft in foreign contiguous territory.

8 CFR § 241.26-241.29

## §§241.26-241.29 [Reserved]

### Subpart C—Deportation of Aliens in the United States (for hearings commenced prior to April 1, 1997)
8 CFR § 241.30

### §241.30 Proceedings commenced prior to April 1, 1997.
Subpart C of 8 CFR part 241 applies to deportation proceedings commenced prior to April 1, 1997. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

8 CFR § 241.31

### §241.31 Final order of deportation.
Except as otherwise required by section 242(c) of the Act for the specific purposes of that section, an order of deportation, including an alternate order of deportation coupled with an order of voluntary departure, made by the immigration judge in proceedings under 8 CFR part 240 shall become final upon dismissal of an appeal by the Board of Immigration Appeals, upon waiver of appeal, or upon expiration of the time allotted for an appeal when no appeal is taken; or, if such an order is issued by the Board or approved by the Board upon certification, it shall be final as of the date of the Board's decision.

8 CFR § 241.32

### §241.32 Warrant of deportation.
A Form I-205, Warrant of Deportation, based upon the final administrative order of deportation in the alien's case shall be issued by a district director. The district director shall exercise the authority contained in section 243 of the Act to determine at whose expense the alien shall be deported and whether his or her mental or physical condition requires personal care and attention en route to his or her destination.

8 CFR § 241.33

### §241.33 Expulsion.
(a) Execution of order. Except in the exercise of discretion by the district director, and for such reasons as are set forth in §212.5(a) of this chapter, once an order of deportation becomes final, an alien shall be taken into custody and the order shall be executed. For the purposes of this part, an order of deportation is final and subject to execution upon the date when any of the following occurs:

(1) A grant of voluntary departure expires;

(2) An immigration judge enters an order of deportation without granting voluntary departure or other relief, and the alien respondent waives his or her right to appeal;

(3) The Board of Immigration Appeals enters an order of deportation on appeal, without granting voluntary departure or other relief; or

(4) A Federal district or appellate court affirms an administrative order of deportation in a petition for review or habeas corpus action.

Inspection and Expedited Removal of Aliens; Detention and..., 62 FR 10312-01

(b) Service of decision. In the case of an order entered by any of the authorities enumerated above, the order shall be executed no sooner than 72 hours after service of the decision, regardless of whether the alien is in Service custody, provided that such period may be waived on the knowing and voluntary request of the alien. Nothing in this paragraph shall be construed, however, to preclude assumption of custody by the Service at the time of issuance of the final order.

## PART 242—[REMOVED AND RESERVED]

106. Part 242 is removed and reserved.

## PART 243—[REMOVED AND RESERVED]

107. Part 243 is removed and reserved.

## PART 244—TEMPORARY PROTECTED STATUS FOR NATIONALS OF DESIGNATED STATES

108. The heading for part 244 is revised as set forth above.

109. The authority citation for part 244 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1254, 1254a note, 8 CFR part 2.

8 CFR § 244.1 8 CFR § 244.2

### §§244.1 and 244.2 [Removed]

8 CFR § 244.1 8 CFR § 244.2

110. Sections 244.1 and 244.2 are removed.

### §§244.3 through 244.22 [Redesignated as §§244.1 through 244.20]

111. Newly designated §§244.3 through 244.22 are further redesignated as §§ 244.1 through 244.20, respectively.

## PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE

112. The authority citation for part 245 is revised to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1182, 1255; 8 CFR part 2.

8 CFR § 245.1

113. Section 245.1 is amended by:

a. Removing the word "and" at the end of the paragraph (c)(3);

b. Removing the "." at the end of paragraphs (c)(4) through (c)(7), and replacing it with a ";";

c. Redesignating paragraph (c)(8) as paragraph (c)(9);

d. Adding a new paragraph (c)(8);

e. Revising newly redesignated paragraph (c)(9) introductory text;

f. Revising newly redesignated paragraphs (c)(9)(i) through (c)(9)(iii); and by

g. Revising paragraph (f), to read as follows:

8 CFR § 245.1

**§245.1 Eligibility.**

* * * * *

(c) * * *

(8) Any arriving alien who is in removal proceedings pursuant to section 235(b)(1) or section 240 of the Act; and

(9) Any alien who seeks to adjust status based upon a marriage which occurred on or after November 10, 1986, and while the alien was in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto.

(i) Commencement of proceedings. The period during which the alien is in **\*10383** deportation, exclusion, or removal proceedings or judicial proceedings relating thereto, commences:

(A) With the issuance of the Form I-221, Order to Show Cause and Notice of Hearing prior to June 20, 1991;

(B) With the filing of a Form I-221, Order to Show Cause and Notice of Hearing, issued on or after June 20, 1991, with the Immigration Court;

(C) With the issuance of Form I-122, Notice to Applicant for Admission Detained for Hearing Before Immigration Judge, prior to April 1, 1997,

(D) With the filing of a Form I-862, Notice to Appear, with the Immigration Court, or

(E) With the issuance and service of Form I-860, Notice and Order of Expedited Removal.

(ii) Termination of proceedings. The period during which the alien is in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto, terminates:

(A) When the alien departs from the United States while an order of exclusion, deportation, or removal is outstanding or before the expiration of the voluntary departure time granted in connection with an alternate order of deportation or removal;

(B) When the alien is found not to be inadmissible or deportable from the United States;

(C) When the Form I-122, I-221, I-860, or I-862 is canceled;

(D) When proceedings are terminated by the immigration judge or the Board of Immigration Appeals; or

(E) When a petition for review or an action for habeas corpus is granted by a Federal court on judicial review.

(iii) Exemptions. This prohibition shall no longer apply if:

(A) The alien is found not to be inadmissible or deportable from the United States;

(B) Form I-122, I-221, I-860, or I-862, is canceled;

(C) Proceedings are terminated by the immigration judge or the Board of Immigration Appeals;

(D) A petition for review or an action for habeas corpus is granted by a Federal court on judicial review;

(E) The alien has resided outside the United States for 2 or more years following the marriage; or

(F) The alien establishes the marriage is bona fide by providing clear and convincing evidence that the marriage was entered into in good faith and in accordance with the laws of the place where the marriage took place, was not entered into for the purpose of procuring the alien's entry as an immigrant, and no fee or other consideration was given (other than to an attorney for assistance in preparation of a lawful petition) for the filing of a petition.

 * * * * *

(f) Concurrent applications to overcome grounds of inadmissibility. Except as provided in 8 CFR parts 235 and 249, an application under this part shall be the sole method of requesting the exercise of discretion under sections 212(g), (h), (i), and (k) of the Act, as they relate to the inadmissibility of an alien in the United States. No fee is required for filing an application to overcome the grounds of inadmissibility of the Act if filed concurrently with an application for adjustment of status under the provisions of the Act of October 28, 1977, and of this part.

 * * * * *8 CFR § 245.2

114. Section 245.2 is amended by:

a. Revising paragraph (a)(1);

b. Revising paragraph (a)(4)(ii);

c. Revising paragraph (a)(5)(ii) and (iii); and by

d. Revising paragraph (c), to read as follows:

 8 CFR § 245.2

## §245.2 Application.

(a) * * * (1) Jurisdiction. An alien who believes he or she meets the eligibility requirements of section 245 of the Act or section 1 of the Act of November 2, 1966, and §245.1 shall apply to the director having jurisdiction over his or her place of residence unless otherwise instructed in 8 CFR part 245, or by the instruction on the application form. After an alien, other than an arriving alien, is in deportation or removal proceedings, his or her application for adjustment of status under section 245 of the Act or section 1 of the Act of November 2, 1966 shall be made and considered only in those proceedings. An arriving alien, other than an alien in removal proceedings, who believes he or she meets the eligibility requirements of section 245 of the Act or section 1 of the Act of November 2, 1966, and §245.1 shall apply to the director having jurisdiction over his or her place of arrival. An adjustment application by an alien paroled under section 212(d)(5) of the Act, which has been denied by the director, may be renewed in removal proceedings under 8 CFR part 240 only if:

(i) The denied application must have been properly filed subsequent to the applicant's earlier inspection and admission to the United States; and

(ii) The applicant's later absence from and return to the United States was under the terms of an advance parole authorization on Form I-512 granted to permit the applicant's absence and return to pursue the previously filed adjustment application.

 * * * * *

(4) * * *

(ii) Under section 245 of the Act. The departure from the United States of an applicant who is under exclusion, deportation, or removal proceedings shall be deemed an abandonment of the application constituting grounds for termination of the proceeding by reason of the departure. The departure of an applicant who is not under exclusion, deportation, or removal proceedings shall be deemed an abandonment of his or her application constituting grounds for termination, unless the applicant was previously granted advance parole by the Service for such absence, and was inspected upon returning to the United States. If the application

of an individual granted advance parole is subsequently denied, the applicant will be treated as an applicant for admission, and subject to the provisions of sections 212 and 235 of the Act.

 * * * * *

(5) * * *

(ii) Under section 245 of the Act. If the application is approved, the applicant's permanent residence shall be recorded as of the date of the order approving the adjustment of status. An application for adjustment of status, as a preference alien, shall not be approved until an immigrant visa number has been allocated by the Department of State, except when the applicant has established eligibility for the benefits of Public Law 101-238. No appeal lies from the denial of an application by the director, but the applicant, if not an arriving alien, retains the right to renew his or her application in proceedings under 8 CFR part 240. Also, an applicant who is a parolee and meets the two conditions described in §245.2(a)(1) may renew a denied application in proceedings under 8 CFR part 240 to determine admissibility. At the time of renewal of the application, an applicant does not need to meet the statutory requirement of section 245(c) of the Act, or §245.1(g), if, in fact, those requirements were met at the time the renewed application was initially filed with the director. Nothing in this section shall entitle an alien to proceedings under section 240 of the Act who is not otherwise so entitled.

(iii) Under the Act of November 2, 1966. If the application is approved, the applicant's permanent residence shall be recorded in accordance with the provisions of section 1. No appeal lies from the denial of an application by the director, but the applicant, if not an   **10384   arriving alien, retains the right to renew his or her application in proceedings under 8 CFR part 240. Also, an applicant who is a parolee and meets the two conditions described in § 245.2(a)(1) may renew a denied application in proceedings under 8 CFR part 240 to determine admissibility.

 * * * * *

(c) Application under section 214(d) of the Act. An application for permanent resident status pursuant to section 214(d) of the Act shall be filed on Form I-485 with the director having jurisdiction over the applicant's place of residence. A separate application shall be filed by each applicant. If the application is approved, the director shall record the lawful admission of the applicant as of the date of approval. The applicant shall be notified of the decision and, if the application is denied, of the reasons therefor. No appeal shall lie from the denial of an application by the director but such denial shall be without prejudice to the alien's right to renew his or her application in proceedings under 8 CFR part 240.

 8 CFR § 245.5

115. Section 245.5 is amended by revising the first sentence to read as follows:

 8 CFR § 245.5

§245.5 **Medical examination.**

Pursuant to section 232(b) of the Act, an applicant for adjustment of status shall be required to have a medical examination by a designated civil surgeon, whose report setting forth the findings of the mental and physical condition of the applicant, including compliance with section 212(a)(1)(A)(ii) of the Act, shall be incorporated into the record. * * *

 8 CFR § 245.8

116. Section 245.8 is amended by revising paragraph (e), to read as follows:

 8 CFR § 245.8

§245.8 **Adjustment of status as a special immigrant under section 101(a)(27)(K) of the Act.**

 * * * * *

(e) Removal provisions of section 237 of the Act. If the Service is made aware by notification from the appropriate executive department or by any other means that a section 101(a)(27)(K) special immigrant who has already been granted permanent residence fails to complete his or her total active duty service obligation for reasons other than an honorable discharge, the alien may become subject to the removal provisions of section 237 of the Act, provided the alien is in one or more of the classes of deportable aliens specified in section 237 of the Act. The Service shall obtain a current Form DD-214, Certificate of Release or Discharge from Active Duty, from the appropriate executive department for verification of the alien's failure to maintain eligibility.

 * * * * *8 CFR § 245.9

117. Section 245.9 is amended by revising paragraphs (d) and (m), to read as follows:

 8 CFR § 245.9

**§245.9** **Adjustment of Status of Certain Nationals of the People's Republic of China under Public Law 102-404.**
* * * * *

(d) Waivers of inadmissibility under section 212(a) of the Act. An applicant for the benefits of the adjustment of status provisions of Pub. L. 102-404 is automatically exempted from compliance with the requirements of sections 212(a)(5) and 212(a)(7)(A) of the Act. A Pub. L. 102-404 applicant may also apply for one or more waivers of inadmissibility under section 212(a) of the Act, except for inadmissibility under section 212(a)(2)(C), 212(a)(3)(A), 212(a)(3)(B), 212(a)(3)(C) or 212(a)(3)(E) of the Act.
 * * * * *

(m) Effect of enactment on family members other than qualified family members. The adjustment of status benefits and waivers provided by Pub. L. 102-404 do not apply to a spouse or child who is not a qualified family member as defined in paragraph (c) of this section. However, a spouse or child whose relationship to the principal alien was established prior to the approval of the principal's adjustment of status application may be accorded the derivative priority date and preference category of the principal alien, in accordance with the provisions of section 203(d) of the Act. The spouse or child may use the priority date and category when it becomes current, in accordance with the limitations set forth in sections 201 and 202 of the Act. Persons who are unable to maintain lawful nonimmigrant status in the United States and are not immediately eligible to apply for adjustment of status may request voluntary departure pursuant to 8 CFR part 240.

 8 CFR § 245.10

118. Section 245.10 is amended by:

a. Revising paragraphs (a) (3) and (6); and by

b. Revising introductory text in paragraph (b), to read as follows:

 8 CFR § 245.10

**§245.10** **Adjustment of status upon payment of additional sum under Public Law 103-317.**
(a) * * *

(3) Is not inadmissible from the United States under any provision of section 212 of the Act, or all grounds for inadmissibility have been waived;
 * * * * *

(6) Remits the sum specified in section 245(i) of the Act, unless payment of the sum is waived under section 245(i) of the Act; and
 * * * * *

(b) Payment of additional sum. An applicant filing under the provisions of section 245(i) of the Act must pay the standard adjustment of status filing fee, as shown on Form I-485 and contained in §103.7(b)(1) of this chapter. The applicant must also pay the additional sum specified in section 245(i) of the Act, unless at the time the application for adjustment of status is filed, the alien is:
 * * * * *8 CFR § 245.11

119. Section 245.11 is amended by:

a. Revising paragraph (a)(4)(ii)(B);

b. Revising paragraph (b)(1)(iii);

c. Revising the introductory text in paragraph (c); and by

d. Revising paragraphs (h) and (i), to read as follows:

 8 CFR § 245.11



**§245.11 Adjustment of aliens in S nonimmigrant classification.**

(a) * * *

(4) * * *

(ii) * * *

(B) Be admissible to the United States as an immigrant, unless the ground of inadmissibility has been waived;

 * * * * *

(b) * * *

(1) * * *

(iii) The family member is not inadmissible from the United States as a participant in Nazi persecution or genocide as described in section 212(a)(3)(E) of the Act;

 * * * * *

(c) Waivers of inadmissibility. An alien seeking to adjust status pursuant to the provisions of section 101(a)(15)(S) of the Act may not be denied adjustment of status for conduct or a condition that:

 * * * * *

(h) Removal under section 237 of the Act. Nothing in this section shall prevent an alien adjusted pursuant to the terms of these provisions from being removed for conviction of a crime of moral turpitude committed within 10 years after being provided lawful permanent residence under this section or for any other ground under section 237 of the Act.

(i) Denial of application. In the event the district director decides to deny an application on Form I-485 and an approved Form I-854 to allow an S nonimmigrant to adjust status, the Assistant Attorney General, Criminal Division, and the relevant LEA shall be notified in writing to that effect. The Assistant Attorney General, Criminal Division, shall concur in or object to  **\*10385** that decision. Unless the Assistant Attorney General, Criminal Division, objects within 7 days, he or she shall be deemed to have concurred in the decision. In the event of an objection by the Assistant Attorney General, Criminal Division, the matter will be expeditiously referred to the Deputy Attorney General for a final resolution. In no circumstances shall the alien or the relevant LEA have a right of appeal from any decision to deny. A denial of an adjustment application under this paragraph may not be renewed in subsequent removal proceedings.

120. Part 246 is revised to read as follows:

**PART 246—RESCISSION OF ADJUSTMENT OF STATUS**
Sec.

246.1 Notice.

246.2 Allegations admitted; no answer filed; no hearing requested.

246.3 Allegations contested or denied; hearing requested.

 8 CFR § 246.4

246.4 Immigration judge's authority; withdrawal and substitution.

246.5 Hearing.

246.6 Decision and order.

246.7 Appeals.
 8 CFR § 246.8
246.8 [Reserved]

246.9 Surrender of Form I-551.

Authority: Authority: 8 U.S.C. 1103, 1254, 1255, 1256, 1259; 8 CFR part 2.
 8 CFR § 246.1

## §246.1 Notice.

If it appears to a district director that a person residing in his or her district was not in fact eligible for the adjustment of status made in his or her case, a proceeding shall be commenced by the personal service upon such person of a notice of intent to rescind which shall inform him or her of the allegations upon which it is intended to rescind the adjustment of his or her status. In such a proceeding the person shall be known as the respondent. The notice shall also inform the respondent that he or she may submit, within thirty days from the date of service of the notice, an answer in writing under oath setting forth reasons why such rescission shall not be made, and that he or she may, within such period, request a hearing before an immigration judge in support of, or in lieu of, his or her written answer. The respondent shall further be informed that he or she may have the assistance of or be represented by counsel or representative of his or her choice qualified under part 292 of this chapter, at no expense to the Government, in the preparation of his or her answer or in connection with his or her hearing, and that he or she may present such evidence in his or her behalf as may be relevant to the rescission.
 8 CFR § 246.2

## §246.2 Allegations admitted; no answer filed; no hearing requested.

If the answer admits the allegations in the notice, or if no answer is filed within the thirty-day period, or if no hearing is requested within such period, the district director shall rescind the adjustment of status previously granted, and no appeal shall lie from his decision.
 8 CFR § 246.3

## §246.3 Allegations contested or denied; hearing requested.

If, within the prescribed time following service of the notice pursuant to § 246.1, the respondent has filed an answer which contests or denies any allegation in the notice, or a hearing is requested, a hearing pursuant to § 246.5 shall be conducted by an immigration judge, and the requirements contained in §§240.3, 240.4, 240.5, 240.6, 240.7, and 240.9 of this chapter shall be followed.
 8 CFR § 246.4

## §246.4 Immigration judge's authority; withdrawal and substitution.

8 CFR § 246.1 8 CFR § 246.2
In any proceeding conducted under this part, the immigration judge shall have authority to interrogate, examine, and cross-examine the respondent and other witnesses, to present and receive evidence, to determine whether adjustment of status shall be rescinded, to make decisions thereon, including an appropriate order, and to take any other action consistent with applicable provisions of law and regulations as may be appropriate to the disposition of the case. Nothing contained in this part shall be construed to diminish the authority conferred on immigration judges by the Act. The immigration judge assigned to conduct a hearing shall, at any time, withdraw if he or she deems himself or herself disqualified. If a hearing has begun but no evidence has been adduced other than the notice and answer, if any, pursuant to §§246.1 and 246.2, or if an immigration judge becomes unavailable to complete his or her duties within a reasonable time, or if at any time the respondent consents to a substitution, another immigration judge may be assigned to complete the case. The new immigration judge shall familiarize himself or herself with the record in the case and shall state for the record that he or she is familiar with the record in the case.
 8 CFR § 246.5

## §246.5 Hearing.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(a) Service counsel. The Government shall be represented at the hearing by a Service counsel who shall have authority to present evidence, and to interrogate, examine, and cross-examine the respondent and other witnesses. The Service counsel is authorized to appeal from a decision of the immigration judge pursuant to §246.7 and to move for reopening or reconsideration pursuant to §3.23 of this chapter.

(b) Opening. The immigration judge shall advise the respondent of the nature of the proceeding and the legal authority under which it is conducted; advise the respondent of his or her right to representation, at no expense to the Government, by counsel or representative of his or her own choice qualified under part 292 of this chapter and require him or her to state then and there whether he or she desires representation; advise the respondent that he or she will have a reasonable opportunity to examine and object to the evidence against him or her, to present evidence in his or her own behalf, and to cross-examine witnesses presented by the Government; place the respondent under oath; read the allegations in the notice to the respondent and explain them in nontechnical language, and enter the notice and respondent's answer, if any, as exhibits in the record.

(c) Pleading by respondent. The immigration judge shall require the respondent to state for the record whether he or she admits or denies the allegations contained in the notice, or any of them, and whether he or she concedes that his or her adjustment of status should be rescinded. If the respondent admits all of the allegations and concedes that the adjustment of status in his or her case should be rescinded under the allegations set forth in the notice, and the immigration judge is satisfied that no issues of law or fact remain, he or she may determine that rescission as alleged has been established by the respondent's admissions. The allegations contained in the notice shall be taken as admitted when the respondent, without reasonable cause, fails or refuses to attend or remain in attendance at the hearing.

8 CFR § 246.6

### §246.6 Decision and order.

The decision of the immigration judge may be oral or written. The formal enumeration of findings is not required. The order shall direct either that the proceeding be terminated or that the adjustment of status be rescinded. Service of the decision and finality of the order of the immigration judge shall be in accordance with, and as stated in §§240.13 (a) and (b) and 240.14 of this chapter. **\*10386**

8 CFR § 246.7

### §246.7 Appeals.

Pursuant to 8 CFR part 3, an appeal shall lie from a decision of an immigration judge under this part to the Board of Immigration Appeals. An appeal shall be taken within 30 days after the mailing of a written decision or the stating of an oral decision. The reasons for the appeal shall be specifically identified in the Notice of Appeal (Form EOIR 26); failure to do so may constitute a ground for dismissal of the appeal by the Board.

8 CFR § 246.8

### §246.8 [Reserved]

8 CFR § 246.9

### §246.9 Surrender of Form I-551.

A respondent whose status as a permanent resident has been rescinded in accordance with section 246 of the Act and this part, shall, upon demand, promptly surrender to the district director having administrative jurisdiction over the office in which the action under this part was taken, the Form I-551 issued to him or her at the time of the grant of permanent resident status.


## PART 248—CHANGE OF NONIMMIGRANT CLASSIFICATION

121. The authority citation for part 248 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1184, 1187, 1258; 8 CFR part 2.

8 CFR § 248.1

122. Section 248.1 is amended by revising paragraph (b)(4) to read as follows:

8 CFR § 248.1

**§248.1 Eligibility.**

* * * * *

(b) * * *

(4) The alien is not the subject of removal proceedings under 8 CFR part 240.

* * * * *

## PART 249—CREATION OF RECORDS OF LAWFUL ADMISSION FOR PERMANENT RESIDENCE

123. The authority citation for part 249 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1182, 1259; 8 CFR part 2.

8 CFR § 249.2

124. Section 249.2 is amended by revising the first sentence in paragraph (a) and by revising paragraph (b), to read as follows:

8 CFR § 249.2

**§249.2 Application.**

(a) Jurisdiction. An application by an alien, other than an arriving alien, who has been served with a notice to appear or warrant of arrest shall be considered only in proceedings under 8 CFR part 240. * * *

(b) Decision. The applicant shall be notified of the decision and, if the application is denied, of the reasons therefor. If the application is granted, a Form I-551, showing that the applicant has acquired the status of an alien lawfully admitted for permanent residence, shall not be issued until the applicant surrenders any other document in his or her possession evidencing compliance with the alien registration requirements of former or existing law. No appeal shall lie from the denial of an application by the district director. However, an alien, other than an arriving alien, may renew the denied application in proceedings under 8 CFR part 240.

## PART 251—ARRIVAL MANIFESTS AND LISTS: SUPPORTING DOCUMENTS

125. The authority citation for part 251 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1182, 1221, 1281, 1282, 8 CFR part 2.

8 CFR § 251.1

126. Section 251.1 is revised to read as follows:

8 CFR § 251.1

**§251.1 Arrival manifests and lists.**

(a) Vessels—(1) General. The master or agent of every vessel arriving in the United States from a foreign place or an outlying possession of the United States shall present to the immigration officer at the port where the immigration inspection is performed a manifest of all crewmen on board on Form I-418, Passenger List and Crew List, in accordance with the instructions contained thereon.

(2) Longshore work notations. The master or agent of the vessel shall indicate in writing immediately below the name of the last alien listed on the Form I-418 whether or not crewmen aboard the vessel will be used to perform longshore work at any United States port before the vessel departs the United States.

(i) If no longshore work will be performed, no further notation regarding longshore work is required.

(ii) If longshore work will be performed, the master or agent shall note which exception listed in section 258 of the Act permits the work. The exceptions are:

(A) The hazardous cargo exception;

(B) The prevailing practice exception in accordance with a port's collective bargaining agreements;

(C) The prevailing practice exception at a port where there is no collective bargaining agreement, but for which the vessel files an attestation;

(D) The prevailing practice exception for automated vessels; and

(E) The reciprocity exception.

(iii) If longshore work will be performed under the hazardous cargo exception, the vessel must either be a tanker or be transporting dry bulk cargo that qualifies as hazardous. All tankers qualify for the hazardous cargo exception, except for a tanker that has been gas-freed to load non-hazardous dry bulk commodities.

(A) To invoke the exception for tankers, the master or agent shall note on the manifest that the vessel is a qualifying tanker.

(B) If the vessel is transporting dry bulk hazardous cargo, the master or agent shall note on the manifest that the vessel's dry bulk cargo is hazardous and shall show the immigration officer the dangerous cargo manifest that is signed by the master or an authorized representative of the owner, and that under 46 CFR 148.02 must be kept in a conspicuous place near the bridge house.

(iv) If longshore work will be performed under the prevailing practice exception, the master or agent shall note on the manifest each port at which longshore work will be performed under this exception. Additionally, for each port the master or agent shall note either that:

(A) The practice of nonimmigrant crewmen doing longshore work is in accordance with all collective bargaining agreements covering 30 percent or more of the longshore workers in the port;

(B) The port has no collective bargaining agreement covering 30 percent or more of the longshore workers in the port and an attestation has been filed with the Secretary of Labor;

(C) An attestation that was previously filed is still valid and the vessel continues to comply with the conditions stated in that attestation; or

(D) The longshore work consists of operating an automated, self-unloading conveyor belt or a vacuum-actuated system.

(v) If longshore work will be performed under the reciprocity exception, the master or agent shall note on the manifest that the work will be done under the reciprocity exception, and will note the nationality of the vessel's registry and the nationality or nationalities of the holders of a majority of the ownership interest in the vessel.

(3) Exception for certain Great Lakes vessels. (i) A manifest shall not be required for a vessel of United States, Canadian, or British registry engaged solely in traffic on the Great Lakes or the St. Lawrence River and connecting waterways, herein designated as a Great Lakes vessel, unless: **\*10387**

(A) The vessel employs nonimmigrant crewmen who will do longshore work at a port in the United States; or

(B) The vessel employs crewmen of other than United States, Canadian, or British citizenship.

(ii) In either situation, the master shall note the manifest in the manner prescribed in paragraph (a)(2) of this section.

(iii) After submission of a manifest on the first voyage of a calendar year, a manifest shall not be required on subsequent arrivals unless a nonimmigrant crewman of other than Canadian or British citizenship is employed on the vessel who was not aboard and listed on the last prior manifest, or a change has occurred regarding the performance of longshore work in the United States by nonimmigrant crewmen, or a change has occurred in the exception that the master or agent of the vessel wishes to invoke which was not noted on the last prior manifest.

(4) The master or agent of a vessel that only bunkers at a United States port en route to another United States port shall annotate Form I-418 presented at the onward port to indicate the time, date, and place of bunkering.

(5) If documentation is required to support an exception, as described in § 258.2 of this chapter, it must accompany the manifest.

(b) Aircraft. The captain or agent of every aircraft arriving in the United States from a foreign place or from an outlying possession of the United States, except an aircraft arriving in the United States directly from Canada on a flight originating in that country, shall present to the immigration officer at the port where the inspection is performed a manifest on United States Customs Service Form 7507 or on the International Civil Aviation Organization's General Declaration of all the alien crewmembers on board, including alien crewmembers who are returning to the United States after taking an aircraft of the same line from the United States to a foreign place or alien crewmembers who are entering the United States as passengers solely for the purpose of taking an aircraft of the same line from the United States to a foreign port. The captain or agent of an aircraft that only refuels at the United States en route to another United States port must annotate the manifest presented at the onward port to indicate the time, date, and place of refueling. The surname, given name, and middle initial of each alien crewman listed also shall be shown on the manifest. In addition, the captain or agent of the aircraft shall indicate the total number of United States citizen crewmembers and total number of alien crewmembers.

(c) Additional documents. The master, captain, or agent shall prepare as a part of the manifest, when one is required for presentation to an immigration officer, a completely executed set of Forms I-95, Conditional Landing Permit, for each nonimmigrant alien crewman on board, except:

(1) A Canadian or British citizen crewman serving on a vessel plying solely between Canada and the United States; or

(2) A nonimmigrant crewman who is in possession of an unmutilated Form I-184, Alien Crewman Landing Permit and Identification Card, or an unmutilated Form I-95 with space for additional endorsements previously issued to him or her as a member of the crew of the same vessel or an aircraft of the same line on his or her last prior arrival in the United States, following which he or she departed from the United States as a member of the crew of the same vessel or an aircraft of the same line.

8 CFR § 251.2

127. Section 251.2 is revised to read as follows:

8 CFR § 251.2

## §251.2 Notification of illegal landings.

As soon as discovered, the master or agent of any vessel from which an alien crewman has illegally landed or deserted in the United States shall inform the immigration officer in charge of the port where the illegal landing or desertion occurred, in writing, of the name, nationality, passport number and, if known, the personal description, circumstances and time of such illegal landing or desertion of such alien crewman, and furnish any other information and documents that might aid in his or her apprehension, including any passport surrendered pursuant to §252.1(d) of this chapter. Failure to file notice of illegal landing or desertion and to furnish any surrendered passport within 24 hours of the time of such landing or desertion becomes known shall be regarded as lack of compliance with section 251(d) of the Act.

8 CFR § 251.3

128. Section 251.3 is revised to read as follows:

8 CFR § 251.3

**§251.3 Departure manifests and lists for vessels.**

(a) Form I-418, Passenger List-Crew List. The master or agent of every vessel departing from the United States shall submit to the immigration officer at the port from which such vessel is to depart directly to some foreign place or outlying possession of the United States, except when a manifest is not required pursuant to §251.1(a), a single Form I-418 completed in accordance with the instructions on the form. Submission of a Form I-418 that lacks any required endorsement shall be regarded as lack of compliance with section 251(c) of the Act.

(b) Exception for certain Great Lakes vessels. The required list need not be submitted for Canadian or British crewmembers of Great Lakes vessels described in §251.1(a)(3).

8 CFR § 251.4

129. Section 251.4 is revised to read as follows:

8 CFR § 251.4

**§251.4 Departure manifests and lists for aircraft.**

(a) United States Customs Service Form 7507 or International Civil Aviation Organization's General Declaration. The captain or agent of every aircraft departing from the United States for a foreign place or an outlying possession of the United States, except on a flight departing for and terminating in Canada, shall submit to the immigration officer at the port from which such aircraft is to depart a completed United States Customs Service Form 7507 or the International Civil Aviation Organization's General Declaration. The form shall contain a list of all alien crewmen on board, including alien crewmen who arrived in the United States as crewmen on an aircraft of the same line and who are departing as passengers. The surname, given name, and middle initial of each such alien crewman listed shall be shown. In addition, the captain or agent of the aircraft shall indicate the total number of alien crewmembers and the total number of United States citizen crewmembers.

(b) Notification of changes in employment for aircraft. The agent of the air transportation line shall immediately notify in writing the nearest immigration office of the termination of employment in the United States of each alien employee of the line furnishing the name, birth date, birthplace, nationality, passport number, and other available information concerning such alien. The procedure to follow in obtaining permission to pay off or discharge an alien crewman in the United States after initial immigration inspection, other than an alien lawfully admitted for permanent residence, is set forth in §252.1(f) of this chapter.

8 CFR § 251.5

130. Section 251.5 is revised to read as follows:

8 CFR § 251.5

**§251.5 Exemptions for private vessels and aircraft.**

The provisions of this part relating to submission of arrival and departure manifests and lists shall not apply to a private vessel or a private aircraft not  **\*10388**  engaged directly or indirectly in the carriage of persons or cargo for hire.

**PART 252—LANDING OF ALIEN CREWMEN**

131. The authority citation for part 252 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1184, 1258, 1281, 1282; 8 CFR part 2.

8 CFR § 252.1

132. Section 252.1 is amended by revising paragraphs (a) through (c) to read as follows:

8 CFR § 252.1

**§252.1 Examination of crewmen.**

(a) Detention prior to examination. All persons employed in any capacity on board any vessel or aircraft arriving in the United States shall be detained on board the vessel or at the airport of arrival by the master or agent of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service.

(b) Classes of aliens subject to examination under this part. The examination of every nonimmigrant alien crewman arriving in the United States shall be in accordance with this part except that the following classes of persons employed on vessels or aircraft shall be examined in accordance with the provisions of 8 CFR parts 235 and 240:

(1) Canadian or British citizen crewmen serving on vessels plying solely between Canada and the United States; or

(2) Canadian or British citizen crewmen of aircraft arriving in a State of the United States directly from Canada on flights originating in that country. The crew of a vessel arriving at a United States port that may not require inspection by or clearance from the United States Customs Service is, nevertheless, subject to examination under this part; however, the master of such a vessel is not required to present Form I-95 for any crewman who is not an applicant for a conditional landing permit.

(c) Requirements for landing permits. Every alien crewman applying for landing privileges in the United States must make his or her application in person before an immigration officer, present whatever documents are required, be photographed and fingerprinted as the district director may require, and establish to the satisfaction of the immigration officer that he or she is not inadmissible under any provision of the law and is entitled clearly and beyond doubt to landing privileges in the United States.
 * * * * *8 CFR § 252.2
133. Section 252.2 is revised to read as follows:
 8 CFR § 252.2

## §252.2 Revocation of conditional landing permits; removal.
(a) Revocation and removal while vessel is in the United States. A crewman whose landing permit is subject to revocation pursuant to section 252(b) of the Act may be taken into custody by any immigration officer without a warrant of arrest and be transferred to the vessel of arrival, if the vessel is in any port in the United States and has not departed foreign since the crewman was issued his or her conditional landing permit. Detention and removal of the crewman shall be at the expense of the transportation line on which the crewman arrived. Removal may be effected on the vessel of arrival or, if the master of the vessel has requested in writing, by alternate means if removal on the vessel of arrival is impractical.

(b) Revocation and removal after vessel has departed the United States. A crewman who was granted landing privileges prior to April 1, 1997, and who has not departed foreign on the vessel of arrival, or on another vessel or aircraft if such permission was granted pursuant to §252.1(f), is subject to removal proceedings under section 240 of the Act as an alien deportable pursuant to section 237(a)(1)(C)(i) of the Act. A crewman who was granted landing privileges on or after April 1, 1997, and who has not departed foreign on the vessel of arrival, or on another vessel or aircraft if such permission was granted pursuant to §252.1(f), shall be removed from the United States without a hearing, except as provided in §208.2(b)(1) of this chapter. In either case, if the alien is removed within 5 years of the date of landing, removal of the crewman shall be at the expense of the owner of the vessel. In the case of a crewman ordered removed more than 5 years after the date of landing, removal shall be at the expense of the appropriation for the enforcement of the Act.
 8 CFR § 252.3
134. Section 252.3 is revised to read as follows:
 8 CFR § 252.3

## §252.3 Great Lakes vessels and tugboats arriving in the United States from Canada; special procedures.
(a) United States vessels and tugboats. An immigration examination shall not be required of any crewman aboard a Great Lakes vessel of United States registry or a tugboat of United States registry arriving from Canada at a port of the United States who has been examined and admitted by an immigration officer as a member of the crew of the same vessel or tugboat or of any other vessel or tugboat of the same company during the current calendar year.

(b) Canadian or British vessels or tugboats. An alien crewman need not be presented for inspection if the alien crewman:

(1) Serves aboard a Great Lakes vessel of Canadian or British registry or aboard a tugboat of Canadian or British registry arriving at a United States port-of-entry from Canada;

(2) Seeks admission for a period of less than 29 days;

(3) Has, during the current calendar year, been inspected and admitted by an immigration officer as a member of the crew of the same vessel or tugboat, or of any other vessel or tugboat of the same company;

(4) Is either a British or Canadian citizen or is in possession of a valid Form I-95 previously issued to him or her as a member of the crew of the same vessel or tugboat, or of any other vessel or tugboat of the same company;

(5) Does not request or require landing privileges in the United States beyond the time the vessel or tugboat will be in port; and,

(6) Will depart to Canada with the vessel or tugboat.

8 CFR § 252.4

135. Section 252.4 is revised to read as follows:

8 CFR § 252.4

**§252.4 Permanent landing permit and identification card.**

A Form I-184 is valid until revoked. It shall be revoked when an immigration officer finds that the crewman is in the United States in willful violation of the terms and conditions of his or her permission to land, or that he or she is inadmissible to the United States. On revocation, the Form I-184 shall be surrendered to an immigration officer. No appeal shall lie from the revocation of Form I-184.

8 CFR § 252.5

136. Section 252.5 is revised to read as follows:

8 CFR § 252.5

**§252.5 Special procedures for deserters from Spanish or Greek ships of war.**

(a) General. Under E.O. 11267 of January 19, 1966 (31 FR 807) and 28 CFR 0.109, and E.O. 11300 of August 17, 1966, (31 FR 11009), and 28 CFR 0.110, the Commissioner and immigration officers (as defined in §103.1(j) of this chapter) are designated as "competent national authorities" on the part of the United States within the meaning of Article XXIV of the 1903 Treaty of Friendship and General Relations between the United States and Spain (33 Stat. 2105, 2117), and "local authorities" and "competent officers" on the part of the United States within the meaning of Article XIII of the Convention between the United States and Greece (33 Stat. 2122, 2131).  **\*10389**

(b) Application for restoration. On application of a Consul General, Consul, Vice-Consul, or Consular-Agent of the Spanish or Greek Government, made in writing pursuant to Article XXIV of the treaty, or Article XIII of the Convention, respectively, stipulating for the restoration of crewmen deserting, stating that the person named therein has deserted from a ship of war of that government, while in any port of the United States, and on proof by the exhibition of the register, crew list, or official documents of the vessel, or a copy or extract therefrom, duly certified, that the person named belonged, at the time of desertion, to the crew of such vessel, such person shall be taken into custody by any immigration officer without a warrant of arrest. Written notification of charges shall be served on the alien when he or she is taken into custody or as soon as practical thereafter.

(c) Examination. Within a reasonable period of time after the arrest, the alien shall be accorded an examination by the district director, acting district director, or the deputy district director having jurisdiction over the place of arrest. The alien shall be informed that he or she may have the assistance of or be represented by a counsel or representative of his or her choice qualified under 8 CFR part 292 without expense to the Government, and that he or she may present such evidence in his or her behalf as may be relevant to this proceeding. If, upon the completion of such examination, it is determined that:

(1) The individual sought by the Spanish or Greek authorities had deserted from a Spanish or Greek ship of war in a United States port;

(2) The individual actually arrested and detained is the person sought;

(3) The individual is not a citizen of the United States; and

(4) The individual had not previously been arrested for the same cause and set at liberty because he or she had been detained for more than 3 months, or more than 2 months in the case of a deserter from a Greek ship of war, from the day of his or her arrest without the Spanish or Greek authorities having found an opportunity to send him or her home, the individual shall be served with a copy of the findings, from which no appeal shall lie, and be surrendered forthwith to the Spanish or Greek authorities if they are prepared to remove him or her from the United States. On written request of the Spanish or Greek authorities, the individual shall be detained, at their expense, for a period not exceeding 3 months or 2 months, respectively, from the day of arrest to afford opportunity to arrange for his or her departure from the United States.

(d) Timely departure not effected. If the Spanish authorities delay in sending the individual home for more than 3 months, or if the Greek authorities delay in sending the individual home for more than 2 months, from the day of his or her arrest, the individual shall be dealt with as any other alien unlawfully in the United States under the removal provisions of the Act, as amended.

(e) Commission of crime. If the individual has committed any crime or offense in the United States, he or she shall not be placed at the disposal of the consul until after the proper tribunal having jurisdiction in his or her case shall have pronounced sentence, and such sentence shall have been executed.

## PART 253—PAROLE OF ALIEN CREWMEN

137. The authority citation for part 253 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1182, 1282, 1283, 1285; 8 CFR part 2.

8 CFR § 253.1

138. In §253.1, paragraph (f) is revised to read as follows:

8 CFR § 253.1

**§253.1 Parole.**

* * * * *

(f) Crewman, stowaway, or alien removable under section 235(c) alleging persecution. Any alien crewman, stowaway, or alien removable under section 235(c) of the Act who alleges that he or she cannot return to his or her country of nationality or last habitual residence (if not a national of any country) because of fear of persecution in that country on account of race, religion, nationality, membership in a particular social group, or political opinion, is eligible to apply for asylum or withholding of removal under 8 CFR part 208. Service officers shall take particular care to ensure that the provisions of §208.5(b) of this chapter regarding special duties toward aliens aboard certain vessels are closely followed.

* * * * *

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

139. The authority citation for part 274a continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1324a; 8 CFR part 2.

8 CFR § 274a.12

140. Section 274a.12 is amended by:

a. Revising paragraphs (a)(10) and (12);

b. Revising paragraphs (c)(8) and (10);

c. Revising paragraph (c)(12); and by

d. Revising paragraph (c)(18), to read as follows:
 8 CFR § 274a.12

**§274a.12 Classes of aliens authorized to accept employment.**
(a) * * *

(10) An alien granted withholding of deportation or removal for the period of time in that status, as evidenced by an employment authorization document issued by the Service;
 * * * * *

(12) An alien granted Temporary Protected Status under section 244 of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service; or
 * * * * *

(c) * * *

(8) An alien who has filed a complete application for asylum or withholding of deportation or removal pursuant to 8 CFR part 208, whose application:

(i) Has not been decided, and who is eligible to apply for employment authorization under §208.7 of this chapter because the 150-day period set forth in that section has expired. Employment authorization may be granted according to the provisions of §208.7 of this chapter in increments to be determined by the Commissioner and shall expire on a specified date; or

(ii) Has been recommended for approval, but who has not yet received a grant of asylum or withholding or deportation or removal;
 * * * * *

(10) An alien who has filed an application for suspension of deportation under section 244 of the Act (as it existed prior to April 1, 1997) or cancellation of removal pursuant to section 240A of the Act. Employment authorization shall be granted in increments not exceeding one year during the period the application is pending (including any period when an administrative appeal or judicial review is pending) and shall expire on a specified date;
 * * * * *

(12) An alien granted benefits under the Family Unity provisions of section 301 of IMMACT 90 and the provisions of part 236, Subpart B of this chapter.
 * * * * *

(18) An alien against whom a final order of deportation or removal exists and who is released on an order of supervision under the authority contained in section 241(a)(3) of the Act may be granted employment authorization in the discretion of the district director only if the alien cannot be removed due to the refusal of all countries designated by the alien or under section 241 of the Act to receive the alien, or because the removal of the alien is otherwise impracticable or  **10390**  contrary to the public interest. Additional factors which may be considered by the district director in adjudicating the application for employment authorization include, but are not limited to, the following:

(i) The existence of economic necessity to be employed;

(ii) The existence of a dependent spouse and/or children in the United States who rely on the alien for support; and

(iii) The anticipated length of time before the alien can be removed from the United States.
 * * * * *

**PART 286—IMMIGRATION USER FEE**
141. The authority citation for part 286 continues to read as follows:

Authority: 8 U.S.C. 1103, 1356; 8 CFR part 2.

8 CFR § 286.9

142. In §286.9, paragraph (b)(3) is revised to read as follows:

8 CFR § 286.9

**§286.9 Fee for processing applications and issuing documentation at land border Ports-of-Entry.**

* * * * *

(b) * * *

(3) A Mexican national in possession of a valid nonresident alien border crossing card or nonimmigrant B-1/B-2 visa who is required to be issued Form I-94, Arrival/Departure Record, pursuant to §235.1(f) of this chapter, must remit the required fee for issuance of Form I-94 upon determination of admissibility.

* * * * *

**PART 287—FIELD OFFICERS; POWERS AND DUTIES**

143. The authority citation for part 287 continues to read as follows:

Authority: 8 U.S.C. 1103, 1182, 1225, 1226, 1251, 1252, 1357; 8 CFR part 2.

8 CFR § 287.3

144. Section 287.3 is revised to read as follows:

8 CFR § 287.3

**§287.3 Disposition of cases of aliens arrested without warrant.**

(a) Examination. An alien arrested without a warrant of arrest under the authority contained in section 287(a)(2) of the Act will be examined by an officer other than the arresting officer. If no other qualified officer is readily available and the taking of the alien before another officer would entail unnecessary delay, the arresting officer, if the conduct of such examination is a part of the duties assigned to him or her, may examine the alien.

(b) Determination of proceedings. If the examining officer is satisfied that there is prima facie evidence that the arrested alien was entering, attempting to enter, or is present in the United States in violation of the immigration laws, the examining officer will refer the case to an immigration judge for further inquiry in accordance with 8 CFR parts 235, 239, or 240, order the alien removed as provided for in section 235(b)(1) of the Act and §235.3(b) of this chapter, or take whatever other action may be appropriate or required under the laws or regulations applicable to the particular case.

(c) Notifications and information. Except in the case of an alien subject to the expedited removal provisions of section 235(b)(1)(A) of the Act, an alien arrested without warrant and placed in formal proceedings under section 238 or 240 of the Act will be advised of the reasons for his or her arrest and the right to be represented at no expense to the Government. The examining officer will provide the alien with a list of the available free legal services provided by organizations and attorneys qualified under 8 CFR part 3 and organizations recognized under §292.2 of this chapter that are located in the district where the hearing will be held. The examining officer shall note on Form I-862 that such a list was provided to the alien. The officer will also advise the alien that any statement made may be used against him or her in a subsequent proceeding.

(d) Custody procedures. Unless voluntary departure has been granted pursuant to subpart C of 8 CFR part 240, a determination will be made within 24 hours of the arrest whether the alien will be continued in custody or released on bond or recognizance and whether a notice to appear and warrant of arrest as prescribed in 8 CFR parts 236 and 239 will be issued.

8 CFR § 287.4

145. In §287.4, paragraph (d) is revised to read as follows:

8 CFR § 287.4

**§287.4** Subpoena.

\* \* \* \* \*

(d) Invoking aid of court. If a witness neglects or refuses to appear and testify as directed by the subpoena served upon him or her in accordance with the provisions of this section, the officer or immigration judge issuing the subpoena shall request the United States Attorney for the district in which the subpoena was issued to report such neglect or refusal to the United States District Court and to request such court to issue an order requiring the witness to appear and testify and to produce the books, papers, or documents designated in the subpoena.

8 CFR § 287.5

146. In §287.5, paragraphs (b) through (f) are revised to read as follows:

8 CFR § 287.5

**§287.5** Exercise of power by immigration officers.

\* \* \* \* \*

(b) Power and authority to patrol the border. The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power to patrol the border conferred by section 287(a)(3) of the Act:

(1) Border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Immigration inspectors (seaport operations only);

(4) Adjudications officers and deportation officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections (seaport operations only);

(5) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(6) Immigration officers who need the authority to patrol the border under section 287(a)(3) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner.

(c) Power and authority to arrest—(1) Arrests of aliens under section 287(a)(2) of the Act for immigration violations. The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the arrest power conferred by section 287(a)(2) of the Act and in accordance with §287.8(c):

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Immigration inspectors;

(v) Adjudications officers;

(vi) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(vii) Immigration officers who need the authority to arrest aliens under section 287(a)(2) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner.

(2) Arrests of persons under section 287(a)(4) of the Act for felonies regulating the admission or removal of aliens. The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise  **\*10391**  the arrest power conferred by section 287(a)(4) of the Act and in accordance with § 287.8(c):

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Immigration inspectors;

(v) Adjudications officers;

(vi) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(vii) Immigration officers who need the authority to arrest persons under section 287(a)(4) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(3) Arrests of persons under section 287(a)(5)(A) of the Act for any offense against the United States. The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the arrest power conferred by section 287(a)(5)(A) of the Act and in accordance with §287.8(c):

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Immigration inspectors (permanent full-time immigration inspectors only);

(v) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(vi) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(vii) Immigration officers who need the authority to arrest persons under section 287(a)(5)(A) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(4) Arrests of persons under section 287(a)(5)(B) of the Act for any felony. (i) Section 287(a)(5)(B) of the Act authorizes designated immigration officers, as listed in paragraph (c)(4)(iii) of this section, to arrest persons, without warrant, for any felony cognizable under the laws of the United States if:

(A) The immigration officer has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony;

(B) The immigration officer is performing duties relating to the enforcement of the immigration laws at the time of the arrest;

(C) There is a likelihood of the person escaping before a warrant can be obtained for his or her arrest; and

(D) The immigration officer has been certified as successfully completing a training program that covers such arrests and the standards with respect to the enforcement activities of the Service as defined in §287.8.

(ii) The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the arrest power conferred by section 287(a)(5)(B) of the Act and in accordance with §287.8(c):

(A) Border patrol agents, including aircraft pilots;

(B) Special agents;

(C) Deportation officers;

(D) Immigration inspectors (permanent full-time immigration inspectors only);

(E) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(F) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(G) Immigration officers who need the authority to arrest persons under section 287(a)(5)(B) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(iii) Notwithstanding the authorization and designation set forth in paragraph (c)(4)(ii) of this section, no immigration officer is authorized to make an arrest for any felony under the authority of section 287(a)(5)(B) of the Act until such time as he or she has been certified by the Director of Training as successfully completing a training course encompassing such arrests and the standards for enforcement activities as defined in §287.8. Such certification shall be valid for the duration of the immigration officer's continuous employment, unless it is suspended or revoked by the Commissioner or the Commissioner's designee for just cause.

(5) Arrests of persons under section 274(a) of the Act who bring in, transport, or harbor certain aliens, or induce them to enter. (i) Section 274(a) of the Act authorizes designated immigration officers, as listed in paragraph (c)(5)(ii) of this section, to arrest persons who bring in, transport, or harbor aliens, or induce them to enter the United States in violation of law. When making an arrest, the designated immigration officer shall adhere to the provisions of the enforcement standard governing the conduct of arrests in §287.8(c).

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 413 of 548   PageID 5356

(ii) The following immigration officers who have successfully completed basic immigration law enforcement training are authorized and designated to exercise the arrest power conferred by section 274(a) of the Act:

(A) Border patrol agents, including aircraft pilots;

(B) Special agents;

(C) Deportation officers;

(D) Immigration inspectors;

(E) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(F) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(G) Immigration officers who need the authority to arrest persons under section 274(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(6) Custody and transportation of previously arrested persons. In addition to the authority to arrest pursuant to a warrant of arrest in paragraph (e)(3)(iv) of this section, detention enforcement officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to take and maintain custody of and transport any person who has been arrested by an immigration officer pursuant to paragraphs (c)(1) through (c)(5) of this section.

(d) Power and authority to conduct searches. The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power to conduct searches conferred by section 287(c) of the Act:

(1) Border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Deportation officers;

(4) Immigration inspectors;

(5) Adjudications officers;

(6) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(7) Immigration officers who need the authority to conduct searches under section 287(c) of the Act in order to  **\*10392** effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner.

(e) Power and authority to execute warrants—(1) Search warrants. The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power conferred by section 287(a) of the Act to execute a search warrant:

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph, and

(iv) Immigration officers who need the authority to execute search warrants under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(2) Issuance of arrest warrants for immigration violations. A warrant of arrest may be issued only by the following immigration officers:

(i) District directors (except foreign);

(ii) Deputy district directors (except foreign);

(iii) Assistant district directors for investigations;

(iv) Deputy assistant district directors for investigations;

(v) Assistant district directors for deportation;

(vi) Deputy assistant district directors for deportation;

(vii) Assistant district directors for examinations;

(viii) Deputy assistant district directors for examinations;

(ix) Officers in charge (except foreign);

(x) Assistant officers in charge (except foreign);

(xi) Chief patrol agents;

(xii) Deputy chief patrol agents;

(xiii) Associate chief patrol agents;

(xiv) Assistant chief patrol agents;

(xv) Patrol agents in charge;

(xvi) The Assistant Commissioner, Investigations;

(xvii) Institutional Hearing Program directors;

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(xviii) Area port directors;

(xix) Port directors; or

(xx) Deputy port directors.

(3) Service of warrant of arrests for immigration violations. The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power pursuant to section 287(a) of the Act to execute warrants of arrest for administrative immigration violations issued under section 236 of the Act or to execute warrants of criminal arrest issued under the authority of the United States:

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Detention enforcement officers (warrants of arrest for administrative immigration violations only);

(v) Immigration inspectors;

(vi) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(vii) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(viii) Immigration officers who need the authority to execute arrest warrants for immigration violations under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner, for warrants of arrest for administrative immigration violations, and with the approval of the Deputy Attorney General, for warrants of criminal arrest.

(4) Service of warrant of arrests for non-immigration violations. The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power to execute warrants of criminal arrest for non-immigration violations issued under the authority of the United States:

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(v) Immigration officers who need the authority to execute warrants of arrest for non-immigration violations under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(f) Power and authority to carry firearms. The following immigration officers who have successfully completed basic immigration enforcement training are hereby authorized and designated to exercise the power conferred by section 287(a) of the Act to carry firearms provided that they are individually qualified by training and experience to handle and safely operate the firearms they are permitted to carry, maintain proficiency in the use of such firearms, and adhere to the provisions of the enforcement standard governing the use of force in §287.8(a):

(1) Border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Deportation officers;

(4) Detention enforcement officers;

(5) Immigration inspectors;

(6) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(7) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(8) Immigration officers who need the authority to carry firearms under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

8 CFR § 287.7

147. Section 287.7 is revised to read as follows:

8 CFR § 287.7

§287.7 Detainer provisions under section 287(d)(3) of the Act.

(a) Detainers in general. Detainers are issued pursuant to sections 236 and 287 of the Act and this chapter. Any authorized Service official may at any time issue a Form I-247, Immigration Detainer-Notice of Action, to any other Federal, State, or local law enforcement agency. A detainer serves to advise another law enforcement agency that the Service seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. The detainer is a request that such agency advise the Service, prior to release of the alien, in order for the Service to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible.

(b) Authority to issue detainers. The following officers are authorized to issue detainers:

(1) Border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Deportation officers;

(4) Immigration inspectors;

(5) Adjudications officers;

(6) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(7) Immigration officers who need the authority to issue detainers under **\*10393** section 287(d)(3) of the Act in order to effectively accomplish their individual missions and who are designated individually or as a class, by the Commissioner.

(c) Availability of records. In order for the Service to accurately determine the propriety of issuing a detainer, serving a notice to appear, or taking custody of an alien in accordance with this section, the criminal justice agency requesting such action or informing the Service of a conviction or act that renders an alien inadmissible or removable under any provision of law shall provide the Service with all documentary records and information available from the agency that reasonably relates to the alien's status in the United States, or that may have an impact on conditions of release.

(d) Temporary detention at Service request. Upon a determination by the Service to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Service.

(e) Financial responsibility for detention. No detainer issued as a result of a determination made under this chapter shall incur any fiscal obligation on the part of the Service, until actual assumption of custody by the Service, except as provided in paragraph (d) of this section.


**PART 299—IMMIGRATION FORMS**

148. The authority citation for part 299 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103; 8 CFR part 2.

8 CFR § 299.1

149. Section 299.1 is amended by:

a. Revising the entries for Forms "I-147", "I-205", "I-246", "I-247", "I-259", "I-284", "I-286", "I-291", "I-296", "I-408", "I-541", "I-589", "I-775", "I-851", and "I-851A";

b. Removing the entries for Forms I-122", "I-221", "I-259C", "I-290A", and "I-444", and by

c. Adding the entries for Forms "I-94T", "I-99", "I-148", "I-160", "I-210", "I-213", "I-217", "I-220A", "I-220B", "I-241", "I-261", "I-270", "I-275", "I-294", "I-407", "I-546", "I-701", "I-770", "I-771", "I-826", "I-827B", "I-860", "I-862", "I-863", "I-867AB", and "I-869" in proper numerical sequence, to the listing of forms, to read as follows:

8 CFR § 299.1

**§299.1 Prescribed forms.**

\* \* \* \* \*

| Form No. | Edition date | Title |
|---|---|---|
| | \* \* \* \* \* \* \* | |
| I-94T | 09-22-87 | Arrival-Departure Record (Transit without visa). |
| | \* \* \* \* \* \* \* | |
| I-99 | 04-01-97 | Notice of Revocation and Penalty. |
| | \* \* \* \* \* \* \* | |

| I-147 | 04-01-97 | Notice of Temporary Inadmissibility to U.S. |
| I-148 | 04-01-97 | Notice of Permanent Inadmissibility. |
| I-160 | 04-01-97 | Notice of Parole/Lookout Intercept. |

* * * * * * *

| I-205 | 04-01-97 | Warrant of Removal. |
| I-210 | 04-01-97 | Notice of Action—Voluntary Departure. |

* * * * * * *

| I-213 | 04-01-97 | Record of Deportable/Inadmissible Alien. |
| I-217 | 04-01-97 | Information for Travel Document or Passport. |
| I-220A | 04-01-97 | Order of Release on Recognizance. |
| I-220B | 04-01-97 | Order of Supervision. |

* * * * * * *

| I-241 | 04-01-97 | Request for Travel Document to Country Designated by Alien. |

* * * * * * *

| I-246 | 04-01-97 | Application for Stay of Removal. |
| I-247 | 04-01-97 | Immigration Detainer—Notice of Action. |
| I-259 | 04-01-97 | Notice to Detain, Deport, Remove, or Present Aliens. |

* * * * * * *

| I-261 | 04-01-97 | Additional Charges of Removability. |
| I-270 | 04-01-97 | Request for Consent to Return Person to Canada. |
| I-275 | 04-01-97 | Withdrawal of Application/Consular Notification. |
| I-284 | 04-01-97 | Notice to Transportation Line Regarding Deportation and Detention Expenses of Detained Alien. |
| I-286 | 04-01-97 | Notification to Alien of Conditions of Release or Detention. |

* * * * * * *

| I-291 | 04-01-97 | Decision on Application for Status as Permanent Resident. |

* * * * * * *

| I-294 | 04-01-97 | Notice of Country to Which Deportation has been Directed and Penalty for Reentry without Permission. |

| I-296 | 04-01-97 | Notice to Alien Ordered Removed. |
|---|---|---|

* * * * * * *

| I-407 | 04-01-97 | Abandonment by Alien of Status as Lawful Permanent Resident. |
|---|---|---|
| I-408 | 04-01-97 | Application to Pay Off or Discharge Alien Crewman. |

* * * * * * *

| I-541 | 04-01-97 | Order of Denial of Application for Extension of Stay or Student Employment or Student Transfer. |
|---|---|---|

* * * * * * *

| I-546 | 04-01-97 | Order to Appear—Deferred Inspection. |
|---|---|---|

* * * * * * *

| I-589 | 04-01-97 | Application for Asylum and Withholding of Removal. |
|---|---|---|

* * * * * * *

| I-701 | 04-01-97 | Detainee Transfer Worksheet. |
|---|---|---|

* * * * * * *

| I-770 | 04-01-97 | Notice of Rights and Request for Disposition. |
|---|---|---|
| I-771 | 04-01-97 | Bond Computation Worksheet. |
| I-775 | 04-01-97 | Visa Waiver Pilot Program Agreement. |

* * * * * * *

| I-826 | 04-01-97 | Notice of Rights and Request for Disposition |
|---|---|---|
| I-851 | 04-01-97 | Notice of Intent to Issue Final Administrative Removal Order. |
| I-851A | 04-01-97 | Final Administrative Removal Order. |

* * * * * * *

| I-860 | 04-01-97 | Notice and Order of Expedited Removal. |
|---|---|---|
| I-862 | 04-01-97 | Notice to Appear. |
| I-863 | 04-01-97 | Notice of Referral to Immigration Judge. |
| I-867AB | 04-01-97 | Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act. |
| I-869 | 04-01-97 | Record of Negative Credible Fear Finding and Request for Review by Immigration Judge. |

* * * * * * *

8 CFR § 299.5

150. Section 299.5 is amended by:

a. Removing the entry for Form "I-259C"; and by

b. Revising the entries for Forms "I-246" and "I-589", and to read as follows:
 8 CFR § 299.5

**§299.5 Display of control numbers.**
* * * * *

| INS form no. | INS form title | Currently assigned OMB control no. |
|---|---|---|
| | * * * * * * * | |
| I-246 | Application for Stay of Removal | 1115-0055 |
| | * * * * * * * | |
| I-589 | Application for Asylum and Withholding of Removal | 1115-0086 |
| | * * * * * * * | |


**\*10394  PART 316—GENERAL REQUIREMENTS FOR NATURALIZATION**
151. The authority citation for part 316 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1181, 1182, 1443, 1447; 8 CFR part 2.
 8 CFR § 316.5
152. Section 316.5 is amended by revising paragraph (c)(3) to read as follows:
 8 CFR § 316.5

**§316.5 Residence in the United States.**
* * * * *
(c) * * *

(3) Removal and return. Any departure from the United States while under an order of removal (including previously issued orders of exclusion or deportation) terminates the applicant's status as a lawful permanent resident and, therefore, disrupts the continuity of residence for purposes of this part.
 * * * * *

**PART 318—PENDING REMOVAL PROCEEDINGS**
153. The heading for part 318 is revised as set forth above.

154. The authority citation for part 318 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1252, 1429, 1443; 8 CFR part 2.
 8 CFR § 318.1
155. Section 318.1 is revised to read as follows:
 8 CFR § 318.1

**§318.1 Warrant of arrest.**

For the purposes of section 318 of the Act, a notice to appear issued under 8 CFR part 239 (including a charging document issued to commence proceedings under sections 236 or 242 of the Act prior to April 1, 1997) shall be regarded as a warrant of arrest.

**PART 329—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: NATURALIZATION BASED UPON ACTIVE DUTY SERVICE IN THE UNITED STATES ARMED FORCES DURING SPECIFIED PERIODS OF HOSTILITIES**

156. The authority citation for part 329 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1440, 1443; 8 CFR part 2.

 **\*10395**  159 Section 329.2 is amended by revising paragraph (e)(3) to read as follows:
 8 CFR § 329.2

**§329.2 Eligibility.**

\* \* \* \* \*

(e) \* \* \*

(3) The applicant may be naturalized even if an outstanding notice to appear pursuant to 8 CFR part 239 (including a charging document issued to commence proceedings under sections 236 or 242 of the Act prior to April 1, 1997) exists.

Dated: February 26, 1997.

Janet Reno,

Attorney General.

[FR Doc. 97-5250 Filed 2-28-97; 3:29 pm]

BILLING CODE 4410-10-P

**Footnotes**

1    Arrangements with these countries provide that U.S. authorities shall notify responsible representatives within 72 hours of the arrest or detention of one of their nationals.

2    When Taiwan nationals (who carry "Republic of China" passports) are detained, notification should be made to the nearest office of the Taiwan Economic and Cultural Representative's Office, the unofficial entity representing Taiwan's interests in the United States.

3    British dependencies are also covered by this agreement. They are: Anguilla, British Virgin Islands, Hong Kong, Bermuda, Montserrat, and the Turks and Caicos Islands. Their residents carry British passports.

4    All U.S.S.R. successor states are covered by this agreement. They are: Armenia, Azerbaijan, Belarus, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Russian Federation, Tajikistan, Turkmenistan, Ukraine, and Uzbekistan.

---

**End of Document**                                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:21-cv-00067-Z    Document 162-2    Filed 09/02/22    Page 423 of 548    PageID 5366

🇺🇸 Official website of the Department of Homeland Security

**U.S. Department of Homeland Security**

# Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Joint DHS/EOIR Statement on MPP Rescheduling

**Release Date:**  March 23, 2020

Due to circumstances resulting from COVID-19, all Migrant Protection Protocol (MPP) master calendar and merit hearings presently scheduled through April 22 will be rescheduled. Neither the MPP program nor any hearings will be cancelled.

Any individual with an MPP hearing date through April 22 should present themselves at their designated port of entry on their previously scheduled date to receive a tear sheet and hearing notice containing their new hearing dates. DHS and EOIR are deeply committed to ensuring that individuals 'have their day in court' while also ensuring the health and safety of aliens, our frontline officers, immigration court professionals, and our citizens.

Topics: Border Security (/topics/border-security)

Keywords: Homeland Security (/keywords/homeland-security) , Migrant Protection Protocols (MPP) (/keywords/migrant-protection-protocols-mpp)

Last Published Date: March 23, 2020

**AR01155**

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 424 of 548   PageID 5367

Official website of the Department of Homeland Security



U.S. Department of
Homeland Security

# Joint Statement by the U.S. Department of Homeland Security and U.S. Department of State on the Expansion of Access to the Central American Minors Program

**Release Date:** June 15, 2021

The following joint statement was released by Secretary Alejandro N. Mayorkas and Secretary of State Antony J. Blinken:

"The Department of Homeland Security's U.S. Citizenship and Immigration Services and Department of State's Bureau of Population, Refugees, and Migration have been making progress toward reinstituting and improving the Central American Minors (CAM) program since our agencies launched the first phase of its reopening on March 10.  As part of this focus on a responsible, phased approach, we continue to reopen cases that were closed when CAM was terminated in 2018.  This is just one component of the President's multi-pronged approach to address the challenges of irregular migration throughout North and Central America.

"Today, we are proud to announce the second phase of the CAM reopening, which will expand access to the program to a greater number of qualifying individuals.  Eligibility to petition will now be extended to include legal guardians (in addition to parents) who are in the United States pursuant to any of the following qualifying categories: lawful permanent residence; temporary protected status; parole; deferred action; deferred enforced departure; or withholding of removal.  In addition, this expansion of eligibility will now include certain U.S.-based parents or legal guardians who have a pending asylum application or a pending U visa

**AR01156**

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 425 of 548   PageID 5368

petition filed before May 15, 2021.  It will allow them to petition for access to the U.S. Refugee Admissions Program on behalf of their children who are nationals of El Salvador, Guatemala, or Honduras for potential resettlement in the United States.  These new changes will dramatically expand access to the CAM program.

"We are firmly committed to welcoming people to the United States with humanity and respect, as well as providing a legal alternative to irregular migration.  We are delivering on our promise to promote safe, orderly, and humane migration from Central America through this expansion of legal pathways to seek humanitarian protection in the United States."

Topics: Citizenship and Immigration Services (/topics/immigration-and-citizenship-services) , Secretary of Homeland Security (/topics/secretary-homeland-security)

Keywords: Central American Migration (/keywords/central-american-migration) , Immigration (/keywords/immigration) , Immigration Reform (/keywords/immigration-reform)

Last Published Date: June 15, 2021

AR01157

Cite as 27 I&N Dec. 762 (BIA 2020)                    Interim Decision #3975

# Matter of J.J. RODRIGUEZ Rodriguez, Respondent

*Decided January 31, 2020*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

  Where the Department of Homeland Security returns an alien to Mexico to await an
immigration hearing pursuant to the Migrant Protection Protocols and provides the alien
with sufficient notice of that hearing, an Immigration Judge should enter an in absentia
order of removal if the alien fails to appear for the hearing.

FOR RESPONDENT:  Pro se

FOR THE DEPARTMENT OF HOMELAND SECURITY:   David A. Landau, Senior
Litigation Coordinator

BEFORE:  Board Panel:  MALPHRUS, Acting Chairman; CREPPY and CASSIDY, Board
Members.

MALPHRUS, Acting Chairman:

  In a decision dated May 15, 2019, an Immigration Judge terminated the
respondent's removal proceedings without prejudice.  The Department of
Homeland Security ("DHS") has appealed from this decision.  While the
appeal was pending, we requested and received supplemental briefing from
the DHS and amici curiae.[1]  The appeal will be sustained, the removal
proceedings will be reinstated, and the record will be remanded for further
proceedings.

## I. FACTUAL AND PROCEDURAL HISTORY

  The respondent is a native and citizen of Honduras who applied for
admission to the United States at the San Ysidro, California, port of entry.
On April 3, 2019, the DHS served him with a notice to appear, charging him
with removability under section 212(a)(7)(A)(i)(I) of the Immigration and
Nationality Act, 8 U.S.C. § 1182(a)(7)(A)(i)(I) (2018), as an alien who, at
the time of admission, did not possess valid entry documents.  The notice to
appear contains the respondent's signature, acknowledging that the DHS had
personally served it on him.  It informed the respondent that his removal
hearing would be held on May 15, 2019, at 12:30 p.m. in the San Diego

---

[1]   We acknowledge and appreciate the briefs submitted by the DHS and amici.

AR01158

Cite as 27 I&N Dec. 762 (BIA 2020)                    Interim Decision #3975

Immigration Court and listed the respondent's address as Domicilio Conocido, Tijuana, Baja California, Mexico.

The DHS also provided the respondent with a document entitled "Migrant Protection Protocols Initial Processing Information" ("MPP Sheet"). The MPP Sheet, which is written in the English language, instructed the respondent to arrive at a specific location at the San Ysidro port of entry at 9:00 a.m. on May 15, 2019, so that he could be transported to the San Diego Immigration Court for his removal hearing. A copy of the MPP Sheet was provided to the respondent in the Spanish language, and both versions of this document contain the signature of the respondent that appears on the notice to appear.

The DHS returned the respondent to Mexico pursuant to the Migrant Protection Protocols to await his removal hearing. The respondent did not appear for this hearing, and the DHS requested that the Immigration Judge enter an in absentia order of removal. The DHS argued that the respondent was provided with adequate notice of his hearing and that the MPP Sheet advised the respondent of the procedure for obtaining transportation to his hearing. Citing due process concerns, the Immigration Judge concluded that the DHS did not provide the respondent with sufficient notice of his hearing and terminated the respondent's removal proceedings without prejudice. The Immigration Judge did not allow the DHS to present evidence regarding the respondent's removability.

## II. ANALYSIS

It is well settled that an Immigration Judge may only "terminate removal proceedings under [specific] circumstances identified in the regulations" and where "the charges of removability against a respondent have not been sustained." *Matter of S-O-G- & F-D-B-*, 27 I&N Dec. 462, 468 (A.G. 2018). We agree with the DHS that the Immigration Judge erred in terminating these proceedings.

In January 2019, the DHS implemented the Migrant Protection Protocols.[2] Under these protocols, the DHS has the discretion to return "certain foreign individuals entering or seeking admission to the U.S. from Mexico—illegally or without proper documentation— . . . to Mexico . . . for the duration of their immigration proceedings." U.S. Dep't of Homeland Security, *Migrant Protection Protocols* (Jan. 24, 2019), https://www.dhs.

---

[2]  On January 25, 2019, the Secretary of the DHS issued a memorandum providing guidance for implementing the Migrant Protection Protocols. *See* Memorandum from Kirstjen M. Nielsen, Sec'y of the DHS, *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019), https://www.dhs.gov/sites/default/files/publications/19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf.

AR01159

gov/news/2019/01/24/migrant-protection-protocols; *see also Innovation Law Lab v. McAleenan*, 924 F.3d 503, 507 (9th Cir. 2019) (per curiam) (granting the DHS's motion for a stay of a preliminary injunction of the Migrant Protection Protocols).

The statutory basis for the Migrant Protection Protocols is section 235(b)(2)(C) of the Act, 8 U.S.C. § 1225(b)(2)(C) (2018), which provides that, in the case of an alien "who is arriving on land . . . from a foreign territory contiguous to the United States," the DHS "may return the alien to that territory pending" a removal proceeding under section 240 of the Act, 8 U.S.C. § 1229a (2018). The regulations at 8 C.F.R. §§ 235.3(d) and 1235.3(d) (2019) additionally state that the DHS

> may require any alien who appears inadmissible and who arrives at a land border port-of-entry from Canada or Mexico, to remain in that country while awaiting a removal hearing. Such alien shall be considered detained for a proceeding within the meaning of section 235(b) of the Act and may be ordered removed in absentia by an immigration judge if the alien fails to appear for the hearing.

The DHS complied with the Act and the regulations when it returned the respondent to Mexico to await his removal hearing.[3]

"Due process requires that the alien be provided with notice of proceedings and an opportunity to be heard." *Matter of G-Y-R-*, 23 I&N Dec. 181, 186 (BIA 2001). This notice must "be reasonably calculated to apprise the alien of his or her scheduled hearing and the immigration charges." *Id.* (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). "[A]ctual notice will always suffice." *Id.* In this case, the level of notice the respondent received satisfied the requirements of due process.

As noted, the notice to appear in this case was personally served on the respondent. It placed him on notice of the "time and place at which [his] proceedings [would] be held," informed him of the charges against him, and warned him of the consequences of failing to appear for his hearing. Sections 239(a)(1)(D), (G) of the Act, 8 U.S.C. § 1229(a)(1)(D), (G) (2018). There is no indication that the notice to appear was deficient. *See Matter of Bermudez-Cota*, 27 I&N Dec. 441, 445 (BIA 2018); 8 C.F.R. § 1003.15(c) (2019). Finally, the DHS's filing of the notice to appear with the San Diego Immigration Court vested that court with adjudicatory authority over the respondent's removal proceedings. *See Matter of Bermudez-Cota*, 27 I&N Dec. at 444–45; *see also Matter of Rosales Vargas and Rosales Rosales*, 27 I&N Dec. 745, 751–52 (BIA 2020).

---

[3] To the extent that amici argue that the Migrant Protection Protocols, section 235(b)(2)(C) of the Act, and the governing regulations are unconstitutional, "[i]t is well settled that we lack jurisdiction to rule on the constitutionality of the Act and the regulations we administer." *Matter of Fuentes-Campos*, 21 I&N Dec. 905, 912 (BIA 1997).

AR01160

In addition to the notice to appear, the DHS provided the respondent with an MPP Sheet, which specified when and where the respondent needed to arrive at the port of entry so that he could be transported to his hearing. The Immigration Judge expressed concern that the respondent may not have understood the instructions contained in the MPP Sheet, but there is no adequate basis to assume that he did not. Both the MPP sheet and the courtesy copy of the MPP Sheet in the Spanish language contain the respondent's signature, and there is no requirement that an alien in immigration proceedings be provided with a notice to appear or any other document in their native language. *See Flores-Chavez v. Ashcroft*, 362 F.3d 1150, 1155 n.4 (9th Cir. 2004) ("Current law does not require that the Notice to Appear . . . be in any language other than English." (citation omitted)); *Matter of D-R-*, 25 I&N Dec. 445, 458 n.10 (BIA 2011) (rejecting an alien's argument that "the DHS's documentary evidence was inadmissible because it had not been translated into [the alien's] native language" since "no such requirement exists in immigration proceedings"), *remanded on other grounds*, *Radojkovic v. Holder*, 599 F. App'x 646, 648 (9th Cir. 2015). In light of the foregoing, we do not agree with either the Immigration Judge or amici that the level of notice the respondent received in this case was insufficient to satisfy the requirements of due process.[4]

Accordingly, where, as here, the DHS returns an alien to Mexico to await an immigration hearing pursuant to the Migrant Protection Protocols and provides the alien with sufficient notice of that hearing, an Immigration Judge should enter an in absentia order of removal if the alien fails to appear for the hearing. *See Matter of Sanchez-Herbert*, 26 I&N Dec. 43, 44 (BIA 2012) ("An alien does not need to be physically in the United States for the Immigration Judge to retain jurisdiction over pending proceedings and to conduct an in absentia hearing.").[5]

Amici raise due process concerns and describe practical difficulties that other aliens have faced after they were returned to Mexico pursuant to the Migrant Protection Protocols. Although amici assert that these aliens had difficulty obtaining and communicating with counsel while awaiting their hearings in Mexico, their cases are not before us. *See, e.g.*, *INS v. Phinpathya*, 464 U.S. 183, 188–89 n.6 (1984) (noting that statements by

---

[4]  In the absence of sufficient notice, an alien may file a motion to rescind the in absentia removal order and reopen the proceedings. Section 240(b)(5)(C) of the Act; 8 C.F.R. § 1003.23(b)(4)(ii) (2019); *see also Flores-Chavez*, 362 F.3d at 1156 (describing such motions as a "critical safeguard" that protect "aliens who did not receive adequate notice").

[5]  Immigration Judges may also continue removal proceedings if they determine that there is "good cause" to do so—for example, where additional information needs to be gathered to determine whether an in absentia order of removal is appropriate. *Matter of L-A-B-R-*, 27 I&N Dec. 405, 407 (A.G. 2018).

AR01161

Cite as 27 I&N Dec. 762 (BIA 2020)                    Interim Decision #3975

counsel are not evidence and are not entitled to evidentiary weight). Amici's arguments and anecdotal evidence do not establish that the Migrant Protection Protocols, as they have been applied in this case, violated the respondent's right to due process. Nor have they shown that the protocols are facially invalid such that termination is warranted in every case involving an alien who has been returned to Mexico pursuant the protocols and later fails to appear for his or her hearing.

Termination of the proceedings was not warranted in this case because there was no legal basis to do so. *See Matter of S-O-G- & F-D-B-*, 27 I&N Dec. at 468. As noted, the filing of the notice to appear vested the San Diego Immigration Court with adjudicatory authority over the respondent's removal proceedings, and the DHS opposed termination and did not move to dismiss the notice to appear pursuant to 8 C.F.R. §§ 239.2(a) and 1239.2(c) (2019). *See Matter of J-A-B- & I-J-V-A-*, 27 I&N Dec. 168, 171 (BIA 2017) (reversing an Immigration Judge's termination order that impinged "upon the [DHS's] exclusive authority to control the prosecution of [removable] aliens" (alterations in original) (citation omitted)). Moreover, the Immigration Judge did not permit the DHS to present evidence regarding the respondent's removability below, so he had no basis for concluding that the DHS had not sustained the charges of removability.

We will therefore reinstate the respondent's removal proceedings and remand the record. The Immigration Judge should have granted the DHS's request to proceed with an in absentia hearing. On remand, if the DHS establishes the respondent's removability based on the facts and the evidence, the Immigration Judge should enter an order of removal. *Matter of Sanchez-Herbert*, 26 I&N Dec. at 45. Accordingly, the DHS's appeal will be sustained, the Immigration Judge's decision will be vacated, the respondent's removal proceedings will be reinstated, and the record will be remanded for further proceedings.

**ORDER:** The appeal is sustained, the Immigration Judge's decision is vacated, and the removal proceedings are reinstated.

**FURTHER ORDER:** The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion and for the entry of a new decision.

AR01162

Case 2:21-cv-00067-Z   Document 162-2   Filed 09/02/22   Page 431 of 548   PageID 5374



U.S. Department of
Homeland Security

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Migrant Protection Protocols Metrics and Measures

The Migrant Protection Protocols (MPP) are a U.S. Government (USG) action whereby citizens and nationals of countries other than Mexico arriving in the United States by land from Mexico -- whether or not at a point of entry -- may be returned to Mexico pursuant to Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) while their U.S. removal proceedings are pending under Section 240 of the INA. MPP is a core component of the USG's efforts to address the migration crisis along the U.S.-Mexico border. (DHS Press Release - January 24, 2019 (/news/2019/01/24/migrant-protection-protocols) ) (U.S.-Mexico Joint Declaration - June 7, 2019 (https://2017-2021.state.gov/u-s-mexico-joint-declaration/index.html) ).

The intended goals of MPP and measurements of how those goals are being met are outlined in the below document.

Further information about MPP can be found on the Migrant Protection Protocols page (/migrant-protection-protocols) .

The previous versions of the below document can be found on the Metrics and Measures Archive page (/publication/metrics-and-measures-archive) .

Se puede encontrar más información sobre el MPP en la página de los Protocolos de Protección a Migrantes (/los-protocolos-de-protecci-n-migrantes) .

Las versiones anteriores del documento al calce se pueden encontrar en la página de Archivos de Métricas y Medidas (/publication/metrics-and-measures-archive) .

**Topics:** Border Security (/topics/border-security)

| Attachment | Ext. | Size | Date |
|---|---|---|---|
| Migrant Protection Protocols Metrics and Measures (https://www.dhs.gov/sites/default/files/publications/migrant_protection_protocols_metrics_and_measures_3.pdf) | PDF | 410.42 KB | 01/21/2021 |
| Métricas y Medidas de los Protocolos de Protección a Migrantes (https://www.dhs.gov/sites/default/files/publications/metricas_y_medidas_de_los_protocolos_de_proteccion_a_migrantes_2.pdf) | PDF | 448.62 KB | 01/21/2021 |

Created Date: July 15, 2020

Last Published Date: July 15, 2020

**AR01163**

# Migrant Protection Protocols Metrics and Measures

The Migrant Protection Protocols (MPP) are a U.S. Government (USG) action whereby citizens and nationals of countries other than Mexico arriving in the United States by land from Mexico -- whether or not at a port of entry (POE) -- may be returned to Mexico pursuant to Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) while their U.S. removal proceedings are pending under Section 240 of the INA.

DHS remains committed to using all available tools to address the unprecedented security and humanitarian crisis at the southern border of the United States. At the peak of the crisis in May 2019, there were more than 4,800 undocumented aliens attempting to cross the border into the United States daily. MPP is a core component of the USG's efforts to address the migration crisis along the U.S.-Mexico border.

The following are the intended goals of MPP and measurements of how those goals are currently being met.

1. **Goal:** **MPP streamlines existing avenues for aliens in removal proceedings who qualify for humanitarian protection in the United States to receive it.**

   o **Metric:** MPP provides a streamlined pathway for aliens to defensively apply for protection or relief from removal, while upholding *non-refoulement* obligations through screenings of fear in Mexico.

      ▪ **Data measurement:** Number of INA Section 240 removal proceedings for aliens subject to MPP which resulted in a grant of relief.

| MPP Aliens Granted Relief |
|---|
| 531 |

      *As of December 31, 2020.
      ** "Relief" in this context refers to asylum, statutory withholding of removal and withholding of removal under the Convention Against Torture.

      ▪ **Data measurement:** Number of MPP aliens referred to U.S. Citizenship and Immigration Services (USCIS) for *non-refoulement* assessment interviews based on the alien's assertion of a fear of persecution or torture in, or returning to, Mexico.

| Number of MPP Aliens Referred to USCIS for Non-Refoulement Assessments |
|---|
| 19,707 |

      * As of December 31, 2020
      ** If USCIS assesses that an alien who affirmatively states a fear of return to Mexico is more likely than not to face persecution on a protected ground or torture in Mexico, the alien is no longer amenable for MPP.

**AR01164**

2. <u>**Goal:**</u> **MPP supports an orderly and timely completion to U.S. immigration processes.**

o **Metric:** MPP provides a pathway for aliens to proceed efficiently through the U.S. immigration court processes, as compared to non-detained dockets.

▪ **Data measurement:** The number of cases completed by immigration judges since MPP's inception.

| MPP Case Completion | | |
|---|---|---|
| **Total Enrolled in MPP** | **Total Cases Completed** | **Case Completion Percentage** |
| 68,039 | 44,014 | 65% |

\* As of December 31, 2020.
\*\* "Total Enrolled" includes only cases in which the notice to appear (NTA) was filed.
\*\*\* "Cases Completed" includes only initial case completions, i.e. it excludes cases that were "completed" a second time due to a motion to reopen or a remand.

3. <u>**Goal:**</u> **MPP prevents "catch and release" into the United States, including for those whose claims are later found to be non-meritorious.**

o **Metric:** MPP decreases the number of aliens released into the interior of United States for the duration of their U.S. removal proceedings.

▪ **Data measurement:** Number of aliens enrolled in MPP by Customs and Border Protection (CBP) across the Southwest Border (SWB).

| Number of Aliens Enrolled in MPP |
|---|
| 68,039 |

\* As of December 31, 2020.
\*\* "Total Enrolled" includes only cases in which the NTA was filed.

4. <u>**Goal:**</u> **MPP provides a deterrent to illegal entry.**

o **Metric:** MPP implementation contributes to decreasing the volume of inadmissible aliens arriving in the United States on land from Mexico (including those apprehended between the POEs).

■ **Data measurement:** Number of enforcement encounters along the SWB.



AR01166

| From: | ████████████ |
|---|---|
| To: | |
| Cc: | |
| Subject: | MPP Data |
| Date: | Monday, March 29, 2021 6:39:42 PM |
| Attachments: | image001.png |
| | Total MPP in absentia removal orders.pdf |
| | Total MPP removal orders.pdf |
| | Total MPP in person Removal orders.pdf |
| | Total MPP Termination Order.pdf |

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

████

Good evening. Please see the attached below. This is an update to the data provided last Thursday. Please let me know if you have any questions. Thank you.

| MPP Cases Terminated | 9,992 |
|---|---|

| Removal Orders Issued in absentia | 27,802 |
|---|---|
| Removal Orders Issued after a hearing (in person) | 4522 |
| **Total Removal Orders** | 32324 |



This communication, along with any attachments, is covered by Federal and State law governing electronic communications, and may contain sensitive or legally privileged information. If the reader is not the intended recipient, you are hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please notify the sender immediately and delete or destroy this message.



NUMBER OF PERSONS ENTERING THE U.S. UNDER
THE END OF MPP OPERATION AS OF MAY 21, 2021

| PoE | New entries (May 21, 2021) | Cumulative total (Feb 19 – May 21, 2021) |
|---|---|---|
| Tijuana | 24 | 2,413 |
| Matamoros | - | 2,295 |
| Ciudad Juarez | 69 | 4,480 |
| Reynosa | - | 845 |
| Nuevo Laredo | - | 483 |
| Piedras Negras | - | 626 |
| TOTAL | 93 | 11,142 |

**AR01168**

Source: IOM End of MPP Daily Monitoring, May 21, 2021.

## <u>MPP Guiding Principles</u>

**Date:**                       January 28, 2019

**Topic:**                      Guiding Principles for Migrant Protection Protocols

**HQ POC/Office:**         Enforcement Programs Division

- Effective January 28, 2019, in accordance with the Commissioner's Memorandum of January 28, 2019, the Office of Field Operations, San Diego Field Office, will, consistent with its existing discretion and authorities, begin to implement Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) through the Migrant Protection Protocols (MPP).
    - To implement the MPP, aliens arriving from Mexico who are amenable to the process (see below), and who in an exercise of discretion the officer determines should be subject to the MPP process, will be issued an Notice to Appear (NTA) and placed into Section 240 removal proceedings.  They will then be transferred to await proceedings in Mexico.

- Aliens in the following categories are not amenable to MPP:
    - Unaccompanied alien children,
    - Citizens or nationals of Mexico,
    - Aliens processed for expedited removal,
    - Aliens in special circumstances:
        - Returning LPRs seeking admission (subject to INA section 212)
        - Aliens with an advance parole document or in parole status
        - Known physical/mental health issues
        - Criminals/history of violence
        - Government of Mexico or USG interest,
    - Any alien who is more likely than not to face persecution or torture in Mexico, or
    - Other aliens at the discretion of the Port Director

- Nothing in this guidance changes existing policies and procedures for processing an alien under procedures other than MPP, except as specifically provided. Thus, for instance, the processing of aliens for expedited removal is unchanged. Once an alien has been processed for expedited removal, including the supervisor approval, the alien may not be processed for MPP.
- Officers, with appropriate supervisory review, retain discretion to process aliens for MPP or under other procedures (e.g., expedited removal), on a case-by-case basis.  Adverse factors precluding placement in the MPP process include, but are not limited to, factors such as prior removal, criminal history, it is more likely than not that the alien will face persecution or torture in Mexico, and permanent bars to readmission.
- If an alien who is potentially amenable to MPP affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, whether before or after they are processed for MPP or other disposition, that alien will be referred to a USCIS asylum officer for screening following the affirmative statement of fear of persecution or

torture in, or return to, Mexico, so that the asylum officer can assess whether it is more likely than not that the alien will face persecution or torture if returned to Mexico.

- If USCIS assesses that an alien who affirmatively states a fear of return to Mexico is more likely than not to face persecution or torture in Mexico, the alien may not be processed for MPP.  Officers retain all existing discretion to process (or re-process) the alien for any other available disposition, including expedited removal, NTA, waivers, or parole.
- Aliens at the POE who are processed for MPP will receive a specific immigration court hearing date and time.  Every effort will be made to schedule similar MPP alien populations (e.g. single adult males, single adult females, family units) for the same hearing dates.
- OFO and USBP will be sharing court dates using only one existing Immigration Scheduling System (ISS) queue.
- Any alien who is subject to MPP will be documented in the appropriate system of records, SIGMA, and the proper code will be added.
- POEs will provide aliens subject to MPP a tear sheet containing information about the process, as well as a list of free or low-cost legal service providers.
- Aliens who return to the POE for their scheduled hearing and affirmatively state a fear of return to Mexico will be referred to USCIS for screening prior to any return to Mexico.  If USCIS assesses that such an alien is more likely than not to face persecution or torture in Mexico, CBP Officers should coordinate with ICE Enforcement and Removal Operations (ERO) to determine whether the alien may be maintained in custody or paroled, or if another disposition is appropriate. Such an alien may not be subject to expedited removal, however, and may not be returned to Mexico to await further proceedings.

*Hearing date and processing*
- POEs will establish scheduling for the arrival of aliens returning for their hearing to permit efficient transportation, according to applicable policy.
- Returning aliens who arrive at the POEs for proceedings will be biometrically identified, screened to ensure they have requisite documents, and turned over to ICE ERO.
- POEs will coordinate with ICE ERO to establish transfer of custody and expeditious transportation from the POE to the hearing. ERO is responsible for the transportation of aliens between the POE and court location, as well as the handling of the alien during all court proceedings.
- If the alien receives a final order of removal from an immigration judge, the alien will be processed in accordance with ERO operations.
- If the alien's INA section 240 removal proceedings are ongoing ERO will transport the alien back to the POE and CBP officers will escort the alien to the United States/Mexico limit line.

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

 **Homeland Security**

January 25, 2019

**ACTION**

MEMORANDUM FOR:       L. Francis Cissna
                      Director
                      U.S. Citizenship and Immigration Services

                      Kevin K. McAleenan
                      Commissioner
                      U.S. Customs and Border Protection

                      Ronald D. Vitiello
                      Deputy Director and Senior Official Performing the Duties of
                      Director
                      U.S. Immigration and Customs Enforcement

FROM:                 Kirstjen M. Nielsen
                      Secretary

SUBJECT:              Policy Guidance for Implementation of the Migrant Protection
                      Protocols

On December 20, 2018, I announced that the Department of Homeland Security (DHS), consistent with the Migrant Protection Protocols (MPP), will begin implementation of Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) on a large-scale basis to address the migration crisis along our southern border. In 1996, Congress added Section 235(b)(2)(C) to the INA. This statutory authority allows the Secretary of Homeland Security to return certain applicants for admission to the contiguous country from which they are arriving on land (whether or not at a designated port of entry) pending removal proceedings under Section 240 of the INA. Consistent with the MPP, citizens and nationals of countries other than Mexico ("third-country nationals") arriving in the United States by land from Mexico—illegally or without proper documentation—may be returned to Mexico pursuant to Section 235(b)(2)(C) for the duration of their Section 240 removal proceedings.

<div align="center">**Section 235(b)(2)(C) and the MPP**</div>

The United States issued the following statement on December 20, 2018, regarding implementation of the Migrant Protection Protocols:

> [T]he United States will begin the process of implementing Section 235(b)(2)(C) . . . with respect to non-Mexican nationals who may be arriving on land (whether or not at a designated port of entry) seeking to enter the United States from Mexico illegally or without proper documentation. Such implementation will be done consistent with applicable domestic and international legal obligations. Individuals subject to this action may return to the United States as necessary and appropriate to attend their immigration court proceedings.

> The United States understands that, according to the Mexican law of migration, the Government of Mexico will afford such individuals all legal and procedural protection[s] provided for under applicable domestic and international law. That includes applicable international human rights law and obligations as a party to the 1951 Convention relating to the Status of Refugees (and its 1967 Protocol) and the Convention Against Torture.

> The United States further recognizes that Mexico is implementing its own, sovereign, migrant protection protocols providing humanitarian support for and humanitarian visas to migrants.

> The United States proposes a joint effort with the Government of Mexico to develop a comprehensive regional plan in consultation with foreign partners to address irregular migration, smuggling, and trafficking with the goal of promoting human rights, economic development, and security.[1]

The Government of Mexico, in response, issued a statement on December 20, 2018. That statement provides, in part, as follows:

1. For humanitarian reasons, [the Government of Mexico] will authorize the temporary entrance of certain foreign individuals coming from the United States who entered that country at a port of entry or who were detained between ports of entry, have been interviewed by U.S. immigration authorities, and have received a notice to appear before an immigration judge. This is based on current Mexican legislation and the international commitments Mexico has signed, such as the Convention Relating to the Status of Refugees, its Protocol, and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, among others.

---

[1] Letter from Chargé d'Affaires John S. Creamer to Sr. Jesús Seade, Subsecretaría para América del Norte, Secretaría de Relaciones Exteriores (Dec. 20, 2018).

2

2. It will allow foreigners who have received a notice to appear to request admission into Mexican territory for humanitarian reasons at locations designated for the international transit of individuals and to remain in national territory. This would be a "stay for humanitarian reasons" and they would be able to enter and leave national territory multiple times.

3. It will ensure that foreigners who have received their notice to appear have all the rights and freedoms recognized in the Constitution, the international treaties to which Mexico is a party, and its Migration Law. They will be entitled to equal treatment with no discrimination whatsoever and due respect will be paid to their human rights. They will also have the opportunity to apply for a work permit for paid employment, which will allow them to meet their basic needs.

4. It will ensure that the measures taken by each government are coordinated at a technical and operational level in order to put mechanisms in place that allow migrants who have receive[d] a notice to appear before a U.S. immigration judge have access without interference to information and legal services, and to prevent fraud and abuse.[2]

**Prosecutorial Discretion and *Non-Refoulement* in the Context of the MPP**

In exercising their prosecutorial discretion regarding whether to place an alien arriving by land from Mexico in Section 240 removal proceedings (rather than another applicable proceeding pursuant to the INA), and, if doing so, whether to return the alien to the contiguous country from which he or she is arriving pursuant to Section 235(b)(2)(C), DHS officials should act consistent with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees[3] (1951 Convention) and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).[4] Specifically, a third-country national should not be involuntarily returned to Mexico pursuant to Section 235(b)(2)(C) of the INA if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the

---

[2] Secretaría de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018).

[3] The United States is not a party to the 1951 Convention but is a party to the 1967 Protocol Relating to the Status of Refugees, which incorporates Articles 2 to 34 of the 1951 Convention. Article 33 of the 1951 Convention provides that: "[n]o Contracting State shall expel or return ('*refouler*') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

[4] Article 3 of the CAT states, "No State Party shall expel, return ('*refouler*') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *See also* Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, Title XXII, § 2242(a) (8 U.S.C. § 1231 note) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.").

3

INA), or would more likely than not be tortured, if so returned pending removal proceedings. The United States expects that the Government of Mexico will comply with the commitments articulated in its statement of December 20, 2018.

U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and U.S. Immigration and Customs Enforcement will issue appropriate internal procedural guidance to carry out the policy set forth in this memorandum.[5]

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

---

[5] A DHS immigration officer, when processing an alien for Section 235(b)(2)(C), should refer to USCIS any alien who has expressed a fear of return to Mexico for a *non-refoulement* assessment by an asylum officer.

4

Secretary
U.S. Department of Homeland Security
Washington, DC 20528



January 20, 2021

| **MEMORANDUM FOR:** | Troy Miller |
| | Senior Official Performing the Duties of the Commissioner |
| | U.S. Customs and Border Protection |
| | |
| | Tae Johnson |
| | Acting Director |
| | U.S. Immigration and Customs Enforcement |
| **FROM:** | David Pekoske |
| | Acting Secretary |
| **SUBJECT:** | **Suspension of Enrollment in the Migrant Protection** |
| | **Protocols Program** |

Effective January 21, 2021, the Department will suspend new enrollments in the Migrant
Protection Protocols (MPP), pending further review of the program.  Aliens who are not already
enrolled in MPP should be processed under other existing legal authorities.

1300 Pennsylvania Avenue NW
Washington, DC 20229



**U.S. Customs and
Border Protection**

January 28, 2019

MEMORANDUM FOR:      Directors, Field Operations
                     Office of Field Operations

                     Director, Field Operations Academy
                     Office of Training and Development

FROM:                Todd A. Hoffman
                     Executive Director
                     Admissibility and Passenger Programs
                     Office of Field Operations

SUBJECT:             Guidance on Migrant Protection Protocols

Effective January 28, 2019, in accordance with the Commissioner's Memorandum of January 28, 2019, and subject to the terms of policy, the Office of Field Operations (OFO) San Diego Field Office will, consistent with its existing discretion and authorities, implement Section 235(b)(2)(C) of the Immigration and Nationality Act (INA).

Under this implementation of section 235(b)(2)(C), referenced as the Migrant Protection Protocols (MPP), DHS is authorized to return certain applicants for admission who arrive via land at the San Ysidro Port of Entry, and who are subject to removal proceedings under Section 240 of the INA, to Mexico pending removal proceedings. Certain aliens, including vulnerable aliens, criminal aliens, or aliens of interest to the Government of Mexico (GoM) or the United States, will not be placed into MPP, in accordance with the Guiding Principles for Migrant Protection Protocols issued today by the Enforcement Programs Division (HQ) (Guiding Principles).

The Guiding Principles outline which aliens may be amenable to MPP. As part of the determination of whether an alien is amenable to MPP, OFO will refer aliens who are potentially amenable, but who affirmatively state fear of return to Mexico, whether before or after they are processed for MPP or other disposition, to United States Citizenship and Immigration Services (USCIS) for screening following the affirmative statement of fear of return to Mexico. Please see the Guiding Principles for MPP.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Please ensure that this memorandum is disseminated to all ports of entry within your jurisdiction.

**AR01176**

**From:**
**Sent:**          Wednesday, May 26, 2021 2:49 PM
**To:**
**Cc:**
**Subject:**       FW: MPP Processing Numbers

And here are the latest MPP processing numbers referenced.

**From:**
**Sent:** Wednesday, May 26, 2021 2:48 PM
**To:**

**Subject:** Re: MPP Processing Numbers

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

MPP processing numbers through Tuesday:

AR01177



NUMBER OF PERSONS ENTERING THE U.S. UNDER
THE END OF MPP OPERATION AS OF MAY 25, 2021

| PoE | New entries (May 25, 2021) | Cumulative total (Feb 19 – May 25, 2021) |
|---|---|---|
| Tijuana | - | 2,413 |
| Matamoros | 8 | 2,303 |
| Ciudad Juarez | - | 4,523 |
| Reynosa | - | 845 |
| Nuevo Laredo | - | 483 |
| Piedras Negras | - | 626 |
| TOTAL | 8 | 11,193 |

Source: IOM End of MPP Daily Monitoring, May 25, 2021.

**From:** ███████████████████████
**Sent:** Tuesday, May 25, 2021 5:14 PM
**To:** ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

**Subject:** Re: MPP Processing Numbers

MPP processing numbers through Monday:

AR01178



**NUMBER OF PERSONS ENTERING THE U.S. UNDER
THE END OF MPP OPERATION AS OF MAY 24, 2021**

| PoE | New entries (May 24, 2021) | Cumulative total (Feb 19 – May 24, 2021) |
|---|---|---|
| Tijuana | | 2,413 |
| Matamoros | - | 2,295 |
| Ciudad Juarez | 43 | 4,523 |
| Reynosa | - | 845 |
| Nuevo Laredo | - | 483 |
| Piedras Negras | - | 626 |
| TOTAL | 43 | 11,185 |

Source: IOM End of MPP Daily Monitoring, May 24, 2021.

**From:** █████████████████████████
**Sent:** Monday, May 24, 2021 11:50 AM
**To:** ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████

**Subject:** Re: MPP Processing Numbers

MPP processing numbers through this past Friday and this week's MPP processing schedule:

AR01179



**NUMBER OF PERSONS ENTERING THE U.S. UNDER THE END OF MPP OPERATION AS OF MAY 21, 2021**

| PoE | New entries (May 21, 2021) | Cumulative total (Feb 19 – May 21, 2021) |
|---|---|---|
| Tijuana | 24 | 2,413 |
| Matamoros | - | 2,295 |
| Ciudad Juarez | 69 | 4,480 |
| Reynosa | - | 845 |
| Nuevo Laredo | - | 483 |
| Piedras Negras | - | 626 |
| TOTAL | 93 | 11,142 |

Source: IOM End of MPP Daily Monitoring, May 21, 2021.



**From:** ▮▮▮▮▮▮▮▮▮▮
**Sent:** Thursday, May 20, 2021 12:49 PM
**To:** ▮▮▮▮▮▮▮▮▮▮

AR01180

**Subject:** Re: MPP Processing Numbers

MPP processing numbers through yesterday:

 **NUMBER OF PERSONS ENTERING THE U.S. UNDER THE END OF MPP OPERATION AS OF MAY 19, 2021**

| PoE | New entries (May 19, 2021) | Cumulative total (Feb 19 – May 19, 2021) |
|---|---|---|
| Tijuana | - | 2,342 |
| Matamoros | - | 2,295 |
| Ciudad Juarez | 71 | 4,411 |
| Reynosa | 12 | 845 |
| Nuevo Laredo | - | 477 |
| Piedras Negras | - | 581 |
| TOTAL | 83 | 10,951 |

Source: IOM End of MPP Daily Monitoring, May 19, 2021.

**From:** ███████████████
**Sent:** Wednesday, May 19, 2021 1:14 PM
**To:** ████████████████████████████████

**Subject:** Re: MPP Processing Numbers

Hi everyone,

Here are the MPP processing numbers through yesterday:

AR01181



**NUMBER OF PERSONS ENTERING THE U.S. UNDER THE END OF MPP OPERATION AS OF MAY 18, 2021**

| PoE | New entries (May 18, 2021) | Cumulative total (Feb 19 – May 18, 2021) |
|---|---|---|
| Tijuana | - | 2,342 |
| Matamoros | 31 | 2,295 |
| Ciudad Juarez | - | 4,340 |
| Reynosa | - | 833 |
| Nuevo Laredo | - | 477 |
| Piedras Negras | - | 581 |
| TOTAL | 31 | 10,868 |

Source: IOM End of MPP Daily Monitoring, May 18, 2021.

**From:** ███████████
**Sent:** Monday, May 17, 2021 11:36 AM
**To:** ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

**Subject:** MPP Processing Numbers

Hi all,

Sending along the latest MPP processing numbers:

AR01182



## NUMBER OF PERSONS ENTERING THE U.S. UNDER THE END OF MPP OPERATION AS OF MAY 14, 2021

| PoE | New entries (May 14, 2021) | Cumulative total (Feb 19 – May 14, 2021) |
|---|---|---|
| Tijuana | - | 2,342 |
| Matamoros | - | 2,264 |
| Ciudad Juarez | 72 | 4,282 |
| Reynosa | - | 833 |
| Nuevo Laredo | - | 477 |
| Piedras Negras | - | 581 |
| TOTAL | 72 | 10,779 |

Source: IOM End of MPP Daily Monitoring, May 14, 2021.

---



AR01183



# DISMANTLING ASYLUM:

## A YEAR INTO THE MIGRANT PROTECTION PROTOCOLS



American Friends
Service Committee

AR01184

AR01185

## AUTHOR

Vanessa Ceceña

## PHOTOGRAPHS

Pedro Rios

## ABOUT THE PROGRAM

The U.S.-Mexico Border Program advances human rights and self-determination of migrant communities through base-building, alliance-building, documentation and policy-impact. We support local community-based organizing campaigns, train and accompany community-based leadership to educate, advocate, mobilize, and organize constituents to secure just and humane immigration policies. Using a human rights framework and in collaboration with community partners, we advance policies affecting immigration and border issues and build alliances to protect migrant and non-migrant rights. Our goal is to engage community partners and leaders to monitor and document instances of civil and human rights abuses by law enforcement agencies. The objective of documenting law enforcement activity is to change policies and practices that violate human rights, and change the public discourse away from militarization of border communities, towards just and humane immigration policies that benefit workers and their families.

## US-MEXICO BORDER PROGRAM STAFF

Pedro Rios, Program Director

Adriana Jasso, Program Coordinator

Benjamin Prado, Program Coordinator

Vanessa Ceceña, Human Rights Program Associate

## JANUARY 2020

3

AR01186

# INTRODUCTION

With the increase of migrants arriving at the US-Mexico border, the current administration met migrants with excessive force and with policies that have placed those seeking refuge and protection in harm's way. The Trump Administration implemented the Migrant Protection Protocols (MPP), also known as Remain in Mexico, on January 24, 2019 as a deterrent to migration flows and as a form of systemic discrimination towards a specific group of migrants, those from Spanish-speaking countries. This policy violates the non-refoulement commitment as set forth by international laws[1] and hinders a migrants access to legal representation.

The following analysis looks at how the journey towards seeking asylum in the US has become more onerous due to policies the US government has orchestrated during the last year, specifically since the enactment of MPP. The migrant's experience is shared through observations of immigration court hearings in San Diego conducted by AFSC staff and volunteers. A total of 483 cases were observed from June 2019 to January 2020. In addition, partners in Mexico and court observers offer reflections to provide an additional perspective into the effects of an unjust and inhumane immigration system.



**Figure 1:** On November 25, 2018, migrants were met on the border in San Ysidro, CA by heavy militarization and force. (AFSC)

AR01187

# MIGRANT PROTECTION PROTOCOLS

On January 24, 2019, the US Department of Homeland Security implemented the Migrant Protection Protocols (MPP), also known as Remain in Mexico, as a pilot program at the San Ysidro Port of Entry in San Diego[2]. The policy would allow border enforcement officers at the port of entry, specifically officers from Customs and Border Protection's Office of Field Operations (OFO), to send asylum-seeking migrants back to Mexico to wait for the immigration court, the Executive Office of Immigration Review (EOIR), to make a decision on their asylum claim. MPP is currently enforced along the entire southern border by both OFO and the US Border Patrol.

| | | | |
|---|---|---|---|
| Honduras | 21,786 | Hong Kong | 3 |
| Guatemala | 15,009 | Gabon | 2 |
| Cuba | 7,709 | Guinea | 2 |
| El Salvador | 7,668 | Namibia | 2 |
| Ecuador | 3,114 | Argentina | 2 |
| Venezuela | 2,046 | Haiti | 2 |
| Nicaragua | 1,414 | Oman | 2 |
| Peru | 136 | Malawi | 1 |
| Colombia | 127 | Cyprus | 1 |
| Mexico | 72 | Paraguay | 1 |
| Dominican Republic | 43 | San Marino | 1 |
| Guadeloupe | 12 | Croatia | 1 |
| Spain | 11 | Afghanistan | 1 |
| Belize | 11 | Vanuatu | 1 |
| Costa Rica | 11 | Democratic Republic of Congo | 1 |
| Holland | 9 | Sudan | 1 |
| Bolivia | 9 | St. Christopher-Nevis | 1 |
| Chile | 8 | Egypt | 1 |
| Brazil | 6 | Laos | 1 |
| Panama | 6 | Macedonia | 1 |
| Uruguay | 5 | Burundi | 1 |
| | | ALL | 59,241 |

**Table 1**: Total number of migrants by nationality returned to Mexico as of December 2019 released by TRAC. The information is based on data obtained from the Executive Office of Immigration Review (EOIR) which oversees Immigration Court operations.

AR01188

The development and implementation of this policy was the government's response to the growing number of people arriving at the US-Mexico border fleeing persecution, economic uncertainty, and crime. It is important to note that these push factors are caused by the US government's role in destabilizing Central American countries throughout decades through its foreign policy, trade agreements, and its "war on drugs"[3].

Under the guidelines for the MPP, migrants that are unaccompanied minors, pregnant women or those that have a severe medical condition are not to be returned to Mexico. The public information about the program does not include information on whether or not those with mental health conditions should be excluded from MPP. As of November 2019, there have been 56,004 migrants returned to Mexico, with many waiting in Mexican border towns to be able to present themselves to immigration officials (*See* table 1)[4].

## FLAWED IMPLEMENTATION

According to the then-Secretary of Homeland Security, Kirstjen Nielsen, the MPP was a  humanitarian proposal that was developed with a "commonsense approach". In a stakeholder meeting with CBP at the San Ysidro Port of Entry attended by AFSC and other organizations the day prior to the implementation of MPP, it was obvious that important details were not well thought out and that the "pilot" would in fact achieve the opposite of protecting migrants. CBP leadership at the San Ysidro Port of Entry indicated that the MPP would, eventually, be expanded to include all asylum-seekers. During this meeting, organizations and attorneys raised the multitude of concerns including violations to the non-refoulement policy, access to legal counsel and the limited housing and social services available in Mexico. When questioned about the support and guidance migrants would receive in Mexico, CBP's implied that that portion of the implementation was the responsibility of the Mexican government, and that they could not tell the Mexican government what to do.

Initially the MPP was only applied to single adults from Central America, but was quickly expanded to also include families regardless of their basis for seeking protection. Later the program was expanded to include asylum-seeking migrants from any Spanish-speaking country. At first, the MPP was only applicable to those migrants arriving at ports of entry and processed by CBP's Office of Field Operations. However, it was soon expanded to grant the US Border Patrol authority to return migrants who were apprehended in between the ports of entry[5].

While the program was piloted in the San Diego Sector, it was ultimately implemented throughout the entire southern US-Mexico border. The

"We have implemented an unprecedented action that will address the urgent humanitarian and security crisis at the Southern border. This humanitarian approach will help to end the exploitation of our generous immigration laws. The Migrant Protection Protocols represent a methodical commonsense approach, exercising long-standing statutory authority to help address the crisis at our Southern border."

– Secretary of Homeland Security Kirstjen M. Nielsen

AR01189

Nogales, Arizona port of entry became the seventh port of entry to process migrants under the MPP on January 2, 2020[6].

## THE JOURNEY TO ASYLUM

A migrant's journey to the US border is arduous and lives are at risk when seeking of refuge and security. While crossing through southern Mexico has historically been a challenge, with stories of migrants being targeted by local police and organized crime, we recently have witnessed an increase in Mexican immigration officials, the National Guard, and federal police making all efforts to block migrants from entering Mexico through its southern border with Guatemala, and from entering the US in the northern border. In June 2019, the Mexican government agreed to increase its immigration enforcement and to increase the number of migrants accepted under MPP, after President Trump threatened to impose additional tariffs[7]. Mexican President Andres Manuel Lopez Obrador responded by deploying thousands of National Guard members to the southern and northern border, an increase in checkpoints, raids of the freight train, *La Bestia*, and most alarmingly, the targeting of migrant shelters by the National Guard.



Q: Were you ever been a victim of violence or extortion?
A: Yes, that's is why I left El Salvador. We had a business. We had a convenience store and some young guys who are gang members began asking us for money at a weekly basis. They initially asked us for a quote and then they began increasing the quote. Then, the quote got greater and I began to have to cover that amount with my own money. Then, one day when we could not pay, they took my 18 year old daughter and they sexually abused her. My daughter got pregnant but then got a miscarriage.

**Figure 2**: Part of a migrant's initial interview with immigration officers that was recorded in the Record of Sworn Statement

Once a migrant arrives at the US-Mexico border and makes the decision to seek entry at a port of entry, she is not allowed to simply approach a CBP officer and claim fear of being in her country of origin. Migrants are required to put their name on an informal list in a notebook that allows them to obtain a number that indicates when they can present themselves to CBP to begin their claim to asylum. This process is currently regulated in Tijuana by Grupo Beta, a group established by the Mexican government in 1990. While Grupo Beta was established to protect migrants heading to the US through Mexico, the group has been widely criticized for violating the rights of migrants. This process is known as "metering"; it began in 2016 when there was a surge of Haitian migrants at the border[8]. During this time, the US government, along with the Mexican government and Grupo Beta, created this metering system.

Advocacy groups expressed their concerns with this new process to CBP, and soon after, CBP claimed that it was not their doing, wiping their hands clean. They argued that they could not control what the Mexican government did on Mexican territory. The metering system has forced migrants to wait months, at times, to present themselves to CBP, subjecting them to precarious housing and violence in Mexican border towns. While unaccompanied minors and those with significant health conditions should be granted priority for processing, there have been numerous cases of CBP and contracted security officers turning migrants away from ports of entry until they "get in line". There have also

been cases of corruption in which migrants had to pay some amount in order to have their name added to the list, as well as cases of discrimination against black migrants[9].

This metering process has pushed migrants to seek entry in between ports of entry, often times by jumping the border wall or by taking dangerous routes through the desert or across the Rio Grande, as occurs in the Texas border region. As a result, we have seen the increase in migrant deaths.

Once in immigration custody, the migrant will be interviewed and processed. Migrants are interviewed and asked about whether or not they are scared to return back to their country of origin. They are fingerprinted and briefly screened for communicable diseases. Credible fear interviews are conducted by asylum officers that are part of US Citizenship and Immigration Services (USCIS). These interviews are conducted in-person or over the phone depending on the availability of asylum officers. This single interview determines whether or not a migrant can move forward with seeking asylum or other immigration relief. While all migrants should be granted a credible fear interview, 12% of migrants interviewed for a study reported not receiving a credible fear interview. The study conducted by AFSC's Latin America and the Caribbean region, in collaboration with the *Coalición Pro Defense del Migrante , A.C.,* found that 80% of migrants interviewed were not afforded in-depth interviews by immigration officials during their initial processing; their "interview" primarily consisted of signing documents[10].

Custody determinations, whether the migrant will be released into the US, placed in the MPP or transferred to an ICE detention center, are made within days or weeks. For those subject to the MPP, they are given additional documents and returned to Mexico where they are then processed by Mexican immigration officials. It is unclear to what extent CBP explains to migrants that they will be sent back to Mexico. Based on anecdotal information from migrants and organizations in Mexico, most



migrants are confused and are unsure as to why they are returned. AFSC was present in Tijuana, Mexico when the first adult, a Honduran migrant, was returned to Mexico. In an interview with Carlos Gomez Perfomo it was clear that he was confused and did not understand why he was being sent back to Mexico.

Migrants returned to Mexico are given paperwork specifically for MPP that explain the process, in addition to the common removal proceeding documents such as the Notice to Appear (NTA). One document instructs them to arrive at a specified port of entry four hours before their immigration hearing to be processed and transported to immigration court.

AR01191

For those initially processed at the California border they are required to present themselves at the San Ysidro-Tijuana port of entry and are scheduled for court in downtown San Diego. This is especially challenging for migrants residing outside of Tijuana. For example, migrants that are processed by immigration officials in the Calexico-Mexicali area, either by OFO or by the US Border Patrol, are scheduled for court in San Diego, either for a morning or afternoon hearing. If a migrant family staying in Mexicali, for example, is scheduled for court at 8 am in San Diego, they would have to be at the San Ysidro port of entry by 4 am. Mexicali is approximately 1.5 hours from Tijuana, therefore the majority of migrants travel to Tijuana from Mexicali a day prior to their hearing, adding an additional burden on migrants and on groups providing support. This can be extremely challenging for families with young children.

> Today, I went down to the San Diego Immigration Court to observe some of the MPP proceedings. As I walked into the waiting area and through the metal detector, the officers greeted me and they were surprisingly nice. Dozens of people sat in the waiting area, waiting for their turn in immigration court. I saw about a dozen children in their parents' arms, waiting to see where they'll go next.
>
> Heading into the courtroom, it was so much smaller than I had imagined. But the proceedings are just as intimidating, confusing, and frustrating as I thought it would be. Sitting in court and listening to all the questions from the judge to the respondents and then to the government lawyer, it was a challenge to keep up with the exchanges. I can't imagine being one of the respondents, not being familiar with the system, laws, or language, and having to navigate their cases without any representation. Many of the respondents simply couldn't find a lawyer that's willing to take their case while they're in Mexico.
>
> After observing for nearly three hours, I felt a bit overwhelmed. It's one thing to learn about the immigration court and MPP, but to see the people that this policy affects is devastating. It is especially hard to see families with young children trying to figure out whether or not they have to be in Mexico while waiting for their immigration case. To see them so worried over the uncertainty of their situation and their helplessness, it reminded me of my own parents who came to the U.S. as refugees from Vietnam.
>
> I think we all need to remember the humanity behind this so called "immigration crisis." As I was leaving, I peeked into another courtroom and I saw an officer handing out candy to little kids awaiting their families' turn in court. It reminded me of the importance of seeing the human faces of the people that are stuck in our broken immigration system."
>
> -Minh, AFSC Intern

Migrants under the MPP must undergo this process for every scheduled hearing until a final decision on their case is reached, which can take at least 6 months from the time of initial processing by immigration officers. Therefore, many migrants will wait in Mexican border towns for at least 8 months to a year waiting to see if they will be granted the protections that are afforded to them based on international laws.

Returning migrants back to Mexico is in a way sending them to be raped or murdered, as an Asylum Officer explained[11]. Under the guidelines for the implementation of MPP, immigration officers are not required to ask migrants if they fear being returned to Mexico. However, if migrants express this fear,

AR01192

they will be scheduled for a non-refoulement interview, in which an Asylum Officer makes a determination about the credibility of their fear.

## NAVIGATING IMMIGRATION COURT

Removal proceedings, also known as deportation proceedings, are civil and not criminal proceedings. These are initiated when an immigration enforcement officer arrests an individual for being present in the US without status or for attempting to enter the US without the proper documentation and issues a Notice to Appear (NTA). The NTA provides information about when and where the person was apprehended, what the government is charging the person with, and the date and location of the person's initial immigration court hearing. Additional information listed on the NTA include the name and position of the processing officer and information on the interpreter used (when applicable).

Initial court hearings tend to be brief, and include an explanation of court procedures, a person's rights during proceedings and a brief explanation of why the person is in court. Some judges go into detail about the need to submit a change of address form, stressing that the court must have a valid mailing address at all times. The judge provides the EOIR pro bono or low-cost immigration services list and encourages the person to hire an attorney.



**Figure 4**: A portion of the first page of a Notice to Appear (NTA) given to a Salvadoran migrant at the San Ysidro

### Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are under removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 3.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents, which you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing.

At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear and that you are inadmissible or removable on the charges contained in the Notice to Appear. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge.

You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of departure voluntarily. You will be given a reasonable opportunity to make any such application to the immigration judge.

**Failure to appear:** You are required to provide the DHS, in writing, with your full mailing address and telephone number. You must notify the Immigration Court immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to one of the offices listed in 8 CFR 241.16(a). Specific addresses on locations for surrender can be obtained from your local DHS office or over the internet at http://www.ice.gov/about/dro/contact.htm. You must surrender within 30 days from the date the order becomes administratively final, unless you obtain an order from a Federal court, immigration court, or the Board of Immigration Appeals staying execution of the removal order. Immigration regulations at 8 CFR 241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Act.

### Request for Prompt Hearing

To expedite a determination in my case, I request an immediate hearing. I waive my right to a 10-day period prior to appearing before an immigration judge.

Before: _____     _____
                                                                        *(Signature of Respondent)*

                                                                        Date: _____

_____
*(Signature and Title of Immigration Officer)*

---

### Certificate of Service

This Notice To Appear was served on the respondent by me on   March 24, 2019  , in the following manner and in compliance with section 239(a)(1)(F) of the Act.

[X] in person          [ ] by certified mail, returned receipt requested          [ ] by regular mail

[ ] Attached is a credible fear worksheet.

[X] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the          SPANISH          language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

                                                                        JANETH ARGUELLES
                                                                        CBPO

X _____          _____
*(Signature of Respondent if Personally Served)*          *(Signature and Title of officer)*

Form I-862 Page 2 (Rev. 08/01/07)

**Figure 5:** The second page of a Notice to Appear (NTA) given to a Salvadoran migrant at the San Ysidro Port of Entry

11

AR01194

## Migrant Protection Protocols

### Initial Processing Information

- You have been identified for processing under the Migrant Protection Protocols and have been issued a Form I-862 Notice to Appear (NTA) for proceedings before an immigration court where you may apply for all forms of relief available under the Immigration and Nationality Act. Pursuant to U.S. law, including section 240 of the Immigration and Nationality Act and implementing regulations, an immigration judge will determine whether you are removable from the United States, and if you are, whether you are eligible for relief or protection from removal. While you will be able to pursue such relief or protection under the same terms and conditions as any alien in section 240 proceedings, pursuant to U.S. law, you will be returned to Mexico and may not attempt to enter the United States until you return to the appropriate port of entry on the date of your hearing before an immigration judge.

- The NTA provides the date and time of your first hearing before an immigration judge in the United States at the court identified on your NTA. On the date of your hearing, you must report to the _____ **SYS / Pedwest** _____ port of entry, located at Port of entry _____ **El Chaparral** _____, at the date and time listed below. If your case cannot be completed in one hearing, the immigration court will provide you with a Notice of Hearing in Removal Proceedings, indicating the date and time for any subsequent hearings. ○ You may call the immigration court at 1-800-898-7180 to obtain case status information 24 hours a day, 7 days a week. If you are calling from outside of the United States, you should dial 001-880-898-7180.

- You should arrive at the port of entry listed above at _____ **0900** _____ a.m./p.m. on _____ **03/19/2019** _____ to ensure that you have time to be processed, transported to your hearing and meet with attorney or accredited representative (if you arrange to be represented during your removal proceedings). The U.S. Government will provide transportation for you from the designated port of entry to the court on the day of your hearing. If you fail to arrive at the appropriate date and time, you may be ordered removed in absentia.
  - ○ When you arrive at the designated port of entry for your hearing, you should bring your NTA or Notice of Hearing in Removal Proceedings and any available government-issued identification and/or travel documents.
  - ○ When you arrive at the designated port of entry for your hearing, you should bring any minor children or other family members who arrived with you to the United States and received an NTA for the same date and time.

You have the statutory privilege of being represented by an attorney or accredited representative of your choosing who is authorized to practice before the immigration courts of the United States, at no expense to the U.S. Government. ○ You have been provided with a List of Legal Service Providers, which has information on low cost or free legal service providers practicing near the immigration court where your hearing(s) will take place.
  - ✦ A list of legal service providers is also available on the Executive Office for Immigration Review website at https://www.justice.gov/eoir/list-pro-bono-legal-service-providers.

If you choose to be represented, you may consult with counsel at no expense to the U.S. Government through any available mechanism, including the following, as applicable: ○ You may consult with your counsel by telephone, email, video conference, or any other remote communication method of your choosing.
  - ○ You may arrange to consult with your counsel in person at a location in Mexico of your choosing.
  - ○ On the day of your immigration hearing, you may arrange to meet with your counsel in-person, in the United States, at your assigned court facility, prior to that hearing.

**Figure 6**: Migrants that are returned to Mexico are given this document every time they are returned to Mexico. It lists information about when and where they need to present themselves on the day of their court hearing.

AR01195

During Master Calendar hearings (MCH), pleadings are entered (response to the factual allegations listed on the NTA) and applications for relief are submitted. The number of MCHs depends on how many continuances are granted. Judges may grant continuances to give the person more time to retain an attorney. Individuals in proceedings may request to be returned back to their country of origin at any time if they choose.

The merits hearing or individual hearing is when the judge and the government attorney (also referred to as a trial attorney) cross examine the person seeking relief, questioning the information provided in the application for relief, which usually includes the person's declaration, country conditions and supporting documents that corroborate the claim for relief. During this hearing, the migrant is able to explain why they should be allowed to stay in the US. This is when the migrant states why they had to flee their country of origin and why they fear being sent back. These individual hearings last a few hours. At the end of the hearing, the judge may give an oral decision or may state that they will issue a decision by writing or schedule another hearing where the decision will be issued. Once a decision is given, the trial attorney and the migrant or their attorney can appeal the decision. If a person is granted the relief sought, then they are allowed to remain in the US and released from custody. If relief is denied, then the person will be deported to their country of origin unless they state that they will appeal the decision.

If a person decides to appeal the judge's initial ruling on the case, they would need to file an appeal to the Board of Immigration Appeals (BIA) within 30 days from the decision. When filing an appeal to the BIA, new information on the case or new arguments may not be submitted. One has to prove that they were eligible and should have been granted the relief sought and that the judge made an erroneous decision. It takes approximately 6 months to receive the decision from the BIA.

## AFSC COURT OBSERVATIONS

AFSC's US-Mexico Border program began observing MPP court hearings in June 2019. Hearings in both the morning and afternoon dockets were observed by office staff and community volunteers in which they completed observation forms and documented their reflections. Whenever possible, in absentia hearings were also observed. From June 2019 to January 10, 2020, hearings for 483 asylum-seekers were observed. This includes single adult and family hearings for migrants from Honduras, El Salvador, Guatemala, Cuba, and Venezuela.

### DUE PROCESS VIOLATIONS

Since the initiation of the controversial policy, advocates noticed procedural and administrative issues that could adversely affect a migrant's case. The most apparent was the erroneous address listed on the Notices to Appear given to migrants. Immigration officers wrote "*Domicilio Conocido, Tijuana, Baja California*", which translates to "Known Address, Tijuana, Baja California", on the formal government document. This incorrect address is the place of residence listed in the migrant's immigration file, and also the mailing address. Other variations of inaccurate addresses have also been used[12]. Even though this issue has been raised by advocacy organizations and has received media attention, it is an ongoing

I will share a story of a teenager from Honduras who speaks English. He spoke for his family in court. They did not have a lawyer. He completed all the forms! He told the judge that when he and his family had arrived at the border on the day of their hearing to be transported to court, they were told they had the wrong day. He knew how to call the court hotline number. He had the correct number. He was able to confirm that he had the correct court date and advocated for himself and his family; he was able to make it to court. He told the judge what happened to them and the judge then excused all absentees fearing that many were being given misinformation at the port of entry. But, only one judge did this.

How many other migrants are being told that they have the wrong court date and are not able to check? This teenager had all of his forms in order. The judge was astounded and delighted. When I visited weeks later, he and his family appeared again and were one of very few who progressed in the system during my visits. This young man will "make it" wherever he goes. The judge actually demonstrated a commitment to providing asylum. This is a wonderful story, but seems all too rare. The majority of the migrants I observed do not speak English, can not read in English, do not have phones or access to making calls to the US. This teenager stands out for his effectiveness. Many others would be just as qualified for asylum, but few make it. Thousands are turned away

I am from a past generation who believed in this country. I am ashamed and bow my head."

-Mary Jo, AFSC volunteer and a San Diego Friend

practice. Having an incorrect address on record for a person in removal proceedings (it is also problematic for anyone that has any open immigration case with DHS, including USCIS) can lead to a person not receiving notices from the court. Correspondence from immigration court can include notification of a change in hearing date or information about the decision on their case.

During court observations, AFSC's court observers witnessed two judges question the trial attorney as to why Border Patrol agents were categorizing migrants that they apprehended as "Arriving Aliens", a category that is usually reserved for people seeking entry at ports of entry, as defined by the Immigration Nationality Act (INA). One attorney representing an adult male argued that his client was not an "arriving alien" and should therefore be granted a bond hearing. This attorney also stated that he believed that Border Patrol was purposely categorizing migrants as such to ensure that they were not released from custody via a bond hearing. While migrants under MPP are not being held in a detention center, they are in DHS custody when they are brought into the US to attend their court hearing. The immigration judge presiding over this case, granted the migrant bond. It was clear that the judge did not agree with DHS's actions and even went on to ask the trail attorney if he (the judge) could also do "whatever he wanted" like immigration officers. With a large percentage of migrants being initially processed by Border Patrol, and with only 4% being represented by an attorney, it is safe to say that many migrants could be potentially granted bond and released from custody (taken out of MPP) if they had an experienced immigration attorney advocating for them[13].

Migrants returned to Mexico have also been issued NTAs that are incomplete. Most commonly the three boxes at the beginning of the NTA, which provides information on the proceedings and allegations of removability or inadmissibility, have been left blank. In addition, immigration officials have been found to write fictitious court dates on forms in order to return migrants to Mexico when

they should be allowed to remain in the US either by being released into the community or by being held in immigration custody[14].

"The migrant asylum-seeking community that are in Mexico waiting to be processed are faced with different scenarios and civil organizations face challenges in providing care according to their needs. Among the main challenges are insecurity, physical danger, a lack of mental health care, bad practices (malas prácticas), and lack of housing.

Many times when leaving their appointments in the United States, asylum-seekers are returned to Tijuana at night, and they must look for shelter or return to the shelter where they are staying. Similarly, they are asked to appear at the port of entry very early, even at 4 am, to attend their court hearings. This causes them to be exposed to danger and insecurity. We had a case of a family that experienced an attempted kidnapping due to this situation.

Having to wait for months in Tijuana makes it easier for their perpetrators to find them. We have had people receiving threats from their countries of origin, indicating that their aggressor already knows their location in Tijuana. We have also heard of people who have come across their perpetrators in Tijuana and have suffered physical violence and threats. Still they must wait in Tijuana, while their lives are in danger.

The process of resilience of migrants, given the current context, requires psychological and sometimes psychiatric support to generate stability while waiting for their asylum cases to be processed, and in order to avoid events that may jeopardize their safety or life

Asylum-seekers are faced with constant raids from Mexican immigration agents (INM) and the National Guard, as well as arbitrary detentions by the Municipal Police. All of these interactions with law enforcement involve acts of extortion, destruction of documents, mistreatment.

Asylum-seekers must wait in Tijuana, or in different border cities for months. The waiting time we have seen varies between 8 to 12 months. Most shelters have a time limit, varying between a couple of days, weeks or months, and sometimes there is no space at the shelters. Migrants often have to rent hotel rooms or apartments in unsafe places, and because they do not have a fixed income, it is difficult for them."

- Espacio Migrant, Tijuana-based migrant shelter and community center

## MIGRANTS INSINUATED OR EXPRESSED FEAR OF RETURN TO MEXICO

At several hearings, migrants expressed fear of returning to Mexico. Others insinuated it based on statements made to the judge. It is important to note that the MPP guidance does not require for judges or immigration officials to ask migrants whether they fear being returned to Mexico. Below are some of the observations highlighting this concern:

- A father described that at a shelter where he and his daughter were staying, a man attempted to rape his daughter while they were sleeping. The man had climbed into the area where they

AR01198

were sleeping and told the father that he wanted to have intercourse with his minor daughter. The father was outraged and immediately notified the shelter manager.

- A family (two adults and three children) described being held at gunpoint in Tijuana while staying with a family friend. They were targeted for being Central American. The father explained to the judge that he did file a police report and took proof to the PedWest port of entry with the goal of demonstrating his fear of being in Mexico to US immigration officials, but he was turned away.

- Observers witnessed migrants express concerns about the violence in Mexico. One father shared with the judge that he knew someone that had been kidnapped, and he was now scared of leaving the shelter with his son. Another mother stated that there was a high level of violence in the area that they were living in.

- Migrants that express fear of being returned back to Mexico are supposed to be interviewed by an Asylum Officer, part of the US Citizenship and Immigration Services (USCIS). However, AFSC observed cases in which individuals attempted to share their fear with the judge, but their case was not flagged for an additional interview with an Asylum Officer.

## MIGRANTS EXPRESSED CHALLENGES IN OBTAINING LEGAL REPRESENTATION

In most cases observed, migrants did not have legal representation. Judges continued many of the cases for a future date to allow migrants more time to obtain legal representation. Many migrants complained of not being able to afford an attorney, not being able to reach legal organizations listed on the EOIR pro bono list, as well as not having calls answered or returned. Some complained that organizations listed on the EOIR pro bono list could not help them because they are in Mexico, or that the waiting list is long. Some migrants stated not knowing how to make international calls.

- A single mother stated she had attempted to contact all the legal services provided on the EOIR form, without having success. She stated she had called multiple times and received no answers or numbers were busy. The judge made a comparison, as in other cases, that other Respondents have been successful in finding legal support, so she should expect to have the same success. When asked if she had a question, she asked, *"Yo que no tengo ayuda de nadie, yo no puedo pagar un abogado, ¿que debo hacer?"* She stated she migrated because she was fleeing not because she wanted to. The judge provided her with four sets of asylum applications. The mother was confused about when she needed to submit the applications. She initially thought she would have to fill them out that same day. The judge clarified and emphasized that it all had to be done in English.

- A father, accompanied by his son, explained to a judge that he made attempts to reach one of legal service providers on the EOIR list, but that they did not answer. The judge did not believe the man's explanation because "they have full-time people". He asked the man "Why

would I give you more time if you haven't done anything [to help yourself]?" The father continued by explaining that he could not dedicate all his time to finding an attorney because he had to work in order to provide for his family.

"In one case a man who was accompanied by his young son provided the Judge his package of completed paperwork. The Judge looked over the documents and advised the man he needed to complete one section. The man returned to the waiting area inside the courtroom. I heard whispering that he did not have a pen. I tapped the person in front of me to pass my pen down to the man. He completed the document and turned to return the pen. The Detention Officer standing in the back of the courtroom apparently observed this activity. I told the person who went to return the pen to me that the man could keep it. I looked toward the Detention Officer for her consent. She stated to me that they weren't allowed to have pens. No pens for taking notes in one of the most important court hearings of your life during which Judges give extensive information and when you have arrived at the border at 4:00 a.m. traveling usually with a child or two or three. Having practiced law for 30 years it is nearly incomprehensible to me that a person would be expected to attend such a court hearing without the ability to take notes. In addition, I have never heard any statistics about injuries caused by a pen.

So the Immigration Court Judges generally are dealing with immigrants who are not represented by an attorney, who are fatigued, who are living in difficult and sometimes dangerous circumstances in Mexico and who are appearing in a courtroom at hearings that are of the utmost significance to their future. Added to these challenges are what I have observed are apparent blatant and repeated failures of due process by border patrol agents.

In almost every court hearing I observed the Judges advised the attorney representing the Homeland Security that the paperwork presented in at least some of the cases was insufficient to show adequate notice had been given. The Judges typically give applicants for asylum additional time to see if they can find an attorney to represent them. In one courtroom, case after case involved the Judge telling the person appearing that the notice of the court hearing failed to identify how the person had come to the attention of the border agent. The form to identify this information is a check the correct box form. No box was checked. The Judge informed the attorney for Homeland Security and the applicant that the failure to complete the form properly meant the type of jurisdiction, and thus the law applicable to the particular hearing, could not be identified resulting in the possibility that the Judge had no jurisdiction at all in the case and the person might legitimately be entitled to be released in the United States. The response of the Homeland Security attorney to these obvious deficiencies was at best obfuscation.

Reflecting on all of my observations my fervent wish for our border community and our beloved country is that one of the generous, forward looking philanthropists in our border county will find a way to fund legal services through a responsible nonprofit entity to provide free legal counsel for immigrants seeking asylum. With effective legal counsel laws may be followed to move us toward humane action we can be proud of instead of actions we are shocked by."

- Ellen, AFSC volunteer, retired attorney, a San Diego Friend

AR01200

## MIGRANTS EXPERIENCED DISRESPECTFUL OR DENIGRATING TREATMENT AT THE HEARINGS

Migrants placed into the MPP process encounter various law enforcement authorities and legal personnel. This can be an intimidating experience. It was clear that many migrants were overwhelmed and didn't understand the court proceedings, and others believed the immigration judge was going to hear out their asylum claim at the initial hearings. In some cases, the judges expressed annoyance with the overwhelming court docket. Some Detention Officers also seemed overwhelmed at needing to keep track of the children with their parents or needing to keep the children quiet at the hearings. Clearly, those most impacted by everyone's frustration were the migrants themselves, who were at the highest state of vulnerability. Below are examples that migrants experienced disrespect or denigrating treatment at the hearings:

- A judge admonished a woman for over 10 minutes about her language of preference. At a previous hearing, she had indicated her language of preference to be Spanish, while at the hearing observed she indicated her language of preference was Kanjobal. She clearly did not speak Spanish well, and stated she was confused about the questions posed to her.

- A verbal exchange between a judge and a migrant:

  IJ: "State your true name?"

  IJ: "Why are you hesitating?"

  R: "I'm cold and nervous."

  IJ: "People that are cold and nervous don't forget their name."

- A Detention Officer forcibly pulled the hoodie from a child's head in a room where 15 children and 12 adults were waiting to have their cases heard. The Detention Officer appeared to be acting out of frustration for not being able to keep the children quiet. Most minors present were under 10 years old and they were segregated from their parents in the courtroom.

## IMMIGRATION JUDGES AND MIGRANTS DEMONSTRATED CONFUSION ABOUT MPP AND COURT PROCESSES

The American Civil Liberties Union, the Southern Poverty Law Center, and the Center for Gender & Refugee Studies have challenged the MPP program for violating United States immigration and administrative laws, as well as for the Administration's apparent intent to not meet its international obligations of safeguarding those seeking asylum in the United States. Consequently, how it has rolled out has caused confusion. At least two judges expressed frustration with how Border Patrol places migrants in the program even though the migrants turned themselves over to them in areas in between the ports of entry, and with the fact that they were categorized as "arriving aliens." Migrants



**Figure 7**: Migrants being initially processed by CBP's OFO at the San Ysidro Port of Entry (AFSC)

experience the greatest amount of confusion about how MPP is supposed to work. Below are some case highlights of that confusion:

- A single mother with two teenage children believed at the initial court hearing, that the judge would determine the asylum case for her and her children at that hearing. She was surprised and upset to learn that she would be returned to Tijuana. She expressed she and her daughters did not have a place to return to.

- During an initial hearing a father accompanied by his son thought that his case for asylum would be heard at a follow-up hearing. He asked the judge "If I win, will I stay in the US?". The judge appeared to not understand the father's question and asked the father, "What do you mean, if you 'win'?"

- One single female asked the judge if she could remain in the US while fighting her case. In response the judge asked the government attorney if it was the government's "intention" to return the woman to Mexico, to which the trial attorney responded that it was. The judge proceeded to tell the woman that he did not have the power to allow her to stay in the country. His advice to her was to find an attorney that could submit a parole request for her.

- Two adult siblings, a brother and sister, believed they could convince the judge that they should be permitted to stay in the US. They provided the judge with a letter written by their aunt and uncle, requesting that they be permitted to stay with them in the US.  The judge replied by stating it wasn't up to him, but rather, it was the government's decision on whether

AR01202

to allow them to stay in the US. The judge turned to the government's attorney and asked him about the process, and the government's attorney responded by stating the siblings would need to make their case at the port.

- A mother with two teenage daughters was confused about the MPP process. Upon learning that she would be returned to Tijuana, she was surprised and insisted she and her daughters could not return to Tijuana.  She said this while becoming visibly emotional.

## INCONSISTENCY BETWEEN IMMIGRATION JUDGES IN HOW THEY DETERMINE OUTCOMES AND CONDUCT COURT HEARINGS

Immigration judges have the responsibility of applying immigration laws as stated in the Immigration Nationality Act (INA) in an unbiased manner and one would imagine, uniformly. However, judges can issue rulings using their own discretion. Judges can also amend administrative court processes to their preference, as was frequently observed. The examples shared below are a few of the many differences observed amongst courtrooms:

- One judge decided to terminate cases instead of removing them in absentia when individuals did not appear in court stating that the government provided migrants with instructions on a non-official form. The judge argued that a Notice to Appear is the only formal document that can be given to migrants per regulations. Migrants placed in MPP are given a form that lists the time and date for them to arrive at a port of entry to be transported to court. Other judges ordered removals in absentia for those who did not appear in court.

- One judge conducted group hearings for all initial hearings on his docket while other judges held individual initial hearings. Another judge held a group hearing, but only because his previous cases took longer than expected and he was short on time.

- Three out of the five judges observed provided migrants with a blank I-589 application, the application used to seek asylum and/or withholding of removal, during initial hearings. The other two judges did not hand out blank applications in the hearings observed.

- One judge instructed migrants to have completed asylum application by the next hearing, if they did not, he warned, they would be deported. Judges can continue cases for a reasonable time, however there is no clear guidance on what constitutes "reasonable".

"Border Kindness has provided comprehensive services to asylum-seekers "returned" to Mexico since the first day the Migrant Protection Protocols policy was instituted. We have provided asylum-seekers returned to Mexico with over 100,000 meals, clothing, medical care, legal and administrative services and transportation.  We have also provided more than 1,000 asylum-seekers with transportation from Mexicali to the San Ysidro Point of Entry – for many of them we have provided transportation numerous times. Border Kindness has purchased bus tickets that exceed 300,000 miles.

[US immigration policies] are an administrative wall. It's a bureaucratic wall. It denies people the ability to legally seek asylum. When they do seek asylum, when they present themselves at a point of entry, they almost immediately or within days are sent back to Mexico to wait for hearings. And then this dance begins, this dance of hearings and court dates and such, in different locations far away, that basically allows the United States to out wait these people, to stall. From the moment they leave Central America, someone is trying to exploit them, for every one person trying to help them, there's 100 trying to exploit them."

-Kelly, Founder of Border Kindness

## ARBITRARY PROTOCOLS APPEAR TO CREATE GREATER UNCERTAINTY FOR MIGRANTS

The MPP process presents serious missteps in ensuring migrants are afforded due process rights protections. Migrants must follow a cumbersome process to get to court, that includes being at the port of entry four hours before their scheduled hearing. They must interact with various security personnel that can have implications on whether they get to attend their court hearings. Equally troubling is the lack of clear guidelines for judges on how to adjudicate MPP cases. Judges have expressed frustration about the MPP process in general and about information Customs and Border Protection officers write on official government documents about migrants. They also have been annoyed at migrants who seem to not be informed about court proceedings.

- In at least one case, a Detention Officer told a migrant that her hearing date was incorrect and that she did not have to present herself to the hearing. She nearly missed her court appearance.  When she disclosed this to the judge, the judge terminated the following 5 cases of migrants who did not appear in court out of abundance of caution, expressing that the Detention Officer might also have given them misinformation about their court dates. Meanwhile, the government attorney wanted to have them removed in absentia.

- In one case, a migrant stated he had missed his first court hearing because a CBP officer would not grant him entry to appear at his hearing.

- A pregnant minor was placed in MPP even though the policy guidance states that no minors traveling without a parent or legal guardian would be subject to MPP, or that pregnant women would be placed into the program. During her hearing, the TA attempted to justify why she was placed in MPP by arguing that immigration officials *assumed* she was married since she was traveling with her partner.

- During an initial hearing on August 19, 2019 a Honduran woman shared that she had a miscarriage on August 6, 2019 and was close to losing her life when she was hospitalized. It

AR01204

can be assumed that the woman was pregnant at the time that she was processed for MPP, a clear violation of the program's guidance. The woman was accompanied by her son, who she described as having mental health issues. The child was visibly upset during the hearing and the judge instructed him to not bite his mother and to not interfere. Individuals with significant health issues, including mental health issues, are presumably exempt from MPP.

## ADDITIONAL CHALLENGES

In addition to challenges observed in court, migrants subject to MPP are faced with additional obstacles to obtaining protection. The majority of migrants apprehended at the border are from the Northern Triangle, with over 15,000 of them from Guatemala. It is estimated that approximately 40% of Guatemalans speak an indigenous language[15]. Therefore, it is safe to say that for many of those subject to the MPP, Spanish is not their primary language. It is most likely that indigenous migrants are not obtaining all of the information presented to them during their initial processing with in a language that they fully understand. Immigration documents are provided primarily in English and asylum applications, along with their supporting documents, must be submitted in English. With only approximately 4% of migrants obtaining legal representation, those that go unrepresented most likely experience difficulties in advocating for an interpreter when interacting with immigration officers or



**Figure 8**: The result of a migrant's non-refoulement, or fear of returning to Mexico, interview.

judges[16]. It is also likely that they have a limited understanding of why they were not allowed into the US and returned to Mexico.

Access to attorney representation is one of the main concerns from the advocacy community. There is pending litigation challenging the policy due to the fact that it limits access to legal representation[17]. While there are immigration attorneys and nonprofit legal service providers wanting to provide representation to migrants returned to Mexico, needing to travel to another country to meet with migrants is a challenging especially for US nonprofit legal service providers. Advocates are also challenging the DHS practice of not allowing attorneys present during non-refoulement interviews, which has led to migrants being returned to Mexico regardless of the violence and threats they have received. Human Rights First has documented 816 cases as of January 21, 2020 in which migrants have experienced brutal attacks, which include kidnappings and extortions, while in Mexico[18].



**Figure 9**: March and rally at the San Ysidro border on November 25, 2018 (AFSC)

## CONCLUSION

MPP has achieved the goal of deterring migrants from entering the US and from exercising their right to seek international protection. While data shows that 89% of migrants allowed into the country show up to all of their court hearings, only 50% of migrants under MPP show up to their court hearings[19]. This low rate is not a reflection of the migrants themselves, but a clear indication that being forced to wait in Mexican border for months, or a year in some cases, without access to adequate social services is detrimental and dangerous. For those that do attend all of their court hearings and apply for immigration relief, the approval rate it 0.1% for migrants subject to MPP. This is compared to

AR01206

a 20% approval rate for removal cases outside of MPP[20]. The low approval rate is in part due to the changes in asylum policy and procedural errors committed by immigration officers.

Given the low rates of asylum approval and court attendance, the Administration continues to create policies to further hinder migrants from fleeing to the US. The Administration has proposed charging $50 per asylum application and will begin conducting DNA testing for all migrants in detention. We have also seen the development of "safe third country" agreements with Guatemala, which makes the claim that migrants have the ability to safely apply for asylum and be granted the protection[21]. In November 2019, the US government began sending Honduran and Salvadoran migrants to Guatemala, explaining, in some cases, that their case was being transferred[22].

The US government has failed to protect migrants seeking protections afforded to them based on US and international laws. There needs to be a shift towards creating just laws and towards defunding the immigration enforcement components of the US Department of Homeland Security[23].

---

[1] United Nations High Commissioner for Refugees, "Advisory opinion on the extraterritorial application of *non-refoulement* obligations under the 1951 Convention relating to the status of refugees and its 1967 protocol", available at https://www.unhcr.org/4d9486929.pdf

[2] US Department of Homeland Security, "Migrant Protection Protocols Announcement", January 24, 2019, available at https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols

[3] Kathryn Johnson, "Why the US should welcome all migrants with compassion and humanity", American Friends Service Committee, February 28, 2018, available at https://refresh19-afsc-1917.pantheonsite.io/blogs/news-and-commentary/why-us-should-welcome-all-migrants-compassion-and-humanity#

[4] TRAC Immigration, Details on MPP (Remain in Mexico) Deportation Proceedings, Syracuse University, available at https://trac.syr.edu/phptools/immigration/mpp/

[5] Jonathan Blitzer, "How the US Asylum System is Keeping Migrants at Risk in Mexico", *The New Yorker*, October 1, 2019, available at https://www.newyorker.com/news/dispatch/how-the-us-asylum-system-is-keeping-migrants-at-risk-in-mexico

[6] US Department of Homeland Security, "DHS begins MPP returns at Nogales for of entry in Arizona", January 2, 2020, available at https://www.dhs.gov/news/2020/01/02/dhs-begins-mpp-returns-nogales-port-entry-arizona

[7] James Fredrick, "How Mexico beefs up immigration enforcement to meet Trump's terms", *NPR*, July 13, 2019, available at https://www.npr.org/2019/07/13/740009105/how-mexico-beefs-up-immigration-enforcement-to-meet-trumps-terms

[8] Stephanie Leutert, Ellie Ezzell, Savitri Arvey, Gabriella Sanchez, Caitlin Yates, and Paul Kuhne, "Asylum Processing and Waitlists at the US-Mexico Border", Mexico Security Initiative, the Center for US-Mexican Studies, and the Migration Policy Centre, December 2018, available at https://www.strausscenter.org/images/MSI/AsylumReport_MSI.pdf

[9] *Ibid*

[10] Rosa María Avendaño Millán, "Entre Muros: Solicitantes de Asilo bajo los Protocolos de Protección a Migrantes", American Friends Service Committee, América Latina y el Caribe, Coalición Pro Defensa del Migrante, October 2019, available at https://www.afsc.org/document/entre-muros-solicitantes-de-asilo-bajo-los-protocolos-de-protecci%C3%B3n-migrantes. An executive summary of the report is also available in English at https://www.afsc.org/document/between-walls-asylum-seekers-under-migrant-protection-protocols

[11] Molly O'Toole, "Aslyum officers rebel against Trump policies they say are immoral and illegal", *Los Angeles Times*, November 25, 2019, available at https://www.latimes.com/politics/story/2019-11-15/asylum-officers-revolt-against-trump-policies-they-say-are-immoral-illegal

AR01207

---

[12] Krista Kshatriya, JD, S. Deborah Kang, PhD, "Walls to Protection: The Grim Reality of Trump's "Remain in Mexico" Policy", UCSD's US Immigration and Policy Center, October 29, 2019, available at http://usipc.ucsd.edu/publications/usipc-walls-to-protection-final.pdf

[13] TRAC Immigration, "Contrasting Experiences: MPP vs. Non-MPP Immigration court cases", Syracuse University, December 19, 2019, available at https://trac.syr.edu/immigration/reports/587/

[14] Gustavo Solis, "CBP's explanation for writing fake court dates on migrant's paperwork doesn't make sense, lawyers say", *The San Diego Union-Tribune*, November 13, 2019, available at https://www.sandiegouniontribune.com/news/immigration/story/2019-11-13/cbps-explanation-for-writing-fake-court-dates-on-migrants-paperwork-doesnt-make-sense-lawyers-say

[15] Tom Jawetz and Scott Shuchart, "Language Access Has Life-or-Death Consequences for Migrants", Center for American Progress, February 20, 2019, available at https://www.americanprogress.org/issues/immigration/reports/2019/02/20/466144/language-access-life-death-consequences-migrants/

[16] TRAC Immigration, "Contrasting Experiences: MPP vs. Non-MPP Immigration court cases", Syracuse University, December 19, 2019, available at https://trac.syr.edu/immigration/reports/587/

[17] Wendy Fry, "ACLU sues over detained immigrants' access to attorneys", *The San Diego Union-Tribune*, November 5, 2019, available at https://www.sandiegouniontribune.com/news/border-baja-california/story/2019-11-05/aclu-sues-over-detained-immigrants-access-to-attorneys

[18] Human Rights First has created a database that is regularly updated with reported cases of attacks on migrants in Mexico. It can be accessed at https://www.humanrightsfirst.org/sites/default/files/PubliclyReportedMPPAttacks-21Jan2020.pdf

[19] TRAC Immigration, "Contrasting Experiences: MPP vs. Non-MPP Immigration court cases", Syracuse University, December 19, 2019, available at https://trac.syr.edu/immigration/reports/587/

[20] Gustavo Solis, "Remain in Mexico has a 0.1 percent asylum grant rate", *The San Diego Union-Tribune*, December 15, 2019, available at https://www.sandiegouniontribune.com/news/border-baja-california/story/2019-12-15/remain-in-mexico-has-a-0-01-percent-asylum-grant-rate

[21] Susan Fratzke, "International experience suggests safe third-country agreement would not solve the US-Mexico border crisis", Migration Policy Institute, June 2019, available at https://www.migrationpolicy.org/news/safe-third-country-agreement-would-not-solve-us-mexico-border-crisis

[22] Kevin Sieff, "The US is putting asylum seekers on planes to Guatemala — often without telling them where they're going", *The Washington Post*, January 13, 2020, available at https://www.washingtonpost.com/world/the_americas/the-us-is-putting-asylum-seekers-on-planes-to-guatemala--often-without-telling-them-where-theyre-going/2020/01/13/0f89a93a-3576-11ea-a1ff-c48c1d59a4a1_story.html

[23] AFSC, along with other organizations, created the Defund Hate Campaign that calls on legislators to eliminate federal funding that supports immigration enforcement and detention. Information the Defund Hate campaign is available at https://www.afsc.org/defund-hate

AR01208





AR01209

*Office for Civil Rights and Civil Liberties*
**U.S. Department of Homeland Security**
Washington, DC 20528



January 29, 2021

MEMORANDUM FOR:     Troy Miller
                    Acting Commissioner
                    U.S. Customs and Border Protection

                    Scott K. Falk
                    Chief Counsel
                    U.S. Customs and Border Protection

                    Tae D. Johnson
                    Acting Director
                    U.S. Immigration and Customs Enforcement

                    Michael P. Davis
                    Executive Deputy Principal Legal Advisor
                    Office of the Principal Legal Advisor
                    U.S. Immigration and Customs Enforcement

                    Tracy Renaud
                    Acting Director
                    U.S. Citizenship and Immigration Services

                    Molly M. Groom
                    Acting Chief Counsel
                    U.S. Citizenship and Immigration Services

FROM:               Katherine Culliton-Gonzalez (b)(6)
                    Officer
                    Office for Civil Rights and Civil Liberties

                    Susan Mathias /s/
                    Assistant General Counsel, Legal Counsel Division
                    Office of the General Counsel

SUBJECT:            Complaints Related to the Implementation of
                    the Migrant Protection Protocols (MPP) [1]

---

[1] CRCL Complaint Nos. 19-06-DHS-0206, 19-06-DHS-0225, 19-08-CBP-0439, 19-08-ICE-0440, 19-09-CBP-0403,
19-10-CBP-0494, 19-10-CBP-0560, 19-10-CBP-0517, 19-10-CBP-0566, 19-11-CBP-0645, 19-11-CBP-0642,
19-11-CBP-0643, 19-12-CBP-0660, 19-11-CBP-0640, 19-11-CBP-0637, 19-11-CBP-0646, 19-11-CBP-0644,
19-11-CBP-0647, 19-11-CBP-0648, 19-11-CBP-0649, 19-11-CBP-0650, 19-11-CBP-0651, and 19-10-CBP-0652

***Protected by Attorney-Client and Deliberative Process Privileges***
***For Official Use Only/Law Enforcement Sensitive***

PURPOSE

This memorandum provides a summary of our findings as well as policy recommendations regarding implementation of the Migrant Protection Protocols (MPP) by U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS).[2]

SUMMARY

From February 15, 2019, through August 16, 2019, the Office for Civil Rights and Civil Liberties (CRCL) investigated whether CBP, ICE, and USCIS had implemented MPP in accordance with the MPP Guiding Principles and civil rights and civil liberties obligations. CRCL investigated a representative sample of complaints alleging, *inter alia*, that non-Spanish speakers have been subjected to MPP; that persons with serious health issues, pregnant women, and other vulnerable populations had been subjected to MPP; and that families had been separated during the MPP process.  CRCL made key findings that persons defined in MPP Guiding Principles[3] as being not amenable to MPP have been placed in the program; that policies and procedures regarding MPP had been inconsistent; that training for U.S. Department of Homeland Security (DHS) personnel had been lacking; and that issues with limited language proficiency had not been addressed.

COMPLAINTS

From February 15, 2019, through August 16, 2019, CRCL reviewed multiple reports and allegations related to violations of civil rights or civil liberties concerning foreign nationals who were returned to Mexico while pending a proceeding under Section 240 of the Immigration and Nationality Act (INA) pursuant to Section 235(b)(2)(C) of INA, under the program known as MPP.  Some of these complaints and matters are on hold due to litigation involving MPP.  Due to that litigation, CRCL coordinated with the DHS Office of General Counsel to refine the scope of investigation.  Accordingly, this investigation was limited and reviewed the following:

1. Whether CBP, ICE, and USCIS have appropriately implemented DHS, CBP, ICE, and USCIS policies and procedures relating to MPP and whether changes or additions to policies and procedures are needed to ensure that the protection of civil rights and civil liberties is appropriately incorporated into DHS's implementation of MPP.  This investigation will not explore, due to the ongoing litigation, the broader question of whether DHS, CBP, ICE, and USCIS policies and procedures relating to MPP are consistent with any applicable and enforceable *non-refoulement* obligations.

---

[2] In order to allow this memorandum to be more freely shared, it does not include personally identifiable information (PII).  PII has been included in the attached memorandum to assist those reviewing CRCL's recommendations who have a need to know that information:

*Protected by Attorney-Client and Deliberative Process Privileges*
*For Official Use Only/Law Enforcement Sensitive*

2

2.  Whether CBP had appropriately implemented the MPP Guiding Principles regarding persons not "amenable to" MPP and discretionary determinations with regard to other vulnerable populations.

February through August 2019, CRCL opened complaint investigations on over two dozen specific MPP-related complaints as a representative sample of the issues to be examined during the investigation.  In summary, complaints received by CRCL alleged that:

1.  Non-Spanish speakers had been subjected to MPP without being provided information about the process in a language they best understand.
2.  Persons with serious mental and physical health issues had been subjected to MPP.
3.  Pregnant women, including women with near full-term pregnancies, had been subjected to MPP.
4.  Other vulnerable populations, including persons with disabilities and LGBTI persons, had been subjected to MPP.
5.  Families were separated during the MPP process.

After the completion of this investigation, CRCL continues to receive complaints alleging deficiencies by CBP, ICE, and USCIS in the implementation of MPP and the application of MPP to populations who are not amenable or are otherwise vulnerable. CRCL has also since opened several complaint investigations relating to MPP that are outside of the scope of both the current litigation and this investigation.[4]

BACKGROUND

On January 25, 2019, former Secretary of Homeland Security Kirstjen M. Nielsen issued a memorandum instructing USCIS, CBP and ICE to implement MPP pursuant to Section 235(b)(2)(C) of the INA.[5] That section of the INA provides that certain persons arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States may be returned to that territory pending removal proceedings.

---

[4] For example, CRCL has opened complaints with allegations of Mexican national children, disabled persons, and non-Spanish speakers being placed in MPP.

[5] In the memorandum, titled *Policy Guidance for Implementation of the Migrant Protection Protocols*, Secretary Nielsen reminded DHS officials to act consistent with the *non-refoulement* principles in the Convention and Protocol Relating to the Status of Refugees, as well as the Convention Against Torture. Specifically, the memorandum states, "a third-country national should not be involuntarily returned to Mexico pursuant to 235(b)(2)(C) of the INA if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion [unless subject to the persecutor bar to asylum], or would more likely than not be tortured." This "more likely than not" standard is consistent with the standard of proof for withholding of removal and *non-refoulement* under INA §241(b)(3) and regulations implementing the Convention Against Torture.  However, the memorandum indicates that this process is not considered withholding of removal. 8 C.F.R. §208.16(a) states: "An asylum officer shall not decide whether the exclusion, deportation, or removal of an alien to a country where the alien's life or freedom would be threatened must be withheld[.]"

### A.  CBP's Role in the MPP Process

Under the MPP policy that was reviewed, when a CBP officer in the Office of Field Operations (OFO) encounters an individual arriving from Mexico at the port of entry or a U.S. Border Patrol (USBP) agent apprehends an individual arriving from Mexico between the ports of entry alleged to be an inadmissible person, they may consider whether they are amenable to MPP and, if so, may return those individuals to Mexico pending a removal proceeding pursuant to section 240 of the INA.  The officers or agents initially perform a general intake process of collecting biographic information and biometrics.  CBP personnel also conduct a preliminary medical screening.  CBP officers and USBP agents then make an MPP amenability determination according to the guidance in the MPP Guiding Principles and applicable local policies.  Once an individual is determined to be amenable to MPP, CBP prepares a case file, schedules the individual's Department of Justice Executive Office for Immigration Review (EOIR) immigration court hearing date using the EOIR scheduling system, prepares documents, and serves those documents on the individual.  The served documents include the "Migrant Protection Protocols Initial Processing Information," also known as a "tear sheet," which has the port of entry, date, and time when the individual is instructed to appear for the immigration court hearing; a Form I-862, *Notice to Appear*; a Form I-286, *Notice of Custody Determination*, and a List of Pro Bono Legal Service Providers in the United States for the immigration court where their hearing will be held.   USBP and OFO coordinate returns to Mexico pursuant to MPP with Mexican immigration officials at set times, which may result in the individual being held in CBP custody at a USBP Station or a port of entry for a period of time, sometimes overnight.[6]  The intake policy for MPP does not include asking an individual whether they fear persecution or torture in Mexico.[7]  To be referred for an assessment regarding an individual's fear of persecution or torture in Mexico, or a fear of return to Mexico, the individual must affirmatively state a fear of persecution or torture in Mexico, or a fear of return to Mexico.  An affirmative statement of this nature will result in CBP coordinating with USCIS for an MPP assessment interview.[8]  If USCIS assesses that a person who affirmatively states a fear of return to Mexico is more likely than not to face persecution or torture in Mexico, the individual may not be processed for MPP.

At the time of the appointed hearing date, CBP officers or agents process individuals in MPP who return from Mexico for their immigration court hearing, transferred the individuals to ICE-Enforcement and Removal Operations (ERO) custody for transport to the immigration court, unless the hearing is being held at an immigration hearing facility (IHF), also known as a "port court" or "tent court."  After returning from immigration court, ICE-ERO transfers custody of the individual back to OFO.  OFO coordinates with Mexican officials to facilitate the return of those individuals to Mexico after the court hearing, pending the next scheduled immigration court hearing.  The same procedures are repeated for the duration of the individual's removal proceedings.

---

[6] CRCL has inquired with CBP and it is CRCL's understanding that CBP does not track the hold times for persons in MPP in summary reporting.

[7] Per CBP guidelines, Mexican nationals are not amenable to MPP.

[8] If it is determined that it would be a violation of the *non-refoulement* principle to return the individual to Mexico, the individual may be placed in DHS custody to await their court hearing.

**B.  ICE's Role in the MPP Process**

Under the program reviewed, at the date and time of a hearing, the individual must report to the designated port of entry. Individuals requiring transportation in order to attend their immigration hearing at an EOIR facility are transferred to ICE ERO's custody under INA §212(d)(5)(A). ICE ERO maintains physical custody of the individual during transportation and while at the immigration court, primarily using contract guards. In order to facilitate access to counsel as required by INA §240(b)(4)(A), ICE ERO was instructed to depart from the Port of Entry (POE) with the respondent "at a time sufficient to ensure arrival at the immigration court not later than one hour before his or her scheduled hearing time in order to afford the individual the opportunity to meet in-person with his or her legal representative."[9] After the immigration court hearing, ICE ERO transports the individual in MPP back to the POE and CBP custody. If the individual has received a grant of relief or an administratively final order of removal, ICE ERO coordinates with CBP to make appropriate custody determinations, pending appeal.[10]

**C.  USCIS's Role in the MPP Process**

When an individual in MPP affirmatively states a fear of persecution or torture in, or return to Mexico, CBP is instructed to refer the individual to USCIS for an MPP assessment interview to determine whether it is more likely than not that the individual will be subject to persecution or torture if returned to Mexico. USCIS policy requires the MPP assessment interviews[11], like other asylum and asylum pre-screening interviews, be conducted confidentially and in a non-adversarial manner. These MPP assessment interviews are often conducted telephonically and occur quickly. USCIS is not required to provide a period of rest or evidence-gathering.  Counsel is permitted only in limited circumstances.

USCIS uses the "more likely than not" standard when assessing whether an individual subject to MPP will face persecution or torture if returned to Mexico.  In order to establish that they would meet the "more likely than not" standard, similar to withholding of removal under INA §241(b)(3) or the Convention Against Torture,[12] asylum officers weigh the credibility of the individual's testimony, known country conditions in Mexico, and whether the individual is subject to the bars to withholding of removal under INA §241(b)(3)(B).  The MPP assessment interview is reviewed by a supervisory asylum officer, who may change or concur with the assessment's conclusion, and provided by USCIS to CBP.  If the standard is met, CBP is to remove the individual from MPP and

[9] Nathalie R. Asher, Acting Executive Associate Director, *Memorandum for Field Office Directors, Enforcement and Removal Operations: Migrant Protection Protocols Guidance*, February 12, 2019, *available at* https://www.ice.gov/sites/default/files/documents/Fact%20sheet/2019/ERO-MPP-Implementation-Memo.pdf.

[10] CRCL has multiple open complaint investigations relating to allegations of individuals being returned to Mexico after receiving a grant of asylum by the Immigration Judge. Those separate investigations are outside of the scope of this memorandum.

[11] USCIS and CBP do not appear to use consistent and agreed-upon terminology for these interviews and assessments. USCIS staff consistently referred to these as "MPP interviews," whereas CBP personnel often used the term "credible fear" to refer to these interviews, despite this process not relating to credible fear. As these interviews and assessments do not appear in any statute or regulation, CRCL will use "Fear in Mexico" and/or *non-refoulement* to refer to this interview and assessment process in this memorandum.

[12] 8 C.F.R. §1208.16 - §1208.18

determine as a matter of discretion which available option to use to process the person, such as placing the individual in expedited removal proceedings, issuing an NTA for removal proceedings under INA §240 or other possible options.  The individual may be transferred to ICE custody pending those proceedings.

CRCL'S INVESTIGATION AND ANALYSIS

**A.  Review of Policy, Guidance, Procedures and Training Materials**

CBP MPP Policies and Training Materials

A January 28, 2019 memorandum from former CBP Commissioner Kevin McAleenan to Todd Owen, Executive Assistant Commissioner, Office of Field Operations, and Carla Provost, Chief of the U.S. Border Patrol instructs CBP to commence implementation of MPP and stated that implementation would begin at the San Ysidro port of entry on January 28, 2019.  A January 28, 2019 memorandum from Todd Hoffman, Executive Director, Admissibility and Passenger Programs, OFO to Field Operations Directors and the Director of the Field Operations Academy, titled *Guidance on Migrant Protection Protocols* instructed the OFO San Diego Field Office to implement Section 235(b)(2)(C) of the INA consistent with its existing discretion and authorities. The memorandum stated, "[c]ertain aliens, **including vulnerable aliens,** criminal aliens, or aliens of interest to the Government of Mexico or the United States, will not be placed into MPP, in accordance with the Guiding Principles for Migrant Protection Protocols issued today by the Enforcement Programs Division (HQ)" (emphasis added).

CBP provided CRCL with a training slide deck relating to the implementation of MPP.  The training materials covered the procedural steps of CBP MPP Processing, including a checklist for the identification of inadmissible persons who are arriving on land from Mexico who are potentially amenable to MPP.  The training slides further instructed CBP staff on procedures and documentation for referring persons in MPP to USCIS for *non-refoulement* "Fear in Mexico" determinations.  These instructions state that if any member of a family unit claims a fear of returning to Mexico, then all individuals in the family unit must be referred to USCIS.  The training slide deck also included procedural instructions for the day before an individual in MPP returns to the Port of Entry (POE) for their hearing before the Executive Office of Immigration Review (EOIR).  On the morning of the return to the POE from Mexico, CBP staff are instructed to complete the IHSC-794 on the morning of the return to the POE from Mexico, regarding medical screening of all individuals "to determine if there have been any changes since the last arrival and to ensure there are no potentially contagious illnesses presented in court."[13]  The completion of this form does not appear to relate to the determination that an individual has no "known mental or physical health issues" and is therefore amenable to MPP.[14] According to the

---

[13] CBP provided CRCL with a copy of the IHSC-794 used at the San Ysidro POE.

[14] The procedures in the slide deck also account for pat-downs, tagging property, and conducting biometric identity verification of the individuals, as well as documenting OFO custody in SIGMA and completing fields addressing the conditions of custody, including the "water accessible," "room temperature," and "safe/sanitary conditions" fields in SIGMA.

process outlined, individuals are provided "MPP Tear Sheets" and then transferred to ICE-ERO custody for their EOIR hearing.

OFO staff were instructed that when individuals in MPP return from their EOIR hearings, staff should verify whether they have affirmatively stated a fear of persecution, torture, or return to Mexico and document this in a "Master Roster" with a "Claim Mex Fear at Court" column. The screenshot on this slide indicates that the "Master Roster" is an Excel spreadsheet. OFO personnel then make a copy of the "MPP Subsequent Hearings Information Tear Sheet" in English and Spanish with the updated date and time and update the "Master Roster" with the new hearing date and Return to Mexico ("RTM") date. OFO is instructed to either retain custody of individuals who claimed a fear of returning to Mexico at court or to transfer those individuals to USBP custody if they were originally apprehended by USBP until USCIS can conduct a "Fear in Mexico" *non-refoulement* interview. If an individual claiming fear of returning to Mexico is not found by USCIS to be more likely than not to suffer persecution or torture in Mexico, the training slides instructed CBP to include the USCIS "MPP Assessment Notice" in the A-file and upload a copy to SIGMA, then complete the individual's return to Mexico.

ICE Operational Involvement

*ERO San Diego Field Office*

CRCL reviewed local guidance and standard operating procedures from the ICE ERO San Diego Field Office detailing their role in custody and transportation of individuals in MPP who return to the United States for an immigration court hearing. According to the guidance reviewed, individuals in medical distress were to remain at the POE. Personal property is kept in storage at the POE while individuals are in custody. The ICE ERO SND guidance states that individuals "in their third trimester of pregnancy should not have been enrolled in [MPP] and are not transported by ERO.[15] Similarly, no Unaccompanied Alien Children (UACs) are transported to the MPP immigration court hearing by ERO. The guidance further stated, "Adults who claim to be missing one or [more] family member, especially children, who are scheduled for court should not be transported, to avoid the perception of separating families."

ICE ERO contract guards (Spectrum) maintained custody of the individuals in MPP while at the immigration court. Immigration court hearings typically conclude between 3:30pm and 5:00pm, at which time Spectrum notifies ERO of the number of detainees who claim fear. ERO notifies the OFO Watch Commander and/or CBP Supervisor that the detainees are en route back to the POE and the number of individuals who claimed fear. The ERO guidance noted that "[a]t the conclusion of each hearing, a new court date or disposition is assigned to the detainees. ERO docket officers track this by running PLAnet[16], which is often not updated until the following day." Each afternoon CBP sends the Form I-216, *Record of Persons and Property Transfer* to a distribution list that includes ICE ERO deportation officers who manage the MPP docket, indicating participants who failed to appear. The guidance noted, "HQ is tracking what happens to

---

[15] This guidance does not provide any clarification regarding individuals who enter their third trimester of pregnancy after being enrolled in MPP.

[16] PLAnet is ICE OPLA's case management system.

those persons in court. In San Diego, persons who fail to show up most often have their cases terminated without prejudice." A daily situation report detailed expected movement, including total and actual appearances by persons in MPP with immigration court hearings, claims of fear in Mexico, and hearing outcomes. This situation report appears to be manually prepared.

When reviewing the San Diego procedures, CRCL found that the document provided by ICE ERO had already incorporated several "lessons learned," including:

- Adjustments were made to ensure that persons in MPP left the POE earlier in order to arrive at the courthouse on time. ERO noted difficulty with getting the Spectrum contractors to adhere to the strict timelines.
- A need for ICE ERO docket officers to adjust to inconsistent practices by Border Patrol and OFO, including scheduling an MPP court date for a respondent in CASE ISS, then sending them out as a family unit to another area of responsibility, or CBP removing persons from MPP enrollment, but not following up with EOIR.
- CBP failing to screen for UACs. The ICE ERO document details a father and daughter who were initially enrolled in MPP together. The 13-year-old girl later appeared at the POE by herself. ICE ERO determined her to be a UAC and had to remind CBP that ICE ERO will not transport UACs to court for an MPP hearing.
- Overcrowding at the San Diego Immigration Court.
- MPP cases extending beyond the 180-day visa issued by the Mexican government and INM refusing to accept the individual being returned to Mexico, leading CBP and ICE to need to find space to detain the individual.

*ICE ERO El Paso Field Office*

CRCL reviewed the contract procedures utilized by ICE by reviewing documents provided by the ICE ERO El Paso Field Office (El Paso). El Paso provided CRCL with copies of the contract modification and Statement of Work (SOW) for Global Precision Systems, LLC (GPS) to provide transportation and guard services for MPP-related hearings at the immigration court. The SOW provided for the mandatory application of restraints to and from the immigration court room, as well as a pat down screening. The SOW also provided for the distribution of masks and hand sanitizer to MPP participants who appear to have flu or cold-like symptoms, and for GPS to request an additional medical screening for individuals with "clear signs of a contagious illness or [who are] demonstrating violent behavior." The SOW provided exceptions from pat downs for minors boarding the vehicle with an adult family member, and exceptions for the use of restraints against pregnant women and minors. The SOW included additional requirements for guards, including one male and one female restroom escort.

USCIS MPP Policies, Procedures, Training Materials, and Email Records

USCIS provided CRCL with copies of the USCIS MPP Assessment Notice, the USCIS MPP Worksheet, MPP training slide decks for asylum officers, local MPP standard operations procedures (SOPs) and tip sheets from the Arlington,[17] Houston, San Francisco, and Los Angeles

---

[17] The APSO Processing Center ("ZAC") at the Arlington Asylum Office has jurisdiction over the majority of MPP cases.

Asylum Offices, and MPP Instructions and Implementation Guidance.  USCIS provided procedures and training materials from both the early implementation of MPP in January 2019 as well as updated training materials from July and August 2019.  CRCL also reviewed the January 2019 USCIS Policy Memorandum, PM-602-0169, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*.[18]

The USCIS MPP Instructions and Implementation Guidance, dated June 3, 2019, require the Asylum Office to receive a Form I-213, *Notice of Deportable/Inadmissible Alien*, from CBP in order to conduct an MPP assessment interview.  Asylum officers are instructed to review available government records to determine whether additional questioning is required about a possible bar to withholding of removal.  Asylum officers are instructed to process accompanying spouses and qualifying children together and in cases where no family member is found to be more likely than not to face persecution or torture in Mexico, to fully develop the record for all family members. Asylum officers analyze the facts from the interview and other available evidence and complete an MPP Assessment Worksheet and transmit the worksheet to a supervisor for review, who may change or concur with the assessment's conclusion. USCIS requires supervisory review of all MPP "Fear in Mexico" cases.  The MPP Assessment Worksheet and MPP Assessment Notice are provided to CBP and/or ICE in English and CBP is responsible for serving the individual in MPP a copy of the MPP Assessment Notice.  Asylum officers are also instructed to email a copy of the MPP Assessment Worksheet and interview notes to Asylum Division headquarters.

The MPP Assessment Notice provided to individuals in MPP contains the interview location and date, determination date, and basic biographic information about the individuals to whom the assessment applies, in addition to a checklist with the possible outcomes of the assessment.

The MPP Training materials included background information on MPP and the USCIS Asylum Division's role in ensuring that the United States' *non-refoulement* commitments are met.  The training materials particularly focus on the higher "more likely than not" legal standard and the differences between the Asylum "well-founded fear" standard of proof and the higher standard in withholding of removal cases.[19]

CRCL reviewed copies of local asylum office emails between supervisory staff advising on how to manage the heavy administrative workload of the USCIS MPP interviews and assessments. In these emails, local management warned that the Microsoft Excel-based "Log" of MPP cases was prone to freeze or crash when multiple people attempted to update it.  Supervisors also warned staff that CBP sometimes makes mistakes with names and Alien Registration Numbers ("A-Numbers", a.k.a. "A#") when referring MPP cases to USCIS and that "The most common mistakes CBP makes are putting the same A# for parent and child, swapping the names and A#s of parent and child, and in one case, assigning the same A# to two different people in two different families."  San Francisco Asylum Office local guidance also referred to the need to instruct officers to schedule rare language interpreters as soon as possible when their applicant needs one,

---

[18] *Available at* https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2019/2019-01-28-Guidance-for-Implementing-Section-35-b-2-C-INA.pdf (last accessed Jan. 29, 2021).
[19] These standards of proof are both distinct from the "significant possibility" standard applied in credible fear screenings.

and the need to instruct support staff to "keep an eye out for I-213s which indicate that an individual was born in Mexico" in order to flag potential nationals of Mexico who have been placed in MPP.[20]

CRCL reviewed a copy of an email exchange in mid-July 2019, between Los Angeles Asylum Office Management and USCIS Asylum Division leadership regarding a case where USBP placed a Guatemalan mother with two Mexican national children into MPP. (b)(5)

CBP referred the entire family, including the Mexican national children, to USCIS for MPP Assessments and that USCIS Asylum Division leadership instructed the Asylum Office not to conduct MPP assessments for families containing Mexican nationals, as they were not amenable to MPP.  CRCL also reviewed an August 7, 2019, email from a Los Angeles Asylum Office section chief reminding supervisory officers to advise USBP that USCIS is unable to complete an MPP assessment in cases where there are one or more family members who are Mexican nationals and instructing supervisors to contact headquarters if they encounter further issues.

CRCL also reviewed copies of emails from local Arlington Asylum Office staff to CBP raising concerns regarding medical issues and amenability to MPP for individuals referred to USCIS for "Fear in Mexico" assessments.  According to local supervisory staff, the asylum office dealt "rather frequently" with cases that appeared to fall within the category of "known physical/mental health issues."  Asylum office staff indicated that CBP staff were reluctant to describe MPP amenability policies in writing and that phone calls from CBP resulted in ambiguous information and a lack of clarity regarding MPP amenability. Some examples are provided below:

- In one October 2019 email exchange, asylum office staff alerted CBP that interview testimony indicated that an 11-year-old boy in MPP had severe epilepsy, with convulsions leading to loss of memory and vomiting.  The response from CBP indicated that CBP was aware of the child's condition and that he had gone through two prior medical screenings while remaining in the MPP program.

- In an email from September 2019 referring a family for a USCIS "Fear in Mexico" MPP Assessment, CBP staff informed USCIS that a four-year-old child in MPP had been medically quarantined and subsequently examined by the Centers for Disease Control and Prevention and found to have chicken pox and that his sister, also a child, had been sexually assaulted in Mexico and transported by CBP to the hospital for medical attention.

---

[20] The existence of this local guidance could indicate that persons who speak rare languages and Mexican nationals have been placed in MPP in sufficient numbers to necessitate these procedures.

- In an October 2019 email exchange, a supervisory asylum officer brought to CBP's attention that a woman had been placed into the MPP program and returned to Mexico with cervical metaplasia, a serious precancerous disease, for which she was unable to receive treatment in Mexico and which was causing increasing bleeding and pain.  The (b)(5), (b) (7)(E) ███████████████████████████████████████████████████ The August 15, 2019, hearing was rescheduled two days before the hearing for September 4, 2019.  On September 5, 2019, USCIS conducted a fear Assessment, during which the individual testified as to her medical condition but was subsequently returned to Mexico. She returned for another EOIR hearing on October 1, 2019 and was interviewed a second time by the asylum office. ██ (b)(5) █████████████████████████████████████████████████████████████████████████████ .

- In an August 2019 email exchange, a supervisory asylum officer brought to CBP's attention that an individual who testified that she had been re-diagnosed with uterine cancer, which had previously been in remission, had been separated from her husband whom she entered the United States with and placed into MPP while he was released to Florida.[21]

- In an October 2019 email exchange, a supervisory asylum officer brought to CBP's attention that a woman referred to USCIS for an MPP "Fear in Mexico" assessment testified that she was pregnant and had previously had surgery on her uterus due to stage one uterine cancer. (b)(5), (b) (7)(E) ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- In a September 2019 email exchange, a supervisory asylum officer brought to CBP's attention that a woman in MPP who was referred to USCIS for an MPP Assessment testified that she suffers from diabetes and was having trouble obtaining access to her medication in Mexico, causing her to lose consciousness and experience pain.  CBP responded, "In regards [sic] to this request, Diabetes (medicated) is not grounds for exclusion from the MPP program.  Subject has been evaluated by our on-site medical team and is on the proper medication.  Subject and her family will remain in the MPP program unless she has established a positive Credible Fear of return to Mexico."

[21] This woman remains in MPP and her next hearing is in June 2020.

## B.  Review of U.S. Government Records for Individual Complaints

As part of its investigation, CRCL reviewed allegations and U.S. government records, including, but not limited to, the following:[22]

Complaint No. 19-10-CBP-0517

CRCL reviewed a July 28, 2019, article from The Guardian titled "'Like a child': the disabled migrant stranded and alone in Mexico".  The article reports that 27-year-old Complainant #1 (given a pseudonym in the article), who has a cognitive disability, was separated from his cousin and her son after crossing the U.S.-Mexico border to flee gang violence in El Salvador and returned to Juarez under MPP on March 30, 2019.  The article stated that among the papers provided by Complainant #1 was a statement from a doctor saying that he had the cognitive age of a four-year-old child.  CRCL received and reviewed an email from CBP providing a timeline of events in Complainant #1's case on August 5, 2019.  The timeline indicated that Complainant #1 was apprehended on March 30, 2019, but was not returned to Mexico until May 9, 2019.  On June 27, 2019, Complainant #1's attorneys brought him back to the POE to ask to be removed from MPP due to mental disability.  On June 28, 2019, he was taken to the Ysleta USBP station where the medical staff found him to be "alert to space, time, location and situation," but also recommended that a psychologist make a determination regarding mental competency.  CBP records dated June 28, 2019, indicate that despite the recommendation for a psychologist to make a determination on mental competency, this did not happen because Complainant #1, who CBP had medical records indicating he allegedly had the cognitive capacity of a child, declined.  At the same time, the records indicated that on June 27, 2019, USBP denied him a "CIS/Asylum interview" due to "mental disability."  When Complainant #1 returned for his court appointment on July 18, 2019, the notes indicate that there was a "credible fear" interview.  CRCL reviewed the USCIS record, and it appears CBP was referring to an MPP "Fear in Mexico" Assessment on July 19, 2019.  Finally, the immigration judge during Complainant #1's July 23, 2019, hearing identified a possible competency issue and said he would conduct a competency hearing on August 16, 2019.  CBP then returned Complainant #1 to Mexico despite his pending mental competency hearing.  CRCL requested copies of records relating to Complainant #1 from CBP on September 6, 2019.  On January 8, 2020, CBP provided records to CRCL, which included a Form I-213 with an August 6, 2019, addendum stating, "The Immigration Judge determined that [Complainant #1] is incompetent to represent himself in removal proceedings and orders that safeguards to be put in place.  Due to the subject's mental health issues, he was returned to the Ysleta Border Patrol Station. [Complainant #1] has been removed from the MPP program."

---

[22] The cases presented here are a representative sample of the allegations investigated by CRCL.  Several MPP cases investigated by CRCL are not detailed in this section for brevity.  For example, Complaint No. 19-10-CBP-0566 raises time-in-custody issues that do not relate to the recommendations in this memorandum.  In that case, CRCL substantiated allegations that Complainant #2, a Cuban national, was held in CBP custody for 48 days, far longer than the 72-hour period permitted by the CBP National Standards on Transport, Escort, Detention, and Search (TEDS).  CBP documents indicate that due to ERO space not being available, she was held in CBP custody in a tent with approximately 100 individuals, until the MPP program expanded beyond Northern Triangle of Central America countries to include Cuban nationals and she was removed to Mexico.

Complaint No. 19-11-CBP-0637

CRCL attempted to investigate allegations that Complainant #3, a 16-year-old autistic boy with limited ability to speak and who is sensitive to touch, was returned to Mexico under MPP. CRCL received and reviewed records from CBP. The records did not include any documentation of a medical screening or medical assessment. Although Complainant #3 was not placed in Expedited Removal and was instead served I-862 NTAs and placed in MPP, the text "CREDIBLE FEAR CLAIM" appears on his I-213. Because CBP does not appear to have (or did not provide) any documentation relating to Complainant #3's medical condition, CRCL is unable fully investigate the allegations.

Complaint No. 19-11-CBP-0642

CRCL investigated allegations that Complainant #4, a 27-year-old asylum seeker from Nicaragua required a wheelchair and treatment by CBP medical staff for severe back injuries prior to being returned to Mexico under MPP. CRCL received and reviewed records from CBP. While the field on the Personal Search Worksheet relating to illness, medications or medical care is blank, the TEDS Detainee Assessment indicates that Complainant #4 did not identify as having a disability, does not have physical or psychological medical needs, and is able bodied. CBP provided CRCL with copies of several other records, and CRCL reviewed available government systems. No records substantiated the claim that Complainant #4 required a wheelchair and medical treatment for back injuries.

Complaint No. 19-11-CBP-0643

CRCL investigated allegations that Complainant #5, a 6-year-old girl from Honduras, was returned to Mexico with "advanced cerebral palsy and significant developmental delays." CBP provided records to CRCL relating to Complainant #5. The I-213 indicated that she, her parents, and brother were processed into MPP as a Family Unit on May 20, 2019. The I-213 further indicated "CRIPPLED LEG, LEFT" and "CRIPPLED LEG, RIGHT" under "Scars, Marks, and Tattoos." The records provided to CRCL by CBP did not include any other documentation relating to her health, including no documentation of any medical screening or assessment. The note by CBP that she had two "crippled leg[s]" indicates that CBP was aware that the child had a disability at the time it placed Complainant #5 into MPP and returned her to Mexico. (b)(5)

Complaint No. 19-11-CBP-0645

CRCL investigated allegations that Complainant #6, a Guatemalan who speaks an indigenous language and has limited Spanish ability was separated from his biological son when being placed into MPP, despite providing a birth certificate. (b)(5), (b) (7)(E)

(b)(5), (b) (7)(E)                              DOJ-EOIR records list his language as "KEKCHI."
On January 8, 2020, CBP provided records for Complainant #6 (b) (7)(E)                              ,
indicating the Complainant #6 was re-united with his child after having been separated after
advocacy from his legal representatives.

Complaint No. 19-11-CBP-0650

CRCL investigated allegations that CBP separated a family consisting of common law partners
Complainant #7 and Complainant #8 and their children, a girl approximately 22 months old,
Complainant #9 and their 6-year-old son, Complainant #10. The allegations received by CRCL
stated that Complainant #7 and their daughter, Complainant #9, remained in the United States and
were separated from Complainant #8 and their son, Complainant #10, who were returned to
Mexico under MPP.  The records provided to CRCL by CBP on January 8, 2020, include an
Unaccompanied Alien Child screening addendum for Complainant #9, despite the Form I-213
noting that she was accompanied by her mother. The records for her brother, Complainant #10
also include a UAC screening addendum, despite his Form I-213 noting that he was accompanied
by his father.  The Form I-213 for Complainant #8 and Complainant #10 both contain an
addendum indicating that "[t]he family unit (below) is being removed from the MMP program
[sic] to reunify the family" and lists all four family members.  CBP provided CRCL with copies of
emails stemming from an inquiry by the father and son's attorney relating to their separation.  In
those emails, CBP personnel state that: "USBP will allow 1 head of household to be processed as a
FMUA[23] with all children and the other head of household (adult) is processed separately. This is
common knowledge. To counter this procedure, heads of household will willingly separate, and
each will take a child or children, in order to be processed as separate FMUAs."

Complaint No. 19-11-CBP-0651

CRCL investigated allegations that Complainant #11 suffered mental health issues while being in
the MPP program.  CBP records indicate that Complainant #11 was apprehended with her son,
Complainant #12.  During her USCIS MPP assessment interview, Complainant #11 testified that
she had been traveling with her son and sister-in-law.  Complainant #11 testified that she
witnessed the abduction of her sister in law in Mexico.  Complainant #11 further testified that she
was abducted by tattooed men in Juarez then taken to a house and raped in front of her son.  The
asylum officer's notes indicate that Complainant #11 became unresponsive during the interview.
CBP provided email records to CRCL on January 8, 2020, stating that she "was on a telephonic
interview with A MPP Asylum Officer when she claimed to having a mental breakdown." [sic]
CBP had contract medical staff evaluate Complainant #11 and they determined that she should be
transported to the hospital for a psychiatric evaluation.  The email stated that she was screened for
depression and sexually transmitted infection and released from the University Medical Center of
El Paso Emergency Department, who prescribed her Mirtazapine, hydroxyzine hydrochlorine, and
doxycycline hyclate.  However, Complainant #11 was not removed from MPP for having a mental
health issue or under CBP's discretion.  She was eventually removed from MPP due to a
determination by USCIS that she was more likely than not to face persecution or torture in Mexico.

---

[23] FMUA is the designation used by CBP for Family Unit Aliens.

Complaint No. 19-10-CBP-0652

CRCL investigated allegations that Complainant #13 was placed into the MPP program despite being deaf and mute.  Complainant #13 was apprehended on March 28, 2019.  (b)(5), (b) (7)(E)



CBP "medically released and cleared" Complainant #13 on April 6, 2019, for return to Mexico under MPP with a court hearing on July 24, 2019.  As Complainant #13 does not speak or hear Spanish, EOIR had to reschedule her hearing for an interpreter.  (b)(5), (b) (7)(E)

### C.  OFO Briefing to CRCL at Paso Del Norte Port of Entry

On July 17, 2019, CRCL met with CBP leadership at the Paso Del Norte Port of Entry (PDN) for a briefing on the implementation of MPP at the POE.  PDN leadership thoroughly explained the MPP process as applied at PDN, including factors considered for amenability determinations and challenges faced by OFO when implementing MPP.

MPP Amenability Determinations at Paso Del Norte



CRCL asked how OFO assesses the category of "known physical or mental health issues" when applying the MPP Guiding Principles at PDN.  (b)(5)

(b)(5)

(b)(5)

CRCL asked PDN leadership how individuals with disabilities are evaluated for amenability to MPP. (b)(5)

MPP Processing at PDN



(b)(5)

.

---

[24] A recent report by the Citizens' Council for Public Security and Criminal Justice found that Ciudad Juarez was the fifth most violent city in the world, by homicide rate. Kate Linthicum, *Five of the six most violent cities in the world are in Mexico, report says*, Los Angeles Times, March 14, 2019, *available at* https://www.latimes.com/world/la-fg-mexico-tijuana-violence-20190314-story.html; *see also* USA Today, *50 of the most dangerous cities in the world*, August 14, 2019, *available at* https://www.usatoday.com/picture-gallery/travel/news/2019/07/24/most-dangerous-cities-world-tijuana-caracas-cape-town/1813211001/.



CRCL asked PDN leadership how they tracked MPP cases. (b)(5)

### D. Review of Component Agency Summary Data Reporting on MPP

USCIS

CRCL reviewed the USCIS Asylum Headquarters MPP Dashboard, which is updated daily and tracks referrals, case outcomes, and pending cases.  The USCIS Asylum Division's summary reporting further parses this data by the individual's nationality; the POE where they appeared; and whether the claim of fear of persecution or torture in Mexico, or a fear of return to Mexico arose during the individual's initial arrival to the United States, during the period when the individual returned to the United States for a hearing after having been initially returned to Mexico, or after the individual is apprehended between ports of entry after having been returned to Mexico pursuant to MPP.  USCIS provided CRCL with a copy of their current daily report for November 13, 2019, in addition to a "Weekly MPP Report" from August 12-18, 2019.  That weekly report indicated that individuals from Cuba, Ecuador, El Salvador, Guatemala, Honduras, Mexico, Nicaragua, Peru, Uruguay, and Venezuela had been referred to USCIS for MPP Fear in Mexico interviews that week. The weekly report indicated that the Mexican individual's MPP USCIS record had been administratively closed without an MPP assessment interview.  Given the numbers in the USCIS summary reporting, it appears that less than 20 percent of individuals in MPP are referred to USCIS for MPP assessment interviews.

CBP

CBP provided CRCL with summary counts of individuals placed in MPP by OFO and USBP from January 28, 2019, through September 26, 2019.  This included 49,455 total individuals returned to Mexico under MPP, of which 856 were accompanied juveniles.[25]

In response to CRCL's request for processing times for individuals who are processed for entry into the United States to attend their immigration court hearings, CBP provided that "[t]ypically an individual takes 10 to 20 minutes to process through CBP systems, biometrically identify them,

---

[25] CBP noted that unaccompanied alien children (UACs) are not MPP amenable.

secure their personal property, and complete a health screening."  CRCL also requested the
following summary data, which CBP stated it does not capture:

- The number of individuals who were identified as not amenable to MPP pursuant to the
  categories in the MPP Guiding Principles;
- The number of LGBT+, intersex, or non-binary gender individuals who have been
  returned to Mexico pursuant to MPP;
- The number of families with children under 5 years of age who have been returned to
  Mexico pursuant to MPP;
- The number of persons with disabilities who have been returned to Mexico pursuant to
  MPP;[26] and
- The number of non-parent (or legal guardian) relatives separated from now-
  unaccompanied children who have been returned to Mexico pursuant to MPP.[27]

### E.  Review of Publicly Available EOIR Data on MPP Cases

The EOIR publishes frequently requested agency records disclosed under the Freedom of
Information Act (FOIA).[28]  This includes anonymized case data from EOIR's docket.  CRCL
examined both the data published by EOIR through September 2019 and summary charts from
Transactional Access Records Clearinghouse (TRAC), a data gathering, research, and distribution
organization at Syracuse University.[29]  This data revealed several areas of concern.

Of principal concern to CRCL is the fact that the EOIR data indicates that through September
2019, 57 Mexican nationals were placed onto EOIR's MPP docket.  CRCL brought this
information to CBP and EOIR's attention on November 8, 2019.  CRCL was informed by CBP
that this was likely a data integrity issue.  Despite repeated requests for clarification, no

---

[26] CBP stated in response, "Aliens in the following categories are not amenable to MPP: unaccompanied alien
children; citizens or nationals of Mexico; aliens processed for expedited removal; aliens in certain special
circumstances; any alien assessed by a USCIS asylum officer as more likely than not to face persecution or torture in
Mexico, or other aliens at the discretion of the Port Director/Chief Patrol Agent. To the extent there are considerations
for specific serious medical issues, the Port Director and Chief Patrol Agent of each individual location maintain their
discretion to review each case on an individualized basis."

[27] CBP stated, in response, "When CBP encounters an alien family unit (consisting of either one or two parents/legal
guardians), CBP will not separate the child from either parent/legal guardian unless the specific criteria provided in
CBP's June 27, 2018 Interim Guidance on Preliminary Injunction in *Ms. L v. ICE* are met. With the appropriate
approvals, CBP officers/USBP agents can separate where a parent/legal guardian is being referred for a felony
prosecution, the parent/legal guardian presents a danger to the child, the parent/legal guardian has a criminal
conviction(s) for felonies or violent misdemeanors, the parent/legal guardian has a communicable disease, or CBP
clearly establishes that the familial relationship is not bonafide.[sic] Non-parent or legal guardians are not considered a
family unit. As such, CBP does not track this data. The criteria to separate a child from a parent/legal guardian would
also render the alien not amenable to MPP. Therefore, no separated parent has been returned to Mexico with the child
remaining in the United States."

[28] These frequently requested EOIR records are publicly available at: https://www.justice.gov/eoir/frequently-
requested-agency-records.

[29] More information about TRAC at Syracuse University is available at: https://trac.syr.edu/aboutTRACgeneral.html.
TRAC publishes MPP data and charts at: https://trac.syr.edu/phptools/immigration/mpp/.

***Protected by Attorney-Client and Deliberative Process Privileges***
***For Official Use Only/Law Enforcement Sensitive***

explanation has been provided to CRCL regarding the alleged data integrity issue. (b)(5)

During listening sessions conducted by CRCL in the normal course of its community engagement, NGOs expressed concerns to CRCL regarding Mexican nationals subjected to MPP.  At the El Paso court, representatives of one NGO said that they directly observed MPP cases involving Mexican nationals.  Some were single adults; others were family members in families of mixed nationality.  They cited TRAC reports that show, according to EOIR data, that through the end of August 2019, 52 Mexican nationals in MPP hearings had been docketed in EOIR's database.  According to the EOIR data at the time, 42 of the 52 Mexican nationals had not yet had a court hearing, seven had showed up to all hearings, and three had been ordered removed in absentia.

Another concern was the issue of non-Spanish-speaking individuals (other than Brazilian nationals) being outside MPP.  While the MPP Guiding Principles are silent on the issue of language access and whether non-Spanish speakers are amenable, CRCL received and observed contradictory information on how CBP is addressing this issue.  In an email exchange that CRCL reviewed between an NGO regarding indigenous language speaking clients from Guatemala (6 K'iche' speakers, 2 Chuj speakers, and 2 Q'eqchi' speakers) and the USBP.  The response received from a Supervisory Border Patrol Agent stated, "Non-Spanish speakers are disqualified from MPP.  The individuals for whom you are requesting exemption do speak Spanish.  Therefore, they will not be removed from MPP."  No reference is made to a policy articulating that non-Spanish speakers are not amenable to MPP, nor is any standard given to what qualifies as sufficient Spanish fluency when making that determination.

CRCL is aware that CBP officially began returning Brazilians to Mexico under MPP.  On February 6, 2020, CRCL's Programs Branch requested that CBP provide a copy of the Portuguese tear sheet being used to process Brazilians in MPP.  USBP headquarters replied that the tear sheet had not yet been formally translated, and stated, "[f]or now, we are using an organically made Portuguese tear sheet which must be read by our translation services on the phone." (b)(5)
No justification was given for not complying with CRCL's information request, despite the 42 U.S.C. §2000-ee1(d) requirement for agency cooperation.

Prior to February 2020, CBP staff informed CRCL that either only Spanish-speaking individuals (or, alternatively, only individuals from Spanish-speaking countries) are amenable to MPP, the nationality data in publicly available EOIR records indicate that the following number of nationals of predominantly non-Spanish speaking countries have been placed in EOIR's MPP docket:

| Nationality | Count of Individual Records |
|---|---|
| Brazil | 7 |
| Holland [The Netherlands] | 7 |
| Haiti | 3 |
| Hong Kong | 3 |
| Namibia | 3 |
| Cyprus | 2 |
| Gabon | 2 |

*Protected by Attorney-Client and Deliberative Process Privileges*
*For Official Use Only/Law Enforcement Sensitive*

| | |
|---|---|
| Guinea | 2 |
| Jamaica | 1 |
| Vanuatu | 1 |
| Uganda | 1 |
| Egypt | 1 |
| Afghanistan | 1 |
| Georgia | 1 |
| Sri Lanka | 1 |
| Oman | 1 |
| Laos | 1 |
| Democratic Republic of Congo | 1 |
| Malawi | 1 |
| Equatorial Guinea | 1 |

(b)(5)



| Language | Count of Individual Records |
|---|---|
| SPANISH | 46,953 |
| SPANISH--SIGN LANGUAGE | 88 |
| MAM | 55 |
| SRANAN TONGO | 31 |
| QUICHE | 26 |
| KONJOBAL | 21 |
| KEKCHI | 20 |
| SRI LANKAN MALAY | 16 |
| QUECHUA | 16 |
| SUDANESE | 9 |
| ENGLISH | 9 |
| SUSU | 7 |
| SOTHO | 7 |
| PALAUAN | 5 |
| QUICHE-ACHI | 5 |
| HONDURAN SIGN LANGUAGE | 4 |
| UNKNOWN LANGUAGE | 4 |
| CHUJ, SAN MATEO IXTATAN | 4 |

| | |
|---|---|
| SOMALI | 3 |
| SHANGHAI | 3 |
| SWAHILI – ENGLISH | 3 |
| GUATELMALAN SIGN LANGUAGE | 3 |
| SAAMIA | 3 |
| #N/A | 2 |
| KONJOBAL, WESTERN (AKATEKO) | 2 |
| RABINAL – ACHI | 2 |
| MISKITO | 2 |
| JACALTECO, WESTERN (POPTI) | 2 |
| CUBULCO ACHI | 2 |
| IXIL | 1 |
| EBIRA | 1 |
| SONINKE | 1 |
| CHUJ, SAN SEBASTIAN COATAN | 1 |
| GARIFUNA | 1 |
| CAKCHIQUEL | 1 |
| **Grand Total** | **47,313** |

In a telephonic conversation with CRCL on July 26, 2019, EOIR court staff indicated that although CBP usually identifies individuals in MPP as Spanish speakers, EOIR staff often find that the individual speaks a different language than Spanish, typically an indigenous language, and must order an interpreter for that language in order to ensure due process and a full and fair hearing.  In discussions with CRCL, individual USCIS asylum officers also indicated that they personally encountered multiple individuals in MPP who required an indigenous language interpreter, (b)(5)

Within the 360 records of non-Spanish speaking individuals in the publicly posted EOIR MPP docket records, there were 95 individuals who required a sign language interpreter at their EOIR immigration court hearings.  (b)(5)

CRCL Findings

1. **The application of MPP to certain family members has meant that individuals who are citizens and/or nationals of Mexico were, at times, permitted to withdraw with family members who are placed in MPP.**  Pursuant to the MPP Guiding Principles, citizens or nationals of Mexico are not amenable to MPP.  This includes circumstances where a Mexican citizen or national is part of a family unit that includes non-Mexican citizens or nationals.  In

order to preserve family unity and comply with the MPP Guiding Principles, CBP should exclude the entire family unit from MPP if a member of the family is a citizen or national of Mexico.

2. **MPP has been applied to persons who do not speak Spanish as their primary language.** Although the MPP Guiding Principles are silent on the issue, CBP's stated policy has been, until recently, not to return any non-Spanish speakers to Mexico. (b)(5)



3. **Persons with known mental and physical health issues have been subjected to MPP, including persons with severe medical conditions and disabilities.** The MPP Guiding Principles have stated that individuals with "known physical/mental health issues" are not amenable to MPP. (b)(5)



(b)(5)

---

[30] While CBP's initial policy was to only enroll aliens from Spanish speaking countries into MPP, CRCL acknowledges that CBP now considers Brazilian nationals to be amenable to MPP.

(b)(5)

4. **Medical screenings for individuals being subjected to MPP have not been consistently documented.**  When reviewing records provided by CBP in response to CRCL's information requests, only records for a few cases included forms indicating which health-related questions were asked of applicants and their responses.  It is CRCL's understanding that CBP is piloting a CBP Form 2500, *Alien Initial Health Interview Questionnaire* in some locations. (b)(5)

5. **Pregnant women have been subjected to MPP.**  CRCL acknowledges that pregnancy is distinct from other medical issues.  However, in the course of this investigation, CRCL has received and observed conflicting information from CBP and ICE with regard to whether pregnant women are amenable to MPP.  PDN leadership suggested to CRCL that OFO does not place clearly pregnant women into the program, but also stated that pregnancy does not automatically make an individual not amenable and pregnant women can be considered for MPP amenability on a case-by-case basis, weighing factors such as gestational age.  The ICE ERO SND guidance received by CRCL expressed a more defined standard that individuals "in their third trimester of pregnancy should not have been enrolled in [MPP] and are not transported by ERO."  In some circumstances, CRCL has heard a possible 5-month standard articulated by CBP and in other circumstances has been told that local agreements with Mexican immigration officials affect whether pregnant individuals are subject to MPP.  On December 18, 2019, Border Patrol headquarters (b)(5) tated that it was a case-by-case analysis whether to exclude individuals from being amenable to MPP. (b)(5)

6. **When USCIS officials discover facts indicating an individual may not be amenable to MPP due to mental or physical health issues, there is no clear process for removing that individual from the MPP program.**  Communications from USCIS to CBP regarding

---

[31] Although the complaints investigated for this memorandum are from 2019, new MPP cases with serious physical/mental health issues continue to be raised to CRCL's attention. On February 4, 2020, CRCL inquired with CBP about an individual in the MPP program who is HIV-positive individual and has been diagnosed with AIDS. CBP responded, "Based the results of his medical screening at the POE, [Complainant #14] was transported to a hospital for evaluation and was cleared to travel by a medical professional.  Upon conclusion of his hearing and screening, [Complainant #14] was returned to Mexico under MPP."

individuals who may not be amenable to MPP but are nonetheless in the MPP program and have been referred to USCIS for an MPP Fear in Mexico assessment have been occuring on an ad-hoc basis without centralized or formal procedures.  Establishing a procedure and standardized documentation for USCIS to alert CBP to facts arising during the MPP Fear in Mexico interview would have ensured that such information is relayed to CBP for its consideration of whether the individual continues to be amenable to MPP.  Standardized documentation was needed to include data fields for all the information CBP would need to re-evaluate MPP amenability due to the newly discovered facts.  CBP should also provided a copy to USCIS of detailed guidance regarding factors impacting MPP amenability so that USCIS can appropriately flag information relevant to amenability.  Such a process should have also been documented in the MPP case tracking system or database proposed in Recommendation 9.

7.  **When EOIR or USCIS requires a non-Spanish interpreter because an individual in MPP does not speak sufficient Spanish to present a claim through a Spanish interpreter, no clear process existed to bring this to CBP's attention.**  CRCL has been informed by staff at both USCIS and EOIR that they have often had to obtain rare/indigenous language interpreters for individuals in MPP whose primary language is not Spanish.  This can lead to delayed processing and wasted time and resources for USCIS and EOIR.  Further, individuals who primarily speak a non-Spanish language should not have been placed in MPP, per the unwritten (but consistently stated) CBP policy that MPP is to be applied to Spanish-speakers.  While these individuals may speak rudimentary Spanish, such that they are able to provide basic responses to CBP's questions at the initial inspection, they may lack a degree of Spanish-language fluency to adequately convey information and to fully understand questions asked and information provided during the non-refoulement interview or immigration court hearing.  Therefore, CBP have should coordinated with USCIS and EOIR to receive reports of interviews and hearings that are conducted in a language other than Spanish, to inform CBP's reconsideration of MPP amenability for those individuals.  If there was a rule or standard being applied by CBP regarding language and MPP amenability, either due to CBP policy or local agreement with Mexican officials, it should have been clearly articulated and documented both within the agency and shared with the NGO and legal community.

8.  **Inconsistent informal policies and local procedures lack clarity on the amenability to MPP of LGBTI individuals.**  PDN leadership stated that under local policy, LGBTI individuals are not considered eligible for MPP, because INM does not accept them for returns.  CRCL has also been informed by CBP staff that San Ysidro POE has local guidance indicating that LGBTI individuals are not amenable to MPP.  However, there did not appear to be consistent screening in order to apply these exceptions, nor is such an exception clearly articulated in written policy. If there is such an exception, either due to CBP policy or local agreement with Mexican officials, it should have been clearly articulated and documented both within the agency and shared with the NGO and legal community.  In a December 18, 2019 meeting with CRCL, Border Patrol headquarters stated that if any LGBTI person stated that they did not want to go back to Mexico, then Border Patrol would not force them to return to Mexico and that LGBTI persons are given a choice if they affirmatively state that they do not wish to be returned to Mexico.  However, CRCL has not seen this policy articulated in written guidance or issued in any format to Border Patrol agents.

9. **Unaccompanied Alien Children (UACs) have been subjected to MPP.**  Documents provided to CRCL by ICE ERO indicate that CBP has at times placed UACs into the MPP program, in violation of the MPP Guiding Principles.

10. **Families have been separated during the MPP process.**  CRCL has substantiated allegations that family units have been separated in the MPP program.  In emails provided to CRCL by CBP, CBP personnel state that it is USBP procedure to separate one parent from the rest of the family and only maintain family unity for the other parent and children.

    Married couples and children with their parents or legal guardians should be processed together and scheduled for the same hearing in immigration court.  Failing to do so may not only impact the family's safety and well-being while waiting for their immigration court hearing but may also impact any claims for relief filed by the family. Family members may be witnesses in each other's defensive claims and may be entitled to derivative status if a parent or spouse is granted relief.

11. **The Department lacks a centralized system for tracking MPP cases and CBP has limited ability to perform reporting and quantitative analysis of the MPP program.** (b)(5)



12. **CBP staff are not adequately trained on the distinction between Credible Fear screenings and other humanitarian screenings and assessments relating to the United States'** *non-refoulement* **obligations.**  In the course of this investigation, CRCL has reviewed

    his also arose repeatedly in communications between CBP and CRCL staff at both the field and headquarters levels.  Further, many of the records for individuals in MPP reviewed by CRCL state "CREDIBLE FEAR CLAIM" on the Form I-213, despite the fact that the individuals had already received an NTA, had not received a Form I-860, *Notice and Order of Expedited Removal,* and therefore would not be legally eligible to receive a credible fear screening. (b)(5)

(b)(5)

## DHS Red Team Report

Following the implementation of MPP by DHS, a DHS Senior Leadership-led effort known as the "Red Team" conducted a top-down review of MPP policies and implementation strategies. The Red Team developed recommendations regarding the implementation of MPP and on November 8, 2019, then Acting Secretary Kevin McAleenan directed DHS components to implement those recommendations. On January 14, 2020, the leadership of CBP, ICE, and USCIS issued a joint memorandum in response. The components stated that many of the recommendations had already been addressed and gave further detail regarding ongoing activities designed to make MPP more "effective and efficient." The ongoing activities included actions to ensure that migrants can access information and speak with DHS officials in their preferred language; reinforcing the avenues by which relevant stakeholders can view MPP proceedings, meet with migrants, or visit temporary hearing locations; standardizing and ensuring the consistency of the information individuals are provided regarding "migrant rights" building on efforts to show "Know Your Rights" videos at temporary hearing locations; advocating with the Government of Mexico, the Department of State, and trusted international organizations to improve the safety and security of MPP migrants while they wait in Mexico; and reinforcing training and standards for those involved in non-adversarial interviewing.

Subsequently, on December 7, 2020 then DHS Acting Secretary Chad Wolf issued a memorandum directing CBP, ICE, and USCIS to take further specific actions to close out the Red Team Report evaluation process. Recommendations in the December 7, 2020 memorandum included developing a DHS.gov MPP landing page; issuing department level guidance to bring greater consistency to MPP operations; issuing additional CBP guidance on document service; and issuing additional CBP guidance on MPP amenability. Concurrently with the issuance of the December 7, 2020 memorandum, the additional guidance was issued and made available on the public MPP website.

## CRCL Recommendations

CRCL recommends[32] that:

1. CBP should adhere to the MPP Guiding Principles and not apply MPP to citizens or nationals of Mexico and coordinate with DOJ EOIR to ensure that Mexican citizens and/or nationals who have been erroneously placed into MPP are expeditiously removed from the program.

2. (b)(5)



---

[32] CRCL acknowledges that there is some overlap between the recommendations contained in this memorandum and the recommendations in the Red Team Report and that some progress towards these recommendations has already occurred.



6. CBP should issue clear written guidance regarding the amenability of late-term pregnant women to MPP, including clear standards for this determination.  CBP also should clarify in written guidance whether late term pregnancy constitutes a "known physical/mental health issue" or falls into a different categorical exception to MPP.

7. CBP fully document medical screenings for every individual placed into MPP.  Medical screenings should use a standard template form to ensure consistency.

8. CBP should issue clear guidance regarding persons with disabilities, either clarifying that persons with disabilities fall within the principle of "known mental or physical health issue" or amending the Guiding Principles to state that persons with disabilities as not being amenable to MPP and amend the training materials accordingly.

9. CBP should issue clear written guidance regarding LGBTI persons and amenability to MPP.

10. CBP and CRCL develop a process in which subsequent to the issuance of this memo, CRCL has an avenue to raise reports of individuals with specific vulnerabilities who have nevertheless be placed in MPP, for CBP to determine whether to remove the individual from MPP.



13. CBP should not separate family units in MPP unless such separations are consistent with published CBP policies on family separations and such separations cannot be avoided by placing the family into another program, such as expedited removal.



14. **(b)(5)**

Please inform us within 60 days whether you concur or non-concur with these recommendations by emailing a response to **(b)(6)** If you concur, please include an action plan.

It is CRCL's statutory responsibility to advise department leadership and personnel about civil rights and civil liberties issues, ensuring respect for civil rights and civil liberties in policy decisions and the implementation of those decisions.  These recommendations are pursuant to that role; we believe they can assist you in making CBP, ICE, and USCIS the best agencies possible. We look forward to continuing to work with you on these important issues.

Copies to:

William A. Ferrara
Executive Assistant Commissioner
Office of Field Operations
U.S. Customs and Border Protection
(b)(6), (b) (7)(C)

Robert W. Harris
Chief of Staff
Office of Field Operations
U.S. Customs and Border Protection
(b)(6), (b) (7)(C)

Rodney S. Scott
Chief
U.S. Border Patrol
U.S. Customs and Border Protection
(b)(6), (b) (7)(C)

Raul L. Ortiz
Deputy Chief
U.S. Border Patrol
U.S. Customs and Border Protection
(b)(6), (b) (7)(C)

Jon A. Roop
Chief of Staff
U.S. Border Patrol
U.S. Customs and Border Protection
(b)(6), (b) (7)(C)

Lise Clavel
Chief of Staff
U.S. Customs and Border Protection
(b)(6), (b) (7)(C)

Rebekah Salazar
Executive Director
Privacy and Diversity Office
Office of the Commissioner
U.S. Customs and Border Protection
(b)(6), (b) (7)(C)

Jeffrey R. Egerton
Deputy Executive Director
Office of Professional Responsibility
U.S. Customs and Border Protection
(b)(6), (b) (7)(C)

Kristy Montes
Director, Custody Support and Compliance
Privacy and Diversity Office
U.S. Customs and Border Protection
(b)(6), (b) (7)(C)

Enrique M. Lucero
(A) Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6), (b) (7)(C)

Peter B. Berg
(A) Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6), (b) (7)(C)

Russell Hott
Assistant Director, Custody Management
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6), (b) (7)(C)

Dawn Daggett
(A) Chief of Staff, Custody Management
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6), (b) (7)(C)

Monica Burke
Deputy Assistant Director, Custody Programs
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6), (b) (7)(C)

Brandon Fauquet
Deputy Chief
Office of Legislative and Intergovernmental Affairs
U.S. Citizenship and Immigration Services

(b)(6), (b) (7)(C)





**U.S. Department of Justice**
Immigration and Naturalization Service

HQOPS (DDP) 50/10-C

*Office of the Executive Associate Commissioner*　　　*425 I Street NW*
*Washington, DC 20536*

OCT - 7 1998

MEMORANDUM FOR REGIONAL DIRECTORS

FROM:　　　Michael A. Pearson
　　　　　　Executive Associate Commissioner
　　　　　　Office of Field Operations

SUBJECT:　Detention Guidelines Effective October 9, 1998

As you know, the Immigration and Naturalization Service (INS) supported a legislative proposal for extension of the Transition Period Custody Rules (TPCR). This extension will allow us to continue the exercise of discretion in custody determinations. However, we expect that it will be some time before this discretion is granted with the result that as of October 9, 1998, TPCR discretionary authority will no longer be in effect. Attached with this memorandum are the detention guidelines which will be in effect as of October 9.

I recognize that 100 percent compliance with these guidelines will be virtually impossible to achieve immediately. Furthermore, 100 percent adherence to the guidelines would have major impacts on other program operations which are critical to the overall INS mission. We have met with Congressional staff to advise them of the impacts on our operations resulting from the expiration of TPCR. We have been advised that we may get future Congressional support for some type of discretionary relief from mandatory detention, but only if we can document and demonstrate that a maximum effort to comply with the detention mandates has been made. Shortly, we will provide you with guidance concerning additional data that we will need to collect and provide to Congress.

At this time, I am directing that, to the extent possible, you adhere to the detention scheme outlined in the attached and work toward utilizing 80 percent of your bedspace for mandatory detention cases. In the event that a District Director, Chief Patrol Agent, or Officer In Charge makes a custody determination which is not in keeping with the guidelines (e.g., a Category 1 case is released to make detention space for a Category 2 or 3), the reasons for the decision must be clearly documented in writing and placed in the alien's file. At any time the mandatory detention occupancy falls below 80 percent of available bedspace, the responsible field manager must notify the Regional Director.

In the event that your District Directors have released someone prior to October 9, who is now subject to detention, nothing in this memorandum should be construed as requiring their rearrest/detention. However, if conditions have changed or circumstances warrant, nothing should preclude you from exercising your authority to rearrest and detain.　AR01240

Additionally, each Regional Director is directed to prepare a written monthly summary
of custody determinations made by field offices within your respective jurisdictions which are
inconsistent with the attached detention guidelines. The monthly summaries will be used to
justify our need for continued discretion in detention decisions in our ongoing discussions with
the Department of Justice, the Administration, and the Congress. The first monthly summary
will be for the month ending October 31. Regions should forward the summaries to this office
not later than 1 week after the end of the month.

Attachment



**U.S. Department of Justice**
Immigration and Naturalization Service

HQOPS 50/10

*425 I Street NW*
*Washington, DC 20536*

OCT - 7 1998

INS DETENTION USE POLICY
October 9, 1998

I.   INTRODUCTION

This policy governs the detention of aliens and supercedes, the
Detention Use Policy issued July 14, 1997.  The purpose of this
policy is to revise the detention priorities of the Immigration
and Naturalization Service (INS) in light of the expiration of
the Transition Period Custody Rules (TPCR).  Section 236(c) of
the Immigration and Nationality Act (INA) is now in full force
and effect.  With the expiration of the TPCR, certain portions
of 8 C.F.R. § 3.19 and § 236.1, as noted in those sections, no
longer apply.

Under this policy, the four categories of alien detention are:
(1) required (with limited exceptions), (2) high priority, (3)
medium priority, and (4) lower priority.  Aliens in category 1--
required detention--must be detained, with a few exceptions.
Aliens in categories 2, 3, and 4 may be detained depending on
the availability of detention space and the facts of each case.
Aliens in category 2 should be detained before aliens in
categories 3 or 4, and aliens in category 3 should be detained
before aliens in category 4.  The District Director or Sector
Chief retains the discretion, however, to do otherwise if the
facts of a given case require.

These instructions do not apply to the detention and release of
juveniles, which is covered in other INS policies.

AR01241

## II.   DEFINITIONS

- *Required detention:* Detention of certain classes of aliens required by the INA or applicable regulations. With few exceptions, aliens subject to required detention must be detained and are not eligible for release.

- *Discretionary detention:* Detention of aliens authorized but not required by the INA or applicable regulations. All aliens in proceedings are subject to discretionary detention unless they fit into one of the categories covered by required detention. Aliens subject to discretionary detention are eligible to be considered individually for release.

- *Final order of removal:* Final removal order issued by an immigration officer, an immigration judge (IJ), the Board of Immigration Appeals, or a Federal judge to an alien placed in proceedings on or after April 1, 1997. INS officers should consult District counsel on issues regarding the finality of removal orders.

- *Final order of deportation or exclusion:* Final deportation or exclusion order issued by an immigration officer, an immigration judge, the Board of Immigration Appeals, or a Federal judge to an alien placed in proceedings before April 1, 1997. INS officers should consult District counsel on issues regarding the finality of deportation or exclusion orders.

## III.  DETENTION CATEGORIES

A.   Arriving Aliens: Expedited Removal under INA § 235.

Category 1: Required detention (with exceptions)

- *Aliens in Expedited Removal.* Arriving aliens at Ports-of-Entry who are inadmissible under INA § 212(a)(6)(C) or 212(a)(7) are subject to expedited removal proceedings pursuant to INA § 235(b)(1). Any alien placed into expedited removal must be deAR01242until

removed from the United States and may not be released
from detention unless (1) parole is required to meet a
medical emergency or legitimate law enforcement
objective, or (2) the alien is referred for a full
removal proceeding under § 240 (for example, upon a
finding of "credible fear of persecution"). Although
parole is discretionary in all cases where it is
available, it is INS policy to favor release of aliens
found to have a credible fear of persecution, provided
that they do not pose a risk of flight or danger to the
community. See INA §§ 235(b)(1), 8 C.F.R. § 235.3.

Aliens who are ordered removed under expedited removal
and who make an unverified claim to United States
citizenship, or to lawful permanent resident, refugee,
or asylee status, are referred to an IJ for a status
review under 8 C.F.R. § 235.3(b)(5)(iv). Such aliens
must be detained pending this review, unless parole is
required to meet a medical emergency or legitimate law
enforcement objective.

If there is insufficient detention space to detain an
alien in expedited removal who arrived at a land border
Port-of-Entry and claims a fear of persecution unrelated
to Canada or Mexico, that alien may be required to wait
in Canada or Mexico pending a final determination of his
or her asylum claim. If an alien expresses a fear of
persecution related to Canada or Mexico, the alien must
be detained for proceedings and may not be required to
wait in that country for a determination of the claim.

Aliens subject to expedited removal who arrive at a land
border Port-of-Entry, but do not claim lawful status in
the United States or a fear of persecution, should be
processed immediately and detained until removed. These
aliens should not be required to wait in Mexico or
Canada pending the issuance of an expedited removal
order.

The INS may permit an alien in expedited removal to
withdraw his or her application for admission. AR01243

Note that the INS maintains approximately 1,100 User Fee beds, which are funded by the User Fee Account. The INS can only use these beds for aliens arrested in support of airport operations.

B.   Aliens in Proceedings: INA § 240 (Removal), § 238 (Expedited Removal of Criminal Aliens), Former INA § 236 (Exclusion), and Former INA § 242 (Deportation).

   1.   Category 1: Required detention (with exceptions)

*   *Aliens subject to required detention in removal and deportation proceedings.* Pursuant to INA § 236(c), the INS must take into custody all aliens who are chargeable as terrorists, and virtually all aliens who are chargeable as criminals, upon their release from criminal incarceration or custody. § 236(c) does not apply to the following groups of aliens who are removable as criminals: (a) aliens who are removable under § 237 for a single crime involving moral turpitude, if they were sentenced to less than a year; (b) aliens who are removable under § 237 for a conviction for high-speed flight from an immigration checkpoint (18 U.S.C. § 758); and (c) aliens who are removable under § 237 for crimes relating to domestic violence, stalking, and the abuse or neglect of children.

    § 236(c) applies to aliens in both removal proceedings under § 240 and deportation proceedings under former § 242. Therefore, under § 236(c) the INS must continue to detain aliens who are described in that section (by their § 237 equivalents) if (a) they were previously taken into custody while in deportation proceedings (i.e., charged under § 241 in proceedings commenced prior to April 1, 1997) and (b) they are still in custody upon the expiration of the TPCR. Note that current § 236(c) does not apply to aliens in exclusion proceedings under former § 2 AR01244

Once in INS custody, the alien may be released during proceedings only if the Attorney General determines that it is necessary to protect a witness, a person cooperating with an investigation, or a family member of such a person. To be considered for release in the exercise of discretion, the alien must also demonstrate that release would not pose a danger to persons or property and that the alien does not pose a flight risk. See the requirements set forth at INA § 236(c)(2).

- *Aliens with aggravated felony convictions in exclusion proceedings.* The INS must detain any alien in exclusion proceedings under former § 236 (i.e., charged under § 212 in proceedings commenced prior to April 1, 1997) who has been convicted of an aggravated felony, as currently defined under INA § 101(a)(43). The INS may not parole such an alien during exclusion proceedings. Note that the expiration of the TPCR has no effect on these aliens since the TPCR did not apply to them.

2. **Category 2: High Priority**

- Aliens removable on security and related grounds, if not subject to required detention.

- Other criminal aliens not subject to required detention.

- Aliens who are a danger to the community or a flight risk, if not subject to required detention.

- Aliens whose detention is essential for border enforcement but are not subject to required detention.

- Aliens engaged in alien smuggling, if not subject to required detention.

AR01245

3.   Category 3: Medium Priority

- Inadmissible, non-criminal arriving aliens who are not in expedited removal proceedings and are not subject to required detention.

- Aliens who have committed fraud before the INS, if not subject to required detention.

- Aliens apprehended at the worksite who have committed fraud in obtaining employment, if not subject to required detention.

4.   Category 4: Low Priority

- Other removable aliens, if not subject to required detention.

- Aliens originally placed in expedited removal who have been referred for a full removal proceeding under § 240 upon a finding of a "credible fear of persecution." See the discussion at section A.1 above regarding the INS policy favoring release.

C.   Aliens with Final Orders of Removal, Deportation, or Exclusion.

1.   Category 1: Required detention (with exceptions)

- *All aliens who have final orders of removal and all aliens who have final orders of deportation and are subject to required detention.*  This category includes all aliens ordered removed under revised § 240, whether or not they are terrorists or criminals, and all criminal aliens ordered removed under revised § 238.  It also includes all terrorist and criminal aliens ordered deported under former § 242 if subject to required detention under § 236(c).

     Revised INA § 241(a) requires the INS to remove within 90 days any of the aliens in this category. The alien

AR01246

may not be released during this 90-day period. See INA § 241(a)(2).

Aliens whom INS is unable to remove within 90 days should be released under an order of supervision. See INA § 241(a)(3). However, the INS may continue to detain certain aliens, including, among others, those who are inadmissible on any ground; deportable or removable on criminal or security grounds; dangerous; or flight risks. See INA § 241(a)(6).

- *Aliens with final orders under expedited removal.* The INS must detain aliens who have been issued final orders under expedited removal (revised § 235(b)(1)) on grounds of being inadmissible under INA § 212(a)(6)(C) or § 212(a)(7). Pending immediate removal, the INS must detain such an alien. However, the INS may stay the removal of such an alien if removal is not practicable or proper, or if the alien is needed to testify in a criminal prosecution. See INA § 241(c)(2).

- Aliens convicted of aggravated felonies with final orders of exclusion. The INS must continue to detain until removal any alien with a final order of exclusion (i.e., charged under section 212 in proceedings commenced prior to April 1, 1997) who has been convicted of an aggravated felony, as currently defined under INA § 101(a)(43). The INS may not parole such an alien unless the alien is determined to be unremovable pursuant to old INA § 236(e)(2) and the alien meets the criteria for release under that provision. See former INA § 236(e) (as designated prior to April 1, 1997) and the Mariel Cuban parole regulations at 8 C.F.R. §§ 212.12 and 212.13.

2. **Category 2: High Priority**

- *Aliens with final orders of deportation (if not terrorists or criminals subject to required detention under § 236(c) and § 241(a)) or exclusion (if not aggravated felons).* Aliens placed into proceedings AR01247

<blockquote>
prior to April 1, 1997, who were or are ordered
deported or excluded, are only subject to required
</blockquote>

- detention if terrorists or convicted of certain
  crimes.  See part C.1 above.  Otherwise, they are
  subject to discretionary detention and, once they have
  a final order of deportation or exclusion, their
  detention should ordinarily be a high priority.

  Please note that the 6-month rule of former INA
  § 242(c) and (d), which regards detention and release,
  continues to apply to these non-terrorist and non-
  criminal aliens with final orders of deportation.
  Non-aggravated felon aliens with final orders of
  exclusion may be paroled from custody in the
  discretion of the INS.

## IV.   GENERAL DIRECTIONS

## A.   Category 1

- Aliens subject to required detention shall have first
  priority for all available[1] INS detention space.

- With the exceptions noted above, category 1 aliens
  shall be detained.

- Each Region should ensure that it maintains sufficient
  non-criminal detention space to provide basic support
  for its full spectrum of law enforcement objectives.
  However, with the exception of this basic level of
  non-criminal detention space, each Region, District,

---

[1] Available detention space means space that is both available and
suitable for the detention of the alien in question.  For example, an
alien terrorist subject to required detention would have first
priority for all INS beds suitable for the detention of terrorists.
No alien should be detained in an INS bed unsuitable for that alien's
detention (regardless of the detention category).    AR01248

- and Sector must seek to comply with the detention priorities outlined above.

  If a category 1 alien comes into INS custody but no detention space is available locally, the responsible office should pursue the following options in rank order:

  1) acquire additional detention space locally, securing funds from the Region if necessary;

  2) transfer the alien to another INS District or Region where space or funding is available;

  3) release an alien in local INS custody who is not subject to required detention (i.e., an alien in category 2, 3, or 4) to make space for the category 1 alien; or

  4) release an alien in INS custody in another District who is not subject to required detention (i.e., an alien in category 2, 3, or 4) to make space for the category 1 alien.

- If a category 1 alien comes into INS custody when all INS criminal beds nationwide (i.e., beds not reserved for juveniles, User Fee operations, or non-criminal detention) are occupied by other category 1 aliens and there are no additional detention funds available, the responsible office should contact its Regional Director to arrange for the release of a lower-priority category 1 alien in order to permit the detention of a higher-priority category 1 alien.

- INA § 236(c) does not require the INS to arrest any alien who is described in that section but was released from criminal incarceration or custody previously. However, if the INS later encounters such an alien in a non-custodial setting and elects to initiate immigration proceedings, the alien is subject to required detention. **AR01249**

•   INA § 236(c) does not require the INS to re-
arrest any alien who is described in that section but
was released from INS custody under the TPCR.

However, the INS may re-arrest such an alien under INA
§ 236(b) if conditions have changed or if
circumstances otherwise warrant.

## B.   Categories 2, 3, and 4

•   Aliens in categories 2, 3, or 4 should generally
be detained according to rank, higher priorities
before lower priorities.   Exceptions to this general
rule may be made as follows:

1) The District Director or Sector Chief may make
an exception in individual cases if local
circumstances require.

2) The Regional Director, with the concurrence of
the Executive Associate Commissioner for Field
Operations, may make an exception to accommodate
special regional enforcement initiatives.

3) The Executive Associate Commissioner for Field
Operations may make an exception to accommodate
special national enforcement initiatives or to
address an emergency.

## C.   Juvenile Aliens

•   This Detention Use Policy does not apply to juvenile
aliens or juvenile detention space.   Please refer to
the instructions for the detention and release of
juvenile aliens issued previously.   AR01250

# OFFICE OF INSPECTOR GENERAL

# U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract (Redacted)

Homeland Security

**November 30, 2017**

**OIG-18-22**

FOR OFFICIAL USE ONLY

# DHS OIG HIGHLIGHTS
## *U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract*

**November 30, 2017**

## Why We Did This Audit

Representative Raúl M. Grijalva requested that we review U.S. Immigration and Customs Enforcement's (ICE) decision to award GEO Care, LLC a contract to establish a Family Case Management Program (FCMP). We sought to determine whether ICE awarded the FCMP contract in accordance with laws, regulations, and guidance. We also conducted a limited review of post-award contract modifications.

## What We Recommend

We did not make any recommendations in this report.

**For Further Information:**
Contact our Office of Public Affairs at (202) 254-4100, or email us at
DHS-OIG.OfficePublicAffairs@oig.dhs.gov

# What We Found

FCMP is an alternative to detention that uses case managers to ensure participants comply with their release conditions, such as attending court hearings, while allowing them to remain in their community as they move through immigration proceedings. In September 2015, ICE awarded the first contracts for case management services in five cities to GEO Care, LLC, a subsidiary of The GEO Group, Inc.

We determined that ICE properly awarded FCMP contracts. Specifically, ICE complied with Federal requirements for open competition; evaluated each vendor's proposal based on technical capabilities, past performance, and price; and supported its determination that GEO Care's proposals represented the best value for the Government.

Price was the determining factor in this acquisition, which is consistent with the evaluation methodology established in ICE's request for proposals.

Losing bidders' pricing was redacted from the report to protect proprietary information pursuant to FAR 3.104-4.

FOR OFFICIAL USE ONLY

**AR01252**

FOR OFFICIAL USE ONLY

# OFFICE OF INSPECTOR GENERAL

Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

NOV 30 2107

| | |
|---|---|
| MEMORANDUM FOR: | Matthew Albence<br>Executive Associate Director<br>Enforcement and Removal Operations<br>U.S. Immigration and Customs Enforcement |
| | Bill Weinberg<br>Chief Acquisition Officer<br>U.S. Immigration and Customs Enforcement |
| FROM: | John E. McCoy II<br>Acting Assistant Inspector General for Audits |
| SUBJECT: | *U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract* |

Attached for your information is our final report, *U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract.* ICE provided technical comments, which we incorporated into the report as appropriate. The report contains no recommendations.

Consistent with our responsibility under the *Inspector General Act*, we will provide copies of our report to congressional committees with oversight and appropriation responsibility over the Department of Homeland Security. We will post a redacted version of the report on our website.

You may call me with any questions, or your staff may contact Donald Bumgardner, Deputy Assistant Inspector General for Audits, at (202) 254-4100.

Attachment

FOR OFFICIAL USE ONLY

AR01253

FOR OFFICIAL USE ONLY

**OFFICE OF INSPECTOR GENERAL**

Department of Homeland Security

# Background

The Family Case Management Program (FCMP) is an alternative to detention that uses case managers to ensure participants comply with immigration obligations, such as check-ins with U.S. Immigration and Customs Enforcement (ICE) and attendance at immigration court hearings, while allowing them to remain in their community as they move through immigration proceedings. FCMP facilitates access to holistic community-based services tailored to each family's needs, including:

- orientation and education about participants' rights and responsibilities;
- individualized family service plans;
- assistance with transportation logistics; and
- safe repatriation and reintegration planning for participants who are returning to their home countries.

In September 2015, ICE awarded five indefinite delivery indefinite quantity (IDIQ)[1] contracts to establish the Family Case Management Program. The contracts were awarded to GEO Care, LLC (GEO Care), a division of The GEO Group, Inc. The GEO Group is a provider of correctional, detention, and community re-entry services, which operates several detention centers under separate ICE contracts.

During the early stages of the acquisition, ICE Enforcement and Removal Operations planned to enroll a maximum of 1,500 families (300 families per location) in each of five targeted metropolitan locations: Baltimore, MD/Washington, DC; Los Angeles, CA; New York City, NY/Newark, NJ; Miami, FL; and Chicago, IL. Enforcement Removal Operations later modified the contract to reflect the maximum enrollment of 800 families in total, approximately 160 families in each of the five locations.

We initiated this audit at the request of Representative Raúl M. Grijalva, who was concerned that the FCMP contract may have been improperly awarded to GEO Care. This report presents the results of our audit, which we conducted to determine whether ICE awarded the FCMP contracts in accordance with laws, regulations, and guidance.

---

[1] According to the Federal Acquisition Regulation (FAR), an indefinite-quantity contract provides for an indefinite quantity, within stated limits, of supplies or services during a fixed period. The Government places orders for individual requirements. See 48 CFR 16.504.

FOR OFFICIAL USE ONLY

AR01254

FOR OFFICIAL USE ONLY

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Results of Audit

ICE properly awarded the FCMP contracts and complied with applicable laws, regulations, and guidance during the acquisition process. Specifically, ICE promoted open vendor competition during the family case management services solicitation process by publicly issuing notices and requests for proposals (RFP). In addition, ICE evaluated vendor proposals in accordance with established criteria and selected the vendor based on a comparative evaluation of proposals, which were adequately documented in the contract file.

### Solicitation and RFP

ICE's Office of Acquisition Management adequately promoted vendor competition by publicly posting solicitations and allowing sufficient response time. ICE posted pre-solicitation notices on February 4, 2015, and 15 days later it issued five RFPs[2] for the provision of family case management services in the following metropolitan locations: Baltimore, MD/Washington, DC; Los Angeles, CA; New York City, NY/Newark, NJ; Miami, FL; and Chicago, IL. Four vendors submitted proposals: GEO Care; Lutheran Immigration and Refugee Service (LIRS); MVM, Inc.; and Baptist Child Family Services. Each vendor had prior experience in providing services either for immigrants or for non-profit organizations.

### Evaluation of Vendor Proposals and Selection

ICE evaluated the vendor proposals according to applicable guidelines and regulations.[3] ICE established two separate committees that independently evaluated each vendor proposal (see appendix A for evaluation factors and ratings). One committee evaluated the proposals for technical and management capabilities without any knowledge of the proposed cost or vendors' past performance. The other committee reviewed only the vendors' past performance and the cost proposals. ICE's ultimate goal was to select a vendor that represented the overall best value for the Government.

LIRS received the highest technical rating (excellent), as well as the highest rating for past performance (substantial confidence). According to the evaluation committee reports, the LIRS proposal demonstrated "excellent"

---

[2] The RFP included information such as the instructions, the Government's requirement based on statement of objectives, seven evaluation factors, and the evaluation methodology. Vendors were required to submit their proposals in three volumes with each volume relating to a specific evaluation factor(s) as shown in appendix A.

[3] FAR, 48 C.F.R. part 15.

FOR OFFICIAL USE ONLY

**AR01255**

FOR OFFICIAL USE ONLY

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

capabilities in the areas of case management and had established community ties.

GEO Care received the second highest technical rating of "good" and the highest rating of "substantial confidence" for past performance. The evaluation committee concluded that GEO Care demonstrated case management capability through its work experience from other contracts and "clearly demonstrated that it has the resources to take on a project of this size, scope and complexity." According to the committee report, GEO Care's Quality Control Plan helped mitigate the committee's concerns about GEO Care's limited experience in the field of social services.

ICE fully documented the independent government cost estimate for the acquisition of family case management services, as required by the *Homeland Security Acquisition Manual*. The independent government cost estimate determined a cost of $17.3 million per location and $86.7 million for all five locations for the full performance period. As shown in table 1, all the vendors' proposals were less than the independent government cost estimate, except for LIRS, which was ███[4] million more than the independent government cost estimate.

As required by FAR 15.304 and 15.305, ICE's evaluation of proposals included a documented review of a cost price analysis to establish price reasonableness. ICE compared the prices proposed by GEO Care, LIRS, MVM, and Baptist Child Family Services for all five program location sites for the full period of performance. Although Baptist Child Family Services proposed the lowest price of ██████ million, it was ineligible for the award because its technical proposal was rated "unacceptable." Of the remaining vendors, GEO Care was priced the lowest at $72.7 million, followed by MVM at ██████ million, and LIRS at ██████ million.

**Table 1. Vendor Evaluation Ratings and Proposed Price**

| Vendor | Technical Rating | Past Performance | Price for Full Performance Period *(in millions)* |
|---|---|---|---|
| LIRS | Excellent | Substantial confidence | ████ |
| GEO Care | Good | Substantial confidence | $72.7 |
| MVM | Acceptable | Satisfactory confidence | ████ |
| BCFS | Unacceptable | Satisfactory confidence | ████ |

*Source:* ICE

---

[4] Losing bidders' pricing was redacted to protect proprietary information pursuant to FAR 3.104-4.

FOR OFFICIAL USE ONLY

**AR01256**

FOR OFFICIAL USE ONLY

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Price was the determining factor in this acquisition, which is consistent with the evaluation methodology established in the RFP. Although LIRS received a technical rating of "excellent," its price proposal was ███ percent more than GEO Care's, which was the second highest rated proposal and the lowest priced. According to the RFP, the combination of technical capability and past performance "are more important than price…. However, the Government will not make an award at a significantly higher overall cost to the Government to achieve only slightly superior technical capability." As such, ICE could not justify the substantially higher proposal cost over a slightly higher technical rating.

ICE's Office of Acquisition Management documented its determination that GEO Care's proposals represented the best value for the government. On September 16, 2015, ICE awarded all five IDIQ contracts in the amount of $72.7 million to GEO Care to establish the FCMP. Each contract has a total potential performance period of 5 years and 6 months.

Contract Modifications

We reviewed five contract modifications that occurred between November 2015 and May 2016, which were properly documented and justified. Reasons for the contract modifications included:

- incorporation of a 5 percent discount offered by GEO Care if the company was awarded four or more of the contracts, which decreased the contract price by $3.6 million to $69.1 million;
- a change in the maximum number of participants to be enrolled; and
- accommodation for community-based organization subcontractor participation. (ICE directed GEO Care to partner with various community-based organizations to maximize local faith-based provider participation in FCMP services.)

Program Costs and Performance Metrics

As of March 30, 2017, ICE reported that it expended $17.5 million in program costs to enroll 781 active participants in FCMP across all five locations. According to ICE, overall program compliance for all five regions is an average of 99 percent for ICE check-ins and appointments, as well as 100 percent attendance at court hearings. Since the inception of FCMP, 23 out of 954 participants (2 percent) were reported as absconders.

FOR OFFICIAL USE ONLY

**AR01257**

## Objective, Scope, and Methodology

We conducted this audit to determine whether ICE awarded the FCMP contract in accordance with laws, regulations, and guidance.

To accomplish our objective we reviewed laws, regulations, and guidance applicable to the contract pre-award and award processes. We interviewed ICE personnel from Enforcement and Removal Operations and the Office of Acquisition Management to obtain an understanding of the program and the acquisition process for the FCMP. In addition, we reviewed contract file documentation, including acquisition planning documents, contract solicitations, vendor requests for proposals, and ICE evaluation reports to determine whether contract pre-award and award procedures were conducted in accordance with laws, regulations, and guidance. We also conducted a limited review of post-award contract modifications and performance metrics. We did not rely on computer-processed data to materially support findings, conclusions, or recommendations in this report.

We conducted this performance audit between January 2016 and April 2017 pursuant to the *Inspector General Act of 1978*, as amended, and according to generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based upon our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based upon our audit objective.

Office of Audits major contributors to this report are: Lisa Vonder Haar, Audit Director; Modupe Ogunduyile, Audit Manager; Gloria Medina-Ortiz, Auditor-in-Charge; Garrick Greer, Auditor; Jason Kim, Auditor; Nedra Rucker, Auditor; Kevin Dolloson, Communications Analyst; and Jeffrey Wilson, Independent Referencer.

FOR OFFICIAL USE ONLY

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix A
## Evaluation Factors and Ratings

**Exhibit 1. Proposals by Volume and Evaluation Factors**

| Volume | Evaluation Factors |
|---|---|
| **I. Demonstrated Technical/ Management Capabilities Proposal** | 1. Performance work statement |
| | 2. Key personnel and staffing plan |
| | 3. Corporate experience |
| | 4. Quality control plan |
| | 5. Management plan |
| **II. Past Performance** | 6. Past performance |
| **III. Price/Cost Proposal** | 7. Price |

*Source: ICE*

**Exhibit 2. Proposal Ratings for Technical and Past Performance**

| Volume I Technical | Volume II Past Performance |
|---|---|
| Excellent | Substantial confidence |
| Good | Satisfactory confidence |
| Acceptable | Limited confidence |
| Marginal | No confidence |
| Unacceptable | Unknown confidence (Neutral) |

*Source: ICE*

FOR OFFICIAL USE ONLY

AR01259

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix B
## Report Distribution

**Department of Homeland Security**

Secretary
Deputy Secretary
Chief of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Assistant Secretary for Office of Policy
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
ICE Audit Liaison

**Office of Management and Budget**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

**Congress**

Congressional Oversight and Appropriations Committees
Raúl M. Grijalva, U.S. House of Representatives

AR01260

## Additional Information and Copies

To view this and any of our other reports, please visit our website at:
www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General
Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click
on the red "Hotline" tab. If you cannot access our website, call our hotline at
(800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

> Department of Homeland Security
> Office of Inspector General, Mail Stop 0305
> Attention: Hotline
> 245 Murray Drive, SW
> Washington, DC 20528-0305

OFFICE OF INSPECTOR GENERAL

# CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry


Homeland
Security

**October 27, 2020**

**OIG-21-02**

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

October 27, 2020

MEMORANDUM FOR:     Mark A. Morgan
                    Senior Official Performing the Duties of the
                    Commissioner
                    U.S. Customs and Border Protection

FROM:               Joseph V. Cuffari, Ph.D.     JOSEPH V      Digitally signed by JOSEPH
                    Inspector General             CUFFARI      V CUFFARI
                                                               Date: 2020.10.27 14:48:03
                                                               -04'00'

SUBJECT:            *CBP Has Taken Steps to Limit Processing of*
                    *Undocumented Aliens at Ports of Entry*

For your action is our final report, *CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry*.  We incorporated the formal comments provided by U.S. Customs and Border Protection (CBP).

The report contains three recommendations aimed at bringing CBP operations in line with long-established practices and promoting the efficient processing of undocumented aliens.  CBP concurred with two of the three recommendations.  Based on information provided in the response to the draft report, we consider one recommendation unresolved and open and two recommendations resolved and open.  Once your office has fully implemented the recommendations, please submit a formal closeout letter to us within 30 days so that we may close the recommendations.  The memorandum should be accompanied by evidence of completion of agreed-upon corrective actions.  Please send your response or closure request to OIGSREFollowup@oig.dhs.gov.

Consistent with our responsibility under the *Inspector General Act*, we will provide copies of our report to congressional committees with oversight and appropriation responsibility over the Department of Homeland Security.  We will post the report on our website for public dissemination.

Please call me with any questions, or your staff may contact Thomas Kait, Assistant Inspector General for Special Reviews and Evaluations, at (202) 981-6000.



# DHS OIG HIGHLIGHTS
## *CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry*

**October 27, 2020**

## Why We Did This Review

We conducted this review to determine whether U.S. Customs and Border Protection (CBP) was turning away asylum seekers at the Southwest Border ports of entry.

## What We Recommend

We made three recommendations aimed at bringing CBP operations in line with long-established practices and promoting the efficient processing of undocumented aliens.

**For Further Information:**
Contact our Office of Public Affairs at (202) 981-6000, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov

## What We Found

In May 2018, DHS and CBP leaders anticipated an increase in undocumented aliens seeking entry at the southern border. In response, the leaders urged undocumented aliens seeking protection under U.S. asylum laws ("asylum seekers") to enter the United States legally at ports of entry rather than illegally between ports. At the same time, the leaders asked CBP for "the number of [undocumented aliens] that would likely be turned away" if all ports conducted "Queue Management," a practice that posts CBP officers at or near the U.S.-Mexico border to control the number of undocumented aliens entering U.S. ports of entry. After learning that 650 aliens would be prevented from entering ports every day, in June 2018, then-DHS Secretary Kirstjen Nielsen authorized the practice. Nielsen also informed CBP ports that while processing undocumented aliens is a component of its mission, they should focus on other priorities, including detection and apprehension of narcotics and currency smugglers.

We found CBP took several additional actions to limit the number of undocumented aliens processed each day at Southwest Border land ports of entry. For instance, without prior public notice, seven ports of entry stopped processing virtually all undocumented aliens, including asylum seekers. Instead, CBP redirected them to other port locations. This redirection contravenes CBP's longstanding practice to process all aliens at a "Class A" port of entry or reclassify the port of entry. Moreover, although asylum seekers legally must be processed once physically within the United States, we found CBP staff turned away asylum seekers at four ports *after* they had already entered the United States. After waiting in Queue Management lines or being redirected to other ports, some asylum seekers and other undocumented aliens crossed the border illegally between ports of entry.

## CBP Response

CBP concurred with all recommendations, except one.

**AR01264**



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

## Table of Contents

Introduction..................................................................................... 3

Background ..................................................................................... 3

Results of Review ........................................................................... 6

    DHS Urged Asylum Seekers to Come to Ports of Entry, But Reassigned
    Staff away from Asylum Processing ........................................... 7

    Without Notice to the Public, CBP Stopped Routine Processing of Most
    Undocumented Aliens, Including Asylum Seekers, at Seven Ports and
    Redirected Them to Other Ports ............................................. 10

    CBP Returned to Mexico Asylum Seekers Who Had Already Entered the
    United States ........................................................................ 15

    CBP Did Not Use All Available Detention Space.................... 16

Conclusion..................................................................................... 18

Recommendations......................................................................... 19

## Appendixes

    Appendix A:  Objective, Scope, and Methodology ................................ 23
    Appendix B:  CBP Comments to the Draft Report................................. 25
    Appendix C:  Timeline of Asylum Processing Significant
                  Events in 2018 ..................................................... 31
    Appendix D:  Office of Special Reviews and Evaluations Major
                  Contributors to This Report ............................... 32
    Appendix E:  Report Distribution.......................................................... 33

## Abbreviations

| | |
|---|---|
| AUSA | Assistant United States Attorney |
| CBP | U.S. Customs and Border Protection |
| C.F.R. | Code of Federal Regulations |
| ICE | U.S. Immigration and Customs Enforcement |
| INA | Immigration and Nationality Act |
| MPP | Migrant Protection Protocol |

**AR01265**



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

| | |
|---|---|
| NTA | Notice to Appear |
| OFO | Office of Field Operations |
| OIG | Office of Inspector General |
| POE | Port of Entry |
| TEDS | CBP National Standards on Transport, Escort, Detention, and Search |
| U.S.C. | United States Code |

**AR01266**



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

# Introduction

From May through June 2018, in response to a surge of undocumented aliens attempting to enter the United States DHS senior leaders publicly urged those seeking asylum to lawfully present themselves at U.S. ports of entry, where U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) officers would process them.  However, DHS and CBP leadership did not take steps to maximize CBP's processing capability at ports of entry.  Instead, they instituted policies and took actions that limited the number of undocumented aliens, including asylum seekers, processed at the ports.

# Background

The *Immigration and Nationality Act* (INA) allows individuals who have fled their home countries because of persecution on account of their race, religion, nationality, membership in a particular social group, or political opinion to apply for asylum or other humanitarian protections in the United States.[1] These individuals may express fear of persecution or torture, a fear of return to their country, or an intent to seek asylum to the CBP OFO officers they encounter when they arrive at U.S. ports of entry, or to U.S. Border Patrol agents if these individuals are apprehended after crossing illegally between ports.

**CBP Processing of Asylum Seekers at Southwest Border Ports of Entry**

CBP refers to aliens who are not in possession of documents allowing them entry into the United States — e.g., a travel visa — as "undocumented aliens." This category of aliens includes asylum seekers,[2] who generally arrive without visas or other legal documentation that authorize entry to the United States.[3] When an undocumented alien arrives at a land port of entry and is processed for expedited removal, CBP OFO officers ask specific questions during processing[4] to determine whether the alien has a fear of persecution or torture in his or her home country or intends to seek asylum, such that the individual

---

[1] *See* 8 U.S.C. §§ 1158, 1225(b)(1)(A)(ii), 1231(b)(3)(A) & note.

[2] Throughout this report, we refer to undocumented aliens who express a fear of returning to their home country or intention to apply for asylum in the United States as asylum seekers.

[3] Other undocumented aliens could potentially include individuals who seek temporary humanitarian entry to attend a funeral or obtain medical care.

[4] CBP's processing includes verifying the alien's identity, checking databases for outstanding warrants or criminal history, searching the alien for drugs or contraband, taking statements from the alien, and requesting follow-on placement with U.S. Immigration and Customs Enforcement.  CBP also refers asylum seekers to U.S. Citizenship and Immigration Services for further processing of their asylum claims.

**AR01267**



should be placed in the asylum adjudication process.  In fiscal year 2018, CBP Southwest Border ports processed 38,269 undocumented aliens seeking asylum, representing approximately one-third of the nearly 125,000 undocumented aliens who arrived at U.S. ports of entry that year.

After processing, CBP OFO holds asylum seekers and other undocumented aliens at the port of entry until U.S. Immigration and Customs Enforcement (ICE) takes custody of the aliens and determines whether to place them in immigration detention or release them.  ICE maintains detention centers for single adults and families, but transfers unaccompanied or separated alien children to the Department of Health and Human Services, Office of Refugee Resettlement, for placement pending adjudication of the asylum claim.

From 2014 through 2018, surges, or "caravans," of undocumented aliens sought to enter the United States through the Southwest Border.  For example, CBP experienced a surge of unaccompanied alien children in 2014, and a surge of Haitian migrants in 2016.  Some came through the ports, while others entered illegally, between the ports of entry.[5]  In 2018, the caravans consisted of more families and unaccompanied alien children, and a greater number of asylum seekers, than in the past.

At times, these surges created overcrowded conditions at CBP port of entry holding facilities, which presented health and safety concerns to both officers and aliens.  The increase in families and unaccompanied children posed additional challenges for ports of entry because CBP national standards require holding vulnerable populations, such as families and children, separately and generally for no longer than 72 hours.[6]  Most ports were designed before the standards were established and before CBP OFO experienced surges of asylum seekers, especially families.  As a result, many ports do not have enough room to hold vulnerable populations separately.[7]  Similarly, ICE has limited detention bed space available to hold families.

---

[5] CBP's U.S. Border Patrol is responsible for processing aliens who have crossed into the United States illegally, between the ports of entry, including those who express an intent to seek asylum.

[6] U.S. Customs and Border Protection, *National Standards on Transport, Escort, Detention, and Search* (TEDS), October 2015. For example, TEDS, 5.0, requires CBP to hold families, unaccompanied children, single adults, and transgender individuals in separate spaces. TEDS, 4.1, also provides that "[d]etainees should generally not be held for longer than 72 hours in CBP hold rooms or holding facilities.  Every effort must be made to hold detainees for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and as operationally feasible."

[7] As reported in *Results of Unannounced Inspections of Conditions for Unaccompanied Alien Children in CBP Custody,* OIG-18-87, in the past, some CBP ports converted offices and conference rooms to hold rooms to accommodate more people in the processing areas.

**AR01268**

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

In 2016, during the surge of Haitian asylum seekers, CBP's San Ysidro port of entry in California, in cooperation with the Mexican government, developed a new approach for preventing overcrowding and health and safety concerns. CBP officers and Mexican government officials began stopping asylum seekers and other undocumented aliens from crossing the international boundary into the U.S. port of entry. Instead, those aliens were required to put their names on a waiting list until CBP had space and staff to process them. The asylum seekers and other undocumented aliens waited in Mexico until CBP notified the Mexican government of the number of aliens CBP could take, and the Mexican government then delivered that number to the port. This practice became known as "Queue Management," though it is also referred to as "metering" or establishing a "limit line."[8]

Since 2016, CBP has used Queue Management at various times to control the flow of undocumented aliens into ports of entry. Most recently, in 2018, as migrant caravans arrived to the Southwest Border and the number of undocumented aliens seeking to enter the United States increased, CBP again began assigning officers to the limit line in an effort to control the number of aliens entering the ports. Since July 2018, Queue Management has become standard practice, with all Southwest Border ports implementing limit lines.

We initiated this review in response to two congressional requests and significant public interest in how CBP processes asylum seekers at ports of entry. Additionally, the U.S. Office of Special Counsel forwarded a whistleblower complaint related to similar issues at one port of entry. In 2018, we conducted unannounced site visits to 12 of the 24 land ports of entry across the four CBP field offices along the Southwest Border, where we interviewed CBP staff and observed port operations.[9] We also evaluated CBP's policies and procedures for processing asylum seekers and other undocumented aliens.[10]

---

[8] At the time of our fieldwork, CBP OFO was piloting another initiative. On January 28, 2019, the San Diego Field Office started the Migrant Protection Protocol (MPP). Under the MPP, certain undocumented aliens arriving from Mexico are required to stay in Mexico to await future immigration proceedings in the United States (e.g., hearing before a U.S. immigration court).

[9] CBP operates 24 land ports of entry along the Southwest Border comprising 46 crossing points; some ports have multiple crossing points or gates, e.g., the Nogales port of entry has three crossing points: DeConcini, Mariposa, and Morley Gate. Four field offices oversee the ports: San Diego in California; Tucson in Arizona; and El Paso and Laredo in Texas.

[10] Some laws and policies apply specifically to asylum seekers, while others apply to the broader category of undocumented aliens, which includes both asylum seekers and other aliens attempting to enter the country without valid documents. Throughout this report, we

AR01269

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Some of the issues we discuss in this report are similar to or the same as issues raised in lawsuits filed by a non-governmental organization and state governments. Specifically, the legality of CBP's Queue Management practice — i.e., the practice of CBP officers standing at a "limit line" position at or near the U.S.-Mexico border to control the number of undocumented aliens entering U.S. ports of entry — currently is being litigated in the court system. See *Al Otro Lado, Inc. v. Nielsen*, 17-cv-2366 (S.D. Cal. 2017).[11]

Accordingly, DHS Office of Inspector General (OIG) does not take a position on the legality of this practice, and will await a final determination by the courts.

# Results of Review

In May 2018, DHS and CBP leaders anticipated an increase in undocumented aliens seeking entry at the southern border. In response, the leaders urged asylum seekers to present their claims at ports of entry rather than presenting the claims after the individuals crossed the border illegally. However, a few weeks later, then-Secretary Kirstjen Nielsen asked CBP for the estimated "number of [undocumented aliens] that would likely be turned away" if all ports conducted "Queue Management." After learning that CBP could turn away 650 undocumented aliens every day, - the Secretary instructed ports to implement Queue Management. This involved CBP officers standing at a "limit line" position at or near the U.S.-Mexico border to control the flow of undocumented aliens entering CBP ports for processing. Further, the Secretary told the ports that processing inadmissible aliens (who include asylum seekers) was not one of CBP's main priorities, and they should consider re-assigning staff away from processing such aliens to focus instead on detection and apprehension of narcotics and currency smugglers.[12]

In addition, we found CBP took several actions to limit the number of undocumented aliens who could be processed each day at the Southwest Border land ports of entry. Seven ports effectively stopped processing undocumented aliens, despite being designated as Class A ports, which are "Port[s] of Entry for all aliens," not just those with documents, according to 8

---

refer to asylum seekers and undocumented aliens, both together and separately as appropriate.

[11] The plaintiffs allege violations of 8 U.S.C. §§ 1158, 1225, 1229; 8 C.F.R. Parts 208, 235; U.S. Const. Amend. V; the *1951 Convention on the Rights of Refugees*; and section 706 of the *Administrative Procedure Act.*

[12] June 5, 2018 Memorandum from Secretary Nielsen, "Prioritization-Based Queue Management."

**AR01270**



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

C.F.R. § 100.4.  CBP broke with a longstanding practice by changing the categories of aliens it would process at these seven ports without changing the ports' classification.  When asylum seekers and other undocumented aliens appeared at these seven ports, CBP officers redirected them to other ports, some of which were more than 30 miles away.  We observed CBP officers telling aliens the port was at capacity and did not have the capability to process them, regardless of actual capacity and capability at the time.  Further, four CBP ports turned away asylum seekers who had already stepped into the United States, telling them to return to Mexico.  Also, at two other ports we visited, CBP had stopped using blocks of available holding cells, allowing those cells to sit empty while asylum seekers and other undocumented aliens waited in the Queue Management lines in Mexico.  As the lines grew longer, some asylum seekers and other undocumented aliens may have crossed the border illegally, between ports of entry, where U.S. Border Patrol is responsible for apprehending and holding them.

## DHS Urged Asylum Seekers to Come to Ports of Entry, But Reassigned Staff away from Asylum Processing

Following the April 2018 announcement of the Zero Tolerance Policy, DHS and CBP began urging asylum seekers in May 2018 to come to ports of entry rather than attempt to enter the United States illegally between ports of entry.  At the same time, DHS and CBP directed ports to assign staff away from processing undocumented aliens, including asylum seekers, to other duties at the ports. Appendix C provides a brief timeline of significant events from April to August 2018 related to CBP's asylum processing.

On April 6, 2018, then-Attorney General Jeff Sessions announced a "Zero Tolerance Policy,"[13] which, as implemented by DHS, required CBP to refer for prosecution every adult who entered the United States illegally, including those

---

[13] In an April 6, 2018 memo, the Attorney General directed United States Attorney's Offices along the Southwest Border, in consultation with the Department of Homeland Security, to adopt a Zero Tolerance Policy for all Improper Entry by Alien offenses, and refer them for prosecution under 8 United States Code (U.S.C.) § 1325(a).  In a press release announcing the "Zero Tolerance Policy," the Department of Justice said, "The implementation of the Attorney General's zero-tolerance policy comes as the Department of Homeland Security reported a 203 percent increase in illegal border crossings from March 2017 to March 2018, and a 37 percent increase from February 2018 to March 2018—the largest month-to-month increase since 2011." https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

**AR01271**



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

traveling with their children.  As a result, parents who entered illegally were separated from their children upon referral for prosecution.[14]

After implementation of the Zero Tolerance Policy, then-DHS Secretary Nielsen and OFO Executive Assistant Commissioner Todd Owen made several public statements urging asylum seekers to come to the ports of entry instead of crossing illegally and risking separation from family members.  For instance, on May 8, 2018, Secretary Nielsen testified before Congress, "Help me message: If you are fleeing and coming to the United States please come to the ports of entry.  [We] will process your claim there."[15]  On June 18, 2018, at a White House Press Briefing, Secretary Nielsen also told reporters, "As I said before, if you're seeking asylum, go to a port of entry.  You do not need to break the law of the United States to seek asylum."[16]  When reporters noted media accounts of families turned away at ports of entry, the Secretary described that reporting as "incorrect."  Further, on July 9, 2018, OFO Executive Assistant Commissioner Owen said during a press conference:

> The lawful way is to claim asylum, present yourself for inspection at the port of entry.  We will keep the family unit together, again, absent concerns for the well-being of the child, absent criminal history for the adult.

However, despite encouraging asylum seekers to enter the United States through the ports of entry, DHS and CBP took actions that limited the number of undocumented aliens, including asylum seekers, CBP could process each day at the Southwest Border land ports of entry.[17]

On April 27, 2018, OFO Executive Assistant Commissioner Owen emailed a memorandum authorizing Southwest Border land ports of entry to establish Queue Management lines[18] when appropriate to facilitate "safe and orderly

---

[14] We assessed CBP's implementation of the policy in our report, *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy,* OIG-18-84, September 27, 2018.

[15] *Homeland Security Secretary Nielsen on Fiscal Year 2019 Budget.*  Testimony before the Senate Appropriations Subcommittee on Homeland Security, May 8, 2018.

[16] White House Press Conference, June 18, 2018, "DHS Secretary Nielsen's Remarks on the Illegal Immigration Crisis."  *See* transcript at https://www.dhs.gov/news/2018/06/18/dhs-secretary-nielsens-remarks-illegal-immigration-crisis.

[17] Numerous factors affect CBP's ability to process undocumented aliens at ports of entry.  The exact number of asylum seekers who were unable to enter the United States because of CBP's Queue Management actions could not be stated with certainty.

[18] The memorandum specified ports "may not create a line specifically for asylum seekers," but could create lines "based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents."

**AR01272**



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

processing of travelers" based on the ports' processing capacity.  Shortly thereafter, on May 24, 2018, DHS Chief of Staff Chad Wolf, on behalf of Secretary Nielsen's Office, asked CBP officials to determine "the number of [undocumented aliens] that would likely be turned away" every day if ports ran Queue Management operations full-time.  Then-CBP Commissioner Kevin McAleenan instructed OFO Executive Assistant Commissioner Owen to report to the Secretary that if CBP assigned 200 officers to work limit lines, they would turn away approximately 650 undocumented aliens per day.

On June 5, 2018, Secretary Nielsen signed a memorandum authorizing port directors to establish Queue Management lines at all the Southwest Border ports.[19]  The memorandum also informed port directors that processing inadmissible arriving aliens[20] (which may include asylum seekers) was not a priority,[21] and authorized port directors to reassign staff away from processing inadmissible arriving aliens, stating:

> CBP personnel and resources that would otherwise be deployed to process inadmissible arriving aliens can focus on the detection and apprehension of narcotics and currency smugglers.

Following this directive, the number of undocumented aliens waiting in Mexico to enter U.S. ports increased from 942 on June 20, 2018, to more than 2,000 on October 1, 2018.[22]  In an October 5, 2018 email addressing the surge of aliens seeking asylum at the ports, then-DHS Deputy Secretary Claire Grady told senior CBP staff, "Business as usual, no matter how outstanding your officers are[,] isn't going to be a match for what we are facing."  Nevertheless, CBP officials did not allocate additional resources to increase processing

---

[19] We made multiple requests to CBP for policies and guidance related to the "Queue Management" program.  Despite the memorandum's title, "Prioritization-Based Queue Management," and the Secretary's initiation of an accompanying pilot program, CBP did not provide the document in response to our requests and none of the CBP staff we interviewed informed us of the memorandum's existence.  DHS OIG only learned about the document through forensic email analysis.

[20] Documents we reviewed such as the "Prioritization-Based Queue Management" memorandum and CBP staff with whom we spoke use the term "inadmissible aliens" interchangeably with "undocumented aliens."

[21] The memorandum reiterated four superseding missions for the ports: 1) National security; 2) Counter-narcotics operations; 3) Economic security; and 4) Trade and travel facilitation.

[22] We derived this number from CBP daily Queue Management reports, which list the number of aliens awaiting processing on the Mexican side of the border.  During OIG site visits and interviews, we learned CBP officials obtain these numbers from sources such as Mexican government officials, non-governmental organizations, and CBP officers' estimates of aliens in line.  CBP does not track the number of aliens arriving at ports who are redirected to another port or told to place their names on a waiting list in Mexico.

**AR01273**



capability at ports of entry.  For instance, in response to an October 18, 2018 email suggesting ways for CBP to mitigate the growing surge of undocumented aliens, a CBP executive told his staff that expanding the operating hours of ports was "too resource intensive just to help the migrants."  In the same email, the executive wrote:

> We might consider adding officers when the port is closed to help secure against breaches [*sic*], but don't want to add extra hours to process more migrants.

In other emails, the executive declined to consider establishing temporary detention facilities for undocumented aliens, or increasing the number of aliens released with Notices to Appear (NTA).[23]  In a March 2019 DHS OIG interview with a senior CBP official on the Southwest Border, the official summarized CBP's response to the surge of undocumented aliens by stating, "We are hoping this thing just goes away."

Thus, while DHS leadership urged asylum seekers to present themselves at ports of entry, the agency took deliberate steps to limit the number of undocumented aliens who could be processed each day at Southwest Border land ports of entry.  By October 30, 2018, the number of undocumented aliens waiting outside the ports to be processed grew to more than 3,000.

## Without Notice to the Public, CBP Stopped Routine Processing of Most Undocumented Aliens, Including Asylum Seekers, at Seven Ports and Redirected Them to Other Ports

During our fieldwork, we learned CBP had stopped the routine processing of most undocumented aliens[24] — including asylum seekers — at 7 of the 24 Southwest Border land ports of entry.[25]  At these seven ports, CBP staff at the limit line do not simply control the flow of undocumented aliens into the port

---

[23] A Notice to Appear (NTA) is a legal document placing an alien in removal proceedings before the U.S. Department of Justice, Executive Office for Immigration Review.  Typically, ICE determines whether to release an individual from DHS custody with an NTA.  Although CBP OFO also has authority to issue NTAs, according to CBP officials, CBP OFO does not exercise that authority routinely.

[24] CBP officials said they make exceptions for some vulnerable populations, such as unaccompanied alien children or pregnant asylum seekers.  This exception does not appear to be documented in CBP policy, and OIG did not independently corroborate CBP's claim.

[25] The seven ports are Otay Mesa, Tecate, Calexico East, and Andrade, which fall under the San Diego field office; and Roma, Rio Grande City, and Progreso, which fall under the Laredo field office.

**AR01274**



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

facility; rather, they "redirect"[26] undocumented aliens who approach the limit line to different ports, telling the aliens the other port can process them more quickly. "Redirected" aliens must then travel through Mexico to another port and take their place behind others already waiting in the Queue Management line at that port.

The seven ports are designated as Class A ports, "Port[s] of Entry for all aliens," according to 8 C.F.R. § 100.4.[27]  CBP has authority to change a port's classification[28] and has done so in the past to restrict, expand, open and close specific ports.[29]  Designation of a port of entry is a formal DHS action.[30]  When changing a port's classification, CBP has published a final rule in the Federal Register.[31]  In a break from these longstanding practices, CBP has redirected undocumented aliens appearing at the seven ports yet has not redesignated those ports from Class A to another classification.

As discussed previously, DHS leadership made public pronouncements encouraging undocumented aliens to arrive at ports of entry, but never notified the public of its decision to stop processing aliens at the seven ports of entry. When DHS OIG asked a senior CBP official at one of the field offices about the lack of notification to the public, the official expressed concern about the legality of the redirection practice.  At the Tecate port of entry in California, several officers also questioned the legality of the redirecting practice and said

---

[26] In this report, "redirect" means the practice of intercepting asylum seekers at a port's limit line position and instructing them to go to another port to apply for asylum.

[27] 8 C.F.R. § 100.4 regulates the type of individuals and cargo that ports process: "Class A means that the port is a designated Port-of-Entry for all aliens."  The regulation also designates other classes of ports that do not process most undocumented aliens.  For example, Class B ports process only certain aliens who are exempt from specific document requirements, in lawful possession of Lawful Permanent Resident cards, or who meet other eligibility requirements.

[28] The Regulation provides, "The designation of such a Port–of–Entry may be withdrawn whenever, in the judgment of the Commissioner, such action is warranted."

[29] *See, e.g.*, CBP, Closing the Jamieson Line, New York Border Crossing, 79 Fed. Reg. 42,449-01 (July 22, 2014); *see also* INS, DOJ, *Freedom of Information Act*, 32 Fed. Reg. 9,616, 9,618 (July 4, 1967) (quoting 8 C.F.R. § 100.4 that Class A ports are "for all aliens" and that designation may be withdrawn by Commissioner whenever warranted).  CBP has added a Class B port and terminated one, after providing the public with notice and a period for commenting on the proposed changes.

[30] *United States v. Nunez-Soberanis*, 406 F. Supp. 3d. 835, 841 (S.D. Cal. 2019).

[31] Statement of Organization; Ports of Entry for Aliens Arriving by Vessel or by Land Transportation, and by Aircraft, 54 Fed. Reg. 47,673 (Nov. 16, 1989) (redesignating St. Aurelie, Maine, from a "Class A" port of entry to "Class B"); Statement of Organization; Ports of Entry for Aliens Arriving by Vessel or by Land Transportation, 49 Fed. Reg. 31,054 (Aug. 3, 1984) (redesignating Fort Hancock, Texas from a "Class B" port of entry to "Class A"); Statement of Organization; Field Service Realignment, 49 Fed. Reg. 30,057-01 (July 26, 1984) (redesignating Richford, Vermont station to a substation).

AR01275



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

they were unwilling to work the limit line position. These officers addressed their concerns with port management and their union representatives, which in turn led to a modification in the redirecting practice — i.e., port management instituted a protocol allowing limit line officers to contact a supervisor to come to the line and assume responsibility for redirecting aliens. Although Tecate now has this protocol in place, the union representative is still unclear whether the practice is legal.

At these seven ports, which fall within the Laredo and San Diego field offices, CBP routinely told undocumented aliens at the limit line that the port currently lacked the capacity (holding space) or capability (staffing and resources) to process them, regardless of the port's actual capacity and capability.[32] For instance, CBP's daily Queue Management reports indicated that from June 20, 2018, until November 8, 2018, all seven ports redirected undocumented aliens to other ports every day for which data was available, even though these records also show the ports did not detain a single undocumented alien in their available hold rooms on 80 percent of those days.[33]

Meanwhile, the ports to which CBP staff redirected the undocumented aliens range from a few miles to more than 30 miles away. Often, this required traversing difficult desert terrain and potentially placed undocumented aliens at risk of encountering criminals who may exploit them, as areas in Mexico along the border with the United States are known to be controlled by criminal cartels. Figures 1 and 2 illustrate the distance redirected undocumented aliens had to travel to a port that might process them.

---

[32] Reports emailed to CBP headquarters indicate the policy of redirecting was known at least to the level of then-CBP Commissioner Kevin McAleenan.

[33] We obtained this data from CBP's daily Queue Management reports, which track how many ports engage in redirecting and how many aliens each port has in its hold rooms. CBP did not provide this data to OIG despite multiple requests, necessitating a forensic analysis of key CBP staff members' emails. CBP OFO did not always generate a daily Queue Management report; however, we were able to obtain and analyze reports for 95 of the 141 days that fall between June 20, 2018, the date of the first report we obtained, and November 8, 2018, the date of the last report we obtained.

**AR01276**

# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

**Figure 1.  San Diego Field Office Redirecting Ports**



*Source*: OIG depiction of CBP data

**Figure 2.  Laredo Field Office Redirecting Ports**



*Source*: OIG depiction of CBP data

Moreover, because CBP officers at the limit line do not generally ask migrants where they are from before redirecting them to another port, Mexican nationals

AR01277



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

seeking asylum may be redirected along with asylum seekers from other countries.  Redirected Mexican nationals must therefore remain in and travel through the very country in which they claim they are subject to persecution.

Our fieldwork indicated other destination ports have long lines of undocumented aliens already waiting to be processed.  Accordingly, those who are redirected from one port must then go to the end of the Queue Management line at another port.  For example, the Otay Mesa and Tecate ports of entry routinely redirected undocumented aliens to the San Ysidro port of entry.  Once there, the aliens must enter the Queue Management line by putting their names on a list that often contains thousands of names, meaning they will wait in Mexico for weeks, if not months, before being granted access to the port to be processed by CBP.[34]

As shown in the following examples, creating barriers to entry at ports of entry may incentivize undocumented aliens to attempt to cross into the United States illegally, between ports of entry.  For example, we interviewed 17 aliens who either were in detention or were recently released, 5 of whom said after growing frustrated with Queue Management and redirection practices at ports of entry, they decided to enter the United States illegally.  We interviewed representatives from several non-profit and non-governmental organizations who stated they had similar concerns.  We also learned of one case in which an asylum seeker crossed the border illegally after waiting in a Queue Management line for 2 days.  When U.S. Border Patrol referred the asylum seeker's case to an Assistant United States Attorney (AUSA) for prosecution, the AUSA refused to prosecute given the long wait to which the asylum seeker was subjected.[35]

While temporarily holding aliens at ports of entry, CBP must directly supervise detained aliens and provide access to appropriate medical care, as detailed in TEDS.[36]  CBP OFO leadership stated they implemented the redirecting procedure at these seven ports because they are remote ports with few staff and outdated facilities.  For example, they said these ports closed at night and are far from medical care.  Before implementing the redirecting procedure, CBP staff drove undocumented aliens to other ports for overnight holds and to medical facilities when necessary.  We found four of the seven redirecting ports close at night, and one is more than 50 minutes away from medical care.  Most

---

[34] CBP officials said they do not have direct access to the list, which is maintained in Mexico. In order to obtain the number of aliens waiting outside each port, CBP port officials and Mexican government officials communicate regularly to identify and schedule waiting aliens for entry and processing.
[35] We learned about this incident during our forensic email analysis.
[36] *See* TEDS, 4.6; TEDS, 4.10.

**AR01278**



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

of the ports' holding capacity is less than 20, but Tecate and Otay Mesa have capacity for 35 and 31, respectively.  Table 1 shows the capacity, distance from a medical center, and hours of operation for each redirecting port.

**Table 1.  Redirecting Ports of Entry Capacity, Distance to Medical Facilities, and Hours of Operation**

| Port | Capacity | Drive Time to Nearest Hospital | Port Hours of Operation |
|------|----------|-------------------------------|-------------------------|
| Tecate | 35 | Sharp Grossmont Hospital (53 min) | 5:00 am–11:00 pm, Daily |
| Calexico East | 10 | El Centro Medical Center (25 min) | 6:00 am–8:00 pm, Mon–Fri 10:00 am–6:00 pm, Sat |
| Andrade | 10 | Yuma Regional Medical Center (21 min) | 6:00 am–10:00 pm Daily |
| Otay Mesa | 31 | Sharp Chula Vista Medical Center (20 min) | 24 hours/7 days a week |
| Roma | 16 | Star County Memorial Hospital (15 min) | 24 hours/7 days a week |
| Rio Grande | 10 | Star County Memorial Hospital (10 min) | 7:00 am–12:00 am, Daily |
| Progreso | 17 | Knapp Medical Center (15 min) | 24 hours/7 days a week |

*Source:* OIG analysis of information CBP provided and information we identified from CBP.gov

## CBP Returned to Mexico Asylum Seekers Who Had Already Entered the United States

Despite provisions in the INA, CBP guidance, and statements from CBP senior leaders requiring CBP staff to process asylum seekers once they have physically entered the United States, at least four CBP ports returned to Mexico some asylum seekers who had crossed the international border and entered the United States.

The INA states any alien who is physically in the United States may apply for asylum.[37]  Consistent with this provision, CBP's April 27, 2018 Queue Management guidance states that once a traveler has entered the United States, he or she must be fully processed by CBP.  DHS also communicated its position on this matter to the public when, on June 18, 2018, it posted on its website:

> Myth: DHS is turning away asylum seekers at ports of entry; FACT: CBP processes all aliens arriving at all ports of entry without documents as expeditiously as possible....[38]

---

[37] 8 U.S.C. § 1225 requires CBP to inspect aliens who are seeking admission to the United States and 8 U.S.C. § 1158 states that any alien who is physically present or arrives in the United States may apply for asylum.

[38] https://www.dhs.gov/news/2018/06/18/myth-vs-fact-dhs-zero-tolerance-policy.

**AR01279**



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Similarly, on July 9, 2018, OFO Executive Assistant Commissioner Owen said in a press conference, "…despite what you may have heard, we never turn away individuals seeking asylum at port[s] of entry."

However, we found that, at four ports of entry — Otay Mesa, San Ysidro, Tecate, and Nogales' Morley Gate — CBP did not process asylum seekers who had entered the United States, returning them to Mexico instead. For instance, our fieldwork indicated, CBP officers at San Ysidro and Tecate ports returned to Mexico asylum seekers who had not only crossed over the international boundary into the United States, but also had entered the ports' buildings.

In addition, all four ports established their limit lines inside the boundary line on the U.S. side of the international border. As a result, asylum seekers and other undocumented aliens stepped into the United States to reach the Queue Management line, where they were instructed either to go to another port, or to return to Mexico to wait in line.[39] Two of the ports, San Ysidro and Otay Mesa, eventually moved their limit lines to the border, but as of August 2019, the Tecate and Nogales' Morley Gate limit lines had not moved, and remained inside the United States. Asylum seekers and other undocumented aliens who approach those limit lines are physically present in the United States at the time CBP turns them away by redirecting them to another port.

## CBP Did Not Use All Available Detention Space

We found two ports had stopped using available detention space, even though undocumented alien families were waiting in Queue Management lines. Management at those ports said staffing was insufficient to monitor the rooms. However, other staff we interviewed disagreed with that assessment. Although CBP is short-staffed at Southwest Border ports, fiscal year 2018 staffing had improved from FY 2016, when larger numbers of aliens were processed.

On June 18, 2018, field offices began sending daily summaries from the ports of entry to CBP headquarters, detailing the number of aliens in custody, the number waiting to be processed, and available holding capacity.[40] The reports

---

[39] CBP officers at the San Ysidro Pedestrian East entry would tell asylum seekers they had to put their names on the Queue Management list and wait for their turn to be processed.
[40] Available holding capacity does not always reflect the ability of a port to accommodate additional detainees. CBP detention standards mandate aliens be segregated by gender and age, and other factors to protect at risk detainees. For example, if a port has only 2 cells, each able to hold 10 detainees, and CBP encounters 10 adult male aliens and 1 unaccompanied alien child, the adult males will all be placed in one cell, while the unaccompanied alien child will be placed in the other cell. The port is then unable to process more adult male aliens, despite being at only 55 percent capacity.

AR01280